# Exhibit 2

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 10-Q

(Mark One)

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

   For the quarterly period ended March 31, 2020

   or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

   For the transition period from _____ to _____

Commission File No. **1-7259**

**SOUTHWEST AIRLINES CO.**

(Exact name of registrant as specified in its charter)

| **Texas** | **74-1563240** |
|---|---|
| (State or other jurisdiction of | (IRS Employer |
| incorporation or organization) | Identification No.) |
| **P.O. Box 36611** | |
| **Dallas, Texas** | **75235-1611** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:  **(214) 792-4000**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common Stock ($1.00 par value) | LUV | New York Stock Exchange |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).  Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).Yes ☐ No ☒
   Number of shares of Common Stock outstanding as of the close of business on April 24, 2020: 508,885,530

TABLE OF CONTENTS TO FORM 10-Q

PART I - FINANCIAL INFORMATION

Item 1. Financial Statements

Condensed Consolidated Balance Sheet as of March 31, 2020 and December 31, 2019

Condensed Consolidated Statement of Comprehensive Income for the three months ended March 31, 2020 and 2019

Condensed Consolidated Statement of Stockholders' Equity as of March 31, 2020 and 2019

Condensed Consolidated Statement of Cash Flows for the three months ended March 31, 2020 and 2019

Notes to Condensed Consolidated Financial Statements

Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations

Item 3. Quantitative and Qualitative Disclosures About Market Risk

Item 4. Controls and Procedures

PART II - OTHER INFORMATION

Item 1. Legal Proceedings

Item 1A. Risk Factors

Item 2. Unregistered Sales of Equity Securities and Use of Proceeds

Item 3. Defaults Upon Senior Securities

Item 4. Mine Safety Disclosures

Item 5. Other Information

Item 6. Exhibits

SIGNATURES

2

SOUTHWEST AIRLINES CO.
FORM 10-Q
PART I – FINANCIAL INFORMATION

**Item 1**. Financial Statements

**Southwest Airlines Co.**
**Condensed Consolidated Balance Sheet**
(in millions)
(unaudited)

| | | March 31, 2020 | | December 31, 2019 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 3,940 | $ | 2,548 |
| Short-term investments | | 1,605 | | 1,524 |
| Accounts and other receivables | | 709 | | 1,086 |
| Inventories of parts and supplies, at cost | | 518 | | 529 |
| Prepaid expenses and other current assets | | 256 | | 287 |
| Total current assets | | 7,028 | | 5,974 |
| | | | | |
| Property and equipment, at cost: | | | | |
| Flight equipment | | 21,580 | | 21,629 |
| Ground property and equipment | | 5,818 | | 5,672 |
| Deposits on flight equipment purchase contracts | | 305 | | 248 |
| Assets constructed for others | | 198 | | 164 |
| | | 27,901 | | 27,713 |
| Less allowance for depreciation and amortization | | 10,912 | | 10,688 |
| | | 16,989 | | 17,025 |
| Goodwill | | 970 | | 970 |
| Operating lease right-of-use assets | | 1,278 | | 1,349 |
| Other assets | | 620 | | 577 |
| | $ | 26,885 | $ | 25,895 |
| | | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ | 1,043 | $ | 1,574 |
| Accrued liabilities | | 1,037 | | 1,749 |
| Current operating lease liabilities | | 330 | | 353 |
| Air traffic liability | | 5,036 | | 4,457 |
| Current maturities of long-term debt | | 2,795 | | 819 |
| Total current liabilities | | 10,241 | | 8,952 |
| | | | | |
| Long-term debt less current maturities | | 2,288 | | 1,846 |
| Air traffic liability - noncurrent | | 1,175 | | 1,053 |
| Deferred income taxes | | 2,278 | | 2,364 |
| Construction obligation | | 198 | | 164 |
| Noncurrent operating lease liabilities | | 936 | | 978 |
| Other noncurrent liabilities | | 694 | | 706 |
| Stockholders' equity: | | | | |
| Common stock | | 808 | | 808 |
| Capital in excess of par value | | 1,582 | | 1,581 |
| Retained earnings | | 17,757 | | 17,945 |
| Accumulated other comprehensive loss | | (186) | | (61) |
| Treasury stock, at cost | | (10,886) | | (10,441) |
| Total stockholders' equity | | 9,075 | | 9,832 |
| | $ | 26,885 | $ | 25,895 |

3

**Southwest Airlines Co.**
**Condensed Consolidated Statement of Comprehensive Income (Loss)**
(in millions, except per share amounts)
(unaudited)

|  | Three months ended March 31, | | | |
|  | 2020 | | 2019 | |
|---|---|---|---|---|
| **OPERATING REVENUES:** | | | | |
| Passenger | $ | 3,845 | $ | 4,745 |
| Freight | | 39 | | 42 |
| Other | | 350 | | 362 |
| Total operating revenues | | 4,234 | | 5,149 |
| | | | | |
| **OPERATING EXPENSES:** | | | | |
| Salaries, wages, and benefits | | 1,854 | | 1,976 |
| Fuel and oil | | 870 | | 1,015 |
| Maintenance materials and repairs | | 272 | | 293 |
| Landing fees and airport rentals | | 339 | | 333 |
| Depreciation and amortization | | 311 | | 297 |
| Other operating expenses | | 698 | | 730 |
| Total operating expenses | | 4,344 | | 4,644 |
| | | | | |
| **OPERATING INCOME (LOSS)** | | (110) | | 505 |
| | | | | |
| **OTHER EXPENSES (INCOME):** | | | | |
| Interest expense | | 28 | | 31 |
| Capitalized interest | | (5) | | (9) |
| Interest income | | (17) | | (23) |
| Other (gains) losses, net | | 28 | | 2 |
| Total other expenses (income) | | 34 | | 1 |
| | | | | |
| **INCOME (LOSS) BEFORE INCOME TAXES** | | (144) | | 504 |
| **PROVISION FOR INCOME TAXES** | | (50) | | 117 |
| | | | | |
| **NET INCOME (LOSS)** | $ | (94) | $ | 387 |
| | | | | |
| **NET INCOME (LOSS) PER SHARE, BASIC** | $ | (0.18) | $ | 0.70 |
| | | | | |
| **NET INCOME (LOSS) PER SHARE, DILUTED** | $ | (0.18) | $ | 0.70 |
| | | | | |
| **COMPREHENSIVE INCOME (LOSS)** | $ | (219) | $ | 463 |
| | | | | |
| **WEIGHTED AVERAGE SHARES OUTSTANDING** | | | | |
| Basic | | 515 | | 551 |
| Diluted | | 515 | | 552 |

See accompanying notes.

4

**Southwest Airlines Co.**
**Condensed Consolidated Statement of Stockholders' Equity**
(in millions, except per share amounts)
(unaudited)

| | Quarter ended March 31, 2020 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Common Stock | Capital in excess of par value | Retained earnings | Accumulated other comprehensive income (loss) | Treasury stock | Total |
| Balance at December 31, 2019 | $ 808 | $ 1,581 | $ 17,945 | $ (61) | $ (10,441) | $ 9,832 |
| Repurchase of common stock | — | — | — | — | (451) | (451) |
| Issuance of common and treasury stock pursuant to Employee stock plans | — | (8) | — | — | 6 | (2) |
| Share-based compensation | — | 9 | — | — | — | 9 |
| Cash dividends, $.180 per share | — | — | (94) | — | — | (94) |
| Comprehensive loss | — | — | (94) | (125) | — | (219) |
| Balance at March 31, 2020 | $ 808 | $ 1,582 | $ 17,757 | $ (186) | $ (10,886) | $ 9,075 |

| | Quarter ended March 31, 2019 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Common Stock | Capital in excess of par value | Retained earnings | Accumulated other comprehensive income (loss) | Treasury stock | Total |
| Balance at December 31, 2018 | $ 808 | $ 1,510 | $ 15,967 | $ 20 | $ (8,452) | $ 9,853 |
| Cumulative effect of adopting Accounting Standards Update No. 2016-02, Leases, codified in Accounting Standards Codification 842 | — | — | 55 | — | — | 55 |
| Balance after adjustment for the new accounting standard | $ 808 | $ 1,510 | $ 16,022 | $ 20 | $ (8,452) | $ 9,908 |
| Repurchase of common stock | — | — | — | — | (500) | (500) |
| Issuance of common and treasury stock pursuant to Employee stock plans | — | (10) | — | — | 6 | (4) |
| Share-based compensation | — | 13 | — | — | — | 13 |
| Cash dividends, $.160 per share | — | — | (89) | — | — | (89) |
| Comprehensive income | — | — | 387 | 76 | — | 463 |
| Balance at March 31, 2019 | $ 808 | $ 1,513 | $ 16,320 | $ 96 | $ (8,946) | $ 9,791 |

See accompanying notes.

5

**Southwest Airlines Co.**
**Condensed Consolidated Statement of Cash Flows**
(in millions)
(unaudited)

|  | Three months ended March 31, | |
|  | 2020 | 2019 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net income (loss) | $ (94) | $ 387 |
| Adjustments to reconcile net income (loss) to cash provided by (used in) operating activities: | | |
| Depreciation and amortization | 311 | 297 |
| Unrealized/realized (gain) loss on fuel derivative instruments | 2 | — |
| Deferred income taxes | (49) | 13 |
| Changes in certain assets and liabilities: | | |
| Accounts and other receivables | 183 | (222) |
| Other assets | 58 | 29 |
| Accounts payable and accrued liabilities | (1,291) | (257) |
| Air traffic liability | 701 | 944 |
| Other liabilities | (132) | (69) |
| Cash collateral received from (provided to) derivative counterparties | (5) | 15 |
| Other, net | (61) | (32) |
| Net cash provided by (used in) operating activities | (377) | 1,105 |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Capital expenditures | (224) | (160) |
| Supplier proceeds | 300 | — |
| Purchases of short-term investments | (1,029) | (251) |
| Proceeds from sales of short-term and other investments | 948 | 575 |
| Net cash provided by (used in) investing activities | (5) | 164 |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Proceeds from issuance of long-term debt | 500 | — |
| Proceeds from revolving credit facility | 1,000 | — |
| Proceeds from term loan credit facility | 1,000 | — |
| Proceeds from Employee stock plans | 11 | 10 |
| Payments of long-term debt and finance lease obligations | (78) | (99) |
| Payments of cash dividends | (188) | (178) |
| Repurchase of common stock | (451) | (500) |
| Other, net | (20) | (12) |
| Net cash provided by (used in) financing activities | 1,774 | (779) |
| | | |
| **NET CHANGE IN CASH AND CASH EQUIVALENTS** | 1,392 | 490 |
| | | |
| **CASH AND CASH EQUIVALENTS AT BEGINNING OF PERIOD** | 2,548 | 1,854 |
| | | |
| **CASH AND CASH EQUIVALENTS AT END OF PERIOD** | $ 3,940 | $ 2,344 |
| | | |
| **CASH PAYMENTS FOR:** | | |
| Interest, net of amount capitalized | $ 14 | $ 15 |
| Income taxes | $ 5 | $ 4 |
| | | |
| **SUPPLEMENTAL DISCLOSURE OF NONCASH TRANSACTIONS** | | |
| Right-of-use assets acquired under operating leases | $ 25 | $ 119 |
| Right-of-use assets acquired under finance leases | $ — | $ 1 |
| Assets constructed for others | $ 34 | $ 21 |

See accompanying notes.

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

1.   BASIS OF PRESENTATION

Southwest Airlines Co. (the "Company" or "Southwest") operates Southwest Airlines, a major passenger airline that provides scheduled air transportation in the United States and near-international markets. The unaudited Condensed Consolidated Financial Statements include accounts of the Company and its wholly owned subsidiaries.

The accompanying unaudited Condensed Consolidated Financial Statements of the Company and its subsidiaries have been prepared in accordance with accounting principles generally accepted in the United States for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles in the United States ("GAAP") for complete financial statements. The unaudited Condensed Consolidated Financial Statements for the interim periods ended March 31, 2020 and  2019 include all adjustments which are, in the opinion of management, necessary for a fair presentation of the results for the interim periods. This includes all normal and recurring adjustments and elimination of significant intercompany transactions. Financial results for the Company and airlines in general can be seasonal in nature. In many years, the Company's revenues, as well as its Operating income and Net income, have been better in its second and third fiscal quarters than in its first and fourth fiscal quarters. Air travel is also significantly impacted by general economic conditions, the amount of disposable income available to consumers, unemployment levels, corporate travel budgets, extreme or severe weather and natural disasters, fears of terrorism or war, impact of fears or actual outbreak of disease or pandemics, and other factors beyond the Company's control. These and other factors, such as the price of jet fuel in some periods, the nature of the Company's fuel hedging program, and the periodic volatility of commodities used by the Company for hedging jet fuel, have created, and may continue to create, significant volatility in the Company's financial results. See Note 4 for further information on fuel and the Company's hedging program. Operating results for the three months ended March 31, 2020, are not necessarily indicative of the results that may be expected for future quarters or for the year ended December 31, 2020. For further information, refer to the Consolidated Financial Statements and footnotes thereto included in the Company's Annual Report on Form 10-K for the year ended December 31, 2019.

2.   WORLDWIDE PANDEMIC

As a result of the rapid spread of the novel coronavirus, COVID-19, throughout the world, including into the United States, on March 11, 2020, the World Health Organization ("WHO") classified the virus as a pandemic. The speed with which the effects of the COVID-19 pandemic have changed the U.S. economic landscape, outlook, and in particular the travel industry, has been swift and unexpected. The Company began to see a negative impact on bookings for future travel in late February 2020, which quickly accelerated into and throughout March. January and February operating revenues were generally in line with the Company's expectations, but March results were significantly below expectations due to the sharp decline in Passenger demand and bookings, combined with an unprecedented level of close-in trip cancellations (Customers canceling close to scheduled flight times). On March 22, the Company began proactively canceling a significant portion of its scheduled flights, and increased those cancellations further beginning on March 27, 2020. In addition, the cancellation of flights, both in March 2020 and for future periods, has resulted in a significant amount of cash refunds and issuance of travel credits to Customers. Further, due to the fears and restrictions involved with travel in the near term, sales of tickets for future travel have been well below the Company's expectations. These events have created a liquidity risk, and the Company reacted quickly by taking the following steps to better enable it to meet all financial obligations as they become due.

In mid-March, the Company closed a transaction to obtain $1.0 billion under the 364-Day Credit Agreement (defined below) from the syndicate of lenders named therein, and also drew down an available $1.0 billion under the Revolving Credit Agreement (defined below). Subsequently, on March 30, 2020, the Company executed an agreement to increase the commitments under the 364-Day Credit Agreement to $3.3 billion, add an uncommitted accordion provision to permit additional term loans in an aggregate amount not to exceed $417 million, and secured the 364-Day Credit

7

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

Agreement with aircraft. This transaction was funded on April 1, 2020. On March 30, 2020, the Company also executed an agreement to secure the Revolving Credit Agreement with aircraft. See Note 8 for further information on these transactions as well as Note 13 for actions taken subsequent to March 31, 2020.

Given the current capital market environment, the Company has been pursuing opportunities for additional financing transactions. The Company has also taken swift actions to preserve cash, including reducing named executive officer salaries and Board of Director cash retainer fees by 20 percent; suspending all hiring and non-contract salary increases; implementing voluntary time-off programs; canceling or deferring hundreds of capital spending projects; modifying vendor and supplier payment terms; and cutting all non-essential spending. The Company has also significantly reduced its published flight schedule through June 2020, and will continue evaluating the need for further flight schedule adjustments.

In response to flight schedule adjustments due to the effects of the COVID-19 pandemic, a number of aircraft were taken out of the Company's schedule beginning in late March. As of March 31, a portion of the Company's fleet had been placed in temporary storage and the Company was actively canceling a significant portion of its previously scheduled flying. Given the current expectation that these aircraft have been grounded temporarily, the Company has continued to record depreciation expense associated with them.

As a result of the events and impacts surrounding the COVID-19 pandemic, including the Company's net loss incurred in first quarter 2020, and the significant number of aircraft that have been placed in temporary storage, the Company considered whether these conditions indicated that it was more likely than not that the Company's $970 million in Goodwill and its $295 million in indefinite-lived intangible assets were impaired. However, upon review, the Company determined that, based on the facts and circumstances in existence as of March 31, 2020, the fair values more likely than not exceeded book values of both its reporting unit and its indefinite-lived intangible assets and therefore, no quantitative test was required.

In addition, the Company has assessed whether any impairment of its amortizable assets existed, and has determined that no charges were deemed necessary under applicable accounting standards as of March 31, 2020.

The Company's assumptions about future conditions important to its assessment of potential impairment of its amortizable assets, indefinite-lived intangible assets, and goodwill, including the impacts of the COVID–19 pandemic and other ongoing impacts to its business, are subject to uncertainty, and the Company will continue to monitor these conditions in future periods as new information becomes available, and will update its analyses accordingly.

The Company's income tax benefit recorded for first quarter 2020 was at a rate of 34.3 percent, which is higher than its first quarter 2019 rate of 23.1 percent. The higher effective tax rate in 2020 reflects the anticipated benefit of carrying back full year 2020 projected net losses to claim tax refunds against previous cash taxes paid relating to tax years 2015 through 2019, some of which were at higher rates than the current year.

On March 27, 2020, President Trump signed into law the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act" or "the Act"), a stimulus bill designed to provide relief for the actual and anticipated devastating economic impacts of the COVID-19 pandemic on the U.S. economy, businesses, and citizens. The airline industry is one of the targeted areas of the CARES Act, which has provided the opportunity for U.S. passenger and cargo airlines to apply for various forms of assistance, including, among others, a payroll support program and loan opportunities. The CARES Act also provides a temporary tax "holiday" from collecting and remitting certain government–imposed ticket taxes, as well as a deferral on payment of certain 2020 Company funded federal employment taxes to future years. The assistance offered to airlines includes significant stipulations and restrictions, as determined by the United States Department of the Treasury (the "Treasury"). See Note 13 for further information on the CARES Act.

8

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

### 3.  NEW ACCOUNTING PRONOUNCEMENTS

On December 18, 2019, the Financial Accounting Standards Board (the "FASB") issued Accounting Standards Update ("ASU") No. 2019-12, Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes. This new standard eliminates certain exceptions in Accounting Standards Codification ("ASC") 740 related to the approach for intraperiod tax allocation, the methodology for calculating income taxes in an interim period, and the recognition of deferred tax liabilities for outside basis differences. It also clarifies and simplifies other aspects of the accounting for income taxes. This standard is effective for fiscal years, and interim periods within those years, beginning after December 15, 2020, with early adoption permitted in any interim period within that year. The Company elected to early adopt this standard as of January 1, 2020. The most significant impact to the Company is the removal of a limit on the tax benefit recognized on pre-tax losses in interim periods. However, the early adoption as of January 1, 2020, did not have an impact on the Company's financial statements or disclosures for first quarter 2020.

On August 29, 2018, the FASB issued ASU No. 2018-15, Intangibles—Goodwill and Other—Internal-Use Software. This standard requires a customer in a cloud computing arrangement that is a service contract to follow the internal-use software guidance in ASC 350-40, Accounting for Internal-Use Software, to determine which implementation costs to (i) capitalize as assets and amortize over the term of the hosting arrangement or (ii) expense as incurred. This standard is effective for public business entities in fiscal years beginning after December 15, 2019, and the standard was adopted and applied prospectively by the Company as of January 1, 2020, but it did not have a significant impact on the Company's financial statements and disclosures.

On August 28, 2018, the FASB issued ASU No. 2018-13, Fair Value Measurement. This standard is effective for public business entities in fiscal years beginning after December 15, 2019, and for interim periods within those fiscal years. This standard requires changes to the disclosure requirements for fair value measurements for certain Level 3 items, and specifies that some of the changes must be applied prospectively, while others should be applied retrospectively. The Company adopted the standard as of January 1, 2020, but it did not have a significant impact on the Company's financial statements or disclosures. See Note 9 for further information on the Company's fair value measurements.

On January 26, 2017, the FASB issued ASU No. 2017-04, Simplifying the Test for Goodwill Impairment. The new standard eliminates Step 2 from the goodwill impairment test. An entity should recognize a goodwill impairment charge for the amount by which the carrying amount exceeds the reporting unit's fair value. This standard is effective for public business entities in fiscal years beginning after December 15, 2019, and the standard was adopted and applied prospectively by the Company as of January 1, 2020, but it did not have a significant impact on the Company's financial statements and disclosures.

On June 16, 2016, the FASB issued ASU No. 2016-13, Measurement of Credit Losses on Financial Instruments. The new standard requires the use of an "expected loss" model on certain types of financial instruments. The standard also amends the impairment model for available-for-sale debt securities and requires estimated credit losses to be recorded as allowances instead of reductions to amortized cost of the securities. This standard is effective for public business entities in fiscal years beginning after December 15, 2019, and the standard was adopted and applied prospectively by the Company as of January 1, 2020, but it did not have a significant impact on the Company's financial statements and disclosures.

### 4.  FINANCIAL DERIVATIVE INSTRUMENTS

**Fuel Contracts**

Airline operators are inherently dependent upon energy to operate and, therefore, are impacted by changes in jet fuel prices. Furthermore, jet fuel and oil typically represents one of the largest operating expenses for airlines. The Company endeavors to acquire jet fuel at the lowest possible cost and to reduce volatility in operating expenses through its fuel hedging program. Although the Company may periodically enter into jet fuel derivatives for short-term timeframes, because jet fuel is not widely traded on an organized futures exchange, there are limited opportunities to hedge directly in jet fuel for time horizons longer than approximately 24 months into the future. However, the Company has found

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

that financial derivative instruments in other commodities, such as West Texas Intermediate ("WTI") crude oil, Brent crude oil, and refined products, such as heating oil and unleaded gasoline, can be useful in decreasing its exposure to jet fuel price volatility. The Company does not purchase or hold any financial derivative instruments for trading or speculative purposes.

The Company has used financial derivative instruments for both short-term and long-term timeframes, and primarily uses a mixture of purchased call options, collar structures (which include both a purchased call option and a sold put option), call spreads (which include a purchased call option and a sold call option), put spreads (which include a purchased put option and a sold put option), and fixed price swap agreements in its portfolio. Although the use of collar structures and swap agreements can reduce the overall cost of hedging, these instruments carry more risk than purchased call options in that the Company could end up in a liability position when the collar structure or swap agreement settles. With the use of purchased call options and call spreads, the Company cannot be in a liability position at settlement, but does not have coverage once market prices fall below the strike price of the purchased call option.

For the purpose of evaluating its net cash spend for jet fuel and for forecasting its future estimated jet fuel expense, the Company evaluates its hedge volumes strictly from an "economic" standpoint and thus does not consider whether the hedges have qualified or will qualify for hedge accounting. The Company defines its "economic" hedge as the net volume of fuel derivative contracts held, including the impact of positions that have been offset through sold positions, regardless of whether those contracts qualify for hedge accounting. The level at which the Company is economically hedged for a particular period is also dependent on current market prices for that period, as well as the types of derivative instruments held and the strike prices of those instruments. For example, the Company may enter into "out-of-the-money" option contracts (including "catastrophic" protection), which may not generate intrinsic gains at settlement if market prices do not rise above the option strike price. Therefore, even though the Company may have an economic hedge in place for a particular period, that hedge may not produce any hedging gains at settlement and may even produce hedging losses depending on market prices, the types of instruments held, and the strike prices of those instruments.

For the three months ended March 31, 2020, the Company had fuel derivative instruments in place for up to 70 percent of its fuel consumption. As of March 31, 2020, the Company also had fuel derivative instruments in place to provide coverage at varying price levels. The following table provides information about the Company's volume of fuel hedging on an economic basis:

| Period (by year) | Maximum fuel hedged as of March 31, 2020 (gallons in millions) (a) | Derivative underlying commodity type as of March 31, 2020 |
|---|---|---|
| Remainder of 2020 | 976 | WTI crude oil, Brent crude oil, and Heating oil |
| 2021 | 1,283 | WTI crude oil and Brent crude oil |
| 2022 | 930 | WTI crude oil and Brent crude oil |
| Beyond 2022 | 529 | WTI crude oil and Brent crude oil |

(a) Due to the types of derivatives utilized by the Company and different price levels of those contracts, these volumes represent the maximum economic hedge in place and may vary significantly as market prices and the Company's flight schedule fluctuates.

Upon proper qualification, the Company accounts for its fuel derivative instruments as cash flow hedges. All periodic changes in fair value of the derivatives designated as hedges are recorded in Accumulated other comprehensive income (loss) ("AOCI") until the underlying jet fuel is consumed. See Note 5.

The Company's results are subject to the possibility that the derivatives will no longer qualify for hedge accounting, in which case any change in the fair value of derivative instruments since the last reporting period would be recorded in Other (gains) losses, net, in the unaudited Condensed Consolidated Statement of Comprehensive Income (Loss) in the period of the change; however, any amounts previously recorded to AOCI would remain there until such time as

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

the original forecasted transaction occurs, at which time these amounts would be reclassified to Fuel and oil expense. Factors that have and may continue to lead to the loss of hedge accounting include: significant fluctuation in energy prices, significant weather events affecting refinery capacity and the production of refined products, and the volatility of the different types of products the Company uses in hedging. Increased volatility in these commodity markets for an extended period of time, especially if such volatility were to worsen, could cause the Company to lose hedge accounting altogether for the commodities used in its fuel hedging program, which would create further volatility in the Company's GAAP financial results. However, even though derivatives may not qualify for hedge accounting, the Company continues to hold the instruments as management believes derivative instruments continue to afford the Company the opportunity to stabilize jet fuel costs. When the Company has sold derivative positions in order to effectively "close" or offset a derivative already held as part of its fuel derivative instrument portfolio, any subsequent changes in fair value of those positions are marked to market through earnings. Likewise, any changes in fair value of those positions that were offset by entering into the sold positions and were de-designated as hedges are concurrently marked to market through earnings. However, any changes in value related to hedges that were deferred as part of AOCI while designated as a hedge would remain until the originally forecasted transaction occurs. In a situation where it becomes probable that a fuel hedged forecasted transaction will not occur, any gains and/or losses that have been recorded to AOCI would be required to be immediately reclassified into earnings. During first quarter 2020, as a result of the drastic drop in demand for air travel, the Company's forecast for second quarter fuel purchases and consumption was significantly reduced, causing the Company to be in an estimated "over– hedged" position for second quarter 2020. Therefore, the Company de–designated a portion of its fuel hedges related to second quarter 2020 and has reclassified approximately $2 million in losses from AOCI into Other (gains) losses, net, in first quarter 2020. The Company did not have any such situations occur during 2019.

11

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

All cash flows associated with purchasing and selling fuel derivatives are classified as Other operating cash flows in the unaudited Condensed Consolidated Statement of Cash Flows. The following table presents the location of all assets and liabilities associated with the Company's derivative instruments within the unaudited Condensed Consolidated Balance Sheet:

| | | Asset derivatives | | Liability derivatives | |
| | Balance Sheet | Fair value at | Fair value at | Fair value at | Fair value at |
| (in millions) | location | 3/31/2020 | 12/31/2019 | 3/31/2020 | 12/31/2019 |
|---|---|---|---|---|---|
| **Derivatives designated as hedges (a)** | | | | | |
| Fuel derivative contracts (gross) | Prepaid expenses and other current assets | $ 5 | $ 48 | $ — | $ — |
| Fuel derivative contracts (gross) | Other assets | 79 | 62 | — | — |
| Interest rate derivative contracts | Prepaid expenses and other current assets | 4 | — | — | — |
| Interest rate derivative contracts | Other assets | — | 2 | — | — |
| Interest rate derivative contracts | Accrued liabilities | — | — | 14 | 5 |
| Interest rate derivative contracts | Other noncurrent liabilities | — | — | 16 | 1 |
| **Total derivatives designated as hedges** | | $ 88 | $ 112 | $ 30 | $ 6 |
| **Derivatives not designated as hedges (a)** | | | | | |
| Fuel derivative contracts (gross) | Prepaid expenses and other current assets | $ 1 | $ — | $ — | $ — |
| Interest rate derivative contracts | Accrued liabilities | — | — | 41 | — |
| Interest rate derivative contracts | Other noncurrent liabilities | — | — | — | — |
| **Total derivatives not designated as hedges** | | $ 1 | $ — | $ 41 | $ — |
| **Total derivatives** | | $ 89 | $ 112 | $ 71 | $ 6 |

(a) Represents the position of each trade before consideration of offsetting positions with each counterparty and does not include the impact of cash collateral deposits provided to or received from counterparties. See discussion of credit risk and collateral following in this Note.

The following table presents the amounts recorded on the unaudited Condensed Consolidated Balance Sheet related to fair value hedges:

| | Carrying amount of the hedged liabilities | | Cumulative amount of fair value hedging adjustment included in the carrying amount of the hedged liabilities (a) | |
| Balance Sheet location of hedged item | March 31, | | March 31, | |
| (in millions) | 2020 | 2019 | 2020 | 2019 |
|---|---|---|---|---|
| Current maturities of long-term debt | $ 504 | $ 300 | $ 4 | $ 2 |
| Long-term debt less current maturities | — | 495 | 18 | 13 |
| | $ 504 | $ 795 | $ 22 | $ 15 |

(a) At March 31, 2020 and 2019, these amounts include the cumulative amount of fair value hedging adjustments remaining for which hedge accounting has been discontinued of $18 million and $20 million, respectively.

12

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

In addition, the Company had the following amounts associated with fuel derivative instruments and hedging activities in its unaudited Condensed Consolidated Balance Sheet:

| (in millions) | Balance Sheet location | March 31, 2020 | December 31, 2019 |
|---|---|---|---|
| Cash collateral deposits held from counterparties for fuel contracts - current | Offset against Prepaid expenses and other current assets | $ 1 | $ 10 |
| Cash collateral deposits held from counterparties for fuel contracts - noncurrent | Offset against Other assets | 19 | 15 |

All of the Company's fuel derivative instruments and interest rate swaps are subject to agreements that follow the netting guidance in the applicable accounting standards for derivatives and hedging. The types of derivative instruments the Company has determined are subject to netting requirements in the accompanying unaudited Condensed Consolidated Balance Sheet are those in which the Company pays or receives cash for transactions with the same counterparty and in the same currency via one net payment or receipt. For cash collateral held by the Company or provided to counterparties, the Company nets such amounts against the fair value of the Company's derivative portfolio by each counterparty. The Company has elected to utilize netting for both its fuel derivative instruments and interest rate swap agreements and also classifies such amounts as either current or noncurrent, based on the net fair value position with each of the Company's counterparties in the unaudited Condensed Consolidated Balance Sheet. If its fuel derivative instruments are in a net asset position with a counterparty, cash collateral amounts held are first netted against current outstanding derivative asset amounts associated with that counterparty until that balance is zero, and then any remainder is applied against the fair value of noncurrent outstanding derivative instruments. As of March 31, 2020, no cash collateral deposits were provided by or held by the Company based on its outstanding interest rate swap agreements.

13

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

The Company has the following recognized financial assets and financial liabilities resulting from those transactions that meet the scope of the disclosure requirements as necessitated by applicable accounting guidance for balance sheet offsetting:

**Offsetting of derivative assets**

**(in millions)**

| | | (i) | (ii) | (iii) = (i) + (ii) | | (i) | (ii) | (iii) = (i) + (ii) | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | **March 31, 2020** | | | | **December 31, 2019** | | |
| **Description** | **Balance Sheet location** | **Gross amounts of recognized assets** | **Gross amounts offset in the Balance Sheet** | **Net amounts of assets presented in the Balance Sheet** | | **Gross amounts of recognized assets** | **Gross amounts offset in the Balance Sheet** | **Net amounts of assets presented in the Balance Sheet** | |
| Fuel derivative contracts | Prepaid expenses and other current assets | $    6 | $    (1) | $    5 | | $    48 | $    (10) | $    38 | |
| Fuel derivative contracts | Other assets | $    79 | $    (19) | $    60 | (a) | $    62 | $    (15) | $    47 | (a) |
| Interest rate derivative contracts | Prepaid expenses and other current assets | $    4 | $    — | $    4 | | $    — | $    — | $    — | |
| Interest rate derivative contracts | Other assets | $    — | $    — | $    — | (a) | $    2 | $    — | $    2 | (a) |

(a) The net amounts of derivative assets and liabilities are reconciled to the individual line item amounts presented in the unaudited Condensed Consolidated Balance Sheet in Note 10.

**Offsetting of derivative liabilities**

**(in millions)**

| | | (i) | (ii) | (iii) = (i) + (ii) | | (i) | (ii) | (iii) = (i) + (ii) | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | **March 31, 2020** | | | | **December 31, 2019** | | |
| **Description** | **Balance Sheet location** | **Gross amounts of recognized liabilities** | **Gross amounts offset in the Balance Sheet** | **Net amounts of liabilities presented in the Balance Sheet** | | **Gross amounts of recognized liabilities** | **Gross amounts offset in the Balance Sheet** | **Net amounts of liabilities presented in the Balance Sheet** | |
| Fuel derivative contracts | Prepaid expenses and other current assets | $    1 | $    (1) | $    — | | $    10 | $    (10) | $    — | |
| Fuel derivative contracts | Other assets | $    19 | $    (19) | $    — | (a) | $    15 | $    (15) | $    — | (a) |
| Interest rate derivative contracts | Accrued liabilities | $    55 | $    — | $    55 | (a) | $    5 | $    — | $    5 | (a) |
| Interest rate derivative contracts | Other noncurrent liabilities | $    16 | $    — | $    16 | | $    1 | $    — | $    1 | |

(a) The net amounts of derivative assets and liabilities are reconciled to the individual line item amounts presented in the unaudited Condensed Consolidated Balance Sheet in Note 10.

14

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

The following tables present the impact of derivative instruments and their location within the unaudited Condensed Consolidated Statement of Comprehensive Income (Loss) for the three months ended March 31, 2020 and 2019:

**Location and amount recognized in income on cash flow and fair value hedging relationships**

| (in millions) | Three months ended March 31, 2020 | | | Three months ended March 31, 2019 | |
| --- | --- | --- | --- | --- | --- |
| | Fuel and oil | Other (gains)/losses, net | Interest expense | Fuel and oil | Interest expense |
| Total | $ 22 | $ 2 | $ 2 | $ 11 | $ 8 |
| | | | | | |
| Loss on cash flow hedging relationships: | | | | | |
| Commodity contracts: | | | | | |
| Amount of loss reclassified from AOCI into income | 22 | 2 | — | 11 | — |
| Interest contracts: | | | | | |
| Amount of loss reclassified from AOCI into income | — | — | — | — | 1 |
| | | | | | |
| Impact of fair value hedging relationships: | | | | | |
| Interest contracts: | | | | | |
| Hedged items | — | — | 4 | — | 6 |
| Derivatives designated as hedging instruments | — | — | (2) | — | 1 |

**Derivatives designated and qualified in cash flow hedging relationships**

| | (Gain) loss recognized in AOCI on derivatives, net of tax | |
| --- | --- | --- |
| | Three months ended March 31, | |
| (in millions) | 2020 | 2019 |
| Fuel derivative contracts | $ 84 | $ (68) |
| Interest rate derivatives | 32 | 12 |
| Total | $ 116 | $ (56) |

**Derivatives not designated as hedges**

| | Loss recognized in income on derivatives | | Location of loss recognized in income on derivatives |
| --- | --- | --- | --- |
| | Three months ended March 31, | | |
| (in millions) | 2020 | 2019 | |
| Interest rate derivatives | $ 24 | $ — | Other (gains) losses, net |

The Company also recorded expense associated with premiums paid for fuel derivative contracts that settled/expired during the three months ended March 31, 2020 and 2019 of $24 million and $28 million, respectively. These amounts are recognized through changes in fair value within AOCI for designated hedges, and are ultimately recorded as a component of Fuel and oil in the unaudited Condensed Consolidated Statement of Comprehensive Income (Loss) during the period the contracts settle.

The fair values of the derivative instruments, depending on the type of instrument, were determined by the use of present value methods or option value models with assumptions about commodity prices based on those observed in

15

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

underlying markets or provided by third parties. Included in the Company's cumulative net unrealized losses from fuel hedges as of March 31, 2020, recorded in AOCI, were approximately $67 million in unrealized losses, net of taxes, which are expected to be realized in earnings during the twelve months subsequent to March 31, 2020.

**Interest Rate Swaps**

The Company is party to certain interest rate swap agreements that are accounted for as either fair value hedges or cash flow hedges, as defined in the applicable accounting guidance for derivative instruments and hedging. Several of the Company's interest rate swap agreements qualify for the "shortcut" method of accounting for hedges, which dictates that the hedges are assumed to be perfectly effective, and thus there is no ineffectiveness to be recorded in earnings.

During first quarter 2019, the Company entered into 12 separate forward-starting interest rate swap agreements related to a series of 12 737 MAX 8 aircraft leases with deliveries originally scheduled between July 2019 and February 2020. These lease contracts expose the Company to interest rate risk as the rental payments are adjusted and become fixed based on the 9-year swap rate at the time of delivery. The primary objective for these interest rate derivatives, which qualified as cash flow hedges, was to hedge the forecasted monthly rental payments. These swap agreements provide for a single payment at maturity based upon the change in the 9-year swap rate between the execution date and the termination date. All 12 swap agreements were terminated during third quarter 2019, resulting in $32 million being "frozen" in AOCI. As a result of the extenuating circumstances involving the MAX aircraft, which are outside the control of the Company, these amounts will be recognized in earnings when the original forecasted transaction occurs, which remains probable.

During third quarter 2019, the Company entered into 12 separate forward-starting interest rate swap agreements, with similar terms as the third quarter 2019 terminated swaps, except for the range of 737 MAX 8 deliveries scheduled were between June 2020 and September 2020. During first quarter 2020, nine of the aircraft leases became no longer probable to be received within the scheduled delivery range. Therefore, the nine associated swap agreements were de-designated and $17 million was "frozen" in AOCI. These amounts will be recognized in earnings when the original forecasted transaction occurs, which continues to be probable. The mark-to-market changes for these swap agreements are now being recorded in earnings, resulting in a $24 million unrealized loss to Other (gains) and losses, net, in the unaudited Condensed Consolidated Statement of Comprehensive Income (Loss) for the three months ended March 31, 2020. The Company will continue to assess the likelihood of the forecasted transactions related to the hedges for the remaining 737 MAX 8 deliveries in future periods.

For the Company's interest rate swap agreements that do not qualify for the "shortcut" or "critical terms match" methods of accounting, ineffectiveness is assessed at each reporting period. If hedge accounting is achieved, all periodic changes in fair value of the interest rate swaps are recorded in AOCI.

**Credit Risk and Collateral**

Credit exposure related to fuel derivative instruments is represented by the fair value of contracts that are an asset to the Company at the reporting date. At such times, these outstanding instruments expose the Company to credit loss in the event of nonperformance by the counterparties to the agreements. However, the Company has not experienced any significant credit loss as a result of counterparty nonperformance in the past. To manage credit risk, the Company selects and periodically reviews counterparties based on credit ratings, limits its exposure with respect to each counterparty, and monitors the market position of the fuel hedging program and its relative market position with each counterparty. At March 31, 2020, the Company had agreements with all of its active counterparties containing early termination rights and/or bilateral collateral provisions whereby security is required if market risk exposure exceeds a specified threshold amount based on the counterparty credit rating. The Company also had agreements with counterparties in which cash deposits and letters of credit are required to be posted as collateral whenever the net fair value of derivatives associated with those counterparties exceeds specific thresholds. In certain cases, the Company has the ability to substitute among these different forms of collateral at its discretion.

16

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

The following table provides the fair values of fuel derivatives, amounts posted as collateral, and applicable collateral posting threshold amounts as of March 31, 2020, at which such postings are triggered:

| (in millions) | A | B | C | D | E | F | Other (a) | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | **Counterparty (CP)** | | | | |
| Fair value of fuel derivatives | $ 23 | $ 10 | $ 20 | $ 8 | $ 9 | $ 8 | $ 7 | $ 85 |
| Cash collateral held from CP | 20 | — | — | — | — | — | — | 20 |
| Letters of credit (LC) | — | — | — | — | — | — | — | — |
| Option to substitute LC for cash | N/A | N/A | (75) to (150) or >(550)(b) | (125) to (150) or >(550)(c) | (c) | N/A | | |
| **If credit rating is investment grade, fair value of fuel derivative level at which:** | | | | | | | | |
| Cash is provided to CP | >(100) | >(50) | (75) to (150) or >(550)(d) | (125) to (150) or >(550)(d) | >(40) | >(65)(d) | | |
| Cash is received from CP | >0(d) | >150(d) | >250(d) | >125(d) | >100(d) | >70(d) | | |
| Cash can be pledged to CP as collateral | (200) to (600)(e) | N/A | (150) to (550)(b) | (150) to (550) (b) | N/A | N/A | | |
| **If credit rating is non-investment grade, fair value of fuel derivative level at which:** | | | | | | | | |
| Cash is provided to CP | (0) to (200) or >(600) | (f) | (0) to (150) or > (550) | (0) to (150) or >(550) | (f) | (f) | | |
| Cash is received from CP | (f) | (f) | (f) | (f) | (f) | (f) | | |
| Cash can be pledged to CP as collateral | (200) to (600) | N/A | (150) to (550) | (150) to (550) | N/A | N/A | | |

(a) Individual counterparties with fair value of fuel derivatives < $8 million.

(b) The Company has the option of providing cash or letters of credit as collateral.

(c) The Company has the option to substitute letters of credit for 100 percent of cash collateral requirement.

(d) Thresholds may vary based on changes in credit ratings within investment grade.

(e) The Company has the option of providing cash as collateral.

(f) Cash collateral is provided at 100 percent of fair value of fuel derivative contracts.

17

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

5.  COMPREHENSIVE INCOME (LOSS)

Comprehensive income (loss) includes changes in the fair value of certain financial derivative instruments that qualify for hedge accounting, unrealized gains and losses on certain investments, and actuarial gains/losses arising from the Company's postretirement benefit obligation. The differences between Net income (loss) and Comprehensive income (loss) for the three months ended March 31, 2020 and 2019 were as follows:

| | Three months ended March 31, | |
| --- | --- | --- |
| (in millions) | 2020 | 2019 |
| **NET INCOME (LOSS)** | $ (94) | $ 387 |
| Unrealized gain (loss) on fuel derivative instruments, net of deferred taxes of ($19) and $22 | (65) | 76 |
| Unrealized loss on interest rate derivative instruments, net of deferred taxes of ($10) and ($3) | (32) | (11) |
| Other, net of deferred taxes of ($9) and $3 | (28) | 11 |
| Total other comprehensive income (loss) | $ (125) | $ 76 |
| **COMPREHENSIVE INCOME (LOSS)** | $ (219) | $ 463 |

A rollforward of the amounts included in AOCI is shown below for the three months ended March 31, 2020:

| (in millions) | Fuel derivatives | Interest rate derivatives | Defined benefit plan items | Other | Deferred tax | Accumulated other comprehensive income (loss) |
| --- | --- | --- | --- | --- | --- | --- |
| Balance at December 31, 2019 | $ (125) | $ (33) | $ 20 | $ 59 | $ 18 | $ (61) |
| Changes in fair value | (108) | (42) | — | (37) | 43 | (144) |
| Reclassification to earnings | 24 | — | — | — | (5) | 19 |
| Balance at March 31, 2020 | $ (209) | $ (75) | $ 20 | $ 22 | $ 56 | $ (186) |

The following table illustrates the significant amounts reclassified out of each component of AOCI for the three months ended March 31, 2020:

| | Three months ended March 31, 2020 | |
| --- | --- | --- |
| (in millions) AOCI components | Amounts reclassified from AOCI | Affected line item in the unaudited Condensed Consolidated Statement of Comprehensive Income (Loss) |
| Unrealized loss on fuel derivative instruments | $ 22 | Fuel and oil expense |
| | 2 | Other (gains) losses, net |
| | 5 | Less: Tax expense |
| | $ 19 | Net of tax |

18

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

6.  REVENUE

**Passenger Revenues**

Revenue is categorized by revenue source as the Company believes it best depicts the nature, amount, timing, and uncertainty of revenue and cash flow. The following table provides the components of Passenger revenue recognized for the three months ended March 31, 2020 and 2019:

| | Three months ended March 31, | | | |
|---|---|---|---|---|
| **(in millions)** | **2020** | | **2019** | |
| Passenger non-loyalty | $ | 3,220 | $ | 4,043 |
| Passenger loyalty - air transportation | | 461 | | 535 |
| Passenger ancillary sold separately | | 164 | | 167 |
| **Total passenger revenues** | $ | 3,845 | $ | 4,745 |

As of March 31, 2020, and December 31, 2019, the components of Air traffic liability and Air traffic liability - noncurrent, including contract liabilities based on tickets sold, unused funds available to the Customer, and loyalty points available for redemption, net of expected spoilage, within the unaudited Condensed Consolidated Balance Sheet were as follows:

| | Balance as of | | | |
|---|---|---|---|---|
| **(in millions)** | **March 31, 2020** | | **December 31, 2019** | |
| Air traffic liability - passenger travel and ancillary passenger services | $ | 2,650 | $ | 2,125 |
| Air traffic liability - loyalty program | | 3,561 | | 3,385 |
| **Total Air traffic liability** | $ | 6,211 | $ | 5,510 |

Rollforwards of the Company's Air traffic liability - loyalty program for the three months ended March 31, 2020 and 2019 were as follows (in millions):

| | Three months ended March 31, | | | |
|---|---|---|---|---|
| | **2020** | | **2019** | |
| Air traffic liability - loyalty program - beginning balance | $ | 3,385 | $ | 3,011 |
| Amounts deferred associated with points awarded | | 656 | | 711 |
| Revenue recognized from points redeemed - Passenger | | (461) | | (535) |
| Revenue recognized from points redeemed - Other | | (19) | | (16) |
| Air traffic liability - loyalty program - ending balance | $ | 3,561 | $ | 3,171 |

19

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

Air traffic liability includes consideration received for ticket and loyalty related performance obligations which have not been satisfied as of a given date. Rollforwards of the amounts included in Air traffic liability as of March 31, 2020 and 2019 were as follows (in millions):

| | | Air traffic liability |
|---|---|---|
| Balance at December 31, 2019 | $ | 5,510 |
| Current period sales (passenger travel, ancillary services, flight loyalty, and partner loyalty) | | 4,565 |
| Revenue from amounts included in contract liability opening balances | | (1,949) |
| Revenue from current period sales | | (1,915) |
| Balance at March 31, 2020 | $ | 6,211 |

| | | Air traffic liability |
|---|---|---|
| Balance at December 31, 2018 | $ | 5,070 |
| Current period sales (passenger travel, ancillary services, flight loyalty, and partner loyalty) | | 5,704 |
| Revenue from amounts included in contract liability opening balances | | (2,008) |
| Revenue from current period sales | | (2,752) |
| Balance at March 31, 2019 | $ | 6,014 |

In first quarter 2020, the Company experienced a significantly higher number of Customer driven flight cancellations as a result of the COVID-19 pandemic. See Note 2 for further information. As a result, the amount of Customer travel funds held by the Company that can be redeemed for future travel as of March 31, 2020, far exceeds previous periods and represents approximately one third of the total Air traffic liability balance at March 31, 2020, as compared to approximately 13 percent of the total Air traffic liability balance at December 31, 2019. In order to provide additional flexibility to Customers who own these funds, the Company has significantly relaxed its previous policies with regards to the time period within which these funds can be redeemed, which is typically twelve months from the original date of purchase. For all Customer travel funds created or expired between March 1 and September 7, 2020 associated with flight cancellations, the Company has extended the expiration date to September 7, 2022. The more significant of these ticket policy changes occurred in April 2020, which may result in a portion of these funds shifting to non-current, based on changes in expectations of when they will be redeemed for travel.

Spoilage estimates are based on the Company's Customers' historical travel behavior as well as assumptions about the Customers' future travel behavior. Assumptions used to generate spoilage estimates can be impacted by several factors including, but not limited to: fare increases, fare sales, changes to the Company's ticketing policies, changes to the Company's refund, exchange, and unused funds policies, seat availability, and economic factors. Given the unprecedented amount of first quarter 2020 Customer flight cancellations and the amount of travel funds provided, the Company expects additional variability in the amount of spoilage revenue recorded in future periods, as the estimates of the portion of those funds that will expire unused may differ from historical experience.

The Company has a co-branded credit card agreement (the "Agreement") with Chase Bank USA, N.A. ("Chase"), through which the Company sells loyalty points and certain marketing components, which consist of the use of Southwest Airlines' brand and access to Rapid Rewards Member lists, licensing and advertising elements, and the use of the Company's resource team. The Company recognized revenue related to the marketing, advertising, and other travel-related benefits of the revenue associated with various loyalty partner agreements including, but not limited to, the Agreement with Chase, within Other operating revenues. For the three months ended March 31, 2020 and 2019, the Company recognized $321 million and $319 million, respectively.

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

7.  NET INCOME (LOSS) PER SHARE

The following table sets forth the computation of basic and diluted net income (loss) per share (in millions, except per share amounts). Antidilutive common stock equivalents, excluded from the diluted net income (loss) per share calculation, consisting primarily of restricted stock units, are not material.

| | Three months ended March 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| **NUMERATOR:** | | |
| Net income (loss) | $ (94) | $ 387 |
| | | |
| **DENOMINATOR:** | | |
| Weighted-average shares outstanding, basic | 515 | 551 |
| Dilutive effect of restricted stock units | — | 1 |
| Adjusted weighted-average shares outstanding, diluted | 515 | 552 |
| | | |
| **NET INCOME (LOSS) PER SHARE:** | | |
| Basic | $ (0.18) | $ 0.70 |
| Diluted | $ (0.18) | $ 0.70 |

8.  DEBT

On March 12, 2020, the Company entered into a new $1.0 billion 364-day term loan credit facility agreement (the "364-Day Credit Agreement") with a syndicate of lenders identified in the 364-Day Credit Agreement that was drawn in full on the closing date. On March 30, 2020, the Company amended and restated the 364-Day Credit Agreement (the "Amended and Restated 364-Day Credit Agreement") with a syndicate of lenders identified in the Amended and Restated 364-Day Credit Agreement to add additional term loan commitments of approximately $2.3 billion, add an uncommitted accordion increase provision to permit additional term loans in an aggregate amount not to exceed approximately $417 million, amend the pricing, amend certain covenants, add certain covenants, and provide for the grant of a security interest in certain aircraft and related assets. The Amended and Restated 364-Day Credit Agreement matures in full on March 29, 2021.

On March 16, 2020, the Company drew down the full $1.0 billion on its existing $1.0 billion revolving credit facility expiring in August 2022 (the "Revolving Credit Agreement"). The Revolving Credit Agreement is a series of short-term borrowings; at the end of each borrowing the Company must elect to roll the facility over into the next borrowing or pay down the facility, therefore the Company has classified the obligation under Current maturities of long-term debt within the unaudited Condensed Consolidated Balance Sheet as of March 31, 2020. The Revolving Credit Agreement also has an accordion feature that would allow the Company, subject to, among other things, the procurement of incremental commitments, to increase the size of the facility to $1.5 billion.

Concurrently with entering into the Amended and Restated 364-Day Credit Agreement on March 30, 2020, the Company also amended the Revolving Credit Agreement (the "Amended and Restated Revolving Credit Agreement"; together with the Amended and Restated 364-Day Credit Agreement, the "Amended and Restated Credit Agreements") to (i) amend the pricing and fees, (ii) amend certain covenants and provisions, (iii) add certain covenants, and (iv) provide for the grant of a security interest in certain aircraft and related assets.

Generally, amounts outstanding under the Amended and Restated Credit Agreements bear interest at interest rates based on either the LIBOR rate (selected by the Company for designated interest periods) or the "alternate base rate" (being the highest of (1) the Wall Street Journal prime rate, (2) one-month adjusted LIBOR (one-month LIBOR plus a statutory

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

reserve rate) plus 1%, and (3) the New York Fed Bank Rate, plus 0.5%). The underlying LIBOR rate is subject to a floor of 1% per annum and the "alternate base rate" is subject to a floor of 1% per annum.

The Amended and Restated Credit Agreements contain customary representations and warranties, covenants, and events of default. The Amended and Restated Credit Agreements are secured by certain separate pools of aircraft and related assets, each with a minimum appraised value ratio requirement. Under the Amended and Restated Credit Agreements, the Company is required to maintain, at all times after March 31, 2021, a specified ratio of (x) adjusted net income (before interest, taxes, depreciation, amortization, and aircraft rental expense) less cash dividends to (y) interest and aircraft rental expense; and to maintain a minimum level of liquidity of $2.5 billion (defined as the aggregate amount available to be borrowed under the Amended and Restated Revolving Credit Agreement plus the aggregate amount of unrestricted cash and cash equivalents of the Company).

During February 2020, the Company issued $500 million senior unsecured notes due 2030. The notes bear interest at 2.625 percent. Interest is payable semi-annually in arrears on February 10 and August 10, beginning in 2020.

As of March 31, 2020, aggregate principal maturities of debt and finance leases (not including amounts associated with interest rate swap agreements, interest on finance leases, and amortization of purchase accounting adjustments) were $741 million for the remainder of 2020, $2.2 billion in 2021, $475 million in 2022, $103 million in 2023, $103 million in 2024, $90 million in 2025, and $1.4 billion thereafter.

9.   FAIR VALUE MEASUREMENTS

Accounting standards pertaining to fair value measurements establish a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value. These tiers include: Level 1, defined as observable inputs such as quoted prices in active markets; Level 2, defined as inputs other than quoted prices in active markets that are either directly or indirectly observable; and Level 3, defined as unobservable inputs in which little or no market data exists, therefore requiring an entity to develop its own assumptions.

As of March 31, 2020, the Company held certain items that are required to be measured at fair value on a recurring basis. These included cash equivalents, short-term investments (primarily treasury bills and certificates of deposit), interest rate derivative contracts, fuel derivative contracts, and available-for-sale securities. The majority of the Company's short-term investments consist of instruments classified as Level 1. However, the Company has certificates of deposit, commercial paper, and time deposits that are classified as Level 2, due to the fact that the fair value for these instruments is determined utilizing observable inputs in non-active markets. Other available-for-sale securities primarily consist of investments associated with the Company's excess benefit plan.

The Company's fuel and interest rate derivative instruments consist of over-the-counter contracts, which are not traded on a public exchange. Fuel derivative instruments currently consist solely of option contracts, whereas interest rate derivatives consist solely of swap agreements. See Note 4 for further information on the Company's derivative instruments and hedging activities. The fair values of swap contracts are determined based on inputs that are readily available in public markets or can be derived from information available in publicly quoted markets. Therefore, the Company has categorized these swap contracts as Level 2. The Company's Treasury Department, which reports to the Chief Financial Officer, determines the value of option contracts utilizing an option pricing model based on inputs that are either readily available in public markets, can be derived from information available in publicly quoted markets, or are provided by financial institutions that trade these contracts. The option pricing model used by the Company is an industry standard model for valuing options and is the same model used by the broker/dealer community (i.e., the Company's counterparties). The inputs to this option pricing model are the option strike price, underlying price, risk free rate of interest, time to expiration, and volatility. Because certain inputs used to determine the fair value of option contracts are unobservable (principally implied volatility), the Company has categorized these option contracts as

22

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

Level 3. Volatility information is obtained from external sources, but is analyzed by the Company for reasonableness and compared to similar information received from other external sources. The fair value of option contracts considers both the intrinsic value and any remaining time value associated with those derivatives that have not yet settled. The Company also considers counterparty credit risk and its own credit risk in its determination of all estimated fair values. To validate the reasonableness of the Company's option pricing model, on a monthly basis, the Company compares its option valuations to third party valuations. If any significant differences were to be noted, they would be researched in order to determine the reason. However, historically, no significant differences have been noted. The Company has consistently applied these valuation techniques in all periods presented and believes it has obtained the most accurate information available for the types of derivative contracts it holds.

Included in Other available-for-sale securities are the Company's investments associated with its deferred compensation plans, which consist of mutual funds that are publicly traded and for which market prices are readily available. These plans are non-qualified deferred compensation plans designed to hold contributions in excess of limits established by the Internal Revenue Code of 1986, as amended. The distribution timing and payment amounts under these plans are made based on the participant's distribution election and plan balance. Assets related to the funded portions of the deferred compensation plans are held in a rabbi trust, and the Company remains liable to these participants for the unfunded portion of the plans. The Company records changes in the fair value of the assets in the Company's earnings.

The following tables present the Company's assets and liabilities that are measured at fair value on a recurring basis at March 31, 2020, and December 31, 2019:

| | | Fair value measurements at reporting date using: | | |
| --- | --- | --- | --- | --- |
| Description | March 31, 2020 | Quoted prices in active markets for identical assets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) |
| **Assets** | | (in millions) | | |
| Cash equivalents | | | | |
| Cash equivalents (a) | $ 3,495 | $ 3,495 | $ — | $ — |
| Commercial paper | 360 | — | 360 | — |
| Certificates of deposit | 19 | — | 19 | — |
| Time deposits | 66 | — | 66 | — |
| Short-term investments: | | | | |
| Treasury bills | 1,396 | 1,396 | — | — |
| Certificates of deposit | 184 | — | 184 | — |
| Time deposits | 25 | — | 25 | — |
| Interest rate derivatives (see Note 4) | 4 | | 4 | |
| Fuel derivatives: | | | | |
| Option contracts (b) | 85 | — | — | 85 |
| Other available-for-sale securities | 182 | 182 | — | — |
| **Total assets** | $ 5,816 | $ 5,073 | $ 658 | $ 85 |
| **Liabilities** | | | | |
| Interest rate derivatives (see Note 4) | $ (71) | $ — | $ (71) | $ — |

(a) Cash equivalents are primarily composed of money market investments.

(b) In the unaudited Condensed Consolidated Balance Sheet amounts are presented as an asset. See Note 4.

23

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

| Description | December 31, 2019 | | Fair value measurements at reporting date using: | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Quoted prices in active markets for identical assets (Level 1) | | Significant other observable inputs (Level 2) | | Significant unobservable inputs (Level 3) | |
| **Assets** | | | (in millions) | | | | | |
| Cash equivalents | | | | | | | | |
| Cash equivalents (a) | $ | 1,999 | $ | 1,999 | $ | — | $ | — |
| Commercial paper | | 535 | | — | | 535 | | — |
| Certificates of deposit | | 14 | | — | | 14 | | — |
| Short-term investments: | | | | | | | | |
| Treasury bills | | 1,196 | | 1,196 | | — | | — |
| Certificates of deposit | | 268 | | — | | 268 | | — |
| Time deposits | | 60 | | — | | 60 | | — |
| Interest rate derivatives (see Note 4) | | 2 | | — | | 2 | | — |
| Fuel derivatives: | | | | | | | | |
| Option contracts (b) | | 110 | | — | | — | | 110 |
| Other available-for-sale securities | | 197 | | 197 | | — | | — |
| **Total assets** | $ | 4,381 | $ | 3,392 | $ | 879 | $ | 110 |
| **Liabilities** | | | | | | | | |
| Interest rate derivatives (see Note 4) | $ | (6) | $ | — | $ | (6) | $ | — |

(a) Cash equivalents are primarily composed of money market investments.

(b) In the unaudited Condensed Consolidated Balance Sheet amounts are presented as a net asset. See Note 4.

24

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

The Company did not have any assets or liabilities measured at fair value on a nonrecurring basis during the three months ended March 31, 2020, or the year ended December 31, 2019. The following tables present the Company's activity for items measured at fair value on a recurring basis using significant unobservable inputs (Level 3) for the three months ended March 31, 2020 and the year ended December 31, 2019:

**Fair value measurements using significant unobservable inputs (Level 3)**

| (in millions) | Fuel derivatives | |
|---|---|---|
| Balance at December 31, 2019 | $ | 110 |
| Total losses for the period | | |
|   Included in earnings | | (2) (a) |
|   Included in other comprehensive income | | (106) |
| Purchases | | 83 (b) |
| Balance at March 31, 2020 | $ | 85 |
| The amount of total losses for the period included in earnings attributable to the change in unrealized gains or losses relating to assets still held at March 31, 2020 | $ | (2) (a) |
| The amount of total losses for the period included in other comprehensive loss attributable to the change in unrealized gains or losses relating to assets still held at March 31, 2020 | $ | (100) |

(a) Included in Other (gains) losses, net, within the unaudited Condensed Consolidated Statement of Comprehensive Income (Loss).
(b) The purchase of fuel derivatives is recorded gross based on the structure of the derivative instrument and whether a contract with multiple derivatives was purchased as a single instrument or separate instruments.

**Fair value measurements using significant unobservable inputs (Level 3)**

| (in millions) | Fuel derivatives | |
|---|---|---|
| Balance at December 31, 2018 | $ | 138 |
| Losses included in other comprehensive loss | | (112) |
| Purchases | | 133 (a) |
| Sales | | (2) (a) |
| Settlements | | (47) |
| Balance at December 31, 2019 | $ | 110 |

(a) The purchase and sale of fuel derivatives are recorded gross based on the structure of the derivative instrument and whether a contract with multiple derivatives was purchased as a single instrument or separate instruments.

The significant unobservable input used in the fair value measurement of the Company's derivative option contracts is implied volatility. Holding other inputs constant, an increase (decrease) in implied volatility would have resulted in a higher (lower) fair value measurement, respectively, for the Company's derivative option contracts.

25

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

The following table presents a range and weighted average of the unobservable inputs utilized in the fair value measurements of the Company's fuel derivatives classified as Level 3 at March 31, 2020:

**Quantitative information about Level 3 fair value measurements**

|  | Valuation technique | Unobservable input | Period (by year) | Range | Weighted Average (a) |
|---|---|---|---|---|---|
| Fuel derivatives | Option model | Implied volatility | Second quarter 2020 | 49-121% | 93% |
|  |  |  | Third quarter 2020 | 50-73% | 59% |
|  |  |  | Fourth quarter 2020 | 41-56% | 47% |
|  |  |  | 2021 | 28-47% | 36% |
|  |  |  | 2022 | 27-30% | 28% |
|  |  |  | Beyond 2022 | 25-27% | 26% |

(a) Implied volatility weighted by the notional amount (barrels of fuel) that will settle in respective period.

The carrying amounts and estimated fair values of the Company's short-term and long-term debt (including current maturities), as well as the applicable fair value hierarchy tier, at March 31, 2020, are presented in the table below. The fair values of the Company's publicly held long-term debt are determined based on inputs that are readily available in public markets or can be derived from information available in publicly quoted markets; therefore, the Company has categorized these agreements as Level 2. Debt under five of the Company's debt agreements is not publicly held. The Company has determined the estimated fair value of this debt to be Level 3, as certain inputs used to determine the fair value of these agreements are unobservable. The Company utilizes indicative pricing from counterparties and a discounted cash flow method to estimate the fair value of the Level 3 items.

| (in millions) | Carrying value | Estimated fair value | Fair value level hierarchy |
|---|---|---|---|
| 2.65% Notes due 2020 | $ 504 | $ 495 | Level 2 |
| Term Loan Agreement payable through 2020 - 5.223% | 120 | 120 | Level 3 |
| 737 Aircraft Note payable through 2020 | 7 | 7 | Level 3 |
| Revolving Credit Facility | 1,000 | 978 | Level 3 |
| Term Loan Agreement due 2021 - 3.000% | 1,000 | 990 | Level 3 |
| 2.75% Notes due 2022 | 300 | 283 | Level 2 |
| Pass Through Certificates due 2022 - 6.24% | 168 | 167 | Level 2 |
| Term Loan Agreement payable through 2026 - 3.03% | 178 | 164 | Level 3 |
| 3.00% Notes due 2026 | 300 | 284 | Level 2 |
| 3.45% Notes due 2027 | 300 | 264 | Level 2 |
| 7.375% Debentures due 2027 | 121 | 139 | Level 2 |
| 2.625% Notes due 2030 | 500 | 420 | Level 2 |

26

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

## 10. SUPPLEMENTAL FINANCIAL INFORMATION

| (in millions) | | March 31, 2020 | | December 31, 2019 |
|---|---|---|---|---|
| Trade receivables | $ | 44 | $ | 53 |
| Credit card receivables | | 4 | | 112 |
| Business partners and other suppliers | | 535 | | 779 |
| Income tax receivable | | 88 | | 87 |
| Other | | 38 | | 55 |
| Accounts and other receivables | $ | 709 | $ | 1,086 |

| (in millions) | | March 31, 2020 | | December 31, 2019 |
|---|---|---|---|---|
| Derivative contracts | $ | 60 | $ | 49 |
| Intangible assets, net | | 296 | | 296 |
| Other | | 264 | | 232 |
| Other assets | $ | 620 | $ | 577 |

| (in millions) | | March 31, 2020 | | December 31, 2019 |
|---|---|---|---|---|
| Accounts payable trade | $ | 218 | $ | 304 |
| Salaries payable | | 226 | | 231 |
| Taxes payable excluding income taxes | | 66 | | 227 |
| Aircraft maintenance payable | | 156 | | 162 |
| Fuel payable | | 57 | | 129 |
| Dividends payable | | — | | 93 |
| Other payable | | 320 | | 428 |
| Accounts payable | $ | 1,043 | $ | 1,574 |

| (in millions) | | March 31, 2020 | | December 31, 2019 |
|---|---|---|---|---|
| Profitsharing and savings plans | $ | 25 | $ | 695 |
| Vacation pay | | 443 | | 434 |
| Health | | 99 | | 120 |
| Workers compensation | | 168 | | 166 |
| Property and income taxes | | 67 | | 79 |
| Derivative contracts | | 55 | | 5 |
| Other | | 180 | | 250 |
| Accrued liabilities | $ | 1,037 | $ | 1,749 |

| (in millions) | | March 31, 2020 | | December 31, 2019 |
|---|---|---|---|---|
| Postretirement obligation | $ | 294 | $ | 288 |
| Other deferred compensation | | 286 | | 313 |
| Other | | 114 | | 105 |
| Other noncurrent liabilities | $ | 694 | $ | 706 |

For further information on supplier receivables, see Note 12. For further information on fuel derivative and interest rate derivative contracts, see Note 4.

**Other Operating Expenses**

Other operating expenses consist of aircraft rentals, distribution costs, advertising expenses, personnel expenses, professional fees, and other operating costs, none of which individually exceeded 10 percent of Operating expenses.

27

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

11.    COMMITMENTS AND CONTINGENCIES

**Los Angeles International Airport**

In October 2017, the Company executed a lease agreement with Los Angeles World Airports ("LAWA") (the "T1.5 Lease"). Under the T1.5 Lease, the Company is overseeing and managing the design, development, financing, construction, and commissioning of a passenger processing facility between Terminal 1 and 2 (the "Terminal 1.5 Project"). The Terminal 1.5 Project is expected to include ticketing, baggage claim, passenger screening, and a bus gate at a cost not to exceed $479 million for site improvements and non-proprietary improvements. Construction on the Terminal 1.5 Project began during third quarter 2017 and is estimated to be substantially completed during fourth quarter 2020. The costs incurred to fund the Terminal 1.5 Project are included within Assets Constructed for Others ("ACFO") and all amounts that have been or will be reimbursed will be included within Construction obligation on the accompanying unaudited Condensed Consolidated Balance Sheet.

Funding for this project is primarily through the Regional Airports Improvement Corporation (the "RAIC"), which is a quasi-governmental special purpose entity that is acting as a conduit borrower under a syndicated credit facility provided by a group of lenders. A loan made under the credit facility for the Terminal 1.5 Project is being used to reimburse the Company for the site improvements and non-proprietary improvements of the Terminal 1.5 Project, and the outstanding loan will be repaid with the proceeds of LAWA's payments to purchase completed construction phases. The Company guaranteed the obligation of the RAIC under the credit facility associated with the Terminal 1.5 Project. As of March 31, 2020, the Company's outstanding remaining guaranteed obligation under the credit facility for the Terminal 1.5 Project was $212 million.

Construction costs recorded in ACFO for the Terminal 1.5 Project were $198 million and $164 million, as of March 31, 2020, and December 31, 2019, respectively.

**Dallas Love Field**

During 2008, the City of Dallas approved the Love Field Modernization Project ("LFMP"), a project to reconstruct Dallas Love Field with modern, convenient air travel facilities. Pursuant to a Program Development Agreement with the City of Dallas and the Love Field Airport Modernization Corporation (or the "LFAMC," a Texas non-profit "local government corporation" established by the City of Dallas to act on the City of Dallas' behalf to facilitate the development of the LFMP), the Company managed this project. Major construction was effectively completed in 2014. During second quarter 2017, the City of Dallas approved using the remaining bond funds for additional terminal construction projects, which were effectively completed in 2018.

Although the City of Dallas received commitments from various sources that helped to fund portions of the LFMP project, including the Federal Aviation Administration ("FAA"), the Transportation Security Administration, and the City of Dallas' Aviation Fund, the majority of the funds used were from the issuance of bonds. The Company guaranteed principal and interest payments on bonds issued by the LFAMC. As of March 31, 2020, $407 million of principal remained outstanding. The net present value of the future principal and interest payments associated with the bonds was $449 million as of March 31, 2020, and was reflected as part of the Company's operating lease right–of–use assets and lease obligations in the unaudited Condensed Consolidated Balance Sheet.

**Contingencies**

The Company is from time to time subject to various legal proceedings and claims arising in the ordinary course of business, including, but not limited to, examinations by the Internal Revenue Service (the "IRS"). The Company's management does not expect that the outcome of any of its currently ongoing legal proceedings or the outcome of any adjustments presented by the IRS, individually or collectively, will have a material adverse effect on the Company's financial condition, results of operations, or cash flow.

28

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

12. BOEING 737 MAX AIRCRAFT GROUNDING

On March 13, 2019, the FAA issued an emergency order for all U.S. airlines to ground all Boeing MAX aircraft. The Company immediately complied with the order and grounded all 34 MAX aircraft in its fleet. The Company will continue to monitor the situation and any potential future accounting implications that arise. The most significant financial impacts of this grounding to the Company thus far have been lost revenues, operating income, and operating cash flows, and delayed capital expenditures, directly associated with its grounded MAX fleet and other new aircraft that have not been able to be delivered. In July 2019, the Boeing Company announced a $4.9 billion after-tax charge for "potential concessions and other considerations to customers for disruptions related to the 737 MAX grounding." In January 2020, the Boeing Company announced an additional pre-tax charge of $2.6 billion related to "estimated potential concessions and other considerations to customers related to the 737 MAX grounding."

During fourth quarter 2019, the Company entered into a Memorandum of Understanding with Boeing to compensate Southwest for estimated financial damages incurred during 2019 related to the grounding of the MAX. The terms of the agreement are confidential, but are intended to provide for a substantial portion of the Company's estimated financial damages associated with both the 34 MAX aircraft that were grounded as of March 13, 2019, as well as the 41 additional MAX aircraft the Company was scheduled to receive (28 owned MAX from Boeing and 13 leased MAX from third parties) from March 13, 2019 through December 31, 2019. In accordance with applicable accounting principles, the Company will account for substantially all of the proceeds received from Boeing as a reduction in cost basis spread across both the existing 31 owned MAX in the Company's fleet, plus the Company's future firm aircraft deliveries as of the date of the agreement. No material financial impacts of the agreement were realized in the Company's earnings during year ended December 31, 2019. A total of $300 million in proceeds received in cash from Boeing are reflected within Investing Activities in the Consolidated Statement of Cash Flows for the three months ended March 31, 2020. Amounts agreed to but not yet received are recorded within Accounts and Other Receivables.

13. SUBSEQUENT EVENTS

In April 2020, the Company reached an agreement in principle with the Treasury with respect to funding support pursuant to the Payroll Support Program under the CARES Act. See Note 2 for further information on the CARES Act. Funds received under the Payroll Support Program are expected to be used to pay Employee wages and benefits through September 30, 2020. The Company's expected aggregate receipts under the Payroll Support Program total approximately $3.3 billion (the "Payroll Support"), for which the Company expects to provide the Treasury consideration in the form of a promissory note representing a $948 million unsecured term loan to the Company and of warrants to purchase up to an aggregate of 2.6 million shares of the Company's common stock, subject to adjustment by the Treasury in each case.

On April 21, 2020, the Company received the first installment of approximately $1.6 billion of expected proceeds, or 50 percent, for which the Company provided consideration in the form of a promissory note representing a $459 million unsecured term loan and of warrants to purchase up to an aggregate of 1.3 million shares of the Company's common stock. The remainder of the funds are expected to be disbursed to the Company, and the additional warrants are expected to be issued, in three installments from May to July 2020.

As consideration for Payroll Support, on April 20, 2020, the Company issued a promissory note (the "Note") in favor of the Treasury and entered into a warrant agreement with the Treasury (the "Warrant Agreement"), pursuant to which the Company agreed to issue warrants (each, a "Warrant") to purchase common stock of the Company to the Treasury. In connection with the initial disbursement on April 21, 2020, the Note was issued at an initial amount of $459 million. Upon each subsequent disbursement of Payroll Support to the Company after April 21, 2020, (i) the principal amount of the Note will be increased in an amount equal to 30 percent of any such disbursement and (ii) the Company will issue a Warrant to the Treasury in an amount equal to 10 percent of the principal amount of the increase to the Note in connection with such disbursement of Payroll Support, divided by the strike price of $36.47 (which was the closing price of the Company's common stock on April 9, 2020).

29

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

The Note matures in full on April 19, 2030, and is subject to mandatory prepayment requirements in connection with certain change of control triggering events that may occur prior to its maturity. The Company has an option to prepay the Note at any time without premium or penalty. Amounts outstanding under the Note bear interest at a rate of 1.00 percent before April 20, 2025 and, afterwards, at a rate equal to Secured Overnight Financing Rate or other benchmark replacement rate consistent with customary market conventions plus margin of 2.00 percent. The Note contains customary representations and warranties and events of default.

The Warrant Agreement sets out the Company's obligations to issue Warrants in connection with disbursements of Payroll Support and to file a resale shelf registration statement for the Warrants and the underlying shares of common stock. The Company has also granted the Treasury certain demand underwritten offering and piggyback registration rights with respect to the Warrants and the underlying common stock. Each Warrant is exercisable at a strike price of $36.47 per share of common stock and will expire on the fifth anniversary of the issue date of such Warrant. The Warrants will be settled through net share settlement or net cash settlement, at the Company's option. The Warrants include adjustments for below market issuances, payment of dividends and other customary anti-dilution provisions. The Warrants do not have voting rights.

By accepting financing under the CARES Act, the Company has agreed to certain restrictions on its business, including:

- The Company is prohibited from repurchasing its common stock and from paying dividends or making capital contributions with respect to its common stock until September 30, 2021.
- The Company must place certain restrictions on certain higher-paid employee and executive pay, including limiting pay increases and severance pay or other benefits upon terminations, until March 24, 2022.
- The Company is prohibited from involuntary terminations or furloughs of its Employees (except for death, disability, cause, or certain disciplinary reasons) until September 30, 2020.
- The Company may not reduce the salary, wages, or benefits of its Employees (other than its Executive Officers or independent contractors, or as otherwise permitted under the terms of the Payroll Support Program) until September 30, 2020.
- Until March 1, 2022, the Company must comply with any requirement issued by the Department of Transportation ("DOT") that the Company maintain certain scheduled air transportation service as DOT deems necessary to ensure services to any point served by the Company before March 1, 2020.
- The Company must maintain certain internal controls and records relating to the CARES Act funds, and is subject to additional reporting requirements.

The Payroll Support will be recorded upon initial receipt of the cash as a deferred expense in the unaudited Condensed Consolidated Balance Sheet, and subsequently reclassified as a contra-expense in the unaudited Condensed Consolidated Statement of Income in second and third quarters 2020-relative to the salaries and wages expected to be incurred by the Company in those periods. At the Company's election, approximately 90 percent of the total $3.3 billion in assistance is expected to be received in second quarter 2020, with the remainder to be received in third quarter 2020. The Company will allocate the proceeds received from the Treasury in accordance with applicable accounting guidance, and based on the consideration provided in the transaction.

The Company has also been notified of general terms associated with the Loan program available to U.S. carriers through the Treasury under the CARES Act. The Company has the opportunity to apply for a 5-year senior secured term loan (the "secured term loan") up to $2.8 billion as of April 20, 2020, that would be collateralized by certain assets of the Company. Interest on the secured term loan would be at LIBOR plus 250 basis points, would be prepayable at any time, and would contain restrictions similar to those noted above associated with the Payroll Support Program. If it agrees to take the secured term loan, the Company would have to provide approximately 7.6 million warrants to the Treasury. The Company plans to apply for the secured term loan by the April 30, 2020 deadline, but is currently undecided as to whether it would agree to draw down on the loan. The deadline for the Company to decide whether to take the loan is currently September 30, 2020. In connection with the secured term loan, should the Company accept the loan, the Company will be required to comply with the relevant provisions of the CARES Act, including those prohibiting the repurchase of common stock and the payment of common stock dividends, as well as those restricting

30

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

the payment of certain executive compensation. Under the CARES Act, these restrictions will apply until one year after the secured term loan is repaid in full.

The terms of the CARES Act represent just one component of the Company's actions to address the liquidity risks presented by the impacts of the COVID-19 pandemic to its business. Commercial air travel in the U.S. and Company Passenger revenues for most of April 2020 have been at levels of less than five percent of comparable amounts experienced in April of 2019. However, much of the Company's operating expenses have not declined at a commensurate amount, leading to significant operating cash outflows. Although the Company has canceled a significant portion of its originally scheduled flights for April, May, June, and July 2020, only a portion of the Company's operating cost structure is variable, and the savings from less fuel consumption, landing fees, and certain other expenses will likely only cover a portion of the lost revenue during this period of time.

The Company believes it has taken appropriate measures to address the significant cash outflows experienced thus far, and continues to evaluate options, should the lack of demand for air travel continue beyond the near term. In addition to the significant reductions in the Company's flight schedule, various voluntary leave options have been offered to the Company's 60,000 plus Employees (including time off without pay and extended time off with partial pay), hundreds of capital spending projects have been canceled or deferred, all non-essential spending has been cut, and existing contracts and payment terms with the majority of its vendors have been evaluated for further savings opportunities.

The Company believes its financial position and preparation prior to the impact of the COVID-19 pandemic have allowed it to react quickly and sensibly in the steps it has taken so far to raise cash and increase its liquidity. Given the Company's continued current access to capital markets, investment grade credit rating, and unencumbered assets (including a significant number of aircraft), it believes it has opportunities and options to raise additional liquidity at reasonable terms. Thus, the Company believes it is probable that the plans it has in place, or that it has the ability to execute as of the date of this filing, when fully implemented, will sufficiently mitigate the present conditions and allow the Company to reasonably handle the liquidity risks presented by the current climate.

The Company drew approximately $2.3 billion under the Amended and Restated 364-Day Credit Agreement on April 1, 2020. On April 24, 2020, the Company also drew an additional $350 million under the $417 million accordion feature that allows the total borrowing capacity under the Amended and Restated 364-Day Credit Agreement to increase to $3.75 billion. As of the date hereof, there is approximately $3.68 billion outstanding under the Amended and Restated 364–Day Credit Agreement.

31

**Item 2.**   Management's Discussion and Analysis of Financial Condition and Results of Operations

Relevant comparative operating statistics for the three months ended March 31, 2020 and 2019 are included below. The Company provides these operating statistics because they are commonly used in the airline industry and, as such, allow readers to compare the Company's performance against its results for the prior year period, as well as against the performance of the Company's peers.

| | Three months ended March 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | Change |
| Revenue passengers carried (000s) | 24,748 | 31,296 | (20.9)% |
| Enplaned passengers (000s) | 29,779 | 37,813 | (21.2)% |
| Revenue passenger miles (RPMs) (in millions)[a] | 23,935 | 30,704 | (22.0)% |
| Available seat miles (ASMs) (in millions)[b] | 35,350 | 37,885 | (6.7)% |
| Load factor[c] | 67.7% | 81.0% | (13.3)  pts. |
| Average length of passenger haul (miles) | 967 | 981 | (1.4)% |
| Average aircraft stage length (miles) | 737 | 751 | (1.9)% |
| Trips flown | 312,393 | 326,390 | (4.3)% |
| Seats flown (000s)[d] | 47,130 | 49,473 | (4.7)% |
| Seats per trip[e] | 150.9 | 151.6 | (0.5)% |
| Average passenger fare | $ 155.37 | $ 151.61 | 2.5 % |
| Passenger revenue yield per RPM (cents)[f] | 16.07 | 15.45 | 4.0 % |
| Operating revenues per ASM (cents)[g] | 11.98 | 13.59 | (11.8)% |
| Passenger revenue per ASM (cents)[h] | 10.88 | 12.52 | (13.1)% |
| Operating expenses per ASM (cents)[i] | 12.29 | 12.26 | 0.2 % |
| Operating expenses per ASM, excluding fuel (cents) | 9.83 | 9.58 | 2.6 % |
| Operating expenses per ASM, excluding fuel and profitsharing (cents) | 9.83 | 9.35 | 5.1 % |
| Fuel costs per gallon, including fuel tax | $ 1.90 | $ 2.05 | (7.3)% |
| Fuel costs per gallon, including fuel tax, economic | $ 1.90 | $ 2.05 | (7.3)% |
| Fuel consumed, in gallons (millions) | 457 | 493 | (7.3)% |
| Active fulltime equivalent Employees | 60,922 | 59,436 | 2.5 % |
| Aircraft at end of period | 742 [j][k] | 753 [j] | (1.5)% |

(a) A revenue passenger mile is one paying passenger flown one mile. Also referred to as "traffic," which is a measure of demand for a given period.
(b) An available seat mile is one seat (empty or full) flown one mile. Also referred to as "capacity," which is a measure of the space available to carry passengers in a given period.
(c) Revenue passenger miles divided by available seat miles.
(d) Seats flown is calculated using total number of seats available by aircraft type multiplied by the total trips flown by the same aircraft type during a particular period.
(e) Seats per trip is calculated by dividing seats flown by trips flown.
(f) Calculated as passenger revenue divided by revenue passenger miles. Also referred to as "yield," this is the average cost paid by a paying passenger to fly one mile, which is a measure of revenue production and fares.
(g) Calculated as operating revenues divided by available seat miles. Also referred to as "operating unit revenues," or "RASM," this is a measure of operating revenue production based on the total available seat miles flown during a particular period.
(h) Calculated as passenger revenue divided by available seat miles. Also referred to as "passenger unit revenues," this is a measure of passenger revenue production based on the total available seat miles flown during a particular period.
(i) Calculated as operating expenses divided by available seat miles. Also referred to as "unit costs," "cost per available seat mile," or "CASM" this is the average cost to fly an aircraft seat (empty or full) one mile, which is a measure of cost efficiencies.
(j) Included 34 Boeing MAX 737 aircraft in long term storage. See Note 12 to the unaudited Condensed Consolidated Financial Statements for further information.
(k) Included 93 Boeing 737 Next Generation aircraft removed from active fleet and placed in long-term storage as of March 31, 2020.

**Financial Overview**

The Company experienced healthy passenger booking and revenue trends for the first two months of 2020, with year-over-year increases in operating revenue per available seat mile ("RASM") that were in line with the Company's expectations. However, the Company experienced sharp declines in passenger demand and bookings beginning in late February 2020, and an unprecedented level of close-in trip cancellations (Customers canceling close to scheduled flight times), which is attributable to concerns relating to the COVID-19 pandemic. See Note 2 to the unaudited Condensed Consolidated Financial Statements for further information.

The Company recorded first quarter GAAP and non-GAAP results for 2020 and 2019 as noted in the following tables. See Note Regarding Use of Non-GAAP Financial Measures and the Reconciliation of Reported Amounts to Non-GAAP Financial Measures for additional detail regarding non-GAAP financial measures.

| | Three months ended March 31, | | | |
|---|---|---|---|---|
| (in millions, except per share amounts) | | | | |
| GAAP | | 2020 | 2019 | Percent Change |
| Operating income (loss) | $ | (110) $ | 505 | n.m. |
| Net income (loss) | $ | (94) $ | 387 | n.m. |
| Net income (loss) per share, diluted | $ | (0.18) $ | 0.70 | n.m. |
| | | | | |
| Non-GAAP | | | | |
| Operating income (loss) | $ | (110) $ | 505 | n.m. |
| Net income (loss) | $ | (77) $ | 387 | n.m. |
| Net income (loss) per share, diluted | $ | (0.15) $ | 0.70 | n.m. |

First quarter 2020 Net loss was $94 million, compared with first quarter 2019 Net income of $387 million. Diluted loss per share for first quarter 2020 was $0.18, as compared with first quarter 2019 diluted earnings per share of $0.70. First quarter 2020 non-GAAP Net loss was $77 million, compared with first quarter 2019 Net income of $387 million. Non-GAAP diluted loss per share for first quarter 2020 was $0.15, as compared with $0.70 for first quarter 2019. First quarter 2020 Operating loss was $110 million, compared with first quarter 2019 Operating income of $505 million, on both a GAAP and non-GAAP basis. The decrease in both GAAP and non-GAAP Net income (loss) was primarily due to the sharp decline in passenger demand and bookings beginning in late February 2020, combined with an unprecedented level of close-in trip cancellations in March 2020, due to the COVID-19 pandemic. In total, these impacts resulted in a 17.8 percent decrease in Operating revenues in first quarter 2020. See below and Note 2 to the unaudited Condensed Consolidated Financial Statements for further information.

For the twelve months ended March 31, 2020, the Company's earnings performance, combined with its actions to manage invested capital, produced an 18.1 percent pre-tax non-GAAP return on invested capital ("ROIC"), or 14.3 percent on an after-tax basis, compared with the Company's pre-tax ROIC of 23.3 percent, or 18.1 percent on an after-tax basis, for the twelve months ended March 31, 2019. The Company's cash balance at March 31, 2020, was higher than planned, due to the Company's efforts to obtain cash during the first quarter 2020 COVID-19 pandemic. The primary cause of the year-over-year decline in pre-tax ROIC was the decrease in Operating income for the twelve months ended March 31, 2020. See the Company's calculation of ROIC in the accompanying reconciliation tables as well as the Note Regarding Use of Non-GAAP Financial Measures.

### COVID-19 Pandemic

See Notes 2 and 13 to the unaudited Condensed Consolidated Financial Statements for further information on the significant impacts to the Company's operations, financial performance, and liquidity from the COVID-19 pandemic. With the sudden and severe drop-off in passenger demand caused by COVID-19 concerns, the Load factor for March 2020 was only 46.6 percent, compared with 85.7 percent in March 2019, with a Load factor of approximately 20

percent for the second half of March 2020. The Company has continued to experience weak passenger demand and bookings in April 2020, and operating revenues are currently estimated to decrease, year-over-year, in the range of 90 to 95 percent; available seat miles (ASMs, or capacity) are estimated to decrease approximately 60 percent, year-over-year; and Load factor is estimated to be approximately 6 percent. For May 2020, operating revenues are also currently estimated to decrease, year-over-year, in the range of 90 to 95 percent; capacity is estimated to decrease in the range of 60 to 70 percent, year-over-year; and Load factor is estimated to be in the range of 5 to 10 percent. The revenue environment remains uncertain, and the Company is unable to reasonably estimate trends beyond May 2020.

The Company expects continued year-over-year unit cost pressure in second quarter 2020, primarily due to its proactive capacity reductions due to the COVID-19 pandemic, as well as the ongoing MAX groundings. The Company is continuing its cost mitigation actions in second quarter 2020.

The Company also continues to take significant measures to enhance and expand upon its already generous and flexible ticketing policies, and to protect both its Employees and passengers on a daily basis. These include, but are not limited to the following:
- Travel funds created because of a flight cancellation between March 1, 2020 and September 7, 2020, will be available for use through September 7, 2022.
- Travel funds that expired or will expire between March 1, 2020 and September 7, 2020, will be available for use through September 7, 2022.
- While the Company has never charged a change fee (though the customer would be required to pay any fare difference), it is now also allowing any Customer to change their travel plans for flights through April 30, 2020, for another date 60 days from the original date of travel, without any fare difference, when booked in the same fare class and between the same origin and destination.
- Rapid Rewards loyalty program members who have travel funds that are set to expire, or funds that are created between March 1, 2020 and September 7, 2020, now have the option to convert those travel funds into Rapid Rewards points at the same rate as they are able to purchase a ticket with points.
- All Rapid Rewards loyalty program members qualifying progress received a "boost" of 15,000 tier qualifying points and 10 flight credits toward A-List and A-List Preferred status, and 25,000 Companion Pass qualifying points and 25 flight credits toward Companion Pass status.
- All current A-List and A-List Preferred tier status members earned status has been extended through December 31, 2021.
- Companion pass Members earned status has been extended through June 30, 2021.
- Snack and beverage service has been suspended on all flights to minimize contact in the cabin until further notice.
- Enhanced aircraft cleaning procedures have been applied since March 4, 2020.
- Procedures and protocol have been implemented with the intent of enabling Employees to wear personal protective equipment and adhere to health officials' recommendations.
- The Company has offered the ability to work remotely to most of the Company's office and clerical Employees, including the vast majority of its more than 6,000 Employees at the Company's headquarters campus in Dallas, Texas.

The Company continues to communicate with its entire workforce on best practices to employ in the current environment while at work, especially considering that a large portion of its Employees come into direct contact with Customers on a daily basis. As of April 24, 2020, far less than 1 percent of the Company's more than 60,000 Employees had tested positive for COVID-19.

In accordance with restrictions contained in the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act" or "the Act"), because the Company has received direct financial assistance from the government under the Act, the Company cannot involuntarily furlough or reduce the pay or benefits of any of its Employees through September 30, 2020, excluding certain Executive Officers. The Company is working on plans to extend its currently offered leave programs beyond second quarter 2020, and will also consider the opportunity to offer a voluntary early retirement program in future periods, depending on expectations regarding the extent and duration of the impacts of the COVID-19

pandemic. The Company's goal will be to maintain a suitably sized workforce to operate the airline at the expected level of forecasted demand for air travel in future periods.

As detailed in Note 2 and Note 13 to the unaudited Condensed Consolidated Financial Statements, the Company has been approved to receive significant assistance from the CARES Act, totaling approximately $3.3 billion from the Payroll Support Program section of the Act. Of this total, $2.3 billion will be in the form of a grant that will not require repayment, and will be utilized to directly offset payroll expenses incurred by the Company, including specified benefits, between April 2020 and September 2020. This direct payroll support of $2.3 billion will be allocated on a pro-rata basis as a contra-expense line item in the unaudited Condensed Consolidated Statement of Comprehensive Income between second and third quarters of 2020. Based on forecasted payroll costs, as defined in the CARES Act, this is expected to result in an allocation of approximately $1.1 billion recorded to directly reduce operating expenses in second quarter 2020, with the remainder recorded as a reduction of third quarter 2020 operating expenses.

**Company Overview**

The Company ended first quarter 2020 with 742 aircraft in its fleet. In response to capacity reductions due to the effects of the COVID-19 pandemic, the Company currently has approximately 350 aircraft in long-term storage or temporary parking. See Note 2 to the unaudited Condensed Consolidated Financial Statements for further information on the effects of the COVID-19 pandemic. This was in addition to the Company's 34 MAX 8 aircraft that were grounded as of March 13, 2019, to comply with the Federal Aviation Administration ("FAA") emergency order issued for all U.S. airlines to ground all MAX aircraft. The Company has not received any MAX aircraft deliveries since February 2019, and Boeing is not currently manufacturing or delivering new MAX aircraft. See Note 12 to the unaudited Condensed Consolidated Financial Statements for further information.

Upon a rescission of the FAA order to ground the MAX fleet, the Company will work closely with Boeing and the FAA to safely reintroduce the 34 MAX 8 aircraft currently in its fleet and estimates it will take the Company several months to comply with applicable FAA directives, including all necessary Pilot simulator training. Regulatory approval of MAX return to service is subject to Boeing's ongoing work with the FAA, who will determine the timing of MAX return to service. Based on Boeing's recent communication on the MAX return to service date, the Company currently expects the MAX to be removed through the end of its published flight schedule date of October 30, 2020. See Note 12 to the unaudited Condensed Consolidated Financial Statements for further information. The Company offers no assurances that current estimations and timelines are correct. Any changes to current estimations could result in additional flight schedule adjustments and reductions beyond October 30, 2020, further delays in MAX aircraft deliveries, and additional financial damages.

In light of the current environment, the Company and Boeing recently agreed to an arrangement requiring the Company to take delivery of no more than 48 aircraft from Boeing through December 31, 2021. The Company and Boeing have agreed to make reasonable efforts in coming months to agree to a new delivery schedule that reflects this arrangement. In addition to the firm deliveries from Boeing, the Company has existing agreements with various third parties to lease 16 MAX aircraft to be delivered in 2020 according to the current delivery schedule. The Company will continue collaborating with Boeing to review its aircraft order book and make any further adjustments to the delivery schedule as circumstances related to the MAX groundings and COVID-19 pandemic evolve. The Company also has flexibility with its retirement plans of Boeing 737-700 aircraft, and continues to plan for multiple scenarios for its fleet and capacity plans. The FAA's timetables and directives will determine the timing of MAX return to service, and the timing of future aircraft deliveries is subject to change. The Company offers no assurances that current estimations and timelines are correct.

Due to the impact of the COVID-19 pandemic on passenger travel demand, the Company has significantly reduced capacity through July 2020, thus far, and currently estimates second quarter 2020 capacity to decrease at least 60 percent, year-over-year. The Company will continue to evaluate the need for further schedule adjustments. Based on significant capacity reductions and shelter-in-place restrictions, the Company currently expects the effects of the COVID-19 pandemic to impact its second quarter 2020 financial performance much more significantly than in first quarter 2020. However, due to the uncertain severity and duration of the COVID-19 pandemic, including the impact

35

on the economy, the Company is currently unable to reasonably estimate the future impact on specific operational and financial trends.

In February 2020, the Company announced its intention to begin service to Steamboat Springs, Colorado through the Yampa Valley Regional Airport, beginning winter 2020, subject to requisite governmental approvals. The Company also began service from Houston to Cozumel on March 7, 2020, and on October 8, 2020, the Company is scheduled to begin service from Phoenix to Cabo San Lucas and Puerto Vallarta. The Company suspended international operations beginning in the second half of March, and the Company's international flights remain suspended due to the COVID–19 pandemic. The Company continues to evaluate its international flight offerings and schedules in light of the COVID–19 pandemic.

During February 2020, the Company launched a new accelerated share repurchase program by advancing $500 million to a third party financial institution in a privately negotiated transaction ("first quarter 2020 ASR program"). The Company received 6.4 million shares of common stock pursuant to the first quarter 2020 ASR program, representing 75 percent of the shares originally expected to be repurchased under that ASR program. The third party financial institution exercised its early termination option for the first quarter 2020 ASR program on March 19, 2020, and the Company received $134 million in cash from the third party financial institution as a result of the termination. The Company also received an additional 0.9 million shares of common stock during February 2020 in final settlement of its $550 million fourth quarter 2019 ASR program, launched during fourth quarter 2019 and completed in February 2020. Additionally, the Company also repurchased approximately 1.9 million shares during first quarter 2020 through $85 million in open market transactions. These purchases were recorded as treasury share repurchases for purposes of calculating earnings per share. As of March 31, 2020, the Company had $899 million remaining under its May 2019 $2.0 billion share repurchase authorization. The Company also made cash dividend payments totaling $188 million during first quarter 2020. The Company has suspended dividends and share repurchase programs until further notice.

**Material Changes in Results of Operations**

**Comparison of three months ended March 31, 2020 and March 31, 2019**

**Operating Revenues**

Total operating revenues for first quarter 2020 decreased by $915 million, or 17.8 percent, year-over-year, to $4.2 billion, due primarily to the sharp decline in passenger demand and bookings beginning in late February 2020, combined with an unprecedented level of close-in trip cancellations in March 2020, due to the COVID-19 pandemic. First quarter 2020 RASM was 11.98 cents, and decreased 11.8 percent, driven primarily by a Load factor decrease of 13.3 points, offset slightly by a passenger revenue yield increase of 4.0 percent, all year-over-year. January and February 2020 unit revenues were in line with original expectations for first quarter year-over-year RASM growth in the range of 3.5 to 5.5 percent. With the sudden and severe drop-off in passenger demand caused by COVID-19 concerns, the Load factor for March 2020 was only 46.6 percent, compared with 85.7 percent in March 2019, with a Load factor of approximately 20 percent for the second half of March 2020.

Passenger revenues for first quarter 2020 decreased by $900 million, or 19.0 percent, year-over-year. On a unit basis, Passenger revenues decreased 13.1 percent, year-over-year. The decrease in Passenger revenues on both a dollar and unit basis was primarily due to the impact of the COVID-19 pandemic, which contributed to the sharp decline in passenger demand and bookings, combined with an unprecedented level of close-in trip cancellations in March 2020. During March 2020, there were several days of net negative bookings, where trip cancellations outpaced new passenger bookings.

Freight revenues for first quarter 2020 decreased by $3 million, or 7.1 percent, compared with first quarter 2019, primarily due to fewer trips flown, coupled with disruptions in supply chain which reduced cargo demand.

Other revenues for first quarter 2020 decreased by $12 million, or 3.3 percent, compared with first quarter 2019. The decrease was primarily due to a decrease in income from business partners, driven by the decline in consumer spending due to economic uncertainty and widespread restrictions related to the COVID-19 pandemic.

The Company has continued to experience weak passenger demand and bookings in April 2020, and operating revenues are currently estimated to decrease, year-over-year, in the range of 90 to 95 percent; available seat miles (ASMs, or capacity) are estimated to decrease approximately 60 percent, year-over-year; and Load factor is estimated to be approximately 6 percent. For May 2020, operating revenues are also currently estimated to decrease, year-over-year, in the range of 90 to 95 percent; capacity is estimated to decrease in the range of 60 to 70 percent, year-over-year; and Load factor is estimated to be in the range of 5 to 10 percent. The revenue environment remains uncertain, and the Company is unable to reasonably estimate trends beyond May 2020.

**Operating Expenses**

Operating expenses for first quarter 2020 decreased by $300 million, or 6.5 percent, compared with first quarter 2019, while capacity decreased 6.7 percent over the same period. Historically, except for changes in the price of fuel, changes in Operating expenses for airlines have been largely driven by changes in capacity, or ASMs. However, the Company's Operating expenses are largely fixed once flight schedules are published; the Company has experienced lower ASMs since the MAX groundings on March 13, 2019, as well as lower ASMs due to flight schedule adjustments in March 2020 related to the COVID-19 pandemic. Flight cancellations are expected to drive unit cost pressure for the duration of the MAX groundings and the COVID-19 pandemic, excluding any impacts associated with grants received from the CARES Act. See "Company Overview" above and Note 13 to the unaudited Condensed Consolidated Financial Statements for further information. The following table presents the Company's Operating expenses per ASM for the first quarter of 2020 and 2019, followed by explanations of these changes on a per ASM basis and dollar basis:

| (in cents, except for percentages) | Three months ended March 31, | | Per ASM change | Percent change |
| --- | --- | --- | --- | --- |
| | 2020 | 2019 | | |
| Salaries, wages, and benefits | 5.24¢ | 5.21¢ | 0.03¢ | 0.6 % |
| Fuel and oil | 2.46 | 2.68 | (0.22) | (8.2) |
| Maintenance materials and repairs | 0.77 | 0.77 | — | — |
| Landing fees and airport rentals | 0.96 | 0.88 | 0.08 | 9.1 |
| Depreciation and amortization | 0.88 | 0.78 | 0.10 | 12.8 |
| Other operating expenses | 1.98 | 1.94 | 0.04 | 2.1 |
| Total | 12.29¢ | 12.26¢ | 0.03¢ | 0.2 % |

Operating expenses per ASM for first quarter 2020 increased by 0.2 percent, compared with first quarter 2019. Operating expenses per ASM for first quarter 2020, excluding Fuel and oil expense and profitsharing (a non-GAAP financial measure), increased 5.1 percent, compared with first quarter 2019. See Note Regarding Use of Non-GAAP Financial Measures and the Reconciliation of Reported Amounts to Non-GAAP Financial Measures for additional detail regarding non-GAAP financial measures. The majority of the year-over-year unit cost increase in first quarter 2020 was driven by lower capacity as a result of the ongoing MAX groundings. Additionally, the Company experienced year-over-year unit cost pressure in first quarter 2020 driven by capacity reductions in March 2020 due to the COVID-19 pandemic; however, the Company's proactive measures to reduce spending, combined with the decrease in its variable, flight-driven expenses, substantially offset the incremental unit cost pressure.

Salaries, wages, and benefits expense for first quarter 2020 decreased by $122 million, or 6.2 percent, compared with first quarter 2019. On a per ASM basis, first quarter 2020 Salaries, wages, and benefits expense increased 0.6 percent, compared with first quarter 2019, as the dollar decreases were more than offset by the 6.7 percent decrease in capacity. On a dollar basis, the majority of the decrease was the result of no Profitsharing expense accrual in first quarter 2020 due to the Company's net loss, compared with a Profitsharing accrual of $88 million in first quarter 2019. The Company

37

implemented new voluntary Time Off Without Pay and Emergency Time Off programs at the end of March. The impacts of these programs are expected to reduce Salaries, wages, and benefits expense in second quarter 2020.

Fuel and oil expense for first quarter 2020 decreased by $145 million, or 14.3 percent, compared with first quarter 2019. On a per ASM basis, first quarter 2020 Fuel and oil expense decreased 8.2 percent, compared with first quarter 2019. On both a dollar and per ASM basis, the majority of these decreases were attributable to lower market jet fuel prices and the remainder of the decrease was due to a significant decrease in fuel gallons consumed. The Company's average jet fuel cost per gallon decreased 7.3 percent, year-over-year, to $1.90 for first quarter 2020, from $2.05 for first quarter 2019. These figures include $24 million, or $.05 per gallon, in premium expense and no cash settlements from fuel derivative contracts in first quarter 2020, compared with $28 million, or $.06 per gallon, in premium expense and $.03 per gallon in favorable cash settlements from fuel derivative contracts in first quarter 2019. The recent market decline in fuel prices reduced the Company's first quarter 2020 Fuel and oil expense by approximately $80 million compared with original projections in January 2020. The Company's fuel efficiency improved slightly during first quarter 2020, compared with the same prior year period, when measured on the basis of ASMs generated per gallon of fuel. The ongoing groundings of the Company's most fuel-efficient MAX aircraft continued to have a negative year-over-year impact on ASMs per gallon (fuel efficiency) in first quarter 2020. However, this negative impact on fuel efficiency was more than offset by flight cancellations and Load factor decline in March 2020, due to the COVID-19 pandemic. The Company operated fewer of its oldest, least fuel-efficient 737-700 aircraft due to reduced capacity and, as a result, consumed fewer gallons per ASM in first quarter 2020. These factors, combined, resulted in a slight year-over-year improvement of 0.8 percent in fuel efficiency in first quarter 2020.

As of April 22, 2020, on an economic basis, the Company had derivative contracts in place related to expected future fuel consumption as follows:

| Period | Maximum percent of estimated fuel consumption covered by fuel derivative contracts at varying West Texas Intermediate/Brent Crude Oil, Heating Oil, and Gulf Coast Jet Fuel-equivalent price levels (a) |
|---|---|
| 2020 | (b) |
| 2021 | 55% |
| 2022 | 37% |
| Beyond 2022 | 20% |

(a) The Company's hedge position includes prices at which the Company considers "catastrophic" coverage. The percentages provided are not indicative of the Company's hedge coverage at every price, but represent the highest level of coverage at a single price. See Note 4 to the unaudited Condensed Consolidated Financial Statements for further information.

(b) The Company's fuel hedging portfolio remains unchanged since the Company's previous update on February 3, 2020. Due to uncertainty regarding available seat mile plans for 2020, the Company is not providing an estimate for the percent of fuel consumption covered by derivative contracts. The prior disclosure on February 3, 2020, was 59 percent.

As a result of applying hedge accounting in prior periods, the Company has amounts in Accumulated other comprehensive income (loss) ("AOCI") that will be recognized in earnings in future periods when the underlying fuel derivative contracts settle. The following table displays the Company's estimated fair value of remaining fuel derivative contracts (not considering the impact of the cash collateral provided to or received from counterparties—see Note 4 to the unaudited Condensed Consolidated Financial Statements for further information), as well as the amount of deferred losses in AOCI at March 31, 2020, and the expected future periods in which these items are expected to settle and/or be recognized in earnings (in millions):

38

| Year | Fair value of fuel derivative contracts at March 31, 2020 | | Amount of losses deferred in AOCI at March 31, 2020 (net of tax) | |
|---|---|---|---|---|
| Remainder of 2020 | $ | 4 | $ | (51) |
| 2021 | | 16 | | (63) |
| 2022 | | 32 | | (36) |
| Beyond 2022 | | 33 | | (10) |
| Total | $ | 85 | $ | (160) |

Assuming no changes to the Company's current fuel derivative portfolio, but including all previous hedge activity for fuel derivatives that have not yet settled, and considering only the expected net cash receipts related to hedges that will settle, the Company is providing the below sensitivity table for second quarter 2020 jet fuel prices at different crude oil assumptions as of April 22, 2020, and for expected premium costs associated with settling contracts.

| Average Brent Crude Oil price per barrel | Estimated economic fuel price per gallon, including taxes and fuel hedging premiums (e) | |
|---|---|---|
| | Second Quarter 2020 (c) | Full Year 2020 (d) |
| $15 | $.80 - $.90 | $.85 - $.95 |
| $20 | $.90 - $1.00 | $.95 - $1.05 |
| **Current Market (a)** | **$1.00 - $1.10** | **$1.20 - $1.30** |
| $30 | $1.10 - $1.20 | $1.15 - $1.25 |
| $40 | $1.25 - $1.35 | $1.35 - $1.45 |
| $50 | $1.50 - $1.60 | $1.55 - $1.65 |
| Estimated fuel hedging premium expense per gallon (b) | $.12 | $.05 - $.10 |
| Estimated premium costs (b) | $24 million | $97 million |

(a) Brent crude oil average market prices as of April 22, 2020, were approximately $26 and $35 per barrel for second quarter 2020 and full year 2020, respectively.
(b) Fuel hedging premium expense per gallon is included in the Company's estimated economic fuel price per gallon estimates above. The Company's fuel hedging premium expense remains unchanged since the Company's previous update on February 3, 2020.
(c) Based on the Company's existing fuel derivative contracts and market prices as of April 22, 2020, second quarter 2020 GAAP and economic fuel costs are estimated to be in the $1.00 to $1.10 per gallon range, including fuel hedging premium expense of approximately $24 million, or $.12 per gallon, and no cash settlements from fuel derivative contracts. See Note Regarding Use of Non-GAAP Financial Measures.
(d)Based on the Company's existing fuel derivative contracts and market prices as of April 22, 2020, annual 2020 GAAP and economic fuel costs are estimated to be in the $1.20 to $1.30 per gallon range, including fuel hedging premium expense of approximately $97 million, ranging from $.05 to $.10 per gallon depending on available seat miles, and no cash settlements from fuel derivative contracts. See Note Regarding Use of Non-GAAP Financial Measures.
(e) The Company's current fuel derivative contracts contain a combination of instruments based in West Texas Intermediate and Brent crude oil; however, the economic fuel price per gallon sensitivities provided assume the relationship between Brent crude oil and refined products based on market prices as of April 22, 2020.

Maintenance materials and repairs expense for first quarter 2020 decreased by $21 million, or 7.2 percent, compared with first quarter 2019. On a per ASM basis, Maintenance materials and repairs expense was flat, as the dollar decreases were offset by the 6.7 percent decrease in capacity. On a dollar basis, approximately 60 percent of the decrease was due to the timing of regular airframe maintenance checks, and the majority of the remainder of the decrease was due to lower engine maintenance expense due to decreased flight hours.

Landing fees and airport rentals expense for first quarter 2020 increased by $6 million, or 1.8 percent, compared with first quarter 2019. On a per ASM basis, Landing fees and airport rentals expense increased 9.1 percent, compared with

first quarter 2019, primarily as a result of decreased capacity in response to COVID-19 pandemic. On a dollar basis, the majority of the increases were due to an increase in space rental rates and usage at various stations throughout the network, partially offset by the reduced flight operations in March 2020 as a result of the COVID-19 pandemic.

Depreciation and amortization expense for first quarter 2020 increased by $14 million, or 4.7 percent, compared with first quarter 2019. On a per ASM basis, Depreciation and amortization expense increased 12.8 percent, compared with first quarter 2019, primarily as a result of decreased capacity in response to the COVID-19 pandemic. On a dollar basis, the increase was primarily associated with the deployment of new technology assets.

Other operating expenses for first quarter 2020 decreased by $32 million, or 4.4 percent, compared with first quarter 2019. On a per ASM basis, Other operating expenses increased 2.1 percent, compared with first quarter 2019, as the dollar decreases were more than offset by the 6.7 percent decrease in capacity in response to the COVID-19 pandemic. On a dollar basis, the decrease was primarily due to lower credit card fees driven by a severe reduction in revenues associated with the COVID-19 pandemic. This was partially offset by aircraft rental expense of $57 million in first quarter 2020, as compared to $43 million in first quarter 2019.

**Other**

Other expenses (income) include interest expense, capitalized interest, interest income, and other gains and losses.

Interest expense for first quarter 2020 decreased by $3 million, or 9.7 percent, compared with first quarter 2019, primarily due to lower debt balances in first quarter 2020.

Capitalized interest for first quarter 2020 decreased by $4 million, or 44.4 percent, compared with first quarter 2019, primarily due to Boeing's halt of production of the Company's undelivered MAX aircraft as of January 2020.

Interest income for first quarter 2020 decreased by $6 million, or 26.1 percent, compared with first quarter 2019, primarily due to lower interest rates.

Other (gains) losses, net, primarily includes amounts recorded as a result of the Company's hedging activities. See Note 4 to the unaudited Condensed Consolidated Financial Statements for further information on the Company's hedging activities. The following table displays the components of Other (gains) losses, net, for the three months ended March 31, 2020 and 2019:

| | Three months ended March 31, | | | |
|---|---|---|---|---|
| (in millions) | 2020 | | 2019 | |
| Mark-to-market impact from fuel contracts settling in future periods | $ | 2 | $ | — |
| Mark-to-market impact from interest rate swap agreements | | 24 | | — |
| Other | | 2 | | 2 |
| | $ | 28 | $ | 2 |

**Income Taxes**

The Company's effective tax rate was approximately 34.3 percent in first quarter 2020, compared with 23.1 percent in first quarter 2019. The higher first quarter tax rate is a result of the impact of the Company's current forecasted full year 2020 net loss, which would allow the Company to carry back such losses to claim tax refunds against taxes paid related to the tax years 2015 through 2019, some of which were at higher rates than the current year.

**Reconciliation of Reported Amounts to Non-GAAP Financial Measures (excluding special items) (unaudited)**
**(in millions, except per share amounts and per ASM amounts)**

| | | Three months ended March 31, | | | Percent |
| --- | --- | --- | --- | --- | --- |
| | | 2020 | | 2019 | Change |
| Fuel and oil expense, as reported (a) | $ | 870 | $ | 1,015 | |
| Deduct: Premium cost of fuel contracts | | (24) | | (28) | |
| Add: Fuel hedge gains included in Fuel and oil expense, net | | — | | 17 | |
| Fuel and oil expense, unhedged | $ | 846 | $ | 1,004 | (15.7)% |
| | | | | | |
| Other (gains) losses, net, as reported | $ | 28 | $ | 2 | |
| Deduct: Mark-to-market impact from fuel contracts settling in future periods (b) | | (2) | | — | |
| Deduct: Mark-to-market impact from interest rate swap agreements | | (24) | | — | |
| Other (gains) losses, net, excluding special items | $ | 2 | $ | 2 | — |
| | | | | | |
| Net income (loss), as reported | $ | (94) | $ | 387 | |
| Add: Mark-to-market impact from fuel contracts settling in future periods (b) | | 2 | | — | |
| Add: Mark-to-market impact from interest rate swap agreements | | 24 | | — | |
| Deduct: Net income (loss) tax impact of special items (c) | | (9) | | — | |
| Net income (loss), excluding special items | $ | (77) | $ | 387 | n.m. |
| | | | | | |
| Net income (loss) per share, diluted, as reported | $ | (0.18) | $ | 0.70 | |
| Add: Impact of special items | | 0.05 | | — | |
| Deduct: Net income (loss) tax impact of special items (c) | | (0.02) | | — | |
| Net income (loss) per share, diluted, excluding special items | $ | (0.15) | $ | 0.70 | n.m. |
| | | | | | |
| Operating expenses per ASM (cents) | | 12.29¢ | | 12.26¢ | |
| Deduct: Fuel and oil expense divided by ASMs | | (2.46) | | (2.68) | |
| Deduct: Profitsharing expense divided by ASMs | | — | | (0.23) | |
| Operating expenses per ASM, excluding Fuel and oil expense and profitsharing (cents) | | 9.83¢ | | 9.35¢ | 5.1% |

(a) There were no adjustments in either period presented resulting in a difference between the Company's GAAP (as reported) results and its economic Fuel and oil expense. See the Note Regarding the Use of Non–GAAP Financial Measures.
(b) Includes $2 million of losses that were reclassified from AOCI into Other (gains) losses, net. See Note 4 to the unaudited Condensed Consolidated Financial Statements for further information.
(c) Tax amounts for each individual special item are calculated at the Company's effective rate for the applicable period and totaled in this line item.

**Non-GAAP Return on Invested Capital (ROIC) (in millions) (unaudited)**

| | | Twelve months ended March 31, 2020 | | Twelve months ended March 31, 2019 | |
|---|---|---|---|---|---|
| Operating income, as reported | $ | 2,343 | $ | 3,094 | |
| Net impact from fuel contracts | | — | | (7) | |
| Operating income, non-GAAP | $ | 2,343 | $ | 3,087 | |
| Net adjustment for aircraft leases (a) | | 134 | | 102 | |
| Adjusted operating income, non-GAAP (A) | $ | 2,477 | $ | 3,189 | |
| | | | | | |
| Non-GAAP tax rate (B) | | 21.4% | (d) | 22.1% | (e) |
| | | | | | |
| Net operating profit after-tax, NOPAT (A* (1-B) = C) | $ | 1,947 | $ | 2,486 | |
| | | | | | |
| Debt, including finance leases (b) | $ | 3,412 | $ | 3,422 | |
| Equity (b) | | 9,714 | | 9,883 | |
| Net present value of aircraft operating leases (b) | | 492 | | 566 | |
| Average invested capital | $ | 13,618 | $ | 13,871 | |
| Equity adjustment for hedge accounting (c) | | 42 | | (169) | |
| Adjusted average invested capital (D) | $ | 13,660 | $ | 13,702 | |
| | | | | | |
| Non-GAAP ROIC, pre-tax (A/D) | | 18.1% | | 23.3% | |
| | | | | | |
| Non-GAAP ROIC, after tax (C/D) | | 14.3% | | 18.1% | |

(a) Net adjustment related to presumption that all aircraft in fleet are owned (i.e., the impact of eliminating aircraft rent expense and replacing with estimated depreciation expense for those same aircraft). The Company makes this adjustment to enhance comparability to other entities that have different capital structures by utilizing alternative financing decisions.

(b) Calculated as an average of the five most recent quarter end balances or remaining obligations. The Net present value of aircraft operating leases represents the assumption that all aircraft in the Company's fleet are owned, as it reflects the remaining contractual commitments discounted at the Company's estimated incremental borrowing rate as of the time each individual lease was signed.

(c) The Equity adjustment for hedge accounting in the denominator adjusts for the cumulative impacts, in AOCI and Retained earnings, of gains and/or losses associated with hedge accounting related to fuel hedge derivatives that will settle in future periods. The current period impact of these gains and/or losses is reflected in the Net impact from fuel contracts in the numerator.

(d) The GAAP twelve month rolling tax rate as of March 31, 2020, was 21.3 percent, and the Non-GAAP twelve month rolling tax rate was 21.4 percent. Utilizing either rate would have resulted in the same Non-GAAP ROIC, after-tax, for the twelve months ended March 31, 2020. See Note Regarding Use of Non-GAAP Financial Measures for additional information.

(e) The GAAP twelve month rolling tax rate as of March 31, 2019, was 22.1 percent, and the Non-GAAP twelve month rolling tax rate was also 22.1 percent. See Note Regarding Use of Non-GAAP Financial Measures for additional information.

42

**Note Regarding Use of Non-GAAP Financial Measures**

The Company's unaudited Condensed Consolidated Financial Statements are prepared in accordance with accounting principles generally accepted in the United States ("GAAP"). These GAAP financial statements may include (i) unrealized noncash adjustments and reclassifications, which can be significant, as a result of accounting requirements and elections made under accounting pronouncements relating to derivative instruments and hedging and (ii) other charges and benefits the Company believes are unusual and/or infrequent in nature and thus may make comparisons to its prior or future performance difficult.

As a result, the Company also provides financial information in this filing that was not prepared in accordance with GAAP and should not be considered as an alternative to the information prepared in accordance with GAAP. The Company provides supplemental non-GAAP financial information (also referred to as "excluding special items"), including results that it refers to as "economic," which the Company's management utilizes to evaluate its ongoing financial performance and the Company believes provides additional insight to investors as supplemental information to its GAAP results. The non-GAAP measures provided that relate to the Company's performance on an economic fuel cost basis include Fuel and oil expense, unhedged; Other (gains) losses, net, non-GAAP; Net income (loss), non-GAAP; Net income (loss) per share, diluted, non-GAAP; Operating expenses per ASM, excluding Fuel and oil expense and profitsharing (cents); Operating income, non-GAAP; Adjusted operating income, non-GAAP; and twelve month rolling income tax rate, non-GAAP. The Company's economic Fuel and oil expense results differ from GAAP results in that they only include the actual cash settlements from fuel hedge contracts - all reflected within Fuel and oil expense in the period of settlement. Thus, Fuel and oil expense on an economic basis has historically been utilized by the Company, as well as some of the other airlines that utilize fuel hedging, as it reflects the Company's actual net cash outlays for fuel during the applicable period, inclusive of settled fuel derivative contracts. Any net premium costs paid related to option contracts that are designated as hedges are reflected as a component of Fuel and oil expense, for both GAAP and non-GAAP (including economic) purposes in the period of contract settlement. The Company believes these economic results provide further insight on the impact of the Company's fuel hedges on its operating performance and liquidity since they exclude the unrealized, noncash adjustments and reclassifications that are recorded in GAAP results in accordance with accounting guidance relating to derivative instruments, and they reflect all cash settlements related to fuel derivative contracts within Fuel and oil expense. This enables the Company's management, as well as investors and analysts, to consistently assess the Company's operating performance on a year-over-year or quarter-over-quarter basis after considering all efforts in place to manage fuel expense. However, because these measures are not determined in accordance with GAAP, such measures are susceptible to varying calculations, and not all companies calculate the measures in the same manner. As a result, the aforementioned measures, as presented, may not be directly comparable to similarly titled measures presented by other companies.

Further information on (i) the Company's fuel hedging program, (ii) the requirements of accounting for derivative instruments, and (iii) the causes of hedge ineffectiveness and/or mark-to-market gains or losses from derivative instruments is included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2019 and Note 4 to the unaudited Condensed Consolidated Financial Statements.

The Company's GAAP results in the applicable periods may include other charges or benefits that are also deemed "special items," that the Company believes make its results difficult to compare to prior periods, anticipated future periods, or industry trends. Financial measures identified as non-GAAP (or as excluding special items) have been adjusted to exclude special items. For the periods presented, in addition to the items discussed above, special items include a $24 million unrealized loss recorded to Other (gains) and losses, net, in the unaudited Condensed Consolidated Statement of Comprehensive Income (Loss), related to nine forward-starting interest rate swap agreements. During first quarter 2020, the interest rate swap agreements, which were related to nine 737 MAX 8 aircraft leases (with deliveries originally scheduled between June 2020 and September 2020), were de-designated due to the scheduled delivery range no longer being probable, resulting in the mark-to-market changes being recorded to earnings.

Because management believes special items can distort the trends associated with the Company's ongoing performance as an airline, the Company believes that evaluation of its financial performance can be enhanced by a supplemental presentation of results that exclude the impact of special items in order to enhance consistency and comparativeness

43

with results in prior periods that do not include such items and as a basis for evaluating operating results in future periods. The following measures are often provided, excluding special items, and utilized by the Company's management, analysts, and investors to enhance comparability of year-over-year results, as well as to industry trends: Other (gains) losses, net, non-GAAP; Net income (loss), non-GAAP; Net income (loss) per share, diluted, non-GAAP; Operating expenses per ASM, excluding Fuel and oil expense and profitsharing (cents); Operating income, non-GAAP; Adjusted operating income, non-GAAP; and twelve month rolling income tax rate, non-GAAP.

The Company has also provided its calculation of return on invested capital, which is a measure of financial performance used by management to evaluate its investment returns on capital. Return on invested capital is not a substitute for financial results as reported in accordance with GAAP, and should not be utilized in place of such GAAP results. Although return on invested capital is not a measure defined by GAAP, it is calculated by the Company, in part, using non-GAAP financial measures. Those non-GAAP financial measures are utilized for the same reasons as those noted above for Net income, non-GAAP and Operating income, non-GAAP. The comparable GAAP measures include charges or benefits that are deemed "special items" that the Company believes make its results difficult to compare to prior periods, anticipated future periods, or industry trends, and the Company's profitability targets and estimates, both internally and externally, are based on non-GAAP results since in the vast majority of cases the "special items" cannot be reliably predicted or estimated. The Company believes non-GAAP return on invested capital is a meaningful measure because it quantifies the Company's effectiveness in generating returns relative to the capital it has invested in its business. Although return on invested capital is commonly used as a measure of capital efficiency, definitions of return on invested capital differ; therefore, the Company is providing an explanation of its calculation for non-GAAP return on invested capital in the accompanying reconciliation, in order to allow investors to compare and contrast its calculation to the calculations provided by other companies.

44

**Liquidity and Capital Resources**

The enormous impact of the COVID-19 pandemic on the U.S. travel industry created an urgent liquidity crisis for the entire airline industry, including the Company. However, due to the Company's low balance sheet leverage, large base of unencumbered assets, and investment grade credit ratings, the Company has been able to quickly access additional liquidity during March and April 2020, as Customer cancellations spiked and sales and revenues dropped while the Company continued to experience significant fixed operating expenses. See Notes 2 and 13 to the unaudited Condensed Consolidated Financial Statements for further information regarding the impact of the COVID-19 pandemic, as well as the transactions completed, assistance obtained and available to the Company under the CARES Act, and measures taken subsequent to March 31, 2020. See Note 8 to the unaudited Condensed Consolidated Financial Statements for further information on the Company's debt agreements. Much uncertainty remains about the time it will take for air travel demand to recover, and the Company continues to assess its immediate and near-term liquidity needs. As of April 24, 2020, the Company had increased its Cash, cash equivalents, and short-term investments to approximately $9.3 billion, compared to the $5.5 billion in such balances as of March 31, 2020. The Company also continues to pursue and assess various sources and options including public, private, and government debt and equity securities to bolster its liquidity and believes that, given current market conditions, it has opportunities to do so.

Net cash used in operating activities was $377 million for the three months ended March 31, 2020, compared with $1.1 billion provided by operating activities in the same prior year period. The operating cash flows for the three months ended March 31, 2020, were affected primarily by a $1.3 billion decrease in Accounts payable and accrued expenses, primarily due to the Company's payout of its 2019 $667 million ProfitSharing distribution to Employees, as well as a significant decline in amounts payable for passenger excise taxes and segment fees as a result of the March drop in passenger ticket sales. These were partially offset by a $701 million increase in Air traffic liability. The increase in Air traffic liability resulted from January and February 2020 bookings, which were then significantly impacted by a decline in Customer demand and increased trip cancellations attributable to concerns relating to the COVID-19 pandemic, primarily in March 2020. For the three months ended March 31, 2019, in addition to the Company's Net income (as adjusted for noncash items), there was a $944 million increase in Air traffic liability as a result of bookings for future travel and sales of loyalty points to business partners. Net cash provided by operating activities is primarily used to finance capital expenditures, repay debt, and provide working capital. Historically, the Company has also used net cash provided by operations to fund stock repurchases and pay dividends; however these shareholder return activities have been suspended due to restrictions associated with the CARES Act. See Note 2 to the unaudited Condensed Consolidated Financial Statements for further information.

Net cash used in investing activities was $5 million during the three months ended March 31, 2020, compared with $164 million provided by investing activities in the same prior year period. Investing activities in both years included Capital expenditures, and changes in the balance of the Company's short-term and noncurrent investments. The Company received $300 million of Supplier proceeds during the three months ended March 31, 2020, which the Company considers an offset to its annual 2020 aircraft capital expenditures. The Company has received an additional $128 million of Supplier proceeds in second quarter 2020. See Note 12 to the unaudited Condensed Consolidated Financial Statements for further information. During the three months ended March 31, 2020, Capital expenditures were $224 million, the majority of which included ongoing technology projects and progress payments related to new aircraft to be delivered to the Company. This compared with $160 million in Capital expenditures during the same prior year period, the majority of which were due to ongoing technology projects. Capital expenditures increased, year-over-year, largely due to an increase in progress payments in first quarter 2020. The majority of capital investment projects originally planned for 2020 have been canceled or deferred, and thus far, the Company has reduced its annual 2020 capital spending more than $1 billion, compared with original plans. In light of the current environment, the Company and Boeing recently agreed to an arrangement requiring the Company to take delivery of no more than 48 aircraft from Boeing through December 31, 2021. The Company and Boeing have agreed to make reasonable efforts in coming months to agree to a new delivery schedule that reflects this arrangement. The Company will continue collaborating with Boeing to review its aircraft order book, and make any further adjustments to the delivery schedule and its capital expenditures as circumstances related to the MAX groundings and COVID-19 pandemic evolve. See Note 2 to the unaudited Condensed Consolidated Financial Statements for further information on the impacts of the COVID-19 pandemic. During the three months ended March 31, 2020, the Company's transactions in short-term and

45

noncurrent investments resulted in a net cash outflow of $81 million, compared with a $324 million inflow during the same prior year period.

Net cash provided by financing activities was $1.8 billion during the three months ended March 31, 2020, compared with $779 million used in financing activities for the same prior year period. During the three months ended March 31, 2020, the Company borrowed $2.5 billion, including $1.0 billion through the 364-day term loan credit facility agreement (the "364–Day Credit Agreement"), $1.0 billion under its existing $1.0 billion revolving credit facility expiring in August 2022 (the "Revolving Credit Agreement"), and $500 million through 2.65% senior unsecured notes due 2030. See Note 8 to the unaudited Condensed Consolidated Financial Statements for further information on the Company's debt agreements. The Company also repurchased $451 million of its outstanding common stock through the First Quarter 2020 ASR Program and open market share repurchases, paid $188 million in cash dividends to Shareholders, and repaid $78 million in debt and finance lease obligations. The Company expects to repay approximately $741 million in debt and finance lease obligations in the remainder of 2020. During the three months ended March 31, 2019, the Company repurchased $500 million of its outstanding common stock through an accelerated share repurchase program, paid $178 million in cash dividends to Shareholders, and repaid $99 million in debt and finance lease obligations.

The Company currently estimates its average daily cash burn to be in the range of $30 million to $35 million in second quarter 2020, compared with its original expectations, prior to the COVID-19 pandemic, in the range of $60 million to $65 million. The Company is evaluating additional measures to further improve its cash burn. Average daily cash burn is calculated as the sum of cash outflows, capital expenditures, and debt service obligations without impacts from cash sales, refunds, or proceeds from financing transactions and the Payroll Support Program.

The Company is a "well-known seasoned issuer" and has an effective shelf registration statement registering an indeterminate amount of debt and equity securities for future sales. The Company currently intends to use the proceeds from any future securities sales off this shelf registration statement for general corporate purposes or for repayment of the 364-Day Credit Agreement, as required therein.

On March 17, 2020, Moody's downgraded the Company's credit ratings to "Baa1" from "A3." On March 18, 2020, Standard & Poor's downgraded the Company's credit ratings to "BBB" from "BBB+." On April 10, 2020, Fitch downgraded the Company's credit ratings to "BBB+" from "A-." The downgrades of the Company's investment grade ratings were based on the Company's increased level of credit risk as a result of the financial impacts of the COVID-19 pandemic. See Note 2 to the unaudited Condensed Consolidated Financial Statements for further information on the impacts of the COVID-19 pandemic.

During February 2020, the Company issued $500 million senior unsecured notes due 2030. The notes bear interest at 2.625 percent. Interest is payable semi-annually in arrears on February 10 and August 10, beginning in 2020.

On March 16, 2020, the Company drew down $1.0 billion under the Revolving Credit Agreement. On March 30, 2020, the Company amended the agreement by providing a security interest in certain aircraft and related assets to the lenders (the "Amended and Restated Revolving Credit Agreement"). The Amended and Restated Revolving Credit Agreement has an accordion feature that would allow the Company, subject to, among other things, the procurement of incremental commitments, to increase the size of the facility to $1.5 billion. Interest on the Amended and Restated Revolving Credit Agreement is based on the Company's credit ratings at the time of borrowing. At the Company's current ratings, the interest cost would be LIBOR plus a spread of 200 basis points, with a LIBOR floor of 1 percent. The Amended and Restated Revolving Credit Agreement contains a financial covenant requiring the Company to maintain a minimum liquidity level of $2.5 billion in addition to, at all times after March 31, 2021, a minimum coverage ratio of adjusted pre-tax income to fixed obligations, as defined. As of March 31, 2020, the Company was in compliance with the liquidity covenant and $1.0 billion was outstanding under the Amended and Restated Revolving Credit Agreement. See Note 8 to the unaudited Condensed Consolidated Financial Statements for further information on the Company's debt agreements.

46

On March 12, 2020, the Company entered into the 364-day Credit Agreement with a syndicate of lenders identified in the 364-Day Credit Agreement that was drawn in full on the closing date. On March 30, 2020, the Company amended and restated the 364-Day Credit Agreement (the "Amended and Restated 364-Day Credit Agreement") with a syndicate of lenders identified in the Amended and Restated 364-Day Credit Agreement to add additional term loan commitments of $2.3 billion, add an uncommitted accordion increase provision to permit additional term loans in an aggregate amount not to exceed $417 million, amend the pricing, amend certain covenants, add certain covenants, and provide for the grant of a security interest in certain aircraft and related assets. The additional $2.3 billion available in the Amended and Restated 364-Day Credit Agreement was fully drawn on April 1, 2020, and matures in full on March 29, 2021. On April 24, 2020, the Company received another $350 million in funds pursuant to its approximately $417 million accordion provision as part of the 364-day term loan agreement. The Company has approximately $67 million remaining under this provision. The amended facility contains a financial covenant requiring the Company to maintain a minimum liquidity level of $2.5 billion in addition to, at all times after March 31, 2021, a minimum coverage ratio of adjusted pre-tax income to fixed obligations, as defined. As of March 31, 2020, the Company was in compliance with the liquidity covenant. The Amended and Restated 364-Day Credit Agreement is subject to mandatory prepayment requirements with the net proceeds of certain capital market transactions that may occur prior to its maturity. See Note 8 to the unaudited Condensed Consolidated Financial Statements for further information on the Company's debt agreements.

During first quarter 2020, the Company launched the First Quarter 2020 ASR Program, resulting in 6.4 million shares being received for $366 million. During the quarter, the Company also repurchased $85 million of its shares of common stock on the open market. These purchases were recorded as treasury share repurchases for purposes of calculating earnings per share. As of March 31, 2020, the Company had $899 million remaining under its May 2019 $2.0 billion share repurchase authorization. The Company has suspended dividends and share repurchase programs until further notice.

The Company routinely carries a working capital deficit, in which its current liabilities exceed its current assets. This is common within the airline industry and is primarily due to the nature of the Air traffic liability account, which is related to advance ticket sales, unused funds available to Customers, and loyalty deferred revenue, which are performance obligations for future Customer flights, do not require future settlement in cash, and are mostly nonrefundable. See Note 6 to the unaudited Condensed Consolidated Financial Statements for further information. The Company has various options available to meet its capital and operating commitments, including unrestricted cash and short-term investments of $5.5 billion as of March 31, 2020, and anticipated future internally generated funds from operations. However, the COVID-19 pandemic continues to rapidly evolve and could have a material adverse impact on the Company's ability to meet its capital and operating commitments. See Note 2 to the unaudited Condensed Consolidated Financial Statements for further information on the impacts of the COVID-19 pandemic. The Company will continue to consider various financing options to maximize liquidity and supplement cash requirements, as necessary.

**Contractual Obligations and Contingent Liabilities and Commitments**

In light of the current environment, the Company and Boeing recently agreed to an arrangement requiring the Company to take delivery of no more than 48 aircraft from Boeing through December 31, 2021. While the Company and Boeing have agreed to make reasonable efforts in coming months to agree to a new delivery schedule that reflects this arrangement, the delivery schedule below reflects existing contractual commitments. In addition to the firm deliveries from Boeing, the Company has existing agreements with various third parties to lease 16 MAX aircraft to be delivered in 2020 according to the current delivery schedule. The Company will continue collaborating with Boeing to review its aircraft order book and make any further adjustments to the delivery schedule as circumstances related to the MAX groundings and COVID-19 pandemic evolve. The Company offers no assurances that current estimations and timelines are correct.

As of March 31, 2020, the Company had firm deliveries and options for Boeing 737 MAX 7 and 737 MAX 8 aircraft as follows:

| | The Boeing Company | | | | |
| | MAX 7 Firm Orders | MAX 8 Firm Orders | MAX 8 Options | Additional MAX 8s | Total |
|---|---|---|---|---|---|
| 2020 | 7 | 55 | — | 16 | 78 (a) |
| 2021 | — | 45 | — | — | 45 (b) |
| 2022 | — | 27 | 14 | — | 41 |
| 2023 | 12 | 22 | 23 | — | 57 |
| 2024 | 11 | 30 | 23 | — | 64 |
| 2025 | — | 40 | 36 | — | 76 |
| 2026 | — | — | 19 | — | 19 |
| | 30 | 219 (c) | 115 | 16 (d) | 380 |

(a) 2020 Contractual Detail

| | The Boeing Company | | | |
| | MAX 7 Firm Orders | MAX 8 Firm Orders | Additional MAX 8s | Total |
|---|---|---|---|---|
| 2019 Contractual Deliveries | 7 | 20 | 13 | 40 |
| 2020 Contractual Deliveries | — | 35 | 3 | 38 |
| 2020 Contractual Total | 7 | 55 | 16 | 78 |

2020 total contractual deliveries include 40 contractual aircraft that the Company expected to be delivered in 2019, but were not received due to the MAX groundings.

(b) Includes one contractual aircraft delivery that shifted from 2019 to 2021.
(c) The Company has flexibility to substitute 737 MAX 7 in lieu of 737 MAX 8 firm orders, upon written advance notification as stated in the contract.
(d) To be acquired in leases from various third parties.

Based on the Company's contractual obligations as of March 31, 2020, and shifting the 40 aircraft undelivered in 2019 into 2020, the Company's capital commitments associated with these firm orders are as follows: $2.1 billion remaining in 2020, $1.7 billion in 2021, $1.2 billion in 2022, $1.6 billion in 2023, $1.9 billion in 2024, and $1.5 billion thereafter. The Company's aircraft spending could be further impacted by the status of the grounding of the MAX aircraft, as all MAX deliveries are suspended until the FAA order is rescinded. The timeline of future deliveries is uncertain.

For aircraft commitments with Boeing, the Company is required to make cash deposits toward the purchase of aircraft in advance. These deposits are classified as Deposits on flight equipment purchase contracts in the unaudited Condensed Consolidated Balance Sheet until the aircraft is delivered, at which time deposits previously made are deducted from the final purchase price of the aircraft and are reclassified as Flight equipment.

The following table details information on the aircraft in the Company's fleet as of March 31, 2020:

| Type | Seats | Average Age (Yrs) | Number of Aircraft | | Number Owned | Number Leased |
|---|---|---|---|---|---|---|
| 737-700 | 143 | 16 | 501 | (a) | 391 | 110 |
| 737-800 | 175 | 5 | 207 | | 200 | 7 |
| 737 MAX 8 | 175 | 2 | 34 | (b) | 31 | 3 |
| Totals | | 12 | 742 | | 622 | 120 |

(a) Included 93 Boeing 737 Next Generation aircraft removed from active fleet and placed in long-term storage as of March 31, 2020.
(b) All 34 of the Company's MAX 8 aircraft were grounded as of March 13, 2019, to comply with an FAA emergency order issued for all U.S. airlines to ground all MAX aircraft. See Note 12 to the unaudited Condensed Consolidated Financial Statements for further information.

**Cautionary Statement Regarding Forward-Looking Statements**

This Form 10-Q contains "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Forward-looking statements are based on, and include statements about, the Company's estimates, expectations, beliefs, intentions, and strategies for the future, and the assumptions underlying these forward-looking statements. Specific forward-looking statements can be identified by the fact that they do not relate strictly to historical or current facts and include, without limitation, statements related to the following:

- the Company's financial outlook, goals, expectations, and projected results of operations, including factors and assumptions underlying the Company's projections, in particular assumptions regarding the impact of the COVID-19 pandemic, and the MAX groundings and the timing of the MAX return to service;
- the Company's expectations about future receipts pursuant to the Payroll Support Program under the CARES Act;
- the Company's plans and expectations regarding its fleet, its fleet order book, and its fleet delivery schedule, including factors and assumptions underlying the Company's plans and expectations, in particular the impacts of the COVID-19 pandemic and the MAX groundings;
- the Company's plans and expectations related to the return of the MAX to service;
- the Company's capacity plans and expectations, including factors and assumptions underlying the Company's plans and expectations, in particular the impacts of the COVID-19 pandemic;
- the Company's network plans;
- the Company's plans, expectations, and estimates related to fuel costs and the Company's related management of risk associated with changing jet fuel prices, including the assumptions underlying the estimates;
- the Company's expectations with respect to capital expenditures and liquidity, including its ability to meet its ongoing capital, operating, and other obligations, and the Company's anticipated needs for, and sources of, funds;
- the Company's assessment of market risks; and
- the Company's plans and expectations related to legal and regulatory proceedings.

While management believes these forward-looking statements are reasonable as and when made, forward-looking statements are not guarantees of future performance and involve risks and uncertainties that are difficult to predict. Therefore, actual results may differ materially from what is expressed in or indicated by the Company's forward-looking statements or from historical experience or the Company's present expectations. Factors that could cause these differences include, among others:

- the extent of the impact of the COVID-19 pandemic, including the duration, spread, severity, and any recurrence of the COVID-19 pandemic, the duration and scope of related government orders and restrictions, and the extent of the impact of the COVID-19 pandemic on overall demand for air travel and the Company's access to capital;
- the impact of fears or actual outbreaks of infectious disease, economic conditions, governmental actions, extreme or severe weather and natural disasters, fears of terrorism or war, actions of competitors, fuel prices, consumer perception, and other factors beyond the Company's control, on consumer behavior and the Company's results of operations and business decisions, plans, strategies, and results;
- the U.S. Treasury's right pursuant to the Payroll Support Program to amend the documents or require new or additional conditions of the payroll support in ways that may be materially adverse to the Company;
- the enactment or adoption of future laws, statutes, and regulations and interpretation or enforcement of current and future laws, statutes, and regulations that affect the terms or application of the Payroll Support Program documents and that may have a material adverse effect on the Company;
- the Company's dependence on Boeing and the Federal Aviation Administration with respect to the timing of the return of the 737 MAX to service and any related changes to the Company's operational and financial assumptions and decisions;
- the Company's dependence on Boeing with respect to the Company's fleet order book and delivery schedule;
- the Company's dependence on other third parties, and the impact on the Company's operations and results of operations of any third party delays or non-performance;

50

- the impact of fuel price changes, fuel price volatility, volatility of commodities used by the Company for hedging jet fuel, and any changes to the Company's fuel hedging strategies and positions, on the Company's business plans and results of operations;
- the impact of labor matters on the Company's results of operations, business decisions, plans, and strategies; and
- other factors as set forth in the Company's filings with the Securities and Exchange Commission, including the detailed factors discussed under the heading "Risk Factors" in the Company's Annual Report on Form 10-K for the year ended December 31, 2019, and in this Quarterly Report on Form 10-Q for the quarter ended March 31, 2020.

Caution should be taken not to place undue reliance on the Company's forward-looking statements, which represent the Company's views only as of the date this report is filed. The Company undertakes no obligation to update publicly or revise any forward-looking statement, whether as a result of new information, future events or otherwise.

51

**Item 3.** Quantitative and Qualitative Disclosures About Market Risk

*Hedging*

As discussed in Note 4 to the unaudited Condensed Consolidated Financial Statements, the Company endeavors to acquire jet fuel at the lowest possible price and to reduce volatility in operating expenses through its fuel hedging program with the use of financial derivative instruments. At March 31, 2020, the estimated fair value of outstanding contracts was an asset of $85 million.

The Company's credit exposure related to fuel derivative instruments is represented by the fair value of contracts that are in an asset position to the Company. At such times, these outstanding instruments expose the Company to credit loss in the event of nonperformance by the counterparties to the agreements. As of March 31, 2020, the Company had agreements with nine counterparties with respect to which the derivatives held were an asset. To manage credit risk, the Company selects and periodically reviews counterparties based on credit ratings, limits its exposure with respect to each counterparty, and monitors the market position of the fuel hedging program and its relative market position with each counterparty. However, if one or more of these counterparties were in a liability position to the Company and were unable to meet their obligations, any open derivative contracts with the counterparty could be subject to early termination, which could result in substantial losses for the Company. At March 31, 2020, the Company had agreements with all of its active counterparties containing early termination rights and/or bilateral collateral provisions whereby security is required if market risk exposure exceeds a specified threshold amount based on the counterparty's credit rating. The Company also had agreements with counterparties in which cash deposits and/or letters of credit are required to be posted as collateral whenever the net fair value of derivatives associated with those counterparties exceeds specific thresholds.

At March 31, 2020, $20 million in cash collateral deposits were held by the Company from counterparties based on its outstanding fuel derivative instrument portfolio. Due to the types of derivatives held as of March 31, 2020, the Company does not have cash collateral exposure. See Note 4 to the unaudited Condensed Consolidated Financial Statements.

The Company is also subject to the risk that the fuel derivatives it uses to hedge against fuel price volatility do not provide adequate protection. The Company has found that financial derivative instruments in commodities, such as West Texas Intermediate crude oil, Brent crude oil, and refined products, such as heating oil and unleaded gasoline, can be useful in decreasing its exposure to jet fuel price volatility. In addition, to add further protection, the Company may periodically enter into jet fuel derivatives for short-term timeframes. Jet fuel is not widely traded on an organized futures exchange and, therefore, there are limited opportunities to hedge directly in jet fuel for time horizons longer than approximately 24 months into the future.

*Financial Market Risk*

The Company is also subject to the risk that it cannot meet the covenants of the Amended and Restated Revolving Credit Agreement and the Amended and Restated 364–Day Credit Agreement. The Amended and Restated Revolving Credit Agreement and the Amended and Restated 364–Day Credit Agreement each contain a financial covenant requiring the Company to maintain a minimum liquidity level of $2.5 billion in addition to, at all times after March 31, 2021, a minimum coverage ratio of adjusted pre-tax income to fixed obligations, as defined. As of March 31, 2020, the Company was in compliance with the liquidity covenant. See Note 8 to the unaudited Condensed Consolidated Financial Statements for further information on the Company's debt agreements.

The Company currently has agreements with organizations that process credit card transactions arising from purchases of air travel tickets by its Customers utilizing American Express, Discover, and MasterCard/VISA. Credit card processors have financial risk associated with tickets purchased for travel because the processor generally forwards the cash related to the purchase to the Company soon after the purchase is completed, but the air travel generally occurs after that time; therefore, the processor will have liability if the Company does not ultimately provide the air travel.

Under these processing agreements, and based on specified conditions, increasing amounts of cash reserves could be required to be posted with the counterparty. There was no cash reserved for this purpose as of March 31, 2020.

A majority of the Company's sales transactions are processed by Chase Paymentech. Should chargebacks processed by Chase Paymentech reach a certain level, proceeds from advance ticket sales could be held back and used to establish a reserve account to cover such chargebacks and any other disputed charges that might occur. Additionally, cash reserves are required to be established if the Company's credit rating falls to specified levels below investment grade. Cash reserve requirements are based on the Company's public debt rating and a corresponding percentage of the Company's Air traffic liability. As of March 31, 2020, no holdbacks are in place.

See Item 7A "Quantitative and Qualitative Disclosures About Market Risk" in the Company's Annual Report on Form 10-K for the year ended December 31, 2019, for further information about market risk, and Note 4 to the unaudited Condensed Consolidated Financial Statements in this Form 10-Q for further information about the Company's fuel derivative instruments.

53

**Item 4.** Controls and Procedures

Disclosure Controls and Procedures

The Company maintains disclosure controls and procedures (as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934 (the "Exchange Act")) designed to provide reasonable assurance that the information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the Securities and Exchange Commission's rules and forms. These include controls and procedures designed to ensure that this information is accumulated and communicated to the Company's management, including its Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. Management, with the participation of the Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures as of March 31, 2020. Based on this evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective as of March 31, 2020, at the reasonable assurance level.

Changes in Internal Control over Financial Reporting

There were no changes in the Company's internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) during the fiscal quarter ended March 31, 2020, that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

PART II. OTHER INFORMATION

**Item 1.**    Legal Proceedings

On June 30, 2015, the U.S. Department of Justice ("DOJ") issued a Civil Investigative Demand ("CID") to the Company. The CID seeks information and documents about the Company's capacity from January 2010 to the date of the CID, including public statements and communications with third parties about capacity. In June 2015, the Company also received a letter from the Connecticut Attorney General requesting information about capacity. The Company is cooperating fully with the DOJ CID and the state inquiry.

Further, on July 1, 2015, a complaint was filed in the United States District Court for the Southern District of New York on behalf of putative classes of consumers alleging collusion among the Company, American Airlines, Delta Air Lines, and United Airlines to limit capacity and maintain higher fares in violation of Section 1 of the Sherman Act. Since then, a number of similar class action complaints were filed in the United States District Courts for the Central District of California, the Northern District of California, the District of Columbia, the Middle District of Florida, the Southern District of Florida, the Northern District of Georgia, the Northern District of Illinois, the Southern District of Indiana, the Eastern District of Louisiana, the District of Minnesota, the District of New Jersey, the Eastern District of New York, the Southern District of New York, the Middle District of North Carolina, the District of Oklahoma, the Eastern District of Pennsylvania, the Northern District of Texas, the District of Vermont, and the Eastern District of Wisconsin. On October 13, 2015, the Judicial Panel on Multi-District Litigation centralized the cases to the United States District Court in the District of Columbia. On March 25, 2016, the plaintiffs filed a Consolidated Amended Complaint in the consolidated cases alleging that the defendants conspired to restrict capacity from 2009 to present. The plaintiffs seek to bring their claims on behalf of a class of persons who purchased tickets for domestic airline travel on the defendants' airlines from July 1, 2011 to present. They seek treble damages, injunctive relief, and attorneys' fees and expenses. On May 11, 2016, the defendants moved to dismiss the Consolidated Amended Complaint, and on October 28, 2016, the Court denied this motion. On December 20, 2017, the Company reached an agreement to settle these cases with a proposed class of all persons who purchased domestic airline transportation services from July 1, 2011, to the date of the settlement. The Company agreed to pay $15 million and to provide certain cooperation with the plaintiffs as set forth in the settlement agreement. The Court granted preliminary approval of the settlement on January 3, 2018, and the plaintiffs provided notice to the proposed settlement class. The Court held a fairness hearing on March 22, 2019, and it issued an order granting final approval of the settlement on May 9, 2019. On June 10, 2019, three objectors filed notices of appeal to the United States Court of Appeals for the District of Columbia Circuit. Two of the objectors dismissed their appeals, and the Company and the other settling parties moved to dismiss the remaining appeal because the district court did not certify the approval order as appealable. After the district court denied the remaining objectors' request to certify the approval order as a final appealable order, on November 6, 2019, the objectors asked the court of appeals to dismiss their appeal. The court of appeals has instructed the parties to brief the jurisdictional issues together with the merits of the objectors' objections to the settlement. The case is continuing as to the remaining defendants. The Company denies all allegations of wrongdoing.

On July 11, 2019, a complaint alleging violations of federal and state laws and seeking certification as a class action was filed against Boeing and the Company in the United States District Court for the Eastern District of Texas in Sherman. The complaint alleges that Boeing and the Company colluded to conceal defects with the MAX aircraft in violation of the Racketeer Influenced and Corrupt Organization Act ("RICO") and also asserts related state law claims based upon the same alleged facts. The complaint seeks damages on behalf of putative classes of customers who purchased tickets for air travel from either the Company or American Airlines between August 29, 2017, and March 13, 2019. The complaint generally seeks money damages, equitable monetary relief, injunctive relief, declaratory relief, and attorneys' fees and other costs. On September 13, 2019, the Company filed a motion to dismiss the complaint and to strike certain class allegations. Boeing also moved to dismiss. On February 14, 2020, the trial court issued a ruling that granted in part and denied in part the motions to dismiss the complaint. The trial court order, among other things: (i) dismissed without prejudice various state law claims that the plaintiffs abandoned in response to the motions, (ii) dismissed with prejudice the remaining state law claims, including fraud by concealment, fraud by misrepresentation, and negligent misrepresentation on the grounds that federal law preempts those claims, and (iii) found that plaintiffs lack Article III standing to pursue one of the plaintiffs' theories of RICO injury. The order denied

the motion to dismiss with respect to two RICO claims premised upon a second theory of RICO injury and denied the motion to strike the class allegations at the pleadings stage. The Company denies all allegations of wrongdoing, including those in the complaint that were not dismissed. The Company believes the plaintiffs' positions are without merit and intends to vigorously defend itself.

On February 19, 2020, a complaint alleging violations of federal securities laws and seeking certification as a class action was filed against the Company and certain of its officers in the United States District Court for the Northern District of Texas in Dallas. The complaint asserts claims under Sections 10(b) and 20 of the Securities Exchange Act and alleges that the Company made material misstatements to investors regarding the Company's safety and maintenance practices and its compliance with federal regulations and requirements. The initial complaint seeks damages on behalf of a putative class of persons who purchased the Company's common stock between February 7, 2017, and June 25, 2019. The complaint generally seeks money damages, pre-judgment and post-judgment interest, and attorneys' fees and other costs. The Company denies all allegations of wrongdoing, including those in the complaint. The Company believes the plaintiffs' positions are without merit and intends to vigorously defend itself.

The Company is from time to time subject to various legal proceedings and claims arising in the ordinary course of business, including, but not limited to, examinations by the IRS.

The Company's management does not expect that the outcome in any of its currently ongoing legal proceedings or the outcome of any proposed adjustments presented to date by the IRS, individually or collectively, will have a material adverse effect on the Company's financial condition, results of operations, or cash flow.

**Item 1A.** Risk Factors

Except for the additional risk factor(s) set forth below, there have been no material changes to the factors disclosed in Item 1A. Risk Factors in the Company's Annual Report on Form 10-K for the year ended December 31, 2019.

*The COVID-19 pandemic has materially and adversely affected, and will likely continue to materially and adversely affect, the Company's results of operations, financial position, and liquidity.*

In late 2019, an outbreak of COVID-19 was identified in Wuhan, China. The COVID-19 outbreak has since spread and grown globally, including within the United States and, in March 2020, the President of the United States declared a national emergency. Demand for both business and leisure air travel has declined significantly due to the COVID-19 pandemic, and the Company has responded by reducing its published flight schedule; instituting a hiring freeze; offering voluntary leave options for Employees; and aggressively evaluating all capital spending, discretionary spending, and non-essential costs for near-term cost reductions or deferrals. The extent of the impact of the COVID-19 pandemic on the Company's business and its financial and operational performance will depend on future developments, including the duration, spread, severity and any recurrence of the COVID-19 pandemic; the duration and scope of related federal, state, and local government orders and restrictions; the extent of the impact of the COVID-19 pandemic on overall demand for air travel; and the Company's access to capital, all of which are highly uncertain and cannot be predicted.

The COVID-19 pandemic has caused public health officials to recommend precautions to mitigate the spread of the virus. Federal, state, and local authorities have imposed self-quarantine requirements, issued directives forcing businesses to temporarily close, restricted international air travel, and issued shelter-in-place and similar orders limiting the movement of individuals. Additionally, businesses have restricted non-essential travel for their employees. Such measures have depressed demand for air travel, disrupted the Company's operations, and materially adversely affected the Company's business. The cancellation of flights, both in March 2020 and for future periods, has resulted in a significant amount of cash refunds and the issuance of travel credits to Customers. The total value of refunds, excluding taxes and related fees, issued to Customers during March 2020 was $248 million. As of April 24th, the total value of refunds, excluding taxes and related fees, issued to Customers month-to-date April 2020 was roughly half of March 2020 levels. Further, due to the fears and restrictions involved with travel in the near term, sales of tickets for future travel have been well below the Company's expectations. The cancellations and cash refunds have negatively affected the Company's revenues and liquidity, and it expects such negative effects to continue. The Company will continue to

be materially adversely affected if government authorities extend existing orders or impose new orders or other restrictions intended to mitigate the spread of COVID-19, or if businesses continue to restrict nonessential travel for their employees, or if fear of travel continues to depress future ticket sales.

Certain Employees of the Company, and employees of its suppliers and service providers, including airport and air traffic personnel, have tested positive for or been suspected of having COVID-19. These cases have resulted in the closure of facilities, reduction in available staffing, and disruptions to the Company's overall operations. Additional instances of actual or perceived risk of infection among the Company's Employees, or its suppliers' or service providers' employees, could further negatively impact the Company's operations. The Company could also be materially adversely affected if it is unable to effectively address employment-related matters, or maintain satisfactory relations with its Employees or its Employees' Representatives.

Moreover, the ability to attract and retain passengers depends, in part, upon the perception and reputation of the Company and the public's concerns regarding the health and safety of travel generally, especially regarding airline travel. Actual or perceived risk of infection on Company flights could have a material adverse effect on the public's perception of the Company, which could harm its reputation and business. The Company expects it will continue to incur COVID-19 related costs as it sanitizes airplanes and implements additional hygiene-related protocol to airplanes, and takes other action to limit infection among its Employees and passengers. In addition, the industry may be subject to enhanced health and hygiene requirements in attempts to counteract future outbreaks, which requirements may be costly and take a significant amount of time to implement.

The COVID-19 pandemic may also materially and adversely affect the Company's supply chain. For example, the Company is dependent on Boeing as its sole supplier for many of its aircraft parts. See "Item 1A. Risk Factors-The Company is currently dependent on Boeing as the sole manufacturer of the Company's aircraft. Further prolonged grounding by the FAA of the Boeing 737 MAX aircraft could materially and adversely affect the Company's business plans, strategies, and results of operations" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2019, for further discussion of and risks related to the Company's relationship with Boeing. The Company is also dependent on (i) sole or limited suppliers for aircraft engines and certain other aircraft parts, equipment, and services, (ii) third party vendors, and (iii) service providers. The COVID-19 pandemic could result in performance problems, ceased operations, or bankruptcies among these suppliers, third party vendors, and service providers. If a supplier, third party vendor, or service provider is unable to timely provide adequate products or support for its products, or otherwise fulfill its commitments to the Company, the Company's operations could be materially adversely affected.

The effects of the COVID-19 pandemic on the financial markets may materially and adversely affect the Company's access to capital and cost of capital, including its ability to raise funds through equity or debt financings. The COVID-19 pandemic has resulted in significant disruption of global financial markets, which has negatively impacted the value of the Company's common stock and its debt ratings and could negatively affect the Company's liquidity. For example, as a result of the economic effects of the COVID-19 pandemic, in March and April 2020, Moody's, S&P Global, and Fitch downgraded the Company's senior unsecured debt ratings, and S&P Global and Fitch downgraded the Company's issuer ratings. In addition, all three rating agencies placed the Company's ratings on review for further downgrade. If the Company's credit ratings were to be further downgraded, or general market conditions were to ascribe higher risk to the Company's rating levels, the airline industry, or the Company, the Company's access to capital and the cost of any debt financing will be negatively affected. In addition, in response to liquidity concerns related to the COVID-19 pandemic and breaking with historical practice, the Company has recently taken on shorter-term debt in the form of its Amended and Restated 364-Day Credit Agreement and secured both its Amended and Restated 364-Day Agreement and its Amended and Restated Revolving Credit Agreement. Further, the Company has taken government assistance under the CARES Act, which requires the Company to comply with related restrictive provisions, including limitations on share buybacks and dividends, limitations on executive compensation, and other requirements described in "The Company has agreed to certain restrictions on its business by accepting financing under the CARES Act" below. The Company continues to evaluate potential sources of additional liquidity in the short-term. The terms of future debt agreements could include more restrictive covenants or require incremental collateral, which may further restrict the Company's business operations. The extent to which the COVID-19 outbreak affects the Company's earnings and liquidity will depend, in part, on the Company's ability to successfully access capital. There is no guarantee that debt

or equity financings will be available in the future to fund the Company's obligations, or that they will be available on terms consistent with the Company's expectations.

In addition, the COVID-19 pandemic has significantly increased economic and demand uncertainty. The current outbreak and continued spread of COVID-19 could cause a global recession, which would have a further adverse impact on the Company's medium- and long-term financial condition and operations. Historically, unfavorable U.S. economic conditions have driven changes in travel patterns, including reduced spending for both leisure and business travel. Unfavorable economic conditions, when low fares are often used to stimulate traffic, have also historically hampered the ability of airlines to raise fares to counteract any increases in fuel, labor, and other costs. Any significant increases in unemployment in the United States and other regions due to the adoption of social distancing and other policies to slow the spread of the virus would likely continue to have a negative impact on passenger bookings, and these effects could exist for an extensive period of time. The COVID-19 pandemic continues to rapidly evolve. The ultimate impact of the COVID-19 pandemic is highly uncertain and subject to change.

***The Company has agreed to certain restrictions on its business by accepting financing under the CARES Act.***

On March 27, 2020, the CARES Act was signed into law. The CARES Act provides liquidity in the form of loans, loan guarantees, and other investments to air carriers, such as the Company, that incurred, or are expected to incur, covered losses such that the continued operations of the business are jeopardized, as determined by the United States Department of the Treasury (the "Treasury").

In April 2020, the Company reached an agreement in principle with the Treasury with respect to funding support pursuant to the Payroll Support Program. Funds received under the Payroll Support Program are expected to be used to pay Employee wages and benefits through September 30, 2020. The Company's expected aggregate receipts under the Payroll Support Program total approximately $3.3 billion, for which the Company expects to provide the Treasury consideration in the form of a promissory note representing a $948 million unsecured term loan to the Company and of warrants to purchase up to an aggregate of 2.6 million shares of the Company's common stock, subject to adjustment by the Treasury in each case. On April 21, 2020, the Company received approximately $1.6 billion of expected proceeds, or 50 percent, for which the Company provided consideration of a promissory note representing a $459 million unsecured term loan and of warrants to purchase up to an aggregate of 1.3 million shares of the Company's common stock. The remainder of the funds are expected to be disbursed to the Company, and the additional warrants are expected to be issued, in three installments from May to July 2020.

By accepting financing under the CARES Act, the Company has agreed to certain restrictions on its business, including:

- The Company is prohibited from repurchasing its common stock and from paying dividends or making capital contributions with respect to its common stock until September 30, 2021;
- The Company must place certain restrictions on certain higher-paid employee and executive pay, including limiting pay increases and severance pay or other benefits upon terminations, until March 24, 2022;
- The Company is prohibited from involuntary terminations or furloughs of its Employees (except for death, disability, cause, or certain disciplinary reasons) until September 30, 2020;
- The Company may not reduce the salary, wages, or benefits of its Employees (other than its Executive Officers or independent contractors, or as otherwise permitted under the terms of the Payroll Support Program) until September 30, 2020;
- Until March 1, 2022, the Company must comply with any requirement issued by the Department of Transportation ("DOT") that the Company maintain certain scheduled air transportation service as DOT deems necessary to ensure services to any point served by the Company before March 1, 2020; and
- The Company must maintain certain internal controls and records relating to the CARES Act funds, and is subject to additional reporting requirements.

These restrictions may affect the profitability of the Company's business activities, require that the Company change certain of its business practices, affect retention of key personnel, and expose the Company to additional costs (including increased compliance costs). Additionally, the Company could be required to issue additional warrants if it participates in additional loan programs under the CARES Act.

58

**Item 2.** Unregistered Sales of Equity Securities and Use of Proceeds

| | (a) | (b) | | (c) | (d) |
|---|---|---|---|---|---|
| | | | | Issuer Purchases of Equity Securities (1) | |
| Period | Total number of shares purchased | Average price paid per share | | Total number of shares purchased as part of publicly announced plans or programs | Maximum dollar value of shares that may yet be purchased under the plans or programs |
| January 1, 2020 through January 31, 2020 | 1,835,017 | $ — | (2) | 1,835,017 | $ 1,350,051,674 |
| February 1, 2020 through February 29, 2020 | 1,300,018 | $ — | (2)(3)(4) | 1,300,018 | $ 831,202,514 |
| March 1, 2020 through March 31, 2020 | 7,879,876 | $ — | (3)(5) | 7,879,876 | $ 898,812,340 |
| Total | 11,014,911 | | | 11,014,911 | |

(1)    On May 15, 2019, the Company's Board of Directors authorized the repurchase of up to $2.0 billion of the Company's common stock. Repurchases are made in accordance with applicable securities laws in open market or private, including accelerated, repurchase transactions from time to time, depending on market conditions, and may be discontinued at any time. On March 16, 2020, the Company announced it was suspending further share repurchase activity following completion of the First Quarter 2020 ASR Program until further notice.

(2)    Under an accelerated share repurchase program entered into by the Company with a third party financial institution in fourth quarter 2019 (the "Fourth Quarter 2019 ASR Program"), the Company paid $550 million and received an initial delivery of 7,276,275 shares during December 2019, representing an estimated 75 percent of the shares to be purchased by the Company under the Fourth Quarter 2019 ASR Program based on a volume-weighted average price of $56.6911 per share of the Company's common stock on the New York Stock Exchange during a calculation period between November 13, 2019 and December 11, 2019. The third party financial institution delivered an additional 1,835,017 shares to the Company in further partial settlements of the Fourth Quarter 2019 ASR Program in January 2020, which was determined based generally on a discount to the volume-weighted average price per share of the Company's common stock during calculation periods completed in January 2020. Final settlement of the Fourth Quarter 2019 ASR Program occurred in February 2020 and was determined based generally on a discount to the volume-weighted average price per share of the Company's common stock during a calculation period completed in February 2020. Upon settlement, the third party financial institution delivered 900,018 additional shares of the Company's common stock to the Company. In total, the average purchase price per share for the 10,011,310 shares repurchased under the Fourth Quarter 2019 ASR Program, upon completion of the Fourth Quarter 2019 ASR Program in February 2020, was $54.9379.

(3)    Under the First Quarter 2020 ASR Program launched in February 2020, the Company paid $500 million and received delivery of 6,405,876 shares during March 2020, representing 75 percent of the shares originally expected to be repurchased under the First Quarter 2020 ASR Program. The third party financial institution exercised its early termination option in March 2020, and sent cash proceeds totaling $134.2 million to the Company in March 2020 to settle the transaction. In total, the average purchase price per share for the 6,405,876 shares repurchased under the First Quarter 2020 ASR Program, upon completion of the First Quarter 2020 ASR Program in March 2020, was $57.1030.

(4)    During the period from February 27, 2020 through February 28, 2020, the Company repurchased 400,000 shares of its common stock on the open market at an average price of $47.1229.

(5)    During March 2020, the Company repurchased 1,474,000 shares of its common stock on the open market under an additional share repurchase plan at an average price of $45.1799 per share.

**Item 3.** Defaults Upon Senior Securities

None

**Item 4.** Mine Safety Disclosures

Not applicable

**Item 5.** Other Information

None

**Item 6. Exhibits**

| | |
|---|---|
| 3.1 | Restated Certificate of Formation of the Company, effective May 18, 2012 (incorporated by reference to Exhibit 3.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2012 (File No. 1-7259)). |
| 3.2 | Second Amended and Restated Bylaws of the Company, effective November 17, 2016 (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K filed November 21, 2016 (File No. 1-7259)). |
| 10.1 | $1,000,000,000 364-Day Credit Agreement among Southwest Airlines Co., the Banks party thereto, JPMorgan Chase Bank, N.A., as Administrative Agent, and JPMorgan Chase Bank, N.A., Bank of America, N.A., and Wells Fargo Bank, N.A., as Joint Lead Arrangers and Joint Bookrunners, dated as of March 12, 2020 (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed March 16, 2020 (File No, 1-7259)). |
| 10.2 | Amended and Restated 364-Day Credit Agreement among Southwest Airlines Co., the Banks party thereto, J.P. Morgan Chase Bank, N.A., as Administrative Agent, J.P. Morgan Chase Bank, N.A., BofA Securities, Inc., and BNP Paribas, as Joint Lead Arrangers and Joint Bookrunners, and Bank of China, New York Branch, Morgan Stanley Senior Funding, Inc., and Wells Fargo Bank, N.A., as Documentation Agents, dated as of March 30, 2020. |
| 10.3 | First Amendment to Revolving Credit Facility Agreement dated as of August 3, 2016, among Southwest Airlines Co., the Banks party thereto, J.P. Morgan Chase Bank, N.A., as Paying Agent and Collateral Agent, and J.P. Morgan Chase Bank, N.A. and Citibank, N.A., as Co-Administrative Agents, dated as of March 30, 2020. |
| 10.4 | Payroll Support Program Agreement by and between Southwest Airlines Co. and the United States Department of the Treasury, dated April 20, 2020. |
| 10.5 | Warrant Agreement by and between Southwest Airlines Co. and the United States Department of the Treasury, dated April 20, 2020. |
| 10.6 | Promissory Note, from Southwest Airlines Co. to the United States Department of the Treasury, dated April 20, 2020. |
| 31.1 | Rule 13a-14(a) Certification of Chief Executive Officer. |
| 31.2 | Rule 13a-14(a) Certification of Chief Financial Officer. |
| 32.1 | Section 1350 Certifications of Chief Executive Officer and Chief Financial Officer. (1) |
| 101.INS | XBRL Instance Document - The instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document. |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document. |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document. |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101). |

(1) Furnished, not filed.

60

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

SOUTHWEST AIRLINES CO.

April 28, 2020                                    By:      /s/   Tammy Romo

                                                          Tammy Romo
                                                          *Executive Vice President & Chief Financial Officer*
                                                          *(On behalf of the Registrant and in*
                                                          *her capacity as Principal Financial*
                                                          *and Accounting Officer)*

61

**EXECUTION VERSION**

---

**AMENDED AND RESTATED 364-DAY CREDIT AGREEMENT**

among

**SOUTHWEST AIRLINES CO.,**

**THE BANKS PARTY HERETO,**

and

**JPMORGAN CHASE BANK, N.A.,**
as Administrative Agent

as of March 30, 2020

**JPMORGAN CHASE BANK, N.A.,**

**BOFA SECURITIES, INC.**

and

**BNP PARIBAS**

as Joint Lead Arrangers and Joint Bookrunners

and

**BANK OF CHINA, NEW YORK BRANCH**,

**MORGAN STANLEY SENIOR FUNDING, INC.**,

and

**WELLS FARGO BANK, N.A.**,

as Documentation Agents

---

**Table of Contents**

|  | Page |
|---|---|
| ARTICLE I DEFINITIONS AND ACCOUNTING TERMS | 2 |
| Section 1.1 Certain Defined Terms | 2 |
| Section 1.2 Computation of Time Periods | 20 |
| Section 1.3 Interest Rates; LIBOR Notification | 20 |
| ARTICLE II LOANS | 21 |
| Section 2.1 Additional Commitments | 21 |
| Section 2.2 Committed Borrowing Procedure | 21 |
| Section 2.3 Conversions | 22 |
| Section 2.4 [Reserved] | 22 |
| Section 2.5 Termination and Reduction of Additional Commitments. | 22 |
| Section 2.6 Loans | 22 |
| Section 2.7 Loan Accounts | 23 |
| Section 2.8 Interest on Loans | 24 |
| Section 2.9 Interest on Overdue Amounts | 24 |
| Section 2.10 Alternate Rate of Interest | 24 |
| Section 2.11 Prepayment of Loans | 25 |
| Section 2.12 Reserve Requirements; Change in Circumstances | 26 |
| Section 2.13 Change in Legality | 27 |
| Section 2.14 Indemnity | 28 |
| Section 2.15 Pro Rata Treatment | 29 |
| Section 2.16 Sharing of Setoffs | 29 |
| Section 2.17 Payments | 29 |
| Section 2.18 Taxes | 30 |
| Section 2.19 Calculation of LIBO Rates | 33 |
| Section 2.20 Booking Loans | 33 |
| Section 2.21 Quotation of Rates | 33 |
| Section 2.22 Defaulting Banks | 33 |
| Section 2.23 Mitigation Obligations; Replacement of Banks | 34 |
| Section 2.24 Incremental Term Loans | 35 |
| ARTICLE III [RESERVED] | 36 |
| ARTICLE IV CONDITIONS OF LENDING | 36 |
| Section 4.1 Conditions Precedent | 36 |
| Section 4.2 Conditions Precedent to Committed Borrowing | 38 |
| ARTICLE V REPRESENTATIONS AND WARRANTIES | 39 |
| Section 5.1 Organization, Authority and Qualifications | 39 |
| Section 5.2 Financial Statements | 39 |
| Section 5.3 Compliance with Agreement and Laws | 39 |
| Section 5.4 Authorization; No Breach; and Valid Agreements | 40 |
| Section 5.5 Litigation and Judgments | 40 |
| Section 5.6 Ownership of Properties | 40 |
| Section 5.7 Taxes | 40 |

i

Section 5.8 Approvals Required                                                         40

Section 5.9 Business; Status as Air Carrier                                            40

Section 5.10 ERISA Compliance                                                          41

Section 5.11 Insurance                                                                 41

Section 5.12 Purpose of Loan                                                           41

Section 5.13 Investment Company Act                                                    41

Section 5.14 General                                                                   41

Section 5.15 Affected Financial Institutions                                           41

Section 5.16 Anti-Corruption Laws and Sanctions                                        41

Section 5.17 Security Interests                                                        42


ARTICLE VI COVENANTS                                                                   42

Section 6.1 Performance of Obligations                                                 42

Section 6.2 Compliance with Laws                                                       42

Section 6.3 Maintenance of Existence, Licenses and Franchises: Compliance With Agreements   42

Section 6.4 Maintenance of Properties                                                  42

Section 6.5 Maintenance of Books and Records                                           42

Section 6.6 Inspection                                                                 43

Section 6.7 Insurance                                                                  43

Section 6.8 Appraisals                                                                 43

Section 6.9 Coverage Ratio                                                             43

Section 6.10 Reporting Requirements                                                    43

Section 6.11 Use of Proceeds                                                           45

Section 6.12 Pool Assets                                                               45

Section 6.13 Restrictions on Liens.                                                    47

Section 6.14 Mergers and Dissolutions                                                  47

Section 6.15 Assignment                                                                47

Section 6.16 Amendments                                                                48

Section 6.17 Liquidity                                                                 48

Section 6.18 Post-Effective Date Items                                                 48

Section 6.19 Further Assurances                                                        48


ARTICLE VII EVENTS OF DEFAULT; REMEDIES                                                49

Section 7.1 Events of Default                                                          49

Section 7.2 Remedies Upon Default                                                      50

Section 7.3 Remedies in General                                                        52


ARTICLE VIII THE Administrative Agent                                                  52

Section 8.1 Authorization and Action                                                   52

Section 8.2 Administrative Agent's Reliance, Etc.                                       52

Section 8.3 Rights of the Administrative Agent as Bank                                 53

Section 8.4 Bank Credit Decision                                                       53

Section 8.5 Administrative Agent's Indemnity                                           53

Section 8.6 Successor Administrative Agent                                             54

Section 8.7 Notice of Default                                                          54

Section 8.8 Collateral Matters                                                         55


ARTICLE IX MISCELLANEOUS                                                               55

ii

Section 9.1 Amendments, Etc                                                                     55

Section 9.2 Notices, Etc.                                                                       56

Section 9.3 No Waiver; Remedies                                                                 57

Section 9.4 Costs, Expenses and Taxes                                                           57

Section 9.5 Indemnity                                                                           57

Section 9.6 Right of Setoff                                                                     58

Section 9.7 **Governing Law**                                                                   58

Section 9.8 Submission To Jurisdiction; Waivers                                                 58

Section 9.9 Survival of Representations and Warranties                                          59

Section 9.10 Binding Effect                                                                     59

Section 9.11 Successors and Assigns; Participations                                             59

Section 9.12 Confidentiality                                                                    62

Section 9.13 Independence of Covenants                                                          63

Section 9.14 Severability                                                                       63

Section 9.15 Integration                                                                        63

Section 9.16 Descriptive Headings                                                               63

Section 9.17 Execution in Counterparts                                                          63

Section 9.18 **WAIVERS OF JURY TRIAL**                                                          63

Section 9.19 No Fiduciary Duty                                                                  63

Section 9.20 USA Patriot Act                                                                    64

Section 9.21 Acknowledgement and Consent to Bail-In of Affected Financial Institutions          64

Section 9.22 Interest Rate Limitation                                                           65

Section 9.23 Amendment and Restatement                                                          65

**SCHEDULES**

| | |
|---|---|
| Pool Assets | Schedule I |
| Existing Term Loans and Additional Commitments | Schedule II |

**EXHIBITS**

| | |
|---|---|
| Form of Notice of Borrowing | Exhibit A |
| Form of Note | Exhibit B |
| Form of Company's Internal Counsel Opinion | Exhibit C-1 |
| Form of Company's Outside Counsel Opinion | Exhibit C-2 |
| Form of Administrative Agent's Counsel Opinion | Exhibit C-3 |
| Form of Financial Report Certificate | Exhibit D |
| Form of Assignment and Assumption | Exhibit E |
| Form of U.S. Tax Compliance Certificate – Foreign Banks (Not Partnerships) | Exhibit F-1 |
| Form of U.S. Tax Compliance Certificate – Non-U.S. Participants (Partnerships) | Exhibit F-2 |
| Form of U.S. Tax Compliance Certificate – Non-U.S. Participants (Not Partnerships) | Exhibit F-3 |
| Form of U.S. Tax Compliance Certificate – Foreign Banks (Partnerships) | Exhibit F-4 |
| Form of Aircraft Mortgage | Exhibit G |
| Form of Mortgaged Aircraft Operating Agreement | Exhibit H |

**AMENDED AND RESTATED 364-DAY CREDIT AGREEMENT**

AMENDED AND RESTATED 364-DAY CREDIT AGREEMENT, dated as of March 30, 2020, among SOUTHWEST AIRLINES CO. (the "Company"), the Banks (as herein defined) and JPMORGAN CHASE BANK, N.A., as the administrative agent for the Banks (in such capacity, the "Administrative Agent").

The Company entered into the 364-Day Credit Agreement, dated as of March 12, 2020 (the "Existing Credit Agreement"), with the Existing Banks, and JPMorgan Chase Bank, N.A., as Administrative Agent, pursuant to which the Existing Banks made term loans (the "Existing Term Loans") in an aggregate principal amount of $1,000,000,000 to the Company.

The Company, the Banks party hereto and the Administrative Agent are entering into this Agreement in order to amend and restate the Existing Credit Agreement in its entirety which, among other things, (i) amends certain terms that apply to the Existing Term Loans; (ii) increases the amount of term loans available hereunder on the Initial Borrowing Date to $3,333,333,333.00 consisting of the Existing Term Loans and additional term loans to be funded on the Initial Borrowing Date in an aggregate principal amount of $2,333,333,333.00, subject to the terms and conditions set forth herein, (iii) re-evidences the "Obligations" under, and as defined in, the Existing Credit Agreement as part of the Obligations, which shall be repayable in accordance with the terms of this Agreement and (iv) adds certain collateral to secure the Obligations.

Accordingly, the Company, the Administrative Agent and the Banks agree that the Existing Credit Agreement is hereby amended and restated as follows effective on the Effective Date:

## ARTICLE 1

## DEFINITIONS AND ACCOUNTING TERMS

Section 1.1    Certain Defined Terms. As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Additional Commitment" means, with respect to each Bank, the obligation of such Bank to make Loans in the aggregate principal and/or face amount set forth opposite the name on Schedule II to this Agreement. The aggregate original amount of the Additional Commitments is $2,333,333,333.00.

"Additional Commitment Termination Date" shall mean the earliest to occur of (i) April 8, 2020, (ii) the date the Additional Commitments are permanently reduced to zero pursuant to Section 2.5(a) or Section 2.6(b) and (iii) the date of the acceleration of the Loans in accordance with Section 7.1 and Section 7.2.

"Additional Term Loans" is defined in Section 2.1(a).

"Adjusted LIBO Rate" means, with respect to any Eurodollar Loan for any Interest Period, an interest rate *per annum* (rounded upwards, if necessary, to the next 1/16 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Adjusted Pre-Tax Income" of any Person means, with respect to any period, income before income taxes of such Person for such period, but excluding (i) any gain or loss arising from the sale of capital assets other than capital assets consisting of Aircraft, (ii) any gain or loss arising from any write-up or write-down

iii

of assets, (iii) income or loss of any other Person, substantially all of the assets of which have been acquired by such Person in any manner, to the extent that such income or loss was realized by such other Person prior to the date of such acquisition, (iv) income or loss of any other Person (other than a Subsidiary) in which such Person has an ownership interest, (v) the income or loss of any other Person to which assets of such Person shall have been sold, transferred, or disposed of, or into which such Person shall have merged, to the extent that such income or loss arises prior to the date of such transaction, (vi) any gain or loss arising from the acquisition of any securities of such Person, (vii) gains or losses reported as extraordinary in accordance with GAAP not previously excluded in clauses (i) through (vi), and (viii) the cumulative effect of changes in accounting methods permitted by GAAP during such period. Notwithstanding the foregoing, the determination of income before income taxes for any period shall be adjusted by any pre-tax non-GAAP financial measures for such period as identified in "Reconciliation of Reported Amounts to Non-GAAP Financial Measures" contained in the Management's Discussion and Analysis of Financial Condition and Results of Operations in the Company's filings in respect of such period on Form 10-Q or Form 10-K with the Securities and Exchange Commission.

"Administrative Agent" means JPMorgan Chase Bank, N.A. in its capacity as administrative agent for the Banks hereunder.

"Administrative Questionnaire" means an Administrative Questionnaire in a form satisfactory to the Administrative Agent, which each Bank shall complete and provide to the Administrative Agent.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means a Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with another Person.

"Agreed Maximum Rate" means, for any date, 2% per annum above the interest rate then applicable to Alternate Base Loans.

"Agreement" means this Amended and Restated 364-Day Credit Agreement, as the same may be amended, supplemented, or modified from time to time.

"Aircraft" means, collectively, airframes and aircraft engines now owned or hereafter acquired by the Company, together with all appliances, equipment, instruments, and accessories (including radio and radar, but excluding passenger convenience equipment) from time to time belonging to, installed in, or appurtenant to such airframes and aircraft engines; provided, however, the term "Aircraft" shall not include airframes and engines leased by the Company.

"Aircraft Mortgage" means that "Aircraft Mortgage" as defined in Section 4.1(e), as the same may be amended, restated, modified, supplemented, extended or amended and restated from time to time.

"Aircraft Protocol" means the official English language text of the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment, adopted on November 16, 2001 at a diplomatic conference in Cape Town, South Africa, and all amendments, supplements and revisions thereto, as in effect in the United States.

"Aircraft Rentals" means the operating expense attributable to aircraft rentals, calculated in accordance with the line item described as such in the Current Financials.

"Alternate Base Loan" means any Loan with respect to which the Company shall have selected an interest rate based on the Alternate Base Rate in accordance with the provisions of Article II.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the New York Fed Bank Rate in effect on such day plus ½ of 1% and (c) the Adjusted LIBO Rate for a one month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) (giving effect to any floor in such rate) plus 1%; provided that for the purpose of this definition, the Adjusted LIBO Rate for any day shall be based on the Screen Rate (or if the Screen Rate is not available for such one month Interest Period, the Interpolated Rate) at approximately 11:00 a.m. London time on such day. Any change in the Alternate Base Rate due to a change in the Prime Rate, the New York Fed Bank Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the New York Fed Bank Rate or the Adjusted LIBO Rate, respectively. If the Alternate Base Rate is being used as an alternate rate of interest pursuant to Section 2.10 (for the avoidance of doubt, only until any amendment has become effective pursuant to Section 2.10(b)), then the Alternate Base Rate shall be the greater of clauses (a) and (b) above and shall be determined without reference to clause (c) above. For the avoidance of doubt, if the Alternate Base Rate as determined pursuant to the foregoing would be less than 1.00%, such rate shall be deemed to be 1.00% for purposes of this Agreement. For purposes hereof: "Prime Rate" shall mean the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"Anti-Corruption Laws" means all laws, rules and regulations of any jurisdiction applicable to the Company or its Subsidiaries from time to time concerning or relating to bribery or corruption.

"Applicable Early Maturity Amount" means, with respect to any Early Maturity Event, the aggregate Net Cash Proceeds received by the Company or its Subsidiary from the Capital Markets Transaction giving rise to such Early Maturity Event.

"Applicable Lending Office" means, with respect to each Bank, such Bank's Domestic Lending Office in the case of an Alternate Base Loan and such Bank's Eurodollar Lending Office in the case of a Eurodollar Loan.

"Applicable Percentage" means, with respect to any Bank, the percentage of the total Additional Commitments represented by such Bank's Additional Commitment; provided that, in the case of Section 2.22 when a Defaulting Bank shall exist, "Applicable Percentage" shall mean the percentage of the Total Additional Commitments (disregarding any Defaulting Bank's Additional Commitment) represented by such Bank's Additional Commitment.

"Applicable Rate" means the relevant per annum rate determined by reference to the Index Debt Rating in effect on such date as set forth below.

v

| Index Debt Ratings S&P/Moody's | Applicable Rate (Eurodollar Loans) | Applicable Rate (Alternate Base Rate Loans) |
|---|---|---|
| BBB/Baa2 or better | 2.000% | 1.000% |
| BBB-/Baa3 or below | 2.250% | 1.250% |

Each change in the Applicable Rate shall apply during the period commencing on the effective date of such change and ending on the date immediately preceding the effective date of the next such change. If the rating system of Moody's or S&P shall change, the Company and the Banks shall negotiate in good faith to amend this definition to reflect such changed rating system and, pending the effectiveness of any such amendment, the Applicable Rate shall be determined by reference to the rating most recently in effect prior to such change.

"Appraisal" means a "desk-top" appraisal report addressed to the Administrative Agent and in form and substance reasonably satisfactory to the Administrative Agent, which will not include physical inspection of aircraft, engines or maintenance records and will assume the equipment is half life in its maintenance cycle, dated the date of delivery of such report to the Banks pursuant to the terms of this Agreement, by one or more independent appraisal firms of recognized national standing selected by the Company (such firm to be reasonably satisfactory, at the time of such Appraisal, to the Administrative Agent) setting forth the fair market value, as determined in accordance with the definition of "current market value" promulgated by the International Society of Transport Aircraft Trading, as of the date of such appraisal, of each Pool Asset or a proposed Pool Asset, as the case may be.

"Appraisal Delivery Date" means (a) the Effective Date, (b) September 30, 2020 and (c) each date of replacement, removal (other than removal of a Pool Asset to the extent that the Company provides documentation reasonably acceptable to the Administrative Agent that such removal of assets will be in compliance with Section 6.12 hereof after giving effect to such removal based on the most recently delivered Appraisal with respect to such Pool Asset) or addition of any Pool Asset if such Pool Asset is an airframe or an airframe and one or more engines installed thereon.

"Appraised Value" means, as of any date of determination, (a) in respect of all Pool Assets, the aggregate current market value as of such date of such Pool Assets and (b) in respect of any Pool Asset or proposed Pool Asset, as the case may be, the current market value as of such date of such Pool Asset or proposed Pool Asset, as applicable, in each case, as provided in the most recently delivered Appraisal.

"Assignment and Assumption" is defined in Section 9.11(c).

"Auditors" means independent certified public accountants of recognized national standing selected by the Company.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms

vi

or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Banks" means those banks and other financial institutions signatory hereto and other banks or financial institutions which from time to time become party hereto pursuant to the provisions of this Agreement.

"Benchmark Replacement" means the sum of: (a) the alternate benchmark rate (which may be a SOFR-Based Rate) that has been selected by the Administrative Agent and the Company giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body and/or (ii) any evolving or then-prevailing market convention for determining a rate of interest as a replacement to the LIBO Rate for U.S. dollar-denominated syndicated credit facilities and (b) the Benchmark Replacement Adjustment; provided that, if the Benchmark Replacement as so determined would be less than 1.00%, the Benchmark Replacement will be deemed to be 1.00% for the purposes of this Agreement; provided further that any such Benchmark Replacement shall be administratively feasible as determined by the Administrative Agent in its sole discretion.

"Benchmark Replacement Adjustment" means the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Company giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the LIBO Rate with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body and/or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the LIBO Rate with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominated syndicated credit facilities at such time (for the avoidance of doubt, such Benchmark Replacement Adjustment shall not be in the form of a reduction to the Applicable Rate).

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest and other administrative matters) that the Administrative Agent decides in its reasonable discretion may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement).

"Benchmark Replacement Date" means the earlier to occur of the following events with respect to the LIBO Rate:

(1) in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of the Screen Rate permanently or indefinitely ceases to provide the Screen Rate; or

(2) in the case of clause (3) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein.

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the LIBO Rate:

(1) a public statement or publication of information by or on behalf of the administrator of the Screen Rate announcing that such administrator has ceased or will cease to provide the Screen Rate, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Screen Rate;

(2) a public statement or publication of information by the regulatory supervisor for the administrator of the Screen Rate, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the administrator for the Screen Rate, a resolution authority with jurisdiction over the administrator for the Screen Rate or a court or an entity with similar insolvency or resolution authority over the administrator for the Screen Rate, in each case which states that the administrator of the Screen Rate has ceased or will cease to provide the Screen Rate permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Screen Rate; and/or

(3) a public statement or publication of information by the regulatory supervisor for the administrator of the Screen Rate announcing that the Screen Rate is no longer representative.

"Benchmark Transition Start Date" means (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication) and (b) in the case of an Early Opt-in Election, the date specified by the Administrative Agent or the Majority Banks, as applicable, by notice to the Company, the Administrative Agent (in the case of such notice by the Majority Banks) and the Banks.

"Benchmark Unavailability Period" means, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the LIBO Rate and solely to the extent that the LIBO Rate has not been replaced with a Benchmark Replacement, the period (x) beginning at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the LIBO Rate for all purposes hereunder in accordance with Section 2.10 and (y) ending at the time that a Benchmark Replacement has replaced the LIBO Rate for all purposes hereunder pursuant to Section 2.10.

"Borrowing" means a borrowing consisting of simultaneous Loans of the same Type and, in the case of Eurodollar Loans, having the same Interest Period, made by each of the Banks pursuant to Section 2.1 or Section 2.24.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close, provided, that with respect to notices and determinations in connection with, and payments of principal and interest on, Eurodollar Loans, such day is also a day for trading in London, England by and between banks in dollar deposits in the Eurodollar Interbank Market.

"Cape Town Convention" means the official English language text of the Convention on International Interests in Mobile Equipment, adopted on November 16, 2001 at a diplomatic conference in Cape Town, South Africa, and all amendments, supplements and revisions thereto, as in effect in the United States.

"Cape Town Treaty" means, collectively, (a) the Cape Town Convention, (b) the Aircraft Protocol and (c) all rules and regulations (including but not limited to the Regulations and Procedures for the International Registry) adopted pursuant thereto and, in the case of each of the foregoing described in clauses (a) through (c), all amendments, supplements and revisions thereto as in effect in the United States.

"Capital Markets Transaction" means any transaction whereby the Company or any of its Subsidiaries issues any debt securities (including, without limitation, any EETC transaction), whether in a public offering or a private placement. Notwithstanding the foregoing, and for the avoidance of doubt, "Capital Markets Transaction" shall not include (i) any intercompany transactions (including but not limited to, any issuances by any Subsidiary of the Company to any other Subsidiary of the Company or to the Company), or any refinancing or replacement thereof with intercompany transactions, (ii) indebtedness incurred in the ordinary course of business of the Company and its Subsidiaries for capital expenditures, purchase money, equipment financings and/or capital leases (but excluding any EETC transaction), (iii) borrowings under the Existing Revolver, or any amendment, modification or waiver of the Existing Revolver, or any amendment and restatement, repricing, extension, refinancing of the Existing Revolver, (iv) any letter of credit, bank guaranty or similar instrument, (v) secured term loans from financial institutions, (vi) sale and leaseback transactions, (vii) any equity transaction, (viii) any debt securities convertible to equity, and (ix) any borrowings or issuances of any debt securities or grants under any program funded or administered by The Federal Reserve or the Federal Reserve Bank of New York, or any other Governmental Authority, including, without limitation, the Primary Market Corporate Credit Facility.

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means the Pool Assets and any other assets that constitute "Collateral" as defined in the Aircraft Mortgage.

"Collateral Coverage Test" means, on any date, the requirement that the Appraised Value of the Pool Assets on such date that are subject to the Lien of the Aircraft Mortgage or to the Lien of an aircraft mortgage granted by a Grantor of Collateral after the Effective Date, in substantially the form of Exhibit G, in favor of the Administrative Agent and filed with the FAA, shall not be less than an amount equal to 1.25 times the aggregate principal amount of all Loans and Additional Commitments outstanding on such date.

"Collateral Coverage Test Cure Period" is defined in Section 6.12.

"Committed Borrowing" means a borrowing consisting of simultaneous Loans from each of the Banks distributed ratably among the Banks in accordance with their respective Additional Commitments.

"Communications" is defined in Section 9.2.

"Company" is defined in the introduction to this Agreement.

"Compounded SOFR" means the compounded average of SOFRs for the applicable Corresponding Tenor, with the rate, or methodology for this rate, and conventions for this rate (which may include

ix

compounding in arrears with a lookback and/or suspension period as a mechanism to determine the interest amount payable prior to the end of each Interest Period) being established by the Administrative Agent in accordance with:

(1)  the rate, or methodology for this rate, and conventions for this rate selected or recommended by the Relevant Governmental Body for determining Compounded SOFR; provided that:

(2)  if, and to the extent that, the Administrative Agent determines that Compounded SOFR cannot be determined in accordance with clause (1) above, then the rate, or methodology for this rate, and conventions for this rate that the Administrative Agent determines in its reasonable discretion are substantially consistent with any evolving or then-prevailing market convention for determining Compounded SOFR for U.S. dollar-denominated syndicated credit facilities at such time;

provided, further, that if the Administrative Agent decides that any such rate, methodology or convention determined in accordance with clause (1) or clause (2) is not administratively feasible for the Administrative Agent, then Compounded SOFR will be deemed unable to be determined for purposes of the definition of "Benchmark Replacement."

"Corresponding Tenor" with respect to a Benchmark Replacement means a tenor (including overnight) having approximately the same length (disregarding Business Day adjustment) as the applicable tenor for the applicable Interest Period with respect to the LIBO Rate.

"Coverage Ratio" means, as of any date, the ratio of (i) for the four fiscal quarter period for which the Company's annual or quarterly Financial Statements have been most recently required to have been delivered pursuant to Section 6.10(a) and Section 6.10(b), the Company's and its Subsidiaries' consolidated Adjusted Pre-Tax Income, plus Aircraft Rentals, plus consolidated Net Interest Expense, and depreciation and amortization, and minus cash dividends paid by the Company, to (ii) the Company's and its Subsidiaries' consolidated Net Interest Expense and Aircraft Rentals for such four-quarter period.

"Current Financials" means the Financial Statements of the Company and its Subsidiaries for the fiscal year ended December 31, 2019.

"Debt" means, without duplication, (a) any indebtedness for borrowed money or incurred in connection with the acquisition or construction of any Property, (b) any obligation under any lease of any Property entered into after the date of this Agreement which is required under GAAP to be capitalized on the lessee's balance sheet, and (c) any direct or indirect guarantee or assumption of indebtedness or obligations described in clause (a) or (b), including without limitation any agreement to provide funds to or otherwise assure the ability of an obligor to repay indebtedness or meet its obligations.

"Debtor Relief Laws" means the Bankruptcy Code of the United States of America and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization, fraudulent transfer or conveyance, suspension of payments, or similar Laws from time to time in effect affecting the Rights of creditors generally.

"Default" means the occurrence of any event which with the giving of notice or the passage of time or both would become an Event of Default.

"Defaulting Bank" means any Bank, as determined by the Administrative Agent, that (a) has failed, in the determination of the Administrative Agent, which determination shall be conclusive subject to manifest

x

error, to fund any portion of its Loans within three Business Days of the date required to be funded by it hereunder unless such Bank notifies the Administrative Agent in writing that such failure is the result of such Bank's reasonable determination that one or more conditions precedent to funding has not been satisfied, (b) has notified the Company, the Administrative Agent or any Bank in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement (unless such writing or public statement relates to such Bank's obligation to fund a Loan hereunder and states that such position is based on such Bank's reasonable determination that a condition precedent to funding cannot be satisfied) or generally under agreements in which it has committed to extend credit, (c) has failed, within three Business Days after written request by the Administrative Agent (whether acting on its own behalf or at the reasonable request of the Company (it being understood that the Administrative Agent shall comply with any such reasonable request)), to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans; provided that any such Bank shall cease to be a Defaulting Bank under this clause (c) upon receipt of such confirmation by the Administrative Agent, (d) has otherwise failed to pay over to the Administrative Agent or any other Bank any other amount required to be paid by it hereunder within three Business Days of the date when due, unless the subject of a good faith dispute, (e) has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or has a direct or indirect parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or (f) has, or has a direct or indirect parent company that has, become the subject of a Bail-In Action. No Bank shall be a Defaulting Bank solely by virtue of the ownership or acquisition of any equity interest in such Bank or a parent company thereof by a Governmental Authority or an instrumentality thereof so long as such ownership interest does not result in or provide such Bank with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Bank (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Bank.

"dollars" and the symbol "$" mean the lawful currency of the United States of America.

"Domestic Lending Office" means, with respect to any Bank, the office of such Bank as such Bank may from time to time specify to the Company and the Administrative Agent.

"Early Maturity Event" means the consummation of a Capital Markets Transaction and receipt of Net Cash Proceeds thereof by the Company or any of its Subsidiaries.

"Early Opt-in Election" means the occurrence of:

(1) (i) a determination by the Administrative Agent or (ii) a notification by the Majority Banks to the Administrative Agent (with a copy to the Company) that the Majority Banks have determined that U.S. dollar-denominated syndicated credit facilities being executed at such time, or that include language similar to that contained in Section 2.10 are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace the LIBO Rate, and

(2) (i) the election by the Administrative Agent or (ii) the election by the Majority Banks to declare that an Early Opt-in Election has occurred and the provision, as applicable, by the Administrative Agent of written notice of such election to the Company and the Banks or by the Majority Banks of written notice of such election to the Administrative Agent.

xi

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the date on which the conditions set forth in Section 4.1 are first met, which date is March 30, 2020.

"Eligible Affiliate Assignee" means, with respect to any Bank, an Affiliate thereof that is: (i) a commercial bank organized under the Laws of the United States, or any state thereof, and having total assets in excess of $1,000,000,000; (ii) a commercial bank organized under the Laws of France, Germany, the Netherlands or the United Kingdom, or under the Laws of a political subdivision of any such country, and having total assets in excess of $1,000,000,000; provided that such bank is acting through a branch or agency located in such country or the United States; or (iii) a commercial bank organized under the Laws of any other country which is a member of the OECD, or under the Laws of a political subdivision of any such country, and having total assets in excess of $1,000,000,000; provided that such bank is acting through a branch or agency located in the United States.

"Entry Point Filing Forms" means each of the FAA form AC 8050-135 forms to be filed with the FAA on the Effective Date.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated thereunder.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Eurodollar Interbank Market" means the London eurodollar interbank market.

"Eurodollar Lending Office" means, with respect to each Bank, the branches or affiliates of such Bank which such Bank may designate from time to time as its "Eurodollar Lending Office" by notice to the Company and the Administrative Agent.

"Eurodollar Loan" means any loan with respect to which the Company shall have selected an interest rate based on the LIBO Rate in accordance with the provisions of Article II.

"Event of Default" means any of the events described in Article VII, provided there has been satisfied any requirement in connection therewith for the giving of notice, lapse of time, or happening of any further condition, event, or act.

"Excluded Taxes" means with respect to any payment made by the Company under this Agreement or any Loan Papers, any of the following Taxes imposed on or with respect to the Administrative Agent or a Bank: (a) income or franchise Taxes imposed on (or measured by) net income by the United States of America (including a state, locality or other political subdivision thereof), or by the jurisdiction (including a state, locality or other political subdivision thereof) under the laws of which such Administrative Agent or Bank is organized or in which its principal office is located or, in the case of any Bank, in which its applicable lending office is located, (b) any branch profits Taxes imposed by the United States of America or any similar Taxes imposed by any other jurisdiction in which the Company is located, (c) in the case of a Foreign Bank (other than an assignee pursuant to a request by the Company under Section 2.23), any U.S. Federal withholding Taxes resulting from any Law in effect on the date such Foreign Bank becomes a party to this Agreement (or designates a new lending office) or is attributable to such Foreign Bank's failure to comply with Section 2.18(f), except to the extent that such Foreign Bank (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Company with respect to such withholding Taxes pursuant to Section 2.18(a), (d) Other Connection Taxes, and (e) any U.S. withholding Taxes imposed by reason of FATCA.

"Existing Banks" means JPMorgan Chase Bank, N.A., Bank of America, N.A. and Wells Fargo Bank, N.A.

"Existing Revolver" means the Revolving Credit Facility Agreement, dated as of August 3, 2016, among the Company, JPMorgan Chase Bank, N.A. and Citibank, N.A. as co-administrative agents, JPMorgan Chase Bank, N.A. as paying agent, and the banks party thereto from time to time, as amended by First Amendment dated as of March 30, 2020, as further extended and amended.

"Existing Term Loans" has the meaning given to it in the preamble. The principal amount of the Existing Term Loans held by each Existing Bank is set forth opposite such Existing Bank's name on Schedule II to this Agreement. The aggregate principal amount of the Existing Term Loans outstanding on the Effective Date is $1,000,000,000.

"FAA" means the Federal Aviation Administration of the United States of America and any successor thereto.

"FATCA" means Sections 1471 through 1474 of the Code as of the date of this Agreement (including any amendment or successor to any such Section so long as such amendment or successor is substantially similar or comparable to the reporting and withholding (and related) obligations of Sections 1471 through 1474 of the Code as of the date of this Agreement and not materially more onerous to comply with), any current or future Treasury regulations promulgated thereunder or published administrative guidance or any other official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any law, regulation, rule, promulgation, guidance notes, practices or official agreement implementing an official government agreement with respect to the foregoing.

"Fed Reserve Board" means the Board of Governors of the Federal Reserve System of the United States.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the New York Fed based on such day's federal funds transactions by depositary institutions, as determined in such manner as shall be set forth on the Federal Reserve Bank of New York's Website from time to time, and published on the next succeeding Business Day by the New York Fed as the effective federal funds rate; provided that if the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"Financial Report Certificate" means a certificate substantially in the form of Exhibit D.

"Financial Statements" means balance sheets, income and loss statements, statements of stockholders' equity, and statements of cash flow prepared in accordance with GAAP and in comparative form to the corresponding period of the preceding fiscal year.

"Foreign Bank" is defined in Section 2.18.

"GAAP" means generally accepted accounting principles in the United States which are applicable as of the date in question for the purpose of the definition of "Financial Statements."

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Grantor" means the Company in its capacity as grantor under the Aircraft Mortgage and any Wholly Owned Domestic Subsidiary at any time that is a party to an Aircraft Mortgage, in substantially the form of Exhibit G, as grantor thereunder.

"Impacted Interest Period" is defined in the definition of "LIBO Rate".

"Increase Effective Date" is defined in Section 2.24(a).

"Increase Joinder" is defined in Section 2.24(a).

"Incremental Amount" shall mean, at any time, the excess, if any, of (i) $416,666,667.00 over (ii) the aggregate amount of all Incremental Term Loans made hereunder prior to such time in accordance with Section 2.24.

"Incremental Bank" is defined in Section 2.24(a).

"Incremental Term Loan" means each Loan made after the Initial Borrowing Date pursuant to the terms of Section 2.24.

"Indemnified Taxes" means (a) Taxes other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Company under any Loan Papers and (b) Other Taxes.

"Initial Borrowing Date" means April 1, 2020.

"Index Debt" means senior, unsecured, non-credit enhanced debt with an original term of longer than one year issued by the Company.

"Index Debt Rating" means, as of any date, the rating that has been most recently announced by S&P and Moody's for the Index Debt of the Company. For purposes of the foregoing, (a) if only one of S&P and Moody's shall have in effect an Index Debt Rating, the Applicable Rate shall be determined by reference to the available rating; (b) if the Index Debt Ratings established by S&P and Moody's shall fall within

different levels, the Applicable Rate shall be based upon the higher rating, except that if the difference is two or more levels, the Applicable Rate shall be based on the rating that is one level below the higher rating; (c) if any Index Debt Rating established by S&P or Moody's shall be changed, such change shall be effective as of the date on which such change is first announced publicly by the rating agency making such change; (d) if S&P or Moody's shall change the basis on which ratings are established, each reference to the rating for the Index Debt announced by S&P or Moody's, as the case may be, shall refer to the then equivalent rating by S&P or Moody's, as the case may be; and (e) if neither S&P nor Moody's shall have in effect an Index Debt Rating, the Applicable Rate shall be set in accordance with the lowest level rating and highest percentage rate set forth in the table in the definition of "Applicable Rate".

"Interest Payment Date" means (i) with respect to any Alternate Base Loan, each Quarterly Payment Date, or if earlier the Maturity Date or the date of prepayment of such Loan or conversion of such Loan to a Eurodollar Loan and (ii) with respect to any Eurodollar Loan, the last day of the Interest Period applicable thereto and, in the case of a Eurodollar Loan with an Interest Period longer than three months each day that would have been the Interest Payment Date for such Loan had successive Interest Periods of three months been applicable to such Loan, or if earlier, the Maturity Date or the date of prepayment of such Loan or conversion of such Loan to an Alternate Base Loan.

"Interest Period" means, as to any Eurodollar Loan, the period commencing on the date of such Loan and ending on the numerically corresponding day (or if there is no corresponding day, the last day) in the calendar month that is one, two, three or six, or, if agreed to by all Banks, twelve months thereafter, as the Company may elect; provided, that (x) if any Interest Period would end on a day which shall not be a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless, with respect to Eurodollar Loans only, such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (y) no Interest Period may be selected that ends later than the Maturity Date. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.

"International Interest" means an "international interest" as defined in the Cape Town Convention.

"International Registry" means the "International Registry" as defined in the Cape Town Convention.

"Interpolated Rate" means, at any time, the rate per annum (rounded to the same number of decimal places as the Screen Rate) determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the Screen Rate for the longest period for which that Screen Rate is available in dollars that is shorter than the Impacted Interest Period and (b) the Screen Rate for the shortest period for which that Screen Rate is available for dollars that is longer the Impacted Interest Period, in each case, as of 11:00 a.m., London time (or as soon thereafter as practicable), two Business Days before the first day of such Impacted Interest Period.

"Laws" means all applicable statutes, laws, treaties, ordinances, rules, regulations, orders, writs, injunctions, decrees, judgments, or opinions of any Tribunal.

"LIBO Rate" means, for any Eurodollar Loan for any Interest Period therefor, a rate per annum equal to the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for dollars for a period equal in length to such Interest Period as displayed on pages LIBOR01 or LIBOR02 of the Reuters Screen that displays such rate (or, in the event such rate does not appear on either of such Reuters pages, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that

xv

publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion; in each case, the "Screen Rate") at approximately 11:00 a.m., London time (or as soon thereafter as practicable), two Business Days before the first day of such Interest Period; provided that if the Screen Rate shall be less than 1.00%, such rate shall be deemed to be 1.00% for purposes of this Agreement; provided, further, that if the Screen Rate shall not be available at such time for such Interest Period (an "Impacted Interest Period") with respect to dollars, then the LIBO Rate shall be the Interpolated Rate at such time (provided that if the Interpolated Rate shall be less than 1.00%, such rate shall be deemed to be 1.00% for purposes of this Agreement). The LIBO Rate for the Interest Period for each Eurodollar Loan comprising part of the same Borrowing shall be determined by the Administrative Agent.

"Lien" means any mortgage, lien, pledge, charge, security interest or other encumbrance in or on, or any interest or title of any vendor, lessor, lender or other secured party to or of any Person under, any conditional sale or other title retention agreement or lease with respect to, any Property or asset of such Person. For avoidance of doubt, the filing of a Uniform Commercial Code financing statement by a Person that is not entitled or authorized in accordance with the applicable Uniform Commercial Code to file such financing statement shall not, in and of itself, constitute a Lien.

"Litigation" means any action conducted, pending, or threatened by or before any Tribunal.

"Loan" means (i) an Existing Term Loan, (ii) an Additional Term Loan made by Banks to the Company pursuant to Section 2.1, and (iii) an Incremental Term Loan made by Incremental Banks pursuant to Section 2.24, and shall be either a Eurodollar Loan or an Alternate Base Loan.

"Loan Papers" means (i) this Agreement, certificates delivered pursuant to this Agreement and exhibits and schedules hereto, (ii) the Aircraft Mortgage, (iii) the Mortgaged Aircraft Operating Agreement, (iv) any notes, security documents, guaranties, and other agreements in favor of the Administrative Agent and Banks, or any or some of them, ever delivered in connection with this Agreement and (v) all renewals, extensions, or restatements of, or amendments or supplements to, any of the foregoing.

"Majority Banks" means, at any time, Banks having Loans and unused Additional Commitments representing more than 50% of the aggregate outstanding Loans and unused Additional Commitments at such time.

"Material Adverse Change" or "Material Adverse Effect" means an act, event or circumstance which materially and adversely affects the business, financial condition or results of operations of the Company and its Subsidiaries on a consolidated basis or the ability of the Company to perform its obligations under this Agreement or any Loan Paper.

"Material Subsidiary" means, at any time, any Subsidiary of the Company having at such time (i) total assets, as of the last day of the most recently ended fiscal quarter for which the Company's annual or quarterly Financial Statements have been most recently required to have been delivered pursuant to Section 6.10, having a net book value greater than or equal to 10% of the total assets of the Company and all of its Subsidiaries on a consolidated basis, (ii) Adjusted Pre-Tax Income, as of the last day of the most recently ended fiscal quarter for which the Company's annual or quarterly Financial Statements have been most recently required to have been delivered pursuant to Section 6.10, greater than or equal to 10% of the total Adjusted Pre-Tax Income of the Company and all of its Subsidiaries on a consolidated basis or (iii) any Pool Assets.

"Maturity Date" means March 29, 2021.

"Moody's" shall mean Moody's Investors Service, Inc. (or any successor thereto).

"Mortgaged Aircraft Operating Agreement" means the mortgaged aircraft operating agreement, in substantially the form of Exhibit H, dated as of the Effective Date, between the Company and the Administrative Agent, as the same may be amended, restated, modified, supplemented, extended or amended and restated from time to time.

"Net Cash Proceeds" means, with respect to any Capital Markets Transaction, the excess of (i) the aggregate amount of all cash received by the Company or any Subsidiary in connection with such transaction over (ii) the sum of the aggregate fees, underwriting discounts, commissions, legal costs and other expenses incurred by the Company or any of its Subsidiaries in connection therewith plus the amount of taxes paid or reasonably estimated to be paid, and any reserves established to fund any contingent liabilities in connection therewith.

"Net Interest Expense" means interest expense minus interest income, excluding in either case capitalized interest, but including payments in the nature of interest under capital leases if and to the extent characterized as such in accordance with GAAP.

"New York Fed" means the Federal Reserve Bank of New York.

"New York Fed Bank Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for any day that is a Business Day, the term "New York Fed Bank Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. on such day received by the Administrative Agent from a federal funds broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates as so determined be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Note" means a promissory note which a Bank may require the Company to execute in accordance with Section 2.7(b), payable to the order of such Bank, in substantially the form of Exhibit B hereto, with the blanks appropriately completed, to evidence the aggregate indebtedness of the Company to such Bank resulting from the Loans made by such Bank to the Company, together with all modifications, extensions, renewals, and rearrangements thereof.

"Notice of Committed Borrowing" is defined in Section 2.2.

"Obligation" means all present and future indebtedness, obligations, and liabilities, and all renewals, extensions, and modifications thereof, owed to the Administrative Agent and Banks, or any or some of them, by the Company, arising pursuant to any Loan Paper, together with all interest thereon and costs, expenses, and reasonable attorneys' fees incurred in the enforcement or collection thereof.

"OECD" means the Organization for Economic Cooperation and Development as constituted on the date hereof (excluding Mexico, Poland and the Czech Republic).

"Officer's Certificate" means a certificate signed in the name of the Company by either its Chairman, its Chief Executive Officer, its Chief Financial Officer, its President, one of its Vice Presidents, its Treasurer, or its Assistant Treasurer, in each case without personal liability.

"Other Connection Taxes" means with respect to the Administrative Agent or any Bank, as the case may be, Taxes imposed as a result of a present or former connection between the Administrative Agent or such Bank, as the case may be, and the jurisdiction imposing such Taxes (other than a connection arising solely from the Administrative Agent or such Bank having executed, delivered, enforced, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, or engaged in any other transaction pursuant to, or enforced, any Loan Papers, or, in each case in accordance with and subject to the provisions of this Agreement, sold or assigned an interest in any Loan Papers).

"Other Taxes" means any present or future stamp, court, documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the registration, receipt or perfection of a security interest under, or otherwise with respect to, this Agreement or any Loan Papers, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than Other Connection Taxes imposed with respect to an assignment under Section 2.23).

"Overnight Bank Funding Rate" means, for any day, the rate comprised of both overnight federal funds and overnight Eurodollar borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the New York Fed as set forth on the Federal Reserve Bank of New York's Website from time to time, and published on the next succeeding Business Day by the New York Fed as an overnight bank funding rate.

"Participant Register" is defined in Section 9.11(b).

"Permitted Liens" means: (a) Liens for taxes, assessments and governmental charges or levies which either are not yet due and payable or are being contested in good faith by appropriate proceedings and for which adequate reserves are established in accordance with GAAP; (b) Liens securing judgments, but only to the extent, for an amount and for a period not resulting in an Event of Default under Section 7.1(d); (c) Liens securing Obligations under this Agreement; (d) Liens constituting normal operational usage of the affected Property, including charter, third party maintenance, storage, leasing, pooling or interchange thereof; (e) Liens imposed by law such as materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business securing obligations that (i) are not overdue for a period of more than 30 days, provided that no enforcement, collection, execution, levy or foreclosure proceeding shall have been commenced with respect thereto, or (ii) are being contested in good faith and for which adequate reserves are established in accordance with GAAP; and (f) salvage or similar rights of insurers under the insurances required to be maintained pursuant to the Mortgaged Aircraft Operating Agreement.

"Person" means and includes an individual, partnership, joint venture, corporation, trust, limited liability company or other entity, Tribunal, unincorporated organization, or government, or any department, agency, or political subdivision thereof.

"Plan" means any plan defined in Section 4021(a) of ERISA in respect of which the Company is an "employer" or a "substantial employer" as such terms are defined in ERISA.

"Pool Assets" means assets of the Company and any of its Wholly Owned Domestic Subsidiaries listed on Schedule I, to the extent modified pursuant to Section 6.12, and shall include only Specified Equipment owned legally by the Company and any of its Wholly Owned Domestic Subsidiaries.

"Prime Rate" is defined in the definition of the term Alternate Base Rate.

"Principal Office" of the Administrative Agent means 500 Stanton Christiana Road, NCC5 / 1st Floor, Newark, Delaware 19713-2107, or such other office as the Administrative Agent may hereafter designate from time to time as its "Principal Office" by notice to the Company and the Banks.

"Property" means all types of real, personal, tangible, intangible, or mixed property.

"Quarterly Payment Date" means the 15th day of each March, June, September and December of each year, the first of which shall be the first such day after the Effective Date.

"Register" is defined in Section 9.11(e).

"Regulation D" means Regulation D of the Fed Reserve Board, as the same is from time to time in effect, and all official rulings and interpretations thereunder or thereof.

"Regulatory Change" means, with respect to any Bank, (a) any adoption or change after the Effective Date of or in United States federal, state or foreign laws, rules, regulations (including Regulation D) or guidelines applying to a class of banks including such Bank, (b) the adoption or making after the Effective Date of any interpretations, directives or requests applying to a class of banks including such Bank of or under any United States federal, state or foreign laws, rules, regulations or guidelines (whether or not having the force of law) by any Tribunal, monetary authority, central bank, or comparable agency charged with the interpretation or administration thereof, or (c) any change in the interpretation or administration of any United States federal, state or foreign laws, rules, regulations or guidelines applying to a class of banks including such Bank by any Tribunal, monetary authority, central bank, or comparable agency charged with the interpretation or administration thereof.

"Relevant Governmental Body" means the Federal Reserve Board and/or the New York Fed, or a committee officially endorsed or convened by the Federal Reserve Board and/or the New York Fed or, in each case, any successor thereto.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Rights" means rights, remedies, powers, and privileges.

"S&P" means Standard & Poor's Financial Services LLC and any successor to its rating agency business.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State or by the United Nations Security Council, the European Union or any European Union member state, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any Person

xix

owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b), or (d) any Person otherwise the subject of any Sanctions.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State.

"Screen Rate" is defined in the definition of "LIBO Rate".

"Secured Parties" shall mean the Administrative Agent and the Banks.

"Senior Officer" means, in each case for the Company, its Chief Executive Officer, Chief Financial Officer, President, Treasurer, or its Assistant Treasurer.

"SOFR" with respect to any day means the secured overnight financing rate published for such day by the New York Fed Bank Rate, as the administrator of the benchmark (or a successor administrator), on the New York Fed's Website.

"SOFR-Based Rate" means SOFR, Compounded SOFR or Term SOFR.

"Specified Equipment" means aircraft consisting of the Boeing 737-700, Boeing 737-800, Boeing 737 MAX 7 and Boeing 737 MAX 8 models (and any later generation model of any thereof), including its related engines; provided that aircraft that is Boeing 737 MAX 7 or Boeing 737 MAX 8 may constitute Specified Equipment solely to the extent that the applicable model is issued an airworthiness certificate by the FAA confirming that it is certified to fly.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentage (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Federal Reserve Board to which the Administrative Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D). Such reserve percentage shall include those imposed pursuant to Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Bank under Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subsidiary" of a Person means any entity of which an aggregate of more than 50% (in number of votes) of the stock (or equivalent interests) is owned of record or beneficially, directly or indirectly, by such Person.

"Successor Company" is defined in Section 6.14(a).

"Taxes" means all present or future taxes, assessments, fees, levies, imposts, duties, deductions, withholdings (including backup withholding), value added taxes or any other goods and services, use or sales taxes, assessments, fees or other charges at any time imposed by any Laws or Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term SOFR" means the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

xx

"Total Additional Commitment" means on the Additional Commitments of all Banks.

"Total Liquidity" means, at any time, the sum of (a) the aggregate amount available to be borrowed by the Company under the Revolving Credit Agreement plus (b) the aggregate amount of unrestricted cash and cash equivalents of the Company and its Subsidiaries at such time.

"Tribunal" means any municipal, state, commonwealth, federal, foreign, territorial, or other court, governmental body, subdivision, agency, department, commission, board, bureau, or instrumentality.

"Type" refers to the distinction between Loans that are Alternate Base Loans and Loans that are Eurodollar Loans.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment; provided that, if the Unadjusted Benchmark Replacement as so determined would be less than 1.00%, the Unadjusted Benchmark Replacement will be deemed to be 1.00% for the purposes of this Agreement.

"United States" and "U.S." each means United States of America.

"U.S. Tax Compliance Certificate" is defined in Section 2.18.

"Wholly Owned Domestic Subsidiary" means a Wholly Owned Subsidiary of the Company organized under the laws of any jurisdiction within the United States.

"Wholly Owned Subsidiary" means, as to any Person, any other Person all of the Capital Stock of which (other than directors' qualifying shares required by law) is owned by such Person directly and/or through other Wholly Owned Subsidiaries.

"Withholding Agent" means the Company and the Administrative Agent.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.2    Computation of Time Periods. In this Agreement in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding."

Section 1.3    Interest Rates; LIBOR Notification. The interest rate on Eurodollar Loans is determined by reference to the LIBO Rate, which is derived from the London interbank offered rate. The London interbank offered rate is intended to represent the rate at which contributing banks may obtain short-term borrowings from each other in the London interbank market. In July 2017, the U.K. Financial Conduct Authority announced that, after the end of 2021, it would no longer persuade or compel contributing banks to make rate submissions to the ICE Benchmark Administration (together with any successor to the ICE Benchmark Administrator, the "IBA") for purposes of the IBA setting the London interbank offered rate. As a result, it is possible that commencing in 2022, the London interbank offered rate may no longer be available or may no longer be deemed an appropriate reference rate upon which to determine the interest rate on Eurodollar Loans. In light of this eventuality, public and private sector industry initiatives are currently underway to identify new or alternative reference rates to be used in place of the London interbank offered rate. Upon the occurrence of a Benchmark Transition Event or an Early Opt-In Election, Section 2.10(b) provides a mechanism for determining an alternative rate of interest. The Administrative Agent will promptly notify the Company, pursuant to Section 2.10(d), of any change to the reference rate upon which the interest rate on Eurodollar Loans is based. However, none of the Administrative Agent and the Banks warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission or any other matter related to the London interbank offered rate or other rates in the definition of "LIBO Rate" or with respect to any alternative or successor rate thereto, or replacement rate thereof (including, without limitation, (i) any such alternative, successor or replacement rate implemented pursuant to Section 2.10(b), whether upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, and (ii) the implementation of any Benchmark Replacement Conforming Changes pursuant to Section 2.10(c)), including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the LIBO Rate or have the same volume or liquidity as did the London interbank offered rate prior to its discontinuance or unavailability.

## ARTICLE II

## LOANS

Section 2.1    Additional Commitments.

(a) Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Bank, severally and not jointly, agrees to make Loans ("Additional Term Loans") in dollars to the Company on the Initial Borrowing Date, in an aggregate amount not to exceed the amount of such Bank's Additional Commitment.

(b) Upon the occurrence of the funding of any Borrowing on or after the Effective Date, the Total Additional Commitments shall be automatically and permanently reduced by the aggregate principal amount of the Loans funded pursuant to such Borrowing, and the Additional Commitment of each Bank shall be automatically and permanently reduced according to its Applicable Percentage.

Section 2.2    Committed Borrowing Procedure on the Initial Borrowing Date. In order to effect a Committed Borrowing, the Company shall hand deliver, telecopy or e-mail to the Administrative Agent a duly completed request for Committed Borrowing, substantially in the form of Exhibit A hereto (a "Notice of Committed Borrowing"), (i) in the case of Eurodollar Loans, not later than 11:00 a.m., New York City time, two Business Days before the Initial Borrowing Date specified for a proposed Committed Borrowing, and (ii) in the case of Alternate Base Loans, not later than 11:00 a.m., New York City time, on the Business Day which is the Initial Borrowing Date specified for a proposed Committed Borrowing. Such notice shall be irrevocable and shall in each case refer to this Agreement and specify (x) whether the Loans then being requested are to be Eurodollar Loans, or Alternate Base Loans, (y) the Initial Borrowing Date of such Loans (which shall be a Business Day) and the aggregate amount thereof (which shall be in the aggregate amount of $2,333,333,333.00) and (z) in the case of a Eurodollar Loan, the Interest Period with respect thereto (which shall not end later than the Maturity Date). If no Interest Period with respect to any Eurodollar Loan is specified in any such Notice of Committed Borrowing, then the Company shall be deemed to have selected an Interest Period of one month's duration. Promptly upon receipt, the Administrative Agent shall advise the other Banks of such Notice of Committed Borrowing and of each Bank's portion of the requested Committed Borrowing by telecopier or e-mail. Each Committed Borrowing shall consist of Loans of the same Type made on the same day and having the same Interest Period.

Section 2.3    Conversions

Subject to the conditions and limitations set forth in this Agreement, the Company shall have the right from time to time to convert all or part of one Type of Loan into another Type of Loan or to continue all or a part of any Loan that is a Eurodollar Loan from one Interest Period to another Interest Period by giving the Administrative Agent written notice (by means of a Notice of Committed Borrowing) (i) in the case of Eurodollar Loans, not later than 11:00 a.m., New York City time, three Business Days before the date specified for such proposed conversion or continuation, and (ii) in the case of Alternate Base Loans, not later than 11:00 a.m., New York City time, on the Business Day which is the date specified for such proposed conversion or continuation. Such notice shall specify (A) the proposed date for conversion or continuation, (B) the amount of the Loan to be converted or continued, (C) in the case of conversions, the Type of Loan to be converted into, and (D) in the case of a continuation of or conversion into a Eurodollar Loan, the duration of the Interest Period applicable thereto; provided that (1) Eurodollar Loans may be converted only on the last day of the applicable Interest Period, (2) except for conversions to Alternate Base Loans, no conversion shall be made while an Event of Default has occurred and is continuing and no continuations of any Eurodollar Loan from one Interest Period to another Interest Period shall be made while an Event of Default has occurred and is continuing, unless such conversion or continuation has been approved by Majority Banks, and (3) each such conversion or continuation shall be in an amount not less than $10,000,000 and shall be an integral multiple of $1,000,000. All notices given under this Section shall be irrevocable. If the Company shall fail to give the Administrative Agent the notice as specified above for continuation or conversion of a Eurodollar Loan prior to the end of the Interest Period with respect thereto, such Eurodollar Loan shall automatically be converted into an Alternate Base Loan on the last day of the Interest Period for such Eurodollar Loan.

Section 2.4    [Reserved].

Section 2.5    Termination and Reduction of Additional Commitments.

(a)    The Company may permanently terminate, or from time to time in part permanently reduce, the Total Additional Commitment, in each case upon at least three Business Days' prior (or, in the case of a refinancing or new facility with the Administrative Agent, on a same-day basis with) written notice

xxiii

to the Administrative Agent (who shall promptly forward a copy thereof to each Bank). Such notice shall specify the date and the amount of the termination or reduction of the Total Additional Commitment. Each such partial reduction of the Total Additional Commitment shall be in a minimum aggregate principal amount of $10,000,000 and in an integral multiple of $1,000,000.

(b)   On the Additional Commitment Termination Date the Total Additional Commitment shall be reduced to zero.

(c)   Each reduction in the Total Additional Commitment pursuant to this Section 2.5 shall be made ratably among the Banks in accordance with their respective Additional Commitments.

Section 2.6    Loans

(a)   The Existing Term Loans under the Existing Credit Agreement shall constitute Loans hereunder. Subject to the terms and conditions set forth herein, each Bank severally agrees to make a Loan in U.S. dollars to the Company on the Initial Borrowing Date, in an aggregate amount not to exceed the amount of such Bank's Additional Commitment. The Existing Term Loan and the Additional Term Loans shall constitute a single tranche of Loans under this Agreement following the making of the Additional Term Loans hereunder.

(b)   Upon the occurrence of any Borrowing, the Total Additional Commitments shall be automatically and permanently reduced by the aggregate principal amount of the Loans funded pursuant to such Borrowing, and the Additional Commitment of each Bank shall be automatically and permanently reduced according to its Applicable Percentage of such funding.

(c)   Each Loan shall be a Eurodollar Loan or an Alternate Base Loan, as the Company may request subject to and in accordance with Section 2.2 or Section 2.3, as applicable. Each Bank may at its option make any Eurodollar Loan by causing a foreign branch or Affiliate of such Bank to make such Loan; provided, however, that any exercise of such option shall not affect the obligation of the Company to repay such Loan in accordance with the terms of this Agreement or increase the Company's obligations to such Bank hereunder. Loans of more than one interest rate option may be outstanding at the same time; provided, however, that the Company shall not be entitled to request any Loan which, if made, would result in an aggregate of more than ten separate Interest Periods being outstanding hereunder at any one time. For purposes of the foregoing, Loans having different Interest Periods, regardless of whether they commence on the same date, shall be considered separate Loans.

(d)   Subject to Section 2.3, each Bank shall make its portion of the Committed Borrowing on the Initial Borrowing Date by paying the amount required to the Administrative Agent at the Principal Office in immediately available funds not later than 1:00 p.m., New York City time, and the Administrative Agent shall by 2:00 p.m., New York City time, credit the amounts so received to the general deposit account of the Company with the Administrative Agent or, if Loans are not made on the Initial Borrowing Date because any condition precedent shall not have been met, return the amounts so received to the respective Banks as soon as practicable.

(e)   The outstanding principal amount of each Loan shall be due and payable on the Maturity Date; provided that, upon the occurrence of an Early Maturity Event and to the extent any Loans are outstanding, all or a portion of the outstanding Loans equal to the Applicable Early Maturity Amount related to such Early Maturity Event (or, if less, the aggregate then outstanding principal amount of Loans) shall be payable as a scheduled payment on or prior to the third Business Day following the occurrence of such Early Maturity Event (provided that to the extent any Additional Commitments are also outstanding,

xxiv

the Applicable Early Maturity Amount shall be applied (dollar for dollar) to first reduce the then outstanding Additional Commitments of the Banks in accordance with the Applicable Percentages until the Additional Commitments are reduced to zero, and then any remainder shall be applied to repay the then outstanding Loans on a pro rata basis).

Section 2.7    Loan Accounts

(a)    The Loans made by each Bank shall be evidenced by one or more loan accounts or records maintained by such Bank in the ordinary course of business. Absent manifest error, the loan accounts or records maintained by the Administrative Agent and each Bank shall be prima facie evidence of the amount of the Loans made by the Banks to the Company and the interest and payments thereon. Any failure so to record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Company hereunder to pay any amount owing with respect to the Loans.

(b)    Upon the request of any Bank made through the Administrative Agent, the Loans made by such Bank may be evidenced by one or more Notes, instead of or in addition to loan accounts, and upon any such request the Company shall execute and deliver such Notes to such Bank. Each such Bank shall, and is hereby authorized by the Company to, endorse on the schedule attached to the relevant Note held by such Bank (or on a continuation of such schedule attached to each such Note and made a part thereof) or in its records relating to such Note an appropriate notation evidencing the date and amount of each Loan of such Bank, each payment or prepayment of principal of any Loan, and the other information provided for on such schedule. The failure of any Bank to make such a notation or any error therein shall not in any manner affect the obligation of the Company to repay the Loans made by such Bank in accordance with the terms of the relevant Note.

Section 2.8    Interest on Loans

(a)    Subject to the provisions of Section 2.9, each Eurodollar Loan shall bear interest at a rate per annum (computed on the basis of the actual number of days elapsed over a year of 360 days) equal to the LIBO Rate for the Interest Period in effect for such Loan plus the Applicable Rate. Interest on each Eurodollar Loan shall be payable on each Interest Payment Date applicable thereto. The applicable LIBO Rate for each Interest Period shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

(b)    Subject to the provisions of Section 2.9, each Alternate Base Loan shall bear interest at the rate per annum equal to the Alternate Base Rate plus the Applicable Rate (if the Alternate Base Rate is based on the Prime Rate, computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as the case may be; if the Alternate Base Rate is based on the LIBO Rate or the Federal Funds Effective Rate, computed on the basis of the actual number of days elapsed over a year of 360 days). Interest on each Alternate Base Loan shall be payable on each Interest Payment Date applicable thereto. The applicable Alternate Base Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

Section 2.9    Interest on Overdue Amounts. If the Company shall default in the payment of the principal of or interest on any Loan or any other amount becoming due hereunder, the Company shall on demand from time to time pay interest, to the extent permitted by Law, on such defaulted amount up to (but not including) the date of actual payment (after as well as before judgment) at a rate per annum equal to (i) in the case of the principal amount of any Eurodollar Loan, 2% above the rate otherwise applicable thereto and (ii) in all other cases, the Agreed Maximum Rate (if the Alternate Base Rate is based on the Prime Rate,

xxv

computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as the case may be; if the Alternate Base Rate is based on the LIBO Rate or the Federal Funds Effective Rate, computed on the basis of the actual number of days elapsed over a year of 360 days).

Section 2.10    Alternate Rate of Interest. (a) If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(i)    Subject to clause (b) below, the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable (including because the Screen Rate is not available or published on a current basis), for dollars such Interest Period; or

(ii)    the Administrative Agent is advised by the Majority Banks that the Adjusted LIBO Rate or the LIBO Rate, as applicable, for dollars and such Interest Period will not adequately and fairly reflect the cost to such Banks (or Bank) of making or maintaining their Loans (or its Loan) included in such Borrowing for dollars and such Interest Period;

then the Administrative Agent shall give notice thereof to the Company and the Banks by telephone, telecopy or electronic mail as promptly as practicable thereafter and, until the Administrative Agent notifies the Company and the Banks that the circumstances giving rise to such notice no longer exist, any interest election request pursuant to Section 2.3 that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective; provided that if the circumstances giving rise to such notice affect only one Type of Borrowings, then the other Type of Borrowings shall be permitted.

(b) Notwithstanding anything to the contrary herein or in any other Loan Paper, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, the Administrative Agent and the Company may amend this Agreement to replace the LIBO Rate with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all Banks and the Company, so long as the Administrative Agent has not received, by such time, written notice of objection to such proposed amendment from Banks comprising the Majority Banks; provided that, with respect to any such proposed amendment containing any SOFR-Based Rate, the Banks shall be entitled to object only to the Benchmark Replacement Adjustment contained therein. Any such amendment with respect to an Early Opt-in Election will become effective on the date that Banks comprising the Majority Banks have delivered to the Administrative Agent written notice that such Majority Banks accept such amendment. No replacement of LIBO Rate with a Benchmark Replacement will occur prior to the applicable Benchmark Transition Start Date.

(c) In connection with the implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Paper, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(d) The Administrative Agent will promptly notify the Company and the Banks of (i) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes and

(iv) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or Banks pursuant to this Section 2.10, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 2.10.

(e) Upon the Company's receipt of notice of the commencement of a Benchmark Unavailability Period, any interest election request pursuant to Section 2.3 that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective.

Section 2.11    Prepayment of Loans

(a)    The Company shall have the right at any time to prepay the Loans, in whole or in part, subject to the requirements of Section 2.14 or Section 2.15 but otherwise without premium or penalty, upon at least three Business Days prior written notice to the Administrative Agent; provided, however, that each such partial prepayment (other than any prepayment as a result of the consummation of a Capital Markets Transaction) shall be in an integral multiple of $1,000,000 and in a minimum aggregate principal amount of $5,000,000. Each notice of prepayment shall specify the prepayment date and the aggregate principal amount of each Borrowing to be prepaid, shall be irrevocable and shall commit the Company to prepay such Borrowing by the amount stated therein.

(b)    [reserved].

(c)    All prepayments under this Section 2.11 shall be accompanied by accrued interest on the principal amount being prepaid to the date of prepayment. Amounts prepaid pursuant to this Section 2.11 may not be reborrowed.

Section 2.12    Reserve Requirements; Change in Circumstances

(a)    Notwithstanding any other provision herein, if after the date of this Agreement any Regulatory Change or change in any Law (i) shall subject the Administrative Agent or a Bank to any Taxes (other than (w) Indemnified Taxes, (x) Taxes described in clauses (c) and (e) of Excluded Taxes, (y) Other Taxes and (z) Other Connection Taxes imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, (ii) shall impose, modify, or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement with respect to any Eurodollar Loan against assets of, deposits with or for the account of, or credit extended by, such Bank under this Agreement, or (iii) with respect to any Eurodollar Loan, shall impose on such Bank or the Eurodollar Interbank Market any other condition, cost or expense affecting this Agreement or any Eurodollar Loan made by such Bank, and the result of any of the foregoing shall be to materially increase the actual cost to such Bank (or such Administrative Agent in the case of (i)) of maintaining its Additional Commitment or of making, converting to, continuing or maintaining any Eurodollar Loan or to materially reduce the amount of any sum received or receivable by such Bank (or such Administrative Agent in the case of (i)) hereunder (whether of principal, interest, or otherwise) in respect thereof, then the Company shall pay to the Administrative Agent for the account of such Bank (or such Administrative Agent in the case of (i)), within ten days following delivery to the Company of the certificate specified in paragraph (c) below by such Bank (or such Administrative Agent in the case of (i)), such additional amount or amounts as will reimburse such Bank (or such Administrative Agent in the case

xxvii

of (i)) for such increase or reduction to such Bank (or such Administrative Agent in the case of (i)) to the extent reasonably allocable to this Agreement.

(b)    If any Bank shall have determined in good faith that any Regulatory Change regarding capital or liquidity requirements or compliance by any Bank (or its parent or any lending office of such Bank) with any request or directive issued subsequent to the Effective Date regarding capital or liquidity requirements (whether or not having the force of Law) of any Tribunal, monetary authority, central bank, or comparable agency, has or would have the effect of reducing the rate of return on such Bank's (or its parent's) capital as a consequence of its obligations hereunder to a level below that which such Bank (or its parent) could have achieved but for such Regulatory Change, or compliance (taking into consideration such Bank's policies with respect to capital adequacy or liquidity) by an amount deemed by such Bank to be material, then from time to time, the Company shall pay to the Administrative Agent for the account of such Bank, within ten days following delivery to the Company of the certificate specified in paragraph (d) below by such Bank, such additional amount or amounts as will reimburse such Bank (or its parent) for such reduction.

(c)    Notwithstanding anything herein to the contrary, (i) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or by United States or foreign regulatory authorities, in each case pursuant to Basel III, and (ii) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof, shall in each case be deemed to be a Regulatory Change and a change in Law, regardless of the date enacted, adopted or issued.

(d)    Each Bank or the Administrative Agent shall notify the Company of any event occurring after the date hereof entitling such Bank to compensation under paragraph (a) or (b) of this Section 2.12 (together with a good faith estimate of the amounts it would be entitled to claim in respect of such event) as promptly as practicable, but in any event on or before the date which is 60 days after the related Regulatory Change, change in any Law or other event; provided that (i) if such Bank or the Administrative Agent fails to give such notice by such date, such Bank or the Administrative Agent shall, with respect to compensation payable pursuant to paragraph (a) or (b) of this Section 2.12 in respect of any costs resulting from such Regulatory Change, change in any Law or other event, only be entitled to payment under paragraph (a) or (b) of this Section 2.12 for costs incurred from and after the date of such notice and (ii) such Bank or the Administrative Agent will take such reasonable actions, if any (including the designation of a different Applicable Lending Office for the Loans of such Bank affected by such event) to avoid the need for, or reduce the amount of, such compensation so long as such actions will not, in the reasonable opinion of such Bank or the Administrative Agent, be materially disadvantageous to such Bank or the Administrative Agent, as the case may be. A certificate of a Bank or the Administrative Agent setting forth in reasonable detail (i) the Regulatory Change, change in any Law or other event giving rise to any costs, (ii) such amount or amounts as shall be necessary to reimburse such Bank or the Administrative Agent as specified in paragraph (a) or (b) of this Section 2.12, as the case may be, and (iii) the calculation of such amount or amounts, shall be delivered to the Company (with a copy to the Administrative Agent) promptly after such Bank or the Administrative Agent determines it is entitled to payment under this Section 2.12, and shall be conclusive and binding absent manifest error. In preparing such certificate, such Bank or the Administrative Agent may employ such assumptions and allocations of costs and expenses as it shall in good faith deem reasonable and may use any reasonable averaging and attribution method.

(e)    In the event any Bank shall seek payment pursuant to this Section 2.12 or the events contemplated under Section 2.10 or Section 2.13 shall have occurred with respect to any Bank, the Company

xxviii

shall have the right to replace such Bank with, and add as "Banks" under this Agreement in place thereof, one or more assignees as provided in Section 2.23(b).

(f)    Without prejudice to the survival of any other obligations of the Company hereunder, the obligations of the Company under this Section 2.12 shall survive for one year after the termination of this Agreement and/or the payment or assignment of any of the Loans or Notes.

Section 2.13    Change in Legality

(a)    Notwithstanding anything to the contrary herein contained, if any Regulatory Change shall make it unlawful for any Bank to make or maintain any Eurodollar Loan or to give effect to its obligations in respect of Eurodollar Loans as contemplated hereby, then, by prompt written notice to the Company and to the Administrative Agent, such Bank may:

(i)    declare that Eurodollar Loans will not thereafter be made by such Bank hereunder, whereupon the Company shall be prohibited from requesting Eurodollar Loans from such Bank hereunder unless such declaration is subsequently withdrawn; and

(ii)    if such unlawfulness shall be effective prior to the end of any Interest Period of an outstanding Eurodollar Loan, require that all outstanding Eurodollar Loans with such Interest Periods made by it be converted to Alternate Base Loans, in which event (A) all such Eurodollar Loans shall be automatically converted to Alternate Base Loans as of the effective date of such notice as provided in paragraph (b) below and (B) all payments and prepayments of principal which would otherwise have been applied to repay the converted Eurodollar Loans shall instead be applied to repay the Alternate Base Loans resulting from the conversion of such Eurodollar Loans.

(b)    For purposes of this Section 2.13, a notice to the Company (with a copy to the Administrative Agent) by any Bank pursuant to paragraph (a) above shall be effective on the date of receipt thereof by the Company. Any Bank having furnished such a notice agrees to withdraw the same promptly following any Regulatory Change that makes it lawful for such Bank to make and maintain Eurodollar Loans.

(c)    If, with respect to any Bank, a condition arises or an event occurs which would, or would upon the giving of notice, result in the payment of amounts pursuant to Section 2.12 or permit such Bank, pursuant to this Section 2.13, to suspend its obligation to make Eurodollar Loans, such Bank, promptly upon becoming aware of the same, shall notify the Company thereof and shall take such steps as may reasonably be available to it (including, without limitation, changing its Applicable Lending Office) to mitigate the effects of such condition or event, provided that such Bank shall be under no obligation to take any step that, in its good faith opinion, would (a) result in its incurring any additional costs in performing its obligations hereunder and under any outstanding Loan (unless the Company has notified such Bank of the Company's agreement to reimburse it for the same) or (b) be otherwise adverse to such Bank in a material respect.

Section 2.14    Indemnity. The Company shall indemnify each Bank against any loss or reasonable expense which such Bank may sustain or incur as a consequence of (a) any failure by the Company to fulfill on the date of any Borrowing hereunder the applicable conditions set forth in Article IV, (b) any failure by the Company to borrow hereunder after a Notice of Committed Borrowing pursuant to Article II has been given, (c) any payment, prepayment, or conversion of a Eurodollar Loan

required by any other provision of this Agreement or otherwise made on a date other than the last day of the applicable Interest Period for any reason, including without limitation the acceleration of outstanding Loans as a result of any Event of Default or (d) any failure by the Company for any reason (including without limitation the existence of a Default or an Event of Default) to pay, prepay or convert a Eurodollar Loan on the date for such payment, prepayment or conversion, specified in the relevant notice of payment, prepayment or conversion under this Agreement. The indemnity of the Company pursuant to the immediately preceding sentence shall include, but not be limited to, any loss or reasonable expense sustained or incurred or to be sustained or incurred in liquidating or employing deposits from third parties acquired to effect or maintain such Loan or any part thereof as a Eurodollar Loan. Such loss or reasonable expense shall include, without limitation, an amount equal to the excess, if any, as reasonably determined by each Bank of (i) its cost of obtaining the funds for the Loan being paid, prepaid, or converted or not borrowed, paid, prepaid or converted (based on the LIBO Rate) for the period from the date of such payment, prepayment, or conversion or failure to borrow, pay, prepay or convert to the last day of the Interest Period for such Loan (or, in the case of a failure to borrow, pay, prepay or convert, the Interest Period for the Loan which would have commenced on the date of such failure to borrow, pay, prepay or convert) over (ii) the amount of interest (as reasonably determined by such Bank) that would be realized by such Bank in reemploying the funds so paid, prepaid, or converted or not borrowed, paid, prepaid or converted for such period or Interest Period, as the case may be. A certificate of each Bank setting forth any amount or amounts and, in reasonable detail, the computations thereof, which such Bank is entitled to receive pursuant to this Section 2.14 shall be delivered to the Company (with a copy to the Administrative Agent) and shall be conclusive, if made in good faith, absent manifest error. The Company shall pay to the Administrative Agent for the account of each Bank the amount shown as due on any certificate within 30 days after its receipt of the same. The obligations of the Company pursuant to this Section 2.14 shall survive the termination of this Agreement and/or the payment or assignment of any of the Loans or Notes.

Section 2.15     Pro Rata Treatment. Except as permitted under Section 2.12(d) and Section 2.14 with respect to interest, (a) each payment or prepayment of principal and each payment of interest with respect to the Loans shall be made pro rata among the Banks in accordance with the respective principal amounts of the Loans extended by each Bank, and (b) conversions of Loans to Loans of another Type, continuations of Loans that are Eurodollar Loans from one Interest Period to another Interest Period, and Loans which are not refinancings of other Loans shall be made pro rata among the Banks in accordance the respective principal amounts of the Loans extended by each Bank.

Section 2.16     Sharing of Setoffs. Each Bank agrees that if it shall through the exercise of a right of banker's lien, setoff, or counterclaim against the Company (pursuant to Section 9.6 or otherwise), including, but not limited to, a secured claim under Section 506 of Title 11 of the United States Code or other security or interest arising from, or in lieu of, such secured claim, received by such Bank under any applicable Debtor Relief Law or otherwise, obtain payment (voluntary or involuntary) in respect of the Loans held by it (other than pursuant to Section 2.12, or Section 2.14) as a result of which the unpaid principal portion of the Loans held by it shall be proportionately less than the unpaid principal portion of the Loans held by any other Bank, it shall be deemed to have simultaneously purchased from such other Bank a participation in the Loans held by such other Bank, so that the aggregate unpaid principal amount of the Loans and participations in Loans pursuant to this Section 2.16 held by each Bank shall be in the same proportion to the aggregate unpaid principal amount of all Loans then outstanding as the principal amount of the Loans held by it prior to such exercise of banker's lien, setoff, or counterclaim was to the principal amount of all Loans outstanding prior to such exercise of banker's lien, setoff, or counterclaim; provided, however, that if any such purchase or purchases or adjustments shall be made pursuant to this Section 2.16 and the payment giving rise thereto shall thereafter be recovered, such purchase or purchases or adjustments shall be rescinded to the extent of such recovery and the purchase price or prices or adjustment restored

xxx

without interest. The Company expressly consents to the foregoing arrangements and agrees that any Bank holding a participation in a Loan deemed to have been so purchased may exercise any and all rights of banker's lien, setoff, or counterclaim with respect to any and all moneys owing by the Company to such Bank as fully as if such Bank had made a Loan directly to the Company in the amount of such participation.

Section 2.17    <u>Payments</u>

(a)    The Company shall make each payment hereunder and under any instrument delivered hereunder not later than 12:00 noon (New York City time) on the day when due in dollars, without setoff or counterclaim, to the Administrative Agent at its Principal Office for the account of the Banks, in federal or other immediately available funds. The Administrative Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal of or interest on Loans (other than pursuant to <u>Section 2.12</u>, and <u>Section 2.14</u>) ratably to the Banks and like funds relating to the payment of any other amount payable to any Bank to such Bank for the account of its Applicable Lending Office, in each case to be applied in accordance with the terms of this Agreement.

(b)    Whenever any payment hereunder or under any Note shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in all such cases be included in the computation of payment of interest; <u>provided</u>, <u>however</u>, if such extension would cause payment of interest on or principal of a Eurodollar Loan to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

(c)    Unless the Administrative Agent shall have received notice from the Company prior to the date on which any payment is due to the Banks hereunder that the Company will not make such payment in full, the Administrative Agent may assume that the Company has made or will make such payment in full to the Administrative Agent on such date and the Administrative Agent may, in reliance upon such assumption, cause to be distributed to each Bank on such due date an amount equal to the amount then due such Bank. If and to the extent the Company shall not have so made such payment in full to the Administrative Agent, each Bank shall repay to the Administrative Agent forthwith on demand such amount distributed to such Bank together with interest thereon, for each day from the date such amount is distributed to such Bank until the date such Bank repays such amount to the Administrative Agent, at the Federal Funds Effective Rate.

Section 2.18    <u>Taxes.</u>    (a)    Each payment by the Company under this Agreement or any Loan Papers shall be made without withholding for any Taxes, unless such withholding is required by applicable Law. If any Withholding Agent determines, in its sole discretion exercised in good faith, that it is so required to withhold Taxes, then such Withholding Agent may so withhold and shall timely pay the full amount of withheld Taxes to the relevant Governmental Authority in accordance with applicable Law. If such Taxes are Indemnified Taxes, then the amount payable by the Company shall be increased as necessary so that, net of such withholding (including such withholding applicable to additional amounts payable under this Section), the amounts received with respect to this Agreement equal the amount which would have received had no such withholding been made.

(a)    The Company shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Law.

(b)    As soon as practicable after any payment of Indemnified Taxes by the Company to a Governmental Authority, the Company shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return

xxxi

reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(c)    The Company shall indemnify the Administrative Agent and each Bank, within 30 days after demand therefor, for the full amount of Indemnified Taxes (including, without limitation, any Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.18) payable or paid by the Administrative Agent or such Bank (or its beneficial owner), as the case may be, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Company by a Bank (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Bank, shall be conclusive, if made in good faith, absent manifest error.

(d)    Each Bank shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for the full amount of any Taxes attributable to such Bank that are payable or paid by the Administrative Agent, and reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority, but only to the extent that the Company has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Company to do so. A certificate as to the amount of such payment or liability delivered to any Bank by the Administrative Agent shall be conclusive absent manifest error. For the avoidance of doubt, there shall be no double recovery under this paragraph where the indemnified party has been indemnified for the same loss under a separate provision of the agreement.

(e)    (i) Any Bank that is entitled to an exemption from or reduction of any applicable withholding Tax with respect to payments hereunder or under any other Loan Papers shall deliver to the Company and the Administrative Agent, at the time or times requested by the Company or the Administrative Agent, such properly completed and executed documentation prescribed by Law as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Bank, if requested by the Company or the Administrative Agent, shall deliver such other documentation prescribed by Law or reasonably requested by the Company or the Administrative Agent as will enable the Company or the Administrative Agent to determine whether or not such Bank is subject to any withholding (including backup withholding) or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such forms (other than such documentation set forth in Sections 2.18(f)(ii)(A) through (E) below or any successor or substantially similar or comparable documentation thereto) shall not be required if in the Bank's good faith judgment such completion, execution or submission would subject such Bank to any material unreimbursed cost or expense (or, in the case of a change in Law, any incremental material unreimbursed cost or expense), unless indemnified by the Company in an amount reasonably satisfactory to such Bank, or would materially prejudice the legal or commercial position of such Bank. If any form or certification previously delivered pursuant to this Section expires or becomes obsolete or inaccurate in any respect with respect to a Bank, such Bank shall promptly (and in any event within 10 days after such expiration, obsolescence or inaccuracy) notify the Company and the Administrative Agent in writing of such expiration, obsolescence or inaccuracy and update the form or certification if it is legally eligible to do so.

(ii) Without limiting the generality of the foregoing, any Bank that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code (a "Foreign Bank") shall, to the extent it is legally entitled to do so, deliver to the Company and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such

xxxii

Foreign Bank becomes a lender under this Agreement (and from time to time thereafter upon the reasonable request of the Company or the Administrative Agent), whichever of the following is applicable:

(A) duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, claiming eligibility for benefits of an income tax treaty to which the United States of America is a party;

(B) duly completed copies of Internal Revenue Service Form W-8ECI;

(C) in the case of a Foreign Bank claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit F-1 to the effect that (i) such Foreign Bank is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Company within the meaning of section 881(c)(3)(B) of the Code, and (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code, and (ii) the interest payments in question are not effectively connected with the United States trade or business conducted by such Bank (a "U.S. Tax Compliance Certificate") and (y) duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable;

(D) to the extent a Foreign Bank is not the beneficial owner (for example, where the Foreign Bank is a partnership or participating Bank granting a typical participation), an Internal Revenue Service Form W-8IMY, accompanied by a Form W-8ECI, W-8BEN or W-8BEN-E, U.S. Tax Compliance Certificate substantially in the form of Exhibit F-2 or F-3 (as applicable), Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that, if the Foreign Bank is a partnership (and not a participating Bank) and one or more beneficial owners of such Foreign Bank are claiming the portfolio interest exemption, such Foreign Bank may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-4 on behalf of each such beneficial owner; or

(E) any other form prescribed by Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax duly completed together with such supplementary documentation as may be prescribed by applicable Law to permit the Company to determine the withholding or deduction required to be made.

(iii) If a payment made to a Bank under this Agreement or any other Loan Papers would be subject to U.S. Federal withholding Tax imposed by FATCA if such Bank were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1

xxxiii

471(b) or 1472(b) of the Code, as applicable), such Bank shall deliver to the Withholding Agent, at the time or times prescribed by Law and at such time or times reasonably requested by the Withholding Agent, such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Withholding Agent as may be necessary for the Withholding Agent to comply with its obligations under FATCA, to determine that such Bank has or has not complied with such Bank's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this Section 2.18(f)(iii), "FATCA" shall include all amendments made to FATCA after the date of this Agreement.

(f)     If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.18 (including additional amounts paid pursuant to this Section 2.18), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including any Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall promptly repay to such indemnified party the amount paid to such indemnified party pursuant to the previous sentence (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this Section 2.18(g), in no event will any indemnified party be required to pay any amount to any indemnifying party pursuant to this Section 2.18(g) if such payment would place such indemnified party in a less favorable position (on a net after-Tax basis) than such indemnified party would have been in if the indemnification payments or additional amounts giving rise to such refund had never been paid. This Section 2.18(g) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes which it deems confidential) to the indemnifying party or any other Person.

(g)     The provisions of this Section 2.18 shall survive the termination of this Agreement and/or the payment or assignment of any of the Loans or Notes.

(h)     For purposes of this Section 2.18, the term "Bank" includes the term "applicable Law" includes FATCA.

Section 2.19     Calculation of LIBO Rates. The provisions of this Agreement relating to calculation of the LIBO Rate are included only for the purpose of determining the rate of interest or other amounts to be paid hereunder that are based upon such rate, it being understood that each Bank shall be entitled to fund and maintain its funding of all or any part of a Eurodollar Loan as it sees fit. All such determinations hereunder, however, shall be made as if each Bank had actually funded and maintained funding of each Eurodollar Loan through the purchase in the Eurodollar InterBank Market of one or more eurodollar deposits in an amount equal to the principal amount of such Loan and having a maturity corresponding to the Interest Period for such Loan.

Section 2.20     Booking Loans. Subject to Section 2.18, any Bank may make, carry, or, transfer Loans at, to, or for the account of any of its branch offices or the office of any Affiliate.

Section 2.21     Quotation of Rates. It is hereby acknowledged that the Company may call the Administrative Agent on or before the date on which notice of a Borrowing,

continuation or conversion is to be delivered by the Company in order to receive an indication of the rate or rates then in effect, but that such projection shall not be binding upon the Administrative Agent or any Bank nor affect the rate of interest which thereafter is actually in effect when the election is made.

Section 2.22    Defaulting Banks. Notwithstanding any provision of this Agreement to the contrary, if any Bank becomes a Defaulting Bank, the Administrative Agent shall deliver written notice to such effect, upon the Administrative Agent's obtaining knowledge of such event, to the Company and such Defaulting Bank, and the following provisions shall apply for so long as such Bank is a Defaulting Bank:

(a)    [Reserved].

(b)    The Additional Commitment and outstanding Loans of such Defaulting Bank shall not be included in determining whether all Banks or the Majority Banks have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to Section 9.1), provided that any waiver, amendment or modification requiring the consent of all Banks or each affected Bank which would increase or extend the term of the Additional Commitment or the Maturity Date of Loans of such Defaulting Bank or which affects such Defaulting Bank differently than other affected Banks shall require the consent of such Defaulting Bank.

(c)    Any amount payable to such Defaulting Bank hereunder (whether on account of principal, interest, fees or otherwise and including any amount that would otherwise be payable to such Defaulting Bank pursuant to Section 2.16, but excluding amounts payable pursuant to Section 2.23) shall, in lieu of being distributed to such Defaulting Bank, subject to any applicable requirements of law, be applied at such time or times as may be determined by the Administrative Agent (i) first, to the payment of any amounts owing by such Defaulting Bank to the Administrative Agent hereunder, (ii) second, to the funding of any Loan in respect of which such Defaulting Bank has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent, (iii) third, to the payment of any amounts owing to the Banks as a result of any judgment of a court of competent jurisdiction obtained by any Bank against such Defaulting Bank as a result of such Defaulting Bank's breach of its obligations under this Agreement, (iv) fourth, to the payment of any amounts owing to the Company as a result of any judgment of a court of competent jurisdiction obtained by the Company against such Defaulting Bank as a result of such Defaulting Bank's breach of its obligations under this Agreement, and (v) fifth, to such Defaulting Bank or as otherwise directed by a court of competent jurisdiction, provided, with respect to this clause (v), that if such payment is (x) a prepayment of the principal amount of any Loans and (y) made at a time when the conditions set forth in clauses (c)-(e) of Section 4.1 are satisfied, such payment shall be applied solely to prepay the Loans of, and reimbursement obligations owed to, all non-Defaulting Banks pro rata prior to being applied to the prepayment of any Loans, or reimbursement obligations owed to, any Defaulting Bank.

In the event that the Administrative Agent and the Company each agrees that a Defaulting Bank has adequately remedied all matters that caused such Bank to be a Defaulting Bank or upon receipt by the Administrative Agent of the confirmation referred to in clause (c) of the definition of "Defaulting Bank", as applicable, then on such date such Bank shall purchase at par such portion of the Loans of the other Banks as the Administrative Agent shall determine may be necessary in order to cause the Banks to hold Loans on a pro rata basis in accordance with their respective Additional Commitments; provided that no adjustments shall be made retroactively with respect to fees accrued while such Bank was a Defaulting Bank.

xxxv

Section 2.23     Mitigation Obligations; Replacement of Banks.

(a)     If any Bank requests compensation under Section 2.12 or Section 2.18, or if the Company is required to pay any additional amount to any Bank or any Governmental Authority for the account of any Bank pursuant to Section 2.12 or Section 2.18, then such Bank shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Bank, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.12 or Section 2.18 in the future and (ii) would not subject such Bank to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Bank. The Company hereby agrees to pay all reasonable costs and expenses incurred by any Bank in connection with any such designation or assignment.

(b)     If (i) any Bank requests compensation under Section 2.12 or Section 2.18, (ii) the Company is required to pay any additional amount to any Bank or any Governmental Authority for the account of any Bank pursuant to Section 2.12 or Section 2.18, (iii) an event contemplated under Section 2.10 or Section 2.13 shall have occurred with respect to any Bank or (iv) any Bank becomes a Defaulting Bank, then, in each case, the Company may, at its sole expense and effort, upon notice to such Bank and the Administrative Agent, require such Bank to assign and delegate, without recourse (except for certain customary representations and warranties, in accordance with and subject to the restrictions contained in Section 9.10), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Bank, if a Bank accepts such assignment); provided that (i) the Company shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, (ii) such Bank shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Company (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.12 or Section 2.18 or payments required to be made pursuant to Section 2.12 or Section 2.18, such assignment will result in a reduction in such compensation or payments. A Bank shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Bank or otherwise, the circumstances entitling the Company to require such assignment and delegation cease to apply.

Section 2.24     Incremental Term Loans.

(a)     Company Request. The Company may, by written notice to the Administrative Agent from time to time, request an increase to the existing term loan facility under this Agreement in an amount not less than $50,000,000 individually and not to exceed the applicable Incremental Amount from one or more Incremental Banks (which may include any existing Bank) willing to provide such Incremental Term Loans in their sole discretion; provided that each Incremental Bank (which is not an existing Bank) shall be subject to the consent of the Administrative Agent. Each such notice shall specify (i) the date of funding of such Incremental Term Loan (each date of funding, an "Increase Effective Date") on which such proposed Incremental Term Loan is funded, which shall be a date not less than three (3) Business Days after the date on which such notice is delivered to the Administrative Agent (or such lesser period as agreed to by the Administrative Agent) and (ii) the identity of each proposed lender of each such Incremental Term Loan and the amount thereof (each provider of an Incremental Term Loan referred to herein as an "Incremental Bank"); provided that (x) any existing Bank approached to provide all or a portion of any proposed Incremental Term Loan may elect or decline, in its sole discretion, to provide such Incremental Term Loan

xxxvi

and (y) there shall be no obligation of the Company to approach any existing Bank with respect to any Incremental Term Loan.

(b)    <u>Conditions</u>. Each Incremental Term Loan is subject to the following conditions precedent on the Increase Effective Date:

(i)    all representations and warranties contained in this Agreement and the other Loan Papers shall be true and correct in all material respects on and as the funding of such Incremental Term Loan (both immediately before and immediately after giving effect thereto) with the same effect as if made on and as of such date except to the extent such representations and warranties expressly relate to an earlier date and in such case, such representations and warranties shall be true and correct in all material respects as of such dates; <u>provided</u> that any representation or warranty that is qualified by materiality, "Material Adverse Change" or "Material Adverse Effect" shall be true and correct in all respects, as though made on and as of the applicable date, immediately before and immediately after giving effect to such Borrowing of Incremental Term Loans;

(ii)    no Default or Event of Default shall have occurred and be continuing or would result from the Borrowings to be made on such Increase Effective Date; <u>provided</u>, for the avoidance of doubt, that no Default or Event of Default in respect of <u>Section 6.12</u> shall have occurred and be continuing nor result from the making of such Borrowing on and as of the applicable Increase Effective Date, without giving effect to any Collateral Coverage Test Cure Period; and

(iii)    after giving effect to the incurrence of such Incremental Term Loans, the aggregate amount of the Existing Term Loans, the Initial Term Loans and the Incremental Term Loans made pursuant to this <u>Section 2.24</u> during the term of this Agreement shall not exceed $3,750,000,000.

(c)    <u>Terms of Incremental Term Loans</u>. The terms and provisions of Incremental Term Loans shall be identical to the existing Loans. For the avoidance of doubt, Incremental Term Loans are intended to be fully fungible with the Existing Term Loans and any Additional Term Loans. Prior to any funding of Incremental Term Loans, the Administrative Agent shall have received a Notice of Borrowing, substantially in the form of <u>Exhibit A</u> hereto, with respect to such Borrowing, (i) in the case of Eurodollar Loans, not later than 11:00 a.m., New York City time, two Business Days before the borrowing date specified for a proposed Borrowing (or such lesser period as agreed to by the Administrative Agent), and (ii) in the case of Alternate Base Loans, not later than 11:00 a.m., New York City time, on the Business Day which is the borrowing date specified for a proposed Borrowing (or such lesser period as agreed to by the Administrative Agent). Such notice shall be irrevocable and shall in each case refer to this Agreement and specify (x) whether the Loans then being requested are to be Eurodollar Loans or Alternate Base Loans, (y) the initial borrowing date of such Incremental Term Loans (which shall be a Business Day) and the aggregate amount thereof and (z) in the case of a Eurodollar Loan, the Interest Period with respect thereto (which shall not end later than the Maturity Date). If no Interest Period with respect to any Eurodollar Loan is specified in any such Notice of Borrowing, then the Company shall be deemed to have selected an Interest Period of one month's duration. Promptly upon receipt, the Administrative Agent shall advise the other Banks of such Notice of Borrowing and of each Bank's portion of the requested Committed Borrowing by telecopier or e-mail. Each Committed Borrowing shall consist of Loans of the same Type made on the same day and having the same Interest Period.

xxxvii

The Incremental Term Loans shall be effected by a joinder agreement (the "Increase Joinder") executed by the Company, the Administrative Agent and each Incremental Bank making such Incremental Term Loan, in form and substance reasonably satisfactory to each of them. The Increase Joinder may, without the consent of any other Banks and in accordance with the provisions of Section 9.1, effect such amendments to this Agreement and the other Loan Papers as may be necessary or appropriate, in the opinion of the Administrative Agent and the Company, to effect the provisions of this Section 2.24. In addition, unless otherwise specifically provided herein, all references in Loan Papers to Loans shall be deemed, unless the context otherwise requires, to include references to Incremental Term Loans made pursuant to this Agreement.

(d)    Equal and Ratable Benefit. The Incremental Term Loans established pursuant to this Section 2.24 shall constitute Loans under, and shall be entitled to all the benefits afforded by, this Agreement and the other Loan Papers and shall, without limiting the foregoing, benefit equally and ratably from the security interests created by the Aircraft Mortgage.

## ARTICLE III

## [RESERVED]

## ARTICLE IV

## CONDITIONS OF LENDING

Section 4.1    Conditions Precedent. The effectiveness of this Agreement is subject to the satisfaction of the following conditions precedent:

(a)    The Administrative Agent shall have received this Agreement, executed and delivered by the Administrative Agent, the Company, each Bank listed on Schedule II and each of the other parties hereto.

(b)    The Administrative Agent shall have received the following, each dated (unless otherwise indicated) the Effective Date:

(i)    Officer's Certificates dated the Effective Date certifying, inter alia, (i) true and correct copies of resolutions adopted by the Board of Directors or Executive Committee, as appropriate, of the Company authorizing the Company to borrow and effect other transactions hereunder, (ii) a true and correct copy of the Company's bylaws in effect on the date hereof, (iii) the incumbency and specimen signatures of the Persons executing any documents on behalf of the Company, (iv) the truth of the representations and warranties made by the Company in this Agreement (or, if any such representation or warranty is

xxxviii

expressly stated to have been made as of a specific date, as of such specific date), and (v) the absence of the occurrence and continuance of any Default or Event of Default.

(ii)     A copy of the Company's charter and all amendments thereto, accompanied by certificates that such copy is correct and complete, one certificate dated within a reasonable time prior to the Effective Date and issued by the Secretary of State of Texas and one certificate dated the Effective Date and executed by the corporate secretary or assistant secretary of the Company.

(iii)     Certificates (dated within twenty days prior to the Effective Date) of existence and good standing of the Company from appropriate officials of Texas.

(iv)     The written opinions of internal and outside counsel to the Company and counsel to the Administrative Agent, substantially in the form set out in Exhibits C-1, C-2 and C-3, respectively, each dated the Effective Date.

(v)     The written opinion of Gilchrist Aviation Law, P.C., special FAA counsel to the Company, in a form reasonably satisfactory to the Administrative Agent, or written confirmation from Gilchrist Aviation Law, P.C. immediately prior to closing that they have reviewed pre-closing FAA indexes and priority search certificates for the airframes and engines that are Pool Assets and confirm they are in a position to issue their opinion in accordance with Section 6.18(a) assuming no intervening filings or registrations.

(vi)     An Administrative Questionnaire (dated any date on or prior to the Effective Date) completed by each Bank which is a party hereto on the Effective Date.

(vii)     Such other agreements, documents, instruments, opinions, certificates, and evidences as the Administrative Agent may reasonably request prior to the Effective Date.

(c)     The Administrative Agent shall have received Lien searches conducted in the recording office of the FAA and, with respect to the applicable Collateral, "priority search certificates" (as defined in the Regulations and Procedures for the International Registry), all as may be reasonably satisfactory to the Administrative Agent (dated as of a date reasonably satisfactory to the Administrative Agent), reflecting the absence of Liens and encumbrances on the assets of the Company and the other Grantors constituting Collateral, other than Permitted Liens, and the absence of registrations (other than sale registrations) on the International Registry with respect to the applicable Collateral, other than the registrations contemplated herein, and (in the case of the searches conducted at the recording office of the FAA) indicating that the Company (or the applicable Grantor) is the registered owner of each of the aircraft which is intended to be covered by the Aircraft Mortgage.

(d)     The Company and the Administrative Agent shall have duly executed and delivered to the Administrative Agent an aircraft mortgage, in substantially the form of Exhibit G (the "Aircraft Mortgage"), together with (i) the filing for recordation with the FAA of the Aircraft Mortgage for recording as evidenced by a written confirmation from Gilchrist Aviation Law, P.C. of its submission to the FAA of the Aircraft Mortgage for recording (together with any other necessary documents, instruments, affidavits or certificates) as the Administrative Agent may deem reasonably necessary to perfect and protect the Liens created thereby, including, without limitation, recordings and filings with the FAA, and all filings and recording fees and taxes in respect thereof shall have been duly paid, (ii) copies of the Entry Point Filing Forms, (iii) evidence that Gilchrist Aviation Law, P.C., special FAA counsel to the Company, (a) has provided email confirmation that the International Interests created by the Aircraft Mortgage have

xxxix

been registered as "prospective" International Interests prior to the execution of the Aircraft Mortgage, and has provided priority search certificates from the International Registry to the Administrative Agent evidencing such prospective International Interests or (b) has established an International Registry Closing Room to facilitate the registration on the International Registry, and provided email confirmation that the Closing Room has been released and thus the International Interests created by the Aircraft Mortgage have been registered against the airframes and engines that are Pool Assets, (iv) evidence, to the extent available, of the filing of financing statements in appropriate form with the Texas Secretary of State and (v) evidence that all other action that the Administrative Agent may deem reasonably necessary to perfect and protect the Liens and security interests created under the Aircraft Mortgage has been taken. The parties hereto acknowledge and agree that any Lien on the Collateral securing Obligations under this Agreement is a Lien in favor of the Administrative Agent for the ratable benefit of the Secured Parties.

(e) A Uniform Commercial Code financing statement covering the security interest in the Collateral, naming the Company, as debtor, and the Administrative Agent, as secured party, shall have been duly filed (or shall be in the process of being so duly filed) in all places necessary within the State of Texas.

(f) The Company and the Administrative Agent shall have entered into the Mortgaged Aircraft Operating Agreement, in substantially the form of Exhibit H.

Section 4.2     Conditions Precedent to Committed Borrowing. The obligation of each Bank to make a Loan on the occasion of the Committed Borrowing on the Initial Borrowing Date shall be subject to the further conditions precedent that on the date of such Committed Borrowing the following statements shall be true (and each of the giving of the applicable Notice of Committed Borrowing and the acceptance by the Company of the proceeds of such Committed Borrowing shall constitute a representation and warranty by the Company that on the date of such Committed Borrowing such statements are true) (or, if any such statement is expressly stated to have been made as of a specific date, as of such specific date):

(a)   The representations and warranties contained in Article V are correct in all material respects (or, to the extent subject to materiality or Material Adverse Effect qualifiers, in all respects) as of the date hereof (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date).

(b)   No event has occurred and is continuing, or would result from such Committed Borrowing, which constitutes either a Default or an Event of Default; provided, for the avoidance of doubt, that no Default or Event of Default in respect of Section 6.12 shall have occurred and be continuing nor result from the making of such Borrowing on and as of the date of such Borrowing, without giving effect to any Collateral Coverage Test Cure Period.

(c)   Any fees or expenses of the Administrative Agent and the Banks that have been invoiced and that are required to be paid on or before the Initial Borrowing Date and all accrued and unpaid interest on the Existing Term Loans shall have been paid.

(d) The Administrative Agent shall have received a copy of the Aircraft Mortgage bearing the FAA filing stamp as the Administrative Agent may deem reasonably necessary to perfect and protect the Liens created thereby.

xl

(e) The Administrative Agent and the Banks shall have received the written opinion of Gilchrist Aviation Law, P.C., special FAA counsel, in form and substance reasonably satisfactory to the Administrative Agent.

# ARTICLE V

## REPRESENTATIONS AND WARRANTIES

The Company represents and warrants to the Administrative Agent and Banks as follows:

Section 5.1    Organization, Authority and Qualifications

(a)   The Company and each of its Material Subsidiaries is a Person duly organized, validly existing, and in good standing under the Laws of the jurisdiction of its organization;

(b)    The Company has the corporate power and authority to execute, deliver, and perform this Agreement and the other Loan Papers to which it is a party and to borrow hereunder;

(c)   On the Effective Date, the Company and each of its Material Subsidiaries is duly qualified as a foreign Person to do business and is in good standing in every jurisdiction where the character of its Properties or nature of its activities make such qualification necessary, except where the failure to be so qualified or in good standing would not have a Material Adverse Effect; and

(d)   On the Effective Date, the Company has no Material Subsidiaries.

Section 5.2    Financial Statements. The Current Financials present fairly in all material respects the consolidated financial position of the Company and its Subsidiaries on the date thereof and the consolidated results of operations and changes in financial position of the Company and its Subsidiaries for the period then ended, all in conformity with GAAP. Except for transactions related to or contemplated by the Loan Papers and transactions disclosed in Forms 10-K and 8-K that the Company shall have filed with the Securities and Exchange Commission before the Effective Date, there has been no Material Adverse Change since December 31, 2019.

Section 5.3    Compliance with Agreement and Laws. On the Effective Date, neither the Company nor any of its Material Subsidiaries is in default in any material respect under the provisions of any instrument evidencing any material obligation, indebtedness, or liability of the Company or any of its Material Subsidiaries or of any agreement relating thereto. Neither the Company nor any of its Material Subsidiaries is in violation of any Law, which default or violation would have a Material Adverse Effect.

Section 5.4    Authorization; No Breach; and Valid Agreements. The execution, delivery, and performance of this Agreement, the borrowings hereunder, and the execution, delivery, and performance of the other Loan Papers to which it is a party by the Company have been duly authorized by all requisite corporate action on the part of the Company and will not violate its charter or bylaws and will not violate any Law or any order of any Tribunal, and will not conflict with, result in a breach of the provisions of or constitute a default under, or result in the imposition of any Lien upon the Property of the Company pursuant to the provisions of, any material loan agreement, credit agreement, indenture, mortgage, deed of trust, franchise, permit, license, note, contract, or other material agreement or instrument to which the Company is now a party. The Loan Papers that include obligations of the Company

are the legal, valid and binding obligations of the Company and are enforceable in accordance with their respective terms, except as such enforceability may be limited by general equitable principles (whether enforcement is sought by proceedings in equity or at law) or applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally.

Section 5.5     Litigation and Judgments. Except as previously disclosed to the Administrative Agent in writing, neither the Company nor any of its Subsidiaries is either party to or aware of the threat of any Litigation which has, in the Company's opinion, a reasonable probability of success and which, if determined adversely to the Company or such Subsidiary, would have a Material Adverse Effect. To the knowledge of the Company, on the Effective Date there is no outstanding unsatisfied money judgment against the Company or any of its Subsidiaries in an amount in excess of $50,000,000, and there are no outstanding unsatisfied money judgments against the Company or any of its Subsidiaries which individually or in the aggregate have or would have a Material Adverse Effect.

Section 5.6     Ownership of Properties. The Company and each of its Material Subsidiaries has good and marketable title (except for Permitted Liens) to all of the Pool Assets, and owns or has valid leasehold (or, in the case of intellectual property, license) interests in all of its other material Properties which are owned or used in connection with its business.

Section 5.7     Taxes. To the extent that failure to do so would have a Material Adverse Effect, the Company and each of its Material Subsidiaries has filed all Tax returns or reports required of it and has paid all Tax liability shown thereon as due to the extent the same has become due and before it may have become delinquent (except to the extent being contested in good faith by appropriate proceedings and for which adequate reserves have been established). As of the Effective Date, the federal income tax liability of the Company and its Subsidiaries has been audited by the Internal Revenue Service and has been finally determined and satisfied for all taxable years at least up to and including the taxable year ended December 31, 2017.

Section 5.8     Approvals Required. Neither the execution and delivery of this Agreement and the other Loan Papers to which it is a party by the Company, nor the consummation by the Company of any of the transactions contemplated hereby or thereby requires the consent or approval of, the giving of notice to, or the registration, recording, or filing of any document with, or the taking of any other action in respect of any Tribunal except for the routine filing of copies of this Agreement and certain other Loan Papers with the Securities and Exchange Commission, except for any of the foregoing required of any Bank or the Administrative Agent.

Section 5.9     Business; Status as Air Carrier. The Company is an air carrier engaged in scheduled air transportation and is in all material respects duly qualified and licensed under all applicable Laws to carry on its business as a scheduled airline currently subject to regulation by the FAA and the Department of Transportation.

Section 5.10     ERISA Compliance. The Company is in compliance in all material respects with ERISA and the rules and regulations thereunder. No Plan of the Company has materially failed to satisfy the "minimum funding standards" of ERISA or is in "at risk" status (within the meaning of ERISA).

Section 5.11     Insurance. The Company maintains with insurance companies or associations of recognized responsibility (or, as to workers' compensation or similar insurance, with an insurance fund or by self-insurance authorized by the jurisdictions in which it operates) insurance concerning its Properties and businesses against such casualties and contingencies and of such types and in

xlii

such amounts (and with co-insurance, self-insurance and deductibles) as it determines to be prudent and consistent with its insurance and loss prevention policies, and in such forms and covering such risks as may then be customary with airlines of a comparable credit standing flying equipment and routes comparable to the Company.

Section 5.12     <u>Purpose of Loan</u>. The proceeds of the Loans will be used for general corporate purposes, including acquisitions, and no part of the proceeds of any Loan will be used for any purpose which would violate, or be inconsistent with, any of the margin regulations of the Fed Reserve Board.

Section 5.13     <u>Investment Company Act</u>. Neither the Company nor any of its Subsidiaries is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

Section 5.14     <u>General</u>. As of the Effective Date, there is no material fact or condition relating to the financial condition and business of the Company and its Subsidiaries which is not reflected in its most recently filed financial statements or any posted SEC Form 8-K which has a Material Adverse Effect and which has not been related, in writing, to the Administrative Agent, other than industry-wide risks in the ordinary course of business associated with the types of business conducted by the Company and its Subsidiaries.

Section 5.15     <u>Affected Financial Institutions</u>. The Company is not an Affected Financial Institution.

Section 5.16     <u>Anti-Corruption Laws and Sanctions</u> . The Company has implemented and maintains in effect policies and procedures designed to maintain material compliance by the Company, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Company, its Subsidiaries and their respective officers and employees, and to the knowledge of the Company its directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in the Company being designated as a Sanctioned Person. None of (a) the Company, any of its Subsidiaries or to the knowledge of the Company or such Subsidiary of the Company any of their respective directors, officers or employees, or (b) to the knowledge of the Company, any agent of the Company or any of its Subsidiaries that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No Loan, use of proceeds or other transaction contemplated by this Agreement will violate any Anti-Corruption Law or applicable Sanctions. Notwithstanding the foregoing or any other provision of this Agreement, the Company shall not be in breach of this <u>Section 5.16</u> or <u>Section 6.3</u> if it operates any of its aircraft (including any Pool Asset) in a Sanctioned Country for which it has obtained legal authority from the United States government to conduct operations in such Sanctioned Country.

Section 5.17     <u>Security Interests</u>. The Aircraft Mortgage is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Aircraft covered thereby except as such enforceability may be limited by general equitable principles (whether enforcement is sought by proceedings in equity or at law) or applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally.

**ARTICLE VI**

**COVENANTS**

So long as the Company may borrow hereunder and until the Obligations have been paid in full, the Company covenants as follows:

Section 6.1     <u>Performance of Obligations</u>. The Company shall duly and punctually pay and perform each of the Obligations under this Agreement and the other Loan Papers under which the Company has Obligations.

Section 6.2     <u>Compliance with Laws</u>. The Company shall comply, and shall cause each of its Material Subsidiaries to comply, in all material respects with all applicable Laws, except for any noncompliance which individually or in the aggregate would not have a Material Adverse Effect, and such compliance shall include, without limitation, paying before the same become delinquent all Taxes imposed upon the Company or any of its Material Subsidiaries or its or their Properties, except to the extent contested diligently and in good faith by proper proceedings, and for which adequate reserves are established in accordance with GAAP.

Section 6.3     <u>Maintenance of Existence, Licenses and Franchises: Compliance With Agreements</u>. Except to the extent otherwise permitted in <u>Article VI</u>, the Company shall maintain, and shall cause each of its Material Subsidiaries to maintain, its existence, and the Company shall preserve and maintain, and shall cause each of its Material Subsidiaries to preserve and maintain, all material licenses, privileges, franchises, certificates, authorizations, and other permits and agreements necessary for the operation of its business. The Company shall comply, and shall cause each of its Material Subsidiaries to comply, with all material agreements binding on it or affecting its properties or business, except for any noncompliance which individually or in the aggregate would not have a Material Adverse Effect. The Company shall maintain in effect and enforce policies and procedures designed to cause material compliance by the

Company, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

Section 6.4    Maintenance of Properties. The Company shall, and shall cause each of its Material Subsidiaries to, cause all of its Properties (other than any Aircraft that constitutes Collateral subject to the Mortgaged Aircraft Operating Agreement) used or useful in the conduct of its business to be maintained and kept in good condition, repair, and working order, and supplied with all necessary equipment, and cause to be made all necessary repairs, renewals, replacements, betterments, and improvements thereof, all as in the judgment of the Company may be necessary so that the business carried on in connection therewith may be properly conducted at all times.

Section 6.5    Maintenance of Books and Records. The Company shall, and shall cause each of its Subsidiaries to, maintain proper books of record and account in which full, true, and correct entries in conformity in all material respects with GAAP will be made in respect of all financial

dealings and transactions that are, individually or in the aggregate, material in relation to their business and activities.

Section 6.6    Inspection. At reasonable times and upon reasonable notice, the Company shall permit, and shall cause each of its Material Subsidiaries to permit, any employees and other representatives of the Administrative Agent during normal business hours, (1) to visit the Company and inspect any Properties (other than any Aircraft that constitutes Collateral subject to the Mortgaged Aircraft Operating Agreement), (2) to examine and make extracts from all books of account and all records that relate to the financial operations of the Company (subject to any confidentiality agreements, copyright restrictions, and similar limitations), and (3) to discuss the Company's and Material Subsidiaries' affairs, finances, Properties, condition (financial or otherwise) and accounts with the Company's and Material Subsidiaries' officers, in each case of the preceding clauses (1) and (2), for the purpose of verifying the accuracy of the various reports delivered by the Company to the Administrative Agent and the Banks pursuant to this Agreement or otherwise ascertaining compliance this Agreement and at such times and as often as may be reasonably requested, but in any event in the case of the preceding clauses (1) and (2), so long as no Event of Default has occurred and is continuing, no more than one time per year.

Section 6.7    Insurance. The Company shall maintain insurance on its Properties with insurers or associations of recognized standing in such amounts (including by way of self-insurance) as it determines to be prudent and consistent with its insurance and loss prevention policies, and in such forms and covering such risks as may then be customary with airlines of a comparable credit standing flying equipment and routes comparable to the Company.

Section 6.8    Appraisals.

(a) On the Effective Date, the Company shall deliver a list of the Pool Assets and estimated current market value of the Pool Assets to the Administrative Agent (for onward distribution to the Banks).

(b) On each Appraisal Delivery Date, the Company shall submit an Appraisal of the Pool Assets to the Administrative Agent (for onward distribution to the Banks) as of the date which is no more than 30 days prior to such Appraisal Delivery Date; provided, however, that if such Appraisal is to be delivered on such Appraisal Delivery Date as a consequence of clause (c) of the definition thereof, the Appraisal to be delivered on such date shall only be in respect of the assets to be removed from and/or added to the Pool Assets.

(c) If an Event of Default has occurred and is continuing, upon the reasonable written request of the Administrative Agent or the Majority Banks, the Company shall, two additional times during the term of this Agreement, submit an Appraisal of the Pool Assets to the Administrative Agent (for onward distribution to the Banks) as soon as reasonably practicable after receipt by the Company of such request.

Section 6.9    Coverage Ratio. The Company shall maintain, at all times after March 31, 2021, a Coverage Ratio of not less than 1.25 to 1.0.

Section 6.10    Reporting Requirements. The Company shall furnish to the Administrative Agent (with sufficient copies for each Bank):

(a)    Within 120 days after the last day of each fiscal year of the Company, Financial Statements (it being understood that delivery of the Company's annual report on Form 10-K for any fiscal year as filed with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended, will satisfy this requirement with respect to such fiscal year) showing the consolidated financial condition and results of operations of the Company and its Subsidiaries as of, and for the year ended on, such last day, accompanied by (i) the opinion, without material qualification, of Auditors, based on an audit using generally accepted auditing standards, that such Financial Statements were prepared in accordance with GAAP and present fairly, in all material respects, the consolidated financial position and results of operations of the Company and its consolidated Subsidiaries for the periods presented and (ii) a Financial Report Certificate;

(b)    Within 60 days after the last day of each of the first three fiscal quarters of the Company (i) Financial Statements showing the consolidated financial condition and results of operations of the Company and its consolidated Subsidiaries as of and for the period from the beginning of the current fiscal year to, such last day (it being understood that delivery of the Company's quarterly report on Form 10-Q for any fiscal quarter as filed with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended, will satisfy this requirement with respect to such fiscal quarter), and (ii) a Financial Report Certificate;

(c)    (i) Promptly after mailing, true copies of all reports, statements, documents, plans, and other written communications furnished by or on behalf of the Company or any of its Subsidiaries to stockholders generally and (ii) promptly upon the filing thereof, copies of all registration statements (other than the exhibits thereto and any registration statements on Form S-8 or its equivalent) and reports on Forms 10-K, 10-Q and 8-K (or their equivalents) which the Company shall have filed with the Securities and Exchange Commission;

(d)    Notice, promptly after the Company or any of its Material Subsidiaries knows or has reason to know of a Default or Event of Default, specifying the nature thereof and what action the Company or any Subsidiary has taken, is taking, or proposes to take with respect thereto;

(e)    Prompt notice of any legal or arbitral proceedings, and of all proceedings by or before any governmental or regulatory authority or agency, and any material development in respect of such legal or other proceedings, affecting the Company, except proceedings which, if adversely determined, would not have a Material Adverse Effect or proceedings with respect to which the Company, in good faith and upon consultation with outside counsel, believes an adverse determination in respect thereof to be unlikely; and

(f)    Promptly upon the Administrative Agent's reasonable request, such other relevant information (not otherwise required to be furnished under the Loan Papers) respecting the business affairs, assets, and liabilities of the Company and any of its Material Subsidiaries.

In the case of paragraphs (a), (b) and (c) above (other than the Financial Report Certificate), the Company may satisfy the reporting requirements in respect thereof by making the documents referred to therein available to the Banks on its website or posted on the Security and Exchange Commission's website at www.sec.gov. In the case of paragraphs (a), (b), (c), (d), (e) and (f) above (other than the Financial Report Certificate), each Bank that is a lender under the Existing Revolver agrees that to the extent any of the deliveries required by this Section 6.10 are delivered to such Bank by the Company under the Existing Revolver in accordance with its terms (whether delivered

pursuant to the preceding sentence or otherwise), the Company shall be deemed to have satisfied the applicable reporting requirement under this Section 6.10 solely with respect to delivery to such Bank. Notwithstanding the foregoing, the Company shall deliver hard copies of any such documents to any Bank that notifies the Company that such delivery is required by any Laws applicable to such Bank.

Section 6.11    Use of Proceeds. Proceeds advanced hereunder shall be used only as represented herein. The Company shall not request any Loan, and the Company shall not use, and shall procure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Loan (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, to the extent such activities, businesses or transaction would be prohibited by Sanctions if conducted by a corporation incorporated in the United States or (c) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 6.12    Pool Assets. The Company (i) will ensure that, subject to clause (c) below, the Appraised Value of the Pool Assets shall satisfy the Collateral Coverage Test (based upon the most recent Appraisal delivered to the Administrative Agent and the Banks pursuant to the provisions of Section 6.8), and (ii) will not (and will not permit any Wholly Owned Domestic Subsidiary to) convey, sell, lease, transfer or otherwise dispose of, whether voluntarily or involuntarily (it being understood that loss of property due to theft, destruction, confiscation, prohibition on use or similar event shall constitute a disposal for purposes of this covenant), or remove or substitute, any Pool Asset (or any engine included in the Pool Assets unless such engine is replaced by another working engine or engines of comparable value, assuming half-time condition) or agree to do any of the foregoing in respect of the Pool Assets at any future time, except that:

(a)    so long as no Event of Default exists, the Company or any of its Wholly Owned Domestic Subsidiaries owning a Pool Asset may replace a Pool Asset with another asset of the Company or such Wholly Owned Domestic Subsidiary (or any other Wholly Owned Domestic Subsidiary) (and Schedule I shall be modified to reflect such replacement), provided that (A) such replacement shall be made on at least a dollar-for-dollar basis based upon (x) in the case of the asset being removed from the Pool Assets, the Appraised Value of such Pool Asset (as determined by the most recently delivered Appraisal with respect to such Pool Asset) and (y) in the case of the asset being added to the Pool Assets, the Appraised Value of such asset (as determined by an Appraisal performed at (or relatively contemporaneously with) the time of such replacement), (B) after giving effect to such replacement, at the time of such replacement the average age of any aircraft constituting Pool Assets shall not exceed 10 years, (C) prior to effecting the replacement, the Company shall have delivered an Officer's Certificate to the Administrative Agent certifying compliance with this Section 6.12 and Section 6.13 and attaching to such certificate the Appraisal required by Section 6.8 and (D) the asset replacing a Pool Asset shall constitute Specified Equipment;

(b)    so long as no Event of Default exists or would result therefrom, the Company or any of its Wholly Owned Domestic Subsidiaries owning a Pool Asset may remove an asset from the Pool Assets (and Schedule I shall be modified to reflect such removal), provided that (A) after giving effect to such removal, the Appraised Value of the remaining Pool Assets (as determined by an Appraisal of all Pool Assets performed at (or relatively contemporaneously with) the time of such removal) shall satisfy the Collateral Coverage Test, (B) after giving effect to such removal, at the time of such removal, the average age of any aircraft constituting Pool Assets shall not exceed 10 years, and (C) prior to effecting the removal, the Company shall have delivered an Officer's Certificate to the Administrative Agent certifying that, and providing calculations demonstrating that, after giving effect to such removal, the Appraised Value of the Pool Assets shall satisfy the Collateral Coverage Test, and otherwise certifying compliance with this Section 6.12 and attaching to such certificate Appraisals of all Pool Assets obtained in connection with such removal;

(c)    in the event (x) that an Appraisal furnished pursuant to Section 6.8 discloses that the Collateral Coverage Test is not satisfied or (y) the Collateral Coverage Test is not satisfied following an involuntary disposal of any Pool Asset (or any engine included in the Pool Assets unless such engine is replaced by another working engine or engines of comparable value, assuming half-time condition) (whether by loss of property due to theft, destruction, confiscation, prohibition on use, any similar event or otherwise), based upon the most recent Appraisal of the Pool Assets (from which the appraised values of the Pool Assets which are the subject of the involuntary disposition shall be subtracted) furnished pursuant to Section 6.8, the Company shall within 60 days after the date of such Appraisal or involuntary disposal, as the case may be (a "Collateral Coverage Test Cure Period"), designate additional assets as Pool Assets to the extent that, (1) after giving effect to such designation, the Appraised Value of the Pool Assets, based on the most recently delivered Appraisal with respect to assets already constituting Pool Assets and based on an Appraisal performed at (or relatively contemporaneously with) the time of such addition with respect to assets being added to Pool Assets, shall satisfy the Collateral Coverage Test (and Schedule I shall be modified to reflect such addition) and (2) after giving effect to such addition, at the time of such addition, the average age of any aircraft constituting Pool Assets shall not exceed 10 years, provided that (A) at the time of such addition, the Administrative Agent and the Banks shall have received an Officer's Certificate certifying that the conditions set forth in this Section 6.12(c) shall have been satisfied after giving effect to such addition and attaching thereto such Appraisal, and (B) the asset being added shall constitute Specified Equipment;

(d)    the Company may at any time and from time to time designate any of its assets as Pool Assets and deliver to the Administrative Agent an Appraisal with respect to such assets being added as Pool Assets (and Schedule I shall be modified to reflect such addition), provided that (A) at the time of such addition, the Administrative Agent and the Banks shall have received an Appraisal with respect to such assets being added as Pool Assets, an Officer's Certificate certifying that the conditions set forth in this Section 6.12(d) shall have been satisfied after giving effect to such addition and attaching thereto such Appraisal, (B) at the time of such addition, the average

age of any aircraft constituting Pool Assets shall not exceed 10 years and (C) the asset being added shall constitute Specified Equipment; and

(e)     at the Company's request, the Lien on any Pool Asset will be promptly released, provided, in each case, that the following conditions are satisfied or waived: (i) no Default or Event of Default has occurred and is continuing, (ii) after giving effect to such release and the addition of any assets pursuant to clause (iv)(z) below, at the time of such release the average age of any aircraft constituting Pool Assets shall not exceed 10 years, (iii) the Company shall deliver to the Administrative Agent an Officer's Certificate demonstrating compliance with the Collateral Coverage Test following such release and certifying that the conditions set forth in this Section 6.12(e) shall have been satisfied and (iii) any of the following or any combination thereof shall have occurred: (x) after giving effect to such release, the remaining Collateral constituting Specified Equipment shall satisfy the Collateral Coverage Test, (y) the Company shall have prepaid the Loans in an amount required to comply with the Collateral Coverage Test, or (z) the Company shall have subjected to the Aircraft Mortgage additional assets that constitute Specified Equipment having an Appraised Value, in the aggregate, required to comply with this Section 6.12. In connection herewith, the Administrative Agent agrees to promptly provide, execute and deliver any documents or releases reasonably requested by the Company to evidence such release, at the Company's expense.

Section 6.13     <u>Restrictions on Liens.</u> (a) The Company will not, nor will it permit any Subsidiary to, create, assume or suffer to exist any Lien upon or with respect to the Collateral or assign any right to receive the proceeds from the sale, transfer or disposition of any of the Collateral, or file or authorize the filing with respect to any of the Collateral of any financing statement naming the Company or any Subsidiary as debtor under the Uniform Commercial Code or any similar notice of Lien naming the Company or any Subsidiary as debtor under any similar recording or notice statute (including, without limitation, any filing under Title 49, United States Code, Section 44107), other than Permitted Liens affecting Collateral.

(b) The Company will not enter into or suffer to exist, and will not permit any of its Subsidiaries to enter into or suffer to exist, any agreement prohibiting or conditioning the creation or assumption of any first priority Lien, subject to Permitted Liens, in favor of the Administrative Agent for the ratable benefit of the Secured Parties upon any Collateral to secure Debt or other obligations of the Company or of any Subsidiary of the Company that holds Collateral.

Section 6.14     <u>Mergers and Dissolutions</u>. (a) The Company will not merge or consolidate with any other person unless:

(i)          no Default or Event of Default has occurred and is continuing or would result therefrom;

(ii)   the Company is the surviving corporation or, if otherwise, (x) such other Person or continuing corporation (the "<u>Successor Company</u>") is a corporation or other entity organized under the laws of a state of the United States and (y) such Successor Company is a U.S. certificated air carrier; and

(iii)   in the case of a Successor Company, the Successor Company shall (A) execute, prior to or contemporaneously with the consummation of such transaction, such agreements, if any, as are in the reasonable opinion of the Administrative Agent, necessary or advisable to evidence the assumption by the Successor Company of liability for all of the obligations of the Company hereunder and the other Loan Papers, and (B) cause to be delivered to the Administrative Agent and the Banks such legal opinions (which may be from in-house counsel) as any of them may reasonably request in connection with the matters specified in the preceding clause (A) and (C) provide such information as each Bank or the Administrative Agent reasonably requests in order to perform its "know your customer" due diligence with respect to the Successor Company.

Upon any consolidation or merger in accordance with this Section 6.14(a) in any case in which the Company is not the surviving corporation, the Successor Company shall succeed to, and be substituted for, and may exercise every right and power of, the Company under this Agreement with the same effect as if such Successor Company had been named as the Company herein. No such consolidation or merger shall have the effect of releasing the Company or any Successor Company which shall theretofore have become successor to the Company in the manner prescribed in this Section 6.14(a) from its liability with respect to any Loan Paper to which it is a party.

(b) The Company will not liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution).

Section 6.15     <u>Assignment</u>. The Company will not assign or transfer any of its Rights, duties, or obligations under any of the Loan Papers to which it is a party.

Section 6.16     <u>Amendments</u>.

(a)     The Company shall not amend, modify, or change the terms or provisions of that certain revolving credit facility agreement (the "<u>Revolving Credit Agreement</u>") dated as of August 3, 2016 among the Company, the banks party thereto, JPMorgan Chase

Bank, N.A., as paying agent, JPMorgan Chase Bank, N.A. and Citibank, N.A., as co-administrative agents, and the other parties party thereto, as amended by First Amendment dated as of March 30, 2020 and as further amended, restated, supplemented, replaced or otherwise modified from time to time, if the effect thereof, either individually or in the aggregate, would make the terms of the Revolving Credit Agreement to be more restrictive to the Company unless this Agreement is amended in accordance with Section 9.1 hereof to add comparable terms or provisions.

(b)     The Company shall cause any of its Subsidiaries that is or becomes a guarantor of obligations under the Revolving Credit Agreement (other than such Subsidiaries pledging "Collateral" (as defined in the Revolving Credit Agreement)) to become a guarantor of the Obligations hereunder.

Section 6.17     Liquidity. The Company shall maintain at all times Total Liquidity of not less than $2,500,000,000.

Section 6.18     Post-Effective Date Items. Within five (5) Business Days of the Effective Date (or such later date as the Administrative Agent may, in its sole discretion, consent to in writing), the Administrative Agent and the Banks shall have received the written opinion of Gilchrist Aviation Law, P.C., special FAA counsel, in the event written confirmation is delivered prior to the Effective Date as described in Section 4.1(b)(v) and in form and substance reasonably satisfactory to the Administrative Agent.

Section 6.19     Further Assurances. The Company will take, or cause to be taken, at the Company's cost and expense, such action with respect to (x) the recording, filing, re-recording and re-filing of the Aircraft Mortgage, as is necessary to maintain, so long as the Aircraft Mortgage is in effect, the priority, perfection and preservation of the Lien created by the Aircraft Mortgage, in the office of the FAA, pursuant to Title 49, and in such other places as may be required under any applicable law or regulation in the U.S., (y) the appropriate registrations with the International Registry as are necessary to maintain, so long as the Aircraft Mortgage is in effect, the priority, perfection and preservation of the Lien created by the Aircraft Mortgage and (z) any financing statements or other instruments as are necessary to maintain, so long as the Aircraft Mortgage is in effect, the priority, perfection and preservation of the Lien created by the Aircraft Mortgage, and will furnish to the Administrative Agent timely notice of the necessity of such action, together with, if requested by Administrative Agent, such instruments, in execution form, and such other information as may be reasonably required to enable the Administrative Agent to take such action or otherwise reasonably requested by Administrative Agent. To the extent permitted by applicable law, the Company hereby authorizes the Administrative Agent to execute and file financing statements or continuation statements necessary to maintain, so long as the Aircraft Mortgage is in effect, the perfection and preservation of the Lien created by the Aircraft Mortgage without the Company's signature appearing thereon. The Company shall pay the costs of, or incidental to, any recording or filing, including, without limitation, any filing of financing or continuation statements, necessary to maintain, so long as the Aircraft Mortgage is in effect, the perfection and preservation of the Lien created by the Aircraft Mortgage.

## ARTICLE VII

## EVENTS OF DEFAULT; REMEDIES

Section 7.1     Events of Default. Any one or more of the following events shall be "Events of Default" hereunder (which shall include by definition the expiration of any grace period with respect thereto), whether the same shall occur and be continuing for any reason whatsoever (and whether such occurrence shall be voluntary or involuntary or come about or be effected by operation of Law or otherwise):

(a)     Payment of Obligation. Failure to pay any principal of any Loan when due whether at maturity, by declaration as authorized by this Agreement, or otherwise; or failure to pay, within five Business Days after the due date thereof, any interest on any Loan; or failure to pay, within five Business Days after the due date thereof, or if no due date therefor is herein specified within five Business Days after written demand therefor is given to the Company by the Administrative Agent, any fee or other amount payable by the Company hereunder or under any of the other Loan Papers.

(b)     Covenants.

(i)     Default shall be made in the observance or performance of the covenants, conditions, and agreements on the part of the Company (or in the case of Section 6.12, on the part of any Subsidiary having any Pool Assets) contained in Section 6.12, 6.13 or 6.17, in each case, subject to a grace period of 5 Business Days in the event that a Senior Officer of the Company did not have advance knowledge of the Default and so long as (i) the Administrative Agent is promptly notified of the Default upon the occurrence thereof and (ii) the interests of the Banks are not materially prejudiced during such period in the reasonable determination of the Administrative Agent.

(ii)     Default shall be made in the observance or performance of any of the other covenants, conditions, and agreements on the part of the Company contained herein, or in any other Loan Papers and such default shall continue for a period of 30 days (or, in the case of Section 6.9, five Business Days) after the Administrative Agent shall have given the Company notice thereof in writing.

(c)    <u>Debtor Relief</u>. The Company or any Material Subsidiary shall file a voluntary petition in bankruptcy or a petition or answer seeking reorganization, arrangement, composition, liquidation, receivership, or similar relief under any Debtor Relief Law, or shall file a petition to take advantage of any Debtor Relief Law, or shall make an assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts as they become due, or shall fail generally to pay its debts as they become due, or shall consent to the appointment of any receiver, trustee, custodian or liquidator of it or all or a substantial part of its Property; or a proceeding or action shall be instituted or commenced against the Company or any Material Subsidiary seeking an order for relief or a reorganization, arrangement, composition, liquidation, receivership, or similar relief under any Debtor Relief Law or seeking the appointment, without the consent of the Company or any Material Subsidiary, of any receiver, trustee, custodian or liquidator of it or all or a substantial part of the Property of the Company or any Material Subsidiary and such proceeding or action shall remain undismissed or unstayed for a period of 90 days; or an order, decree, or judgment for an involuntary petition adjudicating the Company or any Subsidiary insolvent shall be entered by any court of competent jurisdiction and shall remain undismissed or unstayed for a period of 90 days.

(d)    <u>Payment of Judgments</u>. The Company or any of its Material Subsidiaries fails to pay any judgment or order for the payment of money in excess of $50,000,000 rendered against it or any of

xlv

its assets (exclusive of judgment amounts fully covered by insurance where the insurer has admitted liability in respect thereof) and either (i) any enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) the same shall not be discharged (or provisions shall not be made for such discharge), or a stay of execution thereof shall not be procured, within 30 days from the date of entry thereof and the Company or the relevant Material Subsidiary shall not, within said period of 30 days, or such longer period during which execution of the same shall have been stayed, appeal therefrom and cause the execution thereof to be stayed during such appeal.

(e)    Default on Other Debt or Security. The Company or any Material Subsidiary shall (i) fail to pay any principal of or interest on any Debt (other than the Obligation) the principal or face amount of which exceeds $50,000,000 when due (or, where permitted, within any applicable grace period), whether by scheduled maturity, required prepayment, acceleration, demand or otherwise and such default continues unremedied for five Business Days after such due date or applicable grace period, or (ii) fail to perform or observe any other provision (other than a provision that is substantially identical to a provision in this Agreement) contained in any agreement securing or relating to such Debt (or any other breach or default under such Debt agreement occurs) if the effect of such failure to perform or observe such other provisions (or breach or default) is to cause such Debt to become due prior to its stated maturity; provided, however, that if any such failure, breach or default shall be waived or cured (as evidenced by a writing from such holder or trustee) then, to the extent of such waiver or cure, the Event of Default hereunder by reason of such failure, breach or default shall be deemed likewise to have been thereupon waived or cured.

(f)    ERISA. Any "Reportable Event" as such term is defined in ERISA under any Plan, or the appointment by an appropriate Tribunal of a trustee to administer any Plan, or the termination of any Plan within the meaning of Title IV of ERISA, and any of the foregoing results in a material liability to the Pension Benefit Guaranty Corporation; or any Plan fails to satisfy the "minimum funding standards" of ERISA or is determined to be in "at risk" status (within the meaning of ERISA).

(g)    Misrepresentation. Any representation or warranty made by the Company is untrue in any material respect, or any certificate, schedule, statement, report, notice or writing (excluding any Appraisal, for which the Company makes no representation) furnished by the Company to the Administrative Agent or to the Banks, or any of them, is untrue in any material respect on the date as of which the facts set forth are stated or certified, shall remain material at the time of discovery and shall, if curable, remain incorrect in any material respect after 30 days after written notice thereof to the Company (it being understood that any failure by the Company to include within any such schedule, statement, report, notice, or writing any information the omission of which would cause the material included to be misleading shall be as much an untruth as a false statement contained therein).

Section 7.2    Remedies Upon Default. If an Event of Default specified in Section 7.l(c) occurs, the obligation of each Bank to make Loans hereunder shall thereupon automatically terminate (unless previously terminated) and the aggregate unpaid principal balance of and accrued interest on the Obligation shall thereupon become due and payable concurrently therewith, without any action by the Administrative Agent or any Bank and without diligence, presentment, demand, protest, notice of protest or intent to accelerate, or notice of any other kind, all of which are hereby expressly waived. Except as set forth in the preceding sentence, should any other Event of Default occur and be continuing, the Administrative Agent may, and if requested by the Majority Banks, shall, do any one or more of the following:

(a)    Acceleration. Declare (by written notice to the Company) the entire unpaid balance of the Loans, all interest accrued and unpaid thereon and the other Obligation, or any part thereof, immediately due and payable, whereupon it shall be due and payable, without diligence, presentment, demand, protest, notice of protest or intent to accelerate, or other notice of any kind (except any notice or demand specified in this Agreement), all of which are hereby expressly waived.

(b)    Termination. Terminate the Additional Commitments by written notice to the Company (unless previously terminated).

(c)    Judgment. Reduce any claim to judgment.

(d)    Rights. Exercise any and all legal and equitable Rights available to it (including all remedies under the Cape Town Treaty including, without limitation, Article 13 of the Cape Town Convention).

In addition to any other rights and remedies granted to the Administrative Agent and the Banks in the Loan Papers, the Administrative Agent on behalf of the Banks may exercise all rights and remedies of a secured party under the New York Uniform Commercial Code or any other applicable law. Without limiting the generality of the foregoing, to the extent permitted by applicable law, the Administrative Agent, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon the Company (all and each of which demands, defenses, advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, or consent to the use by the Company of any cash collateral arising in respect of the Collateral on such terms as the Administrative Agent deems reasonable, and/or may forthwith sell, lease, assign give an option or options to purchase or otherwise dispose of and deliver, or acquire by

credit bid on behalf of the Banks, the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Administrative Agent or any Bank or elsewhere, upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery, all without assumption of any credit risk. The Administrative Agent or any Bank shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in the Company, which right or equity is hereby waived and released. Subject to the succeeding paragraph, the Administrative Agent shall apply the net proceeds of any action taken by it pursuant to this Article VII, after deducting all reasonable costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any of the Collateral or in any other way relating to the Collateral or the rights of the Administrative Agent and the Banks hereunder, including reasonable attorneys' fees and disbursements, to the payment in whole or in part of the obligations of the Company under the Loan Papers, in such order as the Administrative Agent may elect, and only after such application and after the payment by the Administrative Agent of any other amount required by any provision of law, including Section 9-615(a)(3) of the New York Uniform Commercial Code, need the Administrative Agent account for the surplus, if any, to the Company. To the extent permitted by applicable law, the Company waives all claims, damages and demands it may acquire against the Administrative Agent or any Bank arising out of the exercise by them of any rights hereunder. If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.

Any payment received after acceleration of the Obligations pursuant to Section 7.2 shall be applied (1) first, towards payment of fees and expenses then due under Section 9.4 and amounts pursuant to a Loan Paper payable to the Administrative Agent, (2) second, towards payment of fees and expenses then due under Section 9.4 and Section 9.5 and amounts pursuant to a Loan Paper payable to the Banks and towards payment of interest then due on account of the Loans, ratably among the parties entitled thereto in accordance with the amounts of such fees and expenses and interest then due to such parties, (3) third, towards payment of principal of the Loans then due hereunder ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties, (4) fourth, towards payment of any other Obligations then due hereunder in accordance with the amounts of principal then due to such parties and (5) fifth, all remaining amounts after payment in full of the Obligations shall be promptly returned to the Company.

Section 7.3     Remedies in General. If any Event of Default shall occur and be continuing, the Administrative Agent may immediately proceed to protect and enforce all or any Rights with respect thereto contained in this Agreement or any other Loan Papers or may enforce any other legal or equitable Rights. Any Right may be exercised from time to time, independently or concurrently, and as often as shall be deemed expedient. No waiver of any Event of Default shall extend to any subsequent Event of Default.

**ARTICLE VIII**

**THE ADMINISTRATIVE AGENT**

Section 8.1     Authorization and Action. Each Bank hereby irrevocably appoints and authorizes JPMorgan Chase Bank, N.A. to act as its Administrative Agent and collateral agent hereunder and under each of the other Loan Papers. JPMorgan Chase Bank, N.A. consents to such appointment as Administrative Agent and agrees to perform the duties of the Administrative Agent hereunder and under the other Loan Papers. Each Bank authorizes and directs the Administrative Agent to act on its behalf and to exercise such powers under this Agreement as are specifically delegated to or required of the Administrative Agent by the terms hereto, together with such powers as are reasonably incidental thereto. As to any matters not expressly provided for by this Agreement or the other Loan Papers (including, without limitation, enforcement or collection of the Loans or Notes), the Administrative Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Majority Banks, and such instructions shall be binding upon all Banks and all holders of Loans or Notes; provided, however, that the Administrative Agent shall not be required to take any action which exposes the Administrative Agent to liability or which is contrary to this Agreement or applicable Law.

Section 8.2     Administrative Agent's Reliance, Etc. None of the Administrative Agent and its respective Affiliates, directors, officers, agents, or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with the Loan Papers (i) with the consent or at the request of the Majority Banks (or all the Banks, if required) or (ii) in the absence of its or their own gross negligence or willful misconduct (it being the express intention of the parties that the Administrative Agent and its directors, officers, agents, and employees shall have no liability for actions and omissions under this Section 8.2 resulting from their ordinary contributory negligence). Without limitation of the generality of the foregoing, the Administrative Agent (i) may treat the payee of each Loan or Note as the holder thereof until the Administrative Agent receives written notice of the assignment or transfer thereof signed by such payee and in form satisfactory to the Administrative Agent; (ii) may consult with legal counsel (including counsel for the Company), independent public accountants, and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants, or experts; (iii) makes no warranty or representation to any Bank and shall not be responsible to any Bank for any statements, warranties, or representations made by or on behalf of the Company in or in connection with any Loan Paper; (iv) except as otherwise expressly provided herein, shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants, or conditions of any Loan Paper or to inspect the property (including the books and records) of the Company or any of its Subsidiaries; (v) shall have no responsibility to ensure the satisfaction of any condition set forth in

Article IV or elsewhere herein other than to confirm receipt of items expressly required to be delivered to the Administrative Agent, (vi) shall not be responsible to any Bank for the due execution, legality, validity, enforceability, genuineness, sufficiency, or value of any Loan Paper or any other instrument or document furnished pursuant hereto or thereto; (vii) shall incur no liability under or in respect of any Loan Paper by acting upon any notice, consent, certificate, or other instrument or writing (which may be by telecopier or e-mail) reasonably believed by it to be genuine and signed or sent by the proper party or parties; and (viii) may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon.

Section 8.3    Rights of the Administrative Agent as Bank. With respect to their Additional Commitments and the Loans, if any, made by them and the Notes, if any, issued to them, the Administrative Agent and its Affiliates shall have the same rights and powers under this Agreement or any other Loan Paper as any other Bank and may exercise the same as though it were not the Administrative Agent; and the term "Bank" or "Banks" shall, unless otherwise expressly indicated, include the Administrative Agent, in its individual capacity. The Administrative Agent and its Affiliates may accept deposits from, lend money to, act as trustee under indentures of, and generally engage in any kind of business with, the Company, any of the Subsidiaries and any Person who may do business with or own securities of the Company or of the Subsidiaries, all as if such Bank were not the Administrative Agent, and without any duty to account therefor to the Banks.

Section 8.4    Bank Credit Decision. Each Bank acknowledges and agrees that it has, independently and without reliance upon the Administrative Agent or any other Bank and based on the Current Financials and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Bank also acknowledges and agrees that it will, independently and without reliance upon the Administrative Agent or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement.

Section 8.5     Administrative Agent's Indemnity. The Administrative Agent shall not be required to take any action hereunder or to prosecute or defend any suit in respect of this Agreement or the Loans or Notes unless indemnified to the Administrative Agent's satisfaction by the Banks against loss, cost, liability, and expense. If any indemnity furnished to the Administrative Agent shall become impaired, it may call for additional indemnity and cease to do the acts indemnified against until such additional indemnity is given. In addition, the Banks severally but not jointly agree to indemnify the Administrative Agent (to the extent not reimbursed by the Company), ratably according to the respective principal amounts of the Loans and Additional Commitments then held by each of them; provided that, in the case of Section 2.22, when a Defaulting Bank shall exist, any such Defaulting Bank's Additional Commitment shall be disregarded in the calculation, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Administrative Agent in any way relating to or arising out of this Agreement or any action taken or omitted by the Administrative Agent under this Agreement or the other Loan Papers (including, without limitation, any action taken or omitted under Article II of this Agreement); provided that no Bank shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements resulting from the Administrative Agent's fraud, gross negligence or willful misconduct. Each Bank agrees, however, that it expressly intends, under this Section 8.5, to indemnify the Administrative Agent ratably as aforesaid for all such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, and disbursements arising out of or resulting from the Administrative Agent's ordinary or contributory negligence. Without limitation of the foregoing, each Bank agrees to reimburse the Administrative Agent promptly upon demand for its ratable share of any out-of-pocket expenses (including reasonable counsel fees) incurred by the Administrative Agent in connection with the preparation, execution, administration, or enforcement of, or legal advice in respect of rights or responsibilities under, this Agreement and the other Loan Papers to the extent that the Administrative Agent is not reimbursed for such expenses by the Company. The provisions of this Section 8.5 shall survive the termination of this Agreement and/or the payment or assignment of any of the Loans or Notes.

Section 8.6     Successor Administrative Agent. The Administrative Agent may resign at any time by giving written notice thereof to the Banks and the Company and may be removed as Administrative Agent under this Agreement and the other Loan Papers at any time with or without cause by the Majority Banks. Upon any such resignation or removal, the Majority Banks shall have the right, with the consent, not to be unreasonably withheld or delayed, of the Company (provided that the Company's consent shall not be required during the continuance of a Default or an Event of Default), to appoint a successor Administrative Agent. If no successor Administrative Agent shall have been so appointed and shall have accepted such appointment within 30 calendar days after the retiring Administrative Agent's giving notice of resignation or the Majority Banks' removal of the retiring Administrative Agent, then the retiring Administrative Agent may, on behalf of the Banks, with the consent, not to be unreasonably withheld or delayed, of the Company (provided that the Company's consent shall not be required during the continuance of a Default or Event of Default), appoint a successor Administrative Agent, which shall be a commercial bank organized under the Laws of the United States of America or of any state thereof and having a combined capital and surplus of at least $500,000,000. Upon the acceptance of any appointment as Administrative Agent hereunder and under the other Loan Papers by a successor Administrative Agent, such successor Administrative Agent shall thereupon succeed to and become vested with all rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under this Agreement and the other Loan Papers; provided that solely for purposes of maintaining any security interest granted to the Administrative Agent under any Loan Paper for the benefit of the Secured Parties, the retiring Administrative Agent shall continue to be vested with such security interest as collateral agent for the benefit of the Secured Parties, and continue to be entitled to the rights set forth in such Loan Paper, and, in the case of any Collateral in the possession of the Administrative Agent, shall continue to hold such Collateral, in each case until such time as a successor Administrative Agent is appointed and accepts such appointment in accordance with this Section 8.6 (it being understood and agreed that the retiring Administrative Agent shall have no duty or obligation to take any further action under any Loan Paper, including any action required to maintain the perfection of any such security interest). After any retiring Administrative Agent's resignation or removal as the Administrative Agent hereunder and under the other Loan Papers, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under this Agreement and the other Loan Papers.

Section 8.7     Notice of Default. The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Administrative Agent shall have received written notice from a Bank or the Company referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." If the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Banks; provided, however, if such notice is received from a Bank, the Administrative Agent also shall give notice thereof to the Company. The Administrative Agent shall be entitled to take action or refrain from taking action with respect to such Default or Event of Default as provided in Section 8.1 and Section 8.2.

Section 8.8     Collateral Matters. (a) Except with respect to the exercise of setoff rights in accordance with Section 9.6 or with respect to a Secured Party's right to file a proof of claim in an insolvency proceeding, no Secured Party shall have any right individually to realize upon any of the Collateral, it being understood and agreed that all powers, rights and remedies under the Loan Papers may be exercised solely by the Administrative Agent on behalf of the Secured Parties in accordance with the terms thereof.

(b) The Secured Parties irrevocably authorize the Administrative Agent, at its option and in its discretion, to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Paper to the holder of any Lien on such property that is permitted by Section 6.13. The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon or any certificate prepared by the Company in connection therewith, nor shall the Administrative Agent be responsible or liable to the Banks or any other Secured Party for any failure to monitor or maintain any portion of the Collateral.

## ARTICLE IX

## MISCELLANEOUS

Section 9.1    Amendments, Etc. (a) No amendment or waiver of any provision of this Agreement or any other Loan Paper, nor consent to any departure by the Company herefrom or therefrom, shall in any event be effective unless the same shall be in writing and signed by the Majority Banks (or the Administrative Agent with the consent of the Majority Banks) in all cases, and then, in any case, such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that (i) no amendment, waiver, or consent shall, unless in writing and signed by each Bank directly affected thereby (or the Administrative Agent with the consent of each Bank directly affected thereby), do any of the following: (a) increase the amount of the Additional Commitments of any Banks or subject any Banks to any additional obligations, (b) reduce the principal of, or rate or amount of interest applicable to, any Loan other than as provided in this Agreement, or any fees hereunder, (c) postpone any date fixed for any payment of principal of, or interest on, the Loans or any fees hereunder, (d) extend the Maturity Date, (e) eliminate or reduce the voting rights of any Bank under this Section 9.1, (f) amend Section 2.15 in any manner that would alter the pro rata sharing of payments or Additional Commitment reductions required thereby, (g) change the percentage of the Additional Commitments or of the aggregate unpaid principal amount of the Loans, or the number of Banks, which shall be required for the Banks or any of them to take any action hereunder or (h) amend Section 7.2 in a manner that would alter the "waterfall" provision and (ii) no amendment or modification shall, unless in writing and signed by all Banks (or the Administrative Agent with the consent of all Banks) release all or substantially all of the Collateral (except to the extent contemplated by Section 6.12 hereof, as in effect on the date hereof); and provided, further, that no amendment, waiver, or consent shall, unless in writing and signed by the Administrative Agent in addition to the Banks required above to take such action, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Paper, or modify or waive any provision of Section 2.22.

(b)    Notwithstanding the foregoing, if the Administrative Agent and the Company acting together identify any ambiguity, omission, mistake, typographical error or other defect in any provision of this Agreement or any other Loan Papers, then the Administrative Agent and the Company shall be permitted to amend, modify or supplement such provision to cure such ambiguity, omission, mistake, typographical error or other defect, and such amendment shall become effective without any further action or consent of any other party to this Agreement.

(c)    Notwithstanding the foregoing, if any amendments to this Agreement or any other Loan Paper are required or deemed necessary to effectuate the making of Incremental Term Loans in accordance with the provisions of Section 2.24 hereof, then the Administrative Agent, the Company and such Incremental Banks making Incremental Term Loans shall be permitted to amend, modify or supplement this Agreement and any other Loan Paper for the purpose of effectuating such Incremental Term Loans in accordance with the terms of Section 2.24, and each such amendment shall become effective without any further action or consent of any other party to this Agreement.

Section 9.2    Notices, Etc. The Administrative Agent, any Bank, or the holder of any Loan or Note giving consent or notice or making any request of the Company provided for hereunder, shall notify each Bank and the Administrative Agent. In the event that the holder of any Loan or Note (including any Bank) shall transfer such Loan or Note, it shall promptly so advise the Administrative Agent which shall be entitled to assume conclusively that no transfer of any Loan or Note has been made by any holder (including any Bank) unless and until the Administrative Agent receives written notice to the contrary. Notices, consents, requests, approvals, demands, and other communications (collectively "Communications") provided for herein shall be in writing (including telecopy Communications) and mailed, telecopied, e-mailed (where indicated) or delivered:

(a)    If to the Company, to it at:

Southwest Airlines Co.
P.O. Box 36611, HDQ-6TR
Love Field
Dallas, Texas 75235
Telecopy Number: (214) 932-1322
Attention: Treasurer
E-mail: Capital_Markets-DG@wnco.com

xlviii

(b)    If to the Administrative Agent, to it at:

JPMorgan Chase Bank, N.A.
JPM Loan and Agency Services
500 Stanton Christiana Road
NCC5 / 1st Floor
Newark, DE 19713
Attention: JPM Loan and Agency Services
Tel: 302-634-1929
Email: james.a.campbell@jpmorgan.com and 14698287788@tls.ldsprod.com
Agency Withholding Tax Inquiries:
Email: agency.tax.reporting@jpmorgan.com

Agency Compliance/Financials/Intralinks:
Email: covenant.compliance@jpmchase.com
with a copy to:

JPMorgan Chase Bank, N.A.
383 Madison Avenue, Floor 24
New York, NY 10179
Attention: Cristina Caviness
Telephone Number: (212) 270-7289
E-mail: Cristina.caviness@jpmorgan.com

(c)    If to any Bank, such address or telecopy number as such party may hereafter specify for such purpose by notice to the other parties. All Communications shall, when mailed, telecopied, e-mailed or delivered, be effective and shall be deemed to have been duly given when sent by telecopier or e-mail to any party or the telecopier number or e-mail address, as applicable, as set forth herein or on the signature pages hereof (or other telecopy number or e-mail address designated by such party in a written notice to the other parties hereto), or five days after being mailed to the address as set forth herein (or such other address designated by such party in a written notice to the other parties hereto) respectively, or when delivered to such address; provided, however, Communications to the Administrative Agent pursuant to Article II or Article VIII shall not be effective until received by the Administrative Agent.

Section 9.3    No Waiver; Remedies. No failure on the part of any Bank or the Administrative Agent to exercise, and no delay in exercising, any Right hereunder or under any other Loan Paper shall operate as a waiver thereof; nor shall any single or partial exercise of any such Right, or any abandonment or discontinuance of any steps to enforce such Right, preclude any other or further exercise thereof or the exercise of any other Right. No notice to or demand on the Company in any case shall entitle the Company to any other or further notice or demand in similar or other circumstances. The Rights herein provided are cumulative and not exclusive of any Rights provided by Law.

Section 9.4    Costs, Expenses and Taxes. The Company agrees to pay or reimburse the Administrative Agent for paying: (i) all reasonable costs and expenses of the Administrative Agent in connection with (A) the preparation, execution, delivery, and administration of this Agreement and the other Loan Papers, including, without limitation, the reasonable fees and out-of-pocket expenses of counsel for the Administrative Agent with respect thereto and with respect to advising the Administrative

xlix

Agent as to their respective Rights and responsibilities under this Agreement and the other Loan Papers, and (B) any amendment, modification, supplement, or waiver of any of the terms of this Agreement, and (ii) all reasonable costs and expenses of the Banks and the Administrative Agent (including reasonable counsel's fees, and including reasonable allocated in-house counsel fees for any Bank or the Administrative Agent) in connection with the enforcement of this Agreement and the other Loan Papers. In addition, the Company shall pay any and all Taxes payable or determined to be payable in connection with the execution and delivery of this Agreement and the other Loan Papers, and agrees to save the Administrative Agent and each Bank harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omitting to pay such Taxes, if any, which may be payable or determined to be payable in connection with the execution and delivery of this Agreement or any other Loan Paper. The obligations of the Company under this <u>Section 9.4</u> shall survive the termination of this Agreement and/or repayment of the Loans.

Section 9.5    <u>Indemnity</u>. The Company agrees to indemnify and hold harmless the Administrative Agent and the Banks and each of their respective Affiliates, officers, directors, employees, agents, advisors and representatives against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, deficiencies, expenses, and disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Administrative Agent, any Bank, or any of their respective Affiliates, officers, directors, employees, agents, advisors or other representatives in any way relating to or arising out of the Loan Papers, any transaction related hereto, or any act, omission, or transaction of the Company, its Subsidiaries, and Affiliates, or any of their employees, officers, directors or other representatives, to the extent that any of the same results, directly or indirectly, from any claims made or actions, suits, or proceedings commenced by or on behalf of any person other than the Administrative Agent or a Bank.

The obligation of the Company under this section shall continue for a period of one year after payment of the Obligation and termination of any or all Loan Papers, and **SHALL APPLY WHETHER OR NOT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES AND RELATED EXPENSES ARE IN ANY WAY OR TO ANY EXTENT OWED, IN WHOLE OR IN PART, UNDER ANY CLAIM OR THEORY OF STRICT LIABILITY OR CAUSED, IN WHOLE OR IN PART BY ANY NEGLIGENT ACT OR OMISSION OF ANY KIND BY THE ADMINISTRATIVE AGENT OR ANY BANK**;

<u>provided</u>, <u>however</u>, that (i) although each indemnified party shall have the right to be indemnified from its own ordinary negligence, no indemnified party shall have the right to be indemnified hereunder for willful misconduct, gross negligence or bad faith to the extent found by a final, non-appealable judgment of a court of competent jurisdiction and (ii) the indemnity set forth in this <u>Section 9.5</u> shall not apply to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, deficiencies, expenses or disbursements resulting from a proceeding that does not involve an act or omission by the Company or any of its affiliates and that is brought by an indemnified party against any other indemnified party (other than claims against the Administrative Agent in its capacity or in fulfilling its role as the Administrative Agent under the Loan Papers).

To the fullest extent permitted by applicable law, the Company shall not assert, and hereby waives, any claim against any indemnified party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Papers or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.

Section 9.6    <u>Right of Setoff</u>. If any Event of Default shall have occurred and is continuing, each Bank and each of its Affiliates is hereby authorized at any time and from time to

l

time, to the fullest extent permitted by Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Bank or Affiliate to or for the credit or the account of the Company against any and all obligations of the Company now or hereafter existing under this Agreement and the Loans held by such Bank or Affiliate, irrespective of whether or not such Bank or Affiliate shall have made any demand under this Agreement or any Note and although such obligations may be unmatured. Each Bank agrees promptly to notify the Company and the Administrative Agent after any such setoff and application made by such Bank or Affiliate, but the failure to give such notice shall not affect the validity of such setoff and application. The Rights of each Bank under this Section 9.6 are in addition to the Rights and remedies (including, without limitation, other Rights of setoff) which such Bank may have.

Section 9.7    **GOVERNING LAW. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

Section 9.8    Submission To Jurisdiction; Waivers. The Company hereby irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Papers to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in the Borough of Manhattan (or if such court lacks subject matter jurisdiction, the Supreme Court of the State of New York sitting in the Borough of Manhattan), and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Paper or the transactions relating hereto or thereto, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may (and any such claims, cross-claims or third party claims brought against the Administrative Agent or any of its Affiliates and the respective directors, officers, employees, agents and advisors may only) be heard and determined in such Federal (to the extent permitted by law) or New York State court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law;

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Company, as the case may be at its address set forth in Section 9.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto; and

(d)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction.

Section 9.9    Survival of Representations and Warranties. All representations and warranties contained herein or made in writing by the Company in connection herewith shall survive the execution and delivery of this Agreement and the other Loan Papers, and no investigation

li

by the Administrative Agent or any Bank or any closing shall affect the representations and warranties or the Right of the Administrative Agent or any Bank to rely upon them.

Section 9.10    Binding Effect. This Agreement shall become effective when it shall have been executed by the Company, the Administrative Agent, and each Bank and thereafter shall be binding upon and inure to the benefit of the Company (subject to the provisions of Section 9.11), the Administrative Agent, each Bank and their respective successors and assigns.

Section 9.11    Successors and Assigns; Participations

(a)    Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and permitted assigns of such party, and all covenants, promises, agreements, representations and warranties by or on behalf of the Company, the Administrative Agent or the Banks that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns. Except for any assignment or transfer by the Company of its rights and obligations under this Agreement to a Successor Company in accordance with Section 6.14, the Company may not assign or transfer any its rights or obligations hereunder without the prior written consent of all of the Banks.

(b)    Each Bank may without the consent of the Company sell participations to one or more banks or other entities in all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Additional Commitment or the Loans owing to it and any Note or Notes held by it); provided, however, that (i) such Bank's obligations under this Agreement shall remain unchanged, (ii) such Bank shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such Bank shall remain the holder of its Loans and Notes (if any) for all purposes of this Agreement, (iv) the participating banks or other entities shall be entitled to the cost protection provisions contained in Article II and Section 9.4, but only to the extent that such protection would have been available to such Bank, calculated as if no such participations had been sold, and the indemnity protection provisions contained in Section 9.5, (v) the Company, the Administrative Agent, and the other Banks shall continue to deal solely and directly with such Bank in connection with such Bank's rights and obligations under this Agreement, and (vi) such Bank shall not sell a participation that conveys to the participant the right to vote or give or withhold consents under this Agreement or any other Loan Papers, other than the right to vote upon or consent to (y) amendments, modifications, or waivers with respect to any fees payable hereunder (including the dates fixed for the payment of any such fees) or the amount of principal or the rate of interest payable on, or the dates fixed for any payment of principal of or interest on, the Loans and (z) any extension of the Maturity Date. Each Bank that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Company, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"); provided that no Bank shall have any obligation to disclose all or any portion of the Participant Register to any Person except to the extent that such disclosure is necessary to establish that an Additional Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Bank shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(c)    Each Bank may assign to one or more Persons (other than a natural person, a Defaulting Bank or the Company or any of its Affiliates), all or a portion of its interests, rights, and obligations under this Agreement (including, without limitation, all or a portion of its Additional Commitment or, if the

Additional Commitment is not then in effect, the principal outstanding balance of the Loans at the time owing to it); provided, however, that (i) such assignment, if not to a Bank or an Eligible Affiliate Assignee of the assigning Bank shall be consented to by the Company (which consent shall not be unreasonably withheld or delayed and shall not be required after the occurrence or during the continuance of a Default or Event of Default), the Administrative Agent (which consent shall not be unreasonably withheld or delayed), (ii) each Bank's Additional Commitment or Loans to be assigned shall not be less than $5,000,000 unless (x) otherwise agreed by the Company and the Administrative Agent, (y) in the case of the assigning Bank, such amount is reduced to zero pursuant to such assignment or (z) the assignment is to a Bank, (iii) each such assignment shall be of a constant, and not a varying, percentage of all the assigning Bank's rights and obligations under this Agreement, (iv) the assignee thereof shall deliver to the Company and the Administrative Agent any Internal Revenue Service forms required by Section 2.18, and (v) the parties to each such assignment shall execute and deliver to the Administrative Agent, for its acceptance and recording in the Register (as defined below), an Assignment and Assumption substantially in the form of Exhibit E hereto (an "Assignment and Assumption"), together with a properly completed Administrative Questionnaire, any Note or Notes subject to such assignment and a processing and recordation fee of $3,500 (or such lesser amount as shall be acceptable to the Administrative Agent); provided, however, no such fee shall be required in the case of any assignment requested by the Company pursuant to Article II of this Agreement. Upon such execution, delivery, acceptance, and recording, from and after the effective date specified in each Assignment and Assumption, which effective date shall be at least five Business Days after the execution thereof (unless a shorter period shall be agreed to by the Company, the Administrative Agent, and the assignor Bank), (x) the assignee thereunder shall be a party hereto and, to the extent provided in such Assignment and Assumption, have the rights and obligations of a Bank hereunder and under the other Loan Papers and (y) the assignor Bank thereunder shall, to the extent provided in such Assignment and Assumption, be released from its obligations under this Agreement and the other Loan Papers (and, in the case of an Assignment and Assumption covering all of the remaining portion of an assigning Bank's rights and obligations under this Agreement and the other Loan Papers, such Bank shall cease to be a party hereto and thereto).

(d)    By executing and delivering an Assignment and Assumption, the Bank assignor thereunder and the assignee confirm to and agree with each other and the other parties hereto as follows: (i) other than the representations and warranties that (x) it is the legal and beneficial owner of the interest being assigned thereby, (y) the interest being assigned thereby is free and clear of any lien, encumbrance or other adverse claim and (z) it has full power and authority, and has taken all action necessary, to execute and deliver such Assignment and Assumption and to consummate the transactions contemplated thereby, such Bank assignor makes no representation or warranty and assumes no responsibility with respect to any statements, warranties, or representations made in or in connection with this Agreement or any other Loan Paper or the execution, legality, validity, enforceability, genuineness, sufficiency, or value of this Agreement, any other Loan Paper or any other instrument or document furnished pursuant hereto; (ii) such Bank assignor makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Company or the performance or observance of its respective obligations under this Agreement, any other Loan Paper or any other instrument or document furnished pursuant hereto or thereto; (iii) such assignee confirms that it has received a copy of this Agreement together with copies of financial information and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Assumption; (iv) such assignee will, independently and without reliance upon the Administrative Agent, such Bank assignor, or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such assignee appoints and authorizes the Administrative Agent to take such action on behalf of such assignee and to exercise such powers under this Agreement and the other Loan Papers as are delegated to the Administrative Agent

by the terms hereof and thereof, together with such powers as are reasonably incidental thereto; and (vi) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement are required to be performed by it as a Bank.

(e)    The Administrative Agent shall maintain at its office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Banks and the Additional Commitment of, or principal amount of the Loans owing to, each Bank from time to time (the "Register"). The entries in the Register shall be conclusive, in the absence of manifest error, and the Company, the Administrative Agent, and the Banks may treat each Person whose name is recorded in the Register as a Bank hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Company, any Bank or the Administrative Agent at any reasonable time and from time to time upon reasonable prior notice.

(f)    Upon its receipt of an Assignment and Assumption executed by an assigning Bank and an assignee together with any Note or Notes subject to such assignment and the written consent to such assignment, the Administrative Agent shall, if such Assignment and Assumption has been completed and is substantially in the form of Exhibit E hereto, (i) accept such Assignment and Assumption, (ii) record the information contained therein in the Register, and (iii) give prompt notice thereof to the Banks, the Administrative Agent and the Company. Within five Business Days after receipt of such notice, the Company, at its own expense, shall execute and deliver to the Administrative Agent in exchange for the surrendered Note or Notes, if any, (x) a new Note or Notes to the order of such assignee in an amount equal to its portion of the Loan assumed by it pursuant to such Assignment and Assumption and (y) if the assigning Bank has retained any Loan hereunder, new Notes to the order of the assigning Bank in an amount equal to the Loan retained by it hereunder. Such new Notes shall be in an aggregate principal amount equal to the aggregate principal amount of such surrendered Notes. Such new Notes shall be dated the effective date of such Assignment and Assumption and shall otherwise be in substantially the form of Exhibit E hereto. Cancelled Notes shall be returned to the Company.

(g)    Notwithstanding any other provision herein, any Bank may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.11 (or in connection with any swap, derivative, securitization or credit insurance relating to the Company and its obligations), disclose to the assignee or participant or proposed assignee or participant (or to any direct, indirect, actual or prospective counterparty (and its advisor) to any such swap, derivative or securitization) any information relating to the Company and its Subsidiaries furnished to such Bank by or on behalf of the Company; provided, that prior to any such disclosure, each such assignee or participant or proposed assignee or participant (or any such counterparty (and its advisor)) shall agree for the benefit of the Company to preserve the confidentiality of any confidential information relating to the Company received from such Bank.

(h)    Notwithstanding any other provision set forth in this Agreement, any Bank may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Bank, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Bank from any of its obligations hereunder or substitute any such pledgee or assignee for such Bank as a party hereto.

Section 9.12    Confidentiality. The Administrative Agent and each Bank agrees to keep confidential all Information (as defined below); provided that nothing herein shall prevent

liv

the Administrative Agent or any Bank from disclosing any such Information (a) to the Administrative Agent, any Bank or any affiliate thereof, (b) as permitted by Section 9.11(g), (c) to its employees, directors, agents, attorneys, accountants and other professional advisors or those of any of its affiliates in each case on a need-to-know basis, (d) upon the request or demand of any Governmental Authority, (e) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Law, (f) if requested or required to do so in connection with any litigation or similar proceeding, (g) that has been publicly disclosed, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Bank's investment portfolio in connection with ratings issued with respect to such Bank, (i) in connection with the exercise of any remedy hereunder or under any other Loan Paper, or (j) if agreed by the Company in its sole discretion, to any other Person. "Information" means all information received from the Company relating to the Company or its business, other than any such information that is available to the Administrative Agent or any Bank on a non-confidential basis prior to disclosure by the Company and other than information pertaining to this Agreement routinely provided by arrangers to data service providers, including league table providers, that serve the lending industry; provided that in the case of information received from the Company after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 9.12 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each Bank acknowledges that information furnished to it pursuant to this Agreement or the other Loan Papers may include material non-public information concerning the Company and its Affiliates and their related parties or their respective securities, and confirms that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with those procedures and applicable law, including Federal and state securities laws.

All information, including requests for waivers and amendments, furnished by the Company or the Administrative Agent pursuant to, or in the course of administering, this Agreement or the other Loan Papers will be syndicate-level information, which may contain material non-public information about the Company and its Affiliates and their related parties or their respective securities. Accordingly, each Bank represents to the Company and the Administrative Agent that it has identified in its Administrative Questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal and state securities laws.

Section 9.13    Independence of Covenants. All covenants contained in this Agreement shall be given independent effect so that if a particular action or condition is not permitted by any such covenants, the fact that such action or condition would be permitted by an exception to, or otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or Event of Default if such action is taken or condition exists.

Section 9.14    Severability. Should any clause, sentence, paragraph, or Section of this Agreement be judicially declared to be invalid, unenforceable, or void, such decision will not have the effect of invalidating or voiding the remainder of this Agreement, and the parties hereto agree that the part or parts of this Agreement so held to be invalid, unenforceable, or void will be deemed to have been stricken herefrom and the remainder will have the same force and effectiveness as if such part or parts had never been included herein.

Section 9.15    Integration. This Agreement and the other Loan Papers represent the entire agreement of the Company, the Administrative Agent and the Banks with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Administrative Agent or any Bank relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Papers.

Section 9.16    Descriptive Headings. The section headings appearing in this Agreement have been inserted for convenience only and shall be given no substantive meaning or significance whatever in construing the terms and provisions of this Agreement.

Section 9.17    Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Agreement or any document to be signed in connection with this Agreement shall be deemed to include electronic signatures (in a format reasonably acceptable to the Administrative Agent), deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be and the parties hereto consent to conduct the transactions contemplated hereunder by electronic means.

Section 9.18    **WAIVERS OF JURY TRIAL. THE COMPANY, THE ADMINISTRATIVE AGENT AND THE BANKS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN PAPER AND FOR ANY COUNTERCLAIM**

Section 9.19   <u>No Fiduciary Duty</u>. The Administrative Agent, each Bank and their Affiliates (collectively, solely for purposes of this paragraph, the "<u>Banks</u>"), may have economic interests that conflict with those of the Company, its stockholders and/or its affiliates. The Company agrees that nothing in the Loan Papers or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Bank, on the one hand, and the Company, its stockholders or its affiliates, on the other. The Company acknowledges and agrees that (i) the transactions contemplated by the Loan Papers (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Banks, on the one hand, and the Company, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Bank has assumed an advisory or fiduciary responsibility in favor of the Company, its stockholders or its affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Bank has advised, is currently advising or will advise the Company, its stockholders or its affiliates on other matters) or any other obligation to the Company except the obligations expressly set forth in the Loan Papers and (y) each Bank is acting solely as principal and not as the agent or fiduciary of the Company, its management, stockholders, creditors or any other Person. The Company acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. The Company agrees that it will not claim that any Bank has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to it, in connection with such transaction or the process leading thereto.

Section 9.20   <u>USA Patriot Act</u>. Each Bank hereby notifies the Company that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Patriot Act</u>"), it is required to obtain, verify, and record information that identifies each borrower, guarantor or grantor (the "<u>Loan Parties</u>"), which information includes the name and address of each Loan Party and other information that will allow such Bank to identify such Loan Party in accordance with the Patriot Act. The Company agrees to provide such information as each Bank or the Administrative Agent reasonably requests in order to perform its "know your customer" due diligence.

Section 9.21   <u>Acknowledgement and Consent to Bail-In of Affected Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Paper or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Paper, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)   the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)   the effects of any Bail-In Action on any such liability, including, if applicable:

(i)   a reduction in full or in part or cancellation of any such liability;

(ii)   a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Paper; or

(iii)   the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

Section 9.22    Interest Rate Limitation. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Bank holding such Loan in accordance with applicable law, the rate of interest payable to such Bank in respect of such Loan hereunder, together with all Charges payable to such Bank in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable to such Bank in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Bank in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Bank.

Section 9.23    Amendment and Restatement. Upon the Effective Date, this Agreement shall amend and restate the Existing Credit Agreement, but shall not constitute a novation thereof or in any way impair or otherwise affect the rights or obligations of the parties thereunder (including with respect to Loans and representations and warranties made thereunder) except as such rights or obligations are amended or modified hereby. All Loans and Obligations incurred under the Existing Credit Agreement which are outstanding on the Effective Date shall continue as Loans and Obligations under (and shall be governed by the terms of) this Agreement and the other Loan Papers, and all documents, instruments and agreements delivered pursuant to or in connection with the Existing Credit Agreement not amended and restated in connection with the entry of the parties into this Agreement shall remain in full force and effect, each in accordance with its terms, as of the date of delivery or such other date as contemplated by such document, instrument or agreement to the same extent as if the modifications to the Existing Credit Agreement contained herein were set forth in an amendment to the Existing Credit Agreement in a customary form, unless such document, instrument or agreement has otherwise been terminated or has expired in accordance with or pursuant to the terms of this Agreement, the Existing Credit Agreement or such document, instrument or agreement or as otherwise agreed by the required parties hereto or thereto.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

SOUTHWEST AIRLINES CO.

By: /s/Christopher Monroe
    Name: Christopher Monroe
    Title: Senior Vice President Finance & Treasurer

[Signature page to Southwest Airlines A&R 364-Day Credit Facility Agreement]

JPMORGAN CHASE BANK,
N.A., as a Bank and the
Administrative Agent

By: /s/ Cristina Caviness
Name: Cristina Caviness
Title: Vice President

[Signature page to Southwest Airlines A&R 364-Day Credit Facility Agreement]

BANK OF AMERICA, N.A., as a Bank

By: /s/ Prathamesh Kshirsagar
Name: Prathamesh Kshirsagar
Title: Director

[Signature page to Southwest Airlines A&R 364-Day Credit Facility Agreement]

BNP Paribas, as a Bank

By: /s/ Bo Wang
Name: Bo Wang
Title: Vice President

By: /s/ Ahsan Avais
Name: Ahsan Avais
Title: Vice President

[Signature page to Southwest Airlines A&R 364-Day Credit Facility Agreement]

[Bank of China, New York Branch], as a
Bank


By: /s/ Raymond Qiao
Name: Raymond Qiao
Title: Executive Vice President

[Signature page to Southwest Airlines A&R 364-Day Credit Facility Agreement]

MORGAN STANLEY BANK, N.A., as a
Bank

By: /s/ Subhalakshmi Ghosh-Kohli
Name: Subhalakshmi Ghosh-Kohli
Title: Authorized Signatory

[Signature page to Southwest Airlines A&R 364-Day Credit Facility Agreement]

Wells Fargo Bank, National Association, as
a Bank

By: /s/ Adam Spreyer
Name: Adam Spreyer
Title: Director

[Signature page to Southwest Airlines A&R 364-Day Credit Facility Agreement]

Citibank, N.A., as a Bank

By: /s/ Michael Leonard
Name: Michael Leonard
Title: Vice President

[Signature page to Southwest Airlines A&R 364-Day Credit Facility Agreement]

Goldman Sachs Bank USA, as a Bank

By: /s/ Charles Johnston
Name: Charles Johnston
Title: Authorized Signatory

[Signature page to Southwest Airlines A&R 364-Day Credit Facility Agreement]

STANDARD CHARTERED BANK, as a
Bank


By: /s/ James Beck
Name: James Beck
Title: Associate Director


[Signature page to Southwest Airlines A&R 364-Day Credit Facility Agreement]

Comerica Bank, as a Bank

By: /s/ Gerald R. Finney Jr.
Name: Gerald R. Finney Jr.
Title: Vice President

[Signature page to Southwest Airlines A&R 364-Day Credit Facility Agreement]

**SCHEDULE I**

**POOL ASSETS**

[See attached.]

# SCHEDULE I

## POOL ASSETS

### Airframes and Engines

| | Airframe Make | Airframe Model | U.S. Reg. Number | Airframe MSN | Engine Manufacturer | Engine Model | Engine MSN 1 | Engine MSN 2 |
|---|---|---|---|---|---|---|---|---|
| 1 | Boeing | 737-800 | N8557Q | 63582 | CFM International | CFM56-7B27E/F | 38803 | 38764 |
| 2 | Boeing | 737-800 | N8556Z | 63583 | CFM International | CFM56-7B27E/F | 38796 | 38800 |
| 3 | Boeing | 737-800 | N8555Z | 63600 | CFM International | CFM56-7B27E/F | 38791 | 38792 |
| 4 | Boeing | 737-800 | N8554X | 36993 | CFM International | CFM56-7B27E/F | 38779 | 38773 |
| 5 | Boeing | 737-800 | N8553W | 63601 | CFM International | CFM56-7B27E/F | 38778 | 38776 |
| 6 | Boeing | 737-800 | N8552Z | 63580 | CFM International | CFM56-7B27E/F | 38739 | 38704 |
| 7 | Boeing | 737-800 | N8551Q | 36951 | CFM International | CFM56-7B27E/F | 38678 | 38661 |
| 8 | Boeing | 737-800 | N8549Z | 63597 | CFM International | CFM56-7B27E/F | 38659 | 38658 |
| 9 | Boeing | 737-800 | N8548P | 36968 | CFM International | CFM56-7B27E/F | 38642 | 38643 |
| 10 | Boeing | 737-800 | N8547V | 63572 | CFM International | CFM56-7B27E/F | 38517 | 38500 |
| 11 | Boeing | 737-800 | N8545V | 63573 | CFM International | CFM56-7B27E/F | 38531 | 38526 |
| 12 | Boeing | 737-800 | N8546V | 63574 | CFM International | CFM56-7B27E/F | 38542 | 38540 |
| 13 | Boeing | 737-800 | N8544Z | 36926 | CFM International | CFM56-7B27E/F | 38486 | 38460 |
| 14 | Boeing | 737-800 | N8543Z | 63587 | CFM International | CFM56-7B27E/F | 38459 | 38454 |
| 15 | Boeing | 737-800 | N8542Z | 63581 | CFM International | CFM56-7B27E/F | 38415 | 38414 |
| 16 | Boeing | 737-800 | N8541W | 63599 | CFM International | CFM56-7B27E/F | 38385 | 38378 |
| 17 | Boeing | 737-800 | N8540V | 63598 | CFM International | CFM56-7B27E/F | 38372 | 38371 |
| 18 | Boeing | 737-800 | N8539V | 42534 | CFM International | CFM56-7B27E/F | 38352 | 38348 |
| 19 | Boeing | 737-800 | N8538V | 63586 | CFM International | CFM56-7B27E/F | 38355 | 38342 |
| 20 | Boeing | 737-800 | N8537Z | 63595 | CFM International | CFM56-7B27E/F | 38345 | 38332 |
| 21 | Boeing | 737-800 | N8536Z | 63571 | CFM International | CFM56-7B27E/F | 38344 | 38321 |
| 22 | Boeing | 737-800 | N8535S | 63596 | CFM International | CFM56-7B27E/F | 38330 | 38328 |
| 23 | Boeing | 737-800 | N8532S | 63576 | CFM International | CFM56-7B27E/F | 38297 | 38272 |
| 24 | Boeing | 737-800 | N8533S | 63577 | CFM International | CFM56-7B27E/F | 38292 | 38305 |
| 25 | Boeing | 737-800 | N8534Z | 63578 | CFM International | CFM56-7B27E/F | 38302 | 38299 |
| 26 | Boeing | 737-800 | N8531Q | 63575 | CFM International | CFM56-7B27E/F | 38295 | 38268 |
| 27 | Boeing | 737-800 | N8530W | 63592 | CFM International | CFM56-7B27E/F | 38203 | 38202 |
| 28 | Boeing | 737-800 | N8529Z | 36974 | CFM International | CFM56-7B27E/F | 38168 | 38169 |
| 29 | Boeing | 737-800 | N8528Q | 36927 | CFM International | CFM56-7B27E/F | 38126 | 38165 |
| 30 | Boeing | 737-800 | N8527Q | 36946 | CFM International | CFM56-7B27E/F | 38115 | 38114 |
| 31 | Boeing | 737-800 | N8526W | 36972 | CFM International | CFM56-7B27E/F | 864994 | 864984 |
| 32 | Boeing | 737-800 | N8525S | 36949 | CFM International | CFM56-7B27E/F | 864950 | 864947 |
| 33 | Boeing | 737-800 | N8524Z | 36970 | CFM International | CFM56-7B27E/F | 864933 | 864926 |
| 34 | Boeing | 737-800 | N8523W | 36969 | CFM International | CFM56-7B27E/F | 864887 | 864885 |
| 35 | Boeing | 737-800 | N8522P | 36922 | CFM International | CFM56-7B27E/F | 864878 | 864873 |
| 36 | Boeing | 737-800 | N8520Q | 42532 | CFM International | CFM56-7B27E/F | 864858 | 864844 |
| 37 | Boeing | 737-800 | N8519R | 36910 | CFM International | CFM56-7B27E/F | 864852 | 864851 |
| 38 | Boeing | 737-800 | N8518R | 63593 | CFM International | CFM56-7B27E/F | 864791 | 864797 |
| 39 | Boeing | 737-800 | N8515X | 36943 | CFM International | CFM56-7B27E/F | 864774 | 864766 |
| 40 | Boeing | 737-800 | N8517F | 63594 | CFM International | CFM56-7B27E/F | 864777 | 864773 |
| 41 | Boeing | 737-800 | N8514F | 36975 | CFM International | CFM56-7B27E/F | 864763 | 864761 |
| 42 | Boeing | 737-800 | N8513F | 36976 | CFM International | CFM56-7B27E/F | 864756 | 864747 |

| 43 | Boeing | 737-800 | N8512U | 38816 | CFM International | CFM56-7B27E/F | 864733 | 864731 |
| 44 | Boeing | 737-800 | N8511K | 36670 | CFM International | CFM56-7B27E/F | 864729 | 864710 |
| 45 | Boeing | 737-800 | N8510E | 36944 | CFM International | CFM56-7B27E/F | 864714 | 864700 |
| 46 | Boeing | 737-800 | N8509U | 36925 | CFM International | CFM56-7B27E/F | 864695 | 864677 |
| 47 | Boeing | 737-800 | N8508W | 38814 | CFM International | CFM56-7B27E/F | 864686 | 864685 |
| 48 | Boeing | 737-800 | N8507C | 41531 | CFM International | CFM56-7B27E/F | 864666 | 864640 |
| 49 | Boeing | 737-800 | N8504G | 38812 | CFM International | CFM56-7B27E/F | 864599 | 864598 |
| 50 | Boeing | 737-800 | N8503A | 38813 | CFM International | CFM56-7B27E/F | 864584 | 864582 |
| 51 | Boeing | 737-800 | N8502Z | 36666 | CFM International | CFM56-7B27E/F | 864568 | 864563 |
| 52 | Boeing | 737-800 | N8501V | 41530 | CFM International | CFM56-7B27E/F | 864542 | 864444 |
| 53 | Boeing | 737-8H4 | N8698B | 36977 | CFM International | CFM56-7B27E/F | 864488 | 864487 |
| 54 | Boeing | 737-8H4 | N8699A | 36923 | CFM International | CFM56-7B27E/F | 864497 | 864482 |
| 55 | Boeing | 737-8H4 | N8697C | 36728 | CFM International | CFM56-7B27E/F | 864413 | 865389 |
| 56 | Boeing | 737-8H4 | N8696E | 36678 | CFM International | CFM56-7B27E/F | 864455 | 864437 |
| 57 | Boeing | 737-8H4 | N8695D | 35965 | CFM International | CFM56-7B27E/F | 865167 | 864347 |
| 58 | Boeing | 737-8H4 | N8694E | 36661 | CFM International | CFM56-7B27E/F | 864411 | 864409 |
| 59 | Boeing | 737-8H4 | N8676A | 36941 | CFM International | CFM56-7B27E/F | 862719 | 862713 |
| 60 | Boeing | 737-8H4 | N8675A | 35976 | CFM International | CFM56-7B27E/F | 862714 | 862701 |
| 61 | Boeing | 737-8H4 | N8673F | 36937 | CFM International | CFM56-7B27E/F | 862629 | 862628 |
| 62 | Boeing | 737-8H4 | N8674B | 36734 | CFM International | CFM56-7B27E/F | 862671 | 862675 |
| 63 | Boeing | 737-8H4 | N8672F | 36940 | CFM International | CFM56-7B27E/F | 862613 | 862612 |
| 64 | Boeing | 737-8H4 | N8671D | 36715 | CFM International | CFM56-7B27E/F | 862432 | 862336 |
| 65 | Boeing | 737-8H4 | N8670A | 36656 | CFM International | CFM56-7B27E/F | 862254 | 862156 |
| 66 | Boeing | 737-8H4 | N8669B | 36655 | CFM International | CFM56-7B27E/F | 862139 | 862136 |
| 67 | Boeing | 737-8H4 | N8668A | 36903 | CFM International | CFM56-7B27E/F | 660999 | 660985 |
| 68 | Boeing | 737-8H4 | N8667D | 36657 | CFM International | CFM56-7B27E/F | 660957 | 661927 |
| 69 | Boeing | 737-8H4 | N8662F | 36936 | CFM International | CFM56-7B27E/F | 660829 | 660748 |
| 70 | Boeing | 737-8H4 | N8661A | 36906 | CFM International | CFM56-7B27E/F | 660566 | 660553 |
| 71 | Boeing | 737-8H4 | N8660A | 36654 | CFM International | CFM56-7B27E/F | 661511 | 660471 |
| 72 | Boeing | 737-8H4 | N8659D | 36901 | CFM International | CFM56-7B27E/F | 660527 | 661482 |
| 73 | Boeing | 737-8H4 | N8658A | 36899 | CFM International | CFM56-7B27E/F | 660656 | 660643 |
| 74 | Boeing | 737-8H4 | N8657B | 42535 | CFM International | CFM56-7B27E/F | 660653 | 660638 |
| 75 | Boeing | 737-8H4 | N8656B | 42530 | CFM International | CFM56-7B27E/F | 661562 | 661573 |
| 76 | Boeing | 737-8H4 | N8653A | 37037 | CFM International | CFM56-7B27E/F | 660552 | 661505 |
| 77 | Boeing | 737-8H4 | N8655D | 42529 | CFM International | CFM56-7B27E/F | 660572 | 660569 |
| 78 | Boeing | 737-8H4 | N8654B | 37045 | CFM International | CFM56-7B27E/F | 660571 | 660567 |
| 79 | Boeing | 737-8H4 | N8644C | 35973 | CFM International | CFM56-7B27E/F | 660212 | 660199 |
| 80 | Boeing | 737-8H4 | N8643A | 42524 | CFM International | CFM56-7B27E/F | 660216 | 660209 |
| 81 | Boeing | 737-8H4 | N8652B | 36971 | CFM International | CFM56-7B27E/F | 660484 | 660480 |
| 82 | Boeing | 737-8H4 | N8651A | 36920 | CFM International | CFM56-7B27E/F | 660429 | 660397 |
| 83 | Boeing | 737-8H4 | N8650F | 36909 | CFM International | CFM56-7B27E/F | 660371 | 660361 |
| 84 | Boeing | 737-8H4 | N8649A | 42527 | CFM International | CFM56-7B27E/F | 660322 | 660319 |
| 85 | Boeing | 737-8H4 | N8648A | 42531 | CFM International | CFM56-7B27E/F | 660287 | 657922 |
| 86 | Boeing | 737-8H4 | N8646B | 36935 | CFM International | CFM56-7B27E/F | 660242 | 660241 |
| 87 | Boeing | 737-8H4 | N8647A | 42528 | CFM International | CFM56-7B27E/F | 660245 | 660244 |
| 88 | Boeing | 737-8H4 | N8645A | 36907 | CFM International | CFM56-7B27E/F | 660226 | 660224 |
| 89 | Boeing | 737-8H4 | N8642E | 42525 | CFM International | CFM56-7B27E/F | 660201 | 660195 |
| 90 | Boeing | 737-8H4 | N8639B | 60086 | CFM International | CFM56-7B27E/F | 660139 | 660133 |
| 91 | Boeing | 737-8H4 | N8641B | 60085 | CFM International | CFM56-7B27E/F | 660178 | 660171 |
| 92 | Boeing | 737-8H4 | N8638A | 36911 | CFM International | CFM56-7B27E/F | 660107 | 657995 |

| 93 | Boeing | 737-8H4 | N8640D | 60084 | CFM International | CFM56-7B27E/F | 660144 | 660143 |
|----|--------|---------|--------|-------|------------------|---------------|--------|--------|
| 94 | Boeing | 737-8H4 | N8637A | 42523 | CFM International | CFM56-7B27E/F | 660109 | 658974 |
| 95 | Boeing | 737-8H4 | N500WR | 36898 | CFM International | CFM56-7B27E/F | 660106 | 657978 |
| 96 | Boeing | 737-8H4 | N8324A | 35966 | CFM International | CFM56-7B27E/F | 962369 | 962366 |
| 97 | Boeing | 737-8H4 | N8323C | 37005 | CFM International | CFM56-7B27E/F | 962352 | 962347 |
| 98 | Boeing | 737-8H4 | N8322X | 36997 | CFM International | CFM56-7B27E/F | 962271 | 962267 |
| 99 | Boeing | 737-8H4 | N8321D | 36687 | CFM International | CFM56-7B27E/F | 962264 | 962261 |
| 100 | Boeing | 737-8H4 | N8320J | 36686 | CFM International | CFM56-7B27E/F | 962135 | 962128 |
| 101 | Boeing | 737-8H4 | N8319F | 36994 | CFM International | CFM56-7B27E/F | 963209 | 962198 |
| 102 | Boeing | 737-8H4 | N8318F | 36685 | CFM International | CFM56-7B27E/F | 962173 | 962145 |
| 103 | Boeing | 737-8H4 | N8317M | 36992 | CFM International | CFM56-7B27E/F | 962134 | 962109 |
| 104 | Boeing | 737-8H4 | N8316H | 36684 | CFM International | CFM56-7B27E/F | 960997 | 960990 |
| 105 | Boeing | 737-8H4 | N8315C | 38811 | CFM International | CFM56-7B27E/F | 960979 | 960978 |
| 106 | Boeing | 737-8H4 | N8314L | 36990 | CFM International | CFM56-7B27E/F | 960966 | 960964 |
| 107 | Boeing | 737-8H4 | N8302F | 36680 | CFM International | CFM56-7B27E/F | 960721 | 960713 |
| 108 | Boeing | 737-8H4 | N8301J | 36980 | CFM International | CFM56-7B27E/F | 960657 | 960656 |
| 109 | Boeing | 737-7H4 | N969WN | 41777 | CFM International | CFM56-7B24E | 961486 | 960510 |
| 110 | Boeing | 737-7H4 | N968WN | 36679 | CFM International | CFM56-7B24E | 961473 | 961472 |
| 111 | Boeing | 737-7H4 | N967WN | 36967 | CFM International | CFM56-7B24E | 960329 | 960275 |
| 112 | Boeing | 737-7H4 | N966WN | 36966 | CFM International | CFM56-7B24E | 960284 | 960282 |
| 113 | Boeing | 737-7H4 | N962WN | 36963 | CFM International | CFM56-7B24E | 960213 | 804223 |
| 114 | Boeing | 737-7H4 | N961WN | 36962 | CFM International | CFM56-7B24/3 | 961177 | 960192 |
| 115 | Boeing | 737-7H4 | N960WN | 36675 | CFM International | CFM56-7B24/3 | 960182 | 960180 |
| 116 | Boeing | 737-7H4 | N959WN | 36674 | CFM International | CFM56-7B24/3 | 960139 | 804908 |
| 117 | Boeing | 737-7H4 | N958WN | 36673 | CFM International | CFM56-7B24/3 | 805936 | 804960 |
| 118 | Boeing | 737-7H4 | N957WN | 41528 | CFM International | CFM56-7B24/3 | 805933 | 804955 |
| 119 | Boeing | 737-7H4 | N956WN | 36672 | CFM International | CFM56-7B24/3 | 804899 | 804897 |
| 120 | Boeing | 737-7BD | N556WN | 33936 | CFM International | CFM56-7B24/3 | 804885 | 804863 |
| 121 | Boeing | 737-7H4 | N955WN | 36671 | CFM International | CFM56-7B24/3 | 804844 | 804823 |
| 122 | Boeing | 737-7BD | N555LV | 36726 | CFM International | CFM56-7B24/3 | 805809 | 804725 |
| 123 | Boeing | 737-7H4 | N951WN | 36665 | CFM International | CFM56-7B24/3 | 805301 | 804303 |
| 124 | Boeing | 737-7H4 | N950WN | 36664 | CFM International | CFM56-7B24/3 | 805356 | 804336 |
| 125 | Boeing | 737-7H4 | N949WN | 36663 | CFM International | CFM56-7B24/3 | 804331 | 804322 |
| 126 | Boeing | 737-7H4 | N948WN | 36662 | CFM International | CFM56-7B24/3 | 804204 | 804203 |
| 127 | Boeing | 737-7H4 | N947WN | 36924 | CFM International | CFM56-7B24/3 | 804191 | 804188 |
| 128 | Boeing | 737-7H4 | N946WN | 36918 | CFM International | CFM56-7B24/3 | 804108 | 804107 |
| 129 | Boeing | 737-7H4 | N945WN | 36660 | CFM International | CFM56-7B24/3 | 803864 | 802953 |
| 130 | Boeing | 737-7H4 | N944WN | 36659 | CFM International | CFM56-7B24/3 | 803888 | 802946 |
| 131 | Boeing | 737-7H4 | N943WN | 36913 | CFM International | CFM56-7B24/3 | 802895 | 802894 |
| 132 | Boeing | 737-7BD | N7724A | 36725 | CFM International | CFM56-7B20 | 802123 | 802122 |
| 133 | Boeing | 737-7BD | N7749B | 36724 | CFM International | CFM56-7B20 | 896973 | 896972 |
| 134 | Boeing | 737-7H4 | N942WN | 36648 | CFM International | CFM56-7B24/3 | 802370 | 802267 |
| 135 | Boeing | 737-7H4 | N941WN | 36647 | CFM International | CFM56-7B24/3 | 803273 | 802222 |
| 136 | Boeing | 737-7H4 | N940WN | 36900 | CFM International | CFM56-7B24/3 | 802356 | 802355 |
| 137 | Boeing | 737-7H4 | N939WN | 36646 | CFM International | CFM56-7B24/3 | 803327 | 802330 |
| 138 | Boeing | 737-7H4 | N938WN | 36645 | CFM International | CFM56-7B24/3 | 802320 | 802309 |
| 139 | Boeing | 737-7H4 | N937WN | 36644 | CFM International | CFM56-7B24/3 | 803296 | 802304 |
| 140 | Boeing | 737-7H4 | N936WN | 36643 | CFM International | CFM56-7B24/3 | 896984 | 896910 |
| 141 | Boeing | 737-7H4 | N929WN | 36631 | CFM International | CFM56-7B24/3 | 896688 | 896687 |
| 142 | Boeing | 737-7H4 | N928WN | 36890 | CFM International | CFM56-7B24/3 | 896686 | 896677 |

| 143 | Boeing | 737-7H4 | N927WN | 36889 | CFM International | CFM56-7B24/3 | 897566 | 896662 |
| 144 | Boeing | 737-7H4 | N924WN | 36628 | CFM International | CFM56-7B24/3 | 896586 | 896570 |
| 145 | Boeing | 737-7H4 | N919WN | 36625 | CFM International | CFM56-7B24/3 | 897412 | 897411 |
| 146 | Boeing | 737-7H4 | N920WN | 32460 | CFM International | CFM56-7B24/3 | 896482 | 896456 |
| 147 | Boeing | 737-7H4 | N917WN | 36624 | CFM International | CFM56-7B24/3 | 896352 | 896142 |
| 148 | Boeing | 737-7BD | N7752B | 33943 | CFM International | CFM56-7B20 | 896388 | 896380 |

(EACH OF WHICH ENGINES DESCRIBED ABOVE HAVING AT LEAST 550 RATED TAKEOFF HORSEPOWER OR THE EQUIVALENT THEREOF)

**SCHEDULE II**

**Existing Term Loans and Additional Commitments**

| Bank | Existing Term Loans | Additional Commitments | Total |
|---|---|---|---|
| JPMorgan Chase Bank, N.A. | $333,333,333.34 | $166,666,666.66 | $500,000,000.00 |
| Bank of America, N.A. | $333,333,333.33 | $166,666,666.67 | $500,000,000.00 |
| BNP Paribas | - | $500,000,000.00 | $500,000,000.00 |
| Bank of China, New York Branch | - | $400,000,000.00 | $400,000,000.00 |
| Morgan Stanley Bank, N.A. | - | $400,000,000.00 | $400,000,000.00 |
| Wells Fargo Bank, N.A. | $333,333,333.33 | - | $333,333,333.33 |
| Citibank, N.A. | - | $250,000,000.00 | $250,000,000.00 |
| Goldman Sachs Bank USA | - | $250,000,000.00 | $250,000,000.00 |
| Standard Chartered Bank | - | $150,000,000.00 | $150,000,000.00 |
| Comerica Bank | - | $49,999,999.67 | $49,999,999.67 |
| Total | $1,000,000,000.00 | $2,333,333,333.00 | $3,333,333,333.00 |

**EXHIBIT A**

**FORM OF NOTICE OF [COMMITTED BORROWING] [INCREMENTAL BORROWING] [CONVERSION]
[CONTINUATION]**

_____ , 202__

JPMorgan Chase Bank, N.A.,
as Administrative Agent under the
Credit Agreement referred to below
JPM Loan and Agency Services
500 Stanton Christiana Rd.
NCC5 / 1st Floor
Newark, DE 19713
Attention: JPM Loan and Agency Services
Tel: 302-634-1929
Email: james.a.campbell@jpmorgan.com
14698287788@tls.ldsprod.com

Dear Sirs:

Reference is made to the Amended and Restated 364-Day Credit Agreement dated as of March 30, 2020 (as amended, modified, supplemented, renewed, or extended from time to time, the "Credit Agreement"), among Southwest Airlines Co., the Banks party thereto and JPMorgan Chase Bank, N.A., as Administrative Agent. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement. The undersigned hereby (check whichever is applicable):

_____    1.    Gives you notice pursuant to Section 2.2 of the Credit Agreement that it requests a [Committed][Incremental] Borrowing under the Credit Agreement, and in that connection sets forth below the terms on which such [Committed][Incremental] Borrowing is requested to be made:

| | | |
|---|---|---|
| (A) | Borrowing Date of [Committed][Incremental] Borrowing (a Business Day) | _____ |
| (B) | Principal Amount of [Committed][Incremental] Borrowing | _____ |
| (C) | Interest Rate basis[1] | _____ |
| (D) | Interest Period and the last day thereof[2,3] | _____ |

_____

[1]    Eurodollar Loan or Alternate Base Loan.

[2]    Applicable only to Eurodollar Loans.

[3]    Interest Periods shall have a duration of one, two, three, six or, if agreed by all Banks, twelve months and shall end not later than the Maturity Date.

_____ 2. Gives you notice pursuant to Section 2.3 that it requests the conversion of Loans that are Eurodollar Loans into Alternate Base Loans in the amount of $ [4] on _____, 202_ [5].

_____ 3. Gives you notice pursuant to Section 2.3 of the Credit Agreement that it requests the conversion of Loans that are Alternate Base Loans into Eurodollar Loans in the amount of $ [4], having an Interest Period of _____ months, [3] on _____, 20__.

_____ 4. Gives you notice pursuant to Section 2.3 of the Credit Agreement that it requests the continuation of Eurodollar Loans in the amount of $ [4] to another Interest Period of _____ months, [3] on _____, 20__.

_____ 5. Proceeds of the [Committed][Incremental] Borrowing shall be disbursed pursuant to the funds flow to be agreed between the Company and Administrative Agent.

_____ 6. Gives you notice that it requests a Borrowing increase on the terms below:
   (A)    Borrowing Date of [Committed][Incremental] Borrowing (a Business Day)    _____
   (B)    Current interest rate basis[6]    _____
   (C)    Current Interest Period end date    _____
   (D)    Increase Amount of [Committed][Incremental] Borrowing    _____
   (E)    Existing Term Loan Amount
   (F)    New Aggregate Loan Amount

Very truly yours,

SOUTHWEST AIRLINES CO.

By: __
Name:
_____
Title:
_____

---

[4]   Not less than $10,000,000 and in integral multiples of $1,000,000.

[5]   Must be the last day of the applicable Interest Period.

[6]   Eurodollar Loan or Alternate Base Loan.

**EXHIBIT B**

**FORM OF NOTE**

$_____                                                                                    _____, 202__

FOR VALUE RECEIVED, the undersigned, SOUTHWEST AIRLINES CO., a Texas corporation (the "Company"), hereby promises to pay to the order of_____ (the "Bank") on or before the Maturity Date the lesser of (i) the amount of the Bank's Commitment and (ii) the aggregate amount of Loans made by the Bank to the Company and outstanding on the Maturity Date.

The Company promises to pay interest on the unpaid principal amount of each Loan from the date of such Loan until such principal amount is paid in full, at such interest rates, and payable at such dates and times, as are specified in the Amended and Restated 364-Day Credit Agreement dated as of March 30, 2020 (as amended, modified, supplemented, renewed, or extended from time to time, the "Credit Agreement," the terms defined therein and not otherwise defined herein being used herein as therein defined), among the Company, the Bank, certain other banks and financial institutions party thereto and JPMorgan Chase Bank, N.A., as Administrative Agent.

Both principal and interest are payable in immediately available funds in lawful money of the United States of America to JPMorgan Chase Bank, N.A., as Administrative Agent, at its Principal Office. The amount and type of each Loan made by the Bank to the Company and the maturity thereof, the rate of interest applicable thereto and all payments made on account of principal and interest hereof shall be recorded by the Bank and, prior to any transfer hereof, endorsed on the grid attached hereto which is part of this promissory note; provided, however, any failure by the holder hereof to make any such endorsement shall not limit or otherwise affect the Company's obligations hereunder.

This promissory note may be held by the Bank for the account of its Domestic Lending Office or its Eurodollar Lending Office and may be transferred from one to the other from time to time as the Bank may determine.

This promissory note is one of the Notes referred to in, and is entitled to the benefits of, the Credit Agreement. The Credit Agreement, among other things, (i) provides for the making of Loans by the Bank to the Company from time to time, the indebtedness of the Company resulting from each such Loan being evidenced by this promissory note, and (ii) provisions for acceleration of the maturity hereof upon the happening of certain stated events, also for prepayment on account of principal hereof prior to the maturity hereof upon the terms and conditions therein specified.

Except as expressly provided in the Credit Agreement and the other Loan Papers, the Company and any and all endorsers, guarantors and sureties severally waive demand, presentment for payment notice of dishonor or default or intent to accelerate, protest and notice of protest and diligence in collecting and bringing of suit against any party hereto, and agree to all renewals, extensions. or partial payments hereon and to any release or substitution of security herefor, in whole or in part, with or without notice, before or after maturity.

**THIS PROMISSORY NOTE AND THE RIGHTS AND OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

SOUTHWEST AIRLINES CO.


By:
_____

Name:.
Title:


2

**SCHEDULE TO NOTE DATED _____
ISSUED BY SOUTHWEST AIRLINES CO. TO _____**

| Date | Loan | Type | Maturity | Interest Rate | Principal Repayment | Interest Payments | Balance |
|------|------|------|----------|---------------|---------------------|-------------------|---------|
|  | $ |  |  |  | $ | $ | $ |
|  | $ |  |  |  | $ | $ | $ |
|  | $ |  |  |  | $ | $ | $ |
|  | $ |  |  |  | $ | $ | $ |
|  | $ |  |  |  | $ | $ | $ |
|  | $ |  |  |  | $ | $ | $ |
|  | $ |  |  |  | $ | $ | $ |
|  | $ |  |  |  | $ | $ | $ |
|  | $ |  |  |  | $ | $ | $ |
|  | $ |  |  |  | $ | $ | $ |
|  | $ |  |  |  | $ | $ | $ |
|  | $ |  |  |  | $ | $ | $ |
|  | $ |  |  |  | $ | $ | $ |
|  | $ |  |  |  | $ | $ | $ |
|  | $ |  |  |  | $ | $ | $ |
|  | $ |  |  |  | $ | $ | $ |
|  | $ |  |  |  | $ | $ | $ |
|  | $ |  |  |  | $ | $ | $ |
|  | $ |  |  |  | $ | $ | $ |
|  | $ |  |  |  | $ | $ | $ |
|  | $ |  |  |  | $ | $ | $ |
|  | $ |  |  |  | $ | $ | $ |
|  | $ |  |  |  | $ | $ | $ |

3

**EXHIBIT C–1**

**FORM OF COMPANY'S INTERNAL COUNSEL OPINION**

[See attached.]

[Southwest Airlines Letterhead]

March 30, 2020

The Banks and the Administrative Agent
Referred-to Below

RE: Loans to Southwest Airlines Co.

Ladies and Gentlemen:

This opinion is furnished pursuant to Section 4.1(b)(iv) of the Amended and Restated 364-Day Credit Agreement dated as of March 30, 2020 (the "Credit Agreement"), among Southwest Airlines Co. (the "Company"), the Bank parties thereto, and JPMorgan Chase Bank, N.A., as Administrative Agent. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

I am the Executive Vice President, Chief Legal and Regulatory Officer of the Company and solely in such capacity have examined, either personally or through attorneys under my supervision, originals, or copies certified to my satisfaction, of the Credit Agreement, the Mortgage and Security Agreement, dated as of March 30, 2020, between the Company and the Administrative Agent, as collateral agent (the "Mortgage and Security Agreement"), and the Mortgaged Aircraft Operating Agreement, dated as of March 30, 2020, (collectively with the Credit Agreement and the Mortgage and Security Agreement, the "Opinion Documents"), and such corporate records, certificates of corporate officials as to certain matters of fact, and instruments and documents as I have deemed necessary or advisable as a basis for the opinions set forth herein.

In such examination, I have assumed (i) the genuineness of all signatures (other than the signatures of Persons signing on behalf of the Company), the authenticity and completeness of all documents, certificates, instruments and records submitted to me as originals and the conformity to the original instruments of all documents submitted to me as copies, and the authenticity and completeness of the originals of such copies, (ii) the due authorization, execution and delivery by the Administrative Agent and the Banks of the Opinion Documents, (iii) that the Administrative Agent and the Banks have all requisite power and authority to execute, deliver and perform the Opinion Documents and (iv) the enforceability of the Opinion Documents against the Administrative Agent and the Banks. In addition, in rendering this opinion, I have relied upon, as to certain matters of fact, certificates of officers of the Company and certificates of public officials, without any independent investigation of such matters.

Based upon the foregoing, and relying upon the correctness of all statements of fact contained in the documents, certificates and records that I have examined either personally or through attorneys under my supervision, I am of the opinion that:

1. The Company is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Texas, and is duly qualified to do business in each jurisdiction in which the character or location of its properties or the nature or conduct of its business makes such qualification necessary, except for those jurisdictions where the failure to be so qualified would not have a Material Adverse Effect on the consolidated financial condition of the Company and its Subsidiaries, taken as a whole. The Company has the corporate power to own its properties and to carry on its businesses as now conducted.

2. The execution, delivery and performance by the Company of the Opinion Documents are within its corporate powers, have been duly authorized by all necessary corporate action, and do not conflict with or constitute a default under (i) any law, rule, regulation, order or judgment known to me or contractual restriction of the Company known to me, the violation of which would have a Material Adverse Effect, or (ii) the Restated Certificate of Formation or the Amended and Restated Bylaws of the Company.

3. No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required by the laws of the State of Texas, or the federal laws of the United States of America, for the due execution, delivery and performance by the Company of the Opinion Documents other than routine filings of copies of the Credit Agreement with the Securities and Exchange Commission and routine filings of the Aircraft Mortgage and UCC financing statements to perfect a security interest in collateral.

4. To my knowledge, except as set forth in the Company's Form 10-K for the year ended December 31, 2019 and subsequent Form 8-Ks, there are no legal or governmental proceedings or investigations pending or threatened against the Company or any Subsidiary or any property of the Company or any Subsidiary which individually or, to the extent involving related claims, in the aggregate, involve a material risk of a Material Adverse Effect on (i) the financial condition of the Company and its Subsidiaries considered as a whole, or (ii) the ability of the Company to perform its obligations under the Opinion Documents.

This opinion is for the sole benefit of the Administrative Agent and the Banks and may not be relied upon by any other Person without the express prior written consent of the undersigned. I am licensed to practice law only in the State of Texas and I express no opinion as to matters not governed by the laws of the United States of America or the laws of the State of Texas (except for the usury laws and choice-of-law provisions of the State of Texas, as to which I express no opinion).

[Signature Page Follows]

Very truly yours,


Mark Shaw
Executive Vice President, Chief Legal and Regulatory Officer

**EXHIBIT C–2**

**FORM OF COMPANY'S OUTSIDE COUNSEL OPINION**

[See attached.]

[Winstead Letterhead]

March 30, 2020

To the Banks and the Administrative Agent referred-to below

**Re:   *Southwest Airlines Co. 364-Day Credit Facility***

Ladies and Gentlemen:

This opinion is furnished pursuant to Section 4.l(b)(iv) of the Amended and Restated 364-Day Credit Agreement dated as of March 30, 2020 (the "Credit Agreement"), among Southwest Airlines Co. (the "Company"), the Banks parties thereto, and JPMorgan Chase Bank, N.A., as Administrative Agent. For convenience of reference, terms defined in the Credit Agreement are used therein with the same meanings.

We have acted as special New York counsel of the Company in connection with the negotiation, documentation and consummation of the financing as contemplated by the Credit Agreement, and in this connection, we have examined, among other things, an executed copy of the following:

(1) the Credit Agreement; and

(2) the Mortgage and Security Agreement, dated as of March 30, 2020, between the Company and the Administrative Agent, as collateral agent (the "Aircraft Mortgage"); and

(3) the Mortgaged Aircraft Operating Agreement, dated as of March 30, 2020 (collectively with the Credit Agreement and the Aircraft Mortgage the "Opinion Documents").

We have also reviewed such other documents and certificates and such matters of law as we have considered relevant hereto. We have assumed, for purposes of our opinion hereinafter set forth, (i) that the Opinion Documents have been duly authorized, executed and delivered by each of the parties thereto and that, except as expressly made the subject of our opinions in the following paragraphs, each of the Opinion Documents constitutes the legal, valid, binding and enforceable obligation of each of the parties thereto. As to any other facts material to our opinions expressed herein, we have relied upon the representations and warranties contained in the Opinion Documents and related documents and certificates and upon originals or copies, certified or otherwise identified to our satisfaction, of such corporate records, documents, certificates and other instruments as in our judgment are necessary or appropriate to enable us to render this opinion. We have assumed the genuineness of all signatures, the legal capacity of all natural persons executing documents and the authenticity of all documents submitted to us as originals and the conformity with the authentic originals of all documents submitted to us as copies. In rendering the opinions expressed below, we have also assumed, with your permission and without investigation or inquiry, that the execution,

delivery, and performance of the Opinion Documents by each of the parties thereto do not breach or violate any law, rule, or regulation of any governmental authority or body of any jurisdiction.

For purposes of this opinion, "Aircraft" means the airframes and engines described on Exhibit A to the Aircraft Mortgage on the date hereof; "Cape Town Treaty" means, collectively, the official English language text of (a) the Convention on International Interests in Mobile Equipment, and (b) the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment, in each case adopted on November 16, 2001, at a diplomatic conference in Cape Town, South Africa, and from and after the effective date of the Cape Town Treaty in the relevant country, means when referring to the Cape Town Treaty with respect to that country, the Cape Town Treaty as in effect in such country, unless otherwise indicated, and (c) all rules and regulations adopted pursuant thereto and, in the case of each of the foregoing described in clauses (a) through (c), all amendments, supplements, and revisions thereto, as currently in effect; "FAA" means the United States Federal Aviation Administration; "Financing Statement" means the UCC Financing Statement attached hereto as Annex I; "Transportation Code" means that portion of Title 49 of the United States Code comprising those provisions formerly referred to as the Federal Aviation Act of 1958, as amended, as currently in effect; "Texas UCC" means the Uniform Commercial Code as in effect in the State of Texas on the date hereof; "UCC" means the Uniform Commercial Code as in effect in the State of New York on the date hereof; and "United States" means the United States of America.

Based upon and subject to the foregoing and having regard to legal considerations which we deem relevant, and subject to the comments and qualifications set forth below, we are of the opinion that:

Each of the Opinion Documents constitutes the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except that no opinion is expressed herein as to (A) whether a court outside of the State of New York would give effect to the choice of New York law provided for in the Opinion Documents, (B) any provision in the Opinion Documents relating to the severability of provisions in such documents, (C) any provision of the Opinion Documents that requires any amendment or waiver thereof to be in writing, (D) the effect of any provision of the Opinion Documents imposing penalties or forfeitures, (E) Section 2.16 of the Credit Agreement, (F) Section 9.8 of the Credit Agreement insofar as it relates to submission to the jurisdiction of United States Federal Courts, (G) Section 9.18 of the Credit Agreement or (H) Section 9.21 of the Credit Agreement. Further, we wish to point out that provisions of the Opinion Documents that permit any party thereto to make determinations or to take actions may be subject to a requirement that such determinations be made, and that such actions be taken, on a reasonable basis in good faith.

The Aircraft Mortgage is effective to create a valid security interest in favor of the Administrative Agent in the Aircraft and the other Collateral under the Aircraft Mortgage to the extent the Aircraft and such other Collateral constitute collateral that is of the type in which a security interest can be created under Article 9 of the UCC, to the extent the UCC is applicable to the creation of such security interest (the "Article 9 Collateral").

With respect to the Aircraft and the other Collateral that is subject to the Aircraft Mortgage and that is of a type in which a security interest can be created under Article 9 of the UCC, except for (a) the filing for recordation with the FAA of the Aircraft Mortgage in accordance with the Transportation Code (b) the filing with the FAA of the appropriate FAA forms relating to filings, registrations and recordations under the Cape Town Treaty (including, without limitation, AC Form 8050-135), and (c) such filings, registrations and recordations as may be required under the Cape Town Treaty, except to the extent provided in Section 9-109(c) of the UCC, the Transportation Code and the Cape Town Treaty, pursuant to Sections 9-301 and 9-307 of the UCC, the local law of the State of Texas governs the perfection of such security interest (other than a possessory security interest or a security interest perfected by control) in the Aircraft and such other Collateral.

4.    The Financing Statement is in proper form to be accepted for filing in the office of the Secretary of State of Texas and, under the Texas UCC, the proper place to file the Financing Statement is in said office. To the extent that the filing of a financing statement can be effective to perfect a security interest in the Article 9 Collateral under the Texas UCC, the security interest in favor of the Administrative Agent in that portion of the Article 9 Collateral (other than the Aircraft) described in the Financing Statement will be perfected upon the proper filing of the Financing Statement in the office of the Secretary of State of Texas.

The opinions above are subject to:

the application of general principles of equity (regardless of whether considered in a proceeding of equity or at law), including, without limitation, (x) the possible unavailability of specific performance, injunctive relief or any other equitable remedy and (y) concepts of materiality, reasonableness, good faith and fair dealing;

all applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or similar laws, decrees or regulations affecting the enforcement of creditors' rights generally;

with respect to indemnity, contribution and exculpation provisions contained in the Opinion Documents, limitations based upon public policy considerations; and

possible judicial action giving effect to foreign laws or foreign governmental or judicial action affecting or relating to the rights or remedies of creditors.

Without limiting the foregoing, we express no opinion as to the validity, binding effect or enforceability of any provision of any Loan Paper that purports to (i) prohibit the Company from transferring its rights in the collateral described in the Loan Papers or any proceeds thereof, as contemplated by Section 9-401 of the UCC or other provisions of applicable law, (ii) permit the Administrative Agent to vote or otherwise exercise any rights with respect to any of the collateral under the Loan Papers absent compliance with the requirements of applicable laws and regulations as to the voting of or other exercise of rights with respect to such collateral, (iii) waive, release or vary any defense, right or privilege of, or any duties owing to, the Company to the extent that such waiver, release or variation may be limited by Section 1-102(3), 9-602 or 9-603 of the UCC or other provisions of applicable law, (iv) grant a right to collect any amount that a court determines to constitute unearned interest, post-judgment interest, or a penalty or forfeiture, (v) grant any right of set-off with respect to any contingent or unmatured obligation or to permit any Person purchasing

a participation from a Bank to exercise set-off rights with respect to such participation, (vi) maintain or impose any obligation to pay any amount in U.S. dollars, or specify any rate or method of exchange, where a final judgment concerning such obligation is rendered in another currency, (vii) allow the Administrative Agent or the Banks to obtain reimbursement for costs and expenses, including without limitation attorney's fees and legal expenses and expenses incurred in connection with collection or enforcement or the custody, preservation, use or operation of the collateral under the Loan Papers, to the extent such reimbursement is not permitted by Section 9-207, 9-607, 9-608 or 9-615 of the UCC or other provisions of applicable law, (viii) constitute a waiver of inconvenient forum or improper venue, (ix) relate to the subject matter jurisdiction of a court to adjudicate any controversy, (x) provide for liquidated damages or otherwise specify or limit damages, liabilities or remedies, (xi) allow for service of process by mail or through compliance with the notice provisions of any Loan Paper, or (xii) provide for the severability of, or that the parties to any Loan Paper shall engage in negotiations to replace, any illegal, prohibited or unenforceable provision. In addition, the enforceability of any provision in any Loan Paper to the effect that (i) the terms thereof may not be waived or modified except in writing, (ii) the express terms thereof supersede any inconsistent course of dealing, performance or usage of trade or (iii) certain determinations made by one party shall have conclusive effect, may be limited under certain circumstances. Our opinion in paragraph 1 above with respect to the choice of law and choice of forum provisions of the Loan Papers is given in reliance on, and is limited in scope to, Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York, and we express no opinion with respect to any such provision insofar as it exceeds such scope. We express no opinion as to whether a United States federal court would accept jurisdiction in any dispute, action, suit or proceeding arising out of or relating to the Loan Papers or any of the transactions contemplated thereby.

We express no opinion as to the creation, validity or perfection of any security interest, or the validity, binding effect or enforceability of any Loan Paper, to the extent that such Loan Paper grants or purports to grant a security interest (i) that is not governed by the UCC, (ii) in commercial tort claims or letter-of-credit rights, (iii) in any property the terms of or governing which void or prohibit, or are violated by, the granting, creation, attachment, perfection or enforcement of such security interest or (iv) in any claim against the United States. Our opinions set forth in paragraph 3 above are limited to Article 9 of the UCC and the Transportation Code and therefore do not address (i) laws of jurisdictions other than New York or the United States, (ii) laws of New York other than Article 9 of the UCC or the laws of the United States other than the Transportation Code or (iii) collateral of a type not subject to Article 9 of the UCC. Except as set forth in paragraph 3 above, we express no opinion as to what law governs perfection of any security interest granted by the Loan Papers. We have assumed, without investigation or inquiry, that (i) neither the Administrative Agent nor any Bank has waived, subordinated or agreed with any third-party to any modification of the perfection or priority of any security interest granted by the Loan Papers, (ii) the Company has sufficient rights in the collateral described in the Loan Papers for the security interests granted thereby to attach, and (iii) the Administrative Agent has acquired its interests in the Article 9 Collateral for value within the meaning of Section 9-203 of the UCC. With regard to our opinion in paragraph 4 above, we have relied on the Company's formation documents as the basis for determining that (i) Southwest Airlines Co. is the correct legal name of the Company, and (ii) the Company is solely organized under the laws of the State of Texas. We express no opinion with respect to the legal or beneficial ownership of, or the title or condition of title in or to, the Aircraft

or any other part of the Collateral described in the Loan Papers (and to the extent relevant have assumed, without investigation or inquiry, the accuracy and sufficiency of the description of the Aircraft and such other Collateral). No security interest will exist with respect to after-acquired property of the Company until the Company has rights therein within the meaning of Section 9-203 of the UCC and, in the case of investment property, the Administrative Agent has taken control thereof in the manner prescribed by Section 8-106 of the UCC.

Except as set forth in paragraphs 2, 3, and 4 above, we express no opinion as to the creation, validity or perfection of the security interests purported to be created by the Loan Papers. We express no opinion as to the creation, validity, perfection or priority of such security interests:

(i)   with respect to collateral sold, exchanged or otherwise disposed of by the Company;

to the extent such security interests may be affected by (x) Section 552 of the United States Bankruptcy Code, under which a bankruptcy court has discretion as to the extent to which post-petition proceeds may be subject to a lien arising from a security agreement entered into by the debtor before the commencement of the case, or (y) Section 547(b) of the United States Bankruptcy Code, relating to the power to avoid a preference;

with respect to proceeds (including, without limitation, investment property), to the extent of limitations under Section 9-315 of the UCC on the perfection of a security interest in proceeds;

as to any collateral acquired by the party granting such security interest more than four months after such party changes its name so as to make the relevant financing statements seriously misleading, unless amendments to such financing statements indicating the new name of such party are properly filed before the expiration of such four months;

in insurance except to the extent such insurance constitutes proceeds of Collateral;

as to any collateral acquired by the Company following any change in the jurisdiction of organization (within the meaning of Section 9-102(a)(50) of the UCC) of the Company unless a new financing statement is properly filed in the applicable new jurisdiction within the time specified in Section 9-316 of the UCC;

except to the extent set forth in paragraph 3, as to any property subject to a statute, regulation or treaty of the United States, whose requirements for a security interest's obtaining priority over the rights of a lien creditor with respect to such property preempt Section 9-310(a) of the UCC; or

as to any goods that are an accession to, or commingled or processed with, other goods, to the extent limited by Section 9-335 or 9-336 of the UCC.

We call to your attention that (A) the UCC requires periodic filing of continuation statements in order to maintain the effectiveness of financing statements filed pursuant thereto, and (B) under certain circumstances Sections 9-406, 9-407, 9-408 and 9-409 of the UCC limit the rights of the secured party and/or the enforcement of security interests in the specific type of collateral specified therein.

We express no opinion as to the priority of the security interests purported to be created by the Loan Papers. Without limiting the foregoing, we express no opinion as to the priority of any security interest (i) as against any claims or liens in favor of the United States or any state thereof, or any federal or state agency, instrumentality or political subdivision, including but not limited to liens for payment of federal, state or local taxes that are given priority by operation of law, liens under Title IV of the Employee Retirement Income Security Act of 1974, as amended, or claims arising under 31 U.S.C. § 3713, (ii) as against any rights of a person in possession of proceeds consisting of money or "instruments" (as defined in Section 9-102(a)(47) of the UCC), (iii) as against liens under Section 4-208 of the UCC, relating to security interests of a collecting bank, (iv) as against liens granted under Section 364(d) of the United States Bankruptcy Code, relating to liens granted by a court after the commencement of a case, or (v) that has been perfected by "control" under Sections 8-106, 9-104, 9-105, 9-106 or 9-107 of the UCC, as against any other security interest in the same property that has also been perfected by "control".

We are members of the bar of the State of New York and we do not herein express any opinion as to matters governed by any laws other than the law of the State of New York and the Federal law of the United States of America currently in effect, in each case that in our experience are generally applicable to transaction of this type without regard to the particular nature of the businesses conducted by, or the legal or regulatory status of the Company or any other party to the Opinion Documents. In particular (and without limiting the generality of the foregoing) we express no opinion as to (a) the laws of any country (other than the federal laws of the United States), (b) the effect of such laws (whether limiting, prohibitive or otherwise) on any of the rights or obligations of the Company or of any other party to or beneficiary of any of the Opinion Documents, or (c) whether the choice of the law of the State of New York as the governing law in any Opinion Document would be given effect by any court or other governmental authority other than a New York State court.

Furthermore, without limiting the generality of the foregoing, we express no opinion with respect to, or with respect to the applicability to the opinions expressed herein of any (i) aviation laws (including, without limitation, the Transportation Code, the Cape Town Treaty, or any other laws, rules, or regulations governing, regulating or relating to the sale, acquisition, ownership, registration, leasing, financing, mortgaging, use or operation of any aircraft, aircraft engines or any part thereof), or any other laws, rules or regulations applicable to the particular nature of the equipment or other collateral subject to the Opinion Documents; (ii) any environmental, public health, safety, intellectual property, antitrust or tax laws or laws governing labor relations, pensions or employee benefits, including the Employee Retirement Income Security Act of 1974, as amended; (iii) financial industry regulatory authority rules and any laws relating to bribery, corruption, money-laundering, anti-terrorism, communications, customs, imports or exports, insurance, international trade, sanctions or embargoes (whether foreign trade, economic, financial or otherwise), public utilities, commodities trading, futures or swaps; (iv) compliance with fiduciary duty requirements; or (v) any laws, rules, regulations or ordinances of any county, town or municipality or subdivision or agency thereof.

The opinions set forth above as to the performance by the Company of its obligations in accordance with the terms of the Opinion Documents are based solely upon the facts and

circumstances as they exist on the date hereof and are rendered as if the Company had performed such obligations on the date hereof.

This opinion letter is limited to, and no opinion is implied or may be inferred beyond, the matters expressly stated herein. The opinions expressed herein are rendered only as of the date hereof, and we assume no responsibility to advise you of facts, circumstances, changes in law, or other events or developments that hereafter may occur or be brought to our attention and that may alter, affect or modify the opinions expressed herein.

Very truly yours,

**EXHIBIT C–3**

**FORM OF ADMINISTRATIVE AGENT'S COUNSEL OPINION**

[See attached.]

# Simpson Thacher & Bartlett LLP

425 LEXINGTON AVENUE
NEW YORK, NY 10017-3954

TELEPHONE: +1-212-455-2000
FACSIMILE: +1-212-455-2502

Direct Dial Number                                                                                                E-mail Address

+1-212-455-2000


March 30, 2020


Re:    Amended and Restated 364-Day Credit Agreement

(the "<u>Credit Agreement</u>"),

dated as of March 30, 2020, among

Southwest Airlines Co. (the "<u>Company</u>"), JPMorgan Chase Bank, N.A., as Administrative Agent, and the lending institutions identified in the Credit Agreement (the "<u>Banks</u>").


JPMorgan Chase Bank, N.A., as Administrative
    Agent under the Credit Agreement, as
    hereinafter defined (the "<u>Administrative
    Agent</u>")

The Banks listed on Schedule I hereto which
    are parties to the Credit Agreement on
    the date hereof

Ladies and Gentlemen:

We have acted as counsel to the Administrative Agent in connection with the preparation, execution and delivery of the Credit Agreement.

Unless otherwise indicated, capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Credit Agreement. This opinion letter is furnished to you pursuant to Section 4.1(b)(iv) of the Credit Agreement.

In connection with this opinion, we have examined a copy of the Credit Agreement, signed by the Company, the Administrative Agent and certain of the Banks.

In addition, we have examined, and have relied as to certain matters of fact upon, the documents delivered to you at the closing, and upon originals, or duplicates or certified or conformed copies, of such corporate records, agreements, documents and other instruments and such certificates or comparable documents of public officials and of officers and representatives of the Company and have made such other investigations, as we have deemed relevant and necessary in connection with the opinions hereinafter set forth. In such examination, we have assumed the genuineness of all signatures, the legal capacity of natural persons, the authenticity of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as duplicates or certified or conformed copies, and the authenticity of the originals of such latter documents. In addition, we have relied as to certain matters of fact, upon the representations made in the Credit Agreement.

In rendering the opinion set forth below we have assumed that (1) the Credit Agreement is a valid and legally binding obligation of each party thereto (other than the Company), (2) the

BEIJING    HONG KONG    HOUSTON    LONDON    LOS ANGELES    PALO ALTO    SAO PAULO    SEOUL    TOKYO    WASHINGTON, D.C.

Simpson Thacher & Bartlett LLP

JP Morgan Chase Bank, N.A.
The Banks listed on Schedule I

March 30, 2020

Company is validly existing and in good standing under the laws of its jurisdiction of organization, has the corporate power and authority to execute, deliver and perform its obligations under the Credit Agreement and has duly authorized, executed and delivered the Credit Agreement in accordance with its Articles of Incorporation and By-Laws, (3) execution, delivery and performance by the Company of the Credit Agreement do not violate, or require any consent not obtained under, the laws of the State of Texas or any other applicable laws or any order known to us issued by any court or governmental agency or body and, (4) execution, delivery and performance by the Company of the Credit Agreement do not constitute a breach or violation of any agreement or instrument which is binding upon the Company and (5) the Company is not an "investment company" within the meaning of, and subject to regulation under, the Investment Company Act of 1940, as amended.

Based upon and subject to the foregoing, and subject to the assumptions, qualifications and limitations set forth herein, we are of the opinion that the Credit Agreement constitutes the valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms.

Our opinion set forth above is subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, (ii) general equitable principles (whether considered in a proceeding in equity or at law), (iii) an implied covenant of good faith and fair dealing and (iv) the effects of the possible judicial application of foreign laws or foreign governmental or judicial action affecting creditors' rights.

2

Simpson Thacher & Bartlett LLP

JP Morgan Chase Bank, N.A.
The Banks listed on Schedule I

March 30, 2020

We express no opinion with respect to:

the effect of any provision of the Credit Agreement that is intended to permit modification thereof only by means of an agreement in writing by the parties thereto;

the effect of any provision of the Credit Agreement insofar as it provides that any Person purchasing a participation from a Bank or other Person may exercise set-off or similar rights with respect to such participation or that any Bank or other Person may exercise set-off or similar rights other than in accordance with applicable law;

the effect of any provision of the Credit Agreement imposing penalties or forfeitures;

the enforceability of any provision of the Credit Agreement to the extent that such provision constitutes a waiver of illegality as a defense to the performance of contract obligations; and

the effect of any provision of the Credit Agreement relating to indemnification or exculpation in connection with violations of any securities laws or relating to indemnification, contribution or exculpation in connection with willful, reckless or criminal acts or gross negligence of the indemnified or exculpated Person or the Person receiving contribution.

In connection with the provisions of the Credit Agreement whereby the Company submits to the jurisdiction of the courts of the United States of America located in the City of New York, Borough of Manhattan, we note the limitations of 28 U.S.C. Sections 1331 and 1332 on subject matter jurisdiction of the federal courts. In connection with the provisions of the Credit Agreement that relate to forum selection (including, without limitation, any waiver of any objection to venue or any objection that a court is an inconvenient forum), we note that under NYCPLR Section 510 a New York state court may have discretion to transfer the place of trial, and under 28 U.S.C. Section 1404(a) a United States district court has discretion to transfer an action from one federal court to another.

With respect to matters of Texas law, we understand that you are relying on the opinion of the Company's internal counsel dated the date hereof.

3

Simpson Thacher & Bartlett LLP

JP Morgan Chase Bank, N.A.
The Banks listed on Schedule I

March 30, 2020

We do not express any opinion herein concerning any law other than the law of the State of New York and the federal law of the United States.

This opinion letter is rendered to you in connection with the above described transactions. This opinion letter may not be relied upon by you for any other purpose, or relied upon by, or furnished to, any other person, firm or corporation without our prior written consent.

Very truly yours,

SIMPSON THACHER & BARTLETT LLP

4

**Schedule I**

JPMORGAN CHASE BANK, N.A.

BANK OF AMERICA, N.A.

BNP PARIBAS

BANK OF CHINA, NEW YORK BRANCH

MORGAN STANLEY BANK, N.A.

WELLS FARGO BANK, N.A.

CITIBANK, N.A.

GOLDMAN SACHS BANK USA

STANDARD CHARTERED BANK

COMERICA BANK

**EXHIBIT D**

**FINANCIAL REPORT CERTIFICATE**

FOR_____ ENDED _____, ____

| | |
|---|---|
| ADMINISTRATIVE AGENT: | JPMorgan Chase Bank, N.A. |
| COMPANY: | Southwest Airlines Co. |
| RE: | Amended and Restated 364-Day Credit Agreement |
| DATE: | _____, ____ |

This certificate is delivered pursuant to Section 6.10 of the Amended and Restated 364-Day Credit Agreement dated as of March 30, 2020 (as amended. modified, supplemented, renewed, or extended from time to time, the "Credit Agreement"), among Southwest Airlines Co. (the "Company"), the Banks party thereto and JPMorgan Chase Bank, N.A., as Administrative Agent. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

I certify to the Administrative Agent and the Banks that I am the _____ (president, chief financial officer, treasurer, or assistant treasurer) of the Company on the date hereof and that:

1.    This certificate relates to the fiscal _____ ending on _____, _____ (the "Subject Period"). The Financial Statements for the Subject Period were prepared in conformity with GAAP, and present fairly in all material respects the consolidated financial position and results of operations of the Company and its consolidated Subsidiaries as of the last day of, and for, the Subject Period.

2.    A review of the activities of the Company and its Subsidiaries during the Subject Period has been made under my supervision with a view to determining whether, during the Subject Period, each such entity has kept, observed, performed, and fulfilled all of its obligations under the Loan Papers, and during the Subject Period, to my knowledge, each such entity kept, observed, performed, and fulfilled each and every covenant and condition of the Loan Papers (except for any deviations set forth on the attached schedule).

3.    During the Subject Period, no Default or Event of Default has occurred which has not been cured or waived (except for any Defaults or Events of Default set forth on the attached schedule).

4.    The status of compliance by the Company with Section 6.9 of the Credit Agreement as of the last day of the Subject Period is set forth on the attached schedule.

5.    This certificate is being delivered on behalf of the Company. No person or entity other than the Administrative Agent and the Banks (collectively, the "Subject Recipients") shall be entitled to receive or rely upon this certificate for any purpose. The Subject Recipients agree by their acceptance hereof that (a) they shall look solely to the Company for any loss, cost, damage, expense, claim, demand, suit, or cause of action arising out of or relating in any way to this certificate or its preparation and delivery, and (b) the undersigned shall not under any circumstances have any personal liability whatsoever for the preparation or execution of this certificate.

_____
Name:
Title

The status of compliance by the Company with Section 6.9 of the Credit Agreement as of the last day of the Subject Period is set forth below:

**Section 6.9 — Coverage Ratio**:

| | | |
|---|---|---|
| Consolidated Adjusted Pre-Tax Income* | $_____ | (1) |
| Aircraft Rentals* | $_____ | (2) |
| Net Interest Expense* | $_____ | (3) |
| Depreciation and amortization* | $_____ | (4) |
| Cash dividends paid* | $_____ | (5) |
| Sum of lines (1), (2), (3), and (4), minus line (5) | $_____ | (6) |
| Net Interest Expense* | $_____ | (7) |
| Aircraft Rentals* | $_____ | (8) |
| Sum of lines (7) and (8) | $_____ | (9) |
| Ratio of line (6) to line (9) | _____ to _____ | |
| Minimum Ratio | [___] to 1.00 | |

\*   For four fiscal quarter period ending on last day of Subject Period.

D–2

**EXHIBIT E**

**FORM OF ASSIGNMENT AND ASSUMPTION**

This Assignment and Assumption (the "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into between the Assignor named below (the "Assignor") and the Assignee named below (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent below (i) all of the Assignor's rights and obligations in its capacity as a Bank under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including any letters of credit included in such facilities) and (ii) to the extent permitted to be assigned under applicable Law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Bank) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.  Assignor:      _____

2. Assignee:      _____

                                                                    [and is an Eligible Affiliate Assignee of [*identify Bank*]]

3. Company:      Southwest Airlines Co.

4. Administrative Agent:    JPMorgan Chase Bank, N.A., as administrative agent under the Credit Agreement

5. Credit Agreement:    Amended and Restated 364-Day Credit Agreement dated as of March 30, 2020 among Southwest Airlines Co., the Banks party thereto and JPMorgan Chase Bank, N.A., as Administrative Agent

6. Assigned Interest:

| Aggregate Amount of Commitment/Loans for all Banks | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitment/Loans[8] |
|---|---|---|
| $ | $ | % |
| $ | $ | % |
| $ | $ | % |

Effective Date: _____, 202_ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The Assignee agrees to deliver to the Administrative Agent a completed Administrative Questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Company, the Loan Parties and their Affiliates or their respective securities) will be made available and who may receive such information in accordance with the Assignee's compliance procedures and applicable laws, including Federal and state securities laws.

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR

_____
NAME OF ASSIGNOR

By:_____
   Title:

ASSIGNEE

_____
NAME OF ASSIGNOR

By:_____
   Title:

_____

[8] Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Banks.

E-2

Consented to and Accepted:

JPMORGAN CHASE BANK, N.A., as
Administrative Agent

By_____
Title:

[Consented to:

SOUTHWEST AIRLINES CO.

By_____
Title:][9]

_____

[9] Include if applicable

E-3

ANNEX 1

Amended and Restated 364-Day Credit Agreement dated as of March 30, 2020 among Southwest Airlines Co., the Banks party thereto and JPMorgan Chase Bank, N.A., as Administrative Agent

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1. Representations and Warranties.

1.1 Assignor. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and (b) makes no representation or warranty and assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Paper, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement, any other Loan Papers or any other instrument or document furnished pursuant to the Credit Agreement, (iii) the financial condition of the Company or (iv) the performance or observance by the Company of its respective obligations under the Credit Agreement, any other Loan Paper or any other instrument or document furnished pursuant to the Credit Agreement or any other Loan Paper.

1.2. Assignee. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Bank under the Credit Agreement, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Bank, (iii) it has received a copy of the Credit Agreement, together with copies of financial information and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Bank and (iv) if it is a Foreign Bank, attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, any other Agent, the Assignor or any other Bank, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement, (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit Agreement and the other Loan Papers are required to be performed by it as a Bank, (iii) appoints and authorizes the Administrative Agent to take such action on behalf of the Assignee and to exercise such powers under the Credit Agreement and the other Loan Papers as are delegated to the Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto and (iv) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Bank thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Bank thereunder.

2. Payments. From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other

amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3. <u>General Provisions</u>. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by email or telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

2

**EXHIBIT F-1**

FORM OF

U.S. TAX CERTIFICATE

(For Foreign Banks That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Amended and Restated 364-Day Credit Agreement dated as of March 30, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Southwest Airlines Co., the Banks party thereto and JPMorgan Chase Bank, N.A., as Administrative Agent.

Pursuant to the provisions of Section 2.18 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Company within the meaning of Section 881(c)(3)(B) of the Code, (iv) it is not a controlled foreign corporation related to the Company as described in Section 881(c)(3)(C) of the Code and (v) the interest payments in question are not effectively connected with the undersigned's conduct of a U.S. trade or business.

The undersigned has furnished the Administrative Agent and the Company with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Company and the Administrative Agent and (2) the undersigned shall have at all times furnished the Company and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF BANK]

By:_____
   Name:
   Title:

Date: _____ __, 202__

**EXHIBIT F-2**

FORM OF

U.S. TAX CERTIFICATE

(For Non-U.S. Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Amended and Restated 364-Day Credit Agreement dated as of March 30, 2020 (as amended, modified, supplemented, renewed, or extended prior to the date hereof , the "Credit Agreement"), among Southwest Airlines Co., the Banks party thereto and JPMorgan Chase Bank, N.A., as Administrative Agent.

Pursuant to the provisions of Section 2.18 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its partners/members is a ten percent shareholder of the Company within the meaning of Section 881(c)(3)(B) of the Code, (v) none of its partners/members is a controlled foreign corporation related to the Company as described in Section 881(c)(3)(C) of the Code, and (vi) the interest payments in question are not effectively connected with the undersigned's or its partners/members' conduct of a U.S. trade or business.

The undersigned has furnished its participating Bank with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Bank and (2) the undersigned shall have at all times furnished such Bank with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]


By:_____
   Name:
   Title:

Date: _____ __, 202__

**EXHIBIT F-3**

FORM OF

U.S. TAX CERTIFICATE

(For Non-U.S. Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Amended and Restated 364-Day Credit Agreement dated as of March 30, 2020 (as amended, modified, supplemented, renewed, or extended prior to the date hereof, the "Credit Agreement"), among Southwest Airlines Co., the Banks party thereto and JPMorgan Chase Bank, N.A., as Administrative Agent.

Pursuant to the provisions of Section 2.18 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Company within the meaning of Section 881(c)(3)(B) of the Code, (iv) it is not a controlled foreign corporation related to the Company as described in Section 881(c)(3)(C) of the Code, and (v) the interest payments in question are not effectively connected with the undersigned's conduct of a U.S. trade or business.

The undersigned has furnished its participating Bank with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Bank in writing and (2) the undersigned shall have at all times furnished such Bank with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]


By:_____
  Name:
  Title:

Date: _____ __, 202__

**EXHIBIT F-4**

FORM OF

U.S. TAX CERTIFICATE

(For Foreign Banks That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Amended and Restated 364-Day Credit Agreement dated as of March 30, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Southwest Airlines Co., the Banks party thereto and JPMorgan Chase Bank, N.A., as Administrative Agent.

Pursuant to the provisions of Section 2.18 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement, neither the undersigned nor any of its partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its partners/members is a ten percent shareholder of the Company within the meaning of Section 881(c)(3)(B) of the Code, (v) none of its partners/members is a controlled foreign corporation related to the Company as described in Section 881(c)(3)(C) of the Code, and (vi) the interest payments in question are not effectively connected with the undersigned's or its partners/members' conduct of a U.S. trade or business.

The undersigned has furnished the Administrative Agent and the Company with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Company and the Administrative Agent and (2) the undersigned shall have at all times furnished the Company and the Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF BANK]

By:_____

  Name:

  Title:

Date: _____ __, 202__

H-2-2

**EXHIBIT G**

**FORM OF AIRCRAFT MORTGAGE**

[See attached.]

**MORTGAGE AND SECURITY AGREEMENT**

THIS **MORTGAGE AND SECURITY AGREEMENT** dated as of March 30, 2020 (this "**Mortgage**") is made between **SOUTHWEST AIRLINES CO.** (the "**Grantor**"), and **JPMORGAN CHASE BANK, N.A.** acting as administrative agent (in such capacity, "**Collateral Agent**"), for the Banks, as defined below.

W I T N E S S E T H:

WHEREAS, all capitalized terms used and not otherwise defined herein shall have the respective meanings set forth or referred to in Article 1 hereof;

WHEREAS, all things necessary to make this Mortgage the legal, valid and binding obligation of the Grantor and the Collateral Agent, for the uses and purposes herein set forth, in accordance with its terms, have been done and performed and have happened;

WHEREAS, the parties are entering into this Mortgage pursuant to that certain Amended and Restated 364-Day Credit Agreement, dated as of March 30, 2020 (as such agreement may be amended, restated, amended and restated, supplemented or otherwise modified, renewed or replaced from time to time, the "**Credit Agreement**"), among the Grantor, JPMorgan Chase Bank, N.A., as administrative agent (the "**Administrative Agent**") for the financial institutions party thereto (the "**Banks**"), and the Banks; and

WHEREAS, in order to induce the Collateral Agent and the Banks to enter into the Credit Agreement and the other Loan Papers, the Grantor has agreed to execute and deliver this Mortgage to the Collateral Agent for the ratable benefit of the Banks;

GRANTING CLAUSE

NOW, THEREFORE, THIS MORTGAGE AND SECURITY AGREEMENT WITNESSETH, that, to secure the prompt and complete payment and performance when due of the Obligations of the Grantor under the Credit Agreement and each of the other Loan Papers, to secure the performance and observance by the Grantor of all the agreements, covenants and provisions contained herein and in the other Loan Papers to which it is a party for the benefit of the Secured Parties, and for the uses and purposes and subject to the terms and provisions hereof, and in consideration of the premises and of the covenants herein contained, and of other good and valuable consideration the receipt and adequacy whereof are hereby acknowledged, the Grantor has granted, bargained, sold, assigned, transferred, conveyed, mortgaged, pledged and confirmed, and does hereby grant, bargain, sell, assign, transfer, convey, mortgage, pledge and confirm, unto the Collateral Agent, its successors and permitted assigns, for the security and benefit of the Secured Parties, a first priority continuing security interest (and, in the case of each Airframe and each Engine, an International Interest) in and first priority mortgage Lien, in each case, subject to Permitted Liens, on all estate, right, title and interest of the Grantor in, to and under the following described property, rights, interests and privileges whether now or hereafter acquired and subjected to the Lien of this Mortgage (which collectively, including all property hereafter specifically subjected to the Lien of this Mortgage by any instrument supplemental hereto, are herein called the "**Collateral**"):

(1)    each Airframe as the same is now and will hereafter be constituted, whether now or hereafter acquired and subjected to the Lien of this Mortgage, together with all Parts of whatever nature which are from time to time included in the definition of such "Airframe", whether now or hereafter acquired and subjected to the Lien hereof, and all additions, improvements, accessions and accumulations with respect to any of the foregoing, and all flight records, logs, manuals, maintenance data and inspection, modification and overhaul records and any other related records that are required to be maintained by regulations of the FAA or other Governmental Authority with respect to any of the foregoing (as may be required to be maintained by the Grantor's FAA approved maintenance program) and any Aircraft Documents related to such Airframe;

(2)    each Engine (each such Engine having at least 1750 pounds of thrust or the equivalent thereof) as the same is now and will hereafter be constituted, whether now or hereafter acquired and subjected to the Lien of this Mortgage, and whether or not any such Engine shall be installed in or attached to any Airframe or any other airframe, together with all Parts of whatever nature which are from time to time included in any "Engine", whether now or hereafter acquired and subjected to the Lien hereof, and all additions, improvements, accessions and accumulations with respect to any of the foregoing, and all flight records, logs, manuals, maintenance data and inspection, modification and overhaul records and any other related records that are required to be maintained by regulations of the FAA or other Governmental Authority with respect to any of the foregoing (as may be required to be maintained by the Grantor's FAA approved maintenance program) and any Aircraft Documents related to such Engine;

EXHIBIT A

1

(3)     any continuing rights of the Grantor (to the extent the Grantor may assign or otherwise grant a Lien on them without the consent of any other Person) in respect of any warranty, indemnity or agreement, express or implied, as to title, materials, workmanship, design or patent infringement with respect to such Airframes or Engines (reserving in each case to the Grantor, however, all of the Grantor's other rights and interest in and to such warranty, indemnity or agreement);

(4)     all moneys and securities now or hereafter paid or deposited or required to be paid or deposited to or with Collateral Agent by or for the account of the Grantor pursuant to the terms hereof and held or required to be held by Collateral Agent hereunder;

(5)     all proceeds with respect to requisition of title to or use of any Airframe or Engine or any Part by any Governmental Authority or from the sale or other disposition of any Airframe or Engine or Part or other property described in any of these granting clauses by the Collateral Agent pursuant to the terms of the Mortgaged Aircraft Operating Agreement, and all insurance proceeds or indemnity payments with respect to any Airframe or Engine or Part thereof, but excluding any insurance maintained by the Grantor and not required under Section 3.06 of the Mortgaged Aircraft Operating Agreement;

(6)     each lease required to be assigned pursuant to Section 3.02(b) of the Mortgaged Aircraft Operating Agreement, and including, without limitation, all rents or other payments of any kind made under such assigned lease; and

(7)     all proceeds of the foregoing.

**PROVIDED, HOWEVER**, that notwithstanding any of the foregoing provisions, so long as no Event of Default shall have occurred and be continuing, each of the Secured Parties shall not (and shall not permit any of its Affiliates or other Person lawfully claiming by, through or under it to) take or cause to be taken any action contrary to the Grantor's rights set forth herein and in the other Loan Papers to the quiet enjoyment of the Airframes and Engines, and all revenues, income and profits devised therefrom without hindrance.

HABENDUM CLAUSE

**TO HAVE AND TO HOLD** all and singular the aforesaid property unto the Collateral Agent, its respective successors and permitted assigns, in trust for the benefit and security of the Secured Parties for the uses and purposes and in all cases and as to all property specified in paragraphs (1) through (7) inclusive above, subject to the terms and provisions set forth in this Mortgage.

1.     It is expressly agreed that anything herein contained to the contrary notwithstanding, the Grantor shall remain liable under each of the contracts and agreements included in the Collateral to which it is a party to perform all of the obligations assumed by it thereunder, all in accordance with and pursuant to the terms and provisions thereof, and neither the Collateral Agent nor any of the Banks shall have any obligation or liability under any such contracts and agreements to which the Grantor is a party by reason of or arising out of the assignment hereunder, nor shall the Collateral Agent or any Bank be required or obligated in any manner to perform or fulfill any obligations of the Grantor, or to make any payment, or to make any inquiry as to the nature or sufficiency of any payment received by it, or present or file any claim, or take any action to collect or enforce the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

2.     The Grantor does hereby designate Collateral Agent the true and lawful attorney-in-fact of the Grantor, irrevocably, granted for good and valuable consideration and coupled with an interest and with full power of substitution (in the name of the Grantor or otherwise), subject to the terms and conditions of this Mortgage, to ask, require, demand, receive, sue for, compound and give acquittance for any and all moneys and claims for moneys (in each case including insurance and requisition proceeds and indemnity payments) due and to become due to the Grantor under or arising out of the Collateral, to endorse any checks or other instruments or orders in connection therewith and to file any claims or take any action or institute any proceedings which Collateral Agent may deem to be necessary or advisable in the premises as fully as the Grantor itself could do generally, to sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral, as fully and completely as though the Collateral Agent were the absolute owner thereof for all purposes, and to do, at the Collateral Agent's option and the Grantor's expense, at any time, or from time to time, all acts and things which Collateral Agent deems necessary to protect, preserve or realize upon the Collateral and to effect the intent of this Mortgage; provided, that Collateral Agent shall not exercise any such rights except upon the occurrence and during the continuance of an Event of Default. Without limiting the foregoing, during the continuance of any Event of Default, but subject to the terms hereof and any mandatory requirement of applicable law, Collateral Agent shall have the right under such power of attorney in its discretion to file any

2

claim or take any other action or proceedings, either in its own name or in the name of the Grantor or otherwise, which Collateral Agent may reasonably deem necessary or appropriate to protect and preserve the right, title and interest of the Collateral Agent in and to the security intended to be afforded hereby. The Grantor agrees that promptly upon receipt thereof, it will transfer to the Collateral Agent any and all moneys from time to time received by the Grantor constituting part of the Collateral, for distribution by the Collateral Agent pursuant to the Credit Agreement and this Mortgage.

3.    The Grantor agrees that at any time and from time to time, upon the written request of Collateral Agent, the Grantor, at the Grantor's sole cost and expense, will promptly and duly execute and deliver or cause to be duly executed and delivered any and all such further instruments and documents as Collateral Agent may reasonably deem necessary to perfect, preserve or protect the mortgage, security interest and assignments created or intended to be created hereby or to obtain for the Collateral Agent the full benefits of the assignment hereunder and/or intended to be effected hereunder and of the rights and powers herein granted and/or intended to be granted hereunder including, without limitation, taking such steps as may be required to establish, maintain or enforce the Lien intended to be granted hereunder in full force and effect (whether under the UCC, Title 49, or the law of any other jurisdiction under which any Airframe or other portion of the Collateral is registered).

4.    The Grantor does hereby warrant and represent that none of the Collateral is currently subject to any assignment, pledge or other Lien (other than Permitted Liens), and hereby covenants that it will not otherwise assign or pledge, so long as the Lien of this Mortgage has not been discharged in accordance with the terms hereof, any of its rights, title or interests hereby assigned to any Person other than the Collateral Agent.

**IT IS HEREBY FURTHER COVENANTED AND AGREED** by and among the parties hereto as follows:

•

## DEFINITIONS

**Section 1.01.**    <u>Definitions</u>. 23) For all purposes of this Mortgage, except as otherwise expressly provided or unless the context otherwise requires:

(1)    each of the "**Grantor**," "**Collateral Agent**," any "**Bank**" or any other Person includes any successor in interest to it and any permitted transferee, permitted purchaser or permitted assignee of it;

(2)    the terms defined in this Article 1 have the meanings assigned to them in this Article 1, and include the plural as well as the singular;

(3)    all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles in the United States, as in effect from time to time;

(4)    the words "herein", "hereof" and "hereunder" and other words of similar import refer to this Mortgage as a whole and not to any particular Article, Section or other subdivision;

(5)    all references in this Mortgage to Articles, Sections and Exhibits refer to Articles, Sections and Exhibits of this Mortgage; and

(6)    "knowledge" or "aware" or words of similar import shall mean, when used in reference to the Grantor, the actual knowledge of Grantor.

(b)    For all purposes of this Mortgage, the following capitalized terms have the following respective meanings:

3

"**Administrative Agent**" shall have the meaning given to that term in the recitals to this Mortgage.

"**Affiliate**" means a Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with another Person.

"**Aircraft**" means an Airframe and its two associated Engines. An Airframe is "associated" with the two Engines grouped with it on Exhibit A to this Mortgage (and vice versa).

"**Aircraft Documents**" means, with respect to any Aircraft, all technical data, manuals and log books, and all inspection, modification and overhaul records and other service, repair, maintenance and technical records that are required by (a) the FAA pursuant to FAR 121.380A (or successor regulation) and any other relevant regulation promulgated by the FAA which is applicable to the Grantor as an operator under FAR 121 or (b) the relevant Aviation Authority, to be maintained with respect to such Aircraft, Airframe, Engines or Parts and such term shall include all additions, renewals, revisions and replacements of any such materials from time to time made prior to the release of the Lien of this Mortgage with respect to the applicable Aircraft, or required to be made prior to the release of the Lien of this Mortgage with respect to the applicable Aircraft, by the regulations of the relevant Aviation Authority, and in each case in whatever form and by whatever means or medium (including, without limitation, microfiche, microfilm, paper, CD-ROM or computer disk) such materials may be maintained or retained by or on behalf of the Grantor (provided, that all such materials shall be maintained in the English language or, if in a jurisdiction other than the United States in which the keeping of records in English is not practical, regularly translated in the English language).

"**Aircraft Protocol**" shall mean the official English language text of the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment, adopted on November 16, 2001 at a diplomatic conference in Cape Town, South Africa, and all amendments, supplements and revisions thereto, as in effect in the United States.

"**Airframe**" shall mean (i) each airframe (excluding Engines or engines either initially or from time to time installed thereon) specified by Manufacturer, model, United States Registration Number and Manufacturer's serial number identified on Exhibit A attached hereto or in any supplement to this Mortgage, and (ii) any and all Parts which are from time to time incorporated or installed in or attached to such airframe or which have been removed therefrom until such Part has been replaced.

"**Aviation Authority**" means the FAA or, if any Aircraft is permitted to be, and is, registered with any other Governmental Authority under and in accordance with Section 3.02(e) of the Mortgaged Aircraft Operating Agreement and Annex C thereof, such other Governmental Authority.

"**Bankruptcy Code**" shall mean United States Bankruptcy Code, 11 United States Code Section 101 et seq.

"**Banks**" shall have the meaning given to that term in the recitals to this Mortgage.

"**Cape Town Convention**" shall mean the official English language text of the Convention on International Interests in Mobile Equipment, adopted on November 16, 2001 at a diplomatic conference in Cape Town, South Africa, and all amendments, supplements and revisions thereto, as in effect in the United States.

"**Cape Town Treaty**" shall mean, collectively, (a) the Cape Town Convention, (b) the Aircraft Protocol, and (c) all rules and regulations (including but not limited to the Regulations and Procedures for the International Registry) adopted pursuant thereto and, in the case of each of the foregoing described in clauses (a) through (c), all amendments, supplements and revisions thereto as in effect in the United States.

"**Collateral**" shall have the meaning assigned thereto in the Granting Clause hereof.

"**Collateral Agent**" shall have the meaning given to that term in the first paragraph of this Mortgage.

"**Credit Agreement**" shall have the meaning given to that term in the recitals to this Mortgage.

"**Engine**" shall mean (i) each engine listed by Manufacturer, model and Manufacturer's serial numbers identified on Exhibit A attached hereto or in any supplement to this Mortgage, and whether or not either initially or from time to time installed on an Airframe or any other airframe, and (ii) any and all Parts which are from time to time incorporated or installed in or attached to any such engine and any and all Parts removed therefrom until such Part has been replaced.

"**FAA**" shall mean the Federal Aviation Administration of the United States of America and any successor thereto.

4

"**Governmental Authority**" shall mean the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**International Interest**" shall mean an "international interest" as defined in the Cape Town Treaty.

"**International Registry**" shall mean the "International Registry" as defined in the Cape Town Treaty.

"**Laws**" shall mean all applicable statutes, laws, treaties, ordinances, rules, regulations, orders, writs, injunctions, decrees, judgments, or opinions of any Tribunal.

"**Lien**" shall mean any mortgage, lien, pledge, charge, security interest or other encumbrance in or on, or any interest or title of any vendor, lessor, lender or other secured party to or of any Person under, any conditional sale or other title retention agreement or lease with respect to, any property or asset of such Person. For avoidance of doubt, the filing of a Uniform Commercial Code financing statement by a Person that is not entitled or authorized in accordance with the applicable Uniform Commercial Code to file such financing statement shall not, in and of itself, constitute a Lien.

"**Loan Papers**" shall mean (i) the Credit Agreement, certificates delivered pursuant to the Credit Agreement and exhibits and schedules thereto, (ii) this Mortgage, (iii) the Mortgaged Aircraft Operating Agreement, (iv) any notes, security documents, guaranties, and other agreements in favor of the Administrative Agent and Banks, or any or some of them, ever delivered in connection with the Credit Agreement and (v) all renewals, extensions, or restatements of, or amendments or supplements to, any of the foregoing.

"**Manufacturer**" shall mean, with respect to any Airframe or Engine, the manufacturer thereof, and its successors and assigns.

"**Mortgaged Aircraft Operating Agreement**" means that certain Mortgage Aircraft Operating Agreement, dated as of the date hereof, between Grantor and Collateral Agent pursuant to the Credit Agreement, as such agreement may be amended, restated, amended and restated, supplemented or otherwise modified, renewed or replaced from time to time.

"**Mortgage and Security Agreement**" or "**this Agreement**" or "**this Mortgage**" shall mean this Mortgage and Security Agreement, as the same may from time to time be amended, restated, amended and restated, supplemented or otherwise modified.

"**Obligations**" means all present and future indebtedness, obligations, and liabilities, and all renewals, extensions, and modifications thereof, owed to the Administrative Agent and Banks, or any or some of them, by the Grantor, arising pursuant to any Loan Paper, together with all interest thereon and costs, expenses, and reasonable attorneys' fees incurred in the enforcement or collection thereof.

"**Parts**" shall mean, with respect to an Airframe or Engine, any and all appliances, parts, instruments, appurtenances, accessories, avionics, furnishings, seats, and other equipment of whatever nature (other than (a) complete Engines or engines, (b) any items leased by the Grantor from a third party, and (c) cargo containers which may from time to time be incorporated or installed in or attached to such Airframe or Engine or which have been removed therefrom).

"**Permitted Liens**" shall mean: (a) Liens for taxes, assessments and governmental charges or levies which either are not yet due and payable or are being contested in good faith by appropriate proceedings and for which adequate reserves are established in accordance with GAAP; (b) Liens securing judgments, but only to the extent, for an amount and for a period not resulting in an Event of Default under Section 7.1(d) of the Credit Agreement; (c) Liens securing Obligations under the Credit Agreement; (d) Liens constituting normal operational usage of the affected Property (as defined in the Credit Agreement), including charter, third party maintenance, storage, leasing, pooling or interchange thereof; (e) Liens imposed by law such as materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business securing obligations that (i) are not overdue for a period of more than 30 days, provided that no enforcement, collection, execution, levy or foreclosure proceeding shall have been commenced with respect thereto, or (ii) are being contested in good faith and for which adequate reserves are established in accordance with GAAP; and (f) salvage or similar rights of insurers under the insurances required to be maintained pursuant to the Mortgaged Aircraft Operating Agreement.

5

"**Person**" shall mean and include an individual, partnership, joint venture, corporation, trust, limited liability company or other entity, Tribunal, unincorporated organization, or government, or any department, agency, or political subdivision thereof.

"**Secured Parties**" shall mean the Administrative Agent and the Banks.

"**Title 49**" shall mean Title 49 of the United States Code, as amended and in effect from time to time, and the regulations promulgated thereto.

"**Tribunal**" shall mean any municipal, state, commonwealth, federal, foreign, territorial, or other court, governmental body, subdivision, agency, department, commission, board, bureau, or instrumentality.

"**UCC**" shall mean the Uniform Commercial Code (or any similar equivalent legislation) as in effect in any applicable jurisdiction.

"**United States**" or "**U.S.**" shall mean the United States of America.

**Section 1.02.**    Representations, Warranties and Covenants.

(a)    Title. The Grantor hereby represents and warrants that (i) it has good and marketable title to each Airframe and Engine and will have good and marketable title to each Airframe and Engine listed on any subsequent supplement to this mortgage at the time of execution and delivery thereof; (ii) it will have good title to any other Collateral which is subject to this Mortgage or which becomes subject to this Mortgage from time to time hereafter; and (iii) the Airframes and Engines are correctly described by Manufacturer, model and serial number as set forth on the Manufacturer's serial plate for said Airframes and Engines, in each case subject to Permitted Liens.

(b)    No Liens. The Grantor is, and as to Collateral acquired by it from time to time after the date hereof the Grantor will be, the owner of all Collateral free from any Lien (other than Permitted Liens), and the Grantor shall promptly, at its own expense, (i) defend the Collateral against all Liens (other than Permitted Liens) at any time claiming the same or any interest therein adverse to the Collateral Agent and (ii) take such action as may be necessary to duly discharge any Lien (other than a Permitted Liens) arising at any time.

(c)    Perfected Security Interests. This Mortgage is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in all of the Collateral to the extent purported to be created thereby, subject as to enforceability to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law. With respect to the Collateral, at such time as (a) financing statements in appropriate form are filed in the appropriate offices (and the appropriate fees are paid), and (b) the appropriate filings with the FAA (including filing for recordation of this Mortgage and any future supplement thereto) and registrations with the International Registry, as applicable, are made, the Collateral Agent, for the benefit of the Secured Parties, shall have a first priority perfected security interest and/or mortgage (or comparable Lien) in all of such Collateral to the extent that the Liens on such Collateral may be perfected upon the filings, registrations or recordations or upon the taking of the actions described in clauses (a) and (b) above, subject in each case only to Permitted Liens, and such security interest is entitled to the benefits, rights and protections afforded under the Loan Papers applicable thereto (subject to the qualification set forth in the first sentence of this paragraph).

(d)    Filings. Except for (a) the filing for recordation of this Mortgage with the FAA in accordance with Title 49, (b) the appropriate registrations with the International Registry and (c) the filing of a financing statement (and continuation statements relating thereto at periodic intervals), in appropriate form, with the appropriate office, no further filing or recording of any document is necessary in order to establish and perfect the security interest in the Airframes and Engines constituting Collateral under this Mortgage.

(e)    Further Assurances. The Grantor will take, or cause to be taken, at the Grantor's cost and expense, such action with respect to (x) the recording, filing, re-recording and re-filing of this Mortgage and any supplement to this Mortgage, as is necessary to maintain, so long as this Mortgage is in effect, the priority, perfection and preservation of the Lien created by this Mortgage, in the office of the FAA, pursuant to Title 49, and in such other places as may be required under any applicable law or regulation in the U.S., (y) the appropriate registrations with the International Registry as are necessary to maintain, so long as this Mortgage is in effect, the priority, perfection and preservation of the Lien created by this Mortgage and (z) any financing statements or other instruments as are necessary to maintain, so long as this Mortgage is in effect, the priority, perfection and preservation of the Lien created by this Mortgage, and will furnish to the Collateral Agent timely notice of the

necessity of such action, together with, if requested by Collateral Agent, such instruments, in execution form, and such other information as may be reasonably required to enable the Collateral Agent to take such action or otherwise reasonably requested by Collateral Agent. To the extent permitted by applicable law, the Grantor hereby authorizes the Collateral Agent to execute and file financing statements or continuation statements necessary to maintain, so long as this Mortgage is in effect, the perfection and preservation of the Lien created by this Mortgage without the Grantor's signature appearing thereon. The Grantor shall pay the costs of, or incidental to, any recording or filing, including, without limitation, any filing of financing or continuation statements, necessary to maintain, so long as this Mortgage is in effect, the perfection and preservation of the Lien created by this Mortgage.

(f)    Section 1110 of the Bankruptcy Code. It is the intention of the parties hereto that the security interest created hereby, to the fullest extent available under applicable law, entitles the Collateral Agent, on behalf of the Banks, to all of the benefits of Section 1110 of the Bankruptcy Code with respect to each Airframe and Engine.

(g)    Notice of Certain Events. The Grantor shall provide the Collateral Agent with prior written notice of its intent to convert any Airframe from passenger configuration to cargo configuration.

(h)    [Reserved.]

## ARTICLE 2

### EVENT OF DEFAULT AND REMEDIES

**Section 2.01.**    Event of Default. It shall be an Event of Default hereunder if an "Event of Default" under the Credit Agreement shall have occurred and be continuing thereunder.

**Section 2.02.**    Remedies with Respect to Collateral.

(a)    Remedies Available. Upon the occurrence and continuance of any Event of Default, Collateral Agent may do one or more of the following, in each case subject to the Credit Agreement:

(i)    cause the Grantor, upon the written demand of Collateral Agent, at the Grantor's expense, to deliver promptly, and the Grantor shall deliver promptly, all or such part of the Airframes, the Engines or other Collateral as Collateral Agent may so demand to Collateral Agent or its order, or Collateral Agent, at its option, may enter upon the premises where all or any part of the Airframes, the Engines or other Collateral are located and take immediate possession (to the exclusion of the Grantor and all Persons claiming under or through the Grantor) of and remove the same by summary proceedings or otherwise together with any engine which is not an Engine but which is installed on an Airframe, subject to all of the rights of the owner, lessor, or lien holder of or with respect to such engine;

(ii)    sell all or any part of the Airframes, Engines or other Collateral at public or private sale, whether or not Collateral Agent shall at the time have possession thereof, as Collateral Agent may determine, or otherwise dispose of, hold, use, operate, lease to others or keep idle all or any part of the Airframes, the Engines or other Collateral as Collateral Agent, in its sole discretion, may determine, all free and clear of any rights or claims of whatsoever kind of the Grantor, any person claiming by, through or under the Grantor and any person holding an interest subordinate to the interests of the Collateral Agent hereunder; provided, however, that the Grantor shall be entitled at any time prior to any such disposition to redeem the Collateral by paying in full all of the Obligations; or

(iii)    exercise any or all of the rights and powers and pursue any and all remedies of a secured party under the UCC of the State of New York (whether or not in effect in the jurisdiction in which enforcement is sought) or by any other applicable law (including the Cape Town Convention, and specifically Article 13 thereof, to the extent applicable), or proceed by appropriate court action to enforce the terms or to recover damages for the breach hereof.

Upon every taking of possession of Collateral under this Section 2.02, Collateral Agent may, from time to time, at the expense of the Grantor, make all such expenditures for maintenance, insurance, repairs, replacements, alterations, additions and improvements to and of the Collateral as it may deem proper. In each such case, Collateral

Agent shall have the right to maintain, use, insure, operate, store, lease, control or manage the Collateral and to carry on business and to exercise all rights and powers of the Grantor relating to the Collateral in connection therewith, as Collateral Agent shall deem appropriate, including the right to enter into any and all such agreements with respect to the maintenance, use, insurance, operation, storage, leasing, control, management or disposition of the Collateral or any part thereof as Collateral Agent may determine; and Collateral Agent shall be entitled to collect and receive directly all tolls, rents, revenues, issues, income, products, proceeds and profits of the Collateral and every part thereof, without prejudice, however, to the right of the Collateral Agent under any provision of this Mortgage to collect and receive all cash held by, or required to be deposited with, the Collateral Agent hereunder. Such tolls, rents, revenues, issues, income, products, proceeds and profits shall be applied to pay the expenses of using, operating, storage, leasing, control, management or disposition of the Collateral, and of all maintenance, insurance, repairs, replacement, alterations, additions and improvements, and to make all payments which the Collateral Agent may be required or may elect to make, if any, for taxes, assessments, insurance or other proper charges upon the Collateral or any part thereof (including the employment of engineers and accountants to examine, inspect and make reports upon the properties and books and records of the Grantor), and all other payments which the Collateral Agent may be required or authorized to make under any provision of this Mortgage, as well as just and reasonable compensation for the services of the Collateral Agent, and of all Persons engaged and employed by the Collateral Agent.

In addition, the Grantor shall be liable, without duplication of any amounts payable hereunder or under any Loan Paper, for all reasonable legal fees and other costs and expenses incurred by reason of the occurrence of any Event of Default or the exercise of Collateral Agent's remedies with respect thereto, including all reasonable costs and expenses incurred in connection with the retaking, return or sale of any Airframe, Engines or other Collateral in accordance with the terms hereof, which amounts shall, until paid, be secured by the Lien of this Mortgage.

If any Event of Default shall have occurred and be continuing, at the direction of the Collateral Agent shall at any time thereafter while any Event of Default shall be continuing, without notice of any kind to the Grantor (except as provided herein) to the extent permitted by law, carry out or enforce any one or more of the actions and remedies provided in this Article 2 or elsewhere in this Mortgage or otherwise available to a secured party under applicable law, whether or not any or all of the Collateral is subject to the jurisdiction of such UCC and whether or not such remedies are referred to in this Article 2.

Nothing in the foregoing shall affect the right of each Bank to receive all payments of principal of, and interest on, the Obligations held by such Bank and all other amounts owing to such Bank as and when the same may be due.

Notwithstanding anything to the contrary in this Mortgage, the Credit Agreement or in any other Loan Paper, no right or remedy of the Collateral Agent, the Administrative Agent, or any Bank or other Secured Party, as applicable, under this Section 2.02 or under any other provision of this Mortgage or under any provision of Article VII of the Credit Agreement (including but not limited to any action with respect to any warranty, indemnity or other agreement to give and receive all notices and other instruments or communications, and all other Collateral constituting continuing rights described in clause (3) of the Granting Clause herein) may be exercised or pursued by the Collateral Agent against Collateral included in clause (3) of the Granting Clause (the "**Clause 3 Collateral**") until the Grantor receives written notice from the Collateral Agent during the continuance of an Event of Default to withhold from taking any action with respect to the Clause 3 Collateral (the "**Withhold Notice**"). Until the receipt by the Grantor of the Withhold Notice, the Grantor is authorized to continue to operate its business with respect to the Clause 3 Collateral, and take any action, or withhold from taking any action, including but not limited to any action with respect to any warranty, indemnity or other agreement to give and receive all notices and other instruments or communications, in each case with respect to the Clause 3 Collateral. Upon and after the Collateral Agent has given the Withhold Notice and during the continuance of an Event of Default, the Collateral Agent may exercise all rights, powers, privileges, options and other benefits and entitlements of the Grantor in respect of any warranty, indemnity or agreement (to the extent assigned hereunder) with respect to such Airframes or Engines, including, without limitation, the right to make all waivers and agreements, to give and receive all notices and other instruments or communications, to take such action upon the occurrence of a default thereunder, including the commencement, conduct and consummation of legal, administrative or other proceedings, as shall be permitted thereby or by law, and to do any and all other things which the Grantor is or may be entitled to do thereunder (to the extent assigned hereunder.

(b)    Notice of Sale. The Collateral Agent shall give the Grantor at least ten (10) days' prior written notice of the date fixed for any public sale of any Airframe or Engine or the date on or after which any private sale will be held, which notice the Grantor hereby agrees is reasonable notice.

(c)    Receiver. If any Event of Default shall occur and be continuing, to the extent permitted by applicable law, Collateral Agent shall be entitled, as a matter of right as against the Grantor, without notice or demand and without regard

8

to the adequacy of the security for the Obligations or the solvency of the Grantor, upon the commencement of judicial proceedings by it to enforce any right under this Mortgage, to the appointment of a receiver of the Collateral or any part thereof and of the tolls, rents, revenues, issues, income, products and profits thereof for the recovery of judgment for the indebtedness secured by the Lien created under this Mortgage or for the enforcement of any other proper, legal or equitable remedy available under applicable law.

(d)    Concerning Sales. At any sale under this Article, any Bank may bid for and purchase the property offered for sale, may make payment on account thereof as herein provided, and, upon compliance with the terms of sale, may hold, retain and dispose of such property without further accountability therefor. Any purchaser shall be entitled, for the purpose of making payment for the property purchased, to deliver any of the Obligations in lieu of cash in the amount which shall be payable thereon as principal or interest. Said Obligations, in case the amount so payable to the holders thereof shall be less than the amounts due thereon, shall be returned to the holders thereof after being stamped or endorsed to show partial payment.

**Section 2.03.**    Waiver of Appraisement, Etc To the full extent that it may lawfully so agree, the Grantor agrees that it will not at any time insist upon, plead, claim or take the benefit or advantage of, any appraisement, valuation, stay, extension, or redemption law now or hereafter in force, in order to prevent or hinder the enforcement of this Mortgage or the absolute sale of the Collateral, or any part thereof, or the possession thereof by any purchaser at any sale under this Article 2; but the Grantor, for itself and all who may claim under it so far as it or they now or hereafter lawfully may, hereby waives the benefit of all such laws. The Grantor, for itself and all who may claim under it, waives, to the extent that it lawfully may, all right to have the property in the Collateral marshalled upon any foreclosure hereof, and agrees that any court having jurisdiction to foreclosure under this Mortgage may order the sale of the Collateral as an entirety.

**Section 2.04.**    Application of Proceeds. After the exercise of remedies pursuant to Section 2.02 hereof, any payments in respect of the Obligations and any proceeds (as defined in the UCC) of the Collateral, when received by the Collateral Agent or any other Bank in cash or its equivalent, will be applied as set forth in and in accordance with the Credit Agreement.

**Section 2.05.**    Remedies Cumulative. Each and every right, power and remedy hereby specifically given to the Collateral Agent or otherwise in this Mortgage shall be cumulative and shall be in addition to every other right, power and remedy specifically given under this Mortgage or the other Loan Papers or now or hereafter existing at law, in equity or by statute or treaty and each and every right, power and remedy whether specifically herein given or otherwise existing may be exercised from time to time or simultaneously and as often and in such order as may be deemed expedient by Collateral Agent. All such rights, powers and remedies shall be cumulative and the exercise or the beginning of the exercise of one shall not be deemed a waiver of the right to exercise any other or others. No delay or omission of Collateral Agent in the exercise of any such right, power or remedy and no renewal or extension of any of the Obligations shall impair any such right, power or remedy or shall be construed to be a waiver of any Event of Default or an acquiescence therein. No notice to or demand on the Grantor in any case shall entitle it to any other or further notice or demand in similar or other circumstances or constitute a waiver of any of the rights of the Collateral Agent to any other or further action in any circumstances. In the event that Collateral Agent shall bring any suit to enforce any of its rights hereunder and shall be entitled to judgment, then in such suit such Collateral Agent may recover reasonable expenses, including attorneys' fees, and the amounts thereof shall be included in such judgment.

**Section 2.06.**    Discontinuance of Proceedings. In case Collateral Agent shall have instituted any proceeding to enforce any right, power or remedy under this Mortgage by foreclosure, sale entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason or shall have been determined adversely to Collateral Agent, then and in every such case the Grantor and the Collateral Agent shall be restored to their former positions and rights hereunder with respect to the Collateral subject to the security interest created under this Mortgage, and all rights, remedies and powers of the Collateral Agent shall continue as if no such proceeding had been instituted (but otherwise without prejudice).

# ARTICLE 3

## TERMINATION OF MORTGAGE

**Section 3.01.**    Termination of Mortgage.

(a)    This Mortgage and the Lien of this Mortgage on the Collateral shall terminate upon payment and performance in full of the Obligations then due. Upon termination, the Grantor may request, at the Grantor's sole cost and expense, the Collateral Agent to execute and deliver to, or as directed in writing by, the Grantor an appropriate instrument reasonably required to release the Collateral from the Lien of this Mortgage and the Collateral Agent shall execute and deliver such instrument as aforesaid at the Grantor's expense, whereupon this Mortgage shall terminate and this Mortgage shall be of no further force or effect.

9

(b)    Upon removal or release of any Aircraft, Airframe or Engine from the Pool Assets (as defined in the Credit Agreement) pursuant to and in accordance with Section 6.12 of the Credit Agreement, the Grantor may request, at the Grantor's sole cost and expense, the Collateral Agent to execute and deliver to, or as directed in writing by, the Grantor an appropriate instrument reasonably required to release such Aircraft, Airframe or Engine removed or released from the Pool Assets and the balance of the Collateral relating thereto (if any) from the Lien of this Mortgage and the Collateral Agent shall execute and deliver such instrument as aforesaid at the Grantor's expense, whereupon this Mortgage, solely to the extent it relates to such Aircraft, Airframe or Engine being removed or released from the Pool Assets and the balance of the Collateral relating thereto (if any), shall terminate and this Mortgage, solely to the extent it relates to such Aircraft, Airframe or Engine removed or released from the Pool Assets and the balance of the Collateral relating thereto (if any), shall be of no further force or effect.

# ARTICLE 4

## MISCELLANEOUS

**Section 4.01.**    No Legal Title to Collateral. No Bank or the Collateral Agent shall have legal title to any part of the Collateral. No transfer, by operation of law or otherwise, of any portion of the Obligations or other right, title and interest of Collateral Agent or Bank in and to the Collateral or this Mortgage shall operate to terminate this Mortgage or entitle any successor or transferee of Collateral Agent or such Bank to an accounting or to the transfer to it of legal title to any part of the Collateral.

**Section 4.02.**    Sale of Collateral by Collateral Agent is Binding. Any sale or other conveyance of any Airframe, Engine or other item of Collateral or any interest therein by Collateral Agent made pursuant to the terms of this Mortgage shall bind the Banks and the Grantor, and shall be effective to transfer or convey all right, title and interest of the Collateral Agent, the Grantor, and the other Banks in and to such Airframe, Engine or other item of Collateral or any interest therein. No purchaser or other grantee shall be required to inquire as to the authorization, necessity, expediency or regularity of such sale or conveyance or as to the application of any sale or other proceeds with respect thereto by Collateral Agent.

**Section 4.03.**    Benefit of Mortgage. Nothing in this Mortgage, whether express or implied, shall be construed to give to any Person other than the Grantor, the Collateral Agent and the Banks any legal or equitable right, remedy or claim under or in respect of this Mortgage.

**Section 4.04.**    Notices. All notices and other communication provided for herein shall be in writing (including telecopy communications) and mailed, telecopied, e-mailed (where indicated) or delivered in accordance with Section 9.2 of the Credit Agreement.

**Section 4.05.**    Governing Law. THIS MORTGAGE HAS BEEN DELIVERED IN THE STATE OF NEW YORK AND THIS MORTGAGE AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS MORTGAGE SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK. EACH PARTY TO THIS MORTGAGE HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR OTHER LOAN PAPERS, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN (OR IF SUCH COURT LACKS SUBJECT MATTER JURISDICTION, THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN), AND ANY APPELLATE COURT FROM ANY THEREOF< IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS MORTGAGE OR ANY OTHER LOAN PAPER OF THE TRANSACTIONS RELATING HERETO OR THERETO, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT. EACH PARTY HERETO CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS AND WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT AND AGREES NOT TO PLEAD OR CLAIM THE SAME. EACH OF THE GRANTOR AND THE COLLATERAL AGENT WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS, WHICH MAY BE MADE BY ANY OTHER MEANS PERMITTED BY THE LAW OF SUCH STATE.

**Section 4.06.**    Grantor's Duties. It is expressly agreed, anything herein contained to the contrary notwithstanding, that the Grantor shall remain liable to perform all of the obligations, if any, assumed by it with respect to the Collateral and neither the Collateral Agent nor any Bank shall have any obligations or liabilities with respect to any Collateral by reason of or arising out of this Mortgage, nor shall the Collateral Agent nor any Bank be required or obligated in any manner perform or fulfill any of the obligations of the Grantor under or with respect to any Collateral.

**Section 4.07.**    Counterparts. This Mortgage may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**Section 4.08.**    Waiver; Amendment. 23)  No waiver of any provisions of this Mortgage or consent to any departure by the Grantor therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No notice to or demand on the Grantor in any case shall entitle the Grantor to any other or further notice or demand in similar or other circumstances.

(a)    Neither this Mortgage nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Collateral Agent and the Grantor with respect to which such waiver, amendment or modification is to apply.

**Section 4.09.**    Obligations Absolute. The obligations of the Grantor hereunder shall remain in full force and effect without regard to, and shall not be impaired by any exercise or non-exercise, or any waiver of, any right, remedy, power or privilege by the Collateral Agent under or in respect of this Mortgage or any other Loan Paper.

**Section 4.10.**    Successors and Assigns. This Mortgage shall be binding upon, and inure to the benefit, of each party hereto and its respective successors and permitted assigns; provided, that the Grantor may not transfer or assign any or all of its rights or obligations hereunder without the prior written consent of the Collateral Agent. All agreements, statements, representations and warranties made by the Grantor herein or in any certificate or other instrument delivered by the Grantor or on its behalf under this Mortgage shall be considered to have been relied upon by the Collateral Agent and Banks and shall survive the execution and delivery of this Mortgage and the other Loan Papers regardless of any investigation made by the Collateral Agent or Banks or on their behalf.

**Section 4.11.**    Conflicts with Other Loan Papers. Unless otherwise expressly provided in this Mortgage, if any provision contained in this Mortgage conflicts with any provision of any other Loan Paper, the provision contained in this Mortgage shall govern and control, provided, that the inclusion of supplemental rights or remedies in favor of the Collateral Agent or the Banks in any other Loan Paper shall not be deemed a conflict with this Mortgage.

* * *

11

**IN WITNESS WHEREOF**, the Grantor and the Collateral Agent have caused this Mortgage and Security Agreement to be duly executed by their respective officers thereunto duly authorized.

**SOUTHWEST AIRLINES CO.**, as Grantor

By: _____
  Name:
Title:

**JPMORGAN CHASE BANK, N.A.**, as Collateral Agent

By: _____
Name:
Title:

*Signature Page to Mortgage and Security Agreement*

**EXHIBIT A**

to Mortgage and Security Agreement

**Airframes and Engines**

| | Airframe Make | Airframe Model | U.S. Reg. Number | Airframe MSN | Engine Manufacturer | Engine Model | Engine MSN 1 | Engine MSN 2 |
|---|---|---|---|---|---|---|---|---|
| 1 | Boeing | 737-800 | N8557Q | 63582 | CFM International | CFM56-7B27E/F | 38803 | 38764 |
| 2 | Boeing | 737-800 | N8556Z | 63583 | CFM International | CFM56-7B27E/F | 38796 | 38800 |
| 3 | Boeing | 737-800 | N8555Z | 63600 | CFM International | CFM56-7B27E/F | 38791 | 38792 |
| 4 | Boeing | 737-800 | N8554X | 36993 | CFM International | CFM56-7B27E/F | 38779 | 38773 |
| 5 | Boeing | 737-800 | N8553W | 63601 | CFM International | CFM56-7B27E/F | 38778 | 38776 |
| 6 | Boeing | 737-800 | N8552Z | 63580 | CFM International | CFM56-7B27E/F | 38739 | 38704 |
| 7 | Boeing | 737-800 | N8551Q | 36951 | CFM International | CFM56-7B27E/F | 38678 | 38661 |
| 8 | Boeing | 737-800 | N8549Z | 63597 | CFM International | CFM56-7B27E/F | 38659 | 38658 |
| 9 | Boeing | 737-800 | N8548P | 36968 | CFM International | CFM56-7B27E/F | 38642 | 38643 |
| 10 | Boeing | 737-800 | N8547V | 63572 | CFM International | CFM56-7B27E/F | 38517 | 38500 |
| 11 | Boeing | 737-800 | N8545V | 63573 | CFM International | CFM56-7B27E/F | 38531 | 38526 |
| 12 | Boeing | 737-800 | N8546V | 63574 | CFM International | CFM56-7B27E/F | 38542 | 38540 |
| 13 | Boeing | 737-800 | N8544Z | 36926 | CFM International | CFM56-7B27E/F | 38486 | 38460 |
| 14 | Boeing | 737-800 | N8543Z | 63587 | CFM International | CFM56-7B27E/F | 38459 | 38454 |
| 15 | Boeing | 737-800 | N8542Z | 63581 | CFM International | CFM56-7B27E/F | 38415 | 38414 |
| 16 | Boeing | 737-800 | N8541W | 63599 | CFM International | CFM56-7B27E/F | 38385 | 38378 |
| 17 | Boeing | 737-800 | N8540V | 63598 | CFM International | CFM56-7B27E/F | 38372 | 38371 |
| 18 | Boeing | 737-800 | N8539V | 42534 | CFM International | CFM56-7B27E/F | 38352 | 38348 |
| 19 | Boeing | 737-800 | N8538V | 63586 | CFM International | CFM56-7B27E/F | 38355 | 38342 |
| 20 | Boeing | 737-800 | N8537Z | 63595 | CFM International | CFM56-7B27E/F | 38345 | 38332 |
| 21 | Boeing | 737-800 | N8536Z | 63571 | CFM International | CFM56-7B27E/F | 38344 | 38321 |
| 22 | Boeing | 737-800 | N8535S | 63596 | CFM International | CFM56-7B27E/F | 38330 | 38328 |
| 23 | Boeing | 737-800 | N8532S | 63576 | CFM International | CFM56-7B27E/F | 38297 | 38272 |
| 24 | Boeing | 737-800 | N8533S | 63577 | CFM International | CFM56-7B27E/F | 38292 | 38305 |
| 25 | Boeing | 737-800 | N8534Z | 63578 | CFM International | CFM56-7B27E/F | 38302 | 38299 |
| 26 | Boeing | 737-800 | N8531Q | 63575 | CFM International | CFM56-7B27E/F | 38295 | 38268 |
| 27 | Boeing | 737-800 | N8530W | 63592 | CFM International | CFM56-7B27E/F | 38203 | 38202 |
| 28 | Boeing | 737-800 | N8529Z | 36974 | CFM International | CFM56-7B27E/F | 38168 | 38169 |
| 29 | Boeing | 737-800 | N8528Q | 36927 | CFM International | CFM56-7B27E/F | 38126 | 38165 |
| 30 | Boeing | 737-800 | N8527Q | 36946 | CFM International | CFM56-7B27E/F | 38115 | 38114 |
| 31 | Boeing | 737-800 | N8526W | 36972 | CFM International | CFM56-7B27E/F | 864994 | 864984 |
| 32 | Boeing | 737-800 | N8525S | 36949 | CFM International | CFM56-7B27E/F | 864950 | 864947 |
| 33 | Boeing | 737-800 | N8524Z | 36970 | CFM International | CFM56-7B27E/F | 864933 | 864926 |
| 34 | Boeing | 737-800 | N8523W | 36969 | CFM International | CFM56-7B27E/F | 864887 | 864885 |
| 35 | Boeing | 737-800 | N8522P | 36922 | CFM International | CFM56-7B27E/F | 864878 | 864873 |
| 36 | Boeing | 737-800 | N8520Q | 42532 | CFM International | CFM56-7B27E/F | 864858 | 864844 |
| 37 | Boeing | 737-800 | N8519R | 36910 | CFM International | CFM56-7B27E/F | 864852 | 864851 |
| 38 | Boeing | 737-800 | N8518R | 63593 | CFM International | CFM56-7B27E/F | 864791 | 864797 |
| 39 | Boeing | 737-800 | N8515X | 36943 | CFM International | CFM56-7B27E/F | 864774 | 864766 |
| 40 | Boeing | 737-800 | N8517F | 63594 | CFM International | CFM56-7B27E/F | 864777 | 864773 |
| 41 | Boeing | 737-800 | N8514F | 36975 | CFM International | CFM56-7B27E/F | 864763 | 864761 |
| 42 | Boeing | 737-800 | N8513F | 36976 | CFM International | CFM56-7B27E/F | 864756 | 864747 |

EXHIBIT A

| 43 | Boeing | 737-800 | N8512U | 38816 | CFM International | CFM56-7B27E/F | 864733 | 864731 |
| 44 | Boeing | 737-800 | N8511K | 36670 | CFM International | CFM56-7B27E/F | 864729 | 864710 |
| 45 | Boeing | 737-800 | N8510E | 36944 | CFM International | CFM56-7B27E/F | 864714 | 864700 |
| 46 | Boeing | 737-800 | N8509U | 36925 | CFM International | CFM56-7B27E/F | 864695 | 864677 |
| 47 | Boeing | 737-800 | N8508W | 38814 | CFM International | CFM56-7B27E/F | 864686 | 864685 |
| 48 | Boeing | 737-800 | N8507C | 41531 | CFM International | CFM56-7B27E/F | 864666 | 864640 |
| 49 | Boeing | 737-800 | N8504G | 38812 | CFM International | CFM56-7B27E/F | 864599 | 864598 |
| 50 | Boeing | 737-800 | N8503A | 38813 | CFM International | CFM56-7B27E/F | 864584 | 864582 |
| 51 | Boeing | 737-800 | N8502Z | 36666 | CFM International | CFM56-7B27E/F | 864568 | 864563 |
| 52 | Boeing | 737-800 | N8501V | 41530 | CFM International | CFM56-7B27E/F | 864542 | 864444 |
| 53 | Boeing | 737-8H4 | N8698B | 36977 | CFM International | CFM56-7B27E/F | 864488 | 864487 |
| 54 | Boeing | 737-8H4 | N8699A | 36923 | CFM International | CFM56-7B27E/F | 864497 | 864482 |
| 55 | Boeing | 737-8H4 | N8697C | 36728 | CFM International | CFM56-7B27E/F | 864413 | 865389 |
| 56 | Boeing | 737-8H4 | N8696E | 36678 | CFM International | CFM56-7B27E/F | 864455 | 864437 |
| 57 | Boeing | 737-8H4 | N8695D | 35965 | CFM International | CFM56-7B27E/F | 865167 | 864347 |
| 58 | Boeing | 737-8H4 | N8694E | 36661 | CFM International | CFM56-7B27E/F | 864411 | 864409 |
| 59 | Boeing | 737-8H4 | N8676A | 36941 | CFM International | CFM56-7B27E/F | 862719 | 862713 |
| 60 | Boeing | 737-8H4 | N8675A | 35976 | CFM International | CFM56-7B27E/F | 862714 | 862701 |
| 61 | Boeing | 737-8H4 | N8673F | 36937 | CFM International | CFM56-7B27E/F | 862629 | 862628 |
| 62 | Boeing | 737-8H4 | N8674B | 36734 | CFM International | CFM56-7B27E/F | 862671 | 862675 |
| 63 | Boeing | 737-8H4 | N8672F | 36940 | CFM International | CFM56-7B27E/F | 862613 | 862612 |
| 64 | Boeing | 737-8H4 | N8671D | 36715 | CFM International | CFM56-7B27E/F | 862432 | 862336 |
| 65 | Boeing | 737-8H4 | N8670A | 36656 | CFM International | CFM56-7B27E/F | 862254 | 862156 |
| 66 | Boeing | 737-8H4 | N8669B | 36655 | CFM International | CFM56-7B27E/F | 862139 | 862136 |
| 67 | Boeing | 737-8H4 | N8668A | 36903 | CFM International | CFM56-7B27E/F | 660999 | 660985 |
| 68 | Boeing | 737-8H4 | N8667D | 36657 | CFM International | CFM56-7B27E/F | 660957 | 661927 |
| 69 | Boeing | 737-8H4 | N8662F | 36936 | CFM International | CFM56-7B27E/F | 660829 | 660748 |
| 70 | Boeing | 737-8H4 | N8661A | 36906 | CFM International | CFM56-7B27E/F | 660566 | 660553 |
| 71 | Boeing | 737-8H4 | N8660A | 36654 | CFM International | CFM56-7B27E/F | 661511 | 660471 |
| 72 | Boeing | 737-8H4 | N8659D | 36901 | CFM International | CFM56-7B27E/F | 660527 | 661482 |
| 73 | Boeing | 737-8H4 | N8658A | 36899 | CFM International | CFM56-7B27E/F | 660656 | 660643 |
| 74 | Boeing | 737-8H4 | N8657B | 42535 | CFM International | CFM56-7B27E/F | 660653 | 660638 |
| 75 | Boeing | 737-8H4 | N8656B | 42530 | CFM International | CFM56-7B27E/F | 661562 | 661573 |
| 76 | Boeing | 737-8H4 | N8653A | 37037 | CFM International | CFM56-7B27E/F | 660552 | 661505 |
| 77 | Boeing | 737-8H4 | N8655D | 42529 | CFM International | CFM56-7B27E/F | 660572 | 660569 |
| 78 | Boeing | 737-8H4 | N8654B | 37045 | CFM International | CFM56-7B27E/F | 660571 | 660567 |
| 79 | Boeing | 737-8H4 | N8644C | 35973 | CFM International | CFM56-7B27E/F | 660212 | 660199 |
| 80 | Boeing | 737-8H4 | N8643A | 42524 | CFM International | CFM56-7B27E/F | 660216 | 660209 |
| 81 | Boeing | 737-8H4 | N8652B | 36971 | CFM International | CFM56-7B27E/F | 660484 | 660480 |
| 82 | Boeing | 737-8H4 | N8651A | 36920 | CFM International | CFM56-7B27E/F | 660429 | 660397 |
| 83 | Boeing | 737-8H4 | N8650F | 36909 | CFM International | CFM56-7B27E/F | 660371 | 660361 |
| 84 | Boeing | 737-8H4 | N8649A | 42527 | CFM International | CFM56-7B27E/F | 660322 | 660319 |
| 85 | Boeing | 737-8H4 | N8648A | 42531 | CFM International | CFM56-7B27E/F | 660287 | 657922 |
| 86 | Boeing | 737-8H4 | N8646B | 36935 | CFM International | CFM56-7B27E/F | 660242 | 660241 |
| 87 | Boeing | 737-8H4 | N8647A | 42528 | CFM International | CFM56-7B27E/F | 660245 | 660244 |
| 88 | Boeing | 737-8H4 | N8645A | 36907 | CFM International | CFM56-7B27E/F | 660226 | 660224 |
| 89 | Boeing | 737-8H4 | N8642E | 42525 | CFM International | CFM56-7B27E/F | 660201 | 660195 |
| 90 | Boeing | 737-8H4 | N8639B | 60086 | CFM International | CFM56-7B27E/F | 660139 | 660133 |
| 91 | Boeing | 737-8H4 | N8641B | 60085 | CFM International | CFM56-7B27E/F | 660178 | 660171 |
| 92 | Boeing | 737-8H4 | N8638A | 36911 | CFM International | CFM56-7B27E/F | 660107 | 657995 |

EXHIBIT A

2

| 93 | Boeing | 737-8H4 | N8640D | 60084 | CFM International | CFM56-7B27E/F | 660144 | 660143 |
| 94 | Boeing | 737-8H4 | N8637A | 42523 | CFM International | CFM56-7B27E/F | 660109 | 658974 |
| 95 | Boeing | 737-8H4 | N500WR | 36898 | CFM International | CFM56-7B27E/F | 660106 | 657978 |
| 96 | Boeing | 737-8H4 | N8324A | 35966 | CFM International | CFM56-7B27E/F | 962369 | 962366 |
| 97 | Boeing | 737-8H4 | N8323C | 37005 | CFM International | CFM56-7B27E/F | 962352 | 962347 |
| 98 | Boeing | 737-8H4 | N8322X | 36997 | CFM International | CFM56-7B27E/F | 962271 | 962267 |
| 99 | Boeing | 737-8H4 | N8321D | 36687 | CFM International | CFM56-7B27E/F | 962264 | 962261 |
| 100 | Boeing | 737-8H4 | N8320J | 36686 | CFM International | CFM56-7B27E/F | 962135 | 962128 |
| 101 | Boeing | 737-8H4 | N8319F | 36994 | CFM International | CFM56-7B27E/F | 963209 | 962198 |
| 102 | Boeing | 737-8H4 | N8318F | 36685 | CFM International | CFM56-7B27E/F | 962173 | 962145 |
| 103 | Boeing | 737-8H4 | N8317M | 36992 | CFM International | CFM56-7B27E/F | 962134 | 962109 |
| 104 | Boeing | 737-8H4 | N8316H | 36684 | CFM International | CFM56-7B27E/F | 960997 | 960990 |
| 105 | Boeing | 737-8H4 | N8315C | 38811 | CFM International | CFM56-7B27E/F | 960979 | 960978 |
| 106 | Boeing | 737-8H4 | N8314L | 36990 | CFM International | CFM56-7B27E/F | 960966 | 960964 |
| 107 | Boeing | 737-8H4 | N8302F | 36680 | CFM International | CFM56-7B27E/F | 960721 | 960713 |
| 108 | Boeing | 737-8H4 | N8301J | 36980 | CFM International | CFM56-7B27E/F | 960657 | 960656 |
| 109 | Boeing | 737-7H4 | N969WN | 41777 | CFM International | CFM56-7B24E | 961486 | 960510 |
| 110 | Boeing | 737-7H4 | N968WN | 36679 | CFM International | CFM56-7B24E | 961473 | 961472 |
| 111 | Boeing | 737-7H4 | N967WN | 36967 | CFM International | CFM56-7B24E | 960329 | 960275 |
| 112 | Boeing | 737-7H4 | N966WN | 36966 | CFM International | CFM56-7B24E | 960284 | 960282 |
| 113 | Boeing | 737-7H4 | N962WN | 36963 | CFM International | CFM56-7B24E | 960213 | 804223 |
| 114 | Boeing | 737-7H4 | N961WN | 36962 | CFM International | CFM56-7B24/3 | 961177 | 960192 |
| 115 | Boeing | 737-7H4 | N960WN | 36675 | CFM International | CFM56-7B24/3 | 960182 | 960180 |
| 116 | Boeing | 737-7H4 | N959WN | 36674 | CFM International | CFM56-7B24/3 | 960139 | 804908 |
| 117 | Boeing | 737-7H4 | N958WN | 36673 | CFM International | CFM56-7B24/3 | 805936 | 804960 |
| 118 | Boeing | 737-7H4 | N957WN | 41528 | CFM International | CFM56-7B24/3 | 805933 | 804955 |
| 119 | Boeing | 737-7H4 | N956WN | 36672 | CFM International | CFM56-7B24/3 | 804899 | 804897 |
| 120 | Boeing | 737-7BD | N556WN | 33936 | CFM International | CFM56-7B24/3 | 804885 | 804863 |
| 121 | Boeing | 737-7H4 | N955WN | 36671 | CFM International | CFM56-7B24/3 | 804844 | 804823 |
| 122 | Boeing | 737-7BD | N555LV | 36726 | CFM International | CFM56-7B24/3 | 805809 | 804725 |
| 123 | Boeing | 737-7H4 | N951WN | 36665 | CFM International | CFM56-7B24/3 | 805301 | 804303 |
| 124 | Boeing | 737-7H4 | N950WN | 36664 | CFM International | CFM56-7B24/3 | 805356 | 804336 |
| 125 | Boeing | 737-7H4 | N949WN | 36663 | CFM International | CFM56-7B24/3 | 804331 | 804322 |
| 126 | Boeing | 737-7H4 | N948WN | 36662 | CFM International | CFM56-7B24/3 | 804204 | 804203 |
| 127 | Boeing | 737-7H4 | N947WN | 36924 | CFM International | CFM56-7B24/3 | 804191 | 804188 |
| 128 | Boeing | 737-7H4 | N946WN | 36918 | CFM International | CFM56-7B24/3 | 804108 | 804107 |
| 129 | Boeing | 737-7H4 | N945WN | 36660 | CFM International | CFM56-7B24/3 | 803864 | 802953 |
| 130 | Boeing | 737-7H4 | N944WN | 36659 | CFM International | CFM56-7B24/3 | 803888 | 802946 |
| 131 | Boeing | 737-7H4 | N943WN | 36913 | CFM International | CFM56-7B24/3 | 802895 | 802894 |
| 132 | Boeing | 737-7BD | N7724A | 36725 | CFM International | CFM56-7B20 | 802123 | 802122 |
| 133 | Boeing | 737-7BD | N7749B | 36724 | CFM International | CFM56-7B20 | 896973 | 896972 |
| 134 | Boeing | 737-7H4 | N942WN | 36648 | CFM International | CFM56-7B24/3 | 802370 | 802267 |
| 135 | Boeing | 737-7H4 | N941WN | 36647 | CFM International | CFM56-7B24/3 | 803273 | 802222 |
| 136 | Boeing | 737-7H4 | N940WN | 36900 | CFM International | CFM56-7B24/3 | 802356 | 802355 |
| 137 | Boeing | 737-7H4 | N939WN | 36646 | CFM International | CFM56-7B24/3 | 803327 | 802330 |
| 138 | Boeing | 737-7H4 | N938WN | 36645 | CFM International | CFM56-7B24/3 | 802320 | 802309 |
| 139 | Boeing | 737-7H4 | N937WN | 36644 | CFM International | CFM56-7B24/3 | 803296 | 802304 |
| 140 | Boeing | 737-7H4 | N936WN | 36643 | CFM International | CFM56-7B24/3 | 896984 | 896910 |
| 141 | Boeing | 737-7H4 | N929WN | 36631 | CFM International | CFM56-7B24/3 | 896688 | 896687 |
| 142 | Boeing | 737-7H4 | N928WN | 36890 | CFM International | CFM56-7B24/3 | 896686 | 896677 |

EXHIBIT A

3

| 143 | Boeing | 737-7H4 | N927WN | 36889 | CFM International | CFM56-7B24/3 | 897566 | 896662 |
| 144 | Boeing | 737-7H4 | N924WN | 36628 | CFM International | CFM56-7B24/3 | 896586 | 896570 |
| 145 | Boeing | 737-7H4 | N919WN | 36625 | CFM International | CFM56-7B24/3 | 897412 | 897411 |
| 146 | Boeing | 737-7H4 | N920WN | 32460 | CFM International | CFM56-7B24/3 | 896482 | 896456 |
| 147 | Boeing | 737-7H4 | N917WN | 36624 | CFM International | CFM56-7B24/3 | 896352 | 896142 |
| 148 | Boeing | 737-7BD | N7752B | 33943 | CFM International | CFM56-7B20 | 896388 | 896380 |

(EACH OF WHICH ENGINES DESCRIBED ABOVE HAVING AT LEAST 550 RATED TAKEOFF HORSEPOWER OR THE EQUIVALENT THEREOF)

EXHIBIT A

4

**EXHIBIT H**

**FORM OF MORTGAGED AIRCRAFT OPERATING AGREEMENT**

[See attached.]

**MORTGAGED AIRCRAFT OPERATING AGREEMENT**

This **MORTGAGED AIRCRAFT OPERATING AGREEMENT**, dated as of March 30, 2020 (this "**Agreement**") is made between SOUTHWEST AIRLINES CO. (the "**Company**"), and JPMORGAN CHASE BANK, N.A. acting as administrative agent (in such capacity, "**Collateral Agent**"), for the Banks.

W I T N E S S E T H:

WHEREAS, pursuant to that certain Amended and Restated 364-Day Credit Agreement, dated as of March 30, 2020 (as such agreement may be amended, restated, amended and restated, supplemented or otherwise modified, renewed or replaced from time to time, the "**Credit Agreement**"), among the Company, JPMorgan Chase Bank, N.A., as administrative agent, and the Banks, the Company and the Collateral Agent has agreed to execute and deliver this Agreement.

NOW, THEREFORE, in consideration of the mutual agreements herein contained and other good and valuable consideration, receipt of which is acknowledged, the parties hereto agree as follow:

**ARTICLE I**

**DEFINITIONS**

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires, capitalized terms used herein have the meanings set for in Annex A hereto.

**ARTICLE II**

**[RESERVED]**

**ARTICLE III**

**COVENANTS OF THE COMPANY**

**Section 3.01**   Liens.

(a)      Performance of Obligations. The Company shall perform all of the agreements, covenants and provisions contained in this Agreement for the benefit of the Secured Parties.

(b)      Liens. The Company will not directly or indirectly create, incur, assume or suffer to exist any Lien on or with respect to the Company's interest in the Collateral, except Permitted Liens. The Company shall promptly, at its own expense, take such action as may be necessary to duly discharge (by bonding or otherwise) any such Lien other than a Permitted Liens arising at any time.

**Section 3.02**    Possession, Operation and Use, Maintenance, Registration and Markings.

(a)    General. Except as otherwise expressly provided herein, the Company shall be entitled to operate, use, locate, employ or otherwise utilize or not utilize any Airframe, any Engine or any Part in any lawful manner or place in accordance with the Company's or any Permitted Lessee's business judgment.

(b)    Possession. The Company, without the prior consent of the Collateral Agent, shall not lease or otherwise in any manner deliver, transfer or relinquish possession of any Aircraft, Airframe or Engine or install any Engine, or permit any Engine to be installed, on any airframe other than the associated Airframe; except that the Company may, without such prior written consent of the Collateral Agent:

(i)    Subject or permit any Permitted Lessee to subject (i) any Airframe to normal interchange agreements and (ii) any Engine to normal interchange, pooling, borrowing or similar arrangements, in each case customary in the commercial airline industry and entered into by the Company or such Permitted Lessee, as the case may be, in the ordinary course of business; provided, however, that (A) no transfer of the registration of any Airframe or Engine shall be effected in connection therewith and (B) if the Company's title to any such Airframe or Engine is divested under any such agreement or arrangement, then such Airframe or Engine shall be deemed to have suffered an Event of Loss as of the date of such divestiture, and the Company shall comply with Section 3.04(e) or 3.05, as applicable, in respect thereof;

(ii)    Deliver or permit any Permitted Lessee to deliver possession of any Aircraft, Airframe, Engine or Part (x) to the Airframe Manufacturer, the Engine Manufacturer, the manufacturer thereof or to any third-party maintenance provider for testing, service, repair, maintenance or overhaul work on such Aircraft, Airframe, Engine or Part, or, to the extent required or permitted by Section 3.04, for alterations or modifications in or additions to such Aircraft, Airframe or Engine, (y) to any Person for the purpose of transport to a Person referred to in the preceding clause (x) or (z) to any storage facility;

(iii)    Install or permit any Permitted Lessee to install any Engine on an airframe owned by the Company or such Permitted Lessee, as the case may be, free and clear of all Liens, except (x) Permitted Liens and those that do not apply to such Engine, and (y) the rights of third parties under normal interchange or pooling agreements and arrangements of the type that would be permitted under Section 3.02(b)(i);

(iv)    Install or permit any Permitted Lessee to install any Engine on an airframe leased to the Company or such Permitted Lessee, or owned by the Company or such Permitted Lessee subject to a mortgage, security agreement, conditional sale or other secured financing arrangement, but only if (x) such airframe is free and clear of all Liens, except (A) the rights of the parties to such lease, or any such secured financing arrangement, covering such airframe and (B) Liens of the type permitted by clause (iii) above and (y) the Company or Permitted Lessee, as the case may be, shall have received from the lessor, mortgagee, secured party or conditional seller, in respect of such airframe, a written agreement (which may be a copy of the lease, mortgage, security agreement, conditional sale or other agreement covering such airframe), whereby such Person agrees that it will

2

not acquire or claim any right, title or interest in, or Lien on, such Engine by reason of such Engine being installed on such airframe at any time while such Engine is subject to the Lien of the Mortgage;

(v)   Install or permit any Permitted Lessee to install any Engine on an airframe leased to the Company or such Permitted Lessee or owned by the Company or such Permitted Lessee subject to a mortgage, security agreement, conditional sale or other secured financing arrangement under circumstances where neither clause (iii) or (iv) above is applicable; provided, however, that any such installation shall be deemed an Event of Loss with respect to such Engine, and the Company shall comply with Section 3.04(e) in respect thereof;

(vi)   Transfer or permit any Permitted Lessee to transfer possession of any Aircraft, Airframe or Engine to the U.S. Government, in which event the Company shall promptly notify the Collateral Agent in writing of any such transfer of possession and, in the case of any transfer pursuant to CRAF, in such notification shall identify by name, address and telephone numbers the Contracting Officer Representative or Representatives for the Military Airlift Command of the United States Air Force to whom notices must be given and to whom requests or claims must be made to the extent applicable under CRAF;

(vii)   Enter into a charter or Wet Lease or other similar arrangement with respect to any Aircraft, or any other aircraft on which any Engine may be installed (which shall not be considered a transfer of possession hereunder);

(viii)   So long as no Event of Default shall have occurred and be continuing, and subject to the provisions of the immediately following paragraph, enter into a lease with respect to any Aircraft, Airframe or Engine to any Permitted Air Carrier that both is not then subject to any bankruptcy, insolvency, liquidation, reorganization, dissolution or similar proceeding and does not then have substantially all of its property in the possession of any liquidator, trustee, receiver or similar person or any other Person approved in writing by the Collateral Agent; provided that, in the case only of a lease to a Permitted Foreign Air Carrier, (A) the United States maintains normal diplomatic relations with the country of domicile of such Permitted Foreign Air Carrier (or, in the case of Taiwan, diplomatic relations at least as good as those in effect on the Closing Date) and (B) the Company shall have furnished to the Collateral Agent and the Banks a favorable opinion reasonably acceptable to the Collateral Agent of reputable counsel in the country of domicile of such Permitted Foreign Air Carrier, that (v) the terms of such lease are the legal, valid and binding obligations of the parties thereto enforceable under the laws of such jurisdiction (subject to customary exceptions), (w) it is not necessary for the Collateral Agent or any Bank to register or qualify to do business in such country, if not already so registered or qualified, as a result, in whole or in part, of the proposed lease, (x) the Collateral Agent's Lien in respect of, such Aircraft, Airframe and Engine will be recognized as a first priority (subject to Permitted Liens) security interest and enforceable, subject to customary exceptions not materially less favorable to the Collateral Agent than on the Closing Date in the United States, in such jurisdiction (including the Collateral Agent's right to repossess the Aircraft), (y) the Laws of such jurisdiction of domicile require fair compensation by the government of such jurisdiction, payable in a currency

3

freely convertible into Dollars, for the loss of title to such Aircraft, Airframe or Engine in the event of the requisition by such government of such title (unless the Company shall provide insurance in the amounts required with respect to hull insurance under the Mortgage and this Agreement covering the requisition of title to such Aircraft, Airframe or Engine by the government of such jurisdiction so long as such Aircraft, Airframe or Engine is subject to such lease) and (z) the agreement of such Permitted Air Carrier that its rights under the lease are subject and subordinate to all the terms of the Mortgage and this Agreement is enforceable against such Permitted Air Carrier under applicable law (subject to customary exceptions) and if the lessee is a U.S. Certificated Air Carrier, the Company will be entitled as lessor of the benefits of Section 1110 of the Bankruptcy Code in which the lessee is the debtor;

provided that (1) the rights of any transferee who receives possession by reason of a transfer permitted by any of clauses (i) through (viii) of this Section 3.02(b) (other than by a transfer of any Engine which is deemed an Event of Loss) shall be subject and subordinate to all the terms of the Mortgage and this Agreement, including the rights of the Collateral Agent to void such lease in the exercise of its rights to repossession of any Airframe or any Engine hereunder, (2) the Company shall remain primarily liable for the performance of all of the terms of the Mortgage and this Agreement and all the terms and conditions of the Mortgage and the other Loan Papers shall remain in effect and (3) no lease or transfer of possession otherwise in compliance with this Section 3.02(b) shall (x) result in any registration or re-registration of an Aircraft, except to the extent permitted by Section 3.02(e), or result in the maintenance, operation or use thereof except in compliance with Sections 3.02(c) and 3.02(d) or (y) permit any action not permitted to the Company hereunder.

In the case of any lease permitted under this Section 3.02(b), the Company will include in such lease appropriate provisions which (s) make such lease expressly subject and subordinate to all of the terms of the Mortgage and this Agreement, including the rights of the Collateral Agent to void such lease in the exercise of its rights to repossession of any Airframe or any Engine hereunder; (t) require the Permitted Lessee to comply with the terms of Section 3.06; and (u) require that any Airframe or any Engine subject thereto be used in accordance with the limitations applicable to the Company's possession and use provided in the Mortgage and this Agreement. No lease permitted under this Section 3.02(b) shall be entered into unless (w) the Company shall provide written notice to the Collateral Agent (such notice in the case of a lease to a U.S. Certificated Air Carrier to be given promptly after entering into any such lease or, in the case of a lease to any other Permitted Air Carrier, 10 days in advance of entering into such lease); (x) the Company shall furnish to the Collateral Agent evidence reasonably satisfactory to the Collateral Agent that the insurance required by Section 3.06 remains in effect; (y) all necessary documents shall have been duly filed, registered or recorded in such public offices as may be required fully to preserve the first priority security interest and International Interest (subject to Permitted Liens) of the Collateral Agent in any Aircraft, Airframe and Engines; and (z) the Company shall reimburse the Collateral Agent for all of their respective reasonable out-of-pocket fees and expenses, including, without limitation, reasonable fees and disbursements of counsel to the Collateral Agent incurred by them in connection with any such lease. Except as otherwise provided herein and without in any way relieving the Company from its primary obligation for the performance of its obligations under the Mortgage and this Agreement, the Company may in its sole discretion permit a Permitted Lessee to exercise any or all rights which the Company would be entitled to exercise under Sections 3.02 (other than the right to lease any Aircraft, Airframe or Engine pursuant to Section 3.02(b)(viii)) and 3.04, and may cause

4

a Permitted Lessee to perform any or all of the Company's obligations under Article III, and the Collateral Agent agrees to accept actual and full performance thereof by a Permitted Lessee in lieu of performance by the Company.

The Company shall provide the Collateral Agent a copy of each Permitted Lease which has a term of more than one (1) year promptly after execution thereof. In addition, the Company shall collaterally assign to the Collateral Agent (and take all further actions in order to create, grant, establish, preserve, protect and perfect the validity, perfection and priority of the Liens and security interests created or intended to be created by the Mortgage), as additional security for the Obligations, Company's rights, but not its obligations, under any such Permitted Lease having a term in excess of one (1) year (provided that so long as no Event of Default shall have occurred and be continuing hereunder, Company shall be entitled to exercise all rights and remedies with respect to such Permitted Lease). In connection with the foregoing assignment, the Company shall deliver any chattel paper originals of any Permitted Lease having a term in excess of one (1) year to the Collateral Agent.

The Collateral Agent hereby agrees and each other Secured Party by execution of the Credit Agreement or an "Assignment and Assumption" thereunder agrees, for the benefit of each lessor, conditional seller or secured party of any engine leased to, or purchased by, the Company or any Permitted Lessee subject to a lease, conditional sale or security agreement that the Collateral Agent, each other Secured Party, and their respective successors and assigns will not acquire or claim, as against such lessor, conditional seller or secured party, any right, title or interest in any engine as the result of such engine being installed on an Airframe at any time while such engine is subject to such lease, conditional sale or security agreement and owned by such lessor or conditional seller or subject to a security interest in favor of such secured party.

(c)    Operation and Use. So long as an Aircraft, Airframe or Engine is subject to the Lien of the Mortgage, the Company shall not (or permit any Permitted Lessee to) operate, use or locate such Aircraft, Airframe or Engine, or allow such Aircraft, Airframe or Engine to be operated, used or located, (i) in any area excluded from coverage by any insurance required by the terms of Section 3.06, except in the case of a requisition by the U.S. Government where the Company obtains indemnity in lieu of such insurance from the U.S. Government, or insurance from the U.S. Government, against substantially the same risks and for at least the amounts of the insurance required by Section 3.06 covering such area, or (ii) in any recognized area of hostilities unless covered in accordance with Section 3.06 by war risk insurance, or in either case unless such Aircraft, Airframe or Engine is only temporarily operated, used or located in such area as a result of an emergency, equipment malfunction, navigational error, hijacking, weather condition or other similar unforeseen circumstance, so long as the Company diligently and in good faith proceeds to remove such Aircraft, Airframe or Engine from such area. So long as an Aircraft, Airframe or Engine is subject to the Lien of the Mortgage, the Company shall not permit such Aircraft, Airframe or Engine to be used, operated, maintained, serviced, repaired or overhauled (x) in violation of any Law binding on or applicable to such Aircraft, Airframe, or Engine or (y) in violation of any airworthiness certificate, license or registration of any Governmental Authority relating to such Aircraft, Airframe or Engine, except (i) immaterial or non-recurring violations with respect to which corrective measures are taken promptly by the Company or Permitted Lessee, as the case may be, upon discovery thereof, or (ii) to the extent the validity or application of any such Law or requirement relating to any such certificate, license or registration is being contested in good faith by the Company or Permitted Lessee in any reasonable manner which does not involve any material risk of the sale,

5

forfeiture or loss of such Aircraft, Airframe or Engine, any material risk of criminal liability or material civil penalty against the Collateral Agent or any other Secured Party or impair the Collateral Agent's security interest in such Aircraft, Airframe or Engine.

(d)        Maintenance and Repair. So long as an Aircraft, Airframe or Engine is subject to the Lien of the Mortgage, the Company shall cause such Aircraft, Airframe or Engine to be maintained, serviced, repaired and overhauled in accordance with (i) the Company's maintenance program for the same manufacturer and model as such Aircraft, Airframe or Engine approved by the FAA or maintenance standards required by or substantially equivalent to those required by the central aviation authority of Canada, France, Germany, Japan, the Netherlands or the United Kingdom for such Aircraft, Airframe and Engine, so as to (A) keep such Aircraft, Airframe and Engine in as good operating condition as on the Closing Date, ordinary wear and tear excepted, and (B) keep such Aircraft in such operating condition as may be necessary to enable the applicable airworthiness certification of such Aircraft to be maintained under the regulations of the FAA or other Aviation Authority then having jurisdiction over the operation of such Aircraft, except in any such case during (x) temporary periods of storage in accordance with applicable regulations, maintenance and modification permitted hereunder or (z) periods when the FAA or such other Aviation Authority has revoked or suspended the airworthiness certificates for Boeing 737- 800 and/or Boeing 737-700 aircraft unless such grounding by the FAA or Aviation Authority was caused by the failure of the Company to maintain, service, repair and overhaul such Aircraft in the manner required hereby; and (ii) except during periods when a Permitted Lease with respect to such Aircraft, Airframe or Engine is in effect, the same standards as the Company uses with respect to similar aircraft of similar size in its fleet operated by the Company in similar circumstances and, during any period in which a Permitted Lease with respect to such Aircraft, Airframe or Engine is in effect, the same standards used by the Permitted Lessee with respect to similar aircraft of similar size in its fleet and operated by the Permitted Lessee in similar circumstances (it being understood that this clause (ii) shall not limit the Company's obligations under the preceding clause (i)). The Company further agrees that each Aircraft, Airframe and Engine will be maintained, used, serviced, repaired, overhauled or inspected in compliance with applicable Laws with respect to the maintenance of such Aircraft, Airframe and Engine and in compliance with each applicable airworthiness certificate, license and registration relating to such Aircraft, Airframe or Engine issued by the Aviation Authority, other than minor or nonrecurring violations with respect to which corrective measures are taken upon discovery thereof and except to the extent the Company or Permitted Lessee is contesting in good faith the validity or application of any such Law or requirement relating to any such certificate, license or registration in any reasonable manner which does not create a material risk of sale, loss or forfeiture of such Aircraft, Airframe or Engine or the interest of the Collateral Agent therein, or any material risk of criminal liability or material civil penalty against the Collateral Agent or any other Secured Party. The Company shall maintain or cause to be maintained (or regularly translate) the Aircraft Documents in the English language.

(e)        Registration. On or prior to the Closing Date, the Company shall cause each Aircraft to be duly registered in its name under the Act and except as otherwise permitted by this Section 3.02(e) at all times thereafter shall cause each Aircraft to remain so registered. So long as no Event of Default shall have occurred and be continuing, the Company may, by written notice to the Collateral Agent, request to change the country of registration of any Aircraft (each, a "**Reregistration Request**"). The Collateral Agent shall promptly upon receiving a Reregistration Request, notify the Banks of such Reregistration Request. Any such change in registration shall be effected at the Company's sole cost and expense, and only in compliance with, and subject to all

6

of the conditions set forth in, Annex C hereto. Unless the Mortgage has been discharged, the Company shall also cause the Mortgage to be duly recorded and at all times maintained of record as a valid, first-priority perfected mortgage (subject to Permitted Liens) on the Company's right, title and interest in each Aircraft, Airframe and Engine (except to the extent such perfection or priority cannot be maintained solely as a result of the failure by the Collateral Agent to execute and deliver any necessary documents or such perfection is terminated by the Collateral Agent). Unless the Mortgage has been discharged as to an Airframe or Engine, the Company shall cause the International Interest granted under the Mortgage in favor of the Collateral Agent in such Airframe or such Engine to be registered on the International Registry as an International Interest on such Airframe and Engine, subject to the Collateral Agent providing its consent to the International Registry with respect thereto.

**Section 3.03**    <u>Inspection</u>.

(a)    At all reasonable times, so long as an Aircraft is subject to the Lien of the Mortgage, the Secured Parties and their respective authorized representatives (the "**Inspecting Parties**") may (not more than once every 12 months unless an Event of Default has occurred and is continuing, then such inspection right shall not be so limited) inspect such Aircraft and its associated Airframe and Engines (including without limitation, the related Aircraft Documents) and any such Inspecting Party may make copies of such Aircraft Documents not reasonably deemed confidential by the Company or such Permitted Lessee. The Secured Parties shall not have any duty to make any such inspection and shall not incur any liability or obligation by reason of not making any such inspection, and no inspection pursuant to this Section 3.03 shall relieve Company of any of its obligations hereunder.

(b)    Any inspection of an Aircraft hereunder shall be limited to a visual, walk- around inspection and shall not include the opening of any panels, bays or other components of such Aircraft, and no such inspection shall interfere with the Company's or any Permitted Lessee's maintenance and operation of such Aircraft.

(c)    With respect to such rights of inspection, no Secured Party shall have any duty or liability to make, or any duty or liability by reason of not making, any such visit, inspection or survey.

(d)    Each Inspecting Party shall bear its own expenses in connection with any such inspection (including the cost of any copies made in accordance with Section 3.03(a)) <u>provided</u> that all such expenses incurred while an Event of Default shall be continuing shall be paid by the Company.

(e)    Each of the Inspecting Parties and each of the Secured Parties shall keep, and shall cause their respective employees and representatives to hold in strict confidence all information acquired pursuant to any inspection pursuant this Section 3.03; except for disclosure to any Affiliate of a Bank as a necessary part of the administration of the Credit Agreement and necessary disclosure to participants in the Loans, disclosure in connection with disputes relating to the Loan Papers, or disclosure compelled by judicial or administrative process or by other requirements of Law.

7

**Section 3.04** <u>Replacement and Pooling of Parts, Alterations, Modifications and Additions; Substitution of Engines</u>.

(a)     <u>Replacement of Parts</u>. Except as otherwise provided herein, so long as an Airframe or Engine is subject to the Lien of the Mortgage, the Company, at its own cost and expense, will, or will cause a Permitted Lessee to, at its own cost and expense, promptly replace (or cause to be replaced) all Parts which may from time to time be incorporated or installed in or attached to such Airframe or Engine and which may from time to time become worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use for any reason whatsoever. In addition, the Company may, at its own cost and expense, or may permit a Permitted Lessee at its own cost and expense to, remove (or cause to be removed) in the ordinary course of maintenance, service, repair, overhaul or testing any Parts, whether or not worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use; <u>provided</u>, <u>however</u>, that the Company, except as otherwise provided herein, at its own cost and expense, will, or will cause a Permitted Lessee at its own cost and expense to, replace such Parts as promptly as practicable. All replacement parts shall be owned by Company and be free and clear of all Liens, except for Permitted Liens and pooling arrangements to the extent permitted by Section 3.04(c) below (and except in the case of replacement property temporarily installed on an emergency basis) and shall be in as good an operating condition and have a value and utility not less than the value and utility of the Parts replaced (assuming such replaced Parts were in the condition required hereunder).

(b)     <u>Parts Subject to Lien</u>. Except as otherwise provided herein, any Part at any time removed from any Airframe or Engine shall remain subject to the Lien of the Mortgage, no matter where located, until such time as such Part shall be replaced by a part that has been incorporated or installed in or attached to such Airframe or Engine and that meets the requirements for replacement parts specified above. Immediately upon any replacement part becoming incorporated or installed in or attached to any Airframe or Engine as provided in Section 3.04(a), without further act, (i) the replaced Part shall thereupon be free and clear of all rights of the Collateral Agent and shall no longer be deemed a Part hereunder and (ii) such replacement part shall become subject to the Mortgage and be deemed part of such Airframe or Engine, as the case may be, for all purposes hereof to the same extent as the Parts originally incorporated or installed in or attached to such Airframe or Engine.

(c)     <u>Pooling of Parts</u>. Any Part removed from any Airframe or Engine may be subjected by the Company or a Permitted Lessee to a normal pooling arrangement customary in the airline industry and entered into in the ordinary course of business of the Company or Permitted Lessee, <u>provided</u> that the part replacing such removed Part shall be incorporated or installed in or attached to such Airframe or Engine in accordance with Sections 3.04(a) and 3.04(b) as promptly as practicable after the removal of such removed Part. In addition, any replacement part when incorporated or installed in or attached to any Airframe or Engine may be owned by any third party, subject to a normal pooling arrangement, so long as the Company or a Permitted Lessee, at its own cost and expense, as promptly thereafter as reasonably possible, either (i) causes such replacement part to become subject to the Lien of the Mortgage, free and clear of all Liens except Permitted Liens, at which time such replacement part shall become a Part or (ii) replaces (or causes to be replaced) such replacement part by incorporating or installing in or attaching to such Aircraft, Airframe or Engine a further replacement part owned by the Company free and clear of all Liens

8

except Permitted Liens and which shall become subject to the Lien of the Mortgage in accordance with Section 3.04(b).

(d)    Alterations, Modifications and Additions. The Company shall, or shall cause a Permitted Lessee to, make (or cause to be made) alterations and modifications in and additions to each Aircraft, Airframe and Engine as may be required to be made from time to time to meet the applicable standards of the FAA or other Aviation Authority having jurisdiction over the operation of such Aircraft, to the extent made mandatory in respect of such Aircraft; provided, however, that the Company or a Permitted Lessee may, in good faith and by appropriate procedure, contest the validity or application of any law, rule, regulation or order in any reasonable manner which does not materially adversely affect the Collateral Agent's interest in such Aircraft and does not involve any material risk of sale, forfeiture or loss of such Aircraft or the interest of the Collateral Agent therein, or any material risk of material civil penalty or any material risk of criminal liability being imposed on the Collateral Agent or any other Secured Party. In addition, the Company, at its own expense, may, or may permit a Permitted Lessee at its own cost and expense to, from time to time make or cause to be made such alterations and modifications in and additions to any Airframe or Engine (each an "**Optional Modification**") as the Company or such Permitted Lessee may deem desirable in the proper conduct of its business including, without limitation, removal of Parts which the Company deems obsolete or no longer suitable or appropriate for use in such Airframe or Engine; provided, however, that no such Optional Modification shall (i) materially diminish the fair market value, utility or useful life of such Aircraft or Engine below its fair market value, utility or useful life immediately prior to such Optional Modification (assuming such Aircraft or Engine was in the condition required by the Mortgage and this Agreement immediately prior to such Optional Modification) or (ii) cause such Aircraft to cease to have the applicable standard certificate of airworthiness except that such certificate of airworthiness temporarily may be replaced by an experimental certificate during the process of implementing and testing such Optional Modification and securing related FAA re-certification of such Aircraft. All Parts incorporated or installed in or attached to any Airframe or Engine as the result of any alteration, modification or addition effected by the Company shall be free and clear of any Liens except Permitted Liens and become subject to the Lien of the Mortgage; provided that the Company or any Permitted Lessee may, at any time so long as such Airframe or Engine is subject to the Lien of the Mortgage, remove any such Part (such Part being referred to herein as a "**Removable Part**") from such Airframe or Engine if (i) such Part is in addition to, and not in replacement of or in substitution for, any Part originally incorporated or installed in or attached to such Airframe or Engine at the time of original delivery thereof by the manufacturer or any Part in replacement of, or in substitution for, any such original Part, (ii) such Part is not required to be incorporated or installed in or attached or added to such Airframe or Engine pursuant to the terms of Section 3.02(d) or the first sentence of this Section 3.04(d) and (iii) such Part can be removed from such Airframe or Engine without materially diminishing the fair market value, utility or remaining useful life which such Airframe or Engine would have had at the time of removal had such removal not been effected by the Company, assuming such Aircraft was otherwise maintained in the condition required by the Mortgage and this Agreement and such Removable Part had not been incorporated or installed in or attached to such Airframe or Engine. Upon the removal by the Company of any such Removable Part or obsolete Part as above provided, title thereto shall, without further act, be free and clear of all rights of the Collateral Agent and such Removable Part or obsolete Part shall no longer be deemed a Part hereunder. Removable Parts may be leased from or financed by (and subject to Liens thereunder in favor of) third parties other than the Collateral Agent.

9

(e)    Substitution of Engines. Upon the occurrence of an Event of Loss with respect to any Engine under circumstances in which such Event of Loss has not occurred with respect to the associated Airframe, the Company shall promptly (and in any event within 15 days after such occurrence) give the Collateral Agent written notice of such Event of Loss. Whether or not an Event of Loss with respect to any Engine has occurred, the Company shall have the right at its option at any time so long as no Event of Default is continuing, on at least five Business Days' prior notice to the Collateral Agent, to substitute, and if an Event of Loss shall have occurred with respect to any Engine under circumstances in which an Event of Loss has not occurred with respect to the associated Airframe, shall within 60 days of the occurrence of such Event of Loss substitute, a Replacement Engine for any Engine. In such event, immediately upon the effectiveness of such substitution and without further act, (i) the replaced Engine shall thereupon be free and clear of all rights of the Collateral Agent and the Lien of the Mortgage and shall no longer be deemed an Engine hereunder and (ii) such Replacement Engine shall become subject to the Mortgage and this Agreement for all purposes hereof to the same extent as the replaced Engine. Such Replacement Engine (i) shall be manufactured by the Engine Manufacturer of the Engine being replaced, (ii) shall be of the same model as the Engine to be replaced thereby, or an improved model, that is suitable for installation and use on the associated Airframe and is compatible with the other Engine, (iii) shall have a value, utility and remaining useful life (without regard to hours and cycles) at least equal to the Engine to be replaced thereby (assuming that such Engine had been maintained in accordance with this Agreement) and (iv) at the time of substitution, shall be free and clear of all Liens except Permitted Liens. The Company's right to make a replacement hereunder shall be subject to the fulfillment (which may be simultaneous with such replacement) of the following conditions precedent at the Company's sole cost and expense, and the Collateral Agent agrees to cooperate with the Company to the extent necessary to enable it to timely satisfy such conditions:

(i)   an executed counterpart (or, in the case of subclause (B) below, a photocopy) of each of the following documents shall be delivered to the Collateral Agent:

(A)   the Mortgage Supplement covering the Replacement Engine, which shall have been duly filed for recordation pursuant to the Act or such other applicable law of the jurisdiction other than the United States in which the aircraft of which such Engine is a part is registered, as the case may be;

(B)   a full warranty (as to title) bill of sale, covering the Replacement Engine, executed by the former owner thereof in favor of the Company (or, at the Company's option, other evidence of the Company's ownership of such Replacement Engine, reasonably satisfactory to the Collateral Agent); and

(C)   UCC financing statements covering the security interests created by the Mortgage (or any similar statements or other documents required to be filed or delivered pursuant to the laws of the jurisdiction in which the aircraft of which such Engine is a part is registered) as are deemed necessary or desirable by counsel for the Collateral Agent to protect the security interests of the Collateral Agent in the Replacement Engine;

(ii)   the Company shall have furnished to the Collateral Agent and the Banks an opinion of counsel from counsel reasonably satisfactory to the Collateral Agent

10

to the effect that the Lien of the Mortgage is in full force and effect with respect to the Replacement Engine and such evidence of compliance with the insurance provisions of Section 3.06 with respect to such Replacement Engine as the Collateral Agent shall reasonably request;

(iii)   the Company shall have furnished to the Collateral Agent an opinion of the Company's aviation law counsel reasonably satisfactory to the Collateral Agent and addressed to the Collateral Agent and the Banks as to, the due filing for recordation of the Mortgage Supplement with respect to such Replacement Engine under the Act or such other applicable law of the jurisdiction other than the United States in which the aircraft of which such Engine is a part is registered, as the case may be, and the registrations with the International Registry of (i) the International Interest constituted by such Mortgage Supplement with respect to such Replacement Engine and (ii) if the bill of sale referred to in clause (i)(B) above constitutes a "contract of sale" under the Cape Town Treaty, such contract of sale with respect to such Replacement Engine; and

(iv)   the Company shall have furnished to the Collateral Agent a certificate of a qualified aircraft engineer (who may be an employee of the Company) or an ISTAT-qualified independent appraiser certifying that such Replacement Engine has a value, utility and remaining useful life (without regard to hours and cycles) at least equal to the Engine so replaced (assuming that such Engine had been maintained in accordance with this Agreement).

Upon satisfaction of all conditions to such substitution, (x) the Collateral Agent shall, at the cost and expense of the Company, execute and deliver to the Company such documents and instruments, prepared by the Company at the Company's expense, as the Company shall reasonably request to evidence the release of such replaced Engine from the Lien of the Mortgage and procure the discharge of the International Interest granted under the Mortgage in the replaced Engine, (y) the Collateral Agent shall assign to the Company all claims it may have against any other Person relating to any Event of Loss giving rise to such substitution, if applicable, and (z) the Company shall receive all insurance proceeds (other than those reserved to others under Section 3.06(b) or those subject to Section 3.05(f)) and, subject to Section 3.05(f), proceeds in respect of any Event of Loss giving rise to such replacement to the extent not previously applied to the purchase price of the Replacement Engine as provided in Section 3.05(d).

**Section 3.05**   Loss, Destruction or Requisition.

(a)   Event of Loss With Respect to an Aircraft or Airframe. Upon the occurrence of an Event of Loss with respect to an Aircraft or Airframe, the Company shall promptly upon obtaining knowledge of such Event of Loss (and in any event within 10 days after such occurrence) give the Collateral Agent written notice of such Event of Loss. The Company shall, within 60 days after such occurrence, either:

(i)   if required pursuant to Section 6.12(c)(y) of the Credit Agreement, replace such Aircraft or Airframe, together with its associated Engines, with a Replacement Aircraft pursuant to and in accordance with Section 6.12(c) of the Credit Agreement; or

11

(ii) if permitted pursuant to Section 6.12(b) of the Credit Agreement, have such Aircraft or Airframe, together with its associated Engines, released from the Lien of the Mortgage as set forth in Section 3.01(b) of the Mortgage.

(b) <u>Effect of Replacement</u>. Upon replacement as provided for in Section 3.05(a)(i), (i) the Lien of the Mortgage shall continue with respect to such Replacement Aircraft, as though no Event of Loss had occurred; (ii) the Collateral Agent shall, at the cost and expense of the Company, release from the Lien of the Mortgage the Aircraft suffering such Event of Loss and all related Collateral, by executing and delivering to the Company such documents and instruments, as the Company may reasonably request to evidence such release and procure the discharge of the related International Interest; and (iii) the Collateral Agent shall assign to the Company all claims the Collateral Agent may have against any other Person arising from the Event of Loss and the Company shall receive all insurance proceeds (other than those reserved to others under Section 3.06(b)) and proceeds from any award in respect of condemnation, confiscation, seizure or requisition, including any investment interest thereon, to the extent not previously applied to the purchase price of the Replacement Aircraft, as provided in Section 3.05(d).

(c) <u>Requirements to Aircraft Replacement</u>. In connection with the Company's obligation to provide a Replacement Aircraft as provided in Section 3.05(a)(i), the Company shall:

(i) on the date when the Replacement Aircraft is subjected to the Lien of the Mortgage (such date being referred to in this Section 3.05 as the "**Replacement Closing Date**"), an executed counterpart of each of the following documents (or, in the case of the FAA bill of sale and full warranty bill of sale referred to below, a photocopy thereof) shall have been delivered to the Collateral Agent:

(A) a Mortgage Supplement covering the Replacement Aircraft, which shall have been duly filed for recordation pursuant to the Act or such other applicable law of such jurisdiction other than the United States in which the Replacement Aircraft is to be registered in accordance with Section 3.02(e), as the case may be;

(B) an FAA bill of sale (or a comparable document, if any, of another Aviation Authority, if applicable) covering the airframe constituting the Replacement Aircraft executed by the former owner thereof in favor of the Company;

(C) a full warranty (as to title) bill of sale, covering the Replacement Aircraft, executed by the former owner thereof in favor of the Company (or, at the Company's option, other evidence of the Company's ownership of such Replacement Aircraft reasonably satisfactory to the Collateral Agent); and

(D) UCC financing statements covering the security interests created by the Mortgage (or any similar statements or other documents required to be filed or delivered pursuant to the laws of the jurisdiction in which the Replacement Aircraft may be registered in accordance with Section 3.02(e)) as are deemed necessary or desirable by counsel for the Collateral Agent to protect the security

12

interests of the Collateral Agent in the Replacement Aircraft created by the Mortgage;

(ii)    [Reserved];

(iii)    the Collateral Agent (acting directly or by authorization to its special counsel) shall have received satisfactory evidence as to the compliance with the insurance provisions of Section 3.06 with respect to the Replacement Aircraft;

(iv)    on the Replacement Closing Date, (A) the Company shall cause the Replacement Aircraft to be subject to the Lien of the Mortgage free and clear of Liens (other than Permitted Liens), (B) the Replacement Aircraft shall have been duly certified by the FAA (or other applicable Aviation Authority) as to type and airworthiness in accordance with the terms of this Agreement, (C) application for registration of the Replacement Aircraft in accordance with Section 3.02(e) shall have been duly made with the FAA or other applicable Aviation Authority and the Company (or the Permitted Lessee, if applicable) shall have authority to operate the Replacement Aircraft and (D) the International Interest of the Mortgage with respect to the Replacement Aircraft shall have been registered with the International Registry and, if the bill of sale referred to in (i)(C) above constitutes a "contract of sale" under the Cape Town Treaty, such contract of sale with respect to the Replacement Aircraft shall have been registered with the International Registry; and

(v)    the Collateral Agent and the Banks at the expense of the Company, shall have received (A) an opinion of counsel, addressed to the Collateral Agent and the Banks, to the effect that the Replacement Aircraft has or have duly been made subject to the Lien of the Mortgage, and the Collateral Agent will be entitled to the benefits of Section 1110 with respect to the Replacement Aircraft, provided that such opinion with respect to Section 1110 need not be delivered to the extent that immediately prior to such replacement the benefits of Section 1110 were not, solely by reason of a change in law or court interpretation thereof, available to the Collateral Agent, and (B) an opinion of Company's aviation law counsel reasonably satisfactory to the Collateral Agent and addressed to the Collateral Agent and the Banks as to the due registration of any such Replacement Aircraft and the due filing for recordation of a Mortgage Supplement with respect to such Replacement Aircraft under the Act or such other applicable law of the jurisdiction other than the United States in which the Replacement Aircraft is to be registered in accordance with Section 3.02(e), as the case may be, and the registrations with the International Registry of the interests specified in clause (iv)(D) above with respect to the Replacement Aircraft.

(d)    Payments Received on Account of an Event of Loss. Any amounts, other than insurance proceeds in respect of damage or loss not constituting an Event of Loss (the application of which is provided for in Annex B), received at any time by the Collateral Agent or the Company from any Governmental Authority or any other Person in respect of any Event of Loss shall be held by, or (unless the Company shall be entitled to retain such amounts as provided below) paid over to, the Collateral Agent and will be applied as follows:

(i)    if such amounts are received with respect to an Aircraft or Airframe, and an Engine installed on such Airframe at the time of such Event of Loss, upon compliance

13

by the Company with the applicable terms of Section 3.05(a)(i) with respect to the Event of Loss for which such amounts are received, such amounts shall be paid over to, or retained by, the Company;

(ii)   if such amounts are received with respect to an Aircraft or Airframe, and an Engine installed on such Airframe at the time of such Event of Loss and the Aircraft or Airframe, together with associated Engines, is permitted to be released from the Lien of the Mortgage as set forth in 3.05(a)(ii), such amounts shall be paid over to, or retained by, the Company; and

(iii)   if such amounts are received with respect to an Aircraft or Airframe, and an Engine installed on such Airframe at the time of such Event of Loss and the Aircraft or Airframe, together with associated Engines, is not permitted to be released from the Lien of the Mortgage as set forth in 3.05(a)(ii) because an Event of Default has occurred and continuing, such amounts shall be applied by the Collateral Agent in accordance with the Credit Agreement.

(e)      Requisition for Use. In the event of a requisition for use by any Governmental Authority of any Airframe and any Engines, if any, or engines installed on an Airframe while such Airframe is subject to the Lien of the Mortgage, the Company shall promptly notify the Collateral Agent of such requisition and all of the Company's obligations under this Agreement shall continue to the same extent as if such requisition had not occurred except to the extent that the performance or observance of any obligation by the Company shall have been prevented or delayed by such requisition; provided that the Company's obligations under this Section 3.05 with respect to the occurrence of an Event of Loss for the payment of money and under Section 3.06 (except while an assumption of liability by the U.S. Government of the scope referred to in Section 3.02(c) is in effect) shall not be reduced or delayed by such requisition. Any payments received by the Collateral Agent or the Company or Permitted Lessee from such Governmental Authority with respect to such requisition of use shall be paid over to, or retained by, the Company. In the event of an Event of Loss of an Engine resulting from the requisition for use by a Governmental Authority of such Engine (but not the associated Airframe), the Company will replace such Engine hereunder by complying with the terms of Section 3.04(e) and any payments received by the Collateral Agent or the Company from such Governmental Authority with respect to such requisition shall be paid over to, or retained by, the Company.

(f)      Certain Payments to be Held As Security. Any amount referred to in this Section 3.05 or Section 3.06 which is payable or creditable to, or retainable by, the Company shall not be paid or credited to, or retained by, the Company if at the time of such payment, credit or retention a Default under Section 7.1(a) of the Credit Agreement or an Event of Default shall have occurred and be continuing, but shall be paid to and held by the Collateral Agent as security for the obligations of the Company under the Loan Papers, and at such time as there shall not be continuing any such Default or Event of Default such amount shall, to the extent not theretofore applied as provided herein, be paid over to the Company.

**Section 3.06**   Insurance.

14

(a)    Obligation to Insure. The Company shall comply with, or cause to be complied with, each of the provisions of Annex B, which provisions are hereby incorporated by this reference as if set forth in full herein.

(b)    Insurance for Own Account. Nothing in this Section 3.06 shall limit or prohibit (a) the Company from maintaining the policies of insurance required under Annex B with higher coverage than those specified in Annex B, or (b) the Collateral Agent or any other Additional Insured from obtaining insurance for its own account (and any proceeds payable under such separate insurance shall be payable as provided in the policy relating thereto); provided, however, that no insurance may be obtained or maintained that would limit or otherwise adversely affect the coverage of any insurance required to be obtained or maintained by the Company pursuant to this Section 3.06 and Annex B.

(c)    Indemnification by Government in Lieu of Insurance. The Collateral Agent agrees to accept, in lieu of insurance against any risk with respect to an Aircraft described in Annex B, indemnification from, or insurance provided by, the U.S. Government, or upon the written consent of the Collateral Agent, other Governmental Authority, against such risk in an amount that, when added to the amount of insurance (including permitted self-insurance), if any, against such risk that the Company (or any Permitted Lessee) may continue to maintain, in accordance with this Section 3.06, shall be at least equal to the amount of insurance against such risk otherwise required by this Section 3.06.

(d)    Application of Insurance Proceeds. As between the Company and the Collateral Agent, all insurance proceeds received as a result of the occurrence of an Event of Loss with respect to any Aircraft or any Engine under policies required to be maintained by the Company pursuant to this Section 3.06 will be applied in accordance with Section 3.05(d) and subject to Section 3.05(f). All proceeds of insurance required to be maintained by the Company, in accordance with this Section 3.06 and Section B of Annex B, in respect of any property damage or loss not constituting an Event of Loss with respect to any Aircraft, Airframe or Engine shall be paid over to the Company or the Collateral Agent, as the case may be, as provided in Section B of Annex B and will be applied in payment (or to reimburse the Company) for repairs or for replacement property, and any balance remaining after such repairs or replacement with respect to such damage or loss shall be paid over to, or retained by, the Company.

**ARTICLE IV**


**REMEDIES**


**Section 4.01**    Limitations Under CRAF. Notwithstanding Section 7.2 or Section 7.3 of the Credit Agreement or Article 2 of the Mortgage, during any period that any Aircraft, Airframe or Engine is subject to CRAF in accordance with the provisions of Section 3.02(b)(vi) and in the possession of the U.S. Government, the Collateral Agent shall not, as a result of any Event of Default, exercise its remedies hereunder in such manner as to limit the Company's control under this Agreement (or any Permitted Lessee's control under any Permitted Lease) of such Aircraft, Airframe or Engine, unless at least 30 days' (or such other period as may then be applicable under CRAF) written notice of default hereunder shall have been given by the Collateral Agent or any other Secured Party by registered or certified mail to the Company (and any Permitted Lessee) with a copy to the Contracting Officer Representative or Representatives

15

for the Military Airlift Command of the United States Air Force to whom notices must be given under the contract governing the Company's (or any Permitted Lessee's) participation in CRAF with respect to such Aircraft, Airframe or Engine.

**ARTICLE V**

**MISCELLANEOUS**

**Section 5.01**   Registrations with the International Registry. Each of the parties hereto consents to the registration with the International Registry of the International Interests granted under the Mortgage, and each party hereto covenants and agrees that it will take all such action, at Company's cost, reasonably requested by the Company or the Collateral Agent in order to make any registrations with the International Registry, including becoming a Transacting User Entity with the International Registry and providing consents to any registration as may be contemplated by the Loan Papers.

**Section 5.02**   Storage. Notwithstanding anything to the contrary in any Loan Paper, (A) (i) the Company may place any Aircraft in storage in accordance with the Company's standard storage procedures, (ii) any Aircraft (or any component thereof) may undergo maintenance in accordance with the Company's FAA approved maintenance program and (iii) any Aircraft may be grounded by applicable government authorities, in each case, without the necessity of keeping such Aircraft in good operating condition or maintaining such Aircraft's airworthiness certification or otherwise complying with the provisions of this Agreement, (B) the Company may contest the applicability of any Laws or directives in any reasonable manner and defer compliance therewith until such contest is finally determined or adjudicated, so long as, notwithstanding such deferred compliance with respect to any Aircraft, the Company keeps such Aircraft in good operating condition and maintains such Aircraft's airworthiness certification and (C) the Company may defer maintenance and defer conformity with any airworthiness directive in a manner that is consistent with its FAA approved maintenance program and applicable Laws; provided that if any Aircraft has been placed into storage or grounded as provided in the preceding clause (A) is not in good operating condition or lacks airworthiness certification (any such Aircraft, a "**Non-Compliant Pool Aircraft**") for a period of more than 30 days, then, within 60 days of the end of such 30 day period the Company shall be required to replace such Aircraft with another Aircraft in compliance with Section 6.12(b) of the Credit Agreement; provided, further, that the Company shall not permit the Appraised Value of all Non-Compliant Pool Aircraft at any time to exceed an amount equal to 7.5% of the Appraised Value of all Pool Assets at such time for a period of more than ten Business Days.

**Section 5.03**   Governing Law. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

**Section 5.04**   Notices. All notices and other communication provided for herein shall be in writing (including telecopy communications) and mailed, telecopied, e-mailed (where indicated) or delivered in accordance with Section 9.2 of the Credit Agreement.

16

**Section 5.05**    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**Section 5.06**    Amendment. Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Collateral Agent and the Company with respect to which such waiver, amendment or modification is to apply.

**Section 5.07**    Successors and Assigns. This Agreement shall be binding upon, and inure to the benefit, of each party hereto and its respective successors and permitted assigns.

* * *

17

**IN WITNESS WHEREOF**, the Company and the Collateral Agent have caused this Mortgaged Aircraft Operating Agreement to be duly executed by their respective officers thereunto duly authorized.

**SOUTHWEST AIRLINES CO.**

By:_____
    Name:
    Title:

**JPMORGAN CHASE BANK, N.A.**, as Collateral Agent

By:_____
Name:
Title:

18

**ANNEX A**

**DEFINED TERMS**

"**Act**" means Part A of Subtitle VII of the United States Transportation Code (49 U.S.C., §§ 40101 et seq.).

"**Additional Insured**" is defined in Section D(i) of Annex B.

"**Affiliate**" has the meaning set forth in the Credit Agreement.

"**Aircraft**" means an Airframe and its two associated Engines. An Airframe is "associated" with the two Engines grouped with it on Exhibit A to the Mortgage (and vice versa).

"**Aircraft Documents**" means, with respect to any Aircraft, all technical data, manuals and log books, and all inspection, modification and overhaul records and other service, repair, maintenance and technical records that are required by (a) the FAA pursuant to FAR 121.380A (or successor regulation) and any other relevant regulation promulgated by the FAA which is applicable to the Company as an operator under FAR 121 or (b) the relevant Aviation Authority, to be maintained with respect to such Aircraft, Airframe, Engines or Parts and such term shall include all additions, renewals, revisions and replacements of any such materials from time to time made prior to the release of the Lien of the Mortgage with respect to the applicable Aircraft, or required to be made prior to the release of the Lien of the Mortgage with respect to the applicable Aircraft, by the regulations of the relevant Aviation Authority, and in each case in whatever form and by whatever means or medium (including, without limitation, microfiche, microfilm, paper, CD-ROM or computer disk) such materials may be maintained or retained by or on behalf of the Company (provided, that all such materials shall be maintained in the English language or, if in a jurisdiction other than the United States in which the keeping of records in English is not practical, regularly translated in the English language).

"**Airframe**" means (a) each aircraft (including, in each case, the winglets installed thereon, but excluding Engines or engines from time to time installed thereon) manufactured by Airframe Manufacturer and identified by Airframe Manufacturer's model number, United States registration number and Airframe Manufacturer's serial number set forth on Exhibit A to the Mortgage and any Replacement Airframe and (b) any and all related Parts. Upon substitution of a Replacement Airframe under and in accordance with this Agreement, such Replacement Airframe shall become subject to this Agreement and the Mortgage and shall be an "Airframe" for all purposes of this Agreement and the Mortgage and thereupon the Airframe for which the substitution is made shall no longer be subject to this Agreement and the Mortgage, and such replaced Airframe shall cease to be an "Airframe."

"**Airframe Manufacturer**" means The Boeing Company, a Delaware corporation.

"**Appraised Value**" has the meaning set forth in the Credit Agreement.

"**Aviation Authority**" means the FAA or, if any Aircraft is permitted to be, and is, registered with any other Governmental Authority under and in accordance with Section 3.02(e) of this Agreement and Annex C thereof, such other Governmental Authority.

"**Banks**" has the meaning set forth in the Credit Agreement.

"**Cape Town Treaty**" has the meaning set forth in the Credit Agreement.

"**Closing Date**" means the date of this Agreement.

"**Collateral**" has the meaning set forth in the Mortgage.

"**Collateral Agent**" has the meaning set forth in the introduction to this Agreement.

"**Company**" has the meaning set forth in the introduction to this Agreement.

"**CRAF**" means the Civil Reserve Air Fleet Program established pursuant to 10 U.S.C. Section 9511-13 or any similar substitute program.

"**Credit Agreement**" has the meaning set forth in the recital to this Agreement.

"**Dollars**," "**United States Dollars**" and "**$**" mean lawful money for the time being of the United States of America.

"**Engine**" means, with respect to any Airframe (a) each of the engines manufactured by the Engine Manufacturer and identified by Engine Manufacturer's model number and Engine Manufacturer's serial number set forth on Exhibit A to the Mortgage and any Replacement Engine, in any case whether or not from time to time installed on such Airframe or installed on any other airframe or aircraft, and (b) any and all related Parts. Upon substitution of a Replacement Engine under and in accordance with this Agreement, such Replacement Engine shall become subject to this Agreement and the Mortgage and shall be an "Engine" for all purposes of this Agreement and the Mortgage and thereupon the Engine for which the substitution is made shall no longer be subject to this Agreement and the Mortgage, and such replaced Engine shall cease to be an "Engine.".

"**Engine Manufacturer**" means CFM International, Inc., a Delaware corporation.

"**Event of Default**" has the meaning set forth in the Credit Agreement.

"**Event of Loss**" means, with respect to any Aircraft, Airframe or any Engine, any of the following circumstances, conditions or events with respect to such Property, for any reason whatsoever:

Annex A

20

(a)    the destruction of such Property, damage to such Property beyond economic repair or rendition of such Property permanently unfit for normal use by Company;

(b)    the actual or constructive total loss of such Property or any damage to such Property, or requisition of title or use of such Property, which results in an insurance settlement with respect to such Property on the basis of a total loss or constructive or compromised total loss;

(c)    any theft, hijacking or disappearance of such Property for a period of 180 consecutive days or more;

(d)    any seizure, condemnation, confiscation, taking or requisition (including loss of title) of such Property by any Governmental Authority or purported Governmental Authority (other than a requisition of use by a Permitted Government Entity) for a period exceeding 12 consecutive months;

(e)    as a result of any law, rule, regulation, order or other action by the Aviation Authority or by any Governmental Authority of the government of registry of the Aircraft or by any Governmental Authority otherwise having jurisdiction over the operation or use of the Aircraft, the use of such Property in the normal course of the Company's business of passenger air transportation is prohibited for a period of 18 consecutive months unless the Company, prior to the expiration of such 18-month period, shall have undertaken and shall be diligently carrying forward such steps as may be necessary or desirable to permit the normal use of such Property by the Company, but in any event if such use shall have been prohibited for a period of three consecutive years; and

(f)    any divestiture of title to an Engine treated as an Event of Loss pursuant to Section 3.02(b) of this Agreement.

"**FAA**" has the meaning set forth in the Mortgage.

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Inspecting Parties**" has the meaning set forth in Section 3.03(a).

"**International Interest**" has the meaning set forth in the Mortgage.

"**International Registry**" has the meaning set forth in the Mortgage.

"**Law**" means (a) any constitution, treaty, statute, law, decree, regulation, order, rule or directive of any Governmental Authority, and (b) any judicial or administrative interpretation or application of, or decision under, any of the foregoing.

Annex A

21

"**Lien**" has the meaning set forth in the Credit Agreement.

"**Loan**" has the meaning set forth in the Credit Agreement.

"**Loan Papers**" has the meaning set forth in the Credit Agreement.

"**Mortgage**" means the Mortgage and Security Agreement, dated as of March 30, 2020, between the Company and the Collateral Agent, entered into pursuant to the Credit Agreement.

"**Mortgage Supplement**" means a supplement to the Mortgage, appropriate for the purpose for which it is being used.

"**Non-Compliant Pool Aircraft**" has the meaning set forth in Section 5.02.

"**Optional Modification**" has the meaning set forth in Section 3.04(d).

"**Parts**" means all appliances, parts, components, instruments, appurtenances, accessories, furnishings, seats and other equipment of whatever nature (other than (a) Engines or engines, and (b) any Removable Part that constitutes passenger convenience equipment or is otherwise leased by Company from a third party or subject to a security interest granted to a third party), that may from time to time be installed or incorporated in or attached or appurtenant to any Airframe or any Engine or removed therefrom unless the Lien of the Mortgage shall not be applicable to such Parts in accordance with Section 3.04 of this Agreement.

"**Permitted Air Carrier**" means (a) any manufacturer of airframes or aircraft engines, or any Affiliate of a manufacturer of airframes or aircraft engines, (b) any Permitted Foreign Air Carrier, (c) any U.S. Certificated Air Carrier or (d) any person approved in writing by the Collateral Agent.

"**Permitted Country**" means any country listed on Schedule 1.

"**Permitted Foreign Air Carrier**" means any air carrier with its principal executive offices in any Permitted Country and which is authorized to conduct commercial airline operations and to operate jet aircraft similar to the Aircraft under the applicable Laws of such Permitted Country.

"**Permitted Government Entity**" means (a) the U.S. Government or (b) any other Governmental Authority if the Aircraft is then registered under the laws of the country of such Governmental Authority.

"**Permitted Lease**" means a lease (including a sublease) permitted under Section 3.02(b)(viii) of this Agreement.

Annex A

22

"**Permitted Lessee**" means a lessee under a Permitted Lease.

"**Permitted Liens**" has the meaning set forth in the Mortgage.

"**Person**" has the meaning set forth in the Credit Agreement.

"**Pool Assets**" has the meaning set forth in the Credit Agreement.

"**Property**" of any Person means any property or assets, or interest therein, of such Person.

"**Reregistration Request**" has the meaning set forth in Section 3.02(e).

"**Replacement Aircraft**" means, with respect to any Aircraft, any aircraft substituted for such Aircraft pursuant to Section 3.05(a)(i).

"**Replacement Airframe**" means, with respect to any Airframe, any airframe constituting a Replacement Airframe.

"**Replacement Closing Date**" has the meaning set forth in Section 3.05(c).

"**Replacement Engine**" means, with respect to any Engine, an engine substituted for such Engine pursuant to Section 3.04(e) or 3.05.

"**Removable Part**" is defined in Section 3.04(d).

"**Secured Parties**" has the meaning set forth in the Credit Agreement.

"**Threshold Amount**" means $7,500,000.

"**Transacting User Entity**" is defined in Section 2.1.11 of the Regulations of the International Registry.

"**United States**" or "**U.S.**" means the United States of America; provided that for geographic purposes, "United States" means, in aggregate, the 50 States and the District of Columbia of the United States of America.

"**U.S. Certificated Air Carrier**" means any United States air carrier that is a Citizen of the United States holding an air carrier operating certificate issued pursuant to chapter 447 of title 49 of the United States Code for aircraft capable of carrying 10 or more individuals or 6000 pounds or more of cargo, and as to which there is in force an air carrier operating certificate issued pursuant to Part 121 of the FAA Regulations, or which may operate as an air carrier by certification or otherwise under any successor or substitute provisions therefor or in the absence thereof.

Annex A

23

"**U.S. Government**" means the federal government of the United States, or any instrumentality or agency thereof the obligations of which are guaranteed by the full faith and credit of the federal government of the United States.

"**Wet Lease**" means any arrangement whereby the Company or a Permitted Lessee agrees to furnish an Airframe and the related Engines or engines installed thereon to a third party pursuant to which such Airframe and Engines or engines shall at all times be operated solely by cockpit crew provided by the Company or such Permitted Lessee possessing all current certificates and licenses required by Law, shall be maintained by the Company or such Permitted Lessee in accordance with the provisions of this Agreement and shall continue to be insured by the Company or such Permitted Lessee in accordance with the provisions of this Agreement.

Annex A

24

**ANNEX B**

**INSURANCE**

A.    <u>Liability Insurance</u>.

1.   Except as provided in Section A.2 below, the Company will carry or cause to be carried at all times, at no expense to the Collateral Agent or the Banks, comprehensive airline legal liability insurance (including, but not limited to third party and passenger liability, bodily injury, property damage, war risk and allied perils liability, baggage liability, cargo and mail liability, hangarkeeper's liability and contractual liability insurance, but excluding manufacturer's product liability coverage) with respect to each Aircraft, Airframe and Engine, which is (i) in an amount per occurrence not less than the greater of (x) the amount of comprehensive airline legal liability insurance from time to time applicable to aircraft owned or leased and operated by the Company of the same type and operating on similar routes as the applicable Aircraft and (y) $500,000,000 per occurrence; (ii) of the type and covering the same risks as from time to time applicable to aircraft operated by the Company of the same type as the Aircraft; and (iii) maintained in effect with insurers of U.S. domestically or internationally recognized responsibility (such insurers being referred to herein as "**Approved Insurers**").

2.   During any period that an Aircraft is on the ground and not in operation, Company may carry or cause to be carried, in lieu of the insurance required by Section A.1 above, insurance otherwise conforming with the provisions of said Section A.1 except that (i) the amounts of coverage shall not be required to exceed the amounts of public liability and property damage insurance from time to time applicable to aircraft owned or operated by the Company of the same type as the Aircraft which are on the ground and not in operation and (ii) the scope of the risks covered and the type of insurance shall be the same as from time to time shall be applicable to aircraft owned or operated by the Company of the same type which are on the ground and not in operation.

B.    <u>Hull Insurance</u>.

1.   Except as provided in Section B.2 below, the Company will carry or cause to be carried at all times, at no expense to the Collateral Agent or the Banks, with Approved Insurers "all-risk" ground and flight aircraft hull insurance covering each Aircraft (including the associated Engines when they are installed on the Airframe or any other airframe and including any Engines or Parts when not installed on the Airframe) which is of the type as from time to time applicable to aircraft owned by Company of the same type as such Aircraft for an amount denominated in United States Dollars not less than the Agreed Value. "**Agreed Value**" means for any Aircraft at any time, 100% of the Appraised Value of such Aircraft.

Any policies of insurance carried in accordance with this Section B.1 or Section C covering an Aircraft and any policies taken out in substitution or replacement for any such policies (i) shall name the Collateral Agent as the sole loss payee for any proceeds to be paid under such policies up to an amount equal to the Agreed Value and (ii) shall provide that (A) in the event of a loss involving proceeds in excess of the Threshold Amount, the proceeds in respect of such loss up to an amount equal to the Agreed Value shall be payable to the Collateral Agent, except in the case of a loss with respect to an Engine installed on an airframe other than an

Airframe, in which case the Company (or any Permitted Lessee) shall endeavor to arrange for any payment of insurance proceeds in respect of such loss to be held for the account of the Collateral Agent whether such payment is made to the Company (or any Permitted Lessee) or any third party, it being understood and agreed that in the case of any payment to the Collateral Agent otherwise than in respect of an Event of Loss, the Collateral Agent shall, upon receipt of evidence satisfactory to it that the damage giving rise to such payment shall have been repaired or that such payment shall then be required to pay for repairs then being made, pay the amount of such payment to the Company or its order, and (B) the entire amount of any loss involving proceeds of the Threshold Amount or less or the amount of any proceeds of any loss in excess of the Agreed Value shall be paid to the Company or its order unless an Event of Default shall have occurred and be continuing and the insurers have been notified thereof by the Collateral Agent. In the case of a loss with respect to an engine (other than an Engine) installed on an Airframe, Collateral Agent shall hold any payment to it of any insurance proceeds in respect of such loss for the account of the Company or any other third party that is entitled to receive such proceeds.

2.    During any period that an Aircraft is on the ground and not in operation, the Company may carry or cause to be carried, in lieu of the insurance required by Section B.1 above, insurance otherwise conforming with the provisions of said Section B.1 except that the scope of the risks and the type of insurance shall be the same as from time to time applicable to aircraft owned by the Company of the same type similarly on the ground and not in operation, provided that the Company shall maintain insurance against risk of loss or damage to such Aircraft in an amount equal to the Agreed Value during such period that such Aircraft is on the ground and not in operation.

C.    War-Risk, Hijacking and Allied Perils Insurance. If the Company (or any Permitted Lessee) shall at any time operate or propose to operate any Aircraft, Airframe or Engine (i) in any area of recognized hostilities or (ii) on international routes and war-risk, hijacking or allied perils insurance is maintained by the Company (or any Permitted Lessee) with respect to other aircraft owned or operated by the Company (or any Permitted Lessee) on such routes or in such areas, the Company shall maintain or cause to be maintained, at no expense to the Collateral Agent or the Banks, with Approved Insurers war-risk, hijacking and related perils insurance of substantially the same type carried by major United States commercial air carriers operating the same or comparable models of aircraft on similar routes or in such areas and, in the case of associated hull insurances, in no event in an amount less than the Agreed Value for such Aircraft.

D.    General Provisions. Any policies of insurance carried in accordance with Sections A, B and C, including any policies taken out in substitution or replacement for such policies:

(i)    in the case of Section A, shall name the Collateral Agent, and each Bank as an additional insured (collectively, the "**Additional Insureds**"), as its interests may appear;

(ii)    shall apply worldwide and have no territorial restrictions or limitations (except only in the case of war, hijacking and related perils insurance required under Section C, which shall apply to the fullest extent available in the international insurance market);

Annex B

26

(iii)        shall provide that, in respect of the interests of the Additional Insureds in such policies, the insurance shall not be invalidated or impaired by any act or omission (including misrepresentation and nondisclosure) by the Company (or any Permitted Lessee) or any other Person (including, without limitation, use for illegal purposes of any Aircraft or any Engine) and shall insure the Additional Insureds regardless of any breach or violation of any representation, warranty, declaration, term or condition contained in such policies by the Company (or any Permitted Lessee);

(iv)        shall provide that, if the insurers cancel such insurance for any reason whatsoever, or if the same is allowed to lapse for nonpayment of premium, or if any material change is made in the insurance which adversely affects the interest of any of the Additional Insureds, such cancellation, lapse or change shall not be effective as to the Additional Insureds for 30 days (seven days in the case of war risk, hijacking and allied perils insurance) after receipt by the Additional Insureds of written notice by such insurers of such cancellation, lapse or change, provided that if any notice period specified above is not reasonably obtainable, such policies shall provide for as long a period of prior notice as shall then be reasonably obtainable;

(v)        shall waive any rights of setoff (including for unpaid premiums), recoupment, counterclaim or other deduction, whether by attachment or otherwise, against each Additional Insured;

(vi)        shall be primary without right of contribution from any other insurance that may be available to any Additional Insured;

(vii)        shall provide that all of the liability insurance provisions thereof, except the limits of liability and agreed value, shall operate in all respects as if a separate policy had been issued covering each party insured thereunder;

(viii)        shall provide that none of the Additional Insureds shall be liable for any insurance premium;

(ix)        shall waive any right of the insurers to subrogation against any Additional Insured; and

(x)        shall contain a 50/50% Clause per Lloyd's Aviation Underwriters' Association Standard Policy Form AVS 103.

E.        Reports and Certificates; Other Information. On or prior to each renewal date of the insurance policies required hereunder, the Company will furnish or cause to be furnished to the Collateral Agent insurance certificates describing in reasonable detail the insurance maintained by the Company hereunder and a report, signed by the Company's regularly retained independent insurance broker (the "**Insurance Broker**"), stating the opinion of such Insurance Broker that (a) all premiums in connection with the insurance then due have been paid and (b) such insurance complies with the terms of this Annex B, except that such opinion shall not be required with respect to war risk insurance provided by the FAA. To the extent such agreement is reasonably obtainable the Company will also cause the Insurance Broker to agree to advise the Collateral Agent in writing of any default in the payment of any premium and of any other act or omission on the part of the Company of which it has knowledge and which might invalidate or

Annex B

27

render unenforceable, in whole or in part, any insurance on any Aircraft or Engine or cause the cancellation or termination of such insurance, and to advise the Collateral Agent in writing at least 30 days (seven days in the case of war-risk and allied perils coverage or such shorter period as may be available in the international insurance market, as the case may be) prior to the cancellation, lapse or material adverse change of any insurance maintained pursuant to this Annex B.

F.      Right to Pay Premiums. The Additional Insureds shall have the rights but not the obligations of an additional named insured. None of the Collateral Agent and the other Additional Insured shall have any obligation to pay any premium, commission, assessment or call due on any such insurance (including reinsurance). Notwithstanding the foregoing, in the event of cancellation of any insurance due to the nonpayment of premiums, the Collateral Agent shall have the option, in its sole discretion, to pay any such premium in respect of an Aircraft that is due in respect of the coverage pursuant to this Agreement and to maintain such coverage, as the Collateral Agent may require, until the scheduled expiry date of such insurance and, in such event, the Company shall, upon demand, reimburse the Collateral Agent for amounts so paid by them.

G.      Deductibles; Self-insurance. The Company may self-insure with respect to an Aircraft to the same extent as it does with respect to, or maintain policies with deductibles or premium adjustment provisions consistent with similar provisions applicable to, other comparable aircraft operated by the Company; provided, however, that in the case of hull insurance, such self-insurance shall in no event exceed $150,000,000 per policy year with respect to an Aircraft and all other comparable aircraft operated by the Company, taken together; and provided further that, in the case of public liability insurance, such self-insurance shall in no event exceed $150,000,000 per policy year.

H.      Indemnification by Government in Lieu of Insurance. The Collateral Agent agrees to accept, in lieu of insurance against any risk with respect to the Aircraft described in Paragraph C of this Annex B, indemnification from, or insurance provided by, the government of the United States of America or any agency or instrumentality thereof the obligations of which are supported by the full faith and credit of the U.S. Government, including from the FAA under the FAA's war risk and allied perils insurance program; provided that the provisions of this Paragraph H shall be deemed satisfied if the U.S. Government is obligated to publish notice of any cancellation, reduction, change or lapse described therein in the Federal Register; provided further that in such case, the Company agrees to furnish notice to each additional insured of any such cancellation, reduction, change or lapse immediately following receipt by the Company of notice thereof.

I.      AVN 67B. If the Company shall be insuring the Aircraft in the London or other market that utilizes London-form financier endorsements, an endorsement in the form of AVN 67B (or any form generally accepted in the international aviation insurance markets as the successor to such form) shall satisfy the endorsement requirements set forth in this Annex B.

**ANNEX C**

**FOREIGN REGISTRATION**

The Collateral Agent and the Company hereby agree, subject to the provisions of Section 3.02(e) of this Agreement, that the Company shall be entitled to register any Aircraft or cause any Aircraft to be registered in a country other than the United States, subject to compliance with the following:

      (i)      each of the following requirements is satisfied:

      (A)   no Event of Default shall have occurred and be continuing at the time of such registration;

      (B)   such proposed change of registration is made in connection with a Permitted Lease to a Permitted Air Carrier; and

      (C)   such country is a country with which the United States then maintains normal diplomatic relations or, if Taiwan, the United States then maintains diplomatic relations at least as good as those in effect on the Closing Date;

      (ii)     the Collateral Agent shall have received an opinion of counsel (subject to customary exceptions) reasonably satisfactory to the Collateral Agent addressed to the Collateral Agent and the Banks as to the effect that:

      (A)   such country would recognize the Company's ownership interest in such Aircraft;

      (B)   after giving effect to such change in registration, the Lien of the Mortgage on the Company's right, title and interest in and to such Aircraft shall continue in the reasonable opinion of the Collateral Agent as a valid and duly perfected first priority security interest and International Interest (subject to Permitted Liens) and all filing, recording or other action necessary to protect the same shall have been accomplished (or, if such opinion cannot be given at the time of such proposed change in registration because such change in registration is not yet effective, (1) the opinion shall detail what filing, recording or other action is necessary and (2) the Collateral Agent shall have received a certificate from Company that all possible preparations to accomplish such filing, recording and other action shall have been done, and such filing, recording and other action shall be accomplished and a supplemental opinion to that effect shall be delivered to the Collateral Agent on or prior to the effective date of such change in registration);

      (C)   unless Company or the Permitted Air Carrier shall have agreed to provide insurance covering the risk of requisition of use of such Aircraft by the government of such country (so long as such Aircraft is registered under the laws of such country), the laws of such country require fair compensation by the government of such country payable in currency freely convertible into Dollars and freely

removable from such country (without license or permit, unless Company prior to such proposed reregistration has obtained such license or permit or the obtaining thereof being ministerial in nature and de minimis in expense) for the taking or requisition by such government of such use; and

(D)    it is not necessary, solely as a consequence of such change in registration and without giving effect to any other activity of the Collateral Agent (or any Affiliate of the Collateral Agent), for the Collateral Agent to qualify to do business in such jurisdiction as a result of such reregistration in order to exercise any rights or remedies with respect to such Aircraft.

(b)    In addition, as a condition precedent to any change in registration, Company shall have given to the Collateral Agent and the Banks assurances reasonably satisfactory to the Collateral Agent:

(i)    to the effect that the provisions of Section 3.02 of this Agreement have been complied with after giving effect to such change of registration;

(ii)    of the payment by Company of all reasonable out-of-pocket expenses of each Secured Party in connection with such change of registry, including, without limitation (1) the reasonable fees and disbursements of counsel to the Collateral Agent, (2) any filing or recording fees, taxes or similar payments incurred in connection with the change of registration of such Aircraft and the creation and perfection of the security interest therein in favor of the Collateral Agent for the benefit of the Secured Parties, and (3) all costs and expenses incurred in connection with any filings necessary to continue in the United States the perfection of the security interest in such Aircraft in favor of the Collateral Agent for the benefit of the Secured Parties; and

(iii)    to the effect that the tax and other indemnities in favor of each Person named as an indemnitee under any other Operative Agreement afford each such Person substantially the same protection as provided prior to such change of registration (or Company shall have agreed upon additional indemnities that, together with such original indemnities, in the reasonable judgment of the Collateral Agent, afford such protection).

Annex C

30

**SCHEDULE 1**
**PERMITTED COUNTRIES**

| | |
|---|---|
| Argentina | Luxembourg |
| Aruba | Malaysia |
| Australia | Malta |
| Austria | Mexico |
| Bahamas | Netherlands |
| Belgium | Netherlands Antilles |
| Bolivia | New Zealand |
| Brazil | Norway |
| Canada | Paraguay |
| Chile | People's Republic of China |
| Czech Republic | Peru |
| Denmark | Philippines |
| Egypt | Poland |
| Ecuador | Portugal |
| Finland | Republic of China (Taiwan) |
| France | Singapore |
| Germany | South Africa |
| Greece | South Korea |
| Hungary | Spain |
| Iceland | Sweden |
| India | Switzerland |
| Indonesia | Thailand |
| Ireland | Trinidad and Tobago |
| Italy | United Kingdom |
| Japan | |

**EXECUTION VERSION**

### FIRST AMENDMENT TO REVOLVING CREDIT FACILITY AGREEMENT

First Amendment dated as of March 30, 2020 to Revolving Credit Facility Agreement, dated as of August 3, 2016, among Southwest Airlines Co. (the "Company"), the Banks party hereto, JPMorgan Chase Bank, N.A., as Paying Agent and Collateral Agent and JPMorgan Chase Bank, N.A. and Citibank, N.A., as Co-Administrative Agents for the Banks (in such capacity, the "Co-Administrative Agents") (with capitalized terms used, but not defined, in this paragraph and the recitals below to be defined as provided in Section 1 below).

R E C I T A L S

WHEREAS, the Company entered into the Revolving Credit Facility Agreement, dated as of August 3, 2016, with the Banks party thereto, and JPMorgan Chase Bank, N.A., as Paying Agent, and JPMorgan Chase Bank, N.A. and Citibank, N.A., as Co-Administrative Agents for the Banks (in such capacity, the "Co-Administrative Agents") (as otherwise amended or otherwise modified prior to the date hereof, the "Existing Credit Agreement"; the Existing Credit Agreement, as amended by this Agreement and as further amended or otherwise modified from time to time, the "Credit Agreement");

WHEREAS, the Company has requested certain amendments and modifications to the Existing Credit Agreement and the other Loan Papers as set forth herein; and

WHEREAS, in accordance with Section 9.1 of the Existing Credit Agreement, the Company has requested, and the Agents and the Banks party hereto that constitute Majority Banks have agreed, to amend certain provisions of the Existing Credit Agreement on the terms and subject to the conditions set forth herein.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1.                    Defined Terms; Rules of Construction. Capitalized terms used herein and not otherwise defined herein have the meanings assigned to such terms in the Existing Credit Agreement or, if not defined therein, the Existing Credit Agreement as amended hereby.

SECTION 2.    Amendments to the Existing Credit Agreement. (a) Effective as of the First Amendment Effective Date (as defined below), and subject to the terms and conditions set forth herein, the Existing Credit Agreement is hereby amended to incorporate the changes reflected in the redlined version of the Credit Agreement attached hereto as Annex I.

(b) Effective as of the First Amendment Effective Date, and subject to the terms and conditions set forth herein, Exhibit I (Form of Aircraft Mortgage) is added to the Existing Credit Agreement as attached hereto as Annex II.

(c) Effective as of the First Amendment Effective Date, and subject to the terms and conditions set forth herein, Exhibit J (Form of Mortgaged Aircraft Operating Agreement) is added to the Existing Credit Agreement as attached hereto as Annex III.

-1-

(d) Effective as of the First Amendment Effective Date, and subject to the terms and conditions set forth herein, Schedule II (Pool Assets) to the Existing Credit Agreement is replaced with Schedule II (Pool Assets) as attached hereto as <u>Annex IV</u>.

SECTION 3.    <u>Representations and Warranties</u>. To induce the other parties hereto to enter into this First Amendment, the Company hereby represents and warrants to each other party hereto that, as of the First Amendment Effective Date:

(i)    The execution and delivery of this Amendment, and performance of this Amendment and the Credit Agreement, the borrowings thereunder, and the execution, delivery, and performance of the other Loan Papers to which it is a party by the Company have been duly authorized by all requisite corporate action on the part of the Company and will not violate its charter or bylaws and will not violate any Law or any order of any Tribunal, and will not conflict with, result in a breach of the provisions of or constitute a default under, or result in the imposition of any Lien upon the Property of the Company pursuant to the provisions of, any material loan agreement, credit agreement, indenture, mortgage, deed of trust, franchise, permit, license, note, contract, or other material agreement or instrument to which the Company is now a party. The Loan Papers that include obligations of the Company are the legal, valid and binding obligations of the Company and are enforceable in accordance with their respective terms, except as such enforceability may be limited by general equitable principles (whether enforcement is sought by proceedings in equity or at law) or applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally;

(ii)    no Default or Event of Default exists, both before and after giving effect to this First Amendment;

(iii)    the representations and warranties contained in Article V of the Credit Agreement (except the last sentence of Section 5.2 thereof and except Section 5.5 thereof) are correct in all material respects (or, to the extent subject to materiality or Material Adverse Effect qualifiers, in all respects) on and as of the date hereof (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date), before and after giving effect to this Amendment, as though made on and as of such date; and

(iv)    the Aircraft Mortgage is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in all of the Aircraft covered thereby except as such enforceability may be limited by general equitable principles (whether enforcement is sought by proceedings in equity or at law) or applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally.

SECTION 4.    <u>Conditions of Effectiveness of this First Amendment</u>. This First Amendment shall become effective as of the first date (the "<u>First Amendment Effective Date</u>") when each of the conditions set forth in this <u>Section 4</u> shall have been satisfied:

(a)    The Paying Agent shall have received this First Amendment, executed and delivered by the Paying Agent, the Company and each Bank under the Existing Credit Agreement.

(b)    The Paying Agent shall have received the following, each dated (unless otherwise indicated) the First Amendment Effective Date:

-2-

(i)    Officer's Certificates dated the First Amendment Effective Date certifying, inter alia, (i) true and correct copies of resolutions adopted by the Board of Directors or Executive Committee, as appropriate, of the Company authorizing the Company to borrow and effect other transactions hereunder, (ii) a true and correct copy of the Company's bylaws in effect on the date hereof, (iii) the incumbency and specimen signatures of the Persons executing any documents on behalf of the Company, (iv) the truth of the representations and warranties made by the Company in the Credit Agreement (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date), and (v) the absence of the occurrence and continuance of any Default or Event of Default.

(ii)    A copy of the Company's charter and all amendments thereto, accompanied by certificates that such copy is correct and complete, one certificate dated within a reasonable time prior to the First Amendment Effective Date and issued by the Secretary of State of Texas and one certificate dated the First Amendment Effective Date and executed by the corporate secretary or assistant secretary of the Company.

(iii)    Certificates (dated within twenty days prior to the First Amendment Effective Date) of existence and good standing of the Company from appropriate officials of Texas.

(iv)    The written opinion of Gilchrist Aviation Law, P.C., special FAA counsel to the Company, in a form reasonably satisfactory to the Collateral Agent, or written confirmation from Gilchrist Aviation Law, P.C. immediately prior to closing that they have reviewed pre-closing FAA indexes and priority search certificates for the airframes and engines that are Pool Assets and confirm they are in a position to issue their opinion assuming no intervening filings or registrations.

(v)    The opinions of internal and outside counsel to the Company, in a form reasonably satisfactory to the Paying Agent.

(vi)    Such other agreements, documents, instruments, opinions, certificates, and evidences as the Paying Agent may reasonably request prior to the First Amendment Effective Date.

(c)    The Collateral Agent shall have received Lien searches conducted in the recording office of the FAA and, with respect to the applicable Collateral, "priority search certificates" (as defined in the Regulations and Procedures for the International Registry), all as may be reasonably satisfactory to the Collateral Agent (dated as of a date reasonably satisfactory to the Collateral Agent), reflecting the absence of Liens and encumbrances on the assets of the Company and the other Grantors constituting Collateral, other than Permitted Liens, and the absence of registrations (other than sale registrations) on the International Registry with respect to the applicable Collateral, other than the registrations contemplated herein, and (in the case of the searches conducted at the recording office of the FAA) indicating that the Company (or the applicable Grantor) is the registered owner of each of the aircraft which is intended to be covered by the Aircraft Mortgage.

(d)    The Company and the Collateral Agent shall have duly executed and delivered to the Collateral Agent an aircraft mortgage, in substantially the form of Exhibit I to the Credit Agreement (the "Aircraft Mortgage"), together with (i) the filing for recordation with the FAA of the Aircraft Mortgage for recording as evidenced by a written confirmation from Gilchrist Aviation Law, P.C. of its submission to the FAA of the Aircraft Mortgage from the FAA for recording (together with any other necessary documents, instruments, affidavits or certificates) as the Collateral Agent

-3-

may deem reasonably necessary to perfect and protect the Liens created thereby, including, without limitation, recordings and filings with the FAA, and all filings and recording fees and taxes in respect thereof shall have been duly paid, (ii) copies of the Entry Point Filing Forms, (iii) evidence that Gilchrist Aviation Law, P.C., special FAA counsel to the Company, (a) has provided email confirmation that the International Interests created by the Aircraft Mortgage have been registered as "prospective" International Interests prior to the execution of the Aircraft Mortgage, and has provided priority search certificates from the International Registry to the Collateral Agent evidencing such prospective International Interests or (b) has established an International Registry Closing Room to facilitate the registration on the International Registry, and provided email confirmation that the Closing Room has been released and thus the International Interests created by the Aircraft Mortgage have been registered against the airframes and engines that are Pool Assets, (iv) evidence, to the extent available, of the filing of financing statements in appropriate form with the Texas Secretary of State and (v) evidence that all other action that the Collateral Agent may deem reasonably necessary to perfect and protect the Liens and security interests created under the Aircraft Mortgage has been taken. The parties hereto acknowledge and agree that any Lien described in the Credit Agreement on the Collateral is a Lien in favor of the Collateral Agent for the ratable benefit of the Secured Parties.

(e)    A Uniform Commercial Code financing statement covering the security interest in the Collateral, naming the Company, as debtor, and the Collateral Agent, as secured party, shall have been duly filed (or shall be in the process of being so duly filed) in all places necessary within the State of Texas.

(f)    The Company and the Collateral Agent shall have entered into the Mortgaged Aircraft Operating Agreement, in substantially the form of Exhibit J to the Credit Agreement.

SECTION 5.    Post-Effective Date Items.

(a) On the earlier of the Initial Borrowing Date (as defined in the Term Loan Credit Agreement) and such date that is five (5) Business Days after the First Amendment Effective Date (such later date as the Collateral Agent may, in its sole discretion, consent to in writing), the Collateral Agent and the Banks shall have received the written opinion of Gilchrist Aviation Law, P.C., special FAA counsel, in form and substance reasonably satisfactory to the Collateral Agent.

(b) On the earlier of the Initial Borrowing Date (as defined in the Term Loan Credit Agreement) and such date that is five (5) Business Days after the First Amendment Effective Date (such later date as the Collateral Agent may, in its sole discretion, consent to in writing), the Collateral Agent shall have received a copy of the Aircraft Mortgage bearing the FAA filing stamp as the Collateral Agent may deem reasonably necessary to perfect and protect the Liens created thereby.

SECTION 6.    Effect of Amendment. (%2) Except as expressly set forth in this First Amendment or in the Credit Agreement, this First Amendment shall not by implication or otherwise limit, impair, constitute a waiver of or otherwise affect the rights and remedies of the Banks or the Agents under the Credit Agreement or any other Loan Papers, and shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in the Credit Agreement or any other provision of the Credit Agreement or of any other Loan Papers, all of which are ratified and affirmed in all respects and shall continue in full force and effect. Nothing herein shall be deemed to entitle the Company to a consent to, or a waiver, amendment, modification or other change of, any of the terms,

-4-

conditions, obligations, covenants or agreements contained in the Credit Agreement or any other Loan Paper in similar or different circumstances.

(a)      On and after the First Amendment Effective Date, each reference in the Credit Agreement to "this Agreement", "hereunder", "hereof", "herein", or words of like import, and each reference to the Credit Agreement in any other Loan Paper, in each case shall be deemed a reference to the Credit Agreement as modified by this First Amendment. This First Amendment shall constitute a "Loan Paper" for all purposes of the Credit Agreement and the other Loan Papers.

(b)      This First Amendment, the Credit Agreement and the other Loan Papers constitute the entire agreement among the parties hereto with respect to the subject matter hereof and thereof and supersede all other prior agreements and understandings, both written and verbal, among the parties hereto with respect to the subject matter hereof.

(c)      This First Amendment may not be amended, modified or waived except in accordance with Section 9.1 of the Credit Agreement.

SECTION 7.    <u>GOVERNING LAW</u>. **THIS FIRST AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK. <u>SECTIONS 9.7</u> AND <u>9.8</u> OF THE EXISTING CREDIT AGREEMENT ARE HEREBY INCORPORATED BY REFERENCE INTO THIS FIRST AMENDMENT AND SHALL APPLY TO THIS FIRST AMENDMENT, *MUTATIS MUTANDIS*.**

SECTION 8.    <u>Counterparts</u>. This First Amendment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery by facsimile or other electronic transmission (including in ".pdf" or ".tif" format) of an executed counterpart of a signature page to this First Amendment (in a format reasonably acceptable to the Paying Agent) shall be effective as delivery of an original executed counterpart of this First Amendment.

SECTION 9.    <u>Headings</u>. Section headings herein are included for convenience of reference only and shall not affect the interpretation of this First Amendment.

SECTION 10.    <u>Severability</u>. Section 9.14 of the Existing Credit Agreement is hereby incorporated by reference into this First Amendment and shall apply to this First Amendment, *mutatis mutandis*.

SECTION 11.    <u>Indemnity</u>. Section 9.5 of the Existing Credit Agreement is hereby incorporated by reference to this First Amendment and shall apply to this First Amendment, *mutatis mutandis*.

[*Remainder of page intentionally blank.*]

-5-

IN WITNESS WHEREOF, the parties hereto have caused this First Amendment to be duly executed by their duly authorized officers, all as of the date and year first above written.


SOUTHWEST AIRLINES CO.



By: /s/ Christopher Monroe
    Christopher Monroe
    Senior Vice President Finance & Treasurer




[Signature page to Southwest Airlines
First Amendment to Revolving Credit Facility Agreement]

JPMORGAN CHASE BANK, N.A., as a
   Bank, an Issuing Bank, a Co-
   Administrative Agent, the Paying Agent
   and the Collateral Agent

By: /s/ Cristina Caviness
       Name: Christina Caviness
       Title: Vice President

[Signature page to Southwest Airlines
First Amendment to Revolving Credit Facility Agreement]

CITIBANK, N.A., as a Bank, an Issuing Bank
and a Co-Administrative Agent

By: /s/ Michael Leonard
    Name: Michael Leonard
    Title: Vice President

[Signature page to Southwest Airlines
First Amendment to Revolving Credit Facility Agreement]

BARCLAYS BANK PLC, as a Bank, an Issuing
Bank and the Syndication Agent

By: /s/ Craig Malloy
    Name: Craig Malloy
    Title: Director

[Signature page to Southwest Airlines
First Amendment to Revolving Credit Facility Agreement]

BANK OF AMERICA, N.A., as a Bank and a
   Documentation Agent

By: /s/ Prathamesh Kshirsagar
     Name: Prathamesh Kshirsagar
     Title: Director

[Signature page to Southwest Airlines
First Amendment to Revolving Credit Facility Agreement]

BNP PARIBAS, as a Bank and a Documentation
Agent

By: /s/ Thomas C. Iacono
    Name: Thomas C. Iacono
    Title: Vice President

By: /s/ Robert Papas
    Name: Robert Papas
    Title: Managing Director

[Signature page to Southwest Airlines
First Amendment to Revolving Credit Facility Agreement]

GOLDMAN SACHS BANK USA, as a Bank and
a Documentation Agent


By: /s/ Charles Johnston
Name: Charles Johnston
Title: Authorized Signatory


[Signature page to Southwest Airlines
First Amendment to Revolving Credit Facility Agreement]

MORGAN STANLEY BANK, N.A., as a Bank

By: /s/ Jack Kuhns
    Name: Jack Kuhns
    Title Authorized Signatory

MORGAN STANLEY SENIOR FUNDING,
    INC., as a Documentation Agent

By: /s/Jack Kuhns
    Name: Jack Kuhns
    Title: Vice President

[Signature page to Southwest Airlines
First Amendment to Revolving Credit Facility Agreement]

U.S. BANK NATIONAL ASSOCIATION, as a
Bank and a Documentation Agent


By: /s/ Sean P. Walters
    Name: Sean P. Walters
    Title: Vice President


[Signature page to Southwest Airlines
First Amendment to Revolving Credit Facility Agreement]

WELLS FARGO BANK, N.A., as a Bank and a
    Documentation Agent

By: /s/ Adam Spreyer
    Name: Adam Spreyer
    Title: Director

[Signature page to Southwest Airlines
First Amendment to Revolving Credit Facility Agreement]

COMERICA BANK, as a Bank

By: /s/ Gerald R. Finney Jr.
    Name: Gerald R Finney Jr.
    Title: Vice President

[Signature page to Southwest Airlines
First Amendment to Revolving Credit Facility Agreement]

ANNEX I
FORM OF AMENDED CREDIT AGREEMENT

[See attached]

**EXECUTION VERSION**
**ANNEX I**

—

**$1,000,000,000 REVOLVING CREDIT FACILITY AGREEMENT**

among

**SOUTHWEST AIRLINES CO.,**

**THE BANKS PARTY HERETO,**

**BARCLAYS BANK PLC,**
as Syndication Agent,

**BANK OF AMERICA, N.A.,**
**BNP PARIBAS,**
**GOLDMAN SACHS BANK USA,**
**MORGAN STANLEY SENIOR FUNDING, INC.,**
**U.S. BANK NATIONAL ASSOCIATION**
and
**WELLS FARGO BANK, N.A.,**
as Documentation Agents

and

**JPMORGAN CHASE BANK, N.A.**
and
**CITIBANK, N.A.,**
as Co-Administrative Agents
and

**JPMORGAN CHASE BANK, N.A.,**
as Paying Agent

As of August 3, 2016.

as amended by First Amendment dated March 30, 2020

**JPMORGAN CHASE BANK, N.A.**
and
CITIGROUP GLOBAL MARKETS INC.,
as Joint Lead Arrangers and Joint Bookrunners

—

509265-1983-14872-Active.19588122.12

**Table of Contents**

| | Page |
|---|---|
| ARTICLE I DEFINITIONS AND ACCOUNTING TERMS | ~~1~~2 |
| Section 1.1 Certain Defined Terms | ~~1~~2 |
| Section 1.2 Computation of Time Periods | ~~15~~21 |
| Section 1.3 Interest Rates; LIBOR Notification | 21 |
| | |
| ARTICLE II LOANS | ~~15~~22 |
| Section 2.1 Commitments | ~~15~~22 |
| Section 2.2 Committed Borrowing Procedure | ~~16~~22 |
| Section 2.3 Refinancings; Conversions | ~~16~~22 |
| Section 2.4 Fees | ~~17~~23 |
| Section 2.5 Termination and Reduction of Commitments | ~~17~~23 |
| Section 2.6 Loans | ~~18~~24 |
| Section 2.7 Loan Accounts | ~~18~~24 |
| Section 2.8 Interest on Loans | ~~19~~25 |
| Section 2.9 Interest on Overdue Amounts | ~~19~~25 |
| Section 2.10 Alternate Rate of Interest | ~~19~~25 |
| Section 2.11 Prepayment of Loans | ~~20~~27 |
| Section 2.12 Reserve Requirements; Change in Circumstances | ~~20~~27 |
| Section 2.13 Change in Legality | ~~22~~29 |
| Section 2.14 Indemnity | ~~22~~29 |
| Section 2.15 Pro Rata Treatment | ~~23~~30 |
| Section 2.16 Sharing of Setoffs | ~~23~~30 |
| Section 2.17 Payments | ~~24~~31 |
| Section 2.18 Taxes | ~~24~~31 |
| Section 2.19 Calculation of LIBO Rates | ~~27~~34 |
| Section 2.20 Booking Loans | ~~27~~34 |
| Section 2.21 Quotation of Rates | ~~27~~34 |
| Section 2.22 Defaulting Banks | ~~27~~34 |
| Section 2.23 Mitigation Obligations; Replacement of Banks | ~~29~~36 |
| Section 2.24 Commitment Increases | ~~30~~37 |
| Section 2.25 Extension of the Termination Date | ~~31~~38 |
| | |
| ARTICLE III LETTERS OF CREDIT | ~~33~~40 |
| Section 3.1 L/C Commitment | ~~33~~40 |
| Section 3.2 Procedure for Issuance of Letter of Credit | ~~33~~40 |
| Section 3.3 Fees and Other Charges | ~~34~~40 |
| Section 3.4 L/C Participations | ~~34~~41 |
| Section 3.5 Reimbursement Obligation of the Company | ~~35~~42 |
| Section 3.6 Obligations Absolute | ~~35~~42 |
| Section 3.7 Letter of Credit Payments | ~~35~~42 |
| Section 3.8 Applications | ~~36~~42 |
| | |
| ARTICLE IV CONDITIONS OF LENDING | ~~36~~43 |
| Section 4.1 Conditions Precedent | ~~36~~43 |

Section 4.2 Conditions Precedent to Each Committed Borrowing ~~37~~44

Section 4.3 Conditions Precedent to Each Letter of Credit Issuance ~~37~~44

Section 4.4 Legal Details ~~37~~44

i

509265-1983-14872-Active.19588122.12

ARTICLE V REPRESENTATIONS AND WARRANTIES ......................... 38<u>45</u>
    Section 5.1 Organization, Authority and Qualifications ............... 38<u>45</u>
    Section 5.2 Financial Statements ........................................ 38<u>45</u>
    Section 5.3 Compliance with Agreement and Laws .................... 38<u>45</u>
    Section 5.4 Authorization; No Breach; and Valid Agreements ....... 38<u>45</u>
    Section 5.5 Litigation and Judgments ................................. 39<u>46</u>
    Section 5.6 Ownership of Properties .................................. 39<u>46</u>
    Section 5.7 Taxes ........................................................ 39<u>46</u>
    Section 5.8 Approvals Required ........................................ 39<u>46</u>
    Section 5.9 Business; Status as Air Carrier .......................... 39<u>46</u>
    Section 5.10 ERISA Compliance ...................................... 39<u>46</u>
    Section 5.11 Insurance .................................................. 39<u>46</u>
                  Section 5.12 Purpose of Loan ............ 40<u>47</u>
    Section 5.13 Investment Company Act .................................. 40<u>47</u>
    Section 5.14 General .................................................... 40<u>47</u>
    Section 5.15 EEA Financial Institutions ............................... 40<u>47</u>
    Section 5.16 Anti-Corruption Laws and Sanctions ................... 40<u>47</u>
    Section 5.17 Security Interests ........................................ <u>47</u>

ARTICLE VI COVENANTS ............................................... 40<u>48</u>
    Section 6.1 Performance of Obligations .............................. 40<u>48</u>
    Section 6.2 Compliance with Laws .................................... 40<u>48</u>
    Section 6.3 Maintenance of Existence, Licenses and Franchises: Compliance With Agreements ... 41<u>48</u>
    Section 6.4 Maintenance of Properties ................................ 41<u>48</u>
    Section 6.5 Maintenance of Books and Records ...................... 42<u>48</u>
    Section 6.6 Inspection .................................................. 42<u>48</u>
    Section 6.7 Insurance ................................................... 42<u>49</u>
    Section 6.8 Appraisals .................................................. 42<u>49</u>
    Section 6.9 Coverage Ratio ............................................ 43<u>49</u>
    Section 6.10 Reporting Requirements ................................. 43<u>49</u>
    Section 6.11 Use of Proceeds .......................................... 44<u>50</u>
    Section 6.12 Pool Assets ............................................... 44<u>51</u>
    Section 6.13 Restrictions on Liens ..................................... 45<u>52</u>
    Section 6.14 Mergers and Dissolutions ............................... 45<u>53</u>
    Section 6.15 Assignment ............................................... 46<u>53</u>
    Section 6.16 Amendments .............................................. <u>53</u>
    Section 6.17 Liquidity .................................................. <u>53</u>
    Section 6.18 Further Assurances ....................................... <u>54</u>

ARTICLE VII EVENTS OF DEFAULT; REMEDIES ....................... 46<u>54</u>
             Section 7.1 Events of Default ............ 46<u>54</u>
             Section 7.2 Remedies Upon Default ...... 48<u>56</u>
             Section 7.3 Remedies in General ......... 48<u>58</u>

ARTICLE VIII THE AGENTS ............................................. 49<u>58</u>
             Section 8.1 Authorization and Action .... 49<u>58</u>
             Section 8.2 Agents' Reliance, Etc. ....... 49<u>59</u>

ii

509265-1983-14872 Active.19588122.12

Section 8.4 Bank Credit Decision ........................................ ~~50~~59

Section 8.5 Agents' Indemnity ........................................ ~~50~~60

Section 8.6 Successor Paying Agent ~~51~~ and Successor Collateral Agent ........................................ 60

Section 8.7 Notice of Default ........................................ ~~51~~61

Section 8.8 Co-Administrative Agents and Documentation Agent ........................................ ~~51~~61

Section 8.9 Collateral Matters ........................................ 61


ARTICLE IX MISCELLANEOUS ........................................ ~~51~~61

Section 9.1 Amendments, Etc ........................................ ~~51~~61

Section 9.2 Notices, Etc. ........................................ ~~52~~62

Section 9.3 No Waiver; Remedies ........................................ ~~53~~63

Section 9.4 Costs, Expenses and Taxes ........................................ ~~53~~63

Section 9.5    Indemnity ........................................ ~~53~~64

Section 9.6 Right of Setoff ........................................ ~~54~~64

SECTION 9.7 **GOVERNING LAW** ........................................ ~~54~~65

Section 9.8 Submission To Jurisdiction; Waivers ........................................ ~~54~~65

Section 9.9 Survival of Representations and Warranties ........................................ ~~55~~65

Section 9.10 Binding Effect ........................................ ~~55~~65

Section 9.11 Successors and Assigns; Participations ........................................ ~~55~~66

Section 9.12 Confidentiality ........................................ ~~58~~68

Section 9.13 Independence of Covenants ........................................ ~~58~~69

Section 9.14 Severability ........................................ ~~59~~69

Section 9.15 Integration ........................................ ~~59~~69

Section 9.16 Descriptive Headings ........................................ ~~59~~69

Section 9.17 Execution in Counterparts ........................................ ~~59~~69

Section 9.18 **WAIVERS OF JURY TRIAL** ........................................ ~~59~~70

Section 9.19 No Fiduciary Duty ........................................ ~~59~~70

Section 9.20 USA Patriot Act ........................................ ~~60~~70

Section 9.21 Acknowledgement and Consent to Bail-In of EEA Financial Institutions ........................................ ~~60~~70

Section 9.22 Interest Rate Limitation ........................................ ~~60~~71

**SCHEDULES**

Location of Lending Office; Notice Information ........................................ Schedule I

Pool Assets ........................................ Schedule II

**EXHIBITS**

Form of Notice of Committed Borrowing ........................................ Exhibit A

Form of Note ........................................ Exhibit B

Form of Company's Internal Counsel Opinion ........................................ Exhibit C-1

Form of Company's Outside Counsel Opinion ........................................ Exhibit C-2

Form of Agents' Counsel Opinion ........................................ Exhibit C-3

Form of Financial Report Certificate ........................................ Exhibit D

Form of Assignment and Assumption ........................................ Exhibit E

Form of Appraisal ........................................ Exhibit F

iii

509265-1983-14872-Active.19588122.12

| | |
|---|---|
| Form of U.S. Tax Compliance Certificate – Non-U.S. Participants (Partnerships) | Exhibit G-2 |
| Form of U.S. Tax Compliance Certificate – Non-U.S. Participants (Not Partnerships) | Exhibit G-3 |

iv

Form of U.S. Tax Compliance Certificate – Foreign Banks (Partnerships)            Exhibit G-4
Form of Increased Facility Activation Notice                                      Exhibit H-1
Form of New Bank Supplement                                                       Exhibit H-2
Form of Aircraft Mortgage                                                         Exhibit I
Form of Mortgaged Aircraft Operating Agreement                                    Exhibit J

**REVOLVING CREDIT FACILITY AGREEMENT**

REVOLVING CREDIT FACILITY AGREEMENT, dated as of August 3, 2016, as amended by FIRST AMENDMENT, dated as of March 30, 2020, among SOUTHWEST AIRLINES CO. (the "Company"), the Banks (as herein defined), JPMORGAN CHASE BANK, N.A., as Paying Agent (as herein defined), JPMORGAN CHASE BANK, N.A. and CITIBANK, N.A., as co-administrative agents for the Banks (in such capacity, the "Co-Administrative Agents"), BARCLAYS BANK PLC, as syndication agent for the Banks (in such capacity, the "Syndication Agent") and BANK OF AMERICA, N.A., BNP PARIBAS, GOLDMAN SACHS BANK USA, MORGAN STANLEY SENIOR FUNDING, INC., U.S. BANK NATIONAL ASSOCIATION and WELLS FARGO BANK, N.A., as documentation agents for the Banks (collectively, in such capacity, the "Documentation Agents").

The Company has requested the Banks to extend credit to the Company in order to enable it to borrow on a revolving credit basis and to obtain letters of credit on and after the Effective Date and at any time and from time to time prior to the Termination Date (each as herein defined) in an aggregate principal amount not in excess of the Commitments outstanding at such time. The Banks are willing to extend such credit to the Company on the terms and conditions herein set forth. Accordingly, the Company, the Agents (as herein defined), and the Banks agree as follows:

**ARTICLE I**

**DEFINITIONS AND ACCOUNTING TERMS**

Section 1.1 Certain Defined Terms. As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Additional Commitment Bank" is defined in Section 2.25(c).

"Adjusted LIBO Rate" means, with respect to any Eurodollar Loan for any Interest Period, an interest rate *per annum* (rounded upwards, if necessary, to the next 1/16 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Adjusted Pre-Tax Income" of any Person means, with respect to any period, income before income taxes of such Person for such period, but excluding (i) any gain or loss arising from the sale of capital assets other than capital assets consisting of Aircraft, (ii) any gain or loss arising from any write-up or write-down of assets, (iii) income or loss of any other Person, substantially all of the assets of which have been acquired by such Person in any manner, to the extent that such income or loss was realized by such other Person prior to the date of such acquisition, (iv) income or loss of any other Person (other than a Subsidiary) in which such Person has an ownership interest, (v) the income or loss of any other Person to which assets of such

iv

509265-1983-14872 Active.19588122.12

Person shall have been sold, transferred, or disposed of, or into which such Person shall have merged, to the extent that such income or loss arises prior to the date of such transaction, (vi) any gain or loss arising

1

from the acquisition of any securities of such Person, (vii) gains or losses reported as extraordinary in accordance with GAAP not previously excluded in clauses (i) through (vi), and (viii) the cumulative effect of changes in accounting methods permitted by GAAP during such period. Notwithstanding the foregoing, the determination of income before income taxes for any period shall be adjusted by any pre-tax non-GAAP financial measures for such period as identified in "Reconciliation of Reported Amounts to Non-GAAP Financial Measures" contained in the Management's Discussion and Analysis of Financial Condition and Results of Operations in the Company's filings in respect of such period on Form 10-Q or Form 10-K with the Securities and Exchange Commission.

"Administrative Questionnaire" means an Administrative Questionnaire in a form satisfactory to the Paying Agent, which each Bank shall complete and provide to the Paying Agent.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means a Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with another Person.

"Agents" means the Paying Agent, the Co-Administrative Agents, the Collateral Agent, the Syndication Agent and the Documentation Agents.

"Agreed Maximum Rate" means, for any date, 2% per annum above the interest rate then applicable to Alternate Base Loans.

"Agreement" means this Revolving Credit Facility Agreement, as amended by the First Amendment on the First Amendment Effective Date, as the same may be further amended, supplemented, or modified from time to time.

"Aircraft" means, collectively, airframes and aircraft engines now owned or hereafter acquired by the Company, together with all appliances, equipment, instruments, and accessories (including radio and radar, but excluding passenger convenience equipment) from time to time belonging to, installed in, or appurtenant to such airframes and aircraft engines; provided, however, the term "Aircraft" shall not include airframes and engines leased by the Company.

"Aircraft Mortgage" means that "Aircraft Mortgage" as defined in Section 4(e) of the First Amendment, as the same may be amended, restated, modified, supplemented, extended or amended and restated from time to time.

"Aircraft Protocol" means the official English language text of the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment, adopted on November 16, 2001 at a diplomatic conference in Cape Town, South Africa, and all amendments, supplements and revisions thereto, as in effect in the United States.

"Aircraft Rentals" means the operating expense attributable to aircraft rentals, calculated in accordance with the line item described as such in the Current Financials.

"Alternate Base Loan" means any Committed Loan with respect to which the Company shall have selected an interest rate based on the Alternate Base Rate in accordance with the provisions of Article II.

509265-1983-14872-Active.19588122.12

"Alternate Base Rate" means, for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest of (a) the Prime Rate in effect on such day, (b) the New York Fed Bank Rate in effect on such day plus ½ of 1% and (c) the Adjusted LIBO Rate for a one-month one month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1%, and (c) the New York Fed Bank Rate for such day plus ½ of 1%. For purposes hereof: "Prime Rate" shall mean the rate of interest per annum publicly announced from time to time by JPMorgan Chase Bank, N.A. as its prime rate in effect at its principal office in New York City (the Prime Rate not being intended to be the lowest rate of interest charged by JPMorgan Chase Bank, N.A. in connection with extensions of credit to debtors)(giving effect to any floor in such rate) plus 1%; provided that for the purpose of this definition, the Adjusted LIBO Rate for any day shall be based on the Screen Rate (or if the Screen Rate is not available for such one month Interest Period, the Interpolated Rate) at approximately 11:00 a.m. London time on such day. Any change in the Alternate Base Rate due to a change in the Prime Rate, the LIBO Rate or the New York Fed Bank Rate or the Adjusted LIBO Rate shall be effective as of the opening of business on from and including the effective day date of such change in the Prime Rate, the LIBO Rate or the New York Fed Bank Rate or the Adjusted LIBO Rate, respectively. If the Alternate Base Rate is being used as an alternate rate of interest pursuant to Section 2.10 (for the avoidance of doubt, only until any amendment has become effective pursuant to Section 2.10(b)), then the Alternate Base Rate shall be the greater of clauses (a) and (b) above and shall be determined without reference to clause (c) above. For the avoidance of doubt, if the Alternate Base Rate as determined pursuant to the foregoing would be less than 1.00%, such rate shall be deemed to be 1.00% for purposes of this Agreement. For purposes hereof: "Prime Rate" shall mean the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Fed Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Paying Agent) or any similar release by the Fed Reserve Board (as determined by the Paying Agent). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"Anti-Corruption Laws" means all laws, rules and regulations of any jurisdiction applicable to the Company or its Subsidiaries from time to time concerning or relating to bribery or corruption.

"Applicable Lending Office" means, with respect to each Bank, such Bank's Domestic Lending Office in the case of an Alternate Base Loan and such Bank's Eurodollar Lending Office in the case of a Eurodollar Loan.

"Applicable Rate" means the relevant rate determined by reference to the Index Debt Rating in effect on such date as set forth below :

(a) Prior to such date which shall be no earlier than April 1, 2021 on which the Company delivers an Officer's Certificate certifying that the following conditions have been met as of such date: (i) the loans under the Term Loan Credit Agreement have been repaid in full and other obligations thereunder (other than unasserted contingent indemnification obligations thereunder) have been paid in full and terminated, (ii) for a period of 30 consecutive calendar days on and prior to delivery of such certificate the amount of Loans outstanding under this Agreement has been zero and (iii) the Company is in compliance with Section 6.9 hereof as of such date with calculations demonstrating such compliance (the date of delivery of such Officer's Certificate following satisfaction of such conditions, the "Applicable Rate Reset Date"):

6

| Index Debt Ratings S&P/Moody's | Applicable Rate (Eurodollar Loans) | Applicable Rate (Alternate Base Rate Loans) | Commitment Fee Rate |
|---|---|---|---|
| BBB/Baa2 or better | 2.000% | 1.000% | 0.150% |
| BBB-/Baa3 or below | 2.250% | 1.250% | 0.200% |

(b) From and after the Applicable Rate Reset Date:

| Index Debt Ratings S&P/Moody's | Applicable Rate (Eurodollar Loans) | Applicable Rate (Alternate Base Rate Loans) | Commitment Fee Rate |
|---|---|---|---|
| A/A2 or better | 0.875% | 0.000% | 0.080% |
| A-/A3 | 1.000% | 0.000% | 0.100% |
| BBB+/Baa1 | 1.125% | 0.125% | 0.125% |
| BBB/Baa2 | 1.250% | 0.250% | 0.150% |
| BBB-/Baa3 or below | 1.500% | 0.500% | 0.200% |

(c)    Each change in the Applicable Rate shall apply during the period commencing on the effective date of such change and ending on the date immediately preceding the effective date of the next such change. If the rating system of Moody's or S&P shall change, the Company and the Banks shall negotiate in good faith to amend this definition to reflect such changed rating system and, pending the effectiveness of any such amendment, the Applicable Rate shall be determined by reference to the rating most recently in effect prior to such change.

"Applicable Rate Reset Date" is defined in the definition of "Applicable Rate".

"Application" means an application, in such form as an Issuing Bank may specify from time to time, requesting such Issuing Bank to open a Letter of Credit. Each Issuing Bank shall furnish to the Company a form of Application satisfactory to it promptly following the request therefor by the Company.

"Appraisal" means a "desk-top" appraisal report addressed to the Paying Agent and substantially in the form of Exhibit F, which will not include physical inspection of aircraft, engines or maintenance records and will assume the equipment is half life in its maintenance cycle, dated the date of delivery of such report to the Banks pursuant to the terms of this Agreement, by one or more independent appraisal firms of recognized national standing selected by the Company (such firm to be reasonably satisfactory, at the time of such Appraisal, to the Paying Agent) setting forth the fair market value, as determined in accordance with the definition of "current market value" promulgated by the International Society of Transport Aircraft Trading, as of the date of such appraisal, of each Pool Asset or a proposed Pool Asset, as the case may be.

"Appraisal Delivery Date" means (a) the Effective Date, (b) eachthe First Amendment Effective Date, (c) each six-month anniversary of the First Amendment Effective Date (other than such date falling in the year ofon the Termination Date) and (ed) each date of replacement, removal or addition of any Pool Asset if such Pool Asset is an airframe or an airframe and one or more engines installed thereon.

7

"Appraised Value" means, as of any date of determination, (a) in respect of all Pool Assets, the aggregate current market value as of such date of such Pool Assets and (b) in respect of any Pool Asset or proposed Pool Asset, as the case may be, the current market value as of such date of such Pool Asset or proposed Pool Asset, as applicable, in each case, as provided in the most recently delivered Appraisal.

"Assignment and Assumption" is defined in Section 9.11(c).

"Auditors" means independent certified public accountants of recognized national standing selected by the Company.

"Available Revolving Commitment" means, as to any Bank at any time, an amount equal to the excess, if any, of (a) such Bank's Commitment then in effect over (b) such Bank's Revolving Credit Exposure then outstanding.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable ~~EEA~~ Resolution Authority in respect of any liability of an ~~EEA~~Affected Financial Institution.

"Bail-In Legislation" means~~,~~ (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule~~.~~ and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Banks" means those banks and other financial institutions signatory hereto and other banks or financial institutions which from time to time become party hereto pursuant to the provisions of this Agreement.

"Benchmark Replacement" means the sum of: (a) the alternate benchmark rate (which may be a SOFR-Based Rate) that has been selected by the Paying Agent and the Company giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body and/or (ii) any evolving or then-prevailing market convention for determining a rate of interest as a replacement to the LIBO Rate for U.S. dollar-denominated syndicated credit facilities and (b) the Benchmark Replacement Adjustment; provided that, if the Benchmark Replacement as so determined would be less than 1.00%, the Benchmark Replacement will be deemed to be 1.00% for the purposes of this Agreement; provided further that any such Benchmark Replacement shall be administratively feasible as determined by the Paying Agent in its sole discretion.

~~"Board" means the Board of Governors of the Federal Reserve System of the United States.~~

"Benchmark Replacement Adjustment" means the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Paying Agent and the Company giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the LIBO Rate with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body and/or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the LIBO Rate with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominated syndicated credit facilities at such time (for the avoidance of doubt, such Benchmark Replacement Adjustment shall not be in the form of a reduction to the Applicable Rate).

8

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest and other administrative matters) that the Paying Agent decides in its reasonable discretion may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Paying Agent in a manner substantially consistent with market practice (or, if the Paying Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Paying Agent determines that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as the Paying Agent decides is reasonably necessary in connection with the administration of this Agreement).

"Benchmark Replacement Date" means the earlier to occur of the following events with respect to the LIBO Rate:

(1) in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of the Screen Rate permanently or indefinitely ceases to provide the Screen Rate; or

(2) in the case of clause (3) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein.

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the LIBO Rate:

(1) a public statement or publication of information by or on behalf of the administrator of the Screen Rate announcing that such administrator has ceased or will cease to provide the Screen Rate, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Screen Rate;

(2) a public statement or publication of information by the regulatory supervisor for the administrator of the Screen Rate, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the administrator for the Screen Rate, a resolution authority with jurisdiction over the administrator for the Screen Rate or a court or an entity with similar insolvency or resolution authority over the administrator for the Screen Rate, in each case which states that the administrator of the Screen Rate has ceased or will cease to provide the Screen Rate permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Screen Rate; and/or

(3) a public statement or publication of information by the regulatory supervisor for the administrator of the Screen Rate announcing that the Screen Rate is no longer representative.

"Benchmark Transition Start Date" means (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication) and (b) in the case of an Early Opt-in Election, the date specified by the Paying Agent or the

9

509265-1983-14872 Active.19588122.12

Majority Banks, as applicable, by notice to the Company, the Paying Agent (in the case of such notice by the Majority Banks) and the Banks.

"Benchmark Unavailability Period" means, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the LIBO Rate and solely to the extent that the LIBO Rate has not been replaced with a Benchmark Replacement, the period (x) beginning at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the LIBO Rate for all purposes hereunder in accordance with Section 2.10 and (y) ending at the time that a Benchmark Replacement has replaced the LIBO Rate for all purposes hereunder pursuant to Section 2.10.

"Borrowing" means a Committed Borrowing.

"Borrowing Date" means the Business Day on which the proceeds of any Borrowing are to be made available to the Company.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close, provided, that with respect to notices and determinations in connection with, and payments of principal and interest on, Eurodollar Loans, such day is also a day for trading in London, England by and between banks in dollar deposits in the Eurodollar Interbank Market.

"Cape Town Convention" means the official English language text of the Convention on International Interests in Mobile Equipment, adopted on November 16, 2001 at a diplomatic conference in Cape Town, South Africa, and all amendments, supplements and revisions thereto, as in effect in the United States.

"Cape Town Treaty" means, collectively, (a) the Cape Town Convention, (b) the Aircraft Protocol and (c) all rules and regulations (including but not limited to the Regulations and Procedures for the International Registry) adopted pursuant thereto and, in the case of each of the foregoing described in clauses (a) through (c), all amendments, supplements and revisions thereto as in effect in the United States.

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Co-Administrative Agents" is defined in the introduction to this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means the Pool Assets and any other assets that constitute "Collateral" as defined in the Aircraft Mortgage.

"Collateral Agent" means JPMorgan Chase Bank, N.A. or any successor to JPMorgan Chase Bank, N.A. appointed in accordance with the provisions of Section 8.1, in each case, as the collateral agent for the Banks under this Agreement and the other Loan Papers.

"Collateral Coverage Test" means, on any date, the requirement that the Appraised Value of the Pool Assets on such date that are subject to the Lien of the Aircraft Mortgage or to the Lien of an aircraft mortgage granted by a Grantor of Collateral after the Effective Date, in substantially the form of Exhibit G, in favor

10

509265-1983-14872-Active.19588122.12

of the Collateral Agent and filed with the FAA, shall not be less than an amount equal to 1.25 times the Total Commitment on such date (or, after termination of the Commitments, the sum of the aggregate outstanding amount of Loans and L/C Obligations).

"Collateral Coverage Test Cure Period" is defined in Section 6.12.

"Commitment" means, with respect to each Bank, the obligation of such Bank to make Loans and to issue or participate in Letters of Credit in the aggregate principal and/or face amount set forth opposite the name of such Bank on the signature pages hereof, and, if applicable, amendments hereto, as such amount may be permanently terminated or reduced from time to time pursuant to Section 2.5 and Section 7.2, as such amount may be obtained or increased from time to time pursuant to Section 2.24, and as such amount may be increased or reduced from time to time by assignment or assumption pursuant to Section 2.23(b) and Section 9.11(c). The Commitments shall automatically and permanently terminate on the Termination Date.

"Commitment Fee" is defined in Section 2.4.

"Committed Borrowing" means a borrowing consisting of simultaneous Committed Loans from each of the Banks distributed ratably among the Banks in accordance with their respective Commitments.

"Committed Loan" means a loan by a Bank to the Company pursuant to Section 2.1, and shall be either a Eurodollar Loan or an Alternate Base Loan.

"Communications" is defined in Section 9.2.

"Company" is defined in the introduction to this Agreement.

"Compounded SOFR" means the compounded average of SOFRs for the applicable Corresponding Tenor, with the rate, or methodology for this rate, and conventions for this rate (which may include compounding in arrears with a lookback and/or suspension period as a mechanism to determine the interest amount payable prior to the end of each Interest Period) being established by the Paying Agent in accordance with:

(1)    the rate, or methodology for this rate, and conventions for this rate selected or recommended by the Relevant Governmental Body for determining Compounded SOFR; provided that:

(2)    if, and to the extent that, the Paying Agent determines that Compounded SOFR cannot be determined in accordance with clause (1) above, then the rate, or methodology for this rate, and conventions for this rate that the Paying Agent determines in its reasonable discretion are substantially consistent with any evolving or then-prevailing market convention for determining Compounded SOFR for U.S. dollar-denominated syndicated credit facilities at such time;

provided, further, that if the Paying Agent decides that any such rate, methodology or convention determined in accordance with clause (1) or clause (2) is not administratively feasible for the Paying Agent, then Compounded SOFR will be deemed unable to be determined for purposes of the definition of "Benchmark Replacement."

"Corresponding Tenor" with respect to a Benchmark Replacement means a tenor (including overnight) having approximately the same length (disregarding Business Day adjustment) as the applicable tenor for the applicable Interest Period with respect to the LIBO Rate.

11

509265-1983-14872-Active.19588122.12

"Coverage Ratio" means, as of any date, the ratio of (i) for the four fiscal quarter period for which the Company's annual or quarterly Financial Statements have been most recently required to have been delivered pursuant to Section 6.10(a) and Section 6.10(b), the Company's and its Subsidiaries' consolidated Adjusted Pre-Tax Income, plus Aircraft Rentals, plus consolidated Net Interest Expense, and depreciation and amortization, and minus cash dividends paid by the Company, to (ii) the Company's and its Subsidiaries' consolidated Net Interest Expense and Aircraft Rentals for such four-quarter period.

"Current Financials" means the Financial Statements of the Company and its Subsidiaries for the fiscal year ended December 31, 2015.

"Debt" means, without duplication, (a) any indebtedness for borrowed money or incurred in connection with the acquisition or construction of any Property, (b) any obligation under any lease of any Property entered into after the date of this Agreement which is required under GAAP to be capitalized on the lessee's balance sheet, and (c) any direct or indirect guarantee or assumption of indebtedness or obligations described in clause (a) or (b), including without limitation any agreement to provide funds to or otherwise assure the ability of an obligor to repay indebtedness or meet its obligations.

"Debtor Relief Laws" means the Bankruptcy Code of the United States of America and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization, fraudulent transfer or conveyance, suspension of payments, or similar Laws from time to time in effect affecting the Rights of creditors generally.

"Default" means the occurrence of any event which with the giving of notice or the passage of time or both would become an Event of Default.

"Defaulting Bank" means any Bank, as determined by the Paying Agent, that (a) has failed, in the determination of the Paying Agent, which determination shall be conclusive subject to manifest error, to fund any portion of its Loans or participations in Letters of Credit within three Business Days of the date required to be funded by it hereunder unless such Bank notifies the Paying Agent in writing that such failure is the result of such Bank's reasonable determination that one or more conditions precedent to funding has not been satisfied, (b) has notified the Company, the Paying Agent, any Issuing Bank or any Bank in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement (unless such writing or public statement relates to such Bank's obligation to fund a Loan hereunder and states that such position is based on such Bank's reasonable determination that a condition precedent to funding cannot be satisfied) or generally under agreements in which it has committed to extend credit, (c) has failed, within three Business Days after written request by the Paying Agent (whether acting on its own behalf or at the reasonable request of the Company (it being understood that the Paying Agent shall comply with any such reasonable request)), to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans and participations in then outstanding Letters of Credit; provided that any such Bank shall cease to be a Defaulting Bank under this clause (c) upon receipt of such confirmation by the Paying Agent, (d) has otherwise failed to pay over to the Paying Agent or any other Bank any other amount required to be paid by it hereunder within three Business Days of the date when due, unless the subject of a good faith dispute, (e) has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or has a direct or indirect parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or (f) has, or has a direct or indirect parent company that has, become the subject of a Bail-In Action. No Bank shall be a Defaulting Bank solely by virtue of the ownership or acquisition of any equity interest in such Bank or a parent company thereof by a Governmental Authority

12

509265-1983-14872-Active.19588122.12

or an instrumentality thereof so long as such ownership interest does not result in or provide such Bank with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Bank (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Bank.

"Documentation Agents" is defined in the introduction to this Agreement.

"dollars" and the symbol "$" mean the lawful currency of the United States of America.

"Domestic Lending Office" means, with respect to any Bank, the office of such Bank specified as its "Domestic Lending Office" on Schedule I to this Agreement or such other office of such Bank as such Bank may from time to time specify to the Company and the Paying Agent.

"Early Opt-in Election" means the occurrence of:

(1) (i) a determination by the Paying Agent or (ii) a notification by the Majority Banks to the Paying Agent (with a copy to the Company) that the Majority Banks have determined that U.S. dollar-denominated syndicated credit facilities being executed at such time, or that include language similar to that contained in Section 2.10 are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace the LIBO Rate, and

(2) (i) the election by the Paying Agent or (ii) the election by the Majority Banks to declare that an Early Opt-in Election has occurred and the provision, as applicable, by the Paying Agent of written notice of such election to the Company and the Banks or by the Majority Banks of written notice of such election to the Paying Agent.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Pperson entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the date on which the conditions set forth in Section 4.1 are first met, which date is August 3, 2016.

"Eligible Affiliate Assignee" means, with respect to any Bank, an Affiliate thereof that is: (i) a commercial bank organized under the Laws of the United States, or any state thereof, and having total assets in excess of $1,000,000,000; (ii) a commercial bank organized under the Laws of France, Germany, the Netherlands or the United Kingdom, or under the Laws of a political subdivision of any such country, and having total assets in excess of $1,000,000,000; provided that such bank is acting through a branch or agency located in such country or the United States; or (iii) a commercial bank organized under the Laws of any

13

other country which is a member of the OECD, or under the Laws of a political subdivision of any such country, and having total assets in excess of $1,000,000,000; provided that such bank is acting through a branch or agency located in the United States.

"Entry Point Filing Forms" means each of the FAA form AC 8050-135 forms to be filed with the FAA on the First Amendment Effective Date.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated thereunder.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Pperson), as in effect from time to time.

"Eurocurrency Liabilities" is defined in Regulation D.

"Eurodollar Interbank Market" means the London eurodollar interbank market.

"Eurodollar Lending Office" means, with respect to each Bank, the branches or affiliates of such Bank which such Bank has designated on Schedule I as its "Eurodollar Lending Office" or may hereafter designate from time to time as its "Eurodollar Lending Office" by notice to the Company and the Paying Agent.

"Eurodollar Loan" means any loan with respect to which the Company shall have selected an interest rate based on the LIBO Rate in accordance with the provisions of Article II.

"Event of Default" means any of the events described in Article VII, provided there has been satisfied any requirement in connection therewith for the giving of notice, lapse of time, or happening of any further condition, event, or act.

"Excluded Taxes" means with respect to any payment made by the Company under this Agreement or any Loan Papers, any of the following Taxes imposed on or with respect to the Paying Agent, a Bank or an Issuing Bank: (a) income or franchise Taxes imposed on (or measured by) net income by the United States of America (including a state, locality or other political subdivision thereof), or by the jurisdiction (including a state, locality or other political subdivision thereof) under the laws of which such Paying Agent, Bank or Issuing Bank is organized or in which its principal office is located or, in the case of any Bank, in which its applicable lending office is located, (b) any branch profits Taxes imposed by the United States of America or any similar Taxes imposed by any other jurisdiction in which the Company is located, (c) in the case of a Foreign Bank (other than an assignee pursuant to a request by the Company under Section 2.23), any U.S. Federal withholding Taxes resulting from any Law in effect on the date such Foreign Bank becomes a party to this Agreement (or designates a new lending office) or is attributable to such Foreign Bank's failure to comply with Section 2.18(f), except to the extent that such Foreign Bank (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Company with respect to such withholding Taxes pursuant to Section 2.18(a), (d) Other Connection Taxes, and (e) any U.S. withholding Taxes imposed by reason of FATCA.

"Existing Bank" is defined in Section 2.24(c).

"Existing Credit Agreement" means the Revolving Credit Facility Agreement, dated as of April 2, 2013, among the Company, the banks party thereto and the agents referred to therein.

14

"Existing Termination Date" is defined in Section 2.25(a).

"Extended Termination Date" is defined in Section 2.25(a).

"Extension Date" is defined in Section 2.25(d).

"FAA" means the Federal Aviation Administration of the United States of America and any successor thereto.

"FATCA" means Sections 1471 through 1474 of the Code as of the date of this Agreement (including any amendment or successor to any such Section so long as such amendment or successor is substantially similar or comparable to the reporting and withholding (and related) obligations of Sections 1471 through 1474 of the Code as of the date of this Agreement and not materially more onerous to comply with), any ~~applicable~~current or future Treasury regulations promulgated thereunder or published administrative guidance or any other ~~jud~~official interpretations thereof ~~implementing such Sections whether any thereof are in existence as of the date of this Agreement or promulgated or published thereafter and~~, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any ~~intergovernmental~~law, regulation, rule, promulgation, guidance notes, practices or official agreement~~s~~ implementing an official government agreement with respect to the foregoing.

"Federal Funds Effective Rate" means, for any day, ~~an interest rate per annum equal to~~ the rate calculated by the New York Fed based on such day's ~~(or, if such day is not a Business Day, the most recently occurring Business Day)~~ federal funds transactions by deposit~~o~~ary institutions ~~(~~, as determined in such manner as ~~the New York Fed~~ shall ~~be~~ set forth on ~~its public~~the Federal Reserve Bank of New York's ~~w~~Website from time to time~~)~~, and published on the next succeeding Business Day by the New York Fed as the effective federal funds ~~effective~~ rate: provided that if the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"Federal Reserve Bank of New York's Website" means the website of the New York Fed at http://www.newyorkfed.org, or any successor source.

"Fed Reserve Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Financial Report Certificate" means a certificate substantially in the form of Exhibit D.

"Financial Statements" means balance sheets, income and loss statements, statements of stockholders' equity, and statements of cash flow prepared in accordance with GAAP and in comparative form to the corresponding period of the preceding fiscal year.

"First Amendment" means First Amendment to Credit Agreement dated as of the First Amendment Effective Date.

"First Amendment Effective Date" means March 30, 2020, the date on which all conditions precedent set forth in Section 4 of the First Amendment are satisfied.

"Foreign Bank" is defined in Section 2.18.

"GAAP" means generally accepted accounting principles in the United States which are applicable as of the date in question for the purpose of the definition of "Financial Statements."

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Grantor" means the Company in its capacity as grantor under the Aircraft Mortgage and any Wholly Owned Domestic Subsidiary at any time that is a party to an Aircraft Mortgage, in substantially the form of Exhibit I, as grantor thereunder.

"IBA" is defined in Section 1.3.

"Impacted Interest Period" is defined in the definition of "LIBO Rate".

"Increased Facility Activation Notice" means a notice substantially in the form of Exhibit H-1.

"Increased Facility Bank" is defined in Section 2.24(c).

"Increased Facility Closing Date" means any Business Day designated as such in an Increased Facility Activation Notice.

"Indemnified Taxes" means (a) Taxes other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Company under any Loan Papers and (b) Other Taxes.

"Index Debt" means senior, unsecured, non-credit enhanced debt with an original term of longer than one year issued by the Company.

"Index Debt Rating" means, as of any date, the rating that has been most recently announced by S&P and Moody's for the Index Debt of the Company. For purposes of the foregoing, (a) if only one of S&P and Moody's shall have in effect an Index Debt Rating, the Applicable Rate shall be determined by reference to the available rating; (b) if the Index Debt Ratings established by S&P and Moody's shall fall within different levels, the Applicable Rate shall be based upon the higher rating, except that if the difference is two or more levels, the Applicable Rate shall be based on the rating that is one level below the higher rating; (c) if any Index Debt Rating established by S&P or Moody's shall be changed, such change shall be effective as of the date on which such change is first announced publicly by the rating agency making such change; (d) if S&P or Moody's shall change the basis on which ratings are established, each reference to the rating for the Index Debt announced by S&P or Moody's, as the case may be, shall refer to the then equivalent rating by S&P or Moody's, as the case may be; and (e) if neither S&P nor Moody's shall have in effect an Index Debt Rating, the Applicable Rate shall be set in accordance with the lowest level rating and highest percentage rate set forth in the table in the definition of "Applicable Rate".

"Initial Issuing Banks" means, collectively, JPMorgan Chase Bank, N.A., Citibank, N.A. and Barclays Bank PLC.

"Interest Payment Date" means (i) with respect to any Alternate Base Loan, each Quarterly Payment Date, or if earlier the Termination Date or the date of prepayment of such Loan or conversion of such Loan to a Eurodollar Loan and (ii) with respect to any Eurodollar Loan, the last day of the Interest Period applicable thereto and, in the case of a Eurodollar Loan with an Interest Period longer than three months each day that would have been the Interest Payment Date for such Loan had successive Interest Periods of three months

16

been applicable to such Loan, or if earlier, the Termination Date or the date of prepayment of such Loan or conversion of such Loan to an Alternate Base Loan.

"Interest Period" means, as to any Eurodollar Loan, the period commencing on the date of such Loan and ending on the numerically corresponding day (or if there is no corresponding day, the last day) in the calendar month that is one, two, three or six, or, if agreed to by all Banks, twelve months thereafter, as the Company may elect; provided, that (x) if any Interest Period would end on a day which shall not be a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless, with respect to Eurodollar Loans only, such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (y) no Interest Period may be selected that ends later than the Termination Date. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.

"International Interest" means an "international interest" as defined in the Cape Town Convention.

"International Registry" means the "International Registry" as defined in the Cape Town Convention.

"Interpolated Rate" means, at any time, the rate per annum (rounded to the same number of decimal places as the Screen Rate) determined by the Paying Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the Screen Rate for the longest period for which that Screen Rate is available in dollars that is shorter than the Impacted Interest Period and (b) the Screen Rate for the shortest period for which that Screen Rate is available for dollars that is longer the Impacted Interest Period, in each case, as of 11:00 a.m., London time (or as soon thereafter as practicable), two Business Days before the first day of such Impacted Interest Period.

"Issuing Bank" means each Initial Issuing Bank and each other Bank approved by the Company and that has agreed in writing to act as an "Issuing Bank" hereunder. Each reference herein to "the Issuing Bank" shall be deemed to be a reference to the relevant Issuing Bank.

"Laws" means all applicable statutes, laws, treaties, ordinances, rules, regulations, orders, writs, injunctions, decrees, judgments, or opinions of any Tribunal.

"L/C Commitment" means $300,000,000.

"L/C Obligations" means at any time, an amount equal to the sum of (a) the aggregate then undrawn and unexpired amount of the then outstanding Letters of Credit, if any, and (b) the aggregate amount of drawings under Letters of Credit that have not then been reimbursed pursuant to Section 3.5.

"L/C Participants" means the collective reference to all the Banks other than the Issuing Bank.

"Letters of Credit" is defined in Section 3.1(a).

"LIBO Rate" means, for any Eurodollar Loan for any Interest Period therefor, a rate per annum equal to the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for dollars for a period equal in length to such Interest Period as displayed on pages LIBOR01 or LIBOR02 of the Reuters Screen that displays such rate (or, in the event such rate does not appear on either of such Reuters pages, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Paying Agent in its reasonable discretion; in each case, the

17

"Screen Rate") at approximately 11:00 a.m., London time (or as soon thereafter as practicable), two Business Days before the first day of such Interest Period; provided that if the Screen Rate shall be less than zero1.00%, such rate shall be deemed to be zero1.00% for purposes of this Agreement; provided, further, that if the Screen Rate shall not be available at such time for such Interest Period (an "Impacted Interest Period") with respect to dollars, then the LIBO Rate shall be the Interpolated Rate at such time (provided that if the Interpolated Rate shall be less than zero1.00%, such rate shall be deemed to be zero1.00% for purposes of this Agreement). The LIBO Rate for the Interest Period for each Eurodollar Loan comprising part of the same Borrowing shall be determined by the Paying Agent.

"Lien" means any mortgage, lien, pledge, adverse claim, charge, security interest or other encumbrance in or on, or any interest or title of any vendor, lessor, lender or other secured party to or of any Person under, any conditional sale or other title retention agreement or lease with respect to, any Property or asset of such Person. For avoidance of doubt, the filing of a Uniform Commercial Code financing statement by a Person that is not entitled or authorized in accordance with the applicable Uniform Commercial Code to file such financing statement shall not, in and of itself, constitute a Lien.

"Litigation" means any action conducted, pending, or threatened by or before any Tribunal.

"Loan" means a Committed Loan, a Eurodollar Loan, or an Alternate Base Loan.

"Loan Papers" means (i) this Agreement, certificates delivered pursuant to this Agreement and exhibits and schedules hereto, (ii) the Aircraft Mortgages, (iii) the Mortgaged Aircraft Operating Agreement, (iv) any notes, security documents, guaranties, and other agreements in favor of the Agents and Banks, or any or some of them, ever delivered in connection with this Agreement, (iiiv) any Letters of Credit and (ivvi) all renewals, extensions, or restatements of, or amendments or supplements to, any of the foregoing.

"Majority Banks" means, at any time, Banks having Revolving Credit Exposures and unused Commitments representing more than 50% of the sum of the total Revolving Credit Exposures and unused Commitments at such time.

"Material Adverse Change" or "Material Adverse Effect" means an act, event or circumstance which materially and adversely affects the business, financial condition or results of operations of the Company and its Subsidiaries on a consolidated basis or the ability of the Company to perform its obligations under this Agreement or any Loan Paper.

"Material Subsidiary" means, at any time, any Subsidiary of the Company having at such time (i) total assets, as of the last day of the most recently ended fiscal quarter for which the Company's annual or quarterly Financial Statements have been most recently required to have been delivered pursuant to Section 6.016.10, having a net book value greater than or equal to 10% of the total assets of the Company and all of its Subsidiaries on a consolidated basis, (ii) Adjusted Pre-Tax Income, as of the last day of the most recently ended fiscal quarter for which the Company's annual or quarterly Financial Statements have been most recently required to have been delivered pursuant to Section 6.016.10, greater than or equal to 10% of the total Adjusted Pre-Tax Income of the Company and all of its Subsidiaries on a consolidated basis or (iii) any Pool Assets.

"Moody's" means Moody's Investors Service, Inc. (or any successor thereto).

18

509265-1983-14872-Active.19588122.12

"Mortgaged Aircraft Operating Agreement" means the mortgaged aircraft operating agreement in substantially the form of Exhibit J, dated as of the First Amendment Effective Date, between the Company and the Collateral Agent, as the same may be amended, restated, modified, supplemented, extended or amended and restated from time to time.

"Net Interest Expense" means interest expense minus interest income, excluding in either case capitalized interest, but including payments in the nature of interest under capital leases if and to the extent characterized as such in accordance with GAAP.

"New Bank" is defined in Section 2.24(b).

"New Bank Supplement" is defined in Section 2.24(b).

"New York Fed" means the Federal Reserve Bank of New York.

"New York Fed Bank Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day; provided that if both such rates are not so published (or for any day (or, if such daythat is not a Business Day, for the most recently occurringimmediately preceding Business Day); provided that if none of such rates are published for any day that is a Business Day, the term "New York Fed Bank Rate" means the rate quoted for such day (or, if such day is not a Business Day, the most recently occurring Business Day) for a federal funds transaction quoted at 11:00 a.m. New York City time on such day (or Business Day, as the case may be) received by the Paying Agent from a Ffederal funds broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates shallas so determined be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Non-Compliant Pool Aircraft" is defined in Section 6.4(c).

"Non-Extending Bank" is defined in Section 2.25(b).

"Note" means a promissory note which a Bank may require the Company to execute in accordance with Section 2.7(b), payable to the order of such Bank, in substantially the form of Exhibit B hereto, with the blanks appropriately completed, to evidence the aggregate indebtedness of the Company to such Bank resulting from the Committed Loans made by such Bank to the Company, together with all modifications, extensions, renewals, and rearrangements thereof.

"Notice Deadline" is defined in Section 2.25(b).

"Notice of Committed Borrowing" is defined in Section 2.2.

"Obligation" means all present and future indebtedness, obligations, and liabilities, and all renewals, extensions, and modifications thereof, owed to the Agents and Banks, or any or some of them, by the Company, arising pursuant to any Loan Paper, together with all interest thereon and costs, expenses, and reasonable attorneys' fees incurred in the enforcement or collection thereof.

509265-1983-14872-Active.19588122.12

"OECD" means the Organization for Economic Cooperation and Development as constituted on the date hereof (excluding Mexico, Poland and the Czech Republic).

"Officer's Certificate" means a certificate signed in the name of the Company by either its Chairman, its Chief Executive Officer, its Chief Financial Officer, its President, one of its Vice Presidents, its Treasurer, or its Assistant Treasurer, in each case without personal liability.

"Original Termination Date" means the fifth anniversary of the Effective Date.

"Other Connection Taxes" means with respect to the Paying Agent, any Bank or any Issuing Bank, as the case may be, Taxes imposed as a result of a present or former connection between the Paying Agent, such Bank or such Issuing Bank, as the case may be, and the jurisdiction imposing such Taxes (other than a connection arising solely from the Paying Agent, such Bank or such Issuing Bank having executed, delivered, enforced, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, or engaged in any other transaction pursuant to, or enforced, any Loan Papers, or, in each case in accordance with and subject to the provisions of this Agreement, sold, or assigned ~~or participated~~ an interest in any Loan Papers).

"Other Taxes" means any present or future stamp, court, documentary, intangible, recording, filing or similar ~~excise or property~~ Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, ~~or~~ from the registration, receipt or perfection of a security interest under, or otherwise with respect to, this Agreement or any Loan Papers, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than Other Connection Taxes imposed with respect to an assignment under Section 2.23).

"Overnight Bank Funding Rate" means, for any day, the rate comprised of both overnight federal funds and overnight Eurodollar borrowings by U.S.-managed banking offices of depository institutions (, as such composite rate shall be determined by the New York Fed as set forth on ~~its public~~the Federal Reserve Bank of New York's ~~w~~Website from time to time), and published on the next succeeding Business Day by the New York Fed as an overnight bank funding rate ~~(from and after such date as the New York Fed shall commence to publish such composite rate)~~.

"Paying Agent" means JPMorgan Chase Bank, N.A. or any successor to JPMorgan Chase Bank, N.A. appointed in accordance with the provisions of Section 8.6, in each case, as the paying agent for the Banks under this Agreement and the other Loan Papers.

"Participant Register" is defined in Section 9.11(b).

"Permitted Liens" means: (a) Liens for taxes, assessments and governmental charges or levies which either are not yet due and payable or are being contested in good faith by appropriate proceedings and for which adequate reserves are established in accordance with GAAP; (b) Liens securing judgments, but only to the extent, for an amount and for a period not resulting in an Event of Default under Section 7.1(d); (c) Liens ~~arising~~securing Obligations under this Agreement; (d) Liens constituting normal operational usage of the affected Property, including charter, third party maintenance, storage, leasing, pooling or interchange thereof; ~~and~~ (e) Liens imposed by law such as materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business securing obligations that (i) are not overdue for a period of more than 30 days, provided that no enforcement, collection, execution, levy or foreclosure proceeding shall have been commenced with respect thereto, or (ii) are being contested in good faith and for which adequate reserves are established in accordance with GAAP; and (f) salvage or

20

509265-1983-14872-Active.19588122.12

similar rights of insurers under the insurances required to be maintained pursuant to the Mortgaged Aircraft Operating Agreement.

"Person" means and includes an individual, partnership, joint venture, corporation, trust, limited liability company or other entity, Tribunal, unincorporated organization, or government, or any department, agency, or political subdivision thereof.

"Plan" means any plan defined in Section 4021(a) of ERISA in respect of which the Company is an "employer" or a "substantial employer" as such terms are defined in ERISA.

"Pool Assets" means assets of the Company and any of its Wholly Owned Domestic Subsidiaries listed on Schedule II, to the extent modified pursuant to Section 6.12, and shall include only Specified Equipment owned legally by the Company and any of its Wholly Owned Domestic Subsidiaries.

"Prime Rate" is defined in the definition of the term Alternate Base Rate.

"Principal Office" of the Paying Agent means 500 Stanton Christiana Road, Ops 2, 3rdNCC5 / 1st Floor, Newark, Delaware 19713-2107, or such other office as the Paying Agent may hereafter designate from time to time as its "Principal Office" by notice to the Company and the Banks.

"Property" means all types of real, personal, tangible, intangible, or mixed property.

"Quarterly Payment Date" means the 15th day of each March, June, September and December of each year, the first of which shall be the first such day after the Effective Date.

"Register" is defined in Section 9.11(e).

"Regulation D" means Regulation D of the Fed Reserve Board, as the same is from time to time in effect, and all official rulings and interpretations thereunder or thereof.

"Regulatory Change" means, with respect to any Bank, (a) any adoption or change after the Effective Date of or in United States federal, state or foreign laws, rules, regulations (including Regulation D) or guidelines applying to a class of banks including such Bank, (b) the adoption or making after the Effective Date of any interpretations, directives or requests applying to a class of banks including such Bank of or under any United States federal, state or foreign laws, rules, regulations or guidelines (whether or not having the force of law) by any Tribunal, monetary authority, central bank, or comparable agency charged with the interpretation or administration thereof, or (c) any change in the interpretation or administration of any United States federal, state or foreign laws, rules, regulations or guidelines applying to a class of banks including such Bank by any Tribunal, monetary authority, central bank, or comparable agency charged with the interpretation or administration thereof.

"Reimbursement Obligation" means the obligation of the Company to reimburse the Issuing Bank pursuant to Section 3.5 for amounts drawn under Letters of Credit.

"Relevant Anniversary Date" is defined in Section 2.25(a).

21

"Relevant Governmental Body" means the Fed Reserve Board and/or the New York Fed, or a committee officially endorsed or convened by the Fed Reserve Board and/or the New York Fed or, in each case, any successor thereto.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Request Date" is defined in Section 2.25(a).

"Reserve Percentage" of any Bank for the Interest Period for any Eurodollar Loan means the reserve percentage applicable during such Interest Period under regulations issued from time to time by the Board (or if more than one such percentage shall be so applicable, the daily average of such percentages for those days in such Interest Period during which any such percentage shall be so applicable) for determining the maximum reserve requirement (including, without limitation, any marginal reserve requirement) for such Bank with respect to liabilities or assets consisting of or including Eurocurrency Liabilities having a term equal to such Interest Period.

"Revolving Credit Exposure" means, with respect to any Bank at any time, the sum of the outstanding principal amount of such Bank's Loans and its L/C Obligations at such time. For the purposes of this definition each Bank shall be deemed to hold a pro rata share of the total L/C Obligations based on the percentage which its Commitment represents of the aggregate Commitments.

"Rights" means rights, remedies, powers, and privileges.

"S&P" means Standard & Poor's Financial Services LLC and any successor to its rating agency business.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea, Sudan and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or, the U.S. Department of State or by the United Nations Security Council, the European Union or any European Union member state, (b) any Person operating, organized or resident in a Sanctioned Country or, (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b), or (d) any Person otherwise the subject of any Sanctions.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State.

"Screen Rate" is defined in the definition of "LIBO Rate"Secured Parties" means the Agents and the Banks.

"Senior Officer" means, in each case for the Company, its Chief Executive Officer, Chief Financial Officer, President, Treasurer, or its Assistant Treasurer.

"SOFR" with respect to any day means the secured overnight financing rate published for such day by the New York Fed, as the administrator of the benchmark (or a successor administrator), on the Federal Reserve Bank of New York's Website.

22

509265-1983-14872-Active.19588122.12

"SOFR-Based Rate" means SOFR, Compounded SOFR or Term SOFR.

"Specified Equipment" means ~~next generation~~ aircraft consisting of the Boeing 737-700, Boeing 737-800, Boeing 737 MAX 7 and Boeing 737-~~900ER~~ MAX 8 models (and any later generation model of any thereof~~, such as "MAX") and, as to each such aircraft, up to two spare engines suitable for use on the related airframe.~~), including, its related engines; provided that aircraft that is Boeing 737 MAX 7 or Boeing 737 MAX 8 may constitute Specified Equipment solely to the extent that the applicable model is issued an airworthiness certificate by the FAA confirming that it is certified to fly.

~~"Stated Rate" is defined in Section 9.8.~~

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentage (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Fed Reserve Board to which the Paying Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D). Such reserve percentage shall include those imposed pursuant to Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Bank under Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subsidiary" of a Person means any entity of which an aggregate of more than 50% (in number of votes) of the stock (or equivalent interests) is owned of record or beneficially, directly or indirectly, by such Person.

"Successor Company" is defined in Section 6.14(a).

"Syndication Agent" is defined in the introduction to this Agreement.

"Taxes" means all present or future taxes, assessments, fees, levies, imposts, duties, deductions, withholdings (including backup withholding), value added taxes or any other goods and services, use or sales taxes, assessments, fees or other ~~similar~~ charges at any time imposed by any Laws or Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan Credit Agreement" means the Amended and Restated 364-Day Credit Agreement, dated as of March 30, 2020, among the Company, JPMorgan Chase Bank, N.A. and the banks party thereto from time to time, as amended.

"Term SOFR" means the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"Termination Date" means, the earlier of (a) the Original Termination Date, subject to extension thereof pursuant to Section 2.25, and (b) the date of termination in whole of the Total Commitment pursuant to Section 2.5 or Section 7.2; provided, however, that the Termination Date of any Bank that is a Non-Extending Bank with respect to any requested extension pursuant to Section 2.25 shall be the Termination Date in effect immediately prior to the applicable Extension Date for all purposes of this Agreement.

"Total Commitment" means at any time the aggregate amount of the Banks' Commitments, as in effect at such time.

~~23~~

"Total Liquidity" means, at any time, the sum of (a) the aggregate amount available to be borrowed by the Company under this Agreement plus (b) the aggregate amount of unrestricted cash and cash equivalents of the Company and its Subsidiaries at such time.

"Tribunal" means any municipal, state, commonwealth, federal, foreign, territorial, or other court, governmental body, subdivision, agency, department, commission, board, bureau, or instrumentality.

"Type" refers to the distinction between Committed Loans that are Alternate Base Loans and Committed Loans that are Eurodollar Loans.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment; provided that, if the Unadjusted Benchmark Replacement as so determined would be less than 1.00%, the Unadjusted Benchmark Replacement will be deemed to be 1.00% for the purposes of this Agreement.

"United States" and "U.S." each means United States of America.

"U.S. Tax Compliance Certificate" is defined in Section 2.18.

"Wholly Owned Domestic Subsidiary" means a Wholly Owned Subsidiary of the Company organized under the laws of any jurisdiction within the United States.

"Wholly Owned Subsidiary" means, as to any Person, any other Person all of the Capital Stock of which (other than directors' qualifying shares required by law) is owned by such Person directly and/or through other Wholly Owned Subsidiaries.

"Withholding Agent" means the Company and the Paying Agent.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

24

509265-1983-14872-Active.19588122.12

Section 1.2 <u>Computation of Time Periods</u>. In this Agreement in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding."

Section 1.3 Interest Rates; LIBOR Notification. The interest rate on Eurodollar Loans is determined by reference to the LIBO Rate, which is derived from the London interbank offered rate. The London interbank offered rate is intended to represent the rate at which contributing banks may obtain short-term borrowings from each other in the London interbank market. In July 2017, the U.K. Financial Conduct Authority announced that, after the end of 2021, it would no longer persuade or compel contributing banks to make rate submissions to the ICE Benchmark Administration (together with any successor to the ICE Benchmark Administrator, the "IBA") for purposes of the IBA setting the London interbank offered rate. As a result, it is possible that commencing in 2022, the London interbank offered rate may no longer be available or may no longer be deemed an appropriate reference rate upon which to determine the interest rate on Eurodollar Loans. In light of this eventuality, public and private sector industry initiatives are currently underway to identify new or alternative reference rates to be used in place of the London interbank offered rate. Upon the occurrence of a Benchmark Transition Event or an Early Opt-In Election, Section 2.10(b) provides a mechanism for determining an alternative rate of interest. The Paying Agent will promptly notify the Company, pursuant to Section 2.10(d), of any change to the reference rate upon which the interest rate on Eurodollar Loans is based. However, none of the Paying Agent and the Banks warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission or any other matter related to the London interbank offered rate or other rates in the definition of "LIBO Rate" or with respect to any alternative or successor rate thereto, or replacement rate thereof (including, without limitation, (i) any such alternative, successor or replacement rate implemented pursuant to Section 2.10(b), whether upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, and (ii) the implementation of any Benchmark Replacement Conforming Changes pursuant to Section 2.10(c)), including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the LIBO Rate or have the same volume or liquidity as did the London interbank offered rate prior to its discontinuance or unavailability.

## ARTICLE II

## LOANS

Section 2.1 <u>Commitments</u>. Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Bank, severally and not jointly, agrees to make revolving credit loans in dollars to the Company, at any time and from time to time on and after the Effective Date and until the earlier of the Termination Date and the termination of the Commitment of such Bank in accordance with the terms hereof. Notwithstanding the foregoing, (a) the aggregate principal amount at any time outstanding of all Committed Loans of a Bank shall not exceed such Bank's Commitment and (b) the Total Commitment shall be deemed used from time to time to the extent of the L/C Obligations, and such deemed use of the Total Commitment shall be applied to the Banks ratably according to their respective Commitments, subject, however, to the conditions that (i) at no time shall (A) the sum of (x) the outstanding aggregate principal amount of all Committed Loans made by all Banks and (y) the L/C Obligations exceed (B) the Total Commitment, and (ii) at all times the outstanding aggregate principal amount of all Committed Loans made by a Bank shall equal the product of (x) the percentage which its Commitment represents of the Total Commitment times (y) the outstanding aggregate principal amount of all Committed Loans obligated to have been made by all Banks.

509265-1983-14872-Active.19588122.12

Within the foregoing limits, the Company may borrow, repay, prepay, and reborrow hereunder, on and after the Effective Date and prior to the Termination Date, subject to the terms, provisions, and limitations set forth herein.

Section 2.2 <u>Committed Borrowing Procedure</u>. In order to effect a Committed Borrowing, the Company shall hand deliver, telecopy or e-mail to the Paying Agent a duly completed request for Committed Borrowing, substantially in the form of <u>Exhibit A</u> hereto (a "<u>Notice of Committed Borrowing</u>"), (i) in the case of Eurodollar Loans, not later than 11:00 a.m., New York City time, three Business Days before the Borrowing Date specified for a proposed Committed Borrowing, and (ii) in the case of Alternate Base Loans, not later than 11:00 a.m., New York City time, on the Business Day which is the Borrowing Date specified for a proposed Committed Borrowing. Such notice shall be irrevocable and shall in each case refer to this Agreement and specify (x) whether the Loans then being requested are to be Eurodollar Loans, or Alternate Base Loans, (y) the Borrowing Date of such Loans (which shall be a Business Day) and the aggregate amount thereof (which shall not be less than $10,000,000 and shall be an integral multiple of $1,000,000) and (z) in the case of a Eurodollar Loan, the Interest Period with respect thereto (which shall not end later than the Termination Date). If no Interest Period with respect to any Eurodollar Loan is specified in any such Notice of Committed Borrowing, then the Company shall be deemed to have selected an Interest Period of one month's duration. Promptly, and in any event on the same day the Paying Agent receives a Notice of Committed Borrowing pursuant to this <u>Section 2.3</u> if such notice is received by 11:00 a.m., New York City time on a Business Day and otherwise on the next succeeding Business Day, the Paying Agent shall advise the other Banks of such Notice of Committed Borrowing and of each Bank's portion of the requested Committed Borrowing by telecopier or e-mail. Each Committed Borrowing shall consist of Loans of the same Type made on the same day and having the same Interest Period.

Section 2.3 <u>Refinancings; Conversions</u>

(a)     The Company may refinance all or any part of any Loan with a Loan of the same or a different type made pursuant to <u>Section 2.2</u>, subject to the conditions and limitations set forth herein and elsewhere in this Agreement. Any Loan or part thereof so refinanced shall be deemed to be repaid in accordance with <u>Section 2.17</u> with the proceeds of a new Borrowing hereunder and the proceeds of the new Loan, to the extent they do not exceed the principal amount of the Loan being refinanced, shall not be paid by the Banks to the Paying Agent or by the Paying Agent to the Company pursuant to <u>Section 2.6(c)</u>; <u>provided, however</u>, that (i) if the principal amount extended by a Bank in a refinancing is greater than the principal amount extended by such Bank in the Borrowing being refinanced, then such Bank shall pay such difference to the Paying Agent for distribution to the Banks described in (ii) below, (ii) if the principal amount extended by a Bank in the Borrowing being refinanced is greater than the principal amount being extended by such Bank in the refinancing, the Paying Agent shall return the difference to such Bank out of amounts received pursuant to (i) above, (iii) to the extent any Bank fails to pay the Paying Agent amounts due from it pursuant to (i) above, any Loan or portion thereof being refinanced shall not be deemed repaid in accordance with <u>Section 2.17</u> to the extent of such failure and the Company shall pay such amount to the Paying Agent pursuant to <u>Section 2.17</u> and (iv) to the extent the Company fails to pay to the Paying Agent any amounts due in accordance with <u>Section 2.17</u> as a result of the failure of a Bank to pay the Paying Agent any amounts due as described in (iii) above, the portion of any refinanced Loan deemed not repaid shall be deemed to be outstanding solely to the Bank which has failed to pay the Paying Agent amounts due from it pursuant to (i) above to the full extent of such Bank's portion of such refinanced Loan.

(b)     Subject to the conditions and limitations set forth in this Agreement, the Company shall have the right from time to time to convert all or part of one Type of Committed Loan into another Type of Committed Loan or to continue all or a part of any Committed Loan that is a Eurodollar Loan from one

26

Interest Period to another Interest Period by giving the Paying Agent written notice (by means of a Notice of Committed Borrowing) (i) in the case of Eurodollar Loans, not later than 11:00 a.m., New York City time, three Business Days before the date specified for such proposed conversion or continuation, and (ii) in the case of Alternate Base Loans, not later than 11:00 a.m., New York City time, on the Business Day which is the date specified for such proposed conversion or continuation. Such notice shall specify (A) the proposed date for conversion or continuation, (B) the amount of the Committed Loan to be converted or continued, (C) in the case of conversions, the Type of Committed Loan to be converted into, and (D) in the case of a continuation of or conversion into a Eurodollar Loan, the duration of the Interest Period applicable thereto; provided that (1) Eurodollar Loans may be converted only on the last day of the applicable Interest Period, (2) except for conversions to Alternate Base Loans, no conversion shall be made while a Default or Event of Default has occurred and is continuing and no continuations of any Eurodollar Loan from one Interest Period to another Interest Period shall be made while a Default or Event of Default has occurred and is continuing, unless such conversion or continuation has been approved by Majority Banks, and (3) each such conversion or continuation shall be in an amount not less than $10,000,000 and shall be an integral multiple of $1,000,000. All notices given under this Section shall be irrevocable. If the Company shall fail to give the Paying Agent the notice as specified above for continuation or conversion of a Eurodollar Loan prior to the end of the Interest Period with respect thereto, such Eurodollar Loan shall automatically be converted into an Alternate Base Loan on the last day of the Interest Period for such Eurodollar Loan.

Section 2.4 Fees. The Company agrees to pay to each Bank, through the Paying Agent, on each Quarterly Payment Date and on the Termination Date in arrears, in immediately available funds, a commitment fee (a "Commitment Fee") calculated by multiplying the Applicable Rate by the amount of the average daily Available Revolving Commitment of such Bank during the preceding three-month period (or shorter period commencing with the Effective Date and/or ending with the Termination Date). All Commitment Fees shall be computed by the Paying Agent on the basis of the actual number of days elapsed in a year of 360 days, and shall be conclusive and binding for all purposes, absent manifest error. The Commitment Fee due to each Bank shall commence to accrue on the Effective Date and shall cease to accrue on the Termination Date or, if earlier, the date of the termination of the Commitment of such Bank as provided herein.

Section 2.5 Termination and Reduction of Commitments

(a)    Subject to Section 2.11(b), the Company may permanently terminate, or from time to time in part permanently reduce, the Total Commitment, in each case upon at least three Business Days' prior (or, in the case of a refinancing or new facility with one or more of the Agents, on a same-day basis with) written notice to the Paying Agent (who shall promptly forward a copy thereof to each Bank). Such notice shall specify the date and the amount of the termination or reduction of the Total Commitment. Each such partial reduction of the Total Commitment shall be in a minimum aggregate principal amount of $10,000,000 and in an integral multiple of $1,000,000.

(b)    On the Termination Date the Total Commitment shall be zero.

(c)    Each reduction in the Total Commitment pursuant to this Section 2.5 shall be made ratably among the Banks in accordance with their respective Commitments. Simultaneously with any termination of Commitments pursuant to this Section, the Company shall pay to the Paying Agent for account of the Banks the Commitment Fees on the amount of the Total Commitment so terminated, accrued through the date of such termination.

Section 2.6 Loans

27

509265-1983-14872-Active.19588122.12

(a)    Each Borrowing made by the Company on any date shall be in an integral multiple of $1,000,000 and in a minimum aggregate principal amount of $10,000,000. Committed Loans shall be made by the Banks ratably in accordance with their respective Commitments on the Borrowing Date of the Committed Borrowing; provided, however, that the failure of any Bank to make any Loan shall not in itself relieve any other Bank of its obligation to lend hereunder.

(b)    Each Committed Loan shall be a Eurodollar Loan or an Alternate Base Loan, as the Company may request subject to and in accordance with Section 2.2 or Section 2.3(b), as applicable. Each Bank may at its option make any Eurodollar Loan by causing a foreign branch or Affiliate of such Bank to make such Loan; provided, however, that any exercise of such option shall not affect the obligation of the Company to repay such Loan in accordance with the terms of this Agreement or increase the Company's obligations to such Bank hereunder. Loans of more than one interest rate option may be outstanding at the same time; provided, however, that the Company shall not be entitled to request any Loan which, if made, would result in an aggregate of more than ten separate Interest Periods being outstanding hereunder at any one time. For purposes of the foregoing, Loans having different Interest Periods, regardless of whether they commence on the same date, shall be considered separate Loans.

(c)    Subject to Section 2.3, each Bank shall make its portion of each Committed Borrowing on the proposed Borrowing Date thereof by paying the amount required to the Paying Agent at the Principal Office in immediately available funds not later than 1:00 p.m., New York City time, and the Paying Agent shall by 2:00 p.m., New York City time, credit the amounts so received to the general deposit account of the Company with the Paying Agent or, if Loans are not made on such date because any condition precedent to a Borrowing herein specified shall not have been met, return the amounts so received to the respective Banks as soon as practicable; provided, however, if and to the extent the Paying Agent fails to return any such amounts to a Bank on the Borrowing Date for such Borrowing, the Paying Agent shall pay interest on such unreturned amounts, for each day from such Borrowing Date to the date such amounts are returned to such Bank, at the Federal Funds Effective Rate.

(d)    The outstanding principal amount of each Committed Loan shall be due and payable on the Termination Date.

Section 2.7 Loan Accounts

(a)    The Loans made by each Bank shall be evidenced by one or more loan accounts or records maintained by such Bank in the ordinary course of business. Absent manifest error, the loan accounts or records maintained by the Paying Agent and each Bank shall be prima facie evidence of the amount of the Loans made by the Banks to the Company and the interest and payments thereon. Any failure so to record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Company hereunder to pay any amount owing with respect to the Loans.

(b)    Upon the request of any Bank made through the Paying Agent, the Loans made by such Bank may be evidenced by one or more Notes, instead of or in addition to loan accounts, and upon any such request the Company shall execute and deliver such Notes to such Bank. Each such Bank shall, and is hereby authorized by the Company to, endorse on the schedule attached to the relevant Note held by such Bank (or on a continuation of such schedule attached to each such Note and made a part thereof) or in its records relating to such Note an appropriate notation evidencing the date and amount of each Committed Loan of such Bank, each payment or prepayment of principal of any Committed Loan, and the other information provided for on such schedule. The failure of any Bank to make such a notation or any error therein shall

28

not in any manner affect the obligation of the Company to repay the Committed Loans made by such Bank in accordance with the terms of the relevant Note.

Section 2.8 <u>Interest on Loans</u>

(a)     Subject to the provisions of <u>Section 2.9</u>, each Eurodollar Loan shall bear interest at a rate per annum (computed on the basis of the actual number of days elapsed over a year of 360 days) equal to the LIBO Rate for the Interest Period in effect for such Loan <u>plus</u> the Applicable Rate. Interest on each Eurodollar Loan shall be payable on each Interest Payment Date applicable thereto. The applicable LIBO Rate for each Interest Period shall be determined by the Paying Agent, and such determination shall be conclusive absent manifest error.

(b)     Subject to the provisions of <u>Section 2.9</u>, each Alternate Base Loan shall bear interest at the rate per annum equal to the Alternate Base Rate plus the Applicable Rate (if the Alternate Base Rate is based on the Prime Rate, computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as the case may be; if the Alternate Base Rate is based on the LIBO Rate or the Federal Funds Effective Rate, computed on the basis of the actual number of days elapsed over a year of 360 days). Interest on each Alternate Base Loan shall be payable on each Interest Payment Date applicable thereto. The applicable Alternate Base Rate shall be determined by the Paying Agent, and such determination shall be conclusive absent manifest error.

~~(c)     The Company shall pay to the Paying Agent for the account of each Bank that has made a Eurodollar Loan to the Company, so long as such Bank shall be required under regulations of the Board to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency Liabilities, additional interest on the unpaid principal amount of each such Eurodollar Loan of such Bank, from the date of such Loan until such principal amount is paid in full, at an interest rate per annum for such number of days during the Interest Period for such Loan as shall be pertinent equal to the remainder obtained by subtracting (i)~~ the LIBO Rate for such Interest Period ~~from (ii) the rate obtained by dividing such LIBO Rate referred to in clause (i) above by that percentage equal to 100% minus the Reserve Percentage of such Bank for such Interest Period, payable on the next Interest Payment Date applicable to such Loan. Such additional interest shall be determined by such Bank as, if and to the extent incurred, and shall be payable as aforesaid upon notification thereof by such Bank to the Company through the Paying Agent. Each determination by a Bank of additional interest under this~~ <u>~~Section 2.8(c)~~</u> ~~shall be conclusive and binding for all purposes in the absence of manifest error.~~

Section 2.9 <u>Interest on Overdue Amounts</u>. If the Company shall default in the payment of the principal of or interest on any Loan or any other amount becoming due hereunder, the Company shall on demand from time to time pay interest, to the extent permitted by Law, on such defaulted amount up to (but not including) the date of actual payment (after as well as before judgment) at a rate per annum equal to (i) in the case of the principal amount of any Eurodollar Loan, 2% above the rate otherwise applicable thereto and (ii) in all other cases, the Agreed Maximum Rate (if the Alternate Base Rate is based on the Prime Rate, computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as the case may be; if the Alternate Base Rate is based on the LIBO Rate or the Federal Funds Effective Rate, computed on the basis of the actual number of days elapsed over a year of 360 days).

Section 2.10 <u>Alternate Rate of Interest</u>. ~~In the event, and on each occasion, on the day two Business Days~~<u>(a) If</u> prior to the commencement of any Interest Period for a Eurodollar Loan ~~that is a Committed Loan, the Paying Agent shall have determined that dollar deposits in the amount of the requested principal amount of such Eurodollar Loan are not generally available in the Eurodollar Interbank Market,~~

~~29~~

or that dollar deposits are not generally available in the Eurodollar Interbank Market for the requested Interest Period, or.

(i)    Subject to clause (b) below, the Paying Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable (including because the Screen Rate is not available or published on a current basis), for dollars and such Interest Period; or

that the rate at which such dollar deposits are being offered(ii)    the Paying Agent is advised by the Majority Banks that the Adjusted LIBO Rate or the LIBO Rate, as applicable, for dollars and such Interest Period will not adequately and fairly reflect the cost to the Majoritysuch Banks (or Bank) of making or maintaining such Eurodollar Loan duringtheir Loans (or its Loan) included in such Loan for dollars and such Interest Period, or that reasonable means do not exist for ascertaining the LIBO Rate.;

then the Paying Agent shall, as soon as practicable thereafter, give telecopy notice of such determinationthereof to the Company and the Banks. In the event of any such determination, any request by the Company for a Eurodollar Loan that is a Committed Loan shall, until by telephone, telecopy or electronic mail as promptly as practicable thereafter and, until the Paying Agent notifies the Company and the Banks that the circumstances giving rise to such notice no longer exist, be deemed to be a request for(A) any interest election request pursuant to Section 2.3 that requests the conversion of any Loan to, or continuation of any Loan as, a Eurodollar Loan shall be ineffective and (B) if any Notice of Committed Borrowing requests a Eurodollar Loan, such Loan shall be made as an Alternate Base Loan. Each determination by the Paying Agent hereunder shall be conclusive absent manifest error; provided that if the circumstances giving rise to such notice affect only one Type of Loans, then the other Type of Loans shall be permitted.

(b) Notwithstanding anything to the contrary herein or in any other Loan Paper, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, the Paying Agent and the Company may amend this Agreement to replace the LIBO Rate with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after the Paying Agent has posted such proposed amendment to all Banks and the Company, so long as the Paying Agent has not received, by such time, written notice of objection to such proposed amendment from Banks comprising the Majority Banks; provided that, with respect to any proposed amendment containing any SOFR-Based Rate, the Banks shall be entitled to object only to the Benchmark Replacement Adjustment contained therein. Any such amendment with respect to an Early Opt-in Election will become effective on the date that Banks comprising the Majority Banks have delivered to the Paying Agent written notice that such Majority Banks accept such amendment. No replacement of LIBO Rate with a Benchmark Replacement will occur prior to the applicable Benchmark Transition Start Date.

(c) In connection with the implementation of a Benchmark Replacement, the Paying Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Paper, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(d) The Paying Agent will promptly notify the Company and the Banks of (i) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes and (iv) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Paying Agent or Banks pursuant to this Section 2.10, including any

30

509265-1983-14872-Active.19588122.12

determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 2.10.

(e) Upon the Company's receipt of notice of the commencement of a Benchmark Unavailability Period, (i) any interest election request pursuant to Section 2.3 that requests the conversion of any Loan to, or continuation of any Loan as, a Eurodollar Loan shall be ineffective and (ii) if any Notice of Committed Borrowing requests a Eurodollar Loan, such Loan shall be made as an Alternate Base Loan.

Section 2.11 Prepayment of Loans

(a)    Prior to the Termination Date, the Company shall have the right at any time to prepay any Committed Borrowing, in whole or in part, subject to the requirements of Section 2.14 or Section 2.15 but otherwise without premium or penalty, upon at least five Business Days prior written notice to the Paying Agent; provided, however, that each such partial prepayment shall be in an integral multiple of $1,000,000 and in a minimum aggregate principal amount of $5,000,000. Each notice of prepayment shall specify the prepayment date and the aggregate principal amount of each Borrowing to be prepaid, shall be irrevocable and shall commit the Company to prepay such Borrowing by the amount stated therein.

(b)    On the date of any termination or reduction of the Total Commitment pursuant to Section 2.5(a), the Company shall pay or prepay so much of the Loans as shall be necessary in order that the sum of (x) the aggregate principal amount of the Loans outstanding and (y) the L/C Obligations will not exceed the Total Commitment following such termination or reduction. Subject to the foregoing, any such payment or prepayment shall be applied to such Borrowing or Borrowings as the Company shall select. All prepayments under this paragraph shall be subject to Section 2.14 and Section 2.15.

(c)    All prepayments under this Section 2.11 shall be accompanied by accrued interest on the principal amount being prepaid to the date of prepayment.

Section 2.12 Reserve Requirements; Change in Circumstances

(a)    Notwithstanding any other provision herein, if after the date of this Agreement any Regulatory Change or change in any Law (i) shall subject the Paying Agent, a Bank or an Issuing Bank to any Taxes (other than (w) Indemnified Taxes, (x) Taxes described in clauses (a), (b), (c) and (e) of Excluded Taxes, (y) Other Taxes and (z) Other Connection Taxes imposed on gross or measured by net income, profits or revenue (including value-added or similar Taxes) (however denominated) or that are franchise Taxes or branch profits Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, (ii) shall impose, modify, or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement with respect to any Eurodollar Loan against assets of, deposits with or for the account of, or credit extended by, such Bank under this Agreement (without duplication of any amounts paid pursuant to Section 2.8(e)), or (iii) with respect to any Eurodollar Loan, shall impose on such Bank or the Eurodollar Interbank Market any other condition, cost or expense affecting this Agreement or any Eurodollar Loan made by such Bank, and the result of any of the foregoing shall be to materially increase the actual cost to such Bank (or such Paying Agent or Issuing Bank in the case of (i)) of maintaining its Commitment or of making, converting to, continuing or maintaining any Eurodollar Loan or to materially reduce the amount of any sum received or receivable by such Bank (or such Paying Agent or Issuing Bank in the case of (i)) hereunder (whether of principal, interest, or otherwise) in respect thereof, then the Company shall pay to the Paying Agent for the account of such Bank (or such Paying Agent or Issuing Bank in the case of (i)), within ten days following delivery to the Company of the

31

509265-1983-14872-Active.19588122.12

certificate specified in paragraph (c) below by such Bank (or such Paying Agent or Issuing Bank in the case of (i)), such additional amount or amounts as will reimburse such Bank (or such Paying Agent or Issuing Bank in the case of (i)) for such increase or reduction to such Bank (or such Paying Agent or Issuing Bank in the case of (i)) to the extent reasonably allocable to this Agreement.

(b)    If any Bank shall have determined in good faith that any Regulatory Change regarding capital or liquidity requirements or compliance by any Bank (or its parent or any lending office of such Bank) with any request or directive issued subsequent to the Effective Date regarding capital or liquidity requirements (whether or not having the force of Law) of any Tribunal, monetary authority, central bank, or comparable agency, has or would have the effect of reducing the rate of return on such Bank's (or its parent's) capital as a consequence of its obligations hereunder to a level below that which such Bank (or its parent) could have achieved but for such Regulatory Change, or compliance (taking into consideration such Bank's policies with respect to capital adequacy or liquidity) by an amount deemed by such Bank to be material, then from time to time, the Company shall pay to the Paying Agent for the account of such Bank, within ten days following delivery to the Company of the certificate specified in paragraph (d) below by such Bank, such additional amount or amounts as will reimburse such Bank (or its parent) for such reduction.

(c)    Notwithstanding anything herein to the contrary, (i) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or by United States or foreign regulatory authorities, in each case pursuant to Basel III, and (ii) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof, shall in each case be deemed to be a Regulatory Change and a change in Law, regardless of the date enacted, adopted or issued.

(d)    Each Bank or the Paying Agent or each Issuing Bank shall notify the Company of any event occurring after the date hereof entitling such Bank to compensation under paragraph (a) or (b) of this Section 2.12 (together with a good faith estimate of the amounts it would be entitled to claim in respect of such event) as promptly as practicable, but in any event on or before the date which is 60 days after the related Regulatory Change, change in any Law or other event; provided that (i) if such Bank or the Paying Agent or such Issuing Bank fails to give such notice by such date, such Bank or the Paying Agent or such Issuing Bank shall, with respect to compensation payable pursuant to paragraph (a) or (b) of this Section 2.12 in respect of any costs resulting from such Regulatory Change, change in any Law or other event, only be entitled to payment under paragraph (a) or (b) of this Section 2.12 for costs incurred from and after the date of such notice and (ii) such Bank or the Paying Agent or such Issuing Bank will take such reasonable actions, if any (including the designation of a different Applicable Lending Office for the Loans of such Bank affected by such event) to avoid the need for, or reduce the amount of, such compensation so long as such actions will not, in the reasonable opinion of such Bank or the Paying Agent or such Issuing Bank, be materially disadvantageous to such Bank or the Paying Agent or such Issuing Bank, as the case may be. A certificate of a Bank or the Paying Agent or such Issuing Bank setting forth in reasonable detail (i) the Regulatory Change, change in any Law or other event giving rise to any costs, (ii) such amount or amounts as shall be necessary to reimburse such Bank or the Paying Agent or such Issuing Bank (or participating banks or other entities pursuant to Section 9.11) as specified in paragraph (a) or (b) of this Section 2.12, as the case may be, and (iii) the calculation of such amount or amounts, shall be delivered to the Company (with a copy to the Paying Agent) promptly after such Bank or the Paying Agent or such Issuing Bank determines it is entitled to payment under this Section 2.12, and shall be conclusive and binding absent manifest error. In preparing such certificate, such Bank or the Paying Agent or such Issuing Bank may

32

employ such assumptions and allocations of costs and expenses as it shall in good faith deem reasonable and may use any reasonable averaging and attribution method.

(e)     In the event any Bank shall seek payment pursuant to this Section 2.12 or the events contemplated under Section 2.10 or Section 2.13 shall have occurred with respect to any Bank, the Company shall have the right to replace such Bank with, and add as "Banks" under this Agreement in place thereof, one or more assignees as provided in Section 2.23(b).

(f)     Without prejudice to the survival of any other obligations of the Company hereunder, the obligations of the Company under this Section 2.12 shall survive for one year after the termination of this Agreement and/or the payment or assignment of any of the Loans or Notes.

Section 2.13 Change in Legality

(a)     Notwithstanding anything to the contrary herein contained, if any Regulatory Change shall make it unlawful for any Bank to make or maintain any Eurodollar Loan or to give effect to its obligations in respect of Eurodollar Loans as contemplated hereby, then, by prompt written notice to the Company and to the Paying Agent, such Bank may:

(i)     declare that Eurodollar Loans will not thereafter be made by such Bank hereunder, whereupon the Company shall be prohibited from requesting Eurodollar Loans from such Bank hereunder unless such declaration is subsequently withdrawn; and

(ii)     if such unlawfulness shall be effective prior to the end of any Interest Period of an outstanding Eurodollar Loan, require that all outstanding Eurodollar Loans with such Interest Periods made by it be converted to Alternate Base Loans, in which event (A) all such Eurodollar Loans shall be automatically converted to Alternate Base Loans as of the effective date of such notice as provided in paragraph (b) below and (B) all payments and prepayments of principal which would otherwise have been applied to repay the converted Eurodollar Loans shall instead be applied to repay the Alternate Base Loans resulting from the conversion of such Eurodollar Loans.

(b)     For purposes of this Section 2.13, a notice to the Company (with a copy to the Paying Agent) by any Bank pursuant to paragraph (a) above shall be effective on the date of receipt thereof by the Company. Any Bank having furnished such a notice agrees to withdraw the same promptly following any Regulatory Change that makes it lawful for such Bank to make and maintain Eurodollar Loans.

(c)     If, with respect to any Bank, a condition arises or an event occurs which would, or would upon the giving of notice, result in the payment of amounts pursuant to Section 2.12 or permit such Bank, pursuant to this Section 2.13, to suspend its obligation to make Eurodollar Loans, such Bank, promptly upon becoming aware of the same, shall notify the Company thereof and shall take such steps as may reasonably be available to it (including, without limitation, changing its Applicable Lending Office) to mitigate the effects of such condition or event, provided that such Bank shall be under no obligation to take any step that, in its good faith opinion, would (a) result in its incurring any additional costs in performing its obligations hereunder and under any outstanding Loan (unless the Company has notified such Bank of the Company's agreement to reimburse it for the same) or (b) be otherwise adverse to such Bank in a material respect.

Section 2.14 Indemnity. The Company shall indemnify each Bank against any loss or reasonable expense which such Bank may sustain or incur as a consequence of (a) any failure by the Company to fulfill on the date of any Borrowing hereunder the applicable conditions set forth in Article IV, (b) any

33

509265-1983-14872-Active.19588122.12

failure by the Company to borrow hereunder after a Notice of Committed Borrowing pursuant to Article II has been given, (c) any payment, prepayment, or conversion of a Eurodollar Loan required by any other provision of this Agreement or otherwise made on a date other than the last day of the applicable Interest Period for any reason, including without limitation the acceleration of outstanding Loans as a result of any Event of Default or (d) any failure by the Company for any reason (including without limitation the existence of a Default or an Event of Default) to pay, prepay or convert a Eurodollar Loan on the date for such payment, prepayment or conversion, specified in the relevant notice of payment, prepayment or conversion under this Agreement. The indemnity of the Company pursuant to the immediately preceding sentence shall include, but not be limited to, any loss or reasonable expense sustained or incurred or to be sustained or incurred in liquidating or employing deposits from third parties acquired to effect or maintain such Loan or any part thereof as a Eurodollar Loan. Such loss or reasonable expense shall include, without limitation, an amount equal to the excess, if any, as reasonably determined by each Bank of (i) its cost of obtaining the funds for the Loan being paid, prepaid, or converted or not borrowed, paid, prepaid or converted (based on the LIBO Rate) for the period from the date of such payment, prepayment, or conversion or failure to borrow, pay, prepay or convert to the last day of the Interest Period for such Loan (or, in the case of a failure to borrow, pay, prepay or convert, the Interest Period for the Loan which would have commenced on the date of such failure to borrow, pay, prepay or convert) over (ii) the amount of interest (as reasonably determined by such Bank) that would be realized by such Bank in reemploying the funds so paid, prepaid, or converted or not borrowed, paid, prepaid or converted for such period or Interest Period, as the case may be. A certificate of each Bank setting forth any amount or amounts and, in reasonable detail, the computations thereof, which such Bank is entitled to receive pursuant to this Section 2.14 shall be delivered to the Company (with a copy to the Paying Agent) and shall be conclusive, if made in good faith, absent manifest error. The Company shall pay to the Paying Agent for the account of each Bank the amount shown as due on any certificate within 30 days after its receipt of the same. The obligations of the Company pursuant to this Section 2.14 shall survive the termination of this Agreement and/or the payment or assignment of any of the Loans or Notes.

Section 2.15 <u>Pro Rata Treatment</u>. Except as permitted under Section ~~2.8(e), Section~~ 2.12(d) and Section 2.14 with respect to interest and Section 2.25(e) with respect to principal and interest, (a) each payment or prepayment of principal and each payment of interest with respect to a Committed Borrowing shall be made pro rata among the Banks in accordance with the respective principal amounts of the Loans extended by each Bank, if any, with respect to such Committed Borrowing, and (b) conversions of Committed Loans to Committed Loans of another Type, continuations of Committed Loans that are Eurodollar Loans from one Interest Period to another Interest Period, and Committed Loans which are not refinancings of other Loans shall be made pro rata among the Banks in accordance with their respective Commitments.

Section 2.16 <u>Sharing of Setoffs</u>. Each Bank agrees that if it shall through the exercise of a right of banker's lien, setoff, or counterclaim against the Company (pursuant to Section 9.6 or otherwise), including, but not limited to, a secured claim under Section 506 of Title 11 of the United States Code or other security or interest arising from, or in lieu of, such secured claim, received by such Bank under any applicable Debtor Relief Law or otherwise, obtain payment (voluntary or involuntary) in respect of the Committed Loans held by it (other than pursuant to Section ~~2.8(e), Section~~ 2.12, or Section 2.14) as a result of which the unpaid principal portion of the Committed Loans held by it shall be proportionately less than the unpaid principal portion of the Committed Loans held by any other Bank, it shall be deemed to have simultaneously purchased from such other Bank a participation in the Committed Loans held by such other Bank, so that the aggregate unpaid principal amount of the Committed Loans and participations in Committed Loans pursuant to this Section 2.16 held by each Bank shall be in the same proportion to the aggregate unpaid principal amount of all Committed Loans then outstanding as the principal amount of the Committed Loans held by it prior to such exercise of banker's lien, setoff, or counterclaim was to the principal amount of all Committed Loans outstanding prior to such exercise of banker's lien, setoff, or counterclaim; <u>provided</u>,

509265-1983-14872 Active.19588122.12

however, that if any such purchase or purchases or adjustments shall be made pursuant to this Section 2.16 and the payment giving rise thereto shall thereafter be recovered, such purchase or purchases or adjustments shall be rescinded to the extent of such recovery and the purchase price or prices or adjustment restored without interest. The Company expressly consents to the foregoing arrangements and agrees that any Bank holding a participation in a Committed Loan deemed to have been so purchased may exercise any and all rights of banker's lien, setoff, or counterclaim with respect to any and all moneys owing by the Company to such Bank as fully as if such Bank had made a Committed Loan directly to the Company in the amount of such participation.

Section 2.17 Payments

(a)    The Company shall make each payment hereunder and under any instrument delivered hereunder not later than 12:00 noon (New York City time) on the day when due in dollars, without setoff or counterclaim, to the Paying Agent at its Principal Office for the account of the Banks, in federal or other immediately available funds. The Paying Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal of or interest on Committed Loans (other than pursuant to Section 2.8(c), Section 2.12, and Section 2.14) or Commitment Fees ratably to the Banks and like funds relating to the payment of any other amount payable to any Bank to such Bank for the account of its Applicable Lending Office, in each case to be applied in accordance with the terms of this Agreement.

(b)    Whenever any payment hereunder or under any Note shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in all such cases be included in the computation of payment of interest or Commitment Fee, as the case may be; provided, however, if such extension would cause payment of interest on or principal of a Eurodollar Loan to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

(c)    Unless the Paying Agent shall have received notice from the Company prior to the date on which any payment is due to the Banks hereunder that the Company will not make such payment in full, the Paying Agent may assume that the Company has made or will make such payment in full to the Paying Agent on such date and the Paying Agent may, in reliance upon such assumption, cause to be distributed to each Bank on such due date an amount equal to the amount then due such Bank. If and to the extent the Company shall not have so made such payment in full to the Paying Agent, each Bank shall repay to the Paying Agent forthwith on demand such amount distributed to such Bank together with interest thereon, for each day from the date such amount is distributed to such Bank until the date such Bank repays such amount to the Paying Agent, at the Federal Funds Effective Rate.

Section 2.18 Taxes.    (a)    Each payment by the Company under this Agreement or any Loan Papers shall be made without withholding for any Taxes, unless such withholding is required by anyapplicable Law. If any Withholding Agent determines, in its sole discretion exercised in good faith, that it is so required to withhold Taxes, then such Withholding Agent may so withhold and shall timely pay the full amount of withheld Taxes to the relevant Governmental Authority in accordance with applicable Law. If such Taxes are Indemnified Taxes, then the amount payable by the Company shall be increased as necessary so that, net of such withholding (including such withholding applicable to additional amounts payable under this Section), the Paying Agent or applicable Bank (as the case may be)amounts receivesd with respect to this Agreement equal the amount itwhich would have received had no such withholding been made.

(b)    The Company shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Law.

35

509265-1983-14872-Active.19588122.12

(c)     As soon as practicable after any payment of Indemnified Taxes by the Company to a Governmental Authority, the Company shall deliver to the Paying Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Paying Agent.

(d)     The Company shall indemnify the Paying Agent and each Bank, within 30 days after demand therefor, for the full amount of Indemnified Taxes (including, without limitation, any Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.18) payable or paid by the Paying Agent or such Bank (or its beneficial owner), as the case may be, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Company by a Bank (with a copy to the Paying Agent), or by the Paying Agent on its own behalf or on behalf of a Bank, shall be conclusive, if made in good faith, absent manifest error.

(e)     Each Bank shall severally indemnify the Paying Agent, within 10 days after demand therefor, for the full amount of any Taxes attributable to such Bank that are payable or paid by the Paying Agent, and reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority, but only to the extent that the Company has not already indemnified the Paying Agent for such Indemnified Taxes and without limiting the obligation of the Company to do so. A certificate as to the amount of such payment or liability delivered to any Bank by the Paying Agent shall be conclusive absent manifest error. For the avoidance of doubt, there shall be no double recovery under this paragraph where the indemnified party has been indemnified for the same loss under a separate provision of the agreement.

(f)     (i) Any Bank that is entitled to an exemption from or reduction of any applicable withholding Tax with respect to payments hereunder or under any other Loan Papers shall deliver to the Company and the Paying Agent, at the time or times requested by the Company or the Paying Agent, such properly completed and executed documentation prescribed by Law as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Bank, if requested by the Company or the Paying Agent, shall deliver such other documentation prescribed by Law or reasonably requested by the Company or the Paying Agent as will enable the Company or the Paying Agent to determine whether or not such Bank is subject to any withholding (including backup withholding) or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such forms (other than such documentation set forth in Sections 2.18(f)(ii)(A) through (E) below or any successor or substantially similar or comparable documentation thereto) shall not be required if in the Bank's good faith judgment such completion, execution or submission would subject such Bank to any material unreimbursed cost or expense (or, in the case of a change in Law, any incremental material unreimbursed cost or expense), unless indemnified by the Company in an amount reasonably satisfactory to such Bank, or would materially prejudice the legal or commercial position of such Bank. If any form or certification previously delivered pursuant to this Section expires or becomes obsolete or inaccurate in any respect with respect to a Bank, such Bank shall promptly (and in any event within 10 days after such expiration, obsolescence or inaccuracy) notify the Company and the Paying Agent in writing of such expiration, obsolescence or inaccuracy and update the form or certification if it is legally eligible to do so.

(ii) Without limiting the generality of the foregoing, any Bank that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code (a "Foreign Bank") shall, to the extent it is legally entitled to do so, deliver to the Company and the Paying Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Bank

36

509265-1983-14872-Active.19588122.12

becomes a lender under this Agreement (and from time to time thereafter upon the reasonable request of the Company or the Paying Agent), whichever of the following is applicable:

> (A) duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, claiming eligibility for benefits of an income tax treaty to which the United States of America is a party;

> (B) duly completed copies of Internal Revenue Service Form W-8ECI;

> (C) in the case of a Foreign Bank claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate substantially in the ~~F~~form of Exhibit G-1 to the effect that (i) such Foreign Bank is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Company within the meaning of section 881(c)(3)(B) of the Code, and (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code, and (ii) the interest payments in question are not effectively connected with the United States trade or business conducted by such Bank (a "U.S. Tax Compliance Certificate") and (y) duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable;

> (D) to the extent a Foreign Bank is not the beneficial owner (for example, where the Foreign Bank is a partnership or participating Bank granting a typical participation), an Internal Revenue Service Form W-8IMY, accompanied by a Form W-8ECI, W-8BEN or W-8BEN-E, U.S. Tax Compliance Certificate substantially in the form of Exhibit G-2 or G-3 (as applicable), Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that, if the Foreign Bank is a partnership (and not a participating Bank) and one or more beneficial owners of such Foreign Bank are claiming the portfolio interest exemption, such Foreign Bank may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-4 on behalf of each such beneficial owner; or

> (E) any other form prescribed by Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax duly completed together with such supplementary documentation as may be prescribed by applicable Law to permit the Company to determine the withholding or deduction required to be made.

(iii) If a payment made to a Bank under this Agreement or any other Loan Papers would be subject to U.S. Federal withholding Tax imposed by FATCA if such Bank were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Bank shall deliver to the Withholding Agent, at the time or times prescribed by Law and at such time or times reasonably requested by the Withholding Agent,

509265-1983-14872-Active.19588122.12

such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Withholding Agent as may be necessary for the Withholding Agent to comply with its obligations under FATCA, to determine that such Bank has or has not complied with such Bank's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this Section 2.18(f)(iii), "FATCA" shall include all amendments made to FATCA after the date of this Agreement.

(g)    If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.18 (including additional amounts paid pursuant to this Section 2.18), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including any Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall promptly repay to such indemnified party the amount paid to such indemnified party pursuant to the previous sentence (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this Section 2.18(g), in no event will any indemnified party be required to pay any amount to any indemnifying party pursuant to this Section 2.18(g) if such payment would place such indemnified party in a less favorable position (on a net after-Tax basis) than such indemnified party would have been in if the indemnification payments or additional amounts giving rise to such refund had never been paid. This Section 2.18(g) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes which it deems confidential) to the indemnifying party or any other Person.

(h)    The provisions of this Section 2.18 shall survive the termination of this Agreement and/or the payment or assignment of any of the Loans or Notes.

(i)    For purposes of this Section 2.18, the term "Bank" includes any Issuing Bank and the term "applicable Law" includes FATCA.

Section 2.19 Calculation of LIBO Rates. The provisions of this Agreement relating to calculation of the LIBO Rate are included only for the purpose of determining the rate of interest or other amounts to be paid hereunder that are based upon such rate, it being understood that each Bank shall be entitled to fund and maintain its funding of all or any part of a Eurodollar Loan as it sees fit. All such determinations hereunder, however, shall be made as if each Bank had actually funded and maintained funding of each Eurodollar Loan through the purchase in the Eurodollar InterBank Market of one or more eurodollar deposits in an amount equal to the principal amount of such Loan and having a maturity corresponding to the Interest Period for such Loan.

Section 2.20 Booking Loans. Subject to Section 2.18, any Bank may make, carry, or, transfer Loans at, to, or for the account of any of its branch offices or the office of any Affiliate.

Section 2.21 Quotation of Rates. It is hereby acknowledged that the Company may call the Paying Agent on or before the date on which notice of a Borrowing, continuation or conversion is to be delivered by the Company in order to receive an indication of the rate or rates then in effect, but that such projection shall not be binding upon the Paying Agent or any Bank nor affect the rate of interest which thereafter is actually in effect when the election is made.

509265-1983-14872-Active.19588122.12

Section 2.22 <u>Defaulting Banks</u>. Notwithstanding any provision of this Agreement to the contrary, if any Bank becomes a Defaulting Bank, the Paying Agent shall deliver written notice to such effect, upon the Paying Agent's obtaining knowledge of such event, to the Company and such Defaulting Bank, and the following provisions shall apply for so long as such Bank is a Defaulting Bank:

(a)     Commitment Fees shall cease to accrue with respect to the Commitment of such Defaulting Bank pursuant to <u>Section 2.4</u>.

(b)     The Commitment and Revolving Credit Exposure of such Defaulting Bank shall not be included in determining whether all Banks or the Majority Banks have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to <u>Section 9.1</u>), <u>provided</u> that any waiver, amendment or modification requiring the consent of all Banks or each affected Bank which would increase or extend the term of the Commitment of such Defaulting Bank or which affects such Defaulting Bank differently than other affected Banks shall require the consent of such Defaulting Bank.

(c)     If any L/C Obligations exist at the time a Bank becomes a Defaulting Bank, then:

(i)     all or any part of such L/C Obligations shall be reallocated among the non-Defaulting Banks ratably in accordance with their respective Commitments but only to the extent that (x) the sum of all non-Defaulting Banks' Revolving Credit Exposures does not then exceed the total of all non-Defaulting Banks' Commitments, (y) no non-Defaulting Bank's Revolving Credit Exposure then exceeds such non-Defaulting Bank's Commitments and (z) the conditions set forth in <u>Section 4.3</u> are satisfied at such time;

(ii)     if the reallocation described in clause (i) above cannot, or can only partially, be effected, the Company shall within one Business Day following notice by the Paying Agent cash collateralize the percentage such Defaulting Bank's Commitment represents of the Total Commitment of the L/C Obligations (after giving effect to any partial reallocation pursuant to clause (i) above) in accordance with the procedures set forth in <u>Section 7.2</u> for so long as such L/C Obligations are outstanding;

(iii)     if the Company cash collateralizes any portion of such Defaulting Bank's L/C Obligations pursuant to this <u>Section 2.22(c)</u>, the Company shall not be required to pay any fees to such Defaulting Bank pursuant to <u>Section 3.3</u> with respect to such Defaulting Bank's portion of the L/C Obligations during the period of such collateralization;

(iv)     if the L/C Obligations of the non-Defaulting Banks are reallocated pursuant to this <u>Section 2.22(c)</u>, then the fees payable to the Banks pursuant to <u>Section 3.3</u> shall be adjusted ratably in accordance with their respective Commitments; and

(v)     if any Defaulting Bank's L/C Obligations are neither cash collateralized nor reallocated pursuant to this <u>Section 2.22(c)</u>, then, without prejudice to any rights or remedies of the applicable Issuing Bank or any Bank hereunder, all Commitment Fees that otherwise would have been payable to such Defaulting Bank (solely with respect to the portion of such Defaulting Bank's Commitment that was utilized by such L/C Obligations) and letter of credit fees payable under <u>Section 3.3</u> with respect to such Defaulting Bank's L/C Obligations shall be payable to the applicable Issuing Bank until such L/C Obligations are cash collateralized and/or reallocated.

509265-1983-14872-Active.19588122.12

(d)    So long as any Bank is a Defaulting Bank, no Issuing Bank shall be required to issue, amend or increase any Letter of Credit, unless it is satisfied that the related exposure will be 100% covered by the Commitments of the non-Defaulting Banks and/or cash collateral will be provided by the Company in accordance with Section 2.22(c), and participating interests in any such newly issued or increased Letter of Credit shall be allocated among non-Defaulting Banks in a manner consistent with Section 2.22(c)(i) (and Defaulting Banks shall not participate therein).

(e)    Any amount payable to such Defaulting Bank hereunder (whether on account of principal, interest, fees or otherwise and including any amount that would otherwise be payable to such Defaulting Bank pursuant to Section 2.16, but excluding amounts payable pursuant to Section 2.23) shall, in lieu of being distributed to such Defaulting Bank, subject to any applicable requirements of law, be applied at such time or times as may be determined by the Paying Agent (i) first, to the payment of any amounts owing by such Defaulting Bank to the Paying Agent hereunder, (ii) second, pro rata, to the payment of any amounts owing by such Defaulting Bank to the Issuing Banks hereunder, (iii) third, if so determined by the Paying Agent or requested by an Issuing Bank, held in such account as cash collateral for future funding obligations of the Defaulting Bank in respect of any existing or future participating interest in any Letter of Credit, (iv) fourth, to the funding of any Loan in respect of which such Defaulting Bank has failed to fund its portion thereof as required by this Agreement, as determined by the Paying Agent, (v) fifth, if so determined by the Paying Agent and the Company, held in such account as cash collateral for future funding obligations of the Defaulting Bank in respect of any Loans under this Agreement, (vi) sixth, to the payment of any amounts owing to the Banks or an Issuing Bank as a result of any judgment of a court of competent jurisdiction obtained by any Bank or such Issuing Bank against such Defaulting Bank as a result of such Defaulting Bank's breach of its obligations under this Agreement, (vii) seventh, to the payment of any amounts owing to the Company as a result of any judgment of a court of competent jurisdiction obtained by the Company against such Defaulting Bank as a result of such Defaulting Bank's breach of its obligations under this Agreement, and (viii) eighth, to such Defaulting Bank or as otherwise directed by a court of competent jurisdiction, provided, with respect to this clause (viii), that if such payment is (x) a prepayment of the principal amount of any Loans or reimbursement obligations in respect of any drafts paid by an Issuing Bank under any Letters of Credit which a Defaulting Bank has funded its participation obligations and (y) made at a time when the conditions set forth in Section 4.3 are satisfied, such payment shall be applied solely to prepay the Loans of, and reimbursement obligations owed to, all non-Defaulting Banks pro rata prior to being applied to the prepayment of any Loans, or reimbursement obligations owed to, any Defaulting Bank.

In the event that the Paying Agent, each Issuing Bank and the Company each agrees that a Defaulting Bank has adequately remedied all matters that caused such Bank to be a Defaulting Bank or upon receipt by the Paying Agent of the confirmation referred to in clause (c) of the definition of "Defaulting Bank", as applicable, then on such date such Bank shall purchase at par such portion of the Loans of the other Banks as the Paying Agent shall determine may be necessary in order for such Bank to hold such Loans ratably in accordance with its Commitment.

Section 2.23 Mitigation Obligations; Replacement of Banks. (a)    If any Bank requests compensation under Section 2.12 or Section 2.18, or if the Company is required to pay any additional amount to any Bank or any Governmental Authority for the account of any Bank pursuant to Section 2.12 or Section 2.18, then such Bank shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Bank, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.12 or Section 2.18 in the future and (ii) would not subject such Bank to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Bank.

40

The Company hereby agrees to pay all reasonable costs and expenses incurred by any Bank in connection with any such designation or assignment.

(b)    If (i) any Bank requests compensation under Section 2.12 or Section 2.18, (ii) the Company is required to pay any additional amount to any Bank or any Governmental Authority for the account of any Bank pursuant to Section 2.12 or Section 2.18, (iii) an event contemplated under Section 2.10 or Section 2.13 shall have occurred with respect to any Bank, (iv) any Bank becomes a Defaulting Bank or (v) any Bank becomes a Non-Extending Bank, then, in each case, the Company may, at its sole expense and effort, upon notice to such Bank and the Paying Agent, require such Bank to assign and delegate, without recourse (except for certain customary representations and warranties, in accordance with and subject to the restrictions contained in Section 9.10), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Bank, if a Bank accepts such assignment); provided that (i) the Company shall have received the prior written consent of the Paying Agent, which consent shall not unreasonably be withheld, (ii) such Bank shall have received payment of an amount equal to the outstanding principal of its Loans and participations in any drafts paid by an Issuing Bank under any Letters of Credit, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Company (in the case of all other amounts), (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.12 or Section 2.18 or payments required to be made pursuant to Section 2.12 or Section 2.18, such assignment will result in a reduction in such compensation or payments and (iv) in the case of any such assignment resulting from a Bank becoming a Non-Extending Bank, such assignee shall have provided written notice to the Paying Agent that it consents to the requested extension of the Existing Termination Date with respect any Commitments held (or to be held) by it on the applicable Extension Date. A Bank shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Bank or otherwise, the circumstances entitling the Company to require such assignment and delegation cease to apply.

Section 2.24 Commitment Increases.

(a)    The Company and any one or more Banks (including New Banks) may from time to time agree that such Banks shall obtain or increase the amount of their Commitments by executing and delivering to the Paying Agent an Increased Facility Activation Notice specifying (i) the amount of such increase and (ii) the applicable Increased Facility Closing Date; provided that (i) the aggregate amount of incremental Commitments obtained after the Effective Date pursuant to this Section 2.24 shall not exceed $500,000,000, (ii) with respect to any Increased Facility Closing Date, the increases effected on such date pursuant to this Section 2.24 shall be in a minimum amount of $25,000,000 and (iii) no more than four Increased Facility Closing Dates may occur after the Effective Date. No Bank shall have any obligation to participate in any increase described in this paragraph unless it agrees to do so in its sole discretion.

(b)    Any additional bank or financial institution which, with the consent of the Company, each Issuing Bank (which consent shall not be unreasonably withheld) and the Paying Agent (which consent shall not be unreasonably withheld), elects to become a "Bank" under this Agreement in connection with any increase described in Section 2.24(a) shall execute a New Bank Supplement (each, a "New Bank Supplement"), substantially in the form of Exhibit H-2, whereupon such bank or financial institution (each, a "New Bank") shall become a Bank for all purposes and to the same extent as if originally a party hereto and shall be bound by and entitled to the benefits of this Agreement.

(c)    On each Increased Facility Closing Date, each Bank holding Committed Loans prior to giving effect to this Section 2.24(c) (each, an "Existing Bank") shall be deemed to have assigned to each

41

Bank participating in the relevant Commitment increase (each, an "Increased Facility Bank"), and each such Increased Facility Bank shall be deemed to have purchased from each Existing Bank, at the principal amount thereof (together with accrued interest), such interests in the Committed Loans and participations in Letters of Credit outstanding on such date as shall be necessary in order that, after giving effect to all such assignments and purchases, such Committed Loans and participations in Letters of Credit will be held by all the Banks (including such Increased Facility Banks) ratably in accordance with the percentage which its Commitment represents of the Total Commitment after giving effect to the increase to the Commitments on such Increased Facility Closing Date. In furtherance of the foregoing, on such Increased Facility Closing Date, (i) each Increased Facility Bank agrees to make payments to the Paying Agent for the benefit of the Existing Banks in an amount equal to the principal amount (together with accrued interest) of the interests in the Committed Loans and funded participations in any Letters of Credit relating to any unreimbursed drawings thereunder deemed to have been purchased by such Increased Facility Bank on such Increased Facility Closing Date pursuant to the immediately preceding sentence and (ii) each Existing Bank agrees to accept payments in an amount equal to the principal amount (together with accrued interest) of the interests in the Committed Loans and funded participations in any Letters of Credit relating to any unreimbursed drawings thereunder deemed to have been assigned by such Existing Bank on such Increased Facility Closing Date pursuant to the immediately preceding sentence.

(d)    The effectiveness of any increase to the Commitments pursuant to this Section 2.24 shall be subject to the satisfaction of the following conditions precedent: (i) no Default or Event of Default shall have occurred and be continuing immediately prior to, and immediately after, giving effect to such increase to the Commitments, (ii) the representations and warranties contained in Article V shall be correct in all material respects (or, to the extent subject to materiality or Material Adverse Effect qualifiers, in all respects) on and as of the date of such increase to the Commitments (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date), immediately prior to, and after giving effect to, such increase to the Commitments, as though made on and as of such date, (iii) on a pro forma basis after giving effect to (x) such increase to the Commitments (assuming such incremental Commitments are fully drawn) and (y) any permanent repayment of Debt after the last day of the most recently ended fiscal quarter for which the Company's annual or quarterly Financial Statements have been most recently required to have been delivered pursuant to Section 6.01 (assuming, for such purpose, that (A) such increase to the Commitments (and the full drawing thereof) and any such permanent repayment of Debt occurred on the first day of the four fiscal quarter period for which the Company's annual or quarterly Financial Statements have been most recently required to have been delivered pursuant to Section 6.01 and (B) such incremental Commitments had been borrowed as Eurodollar Loans with successive one-month Interest Periods during the four fiscal quarter period for which the Company's annual or quarterly Financial Statements have been most recently required to have been delivered pursuant to Section 6.01), the Coverage Ratio shall not be less than 1.25 to 1.0 and (iv) the Company shall have delivered such legal opinions, board resolutions, certificates and other documents reasonably requested by the Paying Agent in connection with such increase to the Commitments.

Section 2.25 Extension of the Termination Date.

(a)    The Company may, by notice (the date of such notice, the "Request Date") to the Paying Agent (who shall promptly notify the Banks) not earlier than 60 days and not later than 30 days prior to any anniversary of the Effective Date (each a "Relevant Anniversary Date"), request that each Bank extend such Bank's Termination Date for an additional year from the Termination Date then in effect hereunder (the "Existing Termination Date"; any anniversary of the Existing Termination Date to which Commitments shall be extended being called the "Extended Termination Date"); provided that the Company shall not make more than two such requests during the term of this Agreement.

509265-1983-14872-Active.19588122.12

(b)    Each Bank, acting in its sole and individual discretion, shall, by written notice to the Paying Agent given not later than the date that is 20 days following the Request Date (the "Notice Deadline"), advise the Paying Agent whether or not such Bank agrees to such extension (and each Bank that determines not to so extend its Termination Date (a "Non-Extending Bank") shall notify the Paying Agent of such fact promptly after such determination (but in any event no later than the Notice Deadline)) and any Bank that does not so advise the Paying Agent on or before the Notice Deadline shall be deemed to be a Non-Extending Bank. The election of any Bank to agree to such extension shall not obligate any other Bank to so agree. Promptly following the Notice Deadline, the Paying Agent shall notify the Company of each Bank's determination under this Section.

(c)    The Company shall have the right on or before the Relevant Anniversary Date to replace each Non-Extending Bank with, and add as "Banks" under this Agreement in place thereof, one or more assignees with Commitments terminating on the Extended Termination Date (each, an "Additional Commitment Bank") as provided in Section 2.23(b), each of which Additional Commitment Banks shall have entered into an Assignment and Assumption pursuant to which such Additional Commitment Bank shall undertake a Commitment of such Non-Extending Bank at par (and, if any such Additional Commitment Bank is already a Bank, its Commitment of such Non-Extending Bank shall be in addition to such Bank's Commitment hereunder on such date).

(d)    If (and only if) the aggregate Commitments of the Banks that have agreed to so to extend their Termination Date pursuant to this Section 2.25 and the additional Commitments of the Additional Commitment Banks shall be more than 50% of the aggregate amount of the Commitments in effect immediately prior to the Relevant Anniversary Date, then, effective as of the Relevant Anniversary Date (each such effective date, an "Extension Date"), the Termination Date of each extending Bank and of each Additional Commitment Bank shall be extended to the Extended Termination Date (except that, if such date is not a Business Day, such Extended Termination Date shall be the immediately preceding Business Day), so long as: (i) at the time of and immediately after giving effect to such extension, no Default or Event of Default shall have occurred and be continuing and (ii) the representations and warranties contained in Article V shall be correct in all material respects (or, to the extent subject to materiality or Material Adverse Effect qualifiers, in all respects) on and as of the date of such extension (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date), immediately prior to, and after giving effect to, such extension, as though made on and as of such date.

(e)

(i)    Any Non-Extending Bank may, by written notice to the Paying Agent, at any time after the relevant Extension Date and prior to the applicable Existing Termination Date, elect to extend its Termination Date to the Extended Termination Date and, upon the Paying Agent's receipt of such written notice from any Non-Extending Bank, (x) the Termination Date of such Bank shall be automatically extended to the Extended Termination Date (except that, if such date is not a Business Day, such Extended Termination Date shall be the immediately preceding Business Day) and (y) such Bank shall no longer be a Non-Extending Bank with respect to the applicable extension. The Paying Agent shall promptly give notice to the Company of any such extension pursuant to this Section 2.21(e)(i).

(ii)    On the Termination Date applicable to the Loans of any Non-Extending Bank, the Company shall repay any then outstanding Loans of such Non-Extending Bank (and pay any additional amounts required pursuant to Section 2.14). Following any extension pursuant to this Section 2.25, the L/C Obligations shall continue to be deemed to be held

43

ratably among the Banks, but on the Termination Date applicable to the Loans of any Non-Extending Bank, the L/C Obligations deemed to be held by such Non-Extending Bank immediately prior to giving effect to such Termination Date shall be ratably reallocated, to the extent of the unused Commitments of the extending Banks, to such extending Banks (without regard to whether the conditions set forth in Section 4.3 can then be satisfied); provided that the Company shall repay the Loans of the extending Banks pro rata to the extent necessary to allow the L/C Obligations deemed to be held by such Non-Extending Bank immediately prior to giving effect to such Termination Date to be fully reallocated to the extending Banks.

(f)    Conflicting Provisions. This Section 2.25 shall supersede any provisions in Section 2.15 or Section 9.1 to the contrary.

## ARTICLE III

## LETTERS OF CREDIT

Section 3.1 L/C Commitment

(a)    Subject to the terms and conditions hereof, each Issuing Bank, in reliance on the agreements of the other Banks set forth in Section 3.4(a), agrees to issue letters of credit ("Letters of Credit") in dollars for the account of the Company on any Business Day on and after the Effective Date and until the termination of the Commitment of the Issuing Bank in accordance with the terms hereof, in such form as may be approved from time to time by the Issuing Bank; provided that Barclays Bank PLC shall have no obligation to issue commercial Letters of Credit hereunder; provided, further, that no Issuing Bank shall issue any Letter of Credit if, after giving effect to such issuance, (i) the L/C Obligations would exceed the L/C Commitment or (ii) the excess of the Total Commitment over the aggregate amount of Loans and L/C Obligations then outstanding would be less than zero; provided, further, that no Initial Issuing Bank shall at any time be obligated to issue any Letter of Credit if, after giving effect to such issuance, the sum of (x) the aggregate undrawn and unexpired amount of all then outstanding Letters of Credit issued by such Initial Issuing Bank and (y) the aggregate amount of drawings under Letters of Credit issued by such Initial Issuing Bank that have not then been reimbursed pursuant Section 3.5 would exceed $100,000,000. Each Letter of Credit shall (i) be denominated in dollars and (ii) expire no later than the earlier of (x) the first anniversary of its date of issuance and (y) the date that is five Business Days prior to the later of (A) the Original Termination Date and (B) if any Commitments are extended pursuant to Section 2.25, such extended termination date as determined pursuant to Section 2.25, provided that any Letter of Credit with a one-year term may provide for the renewal thereof for additional one-year periods (which shall in no event extend beyond the date referred to in clause (y) above).

(b)    No Issuing Bank shall at any time be obligated to issue any Letter of Credit if such issuance would conflict with, or cause such Issuing Bank or any L/C Participant to exceed any limits imposed by, any applicable Laws.

Section 3.2 Procedure for Issuance of Letter of Credit. The Company may from time to time request that the Issuing Bank issue a Letter of Credit by delivering to the Issuing Bank at its address for notices specified herein an Application therefor, completed to the reasonable satisfaction of the Issuing Bank, and such other certificates, documents and other papers and information as the Issuing Bank may reasonably request. Upon receipt of any Application, the Issuing Bank will process such Application and

44

the certificates, documents and other papers and information delivered to it in connection therewith in accordance with its customary procedures and shall promptly issue the Letter of Credit requested thereby (but in no event shall the Issuing Bank be required to issue any Letter of Credit earlier than three Business Days after its receipt of the Application therefor and all such other certificates, documents and other papers and information relating thereto) by issuing the original of such Letter of Credit to the beneficiary thereof or as otherwise may be agreed by the Issuing Bank and the Company. The Issuing Bank shall furnish a copy of such Letter of Credit to the Company promptly following the issuance thereof. The Issuing Bank shall promptly furnish to the Paying Agent, which shall in turn promptly furnish to the Banks, notice of the issuance of each Letter of Credit (including the amount thereof).

Section 3.3 Fees and Other Charges

(a)    The Company will pay to the Paying Agent for the ratable benefit of the Banks on each Quarterly Payment Date after the issuance date and on the Termination Date a fee on all outstanding Letters of Credit at a per annum rate equal to the Applicable Rate then in effect with respect to Eurodollar Loans. In addition, the Company shall pay to the Issuing Bank for its own account a fronting fee at a per annum rate separately agreed upon between the Company and the Issuing Bank (which fee, in the case of Citibank, N.A., is reflected in the fee letter dated June 23, 2016, between the Company and Citibank, N.A. and, in the case of JPMorgan Chase Bank, N.A., is reflected in the fee letter dated June 23, 2016, between the Company and JPMorgan Chase Bank, N.A.) on the undrawn and unexpired amount of each Letter of Credit, payable quarterly in arrears on each Quarterly Payment Date after the issuance date and on the Termination Date. Fees payable pursuant this Section 3.3(a) shall be calculated on the basis of a 360-day year for the actual days elapsed.

(b)    In addition to the foregoing fees, the Company shall pay or reimburse the Issuing Bank for such normal and customary costs and expenses as are incurred or charged by the Issuing Bank in issuing, negotiating, effecting payment under, amending or otherwise administering any Letter of Credit.

Section 3.4 L/C Participations

(a)    The Issuing Bank irrevocably agrees to grant and hereby grants to each L/C Participant, and, to induce the Issuing Bank to issue Letters of Credit, each L/C Participant irrevocably agrees to accept and purchase and hereby accepts and purchases from the Issuing Bank, on the terms and conditions set forth below, for such L/C Participant's own account and risk an undivided interest, equal to the percentage which such L/C Participant's Commitment represents of the Total Commitment, in the Issuing Bank's obligations and rights under and in respect of each Letter of Credit and the amount of each draft paid by the Issuing Bank thereunder. Each L/C Participant unconditionally and irrevocably agrees with the Issuing Bank that, if a draft is paid under any Letter of Credit for which the Issuing Bank is not reimbursed in full by the Company in accordance with the terms of this Agreement, such L/C Participant shall pay to the Issuing Bank upon demand a fraction of the amount of such draft, or any part thereof, that is not so reimbursed, equal to the percentage which such L/C Participant's Commitment represents of the Total Commitment.

(b)    If any amount required to be paid by any L/C Participant to the Issuing Bank pursuant to Section 3.4(a) in respect of any unreimbursed portion of any payment made by the Issuing Bank under any Letter of Credit is paid to the Issuing Bank within three Business Days after the date such payment is due, such L/C Participant shall pay to the Issuing Bank on demand an amount equal to the product of (i) such amount, times (ii) the daily average Federal Funds Effective Rate during the period from and including the date such payment is required to the date on which such payment is immediately available to the Issuing Bank, times (iii) a fraction the numerator of which is the number of days that elapse during such period and

45

509265-1983-14872 Active.19588122.12

the denominator of which is 360. If any such amount required to be paid by any L/C Participant pursuant to Section 3.4(a) is not made available to the Issuing Bank by such L/C Participant within three Business Days after the date such payment is due, the Issuing Bank shall be entitled to recover from such L/C Participant, on demand, such amount with interest thereon calculated from such due date at the rate per annum applicable to Alternate Base Loans. A certificate of the Issuing Bank submitted to any L/C Participant with respect to any amounts owing under this Section shall be conclusive in the absence of manifest error.

(c)    Whenever, at any time after the Issuing Bank has made payment under any Letter of Credit and has received from any L/C Participant its pro rata share of such payment in accordance with Section 3.4(a), the Issuing Bank receives any payment related to such Letter of Credit (whether directly from the Company or otherwise, including proceeds of collateral applied thereto by the Issuing Bank), or any payment of interest on account thereof, the Issuing Bank will distribute to such L/C Participant its pro rata share thereof; provided, however, that in the event that any such payment received by the Issuing Bank shall be required to be returned by the Issuing Bank, such L/C Participant shall return to the Issuing Bank the portion thereof previously distributed by the Issuing Bank to it.

Section 3.5 Reimbursement Obligation of the Company. If any draft is paid under any Letter of Credit, the Company shall reimburse the Issuing Bank for the amount of (a) the draft so paid and (b) any Taxes, fees, charges or other costs or expenses incurred by the Issuing Bank in connection with such payment, not later than 12:00 noon, New York City time, on (i) the Business Day that the Company receives notice of such draft, if such notice is received on such day prior to 10:00 a.m., New York City time, or (ii) if clause (i) above does not apply, the Business Day immediately following the day that the Company receives such notice. Each such payment shall be made to the Issuing Bank at its address for notices referred to herein in dollars and in immediately available funds. Interest shall be payable on any such amounts from the date on which the relevant draft is paid until payment in full at the rate set forth in (x) until the Business Day next succeeding the date of the relevant notice, Section 2.8(b) and (y) thereafter, Section 2.9.

Section 3.6 Obligations Absolute. The Company's obligations under this Article III shall be absolute and unconditional under any and all circumstances and irrespective of any setoff, counterclaim or defense to payment that the Company may have or have had against the Issuing Bank, any beneficiary of a Letter of Credit or any other Person. The Company also agrees with the Issuing Bank that the Issuing Bank shall not be responsible for, and the Company's Reimbursement Obligations under Section 3.5 shall not be affected by, among other things, the validity or genuineness of documents or of any endorsements thereon, even though such documents shall in fact prove to be invalid, fraudulent or forged, or any dispute between or among the Company and any beneficiary of any Letter of Credit or any other party to which such Letter of Credit may be transferred or any claims whatsoever of the Company against any beneficiary of such Letter of Credit or any such transferee. The Issuing Bank shall not be liable for any error, omission, interruption or delay in transmission, dispatch or delivery of any message or advice, however transmitted, in connection with any Letter of Credit, except for errors or omissions found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence, willful misconduct or bad faith of the Issuing Bank. The Company agrees that any action taken or omitted by the Issuing Bank under or in connection with any Letter of Credit or the related drafts or documents, if done in the absence of gross negligence, willful misconduct or bad faith and in accordance with the standards of care specified in the Uniform Commercial Code of the State of New York, shall be binding on the Company and shall not result in any liability of the Issuing Bank to the Company.

Section 3.7 Letter of Credit Payments. If any draft shall be presented for payment under any Letter of Credit, the Issuing Bank shall promptly notify the Company of the date and amount thereof. The responsibility of the Issuing Bank to the Company in connection with any draft presented for payment

46

509265-1983-14872-Active.19588122.12

under any Letter of Credit shall, in addition to any payment obligation expressly provided for in such Letter of Credit, be limited to determining that the documents (including each draft) delivered under such Letter of Credit in connection with such presentment are substantially in conformity with such Letter of Credit.

Section 3.8 <u>Applications</u>. To the extent that any provision of any Application related to any Letter of Credit is inconsistent with the provisions of this <u>Article III</u>, the provisions of this <u>Article III</u> shall apply.

## ARTICLE IV

## CONDITIONS OF LENDING

Section 4.1 <u>Conditions Precedent</u>. The effectiveness of this Agreement is subject to the satisfaction of the following conditions precedent:

(a)     The Paying Agent shall have received this Agreement, executed and delivered by the Paying Agent, the Co-Administrative Agents, the Company, each Person listed on <u>Schedule I</u> and each of the other parties hereto.

(b)   The Paying Agent shall have received the following, each dated (unless otherwise indicated) the Effective Date:

(i)     Officer's Certificates dated the Effective Date certifying, <u>inter alia</u>, (i) true and correct copies of resolutions adopted by the Board of Directors or Executive Committee, as appropriate, of the Company authorizing the Company to borrow and effect other transactions hereunder, (ii) a true and correct copy of the Company's bylaws in effect on the date hereof, (iii) the incumbency and specimen signatures of the Persons executing any documents on behalf of the Company, (iv) the truth of the representations and warranties made by the Company in this Agreement (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date), and (v) the absence of the occurrence and continuance of any Default or Event of Default.

(ii)     A copy of the Company's charter and all amendments thereto, accompanied by certificates that such copy is correct and complete, one certificate dated within a reasonable time prior to the Effective Date and issued by the Secretary of State of Texas and one certificate dated the Effective Date and executed by the corporate secretary or assistant secretary of the Company.

(iii)     Certificates (dated within twenty days prior to the Effective Date) of existence and good standing of the Company from appropriate officials of Texas.

(iv)     The written opinions of internal and outside counsel to the Company and counsel to the Paying Agent, substantially in the form set out in <u>Exhibits C-1</u>, <u>C-2</u> and <u>C-3</u>, respectively, each dated the Effective Date.

(v)     An Administrative Questionnaire (dated any date on or prior to the Effective Date) completed by each Bank which is a party hereto on the Effective Date.

47

509265-1983-14872-Active.19588122.12

(vi)    Such other agreements, documents, instruments, opinions, certificates, and evidences as the Paying Agent may reasonably request prior to the Effective Date.

(c)    Any fees or expenses of the Paying Agent, the other Agents and the Banks required to be paid on or before the Effective Date shall have been paid.

(d)    The commitments under the Existing Credit Agreement shall have been terminated and all amounts owing thereunder shall have been paid in full. Each party hereto that is also a party to the Existing Credit Agreement hereby waives any requirement under the Existing Credit Agreement of advance notice for any such termination or payment.

Section 4.2 <u>Conditions Precedent to Each Committed Borrowing</u>. The obligation of each Bank to make a Committed Loan on the occasion of any Committed Borrowing (including the initial Committed Borrowing, but excluding any Committed Borrowing used exclusively to finance the payment of any Reimbursement Obligation) shall be subject to the further conditions precedent that on the date of such Committed Borrowing the following statements shall be true (and each of the giving of the applicable Notice of Committed Borrowing and the acceptance by the Company of the proceeds of such Committed Borrowing shall constitute a representation and warranty by the Company that on the date of such Committed Borrowing such statements are true):

(a)    The representations and warranties contained in <u>Article V</u> (except the last sentence of <u>Section 5.2</u> and except <u>Section 5.5</u>) are correct in all material respects (or, to the extent subject to materiality or Material Adverse Effect qualifiers, in all respects) on and as of the date of such Committed Borrowing (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date), before and after giving effect to such Committed Borrowing, as though made on and as of such date;

(b)    No event has occurred and is continuing, or would result from such Committed Borrowing, which constitutes either a Default or an Event of Default; ~~and~~provided, for the avoidance of doubt, that no Default or Event of Default in respect of Section 6.12 shall have occurred and be continuing nor result from the making of such Borrowing on and as of the date of such Borrowing, without giving effect to any Collateral Coverage Test Cure Period; and

(c)    Following the making of such Committed Borrowing and all other Borrowings to be made on the same day under this Agreement, the sum of the aggregate principal amount of all Loans then outstanding and of the L/C Obligations shall not exceed the Total Commitment.

Section 4.3 <u>Conditions Precedent to Each Letter of Credit Issuance</u>. The obligation of the Issuing Bank to issue a Letter of Credit (including the initial Letter of Credit) shall be subject to the further conditions precedent that on the date of the issuance of such Letter of Credit the following statements shall be true (and each delivery of an Application by the Company shall constitute a representation and warranty by the Company that on the date of such Application such statements are true):

(a)    The representations and warranties contained in <u>Article V</u> (except the last sentence of <u>Section 5.2</u> and except <u>Section 5.5</u>) are correct in all material respects (or, to the extent subject to materiality or Material Adverse Effect qualifiers, in all respects) on and as of the date of the issuance of such Letter of Credit (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date), before and after giving effect to such issuance, as though made on and as of such date;

48

(b)    No event has occurred and is continuing, or would result from the issuance of such Letter of Credit, which constitutes either a Default or an Event of Default; and

(c)    Following the issuance of such Letter of Credit and the making of any Borrowings to be made on the same day under this Agreement, the sum of the aggregate principal amount of all Loans then outstanding and of the L/C Obligations shall not exceed the Total Commitment.

Section 4.4 <u>Legal Details</u>. All documents executed or submitted pursuant hereto by the Company shall be reasonably satisfactory in form and substance to the Paying Agent and its counsel. The Paying Agent shall, promptly following satisfaction of the conditions specified in <u>Section 4.1</u>, notify the Company and each of the Banks of such satisfaction and the date of the Effective Date. All legal matters incident to the transactions contemplated by this Agreement (including without limitation matters arising from time to time as a result of changes occurring with respect to any Laws) shall be reasonably satisfactory to counsel to the Paying Agent.The Company represents and warrants to the Agents and Banks as follows:

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

Section 5.1 <u>Organization, Authority and Qualifications</u>

(a)    The Company and each of its Material Subsidiaries is a Person duly organized, validly existing, and in good standing under the Laws of the jurisdiction of its organization;

(b)    The Company has the corporate power and authority to execute, deliver, and perform this Agreement and the other Loan Papers to which it is a party and to borrow hereunder;

(c)    On the Effective Date, the Company and each of its Material Subsidiaries is duly qualified as a foreign Person to do business and is in good standing in every jurisdiction where the character of its Properties or nature of its activities make such qualification necessary, except where the failure to be so qualified or in good standing would not have a Material Adverse Effect; and

(d)    On the Effective Date, the Company has no Material Subsidiaries.

Section 5.2 <u>Financial Statements</u>. The Current Financials present fairly in all material respects the consolidated financial position of the Company and its Subsidiaries on the date thereof and the consolidated results of operations and changes in financial position of the Company and its Subsidiaries for the period then ended, all in conformity with GAAP. Except for transactions related to or contemplated by the Loan Papers and transactions disclosed in Forms 10-Q and 8-K that the Company shall have filed with the Securities and Exchange Commission before the Effective Date, there has been no Material Adverse Change since December 31, 2015.

Section 5.3 <u>Compliance with Agreement and Laws</u>. On the Effective Date, neither the Company nor any of its Material Subsidiaries is in default in any material respect under the provisions of any instrument evidencing any material obligation, indebtedness, or liability of the Company or any of its Material Subsidiaries or of any agreement relating thereto. Neither the Company nor any of its Material Subsidiaries is in violation of any Law, which default or violation would have a Material Adverse Effect.

509265-1983-14872-Active.19588122.12

Section 5.4 <u>Authorization; No Breach; and Valid Agreements</u>. The execution, delivery, and performance of this Agreement, the borrowings hereunder, and the execution, delivery, and performance of the other Loan Papers to which it is a party by the Company have been duly authorized by all requisite corporate action on the part of the Company and will not violate its charter or bylaws and will not violate any Law or any order of any Tribunal, and will not conflict with, result in a breach of the provisions of or constitute a default under, or result in the imposition of any Lien upon the Property of the Company pursuant to the provisions of, any material loan agreement, credit agreement, indenture, mortgage, deed of trust, franchise, permit, license, note, contract, or other material agreement or instrument to which the Company is now a party. The Loan Papers that include obligations of the Company are the legal, valid and binding obligations of the Company and are enforceable in accordance with their respective terms, except as such enforceability may be limited by general equitable principles (whether enforcement is sought by proceedings in equity or at law) or applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally.

Section 5.5 <u>Litigation and Judgments</u>. Except as previously disclosed to the Paying Agent in writing, neither the Company nor any of its Subsidiaries is either party to or aware of the threat of any Litigation which has, in the Company's opinion, a reasonable probability of success and which, if determined adversely to the Company or such Subsidiary, would have a Material Adverse Effect. To the knowledge of the Company, on the Effective Date there is no outstanding unsatisfied money judgment against the Company or any of its Subsidiaries in an amount in excess of $50,000,000, and there are no outstanding unsatisfied money judgments against the Company or any of its Subsidiaries which individually or in the aggregate have or would have a Material Adverse Effect.

Section 5.6 <u>Ownership of Properties</u>. The Company and each of its Material Subsidiaries has good and marketable title (except for Permitted Liens) to all of the Pool Assets, and owns or has valid leasehold (or, in the case of ~~I~~intellectual ~~P~~property, license) interests in all of its other material Properties which are owned or used in connection with its business.

Section 5.7 <u>Taxes</u>. To the extent that failure to do so would have a Material Adverse Effect, the Company and each of its Material Subsidiaries has filed all Tax returns or reports required of it and has paid all Tax liability shown thereon as due to the extent the same has become due and before it may have become delinquent (except to the extent being contested in good faith by appropriate proceedings and for which adequate reserves have been established). As of the Effective Date, the federal income tax liability of the Company and its Subsidiaries has been audited by the Internal Revenue Service and has been finally determined and satisfied for all taxable years at least up to and including the taxable year ended December 31, 2013.

Section 5.8 <u>Approvals Required</u>. Neither the execution and delivery of this Agreement and the other Loan Papers to which it is a party by the Company, nor the consummation by the Company of any of the transactions contemplated hereby or thereby requires the consent or approval of, the giving of notice to, or the registration, recording, or filing of any document with, or the taking of any other action in respect of any Tribunal except for the routine filing of copies of this Agreement and certain other Loan Papers with the Securities and Exchange Commission, except for any of the foregoing required of any Bank or Agent.

Section 5.9 <u>Business; Status as Air Carrier</u>. The Company is an air carrier engaged in scheduled air transportation and is in all material respects duly qualified and licensed under all applicable Laws to carry on its business as a scheduled airline currently subject to regulation by the ~~Federal Aviation Administration~~FAA and the Department of Transportation.

50

Section 5.10 <u>ERISA Compliance</u>. The Company is in compliance in all material respects with ERISA and the rules and regulations thereunder. No Plan of the Company has materially failed to satisfy the "minimum funding standards" of ERISA or is in "at risk" status (within the meaning of ERISA).

Section 5.11 <u>Insurance</u>. The Company maintains with insurance companies or associations of recognized responsibility (or, as to workers' compensation or similar insurance, with an insurance fund or by self-insurance authorized by the jurisdictions in which it operates) insurance concerning its Properties and businesses against such casualties and contingencies and of such types and in such amounts (and with co-insurance, self-insurance and deductibles) as it determines to be prudent and consistent with its insurance and loss prevention policies, and in such forms and covering such risks as may then be customary with airlines of a comparable credit standing flying equipment and routes comparable to the Company.

Section 5.12 <u>Purpose of Loan</u>. The proceeds of the Loans will be used for general corporate purposes, including acquisitions, and no part of the proceeds of any Loan will be used for any purpose which would violate, or be inconsistent with, any of the margin regulations of the Fed Reserve Board.

Section 5.13 <u>Investment Company Act</u>. Neither the Company nor any of its Subsidiaries is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

Section 5.14 <u>General</u>. As of the Effective Date, there is no material fact or condition relating to the financial condition and business of the Company and its Subsidiaries which is not reflected in its most recently filed financial statements or any posted SEC Form 8-K which has a Material Adverse Effect and which has not been related, in writing, to the Paying Agent, other than industry-wide risks in the ordinary course of business associated with the types of business conducted by the Company and its Subsidiaries.

Section 5.15 <u>EEA Financial Institutions</u>. The Company is not an EEA Financial Institution.

Section 5.16 <u>Anti-Corruption Laws and Sanctions</u>. The Company has implemented and maintains in effect policies and procedures designed to maintain material compliance by the Company, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Company, its Subsidiaries and their respective officers and employees, and to the knowledge of the Company its directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in the Company being designated as a Sanctioned Person. None of (a) the Company, any of its Subsidiaries or to the knowledge of the Company or such Subsidiary of the Company any of their respective directors, officers or employees, or (b) to the knowledge of the Company, any agent of the Company or any of its Subsidiaries that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No Loan or Letter of Credit, use of proceeds or other transaction contemplated by this Agreement will violate any Anti-Corruption Law or applicable Sanctions. Notwithstanding the foregoing or any other provision of this Agreement, the Company shall not be in breach of this Section 5.16 or Section 6.3 if it operates any of its aircraft (including any Pool Asset) in a Sanctioned Country for which it has obtained legal authority from the United States government to conduct operations in such Sanctioned Country.

Section 5.17 Security Interests. The Aircraft Mortgage is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Aircraft covered thereby except as such enforceability may be limited by general equitable principles (whether enforcement is sought by proceedings in equity or at law) or applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally. So

51

509265-1983-14872-Active.19588122.12

long as the Company may borrow hereunder and until the Obligations have been paid in full, the Company covenants as follows:

## ARTICLE VI

## COVENANTS

Section 6.1 <u>Performance of Obligations</u>. The Company shall duly and punctually pay and perform each of the Obligations under this Agreement and the other Loan Papers under which the Company has Obligations.

Section 6.2 <u>Compliance with Laws</u>. The Company shall comply, and shall cause each of its Material Subsidiaries to comply, in all material respects with all applicable Laws, except for any noncompliance which individually or in the aggregate would not have a Material Adverse Effect, and such compliance shall include, without limitation, paying before the same become delinquent all Taxes imposed upon the Company or any of its Material Subsidiaries or its or their Properties, except to the extent contested diligently and in good faith by proper proceedings, and for which adequate reserves are established in accordance with GAAP.

Section 6.3 <u>Maintenance of Existence, Licenses and Franchises: Compliance With Agreements</u>. Except to the extent otherwise permitted in <u>Article VI</u>, the Company shall maintain, and shall cause each of its Material Subsidiaries to maintain, its existence, and the Company shall preserve and maintain, and shall cause each of its Material Subsidiaries to preserve and maintain, all material licenses, privileges, franchises, certificates, authorizations, and other permits and agreements necessary for the operation of its business. The Company shall comply, and shall cause each of its Material Subsidiaries to comply, with all material agreements binding on it or affecting its properties or business, except for any noncompliance which individually or in the aggregate would not have a Material Adverse Effect. The Company shall maintain in effect and enforce policies and procedures designed to cause material compliance by the Company, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

Section 6.4 <u>Maintenance of Properties</u>. ~~(a)~~ The Company shall, and shall cause each of its Material Subsidiaries to, cause all of its Properties <u>(other than any Aircraft that constitutes Collateral subject to the Mortgaged Aircraft Operating Agreement)</u> used or useful in the conduct of its business to be maintained and kept in good condition, repair, and working order, and supplied with all necessary equipment, and cause to be made all necessary repairs, renewals, replacements, betterments, and improvements thereof, all as in the judgment of the Company may be necessary so that the business carried on in connection therewith may be properly conducted at all times. ~~(b) The Company shall, at its expense, maintain, service, repair, overhaul, improve, and rebuild the Aircraft so as to keep all Aircraft in good operating condition and as required to meet, no later than the applicable termination date (i.e., the date by which compliance with such standards is required), the airworthiness standards of the Federal Aviation Administration and the Department of Transportation (to the extent such standards are applicable to the Aircraft) or the standards observed by the Company with respect to Property of similar type, whichever is higher. The Company shall maintain, service, repair and overhaul all Aircraft in compliance with its Federal Aviation Administration approved maintenance program. The Company shall comply with all Laws of Tribunals having jurisdiction over the Company or the Aircraft, including all applicable requirements of the Federal Aviation Administration and the Department of Transportation as to operation, maintenance, or use of the Aircraft. In the event that any such Law requires alteration of any Aircraft, the Company shall conform thereto or obtain conformance~~

~~52~~

therewith at no expense to the Agents or the Banks no later than the applicable termination date (i.e., the date by which such alteration is required).

(e) Notwithstanding anything to the contrary in this Section 6.4, (A) (i) the Company may place an Aircraft in storage in accordance with the Company's standard storage procedures (including, in the case of Aircraft in the Company's Boeing 737-300 and 737-500 fleet, for decommissioning purposes), (ii) an Aircraft (or any component thereof) may undergo maintenance in accordance with the Company's Federal Aviation Administration approved maintenance program and (iii) an Aircraft may be grounded by applicable government authorities, in each case, without the necessity of keeping such Aircraft in good operating condition or maintaining such Aircraft's airworthiness certification or otherwise complying with the foregoing provisions of this Section 6.4, (B) the Company may contest the applicability of any Laws or directives described in this Section 6.4 in any reasonable manner and defer compliance therewith until such contest is finally determined or adjudicated, so long as, notwithstanding such deferred compliance with respect to any Aircraft, the Company keeps such Aircraft in good operating condition and maintains such Aircraft's airworthiness certification and (C) the Company may defer maintenance and defer conformity with any airworthiness directive in a manner that is consistent with its Federal Aviation Administration approved maintenance program and applicable Laws; provided that if any Aircraft that is a Pool Asset that has been placed into storage or grounded as provided in the preceding clause (A) is not in good operating condition or lacks airworthiness certification (any such Aircraft, a "Non-Compliant Pool Aircraft") for a period of more than 30 days, then, within 60 days of the end of such 30 day period the Company shall be required to replace such Aircraft with another Aircraft in compliance with Section 6.12(b) hereof; provided, further, that the Company shall not permit the Appraised Value of all Non-Compliant Pool Aircraft at any time to exceed an amount equal to 7.5% of the Appraised Value of all Pool Assets at such time for a period of more than ten Business Days.

Section 6.5 Maintenance of Books and Records. The Company shall, and shall cause each of its Subsidiaries to, maintain proper books of record and account in which full, true, and correct entries in conformity in all material respects with GAAP will be made in respect of all financial dealings and transactions that are, individually or in the aggregate, material in relation to their business and activities.

Section 6.6 Inspection. At reasonable times and upon reasonable notice, the Company shall permit, and shall cause each of its Material Subsidiaries to permit, any employees and other representatives of the Paying Agent or any Bank (provided that any visit or examination by any Bank must be coordinated in advance with the Paying Agent), during normal business hours, (1) to visit the Company and inspect any Properties, (other than any Aircraft that constitutes Collateral subject to the Mortgaged Aircraft Operating Agreement), (2) to examine and make extracts from all books of account and all records that relate to the financial operations of the Company (subject to any confidentiality agreements, copyright restrictions, and similar limitations), and (3) to discuss the Company's and Material Subsidiaries' affairs, finances, Properties, condition (financial or otherwise) and accounts with the Company's and Material Subsidiaries' officers, in each case of the preceding clauses (1), and (2) and (3), for the purpose of verifying the accuracy of the various reports delivered by the Company to the Paying Agent and the Banks pursuant to this Agreement or otherwise ascertaining compliance this Agreement and at such times and as often as may be reasonably requested, but in any event in the case of the preceding clauses (1) and (2), so long as no Event of Default has occurred and is continuing, no more than one time per year; provided, however, that (a) any such inspection of Aircraft (i) shall be limited to the Pool Assets, (ii) shall be a visual, walk-around inspection and (iii) may not include opening any panels, bays or the like, (b) no exercise of any inspection rights provided for in this Section 6.6 shall interfere with the normal operation or maintenance of any Aircraft by, or the business of, the Company, and (c) the Paying Agent and each Bank shall cause their respective employees and representatives to hold in strict confidence all information acquired pursuant to such Agent's

53

~~or Bank's Rights under this Section 6.6, except for disclosure to any Affiliate of a Bank as a necessary part of the administration of this Agreement and necessary disclosure to participants in the Loans or Commitments, disclosure in connection with disputes relating to the Loan Papers, or disclosure compelled by judicial or administrative process or by other requirements of Law.~~

Section 6.7 <u>Insurance</u>. The Company shall maintain insurance on its Properties with insurers or associations of recognized standing in such amounts (including by way of self-insurance) as it determines to be prudent and consistent with its insurance and loss prevention policies, and in such forms and covering such risks as may then be customary with airlines of a comparable credit standing flying equipment and routes comparable to the Company. ~~Without in any way limiting the foregoing, the Company shall maintain insurance on the Aircraft, including "all-risk" hull insurance and aviation liability insurance, consistent with the previous sentence~~.

<u>Section 6.8 Appraisals.</u>

<u>(a) On the First Amendment Effective Date, the Company shall deliver a list of the Pool Assets and estimated current market value of the Pool Assets to the Collateral Agent (for onward distribution to the Banks).</u>

~~Section 6.8~~ ~~Appraisals.~~<u>(b)</u> On each Appraisal Delivery Date, the Company shall submit an Appraisal of the Pool Assets to the Paying Agent (for onward distribution to the Banks) as of the date which is no more than 30 days prior to such Appraisal Delivery Date; <u>provided</u> ~~that the Appraisal to be delivered on the Effective Date may be dated as of March 31, 2016; and~~ <u>provided</u>, however, that if such Appraisal is to be delivered on such Appraisal Delivery Date as a consequence of clause (c) of the definition thereof, the Appraisal to be delivered on such date shall only be in respect of the assets to be removed from and/or added to the Pool Assets.

<u>(c) If an Event of Default has occurred and is continuing, upon request by the Paying Agent or Majority Banks reasonably requested by the Paying Agent or the Majority Banks, the Company shall, four additional times during the term of this Agreement, in each case submit an Appraisal of the Pool Assets to the Paying Agent (for onward distribution to the Banks) as soon as reasonably practicable after receipt by the Company of such request.</u>

Section 6.9 <u>Coverage Ratio</u>. The Company shall maintain<u>, at all times</u> <u>after March 31, 2021,</u> a Coverage Ratio of not less than 1.25 to 1.0.The Company shall have the option to reduce the required Coverage Ratio to 0.80 to 1.0 for two consecutive fiscal quarters by written notice to the Banks. If such notice is given, the Company shall be irrevocably obligated to pay to each Bank a quarterly fee equal to 0.25% of such Bank's Commitment for each quarter (with the amount of such Commitment being determined on an average basis if such Commitment has changed during such quarter), payable on each date on which financial statements for the two relevant fiscal quarters are required to be delivered; <u>provided</u> that (i) such option may be exercised no more than once between the Effective Date and the Termination Date and (ii) such fee shall be payable in respect of any quarter only if the Coverage Ratio for such quarter is less than 1.25 to 1.0.

Section 6.10 <u>Reporting Requirements</u>. The Company shall furnish to the Paying Agent (with sufficient copies for each Bank):

(a)    Within 120 days after the last day of each fiscal year of the Company, Financial Statements (it being understood that delivery of the Company's annual report on Form 10-K for any fiscal year as filed with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended, will satisfy this requirement with respect to such fiscal year) showing the consolidated financial condition and results of operations of the Company and its Subsidiaries as of, and for the year ended on, such last day, accompanied by (i) the opinion, without material qualification, of Auditors, based on an audit using generally accepted auditing standards, that such Financial Statements were prepared in accordance with GAAP and present fairly, in all material respects, the consolidated financial position and results of operations of the Company and its consolidated Subsidiaries for the periods presented and (ii) a Financial Report Certificate;

(b)    Within 60 days after the last day of each of the first three fiscal quarters of the Company (i) Financial Statements showing the consolidated financial condition and results of operations of the Company and its consolidated Subsidiaries as of and for the period from the beginning of the current fiscal year to, such last day (it being understood that delivery of the Company's quarterly report on Form 10-Q for any fiscal quarter as filed with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended, will satisfy this requirement with respect to such fiscal quarter), and (ii) a Financial Report Certificate;

(c)    (i) Promptly after mailing, true copies of all reports, statements, documents, plans, and other written communications furnished by or on behalf of the Company or any of its Subsidiaries to stockholders generally and (ii) promptly upon the filing thereof, copies of all registration statements (other than the exhibits thereto and any registration statements on Form S‑8 or its equivalent) and reports on Forms 10-K, 10-Q and 8-K (or their equivalents) which the Company shall have filed with the Securities and Exchange Commission;

(d)    Notice, promptly after the Company or any of its Material Subsidiaries knows or has reason to know of a Default or Event of Default, specifying the nature thereof and what action the Company or any Subsidiary has taken, is taking, or proposes to take with respect thereto;

(e)    Prompt notice of any legal or arbitral proceedings, and of all proceedings by or before any governmental or regulatory authority or agency, and any material development in respect of such legal or other proceedings, affecting the Company, except proceedings which, if adversely determined, would not have a Material Adverse Effect or proceedings with respect to which the Company, in good faith and upon consultation with outside counsel, believes an adverse determination in respect thereof to be unlikely; and

(f)    Promptly upon the Paying Agent's reasonable request, such other relevant information (not otherwise required to be furnished under the Loan Papers) respecting the business affairs, assets, and liabilities of the Company and any of its Material Subsidiaries.

In the case of paragraphs (a), (b) and (c) above (other than the Financial Report Certificate), the Company may satisfy the reporting requirements in respect thereof by making the documents referred to therein available to the Banks on its website or posted on the Security and Exchange Commission's website at www.sec.gov. Notwithstanding the foregoing, the Company shall deliver hard copies of any such documents to any Bank that notifies the Company that such delivery is required by any Laws applicable to such Bank.

Section 6.11 Use of Proceeds. Proceeds advanced hereunder shall be used only as represented herein. The Company shall not request any Loan or Letter of Credit, and the Company shall not use, and shall procure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Loan or Letter of Credit (a) in furtherance of an offer, payment,

509265-1983-14872 Active.19588122.12

promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, to the extent such activities, businesses or transaction would be prohibited by Sanctions if conducted by a corporation incorporated in the United States or (c) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 6.12 Pool Assets. The Company (i) will ensure that, subject to clause (c) below, the Appraised Value of the Pool Assets shall satisfy the Collateral Coverage Test (based upon the most recent Appraisal delivered to the Paying Agent and the Banks pursuant to the provisions of Section 6.8), and (ii) will not (and will not permit any Wholly Owned Domestic Subsidiary to) convey, sell, lease, transfer or otherwise dispose of, whether voluntarily or involuntarily (it being understood that loss of property due to theft, destruction, confiscation, prohibition on use or similar event shall constitute a disposal for purposes of this covenant), or remove or substitute, any Pool Asset (or any engine included in the Pool Assets unless such engine is replaced by another working engine or engines of comparable value, assuming half-time condition) or agree to do any of the foregoing in respect of the Pool Assets at any future time, except that:

(a)    so long as no Event of Default exists, the Company or any of its Wholly Owned Domestic Subsidiaries owning a Pool Asset may replace a Pool Asset with another asset of the Company or such Wholly Owned Domestic Subsidiary (or any other Wholly Owned Domestic Subsidiary) (and Schedule II shall be modified to reflect such replacement), provided that (A) such replacement shall be made on at least a dollar-for-dollar basis based upon (x) in the case of the asset being removed from the Pool Assets, the Appraised Value of such Pool Asset (as determined by the most recently delivered Appraisal with respect to such Pool Asset) and (y) in the case of the asset being added to the Pool Assets, the Appraised Value of such asset (as determined by an Appraisal performed at (or relatively contemporaneously with) the time of such replacement), and (B) after giving effect to such replacement, at the time of such replacement the average age of any aircraft constituting Pool Assets shall not exceed 14 years, (C) prior to effecting the replacement, the Company shall have delivered an Officer's Certificate to the Paying Agent certifying compliance with this Section 6.12 and Section 6.13 and attaching to such certificate the Appraisal required by Section 6.8; and (C) the asset replacing a Pool Asset shall constitute Specified Equipment.

(b)    so long as no Event of Default exists or would result therefrom, the Company or any of its Wholly Owned Domestic Subsidiaries owning a Pool Asset may remove an asset from the Pool Assets (and Schedule II shall be modified to reflect such removal), provided that (A) after giving effect to such removal, the Appraised Value of the remaining Pool Assets (as determined by an Appraisal of all Pool Assets performed at (or relatively contemporaneously with) the time of such removal) shall satisfy the Collateral Coverage Test, and (B) after giving effect to such removal, at the time of such removal, the average age of any aircraft constituting Pool Assets shall not exceed 14 years, and (C) prior to effecting the removal, the Company shall have delivered an Officer's Certificate to the Paying Agent certifying that, and providing calculations demonstrating that, after giving effect to such removal, the Appraised Value of the Pool Assets shall satisfy the Collateral Coverage Test, and otherwise certifying compliance with this Section 6.12 and attaching to such certificate Appraisals of all Pool Assets obtained in connection with such removal; and

(c)    in the event (x) that an Appraisal furnished pursuant to Section 6.8 discloses that the Collateral Coverage Test is not satisfied or (y) the Collateral Coverage Test is not satisfied following an involuntary disposal of any Pool Asset (or any engine included in the Pool Assets unless such engine is replaced by another working engine or engines of comparable value, assuming half-time condition) (whether by loss of property due to theft, destruction, confiscation, prohibition on use, any similar event or otherwise), based upon the most recent Appraisal of the Pool Assets (from which the appraised values of the Pool Assets

56

509265-1983-14872-Active.19588122.12

which are the subject of the involuntary disposition shall be subtracted) furnished pursuant to Section 6.8, the Company shall within 60 days after the date of such Appraisal or involuntary disposal, as the case may be (a "Collateral Coverage Test Cure Period"), designate additional assets as Pool Assets to the extent that, (1) after giving effect to such designation, the Appraised Value of the Pool Assets, based on the most recently delivered Appraisal with respect to assets already constituting Pool Assets and based on an Appraisal performed at (or relatively contemporaneously with) the time of such addition with respect to assets being added to Pool Assets, shall satisfy the Collateral Coverage Test (and Schedule II shall be modified to reflect such addition) and (2) after giving effect to such addition, at the time of such addition, the average age of any aircraft constituting Pool Assets shall not exceed 14 years, provided that (A) at the time of such addition, the Paying Agent and the Banks shall have received an Officer's Certificate certifying that the conditions set forth in this Section 6.12 shall have been satisfied after giving effect to such addition and attaching thereto such Appraisal, and (B) the asset being added shall constitute Specified Equipment.

(d)    the Company may at any time and from time to time designate any of its assets as Pool Assets and deliver to the Paying Agent an Appraisal with respect to such assets being added as Pool Assets (and Schedule II shall be modified to reflect such addition), provided that (A) at the time of such addition, the Paying Agent and the Banks shall have received an Appraisal with respect to such assets being added as Pool Assets, an Officer's Certificate certifying that the conditions set forth in this Section 6.12 shall have been satisfied after giving effect to such addition and attaching thereto such Appraisal, (B) at the time of such addition, the average age of any aircraft constituting Pool Assets shall not exceed 14 years and (C) the asset being added shall constitute Specified Equipment

(e)    at the Company's request, the Lien on any Pool Asset will be promptly released, provided, in each case, that the following conditions are satisfied or waived: (i) no Default or Event of Default has occurred and is continuing, (ii) after giving effect to such release and the addition of any assets pursuant to clause (iv)(z) below, at the time of such release the average age of any aircraft constituting Pool Assets shall not exceed 14 years, (iii) the Company shall deliver to the Collateral Agent an Officer's Certificate demonstrating compliance with the Collateral Coverage Test following such release and certifying that the conditions set forth in this Section 6.12(e) shall have been satisfied and (iv) any of the following or any combination thereof shall have occurred: (x) after giving effect to such release, the remaining Collateral constituting Specified Equipment shall satisfy the Collateral Coverage Test, (y) the Company shall have prepaid the Loans in an amount required to comply with the Collateral Coverage Test, or (z) the Company shall have subjected to the Aircraft Mortgage additional assets that constitute Specified Equipment having an Appraised Value, in the aggregate, required to comply with this Section 6.12. In connection herewith, the Collateral Agent agrees to promptly provide, execute and deliver any documents or releases reasonably requested by the Company to evidence such release, at the Company's expense.

Section 6.13 Restrictions on Liens. (a) The Company will not, nor will it permit any Subsidiary to, create, assume or suffer to exist any Lien upon or with respect to the Pool Assets, or enter into any arrangement with any Person that would materially negatively impact the value of any Pool Asset realizable by any third partyCollateral or assign any right to receive the proceeds from the sale, transfer or disposition of any of the Pool AssetsCollateral, or file or authorize the filing with respect to any of the Pool AssetsCollateral of any financing statement naming the Company or any Subsidiary as debtor under the Uniform Commercial Code or any similar notice of Lien naming the Company or any Subsidiary as debtor under any similar recording or notice statute (including, without limitation, any filing under Title 49, United States Code, Section 44107), other than Permitted Liens affecting Pool AssetsCollateral.

57

509265-1983-14872-Active.19588122.12

(b) The Company will not enter into or suffer to exist, and will not permit any of its Subsidiaries to enter into or suffer to exist, any agreement prohibiting or conditioning the creation or assumption of any first priority Lien, subject to Permitted Liens, in favor of the Collateral Agent for the ratable benefit of the Secured Parties upon any ~~Pool Asset~~Collateral to secure Debt or other obligations of the Company or of any Subsidiary of the Company that holds ~~Pool Assets~~Collateral.

Section 6.14 Mergers and Dissolutions. (a) The Company will not merge or consolidate with any other person unless:

(i)    no Default or Event of Default has occurred and is continuing or would result therefrom;

(ii)    the Company is the surviving corporation or, if otherwise, (x) such other Person or continuing corporation (the "Successor Company") is a corporation or other entity organized under the laws of a state of the United States and (y) such Successor Company is a U.S. certificated air carrier; and

(iii)    in the case of a Successor Company, the Successor Company shall (A) execute, prior to or contemporaneously with the consummation of such transaction, such agreements, if any, as are in the reasonable opinion of the Paying Agent, necessary or advisable to evidence the assumption by the Successor Company of liability for all of the obligations of the Company hereunder and the other Loan Papers, and (B) cause to be delivered to the Paying Agent and the Banks such legal opinions (which may be from in-house counsel) as any of them may reasonably request in connection with the matters specified in the preceding clause (A) and (C) provide such information as each Bank or the Paying Agent reasonably requests in order to perform its "know your customer" due diligence with respect to the Successor Company.

Upon any consolidation or merger in accordance with this Section 6.14(a) in any case in which the Company is not the surviving corporation, the Successor Company shall succeed to, and be substituted for, and may exercise every right and power of, the Company under this Agreement with the same effect as if such Successor Company had been named as the Company herein. No such consolidation or merger shall have the effect of releasing the Company or any Successor Company which shall theretofore have become successor to the Company in the manner prescribed in this Section 6.14(a) from its liability with respect to any Loan Paper to which it is a party.

(b) The Company will not liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution).

Section 6.15 Assignment. The Company will not assign or transfer any of its Rights, duties, or obligations under any of the Loan Papers to which it is a party.

Section 6.16 Amendments.

(a) The Company shall not amend, modify, or change the terms or provisions of the Term Loan Credit Agreement, if the effect thereof, either individually or in the aggregate, would make the terms of the Term Loan Credit Agreement to be more restrictive to the Company unless this Agreement is amended in accordance with Section 9.1 hereof to add comparable terms or provisions.

58

(b)      The Company shall cause any of its Subsidiaries that is or becomes a guarantor of obligations under the Term Loan Credit Agreement (other than such Subsidiaries pledging "Collateral" (as defined in the Term Loan Credit Agreement)) to become a guarantor of the Obligations hereunder.

Section 6.17 Liquidity. The Company shall maintain at all times Total Liquidity of not less than $2,500,000,000.

Section 6.18 Further Assurances. The Company will take, or cause to be taken, at the Company's cost and expense, such action with respect to (x) the recording, filing, re-recording and re-filing of the Aircraft Mortgage, as is necessary to maintain, so long as the Aircraft Mortgage is in effect, the priority, perfection and preservation of the Lien created by the Aircraft Mortgage, in the office of the FAA, pursuant to Title 49, and in such other places as may be required under any applicable law or regulation in the U.S., (y) the appropriate registrations with the International Registry as are necessary to maintain, so long as the Aircraft Mortgage is in effect, the priority, perfection and preservation of the Lien created by the Aircraft Mortgage and (z) any financing statements or other instruments as are necessary to maintain, so long as the Aircraft Mortgage is in effect, the priority, perfection and preservation of the Lien created by the Aircraft Mortgage, and will furnish to the Collateral Agent timely notice of the necessity of such action, together with, if requested by Collateral Agent, such instruments, in execution form, and such other information as may be reasonably required to enable the Collateral Agent to take such action or otherwise reasonably requested by Collateral Agent. To the extent permitted by applicable law, the Company hereby authorizes the Collateral Agent to execute and file financing statements or continuation statements necessary to maintain, so long as the Aircraft Mortgage is in effect, the perfection and preservation of the Lien created by the Aircraft Mortgage without the Company's signature appearing thereon. The Company shall pay the costs of, or incidental to, any recording or filing, including, without limitation, any filing of financing or continuation statements, necessary to maintain, so long as the Aircraft Mortgage is in effect, the perfection and preservation of the Lien created by the Aircraft Mortgage. Section 7.1 Events of Default. Any one or more of the following events shall be "Events of Default" hereunder (which shall include by definition the expiration of any grace period with respect thereto), whether the same shall occur and be continuing for any reason whatsoever (and whether such occurrence shall be voluntary or involuntary or come about or be effected by operation of Law or otherwise):

ARTICLE VII

EVENTS OF DEFAULT; REMEDIES

(a)      Payment of Obligation. Failure to pay any principal of any Loan or any Reimbursement Obligation when due whether at maturity, by declaration as authorized by this Agreement, or otherwise; or failure to pay, within five Business Days after the due date thereof, any interest on any Loan or any Reimbursement Obligation; or failure to pay, within five Business Days after the due date thereof, or if no due date therefor is herein specified within five Business Days after written demand therefor is given to the Company by the Paying Agent, any fee or other amount payable by the Company hereunder or under any of the other Loan Papers.

(b)      Covenants.

(i)      Default shall be made in the observance or performance of the covenants, conditions, and agreements on the part of the Company (or in the case of Section 6.12, on the part of any Subsidiary having any Pool Assets) contained in Section 6.12, 6.13 or 6.17, in each case

59

509265-1983-14872-Active.19588122.12

subject to a grace period of 5 Business Days in the event that a Senior Officer of the Company did not have advance knowledge of the Default and so long as (i) the Paying Agent is promptly notified of the Default upon the occurrence thereof and (ii) the interests of the Banks are not materially prejudiced during such period in the reasonable determination of the Paying Agent.

(bii)     Covenants. Default shall be made in the observance or performance of any other of the other covenants, conditions, and agreements on the part of the Company (or in the case of Section 6.12, on the part of any Subsidiary having any Pool Assets) contained herein, or in any other Loan Papers and such default shall continue for a period of 30 days (or, in the case of Section 6.9, five Business Days) after the Paying Agent shall have given the Company notice thereof in writing.

(c)     Debtor Relief. The Company or any Material Subsidiary shall file a voluntary petition in bankruptcy or a petition or answer seeking reorganization, arrangement, composition, liquidation, receivership, or similar relief under any Debtor Relief Law, or shall file a petition to take advantage of any Debtor Relief Law, or shall make an assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts as they become due, or shall fail generally to pay its debts as they become due, or shall consent to the appointment of any receiver, trustee, custodian or liquidator of it or all or a substantial part of its Property; or a proceeding or action shall be instituted or commenced against the Company or any Material Subsidiary seeking an order for relief or a reorganization, arrangement, composition, liquidation, receivership, or similar relief under any Debtor Relief Law or seeking the appointment, without the consent of the Company or any Material Subsidiary, of any receiver, trustee, custodian or liquidator of it or all or a substantial part of the Property of the Company or any Material Subsidiary and such proceeding or action shall remain undismissed or unstayed for a period of 90 days; or an order, decree, or judgment for an involuntary petition adjudicating the Company or any Subsidiary insolvent shall be entered by any court of competent jurisdiction and shall remain undismissed or unstayed for a period of 90 days.

(d)     Payment of Judgments. The Company or any of its Material Subsidiaries fails to pay any judgment or order for the payment of money in excess of $50,000,000 rendered against it or any of its assets (exclusive of judgment amounts fully covered by insurance where the insurer has admitted liability in respect thereof) and either (i) any enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) the same shall not be discharged (or provisions shall not be made for such discharge), or a stay of execution thereof shall not be procured, within 30 days from the date of entry thereof and the Company or the relevant Material Subsidiary shall not, within said period of 30 days, or such longer period during which execution of the same shall have been stayed, appeal therefrom and cause the execution thereof to be stayed during such appeal.

(e)     Default on Other Debt or Security. The Company or any Material Subsidiary shall (i) fail to pay any principal of or interest on any Debt (other than the Obligation) the principal or face amount of which exceeds $50,000,000 when due (or, where permitted, within any applicable grace period), whether by scheduled maturity, required prepayment, acceleration, demand or otherwise and such default continues unremedied for five Business Days after such due date or applicable grace period, or (ii) fail to perform or observe any other provision (other than a provision that is substantially identical to a provision in this Agreement) contained in any agreement securing or relating to such Debt (or any other breach or default under such Debt agreement occurs) if the effect of such failure to perform or observe such other provisions (or breach or default) is to cause such Debt to become due prior to its stated maturity; provided, however, that if any such failure, breach or default shall be waived or cured (as evidenced by a writing from such holder or trustee) then, to the extent of such waiver or cure, the Event of Default hereunder by reason of such failure, breach or default shall be deemed likewise to have been thereupon waived or cured.

(f)    ERISA. Any "Reportable Event" as such term is defined in ERISA under any Plan, or the appointment by an appropriate Tribunal of a trustee to administer any Plan, or the termination of any Plan within the meaning of Title IV of ERISA, and any of the foregoing results in a material liability to the Pension Benefit Guaranty Corporation; or any Plan fails to satisfy the "minimum funding standards" of ERISA or is determined to be in "at risk" status (within the meaning of ERISA).

(g)    Misrepresentation. Any representation or warranty made by the Company is untrue in any material respect, or any certificate, schedule, statement, report, notice or writing (excluding any Appraisal, for which the Company makes no representation) furnished by the Company to the Agents or to the Banks, or any of them, is untrue in any material respect on the date as of which the facts set forth are stated or certified, shall remain material at the time of discovery and shall, if curable, remain incorrect in any material respect after 30 days after written notice thereof to the Company (it being understood that any failure by the Company to include within any such schedule, statement, report, notice, or writing any information the omission of which would cause the material included to be misleading shall be as much an untruth as a false statement contained therein).

Section 7.2 Remedies Upon Default. (a) If an Event of Default specified in Section 7.l(c) occurs, the Commitments of the Banks shall thereupon automatically terminate and the aggregate unpaid principal balance of and accrued interest on the Obligation shall thereupon become due and payable concurrently therewith, without any action by the Paying Agent or any Bank and without diligence, presentment, demand, protest, notice of protest or intent to accelerate, or notice of any other kind, all of which are hereby expressly waived. Except as set forth in the preceding sentence, should any other Event of Default occur and be continuing, the Paying Agent may, and if requested by the Majority Banks, shall, do any one or more of the following:(ai) Acceleration. Declare (by written notice to the Company) the entire unpaid balance of the Obligation, or any part thereof, immediately due and payable, whereupon it shall be due and payable, without diligence, presentment, demand, protest, notice of protest or intent to accelerate, or other notice of any kind (except any notice or demand specified in this Agreement), all of which are hereby expressly waived.

(bii) Termination. Terminate the Commitments by written notice to the Company.

(eiii) Judgment. Reduce any claim to judgment.

(div) Rights. Exercise any and all legal and equitable Rights available to it (including all remedies under the Cape Town Treaty including, without limitation, Article 13 of the Cape Town Convention).

(b) With respect to all Letters of Credit with respect to which presentment for honor shall not have occurred at the time of an acceleration pursuant to this Section 7.2, the Company shall, upon any such acceleration, deposit in a cash collateral account opened by the Paying Agent an amount equal to the aggregate then undrawn and unexpired amount of such Letters of Credit. Amounts held in such cash collateral account shall be applied by the Paying Agent to the payment of drafts drawn under such Letters of Credit, and the unused portion thereof after all such Letters of Credit shall have expired or been fully drawn upon, if any, shall be applied to repay other obligations of the Company hereunder and under the other Loan Papers. After all such Letters of Credit shall have expired or been fully drawn upon, all Reimbursement Obligations shall have been satisfied and all other obligations of the Company hereunder and under the other Loan Papers shall have been paid in full, the balance, if any, in such cash collateral account shall be returned to the Company (or such other Person as may be lawfully entitled thereto).

61

509265-1983-14872-Active.19588122.12

(c) In addition to any other rights and remedies granted to the Collateral Agent and the Banks in the Loan Papers, the Collateral Agent on behalf of the Banks may exercise all rights and remedies of a secured party under the New York Uniform Commercial Code or any other applicable law. Without limiting the generality of the foregoing, the Collateral Agent, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon the Company (all and each of which demands, defenses, advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, or consent to the use by the Company of any cash collateral arising in respect of the Collateral on such terms as the Collateral Agent deems reasonable, and/or may forthwith sell, lease, assign give an option or options to purchase or otherwise dispose of and deliver, or acquire by credit bid on behalf of the Banks, the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Collateral Agent or any Bank or elsewhere, upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery, all without assumption of any credit risk. The Collateral Agent or any Bank shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in the Company, which right or equity is hereby waived and released. Subject to the succeeding paragraph, the Collateral Agent shall apply the net proceeds of any action taken by it pursuant to this Article VII, after deducting all reasonable costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any of the Collateral or in any other way relating to the Collateral or the rights of the Collateral Agent and the Banks hereunder, including reasonable attorneys' fees and disbursements, to the payment in whole or in part of the obligations of the Company under the Loan Papers, in such order as the Collateral Agent may elect, and only after such application and after the payment by the Collateral Agent of any other amount required by any provision of law, including Section 9-615(a)(3) of the New York Uniform Commercial Code, need the Collateral Agent account for the surplus, if any, to the Company. To the extent permitted by applicable law, the Company waives all claims, damages and demands it may acquire against the Collateral Agent or any Bank arising out of the exercise by them of any rights hereunder. If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.

(d) Notwithstanding anything herein to the contrary, following an acceleration of the Obligations pursuant to Section 7.2:

(A) all payments received on account of the Obligations (including, without limitation, all proceeds of the sale of any Pool Assets received by the Paying Agent) shall, subject to Section 2.22, be applied by the Paying Agent as follows:

(i)    first, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts payable to the Agents (including fees and disbursements and other charges of counsel to the Agents payable under Section 9.4 and amounts pursuant to a fee letter payable to the Paying Agent in its capacity as such);

(ii)    second, to payment of that portion of the Obligations constituting fees, expenses, indemnities and other amounts (other than principal, reimbursement obligations in respect of means a payment made by an Issuing Bank pursuant to a Letter of Credit, interest and Letter of Credit fees) payable to the Banks and the Issuing Banks (including fees and disbursements and other charges of counsel to the Banks and the Issuing Banks payable under Section 9.4 or Section 9.5)

62

509265-1983-14872-Active.19588122.12

arising under the Loan Papers, ratably among them in proportion to the respective amounts described in this clause (ii) payable to them;

        (iii)    third, to payment of that portion of the Obligations constituting accrued and unpaid Letter of Credit fees and charges and interest on (x) the Loans and (y) unreimbursed payments made by an Issuing Bank pursuant to a Letter of Credit, ratably among the Banks and the Issuing Banks in proportion to the respective amounts described in this clause (iii) payable to them;

        (iv)    fourth, (A) to payment of that portion of the Obligations constituting unpaid principal of the Loans and unreimbursed payment made by an Issuing Bank pursuant to a Letter of Credit and (B) to cash collateralize that portion of L/C Obligations comprising the undrawn amount of Letters of Credit to the extent not otherwise cash collateralized by the Company pursuant to Article III or Section 2.22, ratably among the Banks and the Issuing Banks in proportion to the respective amounts described in this clause (iv) payable to them; provided that (x) any such amounts applied pursuant to subclause (B) above shall be paid to the Paying Agent for the ratable account of the applicable Issuing Banks to cash collateralize Obligations in respect of Letters of Credit, (y) subject to Article III or Section 2.22, amounts used to cash collateralize the aggregate amount of Letters of Credit pursuant to this clause (iv) shall be used to satisfy drawings under such Letters of Credit as they occur and (z) upon the expiration of any Letter of Credit (without any pending drawings), the pro rata share of cash collateral shall be distributed to the other Obligations, if any, in the order set forth in this Section 7.2(d);

        (v)    fifth, to the payment in full of all other Obligations, in each case ratably among the Agents, the Banks and the Issuing Banks based upon the respective aggregate amounts of all such Obligations owing to them in accordance with the respective amounts thereof then due and payable; and

        (vi)    finally, the balance, if any, after all Obligations have been indefeasibly paid in full, to the Company or as otherwise required by law; and

(B) if any amount remains on deposit as cash collateral after all Letters of Credit have either been fully drawn or expired (without any pending drawings), such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

Section 7.3 <u>Remedies in General</u>. If any Event of Default shall occur and be continuing, the Paying Agent may immediately proceed to protect and enforce all or any Rights with respect thereto contained in this Agreement or any other Loan Papers or may enforce any other legal or equitable Rights. Any Right may be exercised from time to time, independently or concurrently, and as often as shall be deemed expedient. No waiver of any Event of Default shall extend to any subsequent Event of Default.Section 8.1 <u>Authorization and Action</u>. Each Bank hereby irrevocably appoints and authorizes (a) JPMorgan Chase Bank, N.A. to act as its Paying Agent and Collateral Agent hereunder and under each of the other Loan Papers, (b) JPMorgan Chase Bank, N.A. and Citibank, N.A. to act as Co-Administrative Agents hereunder and under each of the other Loan Papers, (c) Barclays Bank PLC to act as Syndication Agent hereunder and (d) Bank of America, N.A., BNP Paribas, Goldman Sachs Bank USA, Morgan Stanley Senior Funding, Inc., U.S. Bank National Association and Wells Fargo Bank, N.A. to act as Documentation Agents hereunder. JPMorgan Chase Bank, N.A. consents to such appointment as Paying Agent and agrees to perform the duties of the Paying Agent hereunder and under the other Loan Papers. Each of JPMorgan Chase Bank, N.A. and Citibank, N.A. consents to its appointment as a Co-Administrative Agent, Barclays Bank PLC consents to its appointment as Syndication Agent and each of Bank of America, N.A., BNP Paribas, Goldman Sachs Bank USA, Morgan Stanley Senior Funding, Inc., U.S. Bank National Association and Wells Fargo Bank, N.A.

509265-1983-14872 Active.19588122.12

consents to its appointment as Documentation Agent. Each Bank authorizes and directs the Paying Agent to act on its behalf and to exercise such powers under this Agreement as are specifically delegated to or required of such Agent by the terms hereto, together with such powers as are reasonably incidental thereto. As to any matters not expressly provided for by this Agreement or the other Loan Papers (including, without limitation, enforcement or collection of the Loans or Notes), the Paying Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Majority Banks, and such instructions shall be binding upon all Banks and all holders of Loans or Notes; provided, however, that no Agent shall be required to take any action which exposes such Agent to ~~personal~~ liability or which is contrary to this Agreement or applicable Law.

## ARTICLE VIII

## THE AGENTS

Section 8.2 Agents' Reliance, Etc. None of the Agents and none of their respective Affiliates, directors, officers, agents, or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with the Loan Papers (i) with the consent or at the request of the Majority Banks (or all the Banks, if required) or (ii) in the absence of its or their own gross negligence or willful misconduct (it being the express intention of the parties that the Agents and their respective directors, officers, agents, and employees shall have no liability for actions and omissions under this Section 8.2 resulting from their ordinary contributory negligence). Without limitation of the generality of the foregoing, each Agent (i) may treat the payee of each Loan or Note as the holder thereof until such Agent receives written notice of the assignment or transfer thereof signed by such payee and in form satisfactory to such Agent; (ii) may consult with legal counsel (including counsel for the Company), independent public accountants, and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants, or experts; (iii) makes no warranty or representation to any Bank and shall not be responsible to any Bank for any statements, warranties, or representations made by or on behalf of the Company in or in connection with any Loan Paper; (iv) except as otherwise expressly provided herein, shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants, or conditions of any Loan Paper or to inspect the property (including the books and records) of the Company or any of its Subsidiaries; (v) shall have no responsibility to ensure the satisfaction of any condition set forth in Article IV or elsewhere herein other than to confirm receipt of items expressly required to be delivered to the Paying Agent, (vi) shall not be responsible to any Bank for the due execution, legality, validity, enforceability, genuineness, sufficiency, or value of any Loan Paper or any other instrument or document furnished pursuant hereto or thereto; (vii) shall incur no liability under or in respect of any Loan Paper by acting upon any notice, consent, certificate, or other instrument or writing (which may be by telecopier or e-mail) reasonably believed by it to be genuine and signed or sent by the proper party or parties; and (viii) may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon.

Section 8.3 Rights of Agents as Banks. With respect to their Commitments, the Loans, if any, made by them and the Notes, if any, issued to them, each Bank that is an Agent (including any Agent that hereafter becomes a holder of a Loan or Note) and its Affiliates shall have the same rights and powers under this Agreement or any other Loan Paper as any other Bank and may exercise the same as though it were not an Agent; and the term "Bank" or "Banks" shall, unless otherwise expressly indicated, include each Bank that is an Agent (including any Agent that hereafter becomes a holder of a Loan or Note), in its individual capacity. Each Bank that is an Agent (including any Agent that hereafter becomes a holder of a Loan or

64

Note) and its Affiliates may accept deposits from, lend money to, act as trustee under indentures of, and generally engage in any kind of business with, the Company, any of the Subsidiaries and any Person who may do business with or own securities of the Company or of the Subsidiaries, all as if such Bank were not an Agent, and without any duty to account therefor to the Banks.

Section 8.4 Bank Credit Decision. Each Bank acknowledges and agrees that it has, independently and without reliance upon any of the Agents or any other Bank and based on the Current Financials and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Bank also acknowledges and agrees that it will, independently and without reliance upon any of the Agents or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement.

Section 8.5 Agents' Indemnity. None of the Agents shall be required to take any action hereunder or to prosecute or defend any suit in respect of this Agreement or the Loans or Notes unless indemnified to such Agent's satisfaction by the Banks against loss, cost, liability, and expense. If any indemnity furnished to such Agent shall become impaired, it may call for additional indemnity and cease to do the acts indemnified against until such additional indemnity is given. In addition, the Banks severally but not jointly agree to indemnify the Paying Agent (to the extent not reimbursed by the Company), ratably according to the respective principal amounts of the Committed Loans then held by each of them (or if no Committed Loans are at the time outstanding, ratably according to either (i) the respective amounts of their Commitments, or (ii) if the Commitments have terminated, the respective amounts of the Commitments immediately prior to such termination; provided that, in the case of Section 2.22, when a Defaulting Bank shall exist, any such Defaulting Bank's Commitment shall be disregarded in the calculation), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against such Agent in any way relating to or arising out of this Agreement or any action taken or omitted by such Agent under this Agreement or the other Loan Papers (including, without limitation, any action taken or omitted under Article II of this Agreement); provided that no Bank shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements resulting from such Agent's fraud, gross negligence or willful misconduct. Each Bank agrees, however, that it expressly intends, under this Section 8.5, to indemnify each Agent ratably as aforesaid for all such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, and disbursements arising out of or resulting from such Agent's ordinary or contributory negligence. Without limitation of the foregoing, each Bank agrees to reimburse the Paying Agent promptly upon demand for its ratable share of any out-of-pocket expenses (including reasonable counsel fees) incurred by such Agent in connection with the preparation, execution, administration, or enforcement of, or legal advice in respect of rights or responsibilities under, this Agreement and the other Loan Papers to the extent that such Agent is not reimbursed for such expenses by the Company. The provisions of this Section 8.5 shall survive the termination of this Agreement and/or the payment or assignment of any of the Loans or Notes.

Section 8.6 Successor Paying Agent and Successor Collateral Agent. TheEach of the Paying Agent and the Collateral Agent may resign at any time by giving written notice thereof to the Banks and the Company and may be removed as Paying Agent or Collateral Agent, as applicable, under this Agreement and the other Loan Papers at any time with or without cause by the Majority Banks. Upon any such resignation or removal, the Majority Banks shall have the right, with the consent, not to be unreasonably withheld or delayed, of the Company (provided that the Company's consent shall not be required during the continuance of a Default or an Event of Default), to appoint a successor Paying Agent or a successor Collateral Agent. If no successor Paying Agent or Collateral Agent shall have been so appointed and shall have accepted such

65

509265-1983-14872-Active.19588122.12

appointment within 30 calendar days after the retiring Paying Agent or Collateral Agent's, as applicable, giving notice of resignation or the Majority Banks' removal of the retiring PayingCollateral Agent, then the retiring Paying Agent or Collateral Agent, as applicable, may, on behalf of the Banks, with the consent, not to be unreasonably withheld or delayed, of the Company (provided that the Company's consent shall not be required during the continuance of a Default or Event of Default), appoint a successor Paying Agent, which shall be a commercial bank organized under the Laws of the United States of America or of any state thereof and having a combined capital and surplus of at least $500,000,000 or a successor Collateral Agent. Upon the acceptance of any appointment as PayingCollateral Agent hereunder and under the other Loan Papers by a successor Paying Agent or a successor Collateral Agent, such successor Paying Agent or such successor Collateral Agent shall thereupon succeed to and become vested with all rights, powers, privileges and duties of the retiring Paying Agent or Collateral Agent, and the retiring Paying Agent or Collateral Agent shall be discharged from its duties and obligations under this Agreement and the other Loan Papers; provided that solely for purposes of maintaining any security interest granted to the Collateral Agent under any Loan Paper for the benefit of the Secured Parties, the retiring Collateral Agent shall continue to be vested with such security interest as collateral agent for the benefit of the Secured Parties, and continue to be entitled to the rights set forth in such Loan Paper, and, in the case of any Collateral in the possession of the Collateral Agent, shall continue to hold such Collateral, in each case until such time as a successor Collateral Agent is appointed and accepts such appointment in accordance with this Section 8.6 (it being understood and agreed that the retiring Collateral Agent shall have no duty or obligation to take any further action under any Loan Paper, including any action required to maintain the perfection of any such security interest). After any retiring Paying Agent's or Collateral Agent's resignation or removal as the Paying Agent or the Collateral Agent hereunder and under the other Loan Papers, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Paying Agent under this Agreement and the other Loan Papers.

Section 8.7 Notice of Default. The Paying Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Paying Agent shall have received written notice from a Bank or the Company referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." If the Paying Agent receives such a notice, the Paying Agent shall give notice thereof to the Banks; provided, however, if such notice is received from a Bank, the Paying Agent also shall give notice thereof to the Company. The Paying Agent shall be entitled to take action or refrain from taking action with respect to such Default or Event of Default as provided in Section 8.1 and Section 8.2.

Section 8.8 Co-Administrative Agents and Documentation Agent. The Co-Administrative Agents, the Syndication Agent and the Documentation Agents shall not have any duties or responsibilities hereunder in their capacities as such.

Section 8.9 Collateral Matters. (a) Except with respect to the exercise of setoff rights in accordance with Section 9.6 or with respect to a Secured Party's right to file a proof of claim in an insolvency proceeding, no Secured Party shall have any right individually to realize upon any of the Collateral, it being understood and agreed that all powers, rights and remedies under the Loan Papers may be exercised solely by the Collateral Agent on behalf of the Secured Parties in accordance with the terms thereof.

(b) The Secured Parties irrevocably authorize the Collateral Agent, at its option and in its discretion, to subordinate any Lien on any property granted to or held by the Collateral Agent under any Loan Paper to the holder of any Lien on such property that is permitted by Section 6.13. The Collateral Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral

66

Agent's Lien thereon or any certificate prepared by the Company in connection therewith, nor shall the Collateral Agent be responsible or liable to the Banks or any other Secured Party for any failure to monitor or maintain any portion of the Collateral.

## ARTICLE IX

## MISCELLANEOUS

Section 9.1 Amendments, Etc. (a) Except as provided in Section 2.25, no amendment or waiver of any provision of this Agreement or any other Loan Paper, nor consent to any departure by the Company herefrom or therefrom, shall in any event be effective unless the same shall be in writing and signed by the Majority Banks (or the Paying Agent with the consent of the Majority Banks) in all cases, and then, in any case, such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that (i) no amendment, waiver, or consent shall, unless in writing and signed by each Bank directly affected thereby (or the Paying Agent with the consent of each Bank directly affected thereby), do any of the following: (a) increase the amount of the Commitments of any Banks or subject any Banks to any additional obligations, (b) reduce the principal of, or rate or amount of interest applicable to, any Loan or participation in any Letter of Credit other than as provided in this Agreement, or any fees hereunder, (c) postpone any date fixed for any payment of principal of, or interest on, the Loans or any fees hereunder, (d) extend the expiration date of any Bank's Commitment, (e) eliminate or reduce the voting rights of any Bank under this Section 9.1, (f) amend Section 2.5(c) or Section 2.15 in any manner that would alter the pro rata sharing of payments or Commitment reductions required thereby or, (g) change the percentage of the Commitments or of the aggregate unpaid principal amount of the Loans, or the number of Banks, which shall be required for the Banks or any of them to take any action hereunder or (h) amend Section 7.2 in a manner that would alter the "waterfall" provision and (ii) no amendment or modification shall, unless in writing and signed by all Banks (or the Paying Agent with the consent of all Banks) release all or substantially all of the Collateral (except to the extent contemplated by Section 6.12 hereof, as in effect on the First Amendment Effective Date); provided, further, that no amendment waiver, or consent shall modify or waive any provision of Section 2.22, Article III or Section 4.3 without the written consent of each Issuing Bank; and provided, further, that no amendment, waiver, or consent shall, unless in writing and signed by the Paying Agent in addition to the Banks required above to take such action, affect the rights or duties of the Paying Agent under this Agreement or any other Loan Paper, or modify or waive any provision of Section 2.22.

(b) Notwithstanding the foregoing, if the Paying Agent and the Company acting together identify any ambiguity, omission, mistake, typographical error or other defect in any provision of this Agreement or any other Loan Papers, then the Paying Agent and the Company shall be permitted to amend, modify or supplement such provision to cure such ambiguity, omission, mistake, typographical error or other defect, and such amendment shall become effective without any further action or consent of any other party to this Agreement

Section 9.2 Notices, Etc. Any Agent, any Bank, or the holder of any Loan or Note giving consent or notice or making any request of the Company provided for hereunder, shall notify each Bank and the Paying Agent thereof. In the event that the holder of any Loan or Note (including any Bank) shall transfer such Loan or Note, it shall promptly so advise the Paying Agent which shall be entitled to assume conclusively that no transfer of any Loan or Note has been made by any holder (including any Bank) unless and until such Agent receives written notice to the contrary. Notices, consents, requests, approvals, demands, and other communications (collectively "Communications") provided for herein shall be in writing (including

67

509265-1983-14872 Active.19588122.12

telecopy Communications) and mailed, telecopied, e-mailed (where indicated) or delivered:(a)    If to the Company, to it at:

> Southwest Airlines Co.
> P.O. Box 36611, HDQ-6TR
> Love Field
> Dallas, Texas 75235
> Telecopy Number: (214) 932-1322
> Attention: Treasurer
> E-mail: Capital_Markets-DG@wnco.com

(b)    If to the Paying Agent, to it at:

> JPMorgan Chase Bank, N.A.
> JPM Loan and Agency Services
> 500 Stanton Christiana Road
> Ops 2, 3rd Floor
> Newark, DE 19713-2107
> Attention: Robert Madak
> Telecopy Number: (302) 634-1028
> Telephone Number: (302) 634-1392
> E-mail: robert.madak@jpmorgan.com and 14698287788@tls.ldsprod.com

> with a copy to:

> JPMorgan Chase Bank, N.A.
> 383 Madison Avenue, Floor 24
> New York, NY 10179
> Attention: Robert Kellas
> Telecopy Number: (212) 270-5100
> Telephone Number: (212) 270-3560
> E-mail: robert.kellas@jpmorgan.com

(c)    If to any Bank or any other Agent, as specified on Schedule I hereto or, in the case of any party, such other address or telecopy number as such party may hereafter specify for such purpose by notice to the other parties. All Communications shall, when mailed, telecopied, e-mailed or delivered, be effective and shall be deemed to have been duly given when sent by telecopier or e-mail to any party or the telecopier number or e-mail address, as applicable, as set forth herein or on the signature pages hereof (or other telecopy number or e-mail address designated by such party in a written notice to the other parties hereto), or five days after being mailed to the address as set forth herein (or such other address designated by such party in a written notice to the other parties hereto) respectively, or when delivered to such address; provided, however, Communications to any Agent pursuant to Article II or Article VIII shall not be effective until received by such Agent.

Section 9.3 No Waiver; Remedies. No failure on the part of any Bank or any Agent to exercise, and no delay in exercising, any Right hereunder or under any other Loan Paper shall operate as a

509265-1983-14872-Active.19588122.12

waiver thereof; nor shall any single or partial exercise of any such Right, or any abandonment or discontinuance of any steps to enforce such Right, preclude any other or further exercise thereof or the exercise of any other Right. No notice to or demand on the Company in any case shall entitle the Company to any other or further notice or demand in similar or other circumstances. The Rights herein provided are cumulative and not exclusive of any Rights provided by Law.

Section 9.4 <u>Costs, Expenses and Taxes</u>. The Company agrees to pay or reimburse the Agents for paying: (i) all reasonable costs and expenses of the Agents in connection with (A) the preparation, execution, delivery, and administration of this Agreement and the other Loan Papers, including, without limitation, the reasonable fees and out-of-pocket expenses of counsel for the Agents with respect thereto and with respect to advising the Agents as to their respective Rights and responsibilities under this Agreement and the other Loan Papers, and (B) any amendment, modification, supplement, or waiver of any of the terms of this Agreement, and (ii) all reasonable costs and expenses of the Banks and the Agents (including reasonable counsel's fees, and including reasonable allocated in-house counsel fees for any Bank or any Agent) in connection with the enforcement of this Agreement and the other Loan Papers. In addition, the Company shall pay any and all Taxes payable or determined to be payable in connection with the execution and delivery of this Agreement and the other Loan Papers, and agrees to save the Agents and each Bank harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omitting to pay such Taxes, if any, which may be payable or determined to be payable in connection with the execution and delivery of this Agreement or any other Loan Paper. The obligations of the Company under this <u>Section 9.4</u> shall survive the termination of this Agreement and/or repayment of the Loans.

Section 9.5     <u>Indemnity</u>. The Company agrees to indemnify and hold harmless the Agents and the Banks and each of their respective Affiliates, officers, directors, employees, agents, advisors and representatives against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, deficiencies, expenses, and disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against any Agent, any Bank, or any of their respective Affiliates, officers, directors, employees, agents, advisors or other representatives in any way relating to or arising out of the Loan Papers, any transaction related hereto, or any act, omission, or transaction of the Company, its Subsidiaries, and Affiliates, or any of their employees, officers, directors or other representatives, to the extent that any of the same results, directly or indirectly, from any claims made or actions, suits, or proceedings commenced by or on behalf of any person other than an Agent or a Bank. The obligation of the Company under this section shall continue for a period of one year after payment of the Obligation and termination of any or all Loan Papers, and **SHALL APPLY WHETHER OR NOT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES AND RELATED EXPENSES ARE IN ANY WAY OR TO ANY EXTENT OWED, IN WHOLE OR IN PART, UNDER ANY CLAIM OR THEORY OF STRICT LIABILITY OR CAUSED, IN WHOLE OR IN PART BY ANY NEGLIGENT ACT OR OMISSION OF ANY KIND BY ANY AGENT OR ANY BANK**;

provided, however, that (i) although each indemnified party shall have the right to be indemnified from its own ordinary negligence, no indemnified party shall have the right to be indemnified hereunder for willful misconduct, gross negligence or bad faith to the extent found by a final, non-appealable judgment of a court of competent jurisdiction and (ii) the indemnity set forth in this <u>Section 9.5</u> shall not apply to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, deficiencies, expenses or disbursements resulting from a proceeding that does not involve an act or omission by the Company or any of its affiliates and that is brought by an indemnified party against any other indemnified party (other than claims against any Agent in its capacity or in fulfilling its role as an Agent under the Loan Papers).

509265-1983-14872-Active.19588122.12

To the fullest extent permitted by applicable law, the Company shall not assert, and hereby waives, any claim against any indemnified party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Papers or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof.

Section 9.6 Right of Setoff. If any Event of Default shall have occurred and is continuing, each Bank and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Bank or Affiliate to or for the credit or the account of the Company against any and all obligations of the Company now or hereafter existing under this Agreement and the Loans held by such Bank or Affiliate, irrespective of whether or not such Bank or Affiliate shall have made any demand under this Agreement or any Note and although such obligations may be unmatured. Each Bank agrees promptly to notify the Company and the Paying Agent after any such setoff and application made by such Bank or Affiliate, but the failure to give such notice shall not affect the validity of such setoff and application. The Rights of each Bank under this Section 9.6 are in addition to the Rights and remedies (including, without limitation, other Rights of setoff) which such Bank may have.

SECTION 9.7 **GOVERNING LAW. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

Section 9.8 Submission To Jurisdiction; Waivers. The Company hereby irrevocably and unconditionally:(a)     submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Papers to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive ~~general~~ jurisdiction of the United ~~s~~States ~~and federal~~District ~~e~~Court~~s located in~~for the ~~City~~Southern District of New York~~,~~; sitting in the Borough of Manhattan~~, and~~ (or if such court lacks subject matter jurisdiction, the Supreme Court of the State of New York sitting in the Borough of Manhattan), and any appellate court~~s~~ from any thereof~~;~~, in any action or proceeding arising out of or relating to this Agreement or any other Loan Paper or the transactions relating hereto or thereto, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may (and any such claims, cross-claims or third party claims brought against the Paying Agent or any of its Affiliates and the respective directors, officers, employees, agents and advisors may only) be heard and determined in such Federal (to the extent permitted by law) or New York State court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law;

(b)     consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)     agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Company, as the case may be at its address set forth in Section 9.2 or at such other address of which the Paying Agent shall have been notified pursuant thereto; and

70

509265-1983-14872-Active.19588122.12

(d)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction.

Section 9.9 <u>Survival of Representations and Warranties</u>. All representations and warranties contained herein or made in writing by the Company in connection herewith shall survive the execution and delivery of this Agreement and the other Loan Papers, and no investigation by any Agent or any Bank or any closing shall affect the representations and warranties or the Right of any Agent or any Bank to rely upon them.

Section 9.10 <u>Binding Effect</u>. This Agreement shall become effective when it shall have been executed by the Company, the Agents, and each Bank and thereafter shall be binding upon and inure to the benefit of the Company (subject to the provisions of <u>Section 9.11</u>), the Agents, each Bank and their respective successors and assigns.

Section 9.11 <u>Successors and Assigns; Participations</u>

(a)    Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and permitted assigns of such party, and all covenants, promises, agreements, representations and warranties by or on behalf of the Company, the Agents or the Banks that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns. Except for any assignment or transfer by the Company of its rights and obligations under this Agreement to a Successor Company in accordance with Section 6.14, the Company may not assign or transfer any its rights or obligations hereunder without the prior written consent of all of the Banks.

(b)    Each Bank may without the consent of the Company sell participations to one or more banks or other entities in all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitment and the Loans owing to it and any Note or Notes held by it); <u>provided</u>, <u>however</u>, that (i) such Bank's obligations under this Agreement shall remain unchanged, (ii) such Bank shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such Bank shall remain the holder of its Loans and Notes (if any) for all purposes of this Agreement, (iv) the participating banks or other entities shall be entitled to the cost protection provisions contained in <u>Article II</u> and <u>Section 9.4</u>, but only to the extent that such protection would have been available to such Bank, calculated as if no such participations had been sold, and the indemnity protection provisions contained in <u>Section 9.5</u>, (v) the Company, the Agents, and the other Banks shall continue to deal solely and directly with such Bank in connection with such Bank's rights and obligations under this Agreement, and (vi) such Bank shall not sell a participation that conveys to the participant the right to vote or give or withhold consents under this Agreement or any other Loan Papers, other than the right to vote upon or consent to (y) amendments, modifications, or waivers with respect to any fees payable hereunder (including the dates fixed for the payment of any such fees) or the amount of principal or the rate of interest payable on, or the dates fixed for any payment of principal of or interest on, the Loans and (z) any extension of the Termination Date. Each Bank that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Company, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under this Agreement (the "<u>Participant Register</u>"); <u>provided</u> that no Bank shall have any obligation to disclose all or any portion of the Participant Register to any Person except to the extent that such disclosure is necessary to establish that a Commitment, Loan, Letter of Credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Bank shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

71

(c)    Each Bank may assign to one or more Persons (other than a natural person, a Defaulting Bank or the Company or any of its Affiliates), all or a portion of its interests, rights, and obligations under this Agreement (including, without limitation, all or a portion of its Commitment and the same portion of the Committed Loans at the time owing to it); provided, however, that (i) such assignment, if not to a Bank or an Eligible Affiliate Assignee of the assigning Bank, shall be consented to by the Company (which consent shall not be unreasonably withheld or delayed and shall not be required after the occurrence or during the continuance of a Default or Event of Default), the Paying Agent and each Issuing Bank (which consent shall not be unreasonably withheld or delayed), (ii) each Bank's Commitment (including Loans owing to it and its pro rata share of the L/C Obligations) to be assigned shall not be less than $5,000,000 minus reductions pursuant to Section 2.5(a) unless (x) otherwise agreed by the Company and the Paying Agent, (y) in the case of the assigning Bank, such amount is reduced to zero pursuant to such assignment or (z) the assignment is to a Bank, (iii) each such assignment shall be of a constant, and not a varying, percentage of all the assigning Bank's rights and obligations under this Agreement, (iv) the assignee thereof shall deliver to the Company and the Paying Agent any Internal Revenue Service forms required by Section 2.18, and (v) the parties to each such assignment shall execute and deliver to the Paying Agent, for its acceptance and recording in the Register (as defined below), an Assignment and Assumption substantially in the form of Exhibit E hereto (an "Assignment and Assumption"), together with a properly completed Administrative Questionnaire, any Note or Notes subject to such assignment and a processing and recordation fee of $3,500 (or such lesser amount as shall be acceptable to the Paying Agent); provided, however, no such fee shall be required in the case of any assignment requested by the Company pursuant to Article II of this Agreement. Upon such execution, delivery, acceptance, and recording, from and after the effective date specified in each Assignment and Assumption, which effective date shall be at least five Business Days after the execution thereof (unless a shorter period shall be agreed to by the Company, the Paying Agent, and the assignor Bank), (x) the assignee thereunder shall be a party hereto and, to the extent provided in such Assignment and Assumption, have the rights and obligations of a Bank hereunder and under the other Loan Papers and (y) the assignor Bank thereunder shall, to the extent provided in such Assignment and Assumption, be released from its obligations under this Agreement and the other Loan Papers (and, in the case of an Assignment and Assumption covering all of the remaining portion of an assigning Bank's rights and obligations under this Agreement and the other Loan Papers, such Bank shall cease to be a party hereto and thereto).

(d)    By executing and delivering an Assignment and Assumption, the Bank assignor thereunder and the assignee confirm to and agree with each other and the other parties hereto as follows: (i) other than the representations and warranties that (x) it is the legal and beneficial owner of the interest being assigned thereby, (y) the interest being assigned thereby is free and clear of any lien, encumbrance or other adverse claim and (z) it has full power and authority, and has taken all action necessary, to execute and deliver such Assignment and Assumption and to consummate the transactions contemplated thereby, such Bank assignor makes no representation or warranty and assumes no responsibility with respect to any statements, warranties, or representations made in or in connection with this Agreement or any other Loan Paper or the execution, legality, validity, enforceability, genuineness, sufficiency, or value of this Agreement, any other Loan Paper or any other instrument or document furnished pursuant hereto; (ii) such Bank assignor makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Company or the performance or observance of its respective obligations under this Agreement, any other Loan Paper or any other instrument or document furnished pursuant hereto or thereto; (iii) such assignee confirms that it has received a copy of this Agreement together with copies of financial information and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Assumption; (iv) such assignee will, independently and without reliance upon the Agents, such Bank assignor, or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such assignee appoints and authorizes the Paying Agent to take such action on

72

509265-1983-14872-Active.19588122.12

behalf of such assignee and to exercise such powers under this Agreement and the other Loan Papers as are delegated to each such Agent by the terms hereof and thereof, together with such powers as are reasonably incidental thereto; and (vi) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement are required to be performed by it as a Bank.

(e)    The Paying Agent shall maintain at its office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Banks and the Commitment of, and principal amount of the Loans and L/C Obligations owing to, each Bank from time to time (the "Register"). The entries in the Register shall be conclusive, in the absence of manifest error, and the Company, the Agents, and the Banks may treat each Person whose name is recorded in the Register as a Bank hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Company, any Bank or the Paying Agent at any reasonable time and from time to time upon reasonable prior notice.

(f)    Upon its receipt of an Assignment and Assumption executed by an assigning Bank and an assignee together with any Note or Notes subject to such assignment and the written consent to such assignment, the Paying Agent shall, if such Assignment and Assumption has been completed and is substantially in the form of Exhibit E hereto, (i) accept such Assignment and Assumption, (ii) record the information contained therein in the Register, and (iii) give prompt notice thereof to the Banks, the Paying Agent and the Company. Within five Business Days after receipt of such notice, the Company, at its own expense, shall execute and deliver to the Paying Agent in exchange for the surrendered Note or Notes, if any, (x) a new Note or Notes to the order of such assignee in an amount equal to its portion of the Commitment assumed by it pursuant to such Assignment and Assumption and (y) if the assigning Bank has retained any Commitment hereunder, new Notes to the order of the assigning Bank in an amount equal to the Commitment retained by it hereunder. Such new Notes shall be in an aggregate principal amount equal to the aggregate principal amount of such surrendered Notes. Such new Notes shall be dated the effective date of such Assignment and Assumption and shall otherwise be in substantially the form of Exhibit D-1 or D-2 as applicable, hereto. Cancelled Notes shall be returned to the Company.

(g)    Notwithstanding any other provision herein, any Bank may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.11 (or in connection with any swap, derivative, securitization or credit insurance relating to the Company and its obligations), disclose to the assignee or participant or proposed assignee or participant (or to any direct, indirect, actual or prospective counterparty (and its advisor) to any such swap, derivative or securitization) any information relating to the Company and its Subsidiaries furnished to such Bank by or on behalf of the Company; provided, that prior to any such disclosure, each such assignee or participant or proposed assignee or participant (or any such counterparty (and its advisor)) shall agree for the benefit of the Company to preserve the confidentiality of any confidential information relating to the Company received from such Bank.

(h)    Notwithstanding any other provision set forth in this Agreement, any Bank may at any time ~~create~~pledge or assign a security interest in all or any portion of its ~~R~~rights under this Agreement ~~(including, without limitation, the Loans owing to it and any Notes held by it) in favor of any~~to secure obligations of such Bank, including any pledge or assignment to secure obligations to a Federal Reserve Bank ~~in accordance with Regulation A of the Board.~~, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Bank from any of its obligations hereunder or substitute any such pledgee or assignee for such Bank as a party hereto.

73

Section 9.12 <u>Confidentiality</u>. Each Agent, each Issuing Bank and each Bank agrees to keep confidential all Information (as defined below); <u>provided</u> that nothing herein shall prevent any Agent, any Issuing Bank or any Bank from disclosing any such Information (a) to any Agent, any Issuing Bank, any Bank or any affiliate thereof, (b) as permitted by <u>Section 9.11(g)</u>, (c) to its employees, directors, agents, attorneys, accountants and other professional advisors or those of any of its affiliates in each case on a need-to-know basis, (d) upon the request or demand of any Governmental Authority, (e) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Law, (f) if requested or required to do so in connection with any litigation or similar proceeding, (g) that has been publicly disclosed, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Bank's investment portfolio in connection with ratings issued with respect to such Bank, (i) in connection with the exercise of any remedy hereunder or under any other Loan Paper, or (j) if agreed by the Company in its sole discretion, to any other Person. "<u>Information</u>" means all information received from the Company relating to the Company or its business, other than any such information that is available to the Agents, any Issuing Bank or any Bank on a non-confidential basis prior to disclosure by the Company and other than information pertaining to this Agreement routinely provided by arrangers to data service providers, including league table providers, that serve the lending industry; <u>provided</u> that in the case of information received from the Company after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this <u>Section 9.12</u> shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information. Each Bank acknowledges that information furnished to it pursuant to this Agreement or the other Loan Papers may include material non-public information concerning the Company and its Affiliates and their related parties or their respective securities, and confirms that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with those procedures and applicable law, including Federal and state securities laws.

All information, including requests for waivers and amendments, furnished by the Company or the Paying Agent pursuant to, or in the course of administering, this Agreement or the other Loan Papers will be syndicate-level information, which may contain material non-public information about the Company and its Affiliates and their related parties or their respective securities. Accordingly, each Bank represents to the Company and the Paying Agent that it has identified in its Administrative Questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal and state securities laws.

Section 9.13 <u>Independence of Covenants</u>. All covenants contained in this Agreement shall be given independent effect so that if a particular action or condition is not permitted by any such covenants, the fact that such action or condition would be permitted by an exception to, or otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or Event of Default if such action is taken or condition exists.

Section 9.14 <u>Severability</u>. Should any clause, sentence, paragraph, or Section of this Agreement be judicially declared to be invalid, unenforceable, or void, such decision will not have the effect of invalidating or voiding the remainder of this Agreement, and the parties hereto agree that the part or parts of this Agreement so held to be invalid, unenforceable, or void will be deemed to have been stricken herefrom

74

and the remainder will have the same force and effectiveness as if such part or parts had never been included herein.

Section 9.15 <u>Integration</u>. This Agreement and the other Loan Papers represent the entire agreement of the Company, the Paying Agent and the Banks with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Paying Agent or any Bank relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Papers.

Section 9.16 <u>Descriptive Headings</u>. The section headings appearing in this Agreement have been inserted for convenience only and shall be given no substantive meaning or significance whatever in construing the terms and provisions of this Agreement.

Section 9.17 <u>Execution in Counterparts</u>. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. <u>The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Agreement or any document to be signed in connection with this Agreement shall be deemed to include electronic signatures (in a format reasonably acceptable to the Paying Agent), deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be and the parties hereto consent to conduct the transactions contemplated hereunder by electronic means.</u>

Section 9.18 **<u>WAIVERS OF JURY TRIAL</u>. THE COMPANY, THE PAYING AGENT AND THE BANKS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN PAPER AND FOR ANY COUNTERCLAIM THEREIN.**

Section 9.19 <u>No Fiduciary Duty</u>. The Paying Agent, each Bank and their Affiliates (collectively, solely for purposes of this paragraph, the "<u>Banks</u>"), may have economic interests that conflict with those of the Company, its stockholders and/or its affiliates. The Company agrees that nothing in the Loan Papers or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Bank, on the one hand, and the Company, its stockholders or its affiliates, on the other. The Company acknowledges and agrees that (i) the transactions contemplated by the Loan Papers (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Banks, on the one hand, and the Company, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Bank has assumed an advisory or fiduciary responsibility in favor of the Company, its stockholders or its affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Bank has advised, is currently advising or will advise the Company, its stockholders or its affiliates on other matters) or any other obligation to the Company except the obligations expressly set forth in the Loan Papers and (y) each Bank is acting solely as principal and not as the agent or fiduciary of the Company, its management, stockholders, creditors or any other Person. The Company acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. The Company agrees that it will not claim that any Bank has rendered advisory services of

~~75~~

any nature or respect, or owes a fiduciary or similar duty to it, in connection with such transaction or the process leading thereto.

Section 9.20 USA Patriot Act. Each Bank hereby notifies the Company that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), it is required to obtain, verify, and record information that identifies each borrower, guarantor or grantor (the "Loan Parties"), which information includes the name and address of each Loan Party and other information that will allow such Bank to identify such Loan Party in accordance with the Patriot Act. The Company agrees to provide such information as each Bank or the Paying Agent reasonably requests in order to perform its "know your customer" due diligence.

Section 9.21 Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Loan Paper or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any ~~EEA~~Affected Financial Institution arising under any Loan Paper, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of ~~an EEA~~the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by ~~an EEA~~the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an ~~EEA~~Affected Financial Institution; and

(b)    the effects of any Bail-~~I~~in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such ~~EEA~~Affected Financial Institution, its parent ~~entity~~undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Paper; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of ~~any EEA~~the applicable Resolution Authority.

Section 9.22 Interest Rate Limitation. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Bank holding such Loan in accordance with applicable law, the rate of interest payable to such Bank in respect of such Loan hereunder, together with all Charges payable to such Bank in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable to such Bank in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Bank in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Bank.

509265-1983-14872-Active.19588122.12

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

SOUTHWEST AIRLINES CO.

By: _____

      Name:
      Title:

[Signature page to Southwest Airlines Revolving Credit Facility Agreement]

509265-1983-14872-Active.19588122.12

$125,000,000

JPMORGAN CHASE BANK, N.A., as a Bank, an Issuing Bank, a Co-Administrative Agent and the Paying Agent

By: _____

    Name:
    Title:

[Signature page to Southwest Airlines Revolving Credit Facility Agreement]

509265-1983-14872-Active.19588122.12

$125,000,000

CITIBANK, N.A., as a Bank, an Issuing Bank and a Co-Administrative Agent

By: _____
      Name:
      Title:

[Signature page to Southwest Airlines Revolving Credit Facility Agreement]

509265-1983-14872-Active.19588122.12

$125,000,000                                      BARCLAYS BANK PLC, as a Bank, an Issuing Bank and the Syndication Agent


By: _____

    Name:
    Title:


[Signature page to Southwest Airlines Revolving Credit Facility Agreement]

509265-1983-14872 Active.19588122.12

$95,000,000                                                         BANK OF AMERICA, N.A., as a Bank and a Documentation Agent

By: _____

      Name:

      Title:

[Signature page to Southwest Airlines Revolving Credit Facility Agreement]

509265-1983-14872-Active.19588122.12

$95,000,000                                    BNP PARIBAS, as a Bank and a Documentation Agent

By: _____
     Name:
     Title:

[Signature page to Southwest Airlines Revolving Credit Facility Agreement]

509265-1983-14872-Active.19588122.12

$95,000,000                                    GOLDMAN SACHS BANK USA, as a Bank and a Documentation Agent

By: _____
     Name:
     Title:

[Signature page to Southwest Airlines Revolving Credit Facility Agreement]

$~~95,000,000~~65,000,000                                   MORGAN STANLEY BANK, N.A., as a Bank

By:
_____
        Name:
        Title:

MORGAN STANLEY SENIOR FUNDING,
    INC., as a Documentation Agent

By:
_____
        Name:
        Title:

[Signature page to Southwest Airlines Revolving Credit Facility Agreement]

509265-1983-14872-Active.19588122.12

$95,000,000

U.S. BANK NATIONAL ASSOCIATION, as a Bank and a Documentation Agent

By: _____
   Name:
   Title:

[Signature page to Southwest Airlines Revolving Credit Facility Agreement]

509265-1983-14872-Active.19588122.12

$~~95,000,000~~125,000,000                          WELLS FARGO BANK, N.A., as a Bank and a Documentation Agent


By: _____
     Name:
     Title:



[Signature page to Southwest Airlines Revolving Credit Facility Agreement]

509265-1983-14872-Active.19588122.12

$55,000,000                                          COMERICA BANK, as a Bank

By: _____
        Name:
        Title:

[Signature page to Southwest Airlines Revolving Credit Facility Agreement]

509265-1983-14872 Active.19588122.12

| Summary Report:<br>Litera ® Change-Pro for Word 10.7.0.7 Document comparison done on<br>3/30/2020 9:24:29 AM | |
|---|---|
| **Style name:** STB Option 1 | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://STBDMS/Active/34532059/1 | |
| **Modified DMS:** iw://STBDMS/Active/34532059/9 | |
| **Changes:** | |
| **Add** | 429 |
| **Delete** | 296 |
| **Move From** | 15 |
| **Move To** | 15 |
| **Table Insert** | 3 |
| **Table Delete** | 0 |
| **Table moves to** | 0 |
| **Table moves from** | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format Changes | 0 |
| **Total Changes:** | 758 |

ANNEX II
FORM OF AIRCRAFT MORTGAGE

[See attached]

**MORTGAGE AND SECURITY AGREEMENT**

THIS **MORTGAGE AND SECURITY AGREEMENT** dated as of March 30, 2020 (this "**Mortgage**") is made between **SOUTHWEST AIRLINES CO.** (the "**Grantor**"), and **JPMORGAN CHASE BANK, N.A.** acting as an administrative agent (in such capacity, "**Collateral Agent**"), for the Banks, as defined below.

W I T N E S S E T H:

WHEREAS, all capitalized terms used and not otherwise defined herein shall have the respective meanings set forth or referred to in Article 1 hereof;

WHEREAS, all things necessary to make this Mortgage the legal, valid and binding obligation of the Grantor and the Collateral Agent, for the uses and purposes herein set forth, in accordance with its terms, have been done and performed and have happened;

WHEREAS, the parties are entering into this Mortgage pursuant to that certain Revolving Credit Facility Agreement, dated as of August 3, 2016, as amended by First Amendment to Revolving Credit Facility Agreement dated as of March 30, 2020 (as such agreements may be amended, restated, amended and restated, supplemented or otherwise modified, renewed or replaced from time to time, collectively, the "**Credit Agreement**"), among the Grantor, JPMorgan Chase Bank, N.A., and Citibank, N.A., as co- administrative agents (collectively, the "**Administrative Agent**") for the financial institutions party thereto (the "**Banks**"), the Banks, and other parties identified therein; and

WHEREAS, in order to induce the Collateral Agent and the Banks to enter into the Credit Agreement and the other Loan Papers, the Grantor has agreed to execute and deliver this Mortgage to the Collateral Agent for the ratable benefit of the Banks;

GRANTING CLAUSE

NOW, THEREFORE, THIS MORTGAGE AND SECURITY AGREEMENT WITNESSETH, that, to secure the prompt and complete payment and performance when due of the Obligations of the Grantor under the Credit Agreement and each of the other Loan Papers, to secure the performance and observance by the Grantor of all the agreements, covenants and provisions contained herein and in the other Loan Papers to which it is a party for the benefit of the Secured Parties, and for the uses and purposes and subject to the terms and provisions hereof, and in consideration of the premises and of the covenants herein contained, and of other good and valuable consideration the receipt and adequacy whereof are hereby acknowledged, the Grantor has granted, bargained, sold, assigned, transferred, conveyed, mortgaged, pledged and confirmed, and does hereby grant, bargain, sell, assign, transfer, convey, mortgage, pledge and confirm, unto the Collateral Agent, its successors and permitted assigns, for the security and benefit of the Secured Parties, a first priority continuing security interest (and, in the case of each Airframe and each Engine, an International Interest) in and first priority mortgage Lien, in each case, subject to Permitted Liens, on all estate, right, title and interest of the Grantor in, to and under the following described property, rights, interests and privileges whether now or hereafter acquired and subjected to the Lien of this Mortgage (which collectively, including all property hereafter specifically subjected to the Lien of this Mortgage by any instrument supplemental hereto, are herein called the "**Collateral**"):

(1)    each Airframe as the same is now and will hereafter be constituted, whether now or hereafter acquired and subjected to the Lien of this Mortgage, together with all Parts of whatever nature which are from time to time included in the definition of such "Airframe", whether now or hereafter acquired and subjected to the Lien hereof, and all additions, improvements, accessions and accumulations with respect to any of the foregoing, and all flight records, logs, manuals, maintenance data and inspection, modification and overhaul records and any other related records that are required to be maintained by regulations of the FAA or other Governmental Authority with respect to any of the foregoing (as may be required to be maintained by the Grantor's FAA approved maintenance program) and any Aircraft Documents related to such Airframe;

(2)    each Engine (each such Engine having at least 1750 pounds of thrust or the equivalent thereof) as the same is now and will hereafter be constituted, whether now or hereafter acquired and subjected to the Lien of this Mortgage, and whether or not any such Engine shall be installed in or attached to any Airframe or any other airframe, together with all Parts of whatever nature which are from time to time included in any "Engine", whether now or hereafter acquired and subjected to the Lien hereof, and all additions, improvements, accessions and accumulations with respect to any of the foregoing, and all flight records, logs, manuals, maintenance data and inspection, modification and overhaul records and any other related records that are required to be maintained by regulations of the FAA or other

1

4819-1357-2280v.2 12479-82

Governmental Authority with respect to any of the foregoing (as may be required to be maintained by the Grantor's FAA approved maintenance program) and any Aircraft Documents related to such Engine;

(3)    any continuing rights of the Grantor (to the extent the Grantor may assign or otherwise grant a Lien on them without the consent of any other Person) in respect of any warranty, indemnity or agreement, express or implied, as to title, materials, workmanship, design or patent infringement with respect to such Airframes or Engines (reserving in each case to the Grantor, however, all of the Grantor's other rights and interest in and to such warranty, indemnity or agreement);

(4)    all moneys and securities now or hereafter paid or deposited or required to be paid or deposited to or with Collateral Agent by or for the account of the Grantor pursuant to the terms hereof and held or required to be held by Collateral Agent hereunder;

(5)    all proceeds with respect to requisition of title to or use of any Airframe or Engine or any Part by any Governmental Authority or from the sale or other disposition of any Airframe or Engine or Part or other property described in any of these granting clauses by the Collateral Agent pursuant to the terms of the Mortgaged Aircraft Operating Agreement, and all insurance proceeds or indemnity payments with respect to any Airframe or Engine or Part thereof, but excluding any insurance maintained by the Grantor and not required under Section 3.06 of the Mortgaged Aircraft Operating Agreement;

(6)    each lease required to be assigned pursuant to Section 3.02(b) of the Mortgaged Aircraft Operating Agreement, and including, without limitation, all rents or other payments of any kind made under such assigned lease; and

(7)    all proceeds of the foregoing.

**PROVIDED, HOWEVER**, that notwithstanding any of the foregoing provisions, so long as no Event of Default shall have occurred and be continuing, each of the Secured Parties shall not (and shall not permit any of its Affiliates or other Person lawfully claiming by, through or under it to) take or cause to be taken any action contrary to the Grantor's rights set forth herein and in the other Loan Papers to the quiet enjoyment of the Airframes and Engines, and all revenues, income and profits devised therefrom without hindrance.

HABENDUM CLAUSE

**TO HAVE AND TO HOLD** all and singular the aforesaid property unto the Collateral Agent, its respective successors and permitted assigns, in trust for the benefit and security of the Secured Parties for the uses and purposes and in all cases and as to all property specified in paragraphs (1) through (7) inclusive above, subject to the terms and provisions set forth in this Mortgage.

1.    It is expressly agreed that anything herein contained to the contrary notwithstanding, the Grantor shall remain liable under each of the contracts and agreements included in the Collateral to which it is a party to perform all of the obligations assumed by it thereunder, all in accordance with and pursuant to the terms and provisions thereof, and neither the Collateral Agent nor any of the Banks shall have any obligation or liability under any such contracts and agreements to which the Grantor is a party by reason of or arising out of the assignment hereunder, nor shall the Collateral Agent or any Bank be required or obligated in any manner to perform or fulfill any obligations of the Grantor, or to make any payment, or to make any inquiry as to the nature or sufficiency of any payment received by it, or present or file any claim, or take any action to collect or enforce the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

2.    The Grantor does hereby designate Collateral Agent the true and lawful attorney-in-fact of the Grantor, irrevocably, granted for good and valuable consideration and coupled with an interest and with full power of substitution (in the name of the Grantor or otherwise), subject to the terms and conditions of this Mortgage, to ask, require, demand, receive, sue for, compound and give acquittance for any and all moneys and claims for moneys (in each case including insurance and requisition proceeds and indemnity payments) due and to become due to the Grantor under or arising out of the Collateral, to endorse any checks or other instruments or orders in connection therewith and to file any claims or take any action or institute any proceedings which Collateral Agent may deem to be necessary or advisable in the premises as fully as the Grantor itself could do generally, to sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral, as fully and completely as though the Collateral Agent were the absolute owner thereof for all purposes, and to do, at the Collateral Agent's option and the Grantor's expense, at any time, or from time to time, all acts and things which Collateral Agent deems necessary to protect, preserve or realize upon the Collateral and to effect the intent of this Mortgage; provided, that Collateral

2

Agent shall not exercise any such rights except upon the occurrence and during the continuance of an Event of Default. Without limiting the foregoing, during the continuance of any Event of Default, but subject to the terms hereof and any mandatory requirement of applicable law, Collateral Agent shall have the right under such power of attorney in its discretion to file any claim or take any other action or proceedings, either in its own name or in the name of the Grantor or otherwise, which Collateral Agent may reasonably deem necessary or appropriate to protect and preserve the right, title and interest of the Collateral Agent in and to the security intended to be afforded hereby. The Grantor agrees that promptly upon receipt thereof, it will transfer to the Collateral Agent any and all moneys from time to time received by the Grantor constituting part of the Collateral, for distribution by the Collateral Agent pursuant to the Credit Agreement and this Mortgage.

3.    The Grantor agrees that at any time and from time to time, upon the written request of Collateral Agent, the Grantor, at the Grantor's sole cost and expense, will promptly and duly execute and deliver or cause to be duly executed and delivered any and all such further instruments and documents as Collateral Agent may reasonably deem necessary to perfect, preserve or protect the mortgage, security interest and assignments created or intended to be created hereby or to obtain for the Collateral Agent the full benefits of the assignment hereunder and/or intended to be effected hereunder and of the rights and powers herein granted and/or intended to be granted hereunder including, without limitation, taking such steps as may be required to establish, maintain or enforce the Lien intended to be granted hereunder in full force and effect (whether under the UCC, Title 49, or the law of any other jurisdiction under which any Airframe or other portion of the Collateral is registered).

4.    The Grantor does hereby warrant and represent that none of the Collateral is currently subject to any assignment, pledge or other Lien (other than Permitted Liens), and hereby covenants that it will not otherwise assign or pledge, so long as the Lien of this Mortgage has not been discharged in accordance with the terms hereof, any of its rights, title or interests hereby assigned to any Person other than the Collateral Agent.

**IT IS HEREBY FURTHER COVENANTED AND AGREED** by and among the parties hereto as follows:

## ARTICLE 1

### DEFINITIONS

**Section 1.01.**   Definitions. 1)  For all purposes of this Mortgage, except as otherwise expressly provided or unless the context otherwise requires:

(1)    each of the "**Grantor**," "**Collateral Agent**," any "**Bank**" or any other Person includes any successor in interest to it and any permitted transferee, permitted purchaser or permitted assignee of it;

(2)    the terms defined in this Article 1 have the meanings assigned to them in this Article 1, and include the plural as well as the singular;

(3)    all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles in the United States, as in effect from time to time;

(4)    the words "herein", "hereof" and "hereunder" and other words of similar import refer to this Mortgage as a whole and not to any particular Article, Section or other subdivision;

(5)    all references in this Mortgage to Articles, Sections and Exhibits refer to Articles, Sections and Exhibits of this Mortgage; and

(6)    "knowledge" or "aware" or words of similar import shall mean, when used in reference to the Grantor, the actual knowledge of Grantor.

(b)   For all purposes of this Mortgage, the following capitalized terms have the following respective meanings:

"**Administrative Agent**" shall have the meaning given to that term in the recitals to this Mortgage.

3

"**Affiliate**" means a Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with another Person.

"**Aircraft**" means an Airframe and its two associated Engines. An Airframe is "associated" with the two Engines grouped with it on Exhibit A to this Mortgage (and vice versa).

"**Aircraft Documents**" means, with respect to any Aircraft, all technical data, manuals and log books, and all inspection, modification and overhaul records and other service, repair, maintenance and technical records that are required by (a) the FAA pursuant to FAR 121.380A (or successor regulation) and any other relevant regulation promulgated by the FAA which is applicable to the Grantor as an operator under FAR 121 or (b) the relevant Aviation Authority, to be maintained with respect to such Aircraft, Airframe, Engines or Parts and such term shall include all additions, renewals, revisions and replacements of any such materials from time to time made prior to the release of the Lien of this Mortgage with respect to the applicable Aircraft, or required to be made prior to the release of the Lien of this Mortgage with respect to the applicable Aircraft, by the regulations of the relevant Aviation Authority, and in each case in whatever form and by whatever means or medium (including, without limitation, microfiche, microfilm, paper, CD-ROM or computer disk) such materials may be maintained or retained by or on behalf of the Grantor (provided, that all such materials shall be maintained in the English language or, if in a jurisdiction other than the United States in which the keeping of records in English is not practical, regularly translated in the English language).

"**Aircraft Protocol**" shall mean the official English language text of the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment, adopted on November 16, 2001 at a diplomatic conference in Cape Town, South Africa, and all amendments, supplements and revisions thereto, as in effect in the United States.

"**Airframe**" shall mean (i) each airframe (excluding Engines or engines either initially or from time to time installed thereon) specified by Manufacturer, model, United States Registration Number and Manufacturer's serial number identified on Exhibit A attached hereto or in any supplement to this Mortgage, and (ii) any and all Parts which are from time to time incorporated or installed in or attached to such airframe or which have been removed therefrom until such Part has been replaced.

"**Aviation Authority**" means the FAA or, if any Aircraft is permitted to be, and is, registered with any other Governmental Authority under and in accordance with Section 3.02(e) of the Mortgaged Aircraft Operating Agreement and Annex C thereof, such other Governmental Authority.

"**Bankruptcy Code**" shall mean United States Bankruptcy Code, 11 United States Code Section 101 et seq.

"**Banks**" shall have the meaning given to that term in the recitals to this Mortgage.

"**Cape Town Convention**" shall mean the official English language text of the Convention on International Interests in Mobile Equipment, adopted on November 16, 2001 at a diplomatic conference in Cape Town, South Africa, and all amendments, supplements and revisions thereto, as in effect in the United States.

"**Cape Town Treaty**" shall mean, collectively, (a) the Cape Town Convention, (b) the Aircraft Protocol, and (c) all rules and regulations (including but not limited to the Regulations and Procedures for the International Registry) adopted pursuant thereto and, in the case of each of the foregoing described in clauses (a) through (c), all amendments, supplements and revisions thereto as in effect in the United States.

"**Collateral**" shall have the meaning assigned thereto in the Granting Clause hereof.

"**Collateral Agent**" shall have the meaning given to that term in the first paragraph of this Mortgage.

"**Credit Agreement**" shall have the meaning given to that term in the recitals to this Mortgage.

"**Engine**" shall mean (i) each engine listed by Manufacturer, model and Manufacturer's serial numbers identified on Exhibit A attached hereto or in any supplement to this Mortgage, and whether or not either initially or from time to time installed on an Airframe or any other airframe, and (ii) any and all Parts which are from time to time incorporated or installed in or attached to any such engine and any and all Parts removed therefrom until such Part has been replaced.

"**FAA**" shall mean the Federal Aviation Administration of the United States of America and any successor thereto.

"**Governmental Authority**" shall mean the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central

4

bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**International Interest**" shall mean an "international interest" as defined in the Cape Town Treaty.

"**International Registry**" shall mean the "International Registry" as defined in the Cape Town Treaty.

"**Laws**" shall mean all applicable statutes, laws, treaties, ordinances, rules, regulations, orders, writs, injunctions, decrees, judgments, or opinions of any Tribunal.

"**Lien**" shall mean any mortgage, lien, pledge, charge, security interest or other encumbrance in or on, or any interest or title of any vendor, lessor, lender or other secured party to or of any Person under, any conditional sale or other title retention agreement or lease with respect to, any property or asset of such Person. For avoidance of doubt, the filing of a Uniform Commercial Code financing statement by a Person that is not entitled or authorized in accordance with the applicable Uniform Commercial Code to file such financing statement shall not, in and of itself, constitute a Lien.

"**Loan Papers**" shall mean (i) the Credit Agreement, certificates delivered pursuant to the Credit Agreement and exhibits and schedules thereto, (ii) this Mortgage, (iii) the Mortgaged Aircraft Operating Agreement, (iv) any notes, security documents, guaranties, and other agreements in favor of the Agents (as defined in the Credit Agreement) and Banks, or any or some of them, ever delivered in connection with the Credit Agreement, (v) any Letters of Credit (as defined in the Credit Agreement) and (vi) all renewals, extensions, or restatements of, or amendments or supplements to, any of the foregoing.

"**Manufacturer**" shall mean, with respect to any Airframe or Engine, the manufacturer thereof, and its successors and assigns.

"**Mortgaged Aircraft Operating Agreement**" means that certain Mortgage Aircraft Operating Agreement, dated as of the date hereof, between Grantor and Collateral Agent pursuant to the Credit Agreement, as such agreement may be amended, restated, amended and restated, supplemented or otherwise modified, renewed or replaced from time to time.

"**Mortgage and Security Agreement**" or "**this Agreement**" or "**this Mortgage**" shall mean this Mortgage and Security Agreement, as the same may from time to time be amended, restated, amended and restated, supplemented or otherwise modified.

"**Obligations**" means all present and future indebtedness, obligations, and liabilities, and all renewals, extensions, and modifications thereof, owed to the Administrative Agent and Banks, or any or some of them, by the Grantor, arising pursuant to any Loan Paper, together with all interest thereon and costs, expenses, and reasonable attorneys' fees incurred in the enforcement or collection thereof.

"**Parts**" shall mean, with respect to an Airframe or Engine, any and all appliances, parts, instruments, appurtenances, accessories, avionics, furnishings, seats, and other equipment of whatever nature (other than (a) complete Engines or engines, (b) any items leased by the Grantor from a third party, and (c) cargo containers which may from time to time be incorporated or installed in or attached to such Airframe or Engine or which have been removed therefrom).

"**Permitted Liens**" shall mean: (a) Liens for taxes, assessments and governmental charges or levies which either are not yet due and payable or are being contested in good faith by appropriate proceedings and for which adequate reserves are established in accordance with GAAP; (b) Liens securing judgments, but only to the extent, for an amount and for a period not resulting in an Event of Default under Section 7.1(d) of the Credit Agreement; (c) Liens securing Obligations under the Credit Agreement; (d) Liens constituting normal operational usage of the affected Property (as defined in the Credit Agreement), including charter, third party maintenance, storage, leasing, pooling or interchange thereof; (e) Liens imposed by law such as materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business securing obligations that (i) are not overdue for a period of more than 30 days, provided that no enforcement, collection, execution, levy or foreclosure proceeding shall have been commenced with respect thereto, or (ii) are being contested in good faith and for which adequate reserves are established in accordance with GAAP; and (f) salvage or similar rights of insurers under the insurances required to be maintained pursuant to the Mortgaged Aircraft Operating Agreement.

"**Person**" shall mean and include an individual, partnership, joint venture, corporation, trust, limited liability company or other entity, Tribunal, unincorporated organization, or government, or any department, agency, or political subdivision thereof.

"**Secured Parties**" shall mean the Administrative Agent and the Banks.

5

"**Title 49**" shall mean Title 49 of the United States Code, as amended and in effect from time to time, and the regulations promulgated thereto.

"**Tribunal**" shall mean any municipal, state, commonwealth, federal, foreign, territorial, or other court, governmental body, subdivision, agency, department, commission, board, bureau, or instrumentality.

"**UCC**" shall mean the Uniform Commercial Code (or any similar equivalent legislation) as in effect in any applicable jurisdiction.

"**United States**" or "**U.S.**" shall mean the United States of America.

**Section 1.02.**    Representations, Warranties and Covenants.

(a)    Title. The Grantor hereby represents and warrants that (i) it has good and marketable title to each Airframe and Engine and will have good and marketable title to each Airframe and Engine listed on any subsequent supplement to this mortgage at the time of execution and delivery thereof; (ii) it will have good title to any other Collateral which is subject to this Mortgage or which becomes subject to this Mortgage from time to time hereafter; and (iii) the Airframes and Engines are correctly described by Manufacturer, model and serial number as set forth on the Manufacturer's serial plate for said Airframes and Engines, in each case subject to Permitted Liens.

(b)    No Liens. The Grantor is, and as to Collateral acquired by it from time to time after the date hereof the Grantor will be, the owner of all Collateral free from any Lien (other than Permitted Liens), and the Grantor shall promptly, at its own expense, (i) defend the Collateral against all Liens (other than Permitted Liens) at any time claiming the same or any interest therein adverse to the Collateral Agent and (ii) take such action as may be necessary to duly discharge any Lien (other than a Permitted Liens) arising at any time.

(c)    Perfected Security Interests. This Mortgage is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in all of the Collateral to the extent purported to be created thereby, subject as to enforceability to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law. With respect to the Collateral, at such time as (a) financing statements in appropriate form are filed in the appropriate offices (and the appropriate fees are paid), and (b) the appropriate filings with the FAA (including filing for recordation of this Mortgage and any future supplement thereto) and registrations with the International Registry, as applicable, are made, the Collateral Agent, for the benefit of the Secured Parties, shall have a first priority perfected security interest and/or mortgage (or comparable Lien) in all of such Collateral to the extent that the Liens on such Collateral may be perfected upon the filings, registrations or recordations or upon the taking of the actions described in clauses (a) and (b) above, subject in each case only to Permitted Liens, and such security interest is entitled to the benefits, rights and protections afforded under the Loan Papers applicable thereto (subject to the qualification set forth in the first sentence of this paragraph).

(d)    Filings. Except for (a) the filing for recordation of this Mortgage with the FAA in accordance with Title 49, (b) the appropriate registrations with the International Registry and (c) the filing of a financing statement (and continuation statements relating thereto at periodic intervals), in appropriate form, with the appropriate office, no further filing or recording of any document is necessary in order to establish and perfect the security interest in the Airframes and Engines constituting Collateral under this Mortgage.

(e)    Further Assurances. The Grantor will take, or cause to be taken, at the Grantor's cost and expense, such action with respect to (x) the recording, filing, re-recording and re-filing of this Mortgage and any supplement to this Mortgage, as is necessary to maintain, so long as this Mortgage is in effect, the priority, perfection and preservation of the Lien created by this Mortgage, in the office of the FAA, pursuant to Title 49, and in such other places as may be required under any applicable law or regulation in the U.S., (y) the appropriate registrations with the International Registry as are necessary to maintain, so long as this Mortgage is in effect, the priority, perfection and preservation of the Lien created by this Mortgage and (z) any financing statements or other instruments as are necessary to maintain, so long as this Mortgage is in effect, the priority, perfection and preservation of the Lien created by this Mortgage, and will furnish to the Collateral Agent timely notice of the necessity of such action, together with, if requested by Collateral Agent, such instruments, in execution form, and such other information as may be reasonably required to enable the Collateral Agent to take such action or otherwise reasonably requested by Collateral Agent. To the extent permitted by applicable law, the Grantor hereby authorizes the Collateral Agent to execute and file financing statements or continuation statements necessary to maintain, so long as this Mortgage is in effect, the perfection and preservation of the Lien created by this Mortgage without the Grantor's signature appearing thereon. The Grantor shall pay the costs of, or incidental to, any recording or filing, including, without limitation, any filing of financing or continuation

6

statements, necessary to maintain, so long as this Mortgage is in effect, the perfection and preservation of the Lien created by this Mortgage.

(f)    Section 1110 of the Bankruptcy Code. It is the intention of the parties hereto that the security interest created hereby, to the fullest extent available under applicable law, entitles the Collateral Agent, on behalf of the Banks, to all of the benefits of Section 1110 of the Bankruptcy Code with respect to each Airframe and Engine.

(g)    Notice of Certain Events. The Grantor shall provide the Collateral Agent with prior written notice of its intent to convert any Airframe from passenger configuration to cargo configuration.

(h)    [Reserved.]

## ARTICLE 2

### EVENT OF DEFAULT AND REMEDIES

**Section 2.01.**    Event of Default. It shall be an Event of Default hereunder if an "Event of Default" under the Credit Agreement shall have occurred and be continuing thereunder.

**Section 2.02.**    Remedies with Respect to Collateral.

(a)    Remedies Available. Upon the occurrence and continuance of any Event of Default, Collateral Agent may do one or more of the following, in each case subject to the Credit Agreement:

(i)    cause the Grantor, upon the written demand of Collateral Agent, at the Grantor's expense, to deliver promptly, and the Grantor shall deliver promptly, all or such part of the Airframes, the Engines or other Collateral as Collateral Agent may so demand to Collateral Agent or its order, or Collateral Agent, at its option, may enter upon the premises where all or any part of the Airframes, the Engines or other Collateral are located and take immediate possession (to the exclusion of the Grantor and all Persons claiming under or through the Grantor) of and remove the same by summary proceedings or otherwise together with any engine which is not an Engine but which is installed on an Airframe, subject to all of the rights of the owner, lessor, or lien holder of or with respect to such engine;

(ii)    sell all or any part of the Airframes, Engines or other Collateral at public or private sale, whether or not Collateral Agent shall at the time have possession thereof, as Collateral Agent may determine, or otherwise dispose of, hold, use, operate, lease to others or keep idle all or any part of the Airframes, the Engines or other Collateral as Collateral Agent, in its sole discretion, may determine, all free and clear of any rights or claims of whatsoever kind of the Grantor, any person claiming by, through or under the Grantor and any person holding an interest subordinate to the interests of the Collateral Agent hereunder; provided, however, that the Grantor shall be entitled at any time prior to any such disposition to redeem the Collateral by paying in full all of the Obligations; or

(iii)    exercise any or all of the rights and powers and pursue any and all remedies of a secured party under the UCC of the State of New York (whether or not in effect in the jurisdiction in which enforcement is sought) or by any other applicable law (including the Cape Town Convention, and specifically Article 13 thereof, to the extent applicable), or proceed by appropriate court action to enforce the terms or to recover damages for the breach hereof.

Upon every taking of possession of Collateral under this Section 2.02, Collateral Agent may, from time to time, at the expense of the Grantor, make all such expenditures for maintenance, insurance, repairs, replacements, alterations, additions and improvements to and of the Collateral as it may deem proper. In each such case, Collateral Agent shall have the right to maintain, use, insure, operate, store, lease, control or manage the Collateral and to carry on business and to exercise all rights and powers of the Grantor relating to the Collateral in connection therewith, as Collateral Agent shall deem appropriate, including the right to enter into any and all such agreements with respect to the maintenance, use, insurance, operation, storage, leasing, control, management or disposition of the Collateral or any part thereof as Collateral Agent may determine; and Collateral Agent shall be entitled to collect and receive directly all tolls, rents, revenues, issues, income, products, proceeds and profits of the Collateral and every part thereof, without prejudice, however, to the right of the Collateral Agent under any provision of this Mortgage to collect and receive all cash held by, or required to be deposited with, the Collateral Agent hereunder. Such tolls, rents, revenues, issues, income, products, proceeds and profits shall be applied to pay the expenses of using, operating, storage, leasing, control,

7

management or disposition of the Collateral, and of all maintenance, insurance, repairs, replacement, alterations, additions and improvements, and to make all payments which the Collateral Agent may be required or may elect to make, if any, for taxes, assessments, insurance or other proper charges upon the Collateral or any part thereof (including the employment of engineers and accountants to examine, inspect and make reports upon the properties and books and records of the Grantor), and all other payments which the Collateral Agent may be required or authorized to make under any provision of this Mortgage, as well as just and reasonable compensation for the services of the Collateral Agent, and of all Persons engaged and employed by the Collateral Agent.

In addition, the Grantor shall be liable, without duplication of any amounts payable hereunder or under any Loan Paper, for all reasonable legal fees and other costs and expenses incurred by reason of the occurrence of any Event of Default or the exercise of Collateral Agent's remedies with respect thereto, including all reasonable costs and expenses incurred in connection with the retaking, return or sale of any Airframe, Engines or other Collateral in accordance with the terms hereof, which amounts shall, until paid, be secured by the Lien of this Mortgage.

If any Event of Default shall have occurred and be continuing, at the direction of the Collateral Agent shall at any time thereafter while any Event of Default shall be continuing, without notice of any kind to the Grantor (except as provided herein) to the extent permitted by law, carry out or enforce any one or more of the actions and remedies provided in this Article 2 or elsewhere in this Mortgage or otherwise available to a secured party under applicable law, whether or not any or all of the Collateral is subject to the jurisdiction of such UCC and whether or not such remedies are referred to in this Article 2.

Nothing in the foregoing shall affect the right of each Bank to receive all payments of principal of, and interest on, the Obligations held by such Bank and all other amounts owing to such Bank as and when the same may be due.

Notwithstanding anything to the contrary in this Mortgage, the Credit Agreement or in any other Loan Paper, no right or remedy of the Collateral Agent, the Administrative Agent, Paying Agent or any other Agent or any Bank or other Secured Party, as applicable, under this Section 2.02 or under any other provision of this Mortgage or under any provision of Article VII of the Credit Agreement (including but not limited to any action with respect to any warranty, indemnity or other agreement to give and receive all notices and other instruments or communications, and all other Collateral constituting continuing rights described in clause (3) of the Granting Clause herein) may be exercised or pursued by the Collateral Agent against Collateral included in clause (3) of the Granting Clause (the "**Clause 3 Collateral**") until the Grantor receives written notice from the Collateral Agent during the continuance of an Event of Default to withhold from taking any action with respect to the Clause 3 Collateral (the "**Withhold Notice**"). Until the receipt by the Grantor of the Withhold Notice, the Grantor is authorized to continue to operate its business with respect to the Clause 3 Collateral, and take any action, or withhold from taking any action, including but not limited to any action with respect to any warranty, indemnity or other agreement to give and receive all notices and other instruments or communications, in each case with respect to the Clause 3 Collateral. Upon and after the Collateral Agent has given the Withhold Notice and during the continuance of an Event of Default, the Collateral Agent may exercise all rights, powers, privileges, options and other benefits and entitlements of the Grantor in respect of any warranty, indemnity or agreement (to the extent assigned hereunder) with respect to such Airframes or Engines, including, without limitation, the right to make all waivers and agreements, to give and receive all notices and other instruments or communications, to take such action upon the occurrence of a default thereunder, including the commencement, conduct and consummation of legal, administrative or other proceedings, as shall be permitted thereby or by law, and to do any and all other things which the Grantor is or may be entitled to do thereunder (to the extent assigned hereunder).

(b)    Notice of Sale. The Collateral Agent shall give the Grantor at least ten (10) days' prior written notice of the date fixed for any public sale of any Airframe or Engine or the date on or after which any private sale will be held, which notice the Grantor hereby agrees is reasonable notice.

(c)    Receiver. If any Event of Default shall occur and be continuing, to the extent permitted by applicable law, Collateral Agent shall be entitled, as a matter of right as against the Grantor, without notice or demand and without regard to the adequacy of the security for the Obligations or the solvency of the Grantor, upon the commencement of judicial proceedings by it to enforce any right under this Mortgage, to the appointment of a receiver of the Collateral or any part thereof and of the tolls, rents, revenues, issues, income, products and profits thereof for the recovery of judgment for the indebtedness secured by the Lien created under this Mortgage or for the enforcement of any other proper, legal or equitable remedy available under applicable law.

(d)    Concerning Sales. At any sale under this Article, any Bank may bid for and purchase the property offered for sale, may make payment on account thereof as herein provided, and, upon compliance with the terms of sale, may

8

hold, retain and dispose of such property without further accountability therefor. Any purchaser shall be entitled, for the purpose of making payment for the property purchased, to deliver any of the Obligations in lieu of cash in the amount which shall be payable thereon as principal or interest. Said Obligations, in case the amount so payable to the holders thereof shall be less than the amounts due thereon, shall be returned to the holders thereof after being stamped or endorsed to show partial payment.

**Section 2.03.**    Waiver of Appraisement, Etc To the full extent that it may lawfully so agree, the Grantor agrees that it will not at any time insist upon, plead, claim or take the benefit or advantage of, any appraisement, valuation, stay, extension, or redemption law now or hereafter in force, in order to prevent or hinder the enforcement of this Mortgage or the absolute sale of the Collateral, or any part thereof, or the possession thereof by any purchaser at any sale under this Article 2; but the Grantor, for itself and all who may claim under it so far as it or they now or hereafter lawfully may, hereby waives the benefit of all such laws. The Grantor, for itself and all who may claim under it, waives, to the extent that it lawfully may, all right to have the property in the Collateral marshalled upon any foreclosure hereof, and agrees that any court having jurisdiction to foreclosure under this Mortgage may order the sale of the Collateral as an entirety.

**Section 2.04.**    Application of Proceeds. After the exercise of remedies pursuant to Section 2.02 hereof, any payments in respect of the Obligations and any proceeds (as defined in the UCC) of the Collateral, when received by the Collateral Agent or any other Bank in cash or its equivalent, will be applied as set forth in and in accordance with the Credit Agreement.

**Section 2.05.**    Remedies Cumulative. Each and every right, power and remedy hereby specifically given to the Collateral Agent or otherwise in this Mortgage shall be cumulative and shall be in addition to every other right, power and remedy specifically given under this Mortgage or the other Loan Papers or now or hereafter existing at law, in equity or by statute or treaty and each and every right, power and remedy whether specifically herein given or otherwise existing may be exercised from time to time or simultaneously and as often and in such order as may be deemed expedient by Collateral Agent. All such rights, powers and remedies shall be cumulative and the exercise or the beginning of the exercise of one shall not be deemed a waiver of the right to exercise any other or others. No delay or omission of Collateral Agent in the exercise of any such right, power or remedy and no renewal or extension of any of the Obligations shall impair any such right, power or remedy or shall be construed to be a waiver of any Event of Default or an acquiescence therein. No notice to or demand on the Grantor in any case shall entitle it to any other or further notice or demand in similar or other circumstances or constitute a waiver of any of the rights of the Collateral Agent to any other or further action in any circumstances. In the event that Collateral Agent shall bring any suit to enforce any of its rights hereunder and shall be entitled to judgment, then in such suit such Collateral Agent may recover reasonable expenses, including attorneys' fees, and the amounts thereof shall be included in such judgment.

**Section 2.06.**    Discontinuance of Proceedings. In case Collateral Agent shall have instituted any proceeding to enforce any right, power or remedy under this Mortgage by foreclosure, sale entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason or shall have been determined adversely to Collateral Agent, then and in every such case the Grantor and the Collateral Agent shall be restored to their former positions and rights hereunder with respect to the Collateral subject to the security interest created under this Mortgage, and all rights, remedies and powers of the Collateral Agent shall continue as if no such proceeding had been instituted (but otherwise without prejudice).

# ARTICLE 3

## TERMINATION OF MORTGAGE

**Section 3.01.**    Termination of Mortgage.

(a)    This Mortgage and the Lien of this Mortgage on the Collateral shall terminate upon payment and performance in full of the Obligations then due. Upon termination, the Grantor may request, at the Grantor's sole cost and expense, the Collateral Agent to execute and deliver to, or as directed in writing by, the Grantor an appropriate instrument reasonably required to release the Collateral from the Lien of this Mortgage and the Collateral Agent shall execute and deliver such instrument as aforesaid at the Grantor's expense, whereupon this Mortgage shall terminate and this Mortgage shall be of no further force or effect.

(b)    Upon removal or release of any Aircraft, Airframe or Engine from the Pool Assets (as defined in the Credit Agreement) pursuant to and in accordance with Section 6.12 of the Credit Agreement, the Grantor may request, at the Grantor's sole cost and expense, the Collateral Agent to execute and deliver to, or as directed in writing by, the Grantor an appropriate instrument reasonably required to release such Aircraft, Airframe or Engine removed or released from the Pool Assets and the balance of the Collateral relating thereto (if any) from the Lien of this Mortgage and the Collateral Agent shall execute and deliver such instrument as aforesaid at the Grantor's expense, whereupon this Mortgage, solely to the extent it relates to such Aircraft, Airframe or Engine being removed or released from the Pool Assets and the balance of the Collateral

9

relating thereto (if any), shall terminate and this Mortgage, solely to the extent it relates to such Aircraft, Airframe or Engine removed or released from the Pool Assets and the balance of the Collateral relating thereto (if any), shall be of no further force or effect.

## ARTICLE 4

### MISCELLANEOUS

**Section 4.01.**    No Legal Title to Collateral. No Bank or the Collateral Agent shall have legal title to any part of the Collateral. No transfer, by operation of law or otherwise, of any portion of the Obligations or other right, title and interest of Collateral Agent or Bank in and to the Collateral or this Mortgage shall operate to terminate this Mortgage or entitle any successor or transferee of Collateral Agent or such Bank to an accounting or to the transfer to it of legal title to any part of the Collateral.

**Section 4.02.**    Sale of Collateral by Collateral Agent is Binding. Any sale or other conveyance of any Airframe, Engine or other item of Collateral or any interest therein by Collateral Agent made pursuant to the terms of this Mortgage shall bind the Banks and the Grantor, and shall be effective to transfer or convey all right, title and interest of the Collateral Agent, the Grantor, and the other Banks in and to such Airframe, Engine or other item of Collateral or any interest therein. No purchaser or other grantee shall be required to inquire as to the authorization, necessity, expediency or regularity of such sale or conveyance or as to the application of any sale or other proceeds with respect thereto by Collateral Agent.

**Section 4.03.**    Benefit of Mortgage. Nothing in this Mortgage, whether express or implied, shall be construed to give to any Person other than the Grantor, the Collateral Agent and the Banks any legal or equitable right, remedy or claim under or in respect of this Mortgage.

**Section 4.04.**    Notices. All notices and other communication provided for herein shall be in writing (including telecopy communications) and mailed, telecopied, e-mailed (where indicated) or delivered in accordance with Section 9.2 of the Credit Agreement.

**Section 4.05.**    Governing Law. THIS MORTGAGE HAS BEEN DELIVERED IN THE STATE OF NEW YORK AND THIS MORTGAGE AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS MORTGAGE SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK. EACH PARTY TO THIS MORTGAGE HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR OTHER LOAN PAPERS, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN (OR IF SUCH COURT LACKS SUBJECT MATTER JURISDICTION, THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN), AND ANY APPELLATE COURT FROM ANY THEREOF< IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS MORTGAGE OR ANY OTHER LOAN PAPER OF THE TRANSACTIONS RELATING HERETO OR THERETO, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT. EACH PARTY HERETO CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS AND WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT AND AGREES NOT TO PLEAD OR CLAIM THE SAME. EACH OF THE GRANTOR AND THE COLLATERAL AGENT WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS, WHICH MAY BE MADE BY ANY OTHER MEANS PERMITTED BY THE LAW OF SUCH STATE.

**Section 4.06.**    Grantor's Duties. It is expressly agreed, anything herein contained to the contrary notwithstanding, that the Grantor shall remain liable to perform all of the obligations, if any, assumed by it with respect to the Collateral and neither the Collateral Agent nor any Bank shall have any obligations or liabilities with respect to any Collateral by reason of or arising out of this Mortgage, nor shall the Collateral Agent nor any Bank be required or obligated in any manner perform or fulfill any of the obligations of the Grantor under or with respect to any Collateral.

**Section 4.07.**    Counterparts. This Mortgage may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**Section 4.08.**    Waiver; Amendment. 1)  No waiver of any provisions of this Mortgage or consent to any departure by the Grantor therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then

10

such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No notice to or demand on the Grantor in any case shall entitle the Grantor to any other or further notice or demand in similar or other circumstances.

(a)    Neither this Mortgage nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Collateral Agent and the Grantor with respect to which such waiver, amendment or modification is to apply.

**Section 4.09.**    <u>Obligations Absolute</u>. The obligations of the Grantor hereunder shall remain in full force and effect without regard to, and shall not be impaired by any exercise or non-exercise, or any waiver of, any right, remedy, power or privilege by the Collateral Agent under or in respect of this Mortgage or any other Loan Paper.

**Section 4.10.**    <u>Successors and Assigns</u>. This Mortgage shall be binding upon, and inure to the benefit, of each party hereto and its respective successors and permitted assigns; <u>provided</u>, that the Grantor may not transfer or assign any or all of its rights or obligations hereunder without the prior written consent of the Collateral Agent. All agreements, statements, representations and warranties made by the Grantor herein or in any certificate or other instrument delivered by the Grantor or on its behalf under this Mortgage shall be considered to have been relied upon by the Collateral Agent and Banks and shall survive the execution and delivery of this Mortgage and the other Loan Papers regardless of any investigation made by the Collateral Agent or Banks or on their behalf.

**Section 4.11.**    <u>Conflicts with Other Loan Papers</u>. Unless otherwise expressly provided in this Mortgage, if any provision contained in this Mortgage conflicts with any provision of any other Loan Paper, the provision contained in this Mortgage shall govern and control, <u>provided</u>, that the inclusion of supplemental rights or remedies in favor of the Collateral Agent or the Banks in any other Loan Paper shall not be deemed a conflict with this Mortgage.

\* \* \*

11

**IN WITNESS WHEREOF**, the Grantor and the Collateral Agent have caused this Mortgage and Security Agreement to be duly executed by their respective officers thereunto duly authorized.

**SOUTHWEST AIRLINES CO.**, as Grantor

By:  _____
  Name:
Title:

**JPMORGAN CHASE BANK, N.A.**, as Collateral Agent

By:  _____
Name:
Title:

*Signature Page to Mortgage and Security Agreement*

**EXHIBIT A**

to Mortgage and Security Agreement

**Airframes and Engines**

| | Airframe Make | Airframe Model | U.S. Reg. Number | Airframe MSN | Engine Manufacturer | Engine Model | Engine MSN 1 | Engine MSN 2 |
|---|---|---|---|---|---|---|---|---|
| 1 | Boeing | 737-8H4 | N8635F | 60083 | CFM International | CFM56-7B27E/F | 658992 | 658949 |
| 2 | Boeing | 737-8H4 | N8634A | 42522 | CFM International | CFM56-7B27E/F | 658985 | 658982 |
| 3 | Boeing | 737-8H4 | N8633A | 36905 | CFM International | CFM56-7B27E/F | 658937 | 658892 |
| 4 | Boeing | 737-8H4 | N8632A | 60082 | CFM International | CFM56-7B27E/F | 658893 | 658891 |
| 5 | Boeing | 737-8H4 | N8631A | 42385 | CFM International | CFM56-7B27E/F | 657908 | 658873 |
| 6 | Boeing | 737-8H4 | N8623F | 36731 | CFM International | CFM56-7B27E/F | 658491 | 658488 |
| 7 | Boeing | 737-8H4 | N8619F | 33939 | CFM International | CFM56-7B27E/F | 658361 | 658359 |
| 8 | Boeing | 737-8H4 | N8620H | 42526 | CFM International | CFM56-7B27E/F | 658371 | 658351 |
| 9 | Boeing | 737-8H4 | N8618N | 36915 | CFM International | CFM56-7B27E/F | 658355 | 658354 |
| 10 | Boeing | 737-8H4 | N8617E | 36912 | CFM International | CFM56-7B27E/F | 658280 | 658279 |
| 11 | Boeing | 737-8H4 | N8616C | 36914 | CFM International | CFM56-7B27E/F | 658267 | 658257 |
| 12 | Boeing | 737-8H4 | N8615E | 36933 | CFM International | CFM56-7B27E/F | 962655 | 658223 |
| 13 | Boeing | 737-8H4 | N8614M | 36908 | CFM International | CFM56-7B27E/F | 962723 | 962719 |
| 14 | Boeing | 737-8H4 | N8613K | 36998 | CFM International | CFM56-7B27E/F | 963686 | 962683 |
| 15 | Boeing | 737-8H4 | N8605E | 36891 | CFM International | CFM56-7B27E/F | 962478 | 963475 |
| 16 | Boeing | 737-8H4 | N8329B | 37006 | CFM International | CFM56-7B27E/F | 962467 | 962465 |
| 17 | Boeing | 737-8H4 | N8328A | 38818 | CFM International | CFM56-7B27E/F | 962456 | 962448 |
| 18 | Boeing | 737-8H4 | N8327A | 37009 | CFM International | CFM56-7B27E/F | 962411 | 962410 |
| 19 | Boeing | 737-8H4 | N8326F | 35969 | CFM International | CFM56-7B27E/F | 962416 | 962415 |
| 20 | Boeing | 737-8H4 | N8325D | 37003 | CFM International | CFM56-7B27E/F | 962402 | 962401 |
| 21 | Boeing | 737-7H4 | N954WN | 36669 | CFM International | CFM56-7B24/3 | 804732 | 804718 |
| 22 | Boeing | 737-7H4 | N953WN | 36668 | CFM International | CFM56-7B24/3 | 804651 | 804507 |
| 23 | Boeing | 737-7H4 | N952WN | 36667 | CFM International | CFM56-7B24/3 | 804571 | 804568 |
| 24 | Boeing | 737-7BD | N7737E | 33929 | CFM International | CFM56-7B20 | 894174 | 894335 |
| 25 | Boeing | 737-7BD | N7736A | 35109 | CFM International | CFM56-7B20 | 894344 | 890882 |
| 26 | Boeing | 737-7H4 | N258WN | 32516 | CFM International | CFM56-7B24 | 894248 | 894154 |
| 27 | Boeing | 737-7H4 | N257WN | 32515 | CFM International | CFM56-7B24 | 894221 | 892867 |
| 28 | Boeing | 737-7H4 | N256WN | 32514 | CFM International | CFM56-7B24 | 894216 | 894200 |
| 29 | Boeing | 737-7H4 | N255WN | 32513 | CFM International | CFM56-7B24 | 894198 | 894197 |
| 30 | Boeing | 737-7H4 | N254WN | 32512 | CFM International | CFM56-7B24 | 894173 | 894172 |
| 31 | Boeing | 737-7H4 | N253WN | 32511 | CFM International | CFM56-7B24 | 895150 | 894101 |
| 32 | Boeing | 737-7H4 | N252WN | 34973 | CFM International | CFM56-7B24 | 894140 | 894139 |
| 33 | Boeing | 737-7H4 | N251WN | 32510 | CFM International | CFM56-7B24 | 894136 | 894135 |
| 34 | Boeing | 737-7H4 | N250WN | 34972 | CFM International | CFM56-7B24 | 894122 | 892987 |
| 35 | Boeing | 737-7H4 | N249WN | 34951 | CFM International | CFM56-7B24 | 892993 | 892992 |
| 36 | Boeing | 737-7H4 | N247WN | 32508 | CFM International | CFM56-7B24 | 892958 | 892957 |
| 37 | Boeing | 737-7H4 | N246LV | 32507 | CFM International | CFM56-7B24 | 892950 | 892946 |
| 38 | Boeing | 737-7H4 | N245WN | 32506 | CFM International | CFM56-7B24 | 892943 | 892942 |
| 39 | Boeing | 737-7H4 | N244WN | 34864 | CFM International | CFM56-7B24 | 874962 | 892930 |
| 40 | Boeing | 737-7H4 | N239WN | 34714 | CFM International | CFM56-7B24 | 892885 | 892884 |
| 41 | Boeing | 737-7H4 | N238WN | 34713 | CFM International | CFM56-7B24 | 892396 | 892284 |
| 42 | Boeing | 737-7H4 | N236WN | 34631 | CFM International | CFM56-7B24 | 892838 | 892835 |
| 43 | Boeing | 737-7H4 | N235WN | 34630 | CFM International | CFM56-7B24 | 893784 | 892813 |
| 44 | Boeing | 737-7H4 | N234WN | 32502 | CFM International | CFM56-7B24 | 892790 | 892776 |

EXHIBIT A

| 45 | Boeing | 737-7H4 | N233LV | 32501 | CFM International | CFM56-7B24 | 893759 | 893752 |
| 46 | Boeing | 737-7BD | N7720F | 33922 | CFM International | CFM56-7B20 | 892655 | 892654 |
| 47 | Boeing | 737-7H4 | N228WN | 32496 | CFM International | CFM56-7B24 | 892606 | 892605 |
| 48 | Boeing | 737-7H4 | N222WN | 34290 | CFM International | CFM56-7B24 | 892526 | 892525 |
| 49 | Boeing | 737-7BD | N7715E | 33921 | CFM International | CFM56-7B20 | 893511 | 893510 |
| 50 | Boeing | 737-7H4 | N221WN | 34259 | CFM International | CFM56-7B24 | 892516 | 892515 |
| 51 | Boeing | 737-752 | N7835A | 34294 | CFM International | CFM56-7B22 | 892486 | 893127 |
| 52 | Boeing | 737-7H4 | N218WN | 32489 | CFM International | CFM56-7B24 | 892439 | 892438 |
| 53 | Boeing | 737-7H4 | N217JC | 34232 | CFM International | CFM56-7B24 | 892429 | 892428 |
| 54 | Boeing | 737-7BD | N7713A | 33919 | CFM International | CFM56-7B20 | 892416 | 892415 |
| 55 | Boeing | 737-7H4 | N214WN | 32486 | CFM International | CFM56-7B24 | 892183 | 892182 |
| 56 | Boeing | 737-7H4 | N215WN | 32487 | CFM International | CFM56-7B24 | 893199 | 893194 |
| 57 | Boeing | 737-7H4 | N213WN | 34217 | CFM International | CFM56-7B24 | 892217 | 892212 |
| 58 | Boeing | 737-7H4 | N212WN | 32485 | CFM International | CFM56-7B24 | 892201 | 892195 |
| 59 | Boeing | 737-7H4 | N211WN | 34163 | CFM International | CFM56-7B24 | 892214 | 892190 |
| 60 | Boeing | 737-7H4 | N209WN | 32484 | CFM International | CFM56-7B24 | 892188 | 892179 |
| 61 | Boeing | 737-7H4 | N210WN | 34162 | CFM International | CFM56-7B24 | 892213 | 892189 |
| 62 | Boeing | 737-7H4 | N208WN | 29856 | CFM International | CFM56-7B24 | 892186 | 892185 |
| 63 | Boeing | 737-7H4 | N207WN | 34012 | CFM International | CFM56-7B24 | 892187 | 892178 |
| 64 | Boeing | 737-7H4 | N206WN | 34011 | CFM International | CFM56-7B24 | 892176 | 892166 |
| 65 | Boeing | 737-7H4 | N205WN | 34010 | CFM International | CFM56-7B24 | 892196 | 892193 |
| 66 | Boeing | 737-7H4 | N203WN | 32483 | CFM International | CFM56-7B24 | 893135 | 892285 |
| 67 | Boeing | 737-7H4 | N202WN | 33999 | CFM International | CFM56-7B24 | 892275 | 892274 |
| 68 | Boeing | 737-7H4 | N201LV | 29854 | CFM International | CFM56-7B24 | 893278 | 893277 |
| 69 | Boeing | 737-7H4 | N200WN | 32482 | CFM International | CFM56-7B24 | 892254 | 892253 |
| 70 | Boeing | 737-7H4 | N499WN | 32481 | CFM International | CFM56-7B24 | 893245 | 892248 |
| 71 | Boeing | 737-7H4 | N498WN | 32480 | CFM International | CFM56-7B24 | 893230 | 892243 |
| 72 | Boeing | 737-7H4 | N496WN | 32478 | CFM International | CFM56-7B24 | 892242 | 892241 |
| 73 | Boeing | 737-7H4 | N497WN | 32479 | CFM International | CFM56-7B24 | 892247 | 892244 |

(EACH OF WHICH ENGINES DESCRIBED ABOVE HAVING AT LEAST 550 RATED TAKEOFF HORSEPOWER OR THE EQUIVALENT THEREOF)

EXHIBIT A

2

ANNEX III
FORM OF MORTGAGED AIRCRAFT OPERATING AGREEMENT

[See attached]

**MORTGAGED AIRCRAFT OPERATING AGREEMENT**

This **MORTGAGED AIRCRAFT OPERATING AGREEMENT**, dated as of March 30, 2020 (this "**Agreement**") is made between SOUTHWEST AIRLINES CO. (the "**Company**"), and JPMORGAN CHASE BANK, N.A. acting as co-administrative agent (in such capacity, "**Collateral Agent**"), for the Banks.

W I T N E S S E T H:

WHEREAS, pursuant to that certain Revolving Credit Facility Agreement, dated as of August 3, 2016, as amended by First Amendment dated as of March 30, 2020 (as such agreements may be amended, restated, amended and restated, supplemented or otherwise modified, renewed or replaced from time to time, collectively, the "**Credit Agreement**"), among the Company, JPMorgan Chase Bank, N.A., and Citibank, N.A., as co-administrative agents, the Banks, and other parties identified therein, the Company and the Collateral Agent has agreed to execute and deliver this Agreement.

NOW, THEREFORE, in consideration of the mutual agreements herein contained and other good and valuable consideration, receipt of which is acknowledged, the parties hereto agree as follow:

# ARTICLE I

# DEFINITIONS

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires, capitalized terms used herein have the meanings set for in Annex A hereto.

# ARTICLE II

**[RESERVED]**

# ARTICLE III

# COVENANTS OF THE COMPANY

**Section 3.01**   Liens.

(a)        Performance of Obligations. The Company shall perform all of the agreements, covenants and provisions contained in this Agreement for the benefit of the Secured Parties.

(b)        Liens. The Company will not directly or indirectly create, incur, assume or suffer to exist any Lien on or with respect to the Company's interest in the Collateral, except

Permitted Liens. The Company shall promptly, at its own expense, take such action as may be necessary to duly discharge (by bonding or otherwise) any such Lien other than a Permitted Liens arising at any time.

**Section 3.02**    Possession, Operation and Use, Maintenance, Registration and Markings.

(a)    General. Except as otherwise expressly provided herein, the Company shall be entitled to operate, use, locate, employ or otherwise utilize or not utilize any Airframe, any Engine or any Part in any lawful manner or place in accordance with the Company's or any Permitted Lessee's business judgment.

(b)    Possession. The Company, without the prior consent of the Collateral Agent, shall not lease or otherwise in any manner deliver, transfer or relinquish possession of any Aircraft, Airframe or Engine or install any Engine, or permit any Engine to be installed, on any airframe other than the associated Airframe; except that the Company may, without such prior written consent of the Collateral Agent:

(i)    Subject or permit any Permitted Lessee to subject (i) any Airframe to normal interchange agreements and (ii) any Engine to normal interchange, pooling, borrowing or similar arrangements, in each case customary in the commercial airline industry and entered into by the Company or such Permitted Lessee, as the case may be, in the ordinary course of business; provided, however, that (A) no transfer of the registration of any Airframe or Engine shall be effected in connection therewith and (B) if the Company's title to any such Airframe or Engine is divested under any such agreement or arrangement, then such Airframe or Engine shall be deemed to have suffered an Event of Loss as of the date of such divestiture, and the Company shall comply with Section 3.04(e) or 3.05, as applicable, in respect thereof;

(ii)    Deliver or permit any Permitted Lessee to deliver possession of any Aircraft, Airframe, Engine or Part (x) to the Airframe Manufacturer, the Engine Manufacturer, the manufacturer thereof or to any third-party maintenance provider for testing, service, repair, maintenance or overhaul work on such Aircraft, Airframe, Engine or Part, or, to the extent required or permitted by Section 3.04, for alterations or modifications in or additions to such Aircraft, Airframe or Engine, (y) to any Person for the purpose of transport to a Person referred to in the preceding clause (x) or (z) to any storage facility;

(iii)    Install or permit any Permitted Lessee to install any Engine on an airframe owned by the Company or such Permitted Lessee, as the case may be, free and clear of all Liens, except (x) Permitted Liens and those that do not apply to such Engine, and (y) the rights of third parties under normal interchange or pooling agreements and arrangements of the type that would be permitted under Section 3.02(b)(i);

(iv)    Install or permit any Permitted Lessee to install any Engine on an airframe leased to the Company or such Permitted Lessee, or owned by the Company or such Permitted Lessee subject to a mortgage, security agreement, conditional sale or other secured financing arrangement, but only if (x) such airframe is free and clear of all Liens, except (A) the rights of the parties to such lease, or any such secured financing arrangement, covering such airframe and (B) Liens of the type permitted by clause (iii) above and (y)

2

the Company or Permitted Lessee, as the case may be, shall have received from the lessor, mortgagee, secured party or conditional seller, in respect of such airframe, a written agreement (which may be a copy of the lease, mortgage, security agreement, conditional sale or other agreement covering such airframe), whereby such Person agrees that it will not acquire or claim any right, title or interest in, or Lien on, such Engine by reason of such Engine being installed on such airframe at any time while such Engine is subject to the Lien of the Mortgage;

(v)    Install or permit any Permitted Lessee to install any Engine on an airframe leased to the Company or such Permitted Lessee or owned by the Company or such Permitted Lessee subject to a mortgage, security agreement, conditional sale or other secured financing arrangement under circumstances where neither clause (iii) or (iv) above is applicable; provided, however, that any such installation shall be deemed an Event of Loss with respect to such Engine, and the Company shall comply with Section 3.04(e) in respect thereof;

(vi)    Transfer or permit any Permitted Lessee to transfer possession of any Aircraft, Airframe or Engine to the U.S. Government, in which event the Company shall promptly notify the Collateral Agent in writing of any such transfer of possession and, in the case of any transfer pursuant to CRAF, in such notification shall identify by name, address and telephone numbers the Contracting Officer Representative or Representatives for the Military Airlift Command of the United States Air Force to whom notices must be given and to whom requests or claims must be made to the extent applicable under CRAF;

(vii)    Enter into a charter or Wet Lease or other similar arrangement with respect to any Aircraft, or any other aircraft on which any Engine may be installed (which shall not be considered a transfer of possession hereunder);

(viii)    So long as no Event of Default shall have occurred and be continuing, and subject to the provisions of the immediately following paragraph, enter into a lease with respect to any Aircraft, Airframe or Engine to any Permitted Air Carrier that both is not then subject to any bankruptcy, insolvency, liquidation, reorganization, dissolution or similar proceeding and does not then have substantially all of its property in the possession of any liquidator, trustee, receiver or similar person or any other Person approved in writing by the Collateral Agent; provided that, in the case only of a lease to a Permitted Foreign Air Carrier, (A) the United States maintains normal diplomatic relations with the country of domicile of such Permitted Foreign Air Carrier (or, in the case of Taiwan, diplomatic relations at least as good as those in effect on the Closing Date) and (B) the Company shall have furnished to the Collateral Agent and the Banks a favorable opinion reasonably acceptable to the Collateral Agent of reputable counsel in the country of domicile of such Permitted Foreign Air Carrier, that (v) the terms of such lease are the legal, valid and binding obligations of the parties thereto enforceable under the laws of such jurisdiction (subject to customary exceptions), (w) it is not necessary for the Collateral Agent or any Bank to register or qualify to do business in such country, if not already so registered or qualified, as a result, in whole or in part, of the proposed lease, (x) the Collateral Agent's Lien in respect of, such Aircraft, Airframe and Engine will be recognized as a first priority (subject to Permitted Liens) security interest and enforceable,

3

subject to customary exceptions not materially less favorable to the Collateral Agent than on the Closing Date in the United States, in such jurisdiction (including the Collateral Agent's right to repossess the Aircraft), (y) the Laws of such jurisdiction of domicile require fair compensation by the government of such jurisdiction, payable in a currency freely convertible into Dollars, for the loss of title to such Aircraft, Airframe or Engine in the event of the requisition by such government of such title (unless the Company shall provide insurance in the amounts required with respect to hull insurance under the Mortgage and this Agreement covering the requisition of title to such Aircraft, Airframe or Engine by the government of such jurisdiction so long as such Aircraft, Airframe or Engine is subject to such lease) and (z) the agreement of such Permitted Air Carrier that its rights under the lease are subject and subordinate to all the terms of the Mortgage and this Agreement is enforceable against such Permitted Air Carrier under applicable law (subject to customary exceptions) and if the lessee is a U.S. Certificated Air Carrier, the Company will be entitled as lessor of the benefits of Section 1110 of the Bankruptcy Code in which the lessee is the debtor;

provided that (1) the rights of any transferee who receives possession by reason of a transfer permitted by any of clauses (i) through (viii) of this Section 3.02(b) (other than by a transfer of any Engine which is deemed an Event of Loss) shall be subject and subordinate to all the terms of the Mortgage and this Agreement, including the rights of the Collateral Agent to void such lease in the exercise of its rights to repossession of any Airframe or any Engine hereunder, (2) the Company shall remain primarily liable for the performance of all of the terms of the Mortgage and this Agreement and all the terms and conditions of the Mortgage and the other Loan Papers shall remain in effect and (3) no lease or transfer of possession otherwise in compliance with this Section 3.02(b) shall (x) result in any registration or re-registration of an Aircraft, except to the extent permitted by Section 3.02(e), or result in the maintenance, operation or use thereof except in compliance with Sections 3.02(c) and 3.02(d) or (y) permit any action not permitted to the Company hereunder.

In the case of any lease permitted under this Section 3.02(b), the Company will include in such lease appropriate provisions which (s) make such lease expressly subject and subordinate to all of the terms of the Mortgage and this Agreement, including the rights of the Collateral Agent to void such lease in the exercise of its rights to repossession of any Airframe or any Engine hereunder; (t) require the Permitted Lessee to comply with the terms of Section 3.06; and (u) require that any Airframe or any Engine subject thereto be used in accordance with the limitations applicable to the Company's possession and use provided in the Mortgage and this Agreement. No lease permitted under this Section 3.02(b) shall be entered into unless (w) the Company shall provide written notice to the Collateral Agent (such notice in the case of a lease to a U.S. Certificated Air Carrier to be given promptly after entering into any such lease or, in the case of a lease to any other Permitted Air Carrier, 10 days in advance of entering into such lease); (x) the Company shall furnish to the Collateral Agent evidence reasonably satisfactory to the Collateral Agent that the insurance required by Section 3.06 remains in effect; (y) all necessary documents shall have been duly filed, registered or recorded in such public offices as may be required fully to preserve the first priority security interest and International Interest (subject to Permitted Liens) of the Collateral Agent in any Aircraft, Airframe and Engines; and (z) the Company shall reimburse the Collateral Agent for all of their respective reasonable out-of-pocket fees and expenses, including, without limitation, reasonable fees and disbursements of counsel to the Collateral Agent incurred by them in connection with any such lease. Except as otherwise provided herein and without in any way relieving the Company from its primary obligation for the performance of its obligations under the Mortgage and this

4

Agreement, the Company may in its sole discretion permit a Permitted Lessee to exercise any or all rights which the Company would be entitled to exercise under Sections 3.02 (other than the right to lease any Aircraft, Airframe or Engine pursuant to Section 3.02(b)(viii)) and 3.04, and may cause a Permitted Lessee to perform any or all of the Company's obligations under Article III, and the Collateral Agent agrees to accept actual and full performance thereof by a Permitted Lessee in lieu of performance by the Company.

The Company shall provide the Collateral Agent a copy of each Permitted Lease which has a term of more than one (1) year promptly after execution thereof. In addition, the Company shall collaterally assign to the Collateral Agent (and take all further actions in order to create, grant, establish, preserve, protect and perfect the validity, perfection and priority of the Liens and security interests created or intended to be created by the Mortgage), as additional security for the Obligations, Company's rights, but not its obligations, under any such Permitted Lease having a term in excess of one (1) year (provided that so long as no Event of Default shall have occurred and be continuing hereunder, Company shall be entitled to exercise all rights and remedies with respect to such Permitted Lease). In connection with the foregoing assignment, the Company shall deliver any chattel paper originals of any Permitted Lease having a term in excess of one (1) year to the Collateral Agent.

The Collateral Agent hereby agrees and each other Secured Party by execution of the Credit Agreement or an "Assignment and Assumption" thereunder agrees, for the benefit of each lessor, conditional seller or secured party of any engine leased to, or purchased by, the Company or any Permitted Lessee subject to a lease, conditional sale or security agreement that the Collateral Agent, each other Secured Party, and their respective successors and assigns will not acquire or claim, as against such lessor, conditional seller or secured party, any right, title or interest in any engine as the result of such engine being installed on an Airframe at any time while such engine is subject to such lease, conditional sale or security agreement and owned by such lessor or conditional seller or subject to a security interest in favor of such secured party.

(c)    Operation and Use. So long as an Aircraft, Airframe or Engine is subject to the Lien of the Mortgage, the Company shall not (or permit any Permitted Lessee to) operate, use or locate such Aircraft, Airframe or Engine, or allow such Aircraft, Airframe or Engine to be operated, used or located, (i) in any area excluded from coverage by any insurance required by the terms of Section 3.06, except in the case of a requisition by the U.S. Government where the Company obtains indemnity in lieu of such insurance from the U.S. Government, or insurance from the U.S. Government, against substantially the same risks and for at least the amounts of the insurance required by Section 3.06 covering such area, or (ii) in any recognized area of hostilities unless covered in accordance with Section 3.06 by war risk insurance, or in either case unless such Aircraft, Airframe or Engine is only temporarily operated, used or located in such area as a result of an emergency, equipment malfunction, navigational error, hijacking, weather condition or other similar unforeseen circumstance, so long as the Company diligently and in good faith proceeds to remove such Aircraft, Airframe or Engine from such area. So long as an Aircraft, Airframe or Engine is subject to the Lien of the Mortgage, the Company shall not permit such Aircraft, Airframe or Engine to be used, operated, maintained, serviced, repaired or overhauled (x) in violation of any Law binding on or applicable to such Aircraft, Airframe, or Engine or (y) in violation of any airworthiness certificate, license or registration of any Governmental Authority relating to such Aircraft, Airframe or Engine, except (i) immaterial or non-recurring violations with respect to which corrective measures are taken promptly by the Company or Permitted Lessee, as the case may be, upon

5

discovery thereof, or (ii) to the extent the validity or application of any such Law or requirement relating to any such certificate, license or registration is being contested in good faith by the Company or Permitted Lessee in any reasonable manner which does not involve any material risk of the sale, forfeiture or loss of such Aircraft, Airframe or Engine, any material risk of criminal liability or material civil penalty against the Collateral Agent or any other Secured Party or impair the Collateral Agent's security interest in such Aircraft, Airframe or Engine.

(d)        Maintenance and Repair. So long as an Aircraft, Airframe or Engine is subject to the Lien of the Mortgage, the Company shall cause such Aircraft, Airframe or Engine to be maintained, serviced, repaired and overhauled in accordance with (i) the Company's maintenance program for the same manufacturer and model as such Aircraft, Airframe or Engine approved by the FAA or maintenance standards required by or substantially equivalent to those required by the central aviation authority of Canada, France, Germany, Japan, the Netherlands or the United Kingdom for such Aircraft, Airframe and Engine, so as to (A) keep such Aircraft, Airframe and Engine in as good operating condition as on the Closing Date, ordinary wear and tear excepted, and (B) keep such Aircraft in such operating condition as may be necessary to enable the applicable airworthiness certification of such Aircraft to be maintained under the regulations of the FAA or other Aviation Authority then having jurisdiction over the operation of such Aircraft, except in any such case during (x) temporary periods of storage in accordance with applicable regulations, maintenance and modification permitted hereunder or (z) periods when the FAA or such other Aviation Authority has revoked or suspended the airworthiness certificates for Boeing 737- 800 and/or Boeing 737-700 aircraft unless such grounding by the FAA or Aviation Authority was caused by the failure of the Company to maintain, service, repair and overhaul such Aircraft in the manner required hereby; and (ii) except during periods when a Permitted Lease with respect to such Aircraft, Airframe or Engine is in effect, the same standards as the Company uses with respect to similar aircraft of similar size in its fleet operated by the Company in similar circumstances and, during any period in which a Permitted Lease with respect to such Aircraft, Airframe or Engine is in effect, the same standards used by the Permitted Lessee with respect to similar aircraft of similar size in its fleet and operated by the Permitted Lessee in similar circumstances (it being understood that this clause (ii) shall not limit the Company's obligations under the preceding clause (i)). The Company further agrees that each Aircraft, Airframe and Engine will be maintained, used, serviced, repaired, overhauled or inspected in compliance with applicable Laws with respect to the maintenance of such Aircraft, Airframe and Engine and in compliance with each applicable airworthiness certificate, license and registration relating to such Aircraft, Airframe or Engine issued by the Aviation Authority, other than minor or nonrecurring violations with respect to which corrective measures are taken upon discovery thereof and except to the extent the Company or Permitted Lessee is contesting in good faith the validity or application of any such Law or requirement relating to any such certificate, license or registration in any reasonable manner which does not create a material risk of sale, loss or forfeiture of such Aircraft, Airframe or Engine or the interest of the Collateral Agent therein, or any material risk of criminal liability or material civil penalty against the Collateral Agent or any other Secured Party. The Company shall maintain or cause to be maintained (or regularly translate) the Aircraft Documents in the English language.

(e)        Registration. On or prior to the Closing Date, the Company shall cause each Aircraft to be duly registered in its name under the Act and except as otherwise permitted by this Section 3.02(e) at all times thereafter shall cause each Aircraft to remain so registered. So long as no Event of Default shall have occurred and be continuing, the Company may, by written notice to the Collateral Agent, request to change the country of registration of any Aircraft (each, a

6

"**Reregistration Request**"). The Collateral Agent shall promptly upon receiving a Reregistration Request, notify the Banks of such Reregistration Request. Any such change in registration shall be effected at the Company's sole cost and expense, and only in compliance with, and subject to all of the conditions set forth in, Annex C hereto. Unless the Mortgage has been discharged, the Company shall also cause the Mortgage to be duly recorded and at all times maintained of record as a valid, first-priority perfected mortgage (subject to Permitted Liens) on the Company's right, title and interest in each Aircraft, Airframe and Engine (except to the extent such perfection or priority cannot be maintained solely as a result of the failure by the Collateral Agent to execute and deliver any necessary documents or such perfection is terminated by the Collateral Agent). Unless the Mortgage has been discharged as to an Airframe or Engine, the Company shall cause the International Interest granted under the Mortgage in favor of the Collateral Agent in such Airframe or such Engine to be registered on the International Registry as an International Interest on such Airframe and Engine, subject to the Collateral Agent providing its consent to the International Registry with respect thereto.

**Section 3.03**    Inspection.

(a)        At all reasonable times, so long as an Aircraft is subject to the Lien of the Mortgage, the Secured Parties and their respective authorized representatives (the "**Inspecting Parties**") may (not more than once every 12 months unless an Event of Default has occurred and is continuing, then such inspection right shall not be so limited) inspect such Aircraft and its associated Airframe and Engines (including without limitation, the related Aircraft Documents) and any such Inspecting Party may make copies of such Aircraft Documents not reasonably deemed confidential by the Company or such Permitted Lessee. The Secured Parties shall not have any duty to make any such inspection and shall not incur any liability or obligation by reason of not making any such inspection, and no inspection pursuant to this Section 3.03 shall relieve Company of any of its obligations hereunder.

(b)        Any inspection of an Aircraft hereunder shall be limited to a visual, walk- around inspection and shall not include the opening of any panels, bays or other components of such Aircraft, and no such inspection shall interfere with the Company's or any Permitted Lessee's maintenance and operation of such Aircraft.

(c)        With respect to such rights of inspection, no Secured Party shall have any duty or liability to make, or any duty or liability by reason of not making, any such visit, inspection or survey.

(d)        Each Inspecting Party shall bear its own expenses in connection with any such inspection (including the cost of any copies made in accordance with Section 3.03(a)) provided that all such expenses incurred while an Event of Default shall be continuing shall be paid by the Company.

(e)        Each of the Inspecting Parties and each of the Secured Parties shall keep, and shall cause their respective employees and representatives to hold in strict confidence all information acquired pursuant to any inspection pursuant this Section 3.03; except for disclosure to any Affiliate of a Bank as a necessary part of the administration of the Credit Agreement and necessary disclosure to participants in the Loans, disclosure in connection with disputes relating

7

to the Loan Papers, or disclosure compelled by judicial or administrative process or by other requirements of Law.

**Section 3.04**    Replacement and Pooling of Parts, Alterations, Modifications and Additions; Substitution of Engines.

(a)    Replacement of Parts. Except as otherwise provided herein, so long as an Airframe or Engine is subject to the Lien of the Mortgage, the Company, at its own cost and expense, will, or will cause a Permitted Lessee to, at its own cost and expense, promptly replace (or cause to be replaced) all Parts which may from time to time be incorporated or installed in or attached to such Airframe or Engine and which may from time to time become worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use for any reason whatsoever. In addition, the Company may, at its own cost and expense, or may permit a Permitted Lessee at its own cost and expense to, remove (or cause to be removed) in the ordinary course of maintenance, service, repair, overhaul or testing any Parts, whether or not worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use; provided, however, that the Company, except as otherwise provided herein, at its own cost and expense, will, or will cause a Permitted Lessee at its own cost and expense to, replace such Parts as promptly as practicable. All replacement parts shall be owned by Company and be free and clear of all Liens, except for Permitted Liens and pooling arrangements to the extent permitted by Section 3.04(c) below (and except in the case of replacement property temporarily installed on an emergency basis) and shall be in as good an operating condition and have a value and utility not less than the value and utility of the Parts replaced (assuming such replaced Parts were in the condition required hereunder).

(b)    Parts Subject to Lien. Except as otherwise provided herein, any Part at any time removed from any Airframe or Engine shall remain subject to the Lien of the Mortgage, no matter where located, until such time as such Part shall be replaced by a part that has been incorporated or installed in or attached to such Airframe or Engine and that meets the requirements for replacement parts specified above. Immediately upon any replacement part becoming incorporated or installed in or attached to any Airframe or Engine as provided in Section 3.04(a), without further act, (i) the replaced Part shall thereupon be free and clear of all rights of the Collateral Agent and shall no longer be deemed a Part hereunder and (ii) such replacement part shall become subject to the Mortgage and be deemed part of such Airframe or Engine, as the case may be, for all purposes hereof to the same extent as the Parts originally incorporated or installed in or attached to such Airframe or Engine.

(c)    Pooling of Parts. Any Part removed from any Airframe or Engine may be subjected by the Company or a Permitted Lessee to a normal pooling arrangement customary in the airline industry and entered into in the ordinary course of business of the Company or Permitted Lessee, provided that the part replacing such removed Part shall be incorporated or installed in or attached to such Airframe or Engine in accordance with Sections 3.04(a) and 3.04(b) as promptly as practicable after the removal of such removed Part. In addition, any replacement part when incorporated or installed in or attached to any Airframe or Engine may be owned by any third party, subject to a normal pooling arrangement, so long as the Company or a Permitted Lessee, at its own cost and expense, as promptly thereafter as reasonably possible, either (i) causes such replacement part to become subject to the Lien of the Mortgage, free and clear of all Liens except Permitted Liens, at which time such replacement part shall become a Part or (ii) replaces (or causes to be

8

replaced) such replacement part by incorporating or installing in or attaching to such Aircraft, Airframe or Engine a further replacement part owned by the Company free and clear of all Liens except Permitted Liens and which shall become subject to the Lien of the Mortgage in accordance with Section 3.04(b).

(d)      Alterations, Modifications and Additions. The Company shall, or shall cause a Permitted Lessee to, make (or cause to be made) alterations and modifications in and additions to each Aircraft, Airframe and Engine as may be required to be made from time to time to meet the applicable standards of the FAA or other Aviation Authority having jurisdiction over the operation of such Aircraft, to the extent made mandatory in respect of such Aircraft; provided, however, that the Company or a Permitted Lessee may, in good faith and by appropriate procedure, contest the validity or application of any law, rule, regulation or order in any reasonable manner which does not materially adversely affect the Collateral Agent's interest in such Aircraft and does not involve any material risk of sale, forfeiture or loss of such Aircraft or the interest of the Collateral Agent therein, or any material risk of material civil penalty or any material risk of criminal liability being imposed on the Collateral Agent or any other Secured Party. In addition, the Company, at its own expense, may, or may permit a Permitted Lessee at its own cost and expense to, from time to time make or cause to be made such alterations and modifications in and additions to any Airframe or Engine (each an "**Optional Modification**") as the Company or such Permitted Lessee may deem desirable in the proper conduct of its business including, without limitation, removal of Parts which the Company deems obsolete or no longer suitable or appropriate for use in such Airframe or Engine; provided, however, that no such Optional Modification shall (i) materially diminish the fair market value, utility or useful life of such Aircraft or Engine below its fair market value, utility or useful life immediately prior to such Optional Modification (assuming such Aircraft or Engine was in the condition required by the Mortgage and this Agreement immediately prior to such Optional Modification) or (ii) cause such Aircraft to cease to have the applicable standard certificate of airworthiness except that such certificate of airworthiness temporarily may be replaced by an experimental certificate during the process of implementing and testing such Optional Modification and securing related FAA re-certification of such Aircraft. All Parts incorporated or installed in or attached to any Airframe or Engine as the result of any alteration, modification or addition effected by the Company shall be free and clear of any Liens except Permitted Liens and become subject to the Lien of the Mortgage; provided that the Company or any Permitted Lessee may, at any time so long as such Airframe or Engine is subject to the Lien of the Mortgage, remove any such Part (such Part being referred to herein as a "**Removable Part**") from such Airframe or Engine if (i) such Part is in addition to, and not in replacement of or in substitution for, any Part originally incorporated or installed in or attached to such Airframe or Engine at the time of original delivery thereof by the manufacturer or any Part in replacement of, or in substitution for, any such original Part, (ii) such Part is not required to be incorporated or installed in or attached or added to such Airframe or Engine pursuant to the terms of Section 3.02(d) or the first sentence of this Section 3.04(d) and (iii) such Part can be removed from such Airframe or Engine without materially diminishing the fair market value, utility or remaining useful life which such Airframe or Engine would have had at the time of removal had such removal not been effected by the Company, assuming such Aircraft was otherwise maintained in the condition required by the Mortgage and this Agreement and such Removable Part had not been incorporated or installed in or attached to such Airframe or Engine. Upon the removal by the Company of any such Removable Part or obsolete Part as above provided, title thereto shall, without further act, be free and clear of all rights of the Collateral Agent and such Removable Part or obsolete Part shall no longer be deemed a Part

9

hereunder. Removable Parts may be leased from or financed by (and subject to Liens thereunder in favor of) third parties other than the Collateral Agent.

(e)        Substitution of Engines. Upon the occurrence of an Event of Loss with respect to any Engine under circumstances in which such Event of Loss has not occurred with respect to the associated Airframe, the Company shall promptly (and in any event within 15 days after such occurrence) give the Collateral Agent written notice of such Event of Loss. Whether or not an Event of Loss with respect to any Engine has occurred, the Company shall have the right at its option at any time so long as no Event of Default is continuing, on at least five Business Days' prior notice to the Collateral Agent, to substitute, and if an Event of Loss shall have occurred with respect to any Engine under circumstances in which an Event of Loss has not occurred with respect to the associated Airframe, shall within 60 days of the occurrence of such Event of Loss substitute, a Replacement Engine for any Engine. In such event, immediately upon the effectiveness of such substitution and without further act, (i) the replaced Engine shall thereupon be free and clear of all rights of the Collateral Agent and the Lien of the Mortgage and shall no longer be deemed an Engine hereunder and (ii) such Replacement Engine shall become subject to the Mortgage and this Agreement for all purposes hereof to the same extent as the replaced Engine. Such Replacement Engine (i) shall be manufactured by the Engine Manufacturer of the Engine being replaced, (ii) shall be of the same model as the Engine to be replaced thereby, or an improved model, that is suitable for installation and use on the associated Airframe and is compatible with the other Engine, (iii) shall have a value, utility and remaining useful life (without regard to hours and cycles) at least equal to the Engine to be replaced thereby (assuming that such Engine had been maintained in accordance with this Agreement) and (iv) at the time of substitution, shall be free and clear of all Liens except Permitted Liens. The Company's right to make a replacement hereunder shall be subject to the fulfillment (which may be simultaneous with such replacement) of the following conditions precedent at the Company's sole cost and expense, and the Collateral Agent agrees to cooperate with the Company to the extent necessary to enable it to timely satisfy such conditions:

(i)   an executed counterpart (or, in the case of subclause (B) below, a photocopy) of each of the following documents shall be delivered to the Collateral Agent:

(A)   the Mortgage Supplement covering the Replacement Engine, which shall have been duly filed for recordation pursuant to the Act or such other applicable law of the jurisdiction other than the United States in which the aircraft of which such Engine is a part is registered, as the case may be;

(B)    a full warranty (as to title) bill of sale, covering the Replacement Engine, executed by the former owner thereof in favor of the Company (or, at the Company's option, other evidence of the Company's ownership of such Replacement Engine, reasonably satisfactory to the Collateral Agent); and

(C)    UCC financing statements covering the security interests created by the Mortgage (or any similar statements or other documents required to be filed or delivered pursuant to the laws of the jurisdiction in which the aircraft of which such Engine is a part is registered) as are deemed necessary or desirable by counsel for the Collateral Agent to protect the security interests of the Collateral Agent in the Replacement Engine;

10

(ii)   the Company shall have furnished to the Collateral Agent and the Banks an opinion of counsel from counsel reasonably satisfactory to the Collateral Agent to the effect that the Lien of the Mortgage is in full force and effect with respect to the Replacement Engine and such evidence of compliance with the insurance provisions of Section 3.06 with respect to such Replacement Engine as the Collateral Agent shall reasonably request;

(iii)   the Company shall have furnished to the Collateral Agent an opinion of the Company's aviation law counsel reasonably satisfactory to the Collateral Agent and addressed to the Collateral Agent and the Banks as to, the due filing for recordation of the Mortgage Supplement with respect to such Replacement Engine under the Act or such other applicable law of the jurisdiction other than the United States in which the aircraft of which such Engine is a part is registered, as the case may be, and the registrations with the International Registry of (i) the International Interest constituted by such Mortgage Supplement with respect to such Replacement Engine and (ii) if the bill of sale referred to in clause (i)(B) above constitutes a "contract of sale" under the Cape Town Treaty, such contract of sale with respect to such Replacement Engine; and

(iv)   the Company shall have furnished to the Collateral Agent a certificate of a qualified aircraft engineer (who may be an employee of the Company) or an ISTAT-qualified independent appraiser certifying that such Replacement Engine has a value, utility and remaining useful life (without regard to hours and cycles) at least equal to the Engine so replaced (assuming that such Engine had been maintained in accordance with this Agreement).

Upon satisfaction of all conditions to such substitution, (x) the Collateral Agent shall, at the cost and expense of the Company, execute and deliver to the Company such documents and instruments, prepared by the Company at the Company's expense, as the Company shall reasonably request to evidence the release of such replaced Engine from the Lien of the Mortgage and procure the discharge of the International Interest granted under the Mortgage in the replaced Engine, (y) the Collateral Agent shall assign to the Company all claims it may have against any other Person relating to any Event of Loss giving rise to such substitution, if applicable, and (z) the Company shall receive all insurance proceeds (other than those reserved to others under Section 3.06(b) or those subject to Section 3.05(f)) and, subject to Section 3.05(f), proceeds in respect of any Event of Loss giving rise to such replacement to the extent not previously applied to the purchase price of the Replacement Engine as provided in Section 3.05(d).

**Section 3.05**   Loss, Destruction or Requisition.

(a)   Event of Loss With Respect to an Aircraft or Airframe. Upon the occurrence of an Event of Loss with respect to an Aircraft or Airframe, the Company shall promptly upon obtaining knowledge of such Event of Loss (and in any event within 10 days after such occurrence) give the Collateral Agent written notice of such Event of Loss. The Company shall, within 60 days after such occurrence, either:

11

(i)　　if required pursuant to Section 6.12(c)(y) of the Credit Agreement, replace such Aircraft or Airframe, together with its associated Engines, with a Replacement Aircraft pursuant to and in accordance with Section 6.12(c) of the Credit Agreement; or

(ii)　　if permitted pursuant to Section 6.12(b) of the Credit Agreement, have such Aircraft or Airframe, together with its associated Engines, released from the Lien of the Mortgage as set forth in Section 3.01(b) of the Mortgage.

(b)　　Effect of Replacement. Upon replacement as provided for in Section 3.05(a)(i), (i) the Lien of the Mortgage shall continue with respect to such Replacement Aircraft, as though no Event of Loss had occurred; (ii) the Collateral Agent shall, at the cost and expense of the Company, release from the Lien of the Mortgage the Aircraft suffering such Event of Loss and all related Collateral, by executing and delivering to the Company such documents and instruments, as the Company may reasonably request to evidence such release and procure the discharge of the related International Interest; and (iii) the Collateral Agent shall assign to the Company all claims the Collateral Agent may have against any other Person arising from the Event of Loss and the Company shall receive all insurance proceeds (other than those reserved to others under Section 3.06(b)) and proceeds from any award in respect of condemnation, confiscation, seizure or requisition, including any investment interest thereon, to the extent not previously applied to the purchase price of the Replacement Aircraft, as provided in Section 3.05(d).

(c)　　Requirements to Aircraft Replacement. In connection with the Company's obligation to provide a Replacement Aircraft as provided in Section 3.05(a)(i), the Company shall:

(i)　on the date when the Replacement Aircraft is subjected to the Lien of the Mortgage (such date being referred to in this Section 3.05 as the "**Replacement Closing Date**"), an executed counterpart of each of the following documents (or, in the case of the FAA bill of sale and full warranty bill of sale referred to below, a photocopy thereof) shall have been delivered to the Collateral Agent:

(A)　a Mortgage Supplement covering the Replacement Aircraft, which shall have been duly filed for recordation pursuant to the Act or such other applicable law of such jurisdiction other than the United States in which the Replacement Aircraft is to be registered in accordance with Section 3.02(e), as the case may be;

(B)　an FAA bill of sale (or a comparable document, if any, of another Aviation Authority, if applicable) covering the airframe constituting the Replacement Aircraft executed by the former owner thereof in favor of the Company;

(C)　a full warranty (as to title) bill of sale, covering the Replacement Aircraft, executed by the former owner thereof in favor of the Company (or, at the Company's option, other evidence of the Company's ownership of such Replacement Aircraft reasonably satisfactory to the Collateral Agent); and

(D)　UCC financing statements covering the security interests created by the Mortgage (or any similar statements or other documents required to be filed or delivered pursuant to the laws of the jurisdiction in which the Replacement

12

Aircraft may be registered in accordance with Section 3.02(e)) as are deemed necessary or desirable by counsel for the Collateral Agent to protect the security interests of the Collateral Agent in the Replacement Aircraft created by the Mortgage;

(ii)    [Reserved];

(iii)    the Collateral Agent (acting directly or by authorization to its special counsel) shall have received satisfactory evidence as to the compliance with the insurance provisions of Section 3.06 with respect to the Replacement Aircraft;

(iv)    on the Replacement Closing Date, (A) the Company shall cause the Replacement Aircraft to be subject to the Lien of the Mortgage free and clear of Liens (other than Permitted Liens), (B) the Replacement Aircraft shall have been duly certified by the FAA (or other applicable Aviation Authority) as to type and airworthiness in accordance with the terms of this Agreement, (C) application for registration of the Replacement Aircraft in accordance with Section 3.02(e) shall have been duly made with the FAA or other applicable Aviation Authority and the Company (or the Permitted Lessee, if applicable) shall have authority to operate the Replacement Aircraft and (D) the International Interest of the Mortgage with respect to the Replacement Aircraft shall have been registered with the International Registry and, if the bill of sale referred to in (i)(C) above constitutes a "contract of sale" under the Cape Town Treaty, such contract of sale with respect to the Replacement Aircraft shall have been registered with the International Registry; and

(v)    the Collateral Agent and the Banks at the expense of the Company, shall have received (A) an opinion of counsel, addressed to the Collateral Agent and the Banks, to the effect that the Replacement Aircraft has or have duly been made subject to the Lien of the Mortgage, and the Collateral Agent will be entitled to the benefits of Section 1110 with respect to the Replacement Aircraft, _provided_ that such opinion with respect to Section 1110 need not be delivered to the extent that immediately prior to such replacement the benefits of Section 1110 were not, solely by reason of a change in law or court interpretation thereof, available to the Collateral Agent, and (B) an opinion of Company's aviation law counsel reasonably satisfactory to the Collateral Agent and addressed to the Collateral Agent and the Banks as to the due registration of any such Replacement Aircraft and the due filing for recordation of a Mortgage Supplement with respect to such Replacement Aircraft under the Act or such other applicable law of the jurisdiction other than the United States in which the Replacement Aircraft is to be registered in accordance with Section 3.02(e), as the case may be, and the registrations with the International Registry of the interests specified in clause (iv)(D) above with respect to the Replacement Aircraft.

(d)    Payments Received on Account of an Event of Loss. Any amounts, other than insurance proceeds in respect of damage or loss not constituting an Event of Loss (the application of which is provided for in Annex B), received at any time by the Collateral Agent or the Company from any Governmental Authority or any other Person in respect of any Event of Loss shall be held by, or (unless the Company shall be entitled to retain such amounts as provided below) paid over to, the Collateral Agent and will be applied as follows:

13

(i)    if such amounts are received with respect to an Aircraft or Airframe, and an Engine installed on such Airframe at the time of such Event of Loss, upon compliance by the Company with the applicable terms of Section 3.05(a)(i) with respect to the Event of Loss for which such amounts are received, such amounts shall be paid over to, or retained by, the Company;

(ii)    if such amounts are received with respect to an Aircraft or Airframe, and an Engine installed on such Airframe at the time of such Event of Loss and the Aircraft or Airframe, together with associated Engines, is permitted to be released from the Lien of the Mortgage as set forth in 3.05(a)(ii), such amounts shall be paid over to, or retained by, the Company; and

(iii)    if such amounts are received with respect to an Aircraft or Airframe, and an Engine installed on such Airframe at the time of such Event of Loss and the Aircraft or Airframe, together with associated Engines, is not permitted to be released from the Lien of the Mortgage as set forth in 3.05(a)(ii) because an Event of Default has occurred and continuing, such amounts shall be applied by the Collateral Agent in accordance with the Credit Agreement.

(e)    Requisition for Use. In the event of a requisition for use by any Governmental Authority of any Airframe and any Engines, if any, or engines installed on an Airframe while such Airframe is subject to the Lien of the Mortgage, the Company shall promptly notify the Collateral Agent of such requisition and all of the Company's obligations under this Agreement shall continue to the same extent as if such requisition had not occurred except to the extent that the performance or observance of any obligation by the Company shall have been prevented or delayed by such requisition; provided that the Company's obligations under this Section 3.05 with respect to the occurrence of an Event of Loss for the payment of money and under Section 3.06 (except while an assumption of liability by the U.S. Government of the scope referred to in Section 3.02(c) is in effect) shall not be reduced or delayed by such requisition. Any payments received by the Collateral Agent or the Company or Permitted Lessee from such Governmental Authority with respect to such requisition of use shall be paid over to, or retained by, the Company. In the event of an Event of Loss of an Engine resulting from the requisition for use by a Governmental Authority of such Engine (but not the associated Airframe), the Company will replace such Engine hereunder by complying with the terms of Section 3.04(e) and any payments received by the Collateral Agent or the Company from such Governmental Authority with respect to such requisition shall be paid over to, or retained by, the Company.

(f)    Certain Payments to be Held As Security. Any amount referred to in this Section 3.05 or Section 3.06 which is payable or creditable to, or retainable by, the Company shall not be paid or credited to, or retained by, the Company if at the time of such payment, credit or retention a Default under Section 7.1(a) of the Credit Agreement or an Event of Default shall have occurred and be continuing, but shall be paid to and held by the Collateral Agent as security for the obligations of the Company under the Loan Papers, and at such time as there shall not be continuing any such Default or Event of Default such amount shall, to the extent not theretofore applied as provided herein, be paid over to the Company.

**Section 3.06**   Insurance.

14

(a)     <u>Obligation to Insure</u>. The Company shall comply with, or cause to be complied with, each of the provisions of Annex B, which provisions are hereby incorporated by this reference as if set forth in full herein.

(b)     <u>Insurance for Own Account</u>. Nothing in this Section 3.06 shall limit or prohibit (a) the Company from maintaining the policies of insurance required under Annex B with higher coverage than those specified in Annex B, or (b) the Collateral Agent or any other Additional Insured from obtaining insurance for its own account (and any proceeds payable under such separate insurance shall be payable as provided in the policy relating thereto); <u>provided</u>, <u>however</u>, that no insurance may be obtained or maintained that would limit or otherwise adversely affect the coverage of any insurance required to be obtained or maintained by the Company pursuant to this Section 3.06 and Annex B.

(c)     <u>Indemnification by Government in Lieu of Insurance</u>. The Collateral Agent agrees to accept, in lieu of insurance against any risk with respect to an Aircraft described in Annex B, indemnification from, or insurance provided by, the U.S. Government, or upon the written consent of the Collateral Agent, other Governmental Authority, against such risk in an amount that, when added to the amount of insurance (including permitted self-insurance), if any, against such risk that the Company (or any Permitted Lessee) may continue to maintain, in accordance with this Section 3.06, shall be at least equal to the amount of insurance against such risk otherwise required by this Section 3.06.

(d)     <u>Application of Insurance Proceeds</u>. As between the Company and the Collateral Agent, all insurance proceeds received as a result of the occurrence of an Event of Loss with respect to any Aircraft or any Engine under policies required to be maintained by the Company pursuant to this Section 3.06 will be applied in accordance with Section 3.05(d) and subject to Section 3.05(f). All proceeds of insurance required to be maintained by the Company, in accordance with this Section 3.06 and Section B of Annex B, in respect of any property damage or loss not constituting an Event of Loss with respect to any Aircraft, Airframe or Engine shall be paid over to the Company or the Collateral Agent, as the case may be, as provided in Section B of Annex B and will be applied in payment (or to reimburse the Company) for repairs or for replacement property, and any balance remaining after such repairs or replacement with respect to such damage or loss shall be paid over to, or retained by, the Company.

# ARTICLE IV

# REMEDIES

**Section 4.01**     <u>Limitations Under CRAF</u>. Notwithstanding Section 7.2 or Section 7.3 of the Credit Agreement or Article 2 of the Mortgage, during any period that any Aircraft, Airframe or Engine is subject to CRAF in accordance with the provisions of Section 3.02(b)(vi) and in the possession of the U.S. Government, the Collateral Agent shall not, as a result of any Event of Default, exercise its remedies hereunder in such manner as to limit the Company's control under this Agreement (or any Permitted Lessee's control under any Permitted Lease) of such Aircraft, Airframe or Engine, unless at least 30 days' (or such other period as may then be applicable under CRAF) written notice of default hereunder shall have been given by the

15

Collateral Agent or any other Secured Party by registered or certified mail to the Company (and any Permitted Lessee) with a copy to the Contracting Officer Representative or Representatives for the Military Airlift Command of the United States Air Force to whom notices must be given under the contract governing the Company's (or any Permitted Lessee's) participation in CRAF with respect to such Aircraft, Airframe or Engine.

# ARTICLE V

# MISCELLANEOUS

**Section 5.01**    Registrations with the International Registry. Each of the parties hereto consents to the registration with the International Registry of the International Interests granted under the Mortgage, and each party hereto covenants and agrees that it will take all such action, at Company's cost, reasonably requested by the Company or the Collateral Agent in order to make any registrations with the International Registry, including becoming a Transacting User Entity with the International Registry and providing consents to any registration as may be contemplated by the Loan Papers.

**Section 5.02**    Storage. Notwithstanding anything to the contrary in any Loan Paper, (A) (i) the Company may place any Aircraft in storage in accordance with the Company's standard storage procedures, (ii) any Aircraft (or any component thereof) may undergo maintenance in accordance with the Company's FAA approved maintenance program and (iii) any Aircraft may be grounded by applicable government authorities, in each case, without the necessity of keeping such Aircraft in good operating condition or maintaining such Aircraft's airworthiness certification or otherwise complying with the provisions of this Agreement, (B) the Company may contest the applicability of any Laws or directives in any reasonable manner and defer compliance therewith until such contest is finally determined or adjudicated, so long as, notwithstanding such deferred compliance with respect to any Aircraft, the Company keeps such Aircraft in good operating condition and maintains such Aircraft's airworthiness certification and (C) the Company may defer maintenance and defer conformity with any airworthiness directive in a manner that is consistent with its FAA approved maintenance program and applicable Laws; provided that if any Aircraft has been placed into storage or grounded as provided in the preceding clause (A) is not in good operating condition or lacks airworthiness certification (any such Aircraft, a "**Non-Compliant Pool Aircraft**") for a period of more than 30 days, then, within 60 days of the end of such 30 day period the Company shall be required to replace such Aircraft with another Aircraft in compliance with Section 6.12(b) of the Credit Agreement; provided, further, that the Company shall not permit the Appraised Value of all Non-Compliant Pool Aircraft at any time to exceed an amount equal to 7.5% of the Appraised Value of all Pool Assets at such time for a period of more than ten Business Days.

**Section 5.03**    Governing Law. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

16

**Section 5.04**   <u>Notices</u>. All notices and other communication provided for herein shall be in writing (including telecopy communications) and mailed, telecopied, e-mailed (where indicated) or delivered in accordance with Section 9.2 of the Credit Agreement.

**Section 5.05**   <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**Section 5.06**   Amendment. Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Collateral Agent and the Company with respect to which such waiver, amendment or modification is to apply.

**Section 5.07**   <u>Successors and Assigns</u>. This Agreement shall be binding upon, and inure to the benefit, of each party hereto and its respective successors and permitted assigns.

* * *

17

**IN WITNESS WHEREOF**, the Company and the Collateral Agent have caused this Mortgaged Aircraft Operating Agreement to be duly executed by their respective officers thereunto duly authorized.

**SOUTHWEST AIRLINES CO.**

By:_____
  Name:
  Title:

**JPMORGAN CHASE BANK, N.A.**, as Collateral Agent

By:_____
Name:
Title:

18

# ANNEX A

# DEFINED TERMS

"**Act**" means Part A of Subtitle VII of the United States Transportation Code (49 U.S.C., §§ 40101 et seq.).

"**Additional Insured**" is defined in Section D(i) of Annex B.

"**Affiliate**" has the meaning set forth in the Credit Agreement.

"**Aircraft**" means an Airframe and its two associated Engines. An Airframe is "associated" with the two Engines grouped with it on Exhibit A to the Mortgage (and vice versa).

"**Aircraft Documents**" means, with respect to any Aircraft, all technical data, manuals and log books, and all inspection, modification and overhaul records and other service, repair, maintenance and technical records that are required by (a) the FAA pursuant to FAR 121.380A (or successor regulation) and any other relevant regulation promulgated by the FAA which is applicable to the Company as an operator under FAR 121 or (b) the relevant Aviation Authority, to be maintained with respect to such Aircraft, Airframe, Engines or Parts and such term shall include all additions, renewals, revisions and replacements of any such materials from time to time made prior to the release of the Lien of the Mortgage with respect to the applicable Aircraft, or required to be made prior to the release of the Lien of the Mortgage with respect to the applicable Aircraft, by the regulations of the relevant Aviation Authority, and in each case in whatever form and by whatever means or medium (including, without limitation, microfiche, microfilm, paper, CD-ROM or computer disk) such materials may be maintained or retained by or on behalf of the Company (provided, that all such materials shall be maintained in the English language or, if in a jurisdiction other than the United States in which the keeping of records in English is not practical, regularly translated in the English language).

"**Airframe**" means (a) each aircraft (including, in each case, the winglets installed thereon, but excluding Engines or engines from time to time installed thereon) manufactured by Airframe Manufacturer and identified by Airframe Manufacturer's model number, United States registration number and Airframe Manufacturer's serial number set forth on Exhibit A to the Mortgage and any Replacement Airframe and (b) any and all related Parts. Upon substitution of a Replacement Airframe under and in accordance with this Agreement, such Replacement Airframe shall become subject to this Agreement and the Mortgage and shall be an "Airframe" for all purposes of this Agreement and the Mortgage and thereupon the Airframe for which the substitution is made shall no longer be subject to this Agreement and the Mortgage, and such replaced Airframe shall cease to be an "Airframe."

"**Airframe Manufacturer**" means The Boeing Company, a Delaware corporation.

"**Appraised Value**" has the meaning set forth in the Credit Agreement.

"**Aviation Authority**" means the FAA or, if any Aircraft is permitted to be, and is, registered with any other Governmental Authority under and in accordance with Section 3.02(e) of this Agreement and Annex C thereof, such other Governmental Authority.

"**Banks**" has the meaning set forth in the Credit Agreement.

"**Cape Town Treaty**" has the meaning set forth in the Credit Agreement.

"**Closing Date**" means the date of this Agreement.

"**Collateral**" has the meaning set forth in the Mortgage.

"**Collateral Agent**" has the meaning set forth in the introduction to this Agreement.

"**Company**" has the meaning set forth in the introduction to this Agreement.

"**CRAF**" means the Civil Reserve Air Fleet Program established pursuant to 10 U.S.C. Section 9511-13 or any similar substitute program.

"**Credit Agreement**" has the meaning set forth in the recital to this Agreement.

"**Dollars**," "**United States Dollars**" and "**$**" mean lawful money for the time being of the United States of America.

"**Engine**" means, with respect to any Airframe (a) each of the engines manufactured by the Engine Manufacturer and identified by Engine Manufacturer's model number and Engine Manufacturer's serial number set forth on Exhibit A to the Mortgage and any Replacement Engine, in any case whether or not from time to time installed on such Airframe or installed on any other airframe or aircraft, and (b) any and all related Parts. Upon substitution of a Replacement Engine under and in accordance with this Agreement, such Replacement Engine shall become subject to this Agreement and the Mortgage and shall be an "Engine" for all purposes of this Agreement and the Mortgage and thereupon the Engine for which the substitution is made shall no longer be subject to this Agreement and the Mortgage, and such replaced Engine shall cease to be an "Engine.".

"**Engine Manufacturer**" means CFM International, Inc., a Delaware corporation.

"**Event of Default**" has the meaning set forth in the Credit Agreement.

"**Event of Loss**" means, with respect to any Aircraft, Airframe or any Engine, any of the following circumstances, conditions or events with respect to such Property, for any reason whatsoever:

   (a)   the destruction of such Property, damage to such Property beyond economic repair or rendition of such Property permanently unfit for normal use by Company;

Annex A
20

(b)    the actual or constructive total loss of such Property or any damage to such Property, or requisition of title or use of such Property, which results in an insurance settlement with respect to such Property on the basis of a total loss or constructive or compromised total loss;

(c)    any theft, hijacking or disappearance of such Property for a period of 180 consecutive days or more;

(d)    any seizure, condemnation, confiscation, taking or requisition (including loss of title) of such Property by any Governmental Authority or purported Governmental Authority (other than a requisition of use by a Permitted Government Entity) for a period exceeding 12 consecutive months;

(e)    as a result of any law, rule, regulation, order or other action by the Aviation Authority or by any Governmental Authority of the government of registry of the Aircraft or by any Governmental Authority otherwise having jurisdiction over the operation or use of the Aircraft, the use of such Property in the normal course of the Company's business of passenger air transportation is prohibited for a period of 18 consecutive months unless the Company, prior to the expiration of such 18-month period, shall have undertaken and shall be diligently carrying forward such steps as may be necessary or desirable to permit the normal use of such Property by the Company, but in any event if such use shall have been prohibited for a period of three consecutive years; and

(f)    any divestiture of title to an Engine treated as an Event of Loss pursuant to Section 3.02(b) of this Agreement.

"**FAA**" has the meaning set forth in the Mortgage.

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Inspecting Parties**" has the meaning set forth in Section 3.03(a).

"**International Interest**" has the meaning set forth in the Mortgage.

"**International Registry**" has the meaning set forth in the Mortgage.

"**Law**" means (a) any constitution, treaty, statute, law, decree, regulation, order, rule or directive of any Governmental Authority, and (b) any judicial or administrative interpretation or application of, or decision under, any of the foregoing.

"**Lien**" has the meaning set forth in the Credit Agreement.

"**Loan**" has the meaning set forth in the Credit Agreement.

"**Loan Papers**" has the meaning set forth in the Credit Agreement.

"**Mortgage**" means the Mortgage and Security Agreement, dated as of March 30, 2020, between the Company and the Collateral Agent, entered into pursuant to the Credit Agreement.

"**Mortgage Supplement**" means a supplement to the Mortgage, appropriate for the purpose for which it is being used.

"**Non-Compliant Pool Aircraft**" has the meaning set forth in Section 5.02.

"**Optional Modification**" has the meaning set forth in Section 3.04(d).

"**Parts**" means all appliances, parts, components, instruments, appurtenances, accessories, furnishings, seats and other equipment of whatever nature (other than (a) Engines or engines, and (b) any Removable Part that constitutes passenger convenience equipment or is otherwise leased by Company from a third party or subject to a security interest granted to a third party), that may from time to time be installed or incorporated in or attached or appurtenant to any Airframe or any Engine or removed therefrom unless the Lien of the Mortgage shall not be applicable to such Parts in accordance with Section 3.04 of this Agreement.

"**Permitted Air Carrier**" means (a) any manufacturer of airframes or aircraft engines, or any Affiliate of a manufacturer of airframes or aircraft engines, (b) any Permitted Foreign Air Carrier, (c) any U.S. Certificated Air Carrier or (d) any person approved in writing by the Collateral Agent.

"**Permitted Country**" means any country listed on Schedule 1.

"**Permitted Foreign Air Carrier**" means any air carrier with its principal executive offices in any Permitted Country and which is authorized to conduct commercial airline operations and to operate jet aircraft similar to the Aircraft under the applicable Laws of such Permitted Country.

"**Permitted Government Entity**" means (a) the U.S. Government or (b) any other Governmental Authority if the Aircraft is then registered under the laws of the country of such Governmental Authority.

"**Permitted Lease**" means a lease (including a sublease) permitted under Section 3.02(b)(viii) of this Agreement.

"**Permitted Lessee**" means a lessee under a Permitted Lease.

"**Permitted Liens**" has the meaning set forth in the Mortgage.

"**Person**" has the meaning set forth in the Credit Agreement.

"**Pool Assets**" has the meaning set forth in the Credit Agreement.

"**Property**" of any Person means any property or assets, or interest therein, of such Person.

"**Reregistration Request**" has the meaning set forth in Section 3.02(e).

"**Replacement Aircraft**" means, with respect to any Aircraft, any aircraft substituted for such Aircraft pursuant to Section 3.05(a)(i).

"**Replacement Airframe**" means, with respect to any Airframe, any airframe constituting a Replacement Airframe.

"**Replacement Closing Date**" has the meaning set forth in Section 3.05(c).

"**Replacement Engine**" means, with respect to any Engine, an engine substituted for such Engine pursuant to Section 3.04(e) or 3.05.

"**Removable Part**" is defined in Section 3.04(d).

"**Secured Parties**" has the meaning set forth in the Credit Agreement.

"**Threshold Amount**" means $7,500,000.

"**Transacting User Entity**" is defined in Section 2.1.11 of the Regulations of the International Registry.

"**United States**" or "**U.S.**" means the United States of America; provided that for geographic purposes, "United States" means, in aggregate, the 50 States and the District of Columbia of the United States of America.

"**U.S. Certificated Air Carrier**" means any United States air carrier that is a Citizen of the United States holding an air carrier operating certificate issued pursuant to chapter 447 of title 49 of the United States Code for aircraft capable of carrying 10 or more individuals or 6000 pounds or more of cargo, and as to which there is in force an air carrier operating certificate issued pursuant to Part 121 of the FAA Regulations, or which may operate as an air carrier by certification or otherwise under any successor or substitute provisions therefor or in the absence thereof.

"**U.S. Government**" means the federal government of the United States, or any instrumentality or agency thereof the obligations of which are guaranteed by the full faith and credit of the federal government of the United States.

"**Wet Lease**" means any arrangement whereby the Company or a Permitted Lessee agrees to furnish an Airframe and the related Engines or engines installed thereon to a third party pursuant to which such Airframe and Engines or engines shall at all times be operated solely by cockpit crew provided by the Company or such Permitted Lessee possessing all current certificates and licenses required by Law, shall be maintained by the Company or such Permitted Lessee in accordance with the provisions of this Agreement and shall continue to be insured by the Company or such Permitted Lessee in accordance with the provisions of this Agreement.

Annex A

24

## ANNEX B

## INSURANCE

A.    Liability Insurance.

1.    Except as provided in Section A.2 below, the Company will carry or cause to be carried at all times, at no expense to the Collateral Agent or the Banks, comprehensive airline legal liability insurance (including, but not limited to third party and passenger liability, bodily injury, property damage, war risk and allied perils liability, baggage liability, cargo and mail liability, hangarkeeper's liability and contractual liability insurance, but excluding manufacturer's product liability coverage) with respect to each Aircraft, Airframe and Engine, which is (i) in an amount per occurrence not less than the greater of (x) the amount of comprehensive airline legal liability insurance from time to time applicable to aircraft owned or leased and operated by the Company of the same type and operating on similar routes as the applicable Aircraft and (y) $500,000,000 per occurrence; (ii) of the type and covering the same risks as from time to time applicable to aircraft operated by the Company of the same type as the Aircraft; and (iii) maintained in effect with insurers of U.S. domestically or internationally recognized responsibility (such insurers being referred to herein as "**Approved Insurers**").

2.    During any period that an Aircraft is on the ground and not in operation, Company may carry or cause to be carried, in lieu of the insurance required by Section A.1 above, insurance otherwise conforming with the provisions of said Section A.1 except that (i) the amounts of coverage shall not be required to exceed the amounts of public liability and property damage insurance from time to time applicable to aircraft owned or operated by the Company of the same type as the Aircraft which are on the ground and not in operation and (ii) the scope of the risks covered and the type of insurance shall be the same as from time to time shall be applicable to aircraft owned or operated by the Company of the same type which are on the ground and not in operation.

B.    Hull Insurance.

1.    Except as provided in Section B.2 below, the Company will carry or cause to be carried at all times, at no expense to the Collateral Agent or the Banks, with Approved Insurers "all-risk" ground and flight aircraft hull insurance covering each Aircraft (including the associated Engines when they are installed on the Airframe or any other airframe and including any Engines or Parts when not installed on the Airframe) which is of the type as from time to time applicable to aircraft owned by Company of the same type as such Aircraft for an amount denominated in United States Dollars not less than the Agreed Value. "**Agreed Value**" means for any Aircraft at any time, 100% of the Appraised Value of such Aircraft.

Any policies of insurance carried in accordance with this Section B.1 or Section C covering an Aircraft and any policies taken out in substitution or replacement for any such policies (i) shall name the Collateral Agent as the sole loss payee for any proceeds to be paid under such policies up to an amount equal to the Agreed Value and (ii) shall provide that (A) in the event of a loss involving proceeds in excess of the Threshold Amount, the proceeds in respect of such loss up to an amount equal to the Agreed Value shall be payable to the Collateral Agent, except in the case of a loss with respect to an Engine installed on an airframe other than an

Airframe, in which case the Company (or any Permitted Lessee) shall endeavor to arrange for any payment of insurance proceeds in respect of such loss to be held for the account of the Collateral Agent whether such payment is made to the Company (or any Permitted Lessee) or any third party, it being understood and agreed that in the case of any payment to the Collateral Agent otherwise than in respect of an Event of Loss, the Collateral Agent shall, upon receipt of evidence satisfactory to it that the damage giving rise to such payment shall have been repaired or that such payment shall then be required to pay for repairs then being made, pay the amount of such payment to the Company or its order, and (B) the entire amount of any loss involving proceeds of the Threshold Amount or less or the amount of any proceeds of any loss in excess of the Agreed Value shall be paid to the Company or its order unless an Event of Default shall have occurred and be continuing and the insurers have been notified thereof by the Collateral Agent. In the case of a loss with respect to an engine (other than an Engine) installed on an Airframe, Collateral Agent shall hold any payment to it of any insurance proceeds in respect of such loss for the account of the Company or any other third party that is entitled to receive such proceeds.

2.    During any period that an Aircraft is on the ground and not in operation, the Company may carry or cause to be carried, in lieu of the insurance required by Section B.1 above, insurance otherwise conforming with the provisions of said Section B.1 except that the scope of the risks and the type of insurance shall be the same as from time to time applicable to aircraft owned by the Company of the same type similarly on the ground and not in operation, provided that the Company shall maintain insurance against risk of loss or damage to such Aircraft in an amount equal to the Agreed Value during such period that such Aircraft is on the ground and not in operation.

C.    <u>War-Risk, Hijacking and Allied Perils Insurance</u>. If the Company (or any Permitted Lessee) shall at any time operate or propose to operate any Aircraft, Airframe or Engine (i) in any area of recognized hostilities or (ii) on international routes and war-risk, hijacking or allied perils insurance is maintained by the Company (or any Permitted Lessee) with respect to other aircraft owned or operated by the Company (or any Permitted Lessee) on such routes or in such areas, the Company shall maintain or cause to be maintained, at no expense to the Collateral Agent or the Banks, with Approved Insurers war-risk, hijacking and related perils insurance of substantially the same type carried by major United States commercial air carriers operating the same or comparable models of aircraft on similar routes or in such areas and, in the case of associated hull insurances, in no event in an amount less than the Agreed Value for such Aircraft.

D.    <u>General Provisions</u>. Any policies of insurance carried in accordance with Sections A, B and C, including any policies taken out in substitution or replacement for such policies:

(i)    in the case of Section A, shall name the Collateral Agent, and each Bank as an additional insured (collectively, the "**Additional Insureds**"), as its interests may appear;

(ii)    shall apply worldwide and have no territorial restrictions or limitations (except only in the case of war, hijacking and related perils insurance required under Section C, which shall apply to the fullest extent available in the international insurance market);

Annex B

26

(iii)     shall provide that, in respect of the interests of the Additional Insureds in such policies, the insurance shall not be invalidated or impaired by any act or omission (including misrepresentation and nondisclosure) by the Company (or any Permitted Lessee) or any other Person (including, without limitation, use for illegal purposes of any Aircraft or any Engine) and shall insure the Additional Insureds regardless of any breach or violation of any representation, warranty, declaration, term or condition contained in such policies by the Company (or any Permitted Lessee);

(iv)     shall provide that, if the insurers cancel such insurance for any reason whatsoever, or if the same is allowed to lapse for nonpayment of premium, or if any material change is made in the insurance which adversely affects the interest of any of the Additional Insureds, such cancellation, lapse or change shall not be effective as to the Additional Insureds for 30 days (seven days in the case of war risk, hijacking and allied perils insurance) after receipt by the Additional Insureds of written notice by such insurers of such cancellation, lapse or change, provided that if any notice period specified above is not reasonably obtainable, such policies shall provide for as long a period of prior notice as shall then be reasonably obtainable;

(v)     shall waive any rights of setoff (including for unpaid premiums), recoupment, counterclaim or other deduction, whether by attachment or otherwise, against each Additional Insured;

(vi)     shall be primary without right of contribution from any other insurance that may be available to any Additional Insured;

(vii)     shall provide that all of the liability insurance provisions thereof, except the limits of liability and agreed value, shall operate in all respects as if a separate policy had been issued covering each party insured thereunder;

(viii)     shall provide that none of the Additional Insureds shall be liable for any insurance premium;

(ix)     shall waive any right of the insurers to subrogation against any Additional Insured; and

(x)     shall contain a 50/50% Clause per Lloyd's Aviation Underwriters' Association Standard Policy Form AVS 103.

E.     Reports and Certificates; Other Information. On or prior to each renewal date of the insurance policies required hereunder, the Company will furnish or cause to be furnished to the Collateral Agent insurance certificates describing in reasonable detail the insurance maintained by the Company hereunder and a report, signed by the Company's regularly retained independent insurance broker (the "**Insurance Broker**"), stating the opinion of such Insurance Broker that (a) all premiums in connection with the insurance then due have been paid and (b) such insurance complies with the terms of this Annex B, except that such opinion shall not be required with respect to war risk insurance provided by the FAA. To the extent such agreement is reasonably obtainable the Company will also cause the Insurance Broker to agree to advise the Collateral Agent in writing of any default in the payment of any premium and of any other act or omission on the part of the Company of which it has knowledge and which might invalidate or render unenforceable, in whole or in part, any insurance on any Aircraft or Engine or cause the

cancellation or termination of such insurance, and to advise the Collateral Agent in writing at least 30 days (seven days in the case of war-risk and allied perils coverage or such shorter period as may be available in the international insurance market, as the case may be) prior to the cancellation, lapse or material adverse change of any insurance maintained pursuant to this Annex B.

F.        Right to Pay Premiums. The Additional Insureds shall have the rights but not the obligations of an additional named insured. None of the Collateral Agent and the other Additional Insured shall have any obligation to pay any premium, commission, assessment or call due on any such insurance (including reinsurance). Notwithstanding the foregoing, in the event of cancellation of any insurance due to the nonpayment of premiums, the Collateral Agent shall have the option, in its sole discretion, to pay any such premium in respect of an Aircraft that is due in respect of the coverage pursuant to this Agreement and to maintain such coverage, as the Collateral Agent may require, until the scheduled expiry date of such insurance and, in such event, the Company shall, upon demand, reimburse the Collateral Agent for amounts so paid by them.

G.        Deductibles; Self-insurance. The Company may self-insure with respect to an Aircraft to the same extent as it does with respect to, or maintain policies with deductibles or premium adjustment provisions consistent with similar provisions applicable to, other comparable aircraft operated by the Company; provided, however, that in the case of hull insurance, such self-insurance shall in no event exceed $150,000,000 per policy year with respect to an Aircraft and all other comparable aircraft operated by the Company, taken together; and provided further that, in the case of public liability insurance, such self-insurance shall in no event exceed $150,000,000 per policy year.

H.        Indemnification by Government in Lieu of Insurance. The Collateral Agent agrees to accept, in lieu of insurance against any risk with respect to the Aircraft described in Paragraph C of this Annex B, indemnification from, or insurance provided by, the government of the United States of America or any agency or instrumentality thereof the obligations of which are supported by the full faith and credit of the U.S. Government, including from the FAA under the FAA's war risk and allied perils insurance program; provided that the provisions of this Paragraph H shall be deemed satisfied if the U.S. Government is obligated to publish notice of any cancellation, reduction, change or lapse described therein in the Federal Register; provided further that in such case, the Company agrees to furnish notice to each additional insured of any such cancellation, reduction, change or lapse immediately following receipt by the Company of notice thereof.

I.        AVN 67B. If the Company shall be insuring the Aircraft in the London or other market that utilizes London-form financier endorsements, an endorsement in the form of AVN 67B (or any form generally accepted in the international aviation insurance markets as the successor to such form) shall satisfy the endorsement requirements set forth in this Annex B.

Annex B

28

**ANNEX C**

**FOREIGN REGISTRATION**

The Collateral Agent and the Company hereby agree, subject to the provisions of Section 3.02(e) of this Agreement, that the Company shall be entitled to register any Aircraft or cause any Aircraft to be registered in a country other than the United States, subject to compliance with the following:

(ii)    each of the following requirements is satisfied:

(A)   no Event of Default shall have occurred and be continuing at the time of such registration;

(B)   such proposed change of registration is made in connection with a Permitted Lease to a Permitted Air Carrier; and

(C)   such country is a country with which the United States then maintains normal diplomatic relations or, if Taiwan, the United States then maintains diplomatic relations at least as good as those in effect on the Closing Date;

(iii)    the Collateral Agent shall have received an opinion of counsel (subject to customary exceptions) reasonably satisfactory to the Collateral Agent addressed to the Collateral Agent and the Banks as to the effect that:

(A)   such country would recognize the Company's ownership interest in such Aircraft;

(B)   after giving effect to such change in registration, the Lien of the Mortgage on the Company's right, title and interest in and to such Aircraft shall continue in the reasonable opinion of the Collateral Agent as a valid and duly perfected first priority security interest and International Interest (subject to Permitted Liens) and all filing, recording or other action necessary to protect the same shall have been accomplished (or, if such opinion cannot be given at the time of such proposed change in registration because such change in registration is not yet effective, (1) the opinion shall detail what filing, recording or other action is necessary and (2) the Collateral Agent shall have received a certificate from Company that all possible preparations to accomplish such filing, recording and other action shall have been done, and such filing, recording and other action shall be accomplished and a supplemental opinion to that effect shall be delivered to the Collateral Agent on or prior to the effective date of such change in registration);

(C)   unless Company or the Permitted Air Carrier shall have agreed to provide insurance covering the risk of requisition of use of such Aircraft by the government of such country (so long as such Aircraft is registered under the laws of such country), the laws of such country require fair compensation by the government

of such country payable in currency freely convertible into Dollars and freely removable from such country (without license or permit, unless Company prior to such proposed reregistration has obtained such license or permit or the obtaining thereof being ministerial in nature and de minimis in expense) for the taking or requisition by such government of such use; and

(D)   it is not necessary, solely as a consequence of such change in registration and without giving effect to any other activity of the Collateral Agent (or any Affiliate of the Collateral Agent), for the Collateral Agent to qualify to do business in such jurisdiction as a result of such reregistration in order to exercise any rights or remedies with respect to such Aircraft.

(b)        In addition, as a condition precedent to any change in registration, Company shall have given to the Collateral Agent and the Banks assurances reasonably satisfactory to the Collateral Agent:

(i)   to the effect that the provisions of Section 3.02 of this Agreement have been complied with after giving effect to such change of registration;

(ii)   of the payment by Company of all reasonable out-of-pocket expenses of each Secured Party in connection with such change of registry, including, without limitation (1) the reasonable fees and disbursements of counsel to the Collateral Agent, (2) any filing or recording fees, taxes or similar payments incurred in connection with the change of registration of such Aircraft and the creation and perfection of the security interest therein in favor of the Collateral Agent for the benefit of the Secured Parties, and (3) all costs and expenses incurred in connection with any filings necessary to continue in the United States the perfection of the security interest in such Aircraft in favor of the Collateral Agent for the benefit of the Secured Parties; and

(iii)   to the effect that the tax and other indemnities in favor of each Person named as an indemnitee under any other Operative Agreement afford each such Person substantially the same protection as provided prior to such change of registration (or Company shall have agreed upon additional indemnities that, together with such original indemnities, in the reasonable judgment of the Collateral Agent, afford such protection).

**SCHEDULE 1**

**PERMITTED COUNTRIES**

| | |
|---|---|
| Argentina | Luxembourg |
| Aruba | Malaysia |
| Australia | Malta |
| Austria | Mexico |
| Bahamas | Netherlands |
| Belgium | Netherlands Antilles |
| Bolivia | New Zealand |
| Brazil | Norway |
| Canada | Paraguay |
| Chile | People's Republic of China |
| Czech Republic | Peru |
| Denmark | Philippines |
| Egypt | Poland |
| Ecuador | Portugal |
| Finland | Republic of China (Taiwan) |
| France | Singapore |
| Germany | South Africa |
| Greece | South Korea |
| Hungary | Spain |
| Iceland | Sweden |
| India | Switzerland |
| Indonesia | Thailand |
| Ireland | Trinidad and Tobago |
| Italy | United Kingdom |
| Japan | |

ANNEX IV

**SCHEDULE II**

**POOL ASSETS**

[See attached]

**SCHEDULE II**

**POOL ASSETS**

**Airframes and Engines**

| | Airframe Make | Airframe Model | U.S. Reg. Number | Airframe MSN | Engine Manufacturer | Engine Model | Engine MSN 1 | Engine MSN 2 |
|---|---|---|---|---|---|---|---|---|
| 1 | Boeing | 737-8H4 | N8635F | 60083 | CFM International | CFM56-7B27E/F | 658992 | 658949 |
| 2 | Boeing | 737-8H4 | N8634A | 42522 | CFM International | CFM56-7B27E/F | 658985 | 658982 |
| 3 | Boeing | 737-8H4 | N8633A | 36905 | CFM International | CFM56-7B27E/F | 658937 | 658892 |
| 4 | Boeing | 737-8H4 | N8632A | 60082 | CFM International | CFM56-7B27E/F | 658893 | 658891 |
| 5 | Boeing | 737-8H4 | N8631A | 42385 | CFM International | CFM56-7B27E/F | 657908 | 658873 |
| 6 | Boeing | 737-8H4 | N8623F | 36731 | CFM International | CFM56-7B27E/F | 658491 | 658488 |
| 7 | Boeing | 737-8H4 | N8619F | 33939 | CFM International | CFM56-7B27E/F | 658361 | 658359 |
| 8 | Boeing | 737-8H4 | N8620H | 42526 | CFM International | CFM56-7B27E/F | 658371 | 658351 |
| 9 | Boeing | 737-8H4 | N8618N | 36915 | CFM International | CFM56-7B27E/F | 658355 | 658354 |
| 10 | Boeing | 737-8H4 | N8617E | 36912 | CFM International | CFM56-7B27E/F | 658280 | 658279 |
| 11 | Boeing | 737-8H4 | N8616C | 36914 | CFM International | CFM56-7B27E/F | 658267 | 658257 |
| 12 | Boeing | 737-8H4 | N8615E | 36933 | CFM International | CFM56-7B27E/F | 962655 | 658223 |
| 13 | Boeing | 737-8H4 | N8614M | 36908 | CFM International | CFM56-7B27E/F | 962723 | 962719 |
| 14 | Boeing | 737-8H4 | N8613K | 36998 | CFM International | CFM56-7B27E/F | 963686 | 962683 |
| 15 | Boeing | 737-8H4 | N8605E | 36891 | CFM International | CFM56-7B27E/F | 962478 | 963475 |
| 16 | Boeing | 737-8H4 | N8329B | 37006 | CFM International | CFM56-7B27E/F | 962467 | 962465 |
| 17 | Boeing | 737-8H4 | N8328A | 38818 | CFM International | CFM56-7B27E/F | 962456 | 962448 |
| 18 | Boeing | 737-8H4 | N8327A | 37009 | CFM International | CFM56-7B27E/F | 962411 | 962410 |
| 19 | Boeing | 737-8H4 | N8326F | 35969 | CFM International | CFM56-7B27E/F | 962416 | 962415 |
| 20 | Boeing | 737-8H4 | N8325D | 37003 | CFM International | CFM56-7B27E/F | 962402 | 962401 |
| 21 | Boeing | 737-7H4 | N954WN | 36669 | CFM International | CFM56-7B24/3 | 804732 | 804718 |
| 22 | Boeing | 737-7H4 | N953WN | 36668 | CFM International | CFM56-7B24/3 | 804651 | 804507 |
| 23 | Boeing | 737-7H4 | N952WN | 36667 | CFM International | CFM56-7B24/3 | 804571 | 804568 |
| 24 | Boeing | 737-7BD | N7737E | 33929 | CFM International | CFM56-7B20 | 894174 | 894335 |
| 25 | Boeing | 737-7BD | N7736A | 35109 | CFM International | CFM56-7B20 | 894344 | 890882 |
| 26 | Boeing | 737-7H4 | N258WN | 32516 | CFM International | CFM56-7B24 | 894248 | 894154 |
| 27 | Boeing | 737-7H4 | N257WN | 32515 | CFM International | CFM56-7B24 | 894221 | 892867 |
| 28 | Boeing | 737-7H4 | N256WN | 32514 | CFM International | CFM56-7B24 | 894216 | 894200 |
| 29 | Boeing | 737-7H4 | N255WN | 32513 | CFM International | CFM56-7B24 | 894198 | 894197 |
| 30 | Boeing | 737-7H4 | N254WN | 32512 | CFM International | CFM56-7B24 | 894173 | 894172 |
| 31 | Boeing | 737-7H4 | N253WN | 32511 | CFM International | CFM56-7B24 | 895150 | 894101 |
| 32 | Boeing | 737-7H4 | N252WN | 34973 | CFM International | CFM56-7B24 | 894140 | 894139 |
| 33 | Boeing | 737-7H4 | N251WN | 32510 | CFM International | CFM56-7B24 | 894136 | 894135 |
| 34 | Boeing | 737-7H4 | N250WN | 34972 | CFM International | CFM56-7B24 | 894122 | 892987 |
| 35 | Boeing | 737-7H4 | N249WN | 34951 | CFM International | CFM56-7B24 | 892993 | 892992 |
| 36 | Boeing | 737-7H4 | N247WN | 32508 | CFM International | CFM56-7B24 | 892958 | 892957 |
| 37 | Boeing | 737-7H4 | N246LV | 32507 | CFM International | CFM56-7B24 | 892950 | 892946 |
| 38 | Boeing | 737-7H4 | N245WN | 32506 | CFM International | CFM56-7B24 | 892943 | 892942 |
| 39 | Boeing | 737-7H4 | N244WN | 34864 | CFM International | CFM56-7B24 | 874962 | 892930 |
| 40 | Boeing | 737-7H4 | N239WN | 34714 | CFM International | CFM56-7B24 | 892885 | 892884 |
| 41 | Boeing | 737-7H4 | N238WN | 34713 | CFM International | CFM56-7B24 | 892396 | 892284 |
| 42 | Boeing | 737-7H4 | N236WN | 34631 | CFM International | CFM56-7B24 | 892838 | 892835 |

| 43 | Boeing | 737-7H4 | N235WN | 34630 | CFM International | CFM56-7B24 | 893784 | 892813 |
| 44 | Boeing | 737-7H4 | N234WN | 32502 | CFM International | CFM56-7B24 | 892790 | 892776 |
| 45 | Boeing | 737-7H4 | N233LV | 32501 | CFM International | CFM56-7B24 | 893759 | 893752 |
| 46 | Boeing | 737-7BD | N7720F | 33922 | CFM International | CFM56-7B20 | 892655 | 892654 |
| 47 | Boeing | 737-7H4 | N228WN | 32496 | CFM International | CFM56-7B24 | 892606 | 892605 |
| 48 | Boeing | 737-7H4 | N222WN | 34290 | CFM International | CFM56-7B24 | 892526 | 892525 |
| 49 | Boeing | 737-7BD | N7715E | 33921 | CFM International | CFM56-7B20 | 893511 | 893510 |
| 50 | Boeing | 737-7H4 | N221WN | 34259 | CFM International | CFM56-7B24 | 892516 | 892515 |
| 51 | Boeing | 737-752 | N7835A | 34294 | CFM International | CFM56-7B22 | 892486 | 893127 |
| 52 | Boeing | 737-7H4 | N218WN | 32489 | CFM International | CFM56-7B24 | 892439 | 892438 |
| 53 | Boeing | 737-7H4 | N217JC | 34232 | CFM International | CFM56-7B24 | 892429 | 892428 |
| 54 | Boeing | 737-7BD | N7713A | 33919 | CFM International | CFM56-7B20 | 892416 | 892415 |
| 55 | Boeing | 737-7H4 | N214WN | 32486 | CFM International | CFM56-7B24 | 892183 | 892182 |
| 56 | Boeing | 737-7H4 | N215WN | 32487 | CFM International | CFM56-7B24 | 893199 | 893194 |
| 57 | Boeing | 737-7H4 | N213WN | 34217 | CFM International | CFM56-7B24 | 892217 | 892212 |
| 58 | Boeing | 737-7H4 | N212WN | 32485 | CFM International | CFM56-7B24 | 892201 | 892195 |
| 59 | Boeing | 737-7H4 | N211WN | 34163 | CFM International | CFM56-7B24 | 892214 | 892190 |
| 60 | Boeing | 737-7H4 | N209WN | 32484 | CFM International | CFM56-7B24 | 892188 | 892179 |
| 61 | Boeing | 737-7H4 | N210WN | 34162 | CFM International | CFM56-7B24 | 892213 | 892189 |
| 62 | Boeing | 737-7H4 | N208WN | 29856 | CFM International | CFM56-7B24 | 892186 | 892185 |
| 63 | Boeing | 737-7H4 | N207WN | 34012 | CFM International | CFM56-7B24 | 892187 | 892178 |
| 64 | Boeing | 737-7H4 | N206WN | 34011 | CFM International | CFM56-7B24 | 892176 | 892166 |
| 65 | Boeing | 737-7H4 | N205WN | 34010 | CFM International | CFM56-7B24 | 892196 | 892193 |
| 66 | Boeing | 737-7H4 | N203WN | 32483 | CFM International | CFM56-7B24 | 893135 | 892285 |
| 67 | Boeing | 737-7H4 | N202WN | 33999 | CFM International | CFM56-7B24 | 892275 | 892274 |
| 68 | Boeing | 737-7H4 | N201LV | 29854 | CFM International | CFM56-7B24 | 893278 | 893277 |
| 69 | Boeing | 737-7H4 | N200WN | 32482 | CFM International | CFM56-7B24 | 892254 | 892253 |
| 70 | Boeing | 737-7H4 | N499WN | 32481 | CFM International | CFM56-7B24 | 893245 | 892248 |
| 71 | Boeing | 737-7H4 | N498WN | 32480 | CFM International | CFM56-7B24 | 893230 | 892243 |
| 72 | Boeing | 737-7H4 | N496WN | 32478 | CFM International | CFM56-7B24 | 892242 | 892241 |
| 73 | Boeing | 737-7H4 | N497WN | 32479 | CFM International | CFM56-7B24 | 892247 | 892244 |

(EACH OF WHICH ENGINES DESCRIBED ABOVE HAVING AT LEAST 550 RATED TAKEOFF HORSEPOWER OR THE EQUIVALENT THEREOF)

2

**PAYROLL SUPPORT PROGRAM AGREEMENT**

| | |
|---|---|
| **Recipient:** Southwest Airlines Co.<br>2702 Love Field Drive<br>Dallas, TX 75235 | **PSP Participant Number:** PSA-2004031159 **Employer Identification Number:** 74-1563240 **DUNS Number:** |

**Amount of Initial Payroll Support Payment**: $1,629,590,860

The Department of the Treasury (Treasury) hereby provides Payroll Support (as defined herein) under Division A, Title IV, Subtitle B of the Coronavirus Aid, Relief, and Economic Security Act. The Signatory Entity named above, on behalf of itself and its Affiliates (as defined herein), agrees to comply with this Agreement and applicable Federal law as a condition of receiving Payroll Support. The Signatory Entity and its undersigned authorized representatives acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in connection with this Agreement may result in administrative remedies as well as civil and/or criminal penalties.

**The undersigned hereby agree to the attached Payroll Support Program Agreement.**

/s/ Steven T. Mnuchin

| | |
|---|---|
| Department of the Treasury<br>Name: Steven Mnuchin<br>Title: Secretary<br>Date: April 20, 2020 | Southwest Airlines Co.<br><br>First Authorized Representative:<br>Title:<br>Date: |
| | Southwest Airlines Co.<br><br>Second Authorized Representative:<br>Title:<br>Date: |

OMB Approved No. 1505-0263
Expiration Date: 09/30/2020

**PAYROLL SUPPORT PROGRAM AGREEMENT**

| **Recipient:** Southwest Airlines Co. 2702 Love Field Drive Dallas, TX 75235 | **PSP Participant Number:** PSA-2004031159 **Employer Identification Number:** 74-1563240 **DUNS Number:** |
|---|---|

**Amount of Initial Payroll Support Payment**: $1,629,590,860

The Department of the Treasury (Treasury) hereby provides Payroll Support (as defined herein) under Division A, Title IV, Subtitle B of the Coronavirus Aid, Relief, and Economic Security Act. The Signatory Entity named above, on behalf of itself and its Affiliates (as defined herein), agrees to comply with this Agreement and applicable Federal law as a condition of receiving Payroll Support. The Signatory Entity and its undersigned authorized representatives acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in connection with this Agreement may result in administrative remedies as well as civil and/or criminal penalties.

**The undersigned hereby agree to the attached Payroll Support Program Agreement.**

/s/ Tammy Romo

| Department of the Treasury Name: Title: Date: | Southwest Airlines Co. First Authorized Representative: Tammy Romo Title: Executive Vice President and Chief Financial Officer Date: April 20, 2020 /s/ Chris Monroe |
|---|---|
| | Southwest Airlines Co. Second Authorized Representative: David Christopher Monroe Title:Senior Vice President Finance and Treasurer Date: April 20, 2020 |

OMB Approved No. 1505-0263
Expiration Date: 09/30/2020

**PAYROLL SUPPORT PROGRAM AGREEMENT**
**INTRODUCTION**

The Coronavirus Aid, Relief, and Economic Security Act (CARES Act or Act) directs the Department of the Treasury (Treasury) to provide Payroll Support (as defined herein) to passenger air carriers, cargo air carriers, and certain contractors that must be exclusively used for the continuation of payment of Employee Salaries, Wages, and Benefits (as defined herein). The Act permits Treasury to provide Payroll Support in such form, and on such terms and conditions, as the Secretary of the Treasury determines appropriate, and requires certain assurances from the Recipient (as defined herein).

This Payroll Support Program Agreement, including the application and all supporting documents submitted by the Recipient and the Payroll Support Certification attached hereto (collectively, Agreement), memorializes the binding terms and conditions applicable to the Recipient.

**DEFINITIONS**

As used in this Agreement, the following terms shall have the following respective meanings, unless the context clearly requires otherwise. In addition, this Agreement shall be construed in a manner consistent with any public guidance Treasury may from time to time issue regarding the implementation of Division A, Title IV, Subtitle B of the CARES Act.

*Act* or *CARES Act* means the Coronavirus Aid, Relief, and Economic Security Act (Pub. L. No. 116-136).

*Additional Payroll Support Payment* means any disbursement of Payroll Support occurring after the first disbursement of Payroll Support under this Agreement.

*Affiliate* means any Person that directly or indirectly controls, is controlled by, or is under common control with, the Recipient. For purposes of this definition, "control" of a Person shall mean having the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by ownership of voting equity, by contract, or otherwise.

*Benefits* means, without duplication of any amounts counted as Salary or Wages, pension expenses in respect of Employees, all expenses for accident, sickness, hospital, and death benefits to Employees, and the cost of insurance to provide such benefits; any Severance Pay or Other Benefits payable to Employees pursuant to a bona fide voluntary early retirement program or voluntary furlough; and any other similar expenses paid by the Recipient for the benefit of Employees, including any other fringe benefit expense described in lines 10 and 11 of Financial

2

Reporting Schedule P-6, Form 41, as published by the Department of Transportation, but excluding any Federal, state, or local payroll taxes paid by the Recipient.

*Corporate Officer* means, with respect to the Recipient, its president; any vice president in charge of a principal business unit, division, or function (such as sales, administration or finance); any other officer who performs a policy-making function; or any other person who

performs similar policy making functions for the Recipient. Executive officers of subsidiaries or parents of the Recipient may be deemed Corporate Officers of the Recipient if they perform such policy-making functions for the Recipient.

*Employee* means an individual who is employed by the Recipient and whose principal place of employment is in the United States (including its territories and possessions), including salaried, hourly, full-time, part-time, temporary, and leased employees, but excluding any individual who is a Corporate Officer or independent contractor.

*Involuntary Termination or Furlough* means the Recipient terminating the employment of one or more Employees or requiring one or more Employees to take a temporary suspension or unpaid leave for any reason, including a shut-down or slow-down of business; provided, however, that an Involuntary Termination or Furlough does not include a Permitted Termination or Furlough.

*Maximum Awardable Amount* means the amount determined by the Secretary with respect to the Recipient pursuant to section 4113(a)(1), (2), or (3) (as applicable) of the CARES Act.

*Payroll Support* means funds disbursed by the Secretary to the Recipient under this Agreement, including the first disbursement of Payroll Support and any Additional Payroll Support Payment.

*Permitted Termination or Furlough* means, with respect to an Employee, (1) a voluntary furlough, voluntary leave of absence, voluntary resignation, or voluntary retirement, (2) termination of employment resulting from such Employee's death or disability, or (3) the Recipient terminating the employment of such Employee for cause or placing such Employee on a temporary suspension or unpaid leave of absence for disciplinary reasons, in either case, as reasonably determined by the Recipient acting in good faith.

*Person* means any natural person, corporation, limited liability company, partnership, joint venture, trust, business association, governmental entity, or other entity.

*Recipient* means, collectively, the Signatory Entity; its Affiliates that are air carriers as defined in 49 U.S.C. § 40102; and their respective heirs, executors, administrators, successors, and assigns.

*Salary* means, without duplication of any amounts counted as Benefits, a predetermined regular payment, typically paid on a weekly or less frequent basis but which may be expressed as an

3

hourly, weekly, annual or other rate, as well as cost-of-living differentials, vacation time, paid time off, sick leave, and overtime pay, paid by the Recipient to its Employees, but excluding any Federal, state, or local payroll taxes paid by the Recipient.

*Secretary* means the Secretary of the Treasury.

*Severance Pay or Other Benefits* means any severance payment or other similar benefits, including cash payments, health care benefits, perquisites, the enhancement or acceleration of the payment or vesting of any payment or benefit or any other in-kind benefit payable (whether in lump sum or over time, including after March 24, 2022) by the Recipient to a Corporate Officer or Employee in connection with any termination of such Corporate Officer's or Employee's employment (including, without limitation, resignation, severance, retirement, or constructive termination), which shall be determined and calculated in respect of any Employee or Corporate

Officer of the Recipient in the manner prescribed in 17 CFR 229.402(j) (without regard to its limitation to the five most highly compensated executives and using the actual date of termination of employment rather than the last business day of the Recipient's last completed fiscal year as the trigger event).

*Signatory Entity* means the passenger air carrier, cargo air carrier, or contractor that has entered into this Agreement.

*Taxpayer Protection Instruments* means warrants, options, preferred stock, debt securities, notes, or other financial instruments issued by the Recipient or an Affiliate to Treasury as compensation for the Payroll Support under this Agreement, if applicable.

*Total Compensation* means compensation including salary, wages, bonuses, awards of stock, and any other financial benefits provided by the Recipient or an Affiliate, as applicable, which shall be determined and calculated for the 2019 calendar year or any applicable 12-month period in respect of any Employee or Corporate Officer of the Recipient in the manner prescribed under paragraph e.5 of the award term in 2 CFR part 170, App. A, but excluding any Severance Pay or Other Benefits in connection with a termination of employment.

*Wage* means, without duplication of any amounts counted as Benefits, a payment, typically paid on an hourly, daily, or piecework basis, including cost-of-living differentials, vacation, paid time off, sick leave, and overtime pay, paid by the Recipient to its Employees, but excluding any Federal, state, or local payroll taxes paid by the Recipient.

**PAYROLL SUPPORT PAYMENTS**

1. Upon the execution of this Agreement by Treasury and the Recipient, the Secretary shall approve the Recipient's application for Payroll Support.

2. The Recipient may receive Payroll Support in multiple payments up to the Maximum Awardable Amount, and the amounts (individually and in the aggregate) and timing of such payments will be determined by the Secretary in his sole discretion. The Secretary may, in his sole discretion, increase or reduce the Maximum Awardable Amount (a) consistent with section 4113(a) of the CARES Act and (b) on a pro rata basis in order to address any shortfall in available funds, pursuant to section 4113(c) of the CARES Act.

3. The Secretary may determine in his sole discretion that any Payroll Support shall be conditioned on, and subject to, such additional terms and conditions (including the receipt of, and any terms regarding, Taxpayer Protection Instruments) to which the parties may agree in writing.

**TERMS AND CONDITIONS**

<u>Retaining and Paying Employees</u>

4. The Recipient shall use the Payroll Support exclusively for the continuation of payment of Wages, Salaries, and Benefits to the Employees of the Recipient.

    a. *Furloughs and Layoffs*. The Recipient shall not conduct an Involuntary Termination or Furlough of any Employee between the date of this Agreement and September 30, 2020.

    b. *Employee Salary, Wages, and Benefits*

        i. *Salary and Wages*. Except in the case of a Permitted Termination or Furlough, the Recipient shall not, between the date of this Agreement and September 30, 2020, reduce, without the Employee's consent, (A) the pay rate of any Employee earning a Salary, or (B) the pay rate of any Employee earning Wages.

        ii. *Benefits*. Except in the case of a Permitted Termination or Furlough, the Recipient shall not, between the date of this Agreement and September 30, 2020, reduce, without the Employee's consent, the Benefits of any Employee; provided, however, that for purposes of this paragraph, personnel expenses associated with the performance of work duties, including those described in line 10 of Financial Reporting Schedule P-6, Form 41, as published by the Department of Transportation, may be reduced to the extent the associated work duties are not performed.

5

<u>Dividends and Buybacks</u>

5.  Through September 30, 2021, neither the Recipient nor any Affiliate shall, in any transaction, purchase an equity security of the Recipient or of any direct or indirect parent company of the Recipient that, in either case, is listed on a national securities exchange.

6.  Through September 30, 2021, the Recipient shall not pay dividends, or make any other capital distributions, with respect to the common stock (or equivalent equity interest) of the Recipient.

<u>Limitations on Certain Compensation</u>

7.  Beginning March 24, 2020, and ending March 24, 2022, the Recipient and its Affiliates shall not pay any of the Recipient's Corporate Officers or Employees whose Total Compensation exceeded $425,000 in calendar year 2019 (other than an Employee whose compensation is determined through an existing collective bargaining agreement entered into before March 27, 2020):

    a.  Total Compensation which exceeds, during any 12 consecutive months of such two-year period, the Total Compensation the Corporate Officer or Employee received in calendar year 2019; or

    b.  Severance Pay or Other Benefits in connection with a termination of employment with the Recipient which exceed twice the maximum Total Compensation received by such Corporate Officer or Employee in calendar year 2019.

8.  Beginning March 24, 2020, and ending March 24, 2022, the Recipient and its Affiliates shall not pay any of the Recipient's Corporate Officers or Employees whose Total Compensation exceeded $3,000,000 in calendar year 2019 Total Compensation in excess of the sum of:

    a.  $3,000,000; and

    b.  50 percent of the excess over $3,000,000 of the Total Compensation received by such Corporate Officer or Employee in calendar year 2019.

9.  For purposes of determining applicable amounts under paragraphs 7 and 8 with respect to any Corporate Officer or Employee who was employed by the Recipient or an Affiliate for less than all of calendar year 2019, the amount of Total Compensation in calendar year 2019 shall mean such Corporate Officer's or Employee's Total Compensation on an annualized basis.

6

<u>Continuation of Service</u>

10. If the Recipient is an air carrier, until March 1, 2022, the Recipient shall comply with any applicable requirement issued by the Secretary of Transportation under section 4114(b) of the CARES Act to maintain scheduled air transportation service to any point served by the Recipient before March 1, 2020.

<u>Effective Date</u>

11. This Agreement shall be effective as of the date of its execution by both parties. <u>Reporting and Auditing</u>

12. Until the calendar quarter that begins after the later of March 24, 2022, and the date on which no Taxpayer Protection Instrument is outstanding, not later than 45 days after the end of each of the first three calendar quarters of each calendar year and 90 days after the end of each calendar year, the Signatory Entity, on behalf of itself and each other Recipient, shall certify to Treasury that it is in compliance with the terms and conditions of this Agreement and provide a report containing the following:

    a.  the amount of Payroll Support funds expended during such quarter;

    b.  the Recipient's financial statements (audited by an independent certified public accountant, in the case of annual financial statements); and

    c.  a copy of the Recipient's IRS Form 941 filed with respect to such quarter; and

    d.  a detailed summary describing, with respect to the Recipient, (a) any changes in Employee headcount during such quarter and the reasons therefor, including any Involuntary Termination or Furlough, (b) any changes in the amounts spent by the Recipient on Employee Wages, Salary, and Benefits during such quarter, and (c) any changes in Total Compensation for, and any Severance Pay or Other Benefits in connection with the termination of, Corporate Officers and Employees subject to

        limitation under this Agreement during such quarter; and the reasons for any such changes.

13. If the Recipient or any Affiliate, or any Corporate Officer of the Recipient or any Affiliate, becomes aware of facts, events, or circumstances that may materially affect the Recipient's compliance with the terms and conditions of this Agreement, the Recipient or Affiliate shall promptly provide Treasury with a written description of the events or circumstances and any action taken, or contemplated, to address the issue.

7

14. In the event the Recipient contemplates any action to commence a bankruptcy or insolvency proceeding in any jurisdiction, the Recipient shall promptly notify Treasury.

15. The Recipient shall:

    a.  Promptly provide to Treasury and the Treasury Inspector General a copy of any Department of Transportation Inspector General report, audit report, or report of any other oversight body, that is received by the Recipient relating to this Agreement.

    b.  Immediately notify Treasury and the Treasury Inspector General of any indication of fraud, waste, abuse, or potentially criminal activity pertaining to the Payroll Support.

    c.  Promptly provide Treasury with any information Treasury may request relating to compliance by the Recipient and its Affiliates with this Agreement.

16. The Recipient and Affiliates will provide Treasury, the Treasury Inspector General, and such other entities as authorized by Treasury timely and unrestricted access to all documents, papers, or other records, including electronic records, of the Recipient related to the Payroll Support, to enable Treasury and the Treasury Inspector General to make audits, examinations, and otherwise evaluate the Recipient's compliance with the terms of this Agreement. This right also includes timely and reasonable access to the Recipient's and its Affiliates' personnel for the purpose of interview and discussion related to such documents. This right of access shall continue as long as records are required to be retained.

<u>Recordkeeping and Internal Controls</u>

17. If Treasury notifies the Recipient that the first disbursement of Payroll Support to the Recipient under this Agreement is the Maximum Awardable Amount (subject to any pro rata reductions and as determined by the Secretary as of the date of such disbursement), the Recipient shall maintain the Payroll Support funds in a separate account over which Treasury shall have a perfected security interest to continue the payment of Wages, Salary, and Benefits to the Employees. For the avoidance of doubt, regardless whether the first disbursement of Payroll Support to the Recipient under this Agreement is the Maximum Awardable Amount, if the Recipient is a debtor as defined under 11 U.S.C. § 101(13), the Payroll Support funds, any claim or account receivable arising under this Agreement, and any segregated account holding funds received under this Agreement shall not constitute or become property of the estate under 11 U.S.C. § 541.

18. The Recipient shall expend and account for Payroll Support funds in a manner sufficient to:

8

a. Permit the preparation of accurate, current, and complete quarterly reports as required under this Agreement.

b. Permit the tracing of funds to a level of expenditures adequate to establish that such funds have been used as required under this Agreement.

19. The Recipient shall establish and maintain effective internal controls over the Payroll Support; comply with all requirements related to the Payroll Support established under applicable Federal statutes and regulations; monitor compliance with Federal statutes, regulations, and the terms and conditions of this Agreement; and take prompt corrective actions in accordance with audit recommendations. The Recipient shall promptly remedy any identified instances of noncompliance with this Agreement.

20. The Recipient and Affiliates shall retain all records pertinent to the receipt of Payroll Support and compliance with the terms and conditions of this Agreement (including by suspending any automatic deletion functions for electronic records, including e-mails) for a period of three years following the period of performance. Such records shall include all information necessary to substantiate factual representations made in the Recipient's application for Payroll Support, including ledgers and sub-ledgers, and the Recipient's and Affiliates' compliance with this Agreement. While electronic storage of records (backed up as appropriate) is preferable, the Recipient and Affiliates may store records in hardcopy (paper) format. The term "records" includes all relevant financial and accounting records and all supporting documentation for the information reported on the Recipient's quarterly reports.

21. If any litigation, claim, investigation, or audit relating to the Payroll Support is started before the expiration of the three-year period, the Recipient and Affiliates shall retain all records described in paragraph 20 until all such litigation, claims, investigations, or audit findings have been completely resolved and final judgment entered or final action taken.

Remedies

22. If Treasury believes that an instance of noncompliance by the Recipient or an Affiliate with (a) this Agreement, (b) sections 4114 or 4116 of the CARES Act, or (c) the Internal Revenue Code of 1986 as it applies to the receipt of Payroll Support has occurred, Treasury may notify the Recipient in writing of its proposed determination of noncompliance, provide an explanation of the nature of the noncompliance, and specify a proposed remedy. Upon receipt of such notice, the Recipient shall, within seven days, accept Treasury's proposed remedy, propose an alternative remedy, or provide information and documentation contesting Treasury's proposed determination. Treasury shall consider any such submission by the Recipient and make a final written determination, which will state Treasury's findings regarding noncompliance and the remedy to be imposed.

9

23. If Treasury makes a final determination under paragraph 22 that an instance of noncompliance has occurred, Treasury may, in its sole discretion, withhold any Additional Payroll Support Payments; require the repayment of the amount of any previously disbursed

   Payroll Support, with appropriate interest; require additional reporting or monitoring; initiate suspension or debarment proceedings as authorized under 2 CFR Part 180; terminate this Agreement; or take any such other action as Treasury, in its sole discretion, deems appropriate.

24. Treasury may make a final determination regarding noncompliance without regard to paragraph 22 if Treasury determines, in its sole discretion, that such determination is necessary to protect a material interest of the Federal Government. In such event, Treasury shall notify the Recipient of the remedy that Treasury, in its sole discretion, shall impose, after which the Recipient may contest Treasury's final determination or propose an alternative remedy in writing to Treasury. Following the receipt of such a submission by the Recipient, Treasury may, in its sole discretion, maintain or alter its final determination.

25. Any final determination of noncompliance and any final determination to take any remedial action described herein shall not be subject to further review. To the extent permitted by law, the Recipient waives any right to judicial review of any such determinations and further agrees not to assert in any court any claim arising from or relating to any such determination or remedial action.

26. Instead of, or in addition to, the remedies listed above, Treasury may refer any noncompliance or any allegations of fraud, waste, or abuse to the Treasury Inspector General.

27. Treasury, in its sole discretion, may grant any request by the Recipient for termination of this Agreement, which such request shall be in writing and shall include the reasons for such termination, the proposed effective date of the termination, and the amount of any unused Payroll Support funds the Recipient requests to return to Treasury. Treasury may, in its sole discretion, determine the extent to which the requirements under this Agreement may cease to apply following any such termination.

28. If Treasury determines that any remaining portion of the Payroll Support will not accomplish the purpose of this Agreement, Treasury may terminate this Agreement in its entirety to the extent permitted by law.

Debts

29. Any Payroll Support in excess of the amount which Treasury determines, at any time, the Recipient is authorized to receive or retain under the terms of this Agreement constitutes a debt to the Federal Government.

10

30. Any debts determined to be owed by the Recipient to the Federal Government shall be paid promptly by the Recipient. A debt is delinquent if it has not been paid by the date specified in Treasury's initial written demand for payment, unless other satisfactory arrangements have been made. Interest, penalties, and administrative charges shall be charged on delinquent debts in accordance with 31 U.S.C. § 3717, 31 CFR 901.9, and paragraphs 31 and 32. Treasury will refer any debt that is more than 180 days delinquent to Treasury's Bureau of the Fiscal Service for debt collection services.

31. Penalties on any debts shall accrue at a rate of not more than 6 percent per year or such other higher rate as authorized by law.

32. Administrative charges relating to the costs of processing and handling a delinquent debt shall be determined by Treasury.

33. The Recipient shall not use funds from other federally sponsored programs to pay a debt to the government arising under this Agreement.

Protections for Whistleblowers

34. In addition to other applicable whistleblower protections, in accordance with 41 U.S.C. § 4712, the Recipient shall not discharge, demote, or otherwise discriminate against an Employee as a reprisal for disclosing information to a Person listed below that the Employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant:

    a. A Member of Congress or a representative of a committee of Congress;

    b. An Inspector General;

    c. The Government Accountability Office;

    d. A Treasury employee responsible for contract or grant oversight or management;

    e. An authorized official of the Department of Justice or other law enforcement agency;

    f. A court or grand jury; or

11

g.  A management official or other Employee of the Recipient who has the responsibility to investigate, discover, or address misconduct.

Lobbying

35. The Recipient shall comply with the provisions of 31 U.S.C. § 1352, as amended, and with the regulations at 31 CFR Part 21.

Non-Discrimination

36. The Recipient shall comply with, and hereby assures that it will comply with, all applicable Federal statutes and regulations relating to nondiscrimination including:

a.  Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.*), including Treasury's implementing regulations at 31 CFR Part 22;

b.  Section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. § 794);

c.  The Age Discrimination Act of 1975, as amended (42 U.S.C. §§ 6101–6107), including Treasury's implementing regulations at 31 CFR Part 23 and the general age discrimination regulations at 45 CFR Part 90; and

d.     The Air Carrier Access Act of 1986 (49 U.S.C. § 41705).

Additional Reporting

37. Within seven days after the date of this Agreement, the Recipient shall register in SAM.gov, and thereafter maintain the currency of the information in SAM.gov until at least March 24, 2022. The Recipient shall review and update such information at least annually after the initial registration, and more frequently if required by changes in the Recipient's information. The Recipient agrees that this Agreement and information related thereto, including the Maximum Awardable Amount and any executive total compensation reported pursuant to paragraph 38, may be made available to the public through a U.S. Government website, including SAM.gov.

38. For purposes of paragraph 37, the Recipient shall report total compensation as defined in paragraph e.5 of the award term in 2 CFR part 170, App. A for each of the Recipient's five most highly compensated executives for the preceding completed fiscal year, if:

a. the total Payroll Support is $25,000 or more;

b. in the preceding fiscal year, the Recipient received:

12

      i.  80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance, as defined at 2 CFR 170.320 (and subawards); and

      ii.  $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance, as defined at 2 CFR 170.320 (and subawards); and

c.  the public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. To determine if the public has access to the compensation information, the Recipient shall refer to U.S. Securities and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm.

39. The Recipient shall report executive total compensation described in paragraph 38:

    a.  as part of its registration profile at https://www.sam.gov; and

    b. within five business days after the end of each month following the month in which this Agreement becomes effective, and annually thereafter.

40. The Recipient agrees that, from time to time, it will, at its own expense, promptly upon reasonable request by Treasury, execute and deliver, or cause to be executed and delivered, or use its commercially reasonable efforts to procure, all instruments, documents and information, all in form and substance reasonably satisfactory to Treasury, to enable Treasury to ensure compliance with, or effect the purposes of, this Agreement, which may include, among other documents or information, (a) certain audited financial statements of the Recipient, (b) documentation regarding the Recipient's revenues derived from its business as a passenger or cargo air carrier or regarding the passenger air carriers for which the Recipient provides services as a contractor (as the case may be), and (c) the Recipient's most recent quarterly Federal tax returns. The Recipient agrees to provide Treasury with such documents or information promptly.

41. If the total value of the Recipient's currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period before termination of this Agreement, then the Recipient shall make such reports as required by 2 CFR part 200, Appendix XII.

Other

13

42. The Recipient acknowledges that neither Treasury, nor any other actor, department, or agency of the Federal Government, shall condition the provision of Payroll Support on the Recipient's implementation of measures to enter into negotiations with the certified bargaining representative of a craft or class of employees of the Recipient under the Railway Labor Act (45 U.S.C. 151 *et seq.*) or the National Labor Relations Act (29 U.S.C. 151 *et seq.*), regarding pay or other terms and conditions of employment.

43. Notwithstanding any other provision of this Agreement, the Recipient has no right to, and shall not, transfer, pledge, mortgage, encumber, or otherwise assign this Agreement or any Payroll Support provided under this Agreement, or any interest therein, or any claim, account receivable, or funds arising thereunder or accounts holding Payroll Support, to any party, bank, trust company, or other Person without the express written approval of Treasury.

44. The Signatory Entity will cause its Affiliates to comply with all of their obligations under or relating to this Agreement.

45. Unless otherwise provided in guidance issued by Treasury or the Internal Revenue Service, the form of any Taxpayer Protection Instrument held by Treasury and any subsequent holder will be treated as such form for purposes of the Internal Revenue Code of 1986 (for example, a Taxpayer Protection Instrument in the form of a note will be treated as indebtedness for purposes of the Internal Revenue Code of 1986).

46. This Agreement may not be amended or modified except pursuant to an agreement in writing entered into by the Recipient and Treasury, except that Treasury may unilaterally amend this Agreement if required in order to comply with applicable Federal law or regulation.

47. Subject to applicable law, Treasury may, in its sole discretion, waive any term or condition under this Agreement imposing a requirement on the Recipient or any Affiliate.

48. This Agreement shall bind and inure to the benefit of the parties and their respective heirs, executors, administrators, successors, and assigns.

49. The Recipient represents and warrants to Treasury that this Agreement, and the issuance and delivery to Treasury of the Taxpayer Protection Instruments, if applicable, have been duly authorized by all requisite corporate and, if required, stockholder action, and will not result in the violation by the Recipient of any provision of law, statute, or regulation, or of the articles of incorporation or other constitutive documents or bylaws of the Recipient, or breach or constitute an event of default under any material contract to which the Recipient is a party.

14

50. The Recipient represents and warrants to Treasury that this Agreement has been duly executed and delivered by the Recipient and constitutes a legal, valid, and binding obligation of the Recipient enforceable against the Recipient in accordance with its terms.

51. This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute a single contract.

52. The words "execution," "signed," "signature," and words of like import in any assignment shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act. Notwithstanding anything herein to the contrary, delivery of an executed counterpart of a signature page of this Agreement by electronic means, or confirmation of the execution of this Agreement on behalf of a party by an email from an authorized signatory of such party, shall be effective as delivery of a manually executed counterpart of this Agreement.

53. The captions and paragraph headings appearing herein are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Agreement.

54. This Agreement is governed by and shall be construed in accordance with Federal law. Insofar as there may be no applicable Federal law, this Agreement shall be construed in accordance with the laws of the State of New York, without regard to any rule of conflicts of law (other than section 5-1401 of the New York General Obligations Law) that would result in the application of the substantive law of any jurisdiction other than the State of New York.

55. Nothing in this Agreement shall require any unlawful action or inaction by either party.

56. The requirement pertaining to trafficking in persons at 2 CFR 175.15(b) is incorporated herein and made applicable to the Recipient.

57. This Agreement, together with the attachments hereto, including the Payroll Support Certification and any attached terms regarding Taxpayer Protection Instruments, constitute the entire agreement of the parties relating to the subject matter hereof and supersede any previous agreements and understandings, oral or written, relating to the subject matter hereof.

There may exist other agreements between the parties as to other matters, which are not affected by this Agreement and are not included within this integration clause.

58. No failure by either party to insist upon the strict performance of any provision of this Agreement or to exercise any right or remedy hereunder, and no acceptance of full or partial Payroll Support (if applicable) or other performance by either party during the continuance of any such breach, shall constitute a waiver of any such breach of such provision.

**ATTACHMENT**

Payroll Support Program Certification of Corporate Officer of Recipient

**PAYROLL SUPPORT PROGRAM**

**CERTIFICATION OF CORPORATE OFFICER OF RECIPIENT**

In connection with the Payroll Support Program Agreement (Agreement) between Southwest Airlines Co. and the Department of the Treasury (Treasury) relating to Payroll Support being provided by Treasury to the Recipient under Division A, Title IV, Subtitle B of the Coronavirus Aid, Relief and Economic Security Act, I hereby certify under penalty of perjury to the Treasury that all of the following are true and correct. Capitalized terms used but not defined herein have the meanings set forth in the Agreement.

(1)    I have the authority to make the following representations on behalf of myself and the Recipient. I understand that these representations will be relied upon as material in the decision by Treasury to provide Payroll Support to the Recipient.

(2)    The information and certifications provided by the Recipient in an application for Payroll Support, and in any attachments or other information provided by the Recipient to Treasury related to the application, are true and correct and do not contain any materially false, fictitious, or fraudulent statement, nor any concealment or omission of any material fact.

(3)    The Recipient has the legal authority to apply for the Payroll Support, and it has the institutional, managerial, and financial capability to comply with all obligations, terms, and conditions set forth in the Agreement and any attachment thereto.

(4)    The Recipient and any Affiliate will give Treasury, Treasury's designee or the Treasury Office of Inspector General (as applicable) access to, and opportunity to examine, all documents, papers, or other records of the Recipient or Affiliate pertinent to the provision of Payroll Support made by Treasury based on the application, in order to make audits, examinations, excerpts, and transcripts.

(5)    No Federal appropriated funds, including Payroll Support, have been paid or will be paid, by or on behalf of the Recipient, to any person for influencing or attempting to influence an officer or employee of an agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

(6)    . If the Payroll Support exceeds $100,000, the Recipient shall comply with the disclosure requirements in 31 CFR Part 21 regarding any amounts paid for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the Payroll Support.

**I acknowledge that a materially false, fictitious, or fraudulent statement ( or concealment or omission of a ·material fact) in this certification, or in the application that it supports, may be the subject of criminal prosecution and also may subject me and the Recipient to civil penalties and/or administrative remedies for false claims or otherwise.**

| /s/ Tammy Romo | /s/ Chris Monroe |
|---|---|
| **Corporate Officer of Signatory Entity** | **Second Authorized Representative** |

Name: TammyRomo

Name: David Christopher Monroe

Title: Executive Vice President and Chief Financial Officer

Title: Senior Vice President Finance and Treasurer

Date: April 20, 2020

Date: April 20, 2020

16

Execution Version

---

**WARRANT AGREEMENT**

---

**TABLE OF CONTENTS**

**Page**

Article I
Closing

| | | |
|---|---|---|
| 1.1 | Issuance | 1 |
| 1.2 | Initial Closing; Warrant Closing Date. | 1 |
| 1.3 | Interpretation | 2 |

Article II
Representations and Warranties

| | | |
|---|---|---|
| 2.1 | Representations and Warranties of the Company | 3 |

Article III
Covenants

| | | |
|---|---|---|
| 3.1 | Commercially Reasonable Efforts | 6 |
| 3.2 | Expenses | 7 |
| 3.3 | Sufficiency of Authorized Common Stock; Exchange Listing | 8 |

Article IV
Additional Agreements

| | | |
|---|---|---|
| 4.1 | Investment | 8 |
| 4.2 | Legends | 8 |
| 4.3 | Certain Transactions | 9 |
| 4.4 | Transfer of Warrants and Warrant Shares | 9 |
| 4.5 | Registration Rights | 9 |
| 4.6 | Voting of Warrant Shares | 21 |

Article V
Miscellaneous

| | | |
|---|---|---|
| 5.1 | Survival of Representations and Warranties | 21 |
| 5.2 | Amendment | 21 |
| 5.3 | Waiver of Conditions | 21 |
| 5.4 | **Governing Law: Submission to Jurisdiction, Etc.** | 21 |
| 5.5 | Notices | 21 |
| 5.6 | Definitions | 22 |
| 5.7 | Assignment | 22 |
| 5.8 | Severability | 23 |
| 5.9 | No Third Party Beneficiaries | 23 |

i

LIST OF ANNEXES

ANNEX A:            FORM OF OPINION

ANNEX B:            FORM OF WARRANT

SCHEDULE 1:        WARRANT SHARES FORMULA

SCHEDULE 2:        CAPITALIZATION

SCHEDULE 3:        REQUIRED STOCKHOLDER APPROVALS

**INDEX OF DEFINED TERMS**

| Term | Location of Definition |
|---|---|
| Affiliate | Annex B |
| Agreement | Recitals |
| Appraisal Procedure | Annex B |
| Board of Directors | 2.1(i) |
| Business Combination | Annex B |
| Business Day | Annex B |
| Capitalization Date | 2.1(b) |
| Closing | 1.2(a) |
| Common Stock | Annex B |
| Company | Recitals |
| Company Reports | 2.1(j)(i) |
| Exchange Act | Annex B |
| Governmental Authority | 5.6(a) |
| Holder | 4.5(k)(i) |
| Indemnitee | 4.5(g)(i) |
| Initial Closing | 1.2(a) |
| Lien | 5.6(c) |
| Material Adverse Effect | 5.6(d) |
| Organizational Documents | 5.6(e) |
| Pending Underwritten Offering | 4.5(l) |
| Piggyback Registration | 4.5(a)(iv) |
| Promissory Note | Recitals |
| register; registered; registration | 4.5(k)(ii) |
| Registrable Securities | 4.5(k)(iii) |
| Registration Commencement Date | 4.5(a)(i) |
| Registration Expenses | 4.5(k)(iv) |
| Rule 144; Rule 144A; Rule 159A; Rule 405; Rule 415 | 4.5(k)(v) |
| SEC | 2.1(c) |
| Securities Act | Annex B |
| Selling Expenses | 4.5(k)(vi) |
| Shelf Registration Statement | 4.5(a)(ii) |
| Special Registration | 4.5(i) |

Stockholder Proposals                                                            3.1(b)
Subsidiary                                                                       5.6(f)
Transfer                                                                         4.4
Treasury                                                                         Recitals
Warrant Closing Date                                                            1.2(a)
Warrants                                                                         Recitals
Warrant Shares                                                                   Annex B

iv

WARRANT AGREEMENT dated as of April 20, 2020 (this "Agreement"), between SOUTHWEST AIRLINES CO., a corporation organized under the laws of Texas (the "Company") and the UNITED STATES DEPARTMENT OF THE TREASURY ("Treasury").

WHEREAS, the Company has requested that Treasury provide financial assistance to the Recipient (as defined in the PSP Agreement) that shall exclusively be used for the continuation of payment of employee wages, salaries, and benefits as is permissible under Section 4112(a) of Title IV of the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136 (Mar. 27, 2020), as the same may be amended form time to time (the "CARES Act"), and Treasury is willing to do so on the terms and conditions set forth in the Payroll Support Program Agreement dated as of April 20, 2020, between the Company and Treasury (the "PSP Agreement"); and

WHEREAS, as appropriate compensation to the Federal Government of the United States of America for the provision of financial assistance under the PSP Agreement, SOUTHWEST AIRLINES CO. has agreed to issue a note to be repaid to Treasury on the terms and conditions set forth in the promissory note dated as of April 20, 2020, issued by the Company, in the name of Treasury as the holder (the "Promissory Note") and agreed to issue in a private placement warrants to purchase the number of shares of its Common Stock determined in accordance with Schedule 1 to this Agreement (the "Warrants") to Treasury;

**NOW, THEREFORE**, in consideration of the premises, and of the representations, warranties, covenants and agreements set forth herein, the parties agree as follows:

Article I
**Closing**

1.1    Issuance.

(a)    On the terms and subject to the conditions set forth in this Agreement, the Company agrees to issue to Treasury, on each Warrant Closing Date, Warrants for a number of shares of Common Stock determined by the formula set forth in Schedule 1.

1.2    Initial Closing; Warrant Closing Date.

(a)    On the terms and subject to the conditions set forth in this Agreement, the closing of the initial issuance of the Warrants (the "Initial Closing") will take place on the Closing Date (as defined in the Promissory Note) or, if on the Closing Date the principal amount of the Promissory Note is $0, the first date on which such principal amount is increased. A subsequent closing will take place on the date of each increase, if any, of the principal amount of the Promissory Note (each subsequent closing, together with the Initial Closing, a "Closing" and each such date a "Warrant Closing Date").

(b)        On each Warrant Closing Date, the Company will issue to Treasury a duly executed Warrant or Warrants for a number of shares of Common Stock determined by the formula set forth in Schedule 1, as evidenced by one or more certificates dated the Warrant Closing Date and bearing appropriate legends as hereinafter provided for and in substantially the form attached hereto as Annex B.

(c)        On each Warrant Closing Date, the Company shall deliver to Treasury (i) a written opinion from counsel to the Company (which may be internal counsel) addressed to Treasury and dated as of such Warrant Closing Date, in substantially the form attached hereto as Annex A and (ii) a certificate executed by the chief executive officer, president, executive vice president, chief financial officer, principal accounting officer, treasurer or controller confirming that the representations and warranties of the Company in this Agreement are true and correct with the same force and effect as though expressly made at and as of such Warrant Closing Date and the Company has complied with all agreements on its part to be performed or satisfied hereunder at or prior to such Closing.

(d)        On the initial Warrant Closing Date, the Company shall deliver to Treasury (i) such customary certificates of resolutions or other action, incumbency certificates and/or other certificates of the chief executive officer, president, executive vice president, chief financial officer, principal accounting officer, treasurer or controller as Treasury may require evidencing the identity, authority and capacity of each such officer thereof authorized to act as such officer in connection with this Agreement and (ii) customary resolutions or evidence of corporate authorization, secretary's certificates and such other documents and certificates (including Organizational Documents and good standing certificates) as Treasury may reasonably request relating to the organization, existence and good standing of the Company and any other legal matters relating to the Company, this Agreement, the Warrants or the transactions contemplated hereby or thereby.

1.3    Interpretation.

(a)        When a reference is made in this Agreement to "Recitals," "Articles," "Sections," or "Annexes" such reference shall be to a Recital, Article or Section of, or Annex to, this Warrant Agreement, unless otherwise indicated. The terms defined in the singular have a comparable meaning when used in the plural, and vice versa. References to "herein", "hereof", "hereunder" and the like refer to this Agreement as a whole and not to any particular section or provision, unless the context requires otherwise. The table of contents and headings contained in this Agreement are for reference purposes only and are not part of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed followed by the words "without limitation." No rule of construction against the draftsperson shall be applied in connection with the interpretation or enforcement of this Agreement, as this

Agreement is the product of negotiation between sophisticated parties advised by counsel. All references to "$" or "dollars" mean the lawful currency of the United States of America. Except as expressly stated in this Agreement, all references to any statute, rule or regulation are to the statute, rule or regulation as amended, modified, supplemented or replaced from time to time (and, in the case of statutes, include any rules and regulations promulgated under the statute) and to any section of any statute, rule or regulation include any successor to the section.

(b)      Capitalized terms not defined herein have the meanings ascribed thereto in Annex B.

2

Article II
**Representations and Warranties**

2.1    Representations and Warranties of the Company. The Company represents and warrants to Treasury that as of the date hereof and each Warrant Closing Date (or such other date specified herein):

(a)    Existence, Qualification and Power. The Company is duly organized or formed, validly existing and, if applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, and the Company and each Subsidiary (a) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the this Agreement and the Warrants, and (b) is duly qualified and is licensed and, as applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license, except, in each case referred to in clause (a)(i) or (b), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

(b)    Capitalization. The authorized capital stock of the Company, and the outstanding capital stock of the Company (including securities convertible into, or exercisable or exchangeable for, capital stock of the Company) as of the most recent fiscal month-end preceding the date hereof (the "Capitalization Date") is set forth in Schedule 2. The outstanding shares of capital stock of the Company have been duly authorized and are validly issued and outstanding, fully paid and nonassessable, and subject to no preemptive rights (and were not issued in violation of any preemptive rights). Except as provided in the Warrants, as of the date hereof, the Company does not have outstanding any securities or other obligations providing the holder the right to acquire Common Stock that is not reserved for issuance as specified on Schedule 2, and the Company has not made any other commitment to authorize, issue or sell any Common Stock. Since the Capitalization Date, the Company has not issued any shares of Common Stock, other than (i) shares issued upon the exercise of stock options or delivered under other equity-based awards or other convertible securities or warrants which were issued and outstanding on the Capitalization Date and disclosed on Schedule 2 and (ii) shares disclosed on Schedule 2 as it may be updated by written notice from the Company to Treasury in connection with each Warrant Closing Date.

(c)    Listing. The Common Stock has been registered pursuant to Section 12(b) of the Exchange Act and the shares of the Common Stock outstanding on the date hereof are listed on a national securities exchange. The Company has taken no action designed to, or likely to have the effect of, terminating the registration of the Common Stock under the Exchange Act or the listing of the Common Stock on such national securities exchange, nor has the Company received any

3

notification that the Securities and Exchange Commission (the "SEC") or such exchange is contemplating terminating such registration or listing. The Company is in compliance with applicable continued listing requirements of such exchange in all material respects.

(d)     Governmental Authorization; Other Consents. No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance

by, or enforcement against, the Company of this Agreement, except for such approvals, consents, exemptions, authorizations, actions or notices that have been duly obtained, taken or made and in full force and effect.

(e)     Execution and Delivery; Binding Effect. This Agreement has been duly authorized, executed and delivered by the Company. This Agreement constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, receivership, moratorium or other Laws affecting creditors' rights generally and by general principles of equity.

(f)     The Warrants and Warrant Shares. Each Warrant has been duly authorized and, when executed and delivered as contemplated hereby, will constitute a valid and legally binding obligation of the Company enforceable against the Company in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, receivership, moratorium or other Laws affecting creditors' rights generally and by general principles of equity. The Warrant Shares have been duly authorized and reserved for issuance upon exercise of the Warrants and when so issued in accordance with the terms of the Warrants will be validly issued, fully paid and non-assessable, subject, if applicable, to the approvals of its stockholders set forth on Schedule 3.

(g)     Authorization, Enforceability.

(i)     The Company has the corporate power and authority to execute and deliver this Agreement and the Warrants and, subject, if applicable, to the approvals of its stockholders set forth on Schedule 3, to carry out its obligations hereunder and thereunder (which includes the issuance of the Warrants and Warrant Shares). The execution, delivery and performance by the Company of this Agreement and the Warrants and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate or other organizational action on the part of the Company and its stockholders, and no further approval or authorization is required on the part of the Company, subject, in each case, if applicable, to the approvals of its stockholders set forth on Schedule 3.

4

(ii)     The execution, delivery and performance by the Company of this Agreement do not and will not (a) contravene the terms of its Organizational Documents, (b) conflict with or result in any breach or contravention of, or the creation of any Lien (as defined in the Promissory Note) under, or require any payment to be made under (i) any material Contractual Obligation to which the Company is a party or affecting the Company or the properties of the Company or any Subsidiary or (ii) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which the Company or any Subsidiary or its property is subject or (c) violate any Law, except to the extent that such violation could not reasonably be expected to have a Material Adverse Effect.

(iii)     Other than any current report on Form 8-K required to be filed with the SEC (which shall be made on or before the date on which it is required to be filed), such

filings and approvals as are required to be made or obtained under any state "blue sky" laws, the filing of any proxy statement contemplated by Section 3.1 and such filings and approvals as have been made or obtained, no notice to, filing with, exemption or review by, or authorization, consent or approval of, any Governmental Authority is required to be made or obtained by the Company in connection with the execution, delivery and performance by the Company of this Agreement and the consummation by the Company of the issuance of the Warrants except for any such notices, filings, exemptions, reviews, authorizations, consents and approvals the failure of which to make or obtain would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(h)     <u>Anti-takeover Provisions and Rights Plan.</u> The Board of Directors of the Company (the <u>"Board of Directors"</u>) has taken all necessary action, and will in the future take any necessary action, to ensure that the transactions contemplated by this Agreement and the Warrants and the consummation of the transactions contemplated hereby and thereby, including the exercise of the Warrants in accordance with their terms, will be exempt from any antitakeover or similar provisions of the Company's Organizational Documents, and any other provisions of any applicable "moratorium", "control share", "fair price", "interested stockholder" or other anti-takeover laws and regulations of any jurisdiction, whether existing on the date hereof or implemented after the date hereof. The Company has taken all actions necessary, and will in the future take any necessary action, to render any stockholders' rights plan of the Company inapplicable to this Agreement and the Warrants and the consummation of the transactions contemplated hereby and thereby, including the exercise of the Warrants by Treasury in accordance with its terms.

(i)     <u>Reports.</u>

5

(i)    Since December 31, 2017, the Company and each Subsidiary has timely filed all reports, registrations, documents, filings, statements and submissions, together with any amendments thereto, that it was required to file with any Governmental Authority (the foregoing, collectively, the "Company Reports") and has paid all fees and assessments due and payable in connection therewith, except, in each case, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. As of their respective dates of filing, the Company Reports complied in all material respects with all statutes and applicable rules and regulations of the applicable Governmental Authority. In the case of each such Company Report filed with or furnished to the SEC, such Company Report (A) did not, as of its date or if amended prior to the date hereof, as of the date of such amendment, contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading, and (B) complied as to form in all material respects with the applicable requirements of the Securities Act and the Exchange Act. With respect to all other Company Reports, the Company Reports were complete and accurate in all material respects as of their respective dates. No executive officer of the Company or any Subsidiary has failed in any respect to make the certifications required of him or her under Section 302 or 906 of the Sarbanes-Oxley Act of 2002.

6

(ii)   The Company (A) has implemented and maintains disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act) to ensure that material information relating to the Company, including its Subsidiaries, is made known to the chief executive officer and the chief financial officer of the Company by others within those entities, and (B) has disclosed, based on its most recent evaluation prior to the date hereof, to the Company's outside auditors and the audit committee of the Board of Directors (x) any significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information and (y) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls over financial reporting.

(j)       Offering of Securities. Neither the Company nor any person acting on its behalf has taken any action (including any offering of any securities of the Company under circumstances which would require the integration of such offering with the offering of any of the Warrants under the Securities Act, and the rules and regulations of the Securities and Exchange Commission (the "SEC") promulgated thereunder), which might subject the offering, issuance or sale of any of the Warrants to Treasury pursuant to this Agreement to the registration requirements of the Securities Act.

(k)       Brokers and Finders. No broker, finder or investment banker is entitled to any financial advisory, brokerage, finder's or other fee or commission in connection with this Agreement or the Warrants or the transactions contemplated hereby or thereby based upon arrangements made by or on behalf of the Company or any Subsidiary for which Treasury could have any liability.

Article III
**Covenants**

3.1   Commercially Reasonable Efforts.

(a)       Subject to the terms and conditions of this Agreement, each of the parties will use its commercially reasonable efforts in good faith to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or desirable, or advisable under applicable laws, to enable consummation of the transactions contemplated hereby and shall use commercially reasonable efforts to cooperate with the other party to that end.

(b)       If the Company is required to obtain any stockholder approvals set forth on Schedule 3, then the Company shall comply with this Section 3.1(b) and Section 3.1(c). The Company shall call a special meeting of its stockholders, as promptly as practicable following

7

the Initial Closing, to vote on proposals (collectively, the "Stockholder Proposals") to (i) approve the exercise of the Warrants for Common Stock for purposes of the rules of the national securities exchange on which the Common Stock is listed and/or (ii) amend the Company's Organizational Documents to increase the number of authorized shares of Common Stock to at least such number as shall be sufficient to permit the full exercise of the Warrants for Common Stock and comply with the other provisions of this Section 3.1(b) and Section 3.1(c). The Board

of Directors shall recommend to the Company's stockholders that such stockholders vote in favor of the Stockholder Proposals. In connection with such meeting, the Company shall prepare (and Treasury will reasonably cooperate with the Company to prepare) and file with the SEC as promptly as practicable (but in no event more than ten Business Days after the Initial Closing) a preliminary proxy statement, shall use its reasonable best efforts to respond to any comments of the SEC or its staff thereon and to cause a definitive proxy statement related to such stockholders' meeting to be mailed to the Company's stockholders not more than five Business Days after clearance thereof by the SEC, and shall use its reasonable best efforts to solicit proxies for such stockholder approval of the Stockholder Proposals. The Company shall notify Treasury promptly of the receipt of any comments from the SEC or its staff with respect to the proxy statement and of any request by the SEC or its staff for amendments or supplements to such proxy statement or for additional information and will supply Treasury with copies of all correspondence between the Company or any of its representatives, on the one hand, and the SEC or its staff, on the other hand, with respect to such proxy statement. If at any time prior to such stockholders' meeting there shall occur any event that is required to be set forth in an amendment or supplement to the proxy statement, the Company shall as promptly as practicable prepare and mail to its stockholders such an amendment or supplement. Each of Treasury and the Company agrees promptly to correct any information provided by it or on its behalf for use in the proxy statement if and to the extent that such information shall have become false or misleading in any material respect, and the Company shall as promptly as practicable prepare and mail to its stockholders an amendment or supplement to correct such information to the extent required by applicable laws and regulations. The Company shall consult with Treasury prior to filing any proxy statement, or any amendment or supplement thereto, and provide Treasury with a reasonable opportunity to comment thereon. In the event that the approval of any of the Stockholder Proposals is not obtained at such special stockholders meeting, the Company shall include a proposal to approve (and the Board of Directors shall recommend approval of) each such proposal at a meeting of its stockholders no less than once in each subsequent six-month period beginning on September 30, 2020 until all such approvals are obtained or made.

(c)    None of the information supplied by the Company or any of the Company Subsidiaries for inclusion in any proxy statement in connection with any such stockholders meeting of the Company will, at the date it is filed with the SEC, when first mailed to the Company's stockholders and at the time of any stockholders meeting, and at the time of any

8

amendment or supplement thereof, contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.

3.2   Expenses. The Company shall pay (i) all reasonable out-of-pocket expenses incurred by Treasury (including the reasonable fees, charges and disbursements of any counsel for Treasury) in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the Warrants, any other agreements or documents executed in connection herewith or therewith, or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii) all out-of-pocket expenses incurred by Treasury (including the fees, charges and disbursements of any counsel for Treasury), in connection with the enforcement or protection of its rights in connection with this Agreement and the Warrants, any other agreements or documents executed in connected herewith or therewith, or any

amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), including all such out-of-pocket expenses incurred during any workout, restructuring, negotiations or enforcement in respect of such Warrant Agreement, Warrant and other agreements or documents executed in connection herewith or therewith.

3.3   Sufficiency of Authorized Common Stock; Exchange Listing.

During the period from each Warrant Closing Date (or, if the approval of the Stockholder Proposals is required, the date of such approval) until the date on which no Warrants remain outstanding, the Company shall at all times have reserved for issuance, free of preemptive or similar rights, a sufficient number of authorized and unissued Warrant Shares to effectuate such exercise. Nothing in this Section 3.3 shall preclude the Company from satisfying its obligations in respect of the exercise of the Warrants by delivery of shares of Common Stock which are held in the treasury of the Company. As soon as reasonably practicable following each Warrant Closing Date, the Company shall, at its expense, cause the Warrant Shares to be listed on the same national securities exchange on which the Common Stock is listed, subject to official notice of issuance, and shall maintain such listing for so long as any Common Stock is listed on such exchange. The Company will use commercially reasonable efforts to maintain the listing of Common Stock on such national securities exchange so long as any Warrants or Warrant Shares remain outstanding. Neither the Company nor any of its Subsidiaries shall take any action which would be reasonably expected to result in the delisting or suspension of the Common Stock on such exchange. The foregoing shall not preclude the Company from undertaking any transaction set forth in Section 4.3 subject to compliance with that provision.

9

Article IV
**Additional Agreements**

4.1    <u>Investment Purposes.</u> Treasury acknowledges that the Warrants and the Warrant Shares have not been registered under the Securities Act or under any state securities laws. Treasury (a) is acquiring the Warrants pursuant to an exemption from registration under the Securities Act solely for investment without a view to sell and with no present intention to distribute them to any person in violation of the Securities Act or any applicable U.S. state securities laws; (b) will not sell or otherwise dispose of any of the Warrants or the Warrant Shares, except in compliance with the registration requirements or exemption provisions of the Securities Act and any applicable U.S. state securities laws; and (c) has such knowledge and experience in financial and business matters and in investments of this type that it is capable of evaluating the merits and risks of the Warrants and the Warrant Shares and of making an informed investment decision.

4.2    <u>Legends.</u>

(a)    Treasury agrees that all certificates or other instruments representing the Warrants and the Warrant Shares will bear a legend substantially to the following effect:

"THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE

SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT AND SUCH LAWS."

(b)    In the event that any Warrants or Warrant Shares (i) become registered under the Securities Act or (ii) are eligible to be transferred without restriction in accordance with Rule 144 or another exemption from registration under the Securities Act (other than Rule 144A), the Company shall issue new certificates or other instruments representing such Warrants or Warrant Shares, which shall not contain the legend in Section 4.2(a) above; *provided* that Treasury surrenders to the Company the previously issued certificates or other instruments.

4.3    <u>Certain Transactions.</u> The Company will not merge or consolidate with, or sell, transfer or lease all or substantially all of its property or assets to, any other party unless the successor, transferee or lessee party (or its ultimate parent entity), as the case may be (if not the Company), expressly assumes the due and punctual performance and observance of each and every covenant, agreement and condition of this Agreement and the Warrants to be performed and observed by the Company.

10

4.4     _Transfer of Warrants and Warrant Shares._ Subject to compliance with applicable securities laws, Treasury shall be permitted to transfer, sell, assign or otherwise dispose of (_"Transfer"_) all or a portion of the Warrants or Warrant Shares at any time, and the Company shall take all steps as may be reasonably requested by Treasury to facilitate the Transfer of the Warrants and the Warrant Shares.

4.5     _Registration Rights._

(a)     _Registration._

(i)     Subject to the terms and conditions of this Agreement, the Company covenants and agrees that on or before the earlier of (A) 30 days after the date on which all Warrants that may be issued pursuant to this Agreement have been issued and (B) September 30, 2020 (the end of such period, the _"Registration Commencement Date"),_ the Company shall prepare and file with the SEC a Shelf Registration Statement covering the maximum number of Registrable Securities (or otherwise designate an existing Shelf Registration Statement filed with the SEC to cover the Registrable Securities) that may be issued pursuant to this Agreement and any Warrants outstanding at that time, and, to the extent the Shelf Registration Statement has not theretofore been declared effective or is not automatically effective upon such filing, the Company shall use reasonable best efforts to cause such Shelf Registration Statement to be declared or become effective and to keep such Shelf Registration Statement continuously effective and in compliance with the Securities Act and usable for resale of such Registrable Securities for a period from the date of its initial effectiveness until such time as there are no Registrable Securities remaining (including by refiling such Shelf Registration Statement (or a new Shelf Registration Statement) if the initial Shelf Registration Statement expires). So long as the Company is a well-known seasoned issuer (as defined in Rule 405 under the Securities

Act) at the time of filing of the Shelf Registration Statement with the SEC, such Shelf Registration Statement shall be designated by the Company as an automatic Shelf Registration Statement. Notwithstanding the foregoing, if on the date hereof the Company is not eligible to file a registration statement on Form S-3, then the Company shall not be obligated to file a Shelf Registration Statement unless and until it is so eligible and is requested to do so in writing by Treasury.

(ii)     Any registration pursuant to Section 4.5(a)(i) shall be effected by means of a shelf registration on an appropriate form under Rule 415 under the Securities Act (a _"Shelf Registration Statement")._ If Treasury or any other Holder intends to distribute any Registrable Securities by means of an underwritten offering it shall promptly so advise the Company and the Company shall take all reasonable steps to facilitate such

11

distribution, including the actions required pursuant to Section 4.5(c); *provided* that the Company shall not be required to facilitate an underwritten offering of Registrable Securities unless the total number of Warrant Shares and Warrants expected to be sold in such offering exceeds, or are exercisable for, at least 20% of the total number of Warrant Shares for which Warrants issued under this Agreement could be exercised (giving effect to the anti-dilution adjustments in Warrants); and *provided*, *further* that the Company shall not be required to facilitate more than two completed underwritten offerings within any 12-month period. The lead underwriters in any such distribution shall be selected by the Holders of a majority of the Registrable Securities to be distributed.

(iii)    The Company shall not be required to effect a registration (including a resale of Registrable Securities from an effective Shelf Registration Statement) or an underwritten offering pursuant to Section 4.5(a): (A) prior to the Registration Commencement Date; (B) with respect to securities that are not Registrable Securities; or (C) if the Company has notified Treasury and all other Holders that in the good faith judgment of the Board of Directors, it would be materially detrimental to the Company or its securityholders for such registration or underwritten offering to be effected at such time, in which event the Company shall have the right to defer such registration or offering for a period of not more than 45 days after receipt of the request of Treasury or any other Holder; *provided* that such right to delay a registration or underwritten offering shall be exercised by the Company (1) only if the Company has generally exercised (or is concurrently exercising) similar black-out rights against holders of similar securities that have registration rights and (2) not more than three times in any 12-month period and not more than 90 days in the aggregate in any 12-month period. The Company shall notify the Holders of the date of any anticipated termination of any such deferral period prior to such date.

(iv)    If during any period when an effective Shelf Registration Statement is not available, the Company proposes to register any of its equity securities, other than a registration pursuant to Section 4.5(a)(i) or a Special Registration, and the registration form to be filed may be used for the registration or qualification for distribution of Registrable Securities, the Company will give prompt written notice to Treasury and all other Holders of its intention to effect such a registration (but in no event less than ten days prior to the anticipated filing date) and will include in such registration all Registrable Securities with respect to which the Company has received written requests

for inclusion therein within ten Business Days after the date of the Company's notice (a "Piggyback Registration"). Any such person that has made such a written request may withdraw its Registrable Securities from such Piggyback Registration by giving written notice to the Company and the managing underwriter, if any, on or before the fifth Business Day prior to the planned effective date of such Piggyback Registration.

12

The Company may terminate or withdraw any registration under this Section 4.5(a)(iv) prior to the effectiveness of such registration, whether or not Treasury or any other Holders have elected to include Registrable Securities in such registration.

(v)        If the registration referred to in Section 4.5(a)(iv) is proposed to be underwritten, the Company will so advise Treasury and all other Holders as a part of the written notice given pursuant to Section 4.5(a)(iv). In such event, the right of Treasury and all other Holders to registration pursuant to Section 4.5(a) will be conditioned upon such persons' participation in such underwriting and the inclusion of such person's Registrable Securities in the underwriting if such securities are of the same class of securities as the securities to be offered in the underwritten offering, and each such person will (together with the Company and the other persons distributing their securities through such underwriting) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by the Company; *provided* that Treasury (as opposed to other Holders) shall not be required to indemnify any person in connection with any registration. If any participating person disapproves of the terms of the underwriting, such person may elect to withdraw therefrom by written notice to the Company, the managing underwriters and Treasury (if Treasury is participating in the underwriting).

(vi)       If either (x) the Company grants "piggyback" registration rights to one or more third parties to include their securities in an underwritten offering under the Shelf Registration Statement pursuant to Section 4.5(a)(ii) or (y) a Piggyback Registration under Section 4.5(a)(iv) relates to an underwritten offering on behalf of the Company, and in either case the managing underwriters advise the Company that in their reasonable opinion the number of securities requested to be included in such offering exceeds the number which can be sold without adversely affecting the marketability of such offering (including an adverse effect on the per share offering price), the Company will include in such offering only such number of securities that in the reasonable opinion of such managing underwriters can be sold without adversely affecting the marketability of the offering (including an adverse effect on the per share offering price), which securities will be so included in the following order of priority: (A) first, in the case of a Piggyback Registration under Section 4.5(a)(iv), the securities the Company proposes to sell, (B) then the Registrable Securities of Treasury and all other Holders who have requested inclusion of Registrable Securities pursuant to Section 4.5(a)(ii) or Section 4.5(a)(iv), as applicable, *pro rata* on the basis of the aggregate number of such securities or shares owned by each such person and (C) lastly, any other securities of the Company that have been requested to be so included, subject to the terms of this Agreement; *provided, however,* that if the Company has, prior to the date hereof, entered into an agreement with respect to its securities that is inconsistent with the order of priority contemplated

13

hereby then it shall apply the order of priority in such conflicting agreement to the extent that this Agreement would otherwise result in a breach under such agreement.

(b)        Expenses of Registration. All Registration Expenses incurred in connection with any registration, qualification or compliance hereunder shall be borne by the Company. All Selling Expenses incurred in connection with any registrations hereunder shall be borne by the holders of the securities so registered *pro rata* on the basis of the aggregate offering or sale price of the securities so registered.

(c)        Obligations of the Company. The Company shall use its reasonable best efforts, for so long as there are Registrable Securities outstanding, to take such actions as are under its control to not become an ineligible issuer (as defined in Rule 405 under the Securities Act) and to remain a well-known seasoned issuer (as defined in Rule 405 under the Securities Act) if it has such status on the date hereof or becomes eligible for such status in the future. In addition, whenever required to effect the registration of any Registrable Securities or facilitate the distribution of Registrable Securities pursuant to an effective Shelf Registration Statement, the Company shall, as expeditiously as reasonably practicable:

(i)        Prepare and file with the SEC a prospectus supplement with respect to a proposed offering of Registrable Securities pursuant to an effective registration

statement, subject to Section 4.5(d), keep such registration statement effective and keep such prospectus supplement current until the securities described therein are no longer Registrable Securities. The plan of distribution included in such registration statement shall include, among other things, an underwritten offering, ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers, block trades, privately negotiated transactions, the writing or settlement of options or other derivative transactions and any other method permitted pursuant to applicable law, and any combination of any such methods of sale.

(ii)        Prepare and file with the SEC such amendments and supplements to the applicable registration statement and the prospectus or prospectus supplement used in connection with such registration statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement.

(iii)        Furnish to the Holders and any underwriters such number of copies of the applicable registration statement and each such amendment and supplement thereto (including in each case all exhibits) and of a prospectus, including a preliminary prospectus, in conformity with the requirements of the Securities Act, and such other documents as they may reasonably request in order to facilitate the disposition of Registrable Securities owned or to be distributed by them.

14

(iv)        Use its reasonable best efforts to register and qualify the securities covered by such registration statement under such other securities or Blue Sky laws of such jurisdictions as shall be reasonably requested by the Holders or any managing underwriter(s), to keep such registration or qualification in effect for so long as such registration statement remains in effect, and to take any other action which may be reasonably necessary to enable such seller to consummate the disposition in such jurisdictions of the securities owned by such Holder; *provided* that the Company shall not

be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions.

(v)    Notify each Holder of Registrable Securities at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the happening of any event as a result of which the applicable prospectus, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing.

(vi)    Give written notice to the Holders:

(A)        when any registration statement filed pursuant to Section 4.5(a) or any amendment thereto has been filed with the SEC (except for any amendment effected by the filing of a document with the SEC pursuant to the Exchange Act) and when such registration statement or any post-effective amendment thereto has become effective;

(B)        of any request by the SEC for amendments or supplements to any registration statement or the prospectus included therein or for additional information;

(C)        of the issuance by the SEC of any stop order suspending the effectiveness of any registration statement or the initiation of any proceedings for that purpose;

(D)        of the receipt by the Company or its legal counsel of any notification with respect to the suspension of the qualification of the Common Stock for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose;

15

(E)         of the happening of any event that requires the Company to make changes in any effective registration statement or the prospectus related to the registration statement in order to make the statements therein not misleading (which notice shall be accompanied by an instruction to suspend the use of the prospectus until the requisite changes have been made); and

(F)         if at any time the representations and warranties of the Company contained in any underwriting agreement contemplated by Section 4.5(c)(x) cease to be true and correct.

(vii) Use its reasonable best efforts to prevent the issuance or obtain the withdrawal of any order suspending the effectiveness of any registration statement referred to in Section 4.5(c)(vi)(C) at the earliest practicable time.

(viii) Upon the occurrence of any event contemplated by Section 4.5(c)(v), 4.5(c)(vi)(E) or 4.5(d), promptly prepare a post-effective amendment to such registration statement or a supplement to the related prospectus or file any other required document

so that, as thereafter delivered to the Holders and any underwriters, the prospectus will not contain an untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. If the Company notifies the Holders in accordance with Section 4.5(c)(vi)(E) to suspend the use of the prospectus until the requisite changes to the prospectus have been made, then the Holders and any underwriters shall suspend use of such prospectus and use their reasonable best efforts to return to the Company all copies of such prospectus (at the Company's expense) other than permanent file copies then in such Holders' or underwriters' possession. The total number of days that any such suspension may be in effect in any 12-month period shall not exceed 90 days. The Company shall notify the Holders of the date of any anticipated termination of any such suspension period prior to such date.

(ix)         Use reasonable best efforts to procure the cooperation of the Company's transfer agent in settling any offering or sale of Registrable Securities, including with respect to the transfer of physical stock certificates into book-entry form in accordance with any procedures reasonably requested by the Holders or any managing underwriter(s).

(x)         If an underwritten offering is requested pursuant to Section 4.5(a)(ii), enter into an underwriting agreement in customary form, scope and substance and take all such other actions reasonably requested by the Holders of a majority of the Registrable Securities being sold in connection therewith or by the managing underwriter(s), if any,

16

to expedite or facilitate the underwritten disposition of such Registrable Securities, and in connection therewith in any underwritten offering (including making members of management and executives of the Company available to participate in "road shows", similar sales events and other marketing activities), (A) make such representations and warranties to the Holders that are selling stockholders and the managing underwriter(s), if any, with respect to the business of the Company and its subsidiaries, and the Shelf Registration Statement, prospectus and documents, if any, incorporated or deemed to be incorporated by reference therein, in each case, in customary form, substance and scope, and, if true, confirm the same if and when requested, (B) use its reasonable best efforts to furnish the underwriters with opinions and "10b-5" letters of counsel to the Company, addressed to the managing underwriter(s), if any, covering the matters customarily covered in such opinions and letters requested in underwritten offerings, (C) use its reasonable best efforts to obtain "cold comfort" letters from the independent certified public accountants of the Company (and, if necessary, any other independent certified public accountants of any business acquired by the Company for which financial statements and financial data are included in the Shelf Registration Statement) who have certified the financial statements included in such Shelf Registration Statement, addressed to each of the managing underwriter(s), if any, such letters to be in customary form and covering matters of the type customarily covered in "cold comfort" letters, (D) if an underwriting agreement is entered into, the same shall contain indemnification provisions and procedures customary in underwritten offerings (provided that Treasury shall not be obligated to provide any indemnity), and (E) deliver such documents and certificates as may be reasonably requested by the Holders of a majority of the Registrable Securities being sold in connection therewith, their counsel and the managing

underwriter(s), if any, to evidence the continued validity of the representations and warranties made pursuant to clause (i) above and to evidence compliance with any customary conditions contained in the underwriting agreement or other agreement entered into by the Company.

(xi)     Make available for inspection by a representative of Holders that are selling stockholders, the managing underwriter(s), if any, and any attorneys or accountants retained by such Holders or managing underwriter(s), at the offices where normally kept, during reasonable business hours, financial and other records, pertinent corporate documents and properties of the Company, and cause the officers, directors and employees of the Company to supply all information in each case reasonably requested (and of the type customarily provided in connection with due diligence conducted in connection with a registered public offering of securities) by any such representative, managing underwriter(s), attorney or accountant in connection with such Shelf Registration Statement.

17

(xii)    Use reasonable best efforts to cause all such Registrable Securities to be listed on each national securities exchange on which similar securities issued by the Company are then listed or, if no similar securities issued by the Company are then listed on any national securities exchange, use its reasonable best efforts to cause all such Registrable Securities to be listed on such securities exchange as Treasury may designate.

(xiii)    If requested by Holders of a majority of the Registrable Securities being registered and/or sold in connection therewith, or the managing underwriter(s), if any, promptly include in a prospectus supplement or amendment such information as the Holders of a majority of the Registrable Securities being registered and/or sold in connection therewith or managing underwriter(s), if any, may reasonably request in order to permit the intended method of distribution of such securities and make all required filings of such prospectus supplement or such amendment as soon as practicable after the Company has received such request.

(xiv)    Timely provide to its security holders earning statements satisfying the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder.

(d)    Suspension of Sales. Upon receipt of written notice from the Company that a registration statement, prospectus or prospectus supplement contains or may contain an untrue statement of a material fact or omits or may omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading or that circumstances exist that make inadvisable use of such registration statement, prospectus or prospectus supplement, Treasury and each Holder of Registrable Securities shall forthwith discontinue disposition of Registrable Securities until Treasury and/or Holder has received copies of a supplemented or amended prospectus or prospectus supplement, or until Treasury and/or such Holder is advised in writing by the Company that the use of the prospectus and, if applicable, prospectus supplement may be resumed, and, if so directed by the Company, Treasury and/or such Holder shall deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in Treasury and/or such Holder's possession, of the prospectus and, if applicable, prospectus supplement covering such Registrable Securities current at the time of receipt of such notice. The

total number of days that any such suspension may be in effect in any 12-month period shall not exceed 90 days. The Company shall notify Treasury prior to the anticipated termination of any such suspension period of the date of such anticipated termination

(e)    Termination of Registration Rights. A Holder's registration rights as to any securities held by such Holder shall not be available unless such securities are Registrable Securities.

(f)    Furnishing Information.

18

(i)        Neither Treasury nor any Holder shall use any free writing prospectus (as defined in Rule 405) in connection with the sale of Registrable Securities without the prior written consent of the Company.

(ii)        It shall be a condition precedent to the obligations of the Company to take any action pursuant to Section 4.5(c) that Treasury and/or the selling Holders and the underwriters, if any, shall furnish to the Company such information regarding themselves, the Registrable Securities held by them and the intended method of disposition of such securities as shall be required to effect the registered offering of their Registrable Securities.

(g)    Indemnification.

(i)    The Company agrees to indemnify each Holder and, if a Holder is a person other than an individual, such Holder's officers, directors, employees, agents, representatives and Affiliates, and each Person, if any, that controls a Holder within the meaning of the Securities Act (each, an "Indemnitee"), against any and all losses, claims, damages, actions, liabilities, costs and expenses (including reasonable fees, expenses and disbursements of attorneys and other professionals incurred in connection with investigating, defending, settling, compromising or paying any such losses, claims, damages, actions, liabilities, costs and expenses), joint or several, arising out of or based upon any untrue statement or alleged untrue statement of material fact contained in any registration statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto or any documents incorporated therein by reference or contained in any free writing prospectus (as such term is defined in Rule 405) prepared by the Company or authorized by it in writing for use by such Holder (or any amendment or supplement thereto); or any omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; *provided*, that the Company shall not be liable to such Indemnitee in any such case to the extent that any such loss, claim, damage, liability (or action or proceeding in respect thereof) or expense arises out of or is based upon (A) an untrue statement or omission made in such registration statement, including any such preliminary prospectus or final prospectus contained therein or any such amendments or supplements thereto or contained in any free writing prospectus (as such term is defined in Rule 405) prepared by the Company or authorized by it in writing for use by such Holder (or any amendment or supplement thereto), in reliance upon and in conformity with information regarding such Indemnitee or its plan

of distribution or ownership interests which was furnished in writing to the Company by such Indemnitee for use in connection with such registration statement, including any such preliminary prospectus or final prospectus contained therein or any such

19

amendments or supplements thereto, or (B) offers or sales effected by or on behalf of such Indemnitee "by means of" (as defined in Rule 159A) a "free writing prospectus" (as defined in Rule 405) that was not authorized in writing by the Company.

(ii)    If the indemnification provided for in Section 4.5(g)(i) is unavailable to an Indemnitee with respect to any losses, claims, damages, actions, liabilities, costs or expenses referred to therein or is insufficient to hold the Indemnitee harmless as contemplated therein, then the Company, in lieu of indemnifying such Indemnitee, shall contribute to the amount paid or payable by such Indemnitee as a result of such losses, claims, damages, actions, liabilities, costs or expenses in such proportion as is appropriate to reflect the relative fault of the Indemnitee, on the one hand, and the Company, on the other hand, in connection with the statements or omissions which resulted in such losses, claims, damages, actions, liabilities, costs or expenses as well as any other relevant equitable considerations. The relative fault of the Company, on the one hand, and of the Indemnitee, on the other hand, shall be determined by reference to, among other factors, whether the untrue statement of a material fact or omission to state a material fact relates to information supplied by the Company or by the Indemnitee and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission; the Company and each Holder agree that it would not be just and equitable if contribution pursuant to this Section 4.5(g)(ii) were determined by *pro rata* allocation or by any other method of allocation that does not take account of the equitable considerations referred to in Section 4.5(g)(i). No Indemnitee guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from the Company if the Company was not guilty of such fraudulent misrepresentation.

(h)    Assignment of Registration Rights. The rights of Treasury to registration of Registrable Securities pursuant to Section 4.5(a) may be assigned by Treasury to a transferee or assignee of Registrable Securities in connection with a transfer of a total number of Warrant Shares and/or Warrants exercisable for at least 20% of the total number of Warrant Shares for which Warrants issued and to be issued under this Agreement could be exercised (giving effect to the anti-dilution adjustments in Warrants); *provided*, *however*, the transferor shall, within ten days after such transfer, furnish to the Company written notice of the name and address of such transferee or assignee and the number and type of Registrable Securities that are being assigned.

(i)    Clear Market. With respect to any underwritten offering of Registrable Securities by Treasury or other Holders pursuant to this Section 4.5, the Company agrees not to effect (other than pursuant to such registration or pursuant to a Special Registration) any public sale or distribution, or to file any Shelf Registration Statement (other than such registration or a Special Registration) covering, in the case of an underwritten offering of Common Stock or

20

Warrants, any of its equity securities, or, in each case, any securities convertible into or exchangeable or exercisable for such securities, during the period not to exceed 30 days following the effective date of such offering. The Company also agrees to cause such of its directors and senior executive officers to execute and deliver customary lock-up agreements in such form and for

such time period up to 30 days as may be requested by the managing underwriter. "Special Registration" means the registration of (A) equity securities and/or options or other rights in respect thereof solely registered on Form S-4 or Form S-8 (or successor form) or (B) shares of equity securities and/or options or other rights in respect thereof to be offered to directors, members of management, employees, consultants, customers, lenders or vendors of the Company or Company Subsidiaries or in connection with dividend reinvestment plans.

(j)    Rule 144; Rule 144A. With a view to making available to Treasury and Holders the benefits of certain rules and regulations of the SEC which may permit the sale of the Registrable Securities to the public without registration, the Company agrees to use its reasonable best efforts to:

(i)    make and keep adequate public information available, as those terms are understood and defined in Rule 144(c)(1) or any similar or analogous rule promulgated under the Securities Act, at all times after the date hereof;

(ii)    (A) file with the SEC, in a timely manner, all reports and other documents required of the Company under the Exchange Act, and (B) if at any time the Company is not required to file such reports, make available, upon the request of any Holder, such information necessary to permit sales pursuant to Rule 144A (including the information required by Rule 144A(d)(4) under the Securities Act);

(iii)    so long as Treasury or a Holder owns any Registrable Securities, furnish to Treasury or such Holder forthwith upon request: a written statement by the Company as to its compliance with the reporting requirements of Rule 144 under the Securities Act, and of the Exchange Act; a copy of the most recent annual or quarterly report of the Company; and such other reports and documents as Treasury or Holder may reasonably request in availing itself of any rule or regulation of the SEC allowing it to sell any such securities to the public without registration; *provided*, *however*, that the availability of the foregoing reports on the EDGAR filing system of the SEC will be deemed to satisfy the foregoing delivery requirements; and

(iv)    take such further action as any Holder may reasonably request, all to the extent required from time to time to enable such Holder to sell Registrable Securities without registration under the Securities Act.

21

(k)     As used in this Section 4.5, the following terms shall have the following respective meanings:

(i)     "Holder" means Treasury and any other holder of Registrable Securities to whom the registration rights conferred by this Agreement have been transferred in compliance with Section 4.5(h) hereof.

(ii)     "Register," "registered," and "registration" shall refer to a registration effected by preparing and (A) filing a registration statement in compliance with the Securities Act and applicable rules and regulations thereunder, and the declaration or ordering of effectiveness of such registration statement or (B) filing a prospectus and/or

prospectus supplement in respect of an appropriate effective registration statement on Form S-3.

(iii)     "Registrable Securities" means (A) the Warrants (subject to Section 4.5(p)) and (B) any equity securities issued or issuable directly or indirectly with respect to the securities referred to in the foregoing clause (A) by way of conversion, exercise or exchange thereof, including the Warrant Shares, or share dividend or share split or in connection with a combination of shares, recapitalization, reclassification, merger, amalgamation, arrangement, consolidation or other reorganization, *provided* that, once issued, such securities will not be Registrable Securities when (1) they are sold pursuant to an effective registration statement under the Securities Act, (2) except as provided below in Section 4.5(o), they may be sold pursuant to Rule 144 without limitation thereunder on volume or manner of sale, (3) they shall have ceased to be outstanding or (4) they have been sold in a private transaction in which the transferor's rights under this Agreement are not assigned to the transferee of the securities. No Registrable Securities may be registered under more than one registration statement at any one time.

(iv)     "Registration Expenses" mean all expenses incurred by the Company in effecting any registration pursuant to this Agreement (whether or not any registration or prospectus becomes effective or final) or otherwise complying with its obligations under this Section 4.5, including all registration, filing and listing fees, printing expenses, fees and disbursements of counsel for the Company, blue sky fees and expenses, expenses incurred in connection with any "road show", the reasonable fees and disbursements of Treasury's counsel (if Treasury is participating in the registered offering), and expenses of the Company's independent accountants in connection with any regular or special reviews or audits incident to or required by any such registration, but shall not include Selling Expenses.

22

(v)       "Rule 144", "Rule 144A", "Rule 159A", "Rule 405" and "Rule 415" mean, in each case, such rule promulgated under the Securities Act (or any successor provision), as the same shall be amended from time to time.

(vi)       "Selling Expenses" mean all discounts, selling commissions and stock transfer taxes applicable to the sale of Registrable Securities and fees and disbursements of counsel for any Holder (other than the fees and disbursements of Treasury's counsel included in Registration Expenses).

(l)    At any time, any holder of Securities (including any Holder) may elect to forfeit its rights set forth in this Section 4.5 from that date forward; *provided*, that a Holder forfeiting such rights shall nonetheless be entitled to participate under Section 4.5(a)(iv) – (vi) in any Pending Underwritten Offering to the same extent that such Holder would have been entitled to if the holder had not withdrawn; and *provided*, *further*, that no such forfeiture shall terminate a Holder's rights or obligations under Section 4.5(f) with respect to any prior registration or Pending Underwritten Offering. "*Pending Underwritten Offering*" means, with respect to any Holder forfeiting its rights pursuant to this Section 4.5(l), any underwritten offering of Registrable Securities in which such Holder has advised the Company of its intent to register its

Registrable Securities either pursuant to Section 4.5(a)(ii) or 4.5(a)(iv) prior to the date of such Holder's forfeiture.

(m)       Specific Performance. The parties hereto acknowledge that there would be no adequate remedy at law if the Company fails to perform any of its obligations under this Section 4.5 and that Treasury and the Holders from time to time may be irreparably harmed by any such failure, and accordingly agree that Treasury and such Holders, in addition to any other remedy to which they may be entitled at law or in equity, to the fullest extent permitted and enforceable under applicable law shall be entitled to compel specific performance of the obligations of the Company under this Section 4.5 in accordance with the terms and conditions of this Section 4.5.

(n)       No Inconsistent Agreements. The Company shall not, on or after the date hereof, enter into any agreement with respect to its securities that may impair the rights granted to Treasury and the Holders under this Section 4.5 or that otherwise conflicts with the provisions hereof in any manner that may impair the rights granted to Treasury and the Holders under this Section 4.5. In the event the Company has, prior to the date hereof, entered into any agreement with respect to its securities that is inconsistent with the rights granted to Treasury and the Holders under this Section 4.5 (including agreements that are inconsistent with the order of priority contemplated by Section 4.5(a)(vi)) or that may otherwise conflict with the provisions hereof, the Company shall use its reasonable best efforts to amend such agreements to ensure

23

they are consistent with the provisions of this Section 4.5. Any transaction entered into by the Company that would reasonably be expected to require the inclusion in a Shelf Registration Statement or any Company Report filed with the SEC of any separate financial statements pursuant to Rule 3-05 of Regulation S-X or pro forma financial statements pursuant to Article 11 of Regulation S-X shall include provisions requiring the Company's counterparty to provide any information necessary to allow the Company to comply with its obligation hereunder.

(o)    Certain Offerings by Treasury. In the case of any securities held by Treasury that cease to be Registrable Securities solely by reason of clause (2) in the definition of "Registrable Securities," the provisions of Sections 4.5(a)(ii), clauses (iv), (ix) and (x)-(xii) of Section 4.5(c), Section 4.5(g) and Section 4.5(i) shall continue to apply until such securities otherwise cease to be Registrable Securities. In any such case, an "underwritten" offering or other disposition shall include any distribution of such securities on behalf of Treasury by one or more broker-dealers, an "underwriting agreement" shall include any purchase agreement entered into by such broker-dealers, and any "registration statement" or "prospectus" shall include any offering document approved by the Company and used in connection with such distribution.

(p)    Registered Sales of the Warrants. The Holders agree to sell the Warrants or any portion thereof under the Shelf Registration Statement only beginning 30 days after notifying the Company of any such sale, during which 30-day period Treasury and all Holders of the Warrants shall take reasonable steps to agree to revisions to the Warrants, at the expense of the Company, to permit a public distribution of the Warrants, including entering into a revised warrant agreement, appointing a warrant agent, and making the securities eligible for book entry clearing and settlement at the Depositary Trust Company.

4.6    Voting of Warrant Shares. Notwithstanding anything in this Agreement to the contrary, Treasury shall not exercise any voting rights with respect to the Warrant Shares.

## Article V
## **Miscellaneous**

5.1    Survival of Representations and Warranties. The representations and warranties of the Company made herein or in any certificates delivered in connection with the Initial Closing or any subsequent Closing shall survive such Closing without limitation.

5.2    Amendment. No amendment of any provision of this Agreement will be effective unless made in writing and signed by an officer or a duly authorized representative of each party; *provided* that Treasury may unilaterally amend any provision of this Agreement to the extent

24

required to comply with any changes after the date hereof in applicable federal statutes. No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative of any rights or remedies provided by law.

5.3    <u>Waiver of Conditions.</u> No waiver will be effective unless it is in a writing signed by a duly authorized officer of the waiving party that makes express reference to the provision or provisions subject to such waiver.

5.4    **<u>Governing Law: Submission to Jurisdiction, Etc.</u> This Agreement will be governed by and construed in accordance with the federal law of the United States if and to the extent such law is applicable, and otherwise in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State. Each of the parties hereto agrees (a) to submit to the exclusive jurisdiction and venue of the United States District Court for the District of Columbia and the United States Court of Federal Claims for any and all civil actions, suits or proceedings arising out of or relating to this Agreement or the Warrants or the transactions contemplated hereby or thereby, and (b) that notice may be served upon (i) the Company at the address and in the manner set forth for notices to the Company in Section 5.5 and (ii) Treasury in accordance with federal law. To the extent permitted by applicable law, each of the parties hereto hereby unconditionally waives trial by jury in any civil legal action or proceeding relating to this Agreement or the Warrants or the transactions contemplated hereby or thereby.**

5.5    <u>Notices.</u> Any notice, request, instruction or other document to be given hereunder by any party to the other will be in writing and will be deemed to have been duly given (a) on the date of delivery if delivered personally, or by facsimile, upon confirmation of receipt, or (b) on the second Business Day following the date of dispatch if delivered by a recognized next day courier service. All notices to the Company shall be delivered as set forth below, or pursuant to such other instruction as may be designated in writing by the Company to Treasury. All notices to Treasury shall be delivered as set forth below, or pursuant to such other instructions as may be designated in writing by Treasury to the Company.

If to the Company:

25

Southwest Airlines Co.

P.O. Box 36611, HDQ-6TR

Love Field

Dallas, Texas 75235

Telecopy Number: 214-932-1322

Attention: Treasurer

Email: Capital_Markets-DG@wnco.com

With a copy to:

Southwest Airlines Co.

Legal Department - HDQ-4GC

2702 Love Field Drive

Dallas, TX 75235

If to Treasury:

United States Department of the Treasury

1500 Pennsylvania Avenue, NW, Room 2312

Washington, D.C. 20220

Attention: Assistant General Counsel (Banking and Finance)

Telephone No.: 202-622-0283

Email: eric.froman@treasury.gov

5.6    Definitions.

(a)    The term "Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

(b)    The term "Laws" has the meaning ascribed thereto in the Promissory Note.

(c)    The term "Lien" has the meaning ascribed thereto in the Promissory Note.

(d)    The term "Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect on, the operations, business, properties, liabilities (actual or contingent), condition (financial or otherwise) or prospects of the Company and its Subsidiaries taken as a whole; or (b) a material adverse effect on (i) the ability of the Company to perform its

26

obligations under this Agreement or any Warrant or (ii) the legality, validity, binding effect or enforceability against the Company of this Agreement or any Warrant to which it is a party.

(e)   The term "Organizational Documents" has the meaning ascribed thereto in the Promissory Note.

(f)   The term "Subsidiary" has the meaning ascribed thereto in the Promissory Note.

5.7   Assignment. Neither this Agreement nor any right, remedy, obligation nor liability arising hereunder or by reason hereof shall be assignable by any party hereto without the prior written consent of the other party, and any attempt to assign any right, remedy, obligation or liability hereunder without such consent shall be void, except (a) an assignment, in the case of a Business Combination where such party is not the surviving entity, or a sale of substantially all of its assets, to the entity which is the survivor of such Business Combination or the purchaser in such sale and (b) as provided in Section 4.5.

5.8   Severability. If any provision of this Agreement or the Warrants, or the application thereof to any person or circumstance, is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to persons or circumstances other than those as to which it has been held invalid or unenforceable, will remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination, the parties shall negotiate in good faith in an effort to agree upon a suitable and equitable substitute provision to effect the original intent of the parties.

5.9   No Third Party Beneficiaries. Nothing contained in this Agreement, expressed or implied, is intended to confer upon any person or entity other than the Company and Treasury any benefit, right or remedies, except that the provisions of Section 4.5 shall inure to the benefit of the persons referred to in that Section.

* * *

*[Signature page follows]*

27

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

THE UNITED STATES DEPARTMENT OF THE TREASURY

By: __/s/ Steven T. Mcuchin_____

Name: Steven Mnuchin

Title: Secretary

SOUTHWEST AIRLINES CO.

By:

_____

Name:

Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

THE UNITED STATES DEPARTMENT OF
THE TREASURY

By:

_____
Name:
Title:

SOUTHWEST AIRLINES CO.

By: ___/s/ Tammy Romo_____
Name: Tammy Romo
Title: Executive Vice President and Chief
Financial Officer

**ANNEX A**

## FORM OF OPINION

(a)      The Company has been duly incorporated and is validly existing as a corporation in good standing under the laws of the state of its incorporation.

(b)      Each of the Warrants has been duly authorized and, when executed and delivered as contemplated by the Agreement, will constitute a valid and legally binding obligation of the Company enforceable against the Company in accordance with its terms, except as the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and general equitable principles, regardless of whether such enforceability is considered in a proceeding at law or in equity.

(c)      The shares of Common Stock issuable upon exercise of the Warrants have been duly authorized and reserved for issuance upon exercise of the Warrants and when so issued in accordance with the terms of the Warrants will be validly issued, fully paid and non-assessable **[*insert, if applicable:* **, subject to the approvals of the Company's stockholders set forth on Schedule 3**]**.

(d)      The Company has the corporate power and authority to execute and deliver the Agreement and the Warrants and **[*insert, if applicable:* **, subject to the approvals of the Company's stockholders set forth on Schedule 3**]** to carry out its obligations thereunder (which includes the issuance of the Warrants and Warrant Shares).

(e)      The execution, delivery and performance by the Company of the Agreement and the Warrants and the consummation of the transactions contemplated thereby have been duly authorized by all necessary corporate action on the part of the Company and its stockholders, and no further approval or authorization is required on the part of the Company **[*insert, if applicable:* **, subject, in each case, to the approvals of the Company's stockholders set forth on Schedule 3**]**.

(f)      The Agreement is a valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except as the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and general equitable principles, regardless of whether such enforceability is considered in a proceeding at law or in equity; *provided*, *however*, such counsel need express no opinion with respect to Section 4.5(g) or the severability provisions of the Agreement insofar as Section 4.5(g) is concerned.

(g)        No registration of the Warrant and the Common Stock issuable upon exercise of the Warrant under the U.S. Securities Act of 1933, as amended, is required for the offer and sale of the Warrant or the Common Stock issuable upon exercise of the Warrant by the Company to the Holder pursuant to and in the manner contemplated by this Agreement.

(h)        The Company is not required to be registered as an investment company under the Investment Company Act of 1940, as amended.

**ANNEX B**

**FORM OF WARRANT** [SEE ATTACHED]

**Execution Version**

### FORM OF WARRANT TO PURCHASE COMMON STOCK

THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT AND SUCH LAWS.

**WARRANT**
**to purchase**

**1,258,232**

**Shares of Common Stock**

**of**

**Southwest Airlines Co.**

Issue Date: <u>April 20, 2020</u>

1.    <u>Definitions.</u> Unless the context otherwise requires, when used herein the following terms shall have the meanings indicated.

"*Affiliate*" means, with respect to any person, any person directly or indirectly controlling, controlled by or under common control with, such other person. For purposes of this definition, <u>"control"</u> (including, with correlative meanings, the terms <u>"controlled by"</u> and <u>"under common control with"</u>) when used with respect to any person, means the possession, directly or indirectly, of the power to cause the direction of management and/or policies of such person, whether through the ownership of voting securities by contract or otherwise.

"*Aggregate Net Cash Settlement Amount*" has the meaning ascribed thereto in Section 2(i).

"*Aggregate Net Share Settlement Amount*" has the meaning ascribed thereto in Section 2(ii).

"*Appraisal Procedure*" means a procedure whereby two independent appraisers, one chosen by the Company and one by the Original Warrantholder, shall mutually agree upon the determinations then the subject of appraisal. Each party shall deliver a notice to the other appointing its appraiser within 10 days after the Appraisal Procedure is invoked. If within 30

days after appointment of the two appraisers they are unable to agree upon the amount in question, a third independent appraiser shall be chosen within 10 days thereafter by the mutual consent of such first two appraisers. The decision of the third appraiser so appointed and chosen shall be given within 30 days after the selection of such third appraiser. If three appraisers shall

be appointed and the determination of one appraiser is disparate from the middle determination by more than twice the amount by which the other determination is disparate from the middle determination, then the determination of such appraiser shall be excluded, the remaining two determinations shall be averaged and such average shall be binding and conclusive upon the Company and the Original Warrantholder; otherwise, the average of all three determinations shall be binding upon the Company and the Original Warrantholder. The costs of conducting any Appraisal Procedure shall be borne by the Company.

"*Average Market Price*" means, with respect to any security, the arithmetic average of the Market Price of such security for the 15 consecutive trading day period ending on and including the trading day immediately preceding the determination date.

"*Board of Directors*" means the board of directors of the Company, including any duly authorized committee thereof.

"*Business Combination*" means a merger, consolidation, statutory share exchange or similar transaction that requires the approval of the Company's stockholders.

"*Business Day*" means any day except Saturday, Sunday and any day on which banking institutions in the State of New York generally are authorized or required by law or other governmental actions to close; *provided* that banks shall be deemed to be generally open for business in the event of a "shelter in place" or similar closure of physical branch locations at the direction of any governmental entity if such banks' electronic funds transfer system (including wire transfers) are open for use by customers on such day.

"*Capital Stock*" means (A) with respect to any Person that is a corporation or company, any and all shares, interests, participations or other equivalents (however designated) of capital or capital stock of such Person and (B) with respect to any Person that is not a corporation or company, any and all partnership or other equity interests of such Person.

"*Charter*" means, with respect to any Person, its certificate or articles of incorporation, articles of association, or similar organizational document.

"*Common Stock*" means common stock of the Company, par value $1.00 subject to adjustment as provided in Section 13(E).

"*Company*" means the Person whose name, corporate or other organizational form and jurisdiction of organization is set forth in Item 1 of Schedule A hereto.

"*conversion*" has the meaning set forth in Section 13(B). "*convertible securities*" has the meaning set forth in Section 13(B).

"*Depositary*" means The Depositary Trust Company, its nominees and their respective successors.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, or any successor statute, and the rules and regulations promulgated thereunder.

"*Exercise Date*" means each date a Notice of Exercise substantially in the form annexed hereto is delivered to the Company in accordance with Section 2 hereof.

"*Exercise Price*" means the amount set forth in Item 2 of Schedule A hereto, subject to adjustment as contemplated herein.

"*Expiration Time*" has the meaning set forth in Section 3.

"*Fair Market Value*" means, with respect to any security or other property, the fair market value of such security or other property as determined by the Board of Directors, acting in good faith in reliance on an opinion of a nationally recognized independent investment banking firm retained by the Company for this purpose. For so long as the Original Warrantholder holds this Warrant or any portion thereof, it may object in writing to the Board of Director's calculation of fair market value within 10 days of receipt of written notice thereof. If the Original Warrantholder and the Company are unable to agree on fair market value during the 10-day period following the delivery of the Original Warrantholder's objection, the Appraisal Procedure may be invoked by either party to determine Fair Market Value by delivering written notification thereof not later than the 30th day after delivery of the Original Warrantholder's objection.

"*Initial Number*" has the meaning set forth in Section 13(B).

"*Issue Date*" means the date set forth in Item 3 of Schedule A hereto.

"*Market Price*" means, with respect to a particular security, on any given day, the last reported sale price regular way or, in case no such reported sale takes place on such day, the average of the last closing bid and ask prices regular way, in either case on the principal national securities exchange on which the applicable securities are listed or admitted to trading, or if not listed or admitted to trading on any national securities exchange, the average of the closing bid and ask prices as furnished by two members of the Financial Industry Regulatory Authority, Inc.

2

selected from time to time by the Company for that purpose. "Market Price" shall be determined without reference to after hours or extended hours trading. If such security is not listed and traded in a manner that the quotations referred to above are available for the period required hereunder, the Market Price of such security shall be deemed to be (i) in the event that any portion of the Warrant is held by the Original Warrantholder, the fair market value per share of such security as determined in good faith by the Original Warrantholder or (ii) in all other circumstances, the fair market value per share of such security as determined in good faith by the Board of Directors in reliance on an opinion of a nationally recognized independent investment banking corporation retained by the Company for this purpose and certified in a resolution to the Warrantholder.

"*Original Warrantholder*" means the United States Department of the Treasury. Any actions specified to be taken by the Original Warrantholder hereunder may only be taken by such Person and not by any other Warrantholder.

"*Permitted Transactions*" has the meaning set forth in Section 13(B).

"*Per Share Net Cash Settlement Amount*" means the Average Market Price of a share of Common Stock determined as of the relevant Exercise Date less the then applicable Exercise Price.

"*Per Share Net Share Settlement Amount*" means the quotient of (i) the Average Market Price of a share of Common Stock determined as of the relevant Exercise Date less the then applicable Exercise Price *divided by* (ii) the Average Market Price of a share of Common Stock determined as of the relevant Exercise Date.

"*Person*" has the meaning given to it in Section 3(a)(9) of the Exchange Act and as used in Sections 13(d)(3) and 14(d)(2) of the Exchange Act.

"*Per Share Fair Market Value*" has the meaning set forth in Section 13(C).

"*Pro Rata Repurchases*" means any purchase of shares of Common Stock by the Company or any Affiliate thereof pursuant to (A) any tender offer or exchange offer subject to Section 13(e) or 14(e) of the Exchange Act or Regulation 14E promulgated thereunder or (B) any other offer available to substantially all holders of Common Stock, in the case of both (A) or (B), whether for cash, shares of Capital Stock of the Company, other securities of the Company, evidences of indebtedness of the Company or any other Person or any other property (including, without limitation, shares of Capital Stock, other securities or evidences of indebtedness of a subsidiary), or any combination thereof, effected while this Warrant is outstanding. The "*Effective Date*" of a Pro Rata Repurchase shall mean the date of acceptance of shares for purchase or exchange by the Company under any tender or exchange offer which is

3

a Pro Rata Repurchase or the date of purchase with respect to any Pro Rata Repurchase that is not a tender or exchange offer.

"*Regulatory Approvals*" with respect to the Warrantholder, means, to the extent applicable and required to permit the Warrantholder to exercise this Warrant for shares of Common Stock and to own such Common Stock without the Warrantholder being in violation of applicable law, rule or regulation, the receipt of any necessary approvals and authorizations of, filings and registrations with, notifications to, or expiration or termination of any applicable waiting period under, the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations thereunder.

"*SEC*" means the U.S. Securities and Exchange Commission.

"*Securities Act*" means the Securities Act of 1933, as amended, or any successor statute, and the rules and regulations promulgated thereunder.

"*trading day*" means (A) if the shares of Common Stock are not traded on any national or regional securities exchange or association or over-the-counter market, a Business Day or (B) if the shares of Common Stock are traded on any national or regional securities exchange or association or over-the-counter market, a Business Day on which such relevant exchange or quotation system is scheduled to be open for business and on which the shares of Common Stock (i) are not suspended from trading on any national or regional securities exchange or association or over-the-counter market for any period or periods aggregating one half hour or longer; and (ii)

have traded at least once on the national or regional securities exchange or association or over-the-counter market that is the primary market for the trading of the shares of Common Stock.

"*U.S. GAAP*" means United States generally accepted accounting principles. "*Warrant*" means this Warrant, issued pursuant

to the Warrant Agreement.

"*Warrant Agreement*" means the Warrant Agreement, dated as of the date set forth in Item 4 of Schedule A hereto, as amended from time to time, between the Company and the United States Department of the Treasury.

"*Warrantholder*" has the meaning set forth in Section 2.

"*Warrant Shares*" has the meaning set forth in Section 2.

4

2.     <u>Number of Warrant Shares; Net Exercise.</u> This certifies that, for value received, the United States Department of the Treasury or its permitted assigns (the "*Warrantholder*") is entitled, upon the terms and subject to the conditions hereinafter set forth, to acquire from the Company, in whole or in part, after the receipt of all applicable Regulatory Approvals, if any, up to an aggregate of the number of fully paid and nonassessable shares of Common Stock set forth in Item 5 of Schedule A hereto. The number of shares of Common Stock (the "*Warrant Shares*") issuable upon exercise of this Warrant and the Exercise Price are subject to adjustment as provided herein, and all references to "Common Stock," "Warrant Shares" and "Exercise Price" herein shall be deemed to include any such adjustment or series of adjustments.

Upon exercise of the Warrant in accordance with Section 3 hereof, the Company shall elect to pay or deliver, as the case may be, to the exercising Warrantholder (a) cash ("*Net Cash Settlement*") or (b) Warrant Shares together with cash, if applicable, in lieu of delivering any fractional shares in accordance with Section 5 of this Warrant ("*Net Share Settlement*"). The Company will notify the exercising Warrantholder of its election of a settlement method within one Business Day after the relevant Exercise Date and if it fails to deliver a timely notice shall be deemed to have elected Net Share Settlement.

*(i)*     *Net Cash Settlement.* If the Company elects Net Cash Settlement, it shall pay to the Warrantholder cash equal to the Per Share Net Cash Settlement Amount multiplied by the number of Warrant Shares as to which the Warrant has been exercised as indicated in the Notice of Exercise (the "*Aggregate Net Cash Settlement Amount*").

*(ii)*     *Net Share Settlement.* If the Company elects Net Share Settlement, it shall deliver to the Warrantholder a number of shares of Common Stock equal to the Per Share Net Share Settlement Amount multiplied by the number of Warrant Shares as to which the Warrant has been exercised as indicated in the Notice of Exercise (the "*Aggregate Net Share Settlement Amount*").

3.     <u>Term; Method of Exercise.</u> Subject to Section 2, to the extent permitted by applicable laws and regulations, this Warrant is exercisable, in whole or in part by the Warrantholder, at any time or from time to time after the execution and delivery of this Warrant by the Company on the date hereof, but in no event later than 5:00 p.m., New York City time on

the fifth anniversary of the Issue Date (the "*Expiration Time*"), by the surrender of this Warrant and delivery of the Notice of Exercise annexed hereto, duly completed and executed on behalf of the Warrantholder, at the principal executive office of the Company located at the address set forth in Item 6 of Schedule A hereto (or such other office or agency of the Company in the United States as it may designate by notice in writing to the Warrantholder at the address of the Warrantholder appearing on the books of the Company).

5

If the Warrantholder does not exercise this Warrant in its entirety, the Warrantholder will be entitled to receive from the Company within a reasonable time after the date on which this Warrant has been duly exercised in accordance with the terms of this Warrant, and in any event not exceeding three Business Days after the date thereof, a new warrant in substantially identical form for the purchase of that number of Warrant Shares equal to the difference between the number of Warrant Shares subject to this Warrant and the number of Warrant Shares as to which this Warrant is so exercised. Notwithstanding anything in this Warrant to the contrary, the Warrantholder hereby acknowledges and agrees that its exercise of this Warrant for Warrant Shares is subject to the condition that the Warrantholder will have first received any applicable Regulatory Approvals.

4. Method of Settlement.

(i) *Net Cash Settlement*. If the Company elects Net Cash Settlement, the Company shall, within a reasonable time, not to exceed five Business Days after the date on which this Warrant has been duly exercised in accordance with the terms of this Warrant, pay to the exercising Warrantholder the Aggregate Net Cash Settlement Amount.

(ii) *Net Share Settlement*. If the Company elects Net Share Settlement, shares of Common Stock equal to the Aggregate Net Share Settlement Amount shall be (x) issued in such name or names as the exercising Warrantholder may designate and (y) delivered by the Company or the Company's transfer agent to such Warrantholder or its nominee or nominees (i) if the shares are then able to be so delivered, via book-entry transfer crediting the account of such Warrantholder (or the relevant agent member for the benefit of such Warrantholder) through the Depositary's DWAC system (if the Company's transfer agent participates in such system), or (ii) otherwise in certificated form by physical delivery to the address specified by the Warrantholder in the Notice of Exercise, within a reasonable time, not to exceed three Business Days after the date on which this Warrant has been duly exercised in accordance with the terms of this Warrant. The Company hereby represents and warrants that any Warrant Shares issued upon the exercise of this Warrant in accordance with the provisions of Section 3 will be duly and validly authorized and issued, fully paid and nonassessable and free from all taxes, liens and charges (other than liens or charges created by the Warrantholder, income and franchise taxes incurred in connection with the exercise of the Warrant or taxes in respect of any transfer occurring contemporaneously therewith). The Company agrees that the Warrant Shares so issued will be deemed to have been issued to the Warrantholder as of the close of business on the date on which this Warrant and payment of the Exercise Price are delivered to the Company in accordance with the terms of this Warrant, notwithstanding that the stock transfer books of the Company may then be closed or certificates representing such Warrant Shares may not be actually delivered on such date. The Company will at all times reserve and keep available, out of its authorized but unissued Common Stock, solely for the purpose of providing for the exercise of this Warrant, the

6

aggregate number of shares of Common Stock then issuable upon exercise of this Warrant at any time. The Company will (A) procure, at its sole expense, the listing of the Warrant Shares issuable upon exercise of this Warrant at any time, subject to issuance or notice of issuance, on all principal stock exchanges on which the Common Stock is then listed or traded and (B) maintain such listings of such Warrant Shares at all times after issuance. The Company will use reasonable best efforts to ensure that the Warrant Shares may be issued without violation of any applicable law or regulation or of any requirement of any securities exchange on which the Warrant Shares are listed or traded.

5.    No Fractional Warrant Shares or Scrip. No fractional Warrant Shares or scrip representing fractional Warrant Shares shall be issued upon any exercise of this Warrant. In lieu of any fractional Share to which the Warrantholder would otherwise be entitled, the Warrantholder shall be entitled to receive a cash payment equal to the Average Market Price of the Common Stock determined as of the Exercise Date multiplied by such fraction of a share, less the pro-rated Exercise Price for such fractional share.

6.    No Rights as Stockholders; Transfer Books. This Warrant does not entitle the Warrantholder to any voting rights or other rights as a stockholder of the Company prior to the date of exercise hereof. The Company will at no time close its transfer books against transfer of this Warrant in any manner which interferes with the timely exercise of this Warrant.

7.    Charges, Taxes and Expenses. Issuance of certificates for Warrant Shares to the Warrantholder upon the exercise of this Warrant shall be made without charge to the Warrantholder for any issue or transfer tax or other incidental expense in respect of the issuance of such certificates, all of which taxes and expenses shall be paid by the Company; *provided*, *however*, that the Company shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of any such certificate, or any certificates or other securities in a name other than that of the registered holder of the Warrant surrendered upon exercise of the Warrant.

8.    Transfer/Assignment.

(A)    Subject to compliance with clause (B) of this Section 8, this Warrant and all rights hereunder are transferable, in whole or in part, upon the books of the Company by the registered holder hereof in person or by duly authorized attorney, and a new warrant shall be made and delivered by the Company, of the same tenor and date as this Warrant but registered in the name of one or more transferees, upon surrender of this Warrant, duly endorsed, to the office or agency of the Company described in Section 3. All expenses (other than stock transfer taxes) and other charges payable in connection with the preparation, execution and delivery of the new warrants pursuant to this Section 8 shall be paid by the Company.

7

(B)        If and for so long as required by the Warrant Agreement, this Warrant shall contain the legend as set forth in Sections 4.2(a) of the Warrant Agreement.

9.    <u>Exchange and Registry of Warrant.</u> This Warrant is exchangeable, upon the surrender hereof by the Warrantholder to the Company, for a new warrant or warrants of like tenor and representing the right to purchase the same aggregate number of Warrant Shares. The

Company shall maintain a registry showing the name and address of the Warrantholder as the registered holder of this Warrant. This Warrant may be surrendered for exchange or exercise in accordance with its terms, at the office of the Company, and the Company shall be entitled to rely in all respects, prior to written notice to the contrary, upon such registry.

10.    <u>Loss, Theft, Destruction or Mutilation of Warrant.</u> Upon receipt by the Company of evidence reasonably satisfactory to it of the loss, theft, destruction or mutilation of this Warrant, and in the case of any such loss, theft or destruction, upon receipt of a bond, indemnity or security reasonably satisfactory to the Company, or, in the case of any such mutilation, upon surrender and cancellation of this Warrant, the Company shall make and deliver, in lieu of such lost, stolen, destroyed or mutilated Warrant, a new Warrant of like tenor and representing the right to purchase the same aggregate number of Warrant Shares as provided for in such lost, stolen, destroyed or mutilated Warrant.

11.    <u>Saturdays, Sundays, Holidays, etc.</u> If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall not be a Business Day, then such action may be taken or such right may be exercised on the next succeeding day that is a Business Day.

12.    <u>Information.</u> With a view to making available to Warrantholders the benefits of certain rules and regulations of the SEC which may permit the sale of the Warrants and Warrant Shares to the public without registration, the Company agrees to use its reasonable best efforts to:

(A)        make and keep adequate public information available, as those terms are understood and defined in Rule 144(c) or any similar or analogous rule promulgated under the Securities Act, at all times after the date hereof;

(B)        (x) file with the SEC, in a timely manner, all reports and other documents required of the Company under the Securities Act and the Exchange Act, and (y) if at any time the Company is not required to file such reports, make available, upon the request of any Warrantholder, such information necessary to permit sales pursuant to Rule 144A (including the information required by Rule 144A(d)(4) under the Securities Act);

8

(C)      furnish to any holder of Warrants or Warrant Shares forthwith upon request: a written statement by the Company as to its compliance with the reporting requirements of the Exchange Act and Rule 144(c)(1); a copy of the most recent annual or quarterly report of the Company; and such other reports and documents as the Warrantholder may reasonably request in availing itself of any rule or regulation of the SEC allowing it to sell any such securities to the public without registration; and

(D)      take such further action as any Warrantholder may reasonably request, all to the extent required from time to time to enable such Warantholder to sell Warrants or Warrant Shares without registration under the Securities Act.

13.    <u>Adjustments and Other Rights.</u> The Exercise Price and the number of Warrant Shares issuable upon exercise of the Warrant shall be subject to adjustment from time to time as follows; *provided*, that if more than one subsection of this Section 13 is applicable to a single

event, the subsection shall be applied that produces the largest adjustment and no single event shall cause an adjustment under more than one subsection of this Section 13 so as to result in duplication:

(A)      <u>Stock Splits, Subdivisions, Reclassifications or Combinations.</u> If the Company shall (i) declare and pay a dividend or make a distribution on its Common Stock in shares of Common Stock, (ii) subdivide or reclassify the outstanding shares of Common Stock into a greater number of shares, or (iii) combine or reclassify the outstanding shares of Common Stock into a smaller number of shares, the number of Warrant Shares issuable upon exercise of this Warrant at the time of the record date for such dividend or distribution or the effective date of such subdivision, combination or reclassification shall be proportionately adjusted so that the Warrantholder after such date shall be entitled to acquire the number of shares of Common Stock which such holder would have owned or been entitled to receive in respect of the shares of Common Stock subject to this Warrant after such date had this Warrant been exercised immediately prior to such date. In such event, the Exercise Price in effect at the time of the record date for such dividend or distribution or the effective date of such subdivision, combination or reclassification shall be adjusted to the number obtained by dividing (x) the product of (1) the number of Warrant Shares issuable upon the exercise of this Warrant before such adjustment and (2) the Exercise Price in effect immediately prior to the record or effective date, as the case may be, for the dividend, distribution, subdivision, combination or reclassification giving rise to this adjustment by (y) the new number of Warrant Shares issuable upon exercise of the Warrant determined pursuant to the immediately preceding sentence.

(B)      <u>Certain Issuances of Common Stock or Convertible Securities.</u> If the Company shall issue shares of Common Stock (or rights or warrants or other securities exercisable or convertible into or exchangeable (collectively, a "*conversion*") for shares of Common Stock) (collectively, "*convertible securities*") (other than in Permitted Transactions (as defined below)

9

or a transaction to which subsection (A) of this Section 13 is applicable) without consideration or at a consideration per share (or having a conversion price per share) that is less than 90% of the Average Market Price determined as of the date of the agreement on pricing such shares (or such convertible securities) then, in such event:

(A) the number of Warrant Shares issuable upon the exercise of this Warrant immediately prior to the date of the agreement on pricing of such shares (or of such convertible securities) (the "*Initial Number*") shall be increased to the number obtained by multiplying the Initial Number by a fraction (A) the numerator of which shall be the sum of (x) the number of shares of Common Stock of the Company outstanding on such date and (y) the number of additional shares of Common Stock issued (or into which convertible securities may be exercised or convert) and (B) the denominator of which shall be the sum of (I) the number of shares of Common Stock outstanding on such date and (II) the number of shares of Common Stock which the aggregate consideration receivable by the Company for the total number of shares of Common Stock so issued (or into which convertible securities may be exercised or convert) would purchase at the Average Market Price determined as of the date of the agreement on pricing such shares (or such convertible securities); and

(B) the Exercise Price payable upon exercise of the Warrant shall be adjusted by multiplying such Exercise Price in effect immediately prior to the date of the agreement on pricing of such shares (or of such convertible securities) by a fraction, the numerator of which shall be the number of shares of Common Stock issuable upon exercise of this Warrant prior to such date and the denominator of which shall be the number of shares of Common Stock issuable upon exercise of this Warrant immediately after the adjustment described in clause (A) above.

For purposes of the foregoing, the aggregate consideration receivable by the Company in connection with the issuance of such shares of Common Stock or convertible securities shall be deemed to be equal to the sum of the net offering price (including the Fair Market Value of any non-cash consideration and after deduction of any related expenses payable to third parties) of all such securities plus the minimum aggregate amount, if any, payable upon exercise or conversion of any such convertible securities into shares of Common Stock; and "*Permitted Transactions*" shall mean issuances (i) as consideration for or to fund the acquisition of businesses and/or related assets, (ii) in connection with employee benefit plans and compensation related arrangements in the ordinary course and consistent with past practice approved by the Board of Directors, (iii) in connection with a public or broadly marketed offering and sale of Common Stock or convertible securities for cash conducted by the Company or its affiliates pursuant to registration under the Securities Act or Rule 144A thereunder on a

10

basis consistent with capital raising transactions by comparable institutions and (iv) in connection with the exercise of preemptive rights on terms existing as of the Issue Date. Any adjustment made pursuant to this Section 13(B) shall become effective immediately upon the date of such issuance.

(C)    Other Distributions. In case the Company shall fix a record date for the making of a distribution to all holders of shares of its Common Stock of securities, evidences of indebtedness, assets, cash, rights or warrants (excluding dividends of its Common Stock and other dividends or distributions referred to in Section 13(A)), in each such case, the Exercise Price in effect prior to such record date shall be reduced immediately thereafter to the price determined by multiplying the Exercise Price in effect immediately prior to the reduction by the quotient of (x) the Average Market Price of the Common Stock determined as of the first date on which the Common Stock trades regular way on the principal national securities exchange on which the Common Stock is listed or admitted to trading without the right to receive such distribution, minus the amount of cash and/or the Fair Market Value of the securities, evidences of indebtedness, assets, rights or warrants to be so distributed in respect of one share of Common Stock (such amount and/or Fair Market Value, the "*Per Share Fair Market Value*") divided by (y) the Average Market Price specified in clause (x); such adjustment shall be made successively whenever such a record date is fixed. In such event, the number of Warrant Shares issuable upon the exercise of this Warrant shall be increased to the number obtained by dividing (x) the product of (1) the number of Warrant Shares issuable upon the exercise of this Warrant before such adjustment, and (2) the Exercise Price in effect immediately prior to the distribution giving rise to this adjustment by (y) the new Exercise Price determined in accordance with the immediately preceding sentence. In the event that such distribution is not so made, the Exercise Price and the number of Warrant Shares issuable upon exercise of this Warrant then in effect shall be readjusted, effective as of the date when the Board of Directors determines not to distribute such shares, evidences of indebtedness, assets, rights, cash or warrants, as the case may be, to the

Exercise Price that would then be in effect and the number of Warrant Shares that would then be issuable upon exercise of this Warrant if such record date had not been fixed.

(D)       Certain Repurchases of Common Stock. In case the Company effects a Pro Rata Repurchase of Common Stock, then the Exercise Price shall be reduced to the price determined by multiplying the Exercise Price in effect immediately prior to the Effective Date of such Pro Rata Repurchase by a fraction of which the numerator shall be (i) the product of (x) the number of shares of Common Stock outstanding immediately before such Pro Rata Repurchase and (y) the Average Market Price of a share of Common Stock determined as of the date of the first public announcement by the Company or any of its Affiliates of the intent to effect such Pro Rata Repurchase, minus (ii) the aggregate purchase price of the Pro Rata Repurchase, and of which the denominator shall be the product of (i) the number of shares of Common Stock outstanding

11

immediately prior to such Pro Rata Repurchase minus the number of shares of Common Stock so repurchased and (ii) the Average Market Price per share of Common Stock determined as of the date of the first public announcement by the Company or any of its Affiliates of the intent to effect such Pro Rata Repurchase. In such event, the number of shares of Common Stock issuable upon the exercise of this Warrant shall be increased to the number obtained by dividing (x) the product of (1) the number of Warrant Shares issuable upon the exercise of this Warrant before such adjustment, and (2) the Exercise Price in effect immediately prior to the Pro Rata Repurchase giving rise to this adjustment by (y) the new Exercise Price determined in accordance with the immediately preceding sentence. For the avoidance of doubt, no increase to the Exercise Price or decrease in the number of Warrant Shares issuable upon exercise of this Warrant shall be made pursuant to this Section 13(D).

(E)    Business Combinations. In case of any Business Combination or reclassification of Common Stock (other than a reclassification of Common Stock referred to in Section 13(A)), the Warrantholder's right to receive Warrant Shares upon exercise of this Warrant shall be converted into the right to exercise this Warrant to acquire the number of shares of stock or other securities or property (including cash) which the Common Stock issuable (at the time of such Business Combination or reclassification) upon exercise of this Warrant immediately prior to such Business Combination or reclassification would have been entitled to receive upon consummation of such Business Combination or reclassification; and in any such case, if necessary, the provisions set forth herein with respect to the rights and interests thereafter of the Warrantholder shall be appropriately adjusted so as to be applicable, as nearly as may reasonably be, to the Warrantholder's right to exercise this Warrant in exchange for any shares of stock or other securities or property pursuant to this paragraph. In determining the kind and amount of stock, securities or the property receivable upon exercise of this Warrant following the consummation of such Business Combination, if the holders of Common Stock have the right to elect the kind or amount of consideration receivable upon consummation of such Business Combination, then the consideration that the Warrantholder shall be entitled to receive upon exercise shall be deemed to be the types and amounts of consideration received by the majority of all holders of the shares of common stock that affirmatively make an election (or of all such holders if none make an election).

(F)    Rounding of Calculations; Minimum Adjustments. All calculations under this Section 13 shall be made to the nearest one-tenth (1/10th) of a cent or to the nearest one-hundredth (1/100th) of a share, as the case may be. Any provision of this Section 13 to the

contrary notwithstanding, no adjustment in the Exercise Price or the number of Warrant Shares shall be made if the amount of such adjustment would be less than $0.01 or one-tenth (1/10th) of a share of Common Stock, but any such amount shall be carried forward and an adjustment with respect thereto shall be made at the time of and together with any subsequent adjustment

12

which, together with such amount and any other amount or amounts so carried forward, shall aggregate $0.01 or 1/10th of a share of Common Stock, or more.

(G)    Timing of Issuance of Additional Common Stock Upon Certain Adjustments. In any case in which the provisions of this Section 13 shall require that an adjustment shall become effective immediately after a record date for an event, the Company may defer until the occurrence of such event (i) issuing to the Warrantholder of this Warrant exercised after such record date and before the occurrence of such event the additional shares of Common Stock issuable upon such exercise by reason of the adjustment required by such event over and above the shares of Common Stock issuable upon such exercise before giving effect to such adjustment and (ii) paying to such Warrantholder any amount of cash in lieu of a fractional share of Common Stock; *provided*, *however*, that the Company upon request shall deliver to such Warrantholder a due bill or other appropriate instrument evidencing such Warrantholder's right to receive such additional shares, and such cash, upon the occurrence of the event requiring such adjustment.

(H)    Other Events. For so long as the Original Warrantholder holds this Warrant or any portion thereof, if any event occurs as to which the provisions of this Section 13 are not strictly applicable or, if strictly applicable, would not, in the good faith judgment of the Board of Directors of the Company, fairly and adequately protect the purchase rights of the Warrants in accordance with the essential intent and principles of such provisions, then the Board of Directors shall make such adjustments in the application of such provisions, in accordance with such essential intent and principles, as shall be reasonably necessary, in the good faith opinion of the Board of Directors, to protect such purchase rights as aforesaid. The Exercise Price or the number of Warrant Shares shall not be adjusted in the event of a change in the par value of the Common Stock or a change in the jurisdiction of incorporation of the Company.

(I)    Statement Regarding Adjustments. Whenever the Exercise Price or the number of Warrant Shares shall be adjusted as provided in Section 13, the Company shall forthwith file at the principal office of the Company a statement showing in reasonable detail the facts requiring such adjustment and the Exercise Price that shall be in effect and the number of Warrant Shares after such adjustment, and the Company shall also cause a copy of such statement to be sent by mail, first class postage prepaid, to each Warrantholder at the address appearing in the Company's records.

(J)    Notice of Adjustment Event. In the event that the Company shall propose to take any action of the type described in this Section 13 (but only if the action of the type described in this Section 13 would result in an adjustment in the Exercise Price or the number of Warrant Shares or a change in the type of securities or property to be delivered upon exercise of this Warrant), the Company shall give notice to the Warrantholder, in the manner set forth in Section 13(J), which notice shall specify the record date, if any, with respect to any such action and the

13

approximate date on which such action is to take place. Such notice shall also set forth the facts with respect thereto as shall be reasonably necessary to indicate the effect on the Exercise Price

and the number, kind or class of shares or other securities or property which shall be deliverable upon exercise of this Warrant. In the case of any action which would require the fixing of a record date, such notice shall be given at least 10 days prior to the date so fixed, and in case of all other action, such notice shall be given at least 15 days prior to the taking of such proposed action. Failure to give such notice, or any defect therein, shall not affect the legality or validity of any such action.

(K)    Proceedings Prior to Any Action Requiring Adjustment. As a condition precedent to the taking of any action which would require an adjustment pursuant to this Section 13, the Company shall take any action which may be necessary, including obtaining regulatory, New York Stock Exchange, NASDAQ Stock Market or other applicable national securities exchange or stockholder approvals or exemptions, as applicable, in order that the Company may thereafter validly and legally issue as fully paid and nonassessable all shares of Common Stock that the Warrantholder is entitled to receive upon exercise of this Warrant pursuant to this Section 13.

(L)    Adjustment Rules. Any adjustments pursuant to this Section 13 shall be made successively whenever an event referred to herein shall occur. If an adjustment in Exercise Price made hereunder would reduce the Exercise Price to an amount below par value of the Common Stock, then such adjustment in Exercise Price made hereunder shall reduce the Exercise Price to the par value of the Common Stock.

14.    No Impairment. The Company will not, by amendment of its Charter or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Warrant and in taking of all such action as may be necessary or appropriate in order to protect the rights of the Warrantholder.

15.    Governing Law. **This Warrant will be governed by and construed in accordance with the federal law of the United States if and to the extent such law is applicable, and otherwise in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State. Each of the Company and the Warrantholder agrees (a) to submit to the exclusive jurisdiction and venue of the United States District Court for the District of Columbia for any civil action, suit or proceeding arising out of or relating to this Warrant or the transactions contemplated hereby, and (b) that notice may be served upon the Company at the address in Section 19**

14

**below and upon the Warrantholder at the address for the Warrantholder set forth in the registry maintained by the Company pursuant to Section 9 hereof. To the extent permitted by applicable law, each of the Company and the Warrantholder hereby unconditionally waives trial by jury in any civil legal action or proceeding relating to the Warrant or the transactions contemplated hereby or thereby.**

16.    Binding Effect. This Warrant shall be binding upon any successors or assigns of the Company.

17.    Amendments. This Warrant may be amended and the observance of any term of this Warrant may be waived only with the written consent of the Company and the Warrantholder.

18.    Prohibited Actions. The Company agrees that it will not take any action which would entitle the Warrantholder to an adjustment of the Exercise Price if the total number of shares of Common Stock issuable after such action upon exercise of this Warrant, together with all shares of Common Stock then outstanding and all shares of Common Stock then issuable upon the exercise of all outstanding options, warrants, conversion and other rights, would exceed the total number of shares of Common Stock then authorized by its Charter.

19.    Notices. Any notice, request, instruction or other document to be given hereunder by any party to the other will be in writing and will be deemed to have been duly given (a) on the date of delivery if delivered personally, or by facsimile, upon confirmation of receipt, or (b) on the second Business Day following the date of dispatch if delivered by a recognized next day courier service. All notices hereunder shall be delivered as set forth in Item 7 of Schedule A hereto, or pursuant to such other instructions as may be designated in writing by the party to receive such notice.

20.    Entire Agreement. This Warrant, the forms attached hereto and Schedule A hereto (the terms of which are incorporated by reference herein), and the Warrant Agreement (including all documents incorporated therein), contain the entire agreement between the parties with respect to the subject matter hereof and supersede all prior and contemporaneous arrangements or undertakings with respect thereto.

*[Remainder of page intentionally left blank]*

15

**[Form of Notice of Exercise]**

Date:

TO:　**Southwest Airlines Co. (the "Company")**

RE:　Exercise of Warrant

　　　The undersigned, pursuant to the provisions set forth in the attached Warrant, hereby notifies the Company of its intention to exercise its option with respect to the number of shares of the Common Stock set forth below covered by such Warrant. Pursuant to Section 4 of the Warrant, the undersigned acknowledges that the Company may settle this exercise in net cash or shares. Cash to be paid pursuant to a Net Cash Settlement or payment of fractional shares in connection with a Net Share Settlement should be deposited to the account of the Warrantholder set forth below. Common Stock to be delivered pursuant to a Net Share Settlement shall be delivered to the Warrantholder as indicated below. A new warrant evidencing the remaining shares of Common Stock covered by such Warrant, but not yet subscribed for and purchased, if any, should be issued in the name set forth below.

Number of Warrant Shares: _____

Aggregate Exercise Price:

Address for Delivery of Warrant Shares: _____

Wire Instructions:

　　　Proceeds to be delivered: **$**
　　　Name of Bank:
　　　City/ State of Bank:
　　　ABA Number of Bank
　　　SWIFT #
　　　Name of Account:
　　　Account Number at Bank:

Securities to be issued to:

If in book-entry form through the Depositary:

　Depositary Account Number:　　　　_____

　Name of Agent Member:　　　　　_____

If in certificated form:

Social Security Number or Other Identifying Number:    _____

Name:                 _____

Street Address:               _____

City, State and Zip Code:            _____

Any unexercised Warrants evidenced by the exercising Warrantholder's interest in the Warrant:

Social Security Number or Other Identifying Number:

Name:                 _____

Street Address:               _____

City, State and Zip Code:            _____

Holder:
By:
Name:    Title: _____

IN WITNESS WHEREOF, the Company has caused this Warrant to be duly executed by a duly authorized officer.

Dated:

**COMPANY:** <u>Southwest Airlines Co.</u>

By:  _____
   Name:
   Title:

**<u>Attest:</u>**

By:  _____
   Name:
   Title:

**[Signature Page to Warrant]**

**SCHEDULE A**

Item 1
Name: Southwest Airlines Co.
Corporate or other organizational form: Corporation
Jurisdiction of organization: Texas

Item 2
Exercise Price: $36.47

Item 3
Issue Date: April 20, 2020

Item 4
Date of Warrant Agreement between the Company and the United States Department of the
Treasury: April 20, 2020

Item 5
Number of shares of Common Stock: 1,258,232

Item 6
Company's address: Southwest Airline Co.
                2702 Love Field Drive
                Dallas, Texas 75235-1611

Item 7
Notice information of the Company:
        Southwest Airlines Co.
        P.O. Box 36611, HDQ-6TR
        Love Field
        Dallas, Texas 75235
        Telecopy Number: (214) 932-1322
        Attention: Treasurer
        E-mail: Capital_Markets-DG@wnco.com

        With a copy to:
        Southwest Airlines Co.
        Legal Department - HDQ-4GC
        2702 Love Field Drive
        Dallas, Texas 75235

Notice information of the Holder:

        United States Department of the Treasury

1500 Pennsylvania Avenue, NW, Room 2312
Washington, D.C., 20220
Attention: Assistant General Counsel (Banking and Finance)
Telephone Number: (202) 622-0283
Email: eric.froman@treasury.gov

**SCHEDULE 1**

**WARRANT SHARES FORMULA**

The number of Warrant Shares for which Warrants issued on each Warrant Closing Date shall be exercisable shall equal:

(i)     On the Closing Date, the quotient of (x) the product of the principal amount of the Promissory Note multiplied *by* 0.1 *divided by* (y) the Exercise Price (as defined in Annex B); and

(ii)    On each subsequent Warrant Closing Date, the quotient of (x) the product of the amount by which the principal amount of the Promissory Note is increased on such Warrant Closing Date multiplied *by* 0.1 *divided by* (y) the Exercise Price.

**SCHEDULE 2**

## <u>CAPITALIZATION</u>

Southwest Airlines Co.'s capitalization as of March 31, 2020**:**

| Shares Authorized | 2,000,000,000 |
|---|---|
|  |  |
| Issued Shares | 807,611,634 |
| Treasury Shares | (298,842,909) |
| Shares Outstanding | 508,768,725 |

**SCHEDULE 3**

## <u>REQUIRED STOCKHOLDER APPROVALS</u>

None.

Execution Version

**PROMISSORY NOTE**

THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.

Reference is made to that certain Payroll Support Program Agreement ("PSP Agreement") dated as of the date hereof by and among Southwest Airlines Co., a corporation organized under the laws of Texas ("Issuer"), having an office at 2702 Love Field Drive, Dallas, Texas 75235-1611 and the United States Department of the Treasury ("Treasury"), having an office at 1500 Pennsylvania Avenue, NW, Washington, D.C. 20220, entered into by Issuer and Treasury pursuant to the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136 (Mar. 27, 2020) ("CARES Act").

WHEREAS, Issuer has requested that Treasury provide financial assistance to the Issuer and certain of its Affiliates (as defined below) that are Recipients (as defined in the PSP Agreement) that shall be used for the continuation of payment of employee wages, salaries, and benefits as is permissible under Section 4112(a) of the CARES Act.

WHEREAS, as appropriate compensation to the Federal Government of the United States of America for the provision of financial assistance under the PSP Agreement, Issuer has agreed to issue this Promissory Note ("Note") to Treasury on the terms and conditions set forth herein.

FOR VALUE RECEIVED, Issuer unconditionally promises to pay to the Holder (as defined below) the principal sum of $458,877,258.00, subject to increases and/or decreases made pursuant to Section 2.1, as permissible under the PSP Agreement, or Section 2.3, in each case as noted by the Holder in Schedule I (the "Principal Amount"), outstanding hereunder, together with all accrued interest thereon on the Maturity Date (as defined below) as provided in this Note. Notations made by the Holder in Schedule I shall be final and conclusive absent manifest error; provided, however, that any failure by the Holder to make such notations or any error by omission by the Holder in this regard shall not affect the obligation of the Issuer to pay the full amount of the principal of and interest on the Note or any other amount owing hereunder.

## 1 **DEFINITIONS**

1.1 Defined Terms. As used in this Note, capitalized terms have the meanings specified in Annex A.

1.2 Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." The word "or" is not exclusive. The word "year" shall refer (i) in the case of a leap year, to a year of three hundred sixty-six (366) days, and (ii) otherwise, to a year of three hundred sixty-five (365) days. Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Note in its entirety and not to any particular provision hereof, (d) all references herein to Sections, Annexes and Schedules shall be construed to refer to Sections of, and Annexes and Schedules to, this Note, (e) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

1.3 Accounting Terms. All accounting terms not otherwise defined herein shall be construed in conformity with GAAP, as in effect from time to time.

## 2 **NOTE**

2.1 Principal Amount. Upon any disbursement to the Issuer under the PSP Agreement after the Closing Date, the Principal Amount of this Note shall be increased in an amount equal to 30% of any such disbursement; provided,

1

Execution Version

however, that no increases in the Principal Amount of this Note shall occur pursuant to this Section until the aggregate principal amount of any disbursements to the Issuer under the PSP Agreement is greater than $100,000,000.

2.2 Maturity Date. The aggregate unpaid principal amount of the Note, all accrued and unpaid interest, and all other amounts payable under this Note shall be due and payable on the Maturity Date, unless otherwise provided in Section 5.1.

2.3 Prepayments.

(a)     Optional Prepayments. The Issuer may, upon written notice to the Holder, at any time and from time to time prepay the Note in whole or in part without premium or penalty in a minimum aggregate principal amount equal to the lesser of $5,000,000 and the Principal Amount outstanding.

(b)     Mandatory Prepayments. If a Change of Control occurs, within thirty (30) days following the occurrence of such Change of Control, the Issuer shall prepay the aggregate principal amount outstanding under the Note and any accrued interest or other amounts owing under the Note. The Issuer will not, and will not permit any Subsidiary to, enter into any Contractual Obligation (other than this Note) that, directly or indirectly, restricts the ability of the Issuer or any Subsidiary to make such prepayment hereunder.

2.4 Interest.

(a)     Interest Rate. Subject to paragraph (b) of this Section, the Note shall bear interest on the Principal Amount outstanding from time to time at a rate per annum equal to 1.00% until the fifth anniversary of the Closing Date, and the Applicable SOFR Rate plus 2.00% thereafter until the Maturity Date. All interest hereunder shall be computed on the basis of the actual number of days in each interest period and a year of 365 or 366 days, as applicable, until the fifth anniversary of the Closing Date and computed in a manner determined by the Holder thereafter, based on prevailing customary market conventions for the use of the Applicable SOFR Rate in floating-rate debt instruments at the time of the announcement of the Applicable SOFR Rate. Each interest period will be from, and including, the Closing Date, or from and including the most recent interest payment date to which interest has been paid or provided for, to, but excluding the next interest payment date.

(b)     Default Interest. If any amount payable by the Issuer or any Guarantor under this Note (including principal of the Note, interest, fees or other amount) is not paid when due, whether at stated maturity, upon acceleration or otherwise, such amount shall thereafter bear interest at a rate per annum equal to the applicable Default Rate. While any Event of Default exists, the Issuer or any Guarantor shall pay interest on the principal amount of the Note outstanding hereunder at a rate per annum equal to the applicable Default Rate.

(c)     Payment Dates. Accrued interest on the Note shall be payable in arrears on the last Business Day of March and September of each year, beginning with September 30, 2020, and on the Maturity Date and at such other times as may be specified herein; provided that (i) interest accrued pursuant to paragraph (b) of this Section shall be payable on demand and (ii) in the event of any repayment or prepayment of the Note, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(d)     SOFR Fallback. If, at any time, the Holder or its designee determines that a Benchmark Transition Event has occurred with respect to the Applicable SOFR Rate or SOFR, or any successor rate, the Holder or its designee will designate a Benchmark Replacement and, as applicable, make Benchmark Conforming Changes in a manner consistent with the methodology set forth in the ARRC Fallback Provisions. Any determination, decision or election that may be made by the Holder or its designee pursuant to this Section 2.4(d), and any decision to take or refrain from taking any action or making any determination, decision or election arising out of or relating to this Section 2.4(d), shall be conclusive and binding absent manifest error, may be made by the Holder or its designee in its sole discretion, and, notwithstanding anything to the contrary in this Note, shall become effective without the consent of the Issuer, any Guarantor or any other party. Any terms used in this Section 2.4(d) but not defined in this Note shall be construed in a manner consistent with the ARRC Fallback Provisions.

2.5 Payments Generally.

(a) Payments by Issuer. All payments to be made by the Issuer hereunder shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, (i) for so long as Treasury is the Holder of this Note, each payment under this Note shall be paid in immediately available funds by electronic funds transfer to the account of the United States Treasury maintained at the Federal Reserve Bank of New York specified by Treasury in a written notice to the Issuer, or to such other account as may be specified from time to time by Treasury in a written notice to the Issuer, or (ii) in the event that Treasury is not the Holder of this

2

Execution Version

Note, then each payment under this Note shall be made in immediately available funds by electronic funds transfer to such account as shall be specified by the Holder in a written notice to the Issuer, in each case not later than 12:00 noon (Washington, D.C. time) on the date specified herein. All amounts received by the Holder after such time on any date shall be deemed to have been received on the next succeeding Business Day and any applicable interest or fees shall continue to accrue. If any payment to be made by the Issuer shall fall due on a day that is not a Business Day, payment shall be made on the next succeeding Business Day and such extension of time shall be reflected in computing interest or fees, as the case may be; provided that, if such next succeeding Business Day would fall after the Maturity Date, payment shall be made on the immediately preceding Business Day. Except as otherwise expressly provided herein, all payments hereunder shall be made in Dollars.

(b) Application of Insufficient Payments. If at any time insufficient funds are received by and available to the Holder to pay fully all amounts of principal, interest, fees and other amounts then due hereunder, such funds shall be applied (i) first, to pay interest, fees and other amounts then due hereunder, and (ii) second, to pay principal then due hereunder.

## 3 REPRESENTATIONS AND WARRANTIES

The Issuer and each Guarantor represents and warrants to the Holder on the Closing Date and is deemed to represent and warrant to the Holder on any date on which the amount of the Note is increased pursuant to the terms hereof and in accordance with the PSP Agreement that:

3.1 Existence, Qualification and Power. The Issuer, each Guarantor and each Subsidiary (a) is duly organized or formed, validly existing and, as applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Note, and (c) is duly qualified and is licensed and, as applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license, except, in each case referred to in clause (a) (other than with respect to the Issuer and each Guarantor), (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

3.2 Authorization; No Contravention. The execution, delivery and performance by the Issuer and each Guarantor of the Note have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of its Organizational Documents, (b) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any material Contractual Obligation to which the Issuer or any Guarantor is a party or affecting the Issuer or any Guarantor or the material properties of the Issuer, any Guarantor or any Subsidiary or (ii) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which the Issuer, the Guarantor or any Subsidiary or its property is subject or
(c) violate any Law, except to the extent that such violation could not reasonably be expected to have a Material Adverse Effect.

3.3 Governmental Authorization; Other Consents. No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, the Issuer or any Guarantor of this Note, except for such approvals, consents, exemptions, authorizations, actions or notices that have been duly obtained, taken or made and in full force and effect.

3.4 Execution and Delivery; Binding Effect. This Note has been duly executed and delivered by the Issuer and each Guarantor. This Note constitutes a legal, valid and binding obligation of the Issuer and each Guarantor, enforceable against the Issuer and each Guarantor in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, receivership, moratorium or other Laws affecting creditors' rights generally and by general principles of equity.

## 4 COVENANTS

Until all Obligations shall have been paid in full or until any later date as provided for in this Note, the Issuer covenants and agrees with the Holder that:

4.1 Notices. The Issuer will promptly notify the Holder of the occurrence of any Default.

4.2 Guarantors. The Guarantors listed on the signature page to this Note hereby Guarantee the Guaranteed Obligations as set forth in Annex B. If any Subsidiary (other than an Excluded Subsidiary) is formed or acquired after

3

Execution Version

the Closing Date or if any Subsidiary ceases to be an Excluded Subsidiary, then the Issuer will cause such Subsidiary to become a Guarantor of this Note within 30 days of such Subsidiary being formed or acquired or of such Subsidiary ceasing to be an Excluded Subsidiary pursuant to customary documentation reasonably acceptable to the Holder and on the terms and conditions set forth in Annex B.

4.3 <u>Pari Passu Ranking.</u> The Obligations of the Issuer and any Guaranteed Obligations of any Guarantor under this Note shall be unsecured obligations of the Issuer and any Guarantor ranking *pari passu* with all existing and future senior unsecured Indebtedness of the Issuer or any Guarantor that is not subordinated in right of payment to the holder or lender of such Indebtedness.

## 5 **EVENTS OF DEFAULT**

5.1 <u>Events of Default.</u> If any of the following events (each, an <u>"Event of Default"</u>) shall occur:

(a)    the Issuer shall fail to pay any principal of the Note when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)    the Issuer shall fail to pay any interest on the Note, or any fee or any other amount (other than an amount referred to in clause (a) of this Section) payable under this Note, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of two (2) or more Business Days;

(c)    any representation or warranty made or deemed made by or on behalf of the Issuer or any Guarantor, including those made prior to the Closing Date, in or in connection with this Note or any amendment or modification hereof, or any waiver hereunder, or in the PSP Agreement, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Note, the PSP Agreement or the PSP Application or any amendment or modification hereof or thereof, or any waiver hereunder or thereunder, shall prove to have been incorrect in any material respect (or, in the case of any such representation or warranty under this Note already qualified by materiality, such representation or warranty shall prove to have been incorrect) when made or deemed made;

(d)    the Issuer shall fail to observe or perform any covenant, condition or agreement contained in Section 4.1;

(e)    the Issuer or any Guarantor shall fail to observe or perform any covenant, condition or agreement contained in this Note (other than those specified in clause (a), (b) or (d) of this Section) and such failure shall continue unremedied for a period of 30 or more days after notice thereof by the Holder to the Issuer;

(f)    (i) the Issuer or any Guarantor shall default in the performance of any obligation relating to any Indebtedness (other than Indebtedness under the Note) having an aggregate principal amount equal to or greater than $145,000,000.00 (<u>"Material Indebtedness"</u>) and any applicable grace periods shall have expired and any applicable notice requirements shall have been complied with, and as a result of such default the holder or holders of such Material Indebtedness or any trustee or agent on behalf of such holder or holders shall have caused such Material Indebtedness to become due prior to its scheduled final maturity date or (ii) the Issuer or any Guarantor shall default in the payment of the outstanding principal amount due on the scheduled final maturity date of any Indebtedness outstanding under one or more agreements of the Issuer or any Guarantor, any applicable grace periods shall have expired and any applicable notice requirements shall have been complied with and such failure to make payment when due shall be continuing for a period of more than five (5) consecutive Business Days following the applicable scheduled final maturity date or the applicable grace period thereunder, in an aggregate principal amount at any single time unpaid exceeding $145,000,000.00;

(g)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Issuer, any Guarantor or any Subsidiary or its debts, or of a substantial part of its assets, under any Debtor Relief Law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Issuer or any of its Subsidiaries or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for a period of 60 or more days or an order or decree approving or ordering any of the foregoing shall be entered;

(h)    the Issuer, any Guarantor or any Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Debtor Relief Law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (g) of this Section, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Issuer, any Guarantor or any Subsidiary or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding or (v) make a general assignment for the benefit of creditors;

4

Execution Version

(i)    the Issuer, any Guarantor or any Subsidiary shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(j)    there is entered against the Issuer, any Guarantor or any Subsidiary (i) a final judgment or order for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding an amount equal to or greater than $145,000,000.00 (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied or failed to acknowledge coverage), or (ii) a non-monetary final judgment or order that, either individually or in the aggregate, has or could reasonably be expected to have a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of 30 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; or

(k)    any material provision of the Note, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or satisfaction in full of all Obligations, ceases to be in full force and effect; or the Issuer, any Guarantor or any other Person contests in writing the validity or enforceability of any provision of the Note; or the Issuer or any Guarantor denies in writing that it has any or further liability or obligation under the Note, or purports in writing to revoke, terminate or rescind the Note;

then, and in every such event (other than an event with respect to the Issuer or any Guarantor described in clause (g) or (h) of this Section), and at any time thereafter during the continuance of such event, the Holder may, by notice to the Issuer, take any or all of the following actions, at the same or different times:

(i)    declare any amounts then outstanding under the Note to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Note so declared to be due and payable, together with accrued interest thereon and all fees and other Obligations of the Issuer accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Issuer and any Guarantor; and

(ii)    exercise on all rights and remedies available to it under the Note and Applicable Law;

provided that, in case of any event with respect to the Issuer or any Guarantor described in clause (g) or (h) of this Section, the principal of the Note then outstanding, together with accrued interest thereon and all fees and other Obligations accrued hereunder, shall automatically become due and payable, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Issuer and any Guarantor.

## 6 MISCELLANEOUS

6.1 Notices.

(a) Notices Generally. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by email as follows:

(i)    if to the Issuer or any Guarantor, to Southwest Airlines Co. at P.O. Box 36611, HDQ-6TR, Love Field, Dallas, Texas 75235, Attention of Treasurer (Telecopy No. (214) 932-1322; Email: Capital_Markets-DG@wnco.com), with a copy to Southwest Airlines Co., Attention of Legal Department – HDQ-4GC, 2702 Love Field Drive, Dallas, Texas 75235;

(ii)    if to the Holder, to the Department of the Treasury at 1500 Pennsylvania Avenue, NW, Room 2312, Washington, D.C. 20220, Attention of Assistant General Counsel (Banking and Finance) (Telephone No. (202) 622-0283; Email: eric.froman@treasury.gov); and

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received. Notices delivered through electronic communications, to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b).

(b) Electronic Communications. Notices and other communications to the Holder hereunder may be delivered or furnished by electronic communication (including e-mail, FpML, and Internet or intranet websites) pursuant to procedures approved by the Holder. The Holder, the Issuer or any Guarantor may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

5

Execution Version

Unless the Holder otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by return email or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day.

6.2 Waivers; Amendments.

(a)No Waiver; Remedies Cumulative; Enforcement. No failure or delay by the Holder in exercising any right, remedy, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, remedy, power or privilege, or any abandonment or discontinuance of steps to enforce such a right remedy, power or privilege, preclude any other or further exercise thereof or the exercise of any other right remedy, power or privilege. The rights, remedies, powers and privileges of the Holder hereunder and under the Note are cumulative and are not exclusive of any rights, remedies, powers or privileges that any such Person would otherwise have.

(b)Amendments, Etc. Except as otherwise expressly set forth in this Note, no amendment or waiver of any provision of this Note, and no consent to any departure by the Issuer therefrom, shall be effective unless in writing executed by the Issuer and the Holder, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

6.3 Expenses; Indemnity; Damage Waiver.

(a)Costs and Expenses. The Issuer shall pay (i) all reasonable out-of-pocket expenses incurred by the Holder (including the reasonable fees, charges and disbursements of any counsel for the Holder) in connection with the preparation, negotiation, execution, delivery and administration of this Note and the PSP Agreement, any other agreements or documents executed in connection herewith or therewith, or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii) all out-of-pocket expenses incurred by the Holder (including the fees, charges and disbursements of any counsel for the Holder), in connection with the enforcement or protection of its rights in connection with this Note and the PSP Agreement, any other agreements or documents executed in connection herewith or therewith, or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), including all such out-of-pocket expenses incurred during any workout, restructuring, negotiations or enforcement in respect of such Note, PSP Agreement and other agreements or documents executed in connection herewith or therewith.

(b)Indemnification by the Issuer. The Issuer shall indemnify the Holder and each of its Related Parties (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities, obligations, penalties, fines, settlements, judgments, disbursements and related costs and expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any Person (including the Issuer) arising out of, in connection with, or as a result of (i) the execution or delivery of this Note or any agreement or instrument contemplated hereby, the performance by the Issuer or any Guarantor of its obligations hereunder or the consummation of the transactions contemplated hereby, (ii) the Note or the use or proposed use of the proceeds therefrom, or (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Issuer or any Guarantor, and regardless of whether any Indemnitee is a party thereto.

(c)Waiver of Consequential Damages, Etc. To the fullest extent permitted by Applicable Law, the Issuer and any Guarantor shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Note or any agreement or instrument contemplated hereby, the transactions contemplated hereby, or the use of the proceeds thereof. No Indemnitee referred to in paragraph (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Note or the transactions contemplated hereby.

(d)                                        Payments. All amounts due under this Section shall be payable not later than five (5) days after demand

therefor.

6

Execution Version

(e) <u>Survival.</u> Each party's obligations under this Section shall survive the termination of the Note and payment of the obligations hereunder.

6.4 <u>Successors and Assigns.</u> Neither the Issuer nor any Guarantor may assign or transfer this Note or any of its rights or obligations hereunder and any purported assignment or transfer in violation of this Note shall be void. Holder may assign or participate a portion or all of its rights under this Note at any time in compliance with all Applicable Laws. This Note shall inure to the benefit of and be binding upon Issuer, any Guarantor and Holder and their permitted successors and assigns. Any Holder that assigns, or sells participations in, any portion of the Note will take such actions as are necessary for the Note and such portion to be in "registered form" (within the meaning of Treasury Regulations Section 5f.103-1).

6.5 <u>Counterparts; Integration; Effectiveness.</u> This Note and any amendments, waivers, consents or supplements hereto may be executed in counterparts, each of which shall constitute an original, but all taken together shall constitute a single contract. This Note constitutes the entire contract between Issuer, any Guarantor and the Holder with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto. Notwithstanding anything herein to the contrary, delivery of an executed counterpart of a signature page of this Note by electronic means shall be effective as delivery of a manually executed counterpart of this Note.

6.6 <u>Severability.</u> If any term or provision of this Note is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Note or invalidate or render unenforceable such term or provision in any other jurisdiction.

6.7 <u>Right of Setoff.</u> If an Event of Default shall have occurred and be continuing, the Holder is hereby authorized at any time and from time to time, to the fullest extent permitted by Applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held, and other obligations (in whatever currency) at any time owing, by the Holder, to or for the credit or the account of the Issuer against any and all of the due and unpaid Obligations of the Issuer now or hereafter existing under this Note to the Holder, irrespective of whether or not the Holder shall have made any demand under this Note. The rights of the Holder under this Section are in addition to other rights and remedies (including other rights of setoff) that the Holder may have. The Holder agrees to notify the Issuer promptly after any such setoff and application; <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application.

6.8 <u>Governing Law; Jurisdiction; Etc.</u> This Note will be governed by and construed in accordance with the federal law of the United States if and to the extent such law is applicable, and otherwise in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State. Each of the Issuer, any Guarantor and the Holder agrees (a) to submit to the exclusive jurisdiction and venue of the United States District Court for the District of Columbia for any civil action, suit or proceeding arising out of or relating to this Note or the transactions contemplated hereby, and (b) that notice may be served upon the Issuer, any Guarantor or the Holder at the applicable address in Section 6.1 hereof (or upon any Holder that is not Treasury at an address provided by such Holder to Issuer in writing). To the extent permitted by Applicable Law, each of the Issuer, any Guarantor and the Holder hereby unconditionally waives trial by jury in any civil legal action or proceeding relating to the Note or the transactions contemplated hereby.

6.9 <u>Headings.</u> Section headings used herein are for convenience of reference only, are not part of this Note and shall not affect the construction of, or be taken into consideration in interpreting, this Note.

IN WITNESS WHEREOF, the Issuer has executed this Note as of the day and year written below.

SOUTHWEST AIRLINES CO.
as Issuer


By /s/ Tammy Romo
Name: Tammy Romo
Title: Executive Vice President and
Chief Financial Officer
Date: April 20, 2020

Execution Version

**ANNEX A**
DEFINITIONS

"Affiliate" means any Person that directly or indirectly Controls, is Controlled by, or is under common Control with, the Issuer.

"Applicable Law" means, as to any Person, all applicable Laws binding upon such Person or to which such a Person is subject.

"Applicable SOFR Rate" means a rate of interest based on SOFR that shall be determined by the Holder and publicly announced by the Holder on or prior to the fifth anniversary of the Closing Date and shall, to the extent reasonably practicable, be based on customary market conventions as in effect at the time of such announcement. In no event will the Applicable SOFR Rate be less than 0.00% per annum.

"ARRC Fallback Provisions" means the Fallback Language for New Issuances of LIBOR Floating Rate Notes set forth in the ARRC Recommendations Regarding More Robust Fallback Language for New Issuances of LIBOR Floating Rate Notes, dated April 25, 2019.

"ASU" means the Accounting Standards Update 2016-02, Leases (Topic 842) by the Financial Accounting Standards Board issued on February 25, 2016.

"Beneficial Owner" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time. The terms "Beneficially Owns" and "Beneficially Owned" have a corresponding meaning.

"Business Day" means any on which Treasury and the Federal Reserve Bank of New York are both open for business.

"Capitalized Lease Obligations" means, at the time any determination thereof is to be made, the amount of the liability in respect of a Capitalized Lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) prepared in accordance with GAAP; provided that all leases of such Person that are or would have been treated as operating leases for purposes of GAAP prior to the issuance of the ASU shall continue to be accounted for as operating leases for purposes of all financial definitions and calculations for purposes of this Note (whether or not such operating lease obligations were in effect on such date) notwithstanding the fact that such obligations are required in accordance with the ASU (on a prospective or retroactive basis or otherwise) to be treated as capitalized lease obligations for other purposes.

"Capitalized Leases" means all leases that have been or should be, in accordance with GAAP as in effect on the Closing Date, recorded as capitalized leases; provided that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP; provided, further, that all leases of such Person that are or would have been treated as operating leases for purposes of GAAP prior to the issuance of the ASU shall continue to be accounted for as operating leases for purposes of all financial definitions and calculations for purposes of this Note (whether or not such operating lease obligations were in effect on such date) notwithstanding the fact that such obligations are required in accordance with the ASU (on a prospective or retroactive basis or otherwise) to be treated as capitalized lease obligations for other purposes.

"CARES Act" has the meaning specified in the preamble to this Note.

"Change of Control" means the occurrence of any of the following: (a) the sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of the Issuer and its Subsidiaries, or if the Issuer is a Subsidiary of any Guarantor, such Guarantor (the "Parent Guarantor") and its Subsidiaries, taken as a whole to any Person (including any "person" (as that term is used in Section 13(d)(3) of the Exchange Act)); or (b) the consummation of any transaction (including, without limitation, any merger or consolidation, the result of which is that any Person (including any "person" (as defined above)) becomes the Beneficial Owner, directly or indirectly, of more than 50% of the Voting Stock of the Issuer or Parent Guarantor, as applicable, (measured by voting power rather than number of shares), other than (i) any such transaction where the Voting Stock of the Issuer or Parent Guarantor, as applicable, (measured by voting power rather than number of shares) outstanding immediately prior to such transaction

Annex A-1

Execution Version

constitutes or is converted into or exchanged for at least a majority of the outstanding shares of the Voting Stock of such Beneficial Owner (measured by voting power rather than number of shares), or (ii) any merger or consolidation of the Issuer or Parent Guarantor, as applicable, with or into any Person (including any "person" (as defined above)) which owns or operates (directly or indirectly through a contractual arrangement) a Permitted Business (a "Permitted Person") or a Subsidiary of a Permitted Person, in each case, if immediately after such transaction no Person (including any "person" (as defined above)) is the Beneficial Owner, directly or indirectly, of more than 50% of the total Voting Stock of such Permitted Person (measured by voting power rather than number of shares).

"Closing Date" means the date set forth on the Issuer's and each Guarantor's signature page to this Note.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings analogous thereto.

"Debtor Relief Laws" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means an interest rate (before as well as after judgment) equal to the interest rate on the Note plus 2.00% per annum.

"Disqualified Equity Interest" means any equity interest that, by its terms (or the terms of any security or other equity interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for equity interests that are not Disqualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of Control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of Control or asset sale event shall be subject to the prior repayment in full of the Note and all other Obligations that are accrued and payable), (b) is redeemable at the option of the holder thereof, in whole or in part, (c) provides for scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other equity interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one days after the Maturity Date; provided that if such equity interests are issued pursuant to a plan for the benefit of employees of the Issuer or any Subsidiary or by any such plan to such employees, such equity interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by the Issuer or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability.

"Dollar" and "$" mean lawful money of the United States.

"Event of Default" has the meaning specified in Section 5.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Excluded Subsidiary" means any Subsidiary of the Issuer that is not an obligor in respect of any Material Indebtedness that is unsecured of the Issuer or any of its Subsidiaries, unless such Subsidiary is required to be an obligor under any agreement, instrument or other document relating to any Material Indebtedness that is unsecured of the Issuer or any of its Subsidiaries.

"GAAP" means United States generally accepted accounting principles as in effect as of the date of determination thereof. Notwithstanding any other provision contained herein, (a) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under FASB Accounting Standards Codification 825-Financial Instruments, or any successor thereto (including pursuant to the FASB Accounting Standards Codification), to value any Indebtedness of any subsidiary at "fair value," as defined therein and (b) the amount of any Indebtedness under GAAP with respect to Capitalized Lease Obligations shall be determined in accordance with the definition of Capitalized Lease Obligations.

Annex A-2

Execution Version

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part) or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guaranteed Obligations" has the meaning specified in Annex B.

"Guarantor" means each Guarantor listed on the signature page to this Note and any other Person that Guarantees this Note.

"Holder" means the United States Department of the Treasury or its designees or any other Person that shall have rights pursuant to an assignment hereunder.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP: (a) all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments; (b) all direct or contingent obligations of such Person arising under (i) letters of credit (including standby and commercial), bankers' acceptances and bank guaranties and (ii) surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person; (c) net obligations of such Person under any swap contract; (d) all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business); (e) indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse; (f) attributable indebtedness in respect of any Capitalized Lease Obligation and any synthetic lease obligation of any Person; (g) all obligations of such Person in respect of Disqualified Equity Interests; and (h) all Guarantees of such Person in respect of any of the foregoing. For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person. The amount of any net obligation under any swap contract on any date shall be deemed to be the swap termination value thereof as of such date. The amount of any Indebtedness of any Person for purposes of clause (e) that is expressly made non-recourse or limited-recourse (limited solely to the assets securing such Indebtedness) to such Person shall be deemed to be equal to the lesser of (i) the aggregate principal amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"Indemnitee" has the meaning specified in Section 6.3(b).

"Issuer" has the meaning specified in the preamble to this Note.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or

Annex A-3

Execution Version

administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lien" means any mortgage, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect on, the operations, business, properties, liabilities (actual or contingent), condition (financial or otherwise) or prospects of the Issuer and its Subsidiaries taken as a whole; or (b) a material adverse effect on (i) the ability of the Issuer or any Guarantor to perform its Obligations, (ii) the legality, validity, binding effect or enforceability against the Issuer or any Guarantors of the Note or (iii) the rights, remedies and benefits available to, or conferred upon, the Holder under the Note.

"Material Indebtedness" has the meaning specified in Section 5.1(f).

"Maturity Date" means the date that is ten years after the Closing Date (except that, if such date is not a Business Day, the Maturity Date shall be the next preceding Business Day).

"Note" has the meaning specified in the preamble to this Note.

"Obligations" means all advances to, and debts, liabilities, obligations, covenants and duties of, the Issuer arising under or otherwise with respect to the Note, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against the Issuer or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding. Without limiting the foregoing, the Obligations include (a) the obligation to pay principal, interest, charges, expenses, fees, indemnities and other amounts payable by the Issuer under the Note and (b) the obligation of the Issuer to reimburse any amount in respect of any of the foregoing that the Holder, in each case in its sole discretion, may elect to pay or advance on behalf of the Issuer.

"Obligee Guarantor" has the meaning specified in Annex B.

"Organizational Documents" means (a) as to any corporation, the charter or certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction), (b) as to any limited liability company, the certificate or articles of formation or organization and operating or limited liability agreement and (c) as to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Permitted Business" means any business that is the same as, or reasonably related, ancillary, supportive or complementary to, the business in which the Issuer and its Subsidiaries are engaged on the date of this Note.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Principal Amount" has the meaning specified in the preamble to this Note.

"PSP Agreement" has the meaning specified in the preamble to this Note.

"PSP Application" means the application form and any related materials submitted by the Issuer to Treasury in connection with an application for financial assistance under Division A, Title IV, Subtitle B of the CARES Act.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the agents, advisors and representatives of such Person and of such Person's Affiliates.

"SOFR" means the secured overnight financing rate published by the Federal Reserve Bank of New York, as administrator of the benchmark (or a successor administrator) on the Federal Reserve Bank of New York's (or such successor's) website.

Execution Version

"Subsidiary" of a Person means a corporation, partnership, limited liability company, association or joint venture or other business entity of which a majority of the equity interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time owned or the management of which is Controlled, directly, or indirectly through one or more intermediaries, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Issuer.

"Treasury" has the meaning specified in the preamble to this Note.

"United States" and "U.S." mean the United States of America.

"Voting Stock" of any specified Person as of any date means the equity interests of such Person that is at the time entitled to vote in the election of the board of directors of such Person.

Annex A-5

Execution Version

**ANNEX B**

GUARANTEE

1.        Guarantee of the Obligations. Each Guarantor jointly and severally hereby irrevocably and unconditionally guarantees to the Holder, the due and punctual payment in full of all Obligations (or such lesser amount as agreed by the Holder in its sole discretion) when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) (collectively, the "Guaranteed Obligations").

2.        Payment by a Guarantor. Each Guarantor hereby jointly and severally agrees, in furtherance of the foregoing and not in limitation of any other right which the Holder may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of the Issuer to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), such Guarantor will upon demand pay, or cause to be paid, in cash, to the Holder an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for the Issuer's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against the Issuer for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to the Holder as aforesaid.

3.        Liability of Guarantors Absolute. Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations. In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)      this Guarantee is a guarantee of payment when due and not of collectability;

(b)      the Holder may enforce this Guarantee upon the occurrence of an Event of Default notwithstanding the existence of any dispute between the Issuer and the Holder with respect to the existence of such Event of Default;

(c)      a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against the Issuer or any other Guarantors and whether or not Issuer or such Guarantors are joined in any such action or actions;

(d)      payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any other Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid;

(e)      the Holder, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or subordinate the payment of the same to the payment of any other obligations; (iii) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guarantees of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; and (iv) enforce its rights and remedies even though such action may operate to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against the Issuer or any security for the Guaranteed Obligations; and

(f)      this Guarantee and the obligations of each Guarantor hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following: (i) any failure, delay or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy with respect to the Guaranteed Obligations, or with respect to any security for the payment of the Guaranteed

Annex B-1

Execution Version

Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions hereof; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the Holder's consent to the change, reorganization or termination of the corporate structure or existence of the Issuer or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (v) any defenses, set-offs or counterclaims which the Issuer or any Guarantor may allege or assert against the Holder in respect of the Guaranteed Obligations, including failure of consideration, lack of authority, validity or enforceability, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (vi) any other event or circumstance that might in any manner vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

4.      Waivers by Guarantors. Each Guarantor hereby waives, for the benefit of the Holder: (a) any right to require the Holder, as a condition of payment or performance by such Guarantor, to (i) proceed against Issuer, any Guarantor or any other Person; (ii) proceed against or exhaust any security in favor of the Holder; or (iii) pursue any other remedy in the power of the Holder whatsoever or (b) presentment to, demand for payment from and protest to the Issuer or any Guarantor or notice of acceptance; and (c) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

5.      Guarantors' Rights of Subrogation, Contribution, etc. Until the Guaranteed Obligations shall have been paid in full, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against the Issuer or any other Guarantor or any of its assets in connection with this Guarantee or the performance by such Guarantor of its obligations hereunder, including without limitation (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against the Issuer with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that the Holder now has or may hereafter have against the Issuer, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by the Holder. In addition, until the Guaranteed Obligations shall have been paid in full, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations. If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and paid in full, such amount shall be held in trust for the Holder and shall forthwith be paid over to the Holder to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

6.      Subordination. Any Indebtedness of the Issuer or any Guarantor now or hereafter held by any Guarantor (the "Obligee Guarantor") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for the Holder and shall forthwith be paid over to the Holder to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

7.      Continuing Guarantee. This Guarantee is a continuing guarantee and shall remain in effect until all of the Guaranteed Obligations shall have been paid in full. Each Guarantor hereby irrevocably waives any right to revoke this Guarantee as to future transactions giving rise to any Guaranteed Obligations.

8.      Financial Condition of the Issuer. The Note may be issued to the Issuer without notice to or authorization from any Guarantor regardless of the financial or other condition of the Issuer at the time of such grant. Each Guarantor has adequate means to obtain information from the Issuer on a continuing basis concerning the financial condition of the Issuer and its ability to perform its obligations under the Note, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Issuer and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.

9.      Reinstatement. In the event that all or any portion of the Guaranteed Obligations are paid by the Issuer or any Guarantor, the obligations of any other Guarantor hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from the Holder as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

10.     Discharge of Guarantee Upon Sale of the Guarantor. If, in compliance with the terms and provisions of the Note, all of the capital stock of any Guarantor that is a Subsidiary of the Issuer or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) to any Person (other than to

Annex B-2

Execution Version

the Issuer or to any other Guarantor), the Guarantee of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any beneficiary or any other Person effective as of the time of such asset sale.

Annex B-3

**SCHEDULE I**

| Date | Current Outstanding Principal Amount | Increase or Decrease in Outstanding Principal Amount | Resulting Outstanding Principal Amount | Notation Made By |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Schedule I

CERTIFICATION

I, Gary C. Kelly, Chief Executive Officer of Southwest Airlines Co., certify that:

1.      I have reviewed this quarterly report on Form 10-Q for the quarter ended March 31, 2020 of Southwest Airlines Co.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

 (a)      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)      disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: April 28, 2020

By:    /s/ Gary C. Kelly
       Gary C. Kelly
       Chief Executive Officer

Exhibit 31.2

CERTIFICATION

I, Tammy Romo, Chief Financial Officer of Southwest Airlines Co., certify that:

1.      I have reviewed this quarterly report on Form 10-Q for the quarter ended March 31, 2020 of Southwest Airlines Co.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

 (a)       designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)       designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)       evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)       disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)       all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)       any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: April 28, 2020

By:   /s/ Tammy Romo
      Tammy Romo
      Chief Financial Officer

Exhibit 32.1

CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350,

AS ADOPTED PURSUANT TO

SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report on Form 10-Q of Southwest Airlines Co. (the "Company") for the period ended March 31, 2020 as filed with the Securities and Exchange Commission (the "Report"), Gary C. Kelly, Chief Executive Officer of the Company, and Tammy Romo, Chief Financial Officer of the Company, each certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:  April 28, 2020

By:     /s/ Gary C. Kelly
        Gary C. Kelly
        Chief Executive Officer


By:     /s/ Tammy Romo
        Tammy Romo
        Chief Financial Officer