# Exhibit 5

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2020

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File No. 1-7259



**SOUTHWEST AIRLINES CO.**

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Texas | 74-1563240 |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |
| P.O. Box 36611 | |
| Dallas, Texas | 75235-1611 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:  **(214) 792-4000**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common Stock ($1.00 par value) | LUV | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).  Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of the common stock held by non-affiliates of the registrant was approximately $20,094,518,012 computed by reference to the closing sale price of the common stock on the New York Stock Exchange on June 30, 2020, the last trading day of the registrant's most recently completed second fiscal quarter.

Number of shares of common stock outstanding as of the close of business on February 4, 2021: 590,677,474 shares

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Definitive Proxy Statement for the Company's Annual Meeting of Shareholders to be held May 19, 2021, are incorporated into Part III of this Annual Report on Form 10-K.

**TABLE OF CONTENTS**

**PART I**

| | | |
|---|---|---|
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 27 |
| Item 1B. | Unresolved Staff Comments | 40 |
| Item 2. | Properties | 41 |
| Item 3. | Legal Proceedings | 43 |
| Item 4. | Mine Safety Disclosures | 45 |

**PART II**

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities | 48 |
| Item 6. | Selected Financial Data | 51 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 53 |
| | Liquidity and Capital Resources | 68 |
| | Critical Accounting Policies and Estimates | 75 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 80 |
| Item 8. | Financial Statements and Supplementary Data | 84 |
| | Southwest Airlines Co. Consolidated Balance Sheet | 84 |
| | Southwest Airlines Co. Consolidated Statement of Income (Loss) | 85 |
| | Southwest Airlines Co. Consolidated Statement of Comprehensive Income (Loss) | 86 |
| | Southwest Airlines Co. Consolidated Statement of Stockholders' Equity | 87 |
| | Southwest Airlines Co. Consolidated Statement of Cash Flows | 88 |
| | Notes to Consolidated Financial Statements | 89 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 141 |
| Item 9A. | Controls and Procedures | 141 |
| Item 9B. | Other Information | 142 |

**PART III**

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers, and Corporate Governance | 143 |
| Item 11. | Executive Compensation | 143 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 144 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 144 |
| Item 14. | Principal Accounting Fees and Services | 144 |

**PART IV**

| | | |
|---|---|---|
| Item 15. | Exhibits and Financial Statement Schedules | 146 |
| Item 16. | Form 10-K Summary | 149 |
| Signatures | | 150 |

2

**-PART I-**

Item 1.  *Business*

**Company Overview**

Southwest Airlines Co. (the "Company" or "Southwest") operates Southwest Airlines, a major passenger airline that provides scheduled air transportation in the United States and near-international markets. Southwest commenced service on June 18, 1971, with three Boeing 737 aircraft serving three Texas cities: Dallas, Houston, and San Antonio. At December 31, 2020, Southwest had a total of 718 Boeing 737 aircraft in its fleet and 107 destinations in 40 states, the District of Columbia, the Commonwealth of Puerto Rico, and ten near-international countries: Mexico, Jamaica, The Bahamas, Aruba, Dominican Republic, Costa Rica, Belize, Cuba, the Cayman Islands, and Turks and Caicos.

During 2020, the Company began service to six new destinations including Hilo on Hawaii; Cozumel, Mexico; Steamboat Springs, Colorado; Miami, Florida; Palm Springs, California; and Montrose (Telluride and Crested Butte), Colorado. In addition, the Company has published its initial flight schedules to begin serving Chicago O'Hare International Airport and Sarasota Bradenton International Airport, beginning February 14, 2021, Colorado Springs Municipal Airport and Savannah/Hilton Head International Airport, beginning March 11, 2021, Houston George Bush Intercontinental Airport and Santa Barbara Airport, beginning April 12, 2021, Fresno Yosemite International Airport, beginning April 25, 2021, and Jackson-Medgar Wiley Evers International Airport in Mississippi, beginning June 6, 2021.

**Worldwide Pandemic**

As a result of the rapid spread of the novel coronavirus, COVID-19, throughout the world, including into the United States, on March 11, 2020, the World Health Organization classified the virus as a pandemic. The speed with which the effects of the COVID-19 pandemic have changed the U.S. economic landscape, outlook, and in particular the travel industry, has been swift and unexpected. The Company began to see a negative impact on bookings for future travel in late February 2020, which quickly accelerated during the remainder of first quarter and into second quarter, when trip cancellations outpaced new passenger bookings during the majority of March and April 2020. The Company began proactively canceling a significant portion of its scheduled flights in March 2020, and continued adjusting capacity throughout the remainder of the year, as the Company grounded a significant portion of its fleet and operated a significantly reduced portion of its previously scheduled capacity. The Company continued to experience significant negative impacts to passenger demand and bookings through the remainder of 2020 due to the pandemic.

Based on these events and the uncertainty they created, the Company immediately began to focus on its liquidity, including quickly and substantially enhancing its cash holdings. In April 2020, the Company entered into definitive documentation with the United States Department of Treasury (the "Treasury") with respect to funding support pursuant to the Payroll Support Program under the Coronavirus Aid, Relief and Economic Security Act ("CARES Act"). Payroll support funds under the CARES Act were required to be used solely to pay qualifying Employee salaries, wages, and benefits through at least September 30, 2020. On January 15, 2021, as a result of continued financial hardships to the Company caused by the COVID-19 pandemic, the Company entered into definitive documentation with the Treasury for further payroll support under the Consolidated Appropriations Act, 2021 (the "Payroll Support Program Extension"). Payroll support funds under the Payroll Support Program Extension must be used to pay qualifying Employee salaries, wages, and benefits through at least March 31, 2021.

In addition to obtaining financing under the CARES Act and the Payroll Support Program Extension, the Company obtained significant financing in the capital markets and elsewhere. The Company believes it has made significant progress on bolstering its liquidity through efforts including aggressively evaluating all capital spending, discretionary spending, and non-essential costs for near-term cost reductions or deferrals; reducing the Company's published flight schedule; placing a significant number of aircraft in storage; implementing voluntary separation and time-off programs for Employees; substantially suspending all hiring; reducing the Chief Executive Officer's salary

3

by 20 percent; reducing the other named executive officer salaries and Board of Director cash retainer fees by 20 percent through December 31, 2020; and where possible, modifying vendor and supplier payment terms. For further information on risks related to COVID-19, as well as the significant impacts of COVID-19 on the Company's operations, financial performance, and liquidity, see "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations," and Notes 2, 7, 8, and 9 to the Consolidated Financial Statements. The Company also took significant measures in 2020 in response to the COVID-19 pandemic to support the well-being of both its Customers and Employees including, for example:

- implementing enhanced aircraft cleaning procedures;
- requiring mask or face coverings for Employees and Customers (age two or over);
- implementing measures to support physical distancing, including messaging to Customers and Employees, and modified boarding procedures;
- limiting the number of seats available for sale on each flight through November 30, 2020, to allow for the middle seat to remain open;
- adding Plexiglas® at ticketing and gate counters and baggage services offices;
- implementing Customer and Employee health declarations;
- offering the ability to work remotely to most of the Company's office and clerical Employees, including the vast majority of its Employees at the Company's headquarters campus; and
- working with physician-scientists with knowledge and expertise in infectious disease, disease prevention, and testing protocols, and in particular the latest medical research about COVID-19, to review the Company's multi-layered approach to supporting the well-being of Customers and Employees during the COVID-19 pandemic.

**Boeing 737 MAX Grounding**

In March 2019, the Federal Aviation Administration (the "FAA") issued an emergency order for all U.S. airlines to ground the Boeing 737 MAX aircraft ("MAX"), including the 34 MAX 8 aircraft in the Company's fleet at that time (the "MAX groundings"). As discussed below under "Company Operations" and "Management's Discussion and Analysis of Financial Condition and Results of Operations," the MAX 8 aircraft are the Company's most fuel-efficient aircraft and the MAX groundings have adversely affected the Company's operations and financial results.

On November 18, 2020, the FAA rescinded its March 2019 grounding order, issued an airworthiness directive, and published training requirements, enabling the Company to begin modifying certain operating procedures, implementing enhanced pilot training requirements, installing FAA-approved flight control software updates, and completing other required maintenance tasks specific to the MAX aircraft. Before the Company returns the MAX aircraft to Customer service, every active Southwest Pilot is expected to:

- complete additional FAA-required flight training in one of the Company's nine 737 MAX simulators;
- complete additional FAA-required computer-based training covering MAX procedures; and
- re-take the Company's original 737 MAX 8 computer-based differences training as a refresher to complement the FAA-required training.

Additionally, the Company is continuing work on its 34 MAX aircraft delivered prior to the FAA's rescission of its grounding order to prepare each aircraft for the return to Customer service, including removing the aircraft from storage, installing the new flight control software updates, and performing required maintenance checks. The Company will also conduct multiple readiness flights on each of its MAX aircraft before each such aircraft is operated in Customer service. The Company has scheduled the MAX return to revenue service on March 11, 2021.

**Industry**

4

As discussed above under "Business – Worldwide Pandemic," the travel industry was adversely impacted in 2020 by the COVID-19 pandemic. Like the Company, other U.S. airlines experienced significant year-over-year negative impacts to passenger demand and bookings, but the impact of the COVID-19 pandemic on some of these airlines was particularly severe because of the significant reduction in business demand resulting from companies tightening or even suspending corporate travel. This not only reduced overall demand for air travel, but also resulted in a decrease in the percentage of full-fare purchases. Like the Company, these other airlines responded by quickly and significantly reducing scheduled flights and capacity, reducing operating costs and capital expenditures, accelerating fleet retirements, substantially increasing cash holdings and/or reducing or suspending service in certain markets. Unlike the Company, certain other airlines also furloughed employees and/or ceased service in certain markets.

In addition to the impact of the COVID-19 pandemic, air carriers with the MAX aircraft in their fleets were prohibited from operating the MAX aircraft until completing the FAA's airworthiness directive and training requirements published on November 18, 2020.

The airline industry has historically been an extremely volatile industry subject to numerous other challenges. Among other things, it has been cyclical, energy intensive, labor intensive, capital intensive, technology intensive, highly regulated, heavily taxed, and extremely competitive. The airline industry has also been particularly susceptible to detrimental events such as economic recessions, jet fuel price volatility, unscheduled maintenance disruptions, U.S. government shutdowns, acts of terrorism, poor weather, and natural disasters.
Historically, airline industry results have been particularly susceptible to fuel price volatility; however, the industry experienced a relatively stable and moderate fuel environment in 2020, as compared with recent years, with year-over-year fuel prices lower throughout most of 2020.

**Company Operations**

**Route Structure**

Southwest has historically principally provided point-to-point service, rather than the "hub-and-spoke" service provided by most major U.S. airlines. The hub-and-spoke system concentrates most of an airline's operations at a limited number of central hub cities and serves most other destinations in the system by providing one-stop or connecting service through a hub. By not concentrating operations through one or more central transfer points, Southwest's point-to-point route structure has allowed for more direct nonstop routing than hub-and-spoke service. However, in response to the effects of the COVID-19 pandemic, the Company placed greater reliance in 2020 on connecting traffic in an effort to capture Customer demand. Approximately 72 percent of the Company's Customers flew nonstop during 2020, compared with 77 percent during 2019, and, as of December 31, 2020, Southwest served 667 nonstop city pairs, compared with 720 as of December 31, 2019. For 2020, the Company's average aircraft trip stage length was 743 miles, with an average duration of approximately 2.0 hours, as compared with an average aircraft trip stage length of 748 miles and an average duration of approximately 2.0 hours in 2019.

Southwest's point-to-point service has also enabled it to provide its markets with frequent, conveniently timed flights and low fares. For example, Southwest currently offers 8 weekday roundtrips between Dallas Love Field and Houston Hobby, five weekday roundtrips between Denver and Chicago Midway, four weekday roundtrips between Los Angeles International and Las Vegas, and eight weekday roundtrips between Phoenix and Denver. Southwest complements its high-frequency short-haul routes with long-haul nonstop service including flights between California and Hawaii and between markets such as Los Angeles and Nashville, Los Angeles and Baltimore, and San Diego and Baltimore.

The Company continually works to optimize its route network and schedule through the adjustment of frequencies in its existing markets and the addition of new markets and itineraries, while also pruning less profitable flights from its schedule. The Company's network and schedule optimization efforts have been particularly beneficial in addressing the impacts of the COVID-19 pandemic and the MAX groundings. For example, these efforts have

enabled the Company to continue to expand in key existing markets, such as California, as well as opportunistically introduce service in other markets.

Despite the pandemic, the Company has been able to continue to bolster its presence in California through the addition of new destination options and flights for California Customers. In 2020, the Company significantly expanded its presence at Long Beach Airport by acquiring 17 slots previously held by JetBlue Airways (a "slot" is the right of an air carrier, pursuant to regulations of the FAA or local authorities, to operate a takeoff or landing at certain airports). Further, the Company expanded its California to Hawaii network in 2020 by adding inaugural service between San Diego and Honolulu on the Island of Oahu. The Company has also announced new service from Long Beach to Honolulu and from Long Beach to Kahului on the Island of Maui, each beginning March 11, 2021. The Company also expects to expand its service at John Wayne Airport (Orange County) in 2021, including reinstated international service beginning March 11, 2021, through county authorization to increase capacity to and from the airport. In addition, the Company is currently scheduled to offer over 600 departures from California on peak flying days in the summer of 2021. Based on the most recent data available from the U.S. Department of Transportation (the "DOT"), for the year ended September 30, 2020, Southwest carried more California travelers to, from, and within California than any other airline.

The Company's network and schedule optimization efforts have also enabled it to use otherwise idle aircraft and Employees to provide service to other core markets, as well as new destinations. The additional service has created additional regional and international connectivity that has been structured to improve recoverability during irregular operations, grow the Company's presence in strategic markets that serve as cornerstones for its network, and provide additional options for Customers to reach their final destinations. The Company expects to complement and strengthen its existing route network in or near cities where its Customer base is large, along with adding easier access to popular leisure-oriented destinations. These new destinations include four destinations added in fourth quarter 2020: Steamboat Springs, Colorado; Miami, Florida; Palm Springs, California; and Montrose (Telluride and Crested Butte), Colorado. The Company has further announced first quarter 2021 new service to Chicago O'Hare International Airport; Sarasota Bradenton International Airport; Colorado Springs Municipal Airport; and Savannah/Hilton Head International Airport; and has announced second quarter 2021 new service to Houston George Bush Intercontinental Airport, Santa Barbara Airport, Fresno Yosemite International Airport, and Jackson-Medgar Wiley Evers International Airport in Mississippi.

The COVID-19 pandemic has had a particularly negative impact on international operations and led to the Company's suspension of international operations in first quarter 2020. The Company was able to resume service to Mexico and the Caribbean via Cancun, San Jose del Cabo/Los Cabos, Montego Bay, and Nassau on July 1, 2020; Puerto Vallarta, Mexico on October 8, 2020; Punta Cana, Dominican Republic and Aruba on November 4, 2020; and Havana, Cuba on December 6, 2020. In response to local restrictions imposed by the Bahamian government, the Company temporarily suspended operations to Nassau effective July 22, 2020. The Company is scheduled to resume service to Cozumel, Mexico in first quarter 2021. Service to the Company's other international destinations is expected to resume pending the easing of government restrictions. The Company ended 2020 with 14 international destinations.

### Cost Structure

A key component of the Company's business strategy is its focus on cost discipline and charging competitively low fares. Adjusted for stage length, the Company has lower unit costs, on average, than the majority of the largest domestic carriers; however, as discussed below under "Management's Discussion and Analysis of Financial Condition and Results of Operations," the Company experienced significant unit cost pressure in 2019 following the MAX groundings, and in 2020 following the onset of the COVID-19 pandemic.

The Company's low-cost strategy includes, among other elements, (i) the use of a single aircraft type, the Boeing 737, (ii) the Company's operationally efficient point-to-point route structure, and (iii) its highly productive Employees. Southwest's use of a single aircraft type allows for simplified scheduling, maintenance, flight operations, safety management, and training activities. Southwest's point-to-point route structure includes service to

6

and from many secondary or downtown airports such as Dallas Love Field, Houston Hobby, Chicago Midway, Baltimore-Washington International, Burbank, Manchester, Oakland, San Jose, Providence, and Ft. Lauderdale-Hollywood. These conveniently located airports are typically less congested than other airlines' hub airports, which has contributed to Southwest's ability to achieve high asset utilization because aircraft can be scheduled to minimize the amount of time they are on the ground. This, in turn, has reduced the number of aircraft and gate facilities that would otherwise be required and allows for high Employee productivity (lower headcount per aircraft).

The Company's focus on controlling costs also includes a continued commitment to pursuing, implementing, and enhancing initiatives to reduce fuel consumption and improve fuel efficiency. Although Fuel and oil expense for 2020 decreased compared with 2019, primarily due to capacity cuts in response to the effects of the COVID-19 pandemic, and in part due to lower market jet fuel prices, Fuel and oil expense nonetheless remained the Company's second largest operating cost for 2020. As evidenced by the table below, energy prices can fluctuate significantly in a relatively short amount of time. The table below shows the Company's average cost of jet fuel for each year beginning in 2009 and during each quarter of 2020.

| Year | Cost (Millions) | | Average Cost Per Gallon | | Percentage of Operating Expenses |
|---|---|---|---|---|---|
| 2009 | $ | 3,193 | $ | 2.22 | 31.2 % |
| 2010 | $ | 3,755 | $ | 2.61 | 33.4 % |
| 2011 | $ | 5,751 | $ | 3.25 | 38.2 % |
| 2012 | $ | 6,156 | $ | 3.32 | 37.3 % |
| 2013 | $ | 5,823 | $ | 3.19 | 35.3 % |
| 2014 | $ | 5,355 | $ | 2.97 | 32.6 % |
| 2015 | $ | 3,740 | $ | 1.96 | 23.6 % |
| 2016 | $ | 3,801 | $ | 1.90 | 22.7 % |
| 2017 | $ | 4,076 | $ | 1.99 | 23.0 % |
| 2018 | $ | 4,616 | $ | 2.20 | 24.6 % |
| 2019 | $ | 4,347 | $ | 2.09 | 22.3 % |
| 2020 | $ | 1,849 | $ | 1.45 | 14.4 % |
| First Quarter 2020 | $ | 870 | $ | 1.90 | 20.0 % |
| Second Quarter 2020 | $ | 257 | $ | 1.23 | 12.0 % |
| Third Quarter 2020 | $ | 379 | $ | 1.18 | 11.8 % |
| Fourth Quarter 2020 | $ | 343 | $ | 1.18 | 10.8 % |

The Company focuses on minimizing fuel consumption and improving fuel efficiency through fleet modernization and other fuel initiatives. For example, the Company previously retired all Boeing 737-300 aircraft from its fleet and introduced service with the MAX 8 aircraft, which is more fuel-efficient and releases fewer $CO_2$ emissions per available seat mile than the Company's other aircraft; however, the MAX groundings resulted in the removal of these more fuel-efficient aircraft from the Company's schedule, which, in turn, drove a decline in the Company's overall fuel efficiency in 2019. Although the Company's MAX aircraft remained grounded throughout 2020, the Company improved its fuel efficiency in 2020, as compared with 2019, primarily by operating fewer of its oldest, least fuel-efficient Boeing 737-700 aircraft as a result of capacity cuts in response to the effects of the COVID-19 pandemic. Lower load factors, due to COVID-19, also contributed to fuel efficiency during 2020. The Company continues to undertake a number of other fuel conservation initiatives, which are discussed in detail under "Regulation - Environmental Regulation."

The table below sets forth the Company's available seat miles produced per fuel gallon consumed over the last five years:

| | Year ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2020 | 2019 | 2018 | 2017 | 2016 |
| Available seat miles per fuel gallon consumed | 81.3 | 75.7 | 76.3 | 75.2 | 74.4 |

The Company also enters into fuel derivative contracts to manage its risk associated with significant increases in fuel prices. The Company's fuel hedging activities, as well as the risks associated with high and/or volatile fuel prices, are discussed in more detail below under "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations," and Note 11 to the Consolidated Financial Statements.

Salaries, wages, and benefits expense constituted approximately 52.9 percent of the Company's operating expenses during 2020 and was the Company's largest operating cost. The Company's ability to control labor costs is limited by the terms of its collective-bargaining agreements, and increased labor costs have negatively impacted the Company's low-cost competitive position. The Company's labor costs, and risks associated therewith, are discussed in more detail below under "Risk Factors," "Business - Employees," and "Management's Discussion and Analysis of Financial Condition and Results of Operations."

### Fare Structure

#### *General*

Southwest offers a relatively simple fare structure that features competitive fares and product benefits, including unrestricted fares, as well as lower fares available on a restricted basis. Southwest fare products include three major categories: "Wanna Get Away®," "Anytime," and "Business Select®," to provide Customers options when choosing a fare. All fare products include the privilege of two free checked bags (weight and size limits apply). Southwest does not charge fees for changes to flight reservations although fare differences may apply.

- "Wanna Get Away" fares are generally the lowest fares and are typically subject to advance purchase requirements. They are nonrefundable, but, subject to Southwest's No Show Policy, travel funds may be applied towards future travel on Southwest. Wanna Get Away fares earn six Rapid Rewards® points, under Southwest's Rapid Rewards loyalty program, for each dollar spent on the base fare. The Company's loyalty program is discussed below under "Rapid Rewards Loyalty Program."
- "Anytime" fares are, subject to Southwest's No Show Policy, refundable if canceled, or travel funds may be applied towards future travel on Southwest. If this fare is purchased with nonrefundable travel funds, then the travel funds will be nonrefundable if travel is canceled. Anytime fares earn 10 Rapid Rewards points for each dollar spent on the base fare.
- "Business Select" fares are, subject to Southwest's No Show Policy, refundable if canceled, or travel funds may be applied towards future travel on Southwest. If this fare is purchased with nonrefundable travel funds, then the funds will be nonrefundable if travel is canceled. Business Select fares also include additional perks such as priority boarding with a boarding position in the first 15 boarding positions within boarding group "A," 12 Rapid Rewards points per dollar spent on the base fare - the highest loyalty point multiplier of all Southwest fare products, and "Fly By®" priority security and/or ticket counter access in participating airports. Business Select fares also ordinarily include one complimentary premium beverage coupon for the day of travel (Customers must be of legal drinking age to drink alcoholic beverages); however, the Company has temporarily suspended premium drink service in response to the COVID-19 pandemic.

Southwest's No Show Policy applies if a Customer does not change or cancel a flight segment at least ten minutes prior to scheduled departure and the Customer does not travel on the scheduled flight. In such event, subject to certain exceptions, all segments associated with the reservation will be canceled, and (i) with respect to a "Wanna Get Away" fare, unused travel funds will be forfeited; and (ii) with respect to an "Anytime" or "Business Select" fare, unused travel funds will be held as travel credit for future travel by the Customer on Southwest.

In response to the COVID-19 pandemic, in order to enhance and expand upon its already generous and flexible ticketing policies, the Company extended the expiration of the following Customer travel funds to September 7, 2022:

- Travel funds created because of a flight cancellation between March 1, 2020 and September 7, 2020; and

- Travel funds that would have expired between March 1, 2020 and September 7, 2020.

*Ancillary Services*

The Company offers ancillary services such as Southwest's EarlyBird Check-In®, Upgraded Boarding, and transportation of pets and unaccompanied minors, in accordance with Southwest's respective policies.

EarlyBird Check-In provides Customers with automatic check-in and an assigned boarding position before general boarding positions become available, thereby improving Customers' seat selection options (priority boarding privileges are already a benefit of being an "A-List" tier member under the Company's Rapid Rewards Loyalty Program). The Company has implemented a variable pricing model for EarlyBird Check-In based on the length of the flight and the historical popularity of EarlyBird Check-In on the route.

When available, Southwest sells Upgraded Boarding at the airport, which allows a Customer to pay for an open priority boarding position in the first 15 positions in its "A" boarding group.

Southwest's Pet Policy provides Customers an opportunity to travel with a small cat or dog in the aircraft cabin on domestic flights. Southwest also has an unaccompanied minor travel policy to address the administrative costs and the extra care necessary to safely transport these Customers.

**Inflight Entertainment Portal and WiFi Service**

Southwest offers inflight entertainment and connectivity service on WiFi-enabled aircraft on the majority of its fleet, where available. Southwest's suite of complimentary offerings onboard WiFi-enabled aircraft includes movies-on-demand, messaging, music, live and on-demand television, weather, a flight tracker, and connecting flight information. The inflight entertainment service allows Customers to enjoy gate-to-gate entertainment directly on their personal wireless devices. Customers can also purchase satellite internet service while on WiFi-enabled aircraft.

The free inflight entertainment offerings include approximately 45 free movies-on-demand each month and free app messaging via iMessage or WhatsApp. The television product consists of over 15 live channels and up to 75 on-demand recorded episodes from popular television series. In addition, the onboard entertainment portal offers free digital music and live streaming radio service to Customers within the onboard entertainment portal.

**Rapid Rewards Loyalty Program**

Southwest's Rapid Rewards loyalty program enables program members ("Members") to earn points for every dollar spent on Southwest base fares. The amount of points earned under the program is based on the base fare and fare class purchased, with higher fare products (e.g., Business Select) earning more points than lower fare products (e.g., Wanna Get Away). Each fare class is associated with a points earning multiplier, and points for flights are calculated by multiplying the base fare for the flight by the fare class multiplier. The amount of points required to be redeemed for a flight is based on the base fare and a multiplier. Under the program, (i) Members are able to redeem their points for every available seat, every day, on every flight, with no blackout dates; and (ii) points do not expire.

Under the program, Members continue to accumulate points until the time they decide to redeem them. As a result, the program provides Members significant flexibility and options for earning and redeeming rewards. For example, Members can earn more points (and/or achieve tiered status such as A-List and Companion Pass faster) by purchasing higher fare tickets. Members also have significant flexibility in redeeming points, such as the opportunity to book in advance to take advantage of a lower fare ticket (including many fare sales) and redeem fewer points or by being able to redeem more points and book at the last minute if seats are still available for sale. Members can also earn points through qualifying purchases with Rapid Rewards Partners (which include, for example, car rental agencies, hotels, and restaurants), as well as by using Southwest's co-branded Chase® Visa

credit card. In addition to earning points for revenue flights and qualifying purchases with Rapid Rewards Partners, Members also have the ability to purchase, gift, and transfer points, as well as the ability to donate points to selected charities.

Southwest's Rapid Rewards loyalty program features tier status and Companion Pass programs for the most active Members, including "A-List" and "A-List Preferred" status. A Member who flies 25 qualifying one-way flight segments booked through Southwest or earns 35,000 tier qualifying points per calendar year will qualify for A-List status. A Member who flies 50 qualifying one-way flights booked through Southwest or earns 70,000 tier qualifying points per calendar year will qualify for A-List Preferred status. Except as noted below with respect to actions taken by the Company in response to the COVID-19 pandemic, the Member will maintain A-List or A-List Preferred status for the remainder of the calendar year in which the status was earned and for the entire calendar year immediately following. Both A-List and A-List Preferred Members enjoy benefits such as "Fly By®" priority check-in and security lane access, where available, as well as dedicated phone lines, standby priority, and an earnings bonus on eligible revenue flights (25 percent for A-List and 100 percent for A-List Preferred). In addition, A-List Preferred Members enjoy free inflight satellite internet service on WiFi-enabled aircraft when available. Members who attain A-List or A-List Preferred status receive priority boarding privileges. When these Customers purchase travel at least 36 hours prior to flight time, they receive the best boarding position available (generally, an "A" boarding pass). During the day of travel, if an A-List or A-List Preferred Member's plans change, they have free same-day standby privileges, which allow them to fly on earlier flights between the same city pairs if space is available. Beginning January 1, 2021, A-List and A-List Preferred Members have the same standby privileges free of airline charges, but will be required to pay any additional government taxes and fees associated with changes in their itinerary. Another feature of the Rapid Rewards loyalty program is the Companion Pass. Members who fly 100 qualifying one-way flights or earn 125,000 qualifying points in a calendar year automatically receive a Companion Pass, which provides for unlimited travel for the designated Companion free of charges (other than taxes and fees). Except as noted below with respect to actions taken by the Company in response to the COVID-19 pandemic, the Companion Pass is valid for the remainder of the calendar year in which status was earned and for the following full calendar year to any destination available on Southwest for a designated Companion of the qualifying Member. The Member and designated Companion must travel together on the same flight.

Southwest's Rapid Rewards loyalty program has been designed to drive more revenue by (i) bringing in new Customers, including new Members, as well as new holders of Southwest's co-branded Chase Visa credit card; (ii) increasing business from existing Customers; and (iii) strengthening the Company's Rapid Rewards hotel, rental car, credit card, and other partnerships.

For 2020, Customers of Southwest redeemed approximately 4.1 million flight awards, accounting for approximately 15.8 percent of revenue passenger miles flown. For 2019, Customers of Southwest redeemed approximately 10.7 million flight awards, accounting for approximately 14.1 percent of revenue passenger miles flown. For 2018, Customers of Southwest redeemed approximately 10.4 million flight awards, accounting for approximately 13.8 percent of revenue passenger miles flown. The Company's accounting policies with respect to its loyalty programs are discussed in more detail in Note 1 to the Consolidated Financial Statements.

The Company took significant measures in 2020 in response to the COVID-19 pandemic to enhance its Rapid Rewards loyalty program including the following:

- Through December 15, 2020, Rapid Rewards Members who had qualified travel funds set to expire on September 7, 2022, were given the option to convert those travel funds into Rapid Rewards points at the same rate as they were able to purchase a ticket with points;
- All Rapid Rewards Members who had opened a Rapid Rewards account by April 1, 2020 received a "boost" of 15,000 tier qualifying points and 10 flight credits toward A-List and A-List Preferred status, and 25,000 Companion Pass qualifying points and 25 flight credits toward Companion Pass status;
- For A-List and A-List Preferred Members who earned tier status in 2020, earned status was extended through December 31, 2021; and

10

- For Companion Pass Members who earned Companion Pass benefits to be used through December 2020, Companion Pass benefits were extended through June 30, 2021.

Additionally, in January 2021, in response to the COVID-19 pandemic, the Company made additional changes that affected tier status as well as Companion Pass eligibility, all with the intention of enhancing the Company's Rapid Rewards loyalty program and its Members' experiences:

- All Rapid Rewards Members with valid Rapid Rewards accounts as of December 31, 2020, received a "boost" of 15,000 tier qualifying points and 10 flight credits toward A-List and A-List Preferred status, and 25,000 Companion Pass qualifying points and 25 flight credits toward Companion Pass status;
- Through December 31, 2021, for Members with Southwest's co-branded Chase® Visa Premier or Priority Consumer credit cards, or Premier or Performance Business credit cards, for every $10,000 in spend on their credit cards, they will receive 1,500 Tier Qualifying Points, and those Tier Qualifying Points will be uncapped; and
- For Companion Pass Members who earned Companion Pass benefits to be used through December 2020, which were previously extended through June 30, 2021, those Companion Pass benefits were further extended through December 31, 2021.

**Southwest.com and Direct to Customer Distribution Approach**

The Company primarily offers its fare products directly to Customers through its Internet website, Southwest.com. For the years ended December 31, 2020, and December 31, 2019, approximately 83 percent and 80 percent, respectively, of the Company's Passenger revenues originated from Southwest.com (including revenues from SWABIZ, the Company's online booking tool designed for business Customers who prefer a self-service and low-cost solution for booking their air travel on Southwest). This "direct to Customer" distribution approach has historically provided a cost advantage for the Company because it eliminates fees associated with the use of third party distribution channels such as third party online travel platforms. The Company augments its direct to Customer distribution approach by offering a broad suite of digital platforms to support Customers' travel needs, including full featured websites and apps. These digital platforms help Customers to book and manage their Southwest air travel and also facilitate the purchase of the Company's ancillary products, including EarlyBird, Business Select, vacation packages, rental car reservations, hotel reservations, and travel activities. In addition, the digital platforms provide self-service tools for reservation management and Customer support.

During 2020, the Company launched multiple new digital capabilities to improve Customer self-service, including the ability to update reservation details, and also to perform partial trip cancellations. To better gauge Customers' response to their digital experiences, the Company also launched digital surveying technology, which was used frequently during the COVID-19 pandemic to monitor Customer sentiment. Mobile self-service capabilities were also enhanced during 2020, enabling Customers to find helpful support content on their mobile device without needing agent assistance, and also improving the ability to e-mail a Customer Service Agent from a mobile device. In particular, the Company added mobile self-service capabilities to (i) support mobile boarding passes for bookings of up to eight passengers, (ii) allow travel funds to be used during a booking modification, and (iii) enable Customers to view their unused funds balances in their mobile account.

The Company also continued to improve the revenue generating capabilities of the digital platforms by offering new features to promote its unique fares and upgrades, adding features to support bookings created in global distribution system platforms. The Company also brought Apple Pay® digital payments technology to its mobile website, allowing for digital Apple Pay® transactions across the web, app, and inflight portal experiences.
During the COVID pandemic, the Company swiftly developed digital tools that enabled Customers to easily convert certain unused travel funds to points with no fees or phone calls. The Company also activated digital health acknowledgements, developed targeted shopping and booking messaging about the changing travel environment, and developed custom portals to share information about travel restrictions and the Southwest Promise™.

**Southwest Business® Initiatives**

In addition to improvements in the Company's direct Southwest.com channel of distribution, during 2019 and 2020, the Company took significant action to grow its corporate travel business with the goal of making it easier for corporate travel Customers and travel management companies to do business with Southwest.

In 2019, the Company entered into an agreement with Amadeus IT Group, S.A. ("Amadeus"), and expanded its agreement with Travelport, LP and Travelport International Operations Limited (collectively, "Travelport"), to enable corporate travel Customers and travel management companies to book Southwest products on the Amadeus and Travelport global distribution system ("GDS") platforms. The Company began accepting corporate travel bookings through (i) Travelport's Apollo and Worldspan GDS platforms in second quarter 2020, (ii) Travelport's Galileo GDS platform in third quarter 2020, and (iii) the Amadeus GDS platform in fourth quarter 2020. The Company's expansion into the Travelport and Amadeus GDS channels is intended to facilitate corporate travel managers' ability to book, modify, and cancel Southwest reservations. In December 2020, the Company entered into a new full participation distribution agreement with Sabre Corporation ("Sabre"), to enable Sabre to continue to distribute Southwest content through traditional connectivity to corporations, government agencies, and travel management companies through Sabre's GDS. The new Sabre GDS connectivity is expected to be implemented in second half 2021. The Company also has an agreement with Airlines Reporting Corporation ("ARC") to implement industry-standard processes to handle the settlement of tickets booked through Travelport and Amadeus channels. Once the new Sabre GDS connectivity is implemented, Sabre tickets are also expected to settle via ARC.

Southwest Business has continued to invest in and enhance its online booking tool SWABIZ®, as well as its direct connect channel, with connections to online booking tools, travel management companies, and corporate customers. SWABIZ is designed for business Customers who prefer a self-service and low-cost solution for booking their air travel on Southwest. The site also facilitates car and hotel booking.

**Marketing**

During 2020, as part of the Company's reduction of operating costs in response to the impact of the COVID-19 pandemic, the Company significantly reduced its traditional marketing areas of focus. Instead, in response to the COVID-19 pandemic, the Company implemented and marketed the "Southwest Promise" to reassure Customers of the Company's commitment to Safety and cleanliness from check-in to deplaning the aircraft. The Southwest Promise announced changes to the Company's operations and procedures to better support the well-being of its Employees and Customers, including additional stringent cleaning practices across the fleet and throughout the day, as well as measures to support physical distancing and personal protection and wellness throughout the Customer experience.

**Technology Initiatives**

Over the past several years, the Company has committed significant resources to technology improvements in support of its ongoing operations and initiatives. During 2020, however, in connection with the Company's efforts to reduce capital and operating expenditures in response to the COVID-19 pandemic, the Company narrowed its near-team technology focus and deferred a significant number of technology projects. The Company's key near-term technology focus areas during 2020 included, among others, (i) implementation of corporate GDS capabilities in connection with Southwest Business initiatives; (ii) support of the Company's remote workforce; (iii) enhancements to support Customer loyalty, including with respect to policy updates for Rapid Rewards program tier status and residual travel funds; and (iv) enhancements to Customer self-service capabilities on the Company's digital platforms.

While the Company deferred a significant number of technology projects in 2020, it continued to invest in and execute on major technology projects including, among others, the Company's systems related to (i) aircraft maintenance, planning, and record keeping; (ii) flight planning and scheduling, including with respect to schedule

changes and Customer reaccommodations; (iii) crew scheduling; (iv) human resources management; and (v) technology infrastructure.

**Regulation**

The airline industry is heavily regulated, especially by the federal government, and there are a significant number of governmental agencies and legislative bodies that have the ability to directly or indirectly affect the Company and/or the airline industry financially and/or operationally. Examples of regulations affecting the Company and/or the airline industry, imposed by several of these governmental agencies and legislative bodies, are discussed below.

### Economic and Operational Regulation

#### *Consumer Protection Regulation by the U.S. Department of Transportation*

The DOT regulates economic operating authority for air carriers and consumer protection for airline passengers. The FAA, an agency within the DOT, regulates aviation safety. The DOT and the FAA may impose civil penalties on air carriers for violating their regulations.

To provide passenger transportation in the United States, a domestic airline is required to hold both a Certificate of Public Convenience & Necessity from the DOT and an Air Carrier Operating Certificate from the FAA. A Certificate of Public Convenience & Necessity is unlimited in duration, and the Company's certificate generally permits it to operate among any points within the United States and its territories and possessions. Additional DOT authority, in the form of a certificate or exemption from certificate requirements, is required for a U.S. airline to serve foreign destinations either with its own aircraft or via code-sharing with another airline. Exemptions granted by the DOT to serve international markets are generally limited in duration and are subject to periodic renewal requirements. The DOT may revoke a certificate or exemption, in whole or in part, for failure to comply with federal aviation statutes, regulations, orders, or the terms of the certificate or exemption itself.

The DOT's consumer protection and enforcement authority is derived primarily from a federal statutory prohibition on "unfair or deceptive practices or unfair methods of competition" by air carriers. On December 7, 2020, the DOT published a final rule clarifying its authority in this area. The rule became effective January 6, 2021. The new rule codifies the definitions for the terms ''unfair'' and ''deceptive'' in the DOT's regulations by adopting the definitions used by the Federal Trade Commission, and amends and clarifies the procedures the DOT would follow when engaging in aviation consumer protection rulemaking and enforcement based on its authority to prohibit unfair or deceptive practices. The new rule helps establish clear and consistent criteria for unfair or deceptive practices while aligning DOT's oversight of aviation entities with other government agencies' oversight of other sectors of the economy with regard to unfair or deceptive practices.

The DOT is also charged with prohibiting discrimination by airlines against consumers on the basis of (i) disability; and (ii) race, religion, national origin, sex, or ancestry.

Under the above-described authority, the DOT has also adopted so-called "Passenger Protection Rules," which address a wide variety of matters, including flight delays on the tarmac, chronically delayed flights, denied boarding compensation, baggage liability requirements, ticket refunds, and advertising of airfares, among others. For example, under the DOT's tarmac delay rule and subject to limited exceptions, air carriers must not allow an aircraft to remain on the tarmac for more than 3 hours (for domestic delays) or more than 4 hours (for international delays), without allowing passengers to deplane.

In addition, the Passenger Protection Rules require airlines to (i) display ontime performance on their websites; (ii) adopt customer service plans, publish those plans on their website, and audit their own compliance with their plans; (iii) designate an employee to monitor the performance of their flights; (iv) provide information to passengers on how to file complaints; (v) respond in a timely and substantive fashion to consumer complaints; (vi) pay up to four times the passenger's one-way fare to their final destination that day in compensation to each passenger denied

13

boarding involuntarily from an oversold flight; (vii) refund any checked bag fee for permanently lost luggage; (viii) prominently disclose all potential fees for optional ancillary services on their websites; and (ix) refund passenger fees paid for ancillary services if a flight cancels or oversells and a passenger is unable to take advantage of such services. The FAA Reauthorization Act of 2018, passed by Congress on October 3, 2018, and signed into law on October 5, 2018 (the "2018 Reauthorization Act"), directs the DOT to revise regulations to clarify there is not a maximum level of compensation an air carrier may pay to a passenger who is involuntary denied boarding as a result of an oversold flight.

The Passenger Protection Rules also require that (i) advertised fares include all government-mandated taxes and fees; (ii) passengers be allowed to either hold a reservation for up to 24 hours without making a payment or cancel a paid reservation without penalty for 24 hours after the reservation is made, as long as the reservation is made at least seven days in advance of travel; (iii) fares may not increase after purchase; (iv) baggage fees must be disclosed to the passenger at the time of booking; (v) the same baggage allowances and fees must apply throughout a passenger's trip; (vi) baggage fees must be disclosed on e-ticket confirmations; and (vii) passengers must be promptly notified in the event of delays of more than 30 minutes or if there is a cancellation or diversion of their flight.

The DOT has expressed its intent to aggressively investigate alleged violations of its consumer protection rules. Airlines that violate certain aviation economic regulations and statutes are subject to potential fines of up to $34,174 per occurrence.

The DOT has proposed a rule that would provide for changes to the accessibility of lavatories on single-aisle aircraft for passengers with disabilities. These proposed changes include modifications to the interior of the lavatory, additional services that airlines would provide with respect to lavatory access, training requirements, and improvements to the aircraft's onboard wheelchair. The DOT is also expected to propose and seek comments on a separate rule addressing long-term accessibility changes, such as the requirement for airlines to provide one larger lavatory on single-aisle aircraft. The rulemaking would solicit comment and gather updated information on the costs and benefits of requiring airlines to make lavatories on new single-aisle aircraft large enough, equivalent to that currently found on twin-aisle aircraft, to permit a passenger with a disability (with the help of an assistant, if necessary) to approach, enter, and maneuver within the aircraft lavatory as necessary to use all lavatory facilities and leave by means of the aircraft's on-board wheelchair. Requirements to expand the size of lavatories could impose substantial costs on the Company, either in the short-term or the long-term. Whether the DOT will actually adopt a new rule requiring larger lavatories, and the timing and application of any new rule, are unknown at this time.

In December 2020, the DOT issued a new rule allowing airlines to recognize emotional support animals as pets rather than service animals. Under the new rule, airlines are still required to accept trained service dogs. Airlines can also require a new DOT standardized form wherein the animal's handler certifies that the animal is trained to behave in the cabin and has the necessary vaccinations. The Company is in the process of modifying its policies and procedures to align with the new rule.

The 2018 Reauthorization Act includes numerous provisions related to the DOT's rules and authority. For example:

- the DOT has been given the authority to impose triple the maximum fines for damages to passengers' wheelchairs or other mobility aids, as well as for injury to passengers with disabilities;
- the DOT has been directed to implement a rulemaking to require air carriers to promptly provide a refund for any ancillary fee paid for services a passenger does not receive; and
- the 2018 Reauthorization Act makes it an unfair and deceptive practice to involuntarily deplane a revenue passenger onboard an aircraft if that passenger is traveling on a confirmed reservation and is checked-in for the relevant flight prior to the applicable check-in deadline.

With the exception of potential DOT rules relating to on-board wheelchair requirements and accessible lavatory requirements, which could affect the Company's future capital expenditures for new aircraft, the Company does not

14

believe that pending regulatory developments in this area will have a material effect on the Company's capital expenditures, earnings, or competitive position.

### *Aviation Taxes and Fees*

The statutory authority for the federal government to collect most types of aviation taxes, which are used, in part, to finance programs administered by the FAA, must be periodically reauthorized by the U.S. Congress. The 2018 Reauthorization Act extends most commercial aviation taxes through September 30, 2023. The CARES Act signed into law in March 2020, provided a temporary tax "holiday" from collecting and remitting certain government ticket taxes for tickets purchased between March 28, 2020, and December 31, 2020.

In addition to FAA-related taxes, there are additional federal taxes related to the U.S. Department of Homeland Security. These taxes do not need to be reauthorized periodically. Congress has set the Transportation Security Fee paid by passengers at $5.60 per one-way passenger trip originating in the U.S. In addition, international passengers arriving in the U.S. are subject to U.S. immigration and customs fees that are indexed to inflation. These fees are used to support the operations of U.S. Customs and Border Protection ("CBP"). Finally, the U.S. Department of Agriculture's Animal and Plant Health Inspection Service imposes an agriculture inspection fee on international passengers arriving in the United States.

In 2021, Congress is expected to consider legislation related to federal spending on public infrastructure, including at airports. This legislation could result in an increase in the maximum Passenger Facility Charge, which is assessed by airports and collected by airlines, currently capped at $4.50 per enplanement (with a maximum of two Passenger Facility Charges on a one-way trip). Conversely, this legislation could also result in an infusion of federal investment in public infrastructure that may benefit all modes of transportation.

Finally, the annual congressional budget process is another legislative vehicle by which new aviation taxes or regulations may be imposed. The annual appropriations bill funds the federal government - including the DOT, the FAA, the Transportation Security Administration (the "TSA"), and CBP. Passage of the fiscal year 2022 appropriations bill will be considered throughout 2021 and could result in an increase in one or more of the taxes and fees discussed above, as well as new mandates on the DOT to begin or complete rulemakings related to airline consumer protection.

### Operational, Safety, and Health Regulation

The FAA has the authority to regulate safety aspects of civil aviation operations. Specifically, the Company and certain of its third-party service providers are subject to the jurisdiction of the FAA with respect to aircraft maintenance and operations, including equipment, ground facilities, dispatch, communications, training, and other matters affecting air safety. The FAA, from time to time, issues orders or directives relating to the maintenance and operation of aircraft that require significant expenditures or operational restrictions. The FAA, acting through its own powers or through the appropriate U.S. Attorney, has the power to bring proceedings for the imposition and collection of civil penalties for violation of the FAA's regulations.

The FAA requires airlines to obtain and maintain an Air Carrier Operating Certificate, as well as other certificates, approvals, and authorities. These certificates, approvals, and authorities are subject to suspension or revocation for cause.

The FAA has rules in effect with respect to flight, duty, and rest regulations. Among other things, the rules (i) require a ten hour minimum rest period prior to a pilot's flight duty period; (ii) mandate that a pilot must have an opportunity for eight hours of uninterrupted sleep within the rest period; and (iii) impose pilot "flight time" and "duty time" limitations based upon report times, the number of scheduled flight segments, and other operational factors. The FAA has established flight attendant duty period limitations and rest requirements based on the length of a flight attendant's scheduled duty period, number of flight attendants assigned to a flight, and other operational factors. The 2018 Reauthorization Act contains a provision requiring a modification to the FAA's rules to increase

15

the required flight attendant rest period between duty periods. The FAA has solicited input from the airline industry and other interested parties to obtain more information about current operations with flight attendants and the potential benefits and costs to inform the rulemaking. Flight, duty, and rest regulations affect the Company's staffing flexibility, which could impact the Company's operational performance, costs, and Customer Experience.

The 2018 Reauthorization Act also contains provisions directing the FAA to issue new regulations to establish minimum dimensions for seat size. Further, the 2018 Reauthorization Act expands human trafficking training requirements beyond flight attendants to include several public-facing Employee work groups, as well as requires air carriers to implement a plan and develop training with protocols for preventing and responding to verbal or physical assault committed against customer service agents.

In addition to its role as safety regulator, the FAA operates the nation's air traffic control system and has continued its lengthy and ongoing effort to implement a multi-faceted, air traffic control modernization program called "NextGen." As part of the NextGen initiative, in 2010 the FAA published rules requiring most commercial aircraft operating in the national airspace system to be equipped with Automatic Dependent Surveillance - Broadcast ("ADS-B") technology by January 1, 2020. ADS-B technology is intended to enhance safety and efficiency by moving from ground-based radar and navigational aids to precise tracking using satellite signals. In addition to environmental and efficiency benefits, ADS-B technology gives pilots and air traffic controllers new tools to reduce the risk of runway incursions and aircraft collisions. The Company has implemented technology and programs intended to comply with all applicable ADS-B requirements.

The Air Traffic Organization ("ATO") is the operational arm of the FAA. The ATO is responsible for providing safe and efficient air navigation services to all of the United States and large portions of the Atlantic and Pacific Oceans and the Gulf of Mexico. The Company is subject to any operational changes imposed by the FAA/ATO as they relate to the NextGen program, as well as the day-to-day management of the air traffic control system. The 2018 Reauthorization Act directs the FAA to (i) undertake a comprehensive review and prepare a full report on NextGen implementation and (ii) annually report on NextGen progress and return on investment.

The Company is subject to various other federal, state, and local laws and regulations relating to health and occupational safety, including Department of Health and Human Services, Centers for Disease Control and Prevention, Occupational Safety and Health Administration, and Food and Drug Administration regulations. In response to the COVID-19 pandemic, federal, state, and local government authorities implemented directives, orders, and regulations intended to mitigate the spread of the virus, and in response, the Company modified its practices, policies, and procedures, as appropriate. For example, on January 12, 2021, the Centers for Disease Control and Prevention issued an order effective January 26, 2021 requiring that all passengers (2 years of age or older) traveling by air to the United States from a foreign country (i) obtain a COVID-19 test no more than 3 days before their flight departs, and (ii) provide proof of a negative result (or documentation of having recovered from COVID-19) to the airline prior to boarding the flight. The Centers for Disease Control and Prevention and TSA also issued orders effective February 1, 2021, mandating the wearing of face masks on flights, subject to certain limited exceptions. Additional health requirements or standards, whether mandated by government agencies or voluntarily adopted by the Company, related to the COVID-19 pandemic or otherwise intended to mitigate the spread of communicable diseases could affect the Company's costs and performance.

For further information pertaining to the FAA's oversight and regulatory authority, as well as health and safety regulations related to COVID-19, see "Risk Factors - Legal, Regulatory, Compliance, and Reputational Risks, and COVID-19 Risks."

### Security Regulation

Pursuant to the Aviation and Transportation Security Act ("ATSA"), the TSA, a federal agency of the U.S. Department of Homeland Security, is responsible for certain civil aviation security matters. ATSA and subsequent TSA regulations and procedures implementing ATSA address, among other things, (i) flight deck security; (ii) the use of federal air marshals onboard flights; (iii) airport and aircraft access security; (iv) airline crew security

training; (v) security screening of passengers, baggage, cargo, mail, employees, and vendors; (vi) training and qualifications of security screening personnel; (vii) provision of passenger data to CBP; and (viii) background checks.

Under ATSA, substantially all security officers at airports are federal employees, and significant other elements of airline and airport security are overseen and performed by federal employees, including federal security managers, federal law enforcement officers, and federal air marshals. TSA personnel and TSA-mandated security procedures can affect the Company's operations, costs, and Customer experience. For example, as part of its security measures, the TSA regulates the types of liquid items that can be carried onboard aircraft. In addition, as part of its Secure Flight program, the TSA requires airlines to collect a passenger's full name (as it appears on a government-issued ID), date of birth, gender, and Redress Number (if applicable). Airlines must transmit this information to Secure Flight, which uses the information to perform matching against terrorist watch lists. After matching passenger information against the watch lists, Secure Flight transmits the matching results back to airlines. This serves to identify individuals for more extensive security screening and to prevent individuals on watch lists from boarding an aircraft. It also helps prevent the misidentification of passengers who have names similar to individuals on watch lists. The TSA's multi-layered approach to airport security also includes physical pat down procedures at security checkpoints. These procedures have raised privacy concerns by some air travelers, and have caused delays at screening checkpoints.

Pursuant to the 2018 Reauthorization Act, the FAA is required to issue an order requiring installation of a physical secondary cockpit barrier on "each new aircraft that is manufactured" for delivery to a passenger air carrier. A working group comprised of industry technical experts provided advice and recommendations to the FAA in 2020 on the most effective ways to implement the physical secondary cockpit barrier requirement. Depending on if and how the FAA reacts to the working group's advice and recommendations, as well as the FAA's interpretation and application of the statutory requirement, compliance with the future FAA order could impose a substantial cost on the Company.

The Company, in conjunction with the TSA, participates in TSA PreCheck™, a pre-screening initiative that allows passengers deemed low risk by the TSA to move through security checkpoints with greater efficiency and ease when traveling. Eligible passengers may use dedicated screening lanes at certain airports the Company serves for screening benefits, which include leaving on shoes, light outerwear, and belts, as well as leaving laptops and permitted liquids in carryon bags. A similar CBP-administered program, Global Entry®, allows expedited clearance for pre-approved, low-risk international travelers upon arrival in the United States. The TSA has expressed its plans to leverage advanced transportation security screening technologies, including biometric solutions, to improve security effectiveness and operational efficiency, while also enhancing the passenger experience. The advanced technologies have prompted privacy, cost, and legal concerns from air carriers, travelers, and advocacy groups, which could affect the timing and viability of the TSA's plans.

The Company also participates in the TSA Known Crewmember® program, which is a risk-based screening system that enables TSA security officers to positively verify the identity and employment status of flight-crew members. The program expedites flight crew member access to sterile areas of airports.

The Company works collaboratively with TSA, foreign national governments, and airports to provide risk-based security measures at international locations served by the Company.

The Department of Homeland Security has granted the Company designation coverage under the Support Anti-Terrorism by Fostering Effective Technologies Act of 2002 (the "SAFETY Act") through September 29, 2022. Designation coverage affords the Company certain limitations of liability for claims arising out of an "act of terrorism," as defined under the SAFETY Act. The designation is based on the security program used by the Company to protect its Employees, Customers, and assets from terrorists and other criminal activities.

The Company has made significant investments in facilities, equipment, and technology to process Customers, checked baggage, and cargo efficiently in compliance with applicable security regulations; however, the Company

17

is not able to predict the impact, if any, that various security measures or TSA resource limitations at certain airports will have on Passenger revenues and the Company's costs, either in the short-term or the long-term.

**Environmental Regulation**

The Company is subject to various federal laws and regulations relating to the protection of the environment, including the Clean Air Act, the Resource Conservation and Recovery Act, the Clean Water Act, the Safe Drinking Water Act, and the Comprehensive Environmental Response, Compensation and Liability Act, as well as state and local laws and regulations. These laws and regulations govern aircraft drinking water, emissions, storm water discharges from operations, and the disposal of materials such as jet fuel, chemicals, hazardous waste, and aircraft deicing fluid.

Additionally, in conjunction with airport authorities, other airlines, and state and local environmental regulatory agencies, the Company, as a normal course of business, undertakes voluntary investigation or remediation of soil or groundwater contamination at various airport sites. The Company has not historically experienced any airport site environmental liability that has had a material adverse effect on its capital expenditures, earnings, or competitive position. However, many airports, as well as federal, state and local governmental authorities, are increasingly focused on groundwater contamination caused by so-called "forever chemicals," most notably per- and polyfluoroalkyl substances ("PFAS"). PFAS have been used in many manufacturing and industrial applications over many decades and can be found in numerous products, including building materials and household products. Most notably for aviation, PFAS are a key component in aqueous film-forming foam ("AFFF"), which is widely used to fight petroleum-based fires at both commercial and military aviation facilities. The FAA and the U.S. Department of Defense have strict performance specifications for fire suppression systems, which has contributed to the use of AFFF/PFAS over the decades. PFAS is now the focus of regulatory oversight at airports, as well as the source of litigation by airports against AFFF manufacturers. Moreover, regulatory authorities at the federal, state, and local levels are contemplating both the prohibition of PFAS-based AFFF and costly remediation efforts at airports to address groundwater contamination. The evolving legal and regulatory activity surrounding PFAS could lead to an inadequate supply of FAA-certified AFFF throughout the aviation system and/or increased operating costs at certain airports.

The federal government, as well as several state and local governments, the governments of other countries, and the United Nations' International Civil Aviation Organization ("ICAO") have implemented legislative and regulatory proposals and voluntary measures to address climate change by reducing greenhouse gas emissions. At the federal level, in July 2016, the Environmental Protection Agency (the "EPA") issued a final endangerment finding for greenhouse gas emissions from certain types of aircraft engines, which the agency determined contribute to pollution that causes climate change and endangers public health and the environment. Following this endangerment finding, per the federal Clean Air Act, the EPA adopted aircraft greenhouse gas emissions standards in December 2020. These standards apply to airframe and aircraft engine manufacturers, and align with the standards previously adopted by ICAO.

In addition to aircraft emissions standards, ICAO implemented a "global market-based measure" framework in an effort to control carbon dioxide emissions from international aviation. The focal point of this framework is a carbon offsetting system applicable to aircraft operators designed to cap the growth of emissions related to international aviation emissions. ICAO's Carbon Offsetting and Reduction Scheme for International Aviation ("CORSIA") program is a global market-based measure intended to cap carbon emissions from international civil aviation at their 2019 levels, enabling carbon-neutral growth for the international aviation sector by requiring that international aviation emissions above 2019 levels are offset or reduced through the use of sustainable aviation fuels. The U.S. federal government has opted to participate in the voluntary phases of the CORSIA program from 2021-2026 (additional phases extend through 2035). As part of the CORSIA program, the Company is currently monitoring its international emissions for reporting purposes. Data collected from applicable international flight activity in 2019 will form the baseline and be used in the calculations to determine subsequent carbon offsetting requirements under the CORSIA program. Regardless of the method of regulation or application of CORSIA, further policy changes

18

with regard to climate change are possible, which could significantly increase operating costs in the airline industry and, as a result, adversely affect operations.

In addition to climate change, aircraft noise continues to be an environmental focus, especially as the FAA implements new flight procedures as part of its NextGen airspace modernization program discussed above. The Airport Noise and Capacity Act of 1990 gives airport operators the right, under certain circumstances, to implement local noise abatement programs, provided they do not unreasonably interfere with interstate or foreign commerce or the national air transportation system. Some airports have established airport restrictions to limit noise, including restrictions on aircraft types to be used and limits on the number of hourly or daily operations or the time of operations. These types of restrictions can cause curtailments in service or increases in operating costs and can limit the ability of air carriers to expand operations at the affected airports.

At the federal level, the FAA has committed to inform and involve the public, engage with communities, and give meaningful consideration to community concerns and views when developing new flight procedures, and there is a possibility that Congress may enact legislation in 2021 to address local noise concerns at one or more commercial airports in the United States. In addition, the 2018 Reauthorization Act requires the FAA to consider community noise concerns when proposing a new navigation departure procedure or amending an existing navigation procedure that would direct aircraft over noise sensitive areas. This requirement could delay or otherwise impede the implementation or use of more efficient flight paths.

The Company remains steadfast in its desire to pursue, implement, and enhance initiatives that will reduce fuel consumption, which reduces carbon emissions, and improve fuel efficiency. During 2020, the Company continued its efforts to improve the efficiency of its flight planning and flight operations. In addition, over the years, the Company has undertaken a number of other fuel conservation and emissions reduction initiatives such as the following:

- introduction of the MAX aircraft into the Company's fleet, which is more fuel-efficient and releases fewer $CO_2$ emissions than the Company's other aircraft;
- installation of blended winglets, which reduce drag and increase fuel efficiency, on all aircraft in the Company's fleet;
- upgrading of the Company's 737-800 fleet with designed, split scimitar winglets;
- periodic engine washes;
- use of electric ground power and pre-conditioned air for aircraft at the gate, when available;
- replacement of eligible internal combustion ground support equipment with electric equipment at select locations;
- deployment of auto-throttle and vertical navigation to maintain optimum cruising speeds;
- implementation of engine start procedures to support the Company's single engine taxi procedures;
- adjustment of the timing of auxiliary power unit starts on originating flights to reduce auxiliary power unit usage;
- implementation of fuel planning initiatives to safely reduce loading of excess fuel;
- aircraft cabin interior retrofitting to reduce weight;
- reduction of aircraft engine idle speed while on the ground, which also increases engine life;
- galley refreshes with dry goods weight reduction;
- Company-optimized routes (flying the best wind routes to take advantage of tailwinds or to minimize headwinds);
- improvements in flight planning algorithms to better match the Company's aircraft flight management system and thereby enable the Company to fly at the most efficient altitudes;
- substitution of Pilot and Flight Attendant flight bags with lighter Electronic Flight Bag tablets; and
- implementation of Real Time Descent Winds (automatic uplinking of up-to-date wind data to the aircraft, allowing crews to time the descent to minimize thrust inputs).

19

The Company has also participated in Required Navigation Performance ("RNP") operations as part of the FAA's Performance Based Navigation program, a key component of the NextGen program, which is intended to modernize the U.S. air traffic control system by addressing limitations on air transportation capacity and making more efficient use of airspace. RNP combines the capabilities of advanced aircraft avionics, Global Positioning System ("GPS") satellite navigation (instead of less precise ground-based navigation), and new flight procedures to (i) enable aircraft to carry navigation capabilities, rather than relying on airports; (ii) improve operational capabilities by opening up many new and more direct airport approach paths to produce safer and more efficient flight patterns; and (iii) conserve fuel and reduce emissions. Since its first use of RNP in 2011, Southwest has conducted approximately 321,000 RNP approaches, including over 84,500 in 2020. Southwest must rely on RNP approaches published by the FAA, and the rate of introduction and utilization of RNP approaches continues to be slower than expected, with fuel efficient and emissions reducing RNP approaches currently available at only 57 of the airports Southwest serves. In addition, even at airports with approved RNP approaches, the clearance required from air traffic controllers to perform RNP approaches is often not granted. Southwest continues to work with the FAA to develop and seek more use of RNP approaches and to evolve air traffic control rules to support greater utilization of RNP.

As part of its commitment to corporate sustainability, the Company has published the Southwest One Report™ describing the Company's sustainability strategies, which include the foregoing and other efforts to reduce greenhouse gas emissions and address other environmental matters such as energy and water conservation, waste minimization, and recycling. Information contained in the Southwest One Report is not incorporated by reference into, and does not constitute a part of, this Form 10-K.

Government efforts at the international, federal, state, or local levels to address worldwide climate change, manage greenhouse gas emissions, and reduce aircraft noise could affect aircraft operators, original equipment manufacturers, producers and sellers of aviation fuel, and other third parties on which the Company is dependent. Additional legislative or regulatory activity in this area could require modifications to the Company's equipment, operations, and strategy, and have a material effect on the Company's capital expenditures, earnings, or competitive position.

### Data Privacy and Security Regulation

Like all industries, the airline industry has experienced heightened legislative and regulatory focus on data privacy and data security in the United States and elsewhere. As a result, the Company has been monitoring a growing and fast-evolving set of legal requirements in this area that give consumers much broader access and control over their personal information.

The Company expects federal, state, and other governments to assess and implement cyber-security and data privacy protections, which could result in expanded compliance burdens, costs, and enforcement risks for the Company.

### International Regulation

All international air service is subject to certain U.S. federal requirements and approvals, as well as the regulatory requirements of the appropriate authorities of the foreign countries involved. Foreign regulatory agencies located in jurisdictions served by the Company can impose requirements on various aspects of the Company's business, including safety, marketing, ticket sales, staffing, and tax. In response to the COVID-19 pandemic, certain U.S and foreign regulatory authorities have imposed health requirements for international passengers. For example, on January 12, 2021, the Centers for Disease Control and Prevention issued an order effective January 26, 2021, requiring that all passengers (2 years of age or older) traveling by air to the United States from a foreign country (i) obtain a COVID-19 test no more than 3 days before their flight departs, and (ii) provide proof of a negative result (or documentation of having recovered from COVID-19) to the airline prior to boarding the flight. This order and other new or existing health requirements for international travel could adversely affect demand and the performance of the Company's international flight offerings.

20

The Company has obtained the necessary economic authority from the DOT, as well as approvals required by the FAA and applicable foreign government entities, to conduct operations, under certain circumstances, to points outside of the continental United States currently served by the Company. Certain international authorities and approvals held by the Company are subject to periodic renewal requirements. The Company requests extensions of such authorities and approvals when and as appropriate. To the extent the Company seeks to serve additional foreign destinations in the future, or to renew its authority to serve certain routes, it may be required to obtain necessary authority from the DOT and/or approvals from the FAA, as well as any applicable foreign government entity.

Certain international markets are governed by bilateral air transportation agreements between the United States and foreign countries. Changes in U.S. or foreign government aviation policies could result in the alteration or termination of such agreements, diminish the value of the Company's existing international authorities, present barriers to renewing existing or securing new authorities, or otherwise affect the Company's international operations. There are also capacity limitations at certain international airports, which could impact future service levels. In general, bilateral agreements between the United States and foreign countries the Company currently serves, or may serve in the future, may be subject to renegotiation or reinterpretation from time to time. While the U.S. government has negotiated "open skies" agreements with many countries, which allow for unrestricted access between the United States and respective foreign destinations, agreements with other countries may restrict the Company's entry into those destinations and/or its related growth opportunities.

The CBP is the federal agency of the U.S. Department of Homeland Security charged with facilitating international trade, collecting import duties, and enforcing U.S. regulations with respect to trade, customs, and immigration. To the extent the Company expands its international flight offerings, CBP and its requirements and resources will also become increasingly important considerations to the Company. For instance, with the exception of flights from a small number of foreign "preclearance" locations, arriving international flights may only land at CBP-designated airports, and CBP officers must be present and in sufficient numbers at those airports to effectively process and inspect arriving international passengers, baggage, and cargo. Thus, CBP personnel and CBP-mandated procedures can affect the Company's operations, costs, and Customer experience. The Company has made significant investments in facilities, equipment, and technologies at certain airports in order to improve the Customer experience and to assist CBP with its inspection and processing duties; however, the Company is not able to predict the impact, if any, that various CBP measures or the lack of CBP resources will have on the Company's revenues and costs, either in the short-term or the long-term.

**Insurance**

The Company carries insurance of types customary in the airline industry and in amounts the Company deems adequate to protect the Company and its property and to comply both with applicable regulations and certain of the Company's credit and lease agreements. The policies principally provide coverage for public and passenger liability, property damage, cargo and baggage liability, loss or damage to aircraft, engines, and spare parts, and workers' compensation. In addition, the Company carries a cyber-security insurance policy with regards to data protection and business interruption associated with both security breaches from malicious parties and from certain system failures. The Company also manages insured risk through the use of reinsurance programs, pooling mechanisms, and a wholly-owned captive insurance subsidiary.

Although the Company has been able to purchase aviation, property, liability, and professional insurance via the commercial insurance marketplace, available commercial insurance could be more expensive in the future and/or have material differences in coverage than insurance that has historically been provided and may not be adequate to protect the Company's risk of loss from future events, including acts of terrorism. Further, available cyber-security insurance with regards to data protection and business interruption could be more expensive in the future and/or have material differences in coverage than insurance that has historically been provided and may not be adequate to protect the Company's risk of loss. With respect to any insurance claims, policy coverages and claims are subject to

21

acceptance by the many insurers involved and may require arbitration and/or mediation to effectively settle the claims over prolonged periods of time.

## Competition

Competition within the airline industry is intense and highly unpredictable, and Southwest has competed with other airlines on virtually all of its scheduled routes. In recent years, the majority of domestic airline service has been provided by Southwest and the other largest major U.S. airlines, including American Airlines, Delta Air Lines, and United Airlines. The DOT defines major U.S. airlines as those airlines with annual revenues of at least $1 billion; there are currently 13 passenger airlines offering scheduled service, including Southwest, that meet this standard.

Key competitive factors within the airline industry have historically included (i) pricing and cost structure; (ii) routes, loyalty programs, and schedules; and (iii) customer service, operational reliability, and amenities. As discussed below, the COVID-19 pandemic has significantly altered the competitive landscape amongst the airlines, as the industry has been forced to prioritize liquidity and cost control, which in turn has driven actions such as more widespread discounted fares and flexible customer policies to stimulate traffic.

Airlines, including Southwest, also compete for customers with alternatives to travel, such as videoconferencing and business communication platforms. These alternatives have become particularly prevalent as a result of the COVID-19 pandemic.

### Pricing and Cost Structure

Pricing is a significant competitive factor in the airline industry, and the availability of fare information on the Internet allows travelers to easily compare fares and identify competitor promotions and discounts. During 2020, as a result of the COVID-19 pandemic, the Company experienced an increasingly competitive fare environment, as airlines offered significantly discounted fares to attempt to address unprecedented decreases in consumer demand.

Pricing can be driven by a variety of factors. In addition to the need to stimulate traffic, as has occurred during the COVID-19 pandemic, under normal circumstances, airlines may discount fares to drive traffic in new markets and/or grow market share in existing markets.

The Company believes its low-cost operating structure has historically provided it with an advantage over many of its airline competitors by enabling it to continue to charge low fares. In addition, the Company believes its low-cost operating structure provided it with a significant financial competitive advantage relative to many of its competitors in responding to the financial impact of the COVID-19 pandemic. Further, as discussed below under "Management's Discussion and Analysis of Financial Condition and Results of Operations," all U.S. airlines have continued to experience significant unit cost pressure as a result of the effects of the COVID-19 pandemic. While it has become increasingly difficult for the Company to improve upon its industry cost position, the Company believes its Customer Service, flexible Customer and Rapid Rewards policies, and commitments such as the Southwest Promise continue to positively differentiate it from many of its competitors.

### Routes, Loyalty Programs, and Schedules

The Company also competes with other airlines based on markets served, loyalty opportunities, and flight schedules. While the Company has a robust, point-to-point route network in the United States, some major airlines have more extensive route structures than Southwest, including more extensive international networks. In addition, many competitors have entered into significant commercial relationships with other airlines, such as strategic alliances, code-sharing, and capacity purchase agreements, which increase the airlines' opportunities to expand their route offerings. An alliance or code-sharing agreement enables an airline to offer flights that are operated by another airline and also allows the airline's customers to book travel that includes segments on different airlines through a single reservation or ticket. As a result, depending on the nature of the specific alliance or code-sharing arrangement, a participating airline may be able to, among other things, (i) offer its customers access to more

22

destinations than it would be able to serve on its own, (ii) gain exposure in markets it does not otherwise serve, and (iii) increase the perceived frequency of its flights on certain routes. More extensive route structures, as well as alliance and code-sharing arrangements, not only provide additional route flexibility for participating airlines, they can also allow these airlines to offer their customers more opportunities to earn and redeem loyalty miles or points. A capacity purchase agreement enables an airline to expand its route structure by paying another airline (e.g., a regional airline with smaller aircraft) to operate flights on its behalf in markets that it does not, or cannot, serve itself. The Company continues to evaluate and implement initiatives to better enable itself to offer additional itineraries.

### Customer Service, Operational Reliability, and Amenities

Southwest also competes with other airlines with respect to Customer Service, operational reliability (such as ontime performance), and passenger amenities. According to statistics published by the DOT, Southwest consistently ranks at or near the top among domestic carriers in Customer Satisfaction for having the lowest Customer complaint ratio. However, in particular in response to the COVID-19 pandemic, carriers are increasingly focusing on customer-friendly policies as opportunities to win and retain Customers. In addition, some airlines have more seating options and associated passenger amenities than Southwest, including first class, business class, and other premium seating and related amenities. New and different types of aircraft flown by competitors could have operational attributes and passenger amenities that could be considered more attractive to certain consumers than those associated with the Company's existing fleet.

### Other Forms of Competition

Technology advancements have provided alternatives to air travel, such as videoconferencing, business communication platforms, and the Internet, and these alternatives have significantly increased in scope during the COVID-19 pandemic. The Company is subject to the risk that the significantly increased use of these alternatives could result in permanent changes to consumer behavior and thereby negatively affect demand for air travel.

The airline industry is also subject to varying degrees of competition from other forms of transportation, including surface transportation by automobiles, buses, and trains. Inconveniences and delays associated with air travel security measures can increase surface competition. In addition, surface competition can be significant during economic downturns when consumers cut back on discretionary spending and fewer choose to fly, or when gasoline prices are lower, making surface transportation a less expensive option. Because of the relatively high percentage of short-haul travel provided by Southwest, it is particularly exposed to competition from surface transportation in these instances.

### Seasonality

The Company's business is ordinarily seasonal. Generally, in most markets the Company serves, demand for air travel is greater during the summer months, and, therefore, revenues in the airline industry tend to be stronger in the second (April 1 - June 30) and third (July 1 - September 30) quarters of the year than in the first (January 1 - March 31) and fourth (October 1 - December 31) quarters of the year. As a result, in many cases, the Company's results of operations reflect this seasonality. Factors that could alter this seasonality include, among others, global pandemics such as COVID-19, the price of fuel, general economic conditions, changes in consumer behavior, governmental action, extreme or severe weather and natural disasters, fears of terrorism or war, or changes in the competitive environment. Therefore, the Company's quarterly operating results are not necessarily indicative of operating results for the entire year, and historical operating results in a quarterly or annual period are not necessarily indicative of future operating results.

### Employees

### Total Employees and Labor Union Activity

At December 31, 2020, the Company had approximately 56,500 active fulltime equivalent Employees, consisting of approximately 24,500 flight, 3,000 maintenance, 19,500 ground, Customer, and fleet service, and 9,500 management, technology, finance, marketing, and clerical personnel (associated with non-operational departments). Approximately 83 percent of these Employees were represented by labor unions. The Railway Labor Act establishes the right of airline employees to organize and bargain collectively. Under the Railway Labor Act, collective-bargaining agreements between an airline and a labor union generally do not expire, but instead become amendable as of an agreed date. By the amendable date, if either party wishes to modify the terms of the agreement, it must notify the other party in the manner required by the Railway Labor Act and/or described in the agreement. After receipt of the notice, the parties must meet for direct negotiations. If no agreement is reached, either party may request the National Mediation Board to appoint a federal mediator. If no agreement is reached in mediation, the National Mediation Board may determine an impasse exists and offer binding arbitration to the parties. If either party rejects binding arbitration, a 30-day "cooling off" period begins. At the end of this 30-day period, the parties may engage in "self-help," unless a Presidential Emergency Board is established to investigate and report on the dispute. The appointment of a Presidential Emergency Board maintains the "status quo" for an additional period of time. If the parties do not reach agreement during this period, the parties may then engage in "self-help." "Self-help" includes, among other things, a strike by the union or the airline's imposition of any or all of its proposed amendments and the hiring of new employees to replace any striking workers.

The following table sets forth the Company's Employee groups subject to collective bargaining and the status of their respective collective-bargaining agreements as of December 31, 2020:

| Employee Group | Approximate Number of Employees | Representatives | Status of Agreement |
|---|---|---|---|
| Southwest Pilots | 8,500 | Southwest Airlines Pilots' Association ("SWAPA") | In negotiations |
| Southwest Flight Attendants | 15,400 | Transportation Workers of America, AFL-CIO, Local 556 ("TWU 556") | In negotiations |
| Southwest Ramp, Operations, Provisioning, Freight Agents | 13,100 | Transportation Workers of America, AFL-CIO, Local 555 ("TWU 555") | Amendable February 2021 |
| Southwest Customer Service Agents, Customer Representatives, and Source of Support Representatives | 6,400 | International Association of Machinists and Aerospace Workers, AFL-CIO ("IAM 142") | In negotiations |
| Southwest Material Specialists (formerly known as Stock Clerks) | 310 | International Brotherhood of Teamsters, Local 19 ("IBT 19") | Amendable April 2024 |
| Southwest Mechanics | 2,500 | Aircraft Mechanics Fraternal Association ("AMFA") | Amendable August 2024 |
| Southwest Aircraft Appearance Technicians | 160 | AMFA | In negotiations |
| Southwest Facilities Maintenance Technicians | 40 | AMFA | Amendable November 2022 |
| Southwest Dispatchers | 390 | Transportation Workers of America, AFL-CIO, Local 550 ("TWU 550") | In negotiations |
| Southwest Flight Simulator Technicians | 40 | International Brotherhood of Teamsters ("IBT") | Amendable May 2024 |
| Southwest Flight Crew Training Instructors | 110 | Transportation Workers of America, AFL-CIO, Local 557 ("TWU 557") | Amendable January 2022 |
| Southwest Meteorologists | 10 | TWU 550 | In negotiations |

## Human Capital Resources

### *General*

24

The Company's approach to human capital is a critical strategy with priorities that include, among others: (i) attracting, developing, and retaining a diverse and talented workforce; (ii) providing opportunities for learning, development, career growth, and movement within the Company; (iii) evaluating compensation and benefits, and rewarding performance; (iv) investing in physical, emotional, and financial health of Employees; (v) obtaining Employee feedback; (vi) maintaining and enhancing Company culture; and (vii) communicating with the Board of Directors on a routine basis on key topics, including executive succession planning.

The Company has implemented many programs designed to achieve these priorities, including strong Employee training and benefits programs. The Company's vast Employee training and development opportunities address, among other things, leadership development, diversity and inclusion, communication skills, and human trafficking awareness. The Company rewards Employees with competitive compensation and benefits packages, including attractive medical plans, a 401(k) plan with a dollar-for-dollar match for Employees other than Pilots (subject to vesting requirements and certain compensation limits), a 401(k) plan with a non-elective contribution of 15% for Pilots, and a profit sharing plan.

The Company regularly conducts Employee surveys to assess job satisfaction of its Employees, and uses information from the surveys to improve the Company's ability to attract, develop, and retain talented Employees who will help advance the Company. For many years, the bonus opportunity for the Company's senior leadership group, including its executive officers, has been tied to the Company's performance relative to multiple pre-established performance metrics, including, among others, the Company's voluntary turnover rate for Employees. In addition to bonus opportunities for the Company's senior leadership group, the Company has implemented performance-based compensation programs for other non-contract employee leaders, including managers, supervisors, and team leads.

### *Diversity, Equity, and Inclusion*

Diversity, equity, and inclusion ("DEI") is also an integral part of the Company's culture and processes that support recruitment, hiring, training, and advancement. In an effort to advance the Company's commitment to DEI, the Company recently established the following goals:

- Evolve hiring and development practices to support diversity goals, including posting all open Leadership positions (Supervisor to Vice President) and requiring diverse candidate slates for each role;
- Measure progress in increasing diversity in Senior Leadership;
- Double the percentage of racial diversity and increase gender diversity in the Company's Senior Management Committee by 2025; and
- Engaging the Company's breadth of community partners to leverage relationships in sourcing diverse talent.

Additionally, the Company's Board of Directors has committed to increasing its diverse representation by 2025. The Company has a dedicated Diversity & Inclusion Department that provides regular updates to the Compensation Committee of the Company's Board of Directors. To continue the Company's commitment to inclusion, the Diversity & Inclusion Department has launched a multi-year training plan to increase the cultural competency of the Company's workforce.

### *Effects of COVID-19*

On June 1, 2020, the Company announced Voluntary Separation Program 2020, a voluntary separation program that allowed eligible Employees the opportunity to voluntarily separate from the Company in exchange for severance, medical/dental coverage for a specified period of time, and travel privileges based on years of service. In conjunction with Voluntary Separation Program 2020, the Company also offered certain contract Employees the option to take voluntary Extended Emergency Time Off ("Extended ETO"), for periods between six and 18 months, with the exception of Pilots, who could elect to take Extended ETO for periods up to five years. The Company continues to evaluate and evolve its Extended ETO program, including offering additional Extended ETO opportunities of one, two, or three month durations to certain Employees who are either not currently participating

in Extended ETO, or who are currently on Extended ETO set to expire in coming months. The purpose of Voluntary Separation Program 2020 and Extended ETO is to maintain a suitable sized workforce to operate at reduced capacity relative to the Company's operations prior to the COVID-19 pandemic.

Pursuant to the Payroll Support Program under the CARES Act and the Payroll Support Program Extension under the Consolidated Appropriations Act, 2021, the Company has received funds to protect Employees' jobs by offsetting payroll expenses. In light of the Payroll Support Program and the Payroll Support Program Extension, the Company has not implemented and does not anticipate implementing pay cuts or furloughs through 2021. For further information about the Voluntary Separation Program 2020, Extended ETO, the Payroll Support Program, and the Payroll Support Program Extension, see "Management's Discussion and Analysis of Financial Condition and Results of Operations," and Note 2 to the Consolidated Financial Statements.

**Additional Information About the Company**

The Company was incorporated in Texas in 1967. The following documents are available free of charge through the Company's website, www.southwest.com: the Company's annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and any amendments to those reports that are filed with or furnished to the Securities and Exchange Commission ("SEC") pursuant to Sections 13(a) or 15(d) of the Securities Exchange Act of 1934. These materials are made available through the Company's website as soon as reasonably practicable after they are electronically filed with, or furnished to, the SEC. In addition to its reports filed or furnished with the SEC, the Company publicly discloses material information from time to time in its press releases, at annual meetings of Shareholders, in publicly accessible conferences and Investor presentations, and through its website (principally in its Press Room and Investor Relations pages). References to the Company's website in this Form 10-K are provided as a convenience and do not constitute, and should not be deemed, an incorporation by reference of the information contained on, or available through, the website, and such information should not be considered part of this Form 10-K.

26

## DISCLOSURE REGARDING FORWARD-LOOKING INFORMATION

This Form 10-K contains "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Forward-looking statements are based on, and include statements about, the Company's estimates, expectations, beliefs, intentions, and strategies for the future, and the assumptions underlying these forward-looking statements. Specific forward-looking statements can be identified by the fact that they do not relate strictly to historical or current facts and include, without limitation, words such as "anticipates," "believes," "estimates," "expects," "intends," "may," "will," "would," "could," "plans," "goal," and similar expressions. Although management believes these forward-looking statements are reasonable as and when made, forward-looking statements are not guarantees of future performance and involve risks and uncertainties that are difficult to predict. Therefore, actual results may differ materially from what is expressed in or indicated by the Company's forward-looking statements or from historical experience or the Company's present expectations. Known material risk factors that could cause these differences are set forth below under "Risk Factors." Additional risks or uncertainties (i) that are not currently known to the Company, (ii) that the Company currently deems to be immaterial, or (iii) that could apply to any company, could also materially adversely affect the Company's business, financial condition, or future results.

Caution should be taken not to place undue reliance on the Company's forward-looking statements, which represent the Company's views only as of the date this Form 10-K is filed. The Company undertakes no obligation to update publicly or revise any forward-looking statement, whether as a result of new information, future events, or otherwise.

**Item 1A.   *Risk Factors***

### COVID-19 Risks

*The COVID-19 pandemic has materially and adversely affected, and will likely continue to materially and adversely affect, the Company's results of operations, financial position, and liquidity.*

In late 2019, an outbreak of COVID-19 was identified in Wuhan, China. The COVID-19 outbreak has since spread and grown globally, including within the United States and, in March 2020, the President of the United States declared a national emergency. The COVID-19 pandemic has materially and adversely affected passenger demand and bookings for both business and leisure travel, thereby materially and adversely affecting operating income and cash flows from operations. The Company has bolstered its liquidity through the financings discussed in Notes 7, 8, and 9 to the Consolidated Financial Statements. In addition, the Company has aggressively evaluated all capital spending, discretionary spending, and non-essential costs to identify opportunities for cost reductions or deferrals and significantly reduced annual 2020 cash outlays and spending, compared with original plans. The Company's cost reduction actions have included, among others, (i) cutting or deferring non-essential projects; (ii) reducing the Company's published flight schedule; (iii) placing a significant number of aircraft in storage; (iv) implementing voluntary separation and time-off programs for Employees; (v) substantially suspending all hiring; (vi) reducing the Chief Executive Officer's salary by 20 percent; (vii) reducing the other named executive officer salaries and Board of Director cash retainer fees by 20 percent through December 31, 2020; and (viii) where possible, modifying vendor and supplier payment terms.

The extent of the impact of the COVID-19 pandemic on the Company's business and its financial and operational performance will depend on future developments, including (i) the duration, spread, severity, and any recurrence of the COVID-19 pandemic, including through any new variant strains of the underlying virus; (ii) the effectiveness and availability of vaccines; (iii) the duration and scope of related federal, state, and local government orders and restrictions; (iv) the extent of the impact of the COVID-19 pandemic on overall demand for air travel; and (v) the Company's access to capital, all of which are highly uncertain and cannot be predicted. Continued reductions in the Company's flight schedule could have a significant negative effect on the Company's overall network and operations.

27

The COVID-19 pandemic has caused public health officials to recommend precautions to mitigate the spread of the virus. Since the onset of the COVID-19 pandemic, federal, state, and local authorities have at various times instituted measures such as imposing testing and self-quarantine requirements, issuing directives forcing businesses to reduce operations or temporarily close, restricting international air travel, and issuing shelter-in-place and similar orders limiting the movement of individuals. Additionally, businesses have restricted non-essential travel for their employees. Such measures have depressed demand for air travel, disrupted the Company's operations, and materially adversely affected the Company's business. The resulting cancellations of flights has resulted in a significant amount of cash refunds and the issuance of travel credits to Customers. The total value of refunds, excluding taxes and related fees, issued to Customers during March 2020, second quarter 2020, third quarter 2020, and fourth quarter 2020, was $248 million, $322 million, $162 million, and $202 million, respectively. The cancellations and cash refunds have negatively affected the Company's revenues and liquidity, and the Company expects such negative effects to continue. Further, due to the fears and restrictions involved with travel in the near term, sales of tickets for future travel have been adversely affected. The Company will continue to be materially adversely affected if government authorities extend existing orders or impose new orders or other restrictions intended to mitigate the spread of COVID-19, if businesses continue to restrict travel for their employees, or if fear of travel continues to depress future ticket sales.

Certain Employees of the Company, and employees of its suppliers and service providers, including airport and air traffic personnel, have tested positive for or been suspected of having COVID-19. These cases have resulted in the closure of facilities, reduction in available staffing, and disruptions to the Company's overall operations. Additional instances of actual or perceived risk of infection among the Company's Employees, or its suppliers' or service providers' employees, could further negatively impact the Company's operations. The Company could also be materially adversely affected if it were unable to effectively maintain a suitably skilled and sized workforce, address employment-related matters, or maintain satisfactory relations with its Employees or its Employees' representatives.

Moreover, the ability to attract and retain passengers depends, in part, upon the perception and reputation of the Company and the public's concerns regarding the health and safety of travel generally, especially regarding airline travel. Actual or perceived risk of infection on Company flights could have a material adverse effect on the public's comfort with air travel, which could harm the Company's reputation and business. The Company expects it will continue to incur COVID-19 related costs as it sanitizes airplanes and implements additional hygiene-related protocol to airplanes, and takes other action to limit infection among its Employees and passengers. In addition, the industry may be subject to enhanced health and hygiene requirements in attempts to counteract future outbreaks, which requirements may be costly and take a significant amount of time to implement.

The COVID-19 pandemic may also materially and adversely affect the Company's supply chain. For example, the Company is dependent on Boeing as its sole supplier for many of its aircraft parts. See other Risk Factors and "Management's Discussion and Analysis of Financial Condition and Results of Operations" below for further discussion of and risks related to the Company's relationship with Boeing. The Company is also dependent on (i) sole or limited suppliers for aircraft engines and certain other aircraft parts, equipment, and services; (ii) third party vendors; and (iii) service providers. The COVID-19 pandemic could result in delays and other performance issues, ceased operations, or even bankruptcies among these suppliers, third party vendors, and service providers. If a supplier, third party vendor, or service provider were unable to timely provide adequate products or support for its products, or otherwise fulfill its commitments to the Company, the Company's operations could be materially adversely affected.

The effects of the COVID-19 pandemic on the financial markets may materially and adversely affect the Company's access to capital and cost of capital, including its ability to raise funds through equity or debt financings. The COVID-19 pandemic has resulted in significant disruption of global financial markets, which has negatively impacted the value of the Company's common stock and its debt ratings and could negatively affect the Company's liquidity. For example, as a result of the economic effects of the COVID-19 pandemic, in the first half of 2020, Moody's, S&P Global, and Fitch downgraded the Company's senior unsecured debt ratings and issuer ratings. If the Company's credit ratings were to be further downgraded, or general market conditions were to ascribe higher risk to the Company's rating levels, the airline industry, or the Company, the Company's access to capital and the cost of

28

any debt financing would be negatively affected. The Company continues to evaluate potential sources of additional liquidity in the short-term. The terms of future debt agreements could include more restrictive covenants or require incremental collateral, which could further restrict the Company's business operations. The extent to which the COVID-19 outbreak affects the Company's earnings and liquidity will depend, in part, on the Company's ability to successfully access capital. There is no guarantee that debt or equity financings will be available in the future to fund the Company's obligations, or that they will be available on terms consistent with the Company's expectations.

The COVID-19 pandemic has also significantly increased economic and demand uncertainty. The current outbreak and continued spread of COVID-19 could cause a global recession, which would have a further adverse impact on the Company's medium- and long-term financial condition and operations. Historically, unfavorable U.S. economic conditions have driven changes in travel patterns, including reduced spending for both leisure and business travel. Unfavorable economic conditions, when low fares are often used to stimulate traffic, have also historically hampered the ability of airlines to raise fares to counteract any increases in fuel, labor, and other costs. Any significant increases in unemployment in the United States would likely continue to have a negative impact on passenger bookings, and these effects could exist for an extensive period of time.

Recent developments with respect to COVID-19 vaccines have the potential to affect the scope and duration of the pandemic. While a number of COVID-19 vaccines have received regulatory approval and are available in limited quantities in the United States and other parts of the world, a degree of uncertainty exists with respect to the distribution, utilization, and long-term efficacy of vaccinations among the general population. The impact of COVID-19 vaccines on the pandemic, demand for air travel, and the Company's business remain unknown. Even once the pandemic and fears of travel subside, demand for air travel may remain weak for a significant period of time. In particular, consumer behavior related to traveling may be negatively impacted by adverse changes in the perceived or actual economic climate, including higher unemployment rates, declines in income levels, and loss of wealth resulting from the impact of the COVID-19 pandemic. The COVID-19 pandemic continues to rapidly evolve. The ultimate impact of the COVID-19 pandemic is highly uncertain and subject to change.

*The Company has entered into agreements with the U.S. Treasury with respect to funding support pursuant to the Payroll Support Program under the CARES Act and the Payroll Support Program Extension; pursuant to these agreements the Company has agreed to certain restrictions on how it operates its business and uses its cash, which could limit the ability of the Company to take actions that it otherwise might have determined were in the best interests of the Company and its Shareholders.*

On March 27, 2020, the CARES Act was signed into law. The CARES Act provides liquidity in the form of grants and loans to air carriers, such as the Company, that incurred, or are expected to incur, covered losses such that the continued operations of the business are jeopardized, as determined by the Treasury. In April 2020, the Company entered into an agreement with the Treasury with respect to funding support pursuant to the Payroll Support Program. In January 2021, the Company entered into an additional agreement with the Treasury with respect to the Payroll Support Program Extension. Pursuant to these agreements, the Company has agreed to certain restrictions on, and requirements with respect to, its business and operations, including the following:

- The Company is prohibited from repurchasing its common stock and from paying dividends or making capital contributions with respect to its common stock through March 31, 2022;
- The Company must place certain restrictions on certain higher-paid employee and executive pay, including limiting pay increases and severance pay or other benefits upon terminations, until October 1, 2022;
- The Company is prohibited from implementing involuntary terminations or furloughs of its Employees (except for death, disability, cause, or certain disciplinary reasons) through March 31, 2021;
- The Company may not reduce the salaries, wages, or benefits of its Employees (other than its Executive Officers, or as otherwise permitted under the terms of the Payroll Support Program) through March 31, 2021;

29

- Until March 1, 2022, the Company must comply with any requirement issued by the DOT that the Company maintain certain scheduled air transportation service as DOT deems necessary to ensure services to any point served by the Company before March 1, 2020; and

- The Company must maintain certain internal controls and records relating to the CARES Act funds, and is subject to additional reporting requirements.

These restrictions and requirements may necessitate that the Company take, or limit taking, actions it might otherwise believe to be in the best interests of the Company and its Shareholders. For example, the restrictions could require that the Company change certain of its business practices, risk the Company's ability to retain key personnel, and expose the Company to additional costs (including increased compliance costs).

### Boeing 737-MAX Risks

*The Company is currently dependent on Boeing as the sole manufacturer of the Company's aircraft. Prolonged delays completing the FAA's requirements to return the Boeing 737 MAX aircraft to Customer service, or further regulatory actions by the FAA with respect to the MAX aircraft, could materially and adversely affect the Company's business plans, strategies, and results of operations.*

The Boeing 737 MAX aircraft are crucial to the Company's growth plans and fleet modernization initiatives. On November 18, 2020, the FAA rescinded its March 2019 Boeing 737 MAX grounding order, issued an airworthiness directive, and published training requirements enabling the Company to begin modifying certain operating procedures, implementing enhanced pilot training requirements, installing FAA-approved flight control software updates, and completing other required maintenance tasks specific to the MAX aircraft. See "Business - Boeing 737 MAX Grounding" above. In addition to training its active Pilots, the Company is continuing work on its 34 MAX aircraft delivered prior to the FAA's rescission of the grounding order to prepare each aircraft for the return to Customer service, including removing the aircraft from storage, installing the new flight control software updates, and performing required maintenance checks. The Company will also conduct multiple readiness flights on each of its MAX aircraft before each such aircraft is operated in Customer service.

The MAX groundings have adversely affected the Company's operations and financial results. While the Company has scheduled the MAX return to service on March 11, 2021, any prolonged delays completing the FAA's requirements to return the MAX aircraft to Customer service, or further regulatory actions by the FAA with respect to the Boeing 737 MAX aircraft, could require additional flight schedule adjustments, result in delays of aircraft deliveries, and materially and adversely affect the Company's business plans, strategies, and results of operations.

Boeing no longer manufactures versions of the 737 other than the 737 MAX family of aircraft. If the 737 MAX aircraft were to again become unavailable for the Company's flight operations, the Company's growth would be restricted unless and until it could procure and operate other types of aircraft from Boeing or another manufacturer, seller, or lessor, and the Company's operations would be materially adversely affected. In particular, if the Company's growth were to be dependent upon the introduction of a new aircraft make and model to the Company's fleet, the Company would need to, among other things, (i) develop and implement new maintenance, operating, and training programs; (ii) secure extensive regulatory approvals; and (iii) implement new technologies. The requirements associated with operating a new aircraft make and model could take an extended period of time to fulfill and would likely impose substantial costs on the Company. A shift away from a single fleet type could also add complexity to the Company's operations, present operational and compliance risks, and materially increase the Company's costs. Any of these events would have a material, adverse effect on the Company's business, operating results, and financial condition. The Company could also be materially adversely affected if the pricing or operational attributes of its aircraft were to become less competitive.

Further, even following the rescission of the FAA order to ground the MAX aircraft, the Company continues to be reliant on Boeing to provide necessary resources and support to return the MAX to Customer service. In addition, following the MAX return to Customer service, the Company could face significant operational challenges in

efficiently taking delivery of a large number of MAX aircraft from Boeing and reintroducing the MAX aircraft into the Company's network in a controlled and steady manner.

### Financial Risks

***The airline industry is particularly sensitive to changes in economic conditions; in the event of continued unfavorable economic conditions or economic uncertainty, the Company's results of operations could be further negatively affected, which could require the Company to further adjust its business strategies.***

The airline industry, which is subject to relatively high fixed costs and highly variable and unpredictable demand, is particularly sensitive to changes in economic conditions. Historically, unfavorable U.S. economic conditions have driven changes in travel patterns and have resulted in reduced spending for both leisure and business travel. For some consumers, leisure travel is a discretionary expense, and short-haul travelers, in particular, have the option to replace air travel with surface travel. As has become particularly evident as a result of the COVID-19 pandemic, businesses and other travelers are able to forego air travel by using communication alternatives such as videoconferencing, business communication platforms, and the Internet. In addition, to the extent businesses continue to permit air travel during the COVID-19 pandemic, they are more likely to require the purchase of less expensive tickets to reduce costs. This, in turn, can result in a decrease in average revenue per seat. Also, as has become particularly evident as a result of the COVID-19 pandemic, unfavorable economic conditions, when low fares are often used to stimulate traffic, hamper the ability of airlines to raise fares to counteract any increases in fuel, labor, and other costs. Any continuing or future U.S. or global economic uncertainty could further negatively affect the Company's results of operations and could cause the Company to further adjust its business strategies. Additionally, because expenses of a flight do not vary significantly with the number of passengers carried, a relatively small change in the number of passengers can have a disproportionate effect on an airline's operating and financial results. Therefore, any continued reduction in airline passenger traffic could continue to adversely affect the Company's results of operations.

***The Company's business can be significantly impacted by high and/or volatile fuel prices, and the Company's operations are subject to disruption in the event of any delayed supply of fuel; therefore, the Company's strategic plans and future profitability are likely to be impacted by the Company's ability to effectively address fuel price increases and fuel price volatility and availability.***

Airlines are inherently dependent upon energy to operate, and jet fuel and oil represented approximately 14.4 percent of the Company's operating expenses for 2020. As discussed above under "Business - Cost Structure," although the airline industry experienced a relatively stable and moderate fuel environment in 2020, the cost of fuel can be extremely volatile and unpredictable, and even a small change in market fuel prices can significantly affect profitability. Furthermore, volatility in fuel prices can be due to many external factors that are beyond the Company's control. For example, fuel prices can be impacted by political, environmental, and economic factors, such as (i) dependency on foreign imports of crude oil and the potential for hostilities or other conflicts in oil producing areas; (ii) limitations and/or disruptions in domestic refining or pipeline capacity due to weather, natural disasters, or other factors; (iii) worldwide demand for fuel, particularly in developing countries, which can result in inflated energy prices; (iv) changes in U.S. governmental policies on fuel production, transportation, taxes, and marketing; and (v) changes in currency exchange rates.

The Company's ability to effectively mitigate the impact of fuel price increases could be limited by factors such as its historical low-fare reputation, the portion of its Customer base that purchases travel for leisure purposes, the competitive nature of the airline industry generally, and the risk that higher fares will drive a decrease in demand. The Company attempts to manage its risk associated with volatile jet fuel prices by utilizing over-the-counter fuel derivative instruments to hedge a portion of its future jet fuel purchases. However, energy prices can fluctuate significantly in a relatively short amount of time. Because the Company uses a variety of different derivative instruments at different price points, the Company is subject to the risk that the fuel derivatives it uses will not provide adequate protection against significant increases in fuel prices and in some cases could in fact result in

31

hedging losses, which could result in the Company effectively paying higher than market prices for fuel, thus creating additional volatility in the Company's earnings.

In addition, the Company is subject to the risk that its fuel derivatives will no longer qualify for hedge accounting under applicable accounting standards, which can create additional earnings volatility. Adjustments in the Company's overall fuel hedging strategy, as well as the ability of the commodities used in fuel hedging to qualify for special hedge accounting, could continue to affect the Company's results of operations. In addition, there can be no assurance that the Company will be able to cost-effectively hedge against increases in fuel prices.

The Company's fuel hedging arrangements and the various potential impacts of hedge accounting on the Company's financial position, cash flows, and results of operations are discussed in more detail under "Management's Discussion and Analysis of Financial Condition and Results of Operations," "Quantitative and Qualitative Disclosures About Market Risk," and in Note 1 and Note 11 to the Consolidated Financial Statements.

The Company is also reliant upon the readily available supply and timely delivery of jet fuel to the airports that it serves. A disruption in that supply could present significant challenges to the Company's operations and could ultimately cause the cancellation of flights and/or the inability of the Company to provide service to a particular airport.

*The Company's low-cost structure has historically been one of its primary competitive advantages, and many factors have affected and could continue to affect the Company's ability to control its costs.*

The Company's low-cost structure has historically been one of its primary competitive advantages, as it has enabled it to offer low fares, drive traffic volume, grow market share, and, prior to 2020, protect profits; however, as has been the case for the Company, the COVID-19 pandemic has forced the Company's competitors to implement significant cost reduction measures. Competitor cost reduction measures such as accelerated fleet retirements, capacity cuts, and headcount reductions, could have a negative impact on the Company's relative cost position.

Even before the pandemic, the Company's low-cost position had been challenged by the significant growth of "Ultra-Low Cost Carriers" ("ULCCs"), which in some cases have surpassed the Company's cost advantage with larger aircraft, increased seat density, and lower wages. ULCCs have further introduced "unbundled" service offerings which appeal to price-sensitive travelers through promotion to consumers of an extremely low relative base fare for a seat, while separately charging for related services and products. In response, most major U.S. airlines began to offer expanded cabin segmentation fare products, such as "basic economy" and "premium economy" products. A basic economy product provides for a lower base fare to compete with a ULCC base fare, but may include significant additional restrictions on amenities such as seat assignments (including restrictions on group and family seating), order of boarding, checked baggage and use of overhead bin space, flight changes and refunds, and eligibility for upgrades. A "premium economy" fare targets consumers willing to pay a premium for certain amenities that were previously included in the carriers' base fare (e.g., more favorable seating locations in the main cabin). Also in response to competitive ULCC pricing, some carriers removed fare floors for certain routes, leading to a lower fare offering across the industry.

The Company's low-cost structure can also be negatively impacted by costs over which the Company has limited control. These include costs such as fuel, labor, airport, and regulatory compliance costs.

Jet fuel and oil constituted approximately 14.4 percent of the Company's operating expenses during 2020, and the Company's ability to control the cost of fuel is subject to the external factors discussed in the fifth Risk Factor above.

Salaries, wages, and benefits constituted approximately 52.9 percent of the Company's operating expenses during 2020. The Company's ability to control labor costs is limited by the terms of its collective-bargaining agreements, and this limited control has negatively impacted the Company's low-cost position, in particular in the context of the Company's cost reduction efforts during the COVID-19 pandemic. As discussed further under "Management's

32

Discussion and Analysis of Financial Condition and Results of Operations," the Company's unionized workforce, which makes up approximately 83 percent of its Employees, has had pay scale increases as a result of contractual rate increases, which has put pressure on the Company's labor costs. Additionally, as indicated above under "Business - Employees," the majority of Southwest's unionized Employee work groups, including its Pilots; Flight Attendants; Ramp, Operations, Provisioning, and Freight Agents; Customer Service Agents, Customer Representatives, and Source of Support Representatives; Aircraft Appearance Technicians; Dispatchers; and Meteorologists, are in unions currently in negotiations for labor agreements or have labor agreements that become amendable in 2021, which could result in additional pressure on the Company's low-cost structure.

As discussed above under "Business - Regulation," the airline industry is heavily regulated, and the Company's regulatory compliance costs are subject to potentially significant increases from time to time based on actions by regulatory agencies that are out of the Company's control. Additionally, because of airport infrastructure updates and other factors, the Company has experienced increased space rental rates at various airports in its network. Further, the Company cannot control decisions by other airlines to reduce their capacity. When this occurs, certain fixed airport costs are allocated among a fewer number of total flights, which can result in increased landing fees and other costs for the Company.

The Company is reliant upon third party vendors and service providers, and the Company's low-cost advantage is dependent in part on its ability to obtain and maintain commercially reasonable terms with those parties. Disruptions to capital markets, shortages of skilled personnel, geopolitical developments, and/or adverse economic conditions could subject certain of the Company's third party vendors and service providers to significant financial pressures, which could lead to delays and other performance issues, ceased operations, or even bankruptcies among these third party vendors and service providers. If a third party vendor or service provider is unable to fulfill its commitments to the Company, the Company may be unable to replace that third party vendor or service provider in a short period of time, or at competitive terms, which could have a material adverse effect on the Company's results of operations.

As discussed above under "Business - Insurance," the Company carries insurance of types customary in the airline industry. Although the Company has been able to purchase aviation, property, liability, and professional insurance via the commercial insurance marketplace, available commercial insurance could be more expensive in the future and/or have material differences in coverage than insurance that has historically been provided and may not be adequate to protect against the Company's risk of loss from future events, including acts of terrorism. Further, available cyber-security insurance with regards to data protection and business interruption could be more expensive in the future and/or have material differences in coverage than insurance that has historically been provided and may not be adequate to protect the Company's risk of loss. With respect to any insurance claims, policy coverages and claims are subject to acceptance by the many insurers involved and may require arbitration and/or mediation to effectively settle the claims over prolonged periods of time. In addition, an accident or other incident involving Southwest aircraft could result in costs in excess of its related insurance coverage, which costs could be substantial. Any aircraft accident or other incident, even if fully insured, could also have a material adverse effect on the public's perception of the Company, which could harm its reputation and business.

As discussed below under "Management's Discussion and Analysis of Financial Condition and Results of Operations," the Company experienced significant unit cost pressure in 2019 following the MAX groundings and in 2020 following the onset of the COVID-19 pandemic. Historically, except for changes in the price of fuel, changes in operating expenses for airlines have been largely driven by changes in capacity. However, the Company's operating expenses are largely fixed once flight schedules are published; and the Company experienced lower than expected capacity during 2019 due to the MAX groundings and, in particular, during 2020 due to the COVID-19 pandemic. Throughout the duration of the COVID-19 pandemic, the Company has made schedule adjustments and canceled flights based on consumer demand and booking trends. The continued impact of the COVID-19 pandemic is expected to require the Company to make additional schedule adjustments and drive additional unit cost pressure.

*The Company's results of operations could be adversely impacted if it is unable to effectively execute its strategic plans.*

33

The Company is reliant on the success of its revenue strategies and other strategic plans and initiatives to grow and to help offset increasing costs. The execution of the Company's strategic plans has been significantly negatively affected by the impacts of the COVID-19 pandemic, and the Company cannot predict the duration or scope of continued impacts from the pandemic. Nevertheless, the Company has taken multiple actions to bolster its liquidity and better optimize its network in an effort to position itself to opportunistically recover and grow if and as the pandemic subsides. The timely and effective execution of the Company's strategies is dependent upon, among other factors, (i) the Company's ability to effectively balance its investment of incremental operating expenses and capital expenditures related to its strategies against the need to effectively control costs; (ii) the Company's ability to timely and effectively implement, transition, and maintain related information technology systems and infrastructure; (iii) as discussed below, the Company's ability to maintain satisfactory relations with its Employees or its Employees' representatives; and (iv) the Company's dependence on third parties with respect to the execution of its strategic plans.

*The airline industry is intensely competitive.*

As discussed in more detail above under "Business - Competition," the airline industry is intensely competitive. The Company's primary competitors include other major domestic airlines, as well as regional and new entrant airlines, surface transportation, and alternatives to transportation such as videoconferencing, business communication platforms, and the Internet. The Company's revenues are sensitive to the actions of other carriers with respect to pricing, routes, loyalty programs, scheduling, capacity, customer service, operational reliability, comfort and amenities, cost structure, aircraft fleet, strategic alliances, and code-sharing and similar activities.

**Information Technology Risks**

***The Company is increasingly dependent on technology to operate its business and continues to implement substantial changes to its information systems; any failure, disruption, breach, or delay in implementation of the Company's information systems could materially adversely affect its operations.***

The Company is increasingly dependent on the use of complex technology and systems to run its ongoing operations and support its strategic objectives. These technologies and systems include, among others, the Company's website and reservation system; flight dispatch and tracking systems; flight simulators; check-in kiosks; aircraft maintenance, planning, and record keeping systems; telecommunications systems; flight planning and scheduling systems; crew scheduling systems; human resources systems; and financial planning, management, and accounting systems. The performance, reliability, and security of the Company's technology infrastructure and supporting systems are critical to the Company's operations and initiatives.

Implementation and integration of complex systems and technology present significant challenges in terms of costs, human resources, and development of effective internal controls. Implementation and integration require a balancing between the introduction of new capabilities and the managing of existing systems, and present the risk of operational or security inadequacy or interruption, which could materially affect the Company's ability to effectively operate its business and/or could negatively impact the Company's results of operations.

The Company is also reliant upon the performance of its third party vendors for timely and effective implementation and support of many of its technology initiatives and for maintaining adequate information security measures within the services and/or software they deliver. If any of the Company's significant technologies or automated systems were to cease functioning, or if its third party vendor service providers were to fail to adequately and timely provide technical support, system maintenance, security, or software upgrades for any of the Company's existing systems, the Company could experience service interruptions, delays, and loss of critical data, which could harm its operations, and result in financial losses and reputational damage.

In the ordinary course of business, the Company's systems will continue to require modification and refinements to address growth and changing business requirements. In addition, the Company's systems may require modification to enable the Company to comply with changing regulatory requirements. Modifications and refinements to the

34

Company's systems have been and are expected to continue to be expensive to implement and can divert management's attention from other matters. In particular, during 2020, in connection with the Company's efforts to reduce capital and operating expenditures in response to the COVID-19 pandemic, the Company deferred a significant number of technology projects. In addition, the Company's operations could be adversely affected, or the Company could face imposition of regulatory penalties, if it were unable to timely or effectively modify its systems as necessary or appropriately balance the introduction of new capabilities with the management of existing systems.

The Company has experienced system interruptions and delays that have made its websites and operational systems unavailable or slow to respond, which has prevented the Company from efficiently processing Customer transactions or providing services. Any future system interruptions or delays could reduce the Company's operating revenues and the attractiveness of its services, as well as increase the Company's costs.

The Company's technologies and systems and functions could be damaged or interrupted by catastrophic events beyond its control such as fires, floods, earthquakes, tornadoes and hurricanes, power loss, computer and telecommunications failures, acts of war or terrorism, computer viruses, security breaches, and similar events or disruptions. Any of these events could cause system interruptions, delays, and loss of critical data, and could prevent the Company from processing Customer transactions or providing services, which could make the Company's business and services less attractive and subject the Company to liability. Any of these events could damage the Company's reputation and be expensive to remedy.

*Developing and expanding data security and privacy requirements could increase the Company's operating costs, and any failure of the Company to maintain the security of certain Customer, Employee, and business-related information could result in damage to the Company's reputation and could be costly to remediate.*

The Company must receive information related to its Customers and Employees in order to run its business, and the Company's operations depend upon secure retention and the secure transmission of information over public networks, including information permitting cashless payments. This information is subject to the continually evolving risk of intrusion, tampering, and theft. Although the Company maintains systems to prevent or defend against these risks, these systems require ongoing monitoring and updating as technologies change, and security could be compromised, personal or confidential information could be misappropriated, or system disruptions could occur. In the ordinary course of its business, the Company also provides certain confidential, proprietary, and personal information to third parties. While the Company seeks to obtain assurances that these third parties will protect this information, there is a risk the security of data held by third parties could be breached. A compromise of the Company's security systems could adversely affect the Company's reputation and disrupt its operations and could also result in litigation against the Company or the imposition of penalties. In addition, it could be costly to remediate. Although the Company has not experienced cyber incidents that are individually, or in the aggregate, material, the Company has experienced cyber-attacks in the past, which have thus far been mitigated by preventative, detective, and responsive measures put in place by the Company.

In addition, in response to these types of threats, there has been heightened legislative and regulatory focus on data privacy and security in the United States and elsewhere. As a result, the Company must monitor a growing and fast-evolving set of legal requirements in this area. This regulatory environment is increasingly challenging and may present material obligations and risks to the Company's business, including significantly expanded compliance requirements, costs, and enforcement risks.

The Company has a dedicated cyber-security team and program that focuses on current and emerging data security matters. The Company continues to assess and invest in the growing needs of the cyber-security team through the allocation of skilled personnel, ongoing training, and support of the adoption and implementation of technologies coupled with cyber-security risk management frameworks.

During the majority of 2020, and continuing into 2021, the Company has offered the ability to work remotely to most of the Company's office and clerical Employees, including the vast majority of its Employees at the Company's headquarters campus. Maintaining a remote work force significantly increases the risk of cyber incidents

and events, such as computer viruses and security breaches, due to increased targeted attacks, which have thus far been mitigated by preventative, detective, and responsive measures put in place by the Company.

The Company carries a cyber-security insurance policy with regards to data protection and business interruption associated with both security breaches from malicious parties and from certain system failures. However, available cyber-security insurance with regards to data protection and business interruption could be more expensive in the future and/or have material differences in coverage than insurance that has historically been provided and may not be adequate to protect the Company's risk of loss.

**Operational Risks**

*The Company's business is labor intensive; therefore, the Company could be materially adversely affected in the event of conflict with its Employees or its Employees' representatives.*

The airline business is labor intensive, and for the year ended December 31, 2020, Salaries, wages, and benefits expense represented approximately 52.9 percent of the Company's operating expenses. As discussed further under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and Note 2 to the Consolidated Financial Statements, to address the financial impacts of the COVID pandemic, the Company instituted voluntary separation and extended time off programs to mitigate costs. In addition, during 2020, the Company notified its non-unionized Employees of impending mandatory pay cuts, which have been avoided due to the Company's receipt of additional payroll support funds from Treasury under the Payroll Support Program Extension. The Company also sought equivalent wage and/or work rule concessions from its Employees represented for collective bargaining purposes by labor unions. As of December 31, 2020, approximately 83 percent of the Company's Employees were represented for collective bargaining purposes by labor unions, and because the Company was unable to obtain requested concessions from most of its unionized work groups, it sent furlough notices to the Employees in these work groups. These notices were also rescinded as a result of the Company's receipt of additional payroll support funds from Treasury under the Payroll Support Program Extension. Because of the percentage of its Employees represented for collective bargaining purposes by labor unions, prior to the COVID-19 pandemic, the Company was already particularly exposed in the event of labor-related job actions. The impact of the COVID-19 pandemic has heightened the Company's exposure and demonstrated the risk that the Company's results could be materially adversely affected in the event of conflicts with its Employees or its Employees' representatives.

*The Company is currently dependent on a single engine supplier, as well as single suppliers of certain other aircraft parts and equipment; therefore, the Company could be materially adversely affected (i) if it were unable to obtain timely or sufficient delivery of aircraft parts or equipment from Boeing or other suppliers or adequate maintenance or other support from any of these suppliers, or (ii) in the event of a mechanical or regulatory issue associated with the Company's aircraft parts or equipment.*

The Company is dependent on Boeing as its sole supplier for many of its aircraft parts. The Company is also dependent on sole or limited suppliers for aircraft engines and certain other aircraft parts, equipment, and services. If Boeing, or other suppliers, were unable or unwilling to timely provide adequate products or support for their products, or in the event of a mechanical or regulatory issue associated with engines or other parts, the Company's operations could be materially adversely affected. The Company could also be materially adversely affected if the pricing or operational attributes of its aircraft equipment were to become less competitive.

*The airline industry has faced on-going security concerns and related cost burdens; further threatened or actual terrorist attacks, or other hostilities, even if not made directly on the airline industry, could significantly harm the airline industry and the Company's operations.*

Terrorist attacks or other crimes and hostilities, actual and threatened, have from time to time materially adversely affected the demand for air travel and also have necessitated increased safety and security measures and related costs for the Company and the airline industry generally. Safety and security measures can create delays and

36

inconveniences, which in turn can reduce the Company's competitiveness against surface transportation for short-haul routes and alternatives to transportation such as videoconferencing, business communication platforms, and the Internet. Additional terrorist attacks or other hostilities, even if not made directly on the airline industry, or the fear of such attacks or other hostilities (including elevated national threat warnings, government travel warnings to certain destinations, travel restrictions, or selective cancellation or redirection of flights due to terror threats) would likely have a further significant negative impact on the Company and the airline industry.

*The airline industry is affected by many conditions that are beyond its control, which can impact the Company's business strategies and results of operations.*

In addition to the unpredictable economic conditions and fuel costs discussed above, the Company, like the airline industry in general, is affected by conditions that are largely unforeseeable and outside of its control, including, among others:

- adverse weather and natural disasters;
- changes in consumer preferences, perceptions, spending patterns, or demographic trends (including, without limitation, changes in travel patterns due to government shutdowns or sequestration);
- actual or potential disruptions in the air traffic control system (including, for example, as a result of inadequate FAA staffing levels due to government shutdowns or sequestration);
- actual or perceived delays at various airports resulting from government shutdowns (including, for example, longer wait-times at TSA checkpoints due to inadequate TSA staffing levels);
- changes in the competitive environment due to industry consolidation, industry bankruptcies, and other factors;
- delays in deliveries of new aircraft (including, without limitation, due to FAA groundings of certain aircraft types or due to the closure of the FAA's aircraft registry during government shutdowns);
- outbreaks of disease such as the COVID-19 pandemic; and
- actual or threatened war, terrorist attacks, government travel warnings to certain destinations, travel restrictions, and political instability.

## Legal, Regulatory, Compliance, and Reputational Risks

*The Company is subject to extensive FAA regulation that may necessitate modifications to the Company's operations, business plans, and strategies.*

The FAA promulgates and enforces regulations affecting the airline industry, and exercises extensive regulatory oversight of the Company's operations. The FAA from time to time also issues orders or directives relating to the maintenance and operation of aircraft. FAA orders and directives can be issued with little or no notice, and in certain instances, require the temporary grounding of aircraft and/or the responsive investment of operational and financial resources. The issuance of new FAA regulations, regulatory amendments, or orders or directives could result in flight schedule adjustments and groundings or delays in aircraft deliveries, as well as lower operating revenues, operating income, and net income due to a variety of factors, including, among others, (i) lost revenue due to flight cancellations and disruptions as a result of a smaller operating aircraft fleet, (ii) the lack of ability to make corresponding reductions in expenses because of the fixed nature of many expenses, and (iii) possible negative effects on Customer confidence and airline choice. Government regulation affecting the Company is discussed in more detail in the below risk factor and above under "Business - Regulation."

*Airport capacity constraints and air traffic control inefficiencies have limited and could continue to limit the Company's growth; changes in or additional governmental regulation could increase the Company's operating costs or otherwise limit the Company's ability to conduct business.*

37

Almost all commercial service airports are owned and/or operated by units of local or state governments. Airlines are largely dependent on these governmental entities to provide adequate airport facilities and capacity at an affordable cost. In order to operate efficiently, as well as to add service in current and new markets, the Company must be able to maintain and/or obtain space and facilities at desirable airports with adequate infrastructure. Airport space, facility, and infrastructure constraints may prevent the Company from maintaining existing service and/or implementing new service in a commercially viable manner.

Similarly, the federal government singularly controls all U.S. airspace, and airlines are dependent on the FAA controlling that airspace in a safe and efficient manner. The current air traffic control system is mainly radar-based, supported in large part by antiquated equipment and technologies, and heavily dependent on skilled personnel. As a result, the air traffic control system may not be able to effectively keep pace with future air traffic growth. The FAA's protracted transition to modernized air traffic control systems and newer technologies could adversely impact airspace capacity and the overall efficiency of the system, resulting in limited opportunities for the Company to grow, longer scheduled flight times, increased delays and cancellations, and increased fuel consumption and aircraft emissions. The continuation of these air traffic control constraints or the FAA's inability to meet staffing needs on a long-term basis may have a material adverse effect on the Company's operations.

As discussed above under "Business - Regulation," airlines are also subject to other extensive regulatory requirements. These requirements often impose substantial costs on airlines. The Company's strategic plans and results of operations could be negatively affected by changes in law and future actions taken by domestic and foreign governmental agencies having jurisdiction over its operations, including, but not limited to:

- increases in airport rates and charges;
- limitations on airport gate capacity or use of other airport facilities;
- limitations on route authorities;
- actions and decisions that create difficulties in obtaining access at slot-controlled airports;
- actions and decisions that create difficulties in obtaining operating permits and approvals;
- changes to environmental regulations;
- new or increased taxes or fees, including with respect to potential increases to the federal corporate income tax rate;
- changes to laws that affect the services that can be offered by airlines in particular markets and at particular airports;
- restrictions on competitive practices;
- changes in laws that increase costs for safety, security, compliance, or other Customer Service standards;
- changes in laws that may limit the Company's ability to enter into fuel derivative contracts to hedge against increases in fuel prices;
- changes in laws that may limit or regulate the Company's ability to promote the Company's business or fares;
- airspace closures or restrictions;
- grounding of commercial air traffic by the FAA; and
- the adoption of more restrictive locally-imposed noise regulations.

*The Company is subject to various environmental requirements, including laws and regulations related to climate change and emissions. Compliance with new or existing environmental requirements could materially and adversely affect the Company's business plans, strategies, and results of operations.*

The Company is subject to federal, state, local, and international laws and regulations relating to the protection of the environment, including those relating to aircraft and ground-based emissions, discharges to water systems, safe drinking water, and the management of hazardous substances and waste materials. Certain legislative bodies and regulatory authorities are increasingly focused on climate change and have taken actions to implement additional

38

laws, regulations, and programs intended to protect the environment. For example, as discussed in more detail under "Business – Regulation," the federal government, as well as several state and local governments, the governments of other countries, and the United Nations' International Civil Aviation Organization have implemented legislative and regulatory proposals and voluntary measures intended to reduce greenhouse gas emissions. Compliance with laws, regulations, and other programs intended to reduce emissions or otherwise protect the environment may require the Company to modify its supply chain practices, secure carbon offset credits or otherwise pay for emissions, or make capital investments to modify certain aspects of its operations. Future policy, legal, and regulatory developments relating to the protection of the environment could increase the Company's costs and have a material adverse effect on the Company's plans and operations.

*The Company's future results will suffer if it is unable to effectively manage its expanded international operations and/or Extended Operations ("ETOPS").*

The Company's international flight offerings are subject to CBP-mandated procedures, which can affect the Company's operations, costs, and Customer experience. The Company has made significant investments in facilities, equipment, and technologies at certain airports in order to improve the Customer experience and to assist CBP with its inspection and processing duties; however, the Company is not able to predict the impact, if any, that various CBP measures or the lack of CBP resources will have on Company revenues and costs, either in the short-term or the long-term.

International flying requires the Company to modify certain processes, as the airport environment is dramatically different in certain international locations with respect to, among other things, common-use ticket counters and gate areas, passenger entry requirements (including health requirements imposed in response to the COVID-19 pandemic), local operating requirements, and cultural preferences. Certain international routes served by the Company are also subject to specific aircraft equipage requirements and unique consumer behavior. Route-specific equipage requirements and unique consumer behavior, together or individually, may (i) restrict the Company's flexibility when scheduling and routing aircraft and crews; (ii) require the Company to modify its policies or procedures; and (iii) impact the Company's operational performance, costs, and Customer Experience. In addition, international flying exposes the Company to certain foreign currency risks to the extent the Company chooses to, or is required to, transact in currencies other than the U.S. dollar. To the extent the Company seeks to serve additional international destinations in the future, or to renew its authority to serve certain routes, it may be required to obtain necessary authority from the DOT and/or approvals from the FAA, as well as any applicable foreign government entity.

The Company's operations in non-U.S. jurisdictions may subject the Company to the laws of those jurisdictions rather than, or in addition to, U.S. laws. Laws in some jurisdictions differ in significant respects from those in the United States, and these differences can affect the Company's ability to react to changes in its business, and its rights or ability to enforce rights may be different than would be expected under U.S. laws. Furthermore, enforcement of laws in some jurisdictions can be inconsistent and unpredictable, which can affect both the Company's ability to enforce its rights and to undertake activities that it believes are beneficial to its business. As a result, the Company's ability to generate revenue and its expenses in non-U.S. jurisdictions may differ from what would be expected if U.S. laws governed these operations. Although the Company has policies and procedures in place that are designed to promote compliance with the laws of the jurisdictions in which it operates, a violation by the Company's Employees, contractors, or agents or other intermediaries could nonetheless occur. Any violation (or alleged or perceived violation), even if prohibited by the Company's policies, could have an adverse effect on the Company's reputation and/or its results of operations.

In 2019, the Company began service to Hawaii after receiving approval from the FAA for ETOPS, a regulatory requirement to operate between the U.S. mainland and the Hawaiian Islands. The Company is subject to additional, ongoing, ETOPS-specific regulatory and procedural requirements, which present operational and compliance risks to the Company's business, including costs associated therewith.

39

***The Company is currently subject to pending litigation, and if judgment were to be rendered against the Company in the litigation, such judgment could adversely affect the Company's operating results.***

As discussed below under "Legal Proceedings," the Company is subject to pending litigation.

Regardless of merit, these litigation matters and any potential future claims against the Company may be both time consuming and disruptive to the Company's operations and cause significant expense and diversion of management attention. Should the Company fail to prevail in these or other matters, the Company may be faced with significant monetary damages or injunctive relief that could materially adversely affect its business and might materially affect its financial condition and operating results and could cause reputational harm.

***The Company's reputation and brand could be harmed if it were to experience significant negative publicity, including through social media.***

The Company operates in a public-facing industry with significant exposure to social media. Negative publicity, whether or not justified, can spread rapidly through social media. To the extent that the Company is unable to respond timely and appropriately to negative publicity, the Company's reputation and brand can be harmed. Damage to the Company's overall reputation and brand could have a negative impact on its financial results.

***The Company's Bylaws provide, to the fullest extent permitted by applicable law, that the United States District Court for the Northern District of Texas or, if such court lacks jurisdiction, the state district court of Dallas County, Texas, will be the exclusive forum for certain legal actions between the Company and its Shareholders, which could increase costs to bring a claim, discourage claims, or limit the ability of the Company's Shareholders to bring a claim in a judicial forum viewed by the Shareholders as more favorable for disputes with the Company or the Company's directors, officers, or other Employees.***

The Company's Bylaws provide, to the fullest extent permitted by law, that, unless the Company consents in writing to the selection of an alternative forum, the United States District Court for the Northern District of Texas or, if such court lacks jurisdiction, the state district court of Dallas County, Texas, will, to the fullest extent permitted by applicable law, be the sole and exclusive forum for (a) any derivative action or proceeding brought on behalf of the Company; (b) any action asserting a claim of breach of a fiduciary duty owed by any director, officer, or other Employee of the Company to the Company or the Company's Shareholders; (c) any action asserting a claim against the Company or any director, officer, or other Employee of the Company pursuant to any provision of the Company's Restated Certificate of Formation or Bylaws (as either may be amended from time to time) or the Texas Business Organizations Code; and (d) any action asserting a claim against the Company or any director, officer, or other Employee of the Company governed by the internal affairs doctrine.

The forum selection provision may increase costs to bring a claim, discourage claims, or limit a Shareholder's ability to bring a claim in a judicial forum that such Shareholder finds favorable for disputes with the Company or the Company's directors, officers, or other Employees, which may discourage such lawsuits against the Company or the Company's directors, officers, and other Employees. Alternatively, if a court were to find the forum selection provision contained in the Company's Bylaws to be inapplicable or unenforceable in an action, the Company could incur additional costs associated with resolving such action in other jurisdictions. The exclusive forum provision in the Bylaws will not preclude or contract the scope of exclusive federal or concurrent jurisdiction for actions brought under the federal securities laws including the Securities Exchange Act of 1934 or the Securities Act of 1933, or the respective rules and regulations promulgated thereunder.

**Item 1B.    *Unresolved Staff Comments***

None.

40

**Item 2.**    *Properties*

**Aircraft**

Southwest operated a total of 718 Boeing 737 aircraft as of December 31, 2020, of which 67 and 70 were under operating and finance leases, respectively. The following table details information on the 718 aircraft as of December 31, 2020:

| Type | Seats | Average Age (Yrs) | Number of Aircraft | Number Owned (a) | Number Leased |
|---|---|---|---|---|---|
| 737-700 | 143 | 16 | 470 | 370 | 100 |
| 737-800 | 175 | 5 | 207 | 190 | 17 |
| 737 MAX 8 | 175 | 2 | 41 | 21 | 20 |
| Totals | | 12 | 718 | 581 | 137 |

(a) As discussed further in Note 7 to the Consolidated Financial Statements, 106 of the Company's aircraft were pledged as collateral as of December 31, 2020, for secured borrowings.

All MAX deliveries were suspended as of March 13, 2019, upon the FAA emergency order for all U.S. airlines to ground all MAX aircraft. The Company reached an agreement with Boeing in December 2020 to begin taking delivery of the delayed MAX aircraft, and received seven new leased 737 MAX 8 aircraft from third parties in December 2020. Including the seven leased MAX aircraft received in December 2020, the Company expects to receive 35 MAX 8 deliveries, including 16 leased aircraft, through the end of 2021.

The delivery schedule below reflects existing contractual commitments, although the timing of future deliveries is uncertain. The Company and Boeing are in discussions to change the Company's aircraft order book, and the Company expects to make further adjustments to the delivery schedule. The Company offers no assurances that current estimations and timelines will not be changed.

41

As of December 31, 2020, the Company had firm deliveries and options for Boeing 737 MAX 7 and 737 MAX 8 aircraft as follows:

| | The Boeing Company | | | | |
| | MAX 7 Firm Orders | MAX 8 Firm Orders | MAX 8 Options | Additional MAX 8s | Total |
|---|---|---|---|---|---|
| 2021 | 7 | 100 | — | 16 | 123 (a) |
| 2022 | — | 27 | 14 | — | 41 |
| 2023 | 12 | 22 | 23 | — | 57 |
| 2024 | 11 | 30 | 23 | — | 64 |
| 2025 | — | 40 | 36 | — | 76 |
| 2026 | — | — | 19 | — | 19 |
| | 30 | 219 (b) | 115 | 16 (c) | 380 |

(a) 2021 Contractual Detail

| | The Boeing Company | | | |
| | MAX 7 Firm Orders | MAX 8 Firm Orders | Additional MAX 8s | Total |
|---|---|---|---|---|
| 2019 Contractual Deliveries | 7 | 20 | 13 | 40 |
| 2020 Contractual Deliveries | — | 35 | 3 | 38 |
| 2021 Contractual Deliveries | — | 45 | — | 45 |
| 2021 Contractual Total | 7 | 100 | 16 | 123 |

The 2021 combined contractual total includes 40 contractual aircraft that the Company expected to be delivered in 2019, but were not received due to the MAX groundings, and 38 contractual aircraft expected in 2020. The Company reached an agreement with Boeing in December 2020 to begin taking delivery of the delayed MAX aircraft, and received seven of these new leased 737 MAX 8 aircraft from third parties in December 2020. Including the seven leased MAX aircraft received in December 2020, the Company expects to receive 35 MAX 8 deliveries, including 16 leased aircraft, through the end of 2021, instead of the 123 shown above. The Company continues to be in discussions with Boeing to restructure its delivery schedule for the MAX aircraft. The schedule reflects one contractual aircraft delivery that shifted from 2019 to 2021.
(b) The Company has flexibility to substitute 737 MAX 7 in lieu of 737 MAX 8 firm orders, upon written advance notification as stated in the contract.
(c) To be acquired in leases from various third parties.

## Ground Facilities and Services

Southwest either leases or pays a usage fee for terminal passenger service facilities at each of the airports it serves, to which various leasehold improvements have been made. The Company leases the land and/or structures on a long-term basis for its aircraft maintenance centers (located at Dallas Love Field, Houston Hobby, Phoenix Sky Harbor, Chicago Midway, Hartsfield-Jackson Atlanta International Airport, and Orlando International Airport) and its main corporate headquarters building, also located near Dallas Love Field. The Company also leases a warehouse and engine repair facility in Atlanta. In 2019, the Company announced its intent to build a new aircraft maintenance facility, scheduled to be completed in first quarter 2022, at Denver International Airport.

The Company has commitments associated with various airport improvement projects, including ongoing construction at Los Angeles International Airport. These projects include the construction of new facilities and the rebuilding or modernization of existing facilities. Additional information regarding these projects is provided below under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and in Note 5 to the Consolidated Financial Statements.

The Company owns two additional headquarters buildings, located across the street from the Company's main headquarters building, on land owned by the Company including (a) an energy-efficient, modern building, called TOPS, which houses certain operational and training functions, including the Company's 24-hour operations and (b) the Wings Complex, completed in 2018, consisting of a Leadership Education and Aircrew Development (LEAD) Center (housing 18 of the Company's 24 Boeing 737 flight simulators and classroom space for Pilot training), an additional office building, and a parking garage. Construction was recently completed on an expansion of the LEAD Center. Once the expansion of the LEAD Center is operational, the LEAD Center will have overall space for a total of 26 Boeing 737 flight simulators.

As of December 31, 2020, the Company operated seven Customer Support and Services call centers. The centers located in Atlanta, San Antonio, Chicago, Albuquerque, and Oklahoma City occupy leased space. The Company owns its Houston and Phoenix centers.

The Company performs substantially all line maintenance on its aircraft and provides ground support services at most of the airports it serves. However, the Company has arrangements with certain aircraft maintenance providers for major component inspections and repairs for its airframes and engines, which comprise the majority of the Company's annual aircraft maintenance costs.

## Item 3.    *Legal Proceedings*

On June 30, 2015, the U.S. Department of Justice ("DOJ") issued a Civil Investigative Demand ("CID") to the Company. The CID seeks information and documents about the Company's capacity from January 2010 to the date of the CID, including public statements and communications with third parties about capacity. In June 2015, the Company also received a letter from the Connecticut Attorney General requesting information about capacity. The Company is cooperating fully with the DOJ CID and the state inquiry.

Further, on July 1, 2015, a complaint was filed in the United States District Court for the Southern District of New York on behalf of putative classes of consumers alleging collusion among the Company, American Airlines, Delta Air Lines, and United Airlines to limit capacity and maintain higher fares in violation of Section 1 of the Sherman Act. Since then, a number of similar class action complaints were filed in the United States District Courts for the Central District of California, the Northern District of California, the District of Columbia, the Middle District of Florida, the Southern District of Florida, the Northern District of Georgia, the Northern District of Illinois, the Southern District of Indiana, the Eastern District of Louisiana, the District of Minnesota, the District of New Jersey, the Eastern District of New York, the Southern District of New York, the Middle District of North Carolina, the District of Oklahoma, the Eastern District of Pennsylvania, the Northern District of Texas, the District of Vermont, and the Eastern District of Wisconsin. On October 13, 2015, the Judicial Panel on Multi-District Litigation centralized the cases to the United States District Court in the District of Columbia. On March 25, 2016, the plaintiffs filed a Consolidated Amended Complaint in the consolidated cases alleging that the defendants conspired to restrict capacity from 2009 to present. The plaintiffs seek to bring their claims on behalf of a class of persons who purchased tickets for domestic airline travel on the defendants' airlines from July 1, 2011 to present. They seek treble damages, injunctive relief, and attorneys' fees and expenses. On May 11, 2016, the defendants moved to dismiss the Consolidated Amended Complaint, and on October 28, 2016, the Court denied this motion. On December 20, 2017, the Company reached an agreement to settle these cases with a proposed class of all persons who purchased domestic airline transportation services from July 1, 2011, to the date of the settlement. The Company agreed to pay $15 million and to provide certain cooperation with the plaintiffs as set forth in the settlement agreement. After notice was provided to the settlement class, the Court held a fairness hearing on March 22, 2019, and it issued an order granting final approval of the settlement on May 9, 2019. On June 10, 2019, three objectors filed notices of appeal to the United States Court of Appeals for the District of Columbia Circuit. Two sets of the objectors dismissed their appeals, and the appeal of the remaining objectors is pending. The case is continuing as to the remaining defendants. The Company denies all allegations of wrongdoing.

43

On July 11, 2019, a complaint alleging violations of federal and state laws and seeking certification as a class action was filed against Boeing and the Company in the United States District Court for the Eastern District of Texas in Sherman. The complaint alleges that Boeing and the Company colluded to conceal defects with the MAX aircraft in violation of the Racketeer Influenced and Corrupt Organization Act ("RICO") and also asserts related state law claims based upon the same alleged facts. The complaint seeks damages on behalf of putative classes of customers who purchased tickets for air travel from either the Company or American Airlines between August 29, 2017, and March 13, 2019. The complaint generally seeks money damages, equitable monetary relief, injunctive relief, declaratory relief, and attorneys' fees and other costs. On September 13, 2019, the Company filed a motion to dismiss the complaint and to strike certain class allegations. Boeing also moved to dismiss. On February 14, 2020, the trial court issued a ruling that granted in part and denied in part the motions to dismiss the complaint. The trial court order, among other things: (i) dismissed without prejudice various state law claims that the plaintiffs abandoned in response to the motions, (ii) dismissed with prejudice the remaining state law claims, including fraud by concealment, fraud by misrepresentation, and negligent misrepresentation on the grounds that federal law preempts those claims, and (iii) found that plaintiffs lack Article III standing to pursue one of the plaintiffs' theories of RICO injury. The order denied the motion to dismiss with respect to two RICO claims premised upon a second theory of RICO injury and denied the motion to strike the class allegations at the pleadings stage. Discovery is ongoing, and class certification briefing is currently underway. The Company denies all allegations of wrongdoing, including those in the complaint that were not dismissed, and intends to vigorously oppose certification of any class. The Company believes the plaintiffs' positions are without merit and intends to vigorously defend itself.

On February 19, 2020, a complaint alleging violations of federal securities laws and seeking certification as a class action was filed against the Company and certain of its officers in the United States District Court for the Northern District of Texas in Dallas. A lead plaintiff has been appointed in the case, and an amended complaint was filed on July 2, 2020. The amended complaint seeks damages on behalf of a putative class of persons who purchased the Company's common stock between February 7, 2017, and January 29, 2020. The amended complaint asserts claims under Sections 10(b) and 20 of the Securities Exchange Act and alleges that the Company made material misstatements to investors regarding the Company's safety and maintenance practices and its compliance with federal regulations and requirements. The amended complaint generally seeks money damages, pre-judgment and post-judgment interest, and attorneys' fees and other costs. On August 17, 2020, the Company and the individual defendants filed a motion to dismiss. On October 1, 2020, the lead plaintiff filed a response in opposition to the motion to dismiss. The Company filed a reply on or about October 21, 2020, such that the motion is now fully briefed. The Company denies all allegations of wrongdoing, including those in the amended complaint. The Company believes the plaintiffs' positions are without merit and intends to vigorously defend itself.

On June 22, 2020, a derivative action for breach of fiduciary duty was filed in the United States District Court for the Northern District of Texas naming the members of the Company's Board of Directors as defendants and the Company as a nominal defendant (the "Derivative Action"). The plaintiff alleges unspecified damage to Company's reputation, goodwill, and standing in the community, as well as damage from exposure to civil and regulatory liability and defense costs. According to the lawsuit, these damages arise from the Company's alleged failure to comply with safety and record maintenance regulations and false statements in public filings regarding the Company's safety practices. The plaintiff alleges the Board, in the absence of good faith, exhibited reckless disregard for its duties of oversight. On October 7, 2020, the Court entered an order staying and administratively closing the Derivative Action. The plaintiff in the Derivative Action shall have the right to reopen the action following the resolution of the Company's motion to dismiss in the ongoing litigation brought under the federal securities laws or upon the occurrence of certain other conditions. The Board and Company deny all allegations of wrongdoing made in the Derivative Action.

The Company is from time to time subject to various legal proceedings and claims arising in the ordinary course of business, including, but not limited to, examinations by the Internal Revenue Service.

The Company's management does not expect that the outcome in any of its currently ongoing legal proceedings or the outcome of any proposed adjustments presented to date by the Internal Revenue Service, individually or

collectively, will have a material adverse effect on the Company's financial condition, results of operations, or cash flow.

**Item 4.**  *Mine Safety Disclosures*

Not applicable.

### INFORMATION ABOUT OUR EXECUTIVE OFFICERS

The following information regarding the Company's executive officers is as of February 3, 2021.

| Name | Position | Age |
|------|----------|-----|
| Gary C. Kelly | Chairman of the Board & Chief Executive Officer | 65 |
| Thomas M. Nealon | President | 60 |
| Michael G. Van de Ven | Chief Operating Officer | 59 |
| Robert E. Jordan | Executive Vice President Corporate Services | 60 |
| Alan Kasher | Executive Vice President Daily Operations | 54 |
| Tammy Romo | Executive Vice President & Chief Financial Officer | 58 |
| Mark R. Shaw | Executive Vice President & Chief Legal & Regulatory Officer | 58 |
| Andrew M. Watterson | Executive Vice President & Chief Commercial Officer | 54 |
| Gregory D. Wells | Retiring Executive Vice President Daily Operations | 62 |

Set forth below is a description of the background of each of the Company's executive officers.

*Gary C. Kelly* has served as the Company's Chairman of the Board since May 2008 and as its Chief Executive Officer since July 2004. Mr. Kelly also served as President from July 2008 to January 2017, Executive Vice President & Chief Financial Officer from June 2001 to July 2004, and Vice President Finance & Chief Financial Officer from 1989 to 2001. Mr. Kelly joined the Company in 1986 as its Controller.

*Thomas M. Nealon* has served as the Company's President since January 2017. Mr. Nealon also served as Executive Vice President Strategy & Innovation from January 2016 to January 2017. Prior to becoming an executive officer of the Company, Mr. Nealon served on the Company's Board of Directors from December 2010 until November 2015. Mr. Nealon has also served as Group Executive Vice President of J.C. Penney Company, Inc., a retail company, from August 2010 until December 2011. In this role Mr. Nealon was responsible for Strategy, jcp.com, Information Technology, Customer Insights, and Digital Ventures. Mr. Nealon also served as J.C. Penney's Executive Vice President & Chief Information Officer from September 2006 until August 2010. Prior to joining J.C. Penney, Mr. Nealon was a partner with The Feld Group, a provider of information technology consulting services, where he served in a consultant capacity as Senior Vice President & Chief Information Officer for the Company from 2002 to 2006. Mr. Nealon also served as Chief Information Officer for Frito-Lay, a division of PepsiCo, Inc., from 1996 to 2000, and in various software engineering, systems engineering, and management positions for Frito-Lay from 1983 to 1996.

*Michael G. Van de Ven* has served as the Company's Chief Operating Officer since May 2008. Mr. Van de Ven also served as Executive Vice President & Chief Operating Officer from May 2008 to January 2017, Chief of Operations from September 2006 to May 2008, Executive Vice President Aircraft Operations from November 2005 through August 2006, Senior Vice President Planning from August 2004 to November 2005, Vice President Financial Planning & Analysis from 2001 to 2004, Senior Director Financial Planning & Analysis from 2000 to 2001, and Director Financial Planning & Analysis from 1997 to 2000. Mr. Van de Ven joined the Company in 1993 as its Director Internal Audit.

*Robert E. Jordan* has served as the Company's Executive Vice President Corporate Services since July 2017. Mr. Jordan also served as Executive Vice President & Chief Commercial Officer from September 2011 to July 2017, Executive Vice President Strategy & Planning from May 2008 to September 2011, Executive Vice President Strategy & Technology from September 2006 to May 2008, Senior Vice President Enterprise Spend Management from August 2004 to September 2006, Vice President Technology from 2002 to 2004, Vice President Purchasing from 2001 to 2002, Controller from 1997 to 2001, Director Revenue Accounting from 1994 to 1997, and Manager Sales Accounting from 1990 to 1994. Mr. Jordan joined the Company in 1988 as a programmer.

*Alan Kasher* has served as the Company's Executive Vice President Daily Operations since February 2021. Mr. Kasher also served as Senior Vice President Air Operations from January 2020 to February 2021, Vice President

46

Flight Operations from November 2015 to January 2020, Managing Director Regulatory Programs & Compliance from February 2015 to November 2015, Director of Operations from February 2013 to February 2015, and Assistant Director of Operations from April 2012 to February 2013. Mr. Kasher joined the Company in September 2000 as a First Officer and was promoted to Captain in April 2007.

*Tammy Romo* has served as the Company's Executive Vice President & Chief Financial Officer since July 2015. Ms. Romo also served as Senior Vice President Finance & Chief Financial Officer from September 2012 to July 2015, Senior Vice President of Planning from February 2010 to September 2012, Vice President of Financial Planning from September 2008 to February 2010, Vice President Controller from February 2006 to August 2008, Vice President Treasurer from September 2004 to February 2006, Senior Director of Investor Relations from March 2002 to September 2004, Director of Investor Relations from December 1994 to March 2002, Manager of Investor Relations from September 1994 to December 1994, and Manager of Financial Reporting from September 1991 to September 1994.

*Mark R. Shaw* has served as the Company's Executive Vice President & Chief Legal & Regulatory Officer since November 2018. Mr. Shaw also served as Executive Vice President, Chief Legal & Regulatory Officer, & Corporate Secretary from August 2018 to November 2018, Senior Vice President, General Counsel, & Corporate Secretary from July 2015 to August 2018, Vice President, General Counsel, & Corporate Secretary from February 2013 to July 2015, and as Associate General Counsel - Corporate & Transactions from February 2008 to February 2013. Mr. Shaw joined the Company in 2000 as an Attorney in the General Counsel Department.

*Andrew M. Watterson* has served as the Company's Executive Vice President & Chief Commercial Officer since January 2020. Mr. Watterson also served as Executive Vice President & Chief Revenue Officer from July 2017 to January 2020, Senior Vice President & Chief Revenue Officer from January 2017 to July 2017, Senior Vice President of Network & Revenue from January 2016 to January 2017, and as Vice President of Network Planning & Performance from October 2013 to January 2016.

*Gregory D. Wells* has served as the Company's Executive Vice President Daily Operations since January 2017. Mr. Wells also served as Senior Vice President Operational Performance from October 2013 to January 2017, Senior Vice President Operations from September 2006 to October 2013, Senior Vice President Ground Operations from November 2005 to September 2006, Vice President Ground Operations from September 2004 to November 2005, Vice President Safety, Security, and Flight Dispatch from October 2001 to September 2004, Director Flight Dispatch from February 1999 to October 2001, Senior Director Ground Operations from August 1998 to February 1999, and Director Ground Operations from August 1996 to August 1998. Prior to August 1996, Mr. Wells had various other operational experience with the Company including as Station Manager in both San Jose and Phoenix. Mr. Wells has over 38 years of experience with the Company. Mr. Wells is retiring from his Executive Vice President position effective March 1, 2021.

47

**PART II**

**Item 5.**      ***Market for Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities***

The Company's common stock is listed on the New York Stock Exchange ("NYSE") and is traded under the symbol "LUV." Although the Company has a history of declaring dividends on a quarterly basis, the Company has not paid a dividend since its 174th consecutive quarterly dividend which was declared and paid in first quarter 2020. Pursuant to the Payroll Support Program under the CARES Act, as supplemented by the Payroll Support Program Extension, the Company is prohibited from paying dividends with respect to its common stock through March 31, 2022. Following the expiration of CARES Act and Payroll Support Program Extension restrictions, the Company's Board of Directors will have sole discretion regarding the timing, amount, and payment of dividends on the basis of operational results, financial condition, cash requirements, future prospects, and other factors deemed relevant by the Board. As of February 4, 2021, there were approximately 11,858 holders of record of the Company's common stock.

48

**Stock Performance Graph**

*The following Performance Graph and related information shall not be deemed "soliciting material" or "filed" with the Securities and Exchange Commission, nor shall such information be incorporated by reference into any future filing under the Securities Act of 1933 or Securities Exchange Act of 1934.*

The following graph compares the cumulative total shareholder return on the Company's common stock over the five-year period ended December 31, 2020, with the cumulative total return during such period of the Standard and Poor's 500 Stock Index and the NYSE ARCA Airline Index. The comparison assumes $100 was invested on December 31, 2015, in the Company's common stock and in each of the foregoing indices and assumes reinvestment of dividends. The stock performance shown on the graph below represents historical stock performance and is not necessarily indicative of future stock price performance.

**COMPARISON OF FIVE YEAR CUMULATIVE TOTAL RETURN AMONG SOUTHWEST AIRLINES CO., S&P 500 INDEX, AND NYSE ARCA AIRLINE INDEX**



|  | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 | 12/31/2019 | 12/31/2020 |
|---|---|---|---|---|---|---|
| **Southwest Airlines Co.** | $ 100 | $ 117 | $ 155 | $ 111 | $ 131 | $ 113 |
| **S&P 500** | $ 100 | $ 112 | $ 136 | $ 130 | $ 171 | $ 203 |
| **NYSE ARCA Airline** | $ 100 | $ 129 | $ 136 | $ 107 | $ 132 | $ 100 |

49

**Issuer Repurchases**

On May 15, 2019, the Company's Board of Directors authorized the repurchase of up to $2.0 billion of the Company's common stock. Subject to certain conditions, including restrictions on the Company pursuant to the CARES Act and Payroll Support Program Extension through March 31, 2022, repurchases may be made in accordance with applicable securities laws in open market or private, including accelerated, repurchase transactions from time to time, depending on market conditions. The Company has announced it has suspended further share repurchase activity until further notice. The Company has approximately $899 million remaining under its current share repurchase authorization.

**Item 6.**    *Selected Financial Data*

The following financial information, for the five years ended December 31, 2020, has been derived from the Company's Consolidated Financial Statements. This information should be viewed in conjunction with the Consolidated Financial Statements and related notes thereto included elsewhere herein. The Company provides the operating data below because these statistics are commonly used in the airline industry and, therefore, allow readers to compare the Company's performance against its results for prior periods, as well as against the performance of the Company's peers.

| | Year ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2020 | 2019 | 2018 | 2017 | 2016 |
| **Financial Data (in millions, except per share amounts):** | | | | | |
| Operating revenues | $ 9,048 | $ 22,428 | $ 21,965 | $ 21,146 | $ 20,289 |
| Operating expenses | 12,864 | 19,471 | 18,759 | 17,739 | 16,767 |
| Operating income (loss) | (3,816) | 2,957 | 3,206 | 3,407 | 3,522 |
| Other expenses (income) net | 440 | — | 42 | 142 | 72 |
| Income (loss) before taxes | (4,256) | 2,957 | 3,164 | 3,265 | 3,450 |
| Provision (benefit) for income taxes | (1,182) | 657 | 699 | (92) | 1,267 |
| Net income (loss) | $ (3,074) | $ 2,300 | $ 2,465 | $ 3,357 | $ 2,183 |
| Net income (loss) per share, basic | $ (5.44) | $ 4.28 | $ 4.30 | $ 5.58 | $ 3.48 |
| Net income (loss) per share, diluted | $ (5.44) | $ 4.27 | $ 4.29 | $ 5.57 | $ 3.45 |
| Cash dividends per common share | $ 0.180 | $ 0.700 | $ 0.605 | $ 0.475 | $ 0.375 |
| Total assets at period-end | $ 34,588 | $ 25,895 | $ 26,243 | $ 25,110 | $ 23,286 |
| Long-term obligations at period-end | $ 10,111 | $ 1,846 | $ 2,771 | $ 3,320 | $ 2,821 |
| Stockholders' equity at period-end | $ 8,876 | $ 9,832 | $ 9,853 | $ 9,641 | $ 7,784 |
| **Operating Data:** | | | | | |
| Revenue passengers carried (000s) | 54,088 | 134,056 | 134,890 | 130,256 | 124,720 |
| Enplaned passengers (000s) | 67,785 | 162,681 | 163,606 | 157,677 | 151,740 |
| Revenue passenger miles (RPMs) (in millions)[a] | 54,221 | 131,345 | 133,322 | 129,041 | 124,798 |
| Available seat miles (ASMs) (in millions)[b] | 103,456 | 157,254 | 159,795 | 153,811 | 148,522 |
| Load factor[c] | 52.4 % | 83.5 % | 83.4 % | 83.9 % | 84.0 % |
| Average length of passenger haul (miles) | 1,002 | 980 | 988 | 991 | 1,001 |
| Average aircraft stage length (miles) | 743 | 748 | 757 | 754 | 760 |
| Trips flown | 897,540 | 1,367,727 | 1,375,030 | 1,347,893 | 1,311,149 |
| Seats flown (000s)[d] | 137,405 | 206,390 | 207,223 | 200,879 | 193,168 |
| Seats per trip[e] | 153.1 | 150.9 | 150.7 | 149.0 | 147.3 |
| Average passenger fare | $ 141.72 | $ 154.98 | $ 151.64 | $ 151.73 | $ 152.89 |
| Passenger revenue yield per RPM (cents)[f] | 14.14 | 15.82 | 15.34 | 15.32 | 15.28 |
| Operating revenues per ASM (cents)[g][j] | 8.75 | 14.26 | 13.75 | 13.75 | 13.66 |
| Passenger revenue per ASM (cents)[h] | 7.41 | 13.21 | 12.80 | 12.85 | 12.84 |
| Operating expenses per ASM (cents)[i] | 12.43 | 12.38 | 11.74 | 11.53 | 11.29 |
| Operating expenses per ASM, excluding fuel (cents) | 10.65 | 9.62 | 8.85 | 8.88 | 8.73 |
| Operating expenses per ASM, excluding fuel and profitsharing (cents) | 10.65 | 9.19 | 8.51 | 8.53 | 8.34 |
| Fuel costs per gallon, including fuel tax | $ 1.45 | $ 2.09 | $ 2.20 | $ 1.99 | $ 1.90 |
| Fuel costs per gallon, including fuel tax, economic | $ 1.49 | $ 2.09 | $ 2.20 | $ 2.06 | $ 2.00 |
| Fuel consumed, in gallons (millions) | 1,273 | 2,077 | 2,094 | 2,045 | 1,996 |
| Active fulltime equivalent Employees | 56,537 (j) | 60,767 | 58,803 | 56,110 | 53,536 |
| Aircraft at end of period | 718 (k)(l) | 747 (k) | 750 | 706 | 723 |

(a)  A revenue passenger mile is one paying passenger flown one mile. Also referred to as "traffic," which is a measure of demand for a given period.
(b)  An available seat mile is one seat (empty or full) flown one mile. Also referred to as "capacity," which is a measure of the space available to carry passengers in a given period.
(c)  Revenue passenger miles divided by available seat miles.
(d)  Seats flown is calculated using total number of seats available by aircraft type multiplied by the total trips flown by the same aircraft type during a particular period.
(e)  Seats per trip is calculated by dividing seats flown by trips flown.
(f)  Calculated as passenger revenue divided by revenue passenger miles. Also referred to as "yield," this is the average cost paid by a paying passenger to fly one mile, which is a measure of revenue production and fares.
(g)  Calculated as operating revenues divided by available seat miles. Also referred to as "operating unit revenues" or "RASM," this is a measure of operating revenue production based on the total available seat miles flown during a particular period.

(h)   Calculated as passenger revenue divided by available seat miles. Also referred to as "passenger unit revenues," this is a measure of passenger revenue production based on the total available seat miles flown during a particular period.

(i)    Calculated as operating expenses divided by available seat miles. Also referred to as "unit costs" or "cost per available seat mile," this is the average cost to fly an aircraft seat (empty or full) one mile, which is a measure of cost efficiencies.

(j)    Included 10,421 Employees participating in the Extended Emergency Time Off program as of December 31, 2020. See Note 2 to the Consolidated Financial Statements for further information.

(k)   Included 32 and 34 Boeing MAX 737 aircraft in long-term storage as of December 31, 2020 and 2019, respectively. See Note 17 to the Consolidated Financial Statements for further information.

(l)    Included 60 Boeing 737 Next Generation aircraft removed from active fleet and remained in long-term storage as of December 31, 2020.

52

**Item 7**.    *Management's Discussion and Analysis of Financial Condition and Results of Operations*

## YEAR IN REVIEW

In late February 2020, the Company began to see a negative impact from the COVID-19 pandemic, which quickly accelerated during the first quarter and continued throughout the remainder of the year. As a consequence, the Company experienced its first annual net loss in 48 years. The Company's prior trend of 47 consecutive years of profitability was a feat unmatched in the U.S. airline industry.

Both GAAP and non-GAAP results, shown in the following tables, were impacted by the pandemic. See Note Regarding Use of Non-GAAP Financial Measures and the Reconciliation of Reported Amounts to Non-GAAP Financial Measures for additional detail regarding non-GAAP financial measures.

| (in millions, except per share amounts) | Year ended December 31, | | Percent Change |
|---|---|---|---|
| GAAP | 2020 | 2019 | |
| Operating income (loss) | $ (3,816) | $ 2,957 | n.m. |
| Net income (loss) | $ (3,074) | $ 2,300 | n.m. |
| Net income (loss) per share, diluted | $ (5.44) | $ 4.27 | n.m. |
| | | | |
| Non-GAAP | | | |
| Operating income (loss) | $ (5,032) | $ 2,957 | n.m. |
| Net income (loss) | $ (3,512) | $ 2,300 | n.m. |
| Net income (loss) per share, diluted | $ (6.22) | $ 4.27 | n.m. |

The COVID-19 pandemic depressed the demand for air travel and negatively impacted both GAAP and non-GAAP results year-over-year. Operating revenues for the year ended December 31, 2020 decreased 59.7 percent as the Company experienced load factors and yields that were considerably lower than historical levels. The Company took action to reduce capacity and swiftly cut costs, which generated a reduction in operating expenses of 33.9 percent. However, due to the fixed nature of a large portion of the Company's cost structure, especially in the short-term, the reduction in operating expenses was not enough to overcome the dramatic decline in revenues.

For periods prior to second quarter 2020, the Company provided its calculation of non-GAAP return on invested capital ("ROIC") as a measure of financial performance used by management to quantify the Company's effectiveness in generating returns relative to the capital invested in the business. By second quarter 2020, the precipitous drop in passenger demand and bookings caused by COVID-19 resulted in a material and adverse effect on the Company's operating income and cash flows from operations. As a result, management ceased focus on ROIC and instead has since focused on bolstering the Company's liquidity through cost reductions, financings, sale-leaseback transactions, and securities offerings. Accordingly, the Company has chosen not to present ROIC in this Form 10-K and does not expect to present it again until and if the operating environment normalizes sufficiently to return the Company to operating income instead of operating loss.

See Notes 2 and 7 to the Consolidated Financial Statements for further information on the significant impacts to the Company's operations, financial performance, and liquidity from the COVID-19 pandemic.

*2021 Outlook*

Thus far in 2021, the Company experienced stalled demand in January and bookings for February 2021, primarily driven by the high level of COVID-19 cases and hospitalizations, as well as a seasonally weaker time period for leisure travel demand following the holidays. However, trip cancellations have stabilized and January 2021 operating revenues are expected to improve slightly compared with the Company's previous estimations for January

53

2021 operating revenues provided mid-December 2020, primarily due to stronger leisure passenger demand in the January holiday return travel period and a slight improvement in load factor. The following table presents selected preliminary estimates of operating revenue, load factor, and capacity for January and February 2021:

| | Estimated January 2021 | Estimated February 2021 |
|---|---|---|
| **Operating revenues year-over-year** | **Down 65% to 70%** | **Down 65% to 75%** |
| *Previous estimation* | *Down 65% to 75%* | *(a)* |
| *As compared with 2019* | *Down 65% to 70%* | *Down 65% to 75%* |
| **Load factor** | **50% to 55%** | **50% to 55%** |
| *Previous estimation* | *45% to 55%* | *(a)* |
| **ASMs year-over-year** | **Down ~41%** | **Down ~46%** |
| *Previous estimation* | *Down 40% to 45%* | *Down 40% to 45%* |
| *As compared with 2019* | *Down ~43%* | *Down ~45%* |

(a) No previous estimation provided.

The Company estimates its March 2021 capacity to decrease approximately 16 percent, year-over-year, or 31 percent, compared with March 2019. The Company estimates its first quarter 2021 capacity to decrease approximately 35 percent year-over-year, primarily driven by the continued negative effects of the pandemic.

Excluding Fuel and oil expense and special items, first quarter 2021 operating expenses are expected to decrease in the range of 15 to 20 percent, year-over-year, primarily due to lower capacity, year-over-year, as well as an estimated $400 million of cost savings from voluntary separation and extended leave programs. See Note 2 to the Consolidated Financial Statements for further description of these programs. The year-over-year projections do not reflect the potential impact of Fuel and oil expense, special items, and profitsharing expense in both years because the Company cannot reliably predict or estimate these items or expenses or their impact to its financial statements in future periods, especially considering the significant volatility of the Fuel and oil expense line item. Accordingly, the Company believes a reconciliation of non-GAAP financial measures to the equivalent GAAP financial measures for projected results is not meaningful or available without unreasonable effort.

*COVID-19 Pandemic*

In response to the far-reaching impacts of the COVID-19 pandemic, the Company has taken significant measures to enhance and expand upon its already generous and flexible ticketing policies, and to support the well-being of both its Employees and passengers on a daily basis. These have included, but are not limited to the following:

- Travel funds created because of a flight cancellation between March 1, 2020 and September 7, 2020, will now expire September 7, 2022.
- Travel funds that would otherwise have expired between March 1, 2020 and September 7, 2020, will now expire September 7, 2022.
- Rapid Rewards® loyalty program members who have travel funds that were set to expire, or funds that were created between March 1, 2020 and September 7, 2020, had the option to convert those travel funds into Rapid Rewards points at the same rate as they were able to purchase a ticket with points, through December 15, 2020.
- All Rapid Rewards loyalty program members with an account opened by December 31, 2020 received a "boost" of 15,000 tier qualifying points and 10 flight credits toward A-List and A-List Preferred status, and 25,000 Companion Pass qualifying points and 25 flight credits toward Companion Pass status.
- All current A-List and A-List Preferred tier status members on April 1, 2020 earned status has been extended through December 31, 2021.
- Companion pass members earned status on April 1, 2020 has been extended through December 31, 2021.
- Enhanced aircraft cleaning procedures have been applied since March 4, 2020.

- Procedures and protocol have been implemented with the requirement that Employees and Customers (age two or over) must wear masks or face coverings.
- Measures to support physical distancing, including messaging to Customers and Employees, and modified boarding procedures, have been implemented.
- A Customer health declaration, which must be acknowledged prior to travel, has been implemented.
- An Employee health declaration, which all Employees are expected to acknowledge, has been implemented.
- The Company continues to offer the ability to work remotely to most of the Company's office and clerical Employees, including the vast majority of its more than 6,000 Employees at the Company's headquarters campus in Dallas, Texas.

The Company continues to communicate with its entire workforce on the employment of best practices and Centers for Disease Control and Prevention guidelines in the current environment while at work, especially considering that a large portion of its Employees come into direct contact with Customers on a daily basis.

As detailed in Note 2 to the Consolidated Financial Statements, in connection with the major negative impact of COVID-19 on air carriers, the Company has received significant financial assistance from the U.S. Department of Treasury (the "Treasury") pursuant to the Payroll Support Program established pursuant to the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"). Amounts received under the Payroll Support Program were approximately $3.4 billion and were utilized to directly offset payroll expenses incurred by the Company, including specified benefits, between April 2020 and September 2020. During 2020, the Company issued a promissory note in favor of the Treasury in the aggregate amount of $976 million and issued warrants valued at a total of $40 million to purchase up to an aggregate of 2.7 million shares of the Company's common stock, subject to adjustment pursuant to the terms of the warrants. Of the approximate $3.4 billion, $2.4 billion consists of a grant that does not require repayment. Approximately $2.3 billion of the direct payroll support of $2.4 billion was allocated on a pro-rata basis as a contra-expense line item in the Consolidated Statement of Comprehensive Income (Loss) between second and third quarters of 2020, with the remaining $40 million allocated to the value of warrants issued from the Company to the Treasury.

In accordance with restrictions contained in the CARES Act, and except as permitted or required under the Payroll Support Program, the Company did not (1) conduct involuntary terminations or furloughs or (2) reduce the salaries, wages, or benefits of any Employee, in each case between the date of the Payroll Support Program agreement and September 30, 2020.

In January 2021, the Company entered into definitive documentation with the Treasury for further payroll support under the Consolidated Appropriations Act, 2021 (the "Payroll Support Program Extension"). Amounts received or to be received under the Payroll Support Program Extension are expected to total approximately $1.7 billion and will be utilized to directly offset payroll expenses incurred by the Company, including specified benefits, between January 2021 and March 2021. Of this total, approximately $1.2 billion consists of a grant that will not require repayment. The Company currently expects this direct payroll support of $1.2 billion will be classified as a contra-expense line item in the unaudited Condensed Consolidated Statement of Comprehensive Income (Loss) during first quarter 2021. The Company has issued a promissory note in favor of the Treasury in an initial amount of approximately $229 million and expects the amount to total approximately $488 million once the remaining payroll support is received. See Note 2 for further information.

In accordance with restrictions contained in the Payroll Support Program Extension, and except as permitted or required under the Payroll Support Program Extension, the Company has agreed not to (1) conduct involuntary terminations or furloughs or (2) reduce the salaries, wages, or benefits of any Employee, in each case between the date of the Payroll Support Program Extension agreement and March 31, 2021.

During second quarter 2020, the Company introduced Voluntary Separation Program 2020 and the Extended Emergency Time Off ("Extended ETO") program which aligned staffing to reduced flight schedules and enabled the Company to avoid involuntary furloughs and layoffs through 2020. Employees had until July 15, 2020, to determine whether to participate in one of these programs, and approximately 15,000 Employees elected to do so. The Company continues to evaluate and evolve its Extended ETO program in early 2021, including offering additional

Extended ETO opportunities of one, two, or three month durations to certain Employees who are either not currently participating in Extended ETO, or who are currently on Extended ETO set to expire in coming months. In accordance with applicable accounting guidance, the Company recorded a total charge of $1.4 billion in 2020 related to the special termination benefits for Employees who had accepted the Company's offer to participate in its Voluntary Separation Program 2020 and the special benefits for Employees who participated in its Extended ETO program; the accrual is being reduced as program benefits are paid. This program has allowed the Company to reduce its fixed cost structure in the near-term, while maintaining the ability to adjust to a recovery in travel demand. See Note 2 to the Consolidated Financial Statements for further information. As a result of these voluntary programs, the Company's salaries, wages, and benefits costs were lowered by approximately $565 million in 2020. The Company expects an incremental $600 million of annual 2021 cost savings from these two programs, for a total reduction in salaries, wages, and benefits of approximately $1.2 billion, compared with annual 2019. In addition, Employees could take Emergency Time Off ("ETO") for a calendar month, or Time Off Without Pay ("TOWOP") or Leave Without Pay ("LWOP") in smaller time increments. Between March 2020 and December 2020, the ETO, TOWOP, and LWOP programs accounted for a savings of approximately $265 million.

**Company Overview**

As of December 31, 2020, the Company operated approximately 50 percent of the daily departures operated as of December 31, 2019, prior to the impacts of the pandemic. The Company is pursuing additional revenue opportunities that utilize idle aircraft and Employees to provide Southwest's legendary Customer Service to new, popular destinations. The Company is leveraging additional airports in or near cities where its Customer base is large, along with adding easier access to popular leisure-oriented destinations from across its domestic-focused network. These additional service points on the Company's map are opportunities it can provide Customers now, all while better positioning the Company for a travel demand rebound. The Company launched service to six new destinations in 2020:

- Hilo International Airport - January 19, 2020
- Cozumel International Airport - March 7, 2020
- Miami International Airport and Palm Springs International Airport - November 15, 2020
- Montrose Regional Airport (Telluride and Crested Butte) and Yampa Valley Regional Airport (Steamboat Springs) - December 19, 2020

The Company has also announced other new destinations and expected service commencement dates including:
- Chicago O'Hare International Airport and Sarasota Bradenton International Airport - February 14, 2021
- Colorado Springs Municipal Airport and Savannah/Hilton Head International Airport - March 11, 2021
- Houston's George Bush Intercontinental Airport and Santa Barbara Airport - April 12, 2021
- Fresno Yosemite International Airport - April 25, 2021
- Jackson-Medgar Wiley Evers International Airport in Mississippi - June 6, 2021

As previously reported, the Company suspended international operations in first quarter 2020 and has resumed selected service as follows:
- Mexico and the Caribbean via Cancun, San Jose del Cabo/Los Cabos, and Montego Bay - July 1, 2020
- Puerto Vallarta, Mexico - October 8, 2020
- Punta Cana, Dominican Republic, and Aruba - November 4, 2020
- Havana, Cuba - December 6, 2020

The Company also resumed service to Nassau on July 1, 2020, but in response to new local restrictions imposed by the Bahamian government, the Company again suspended operations effective July 22, 2020. The Company is scheduled to resume service to Cozumel, Mexico in first quarter 2021. Service to the Company's other international destinations is expected to resume pending the easing of government restrictions.

The Company achieved its goal of launching global distribution system ("GDS") access for corporate travelers in 2020, now at industry-standard participation with Amadeus' GDS platform and Travelport's multiple GDS platforms: Apollo, Worldspan, and Galileo. Also, in December 2020, the Company reached a full-participation GDS

agreement with Sabre, planned to launch in the second half of 2021. The Company's enhancement of its GDS channel strategy complements its goal of distributing its everyday low fares to more corporate travelers through their preferred channel.

On November 18, 2020, the Federal Aviation Administration (the "FAA") issued official requirements to enable airlines to return the Boeing 737 MAX to service. The Company is currently working to meet the FAA's requirements by modifying certain operating procedures, implementing enhanced Pilot training requirements, installing FAA-approved flight control software updates, and completing other required maintenance tasks specific to the MAX aircraft. The Company has scheduled the MAX return to revenue service on March 11, 2021, after the Company is expected to have met all FAA requirements and all active Pilots are expected to have received updated, MAX-related training.

The Company continues its fleet modernization program and expects to retire a significant amount of its Boeing 737-700 fleet over the next 10-15 years. The Company evaluates whether to adhere to or alter its aircraft retirement plans in light of the COVID-19 pandemic and other factors, including whether to retain aircraft longer or accelerate retirements and replacements. The Company plans to use the Boeing 737 MAX 8 aircraft in its fleet modernization program and believes it will also have use for smaller aircraft such as the Boeing 737 MAX 7.

During December 2020, the Company took delivery of seven new leased Boeing 737 MAX 8 aircraft from third parties. The Company recently reached an agreement with The Boeing Company (the "Boeing Agreement") to take delivery of the delayed MAX aircraft and currently expects to receive 35 MAX 8 deliveries through the end of 2021 consisting of 19 purchased aircraft and 16 leased aircraft (including the seven leases received in December 2020). Based on current delivery and retirements plans, the Company currently expects its fleet in 2021 to decrease from its fleet of 747 aircraft as of December 31, 2019. The details of the Boeing Agreement, which included the settlement of 2020 estimated damages relating to the grounding of the Company's 737 MAX 8 aircraft, are confidential. However, as a result of certain delivery credits provided in the Boeing Agreement, as well as progress payments made to date on undelivered aircraft, the Company currently estimates an immaterial amount of aircraft capital expenditures in 2021. See Note 17 to the Consolidated Financial Statements and "Liquidity and Capital Resources" for further information.

The Company and Boeing are in discussions to change the Company's aircraft order book, and the Company expects to make further adjustments to the delivery schedule. The Company offers no assurances that current estimations and timelines will not be changed.

*2020 Compared with 2019*

**Operating Revenues**

Passenger revenues for 2020 decreased by $13.1 billion, or 63.1 percent, compared with 2019. On a unit basis, Passenger revenues decreased 43.9 percent, year-over-year. The decreases in Passenger revenues on both a dollar and unit basis were primarily due to the impact of the COVID-19 pandemic, which resulted in significant reductions in capacity and a sharp decline in passenger demand and bookings during 2020.

Freight revenues for 2020 decreased by $11 million, or 6.4 percent, compared with 2019, primarily due to fewer trips flown, coupled with worldwide supply chain disruptions which reduced cargo demand. This reduction was partially offset by an increase in freight only activities, as the Company transported supplies in response to the COVID-19 pandemic.

Other revenues for 2020 decreased by $258 million, or 17.4 percent, compared with 2019. The decrease was primarily due to a decrease in income from business partners, including Chase Bank USA, N.A. ("Chase") and the impact on spend on the Company's co-brand card, driven by the decline in consumer spending due to economic uncertainty and widespread restrictions related to the COVID-19 pandemic.

**Operating Expenses**

Operating expenses for 2020 decreased by $6.6 billion, or 33.9 percent, compared with 2019, while capacity decreased 34.2 percent over the same period. Historically, except for changes in the price of fuel, changes in Operating expenses for airlines have been largely driven by changes in capacity, or ASMs. However, the Company's Operating expenses are largely fixed once flight schedules are published, and the Company has experienced significant ASM reductions as a result of flight schedule adjustments related to the COVID-19 pandemic. Flight schedule adjustments are expected to drive unit cost pressure for the duration of the COVID-19 pandemic, excluding any impacts associated with grants received under the CARES Act, the Payroll Support Program Extension, or other legislation. See "COVID-19 Pandemic" above and Note 2 to the Consolidated Financial Statements for further information. The following table presents the Company's Operating expenses per ASM for 2020 and 2019, followed by explanations of these changes on a per ASM basis and dollar basis:

| | Year ended December 31, | | Per ASM | Percent |
|---|---|---|---|---|
| (in cents, except for percentages) | 2020 | 2019 | change | change |
| Salaries, wages, and benefits | 6.58 ¢ | 5.27 ¢ | 1.31 ¢ | 24.9 % |
| Payroll support and voluntary Employee programs, net | (0.94) | — | (0.94) | n.m. |
| Fuel and oil | 1.78 | 2.76 | (0.98) | (35.5) |
| Maintenance materials and repairs | 0.72 | 0.78 | (0.06) | (7.7) |
| Landing fees and airport rentals | 1.21 | 0.87 | 0.34 | 39.1 |
| Depreciation and amortization | 1.21 | 0.78 | 0.43 | 55.1 |
| Other operating expenses, net | 1.87 | 1.92 | (0.05) | (2.6) |
| Total | 12.43 ¢ | 12.38 ¢ | 0.05 ¢ | 0.4 % |

Operating expenses per ASM for 2020 increased by 0.4 percent, compared with 2019. The year-over-year unit cost increase in 2020 was primarily driven by significant capacity reductions as a result of the COVID-19 pandemic. The increase was partially offset by decreases in market jet fuel prices, coupled with the funding received through the Payroll Support Program, net of an accrual made for Employees that elected to participate in Voluntary Separation Program 2020 or Extended ETO programs. See Note 2 to the Consolidated Financial Statements for further information. Operating expenses per ASM for 2020, excluding Fuel and oil expense, special items, and profitsharing (a non-GAAP financial measure), increased 28.1 percent year-over-year, primarily due to the significant reduction in capacity associated with the COVID-19 pandemic. See Note Regarding Use of Non-GAAP Financial Measures and the Reconciliation of Reported Amounts to Non-GAAP Financial Measures for additional detail regarding non-GAAP financial measures.

Salaries, wages, and benefits expense for 2020 decreased by $1.5 billion, or 17.9 percent, compared with 2019. On a per ASM basis, Salaries, wages, and benefits expense for 2020 increased 24.9 percent, compared with 2019. On a dollar basis, the decrease was primarily the result of no profitsharing expense accrual in 2020 due to the Company's net loss, compared with a profitsharing accrual of $667 million in 2019. On a per ASM basis, however, the dollar decrease was more than offset by the 34.2 percent decrease in capacity. Excluding profitsharing in both years, the dollar decrease was driven by lower salaries, wages, and benefits expense, as a result of Employees electing Voluntary Separation Program 2020, Extended ETO, and other time off programs offered by the Company.

On October 5, 2020, the Company announced planned pay reductions for non-contract Employees and its intention to approach union leaders for concessions, in further efforts to reduce operating expenses, as there was uncertainty surrounding an extension of the Payroll Support Program. The Company conducted negotiations with various unionized Employee groups. WARN notices were subsequently issued to various groups that were unable to reach agreements on concessions. These WARN notices and pay reduction intentions were retracted after the Payroll Support Program Extension was signed into law.

58

The following table sets forth the Company's unionized Employee groups with amendable contracts that are currently in negotiations on collective-bargaining agreements:

| Employee Group | Approximate Number of Employees | Representatives | Amendable Date |
|---|---|---|---|
| Southwest Pilots | 8,500 | Southwest Airlines Pilots' Association ("SWAPA") | September 2020 |
| Southwest Flight Attendants | 15,400 | Transportation Workers of America, AFL-CIO, Local 556 ("TWU 556") | November 2018 |
| Southwest Customer Service Agents, Customer Representatives, and Source of Support Representatives | 6,400 | International Association of Machinists and Aerospace Workers, AFL-CIO ("IAM 142") | December 2018 |
| Southwest Aircraft Appearance Technicians | 160 | Aircraft Mechanics Fraternal Association ("AMFA") | November 2020 |
| Southwest Dispatchers | 390 | Transportation Workers of America, AFL-CIO, Local 550 ("TWU 550") | June 2019 |
| Southwest Meteorologists | 10 | TWU 550 | June 2019 |

During January 2021, the Company's Flight Crew Training Instructors, represented by Transportation Workers of America, ratified a tentative collective-bargaining agreement with the Company. The newly ratified contract becomes amendable in January 2022.

Payroll support and voluntary Employee programs, net for 2020 was a net decrease to expense of $967 million, compared with no amounts for 2019. On a per ASM basis, Payroll support and voluntary Employee programs, net for 2020 was a net reduction of 0.94 cents. The Company recognized a $2.3 billion allocation of Payroll Support Program proceeds as a reduction to 2020 expenses as part of the CARES Act. The Company also recognized a total of $1.4 billion in expense in 2020 associated with the Voluntary Separation Program 2020 and Extended ETO elections. Given the unusual nature of each of these items, the Company has chosen to net them within a single line item in the Consolidated Statement of Income (Loss). See Note 2 to the Consolidated Financial Statements for further information.

Fuel and oil expense for 2020 decreased by $2.5 billion, or 57.5 percent, compared with 2019. On a per ASM basis, Fuel and oil expense decreased 35.5 percent, compared with 2019, due to lower market jet fuel prices. On a dollar basis, the majority of the decrease was attributable to a significant decrease in fuel gallons consumed, and the remainder of the decrease was due to lower market jet fuel prices. The following table provides more information on the Company's economic fuel cost per gallon:

| (per gallon) | Year ended December 31, | | | |
|---|---|---|---|---|
| | 2020 | | 2019 | |
| Economic fuel costs per gallon | $ | 1.49 | $ | 2.09 |
| Fuel hedging premium expense per gallon | $ | 0.08 | $ | 0.05 |
| Fuel hedging cash settlement gains per gallon | $ | — | $ | (0.02) |

See Note Regarding Use of Non-GAAP Financial Measures and the Reconciliation of Reported Amounts to Non-GAAP Financial Measures for additional detail regarding non-GAAP financial measures. The Company continued to operate fewer of its oldest, least fuel-efficient Boeing 737-700 aircraft as a result of capacity reductions due to the COVID-19 pandemic, which, combined with lower Load factors, resulted in a year-over-year improvement of 7.4 percent in fuel efficiency in 2020. The Company currently estimates first quarter 2021 fuel efficiency to improve in the range of five to six percent, year-over-year, primarily driven by a continuation of lower utilization of its 737-700

aircraft and the Company's continued efforts to reduce its fuel consumption through fleet modernization with the anticipated benefits of the reintroduction of the MAX aircraft.

As of January 21, 2021, on an economic basis, the Company had derivative contracts in place related to expected future fuel consumption as follows:

| Period | Maximum fuel hedged (gallons in millions) (a)(b) |
|---|---|
| 2021 | 1,283 |
| 2022 | 1,220 |
| 2023 | 643 |
| Beyond 2023 | 101 |

(a) The Company's hedge position includes prices at which the Company considers "catastrophic" coverage. The maximum gallons provided are not indicative of the Company's hedge coverage at every price, but represent the highest level of coverage at a single price. See Note 11 to the Consolidated Financial Statements for further information.
(b) The Company holds derivative contracts at various Brent crude oil and West Texas Intermediate ("WTI") crude oil price levels to provide protection against energy market price fluctuations. These gallons that are covered by derivative contracts represent the maximum number of gallons hedged for each respective period, which may be at different strike prices and at strike prices materially higher than the current market prices. The volume of gallons covered by derivative contracts that ultimately get exercised in any given period may vary significantly from the volumes provided, as market prices and the Company's fuel consumption fluctuates.

As a result of applying hedge accounting in prior periods, the Company has amounts in Accumulated other comprehensive income (loss) ("AOCI") that will be recognized in earnings in future periods when the underlying fuel derivative contracts settle. The following table displays the Company's estimated fair value of remaining fuel derivative contracts (not considering the impact of the cash collateral provided to or received from counterparties - see Note 11 to the Consolidated Financial Statements for further information), as well as the amount of deferred losses in AOCI at December 31, 2020, and the expected future periods in which these items are expected to settle and/or be recognized in earnings (in millions):

| Year | Fair value of fuel derivative contracts at December 31, 2020 | Amount of losses deferred in AOCI at December 31, 2020 (net of tax) |
|---|---|---|
| 2021 | $ 13 | $ (54) |
| 2022 | 71 | (25) |
| 2023 | 41 | (13) |
| Beyond 2023 | 9 | — |
| Total | $ 134 | $ (92) |

Assuming no changes to the Company's current fuel derivative portfolio, but including all previous hedge activity for fuel derivatives that have not yet settled, and considering only the expected net cash receipts related to hedges that will settle, the Company is providing the below sensitivity table for first quarter 2021 and full year 2021 jet fuel prices at different crude oil assumptions as of January 21, 2021, and for expected premium costs associated with settling contracts each period, respectively.

60

| Average Brent Crude Oil price per barrel | Estimated economic fuel price per gallon, including taxes and fuel hedging premiums (e) | |
| --- | --- | --- |
| | First Quarter 2021 (c) | Full Year 2021 (d) |
| $40 | $1.30 - $1.40 | $1.25 - $1.35 |
| $50 | $1.45 - $1.55 | $1.50 - $1.60 |
| **Current Market (a)** | **$1.60 - $1.70** | **$1.65 - $1.75** |
| $60 | $1.65 - $1.75 | $1.75 - $1.85 |
| $70 | $1.85 - $1.95 | $2.05 - $2.15 |
| $80 | $1.90 - $2.00 | $2.15 - $2.25 |
| Estimated fuel hedging premium expense per gallon (b) | $0.09 | (f) |
| Estimated premium costs (b) | $25 million | $100 million |

(a) Brent crude oil average market prices as of January 21, 2021, were approximately $56 and $55 per barrel for first quarter 2021 and full year 2021, respectively.

(b) Fuel hedging premium expense per gallon is included in the Company's estimated economic fuel price per gallon estimates above.

(c) Based on the Company's existing fuel derivative contracts and market prices as of January 21, 2021, first quarter 2021 economic fuel costs are estimated to be in the $1.60 to $1.70 per gallon range, including fuel hedging premium expense of approximately $25 million, or $.09 per gallon, and no cash settlements from fuel derivative contracts, on a per gallon basis. See Note Regarding Use of Non-GAAP Financial Measures.

(d) Based on the Company's existing fuel derivative contracts and market prices as of January 21, 2021, annual 2021 economic fuel costs are estimated to be in the $1.65 to $1.75 per gallon range, including fuel hedging premium expense of approximately $100 million and no cash settlements from fuel derivative contracts, on a per gallon basis. See Note Regarding Use of Non-GAAP Financial Measures.

(e) The Company's current fuel derivative contracts contain a combination of instruments based in WTI and Brent crude oil; however, the economic fuel price per gallon sensitivities provided, assume the relationship between Brent crude oil and refined products based on market prices as of January 21, 2021. Economic fuel cost projections do not reflect the potential impact of special items because the Company cannot reliably predict or estimate the hedge accounting impact associated with the volatility of the energy markets, the impact of COVID-19 cases on air travel demand, or the impact to its financial statements in future periods. Accordingly, the Company believes a reconciliation of non-GAAP financial measures to the equivalent GAAP financial measures for projected results is not meaningful or available without unreasonable effort. See Note Regarding Use of Non-GAAP Financial Measures.

(f) Due to continued uncertainty regarding available seat mile plans for 2021, the Company cannot reasonably provide an estimate for its full year 2021 full hedging premium expense per gallon.

Maintenance materials and repairs expense for 2020 decreased by $473 million, or 38.7 percent, compared with 2019. On a per ASM basis, Maintenance materials and repairs expense decreased 7.7 percent, compared with 2019, as the dollar decrease was largely offset by the 34.2 percent decrease in capacity in response to the COVID-19 pandemic. On a dollar basis, approximately 50 percent of the decrease was due to lower engine maintenance expense due to the reduction in flight hours, approximately 25 percent of the decrease was due to the timing of regular airframe maintenance checks, and the majority of the remainder of the decrease was due to reduced operations and placing a portion of the fleet in storage.

Landing fees and airport rentals expense for 2020 decreased by $123 million, or 9.0 percent, compared with 2019. On a per ASM basis, Landing fees and airport rentals expense increased 39.1 percent, compared with 2019, as the dollar decrease was more than offset by the 34.2 percent decrease in capacity in response to the COVID-19 pandemic. On a dollar basis, the majority of the decrease was due to lower landing fees as a result of the reduced number of Trips flown in 2020 as a result of the COVID-19 pandemic.

Depreciation and amortization expense for 2020 increased by $36 million, or 3.0 percent, compared with 2019. On a per ASM basis, Depreciation and amortization expense increased 55.1 percent, compared with 2019, primarily as a result of the 34.2 percent decrease in capacity in response to the COVID-19 pandemic. On a dollar basis, the increase was primarily associated with the deployment of new technology assets.

Other operating expenses, net for 2020 decreased by $1.1 billion, or 36.4 percent, compared with 2019. On a per ASM basis, Other operating expenses, net decreased 2.6 percent, compared with 2019. On both a dollar and per ASM basis, a significant portion of the decreases were due to $222 million gains from the sale-leaseback of ten 737-800 and ten 737 MAX 8 aircraft to third parties in two separate transactions in second quarter 2020, which reduced Other operating expenses for second quarter 2020. The gains were partially offset by $32 million in impairment charges associated with 20 of the Company's Boeing 737-700 aircraft that were retired in fourth quarter 2020. The gains from the sale-leaseback transactions and impairment charges were considered special items and thus excluded from the Company's non-GAAP results. See Note Regarding Use of Non-GAAP Financial Measures and the Reconciliation of Reported Amounts to Non-GAAP Financial Measures for additional detail regarding non-GAAP financial measures. See Note 8 to the Company's Consolidated Financial Statements for further information. Excluding these special items, on a per ASM basis, Other operating expenses increased as the dollar decrease was more than offset by the 34.2 percent decrease in capacity in response to the COVID-19 pandemic. On a dollar basis, excluding the impact of the special items, approximately 40 percent of the decrease was due to lower credit card fees driven by a severe reduction in revenues associated with the COVID-19 pandemic, and the majority of the remainder of the decrease was from various savings as a result of supporting a reduced operation and efforts to reduce discretionary spend.

**Other**

Other expenses (income) include interest expense, capitalized interest, interest income, and other gains and losses.

Interest expense for 2020 increased by $231 million, or 195.8 percent, compared with 2019, primarily due to higher debt balances in 2020, and a $9 million write-off of remaining unamortized costs from the Company's 364-day term loan entered into in first quarter 2020 and repaid in full during second quarter 2020. For further information on the Company's debt transactions in 2020, see Note 7 to the Consolidated Financial Statements. Based on current debt outstanding and current market interest rates, the Company expects first quarter 2021 interest expense to be approximately $113 million.

Capitalized interest for 2020 decreased by $1 million, or 2.8 percent, compared with 2019, primarily due to Boeing's halt of production of the Company's undelivered MAX aircraft. The decrease was partially offset by capitalized interest on technology projects.

Interest income for 2020 decreased by $58 million, or 64.4 percent, compared with 2019, due to lower interest rates, partially offset by higher cash balances.

Other (gains) losses, net, primarily includes amounts recorded as a result of the Company's hedging activities. See Note 11 to the Consolidated Financial Statements for further information on the Company's hedging activities. The following table displays the components of Other (gains) losses, net, for 2020 and 2019:

| | Year ended December 31, | | | |
|---|---|---|---|---|
| (in millions) | 2020 | | 2019 | |
| Mark-to-market impact from fuel contracts settling in current and future periods | $ | 40 | $ | — |
| Premium cost of fuel contracts not designated as hedges | | 34 | | — |
| Mark-to-market impact from interest rate swap agreements | | 28 | | — |
| Post-retirement curtailment charge | | 53 | | — |
| Other | | 3 | | 8 |
| | $ | 158 | $ | 8 |

**Income Taxes**

The Company's annual 2020 effective tax rate was 27.8 percent, higher than the federal statutory tax rate primarily due to the Company's annual net operating loss ("NOL") which, under the CARES Act, can be applied to prior tax years beginning with 2015, when the Company was subject to a higher federal statutory tax rate. The Company's estimated tax refund from its annual 2020 NOL carryback is approximately $470 million. The Company estimates its first quarter 2021 effective tax rate to be in the range of 21 to 22 percent, lower than the annual 2020 tax rate, as the NOL carryback provisions available under the CARES Act are not applicable to years beyond 2020.

*2019 Compared with 2018*

The Company's comparison of 2019 results to 2018 results is included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2019, under Part II Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations.

63

**Reconciliation of Reported Amounts to Non-GAAP Financial Measures (excluding special items) (unaudited) (in millions, except per share amounts and per ASM amounts)**

| | | Year ended December 31, | | | Percent |
|---|---|---|---|---|---|
| | | 2020 | | 2019 | Change |
| **Fuel and oil expense, unhedged** | $ | 1,810 | $ | 4,299 | |
| Add: Premium cost of fuel contracts designated as hedges | | 64 | | 95 | |
| Deduct: Fuel hedge gains included in Fuel and oil expense, net | | (25) | | (47) | |
| **Fuel and oil expense, as reported** | $ | 1,849 | $ | 4,347 | |
| Add: Contracts settling in the current period, but for which losses were reclassified from AOCI (a) | | 25 | | — | |
| Add: Premium cost of fuel contracts not designated as hedges | | 34 | | — | |
| **Fuel and oil expense, excluding special items (economic)** | $ | 1,908 | $ | 4,347 | (56.1)% |
| | | | | | |
| **Total operating expenses, as reported** | $ | 12,864 | $ | 19,471 | |
| Add: Payroll support and voluntary Employee programs, net | | 967 | | — | |
| Add: Contracts settling in the current period, but for which losses were reclassified from AOCI (a) | | 25 | | — | |
| Add: Premium cost of fuel contracts not designated as hedges | | 34 | | — | |
| Add: Gain from aircraft sale-leaseback transactions | | 222 | | — | |
| Deduct: Impairment of long-lived assets | | (32) | | — | |
| **Total operating expenses, excluding special items** | $ | 14,080 | $ | 19,471 | (27.7)% |
| | | | | | |
| **Operating income (loss), as reported** | $ | (3,816) | $ | 2,957 | |
| Deduct: Payroll support and voluntary Employee programs, net | | (967) | | — | |
| Deduct: Contracts settling in the current period, but for which losses were reclassified from AOCI (a) | | (25) | | — | |
| Deduct: Premium cost of fuel contracts not designated as hedges | | (34) | | — | |
| Deduct: Gain from aircraft sale-leaseback transactions | | (222) | | — | |
| Add: Impairment of long-lived assets | | 32 | | — | |
| **Operating income (loss), excluding special items** | $ | (5,032) | $ | 2,957 | n.m. |
| | | | | | |
| **Other (gains) losses, net, as reported** | $ | 158 | $ | 8 | |
| Deduct: Mark-to-market impact from fuel contracts settling in current and future periods (a) | | (40) | | — | |
| Deduct: Premium cost of fuel contracts not designated as hedges | | (34) | | — | |
| Deduct: Mark-to-market impact from interest rate swap agreements | | (28) | | — | |
| Deduct: Post-retirement curtailment charge | | (53) | | — | |
| **Other (gains) losses, net, excluding special items** | $ | 3 | $ | 8 | (62.5)% |
| | | | | | |
| **Income (loss) before income taxes, as reported** | $ | (4,256) | $ | 2,957 | |
| Deduct: Payroll support and voluntary Employee programs, net | | (967) | | — | |
| Deduct: Contracts settling in the current period, but for which losses were reclassified from AOCI (a) | | (25) | | — | |
| Deduct: Gain from aircraft sale-leaseback transactions | | (222) | | — | |
| Add: Impairment of long-lived assets | | 32 | | — | |
| Add: Mark-to-market impact from fuel contracts settling in current and future periods (a) | | 40 | | — | |
| Add: Mark-to-market impact from interest rate swap agreements | | 28 | | — | |
| Add: Post-retirement curtailment charge | | 53 | | — | |
| **Income (loss) before income taxes, excluding special items** | $ | (5,317) | $ | 2,957 | n.m. |

64

| | | | | | |
|---|---|---|---|---|---|
| **Provision (benefit) for income taxes, as reported** | $ | (1,182) | $ | 657 | |
| Deduct: Net income (loss) tax impact of fuel and special items, excluding GAAP to Non-GAAP tax rate difference (b) | | (376) | | — | |
| Deduct: GAAP to Non-GAAP tax rate difference (c) | | (247) | | — | |
| **Provision (benefit) for income taxes, net, excluding special items** | $ | (1,805) | $ | 657 | n.m. |
| | | | | | |
| **Net income (loss), as reported** | $ | (3,074) | $ | 2,300 | |
| Deduct: Payroll support and voluntary Employee programs, net | | (967) | | — | |
| Deduct: Contracts settling in the current period, but for which losses were reclassified from AOCI (a) | | (25) | | — | |
| Deduct: Gain from aircraft sale-leaseback transactions | | (222) | | — | |
| Add: Impairment of long-lived assets | | 32 | | — | |
| Add: Mark-to-market impact from fuel contracts settling in current and future periods (a) | | 40 | | — | |
| Add: Mark-to-market impact from interest rate swap agreements | | 28 | | — | |
| Add: Post-retirement curtailment charge | | 53 | | — | |
| Add: Net income (loss) tax impact of special items, excluding GAAP to Non-GAAP tax rate difference (b) | | 376 | | — | |
| Add: GAAP to Non-GAAP tax rate difference (c) | | 247 | | — | |
| **Net income (loss), excluding special items** | $ | (3,512) | $ | 2,300 | n.m. |
| | | | | | |
| **Net income (loss) per share, diluted, as reported** | $ | (5.44) | $ | 4.27 | |
| Deduct: Impact of special items | | (1.83) | | — | |
| Deduct: Net impact of net income (loss) above from fuel contracts divided by dilutive shares | | (0.04) | | — | |
| Add: Net income (loss) tax impact of special items, excluding GAAP to Non-GAAP tax rate difference (b) | | 0.66 | | — | |
| Add: GAAP to Non-GAAP tax rate difference (c) | | 0.43 | | — | |
| **Net income (loss) per share, diluted, excluding special items** | $ | (6.22) | $ | 4.27 | n.m. |
| | | | | | |
| **Operating expenses per ASM (cents)** | | 12.43 ¢ | | 12.38 ¢ | |
| Add: Impact of special items | | 1.18 | | — | |
| Deduct: Fuel and oil expense divided by ASMs | | (1.84) | | (2.76) | |
| Deduct: Profitsharing expense divided by ASMs | | — | | (0.43) | |
| **Operating expenses per ASM, excluding Fuel and oil expense, profitsharing, and special items (cents)** | | 11.77 ¢ | | 9.19 ¢ | 28.1 % |

(a) See Note 11 to Consolidated Financial Statements for further information.

(b) Tax amounts for each individual special item are calculated at the Company's effective rate for the applicable period and totaled in this line item. The Non-GAAP tax rate considers the appropriate tax treatment for special items and also reflects the anticipated benefit of carrying back full year 2020 net losses to claim tax refunds against previous cash taxes paid relating to tax years 2015 through 2019, some of which were at higher rates than the current year. The impact to Net income (loss) may not be equivalent to the special item multiplied by the effective tax rate, in all cases.

(c) Adjustment related to GAAP and Non-GAAP tax rate differences, primarily due to the Payroll Support Program being excluded as a special item.

65

**Note Regarding Use of Non-GAAP Financial Measures**

The Company's Consolidated Financial Statements are prepared in accordance with accounting principles generally accepted in the United States ("GAAP"). These GAAP financial statements may include (i) unrealized noncash adjustments and reclassifications, which can be significant, as a result of accounting requirements and elections made under accounting pronouncements relating to derivative instruments and hedging and (ii) other charges and benefits the Company believes are unusual and/or infrequent in nature and thus may make comparisons to its prior or future performance difficult.

As a result, the Company also provides financial information in this filing that was not prepared in accordance with GAAP and should not be considered as an alternative to the information prepared in accordance with GAAP. The Company provides supplemental non-GAAP financial information (also referred to as "excluding special items"), including results that it refers to as "economic," which the Company's management utilizes to evaluate its ongoing financial performance and the Company believes provides additional insight to investors as supplemental information to its GAAP results. The non-GAAP measures provided that relate to the Company's performance on an economic fuel cost basis include Fuel and oil expense, non-GAAP; Total operating expenses, non-GAAP; Operating income (loss), non-GAAP; Other (gains) losses, net, non-GAAP; Income (loss) before income taxes, non-GAAP; Provision (benefit) for income taxes, net, non-GAAP; Net income (loss), non-GAAP; Net income (loss) per share, diluted, non-GAAP; and Operating expenses per ASM, non-GAAP, excluding Fuel and oil expense and profitsharing (cents). The Company's economic Fuel and oil expense results differ from GAAP results in that they only include the actual cash settlements from fuel hedge contracts - all reflected within Fuel and oil expense in the period of settlement. Thus, Fuel and oil expense on an economic basis has historically been utilized by the Company, as well as some of the other airlines that utilize fuel hedging, as it reflects the Company's actual net cash outlays for fuel during the applicable period, inclusive of settled fuel derivative contracts. Any net premium costs paid related to option contracts that are designated as hedges are reflected as a component of Fuel and oil expense, for both GAAP and non-GAAP (including economic) purposes in the period of contract settlement. The Company believes these economic results provide further insight into the impact of the Company's fuel hedges on its operating performance and liquidity since they exclude the unrealized, noncash adjustments and reclassifications that are recorded in GAAP results in accordance with accounting guidance relating to derivative instruments, and they reflect all cash settlements related to fuel derivative contracts within Fuel and oil expense. This enables the Company's management, as well as investors and analysts, to consistently assess the Company's operating performance on a year-over-year or quarter-over-quarter basis after considering all efforts in place to manage fuel expense. However, because these measures are not determined in accordance with GAAP, such measures are susceptible to varying calculations, and not all companies calculate the measures in the same manner. As a result, the aforementioned measures, as presented, may not be directly comparable to similarly titled measures presented by other companies.

Further information on (i) the Company's fuel hedging program, (ii) the requirements of accounting for derivative instruments, and (iii) the causes of hedge ineffectiveness and/or mark-to-market gains or losses from derivative instruments is included in Note 11 to the Consolidated Financial Statements.

The Company's GAAP results in the applicable periods may include other charges or benefits that are also deemed "special items," that the Company believes make its results difficult to compare to prior periods, anticipated future periods, or industry trends. Financial measures identified as non-GAAP (or as excluding special items) have been adjusted to exclude special items. For the periods presented, in addition to the items discussed above, special items include:
1. Proceeds related to the Payroll Support Program under the CARES Act, which were used to pay Employee salaries, wages, and benefits;
2. Accrued charges related to the special termination benefits upon Employees accepting Voluntary Separation Program 2020 or Extended ETO as of December 31, 2020;
3. Gains associated with the sale-leaseback of ten Boeing 737-800 aircraft and ten Boeing 737 MAX 8 aircraft to third parties;
4. A noncash impairment charge related to 20 Boeing 737-700 aircraft that were retired during 2020;

66

5. Unrealized losses related to twelve forward-starting interest rate swap agreements. During 2020, the interest rate swap agreements, which were related to twelve 737 MAX 8 aircraft leases (with deliveries originally scheduled between June 2020 and September 2020), were de-designated as hedges due to the scheduled delivery range no longer being probable, resulting in the mark-to-market changes being recorded to earnings; and

6. A post-retirement curtailment charge related to Employees who accepted Voluntary Separation Program 2020 and elected to participate in the Company's retiree medical benefits plan.

Because management believes special items can distort the trends associated with the Company's ongoing performance as an airline, the Company believes that evaluation of its financial performance can be enhanced by a supplemental presentation of results that exclude the impact of special items in order to enhance consistency and comparativeness with results in prior periods that do not include such items and as a basis for evaluating operating results in future periods. The following measures are often provided, excluding special items, and utilized by the Company's management, analysts, and investors to enhance comparability of year-over-year results, as well as to industry trends: Fuel and oil expense, non-GAAP; Total operating expenses, non-GAAP; Operating income (loss), non-GAAP; Other (gains) losses, net, non-GAAP; Income (loss) before income taxes, non-GAAP; Provision (benefit) for income taxes, net, non-GAAP; Net income (loss), non-GAAP; Net income (loss) per share, diluted, non-GAAP; and Operating expenses per ASM, non-GAAP, excluding Fuel and oil expense and profitsharing (cents).

The Company has also utilized and provided average cash burn and average daily core cash burn, which are non-GAAP financial measures. Cash burn is a supplemental measure that most U.S. airlines began providing in 2020 to measure liquidity in light of the negative financial effects of the pandemic. For the three months ended December 31, 2020, average daily core cash burn was approximately $12 million, calculated as Loss before income taxes, non-GAAP, of $1.3 billion (as provided in the Non-GAAP reconciliation below), adjusted for Depreciation and amortization expense of $316 million; Capital expenditures of $90 million; and adjusted amortizing debt service payments of approximately $43 million; divided by the number of days in the period. The Company utilizes average daily core cash burn to monitor the performance of its core business as a proxy for its ability to achieve sustainable cash and profit break-even results. The following table provides the components of Loss before income taxes, non-GAAP for the three months ended December 31, 2020:

| (in millions) | Three months ended December 31, 2020 |
|---|---|
| **Loss before income taxes, as reported** | $        (1,331) |
| Deduct: Payroll support and voluntary Employee programs, net | (34) |
| Deduct: Contracts settling in the current period, but for which losses were reclassified from AOCI (a) | (9) |
| Add: Impairment of long-lived assets | 32 |
| Add: Post-retirement curtailment charge | 53 |
| **Loss before income taxes, excluding special items** | $        (1,289) |

(a) See Note 11 to Consolidated Financial Statements for further information.

Given that the Company's cash burn calculation is derived from Loss before income taxes, non-GAAP, the Company excludes the following items in its calculation of average core cash burn: financing transactions; Payroll Support Program proceeds; Supplier proceeds; voluntary separation and extended emergency time off program payments; and other changes in working capital. Cash burn methodology varies by airline, and the Company's fourth quarter 2020 average daily core cash burn of $12 million may differ materially by utilizing cash burn calculations that adjust for changes in working capital. Utilizing an alternative cash burn approach, which adjusts for changes in working capital, among other items, the Company's fourth quarter 2020 daily cash burn was approximately $15 million.

**Liquidity and Capital Resources**

The enormous impact of the COVID-19 pandemic on the U.S. travel industry created an urgent liquidity crisis for the entire airline industry, including the Company. However, due to the Company's pre-pandemic low balance sheet leverage, large base of unencumbered assets, and investment-grade credit ratings, the Company was able to quickly access additional liquidity during 2020, as Customer cancellations spiked and sales and revenues dropped while the Company continued to experience significant fixed operating expenses. See Note 2 and Note 7 to the Consolidated Financial Statements for further information regarding the impact of the COVID-19 pandemic, as well as the transactions completed and assistance obtained under the CARES Act. Much uncertainty remains about the time it will take for air travel demand to recover, and the Company continues to assess its immediate and near-term liquidity needs. The Company also continues to assess various sources and options including public and private financings to bolster its liquidity and believes that, given current market conditions, it has opportunities to do so.

Net cash used in operating activities for 2020 was $1.1 billion, and net cash provided by operating activities for 2019 was $4.0 billion. Operating cash inflows are primarily derived from providing air transportation to Customers. The vast majority of tickets are purchased prior to the day on which travel is provided and, in some cases, several months before the anticipated travel date. Operating cash outflows are related to the recurring expenses of airline operations. The operating cash flows for 2020 were affected primarily by the COVID-19 pandemic, which resulted in a significant drop in travel demand, sales, and revenues, leading to the Company's Net loss (as adjusted for noncash items), the Company's funding of its $667 million 2019 profitsharing distribution to Employees in 2020, a significant decline in amounts payable for passenger excise taxes and segment fees as a result of the decline in passenger ticket sales, and the suspension of collection of certain ticket taxes as dictated by the CARES Act. These were partially offset by $2.4 billion in Payroll Support Program grant proceeds received as part of the CARES Act, of which approximately $2.3 billion of this direct payroll support were used to offset eligible costs and thus included in operating activities, with the remaining $40 million allocated to the value of warrants issued and thus included in financing activities. These net decreases in operating activities were partially offset by a $1.6 billion increase in Air traffic liability. The increase in Air traffic liability was due to ticket sales in 2020 for future travel that have not been flown, as a result of the significant number of Customer trip cancellations associated with the COVID-19 pandemic, and growth in Rapid Rewards points earned due to multiple loyalty credit card promotions throughout 2020. The operating cash flows for 2019 were impacted primarily by the Company's results of operations, as adjusted for non-cash items as well as changes in the Air traffic liability and Accrued liabilities balances. Cash flows associated with entering into new fuel derivatives, which are classified as Other, net, operating cash flows, were net outflows of $129 million in 2020 and $131 million in 2019. See Note 11 to the Consolidated Financial Statements for further information. Net cash provided by operating activities is primarily used to finance capital expenditures, repay debt, and provide working capital. Historically, the Company has also used net cash provided by operations to fund stock repurchases and pay dividends; however these shareholder return activities have been suspended due to restrictions associated with the CARES Act and the Payroll Support Program Extension. See Note 2 to the Consolidated Financial Statements for further information.

Net cash used in investing activities for 2020 and 2019 was $16 million and $303 million, respectively. Investing activities in both years included Capital expenditures, and changes in the balance of the Company's short-term and noncurrent investments. The Company also raised $815 million from the sale-leaseback of 20 aircraft (see Note 8 to the Consolidated Financial Statements for more details on the sale-leaseback transactions) and received $428 million of Supplier proceeds during 2020, which the Company considers an offset to its aircraft capital expenditures. See Note 17 to the Consolidated Financial Statements for further information on Supplier proceeds. During 2020, Capital expenditures were $515 million, compared with $1.0 billion in the same prior year period, the majority of which included ongoing technology projects, airport and other facility construction projects, and progress payments related to future aircraft deliveries from the manufacturer. Capital expenditures decreased, year-over-year, largely due to a decrease in technology project expenditures, progress payments, and several projects in process during 2019 but completed and placed into service during 2020. The Company more than offset its originally planned annual 2020 capital spending of approximately $1.4 billion to $1.5 billion, primarily due to no purchased aircraft deliveries from Boeing, combined with its receipt of proceeds from sale-leaseback transactions, Supplier proceeds, and the cancellation or deferral of the majority of its capital investment projects originally

planned for 2020. See Notes 5 and 17 to the Condensed Consolidated Financial Statements for further information. As a result of certain delivery credits provided in the Boeing Agreement, as well as progress payments made to date on undelivered aircraft, the Company currently estimates an immaterial amount of aircraft capital expenditures in 2021. Therefore, the Company currently estimates its annual 2021 capital expenditures to be no more than $500 million, driven primarily by technology, facilities, and operational investments. The Company has reduced its combined 2020 and 2021 capital spending by approximately $5.5 billion, compared with planning projections prior to the pandemic. The Company continues its fleet modernization program and expects to retire a significant amount of its Boeing 737-700 fleet over the next 10-15 years. The Company evaluates whether to adhere to or alter its aircraft retirement plans in light of the COVID-19 pandemic and other factors, including whether to retain aircraft longer or accelerate retirements and replacements. The Company plans to use the Boeing 737 MAX 8 aircraft in its fleet modernization program and believes it will also have use for a smaller aircraft such as the Boeing 737 MAX 7. In light of the current environment, the Company expects to take delivery of 35 MAX 8 aircraft through December 31, 2021, including 16 leased aircraft, 7 of which were delivered in December 2020. The Company and Boeing are in discussions to change the Company's aircraft order book and to formally revise the existing purchase agreement for years after 2021. As a result, the Company expects to make further adjustments to its aircraft purchase quantities, aircraft variants, delivery schedule and related capital expenditures, although no assurance can be given about the outcome of discussions. The Company cannot predict when the effects of the COVID-19 pandemic on air travel will end, but the Company expects that its capital expenditures will increase from current levels after U.S. air travel returns to normal.

Net cash provided by financing activities for 2020 was $9.7 billion, and net cash used in financing activities for 2019 was $3.0 billion. During 2020, the Company borrowed $13.6 billion, through various transactions, as explained in detail in Notes 2 and 7 to the Consolidated Financial Statements. An additional $2.3 billion was raised from a public offering of 80,500,000 shares of common stock. These financings were partially offset by the repayment in 2020 of all $3.7 billion borrowed under the Company's Amended and Restated 364-Day Credit Agreement, the full repayment of the $1.0 billion drawn under the Company's $1.0 billion revolving credit facility, and the full repayment of the $500 million 2.65% Notes due 2020. See Note 7 to Consolidated Financial Statements for further information on the Company's debt agreements. During 2019, the Company repurchased $2.0 billion of its outstanding common stock, repaid $615 million in debt and finance lease obligations, and paid $372 million in cash dividends to Shareholders.

A discussion of the Company's most significant drivers impacting cash flow for 2018 are included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2019, under Part II Item 7, Liquidity and Capital Resources.

Since March 2020, the Company reduced annual 2020 spending by approximately $8 billion, compared with original plans. Average daily core cash burn was approximately $12 million in fourth quarter 2020. The Company expects average core cash burn of approximately $17 million per day in the first quarter of 2021, as a result of continued softness in demand and a seasonally weaker travel period in January and February 2021, as well as rising fuel prices. Including certain changes in working capital, the Company expects average core cash burn in first quarter 2021 to be in the range of $10 million to $15 million per day, compared with approximately $15 million per day in fourth quarter 2020. While vaccine availability should mark the beginning of the end of the pandemic, current passenger booking trends do not indicate significant improvement through March 2021. In response to current trends, the Company's capacity plans remain conservative through, at least, March 2021, and the Company will continue to monitor bookings and adjust flight activity, accordingly. While the Company hopes to achieve cash burn break even in 2021, it is wholly dependent upon a substantial rebound in passenger traffic and revenue; and, it is difficult to predict the timing of such a rebound, especially with respect to business travel. In order to achieve cash burn break even, the Company continues to estimate operating revenues will need to recover to a range of 60 to 70 percent of 2019 levels, which is roughly double current levels. Average core cash burn projections do not reflect the potential impact of special items because the Company cannot reliably predict or estimate those items or expenses or their impact to its financial statements in future periods. Accordingly, the Company believes a reconciliation of non-GAAP financial measures to the equivalent GAAP financial measures for projected results is not meaningful or available without unreasonable effort. See Note Regarding Use of Non-GAAP Financial

69

Measures and the Reconciliation of Reported Amounts to Non-GAAP Financial Measures for additional detail regarding non-GAAP financial measures including the cash burn formula.

Cash burn methodology varies by airline, and the Company's average daily core cash burn may differ materially by utilizing cash burn calculations that adjust for changes in working capital. The Company's average daily core cash burn was approximately $14 million in December 2020 and approximately $12 million in fourth quarter 2020. Utilizing an alternative cash burn approach, which adjusts for changes in working capital-including changes in Air traffic liability and cash payments for voluntary separation and Extended ETO programs, among other items — the Company's average daily core cash burn was approximately $18 million in December 2020 and approximately $15 million in fourth quarter 2020.

The Company is a "well-known seasoned issuer" and currently has an effective shelf registration statement registering an indeterminate amount of debt and equity securities for future sales. The Company currently intends to use the proceeds from any future securities sales off this shelf registration statement for general corporate purposes.

The Company has access to $1.0 billion under its Amended and Restated Revolving Credit Agreement, as amended (the "Amended A&R Credit Agreement"). The Amended A&R Credit Agreement has an accordion feature that would allow the Company, subject to, among other things, the procurement of incremental commitments, to increase the size of the facility to $1.5 billion. Interest on the facility is based on the Company's credit ratings at the time of borrowing. At the Company's current ratings, the interest cost would be LIBOR plus a spread of 200.0 basis points. The facility contains a financial covenant to maintain total liquidity, as defined in the Amended A&R Credit Agreement, of $1.5 billion at all times under the Amended A&R Credit Agreement; the Company was compliant with this requirement as of December 31, 2020. There were no amounts outstanding under the Amended A&R Credit Agreement as of December 31, 2020.

The Company entered into the following share repurchases during 2020, which were each recorded as a treasury share purchase for purposes of calculating earnings per share. See Part II, Item 5 for further information on the Company's share repurchase authorizations.

| Share repurchases (in millions) | Shares received | Cash paid | |
| --- | --- | --- | --- |
| First Quarter 2020 Accelerated Share Repurchase Program | 6.4 | $ | 366 |
| Open Market Share Repurchases | 1.9 | | 85 |
| Total | 8.3 | $ | 451 |

On March 17, 2020, Moody's downgraded the Company's credit ratings to "Baa1" from "A3." On March 18, 2020, Standard & Poor's downgraded the Company's credit ratings to "BBB" from "BBB+." On April 10, 2020, Fitch downgraded the Company's credit ratings to "BBB+" from "A-." The downgrades of the Company's investment-grade ratings were based on the Company's increased level of credit risk as a result of the financial impacts of the COVID-19 pandemic. See Note 2 to the Consolidated Financial Statements for further information on the impacts of the COVID-19 pandemic.

Although not the case at December 31, 2020 due to the Company's recent significant financing activities, the Company has historically carried a working capital deficit, in which its current liabilities exceed its current assets. This is common within the airline industry and is primarily due to the nature of the Air traffic liability account, which is related to advance ticket sales, unused funds available to Customers, and loyalty deferred revenue, which are performance obligations for future Customer flights, do not require future settlement in cash, and are mostly nonrefundable. See Note 6 to the Consolidated Financial Statements for further information. The Company has various options available to meet its capital and operating commitments, including unrestricted cash and short-term investments of $13.3 billion as of December 31, 2020, and anticipated future internally generated funds from operations. However, the COVID-19 pandemic continues to evolve and could have a material adverse impact on the Company's ability to meet its capital and operating commitments. See Note 2 to the Consolidated Financial

Statements for further information on the impacts of the COVID-19 pandemic. The Company will continue to consider various financing options to maximize liquidity and supplement cash requirements, as necessary.

The Company has a large net deferred tax liability on its Consolidated Balance Sheet. The deferral of income taxes has resulted in a significant benefit to the Company and its liquidity position. Since the Company purchases the majority of the aircraft it acquires, it has been able to utilize accelerated depreciation methods (including bonus depreciation) available under the Internal Revenue Code of 1986, as amended, in 2020 and in previous years, which has enabled the Company to accelerate cash tax benefits of depreciation. Based on the Company's scheduled future aircraft deliveries from Boeing and existing tax laws in effect, the Company will continue to accelerate the cash income tax benefits related to aircraft purchases. However, due to the Company's net taxable loss incurred in 2020, and a provision within the CARES Act that allows entities to carry back such 2020 losses to prior periods of up to five years, and claim refunds of federal taxes paid, the Company expects to receive a significant cash tax refund once it completes all the necessary requirements to make the appropriate filings with the Internal Revenue Service. See Note 15 to the Consolidated Financial Statements for further information. The Company has paid in the past, and will continue to pay in the future, significant cash taxes to the various taxing jurisdictions where it operates. The Company expects to be able to continue to meet such obligations utilizing cash and investments on hand, as well as cash generated from its ongoing operations.

71

**Off-Balance Sheet Arrangements, Contractual Obligations, and Contingent Liabilities and Commitments**

The Company has contractual obligations and commitments primarily with regard to future purchases of aircraft, payment of debt, and lease arrangements. For aircraft commitments with Boeing, the Company is required to make cash deposits toward the purchase of aircraft in advance. These deposits are classified as Deposits on flight equipment purchase contracts in the Consolidated Balance Sheet until the aircraft is delivered, at which time deposits previously made are deducted from the final purchase price of the aircraft and are reclassified as Flight equipment. See Part I, Item 2 for a complete table of the Company's contractual firm deliveries and options for Boeing 737 MAX 7 and 737 MAX 8 aircraft, Note 5 to the Consolidated Financial Statements for the financial commitments related to these firm deliveries, and Note 17 to the Consolidated Financial Statements for further information about the MAX groundings and expected return to service.

The leasing of aircraft (including the sale and leaseback of aircraft) provides flexibility to the Company as a source of financing. Although the Company is responsible for all maintenance, insurance, and expense associated with operating leased aircraft, and retains the risk of loss for these aircraft, it has generally not made guarantees to the lessors regarding the residual value (or market value) of the aircraft at the end of the lease terms. Assets and obligations under operating leases are included in the Company's Consolidated Balance Sheet. See Note 3 and Note 8 to the Consolidated Financial Statements for further information. Disclosure of the expected contractual obligations associated with the Company's leased aircraft is included below.

As of December 31, 2020, the Company had 184 leased aircraft, including 47 Boeing 717-200 aircraft ("B717s") subleased to Delta. Of these leased aircraft, 112 are under operating leases, including 45 B717s subleased to Delta. See Note 8 to the Consolidated Financial Statements for further information on this transaction.

The Company is required to provide standby letters of credit to support certain obligations that arise in the ordinary course of business and may choose to provide letters of credit in place of posting cash collateral related to its fuel hedging positions. Although the letters of credit are off-balance sheet, the majority of the obligations to which they relate are reflected as liabilities in the Consolidated Balance Sheet. Outstanding letters of credit totaled $138 million at December 31, 2020.

The following table aggregates the Company's material expected contractual obligations and commitments as of December 31, 2020:

| Contractual obligations | | Obligations by period (in millions) | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2021 | | 2022 - 2023 | | 2024 - 2025 | | Thereafter | | Total |
| Long-term debt (a) | $ | 136 | $ | 1,763 | $ | 3,987 | $ | 4,291 | $ | 10,177 |
| Interest commitments - fixed (b) | | 340 | | 625 | | 469 | | 298 | | 1,732 |
| Interest commitments - floating (c) | | 8 | | 11 | | 8 | | 3 | | 30 |
| Facility and other operating lease commitments | | 91 | | 122 | | 83 | | 557 | | 853 |
| Aircraft operating lease commitments (d) | | 280 | | 350 | | 266 | | 599 | | 1,495 |
| Aircraft finance lease commitments (e) | | 102 | | 192 | | 164 | | 156 | | 614 |
| Aircraft purchase commitments (f) | | 3,727 | | 2,778 | | 3,416 | | — | | 9,921 |
| Other commitments | | 150 | | 252 | | 183 | | 293 | | 878 |
| Total contractual obligations | $ | 4,834 | $ | 6,093 | $ | 8,576 | $ | 6,197 | $ | 25,700 |

(a)  Includes principal only. See Note 7 to the Consolidated Financial Statements for additional information.
(b)  Related to fixed-rate debt (either at issuance or through swaps) only.
(c)  Interest obligations associated with floating-rate debt is estimated utilizing forward interest rate curves as of December 31, 2020, and can be subject to significant fluctuation.
(d)  Includes the impact of the B717 sublease transaction entered into in 2012. See Note 8 to the Consolidated Financial Statements for additional information.
(e)  Includes principal and interest on finance leases. See Note 8 to the Consolidated Financial Statements for additional information.
(f)  This reflects firm orders for purchased MAX aircraft from Boeing; assuming a shift of the 27 MAX aircraft and 35 MAX aircraft contractually scheduled for delivery in 2019 and 2020, respectively, into 2021, due to the MAX grounding from March 13, 2019 until late 2020 which consisted of $743 million from 2019 and $1.3 billion from 2020. See Note 5 to the Consolidated Financial Statements for further information. See Part I, Item 2 for a complete table of the Company's contractual firm deliveries.

## Airport Projects

The Company periodically enters into commitments associated with various airport improvement projects that could impact its future liquidity needs in differing ways. These projects, which are typical within the airline industry, include the construction of new facilities and the rebuilding or modernization of existing facilities and are discussed in more detail in Note 5 to the Consolidated Financial Statements.

### Dallas Love Field

For the rebuilding of the facilities at Dallas Love Field, the Company guaranteed principal, premium, and interest on $456 million in bonds issued by the Love Field Airport Modernization Corporation ("LFAMC") that were utilized to fund the majority of the project. The amount of bonds outstanding as of December 31, 2020, was $399 million. Repayment of the bonds is through the "Facilities Payments" described below. Reimbursement of the Company for its payment of Facilities Payments is made through recurring ground rents, fees, and other revenues collected at the airport.

Prior to the issuance of the bonds by the LFAMC, the Company entered into two separate funding agreements: (i) a "Facilities Agreement" pursuant to which the Company is obligated to make debt service payments on the principal and interest amounts associated with the bonds ("Facilities Payments"), less other sources of funds the City of Dallas may apply to the repayment of the bonds (including, but not limited to, passenger facility charges collected from passengers originating from the airport); and (ii) a "Revenue Credit Agreement" pursuant to which the City of Dallas reimburses the Company for the Facilities Payments made by the Company.

73

A majority of the monies transferred from the City of Dallas to the Company under the Revenue Credit Agreement originate from a reimbursement account created in the "Use and Lease Agreement" between the City of Dallas and the Company. The Use and Lease Agreement is a 20-year agreement providing for, among other things, the Company's lease of space at the Airport from the City of Dallas. The remainder of such monies transferred from the City of Dallas to the Company under the Revenue Credit Agreement originates from (i) use and lease agreements with other airlines, (ii) various concession agreements, and (iii) other airport miscellaneous revenues.

The Company's liquidity could be impacted by this project to the extent there are timing differences between the Company's payment of the Facilities Payments pursuant to the Facilities Agreement and the transfer of monies back to the Company pursuant to the Revenue Credit Agreement; however, the Company does not currently expect that to occur. The project has not had a significant impact on the Company's capital resources or financial position.

### Los Angeles International Airport

In October 2017, the Company executed a lease agreement (the "T1.5 Lease") with Los Angeles World Airports ("LAWA"), which owns and operates Los Angeles International Airport ("LAX"). Under the T1.5 Lease, the Company oversaw and managed the design, development, financing, construction, and commissioning of a passenger processing facility between Terminal 1 and 2 (the "Terminal 1.5 Project"). The Terminal 1.5 Project includes ticketing, baggage claim, passenger screening, and a bus gate at a cost not to exceed $464 million for site improvements and non-proprietary improvements.

Funding for the Terminal 1.5 Project is primarily through the Regional Airports Improvement Corporation (the "RAIC"), which is a quasi-governmental special purpose entity that acts as a conduit borrower under a syndicated credit facility provided by a group of lenders. A loan made under the credit facility for the Terminal 1.5 Project is being used to reimburse the Company for the site improvements and non-proprietary improvements of the Terminal 1.5 Project, and the outstanding loan will be repaid with the proceeds of LAWA's payments to purchase completed construction phases. The Company guaranteed the obligation of the RAIC under the credit facility associated with the Terminal 1.5 Project. As of December 31, 2020, the Company's outstanding guaranteed obligation under the credit facility for the Terminal 1.5 Project was $318 million.

The Company's liquidity could be impacted by this project under certain circumstances; however, the Company does not expect this to occur based on its past experience with other projects. This project is not expected to have a significant impact on the Company's capital resources or financial position. Construction on the Terminal 1.5 Project began during third quarter 2017 and was substantially completed as of December 31, 2020; however, the Terminal 1.5 Project will not be placed into service until second quarter 2021, at which time LAWA is expected to repay the outstanding loan and purchase the remaining completed assets for accounting purposes.

74

**CRITICAL ACCOUNTING POLICIES AND ESTIMATES**

The Company's Consolidated Financial Statements have been prepared in accordance with GAAP. The Company's significant accounting policies are described in Note 1 to the Consolidated Financial Statements. The preparation of financial statements in accordance with GAAP requires the Company's management to make estimates and assumptions that affect the amounts reported in the Consolidated Financial Statements and accompanying footnotes. The Company's estimates and assumptions are based on historical experience and changes in the business environment. However, actual results may differ from estimates under different conditions, sometimes materially. Critical accounting policies and estimates are defined as those that both (i) are most important to the portrayal of the Company's financial condition and results and (ii) require management's most subjective judgments. The Company's critical accounting policies and estimates are described below.

*Revenue Recognition*

Tickets sold for Passenger air travel are initially deferred as Air traffic liability. Passenger revenue is recognized and Air traffic liability is reduced when the service is provided (i.e., when the flight takes place). Air traffic liability primarily represents tickets sold for future travel dates, funds that are past flight date and remain unused, but are expected to be used in the future, and the Company's liability for loyalty benefits that are expected to be redeemed in the future. Air traffic liability fluctuates throughout the year based on seasonal travel patterns, fare sale activity, and activity associated with the Company's loyalty program. See Note 1 to the Consolidated Financial Statements for information about the Company's revenue recognition policies.

For air travel on Southwest, the amount of tickets that will expire unused are estimated and recognized in Passenger revenue once the scheduled flight date has passed. Estimating the amount of tickets that will expire unused involves some level of subjectivity and judgment. The majority of the Company's tickets sold are nonrefundable, which is the primary source of unused tickets. The Company has a No Show policy that applies to fares that are not canceled or changed by a Customer at least ten minutes prior to a flight's scheduled departure. See Note 1 to the Consolidated Financial Statements for further information. According to the Company's current "Contract of Carriage," all refundable tickets that are sold but not flown on the travel date can be reused for another flight up to a year from the date of sale, or some tickets can be refunded. This policy also applies to unused Customer funds that may be the result of an exchange downgrade, in which a Customer exchanges their ticket from a previously purchased flight for a lower priced ticket, with the price difference being effectively refunded through it being made available for use by the Customer towards travel up to twelve months from the date of original purchase. As a result of the COVID-19 pandemic, for all Customer travel funds created or scheduled to expire between March 1 and September 7, 2020 associated with flight cancellations, the Company has extended the expiration date to September 7, 2022. Further, the Company announced in August 2020, that it would allow qualified travel funds to be converted to Rapid Rewards points through December 15, 2020. Despite the possibility that some of these travel funds may be redeemed beyond the following twelve-month period, the Company has continued to classify them as "current" in the accompanying Consolidated Balance Sheet as they remain a demand liability and the Company does not have sufficient data to enable it to accurately estimate the portion that will not be redeemed for travel in the subsequent twelve months. Fully refundable tickets rarely expire unused. Estimates of tickets that will expire unused are based on historical experience over many years. The Company has consistently applied this accounting method to estimate revenue from unused tickets at the date of scheduled travel. Holding other factors constant, a 10 percent change in the Company's estimate of the amount of tickets that will expire unused would have resulted in a $26 million, or less than one percent, change in Passenger revenues recognized for the year ended December 31, 2020.

Events and circumstances outside of historical fare sale activity or historical Customer travel patterns can result in actual spoiled tickets differing significantly from estimates. The Company evaluates its estimates within a narrow range of acceptable amounts. If actual spoilage results in an amount outside of this range, estimates and assumptions are reviewed and adjustments to Air traffic liability and to Passenger revenue are recorded, as necessary. Assumptions used to generate spoilage estimates can be impacted by several factors including, but not limited to: fare increases, fare sales, changes to the Company's ticketing policies, changes to the Company's refund, exchange and unused funds policies, seat availability, and economic factors. The Company's estimation techniques have been

consistently applied from year to year; however, as with any estimates, actual spoiled tickets may vary from estimated amounts. Given the unprecedented amount of 2020 Customer flight cancellations and the amount of travel funds available to Customers for use through September 2022, the Company expects additional variability in the amount of spoilage revenue recorded in future periods, especially as a percentage of revenues, as the estimates of the portion of sold tickets that will expire unused may differ from historical experience and the Company's overall revenues remain well below pre-COVID-19 pandemic levels.

### Impairment Accounting

The Company applies a fair value based impairment test to the carrying value of goodwill and indefinite-lived intangible assets annually on October 1st, or more frequently if certain events or circumstances indicate that an impairment loss may have been incurred. The Company assesses the value of goodwill and indefinite-lived intangible assets under either a qualitative or quantitative approach. Under a qualitative approach, the Company considers various market factors, including applicable key assumptions also used in the quantitative assessment listed below. These factors are analyzed to determine if events and circumstances could reasonably have affected the fair value of goodwill and indefinite-lived intangible assets. If the Company determines that it is more likely than not that an indefinite-lived intangible asset or reporting unit goodwill is impaired, the quantitative approach is used to assess the asset or reporting unit fair value and the amount of the impairment. Under a quantitative approach, the fair value of the Company's indefinite-lived intangible assets or reporting unit is calculated based on key market participant assumptions. If the indefinite-lived intangible assets' carrying value exceeds the fair value calculated using the quantitative approach, an impairment charge is recorded for the difference in fair value and carrying value. If the reporting unit carrying value exceeds the reporting unit fair value calculated using the quantitative approach, an impairment charge is recorded for the difference between fair value and carrying value, limited to the amount of goodwill in the reporting unit.

When performing a quantitative impairment assessment of goodwill and indefinite-lived intangible assets, fair value is estimated based on (i) recent market transactions, where available, (ii) projected discounted cash flows (an income approach), or (iii) a combination of limited market transactions and the lease savings method (which reflects potential annual after-tax lease savings arising from owning the certain indefinite-lived intangibles rather than leasing them from another airline at market rates).

*Key Assumptions.* Key assumptions and/or estimates made in the Company's quantitative impairment tests included the following: (i) a projection of revenues, expenses, and cash flows; (ii) terminal period revenue growth and cash flows; (iii) an estimated weighted average cost of capital; (iv) an assumed discount rate, depending on the asset, (v) a tax rate, and (vi) market purchase prices and/or lease rates for comparable assets. The Company believes these assumptions are consistent with those a hypothetical market participant would use given circumstances that were present at the time the estimates were made. However, actual results and amounts may be significantly different from the Company's estimates. Due to the drastic reduction in air travel as a result of the pandemic in 2020, the Company determined that it would perform a quantitative assessment of its Goodwill and indefinite-lived intangible assets. Based on the result of the annual impairment tests performed as of October 1, 2020, no impairment was determined to exist for Goodwill or indefinite-lived intangible assets, as the fair values of the reporting unit and indefinite-lived intangible assets exceeded their respective carrying values.

Future impairment of Goodwill and indefinite-lived intangible assets may result from changes in assumptions, estimates, or circumstances, some of which are beyond the Company's control. Factors which could result in an impairment of Goodwill, holding other assumptions constant, could include, but are not limited to: (i) a significant reduction in passenger demand as a result of domestic or global economic conditions; (ii) significantly higher prices for jet fuel; (iii) lower fares or passenger yields as a result of increased competition or lower demand; (iv) a significant increase in future capital expenditure commitments; and (v) significant disruptions to the Company's operations as a result of both internal and external events such as terrorist activities, actual or threatened war, labor actions by Employees, or further industry regulation. Factors which could result in an impairment of owned domestic slots, holding other assumptions constant, could include, but are not limited to: (i) a change in competition in the slotted airport; (ii) a change in governmental regulations in the slotted airport; (iii) significantly higher prices for jet fuel; and (iv) increased competition at a nearby airport.

76

*Long lived assets.* Long-lived assets, which primarily consist of Flight equipment and related assets, are evaluated for impairment when events and circumstances indicate the assets may be impaired. Indicators include, but are not limited to: (i) a decision to permanently remove long-lived assets from operations, (ii) significant changes in the estimated useful life, (iii) significant changes in projected cash flows, (iv) significant decreases in market value and (v) changes in technology. For long-lived assets held for sale, when the carrying amount of these assets is greater than the fair value, less the cost to sell, depreciation is discontinued and an impairment loss is recorded.

In evaluating the potential for impairment associated with aircraft used in operations, assets are grouped at the entire Boeing 737 fleet level, as the Company has determined this is the lowest level for which there are identifiable cash flows. Future cash flows are estimated based on projections of capacity, passenger yield, fuel, labor costs, and other relevant factors. If an impairment were to exist, the impairment loss recognized is the amount by which the fleet's carrying amount exceeds its estimated fair value. Aircraft fair values are estimated using published sources, appraisals, and bids received from third parties, as available. In 2020, the Company recorded an impairment charge of $32 million, associated with 20 of the Company's Boeing 737-700 aircraft that were retired early in fourth quarter 2020.

### *Fair Value Measurements and Financial Derivative Instruments*

The Company utilizes unobservable (Level 3) inputs in determining the fair value of certain assets and liabilities. At December 31, 2020, these consisted of its fuel derivative option contracts, which were an asset of $134 million. The Company utilizes financial derivative instruments primarily to manage its risk associated with changing jet fuel prices. See "Quantitative and Qualitative Disclosures about Market Risk" for more information on these risk management activities, Note 11 to the Consolidated Financial Statements for more information on the Company's fuel hedging program and financial derivative instruments, and Note 12 to the Consolidated Financial Statements for more information about fair value measurements.

All derivatives are required to be reflected at fair value and recorded on the Consolidated Balance Sheet. At December 31, 2020, the Company was a party to over 250 separate financial derivative instruments related to its fuel hedging program for future periods. Changes in the fair values of these instruments can vary dramatically based on changes in the underlying commodity prices. For example, during 2020, market "spot" prices for Brent crude oil peaked at a high average daily price of approximately $69 per barrel and hit a low average daily price of approximately $19 per barrel. During 2019, market spot prices ranged from a high average daily price of approximately $75 per barrel to a low average daily price of approximately $55 per barrel. Market price changes can be driven by factors such as supply and demand, inventory levels, weather events, refinery capacity, political agendas, the value of the U.S. dollar, geopolitical events, the extent of the COVID-19 pandemic, and general economic conditions, among other items. The financial derivative instruments utilized by the Company primarily are a combination of collars, purchased call options, call spreads, put spreads, and fixed price swap agreements.

The Company enters into financial derivative instruments with third party institutions in "over-the-counter" markets. Since the majority of the Company's financial derivative instruments are not traded on a market exchange, the Company estimates their fair values. Depending on the type of instrument, the values are determined by the use of present value methods or standard option value models with assumptions about commodity prices based on those observed in underlying markets.

The Company determines the fair value of fuel derivative option contracts utilizing an option pricing model based on inputs that are either readily available in public markets, can be derived from information available in publicly quoted markets, or are quoted by its counterparties. In situations where the Company obtains inputs via quotes from its counterparties, it verifies the reasonableness of these quotes via similar quotes from another counterparty as of each date for which financial statements are prepared. The Company has consistently applied these valuation techniques in all periods presented and believes it has obtained the most accurate information available for the types of derivative contracts it holds. Due to the fact that certain inputs used in determining the estimated fair value of its option contracts are considered unobservable (primarily implied volatility), the Company has categorized these option contracts as Level 3. Although implied volatility is not directly observable, it is derived primarily from changes in market prices, which are observable. Based on the Company's portfolio of option contracts as of

December 31, 2020, a 10 percent change in implied volatility, holding all other factors constant, would have resulted in a change in the fair value of this portfolio of less than $15 million.

Fair values for financial derivative instruments are estimated prior to the time that the financial derivative instruments settle. However, once settlement of the financial derivative instruments occurs and the hedged jet fuel is purchased and consumed, all values and prices are known and are recognized in the financial statements. Although the Company continues to use a prospective assessment to determine that commodities continue to qualify for hedge accounting in specific locations where the Company hedges, there are no assurances that these commodities will continue to qualify in the future. This is due to the fact that future price changes in these refined products may not be consistent with historical price changes. Increased volatility in these commodity markets for an extended period of time, especially if such volatility were to worsen, could cause the Company to lose hedge accounting altogether for the commodities used in its fuel hedging program. Further, should the anticipated fuel purchases covered by the Company's fuel hedges no longer be probable of occurring, the Company would discontinue hedge accounting. The loss of hedge accounting would create further volatility in the Company's GAAP financial results.

As discussed in Note 11 to the Consolidated Financial Statements, any changes in fair value of cash flow derivatives designated as hedges are offset within AOCI until the period in which the expected future cash flow impacts earnings. Any changes in the fair value of fuel derivatives that do not qualify for hedge accounting are reflected in earnings within Other (gains) losses, net, in the period of the change. Because the Company has extensive historical experience in valuing the derivative instruments it holds, and such experience is continually evaluated against its counterparties each period when such instruments expire and are settled for cash, the Company believes it is unlikely that an independent third party would value the Company's derivative contracts at a significantly different amount than what is reflected in the Company's financial statements. In addition, the Company also has bilateral credit provisions in some of its counterparty agreements, which provide for parties (or the Company) to provide cash collateral when the fair value of fuel derivatives with a single party exceeds certain threshold levels. Since this cash collateral is based on the estimated fair value of the Company's outstanding fuel derivative contracts, this provides further validation to the Company's estimate of fair values.

### *Loyalty Accounting*

The Company utilizes estimates in the recognition of revenues and liabilities associated with its loyalty program. These estimates primarily include the liability associated with Rapid Rewards loyalty member ("Member") account balances that are expected to be redeemed for travel or other products at a future date. Loyalty account balances include points earned through flights taken, points sold to Customers, or points earned through business partners participating in the loyalty program.

Under the Southwest Rapid Rewards loyalty program, Members earn points for every dollar spent on Southwest base fares. The amount of points earned under the program is based on the fare and fare class purchased, with higher fare products (e.g., Business Select) earning more points than lower fare products (e.g., Wanna Get Away). Each fare class is associated with a points earning multiplier, and points for flights are calculated by multiplying the fare for the flight by the fare class multiplier. Likewise, the amount of points required to be redeemed for a flight can differ based on the fare purchased. Under the program, (i) Members are able to redeem their points for every available seat, every day, on every flight, with no blackout dates; and (ii) points do not expire. In addition, Members are able to redeem their points for items other than travel on Southwest Airlines, such as international flights on other airlines, cruises, hotel stays, rental cars, gift cards, event tickets, and more. In addition to earning points for revenue flights and qualifying purchases with Rapid Rewards Partners, Members also have the ability to purchase, gift, and transfer points, as well as the ability to donate points to selected charities.

The Company utilizes the deferred revenue method of accounting for points earned through flights taken in its loyalty program. The Company also sells points and related services to business partners participating in the loyalty program. Liabilities are recorded for the relative standalone selling price of the Rapid Rewards points which are awarded each period. The liabilities recorded represent the total number of points expected to be redeemed by Members, regardless of whether the Members may have enough to qualify for a full travel award. At December 31,

78

2020, the loyalty liabilities were approximately $4.4 billion, including $1.1 billion classified within Air traffic liability and $3.3 billion classified as Air traffic liability – noncurrent.

In order to determine the value of each loyalty point, certain assumptions must be made at the time of measurement, which include an allocation of passenger revenue between the flight and loyalty points earned by passengers, and the fair value of Rapid Rewards points, which are generally based on their redemption value to the Customer. See Note 6 to the Consolidated Financial Statements for further information on determining the estimated fair value of each loyalty point.

The majority of the points sold to business partners are through the Southwest co-branded credit card agreement ("Agreement") with Chase Bank USA, N.A. Consideration received as part of this Agreement is subject to Accounting Standards Codification 606, Revenue From Contracts With Customers. The Agreement has the following multiple elements: travel points to be awarded, use of the Southwest Airlines' brand and access to Rapid Rewards Member lists, advertising elements, and the Company's resource team. These elements are combined into two performance obligations, transportation and marketing, and consideration from the Agreement is allocated based on the relative selling price of each performance obligation.

Significant management judgment was used to estimate the selling price of each of the performance obligations in the Agreement at inception. The objective is to determine the price at which the Company would transact a sale if the product or service was sold on a stand-alone basis. The Company determines the best estimate of selling price by considering multiple inputs and methods including, but not limited to, the estimated selling price of comparable travel, discounted cash flows, brand value, published selling prices, number of points awarded, and the number of points redeemed. The Company estimates the selling prices and volumes over the term of the Agreement in order to determine the allocation of proceeds to each of the multiple performance obligations. The Company records revenue related to air transportation when the transportation is delivered and revenue related to marketing elements when the performance obligation is satisfied. A one percent increase or decrease in the Company's estimate of the standalone selling prices, implemented as of January 1, 2020, resulting in an allocation of proceeds to air transportation would
not have had a material impact on the Company's Operating revenues for the year ended December 31, 2020.

Under its current program, Southwest estimates the portion of loyalty points that will not be redeemed. In estimating the spoilage, the Company takes into account the Member's past behavior, as well as several factors related to the Member's account that are expected to be indicative of the likelihood of future point redemption. These factors are typically representative of a Member's level of engagement in the loyalty program. They include, but are not limited to, tenure with the program, points accrued in the program, and points redeemed in the program. The Company believes it has obtained sufficient historical behavioral data to develop a predictive statistical model to analyze the amount of spoilage expected for all loyalty points. The Company updates this model at least annually, and applies the new spoilage rates effective October 1st each year, or more frequently if required by changes in the business. Changes in the spoilage rates applied annually in recent years have not had a material impact on Passenger revenues. For the year ended December 31, 2020, based on actual redemptions of points sold to business partners and earned through flights, a hypothetical one percentage point change in the estimated spoilage rate would have resulted in a change to Passenger revenue of approximately $61 million (an increase in spoilage would have resulted in an increase in revenue and a decrease in spoilage would have resulted in a decrease in revenue). Given that Member behavior will continue to develop as the program matures, the Company expects the current estimates may change in future periods. However, the Company believes its current estimates are reasonable given current facts and circumstances.

79

**Item 7A.    *Quantitative and Qualitative Disclosures About Market Risk***

The Company has interest rate risk in its floating-rate debt obligations and interest rate swaps, commodity price risk in jet fuel required to operate its aircraft fleet, and market risk in the derivatives used to manage its fuel hedging program and in the form of fixed-rate debt instruments. As of December 31, 2020, the Company operated a total of 137 aircraft under operating and finance leases. However, except for a small number of aircraft that have lease payments that fluctuate based in part on changes in market interest rates, the remainder of the leases are not considered market sensitive financial instruments and, therefore, are not included in the interest rate sensitivity analysis below. The Company also has 47 aircraft under operating and finance lease that have been subleased to another carrier. Further information about these leases is disclosed in Note 8 to the Consolidated Financial Statements. The Company does not purchase or hold any derivative financial instruments for trading purposes. See Note 11 to the Consolidated Financial Statements for information on the Company's accounting for its hedging program and for further details on the Company's financial derivative instruments.

### *Hedging*

The Company purchases jet fuel at prevailing market prices, but seeks to manage market risk through execution of a documented hedging strategy. The Company utilizes financial derivative instruments, on both a short-term and a long-term basis, as a form of insurance against the potential for significant increases in fuel prices. The Company believes there can be significant risk in not hedging against the possibility of such fuel price increases, especially in energy markets in which prices are high and/or rising. The Company expects to consume approximately 284 million gallons of jet fuel in first quarter 2021. Based on this anticipated usage, a change in jet fuel prices of just one cent per gallon would impact the Company's Fuel and oil expense by approximately $3 million for the three months ended March 31, 2021, excluding any impact associated with fuel derivative instruments held.

As of December 31, 2020, the Company held a net position of fuel derivative instruments that represented a hedge for a portion of its anticipated jet fuel purchases for future periods. See Note 11 to the Consolidated Financial Statements for further information. The Company may increase or decrease the volume of fuel hedged based on its expectation of future market prices and its forecasted fuel consumption levels, while considering the significant cost that can be associated with different types of hedging strategies. The gross fair value of outstanding financial derivative instruments related to the Company's jet fuel market price risk at December 31, 2020, was an asset of $134 million. In addition, $34 million in cash collateral deposits were held by the Company in connection with these instruments based on their fair value as of December 31, 2020. The fair values of the derivative instruments, depending on the type of instrument, were determined by use of present value methods or standard option value models with assumptions about commodity prices based on those observed in underlying markets. An immediate 10 percent increase or decrease in underlying fuel-related commodity prices from the December 31, 2020, prices would correspondingly change the fair value of the commodity derivative instruments in place by approximately $84 million. Fluctuations in the related commodity derivative instrument cash flows may change by more or less than this amount based upon further fluctuations in futures prices, as well as related income tax effects. In addition, this does not consider changes in cash or letters of credit utilized as collateral provided to or by counterparties, which would fluctuate in an amount equal to or less than this amount, depending on the type of collateral arrangement in place with each counterparty. This sensitivity analysis uses industry standard valuation models and holds all inputs constant at December 31, 2020, levels, except underlying futures prices.

The Company's credit exposure related to fuel derivative instruments is represented by the fair value of contracts that are in an asset position to the Company. At such times, these outstanding instruments expose the Company to credit loss in the event of nonperformance by the counterparties to the agreements. As of December 31, 2020, the Company had nine counterparties in which the derivatives held were an asset. To manage credit risk, the Company selects and periodically reviews counterparties based on credit ratings, limits its exposure with respect to each counterparty, and monitors the market position of the fuel hedging program and its relative market position with each counterparty. However, if one or more of these counterparties were in a liability position to the Company and were unable to meet their obligations, any open derivative contracts with the counterparty could be subject to early termination, which could result in substantial losses for the Company. At December 31, 2020, the Company had

agreements with all of its active counterparties containing early termination rights and/or bilateral collateral provisions whereby security is required if market risk exposure exceeds a specified threshold amount based on the counterparty's credit rating. The Company also had agreements with counterparties in which cash deposits and/or letters of credit are required to be posted as collateral whenever the net fair value of derivatives associated with those counterparties exceeds specific thresholds. Refer to the counterparty credit risk and collateral table provided in Note 11 to the Consolidated Financial Statements for the fair values of fuel derivatives, amounts held as collateral, and applicable collateral posting threshold amounts as of December 31, 2020, at which such postings are triggered.

The Company is also subject to the risk that the fuel derivatives it uses to hedge against fuel price volatility do not provide adequate protection. The Company has found that financial derivative instruments in commodities, such as West Texas Intermediate crude oil, Brent crude oil, and refined products, such as heating oil and unleaded gasoline, can be useful in decreasing its exposure to jet fuel price volatility. In addition, to add further protection, the Company may periodically enter into jet fuel derivatives for short-term timeframes. Jet fuel is not widely traded on an organized futures exchange and, therefore, there are limited opportunities to hedge directly in jet fuel for time horizons longer than approximately 24 months into the future.

The Company also has agreements with each of its counterparties associated with its outstanding interest rate swap agreements in which cash collateral may be required based on the fair value of outstanding derivative instruments, as well as the Company's and its counterparty's credit ratings. As of December 31, 2020, no cash collateral deposits were provided by or held by the Company based on its outstanding interest rate swap agreements.

Due to the significance of the Company's fuel hedging program and the emphasis that the Company places on utilizing fuel derivatives to reduce its fuel price risk, the Company has created a system of governance and management oversight and has put in place a number of internal controls designed so that procedures are properly followed and accountability is present at the appropriate levels. For example, the Company has put in place controls designed to: (i) create and maintain a comprehensive risk management policy; (ii) provide for proper authorization by the appropriate levels of management; (iii) provide for proper segregation of duties; (iv) maintain an appropriate level of knowledge regarding the execution of and the accounting for derivative instruments; and (v) have key performance indicators in place in order to adequately measure the performance of its hedging activities. The Company believes the governance structure that it has in place is adequate given the size and sophistication of its hedging program.

### *Financial Market Risk*

The vast majority of the Company's tangible assets are aircraft, which are long-lived. The Company's strategy is to maintain a conservative balance sheet and grow capacity steadily and profitably under the right conditions. While the Company uses financial leverage, it strives to maintain a strong balance sheet and has a "BBB+" rating with Fitch, a "BBB" rating with Standard & Poor's, and a "Baa1" credit rating with Moody's as of December 31, 2020, all of which are considered "investment grade." See Note 7 to the Consolidated Financial Statements for more information on the material terms of the Company's short-term and long-term debt.

The following table presents the Company's fixed-rate senior unsecured notes outstanding as of December 31, 2020:

| (in millions) | | December 31, 2020 |
|---|---|---|
| 2.75% Notes due 2022 | $ | 300 |
| 4.75% Notes due 2023 | | 1,250 |
| 5.25% Notes due 2025 | | 1,550 |
| 3.00% Notes due 2026 | | 300 |
| 3.45% Notes due 2027 | | 300 |
| 5.125% Notes due 2027 | | 2,000 |
| 7.375% Debentures due 2027 | | 100 |
| 2.625% Notes due 2030 | | 500 |

The $100 million 7.375% senior unsecured notes due 2027 had at one point been converted to a floating rate, but the Company subsequently terminated the fixed-to-floating interest rate swap agreements related to it. The effect of this termination was that the interest associated with this debt prospectively reverted back to its original fixed rate. As a result of the gain realized on this transaction, which is being amortized over the remaining term of the corresponding notes, and based on projected interest rates at the date of termination, the Company does not believe its future interest expense, based on projected future interest rates at the date of termination, associated with these notes will significantly differ from the expense it would have recorded had the notes remained at floating rates. The Company had no secured fixed rate debt as of December 31, 2020.

The carrying value of the Company's floating rate debt totaled $449 million, and this debt had a weighted-average maturity of 3.47 years at floating rates averaging 1.65 percent for the year ended December 31, 2020. The Company's floating rate debt represented 4.3 percent of the Company's total outstanding debt as of December 31, 2020. In addition, the Company's total debt (both floating and fixed rate debt) divided by total assets was 29.9 percent as of December 31, 2020.

The Company also has some risk associated with changing interest rates due to the short-term nature of its invested cash, which totaled $11.1 billion, and short-term investments, which totaled $2.3 billion at December 31, 2020. See Notes 1 and 12 to the Consolidated Financial Statements for further information. The Company currently invests available cash in certificates of deposit, highly rated money market instruments, investment grade commercial paper, treasury securities, U.S. government agency securities, and other highly rated financial instruments, depending on market conditions and operating cash requirements. Because of the short-term nature of these investments, the returns earned parallel closely with short-term floating interest rates. The Company has not undertaken any additional actions to cover interest rate market risk and is not a party to any other material market interest rate risk management activities.

A hypothetical 10 percent change in market interest rates as of December 31, 2020, would have resulted in an approximate $59 million change on the fair value of the Company's fixed-rate debt instruments. See Note 12 to the Consolidated Financial Statements for further information on the fair value of financial instruments. A change in market interest rates could, however, have a corresponding effect on earnings and cash flows associated with the Company's floating-rate debt, invested cash (excluding cash collateral deposits held, if applicable), floating-rate aircraft leases, and short-term investments because of the floating-rate nature of these items. Assuming floating market rates in effect as of December 31, 2020 were held constant throughout a 12-month period, a hypothetical 10 percent change in those rates would have an immaterial impact on the Company's net earnings and cash flows. Utilizing these assumptions and considering the Company's cash balance (excluding the impact of cash collateral deposits held from or provided to counterparties, if applicable), short-term investments, and floating-rate debt outstanding at December 31, 2020, an increase in rates would have a net positive effect on the Company's earnings and cash flows, while a decrease in rates would have a net negative effect on the Company's earnings and cash flows. However, a 10 percent change in market rates would not impact the Company's earnings or cash flow associated with the Company's publicly traded fixed-rate debt.

The Company is also subject to a financial covenant included in its Amended A&R Credit Agreement, and is subject to credit rating triggers related to its credit card transaction processing agreements, the pricing related to any funds drawn under its Amended A&R Credit Agreement, and some of its hedging counterparty agreements. Certain covenants include the maintenance of minimum credit ratings and/or triggers that are based on changes in these ratings. The Company's Amended A&R Credit Agreement contains a financial covenant to maintain total liquidity, as defined therein, of $1.5 billion at all times. As of December 31, 2020, the Company was in compliance with this covenant and there were no amounts outstanding under the Amended A&R Credit Agreement. However, if conditions change and the Company fails to meet the minimum standards set forth in the Amended A&R Credit Agreement, there could be a reduction in the availability of cash under the facility, or an increase in the costs to keep the facility intact as written. The Company's hedging counterparty agreements contain ratings triggers in which cash collateral could be required to be posted with the counterparty if the Company's credit rating were to fall below investment grade by two of the three major rating agencies, and if the Company were in a net liability position with the counterparty. See Note 11 to the Consolidated Financial Statements for further information.

The Company currently has agreements with organizations that process credit card transactions arising from purchases of air travel tickets by its Customers utilizing American Express, Discover, and MasterCard/VISA. Credit card processors have financial risk associated with tickets purchased for travel because the processor generally forwards the cash related to the purchase to the Company soon after the purchase is completed, but the air travel generally occurs after that time; therefore, the processor will have liability if the Company does not ultimately provide the air travel. Under these processing agreements, and based on specified conditions, increasing amounts of cash reserves could be required to be posted with the counterparty. There was no cash reserved for this purpose as of December 31, 2020.

A majority of the Company's sales transactions are processed by Chase Paymentech. Should chargebacks processed by Chase Paymentech reach a certain level, proceeds from advance ticket sales could be held back and used to establish a reserve account to cover such chargebacks and any other disputed charges that might occur. Additionally, cash reserves are required to be established if the Company's credit rating falls to specified levels below investment grade. Cash reserve requirements are based on the Company's public debt rating and a corresponding percentage of the Company's Air traffic liability. As of December 31, 2020, no holdbacks were in place.

As of December 31, 2020, the Company was in compliance with all credit card processing agreements. The inability to enter into credit card processing agreements would have a material adverse effect on the business of the Company. The Company believes that it will be able to continue to renew its existing credit card processing agreements or will be able to enter into new credit card processing agreements with other processors in the future.

**Item 8.**    *Financial Statements and Supplementary Data*

**Southwest Airlines Co.**
**Consolidated Balance Sheet**
(in millions, except share data)

| | | December 31, 2020 | | December 31, 2019 |
|---|---|---:|---|---:|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 11,063 | $ | 2,548 |
| Short-term investments | | 2,271 | | 1,524 |
| Accounts and other receivables | | 1,130 | | 1,086 |
| Inventories of parts and supplies, at cost | | 414 | | 529 |
| Prepaid expenses and other current assets | | 295 | | 287 |
| Total current assets | | 15,173 | | 5,974 |
| | | | | |
| Property and equipment, at cost: | | | | |
| Flight equipment | | 20,877 | | 21,629 |
| Ground property and equipment | | 6,083 | | 5,672 |
| Deposits on flight equipment purchase contracts | | 305 | | 248 |
| Assets constructed for others | | 309 | | 164 |
| | | 27,574 | | 27,713 |
| Less allowance for depreciation and amortization | | 11,743 | | 10,688 |
| | | 15,831 | | 17,025 |
| Goodwill | | 970 | | 970 |
| Operating lease right-of-use assets | | 1,892 | | 1,349 |
| Other assets | | 722 | | 577 |
| | $ | 34,588 | $ | 25,895 |
| | | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ | 931 | $ | 1,574 |
| Accrued liabilities | | 2,259 | | 1,749 |
| Current operating lease liabilities | | 306 | | 353 |
| Air traffic liability | | 3,790 | | 4,457 |
| Current maturities of long-term debt | | 220 | | 819 |
| Total current liabilities | | 7,506 | | 8,952 |
| | | | | |
| Long-term debt less current maturities | | 10,111 | | 1,846 |
| Air traffic liability - noncurrent | | 3,343 | | 1,053 |
| Deferred income taxes | | 1,634 | | 2,364 |
| Construction obligation | | 309 | | 164 |
| Noncurrent operating lease liabilities | | 1,562 | | 978 |
| Other noncurrent liabilities | | 1,247 | | 706 |
| Stockholders' equity: | | | | |
| Common stock, $1.00 par value: 2,000,000,000 shares authorized; 888,111,634 and 807,611,634 shares issued in 2020 and 2019 respectively | | 888 | | 808 |
| Capital in excess of par value | | 4,191 | | 1,581 |
| Retained earnings | | 14,777 | | 17,945 |
| Accumulated other comprehensive loss | | (105) | | (61) |
| Treasury stock, at cost: 297,637,297 and 288,547,318 shares in 2020 and 2019 respectively | | (10,875) | | (10,441) |
| Total stockholders' equity | | 8,876 | | 9,832 |
| | $ | 34,588 | $ | 25,895 |

See accompanying notes.

**Southwest Airlines Co.**
**Consolidated Statement of Income (Loss)**
(in millions, except per share amounts)

| | Year ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | | 2020 | | 2019 | | 2018 |
| **OPERATING REVENUES:** | | | | | | |
| Passenger | $ | 7,665 | $ | 20,776 | $ | 20,455 |
| Freight | | 161 | | 172 | | 175 |
| Other | | 1,222 | | 1,480 | | 1,335 |
| Total operating revenues | | 9,048 | | 22,428 | | 21,965 |
| | | | | | | |
| **OPERATING EXPENSES, NET:** | | | | | | |
| Salaries, wages, and benefits | | 6,811 | | 8,293 | | 7,649 |
| Payroll support and voluntary Employee programs, net | | (967) | | — | | — |
| Fuel and oil | | 1,849 | | 4,347 | | 4,616 |
| Maintenance materials and repairs | | 750 | | 1,223 | | 1,107 |
| Landing fees and airport rentals | | 1,240 | | 1,363 | | 1,334 |
| Depreciation and amortization | | 1,255 | | 1,219 | | 1,201 |
| Other operating expenses | | 1,926 | | 3,026 | | 2,852 |
| Total operating expenses, net | | 12,864 | | 19,471 | | 18,759 |
| | | | | | | |
| **OPERATING INCOME (LOSS)** | | (3,816) | | 2,957 | | 3,206 |
| | | | | | | |
| **OTHER EXPENSES (INCOME):** | | | | | | |
| Interest expense | | 349 | | 118 | | 131 |
| Capitalized interest | | (35) | | (36) | | (38) |
| Interest income | | (32) | | (90) | | (69) |
| Other (gains) losses, net | | 158 | | 8 | | 18 |
| Total other expenses (income) | | 440 | | — | | 42 |
| | | | | | | |
| **INCOME (LOSS) BEFORE INCOME TAXES** | | (4,256) | | 2,957 | | 3,164 |
| **PROVISION (BENEFIT) FOR INCOME TAXES** | | (1,182) | | 657 | | 699 |
| **NET INCOME (LOSS)** | $ | (3,074) | $ | 2,300 | $ | 2,465 |
| **NET INCOME (LOSS) PER SHARE, BASIC** | $ | (5.44) | $ | 4.28 | $ | 4.30 |
| **NET INCOME (LOSS) PER SHARE, DILUTED** | $ | (5.44) | $ | 4.27 | $ | 4.29 |

See accompanying notes.

85

**Southwest Airlines Co.**
**Consolidated Statement of Comprehensive Income (Loss)**
(in millions)

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | 2018 |
| NET INCOME (LOSS) | $ (3,074) | $ 2,300 | $ 2,465 |
| Unrealized gain (loss) on fuel derivative instruments, net of deferred taxes of $2, ($16), and ($7) | 4 | (53) | (26) |
| Unrealized gain (loss) on interest rate derivative instruments, net of deferred taxes of ($8), ($8), and $1 | (25) | (25) | 6 |
| Unrealized gain (loss) on defined benefit plan items, net of deferred taxes of ($15), ($9), and $15 | (48) | (29) | 52 |
| Other, net of deferred taxes of $7, $8, and ($2) | 25 | 26 | (6) |
| OTHER COMPREHENSIVE INCOME (LOSS) | $ (44) | $ (81) | $ 26 |
| COMPREHENSIVE INCOME (LOSS) | $ (3,118) | $ 2,219 | $ 2,491 |

See accompanying notes.

86

**Southwest Airlines Co.**
**Consolidated Statement of Stockholders' Equity**
(in millions, except per share amounts)

| | Common Stock | | Capital in excess of par value | | Retained earnings | | Accumulated other comprehensive income (loss) | | Treasury stock | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Year ended December 31, 2020, 2019, and 2018 | | | | | |
| Balance at December 31, 2017 (as reported) | $ | 808 | $ | 1,451 | $ | 13,832 | $ | 12 | $ | (6,462) | $ | 9,641 |
| Cumulative effect of adopting Accounting Standards Update No. 2017-12, Targeted Improvements to Accounting for Hedging Activities | | — | | — | | 18 | | (18) | | — | | — |
| Balance after adjustment for the new accounting standard | $ | 808 | $ | 1,451 | $ | 13,850 | $ | (6) | $ | (6,462) | $ | 9,641 |
| Repurchase of common stock | | — | | — | | — | | — | | (2,000) | | (2,000) |
| Issuance of common and treasury stock pursuant to Employee stock plans | | — | | 13 | | — | | — | | 10 | | 23 |
| Share-based compensation | | — | | 46 | | — | | — | | — | | 46 |
| Cash dividends, $0.605 per share | | — | | — | | (348) | | — | | — | | (348) |
| Comprehensive income | | — | | — | | 2,465 | | 26 | | — | | 2,491 |
| Balance at December 31, 2018 (as reported) | $ | 808 | $ | 1,510 | $ | 15,967 | $ | 20 | $ | (8,452) | $ | 9,853 |
| Cumulative effect of adopting Accounting Standards Update No. 2016-02, Leases, codified in Accounting Standards Codification 842 (See Note 3 to the Consolidated Financial Statements for additional information) | | — | | — | | 55 | | — | | — | | 55 |
| Balance after adjustment for the new accounting standard | $ | 808 | $ | 1,510 | $ | 16,022 | $ | 20 | $ | (8,452) | $ | 9,908 |
| Repurchase of common stock | | — | | — | | — | | — | | (2,000) | | (2,000) |
| Issuance of common and treasury stock pursuant to Employee stock plans | | — | | 16 | | — | | — | | 11 | | 27 |
| Share-based compensation | | — | | 55 | | — | | — | | — | | 55 |
| Cash dividends, $0.700 per share | | — | | — | | (377) | | — | | — | | (377) |
| Comprehensive income | | — | | — | | 2,300 | | (81) | | — | | 2,219 |
| Balance at December 31, 2019 | $ | 808 | $ | 1,581 | $ | 17,945 | $ | (61) | $ | (10,441) | $ | 9,832 |
| Repurchase of common stock | | — | | — | | — | | — | | (451) | | (451) |
| Issuance of common stock, net of issuance costs | | 80 | | 2,144 | | — | | — | | — | | 2,224 |
| Issuance of common and treasury stock pursuant to Employee stock plans | | — | | 17 | | — | | — | | 17 | | 34 |
| Share-based compensation | | — | | 17 | | — | | — | | — | | 17 |
| Cash dividends, $0.180 per share | | — | | — | | (94) | | — | | — | | (94) |
| Stock warrants | | — | | 40 | | — | | — | | — | | 40 |
| Equity feature of convertible notes, net of issuance costs | | — | | 392 | | — | | — | | — | | 392 |
| Comprehensive loss | | — | | — | | (3,074) | | (44) | | — | | (3,118) |
| Balance at December 31, 2020 | $ | 888 | $ | 4,191 | $ | 14,777 | $ | (105) | $ | (10,875) | $ | 8,876 |

See accompanying notes.

87

**Southwest Airlines Co.**
**Consolidated Statement of Cash Flows**
(in millions)

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | 2018 |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | |
| Net income (loss) | $ (3,074) | $ 2,300 | $ 2,465 |
| Adjustments to reconcile net income (loss) to cash provided by (used in) operating activities: | | | |
| Depreciation and amortization | 1,255 | 1,219 | 1,201 |
| Impairment of long-lived assets | 32 | — | — |
| Unrealized/realized (gain) loss on fuel derivative instruments | 15 | — | (14) |
| Deferred income taxes | (716) | (55) | 301 |
| Gain on sale-leaseback transactions | (222) | — | — |
| Changes in certain assets and liabilities: | | | |
| Accounts and other receivables | (294) | (94) | 117 |
| Other assets | 415 | 239 | (227) |
| Accounts payable and accrued liabilities | 231 | 298 | 545 |
| Air traffic liability | 1,623 | 440 | 506 |
| Other liabilities | (306) | (277) | — |
| Cash collateral received from (provided to) derivative counterparties | 9 | 25 | (15) |
| Other, net | (95) | (108) | 14 |
| Net cash provided by (used in) operating activities | (1,127) | 3,987 | 4,893 |
| | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | |
| Capital expenditures | (515) | (1,027) | (1,922) |
| Supplier proceeds | 428 | 400 | — |
| Proceeds from sale-leaseback transactions | 815 | — | — |
| Assets constructed for others | — | — | (54) |
| Purchases of short-term investments | (5,080) | (2,122) | (2,409) |
| Proceeds from sales of short-term and other investments | 4,336 | 2,446 | 2,342 |
| Other, net | — | — | 5 |
| Net cash used in investing activities | (16) | (303) | (2,038) |
| | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | |
| Issuance of common stock | 2,294 | — | — |
| Proceeds from issuance of long-term debt | 5,622 | — | — |
| Proceeds from term loan credit facility | 3,683 | — | — |
| Proceeds from revolving credit facility | 1,000 | — | — |
| Proceeds from convertible notes | 2,300 | — | — |
| Proceeds from Payroll Support Program loan and warrants | 1,016 | — | — |
| Proceeds from Employee stock plans | 48 | 40 | 35 |
| Repurchase of common stock | (451) | (2,000) | (2,000) |
| Reimbursement for assets constructed for others | — | — | 170 |
| Payments of long-term debt and finance lease obligations | (839) | (615) | (342) |
| Payments of term loan credit facility | (3,683) | — | — |
| Payments of revolving credit facility | (1,000) | — | — |
| Payments of cash dividends | (188) | (372) | (332) |
| Payments of terminated interest rate derivative instruments | (59) | — | — |
| Repayment of construction obligation | — | — | (30) |
| Capitalized financing items | (134) | — | — |
| Other, net | 49 | (43) | 3 |
| Net cash provided by (used in) financing activities | 9,658 | (2,990) | (2,496) |
| **NET CHANGE IN CASH AND CASH EQUIVALENTS** | 8,515 | 694 | 359 |
| | | | |
| **CASH AND CASH EQUIVALENTS AT BEGINNING OF PERIOD** | 2,548 | 1,854 | 1,495 |
| | | | |
| **CASH AND CASH EQUIVALENTS AT END OF PERIOD** | $ 11,063 | $ 2,548 | $ 1,854 |
| | | | |
| **CASH PAYMENTS FOR:** | | | |
| Interest, net of amount capitalized | $ 212 | $ 88 | $ 107 |
| Income taxes | $ 19 | $ 779 | $ 327 |
| | | | |
| **SUPPLEMENTAL DISCLOSURE OF NONCASH TRANSACTIONS:** | | | |
| Assets constructed for others | $ 145 | $ 65 | $ 171 |
| Supplier receivables | $ — | $ 428 | $ — |

See accompanying notes.

**Southwest Airlines Co.**
**Notes to Consolidated Financial Statements**

## 1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Presentation

Southwest Airlines Co. (the "Company") operates Southwest Airlines, a major domestic airline. The Consolidated Financial Statements include the accounts of the Company and its wholly owned subsidiaries, which include AirTran Holdings, LLC, the successor to AirTran Holdings, Inc. ("AirTran Holdings"), the former parent company of AirTran Airways, Inc., and Triple Crown Assurance Co., an insurance captive. The accompanying Consolidated Financial Statements include the results of operations and cash flows for all periods presented and all significant inter-entity balances and transactions have been eliminated. The preparation of financial statements in conformity with generally accepted accounting principles in the United States ("GAAP") requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from these estimates.

Effective as of January 1, 2019, the Company adopted Accounting Standards Update ("ASU") No. 2016-02, Leases, codified in Accounting Standards Codification ("ASC") 842 (the "New Lease Standard"). All amounts and disclosures set forth in this Form 10-K, reflect the adoption of this ASU, while all periods prior to 2019 remain in accordance with prior accounting requirements. See Note 3 for further information.

### Cash and Cash Equivalents

Cash in excess of that necessary for operating requirements is invested in short-term, highly liquid, income-producing investments. Investments with original maturities of three months or less when purchased are classified as cash and cash equivalents, which primarily consist of certificates of deposit, money market funds, and investment grade commercial paper issued by major corporations and financial institutions. Cash and cash equivalents are stated at cost, which approximates fair value.

As of December 31, 2020 and 2019, $34 million and $25 million, respectively, in cash collateral deposits were held by the Company from its fuel hedge counterparties, and no cash collateral deposits were held by or provided by the Company to its interest rate hedge counterparties for both periods. Cash collateral amounts provided or held associated with fuel and interest rate derivative instruments are not restricted in any way and earn interest income at an agreed upon rate that approximates the rates earned on short-term securities issued by the U.S. Government. Depending on the fair value of the Company's fuel and interest rate derivative instruments, the amounts of collateral deposits held or provided at any point in time can fluctuate significantly. See Note 11 for further information on these collateral deposits and fuel derivative instruments.

### Short-term and Noncurrent Investments

Short-term investments consist of investments with original maturities of greater than three months but less than twelve months when purchased. These are primarily short-term securities issued by the U.S. Government and certificates of deposit issued by domestic banks. All of these investments are classified as available-for-sale securities and are stated at fair value, which approximates cost. For all short-term investments, at each reset period or upon reinvestment, the Company accounts for the transaction as Proceeds from sales of short-term investments for the security relinquished, and Purchases of short-investments for the security purchased, in the accompanying Consolidated Statement of Cash Flows. Unrealized gains and losses, net of tax, if any, are recognized in Accumulated other comprehensive income (loss) ("AOCI") in the accompanying Consolidated Balance Sheet. Realized net gains and losses on specific investments, if any, are reflected in Interest income in the accompanying Consolidated Statement of Income (Loss). Both unrealized and realized gains and/or losses associated with investments were immaterial for all years presented.

Noncurrent investments consist of investments with maturities of greater than twelve months. Noncurrent investments are included as a component of Other assets in the Consolidated Balance Sheet.

### Accounts and Other Receivables

Accounts and other receivables are initially recorded at cost and are evaluated for collectability in every period. They primarily consist of the amounts due from the Company's business partners and other suppliers, amounts due from business partners in the Company's loyalty program, and tax receivables from overpayment or net operating losses that are allowed to be carried back to prior periods to claim refunds against prior taxes paid. See Note 16 for further information. The allowance for doubtful accounts was immaterial at December 31, 2020 and 2019. In addition, the provision for doubtful accounts and write-offs for 2020, 2019, and 2018 were each immaterial.

### Inventories

Inventories primarily consist of aircraft fuel, flight equipment expendable parts, materials, and supplies. All of these items are carried at average cost, less an allowance for obsolescence. These items are generally charged to expense when issued for use. The reserve for obsolescence was immaterial at December 31, 2020, and 2019. In addition, the Company's provision for obsolescence and write-offs for 2020, 2019, and 2018 were each immaterial.

### Property and Equipment

Property and equipment is stated at cost. Capital expenditures include payments made for aircraft, other flight equipment, purchase deposits related to future aircraft deliveries, airport and other facility construction projects, and ground and other property and equipment. Depreciation is provided by the straight-line method to estimated residual values over periods of approximately 25 years for flight equipment, and 5 to 30 years for ground property and equipment. Residual values estimated for aircraft are approximately 15 percent, and generally range from 0 to 10 percent for ground property and equipment. Assets constructed for others consists of airport improvement projects in which the Company is considered to have control of the asset during the construction period. Once construction is effectively completed, the sale-leaseback model would apply when control passes from the lessee to the lessor. See Note 5 for further information.

The Company evaluates its long-lived assets used in operations for impairment when events and circumstances indicate that the undiscounted cash flows to be generated by that asset are less than the carrying amounts of the asset and may not be recoverable. Factors that would indicate potential impairment include, but are not limited to, significant decreases in the market value of the long-lived asset(s), a significant change in the long-lived asset's physical condition, and operating or cash flow losses associated with the use of the long-lived asset. If an asset is deemed to be impaired, an impairment loss is recorded for the excess of the asset book value in relation to its estimated fair value. As a result of the events and impacts surrounding the COVID-19 pandemic, including the Company's net loss incurred during the year ended December 31, 2020, and the significant number of aircraft that have been placed in storage, the Company assessed whether any impairment of its amortizable assets existed. No aircraft impairment charges were deemed necessary for the majority of 2020. For the purpose of impairment assessment, the Company evaluates its all Boeing fleet as one asset group. However, during fourth quarter 2020, the Company made the decision to permanently ground, and accelerate the retirement of, 20 of its 737-700 aircraft as of December 31, 2020. This action resulted in the Company recording $32 million in impairment charges associated with these 20 aircraft.

### Leases

The Company determines if an arrangement is a lease at inception. Operating leases are included in Operating lease right-of-use assets, Current operating lease liabilities, and Noncurrent operating lease liabilities in the Consolidated Balance Sheet. Finance leases are included in Property and equipment, Current maturities of long-term debt, and Long-term debt less current maturities in the Consolidated Balance Sheet.

Right-of-use assets represent the Company's right to use an underlying asset for the lease term, and lease liabilities represent the Company's obligation to make lease payments arising from the lease. The lease liability is measured as the present value of the unpaid lease payments, and the right-of-use asset value is derived from the calculation of the lease liability. Lease payments include fixed and in-substance fixed payments, variable payments based on an index or rate, reasonably certain purchase options, termination penalties, fees paid by the lessee to the owners of a special-purpose entity for restructuring the transaction, and probable amounts the lessee will owe under a residual value guarantee. Lease payments do not include (i) variable lease payments other than those that depend on an index or rate, (ii) any guarantee by the lessee of the lessor's debt, or (iii) any amount allocated to non-lease components, if such election is made upon adoption, per the provisions of the New Lease Standard. The Company uses its estimated incremental borrowing rate, which is derived from information available at the lease commencement date, in determining the present value of lease payments, since the Company does not know the actual implicit rates in its leases. The Company gives consideration to its recent debt issuances as well as publicly available data for instruments with similar characteristics when calculating its incremental borrowing rate. Lease expense for operating lease payments is recognized on a straight-line basis over the lease term. The Company combines lease and nonlease components for all asset groups. The Company's lease term includes any option to extend the lease when it is reasonably certain to be exercised based on considering all relevant economic factors.

### *Aircraft and Engine Maintenance*

The cost of scheduled inspections and repairs and routine maintenance costs for all aircraft and engines are charged to Maintenance materials and repairs expense within the accompanying Consolidated Statement of Income (Loss) as incurred.

The Company has maintenance agreements related to certain of its aircraft engines with external service providers, including agreements that effectively transfer the risk of performance of such work to the service provider. Under the agreements where the risk of performance is deemed transferred to the counterparty, the appropriate expense is recorded commensurate with the period in which the corresponding level of service is provided. Generally, expense is recorded on a straight-line basis over the term of the agreement based on the Company's best estimate of expected future aircraft utilization. For its engine maintenance contracts that do not transfer risk to the service provider, the Company records expense on a time and materials basis when an engine repair event takes place.

Modifications that significantly enhance the operating performance or extend the useful lives of aircraft or engines are capitalized and amortized over the remaining life of the asset.

### *Goodwill and Intangible Assets*

The Company applies a fair value based impairment test to the carrying value of goodwill and indefinite-lived intangible assets annually on October 1st, or more frequently if certain events or circumstances indicate that an impairment loss may have been incurred. The Company assesses the value of goodwill and indefinite-lived intangible assets under either a qualitative or quantitative approach. Under a qualitative approach, the Company considers various market factors, including applicable key assumptions also used in the quantitative assessment listed below. These factors are analyzed to determine if events and circumstances could reasonably have affected the fair value of goodwill and indefinite-lived intangible assets. If the Company determines that it is more likely than not that an indefinite-lived intangible asset or reporting unit goodwill is impaired, the quantitative approach is used to assess the asset or reporting unit fair value and the amount of the impairment. Under a quantitative approach, the fair value of the Company's indefinite-lived intangible asset or reporting unit is calculated based on key market participant assumptions. If the indefinite-lived intangible assets' carrying value exceeds the fair value calculated using the quantitative approach, an impairment charge is recorded for the difference in fair value and carrying value. If the reporting unit carrying value exceeds the reporting unit fair value calculated using the quantitative approach, an impairment charge is recorded for the difference between fair value and carrying value, limited to the amount of goodwill in the reporting unit.

When performing a quantitative impairment assessment of goodwill and indefinite-lived intangible assets, fair value is estimated based on (i) recent market transactions, where available, (ii) projected discounted cash flows (an

91

income approach), or (iii) a combination of limited market transactions and the lease savings method (which reflects potential annual after-tax lease savings arising from owning the certain indefinite-lived intangibles rather than leasing them from another airline at market rates).

The Company applied the quantitative approach during its annual 2020 impairment tests. Key assumptions and/or estimates made in the Company's 2020 impairment tests included the following: (i) a projection of revenues, expenses, and cash flows; (ii) terminal period revenue growth and cash flows; (iii) an estimated weighted average cost of capital; (iv) an assumed discount rate depending on the asset; (v) a tax rate; and (vi) market purchase prices and lease rates for comparable assets. The Company believes these assumptions are consistent with those a hypothetical market participant would use given circumstances that were present at the time the estimates were made. However, actual results and amounts may be significantly different from the Company's estimates. As a result of the annual impairment tests performed as of October 1, 2020, no impairment was determined to exist for Goodwill or indefinite-lived intangible assets, as the fair values of the reporting unit and indefinite-lived intangible assets exceeded their respective carrying values.

The Company's intangible assets primarily consist of acquired rights to certain airport owned takeoff and landing slots (a "slot" is the right of an air carrier, pursuant to regulations of the Federal Aviation Administration ("FAA"), to operate a takeoff or landing at a specific time at certain airports) at certain domestic slot-controlled airports. Indefinite lived slots of $295 million are included as a component of Other assets in the Company's Consolidated Balance Sheet, as of December 31, 2020 and 2019.

### *Revenue Recognition*

Tickets sold are initially deferred as Air traffic liability. Passenger revenue is recognized and Air traffic liability is reduced when transportation is provided. Air traffic liability primarily represents tickets sold for future travel dates, funds that are past flight date and remain unused, but are expected to be used in the future, and the Company's liability for loyalty benefits that are expected to be redeemed in the future. The majority of the Company's tickets sold are nonrefundable. Southwest has a No Show policy that applies to fares that are not canceled or changed by a Customer at least ten minutes prior to a flight's scheduled departure. Nonrefundable tickets that are sold but not flown on the travel date, and are canceled in accordance with the No Show policy, can be applied to future travel. Refundable tickets that are sold but not flown on the travel date can also be applied to future travel. A small percentage of tickets (or partial tickets) expire unused. The Company estimates the amount of tickets that expire unused and recognizes such amounts in Passenger revenue once the scheduled flight date has lapsed in proportion to the pattern of flights taken by the Customers. Based on the Company's revenue recognition policy, revenue is recorded at the flight date for a Customer who does not change his/her itinerary and loses his/her funds as the Company has then fulfilled its performance obligation. Amounts collected from passengers for ancillary services are also recognized when the service is provided, which is typically the flight date.

Initial spoilage estimates for both tickets and funds available for future use are routinely adjusted and ultimately finalized once the tickets expire, which is typically twelve months after the original purchase date. However, during 2020, the Company extended the expiration dates for a significant amount of tickets and funds beyond its normal twelve months. Spoilage estimates are based on the Company's Customers' historical travel behavior as well as assumptions about the Customers' future travel behavior. Assumptions used to generate spoilage estimates can be impacted by several factors including, but not limited to: fare increases, fare sales, changes to the Company's ticketing policies, changes to the Company's refund, exchange, and unused funds policies, seat availability, and economic factors. Given the unprecedented amount of 2020 Customer flight cancellations and the amount of travel funds provided, the Company expects additional variability in the amount of spoilage revenue recorded in future periods, as the estimates of the portion of sold tickets that will expire unused may differ from historical experience. See Note 6 for further information.

Approximately $184 million, approximately $615 million, and approximately $566 million of the Company's Operating revenues in 2020, 2019, and 2018, respectively, were attributable to foreign operations. The remainder of

92

the Company's Operating revenues, approximately $8.9 billion, approximately $21.8 billion, and approximately $21.4 billion in 2020, 2019, and 2018, respectively, were attributable to domestic operations.

### Loyalty Program

The Company records a liability for the relative fair value of providing free travel under its loyalty program for all points earned from flight activity or sold to companies participating in the Company's Rapid Rewards loyalty program as business partners that are expected to be redeemed for future travel. The loyalty liability represents performance obligations that will be satisfied when a Rapid Rewards loyalty member redeems points for travel or other goods and services. Points earned from flight activity are valued at their relative standalone selling price by applying fair value based on historical redemption patterns. Points earned from business partner activity, which primarily consist of points sold, along with related marketing services, to companies participating in the Rapid Rewards loyalty program, are valued using a relative fair value methodology based on the contractual rate which partners pay to Southwest to award Rapid Rewards points to the business partner's customers. For points that are expected to remain unused, the Company recognizes spoilage in proportion to the pattern of points used by the Customer, which approximates the average period over which the population of Rapid Reward Members redeem their points. The Company records passenger revenue related to air transportation when the transportation is delivered. The marketing elements are recognized as Other - net revenue when earned. The Company's liability for loyalty benefits includes a portion that is expected to be redeemed during the following twelve months (classified as a component of Air traffic liability), and a portion that is not expected to be redeemed during the following twelve months (classified as Air traffic liability - noncurrent). The Company continually updates this analysis and adjusts the split between current and non-current liabilities as appropriate. See Note 6 for further information.

### Advertising

Advertising costs are charged to expense as incurred. Advertising and promotions expense for the years ended December 31, 2020, 2019, and 2018 was $156 million, $212 million, and $215 million, respectively, and is included as a component of Other operating expense in the accompanying Consolidated Statement of Income (Loss).

### Share-based Employee Compensation

The Company has share-based compensation plans covering certain Employees, including a plan that also covers the Company's Board of Directors. The Company accounts for share-based compensation based on its grant date fair value. See Note 10 for further information.

### Financial Derivative Instruments

The Company accounts for financial derivative instruments at fair value and applies hedge accounting rules where appropriate. The Company utilizes various derivative instruments, including jet fuel, crude oil, unleaded gasoline, and heating oil-based derivatives, to attempt to reduce the risk of its exposure to jet fuel price increases. These instruments are accounted for as cash flow hedges upon proper qualification. The Company also has had interest rate swap agreements to convert certain floating-rate debt to a fixed-rate and had interest rate swap agreements to convert portions of its fixed-rate debt to floating rates. The Company has forward-stating interest rate swap agreements, the primary objective of which is to hedge forecasted debt issuances. These interest rate hedges are appropriately designated as cash flow hedges.

Since the majority of the Company's financial derivative instruments are not traded on a market exchange, the Company estimates their fair values. Depending on the type of instrument, the values are determined by the use of present value methods or option value models with assumptions about commodity prices based on those observed in underlying markets.

All cash flows associated with purchasing and selling derivatives are classified as operating cash flows in the Consolidated Statement of Cash Flows, within Changes in certain assets and liabilities. The Company classifies its

93

cash collateral provided to or held from counterparties in a "net" presentation on the Consolidated Balance Sheet against the fair value of the derivative positions with those counterparties. See Note 11 for further information.

### Software Capitalization

The Company capitalizes certain internal and external costs related to the acquisition and development of internal use software during the application development stages of projects. The Company amortizes these costs using the straight-line method over the estimated useful life of the software, which is typically five to fifteen years. Costs incurred during the preliminary project or the post-implementation/operation stages of the project are expensed as incurred. Capitalized computer software, included as a component of Ground property and equipment in the accompanying Consolidated Balance Sheet, net of accumulated depreciation, was $697 million and $630 million at December 31, 2020, and 2019, respectively. Computer software depreciation expense was $203 million, $177 million, and $155 million for the years ended December 31, 2020, 2019, and 2018, respectively, and is included as a component of Depreciation and amortization expense in the accompanying Consolidated Statement of Income (Loss). The Company evaluates internal use software for impairment on a quarterly basis; if it is determined the value of an asset was not recoverable or it qualifies for impairment, a charge will be recorded to write down the software to the lower of its carrying value or fair value. The Company had no significant impairments during 2020, 2019, or 2018.

### Insurance Reserves

The Company uses a combination of insurance and self-insurance mechanisms, including a wholly-owned captive insurance entity and participation in a reinsurance treaty, to provide for the potential liabilities associated with certain risks, including workers' compensation, healthcare benefits, general liability, and aviation liability. Liabilities associated with the risks that are retained by the Company are not discounted and are estimated, in part, by considering historical claims experience, demographics, exposure and severity factors and other actuarial assumptions.

### Income Taxes

The Company accounts for deferred income taxes utilizing an asset and liability method, whereby deferred tax assets and liabilities are recognized based on the tax effect of temporary differences between the financial statements and the tax basis of assets and liabilities, as measured by current enacted tax rates. The Company also evaluates the need for a valuation allowance to reduce deferred tax assets to estimated recoverable amounts.

The Company's policy for recording interest and penalties associated with uncertain tax positions is to record such items as a component of Income (loss) before income taxes. Penalties are recorded in Other (gains) losses, net, and interest paid or received is recorded in Interest expense or Interest income, respectively, in the accompanying Consolidated Statement of Income (Loss). There were no material amounts recorded for penalties and interest related to uncertain tax positions for all years presented. See Note 15 for further information.

### Concentration Risk

Approximately 83 percent of the Company's full-time equivalent Employees are unionized and are covered by collective-bargaining agreements. A percentage of the Company's unionized Employees, including its Pilots, Flight Attendants, Customer Service Agents, Dispatchers, Aircraft Appearance Technicians, and Meteorologists, which had contracts that became amendable on or before December 31, 2020, are in discussions on labor agreements. Those unionized Employee groups in discussions represent approximately 55 percent of the Company's full-time equivalent Employees as of December 31, 2020.

The Company attempts to minimize its concentration risk with regards to its cash, cash equivalents, and its investment portfolio. This is accomplished by diversifying and limiting amounts among different counterparties, the type of investment, and the amount invested in any individual security or money market fund.

94

To manage risk associated with financial derivative instruments held, the Company selects and will periodically review counterparties based on credit ratings, limits its exposure to a single counterparty, and monitors the market position of the program and its relative market position with each counterparty. The Company also has agreements with counterparties containing early termination rights and/or bilateral collateral provisions whereby security is required if market risk exposure exceeds a specified threshold amount or credit ratings fall below certain levels. Collateral deposits provided to or held from counterparties serve to decrease, but not totally eliminate, the credit risk associated with the Company's hedging program. See Note 11 for further information.

As of December 31, 2020, the Company operated an all-Boeing fleet, all of which are variations of the Boeing 737. The Boeing 737 MAX aircraft ("MAX") are crucial to the Company's growth plans and fleet modernization initiatives. On March 13, 2019, the FAA issued an emergency order for all U.S. airlines to ground the MAX aircraft, including the 34 MAX aircraft in the Company's fleet. On November 18, 2020, the FAA rescinded its order to ground the MAX fleet. The Company is currently working to meet the FAA's requirements by modifying certain operating procedures, implementing enhanced Pilot training requirements, installing FAA-approved flight control software updates, and completing other required maintenance tasks specific to the MAX aircraft. The Company currently estimates that the MAX will return to service on March 11, 2021 after all active Pilots have received updated, MAX-related training.

The MAX fleet grounding has adversely affected the Company's operating results, and could have a material adverse effect on the Company's operating results in future periods.

Boeing no longer manufactures versions of the 737 other than the 737 MAX family of aircraft. If the 737 MAX aircraft were to again become unavailable for the Company's flight operations, the Company's growth would be restricted unless and until it could procure and operate other types of aircraft from Boeing or another manufacturer, seller, or lessor, and the Company's operations would be materially adversely affected. In particular, if the Company's growth were to be dependent upon the introduction of a new aircraft make and model to the Company's fleet, the Company would need to, among other things, (i) develop and implement new maintenance, operating, and training programs, (ii) secure extensive regulatory approvals, and (iii) implement new technologies. The requirements associated with operating a new aircraft make and model could take an extended period of time to fulfill and would likely impose substantial costs on the Company. A shift away from a single fleet type could also add complexity to the Company's operations, present operational and compliance risks, and materially increase the Company's costs. Any of these events would have a material, adverse effect on the Company's business, operating results, and financial condition. The Company could also be materially adversely affected if the pricing or operational attributes of its aircraft were to become less competitive. See Note 17 for further information.

The Company is also dependent on sole or limited suppliers for aircraft engines and certain other aircraft parts and services and would, therefore, also be materially adversely impacted in the event of the unavailability of, inadequate support for, or a mechanical or regulatory issue associated with, engines and other parts.

The Company has historically entered into agreements with some of its co-brand, payment, and loyalty partners that contain exclusivity aspects which place certain confidential restrictions on the Company from entering into certain arrangements with other payment and loyalty partners. Some of these agreements automatically renew on an annual basis, unless either party objects to such extension. None of these agreements are more than 10 years in length. The Company believes the financial benefits generated by the exclusivity aspects of these arrangements outweigh the risks involved with such agreements.

## 2. WORLDWIDE PANDEMIC

As a result of the rapid spread of the novel coronavirus, COVID-19, throughout the world, including into the United States, on March 11, 2020, the World Health Organization classified the virus as a pandemic. The speed with which the effects of the COVID-19 pandemic have changed the U.S. economic landscape, outlook, and in particular the travel industry, were swift and unexpected. The Company began to see a negative impact on bookings for future

travel in late February 2020, which quickly accelerated during the remainder of first quarter and into second quarter, when trip cancellations outpaced new passenger bookings during the majority of March and April 2020. The Company began proactively canceling a significant portion of its scheduled flights in March 2020, and continued adjusting capacity throughout the remainder of the year, as the Company grounded a significant portion of its fleet and operated a significantly reduced portion of its previously scheduled capacity. The Company continued to experience significant negative impacts to passenger demand and bookings through the remainder of 2020 due to the pandemic.

Based on these events and the uncertainty they created, the Company immediately began to focus on its liquidity, including quickly and substantially enhancing its cash holdings. Throughout 2020, the Company raised a total of $18.9 billion in capital, net of transaction fees.

On April 20, 2020, the Company entered into definitive documentation with the United States Department of Treasury (the "Treasury") with respect to funding support pursuant to the Payroll Support Program ("Payroll Support") under the Coronavirus Aid, Relief and Economic Security Act ("CARES Act"). During 2020, the Company received a total of $3.4 billion of relief funds under the CARES Act. As consideration for the Payroll Support, the Company issued a promissory note (the "Note") in favor of the Treasury and entered into a warrant agreement with the Treasury (the "Warrant Agreement"), pursuant to which the Company agreed to issue warrants (each, a "Warrant") to purchase common stock of the Company to the Treasury. During 2020, the Company provided a Note in the aggregate amount of $976 million and issued Warrants valued at a total of $40 million to purchase up to an aggregate of 2.7 million shares of the Company's common stock, subject to adjustment pursuant to the terms of the Warrants. Pursuant to the terms of the Payroll Support Program agreement and the CARES Act, the Payroll Support funds could only be utilized to pay qualifying salaries, wages, and benefits, as defined in the CARES Act. As of December 31, 2020, excluding the $976 million Note and value allocated to the Warrants, all Payroll Support funds received have been allocated to reduce eligible costs in the accompanying Consolidated Statement of Comprehensive Income (Loss) for the year ended December 31, 2020.

The Note matures in full on April 19, 2030, and is subject to mandatory prepayment requirements in connection with certain change of control triggering events that may occur prior to its maturity. The Company has an option to prepay the Note at any time without premium or penalty. Amounts outstanding under the Note bear interest at a rate of 1.00 percent before April 20, 2025 and, afterwards, at a rate equal to the Secured Overnight Financing Rate or other benchmark replacement rate consistent with customary market conventions plus a margin of 2.00 percent. The Note contains customary representations and warranties and events of default. Also under the Cares Act terms, as supplemented by the Payroll Support Program Extension (discussed below), the Company is prohibited from repurchasing its common stock and from paying dividends or making capital contributions with respect to its common stock through March 31, 2022.

The Warrant Agreement sets out the Company's obligations to issue Warrants in connection with disbursements of Payroll Support and to file a resale shelf registration statement for the Warrants and the underlying shares of common stock. The Company has also granted the Treasury certain demand underwritten offering and piggyback registration rights with respect to the Warrants and the underlying common stock. Each Warrant is exercisable at a strike price of $36.47 per share of common stock and will expire on the fifth anniversary of the issue date of such Warrant. The Warrants will be settled through net share settlement or net cash settlement, at the Company's option. The Warrants include adjustments for below market issuances, payment of dividends, and other customary anti-dilution provisions. The Warrants do not have voting rights.

In addition to obtaining financing under the CARES Act and accessing the capital markets, the Company believes it has made significant progress on bolstering its liquidity through efforts including aggressively evaluating all capital spending, discretionary spending, and non-essential costs for near-term cost reductions or deferrals; reducing the Company's published flight schedule; placing a significant number of aircraft in storage; implementing voluntary separation and time-off programs for Employees; substantially suspending all hiring; reducing the Chief Executive Officer's salary by 20 percent; reducing the other named executive officer salaries and Board of Director cash

retainer fees by 20 percent through December 31, 2020; and modifying vendor and supplier payment terms. The Company will continue evaluating the need for further flight schedule adjustments.

On December 27, 2020, President Trump signed into law the Consolidated Appropriations Act, 2021 (the "Payroll Support Program Extension"). Among other items, this Payroll Support Program Extension will provide up to an additional $15 billion in support to U.S. airlines through payroll support grants as well as loans that will require repayment to the U.S. government. During January 2021, the Company completed its application for such additional support, and finalized an agreement with the Treasury in which it will receive approximately $1.7 billion in funds that will be used to pay qualifying Employee wages and benefits through at least March 31, 2021. The Company received an initial installment of $864 million in January 2021, and expects to receive the remainder of funds during first quarter 2021.

As consideration for the payroll support received in January 2021, the Company issued a promissory note in favor of the Treasury and entered into a warrant agreement with the Treasury, pursuant to which the Company agreed to issue warrants to purchase common stock of the Company to the Treasury. The promissory note was issued for $229 million and warrants were valued at a total of $9 million to purchase up to an aggregate of 495 thousand shares of the Company's common stock, subject to adjustment pursuant to the terms of the warrants. Once the second installment is received, the Company will issue the remaining $259 million promissory note and warrants to purchase up to an additional 560 thousand shares of the Company's common stock. The funds received during 2021 can only be utilized to pay qualifying salaries, wages, and benefits, as defined. Excluding the amounts allocated to the promissory note and value allocated to the Warrants, all funds received during 2021 are expected to be allocated to reduce eligible costs in the year ended December 31, 2021.

On June 1, 2020, the Company announced Voluntary Separation Program 2020, a voluntary separation program that allowed eligible Employees the opportunity to voluntarily separate from the Company in exchange for severance, medical/dental coverage for a specified period of time, and travel privileges based on years of service. Virtually all of the Company's Employees hired before June 1, 2020 were eligible to participate in Voluntary Separation Program 2020. A total of over 4,200 Employees elected to participate in Voluntary Separation Program 2020, consisting of the following breakdown among workgroups: 1,060 from Ground Operations and Provisioning, 725 Flight Attendants, 630 Pilots, 390 from Customer Support and Services, 185 from Maintenance, 90 from other Contract groups, and 1,140 Managerial and Administrative Employees. Voluntary Separation Program 2020 participants' last day of work primarily fell between August 15, 2020 and September 30, 2020, as assigned by the Company based on the operational needs of particular work locations and departments, determined on an individual-by-individual basis.

In conjunction with Voluntary Separation Program 2020, the Company also offered certain contract Employees the option to take voluntary Extended Emergency Time Off ("Extended ETO"), for periods between six and 18 months, with the exception of Pilots, who could elect to take Extended ETO for periods up to five years. Approximately 11,000 Employees participated in the Extended ETO program, and 10,421 employees remained on Extended ETO leave as of December 31, 2020. Employees taking Extended ETO do not perform any work for the Company and are considered inactive while on leave, but do get paid a portion of their wages and continue to receive all associated benefits, as well as accrue service credit for all benefits. Contract employees who elected to take Extended ETO for periods between 12 and 18 months and had 10 or more years of service have been given the opportunity to convert to the Voluntary Separation Program 2020 beginning on September 1, 2020, until up to 90 days before the end of their respective Extended ETO term.

The purpose of Voluntary Separation Program 2020 and Extended ETO is to maintain a suitable sized workforce to operate at reduced capacity relative to the Company's operations prior to the COVID-19 pandemic. In accordance with the accounting guidance in ASC Topic 712 (Compensation — Nonretirement Postemployment Benefits), the Company accrued charges related to the special termination benefits described above upon Employees accepting Voluntary Separation Program 2020 or Extended ETO offers, which will be reduced as program benefits are paid. Costs incurred for Voluntary Separation Program 2020 and Extended ETO, which totaled $1.4 billion throughout 2020, are recorded as a component of Payroll support and voluntary Employee programs, net, in the accompanying Consolidated Statement of Comprehensive Income (Loss). Within that line item, these charges are netted against the

allocation of the remainder of the Payroll Support Program funds utilized to fund salaries, wages, and benefits, which totaled $2.3 billion throughout 2020.

The Company accrued expenses totaling $620 million for its Extended ETO program throughout 2020, consisting of future wages and benefits for the Employees that will not be working. The Company has accrued amounts up to 18 months for all Employees that elected Extended ETO, but did not include amounts related to Pilots for periods beyond February 2022, based on the uncertainty of its future capacity levels, and because it is not currently probable that such Employees will not be recalled to work beyond that timeframe. Therefore, future adjustments to the amounts accrued as of December 31, 2020, may become necessary at a later date. For both the Voluntary Support Program 2020 and Extended ETO programs combined, approximately $454 million of the liability balances were relieved during 2020 (primarily through payments to Employees), leaving a balance of $914 million as of December 31, 2020.

In response to flight schedule adjustments due to the effects of the COVID-19 pandemic, a number of aircraft were taken out of the Company's schedule beginning in late March, and placed in short-term storage, as well as some in a longer term storage program. In addition, during fourth quarter 2020, the Company made the decision to permanently retire 20 of its older 737-700 aircraft, given the expected return to service of the Company's Boeing MAX 737 aircraft on March 11, 2021. The early retirement of these 20 737-700s resulted in an impairment charge of $32 million in 2020, which is classified within Other operating expenses in the Consolidated Statement of Income (Loss). As of December 31, 2020, 92 aircraft remained in temporary storage. Given the current expectation that these aircraft have been placed in storage temporarily, the Company has continued to record depreciation expense associated with them.

As a result of the events and impacts surrounding the COVID-19 pandemic, including the Company's net loss incurred during the year ended December 31, 2020, and the significant number of aircraft that have been placed in storage, the Company considered whether these conditions indicated that it was more likely than not that the Company's $970 million in Goodwill and its $295 million in indefinite-lived intangible assets were impaired. As a result of the annual impairment tests performed as of October 1, 2020, no impairment was determined to exist for Goodwill or indefinite-lived intangible assets, See Note 1 for further information.

In addition, the Company has assessed whether any impairment of its amortizable assets existed, and has determined that no charges were deemed necessary under applicable accounting standards as of December 31, 2020.

The Company's assumptions about future conditions important to its assessment of potential impairment of its amortizable assets, indefinite-lived intangible assets, and Goodwill, including the impacts of the COVID-19 pandemic and other ongoing impacts to its business, are subject to uncertainty, and the Company will continue to monitor these conditions in future periods as new information becomes available, and will update its analyses accordingly.

## 3. NEW ACCOUNTING PRONOUNCEMENTS AND ACCOUNTING CHANGES

On August 5, 2020, the Financial Accounting Standards Board (the "FASB") issued ASU No. 2020-06, Debt—Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging—Contracts in Entity's Own Equity (Subtopic 815-40): Accounting for Convertible Instruments and Contracts in an Entity's Own Equity. This new standard reduces the number of accounting models for convertible debt instruments and convertible preferred stock, enhances information transparency by making targeted improvements to the disclosures for convertible instruments and earnings-per-share (EPS) guidance, and amends the guidance for the derivatives scope exception for contracts in an entity's own equity to reduce form-over-substance-based accounting conclusions. This standard is effective for fiscal years beginning after December 15, 2021. Companies may elect early adoption for periods beginning after December 15, 2020. The FASB specified that an entity should adopt the guidance as of the beginning of its annual fiscal year. The Company is evaluating this new standard and plans to provide additional information about its expected impact on the Company's financial statements and disclosures at a future date.

On December 18, 2019, the FASB issued ASU No. 2019-12, Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes. This new standard eliminates certain exceptions in ASC 740 related to the approach for intraperiod tax allocation, the methodology for calculating income taxes in an interim period, and the recognition of deferred tax liabilities for outside basis differences. It also clarifies and simplifies other aspects of the accounting for income taxes. This standard is effective for fiscal years, and interim periods within those years, beginning after December 15, 2020, with early adoption permitted in any interim period within that year. The Company elected to early adopt this standard as of January 1, 2020. The most significant impact to the Company is the removal of a limit on the tax benefit recognized on pre-tax losses in interim periods. However, the early adoption as of January 1, 2020, did not have an impact on the Company's financial statements or disclosures for 2020.

On August 29, 2018, the FASB issued ASU No. 2018-15, Intangibles—Goodwill and Other—Internal-Use Software. This standard requires a customer in a cloud computing arrangement that is a service contract to follow the internal-use software guidance in ASC 350-40, Accounting for Internal-Use Software, to determine which implementation costs to (i) capitalize as assets and amortize over the term of the hosting arrangement or (ii) expense as incurred. This standard is effective for public business entities in fiscal years beginning after December 15, 2019, and the standard was adopted and applied prospectively by the Company as of January 1, 2020, but it did not have a significant impact on the Company's financial statements and disclosures.

On August 28, 2018, the FASB issued ASU No. 2018-13, Fair Value Measurement. This standard is effective for public business entities in fiscal years beginning after December 15, 2019, and for interim periods within those fiscal years. This standard requires changes to the disclosure requirements for fair value measurements for certain Level 3 items, and specifies that some of the changes must be applied prospectively, while others should be applied retrospectively. The Company adopted the standard as of January 1, 2020, but it did not have a significant impact on the Company's financial statements or disclosures. See Note 12 for further information on the Company's fair value measurements.

On January 26, 2017, the FASB issued ASU No. 2017-04, Simplifying the Test for Goodwill Impairment. The new standard eliminates Step 2 from the goodwill impairment test. An entity should recognize a goodwill impairment charge for the amount by which the carrying amount exceeds the reporting unit's fair value. This standard is effective for public business entities in fiscal years beginning after December 15, 2019, and the standard was adopted and applied prospectively by the Company as of January 1, 2020, but it did not have a significant impact on the Company's financial statements and disclosures.

On June 16, 2016, the FASB issued ASU No. 2016-13, Measurement of Credit Losses on Financial Instruments. The new standard requires the use of an "expected loss" model on certain types of financial instruments. The standard also amends the impairment model for available-for-sale debt securities and requires estimated credit losses to be recorded as allowances instead of reductions to amortized cost of the securities. This standard is effective for public business entities in fiscal years beginning after December 15, 2019, and the standard was adopted and applied prospectively by the Company as of January 1, 2020, but it did not have a significant impact on the Company's financial statements and disclosures.

On February 25, 2016, the FASB issued the New Lease Standard. The New Lease Standard requires lessees to recognize a right-of-use asset and a lease liability on the balance sheet for all leases (with the exception of short-term leases, as defined in the New Lease Standard) at the lease commencement date and recognize expenses on the income statement in a similar manner to the legacy guidance in ASC 840, Leases ("ASC 840").

The Company adopted the provisions of the New Lease Standard effective January 1, 2019, using the modified retrospective adoption method, utilizing the simplified transition option available in the New Lease Standard, which allows entities to continue to apply the legacy guidance in ASC 840, including its disclosure requirements, in the comparative periods presented in the year of adoption. The Company elected the package of practical expedients available under the transition provisions of the New Lease Standard, including (i) not reassessing whether expired or existing contracts contain leases, (ii) not reassessing lease classification, and (iii) not revaluing initial direct costs for existing leases.

In addition, the New Lease Standard eliminated the previous build-to-suit lease accounting guidance and resulted in derecognition of build-to-suit assets and liabilities that remained on the balance sheet after the end of the construction period, including the related deferred taxes. However, given the Company's guarantee associated with the bonds issued to fund the Dallas Love Field Modernization Program (the "LFMP"), the remaining debt service amount as of the adoption date was considered a minimum rental payment under the New Lease Standard, and therefore was recorded as a lease liability with a corresponding right-of-use asset on the Consolidated Balance Sheet that will be reduced through debt service payments made in 2019 and beyond. See Note 8 for disclosures related to the New Lease Standard, and Note 5 for further information on the Company's build-to-suit projects.

## 4. NET INCOME (LOSS) PER SHARE

The following table sets forth the computation of basic and diluted net income (loss) per share (in millions except per share amounts). An immaterial number of shares related to the Company's restricted stock units, stock warrants, and convertible notes were excluded from the denominator for fiscal year ended December 31, 2020, because inclusion of such shares would be antidilutive.

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | 2018 |
| **NUMERATOR:** | | | |
| Net income (loss) | $ (3,074) | $ 2,300 | $ 2,465 |
| | | | |
| **DENOMINATOR:** | | | |
| Weighted-average shares outstanding, basic | 565 | 538 | 573 |
| Dilutive effect of restricted stock units | — | 1 | 1 |
| Adjusted weighted-average shares outstanding, diluted | 565 | 539 | 574 |
| | | | |
| **NET INCOME (LOSS) PER SHARE:** | | | |
| Basic | $ (5.44) | $ 4.28 | $ 4.30 |
| Diluted | $ (5.44) | $ 4.27 | $ 4.29 |

## 5. COMMITMENTS AND CONTINGENCIES

*Commitments*

The Company has contractual obligations and commitments primarily with regard to future purchases of aircraft, repayment of debt (see Note 7), and lease arrangements (see Note 8). During the year ended December 31, 2020, the Company leased seven new Boeing 737 MAX 8 aircraft. The Company expects to lease an additional nine new 737 MAX 8 aircraft in 2021. The Company has firm orders in place with Boeing for 219 737 MAX 8 aircraft and 30 737 MAX 7 aircraft, as well as options for 115 737 MAX 8 aircraft as of December 31, 2020. The Company's 34 Boeing 737 MAX 8 aircraft were previously grounded on March 13, 2019, upon the FAA emergency order for all U.S. airlines to ground all MAX aircraft. On November 18, 2020, the FAA rescinded the emergency order and issued official requirements to enable airlines to return the 737 MAX to service. See Note 17 for further information.

All MAX deliveries that should have occurred in 2019 and 2020 based on the Company's existing commitment contract with Boeing have been assumed to shift into future periods. However, the Company reached an agreement with The Boeing Company (the "Boeing Agreement") in December 2020, for the Company to begin to take delivery of the delayed MAX aircraft, with the expectation that the Company will take delivery of 35 MAX 8 aircraft, including the 16 leased aircraft discussed above, through the end of 2021, and that the parties expect to formally revise the existing purchase agreement in 2021 for future deliveries. Based on the Company's current contract with Boeing (prior to the recent Boeing Agreement), capital commitments associated with its firm orders are as follows:

100

$1.7 billion in 2021, $1.2 billion in 2022, $1.6 billion in 2023, $1.9 billion in 2024, and $1.5 billion in 2025. In addition, the capital commitments associated with the contractual MAX deliveries that did not take place in 2019 and 2020, which are assumed to shift to future periods, total $2.1 billion ($743 million from 2019 and $1.3 billion from 2020). However, based on the Boeing Agreement, the Company is expected to take no more than 19 purchased MAX aircraft through December 31, 2021. The Boeing Agreement also stipulated a confidential settlement for estimated financial damages incurred by the Company in 2020 as a result of the MAX grounding, in the form of credits that can be taken against future payments due to Boeing. With respect to the 19 expected purchased MAX deliveries, considering contractual progress payments that have been made to Boeing and expected credits from Boeing, the Company expects its actual aircraft capital expenditures during 2021 to be immaterial. The Company is continuing discussions with Boeing to refresh its order book and the timeline of future deliveries is uncertain.

**Los Angeles International Airport**

In October 2017, the Company executed a lease agreement with Los Angeles World Airports ("LAWA") (the "T1.5 Lease"). Under the T1.5 Lease, the Company oversaw and managed the design, development, financing, construction, and commissioning of a passenger processing facility between Terminal 1 and 2 (the "Terminal 1.5 Project"). The Terminal 1.5 Project includes ticketing, baggage claim, passenger screening, and a bus gate at a cost not to exceed $464 million for site improvements and non-proprietary improvements. Construction on the Terminal 1.5 Project began during third quarter 2017 and was substantially completed at December 31, 2020; however, the Terminal 1.5 Project will not be placed into service until second quarter 2021, at which time LAWA is expected to repay the outstanding loan and purchase the remaining completed assets for accounting purposes. The costs incurred to fund the Terminal 1.5 Project are included within Assets Constructed for Others ("ACFO") and all amounts that have been or will be reimbursed will be included within Construction obligation on the accompanying Consolidated Balance Sheet. Upon completion of any individual asset as part of the overall project, the asset and associated liability on the balance sheet are de-recognized in accordance with applicable accounting guidance.

Funding for this project is primarily through the Regional Airports Improvement Corporation (the "RAIC"), which is a quasi-governmental special purpose entity that is acting as a conduit borrower under a syndicated credit facility provided by a group of lenders. A loan made under the credit facility for the Terminal 1.5 Project is being used to reimburse the Company for the site improvements and non-proprietary improvements of the Terminal 1.5 Project, and the outstanding loan will be repaid with the proceeds of LAWA's payments to purchase completed construction phases. The Company guaranteed the obligation of the RAIC under the credit facility associated with the Terminal 1.5 Project. As of December 31, 2020, the Company's outstanding guaranteed obligation under the credit facility for the Terminal 1.5 Project was $318 million.

Construction costs recorded in ACFO for the Terminal 1.5 Project, which exclude costs associated with assets that were previously completed and placed into service, were $309 million and $164 million, as of December 31, 2020, and December 31, 2019, respectively.

**Dallas Love Field**

During 2008, the City of Dallas approved the LFMP, a project to reconstruct Dallas Love Field with modern, convenient air travel facilities. Pursuant to a Program Development Agreement with the City of Dallas and the Love Field Airport Modernization Corporation (or the "LFAMC," a Texas non-profit "local government corporation" established by the City of Dallas to act on the City of Dallas' behalf to facilitate the development of the LFMP), the Company managed this project. Major construction was effectively completed in 2014. During second quarter 2017, the City of Dallas approved using the remaining bond funds for additional terminal construction projects, which were effectively completed in 2018.

Although the City of Dallas received commitments from various sources that helped to fund portions of the LFMP project, including the FAA, the Transportation Security Administration, and the City of Dallas' Aviation Fund, the majority of the funds used were from the issuance of bonds. The Company guaranteed principal and interest payments on bonds issued by the LFAMC. As of December 31, 2020, $399 million of principal remained outstanding. The net present value of the future principal and interest payments associated with the bonds were $433

101

million and $444 million as of December 31, 2020 and December 31, 2019, respectively, and was reflected as part of the Company's operating lease right-of-use assets and lease obligations in the Consolidated Balance Sheet.

*Contingencies*

The Company is from time to time subject to various legal proceedings and claims arising in the ordinary course of business, including, but not limited to, examinations by the Internal Revenue Service ("IRS"). The Company's management does not expect that the outcome of any of its currently ongoing legal proceedings or the outcome of any adjustments presented by the IRS, individually or collectively, will have a material adverse effect on the Company's financial condition, results of operations, or cash flow.

**6. REVENUE**

**Passenger Revenues**

The Company's contracts with its Customers primarily consist of its tickets sold, which are initially deferred as Air traffic liability. Passenger revenue associated with tickets is recognized when the performance obligation to the Customer is satisfied, which is primarily when travel is provided.

Revenue is categorized by revenue source as the Company believes it best depicts the nature, amount, timing, and uncertainty of revenue and cash flow. The following table provides the components of Passenger revenue recognized for the years ended December 31, 2020, 2019, and 2018:

| (in millions) | Year ended December 31, | | |
| --- | --- | --- | --- |
| | **2020** | **2019** | **2018** |
| Passenger non-loyalty | $ 6,303 | $ 17,578 | $ 17,506 |
| Passenger loyalty - air transportation | 1,003 | 2,487 | 2,307 |
| Passenger ancillary sold separately | 359 | 711 | 642 |
| **Total passenger revenues** | $ 7,665 | $ 20,776 | $ 20,455 |

Passenger non-loyalty includes all revenues recognized from Passengers related to flights paid for primarily with cash or credit card. All Customers purchasing a ticket on Southwest Airlines are generally able to check up to two bags at no extra charge (with certain exceptions as stated in the Company's published Contract of Carriage), and the Company also does not charge a fee for a Customer to make a change to their flight after initial purchase, although fare differences may apply. Passenger loyalty - air transportation primarily consists of the revenue recognized associated with award flights taken by loyalty program members upon redemption of loyalty points. Passenger ancillary sold separately includes any revenue recognized associated with ancillary fees charged separately, such as in-flight purchases, EarlyBird Check-In®, and Upgraded Boarding.

In order to determine the value of each loyalty point, certain assumptions must be made at the time of measurement, which include the following:

- *Allocation of Passenger Revenue* - Revenues from Passengers, related to travel, who also earn Rapid Rewards Points have been allocated between flight (recognized as revenue when transportation is provided) and Rapid Rewards Points (deferred until points are redeemed) based on each obligation's relative standalone selling price. The Company utilizes historical earning patterns to assist in this allocation.
- *Fair Value of Rapid Rewards Points* - Determined from the base fare value of tickets which were purchased using prior point redemptions for travel and other products and services, which the Company believes to be indicative of the fair value of points as perceived by Customers and representative of the value of each point at the time of redemption. The Company's booking site allows a Customer to toggle between fares utilizing either cash or point redemptions, which provides the Customer with an approximation of the equivalent value of their points. The value can differ, however, based on demand, the amount of time prior to the

flight, and other factors. The fare mix during the period measured represents a constraint, which could result in the assumptions above changing at the measurement date, as fare classes can have different coefficients used to determine the total loyalty points needed to purchase an award ticket. The mixture of these fare classes and changes in the coefficients used by the Company could cause the fair value per point to increase or decrease.

For points that are expected to remain unused, the Company recognizes spoilage in proportion to the pattern of points used by the Customer, which approximates the average period over which the population of Rapid Reward Members redeem their points. The Company utilizes historical behavioral data to develop a predictive statistical model to analyze the amount of spoilage expected for points sold to business partners and earned through flight. The Company continues to evaluate expected spoilage annually and applies appropriate adjustments in the fourth quarter of each year, or other times, if changes in Customer behavior are detected. Changes to spoilage estimates impact revenue recognition prospectively. Due to the size of the Company's liability for loyalty benefits, changes in Customer behavior and/or expected future redemption patterns could result in significant variations in Passenger revenue.

The Company allocates consideration received to performance obligations based on the relative fair value of those obligations. The Company has a co-branded credit card agreement ("Agreement") with Chase Bank USA, N.A. ("Chase"), through which the Company sells loyalty points and certain marketing components, which consist of the use of the Southwest Airlines brand and access to Rapid Rewards Member lists, licensing and advertising elements, and the use of the Company's resource team. In 2018, Chase and the Company executed a multi-year extension of the Agreement, extending the decades-long relationship between the parties. The Company estimated the selling prices and volumes over the term of the Agreement in order to determine the allocation of proceeds to each of the two performance obligations identified in the Agreement, which have been characterized as a transportation component and a marketing component. The allocations utilized are reviewed to determine if adjustment is necessary any time there is a modification to the Agreement. The Company records Passenger revenue related to loyalty point redemptions for air travel when the travel is delivered, and the marketing elements are recognized as Other revenue when the performance obligations related to those services are satisfied, which is generally the same period consideration is received from Chase.

As performance obligations to Customers are satisfied, the related revenue is recognized. The events that result in revenue recognition that are associated with performance obligations identified as a part of the Rapid Rewards Program are as follows:

- *Tickets and Rapid Rewards Points* - When a flight occurs, the related performance obligation is satisfied and the related value provided by the Customer, whether from purchased tickets or Rapid Rewards Points, is recognized as revenue.
- *Loyalty points redeemed for goods and/or services other than travel* - Rapid Rewards Members have the option to redeem points for goods and services offered through a third party vendor, who acts as principal. The performance obligation related to the purchase of these goods and services is satisfied when the good and/or service is delivered to the Customer.
- *Marketing Royalties* - As part of its Agreement with Chase, Southwest provides certain deliverables, including use of the Southwest Airlines' brand, access to Rapid Rewards Member lists, advertising elements, and the Company's resource team. These performance obligations are satisfied each month that the Agreement is active.

As of the years ended December 31, 2020 and 2019, the components of Air traffic liability, including contract liabilities based on tickets sold, unused funds available to the Customer, and loyalty points available for redemption, net of expected spoilage, within the Consolidated Balance Sheet were as follows:

103

| (in millions) | Balance as of | |
| --- | --- | --- |
| | December 31, 2020 | December 31, 2019 |
| Air traffic liability - passenger travel and ancillary passenger services | $ 2,686 | $ 2,125 |
| Air traffic liability - loyalty program | 4,447 | 3,385 |
| **Total Air traffic liability** | $ 7,133 | $ 5,510 |

The balance in Air traffic liability - passenger travel and ancillary passenger services also includes unused funds that are available for use by Customers and are not currently associated with a ticket, but represent funds effectively refunded and made available for use to purchase a ticket for a flight that occurs prior to their expiration. These funds are typically created as a result of a prior ticket cancellation or exchange. Rollforwards of the Company's Air traffic liability - loyalty program for the years ended December 31, 2020 and 2019 were as follows (in millions):

| | Year ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Air traffic liability - loyalty program - beginning balance | $ 3,385 | $ 3,011 |
| Amounts deferred associated with points awarded | 1,958 | 2,941 |
| Revenue recognized from points redeemed - Passenger | (1,003) | (2,487) |
| Revenue recognized from points redeemed - Other | (60) | (80) |
| Unused funds converted to loyalty points | 167 | — |
| Air traffic liability - loyalty program - ending balance | $ 4,447 | $ 3,385 |

Air traffic liability includes consideration received for ticket and loyalty related performance obligations which have not been satisfied as of a given date. Rollforwards of the amounts included in Air traffic liability as of December 31, 2020 and 2019 were as follows (in millions):

| | Air traffic liability |
| --- | --- |
| Balance at December 31, 2019 | $ 5,510 |
| Current period sales (passenger travel, ancillary services, flight loyalty, and partner loyalty) | 9,348 |
| Revenue from amounts included in contract liability opening balances | (2,317) |
| Revenue from current period sales | (5,408) |
| Balance at December 31, 2020 | $ 7,133 |

| | Air traffic liability |
| --- | --- |
| Balance at December 31, 2018 | $ 5,070 |
| Current period sales (passenger travel, ancillary services, flight loyalty, and partner loyalty) | 21,296 |
| Revenue from amounts included in contract liability opening balances | (3,816) |
| Revenue from current period sales | (17,040) |
| Balance at December 31, 2019 | $ 5,510 |

During 2020, the Company experienced a significantly higher number of Customer-driven flight cancellations as a result of the COVID-19 pandemic. See Note 2 for further information. As a result, the amount of Customer travel funds held by the Company, net of spoilage, that can be redeemed for future travel as of December 31, 2020, far exceeds previous periods and represents approximately 28 percent of the total Air traffic liability balance at December 31, 2020, as compared to approximately 2 percent of the total Air traffic liability balance at December 31, 2019. In order to provide additional flexibility to Customers who hold these funds, the Company has significantly relaxed its previous policies with regards to the time period within which these funds can be redeemed, which is typically twelve months from the original date of purchase. For all Customer travel funds created or scheduled to expire between March 1 and September 7, 2020 associated with flight cancellations, the Company has extended the expiration date to September 7, 2022. At December 31 2020, $2.1 billion of Customer travel funds

remain in Air traffic liability with a September 7, 2022 expiration date. The Company does not have sufficient data to accurately predict the timing of performance obligation satisfaction on these funds due to certain constraints including, but not limited to, consumer confidence, economic health, vaccines, and uncertainty regarding customer travel fund redemption patterns for funds that live longer than 12 months as this is unprecedented in Company history. As a result, recognition of these travel funds as flown revenue, refunds, or spoilage revenue will likely be more volatile from period to period compared to past periods. Further, as presented in the above tables, the Company announced in August 2020 that it would allow qualified travel funds to be converted to Rapid Rewards points through December 15, 2020. Despite the possibility that some of these travel funds may be redeemed beyond the following twelve-month period, the Company has continued to classify them as "current" in the accompanying Consolidated Balance Sheet as they remain a demand liability and the Company does not have sufficient data to enable it to accurately estimate the portion that will not be redeemed for travel in the subsequent twelve months.

Further, as presented in the above tables, the Company provided a benefit to Rapid Reward members to allow qualified travel funds to be converted to Rapid Rewards points through December 15, 2020. Recognition of revenue associated with the Company's loyalty liability can be difficult to predict, as the number of award seats available to members is not currently restricted and they could choose to redeem their points at any time that a seat is available. The performance obligations classified as a current liability related to the Company's loyalty program were estimated based on expected redemptions utilizing historical redemption patterns, and forecasted flight availability, fares, and coefficients. The entire balance classified as Air traffic liability—noncurrent relates to loyalty points that were estimated to be redeemed in periods beyond 12 months following the representative balance sheet date. The Company expects the majority of loyalty points to be redeemed within two years.

All performance obligations related to freight services sold are completed within twelve months or less; therefore, the Company has elected to not disclose the amount of the remaining transaction price and its expected timing of recognition for freight shipments.

Other revenues primarily consist of marketing royalties associated with the Company's co-branded Chase® Visa credit card, but also include commissions and advertising associated with Southwest.com®. All amounts classified as Other revenues are paid monthly, coinciding with the Company fulfilling its deliverables; therefore, the Company has elected to not disclose the amount of the remaining transaction price and its expected timing of recognition for such services provided.

The Company recognized revenue related to the marketing, advertising, and other travel-related benefits of the revenue associated with various loyalty partner agreements including, but not limited to, the Agreement with Chase, within Other operating revenues. For the years ended December 31, 2020, 2019, and 2018 the Company recognized $1.1 billion, $1.3 billion, and $1.1 billion, respectively.

The Company is also required to collect certain taxes and fees from Customers on behalf of government agencies and remit these back to the applicable governmental entity on a periodic basis; however, some of these ticket taxes were suspended during 2020 as allowed by the CARES Act. These taxes and fees include foreign and U.S. federal transportation taxes, federal security charges, and airport passenger facility charges. These items are collected from Customers at the time they purchase their tickets, are excluded from the contract transaction price, and are therefore not included in Passenger revenue. The Company records a liability upon collection from the Customer and relieves the liability when payments are remitted to the applicable governmental agency.

## 7. FINANCING ACTIVITIES

| (in millions) | December 31, 2020 | December 31, 2019 |
|---|---|---|
| 737 Aircraft Notes payable through April 2020 | $ — | $ 20 |
| Term Loan Agreement payable through May 2020 - 5.223% | — | 134 |
| 2.65% Notes due November 2020 | — | 500 |
| 2.75% Notes due 2022 | 300 | 300 |
| Pass Through Certificates due 2022 - 6.24% | 137 | 197 |
| 4.75% Notes due 2023 | 1,250 | — |
| 1.25% Convertible Notes due 2025 | 1,945 | — |
| 5.25% Notes due 2025 | 1,550 | — |
| Term Loan Agreement payable through 2025 - 1.65% | 119 | — |
| 3.00% Notes due 2026 | 300 | 300 |
| Term Loan Agreement payable through 2026 - 1.34% | 159 | 178 |
| 3.45% Notes due 2027 | 300 | 300 |
| 5.125% Notes due 2027 | 2,000 | — |
| 7.375% Debentures due 2027 | 119 | 122 |
| Term Loan Agreement payable through 2028 - 1.65% | 184 | — |
| 2.625% Notes due 2030 | 500 | — |
| 1.000% Payroll Support Program Loan due 2030 (See Note 2) | 976 | — |
| Finance leases | 542 | 627 |
|  | $ 10,381 | $ 2,678 |
| Less current maturities | 220 | 819 |
| Less debt discount and issuance costs | 50 | 13 |
|  | $ 10,111 | $ 1,846 |

AirTran Holdings was party to aircraft purchase financing facilities. Each note was secured by a first mortgage on the aircraft to which it related. The notes bore interest at a floating rate per annum equal to a margin plus the three or six-month LIBOR in effect at the commencement of each semi-annual or three-month period, as applicable. Principal and interest under the notes were payable semi-annually or every three months as applicable. The three remaining notes matured in 2020 (February and April) and were redeemed in full utilizing available cash on hand. As discussed further in Note 11, a portion of the above floating-rate debt had been effectively converted to a fixed rate via interest rate swap agreements which expired as the underlying notes matured.

In third quarter 2020, the Company entered into agreements with a financing institution to borrow $125 million ($121 million, net of fees) secured by four Boeing 737-800 aircraft. These borrowings, which were recorded as a financing transaction in the Company's Consolidated Statement of Cash Flows, and as debt in the accompanying Consolidated Balance Sheet, bear interest at a rate equal to the 3 month LIBOR plus 1.4 percent, payable in quarterly installments through September 29, 2025.

During 2020, the Company issued $2.0 billion of unsecured notes due 2027, of which $1.3 billion was issued June 8, 2020 (the "$1.3 billion 2027 Notes") and $700 million was issued July 31, 2020 (the "$700 million 2027 Notes"). The notes bear interest at 5.125%. Interest is payable semi-annually in arrears on June 15 and December 15, beginning December 15, 2020. The $700 million 2027 Notes were offered as an additional issuance of the Company's $1.3 billion 2027 Notes issued on June 8, 2020. The $700 million 2027 Notes were issued at a premium and this premium has been included within Capitalized financing items in the Consolidated Statement of Cash Flows. A portion of the proceeds from the $1.3 billion 2027 Notes were used to repay a portion of the outstanding Amended and Restated 364-Day Credit Agreement balance. See below for more information regarding the Amended and Restated 364-Day Credit Agreement.

In second quarter 2020, the Company, through special purpose entities, entered into agreements with a financing institution and trusts to borrow $197 million ($190 million, net of fees) secured by six Boeing 737-800 aircraft.

These borrowings, which were recorded as a financing transaction in the Company's Consolidated Statement of Cash Flows, and as debt in the accompanying unaudited Condensed Consolidated Balance Sheet, bear interest at a rate equal to the 3 month LIBOR plus 1.4 percent, payable in quarterly installments through June 30, 2028. The special purpose entities were determined to be variable interest entities for which the Company is the primary beneficiary, and therefore were consolidated in the accompanying Consolidated Financial Statements.

During 2020, the Company issued $1.55 billion of unsecured notes due 2025, of which $1.25 billion was issued May 4, 2020 (the "$1.25 billion 2025 Notes") and $300 million was issued July 31, 2020 (the "$300 million 2025 Notes"). The notes bear interest at 5.250%. Interest is payable semi-annually in arrears on May 4 and November 4, beginning November 4, 2020. The $300 million 2025 Notes were offered as an additional issuance of the Company's $1.25 billion 2025 Notes issued on May 4, 2020. The $300 million 2025 Notes were issued at a premium and this premium has been included within Capitalized financing items in the Consolidated Statement of Cash Flows. The proceeds from the $1.25 billion 2025 Notes were used to repay a portion of the outstanding Amended and Restated 364-Day Credit Agreement balance.

During 2020, the Company issued $1.25 billion of unsecured notes due 2023, of which $750 million was issued May 4, 2020 (the "$750 million 2023 Notes") and $500 million was issued June 8, 2020 (the "$500 million 2023 Notes"). The notes bear interest at 4.750%. Interest is payable semi-annually in arrears on May 4 and November 4, beginning November 4, 2020. The $500 million 2023 Notes were offered as an additional issuance of the Company's $750 million 2023 Notes issued on May 4, 2020. The $500 million 2023 Notes were issued at a premium and this premium has been included within Capitalized financing items in the Consolidated Statement of Cash Flows. The proceeds from the $750 million 2023 Notes and a portion of the proceeds of the $500 million 2023 Notes were used to repay a portion of the outstanding Amended and Restated 364-Day Credit Agreement balance.

On May 1, 2020, the Company completed the public offering of $2.3 billion aggregate principal amount of 1.250% Convertible Senior Notes due 2025 (the "Convertible Notes"), which included the full exercise of the underwriters' option to buy an additional $300 million aggregate principal amount of Convertible Notes. The Convertible Notes bear interest at the rate of 1.25% per year and will mature on May 1, 2025. Interest on the notes is payable semi-annually in arrears on May 1 and November 1 of each year, beginning on November 1, 2020.

Holders may convert their Convertible Notes at their option at any time prior to the close of business on the business day immediately preceding February 1, 2025, only under the following circumstances: (1) during any calendar quarter commencing after the calendar quarter ending on June 30, 2020 (and only during such calendar quarter), if the last reported sale price of the common stock for at least 20 trading days (whether or not consecutive) during a period of 30 consecutive trading days ending on the last trading day of the immediately preceding calendar quarter is greater than or equal to 130 percent of the conversion price on each applicable trading day; (2) during the five business day period after any ten consecutive trading day period in which the trading price per $1,000 principal amount of Convertible Notes for each trading day of the measurement period was less than 98 percent of the product of the last reported sale price of the Company's common stock and the conversion rate on each such trading day; or (3) upon the occurrence of specified corporate events as defined. On or after February 1, 2025, until the close of business on the second scheduled trading day immediately preceding the maturity date, holders may convert their notes at any time, regardless of the foregoing circumstances. As of December 31, 2020, conditions had not been met to convert.

Upon conversion, the Company will pay or deliver, as the case may be, cash, shares of the Company's common stock or a combination of cash and shares of common stock, at the Company's election. The Company intends, however, to settle conversions by paying cash up to the principal amount, with any excess conversion value settled in shares of common stock. The initial conversion rate is 25.9909 shares of common stock per $1,000 principal amount of Convertible Notes (equivalent to an initial conversion price of approximately $38.48 per share of common stock). The conversion rate will be subject to adjustment in some events, but will not be adjusted for any accrued and unpaid interest. In addition, in the event of certain corporate events that occur prior to the maturity date, the Company will increase the conversion rate for a holder who elects to convert its Convertible Notes in connection with such a corporate event in certain circumstances. In the event of a "Fundamental Change," as defined, the holders may require the Company to purchase for cash all or a portion of their notes at a purchase price equal to 100

percent of the principal amount of the notes, plus accrued and unpaid interest, if any. The Company may not redeem the notes at its option prior to the maturity date.

Upon issuance, the Company bifurcated the Convertible Notes for accounting purposes between a liability component and an equity component utilizing applicable guidance. The liability component was determined by estimating the fair value of a hypothetical issuance of an identical offering excluding the conversion feature of the Convertible Notes, which has been estimated at $1.9 billion, and is reflected as a component of Long-term debt in the Consolidated Balance Sheet. The effective interest rate of this liability was 5.2 percent. The equity component was calculated as the difference between the liability component and the face amount of the Convertible Notes, determined to be $403 million, and was classified within Additional paid in capital in the Consolidated Balance Sheet. The Convertible Notes proceeds are also shown within the financing activities section in the Consolidated Statement of Cash Flows. The amount of the equity component in the transaction also represents a discount on the liability portion of the Convertible Notes, and as such is being amortized as a non-cash component of interest expense over the 5-year term of the notes. The costs incurred in the issuance, including underwriters' discount, totaling $62 million, are classified as a cash outflow within the financing activities section in the Consolidated Statement of Cash Flows, and is also being amortized to expense over the term of the notes. Issuance costs attributable to the equity component of $11 million were netted with the equity component in the Consolidated Statement of Stockholders' Equity. The amortization expense for debt discounts and debt issuance costs for 2020 was $48 million and $5 million, respectively. The Company did not have convertible instruments during 2019 or 2018.

Because the Company intends to settle conversions by paying cash up to the principal amount of the Convertible Notes, with any excess conversion value settled in shares of common stock, the Convertible Notes are being accounted for using the treasury stock method for the purposes of Net income (loss) per share. Using this method, the denominator will be affected when the average share price of the Company's common stock for a given period is greater than the conversion price of approximately $38.48 per share. The Convertible Notes stipulated that holders of the notes may not elect to convert their Convertible Notes to shares of common stock until after June 30, 2020, and therefore there was no dilutive impact related to the notes prior to July 1, 2020. As consideration for the Payroll Support funding, the Company agreed to issue Warrants to the Treasury to purchase the Company's common stock in connection with each disbursement of Payroll Support to the Company. The Company accounts for the Warrants using the treasury stock method. Using this method, the denominator will be affected when the average share price of the Company's common stock for a given period is greater than the warrant exercise price of $36.47 per share. While the Company is reporting a net loss, all potential shares are considered antidilutive and have no impact on Net income (loss) per share.

On March 12, 2020, the Company entered into a new $1.0 billion 364-day term loan credit facility agreement (the "364-Day Credit Agreement") with a syndicate of lenders identified in the 364-Day Credit Agreement. The 364-Day Credit Agreement was drawn in full on the closing date. On March 30, 2020, the Company amended and restated the 364-Day Credit Agreement (the "Amended and Restated 364-Day Credit Agreement") with a syndicate of lenders identified in the Amended and Restated 364-Day Credit Agreement to add additional term loan commitments of approximately $2.3 billion, add an uncommitted accordion increase provision to permit additional term loans in an aggregate amount not to exceed approximately $417 million, amend the pricing, amend certain covenants, add certain covenants, and provide for the grant of a security interest in certain aircraft and related assets. The Company drew approximately $2.3 billion under the Amended and Restated 364-Day Credit Agreement on April 1, 2020. On April 24, 2020, the Company drew an additional $350 million under the $417 million accordion feature. The Amended and Restated 364-Day Credit Agreement was originally set to mature in full on March 29, 2021. The outstanding Amended and Restated 364-Day Credit Agreement balance was repaid in full in second quarter 2020, and the agreement has been terminated.

Concurrently with entering into the Amended and Restated 364-Day Credit Agreement on March 30, 2020, the Company also amended its existing $1.0 billion revolving credit facility expiring in August 2022 (the "Amended and Restated Revolving Credit Agreement") to (i) amend the pricing and fees, (ii) amend certain covenants and provisions, (iii) add certain covenants, and (iv) provide for the grant of a security interest in certain aircraft and

108

related assets. In second quarter 2020, the Company repaid in full the $1.0 billion drawn on the Amended and Restated Revolving Credit Agreement.

On November 23, 2020, the Company amended the Amended and Restated Revolving Credit Agreement to (i) amend the pricing and fees, (ii) amend certain covenants and provisions, (iii) remove a financial covenant, and (iv) amend an exhibit for conforming changes to the compliance certificate (the "Amendment," and the Amended and Restated Revolving Credit Agreement as amended by the Amendment, the "Amended A&R Credit Agreement"). The amount of the loan commitments, the tenor, and the collateral under the Amended and Restated Revolving Credit Agreement remain unchanged by the Amendment. As of December 31, 2020, there were no amounts outstanding under the Amended A&R Credit Agreement.

Generally, amounts outstanding under the Amended A&R Credit Agreement bear interest at interest rates based on either the LIBOR rate (selected by the Company for designated interest periods) or the "alternate base rate" (being the highest of (1) the Wall Street Journal prime rate, (2) one-month adjusted LIBOR (one-month LIBOR plus a statutory reserve rate) plus 1 percent, and (3) the New York Fed Bank Rate, plus 0.5 percent). The underlying LIBOR rate is subject to a floor of 1 percent per annum and the "alternate base rate" is subject to a floor of 1 percent per annum.

The Amended A&R Credit Agreement contains customary representations and warranties, covenants, and events of default. The Amended A&R Credit Agreement is secured by a pool of 73 aircraft and related assets, each with a minimum appraised value ratio requirement. Under the Amended A&R Credit Agreement, the Company is required to maintain a minimum level of liquidity of $1.5 billion (defined as the sum of (i) the aggregate amount available to be borrowed under the Amended A&R Credit Agreement plus (ii) the aggregate amount of unrestricted cash and cash equivalents of the Company plus (iii) the aggregate amount of short-term investments of the Company). As of December 31, 2020, the Company was in compliance with this covenant and all other covenants in the Amended A&R Credit Agreement. The Amended A&R Credit Agreement is a series of short-term borrowings; at the end of each borrowing the Company must elect to roll the facility over into the next borrowing or pay down the facility. The Amended A&R Credit Agreement has an accordion feature that would allow the Company, subject to, among other things, the procurement of incremental commitments, to increase the size of the facility to $1.5 billion.

During February 2020, the Company issued $500 million senior unsecured notes due 2030. The notes bear interest at 2.625 percent. Interest is payable semi-annually in arrears on February 10 and August 10, beginning in 2020.

During November 2017, the Company issued $300 million senior unsecured notes due 2022. The notes bear interest at 2.75 percent. Interest is payable semi-annually in arrears on May 16 and November 16.

Also during November 2017, the Company issued $300 million senior unsecured notes due 2027. The notes bear interest at 3.45 percent. Interest is payable semi-annually in arrears on May 16 and November 16.

During November 2016, the Company issued $300 million senior unsecured notes due 2026. The notes bear interest at 3.00 percent. Interest is payable semi-annually in arrears on May 15 and November 15.

During October 2016, the Company entered into a term loan agreement providing for loans to the Company aggregating up to $215 million, to be secured by mortgages on seven of the Company's 737-800 aircraft. The Company borrowed the full $215 million and secured this loan with the requisite seven aircraft mortgages. The loan matures on October 31, 2026, and is repayable via semi-annual installments of principal that began on April 30, 2018. The loan bears interest at the LIBO Rate (as defined in the term loan agreement) plus 1.10 percent, which equates to a current rate of 1.34 percent, and interest is payable semi-annually in installments.

During November 2015, the Company issued $500 million senior unsecured notes due 2020. The notes bore interest at 2.65 percent, payable semi-annually in arrears on May 5 and November 5. Concurrently, the Company entered into a fixed-to-floating interest rate swap to convert the interest on these unsecured notes to a floating rate until their maturity. The notes were redeemed early in full on October 5, 2020, utilizing available cash on hand.

On May 6, 2008, the Company entered into a term loan agreement providing for loans to the Company aggregating up to $600 million, to be secured by first-lien mortgages on 21 of the Company's 737-700 aircraft. On May 9, 2008, the Company borrowed the full $600 million and secured these loans with the requisite 21 aircraft mortgages. The loans matured and were fully repaid on May 9, 2020. The loans bore interest at the LIBO Rate (as defined in the term loan agreement) plus 0.95 percent. Pursuant to the terms of the term loan agreement, the Company entered into an interest rate swap agreement to convert the variable rate on the term loan to a fixed 5.223 percent until maturity.

On October 3, 2007, grantor trusts established by the Company issued $500 million Pass Through Certificates consisting of $412 million 6.15 percent Series A certificates and $88 million 6.65 percent Series B certificates. A separate trust was established for each class of certificates. The trusts used the proceeds from the sale of certificates to acquire equipment notes in the same amounts, which were issued by the Company on a full recourse basis. Payments on the equipment notes held in each trust are passed through to the holders of certificates of such trust. The equipment notes were issued for each of 16 Boeing 737-700 aircraft owned by the Company and are secured by a mortgage on each aircraft. Beginning February 1, 2008, principal and interest payments on the equipment notes held for both series of certificates became due semi-annually until the balance of the certificates mature on August 1, 2022. Prior to their issuance, the Company also entered into swap agreements to hedge the variability in interest rates on the Pass Through Certificates. The swap agreements were accounted for as cash flow hedges, and resulted in a payment by the Company of $20 million upon issuance of the Pass Through Certificates. The effective portion of the hedge is being amortized to interest expense concurrent with the amortization of the debt and is reflected in the above table as a reduction in the debt balance. The ineffectiveness of the hedge transaction was immaterial.

On February 28, 1997, the Company issued $100 million of senior unsecured 7.375 percent debentures due March 1, 2027. Interest is payable semi-annually on March 1 and September 1. The debentures may be redeemed, at the option of the Company, in whole at any time or in part from time to time, at a redemption price equal to the greater of the principal amount of the debentures plus accrued interest at the date of redemption or the sum of the present values of the remaining scheduled payments of principal and interest thereon, discounted to the date of redemption at the comparable treasury rate plus 20 basis points, plus accrued interest at the date of redemption.

The Company is required to provide standby letters of credit to support certain obligations that arise in the ordinary course of business. Although the letters of credit are an off-balance sheet item, the majority of the obligations to which they relate are reflected as liabilities in the Consolidated Balance Sheet. Outstanding letters of credit totaled $138 million at December 31, 2020.

The net book value of the assets pledged as collateral for the Company's secured borrowings, primarily aircraft, was $2.1 billion at December 31, 2020.

**Other Financings**

During 2020, the Company entered into sale-leaseback arrangements and issued common stock. See Notes 8 and 9, respectively, for further information.

As of December 31, 2020, aggregate annual principal maturities of debt and finance leases (not including amounts associated with interest on finance leases) for the five-year period ending December 31, 2025, and thereafter, were $220 million in 2021, $524 million in 2022, $1.4 billion in 2023, $152 million in 2024, $4.0 billion in 2025, and $4.4 billion thereafter.

**8. LEASES**

The Company enters into leases for aircraft, property, and other types of equipment in the normal course of business. The accounting for these leases follows the requirements of the New Lease Standard, which the Company adopted as of January 1, 2019. See Note 3 for further information.

As of December 31, 2020, the Company held aircraft leases with remaining terms ranging from one month to 13 years. The aircraft leases generally can be renewed for three months to six years at rates based on fair market value at the end of the lease term. Residual value guarantees included in the Company's lease agreements are not material. On July 9, 2012, the Company signed an agreement with Delta Air Lines, Inc. and Boeing Capital Corp. to lease or sublease 88 AirTran Airways, Inc. Boeing 717-200 aircraft ("B717s") to Delta at agreed-upon lease rates. Eight and 20 operating leases expired during 2019 and 2020, respectively. Ten owned B717s were sold in 2019. The proceeds from the sale, which were not material, were netted within Capital expenditures in the Consolidated Statement of Cash Flows. Excluding the 20 aircraft for which operating leases expired during 2020, the following remained: 45 on operating leases and two on finance leases. The sublease terms for the 45 B717s on operating lease and the two B717s on finance lease coincide with the Company's remaining lease terms for these aircraft from the original lessor, which have remaining lease terms ranging from approximately one month to four years. The Company's future sublease income associated with the 45 B717s on operating lease as of December 31, 2020, was as follows: $41 million in 2021, $17 million in 2022, $7 million in 2023, and $1 million in 2024. The two B717s classified by the Company as finance leases are accounted for as direct financing leases, and the remaining 45 subleases are accounted for as operating leases. There are no contingent payments and no significant residual value conditions associated with the transaction.

In second quarter 2020, the Company entered into transactions with third parties, involving ten of the Company's Boeing 737-800 aircraft and ten of the Company's Boeing 737 MAX 8 aircraft that qualified as sale-leaseback arrangements under applicable accounting guidance. The Company sold the ten 737-800 aircraft to a third party for $405 million, then immediately leased the aircraft back for approximately ten years. The Company sold the ten 737 MAX 8 aircraft to a third party for $410 million, then immediately leased the aircraft back for approximately 13 years. As such, the aircraft were de-recognized from Property and equipment at their remaining net book values. All of the leases from the sale-leasebacks are accounted for as operating leases, and thus are now reflected as part of the Company's Operating lease right-of-use assets and operating lease liabilities in the accompanying Consolidated Balance Sheet. The 737-800 and 737 MAX 8 sale-leaseback transactions resulted in a recognized gain of $153 million and $69 million, respectively, reflected within Other operating expenses, net in the accompanying Consolidated Statement of Comprehensive Income (Loss).

At each airport where the Company conducts flight operations, the Company has lease agreements, generally with a governmental unit or authority, for the use of airport terminals, airfields, office space, cargo warehouses, gates, and/or maintenance facilities. These leases are classified as operating lease agreements and have lease terms remaining ranging from one month to 40 years. Certain leases can be renewed from 6 months to ten years. The majority of the airport terminal leases contain certain provisions for periodic adjustments to rates that depend upon airport operating costs or use of the facilities, and are reset at least annually. Due to the nature and variability of the rates, the majority of these leases are not recorded on the Consolidated Balance Sheet.

The Company also leases certain technology assets, fuel storage tanks, and various other equipment that qualify as leases under the applicable accounting guidance. The remaining lease terms range from three months to six years. Certain leases can be renewed from six months to five years.

Lease-related assets and liabilities recorded on the Consolidated Balance Sheet were as follows:

| (in millions) | Balance Sheet location | December 31, 2020 | December 31, 2019 |
|---|---|---|---|
| **Assets** | | | |
| Operating | Operating lease right-of-use assets (net) | $ 1,892 | $ 1,349 |
| Finance | Property and equipment (net of allowance for depreciation and amortization of $567 and $455) | 667 | 779 |
| Total lease assets | | $ 2,559 | $ 2,128 |
| | | | |
| **Liabilities** | | | |
| Current | | | |
| Operating | Current operating lease liabilities | $ 306 | $ 353 |
| Finance | Current maturities of long-term debt | 83 | 85 |
| Noncurrent | | | |
| Operating | Noncurrent operating lease liabilities | 1,562 | 978 |
| Finance | Long-term debt less current maturities | 459 | 542 |
| Total lease liabilities | | $ 2,410 | $ 1,958 |

The components of lease costs, included in the Consolidated Statement of Comprehensive Income (Loss), were as follows:

| (in millions) | Statement of Comprehensive Income (Loss) location | Year ended December 31, 2020 | Year ended December 31, 2019 |
|---|---|---|---|
| Operating lease cost - aircraft (a) | Other operating expenses | $ 216 | $ 182 |
| Operating lease cost - other | Landing fees and airport rentals, and Other operating expenses | 89 | 89 |
| Short-term lease cost | Other operating expenses | 1 | 4 |
| Variable lease cost | Landing fees and airport rentals, and Other operating expenses | 1,260 | 1,377 |
| Finance lease cost: | | | |
| Amortization of lease liabilities | Depreciation and amortization | 113 | 116 |
| Interest on lease liabilities | Interest expense | 22 | 26 |
| Total net finance lease cost | | $ 135 | $ 142 |

(a) Net of sublease income of $78 million and $97 million for the years ended December 31, 2020 and 2019.

Supplemental cash flow information related to leases, included in the Consolidated Statement of Cash Flows, was as follows:

| (in millions) | Year ended December 31, 2020 | Year ended December 31, 2019 |
|---|---|---|
| Cash paid for amounts included in the measurement of lease liabilities: | | |
| Operating cash flows for operating leases | $ 398 | $ 379 |
| Operating cash flows for finance leases | 22 | 26 |
| Financing cash flows for finance leases | 85 | 85 |
| Right-of-use assets obtained in exchange for lease obligations: | | |
| Operating leases | 915 | 230 |
| Finance leases | — | 1 |

112

As of December 31, 2020, maturities of lease liabilities were as follows:

| (in millions) | Operating leases | | Finance leases | |
|---|---|---|---|---|
| 2021 | $ | 371 | $ | 102 |
| 2022 | | 253 | | 98 |
| 2023 | | 219 | | 94 |
| 2024 | | 193 | | 90 |
| 2025 | | 156 | | 74 |
| Thereafter | | 1,156 | | 156 |
| Total lease payments | $ | 2,348 | $ | 614 |
| Less imputed interest | | (480) | | (72) |
| Total lease obligations | | 1,868 | | 542 |
| Less current obligations | | (306) | | (83) |
| Long-term lease obligations | $ | 1,562 | $ | 459 |

The table below presents additional information related to the Company's leases:

| Weighted average remaining lease term | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Operating leases | 10 years | 9 years |
| Finance leases | 7 years | 8 years |
| | | |
| **Weighted average discount rate** | | |
| Operating leases (a) | 3.8 % | 3.7 % |
| Finance leases | 3.8 % | 3.8 % |

(a) Upon adoption of the New Lease Standard, the incremental borrowing rate used for existing leases was established as of January 1, 2019.

As of December 31, 2020, the Company had additional operating lease commitments that had not yet commenced of approximately $291 million for nine Boeing 737 MAX 8 aircraft contractually to be delivered in 2021, each with lease terms of nine years.

## 9. COMMON STOCK

The Company has one class of capital stock, its common stock. On May 1, 2020, the Company completed the public offering of 80.5 million shares of $1.00 par value common stock of the Company, which included the full exercise of the underwriters' option to purchase an additional 10.5 million shares of common stock, at a public offering price of $28.50 per share. As discussed further in Note 2, in connection with funding that the Company has received under the CARES Act, the Company issued Warrants to acquire up to 2.7 million shares of the Company's common stock to the Treasury.

Holders of shares of common stock are entitled to receive dividends when and if declared by the Board of Directors and are entitled to one vote per share on all matters submitted to a vote of the Shareholders. Pursuant to the Payroll Support Program under the CARES Act, as supplemented by the Payroll Support Program Extension, the Company is prohibited from paying dividends with respect to its common stock through March 31, 2022. See Note 2 for further information on the CARES Act. At December 31, 2020, the Company had 60 million shares of common stock reserved for issuance pursuant to Employee equity plans (of which 25 million shares had not been granted) through various share-based compensation arrangements. See Note 10 to the Consolidated Financial Statements for information regarding the Company's equity plans.

## 10. STOCK PLANS

### *Share-based Compensation*

The Company accounts for share-based compensation utilizing fair value, which is determined on the date of grant for all instruments. The Consolidated Statement of Income (Loss) for the years ended December 31, 2020, 2019, and 2018, reflects share-based compensation expense of $17 million, $55 million, and $46 million, respectively. The total tax impact recognized in earnings from share-based compensation arrangements for the years ended December 31, 2020, 2019, and 2018, was not material. As of December 31, 2020, there was $29 million of total unrecognized compensation cost related to share-based compensation arrangements, which is expected to be recognized over a weighted-average period of 1.8 years. The Company expects substantially all unvested shares associated with time-based restricted stock unit awards to vest.

### *Restricted Stock Units and Stock Grants*

Under the Company's Amended and Restated 2007 Equity Incentive Plan ("2007 Equity Plan"), which has been approved by Shareholders, the Company granted restricted stock units ("RSUs") and performance-based restricted stock units ("PBRSUs") to certain Employees during 2020, 2019, and 2018. Outstanding RSUs vest over three years, subject generally to the individual's continued employment or service. PBRSUs granted are subject to the Company's performance with respect to a three-year simple average of Return on Invested Capital, after taxes and excluding special items, for the defined performance period and are also subject generally to the individual's continued employment or service. The number of PBRSUs vesting on the vesting date will be interpolated based on the Company's Return on Invested Capital performance and ranges from zero PBRSUs to 200 percent of granted PBRSUs. Forfeiture rates are estimated at the time of grant based on historical actuals for similar grants, and are trued-up to actuals over the vesting period. The Company recognizes all expense on a straight-line basis over the vesting period, with any changes in expense due to the number of PBRSUs expected to vest being modified on a prospective basis.

Aggregated information regarding the Company's RSUs and PBRSUs is summarized below:

| | All Restricted Stock Units | | |
| --- | --- | --- | --- |
| | Units (000) | | Wtd. Average Fair Value (per share) |
| Outstanding December 31, 2017 | 1,294 | $ | 45.32 |
| Granted | 782 | (a) | 60.80 |
| Vested | (670) | | 45.11 |
| Surrendered | (64) | | 47.05 |
| Outstanding December 31, 2018 | 1,342 | | 52.56 |
| Granted | 994 | (b) | 57.49 |
| Vested | (744) | | 42.42 |
| Surrendered | (47) | | 57.72 |
| Outstanding December 31, 2019, Unvested | 1,545 | | 57.65 |
| Granted | 1,235 | (c) | 56.89 |
| Vested | (715) | | 54.70 |
| Surrendered | (103) | | 58.04 |
| Outstanding December 31, 2020, Unvested | 1,962 | | 57.81 |

(a) Includes 308 thousand PBRSUs
(b) Includes 387 thousand PBRSUs
(c) Includes 519 thousand PBRSUs

114

In addition, the Company granted approximately 54 thousand shares of unrestricted stock at a weighted average grant price of $29.60 in 2020, approximately 31 thousand shares at a weighted average grant price of $52.01 in 2019, and approximately 28 thousand shares at a weighted average grant price of $53.01 in 2018, to members of its Board of Directors.

A remaining balance of up to 19 million shares of the Company's common stock may be issued pursuant to grants under the 2007 Equity Plan.

### Employee Stock Purchase Plan

Under the Amended and Restated 1991 Employee Stock Purchase Plan ("ESPP"), which has been approved by Shareholders, the Company is authorized to issue up to a remaining balance of 6 million shares of the Company's common stock to Employees of the Company. These shares may be issued at a price equal to 90 percent of the market value at the end of each monthly purchase period. Common stock purchases are paid for through periodic payroll deductions.

The following table provides information about the Company's ESPP activity during 2020, 2019, and 2018:

**Employee Stock Purchase Plan**

| Year ended | Total number of shares purchased (in thousands) | | Average price paid per share | | (a) Weighted-average fair value of each purchase right under the ESPP |
|---|---|---|---|---|---|
| December 31, 2018 | 661 | $ | 50.73 | $ | 5.64 |
| December 31, 2019 | 821 | $ | 47.60 | $ | 5.29 |
| December 31, 2020 | 1,386 | $ | 34.39 | $ | 3.82 |

(a) The weighted-average fair value of each purchase right under the ESPP granted is equal to a ten percent discount from the market value of the Common Stock at the end of each monthly purchase period.

### Taxes

Grants of RSUs result in the creation of a deferred tax asset, which is a temporary difference, until the time the RSU vests. All excess tax benefits and tax deficiencies are recorded through the income statement. Due to the treatment of RSUs for tax purposes, the Company's effective tax rate from year to year is subject to variability.

## 11. FINANCIAL DERIVATIVE INSTRUMENTS

### Fuel Contracts

Airline operators are inherently dependent upon energy to operate and, therefore, are impacted by changes in jet fuel prices. Furthermore, jet fuel and oil typically represents one of the largest operating expenses for airlines. The Company endeavors to acquire jet fuel at the lowest possible cost and to reduce volatility in operating expenses through its fuel hedging program. Although the Company may periodically enter into jet fuel derivatives for short-term timeframes, because jet fuel is not widely traded on an organized futures exchange, there are limited opportunities to hedge directly in jet fuel for time horizons longer than approximately 24 months into the future. However, the Company has found that financial derivative instruments in other commodities, such as West Texas Intermediate ("WTI") crude oil, Brent crude oil, and refined products, such as heating oil and unleaded gasoline, can be useful in decreasing its exposure to jet fuel price volatility. The Company does not purchase or hold any financial derivative instruments for trading or speculative purposes.

The Company has used financial derivative instruments for both short-term and long-term timeframes, and primarily uses a mixture of purchased call options, collar structures (which include both a purchased call option and

115

a sold put option), call spreads (which include a purchased call option and a sold call option), put spreads (which include a purchased put option and a sold put option), and fixed price swap agreements in its portfolio. Although the use of collar structures and swap agreements can reduce the overall cost of hedging, these instruments carry more risk than purchased call options in that the Company could end up in a liability position when the collar structure or swap agreement settles. With the use of purchased call options and call spreads, the Company cannot be in a liability position at settlement, but does not have coverage once market prices fall below the strike price of the purchased call option.

For the purpose of evaluating its net cash spend for jet fuel and for forecasting its future estimated jet fuel expense, the Company evaluates its hedge volumes strictly from an "economic" standpoint and thus does not consider whether the hedges have qualified or will qualify for hedge accounting. The Company defines its "economic" hedge as the net volume of fuel derivative contracts held, including the impact of positions that have been offset through sold positions, regardless of whether those contracts qualify for hedge accounting. The level at which the Company is economically hedged for a particular period is also dependent on current market prices for that period, as well as the types of derivative instruments held and the strike prices of those instruments. For example, the Company may enter into "out-of-the-money" option contracts (including catastrophic protection), which may not generate intrinsic gains at settlement if market prices do not rise above the option strike price. Therefore, even though the Company may have an economic hedge in place for a particular period, that hedge may not produce any hedging gains at settlement and may even produce hedging losses depending on market prices, the types of instruments held, and the strike prices of those instruments.

For 2020, the Company had fuel derivative instruments in place for up to 77 percent of its fuel consumption. As of December 31, 2020, the Company also had fuel derivative instruments in place to provide coverage at varying price levels. The following table provides information about the Company's volume of fuel hedging on an economic basis:

| Period (by year) | Maximum fuel hedged as of December 31, 2020 (gallons in millions) (a) | Derivative underlying commodity type as of December 31, 2020 |
|---|---|---|
| 2021 | 1,283 | WTI crude oil and Brent crude oil |
| 2022 | 1,220 | WTI crude oil and Brent crude oil |
| 2023 | 643 | WTI crude oil and Brent crude oil |
| Beyond 2023 | 101 | WTI crude oil |

(a) Due to the types of derivatives utilized by the Company and different price levels of those contracts, these volumes represent the maximum economic hedge in place and may vary significantly as market prices and the Company's flight schedule fluctuate.

Upon proper qualification, the Company accounts for its fuel derivative instruments as cash flow hedges. All periodic changes in fair value of the derivatives designated as hedges are recorded in AOCI until the underlying jet fuel is consumed. See Note 13.

The Company's results are subject to the possibility that the derivatives will no longer qualify for hedge accounting, in which case any change in the fair value of derivative instruments since the last reporting period would be recorded in Other (gains) losses, net, in the Consolidated Statement of Income (Loss) in the period of the change; however, any amounts previously recorded to AOCI would remain there until such time as the original forecasted transaction occurs, at which time these amounts would be reclassified to Fuel and oil expense. Factors that have and may continue to lead to the loss of hedge accounting include: significant fluctuation in energy prices, significant weather events affecting refinery capacity and the production of refined products, and the volatility of the different types of products the Company uses in hedging. Increased volatility in these commodity markets for an extended period of time, especially if such volatility were to worsen, could cause the Company to lose hedge accounting altogether for the commodities used in its fuel hedging program, which would create further volatility in the Company's GAAP financial results. However, even though derivatives may not qualify for hedge accounting, the Company continues to hold the instruments as management believes derivative instruments continue to afford the

116

Company the opportunity to stabilize jet fuel costs. When the Company has sold derivative positions in order to effectively "close" or offset a derivative already held as part of its fuel derivative instrument portfolio, any subsequent changes in fair value of those positions are marked to market through earnings. Likewise, any changes in fair value of those positions that were offset by entering into the sold positions and were de-designated as hedges are concurrently marked to market through earnings. However, any changes in value related to hedges that were deferred as part of AOCI while designated as a hedge would remain until the originally forecasted transaction occurs. In a situation where it becomes probable that a fuel hedged forecasted transaction will not occur, any gains and/or losses that have been recorded to AOCI would be required to be immediately reclassified into earnings.

During 2020, as a result of the drastic drop in demand for air travel due to the COVID-19 pandemic, the Company's forecast for 2020 and 2021 fuel purchases and consumption was significantly reduced, causing the Company to be in an estimated "over-hedged" position for second, third, and fourth quarter 2020, and full year 2021. Therefore, the Company de-designated a portion of its fuel hedges related to these periods, and has reclassified approximately $39 million in losses from AOCI into Other (gains) losses, net, during 2020. The Company did not have any such situations occur during 2019 or 2018.

Accounting pronouncements pertaining to derivative instruments and hedging are complex with stringent requirements, including the documentation of a Company hedging strategy, statistical analysis to qualify a commodity for hedge accounting both on a historical and a prospective basis, and strict contemporaneous documentation that is required at the time each hedge is designated by the Company. This statistical analysis involves utilizing regression analyses that compare changes in the price of jet fuel to changes in the prices of the commodities used for hedging purposes.

All cash flows associated with purchasing and selling fuel derivatives are classified as Other operating cash flows in the Consolidated Statement of Cash Flows. The following table presents the location of all assets and liabilities associated with the Company's derivative instruments within the Consolidated Balance Sheet:

| (in millions) | Balance Sheet location | Asset derivatives | | Liability derivatives | |
|---|---|---|---|---|---|
| | | Fair value at 12/31/2020 | Fair value at 12/31/2019 | Fair value at 12/31/2020 | Fair value at 12/31/2019 |
| **Derivatives designated as hedges (a)** | | | | | |
| Fuel derivative contracts (gross) | Prepaid expenses and other current assets | $          9 | $          48 | $          — | $          — |
| Fuel derivative contracts (gross) | Other assets | 121 | 62 | — | — |
| Interest rate derivative contracts | Other assets | — | 2 | — | — |
| Interest rate derivative contracts | Accrued liabilities | — | — | — | 5 |
| Interest rate derivative contracts | Other noncurrent liabilities | — | — | 6 | 1 |
| **Total derivatives designated as hedges** | | $          130 | $          112 | $          6 | $          6 |
| **Derivatives not designated as hedges (a)** | | | | | |
| Fuel derivative contracts (gross) | Prepaid expenses and other current assets | $          4 | $          — | $          — | $          — |
| **Total derivatives** | | $          134 | $          112 | $          6 | $          6 |

(a) Represents the position of each trade before consideration of offsetting positions with each counterparty and does not include the impact of cash collateral deposits provided to or received from counterparties. See discussion of credit risk and collateral following in this Note.

117

In addition, the Company had the following amounts associated with fuel derivative instruments and hedging activities in its Consolidated Balance Sheet:

| (in millions) | Balance Sheet location | December 31, 2020 | December 31, 2019 |
|---|---|---|---|
| Cash collateral deposits held from counterparties for fuel contracts - current | Offset against Prepaid expenses and other current assets | $ 3 | $ 10 |
| Cash collateral deposits held from counterparties for fuel contracts - noncurrent | Offset against Other assets | 31 | 15 |

All of the Company's fuel derivative instruments and interest rate swaps are subject to agreements that follow the netting guidance in the applicable accounting standards for derivatives and hedging. The types of derivative instruments the Company has determined are subject to netting requirements in the accompanying Consolidated Balance Sheet are those in which the Company pays or receives cash for transactions with the same counterparty and in the same currency via one net payment or receipt. For cash collateral held by the Company or provided to counterparties, the Company nets such amounts against the fair value of the Company's derivative portfolio by each counterparty. The Company has elected to utilize netting for both its fuel derivative instruments and interest rate swap agreements and also classifies such amounts as either current or noncurrent, based on the net fair value position with each of the Company's counterparties in the Consolidated Balance Sheet. If its fuel derivative instruments are in a net asset position with a counterparty, cash collateral amounts held are first netted against current outstanding derivative asset amounts associated with that counterparty until that balance is zero, and then any remainder is applied against the fair value of noncurrent outstanding derivative instruments. No cash collateral deposits were provided by or held by the Company based on its outstanding interest rate swap agreements.

The Company has the following recognized financial assets and financial liabilities resulting from those transactions that meet the scope of the disclosure requirements as necessitated by applicable accounting guidance for balance sheet offsetting:

**Offsetting of derivative assets**
(in millions)

| | | (i) | (ii) | (iii) = (i) + (ii) | (i) | (ii) | (iii) = (i) + (ii) |
|---|---|---|---|---|---|---|---|
| | | December 31, 2020 | | | December 31, 2019 | | |
| Description | Balance Sheet location | Gross amounts of recognized assets | Gross amounts offset in the Balance Sheet | Net amounts of assets presented in the Balance Sheet | Gross amounts of recognized assets | Gross amounts offset in the Balance Sheet | Net amounts of assets presented in the Balance Sheet |
| Fuel derivative contracts | Prepaid expenses and other current assets | $ 13 | $ (3) | $ 10 | $ 48 | $ (10) | $ 38 |
| Fuel derivative contracts | Other assets | $ 121 | $ (31) | $ 90 (a) | $ 62 | $ (15) | $ 47 (a) |
| Interest rate derivative contracts | Other assets | $ — | $ — | $ — (a) | $ 2 | $ — | $ 2 (a) |

(a) The net amounts of derivative assets and liabilities are reconciled to the individual line item amounts presented in the Consolidated Balance Sheet in Note 16.

118

**Offsetting of derivative liabilities**
(in millions)

| | | (i) | (ii) | (iii) = (i) + (ii) | (i) | (ii) | (iii) = (i) + (ii) |
| | | | December 31, 2020 | | | December 31, 2019 | |
| Description | Balance Sheet location | Gross amounts of recognized liabilities | Gross amounts offset in the Balance Sheet | Net amounts of liabilities presented in the Balance Sheet | Gross amounts of recognized liabilities | Gross amounts offset in the Balance Sheet | Net amounts of liabilities presented in the Balance Sheet |
|---|---|---|---|---|---|---|---|
| Fuel derivative contracts | Prepaid expenses and other current assets | $ 3 | $ (3) | $ — | $ 10 | $ (10) | $ — |
| Fuel derivative contracts | Other assets | $ 31 | $ (31) | $ — (a) | $ 15 | $ (15) | $ — (a) |
| Interest rate derivative contracts | Accrued liabilities | $ — | $ — | $ — | $ 5 | $ — | $ 5 |
| Interest rate derivative contracts | Other noncurrent liabilities | $ 6 | $ — | $ 6 | $ 1 | $ — | $ 1 |

(a) The net amounts of derivative assets and liabilities are reconciled to the individual line item amounts presented in the Consolidated Balance Sheet in Note 16.

119

The following tables present the impact of derivative instruments and their location within the Consolidated Statement of Income (Loss) for the year ended December 31, 2020 and 2019:

**Location and amount recognized in income on cash flow and fair value hedging relationships**

| (in millions) | Year ended December 31, 2020 | | | Year ended December 31, 2019 | |
| --- | --- | --- | --- | --- | --- |
| | Fuel and oil | Other (gains)/losses, net | Interest expense | Fuel and oil | Interest expense |
| Total | $ 70 | $ 39 | $ 6 | $ 48 | $ 29 |
| | | | | | |
| Loss on cash flow hedging relationships | | | | | |
| Commodity contracts: | | | | | |
| Amount of loss reclassified from AOCI into income | 70 | 39 | — | 48 | — |
| Interest contracts: | | | | | |
| Amount of loss reclassified from AOCI into income | — | — | 1 | — | 5 |
| | | | | | |
| Impact of fair value hedging relationships: | | | | | |
| Interest contracts: | | | | | |
| Hedged items | — | — | 11 | — | 22 |
| Derivatives designated as hedging instruments | — | — | (6) | — | 2 |

**Derivatives designated and qualified in cash flow hedging relationships**

| (in millions) | Loss recognized in AOCI on derivatives, net of tax | |
| --- | --- | --- |
| | Year ended December 31, | |
| | 2020 | 2019 |
| Fuel derivative contracts | $ 80 | $ 90 |
| Interest rate derivatives | 26 | 29 |
| Total | $ 106 | $ 119 |

**Derivatives not designated as hedges**

| (in millions) | Loss recognized in income on derivatives | | Location of loss recognized in income on derivatives |
| --- | --- | --- | --- |
| | Year ended December 31, | | |
| | 2020 | 2019 | |
| Fuel derivative contracts | $ 1 | $ — | Other (gains) losses, net |
| Interest rate derivatives | 28 | — | Other (gains) losses, net |
| Total | $ 29 | $ — | |

The Company also recorded expense associated with premiums paid for fuel derivative contracts that settled/expired during 2020, 2019, and 2018. Gains and/or losses associated with fuel derivatives that qualify for hedge accounting are ultimately recorded to Fuel and oil expense. Gains and/or losses associated with fuel derivatives that do not qualify for hedge accounting are recorded to Other (gains) and losses, net. The following table presents the impact of premiums paid for fuel derivative contracts and their location within the Consolidated Statement of Income (Loss) during the period the contract settles:

| | Premium expense recognized in income on derivatives | | | | | | |
| | Year ended December 31, | | | | | | Location of premium expense recognized in income on derivatives |
| (in millions) | 2020 | | 2019 | | 2018 | | |
| Fuel derivative contracts designated as hedges | $ | 64 | $ | 95 | $ | 135 | Fuel and oil |
| Fuel derivative contracts not designated as hedges | $ | 34 | $ | — | $ | — | Other (gains) losses, net |

The fair values of the derivative instruments, depending on the type of instrument, were determined by the use of present value methods or option value models with assumptions about commodity prices based on those observed in underlying markets or provided by third parties. Included in the Company's cumulative net unrealized losses from fuel hedges as of December 31, 2020, recorded in AOCI, were approximately $54 million in unrealized losses, net of taxes, which are expected to be realized in earnings during the twelve months subsequent to December 31, 2020.

*Interest Rate Swaps*

The Company is party to certain interest rate swap agreements that are accounted for as cash flow hedges, and has in the past held interest rate swap agreements that have qualified as fair value hedges, as defined in the applicable accounting guidance for derivative instruments and hedging. Several of the Company's interest rate swap agreements have historically qualified for the "shortcut" method of accounting for hedges, which dictated that the hedges were assumed to be perfectly effective, and, thus, there was no ineffectiveness to be recorded in earnings. For the Company's interest rate swap agreements that do not qualify for the "shortcut" or "critical terms match" methods of accounting, ineffectiveness is assessed at each reporting period. If hedge accounting is achieved, all periodic changes in fair value of the interest rate swaps are recorded in AOCI. The ineffectiveness associated with all of the Company's interest rate swap agreements for all periods presented was not material.

During first quarter 2019, the Company entered into 12 separate forward-starting interest rate swap agreements related to a series of 12 Boeing 737 MAX 8 aircraft leases with deliveries originally scheduled between July 2019 and February 2020. These lease contracts exposed the Company to interest rate risk as the rental payments were subject to adjustment and would become fixed based on the 9-year swap rate at the time of delivery. The primary objective of these interest rate derivatives, which qualified as cash flow hedges, was to hedge the forecasted monthly rental payments. These swap agreements provided for a single payment at maturity based upon the change in the 9-year swap rate between the execution date and the termination date. All 12 swap agreements were terminated during third quarter 2019, resulting in $32 million being "frozen" in AOCI. Three of these leased aircraft were received in December 2020 and the remainder are expected to be received during 2021. The earnings impact of the interest rate swaps associated with the aircraft received in 2020 was not material.

During third quarter 2019, the Company entered into 12 separate forward-starting interest rate swap agreements, related to a series of 12 Boeing 737 MAX 8 aircraft leases. The third quarter 2019 swaps contain similar terms as the third quarter 2019 terminated swaps discussed above, except that the related 737 MAX 8 deliveries were scheduled to occur between June 2020 and September 2020. During the year ended December 31, 2020, all 12 of the aircraft leases became no longer probable to be received within the scheduled delivery range. Therefore, the 12 associated swap agreements were de-designated and $31 million was "frozen" in AOCI. Three of these aircraft leases were received in December 2020 and the remainder are expected to be received during 2021. The earnings impact of the interest rate swaps associated with the aircraft received in 2020 was not material. The mark-to-market changes for these swap agreements were recorded in earnings, resulting in a $28 million unrealized loss to Other (gains) and losses, net, in the Consolidated Statement of Comprehensive Income (Loss) for the year ended December 31, 2020. In addition, the 12 swap agreements were terminated resulting in $59 million paid to the counterparty during 2020.

121

The fair values of the interest rate swap agreements, which are adjusted regularly, have been aggregated by counterparty for classification in the Consolidated Balance Sheet. Agreements totaling a liability of $6 million are cash flow hedges and are classified as components of Other noncurrent liabilities. The corresponding offsetting adjustment related to the liability associated with the Company's cash flow hedges is to AOCI. See Note 13.

*Credit Risk and Collateral*

Credit exposure related to fuel derivative instruments is represented by the fair value of contracts that are an asset to the Company at the reporting date. At such times, these outstanding instruments expose the Company to credit loss in the event of nonperformance by the counterparties to the agreements. However, the Company has not experienced any significant credit loss as a result of counterparty nonperformance in the past. To manage credit risk, the Company selects and periodically reviews counterparties based on credit ratings, limits its exposure with respect to each counterparty, and monitors the market position of the fuel hedging program and its relative market position with each counterparty. At December 31, 2020, the Company had agreements with all of its active counterparties containing early termination rights and/or bilateral collateral provisions whereby security is required if market risk exposure exceeds a specified threshold amount based on the counterparty's credit rating. The Company also had agreements with counterparties in which cash deposits and letters of credit were required to be posted as collateral whenever the net fair value of derivatives associated with those counterparties exceeds specific thresholds. In certain cases, the Company has the ability to substitute among these different forms of collateral in its discretion. The following table provides the fair values of fuel derivatives, amounts posted as collateral, and applicable collateral posting threshold amounts as of December 31, 2020, at which such postings are triggered:

| (in millions) | A | B | C | D | E | F | Other (a) | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | **Counterparty (CP)** | | | | |
| Fair value of fuel derivatives | $ 33 | $ 15 | $ 33 | $ 14 | $ 17 | $ 11 | $ 11 | $ 134 |
| Cash collateral held from CP | 34 | — | — | — | — | — | — | 34 |
| Letters of credit (LC) | — | — | — | — | — | — | — | — |
| Option to substitute LC for cash | N/A | N/A | (75) to (150) or >(550)(b) | (125) to (150) or > (550)(c) | (c) | N/A | | |
| **If credit rating is investment grade, fair value of fuel derivative level at which:** | | | | | | | | |
| Cash is provided to CP | >(100) | >(50) | (75) to (150) or >(550)(d) | (125) to (150) or > (550)(d) | >(40) | >(65)(d) | | |
| Cash is received from CP | >0(d) | >150(d) | >250(d) | >(125)(d) | >100(d) | >70(d) | | |
| Cash can be pledged to CP as collateral | (200) to (600)(e) | N/A | (150) to (550) (b) | (150) to (550)(b) | N/A | N/A | | |
| **If credit rating is non-investment grade, fair value of fuel derivative level at which:** | | | | | | | | |
| Cash is provided to CP | (0) to (200) or >(600) | (f) | (0) to (150) or >(550) | (0) to (150) or >(550) | (f) | (f) | | |
| Cash is received from CP | (f) | (f) | (f) | (f) | (f) | (f) | | |
| Cash can be pledged to CP as collateral | (200) to (600) | N/A | (150) to (550) | (150) to (550) | N/A | N/A | | |

(a) Individual counterparties with fair value of fuel derivatives <$10 million.

(b) The Company has the option of providing cash or letters of credit as collateral.

(c) The Company has the option to substitute letters of credit for 100 percent of cash collateral requirement.

(d) Thresholds may vary based on changes in credit ratings within investment grade.

(e) The Company has the option of providing cash as collateral.

(f) Cash collateral is provided at 100 percent of fair value of fuel derivative contracts.

## 12. FAIR VALUE MEASUREMENTS

Accounting standards pertaining to fair value measurements establish a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value. These tiers include: Level 1, defined as observable inputs such as quoted prices in active markets; Level 2, defined as inputs other than quoted prices in active markets that are either directly or indirectly observable; and Level 3, defined as unobservable inputs in which little or no market data exists, therefore requiring an entity to develop its own assumptions.

As of December 31, 2020, the Company held certain items that are required to be measured at fair value on a recurring basis. These included cash equivalents, short-term investments (primarily treasury bills and certificates of deposit), interest rate derivative contracts, fuel derivative contracts, and available-for-sale securities. The majority of the Company's short-term investments consist of instruments classified as Level 1. However, the Company has certificates of deposit, commercial paper, and time deposits that are classified as Level 2, due to the fact that the fair value for these instruments is determined utilizing observable inputs in non-active markets. Other available-for-sale securities primarily consist of investments associated with the Company's excess benefit plan.

The Company's fuel and interest rate derivative instruments consist of over-the-counter contracts, which are not traded on a public exchange. Fuel derivative instruments currently consist solely of option contracts, whereas interest rate derivatives consist solely of swap agreements. See Note 11 for further information on the Company's derivative instruments and hedging activities. The fair values of swap contracts are determined based on inputs that are readily available in public markets or can be derived from information available in publicly quoted markets. Therefore, the Company has categorized these swap contracts as Level 2. The Company's Treasury Department, which reports to the Chief Financial Officer, determines the value of option contracts utilizing an option pricing model based on inputs that are either readily available in public markets, can be derived from information available in publicly quoted markets, or are provided by financial institutions that trade these contracts. The option pricing model used by the Company is an industry standard model for valuing options and is the same model used by the broker/dealer community (i.e., the Company's counterparties). The inputs to this option pricing model are the option strike price, underlying price, risk free rate of interest, time to expiration, and volatility. Because certain inputs used to determine the fair value of option contracts are unobservable (principally implied volatility), the Company has categorized these option contracts as Level 3. Volatility information is obtained from external sources, but is analyzed by the Company for reasonableness and compared to similar information received from other external sources. The fair value of option contracts considers both the intrinsic value and any remaining time value associated with those derivatives that have not yet settled. The Company also considers counterparty credit risk and its own credit risk in its determination of all estimated fair values. To validate the reasonableness of the Company's option pricing model, on a monthly basis, the Company compares its option valuations to third party valuations. If any significant differences were to be noted, they would be researched in order to determine the reason. However, historically, no significant differences have been noted. The Company has consistently applied these valuation techniques in all periods presented and believes it has obtained the most accurate information available for the types of derivative contracts it holds.

Included in Other available-for-sale securities are the Company's investments associated with its deferred compensation plans, which consist of mutual funds that are publicly traded and for which market prices are readily available. These plans are non-qualified deferred compensation plans designed to hold contributions in excess of limits established by the Internal Revenue Code of 1986, as amended. The distribution timing and payment amounts under these plans are made based on the participant's distribution election and plan balance. Assets related to the funded portions of the deferred compensation plans are held in a rabbi trust, and the Company remains liable to these participants for the unfunded portion of the plans. The Company records changes in the fair value of the assets in the Company's earnings.

The following tables present the Company's assets and liabilities that are measured at fair value on a recurring basis at December 31, 2020, and December 31, 2019:

| Description | December 31, 2020 | | Fair value measurements at reporting date using: | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Quoted prices in active markets for identical assets (Level 1) | | Significant other observable inputs (Level 2) | | Significant unobservable inputs (Level 3) | |
| Assets | | | (in millions) | | | | | |
| Cash equivalents: | | | | | | | | |
| Cash equivalents (a) | $ | 10,663 | $ | 10,663 | $ | — | $ | — |
| Commercial paper | | 90 | | — | | 90 | | — |
| Certificates of deposit | | 10 | | — | | 10 | | — |
| Time deposits | | 300 | | — | | 300 | | — |
| Short-term investments: | | | | | | | | |
| Treasury bills | | 1,800 | | 1,800 | | — | | — |
| Certificates of deposit | | 46 | | — | | 46 | | — |
| Time deposits | | 425 | | — | | 425 | | — |
| Fuel derivatives: | | | | | | | | |
| Option contracts (b) | | 134 | | — | | — | | 134 |
| Other available-for-sale securities | | 259 | | 259 | | — | | — |
| Total assets | $ | 13,727 | $ | 12,722 | $ | 871 | $ | 134 |
| Liabilities | | | | | | | | |
| Interest rate derivatives (see Note 11) | $ | (6) | $ | — | $ | (6) | $ | — |

(a) Cash equivalents are primarily composed of money market investments.

(b) In the Consolidated Balance Sheet amounts are presented as an asset. See Note 11.

| | | | Fair value measurements at reporting date using: | | |
|---|---|---|---|---|---|
| Description | December 31, 2019 | | Quoted prices in active markets for identical assets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) |
| **Assets** | | | (in millions) | | |
| Cash equivalents: | | | | | |
| Cash equivalents (a) | $ | 1,999 | $ 1,999 | $ — | $ — |
| Commercial paper | | 535 | — | 535 | — |
| Certificates of deposit | | 14 | — | 14 | — |
| Short-term investments: | | | | | |
| Treasury bills | | 1,196 | 1,196 | — | — |
| Certificates of deposit | | 268 | — | 268 | — |
| Time deposits | | 60 | — | 60 | — |
| Interest rate derivatives (see Note 11) | | 2 | — | 2 | — |
| Fuel derivatives: | | | | | |
| Option contracts (b) | | 110 | — | — | 110 |
| Other available-for-sale securities | | 197 | 197 | — | — |
| **Total assets** | $ | 4,381 | $ 3,392 | $ 879 | $ 110 |
| **Liabilities** | | | | | |
| Interest rate derivatives (see Note 11) | $ | (6) | $ — | $ (6) | $ — |

(a) Cash equivalents are primarily composed of money market investments.

(b) In the Consolidated Balance Sheet amounts are presented as an asset. See Note 11.

The Company did not have any material assets or liabilities measured at fair value on a nonrecurring basis as of December 31, 2020 or 2019. The following tables present the Company's activity for items measured at fair value on a recurring basis using significant unobservable inputs (Level 3) for 2020 and 2019:

| Fair value measurements using significant unobservable inputs (Level 3) | | |
|---|---|---|
| (in millions) | **Fuel derivatives** | |
| Balance at December 31, 2019 | $ | 110 |
| Total (realized or unrealized) losses for the period | | |
| Included in earnings | | (40) (a) |
| Included in other comprehensive loss | | (65) |
| Purchases | | 129 (b) |
| Balance at December 31, 2020 | $ | 134 |
| The amount of total losses for the period included in earnings attributable to the change in unrealized gains or losses relating to assets still held at December 31, 2020 | $ | (15) (a) |
| The amount of total losses for the period included in other comprehensive loss attributable to the change in unrealized gains or losses relating to assets still held at December 31, 2020 | $ | (41) |

(a) Included in Other (gains) losses, net, within the Consolidated Statement of Comprehensive Income (Loss).

(b) The purchase of fuel derivatives is recorded gross based on the structure of the derivative instrument and whether a contract with multiple derivatives was purchased as a single instrument or separate instruments.

**Fair value measurements using significant unobservable inputs (Level 3)**

| (in millions) | Fuel derivatives |
|---|---|
| Balance at December 31, 2018 | $ 138 |
| Total losses (realized or unrealized) included in other comprehensive income (loss) | (112) |
| Purchases | 133  (a) |
| Sales | (2) (a) |
| Settlements | (47) |
| Balance at December 31, 2019 | $ 110 |

(a) The purchase and sale of fuel derivatives are recorded gross based on the structure of the derivative instrument and whether a contract with multiple derivatives was purchased as a single instrument or separate instruments.

The significant unobservable input used in the fair value measurement of the Company's derivative option contracts is implied volatility. Holding other inputs constant, an increase (decrease) in implied volatility would have resulted in a higher (lower) fair value measurement, respectively, for the Company's derivative option contracts.

The following table presents a range and weighted average of the unobservable inputs utilized in the fair value measurements of the Company's fuel derivatives classified as Level 3 at December 31, 2020:

**Quantitative information about Level 3 fair value measurements**

| | Valuation technique | Unobservable input | Period (by year) | Range | Weighted Average (a) |
|---|---|---|---|---|---|
| Fuel derivatives | Option model | Implied volatility | 2021 | 29-43% | 33 % |
| | | | 2022 | 25-32% | 28 % |
| | | | 2023 | 23-26% | 25 % |
| | | | Beyond 2023 | 25-26% | 25 % |

(a) Implied volatility weighted by the notional amount (barrels of fuel) that will settle in respective period.

The carrying amounts and estimated fair values of the Company's short-term and long-term debt (including current maturities), as well as the applicable fair value hierarchy tier, at December 31, 2020, are presented in the table below. The fair values of the Company's publicly held long-term debt are determined based on inputs that are readily available in public markets or can be derived from information available in publicly quoted markets; therefore, the Company has categorized these agreements as Level 2. Debt under four of the Company's debt agreements is not publicly held. The Company has determined the estimated fair value of this debt to be Level 3, as certain inputs used to determine the fair value of these agreements are unobservable. The Company utilizes indicative pricing from counterparties and a discounted cash flow method to estimate the fair value of the Level 3 items.

| (in millions) | Carrying value | Estimated fair value | Fair value level hierarchy |
|---|---|---|---|
| 2.75% Notes due 2022 | $ 300 | $ 311 | Level 2 |
| Pass Through Certificates due 2022 - 6.24% | 137 | 140 | Level 2 |
| 4.75% Notes due 2023 | 1,250 | 1,362 | Level 2 |
| 1.25% Convertible Notes due 2025 | 1,945 | 3,359 | Level 2 |
| 5.25% Notes due 2025 | 1,550 | 1,799 | Level 2 |
| Term Loan Agreement payable through 2025 - 1.65% | 119 | 119 | Level 3 |
| 3.00% Notes due 2026 | 300 | 324 | Level 2 |
| Term Loan Agreement payable through 2026 - 1.34% | 159 | 155 | Level 3 |
| 3.45% Notes due 2027 | 300 | 329 | Level 2 |
| 5.125% Notes due 2027 | 2,000 | 2,383 | Level 2 |
| 7.375% Debentures due 2027 | 119 | 145 | Level 2 |
| Term Loan Agreement payable through 2028 - 1.65% | 184 | 183 | Level 3 |
| 2.625% Notes due 2030 | 500 | 515 | Level 2 |
| 1.000% Payroll Support Program Loan due 2030 | 976 | 953 | Level 3 |

127

## 13. ACCUMULATED OTHER COMPREHENSIVE INCOME (LOSS)

Comprehensive income (loss) includes changes in the fair value of certain financial derivative instruments that qualify for hedge accounting, unrealized gains and losses on certain investments, and actuarial gains/losses arising from the Company's postretirement benefit obligation. A rollforward of the amounts included in AOCI, net of taxes, is shown below for 2020 and 2019:

| (in millions) | Fuel derivatives | | Interest rate derivatives | | Defined benefit plan items | | Other | | Deferred tax impact | | Accumulated other comprehensive income (loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2018 | $ | (56) | $ | — | $ | 58 | $ | 25 | $ | (7) | $ | 20 |
| Changes in fair value | | (117) | | (38) | | (38) | | 34 | | 37 | | (122) |
| Reclassification to earnings | | 48 | | 5 | | — | | — | | (12) | | 41 |
| Balance at December 31, 2019 | $ | (125) | $ | (33) | $ | 20 | $ | 59 | $ | 18 | $ | (61) |
| Changes in fair value | | (103) | | (34) | | (63) | | 32 | | 39 | | (129) |
| Reclassification to earnings | | 109 | | 1 | | — | | — | | (25) | | 85 |
| Balance at December 31, 2020 | $ | (119) | $ | (66) | $ | (43) | $ | 91 | $ | 32 | $ | (105) |

The following table illustrates the significant amounts reclassified out of each component of AOCI for the year ended December 31, 2020:

| | Year ended December 31, 2020 | | |
|---|---|---|---|
| (in millions)  AOCI components | | Amounts reclassified from AOCI | Affected line item in the Consolidated Statement of Comprehensive Income (Loss) |
| Unrealized loss on fuel derivative instruments | $ | 70 | Fuel and oil expense |
| | | 39 | Other (gains) losses, net |
| | | 25 | Less: Tax expense |
| | $ | 84 | Net of tax |
| Unrealized loss on interest rate derivative instruments | $ | 1 | Interest expense |
| | | — | Less: Tax expense |
| | $ | 1 | Net of tax |
| Total reclassifications for the period | $ | 85 | Net of tax |

## 14. EMPLOYEE RETIREMENT PLANS

### *Defined Contribution Plans*

Southwest has defined contribution plans covering substantially all of its Employees. Contributions under all defined contribution plans are primarily based on Employee compensation and performance of the Company. The Company sponsors Employee savings plans under section 401(k) of the Internal Revenue Code of 1986, as amended. The Southwest Airlines Co. 401(k) Plan includes Company matching contributions and the Southwest Airlines Pilots Retirement Saving Plan has non-elective Company contributions. In addition, the Southwest Airlines Co. ProfitSharing Plan (ProfitSharing Plan) is a defined contribution plan to which the Company may contribute a percentage of its eligible pre-tax profits, as defined, on an annual basis. No Employee contributions to the ProfitSharing Plan are allowed.

Amounts associated with the Company's defined contribution plans expensed in 2020, 2019, and 2018, reflected as a component of Salaries, wages, and benefits, were $561 million, $1.2 billion, and $1.0 billion, respectively.

128

*Postretirement Benefit Plans*

The Company provides postretirement benefits to qualified retirees in the form of medical and dental coverage. Employees must meet minimum levels of service and age requirements as set forth by the Company, or as specified in collective-bargaining agreements with specific workgroups. Employees meeting these requirements, as defined, may use accrued unused sick time to pay for medical and dental premiums from the age of retirement until age 65.

The following table shows the change in the accumulated postretirement benefit obligation ("APBO") for the years ended December 31, 2020 and 2019:

| (in millions) | | 2020 | | 2019 |
|---|---|---|---|---|
| APBO at beginning of period | $ | 288 | $ | 232 |
| Service cost | | 22 | | 17 |
| Interest cost | | 10 | | 10 |
| Benefits paid | | (10) | | (9) |
| Actuarial loss | | 63 | | 38 |
| Curtailment | | 53 | | — |
| Special termination benefits | | 2 | | — |
| APBO at end of period | $ | 428 | $ | 288 |

During 2020, the Company recorded a $63 million actuarial loss as an increase to the APBO with an offset to AOCI. This actuarial loss is reflected above and resulted from changes in certain key assumptions used to determine the Company's year-end obligation. The assumption change that resulted in the largest portion of the actuarial loss was a reduction in the discount rate used, which caused the funded position to deteriorate. During 2020, the Company also recognized a Curtailment charge and Special termination benefit charge as a result of elections to participate in the plan by eligible Employees upon separating from the Company via Voluntary Separation Plan 2020. See Note 2 for further information.

All plans are unfunded, and benefits are paid as they become due. Estimated future benefit payments expected to be paid are $24 million in 2021, $25 million in 2022, $24 million in 2023, $24 million in 2024, $26 million in 2025, and $146 million for the next five years thereafter.

The following table reconciles the funded status of the plans to the accrued postretirement benefit cost recognized in Other non-current liabilities on the Company's Consolidated Balance Sheet at December 31, 2020 and 2019.

| (in millions) | | 2020 | | 2019 |
|---|---|---|---|---|
| Funded status | $ | (428) | $ | (288) |
| Unrecognized net actuarial (gain) loss | | 40 | | (24) |
| Unrecognized prior service cost | | 3 | | 4 |
| Accumulated other comprehensive income (loss) | | (43) | | 20 |
| Consolidated Balance Sheet liability | $ | (428) | $ | (288) |

129

The consolidated periodic postretirement benefit cost for the years ended December 31, 2020, 2019, and 2018, included the following:

| (in millions) | 2020 | | 2019 | | 2018 | |
|---|---|---|---|---|---|---|
| Service cost | $ | 22 | $ | 17 | $ | 18 |
| Interest cost | | 10 | | 10 | | 9 |
| Amortization of prior service cost | | 1 | | 1 | | 3 |
| Amortization of net gain | | — | | (2) | | — |
| Curtailment | | 53 | | — | | — |
| Special termination benefits | | 2 | | — | | — |
| Net periodic postretirement benefit cost | $ | 88 | $ | 26 | $ | 30 |

Service cost and Special termination benefits are recognized within Salaries, wages, and benefits expense, and all other costs are recognized in Other (gains) losses, net in the Consolidated Statement of Income (Loss). Unrecognized prior service cost is expensed using a straight-line amortization of the cost over the average future service of Employees expected to receive benefits under the plans. Actuarial gains are amortized utilizing the minimum amortization method. The following actuarial assumptions were used to account for the Company's postretirement benefit plans at December 31, 2020, 2019, and 2018:

| | 2020 | 2019 | 2018 |
|---|---|---|---|
| Weighted-average discount rate | 2.45 % | 3.30 % | 4.35 % |
| Assumed healthcare cost trend rate (a) | 6.75 % | 7.13 % | 7.13 % |

(a) The assumed healthcare cost trend rate is expected to be 6.50% for 2021, then decline gradually to 4.75% by 2028 and remain level thereafter.

The selection of a discount rate is made annually and is selected by the Company based upon comparison of the expected future cash flows associated with the Company's future payments under its consolidated postretirement obligations to a yield curve created using high quality bonds that closely match those expected future cash flows. This rate decreased during 2020 due to market conditions. The assumed healthcare trend rate is also reviewed at least annually and is determined based upon both historical experience with the Company's healthcare benefits paid and expectations of how those trends may or may not change in future years.

130

## 15. INCOME TAXES

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. The components of deferred tax assets and liabilities at December 31, 2020 and 2019, are as follows:

| (in millions) | | 2020 | | 2019 |
|---|---|---|---|---|
| **DEFERRED TAX LIABILITIES:** | | | | |
| Accelerated depreciation | $ | 2,939 | $ | 3,096 |
| Prepaid insurance | | 190 | | 12 |
| Operating lease right-of-use assets | | 423 | | 293 |
| Other | | 67 | | 81 |
| Total deferred tax liabilities | | 3,619 | | 3,482 |
| **DEFERRED TAX ASSETS:** | | | | |
| Accrued employee benefits | | 491 | | 346 |
| Rapid rewards loyalty liability | | 632 | | 305 |
| Operating lease liabilities | | 443 | | 308 |
| Residual travel funds | | 117 | | — |
| Construction obligation | | 72 | | 38 |
| Net operating losses and tax credits | | 60 (a) | | 8 |
| Other | | 170 | | 113 |
| Total deferred tax assets | | 1,985 | | 1,118 |
| Net deferred tax liability | $ | 1,634 | $ | 2,364 |

(a) At December 31, 2020, the Company had approximately $852 million of state net operating loss carryforwards to reduce future state taxable income. These state net operating loss carryforwards will expire in years 2025 - 2040 if unused.

The Company's income tax benefit recorded was 27.8 percent for 2020, which is higher than its tax rate of 22.2 percent for 2019. The higher effective tax rate in 2020 reflects the benefit of carrying back 2020 net losses to claim tax refunds against previous cash taxes paid relating to tax years 2015 through 2019, some of which were at higher rates than the current year. The provision (benefit) for income taxes is composed of the following:

| (in millions) | | 2020 | | 2019 | | 2018 |
|---|---|---|---|---|---|---|
| **CURRENT:** | | | | | | |
| Federal (a) | $ | (273) | $ | 610 | $ | 338 |
| State | | (5) | | 102 | | 60 |
| Change in federal statutory rate (b) | | (188) | | — | | — |
| Total current | | (466) | | 712 | | 398 |
| **DEFERRED:** | | | | | | |
| Federal (a) | | (589) | | (18) | | 299 |
| State | | (76) | | (6) | | 2 |
| State net operating losses | | (51) | | — | | — |
| Change in federal statutory tax rate (c) | | — | | (31) | | — |
| Total deferred | | (716) | | (55) | | 301 |
| | $ | (1,182) | $ | 657 | $ | 699 |

(a) The CARES Act allows entities to carry back 2020 losses to prior periods of up to five years, and claim refunds of federal taxes paid, and the Company expects to receive a significant cash tax refund once it completes all the necessary requirements to make the appropriate filings with the IRS.
(b) The benefit is representative of the excess refund generated as the result of carrying the 2020 losses back to a period when the federal statutory tax rate was 35 percent as opposed to the current tax rate of 21 percent.
(c) The Tax Cuts and Jobs Act was enacted in December 2017, which reduced the U.S. federal corporate tax rate from the previous rate of 35 percent to 21 percent.

The effective tax rate on Income (loss) before income taxes differed from the federal income tax statutory rate for the following reasons:

| (in millions) | 2020 | | 2019 | | 2018 | |
|---|---|---|---|---|---|---|
| Tax at statutory U.S. tax rates | $ | (894) | $ | 621 | $ | 664 |
| State income taxes, net of federal benefit | | (115) | | 76 | | 49 |
| Change in federal statutory tax rate | | (188) (a) | | (31) (b) | | — |
| Other, net | | 15 | | (9) | | (14) |
| Total income tax provision (benefit) | $ | (1,182) | $ | 657 | $ | 699 |

(a) The benefit is representative of the excess refund generated as the result of carrying the 2020 losses back to a period when the federal statutory tax rate was 35 percent as opposed to the current tax rate of 21 percent.
(b) The Tax Cuts and Jobs Act was enacted in December 2017, which reduced the U.S. federal corporate tax rate from the previous rate of 35 percent to 21 percent.

The only periods subject to examination for the Company's federal tax return are the 2019 and 2020 tax years. The Company is also subject to various examinations from state and local income tax jurisdictions in the ordinary course of business. These examinations are not expected to have a material effect on the financial results of the Company.

## 16. SUPPLEMENTAL FINANCIAL INFORMATION

| (in millions) | December 31, 2020 | | December 31, 2019 | |
|---|---|---|---|---|
| Trade receivables | $ | 46 | $ | 53 |
| Credit card receivables | | 35 | | 112 |
| Business partners and other suppliers | | 274 | | 779 |
| Taxes receivable | | 740 (a) | | 87 |
| Other | | 35 | | 55 |
| Accounts and other receivables | $ | 1,130 | $ | 1,086 |

| (in millions) | December 31, 2020 | | December 31, 2019 | |
|---|---|---|---|---|
| Derivative contracts | $ | 90 | $ | 49 |
| Intangible assets, net | | 295 | | 296 |
| Other | | 337 | | 232 |
| Other assets | $ | 722 | $ | 577 |

| (in millions) | December 31, 2020 | | December 31, 2019 | |
|---|---|---|---|---|
| Accounts payable trade | $ | 111 | $ | 304 |
| Salaries payable | | 201 | | 231 |
| Taxes payable excluding income taxes | | 49 | | 227 |
| Aircraft maintenance payable | | 95 | | 162 |
| Fuel payable | | 66 | | 129 |
| Dividends payable | | — | | 93 |
| Other payable | | 409 | | 428 |
| Accounts payable | $ | 931 | $ | 1,574 |

132

| (in millions) | December 31, 2020 | | December 31, 2019 | |
|---|---|---|---|---|
| Extended Emergency Time Off | $ | 393 | $ | — |
| Voluntary Separation Program 2020 | | 143 | | — |
| Profitsharing and savings plans | | 25 | | 695 |
| Vendor prepayment | | 600 (b) | | — |
| Vacation pay | | 436 | | 434 |
| Health | | 111 | | 120 |
| Workers compensation | | 161 | | 166 |
| Property and income taxes | | 84 | | 79 |
| Interest | | 49 | | 16 |
| Other | | 257 | | 239 |
| Accrued liabilities | $ | 2,259 | $ | 1,749 |

| (in millions) | December 31, 2020 | | December 31, 2019 | |
|---|---|---|---|---|
| Extended Emergency Time Off | $ | 57 | $ | — |
| Voluntary Separation Program 2020 | | 321 | | — |
| Postretirement obligation | | 428 | | 288 |
| Other deferred compensation | | 353 | | 313 |
| Other | | 88 | | 105 |
| Other noncurrent liabilities | $ | 1,247 | $ | 706 |

(a) This amount includes approximately $470 million associated with a significant cash tax refund expected as a result of the CARES Act allowing entities to carry back 2020 losses to prior periods of up to five years, and claim refunds of federal taxes paid. This amount also includes excise taxes remitted to taxing authorities for which the subsequent flights were canceled by Customers, resulting in amounts due back to the Company. See Note 15 for further information.
(b) In fourth quarter 2020, the Company received a $600 million prepayment from Chase for Rapid Rewards points expected to be purchased during 2021, based on cardholder activity on its Visa card associated with its loyalty program. The Company currently expects the majority of this amount to be reclassified to deferred revenue in Air Traffic liability--loyalty during the first half of 2021.

For further information on supplier receivables, see Note 17. For further information on fuel derivative and interest rate derivative contracts, see Note 11.

### *Other Operating Expenses*

Other operating expenses consist of aircraft rentals, distribution costs, advertising expenses, personnel expenses, professional fees, and other operating costs, none of which individually exceed 10 percent of Operating expenses.

### 17. BOEING 737 MAX AIRCRAFT GROUNDING AND RETURN TO SERVICE

On March 13, 2019, the FAA issued an emergency order for all U.S. airlines to ground all Boeing MAX aircraft. The Company immediately complied with the order and grounded all 34 MAX aircraft in its fleet. On November 18, 2020, the FAA rescinded the emergency order and issued official requirements to enable U.S. airlines to return the Boeing 737 MAX to service.

The most significant financial impacts of the grounding to the Company were the lost revenues, operating income, and operating cash flows, and delayed capital expenditures, directly associated with its grounded MAX fleet and other new aircraft that have not been able to be delivered. In July 2019, the Boeing Company announced a $4.9 billion after-tax charge for "potential concessions and other considerations to customers for disruptions related to the 737 MAX grounding." In January 2020, the Boeing Company announced an additional pre-tax charge of $2.6

133

billion related to "estimated potential concessions and other considerations to customers related to the 737 MAX grounding."

During fourth quarter 2019, the Company entered into a Memorandum of Understanding with Boeing to compensate Southwest for estimated financial damages incurred during 2019 related to the grounding of the MAX. The terms of the agreement are confidential, but are intended to provide for a substantial portion of the Company's financial damages associated with both the 34 MAX aircraft that were grounded as of March 13, 2019, as well as the 41 additional MAX aircraft the Company was scheduled to receive (28 owned MAX from Boeing and 13 leased MAX from third parties) from March 13, 2019 through December 31, 2019. In accordance with applicable accounting principles, the Company will account for substantially all of the proceeds received from Boeing as a reduction in cost basis spread across both the existing owned MAX in the Company's fleet at the time, plus the Company's future firm aircraft deliveries as of the date of the agreement. No material financial impacts of the agreement were realized in the Company's earnings during the years ended December 31, 2019 and 2020. A total of $428 million in proceeds received in cash from Boeing are reflected within Investing Activities in the Consolidated Statement of Cash Flows for the year ended December 31, 2020.

The Company is currently working to meet the FAA's official requirements to enable airlines to return the Boeing 737 MAX to service by modifying certain operating procedures, implementing enhanced Pilot training requirements, installing FAA-approved flight control software updates, and completing other required maintenance tasks specific to the MAX aircraft. The Company has scheduled the MAX return to revenue service on March 11, 2021, after the Company is expected to have met all FAA requirements and all active Pilots are expected to have received updated, MAX-related training. During December 2020, the Company took delivery of seven new leased MAX aircraft from third parties.

During December 2020, the Company entered into the Boeing Agreement to compensate the Company for estimated financial damages incurred during 2020 related to the grounding of the MAX. The terms of the agreement are confidential, but the compensation will be in the form of credit memos taken against future payments due to Boeing as aircraft are delivered in accordance with the amended delivery schedule, or as future progress payments are due. In accordance with applicable accounting principles, the Company will account for substantially all of the compensation received from Boeing as a reduction in cost basis spread across both the existing owned MAX in the Company's fleet, plus the Company's future firm aircraft deliveries from Boeing as of the date of the agreement. No material financial impacts of the agreement were realized in the Company's earnings during the year ended December 31, 2020.

134

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and the Board of Directors of Southwest Airlines Co.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Southwest Airlines Co. (the Company) as of December 31, 2020 and 2019, the related consolidated statements of income (loss), comprehensive income (loss), stockholders' equity and cash flows for each of the three years in the period ended December 31, 2020, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the consolidated financial position of the Company at December 31, 2020 and 2019, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2020, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2020, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), and our report dated February 8, 2021 expressed an unqualified opinion thereon.

**Adoption of New Accounting Standards**

As discussed in Note 3 to the consolidated financial statements, the Company changed its method of accounting for its leases in 2019 due to the modified retrospective adoption of ASU 2016-02, *Leases (Topic 842)*.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical audit matters**

The critical audit matters communicated below are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

135

**Southwest Rapid Rewards loyalty program spoilage**

*Description of the Matter*

As explained in Notes 1 and 6 to the consolidated financial statements, the Company recognizes revenue associated with award flights taken by Southwest Rapid Rewards loyalty program members upon the redemption of loyalty points. The Company estimates the portion of loyalty points that will not be redeemed (spoilage) in estimating the revenue to recognize each period. The Company uses a predictive statistical model that considers the member's past behavior, as well as several other attributes related to the member's account that management believes are indicative of the likelihood of future point redemption, to estimate the amount of spoilage. These other attributes include, but are not limited to, tenure with the program, loyalty points accrued in the program, and points redeemed in the program.

Auditing the Company's estimate of spoilage for loyalty points requires significant judgment due to the complexity of the predictive statistical model and the subjectivity related to the assumptions that are used by management to estimate the likelihood of a member's future point redemption. Additionally, due to the magnitude of the Company's liability for loyalty benefits, changes in customer behavior and/or expected future redemption patterns could result in significant variations in the pattern of passenger revenue recognition.

*How We Addressed the Matter in Our Audit*

We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over management's determination of the spoilage estimate, including the statistical model, significant underlying assumptions selected by management and the data inputs used in the statistical model.

To test the Company's use of the predictive statistical model, we involved our internal specialists to assist in our evaluation of the Company's methodology and the appropriateness of the predictive attributes described above. Our internal specialists also performed corroborative calculations of the resulting estimated spoilage rates. Additionally, we tested the completeness and accuracy of the data used in the predictive statistical model.

**Valuation of financial derivative instruments**

*Description of the Matter*

As explained in Notes 1, 11, and 12 to the financial statements, the Company's fuel derivative instruments consist of over-the-counter contracts, which are not traded on a public exchange and require the Company to estimate their fair values. The fair value of fuel option contracts are determined using option pricing models with inputs about commodity prices, strike prices, risk-free interest rates, term to expiration, and volatility. Because certain inputs used to determine the fair value of option contracts are unobservable (principally implied volatility), the Company has categorized these option contracts as Level 3 fair value measures. The Company analyzes volatility information for reasonableness and compares it to similar information received from external sources and limited observable market data. The fair value of the option contracts considers both the intrinsic value and any remaining time value associated with the derivatives that have not settled.

Auditing the fair value measurement of fuel option contracts is complex and requires significant judgment in order to evaluate the application of the option pricing model and evaluating the reasonableness of the unobservable input of implied volatility used in the fair value measurement of the Company's fuel option contracts.

*How We Addressed the Matter in Our Audit*

We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over the Company's process to calculate the fair value of fuel option derivative contracts, including controls that related to the volatility input.

We involved internal valuation specialists to assist in the testing of the significant inputs in the option pricing model by comparing the market data inputs, including volatility, to external sources. With the support of our specialists, we also tested the application of and the computational accuracy of the option pricing model by performing independent corroborative calculations. Additionally, we compared the Company's fuel option contract valuations to the counterparty valuations, which were independently obtained as part of our audit procedures.

/s/ Ernst & Young LLP
We have served as the Company's auditor since 1971.

Dallas, Texas
February 8, 2021

137

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and the Board of Directors of Southwest Airlines Co.

**Opinion on Internal Control over Financial Reporting**

We have audited Southwest Airlines Co.'s internal control over financial reporting as of December 31, 2020, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 Framework), (the COSO criteria). In our opinion, Southwest Airlines Co. (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2020, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of Southwest Airlines Co. as of December 31, 2020 and 2019, the related consolidated statements of income (loss), comprehensive income (loss), stockholders' equity and cash flows for each of the three years in the period ended December 31, 2020, and the related notes (collectively referred to as the "financial statements") of the Company and our report dated February 8, 2021 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying "Management's Annual Report on Internal Control Over Financial Reporting". Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP

Dallas, Texas
February 8, 2021

139

**QUARTERLY FINANCIAL DATA**
**(unaudited)**

| | Three months ended | | | |
|---|---|---|---|---|
| (in millions except per share amounts) | March 31 | June 30 | Sept. 30 | Dec. 31 |
| **2020** | | | | |
| Operating revenues | $ 4,234 | $ 1,008 | $ 1,793 | $ 2,013 |
| Operating income (loss) | (110) | (1,127) | (1,411) | (1,169) |
| Income (loss) before income taxes | (144) | (1,239) | (1,542) | (1,331) |
| Net income (loss) | (94) | (915) | (1,157) | (908) |
| Net income (loss) per share, basic | (0.18) | (1.63) | (1.96) | (1.54) |
| Net income (loss) per share, diluted | (0.18) | (1.63) | (1.96) | (1.54) |
| | March 31 | June 30 | Sept. 30 | Dec. 31 |
| **2019** | | | | |
| Operating revenues | $ 5,149 | $ 5,909 | $ 5,639 | $ 5,729 |
| Operating income | 505 | 968 | 819 | 665 |
| Income before income taxes | 504 | 968 | 819 | 666 |
| Net income | 387 | 741 | 659 | 514 (a) |
| Net income per share, basic | 0.70 | 1.37 | 1.24 | 0.98 (a) |
| Net income per share, diluted | 0.70 | 1.37 | 1.23 | 0.98 (a) |

(a) In addition to the ongoing impact of the Boeing 737 MAX aircraft ("MAX") grounding that impacted all four quarters of 2019, fourth quarter 2019 also included the impact of the pre-tax $124 million discretionary, special profitsharing award accrual authorized by the Company's Board of Directors during fourth quarter 2019 for compensation received from Boeing related to the Company's estimated 2019 financial damages related to the grounding of the Boeing 737 MAX. See Note 17 to the Consolidated Financial Statements for further information on the MAX groundings. The impact of this accrual resulted in a decrease to Net income of approximately $97 million and reduced Basic and Diluted net income per share by approximately $.18 for the fourth quarter 2019.

140

**Item 9.**     ***Changes in and Disagreements With Accountants on Accounting and Financial Disclosure***

None.

**Item 9A.**     ***Controls and Procedures***

*Evaluation of Disclosure Controls and Procedures.* The Company maintains disclosure controls and procedures (as defined in Rule 13a-15(e) of the Securities Exchange Act (the "Exchange Act")) designed to provide reasonable assurance that the information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms. These include controls and procedures designed to ensure that this information is accumulated and communicated to the Company's management, including its Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. Management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures as of December 31, 2020. Based on this evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective as of December 31, 2020, at the reasonable assurance level.

*Management's Annual Report on Internal Control over Financial Reporting.* Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act). The Company's internal control over financial reporting is a process, under the supervision of the Company's Chief Executive Officer and Chief Financial Officer, designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can provide only reasonable assurance of achieving their control objectives.

Management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's internal control over financial reporting as of December 31, 2020. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework (2013 Framework). Based on this evaluation, management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, concluded that, as of December 31, 2020, the Company's internal control over financial reporting was effective.

Ernst & Young, LLP, the independent registered public accounting firm who audited the Company's Consolidated Financial Statements included in this Form 10-K, has issued an attestation report on the Company's internal control over financial reporting, which is included herein.

*Changes in Internal Control over Financial Reporting.* There were no changes in the Company's internal control over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) during the quarter ended December 31, 2020, that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**Item 9B.** *Other Information*

None.

**PART III**

**Item 10.**  *Directors, Executive Officers, and Corporate Governance*

**Directors and Executive Officers**

The information required by this Item 10 regarding the Company's directors will be set forth under the heading "Proposal 1 - Election of Directors" in the Proxy Statement for the Company's 2021 Annual Meeting of Shareholders and is incorporated herein by reference. The information required by this Item 10 regarding the Company's executive officers is set forth under the heading "Information about our Executive Officers" in Part I of this Form 10-K and is incorporated herein by reference.

**Section 16(a) Compliance**

If applicable, the information required by this Item 10 regarding compliance with Section 16(a) of the Exchange Act will be set forth under the heading "Delinquent Section 16(a) Reports" in the Proxy Statement for the Company's 2021 Annual Meeting of Shareholders and is incorporated herein by reference.

**Corporate Governance**

Except as set forth in the following paragraph, the remaining information required by this Item 10 will be set forth under the heading "Corporate Governance" in the Proxy Statement for the Company's 2021 Annual Meeting of Shareholders and is incorporated herein by reference.

The Company has adopted a Code of Ethics that applies to its principal executive officer, principal financial officer, and principal accounting officer or controller. The Company's Code of Ethics, as well as its Corporate Governance Guidelines and the charters of its Audit, Compensation, and Nominating and Corporate Governance Committees, are available on the Company's website, www.southwest.com. Copies of these documents are also available upon request to Investor Relations, Southwest Airlines Co., P.O. Box 36611, Dallas, TX 75235. The Company intends to disclose any amendments to, or waivers from, its Code of Ethics that apply to the Company's principal executive officer, principal financial officer, and principal accounting officer or controller on the Company's website, www.southwest.com, under the "About Southwest" caption, promptly following the date of any such amendment or waiver.

**Item 11.**  *Executive Compensation*

The information required by this Item 11 will be set forth under the headings "Compensation of Executive Officers" and "Compensation of Directors" in the Proxy Statement for the Company's 2021 Annual Meeting of Shareholders and is incorporated herein by reference.

**Item 12.    *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters***

Except as set forth below regarding securities authorized for issuance under equity compensation plans, the information required by this Item 12 will be set forth under the heading "Voting Securities and Principal Shareholders" in the Proxy Statement for the Company's 2021 Annual Meeting of Shareholders and is incorporated herein by reference.

**Securities Authorized for Issuance under Equity Compensation Plans**

The following table provides information as of December 31, 2020, regarding compensation plans under which equity securities of the Company are authorized for issuance.

**Equity Compensation Plan Information**

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants, and Rights (a) | | Weighted-Average Exercise Price of Outstanding Options, Warrants, and Rights (b) | | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in Column (a)) (c) | |
|---|---|---|---|---|---|---|
| Equity Compensation Plans Approved by Security Holders | 1,961,803 | (1) $ | — | (2) | 24,847,896 | (3) |
| Equity Compensation Plans not Approved by Security Holders | 1,800 | $ | 9.00 | | — | |
| Total | 1,963,603 | $ | — | (2) | 24,847,896 | |

(1) Restricted share units settleable in shares of the Company's common stock.
(2) Restricted share units discussed in footnote (1) above do not have a weighted average exercise price because the restricted share units do not have an exercise price upon vesting.
(3)     Of these shares, (i) 5,962,331 shares remained available for issuance under the Company's tax-qualified employee stock purchase plan; and (ii) 18,885,565 shares remained available for issuance under the Company's 2007 Equity Incentive Plan in connection with the exercise of stock options and stock appreciation rights, the settlement of awards of restricted stock, restricted stock units, and phantom shares, and the grant of unrestricted shares of common stock; however, no more than 1,098,469 shares remain available for grant in connection with awards of unrestricted shares of common stock, stock-settled phantom shares, and awards to non-Employee members of the Board. These shares are in addition to the shares reserved for issuance pursuant to outstanding awards included in column (a).

See Note 10 to the Consolidated Financial Statements for information regarding the material features of the above plans. Each of the above plans provides that the number of shares with respect to which options may be granted, the number of shares of common stock subject to an outstanding option, and the number of restricted share units granted shall be proportionately adjusted in the event of a subdivision or consolidation of shares or the payment of a stock dividend on common stock, and the purchase price per share of outstanding options shall be proportionately revised.

**Item 13.    *Certain Relationships and Related Transactions, and Director Independence***

The information required by this Item 13 will be set forth under the heading "Certain Relationships and Related Transactions, and Director Independence" in the Proxy Statement for the Company's 2021 Annual Meeting of Shareholders and is incorporated herein by reference.

**Item 14.    *Principal Accounting Fees and Services***

144

The information required by this Item 14 will be set forth under the heading "Relationship with Independent Auditors" in the Proxy Statement for the Company's 2021 Annual Meeting of Shareholders and is incorporated herein by reference.

145

**PART IV**

**Item 15.    *Exhibits and Financial Statement Schedules***

(a) 1. *Financial Statements:*

The financial statements included in Item 8. Financial Statements and Supplementary Data above are filed as part of this annual report.

2. *Financial Statement Schedules:*

There are no financial statement schedules filed as part of this annual report, since the required information is included in the Consolidated Financial Statements, including the notes thereto, or the circumstances requiring inclusion of such schedules are not present.

3. Exhibits:

| | |
|---|---|
| 3.1 | Restated Certificate of Formation of the Company, effective May 18, 2012 (incorporated by reference to Exhibit 3.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2012 (File No. 1-7259)). |
| 3.2 | Second Amended and Restated Bylaws of the Company, effective November 17, 2016 (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K filed November 21, 2016 (File No. 1-7259)). |
| 4.1 | Specimen certificate representing common stock of the Company (incorporated by reference to Exhibit 4.2 to the Company's Annual Report on Form 10-K for the year ended December 31, 1994 (File No. 1-7259)). |
| 4.2 | Indenture dated as of September 17, 2004, between the Company and Wells Fargo Bank, N.A., Trustee (incorporated by reference to Exhibit 4.1 to the Company's Registration Statement on Form S-3 filed October 30, 2002 (File No. 333-100861)). |
| 4.3 | Indenture dated as of February 25, 1997, between the Company and U.S. Trust Company of Texas, N.A. (incorporated by reference to Exhibit 4.12 to the Company's Annual Report on Form 10-K for the year ended December 31, 1996 (File No. 1-7259)). |
| 4.4 | First Supplemental Indenture, dated May 1, 2020, between the Company and Wells Fargo Bank, N.A., as trustee (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K filed May 1, 2020 (File No. 1-7259)). |
| 4.5 | Description of Common Stock (incorporated by reference to Exhibit 4.5 to the Company's Annual Report on Form 10-K for the year ended December 31, 2019 (File No. 1-7259)). |
| | The Company is not filing any other instruments evidencing any indebtedness because the total amount of securities authorized under any single such instrument does not exceed 10 percent of its total consolidated assets. Copies of such instruments will be furnished to the Securities and Exchange Commission upon request. |
| 10.1 | Form of Amended and Restated Executive Service Recognition Plan Executive Employment Agreement between the Company and certain Officers of the Company (incorporated by reference to Exhibit 10.2 to the Company's Annual Report on Form 10-K for the year ended December 31, 2008 (File No. 1-7259)). (2) |
| 10.2 | Letter Agreement between Southwest Airlines Co. and Gary C. Kelly, effective as of February 1, 2011 (incorporated by reference to Exhibit 99.1 to the Company's Current Report on Form 8-K filed February 1, 2011 (File No. 1-7259)). (2) |
| 10.3 | Southwest Airlines Co. Amended and Restated Severance Plan for Directors (as amended and restated effective May 19, 2009) (incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2009 (File No. 1-7259)). |

| 10.4 | Southwest Airlines Co. Outside Director Incentive Plan (as amended and restated effective May 16, 2007) (incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2007 (File No. 1-7259)). |
| --- | --- |
| 10.5 | Southwest Airlines Co. 2002 SWAPIA Non-Qualified Stock Option Plan (incorporated by reference to Exhibit 4.1 to the Company's Registration Statement on Form S-8 filed October 30, 2002 (File No. 333-100862)). |
| 10.6 | Southwest Airlines Co. Amended and Restated 2007 Equity Incentive Plan (incorporated by reference to Exhibit 99.1 to the Company's Current Report on Form 8-K filed May 18, 2015 (File No. 1-7259)). (2) |
| 10.7 | Southwest Airlines Co. 2007 Equity Incentive Plan Form of Notice of Grant and Terms and Conditions for Stock Option Grant (incorporated by reference to Exhibit 10.31 to the Company's Annual Report on Form 10-K for the year ended December 31, 2007 (File No. 1-7259)). (2) |
| 10.8 | Southwest Airlines Co. Excess Benefit Plan (incorporated by reference to Exhibit 10.32 to the Company's Annual Report on Form 10-K for the year ended December 31, 2008 (File No. 1-7259)). (2) |
| 10.9 | Amendment No. 1 to the Southwest Airlines Co. Excess Benefit Plan (incorporated by reference to Exhibit 10.33 to the Company's Annual Report on Form 10-K for the year ended December 31, 2008 (File No. 1-7259)). (2) |
| 10.10 | Amendment No. 2 to the Southwest Airlines Co. Excess Benefit Plan (incorporated by reference to Exhibit 10.34 to the Company's Annual Report on Form 10-K for the year ended December 31, 2008 (File No. 1-7259)). (2) |
| 10.11 | Amended and Restated Southwest Airlines Co. 2005 Excess Benefit Plan (as amended and restated, effective as of January 1, 2018) (incorporated by reference to Exhibit 10.5 to the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2017 (File No. 1-7259)). (2) |
| 10.12 | Form of Indemnification Agreement between the Company and its Directors (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed January 22, 2009 (File No. 1-7259)). |
| 10.13 | Southwest Airlines Co. Amended and Restated 2007 Equity Incentive Plan Form of Notice of Grant and Terms and Conditions for Restricted Stock Unit grants (incorporated by reference to Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2014 (File No. 1-7259)). (2) |
| 10.13(a) | Southwest Airlines Co. Amended and Restated 2007 Equity Incentive Plan Form of Notice of Grant and Terms and Conditions for Restricted Stock Unit grants (effective 2021). (2) |
| 10.14 | $1,000,000,000 Revolving Credit Facility Agreement among the Company, the Banks party thereto, Barclays Bank PLC, as Syndication Agent, Bank of America, N.A., BNP Paribas, Goldman Sachs Bank USA, Morgan Stanley Senior Funding, Inc., U.S. Bank National Association, and Wells Fargo Bank, N.A., as Documentation Agents, JPMorgan Chase Bank, N.A. and Citibank, N.A., as Co-Administrative Agents, and JPMorgan Chase Bank, N.A., as Paying Agent, dated as of August 3, 2016 (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed August 9, 2016 (File No. 1-7259)). |
| 10.15 | First Amendment to Revolving Credit Facility Agreement dated as of August 3, 2016, among Southwest Airlines Co., the banks party thereto, J.P. Morgan Chase Bank, N.A., as Paying Agent and Collateral Agent, and J.P. Morgan Chase Bank, N.A. and Citibank, N.A., as Co-Administrative Agents, dated as of March 30, 2020 (incorporated by reference to Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2020 (File No. 1-7259)). |
| 10.16 | Second Amendment to Revolving Credit Facility Agreement dated as of August 3, 2016, as amended by the First Amendment dated as of March 30, 2020, among Southwest Airlines Co., the banks party thereto, J.P. Morgan Chase Bank, N.A., as Paying Agent and Collateral Agent, and J.P. Morgan Chase Bank, N.A., and Citibank, N.A., as Co-Administrative Agents, dated as of November 23, 2020. |

| | |
|---|---|
| 10.17 | Purchase Agreement No. 3729 and Aircraft General Terms Agreement, dated December 13, 2011, between The Boeing Company and the Company (incorporated by reference to Exhibit 10.28 to the Company's Annual Report on Form 10-K for the year ended December 31, 2011 (File No. 1-7259)); Supplemental Agreement No. 1 (incorporated by reference to Exhibits 10.3 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2013 (File No. 1-7259)); Supplemental Agreement No. 2 (incorporated by reference to Exhibit 10.4 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2013 (File No. 1-7259)); Supplemental Agreement No. 3 (incorporated by reference to Exhibit 10.27(a) to the Company's Annual Report on Form 10-K for the year ended December 31, 2013 (File No. 1-7259)); Supplemental Agreement No. 4 (incorporated by reference to Exhibit 10.18(a) to the Company's Annual Report on Form 10-K for the year ended December 31, 2015 (File No. 1-7259)); Supplemental Agreement No. 5 (incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2016 (File No. 1-7259)); Supplemental Agreement No. 6 (incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2017 (File No. 1-7259)); Supplemental Agreement No. 7 (incorporated by reference to Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2017 (File No. 1-7259)); Supplemental Letter Agreement No. 6-1162-KLK-0059R3 (incorporated by reference to Exhibit 10.4 to the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2017 (File No. 1-7259)); Supplemental Agreement No. 8 (incorporated by reference to Exhibit 10.16(a) to the Company's Annual Report on Form 10-K for the year ended December 31, 2017 (File No. 1-7259)); Supplemental Agreement No. 9 (incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2018 (File No. 1-7259)); Supplemental Agreement No. 10 (incorporated by reference to Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2018 (File No. 1-7259)); Supplemental Letter Agreement No. 03729-LA-1808800 (incorporated by reference to Exhibit 10.16(a) to the Company's Annual Report on Form 10-K for the year ended December 31, 2018 (File No. 1-7259)); Supplemental Letter Agreement No. 03729-MISC-2001512 (incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2020 (File No. 1-7259)); Supplemental Letter Agreement, dated April 23, 2020 (incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2020 (File No. 1-7259)); Supplemental Letter Agreement No. 6-1162-CJM-039 (incorporated by reference to Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2020 (File No. 1-7259)). (1) |
| 10.18 | Southwest Airlines Co. Senior Executive Short Term Incentive Plan (incorporated by reference to Exhibit 99.1 to the Company's Current Report on Form 8-K filed January 30, 2013 (File No. 1-7259)). (2) |
| 10.19 | Southwest Airlines Co. Deferred Compensation Plan for Senior Leadership and Non-Employee Members of the Southwest Airlines Co. Board of Directors (as amended and restated, effective as of January 1, 2018) (incorporated by reference to Exhibit 10.6 to the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2017 (File No. 1-7259)). (2) |
| 10.20 | Southwest Airlines Co. Amended and Restated 2007 Equity Incentive Plan Form of Notice of Grant and Terms and Conditions for Performance-Based Restricted Stock Unit grants (incorporated by reference to Exhibit 10.4 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2014 (File No. 1-7259)). (2) |
| 10.20(a) | Southwest Airlines Co. Amended and Restated 2007 Equity Incentive Plan Form of Notice of Grant and Terms and Conditions for Performance-Based Restricted Stock Unit grants (effective 2021). (2) |
| 10.21 | Payroll Support Program Agreement by and between Southwest Airlines Co. and the United States Department of the Treasury, dated April 20, 2020 (incorporated by reference to Exhibit 10.4 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2020 (File No. 1-7259)). |
| 10.22 | Warrant Agreement by and between Southwest Airlines Co. and the United States Department of the Treasury, dated April 20, 2020 (incorporated by reference to Exhibit 10.5 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2020 (File No. 1-7259)). |
| 10.23 | Promissory Note, from Southwest Airlines Co. to the United States Department of the Treasury, dated April 20, 2020 (incorporated by reference to Exhibit 10.6 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2020 (File No. 1-7259)). |
| 10.24 | Payroll Support Program Extension Agreement by and between Southwest Airlines Co. and the United States Department of the Treasury, dated January 15, 2021 (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed January 15, 2021 (file No. 1-7259)). |

| | |
|---|---|
| 10.25 | Warrant Agreement by and between Southwest Airlines Co. and the United States Department of the Treasury, dated January 15, 2021 (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed January 15, 2021 (file No. 1-7259)). |
| 10.26 | Promissory Note, from Southwest Airlines Co. to the United States Department of the Treasury, dated January 15, 2021 (incorporated by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K filed January 15, 2021 (file No. 1-7259)). |
| 10.27 | Form of Performance-Based Cash Award and Terms and Conditions. (2) |
| 21 | Subsidiaries of the Company. |
| 23 | Consent of Ernst & Young LLP, Independent Registered Public Accounting Firm. |
| 31.1 | Rule 13a-14(a) Certification of Chief Executive Officer. |
| 31.2 | Rule 13a-14(a) Certification of Chief Financial Officer. |
| 32 | Section 1350 Certification of Chief Executive Officer and Chief Financial Officer. (3) |
| 101.INS | XBRL Instance Document - The instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document. |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document. |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document. |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101). |

(1)  Certain confidential information contained in this agreement has been omitted because it (i) is not material and (ii) would likely cause competitive harm to the Company if publicly disclosed.
(2)  Management contract or compensatory plan or arrangement.
(3)  This exhibit is being furnished rather than filed and shall not be deemed incorporated by reference into any filing, in accordance with Item 601 of Regulation S-K.

A copy of each exhibit may be obtained at a price of 15 cents per page, $10.00 minimum order, by writing to: Investor Relations, Southwest Airlines Co., P.O. Box 36611, Dallas, Texas 75235-1611.

**Item 16.**    *10-K Summary*

None.

149

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

SOUTHWEST AIRLINES CO.

February 8, 2021                                    By      /s/   Tammy Romo

                                                            Tammy Romo
                                                            *Executive Vice President & Chief Financial Officer*
                                                            *(On behalf of the Registrant and in*
                                                            *her capacity as Principal Financial*
                                                            *& Accounting Officer)*

150

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on February 8, 2021, on behalf of the registrant and in the capacities indicated.

| Signature | Title |
|---|---|
| /s/   GARY C. KELLY<br>**Gary C. Kelly** | Chairman of the Board & Chief Executive Officer (Principal Executive Officer) |
| /s/   TAMMY ROMO<br>**Tammy Romo** | Executive Vice President & Chief Financial Officer (Principal Financial & Accounting Officer) |
| /s/   RON RICKS<br>**Ron Ricks** | Vice Chairman of the Board |
| /s/   DAVID W. BIEGLER<br>**David W. Biegler** | Director |
| /s/   J. VERONICA BIGGINS<br>**J. Veronica Biggins** | Director |
| /s/   DOUGLAS H. BROOKS<br>**Douglas H. Brooks** | Director |
| /s/   WILLIAM H. CUNNINGHAM<br>**William H. Cunningham** | Director |
| /s/   JOHN G. DENISON<br>**John G. Denison** | Director |
| /s/   THOMAS W. GILLIGAN<br>**Thomas W. Gilligan** | Director |
| /s/   GRACE D. LIEBLEIN<br>**Grace D. Lieblein** | Director |
| /s/   NANCY B. LOEFFLER<br>**Nancy B. Loeffler** | Director |
| /s/   JOHN T. MONTFORD<br>**John T. Montford** | Director |

151

**SOUTHWEST AIRLINES CO.**
**AMENDED AND RESTATED 2007 EQUITY INCENTIVE PLAN**

<u>**NOTICE OF GRANT OF RESTRICTED STOCK UNITS**</u>

Pursuant to the terms of the Southwest Airlines Co. Amended and Restated 2007 Equity Incentive Plan (the "Plan"), Southwest Airlines Co. (the "Company") hereby grants to you (the "Participant") an award of restricted stock units ("RSUs"), in accordance with, and subject to, the following:

Participant:
Date of Grant:
Number of RSUs Granted:

<u>Vesting Schedule</u>

| Percentage of RSUs Vesting | Vesting Date |
|---|---|
|  |  |
|  |  |
|  |  |

On each Vesting Date, it will be a condition to vesting that the Participant has continuously served as an Employee, Director, or Advisor (each as defined in the Plan) from the Date of Grant through the Vesting Date; provided that special terms will apply if termination of service is due to death, disability, or a qualified retirement (see enclosed Terms and Conditions).

Participant understands and agrees that the RSUs are granted in accordance with, and subject to, the terms and conditions of the Plan and the Terms and Conditions enclosed with this Notice of Grant. The Plan and the prospectus for the Plan are enclosed with this Notice of Grant. Additional copies of these documents are available upon request to the Company's Stock Plan Administration Department.

**By asserting any rights with respect to these RSUs, the Participant (and any person who has acquired the RSUs by will or the laws of descent and distribution or intestacy) will be deemed to have understood and agreed to the terms and conditions of the Plan and the accompanying Terms and Conditions.**

1

**SOUTHWEST AIRLINES CO.**
**AMENDED AND RESTATED 2007 EQUITY INCENTIVE PLAN**
**TERMS AND CONDITIONS**

**<u>RESTRICTED STOCK UNITS</u>**

(Effective for Awards Granted Beginning on February 3, 2021)

By asserting any rights with respect to Restricted Stock Units ("RSUs" or "Restricted Stock Units") received pursuant to the Southwest Airlines Co. Amended and Restated 2007 Equity Incentive Plan (the "Plan"), the recipient of the RSUs (the "Participant") will be deemed to have understood and agreed to the terms and conditions of the Plan and the terms and conditions set forth below. Capitalized terms used and not otherwise defined in these Terms and Conditions shall have the meanings assigned to them in the Plan or in the Notice of Grant of Restricted Stock Units with which these Terms and Conditions are enclosed (the "Notice of Grant").

1.    <u>Vesting</u>. Subject to these Terms and Conditions and the provisions of the Plan, the RSUs will vest in accordance with the schedule set forth in the Notice of Grant.

2.    <u>Interpretation</u>. The Participant's Restricted Stock Unit Award is subject to the terms and conditions of the Plan, which terms and conditions are incorporated herein by reference. The Participant's Restricted Stock Unit Award is also subject to any rules promulgated pursuant to the Plan by the Board, the Committee, or the persons designated by the Committee to administer the day-to-day administration of the Plan. Any decisions or interpretations upon any questions with respect to a Restricted Stock Unit Award or the Plan shall (as permissible pursuant to applicable laws, rules, or regulations, including the rules of any stock exchange upon which the Company's Common Stock is listed or quoted) be determined (i) by the Committee, (ii) by the Board, or (iii) where permitted by the Committee, by any person(s) to whom the Committee has delegated its authority. The Participant (and any person who has acquired the RSUs by will or the laws of descent and distribution or intestacy) agrees to accept any such decisions or interpretations as binding, conclusive, and final in all respects.

3.    <u>Settlement of Restricted Stock Units</u>. Subject to these Terms and Conditions and the provisions of the Plan, upon each Vesting Date, the Participant (or any person who has acquired the RSUs by will or the laws of descent and distribution or intestacy) will become entitled to delivery of one share of Common Stock for each Restricted Stock Unit that vests on that date (the "Vested Shares"). As soon as is administratively and reasonably practicable thereafter (but in any event, no later than 30 days thereafter), such Vested Shares will be registered in the Participant's name or otherwise delivered or credited for the Participant's account or benefit (in each case as determined by the Company), subject to (a) the Participant's satisfaction of any Tax Obligations (as defined in Section 5 below); (b) the Participant's taking of any additional action deemed necessary or advisable by the Company to enable it to accomplish the delivery of the shares of Common Stock; and (c) the condition precedent that, if at any time the Board or the Committee shall determine in their discretion that the listing, registration, or qualification of the Vested Shares is required under any federal, state, or other law, rule, or regulation, or by the requirements of any securities exchange, or that the consent or approval of any governmental regulatory body is necessary or desirable as a condition of, or in connection with, the issuance of the Vested Shares, then the RSUs will not vest in whole or in part unless and until such listing, registration, qualification, consent, or approval shall have been effected or obtained free of any conditions not acceptable to the Board or the Committee;

1

*provided, however*, in the event any action required by clause (a) or (b) above has not been completed by the Participant within 85 days following the applicable Vesting Date, such Restricted Stock Units will be forfeited at 4:00 p.m., Eastern Time, on such date. No fractional shares of Common Stock will be issued in settlement of the RSUs.

4.      Rights Upon Termination of Service. Subject to the provisions of subsections 4(a) and (b) below, in the event of termination of the Participant's Service, any Restricted Stock Units that have not vested as of the date of termination of Service shall automatically and without notice be forfeited at 4:00 p.m., Eastern Time, on the date of termination; provided that, notwithstanding anything in the Plan or the Notice of Grant to the contrary:

(a) in the event of the termination of the Participant's Service as a result of death or Disability, any of the Participant's outstanding RSUs that have not yet vested will fully vest as of the date of termination; and

(b) provided that the Participant's Service has terminated no earlier than 12 months after the Date of Grant, in the event of a "qualified retirement," any outstanding, unvested RSUs will remain outstanding as if the Participant's Service has not terminated and will continue to vest in accordance with the vesting schedule set forth in the Notice of Grant, these Terms and Conditions, and the terms of the Plan.

For purposes of Section 4(b), a Participant's termination of Service will be considered a "qualified retirement" if (a) the Participant has completed at least 10 years of continuous Service; (b) the Participant's age plus completed years of continuous Service equal at least 65 at the time of the Participant's termination of Service; and (c) the Participant has not been terminated for cause.

5.   Taxes.

a.      In order to comply with any federal, state, local, or other laws or regulations of the United States or any other applicable jurisdiction, the Company or any Affiliate is authorized to take such action as it shall deem appropriate to provide that all applicable federal, state, local, or other income, employment, or other tax withholding or similar obligations (collectively, "Tax Obligations") to which the Participant is subject in connection with the RSUs are withheld or collected from the Participant. If and to the extent permitted by the Committee from time to time, the Company is authorized to satisfy the Tax Obligations by any one or more of the following methods: (i) by requiring the Participant to pay such amount in cash or check; (ii) by withholding a number of shares of Common Stock that would otherwise be issued with respect to the RSUs having a market value sufficient to meet the Tax Obligations; (iii) by instructing the Plan administrator to sell, or cause to be sold, on behalf of the Participant a number of Vested Shares having a market value equal to the amount of the Tax Obligations (plus sales commissions) to which the Participant is subject, and the Participant hereby appoints the Corporate Secretary of the Company as the Participant's attorney-in-fact, with full power of substitution and resubstitution, to execute such sale; (iv) by deducting the amount of the Tax Obligations out of any other remuneration otherwise payable by the Company to the Participant; or (v) by such other method as may become available to the Company from time to time.

b.      The Participant is ultimately liable and responsible for all of the Participant's Tax Obligations, regardless of any action taken by the Company in accordance with Section 5.a. The Company makes no representation or undertaking regarding the treatment of any Tax Obligation in connection with the grant, vesting, or settlement of the RSUs or the subsequent sale of any of the shares of Common Stock

2

received upon settlement of any RSUs. The Company does not commit, and is under no obligation, to structure the Plan and its administration to reduce or eliminate a Participant's tax liability.

      c.    The Participant agrees to release and indemnify the Company and its Affiliates from any liability or damages arising from or relating to the Participant's failure to comply with his or her Tax Obligations.

6.    <u>Restriction on Transfer</u>. Restricted Stock Units and any rights with respect to the Participant's Restricted Stock Unit Award may not be sold, assigned, transferred, pledged, hypothecated, or otherwise disposed of by the Participant except by will or the laws of descent and distribution or intestacy, and any attempt to sell, assign, transfer, pledge, hypothecate, or otherwise dispose of the Participant's RSUs will be void and unenforceable against the Company or any Affiliate.

7.    <u>Rights as a Shareholder</u>. The Participant will have no rights as a shareholder with respect to any shares of Common Stock covered by the Participant's Restricted Stock Units unless and until the Restricted Stock Units vest and are registered in the Participant's name or are otherwise delivered or credited for the Participant's account or benefit.

8.    <u>Adjustment of Number of Shares and Related Matters</u>. The number and kind of shares of Common Stock covered by a Participant's Restricted Stock Unit Award shall be subject to adjustment in accordance with the terms of the Plan relating to recapitalization or reorganization.

9.    <u>Investment Representation</u>. By accepting any shares of Common Stock issued pursuant to the Participant's Restricted Stock Unit Award, the Participant represents and warrants to the Company that the receipt of such shares shall be for investment and not with a view to distribution; *provided that* such representation and warranty shall be inoperative if, in the opinion of counsel to the Company, a proposed distribution of such shares is pursuant to an applicable effective registration statement under the Securities Act of 1933, as amended, or is, without such representation and warranty, exempt from registration under such Act.

10.    <u>Section 409A Compliance</u>. The Plan and these Terms and Conditions are intended to comply with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended ("Section 409A"), including its exceptions, and shall be construed and administered in accordance with such intent. Notwithstanding any other provision of the Plan, these Terms and Conditions, or the Notice of Grant, any settlement of the RSUs may only occur upon an event and in a manner that complies with Section 409A or an applicable exemption. Any RSUs or settlement of RSUs that may be excluded from Section 409A as a short-term deferral shall be excluded from Section 409A to the maximum extent possible. Notwithstanding the foregoing, the Company makes no representations that the RSUs and any settlement of the RSUs comply with Section 409A, and the Company will not be liable for any portion of any taxes, penalties, interest, or other expenses that the Participant may incur because of non-compliance with Section 409A.

Notwithstanding any provision of the Plan, these Terms and Conditions, or the Notice of Grant to the contrary, if the Participant is a "specified employee" within the meaning of Section 409A as of the date of the Participant's termination of Service, and the Company determines in good faith that immediate settlement of the RSUs would cause a violation of Section 409A, then to the extent shares are issuable upon the Participant's "separation from service" within the meaning of Section 409A and issuance (i) is subject to the provisions of Section 409A; (ii) is not otherwise excluded under Section 409A; and (iii) would otherwise occur during the first six-

3

month period following the Participant's separation from service, such shares shall become issuable on the earlier of (1) the first business day after the date that is six months following the date of separation from service or (2) the date of the Participant's death.

11.   No Right to Continued Service and other Participant Acknowledgments. Nothing herein shall be construed to confer upon the Participant any right to continue as an Employee, Director, or Advisor or to interfere with or restrict in any way the right of the Company or any Affiliate to discharge the Participant at any time (subject to any contractual rights of the Participant) for any reason whatsoever, with or without cause and with or without advance notice. Furthermore, nothing herein shall in any way be construed as imposing on the Company or any Affiliate a contractual obligation between the Company or any Affiliate and the Participant, other than with respect to the specific terms of the Participant's Restricted Stock Unit Award.

12.   Law Governing. The Participant's Restricted Stock Unit Award shall be governed by, and construed in accordance with, the laws of the State of Texas, without regard to conflicts of laws principles thereof.

13.   Legal Construction. In the event that any one or more of these Terms and Conditions shall be held by a Court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect for any reason, the invalid, illegal, or unenforceable term or condition shall not affect any other term or condition, and these Terms and Conditions shall be construed in all respects as if the invalid, illegal, or unenforceable term or condition had never been contained herein.

14.   Amendments. The Plan and the RSUs may be amended or altered by the Board or the Committee to the extent provided in the Plan.

4

**SOUTHWEST AIRLINES CO.**
**AMENDED AND RESTATED 2007 EQUITY INCENTIVE PLAN**


**NOTICE OF GRANT OF PERFORMANCE-BASED RESTRICTED STOCK UNITS**


Pursuant to the terms of the Southwest Airlines Co. Amended and Restated 2007 Equity Incentive Plan (the "Plan"), Southwest Airlines Co. (the "Company") hereby grants to you (the "Participant") an award of performance-based restricted stock units ("PBRSUs"), in accordance with, and subject to, the following:

Participant:

Date of Grant:

Performance Period:

Vesting Date:

Number of PBRSUs Granted ("Grant Amount"):


**Schedule of Performance Targets/Number of PBRSUs Vesting**

| [Performance Target(s)] | Number of PBRSUs Vesting and Settleable in Shares of Common Stock as of the Vesting Date |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |


Participant understands and agrees that the PBRSUs are granted in accordance with, and subject to, the terms and conditions of the Plan and the Terms and Conditions enclosed with this Notice of Grant. The Plan and the prospectus for the Plan are enclosed with this Notice of Grant. Additional copies of these documents are available upon request to the Company's Stock Plan Administration Department.

**By asserting any rights with respect to these PBRSUs, the Participant (and any person who has acquired the PBRSUs by will or the laws of descent and distribution or intestacy) will be deemed to have understood and agreed to the terms and conditions of the Plan and the accompanying Terms and Conditions.**


1

**SOUTHWEST AIRLINES CO.**
**AMENDED AND RESTATED 2007 EQUITY INCENTIVE PLAN**
**TERMS AND CONDITIONS**

**PERFORMANCE-BASED RESTRICTED STOCK UNITS**

(Effective for Awards Granted Beginning on February 3, 2021)

By asserting any rights with respect to performance-based Restricted Stock Units ("PBRSUs" or "Performance-Based Restricted Stock Units") received pursuant to the Southwest Airlines Co. Amended and Restated 2007 Equity Incentive Plan (the "Plan"), the recipient of the PBRSUs (the "Participant") will be deemed to have understood and agreed to the terms and conditions of the Plan and the terms and conditions set forth below. Capitalized terms used and not otherwise defined in these Terms and Conditions shall have the meanings assigned to them in the Plan or in the Notice of Grant of Performance-Based Restricted Stock Units with which these Terms and Conditions are enclosed (the "Notice of Grant").

1.     Vesting. Subject to these Terms and Conditions and the provisions of the Plan, vesting of the PBRSUs will be subject to and in accordance with the schedule set forth in the Notice of Grant.

2.     Interpretation. The Participant's Performance-Based Restricted Stock Unit Award is subject to the terms and conditions of the Plan, which terms and conditions are incorporated herein by reference. The Participant's Performance-Based Restricted Stock Unit Award is also subject to any rules promulgated pursuant to the Plan by the Board, the Committee, or the persons designated by the Committee to administer the day-to-day administration of the Plan. Any decisions or interpretations upon any questions with respect to a Performance-Based Restricted Stock Unit Award or the Plan, including the determination of the number of shares of Common Stock to be received upon settlement of the Participant's Performance-Based Restricted Stock Units, shall (as permissible pursuant to applicable laws, rules, or regulations, including the rules of any stock exchange upon which the Company's Common Stock is listed or quoted) be determined (i) by the Committee, (ii) by the Board, or (iii) where permitted by the Committee, by any person(s) to whom the Committee has delegated its authority. The Participant (and any person who has acquired the PBRSUs by will or the laws of descent and distribution or intestacy) agrees to accept any such decisions or interpretations as binding, conclusive, and final in all respects.

3.     Settlement of Performance-Based Restricted Stock Units. Subject to these Terms and Conditions and the provisions of the Plan, on the Vesting Date, the Participant (or any person who has acquired the PBRSUs by will or the laws of descent and distribution or intestacy) will become entitled to delivery of one share of Common Stock for each Performance-Based Restricted Stock Unit that vests, as determined in accordance with the schedule set forth in the Notice of Grant (the "Vested Shares"). As soon as is administratively and reasonably practicable after the Vesting Date (but in any event, no later than 30 days thereafter), such Vested Shares will be registered in the Participant's name or otherwise delivered or credited for the Participant's account or benefit (in each case as determined by the Company), subject to (a) the Participant's satisfaction of any Tax Obligations (as defined in Section 5 below); (b) the Participant's taking of any additional action deemed necessary or advisable by the Company to enable it to accomplish the delivery of the shares of Common Stock; and (c) the condition precedent that, if at any time the Board or the Committee shall determine in their discretion that the listing, registration, or qualification of the Vested Shares is required under any federal, state, or other law, rule, or regulation, or by the requirements of any securities exchange, or that the consent or approval of any governmental regulatory body is necessary or desirable as a condition of, or in connection with, the issuance of the Vested Shares, then the PBRSUs will not vest in whole or in part unless and until such listing, registration, qualification, consent, or approval shall have been effected or obtained free of any conditions not acceptable to the Board or the Committee; *provided, however*, in the event any action required by clause (a) or (b) above has not been completed by the Participant within 85 days following the Vesting Date, such Performance-Based Restricted

1

Stock Units will be forfeited at 4:00 p.m., Eastern Time, on such date. No fractional shares of Common Stock will be issued in settlement of the PBRSUs.

4.    Rights Upon Termination of Service. Subject to the provisions of subsections 4(a) and (b) below, in the event of termination of the Participant's Service prior to the Vesting Date, all Performance-Based Restricted Stock Units shall automatically and without notice be forfeited at 4:00 p.m., Eastern Time, on the date of termination; provided that, notwithstanding anything in the Plan or the Notice of Grant to the contrary:

(a) in the event of the termination of the Participant's Service as a result of death or Disability, such Participant's Performance-Based Restricted Stock Units will remain outstanding as if the Participant's Service has not terminated and will otherwise be settleable in accordance with the Notice of Grant, these Terms and Conditions, and the terms of the Plan; and

(b) provided that the Participant's Service has terminated no earlier than 12 months after the Date of Grant, in the event of a "qualified retirement," such Participant's Performance-Based Restricted Stock Units will remain outstanding as if the Participant's Service has not terminated and will otherwise be settleable in accordance with the Notice of Grant, these Terms and Conditions, and the terms of the Plan; however, the number of shares received upon settlement will be prorated based on the Participant's number of days of Service between the Date of Grant and the end of the Performance Period.

For purposes of Section 4(b), a Participant's termination of Service will be considered a "qualified retirement" if (a) the Participant has completed at least 10 years of continuous Service; (b) the Participant's age plus completed years of continuous Service equal at least 65 at the time of the Participant's termination of Service; and (c) the Participant has not been terminated for cause.

5.    Taxes.

a.    In order to comply with any federal, state, local, or other laws or regulations of the United States or any other applicable jurisdiction, the Company or any Affiliate is authorized to take such action as it shall deem appropriate to provide that all applicable federal, state, local, or other income, employment, or other tax withholding or similar obligations (collectively, "Tax Obligations") to which the Participant is subject in connection with the PBRSUs are withheld or collected from the Participant. If and to the extent permitted by the Committee from time to time, the Company is authorized to satisfy the Tax Obligations by any one or more of the following methods: (i) by requiring the Participant to pay such amount in cash or check; (ii) by withholding a number of shares of Common Stock that would otherwise be issued with respect to the PBRSUs having a market value sufficient to meet the Tax Obligations; (iii) by instructing the Plan administrator to sell, or cause to be sold, on behalf of the Participant a number of Vested Shares having a market value equal to the amount of the Tax Obligations (plus sales commissions) to which the Participant is subject, and the Participant hereby appoints the Corporate Secretary of the Company as the Participant's attorney-in-fact, with full power of substitution and resubstitution, to execute such sale; (iv) by deducting the amount of the Tax Obligations out of any other remuneration otherwise payable by the Company to the Participant; or (v) by such other method as may be available to the Company from time to time.

b.    The Participant is ultimately liable and responsible for all of the Participant's Tax Obligations, regardless of any action taken by the Company in accordance with Section 5.a. The Company makes no representation or undertaking regarding the treatment of any Tax Obligation in connection with the grant, vesting, or settlement of the PBRSUs or the subsequent sale of any of the shares of Common Stock received upon settlement of any PBRSUs. The Company does not commit, and is under no obligation, to structure the Plan and its administration to reduce or eliminate a Participant's tax liability.

2

c.      The Participant agrees to release and indemnify the Company and its Affiliates from any liability or damages arising from or relating to the Participant's failure to comply with his or her Tax Obligations.

6.      Restriction on Transfer. Performance-Based Restricted Stock Units and any rights with respect to the Participant's Performance-Based Restricted Stock Unit Award may not be sold, assigned, transferred, pledged, hypothecated, or otherwise disposed of by the Participant except by will or the laws of descent and distribution or intestacy, and any attempt to sell, assign, transfer, pledge, hypothecate, or otherwise dispose of the Participant's PBRSUs will be void and unenforceable against the Company or any Affiliate.

7.      Rights as a Shareholder. The Participant will have no rights as a shareholder with respect to any shares of Common Stock covered by the Participant's Performance-Based Restricted Stock Units unless and until the Performance-Based Restricted Stock Units vest and are registered in the Participant's name or are otherwise delivered or credited for the Participant's account or benefit.

8.      Adjustment of Number of Shares and Related Matters. The number and kind of shares of Common Stock covered by a Participant's Performance-Based Restricted Stock Unit Award shall be subject to adjustment in accordance with the terms of the Plan relating to recapitalization or reorganization.

9.      Investment Representation. By accepting any shares of Common Stock issued pursuant to the Participant's Performance-Based Restricted Stock Unit Award, the Participant represents and warrants to the Company that the receipt of such shares shall be for investment and not with a view to distribution; *provided that* such representation and warranty shall be inoperative if, in the opinion of counsel to the Company, a proposed distribution of such shares is pursuant to an applicable effective registration statement under the Securities Act of 1933, as amended, or is, without such representation and warranty, exempt from registration under such Act.

10.     Section 409A Compliance. The Plan and these Terms and Conditions are intended to comply with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended ("Section 409A"), including its exceptions, and shall be construed and administered in accordance with such intent. Notwithstanding any other provision of the Plan, these Terms and Conditions, or the Notice of Grant, any settlement of the PBRSUs may only occur upon an event and in a manner that complies with Section 409A or an applicable exemption. Any PBRSUs or settlement of PBRSUs that may be excluded from Section 409A as a short-term deferral shall be excluded from Section 409A to the maximum extent possible. Notwithstanding the foregoing, the Company makes no representations that the PBRSUs and any settlement of the PBRSUs comply with Section 409A, and the Company will not be liable for any portion of any taxes, penalties, interest, or other expenses that the Participant may incur because of non-compliance with Section 409A.

Notwithstanding any provision of the Plan, these Terms and Conditions, or the Notice of Grant to the contrary, if the Participant is a "specified employee" within the meaning of Section 409A as of the date of the Participant's termination of Service, and the Company determines in good faith that immediate settlement of the PBRSUs would cause a violation of Section 409A, then to the extent shares are issuable upon the Participant's "separation from service" within the meaning of Section 409A and issuance (i) is subject to the provisions of Section 409A; (ii) is not otherwise excluded under Section 409A; and (iii) would otherwise occur during the first six-month period following the Participant's separation from service, such shares shall become issuable on the earlier of (1) the first business day after the date that is six months following the date of separation from service or (2) the date of the Participant's death.

11.     No Right to Continued Service and other Participant Acknowledgments. Nothing herein shall be construed to confer upon the Participant any right to continue as an Employee, Director, or Advisor or to interfere with or restrict in any way the right of the Company or any Affiliate to discharge

3

the Participant at any time (subject to any contractual rights of the Participant) for any reason whatsoever, with or without cause and with or without advance notice. Furthermore, nothing herein shall in any way be construed as imposing on the Company or any Affiliate a contractual obligation between the Company or any Affiliate and the Participant, other than with respect to the specific terms of the Participant's Performance-Based Restricted Stock Unit Award.

12.     <u>Law Governing</u>. The Participant's Performance-Based Restricted Stock Unit Award shall be governed by, and construed in accordance with, the laws of the State of Texas, without regard to conflicts of laws principles thereof.

13.     <u>Legal Construction</u>. In the event that any one or more of these Terms and Conditions shall be held by a Court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect for any reason, the invalid, illegal, or unenforceable term or condition shall not affect any other term or condition, and these Terms and Conditions shall be construed in all respects as if the invalid, illegal, or unenforceable term or condition had never been contained herein.

14.     <u>Amendments</u>. The Plan and the PBRSUs may be amended or altered by the Board or the Committee to the extent provided in the Plan.

**EXECUTION VERSION**

## SECOND AMENDMENT TO REVOLVING CREDIT FACILITY AGREEMENT

Second Amendment (this "Amendment") dated as of November 23, 2020 to Revolving Credit Facility Agreement, dated as of August 3, 2016, as amended by the First Amendment dated as of March 30, 2020, among Southwest Airlines Co. (the "Company"), the Banks party hereto, JPMorgan Chase Bank, N.A., as Paying Agent and Collateral Agent and JPMorgan Chase Bank, N.A. and Citibank, N.A., as Co-Administrative Agents for the Banks (in such capacity, the "Co-Administrative Agents") (with capitalized terms used, but not defined, in this paragraph and the recitals below to be defined as provided in Section 1 below).

### R E C I T A L S

WHEREAS, the Company entered into the Revolving Credit Facility Agreement, dated as of August 3, 2016, as amended by First Amendment dated March 30, 2020, with the Banks party thereto, and JPMorgan Chase Bank, N.A., as Paying Agent, and JPMorgan Chase Bank, N.A. and Citibank, N.A. as Co-Administrative Agents for the Banks (in such capacity, the "Co-Administrative Agents") (as otherwise amended or otherwise modified prior to the date hereof, the "Existing Credit Agreement"; the Existing Credit Agreement, as amended by this Amendment and as further amended or otherwise modified from time to time, the "Credit Agreement");

WHEREAS, the Company has requested certain amendments and modifications to the Existing Credit Agreement and the other Loan Papers as set forth herein; and

WHEREAS, in accordance with Section 9.1 of the Existing Credit Agreement, the Company has requested, and the Agents and the Banks party hereto that constitute Majority Banks have agreed, to amend certain provisions of the Existing Credit Agreement on the terms and subject to the conditions set forth herein.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1.    Defined Terms; Rules of Construction. Capitalized terms used herein and not otherwise defined herein have the meanings assigned to such terms in the Existing Credit Agreement or, if not defined therein, the Existing Credit Agreement as amended hereby.

SECTION 2.    Amendments to the Existing Credit Agreement.

(a) Effective as of the Second Amendment Effective Date (as defined below), and subject to the terms and conditions set forth herein, the Existing Credit Agreement is hereby amended to incorporate the changes reflected in the redlined version of the Credit Agreement attached hereto as Annex I.

(b) Effective as of the Second Amendment Effective Date, and subject to the terms and conditions set forth herein, Exhibit D (Financial Report Certificate) to the Existing Credit Agreement is replaced with Exhibit D (Financial Report Certificate) as attached hereto as Annex II. For the avoidance of doubt, a Financial Report Certificate delivered after the date hereof (including the Financial Report Certificate with respect to fiscal quarter period ending on September 30, 2020) shall be substantially in the form of Exhibit D as amended hereby.

SECTION 3.    Representations and Warranties. To induce the other parties hereto to enter into this Amendment, the Company hereby represents and warrants to each other party hereto that, as of the Second Amendment Effective Date:

(i)    The execution and delivery of this Amendment, and performance of this Amendment and the Credit Agreement, the borrowings thereunder, and the execution, delivery, and performance of the other Loan Papers to which it is a party by the Company have been duly authorized by all requisite corporate action on the part of the Company and will not violate its charter or bylaws and will not violate any Law or any order of any Tribunal, and will not conflict with, result in a breach of the provisions of or constitute a default under, or result in the imposition of any Lien upon the Property of the Company pursuant to the provisions of, any material loan agreement, credit agreement, indenture, mortgage, deed of trust, franchise, permit, license, note, contract, or other material agreement or instrument to which the Company is now a party. The Loan Papers that include obligations of the Company are the legal, valid and binding obligations of the Company and are enforceable in accordance with their respective terms, except as such enforceability may be limited by general equitable principles (whether enforcement is sought by proceedings in equity or at law) or applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally;

(ii)    no Default or Event of Default exists, both before and after giving effect to this Amendment; and

(iii)    the representations and warranties contained in Article V of the Credit Agreement (except the last sentence of Section 5.2 thereof and except Section 5.5 thereof) are correct in all material respects (or, to the extent subject to materiality or Material Adverse Effect qualifiers, in all respects) on and as of the date hereof (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date), before and after giving effect to this Amendment, as though made on and as of such date.

SECTION 4.    Conditions of Effectiveness of this Amendment. This Amendment shall become effective as of the first date (the "Second Amendment Effective Date") when each of the conditions set forth in this Section 4 shall have been satisfied:

(a)    The Paying Agent shall have received this Amendment, executed and delivered by the Paying Agent, the Company and each Bank under the Existing Credit Agreement constituting Majority Banks.

(b)    Any fees or expenses of the Paying Agent, the other Agents and the Banks required to be paid by the Credit Agreement and any fee letter executed by the Company on or before the Second Amendment Effective Date shall have been paid; provided that with respect to legal fees, a reasonably detailed invoice therefor shall have been delivered to the Company at least one full Business Day prior to the closing.

SECTION 5.    Effect of Amendment. Except as expressly set forth in this Amendment or in the Credit Agreement, this Amendment shall not by implication or otherwise limit, impair, constitute a waiver of or otherwise affect the rights and remedies of the Banks or the Agents under the Credit Agreement or any other Loan Papers, and shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in the Credit Agreement or any other provision of the Credit Agreement or of any other Loan Papers, all of which are ratified and affirmed in all respects and shall continue in full force and effect. Nothing herein shall be deemed to entitle the

-2-

Company to a consent to, or a waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants or agreements contained in the Credit Agreement or any other Loan Paper in similar or different circumstances.

(i) On and after the Second Amendment Effective Date, each reference in the Credit Agreement to "this Agreement", "hereunder", "hereof", "herein", or words of like import, and each reference to the Credit Agreement in any other Loan Paper, in each case shall be deemed a reference to the Credit Agreement as modified by this Amendment. This Amendment shall constitute a "Loan Paper" for all purposes of the Credit Agreement and the other Loan Papers.

(ii) This Amendment, the Credit Agreement and the other Loan Papers constitute the entire agreement among the parties hereto with respect to the subject matter hereof and thereof and supersede all other prior agreements and understandings, both written and verbal, among the parties hereto with respect to the subject matter hereof.

(iii) This Amendment may not be amended, modified or waived except in accordance with Section 9.1 of the Credit Agreement.

SECTION 6.     GOVERNING LAW. **THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK. SECTIONS 9.7 AND 9.8 OF THE EXISTING CREDIT AGREEMENT ARE HEREBY INCORPORATED BY REFERENCE INTO THIS AMENDMENT AND SHALL APPLY TO THIS AMENDMENT, *MUTATIS MUTANDIS*.**

SECTION 7.     Counterparts. This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery by facsimile or other electronic transmission (including in ".pdf" or ".tif" format) of an executed counterpart of a signature page to this Amendment (in a format reasonably acceptable to the Paying Agent) shall be effective as delivery of an original executed counterpart of this Amendment. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Amendment and/or any document to be signed in connection with this Amendment and the transactions contemplated hereby shall be deemed to include Electronic Signatures (as defined below), deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be. As used herein, "Electronic Signatures" means any electronic symbol or process attached to, or associated with, any contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record.

SECTION 8.     Headings. Section headings herein are included for convenience of reference only and shall not affect the interpretation of this Amendment.

SECTION 9.     Severability. Section 9.14 of the Existing Credit Agreement is hereby incorporated by reference into this Amendment and shall apply to this Amendment, *mutatis mutandis*.

SECTION 10.     Indemnity. Section 9.5 of the Existing Credit Agreement is hereby incorporated by reference to this Amendment and shall apply to this Amendment, *mutatis mutandis*.

SECTION 11.     Reaffirmation.

-3-

(a) The Company hereby (i) expressly acknowledges the terms of the Credit Agreement (as amended by this Amendment), (ii) ratifies and affirms its obligations under the Loan Papers (including guarantees and security agreements) (as amended by this Amendment) executed by the Company, (iii) acknowledges, renews and extends its continued liability under all such Loan Papers (as amended by this Amendment) and agrees such Loan Papers remain in full force and effect, (iv) agrees that the Aircraft Mortgage secures all Obligations of the Company in accordance with the terms thereof and (v) confirms this Amendment does not represent a novation of any Loan Paper. The Company ratifies and confirms that all Liens granted, conveyed, or assigned to the Administrative Agent pursuant to each Loan Paper to which it is a party remain in full force and effect, are not released or reduced, and continue to secure full payment and performance of the Obligations (in each case other than as any such Liens have been released or reduced from time to time in accordance with the Loan Papers prior to the date hereof).

(b) The Company hereby reaffirms, as of the Second Amendment Effective Date, the covenants and agreements contained in each Loan Paper to which it is a party, as modified and in effect immediately after giving effect to this Amendment and the transactions contemplated thereby.

(c) The Company hereby acknowledges and agrees that the acceptance by the Administrative Agent and each applicable Bank of this document shall not be construed in any manner to establish any course of dealing on such Person's part, including the providing of any notice or the requesting of any acknowledgment not otherwise expressly provided for in any Loan Paper with respect to any future amendment, waiver, supplement or other modification to any Loan Paper or any arrangement contemplated by any Loan Paper.

[*Remainder of page intentionally blank.*]

-4-

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed by their duly authorized officers, all as of the date and year first above written.

SOUTHWEST AIRLINES CO.
By: /s/ Chris Monroe

Name: Chris Monroe
Title: Senior Vice President Finance and Treasurer

[Signature page to Southwest Airlines
Second Amendment to Revolving Credit Facility Agreement]

JPMORGAN CHASE BANK, N.A., as a Bank, an Issuing Bank, a Co-Administrative Agent, the Paying Agent and the Collateral Agent

By: /s/ Cristina Caviness

Name: Cristina Caviness
Title: Vice President

[Signature page to Southwest Airlines
Second Amendment to Revolving Credit Facility Agreement]

CITIBANK, N.A., as a Bank, an Issuing Bank and Co-Administrative Agent

By: /s/ Michael Leonard

Name: Michael Leonard
Title: Vice President

[Signature page to Southwest Airlines
Second Amendment to Revolving Credit Facility Agreement]

BARCLAYS BANK PLC, as a Bank

By: /s/ Craig Malloy

Name: Craig Malloy
Title: Director

[Signature page to Southwest Airlines
Second Amendment to Revolving Credit Facility Agreement]

BANK OF AMERICA, N.A., as a Bank
By: /s/ Prathamesh Kshirsagar

Name: Prathamesh Kshirsagar
Title: Director

[Signature page to Southwest Airlines
Second Amendment to Revolving Credit Facility Agreement]

BNP PARIBAS, as a Bank

By: /s/ Robert Papas


Name: Robert Papas
Title: Managing Director

By: /s/ Thomas Iacono


Name: Thomas Iacono
Title: Vice President


[Signature page to Southwest Airlines
Second Amendment to Revolving Credit Facility Agreement]

GOLDMAN SACHS BANK USA, as a Bank
By: /s/ Mahesh Mohan


Name: Mahesh Mohan
Title: Authorized Signatory

[Signature page to Southwest Airlines
Second Amendment to Revolving Credit Facility Agreement]

MORGAN STANLEY BANK, N.A., as a Bank

By: /s/ Jack Kuhns

Name: Jack Kuhns
Title Authorized Signatory

[Signature page to Southwest Airlines
Second Amendment to Revolving Credit Facility Agreement]

U.S. BANK NATIONAL ASSOCIATION, as a Bank
By: /s/ Sean P. Walters

Name: Sean P. Walters
Title: Vice President

[Signature page to Southwest Airlines
Second Amendment to Revolving Credit Facility Agreement]

WELLS FARGO BANK, N.A., as a Bank
By: /s/ Adam Spreyer

Name: Adam Spreyer
Title: Director

[Signature page to Southwest Airlines
Second Amendment to Revolving Credit Facility Agreement]

COMERICA BANK, as a Bank

By: /s/ Carl Bradley

Name: Carl Bradley
Title: Portfolio Manager

[Signature page to Southwest Airlines
Second Amendment to Revolving Credit Facility Agreement]

ANNEX I
FORM OF AMENDED CREDIT AGREEMENT

[See attached]

EXECUTION VERSION
ANNEX I

**$1,000,000,000 REVOLVING CREDIT FACILITY AGREEMENT**

among

**SOUTHWEST AIRLINES CO.,**

**THE BANKS PARTY HERETO,**

**BARCLAYS BANK PLC,**
**as Syndication Agent,**


**BANK OF AMERICA, N.A.,**

**BNP PARIBAS,**

**GOLDMAN SACHS BANK USA,**

**MORGAN STANLEY SENIOR FUNDING, INC.,**

**U.S. BANK NATIONAL ASSOCIATION**

and

**WELLS FARGO BANK, N.A.,**

as Documentation Agents


and


**JPMORGAN CHASE BANK, N.A.**

and

**CITIBANK, N.A.,**

as Co-Administrative Agents

and

**JPMORGAN CHASE BANK, N.A.,**

as Paying Agent


As of August 3, 2016,

**as amended by First Amendment dated March 30, 2020 and**

Second Amendment dated November 23, 2020

**JPMORGAN CHASE BANK, N.A.**


**and**
**CITIGROUP GLOBAL MARKETS Inc.,**
**as Joint Lead Arrangers and Joint Bookrunners**

**Table of Contents**

| | Page |
|---|---|
| ARTICLE I DEFINITIONS AND ACCOUNTING TERMS…………………………………………...2 | |
| Section 1.1 Certain Defined Terms………………………………………..…………...2 | |
| Section 1.2 Computation of Time Periods………………………………………2122 | |
| Section 1.3 Interest Rates; LIBOR Notification…………………………………2122 | |
| | |
| ARTICLE II LOANS…………………………………………………………………22 | |
| Section 2.1 Commitments…………………………………………………..22 | |
| Section 2.2 Committed Borrowing Procedure…………………………………2223 | |
| Section 2.3 Refinancings; Conversions…………………………………………2223 | |
| Section 2.4 Fees………………………………………………………………2324 | |
| Section 2.5 Termination and Reduction of Commitments………………………2324 | |
| Section 2.6 Loans……………………………………………………………2425 | |
| Section 2.7 Loan Accounts……………………………………………………2425 | |
| Section 2.8 Interest on Loans…………………………………………………2526 | |
| Section 2.9 Interest on Overdue Amounts……………………………………2526 | |
| Section 2.10 Alternate Rate of Interest………………………………………2526 | |
| Section 2.11 Prepayment of Loans ……………………………………………27 | |
| Section 2.12 Reserve Requirements; Change in Circumstances………………2728 | |
| Section 2.13 Change in Legality………………………………………………29 | |
| Section 2.14 Indemnity………………………………………………………2930 | |
| Section 2.15 Pro Rata Treatment………………………………………………3031 | |
| Section 2.16 Sharing of Setoffs………………………………………………3031 | |
| Section 2.17 Payments………………………………………………………31 | |
| Section 2.18 Taxes……………………………………………………………3132 | |
| Section 2.19 Calculation of LIBO Rates………………………………………3435 | |
| Section 2.20 Booking Loans……………………………………………………3435 | |
| Section 2.21 Quotation of Rates………………………………………………3435 | |
| Section 2.22 Defaulting Banks…………………………………………………3435 | |
| Section 2.23 Mitigation Obligations; Replacement of Banks…………………3637 | |
| Section 2.24 Commitment Increases……………………………………………3738 | |
| Section 2.25 Extension of the Termination Date………………………………3839 | |
| | |
| ARTICLE III LETTERS OF CREDIT………………………………………………40 | |
| Section 3.1 L/C Commitment…………………………………………………40 | |
| Section 3.2 Procedure for Issuance of Letter of Credit………………………4041 | |
| Section 3.3 Fees and Other Charges……………………………………………4041 | |
| Section 3.4 L/C Participations…………………………………………………4142 | |
| Section 3.5 Reimbursement Obligation of the Company………………………42 | |
| Section 3.6 Obligations Absolute………………………………………………4243 | |
| Section 3.7 Letter of Credit Payments…………………………………………4243 | |
| Section 3.8 Applications………………………………………………………4243 | |
| | |
| ARTICLE IV CONDITIONS OF LENDING…………………………………………43 | |
| Section 4.1 Conditions Precedent………………………………………………...43 | |
| Section 4.2 Conditions Precedent to Each Committed Borrowing………………44 | |
| Section 4.3 Conditions Precedent to Each Letter of Credit Issuance……………4445 | |
| Section 4.4 Legal Details………………………………………………………4445 | |

i

ARTICLE V REPRESENTATIONS AND WARRANTIES…………………………..…………………45

    Section 5.1 Organization, Authority and Qualifications……………………………………………45

    Section 5.2 Financial Statements……………………………………………………~~45~~46

    Section 5.3 Compliance with Agreement and Laws …………………………………………~~5~~46

    Section 5.4 Authorization; No Breach; and Valid Agreements…………………………~~45~~46

    Section 5.5 Litigation and Judgments……………………………………………………46

    Section 5.6 Ownership of Properties……………………………………………~~46~~47

    Section 5.7 Taxes………………………………………………………………~~46~~47

    Section 5.8 Approvals Required………………………………………………~~46~~47

    Section 5.9 Business; Status as Air Carrier…………………………………~~46~~47

    Section 5.10 ERISA Compliance……………………………………………...~~46~~47

    Section 5.11 Insurance………………………………………………………~~46~~47

    Section 5.12 Purpose of Loan………………………………………………………47

    Section 5.13 Investment Company Act……………………………………………..47

    Section 5.14 General……………………………………………………………~~47~~48

    Section 5.15 EEA Financial Institutions……………………………………~~47~~48

    Section 5.16 Anti-Corruption Laws and Sanctions……………………………~~47~~48

    Section 5.17 Security Interests………………………………………………...~~47~~48

ARTICLE VI COVENANTS………………………………………………………………..48

    Section 6.1 Performance of Obligations……………………………………………48

    Section 6.2 Compliance with Laws…………………………………………………48

    Section 6.3 Maintenance of Existence, Licenses and Franchises: Compliance With Agreements~~48~~49

    Section 6.4 Maintenance of Properties…………………………………………...~~48~~49

    Section 6.5 Maintenance of Books and Records………………………………~~48~~49

    Section 6.6 Inspection…………………………………………………………~~48~~49

    Section 6.7 Insurance……………………………………………………………49

    Section 6.8 Appraisals……………………………………………………………49

    Section 6.9 ~~Coverage Ratio~~……………………………………~~49~~[Reserved] 50

    Section 6.10 Reporting Requirements…………………………………………~~49~~50

    Section 6.11 Use of Proceeds………………………………………………...~~50~~51

    Section 6.12 Pool Assets………………………………………………………51

    Section 6.13 Restrictions on Liens……………………………………………~~52~~53

    Section 6.14 Mergers and Dissolutions…………………………………………53

    Section 6.15 Assignment…………………………………………………………~~53~~54

    Section 6.16 Amendments………………………………………………………~~53~~54

    Section 6.17 Liquidity……………………………………………………………~~53~~54

    Section 6.18 Further Assurances…………………………………………………54

ARTICLE VII EVENTS OF DEFAULT; REMEDIES………………………………………54

    Section 7.1 Events of Default………………………………………………………54

    Section 7.2 Remedies Upon Default……………………………………………...56

    Section 7.3 Remedies in General…………………………………………………58

ARTICLE VIII THE AGENTS………………………………………………………...~~58~~59

    Section 8.1 Authorization and Action……………………………………………~~58~~59

    Section 8.2 Agents' Reliance, Etc…………………………………………………59

    Section 8.3 Rights of Agents as Banks……………………………………………~~59~~60

    Section 8.4 Bank Credit Decision…………………………………………………~~59~~60

    Section 8.5 Agents' Indemnity……………………………………………………60

ii

Section 8.6 Successor Paying Agent and Successor Collateral Agent……………………………..~~60~~61

Section 8.7 Notice of Default…………………………………………………………………….61

Section 8.8 Co-Administrative Agents and Documentation Agent………………………………61

Section 8.9 Collateral Matters…………………………………………………………………~~61~~62

ARTICLE IX MISCELLANEOUS……………………………………………………………~~61~~62

Section 9.1 Amendments, Etc……………………………………………………………………~~61~~62

Section 9.2 Notices, Etc…………………………………………………………………………~~62~~63

Section 9.3 No Waiver; Remedies……………………………………………………………….~~63~~64

Section 9.4 Costs, Expenses and Taxes………………………………………………………….~~63~~64

Section 9.5    Indemnity…………………………………………………………………………64

Section 9.6 Right of Setoff……………………………………………………………………….~~64~~65

Section 9.7 **Governing Law**…………………………………………............65

Section 9.8 Submission To Jurisdiction; Waivers……………………………………………….65

Section 9.9 Survival of Representations and Warranties………………………………………….~~65~~66

Section 9.10 Binding Effect……………………………………………………………………….~~65~~66

Section 9.11 Successors and Assigns; Participations……………………………………………….66

Section 9.12 Confidentiality……………………………………………………………………….~~68~~69

Section 9.13 Independence of Covenants………………………………………………………….~~69~~70

Section 9.14 Severability………………………………………………………………………….~~69~~70

Section 9.15 Integration………………………………………………………………………….~~69~~70

Section 9.16 Descriptive Headings……………………………………………..………………….~~69~~70

Section 9.17 Execution in Counterparts………………………………………………………….~~69~~70

Section 9.18 **WAIVERS OF JURY TRIAL**…………………………………………………….70

Section 9.19 No Fiduciary Duty………………………………………………………………….70

Section 9.20 USA Patriot Act…………………………………………………………………….~~70~~71

Section 9.21 Acknowledgement and Consent to Bail-In of EEA Financial Institutions…………~~70~~71

Section 9.22 Interest Rate Limitation…………………………………………………………….71

**SCHEDULES**

Location of Lending Office; Notice Information                                                    Schedule I

  Pool Assets_____                                    Schedule II

**EXHIBITS**

Form of Notice of Committed Borrowing                                                             Exhibit A

Form of Note                                                                                      Exhibit B

Form of Company's Internal Counsel Opinion                                                        Exhibit C-1

Form of Company's Outside Counsel Opinion                                                         Exhibit C-2

Form of Agents' Counsel Opinion                                                                   Exhibit C-3

Form of Financial Report Certificate                                                             Exhibit D

Form of Assignment and Assumption                                                                Exhibit E

Form of Appraisal                                                                                Exhibit F

Form of U.S. Tax Compliance Certificate – Foreign Banks (Not Partnerships)                       Exhibit G-1

Form of U.S. Tax Compliance Certificate – Non-U.S. Participants (Partnerships)                   Exhibit G-2

Form of U.S. Tax Compliance Certificate – Non-U.S. Participants (Not Partnerships)               Exhibit G-3

iii

Form of U.S. Tax Compliance Certificate – Foreign Banks (Partnerships)    Exhibit G-4
Form of Increased Facility Activation Notice                                                                    Exhibit H-1
Form of New Bank Supplement                                                                                      Exhibit H-2
Form of Aircraft Mortgage                                                                                            Exhibit I
Form of Mortgaged Aircraft Operating Agreement                                                      Exhibit J

iv

## REVOLVING CREDIT FACILITY AGREEMENT

REVOLVING CREDIT FACILITY AGREEMENT, dated as of August 3, 2016, as amended by FIRST AMENDMENT, dated as of March 30, 2020 and SECOND AMENDMENT, dated as of November 23, 2020, among SOUTHWEST AIRLINES CO. (the "Company"), the Banks (as herein defined), JPMORGAN CHASE BANK, N.A., as Paying Agent (as herein defined), JPMORGAN CHASE BANK, N.A. and CITIBANK, N.A., as co-administrative agents for the Banks (in such capacity, the "Co-Administrative Agents"), BARCLAYS BANK PLC, as syndication agent for the Banks (in such capacity, the "Syndication Agent") and BANK OF AMERICA, N.A., BNP PARIBAS, GOLDMAN SACHS BANK USA, MORGAN STANLEY SENIOR FUNDING, INC., U.S. BANK NATIONAL ASSOCIATION and WELLS FARGO BANK, N.A., as documentation agents for the Banks (collectively, in such capacity, the "Documentation Agents").

The Company has requested the Banks to extend credit to the Company in order to enable it to borrow on a revolving credit basis and to obtain letters of credit on and after the Effective Date and at any time and from time to time prior to the Termination Date (each as herein defined) in an aggregate principal amount not in excess of the Commitments outstanding at such time. The Banks are willing to extend such credit to the Company on the terms and conditions herein set forth. Accordingly, the Company, the Agents (as herein defined), and the Banks agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

Section I.1 Certain Defined Terms

. As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Additional Commitment Bank" is defined in Section 2.25(c).

"Adjusted LIBO Rate" means, with respect to any Eurodollar Loan for any Interest Period, an interest rate *per annum* (rounded upwards, if necessary, to the next 1/16 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Adjusted Pre-Tax Income" of any Person means, with respect to any period, income before income taxes of such Person for such period, but excluding (i) any gain or loss arising from the sale of capital assets other than capital assets consisting of Aircraft, (ii) any gain or loss arising from any write-up or write-down of assets, (iii) income or loss of any other Person, substantially all of the assets of which have been acquired by such Person in any manner, to the extent that such income or loss was realized by such other Person prior to the date of such acquisition, (iv) income or loss of any other Person (other than a Subsidiary) in which such Person has an ownership interest, (v) the income or loss of any other Person to which assets of such Person shall have been sold, transferred, or disposed of, or into which such Person shall have merged, to the extent that such income or loss arises prior to the date of such transaction, (vi) any gain or loss arising from the acquisition of any securities of such Person, (vii) gains or losses reported as extraordinary in accordance with GAAP not previously excluded in clauses (i) through (vi), and (viii) the cumulative effect of changes in accounting methods permitted by GAAP during such period. Notwithstanding the foregoing, the determination of income before income taxes for any period shall be adjusted by any pre-tax non-GAAP financial measures for such period as identified in "Reconciliation of

5

Reported Amounts to Non-GAAP Financial Measures" contained in the Management's Discussion and Analysis of Financial Condition and Results of Operations in the Company's filings in respect of such period on Form 10-Q or Form 10-K with the Securities and Exchange Commission.

"Administrative Questionnaire" means an Administrative Questionnaire in a form satisfactory to the Paying Agent, which each Bank shall complete and provide to the Paying Agent.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means a Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with another Person.

"Agents" means the Paying Agent, the Co-Administrative Agents, the Collateral Agent, the Syndication Agent and the Documentation Agents.

"Agreed Maximum Rate" means, for any date, 2% per annum above the interest rate then applicable to Alternate Base Loans.

"Agreement" means this Revolving Credit Facility Agreement, as amended by the First Amendment on the First Amendment Effective Date, as the same may be further amended, supplemented, or modified from time to time.

"Aircraft" means, collectively, airframes and aircraft engines now owned or hereafter acquired by the Company, together with all appliances, equipment, instruments, and accessories (including radio and radar, but excluding passenger convenience equipment) from time to time belonging to, installed in, or appurtenant to such airframes and aircraft engines; provided, however, the term "Aircraft" shall not include airframes and engines leased by the Company.

"Aircraft Mortgage" means that "Aircraft Mortgage" as defined in Section 4(e) of the First Amendment, as the same may be amended, restated, modified, supplemented, extended or amended and restated from time to time.

"Aircraft Protocol" means the official English language text of the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment, adopted on November 16, 2001 at a diplomatic conference in Cape Town, South Africa, and all amendments, supplements and revisions thereto, as in effect in the United States.

~~"Aircraft Rentals" means the operating expense attributable to aircraft rentals, calculated in accordance with the line item described as such in the Current Financials.~~

"Alternate Base Loan" means any Committed Loan with respect to which the Company shall have selected an interest rate based on the Alternate Base Rate in accordance with the provisions of Article II.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the New York Fed Bank Rate in effect on such day plus ½ of 1% and (c) the Adjusted LIBO Rate for a one month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) (giving effect to any floor in such rate) plus 1%; provided that for the purpose of this definition, the Adjusted LIBO Rate for any day shall be based on the Screen

6

Rate (or if the Screen Rate is not available for such one month Interest Period, the Interpolated Rate) at approximately 11:00 a.m. London time on such day. Any change in the Alternate Base Rate due to a change in the Prime Rate, the New York Fed Bank Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the New York Fed Bank Rate or the Adjusted LIBO Rate, respectively. If the Alternate Base Rate is being used as an alternate rate of interest pursuant to Section 2.10 (for the avoidance of doubt, only until any amendment has become effective pursuant to Section 2.10(b)), then the Alternate Base Rate shall be the greater of clauses (a) and (b) above and shall be determined without reference to clause (c) above. For the avoidance of doubt, if the Alternate Base Rate as determined pursuant to the foregoing would be less than 1.00%, such rate shall be deemed to be 1.00% for purposes of this Agreement. For purposes hereof: "Prime Rate" shall mean the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Fed Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Paying Agent) or any similar release by the Fed Reserve Board (as determined by the Paying Agent). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"Anti-Corruption Laws" means all laws, rules and regulations of any jurisdiction applicable to the Company or its Subsidiaries from time to time concerning or relating to bribery or corruption.

"Applicable Lending Office" means, with respect to each Bank, such Bank's Domestic Lending Office in the case of an Alternate Base Loan and such Bank's Eurodollar Lending Office in the case of a Eurodollar Loan.

"Applicable Rate" means the relevant rate determined by reference to the Index Debt Rating in effect on such date as set forth below:

~~(a) Prior to such date which shall be no earlier than April 1, 2021 on which the Company delivers an Officer's Certificate certifying that the following conditions have been met as of such date: (i) the loans under the Term Loan Credit Agreement have been repaid in full and other obligations thereunder (other than unasserted contingent indemnification obligations thereunder) have been paid in full and terminated, (ii) for a period of 30 consecutive calendar days on and prior to delivery of such certificate the amount of Loans outstanding under this Agreement has been zero and (iii) the Company is in compliance with Section 6.9 hereof as of such date with calculations demonstrating such compliance (the date of delivery of such Officer's Certificate following satisfaction of such conditions, the "Applicable Rate Reset Date"):~~

| Index Debt Ratings S&P/Moody's | Applicable Rate (Eurodollar Loans) | Applicable Rate (Alternate Base Rate Loans) | Commitment Fee Rate |
|---|---|---|---|
| BBB/Baa2 or better | 2.000% | 1.000% | 0.150% |
| BBB-/Baa3 or below | 2.250% | 1.250% | 0.200% |

7

(b) From and after the Applicable Rate Reset Date:

| Index Debt Ratings S&P/Moody's | Applicable Rate (Eurodollar Loans) | Applicable Rate (Alternate Base Rate Loans) | Commitment Fee Rate |
|---|---|---|---|
| A/A2 or better | 0.875% | 0.000% | 0.080% |
| A-/A3 | 1.000% | 0.000% | 0.100% |
| BBB+/Baa1 | 1.125% | 0.125% | 0.125% |
| BBB/Baa2 | 1.250% | 0.250% | 0.150% |
| BBB-/Baa3 or below | 1.500% | 0.500% | 0.200% |

(c)     Each change in the Applicable Rate shall apply during the period commencing on the effective date of such change and ending on the date immediately preceding the effective date of the next such change. If the rating system of Moody's or S&P shall change, the Company and the Banks shall negotiate in good faith to amend this definition to reflect such changed rating system and, pending the effectiveness of any such amendment, the Applicable Rate shall be determined by reference to the rating most recently in effect prior to such change.

"Applicable Rate Reset Date" is defined in the definition of "Applicable Rate".

"Application" means an application, in such form as an Issuing Bank may specify from time to time, requesting such Issuing Bank to open a Letter of Credit. Each Issuing Bank shall furnish to the Company a form of Application satisfactory to it promptly following the request therefor by the Company.

"Appraisal" means a "desk-top" appraisal report addressed to the Paying Agent and substantially in the form of Exhibit F, which will not include physical inspection of aircraft, engines or maintenance records and will assume the equipment is half life in its maintenance cycle, dated the date of delivery of such report to the Banks pursuant to the terms of this Agreement, by one or more independent appraisal firms of recognized national standing selected by the Company (such firm to be reasonably satisfactory, at the time of such Appraisal, to the Paying Agent) setting forth the fair market value, as determined in accordance with the definition of "current market value" promulgated by the International Society of Transport Aircraft Trading, as of the date of such appraisal, of each Pool Asset or a proposed Pool Asset, as the case may be.

"Appraisal Delivery Date" means (a) the Effective Date, (b) the First Amendment Effective Date, (c) each six-month anniversary of the First Amendment Effective Date (other than on the Termination Date) and (d) each date of replacement, removal or addition of any Pool Asset if such Pool Asset is an airframe or an airframe and one or more engines installed thereon.

"Appraised Value" means, as of any date of determination, (a) in respect of all Pool Assets, the aggregate current market value as of such date of such Pool Assets and (b) in respect of any Pool Asset or proposed Pool Asset, as the case may be, the current market value as of such date of such Pool Asset or proposed Pool Asset, as applicable, in each case, as provided in the most recently delivered Appraisal.

"Assignment and Assumption" is defined in Section 9.11(c).

"Auditors" means independent certified public accountants of recognized national standing selected by the Company.

8

"Available Revolving Commitment" means, as to any Bank at any time, an amount equal to the excess, if any, of (a) such Bank's Commitment then in effect over (b) such Bank's Revolving Credit Exposure then outstanding.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Banks" means those banks and other financial institutions signatory hereto and other banks or financial institutions which from time to time become party hereto pursuant to the provisions of this Agreement.

"Benchmark Replacement" means the sum of: (a) the alternate benchmark rate (which may be a SOFR-Based Rate) that has been selected by the Paying Agent and the Company giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body and/or (ii) any evolving or then-prevailing market convention for determining a rate of interest as a replacement to the LIBO Rate for U.S. dollar-denominated syndicated credit facilities and (b) the Benchmark Replacement Adjustment; provided that, if the Benchmark Replacement as so determined would be less than 1.00%, the Benchmark Replacement will be deemed to be 1.00% for the purposes of this Agreement; provided further that any such Benchmark Replacement shall be administratively feasible as determined by the Paying Agent in its sole discretion.

"Benchmark Replacement Adjustment" means the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Paying Agent and the Company giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the LIBO Rate with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body and/or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the LIBO Rate with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominated syndicated credit facilities at such time (for the avoidance of doubt, such Benchmark Replacement Adjustment shall not be in the form of a reduction to the Applicable Rate).

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest and other administrative matters) that the Paying Agent decides in its reasonable discretion may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Paying Agent in a manner substantially consistent with market practice (or, if the Paying Agent decides that adoption of any portion of such

9

market practice is not administratively feasible or if the Paying Agent determines that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as the Paying Agent decides is reasonably necessary in connection with the administration of this Agreement).

"Benchmark Replacement Date" means the earlier to occur of the following events with respect to the LIBO Rate:

(1) in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of the Screen Rate permanently or indefinitely ceases to provide the Screen Rate; or

(2) in the case of clause (3) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein.

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the LIBO Rate:

(1) a public statement or publication of information by or on behalf of the administrator of the Screen Rate announcing that such administrator has ceased or will cease to provide the Screen Rate, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Screen Rate;

(2) a public statement or publication of information by the regulatory supervisor for the administrator of the Screen Rate, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the administrator for the Screen Rate, a resolution authority with jurisdiction over the administrator for the Screen Rate or a court or an entity with similar insolvency or resolution authority over the administrator for the Screen Rate, in each case which states that the administrator of the Screen Rate has ceased or will cease to provide the Screen Rate permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Screen Rate; and/or

(3) a public statement or publication of information by the regulatory supervisor for the administrator of the Screen Rate announcing that the Screen Rate is no longer representative.

"Benchmark Transition Start Date" means (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication) and (b) in the case of an Early Opt-in Election, the date specified by the Paying Agent or the Majority Banks, as applicable, by notice to the Company, the Paying Agent (in the case of such notice by the Majority Banks) and the Banks.

10

"Benchmark Unavailability Period" means, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the LIBO Rate and solely to the extent that the LIBO Rate has not been replaced with a Benchmark Replacement, the period (x) beginning at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the LIBO Rate for all purposes hereunder in accordance with Section 2.10 and (y) ending at the time that a Benchmark Replacement has replaced the LIBO Rate for all purposes hereunder pursuant to Section 2.10.

"Borrowing" means a Committed Borrowing.

"Borrowing Date" means the Business Day on which the proceeds of any Borrowing are to be made available to the Company.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close, provided, that with respect to notices and determinations in connection with, and payments of principal and interest on, Eurodollar Loans, such day is also a day for trading in London, England by and between banks in dollar deposits in the Eurodollar Interbank Market.

"Cape Town Convention" means the official English language text of the Convention on International Interests in Mobile Equipment, adopted on November 16, 2001 at a diplomatic conference in Cape Town, South Africa, and all amendments, supplements and revisions thereto, as in effect in the United States.

"Cape Town Treaty" means, collectively, (a) the Cape Town Convention, (b) the Aircraft Protocol and (c) all rules and regulations (including but not limited to the Regulations and Procedures for the International Registry) adopted pursuant thereto and, in the case of each of the foregoing described in clauses (a) through (c), all amendments, supplements and revisions thereto as in effect in the United States.

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Co-Administrative Agents" is defined in the introduction to this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means the Pool Assets and any other assets that constitute "Collateral" as defined in the Aircraft Mortgage.

"Collateral Agent" means JPMorgan Chase Bank, N.A. or any successor to JPMorgan Chase Bank, N.A. appointed in accordance with the provisions of Section 8.1, in each case, as the collateral agent for the Banks under this Agreement and the other Loan Papers.

"Collateral Coverage Test" means, on any date, the requirement that the Appraised Value of the Pool Assets on such date that are subject to the Lien of the Aircraft Mortgage or to the Lien of an aircraft mortgage granted by a Grantor of Collateral after the Effective Date, in substantially the form of Exhibit G, in favor of the Collateral Agent and filed with the FAA, shall not be less than an amount equal to 1.25

11

times the Total Commitment on such date (or, after termination of the Commitments, the sum of the aggregate outstanding amount of Loans and L/C Obligations).

"Collateral Coverage Test Cure Period" is defined in Section 6.12.

"Commitment" means, with respect to each Bank, the obligation of such Bank to make Loans and to issue or participate in Letters of Credit in the aggregate principal and/or face amount set forth opposite the name of such Bank on the signature pages hereof, and, if applicable, amendments hereto, as such amount may be permanently terminated or reduced from time to time pursuant to Section 2.5 and Section 7.2, as such amount may be obtained or increased from time to time pursuant to Section 2.24, and as such amount may be increased or reduced from time to time by assignment or assumption pursuant to Section 2.23(b) and Section 9.11(c). The Commitments shall automatically and permanently terminate on the Termination Date.

"Commitment Fee" is defined in Section 2.4.

"Committed Borrowing" means a borrowing consisting of simultaneous Committed Loans from each of the Banks distributed ratably among the Banks in accordance with their respective Commitments.

"Committed Loan" means a loan by a Bank to the Company pursuant to Section 2.1, and shall be either a Eurodollar Loan or an Alternate Base Loan.

"Communications" is defined in Section 9.2.

"Company" is defined in the introduction to this Agreement.

"Compounded SOFR" means the compounded average of SOFRs for the applicable Corresponding Tenor, with the rate, or methodology for this rate, and conventions for this rate (which may include compounding in arrears with a lookback and/or suspension period as a mechanism to determine the interest amount payable prior to the end of each Interest Period) being established by the Paying Agent in accordance with:

(1) the rate, or methodology for this rate, and conventions for this rate selected or recommended by the Relevant Governmental Body for determining Compounded SOFR; provided that:

(2) if, and to the extent that, the Paying Agent determines that Compounded SOFR cannot be determined in accordance with clause (1) above, then the rate, or methodology for this rate, and conventions for this rate that the Paying Agent determines in its reasonable discretion are substantially consistent with any evolving or then-prevailing market convention for determining Compounded SOFR for U.S. dollar-denominated syndicated credit facilities at such time;

provided, further, that if the Paying Agent decides that any such rate, methodology or convention determined in accordance with clause (1) or clause (2) is not administratively feasible for the Paying Agent, then Compounded SOFR will be deemed unable to be determined for purposes of the definition of "Benchmark Replacement."

12

"Corresponding Tenor" with respect to a Benchmark Replacement means a tenor (including overnight) having approximately the same length (disregarding Business Day adjustment) as the applicable tenor for the applicable Interest Period with respect to the LIBO Rate.

~~"Coverage Ratio" means, as of any date, the ratio of (i) for the four fiscal quarter period for which the Company's annual or quarterly Financial Statements have been most recently required to have been delivered pursuant to Section 6.10(a) and Section 6.10(b), the Company's and its Subsidiaries' consolidated Adjusted Pre-Tax Income, plus Aircraft Rentals, plus consolidated Net Interest Expense, and depreciation and amortization, and minus cash dividends paid by the Company, to (ii) the Company's and its Subsidiaries' consolidated Net Interest Expense and Aircraft Rentals for such four-quarter period.~~

"Current Financials" means the Financial Statements of the Company and its Subsidiaries for the fiscal year ended December 31, 2015.

"Debt" means, without duplication, (a) any indebtedness for borrowed money or incurred in connection with the acquisition or construction of any Property, (b) any obligation under any lease of any Property entered into after the date of this Agreement which is required under GAAP to be capitalized on the lessee's balance sheet, and (c) any direct or indirect guarantee or assumption of indebtedness or obligations described in clause (a) or (b), including without limitation any agreement to provide funds to or otherwise assure the ability of an obligor to repay indebtedness or meet its obligations.

"Debtor Relief Laws" means the Bankruptcy Code of the United States of America and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization, fraudulent transfer or conveyance, suspension of payments, or similar Laws from time to time in effect affecting the Rights of creditors generally.

"Default" means the occurrence of any event which with the giving of notice or the passage of time or both would become an Event of Default.

"Defaulting Bank" means any Bank, as determined by the Paying Agent, that (a) has failed, in the determination of the Paying Agent, which determination shall be conclusive subject to manifest error, to fund any portion of its Loans or participations in Letters of Credit within three Business Days of the date required to be funded by it hereunder unless such Bank notifies the Paying Agent in writing that such failure is the result of such Bank's reasonable determination that one or more conditions precedent to funding has not been satisfied, (b) has notified the Company, the Paying Agent, any Issuing Bank or any Bank in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement (unless such writing or public statement relates to such Bank's obligation to fund a Loan hereunder and states that such position is based on such Bank's reasonable determination that a condition precedent to funding cannot be satisfied) or generally under agreements in which it has committed to extend credit, (c) has failed, within three Business Days after written request by the Paying Agent (whether acting on its own behalf or at the reasonable request of the Company (it being understood that the Paying Agent shall comply with any such reasonable request)), to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans and participations in then outstanding Letters of Credit; provided that any such Bank shall cease to be a Defaulting Bank under this clause (c) upon receipt of such confirmation by the Paying Agent, (d) has otherwise failed to pay over to the Paying Agent or any other Bank any other amount required to be paid by it hereunder within three Business Days of the date when due, unless the subject of a good faith dispute, (e) has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian

13

appointed for it, or has a direct or indirect parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or (f) has, or has a direct or indirect parent company that has, become the subject of a Bail-In Action. No Bank shall be a Defaulting Bank solely by virtue of the ownership or acquisition of any equity interest in such Bank or a parent company thereof by a Governmental Authority or an instrumentality thereof so long as such ownership interest does not result in or provide such Bank with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Bank (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Bank.

"Documentation Agents" is defined in the introduction to this Agreement.

"dollars" and the symbol "$" mean the lawful currency of the United States of America.

"Domestic Lending Office" means, with respect to any Bank, the office of such Bank specified as its "Domestic Lending Office" on Schedule I to this Agreement or such other office of such Bank as such Bank may from time to time specify to the Company and the Paying Agent.

"Early Opt-in Election" means the occurrence of:
(1) (i) a determination by the Paying Agent or (ii) a notification by the Majority Banks to the Paying Agent (with a copy to the Company) that the Majority Banks have determined that U.S. dollar-denominated syndicated credit facilities being executed at such time, or that include language similar to that contained in Section 2.10 are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace the LIBO Rate, and

(2) (i) the election by the Paying Agent or (ii) the election by the Majority Banks to declare that an Early Opt-in Election has occurred and the provision, as applicable, by the Paying Agent of written notice of such election to the Company and the Banks or by the Majority Banks of written notice of such election to the Paying Agent.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the date on which the conditions set forth in Section 4.1 are first met, which date is August 3, 2016.

"Eligible Affiliate Assignee" means, with respect to any Bank, an Affiliate thereof that is: (i) a commercial bank organized under the Laws of the United States, or any state thereof, and having total

14

assets in excess of $1,000,000,000; (ii) a commercial bank organized under the Laws of France, Germany, the Netherlands or the United Kingdom, or under the Laws of a political subdivision of any such country, and having total assets in excess of $1,000,000,000; provided that such bank is acting through a branch or agency located in such country or the United States; or (iii) a commercial bank organized under the Laws of any other country which is a member of the OECD, or under the Laws of a political subdivision of any such country, and having total assets in excess of $1,000,000,000; provided that such bank is acting through a branch or agency located in the United States.

"Entry Point Filing Forms" means each of the FAA form AC 8050-135 forms to be filed with the FAA on the First Amendment Effective Date.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated thereunder.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurodollar Interbank Market" means the London eurodollar interbank market.

"Eurodollar Lending Office" means, with respect to each Bank, the branches or affiliates of such Bank which such Bank has designated on Schedule I as its "Eurodollar Lending Office" or may hereafter designate from time to time as its "Eurodollar Lending Office" by notice to the Company and the Paying Agent.

"Eurodollar Loan" means any loan with respect to which the Company shall have selected an interest rate based on the LIBO Rate in accordance with the provisions of Article II.

"Event of Default" means any of the events described in Article VII, provided there has been satisfied any requirement in connection therewith for the giving of notice, lapse of time, or happening of any further condition, event, or act.

"Excluded Taxes" means with respect to any payment made by the Company under this Agreement or any Loan Papers, any of the following Taxes imposed on or with respect to the Paying Agent, a Bank or an Issuing Bank: (a) income or franchise Taxes imposed on (or measured by) net income by the United States of America (including a state, locality or other political subdivision thereof), or by the jurisdiction (including a state, locality or other political subdivision thereof) under the laws of which such Paying Agent, Bank or Issuing Bank is organized or in which its principal office is located or, in the case of any Bank, in which its applicable lending office is located, (b) any branch profits Taxes imposed by the United States of America or any similar Taxes imposed by any other jurisdiction in which the Company is located, (c) in the case of a Foreign Bank (other than an assignee pursuant to a request by the Company under Section 2.23), any U.S. Federal withholding Taxes resulting from any Law in effect on the date such Foreign Bank becomes a party to this Agreement (or designates a new lending office) or is attributable to such Foreign Bank's failure to comply with Section 2.18(f), except to the extent that such Foreign Bank (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Company with respect to such withholding Taxes pursuant to Section 2.18(a), (d) Other Connection Taxes, and (e) any U.S. withholding Taxes imposed by reason of FATCA.

15

"Existing Bank" is defined in Section 2.24(c).

"Existing Credit Agreement" means the Revolving Credit Facility Agreement, dated as of April 2, 2013, among the Company, the banks party thereto and the agents referred to therein.

"Existing Termination Date" is defined in Section 2.25(a).

"Extended Termination Date" is defined in Section 2.25(a).

"Extension Date" is defined in Section 2.25(d).

"FAA" means the Federal Aviation Administration of the United States of America and any successor thereto.

"FATCA" means Sections 1471 through 1474 of the Code as of the date of this Agreement (including any amendment or successor to any such Section so long as such amendment or successor is substantially similar or comparable to the reporting and withholding (and related) obligations of Sections 1471 through 1474 of the Code as of the date of this Agreement and not materially more onerous to comply with), any current or future Treasury regulations promulgated thereunder or published administrative guidance or any other official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any law, regulation, rule, promulgation, guidance notes, practices or official agreement implementing an official government agreement with respect to the foregoing.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the New York Fed based on such day's federal funds transactions by depositary institutions, as determined in such manner as shall be set forth on the Federal Reserve Bank of New York's Website from time to time, and published on the next succeeding Business Day by the New York Fed as the effective federal funds rate; provided that if the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"Federal Reserve Bank of New York's Website" means the website of the New York Fed at http://www.newyorkfed.org, or any successor source.

"Fed Reserve Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Financial Report Certificate" means a certificate substantially in the form of Exhibit D.

"Financial Statements" means balance sheets, income and loss statements, statements of stockholders' equity, and statements of cash flow prepared in accordance with GAAP and in comparative form to the corresponding period of the preceding fiscal year.

"First Amendment" means First Amendment to Credit Agreement dated as of the First Amendment Effective Date.

"First Amendment Effective Date" means March 30, 2020, the date on which all conditions precedent set forth in Section 4 of the First Amendment are satisfied.

"Foreign Bank" is defined in Section 2.18.

16

"GAAP" means generally accepted accounting principles in the United States which are applicable as of the date in question for the purpose of the definition of "Financial Statements."

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Grantor" means the Company in its capacity as grantor under the Aircraft Mortgage and any Wholly Owned Domestic Subsidiary at any time that is a party to an Aircraft Mortgage, in substantially the form of Exhibit I, as grantor thereunder.

"IBA" is defined in Section 1.3.

"Impacted Interest Period" is defined in the definition of "LIBO Rate".

"Increased Facility Activation Notice" means a notice substantially in the form of Exhibit H-1.

"Increased Facility Bank" is defined in Section 2.24(c).

"Increased Facility Closing Date" means any Business Day designated as such in an Increased Facility Activation Notice.

"Indemnified Taxes" means (a) Taxes other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Company under any Loan Papers and (b) Other Taxes.

"Index Debt" means senior, unsecured, non-credit enhanced debt with an original term of longer than one year issued by the Company.

"Index Debt Rating" means, as of any date, the rating that has been most recently announced by S&P and Moody's for the Index Debt of the Company. For purposes of the foregoing, (a) if only one of S&P and Moody's shall have in effect an Index Debt Rating, the Applicable Rate shall be determined by reference to the available rating; (b) if the Index Debt Ratings established by S&P and Moody's shall fall within different levels, the Applicable Rate shall be based upon the higher rating, except that if the difference is two or more levels, the Applicable Rate shall be based on the rating that is one level below the higher rating; (c) if any Index Debt Rating established by S&P or Moody's shall be changed, such change shall be effective as of the date on which such change is first announced publicly by the rating agency making such change; (d) if S&P or Moody's shall change the basis on which ratings are established, each reference to the rating for the Index Debt announced by S&P or Moody's, as the case may be, shall refer to the then equivalent rating by S&P or Moody's, as the case may be; and (e) if neither S&P nor Moody's shall have in effect an Index Debt Rating, the Applicable Rate shall be set in accordance with the lowest level rating and highest percentage rate set forth in the table in the definition of "Applicable Rate".

"Initial Issuing Banks" means, collectively, JPMorgan Chase Bank, N.A., Citibank, N.A. and Barclays Bank PLC.

17

"Interest Payment Date" means (i) with respect to any Alternate Base Loan, each Quarterly Payment Date, or if earlier the Termination Date or the date of prepayment of such Loan or conversion of such Loan to a Eurodollar Loan and (ii) with respect to any Eurodollar Loan, the last day of the Interest Period applicable thereto and, in the case of a Eurodollar Loan with an Interest Period longer than three months each day that would have been the Interest Payment Date for such Loan had successive Interest Periods of three months been applicable to such Loan, or if earlier, the Termination Date or the date of prepayment of such Loan or conversion of such Loan to an Alternate Base Loan.

"Interest Period" means, as to any Eurodollar Loan, the period commencing on the date of such Loan and ending on the numerically corresponding day (or if there is no corresponding day, the last day) in the calendar month that is one, two, three or six, or, if agreed to by all Banks, twelve months thereafter, as the Company may elect; provided, that (x) if any Interest Period would end on a day which shall not be a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless, with respect to Eurodollar Loans only, such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (y) no Interest Period may be selected that ends later than the Termination Date. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.

"International Interest" means an "international interest" as defined in the Cape Town Convention.

"International Registry" means the "International Registry" as defined in the Cape Town Convention.

"Interpolated Rate" means, at any time, the rate per annum (rounded to the same number of decimal places as the Screen Rate) determined by the Paying Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the Screen Rate for the longest period for which that Screen Rate is available in dollars that is shorter than the Impacted Interest Period and (b) the Screen Rate for the shortest period for which that Screen Rate is available for dollars that is longer the Impacted Interest Period, in each case, as of 11:00 a.m., London time (or as soon thereafter as practicable), two Business Days before the first day of such Impacted Interest Period.

"Issuing Bank" means each Initial Issuing Bank and each other Bank approved by the Company and that has agreed in writing to act as an "Issuing Bank" hereunder. Each reference herein to "the Issuing Bank" shall be deemed to be a reference to the relevant Issuing Bank.

"Laws" means all applicable statutes, laws, treaties, ordinances, rules, regulations, orders, writs, injunctions, decrees, judgments, or opinions of any Tribunal.

"L/C Commitment" means $300,000,000.

"L/C Obligations" means at any time, an amount equal to the sum of (a) the aggregate then undrawn and unexpired amount of the then outstanding Letters of Credit, if any, and (b) the aggregate amount of drawings under Letters of Credit that have not then been reimbursed pursuant to Section 3.5.

"L/C Participants" means the collective reference to all the Banks other than the Issuing Bank.

"Letters of Credit" is defined in Section 3.1(a).

18

"LIBO Rate" means, for any Eurodollar Loan for any Interest Period therefor, a rate per annum equal to the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for dollars for a period equal in length to such Interest Period as displayed on pages LIBOR01 or LIBOR02 of the Reuters Screen that displays such rate (or, in the event such rate does not appear on either of such Reuters pages, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Paying Agent in its reasonable discretion; in each case, the "Screen Rate") at approximately 11:00 a.m., London time (or as soon thereafter as practicable), two Business Days before the first day of such Interest Period; provided that if the Screen Rate shall be less than 1.00%, such rate shall be deemed to be 1.00% for purposes of this Agreement; provided, further, that if the Screen Rate shall not be available at such time for such Interest Period (an "Impacted Interest Period") with respect to dollars, then the LIBO Rate shall be the Interpolated Rate at such time (provided that if the Interpolated Rate shall be less than 1.00%, such rate shall be deemed to be 1.00% for purposes of this Agreement). The LIBO Rate for the Interest Period for each Eurodollar Loan comprising part of the same Borrowing shall be determined by the Paying Agent.

"Lien" means any mortgage, lien, pledge, charge, security interest or other encumbrance in or on, or any interest or title of any vendor, lessor, lender or other secured party to or of any Person under, any conditional sale or other title retention agreement or lease with respect to any Property or asset of such Person. For avoidance of doubt, (i) the filing of a Uniform Commercial Code financing statement by a Person that is not entitled or authorized in accordance with the applicable Uniform Commercial Code to file such financing statement or (ii) any Uniform Commercial Code financing statement that has not been terminated as of record after the underlying Lien has been released shall not, in and of itself, constitute a Lien; provided that the Company agrees to use commercially reasonable efforts to have such financing statement terminated promptly after it becomes aware of existence of such financing statement.

"Litigation" means any action conducted, pending, or threatened by or before any Tribunal.

"Loan" means a Committed Loan, a Eurodollar Loan, or an Alternate Base Loan.

"Loan Papers" means (i) this Agreement, certificates delivered pursuant to this Agreement and exhibits and schedules hereto, (ii) the Aircraft Mortgages, (iii) the Mortgaged Aircraft Operating Agreement, (iv) any notes, security documents, guaranties, and other agreements in favor of the Agents and Banks, or any or some of them, ever delivered in connection with this Agreement, (v) any Letters of Credit and (vi) all renewals, extensions, or restatements of, or amendments or supplements to, any of the foregoing.

"Majority Banks" means, at any time, Banks having Revolving Credit Exposures and unused Commitments representing more than 50% of the sum of the total Revolving Credit Exposures and unused Commitments at such time.

"Material Adverse Change" or "Material Adverse Effect" means an act, event or circumstance which materially and adversely affects the business, financial condition or results of operations of the Company and its Subsidiaries on a consolidated basis or the ability of the Company to perform its obligations under this Agreement or any Loan Paper.

"Material Subsidiary" means, at any time, any Subsidiary of the Company having at such time (i) total assets, as of the last day of the most recently ended fiscal quarter for which the Company's annual or quarterly Financial Statements have been most recently required to have been delivered pursuant to

19

Section 6.10, having a net book value greater than or equal to 10% of the total assets of the Company and all of its Subsidiaries on a consolidated basis, (ii) Adjusted Pre-Tax Income, as of the last day of the most recently ended fiscal quarter for which the Company's annual or quarterly Financial Statements have been most recently required to have been delivered pursuant to Section 6.10, greater than or equal to 10% of the total Adjusted Pre-Tax Income of the Company and all of its Subsidiaries on a consolidated basis or (iii) any Pool Assets.

"Moody's" means Moody's Investors Service, Inc. (or any successor thereto).

"Mortgaged Aircraft Operating Agreement" means the mortgaged aircraft operating agreement in substantially the form of Exhibit J, dated as of the First Amendment Effective Date, between the Company and the Collateral Agent, as the same may be amended, restated, modified, supplemented, extended or amended and restated from time to time.

~~"Net Interest Expense" means interest expense minus interest income, excluding in either case capitalized interest, but including payments in the nature of interest under capital leases if and to the extent characterized as such in accordance with GAAP.~~

"New Bank" is defined in Section 2.24(b).

"New Bank Supplement" is defined in Section 2.24(b).

"New York Fed" means the Federal Reserve Bank of New York.

"New York Fed Bank Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for any day that is a Business Day, the term "New York Fed Bank Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. on such day received by the Paying Agent from a federal funds broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates as so determined be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Non-Extending Bank" is defined in Section 2.25(b).

"Note" means a promissory note which a Bank may require the Company to execute in accordance with Section 2.7(b), payable to the order of such Bank, in substantially the form of Exhibit B hereto, with the blanks appropriately completed, to evidence the aggregate indebtedness of the Company to such Bank resulting from the Committed Loans made by such Bank to the Company, together with all modifications, extensions, renewals, and rearrangements thereof.

"Notice Deadline" is defined in Section 2.25(b).

"Notice of Committed Borrowing" is defined in Section 2.2.

"Obligation" means all present and future indebtedness, obligations, and liabilities, and all renewals, extensions, and modifications thereof, owed to the Agents and Banks, or any or some of them, by the Company, arising pursuant to any Loan Paper, together with all interest thereon and costs, expenses, and reasonable attorneys' fees incurred in the enforcement or collection thereof.

20

"OECD" means the Organization for Economic Cooperation and Development as constituted on the date hereof (excluding Mexico, Poland and the Czech Republic).

"Officer's Certificate" means a certificate signed in the name of the Company by either its Chairman, its Chief Executive Officer, its Chief Financial Officer, its President, one of its Vice Presidents, its Treasurer, or its Assistant Treasurer, in each case without personal liability.

"Original Termination Date" means the fifth anniversary of the Effective Date.

"Other Connection Taxes" means with respect to the Paying Agent, any Bank or any Issuing Bank, as the case may be, Taxes imposed as a result of a present or former connection between the Paying Agent, such Bank or such Issuing Bank, as the case may be, and the jurisdiction imposing such Taxes (other than a connection arising solely from the Paying Agent, such Bank or such Issuing Bank having executed, delivered, enforced, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, or engaged in any other transaction pursuant to, or enforced, any Loan Papers, or, in each case in accordance with and subject to the provisions of this Agreement, sold or assigned an interest in any Loan Papers).

"Other Taxes" means any present or future stamp, court, documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the registration, receipt or perfection of a security interest under, or otherwise with respect to, this Agreement or any Loan Papers, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than Other Connection Taxes imposed with respect to an assignment under Section 2.23).

"Overnight Bank Funding Rate" means, for any day, the rate comprised of both overnight federal funds and overnight Eurodollar borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the New York Fed as set forth on the Federal Reserve Bank of New York's Website from time to time, and published on the next succeeding Business Day by the New York Fed as an overnight bank funding rate.

"Paying Agent" means JPMorgan Chase Bank, N.A. or any successor to JPMorgan Chase Bank, N.A. appointed in accordance with the provisions of Section 8.6, in each case, as the paying agent for the Banks under this Agreement and the other Loan Papers.

"Participant Register" is defined in Section 9.11(b).

"Permitted Liens" means: (a) Liens for taxes, assessments and governmental charges or levies which either are not yet due and payable or are being contested in good faith by appropriate proceedings and for which adequate reserves are established in accordance with GAAP; (b) Liens securing judgments, but only to the extent, for an amount and for a period not resulting in an Event of Default under Section 7.1(d); (c) Liens securing Obligations under this Agreement; (d) Liens constituting normal operational usage of the affected Property, including charter, third party maintenance, storage, leasing, pooling or interchange thereof; (e) Liens imposed by law such as materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business securing obligations that (i) are not overdue for a period of more than 30 days, provided that no enforcement, collection, execution, levy or foreclosure proceeding shall have been commenced with respect thereto, or (ii) are being contested in good faith and for which adequate reserves are established in

21

accordance with GAAP; and (f) salvage or similar rights of insurers under the insurances required to be maintained pursuant to the Mortgaged Aircraft Operating Agreement.

"Person" means and includes an individual, partnership, joint venture, corporation, trust, limited liability company or other entity, Tribunal, unincorporated organization, or government, or any department, agency, or political subdivision thereof.

"Plan" means any plan defined in Section 4021(a) of ERISA in respect of which the Company is an "employer" or a "substantial employer" as such terms are defined in ERISA.

"Pool Assets" means assets of the Company and any of its Wholly Owned Domestic Subsidiaries listed on Schedule II, to the extent modified pursuant to Section 6.12, and shall include only Specified Equipment owned legally by the Company and any of its Wholly Owned Domestic Subsidiaries.

"Prime Rate" is defined in the definition of the term Alternate Base Rate.

"Principal Office" of the Paying Agent means 500 Stanton Christiana Road, NCC5 / 1st Floor, Newark, Delaware 19713-2107, or such other office as the Paying Agent may hereafter designate from time to time as its "Principal Office" by notice to the Company and the Banks.

"Property" means all types of real, personal, tangible, intangible, or mixed property.

"Quarterly Payment Date" means the 15th day of each March, June, September and December of each year, the first of which shall be the first such day after the Effective Date.

"Register" is defined in Section 9.11(e).

"Regulation D" means Regulation D of the Fed Reserve Board, as the same is from time to time in effect, and all official rulings and interpretations thereunder or thereof.

"Regulatory Change" means, with respect to any Bank, (a) any adoption or change after the Effective Date of or in United States federal, state or foreign laws, rules, regulations (including Regulation D) or guidelines applying to a class of banks including such Bank, (b) the adoption or making after the Effective Date of any interpretations, directives or requests applying to a class of banks including such Bank of or under any United States federal, state or foreign laws, rules, regulations or guidelines (whether or not having the force of law) by any Tribunal, monetary authority, central bank, or comparable agency charged with the interpretation or administration thereof, or (c) any change in the interpretation or administration of any United States federal, state or foreign laws, rules, regulations or guidelines applying to a class of banks including such Bank by any Tribunal, monetary authority, central bank, or comparable agency charged with the interpretation or administration thereof.

"Reimbursement Obligation" means the obligation of the Company to reimburse the Issuing Bank pursuant to Section 3.5 for amounts drawn under Letters of Credit.

"Relevant Anniversary Date" is defined in Section 2.25(a).

"Relevant Governmental Body" means the Fed Reserve Board and/or the New York Fed, or a committee officially endorsed or convened by the Fed Reserve Board and/or the New York Fed or, in each case, any successor thereto.

22

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Request Date" is defined in Section 2.25(a).

"Revolving Credit Exposure" means, with respect to any Bank at any time, the sum of the outstanding principal amount of such Bank's Loans and its L/C Obligations at such time. For the purposes of this definition each Bank shall be deemed to hold a pro rata share of the total L/C Obligations based on the percentage which its Commitment represents of the aggregate Commitments.

"Rights" means rights, remedies, powers, and privileges.

"S&P" means Standard & Poor's Financial Services LLC and any successor to its rating agency business.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State or by the United Nations Security Council, the European Union or any European Union member state, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b), or (d) any Person otherwise the subject of any Sanctions.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State.

"Secured Parties" means the Agents and the Banks.

"Senior Officer" means, in each case for the Company, its Chief Executive Officer, Chief Financial Officer, President, Treasurer, or its Assistant Treasurer.

"SOFR" with respect to any day means the secured overnight financing rate published for such day by the New York Fed, as the administrator of the benchmark (or a successor administrator), on the Federal Reserve Bank of New York's Website.

"SOFR-Based Rate" means SOFR, Compounded SOFR or Term SOFR.

"Specified Equipment" means aircraft consisting of the Boeing 737-700, Boeing 737-800, Boeing 737 MAX 7 and Boeing 737 MAX 8 models (and any later generation model of any thereof), including, its related engines; provided that aircraft that is Boeing 737 MAX 7 or Boeing 737 MAX 8 may constitute Specified Equipment solely to the extent that the applicable model is issued an airworthiness certificate by the FAA confirming that it is certified to fly.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum

reserve percentage (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Fed Reserve Board to which the Paying Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D). Such reserve percentage shall include those imposed pursuant to Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Bank under Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subsidiary" of a Person means any entity of which an aggregate of more than 50% (in number of votes) of the stock (or equivalent interests) is owned of record or beneficially, directly or indirectly, by such Person.

"Successor Company" is defined in Section 6.14(a).

"Syndication Agent" is defined in the introduction to this Agreement.

"Taxes" means all present or future taxes, assessments, fees, levies, imposts, duties, deductions, withholdings (including backup withholding), value added taxes or any other goods and services, use or sales taxes, assessments, fees or other charges at any time imposed by any Laws or Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

~~"Term Loan Credit Agreement" means the Amended and Restated 364-Day Credit Agreement, dated as of March 30, 2020, among the Company, JPMorgan Chase Bank, N.A. and the banks party thereto from time to time, as amended.~~

"Term SOFR" means the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"Termination Date" means, the earlier of (a) the Original Termination Date, subject to extension thereof pursuant to Section 2.25, and (b) the date of termination in whole of the Total Commitment pursuant to Section 2.5 or Section 7.2; provided, however, that the Termination Date of any Bank that is a Non-Extending Bank with respect to any requested extension pursuant to Section 2.25 shall be the Termination Date in effect immediately prior to the applicable Extension Date for all purposes of this Agreement.

"Total Commitment" means at any time the aggregate amount of the Banks' Commitments, as in effect at such time.

"Total Liquidity" means, at any time, the sum of (a) the aggregate amount available to be borrowed by the Company under this Agreement plus (b) the aggregate amount of unrestricted cash and cash equivalents of the Company and its Subsidiaries at such time plus (c) the aggregate amount of items at such time that are of the type that would appear as short-term investments on the consolidated balance sheet of the Company prepared in accordance with GAAP.

"Tribunal" means any municipal, state, commonwealth, federal, foreign, territorial, or other court, governmental body, subdivision, agency, department, commission, board, bureau, or instrumentality.

"Type" refers to the distinction between Committed Loans that are Alternate Base Loans and Committed Loans that are Eurodollar Loans.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment; provided that, if the Unadjusted Benchmark Replacement as so determined would be less than 1.00%, the Unadjusted Benchmark Replacement will be deemed to be 1.00% for the purposes of this Agreement.

"United States" and "U.S." each means United States of America.

"U.S. Tax Compliance Certificate" is defined in Section 2.18.

"Wholly Owned Domestic Subsidiary" means a Wholly Owned Subsidiary of the Company organized under the laws of any jurisdiction within the United States.

"Wholly Owned Subsidiary" means, as to any Person, any other Person all of the Capital Stock of which (other than directors' qualifying shares required by law) is owned by such Person directly and/or through other Wholly Owned Subsidiaries.

"Withholding Agent" means the Company and the Paying Agent.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section I.2 Computation of Time Periods. In this Agreement in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding."

25

Section I.3 Interest Rates; LIBOR Notification. The interest rate on Eurodollar Loans is determined by reference to the LIBO Rate, which is derived from the London interbank offered rate. The London interbank offered rate is intended to represent the rate at which contributing banks may obtain short-term borrowings from each other in the London interbank market. In July 2017, the U.K. Financial Conduct Authority announced that, after the end of 2021, it would no longer persuade or compel contributing banks to make rate submissions to the ICE Benchmark Administration (together with any successor to the ICE Benchmark Administrator, the "IBA") for purposes of the IBA setting the London interbank offered rate. As a result, it is possible that commencing in 2022, the London interbank offered rate may no longer be available or may no longer be deemed an appropriate reference rate upon which to determine the interest rate on Eurodollar Loans. In light of this eventuality, public and private sector industry initiatives are currently underway to identify new or alternative reference rates to be used in place of the London interbank offered rate. Upon the occurrence of a Benchmark Transition Event or an Early Opt-In Election, Section 2.10(b) provides a mechanism for determining an alternative rate of interest. The Paying Agent will promptly notify the Company, pursuant to Section 2.10(d), of any change to the reference rate upon which the interest rate on Eurodollar Loans is based. However, none of the Paying Agent and the Banks warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission or any other matter related to the London interbank offered rate or other rates in the definition of "LIBO Rate" or with respect to any alternative or successor rate thereto, or replacement rate thereof (including, without limitation, (i) any such alternative, successor or replacement rate implemented pursuant to Section 2.10(b), whether upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, and (ii) the implementation of any Benchmark Replacement Conforming Changes pursuant to Section 2.10(c)), including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the LIBO Rate or have the same volume or liquidity as did the London interbank offered rate prior to its discontinuance or unavailability.

26

## ARTICLE II

## LOANS

Section II.1 Commitments. Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Bank, severally and not jointly, agrees to make revolving credit loans in dollars to the Company, at any time and from time to time on and after the Effective Date and until the earlier of the Termination Date and the termination of the Commitment of such Bank in accordance with the terms hereof. Notwithstanding the foregoing, (a) the aggregate principal amount at any time outstanding of all Committed Loans of a Bank shall not exceed such Bank's Commitment and (b) the Total Commitment shall be deemed used from time to time to the extent of the L/C Obligations, and such deemed use of the Total Commitment shall be applied to the Banks ratably according to their respective Commitments, subject, however, to the conditions that (i) at no time shall (A) the sum of (x) the outstanding aggregate principal amount of all Committed Loans made by all Banks and (y) the L/C Obligations exceed (B) the Total Commitment, and (ii) at all times the outstanding aggregate principal amount of all Committed Loans made by a Bank shall equal the product of (x) the percentage which its Commitment represents of the Total Commitment times (y) the outstanding aggregate principal amount of all Committed Loans obligated to have been made by all Banks.

Within the foregoing limits, the Company may borrow, repay, prepay, and reborrow hereunder, on and after the Effective Date and prior to the Termination Date, subject to the terms, provisions, and limitations set forth herein.

Section II.2 Committed Borrowing Procedure. In order to effect a Committed Borrowing, the Company shall hand deliver, telecopy or e-mail to the Paying Agent a duly completed request for Committed Borrowing, substantially in the form of Exhibit A hereto (a "Notice of Committed Borrowing"), (i) in the case of Eurodollar Loans, not later than 11:00 a.m., New York City time, three Business Days before the Borrowing Date specified for a proposed Committed Borrowing, and (ii) in the case of Alternate Base Loans, not later than 11:00 a.m., New York City time, on the Business Day which is the Borrowing Date specified for a proposed Committed Borrowing. Such notice shall be irrevocable and shall in each case refer to this Agreement and specify (x) whether the Loans then being requested are to be Eurodollar Loans, or Alternate Base Loans, (y) the Borrowing Date of such Loans (which shall be a Business Day) and the aggregate amount thereof (which shall not be less than $10,000,000 and shall be an integral multiple of $1,000,000) and (z) in the case of a Eurodollar Loan, the Interest Period with respect thereto (which shall not end later than the Termination Date). If no Interest Period with respect to any Eurodollar Loan is specified in any such Notice of Committed Borrowing, then the Company shall be deemed to have selected an Interest Period of one month's duration. Promptly, and in any event on the same day the Paying Agent receives a Notice of Committed Borrowing pursuant to this Section 2.3 if such notice is received by 11:00 a.m., New York City time on a Business Day and otherwise on the next succeeding Business Day, the Paying Agent shall advise the other Banks of such Notice of Committed Borrowing and of each Bank's portion of the requested Committed Borrowing by telecopier or e-mail. Each Committed Borrowing shall consist of Loans of the same Type made on the same day and having the same Interest Period.

Section II.3 Refinancings; Conversions

(a) The Company may refinance all or any part of any Loan with a Loan of the same or a different type made pursuant to Section 2.2, subject to the conditions and limitations set forth herein and elsewhere in this Agreement. Any Loan or part thereof so refinanced shall be deemed to be repaid in accordance with Section 2.17 with the proceeds of a new Borrowing hereunder and the proceeds of the new Loan, to the extent they do not exceed the principal amount of the Loan being refinanced, shall not be paid by the Banks to the Paying Agent or by the Paying Agent to the Company pursuant to Section

27

2.6(c); provided, however, that (i) if the principal amount extended by a Bank in a refinancing is greater than the principal amount extended by such Bank in the Borrowing being refinanced, then such Bank shall pay such difference to the Paying Agent for distribution to the Banks described in (ii) below, (ii) if the principal amount extended by a Bank in the Borrowing being refinanced is greater than the principal amount being extended by such Bank in the refinancing, the Paying Agent shall return the difference to such Bank out of amounts received pursuant to (i) above, (iii) to the extent any Bank fails to pay the Paying Agent amounts due from it pursuant to (i) above, any Loan or portion thereof being refinanced shall not be deemed repaid in accordance with Section 2.17 to the extent of such failure and the Company shall pay such amount to the Paying Agent pursuant to Section 2.17 and (iv) to the extent the Company fails to pay to the Paying Agent any amounts due in accordance with Section 2.17 as a result of the failure of a Bank to pay the Paying Agent any amounts due as described in (iii) above, the portion of any refinanced Loan deemed not repaid shall be deemed to be outstanding solely to the Bank which has failed to pay the Paying Agent amounts due from it pursuant to (i) above to the full extent of such Bank's portion of such refinanced Loan.

(b) Subject to the conditions and limitations set forth in this Agreement, the Company shall have the right from time to time to convert all or part of one Type of Committed Loan into another Type of Committed Loan or to continue all or a part of any Committed Loan that is a Eurodollar Loan from one Interest Period to another Interest Period by giving the Paying Agent written notice (by means of a Notice of Committed Borrowing) (i) in the case of Eurodollar Loans, not later than 11:00 a.m., New York City time, three Business Days before the date specified for such proposed conversion or continuation, and (ii) in the case of Alternate Base Loans, not later than 11:00 a.m., New York City time, on the Business Day which is the date specified for such proposed conversion or continuation. Such notice shall specify (A) the proposed date for conversion or continuation, (B) the amount of the Committed Loan to be converted or continued, (C) in the case of conversions, the Type of Committed Loan to be converted into, and (D) in the case of a continuation of or conversion into a Eurodollar Loan, the duration of the Interest Period applicable thereto; provided that (1) Eurodollar Loans may be converted only on the last day of the applicable Interest Period, (2) except for conversions to Alternate Base Loans, no conversion shall be made while a Default or Event of Default has occurred and is continuing and no continuations of any Eurodollar Loan from one Interest Period to another Interest Period shall be made while a Default or Event of Default has occurred and is continuing, unless such conversion or continuation has been approved by Majority Banks, and (3) each such conversion or continuation shall be in an amount not less than $10,000,000 and shall be an integral multiple of $1,000,000. All notices given under this Section shall be irrevocable. If the Company shall fail to give the Paying Agent the notice as specified above for continuation or conversion of a Eurodollar Loan prior to the end of the Interest Period with respect thereto, such Eurodollar Loan shall automatically be converted into an Alternate Base Loan on the last day of the Interest Period for such Eurodollar Loan.

Section II.4 Fees. The Company agrees to pay to each Bank, through the Paying Agent, on each Quarterly Payment Date and on the Termination Date in arrears, in immediately available funds, a commitment fee (a "Commitment Fee") calculated by multiplying the Applicable Rate by the amount of the average daily Available Revolving Commitment of such Bank during the preceding three-month period (or shorter period commencing with the Effective Date and/or ending with the Termination Date). All Commitment Fees shall be computed by the Paying Agent on the basis of the actual number of days elapsed in a year of 360 days, and shall be conclusive and binding for all purposes, absent manifest error. The Commitment Fee due to each Bank shall commence to accrue on the Effective Date and shall cease to accrue on the Termination Date or, if earlier, the date of the termination of the Commitment of such Bank as provided herein.

28

Section II.5 Termination and Reduction of Commitments

(a)Subject to Section 2.11(b), the Company may permanently terminate, or from time to time in part permanently reduce, the Total Commitment, in each case upon at least three Business Days' prior (or, in the case of a refinancing or new facility with one or more of the Agents, on a same-day basis with) written notice to the Paying Agent (who shall promptly forward a copy thereof to each Bank). Such notice shall specify the date and the amount of the termination or reduction of the Total Commitment. Each such partial reduction of the Total Commitment shall be in a minimum aggregate principal amount of $10,000,000 and in an integral multiple of $1,000,000.

(b) On the Termination Date the Total Commitment shall be zero.

(c) Each reduction in the Total Commitment pursuant to this Section 2.5 shall be made ratably among the Banks in accordance with their respective Commitments. Simultaneously with any termination of Commitments pursuant to this Section, the Company shall pay to the Paying Agent for account of the Banks the Commitment Fees on the amount of the Total Commitment so terminated, accrued through the date of such termination.

Section II.6 Loans

(a) Each Borrowing made by the Company on any date shall be in an integral multiple of $1,000,000 and in a minimum aggregate principal amount of $10,000,000. Committed Loans shall be made by the Banks ratably in accordance with their respective Commitments on the Borrowing Date of the Committed Borrowing; provided, however, that the failure of any Bank to make any Loan shall not in itself relieve any other Bank of its obligation to lend hereunder.

(b) Each Committed Loan shall be a Eurodollar Loan or an Alternate Base Loan, as the Company may request subject to and in accordance with Section 2.2 or Section 2.3(b), as applicable. Each Bank may at its option make any Eurodollar Loan by causing a foreign branch or Affiliate of such Bank to make such Loan; provided, however, that any exercise of such option shall not affect the obligation of the Company to repay such Loan in accordance with the terms of this Agreement or increase the Company's obligations to such Bank hereunder. Loans of more than one interest rate option may be outstanding at the same time; provided, however, that the Company shall not be entitled to request any Loan which, if made, would result in an aggregate of more than ten separate Interest Periods being outstanding hereunder at any one time. For purposes of the foregoing, Loans having different Interest Periods, regardless of whether they commence on the same date, shall be considered separate Loans.

(c) Subject to Section 2.3, each Bank shall make its portion of each Committed Borrowing on the proposed Borrowing Date thereof by paying the amount required to the Paying Agent at the Principal Office in immediately available funds not later than 1:00 p.m., New York City time, and the Paying Agent shall by 2:00 p.m., New York City time, credit the amounts so received to the general deposit account of the Company with the Paying Agent or, if Loans are not made on such date because any condition precedent to a Borrowing herein specified shall not have been met, return the amounts so received to the respective Banks as soon as practicable; provided, however, if and to the extent the Paying Agent fails to return any such amounts to a Bank on the Borrowing Date for such Borrowing, the Paying Agent shall pay interest on such unreturned amounts, for each day from such Borrowing Date to the date such amounts are returned to such Bank, at the Federal Funds Effective Rate.

(d) The outstanding principal amount of each Committed Loan shall be due and payable on the Termination Date.

29

Section II.7 Loan Accounts

(a) The Loans made by each Bank shall be evidenced by one or more loan accounts or records maintained by such Bank in the ordinary course of business. Absent manifest error, the loan accounts or records maintained by the Paying Agent and each Bank shall be prima facie evidence of the amount of the Loans made by the Banks to the Company and the interest and payments thereon. Any failure so to record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Company hereunder to pay any amount owing with respect to the Loans.

(b) Upon the request of any Bank made through the Paying Agent, the Loans made by such Bank may be evidenced by one or more Notes, instead of or in addition to loan accounts, and upon any such request the Company shall execute and deliver such Notes to such Bank. Each such Bank shall, and is hereby authorized by the Company to, endorse on the schedule attached to the relevant Note held by such Bank (or on a continuation of such schedule attached to each such Note and made a part thereof) or in its records relating to such Note an appropriate notation evidencing the date and amount of each Committed Loan of such Bank, each payment or prepayment of principal of any Committed Loan, and the other information provided for on such schedule. The failure of any Bank to make such a notation or any error therein shall not in any manner affect the obligation of the Company to repay the Committed Loans made by such Bank in accordance with the terms of the relevant Note.

Section II.8 Interest on Loans

(a) Subject to the provisions of Section 2.9, each Eurodollar Loan shall bear interest at a rate per annum (computed on the basis of the actual number of days elapsed over a year of 360 days) equal to the LIBO Rate for the Interest Period in effect for such Loan plus the Applicable Rate. Interest on each Eurodollar Loan shall be payable on each Interest Payment Date applicable thereto. The applicable LIBO Rate for each Interest Period shall be determined by the Paying Agent, and such determination shall be conclusive absent manifest error.

(b) Subject to the provisions of Section 2.9, each Alternate Base Loan shall bear interest at the rate per annum equal to the Alternate Base Rate plus the Applicable Rate (if the Alternate Base Rate is based on the Prime Rate, computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as the case may be; if the Alternate Base Rate is based on the LIBO Rate or the Federal Funds Effective Rate, computed on the basis of the actual number of days elapsed over a year of 360 days). Interest on each Alternate Base Loan shall be payable on each Interest Payment Date applicable thereto. The applicable Alternate Base Rate shall be determined by the Paying Agent, and such determination shall be conclusive absent manifest error.

Section II.9 Interest on Overdue Amounts. If the Company shall default in the payment of the principal of or interest on any Loan or any other amount becoming due hereunder, the Company shall on demand from time to time pay interest, to the extent permitted by Law, on such defaulted amount up to (but not including) the date of actual payment (after as well as before judgment) at a rate per annum equal to (i) in the case of the principal amount of any Eurodollar Loan, 2% above the rate otherwise applicable thereto and (ii) in all other cases, the Agreed Maximum Rate (if the Alternate Base Rate is based on the Prime Rate, computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as the case may be; if the Alternate Base Rate is based on the LIBO Rate or the Federal Funds Effective Rate, computed on the basis of the actual number of days elapsed over a year of 360 days).

30

Section II.10 <u>Alternate Rate of Interest</u>. (a) If prior to the commencement of any Interest Period for a Eurodollar Loan:

(i)      Subject to clause (b) below, the Paying Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable (including because the Screen Rate is not available or published on a current basis), for dollars and such Interest Period; or

(ii)     the Paying Agent is advised by the Majority Banks that the Adjusted LIBO Rate or the LIBO Rate, as applicable, for dollars and such Interest Period will not adequately and fairly reflect the cost to such Banks (or Bank) of making or maintaining their Loans (or its Loan) included in such Loan for dollars and such Interest Period;

then the Paying Agent shall give notice thereof to the Company and the Banks by telephone, telecopy or electronic mail as promptly as practicable thereafter and, until the Paying Agent notifies the Company and the Banks that the circumstances giving rise to such notice no longer exist, (A) any interest election request pursuant to <u>Section 2.3</u> that requests the conversion of any Loan to, or continuation of any Loan as, a Eurodollar Loan shall be ineffective and (B) if any Notice of Committed Borrowing requests a Eurodollar Loan, such Loan shall be made as an Alternate Base Loan; <u>provided</u> that if the circumstances giving rise to such notice affect only one Type of Loans, then the other Type of Loans shall be permitted.

(b) Notwithstanding anything to the contrary herein or in any other Loan Paper, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, the Paying Agent and the Company may amend this Agreement to replace the LIBO Rate with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after the Paying Agent has posted such proposed amendment to all Banks and the Company, so long as the Paying Agent has not received, by such time, written notice of objection to such proposed amendment from Banks comprising the Majority Banks; <u>provided</u> that, with respect to any proposed amendment containing any SOFR-Based Rate, the Banks shall be entitled to object only to the Benchmark Replacement Adjustment contained therein. Any such amendment with respect to an Early Opt-in Election will become effective on the date that Banks comprising the Majority Banks have delivered to the Paying Agent written notice that such Majority Banks accept such amendment. No replacement of LIBO Rate with a Benchmark Replacement will occur prior to the applicable Benchmark Transition Start Date.

(c) In connection with the implementation of a Benchmark Replacement, the Paying Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Paper, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(d) The Paying Agent will promptly notify the Company and the Banks of (i) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes and (iv) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Paying Agent or Banks pursuant to this <u>Section 2.10</u>,

31

including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 2.10.

(e) Upon the Company's receipt of notice of the commencement of a Benchmark Unavailability Period, (i) any interest election request pursuant to Section 2.3 that requests the conversion of any Loan to, or continuation of any Loan as, a Eurodollar Loan shall be ineffective and (ii) if any Notice of Committed Borrowing requests a Eurodollar Loan, such Loan shall be made as an Alternate Base Loan.

Section II.11 Prepayment of Loans

(a) Prior to the Termination Date, the Company shall have the right at any time to prepay any Committed Borrowing, in whole or in part, subject to the requirements of Section 2.14 or Section 2.15 but otherwise without premium or penalty, upon at least five Business Days prior written notice to the Paying Agent; provided, however, that each such partial prepayment shall be in an integral multiple of $1,000,000 and in a minimum aggregate principal amount of $5,000,000. Each notice of prepayment shall specify the prepayment date and the aggregate principal amount of each Borrowing to be prepaid, shall be irrevocable and shall commit the Company to prepay such Borrowing by the amount stated therein.

(b) On the date of any termination or reduction of the Total Commitment pursuant to Section 2.5(a), the Company shall pay or prepay so much of the Loans as shall be necessary in order that the sum of (x) the aggregate principal amount of the Loans outstanding and (y) the L/C Obligations will not exceed the Total Commitment following such termination or reduction. Subject to the foregoing, any such payment or prepayment shall be applied to such Borrowing or Borrowings as the Company shall select. All prepayments under this paragraph shall be subject to Section 2.14 and Section 2.15.

(c) All prepayments under this Section 2.11 shall be accompanied by accrued interest on the principal amount being prepaid to the date of prepayment.

Section II.12 Reserve Requirements; Change in Circumstances

(a) Notwithstanding any other provision herein, if after the date of this Agreement any Regulatory Change or change in any Law (i) shall subject the Paying Agent, a Bank or an Issuing Bank to any Taxes (other than (w) Indemnified Taxes, (x) Taxes described in clauses (c) and (e) of Excluded Taxes, (y) Other Taxes and (z) Other Connection Taxes imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, (ii) shall impose, modify, or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement with respect to any Eurodollar Loan against assets of, deposits with or for the account of, or credit extended by, such Bank under this Agreement, or (iii) with respect to any Eurodollar Loan, shall impose on such Bank or the Eurodollar Interbank Market any other condition, cost or expense affecting this Agreement or any Eurodollar Loan made by such Bank, and the result of any of the foregoing shall be to materially increase the actual cost to such Bank (or such Paying Agent or Issuing Bank in the case of (i)) of maintaining its Commitment or of making, converting to, continuing or

32

maintaining any Eurodollar Loan or to materially reduce the amount of any sum received or receivable by such Bank (or such Paying Agent or Issuing Bank in the case of (i)) hereunder (whether of principal, interest, or otherwise) in respect thereof, then the Company shall pay to the Paying Agent for the account of such Bank (or such Paying Agent or Issuing Bank in the case of (i)), within ten days following delivery to the Company of the certificate specified in paragraph (c) below by such Bank (or such Paying Agent or Issuing Bank in the case of (i)), such additional amount or amounts as will reimburse such Bank (or such Paying Agent or Issuing Bank in the case of (i)) for such increase or reduction to such Bank (or such Paying Agent or Issuing Bank in the case of (i)) to the extent reasonably allocable to this Agreement.

(b) If any Bank shall have determined in good faith that any Regulatory Change regarding capital or liquidity requirements or compliance by any Bank (or its parent or any lending office of such Bank) with any request or directive issued subsequent to the Effective Date regarding capital or liquidity requirements (whether or not having the force of Law) of any Tribunal, monetary authority, central bank, or comparable agency, has or would have the effect of reducing the rate of return on such Bank's (or its parent's) capital as a consequence of its obligations hereunder to a level below that which such Bank (or its parent) could have achieved but for such Regulatory Change, or compliance (taking into consideration such Bank's policies with respect to capital adequacy or liquidity) by an amount deemed by such Bank to be material, then from time to time, the Company shall pay to the Paying Agent for the account of such Bank, within ten days following delivery to the Company of the certificate specified in paragraph (d) below by such Bank, such additional amount or amounts as will reimburse such Bank (or its parent) for such reduction.

(c) Notwithstanding anything herein to the contrary, (i) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or by United States or foreign regulatory authorities, in each case pursuant to Basel III, and (ii) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof, shall in each case be deemed to be a Regulatory Change and a change in Law, regardless of the date enacted, adopted or issued.

(d) Each Bank or the Paying Agent or each Issuing Bank shall notify the Company of any event occurring after the date hereof entitling such Bank to compensation under paragraph (a) or (b) of this Section 2.12 (together with a good faith estimate of the amounts it would be entitled to claim in respect of such event) as promptly as practicable, but in any event on or before the date which is 60 days after the related Regulatory Change, change in any Law or other event; provided that (i) if such Bank or the Paying Agent or such Issuing Bank fails to give such notice by such date, such Bank or the Paying Agent or such Issuing Bank shall, with respect to compensation payable pursuant to paragraph (a) or (b) of this Section 2.12 in respect of any costs resulting from such Regulatory Change, change in any Law or other event, only be entitled to payment under paragraph (a) or (b) of this Section 2.12 for costs incurred from and after the date of such notice and (ii) such Bank or the Paying Agent or such Issuing Bank will take such reasonable actions, if any (including the designation of a different Applicable Lending Office for the Loans of such Bank affected by such event) to avoid the need for, or reduce the amount of, such compensation so long as such actions will not, in the reasonable opinion of such Bank or the Paying Agent or such Issuing Bank, be materially disadvantageous to such Bank or the Paying Agent or such Issuing Bank, as the case may be. A certificate of a Bank or the Paying Agent or such Issuing Bank setting forth in reasonable detail (i) the Regulatory Change, change in any Law or other event giving rise to any costs, (ii) such amount or amounts as shall be necessary to reimburse such Bank or the Paying Agent or such Issuing Bank (or participating banks or other entities pursuant to Section 9.11) as specified in paragraph (a) or (b) of this Section 2.12, as the case may be, and (iii) the calculation of such amount or

33

amounts, shall be delivered to the Company (with a copy to the Paying Agent) promptly after such Bank or the Paying Agent or such Issuing Bank determines it is entitled to payment under this Section 2.12, and shall be conclusive and binding absent manifest error. In preparing such certificate, such Bank or the Paying Agent or such Issuing Bank may employ such assumptions and allocations of costs and expenses as it shall in good faith deem reasonable and may use any reasonable averaging and attribution method.

(e) In the event any Bank shall seek payment pursuant to this Section 2.12 or the events contemplated under Section 2.10 or Section 2.13 shall have occurred with respect to any Bank, the Company shall have the right to replace such Bank with, and add as "Banks" under this Agreement in place thereof, one or more assignees as provided in Section 2.23(b).

(f) Without prejudice to the survival of any other obligations of the Company hereunder, the obligations of the Company under this Section 2.12 shall survive for one year after the termination of this Agreement and/or the payment or assignment of any of the Loans or Notes.

Section II.13 Change in Legality

(a) Notwithstanding anything to the contrary herein contained, if any Regulatory Change shall make it unlawful for any Bank to make or maintain any Eurodollar Loan or to give effect to its obligations in respect of Eurodollar Loans as contemplated hereby, then, by prompt written notice to the Company and to the Paying Agent, such Bank may:

(i) declare that Eurodollar Loans will not thereafter be made by such Bank hereunder, whereupon the Company shall be prohibited from requesting Eurodollar Loans from such Bank hereunder unless such declaration is subsequently withdrawn; and

(ii) if such unlawfulness shall be effective prior to the end of any Interest Period of an outstanding Eurodollar Loan, require that all outstanding Eurodollar Loans with such Interest Periods made by it be converted to Alternate Base Loans, in which event (A) all such Eurodollar Loans shall be automatically converted to Alternate Base Loans as of the effective date of such notice as provided in paragraph (b) below and (B) all payments and prepayments of principal which would otherwise have been applied to repay the converted Eurodollar Loans shall instead be applied to repay the Alternate Base Loans resulting from the conversion of such Eurodollar Loans.

(b) For purposes of this Section 2.13, a notice to the Company (with a copy to the Paying Agent) by any Bank pursuant to paragraph (a) above shall be effective on the date of receipt thereof by the Company. Any Bank having furnished such a notice agrees to withdraw the same promptly following any Regulatory Change that makes it lawful for such Bank to make and maintain Eurodollar Loans.

(c) If, with respect to any Bank, a condition arises or an event occurs which would, or would upon the giving of notice, result in the payment of amounts pursuant to Section 2.12 or permit such Bank, pursuant to this Section 2.13, to suspend its obligation to make Eurodollar Loans, such Bank, promptly upon becoming aware of the same, shall notify the Company thereof and shall take such steps as may reasonably be available to it (including, without limitation, changing its Applicable Lending Office) to mitigate the effects of such condition or event, provided that such Bank shall be under no obligation to take any step that, in its good faith opinion, would (a) result in its incurring any additional costs in performing its obligations hereunder and under any outstanding Loan (unless the Company has notified such Bank of the Company's agreement to reimburse it for the same) or (b) be otherwise adverse to such Bank in a material respect.

34

Section II.14 Indemnity. The Company shall indemnify each Bank against any loss or reasonable expense which such Bank may sustain or incur as a consequence of (a) any failure by the Company to fulfill on the date of any Borrowing hereunder the applicable conditions set forth in article iv, (b) any failure by the Company to borrow hereunder after a Notice of Committed Borrowing pursuant to article ii has been given, (c) any payment, prepayment, or conversion of a Eurodollar Loan required by any other provision of this Agreement or otherwise made on a date other than the last day of the applicable Interest Period for any reason, including without limitation the acceleration of outstanding Loans as a result of any Event of Default or (d) any failure by the Company for any reason (including without limitation the existence of a Default or an Event of Default) to pay, prepay or convert a Eurodollar Loan on the date for such payment, prepayment or conversion, specified in the relevant notice of payment, prepayment or conversion under this Agreement. The indemnity of the Company pursuant to the immediately preceding sentence shall include, but not be limited to, any loss or reasonable expense sustained or incurred or to be sustained or incurred in liquidating or employing deposits from third parties acquired to effect or maintain such Loan or any part thereof as a Eurodollar Loan. Such loss or reasonable expense shall include, without limitation, an amount equal to the excess, if any, as reasonably determined by each Bank of (i) its cost of obtaining the funds for the Loan being paid, prepaid, or converted or not borrowed, paid, prepaid or converted (based on the LIBO Rate) for the period from the date of such payment, prepayment, or conversion or failure to borrow, pay, prepay or convert to the last day of the Interest Period for such Loan (or, in the case of a failure to borrow, pay, prepay or convert, the Interest Period for the Loan which would have commenced on the date of such failure to borrow, pay, prepay or convert) over (ii) the amount of interest (as reasonably determined by such Bank) that would be realized by such Bank in reemploying the funds so paid, prepaid, or converted or not borrowed, paid, prepaid or converted for such period or Interest Period, as the case may be. A certificate of each Bank setting forth any amount or amounts and, in reasonable detail, the computations thereof, which such Bank is entitled to receive pursuant to this Section 2.14 shall be delivered to the Company (with a copy to the Paying Agent) and shall be conclusive, if made in good faith, absent manifest error. The Company shall pay to the Paying Agent for the account of each Bank the amount shown as due on any certificate within 30 days after its receipt of the same. The obligations of the Company pursuant to this Section 2.14 shall survive the termination of this Agreement and/or the payment or assignment of any of the Loans or Notes.

Section II.15 Pro Rata Treatment. Except as permitted under Section 2.12(d) and Section 2.14 with respect to interest and Section 2.25(e) with respect to principal and interest, (a) each payment or prepayment of principal and each payment of interest with respect to a Committed Borrowing shall be made pro rata among the Banks in accordance with the respective principal amounts of the Loans extended by each Bank, if any, with respect to such Committed Borrowing, and (b) conversions of Committed Loans to Committed Loans of another Type, continuations of Committed Loans that are Eurodollar Loans from one Interest Period to another Interest Period, and Committed Loans which are not refinancings of other Loans shall be made pro rata among the Banks in accordance with their respective Commitments.

Section II.16 Sharing of Setoffs. Each Bank agrees that if it shall through the exercise of a right of banker's lien, setoff, or counterclaim against the Company (pursuant to Section 9.6 or otherwise), including, but not limited to, a secured claim under Section 506 of Title 11 of the United States Code or other security or interest arising from, or in lieu of, such secured claim, received by such Bank under any applicable Debtor Relief Law or otherwise, obtain payment (voluntary or involuntary) in respect of the Committed Loans held by it (other than pursuant to Section 2.12, or Section 2.14) as a result of which the unpaid principal portion of the Committed Loans held by it shall be proportionately

35

less than the unpaid principal portion of the Committed Loans held by any other Bank, it shall be deemed to have simultaneously purchased from such other Bank a participation in the Committed Loans held by such other Bank, so that the aggregate unpaid principal amount of the Committed Loans and participations in Committed Loans pursuant to this Section 2.16 held by each Bank shall be in the same proportion to the aggregate unpaid principal amount of all Committed Loans then outstanding as the principal amount of the Committed Loans held by it prior to such exercise of banker's lien, setoff, or counterclaim was to the principal amount of all Committed Loans outstanding prior to such exercise of banker's lien, setoff, or counterclaim; provided, however, that if any such purchase or purchases or adjustments shall be made pursuant to this Section 2.16 and the payment giving rise thereto shall thereafter be recovered, such purchase or purchases or adjustments shall be rescinded to the extent of such recovery and the purchase price or prices or adjustment restored without interest. The Company expressly consents to the foregoing arrangements and agrees that any Bank holding a participation in a Committed Loan deemed to have been so purchased may exercise any and all rights of banker's lien, setoff, or counterclaim with respect to any and all moneys owing by the Company to such Bank as fully as if such Bank had made a Committed Loan directly to the Company in the amount of such participation.

Section II.17 Payments

(a) The Company shall make each payment hereunder and under any instrument delivered hereunder not later than 12:00 noon (New York City time) on the day when due in dollars, without setoff or counterclaim, to the Paying Agent at its Principal Office for the account of the Banks, in federal or other immediately available funds. The Paying Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal of or interest on Committed Loans (other than pursuant to Section 2.12 and Section 2.14) or Commitment Fees ratably to the Banks and like funds relating to the payment of any other amount payable to any Bank to such Bank for the account of its Applicable Lending Office, in each case to be applied in accordance with the terms of this Agreement.

(b) Whenever any payment hereunder or under any Note shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in all such cases be included in the computation of payment of interest or Commitment Fee, as the case may be; provided, however, if such extension would cause payment of interest on or principal of a Eurodollar Loan to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

(c) Unless the Paying Agent shall have received notice from the Company prior to the date on which any payment is due to the Banks hereunder that the Company will not make such payment in full, the Paying Agent may assume that the Company has made or will make such payment in full to the Paying Agent on such date and the Paying Agent may, in reliance upon such assumption, cause to be distributed to each Bank on such due date an amount equal to the amount then due such Bank. If and to the extent the Company shall not have so made such payment in full to the Paying Agent, each Bank shall repay to the Paying Agent forthwith on demand such amount distributed to such Bank together with interest thereon, for each day from the date such amount is distributed to such Bank until the date such Bank repays such amount to the Paying Agent, at the Federal Funds Effective Rate.

Section II.18Taxes.   (a)   Each payment by the Company under this Agreement or any Loan Papers shall be made without withholding for any Taxes, unless such withholding is required by applicable Law. If any Withholding Agent determines, in its sole discretion exercised in good faith, that it is so required to withhold Taxes, then such Withholding Agent may so withhold and shall timely pay the full amount of withheld Taxes to the relevant Governmental Authority in accordance with applicable

36

Law. If such Taxes are Indemnified Taxes, then the amount payable by the Company shall be increased as necessary so that, net of such withholding (including such withholding applicable to additional amounts payable under this Section), the amounts received with respect to this Agreement equal the amount which would have received had no such withholding been made.

(a)The Company shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Law.

(b) As soon as practicable after any payment of Indemnified Taxes by the Company to a Governmental Authority, the Company shall deliver to the Paying Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Paying Agent.

(c) The Company shall indemnify the Paying Agent and each Bank, within 30 days after demand therefor, for the full amount of Indemnified Taxes (including, without limitation, any Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.18) payable or paid by the Paying Agent or such Bank (or its beneficial owner), as the case may be, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Company by a Bank (with a copy to the Paying Agent), or by the Paying Agent on its own behalf or on behalf of a Bank, shall be conclusive, if made in good faith, absent manifest error.

(d) Each Bank shall severally indemnify the Paying Agent, within 10 days after demand therefor, for the full amount of any Taxes attributable to such Bank that are payable or paid by the Paying Agent, and reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority, but only to the extent that the Company has not already indemnified the Paying Agent for such Indemnified Taxes and without limiting the obligation of the Company to do so. A certificate as to the amount of such payment or liability delivered to any Bank by the Paying Agent shall be conclusive absent manifest error. For the avoidance of doubt, there shall be no double recovery under this paragraph where the indemnified party has been indemnified for the same loss under a separate provision of the agreement.

(e) (i) Any Bank that is entitled to an exemption from or reduction of any applicable withholding Tax with respect to payments hereunder or under any other Loan Papers shall deliver to the Company and the Paying Agent, at the time or times requested by the Company or the Paying Agent, such properly completed and executed documentation prescribed by Law as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Bank, if requested by the Company or the Paying Agent, shall deliver such other documentation prescribed by Law or reasonably requested by the Company or the Paying Agent as will enable the Company or the Paying Agent to determine whether or not such Bank is subject to any withholding (including backup withholding) or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such forms (other than such documentation set forth in Sections 2.18(f)(ii)(A) through (E) below or any successor or substantially similar or comparable documentation thereto) shall not be required if in the Bank's good faith judgment such completion, execution or submission would subject such Bank to any material unreimbursed cost or expense (or, in the case of a change in Law, any incremental material unreimbursed cost or expense), unless indemnified by the Company in an amount reasonably satisfactory to such Bank, or would materially prejudice the legal or commercial position of such Bank. If any form or certification previously delivered pursuant to

37

this Section expires or becomes obsolete or inaccurate in any respect with respect to a Bank, such Bank shall promptly (and in any event within 10 days after such expiration, obsolescence or inaccuracy) notify the Company and the Paying Agent in writing of such expiration, obsolescence or inaccuracy and update the form or certification if it is legally eligible to do so.

(ii) Without limiting the generality of the foregoing, any Bank that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code (a "Foreign Bank") shall, to the extent it is legally entitled to do so, deliver to the Company and the Paying Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Bank becomes a lender under this Agreement (and from time to time thereafter upon the reasonable request of the Company or the Paying Agent), whichever of the following is applicable:

(A)    duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, claiming eligibility for benefits of an income tax treaty to which the United States of America is a party;

(B)    duly completed copies of Internal Revenue Service Form W-8ECI;

(C)    in the case of a Foreign Bank claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit G-1 to the effect that (i) such Foreign Bank is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Company within the meaning of section 881(c)(3)(B) of the Code, and (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code, and (ii) the interest payments in question are not effectively connected with the United States trade or business conducted by such Bank (a "U.S. Tax Compliance Certificate") and (y) duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable;

(D)    to the extent a Foreign Bank is not the beneficial owner (for example, where the Foreign Bank is a partnership or participating Bank granting a typical participation), an Internal Revenue Service Form W-8IMY, accompanied by a Form W-8ECI, W-8BEN or W-8BEN-E, U.S. Tax Compliance Certificate substantially in the form of Exhibit G-2 or G-3 (as applicable), Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that, if the Foreign Bank is a partnership (and not a participating Bank) and one or more beneficial owners of such Foreign Bank are claiming the portfolio interest exemption, such Foreign Bank may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-4 on behalf of each such beneficial owner; or

(E)    any other form prescribed by Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax

38

duly completed together with such supplementary documentation as may be prescribed by applicable Law to permit the Company to determine the withholding or deduction required to be made.

(iii) If a payment made to a Bank under this Agreement or any other Loan Papers would be subject to U.S. Federal withholding Tax imposed by FATCA if such Bank were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Bank shall deliver to the Withholding Agent, at the time or times prescribed by Law and at such time or times reasonably requested by the Withholding Agent, such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Withholding Agent as may be necessary for the Withholding Agent to comply with its obligations under FATCA, to determine that such Bank has or has not complied with such Bank's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this Section 2.18(f)(iii), "FATCA" shall include all amendments made to FATCA after the date of this Agreement.

(f) If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.18 (including additional amounts paid pursuant to this Section 2.18), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including any Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall promptly repay to such indemnified party the amount paid to such indemnified party pursuant to the previous sentence (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this Section 2.18(g), in no event will any indemnified party be required to pay any amount to any indemnifying party pursuant to this Section 2.18(g) if such payment would place such indemnified party in a less favorable position (on a net after-Tax basis) than such indemnified party would have been in if the indemnification payments or additional amounts giving rise to such refund had never been paid. This Section 2.18(g) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes which it deems confidential) to the indemnifying party or any other Person.

(g) The provisions of this Section 2.18 shall survive the termination of this Agreement and/or the payment or assignment of any of the Loans or Notes.

(h) For purposes of this Section 2.18, the term "Bank" includes any Issuing Bank and the term "applicable Law" includes FATCA.

Section II.19 Calculation of LIBO Rates. The provisions of this Agreement relating to calculation of the LIBO Rate are included only for the purpose of determining the rate of interest or other amounts to be paid hereunder that are based upon such rate, it being understood that each Bank shall be entitled to fund and maintain its funding of all or any part of a Eurodollar Loan as it sees fit. All such determinations hereunder, however, shall be made as if each Bank had actually funded and maintained funding of each Eurodollar Loan through the purchase in the Eurodollar InterBank Market of one or more eurodollar deposits in an amount equal to the principal amount of such Loan and having a maturity corresponding to the Interest Period for such Loan.

39

Section II.20 Booking Loans. Subject to Section 2.18, any Bank may make, carry, or, transfer Loans at, to, or for the account of any of its branch offices or the office of any Affiliate.

Section II.21 Quotation of Rates. It is hereby acknowledged that the Company may call the Paying Agent on or before the date on which notice of a Borrowing, continuation or conversion is to be delivered by the Company in order to receive an indication of the rate or rates then in effect, but that such projection shall not be binding upon the Paying Agent or any Bank nor affect the rate of interest which thereafter is actually in effect when the election is made.

Section II.22 Defaulting Banks. Notwithstanding any provision of this Agreement to the contrary, if any Bank becomes a Defaulting Bank, the Paying Agent shall deliver written notice to such effect, upon the Paying Agent's obtaining knowledge of such event, to the Company and such Defaulting Bank, and the following provisions shall apply for so long as such Bank is a Defaulting Bank:

(a) Commitment Fees shall cease to accrue with respect to the Commitment of such Defaulting Bank pursuant to Section 2.4.

(b) The Commitment and Revolving Credit Exposure of such Defaulting Bank shall not be included in determining whether all Banks or the Majority Banks have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to Section 9.1), provided that any waiver, amendment or modification requiring the consent of all Banks or each affected Bank which would increase or extend the term of the Commitment of such Defaulting Bank or which affects such Defaulting Bank differently than other affected Banks shall require the consent of such Defaulting Bank.

(c) If any L/C Obligations exist at the time a Bank becomes a Defaulting Bank, then:

(i) all or any part of such L/C Obligations shall be reallocated among the non-Defaulting Banks ratably in accordance with their respective Commitments but only to the extent that (x) the sum of all non-Defaulting Banks' Revolving Credit Exposures does not then exceed the total of all non-Defaulting Banks' Commitments, (y) no non-Defaulting Bank's Revolving Credit Exposure then exceeds such non-Defaulting Bank's Commitments and (z) the conditions set forth in Section 4.3 are satisfied at such time;

(ii) if the reallocation described in clause (i) above cannot, or can only partially, be effected, the Company shall within one Business Day following notice by the Paying Agent cash collateralize the percentage such Defaulting Bank's Commitment represents of the Total Commitment of the L/C Obligations (after giving effect to any partial reallocation pursuant to clause (i) above) in accordance with the procedures set forth in Section 7.2 for so long as such L/C Obligations are outstanding;

(iii) if the Company cash collateralizes any portion of such Defaulting Bank's L/C Obligations pursuant to this Section 2.22(c), the Company shall not be required to pay any fees to such Defaulting Bank pursuant to Section 3.3 with respect to such Defaulting Bank's portion of the L/C Obligations during the period of such collateralization;

(iv) if the L/C Obligations of the non-Defaulting Banks are reallocated pursuant to this Section 2.22(c), then the fees payable to the Banks pursuant to Section 3.3 shall be adjusted ratably in accordance with their respective Commitments; and

40

(v) if any Defaulting Bank's L/C Obligations are neither cash collateralized nor reallocated pursuant to this Section 2.22(c), then, without prejudice to any rights or remedies of the applicable Issuing Bank or any Bank hereunder, all Commitment Fees that otherwise would have been payable to such Defaulting Bank (solely with respect to the portion of such Defaulting Bank's Commitment that was utilized by such L/C Obligations) and letter of credit fees payable under Section 3.3 with respect to such Defaulting Bank's L/C Obligations shall be payable to the applicable Issuing Bank until such L/C Obligations are cash collateralized and/or reallocated.

(d) So long as any Bank is a Defaulting Bank, no Issuing Bank shall be required to issue, amend or increase any Letter of Credit, unless it is satisfied that the related exposure will be 100% covered by the Commitments of the non-Defaulting Banks and/or cash collateral will be provided by the Company in accordance with Section 2.22(c), and participating interests in any such newly issued or increased Letter of Credit shall be allocated among non-Defaulting Banks in a manner consistent with Section 2.22(c)(i) (and Defaulting Banks shall not participate therein).

(e) Any amount payable to such Defaulting Bank hereunder (whether on account of principal, interest, fees or otherwise and including any amount that would otherwise be payable to such Defaulting Bank pursuant to Section 2.16, but excluding amounts payable pursuant to Section 2.23) shall, in lieu of being distributed to such Defaulting Bank, subject to any applicable requirements of law, be applied at such time or times as may be determined by the Paying Agent (i) first, to the payment of any amounts owing by such Defaulting Bank to the Paying Agent hereunder, (ii) second, pro rata, to the payment of any amounts owing by such Defaulting Bank to the Issuing Banks hereunder, (iii) third, if so determined by the Paying Agent or requested by an Issuing Bank, held in such account as cash collateral for future funding obligations of the Defaulting Bank in respect of any existing or future participating interest in any Letter of Credit, (iv) fourth, to the funding of any Loan in respect of which such Defaulting Bank has failed to fund its portion thereof as required by this Agreement, as determined by the Paying Agent, (v) fifth, if so determined by the Paying Agent and the Company, held in such account as cash collateral for future funding obligations of the Defaulting Bank in respect of any Loans under this Agreement, (vi) sixth, to the payment of any amounts owing to the Banks or an Issuing Bank as a result of any judgment of a court of competent jurisdiction obtained by any Bank or such Issuing Bank against such Defaulting Bank as a result of such Defaulting Bank's breach of its obligations under this Agreement, (vii) seventh, to the payment of any amounts owing to the Company as a result of any judgment of a court of competent jurisdiction obtained by the Company against such Defaulting Bank as a result of such Defaulting Bank's breach of its obligations under this Agreement, and (viii) eighth, to such Defaulting Bank or as otherwise directed by a court of competent jurisdiction, provided, with respect to this clause (viii), that if such payment is (x) a prepayment of the principal amount of any Loans or reimbursement obligations in respect of any drafts paid by an Issuing Bank under any Letters of Credit which a Defaulting Bank has funded its participation obligations and (y) made at a time when the conditions set forth in Section 4.3 are satisfied, such payment shall be applied solely to prepay the Loans of, and reimbursement obligations owed to, all non-Defaulting Banks pro rata prior to being applied to the prepayment of any Loans, or reimbursement obligations owed to, any Defaulting Bank.

In the event that the Paying Agent, each Issuing Bank and the Company each agrees that a Defaulting Bank has adequately remedied all matters that caused such Bank to be a Defaulting Bank or upon receipt by the Paying Agent of the confirmation referred to in clause (c) of the definition of "Defaulting Bank", as applicable, then on such date such Bank shall purchase at par such portion of the Loans of the other

41

Banks as the Paying Agent shall determine may be necessary in order for such Bank to hold such Loans ratably in accordance with its Commitment.

Section II.23 Mitigation Obligations; Replacement of Banks.

(a) If any Bank requests compensation under Section 2.12 or Section 2.18, or if the Company is required to pay any additional amount to any Bank or any Governmental Authority for the account of any Bank pursuant to Section 2.12 or Section 2.18, then such Bank shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Bank, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.12 or Section 2.18 in the future and (ii) would not subject such Bank to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Bank. The Company hereby agrees to pay all reasonable costs and expenses incurred by any Bank in connection with any such designation or assignment.

(b) If (i) any Bank requests compensation under Section 2.12 or Section 2.18, (ii) the Company is required to pay any additional amount to any Bank or any Governmental Authority for the account of any Bank pursuant to Section 2.12 or Section 2.18, (iii) an event contemplated under Section 2.10 or Section 2.13 shall have occurred with respect to any Bank, (iv) any Bank becomes a Defaulting Bank or (v) any Bank becomes a Non-Extending Bank, then, in each case, the Company may, at its sole expense and effort, upon notice to such Bank and the Paying Agent, require such Bank to assign and delegate, without recourse (except for certain customary representations and warranties, in accordance with and subject to the restrictions contained in Section 9.10), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Bank, if a Bank accepts such assignment); provided that (i) the Company shall have received the prior written consent of the Paying Agent, which consent shall not unreasonably be withheld, (ii) such Bank shall have received payment of an amount equal to the outstanding principal of its Loans and participations in any drafts paid by an Issuing Bank under any Letters of Credit, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Company (in the case of all other amounts), (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.12 or Section 2.18 or payments required to be made pursuant to Section 2.12 or Section 2.18, such assignment will result in a reduction in such compensation or payments and (iv) in the case of any such assignment resulting from a Bank becoming a Non-Extending Bank, such assignee shall have provided written notice to the Paying Agent that it consents to the requested extension of the Existing Termination Date with respect any Commitments held (or to be held) by it on the applicable Extension Date. A Bank shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Bank or otherwise, the circumstances entitling the Company to require such assignment and delegation cease to apply.

Section II.24 Commitment Increases.

(a) The Company and any one or more Banks (including New Banks) may from time to time agree that such Banks shall obtain or increase the amount of their Commitments by executing and delivering to the Paying Agent an Increased Facility Activation Notice specifying (i) the amount of such increase and (ii) the applicable Increased Facility Closing Date; provided that (i) the aggregate amount of incremental Commitments obtained after the Effective Date pursuant to this Section 2.24 shall not exceed

42

$500,000,000, (ii) with respect to any Increased Facility Closing Date, the increases effected on such date pursuant to this Section 2.24 shall be in a minimum amount of $25,000,000 and (iii) no more than four Increased Facility Closing Dates may occur after the Effective Date. No Bank shall have any obligation to participate in any increase described in this paragraph unless it agrees to do so in its sole discretion.

(b) Any additional bank or financial institution which, with the consent of the Company, each Issuing Bank (which consent shall not be unreasonably withheld) and the Paying Agent (which consent shall not be unreasonably withheld), elects to become a "Bank" under this Agreement in connection with any increase described in Section 2.24(a) shall execute a New Bank Supplement (each, a "New Bank Supplement"), substantially in the form of Exhibit H-2, whereupon such bank or financial institution (each, a "New Bank") shall become a Bank for all purposes and to the same extent as if originally a party hereto and shall be bound by and entitled to the benefits of this Agreement.

(c) On each Increased Facility Closing Date, each Bank holding Committed Loans prior to giving effect to this Section 2.24(c) (each, an "Existing Bank") shall be deemed to have assigned to each Bank participating in the relevant Commitment increase (each, an "Increased Facility Bank"), and each such Increased Facility Bank shall be deemed to have purchased from each Existing Bank, at the principal amount thereof (together with accrued interest), such interests in the Committed Loans and participations in Letters of Credit outstanding on such date as shall be necessary in order that, after giving effect to all such assignments and purchases, such Committed Loans and participations in Letters of Credit will be held by all the Banks (including such Increased Facility Banks) ratably in accordance with the percentage which its Commitment represents of the Total Commitment after giving effect to the increase to the Commitments on such Increased Facility Closing Date. In furtherance of the foregoing, on such Increased Facility Closing Date, (i) each Increased Facility Bank agrees to make payments to the Paying Agent for the benefit of the Existing Banks in an amount equal to the principal amount (together with accrued interest) of the interests in the Committed Loans and funded participations in any Letters of Credit relating to any unreimbursed drawings thereunder deemed to have been purchased by such Increased Facility Bank on such Increased Facility Closing Date pursuant to the immediately preceding sentence and (ii) each Existing Bank agrees to accept payments in an amount equal to the principal amount (together with accrued interest) of the interests in the Committed Loans and funded participations in any Letters of Credit relating to any unreimbursed drawings thereunder deemed to have been assigned by such Existing Bank on such Increased Facility Closing Date pursuant to the immediately preceding sentence.

(d) The effectiveness of any increase to the Commitments pursuant to this Section 2.24 shall be subject to the satisfaction of the following conditions precedent: (i) no Default or Event of Default shall have occurred and be continuing immediately prior to, and immediately after, giving effect to such increase to the Commitments, (ii) the representations and warranties contained in Article V shall be correct in all material respects (or, to the extent subject to materiality or Material Adverse Effect qualifiers, in all respects) on and as of the date of such increase to the Commitments (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date), immediately prior to, and after giving effect to, such increase to the Commitments, as though made on and as of such date, and (iii) on a pro forma basis after giving effect to (x) such increase to the Commitments (assuming such incremental Commitments are fully drawn) and (y) any permanent repayment of Debt after the last day of the most recently ended fiscal quarter for which the Company's annual or quarterly Financial Statements have been most recently required to have been delivered pursuant to Section 6.01 (assuming, for such purpose, that (A) such increase to the Commitments (and the full drawing thereof) and any such permanent repayment of Debt occurred on the first day of the four fiscal quarter period for which the Company's annual or quarterly Financial Statements have been most

43

~~recently required to have been delivered pursuant to Section 6.01 and (B) such incremental Commitments had been borrowed as Eurodollar Loans with successive one-month Interest Periods during the four-fiscal quarter period for which the Company's annual or quarterly Financial Statements have been most recently required to have been delivered pursuant to Section 6.01), the Coverage Ratio shall not be less than 1.25 to 1.0 and (iv~~) the Company shall have delivered such legal opinions, board resolutions, certificates and other documents reasonably requested by the Paying Agent in connection with such increase to the Commitments.

Section II.25 Extension of the Termination Date.

i.The Company may, by notice (the date of such notice, the "<u>Request Date</u>") to the Paying Agent (who shall promptly notify the Banks) not earlier than 60 days and not later than 30 days prior to any anniversary of the Effective Date (each a "<u>Relevant Anniversary Date</u>"), request that each Bank extend such Bank's Termination Date for an additional year from the Termination Date then in effect hereunder (the "<u>Existing Termination Date</u>"; any anniversary of the Existing Termination Date to which Commitments shall be extended being called the "<u>Extended Termination Date</u>"); <u>provided</u> that the Company shall not make more than two such requests during the term of this Agreement.

(b) Each Bank, acting in its sole and individual discretion, shall, by written notice to the Paying Agent given not later than the date that is 20 days following the Request Date (the "<u>Notice Deadline</u>"), advise the Paying Agent whether or not such Bank agrees to such extension (and each Bank that determines not to so extend its Termination Date (a "<u>Non-Extending Bank</u>") shall notify the Paying Agent of such fact promptly after such determination (but in any event no later than the Notice Deadline)) and any Bank that does not so advise the Paying Agent on or before the Notice Deadline shall be deemed to be a Non-Extending Bank. The election of any Bank to agree to such extension shall not obligate any other Bank to so agree. Promptly following the Notice Deadline, the Paying Agent shall notify the Company of each Bank's determination under this Section.

(c) The Company shall have the right on or before the Relevant Anniversary Date to replace each Non-Extending Bank with, and add as "Banks" under this Agreement in place thereof, one or more assignees with Commitments terminating on the Extended Termination Date (each, an "<u>Additional Commitment Bank</u>") as provided in Section 2.23(b), each of which Additional Commitment Banks shall have entered into an Assignment and Assumption pursuant to which such Additional Commitment Bank shall undertake a Commitment of such Non-Extending Bank at par (and, if any such Additional Commitment Bank is already a Bank, its Commitment of such Non-Extending Bank shall be in addition to such Bank's Commitment hereunder on such date).

(d) If (and only if) the aggregate Commitments of the Banks that have agreed to so to extend their Termination Date pursuant to this Section 2.25 and the additional Commitments of the Additional Commitment Banks shall be more than 50% of the aggregate amount of the Commitments in effect immediately prior to the Relevant Anniversary Date, then, effective as of the Relevant Anniversary Date (each such effective date, an "<u>Extension Date</u>"), the Termination Date of each extending Bank and of each Additional Commitment Bank shall be extended to the Extended Termination Date (except that, if such date is not a Business Day, such Extended Termination Date shall be the immediately preceding Business Day), so long as: (i) at the time of and immediately after giving effect to such extension, no Default or Event of Default shall have occurred and be continuing and (ii) the representations and

44

warranties contained in Article V shall be correct in all material respects (or, to the extent subject to materiality or Material Adverse Effect qualifiers, in all respects) on and as of the date of such extension (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date), immediately prior to, and after giving effect to, such extension, as though made on and as of such date.

(e)

(i) Any Non-Extending Bank may, by written notice to the Paying Agent, at any time after the relevant Extension Date and prior to the applicable Existing Termination Date, elect to extend its Termination Date to the Extended Termination Date and, upon the Paying Agent's receipt of such written notice from any Non-Extending Bank, (x) the Termination Date of such Bank shall be automatically extended to the Extended Termination Date (except that, if such date is not a Business Day, such Extended Termination Date shall be the immediately preceding Business Day) and (y) such Bank shall no longer be a Non-Extending Bank with respect to the applicable extension. The Paying Agent shall promptly give notice to the Company of any such extension pursuant to this Section 2.21(e)(i).

(ii) On the Termination Date applicable to the Loans of any Non-Extending Bank, the Company shall repay any then outstanding Loans of such Non-Extending Bank (and pay any additional amounts required pursuant to Section 2.14). Following any extension pursuant to this Section 2.25, the L/C Obligations shall continue to be deemed to be held ratably among the Banks, but on the Termination Date applicable to the Loans of any Non-Extending Bank, the L/C Obligations deemed to be held by such Non-Extending Bank immediately prior to giving effect to such Termination Date shall be ratably reallocated, to the extent of the unused Commitments of the extending Banks, to such extending Banks (without regard to whether the conditions set forth in Section 4.3 can then be satisfied); provided that the Company shall repay the Loans of the extending Banks pro rata to the extent necessary to allow the L/C Obligations deemed to be held by such Non-Extending Bank immediately prior to giving effect to such Termination Date to be fully reallocated to the extending Banks.

(f) Conflicting Provisions. This Section 2.25 shall supersede any provisions in Section 2.15 or Section 9.1 to the contrary.

## ARTICLE III

## LETTERS OF CREDIT

Section III.1 L/C Commitment

(a) Subject to the terms and conditions hereof, each Issuing Bank, in reliance on the agreements of the other Banks set forth in Section 3.4(a), agrees to issue letters of credit ("Letters of Credit") in dollars for the account of the Company on any Business Day on and after the Effective Date and until the termination of the Commitment of the Issuing Bank in accordance with the terms hereof, in such form as may be approved from time to time by the Issuing Bank; provided that Barclays Bank PLC shall have no obligation to issue commercial Letters of Credit hereunder; provided, further, that no

45

Issuing Bank shall issue any Letter of Credit if, after giving effect to such issuance, (i) the L/C Obligations would exceed the L/C Commitment or (ii) the excess of the Total Commitment over the aggregate amount of Loans and L/C Obligations then outstanding would be less than zero; provided, further, that no Initial Issuing Bank shall at any time be obligated to issue any Letter of Credit if, after giving effect to such issuance, the sum of (x) the aggregate undrawn and unexpired amount of all then outstanding Letters of Credit issued by such Initial Issuing Bank and (y) the aggregate amount of drawings under Letters of Credit issued by such Initial Issuing Bank that have not then been reimbursed pursuant Section 3.5 would exceed $100,000,000. Each Letter of Credit shall (i) be denominated in dollars and (ii) expire no later than the earlier of (x) the first anniversary of its date of issuance and (y) the date that is five Business Days prior to the later of (A) the Original Termination Date and (B) if any Commitments are extended pursuant to Section 2.25, such extended termination date as determined pursuant to Section 2.25, provided that any Letter of Credit with a one-year term may provide for the renewal thereof for additional one-year periods (which shall in no event extend beyond the date referred to in clause (y) above).

(b) No Issuing Bank shall at any time be obligated to issue any Letter of Credit if such issuance would conflict with, or cause such Issuing Bank or any L/C Participant to exceed any limits imposed by, any applicable Laws.

Section III.2 Procedure for Issuance of Letter of Credit. The Company may from time to time request that the Issuing Bank issue a Letter of Credit by delivering to the Issuing Bank at its address for notices specified herein an Application therefor, completed to the reasonable satisfaction of the Issuing Bank, and such other certificates, documents and other papers and information as the Issuing Bank may reasonably request. Upon receipt of any Application, the Issuing Bank will process such Application and the certificates, documents and other papers and information delivered to it in connection therewith in accordance with its customary procedures and shall promptly issue the Letter of Credit requested thereby (but in no event shall the Issuing Bank be required to issue any Letter of Credit earlier than three Business Days after its receipt of the Application therefor and all such other certificates, documents and other papers and information relating thereto) by issuing the original of such Letter of Credit to the beneficiary thereof or as otherwise may be agreed by the Issuing Bank and the Company. The Issuing Bank shall furnish a copy of such Letter of Credit to the Company promptly following the issuance thereof. The Issuing Bank shall promptly furnish to the Paying Agent, which shall in turn promptly furnish to the Banks, notice of the issuance of each Letter of Credit (including the amount thereof).

Section III.3 Fees and Other Charges

(a) The Company will pay to the Paying Agent for the ratable benefit of the Banks on each Quarterly Payment Date after the issuance date and on the Termination Date a fee on all outstanding Letters of Credit at a per annum rate equal to the Applicable Rate then in effect with respect to Eurodollar Loans. In addition, the Company shall pay to the Issuing Bank for its own account a fronting fee at a per annum rate separately agreed upon between the Company and the Issuing Bank (which fee, in the case of Citibank, N.A., is reflected in the fee letter dated June 23, 2016, between the Company and Citibank, N.A. and, in the case of JPMorgan Chase Bank, N.A., is reflected in the fee letter dated June 23, 2016, between the Company and JPMorgan Chase Bank, N.A.) on the undrawn and unexpired amount of each Letter of Credit, payable quarterly in arrears on each Quarterly Payment Date after the issuance date and on the Termination Date. Fees payable pursuant this Section 3.3(a) shall be calculated on the basis of a 360-day year for the actual days elapsed.

46

(b) In addition to the foregoing fees, the Company shall pay or reimburse the Issuing Bank for such normal and customary costs and expenses as are incurred or charged by the Issuing Bank in issuing, negotiating, effecting payment under, amending or otherwise administering any Letter of Credit.

Section III.4 L/C Participations

(a) The Issuing Bank irrevocably agrees to grant and hereby grants to each L/C Participant, and, to induce the Issuing Bank to issue Letters of Credit, each L/C Participant irrevocably agrees to accept and purchase and hereby accepts and purchases from the Issuing Bank, on the terms and conditions set forth below, for such L/C Participant's own account and risk an undivided interest, equal to the percentage which such L/C Participant's Commitment represents of the Total Commitment, in the Issuing Bank's obligations and rights under and in respect of each Letter of Credit and the amount of each draft paid by the Issuing Bank thereunder. Each L/C Participant unconditionally and irrevocably agrees with the Issuing Bank that, if a draft is paid under any Letter of Credit for which the Issuing Bank is not reimbursed in full by the Company in accordance with the terms of this Agreement, such L/C Participant shall pay to the Issuing Bank upon demand a fraction of the amount of such draft, or any part thereof, that is not so reimbursed, equal to the percentage which such L/C Participant's Commitment represents of the Total Commitment.

(b) If any amount required to be paid by any L/C Participant to the Issuing Bank pursuant to Section 3.4(a) in respect of any unreimbursed portion of any payment made by the Issuing Bank under any Letter of Credit is paid to the Issuing Bank within three Business Days after the date such payment is due, such L/C Participant shall pay to the Issuing Bank on demand an amount equal to the product of (i) such amount, times (ii) the daily average Federal Funds Effective Rate during the period from and including the date such payment is required to the date on which such payment is immediately available to the Issuing Bank, times (iii) a fraction the numerator of which is the number of days that elapse during such period and the denominator of which is 360. If any such amount required to be paid by any L/C Participant pursuant to Section 3.4(a) is not made available to the Issuing Bank by such L/C Participant within three Business Days after the date such payment is due, the Issuing Bank shall be entitled to recover from such L/C Participant, on demand, such amount with interest thereon calculated from such due date at the rate per annum applicable to Alternate Base Loans. A certificate of the Issuing Bank submitted to any L/C Participant with respect to any amounts owing under this Section shall be conclusive in the absence of manifest error.

(c) Whenever, at any time after the Issuing Bank has made payment under any Letter of Credit and has received from any L/C Participant its pro rata share of such payment in accordance with Section 3.4(a), the Issuing Bank receives any payment related to such Letter of Credit (whether directly from the Company or otherwise, including proceeds of collateral applied thereto by the Issuing Bank), or any payment of interest on account thereof, the Issuing Bank will distribute to such L/C Participant its pro rata share thereof; provided, however, that in the event that any such payment received by the Issuing Bank shall be required to be returned by the Issuing Bank, such L/C Participant shall return to the Issuing Bank the portion thereof previously distributed by the Issuing Bank to it.

Section III.5 Reimbursement Obligation of the Company. If any draft is paid under any Letter of Credit, the Company shall reimburse the Issuing Bank for the amount of (a) the draft so paid and (b) any Taxes, fees, charges or other costs or expenses incurred by the Issuing Bank in connection with such payment, not later than 12:00 noon, New York City time, on (i) the Business Day that the Company receives notice of such draft, if such notice is received on such day prior to 10:00 a.m., New York City time, or (ii) if clause (i) above does not apply, the Business Day immediately following the day that the

47

Company receives such notice. Each such payment shall be made to the Issuing Bank at its address for notices referred to herein in dollars and in immediately available funds. Interest shall be payable on any such amounts from the date on which the relevant draft is paid until payment in full at the rate set forth in (x) until the Business Day next succeeding the date of the relevant notice, Section 2.8(b) and (y) thereafter, Section 2.9.

Section III.6 Obligations Absolute. The Company's obligations under this Article III shall be absolute and unconditional under any and all circumstances and irrespective of any setoff, counterclaim or defense to payment that the Company may have or have had against the Issuing Bank, any beneficiary of a Letter of Credit or any other Person. The Company also agrees with the Issuing Bank that the Issuing Bank shall not be responsible for, and the Company's Reimbursement Obligations under Section 3.5 shall not be affected by, among other things, the validity or genuineness of documents or of any endorsements thereon, even though such documents shall in fact prove to be invalid, fraudulent or forged, or any dispute between or among the Company and any beneficiary of any Letter of Credit or any other party to which such Letter of Credit may be transferred or any claims whatsoever of the Company against any beneficiary of such Letter of Credit or any such transferee. The Issuing Bank shall not be liable for any error, omission, interruption or delay in transmission, dispatch or delivery of any message or advice, however transmitted, in connection with any Letter of Credit, except for errors or omissions found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence, willful misconduct or bad faith of the Issuing Bank. The Company agrees that any action taken or omitted by the Issuing Bank under or in connection with any Letter of Credit or the related drafts or documents, if done in the absence of gross negligence, willful misconduct or bad faith and in accordance with the standards of care specified in the Uniform Commercial Code of the State of New York, shall be binding on the Company and shall not result in any liability of the Issuing Bank to the Company.

Section III.7 Letter of Credit Payments. If any draft shall be presented for payment under any Letter of Credit, the Issuing Bank shall promptly notify the Company of the date and amount thereof. The responsibility of the Issuing Bank to the Company in connection with any draft presented for payment under any Letter of Credit shall, in addition to any payment obligation expressly provided for in such Letter of Credit, be limited to determining that the documents (including each draft) delivered under such Letter of Credit in connection with such presentment are substantially in conformity with such Letter of Credit.

Section III.8 Applications. To the extent that any provision of any Application related to any Letter of Credit is inconsistent with the provisions of this Article III, the provisions of this Article III shall apply.

ARTICLE IV

CONDITIONS OF LENDING

Section IV.1 Conditions Precedent. The effectiveness of this Agreement is subject to the satisfaction of the following conditions precedent:

(a) The Paying Agent shall have received this Agreement, executed and delivered by the Paying Agent, the Co-Administrative Agents, the Company, each Person listed on Schedule I and each of the other parties hereto.

48

(b) The Paying Agent shall have received the following, each dated (unless otherwise indicated) the Effective Date:

(i) Officer's Certificates dated the Effective Date certifying, <u>inter alia,</u> (i) true and correct copies of resolutions adopted by the Board of Directors or Executive Committee, as appropriate, of the Company authorizing the Company to borrow and effect other transactions hereunder, (ii) a true and correct copy of the Company's bylaws in effect on the date hereof, (iii) the incumbency and specimen signatures of the Persons executing any documents on behalf of the Company, (iv) the truth of the representations and warranties made by the Company in this Agreement (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date), and (v) the absence of the occurrence and continuance of any Default or Event of Default.

(ii) A copy of the Company's charter and all amendments thereto, accompanied by certificates that such copy is correct and complete, one certificate dated within a reasonable time prior to the Effective Date and issued by the Secretary of State of Texas and one certificate dated the Effective Date and executed by the corporate secretary or assistant secretary of the Company.

(iii) Certificates (dated within twenty days prior to the Effective Date) of existence and good standing of the Company from appropriate officials of Texas.

(iv) The written opinions of internal and outside counsel to the Company and counsel to the Paying Agent, substantially in the form set out in <u>Exhibits C-1</u>, <u>C-2</u> and <u>C-3</u>, respectively, each dated the Effective Date.

(v) An Administrative Questionnaire (dated any date on or prior to the Effective Date) completed by each Bank which is a party hereto on the Effective Date.

(vi) Such other agreements, documents, instruments, opinions, certificates, and evidences as the Paying Agent may reasonably request prior to the Effective Date.

(c) Any fees or expenses of the Paying Agent, the other Agents and the Banks required to be paid on or before the Effective Date shall have been paid.

(d) The commitments under the Existing Credit Agreement shall have been terminated and all amounts owing thereunder shall have been paid in full. Each party hereto that is also a party to the Existing Credit Agreement hereby waives any requirement under the Existing Credit Agreement of advance notice for any such termination or payment.

<u>Section IV.2 Conditions Precedent to Each Committed Borrowing</u>. The obligation of each Bank to make a Committed Loan on the occasion of any Committed Borrowing (including the initial Committed Borrowing, but excluding any Committed Borrowing used exclusively to finance the payment of any Reimbursement Obligation) shall be subject to the further conditions precedent that on the date of such Committed Borrowing the following statements shall be true (and each of the giving of the

49

applicable Notice of Committed Borrowing and the acceptance by the Company of the proceeds of such Committed Borrowing shall constitute a representation and warranty by the Company that on the date of such Committed Borrowing such statements are true):

(a) The representations and warranties contained in Article V (except the last sentence of Section 5.2 and except Section 5.5) are correct in all material respects (or, to the extent subject to materiality or Material Adverse Effect qualifiers, in all respects) on and as of the date of such Committed Borrowing (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date), before and after giving effect to such Committed Borrowing, as though made on and as of such date;

(b) No event has occurred and is continuing, or would result from such Committed Borrowing, which constitutes either a Default or an Event of Default; provided, for the avoidance of doubt, that no Default or Event of Default in respect of Section 6.12 shall have occurred and be continuing nor result from the making of such Borrowing on and as of the date of such Borrowing, without giving effect to any Collateral Coverage Test Cure Period; and

(c) Following the making of such Committed Borrowing and all other Borrowings to be made on the same day under this Agreement, the sum of the aggregate principal amount of all Loans then outstanding and of the L/C Obligations shall not exceed the Total Commitment.

Section IV.3 Conditions Precedent to Each Letter of Credit Issuance. The obligation of the Issuing Bank to issue a Letter of Credit (including the initial Letter of Credit) shall be subject to the further conditions precedent that on the date of the issuance of such Letter of Credit the following statements shall be true (and each delivery of an Application by the Company shall constitute a representation and warranty by the Company that on the date of such Application such statements are true):

(a) The representations and warranties contained in Article V (except the last sentence of Section 5.2 and except Section 5.5) are correct in all material respects (or, to the extent subject to materiality or Material Adverse Effect qualifiers, in all respects) on and as of the date of the issuance of such Letter of Credit (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date), before and after giving effect to such issuance, as though made on and as of such date;

(b) No event has occurred and is continuing, or would result from the issuance of such Letter of Credit, which constitutes either a Default or an Event of Default; and

(c) Following the issuance of such Letter of Credit and the making of any Borrowings to be made on the same day under this Agreement, the sum of the aggregate principal amount of all Loans then outstanding and of the L/C Obligations shall not exceed the Total Commitment.

Section IV.4 Legal Details. All documents executed or submitted pursuant hereto by the Company shall be reasonably satisfactory in form and substance to the Paying Agent and its counsel. The Paying Agent shall, promptly following satisfaction of the conditions specified in Section 4.1, notify the Company and each of the Banks of such satisfaction and the date of the Effective Date. All legal matters incident to the transactions contemplated by this Agreement (including without limitation matters arising from time to time as a result of changes occurring with respect to any Laws) shall be reasonably satisfactory to counsel to the Paying Agent.

50

**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES**

The Company represents and warrants to the Agents and Banks as follows:

Section V.1 Organization, Authority and Qualifications

(a) The Company and each of its Material Subsidiaries is a Person duly organized, validly existing, and in good standing under the Laws of the jurisdiction of its organization;

(b) The Company has the corporate power and authority to execute, deliver, and perform this Agreement and the other Loan Papers to which it is a party and to borrow hereunder;

(c) On the Effective Date, the Company and each of its Material Subsidiaries is duly qualified as a foreign Person to do business and is in good standing in every jurisdiction where the character of its Properties or nature of its activities make such qualification necessary, except where the failure to be so qualified or in good standing would not have a Material Adverse Effect; and

(d) On the Effective Date, the Company has no Material Subsidiaries.

Section V.2 Financial Statements. The Current Financials present fairly in all material respects the consolidated financial position of the Company and its Subsidiaries on the date thereof and the consolidated results of operations and changes in financial position of the Company and its Subsidiaries for the period then ended, all in conformity with GAAP. Except for transactions related to or contemplated by the Loan Papers and transactions disclosed in Forms 10-Q and 8-K that the Company shall have filed with the Securities and Exchange Commission before the Effective Date, there has been no Material Adverse Change since December 31, 2015.

Section V.3 Compliance with Agreement and Laws. On the Effective Date, neither the Company nor any of its Material Subsidiaries is in default in any material respect under the provisions of any instrument evidencing any material obligation, indebtedness, or liability of the Company or any of its Material Subsidiaries or of any agreement relating thereto. Neither the Company nor any of its Material Subsidiaries is in violation of any Law, which default or violation would have a Material Adverse Effect.

Section V.4 Authorization; No Breach; and Valid Agreements. The execution, delivery, and performance of this Agreement, the borrowings hereunder, and the execution, delivery, and performance of the other Loan Papers to which it is a party by the Company have been duly authorized by all requisite corporate action on the part of the Company and will not violate its charter or bylaws and will not violate any Law or any order of any Tribunal, and will not conflict with, result in a breach of the provisions of or constitute a default under, or result in the imposition of any Lien upon the Property of the Company pursuant to the provisions of, any material loan agreement, credit agreement, indenture, mortgage, deed of trust, franchise, permit, license, note, contract, or other material agreement or instrument to which the Company is now a party. The Loan Papers that include obligations of the Company are the legal, valid and binding obligations of the Company and are enforceable in accordance with their respective terms, except as such enforceability may be limited by general equitable principles (whether enforcement is sought by proceedings in equity or at law) or applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally.

Section V.5 Litigation and Judgments. Except as previously disclosed to the Paying Agent in writing, neither the Company nor any of its Subsidiaries is either party to or aware of the threat of any Litigation which has, in the Company's opinion, a reasonable probability of success and which, if determined adversely to the Company or such Subsidiary, would have a Material Adverse Effect. To the knowledge of the Company, on the Effective Date there is no outstanding unsatisfied money judgment against the Company or any of its Subsidiaries in an amount in excess of $50,000,000, and there are no outstanding unsatisfied money judgments against the Company or any of its Subsidiaries which individually or in the aggregate have or would have a Material Adverse Effect.

Section V.6 Ownership of Properties. The Company and each of its Material Subsidiaries has good and marketable title (except for Permitted Liens) to all of the Pool Assets, and owns or has valid leasehold (or, in the case of intellectual property, license) interests in all of its other material Properties which are owned or used in connection with its business.

Section V.7 Taxes. To the extent that failure to do so would have a Material Adverse Effect, the Company and each of its Material Subsidiaries has filed all Tax returns or reports required of it and has paid all Tax liability shown thereon as due to the extent the same has become due and before it may have become delinquent (except to the extent being contested in good faith by appropriate proceedings and for which adequate reserves have been established). As of the Effective Date, the federal income tax liability of the Company and its Subsidiaries has been audited by the Internal Revenue Service and has been finally determined and satisfied for all taxable years at least up to and including the taxable year ended December 31, 2013.

Section V.8 Approvals Required. Neither the execution and delivery of this Agreement and the other Loan Papers to which it is a party by the Company, nor the consummation by the Company of any of the transactions contemplated hereby or thereby requires the consent or approval of, the giving of notice to, or the registration, recording, or filing of any document with, or the taking of any other action in respect of any Tribunal except for the routine filing of copies of this Agreement and certain other Loan Papers with the Securities and Exchange Commission, except for any of the foregoing required of any Bank or Agent.

Section V.9 Business; Status as Air Carrier. The Company is an air carrier engaged in scheduled air transportation and is in all material respects duly qualified and licensed under all applicable Laws to carry on its business as a scheduled airline currently subject to regulation by the FAA and the Department of Transportation.

Section V.10 ERISA Compliance

. The Company is in compliance in all material respects with ERISA and the rules and regulations thereunder. No Plan of the Company has materially failed to satisfy the "minimum funding standards" of ERISA or is in "at risk" status (within the meaning of ERISA).

Section V.11 Insurance. The Company maintains with insurance companies or associations of recognized responsibility (or, as to workers' compensation or similar insurance, with an insurance fund or by self-insurance authorized by the jurisdictions in which it operates) insurance concerning its Properties and businesses against such casualties and contingencies and of such types and in such amounts (and with co-insurance, self-insurance and deductibles) as it determines to be prudent and consistent with its insurance and loss prevention policies, and in such forms and covering such risks

52

as may then be customary with airlines of a comparable credit standing flying equipment and routes comparable to the Company.

Section V.12 Purpose of Loan. The proceeds of the Loans will be used for general corporate purposes, including acquisitions, and no part of the proceeds of any Loan will be used for any purpose which would violate, or be inconsistent with, any of the margin regulations of the Fed Reserve Board.

Section V.13 Investment Company Act. Neither the Company nor any of its Subsidiaries is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

Section V.14 General. As of the Effective Date, there is no material fact or condition relating to the financial condition and business of the Company and its Subsidiaries which is not reflected in its most recently filed financial statements or any posted SEC Form 8-K which has a Material Adverse Effect and which has not been related, in writing, to the Paying Agent, other than industry-wide risks in the ordinary course of business associated with the types of business conducted by the Company and its Subsidiaries.

Section V.15 EEA Financial Institutions. The Company is not an EEA Financial Institution.

Section V.16 Anti-Corruption Laws and Sanctions. The Company has implemented and maintains in effect policies and procedures designed to maintain material compliance by the Company, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Company, its Subsidiaries and their respective officers and employees, and to the knowledge of the Company its directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in the Company being designated as a Sanctioned Person. None of (a) the Company, any of its Subsidiaries or to the knowledge of the Company or such Subsidiary of the Company any of their respective directors, officers or employees, or (b) to the knowledge of the Company, any agent of the Company or any of its Subsidiaries that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No Loan or Letter of Credit, use of proceeds or other transaction contemplated by this Agreement will violate any Anti-Corruption Law or applicable Sanctions. Notwithstanding the foregoing or any other provision of this Agreement, the Company shall not be in breach of this Section 5.16 or Section 6.3 if it operates any of its aircraft (including any Pool Asset) in a Sanctioned Country for which it has obtained legal authority from the United States government to conduct operations in such Sanctioned Country.

Section V.17 Security Interests. The Aircraft Mortgage is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Aircraft covered thereby except as such enforceability may be limited by general equitable principles (whether enforcement is sought by proceedings in equity or at law) or applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally.

**ARTICLE VI**

**COVENANTS**

So long as the Company may borrow hereunder and until the Obligations have been paid in full, the Company covenants as follows:

Section VI.1 Performance of Obligations. The Company shall duly and punctually pay and perform each of the Obligations under this Agreement and the other Loan Papers under which the Company has Obligations.

Section VI.2 Compliance with Laws. The Company shall comply, and shall cause each of its Material Subsidiaries to comply, in all material respects with all applicable Laws, except for any noncompliance which individually or in the aggregate would not have a Material Adverse Effect, and such compliance shall include, without limitation, paying before the same become delinquent all Taxes imposed upon the Company or any of its Material Subsidiaries or its or their Properties, except to the extent contested diligently and in good faith by proper proceedings, and for which adequate reserves are established in accordance with GAAP.

Section VI.3 Maintenance of Existence, Licenses and Franchises: Compliance With Agreements. Except to the extent otherwise permitted in Article VI, the Company shall maintain, and shall cause each of its Material Subsidiaries to maintain, its existence, and the Company shall preserve and maintain, and shall cause each of its Material Subsidiaries to preserve and maintain, all material licenses, privileges, franchises, certificates, authorizations, and other permits and agreements necessary for the operation of its business. The Company shall comply, and shall cause each of its Material Subsidiaries to comply, with all material agreements binding on it or affecting its properties or business, except for any noncompliance which individually or in the aggregate would not have a Material Adverse Effect. The Company shall maintain in effect and enforce policies and procedures designed to cause material compliance by the Company, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

Section VI.4 Maintenance of Properties. The Company shall, and shall cause each of its Material Subsidiaries to, cause all of its Properties (other than any Aircraft that constitutes Collateral subject to the Mortgaged Aircraft Operating Agreement) used or useful in the conduct of its business to be maintained and kept in good condition, repair, and working order, and supplied with all necessary equipment, and cause to be made all necessary repairs, renewals, replacements, betterments, and improvements thereof, all as in the judgment of the Company may be necessary so that the business carried on in connection therewith may be properly conducted at all times.

Section VI.5 Maintenance of Books and Records. The Company shall, and shall cause each of its Subsidiaries to, maintain proper books of record and account in which full, true, and correct entries in conformity in all material respects with GAAP will be made in respect of all financial dealings and transactions that are, individually or in the aggregate, material in relation to their business and activities.

Section VI.6 Inspection. At reasonable times and upon reasonable notice, the Company shall permit, and shall cause each of its Material Subsidiaries to permit, any employees and other representatives of the Paying Agent, during normal business hours, (1) to visit the Company and inspect any Properties (other than any Aircraft that constitutes Collateral subject to the Mortgaged Aircraft Operating Agreement), (2) to examine and make extracts from all books of account and all records that relate to the financial operations of the Company (subject to any confidentiality agreements, copyright restrictions, and similar limitations), and (3) to discuss the Company's and Material Subsidiaries' affairs, finances, Properties, condition (financial or otherwise) and accounts with the Company's and Material Subsidiaries' officers, in each case of the preceding clauses (1) and (2), for the purpose of verifying the

54

accuracy of the various reports delivered by the Company to the Paying Agent and the Banks pursuant to this Agreement or otherwise ascertaining compliance this Agreement and at such times and as often as may be reasonably requested, but in any event in the case of the preceding clauses (1) and (2), so long as no Event of Default has occurred and is continuing, no more than one time per year.

Section VI.7 Insurance. The Company shall maintain insurance on its Properties with insurers or associations of recognized standing in such amounts (including by way of self-insurance) as it determines to be prudent and consistent with its insurance and loss prevention policies, and in such forms and covering such risks as may then be customary with airlines of a comparable credit standing flying equipment and routes comparable to the Company.

Section VI.8 Appraisals.

(a) On the First Amendment Effective Date, the Company shall deliver a list of the Pool Assets and estimated current market value of the Pool Assets to the Collateral Agent (for onward distribution to the Banks).

(b) On each Appraisal Delivery Date, the Company shall submit an Appraisal of the Pool Assets to the Paying Agent (for onward distribution to the Banks) as of the date which is no more than 30 days prior to such Appraisal Delivery Date; provided, however, that if such Appraisal is to be delivered on such Appraisal Delivery Date as a consequence of clause (c) of the definition thereof, the Appraisal to be delivered on such date shall only be in respect of the assets to be removed from and/or added to the Pool Assets.

(c) If an Event of Default has occurred and is continuing, upon request by the Paying Agent or Majority Banks reasonably requested by the Paying Agent or the Majority Banks, the Company shall, four additional times during the term of this Agreement, in each case submit an Appraisal of the Pool Assets to the Paying Agent (for onward distribution to the Banks) as soon as reasonably practicable after receipt by the Company of such request.

Section VI.9 ~~Coverage Ratio~~[Reserved]. ~~The Company shall maintain, at all times after March 31, 2021, a Coverage Ratio of not less than 1.25 to 1.0.~~

~~The Company shall have the option to reduce the required Coverage Ratio to 0.80 to 1.0 for two consecutive fiscal quarters by written notice to the Banks. If such notice is given, the Company shall be irrevocably obligated to pay to each Bank a quarterly fee equal to 0.25% of such Bank's Commitment for each quarter (with the amount of such Commitment being determined on an average basis if such Commitment has changed during such quarter), payable on each date on which financial statements for the two relevant fiscal quarters are required to be delivered; provided that (i) such option may be exercised no more than once between the Effective Date and the Termination Date and (ii) such fee shall be payable in respect of any quarter only if the Coverage Ratio for such quarter is less than 1.25 to 1.0.~~

.

55

Section VI.10 Reporting Requirements. The Company shall furnish to the Paying Agent (with sufficient copies for each Bank):

(a) Within 120 days after the last day of each fiscal year of the Company, Financial Statements (it being understood that delivery of the Company's annual report on Form 10-K for any fiscal year as filed with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended, will satisfy this requirement with respect to such fiscal year) showing the consolidated financial condition and results of operations of the Company and its Subsidiaries as of, and for the year ended on, such last day, accompanied by (i) the opinion, without material qualification, of Auditors, based on an audit using generally accepted auditing standards, that such Financial Statements were prepared in accordance with GAAP and present fairly, in all material respects, the consolidated financial position and results of operations of the Company and its consolidated Subsidiaries for the periods presented and (ii) a Financial Report Certificate;

(b) Within 60 days after the last day of each of the first three fiscal quarters of the Company (i) Financial Statements showing the consolidated financial condition and results of operations of the Company and its consolidated Subsidiaries as of and for the period from the beginning of the current fiscal year to, such last day (it being understood that delivery of the Company's quarterly report on Form 10-Q for any fiscal quarter as filed with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended, will satisfy this requirement with respect to such fiscal quarter), and (ii) a Financial Report Certificate;

(c) (i) Promptly after mailing, true copies of all reports, statements, documents, plans, and other written communications furnished by or on behalf of the Company or any of its Subsidiaries to stockholders generally and (ii) promptly upon the filing thereof, copies of all registration statements (other than the exhibits thereto and any registration statements on Form S8 or its equivalent) and reports on Forms 10-K, 10-Q and 8-K (or their equivalents) which the Company shall have filed with the Securities and Exchange Commission;

(d) Notice, promptly after the Company or any of its Material Subsidiaries knows or has reason to know of a Default or Event of Default, specifying the nature thereof and what action the Company or any Subsidiary has taken, is taking, or proposes to take with respect thereto;

(e) Prompt notice of any legal or arbitral proceedings, and of all proceedings by or before any governmental or regulatory authority or agency, and any material development in respect of such legal or other proceedings, affecting the Company, except proceedings which, if adversely determined, would not have a Material Adverse Effect or proceedings with respect to which the Company, in good faith and upon consultation with outside counsel, believes an adverse determination in respect thereof to be unlikely; and

(f) Promptly upon the Paying Agent's reasonable request, such other relevant information (not otherwise required to be furnished under the Loan Papers) respecting the business affairs, assets, and liabilities of the Company and any of its Material Subsidiaries.

In the case of paragraphs (a), (b) and (c) above (other than the Financial Report Certificate), the Company may satisfy the reporting requirements in respect thereof by making the documents referred to therein available to the Banks on its website or posted on the Security and Exchange Commission's website at www.sec.gov. Notwithstanding the foregoing, the Company shall deliver hard copies of any such

56

documents to any Bank that notifies the Company that such delivery is required by any Laws applicable to such Bank.

Section VI.11 Use of Proceeds. Proceeds advanced hereunder shall be used only as represented herein. The Company shall not request any Loan or Letter of Credit, and the Company shall not use, and shall procure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Loan or Letter of Credit (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, to the extent such activities, businesses or transaction would be prohibited by Sanctions if conducted by a corporation incorporated in the United States or (c) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

Section VI.12 Pool Assets. The Company (i) will ensure that, subject to clause (c) below, the Appraised Value of the Pool Assets shall satisfy the Collateral Coverage Test (based upon the most recent Appraisal delivered to the Paying Agent and the Banks pursuant to the provisions of Section 6.8), and (ii) will not (and will not permit any Wholly Owned Domestic Subsidiary to) convey, sell, lease, transfer or otherwise dispose of, whether voluntarily or involuntarily (it being understood that loss of property due to theft, destruction, confiscation, prohibition on use or similar event shall constitute a disposal for purposes of this covenant), or remove or substitute, any Pool Asset (or any engine included in the Pool Assets unless such engine is replaced by another working engine or engines of comparable value, assuming half-time condition) or agree to do any of the foregoing in respect of the Pool Assets at any future time, except that:

(a) so long as no Event of Default exists, the Company or any of its Wholly Owned Domestic Subsidiaries owning a Pool Asset may replace a Pool Asset with another asset of the Company or such Wholly Owned Domestic Subsidiary (or any other Wholly Owned Domestic Subsidiary) (and Schedule II shall be modified to reflect such replacement), provided that (A) such replacement shall be made on at least a dollar-for-dollar basis based upon (x) in the case of the asset being removed from the Pool Assets, the Appraised Value of such Pool Asset (as determined by the most recently delivered Appraisal with respect to such Pool Asset) and (y) in the case of the asset being added to the Pool Assets, the Appraised Value of such asset (as determined by an Appraisal performed at (or relatively contemporaneously with) the time of such replacement), (B) after giving effect to such replacement, at the time of such replacement the average age of any aircraft constituting Pool Assets shall not exceed 14 years, (C) prior to effecting the replacement, the Company shall have delivered an Officer's Certificate to the Paying Agent certifying compliance with this Section 6.12 and Section 6.13 and attaching to such certificate the Appraisal required by Section 6.8 and (C) the asset replacing a Pool Asset shall constitute Specified Equipment.

(b) so long as no Event of Default exists or would result therefrom, the Company or any of its Wholly Owned Domestic Subsidiaries owning a Pool Asset may remove an asset from the Pool Assets (and Schedule II shall be modified to reflect such removal), provided that (A) after giving effect to such removal, the Appraised Value of the remaining Pool Assets (as determined by an Appraisal of all Pool Assets performed at (or relatively contemporaneously with) the time of such removal) shall satisfy the Collateral Coverage Test, (B) after giving effect to such removal, at the time of such removal, the average age of any aircraft constituting Pool Assets shall not exceed 14 years, and (C) prior to effecting

57

the removal, the Company shall have delivered an Officer's Certificate to the Paying Agent certifying that, and providing calculations demonstrating that, after giving effect to such removal, the Appraised Value of the Pool Assets shall satisfy the Collateral Coverage Test, and otherwise certifying compliance with this Section 6.12 and attaching to such certificate Appraisals of all Pool Assets obtained in connection with such removal;

(c) in the event (x) that an Appraisal furnished pursuant to Section 6.8 discloses that the Collateral Coverage Test is not satisfied or (y) the Collateral Coverage Test is not satisfied following an involuntary disposal of any Pool Asset (or any engine included in the Pool Assets unless such engine is replaced by another working engine or engines of comparable value, assuming half-time condition) (whether by loss of property due to theft, destruction, confiscation, prohibition on use, any similar event or otherwise), based upon the most recent Appraisal of the Pool Assets (from which the appraised values of the Pool Assets which are the subject of the involuntary disposition shall be subtracted) furnished pursuant to Section 6.8, the Company shall within 60 days after the date of such Appraisal or involuntary disposal, as the case may be (a "Collateral Coverage Test Cure Period"), designate additional assets as Pool Assets to the extent that, (1) after giving effect to such designation, the Appraised Value of the Pool Assets, based on the most recently delivered Appraisal with respect to assets already constituting Pool Assets and based on an Appraisal performed at (or relatively contemporaneously with) the time of such addition with respect to assets being added to Pool Assets, shall satisfy the Collateral Coverage Test (and Schedule II shall be modified to reflect such addition) and (2) after giving effect to such addition, at the time of such addition, the average age of any aircraft constituting Pool Assets shall not exceed 14 years, provided that (A) at the time of such addition, the Paying Agent and the Banks shall have received an Officer's Certificate certifying that the conditions set forth in this Section 6.12 shall have been satisfied after giving effect to such addition and attaching thereto such Appraisal, and (B) the asset being added shall constitute Specified Equipment.

(d) the Company may at any time and from time to time designate any of its assets as Pool Assets and deliver to the Paying Agent an Appraisal with respect to such assets being added as Pool Assets (and Schedule II shall be modified to reflect such addition), provided that (A) at the time of such addition, the Paying Agent and the Banks shall have received an Appraisal with respect to such assets being added as Pool Assets, an Officer's Certificate certifying that the conditions set forth in this Section 6.12 shall have been satisfied after giving effect to such addition and attaching thereto such Appraisal, (B) at the time of such addition, the average age of any aircraft constituting Pool Assets shall not exceed 14 years and (C) the asset being added shall constitute Specified Equipment

(e) at the Company's request, the Lien on any Pool Asset will be promptly released, provided, in each case, that the following conditions are satisfied or waived: (i) no Default or Event of Default has occurred and is continuing, (ii) after giving effect to such release and the addition of any assets pursuant to clause (iv)(z) below, at the time of such release the average age of any aircraft constituting Pool Assets shall not exceed 14 years, (iii) the Company shall deliver to the Collateral Agent an Officer's Certificate demonstrating compliance with the Collateral Coverage Test following such release and certifying that the conditions set forth in this Section 6.12(e) shall have been satisfied and (iv) any of the following or any combination thereof shall have occurred: (x) after giving effect to such release, the remaining Collateral constituting Specified Equipment shall satisfy the Collateral Coverage Test, (y) the Company shall have prepaid the Loans in an amount required to comply with the Collateral Coverage Test, or (z) the Company shall have subjected to the Aircraft Mortgage additional assets that constitute Specified Equipment having an Appraised Value, in the aggregate, required to comply with this Section 6.12. In connection herewith, the Collateral Agent agrees to promptly provide, execute and

58

deliver any documents or releases reasonably requested by the Company to evidence such release, at the Company's expense.

Section VI.13 Restrictions on Liens. (a) The Company will not, nor will it permit any Subsidiary to, create, assume or suffer to exist any Lien upon or with respect to the Collateral or assign any right to receive the proceeds from the sale, transfer or disposition of any of the Collateral, or file or authorize the filing with respect to any of the Collateral of any financing statement naming the Company or any Subsidiary as debtor under the Uniform Commercial Code or any similar notice of Lien naming the Company or any Subsidiary as debtor under any similar recording or notice statute (including, without limitation, any filing under Title 49, United States Code, Section 44107), other than Permitted Liens affecting Collateral.

(b)The Company will not enter into or suffer to exist, and will not permit any of its Subsidiaries to enter into or suffer to exist, any agreement prohibiting or conditioning the creation or assumption of any first priority Lien, subject to Permitted Liens, in favor of the Collateral Agent for the ratable benefit of the Secured Parties upon any Collateral to secure Debt or other obligations of the Company or of any Subsidiary of the Company that holds Collateral.

Section VI.14 Mergers and Dissolutions(a). (a) The Company will not merge or consolidate with any other person unless:

(i) no Default or Event of Default has occurred and is continuing or would result therefrom;

(ii) the Company is the surviving corporation or, if otherwise, (x) such other Person or continuing corporation (the "Successor Company") is a corporation or other entity organized under the laws of a state of the United States and (y) such Successor Company is a U.S. certificated air carrier; and

(iii) in the case of a Successor Company, the Successor Company shall (A) execute, prior to or contemporaneously with the consummation of such transaction, such agreements, if any, as are in the reasonable opinion of the Paying Agent, necessary or advisable to evidence the assumption by the Successor Company of liability for all of the obligations of the Company hereunder and the other Loan Papers, and (B) cause to be delivered to the Paying Agent and the Banks such legal opinions (which may be from in-house counsel) as any of them may reasonably request in connection with the matters specified in the preceding clause (A) and (C) provide such information as each Bank or the Paying Agent reasonably requests in order to perform its "know your customer" due diligence with respect to the Successor Company.

Upon any consolidation or merger in accordance with this Section 6.14(a) in any case in which the Company is not the surviving corporation, the Successor Company shall succeed to, and be substituted for, and may exercise every right and power of, the Company under this Agreement with the same effect as if such Successor Company had been named as the Company herein. No such consolidation or merger shall have the effect of releasing the Company or any Successor Company which shall theretofore have become successor to the Company in the manner prescribed in this Section 6.14(a) from its liability with respect to any Loan Paper to which it is a party.

59

(b) The Company will not liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution).

Section VI.15Assignment. The Company will not assign or transfer any of its Rights, duties, or obligations under any of the Loan Papers to which it is a party.

Section VI.16 ~~Amendments~~[Reserved].

~~(a) The Company shall not amend, modify, or change the terms or provisions of the Term Loan Credit Agreement, if the effect thereof, either individually or in the aggregate, would make the terms of the Term Loan Credit Agreement to be more restrictive to the Company unless this Agreement is amended in accordance with Section 9.1 hereof to add comparable terms or provisions.~~

~~(b)     The Company shall cause any of its Subsidiaries that is or becomes a guarantor of obligations under the Term Loan Credit Agreement (other than such Subsidiaries pledging "Collateral" (as defined in the Term Loan Credit Agreement)) to become a guarantor of the Obligations hereunder.~~

Section VI.17 Liquidity. The Company shall maintain at all times Total Liquidity of not less than $~~2,500,000,000~~1,500,000,000.

Section VI.18 Further Assurances. The Company will take, or cause to be taken, at the Company's cost and expense, such action with respect to (x) the recording, filing, re-recording and re-filing of the Aircraft Mortgage, as is necessary to maintain, so long as the Aircraft Mortgage is in effect, the priority, perfection and preservation of the Lien created by the Aircraft Mortgage, in the office of the FAA, pursuant to Title 49, and in such other places as may be required under any applicable law or regulation in the U.S., (y) the appropriate registrations with the International Registry as are necessary to maintain, so long as the Aircraft Mortgage is in effect, the priority, perfection and preservation of the Lien created by the Aircraft Mortgage and (z) any financing statements or other instruments as are necessary to maintain, so long as the Aircraft Mortgage is in effect, the priority, perfection and preservation of the Lien created by the Aircraft Mortgage, and will furnish to the Collateral Agent timely notice of the necessity of such action, together with, if requested by Collateral Agent, such instruments, in execution form, and such other information as may be reasonably required to enable the Collateral Agent to take such action or otherwise reasonably requested by Collateral Agent. To the extent permitted by applicable law, the Company hereby authorizes the Collateral Agent to execute and file financing statements or continuation statements necessary to maintain, so long as the Aircraft Mortgage is in effect, the perfection and preservation of the Lien created by the Aircraft Mortgage without the Company's signature appearing thereon. The Company shall pay the costs of, or incidental to, any recording or filing, including, without limitation, any filing of financing or continuation statements, necessary to maintain, so long as the Aircraft Mortgage is in effect, the perfection and preservation of the Lien created by the Aircraft Mortgage.

## ARTICLE VII

## EVENTS OF DEFAULT; REMEDIES

Section VII.1 Events of Default. Any one or more of the following events shall be "Events of Default" hereunder (which shall include by definition the expiration of any grace period with respect thereto), whether the same shall occur and be continuing for any reason whatsoever (and whether such occurrence shall be voluntary or involuntary or come about or be effected by operation of Law or otherwise):

(a) <u>Payment of Obligation</u>. Failure to pay any principal of any Loan or any Reimbursement Obligation when due whether at maturity, by declaration as authorized by this Agreement, or otherwise; or failure to pay, within five Business Days after the due date thereof, any interest on any Loan or any Reimbursement Obligation; or failure to pay, within five Business Days after the due date thereof, or if no due date therefor is herein specified within five Business Days after written demand therefor is given to the Company by the Paying Agent, any fee or other amount payable by the Company hereunder or under any of the other Loan Papers.

(b) <u>Covenants</u>.

(i)    Default shall be made in the observance or performance of the covenants, conditions, and agreements on the part of the Company (or in the case of <u>Section 6.12</u>, on the part of any Subsidiary having any Pool Assets) contained in <u>Section 6.12</u>, <u>6.13</u> or <u>6.17</u>, in each case subject to a grace period of 5 Business Days in the event that a Senior Officer of the Company did not have advance knowledge of the Default and so long as (i) the Paying Agent is promptly notified of the Default upon the occurrence thereof and (ii) the interests of the Banks are not materially prejudiced during such period in the reasonable determination of the Paying Agent.

(ii)    Default shall be made in the observance or performance of any of the other covenants, conditions, and agreements on the part of the Company contained herein, or in any other Loan Papers and such default shall continue for a period of 30 days ~~(or, in the case of Section 6.9, five Business Days)~~ after the Paying Agent shall have given the Company notice thereof in writing.

(c) <u>Debtor Relief</u>. The Company or any Material Subsidiary shall file a voluntary petition in bankruptcy or a petition or answer seeking reorganization, arrangement, composition, liquidation, receivership, or similar relief under any Debtor Relief Law, or shall file a petition to take advantage of any Debtor Relief Law, or shall make an assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts as they become due, or shall fail generally to pay its debts as they become due, or shall consent to the appointment of any receiver, trustee, custodian or liquidator of it or all or a substantial part of its Property; or a proceeding or action shall be instituted or commenced against the Company or any Material Subsidiary seeking an order for relief or a reorganization, arrangement, composition, liquidation, receivership, or similar relief under any Debtor Relief Law or seeking the appointment, without the consent of the Company or any Material Subsidiary, of any receiver, trustee, custodian or liquidator of it or all or a substantial part of the Property of the Company or any Material Subsidiary and such proceeding or action shall remain undismissed or unstayed for a period of 90 days; or an order, decree, or judgment for an involuntary petition adjudicating the Company or any Subsidiary insolvent shall be entered by any court of competent jurisdiction and shall remain undismissed or unstayed for a period of 90 days.

(d) <u>Payment of Judgments</u>. The Company or any of its Material Subsidiaries fails to pay any <u>final</u> judgment or order for the payment of money in excess of $~~50,000,000~~<u>150,000,000</u> rendered against it or any of its assets (exclusive of <u>any</u> judgment <u>or order the</u> amounts <u>of which are</u> fully covered by insurance ~~where~~<u>less any applicable deductible and as to which</u> the insurer has ~~admitted liability~~<u>been notified of such judgment or order and has not denied coverage</u> in respect thereof) and either (i) any enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) the same shall not be <u>stayed, vacated, satisfied,</u> discharged <u>or bonded pending appeal</u> (or provisions shall not be made for such <u>stay, vacation, satisfaction,</u> discharge <u>or bond</u>), or a stay of execution thereof shall not be procured, within ~~30~~<u>60</u> days from the date of entry thereof and the Company or the relevant

61

Material Subsidiary shall not, within said period of ~~30~~60 days, or such longer period during which execution of the same shall have been stayed, appeal therefrom and cause the execution thereof to be stayed during such appeal.

(e) <u>Default on Other Debt or Security</u>. The Company or any Material Subsidiary shall (i) fail to pay any principal of or interest on any Debt (other than the Obligation) the principal or face amount of which exceeds $~~50,000,000~~150,000,000 when due (or, where permitted, within any applicable grace period), whether by scheduled maturity, required prepayment, acceleration, demand or otherwise and such default continues unremedied for five Business Days after such due date or applicable grace period, or (ii) fail to perform or observe any other provision (other than a provision that is substantially identical to a provision in this Agreement) contained in any agreement securing or relating to such Debt (or any other breach or default under such Debt agreement occurs) if the effect of such failure to perform or observe such other provisions (or breach or default) is to cause such Debt to become due prior to its stated maturity; <u>provided</u>, <u>however</u>, that if any such failure, breach or default shall be waived or cured (as evidenced by a writing from such holder or trustee) then, to the extent of such waiver or cure, the Event of Default hereunder by reason of such failure, breach or default shall be deemed likewise to have been thereupon waived or cured.

(f) <u>ERISA</u>. Any "<u>Reportable Event</u>" as such term is defined in ERISA under any Plan, or the appointment by an appropriate Tribunal of a trustee to administer any Plan, or the termination of any Plan within the meaning of Title IV of ERISA, and any of the foregoing results in a material liability to the Pension Benefit Guaranty Corporation; or any Plan fails to satisfy the "minimum funding standards" of ERISA or is determined to be in "at risk" status (within the meaning of ERISA).

(g) <u>Misrepresentation</u>. Any representation or warranty made by the Company is untrue in any material respect, or any certificate, schedule, statement, report, notice or writing (excluding any Appraisal, for which the Company makes no representation) furnished by the Company to the Agents or to the Banks, or any of them, is untrue in any material respect on the date as of which the facts set forth are stated or certified, shall remain material at the time of discovery and shall, if curable, remain incorrect in any material respect after 30 days after written notice thereof to the Company (it being understood that any failure by the Company to include within any such schedule, statement, report, notice, or writing any information the omission of which would cause the material included to be misleading shall be as much an untruth as a false statement contained therein).

<u>Section VII.2 Remedies Upon Default</u>. (a) If an Event of Default specified in <u>Section 7.l(c)</u> occurs, the Commitments of the Banks shall thereupon automatically terminate and the aggregate unpaid principal balance of and accrued interest on the Obligation shall thereupon become due and payable concurrently therewith, without any action by the Paying Agent or any Bank and without diligence, presentment, demand, protest, notice of protest or intent to accelerate, or notice of any other kind, all of which are hereby expressly waived. Except as set forth in the preceding sentence, should any other Event of Default occur and be continuing, the Paying Agent may, and if requested by the Majority Banks, shall, do any one or more of the following:

(i) <u>Acceleration</u>. Declare (by written notice to the Company) the entire unpaid balance of the Obligation, or any part thereof, immediately due and payable, whereupon it shall be due and payable, without diligence, presentment, demand, protest, notice of protest or intent to accelerate, or other notice of

62

any kind (except any notice or demand specified in this Agreement), all of which are hereby expressly waived.

(ii) <u>Termination</u>. Terminate the Commitments by written notice to the Company.

(iii) <u>Judgment</u>. Reduce any claim to judgment.

(iv) <u>Rights</u>. Exercise any and all legal and equitable Rights available to it (including all remedies under the Cape Town Treaty including, without limitation, Article 13 of the Cape Town Convention).

(b) With respect to all Letters of Credit with respect to which presentment for honor shall not have occurred at the time of an acceleration pursuant to this <u>Section 7.2</u>, the Company shall, upon any such acceleration, deposit in a cash collateral account opened by the Paying Agent an amount equal to the aggregate then undrawn and unexpired amount of such Letters of Credit. Amounts held in such cash collateral account shall be applied by the Paying Agent to the payment of drafts drawn under such Letters of Credit, and the unused portion thereof after all such Letters of Credit shall have expired or been fully drawn upon, if any, shall be applied to repay other obligations of the Company hereunder and under the other Loan Papers. After all such Letters of Credit shall have expired or been fully drawn upon, all Reimbursement Obligations shall have been satisfied and all other obligations of the Company hereunder and under the other Loan Papers shall have been paid in full, the balance, if any, in such cash collateral account shall be returned to the Company (or such other Person as may be lawfully entitled thereto).

(c) In addition to any other rights and remedies granted to the Collateral Agent and the Banks in the Loan Papers, the Collateral Agent on behalf of the Banks may exercise all rights and remedies of a secured party under the New York Uniform Commercial Code or any other applicable law. Without limiting the generality of the foregoing, the Collateral Agent, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon the Company (all and each of which demands, defenses, advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, or consent to the use by the Company of any cash collateral arising in respect of the Collateral on such terms as the Collateral Agent deems reasonable, and/or may forthwith sell, lease, assign give an option or options to purchase or otherwise dispose of and deliver, or acquire by credit bid on behalf of the Banks, the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Collateral Agent or any Bank or elsewhere, upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery, all without assumption of any credit risk. The Collateral Agent or any Bank shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in the Company, which right or equity is hereby waived and released. Subject to the succeeding paragraph, the Collateral Agent shall apply the net proceeds of any action taken by it pursuant to this <u>Article VII</u>, after deducting all reasonable costs and expenses of every kind incurred in connection therewith or

63

incidental to the care or safekeeping of any of the Collateral or in any other way relating to the Collateral or the rights of the Collateral Agent and the Banks hereunder, including reasonable attorneys' fees and disbursements, to the payment in whole or in part of the obligations of the Company under the Loan Papers, in such order as the Collateral Agent may elect, and only after such application and after the payment by the Collateral Agent of any other amount required by any provision of law, including Section 9-615(a)(3) of the New York Uniform Commercial Code, need the Collateral Agent account for the surplus, if any, to the Company. To the extent permitted by applicable law, the Company waives all claims, damages and demands it may acquire against the Collateral Agent or any Bank arising out of the exercise by them of any rights hereunder. If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.

(d) Notwithstanding anything herein to the contrary, following an acceleration of the Obligations pursuant to Section 7.2:

(A) all payments received on account of the Obligations (including, without limitation, all proceeds of the sale of any Pool Assets received by the Paying Agent) shall, subject to Section 2.22, be applied by the Paying Agent as follows:

(i) first, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts payable to the Agents (including fees and disbursements and other charges of counsel to the Agents payable under Section 9.4 and amounts pursuant to a fee letter payable to the Paying Agent in its capacity as such);

(ii) second, to payment of that portion of the Obligations constituting fees, expenses, indemnities and other amounts (other than principal, reimbursement obligations in respect of means a payment made by an Issuing Bank pursuant to a Letter of Credit, interest and Letter of Credit fees) payable to the Banks and the Issuing Banks (including fees and disbursements and other charges of counsel to the Banks and the Issuing Banks payable under Section 9.4 or Section 9.5) arising under the Loan Papers, ratably among them in proportion to the respective amounts described in this clause (ii) payable to them;

(iii) third, to payment of that portion of the Obligations constituting accrued and unpaid Letter of Credit fees and charges and interest on (x) the Loans and (y) unreimbursed payments made by an Issuing Bank pursuant to a Letter of Credit, ratably among the Banks and the Issuing Banks in proportion to the respective amounts described in this clause (iii) payable to them;

(iv) fourth, (A) to payment of that portion of the Obligations constituting unpaid principal of the Loans and unreimbursed payment made by an Issuing Bank pursuant to a Letter of Credit and (B) to cash collateralize that portion of L/C Obligations comprising the undrawn amount of Letters of Credit to the extent not otherwise cash collateralized by the Company pursuant to Article III or Section 2.22, ratably among the Banks and the Issuing Banks in proportion to the respective amounts described in this clause (iv) payable to them; provided that (x) any such amounts applied pursuant to subclause (B) above shall be paid to the Paying Agent for the ratable account of the applicable Issuing Banks to cash collateralize Obligations in respect of Letters of Credit, (y) subject to Article III or Section 2.22, amounts used to cash collateralize the aggregate amount of Letters of Credit pursuant to this clause (iv) shall be used to satisfy

64

drawings under such Letters of Credit as they occur and (z) upon the expiration of any Letter of Credit (without any pending drawings), the pro rata share of cash collateral shall be distributed to the other Obligations, if any, in the order set forth in this Section 7.2(d);

(v) fifth, to the payment in full of all other Obligations, in each case ratably among the Agents, the Banks and the Issuing Banks based upon the respective aggregate amounts of all such Obligations owing to them in accordance with the respective amounts thereof then due and payable; and

(vi) finally, the balance, if any, after all Obligations have been indefeasibly paid in full, to the Company or as otherwise required by law; and

(B) if any amount remains on deposit as cash collateral after all Letters of Credit have either been fully drawn or expired (without any pending drawings), such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

Section VII.3 Remedies in General. If any Event of Default shall occur and be continuing, the Paying Agent may immediately proceed to protect and enforce all or any Rights with respect thereto contained in this Agreement or any other Loan Papers or may enforce any other legal or equitable Rights. Any Right may be exercised from time to time, independently or concurrently, and as often as shall be deemed expedient. No waiver of any Event of Default shall extend to any subsequent Event of Default.

**ARTICLE VIII**

**THE AGENTS**

Section VIII.1 Authorization and Action. Each Bank hereby irrevocably appoints and authorizes (a) JPMorgan Chase Bank, N.A. to act as its Paying Agent and Collateral Agent hereunder and under each of the other Loan Papers, (b) JPMorgan Chase Bank, N.A. and Citibank, N.A. to act as Co-Administrative Agents hereunder and under each of the other Loan Papers, (c) Barclays Bank PLC to act as Syndication Agent hereunder and (d) Bank of America, N.A., BNP Paribas, Goldman Sachs Bank USA, Morgan Stanley Senior Funding, Inc., U.S. Bank National Association and Wells Fargo Bank, N.A. to act as Documentation Agents hereunder. JPMorgan Chase Bank, N.A. consents to such appointment as Paying Agent and agrees to perform the duties of the Paying Agent hereunder and under the other Loan Papers. Each of JPMorgan Chase Bank, N.A. and Citibank, N.A. consents to its appointment as a Co-Administrative Agent, Barclays Bank PLC consents to its appointment as Syndication Agent and each of Bank of America, N.A., BNP Paribas, Goldman Sachs Bank USA, Morgan Stanley Senior Funding, Inc., U.S. Bank National Association and Wells Fargo Bank, N.A. consents to its appointment as Documentation Agent. Each Bank authorizes and directs the Paying Agent to act on its behalf and to exercise such powers under this Agreement as are specifically delegated to or required of such Agent by the terms hereto, together with such powers as are reasonably incidental thereto. As to any matters not expressly provided for by this Agreement or the other Loan Papers (including, without limitation, enforcement or collection of the Loans or Notes), the Paying Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Majority Banks, and such instructions shall be binding upon all Banks and all holders of Loans or Notes; provided, however, that no Agent shall be required to take any action which exposes such Agent to liability or which is contrary to this Agreement or applicable Law.

Section VIII.2 Agents' Reliance, Etc. None of the Agents and none of their respective Affiliates, directors, officers, agents, or employees shall be liable for any action taken or omitted to be

65

taken by it or them under or in connection with the Loan Papers (i) with the consent or at the request of the Majority Banks (or all the Banks, if required) or (ii) in the absence of its or their own gross negligence or willful misconduct (it being the express intention of the parties that the Agents and their respective directors, officers, agents, and employees shall have no liability for actions and omissions under this <u>Section 8.2</u> resulting from their ordinary contributory negligence). Without limitation of the generality of the foregoing, each Agent (i) may treat the payee of each Loan or Note as the holder thereof until such Agent receives written notice of the assignment or transfer thereof signed by such payee and in form satisfactory to such Agent; (ii) may consult with legal counsel (including counsel for the Company), independent public accountants, and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants, or experts; (iii) makes no warranty or representation to any Bank and shall not be responsible to any Bank for any statements, warranties, or representations made by or on behalf of the Company in or in connection with any Loan Paper; (iv) except as otherwise expressly provided herein, shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants, or conditions of any Loan Paper or to inspect the property (including the books and records) of the Company or any of its Subsidiaries; (v) shall have no responsibility to ensure the satisfaction of any condition set forth in <u>Article IV</u> or elsewhere herein other than to confirm receipt of items expressly required to be delivered to the Paying Agent, (vi) shall not be responsible to any Bank for the due execution, legality, validity, enforceability, genuineness, sufficiency, or value of any Loan Paper or any other instrument or document furnished pursuant hereto or thereto; (vii) shall incur no liability under or in respect of any Loan Paper by acting upon any notice, consent, certificate, or other instrument or writing (which may be by telecopier or e-mail) reasonably believed by it to be genuine and signed or sent by the proper party or parties; and (viii) may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon.

Section VIII.3 <u>Rights of Agents as Banks</u>. With respect to their Commitments, the Loans, if any, made by them and the Notes, if any, issued to them, each Bank that is an Agent (including any Agent that hereafter becomes a holder of a Loan or Note) and its Affiliates shall have the same rights and powers under this Agreement or any other Loan Paper as any other Bank and may exercise the same as though it were not an Agent; and the term "Bank" or "Banks" shall, unless otherwise expressly indicated, include each Bank that is an Agent (including any Agent that hereafter becomes a holder of a Loan or Note), in its individual capacity. Each Bank that is an Agent (including any Agent that hereafter becomes a holder of a Loan or Note) and its Affiliates may accept deposits from, lend money to, act as trustee under indentures of, and generally engage in any kind of business with, the Company, any of the Subsidiaries and any Person who may do business with or own securities of the Company or of the Subsidiaries, all as if such Bank were not an Agent, and without any duty to account therefor to the Banks.

Section VIII.4 <u>Bank Credit Decision</u>. Each Bank acknowledges and agrees that it has, independently and without reliance upon any of the Agents or any other Bank and based on the Current Financials and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Bank also acknowledges and agrees that it will, independently and without reliance upon any of the Agents or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement.

Section VIII.5 <u>Agents' Indemnity</u>. None of the Agents shall be required to take any action hereunder or to prosecute or defend any suit in respect of this Agreement or the Loans or Notes unless indemnified to such Agent's satisfaction by the Banks against loss, cost, liability, and expense. If

66

any indemnity furnished to such Agent shall become impaired, it may call for additional indemnity and cease to do the acts indemnified against until such additional indemnity is given. In addition, the Banks severally but not jointly agree to indemnify the Paying Agent (to the extent not reimbursed by the Company), ratably according to the respective principal amounts of the Committed Loans then held by each of them (or if no Committed Loans are at the time outstanding, ratably according to either (i) the respective amounts of their Commitments, or (ii) if the Commitments have terminated, the respective amounts of the Commitments immediately prior to such termination; provided that, in the case of Section 2.22, when a Defaulting Bank shall exist, any such Defaulting Bank's Commitment shall be disregarded in the calculation, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against such Agent in any way relating to or arising out of this Agreement or any action taken or omitted by such Agent under this Agreement or the other Loan Papers (including, without limitation, any action taken or omitted under article ii of this Agreement); provided that no Bank shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements resulting from such Agent's fraud, gross negligence or willful misconduct. Each Bank agrees, however, that it expressly intends, under this Section 8.5, to indemnify each Agent ratably as aforesaid for all such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, and disbursements arising out of or resulting from such Agent's ordinary or contributory negligence. Without limitation of the foregoing, each Bank agrees to reimburse the Paying Agent promptly upon demand for its ratable share of any out-of-pocket expenses (including reasonable counsel fees) incurred by such Agent in connection with the preparation, execution, administration, or enforcement of, or legal advice in respect of rights or responsibilities under, this Agreement and the other Loan Papers to the extent that such Agent is not reimbursed for such expenses by the Company. The provisions of this Section 8.5 shall survive the termination of this Agreement and/or the payment or assignment of any of the Loans or Notes.

Section VIII.6 Successor Paying Agent and Successor Collateral Agent. Each of the Paying Agent and the Collateral Agent may resign at any time by giving written notice thereof to the Banks and the Company and may be removed as Paying Agent or Collateral Agent, as applicable, under this Agreement and the other Loan Papers at any time with or without cause by the Majority Banks. Upon any such resignation or removal, the Majority Banks shall have the right, with the consent, not to be unreasonably withheld or delayed, of the Company (provided that the Company's consent shall not be required during the continuance of a Default or an Event of Default), to appoint a successor Paying Agent or a successor Collateral Agent. If no successor Paying Agent or Collateral Agent shall have been so appointed and shall have accepted such appointment within 30 calendar days after the retiring Paying Agent or Collateral Agent's, as applicable, giving notice of resignation or the Majority Banks' removal of the retiring Collateral Agent, then the retiring Paying Agent or Collateral Agent, as applicable, may, on behalf of the Banks, with the consent, not to be unreasonably withheld or delayed, of the Company (provided that the Company's consent shall not be required during the continuance of a Default or Event of Default), appoint a successor Paying Agent, which shall be a commercial bank organized under the Laws of the United States of America or of any state thereof and having a combined capital and surplus of at least $500,000,000 or a successor Collateral Agent. Upon the acceptance of any appointment as Collateral Agent hereunder and under the other Loan Papers by a successor Paying Agent or a successor Collateral Agent, such successor Paying Agent or such successor Collateral Agent shall thereupon succeed to and become vested with all rights, powers, privileges and duties of the retiring Paying Agent or Collateral Agent, and the retiring Paying Agent or Collateral Agent shall be discharged from its duties and obligations under this Agreement and the other Loan Papers; provided that solely for purposes of maintaining any security interest granted to the Collateral Agent under any Loan Paper for the benefit of the Secured Parties, the retiring Collateral Agent shall continue to be vested with such security interest as

67

collateral agent for the benefit of the Secured Parties, and continue to be entitled to the rights set forth in such Loan Paper, and, in the case of any Collateral in the possession of the Collateral Agent, shall continue to hold such Collateral, in each case until such time as a successor Collateral Agent is appointed and accepts such appointment in accordance with this Section 8.6 (it being understood and agreed that the retiring Collateral Agent shall have no duty or obligation to take any further action under any Loan Paper, including any action required to maintain the perfection of any such security interest). After any retiring Paying Agent's or Collateral Agent's resignation or removal as the Paying Agent or the Collateral Agent hereunder and under the other Loan Papers, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Paying Agent under this Agreement and the other Loan Papers.

Section VIII.7 Notice of Default. The Paying Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Paying Agent shall have received written notice from a Bank or the Company referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." If the Paying Agent receives such a notice, the Paying Agent shall give notice thereof to the Banks; provided, however, if such notice is received from a Bank, the Paying Agent also shall give notice thereof to the Company. The Paying Agent shall be entitled to take action or refrain from taking action with respect to such Default or Event of Default as provided in Section 8.1 and Section 8.2.

Section VIII.8 Co-Administrative Agents and Documentation Agent. The Co-Administrative Agents, the Syndication Agent and the Documentation Agents shall not have any duties or responsibilities hereunder in their capacities as such.

Section VIII.9 Collateral Matters. (a) Except with respect to the exercise of setoff rights in accordance with Section 9.6 or with respect to a Secured Party's right to file a proof of claim in an insolvency proceeding, no Secured Party shall have any right individually to realize upon any of the Collateral, it being understood and agreed that all powers, rights and remedies under the Loan Papers may be exercised solely by the Collateral Agent on behalf of the Secured Parties in accordance with the terms thereof.

(b) The Secured Parties irrevocably authorize the Collateral Agent, at its option and in its discretion, to subordinate any Lien on any property granted to or held by the Collateral Agent under any Loan Paper to the holder of any Lien on such property that is permitted by Section 6.13. The Collateral Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon or any certificate prepared by the Company in connection therewith, nor shall the Collateral Agent be responsible or liable to the Banks or any other Secured Party for any failure to monitor or maintain any portion of the Collateral.

**ARTICLE IX**

**MISCELLANEOUS**

Section IX.1 Amendments, Etc. (a) Except as provided in Section 2.25, no amendment or waiver of any provision of this Agreement or any other Loan Paper, nor consent to any departure by the Company herefrom or therefrom, shall in any event be effective unless the same shall be in writing and signed by the Majority Banks (or the Paying Agent with the consent of the Majority Banks) in all cases, and then, in any case, such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that (i) no amendment, waiver, or consent shall, unless in writing and signed by each Bank directly affected thereby (or the Paying Agent with the consent of each Bank directly affected thereby), do any of the following: (a) increase the amount of the

68

Commitments of any Banks or subject any Banks to any additional obligations, (b) reduce the principal of, or rate or amount of interest applicable to, any Loan or participation in any Letter of Credit other than as provided in this Agreement, or any fees hereunder, (c) postpone any date fixed for any payment of principal of, or interest on, the Loans or any fees hereunder, (d) extend the expiration date of any Bank's Commitment, (e) eliminate or reduce the voting rights of any Bank under this Section 9.1, (f) amend Section 2.5(c) or Section 2.15 in any manner that would alter the pro rata sharing of payments or Commitment reductions required thereby, (g) change the percentage of the Commitments or of the aggregate unpaid principal amount of the Loans, or the number of Banks, which shall be required for the Banks or any of them to take any action hereunder or (h) amend Section 7.2 in a manner that would alter the "waterfall" provision and (ii) no amendment or modification shall, unless in writing and signed by all Banks (or the Paying Agent with the consent of all Banks) release all or substantially all of the Collateral (except to the extent contemplated by Section 6.12 hereof, as in effect on the First Amendment Effective Date); provided, further, that no amendment waiver, or consent shall modify or waive any provision of Section 2.22, Article III or Section 4.3 without the written consent of each Issuing Bank; and provided, further, that no amendment, waiver, or consent shall, unless in writing and signed by the Paying Agent in addition to the Banks required above to take such action, affect the rights or duties of the Paying Agent under this Agreement or any other Loan Paper, or modify or waive any provision of Section 2.22.

(b) Notwithstanding the foregoing, if the Paying Agent and the Company acting together identify any ambiguity, omission, mistake, typographical error or other defect in any provision of this Agreement or any other Loan Papers, then the Paying Agent and the Company shall be permitted to amend, modify or supplement such provision to cure such ambiguity, omission, mistake, typographical error or other defect, and such amendment shall become effective without any further action or consent of any other party to this Agreement

Section IX.2 Notices, Etc. Any Agent, any Bank, or the holder of any Loan or Note giving consent or notice or making any request of the Company provided for hereunder, shall notify each Bank and the Paying Agent thereof. In the event that the holder of any Loan or Note (including any Bank) shall transfer such Loan or Note, it shall promptly so advise the Paying Agent which shall be entitled to assume conclusively that no transfer of any Loan or Note has been made by any holder (including any Bank) unless and until such Agent receives written notice to the contrary. Notices, consents, requests, approvals, demands, and other communications (collectively "Communications") provided for herein shall be in writing (including telecopy Communications) and mailed, telecopied, e-mailed (where indicated) or delivered:

(a)        If to the Company, to it at:
           Southwest Airlines Co.
           P.O. Box 36611, HDQ-6TR
           Love Field
           Dallas, Texas 75235
           Telecopy Number: (214) 932-1322
           Attention: Treasurer
           E-mail: Capital_Markets-DG@wnco.com

69

(b)         If to the Paying Agent, to it at:

JPMorgan Chase Bank, N.A.

JPM Loan and Agency Services

500 Stanton Christiana Road

Ops 2, 3rd Floor

Newark, DE 19713-2107

Attention: Robert Madak

Telecopy Number: (302) 634-1028

Telephone Number: (302) 634-1392

E-mail: robert.madak@jpmorgan.com and 14698287788@tls.ldsprod.com

with a copy to:

JPMorgan Chase Bank, N.A.
383 Madison Avenue, Floor 24
New York, NY 10179
Attention: Robert Kellas

Telecopy Number: (212) 270-5100
Telephone Number: (212) 270-3560
E-mail: robert.kellas@jpmorgan.com

(c) If to any Bank or any other Agent, as specified on <u>Schedule I</u> hereto or, in the case of any party, such other address or telecopy number as such party may hereafter specify for such purpose by notice to the other parties. All Communications shall, when mailed, telecopied, e-mailed or delivered, be effective and shall be deemed to have been duly given when sent by telecopier or e-mail to any party or the telecopier number or e-mail address, as applicable, as set forth herein or on the signature pages hereof (or other telecopy number or e-mail address designated by such party in a written notice to the other parties hereto), or five days after being mailed to the address as set forth herein (or such other address designated by such party in a written notice to the other parties hereto) respectively, or when delivered to such address; <u>provided</u>, <u>however</u>, Communications to any Agent pursuant to <u>Article II</u> or <u>Article VIII</u> shall not be effective until received by such Agent.

Section IX.3 No Waiver; Remedies. No failure on the part of any Bank or any Agent to exercise, and no delay in exercising, any Right hereunder or under any other Loan Paper shall operate as a waiver thereof; nor shall any single or partial exercise of any such Right, or any abandonment or discontinuance of any steps to enforce such Right, preclude any other or further exercise thereof or the exercise of any other Right. No notice to or demand on the Company in any case shall entitle the Company to any other or further notice or demand in similar or other circumstances. The Rights herein provided are cumulative and not exclusive of any Rights provided by Law.

Section IX.4 Costs, Expenses and Taxes. The Company agrees to pay or reimburse the Agents for paying: (i) all reasonable costs and expenses of the Agents in connection with (A) the preparation, execution, delivery, and administration of this Agreement and the other Loan Papers, including, without limitation, the reasonable fees and out-of-pocket expenses of counsel for the Agents with respect thereto and with respect to advising the Agents as to their respective Rights and responsibilities under this Agreement and the other Loan Papers, and (B) any amendment, modification,

70

supplement, or waiver of any of the terms of this Agreement (limited in the case of legal fees and expenses, to the reasonable fees, disbursements and other charges of Simpson Thacher & Bartlett LLP, as counsel to the Paying Agent and the Banks, one firm of aviation counsel, and, if necessary, a single local counsel in each appropriate jurisdiction), and (ii) all reasonable costs and expenses of the Banks and the Agents (including reasonable counsel's fees, and including reasonable allocated in-house counsel fees for any Bank or any Agent) in connection with the enforcement of this Agreement and the other Loan Papers (limited in the case of legal fees and expenses, to one firm of outside counsel, one firm of aviation counsel, and, if necessary, a single local counsel in each appropriate jurisdiction to the Paying Agent and the Banks, taken as a whole (and, in each case, in the case of an actual or perceived conflict of interest, an additional counsel to all such similarly situated affected parties)). In addition, the Company shall pay any and all Taxes payable or determined to be payable in connection with the execution and delivery of this Agreement and the other Loan Papers, and agrees to save the Agents and each Bank harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omitting to pay such Taxes, if any, which may be payable or determined to be payable in connection with the execution and delivery of this Agreement or any other Loan Paper. The obligations of the Company under this Section 9.4 shall survive the termination of this Agreement and/or repayment of the Loans.

Section 1.1    *Indemnity*. The Company agrees to indemnify and hold harmless the Agents and the Banks and each of their respective Affiliates, officers, directors, employees, agents, advisors and representatives against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, deficiencies, expenses, and disbursements of any kind or nature whatsoever (limited in the case of legal fees and expenses, to one firm of outside counsel, one firm of aviation counsel, and, if necessary, a single local counsel in each appropriate jurisdiction to the Paying Agent and the Banks, taken as a whole (and, in each case, in the case of an actual or perceived conflict of interest, an additional counsel to all such similarly situated affected parties)) which may be imposed on, incurred by or asserted against any Agent, any Bank, or any of their respective Affiliates, officers, directors, employees, agents, advisors or other representatives in any way relating to or arising out of the Loan Papers, any transaction related hereto, or any act, omission, or transaction of the Company, its Subsidiaries, and Affiliates, or any of their employees, officers, directors or other representatives, to the extent that any of the same results, directly or indirectly, from any claims made or actions, suits, or proceedings commenced by or on behalf of any person other than an Agent or a Bank.

The obligation of the Company under this section shall continue for a period of one year after payment of the Obligation and termination of any or all Loan Papers, and **SHALL APPLY WHETHER OR NOT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES AND RELATED EXPENSES ARE IN ANY WAY OR TO ANY EXTENT OWED, IN WHOLE OR IN PART, UNDER ANY CLAIM OR THEORY OF STRICT LIABILITY OR CAUSED, IN WHOLE OR IN PART BY ANY NEGLIGENT ACT OR OMISSION OF ANY KIND BY ANY AGENT OR ANY BANK**;

provided, however, that (i) although each indemnified party shall have the right to be indemnified from its own ordinary negligence, no indemnified party shall have the right to be indemnified hereunder for willful misconduct, gross negligence or bad faith to the extent found by a final, non-appealable judgment of a court of competent jurisdiction and (ii) the indemnity set forth in this Section 9.5 shall not apply to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, deficiencies, expenses or disbursements resulting from a proceeding that does not involve an act or omission by the Company or any of its affiliates and that is brought by an indemnified party against any other indemnified party (other than claims against any Agent in its capacity or in fulfilling its role as an Agent under the Loan Papers).

71

To the fullest extent permitted by applicable law, the Company shall not assert, and hereby waives, any claim against any indemnified party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Papers or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof.

Section IX.5 Right of Setoff. If any Event of Default shall have occurred and is continuing, each Bank and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Bank or Affiliate to or for the credit or the account of the Company against any and all obligations of the Company now or hereafter existing under this Agreement and the Loans held by such Bank or Affiliate, irrespective of whether or not such Bank or Affiliate shall have made any demand under this Agreement or any Note and although such obligations may be unmatured. Each Bank agrees promptly to notify the Company and the Paying Agent after any such setoff and application made by such Bank or Affiliate, but the failure to give such notice shall not affect the validity of such setoff and application. The Rights of each Bank under this Section 9.6 are in addition to the Rights and remedies (including, without limitation, other Rights of setoff) which such Bank may have.

Section IX.6 **Governing Law.** THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

Section IX.7 Submission To Jurisdiction; Waivers. The Company hereby irrevocably and unconditionally:

(a) submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Papers to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in the Borough of Manhattan (or if such court lacks subject matter jurisdiction, the Supreme Court of the State of New York sitting in the Borough of Manhattan), and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Paper or the transactions relating hereto or thereto, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may (and any such claims, cross-claims or third party claims brought against the Paying Agent or any of its Affiliates and the respective directors, officers, employees, agents and advisors may only) be heard and determined in such Federal (to the extent permitted by law) or New York State court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law;

(b) consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

72

(c) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Company, as the case may be at its address set forth in Section 9.2 or at such other address of which the Paying Agent shall have been notified pursuant thereto; and

(d) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction.

Section IX.8 Survival of Representations and Warranties. All representations and warranties contained herein or made in writing by the Company in connection herewith shall survive the execution and delivery of this Agreement and the other Loan Papers, and no investigation by any Agent or any Bank or any closing shall affect the representations and warranties or the Right of any Agent or any Bank to rely upon them.

Section IX.9 Binding Effect. This Agreement shall become effective when it shall have been executed by the Company, the Agents, and each Bank and thereafter shall be binding upon and inure to the benefit of the Company (subject to the provisions of Section 9.11), the Agents, each Bank and their respective successors and assigns.

Section IX.10 Successors and Assigns; Participations

(a) Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and permitted assigns of such party, and all covenants, promises, agreements, representations and warranties by or on behalf of the Company, the Agents or the Banks that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns. Except for any assignment or transfer by the Company of its rights and obligations under this Agreement to a Successor Company in accordance with Section 6.14, the Company may not assign or transfer any its rights or obligations hereunder without the prior written consent of all of the Banks.

(b) Each Bank may without the consent of the Company sell participations to one or more banks or other entities in all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitment and the Loans owing to it and any Note or Notes held by it); provided, however, that (i) such Bank's obligations under this Agreement shall remain unchanged, (ii) such Bank shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such Bank shall remain the holder of its Loans and Notes (if any) for all purposes of this Agreement, (iv) the participating banks or other entities shall be entitled to the cost protection provisions contained in Article II and Section 9.4, but only to the extent that such protection would have been available to such Bank, calculated as if no such participations had been sold, and the indemnity protection provisions contained in Section 9.5, (v) the Company, the Agents, and the other Banks shall continue to deal solely and directly with such Bank in connection with such Bank's rights and obligations under this Agreement, and (vi) such Bank shall not sell a participation that conveys to the participant the right to vote or give or withhold consents under this Agreement or any other Loan Papers, other than the right to vote upon or consent to (y) amendments, modifications, or waivers with respect to any fees payable hereunder (including the dates fixed for the payment of any such fees) or the amount of principal or the rate of interest payable on, or the dates fixed for any payment of principal of or interest on, the Loans and (z) any extension of the Termination Date. Each Bank that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Company, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's

interest in the Loans or other obligations under this Agreement (the "Participant Register"); provided that no Bank shall have any obligation to disclose all or any portion of the Participant Register to any Person except to the extent that such disclosure is necessary to establish that a Commitment, Loan, Letter of Credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Bank shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(c) Each Bank may assign to one or more Persons (other than a natural person, a Defaulting Bank or the Company or any of its Affiliates), all or a portion of its interests, rights, and obligations under this Agreement (including, without limitation, all or a portion of its Commitment and the same portion of the Committed Loans at the time owing to it); provided, however, that (i) such assignment, if not to a Bank or an Eligible Affiliate Assignee of the assigning Bank, shall be consented to by the Company (which consent shall not be unreasonably withheld or delayed and shall not be required after the occurrence or during the continuance of a Default or Event of Default), the Paying Agent and each Issuing Bank (which consent shall not be unreasonably withheld or delayed), (ii) each Bank's Commitment (including Loans owing to it and its pro rata share of the L/C Obligations) to be assigned shall not be less than $5,000,000 minus reductions pursuant to Section 2.5(a) unless (x) otherwise agreed by the Company and the Paying Agent, (y) in the case of the assigning Bank, such amount is reduced to zero pursuant to such assignment or (z) the assignment is to a Bank, (iii) each such assignment shall be of a constant, and not a varying, percentage of all the assigning Bank's rights and obligations under this Agreement, (iv) the assignee thereof shall deliver to the Company and the Paying Agent any Internal Revenue Service forms required by Section 2.18, and (v) the parties to each such assignment shall execute and deliver to the Paying Agent, for its acceptance and recording in the Register (as defined below), an Assignment and Assumption substantially in the form of Exhibit E hereto (an "Assignment and Assumption"), together with a properly completed Administrative Questionnaire, any Note or Notes subject to such assignment and a processing and recordation fee of $3,500 (or such lesser amount as shall be acceptable to the Paying Agent); provided, however, no such fee shall be required in the case of any assignment requested by the Company pursuant to Article II of this Agreement. Upon such execution, delivery, acceptance, and recording, from and after the effective date specified in each Assignment and Assumption, which effective date shall be at least five Business Days after the execution thereof (unless a shorter period shall be agreed to by the Company, the Paying Agent, and the assignor Bank), (x) the assignee thereunder shall be a party hereto and, to the extent provided in such Assignment and Assumption, have the rights and obligations of a Bank hereunder and under the other Loan Papers and (y) the assignor Bank thereunder shall, to the extent provided in such Assignment and Assumption, be released from its obligations under this Agreement and the other Loan Papers (and, in the case of an Assignment and Assumption covering all of the remaining portion of an assigning Bank's rights and obligations under this Agreement and the other Loan Papers, such Bank shall cease to be a party hereto and thereto).

(d) By executing and delivering an Assignment and Assumption, the Bank assignor thereunder and the assignee confirm to and agree with each other and the other parties hereto as follows: (i) other than the representations and warranties that (x) it is the legal and beneficial owner of the interest being assigned thereby, (y) the interest being assigned thereby is free and clear of any lien, encumbrance or other adverse claim and (z) it has full power and authority, and has taken all action necessary, to execute and deliver such Assignment and Assumption and to consummate the transactions contemplated thereby, such Bank assignor makes no representation or warranty and assumes no responsibility with respect to any statements, warranties, or representations made in or in connection with this Agreement or any other Loan Paper or the execution, legality, validity, enforceability, genuineness, sufficiency, or value

74

of this Agreement, any other Loan Paper or any other instrument or document furnished pursuant hereto; (ii) such Bank assignor makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Company or the performance or observance of its respective obligations under this Agreement, any other Loan Paper or any other instrument or document furnished pursuant hereto or thereto; (iii) such assignee confirms that it has received a copy of this Agreement together with copies of financial information and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Assumption; (iv) such assignee will, independently and without reliance upon the Agents, such Bank assignor, or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such assignee appoints and authorizes the Paying Agent to take such action on behalf of such assignee and to exercise such powers under this Agreement and the other Loan Papers as are delegated to each such Agent by the terms hereof and thereof, together with such powers as are reasonably incidental thereto; and (vi) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement are required to be performed by it as a Bank.

(e) The Paying Agent shall maintain at its office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Banks and the Commitment of, and principal amount of the Loans and L/C Obligations owing to, each Bank from time to time (the "Register"). The entries in the Register shall be conclusive, in the absence of manifest error, and the Company, the Agents, and the Banks may treat each Person whose name is recorded in the Register as a Bank hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Company, any Bank or the Paying Agent at any reasonable time and from time to time upon reasonable prior notice.

(f) Upon its receipt of an Assignment and Assumption executed by an assigning Bank and an assignee together with any Note or Notes subject to such assignment and the written consent to such assignment, the Paying Agent shall, if such Assignment and Assumption has been completed and is substantially in the form of Exhibit E hereto, (i) accept such Assignment and Assumption, (ii) record the information contained therein in the Register, and (iii) give prompt notice thereof to the Banks, the Paying Agent and the Company. Within five Business Days after receipt of such notice, the Company, at its own expense, shall execute and deliver to the Paying Agent in exchange for the surrendered Note or Notes, if any, (x) a new Note or Notes to the order of such assignee in an amount equal to its portion of the Commitment assumed by it pursuant to such Assignment and Assumption and (y) if the assigning Bank has retained any Commitment hereunder, new Notes to the order of the assigning Bank in an amount equal to the Commitment retained by it hereunder. Such new Notes shall be in an aggregate principal amount equal to the aggregate principal amount of such surrendered Notes. Such new Notes shall be dated the effective date of such Assignment and Assumption and shall otherwise be in substantially the form of Exhibit D-1 or D-2 as applicable, hereto. Cancelled Notes shall be returned to the Company.

(g) Notwithstanding any other provision herein, any Bank may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.11 (or in connection with any swap, derivative, securitization or credit insurance relating to the Company and its obligations), disclose to the assignee or participant or proposed assignee or participant (or to any direct, indirect, actual or prospective counterparty (and its advisor) to any such swap, derivative or securitization) any information relating to the Company and its Subsidiaries furnished to such Bank by or on behalf of the Company; provided, that prior to any such disclosure, each such assignee or participant or proposed assignee or participant (or any such counterparty (and its advisor)) shall agree for the benefit

75

of the Company to preserve the confidentiality of any confidential information relating to the Company received from such Bank.

(h) Notwithstanding any other provision set forth in this Agreement, any Bank may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Bank, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Bank from any of its obligations hereunder or substitute any such pledgee or assignee for such Bank as a party hereto.

Section IX.11 Confidentiality. Each Agent, each Issuing Bank and each Bank agrees to keep confidential all Information (as defined below); provided that nothing herein shall prevent any Agent, any Issuing Bank or any Bank from disclosing any such Information (a) to any Agent, any Issuing Bank, any Bank or any affiliate thereof, (b) as permitted by Section 9.11(g), (c) to its employees, directors, agents, attorneys, accountants and other professional advisors or those of any of its affiliates in each case on a need-to-know basis, (d) upon the request or demand of any Governmental Authority, (e) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Law, (f) if requested or required to do so in connection with any litigation or similar proceeding, (g) that has been publicly disclosed, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Bank's investment portfolio in connection with ratings issued with respect to such Bank, (i) in connection with the exercise of any remedy hereunder or under any other Loan Paper, or (j) if agreed by the Company in its sole discretion, to any other Person. "Information" means all information received from the Company relating to the Company or its business, other than any such information that is available to the Agents, any Issuing Bank or any Bank on a non-confidential basis prior to disclosure by the Company and other than information pertaining to this Agreement routinely provided by arrangers to data service providers, including league table providers, that serve the lending industry; provided that in the case of information received from the Company after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 9.12 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each Bank acknowledges that information furnished to it pursuant to this Agreement or the other Loan Papers may include material non-public information concerning the Company and its Affiliates and their related parties or their respective securities, and confirms that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with those procedures and applicable law, including Federal and state securities laws.

All information, including requests for waivers and amendments, furnished by the Company or the Paying Agent pursuant to, or in the course of administering, this Agreement or the other Loan Papers will be syndicate-level information, which may contain material non-public information about the Company and its Affiliates and their related parties or their respective securities. Accordingly, each Bank represents to the Company and the Paying Agent that it has identified in its Administrative Questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal and state securities laws.

76

Section IX.12 Independence of Covenants. All covenants contained in this Agreement shall be given independent effect so that if a particular action or condition is not permitted by any such covenants, the fact that such action or condition would be permitted by an exception to, or otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or Event of Default if such action is taken or condition exists.

Section IX.13 Severability. Should any clause, sentence, paragraph, or Section of this Agreement be judicially declared to be invalid, unenforceable, or void, such decision will not have the effect of invalidating or voiding the remainder of this Agreement, and the parties hereto agree that the part or parts of this Agreement so held to be invalid, unenforceable, or void will be deemed to have been stricken herefrom and the remainder will have the same force and effectiveness as if such part or parts had never been included herein.

Section IX.14 Integration. This Agreement and the other Loan Papers represent the entire agreement of the Company, the Paying Agent and the Banks with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Paying Agent or any Bank relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Papers.

Section IX.15 Descriptive Headings. The section headings appearing in this Agreement have been inserted for convenience only and shall be given no substantive meaning or significance whatever in construing the terms and provisions of this Agreement.

Section IX.16 Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Agreement or any document to be signed in connection with this Agreement shall be deemed to include electronic signatures (in a format reasonably acceptable to the Paying Agent), deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be and the parties hereto consent to conduct the transactions contemplated hereunder by electronic means.

Section IX.17 **WAIVERS OF JURY TRIAL. THE COMPANY, THE PAYING AGENT AND THE BANKS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN PAPER AND FOR ANY COUNTERCLAIM THEREIN.**

Section IX.18 No Fiduciary Duty. The Paying Agent, each Bank and their Affiliates (collectively, solely for purposes of this paragraph, the "Banks"), may have economic interests that conflict with those of the Company, its stockholders and/or its affiliates. The Company agrees that nothing in the Loan Papers or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Bank, on the one hand, and the Company, its stockholders or its affiliates, on the other. The Company acknowledges and agrees that (i) the transactions contemplated by the Loan Papers (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Banks, on the one hand, and the Company, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Bank has assumed an advisory or fiduciary responsibility in favor of the Company, its stockholders or its

77

affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Bank has advised, is currently advising or will advise the Company, its stockholders or its affiliates on other matters) or any other obligation to the Company except the obligations expressly set forth in the Loan Papers and (y) each Bank is acting solely as principal and not as the agent or fiduciary of the Company, its management, stockholders, creditors or any other Person. The Company acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. The Company agrees that it will not claim that any Bank has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to it, in connection with such transaction or the process leading thereto.

Section IX.19 USA Patriot Act. Each Bank hereby notifies the Company that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), it is required to obtain, verify, and record information that identifies each borrower, guarantor or grantor (the "Loan Parties"), which information includes the name and address of each Loan Party and other information that will allow such Bank to identify such Loan Party in accordance with the Patriot Act. The Company agrees to provide such information as each Bank or the Paying Agent reasonably requests in order to perform its "know your customer" due diligence.

Section IX.20 Acknowledgement and Consent to Bail-In of EEA Financial Institutions.

Notwithstanding anything to the contrary in any Loan Paper or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Paper, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Paper; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

Section IX.21 Interest Rate Limitation. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Bank holding such Loan in accordance with applicable law, the rate of

78

interest payable to such Bank in respect of such Loan hereunder, together with all Charges payable to such Bank in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable to such Bank in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Bank in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Bank.

79

$125,000,000                         JPMORGAN CHASE BANK, N.A., as a Bank, an
                                       Issuing Bank, a Co-Administrative Agent and the
                                       Paying Agent

                                     By: _____
                                         Name:
                                         Title:

[Signature page to Southwest Airlines Revolving Credit Facility Agreement]

$125,000,000                         CITIBANK, N.A., as a Bank, an Issuing Bank and a Co-
                                       Administrative Agent

                                     By: _____

                                          Name:
                                          Title:


                       [Signature page to Southwest Airlines Revolving Credit Facility Agreement]

$125,000,000                                         BARCLAYS BANK PLC, as a Bank, an Issuing Bank
                                                        and the Syndication Agent

                                                    By: _____

                                                         Name:
                                                         Title:


[Signature page to Southwest Airlines Revolving Credit Facility Agreement]

$95,000,000                    BANK OF AMERICA, N.A., as a Bank, and a
                                 Documentation Agent

                               By: _____

                                    Name:
                                    Title:


                    [Signature page to Southwest Airlines Revolving Credit Facility Agreement]

$95,000,000                                BNP PARIPAS, as a Bank and a Documentation Agent

                                           By: _____
                                                Name:
                                                Title:


[Signature page to Southwest Airlines Revolving Credit Facility Agreement]

$95,000,000

GOLDMAN SACHS BANK USA, as a Bank and a
  Documentation Agent

By: _____

   Name:

   Title:

[Signature page to Southwest Airlines Revolving Credit Facility Agreement]

$65,000,000

MORGAN STANLEY BANK, N.A., as a Bank

By: _____
    Name:
    Title:

MORGAN STANLEY SENIOR FUNDING, INC., as
    a Documentation Agent

By: _____
    Name:
    Title:

[Signature page to Southwest Airlines Revolving Credit Facility Agreement]

$95,000,000                                    U.S. BANK NATIONAL ASSOCIATION, as a Bank
                                                 and a Documentation Agent

                                               By: _____
                                                     Name:
                                                     Title:


[Signature page to Southwest Airlines Revolving Credit Facility Agreement]

$125,000,000                          WELLS FARGO BANK, N.A., as a Bank and a
                                         Documentation Agent

                                      By: _____
                                            Name:
                                            Title:


                [Signature page to Southwest Airlines Revolving Credit Facility Agreement]

$55,000,000                              COMERICA BANK, as a Bank

                                         By: _____
                                              Name:
                                              Title:


[Signature page to Southwest Airlines Revolving Credit Facility Agreement]

ANNEX II

EXHIBIT D – FINANCIAL REPORT CERTIFICATE

[See attached]

**EXHIBIT D**
**FINANCIAL REPORT CERTIFICATE**
FOR_____ ENDED _____, ____


PAYING AGENT:               JPMorgan Chase Bank, N.A.

COMPANY:                   Southwest Airlines Co.

RE:                           $1,000,000,000 Revolving Credit Facility Agreement

DATE:                     _____, ____


       This certificate is delivered pursuant to Section 6.10 of the $1,000,000,000 Revolving Credit Facility Agreement dated as of August 3, 2016 (as amended. modified, supplemented, renewed, or extended from time to time, the "Credit Agreement"), among Southwest Airlines Co. (the "Company"), the Banks party thereto, JPMorgan Chase Bank, N.A., as Paying Agent, JPMorgan Chase Bank, N.A. and Citibank, N.A., as Co-Administrative Agents, Barclays Bank PLC, as Syndication Agent, and Bank of America, N.A., BNP Paribas, Goldman Sachs Bank USA, Morgan Stanley Senior Funding, Inc., U.S. Bank National Association and Wells Fargo Bank, N.A., as Documentation Agents. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

       I certify to the Agents and the Banks that I am the _____ (president, chief financial officer, treasurer, or assistant treasurer) of the Company on the date hereof and that:

       This certificate relates to the fiscal _____ ending on _____, _____ (the "Subject Period"). The Financial Statements for the Subject Period were prepared in conformity with GAAP, and present fairly in all material respects the consolidated financial position and results of operations of the Company and its consolidated Subsidiaries as of the last day of, and for, the Subject Period.

       A review of the activities of the Company and its Subsidiaries during the Subject Period has been made under my supervision with a view to determining whether, during the Subject Period, each such entity has kept, observed, performed, and fulfilled all of its obligations under the Loan Papers, and during the Subject Period, to my knowledge, each such entity kept, observed, performed, and fulfilled each and every covenant and condition of the Loan Papers (except for any deviations set forth on the attached schedule).

       During the Subject Period, no Default or Event of Default has occurred which has not been cured or waived (except for any Defaults or Events of Default set forth on the attached schedule).

       This certificate is being delivered on behalf of the Company. No person or entity other than the Agents and the Banks (collectively, the "Subject Recipients") shall be entitled to receive or rely upon this certificate for any purpose. The Subject Recipients agree by their acceptance hereof that (a) they shall look solely to the Company for any loss, cost, damage, expense, claim, demand, suit, or cause of action arising out of or relating in any way to this certificate or its preparation and delivery, and (b) the undersigned shall not under any circumstances have any personal liability whatsoever for the preparation or execution of this certificate.


                                          _____

                                      Name:

                                      Title

**SOUTHWEST AIRLINES CO.**
**SENIOR EXECUTIVE SHORT TERM INCENTIVE PLAN**

**NOTICE OF GRANT OF PERFORMANCE-BASED CASH AWARD**

Southwest Airlines Co. (the "Company") hereby grants to you (the "Participant") a performance-based cash award (the "Award") pursuant to the Southwest Airlines Co. Senior Executive Short Term Incentive Plan (the "Plan"). Capitalized terms used and not otherwise defined in this Notice of Grant are defined in the Plan or in the accompanying Terms and Conditions. The Award represents the right to receive a cash payment under the Plan, in accordance with, and subject to, the following:

Participant:
Date of Grant:
Performance Period:
Vesting Date:
Target Value:

**Schedule of Performance Targets/Cash Amount Payable Upon Vesting**

| [Performance Target(s)] | Cash Amount Payable |
| --- | --- |
|  |  |
|  |  |
|  |  |
|  |  |

Participant understands and agrees that the Award is granted in accordance with, and subject to, the terms and conditions of the Plan and the Terms and Conditions enclosed with this Notice of Grant.

**By asserting any rights with respect to this Award, the Participant (and any person who has acquired the Award by will or the laws of descent and distribution or intestacy) will be deemed to have understood and agreed to the terms and conditions of the Plan and the accompanying Terms and Conditions.**

**SOUTHWEST AIRLINES CO.**
**SENIOR EXECUTIVE SHORT TERM INCENTIVE PLAN**
**TERMS AND CONDITIONS**

**PERFORMANCE-BASED CASH AWARD**

By asserting any rights with respect to the performance-based cash award (the "Award") received pursuant to the Southwest Airlines Co. Senior Executive Short Term Incentive Plan (the "Plan") and granted pursuant to the Notice of Grant with which these Terms and Conditions are attached (the "Notice of Grant"), the recipient of the Award (the "Participant") will be deemed to have understood and agreed to the terms and conditions of the Plan and the terms and conditions set forth below. Capitalized terms used and not otherwise defined in these Terms and Conditions or in the Notice of Grant shall have the meanings assigned to them in Appendix A to these Terms and Conditions.

1.     Vesting. Subject to these Terms and Conditions and the provisions of the Plan, vesting of the Award will be subject to and in accordance with the schedule set forth in the Notice of Grant.

2.     Interpretation. The Participant's Award is subject to the terms and conditions of the Plan, which terms and conditions are incorporated herein by reference. The Participant's Award is also subject to any rules promulgated pursuant to the Plan by the Company's Board of Directors (the "Board"), the Compensation Committee of the Board (the "Committee"), or the persons designated by the Committee to administer the day-to-day administration of the Plan. Any decisions or interpretations upon any questions with respect to an Award or the Plan, including the determination of the cash amount to be received, shall (as permissible pursuant to applicable laws, rules, or regulations, including the rules of any stock exchange upon which the Company's Common Stock is listed or quoted) be determined (i) by the Committee, (ii) by the Board, or (iii) where permitted by the Committee, by any person(s) to whom the Committee has delegated its authority. The Participant (and any person who has acquired the Award by will or the laws of descent and distribution or intestacy) agrees to accept any such decisions or interpretations as binding, conclusive, and final in all respects.

3.     Payment of Award. Subject to these Terms and Conditions and the provisions of the Plan, on the Vesting Date, the Participant (or any person who has acquired the Award by will or the laws of descent and distribution or intestacy) will become entitled to a lump sum cash payment of the Award. The final value of the Award will be determined in accordance with the schedule set forth in the Notice of Grant (the "Vested Award"). Payment of the Vested Award will be made as soon as is administratively and reasonably practicable after the Vesting Date, but in any event no later than 30 days thereafter, subject to the Participant's satisfaction of any Tax Obligations (as defined in Section 5 below); provided, however, in the event any action required to satisfy the Participant's Tax Obligations has not been completed by the Participant within 85 days following the Vesting Date, the Award will be forfeited at 4:00 p.m., Eastern Time, on such date.

4.     Rights Upon Termination of Service.

Subject to the provisions of subsections 4(a) and (b) below, in the event of termination of the Participant's Service prior to the Vesting Date, any Award that has not vested shall automatically and without notice be forfeited at 4:00 p.m., Eastern Time, on the date of termination; provided that, notwithstanding anything in the Plan or the Notice of Grant to the contrary:

(a) in the event of the termination of the Participant's Service as a result of death or Disability, such Participant's Award will remain outstanding as if the Participant's Service has not terminated and will otherwise be payable in accordance with the Notice of Grant, these Terms and Conditions, and the terms of the Plan; and

1

(b) provided that the Participant's Service has terminated no earlier than 12 months after the Date of Grant, in the event of a "qualified retirement," such Participant's Award will remain outstanding as if the Participant's Service has not terminated and will otherwise be payable in accordance with the Notice of Grant, these Terms and Conditions, and the terms of the Plan; however, the amount of cash payable will be prorated based on the Participant's number of days of Service between the Date of Grant and the end of the Performance Period.

For purposes of Section 4(b), a Participant's termination of Service will be considered a "qualified retirement" if (a) the Participant has completed at least 10 years of continuous Service; (b) the Participant's age plus completed years of continuous Service equal at least 65 at the time of the Participant's termination of Service; and (c) the Participant has not been terminated for cause.

5.    Taxes.

a.    In order to comply with any federal, state, local, or other laws or regulations of the United States or any other applicable jurisdiction, the Company or any Affiliate is authorized to take such action as it deems appropriate to provide that all applicable federal, state, local, or other income, employment, or other tax withholding or similar obligations (collectively, "Tax Obligations") to which the Participant is subject in connection with the Award are withheld or collected from the Participant. If and to the extent permitted by the Committee from time to time, the Company is authorized to satisfy the Tax Obligations by any one or more of the following methods: (i) by requiring the Participant to pay such amount in cash or check; (ii) by withholding an amount that would otherwise be payable with respect to the Award that is equal to the amount of the Tax Obligations; (iii) by deducting the amount of the Tax Obligations out of any other remuneration otherwise payable by the Company to the Participant; or (iv) by such other method as may be available to the Company from time to time.

b.    The Participant is ultimately liable and responsible for all of the Participant's Tax Obligations, regardless of any action taken by the Company in accordance with Section 5.a. The Company makes no representation or undertaking regarding the treatment of any Tax Obligation in connection with the grant, vesting, or payment of the Award. The Company does not commit, and is under no obligation, to structure the Plan and its administration to reduce or eliminate a Participant's tax liability.

c.    The Participant agrees to release and indemnify the Company and its Affiliates from any liability or damages arising from or relating to the Participant's failure to comply with his or her Tax Obligations.

6.    Restriction on Transfer. The Participant's Award and any rights with respect to the Participant's Award may not be sold, assigned, transferred, pledged, hypothecated, or otherwise disposed of by the Participant except by will or the laws of descent and distribution or intestacy, and any attempt to sell, assign, transfer, pledge, hypothecate, or otherwise dispose of the Participant's Award will be void and unenforceable against the Company or any Affiliate.

7.    Section 409A Compliance. The Plan and these Terms and Conditions are intended to comply with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended ("Section 409A"), including its exceptions, and shall be construed and administered in accordance with such intent. Notwithstanding any other provision of the Plan, these Terms and Conditions, or the Notice of Grant, the Company may only make cash payments pursuant to this Award upon an event and in a manner that complies with Section 409A or an applicable exemption. Any payments that may be excluded from Section 409A as a short-term deferral shall be excluded from Section 409A to the maximum extent possible. Notwithstanding the foregoing, the Company makes no representations that the Award or payments made pursuant to the Award comply with Section 409A, and the Company will not be liable for any portion of any taxes, penalties, interest or other expenses that the Participant may incur because of non-compliance with Section 409A.

2

Notwithstanding any provision of the Plan, these Terms and Conditions, or the Notice of Grant to the contrary, if the Participant is a "specified employee" within the meaning of Section 409A as of the date of the Participant's termination of Service, and the Company determines in good faith that immediate payment of any amounts under the Award would cause a violation of Section 409A, then any amount due upon the Participant's "separation from service" within the meaning of Section 409A that (i) is subject to the provisions of Section 409A; (ii) is not otherwise excluded under Section 409A; and (iii) would otherwise be paid during the first six-month period following the Participant's separation from service, shall become payable on the earlier of (1) the first business day after the date that is six months following the date of separation from service or (2) the date of the Participant's death.

8.     No Right to Continued Service and other Participant Acknowledgments. Nothing herein shall be construed to confer upon the Participant any right to continue as an Employee, Director or Advisor or to interfere with or restrict in any way the right of the Company or any Affiliate to discharge the Participant at any time (subject to any contractual rights of the Participant) for any reason whatsoever, with or without cause and with or without advance notice. Furthermore, nothing herein shall in any way be construed as imposing on the Company or any Affiliate a contractual obligation between the Company or any Affiliate and the Participant, other than with respect to the specific terms of the Participant's Award.

9.     Law Governing. The Participant's Award shall be governed by, and construed in accordance with, the laws of the State of Texas, without regard to conflicts of laws principles thereof.

10.     Legal Construction. In the event that any one or more of these Terms and Conditions shall be held by a Court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect for any reason, the invalid, illegal, or unenforceable term or condition shall not affect any other term or condition, and these Terms and Conditions shall be construed in all respects as if the invalid, illegal, or unenforceable term or condition had never been contained herein.

Appendix A

Definitions

"*Advisor*" means any natural person performing advisory or consulting services for the Company or any Subsidiary, with or without compensation, to whom the Company chooses to grant an Award under the Plan; *provided that* (i) *bona fide* services must be rendered by such person; and (ii) such services are not rendered in connection with the offer or sale of securities in a capital-raising transaction and do not directly or indirectly promote or maintain a market for the Company's securities.

"*Affiliate*" means any corporation, partnership, limited liability company, or partnership, association, trust, or other organization that directly or indirectly controls, is controlled by, or is under common control with, the Company. For purposes of the preceding sentence, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any entity or organization, shall mean the possession, directly or indirectly, of the power (i) to vote more than 50 percent of the securities having ordinary voting power for the election of directors of the controlled entity or organization; or (ii)  to direct or cause the direction of the management and policies of the controlled entity or organization, whether through the ownership of voting securities or by contract or otherwise.

"*Director*" means an individual who is a member of the Southwest Airlines Co. Board of Directors.

"*Disability*" *means the inability of a Participant to continue to perform services for the Company because of the sickness or injury of the Participant, as determined by the Company's Chief Executive Officer, Chief People Officer, Chief Financial Officer, and/or General Counsel. Such a determination will be made in good faith and in the sole discretion of one or more of these officers, who shall also have sole discretion to determine the effective date of a Participant's termination of Service as a result of Disability.*

"*Employee*" means any person (including a Director) in an employment relationship with the Company or any Affiliate.

"*Service*" means a Participant's employment or service with the Company or any Affiliate of the Company, whether in the capacity of an Employee, a Director, or an Advisor. A Participant's Service shall not be deemed to have terminated merely because of a change in the capacity in which the Participant renders Service to the Company or any Affiliate or because of a change in entity for which services are performed; provided, however, to the extent necessary to comply with the provisions of Section 409A, a termination of Service shall mean a "separation from service" within the meaning of Section 409A.

4

**Exhibit 21**

**Southwest Airlines Co.**
**Subsidiaries**

| Name | State or Other Jurisdiction of Incorporation or Organization |
| --- | --- |
| AirTran Airways 717 Leasing Corporation | Delaware |
| AirTran Airways, Inc. | Delaware |
| AirTran Holdings, LLC | Texas |
| Southwest Jet Fuel Co. | Texas |
| Triple Crown Assurance Co. | Texas |

**Exhibit 23**

Consent of Independent Registered Public Accounting Firm

We consent to the incorporation by reference in the following Registration Statements (Form S-8 Nos. 33-20275, 33-57327, 33-40652, 33-40653, 333-64431, 333-67627, 333-67631, 333-82735, 333-89303, 333-52388, 333-52390, 333-53610, 333-53616, 333-57478, 333-46560, 333-98761, 333-100862, 333-104245, 333-117802, 333-139362, 333-146891, 333-160762, 333-166980, 333-190268, 333-205979, Form S-3 Nos. 333-158397, 333-180969, 333-203761, 333-222963, 333-248077, and Form S-4 No. 333-170742) of Southwest Airlines Co. and in the related Prospectuses of our reports dated February 8, 2021, with respect to the consolidated financial statements of Southwest Airlines Co., and the effectiveness of internal control over financial reporting of Southwest Airlines Co., included in this Annual Report (Form 10-K) for the year ended December 31, 2020.

/s/ Ernst & Young, LLP

Dallas, Texas
February 8, 2021

Exhibit 31.1

CERTIFICATION

I, Gary C. Kelly, Chairman of the Board & Chief Executive Officer of Southwest Airlines Co., certify that:

1.	I have reviewed this annual report on Form 10-K for the year ended December 31, 2020 of Southwest Airlines Co.;

2.	Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.	Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.	The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)	designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)	designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)	evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)	disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.	The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)	all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)	any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:  February 8, 2021

By:	/s/ Gary C. Kelly
	Gary C. Kelly
	Chairman of the Board & Chief Executive Officer
	(Principal Executive Officer)

Exhibit 31.2

CERTIFICATION

I, Tammy Romo, Senior Vice President Finance & Chief Financial Officer of Southwest Airlines Co., certify that:

1.      I have reviewed this annual report on Form 10-K for the year ended December 31, 2020, of Southwest Airlines Co.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

 (a)      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)      disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 8, 2021

By:   /s/ Tammy Romo
      Tammy Romo
      Executive Vice President & Chief Financial Officer
      (Principal Financial & Accounting Officer)

Exhibit 32

CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350,

AS ADOPTED PURSUANT TO

SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

   In connection with the Annual Report on Form 10-K of Southwest Airlines Co. (the "Company") for the period ended December 31, 2020, as filed with the Securities and Exchange Commission (the "Report"), Gary C. Kelly, Chairman of the Board & Chief Executive Officer of the Company, and Tammy Romo, Senior Vice President Finance & Chief Financial Officer of the Company, each certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)      The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2)      The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:  February 8, 2021

By:   /s/ Gary C. Kelly
      Gary C. Kelly
      Chairman of the Board & Chief Executive Officer
      (Principal Executive Officer)


By:   /s/ Tammy Romo
      Tammy Romo
      Executive Vice President & Chief Financial Officer
      (Principal Financial & Accounting Officer)