# Exhibit 6

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-Q**

(Mark One)

☒     **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended March 31, 2021

or

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File No. **1-7259**



**SOUTHWEST AIRLINES CO.**
(Exact name of registrant as specified in its charter)

| **Texas** | | **74-1563240** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | | (IRS Employer Identification No.) |
| **P.O. Box 36611** | | |
| **Dallas, Texas** | | **75235-1611** |
| (Address of principal executive offices) | | (Zip Code) |

Registrant's telephone number, including area code:  **(214) 792-4000**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common Stock ($1.00 par value) | LUV | New York Stock Exchange |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).  Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).Yes ☐ No ☒

Number of shares of Common Stock outstanding as of the close of business on April 23, 2021: 591,376,576

TABLE OF CONTENTS TO FORM 10-Q

PART I - FINANCIAL INFORMATION

    Item 1. Financial Statements

    Condensed Consolidated Balance Sheet as of March 31, 2021 and December 31, 2020

    Condensed Consolidated Statement of Comprehensive Income (Loss) for the three months ended March 31, 2021 and 2020

    Condensed Consolidated Statement of Stockholders' Equity as of March 31, 2021 and 2020

    Condensed Consolidated Statement of Cash Flows for the three months ended March 31, 2021 and 2020

    Notes to Condensed Consolidated Financial Statements

    Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations

    Item 3. Quantitative and Qualitative Disclosures About Market Risk

    Item 4. Controls and Procedures

PART II - OTHER INFORMATION

    Item 1. Legal Proceedings

    Item 1A. Risk Factors

    Item 2. Unregistered Sales of Equity Securities and Use of Proceeds

    Item 3. Defaults Upon Senior Securities

    Item 4. Mine Safety Disclosures

    Item 5. Other Information

    Item 6. Exhibits

SIGNATURES

SOUTHWEST AIRLINES CO.
FORM 10-Q
PART I – FINANCIAL INFORMATION

**Item 1.** Financial Statements

**Southwest Airlines Co.**
**Condensed Consolidated Balance Sheet**
(in millions)
(unaudited)

| | March 31, 2021 | December 31, 2020 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 11,971 | $ 11,063 |
| Short-term investments | 2,377 | 2,271 |
| Accounts and other receivables | 937 | 1,130 |
| Inventories of parts and supplies, at cost | 448 | 414 |
| Prepaid expenses and other current assets | 367 | 295 |
| Total current assets | 16,100 | 15,173 |
| | | |
| Property and equipment, at cost: | | |
| Flight equipment | 20,876 | 20,877 |
| Ground property and equipment | 6,111 | 6,083 |
| Deposits on flight equipment purchase contracts | 53 | 305 |
| Assets constructed for others | 341 | 309 |
| | 27,381 | 27,574 |
| Less allowance for depreciation and amortization | 11,733 | 11,743 |
| | 15,648 | 15,831 |
| Goodwill | 970 | 970 |
| Operating lease right-of-use assets | 2,032 | 1,892 |
| Other assets | 743 | 722 |
| | $ 35,493 | $ 34,588 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 1,094 | $ 931 |
| Accrued liabilities | 1,665 | 2,259 |
| Current operating lease liabilities | 292 | 306 |
| Air traffic liability | 4,906 | 3,790 |
| Current maturities of long-term debt | 225 | 220 |
| Total current liabilities | 8,182 | 7,506 |
| | | |
| Long-term debt less current maturities | 10,546 | 10,111 |
| Air traffic liability - noncurrent | 2,826 | 3,343 |
| Deferred income taxes | 1,660 | 1,634 |
| Construction obligation | 341 | 309 |
| Noncurrent operating lease liabilities | 1,722 | 1,562 |
| Other noncurrent liabilities | 1,123 | 1,247 |
| Stockholders' equity: | | |
| Common stock | 888 | 888 |
| Capital in excess of par value | 4,220 | 4,191 |
| Retained earnings | 14,912 | 14,777 |
| Accumulated other comprehensive loss | (60) | (105) |
| Treasury stock, at cost | (10,867) | (10,875) |
| Total stockholders' equity | 9,093 | 8,876 |
| | $ 35,493 | $ 34,588 |

See accompanying notes.

**Southwest Airlines Co.**
**Condensed Consolidated Statement of Comprehensive Income (Loss)**
(in millions, except per share amounts)
(unaudited)

|  | Three months ended March 31, | |
|  | 2021 | 2020 |
| --- | ---: | ---: |
| **OPERATING REVENUES:** | | |
| Passenger | $ 1,712 | $ 3,845 |
| Freight | 43 | 39 |
| Other | 297 | 350 |
| Total operating revenues | 2,052 | 4,234 |
| | | |
| **OPERATING EXPENSES, NET:** | | |
| Salaries, wages, and benefits | 1,571 | 1,854 |
| Payroll support and voluntary Employee programs, net | (1,448) | — |
| Fuel and oil | 469 | 870 |
| Maintenance materials and repairs | 173 | 272 |
| Landing fees and airport rentals | 313 | 339 |
| Depreciation and amortization | 312 | 311 |
| Other operating expenses | 463 | 698 |
| Total operating expenses, net | 1,853 | 4,344 |
| | | |
| **OPERATING INCOME (LOSS)** | 199 | (110) |
| | | |
| **OTHER EXPENSES (INCOME):** | | |
| Interest expense | 114 | 28 |
| Capitalized interest | (11) | (5) |
| Interest income | (2) | (17) |
| Other (gains) losses, net | (48) | 28 |
| Total other expenses (income) | 53 | 34 |
| | | |
| **INCOME (LOSS) BEFORE INCOME TAXES** | 146 | (144) |
| **PROVISION (BENEFIT) FOR INCOME TAXES** | 30 | (50) |
| | | |
| **NET INCOME (LOSS)** | $ 116 | $ (94) |
| | | |
| **NET INCOME (LOSS) PER SHARE, BASIC** | $ 0.20 | $ (0.18) |
| | | |
| **NET INCOME (LOSS) PER SHARE, DILUTED** | $ 0.19 | $ (0.18) |
| | | |
| **COMPREHENSIVE INCOME (LOSS)** | $ 180 | $ (219) |
| | | |
| **WEIGHTED AVERAGE SHARES OUTSTANDING** | | |
| Basic | 591 | 515 |
| Diluted | 609 | 515 |

See accompanying notes.

4

**Southwest Airlines Co.**
**Condensed Consolidated Statement of Stockholders' Equity**
(in millions, except per share amounts)
(unaudited)

| | Common Stock | Capital in excess of par value | Retained earnings | Accumulated other comprehensive income (loss) | Treasury stock | Total |
|---|---|---|---|---|---|---|
| Balance at December 31, 2020 | $ 888 | $ 4,191 | $ 14,777 | $ (105) | $ (10,875) | $ 8,876 |
| Cumulative effect of adopting Accounting Standards Update No. 2016-01, Financial Instruments (See Note 1) | — | — | 19 | (19) | — | — |
| Issuance of common and treasury stock pursuant to Employee stock plans | — | (8) | — | — | 8 | — |
| Share-based compensation | — | 14 | — | — | — | 14 |
| Stock warrants | — | 23 | — | — | — | 23 |
| Comprehensive income | — | — | 116 | 64 | — | 180 |
| Balance at March 31, 2021 | $ 888 | $ 4,220 | $ 14,912 | $ (60) | $ (10,867) | $ 9,093 |

| | Common Stock | Capital in excess of par value | Retained earnings | Accumulated other comprehensive loss | Treasury stock | Total |
|---|---|---|---|---|---|---|
| Balance at December 31, 2019 | $ 808 | $ 1,581 | $ 17,945 | $ (61) | $ (10,441) | $ 9,832 |
| Repurchase of common stock | — | — | — | — | (451) | (451) |
| Issuance of common and treasury stock pursuant to Employee stock plans | — | (8) | — | — | 6 | (2) |
| Share-based compensation | — | 9 | — | — | — | 9 |
| Cash dividends, $0.180 per share | — | — | (94) | — | — | (94) |
| Comprehensive loss | — | — | (94) | (125) | — | (219) |
| Balance at March 31, 2020 | $ 808 | $ 1,582 | $ 17,757 | $ (186) | $ (10,886) | $ 9,075 |

See accompanying notes.

5

**Southwest Airlines Co.**
**Condensed Consolidated Statement of Cash Flows**
(in millions)
(unaudited)

|  | Three months ended March 31, | |
|---|---|---|
|  | 2021 | 2020 |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net income (loss) | $ 116 | $ (94) |
| Adjustments to reconcile net income (loss) to cash used in operating activities: | | |
| Depreciation and amortization | 312 | 311 |
| Unrealized/realized (gain) loss on fuel derivative instruments | (7) | 2 |
| Deferred income taxes | 5 | (49) |
| Changes in certain assets and liabilities: | | |
| Accounts and other receivables | (234) | 183 |
| Other assets | (11) | 58 |
| Accounts payable and accrued liabilities | (66) | (1,291) |
| Air traffic liability | 599 | 701 |
| Other liabilities | (122) | (132) |
| Cash collateral received from (provided to) derivative counterparties | 38 | (5) |
| Other, net | 15 | (61) |
| Net cash provided by (used in) operating activities | 645 | (377) |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Capital expenditures | (95) | (224) |
| Supplier proceeds | — | 300 |
| Purchases of short-term investments | (1,324) | (1,029) |
| Proceeds from sales of short-term and other investments | 1,218 | 948 |
| Net cash used in investing activities | (201) | (5) |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Proceeds from issuance of long-term debt | — | 500 |
| Proceeds from term loan credit facility | — | 1,000 |
| Proceeds from revolving credit facility | — | 1,000 |
| Proceeds from Payroll Support Program loan and warrants | 511 | — |
| Proceeds from Employee stock plans | 13 | 11 |
| Repurchase of common stock | — | (451) |
| Payments of long-term debt and finance lease obligations | (67) | (78) |
| Payments of cash dividends | — | (188) |
| Other, net | 7 | (20) |
| Net cash provided by financing activities | 464 | 1,774 |
| **NET CHANGE IN CASH AND CASH EQUIVALENTS** | 908 | 1,392 |
| **CASH AND CASH EQUIVALENTS AT BEGINNING OF PERIOD** | 11,063 | 2,548 |
| **CASH AND CASH EQUIVALENTS AT END OF PERIOD** | $ 11,971 | $ 3,940 |
| | | |
| **CASH PAYMENTS FOR:** | | |
| Interest, net of amount capitalized | $ 17 | $ 14 |
| Income taxes | $ 1 | $ 5 |
| | | |
| **SUPPLEMENTAL DISCLOSURE OF NONCASH TRANSACTIONS:** | | |
| Right-of-use assets acquired under operating leases | $ 218 | $ 25 |
| Assets constructed for others | $ 32 | $ 34 |

See accompanying notes.

6

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

1.  BASIS OF PRESENTATION

Southwest Airlines Co. (the "Company" or "Southwest") operates Southwest Airlines, a major passenger airline that provides scheduled air transportation in the United States and near-international markets. The unaudited Condensed Consolidated Financial Statements include accounts of the Company and its wholly owned subsidiaries.

The accompanying unaudited Condensed Consolidated Financial Statements of the Company and its subsidiaries have been prepared in accordance with accounting principles generally accepted in the United States for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles in the United States ("GAAP") for complete financial statements. The unaudited Condensed Consolidated Financial Statements for the interim periods ended March 31, 2021 and 2020 include all adjustments which are, in the opinion of management, necessary for a fair presentation of the results for the interim periods. This includes all normal and recurring adjustments and elimination of significant intercompany transactions. Financial results for the Company and airlines in general can be seasonal in nature. In many years, the Company's revenues, as well as its Operating income and Net income, have been better in its second and third fiscal quarters than in its first and fourth fiscal quarters. However, beginning in early 2020, as a result of the COVID-19 pandemic, the Company's results have not been in line with such historical trends. See Note 2 for further information. Air travel is also significantly impacted by general economic conditions, the amount of disposable income available to consumers and changes in consumer behavior, unemployment levels, corporate travel budgets, global pandemics such as COVID-19, extreme or severe weather and natural disasters, fears of terrorism or war, governmental actions, and other factors beyond the Company's control. These and other factors, such as the price of jet fuel in some periods, the nature of the Company's fuel hedging program, and the periodic volatility of commodities used by the Company for hedging jet fuel, have created, and may continue to create, significant volatility in the Company's financial results. See Note 4 for further information on fuel and the Company's hedging program. Operating results for the three months ended March 31, 2021, are not necessarily indicative of the results that may be expected for future quarters or for the year ended December 31, 2021. For further information, refer to the Consolidated Financial Statements and footnotes thereto included in the Company's Annual Report on Form 10-K for the year ended December 31, 2020.

In the unaudited Condensed Consolidated Statement of Comprehensive Income (Loss), for the three months ended March 31, 2021, Payroll support and voluntary Employee programs, net, includes the correction of previously underaccrued payroll tax credits, related to fourth quarter 2020, of $88 million, pre-tax. Other gains and losses, net, includes gains of $60 million, pre-tax, to correct investment gains related to prior periods previously recorded in Accumulated other comprehensive income (loss) ("AOCI").

In the unaudited Condensed Consolidated Statement of Stockholders' Equity, for the three months ended March 31, 2021, the Company recorded a decrease of $19 million, net of tax, in AOCI and a corresponding increase in Retained earnings to correct the amount of the impact of the cumulative effect of adopting Accounting Standard Update ("ASU") 2016-01, Financial Instruments in 2018.

These corrections are not considered material to prior period financial statements and are not expected to be material to the full year 2021 financial statements.

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

2.   WORLDWIDE PANDEMIC

As a result of the rapid spread of the novel coronavirus, COVID-19, throughout the world, including into the United States, on March 11, 2020, the World Health Organization classified the virus as a pandemic. The speed with which the effects of the COVID-19 pandemic changed the U.S. economic landscape, outlook, and in particular the travel industry, was swift and unexpected. The Company saw a negative impact on bookings for future travel throughout 2020. The Company proactively canceled a significant portion of its scheduled flights in March 2020 and continued adjusting capacity throughout 2020, as the Company grounded a significant portion of its fleet and operated a significantly reduced portion of its previously scheduled capacity. The Company continued to experience significant negative impacts to passenger demand and bookings through first quarter 2021 due to the pandemic.

In April 2020, the Company entered into definitive documentation with the United States Department of Treasury ("Treasury") with respect to funding support pursuant to the Payroll Support Program ("Payroll Support") under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). During 2020, the Company received a total of $3.4 billion of relief funds under the CARES Act. As consideration for the Payroll Support, the Company issued a promissory note in favor of Treasury and entered into a warrant agreement with Treasury, pursuant to which the Company agreed to issue warrants to purchase common stock of the Company to Treasury. During 2020, the Company provided the promissory note in the aggregate amount of $976 million and issued warrants valued at a total of $40 million to purchase up to an aggregate of 2.7 million shares of the Company's common stock, subject to adjustment pursuant to the terms of the warrants. Payroll Support funds were used solely to pay qualifying employee salaries, wages, and benefits.

On January 15, 2021, the Company entered into definitive documentation with Treasury with respect to funding support under the Consolidated Appropriations Act, 2021 (the "Payroll Support Program Extension"). Payroll Support Program Extension funds were used solely to pay qualifying employee wages and benefits. As of March 31, 2021, the Company had received $1.7 billion associated with the Payroll Support Program Extension. As consideration for the Payroll Support Program Extension, the Company issued a promissory note (the "PSP2 Note") in favor of Treasury and entered into a warrant agreement (the "PSP2 Warrant Agreement") with Treasury pursuant to which the Company agreed to issue warrants (each, a "PSP2 Warrant") to purchase common stock of the Company to Treasury. As of March 31, 2021, the Company had provided a PSP2 Note in the aggregate amount of $488 million and issued PSP2 Warrants valued at a total of $23 million to purchase up to an aggregate of 1.1 million shares of the Company's common stock, subject to adjustment pursuant to the terms of the PSP2 Warrants. Pursuant to the terms of the Payroll Support Program Extension, the payroll support funds could only be utilized to pay qualifying salaries, wages, and benefits, as defined. As of March 31, 2021, excluding the $488 million PSP2 Note and value allocated to the PSP2 Warrants, all Payroll Support Program Extension funds received had been allocated to reduce eligible costs in the accompanying unaudited Condensed Consolidated Statement of Comprehensive Income (Loss) for the three months ended March 31, 2021.

On April 23, 2021, the Company received an additional $259 million related to the Payroll Support Program Extension, for which the Company provided Treasury consideration in the form of an increase of the PSP2 Note in an amount of $78 million and a PSP2 Warrant to purchase up to 168 thousand shares of the Company's common stock under the PSP2 Warrant Agreement. The grant portion of the payroll support funds will be allocated to reduce qualifying employee salaries, wages, and benefits during second quarter 2021. After taking into account the additional support under the Payroll Support Program Extension, the Company has received $2.0 billion of payroll support under the Payroll Support Program Extension, for which the Company has provided Treasury with a PSP2 Note in the aggregate amount of $566 million and PSP2 Warrants to purchase up to 1.2 million shares of the Company's common stock.

The PSP2 Note matures in full on January 15, 2031, and is subject to mandatory prepayment requirements in connection with certain change of control triggering events that may occur prior to its maturity. The Company has an option to prepay the PSP2 Note at any time without premium or penalty. Amounts outstanding under the PSP2 Note bear interest at a rate of 1.00 percent before January 15, 2026, and, afterwards, at a rate equal to the Secured Overnight Financing Rate or other benchmark replacement rate consistent with customary market conventions plus a margin of 2.00 percent. The PSP2 Note contains customary representations and warranties and events of default.

8

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

Also under the terms of the Payroll Support (discussed above) and Payroll Support Program Extension, the Company is prohibited from repurchasing its common stock and from paying dividends with respect to its common stock through March 31, 2022.

The PSP2 Warrant Agreement sets out the Company's obligations to issue PSP2 Warrants in connection with disbursements of funding support pursuant to the Payroll Support Program Extension and to file or designate a resale shelf registration statement for the PSP2 Warrants and the underlying shares of common stock. The Company has also granted Treasury certain demand underwritten offering and piggyback registration rights with respect to the PSP2 Warrants and the underlying common stock. Each PSP2 Warrant is exercisable at a strike price of $46.28 per share of common stock and will expire on the fifth anniversary of the issue date of such PSP2 Warrant. The PSP2 Warrants will be settled through net share settlement or net cash settlement, at the Company's option. The PSP2 Warrants include adjustments for below market issuances, payment of dividends, and other customary anti-dilution provisions. The PSP2 Warrants do not have voting rights.

On March 11, 2021, President Biden signed into law the American Rescue Plan Act of 2021, which includes provisions for an expected $14 billion of further payroll support ("PSP3 Payroll Support") for eligible U.S. airlines (the "PSP3 Payroll Support Program"). On April 23, 2021, the Company finalized an agreement with Treasury in which the Company is expected to receive an aggregate of approximately $1.9 billion in PSP3 Payroll Support funds that will be used to pay qualifying employee salaries, wages, and benefits through at least September 30, 2021. The Company received an initial installment of $926 million on April 23, 2021, and expects to receive the remainder of PSP3 Payroll Support funds during second quarter 2021.

As consideration for the PSP3 Payroll Support, on April 23, 2021, the Company issued a promissory note (the "PSP3 Note") in favor of Treasury and entered into a warrant agreement with Treasury (the "PSP3 Warrant Agreement"), pursuant to which the Company agreed to issue warrants (each, a "PSP3 Warrant") to purchase common stock of the Company to Treasury. The PSP3 Note was issued for $248 million and the Company issued a PSP3 Warrant valued at a total of $9 million to purchase up to an aggregate of 424 thousand shares of the Company's common stock, subject to adjustment pursuant to the terms of the PSP3 Warrant. Upon each subsequent disbursement of PSP3 Payroll Support to the Company after April 23, 2021, (i) the principal amount of the PSP3 Note will automatically be increased in an amount equal to 30 percent of any such disbursement and (ii) the Company will issue an additional PSP3 Warrant to Treasury in an amount equal to 10 percent of the principal amount of the increase to the PSP3 Note in connection with such disbursement of PSP3 Payroll Support, divided by the strike price of $58.51 (which was the closing price of the Company's common stock on March 10, 2021). The PSP3 Payroll Support funds received can only be utilized to pay qualifying salaries, wages, and benefits, as defined. Excluding the amounts allocated to the PSP3 Note and value allocated to the PSP3 Warrants, all PSP3 Payroll Support funds received are expected to be allocated to reduce eligible costs in the year ended December 31, 2021. The Company currently expects the grant portion of the direct payroll support of $1.3 billion will be classified as a contra-expense line item in the unaudited Condensed Consolidated Statement of Comprehensive Income (Loss).

On June 1, 2020, the Company announced Voluntary Separation Program 2020, a voluntary separation program that allowed eligible Employees the opportunity to voluntarily separate from the Company in exchange for severance, medical/dental coverage for a specified period of time, and travel privileges based on years of service. Virtually all of the Company's Employees hired before June 1, 2020 were eligible to participate in Voluntary Separation Program 2020.

In conjunction with Voluntary Separation Program 2020, the Company also offered certain contract Employees the option to take voluntary Extended Emergency Time Off ("Extended ETO"), for periods between six and 18 months, with the exception of Pilots, who could elect to take Extended ETO for periods up to five years. Approximately 11,000 Employees participated in the Extended ETO program, and 8,164 Employees remained on Extended ETO leave as of March 31, 2021. Employees taking Extended ETO do not perform any work for the Company and are considered inactive while on leave, but do get paid a portion of their wages and continue to receive all associated benefits, as well as accrue service credit for all benefits. Contract employees who elected to take Extended ETO for periods between 12 and 18 months and had 10 or more years of service were given the opportunity to convert to the

9

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

Voluntary Separation Program 2020 beginning on September 1, 2020, until up to 90 days before the end of their respective Extended ETO term.

The purpose of Voluntary Separation Program 2020 and Extended ETO is to maintain a reduced workforce to operate at reduced capacity relative to the Company's operations prior to the COVID-19 pandemic. In accordance with the accounting guidance in ASC Topic 712 (Compensation — Nonretirement Postemployment Benefits), the Company accrued charges related to the special termination benefits described above upon Employees accepting Voluntary Separation Program 2020 or Extended ETO offers, which have been reduced as program benefits are paid. During first quarter 2021, the Company determined that it was no longer probable that a portion of the Employees remaining on Extended ETO would remain on such leave for their entire elected term. Therefore, a portion of the accruals previously recorded were reversed, resulting in a $141 million credit to expense. In addition, the Company continues to be subject to overstaffing levels in certain workgroups and locations, and offered some of the Employees on Extended ETO the opportunity to extend their leave periods by one, two, or three months. Based on the acceptances received, the Company accrued an additional $26 million in expense associated with the program. Both of these items are classified within Payroll support and voluntary Employee programs, net, in the accompanying unaudited Condensed Consolidated Statement of Comprehensive Income (Loss), and are in addition to the allocation of the Payroll Support Program Extension funds utilized to fund salaries, wages, and benefits, which totaled $1.2 billion during first quarter 2021.

The Company accrued expense totaling $620 million for its Extended ETO program in 2020, and considering the adjustments described above, as well as payments subsequently made, $190 million remains accrued as of March 31, 2021. The balance consists of future wages and benefits for the Employees that will not be working during their leave. The Company accrued amounts for up to the first 18 months from inception for all Employees that elected Extended ETO, but did not include amounts related to Pilots for periods beyond February 2022, based on the uncertainty of the Company's future capacity levels, and because it is not currently probable that such Employees will not be recalled to work beyond that timeframe. Therefore, future adjustments to the amounts accrued may become necessary at a later date. For both the Voluntary Support Program 2020 and Extended ETO programs combined, approximately $188 million of the liability balances were relieved during first quarter 2021 through payments to Employees, leaving a balance of $611 million as of March 31, 2021.

In response to flight schedule adjustments due to the effects of the COVID-19 pandemic, a number of aircraft were taken out of the Company's schedule beginning in late March 2020, and placed in short-term storage, as well as some in a longer term storage program. As of March 31, 2021, 66 aircraft remained in temporary or long-term storage. Given the current expectation that these aircraft have been placed in storage temporarily, the Company has continued to record depreciation expense associated with them.

3.   NEW ACCOUNTING PRONOUNCEMENTS

On January 7, 2021, the Financial Accounting Standards Board (the "FASB") issued ASU No. 2021-01, Reference Rate Reform (Topic 848). This new standard provides optional temporary guidance for entities transitioning away from LIBOR to new reference rates so that derivatives affected by the discounting transition are explicitly eligible for certain optional expedients and exceptions with Topic 848. These amendments do not apply to any contract modifications made after December 31, 2022, any new hedging relationships entered into after December 31, 2022, or to existing hedging relationships evaluated for effectiveness existing as of December 31, 2022, that apply certain optional practical expedients. This standard is effective immediately and may be applied (i) on a full retrospective basis as of any date from the beginning of an interim period that includes or is subsequent to March 12, 2020, or (ii) on a prospective basis to new modifications from any date within an interim period that includes or is subsequent to the date of the issuance of a final update, up to the date that financial statements are available to be issued. The Company is currently evaluating its contracts that reference LIBOR and the potential impacts of applying the optional temporary guidance under this standard. There were no LIBOR-related contract modifications during first quarter 2021, and the Company will provide additional information about the transition to new reference rates for affected contracts and adoption of this standard at a future date, if material.

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

On August 5, 2020, the FASB issued ASU No. 2020-06, Debt—Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging—Contracts in Entity's Own Equity (Subtopic 815-40): Accounting for Convertible Instruments and Contracts in an Entity's Own Equity. This new standard reduces the number of accounting models for convertible debt instruments and convertible preferred stock, enhances information transparency by making targeted improvements to the disclosures for convertible instruments and earnings-per-share (EPS) guidance, and amends the guidance for the derivatives scope exception for contracts in an entity's own equity to reduce form-over-substance-based accounting conclusions. This standard is effective for fiscal years beginning after December 15, 2021. Companies may elect early adoption for periods beginning no earlier than December 15, 2020, including interim periods within those fiscal years. The FASB specified that an entity should adopt the guidance as of the beginning of its annual fiscal year. The Company plans to adopt this standard as of January 1, 2022. Upon adoption, the Company will reclassify the remaining equity component from Additional paid-in capital to Long-term debt associated with its convertible notes, and no longer record amortization of the debt discount to Interest expense. The computation of diluted net income (loss) per share will be affected in the numerator as the Company will no longer record the debt discount amortization in Interest expense and may have to add back Interest expense to the numerator. The denominator could also be affected as the Company will be required to use the if-converted method to calculate diluted shares.

4.   FINANCIAL DERIVATIVE INSTRUMENTS

**Fuel Contracts**
Airline operators are inherently dependent upon energy to operate and, therefore, are impacted by changes in jet fuel prices. Furthermore, jet fuel and oil typically represents one of the largest operating expenses for airlines. The Company endeavors to acquire jet fuel at the lowest possible cost and to reduce volatility in operating expenses through its fuel hedging program. Although the Company may periodically enter into jet fuel derivatives for short-term timeframes, because jet fuel is not widely traded on an organized futures exchange, there are limited opportunities to hedge directly in jet fuel for time horizons longer than approximately 24 months into the future. However, the Company has found that financial derivative instruments in other commodities, such as West Texas Intermediate ("WTI") crude oil, Brent crude oil, and refined products, such as heating oil and unleaded gasoline, can be useful in decreasing its exposure to jet fuel price volatility. The Company does not purchase or hold any financial derivative instruments for trading or speculative purposes.

The Company has used financial derivative instruments for both short-term and long-term timeframes, and primarily uses a mixture of purchased call options, collar structures (which include both a purchased call option and a sold put option), call spreads (which include a purchased call option and a sold call option), put spreads (which include a purchased put option and a sold put option), and fixed price swap agreements in its portfolio. Although the use of collar structures and swap agreements can reduce the overall cost of hedging, these instruments carry more risk than purchased call options in that the Company could end up in a liability position when the collar structure or swap agreement settles. With the use of purchased call options and call spreads, the Company cannot be in a liability position at settlement, but does not have coverage once market prices fall below the strike price of the purchased call option.

For the purpose of evaluating its net cash spend for jet fuel and for forecasting its future estimated jet fuel expense, the Company evaluates its hedge volumes strictly from an "economic" standpoint and thus does not consider whether the hedges have qualified or will qualify for hedge accounting. The Company defines its "economic" hedge as the net volume of fuel derivative contracts held, including the impact of positions that have been offset through sold positions, regardless of whether those contracts qualify for hedge accounting. The level at which the Company is economically hedged for a particular period is also dependent on current market prices for that period, as well as the types of derivative instruments held and the strike prices of those instruments. For example, the Company may enter into "out-of-the-money" option contracts (including "catastrophic" protection), which may not generate intrinsic gains at settlement if market prices do not rise above the option strike price. Therefore, even though the Company may have an economic hedge in place for a particular period, that hedge may not produce any hedging

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

gains at settlement and may even produce hedging losses depending on market prices, the types of instruments held, and the strike prices of those instruments.

As of March 31, 2021, the Company had fuel derivative instruments in place to provide coverage in future periods at varying price levels. The following table provides information about the Company's volume of fuel hedging on an economic basis:

| Period (by year) | Maximum fuel hedged as of March 31, 2021 (gallons in millions) (a) | Derivative underlying commodity type as of March 31, 2021 |
|---|---|---|
| Remainder of 2021 | 962 | WTI crude oil and Brent crude oil |
| 2022 | 1,220 | WTI crude oil and Brent crude oil |
| 2023 | 643 | WTI crude oil and Brent crude oil |
| Beyond 2023 | 106 | WTI crude oil |

(a) Due to the types of derivatives utilized by the Company and different price levels of those contracts, these volumes represent the maximum economic hedge in place and may vary significantly as market prices and the Company's flight schedule fluctuate.

Upon proper qualification, the Company accounts for its fuel derivative instruments as cash flow hedges. Qualification is re-evaluated quarterly, and all periodic changes in fair value of the derivatives designated as hedges are recorded in AOCI until the underlying jet fuel is consumed. See Note 5.

If a derivative ceases to qualify for hedge accounting, any change in the fair value of derivative instruments since the last reporting period would be recorded in Other (gains) losses, net, in the unaudited Condensed Consolidated Statement of Comprehensive Income (Loss) in the period of the change; however, any amounts previously recorded to AOCI would remain there until such time as the original forecasted transaction occurs, at which time these amounts would be reclassified to Fuel and oil expense. Factors that have and may continue to lead to the loss of hedge accounting include: significant fluctuation in energy prices, significant weather events affecting refinery capacity and the production of refined products, and the volatility of the different types of products the Company uses in hedging. Increased volatility in these commodity markets for an extended period of time, especially if such volatility were to worsen, could cause the Company to lose hedge accounting altogether for the commodities used in its fuel hedging program, which would create further volatility in the Company's GAAP financial results. However, even though derivatives may not qualify for hedge accounting, the Company continues to hold the instruments as management believes derivative instruments continue to afford the Company the opportunity to stabilize jet fuel costs. When the Company has sold derivative positions in order to effectively "close" or offset a derivative already held as part of its fuel derivative instrument portfolio, any subsequent changes in fair value of those positions are marked to market through earnings. Likewise, any changes in fair value of those positions that were offset by entering into the sold positions and were de-designated as hedges are concurrently marked to market through earnings. However, any changes in value related to hedges that were deferred as part of AOCI while designated as a hedge would remain until the originally forecasted transaction occurs. In a situation where it becomes probable that a fuel hedged forecasted transaction will not occur, any gains and/or losses that have been recorded to AOCI would be required to be immediately reclassified into earnings.

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

All cash flows associated with purchasing and selling fuel derivatives are classified as Other operating cash flows in the unaudited Condensed Consolidated Statement of Cash Flows. The following table presents the location of all assets and liabilities associated with the Company's derivative instruments within the unaudited Condensed Consolidated Balance Sheet:

| | | Asset derivatives | | Liability derivatives | |
| --- | --- | --- | --- | --- | --- |
| (in millions) | Balance Sheet location | Fair value at 3/31/2021 | Fair value at 12/31/2020 | Fair value at 3/31/2021 | Fair value at 12/31/2020 |
| **Derivatives designated as hedges (a)** | | | | | |
| Fuel derivative contracts (gross) | Prepaid expenses and other current assets | $ 58 | $ 9 | $ — | $ — |
| Fuel derivative contracts (gross) | Other assets | 182 | 121 | — | — |
| Interest rate derivative contracts | Other assets | 6 | — | — | — |
| Interest rate derivative contracts | Other noncurrent liabilities | — | — | — | 6 |
| **Total derivatives designated as hedges** | | $ 246 | $ 130 | $ — | $ 6 |
| **Derivatives not designated as hedges (a)** | | | | | |
| Fuel derivative contracts (gross) | Prepaid expenses and other current assets | $ 9 | $ 4 | $ — | $ — |
| **Total derivatives** | | $ 255 | $ 134 | $ — | $ 6 |

(a) Represents the position of each trade before consideration of offsetting positions with each counterparty and does not include the impact of cash collateral deposits provided to or received from counterparties. See discussion of credit risk and collateral following in this Note 4.

In addition, the Company had the following amounts associated with fuel derivative instruments and hedging activities in its unaudited Condensed Consolidated Balance Sheet:

| (in millions) | Balance Sheet location | March 31, 2021 | December 31, 2020 |
| --- | --- | --- | --- |
| Cash collateral deposits held from counterparties for fuel contracts - current | Offset against Prepaid expenses and other current assets | $ 15 | $ 3 |
| Cash collateral deposits held from counterparties for fuel contracts - noncurrent | Offset against Other assets | 57 | 31 |

All of the Company's fuel derivative instruments and interest rate swaps are subject to agreements that follow the netting guidance in the applicable accounting standards for derivatives and hedging. The types of derivative instruments the Company has determined are subject to netting requirements in the accompanying unaudited Condensed Consolidated Balance Sheet are those in which the Company pays or receives cash for transactions with the same counterparty and in the same currency via one net payment or receipt. For cash collateral held by the Company or provided to counterparties, the Company nets such amounts against the fair value of the Company's derivative portfolio by each counterparty. The Company has elected to utilize netting for both its fuel derivative instruments and interest rate swap agreements and also classifies such amounts as either current or noncurrent, based on the net fair value position with each of the Company's counterparties in the unaudited Condensed Consolidated Balance Sheet. If its fuel derivative instruments are in a net asset position with a counterparty, cash collateral amounts held are first netted against current outstanding derivative asset amounts associated with that counterparty until that balance is zero, and then any remainder is applied against the fair value of noncurrent outstanding derivative instruments. As of March 31, 2021, no cash collateral deposits were provided by or held by the Company based on its outstanding interest rate swap agreements.

13

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

The Company has the following recognized financial assets and financial liabilities resulting from those transactions that meet the scope of the disclosure requirements as necessitated by applicable accounting guidance for balance sheet offsetting:

**Offsetting of derivative assets**
**(in millions)**

| | | (i) | (ii) | (iii) = (i) + (ii) | (i) | (ii) | (iii) = (i) + (ii) |
|---|---|---|---|---|---|---|---|
| | | | **March 31, 2021** | | | **December 31, 2020** | |
| **Description** | **Balance Sheet location** | **Gross amounts of recognized assets** | **Gross amounts offset in the Balance Sheet** | **Net amounts of assets presented in the Balance Sheet** | **Gross amounts of recognized assets** | **Gross amounts offset in the Balance Sheet** | **Net amounts of assets presented in the Balance Sheet** |
| Fuel derivative contracts | Prepaid expenses and other current assets | $ 67 | $ (15) | $ 52 | $ 13 | $ (3) | $ 10 |
| Fuel derivative contracts | Other assets | $ 182 | $ (57) | $ 125 (a) | $ 121 | $ (31) | $ 90 (a) |
| Interest rate derivative contracts | Other assets | $ 6 | $ — | $ 6 (a) | $ — | $ — | $ — (a) |

(a) The net amounts of derivative assets and liabilities are reconciled to the individual line item amounts presented in the unaudited Condensed Consolidated Balance Sheet in Note 9.

**Offsetting of derivative liabilities**
**(in millions)**

| | | (i) | (ii) | (iii) = (i) + (ii) | (i) | (ii) | (iii) = (i) + (ii) |
|---|---|---|---|---|---|---|---|
| | | | **March 31, 2021** | | | **December 31, 2020** | |
| **Description** | **Balance Sheet location** | **Gross amounts of recognized liabilities** | **Gross amounts offset in the Balance Sheet** | **Net amounts of liabilities presented in the Balance Sheet** | **Gross amounts of recognized liabilities** | **Gross amounts offset in the Balance Sheet** | **Net amounts of liabilities presented in the Balance Sheet** |
| Fuel derivative contracts | Prepaid expenses and other current assets | $ 15 | $ (15) | $ — | $ 3 | $ (3) | $ — |
| Fuel derivative contracts | Other assets | $ 57 | $ (57) | $ — (a) | $ 31 | $ (31) | $ — (a) |
| Interest rate derivative contracts | Other noncurrent liabilities | $ — | $ — | $ — | $ 6 | $ — | $ 6 |

(a) The net amounts of derivative assets and liabilities are reconciled to the individual line item amounts presented in the unaudited Condensed Consolidated Balance Sheet in Note 9.

14

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

The following tables present the impact of derivative instruments and their location within the unaudited Condensed Consolidated Statement of Comprehensive Income (Loss) for the three months ended March 31, 2021 and 2020:

Location and amount recognized in income on cash flow and fair value hedging relationships

| (in millions) | | Three months ended March 31, 2021 | | | | Three months ended March 31, 2020 | | |
|---|---|---|---|---|---|---|---|---|
| | | Fuel and oil | Other (gains)/losses, net | Other operating expenses | | Fuel and oil | Other (gains)/losses, net | Interest expense |
| Total | $ | 16 | $  6 | $  1 | $ | 22 | $  2 | $  2 |
| | | | | | | | | |
| Loss on cash flow hedging relationships: | | | | | | | | |
| Commodity contracts: | | | | | | | | |
| Amount of loss reclassified from AOCI into income | | 16 | 6 | — | | 22 | 2 | — |
| Interest contracts: | | | | | | | | |
| Amount of loss reclassified from AOCI into income | | — | — | 1 | | — | — | — |
| | | | | | | | | |
| Impact of fair value hedging relationships: | | | | | | | | |
| Interest contracts: | | | | | | | | |
| Hedged items | | — | — | — | | — | — | 4 |
| Derivatives designated as hedging instruments | | — | — | — | | — | — | (2) |

**Derivatives designated and qualified in cash flow hedging relationships**

| | | (Gain) loss recognized in AOCI on derivatives, net of tax | | |
|---|---|---|---|---|
| | | Three months ended March 31, | | |
| (in millions) | | 2021 | | 2020 |
| Fuel derivative contracts | $ | (84) | $ | 84 |
| Interest rate derivatives | | (9) | | 32 |
| Total | $ | (93) | $ | 116 |

**Derivatives not designated as hedges**

| | | (Gain) loss recognized in income on derivatives | | | Location of (gain) loss recognized in income on derivatives |
|---|---|---|---|---|---|
| | | Three months ended March 31, | | | |
| (in millions) | | 2021 | | 2020 | |
| Fuel derivative contracts | $ | (5) | $ | — | Other (gains) losses, net |
| Interest rate derivatives | | — | | 24 | Other (gains) losses, net |
| Total | $ | (5) | $ | 24 | |

15

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

The Company also recorded expense associated with premiums paid for fuel derivative contracts that settled/expired during the three months ended March 31, 2021 and 2020. Gains and/or losses associated with fuel derivatives that qualify for hedge accounting are ultimately recorded to Fuel and oil expense. Gains and/or losses associated with fuel derivatives that do not qualify for hedge accounting are recorded to Other (gains) and losses, net. The following table presents the impact of premiums paid for fuel derivative contracts and their location within the unaudited Condensed Consolidated Statement of Comprehensive Income (Loss) during the period the contract settles:

| | Premium expense recognized in income on derivatives | | Location of premium expense recognized in income on derivatives |
|---|---|---|---|
| | Three months ended March 31, | | |
| (in millions) | 2021 | 2020 | |
| Fuel derivative contracts designated as hedges | $ 14 | $ 24 | Fuel and oil |
| Fuel derivative contracts not designated as hedges | 11 | — | Other (gains) losses, net |

The fair values of the derivative instruments, depending on the type of instrument, were determined by the use of present value methods or option value models with assumptions about commodity prices based on those observed in underlying markets or provided by third parties. Included in the Company's cumulative net unrealized losses from fuel hedges as of March 31, 2021, recorded in AOCI, were approximately $19 million in net unrealized losses, net of taxes, which are expected to be realized in earnings during the twelve months subsequent to March 31, 2021.

**Interest Rate Swaps**
The Company is party to certain interest rate swap agreements that are accounted for as cash flow hedges, and has in the past held interest rate swap agreements that have qualified as fair value hedges, as defined in the applicable accounting guidance for derivative instruments and hedging. Several of the Company's interest rate swap agreements qualify for the "shortcut" method of accounting for hedges, which dictated that the hedges were assumed to be perfectly effective, and, thus, there was no ineffectiveness to be recorded in earnings.

During 2019, the Company had entered into forward-starting interest rate swap agreements related to a series of 12 Boeing 737 MAX 8 aircraft leases originally scheduled to be received between July 2019 and February 2020. These lease contracts exposed the Company to interest rate risk as the rental payments were subject to adjustment and would become fixed based on the 9-year swap rate at the time of delivery. As a result of the grounding of the MAX aircraft, those deliveries were significantly delayed. These original agreements were subsequently terminated in third quarter 2019, and the Company entered into new interest rate swap agreements based on revised expected aircraft delivery dates. As the revised delivery dates were also not met, these subsequent agreements were subsequently de-designated as hedges and the agreements terminated. The Company received three of the twelve aircraft in December 2020, and an additional eight aircraft in first quarter 2021. The remaining delivery is expected during third quarter 2021. As a result of the discontinued hedges, the Company had cumulative losses "frozen" in AOCI, which are being recognized in earnings over the 9-year lease terms of each aircraft upon delivery. Therefore, the Company has reclassified approximately $1 million in losses from AOCI into Other operating expenses, in the unaudited Condensed Consolidated Statement of Income (Loss) for the three months ended March 31, 2021. No such reclassifications occurred in 2020. The cumulative amounts remaining in AOCI as of March 31, 2021, associated with future aircraft deliveries, was $62 million.

For the Company's interest rate swap agreements that do not qualify for the "shortcut" or "critical terms match" methods of accounting, ineffectiveness is assessed at each reporting period. If hedge accounting is achieved, all periodic changes in fair value of the interest rate swaps are recorded in AOCI.

16

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

**Credit Risk and Collateral**

Credit exposure related to fuel derivative instruments is represented by the fair value of contracts that are an asset to the Company at the reporting date. At such times, these outstanding instruments expose the Company to credit loss in the event of nonperformance by the counterparties to the agreements. However, the Company has not experienced any significant credit loss as a result of counterparty nonperformance in the past. To manage credit risk, the Company selects and periodically reviews counterparties based on credit ratings, limits its exposure with respect to each counterparty, and monitors the market position of the fuel hedging program and its relative market position with each counterparty. At March 31, 2021, the Company had agreements with all of its active counterparties containing early termination rights and/or bilateral collateral provisions whereby security is required if market risk exposure exceeds a specified threshold amount based on the counterparty's credit rating. The Company also had agreements with counterparties in which cash deposits and letters of credit were required to be posted as collateral whenever the net fair value of derivatives associated with those counterparties exceeds specific thresholds. In certain cases, the Company has the ability to substitute among these different forms of collateral at its discretion.

The following table provides the fair values of fuel derivatives, amounts posted as collateral, and applicable collateral posting threshold amounts as of March 31, 2021, at which such postings are triggered:

| (in millions) | A | B | C | D | E | F | G | Other (a) | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | | | **Counterparty (CP)** | | | | | |
| Fair value of fuel derivatives | $ 60 | $ 28 | $ 60 | $ 28 | $ 30 | $ 21 | $ 18 | $ 4 | $ 249 |
| Cash collateral held from CP | 72 | — | — | — | — | — | — | — | 72 |
| Option to substitute LC for cash | N/A | N/A | (b) | (b) | (b) | N/A | (b) | | |
| If credit rating is investment grade, fair value of fuel derivative level at which: | | | | | | | | | |
| Cash is provided to CP | >(100) | >(50) | >(75) | >(125) | >(40) | >(65) | >(100) | | |
| Cash is received from CP | >0(c) | >150(c) | >250(c) | >125(c) | >100(c) | >70(c) | >100(c) | | |
| If credit rating is non-investment grade, fair value of fuel derivative level at which: | | | | | | | | | |
| Cash is received from CP | (d) | (d) | (d) | (d) | (d) | (d) | (d) | | |

(a) Individual counterparties with fair value of fuel derivatives < $4 million.
(b) The Company has the option to substitute letters of credit for 100 percent of cash collateral requirement.
(c) Thresholds may vary based on changes in credit ratings within investment grade.
(d) Cash collateral is provided at 100 percent of fair value of fuel derivative contracts.

17

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

5.   COMPREHENSIVE INCOME (LOSS)

Comprehensive income (loss) includes changes in the fair value of certain financial derivative instruments that qualify for hedge accounting, unrealized gains and losses on certain investments, and actuarial gains/losses arising from the Company's postretirement benefit obligation. The differences between Net income (loss) and Comprehensive income (loss) for the three months ended March 31, 2021 and 2020 were as follows:

| (in millions) | Three months ended March 31, 2021 | Three months ended March 31, 2020 |
|---|---|---|
| **NET INCOME (LOSS)** | $ 116 | $ (94) |
| Unrealized gain (loss) on fuel derivative instruments, net of deferred taxes of $30 and ($19) | 101 | (65) |
| Unrealized gain (loss) on interest rate derivative instruments, net of deferred taxes of $3 and ($10) | 10 | (32) |
| Other, net of deferred taxes of ($13) and ($9) | (47) | (28) |
| Total other comprehensive income (loss) | $ 64 | $ (125) |
| **COMPREHENSIVE INCOME (LOSS)** | $ 180 | $ (219) |

A rollforward of the amounts included in AOCI, net of taxes, is shown below for the three months ended March 31, 2021:

| (in millions) | Fuel derivatives | Interest rate derivatives | Defined benefit plan items | Other | Deferred tax | Accumulated other comprehensive income (loss) |
|---|---|---|---|---|---|---|
| Balance at December 31, 2020 | $ (119) | $ (66) | $ (43) | $ 91 | $ 32 | $ (105) |
| Cumulative effect of adopting ASU 2016-01 as of January 1, 2018 — See Note 1 | — | — | — | (31) | 12 | (19) |
| Changes in fair value | 109 | 12 | — | — | (28) | 93 |
| Reclassification to earnings | 22 | 1 | — | (60) (a) | 8 | (29) |
| Balance at March 31, 2021 | $ 12 | $ (53) | $ (43) | $ — | $ 24 | $ (60) |

(a) Investment gains related to prior periods that were reclassified from AOCI into Other (gains) losses, net. See Note 1.

18

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

The following tables illustrate the significant amounts reclassified out of each component of AOCI for the three months ended March 31, 2021:

| | Three months ended March 31, 2021 | | |
|---|---|---|---|
| **(in millions)** **AOCI components** | **Amounts reclassified from AOCI** | | **Affected line item in the unaudited Condensed Consolidated Statement of Comprehensive Income (Loss)** |
| Unrealized loss on fuel derivative instruments | $ | 16 | Fuel and oil expense |
| | | 6 | Other (gains) losses, net |
| | | 5 | Less: Tax expense |
| | $ | 17 | Net of tax |
| Unrealized loss on interest rate derivative instruments | $ | 1 | Other operating expenses |
| | | — | Less: Tax expense |
| | $ | 1 | Net of tax |
| Unrealized gain on deferred compensation plan investment (See Note 1) | $ | (60) | Other (gains) losses, net |
| | | (13) | Less: Tax expense |
| | $ | (47) | Net of tax |
| | | | |
| Total reclassifications for the period | $ | (29) | Net of tax |

## 6.   REVENUE

**Passenger Revenues**

Revenue is categorized by revenue source as the Company believes it best depicts the nature, amount, timing, and uncertainty of revenue and cash flow. The following table provides the components of Passenger revenue recognized for the three months ended March 31, 2021 and March 31, 2020:

| | Three months ended March 31, | | | |
|---|---|---|---|---|
| **(in millions)** | **2021** | | **2020** | |
| Passenger non-loyalty | $ | 1,354 | $ | 3,220 |
| Passenger loyalty - air transportation | | 278 | | 461 |
| Passenger ancillary sold separately | | 80 | | 164 |
| **Total passenger revenues** | $ | 1,712 | $ | 3,845 |

As of March 31, 2021, and December 31, 2020, the components of Air traffic liability and Air traffic liability - noncurrent, including contract liabilities based on tickets sold, unused funds available to the Customer, and loyalty points available for redemption, net of expected spoilage, within the unaudited Condensed Consolidated Balance Sheet were as follows:

| | Balance as of | | | |
|---|---|---|---|---|
| **(in millions)** | **March 31, 2021** | | **December 31, 2020** | |
| Air traffic liability - passenger travel and ancillary passenger services | $ | 3,109 | $ | 2,686 |
| Air traffic liability - loyalty program | | 4,623 | | 4,447 |
| **Total Air traffic liability** | $ | 7,732 | $ | 7,133 |

The balance in Air traffic liability - passenger travel and ancillary passenger services also includes unused funds that are available for use by Customers and are not currently associated with a ticket, but represent funds effectively refunded and made available for use to purchase a ticket for a flight that occurs prior to their expiration. These funds are typically created as a result of a prior ticket cancellation or exchange. Rollforwards of the Company's Air traffic liability - loyalty program for the three months ended March 31, 2021 and March 31, 2020 were as follows (in millions):

| | Three months ended March 31, | | | |
|---|---|---|---|---|
| | **2021** | | **2020** | |
| Air traffic liability - loyalty program - beginning balance | $ | 4,447 | $ | 3,385 |
| Amounts deferred associated with points awarded | | 466 | | 656 |
| Revenue recognized from points redeemed - Passenger | | (278) | | (461) |
| Revenue recognized from points redeemed - Other | | (12) | | (19) |
| Air traffic liability - loyalty program - ending balance | $ | 4,623 | $ | 3,561 |

Air traffic liability includes consideration received for ticket and loyalty related performance obligations which have not been satisfied as of a given date. Rollforwards of the amounts included in Air traffic liability as of March 31, 2021 and March 31, 2020 were as follows (in millions):

| | Air traffic liability | |
|---|---|---|
| Balance at December 31, 2020 | $ | 7,133 |
| Current period sales (passenger travel, ancillary services, flight loyalty, and partner loyalty) | | 2,324 |
| Revenue from amounts included in contract liability opening balances | | (743) |
| Revenue from current period sales | | (982) |

| | | |
|---|---|---:|
| Balance at March 31, 2021 | $ | 7,732 |

| | | Air traffic liability |
|---|---|---:|
| Balance at December 31, 2019 | $ | 5,510 |
| Current period sales (passenger travel, ancillary services, flight loyalty, and partner loyalty) | | 4,565 |
| Revenue from amounts included in contract liability opening balances | | (1,949) |
| Revenue from current period sales | | (1,915) |
| Balance at March 31, 2020 | $ | 6,211 |

During 2020, the Company experienced a significantly higher number of Customer-driven flight cancellations as a result of the COVID-19 pandemic. See Note 2 for further information. As a result, the amount of Customer travel funds held by the Company, net of spoilage, that can be redeemed for future travel as of March 31, 2021, represents approximately 22 percent of the total Air traffic liability balance at March 31, 2021, as compared to approximately 28 percent of the total Air traffic liability balance at December 31, 2020. Both of these recent periods represent a significantly higher portion than the approximate 2 percent of the Air traffic liability balance that Customer funds made up as of December 31, 2019. In order to provide additional flexibility to Customers who hold these funds, the Company has significantly relaxed its previous policies with regards to the time period within which these funds can be redeemed, which is typically twelve months from the original date of purchase. For all Customer travel funds created or that would have otherwise expired between March 1 and September 7, 2020 associated with flight cancellations, the Company has extended the expiration date to September 7, 2022. At March 31, 2021, $1.8 billion of Customer travel funds remain in Air traffic liability with a September 7, 2022 expiration date. The Company has limited data available to predict the occurrence or timing of performance obligation satisfaction on these funds due to certain constraints including, but not limited to, consumer confidence, economic health, vaccines, and uncertainty regarding customer travel fund redemption patterns for funds that live longer than 12 months as this is unprecedented in Company history. As a result, recognition of these travel funds as flown revenue, refunds, or spoilage revenue will likely be more volatile from period to period compared to what previous Customer behavior

may indicate, as cumulative revenue recognized is constrained to amounts that are not probable of being reversed. Despite the possibility that some of these travel funds may be redeemed beyond the following twelve-month period, the Company has continued to classify them as "current" in the accompanying unaudited Condensed Consolidated Balance Sheet as they remain a demand liability and the Company has limited data to enable it to accurately estimate the portion that will not be redeemed for travel in the subsequent twelve months.

Recognition of revenue associated with the Company's loyalty liability can be difficult to predict, as the number of award seats available to members is not currently restricted and they could choose to redeem their points at any time that a seat is available. The performance obligations classified as a current liability related to the Company's loyalty program were estimated based on expected redemptions utilizing historical redemption patterns, and forecasted flight availability, fares, and coefficients. The entire balance classified as Air traffic liability—noncurrent relates to loyalty points that were estimated to be redeemed in periods beyond 12 months following the representative balance sheet date. The Company expects the majority of loyalty points to be redeemed within two years.

Spoilage estimates are based on the Company's Customers' historical travel behavior, as well as assumptions about the Customers' future travel behavior. Assumptions used to generate spoilage estimates can be impacted by several factors including, but not limited to: fare increases, fare sales, changes to the Company's ticketing policies, changes to the Company's refund, exchange, and unused funds policies, seat availability, and economic factors. Given the unprecedented amount of 2020 Customer flight cancellations and the amount of travel funds provided, the Company expects additional variability in the amount of spoilage revenue recorded in future periods, as the estimates of the portion of sold tickets that will expire unused may differ from historical experience.

The Company has a co-branded credit card agreement (the "Agreement") with Chase Bank USA, N.A. ("Chase"), through which the Company sells loyalty points and certain marketing components, which consist of the use of the brand and access to Rapid Rewards Member lists, licensing and advertising elements, and the use of the Company's resource team. In 2018, Chase and Southwest executed a multi-year extension of the Agreement, extending the decades-long relationship between the parties. The Company recognized revenue related to the marketing, advertising, and other travel-related benefits of the revenue associated with various loyalty partner agreements including, but not limited to, the Agreement with Chase, within Other operating revenues. For the three months ended March 31, 2021 and March 31, 2020, the Company recognized $280 million and $321 million, respectively.

19

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

## 7.   NET INCOME (LOSS) PER SHARE

The following table sets forth the computation of basic and diluted net income (loss) per share (in millions, except per share amounts). An immaterial number of shares related to the Company's restricted stock units were excluded from the denominator for both periods presented, because inclusion of such shares would be antidilutive.

| | Three months ended March 31, | |
| --- | --- | --- |
| | **2021** | **2020** |
| **NUMERATOR:** | | |
| Net income (loss) | $ 116 | $ (94) |
| | | |
| **DENOMINATOR:** | | |
| Weighted-average shares outstanding, basic | 591 | 515 |
| Dilutive effects of convertible notes (a) | 16 | — |
| Dilutive effect of stock warrants | 1 | — |
| Dilutive effect of restricted stock units | 1 | — |
| Adjusted weighted-average shares outstanding, diluted | 609 | 515 |
| | | |
| **NET INCOME (LOSS) PER SHARE:** | | |
| Basic | $ 0.20 | $ (0.18) |
| Diluted | $ 0.19 | $ (0.18) |

(a) Because the Company intends to settle conversions by paying cash up to the principal amount of the convertible notes, with any excess conversion value settled in shares of common stock, the convertible notes are being accounted for using the treasury stock method for the purposes of Net income (loss) per share. Using this method, the denominator will be affected when the average share price of the Company's common stock for a given period is greater than the conversion price of approximately $38.48 per share, and the Company reports Net income for the given period. For the three months ended March 31, 2021, the average market price of the Company's common stock exceeded this conversion price per share and as such, the common shares underlying the convertible notes were included in the diluted calculation. See Note 8 for further information on the convertible notes.

## 8.   FAIR VALUE MEASUREMENTS

Accounting standards pertaining to fair value measurements establish a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value. These tiers include: Level 1, defined as observable inputs such as quoted prices in active markets; Level 2, defined as inputs other than quoted prices in active markets that are either directly or indirectly observable; and Level 3, defined as unobservable inputs in which little or no market data exists, therefore requiring an entity to develop its own assumptions.

As of March 31, 2021, the Company held certain items that are required to be measured at fair value on a recurring basis. These included cash equivalents, short-term investments (primarily treasury bills and certificates of deposit), interest rate derivative contracts, fuel derivative contracts, and available-for-sale securities. The majority of the Company's short-term investments consist of instruments classified as Level 1. However, the Company has certificates of deposit, commercial paper, and time deposits that are classified as Level 2, due to the fact that the fair value for these instruments is determined utilizing observable inputs in non-active markets. Other available-for-sale securities primarily consist of investments in equity securities with readily determinable market values associated with the Company's excess benefit plan.

The Company's fuel and interest rate derivative instruments consist of over-the-counter contracts, which are not traded on a public exchange. Fuel derivative instruments currently consist solely of option contracts, whereas interest rate derivatives consist solely of swap agreements. See Note 4 for further information on the Company's

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

derivative instruments and hedging activities. The fair values of swap contracts are determined based on inputs that are readily available in public markets or can be derived from information available in publicly quoted markets. Therefore, the Company has categorized these swap contracts as Level 2. The Company's Treasury Department, which reports to the Chief Financial Officer, determines the value of option contracts utilizing an option pricing model based on inputs that are either readily available in public markets, can be derived from information available in publicly quoted markets, or are provided by financial institutions that trade these contracts. The option pricing model used by the Company is an industry standard model for valuing options and is a similar model used by the broker/dealer community (i.e., the Company's counterparties). The inputs to this option pricing model are the option strike price, underlying price, risk free rate of interest, time to expiration, and volatility. Because certain inputs used to determine the fair value of option contracts are unobservable (principally implied volatility), the Company has categorized these option contracts as Level 3. Volatility information is obtained from external sources, but is analyzed by the Company for reasonableness and compared to similar information received from other external sources. The fair value of option contracts considers both the intrinsic value and any remaining time value associated with those derivatives that have not yet settled. The Company also considers counterparty credit risk and its own credit risk in its determination of all estimated fair values. To validate the reasonableness of the Company's option pricing model, on a monthly basis, the Company compares its option valuations to third party valuations. If any significant differences were to be noted, they would be researched in order to determine the reason. However, historically, no significant differences have been noted. The Company has consistently applied these valuation techniques in all periods presented and believes it has obtained the most accurate information available for the types of derivative contracts it holds.

Included in Other available-for-sale securities are the Company's investments associated with its deferred compensation plans, which consist of mutual funds that are publicly traded and for which market prices are readily available. These plans are non-qualified deferred compensation plans designed to hold contributions in excess of limits established by the Internal Revenue Code of 1986, as amended. The distribution timing and payment amounts under these plans are made based on the participant's distribution election and plan balance. Assets related to the funded portions of the deferred compensation plans are held in a rabbi trust, and the Company remains liable to these participants for the unfunded portion of the plans. The Company records changes in the fair value of plan obligations and plan assets, which net to zero, within the Salaries, wages, and benefits line and Other (gains) losses line, respectively, of the unaudited Condensed Consolidated Statement of Comprehensive Income (Loss).

21

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

The following tables present the Company's assets and liabilities that are measured at fair value on a recurring basis at March 31, 2021, and December 31, 2020:

| | | | Fair value measurements at reporting date using: | | |
| | | | Quoted prices in active markets for identical assets | Significant other observable inputs | Significant unobservable inputs |
| Description | | March 31, 2021 | (Level 1) | (Level 2) | (Level 3) |
| **Assets** | | | (in millions) | | |
| Cash equivalents: | | | | | |
| Cash equivalents (a) | $ | 11,600 | $ 11,600 | $ — | $ — |
| Commercial paper | | 90 | — | 90 | — |
| Certificates of deposit | | 6 | — | 6 | — |
| Time deposits | | 275 | — | 275 | — |
| Short-term investments: | | | | | |
| Treasury bills | | 1,800 | 1,800 | — | — |
| Certificates of deposit | | 27 | — | 27 | — |
| Time deposits | | 550 | — | 550 | — |
| Fuel derivatives: | | | | | |
| Option contracts (b) | | 249 | — | — | 249 |
| Interest rate derivatives (see Note 4) | | 6 | — | 6 | — |
| Other available-for-sale securities | | 240 | 240 | — | — |
| **Total assets** | $ | 14,843 | $ 13,640 | $ 954 | $ 249 |

(a) Cash equivalents are primarily composed of money market investments.
(b) In the unaudited Condensed Consolidated Balance Sheet amounts are presented as an asset. See Note 4.

| | | | Fair value measurements at reporting date using: | | |
| | | | Quoted prices in active markets for identical assets | Significant other observable inputs | Significant unobservable inputs |
| Description | | December 31, 2020 | (Level 1) | (Level 2) | (Level 3) |
| **Assets** | | | (in millions) | | |
| Cash equivalents: | | | | | |
| Cash equivalents (a) | $ | 10,663 | $ 10,663 | $ — | $ — |
| Commercial paper | | 90 | — | 90 | — |
| Certificates of deposit | | 10 | — | 10 | — |
| Time deposits | | 300 | — | 300 | — |
| Short-term investments: | | | | | |
| Treasury bills | | 1,800 | 1,800 | — | — |
| Certificates of deposit | | 46 | — | 46 | — |
| Time deposits | | 425 | — | 425 | — |
| Fuel derivatives: | | | | | |
| Option contracts (b) | | 134 | — | — | 134 |
| Other available-for-sale securities | | 259 | 259 | — | — |
| **Total assets** | $ | 13,727 | $ 12,722 | $ 871 | $ 134 |
| **Liabilities** | | | | | |
| Interest rate derivatives (see Note 4) | $ | (6) | $ — | $ (6) | $ — |

(a) Cash equivalents are primarily composed of money market investments.
(b) In the unaudited Condensed Consolidated Balance Sheet amounts are presented as an asset. See Note 4.

22

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

The Company did not have any material assets or liabilities measured at fair value on a nonrecurring basis during the three months ended March 31, 2021, or the year ended December 31, 2020. The following table presents the Company's activity for items measured at fair value on a recurring basis using significant unobservable inputs (Level 3) for the three months ended March 31, 2021:

**Fair value measurements using significant unobservable inputs (Level 3)**

| (in millions) | Fuel derivatives |
|---|---:|
| Balance at December 31, 2020 | $ 134 |
| Total gains (losses) for the period | |
| Included in earnings | (1) (a) |
| Included in other comprehensive income | 117 |
| Settlements | (1) |
| Balance at March 31, 2021 | $ 249 |
| The amount of total losses for the period included in earnings attributable to the change in unrealized gains or losses relating to assets still held at March 31, 2021 | $ (2) (a) |
| The amount of total gains for the period included in other comprehensive income attributable to the change in unrealized gains or losses relating to assets still held at March 31, 2021 | $ 116 |

(a) Included in Other (gains) losses, net, within the unaudited Condensed Consolidated Statement of Comprehensive Income (Loss).

The significant unobservable input used in the fair value measurement of the Company's derivative option contracts is implied volatility. Holding other inputs constant, an increase (decrease) in implied volatility would have resulted in a higher (lower) fair value measurement, respectively, for the Company's derivative option contracts.

The following table presents a range and weighted average of the unobservable inputs utilized in the fair value measurements of the Company's fuel derivatives classified as Level 3 at March 31, 2021:

**Quantitative information about Level 3 fair value measurements**

| | Valuation technique | Unobservable input | Period (by year) | Range | Weighted Average (a) |
|---|---|---|---|---|---:|
| Fuel derivatives | Option model | Implied volatility | Second quarter 2021 | 22-46% | 32 % |
| | | | Third quarter 2021 | 30-40% | 33 % |
| | | | Fourth quarter 2021 | 29-36% | 31 % |
| | | | 2022 | 25-34% | 29 % |
| | | | 2023 | 23-26% | 25 % |
| | | | Beyond 2023 | 23-25% | 24 % |

(a) Implied volatility weighted by the notional amount (barrels of fuel) that will settle in respective period.

The carrying amounts and estimated fair values of the Company's short-term and long-term debt (including current maturities), as well as the applicable fair value hierarchy tier, at March 31, 2021, are presented in the table below. The fair values of the Company's publicly held long-term debt are determined based on inputs that are readily available in public markets or can be derived from information available in publicly quoted markets; therefore, the Company has categorized these agreements as Level 2. Debt under five of the Company's debt agreements is not publicly held. The Company has determined the estimated fair value of this debt to be Level 3, as certain inputs used to determine the fair value of these agreements are unobservable. The Company utilizes indicative pricing from counterparties and a discounted cash flow method to estimate the fair value of the Level 3 items.

23

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

| (in millions) | Carrying value | Estimated fair value | Fair value level hierarchy |
|---|---|---|---|
| 2.75% Notes due 2022 | $ 300 | $ 309 | Level 2 |
| Pass Through Certificates due 2022 - 6.24% | 105 | 107 | Level 2 |
| 4.75% Notes due 2023 | 1,250 | 1,350 | Level 2 |
| 1.25% Convertible Notes due 2025 | 1,963 | 3,968 | Level 2 |
| 5.25% Notes due 2025 | 1,550 | 1,765 | Level 2 |
| Term Loan Agreement payable through 2025 - 1.59% | 112 | 112 | Level 3 |
| 3.00% Notes due 2026 | 300 | 317 | Level 2 |
| Term Loan Agreement payable through 2026 - 1.34% | 159 | 157 | Level 3 |
| 3.45% Notes due 2027 | 300 | 318 | Level 2 |
| 5.125% Notes due 2027 | 2,000 | 2,301 | Level 2 |
| 7.375% Debentures due 2027 | 119 | 145 | Level 2 |
| Term Loan Agreement payable through 2028 - 1.60% | 178 | 177 | Level 3 |
| 2.625% Notes due 2030 | 500 | 492 | Level 2 |
| 1.000% Payroll Support Program Loan due 2030 | 976 | 941 | Level 3 |
| 1.000% Payroll Support Program Loan due 2031 | 488 | 460 | Level 3 |

**Convertible Notes**

On May 1, 2020, the Company completed the public offering of $2.3 billion aggregate principal amount of 1.250% Convertible Senior Notes due 2025 (the "Convertible Notes").

Upon conversion, the Company will pay or deliver, as the case may be, cash, shares of the Company's common stock or a combination of cash and shares of common stock, at the Company's election. The Company intends, however, to settle conversions by paying cash up to the principal amount, with any excess conversion value settled in shares of common stock. The initial conversion rate is 25.9909 shares of common stock per $1,000 principal amount of Convertible Notes (equivalent to an initial conversion price of approximately $38.48 per share of common stock).

Upon issuance, the Company bifurcated the Convertible Notes for accounting purposes between a liability component and an equity component utilizing applicable guidance. The liability component was determined by estimating the fair value of a hypothetical issuance of an identical offering excluding the conversion feature of the Convertible Notes. The carrying amount of the equity component was calculated as the difference between the liability component and the face amount of the Convertible Notes, which was determined to be $403 million. The equity component is not remeasured as long as it continues to meet the conditions for equity classification, which it had as of March 31, 2021, and December 31, 2020. The following table details the liability component recognized related to the Convertible Notes as of March 31, 2021, and December 31, 2020:

| (in millions) | March 31, 2021 | December 31, 2020 |
|---|---|---|
| Liability component: | | |
| Principal amount | $ 2,300 | $ 2,300 |
| Unamortized debt discount | (337) | (355) |
| Net carrying amount | $ 1,963 | $ 1,945 |

The effective interest rate on the liability component approximates 5.2 percent for the three months ended March 31, 2021. The Company recognized $28 million of interest expense associated with the Convertible Notes during the three months ended March 31, 2021, including $19 million of non-cash amortization of the debt discount, $2 million of non-cash amortization of debt issuance costs, and $7 million of contractual coupon interest. The

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

unamortized debt discount and issuance costs will be recognized as non-cash interest expense over the 5-year term of the notes, through May 1, 2025.

As of March 31, 2021, the if-converted value of the Convertible Notes exceeded the principal amount by $881 million, using the average stock price for the three months ended March 31, 2021. The Convertible Notes did not meet the criteria to be converted throughout first quarter 2021. However, the conversion criteria were subsequently met, and holders of the Convertible Notes are able to convert during the calendar quarter beginning April 1, 2021.

9. SUPPLEMENTAL FINANCIAL INFORMATION

| (in millions) | | March 31, 2021 | | December 31, 2020 |
|---|---|---|---|---|
| Trade receivables | $ | 59 | $ | 46 |
| Credit card receivables | | 92 | | 35 |
| Business partners and other suppliers (a) | | 73 | | 274 |
| Taxes receivable (b) | | 705 | | 740 |
| Other | | 8 | | 35 |
| Accounts and other receivables | $ | 937 | $ | 1,130 |

| (in millions) | | March 31, 2021 | | December 31, 2020 |
|---|---|---|---|---|
| Derivative contracts | $ | 131 | $ | 90 |
| Intangible assets, net | | 295 | | 295 |
| Other | | 317 | | 337 |
| Other assets | $ | 743 | $ | 722 |

| (in millions) | | March 31, 2021 | | December 31, 2020 |
|---|---|---|---|---|
| Accounts payable trade | $ | 169 | $ | 111 |
| Salaries payable | | 197 | | 201 |
| Taxes payable excluding income taxes | | 190 | | 49 |
| Aircraft maintenance payable | | 83 | | 95 |
| Fuel payable | | 98 | | 66 |
| Other payable | | 357 | | 409 |
| Accounts payable | $ | 1,094 | $ | 931 |

| (in millions) | | March 31, 2021 | | December 31, 2020 |
|---|---|---|---|---|
| Extended Emergency Time Off | $ | 190 | $ | 393 |
| Voluntary Separation Program 2020 | | 124 | | 143 |
| Profitsharing and savings plans | | 46 | | 25 |
| Vendor prepayment (a) | | 277 | | 600 |
| Vacation pay | | 443 | | 436 |
| Health | | 109 | | 111 |
| Workers compensation | | 163 | | 161 |
| Property and income taxes | | 80 | | 84 |
| Interest | | 111 | | 49 |
| Other | | 122 | | 257 |
| Accrued liabilities | $ | 1,665 | $ | 2,259 |

25

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

| (in millions) | March 31, 2021 | December 31, 2020 |
|---|---|---|
| Extended Emergency Time Off | $ — | $ 57 |
| Voluntary Separation Program 2020 | 297 | 321 |
| Postretirement obligation | 430 | 428 |
| Other deferred compensation | 319 | 353 |
| Other | 77 | 88 |
| Other noncurrent liabilities | $ 1,123 | $ 1,247 |

(a) In fourth quarter 2020, the Company received a $600 million prepayment from Chase for Rapid Rewards points expected to be purchased during 2021, based on cardholder activity on the Visa credit card associated with its loyalty program. During first quarter 2021, $323 million was reclassified to deferred revenue in Air Traffic liability--loyalty (including $106 million that would have been a receivable from business partners as of March 31, 2021), and the remainder is expected to be reclassified during second quarter 2021.

(b) Both periods include approximately $470 million associated with a significant cash tax refund expected as a result of the CARES Act allowing entities to carry back 2020 losses to prior periods of up to five years, and claim refunds of federal taxes paid. This amount also includes excise taxes remitted to taxing authorities for which the subsequent flights were canceled by Customers, resulting in amounts due back to the Company.

For further information on fuel derivative and interest rate derivative contracts, see Note 4.

**Other Operating Expenses**
Other operating expenses consists of aircraft rentals, distribution costs, advertising expenses, personnel expenses, professional fees, and other operating costs, none of which individually exceeded 10 percent of Operating expenses for the three months ended March 31, 2021.

10.    COMMITMENTS AND CONTINGENCIES

**Los Angeles International Airport**
In October 2017, the Company executed a lease agreement with Los Angeles World Airports ("LAWA") (the "T1.5 Lease"). Under the T1.5 Lease, the Company oversaw and managed the design, development, financing, construction, and commissioning of a passenger processing facility between Terminal 1 and 2 (the "Terminal 1.5 Project"). The Terminal 1.5 Project includes ticketing, baggage claim, passenger screening, and a bus gate at a cost not to exceed $464 million for site improvements and non-proprietary improvements. Construction on the Terminal 1.5 Project began during third quarter 2017 and was substantially completed at December 31, 2020; however, the Terminal 1.5 Project will not be placed into service until second quarter 2021, at which time LAWA is expected to repay the outstanding loan and purchase the remaining completed assets for accounting purposes. The costs incurred to fund the Terminal 1.5 Project are included within Assets Constructed for Others ("ACFO") and all amounts that have been or will be reimbursed will be included within Construction obligation on the accompanying unaudited Condensed Consolidated Balance Sheet. Upon completion of any individual asset as part of the overall project, the asset and associated liability on the balance sheet are de-recognized in accordance with applicable accounting guidance.

Funding for this project is primarily through the Regional Airports Improvement Corporation (the "RAIC"), which is a quasi-governmental special purpose entity that is acting as a conduit borrower under a syndicated credit facility provided by a group of lenders. A loan made under the credit facility for the Terminal 1.5 Project is being used to reimburse the Company for the site improvements and non-proprietary improvements of the Terminal 1.5 Project, and the outstanding loan will be repaid with the proceeds of LAWA's payments to purchase completed construction phases. The Company guaranteed the obligation of the RAIC under the credit facility associated with the Terminal 1.5 Project. As of March 31, 2021, the Company's outstanding guaranteed obligation under the credit facility for the Terminal 1.5 Project was $364 million.

26

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

Construction costs recorded in ACFO for the Terminal 1.5 Project, which exclude costs associated with assets that were previously completed and placed into service, were $341 million and $309 million, as of March 31, 2021, and December 31, 2020, respectively.

**Dallas Love Field**

During 2008, the City of Dallas approved the Love Field Modernization Project ("LFMP"), a project to reconstruct Dallas Love Field with modern, convenient air travel facilities. Pursuant to a Program Development Agreement with the City of Dallas and the Love Field Airport Modernization Corporation (or the "LFAMC," a Texas non-profit "local government corporation" established by the City of Dallas to act on the City of Dallas' behalf to facilitate the development of the LFMP), the Company managed this project. Major construction was effectively completed in 2014. During second quarter 2017, the City of Dallas approved using the remaining bond funds for additional terminal construction projects, which were effectively completed in 2018.

Although the City of Dallas received commitments from various sources that helped to fund portions of the LFMP project, including the Federal Aviation Administration ("FAA"), the Transportation Security Administration, and the City of Dallas' Aviation Fund, the majority of the funds used were from the issuance of bonds. The Company guaranteed principal and interest payments on bonds issued by the LFAMC. As of March 31, 2021, $399 million of principal remained outstanding. The net present value of the future principal and interest payments associated with the bonds was $438 million as of March 31, 2021, and was reflected as part of the Company's operating lease right–of–use assets and lease obligations in the unaudited Condensed Consolidated Balance Sheet.

**Contractual Obligations and Contingent Liabilities and Commitments**

On March 24, 2021, the Company entered into Supplemental Agreement No. 12 (the "Supplement") to its aircraft purchase agreement with The Boeing Company ("Boeing") relating to the Company's purchase of Boeing 737 MAX 7 and 737 MAX 8 aircraft. Pursuant to the Supplement (i) the Company added 100 firm orders for the MAX 7, with the first 30 to be delivered in 2022; (ii) the Company added 155 MAX aircraft options; (iii) the order book was extended to include deliveries through 2031; and (iv) the Company converted 70 MAX 8 firm orders to MAX 7 firm orders. The Supplement also includes certain confidential credits, discounts, and other concessions provided to the Company by Boeing.

27

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

As of March 31, 2021, based on the Supplement to its aircraft purchase agreement with Boeing, the Company had firm deliveries and options for Boeing 737 MAX 7 and 737 MAX 8 aircraft as follows:

| | The Boeing Company | | | | |
|---|---|---|---|---|---|
| | MAX 7 Firm Orders | MAX 8 Firm Orders | MAX 7 or 8 Options | Additional MAX 8s | Total |
| 2021 | — | 19 | — | 9 | 28 (a) |
| 2022 | 30 | — | 42 | — | 72 |
| 2023 | 30 | — | 38 | — | 68 |
| 2024 | 30 | — | 40 | — | 70 |
| 2025 | 30 | — | 40 | — | 70 |
| 2026 | 15 | 15 | 40 | — | 70 |
| 2027 | 15 | 15 | 30 | — | 60 |
| 2028 | 15 | 15 | 30 | — | 60 |
| 2029 | 20 | 30 | 10 | — | 60 |
| 2030 | 15 | 45 | — | — | 60 |
| 2031 | — | 10 | — | — | 10 |
| | 200 | 149 (b) | 270 | 9 (c) | 628 |

(a) Includes 20 737 MAX 8s delivered as of March 31, 2021, consisting of 12 owned and 8 leased aircraft.
(b) The Company has flexibility to designate firm orders or options as MAX 7 or MAX 8, upon written advance notification as stated in the contract.
(c) These 9 additional MAX 8 aircraft are leases to be acquired from various third parties, including 8 leased MAX 8 aircraft delivered in first quarter 2021. The Company also received 7 leased MAX 8 aircraft in fourth quarter 2020, for a total of 16 MAX 8 operating leased aircraft from third parties in 2020 and 2021, combined.

Based on the Company's existing agreement with Boeing as reflected in the delivery schedule above, the Company's cash capital commitments associated with its firm orders are as follows: none for 2021 (due to previously agreed upon delivery credits provided by The Boeing Company to the Company due to the settlement of 2020 estimated damages relating to the FAA grounding of the 737 MAX aircraft and progress payments made to date on undelivered aircraft), $700 million in 2022, $1.1 billion in 2023, $1.0 billion in 2024, $1.1 billion in 2025, $1.2 billion in 2026, and $7.2 billion thereafter.

**Contingencies**
The Company is from time to time subject to various legal proceedings and claims arising in the ordinary course of business, including, but not limited to, examinations by the Internal Revenue Service ("IRS"). The Company's management does not expect that the outcome of any of its currently ongoing legal proceedings or the outcome of any adjustments presented by the IRS, individually or collectively, will have a material adverse effect on the Company's financial condition, results of operations, or cash flow.

11.    BOEING 737 MAX AIRCRAFT GROUNDING AND RETURN TO SERVICE

On March 13, 2019, the FAA issued an emergency order for all U.S. airlines to ground all Boeing MAX aircraft. The Company immediately complied with the order and grounded all 34 MAX aircraft in its fleet. On November 18, 2020, the FAA rescinded the emergency order and issued official requirements to enable U.S. airlines to return the Boeing 737 MAX to service. The Company returned the MAX to revenue service on March 11, 2021, after the Company met all FAA requirements and Pilots received updated, MAX-related training.

The most significant financial impacts of the grounding to the Company were the lost revenues, operating income, and operating cash flows, and delayed capital expenditures, directly associated with its grounded MAX fleet and other new aircraft that were not able to be delivered. In July 2019, The Boeing Company ("Boeing") announced a

**Southwest Airlines Co.**
**Notes to Condensed Consolidated Financial Statements**
(unaudited)

$4.9 billion after-tax charge for "potential concessions and other considerations to customers for disruptions related to the 737 MAX grounding." In January 2020, Boeing announced an additional pre-tax charge of $2.6 billion related to "estimated potential concessions and other considerations to customers related to the 737 MAX grounding."

During 2019, the Company entered into a Memorandum of Understanding with Boeing to compensate Southwest for estimated financial damages incurred during 2019 related to the grounding of the MAX. The terms of the agreement are confidential, but are intended to provide for a substantial portion of the Company's financial damages associated with both the 34 MAX aircraft that were grounded as of March 13, 2019, as well as the 41 additional MAX aircraft the Company was scheduled to receive (28 owned MAX from Boeing and 13 leased MAX from third parties) from March 13, 2019 through December 31, 2019. In accordance with applicable accounting principles, the Company will account for substantially all of the proceeds received from Boeing as a reduction in cost basis spread across both the existing 31 owned MAX in the Company's fleet at the time, and the Company's future firm aircraft deliveries as of the date of the agreement. No material financial impacts of the agreement were realized in the Company's earnings during the years ended December 31, 2019 and 2020.

During December 2020, the Company entered into an agreement with Boeing to compensate the Company for estimated financial damages incurred during 2020 related to the grounding of the MAX. The terms of the agreement are confidential, but the compensation is in the form of credit memos taken against future payments due to Boeing as aircraft are delivered in accordance with the amended delivery schedule, or as future progress payments are due. In accordance with applicable accounting principles, the Company has accounted for substantially all of the compensation received from Boeing as a reduction in cost basis spread across both the existing owned MAX in the Company's fleet, and the Company's future firm aircraft deliveries from Boeing as of the date of the agreement. No material financial impacts of the agreement were realized in the Company's earnings during the three months ended March 31, 2021.

29

**Item 2.**  Management's Discussion and Analysis of Financial Condition and Results of Operations

Relevant comparative operating statistics for the three months ended March 31, 2021 and 2020 are included below. The Company provides these operating statistics because they are commonly used in the airline industry and, as such, allow readers to compare the Company's performance against its results for the prior year period, as well as against the performance of the Company's peers. In the first quarter of both years, most of these operating statistics were significantly impacted by the COVID-19 pandemic and decisions the Company made as a result of the pandemic. See Note 2 to the unaudited Condensed Consolidated Financial Statements for further information.

| | Three months ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | 2021 | | 2020 | Change |
| Revenue passengers carried (000s) | | 14,225 | 24,748 | (42.5)% |
| Enplaned passengers (000s) | | 17,927 | 29,779 | (39.8)% |
| Revenue passenger miles (RPMs) (in millions)[a] | | 14,875 | 23,935 | (37.9)% |
| Available seat miles (ASMs) (in millions)[b] | | 23,146 | 35,350 | (34.5)% |
| Load factor[c] | | 64.3 % | 67.7 % | (3.4)  pts. |
| Average length of passenger haul (miles) | | 1,046 | 967 | 8.2 % |
| Average aircraft stage length (miles) | | 772 | 737 | 4.7 % |
| Trips flown | | 192,401 | 312,393 | (38.4)% |
| Seats flown (000s)[d] | | 29,791 | 47,130 | (36.8)% |
| Seats per trip[e] | | 154.8 | 150.9 | 2.6 % |
| Average passenger fare | $ | 120.36 | $ 155.37 | (22.5)% |
| Passenger revenue yield per RPM (cents)[f] | | 11.51 | 16.07 | (28.4)% |
| Operating revenues per ASM (cents)[g] | | 8.86 | 11.98 | (26.0)% |
| Passenger revenue per ASM (cents)[h] | | 7.40 | 10.88 | (32.0)% |
| Operating expenses per ASM (cents)[i] | | 8.00 | 12.29 | (34.9)% |
| Operating expenses per ASM, excluding fuel (cents) | | 5.98 | 9.83 | (39.2)% |
| Operating expenses per ASM, excluding fuel and profitsharing (cents) | | 5.88 | 9.83 | (40.2)% |
| Fuel costs per gallon, including fuel tax | $ | 1.63 | $ 1.90 | (14.2)% |
| Fuel costs per gallon, including fuel tax, economic | $ | 1.70 | $ 1.90 | (10.5)% |
| Fuel consumed, in gallons (millions) | | 286 | 457 | (37.4)% |
| Active fulltime equivalent Employees | | 56,051 [j] | 60,922 | (8.0)% |
| Aircraft at end of period[k][l] | | 730 | 742 | (1.6)% |

(a) A revenue passenger mile is one paying passenger flown one mile. Also referred to as "traffic," which is a measure of demand for a given period.
(b) An available seat mile is one seat (empty or full) flown one mile. Also referred to as "capacity," which is a measure of the space available to carry passengers in a given period.
(c) Revenue passenger miles divided by available seat miles.
(d) Seats flown is calculated using total number of seats available by aircraft type multiplied by the total trips flown by the same aircraft type during a particular period.
(e) Seats per trip is calculated by dividing seats flown by trips flown.
(f) Calculated as passenger revenue divided by revenue passenger miles. Also referred to as "yield," this is the average cost paid by a paying passenger to fly one mile, which is a measure of revenue production and fares.
(g) Calculated as operating revenues divided by available seat miles. Also referred to as "operating unit revenues," or "RASM," this is a measure of operating revenue production based on the total available seat miles flown during a particular period.
(h) Calculated as passenger revenue divided by available seat miles. Also referred to as "passenger unit revenues," this is a measure of passenger revenue production based on the total available seat miles flown during a particular period.
(i) Calculated as operating expenses divided by available seat miles. Also referred to as "unit costs," "cost per available seat mile," or "CASM" this is the average cost to fly an aircraft seat (empty or full) one mile, which is a measure of cost efficiencies.
(j) Included 8,164 Employees participating in the Extended Emergency Time Off program as of March 31, 2021. See Note 2 to the unaudited Condensed Consolidated Financial Statements for further information.
(k) Included 7 Boeing 737 MAX aircraft in temporary storage as of March 31, 2021, and 34 Boeing 737 MAX aircraft in long term storage as of March 31, 2020. See Note 11 to the unaudited Condensed Consolidated Financial Statements for further information.
(l) Included 59 and 93 Boeing 737 Next Generation aircraft removed from active fleet and in temporary storage as of March 31, 2021 and 2020, respectively.

**Financial Overview**

In late February 2020, the Company began to see a negative impact from the COVID-19 pandemic, which quickly accelerated during first quarter 2020 and continued throughout 2020. The Company continued to experience significant negative impacts to passenger demand and bookings through the entirety of first quarter 2021, although modest improvements in leisure bookings were noted in mid-February 2021 that steadily improved through March 2021. The Company's financial results in both years, on both a GAAP and Non-GAAP basis, were significantly impacted by the pandemic and resulting effect on demand and passenger bookings. In addition, GAAP results in first quarter 2021 included $1.2 billion in Payroll Support Program Extension grants. See Note 2 to the unaudited Condensed Consolidated Financial Statements for further information.

See Note Regarding Use of Non-GAAP Financial Measures and the Reconciliation of Reported Amounts to Non-GAAP Financial Measures for additional detail regarding non-GAAP financial measures.

*COVID-19 Pandemic*

In response to the far-reaching impacts of the COVID-19 pandemic, the Company took, and continues to assess and modify, measures to support the well-being of both its Employees and passengers, including procedures and policies intended to maintain cleanliness on aircraft and at facilities, and mitigate the spread of the virus. The Company also continues to monitor guidelines and recommendations from the Centers for Disease Control and Prevention applicable to the Company's daily operations, as well as how the majority of the Company's office and clerical Employees work on a daily basis.

As detailed in Note 2 to the unaudited Condensed Consolidated Financial Statements, in connection with the major negative impact of COVID-19 on air carriers, in 2020, the Company received significant financial assistance from the U.S. Department of Treasury ("Treasury") pursuant to the Payroll Support Program established pursuant to the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act").

In January 2021, the Company entered into definitive documentation with Treasury for further payroll support under the Consolidated Appropriations Act, 2021 (the "Payroll Support Program Extension"). As of March 31, 2021, amounts received under the Payroll Support Program Extension were approximately $1.7 billion and a portion has been recognized in the financial statements as a grant to directly offset qualifying payroll expenses incurred by the Company, including specified benefits, between January 2021 and March 2021. As consideration for the Payroll Support Program Extension, during first quarter 2021, the Company issued a promissory note (the "PSP2 Note") in favor of Treasury in the aggregate amount of $488 million and issued warrants (each, a "PSP2 Warrant") valued at a total of $23 million to purchase up to an aggregate of 1.1 million shares of the Company's common stock, subject to adjustment pursuant to the terms of the PSP2 Warrants. Of the approximate $1.7 billion of further payroll support proceeds as of March 31, 2021, $1.2 billion consisted of a grant that does not require repayment. The grant of $1.2 billion was allocated on a pro-rata basis as a contra-expense line item in the unaudited Condensed Consolidated Statement of Comprehensive Income (Loss) during first quarter 2021, with the remaining $23 million allocated to the value of PSP2 Warrants issued from the Company to Treasury. See Note 2 to the unaudited Condensed Financial Statements for further information.

On April 23, 2021, the Company received an additional $259 million related to the Payroll Support Program Extension, for which the Company provided Treasury consideration in the form of an increase of the PSP2 Note in an amount of $78 million and a PSP2 Warrant to purchase up to 168 thousand shares of the Company's common stock under the PSP2 Warrant Agreement. After taking into account the additional support under the Payroll Support Program Extension, the Company has received $2.0 billion of payroll support under the Payroll Support Program Extension, for which the Company has provided Treasury with a PSP2 Note in the aggregate amount of $566 million and PSP2 Warrants to purchase up to 1.2 million shares of the Company's common stock.

In accordance with restrictions contained in the Payroll Support Program Extension, and except as permitted or required under the Payroll Support Program Extension, the Company has not (1) conducted involuntary

31

terminations or furloughs or (2) reduced the salaries, wages, or benefits, as defined, of any employee, in each case between the date of the Payroll Support Program Extension agreement and March 31, 2021.

On April 23, 2021, the Company entered into definitive documentation with Treasury for further payroll support under the American Rescue Plan Act of 2021 (the "PSP3 Payroll Support Program"). Amounts received or to be received under the PSP3 Payroll Support Program are expected to total approximately $1.9 billion, all or a portion of which will again be utilized to directly offset qualifying payroll expenses incurred by the Company, including specified benefits, through at least September 30, 2021. Of this total, approximately $1.3 billion consists of a grant that will not require repayment. The Company currently expects this grant of $1.3 billion will be classified as a contra-expense line item in the unaudited Condensed Consolidated Statement of Comprehensive Income (Loss) during second quarter and third quarter 2021. As consideration for the PSP3 Payroll Support Program, the Company is expected to issue a promissory note in favor of Treasury in the aggregate amount of approximately $526 million and issue warrants (each, a "PSP3 Warrant") valued at a total of approximately $18 million to purchase up to an aggregate of approximately 899 thousand shares of the Company's common stock, subject to adjustment pursuant to the terms of the PSP3 Warrants. See Note 2 to the unaudited Condensed Financial Statements for further information.

In accordance with restrictions contained in the PSP3 Payroll Support Program, and except as permitted or required under the PSP3 Payroll Support Program, the Company has agreed not to (1) conduct involuntary terminations or furloughs or (2) reduce the salaries, wages, or benefits, as defined, of any employee, in each case between the date of the PSP3 Payroll Support Program agreement and the later of September 30, 2021 or the date on which the Company has expended all of the PSP3 Payroll Support Program funds.

During second quarter 2020, the Company introduced Voluntary Separation Program 2020 and the Extended Emergency Time Off ("Extended ETO") program which helped closer align staffing to reduced flight schedules and enabled the Company to avoid involuntary furloughs and layoffs. Employees had until July 15, 2020, to determine whether to participate in one of these programs, and approximately 15,000 Employees elected to do so. The Company continues to evaluate and evolve its Extended ETO program in 2021. In accordance with applicable accounting guidance, the Company recorded a total charge of $1.4 billion in 2020 related to the special termination benefits for Employees who had accepted the Company's offer to participate in its Voluntary Separation Program 2020 and the special benefits for Employees who participated in its Extended ETO program. The accrual is being reduced as program benefits are paid or as it becomes no longer probable that Employees will remain on leave for their elected terms. This program has allowed the Company to reduce its fixed cost structure in the near-term, while maintaining the ability to adjust to a recovery in travel demand. See Note 2 to the unaudited Condensed Consolidated Financial Statements for further information. As a result of these voluntary programs, the Company's salaries, wages, and benefits costs were lowered by approximately $412 million in first quarter 2021.

See Note 2 to the unaudited Condensed Consolidated Financial Statements for further information on the significant impacts to the Company's operations, financial performance, and liquidity from the COVID-19 pandemic.

Thus far, the Company continues to experience improvements in leisure passenger demand and bookings for April and May 2021 travel, with expectations of improving passenger traffic and fares compared with March 2021. The Company continues to experience an increase in bookings farther out on the booking curve, with approximately 35 percent and 20 percent of anticipated bookings currently in place for June and July, respectively. These represent fairly typical future booking patterns; however, business travel continues to significantly lag leisure and is expected to have a significant negative impact on close-in demand and average passenger fares.

The following table presents selected preliminary estimates of operating revenue, load factor, and capacity for April and May 2021:

| | Estimated April 2021 | Estimated May 2021 |
|---|---|---|
| **Operating revenue compared with 2019 (a)** | **Down 40% to 45%** | **Down 35% to 40%** |
| *Previous estimation* | *(b)* | *(b)* |
| **Load factor** | **75% to 80%** | **75% to 80%** |
| *Previous estimation* | *(b)* | *(b)* |
| **ASMs year-over-year** | **Up ~83%** | **Up ~127%** |
| *Previous estimation* | *(b)* | *(b)* |

(a) The Company believes that operating revenues compared with 2019 is a more relevant measure of performance than a year-over-year comparison due to the significant impacts in 2020 due to the pandemic.
(b) Remains unchanged from the previously provided estimation.

The Company estimates its June 2021 capacity to decrease approximately 4 percent as compared with June 2019. The Company estimates its second quarter 2021 capacity to increase approximately 90 percent, year-over-year, and decrease approximately 15 percent as compared with 2019, driven by improving passenger demand and bookings.

Excluding Fuel and oil expense, special items, and profitsharing expense, the Company's second quarter 2021 operating expenses are expected to increase in the range of 10 to 15 percent, year-over-year, which includes an estimated $325 million of salaries, wages, and benefits cost savings from voluntary separation and extended leave programs. See Note 2 to the unaudited Condensed Consolidated Financial Statements for further description of these programs. Second quarter 2021 operating expenses, excluding fuel and oil expense, special items, and profitsharing, are also expected to increase compared with first quarter 2021, with 60 to 70 percent of the sequential increase attributable to variable, flight-driven expenses as capacity is expected to increase to near-2019 levels by June 2021. These variable, flight-driven cost increases are primarily in salaries, wages, and benefits due to staffing increases; maintenance expense to return aircraft to revenue service, along with higher flight-driven maintenance expenses as flight levels increase; landing fees; and personnel, passenger, and revenue-related costs. In addition, the Company is experiencing cost increases primarily due to airport cost inflation; higher aircraft ownership costs due to MAX deliveries; and certain favorable tax and insurance settlements realized in first quarter 2021 operating expenses that are non-recurring in second quarter 2021. Despite increasing capacity and operating expenses, both sequentially and year-over-year, second quarter 2021 operating expenses are estimated to remain below second quarter 2019 levels. The projections do not reflect the potential impact of Fuel and oil expense, special items, and profitsharing expense because the Company cannot reliably predict or estimate these items or expenses or their impact to its financial statements in future periods, especially considering the significant volatility of the Fuel and oil expense line item. Accordingly, the Company believes a reconciliation of non-GAAP financial measures to the equivalent GAAP financial measures for projected results is not meaningful or available without unreasonable effort.

**Company Overview**

On November 18, 2020, the Federal Aviation Administration (the "FAA") issued official requirements to enable airlines to return the Boeing 737 MAX to service. The Company has worked to meet the FAA's requirements by modifying certain operating procedures, implementing enhanced Pilot training requirements, installing FAA-approved flight control software updates, and completing other required maintenance tasks specific to the MAX aircraft. The Company returned the MAX to service on March 11, 2021, after the Company met all FAA requirements and Pilots received updated, MAX-related training. In April 2021, the Company removed 32 of its MAX aircraft from service due to a Boeing production issue related to the electrical power system on a subset of MAX aircraft. Upon learning of the issue, the Company immediately removed these aircraft from service, out of an abundance of caution, and is currently awaiting more guidance from Boeing and the FAA regarding the appropriate corrective actions. The Company has covered impacted flights with other aircraft in the fleet and has not experienced significant operational disruptions. Once the Company receives formal guidance from Boeing and the FAA, the Company anticipates the actions necessary to return the affected 32 aircraft to service will take two to

33

three days per aircraft and several weeks in total. The Company is in the process of returning its stored 737-700 aircraft to revenue service to support flight schedules in summer 2021 and beyond.

On March 24, 2021, the Company entered into Supplemental Agreement No. 12 (the "Supplement") to its aircraft purchase agreement with Boeing relating to the Company's purchase of Boeing 737 MAX 7 and 737 MAX 8 aircraft. Pursuant to the Supplement (i) the Company added 100 firm orders for the MAX 7, with the first 30 to be delivered in 2022; (ii) the Company added 155 MAX aircraft options; (iii) the order book was extended to include deliveries through 2031; and (iv) the Company converted 70 MAX 8 firm orders to MAX 7 firm orders. The Supplement also includes certain confidential credits, discounts, and other concessions provided to the Company by Boeing.

Based on the Company's existing delivery schedule with Boeing, as reflected in Note 10 to the unaudited Condensed Consolidated Financial Statements, the Company's contractual aircraft capital spending commitments associated with firm orders for all years 2021 through 2026, which consists of 169 MAX firm orders from Boeing (135 MAX 7 and 34 MAX 8 aircraft), are approximately $5.1 billion. The Company's capital commitments associated with its existing firm orders are as follows: none for 2021 (due to previously agreed upon delivery credits provided by The Boeing Company to the Company due to the settlement of 2020 estimated damages relating to the FAA grounding of the 737 MAX aircraft and progress payments made to date on undelivered aircraft) and approximately $700 million in 2022 (net of progress payments made on undelivered MAX aircraft and previously agreed upon delivery credits provided by Boeing to the Company). The Company estimates its 2021 capital expenditures to be approximately $500 million, primarily driven by technology, facilities, and operational investments. See Note 10 to the unaudited Condensed Consolidated Financial Statements for further information.

The Company ended first quarter 2021 with 730 aircraft in its fleet. During first quarter 2021, 20 Boeing 737 MAX aircraft were delivered and the Company returned eight leased 737-700 aircraft. The Company expects eight additional Boeing 737 MAX aircraft to be delivered by December 31, 2021 and expects to retire up to nine more 737-700 aircraft in 2021. In response to capacity reductions due to the effects of the COVID-19 pandemic, as of March 31, 2021, the Company had approximately 66 aircraft in temporary storage. These stored aircraft provide greater flexibility to adapt to the seasonal demand patterns that are currently expected to develop during second quarter 2021. The Company continues the acceleration of fleet modernization efforts to replace its 737-700 aircraft with the MAX, and the development of tangible steps that are aimed at improving upon the Company's environmental stewardship and supporting the environmental sustainability goal to be carbon neutral by 2050. See Note 2 to the unaudited Condensed Consolidated Financial Statements for further information on the effects of the COVID-19 pandemic.

The Company has published its flight schedule through November 5, 2021. The Company is pursuing additional revenue opportunities that utilize idle aircraft and Employees to provide Southwest's legendary Customer Service to new, popular destinations. The Company is leveraging additional airports in or near cities where its Customer base is large, along with adding easier access to popular leisure-oriented destinations from across its domestic-focused network. These additional service points on the Company's map are opportunities it can provide Customers now, all while better positioning the Company for a travel demand rebound. During 2021, the Company has begun service to new destinations including:

- Chicago O'Hare International Airport and Sarasota Bradenton International Airport - February 14, 2021
- Colorado Springs Municipal Airport and Savannah/Hilton Head International Airport - March 11, 2021
- Houston's George Bush Intercontinental Airport and Santa Barbara Airport - April 12, 2021
- Fresno Yosemite International Airport - April 25, 2021

The Company has also announced other new destinations and expected service commencement dates including:
- Destin-Fort Walton Beach Airport - May 6, 2021
- Myrtle Beach International Airport - May 23, 2021
- Bozeman Yellowstone International Airport - May 27, 2021
- Jackson-Medgar Wiley Evers International Airport in Mississippi - June 6, 2021

34

- Eugene Airport in Oregon - August 29, 2021
- Bellingham International Airport in Washington - Second half 2021

**Material Changes in Results of Operations**

**Comparison of three months ended March 31, 2021 and March 31, 2020**

**Operating Revenues**

Total operating revenues for first quarter 2021 decreased by $2.2 billion, or 51.5 percent, year-over-year, to $2.1 billion, driven primarily by the continued weak Passenger demand and bookings due to the COVID-19 pandemic throughout first quarter 2021. First quarter 2021 operating revenues per available seat mile (RASM) were 8.86 cents, and decreased 26.0 percent, compared with first quarter 2020, primarily driven by the drop in passenger demand caused by the COVID-19 pandemic, which contributed to the Load factor decrease of 3.4 points, and the passenger revenue yield decrease of 28.4 percent, year-over-year.

Passenger revenues for first quarter 2021 decreased by $2.1 billion, or 55.5 percent, year-over-year. On a unit basis, Passenger revenues decreased 32.0 percent, year-over-year. The decrease in Passenger revenues on both a dollar and unit basis was primarily due to the impact of the COVID-19 pandemic, which resulted in significant reductions in capacity and a depressed passenger demand and bookings throughout the first quarter 2021, versus primarily only impacting March in the first quarter of 2020.

Freight revenues for first quarter 2021 increased by $4 million, or 10.3 percent, compared with first quarter 2020, primarily due to increased demand as businesses reduce pandemic driven restrictions.

Other revenues for first quarter 2021 decreased by $53 million, or 15.1 percent, compared with first quarter 2020. The decrease was primarily due to a decrease in income from business partners, including Chase Bank USA, N.A. ("Chase") and the impact on spend on the Company's co-brand card, driven by the decline in consumer spending resulting from the COVID-19 pandemic.

**Operating Expenses**

Operating expenses for first quarter 2021 decreased by $2.5 billion, or 57.3 percent, compared with first quarter 2020, while capacity decreased 34.5 percent over the same prior year period. The operating expense decrease was primarily due to the $1.2 billion in grants allocated to fund eligible salaries, wages, and benefits through the Payroll Support Program Extension. Historically, except for changes in the price of fuel, changes in Operating expenses for airlines have been largely driven by changes in capacity, or ASMs. However, the Company's Operating expenses are largely fixed once flight schedules are published, and the Company has experienced significant ASM reductions as a result of flight schedule adjustments related to the COVID-19 pandemic. Flight schedule adjustments are expected to drive unit cost pressure for the duration of the COVID-19 pandemic, excluding any impacts associated with grants received under the CARES Act, the Payroll Support Program Extension, the PSP3 Payroll Support Program, or other legislation. See "COVID-19 Pandemic" above and Note 2 to the unaudited Condensed Consolidated Financial Statements for further information. The following table presents the Company's Operating expenses per ASM for the first quarter of 2021 and 2020, followed by explanations of these changes on a per ASM basis and dollar basis:

35

| (in cents, except for percentages) | Three months ended March 31, | | Per ASM change | Percent change |
| --- | --- | --- | --- | --- |
| | **2021** | **2020** | | |
| Salaries, wages, and benefits | 6.79 ¢ | 5.24 ¢ | 1.55 ¢ | 29.6 % |
| Payroll support and voluntary Employee programs, net | (6.25) | — | (6.25) | n.m. |
| Fuel and oil | 2.02 | 2.46 | (0.44) | (17.9) |
| Maintenance materials and repairs | 0.75 | 0.77 | (0.02) | (2.6) |
| Landing fees and airport rentals | 1.35 | 0.96 | 0.39 | 40.6 |
| Depreciation and amortization | 1.35 | 0.88 | 0.47 | 53.4 |
| Other operating expenses, net | 1.99 | 1.98 | 0.01 | 0.5 |
| Total | 8.00 ¢ | 12.29 ¢ | (4.29)¢ | (34.9)% |

Operating expenses per ASM for first quarter 2021 decreased by 34.9 percent, compared with first quarter 2020. The year-over-year unit cost decrease in first quarter 2021 was primarily driven by the funding received through the Payroll Support Program Extension, coupled with decreases in market jet fuel prices. These decreases were partially offset by significant capacity reductions as a result of the COVID-19 pandemic. See Note 2 to the unaudited Condensed Consolidated Financial Statements for further information. Operating expenses per ASM for first quarter 2021, excluding Fuel and oil expense, profitsharing, and special items, (a non-GAAP financial measure), increased 23.4 percent, compared with first quarter 2020. See Note Regarding Use of Non-GAAP Financial Measures and the Reconciliation of Reported Amounts to Non-GAAP Financial Measures for additional detail regarding non-GAAP financial measures. The majority of the year-over-year unit cost increase in first quarter 2021 was driven by significant capacity reductions due to the COVID-19 pandemic.

Salaries, wages, and benefits expense for first quarter 2021 decreased by $283 million, or 15.3 percent, compared with first quarter 2020. On a per ASM basis, first quarter 2021 Salaries, wages, and benefits expense increased 29.6 percent, compared with first quarter 2020, as the dollar decrease was more than offset by the 34.5 percent decrease in capacity. On a dollar basis, the decrease was primarily driven by lower salaries, wages, and benefits expense, as a result of Voluntary Separation Program 2020, Extended ETO, and other time off programs offered by the Company.

Payroll support and voluntary Employee programs, net for first quarter 2021 was a net decrease to expense of $1.4 billion, compared with no amounts for first quarter 2020. On a per ASM basis, first quarter 2021 Payroll support and voluntary Employee programs, net was a net reduction of 6.25 cents. During first quarter 2021, the items included in this line item include:

- $1.2 billion of Payroll Support Program Extension proceeds;
- $116 million of the Employee Retention Tax Credit for continuing to pay Employees' salaries during the time they were not working as a result of the decline in business due to the pandemic; and
- A $115 million net reduction in the Extended ETO liability.

See Note 2 to the unaudited Condensed Consolidated Financial Statements for further information.

Fuel and oil expense for first quarter 2021 decreased by $401 million, or 46.1 percent, compared with first quarter 2020. On a per ASM basis, first quarter 2021 Fuel and oil expense decreased 17.9 percent, due primarily to lower market jet fuel prices. On a dollar basis, the majority of the decrease was attributable to a significant decrease in fuel gallons consumed, and the remainder of the decrease was due to lower market jet fuel prices. The following table provides more information on the Company's economic fuel cost per gallon, including the impact of fuel hedging premium expense and fuel derivative contracts:

36

|  | Three months ended March 31, | |
|  | 2021 | 2020 |
|---|---|---|
| Economic fuel costs per gallon | $ 1.70 | $ 1.90 |
| Fuel hedging premium expense (in millions) | $ 25 | $ 24 |
| Fuel hedging premium expense per gallon | $ 0.09 | $ 0.05 |
| Fuel hedging cash settlement gains per gallon | $ 0.01 | $ — |

See Note Regarding Use of Non-GAAP Financial Measures and the Reconciliation of Reported Amounts to Non-GAAP Financial Measures for additional detail regarding non-GAAP financial measures. The Company had a reduced schedule and lower Load factors during first quarter 2021, which, combined with the Company continuing to operate fewer of its oldest, least fuel-efficient Boeing 737-700 aircraft as a result of capacity reductions due to the COVID-19 pandemic, resulted in a year-over-year improvement of 4.7 percent in ASMs per gallons ("fuel efficiency") in first quarter 2021. While the Company expects to return more of its 737-700 aircraft to service to support planned capacity increases, second quarter 2021 fuel efficiency is currently estimated to be sequentially in line with first quarter 2021, on a nominal basis, also taking into account the return of its most fuel-efficient aircraft, the MAX, to service in March 2021.

As of April 15, 2021, on an economic basis, the Company had derivative contracts in place related to expected future fuel consumption as follows:

| Period | Maximum fuel hedged (gallons in millions) (a)(b) |
|---|---|
| Remainder of 2021 | 962 |
| 2022 | 1,220 |
| 2023 | 643 |
| Beyond 2023 | 106 |

(a) The Company's hedge position includes prices at which the Company considers "catastrophic" coverage. The maximum gallons provided are not indicative of the Company's hedge coverage at every price, but represent the highest level of coverage at a single price. See Note 4 to the unaudited Condensed Consolidated Financial Statements for further information.
(b) The Company holds derivative contracts at various Brent crude oil, West Texas Intermediate ("WTI") crude oil, and heating oil price levels to provide protection against energy market price fluctuations. These gallons that are covered by derivative contracts represent the maximum number of gallons hedged for each respective period, which may be at different strike prices and at strike prices materially higher than the current market prices. The volume of gallons covered by derivative contracts that ultimately get exercised in any given period may vary significantly from the volumes provided, as market prices and the Company's fuel consumption fluctuates.

As a result of applying hedge accounting in prior periods, the Company has amounts in Accumulated other comprehensive income (loss) ("AOCI") that will be recognized in earnings in future periods when the underlying fuel derivative contracts settle. The following table displays the Company's estimated fair value of remaining fuel derivative contracts (not considering the impact of the cash collateral provided to or received from counterparties—see Note 4 to the unaudited Condensed Consolidated Financial Statements for further information), as well as the deferred amounts in AOCI at March 31, 2021, and the expected future periods in which these items are expected to settle and/or be recognized in earnings (in millions):

| Year | Fair value of fuel derivative contracts at March 31, 2021 | Amount of gains (losses) deferred in AOCI at March 31, 2021 (net of tax) |
|---|---|---|
| Remainder of 2021 | $ 33 | $ (26) |
| 2022 | 140 | 28 |
| 2023 | 64 | 5 |
| Beyond 2023 | 12 | 2 |
| Total | $ 249 | $ 9 |

Assuming no changes to the Company's current fuel derivative portfolio, but including all previous hedge activity for fuel derivatives that have not yet settled, and considering only the expected net cash receipts related to hedges that will settle, the Company is providing the below sensitivity table for second quarter 2021 and full year 2021 jet fuel prices at different crude oil assumptions as of April 15, 2021, and for expected premium costs associated with settling contracts.

| Average Brent Crude Oil price per barrel | Estimated economic fuel price per gallon, including taxes and fuel hedging premiums (e) | |
| --- | --- | --- |
| | Second Quarter 2021 (c) | Full Year 2021 (d) |
| $40 | $1.35 - $1.45 | $1.35 - $1.45 |
| $50 | $1.55 - $1.65 | $1.55 - $1.65 |
| **Current Market (a)** | **$1.85 - $1.95** | **$1.85 - $1.95** |
| $70 | $1.90 - $2.00 | $1.90 - $2.00 |
| $80 | $2.00 - $2.10 | $2.00 - $2.10 |
| $90 | $2.10 - $2.20 | $2.10 - $2.20 |
| Estimated fuel hedging premium expense per gallon (b) | $0.06 | (f) |
| Estimated premium costs (b) | $25 million | $100 million |

(a) Brent crude oil average market prices as of April 15, 2021, were approximately $66 and $64 per barrel for second quarter 2021 and full year 2021, respectively.
(b) Fuel hedging premium expense per gallon is included in the Company's estimated economic fuel price per gallon estimates above.
(c) Based on the Company's existing fuel derivative contracts and market prices as of April 15, 2021, second quarter 2021 economic fuel costs are estimated to be in the $1.85 to $1.95 per gallon range, including fuel hedging premium expense of approximately $25 million, or $0.06 per gallon, and $0.01 per gallon in favorable cash settlements from fuel derivative contracts. See Note Regarding Use of Non-GAAP Financial Measures.
(d) Based on the Company's existing fuel derivative contracts and market prices as of April 15, 2021, annual 2021 economic fuel costs are estimated to be in the $1.85 to $1.95 per gallon range, including fuel hedging premium expense of approximately $100 million and no cash settlements from fuel derivative contracts, on a per gallon basis. See Note Regarding Use of Non-GAAP Financial Measures.
(e) Economic fuel cost projections do not reflect the potential impact of special items because the Company cannot reliably predict or estimate the hedge accounting impact associated with the volatility of the energy markets, the impact of COVID-19 cases on air travel demand, or the impact to the Company's financial statements in future periods. Accordingly, the Company believes a reconciliation of non-GAAP financial measures to the equivalent GAAP financial measures for projected results is not meaningful or available without unreasonable effort. See Note Regarding Use of Non-GAAP Financial Measures.
(f) Due to continued uncertainty regarding available seat mile plans for 2021, the Company cannot reasonably provide an estimate for its full year 2021 fuel hedging premium expense per gallon.

Maintenance materials and repairs expense for first quarter 2021 decreased by $99 million, or 36.4 percent, compared with first quarter 2020. On a per ASM basis, Maintenance materials and repairs expense decreased 2.6 percent, as the dollar decrease was largely offset by the 34.5 percent decrease in capacity in response to the COVID-19 pandemic. On a dollar basis, approximately 50 percent of the decrease was due to lower engine maintenance expense due to the reduction in flight hours and the majority of the remainder of the decrease was due to reduced operations and placing a portion of the fleet in storage.

Landing fees and airport rentals expense for first quarter 2021 decreased by $26 million, or 7.7 percent, compared with first quarter 2020. On a per ASM basis, Landing fees and airport rentals expense increased 40.6 percent, compared with first quarter 2020, as the dollar decrease was more than offset by the 34.5 percent decrease in capacity in response to the COVID-19 pandemic and as a significant portion of space rentals are essentially fixed in the short term. On a dollar basis, the decrease was primarily due to lower landing fees as a result of the reduced number of Trips flown in first quarter 2021 as a result of the COVID-19 pandemic.

Depreciation and amortization expense for first quarter 2021 increased by $1 million, or 0.3 percent, compared with first quarter 2020. On a per ASM basis, Depreciation and amortization expense increased by 53.4 percent, compared

with first quarter 2020, primarily as a result of the 34.5 percent decrease in capacity in response to the COVID-19 pandemic and continued storage of a portion of the Company's fleet. On a dollar basis, Depreciation and amortization expense was relatively flat as the Company reduced capital expenditures in response to the pandemic.

Other operating expenses, net for first quarter 2021 decreased by $235 million, or 33.7 percent, compared with first quarter 2020. Included within this line item was aircraft rentals expense in the amounts of $51 million and $57 million for the periods ended March 31, 2021 and 2020, respectively. On a per ASM basis, Other operating expenses, net increased 0.5 percent, compared with first quarter 2020, in line with the 34.5 percent decrease in capacity in response to the COVID-19 pandemic. On a dollar basis, approximately 70 percent of the decrease was due to various savings as a result of supporting a reduced operation and other efforts to reduce discretionary spend. The majority of the remainder of the decrease was due to lower credit card fees driven by a significant reduction in revenues associated with the COVID-19 pandemic.

**Other**

Other expenses (income) include interest expense, capitalized interest, interest income, and other gains and losses.

Interest expense for first quarter 2021 increased by $86 million, compared with first quarter 2020, primarily due to higher debt balances. Based on current debt outstanding and current market interest rates, the Company currently expects second quarter 2021 interest expense to be approximately $115 million.

Capitalized interest for first quarter 2021 increased by $6 million, compared with first quarter 2020, primarily due to Boeing resuming production of the Company's undelivered MAX aircraft.

Interest income for first quarter 2021 decreased by $15 million, compared with first quarter 2020, due to lower interest rates.

Other (gains) losses, net, primarily includes amounts recorded as a result of the Company's hedging activities. See Note 4 to the unaudited Condensed Consolidated Financial Statements for further information on the Company's hedging activities. The following table displays the components of Other (gains) losses, net, for the three months ended March 31, 2021 and 2020:

| (in millions) | Three months ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | 2021 | | 2020 | |
| Mark-to-market impact from fuel contracts settling in current and future periods | $ | 1 | $ | 2 |
| Premium cost of fuel contracts not designated as hedges | | 11 | | — |
| Mark-to-market impact from interest rate swap agreements | | — | | 24 |
| Other (a) | | (60) | | 2 |
| | $ | (48) | $ | 28 |

(a) See Note 1 to the unaudited Condensed Consolidated Financial Statements for further information.

**Income Taxes**

The Company's effective tax rate was approximately 20.6 percent in first quarter 2021, compared with 34.3 percent in first quarter 2020. The prior year higher first quarter tax rate was a result of the anticipated Net operating loss for full year 2020, which allowed the Company to carry back losses to receive tax refunds on amounts paid from 2015 through 2019. The Company currently estimates its annual 2021 effective tax rate to be approximately 23 percent.

39

**Reconciliation of Reported Amounts to Non-GAAP Financial Measures (excluding special items) (unaudited)**
**(in millions, except per share amounts and per ASM amounts)**

| | | Three months ended March 31, | | | Percent |
|---|---|---|---|---|---|
| | | 2021 | | 2020 | Change |
| **Fuel and oil expense, unhedged** | $ | 464 | $ | 846 | |
| Add: Premium cost of fuel contracts designated as hedges | | 14 | | 24 | |
| Deduct: Fuel hedge gains included in Fuel and oil expense, net | | (9) | | — | |
| **Fuel and oil expense, as reported** | $ | 469 | $ | 870 | |
| Add: Fuel hedge contracts settling in the current period, but for which losses were reclassified from AOCI (a) | | 8 | | — | |
| Add: Premium cost of fuel contracts not designated as hedges | | 11 | | — | |
| **Fuel and oil expense, excluding special items (economic)** | $ | 488 | $ | 870 | (43.9) |
| | | | | | |
| **Total operating expenses, net, as reported** | $ | 1,853 | $ | 4,344 | |
| Add: Payroll support and voluntary Employee programs, net | | 1,448 | | — | |
| Add: Fuel hedge contracts settling in the current period, but for which losses were reclassified from AOCI (a) | | 8 | | — | |
| Add: Interest rate swap agreements terminated in a prior period, but for which losses were reclassified from AOCI (a) | | 1 | | — | |
| Add: Premium cost of fuel contracts not designated as hedges | | 11 | | — | |
| **Total operating expenses, excluding special items** | $ | 3,321 | $ | 4,344 | (23.5)% |
| | | | | | |
| **Operating income (loss), as reported** | $ | 199 | $ | (110) | |
| Deduct: Payroll support and voluntary Employee programs, net | | (1,448) | | — | |
| Deduct: Fuel hedge contracts settling in the current period, but for which losses were reclassified from AOCI (a) | | (8) | | — | |
| Deduct: Interest rate swap agreements terminated in a prior period, but for which losses were reclassified from AOCI (a) | | (1) | | — | |
| Deduct: Premium cost of fuel contracts not designated as hedges | | (11) | | — | |
| **Operating loss, excluding special items** | $ | (1,269) | $ | (110) | n.m. |
| | | | | | |
| **Other (gains) losses, net, as reported** | $ | (48) | $ | 28 | |
| Deduct: Mark-to-market impact from fuel contracts settling in current and future periods (a) | | (1) | | (2) | |
| Deduct: Premium cost of fuel contracts not designated as hedges | | (11) | | — | |
| Deduct: Mark-to-market impact from interest rate swap agreements | | — | | (24) | |
| **Other (gains) losses, net, excluding special items** | $ | (60) | $ | 2 | n.m. |
| | | | | | |
| **Income (loss) before income taxes, as reported** | $ | 146 | $ | (144) | |
| Deduct: Payroll support and voluntary Employee programs, net | | (1,448) | | — | |
| Deduct: Fuel hedge contracts settling in the current period, but for which losses were reclassified from AOCI (a) | | (8) | | — | |
| Deduct: Interest rate swap agreements terminated in a prior period, but for which losses were reclassified from AOCI (a) | | (1) | | — | |
| Add: Mark-to-market impact from fuel contracts settling in current and future periods | | 1 | | 2 | |
| Add: Mark-to-market impact from interest rate swap agreements | | — | | 24 | |
| **Loss before income taxes, excluding special items** | $ | (1,310) | $ | (118) | n.m. |
| | | | | | |
| **Provision (benefit) for income taxes, as reported** | $ | 30 | $ | (50) | |
| Add (Deduct): Net income (loss) tax impact of fuel and special items (b) | | (325) | | 9 | |
| **Benefit for income taxes, net, excluding special items** | $ | (295) | $ | (41) | n.m. |

| | Three months ended March 31, | | | | Percent |
| --- | --- | --- | --- | --- | --- |
| | **2021** | | **2020** | | **Change** |
| **Net income (loss), as reported** | $ | 116 | $ | (94) | |
| Deduct: Payroll support and voluntary Employee programs, net | | (1,448) | | — | |
| Deduct: Fuel hedge contracts settling in the current period, but for which losses were reclassified from AOCI (a) | | (8) | | — | |
| Deduct: Interest rate swap agreements terminated in a prior period, but for which losses were reclassified from AOCI (a) | | (1) | | — | |
| Add: Mark-to-market impact from fuel contracts settling in current and future periods (a) | | 1 | | 2 | |
| Add: Mark-to-market impact from interest rate swap agreements | | — | | 24 | |
| Add (Deduct): Net income (loss) tax impact of special items (b) | | 325 | | (9) | |
| **Net loss, excluding special items** | $ | (1,015) | $ | (77) | n.m. |
| | | | | | |
| **Net income (loss) per share, diluted, as reported** | $ | 0.19 | $ | (0.18) | |
| Add (Deduct): Impact of special items | | (2.38) | | 0.05 | |
| Deduct: Net impact of net income (loss) above from fuel contracts divided by dilutive shares | | (0.01) | | — | |
| Add (Deduct): Net income (loss) tax impact of special items (b) | | 0.53 | | (0.02) | |
| Deduct: GAAP to Non-GAAP diluted weighted average shares difference (c) | | (0.05) | | — | |
| **Net loss per share, diluted, excluding special items** | $ | (1.72) | $ | (0.15) | n.m. |
| | | | | | |
| **Operating expenses per ASM (cents)** | | 8.00 ¢ | | 12.29 ¢ | |
| Add: Impact of special items | | 6.25 | | — | |
| Deduct: Fuel and oil expense divided by ASMs | | (2.02) | | (2.46) | |
| Deduct: Profitsharing expense divided by ASMs | | (0.10) | | — | |
| **Operating expenses per ASM, excluding Fuel and oil expense, profitsharing, and special items (cents)** | | 12.13 ¢ | | 9.83 ¢ | 23.4% |

(a) See Note 4 to the unaudited Condensed Consolidated Financial Statements for further information.

(b) Tax amounts for each individual special item are calculated at the Company's effective rate for the applicable period and totaled in this line item.

(c) Adjustment related to GAAP and Non-GAAP diluted weighted average shares difference, due to the Company being in a Net income position on a GAAP basis versus a Net loss position on a Non-GAAP basis. See Note 7 to the unaudited Condensed Consolidated Financial Statements for further information.

41

**Note Regarding Use of Non-GAAP Financial Measures**

The Company's unaudited Condensed Consolidated Financial Statements are prepared in accordance with accounting principles generally accepted in the United States ("GAAP"). These GAAP financial statements may include (i) unrealized noncash adjustments and reclassifications, which can be significant, as a result of accounting requirements and elections made under accounting pronouncements relating to derivative instruments and hedging and (ii) other charges and benefits the Company believes are unusual and/or infrequent in nature and thus may make comparisons to its prior or future performance difficult.

As a result, the Company also provides financial information in this filing that was not prepared in accordance with GAAP and should not be considered as an alternative to the information prepared in accordance with GAAP. The Company provides supplemental non-GAAP financial information (also referred to as "excluding special items"), including results that it refers to as "economic," which the Company's management utilizes to evaluate its ongoing financial performance and the Company believes provides additional insight to investors as supplemental information to its GAAP results. The non-GAAP measures provided that relate to the Company's performance on an economic fuel cost basis include Fuel and oil expense, non-GAAP; Total operating expenses, non-GAAP; Operating loss, non-GAAP; Other (gains) losses, net, non-GAAP; Loss before income taxes, non-GAAP; Benefit for income taxes, net, non-GAAP; Net loss, non-GAAP; Net loss per share, diluted, non-GAAP; and Operating expenses per ASM, non-GAAP, excluding Fuel and oil expense and profitsharing (cents). The Company's economic Fuel and oil expense results differ from GAAP results in that they only include the actual cash settlements from fuel hedge contracts - all reflected within Fuel and oil expense in the period of settlement. Thus, Fuel and oil expense on an economic basis has historically been utilized by the Company, as well as some of the other airlines that utilize fuel hedging, as it reflects the Company's actual net cash outlays for fuel during the applicable period, inclusive of settled fuel derivative contracts. Any net premium costs paid related to option contracts that are designated as hedges are reflected as a component of Fuel and oil expense, for both GAAP and non-GAAP (including economic) purposes in the period of contract settlement. The Company believes these economic results provide further insight into the impact of the Company's fuel hedges on its operating performance and liquidity since they exclude the unrealized, noncash adjustments and reclassifications that are recorded in GAAP results in accordance with accounting guidance relating to derivative instruments, and they reflect all cash settlements related to fuel derivative contracts within Fuel and oil expense. This enables the Company's management, as well as investors and analysts, to consistently assess the Company's operating performance on a year-over-year or quarter-over-quarter basis after considering all efforts in place to manage fuel expense. However, because these measures are not determined in accordance with GAAP, such measures are susceptible to varying calculations, and not all companies calculate the measures in the same manner. As a result, the aforementioned measures, as presented, may not be directly comparable to similarly titled measures presented by other companies.

Further information on (i) the Company's fuel hedging program, (ii) the requirements of accounting for derivative instruments, and (iii) the causes of hedge ineffectiveness and/or mark-to-market gains or losses from derivative instruments is included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2020 and Note 4 to the unaudited Condensed Consolidated Financial Statements.

The Company's GAAP results in the applicable periods may include other charges or benefits that are also deemed "special items," that the Company believes make its results difficult to compare to prior periods, anticipated future periods, or industry trends. Financial measures identified as non-GAAP (or as excluding special items) have been adjusted to exclude special items. For the periods presented, in addition to the items discussed above, special items include:

1. Proceeds related to the Payroll Support Program Extension, which were used to pay a portion of Employee salaries, wages, and benefits;
2. Charges and adjustments to previously accrued amounts related to the Company's extended leave program;
3. Adjustments for prior period losses reclassified from AOCI associated with forward-starting interest rate swap agreements that were terminated in prior periods related to eleven 737 MAX 8 aircraft leases; and

42

4.  Unrealized losses related to nine forward-starting interest rate swap agreements. During first quarter 2020, the interest rate swap agreements, which were related to nine 737 MAX 8 aircraft leases (with deliveries originally scheduled between June 2020 and September 2020), were de-designated as hedges due to the scheduled delivery range no longer being probable, resulting in the mark-to-market changes being recorded to earnings.

Because management believes special items can distort the trends associated with the Company's ongoing performance as an airline, the Company believes that evaluation of its financial performance can be enhanced by a supplemental presentation of results that exclude the impact of special items in order to enhance consistency and comparativeness with results in prior periods that do not include such items and as a basis for evaluating operating results in future periods. The following measures are often provided, excluding special items, and utilized by the Company's management, analysts, and investors to enhance comparability of year-over-year results, as well as to industry trends: Fuel and oil expense, non-GAAP; Total operating expenses, non-GAAP; Operating loss, non-GAAP; Other (gains) losses, net, non-GAAP; Loss before income taxes, non-GAAP; Benefit for income taxes, net, non-GAAP; Net loss, non-GAAP; Net loss per share, diluted, non-GAAP; and Operating expenses per ASM, non-GAAP, excluding Fuel and oil expense and profitsharing (cents).

The Company has also utilized and provided average cash burn and average daily core cash burn which are non-GAAP financial measures. Cash burn is a supplemental measure that most U.S. airlines began providing in 2020 to measure liquidity in light of the negative financial effects of the pandemic. The Company utilizes average daily core cash burn to monitor the performance of its core business as a proxy for its ability to achieve sustainable break-even or positive results on a cash basis. Cash burn methodology may vary by airline, but see the Company's calculation of cash burn below:

| (in millions, except for Days in the period) | Three months ended March 31, 2021 |
|---|---|
| **Loss before income taxes, non-GAAP** | $ (1,310) |
| Depreciation and amortization expense | 312 |
| Capital expenditures | (95) |
| Debt service payments | (67) |
| **Core cash burn** | $ (1,160) |
| | |
| **Days in the period** | 90 |
| | |
| **Average daily core cash burn** | $ (13) |
| | |
| **Core cash burn, prior to changes in working capital** | $ (1,160) |
| Increase in Air traffic liability | 599 |
| Payments associated with Voluntary Employee Programs | (188) |
| Other (a) | 315 |
| **Core cash burn, adjusted for changes in working capital** | $ (434) |
| | |
| **Days in the period** | 90 |
| | |
| **Average daily core cash burn, adjusted for changes in working capital** | $ (5) |

(a) Adjustment primarily related to the prepayment in fourth quarter 2020 from Chase for Rapid Reward points expected to be purchased in 2021. See Note 9 to the unaudited condensed Consolidated Financial Statements for further information.

43

**Liquidity and Capital Resources**

The enormous impact of the COVID-19 pandemic on the U.S. travel industry created an urgent liquidity crisis for the entire airline industry, including the Company. However, due to the Company's pre-pandemic low balance sheet leverage, large base of unencumbered assets, and investment-grade credit ratings, the Company was able to quickly access additional liquidity during 2020 and 2021, as Customer cancellations spiked and sales and revenues dropped while the Company continued to experience significant fixed operating expenses. See Note 2 to the unaudited Condensed Consolidated Financial Statements for further information regarding the impact of the COVID-19 pandemic and assistance obtained under the CARES Act, Payroll Support Program Extension, and PSP3 Payroll Support Program. Much uncertainty remains about the time it will take for air travel demand to recover, and the Company continues to assess its immediate and near-term liquidity needs. The Company also continues to assess various sources and options including public and private financings to bolster its liquidity and believes that, given current market conditions, it has opportunities to do so.

Net cash provided by operating activities was $645 million for the three months ended March 31, 2021, compared with $377 million used in operating activities in the same prior year period. Operating cash inflows are primarily derived from providing air transportation to Customers. The vast majority of tickets are purchased prior to the day on which travel is provided and, in some cases, several months before the anticipated travel date. Operating cash outflows are related to the recurring expenses of airline operations. The operating cash flows for both periods presented, were affected primarily by the COVID-19 pandemic, which resulted in a significant drop in travel demand, sales, and revenues. Operating cash flows for the three months ended March 31, 2021, included $1.2 billion in Payroll Support Program Extension grant proceeds received as part of the Consolidated Appropriations Act, 2021 of which nearly all of this direct payroll support was used to offset eligible costs and thus included in operating activities, with the remaining $23 million allocated to the value of PSP2 Warrants issued and thus included in financing activities. These net increases in operating cash flows were also a result of a $599 million increase in Air traffic liability driven by increased ticket sales related to an increase in leisure travel demand. For the three months ended March 31, 2020, the operating cash flows were affected primarily by a $1.3 billion decrease in Accounts payable and accrued expenses, primarily due to the Company's payout of its 2019 $667 million ProfitSharing distribution to Employees in March 2020, as well as a significant decline in amounts payable for passenger excise taxes and segment fees as a result of the March 2020 drop in passenger ticket sales. These were partially offset by a $701 million increase in Air traffic liability. The increase in Air traffic liability resulted from January and February 2020 bookings, which were then significantly impacted by a decline in Customer demand and increased trip cancellations attributable to concerns relating to the COVID-19 pandemic, primarily in March 2020. Historically, the Company has also used net cash provided by operations to fund stock repurchases and pay dividends; however these shareholder return activities have been suspended due to restrictions associated with the payroll assistance under the CARES Act, Payroll Support Program Extension, and PSP3 Payroll Support Program. See Note 2 to the unaudited Condensed Consolidated Financial Statements for further information.

Net cash used in investing activities totaled $201 million during the three months ended March 31, 2021, compared with $5 million used in the same prior year period. Investing activities in both years included Capital expenditures, and changes in the balance of the Company's short-term and noncurrent investments. During the three months ended March 31, 2021, Capital expenditures were $95 million, compared with $224 million in the same prior year period. Capital expenditures decreased, year-over-year, largely due to a decrease in technology project expenditures and several projects being placed into service since March 31, 2020. In addition, the Company did not make progress payments on future deliveries during the three months ended March 31, 2021, compared to the same prior year period, when progress payments were made. See Notes 2 and 11 to the unaudited Condensed Consolidated Financial Statements for further information. As a result of previously agreed upon delivery credits provided by Boeing to the Company due to the settlement of 2020 estimated damages relating to the FAA grounding of the 737 MAX aircraft and progress payments made to date on undelivered aircraft, the Company currently estimates no aircraft capital expenditures in 2021. Therefore, the Company currently estimates its annual 2021 capital expenditures to be approximately $500 million, driven primarily by technology, facilities, and operational investments. The Company cannot predict when the effects of the COVID-19 pandemic on air travel will end, but

44

the Company expects that its capital expenditures will increase from current levels if U.S. air travel returns to pre-pandemic levels.

Net cash provided by financing activities was $464 million during the three months ended March 31, 2021, compared with $1.8 billion provided by financing activities for the same prior year period. During the three months ended March 31, 2021, the Company borrowed $488 million of loan proceeds under the Payroll Support Program Extension. See Note 2 to the unaudited Condensed Consolidated Financial Statements for further information. The Company repaid $67 million in debt and finance lease obligations during the three months ended March 31, 2021, and is scheduled to repay approximately $153 million in debt and finance lease obligations during the remainder of 2021. During the three months ended March 31, 2020, the Company borrowed $2.5 billion, through various transactions, in order to improve its liquidity position as a result of the onset of the pandemic. The Company also repurchased $451 million of its outstanding common stock, paid $188 million in cash dividends to Shareholders, and repaid $78 million in debt and finance lease obligations.

Average daily core cash burn was approximately $13 million in first quarter 2021, compared with fourth quarter 2020 average core cash burn of $12 million per day. Average core cash burn was approximately $9 million per day in March 2021. Including changes in working capital — most notably, cash flow from future bookings — average core cash flow turned positive in March 2021, and the Company generated approximately $4 million per day, as revenue and booking trends improved. The Company's average core cash burn (which excludes changes in working capital) in second quarter 2021 is currently estimated to be in the range of approximately $2 million to $4 million per day. Based on current booking trends and cost outlook, the Company is hopeful it can achieve breakeven average core cash flow, or better, by June 2021. Cash burn is a supplemental measure that most U.S. airlines began providing in 2020 to measure liquidity in light of the negative financial effects of the pandemic. Average daily core cash burn is calculated as Loss before income taxes, non-GAAP, adjusted for Depreciation and amortization expense; Capital expenditures; and adjusted amortizing debt service payments; divided by the number of days in the period. The Company utilizes average daily core cash burn to monitor the performance of its core business as a proxy for its ability to achieve sustainable break-even or positive results on a cash basis. Average core cash burn projections do not reflect the potential impact of special items because the Company cannot reliably predict or estimate those items or expenses or their impact to its financial statements in future periods. Accordingly, the Company believes a reconciliation of non-GAAP financial measures to the equivalent GAAP financial measures for projected results is not meaningful or available without unreasonable effort. See Note Regarding Use of Non-GAAP Financial Measures and the Reconciliation of Reported Amounts to Non-GAAP Financial Measures for additional detail regarding non-GAAP financial measures including the cash burn formula.

Utilizing an alternative cash burn approach, which adjusts for changes in working capital, among other items, the Company's first quarter 2021 daily cash burn was approximately $5 million. Cash burn methodology varies by airline, and the Company's first quarter 2021 average daily core cash burn of $13 million may differ materially by utilizing cash burn calculations that adjust for changes in working capital.

The Company is a "well-known seasoned issuer" and currently has an effective shelf registration statement registering an indeterminate amount of debt and equity securities for future sales. The Company currently intends to use the proceeds from any future securities sales off this shelf registration statement for general corporate purposes.

The Company has access to $1.0 billion under its Amended and Restated Revolving Credit Facility, as amended (the "Revolving Credit Facility"). The Revolving Credit Facility has an accordion feature that would allow the Company, subject to, among other things, the procurement of incremental commitments, to increase the size of the facility to $1.5 billion. Interest on the facility is based on the Company's credit ratings at the time of borrowing. At the Company's current ratings, the interest cost would be LIBOR plus a spread of 200.0 basis points. The facility contains a financial covenant to maintain total liquidity, as defined in the Revolving Credit Facility, of $1.5 billion at all times under the Revolving Credit Facility; the Company was compliant with this requirement as of March 31, 2021. There were no amounts outstanding under the Revolving Credit Facility as of March 31, 2021.

45

Although not the case at March 31, 2021, due to the Company's significant financing activities, the Company has historically carried a working capital deficit, in which its current liabilities exceed its current assets. This is common within the airline industry and is primarily due to the nature of the Air traffic liability account, which is related to advance ticket sales, unused funds available to Customers, and loyalty deferred revenue, which are performance obligations for future Customer flights, do not require future settlement in cash, and are mostly nonrefundable. See Note 6 to the unaudited Condensed Consolidated Financial Statements for further information. The Company has various options available to meet its capital and operating commitments, including unrestricted cash and short-term investments of $14.3 billion as of March 31, 2021, and anticipated future internally generated funds from operations. However, the COVID-19 pandemic continues to evolve and could have a material adverse impact on the Company's ability to meet its capital and operating commitments. See Note 2 to the unaudited Condensed Consolidated Financial Statements for further information on the impacts of the COVID-19 pandemic. The Company will continue to consider various financing options to maximize liquidity and supplement cash requirements, as necessary.

On March 24, 2021, the Company entered into the Supplement to its aircraft purchase agreement with Boeing relating to the Company's purchase of Boeing 737 MAX 7 and 737 MAX 8 aircraft. Pursuant to the Supplement (i) the Company added 100 firm orders for the MAX 7, with the first 30 to be delivered in 2022; (ii) the Company added 155 MAX aircraft options; (iii) the order book was extended to include deliveries through 2031; and (iv) the Company converted 70 MAX 8 firm orders to MAX 7 firm orders. The Supplement also includes certain confidential credits, discounts, and other concessions provided to the Company by Boeing.

The following table details information on the aircraft in the Company's fleet as of March 31, 2021:

| Type | Seats | Average Age (Yrs) | Number of Aircraft | | Number Owned | Number Leased |
|---|---|---|---|---|---|---|
| 737-700 | 143 | 16 | 462 | (a) | 370 | 92 |
| 737-800 | 175 | 6 | 207 | | 190 | 17 |
| 737 MAX 8 | 175 | 2 | 61 | (a) | 33 | 28 |
| Totals | | 12 | 730 | | 593 | 137 |

(a) Included 59 Boeing 737 Next Generation and 7 Boeing 737 MAX 8 aircraft removed from active fleet and in temporary storage as of March 31, 2021.

**Cautionary Statement Regarding Forward-Looking Statements**

This Form 10-Q contains "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Forward-looking statements are based on, and include statements about, the Company's estimates, expectations, beliefs, intentions, and strategies for the future, and the assumptions underlying these forward-looking statements. Specific forward-looking statements can be identified by the fact that they do not relate strictly to historical or current facts and include, without limitation, statements related to the following:

- the Company's expectations related to payroll support pursuant to the American Rescue Plan Act of 2021;
- the Company's financial outlook, expectations, and projected results of operations, including underlying assumptions and estimates, in particular related to the anticipated lessening of the negative impact of the COVID-19 pandemic;
- the Company's capacity plans and expectations, including underlying assumptions and estimates, in particular related to the anticipated lessening of the negative impact of the COVID-19 pandemic on demand and bookings;
- the Company's fleet plans and related expectations;
- the Company's initiatives, including its environmental sustainability goal;
- the Company's network plans and related expectations;
- the Company's plans, expectations, and estimates related to fuel efficiency and fuel costs and the Company's related management of risk associated with changing jet fuel prices, including the assumptions underlying the estimates;
- the Company's expectations with respect to capital expenditures, cash burn/cash flows, and liquidity, including its ability to meet its ongoing capital, operating, and other obligations, and the Company's anticipated needs for, and sources of, funds;
- the Company's assessment of market risks; and
- the Company's plans and expectations related to legal and regulatory proceedings.

While management believes these forward-looking statements are reasonable as and when made, forward-looking statements are not guarantees of future performance and involve risks and uncertainties that are difficult to predict. Therefore, actual results may differ materially from what is expressed in or indicated by the Company's forward-looking statements or from historical experience or the Company's present expectations. Factors that could cause these differences include, among others:

- the extent of the COVID-19 pandemic, including the duration, spread, severity, and any recurrence of the COVID-19 pandemic, including through any new variant strains of the underlying virus; the effectiveness and availability of vaccines; the duration and scope of related government orders and restrictions; the duration and scope of the Company's actions to address Customer and Employee health concerns; the extent of the impact of the COVID-19 pandemic on overall demand for air travel and the Company's related business plans and decisions; any negative impact of the COVID-19 pandemic on the Company's ability to retain key Employees; and any negative impact of the COVID-19 pandemic on the Company's access to capital;
- the impact of fears or actual outbreaks of other diseases, economic conditions, extreme or severe weather and natural disasters, fears of terrorism or war, actions of competitors, consumer perception, and other factors beyond the Company's control, on consumer behavior and the Company's results of operations and business decisions, plans, strategies, and results;
- the Company's dependence on Boeing with respect to the Company's fleet order book, delivery schedule, and other performance requirements under its agreements with the Company, including with respect to the Company's ability to return all of its MAX aircraft to revenue service;
- the Company's and Boeing's dependence on other third-party providers to perform in accordance with expectations in connection with the manufacture and delivery of aircraft;
- the impact of the Company's obligations and restrictions related to its participation in the U.S. Treasury's payroll support programs, including restrictions and obligations associated with its loans from, and warrants

47

issued to, the U.S. Treasury; and any related negative impact on the Company' ability to retain key Employees;

- the enactment or adoption of future laws, statutes, and regulations and interpretations or enforcement of current and future laws, statutes, and regulations that affect the terms or application of the Company's payroll support agreements with the U.S. Treasury and that may have a material adverse effect on the Company;
- the impact of governmental actions and governmental regulations on the Company's plans, strategies, financial results, and operations;
- the Company's ability to timely and effectively implement, transition, and maintain the necessary information technology systems and infrastructure to support its operations and initiatives;
- the impact of fuel price changes, fuel price volatility, volatility of commodities used by the Company for hedging jet fuel, and any changes to the Company's fuel hedging strategies and positions, on the Company's business plans and results of operations; and
- other factors as set forth in the Company's filings with the Securities and Exchange Commission, including the detailed factors discussed under the heading "Risk Factors" in the Company's Annual Report on Form 10-K for the year ended December 31, 2020.

Caution should be taken not to place undue reliance on the Company's forward-looking statements, which represent the Company's views only as of the date this report is filed. The Company undertakes no obligation to update publicly or revise any forward-looking statement, whether as a result of new information, future events or otherwise.

48

**Item 3.** Quantitative and Qualitative Disclosures About Market Risk

*Hedging*

As discussed in Note 4 to the unaudited Condensed Consolidated Financial Statements, the Company endeavors to acquire jet fuel at the lowest possible price and to reduce volatility in operating expenses through its fuel hedging program with the use of financial derivative instruments. At March 31, 2021, the estimated fair value of outstanding contracts was an asset of $249 million.

The Company's credit exposure related to fuel derivative instruments is represented by the fair value of contracts that are in an asset position to the Company. At such times, these outstanding instruments expose the Company to credit loss in the event of nonperformance by the counterparties to the agreements. As of March 31, 2021, the Company had nine counterparties for which the derivatives held were an asset. To manage credit risk, the Company selects and periodically reviews counterparties based on credit ratings, limits its exposure with respect to each counterparty, and monitors the market position of the fuel hedging program and its relative market position with each counterparty. However, if one or more of these counterparties were in a liability position to the Company and were unable to meet their obligations, any open derivative contracts with the counterparty could be subject to early termination, which could result in substantial losses for the Company. At March 31, 2021, the Company had agreements with all of its active counterparties containing early termination rights and/or bilateral collateral provisions whereby security is required if market risk exposure exceeds a specified threshold amount based on the counterparty's credit rating. The Company also had agreements with counterparties in which cash deposits and/or letters of credit are required to be posted as collateral whenever the net fair value of derivatives associated with those counterparties exceeds specific thresholds.

At March 31, 2021, $72 million in cash collateral deposits were held by the Company from counterparties based on the Company's outstanding fuel derivative instrument portfolio. Due to the types of derivatives held as of March 31, 2021, the Company does not have cash collateral exposure. See Note 4 to the unaudited Condensed Consolidated Financial Statements.

The Company is also subject to the risk that the fuel derivatives it uses to hedge against fuel price volatility do not provide adequate protection. The Company has found that financial derivative instruments in commodities, such as WTI crude oil, Brent crude oil, and refined products, such as heating oil and unleaded gasoline, can be useful in decreasing its exposure to jet fuel price volatility. In addition, to add further protection, the Company may periodically enter into jet fuel derivatives for short-term timeframes. Jet fuel is not widely traded on an organized futures exchange and, therefore, there are limited opportunities to hedge directly in jet fuel for time horizons longer than approximately 24 months into the future.

*Financial Market Risk*

The Company currently has agreements with organizations that process credit card transactions arising from purchases of air travel tickets by its Customers utilizing American Express, Discover, and MasterCard/VISA. Credit card processors have financial risk associated with tickets purchased for travel because the processor generally forwards the cash related to the purchase to the Company soon after the purchase is completed, but the air travel generally occurs after that time; therefore, the processor will have liability if the Company does not ultimately provide the air travel. Under these processing agreements, and based on specified conditions, increasing amounts of cash reserves could be required to be posted with the counterparty. There was no cash reserved for this purpose as of March 31, 2021.

A majority of the Company's sales transactions are processed by Chase Paymentech. Should chargebacks processed by Chase Paymentech reach a certain level, proceeds from advance ticket sales could be held back and used to establish a reserve account to cover such chargebacks and any other disputed charges that might occur. Additionally, cash reserves are required to be established if the Company's credit rating falls to specified levels

below investment grade. Cash reserve requirements are based on the Company's public debt rating and a corresponding percentage of the Company's Air traffic liability. As of March 31, 2021, no holdbacks were in place.

See Item 7A "Quantitative and Qualitative Disclosures About Market Risk" in the Company's Annual Report on Form 10-K for the year ended December 31, 2020, for further information about market risk, and Note 4 to the unaudited Condensed Consolidated Financial Statements in this Form 10-Q for further information about the Company's fuel derivative instruments.

50

**Item 4.** Controls and Procedures

Disclosure Controls and Procedures

The Company maintains disclosure controls and procedures (as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934 (the "Exchange Act")) designed to provide reasonable assurance that the information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the Securities and Exchange Commission's rules and forms. These include controls and procedures designed to ensure that this information is accumulated and communicated to the Company's management, including its Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. Management, with the participation of the Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures as of March 31, 2021. Based on this evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective as of March 31, 2021, at the reasonable assurance level.

Changes in Internal Control over Financial Reporting

There were no changes in the Company's internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) during the fiscal quarter ended March 31, 2021, that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

PART II. OTHER INFORMATION

**Item 1.**    Legal Proceedings

On June 30, 2015, the U.S. Department of Justice ("DOJ") issued a Civil Investigative Demand ("CID") to the Company. The CID seeks information and documents about the Company's capacity from January 2010 to the date of the CID, including public statements and communications with third parties about capacity. In June 2015, the Company also received a letter from the Connecticut Attorney General requesting information about capacity. The Company is cooperating fully with the DOJ CID and the state inquiry.

Further, on July 1, 2015, a complaint was filed in the United States District Court for the Southern District of New York on behalf of putative classes of consumers alleging collusion among the Company, American Airlines, Delta Air Lines, and United Airlines to limit capacity and maintain higher fares in violation of Section 1 of the Sherman Act. Since then, a number of similar class action complaints were filed in the United States District Courts for the Central District of California, the Northern District of California, the District of Columbia, the Middle District of Florida, the Southern District of Florida, the Northern District of Georgia, the Northern District of Illinois, the Southern District of Indiana, the Eastern District of Louisiana, the District of Minnesota, the District of New Jersey, the Eastern District of New York, the Southern District of New York, the Middle District of North Carolina, the District of Oklahoma, the Eastern District of Pennsylvania, the Northern District of Texas, the District of Vermont, and the Eastern District of Wisconsin. On October 13, 2015, the Judicial Panel on Multi-District Litigation centralized the cases to the United States District Court in the District of Columbia. On March 25, 2016, the plaintiffs filed a Consolidated Amended Complaint in the consolidated cases alleging that the defendants conspired to restrict capacity from 2009 to present. The plaintiffs seek to bring their claims on behalf of a class of persons who purchased tickets for domestic airline travel on the defendants' airlines from July 1, 2011 to present. They seek treble damages, injunctive relief, and attorneys' fees and expenses. On May 11, 2016, the defendants moved to dismiss the Consolidated Amended Complaint, and on October 28, 2016, the Court denied this motion. On December 20, 2017, the Company reached an agreement to settle these cases with a proposed class of all persons who purchased domestic airline transportation services from July 1, 2011, to the date of the settlement. The Company agreed to pay $15 million and to provide certain cooperation with the plaintiffs as set forth in the settlement agreement. The Court granted preliminary approval of the settlement on January 3, 2018, and the plaintiffs provided notice to the proposed settlement class. The Court held a fairness hearing on March 22, 2019, and it issued an order granting final approval of the settlement on May 9, 2019. On June 10, 2019, three sets of objectors filed notices of appeal to the United States Court of Appeals for the District of Columbia Circuit. Two sets of the objectors dismissed their appeals, and the Company and the other settling parties moved to dismiss the remaining appeal because the district court did not certify the approval order as appealable. The court of appeals ordered the parties to brief the jurisdictional issue and the merits of the objections raised in the appeal, and oral argument was held on April 14, 2021. The case is continuing as to the remaining defendants. The Company denies all allegations of wrongdoing.

On July 11, 2019, a complaint alleging violations of federal and state laws and seeking certification as a class action was filed against Boeing and the Company in the United States District Court for the Eastern District of Texas in Sherman. The complaint alleges that Boeing and the Company colluded to conceal defects with the MAX aircraft in violation of the Racketeer Influenced and Corrupt Organization Act ("RICO") and also asserts related state law claims based upon the same alleged facts. The complaint seeks damages on behalf of putative classes of customers who purchased tickets for air travel from either the Company or American Airlines between August 29, 2017, and March 13, 2019. The complaint generally seeks money damages, equitable monetary relief, injunctive relief, declaratory relief, and attorneys' fees and other costs. On September 13, 2019, the Company filed a motion to dismiss the complaint and to strike certain class allegations. Boeing also moved to dismiss. On February 14, 2020, the trial court issued a ruling that granted in part and denied in part the motions to dismiss the complaint. The trial court order, among other things: (i) dismissed without prejudice various state law claims that the plaintiffs abandoned in response to the motions, (ii) dismissed with prejudice the remaining state law claims, including fraud by concealment, fraud by misrepresentation, and negligent misrepresentation on the grounds that federal law preempts those claims, and (iii) found that plaintiffs lack Article III standing to pursue one of the plaintiffs' theories

52

of RICO injury. The order denied the motion to dismiss with respect to two RICO claims premised upon a second theory of RICO injury and denied the motion to strike the class allegations at the pleadings stage. Discovery is ongoing, class certification briefing has been completed, and a class certification hearing was held before the court on April 26, 2021. The Company denies all allegations of wrongdoing, including those in the complaint that were not dismissed. The Company believes the plaintiffs' positions are without merit and intends to vigorously defend itself.

On February 19, 2020, a complaint alleging violations of federal securities laws and seeking certification as a class action was filed against the Company and certain of its officers in the United States District Court for the Northern District of Texas in Dallas. A lead plaintiff has been appointed in the case, and an amended complaint was filed on July 2, 2020. The amended complaint seeks damages on behalf of a putative class of persons who purchased the Company's common stock between February 7, 2017, and January 29, 2020. The amended complaint asserts claims under Sections 10(b) and 20 of the Securities Exchange Act and alleges that the Company made material misstatements to investors regarding the Company's safety and maintenance practices and its compliance with federal regulations and requirements. The amended complaint generally seeks money damages, pre-judgment and post-judgment interest, and attorneys' fees and other costs. On August 17, 2020, the Company and the individual defendants filed a motion to dismiss. On October 1, 2020, the lead plaintiff filed a response in opposition to the motion to dismiss. The Company filed a reply on or about October 21, 2020, such that the motion is now fully briefed, although the parties have each supplemented their prior briefing with regard to more recent case holdings in other matters. The Company denies all allegations of wrongdoing, including those in the amended complaint. The Company believes the plaintiffs' positions are without merit and intends to vigorously defend itself.

On June 22, 2020, a derivative action for breach of fiduciary duty was filed in the United States District Court for the Northern District of Texas naming the members of the Company's Board of Directors as defendants and the Company as a nominal defendant. The plaintiff alleges unspecified damage to Company's reputation, goodwill, and standing in the community, as well as damage from exposure to civil and regulatory liability and defense costs. According to the lawsuit, these damages arise from the Company's alleged failure to comply with safety and record maintenance regulations and false statements in public filings regarding the Company's safety practices. The plaintiff alleges the Board, in the absence of good faith, exhibited reckless disregard for its duties of oversight. The lawsuit is in its early stages, and the Board and Company deny all allegations of wrongdoing.

The Company is from time to time subject to various legal proceedings and claims arising in the ordinary course of business, including, but not limited to, examinations by the IRS.

The Company's management does not expect that the outcome in any of its currently ongoing legal proceedings or the outcome of any proposed adjustments presented to date by the IRS, individually or collectively, will have a material adverse effect on the Company's financial condition, results of operations, or cash flow.

53

**Item 1A.** Risk Factors

There have been no material changes to the factors disclosed in Item 1A. Risk Factors in the Company's Annual Report on Form 10-K for the year ended December 31, 2020.

**Item 2.** Unregistered Sales of Equity Securities and Use of Proceeds

(a) In connection with funding that the Company had received under the Payroll Support Program Extension, the Company has issued PSP2 Warrants to acquire up to 1.2 million shares of the Company's common stock since January 2021 to Treasury under an exemption from registration pursuant to Section 4(a)(2) of the Securities Act of 1933, as amended. For additional information regarding the PSP2 Warrants, see Note 2 of the unaudited Condensed Consolidated Financial Statements.

(c) On May 15, 2019, the Company's Board of Directors authorized the repurchase of up to $2.0 billion of the Company's common stock. Subject to certain conditions, including restrictions on the Company pursuant to the CARES Act, the Payroll Support Program Extension, and the PSP3 Payroll Support Program through September 30, 2022, repurchases may be made in accordance with applicable securities laws in open market or private, including accelerated, repurchase transactions from time to time, depending on market conditions. The Company has announced it has suspended further share repurchase activity until further notice. The Company has approximately $899 million remaining under its current share repurchase authorization.

**Item 3.** Defaults Upon Senior Securities

None

**Item 4.** Mine Safety Disclosures

Not applicable

**Item 5.** Other Information

On January 15, 2021, the Company entered into definitive documentation with the United States Department of the Treasury ("Treasury") with respect to funding support pursuant to Subtitle A of Title IV of Division N of the Consolidated Appropriations Act, 2021 (the "PSP Extension Law"). On January 15, 2021, the Company entered into a payroll support program extension agreement (the "Payroll Support Program Extension"), pursuant to which the Company received payroll support funding ("PSP2 Payroll Support") under the PSP Extension Law. As consideration for the PSP2 Payroll Support, the Company issued a promissory note (the "PSP2 Note") in favor of Treasury and entered into a warrant agreement with Treasury (the "PSP2 Warrant Agreement" and, together with the Payroll Support Program Extension and the PSP2 Note, the "PSP2 Payroll Support Documents"), pursuant to which the Company agreed to issue warrants (each, a "PSP2 Warrant") to purchase common stock of the Company to Treasury in connection with each disbursement of PSP2 Payroll Support. The Company received disbursements of PSP2 Payroll Support on each of January 15, 2021 and March 5, 2021.

On April 23, 2021, the Company received additional PSP2 Payroll Support from Treasury in the amount of $259,105,560 (the "Additional PSP2 Support"), for which the Company provided Treasury consideration in the form of an increase of the PSP2 Note in an amount of $77,731,668 and a PSP2 Warrant to purchase up to 167,960 shares of the Company's common stock under the PSP2 Warrant Agreement. After taking into account the Additional PSP2 Support, the Company has received $1,986,475,960 of PSP2 Payroll Support, for which the Company has provided Treasury with a PSP2 Note in the aggregate amount of $565,942,788 and PSP2 Warrants to purchase up to 1,222,867 shares of the Company's common stock.

A description of the PSP2 Payroll Support Documents can be found in the Company's Current Report on Form 8-K filed with the U.S. Securities and Exchange Commission on January 15, 2021, and a copy of each PSP2 Payroll Support Document is attached as an exhibit thereto. See Note 2 to the unaudited Condensed Consolidated Financial Statements for further information.

On April 23, 2021, the Company entered into definitive documentation with Treasury with respect to funding support pursuant to Section 7301 of the American Rescue Plan Act of 2021 (the "ARP"). Funds received under the ARP must be used to pay qualifying employee salaries, wages and benefits. The Company's expected aggregate receipts under the program total $1,852,786,128, for which the Company expects to provide Treasury consideration in the form of (i) a promissory note in an amount equal to $525,835,838 and (ii) warrants to purchase up to an aggregate of 898,711 shares of the Company's common stock, subject to adjustments by Treasury pursuant to the terms of the warrants in each case. Funds are expected to be disbursed to the Company in multiple installments.

On April 23, 2021, the Company entered into a Payroll Support Program 3 Agreement (the "PSP3 Agreement") with Treasury, pursuant to which the Company will receive payroll support funding ("PSP3 Payroll Support") under the ARP. On April 23, 2021, the Company received $926,393,064, or 50 percent, of the total expected PSP3 Payroll Support (the "Initial PSP3 Payroll Support") pursuant to the ARP. Pursuant to the PSP3 Agreement and the ARP, in connection with the receipt of PSP3 Payroll Support, the Company is subject to certain restrictions, including prohibitions against involuntary furloughs and reductions in employee pay rates and benefits from the date of the PSP3 Agreement through the later of September 30, 2021 and the date the Company has expended all of the PSP3 Payroll Support; the elimination of share repurchases and dividends through September 30, 2022; and limits on executive compensation until April 1, 2023.

As consideration for the PSP3 Payroll Support, on April 23, 2021, the Company issued a promissory note (the "PSP3 Note") in favor of Treasury and entered into a warrant agreement with Treasury (the "PSP3 Warrant Agreement" and together with the PSP3 Agreement and the PSP3 Note, the "PSP3 Payroll Support Documents"), pursuant to which the Company agreed to issue warrants (each, a "PSP3 Warrant") to purchase common stock of the Company to Treasury. In connection with the disbursement of the Initial PSP3 Payroll Support on April 23, 2021, the PSP3 Note was issued in an initial amount of $247,917,919, and the Company issued a PSP3 Warrant to purchase up to 423,719 shares of common stock. Upon each subsequent disbursement of PSP3 Payroll Support to the Company under the PSP3 Agreement after April 23, 2021, (i) the principal amount of the PSP3 Note will automatically be increased in an amount equal to 30 percent of any such disbursement and (ii) the Company will issue an additional PSP3 Warrant to Treasury in an amount equal to 10 percent of the principal amount of the increase to the PSP3 Note in connection with such disbursement of PSP3 Payroll Support, divided by the strike price of $58.51 (which was the closing price of the Company's common stock on March 10, 2021).

The PSP3 Note matures in full on April 23, 2031, and is subject to mandatory prepayment requirements in connection with certain change of control triggering events that may occur prior to its maturity. The Company has an option to prepay the PSP3 Note at any time without premium or penalty. Amounts outstanding under the PSP3 Note bear interest at a rate of 1.00 percent before April 23, 2026 and, afterwards, at a rate equal to the Secured Overnight Financing Rate (SOFR) or other benchmark replacement rate consistent with customary market conventions plus a margin of 2.00 percent. The PSP3 Note contains customary representations and warranties and events of default.

The PSP3 Warrant Agreement sets out the Company's obligations to issue PSP3 Warrants in connection with disbursements of PSP3 Payroll Support and to file or designate a resale shelf registration statement for the PSP3 Warrants and the underlying shares of common stock. The Company has also granted Treasury certain demand underwritten offering and piggyback registration rights with respect to the PSP3 Warrants and the underlying common stock. Each PSP3 Warrant is exercisable at a strike price of $58.51 per share of common stock and will expire on the fifth anniversary of the issue date of such PSP3 Warrant. The PSP3 Warrants will be settled through net share settlement or net cash settlement, at the Company's option. The PSP3 Warrants include adjustments for below market issuances, payment of dividends and other customary anti-dilution provisions. The PSP3 Warrants do not have voting rights.

The description of the PSP3 Payroll Support Documents in this Item 5 is qualified in its entirety by reference to the full text of each of the PSP3 Payroll Support Documents, copies of which are filed as exhibits to this Quarterly Report on Form 10-Q.

The PSP3 Payroll Support Documents are not intended to be a source of factual, business, or operational information about the Company or its subsidiaries. The representations and warranties and covenants contained in the PSP3 Payroll Support Documents were made only for purposes of such agreements and as of specific dates, were solely for the benefit of the parties to such agreements, and may be subject to limitations agreed upon by the parties, including being qualified by disclosures for the purpose of allocating contractual risk between the parties instead of establishing matters as facts; and may be subject to standards of materiality applicable to the contracting parties that differ from those applicable to investors or security holders. Accordingly, investors should not rely on the representations, warranties, and covenants or any descriptions thereof as characterizations of the actual state of facts or condition of the Company.

**Item 6. Exhibits**

| | |
|---|---|
| 3.1 | Restated Certificate of Formation of the Company, effective May 18, 2012 (incorporated by reference to Exhibit 3.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2012 (File No. 1-7259)). |
| 3.2 | Second Amended and Restated Bylaws of the Company, effective November 17, 2016 (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K filed November 21, 2016 (File No. 1-7259)). |
| 10.1 | Supplemental Agreement No. 12 to Purchase Agreement No. 3729, dated December 13, 2011, between The Boeing Company and the Company. (1) |
| 10.2 | Supplemental Letter Agreement No. 6-1162-CAF-0390R2, to Purchase Agreement No. 3729, dated December 13, 2011, between The Boeing Company and the Company. (1) |
| 10.3 | Mortgage and Security Agreement Supplement No. 1, dated March 30, 2021, between Southwest Airlines Co. and JPMorgan Chase Bank, N.A., acting as an administrative agent, pursuant to the Revolving Credit Facility Agreement dated as of August 3, 2016, as amended. |
| 10.4 | Payroll Support Program 3 Agreement by and between Southwest Airlines Co. and the United States Department of the Treasury, dated April 23, 2021. |
| 10.5 | Warrant Agreement by and between Southwest Airlines Co. and the United States Department of the Treasury, dated April 23, 2021. |
| 10.6 | Promissory Note, from Southwest Airlines Co. to the United States Department of the Treasury, dated April 23, 2021. |
| 31.1 | Rule 13a-14(a) Certification of Chief Executive Officer. |
| 31.2 | Rule 13a-14(a) Certification of Chief Financial Officer. |
| 32.1 | Section 1350 Certifications of Chief Executive Officer and Chief Financial Officer. (2) |
| 101.INS | XBRL Instance Document - The instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document. |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document. |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document. |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101). |

(1) Certain confidential information contained in this agreement has been omitted because it (i) is not material and (ii) would likely cause competitive harm to the Company if publicly disclosed.

(2) Furnished, not filed.

57

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

SOUTHWEST AIRLINES CO.

April 27, 2021                              By:        /s/   Tammy Romo

                                                       Tammy Romo
                                                       *Executive Vice President & Chief Financial Officer*
                                                       *(On behalf of the Registrant and in*
                                                       *her capacity as Principal Financial*
                                                       *and Accounting Officer)*

58

**SUPPLEMENTAL AGREEMENT NO. 12**

**to**

**Purchase Agreement No. 03729**

**between**

**THE BOEING COMPANY**

**and**

**SOUTHWEST AIRLINES CO.**

**Relating to Boeing Model 737-8 and 737-7 Aircraft**

THIS SUPPLEMENTAL AGREEMENT No. 12 (**SA-12**), entered into as of <u>March 24</u>, 2021, is made between THE BOEING COMPANY, a Delaware corporation (**Boeing**), and SOUTHWEST AIRLINES CO., a Texas corporation (**Customer**).

<u>RECITALS</u>:

WHEREAS, Customer and Boeing entered into Purchase Agreement Number PA-03729 dated December 13, 2011, as amended and supplemented, (**Purchase Agreement**) relating to the purchase and sale of Boeing Model 737-8 (**737-8 Aircraft**) and Model 737-7 aircraft (**737-7 Aircraft**); collectively the "**Aircraft**". This SA-12 is an amendment to and is incorporated into the Purchase Agreement. Capitalized terms used herein but not otherwise defined will have the meaning set forth in the Purchase Agreement;

WHEREAS, Boeing and Customer agree to the sale and purchase of an additional one hundred (100) Firm 737-7 MAX Aircraft, to provide one hundred fifty (150) 2020 Option Aircraft, and five (5) additional Original Option Aircraft (Original Option Aircraft is defined as the options contained on Attachment 1-A to Letter Agreement No. 1106474R3 entitled "Option Aircraft");

WHEREAS, Boeing has offered and Customer has accepted sixty (60) 737-8 Remarket Aircraft for substitution as Original Option Aircraft or Firm Aircraft;

WHEREAS, Boeing and Customer agree to amend the Purchase Agreement to include **[\*\*\*]**;

WHEREAS, Boeing and Customer agree to amend the Purchase Agreement to document Customer's substitution of seventy (70) firm Model 737-8 Aircraft to firm Model 737-7 Aircraft;

WHEREAS, Boeing and Customer agree to amend the Purchase Agreement to revise the scheduled delivery stream and identify nominal delivery months for the Aircraft;

**[\*\*\*] = Certain identified information has been excluded from the exhibit because it is both not material and is of the type that the registrant treats as private or confidential.**

1

WHEREAS, Boeing and Customer agree to amend the Purchase Agreement terms on **[\*\*\*]**;

WHEREAS, Customer has requested and Boeing has agreed to **[\*\*\*]**;

WHEREAS, Boeing and Customer agree to amend the Purchase Agreement to include **[\*\*\*]**; and

WHEREAS, Boeing and Customer agree to amend the Purchase Agreement to make certain changes to the Letter Agreements as a result of the respective changes in this Supplemental Agreement.

NOW, THEREFORE, the parties agree that the Purchase Agreement is amended as set forth below and otherwise agree as follows:

1.  <u>TABLE OF CONTENTS</u>.

The Table of Contents of the Purchase Agreement is deleted in its entirety and replaced with a new Table of Contents (attached), which lists the Tables, Exhibits, and Letter Agreements revised by this SA-12 and is identified by "SA-12". Such revised Table of Contents is incorporated into the Purchase Agreement by this reference.

2.  <u>Tables</u>.

Table 1A, <u>Aircraft Delivery, Description, Price and Advance Payments – 737-8 Aircraft</u>, is deleted in its entirety and replaced by a new Table 1A (identified by "SA-12") attached hereto and incorporated into the Purchase Agreement by this reference.

Table 1B, <u>Aircraft Delivery, Description, Price and Advance Payments – 737-7 Aircraft</u>, is deleted in its entirety and replaced by a new Table 1B (identified by "SA-12") attached hereto and incorporated into the Purchase Agreement by this reference.

3.  <u>EXHIBITS</u>.

    3.1     Exhibit A3, <u>737-8 Remarket Aircraft Configuration</u>, is added to and incorporated into the Purchase Agreement by this reference.

    3.2     Exhibit B-1, <u>Remarket Aircraft Technical Acceptance and Delivery Requirements and Responsibilities</u>, is added to and incorporated into the Purchase Agreement by this reference.

SWA-PA-03729                                **BOEING PROPRIETARY**                                SA-12

4. <u>LETTER AGREEMENTS</u>.

4.1.    Letter Agreement SWA-PA-03729-LA-1106471R1, <u>Substitute Aircraft</u>, is deleted in its entirety and is replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1106471R2.

4.2. Letter Agreement SWA-PA-03729-LA-1106473R1, [***], deleted in its entirety and is replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1106473R2.

4.3. Letter Agreement SWA-PA-03729-LA-1106474R2, <u>Option Aircraft</u>, and its Attachment 1 are deleted in their entirety and are replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1106474R3 and its Attachment 1.

4.4. Letter Agreement SWA-PA-03729-LA-1106475R3, [***], is deleted in its entirety and is replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1106475R4.

4.5. Letter Agreement SWA-PA-03729-LA-1106484R1, [***], is deleted in its entirety and is replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1106484R2.

4.6. Letter Agreement SWA-PA-03729-LA-1301170R2, [***], is deleted in its entirety and is replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1301170R3.

4.7. Letter Agreement SWA-PA-03729-LA-1602486, [***], is deleted in its entirety and is replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1602486R1.

4.8. Letter Agreement SWA-PA-03729-LA-2100594, <u>737-8 Remarket Aircraft</u>, is added to and incorporated into the Purchase Agreement by this reference.

4.9. Letter Agreement SWA-PA-03729-LA-2100700, <u>Remarket Aircraft Open Configuration Matters</u>, is added to and incorporated into the Purchase Agreement by this reference.

4.10. Letter Agreement SWA-PA-03729-LA-2100811, [***], is added to and incorporated into the Purchase Agreement by this reference.

4.11. Letter Agreement SWA-PA-03729-LA-2100812, [***], is added to and incorporated into the Purchase Agreement by this reference

**BOEING PROPRIETARY**

4.12.    Letter Agreement SWA-PA-03729-LA-2100813, [***], is added to and incorporated into the Purchase Agreement by this reference.

4.13.    Letter Agreement SWA-PA-03729-LA-2100814, [***], is added to and incorporated into the Purchase Agreement by this reference.

4.14.    Letter Agreement SWA-PA-03729-LA-2100819, [***] is added to and incorporated into the Purchase Agreement by this reference.

4.15.    Letter Agreement SWA-PA-03729-LA-2100825, [***], is added to and incorporated into the Purchase Agreement by this reference.

4.16.    Letter Agreement SWA-PA-03729-LA-2100841, [***], is added to and incorporated into the Purchase Agreement by this reference.

4.17.    Letter Agreement SWA-PA-03729-LA-2100984, [***], is added to and incorporated into the Purchase Agreement by this reference.

5.    <u>ADVANCE PAYMENT IMPACTS</u>.

Due to the substitution of seventy (70) 737-8 to 737-7 Aircraft, Customer has**[***]**

6.    <u>IMPACTS TO PREVIOUSLY DELIVERED AIRCRAFT.</u>

In accordance with Letter Agreement SWA-PA-03729-LA-2100819, **[***]**

7.    [***]

SWA-PA-03729                                            4                                            SA-12

**BOEING PROPRIETARY**

The Purchase Agreement is deemed to be supplemented to the extent herein provided and as so supplemented will continue in full force and effect.

EXECUTED IN DUPLICATE as of the day and year first above written.

THE BOEING COMPANY                          SOUTHWEST AIRLINES CO.

By: /s/ Carson J May                        By: /s/ Michael Van de Ven

Name: Carson J May                          Name: Michael Van de Ven

Its: Attorney-in-Fact                       Its: Chief Operating Officer

**BOEING PROPRIETARY**

**TABLE OF CONTENTS**

| **ARTICLES** | **TITLES** | |
| Article 1 | Quantity, Model and Description | SA-2 |
| Article 2 | Delivery Schedule | |
| Article 3 | Price | |
| Article 4 | Payment | SA-2 |
| Article 5 | Additional Terms | |

| **TABLE** | **TITLE** | |
| **1A** | **737-8 Aircraft Information Table** | **SA-12** |
| **1B** | **737-7 Aircraft Information Table** | **SA-12** |
| EXHIBIT | | |
| A1 | 737-8 Aircraft Configuration | SA-11 |
| A2 | 737-7 Aircraft Configuration | SA-8 |
| **A3** | **737-8 Remarket Aircraft Configuration** | **SA-12** |
| B* | Aircraft Delivery Requirements and Responsibilities | |
| **B-1** | **Remarket Aircraft Technical** | **SA-12** |
| | **Acceptance and Delivery Requirements and Responsibilities** | |

| SUPPLEMENTAL EXHIBITS | TITLES | |
| AE1* | Escalation Adjustment/Airframe and Optional Features | |
| BFE1 | BFE Variables for 737-8 | SA-7 |
| BFE2 | BFE Variables for 737-7 | SA-8 |
| CS1 | Customer Support Variables | |
| CS1-7MAX | Customer Support Variables    SA-2 | |
| EE1* | Engine Escalation/Engine Warranty and Patent Indemnity | |

SWA-PA-03729

SA-12

Page 1

**BOEING PROPRIETARY**

SLP1*                                         Service Life Policy Components

| **LETTER AGREEMENTS** | **TITLES** | |
|---|---|---|
| SWA-PA-03729-LA-1106463R3 | Open Matters | SA-8 |
| SWA-PA-03729-LA-1106464* | [***] | |
| SWA-PA-03729-LA-1106465* | [***] | |
| SWA-PA-03729-LA-1106466 | [***] | |
| SWA-PA-03729-LA-1106467R2 | [***] | SA-8 |
| SWA-PA-03729-LA-1106468* | [***] | |
| SWA-PA-03729-LA-1106469R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106470R1 | [***] | SA-2 |
| **SWA-PA-03729-LA-1106471R2** | **Substitute Aircraft** | **SA-12** |
| **SWA-PA-03729-LA-1106473R2** | **[***]** | |
| **SWA-PA-03729-LA-1106474R3** | **Option Aircraft** | **SA-12** |
| **SWA-PA-03729-LA-1106475R4** | **[***]** | **SA-12** |
| SWA-PA-03729-LA-1106476R2 | [***] | SA-8 |
| SWA-PA-03729-LA-1106477* | [***] | |
| SWA-PA-03729-LA-1106478 | [***] | |
| SWA-PA-03729-LA-1106479R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106480R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106481R2 | [***] | SA-2 |
| SWA-PA-03729-LA-1106482* | [***] | |
| SWA-PA-03729-LA-1106483* | [***] | |
| **SWA-PA-03729-LA-1106484R2** | **[***]** | **SA-12** |
| SWA-PA-03729-LA-1106485* | [***] | |

SWA-PA-03729                                                     SA-12
                                                                Page 2

**BOEING PROPRIETARY**

| LETTER AGREEMENTS | TITLES | |
|---|---|---|
| SWA-PA-03729-LA-1209080 | [***] | SA-1 |
| SWA-PA-03729-LA-1210419 | [***] | SA-1 |
| SWA-PA-03729-LA-1300943 | [***] | SA-2 |
| SWA-PA-03729-LA-1301168R3 | [***] | SA-6 |
| **SWA-PA-03729-LA-1301170R3** | **[***]** | **SA-12** |
| SWA-PA-03729-LA-1400371 | [***] | SA-7 |
| SWA-PA-03729-LA-1503792 | Service Ready Operational Validation | SA-6 |
| SWA-PA-03729-LA-1500831 | [***] | SA-7 |
| **SWA-PA-03729-LA-1602486R1** | **[***]** | **SA-12** |
| **SWA-PA-03729-LA-2100594** | **737-8 Remarket Production Aircraft** | **SA-12** |
| **SWA-PA-03729-LA-2100700** | **737-8 Open Configuration Matters – Remarket Production Aircraft** | **SA-12** |
| **SWA-PA-03729-LA-2100811** | **[***]** | **SA-12** |
| **SWA-PA-03729-LA-2100812** | **[***]** | **SA-12** |
| **SWA-PA-03729-LA-2100813** | **[***]** | **SA-12** |
| **SWA-PA-03729-LA-2100814** | **[***]** | **SA-12** |
| **SWA-PA-03729-LA-2100819** | **[***]** | **SA-12** |
| **SWA-PA-03729-LA-2100825** | **[***]** | **SA-12** |
| **SWA-PA-03729-LA-2100841** | **[***]** | **SA-12** |

**BOEING PROPRIETARY**

| **LETTER AGREEMENTS** | **TITLES** | |
| --- | --- | --- |
| **SWA-PA-03729-LA-2100984** | **[***]** | **SA-12** |

\* Denotes revision to Page 1 or Page 2 only to reference 737-7 (SA-2)

**INACTIVE / DELETED TABLES, EXHIBITS, AND LETTER AGREEMENTS**

RESTRICTED LETTER AGREEMENTS

| Letter Agreement | Title | Last Updated under SA | Current Status |
|---|---|---|---|
| SWA-PA-03729-LA-1106472R1 | **[***]** | SA-2 | Deleted under SA-4 |
| SWA-PA-01810/03729-LA-1301169 | **[***]** | SA-2 | Deleted under SA-4 |

**Table 1A To**

**Purchase Agreement No. PA-03729**

**Aircraft Delivery, Description, Price and Advance Payments**

**737-8 Aircraft**

| | | |
|---|---|---|
| **Airframe Model/MTOW:** 737-8 | 181,200 pounds | **Detail Specification:** D019A008-P (5/1/2017) |
| **Engine Model/Thrust:** CFMLEAP-1B28(2) | 28,800 pounds | **Airframe Price Base Year/Escalation Formula:** Jul-11   Non-Standard |
| **Airframe Price:** [***] | | **Engine Price Base Year/Escalation Formula:** N/A   N/A |
| **Optional Features:** [***] | | |
| **Sub-Total of Airframe and Features:** [***] | | **Airframe Escalation Data:** |
| **Engine Price (Per Aircraft):** [***] | | **Base Year Index (ECI):** [***] |
| **Aircraft Basic Price (Excluding BFE/SPE):** [***] | | **Base Year Index (CPI):** [***] |
| **Buyer Furnished Equipment (BFE) Estimate:** [***] | | |
| **Seller Purchased Equipment (SPE) Estimate:** [***] | | |

| Delivery Date* | Original Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Jul-2017 | Jul-2017 | 1 | [***] | 36929† | [***] | A | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Jul-2017 | Jul-2017 | 2 | [***] | 42558†, 42559† | [***] | C | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Aug-2017 | Aug-2017 | 3 | [***] | 36979, 36930, 36984 | [***] | A | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Aug-2017 | Aug-2017 | 1 | [***] | 42567 | [***] | C | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Aug-2017 | Aug-2017 | 2 | [***] | 42563, 42566† | [***] | C | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Sep-2017 | Sep-2017 | 1 | [***] | 36934 | [***] | A | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Oct-2017 | Oct-2017 | 1 | [***] | 42544 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Oct-2017 | Oct-2017 | 1 | [***] | 42570 | [***] | C | | [***] | [***] | [***] | [***] | [***] |
| Nov-2017 | Nov-2017 | 1 | [***] | 36988† | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Dec-2017 | Dec-2017 | 1 | [***] | 42554† | [***] | C | | [***] | [***] | [***] | [***] | [***] |
| Mar-2018 | Mar-2018 | 1 | [***] | 36989† | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Mar-2018 | Mar-2018 | 1 | [***] | 42571 | [***] | C | | [***] | [***] | [***] | [***] | [***] |
| Apr-2018 | Apr-2018 | 1 | [***] | 42546 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Jun-2018 | Jun-2018 | 1 | [***] | 42572 | [***] | C | | [***] | [***] | [***] | [***] | [***] |
| Jun-2018 | Jun-2018 | 1 | [***] | 42547 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Aug-2018 | Aug-2018 | 3 | [***] | 42548, 37019, 42549 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Aug-2018 | Aug-2018 | 1 | [***] | 42574 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2018 | Aug-2018 | 1 | [***] | 42575 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2018 | Sep-2018 | 2 | [***] | 42573, 42576 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2018 | Dec-2018 | 1 | [***] | 42577 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2018 | Dec-2018 | 4 | [***] | 37042, 42550, 42551, 37043 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Feb-2021 | Jul-2019 | 1 | [***] | 42633 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Feb- | Jul-2019 | 2 | [***] | | [***] | | | [***] | [***] | [***] | [***] | [***] |

| 2021 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Feb-2021 | Aug-2019 | 1 | [***] | 42634 | [***] | | | [***] | [***] | [***] | [***] | [***] |

SA-12

**Table 1A To**

**Purchase Agreement No. PA-03729**

**Aircraft Delivery, Description, Price and Advance Payments**

**737-8 Aircraft**

| Delivery Date* | Original Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Feb-2021 | Dec-2019 | 1 | [***] | 36722 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Feb-2021 | Dec-2019 | 1 | [***] | 42537 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Mar-2021 | Aug-2019 | 1 | [***] | 42641 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2021 | Sep-2019 | 1 | [***] | 65471 | [***] | E OPEX | | [***] | [***] | [***] | [***] | [***] |
| Apr-2021 | Nov-2019 | 1 | [***] | 42536 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Mar-2021 | Aug-2019 | 1 | [***] | 42637 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2021 | Sep-2019 | 1 | [***] | 65438 | [***] | E OPEX | | [***] | [***] | [***] | [***] | [***] |
| Apr-2021 | Oct-2019 | 2 | [***] | 42646, 42662 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2021 | Oct-2019 | 2 | [***] | 42647, 42661 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2021 | Oct-2019 | 1 | [***] | 65439 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Mar-2021 | Oct-2019 | 1 | [***] | 65440 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Apr-2021 | Nov-2019 | 1 | [***] | 42664 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2021 | Nov-2019 | 1 | [***] | 65473 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jan-2026 | Dec-2019 | 1 | [***] | 42666 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2026 | Feb-2020 | 1 | [***] | 36727 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Feb-2026 | Mar-2020 | 1 | [***] | 42580 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2026 | Mar-2020 | 1 | [***] | 42579 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2026 | Apr-2020 | 1 | [***] | 42539 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Apr-2026 | Apr-2020 | 1 | [***] | 65441 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jun-2026 | May-2020 | 1 | [***] | 42669 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2026 | May-2020 | 1 | [***] | 42553 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| May-2026 | May-2020 | 1 | [***] | 35970 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Aug-2026 | Jun-2020 | 1 | [***] | 42607 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2026 | Jun-2020 | 1 | [***] | 65442 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Nov-2026 | Jul-2020 | 1 | [***] | 42665 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2026 | Jul-2020 | 1 | [***] | 42540 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Nov-2026 | Jul-2020 | 1 | [***] | 65443 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Dec-2026 | Jul-2020 | 1 | [***] | 65444 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Feb-2027 | Aug-2020 | 2 | [***] | 42672, 42673 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2027 | Aug-2020 | 1 | [***] | 42541 | [***] | A | | [***] | [***] | [***] | [***] | [***] |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Mar-2027 | Aug-2020 | 1 | [***] | 65445 | [***] | OPEX | [***] | [***] | [***] | [***] | [***] |
| Apr-2027 | Aug-2020 | 1 | [***] | 65446 | [***] | OPEX | [***] | [***] | [***] | [***] | [***] |
| May-2027 | Sep-2020 | 1 | [***] | 42674 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2027 | Sep-2020 | 1 | [***] | 42691 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2027 | Sep-2020 | 1 | [***] | 42694 | [***] | | [***] | [***] | [***] | [***] | [***] |

**SA-12**

**Table 1A To**

**Purchase Agreement No. PA-03729**

**Aircraft Delivery, Description, Price and Advance Payments**

**737-8 Aircraft**

| Delivery Date* | Original Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Apr-2027 | Sep-2020 | 1 | [***] | 33941 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Aug-2027 | Sep-2020 | 1 | [***] | 65472 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Sep-2027 | Sep-2020 | 1 | [***] | 65447 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Oct-2027 | Sep-2020 | 1 | [***] | 65448 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Nov-2027 | Oct-2020 | 1 | [***] | 42615 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2027 | Oct-2020 | 1 | [***] | 42543 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Dec-2027 | Oct-2020 | 1 | [***] | 65474 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Feb-2028 | Nov-2020 | 2 | [***] | 42697, 42699 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2028 | Nov-2020 | 1 | [***] | 36733 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Mar-2028 | Nov-2020 | 1 | [***] | 65475 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Apr-2028 | Dec-2020 | 1 | [***] | 42703 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2028 | Dec-2020 | 1 | [***] | 33940 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| May-2028 | Jan-2021 | 1 | [***] | 35974 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Jun-2028 | Jan-2021 | 1 | [***] | 65450 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jul-2028 | Jan-2021 | 1 | [***] | 65449 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Sep-2028 | Feb-2021 | 1 | [***] | 65451 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Aug-2028 | Feb-2021 | 1 | [***] | 65835 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Oct-2028 | Mar-2021 | 1 | [***] | 42648 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2028 | Mar-2021 | 1 | [***] | 65452 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Nov-2028 | Apr-2021 | 1 | [***] | 42650 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2028 | Apr-2021 | 1 | [***] | 42651 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2029 | Apr-2021 | 1 | [***] | 42649 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2029 | Apr-2021 | 1 | [***] | 65454 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Feb-2029 | Apr-2021 | 1 | [***] | 65453 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Feb-2029 | May-2021 | 1 | [***] | 42652 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2029 | May-2021 | 1 | [***] | 42653 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2029 | May-2021 | 1 | [***] | 42654 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2029 | May-2021 | 1 | [***] | 65455 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Mar-2029 | May-2021 | 1 | [***] | 65456 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Apr-2029 | Jun-2021 | 3 | [***] | 42655, 42656, 42670 | [***] | | | [***] | [***] | [***] | [***] | [***] |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| May-2029 | Jun-2021 | 1 | [***] | 65457 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| May-2029 | Jul-2021 | 1 | [***] | 42658 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2029 | Jul-2021 | 1 | [***] | 65460 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jul-2029 | Jul-2021 | 1 | [***] | 65459 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jun-2029 | Jul-2021 | 1 | [***] | 65458 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |

**SA-12**

SWA-PA-03729 107813 / 108198 / 108732

**Boeing Proprietary**

**Table 1A To**

**Purchase Agreement No. PA-03729**

**Aircraft Delivery, Description, Price and Advance Payments**

**737-8 Aircraft**

| Delivery Date* | Original Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| May-2029 | Jul-2021 | 1 | [***] | 65834 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Sep-2029 | Aug-2021 | 1 | [***] | 65461 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jul-2029 | Aug-2021 | 1 | [***] | 65836 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Aug-2029 | Aug-2021 | 1 | [***] | 65837 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Aug-2029 | Aug-2021 | 1 | [***] | 65838 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Aug-2029 | Aug-2021 | 1 | [***] | 65839 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Sep-2029 | Aug-2021 | 1 | [***] | 66974 | [***] | | Note 4 | [***] | [***] | [***] | [***] | [***] |
| Nov-2029 | Sep-2021 | 1 | [***] | 65462 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Oct-2029 | Sep-2021 | 1 | [***] | 65463 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Oct-2029 | Sep-2021 | 1 | [***] | 65840 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Oct-2029 | Sep-2021 | 1 | [***] | 65841 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Nov-2029 | Oct-2021 | 1 | [***] | 65466 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Dec-2029 | Oct-2021 | 2 | [***] | 65465, 65464 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jan-2030 | Nov-2021 | 1 | [***] | 65467 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jan-2030 | Dec-2021 | 1 | [***] | 65468 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jan-2030 | Dec-2021 | 2 | [***] | 65842, 65843 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Feb-2030 | Jan-2022 | 1 | [***] | 65469 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Feb-2030 | Jan-2022 | 1 | [***] | 65470 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Feb-2030 | Apr-2022 | 1 | [***] | 65844 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Mar-2030 | Jul-2022 | 3 | [***] | 65855, 65853, 65851 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Mar-2030 | Aug-2022 | 1 | [***] | 65845 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Apr-2030 | Aug-2022 | 2 | [***] | 65847, 65849 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Apr-2030 | Oct-2022 | 2 | [***] | 65857, 65859 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| May-2030 | Dec-2022 | 1 | [***] | 65861 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| May-2030 | Mar-2023 | 1 | [***] | 36732 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| May-2030 | Apr-2023 | 1 | [***] | 38806 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| May-2030 | Jun-2023 | 1 | [***] | 37034 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Jun-2030 | Aug-2023 | 1 | [***] | 42552 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Jun-2030 | Oct-2023 | 1 | [***] | 42538 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Jun-2030 | Nov-2023 | 1 | [***] | 38815 | [***] | B | | [***] | [***] | [***] | [***] | [***] |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jul-2030 | Mar-2024 | 3 | [***] | 38817, 35968, 35972 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Jul-2030 | Apr-2024 | 1 | [***] | 36736 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Aug-2030 | Jun-2024 | 1 | [***] | 42542 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Aug-2030 | Jul-2024 | 2 | [***] | 35963, 35967 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Aug-2030 | Sep-2024 | 1 | [***] | 36730 | [***] | B | | [***] | [***] | [***] | [***] | [***] |

**Table 1A To**

**Purchase Agreement No. PA-03729**

**Aircraft Delivery, Description, Price and Advance Payments**

**737-8 Aircraft**

| Delivery Date* | Original Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sep-2030 | Nov-2024 | 1 | [***] | 35971 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Sep-2030 | Dec-2024 | 1 | [***] | 35975 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Sep-2030 | Jan-2025 | 2 | [***] | 38804, 38805 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Oct-2030 | Jan-2025 | 2 | [***] | 65863, 65865 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Oct-2030 | Feb-2025 | 1 | [***] | 36729 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Nov-2030 | Feb-2025 | 2 | [***] | 65868, 65869 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Nov-2030 | Mar-2025 | 2 | [***] | 65870, 65871 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Dec-2030 | Apr-2025 | 2 | [***] | 65872, 65873 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Dec-2030 | May-2025 | 2 | [***] | 65846, 65848 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Jan-2031 | Jun-2025 | 1 | [***] | 65852 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Feb-2031 | Jun-2025 | 1 | [***] | 65850 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Mar-2031 | Jul-2025 | 1 | [***] | 65854 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Apr-2031 | Jul-2025 | 1 | [***] | 65856 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| May-2031 | Aug-2025 | 1 | [***] | 65860 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Jun-2031 | Aug-2025 | 1 | [***] | 65858 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Jul-2031 | Sep-2025 | 1 | [***] | 65862 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Aug-2031 | Oct-2025 | 1 | [***] | 65864 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Sep-2031 | Nov-2025 | 1 | [***] | 65866 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Oct-2031 | Dec-2025 | 1 | [***] | 65867 | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |

Total:   **180**

\* [***]
\*\* Manufacturer Serial Numbers (MSN) are for reference only and are subject to change.
† [***]

Notes:
(1) [***]
(2) [***]
(3) [***]
(4) [***]

**Table 1B To**

**Purchase Agreement No. PA-03729**

**Aircraft Delivery, Description, Price and Advance Payments**

**737-7 Aircraft**

| | | |
|---|---|---|
| Airframe Model/MTOW: | 737-7 | 177,000 pounds |
| Engine Model/Thrust: | CFMLEAP-1B27C | 26,400 pounds |
| Airframe Price: | [***] | |
| Optional Features: | [***] | |
| Sub-Total of Airframe and Features: | [***] | |
| Engine Price (Per Aircraft): | [***] | |
| Aircraft Basic Price (Excluding BFE/SPE): | [***] | |
| Buyer Furnished Equipment (BFE) Estimate: | [***] | |
| Seller Purchased Equipment (SPE) Estimate: | [***] | |

| | | |
|---|---|---|
| Detail Specification: | D019A008SWA17P-1 | |
| Airframe Price Base Year/Escalation Formula: | Jul-11 | ECI-MFG/CPI |
| Engine Price Base Year/Escalation Formula: | N/A | N/A |
| **Airframe Escalation Data:** | | |
| Base Year Index (ECI): | [***] | |
| Base Year Index (CPI): | [***] | |

| Delivery Date* | Original Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Note | Escalation Estimate Adv Payment Base Price Per A/P | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-22 | Apr-2019 | 3 | [***] | 42586, 42587, 42588 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-22 | May-2019 | 1 | [***] | 42589 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-22 | May-2019 | 1 | [***] | 42590 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-22 | Aug-2019 | 2 | [***] | 42561, 42569 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-22 | Jan-2023 | 1 | [***] | 42591 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-22 | Feb-2023 | 1 | [***] | 42592 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-22 | Mar-2023 | 1 | [***] | 42595 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-22 | Apr-2023 | 1 | [***] | 42598 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-22 | May-2023 | 1 | [***] | 42600 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-22 | Jun-2023 | 1 | [***] | 42602 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-22 | Jul-2023 | 1 | [***] | 42603 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-22 | Aug-2023 | 1 | [***] | 42604 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-22 | Sep-2023 | 1 | [***] | 42609 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-22 | Oct-2023 | 1 | [***] | 42614 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-22 | Nov-2023 | 1 | [***] | 42613 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-22 | Dec-2023 | 1 | [***] | 42616 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-22 | Jan-2024 | 1 | [***] | 42618 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-22 | Feb-2024 | 1 | [***] | 42620 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-22 | Mar-2024 | 1 | [***] | 42621 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-22 | Apr-2024 | 1 | [***] | 42623 | [***] | | [***] | [***] | [***] | [***] | [***] |

**Boeing Proprietary**

**Table 1B To**

**Purchase Agreement No. PA-03729**

**Aircraft Delivery, Description, Price and Advance Payments**

**737-7 Aircraft**

| Delivery Date* | Original Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Note | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Oct-22 | May-2024 | 1 | [***] | 42627 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-22 | Jun-2024 | 1 | [***] | 42629 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-22 | Jul-2024 | 1 | [***] | 42631 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-22 | Aug-2024 | 1 | [***] | 42632 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-22 | Sep-2024 | 1 | [***] | 42635 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Dec-22 | Oct-2024 | 1 | [***] | 42638 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Dec-22 | Nov-2024 | 1 | [***] | 42642 | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2023 | Jul-21 | 2 | [***] | 42657, 42671 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Feb-2023 | Mar-22 | 2 | [***] | 42679, 42678 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Feb-2023 | Apr-22 | 1 | [***] | 42688 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | Apr-22 | 2 | [***] | 42681, 42680 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | May-22 | 1 | [***] | 42684 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | May-22 | 2 | [***] | 42683, 42682 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | Jun-22 | 1 | [***] | 42687 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| May-2023 | Jun-22 | 2 | [***] | 42686, 42685 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| May-2023 | Jul-22 | 1 | [***] | 42690 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | Jul-22 | 1 | [***] | 42689 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | Aug-22 | 1 | [***] | 42693 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Jul-2023 | Aug-22 | 1 | [***] | 42695 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Jul-2023 | Jan-23 | 1 | [***] | 42565 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | Jan-23 | 1 | [***] | 42560 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | Feb-23 | 2 | [***] | 42562, 42564 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | Mar-23 | 1 | [***] | 42557 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | Apr-23 | 1 | [***] | 42555 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | May-23 | 2 | [***] | 42594, 42568 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | Jun-23 | 1 | [***] | 42581 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Nov-2023 | Jul-23 | 2 | [***] | 42582, 42597 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | Aug-23 | 1 | [***] | 42593 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | Sep-23 | 1 | [***] | 42578 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Jan-2024 | Sep-23 | 1 | [***] | 42601 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |

**Table 1B To**

**Purchase Agreement No. PA-03729**

**Aircraft Delivery, Description, Price and Advance Payments**

**737-7 Aircraft**

| Delivery Date* | Original Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Note | Escalation Estimate Adv Payment Base Price Per A/P | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-2024 | Oct-23 | 1 | [***] | 42605 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Feb-2024 | Dec-23 | 1 | [***] | 42583 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Feb-2024 | Jan-24 | 2 | [***] | 42584, 42585 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Mar-2024 | Jan-24 | 1 | [***] | 42611 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Mar-2024 | Feb-24 | 2 | [***] | 42596, 42599 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | Feb-24 | 1 | [***] | 42612 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | Apr-24 | 2 | [***] | 42606, 42617 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| May-2024 | May-24 | 3 | [***] | 42608, 42619, 42622 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | Jun-24 | 1 | [***] | 42610 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | Aug-24 | 1 | [***] | 42626 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Jul-2024 | Aug-24 | 1 | [***] | 42624 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Jul-2024 | Sep-24 | 1 | [***] | 42630 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | Oct-24 | 2 | [***] | 42625, 42636 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | Nov-24 | 1 | [***] | 42639 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | Dec-24 | 2 | [***] | 42640, 42628 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Oct-2024 | Feb-25 | 1 | [***] | 42643 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Oct-2024 | Mar-25 | 2 | [***] | 42645, 42644 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | Apr-25 | 2 | [***] | 42659, 42660 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Dec-2024 | May-25 | 1 | [***] | 42663 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Dec-2024 | Jun-25 | 1 | [***] | 42667 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Jan-2025 | Jul-25 | 1 | [***] | 42668 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Jan-2025 | Aug-25 | 1 | [***] | 42675 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Feb-2025 | Sep-25 | 2 | [***] | 42677, 42676 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Feb-2025 | Oct-25 | 1 | [***] | 42692 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Mar-2025 | Oct-25 | 1 | [***] | 42696 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Mar-2025 | Nov-25 | 2 | [***] | 42698, 42700 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Apr-2025 | Dec-25 | 2 | [***] | 42702, 42701 | [***] | ***737-8 Sub | [***] | [***] | [***] | [***] | [***] |
| Apr-2025 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2025 | | 3 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2025 | | 2 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |

Table 1B To

Purchase Agreement No. PA-03729

Aircraft Delivery, Description, Price and Advance Payments

737-7 Aircraft

| Delivery Date* | Original Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Note | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Jul-2025 | | 2 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2025 | | 2 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2025 | | 2 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2025 | | 3 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2025 | | 2 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Dec-2025 | | 3 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2026 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2026 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2026 | | 2 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2026 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2026 | | 2 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2026 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2026 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2026 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2026 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2026 | | 2 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2026 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Dec-2026 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2027 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2027 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2027 | | 2 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2027 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2027 | | 2 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2027 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2027 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2027 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2027 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2027 | | 2 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2027 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Dec-2027 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |

**Table 1B To**

**Purchase Agreement No. PA-03729**

**Aircraft Delivery, Description, Price and Advance Payments**

**737-7 Aircraft**

| Delivery Date* | Original Delivery Date* | Number of Aircraft | Escalation Factor (Airframe | Manufacturer Serial Number** | Escalation Factor | Note | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Jan-2028 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2028 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2028 | | 2 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2028 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2028 | | 2 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2028 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2028 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2028 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2028 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2028 | | 2 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2028 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Dec-2028 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2029 | | 2 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2029 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2029 | | 2 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2029 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2029 | | 2 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2029 | | 2 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2029 | | 2 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2029 | | 2 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2029 | | 2 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2029 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2029 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Dec-2029 | | 2 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2030 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2030 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2030 | | 2 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2030 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2030 | | 2 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2030 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |

SWA-PA-03729 107953- 1F 116795- 1F

**Boeing Proprietary**

SA-12

**Table 1B To**

**Purchase Agreement No. PA-03729**

**Aircraft Delivery, Description, Price and Advance Payments**

**737-7 Aircraft**

| Delivery Date* | Original Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Note | Escalation Estimate Adv Payment Base Price Per A/P | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
| Jul-2030 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2030 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2030 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2030 | | 2 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2030 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |
| Dec-2030 | | 1 | [***] | | [***] | | [***] | [***] | [***] | [***] | [***] |

Total: **200**

\* [***]
.
\*\* Manufacturer Serial Numbers (MSN) are for reference only and are subject to change.
\*\*\* [***]

Notes:
(1) [***].

# AIRCRAFT CONFIGURATION FOR

# REMARKET AIRCRAFT

# BETWEEN

# THE BOEING COMPANY

# AND

# SOUTHWEST AIRLINES CO.

## EXHIBIT A-3 to PURCHASE AGREEMENT NUMBER PA-03729

Page 1

**BOEING PROPRIETARY**

**Exhibit A-3**

**AIRCRAFT CONFIGURATION for Remarket aircraft**

**Dated March < >, 2021**

**relating to**

**BOEING MODEL 737-8 REMARKET AIRCRAFT**

This Exhibit A-3 contains the As-Built Configuration for Initial Technical Acceptance of the Remarket Aircraft identified below, and will be amended by way of supplemental agreement, pursuant to the provisions of Letter Agreement SWA-PA-03729-LA-2100700, entitled "Remarket Aircraft Open Matters," to describe the Delivery Configuration of the Remarket Aircraft, subsequent to Boeing and Customer finalizing the Delivery Configuration for the Remarket Aircraft.

**EXHIBIT A-3**
**THE AS-BUILT CONFIGURATION FOR THE REMARKET AIRCRAFT IS UNDETERMINED AT THIS POINT IN TIME. ONCE THE AS-BUILT CONFIGURATION IS DETERMINED, A REVISION TO THIS EXHIBIT A-3 WILL BE INCORPORATED INTO THE PURCHASE AGREEMENT.**

BOEING PROPRIETARY

# REMARKET AIRCRAFT TECHNICAL ACCEPTANCE AND DELIVERY REQUIREMENTS AND RESPONSIBILITIES

## between

## THE BOEING COMPANY

## and

## SOUTHWEST aIRLINES co.

## Exhibit B-1 to Purchase Agreement
## Number PA-03729

BOEING PROPRIETARY

**EXHIBIT B-1**

**REMARKET AIRCRAFT TECHNICAL ACCEPTANCE AND
DELIVERY REQUIREMENTS AND RESPONSIBILITIES**

**relating to**

**Boeing Model 737-8 Remarket Aircraft**

Both Boeing and Customer have certain documentation and approval responsibilities at various times during the construction and delivery cycle of the Remarket Aircraft that are critical to accomplishing final delivery of the Reconfigured Remarket Aircraft, and ensuring a positive experience for both parties. This Exhibit B-1 documents those responsibilities and indicates recommended completion deadlines for the actions to be accomplished.

**EXHIBIT B-1**

**THE REMARKET AIRCRAFT TECHNICAL ACCEPTANCE AND**

**DELIVERY REQUIREMENTS AND RESPONSIBILITIES ARE UNDETERMINED AT THIS POINT IN TIME. ONCE THE REMARKET AIRCRAFT TECHNICAL ACCEPTANCE AND**

**DELIVERY REQUIREMENTS AND RESPONSIBILITIES ARE DETERMINED, A REVISION TO THIS EXHIBIT B-1 WILL BE INCORPORATED INTO THE PURCHASE AGREEMENT.**

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle WA 98124-2207

SWA-PA-03729-LA-1106471R2

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    Substitute Aircraft

References:    1)    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft (**Aircraft**)

2)    Letter Agreement No. SWA-PA-03729-LA-1106469, **[***]**

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.    **[***]**

2.    **[***]**

SWA-PA-03729 LA-1106471R2                                                                                    SA-12
Aircraft Model Substitution                                                                                    Page 1

**BOEING PROPRIETARY**



3. **[***]**

4. **[***]**



5. <u>Assignment</u>.

    Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part.

6. <u>Confidential Treatment</u>.

    Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a

SWA-PA-03729 LA-1106471R2                                                                                     SA-12
Aircraft Model Substitution                                                                                     Page 3
**BOEING PROPRIETARY**



need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By

/s/ Carson J May

Name

Carson J. May

Its

Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:    March 24, 2021

SOUTHWEST AIRLINES CO.

By

/s/ Michael Van de Ven

Name

Michael Van de Ven

Its    Chief Operating Officer

SWA-PA-03729 LA-1106471R2                                                                    SA-12
Aircraft Model Substitution                                                                  Page 4

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle WA 98124-2207

SWA-PA-03729-LA-1106473**R2**

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:     **[***]**

References:     1)     Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and Model 737-7 aircraft

2)     Letter Agreement SWA-PA-03729-LA-1106471R2 entitled "Substitute Aircraft" (**Substitution Letter**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.     **[***]**

SWA-PA-03729 LA-1106473R2                                                                                   SA-12
**[***]**                                                                                                          Page 1

**BOEING PROPRIETARY**



BOEING PROPRIETARY



2.   **[\*\*\*]**

**BOEING PROPRIETARY**



SWA-PA-03729 LA-1106473R2                                                    SA-12
[***]                                                                      Page 4

**BOEING PROPRIETARY**



**BOEING PROPRIETARY**



3.   **[***]**

4.   Assignment.

Unless otherwise noted herein, **[***]** described in this Letter Agreement are provided **[***]** to Customer and in consideration of Customer's taking title to the Substitute Aircraft at time of delivery and becoming the operator of the Substitute Aircraft. This Letter Agreement cannot be assigned, in whole or in part, without the prior written consent of Boeing.

5. Confidentiality

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of

SWA-PA-03729 LA-1106473R2                                                                                            SA-12

**[***]**                                                                                                                      Page 6

**BOEING PROPRIETARY**



Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By      /s/ Carson J May

Name      Carson J May

Its      Attorney-In-Fact


ACCEPTED AND AGREED TO this

Date:      March 24 , 2021

SOUTHWEST AIRLINES CO.

By      /s/ Michael Van de Ven

Name      Michael Van de Ven

Its      Chief Operating Officer


SWA-PA-03729 LA-1106473R2

**[***]**

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle WA 98124-2207

SWA-PA-03729-LA-1106474**R3**

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:      Option Aircraft

Reference:      Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft and Model 737-7 aircraft

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.      Right to Purchase Option Aircraft.

Subject to the terms and conditions contained in this Letter Agreement, in addition to the Aircraft described in Table 1 to the Purchase Agreement as of the date of execution of this Letter Agreement, Customer will have the option to purchase additional Boeing Model 737-8 aircraft as option aircraft (**Option Aircraft**).

2.      Delivery.

The number of Option Aircraft and delivery dates are listed in the Attachment 1-A and 1-B (collectively **Attachment 1**) to this Letter Agreement. The Attachment 1-A Aircraft are the Original Option Aircraft (**Original Option Aircraft**) and the Attachment 1-B are the 2020 Option Aircraft (**2020 Option Aircraft**).

3.      Configuration.

3.1 Subject to the provisions of Article 3.2, below, the configuration for the Option Aircraft will be the Detail Specification for Boeing Model 737-8 aircraft at the revision level in effect at the time of Definitive Agreement (as defined in Article 8). Such Detail Specification will be revised to include (i) changes applicable to the Detail Specification that are developed by Boeing between the Option Exercise Date (as defined below) and the signing of the Definitive Agreement, (ii) changes required to obtain required regulatory certificates, and (iii) other changes as mutually agreed.



3.2 Boeing reserves the right to configure the Option Aircraft starting from a different configuration specification, provided that it can achieve the same configuration which would result pursuant to the provisions of Article 3.1.

4.    **[***]**

5.    **[***]**



6.    **[***]**

7.    **[***]**

8.    **[***]**

9.    Assignment.

Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Option Aircraft and cannot be assigned in whole or in part.

10.    Confidentiality.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees

SWA-PA-03729 LA-1106474R3                                                                                        SA-12

Option Aircraft                                                                                                        Page 3

**BOEING PROPRIETARY**

*BOEING*

to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

| By | /s/ Carson J May |
| Name | Carson J May |
| Its | Attorney-In-Fact |

ACCEPTED AND AGREED TO this

| Date: | March 24 , 2021 |

SOUTHWEST AIRLINES CO.

| By | /s/ Michael Van de Ven |
| Name | |
| | Michael Van de Ven |
| Its | Chief Operating Officer |

SWA-PA-03729 LA-1106474R3                                                                 SA-12
Option Aircraft                                                                                     Page 4

**BOEING PROPRIETARY**

**Attachment 1-A To**
**Letter Agreement No. 1106474**
**Aircraft Delivery, Description, Price and Advance Payments**

| | | | |
|---|---|---|---|
| **Airframe Model/MTOW:** 737-8 | 181,200 pounds | **Detail Specification:** | D019A008-S |
| **Engine Model/Thrust:** CFMLEAP-1B28(1) | | | (5/1/2017) |
| | 28,800 pounds | **Airframe Price Base Year/Escalation Formula:** | Jul-11    ECI-MFG/CPI |
| **Airframe Price:** | [***] | **Engine Price Base Year/Escalation Formula:** | N/A    N/A |
| **Optional Features:** | [***] | | |
| **Sub-Total of Airframe and Features:** | [***] | **Airframe Escalation Data:** | |
| **Engine Price (Per Aircraft):** | [***] | **Base Year Index (ECI):** | [***] |
| **Aircraft Basic Price (Excluding BFE/SPE):** | [***] | **Base Year Index (CPI):** | [***] |
| **Buyer Furnished Equipment (BFE) Estimate:** | [***] | | |
| **Seller Purchased Equipment (SPE) Estimate:** | [***] | | |

**Non-Refundable Deposit/Aircraft at Def Agreement:**    [***]

| Delivery Date | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Note | MSN | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Mar-2022 | 5 | [***] | [***] | Remarket Aircraft** | 67206, 67205, 67207, 67208, 67209 | [***] | [***] | [***] | [***] | [***] |
| Apr-2022 | 5 | [***] | [***] | Remarket Aircraft** | 67210, 67211, 67212, 67213, 67214 | [***] | [***] | [***] | [***] | [***] |
| May-2022 | 1 | [***] | [***] | Remarket Aircraft** | | [***] | [***] | [***] | [***] | [***] |
| May-2022 | 4 | [***] | [***] | Remarket Aircraft** | 67216, 67215, 67218, 67217 | [***] | [***] | [***] | [***] | [***] |
| Jun-2022 | 3 | [***] | [***] | Remarket Aircraft** | | [***] | [***] | [***] | [***] | [***] |
| Jul-2022 | 3 | [***] | [***] | Remarket Aircraft** | | [***] | [***] | [***] | [***] | [***] |
| Aug-2022 | 3 | [***] | [***] | Remarket Aircraft** | | [***] | [***] | [***] | [***] | [***] |
| Sep-2022 | 1 | [***] | [***] | Remarket Aircraft** | | [***] | [***] | [***] | [***] | [***] |
| Sep-2022 | 2 | [***] | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2022 | 1 | [***] | [***] | Remarket Aircraft** | | [***] | [***] | [***] | [***] | [***] |
| Oct-2022 | 3 | [***] | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2022 | 3 | [***] | [***] | Remarket Aircraft** | | [***] | [***] | [***] | [***] | [***] |
| Nov-2022 | 3 | [***] | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2022 | 3 | [***] | [***] | Remarket Aircraft** | | [***] | [***] | [***] | [***] | [***] |
| Dec-2022 | 2 | [***] | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2023 | 2 | [***] | [***] | Remarket Aircraft** | | [***] | [***] | [***] | [***] | [***] |
| Jan-2023 | 1 | [***] | [***] | | | [***] | [***] | [***] | [***] | [***] |

| | | [***] | [***] | | | [***] | [***] | [***] | [***] | [***] |
|---|---|---|---|---|---|---|---|---|---|---|
| Feb-2023 | 3 | | | Remarket Aircraft** | | | | | | |
| Mar-2023 | 2 | [***] | [***] | Remarket Aircraft** | | [***] | [***] | [***] | [***] | [***] |

SWA-PA-03729-LA-1106474 107813 116801- 1F.txt

**Boeing Proprietary**

Page 1

**Attachment 1-A To**
**Letter Agreement No. 1106474**
**Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Note | MSN | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Mar-2023 | 1 | [***] | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 2 | [***] | [***] | Remarket Aircraft** | | [***] | [***] | [***] | [***] | [***] |
| May-2023 | 3 | [***] | [***] | Remarket Aircraft** | | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 2 | [***] | [***] | Remarket Aircraft** | | [***] | [***] | [***] | [***] | [***] |
| Jul-2023 | 3 | [***] | [***] | Remarket Aircraft** | | [***] | [***] | [***] | [***] | [***] |
| Jul-2023 | 2 | [***] | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 2 | [***] | [***] | Remarket Aircraft** | | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | 2 | [***] | [***] | Remarket Aircraft** | | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | 2 | [***] | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 3 | [***] | [***] | Remarket Aircraft** | | [***] | [***] | [***] | [***] | [***] |
| Nov-2023 | 2 | [***] | [***] | Remarket Aircraft** | | [***] | [***] | [***] | [***] | [***] |
| Nov-2023 | 2 | [***] | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 2 | [***] | [***] | Remarket Aircraft** | | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 2 | [***] | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2024 | 3 | [***] | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2024 | 3 | [***] | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2024 | 4 | [***] | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 4 | [***] | [***] | | | [***] | [***] | [***] | [***] | [***] |
| May-2024 | 3 | [***] | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 2 | [***] | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2025 | 3 | [***] | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2025 | 3 | [***] | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2025 | 4 | [***] | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2025 | 4 | [***] | [***] | | | [***] | [***] | [***] | [***] | [***] |

| | | [***] | [***] | | | [***] | [***] | [***] | [***] | [***] |
|---|---|---|---|---|---|---|---|---|---|---|
| May-2025 | 1 | | | | | | | | | |
| May-2025 | 3 | [***] | [***] | Previously Earned | *** | [***] | [***] | [***] | [***] | [***] |
| Jun-2025 | 2 | [***] | [***] | Previously Earned | *** | [***] | [***] | [***] | [***] | [***] |

Total: 120

[***]

SWA-RA-03729-LA-1106474 107813 116801- 1F.txt

**Boeing Proprietary**

**Attachment 1-A To**
**Letter Agreement No. 1106474**
**Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Note | MSN | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |

** [***]
***[***]

**Note:**

(1) [***]

**Attachment 1-B To**
**Letter Agreement No. 1106474**
**Aircraft Delivery, Description, Price and Advance Payments**

| | | |
|---|---|---|
| **Airframe Model/MTOW:** | 737-8 | 181,200 pounds |
| **Engine Mode/Thrust:** | CFMLEAP-1B28[1] | 28,800 pounds |

| | |
|---|---|
| **Airframe Price:** | [***] |
| **Optional Features:** | [***] |
| **Sub-Total of Airframe and Features:** | [***] |
| **Engine Price (Per Aircraft):** | [***] |
| **Aircraft Basic Price (Excluding BFE/SPE):** | [***] |
| **Buyer Furnished Equipment (BFE) Estimate:** | [***] |
| **Seller Purchased Equipment (SPE) Estimate:** | [***] |
| **Deposit per Aircraft:** | [***] |

| | |
|---|---|
| **Detail Specification:** | D019A008-S (5/1/2017) |
| **Airframe Price Base Year/Escalation Formula:** | Jul-11  Non-Standard |
| **Engine Price Base Year/Escalation Formula:** | Jul-11  Non-Standard |

**Airframe Escalation Data:**

| | |
|---|---|
| **Base Year Index (ECI):** | |
| **Base Year Index (CPI):** | |

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Escalation Factor | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Jul-2024 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | 4 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Oct-2024 | 4 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Dec-2024 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Jun-2025 | 1 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Jul-2025 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Aug-2025 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Sep-2025 | 4 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Oct-2025 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Nov-2025 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Dec-2025 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

**Attachment 1-B To**
**Letter Agreement No. 1106474**
**Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Escalation Factor | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Jan-2026 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Feb-2026 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Mar-2026 | 4 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Apr-2026 | 4 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| May-2026 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Jun-2026 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Jul-2026 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Aug-2026 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Sep-2026 | 4 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Oct-2026 | 4 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Nov-2026 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Dec-2026 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Jan-2027 | 2 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Feb-2027 | 2 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Mar-2027 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Apr-2027 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| May-2027 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Jun-2027 | 2 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Jul-2027 | 2 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Aug-2027 | 2 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Sep-2027 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Oct-2027 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Nov-2027 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Dec-2027 | 2 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Jan-2028 | 2 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

SWA-PA-03729-LA-116800 JPEG

Boeing Proprietary

**Attachment 1-B To**

**Letter Agreement No. 1106474**

**Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Escalation Factor | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Feb-2028 | 2 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Mar-2028 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Apr-2028 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| May-2028 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Jun-2028 | 2 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Jul-2028 | 2 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Aug-2028 | 2 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Sep-2028 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Oct-2028 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Nov-2028 | 3 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Dec-2028 | 2 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Jan-2029 | 1 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Feb-2029 | 1 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Mar-2029 | 1 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Apr-2029 | 1 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| May-2029 | 1 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Jun-2029 | 1 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Jul-2029 | 1 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Aug-2029 | 1 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Sep-2029 | 1 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Oct-2029 | 1 | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

Total:        150

* [***]

SWA-PA-03729-LA-116800- 1F.txt                    **Boeing Proprietary**                    Page 3

**Attachment 1-B To**

**Letter Agreement No. 1106474**

**Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date | | Escalation Estimate | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Escalation | Adv Payment Base | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| | | | Deadline | Factor | Price Per A/P | | | | |

**Note:**

(1) [***]

**Boeing Proprietary**



The Boeing Company
P.O. Box 3707
Seattle WA 98124-2207

SWA-PA-03729-LA-1106475**R4**

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:        **[\*\*\*]**

References:    1)    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and Model 737-7 aircraft

2)    Letter Agreement SWA-PA-03729-LA-1106474R2 entitled "Option Aircraft" (**Option Aircraft Letter Agreement**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.      **[\*\*\*]**



**BOEING PROPRIETARY**



**BOEING PROPRIETARY**



2.      **[***]**

3.      <u>Assignment</u>.

Unless otherwise noted herein, **[***]** described in this Letter Agreement are provided **[***]** to Customer and in consideration of Customer's taking title to the Option Aircraft at time of delivery and becoming the operator of the Option Aircraft. This Letter Agreement cannot be assigned, in whole or in part, without the prior written consent of Boeing.

SWA-PA-03729-LA-1106475R4                                                                                            **SA-12**

**[***]**                                                                                                                                  Page 4

**BOEING PROPRIETARY**



4.    Confidentiality

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.



Very truly yours,


THE BOEING COMPANY

By

    /s/ Carson J May

Name

    Carson J May

Its

    Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:    March 24 , 2021

SOUTHWEST AIRLINES CO.

By

    /s/ Michael Van de Ven

Name

    Michael Van de Ven

Its

    Chief Operating Officer

SWA-PA-03729-LA-1106475R4

[***]

**BOEING PROPRIETARY**

**SA-12**

Page 6



The Boeing Company
P.O. Box 3707
Seattle WA 98124-2207

SWA-PA-03729-LA-1106484R2

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:     **[\*\*\*]**

Reference:     Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.     Defined Terms: The following capitalized terms have the following meaning:

1.1     **[\*\*\*]**

1.2     **[\*\*\*]**

1.3     **Program Aircraft** means each firm and exercised Option Aircraft specified in Table 1 of the Purchase Agreement as of the date of this Letter that are scheduled for delivery prior to 2024.

2.     **[\*\*\*]**

3.     **[\*\*\*]**

SWA-PA-03729-LA-1106484R3                                                                                    **SA-12**
**[\*\*\*]**                                                                                                                                   Page 1
**BOEING PROPRIETARY**



4.    **[***]**

**BOEING PROPRIETARY**



5.      **[***]**

6.      **[***]**

7.      <u>Assignment</u>. Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part.

8.      <u>Confidentiality</u>. Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a

SWA-PA-03729-LA-1106484R2                                                                                    **SA-12**

**[***]**                                                                                                              Page 3

**BOEING PROPRIETARY**



confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By     /s/ Carson J May

Its      Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:      March 25 , 2021

SOUTHWEST AIRLINES CO.

By     /s/ Michael Van de Ven

Its     Chief Operating Officer

SWA-PA-03729-LA-1106484R2                                                          **SA-12**

**[\*\*\*]**                                                                                Page 4

**BOEING PROPRIETARY**



**ATTACHMENT A**
**[\*\*\*]**

| [\*\*\*] | [\*\*\*] | [\*\*\*] |
|---|---|---|
| [\*\*\*] | [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] | [\*\*\*] |

**BOEING PROPRIETARY**



ATTACHMENT B

[***]

| [***] | [***] | [***] | [***] |
|---|---|---|---|
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |



ATTACHMENT B

[***]

| [***] | [***] | [***] | [***] |
|---|---|---|---|
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |

SWA-PA-03729-LA-1106484R2

[***]

**BOEING PROPRIETARY**



**ATTACHMENT B**

[***]

| [***] | [***] | [***] | [***] |
|-------|-------|-------|-------|
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |

**BOEING PROPRIETARY**



ATTACHMENT B

[***]

| [***] | [***] | [***] | [***] |
|---|---|---|---|
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |



ATTACHMENT B

[***]

| [***] | [***] | [***] | [***] |
|---|---|---|---|
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |



The Boeing Company
P.O. Box 3707
Seattle WA 98124-2207

SWA-PA-03729-LA-1301170**R3**

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:     **[\*\*\*]**

Reference:     Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.     **[\*\*\*]**

**BOEING PROPRIETARY**





2.    **[***]**

3.    Assignment.

Unless otherwise noted herein, **[***]** described in this Letter Agreement are provided **[***]** to Customer and in consideration of Customer's taking title to the 737-7 Aircraft at time of delivery and becoming the operator of the 737-7 Aircraft. This Letter

SWA-PA-03729-LA-1301170R3                                                                                       **SA-12**
**[***]**                                                                                                                 Page 3

**BOEING PROPRIETARY**



Agreement cannot be assigned, in whole or in part, without the prior written consent of Boeing.

4.    Confidentiality

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

SWA-PA-03729-LA-1301170R3                                                                                                 **SA-12**

[***]                                                                                                                              Page 4

**BOEING PROPRIETARY**



Very truly yours,

  THE BOEING COMPANY

By       /s/ Carson J May

Name     Carson J May

Its      Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:    March 24 , 2021

SOUTHWEST AIRLINES CO.

By       /s/ Michael Van de Ven

Name     Michael Van de Ven

Its      Chief Operating Officer

The Boeing Company
P.O. Box 3707
Seattle WA 98124-2207

_**BOEING**_

SWA-PA-03729-LA-1602486R1

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    **[\*\*\*]**

Reference:     Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

**[\*\*\*]**

1.    Definitions.

In this Letter Agreement, the following terms have meanings as follows:

**Aircraft** refers to any of the Boeing Model 737-8 and 737-7 aircraft described in Table 1A and Table 1B, respectively, of the Purchase Agreement.

**[\*\*\*]**

**[\*\*\*]**

**Effective Date** means the date on which SA-12 is mutually executed by the parties.

**[\*\*\*]**

2.    **[\*\*\*]**

SWA-PA-03729-LA-1602486R1                                                      **SA-12**
**[\*\*\*]**                                                                        Page 1

**BOEING PROPRIETARY**



3.    **[\*\*\*]**

4.    **[\*\*\*]**

**BOEING PROPRIETARY**



5.   **[***]**

6.   **[***]**

7.   **[***]**

8.   **[***]**

9.   **[***]**

10.   Assignment.

Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or in part.

SWA-PA-03729-LA-1301170R3                                                                                                   **SA-12**
**[***]**                                                                                                                            Page 3
**BOEING PROPRIETARY**



11.   Confidentiality.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.



Very truly yours,

THE BOEING COMPANY

By
_____/s/ Carson J May_____

Name
_____Carson J May_____

Its
_____Attorney-In-Fact_____


ACCEPTED AND AGREED TO this

Date:    _____March 24 , 2021_____

SOUTHWEST AIRLINES CO.

By    _____/s/ Michael Van de Ven_____

Name    _____Michael Van de Ven_____

Its    _____Chief Operating Officer_____

SWA-PA-03729-LA-1301170R3                                    **SA-12**
**[\*\*\*]**                                                     Page 5

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124 2207

SWA-PA-03729-LA-2100594

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    737-8 Remarket Aircraft

Reference:      a) Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to models 737-8 and 737-7 aircraft (**Aircraft)**; and

b) Letter Agreement No. SWA-PA-03729-LA-2100700 entitled "Remarket Aircraft – Open Configuration Matters" (**Remarket Aircraft Open Configuration Matters**) to the Purchase Agreement

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement and governs Customer's purchase of sixty (60) remarket Boeing model 737-8 Aircraft with CFMI engines (**Remarket Aircraft**), under the terms and conditions described in this Letter Agreement and the Purchase Agreement. All capitalized terms which are not otherwise defined herein shall have the definitions specified in the Purchase Agreement and other letter agreements specifically addressing the Remarket Aircraft.

This Letter Agreement incorporates in the Purchase Agreement those terms applicable only to the Remarket Aircraft. Except as expressly amended by the terms of this Letter Agreement, Remarket Aircraft are in all other respects "Aircraft" under the terms of the Purchase Agreement.

**[\*\*\*]**




**[\*\*\*]**




SA-12

Page 1

**BOEING PROPRIETARY**



**[\*\*\*]**

1.   **[\*\*\*]**

2.   **[\*\*\*]**

SWA-PA-03729-LA-2100594                                                                                                      SA-12

**BOEING PROPRIETARY**



`

3. Miscellaneous.

   3.1 **[***]**

   3.2 **[***]**

   3.3 **[***]**

   3.4 **[***]**

4. **[***]**

**BOEING PROPRIETARY**



5.    <u>Assignment</u>.

     Notwithstanding any other provisions of the Purchase Agreement to the contrary, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Remarket Aircraft and the Replacement Aircraft and cannot be assigned in whole or in part.

SWA-PA-03729-LA-2100594                                                                                                                SA-12

**BOEING PROPRIETARY**



6.    <u>Confidential Treatment</u>.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally or to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Remarket Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

SWA-PA-03729-LA-2100594                                                                                     SA-12

Page 5

**BOEING PROPRIETARY**



Very truly yours,

THE BOEING COMPANY

By        /s/ Carson J May

Name      Carson J May

Its       Attorney-In-Fact


ACCEPTED AND AGREED TO this

Date:     March 24, 2021


SOUTHWEST AIRLINES CO.

By        /s/ Michael Van de Ven

Name      Michael Van de Ven

Its       Chief Operating Officer


SWA-PA-03729-LA-2100594                                      SA-12
                                                            Page 6

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124 2207

SWA-PA-03729-LA-2100700


Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611


Subject:    Remarket Aircraft – Open Matters


References:    1)    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft (**Aircraft**)

2)    Letter Agreement No. SWA-PA-03729-LA-1106474R3 entitled "Option Aircraft" (**Option Aircraft Letter Agreement**) to the Purchase Agreement


This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement will have the same meaning as in the Purchase Agreement.

1.    Commitment of the Parties. Customer and Boeing agree that there are various details associated with the Remarket Aircraft in Attachment 1-A to the Option Aircraft Letter Agreement that have yet to be discussed and finalized between the Parties.

1.1    [***]


1.2    [***]


2.    **[***]**


SA-12

Page 1

**BOEING PROPRIETARY**



3.   **[\*\*\*]**

4.   **[\*\*\*]**

5.   Confidential Treatment.

      Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally or to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Remarket Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of

SWA-PA-03729-LA-2100700                                                                                       SA-12
Remarket Aircraft – Open Matters                                                                          Page 2

**BOEING PROPRIETARY**



Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By        /s/ Carson J May

Name      Carson J May

Its       Attorney-In-Fact


ACCEPTED AND AGREED TO this

Date:     March 24, 2021


SOUTHWEST AIRLINES CO.

By        /s/ Michael Van de Ven

Name      Michael Van de Ven

Its       Chief Operating Officer

**BOEING PROPRIETARY**

Case 4:23-cv-00115    Document 56-6    Filed 11/20/23 in TXSD    Page 150 of 293

**_BOEING_**

The Boeing Company
P.O. Box 3707
Seattle, WA 98124 2207

SWA-PA-03729-LA-2100811

Southwest Airlines Co.

2702 Love Field Drive

P.O. Box 36611

Dallas, Texas 75235-1611

Subject:     **[***]**

References:    1)    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and Model 737-7 aircraft

2)    Letter Agreement SWA-PA-03729-LA-1106474R3 entitled "Option Aircraft" (**Option Aircraft Letter Agreement**)

3)    Letter Agreement SWA-PA-03729-LA-1106475R4 entitled **[***]**

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

**[***]**

**[***]**

**[***]**

SA-12

Page 1

**BOEING PROPRIETARY**



1.    **[\*\*\*]**

**BOEING PROPRIETARY**



2.      **[\*\*\*]**

**BOEING PROPRIETARY**



3.    <u>Confidentiality.</u>

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article)

SWA-PA-03729-LA-2100811                                                                                                          SA-12

[***]                                                                                                                                        Page 4

**BOEING PROPRIETARY**



without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By      /s/ Carson J May

Its     Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:        March 24 , 2021

SOUTHWEST AIRLINES CO.

By      /s/ Michael Van de Ven

Its     Chief Operating Officer

SWA-PA-03729-LA-2100811                                                 SA-12
[***]                                                                   Page 5

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124 2207

SWA-PA-03729-LA-2100812

Southwest Airlines Co.

2702 Love Field Drive

P.O. Box 36611

Dallas, Texas 75235-1611

Subject:      **[\*\*\*]**

References:   1)   Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and Model 737-7 aircraft

2)   Letter Agreement SWA-PA-03729-LA-1106474R3 entitled "Option Aircraft" (**Option Aircraft Letter Agreement**)

3)   Letter Agreement SWA-PA-03729-LA-1106475R4 entitled **[\*\*\*]**

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

**[\*\*\*]**

1.     **[\*\*\*]**

SA-12

Page 1

**BOEING PROPRIETARY**

BOEING PROPRIETARY



2.    **[\*\*\*]**

**BOEING PROPRIETARY**



3.      [***]

**BOEING PROPRIETARY**



4.    Confidentiality.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

SWA-PA-03729-LA-2100812                                                                                       SA-12

[***]                                                                                                                   Page 5

**BOEING PROPRIETARY**

Very truly yours,

THE BOEING COMPANY

By          /s/ Carson J May

Name        Carson J May

Its         Attorney-In-Fact


ACCEPTED AND AGREED TO this

Date:       March 24 , 2021


SOUTHWEST AIRLINES CO.

By          /s/ Michael Van de Ven

Name        Michael Van de Ven

Its         Chief Operating Officer

SWA-PA-03729-LA-2100812                                                SA-12

[***]                                                                  Page 6

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124 2207

SWA-PA-03729-LA-2100813

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    **[***]**

Reference:    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft and Model 737-7 aircraft

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

**[***]**

1.    **[***]**

2.    Assignment.

Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and leased aircraft and cannot be assigned in whole or in part.

3.    Confidentiality

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and

SA-12

Page 1

**BOEING PROPRIETARY**

officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.



Very truly yours,
THE BOEING COMPANY

By          /s/ Carson J May

Name        Carson J May
Its         Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:       March 24 , 2021

SOUTHWEST AIRLINES CO.

By
            /s/ Michael Van de Ven

Name        Michael Van de Ven

Its         Chief Operating Officer

SWA-PA-03729-LA-2100813                                                    SA-12
[***]                                                                   Page 3
                        **BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124 2207

SWA-PA-03729-LA-2100814

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    **[\*\*\*]**

Reference:    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement will have the same meaning as in the Purchase Agreement.

1.    <u>Definitions</u>.

[\*\*\*]

[\*\*\*]

[\*\*\*]

[\*\*\*]

**Option Aircraft** will have the meaning specified in Letter Agreement Number LA-1106474R3 relating to Option Aircraft.

**Original Option Aircraft** will have the meaning specified in Letter Agreement Number LA-1106474R3 relating to Option Aircraft.

**2020 Option Aircraft** will have the meaning specified in Letter Agreement Number LA-1106474R3 relating to Option Aircraft.

**Program Aircraft** means (i) each firm and exercised Option Aircraft in Table 1 of the Purchase Agreement as of the date of this Letter Agreement that are scheduled

SWA-PA-03729-LA-2100814                                      SA-12
**[\*\*\*]**                                                   Page 1

**BOEING PROPRIETARY**



for delivery after January 1, 2024, (ii) each of the (100) 737-7 firm Aircraft, (iii) each exercised Original Option Aircraft, and (iv) each exercised 2020 Option Aircraft.

    [***]

2.    <u>Applicability</u>.

    2.1  **[***]**

    2.2  **[***]**

3.    **[***]**

4.    **[***]**

5.    **[***]**



6.    **[***]**

7.    <u>Assignment</u>.

Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer becoming the operator of the Aircraft and cannot be assigned, in whole or in part, without the prior written consent of Boeing.

8.    <u>Confidentiality</u>.

The information contained herein represents confidential business information and has value precisely because it is not available generally or to other parties. Customer will limit the disclosure of its contents to employees of Customer with a need to know the contents for purposes of helping Customer perform its obligations under the Purchase Agreement and who understand they are not to disclose its contents to any other person or entity without the prior written consent of Boeing.

ACCEPTED AND AGREED TO this

Date:    March 24, 2021

| southwest airlines co. | | THE BOEING COMPANY | |
|---|---|---|---|
| By: | /s/ Michael Van de Ven | By: | /s/ Carson J May |
| Name: | Michael Van de Ven | Name: | Carson J May |
| Title: | Chief Operating Officer | Title: | Attorney-In-Fact |

SWA-PA-03729-LA-2100814                                                          SA-12
**[***]**                                                                                        Page 3

**BOEING PROPRIETARY**



**ATTACHMENT A**

[***]

| [***] | [***] | [***] |
| --- | --- | --- |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |

**BOEING PROPRIETARY**

**ATTACHMENT B-1 : [***]**

[***]

[***]

| [***] | [***] |
|-------|-------|
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |

| [***] | [***] |
|-------|-------|
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |

| [***] | [***] |
|-------|-------|
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |

**BOEING PROPRIETARY**



**ATTACHMENT B-2: [\*\*\*]**

[\*\*\*]

[\*\*\*]

| [\*\*\*] | [\*\*\*] |
|---|---|
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |
| [\*\*\*] | [\*\*\*] |

**BOEING PROPRIETARY**



| [***] | [***] |
|---|---|
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |

**BOEING PROPRIETARY**

**BOEING PROPRIETARY**



| [***] | [***] |
|-------|-------|
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |

**BOEING PROPRIETARY**

Case 4:23-cv-00115     Document 56-6     Filed 11/20/23 in TXSD     Page 178 of 293

**BOEING PROPRIETARY**



| | |
|---|---|
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |



The Boeing Company
P.O. Box 3707
Seattle, WA 98124 2207

SWA-PA-03729-LA-2100819

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    **[\*\*\*]**

References:    1)    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft (**Aircraft**)

2)    Letter Agreement No. SWA-PA-03729-LA-1301170R3, **[\*\*\*]**

3)    Letter Agreement No. SWA-PA-03729-LA-2100812, **[\*\*\*]**

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.    **[\*\*\*]**

SWA-PA-03729-LA-2100819                                                            SA-12
**[\*\*\*]**                                                                                    Page 1

**BOEING PROPRIETARY**



2.    <u>Assignment</u>.

Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part.

3.    <u>Confidential Treatment</u>.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

SWA-PA-03729-LA-2100819                                                                                                                      SA-12

**[***]**                                                                                                                                        Page 2

**BOEING PROPRIETARY**



Very truly yours,

THE BOEING COMPANY

By

_/s/ Carson J May_

Name    Carson J May

Its    Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:    March 24 , 2021

SOUTHWEST AIRLINES CO.

By

_/s/ Michael Van de Ven_

Name    Michael Van de Ven

Its    Chief Operating Officer

SWA-PA-03729-LA-2100819    SA-12

**[\*\*\*]**    Page 3

**BOEING PROPRIETARY**

SWA-PA-03729-LA-2100825

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    **[\*\*\*]**

References:    1)    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft (**Aircraft**)

   This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.    **[\*\*\*]**

**BOEING PROPRIETARY**



2.    Assignment.

        Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part.

3.    Confidential Treatment.

        Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

SWA-PA-03729-LA-2100825                                                                                            SA-12

**[\*\*\*]**                                                                                                                    Page 2

**BOEING PROPRIETARY**



Very truly yours,

THE BOEING COMPANY

By

/s/ Carson J May

Name

Carson J May

Its

Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:   March 24 , 2021

SOUTHWEST AIRLINES CO.

By

/s/ Michael Van de Ven

Name

Michael Van de Ven

Its

Chiefs Operating Officer

SWA-PA-03729-LA-2100825                                        SA-12

[***]                                                         Page 3

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124 2207

SWA-PA-03729-LA-2100841

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    **[***]**

Reference:    1)    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and Model 737-7 aircraft

2)    Letter Agreement SWA-PA-03729-LA-2100594 entitled "737-8 Remarket Aircraft"    (**Remarket Aircraft Letter Agreement**)

3)    Letter Agreement SWA-PA-03729-LA-1106474R3 entitled "Option Aircraft"

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.    **[***]**



**BOEING PROPRIETARY**



2.    **[\*\*\*]**

**BOEING PROPRIETARY**



3.    **[***]**

4.    <u>Assignment</u>.

Unless otherwise noted herein, **[***]** described in this Letter Agreement are provided **[***]** to Customer and in consideration of Customer's taking title to the 737-8 Aircraft at time of delivery and becoming the operator of such 737-8 Aircraft. This Letter Agreement cannot be assigned, in whole or in part, without the prior written consent of Boeing.

5.    <u>Confidentiality</u>

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental



regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,
THE BOEING COMPANY

By        /s/ Carson J May

Name      Carson J May
Its       Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:     March 24 , 2021

SOUTHWEST AIRLINES CO.
By
          /s/ Michael Van de Ven
Name
          Michael Van de Ven

Its
          Chief Operating Officer

SWA-PA-03729-LA-2100841                                                    SA-12
**[***]**                                                                  Page 5

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124 2207

SWA-PA-03729-LA-2100984


Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:     **[\*\*\*]**

References:    1)    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and Model 737-7 aircraft

2)    Letter Agreement SWA-PA-03729-LA-1106471 entitled "Substitute Aircraft" (**Substitution Letter**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.     **[\*\*\*]**


SWA-PA-03729-LA-2100984                                                                          SA-12

                                                                                                 Page 1

**BOEING PROPRIETARY**





2.    **[***]**.

3.    <u>Assignment</u>.

Unless otherwise noted herein, **[***]** described in this Letter Agreement are provided **[***]** to Customer and in consideration of **[***]**. This Letter Agreement cannot be assigned, in whole or in part, without the prior written consent of Boeing.

4.    <u>Confidentiality</u>

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.



Very truly yours,

THE BOEING COMPANY

By        /s/ Carson J May

Name      Carson J May

Its       Attorney-In-Fact


ACCEPTED AND AGREED TO this

Date:     March 24 , 2021

SOUTHWEST AIRLINES CO.

By

          /s/ Michael Van de Ven

Name

          Michael Van de Ven

Its

          Chief Operating Officer

SWA-PA-03729-LA-2100984                                                    SA-12

**[\*\*\*]**                                                               Page 4

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

6-1162-CAF-0390R2

Southwest Airlines Co. 2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    Certain Contractual Matters

Reference:     Purchase Agreement Nos. 1810 and 3729 between The Boeing Company **(Boeing)** and Southwest Airlines Co. **(Customer)** relating to Model 737- 700, -800 and 737-7/8/9 aircraft **(Purchase Agreements)**

This letter agreement **(Letter Agreement)** amends and supplements the Purchase Agreements. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreements.

In consideration of **[***]**


**[***]**


**[***]**


**[***]**


**[***] = Certain identified information has been excluded from the exhibit because it is both not material and is of the type that the registrant treats as private and confidential.**


6-1162-CAF-0390R2

Certain Contractual Matters                                                                 Page 1

**[\*\*\*]**

Customer understands that certain information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations specifically relating to this Letter Agreement and who understand they are not to disclose its contents to any other person or entity without the prior written consent of Boeing and (c) attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this clause, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

6-1162-CAF-0390R2

Certain Contractual Matters

**BOEING PROPRIETARY**

Very truly yours,
THE BOEING COMPANY

By      /s/ Carson J. May

Name    Carson J. May

Its     Attorney-In-Fact


ACCEPTED AND AGREED TO this
Date:   March 24, 2021

SOUTHWEST AIRLINES CO.

By      /s/ Michael Van de Ven

Name    Michael Van de Ven

Its     Chief Operating Officer


6-1162-CAF-0390R2
Certain Contractual Matters                                    Page 3

**BOEING PROPRIETARY**

**MORTGAGE AND SECURITY AGREEMENT SUPPLEMENT NO. 1**

**MORTGAGE AND SECURITY AGREEMENT SUPPLEMENT NO. 1,** dated March 30, 2021 (this "**Mortgage Supplement**") is made between **SOUTHWEST AIRLINES CO.** (the "**Grantor**"), and **JPMORGAN CHASE BANK, N.A.** acting as an administrative agent (in such capacity, "**Collateral Agent**").

W I T N E S S E T H:

**WHEREAS**, all capitalized terms used and not otherwise defined herein shall have the respective meanings set forth or referred to in Article 1 of that certain the Mortgage and Security Agreement, dated as of March 30, 2020 (the "**Mortgage**"), between the Grantor and the Collateral Agent, recorded by the FAA on May 13, 2020, and assigned conveyance number MC036889;

**WHEREAS**; the parties entered into the Mortgage pursuant to that certain Revolving Credit Facility Agreement, dated as of August 3, 2016, as amended by First Amendment to Revolving Credit Facility Agreement dated as of March 30, 2020 (as such agreements may be amended, restated, amended and restated, supplemented or otherwise modified, renewed or replaced from time to time, collectively, the "**Credit Agreement**"), among the Grantor, JPMorgan Chase Bank, N.A., and Citibank, N.A., as co-administrative agents (collectively, the "**Administrative Agent**") for the financial institutions party thereto (the "**Banks**"), the Banks, and other parties identified therein; and

**WHEREAS**, the Mortgage provides for the execution and delivery of supplements thereto for purposes of specifically subjecting to the Lien of the Mortgage certain airframes and/or engines therein described.

**NOW, THEREFORE,** to secure the prompt and complete payment and performance when due of the Obligations of the Grantor under the Credit Agreement and each of the other Loan Papers, to secure the performance and observance by the Grantor of all the agreements, covenants and provisions contained in the Mortgage and in the other Loan Papers to which it is a party for the benefit of the Secured Parties, and for the uses and purposes and subject to the terms and provisions hereof, and in consideration of the premises and of the covenants herein contained, and of other good and valuable consideration the receipt and adequacy whereof are hereby acknowledged, the Grantor has granted, bargained, sold, assigned, transferred, conveyed, mortgaged, pledged and confirmed, and does hereby grant, bargain, sell, assign, transfer, convey, mortgage, pledge and confirm, unto the Collateral Agent, its successors and permitted assigns, for the security and benefit of the Secured Parties, a first priority continuing security interest (and, in the case of each airframe and each engine described in Annex A hereto, an International Interest) in and first priority mortgage Lien, in each case, subject to Permitted Liens, on all estate, right, title and interest of the Grantor in and to the airframes and engines described in Annex A hereto, whether or not any such engine shall be installed in or attached to any airframe described in Annex A hereto or any other airframe, together with all Parts of whatever nature relating thereto, and all additions, improvements, accessions and accumulations with respect to any of the foregoing, and all flight records, logs, manuals, maintenance data and inspection, modification and overhaul records and any other related records that are required to be maintained by regulations of the FAA or other Governmental Authority with respect to any of the foregoing (as may be required to be maintained by the Grantor's FAA approved maintenance program) and any Aircraft Documents related to any such airframe or engine.

**TO HAVE AND TO HOLD** all and singular the aforesaid property unto the Collateral Agent, its respective successors and permitted assigns, in trust for the benefit and security of the Secured Parties for the uses and purposes, subject to the terms and provisions set forth in the Mortgage.

This Mortgage Supplement shall be construed as supplemental to the Mortgage and shall form a part thereof, and the Mortgage is hereby incorporated by reference herein and is hereby ratified, approved and confirmed. Each of airframes and engines described in Annex A hereto shall be added to Exhibit A to the Mortgage and shall constitute an "Airframe" and an "Engine", as applicable, under the Mortgage, unless and until such airframe or such engine is released from the Lien of the Mortgage in accordance with the terms thereof.

This Mortgage Supplement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**THIS MORTGAGE SUPPLEMENT HAS BEEN DELIVERED IN THE STATE OF NEW YORK AND THIS MORTGAGE SUPPLEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES**

4835-3235-5039v.7 12479-82

**UNDER THIS MORTGAGE SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

4835-3235-5039v.7 12479-82

IN WITNESS WHEREOF, the Grantor and the Collateral Agent have caused this Mortgage and Security Agreement Supplement No. 1 to be duly executed by their respective officers thereunto duly authorized.

SOUTHWEST AIRLINES CO., as Grantor

By:  /s/ Chris Monroe
   Name: Chris Monroe
   Title: SVP, Finance

JPMORGAN CHASE BANK, N.A., as Collateral Agent

By:  /s/ Cristina Caviness
Name: Cristina Caviness
Title: Executive Director

*Signature Page to Mortgage and Security Agreement Supplement No. 1*

4835-3235-5039v.7 12479-82

**Annex A**

to Mortgage and Security Agreement Supplement No. 1

**Airframes and Engines**

|  | Airframe Make | Airframe Model | Airframe MSN | U.S. Reg. Number | Engine Manufacturer | Engine Model | Engine MSN 1 | Engine MSN 2 |
|---|---|---|---|---|---|---|---|---|
| 1 | Boeing | 737-7H4 | 36913 | N943WN | CFM International | CFM56-7B22E | 896468 | 802895 |
| 2 | Boeing | 737-7H4 | 36659 | N944WN | CFM International | CFM56-7B22E | 896402 | 803888 |
| 3 | Boeing | 737-7H4 | 36660 | N945WN | CFM International | CFM56-7B22E | 897306 | 802953 |
| 4 | Boeing | 737-7H4 | 36918 | N946WN | CFM International | CFM56-7B22E | 804107 | 804108 |
| 5 | Boeing | 737-7H4 | 36924 | N947WN | CFM International | CFM56-7B22E | 896235 | 804191 |
| 6 | Boeing | 737-7H4 | 36662 | N948WN | CFM International | CFM56-7B22E | 804203 | 896240 |
| 7 | Boeing | 737-7H4 | 36663 | N949WN | CFM International | CFM56-7B22E | 896467 | 804322 |
| 8 | Boeing | 737-7H4 | 36664 | N950WN | CFM International | CFM56-7B22E | 804336 | 896389 |
| 9 | Boeing | 737-7H4 | 36665 | N951WN | CFM International | CFM56-7B22E | 805301 | 804303 |
| 10 | Boeing | 737-7BD | 36726 | N555LV | CFM International | CFM56-7B22E | 804725 | 805809 |
| 11 | Boeing | 737-7H4 | 36671 | N955WN | CFM International | CFM56-7B22E | 804823 | 804844 |
| 12 | Boeing | 737-7BD | 33936 | N556WN | CFM International | CFM56-7B22E | 804863 | 804885 |
| 13 | Boeing | 737-7H4 | 36672 | N956WN | CFM International | CFM56-7B22E | 804897 | 804899 |
| 14 | Boeing | 737-7H4 | 41528 | N957WN | CFM International | CFM56-7B22E | 805933 | 804955 |
| 15 | Boeing | 737-7H4 | 36673 | N958WN | CFM International | CFM56-7B22E | 805936 | 804960 |
| 16 | Boeing | 737-7H4 | 36674 | N959WN | CFM International | CFM56-7B22E | 804908 | 960139 |
| 17 | Boeing | 737-7H4 | 36675 | N960WN | CFM International | CFM56-7B22E | 960180 | 960182 |
| 18 | Boeing | 737-7H4 | 36962 | N961WN | CFM International | CFM56-7B22E | 961177 | 960192 |
| 19 | Boeing | 737-7H4 | 36963 | N962WN | CFM International | CFM56-7B22E | 960213 | 804223 |
| 20 | Boeing | 737-7H4 | 36676 | N963WN | CFM International | CFM56-7B22E | 804278 | 805295 |
| 21 | Boeing | 737-7H4 | 36965 | N964WN | CFM International | CFM56-7B22E | 960259 | 960266 |
| 22 | Boeing | 737-7H4 | 36677 | N965WN | CFM International | CFM56-7B22E | 960280 | 960292 |
| 23 | Boeing | 737-7H4 | 36966 | N966WN | CFM International | CFM56-7B22E | 960282 | 960284 |
| 24 | Boeing | 737-7H4 | 36967 | N967WN | CFM International | CFM56-7B22E | 960275 | 960329 |

(EACH OF WHICH ENGINES DESCRIBED ABOVE HAVING AT LEAST 550 RATED TAKEOFF HORSEPOWER OR THE EQUIVALENT THEREOF)

4835-3235-5039v.7 12479-82

**SCHEDULE II**
**POOL ASSETS**
**Airframes and Engines**

| | Airframe Make | Airframe Model | U.S. Reg. Number | Airframe MSN | Engine Manufacturer | Engine Model | Engine MSN 1 | Engine MSN 2 |
|---|---|---|---|---|---|---|---|---|
| 1 | Boeing | 737-8H4 | N8635F | 60083 | CFM International | CFM56-7B27E/F | 658992 | 658949 |
| 2 | Boeing | 737-8H4 | N8634A | 42522 | CFM International | CFM56-7B27E/F | 658985 | 658982 |
| 3 | Boeing | 737-8H4 | N8633A | 36905 | CFM International | CFM56-7B27E/F | 658937 | 658892 |
| 4 | Boeing | 737-8H4 | N8632A | 60082 | CFM International | CFM56-7B27E/F | 658893 | 658891 |
| 5 | Boeing | 737-8H4 | N8631A | 42385 | CFM International | CFM56-7B27E/F | 657908 | 658873 |
| 6 | Boeing | 737-8H4 | N8623F | 36731 | CFM International | CFM56-7B27E/F | 658491 | 658488 |
| 7 | Boeing | 737-8H4 | N8619F | 33939 | CFM International | CFM56-7B27E/F | 658361 | 658359 |
| 8 | Boeing | 737-8H4 | N8620H | 42526 | CFM International | CFM56-7B27E/F | 658371 | 658351 |
| 9 | Boeing | 737-8H4 | N8618N | 36915 | CFM International | CFM56-7B27E/F | 658355 | 658354 |
| 10 | Boeing | 737-8H4 | N8617E | 36912 | CFM International | CFM56-7B27E/F | 658280 | 658279 |
| 11 | Boeing | 737-8H4 | N8616C | 36914 | CFM International | CFM56-7B27E/F | 658267 | 658257 |
| 12 | Boeing | 737-8H4 | N8615E | 36933 | CFM International | CFM56-7B27E/F | 962655 | 658223 |
| 13 | Boeing | 737-8H4 | N8614M | 36908 | CFM International | CFM56-7B27E/F | 962723 | 962719 |
| 14 | Boeing | 737-8H4 | N8613K | 36998 | CFM International | CFM56-7B27E/F | 963686 | 962683 |
| 15 | Boeing | 737-8H4 | N8605E | 36891 | CFM International | CFM56-7B27E/F | 962478 | 963475 |
| 16 | Boeing | 737-8H4 | N8329B | 37006 | CFM International | CFM56-7B27E/F | 962467 | 962465 |
| 17 | Boeing | 737-8H4 | N8328A | 38818 | CFM International | CFM56-7B27E/F | 962456 | 962448 |
| 18 | Boeing | 737-8H4 | N8327A | 37009 | CFM International | CFM56-7B27E/F | 962411 | 962410 |
| 19 | Boeing | 737-8H4 | N8326F | 35969 | CFM International | CFM56-7B27E/F | 962416 | 962415 |
| 20 | Boeing | 737-8H4 | N8325D | 37003 | CFM International | CFM56-7B27E/F | 962402 | 962401 |
| 21 | Boeing | 737-7H4 | N954WN | 36669 | CFM International | CFM56-7B24/3 | 804732 | 804718 |
| 22 | Boeing | 737-7H4 | N953WN | 36668 | CFM International | CFM56-7B24/3 | 804651 | 804507 |
| 23 | Boeing | 737-7H4 | N952WN | 36667 | CFM International | CFM56-7B24/3 | 804571 | 804568 |
| 24 | Boeing | 737-7BD | N7737E | 33929 | CFM International | CFM56-7B20 | 894174 | 894335 |
| 25 | Boeing | 737-7BD | N7736A | 35109 | CFM International | CFM56-7B20 | 894344 | 890882 |
| 26 | Boeing | 737-7H4 | N258WN | 32516 | CFM International | CFM56-7B24 | 894248 | 894154 |
| 27 | Boeing | 737-7H4 | N257WN | 32515 | CFM International | CFM56-7B24 | 894221 | 892867 |
| 28 | Boeing | 737-7H4 | N256WN | 32514 | CFM International | CFM56-7B24 | 894216 | 894200 |
| 29 | Boeing | 737-7H4 | N255WN | 32513 | CFM International | CFM56-7B24 | 894198 | 894197 |
| 30 | Boeing | 737-7H4 | N254WN | 32512 | CFM International | CFM56-7B24 | 894173 | 894172 |
| 31 | Boeing | 737-7H4 | N253WN | 32511 | CFM International | CFM56-7B24 | 895150 | 894101 |
| 32 | Boeing | 737-7H4 | N252WN | 34973 | CFM International | CFM56-7B24 | 894140 | 894139 |
| 33 | Boeing | 737-7H4 | N251WN | 32510 | CFM International | CFM56-7B24 | 894136 | 894135 |
| 34 | Boeing | 737-7H4 | N250WN | 34972 | CFM International | CFM56-7B24 | 894122 | 892987 |
| 35 | Boeing | 737-7H4 | N249WN | 34951 | CFM International | CFM56-7B24 | 892993 | 892992 |
| 36 | Boeing | 737-7H4 | N247WN | 32508 | CFM International | CFM56-7B24 | 892958 | 892957 |
| 37 | Boeing | 737-7H4 | N246LV | 32507 | CFM International | CFM56-7B24 | 892950 | 892946 |
| 38 | Boeing | 737-7H4 | N245WN | 32506 | CFM International | CFM56-7B24 | 892943 | 892942 |
| 39 | Boeing | 737-7H4 | N244WN | 34864 | CFM International | CFM56-7B24 | 874962 | 892930 |
| 40 | Boeing | 737-7H4 | N239WN | 34714 | CFM International | CFM56-7B24 | 892885 | 892884 |
| 41 | Boeing | 737-7H4 | N238WN | 34713 | CFM International | CFM56-7B24 | 892396 | 892284 |
| 42 | Boeing | 737-7H4 | N236WN | 34631 | CFM International | CFM56-7B24 | 892838 | 892835 |

| 43 | Boeing | 737-7H4 | N235WN | 34630 | CFM International | CFM56-7B24 | 893784 | 892813 |
|----|--------|---------|--------|-------|------------------|------------|--------|--------|
| 44 | Boeing | 737-7H4 | N234WN | 32502 | CFM International | CFM56-7B24 | 892790 | 892776 |
| 45 | Boeing | 737-7H4 | N233LV | 32501 | CFM International | CFM56-7B24 | 893759 | 893752 |
| 46 | Boeing | 737-7BD | N7720F | 33922 | CFM International | CFM56-7B20 | 892655 | 892654 |
| 47 | Boeing | 737-7H4 | N228WN | 32496 | CFM International | CFM56-7B24 | 892606 | 892605 |
| 48 | Boeing | 737-7H4 | N222WN | 34290 | CFM International | CFM56-7B24 | 892526 | 892525 |
| 49 | Boeing | 737-7BD | N7715E | 33921 | CFM International | CFM56-7B20 | 893511 | 893510 |
| 50 | Boeing | 737-7H4 | N221WN | 34259 | CFM International | CFM56-7B24 | 892516 | 892515 |
| 51 | Boeing | 737-752 | N7835A | 34294 | CFM International | CFM56-7B22 | 892486 | 893127 |
| 52 | Boeing | 737-7H4 | N218WN | 32489 | CFM International | CFM56-7B24 | 892439 | 892438 |
| 53 | Boeing | 737-7H4 | N217JC | 34232 | CFM International | CFM56-7B24 | 892429 | 892428 |
| 54 | Boeing | 737-7BD | N7713A | 33919 | CFM International | CFM56-7B20 | 892416 | 892415 |
| 55 | Boeing | 737-7H4 | N214WN | 32486 | CFM International | CFM56-7B24 | 892183 | 892182 |
| 56 | Boeing | 737-7H4 | N215WN | 32487 | CFM International | CFM56-7B24 | 893199 | 893194 |
| 57 | Boeing | 737-7H4 | N213WN | 34217 | CFM International | CFM56-7B24 | 892217 | 892212 |
| 58 | Boeing | 737-7H4 | N212WN | 32485 | CFM International | CFM56-7B24 | 892201 | 892195 |
| 59 | Boeing | 737-7H4 | 36913 | N943WN | CFM International | CFM56-7B22E | 896468 | 802895 |
| 60 | Boeing | 737-7H4 | 36659 | N944WN | CFM International | CFM56-7B22E | 896402 | 803888 |
| 61 | Boeing | 737-7H4 | 36660 | N945WN | CFM International | CFM56-7B22E | 897306 | 802953 |
| 62 | Boeing | 737-7H4 | 36918 | N946WN | CFM International | CFM56-7B22E | 804107 | 804108 |
| 63 | Boeing | 737-7H4 | 36924 | N947WN | CFM International | CFM56-7B22E | 896235 | 804191 |
| 64 | Boeing | 737-7H4 | 36662 | N948WN | CFM International | CFM56-7B22E | 804203 | 896240 |
| 65 | Boeing | 737-7H4 | 36663 | N949WN | CFM International | CFM56-7B22E | 896467 | 804322 |
| 66 | Boeing | 737-7H4 | 36664 | N950WN | CFM International | CFM56-7B22E | 804336 | 896389 |
| 67 | Boeing | 737-7H4 | 36665 | N951WN | CFM International | CFM56-7B22E | 805301 | 804303 |
| 68 | Boeing | 737-7BD | 36726 | N555LV | CFM International | CFM56-7B22E | 804725 | 805809 |
| 69 | Boeing | 737-7H4 | 36671 | N955WN | CFM International | CFM56-7B22E | 804823 | 804844 |
| 70 | Boeing | 737-7BD | 33936 | N556WN | CFM International | CFM56-7B22E | 804863 | 804885 |
| 71 | Boeing | 737-7H4 | 36672 | N956WN | CFM International | CFM56-7B22E | 804897 | 804899 |
| 72 | Boeing | 737-7H4 | 41528 | N957WN | CFM International | CFM56-7B22E | 805933 | 804955 |
| 73 | Boeing | 737-7H4 | 36673 | N958WN | CFM International | CFM56-7B22E | 805936 | 804960 |
| 74 | Boeing | 737-7H4 | 36674 | N959WN | CFM International | CFM56-7B22E | 804908 | 960139 |
| 75 | Boeing | 737-7H4 | 36675 | N960WN | CFM International | CFM56-7B22E | 960180 | 960182 |
| 76 | Boeing | 737-7H4 | 36962 | N961WN | CFM International | CFM56-7B22E | 961177 | 960192 |
| 77 | Boeing | 737-7H4 | 36963 | N962WN | CFM International | CFM56-7B22E | 960213 | 804223 |
| 78 | Boeing | 737-7H4 | 36676 | N963WN | CFM International | CFM56-7B22E | 804278 | 805295 |
| 79 | Boeing | 737-7H4 | 36965 | N964WN | CFM International | CFM56-7B22E | 960259 | 960266 |
| 80 | Boeing | 737-7H4 | 36677 | N965WN | CFM International | CFM56-7B22E | 960280 | 960292 |
| 81 | Boeing | 737-7H4 | 36966 | N966WN | CFM International | CFM56-7B22E | 960282 | 960284 |
| 82 | Boeing | 737-7H4 | 36967 | N967WN | CFM International | CFM56-7B22E | 960275 | 960329 |

(EACH OF WHICH ENGINES DESCRIBED ABOVE HAVING AT LEAST 550 RATED TAKEOFF HORSEPOWER OR THE EQUIVALENT THEREOF)

SCHEDULE II - 2

**PAYROLL SUPPORT PROGRAM 3 AGREEMENT**

| | |
|---|---|
| **Recipient:** Southwest Airlines Co.<br>2702 Love Field Drive<br>Dallas, TX 75235 | **PSP Participant Number:** PSA-2004031159<br>**Employer Identification Number:** 74-1563240<br>**DUNS Number:** 055329262 |

**Additional Recipients:** None.

**Amount of Initial Payroll Support Payment:** $926,393,063.95

The Department of the Treasury (Treasury) hereby provides Payroll Support (as defined herein) under section 7301 of the American Rescue Plan Act of 2021. The Signatory Entity named above, on behalf of itself and its Affiliates (as defined herein), agrees to comply with this Agreement and applicable Federal law as a condition of receiving Payroll Support. The Signatory Entity and its undersigned authorized representatives acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in connection with this Agreement may result in administrative remedies as well as civil and/or criminal penalties.

**The undersigned hereby agree to the attached Payroll Support Program 3 Agreement.**

/s/ David A Lebryk

Department of the Treasury

Name: David A. Lebryk

Title: Fiscal Assistant Secretary

Date: April 23, 2021

/s/ Tamy Romo

Southwest Airlines Co.

First Authorized Representative: Tammy Romo

Title: Executive Vice President and Chief Financial Officer

Date: April 23, 2021


/s/ Chris Monroe

Southwest Airlines Co.

Second Authorized Representative: David Christopher Monroe

Title: Senior Vice President Finance and Treasurer

Date: April 23, 2021

OMB Approval No. 1505-0263

PAPERWORK REDUCTION ACT NOTICE

The information collected will be used for the U.S. Government to process requests for support. The estimated burden associated with this collection of information is 2 hours per response. Comments concerning the accuracy of this burden estimate and suggestions for reducing this burden should be directed to the Office of Privacy, Transparency and Records, Department of the Treasury, 1500 Pennsylvania Ave., N.W., Washington, D.C. 20220. DO NOT send the form to this address. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid control number assigned by OMB.

## PAYROLL SUPPORT PROGRAM 3 AGREEMENT
### INTRODUCTION

Section 7301 of the American Rescue Plan Act of 2021 (ARP) directs the Department of the Treasury (Treasury) to provide Payroll Support (as defined herein) to passenger air carriers and certain contractors that must be exclusively used for the continuation of payment of Employee Salaries, Wages, and Benefits (as defined herein). The ARP requires certain assurances from the Recipient (as defined herein).

This Payroll Support Program 3 Agreement, including all supporting documents submitted by the Recipient and the Payroll Support Program 3 Certification attached hereto (collectively, Agreement), memorializes the binding terms and conditions applicable to the Recipient.

### DEFINITIONS

As used in this Agreement, the following terms shall have the following respective meanings, unless the context clearly requires otherwise. In addition, this Agreement shall be construed in a manner consistent with any public guidance Treasury may from time to time issue regarding the implementation of section 7301 of the ARP.

*Additional Payroll Support Payment* means any disbursement of Payroll Support occurring after the first disbursement of Payroll Support under this Agreement.

*Affiliate* means any Person that directly or indirectly controls, is controlled by, or is under common control with, the Recipient. For purposes of this definition, "control" of a Person shall mean having the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by ownership of voting equity, by contract, or otherwise.

*ARP* means the American Rescue Plan Act of 2021.

*Benefits* means, without duplication of any amounts counted as Salary or Wages, pension expenses in respect of Employees, all expenses for accident, sickness, hospital, and death benefits to Employees, and the cost of insurance to provide such benefits; any Severance Pay or Other Benefits payable to Employees pursuant to a bona fide voluntary early retirement program or voluntary furlough; and any other similar expenses paid by the Recipient for the benefit of Employees, including any other fringe benefit expense described in lines 10 and 11 of Financial Reporting Schedule P-6, Form 41, as published by the Department of Transportation, but excluding any Federal, state, or local payroll taxes paid by the Recipient.

*Corporate Officer* means, with respect to the Recipient, its president; any vice president in charge of a principal business unit, division, or function (such as sales, administration or finance); any other officer who performs a policy-making function; or any other person who performs similar policy making functions for the Recipient. Executive officers of subsidiaries or

2

parents of the Recipient may be deemed Corporate Officers of the Recipient if they perform such policy-making functions for the Recipient.

*Employee* means an individual who is employed by the Recipient and whose principal place of employment is in the United States (including its territories and possessions), including salaried, hourly, full-time, part-time, temporary, and leased employees, but excluding any individual who is a Corporate Officer or independent contractor.

*Involuntary Termination or Furlough* means the Recipient terminating the employment of one or more Employees or requiring one or more Employees to take a temporary suspension or unpaid leave for any reason, including a shut-down or slow-down of business; provided, however, that an Involuntary Termination or Furlough does not include a Permitted Termination or Furlough.

*Maximum Awardable Amount* means the amount determined by the Secretary with respect to the Recipient pursuant to section 7301(b)(2) of the ARP.

*Payroll Support* means funds disbursed by the Secretary to the Recipient under this Agreement, including the first disbursement of Payroll Support and any Additional Payroll Support Payment.

*Permitted Termination or Furlough* means, with respect to an Employee, (1) a voluntary furlough, voluntary leave of absence, voluntary resignation, or voluntary retirement, (2) termination of employment resulting from such Employee's death or disability, or (3) the Recipient terminating the employment of such Employee for cause or placing such Employee on a temporary suspension or unpaid leave of absence for disciplinary reasons, in either case, as reasonably determined by the Recipient acting in good faith.

*Person* means any natural person, corporation, limited liability company, partnership, joint venture, trust, business association, governmental entity, or other entity.

*PSP1* means the Payroll Support Program established under Division A, Title IV, Subtitle B of the Coronavirus Aid, Relief, and Economic Security Act (Pub. L. No. 116-136).

*PSP2* means the Payroll Support Program Extension established under Subtitle A of Title IV of Division N of the Consolidated Appropriations Act, 2021.

*Recipient* means, collectively, the Signatory Entity; its Affiliates that are listed on the signature page hereto as Additional Recipients; and their respective heirs, executors, administrators, successors, and assigns.

*Salary* means, without duplication of any amounts counted as Benefits, a predetermined regular payment, typically paid on a weekly or less frequent basis but which may be expressed as an hourly, weekly, annual or other rate, as well as cost-of-living differentials, vacation time, paid time off, sick leave, and overtime pay, paid by the Recipient to its Employees, but excluding any Federal, state, or local payroll taxes paid by the Recipient.

*Secretary* means the Secretary of the Treasury.

3

*Severance Pay or Other Benefits* means any severance payment or other similar benefits, including cash payments, health care benefits, perquisites, the enhancement or acceleration of the payment or vesting of any payment or benefit or any other in-kind benefit payable (whether in lump sum or over time, including after October 1, 2022) by the Recipient to a Corporate Officer or Employee in connection with any termination of such Corporate Officer's or Employee's employment (including, without limitation, resignation, severance, retirement, or constructive termination), which shall be determined and calculated in respect of any Employee or Corporate Officer of the Recipient in the manner prescribed in 17 CFR 229.402(j) (without regard to its limitation to the five most highly compensated executives and using the actual date of termination of employment rather than the last business day of the Recipient's last completed fiscal year as the trigger event).

*Signatory Entity* means the passenger air carrier or contractor that has entered into this Agreement.

*Taxpayer Protection Instruments* means warrants, options, preferred stock, debt securities, notes, or other financial instruments issued by the Recipient or an Affiliate to Treasury as compensation for the Payroll Support under this Agreement, if applicable.

*Total Compensation* means compensation including salary, wages, bonuses, awards of stock, and any other financial benefits provided by the Recipient or an Affiliate, as applicable, which shall be determined and calculated for the 2019 calendar year or any applicable 12-month period in respect of any Employee or Corporate Officer of the Recipient in the manner prescribed under paragraph e.6 of the award term in 2 CFR part 170, App. A, but excluding any Severance Pay or Other Benefits in connection with a termination of employment.

*Wage* means, without duplication of any amounts counted as Benefits, a payment, typically paid on an hourly, daily, or piecework basis, including cost-of-living differentials, vacation, paid time off, sick leave, and overtime pay, paid by the Recipient to its Employees, but excluding any Federal, state, or local payroll taxes paid by the Recipient.

**PAYROLL SUPPORT PAYMENTS**

1.  Upon the execution of this Agreement by Treasury and the Recipient, the Secretary shall approve the Recipient to receive Payroll Support.

2.  The Recipient may receive Payroll Support in multiple payments up to the Maximum Awardable Amount, and the amounts (individually and in the aggregate) and timing of such payments will be determined by the Secretary in her sole discretion. The Secretary may, in her sole discretion, increase or reduce the Maximum Awardable Amount consistent with section 7301 of the ARP.

3.  The Secretary may determine in her sole discretion that any Payroll Support shall be conditioned on, and subject to, compliance by the Recipient with all applicable requirements under (a) PSP2 and (b) PSP1 if the Recipient received financial assistance in PSP1, and such additional terms and conditions (including the receipt of, and any terms regarding, Taxpayer Protection Instruments) to which the parties may agree in writing.

4

**TERMS AND CONDITIONS**

<u>Retaining and Paying Employees</u>

4.  The Recipient shall use the Payroll Support exclusively for the continuation of payment of Wages, Salaries, and Benefits to the Employees of the Recipient.

    a.  *Furloughs and Layoffs*. The Recipient shall not conduct an Involuntary Termination or Furlough of any Employee between the date of this Agreement and September 30, 2021 or the date on which the Recipient has expended all of the Payroll Support, whichever is later.

    b.  *Employee Salary, Wages, and Benefits*

        i.  *Salary and Wages*. Except in the case of a Permitted Termination or Furlough, the Recipient shall not, between the date of this Agreement and September 30, 2021 or the date on which the Recipient has expended all of the Payroll Support, whichever is later, reduce, without the Employee's consent, (A) the pay rate of any Employee earning a Salary, or (B) the pay rate of any Employee earning Wages.

        ii.  *Benefits*. Except in the case of a Permitted Termination or Furlough, the Recipient shall not, between the date of this Agreement and September 30, 2021 or the date on which the Recipient has expended all of the Payroll Support, whichever is later, reduce, without the Employee's consent, the Benefits of any Employee; provided, however, that for purposes of this paragraph, personnel expenses associated with the performance of work duties, including those described in line 10 of Financial Reporting Schedule P-6, Form 41, as published by the Department of Transportation, may be reduced to the extent the associated work duties are not performed.

<u>Dividends and Buybacks</u>

5.  Through September 30, 2022, neither the Recipient nor any Affiliate shall, in any transaction, purchase an equity security of the Recipient or of any direct or indirect parent company of the Recipient that, in either case, is listed on a national securities exchange.

6.  Through September 30, 2022, the Recipient shall not pay dividends, or make any other capital distributions, with respect to the common stock (or equivalent equity interest) of the Recipient.

<u>Limitations on Certain Compensation</u>

7.  Beginning April 1, 2021, and ending April 1, 2023, the Recipient and its Affiliates shall not pay any of the Recipient's Corporate Officers or Employees whose Total Compensation exceeded $425,000 in calendar year 2019 (other than an Employee whose compensation is

5

determined through an existing collective bargaining agreement entered into before March 11, 2021):

    a.  Total Compensation which exceeds, during any 12 consecutive months of such two-year period, the Total Compensation the Corporate Officer or Employee received in calendar year 2019; or

    b.  Severance Pay or Other Benefits in connection with a termination of employment with the Recipient which exceed twice the maximum Total Compensation received by such Corporate Officer or Employee in calendar year 2019.

8.  Beginning April 1, 2021, and ending April 1, 2023, the Recipient and its Affiliates shall not pay, during any 12 consecutive months of such two-year period, any of the Recipient's Corporate Officers or Employees whose Total Compensation exceeded $3,000,000 in calendar year 2019 Total Compensation in excess of the sum of:

    a.  $3,000,000; and

    b.  50 percent of the excess over $3,000,000 of the Total Compensation received by such Corporate Officer or Employee in calendar year 2019.

9.  For purposes of determining applicable amounts under paragraphs 7 and 8 with respect to any Corporate Officer or Employee who was employed by the Recipient or an Affiliate for less than all of calendar year 2019, the amount of Total Compensation in calendar year 2019 shall mean such Corporate Officer's or Employee's Total Compensation on an annualized basis.

<u>Service and Eligibility</u>

10.1  If the Recipient is an air carrier, until March 1, 2022, the Recipient shall comply with any applicable requirement issued by the Secretary of Transportation under section 407 of the PSP Extension Law to maintain scheduled air transportation service to any point served by the Recipient before March 1, 2020.

10.2  The Recipient represents, warrants, and certifies that as of March 31, 2021, the Recipient:

    a.  provided air transportation as an air carrier, as defined under 49 U.S.C. § 40102; or

    b.  (i) performed, under contract with a passenger air carrier conducting operations under 14 CFR part 121, (A) catering functions; or (B) functions on the property of an airport that were directly related to the air transportation of persons, property, or mail, including the loading and unloading of property on aircraft, assistance to passengers under 14 CFR part 382, security, airport ticketing and check-in functions, groundhandling of aircraft, or aircraft cleaning and sanitization functions and waste removal; or (ii) was a subcontractor that performed such functions.

10.3  The Recipient represents, warrants, and certifies that between March 31, 2021, and the effective date of this Agreement, it has not:

    a.  conducted an Involuntary Termination or Furlough;

6

b.  reduced, without the Employee's consent, (i) the pay rate of any Employee earning a Salary, or (ii) the pay rate of any Employee earning Wages; or

c.  except in the case of a Permitted Termination or Furlough, reduced, without the Employee's consent, the Benefits of any Employee (provided, however, that for purposes of this subparagraph, personnel expenses associated with the performance of work duties, including those described in line 10 of Financial Reporting Schedule P-6, Form 41, as published by the Department of Transportation, may be reduced to the extent the associated work duties are not performed).

Effective Date

11. This Agreement shall be effective as of the date of its execution by both parties.

Reporting and Auditing

12. Until the calendar quarter that begins after the later of January 1, 2023, and the date on which no Taxpayer Protection Instrument is outstanding, not later than 45 days after the end of each of the first three calendar quarters of each calendar year and 90 days after the end of each calendar year, the Signatory Entity, on behalf of itself and each other Recipient, shall certify to Treasury that it is in compliance with the terms and conditions of this Agreement and provide a report containing the following:

a.  the amount of Payroll Support funds expended during such quarter;

b.  the Recipient's financial statements (audited by an independent certified public accountant, in the case of annual financial statements);

c.  a copy of the Recipient's IRS Form 941 filed with respect to such quarter; and

d.  a detailed summary describing, with respect to the Recipient, (a) any changes in Employee headcount during such quarter and the reasons therefor, including any Involuntary Termination or Furlough, (b) any changes in the amounts spent by the Recipient on Employee Wages, Salary, and Benefits during such quarter, and (c) any changes in Total Compensation for, and any Severance Pay or Other Benefits in connection with the termination of, Corporate Officers and Employees subject to limitation under this Agreement during such quarter; and the reasons for any such changes.

13. If the Recipient or any Affiliate, or any Corporate Officer of the Recipient or any Affiliate, becomes aware of facts, events, or circumstances that may materially affect the Recipient's compliance with the terms and conditions of this Agreement, the Recipient or Affiliate shall promptly provide Treasury with a written description of the events or circumstances and any action taken, or contemplated, to address the issue.

14. In the event the Recipient contemplates any action to commence a bankruptcy or insolvency proceeding in any jurisdiction, the Recipient shall promptly notify Treasury.

7

15. The Recipient shall:

   a. Promptly provide to Treasury and the Treasury Inspector General a copy of any Department of Transportation Inspector General report, audit report, or report of any other oversight body, that is received by the Recipient relating to this Agreement.

   b. Immediately notify Treasury and the Treasury Inspector General of any indication of fraud, waste, abuse, or potentially criminal activity pertaining to the Payroll Support.

   c. Promptly provide Treasury with any information Treasury may request relating to compliance by the Recipient and its Affiliates with this Agreement.

16. The Recipient and Affiliates will provide Treasury, the Treasury Inspector General, and such other entities as authorized by Treasury timely and unrestricted access to all documents, papers, or other records, including electronic records, of the Recipient related to the Payroll Support, to enable Treasury and the Treasury Inspector General to make audits, examinations, and otherwise evaluate the Recipient's compliance with the terms of this Agreement. This right also includes timely and reasonable access to the Recipient's and its Affiliates' personnel for the purpose of interview and discussion related to such documents. This right of access shall continue as long as records are required to be retained. In addition, the Recipient will provide timely reports as reasonably required by Treasury, the Treasury Inspector General, and such other entities as authorized by Treasury to comply with applicable law and to assess program effectiveness.

Recordkeeping and Internal Controls

17. If the Recipient is a debtor as defined under 11 U.S.C. § 101(13), the Payroll Support funds, any claim or account receivable arising under this Agreement, and any segregated account holding funds received under this Agreement shall not constitute or become property of the estate under 11 U.S.C. § 541.

18. The Recipient shall expend and account for Payroll Support funds in a manner sufficient to:

   a. Permit the preparation of accurate, current, and complete quarterly reports as required under this Agreement.

   b. Permit the tracing of funds to a level of expenditures adequate to establish that such funds have been used as required under this Agreement.

19. The Recipient shall establish and maintain effective internal controls over the Payroll Support; comply with all requirements related to the Payroll Support established under applicable Federal statutes and regulations; monitor compliance with Federal statutes, regulations, and the terms and conditions of this Agreement; and take prompt corrective

8

actions in accordance with audit recommendations. The Recipient shall promptly remedy any identified instances of noncompliance with this Agreement.

20. The Recipient and Affiliates shall retain all records pertinent to the receipt of Payroll Support and compliance with the terms and conditions of this Agreement (including by suspending any automatic deletion functions for electronic records, including e-mails) for a period of three years following the period of performance. Such records shall include all information necessary to substantiate factual representations made in the supporting documents submitted by the Recipient related to the Payroll Support, including ledgers and sub-ledgers, and the Recipient's and Affiliates' compliance with this Agreement. While electronic storage of records (backed up as appropriate) is preferable, the Recipient and Affiliates may store records in hardcopy (paper) format. The term "records" includes all relevant financial and accounting records and all supporting documentation for the information reported on the Recipient's quarterly reports.

21. If any litigation, claim, investigation, or audit relating to the Payroll Support is started before the expiration of the three-year period, the Recipient and Affiliates shall retain all records described in paragraph 20 until all such litigation, claims, investigations, or audit findings have been completely resolved and final judgment entered or final action taken.

Remedies

22. If Treasury believes that an instance of noncompliance by the Recipient or an Affiliate with (a) this Agreement, (b) section 7301 of the ARP, or (c) the Internal Revenue Code of 1986 as it applies to the receipt of Payroll Support has occurred, Treasury may notify the Recipient in writing of its proposed determination of noncompliance, provide an explanation of the nature of the noncompliance, and specify a proposed remedy. Upon receipt of such notice, the Recipient shall, within seven days, accept Treasury's proposed remedy, propose an alternative remedy, or provide information and documentation contesting Treasury's proposed determination. Treasury shall consider any such submission by the Recipient and make a final written determination, which will state Treasury's findings regarding noncompliance and the remedy to be imposed.

23. If Treasury makes a final determination under paragraph 22 that an instance of noncompliance has occurred, Treasury may, in its sole discretion, withhold any Additional Payroll Support Payments; require the repayment of the amount of any previously disbursed Payroll Support, with appropriate interest; require additional reporting or monitoring; initiate suspension or debarment proceedings as authorized under 2 CFR Part 180; terminate this Agreement; or take any such other action as Treasury, in its sole discretion, deems appropriate.

24. Treasury may make a final determination regarding noncompliance without regard to paragraph 22 if Treasury determines, in its sole discretion, that such determination is necessary to protect a material interest of the Federal Government. In such event, Treasury shall notify the Recipient of the remedy that Treasury, in its sole discretion, shall impose,

9

after which the Recipient may contest Treasury's final determination or propose an alternative remedy in writing to Treasury. Following the receipt of such a submission by the Recipient, Treasury may, in its sole discretion, maintain or alter its final determination.

25. Any final determination of noncompliance and any final determination to take any remedial action described herein shall not be subject to further review. To the extent permitted by law, the Recipient waives any right to judicial review of any such determinations and further agrees not to assert in any court any claim arising from or relating to any such determination or remedial action.

26. Instead of, or in addition to, the remedies listed above, Treasury may refer any noncompliance or any allegations of fraud, waste, or abuse to the Treasury Inspector General.

27. Treasury, in its sole discretion, may grant any request by the Recipient for termination of this Agreement, which such request shall be in writing and shall include the reasons for such termination, the proposed effective date of the termination, and the amount of any unused Payroll Support funds the Recipient requests to return to Treasury. Treasury may, in its sole discretion, determine the extent to which the requirements under this Agreement may cease to apply following any such termination.

28. If Treasury determines that any remaining portion of the Payroll Support will not accomplish the purpose of this Agreement, Treasury may terminate this Agreement in its entirety to the extent permitted by law.

Debts

29. Any Payroll Support in excess of the amount which Treasury determines, at any time, the Recipient is authorized to receive or retain under the terms of this Agreement constitutes a debt to the Federal Government.

30. Any debts determined to be owed by the Recipient to the Federal Government shall be paid promptly by the Recipient. A debt is delinquent if it has not been paid by the date specified in Treasury's initial written demand for payment, unless other satisfactory arrangements have been made. Interest, penalties, and administrative charges shall be charged on delinquent debts in accordance with 31 U.S.C. § 3717, 31 CFR 901.9, and paragraphs 31 and 32. Treasury will refer any debt that is more than 180 days delinquent to Treasury's Bureau of the Fiscal Service for debt collection services.

31. Penalties on any debts shall accrue at a rate of not more than 6 percent per year or such other higher rate as authorized by law.

32. Administrative charges relating to the costs of processing and handling a delinquent debt shall be determined by Treasury.

33. The Recipient shall not use funds from other federally sponsored programs to pay a debt to the government arising under this Agreement.

10

Protections for Whistleblowers

34. In addition to other applicable whistleblower protections, in accordance with 41 U.S.C. § 4712, the Recipient shall not discharge, demote, or otherwise discriminate against an Employee as a reprisal for disclosing information to a Person listed below that the Employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant:

    a.  A Member of Congress or a representative of a committee of Congress;

    b.  An Inspector General;

    c.  The Government Accountability Office;

    d.  A Treasury employee responsible for contract or grant oversight or management;

    e.  An authorized official of the Department of Justice or other law enforcement agency;

    f.  A court or grand jury; or

    g.  A management official or other Employee of the Recipient who has the responsibility to investigate, discover, or address misconduct.

Lobbying

35. The Recipient shall comply with the provisions of 31 U.S.C. § 1352, as amended, and with the regulations at 31 CFR Part 21.

Non-Discrimination

36. The Recipient shall comply with, and hereby assures that it will comply with, all applicable Federal statutes and regulations relating to nondiscrimination including:

    a.  Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.*), including Treasury's implementing regulations at 31 CFR Part 22;

    b.  Section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. § 794);

    c.  The Age Discrimination Act of 1975, as amended (42 U.S.C. §§ 6101–6107), including Treasury's implementing regulations at 31 CFR Part 23 and the general age discrimination regulations at 45 CFR Part 90; and

    d.  The Air Carrier Access Act of 1986 (49 U.S.C. § 41705).

Additional Reporting

37. Within seven days after the date of this Agreement, the Recipient shall register in SAM.gov, and thereafter maintain the currency of the information in SAM.gov until at least January 1, 2023. The Recipient shall review and update such information at least annually after the initial registration, and more frequently if required by changes in the Recipient's information. The Recipient agrees that this Agreement and information related thereto, including the Maximum Awardable Amount and any executive total compensation reported pursuant to paragraph 38, may be made available to the public through a U.S. Government website, including SAM.gov.

38. For purposes of paragraph 37, the Recipient shall report total compensation as defined in paragraph e.6 of the award term in 2 CFR part 170, App. A for each of the Recipient's five most highly compensated executives for the preceding completed fiscal year, if:
    a. the total Payroll Support is $25,000 or more;
    b. in the preceding fiscal year, the Recipient received:
        i. 80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance, as defined at 2 CFR 170.320 (and subawards); and
        ii. $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance, as defined at 2 CFR 170.320 (and subawards); and
    c. the public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. To determine if the public has access to the compensation information, the Recipient shall refer to U.S. Securities and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm.

39. The Recipient shall report executive total compensation described in paragraph 38:
    a. as part of its registration profile at https://www.sam.gov; and
    b. within five business days after the end of each month following the month in which this Agreement becomes effective, and annually thereafter.

40. The Recipient agrees that, from time to time, it will, at its own expense, promptly upon reasonable request by Treasury, execute and deliver, or cause to be executed and delivered, or use its commercially reasonable efforts to procure, all instruments, documents and information, all in form and substance reasonably satisfactory to Treasury, to enable Treasury to ensure compliance with, or effect the purposes of, this Agreement, which may include, among other documents or information, (a) certain audited financial statements of the Recipient, (b) documentation regarding the Recipient's revenues derived from its business as

12

a passenger air carrier or regarding the passenger air carriers for which the Recipient provides services as a contractor (as the case may be), and (c) the Recipient's most recent quarterly Federal tax returns. The Recipient agrees to provide Treasury with such documents or information promptly.

41. If the total value of the Recipient's currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period before termination of this Agreement, then the Recipient shall make such reports as required by 2 CFR part 200, Appendix XII.

Other

42. [Reserved]

43. Notwithstanding any other provision of this Agreement, the Recipient has no right to, and shall not, transfer, pledge, mortgage, encumber, or otherwise assign this Agreement or any Payroll Support provided under this Agreement, or any interest therein, or any claim, account receivable, or funds arising thereunder or accounts holding Payroll Support, to any party, bank, trust company, or other Person without the express written approval of Treasury.

44. The Signatory Entity will cause its Affiliates to comply with all of their obligations under or relating to this Agreement.

45. Unless otherwise provided in guidance issued by Treasury or the Internal Revenue Service, the form of any Taxpayer Protection Instrument held by Treasury and any subsequent holder will be treated as such form for purposes of the Internal Revenue Code of 1986 (for example, a Taxpayer Protection Instrument in the form of a note will be treated as indebtedness for purposes of the Internal Revenue Code of 1986).

46. This Agreement may not be amended or modified except pursuant to an agreement in writing entered into by the Recipient and Treasury, except that Treasury may unilaterally amend this Agreement if required in order to comply with applicable Federal law or regulation.

47. Subject to applicable law, Treasury may, in its sole discretion, waive any term or condition under this Agreement imposing a requirement on the Recipient or any Affiliate.

48. This Agreement shall bind and inure to the benefit of the parties and their respective heirs, executors, administrators, successors, and assigns.

49. The Recipient represents and warrants to Treasury that this Agreement, and the issuance and delivery to Treasury of the Taxpayer Protection Instruments, if applicable, have been duly authorized by all requisite corporate and, if required, stockholder action, and will not result in the violation by the Recipient of any provision of law, statute, or regulation, or of the articles of incorporation or other constitutive documents or bylaws of the Recipient, or breach or constitute an event of default under any material contract to which the Recipient is a party.

13

50. The Recipient represents and warrants to Treasury that this Agreement has been duly executed and delivered by the Recipient and constitutes a legal, valid, and binding obligation of the Recipient enforceable against the Recipient in accordance with its terms.

51. This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute a single contract.

52. The words "execution," "signed," "signature," and words of like import in any assignment shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act. Notwithstanding anything herein to the contrary, delivery of an executed counterpart of a signature page of this Agreement by electronic means, or confirmation of the execution of this Agreement on behalf of a party by an email from an authorized signatory of such party, shall be effective as delivery of a manually executed counterpart of this Agreement.

53. The captions and paragraph headings appearing herein are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Agreement.

54. This Agreement is governed by and shall be construed in accordance with Federal law. Insofar as there may be no applicable Federal law, this Agreement shall be construed in accordance with the laws of the State of New York, without regard to any rule of conflicts of law (other than section 5-1401 of the New York General Obligations Law) that would result in the application of the substantive law of any jurisdiction other than the State of New York.

55. Nothing in this Agreement shall require any unlawful action or inaction by either party.

56. The requirement pertaining to trafficking in persons at 2 CFR 175.15(b) is incorporated herein and made applicable to the Recipient.

57. This Agreement, together with the attachments hereto, including the Payroll Support Program 3 Certification and any attached terms regarding Taxpayer Protection Instruments, constitute the entire agreement of the parties relating to the subject matter hereof and supersede any previous agreements and understandings, oral or written, relating to the subject matter hereof. There may exist other agreements between the parties as to other matters, which are not affected by this Agreement and are not included within this integration clause.

58. No failure by either party to insist upon the strict performance of any provision of this Agreement or to exercise any right or remedy hereunder, and no acceptance of full or partial Payroll Support (if applicable) or other performance by either party during the continuance of any such breach, shall constitute a waiver of any such breach of such provision.

**ATTACHMENT**

14

Payroll Support Program 3 Certification of Corporate Officer of Recipient

15

**PAYROLL SUPPORT PROGRAM 3**

**CERTIFICATION OF CORPORATE OFFICER OF RECIPIENT**

In connection with the Payroll Support Program 3 Agreement (Agreement) between Southwest Airlines Co. and the Department of the Treasury (Treasury) relating to Payroll Support being provided by Treasury to the Recipient under section 7301 of the American Rescue Plan Act of 2021, I hereby certify under penalty of perjury to the Treasury that all of the following are true and correct. Capitalized terms used but not defined herein have the meanings set forth in the Agreement.

(1)   I have the authority to make the following representations on behalf of myself and the Recipient. I understand that these representations will be relied upon as material in the decision by Treasury to provide Payroll Support to the Recipient.

(2) The information, certifications, attachments, and other information provided by the Recipient to Treasury related to the Payroll Support are true and correct and do not contain any materially false, fictitious, or fraudulent statement, nor any concealment or omission of any material fact.

(3) The Recipient has the legal authority to apply for the Payroll Support, and it has the institutional, managerial, and financial capability to comply with all obligations, terms, and conditions set forth in the Agreement and any attachment thereto.

(4) The Recipient and any Affiliate will give Treasury, Treasury's designee or the Treasury Office of Inspector General (as applicable) access to, and opportunity to examine, all documents, papers, or other records of the Recipient or Affiliate pertinent to the provision of Payroll Support made by Treasury to the Recipient, in order to make audits, examinations, excerpts, and transcripts.

(5) No Federal appropriated funds, including Payroll Support, have been paid or will be paid, by or on behalf of the Recipient, to any person for influencing or attempting to influence an officer or employee of an agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

(6) If the Payroll Support exceeds $100,000, the Recipient shall comply with the disclosure requirements in 31 CFR Part 21 regarding any amounts paid for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the Payroll Support.

**I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification may be the subject of criminal prosecution and also may subject me and the Recipient to civil penalties and/or administrative remedies for false claims or otherwise.**

/s/ Tammy Romo

Corporate Officer of Signatory Entity

Name: Tammy Romo

Title: Executive Vice President and Chief Financial Officer

Date: April 23, 2021

/s/ Chris Monroe

Second Authorized Representative

Name: David Christopher Monroe

Title: Senior Vice President Finance and Treasurer

Date: April 23, 2021

*Execution Version*

# WARRANT AGREEMENT

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|

Article I

Closing

| 1.1 | Issuance | 1 |
| 1.2 | Initial Closing; Warrant Closing Date. | 1 |
| 1.3 | Interpretation | 2 |

Article II

Representations and Warranties

| 2.1 | Representations and Warranties of the Company | 3 |

Article III

Covenants

| 3.1 | Commercially Reasonable Efforts | 6 |
| 3.2 | Expenses | 7 |
| 3.3 | Sufficiency of Authorized Common Stock, Exchange Listing | 8 |

Article IV Art

Additional Agreements

| 4.1 | Investment | 8 |
| 4.2 | Legends | 8 |
| 4.3 | Certain Transactions | 9 |
| 4.4 | Transfer of Warrants and Warrant Shares | 9 |
| 4.5 | Registration Rights | 9 |
| 4.6 | Voting of Warrant Shares | 21 |

Article V

Miscellaneous

| 5.1 | Survival of Representations and Warranties | 21 |
| 5.2 | Amendment | 21 |
| 5.3 | Waiver of Conditions | 21 |
| 5.4 | **Governing Law: Submission to Jurisdiction, Etc.** | 21 |
| 5.5 | Notices | 21 |
| 5.6 | Definitions | 22 |
| 5.7 | Assignment | 22 |
| 5.8 | Severability | 23 |

5.9    No Third Party Beneficiaries........................................................................................ 23

LIST OF ANNEXES

| | |
|---|---|
| ANNEX A: | FORM OF OPINION |
| ANNEX B: | FORM OF WARRANT |
| SCHEDULE 1: | WARRANT SHARES FORMULA |
| SCHEDULE 2: | CAPITALIZATION |
| SCHEDULE 3: | REQUIRED STOCKHOLDER APPROVALS |

-iii-

**INDEX OF DEFINED TERMS**

| Term | Location of Definition |
|------|------------------------|
| Affiliate | Annex B |
| Agreement | Recitals |
| Appraisal Procedure | Annex B |
| Board of Directors | 2.1(i) |
| Business Combination | Annex B |
| Business Day | Annex B |
| Capitalization Date | 2.1(b) |
| Closing | 1.2(a) |
| Common Stock | Annex B |
| Company | Recitals |
| Company Reports | 2.1(j)(i) |
| Exchange Act | Annex B |
| Governmental Authority | 5.6(a) |
| Holder | 4.5(k)(i) |
| Indemnitee | 4.5(g)(i) |
| Initial Closing | 1.2(a) |
| Lien | 5.6(c) |
| Material Adverse Effect | 5.6(d) |
| Organizational Documents | 5.6(e) |
| Pending Underwritten Offering | 4.5(l) |
| Piggyback Registration | 4.5(a)(iv) |
| Promissory Note | Recitals |
| register; registered; registration | 4.5(k)(ii) |
| Registrable Securities | 4.5(k)(iii) |
| Registration Commencement Date | 4.5(a)(i) |
| Registration Expenses | 4.5(k)(iv) |
| Rule 144; Rule 144A; Rule 159A; Rule 405; Rule 415 | 4.5(k)(v) |
| SEC | 2.1(c) |
| Securities Act | Annex B |
| Selling Expenses | 4.5(k)(vi) |
| Shelf Registration Statement | 4.5(a)(ii) |
| Special Registration | 4.5(i) |
| Stockholder Proposals | 3.1(b) |
| Subsidiary | 5.6(f) |
| Transfer | 4.4 |
| Treasury | Recitals |
| Warrant Closing Date | 1.2(a) |
| Warrants | Recitals |
| Warrant Shares | Annex B |

WARRANT AGREEMENT dated as of April 23, 2021 (this "Agreement"), between SOUTHWEST AIRLINES CO., a corporation organized under the laws of Texas (the "Company") and the UNITED STATES DEPARTMENT OF THE TREASURY ("Treasury").

WHEREAS, the Company has requested that Treasury provide financial assistance to the Recipient (as defined in the PSP3 Agreement) that shall exclusively be used for the continuation of payment of employee wages, salaries, and benefits as is permissible under Section 7301(b)(1) of Subtitle C of Title VII of the American Rescue Plan Act of 2021 (March 11, 2021), as the same may be amended from time to time, and Treasury is willing to do so on the terms and conditions set forth in that certain Payroll Support Program 3 Agreement dated as of April 23, 2021, between the Company and Treasury (the "PSP3 Agreement"); and

WHEREAS, as appropriate compensation to the Federal Government of the United States of America for the provision of financial assistance under the PSP3 Agreement, SOUTHWEST AIRLINES CO. has agreed to issue a note to be repaid to Treasury on the terms and conditions set forth in the promissory note dated as of April 23, 2021, issued by the Company, in the name of Treasury as the holder (the "Promissory Note") and agreed to issue in a private placement warrants to purchase the number of shares of its Common Stock determined in accordance with Schedule 1 to this Agreement (the "Warrants") to Treasury;

NOW, THEREFORE, in consideration of the premises, and of the representations, warranties, covenants and agreements set forth herein, the parties agree as follows:

Article I

**Closing**

1.1    Issuance.

(a)    On the terms and subject to the conditions set forth in this Agreement, the Company agrees to issue to Treasury, on each Warrant Closing Date, Warrants for a number of shares of Common Stock determined by the formula set forth in Schedule 1.

1.2    Initial Closing; Warrant Closing Date.

(a)    On the terms and subject to the conditions set forth in this Agreement, the closing of the initial issuance of the Warrants (the "Initial Closing") will take place on the Closing Date (as defined in the Promissory Note) or, if on the Closing Date the principal amount of the Promissory Note is $0, the first date on which such principal amount is increased. After the Initial Closing, the closing of any subsequent issuance will take place on the date of each increase, if any, of the principal amount of the Promissory Note (each subsequent closing, together with the Initial Closing, a "Closing" and each such date a "Warrant Closing Date").

(b)    On each Warrant Closing Date, the Company will issue to Treasury a duly executed Warrant or Warrants for a number of shares of Common Stock determined by the formula set forth in Schedule 1, as evidenced by one or more certificates dated the Warrant Closing Date and

bearing appropriate legends as hereinafter provided for and in substantially the form attached hereto as <u>Annex B</u>.

(c)    On each Warrant Closing Date, the Company shall deliver to Treasury (i) a written opinion from counsel to the Company (which may be internal counsel) addressed to Treasury and dated as of such Warrant Closing Date, in substantially the form attached hereto as <u>Annex A</u> and (ii) a certificate executed by the chief executive officer, president, executive vice president, chief financial officer, principal accounting officer, treasurer or controller confirming that the representations and warranties of the Company in this Agreement are true and correct with the same force and effect as though expressly made at and as of such Warrant Closing Date and the Company has complied with all agreements on its part to be performed or satisfied hereunder at or prior to such Closing.

(d)    On the initial Warrant Closing Date, the Company shall deliver to Treasury (i) such customary certificates of resolutions or other action, incumbency certificates and/or other certificates of the chief executive officer, president, executive vice president, chief financial officer, principal accounting officer, treasurer or controller as Treasury may require evidencing the identity, authority and capacity of each such officer thereof authorized to act as such officer in connection with this Agreement and (ii) customary resolutions or evidence of corporate authorization, secretary's certificates and such other documents and certificates (including Organizational Documents and good standing certificates) as Treasury may reasonably request relating to the organization, existence and good standing of the Company and any other legal matters relating to the Company, this Agreement, the Warrants or the transactions contemplated hereby or thereby.

      1.3    <u>Interpretation</u>.

(a)    When a reference is made in this Agreement to "Recitals," "Articles," "Sections," or "Annexes" such reference shall be to a Recital, Article or Section of, or Annex to, this Warrant Agreement, unless otherwise indicated. The terms defined in the singular have a comparable meaning when used in the plural, and vice versa. References to "herein", "hereof", "hereunder" and the like refer to this Agreement as a whole and not to any particular section or provision, unless the context requires otherwise. The table of contents and headings contained in this Agreement are for reference purposes only and are not part of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed followed by the words "without limitation." No rule of construction against the draftsperson shall be applied in connection with the interpretation or enforcement of this Agreement, as this Agreement is the product of negotiation between sophisticated parties advised by counsel. All references to "$" or "dollars" mean the lawful currency of the United States of America. Except as expressly stated in this Agreement, all references to any statute, rule or regulation are to the statute, rule or regulation as amended, modified, supplemented or replaced from time to time (and, in the case of statutes, include any rules and regulations promulgated under the statute) and to any section of any statute, rule or regulation include any successor to the section.

(b)    Capitalized terms not defined herein have the meanings ascribed thereto in Annex B.

- 2 -

Article II

**Representations and Warranties**

2.1    Representations and Warranties of the Company. The Company represents and warrants to Treasury that as of the date hereof and each Warrant Closing Date (or such other date specified herein):

(a)    Existence, Qualification and Power. The Company is duly organized or formed, validly existing and, if applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, and the Company and each Subsidiary (a) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the this Agreement and the Warrants, and (b) is duly qualified and is licensed and, as applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license, except, in each case referred to in clause (a)(i) or (b), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

(b)    Capitalization. The authorized capital stock of the Company, and the outstanding capital stock of the Company (including securities convertible into, or exercisable or exchangeable for, capital stock of the Company) as of the most recent fiscal month-end preceding the date hereof (the "Capitalization Date") is set forth in Schedule 2. The outstanding shares of capital stock of the Company have been duly authorized and are validly issued and outstanding, fully paid and nonassessable, and subject to no preemptive rights (and were not issued in violation of any preemptive rights). Except as provided in the Warrants, as of the date hereof, the Company does not have outstanding any securities or other obligations providing the holder the right to acquire Common Stock that is not reserved for issuance as specified on Schedule 2, and the Company has not made any other commitment to authorize, issue or sell any Common Stock. Since the Capitalization Date, the Company has not issued any shares of Common Stock, other than (i) shares issued upon the exercise of stock options or delivered under other equity-based awards or other convertible securities or warrants which were issued and outstanding on the Capitalization Date and disclosed on Schedule 2 and (ii) shares disclosed on Schedule 2 as it may be updated by written notice from the Company to Treasury in connection with each Warrant Closing Date.

(c)    Listing. The Common Stock has been registered pursuant to Section 12(b) of the Exchange Act and the shares of the Common Stock outstanding on the date hereof are listed on a national securities exchange. The Company has taken no action designed to, or likely to have the effect of, terminating the registration of the Common Stock under the Exchange Act or the listing of the Common Stock on such national securities exchange, nor has the Company received any notification that the Securities and Exchange Commission (the "SEC") or such exchange is contemplating terminating such registration or listing. The Company is in compliance with applicable continued listing requirements of such exchange in all material respects.

- 3 -

(d)  Governmental Authorization; Other Consents. No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, the Company of this Agreement, except for such approvals, consents, exemptions, authorizations, actions or notices that have been duly obtained, taken or made and are in full force and effect.

(e)  Execution and Delivery; Binding Effect. This Agreement has been duly authorized, executed and delivered by the Company. This Agreement constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, receivership, moratorium or other Laws affecting creditors' rights generally and by general principles of equity.

(f)  The Warrants and Warrant Shares. Each Warrant has been duly authorized and, when executed and delivered as contemplated hereby, will constitute a valid and legally binding obligation of the Company enforceable against the Company in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, receivership, moratorium or other Laws affecting creditors' rights generally and by general principles of equity. The Warrant Shares have been duly authorized and reserved for issuance upon exercise of the Warrants and when so issued in accordance with the terms of the Warrants will be validly issued, fully paid and non-assessable, subject, if applicable, to the approvals of its stockholders set forth on Schedule 3.

(g)  Authorization, Enforceability.

(i)  The Company has the corporate power and authority to execute and deliver this Agreement and the Warrants and, subject, if applicable, to the approvals of its stockholders set forth on Schedule 3, to carry out its obligations hereunder and thereunder (which includes the issuance of the Warrants and Warrant Shares). The execution, delivery and performance by the Company of this Agreement and the Warrants and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate or other organizational action on the part of the Company and its stockholders, and no further approval or authorization is required on the part of the Company, subject, in each case, if applicable, to the approvals of its stockholders set forth on Schedule 3.

(ii)  The execution, delivery and performance by the Company of this Agreement do not and will not (a) contravene the terms of its Organizational Documents, (b) conflict with or result in any breach or contravention of, or the creation of any Lien (as defined in the Promissory Note) under, or require any payment to be made under (i) any material Contractual Obligation to which the Company is a party or affecting the Company or the properties of the Company or any Subsidiary or (ii) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which the Company or any Subsidiary or its property is subject or (c) violate any Law, except to the extent that such violation could not reasonably be expected to have a Material Adverse Effect.

- 4 -

(iii)    Other than any current report on Form 8-K required to be filed with the SEC (which shall be made on or before the date on which it is required to be filed), such filings and approvals as are required to be made or obtained under any state "blue sky" laws, the filing of any proxy statement contemplated by Section 3.1 and such filings and approvals as have been made or obtained, no notice to, filing with, exemption or review by, or authorization, consent or approval of, any Governmental Authority is required to be made or obtained by the Company in connection with the execution, delivery and performance by the Company of this Agreement and the consummation by the Company of the issuance of the Warrants except for any such notices, filings, exemptions, reviews, authorizations, consents and approvals the failure of which to make or obtain would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(h)    Anti-takeover Provisions and Rights Plan. The Board of Directors of the Company (the "Board of Directors") has taken all necessary action, and will in the future take any necessary action, to ensure that the transactions contemplated by this Agreement and the Warrants and the consummation of the transactions contemplated hereby and thereby, including the exercise of the Warrants in accordance with their terms, will be exempt from any anti-takeover or similar provisions of the Company's Organizational Documents, and any other provisions of any applicable "moratorium", "control share", "fair price", "interested stockholder" or other anti-takeover laws and regulations of any jurisdiction, whether existing on the date hereof or implemented after the date hereof. The Company has taken all actions necessary, and will in the future take any necessary action, to render any stockholders' rights plan of the Company inapplicable to this Agreement and the Warrants and the consummation of the transactions contemplated hereby and thereby, including the exercise of the Warrants by Treasury in accordance with its terms.

(i)    Reports.

(i)    Since December 31, 2017, the Company and each Subsidiary has timely filed all reports, registrations, documents, filings, statements and submissions, together with any amendments thereto, that it was required to file with any Governmental Authority (the foregoing, collectively, the "Company Reports") and has paid all fees and assessments due and payable in connection therewith, except, in each case, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. As of their respective dates of filing, the Company Reports complied in all material respects with all statutes and applicable rules and regulations of the applicable Governmental Authority. In the case of each such Company Report filed with or furnished to the SEC, such Company Report (A) did not, as of its date or if amended prior to the date hereof, as of the date of such amendment, contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading, and (B) complied as to form in all material respects with the applicable requirements of the Securities Act and the Exchange Act. With respect to all other Company Reports, the Company Reports were complete and accurate in all material respects as of their respective dates. No executive officer of the Company or any Subsidiary has failed

- 5 -

in any respect to make the certifications required of him or her under Section 302 or 906 of the Sarbanes-Oxley Act of 2002.

(ii)    The Company (A) has implemented and maintains disclosure controls and procedures (as defined in Rule 13a15(e) of the Exchange Act) to ensure that material information relating to the Company, including its Subsidiaries, is made known to the chief executive officer and the chief financial officer of the Company by others within those entities, and (B) has disclosed, based on its most recent evaluation prior to the date hereof, to the Company's outside auditors and the audit committee of the Board of Directors (x) any significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information and (y) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls over financial reporting.

(j)    Offering of Securities. Neither the Company nor any person acting on its behalf has taken any action (including any offering of any securities of the Company under circumstances which would require the integration of such offering with the offering of any of the Warrants under the Securities Act, and the rules and regulations of the Securities and Exchange Commission (the "SEC") promulgated thereunder), which might subject the offering, issuance or sale of any of the Warrants to Treasury pursuant to this Agreement to the registration requirements of the Securities Act.

(k)    Brokers and Finders. No broker, finder or investment banker is entitled to any financial advisory, brokerage, finder's or other fee or commission in connection with this Agreement or the Warrants or the transactions contemplated hereby or thereby based upon arrangements made by or on behalf of the Company or any Subsidiary for which Treasury could have any liability.

Article III

**Covenants**

3.1    Commercially Reasonable Efforts.

(a)    Subject to the terms and conditions of this Agreement, each of the parties will use its commercially reasonable efforts in good faith to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or desirable, or advisable under applicable laws, to enable consummation of the transactions contemplated hereby and shall use commercially reasonable efforts to cooperate with the other party to that end.

(b)    If the Company is required to obtain any stockholder approvals set forth on Schedule 3, then the Company shall comply with this Section 3.1(b) and Section 3.1(c). The Company shall call a special meeting of its stockholders, as promptly as practicable following the Initial Closing, to vote on proposals (collectively, the "Stockholder Proposals") to (i) approve the exercise of the Warrants for Common Stock for purposes of the rules of the national securities

- 6 -

exchange on which the Common Stock is listed and/or (ii) amend the Company's Organizational Documents to increase the number of authorized shares of Common Stock to at least such number as shall be sufficient to permit the full exercise of the Warrants for Common Stock and comply with the other provisions of this Section 3.1(b) and Section 3.1(c). The Board of Directors shall recommend to the Company's stockholders that such stockholders vote in favor of the Stockholder Proposals. In connection with such meeting, the Company shall prepare (and Treasury will reasonably cooperate with the Company to prepare) and file with the SEC as promptly as practicable (but in no event more than ten Business Days after the Initial Closing) a preliminary proxy statement, shall use its reasonable best efforts to respond to any comments of the SEC or its staff thereon and to cause a definitive proxy statement related to such stockholders' meeting to be mailed to the Company's stockholders not more than five Business Days after clearance thereof by the SEC, and shall use its reasonable best efforts to solicit proxies for such stockholder approval of the Stockholder Proposals. The Company shall notify Treasury promptly of the receipt of any comments from the SEC or its staff with respect to the proxy statement and of any request by the SEC or its staff for amendments or supplements to such proxy statement or for additional information and will supply Treasury with copies of all correspondence between the Company or any of its representatives, on the one hand, and the SEC or its staff, on the other hand, with respect to such proxy statement. If at any time prior to such stockholders' meeting there shall occur any event that is required to be set forth in an amendment or supplement to the proxy statement, the Company shall as promptly as practicable prepare and mail to its stockholders such an amendment or supplement. Each of Treasury and the Company agrees promptly to correct any information provided by it or on its behalf for use in the proxy statement if and to the extent that such information shall have become false or misleading in any material respect, and the Company shall as promptly as practicable prepare and mail to its stockholders an amendment or supplement to correct such information to the extent required by applicable laws and regulations. The Company shall consult with Treasury prior to filing any proxy statement, or any amendment or supplement thereto, and provide Treasury with a reasonable opportunity to comment thereon. In the event that the approval of any of the Stockholder Proposals is not obtained at such special stockholders meeting, the Company shall include a proposal to approve (and the Board of Directors shall recommend approval of) each such proposal at a meeting of its stockholders no less than once in each subsequent sixmonth period beginning on June 30, 2021 until all such approvals are obtained or made.

(c)    None of the information supplied by the Company or any of the Company Subsidiaries for inclusion in any proxy statement in connection with any such stockholders meeting of the Company will, at the date it is filed with the SEC, when first mailed to the Company's stockholders and at the time of any stockholders meeting, and at the time of any amendment or supplement thereof, contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.

3.2    <u>Expenses</u>. The Company shall pay (i) all reasonable outofpocket expenses incurred by Treasury (including the reasonable fees, charges and disbursements of any counsel for Treasury) in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the Warrants, any other agreements or documents executed

- 7 -

in connection herewith or therewith, or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii) all outofpocket expenses incurred by Treasury (including the fees, charges and disbursements of any counsel for Treasury), in connection with the enforcement or protection of its rights in connection with this Agreement and the Warrants, any other agreements or documents executed in connected herewith or therewith, or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), including all such out-of-pocket expenses incurred during any workout, restructuring, negotiations or enforcement in respect of such Warrant Agreement, Warrant and other agreements or documents executed in connection herewith or therewith.

3.3    Sufficiency of Authorized Common Stock; Exchange Listing.

During the period from each Warrant Closing Date (or, if the approval of the Stockholder Proposals is required, the date of such approval) until the date on which no Warrants remain outstanding, the Company shall at all times have reserved for issuance, free of preemptive or similar rights, a sufficient number of authorized and unissued Warrant Shares to effectuate such exercise. Nothing in this Section 3.3 shall preclude the Company from satisfying its obligations in respect of the exercise of the Warrants by delivery of shares of Common Stock which are held in the treasury of the Company. As soon as reasonably practicable following each Warrant Closing Date, the Company shall, at its expense, cause the Warrant Shares to be listed on the same national securities exchange on which the Common Stock is listed, subject to official notice of issuance, and shall maintain such listing for so long as any Common Stock is listed on such exchange. The Company will use commercially reasonable efforts to maintain the listing of Common Stock on such national securities exchange so long as any Warrants or Warrant Shares remain outstanding. Neither the Company nor any of its Subsidiaries shall take any action which would be reasonably expected to result in the delisting or suspension of the Common Stock on such exchange. The foregoing shall not preclude the Company from undertaking any transaction set forth in Section 4.3 subject to compliance with that provision.

Article IV

**Additional Agreements**

4.1    Investment

Purposes. Treasury acknowledges that the Warrants and the Warrant Shares have not been registered under the Securities Act or under any state securities laws. Treasury (a) is acquiring the Warrants pursuant to an exemption from registration under the Securities Act solely for investment without a view to sell and with no present intention to distribute them to any person in violation of the Securities Act or any applicable U.S. state securities laws; (b) will not sell or otherwise dispose of any of the Warrants or the Warrant Shares, except in compliance with the registration requirements or exemption provisions of the Securities Act and any applicable U.S. state securities laws; and (c) has such knowledge and experience in financial and business matters and in investments of this type that it is capable of evaluating the merits and risks of the Warrants and the Warrant Shares and of making an informed investment decision.

4.2    Legends.

(a)    Treasury agrees that all certificates or other instruments representing the Warrants and the Warrant Shares will bear a legend substantially to the following effect:

"THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT AND SUCH LAWS."

(b)    In the event that any Warrants or Warrant Shares (i) become registered under the Securities Act or (ii) are eligible to be transferred without restriction in accordance with Rule 144 or another exemption from registration under the Securities Act (other than Rule 144A), the Company shall issue new certificates or other instruments representing such Warrants or Warrant Shares, which shall not contain the legend in Section 4.2(a) above; *provided* that Treasury surrenders to the Company the previously issued certificates or other instruments.

4.3    Certain Transactions. The Company will not merge or consolidate with, or sell, transfer or lease all or substantially all of its property or assets to, any other party unless the successor, transferee or lessee party (or its ultimate parent entity), as the case may be (if not the Company), expressly assumes the due and punctual performance and observance of each and every covenant, agreement and condition of this Agreement and the Warrants to be performed and observed by the Company.

4.4    Transfer of Warrants and Warrant Shares. Subject to compliance with applicable securities laws, Treasury shall be permitted to transfer, sell, assign or otherwise dispose of ("Transfer") all or a portion of the Warrants or Warrant Shares at any time, and the Company shall take all steps as may be reasonably requested by Treasury to facilitate the Transfer of the Warrants and the Warrant Shares.

4.5    Registration Rights.

(a)    Registration.

(i)    Subject to the terms and conditions of this Agreement, the Company covenants and agrees that on or before the earlier of (A) 30 days after the date on which all Warrants that may be issued pursuant to this Agreement have been issued and (B) June 30, 2021 (the end of such period, the "Registration Commencement Date"), the Company shall prepare and file with the SEC a Shelf Registration Statement covering the maximum number of Registrable Securities (or otherwise designate an existing Shelf Registration Statement filed with the SEC to cover the Registrable Securities) that may be issued pursuant to this Agreement and any Warrants outstanding at that time, and, to the extent the Shelf Registration Statement has not theretofore been declared effective or is not automatically effective upon such filing, the Company shall use

- 9 -

reasonable best efforts to cause such Shelf Registration Statement to be declared or become effective and to keep such Shelf Registration Statement continuously effective and in compliance with the Securities Act and usable for resale of such Registrable Securities for a period from the date of its initial effectiveness until such time as there are no Registrable Securities remaining (including by refiling such Shelf Registration Statement (or a new Shelf Registration Statement) if the initial Shelf Registration Statement expires). So long as the Company is a well-known seasoned issuer (as defined in Rule 405 under the Securities Act) at the time of filing of the Shelf Registration Statement with the SEC, such Shelf Registration Statement shall be designated by the Company as an automatic Shelf Registration Statement. Notwithstanding the foregoing, if on the date hereof the Company is not eligible to file a registration statement on Form S-3, then the Company shall not be obligated to file a Shelf Registration Statement unless and until it is so eligible and is requested to do so in writing by Treasury.

(ii)    Any registration pursuant to Section 4.5(a)(i) shall be effected by means of a shelf registration on an appropriate form under Rule 415 under the Securities Act (a "Shelf Registration Statement"). If Treasury or any other Holder intends to distribute any Registrable Securities by means of an underwritten offering it shall promptly so advise the Company and the Company shall take all reasonable steps to facilitate such distribution, including the actions required pursuant to Section 4.5(c); *provided* that the Company shall not be required to facilitate an underwritten offering of Registrable Securities unless the total number of Warrant Shares and Warrants expected to be sold in such offering exceeds, or are exercisable for, at least 20% of the total number of Warrant Shares for which Warrants issued under this Agreement could be exercised (giving effect to the anti-dilution adjustments in Warrants); and *provided*, *further* that the Company shall not be required to facilitate more than two completed underwritten offerings within any 12-month period. The lead underwriters in any such distribution shall be selected by the Holders of a majority of the Registrable Securities to be distributed.

(iii)    The Company shall not be required to effect a registration (including a resale of Registrable Securities from an effective Shelf Registration Statement) or an underwritten offering pursuant to Section 4.5(a): (A) prior to the Registration Commencement Date; (B) with respect to securities that are not Registrable Securities; or (C) if the Company has notified Treasury and all other Holders that in the good faith judgment of the Board of Directors, it would be materially detrimental to the Company or its securityholders for such registration or underwritten offering to be effected at such time, in which event the Company shall have the right to defer such registration or offering for a period of not more than 45 days after receipt of the request of Treasury or any other Holder; *provided* that such right to delay a registration or underwritten offering shall be exercised by the Company (1) only if the Company has generally exercised (or is concurrently exercising) similar black-out rights against holders of similar securities that have registration rights and (2) not more than three times in any 12-month period and not more than 90 days in the aggregate in any 12-month period. The Company shall notify the Holders of the date of any anticipated termination of any such deferral period prior to such date.

(iv)    If during any period when an effective Shelf Registration Statement is not available, the Company proposes to register any of its equity securities, other than a registration pursuant to

- 10 -

Section 4.5(a)(i) or a Special Registration, and the registration form to be filed may be used for the registration or qualification for distribution of Registrable Securities, the Company will give prompt written notice to Treasury and all other Holders of its intention to effect such a registration (but in no event less than ten days prior to the anticipated filing date) and will include in such registration all Registrable Securities with respect to which the Company has received written requests for inclusion therein within ten Business Days after the date of the Company's notice (a "Piggyback Registration"). Any such person that has made such a written request may withdraw its Registrable Securities from such Piggyback Registration by giving written notice to the Company and the managing underwriter, if any, on or before the fifth Business Day prior to the planned effective date of such Piggyback Registration. The Company may terminate or withdraw any registration under this Section 4.5(a)(iv) prior to the effectiveness of such registration, whether or not Treasury or any other Holders have elected to include Registrable Securities in such registration.

(v)    If the registration referred to in Section 4.5(a)(iv) is proposed to be underwritten, the Company will so advise Treasury and all other Holders as a part of the written notice given pursuant to Section 4.5(a)(iv). In such event, the right of Treasury and all other Holders to registration pursuant to Section 4.5(a) will be conditioned upon such persons' participation in such underwriting and the inclusion of such person's Registrable Securities in the underwriting if such securities are of the same class of securities as the securities to be offered in the underwritten offering, and each such person will (together with the Company and the other persons distributing their securities through such underwriting) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by the Company; *provided* that Treasury (as opposed to other Holders) shall not be required to indemnify any person in connection with any registration. If any participating person disapproves of the terms of the underwriting, such person may elect to withdraw therefrom by written notice to the Company, the managing underwriters and Treasury (if Treasury is participating in the underwriting).

(vi)    If either (x) the Company grants "piggyback" registration rights to one or more third parties to include their securities in an underwritten offering under the Shelf Registration Statement pursuant to Section 4.5(a)(ii) or (y) a Piggyback Registration under Section 4.5(a)(iv) relates to an underwritten offering on behalf of the Company, and in either case the managing underwriters advise the Company that in their reasonable opinion the number of securities requested to be included in such offering exceeds the number which can be sold without adversely affecting the marketability of such offering (including an adverse effect on the per share offering price), the Company will include in such offering only such number of securities that in the reasonable opinion of such managing underwriters can be sold without adversely affecting the marketability of the offering (including an adverse effect on the per share offering price), which securities will be so included in the following order of priority: (A) first, in the case of a Piggyback Registration under Section 4.5(a)(iv), the securities the Company proposes to sell, (B) then the Registrable Securities of Treasury and all other Holders who have requested inclusion of Registrable Securities pursuant to Section 4.5(a)(ii) or Section 4.5(a)(iv), as applicable, *pro rata* on the basis of the aggregate number of such securities or shares owned by each such person and (C) lastly, any other securities of the Company that have been requested to

- 11 -

be so included, subject to the terms of this Agreement; *provided, however,* that if the Company has, prior to the date hereof, entered into an agreement with respect to its securities that is inconsistent with the order of priority contemplated hereby then it shall apply the order of priority in such conflicting agreement to the extent that this Agreement would otherwise result in a breach under such agreement.

(b)    Expenses of Registration. All Registration Expenses incurred in connection with any registration, qualification or compliance hereunder shall be borne by the Company. All Selling Expenses incurred in connection with any registrations hereunder shall be borne by the holders of the securities so registered *pro rata* on the basis of the aggregate offering or sale price of the securities so registered.

(c)    Obligations of the Company. The Company shall use its reasonable best efforts, for so long as there are Registrable Securities outstanding, to take such actions as are under its control to not become an ineligible issuer (as defined in Rule 405 under the Securities Act) and to remain a well-known seasoned issuer (as defined in Rule 405 under the Securities Act) if it has such status on the date hereof or becomes eligible for such status in the future. In addition, whenever required to effect the registration of any Registrable Securities or facilitate the distribution of Registrable Securities pursuant to an effective Shelf Registration Statement, the Company shall, as expeditiously as reasonably practicable:

(i)    Prepare and file with the SEC a prospectus supplement with respect to a proposed offering of Registrable Securities pursuant to an effective registration statement, subject to Section 4.5(d), keep such registration statement effective and keep such prospectus supplement current until the securities described therein are no longer Registrable Securities. The plan of distribution included in such registration statement, or, as applicable, prospectus supplement thereto, shall include, among other things, an underwritten offering, ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers, block trades, privately negotiated transactions, the writing or settlement of options or other derivative transactions and any other method permitted pursuant to applicable law, and any combination of any such methods of sale.

(ii)    Prepare and file with the SEC such amendments and supplements to the applicable registration statement and the prospectus or prospectus supplement used in connection with such registration statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement.

(iii)    Furnish to the Holders and any underwriters such number of copies of the applicable registration statement and each such amendment and supplement thereto (including in each case all exhibits) and of a prospectus, including a preliminary prospectus, in conformity with the requirements of the Securities Act, and such other documents as they may reasonably request in order to facilitate the disposition of Registrable Securities owned or to be distributed by them.

- 12 -

(iv)    Use its reasonable best efforts to register and qualify the securities covered by such registration statement under such other securities or Blue Sky laws of such jurisdictions as shall be reasonably requested by the Holders or any managing underwriter(s), to keep such registration or qualification in effect for so long as such registration statement remains in effect, and to take any other action which may be reasonably necessary to enable such seller to consummate the disposition in such jurisdictions of the securities owned by such Holder; *provided* that the Company shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions.

(v)    Notify each Holder of Registrable Securities at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the happening of any event as a result of which the applicable prospectus, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing.

(vi)    Give written notice to the Holders:

(A)    when any registration statement filed pursuant to Section 4.5(a) or any amendment thereto has been filed with the SEC (except for any amendment effected by the filing of a document with the SEC pursuant to the Exchange Act) and when such registration statement or any post-effective amendment thereto has become effective;

(B)    of any request by the SEC for amendments or supplements to any registration statement or the prospectus included therein or for additional information;

(C)    of the issuance by the SEC of any stop order suspending the effectiveness of any registration statement or the initiation of any proceedings for that purpose;

(D)    of the receipt by the Company or its legal counsel of any notification with respect to the suspension of the qualification of the Common Stock for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose;

(E)    of the happening of any event that requires the Company to make changes in any effective registration statement or the prospectus related to the registration statement in order to make the statements therein not misleading (which notice shall be accompanied by an instruction to suspend the use of the prospectus until the requisite changes have been made); and

(F)    if at any time the representations and warranties of the Company contained in any underwriting agreement contemplated by Section 4.5(c)(x) cease to be true and correct.

- 13 -

(vii)     Use its reasonable best efforts to prevent the issuance or obtain the withdrawal of any order suspending the effectiveness of any registration statement referred to in Section 4.5(c)(vi)(C) at the earliest practicable time.

(viii)     Upon the occurrence of any event contemplated by Section 4.5(c)(v), 4.5(c)(vi)(E) or 4.5(d), promptly prepare a post-effective amendment to such registration statement or a supplement to the related prospectus or file any other required document so that, as thereafter delivered to the Holders and any underwriters, the prospectus will not contain an untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. If the Company notifies the Holders in accordance with Section 4.5(c)(vi)(E) to suspend the use of the prospectus until the requisite changes to the prospectus have been made, then the Holders and any underwriters shall suspend use of such prospectus and use their reasonable best efforts to return to the Company all copies of such prospectus (at the Company's expense) other than permanent file copies then in such Holders' or underwriters' possession. The total number of days that any such suspension may be in effect in any 12-month period shall not exceed 90 days. The Company shall notify the Holders of the date of any anticipated termination of any such suspension period prior to such date.

(ix)     Use reasonable best efforts to procure the cooperation of the Company's transfer agent in settling any offering or sale of Registrable Securities, including with respect to the transfer of physical stock certificates into book-entry form in accordance with any procedures reasonably requested by the Holders or any managing underwriter(s).

(x)     If an underwritten offering is requested pursuant to Section 4.5(a)(ii), enter into an underwriting agreement in customary form, scope and substance and take all such other actions reasonably requested by the Holders of a majority of the Registrable Securities being sold in connection therewith or by the managing underwriter(s), if any, to expedite or facilitate the underwritten disposition of such Registrable Securities, and in connection therewith in any underwritten offering (including making members of management and executives of the Company available to participate in "road shows", similar sales events and other marketing activities), (A) make such representations and warranties to the Holders that are selling stockholders and the managing underwriter(s), if any, with respect to the business of the Company and its subsidiaries, and the Shelf Registration Statement, prospectus and documents, if any, incorporated or deemed to be incorporated by reference therein, in each case, in customary form, substance and scope, and, if true, confirm the same if and when requested, (B) use its reasonable best efforts to furnish the underwriters with opinions and "10b-5" letters of counsel to the Company, addressed to the managing underwriter(s), if any, covering the matters customarily covered in such opinions and letters requested in underwritten offerings, (C) use its reasonable best efforts to obtain "cold comfort" letters from the independent certified public accountants of the Company (and, if necessary, any other independent certified public accountants of any business acquired by the Company for which financial statements and financial data are included in the Shelf Registration Statement) who have certified the financial statements included in such Shelf Registration Statement, addressed to each of the managing underwriter(s), if any, such letters to be in

- 14 -

customary form and covering matters of the type customarily covered in "cold comfort" letters, (D) if an underwriting agreement is entered into, the same shall contain indemnification provisions and procedures customary in underwritten offerings (provided that Treasury shall not be obligated to provide any indemnity), and (E) deliver such documents and certificates as may be reasonably requested by the Holders of a majority of the Registrable Securities being sold in connection therewith, their counsel and the managing underwriter(s), if any, to evidence the continued validity of the representations and warranties made pursuant to clause (A) above and to evidence compliance with any customary conditions contained in the underwriting agreement or other agreement entered into by the Company.

(xi)    Make available for inspection by a representative of Holders that are selling stockholders, the managing underwriter(s), if any, and any attorneys or accountants retained by such Holders or managing underwriter(s), at the offices where normally kept, during reasonable business hours, financial and other records, pertinent corporate documents and properties of the Company, and cause the officers, directors and employees of the Company to supply all information in each case reasonably requested (and of the type customarily provided in connection with due diligence conducted in connection with a registered public offering of securities) by any such representative, managing underwriter(s), attorney or accountant in connection with such Shelf Registration Statement.

(xii)    Use reasonable best efforts to cause all such Registrable Securities to be listed on each national securities exchange on which similar securities issued by the Company are then listed or, if no similar securities issued by the Company are then listed on any national securities exchange, use its reasonable best efforts to cause all such Registrable Securities to be listed on such securities exchange as Treasury may designate.

(xiii)    If requested by Holders of a majority of the Registrable Securities being registered and/or sold in connection therewith, or the managing underwriter(s), if any, promptly include in a prospectus supplement or amendment such information as the Holders of a majority of the Registrable Securities being registered and/or sold in connection therewith or managing underwriter(s), if any, may reasonably request in order to permit the intended method of distribution of such securities and make all required filings of such prospectus supplement or such amendment as soon as practicable after the Company has received such request.

(xiv)    Timely provide to its security holders earning statements satisfying the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder.

(d)    Suspension of Sales. Upon receipt of written notice from the Company that a registration statement, prospectus or prospectus supplement contains or may contain an untrue statement of a material fact or omits or may omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading or that circumstances exist that make inadvisable use of such registration statement, prospectus or prospectus supplement, Treasury and each Holder of Registrable Securities shall forthwith discontinue disposition of Registrable Securities until Treasury and/or Holder has received copies of a supplemented or

- 15 -

amended prospectus or prospectus supplement, or until Treasury and/or such Holder is advised in writing by the Company that the use of the prospectus and, if applicable, prospectus supplement may be resumed, and, if so directed by the Company, Treasury and/or such Holder shall deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in Treasury and/or such Holder's possession, of the prospectus and, if applicable, prospectus supplement covering such Registrable Securities current at the time of receipt of such notice. The total number of days that any such suspension may be in effect in any 12-month period shall not exceed 90 days. The Company shall notify Treasury prior to the anticipated termination of any such suspension period of the date of such anticipated termination

(e)    Termination of Registration Rights. A Holder's registration rights as to any securities held by such Holder shall not be available unless such securities are Registrable Securities.

(f)    Furnishing Information.

(i)    Neither Treasury nor any Holder shall use any free writing prospectus (as defined in Rule 405) in connection with the sale of Registrable Securities without the prior written consent of the Company.

(ii)    It shall be a condition precedent to the obligations of the Company to take any action pursuant to Section 4.5(c) that Treasury and/or the selling Holders and the underwriters, if any, shall furnish to the Company such information regarding themselves, the Registrable Securities held by them and the intended method of disposition of such securities as shall be required to effect the registered offering of their Registrable Securities.

(g)    Indemnification.

(i)    The Company agrees to indemnify each Holder and, if a Holder is a person other than an individual, such Holder's officers, directors, employees, agents, representatives and Affiliates, and each Person, if any, that controls a Holder within the meaning of the Securities Act (each, an "Indemnitee"), against any and all losses, claims, damages, actions, liabilities, costs and expenses (including reasonable fees, expenses and disbursements of attorneys and other professionals incurred in connection with investigating, defending, settling, compromising or paying any such losses, claims, damages, actions, liabilities, costs and expenses), joint or several, arising out of or based upon any untrue statement or alleged untrue statement of material fact contained in any registration statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto or any documents incorporated therein by reference or contained in any free writing prospectus (as such term is defined in Rule 405) prepared by the Company or authorized by it in writing for use by such Holder (or any amendment or supplement thereto); or any omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; *provided*, that the Company shall not be liable to such Indemnitee in any such case to the extent that any such loss, claim, damage, liability (or action or proceeding in respect thereof) or expense arises out of or is based upon (A) an untrue statement or omission made in such registration statement, including any such preliminary prospectus or final

- 16 -

prospectus contained therein or any such amendments or supplements thereto or contained in any free writing prospectus (as such term is defined in Rule 405) prepared by the Company or authorized by it in writing for use by such Holder (or any amendment or supplement thereto), in reliance upon and in conformity with information regarding such Indemnitee or its plan of distribution or ownership interests which was furnished in writing to the Company by such Indemnitee for use in connection with such registration statement, including any such preliminary prospectus or final prospectus contained therein or any such amendments or supplements thereto, or (B) offers or sales effected by or on behalf of such Indemnitee "by means of" (as defined in Rule 159A) a "free writing prospectus" (as defined in Rule 405) that was not authorized in writing by the Company.

(ii)    If the indemnification provided for in Section 4.5(g)(i) is unavailable to an Indemnitee with respect to any losses, claims, damages, actions, liabilities, costs or expenses referred to therein or is insufficient to hold the Indemnitee harmless as contemplated therein, then the Company, in lieu of indemnifying such Indemnitee, shall contribute to the amount paid or payable by such Indemnitee as a result of such losses, claims, damages, actions, liabilities, costs or expenses in such proportion as is appropriate to reflect the relative fault of the Indemnitee, on the one hand, and the Company, on the other hand, in connection with the statements or omissions which resulted in such losses, claims, damages, actions, liabilities, costs or expenses as well as any other relevant equitable considerations. The relative fault of the Company, on the one hand, and of the Indemnitee, on the other hand, shall be determined by reference to, among other factors, whether the untrue statement of a material fact or omission to state a material fact relates to information supplied by the Company or by the Indemnitee and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission; the Company and each Holder agree that it would not be just and equitable if contribution pursuant to this Section 4.5(g)(ii) were determined by *pro rata* allocation or by any other method of allocation that does not take account of the equitable considerations referred to in Section 4.5(g)(i). No Indemnitee guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from the Company if the Company was not guilty of such fraudulent misrepresentation.

(h)    Assignment of Registration Rights. The rights of Treasury to registration of Registrable Securities pursuant to Section 4.5(a) may be assigned by Treasury to a transferee or assignee of Registrable Securities in connection with a transfer of a total number of Warrant Shares and/or Warrants exercisable for at least 20% of the total number of Warrant Shares for which Warrants issued and to be issued under this Agreement could be exercised (giving effect to the anti-dilution adjustments in Warrants); *provided*, *however*, the transferor shall, within ten days after such transfer, furnish to the Company written notice of the name and address of such transferee or assignee and the number and type of Registrable Securities that are being assigned.

(i)    Clear Market. With respect to any underwritten offering of Registrable Securities by Treasury or other Holders pursuant to this Section 4.5, the Company agrees not to effect (other than pursuant to such registration or pursuant to a Special Registration) any public sale or distribution, or to file any Shelf Registration Statement (other than such registration or a Special

- 17 -

Registration) covering, in the case of an underwritten offering of Common Stock or Warrants, any of its equity securities, or, in each case, any securities convertible into or exchangeable or exercisable for such securities, during the period not to exceed 30 days following the effective date of such offering. The Company also agrees to cause such of its directors and senior executive officers to execute and deliver customary lock-up agreements in such form and for such time period up to 30 days as may be requested by the managing underwriter. "Special Registration" means the registration of (A) equity securities and/or options or other rights in respect thereof solely registered on Form S-4 or Form S-8 (or successor form) or (B) shares of equity securities and/or options or other rights in respect thereof to be offered to directors, members of management, employees, consultants, customers, lenders or vendors of the Company or Company Subsidiaries or in connection with dividend reinvestment plans.

(j)    Rule 144; Rule 144A. With a view to making available to Treasury and Holders the benefits of certain rules and regulations of the SEC which may permit the sale of the Registrable Securities to the public without registration, the Company agrees to use its reasonable best efforts to:

(i)    make and keep adequate public information available, as those terms are understood and defined in Rule 144(c)(1) or any similar or analogous rule promulgated under the Securities Act, at all times after the date hereof;

(ii)    (A) file with the SEC, in a timely manner, all reports and other documents required of the Company under the Exchange Act, and (B) if at any time the Company is not required to file such reports, make available, upon the request of any Holder, such information necessary to permit sales pursuant to Rule 144A (including the information required by Rule 144A(d)(4) under the Securities Act);

(iii)    so long as Treasury or a Holder owns any Registrable Securities, furnish to Treasury or such Holder forthwith upon request: a written statement by the Company as to its compliance with the reporting requirements of Rule 144 under the Securities Act, and of the Exchange Act; a copy of the most recent annual or quarterly report of the Company; and such other reports and documents as Treasury or Holder may reasonably request in availing itself of any rule or regulation of the SEC allowing it to sell any such securities to the public without registration; *provided*, *however*, that the availability of the foregoing reports on the EDGAR filing system of the SEC will be deemed to satisfy the foregoing delivery requirements; and

(iv)    take such further action as any Holder may reasonably request, all to the extent required from time to time to enable such Holder to sell Registrable Securities without registration under the Securities Act.

(k)    As used in this Section 4.5, the following terms shall have the following respective meanings:

- 18 -

(i)    "Holder" means Treasury and any other holder of Registrable Securities to whom the registration rights conferred by this Agreement have been transferred in compliance with Section 4.5(h) hereof.

(ii)    "Register," "registered," and "registration" shall refer to a registration effected by preparing and (A) filing a registration statement in compliance with the Securities Act and applicable rules and regulations thereunder, and the declaration or ordering of effectiveness of such registration statement or (B) filing a prospectus and/or prospectus supplement in respect of an appropriate effective registration statement on Form S-3.

(iii)    "Registrable Securities" means (A) the Warrants (subject to Section 4.5(p)) and (B) any equity securities issued or issuable directly or indirectly with respect to the securities referred to in the foregoing clause (A) by way of conversion, exercise or exchange thereof, including the Warrant Shares, or share dividend or share split or in connection with a combination of shares, recapitalization, reclassification, merger, amalgamation, arrangement, consolidation or other reorganization, *provided* that, once issued, such securities will not be Registrable Securities when (1) they are sold pursuant to an effective registration statement under the Securities Act, (2) except as provided below in Section 4.5(o), they may be sold pursuant to Rule 144 without limitation thereunder on volume or manner of sale, (3) they shall have ceased to be outstanding or (4) they have been sold in a private transaction in which the transferor's rights under this Agreement are not assigned to the transferee of the securities. No Registrable Securities may be registered under more than one registration statement at any one time.

(iv)    "Registration Expenses" mean all expenses incurred by the Company in effecting any registration pursuant to this Agreement (whether or not any registration or prospectus becomes effective or final) or otherwise complying with its obligations under this Section 4.5, including all registration, filing and listing fees, printing expenses, fees and disbursements of counsel for the Company, blue sky fees and expenses, expenses incurred in connection with any "road show", the reasonable fees and disbursements of Treasury's counsel (if Treasury is participating in the registered offering), and expenses of the Company's independent accountants in connection with any regular or special reviews or audits incident to or required by any such registration, but shall not include Selling Expenses.

(v)    "Rule 144", "Rule 144A", "Rule 159A", "Rule 405" and "Rule 415" mean, in each case, such rule promulgated under the Securities Act (or any successor provision), as the same shall be amended from time to time.

(vi)    "Selling Expenses" mean all discounts, selling commissions and stock transfer taxes applicable to the sale of Registrable Securities and fees and disbursements of counsel for any Holder (other than the fees and disbursements of Treasury's counsel included in Registration Expenses).

(l)    At any time, any holder of Securities (including any Holder) may elect to forfeit its rights set forth in this Section 4.5 from that date forward; *provided*, that a Holder forfeiting such rights shall nonetheless be entitled to participate under Section 4.5(a)(iv) – (vi) in any Pending

- 19 -

Underwritten Offering to the same extent that such Holder would have been entitled to if the holder had not withdrawn; and *provided*, *further*, that no such forfeiture shall terminate a Holder's rights or obligations under Section 4.5(f) with respect to any prior registration or Pending Underwritten Offering. "*Pending Underwritten Offering"* means*,* with respect to any Holder forfeiting its rights pursuant to this Section 4.5(l), any underwritten offering of Registrable Securities in which such Holder has advised the Company of its intent to register its Registrable Securities either pursuant to Section 4.5(a)(ii) or 4.5(a)(iv) prior to the date of such Holder's forfeiture.

(m)    Specific Performance. The parties hereto acknowledge that there would be no adequate remedy at law if the Company fails to perform any of its obligations under this Section 4.5 and that Treasury and the Holders from time to time may be irreparably harmed by any such failure, and accordingly agree that Treasury and such Holders, in addition to any other remedy to which they may be entitled at law or in equity, to the fullest extent permitted and enforceable under applicable law shall be entitled to compel specific performance of the obligations of the Company under this Section 4.5 in accordance with the terms and conditions of this Section 4.5.

(n)    No Inconsistent Agreements. The Company shall not, on or after the date hereof, enter into any agreement with respect to its securities that may impair the rights granted to Treasury and the Holders under this Section 4.5 or that otherwise conflicts with the provisions hereof in any manner that may impair the rights granted to Treasury and the Holders under this Section 4.5. In the event the Company has, prior to the date hereof, entered into any agreement with respect to its securities that is inconsistent with the rights granted to Treasury and the Holders under this Section 4.5 (including agreements that are inconsistent with the order of priority contemplated by Section 4.5(a)(vi)) or that may otherwise conflict with the provisions hereof, the Company shall use its reasonable best efforts to amend such agreements to ensure they are consistent with the provisions of this Section 4.5. Any transaction entered into by the Company that would reasonably be expected to require the inclusion in a Shelf Registration Statement or any Company Report filed with the SEC of any separate financial statements pursuant to Rule 3-05 of Regulation S-X or pro forma financial statements pursuant to Article 11 of Regulation S-X shall include provisions requiring the Company's counterparty to provide any information necessary to allow the Company to comply with its obligation hereunder.

(o)    Certain Offerings by Treasury. In the case of any securities held by Treasury that cease to be Registrable Securities solely by reason of clause (2) in the definition of "Registrable Securities," the provisions of Sections 4.5(a)(ii), clauses (iv), (ix) and (x)-(xii) of Section 4.5(c), Section 4.5(g) and Section 4.5(i) shall continue to apply until such securities otherwise cease to be Registrable Securities. In any such case, an "underwritten" offering or other disposition shall include any distribution of such securities on behalf of Treasury by one or more broker-dealers, an "underwriting agreement" shall include any purchase agreement entered into by such broker-dealers, and any "registration statement" or "prospectus" shall include any offering document approved by the Company and used in connection with such distribution.

- 20 -

(p)   Registered Sales of the Warrants. The Holders agree to sell the Warrants or any portion thereof under the Shelf Registration Statement only beginning 30 days after notifying the Company of any such sale, during which 30-day period Treasury and all Holders of the Warrants shall take reasonable steps to agree to revisions to the Warrants, at the expense of the Company, to permit a public distribution of the Warrants, including entering into a revised warrant agreement, appointing a warrant agent, and making the securities eligible for book entry clearing and settlement at the Depositary Trust Company.

4.6   Voting of Warrant Shares. Notwithstanding anything in this Agreement to the contrary, Treasury shall not exercise any voting rights with respect to the Warrant Shares.

Article V
**Miscellaneous**

5.1   Survival of Representations and Warranties. The representations and warranties of the Company made herein or in any certificates delivered in connection with the Initial Closing or any subsequent Closing shall survive such Closing without limitation.

5.2   Amendment. No amendment of any provision of this Agreement will be effective unless made in writing and signed by an officer or a duly authorized representative of each party; *provided* that Treasury may unilaterally amend any provision of this Agreement to the extent required to comply with any changes after the date hereof in applicable federal statutes. No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative of any rights or remedies provided by law.

5.3   Waiver of Conditions. No waiver will be effective unless it is in a writing signed by a duly authorized officer of the waiving party that makes express reference to the provision or provisions subject to such waiver.

5.4   **Governing Law: Submission to Jurisdiction, Etc. This Agreement will be governed by and construed in accordance with the federal law of the United States if and to the extent such law is applicable, and otherwise in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State. Each of the parties hereto agrees (a) to submit to the exclusive jurisdiction and venue of the United States District Court for the District of Columbia and the United States Court of Federal Claims for any and all civil actions, suits or proceedings arising out of or relating to this Agreement or the Warrants or the transactions contemplated hereby or thereby, and (b) that notice may be served upon (i) the Company at the address and in the manner set forth for notices to the Company in Section 5.5 and (ii) Treasury in accordance with federal law. To the extent permitted by applicable law, each of the parties hereto hereby unconditionally waives trial by jury in any civil legal action or proceeding relating to this Agreement or the Warrants or the transactions contemplated hereby or thereby.**

5.5   Notices. Any notice, request, instruction or other document to be given hereunder by any party to the other will be in writing and will be deemed to have been duly given (a) on the

- 21 -

date of delivery if delivered personally, or by facsimile, upon confirmation of receipt, or (b) on the second Business Day following the date of dispatch if delivered by a recognized next day courier service. All notices to the Company shall be delivered as set forth below, or pursuant to such other instruction as may be designated in writing by the Company to Treasury. All notices to Treasury shall be delivered as set forth below, or pursuant to such other instructions as may be designated in writing by Treasury to the Company.

If to the Company:

> Southwest Airlines Co.
> P.O. Box 36611, HDQ-6TR
> Love Field
> Dallas, Texas 75235
> Telecopy Number: (214) 932-1322
> Attention: Treasurer
> E-mail: Capital_Markets-DG@wnco.com

With a copy to:

> Southwest Airlines Co.
> Legal Department - HDQ-4GC
> 2702 Love Field Drive
> Dallas, Texas 75235

If to Treasury:

> United States Department of the Treasury
> 1500 Pennsylvania Avenue, NW, Room 2312
> Washington, D.C. 20220
> Attention: Assistant General Counsel (Banking and Finance)

5.6   Definitions.

(a)   The term "Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

(b)   The term "Laws" has the meaning ascribed thereto in the Promissory Note.

(c)   The term "Lien" has the meaning ascribed thereto in the Promissory Note.

(d)   The term "Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect on, the operations, business, properties, liabilities (actual or contingent),

- 22 -

condition (financial or otherwise) or prospects of the Company and its Subsidiaries taken as a whole; or (b) a material adverse effect on (i) the ability of the Company to perform its obligations under this Agreement or any Warrant or (ii) the legality, validity, binding effect or enforceability against the Company of this Agreement or any Warrant to which it is a party.

(e)    The term "Organizational Documents" has the meaning ascribed thereto in the Promissory Note.

(f)    The term "Subsidiary" has the meaning ascribed thereto in the Promissory Note.

5.7    Assignment. Neither this Agreement nor any right, remedy, obligation nor liability arising hereunder or by reason hereof shall be assignable by any party hereto without the prior written consent of the other party, and any attempt to assign any right, remedy, obligation or liability hereunder without such consent shall be void, except (a) an assignment, in the case of a Business Combination where such party is not the surviving entity, or a sale of substantially all of its assets, to the entity which is the survivor of such Business Combination or the purchaser in such sale and (b) as provided in Section 4.5.

5.8    Severability. If any provision of this Agreement or the Warrants, or the application thereof to any person or circumstance, is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to persons or circumstances other than those as to which it has been held invalid or unenforceable, will remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination, the parties shall negotiate in good faith in an effort to agree upon a suitable and equitable substitute provision to effect the original intent of the parties.

5.9    No Third Party Beneficiaries. Nothing contained in this Agreement, expressed or implied, is intended to confer upon any person or entity other than the Company and Treasury any benefit, right or remedies, except that the provisions of Section 4.5 shall inure to the benefit of the persons referred to in that Section.

* * *

*[Signature page follows]*

- 23 -

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

THE UNITED STATES DEPARTMENT OF THE TREASURY

By: /s/ David A Lebryk
Name: David A. Lebryk
Title: Fiscal Assistant Secretary

SOUTHWEST AIRLINES CO.

By: /s/ Tammy Romo
Name: Tammy Romo
Title: Executive Vice President and Chief Financial Officer

**ANNEX A**

**FORM OF OPINION**

(a)    The Company has been duly incorporated and is validly existing as a corporation in good standing under the laws of the state of its incorporation.

(b)    Each of the Warrants has been duly authorized and, when executed and delivered as contemplated by the Agreement, will constitute a valid and legally binding obligation of the Company enforceable against the Company in accordance with its terms, except as the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and general equitable principles, regardless of whether such enforceability is considered in a proceeding at law or in equity.

(c)    The shares of Common Stock issuable upon exercise of the Warrants have been duly authorized and reserved for issuance upon exercise of the Warrants and when so issued in accordance with the terms of the Warrants will be validly issued, fully paid and non-assessable **[*insert, if applicable:* , subject to the approvals of the Company's stockholders set forth on <u>Schedule 3</u>].**

(d)    The Company has the corporate power and authority to execute and deliver the Agreement and the Warrants and **[*insert, if applicable:* , subject to the approvals of the Company's stockholders set forth on <u>Schedule 3</u>]** to carry out its obligations thereunder (which includes the issuance of the Warrants and Warrant Shares).

(e)    The execution, delivery and performance by the Company of the Agreement and the Warrants and the consummation of the transactions contemplated thereby have been duly authorized by all necessary corporate action on the part of the Company and its stockholders, and no further approval or authorization is required on the part of the Company **[*insert, if applicable:* , subject, in each case, to the approvals of the Company's stockholders set forth on <u>Schedule 3</u>].**

(f)    The Agreement is a valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except as the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and general equitable principles, regardless of whether such enforceability is considered in a proceeding at law or in equity; *provided*, *however*, such counsel need express no opinion with respect to Section 4.5(g) or the severability provisions of the Agreement insofar as Section 4.5(g) is concerned.

(g)    No registration of the Warrant and the Common Stock issuable upon exercise of the Warrant under the U.S. Securities Act of 1933, as amended, is required for the offer and sale of the Warrant or the Common Stock issuable upon exercise of the Warrant by the Company to the Holder pursuant to and in the manner contemplated by this Agreement.

(h)    The Company is not required to be registered as an investment company under the Investment Company Act of 1940, as amended.

[AM_ACTIVE 403067921_2]

**ANNEX B**

**FORM OF WARRANT**

[SEE ATTACHED]

- 3 -

**FORM OF WARRANT TO PURCHASE COMMON STOCK**

THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT AND SUCH LAWS.

**WARRANT**
**to purchase**

**Shares of Common Stock**

**of Southwest Airlines Co.**

Issue Date:_____

1. Definitions. Unless the context otherwise requires, when used herein the following terms shall have the meanings indicated.

"*Affiliate*" means, with respect to any person, any person directly or indirectly controlling, controlled by or under common control with, such other person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with") when used with respect to any person, means the possession, directly or indirectly, of the power to cause the direction of management and/or policies of such person, whether through the ownership of voting securities by contract or otherwise.

"*Aggregate Net Cash Settlement Amount*" has the meaning ascribed thereto in Section 2(i).

"*Aggregate Net Share Settlement Amount*" has the meaning ascribed thereto in Section 2(ii).

"*Appraisal Procedure*" means a procedure whereby two independent appraisers, one chosen by the Company and one by the Original Warrantholder, shall mutually agree upon the determinations then the subject of appraisal. Each party shall deliver a notice to the other appointing its appraiser within 10 days after the Appraisal Procedure is invoked. If within 30 days after appointment of the two appraisers they are unable to agree upon the amount in question, a third independent appraiser shall be chosen within 10 days thereafter by the mutual consent of such first two appraisers. The decision of the third appraiser so appointed and chosen shall be given within 30 days after the selection of such third appraiser. If three appraisers shall be appointed and the determination of one appraiser is disparate from the middle determination by more than twice the amount by which the other determination is disparate from the middle

- 4 -

determination, then the determination of such appraiser shall be excluded, the remaining two determinations shall be averaged and such average shall be binding and conclusive upon the Company and the Original Warrantholder; otherwise, the average of all three determinations shall be binding upon the Company and the Original Warrantholder. The costs of conducting any Appraisal Procedure shall be borne by the Company.

"*Average Market Price*" means, with respect to any security, the arithmetic average of the Market Price of such security for the 15 consecutive trading day period ending on and including the trading day immediately preceding the determination date.

"*Board of Directors*" means the board of directors of the Company, including any duly authorized committee thereof.

"*Business Combination*" means a merger, consolidation, statutory share exchange or similar transaction that requires the approval of the Company's stockholders.

"*Business Day*" means any day except Saturday, Sunday and any day on which banking institutions in the State of New York generally are authorized or required by law or other governmental actions to close; *provided* that banks shall be deemed to be generally open for business in the event of a "shelter in place" or similar closure of physical branch locations at the direction of any governmental entity if such banks' electronic funds transfer system (including wire transfers) are open for use by customers on such day.

"*Capital Stock*" means (A) with respect to any Person that is a corporation or company, any and all shares, interests, participations or other equivalents (however designated) of capital or capital stock of such Person and (B) with respect to any Person that is not a corporation or company, any and all partnership or other equity interests of such Person.

"*Charter*" means, with respect to any Person, its certificate or articles of incorporation, articles of association, or similar organizational document.

"*Common Stock*" means common stock of the Company, par value $1.00 subject to adjustment as provided in Section 13(E).

"*Company*" means the Person whose name, corporate or other organizational form and jurisdiction of organization is set forth in Item 1 of Schedule A hereto.

"*conversion*" has the meaning set forth in Section 13(B).

"*convertible securities*" has the meaning set forth in Section 13(B).

"*Depositary*" means The Depositary Trust Company, its nominees and their respective successors.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, or any successor statute, and the rules and regulations promulgated thereunder.

- 5 -

"*Exercise Date*" means each date a Notice of Exercise substantially in the form annexed hereto is delivered to the Company in accordance with Section 2 hereof.

"*Exercise Price*" means the amount set forth in Item 2 of Schedule A hereto, subject to adjustment as contemplated herein.

"*Fair Market Value*" means, with respect to any security or other property, the fair market value of such security or other property as determined by the Board of Directors, acting in good faith in reliance on an opinion of a nationally recognized independent investment banking firm retained by the Company for this purpose. For so long as the Original Warrantholder holds this Warrant or any portion thereof, it may object in writing to the Board of Director's calculation of fair market value within 10 days of receipt of written notice thereof. If the Original Warrantholder and the Company are unable to agree on fair market value during the 10-day period following the delivery of the Original Warrantholder's objection, the Appraisal Procedure may be invoked by either party to determine Fair Market Value by delivering written notification thereof not later than the 30th day after delivery of the Original Warrantholder's objection.

"*Initial Number*" has the meaning set forth in Section 13(B).

"*Issue Date*" means the date set forth in Item 3 of Schedule A hereto.

"*Market Price*" means, with respect to a particular security, on any given day, the last reported sale price regular way or, in case no such reported sale takes place on such day, the average of the last closing bid and ask prices regular way, in either case on the principal national securities exchange on which the applicable securities are listed or admitted to trading, or if not listed or admitted to trading on any national securities exchange, the average of the closing bid and ask prices as furnished by two members of the Financial Industry Regulatory Authority, Inc. selected from time to time by the Company for that purpose. "Market Price" shall be determined without reference to after hours or extended hours trading. If such security is not listed and traded in a manner that the quotations referred to above are available for the period required hereunder, the Market Price of such security shall be deemed to be (i) in the event that any portion of the Warrant is held by the Original Warrantholder, the fair market value per share of such security as determined in good faith by the Original Warrantholder or (ii) in all other circumstances, the fair market value per share of such security as determined in good faith by the Board of Directors in reliance on an opinion of a nationally recognized independent investment banking corporation retained by the Company for this purpose and certified in a resolution to the Warrantholder.

"*Original Warrantholder*" means the United States Department of the Treasury. Any actions specified to be taken by the Original Warrantholder hereunder may only be taken by such Person and not by any other Warrantholder.

"*Permitted Transactions*" has the meaning set forth in Section 13(B).

- 6 -

"*Per Share Net Cash Settlement Amount*" means the Average Market Price of a share of Common Stock determined as of the relevant Exercise Date less the then applicable Exercise Price.

"*Per Share Net Share Settlement Amount*" means the quotient of (i) the Average Market Price of a share of Common Stock determined as of the relevant Exercise Date less the then applicable Exercise Price *divided by* (ii) the Average Market Price of a share of Common Stock determined as of the relevant Exercise Date.

"*Person*" has the meaning given to it in Section 3(a)(9) of the Exchange Act and as used in Sections 13(d)(3) and 14(d)(2) of the Exchange Act.

"*Per Share Fair Market Value*" has the meaning set forth in Section 13(C).

"*Pro Rata Repurchases*" means any purchase of shares of Common Stock by the Company or any Affiliate thereof pursuant to (A) any tender offer or exchange offer subject to Section 13(e) or 14(e) of the Exchange Act or Regulation 14E promulgated thereunder or (B) any other offer available to substantially all holders of Common Stock, in the case of both (A) or (B), whether for cash, shares of Capital Stock of the Company, other securities of the Company, evidences of indebtedness of the Company or any other Person or any other property (including, without limitation, shares of Capital Stock, other securities or evidences of indebtedness of a subsidiary), or any combination thereof, effected while this Warrant is outstanding. The "*Effective Date*" of a Pro Rata Repurchase shall mean the date of acceptance of shares for purchase or exchange by the Company under any tender or exchange offer which is a Pro Rata Repurchase or the date of purchase with respect to any Pro Rata Repurchase that is not a tender or exchange offer.

"*Regulatory Approvals*" with respect to the Warrantholder, means, to the extent applicable and required to permit the Warrantholder to exercise this Warrant for shares of Common Stock and to own such Common Stock without the Warrantholder being in violation of applicable law, rule or regulation, the receipt of any necessary approvals and authorizations of, filings and registrations with, notifications to, or expiration or termination of any applicable waiting period under, the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations thereunder.

"*SEC*" means the U.S. Securities and Exchange Commission.

"*Securities Act*" means the Securities Act of 1933, as amended, or any successor statute, and the rules and regulations promulgated thereunder.

"*trading day*" means (A) if the shares of Common Stock are not traded on any national or regional securities exchange or association or over-the-counter market, a Business Day or (B) if the shares of Common Stock are traded on any national or regional securities exchange or association or over-the-counter market, a Business Day on which such relevant exchange or quotation system is scheduled to be open for business and on which the shares of Common Stock (i) are not suspended from trading on any national or regional securities exchange or association

- 7 -

or over-the-counter market for any period or periods aggregating one half hour or longer; and (ii) have traded at least once on the national or regional securities exchange or association or over-the-counter market that is the primary market for the trading of the shares of Common Stock.

"*U.S. GAAP*" means United States generally accepted accounting principles.

"*Warrant*" means this Warrant, issued pursuant to the Warrant Agreement.

"*Warrant Agreement*" means the Warrant Agreement, dated as of the date set forth in Item 4 of Schedule A hereto, as amended from time to time, between the Company and the United States Department of the Treasury.

"*Warrantholder*" has the meaning set forth in Section 2.

"*Warrant Shares*" has the meaning set forth in Section 2.

2. Number of Warrant Shares; Net Exercise. This certifies that, for value received, the United States Department of the Treasury or its permitted assigns (the "*Warrantholder*") is entitled, upon the terms and subject to the conditions hereinafter set forth, to acquire from the Company, in whole or in part, after the receipt of all applicable Regulatory Approvals, if any, up to an aggregate of the number of fully paid and nonassessable shares of Common Stock set forth in Item 5 of Schedule A hereto. The number of shares of Common Stock (the "*Warrant Shares*") issuable upon exercise of this Warrant and the Exercise Price are subject to adjustment as provided herein, and all references to "Common Stock," "Warrant Shares" and "Exercise Price" herein shall be deemed to include any such adjustment or series of adjustments.

Upon exercise of the Warrant in accordance with Section 3 hereof, the Company shall elect to pay or deliver, as the case may be, to the exercising Warrantholder (a) cash ("*Net Cash Settlement*") or (b) Warrant Shares together with cash, if applicable, in lieu of delivering any fractional shares in accordance with Section 5 of this Warrant ("*Net Share Settlement*"). The Company will notify the exercising Warrantholder of its election of a settlement method within one Business Day after the relevant Exercise Date and if it fails to deliver a timely notice shall be deemed to have elected Net Share Settlement.

(i) *Net Cash Settlement.* If the Company elects Net Cash Settlement, it shall pay to the Warrantholder cash equal to the Per Share Net Cash Settlement Amount multiplied by the number of Warrant Shares as to which the Warrant has been exercised as indicated in the Notice of Exercise (the "*Aggregate Net Cash Settlement Amount*").

(ii) *Net Share Settlement*. If the Company elects Net Share Settlement, it shall deliver to the Warrantholder a number of shares of Common Stock equal to the Per Share Net Share Settlement Amount multiplied by the number of Warrant Shares as to which the Warrant has been exercised as indicated in the Notice of Exercise (the "*Aggregate Net Share Settlement Amount*").

- 8 -

3. Term; Method of Exercise. Subject to Section 2, to the extent permitted by applicable laws and regulations, this Warrant is exercisable, in whole or in part by the Warrantholder, at any time or from time to time after the execution and delivery of this Warrant by the Company on the date hereof, but in no event later than 5:00 p.m., New York City time on the fifth anniversary of the Issue Date of this Warrant, by the surrender of this Warrant and delivery of the Notice of Exercise annexed hereto, duly completed and executed on behalf of the Warrantholder, at the principal executive office of the Company located at the address set forth in Item 6 of Schedule A hereto (or such other office or agency of the Company in the United States as it may designate by notice in writing to the Warrantholder at the address of the Warrantholder appearing on the books of the Company).

If the Warrantholder does not exercise this Warrant in its entirety, the Warrantholder will be entitled to receive from the Company within a reasonable time after the date on which this Warrant has been duly exercised in accordance with the terms of this Warrant, and in any event not exceeding three Business Days after the date thereof, a new warrant in substantially identical form for the purchase of that number of Warrant Shares equal to the difference between the number of Warrant Shares subject to this Warrant and the number of Warrant Shares as to which this Warrant is so exercised. Notwithstanding anything in this Warrant to the contrary, the Warrantholder hereby acknowledges and agrees that its exercise of this Warrant for Warrant Shares is subject to the condition that the Warrantholder will have first received any applicable Regulatory Approvals.

4. Method of Settlement.

(i) *Net Cash Settlement*. If the Company elects Net Cash Settlement, the Company shall, within a reasonable time, not to exceed five Business Days after the date on which this Warrant has been duly exercised in accordance with the terms of this Warrant, pay to the exercising Warrantholder the Aggregate Net Cash Settlement Amount.

(ii) *Net Share Settlement*. If the Company elects Net Share Settlement, shares of Common Stock equal to the Aggregate Net Share Settlement Amount shall be (x) issued in such name or names as the exercising Warrantholder may designate and (y) delivered by the Company or the Company's transfer agent to such Warrantholder or its nominee or nominees (i) if the shares are then able to be so delivered, via book-entry transfer crediting the account of such Warrantholder (or the relevant agent member for the benefit of such Warrantholder) through the Depositary's DWAC system (if the Company's transfer agent participates in such system), or (ii) otherwise in certificated form by physical delivery to the address specified by the Warrantholder in the Notice of Exercise, within a reasonable time, not to exceed three Business Days after the date on which this Warrant has been duly exercised in accordance with the terms of this Warrant. The Company hereby represents and warrants that any Warrant Shares issued upon the exercise of this Warrant in accordance with the provisions of Section 3 will be duly and validly authorized and issued, fully paid and nonassessable and free from all taxes, liens and charges (other than liens or charges created by the Warrantholder, income and franchise taxes incurred in connection with the exercise of the Warrant or taxes in respect of any transfer occurring

- 9 -

contemporaneously therewith). The Company agrees that the Warrant Shares so issued will be deemed to have been issued to the Warrantholder as of the close of business on the date on which this Warrant and payment of the Exercise Price are delivered to the Company in accordance with the terms of this Warrant, notwithstanding that the stock transfer books of the Company may then be closed or certificates representing such Warrant Shares may not be actually delivered on such date. The Company will at all times reserve and keep available, out of its authorized but unissued Common Stock, solely for the purpose of providing for the exercise of this Warrant, the aggregate number of shares of Common Stock then issuable upon exercise of this Warrant at any time. The Company will (A) procure, at its sole expense, the listing of the Warrant Shares issuable upon exercise of this Warrant at any time, subject to issuance or notice of issuance, on all principal stock exchanges on which the Common Stock is then listed or traded and (B) maintain such listings of such Warrant Shares at all times after issuance. The Company will use reasonable best efforts to ensure that the Warrant Shares may be issued without violation of any applicable law or regulation or of any requirement of any securities exchange on which the Warrant Shares are listed or traded.

5. No Fractional Warrant Shares or Scrip. No fractional Warrant Shares or scrip representing fractional Warrant Shares shall be issued upon any exercise of this Warrant. In lieu of any fractional Share to which the Warrantholder would otherwise be entitled, the Warrantholder shall be entitled to receive a cash payment equal to the Average Market Price of the Common Stock determined as of the Exercise Date multiplied by such fraction of a share, less the pro-rated Exercise Price for such fractional share.

6. No Rights as Stockholders; Transfer Books. This Warrant does not entitle the Warrantholder to any voting rights or other rights as a stockholder of the Company prior to the date of exercise hereof. The Company will at no time close its transfer books against transfer of this Warrant in any manner which interferes with the timely exercise of this Warrant.

7. Charges, Taxes and Expenses. Issuance of certificates for Warrant Shares to the Warrantholder upon the exercise of this Warrant shall be made without charge to the Warrantholder for any issue or transfer tax or other incidental expense in respect of the issuance of such certificates, all of which taxes and expenses shall be paid by the Company; *provided*, *however*, that the Company shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of any such certificate, or any certificates or other securities in a name other than that of the registered holder of the Warrant surrendered upon exercise of the Warrant.

8. Transfer/Assignment.

(A) Subject to compliance with clause (B) of this Section 8, this Warrant and all rights hereunder are transferable, in whole or in part, upon the books of the Company by the registered holder hereof in person or by duly authorized attorney, and a new warrant shall be made and delivered by the Company, of the same tenor and date as this Warrant but registered in the name of one or more transferees, upon surrender of this Warrant, duly endorsed, to the office or agency of the Company described in Section 3. All expenses (other than stock transfer taxes) and other

- 10 -

charges payable in connection with the preparation, execution and delivery of the new warrants pursuant to this Section 8 shall be paid by the Company.

(B) If and for so long as required by the Warrant Agreement, this Warrant shall contain the legend as set forth in Sections 4.2(a) of the Warrant Agreement.

9. Exchange and Registry of Warrant. This Warrant is exchangeable, upon the surrender hereof by the Warrantholder to the Company, for a new warrant or warrants of like tenor and representing the right to purchase the same aggregate number of Warrant Shares. The Company shall maintain a registry showing the name and address of the Warrantholder as the registered holder of this Warrant. This Warrant may be surrendered for exchange or exercise in accordance with its terms, at the office of the Company, and the Company shall be entitled to rely in all respects, prior to written notice to the contrary, upon such registry.

10. Loss, Theft, Destruction or Mutilation of Warrant. Upon receipt by the Company of evidence reasonably satisfactory to it of the loss, theft, destruction or mutilation of this Warrant, and in the case of any such loss, theft or destruction, upon receipt of a bond, indemnity or security reasonably satisfactory to the Company, or, in the case of any such mutilation, upon surrender and cancellation of this Warrant, the Company shall make and deliver, in lieu of such lost, stolen, destroyed or mutilated Warrant, a new Warrant of like tenor and representing the right to purchase the same aggregate number of Warrant Shares as provided for in such lost, stolen, destroyed or mutilated Warrant.

11. Saturdays, Sundays, Holidays, etc. If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall not be a Business Day, then such action may be taken or such right may be exercised on the next succeeding day that is a Business Day.

12. Information. With a view to making available to Warrantholders the benefits of certain rules and regulations of the SEC which may permit the sale of the Warrants and Warrant Shares to the public without registration, the Company agrees to use its reasonable best efforts to:

(A) make and keep adequate public information available, as those terms are understood and defined in Rule 144(c) or any similar or analogous rule promulgated under the Securities Act, at all times after the date hereof;

(B) file with the SEC, in a timely manner, all reports and other documents required of the Company under the Securities Act and the Exchange Act, and (y) if at any time the Company is not required to file such reports, make available, upon the request of any Warrantholder, such information necessary to permit sales pursuant to Rule 144A (including the information required by Rule 144A(d)(4) under the Securities Act);

(C) furnish to any holder of Warrants or Warrant Shares forthwith upon request: a written statement by the Company as to its compliance with the reporting requirements of the Exchange Act and Rule 144(c)(1); a copy of the most recent annual or quarterly report of the Company;

- 11 -

and such other reports and documents as the Warrantholder may reasonably request in availing itself of any rule or regulation of the SEC allowing it to sell any such securities to the public without registration; and

(D) take such further action as any Warrantholder may reasonably request, all to the extent required from time to time to enable such Warantholder to sell Warrants or Warrant Shares without registration under the Securities Act.

13. Adjustments and Other Rights. The Exercise Price and the number of Warrant Shares issuable upon exercise of the Warrant shall be subject to adjustment from time to time as follows; *provided*, that if more than one subsection of this Section 13 is applicable to a single event, the subsection shall be applied that produces the largest adjustment and no single event shall cause an adjustment under more than one subsection of this Section 13 so as to result in duplication:

(A) Stock Splits, Subdivisions, Reclassifications or Combinations. If the Company shall (i) declare and pay a dividend or make a distribution on its Common Stock in shares of Common Stock, (ii) subdivide or reclassify the outstanding shares of Common Stock into a greater number of shares, or (iii) combine or reclassify the outstanding shares of Common Stock into a smaller number of shares, the number of Warrant Shares issuable upon exercise of this Warrant at the time of the record date for such dividend or distribution or the effective date of such subdivision, combination or reclassification shall be proportionately adjusted so that the Warrantholder after such date shall be entitled to acquire the number of shares of Common Stock which such holder would have owned or been entitled to receive in respect of the shares of Common Stock subject to this Warrant after such date had this Warrant been exercised immediately prior to such date. In such event, the Exercise Price in effect at the time of the record date for such dividend or distribution or the effective date of such subdivision, combination or reclassification shall be adjusted to the number obtained by dividing (x) the product of (1) the number of Warrant Shares issuable upon the exercise of this Warrant before such adjustment and (2) the Exercise Price in effect immediately prior to the record or effective date, as the case may be, for the dividend, distribution, subdivision, combination or reclassification giving rise to this adjustment by (y) the new number of Warrant Shares issuable upon exercise of the Warrant determined pursuant to the immediately preceding sentence.

(B) Certain Issuances of Common Stock or Convertible Securities. If the Company shall issue shares of Common Stock (or rights or warrants or other securities exercisable or convertible into or exchangeable (collectively, a "*conversion*") for shares of Common Stock) (collectively, "*convertible securities*") (other than in Permitted Transactions (as defined below) or a transaction to which subsection (A) of this Section 13 is applicable) without consideration or at a consideration per share (or having a conversion price per share) that is less than 90% of the Average Market Price determined as of the date of the agreement on pricing such shares (or such convertible securities) then, in such event:

(A) the number of Warrant Shares issuable upon the exercise of this Warrant immediately prior to the date of the agreement on pricing of such shares (or of such convertible securities) (the "*Initial Number*") shall be increased to the

- 12 -

number obtained by multiplying the Initial Number by a fraction (A) the numerator of which shall be the sum of (x) the number of shares of Common Stock of the Company outstanding on such date and (y) the number of additional shares of Common Stock issued (or into which convertible securities may be exercised or convert) and (B) the denominator of which shall be the sum of (I) the number of shares of Common Stock outstanding on such date and (II) the number of shares of Common Stock which the aggregate consideration receivable by the Company for the total number of shares of Common Stock so issued (or into which convertible securities may be exercised or convert) would purchase at the Average Market Price determined as of the date of the agreement on pricing such shares (or such convertible securities); and

(B) the Exercise Price payable upon exercise of the Warrant shall be adjusted by multiplying such Exercise Price in effect immediately prior to the date of the agreement on pricing of such shares (or of such convertible securities) by a fraction, the numerator of which shall be the number of shares of Common Stock issuable upon exercise of this Warrant prior to such date and the denominator of which shall be the number of shares of Common Stock issuable upon exercise of this Warrant immediately after the adjustment described in clause (A) above.

For purposes of the foregoing, the aggregate consideration receivable by the Company in connection with the issuance of such shares of Common Stock or convertible securities shall be deemed to be equal to the sum of the net offering price (including the Fair Market Value of any non-cash consideration and after deduction of any related expenses payable to third parties) of all such securities plus the minimum aggregate amount, if any, payable upon exercise or conversion of any such convertible securities into shares of Common Stock; and "*Permitted Transactions*" shall mean issuances (i) as consideration for or to fund the acquisition of businesses and/or related assets, (ii) in connection with employee benefit plans and compensation related arrangements in the ordinary course and consistent with past practice approved by the Board of Directors, (iii) in connection with a public or broadly marketed offering and sale of Common Stock or convertible securities for cash conducted by the Company or its affiliates pursuant to registration under the Securities Act or Rule 144A thereunder on a basis consistent with capital raising transactions by comparable institutions and (iv) in connection with the exercise of preemptive rights on terms existing as of the Issue Date. Any adjustment made pursuant to this Section 13(B) shall become effective immediately upon the date of such issuance.

(C) Other Distributions. In case the Company shall fix a record date for the making of a distribution to all holders of shares of its Common Stock of securities, evidences of indebtedness, assets, cash, rights or warrants (excluding dividends of its Common Stock and other dividends or distributions referred to in Section 13(A)), in each such case, the Exercise Price in effect prior to such record date shall be reduced immediately thereafter to the price determined by multiplying the Exercise Price in effect immediately prior to the reduction by the quotient of (x) the Average Market Price of the Common Stock determined as of the first date on which the Common Stock trades regular way on the principal national securities exchange on which the Common Stock is listed or admitted to trading without the right to receive such distribution, minus the amount of

- 13 -

cash and/or the Fair Market Value of the securities, evidences of indebtedness, assets, rights or warrants to be so distributed in respect of one share of Common Stock (such amount and/or Fair Market Value, the "*Per Share Fair Market Value*") divided by (y) the Average Market Price specified in clause (x); such adjustment shall be made successively whenever such a record date is fixed. In such event, the number of Warrant Shares issuable upon the exercise of this Warrant shall be increased to the number obtained by dividing (x) the product of (1) the number of Warrant Shares issuable upon the exercise of this Warrant before such adjustment, and (2) the Exercise Price in effect immediately prior to the distribution giving rise to this adjustment by (y) the new Exercise Price determined in accordance with the immediately preceding sentence. In the event that such distribution is not so made, the Exercise Price and the number of Warrant Shares issuable upon exercise of this Warrant then in effect shall be readjusted, effective as of the date when the Board of Directors determines not to distribute such shares, evidences of indebtedness, assets, rights, cash or warrants, as the case may be, to the Exercise Price that would then be in effect and the number of Warrant Shares that would then be issuable upon exercise of this Warrant if such record date had not been fixed.

(D) Certain Repurchases of Common Stock. In case the Company effects a Pro Rata Repurchase of Common Stock, then the Exercise Price shall be reduced to the price determined by multiplying the Exercise Price in effect immediately prior to the Effective Date of such Pro Rata Repurchase by a fraction of which the numerator shall be (i) the product of (x) the number of shares of Common Stock outstanding immediately before such Pro Rata Repurchase and (y) the Average Market Price of a share of Common Stock determined as of the date of the first public announcement by the Company or any of its Affiliates of the intent to effect such Pro Rata Repurchase, minus (ii) the aggregate purchase price of the Pro Rata Repurchase, and of which the denominator shall be the product of (i) the number of shares of Common Stock outstanding immediately prior to such Pro Rata Repurchase minus the number of shares of Common Stock so repurchased and (ii) the Average Market Price per share of Common Stock determined as of the date of the first public announcement by the Company or any of its Affiliates of the intent to effect such Pro Rata Repurchase. In such event, the number of shares of Common Stock issuable upon the exercise of this Warrant shall be increased to the number obtained by dividing (x) the product of (1) the number of Warrant Shares issuable upon the exercise of this Warrant before such adjustment, and (2) the Exercise Price in effect immediately prior to the Pro Rata Repurchase giving rise to this adjustment by (y) the new Exercise Price determined in accordance with the immediately preceding sentence. For the avoidance of doubt, no increase to the Exercise Price or decrease in the number of Warrant Shares issuable upon exercise of this Warrant shall be made pursuant to this Section 13(D).

(E) Business Combinations. In case of any Business Combination or reclassification of Common Stock (other than a reclassification of Common Stock referred to in Section 13(A)), the Warrantholder's right to receive Warrant Shares upon exercise of this Warrant shall be converted into the right to exercise this Warrant to acquire the number of shares of stock or other securities or property (including cash) which the Common Stock issuable (at the time of such Business Combination or reclassification) upon exercise of this Warrant immediately prior to such Business Combination or reclassification would have been entitled to receive upon consummation of such Business Combination or reclassification; and in any such case, if

- 14 -

necessary, the provisions set forth herein with respect to the rights and interests thereafter of the Warrantholder shall be appropriately adjusted so as to be applicable, as nearly as may reasonably be, to the Warrantholder's right to exercise this Warrant in exchange for any shares of stock or other securities or property pursuant to this paragraph. In determining the kind and amount of stock, securities or the property receivable upon exercise of this Warrant following the consummation of such Business Combination, if the holders of Common Stock have the right to elect the kind or amount of consideration receivable upon consummation of such Business Combination, then the consideration that the Warrantholder shall be entitled to receive upon exercise shall be deemed to be the types and amounts of consideration received by the majority of all holders of the shares of common stock that affirmatively make an election (or of all such holders if none make an election).

(F) Rounding of Calculations; Minimum Adjustments. All calculations under this Section 13 shall be made to the nearest one-tenth (1/10th) of a cent or to the nearest one- hundredth (1/100th) of a share, as the case may be. Any provision of this Section 13 to the contrary notwithstanding, no adjustment in the Exercise Price or the number of Warrant Shares shall be made if the amount of such adjustment would be less than $0.01 or one-tenth (1/10th) of a share of Common Stock, but any such amount shall be carried forward and an adjustment with respect thereto shall be made at the time of and together with any subsequent adjustment which, together with such amount and any other amount or amounts so carried forward, shall aggregate $0.01 or 1/10th of a share of Common Stock, or more.

(G) Timing of Issuance of Additional Common Stock Upon Certain Adjustments. In any case in which the provisions of this Section 13 shall require that an adjustment shall become effective immediately after a record date for an event, the Company may defer until the occurrence of such event (i) issuing to the Warrantholder of this Warrant exercised after such record date and before the occurrence of such event the additional shares of Common Stock issuable upon such exercise by reason of the adjustment required by such event over and above the shares of Common Stock issuable upon such exercise before giving effect to such adjustment and (ii) paying to such Warrantholder any amount of cash in lieu of a fractional share of Common Stock; *provided*, *however*, that the Company upon request shall deliver to such Warrantholder a due bill or other appropriate instrument evidencing such Warrantholder's right to receive such additional shares, and such cash, upon the occurrence of the event requiring such adjustment.

(H) Other Events. For so long as the Original Warrantholder holds this Warrant or any portion thereof, if any event occurs as to which the provisions of this Section 13 are not strictly applicable or, if strictly applicable, would not, in the good faith judgment of the Board of Directors of the Company, fairly and adequately protect the purchase rights of the Warrants in accordance with the essential intent and principles of such provisions, then the Board of Directors shall make such adjustments in the application of such provisions, in accordance with such essential intent and principles, as shall be reasonably necessary, in the good faith opinion of the Board of Directors, to protect such purchase rights as aforesaid. The Exercise Price or the number of Warrant Shares shall not be adjusted in the event of a change in the par value of the Common Stock or a change in the jurisdiction of incorporation of the Company.

- 15 -

(I) Statement Regarding Adjustments. Whenever the Exercise Price or the number of Warrant Shares shall be adjusted as provided in Section 13, the Company shall forthwith file at the principal office of the Company a statement showing in reasonable detail the facts requiring such adjustment and the Exercise Price that shall be in effect and the number of Warrant Shares after such adjustment, and the Company shall also cause a copy of such statement to be sent by mail, first class postage prepaid, to each Warrantholder at the address appearing in the Company's records.

(J) Notice of Adjustment Event. In the event that the Company shall propose to take any action of the type described in this Section 13 (but only if the action of the type described in this Section 13 would result in an adjustment in the Exercise Price or the number of Warrant Shares or a change in the type of securities or property to be delivered upon exercise of this Warrant), the Company shall give notice to the Warrantholder, in the manner set forth in Section 13(J), which notice shall specify the record date, if any, with respect to any such action and the approximate date on which such action is to take place. Such notice shall also set forth the facts with respect thereto as shall be reasonably necessary to indicate the effect on the Exercise Price and the number, kind or class of shares or other securities or property which shall be deliverable upon exercise of this Warrant. In the case of any action which would require the fixing of a record date, such notice shall be given at least 10 days prior to the date so fixed, and in case of all other action, such notice shall be given at least 15 days prior to the taking of such proposed action. Failure to give such notice, or any defect therein, shall not affect the legality or validity of any such action.

(K) Proceedings Prior to Any Action Requiring Adjustment. As a condition precedent to the taking of any action which would require an adjustment pursuant to this Section 13, the Company shall take any action which may be necessary, including obtaining regulatory, New York Stock Exchange, NASDAQ Stock Market or other applicable national securities exchange or stockholder approvals or exemptions, as applicable, in order that the Company may thereafter validly and legally issue as fully paid and nonassessable all shares of Common Stock that the Warrantholder is entitled to receive upon exercise of this Warrant pursuant to this Section 13.

(L) Adjustment Rules. Any adjustments pursuant to this Section 13 shall be made successively whenever an event referred to herein shall occur. If an adjustment in Exercise Price made hereunder would reduce the Exercise Price to an amount below par value of the Common Stock, then such adjustment in Exercise Price made hereunder shall reduce the Exercise Price to the par value of the Common Stock.

14. No Impairment. The Company will not, by amendment of its Charter or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Warrant and in taking of all such action as may be necessary or appropriate in order to protect the rights of the Warrantholder.

15. Governing Law. **This Warrant will be governed by and construed in accordance with the federal law of the United States if and to the extent such law is applicable, and**

- 16 -

**otherwise in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State. Each of the Company and the Warrantholder agrees (a) to submit to the exclusive jurisdiction and venue of the United States District Court for the District of Columbia for any civil action, suit or proceeding arising out of or relating to this Warrant or the transactions contemplated hereby, and (b) that notice may be served upon the Company at the address in Section 19 below and upon the Warrantholder at the address for the Warrantholder set forth in the registry maintained by the Company pursuant to Section 9 hereof. To the extent permitted by applicable law, each of the Company and the Warrantholder hereby unconditionally waives trial by jury in any civil legal action or proceeding relating to the Warrant or the transactions contemplated hereby or thereby.**

16. Binding Effect. This Warrant shall be binding upon any successors or assigns of the Company.

17. Amendments. This Warrant may be amended and the observance of any term of this Warrant may be waived only with the written consent of the Company and the Warrantholder.

18. Prohibited Actions. The Company agrees that it will not take any action which would entitle the Warrantholder to an adjustment of the Exercise Price if the total number of shares of Common Stock issuable after such action upon exercise of this Warrant, together with all shares of Common Stock then outstanding and all shares of Common Stock then issuable upon the exercise of all outstanding options, warrants, conversion and other rights, would exceed the total number of shares of Common Stock then authorized by its Charter.

19. Notices. Any notice, request, instruction or other document to be given hereunder by any party to the other will be in writing and will be deemed to have been duly given (a) on the date of delivery if delivered personally, or by facsimile, upon confirmation of receipt, or (b) on the second Business Day following the date of dispatch if delivered by a recognized next day courier service. All notices hereunder shall be delivered as set forth in Item 7 of Schedule A hereto, or pursuant to such other instructions as may be designated in writing by the party to receive such notice.

20. Entire Agreement. This Warrant, the forms attached hereto and Schedule A hereto (the terms of which are incorporated by reference herein), and the Warrant Agreement (including all documents incorporated therein), contain the entire agreement between the parties with respect to the subject matter hereof and supersede all prior and contemporaneous arrangements or undertakings with respect thereto.

*[Remainder of page intentionally left blank]*

- 17 -

**[Form of Notice of Exercise]**
**Date: _____**

TO:   **Southwest Airlines Co. (the "Company")**

RE:   Exercise of Warrant

The undersigned, pursuant to the provisions set forth in the attached Warrant, hereby notifies the Company of its intention to exercise its option with respect to the number of shares of the Common Stock set forth below covered by such Warrant. Pursuant to Section 4 of the Warrant, the undersigned acknowledges that the Company may settle this exercise in net cash or shares. Cash to be paid pursuant to a Net Cash Settlement or payment of fractional shares in connection with a Net Share Settlement should be deposited to the account of the Warrantholder set forth below. Common Stock to be delivered pursuant to a Net Share Settlement shall be delivered to the Warrantholder as indicated below. A new warrant evidencing the remaining shares of Common Stock covered by such Warrant, but not yet subscribed for and purchased, if any, should be issued in the name set forth below.

Number of Warrant Shares: _____

Aggregate Exercise Price: _____

Address for Delivery of Warrant Shares:_____

Wire Instructions:

Proceeds to be delivered:        $
Name of Bank:
City/ State of Bank:
ABA Number of Bank
SWIFT #
Name of Account:
Account Number at Bank:

Securities to be issued to:

If in book-entry form through the Depositary:

Depositary Account Number:

Name of Agent Member:

If in certificated form:

Social Security Number or Other Identifying Number:

- 18 -

Name: _____

Street Address: _____

City, State and Zip Code: _____

Any unexercised Warrants evidenced by the exercising Warrantholder's interest in the Warrant:

Social Security Number or Other Identifying Number: _____

Name: _____

Street Address: _____

City, State and Zip Code: _____

Holder: _____
By: _____
Name: _____
Title: _____

- 19 -

IN WITNESS WHEREOF, the Company has caused this Warrant to be duly executed by a duly authorized officer.

Dated: _____

**COMPANY: SOUTHWEST AIRLINES CO.**

By: _____
Name: Tammy Romo
Title: Executive Vice President and Chief Financial Officer

**Attest:**

By: _____
Name: David Christopher Monroe
Title: Senior Vice President Finance and Treasurer

**[Signature Page to Warrant]**

- 20 -

*Execution Version*

Item 1
Name: Southwest Airlines Co.
Corporate or other organizational form: Corporation
Jurisdiction of organization: Texas

Item 2
Exercise Price: $58.51

Item 3
Issue Date:

Item 4
Date of Warrant Agreement between the Company and the United States Department of the Treasury: April 23, 2021

Item 5
Number of shares of Common Stock:

Item 6
Company's address:

Southwest Airlines Co.
2702 Love Field Drive
Dallas, Texas 75235-1611

Item 7
Notice information of the Company:

Southwest Airlines Co.
P.O. Box 36611, HDQ-6TR
Love Field
Dallas, Texas 75235
Telecopy Number: (214) 932-1322
Attention: Treasurer
E-mail: Capital_Markets-DG@wnco.com

With a copy to:

Southwest Airlines Co.
Legal Department - HDQ-4GC
2702 Love Field Drive
Dallas, Texas 75235

Notice Information of the Holder:

United States Department of the Treasury

1500 Pennsylvania Avenue, NW, Room 2312

Washington, D.C., 20220

Attention: Assistant General Counsel (Banking and Finance)

Telephone Number: (202) 622-0283

Email: eric.froman@treasury.gov

- 22 -

*Execution Version*

**SCHEDULE 1**

**WARRANT SHARES FORMULA**

The number of Warrant Shares for which Warrants issued on each Warrant Closing Date shall be exercisable shall equal:

(i)     On the Closing Date, the quotient of (x) the product of the principal amount of the Promissory Note multiplied *by* 0.1 *divided by* (y) the Exercise Price (as defined in Annex B); and

(ii)    On each subsequent Warrant Closing Date, the quotient of (x) the product of the amount by which the principal amount of the Promissory Note is increased on such Warrant Closing Date multiplied *by* 0.1 *divided by* (y) the Exercise Price.

SCHEDULE 2

**CAPITALIZATION**

**Southwest Airlines Co.'s capitalization as of March 31, 2021**:

| | |
|---|---|
| Shares of Common Stock Authorized | 2,000,000,000 |
| | |
| Issued Shares | 888,111,634 |
| Treasury Shares | (296,817,710) |
| Shares Outstanding | 591,293,924 |

The number of shares of Common Stock outstanding as of March 31, 2021 excludes:

- 5,677,739 shares of Common Stock that are reserved for future issuance under the Company's Amended and Restated Employee Stock Purchase Plan;
- 2,604,213 shares of Common Stock represented by restricted stock units and performance-based restricted stock units that have been granted and are unvested pursuant to the Company's Amended and Restated 2007 Equity Incentive Plan and 17,108,473 other shares of Common Stock that are reserved for future issuance under the Company's Equity Incentive Plan;
- 2,676,331 shares reserved for issuance upon exercise of warrants issued to Treasury pursuant to the Warrant Agreement, dated as of April 20, 2020, between the Company and Treasury;
- 80,701,710 shares reserved for issuance upon conversion of the Company's $2.3 billion aggregate principal amount of 1.250% Convertible Senior Notes due 2025 issued on May 1, 2020 pursuant to a public offering; and
- 1,500,000 shares reserved for issuance upon exercise of warrants issued to Treasury pursuant to the Warrant Agreement, dated as of January 15, 2021, between the Company and Treasury.

Excluding any shares of Common Stock issued upon the exercise of stock options or delivered under the equity-based awards or other programs described above, from March 31, 2021 and through April 23, 2021, the Company has not issued or reserved for issuance, as the case may be, any shares of Common Stock, other than the following:

- 1,100,000 shares reserved for issuance upon exercise of warrants issued to Treasury pursuant to this Agreement.

- 24 -

**SCHEDULE 3**

<u>**REQUIRED STOCKHOLDER APPROVALS**</u>

None.

*Execution Version*

**PROMISSORY NOTE**

THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.

Reference is made to that certain Payroll Support Program 3 Agreement ("PSP3 Agreement") dated as of the date hereof by and among Southwest Airlines Co., a corporation organized under the laws of Texas ("Issuer"), having an office at 2702 Love Field Drive, Dallas, Texas 75235-1611 and the United States Department of the Treasury ("Treasury"), having an office at 1500 Pennsylvania Avenue, NW, Washington, D.C. 20220, entered into by Issuer and Treasury pursuant to the American Rescue Plan Act of 2021 (March 11, 2021) ("PSP3 Extension Law").

WHEREAS, Issuer has requested that Treasury provide financial assistance to the Issuer and certain of its Affiliates (as defined below) that are Recipients (as defined in the PSP3 Agreement) that shall be used for the continuation of payment of employee wages, salaries, and benefits as is permissible under Section 7301(b)(1) of the PSP3 Extension Law.

WHEREAS, as appropriate compensation to the Federal Government of the United States of America for the provision of financial assistance under the PSP3 Agreement, Issuer has agreed to issue this Promissory Note ("Note") to Treasury on the terms and conditions set forth herein.

FOR VALUE RECEIVED, Issuer unconditionally promises to pay to the Holder (as defined below) the principal sum of $247,917,919.18, subject to increases and/or decreases made pursuant to Section 2.1, as permissible under the PSP3 Agreement, or Section 2.3, in each case as noted by the Holder in Schedule I (the "Principal Amount"), outstanding hereunder, together with all accrued interest thereon on the Maturity Date (as defined below) as provided in this Note. Notations made by the Holder in Schedule I shall be final and conclusive absent manifest error; provided, however, that any failure by the Holder to make such notations or any error by omission by the Holder in this regard shall not affect the obligation of the Issuer to pay the full amount of the principal of and interest on the Note or any other amount owing hereunder.

1    **DEFINITIONS**

1.1    Defined Terms. As used in this Note, capitalized terms have the meanings specified in Annex A.

1.2    Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." The word "or" is not exclusive. The word "year" shall refer (i) in the case of a leap year, to a year of three hundred sixty-six (366) days, and (ii) otherwise, to a year of three hundred sixty-five (365) days. Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Note in its entirety and not to any particular provision hereof, (d) all references herein to Sections, Annexes and Schedules shall be construed to refer to Sections of, and Annexes and Schedules to, this Note, (e) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

1.3    Accounting Terms. All accounting terms not otherwise defined herein shall be construed in conformity with GAAP, as in effect from time to time.

2    **NOTE**

2.1    Principal Amount. Upon any disbursement to the Issuer under the PSP3 Agreement after the Closing Date, the Principal Amount of this Note shall be increased in an amount equal to 30 % of any such disbursement; provided,

however, that no increases in the Principal Amount of this Note shall occur pursuant to this Section until the aggregate principal amount of any disbursements to the Issuer under the PSP3 Agreement is greater than $100,000,000.

2.2    Maturity Date. The aggregate unpaid principal amount of the Note, all accrued and unpaid interest, and all other amounts payable under this Note shall be due and payable on the Maturity Date, unless otherwise provided in Section 5.1.

2.3    Prepayments.

(a)    Optional Prepayments. The Issuer may, upon written notice to the Holder, at any time and from time to time prepay the Note in whole or in part without premium or penalty in a minimum aggregate principal amount equal to the lesser of $5,000,000 and the Principal Amount outstanding.

(b)    Mandatory Prepayments. If a Change of Control occurs, within thirty (30) days following the occurrence of such Change of Control, the Issuer shall prepay the aggregate principal amount outstanding under the Note and any accrued interest or other amounts owing under the Note. The Issuer will not, and will not permit any Subsidiary to, enter into any Contractual Obligation (other than this Note) that, directly or indirectly, restricts the ability of the Issuer or any Subsidiary to make such prepayment hereunder.

2.4    Interest.

(a)    Interest Rate. Subject to paragraph (b) of this Section, the Note shall bear interest on the Principal Amount outstanding from time to time at a rate per annum equal to 1.00% until the fifth anniversary of the Closing Date, and the Applicable SOFR Rate plus 2.00% thereafter until the Maturity Date. All interest hereunder shall be computed on the basis of the actual number of days in each interest period and a year of 365 or 366 days, as applicable, until the fifth anniversary of the Closing Date and computed in a manner determined by the Holder thereafter, based on prevailing customary market conventions for the use of the Applicable SOFR Rate in floating-rate debt instruments at the time of the announcement of the Applicable SOFR Rate. Each interest period will be from, and including, the Closing Date, or from and including the most recent interest payment date to which interest has been paid or provided for, to, but excluding the next interest payment date.

(b)    Default Interest. If any amount payable by the Issuer or any Guarantor under this Note (including principal of the Note, interest, fees or other amount) is not paid when due, whether at stated maturity, upon acceleration or otherwise, such amount shall thereafter bear interest at a rate per annum equal to the applicable Default Rate. While any Event of Default exists, the Issuer or any Guarantor shall pay interest on the principal amount of the Note outstanding hereunder at a rate per annum equal to the applicable Default Rate.

(c)    Payment Dates. Accrued interest on the Note shall be payable in arrears on the last Business Day of March and September of each year, beginning with September 30, 2021 , and on the Maturity Date and at such other times as may be specified herein; provided that (i) interest accrued pursuant to paragraph (b) of this Section shall be payable on demand and (ii) in the event of any repayment or prepayment of the Note, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(d)    SOFR Fallback. If, at any time, the Holder or its designee determines that a Benchmark Transition Event has occurred with respect to the Applicable SOFR Rate or SOFR, or any successor rate, the Holder or its designee will designate a Benchmark Replacement and, as applicable, make Benchmark Conforming Changes in a manner consistent with the methodology set forth in the ARRC Fallback Provisions. Any determination, decision or election that may be made by the Holder or its designee pursuant to this Section 2.4(d), and any decision to take or refrain from taking any action or making any determination, decision or election arising out of or relating to this Section 2.4(d), shall be conclusive and binding absent manifest error, may be made by the Holder or its designee in its sole discretion, and, notwithstanding anything to the contrary in this Note, shall become effective without the consent of the Issuer, any Guarantor or any other party. Any terms used in this Section 2.4(d) but not defined in this Note shall be construed in a manner consistent with the ARRC Fallback Provisions.

2.5    Payments Generally.

(a)    Payments by Issuer. All payments to be made by the Issuer hereunder shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, (i) for so long as Treasury is the Holder of this Note, each payment under this Note shall be paid in immediately available funds by electronic funds transfer to the account of the United States Treasury maintained at the Federal Reserve Bank of New York specified by Treasury in a written notice to the Issuer, or to such other account as may be specified from time to time by Treasury in a written notice to the Issuer, or (ii) in the event that Treasury is not the Holder of this

2

Note, then each payment under this Note shall be made in immediately available funds by electronic funds transfer to such account as shall be specified by the Holder in a written notice to the Issuer, in each case not later than 12:00 noon (Washington, D.C. time) on the date specified herein. All amounts received by the Holder after such time on any date shall be deemed to have been received on the next succeeding Business Day and any applicable interest or fees shall continue to accrue. If any payment to be made by the Issuer shall fall due on a day that is not a Business Day, payment shall be made on the next succeeding Business Day and such extension of time shall be reflected in computing interest or fees, as the case may be; provided that, if such next succeeding Business Day would fall after the Maturity Date, payment shall be made on the immediately preceding Business Day. Except as otherwise expressly provided herein, all payments hereunder shall be made in Dollars.

(b)    Application of Insufficient Payments. If at any time insufficient funds are received by and available to the Holder to pay fully all amounts of principal, interest, fees and other amounts then due hereunder, such funds shall be applied (i) first, to pay interest, fees and other amounts then due hereunder, and (ii) second, to pay principal then due hereunder.

3    **REPRESENTATIONS AND WARRANTIES**

The Issuer and each Guarantor represents and warrants to the Holder on the Closing Date and is deemed to represent and warrant to the Holder on any date on which the amount of the Note is increased pursuant to the terms hereof and in accordance with the PSP3 Agreement that:

3.1    Existence, Qualification and Power. The Issuer, each Guarantor and each Subsidiary (a) is duly organized or formed, validly existing and, as applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Note, and (c) is duly qualified and is licensed and, as applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license, except, in each case referred to in clause (a) (other than with respect to the Issuer and each Guarantor), (b) (i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

3.2    Authorization; No Contravention. The execution, delivery and performance by the Issuer and each Guarantor of the Note have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of its Organizational Documents, (b) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any material Contractual Obligation to which the Issuer or any Guarantor is a party or affecting the Issuer or any Guarantor or the material properties of the Issuer, any Guarantor or any Subsidiary or (ii) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which the Issuer, the Guarantor or any Subsidiary or its property is subject or (c) violate any Law, except to the extent that such violation could not reasonably be expected to have a Material Adverse Effect.

3.3    Governmental Authorization; Other Consents. No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, the Issuer or any Guarantor of this Note, except for such approvals, consents, exemptions, authorizations, actions or notices that have been duly obtained, taken or made and in full force and effect.

3.4    Execution and Delivery; Binding Effect. This Note has been duly executed and delivered by the Issuer and each Guarantor. This Note constitutes a legal, valid and binding obligation of the Issuer and each Guarantor, enforceable against the Issuer and each Guarantor in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, receivership, moratorium or other Laws affecting creditors' rights generally and by general principles of equity.

4    **COVENANTS**

Until all Obligations shall have been paid in full or until any later date as provided for in this Note, the Issuer covenants and agrees with the Holder that:

4.1    Notices. The Issuer will promptly notify the Holder of the occurrence of any Default.

4.2    Guarantors. The Guarantors listed on the signature page to this Note hereby Guarantee the Guaranteed Obligations as set forth in Annex B. If any Subsidiary (other than an Excluded Subsidiary) is formed or acquired after

3

the Closing Date or if any Subsidiary ceases to be an Excluded Subsidiary, then the Issuer will cause such Subsidiary to become a Guarantor of this Note within 30 days of such Subsidiary being formed or acquired or of such Subsidiary ceasing to be an Excluded Subsidiary pursuant to customary documentation reasonably acceptable to the Holder and on the terms and conditions set forth in Annex B.

4.3    Pari Passu Ranking. The Obligations of the Issuer and any Guaranteed Obligations of any Guarantor under this Note shall be unsecured obligations of the Issuer and any Guarantor ranking pari passu with all existing and future senior unsecured Indebtedness of the Issuer or any Guarantor that is not subordinated in right of payment to the holder or lender of such Indebtedness.

5    **EVENTS OF DEFAULT**

5.1    Events of Default. If any of the following events (each, an "Event of Default") shall occur:

(a)    the Issuer shall fail to pay any principal of the Note when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)    the Issuer shall fail to pay any interest on the Note, or any fee or any other amount (other than an amount referred to in clause (a) of this Section) payable under this Note, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of two (2) or more Business Days;

(c)    any representation or warranty made or deemed made by or on behalf of the Issuer or any Guarantor, including those made prior to the Closing Date, in or in connection with this Note or any amendment or modification hereof, or any waiver hereunder, or in the PSP3 Agreement, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Note, the PSP3 Agreement or the PSP3 Application or any amendment or modification hereof or thereof, or any waiver hereunder or thereunder, shall prove to have been incorrect in any material respect (or, in the case of any such representation or warranty under this Note already qualified by materiality, such representation or warranty shall prove to have been incorrect) when made or deemed made;

(d)    the Issuer shall fail to observe or perform any covenant, condition or agreement contained in Section 4.1;

(e)    the Issuer or any Guarantor shall fail to observe or perform any covenant, condition or agreement contained in this Note (other than those specified in clause (a), (b) or (d) of this Section) and such failure shall continue unremedied for a period of 30 or more days after notice thereof by the Holder to the Issuer;

(f)    (i) the Issuer or any Guarantor shall default in the performance of any obligation relating to any Indebtedness (other than Indebtedness under the Note) having an aggregate principal amount equal to or greater than $145,000,000.00 ("Material Indebtedness") and any applicable grace periods shall have expired and any applicable notice requirements shall have been complied with, and as a result of such default the holder or holders of such Material Indebtedness or any trustee or agent on behalf of such holder or holders shall have caused such Material Indebtedness to become due prior to its scheduled final maturity date or (ii) the Issuer or any Guarantor shall default in the payment of the outstanding principal amount due on the scheduled final maturity date of any Indebtedness outstanding under one or more agreements of the Issuer or any Guarantor, any applicable grace periods shall have expired and any applicable notice requirements shall have been complied with and such failure to make payment when due shall be continuing for a period of more than five (5) consecutive Business Days following the applicable scheduled final maturity date or the applicable grace period thereunder, in an aggregate principal amount at any single time unpaid exceeding $145,000,000.00;

(g)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Issuer, any Guarantor or any Subsidiary or its debts, or of a substantial part of its assets, under any Debtor Relief Law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Issuer or any of its Subsidiaries or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for a period of 60 or more days or an order or decree approving or ordering any of the foregoing shall be entered;

(h)    the Issuer, any Guarantor or any Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Debtor Relief Law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (g) of this Section, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Issuer, any Guarantor or any Subsidiary or for a substantial part of its assets, (iv)

4

file an answer admitting the material allegations of a petition filed against it in any such proceeding or (v) make a general assignment for the benefit of creditors;

(i)    the Issuer, any Guarantor or any Subsidiary shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(j)    there is entered against the Issuer, any Guarantor or any Subsidiary (i) a final judgment or order for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding an amount equal to or greater than $145,000,000.00 (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied or failed to acknowledge coverage), or (ii) a non-monetary final judgment or order that, either individually or in the aggregate, has or could reasonably be expected to have a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of 30 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; or

(k)    any material provision of the Note, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or satisfaction in full of all Obligations, ceases to be in full force and effect; or the Issuer, any Guarantor or any other Person contests in writing the validity or enforceability of any provision of the Note; or the Issuer or any Guarantor denies in writing that it has any or further liability or obligation under the Note, or purports in writing to revoke, terminate or rescind the Note;

then, and in every such event (other than an event with respect to the Issuer or any Guarantor described in clause (g) or (h) of this Section), and at any time thereafter during the continuance of such event, the Holder may, by notice to the Issuer, take any or all of the following actions, at the same or different times:

(i)    declare any amounts then outstanding under the Note to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Note so declared to be due and payable, together with accrued interest thereon and all fees and other Obligations of the Issuer accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Issuer and any Guarantor; and

(ii)    exercise on all rights and remedies available to it under the Note and Applicable Law;

provided that, in case of any event with respect to the Issuer or any Guarantor described in clause (g) or (h) of this Section, the principal of the Note then outstanding, together with accrued interest thereon and all fees and other Obligations accrued hereunder, shall automatically become due and payable, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Issuer and any Guarantor.

6    **MISCELLANEOUS**

6.1    Notices.

(a)    Notices Generally. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by email as follows:

(i)    if to the Issuer or any Guarantor, to Southwest Airlines Co. at P.O. Box 36611, HDQ-6TR, Love Field, Dallas, Texas 75235, Attention of Treasurer (Telecopy No. (214) 932-1322; Email: Capital_Markets-DG@wnco.com), with a copy to Southwest Airlines Co., Attention of Legal Department – HDQ-4GC, 2702 Love Field Drive, Dallas, Texas 75235;

(ii)    if to the Holder, to the Department of the Treasury at 1500 Pennsylvania Avenue, NW, Room 2312, Washington, D.C. 20220, Attention of Assistant General Counsel (Banking and Finance) (Telephone No. (202) 622-0283; Email: eric.froman@treasury.gov); and

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received. Notices delivered through electronic communications, to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b).

(b)    Electronic Communications. Notices and other communications to the Holder hereunder may be delivered or furnished by electronic communication (including e mail, FpML, and Internet or intranet websites) pursuant to

5

procedures approved by the Holder. The Holder, the Issuer or any Guarantor may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications. Unless the Holder otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day.

6.2    Waivers; Amendments.

(a)    No Waiver; Remedies Cumulative; Enforcement. No failure or delay by the Holder in exercising any right, remedy, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, remedy, power or privilege, or any abandonment or discontinuance of steps to enforce such a right remedy, power or privilege, preclude any other or further exercise thereof or the exercise of any other right remedy, power or privilege. The rights, remedies, powers and privileges of the Holder hereunder and under the Note are cumulative and are not exclusive of any rights, remedies, powers or privileges that any such Person would otherwise have.

(b)    Amendments, Etc. Except as otherwise expressly set forth in this Note, no amendment or waiver of any provision of this Note, and no consent to any departure by the Issuer therefrom, shall be effective unless in writing executed by the Issuer and the Holder, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

6.3    Expenses; Indemnity; Damage Waiver.

(a)    Costs and Expenses. The Issuer shall pay (i) all reasonable out of pocket expenses incurred by the Holder (including the reasonable fees, charges and disbursements of any counsel for the Holder) in connection with the preparation, negotiation, execution, delivery and administration of this Note and the PSP3 Agreement, any other agreements or documents executed in connection herewith or therewith, or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii) all out of pocket expenses incurred by the Holder (including the fees, charges and disbursements of any counsel for the Holder), in connection with the enforcement or protection of its rights in connection with this Note and the PSP3 Agreement, any other agreements or documents executed in connection herewith or therewith, or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), including all such out of pocket expenses incurred during any workout, restructuring, negotiations or enforcement in respect of such Note, PSP3 Agreement and other agreements or documents executed in connection herewith or therewith.

(b)    Indemnification by the Issuer. The Issuer shall indemnify the Holder and each of its Related Parties (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities, obligations, penalties, fines, settlements, judgments, disbursements and related costs and expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any Person (including the Issuer) arising out of, in connection with, or as a result of (i) the execution or delivery of this Note or any agreement or instrument contemplated hereby, the performance by the Issuer or any Guarantor of its obligations hereunder or the consummation of the transactions contemplated hereby, (ii) the Note or the use or proposed use of the proceeds therefrom, or (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Issuer or any Guarantor, and regardless of whether any Indemnitee is a party thereto.

(c)    Waiver of Consequential Damages, Etc. To the fullest extent permitted by Applicable Law, the Issuer and any Guarantor shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Note or any agreement or instrument contemplated hereby, the transactions contemplated hereby, or the use of the proceeds thereof. No Indemnitee referred to in paragraph (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed

6

by it through telecommunications, electronic or other information transmission systems in connection with this Note or the transactions contemplated hereby.

(d)    Payments. All amounts due under this Section shall be payable not later than five (5) days after demand therefor.

(e)    Survival. Each party's obligations under this Section shall survive the termination of the Note and payment of the obligations hereunder.

6.4    Successors and Assigns. Neither the Issuer nor any Guarantor may assign or transfer this Note or any of its rights or obligations hereunder and any purported assignment or transfer in violation of this Note shall be void. Holder may assign or participate a portion or all of its rights under this Note at any time in compliance with all Applicable Laws. This Note shall inure to the benefit of and be binding upon Issuer, any Guarantor and Holder and their permitted successors and assigns. Any Holder that assigns, or sells participations in, any portion of the Note will take such actions as are necessary for the Note and such portion to be in "registered form" (within the meaning of Treasury Regulations Section 5f.103-1).

6.5    Counterparts; Integration; Effectiveness. This Note and any amendments, waivers, consents or supplements hereto may be executed in counterparts, each of which shall constitute an original, but all taken together shall constitute a single contract. This Note constitutes the entire contract between Issuer, any Guarantor and the Holder with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto. Notwithstanding anything herein to the contrary, delivery of an executed counterpart of a signature page of this Note by electronic means shall be effective as delivery of a manually executed counterpart of this Note.

6.6    Severability. If any term or provision of this Note is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Note or invalidate or render unenforceable such term or provision in any other jurisdiction.

6.7    Right of Setoff. If an Event of Default shall have occurred and be continuing, the Holder is hereby authorized at any time and from time to time, to the fullest extent permitted by Applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held, and other obligations (in whatever currency) at any time owing, by the Holder, to or for the credit or the account of the Issuer against any and all of the due and unpaid Obligations of the Issuer now or hereafter existing under this Note to the Holder, irrespective of whether or not the Holder shall have made any demand under this Note. The rights of the Holder under this Section are in addition to other rights and remedies (including other rights of setoff) that the Holder may have. The Holder agrees to notify the Issuer promptly after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

6.8    Governing Law; Jurisdiction; Etc. This Note will be governed by and construed in accordance with the federal law of the United States if and to the extent such law is applicable, and otherwise in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State. Each of the Issuer, any Guarantor and the Holder agrees (a) to submit to the exclusive jurisdiction and venue of the United States District Court for the District of Columbia for any civil action, suit or proceeding arising out of or relating to this Note or the transactions contemplated hereby, and (b) that notice may be served upon the Issuer, any Guarantor or the Holder at the applicable address in Section 6.1 hereof (or upon any Holder that is not Treasury at an address provided by such Holder to Issuer in writing). To the extent permitted by Applicable Law, each of the Issuer, any Guarantor and the Holder hereby unconditionally waives trial by jury in any civil legal action or proceeding relating to the Note or the transactions contemplated hereby.

6.9    Headings. Section headings used herein are for convenience of reference only, are not part of this Note and shall not affect the construction of, or be taken into consideration in interpreting, this Note.

7

IN WITNESS WHEREOF, the Issuer has executed this Note as of the day and year written below.

SOUTHWEST AIRLINES CO.,
as Issuer


By _/s/ Tammy Romo_____
 Name: Tammy Romo
 Title: Executive Vice President and Chief Financial Officer
Date: April 23, 2021

**ANNEX A**

DEFINITIONS

"Affiliate" means any Person that directly or indirectly Controls, is Controlled by, or is under common Control with, the Issuer.

"Applicable Law" means, as to any Person, all applicable Laws binding upon such Person or to which such a Person is subject.

"Applicable SOFR Rate" means a rate of interest based on SOFR that shall be determined by the Holder and publicly announced by the Holder on or prior to the fifth anniversary of the Closing Date and shall, to the extent reasonably practicable, be based on customary market conventions as in effect at the time of such announcement. In no event will the Applicable SOFR Rate be less than 0.00% per annum.

"ARRC Fallback Provisions" means the Fallback Language for New Issuances of LIBOR Floating Rate Notes set forth in the ARRC Recommendations Regarding More Robust Fallback Language for New Issuances of LIBOR Floating Rate Notes, dated April 25, 2019.

"ASU" means the Accounting Standards Update 2016-02, Leases (Topic 842) by the Financial Accounting Standards Board issued on February 25, 2016.

"Beneficial Owner" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time. The terms "Beneficially Owns" and "Beneficially Owned" have a corresponding meaning.

"Business Day" means any on which Treasury and the Federal Reserve Bank of New York are both open for business.

"Capitalized Lease Obligations" means, at the time any determination thereof is to be made, the amount of the liability in respect of a Capitalized Lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) prepared in accordance with GAAP; provided that all leases of such Person that are or would have been treated as operating leases for purposes of GAAP prior to the issuance of the ASU shall continue to be accounted for as operating leases for purposes of all financial definitions and calculations for purposes of this Note (whether or not such operating lease obligations were in effect on such date) notwithstanding the fact that such obligations are required in accordance with the ASU (on a prospective or retroactive basis or otherwise) to be treated as capitalized lease obligations for other purposes.

"Capitalized Leases" means all leases that have been or should be, in accordance with GAAP as in effect on the Closing Date, recorded as capitalized leases; provided that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP; provided, further, that all leases of such Person that are or would have been treated as operating leases for purposes of GAAP prior to the issuance of the ASU shall continue to be accounted for as operating leases for purposes of all financial definitions and calculations for purposes of this Note (whether or not such operating lease obligations were in effect on such date) notwithstanding the fact that such obligations are required in accordance with the ASU (on a prospective or retroactive basis or otherwise) to be treated as capitalized lease obligations for other purposes.

"Change of Control" means the occurrence of any of the following: (a) the sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of the Issuer and its Subsidiaries, or if the Issuer is a Subsidiary of any Guarantor, such Guarantor (the "Parent Guarantor") and its Subsidiaries, taken as a whole to any Person (including any "person" (as that term is used in Section 13(d)(3) of the Exchange Act)); or (b) the consummation of any transaction (including, without limitation, any merger or consolidation), the result of which is that any Person (including any "person" (as defined above)) becomes the Beneficial Owner, directly or indirectly, of more than 50% of the Voting Stock of the Issuer or Parent Guarantor, as applicable, (measured by voting power rather than number of shares), other than (i) any such transaction where the Voting Stock of the Issuer or Parent Guarantor, as applicable, (measured by voting power rather than number of shares) outstanding immediately prior to such transaction constitutes or is converted into or exchanged for at least a majority of the outstanding shares of the Voting Stock of

Annex A-1

such Beneficial Owner (measured by voting power rather than number of shares), or (ii) any merger or consolidation of the Issuer or Parent Guarantor, as applicable, with or into any Person (including any "person" (as defined above)) which owns or operates (directly or indirectly through a contractual arrangement) a Permitted Business (a "Permitted Person") or a Subsidiary of a Permitted Person, in each case, if immediately after such transaction no Person (including any "person" (as defined above)) is the Beneficial Owner, directly or indirectly, of more than 50% of the total Voting Stock of such Permitted Person (measured by voting power rather than number of shares).

"Closing Date" means the date set forth on the Issuer's and each Guarantor's signature page to this Note.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings analogous thereto.

"Debtor Relief Laws" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means an interest rate (before as well as after judgment) equal to the interest rate on the Note plus 2.00% per annum.

"Disqualified Equity Interest" means any equity interest that, by its terms (or the terms of any security or other equity interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for equity interests that are not Disqualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of Control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of Control or asset sale event shall be subject to the prior repayment in full of the Note and all other Obligations that are accrued and payable), (b) is redeemable at the option of the holder thereof, in whole or in part, (c) provides for scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other equity interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one days after the Maturity Date; provided that if such equity interests are issued pursuant to a plan for the benefit of employees of the Issuer or any Subsidiary or by any such plan to such employees, such equity interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by the Issuer or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability.

"Dollar" and "$" mean lawful money of the United States.

"Event of Default" has the meaning specified in Section 5.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Excluded Subsidiary" means any Subsidiary of the Issuer that is not an obligor in respect of any Material Indebtedness that is unsecured of the Issuer or any of its Subsidiaries, unless such Subsidiary is required to be an obligor under any agreement, instrument or other document relating to any Material Indebtedness that is unsecured of the Issuer or any of its Subsidiaries.

"GAAP" means United States generally accepted accounting principles as in effect as of the date of determination thereof. Notwithstanding any other provision contained herein, (a) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under FASB Accounting Standards Codification 825-Financial Instruments, or any successor thereto (including pursuant to the FASB Accounting Standards Codification), to value any Indebtedness of any subsidiary at "fair value," as defined therein and (b) the amount of any Indebtedness under GAAP with respect to Capitalized Lease Obligations shall be determined in accordance with the definition of Capitalized Lease Obligations.

Annex A-2

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part) or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guaranteed Obligations" has the meaning specified in Annex B.

"Guarantor" means each Guarantor listed on the signature page to this Note and any other Person that Guarantees this Note.

"Holder" means the United States Department of the Treasury or its designees or any other Person that shall have rights pursuant to an assignment hereunder.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP: (a) all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments; (b) all direct or contingent obligations of such Person arising under (i) letters of credit (including standby and commercial), bankers' acceptances and bank guaranties and (ii) surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person; (c) net obligations of such Person under any swap contract; (d) all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business); (e) indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse; (f) attributable indebtedness in respect of any Capitalized Lease Obligation and any synthetic lease obligation of any Person; (g) all obligations of such Person in respect of Disqualified Equity Interests; and (h) all Guarantees of such Person in respect of any of the foregoing. For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person. The amount of any net obligation under any swap contract on any date shall be deemed to be the swap termination value thereof as of such date. The amount of any Indebtedness of any Person for purposes of clause (e) that is expressly made non-recourse or limited-recourse (limited solely to the assets securing such Indebtedness) to such Person shall be deemed to be equal to the lesser of (i) the aggregate principal amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"Indemnitee" has the meaning specified in Section 6.3(b).

"Issuer" has the meaning specified in the preamble to this Note.

Annex A-3

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lien" means any mortgage, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect on, the operations, business, properties, liabilities (actual or contingent), condition (financial or otherwise) or prospects of the Issuer and its Subsidiaries taken as a whole; or (b) a material adverse effect on (i) the ability of the Issuer or any Guarantor to perform its Obligations, (ii) the legality, validity, binding effect or enforceability against the Issuer or any Guarantors of the Note or (iii) the rights, remedies and benefits available to, or conferred upon, the Holder under the Note.

"Material Indebtedness" has the meaning specified in Section 5.1(f).

"Maturity Date" means the date that is ten years after the Closing Date (except that, if such date is not a Business Day, the Maturity Date shall be the next preceding Business Day).

"Note" has the meaning specified in the preamble to this Note.

"Obligations" means all advances to, and debts, liabilities, obligations, covenants and duties of, the Issuer arising under or otherwise with respect to the Note, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against the Issuer or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding. Without limiting the foregoing, the Obligations include (a) the obligation to pay principal, interest, charges, expenses, fees, indemnities and other amounts payable by the Issuer under the Note and (b) the obligation of the Issuer to reimburse any amount in respect of any of the foregoing that the Holder, in each case in its sole discretion, may elect to pay or advance on behalf of the Issuer.

"Obligee Guarantor" has the meaning specified in Annex B.

"Organizational Documents" means (a) as to any corporation, the charter or certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction), (b) as to any limited liability company, the certificate or articles of formation or organization and operating or limited liability agreement and (c) as to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Permitted Business" means any business that is the same as, or reasonably related, ancillary, supportive or complementary to, the business in which the Issuer and its Subsidiaries are engaged on the date of this Note.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Principal Amount" has the meaning specified in the preamble to this Note.

"PSP3 Extension Law" has the meaning specified in the preamble to this Note.

"PSP3 Agreement" has the meaning specified in the preamble to this Note.

"PSP3 Application" means the application form and any related materials submitted by the Issuer to Treasury in connection with an application for financial assistance under Section 7301 of the PSP3 Extension Law.

Annex A-4

"Related Parties" means, with respect to any Person, such Person's Affiliates and the agents, advisors and representatives of such Person and of such Person's Affiliates.

"SOFR" means the secured overnight financing rate published by the Federal Reserve Bank of New York, as administrator of the benchmark (or a successor administrator) on the Federal Reserve Bank of New York's (or such successor's) website.

"Subsidiary" of a Person means a corporation, partnership, limited liability company, association or joint venture or other business entity of which a majority of the equity interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time owned or the management of which is Controlled, directly, or indirectly through one or more intermediaries, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Issuer.

"Treasury" has the meaning specified in the preamble to this Note.

"United States" and "U.S." mean the United States of America.

"Voting Stock" of any specified Person as of any date means the equity interests of such Person that is at the time entitled to vote in the election of the board of directors of such Person.

Annex A-5

**ANNEX B**

GUARANTEE

1.  <u>Guarantee of the Obligations</u>. Each Guarantor jointly and severally hereby irrevocably and unconditionally guarantees to the Holder, the due and punctual payment in full of all Obligations (or such lesser amount as agreed by the Holder in its sole discretion) when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) (collectively, the "<u>Guaranteed Obligations</u>").

2.  <u>Payment by a Guarantor</u>. Each Guarantor hereby jointly and severally agrees, in furtherance of the foregoing and not in limitation of any other right which the Holder may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of the Issuer to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), such Guarantor will upon demand pay, or cause to be paid, in cash, to the Holder an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for the Issuer's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against the Issuer for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to the Holder as aforesaid.

3.  <u>Liability of Guarantors Absolute</u>. Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations. In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)   this Guarantee is a guarantee of payment when due and not of collectability;

(b)   the Holder may enforce this Guarantee upon the occurrence of an Event of Default notwithstanding the existence of any dispute between the Issuer and the Holder with respect to the existence of such Event of Default;

is brought against the Issuer or any other Guarantors and whether or not Issuer or such Guarantors are joined in any such action or actions;

(d)   payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any other Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid;

(e)   the Holder, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or subordinate the payment of the same to the payment of any other obligations; (iii) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guarantees of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; and (iv) enforce its rights and remedies even though such action may operate to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against the Issuer or any security for the Guaranteed Obligations; and

(f)   this Guarantee and the obligations of each Guarantor hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following: (i) any failure, delay or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy with respect to the Guaranteed Obligations, or with respect to any security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the

terms or provisions hereof; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the Holder's consent to the change, reorganization or termination of the corporate structure or existence of the Issuer or any of its Subsidiaries and to any correspond¬ing restructuring of the Guaranteed Obligations; (v) any defenses, set offs or counterclaims which the Issuer or any Guarantor may allege or assert against the Holder in respect of the Guaranteed Obligations, including failure of consideration, lack of authority, validity or enforceability, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (vi) any other event or circumstance that might in any manner vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

4.    Waivers by Guarantors. Each Guarantor hereby waives, for the benefit of the Holder: (a) any right to require the Holder, as a condition of payment or performance by such Guarantor, to (i) proceed against Issuer, any Guarantor or any other Person; (ii) proceed against or exhaust any security in favor of the Holder; or (iii)  pursue any other remedy in the power of the Holder whatsoever or (b) presentment to, demand for payment from and protest to the Issuer or any Guarantor or notice of acceptance; and (c) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

5.    Guarantors' Rights of Subrogation, Contribution, etc. Until the Guaranteed Obligations shall have been paid in full, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against the Issuer or any other Guarantor or any of its assets in connection with this Guarantee or the performance by such Guarantor of its obligations hereunder, including without limitation (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against the Issuer with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that the Holder now has or may hereafter have against the Issuer, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by the Holder. In addition, until the Guaranteed Obligations shall have been paid in full, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations. If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and paid in full, such amount shall be held in trust for the Holder and shall forthwith be paid over to the Holder to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

6.    Subordination. Any Indebtedness of the Issuer or any Guarantor now or hereafter held by any Guarantor (the "Obligee Guarantor") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for the Holder and shall forthwith be paid over to the Holder to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

7.    Continuing Guarantee. This Guarantee is a continuing guarantee and shall remain in effect until all of the Guaranteed Obligations shall have been paid in full. Each Guarantor hereby irrevocably waives any right to revoke this Guarantee as to future transactions giving rise to any Guaranteed Obligations.

8.    Financial Condition of the Issuer. The Note may be issued to the Issuer without notice to or authorization from any Guarantor regardless of the financial or other condition of the Issuer at the time of such grant. Each Guarantor has adequate means to obtain information from the Issuer on a continuing basis concerning the financial condition of the Issuer and its ability to perform its obligations under the Note, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Issuer and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.

9.    Reinstatement. In the event that all or any portion of the Guaranteed Obligations are paid by the Issuer or any Guarantor, the obligations of any other Guarantor hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from the Holder as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

10.    Discharge of Guarantee Upon Sale of the Guarantor. If, in compliance with the terms and provisions of the Note, all of the capital stock of any Guarantor that is a Subsidiary of the Issuer or any of its successors in interest

Annex B-2

hereunder shall be sold or otherwise disposed of (including by merger or consolidation) to any Person (other than to the Issuer or to any other Guarantor), the Guarantee of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any beneficiary or any other Person effective as of the time of such asset sale.

Annex B-3

**SCHEDULE I**

| Date | Current Outstanding Principal Amount | Increase or Decrease in Outstanding Principal Amount | Resulting Outstanding Principal Amount | Notation Made By |
|------|------|------|------|------|
|      |      |      |      |      |
|      |      |      |      |      |
|      |      |      |      |      |
|      |      |      |      |      |
|      |      |      |      |      |
|      |      |      |      |      |
|      |      |      |      |      |
|      |      |      |      |      |
|      |      |      |      |      |
|      |      |      |      |      |
|      |      |      |      |      |
|      |      |      |      |      |
|      |      |      |      |      |
|      |      |      |      |      |
|      |      |      |      |      |
|      |      |      |      |      |
|      |      |      |      |      |
|      |      |      |      |      |
|      |      |      |      |      |
|      |      |      |      |      |

Schedule I

Exhibit 31.1

CERTIFICATION

I, Gary C. Kelly, Chief Executive Officer of Southwest Airlines Co., certify that:

1.    I have reviewed this quarterly report on Form 10-Q for the quarter ended March 31, 2021 of Southwest Airlines Co.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

 (a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: April 27, 2021

By:    /s/ Gary C. Kelly
       Gary C. Kelly
       Chief Executive Officer

Exhibit 31.2

CERTIFICATION

I, Tammy Romo, Chief Financial Officer of Southwest Airlines Co., certify that:

1.      I have reviewed this quarterly report on Form 10-Q for the quarter ended March 31, 2021 of Southwest Airlines Co.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

 (a)      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)      disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.


Date: April 27, 2021

                                                By:    /s/ Tammy Romo
                                                       Tammy Romo
                                                       Chief Financial Officer

Exhibit 32.1

CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350,

AS ADOPTED PURSUANT TO

SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report on Form 10-Q of Southwest Airlines Co. (the "Company") for the period ended March 31, 2021 as filed with the Securities and Exchange Commission (the "Report"), Gary C. Kelly, Chief Executive Officer of the Company, and Tammy Romo, Chief Financial Officer of the Company, each certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:  April 27, 2021

By:     /s/ Gary C. Kelly
        Gary C. Kelly
        Chief Executive Officer


By:     /s/ Tammy Romo
        Tammy Romo
        Chief Financial Officer