# Exhibit 9

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2021

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File No. 1-7259



## SOUTHWEST AIRLINES CO.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Texas | 74-1563240 |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |
| P.O. Box 36611 | |
| Dallas, Texas | 75235-1611 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(214) 792-4000**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common Stock ($1.00 par value) | LUV | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐ No ☒

The aggregate market value of the common stock held by non-affiliates of the registrant was approximately $31,305,364,914 computed by reference to the closing sale price of the common stock on the New York Stock Exchange on June 30, 2021, the last trading day of the registrant's most recently completed second fiscal quarter.

Number of shares of common stock outstanding as of the close of business on February 2, 2022: 592,391,878 shares

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Definitive Proxy Statement for the Company's Annual Meeting of Shareholders to be held May 18, 2022, are incorporated into Part III of this Annual Report on Form 10-K.

**TABLE OF CONTENTS**

**PART I**

| | | |
|---|---|---|
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 28 |
| Item 1B. | Unresolved Staff Comments | 42 |
| Item 2. | Properties | 43 |
| Item 3. | Legal Proceedings | 44 |
| Item 4. | Mine Safety Disclosures | 46 |

**PART II**

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities | 49 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 52 |
| | Liquidity and Capital Resources | 69 |
| | Critical Accounting Policies and Estimates | 72 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 76 |
| Item 8. | Financial Statements and Supplementary Data | 80 |
| | Southwest Airlines Co. Consolidated Balance Sheet | 80 |
| | Southwest Airlines Co. Consolidated Statement of Income (Loss) | 81 |
| | Southwest Airlines Co. Consolidated Statement of Comprehensive Income (Loss) | 82 |
| | Southwest Airlines Co. Consolidated Statement of Stockholders' Equity | 83 |
| | Southwest Airlines Co. Consolidated Statement of Cash Flows | 84 |
| | Notes to Consolidated Financial Statements | 85 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 134 |
| Item 9A. | Controls and Procedures | 134 |
| Item 9B. | Other Information | 135 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 135 |

**PART III**

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers, and Corporate Governance | 136 |
| Item 11. | Executive Compensation | 136 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 137 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 137 |
| Item 14. | Principal Accounting Fees and Services | 137 |

**PART IV**

| | | |
|---|---|---|
| Item 15. | Exhibits and Financial Statement Schedules | 139 |
| Item 16. | Form 10-K Summary | 142 |
| Signatures | | 143 |

-PART I-

Item 1.    *Business*

**Company Overview**

Southwest Airlines Co. (the "Company" or "Southwest") operates Southwest Airlines, a major passenger airline that provides scheduled air transportation in the United States and near-international markets. Southwest commenced service on June 18, 1971, with three Boeing 737 aircraft serving three Texas cities: Dallas, Houston, and San Antonio. At December 31, 2021, Southwest had a total of 728 Boeing 737 aircraft in its fleet and 121 destinations in 42 states, the District of Columbia, the Commonwealth of Puerto Rico, and ten near-international countries: Mexico, Jamaica, The Bahamas, Aruba, Dominican Republic, Costa Rica, Belize, Cuba, the Cayman Islands, and Turks and Caicos.

During 2021, the Company began service to 14 new destinations including Chicago (O'Hare), Illinois; Houston (Bush), Texas; Jackson, Mississippi; Colorado Springs, Colorado; Savannah, Georgia/Hilton Head, South Carolina; Sarasota, Florida; Santa Barbara, California; Fresno, California; Destin, Florida; Bozeman, Montana; Myrtle Beach, South Carolina; Eugene, Oregon; Bellingham, Washington; and Syracuse, New York.

**Worldwide Pandemic**

In March 2020, the World Health Organization classified the novel coronavirus, COVID-19, as a pandemic. The speed with which the effects of the COVID-19 pandemic changed the U.S. economic landscape, outlook, and in particular the travel industry, was swift and unexpected and resulted in a significant negative impact on travel demand, revenues, and bookings throughout 2020. The Company responded by cancelling a significant portion of its scheduled flights, grounding a significant portion of its fleet, significantly reducing planned capital spending, and significantly reducing its previously scheduled capacity. Further, the Company substantially enhanced its cash holdings by obtaining significant financing in the capital markets, through payroll funding support ("Payroll Support") with the U.S. Department of Treasury ("Treasury"), and elsewhere. In addition, the Company offered voluntary separation and extended time-off programs for its Employees, which significantly reduced the Company's active headcount.

The Company continued to experience negative and unpredictable fluctuating pandemic-related impacts to passenger demand and bookings in 2021. Modest improvements in leisure bookings began in mid-February 2021 and further improved in March 2021. Travel demand and bookings accelerated during second quarter 2021 as a result of declining reported COVID-19 cases throughout the United States, the easing of travel restrictions, and an increase in the number of individuals vaccinated. Despite some softness in bookings and elevated trip cancellations due to surging COVID-19 cases in August and September as a result of the Delta variant, and in December as a result of the Omicron variant, third quarter and fourth quarter 2021 domestic leisure demand was also strong and a dramatic improvement from 2020.

The unpredictable fluctuating extent of the travel demand improvement over the course of 2021, combined with the reduction in the Company's available workforce, contributed to operational challenges and resulting declines in the Company's operational performance as the Company struggled to return to the staffing levels necessary for operational demands. In response, the Company continued its efforts to correspondingly adjust capacity throughout 2021 and into first quarter 2022. In addition, the Company aggressively hired new Employees in third and fourth quarter 2021, and is continuing these efforts in 2022, to balance its schedule with its crew and ground operations resources.

For further information on risks related to COVID-19, as well as the significant impacts of COVID-19 on the Company's operations, financial performance, and liquidity, see "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations," and Notes 2, 7, and 9 to the Consolidated Financial Statements.

**Industry**

As discussed above under "Business – Worldwide Pandemic," the travel industry was adversely impacted in 2020 and 2021 by the COVID-19 pandemic, including the recent Delta and Omicron variants. Like the Company, other U.S. airlines experienced significant negative impacts to passenger demand and revenues; however the impact of the COVID-19 pandemic on some of these airlines was particularly severe because of the percentage of their operations that had historically been dependent on business and international travel, each of which suffered particular harm as a result of the pandemic. Demand for business travel declined significantly due to companies tightening or even suspending corporate travel. This not only reduced overall demand for air travel, but also resulted in a decrease in the percentage of full-fare purchases. Demand for international travel was significantly harmed by the imposition of international travel restrictions. Like the Company, these other airlines responded with adjustments to their flight schedules, capacity, operating costs and capital expenditures, and fleet plans. Unlike the Company, certain other airlines also furloughed employees and/or ceased service in certain markets.

Like the Company, other U.S. airlines began to mitigate cash losses and recover from the COVID-19 pandemic in 2021, while facing challenges such as the Delta and Omicron variants, lower passenger revenue yields (i.e., pricing), higher fuel prices and other cost inflation, and surges in leisure travel demand against constrained personnel resources resulting in operational challenges. Overall, the U.S. airline industry saw a strong recovery of domestic leisure travel demand during peak travel periods in 2021 as a result of declining reported COVID-19 cases throughout the United States, the easing of travel restrictions, and an increase in the number of individuals vaccinated against COVID-19. However, business travel remained at a significantly reduced level throughout 2021, as compared with pre-pandemic levels.

The airline industry has historically been an extremely volatile industry subject to numerous other challenges. Among other things, it has been cyclical, energy intensive, labor intensive, capital intensive, technology intensive, highly regulated, heavily taxed, and extremely competitive. The airline industry has also been particularly susceptible to detrimental events such as economic recessions, jet fuel price volatility, unscheduled maintenance disruptions, U.S. government shutdowns, acts of terrorism, poor weather, and natural disasters.

Historically, airline industry results have been particularly susceptible to fuel price volatility. In 2021, the industry experienced a very challenging fuel environment, as compared with recent years, with year-over-year fuel prices significantly higher throughout most of 2021.

**Company Operations**

**Route Structure**

Southwest has historically principally provided point-to-point service, rather than the "hub-and-spoke" service provided by most major U.S. airlines. The hub-and-spoke system concentrates most of an airline's operations at a limited number of central hub cities and serves most other destinations in the system by providing one-stop or connecting service through a hub. By not concentrating operations through one or more central transfer points, Southwest's point-to-point route structure has allowed for more direct nonstop routing than hub-and-spoke service. However, in response to the effects of the COVID-19 pandemic, the Company placed greater reliance in 2020 and 2021 on connecting traffic in an effort to capture Customer demand. Approximately 73 percent of the Company's Customers flew nonstop during 2021, compared with 72 percent during 2020, and compared with 77 percent during 2019, and, as of December 31, 2021, Southwest served 788 nonstop city pairs, compared with 667 as of December 31, 2020, and compared with 720 as of December 31, 2019. For 2021, the Company's average aircraft trip stage length was 790 miles, with an average duration of approximately 2.1 hours, as compared with an average aircraft trip stage length of 743 miles and an average duration of approximately 2.0 hours in 2020, and as compared with an average aircraft trip stage length of 748 miles and an average duration of approximately 2.0 hours in 2019.

4

Southwest's point-to-point service has also enabled it to provide its markets with frequent, conveniently timed flights and low fares. For example, Southwest currently offers ten weekday roundtrips between Dallas Love Field and Houston Hobby (and an additional six to Houston Bush), seven weekday roundtrips between Denver and Chicago Midway (and an additional six to Chicago O'Hare), seven weekday roundtrips between Los Angeles International and Las Vegas, twelve weekday round trips between Burbank and Oakland, and nine weekday roundtrips between Phoenix and Denver. Southwest complements its high-frequency short-haul routes with long-haul nonstop service including flights between Hawaii and California, Las Vegas, and Phoenix, and between markets such as Los Angeles and Nashville, Los Angeles and Baltimore, Oakland and Houston, Las Vegas and Orlando, and San Diego and Baltimore.

The Company continually works to optimize its route network and schedule through the adjustment of frequencies in its existing markets and the addition of new markets and itineraries, while also pruning less profitable flights from its schedule. The Company's network and schedule optimization efforts have been particularly beneficial in addressing the impacts of the COVID-19 pandemic. For example, these efforts have enabled the Company to continue to add cities in key existing markets, such as California, as well as opportunistically introduce service in other markets during the pandemic. As part of the Company's recovery from the impacts of the COVID-19 pandemic, the Company remains focused on restoring its network to pre-pandemic levels through adding back depth and frequency to the Company's network while balancing its network schedule with its crew resources.

Despite the pandemic, the Company has been able to continue to bolster its presence in California through the addition of new destination options and flights for California Customers. In 2021, the Company added many new destinations to its route map, including new California service to Santa Barbara and Fresno. Further, the Company expanded its California to Hawaii network in 2021 by adding inaugural service between Los Angeles and Hawaii in June 2021. The Company also added inaugural service to Hawaii from Las Vegas and Phoenix in June 2021. The Company also expanded its service at John Wayne Airport (Orange County) in 2021, including reinstated international service beginning in March 2021. In addition, the Company is currently scheduled to offer over 700 departures from California on peak flying days in the summer of 2022. Based on the most recent data available from the U.S. Department of Transportation (the "DOT"), for the year ended September 30, 2021, Southwest carried more California travelers to, from, and within California than any other airline.

The Company's network and schedule optimization efforts have also enabled it to use otherwise idle aircraft, while overall travel demand has been reduced. This, in turn, has enabled the Company to better optimize its service amongst its core markets and, in 2021, it enabled the Company to provide service to 14 new destinations. The additional service has created additional regional and international connectivity that has been structured to grow the Company's presence in strategic markets that serve as cornerstones for its network and provide additional options for Customers to reach their final destinations. The Company expects to complement and strengthen its existing route network in or near cities where its Customer base is large, along with adding easier access to popular leisure-oriented destinations.

The COVID-19 pandemic had a particularly negative impact on the Company's international operations and led to the Company's suspension of international operations at the beginning of the pandemic. The Company has since resumed service to 13 of its 14 international destinations. The Company's operations to the Cayman Islands are temporarily suspended due to impacts from the COVID-19 pandemic, but with the easing of government restrictions and the continued increase in demand for beach and leisure destinations, the Company intends to resume service to the Cayman Islands in 2022.

**Boeing 737 MAX**

In March 2019, the Federal Aviation Administration (the "FAA") issued an emergency order for all U.S. airlines to ground all Boeing 737 MAX ("MAX") aircraft. The Company immediately complied with the order and grounded all 34 Boeing 737 MAX 8 ("-8") aircraft in its fleet. In November 2020, the FAA rescinded the emergency order and issued official requirements to enable U.S. airlines to return the MAX to service. The Company returned the MAX to service in March 2021, after the Company met all FAA requirements and Pilots received updated, MAX-

Table of Contents

related training. Following the FAA rescission of the emergency order, the Company took delivery of 35 -8 aircraft through the end of 2021 and had 69 -8 aircraft in its fleet at 2021 year-end.

During 2021, the Company entered into supplemental agreements with The Boeing Company ("Boeing") to increase its 2022 firm orders of Boeing 737 MAX 7 ("-7") aircraft, accelerate options into 2022, 2023, 2024, and 2025, and add new options in 2026 and 2027, in each case with the goal of improving potential growth opportunities, restoring the Company's network closer to pre-pandemic levels, lowering operating costs, reducing carbon emissions per available seat mile, and further modernizing the Company's fleet with more fuel efficient aircraft. Additionally, during 2021, the Company exercised 42 2022 options for -7 aircraft and exercised 22 2023 options for -7 aircraft. Fleet and capacity plans will continue to evolve as the Company manages through the pandemic recovery period, and the Company will continue to evaluate its remaining MAX options. However, with its cost-effective order book, the Company retains significant flexibility to manage its fleet size, including opportunities to accelerate fleet modernization efforts if growth opportunities do not materialize. The Company continues to plan for 30-35 Boeing 737-700 retirements annually. Additional information regarding the Company's current fleet and fleet delivery schedule is included in "Item 2 – Properties" below. The delivery schedule for the -7 is dependent on the FAA issuing required certifications and approvals to Boeing and the Company. The FAA will ultimately determine the timing of the -7 certification and entry into service, and the Company therefore offers no assurances that current estimations and timelines are correct.

### Cost Structure

A key component of the Company's business strategy is its focus on cost discipline and charging competitively low fares. The Company's low-cost strategy includes, among other elements, (i) the use of a single aircraft type, the Boeing 737, (ii) the Company's point-to-point route structure, and (iii) its highly productive Employees. Southwest's use of a single aircraft type has historically allowed for simplified scheduling, maintenance, flight operations, safety management, and training activities. Southwest's point-to-point route structure includes service to and from many secondary or downtown airports such as Dallas Love Field, Houston Hobby, Chicago Midway, Baltimore-Washington International, Burbank, Manchester, Oakland, San Jose, Providence, and Ft. Lauderdale-Hollywood. These conveniently located airports are typically less congested than other airlines' hub airports, which has contributed to Southwest's ability to achieve high asset utilization because aircraft can be scheduled to minimize the amount of time they are on the ground. This, in turn, has reduced the number of aircraft and gate facilities that would otherwise be required and allows for high Employee productivity (lower headcount per aircraft).

The Company's focus on controlling costs also includes a continued commitment to pursuing, implementing, and enhancing initiatives to reduce fuel consumption and improve fuel efficiency. The Company focuses on minimizing fuel consumption and improving fuel efficiency through fleet modernization and other fuel initiatives. For example, in 2021 the Company returned its -8 aircraft to service, which are more fuel-efficient and release fewer $CO_2$ emissions per available seat mile than the Company's other aircraft.

Fuel and oil expense can be extremely volatile and unpredictable, and even a small change in market fuel prices can significantly affect profitability. Fuel and oil expense for 2021 increased significantly compared with 2020, primarily due to higher market jet fuel prices, and in part due to higher capacity in response to consumer demand. Fuel and oil expense remained the Company's second largest operating cost for 2021. As evidenced by the table below, energy prices can fluctuate significantly in a relatively short amount of time. The table below shows the Company's average cost of jet fuel for each year beginning in 2011 and during each quarter of 2021.

| Year | Cost (Millions) | | Average Cost Per Gallon | | Percentage of Operating Expenses |
|---|---|---|---|---|---|
| 2011 | $ | 5,751 | $ | 3.25 | 38.2 % |
| 2012 | $ | 6,156 | $ | 3.32 | 37.3 % |
| 2013 | $ | 5,823 | $ | 3.19 | 35.3 % |
| 2014 | $ | 5,355 | $ | 2.97 | 32.6 % |
| 2015 | $ | 3,740 | $ | 1.96 | 23.6 % |
| 2016 | $ | 3,801 | $ | 1.90 | 22.7 % |
| 2017 | $ | 4,076 | $ | 1.99 | 23.0 % |
| 2018 | $ | 4,616 | $ | 2.20 | 24.6 % |
| 2019 | $ | 4,347 | $ | 2.09 | 22.3 % |
| 2020 | $ | 1,849 | $ | 1.45 | 14.4 % |
| 2021 | $ | 3,310 | $ | 1.98 | 23.5 % |
| First Quarter 2021 | $ | 469 | $ | 1.63 | 25.3 % |
| Second Quarter 2021 | $ | 803 | $ | 1.88 | 23.5 % |
| Third Quarter 2021 | $ | 990 | $ | 2.01 | 25.1 % |
| Fourth Quarter 2021 | $ | 1,049 | $ | 2.25 | 21.6 % |

The MAX groundings in early 2019 resulted in the removal of these more fuel-efficient aircraft from the Company's schedule, which, in turn, drove a decline in the Company's overall fuel efficiency in 2019. Although the Company's MAX aircraft remained grounded throughout 2020, the Company improved its fuel efficiency in 2020, as compared with 2019, primarily by operating fewer of its oldest, least fuel-efficient Boeing 737-700 aircraft as a result of capacity cuts in response to the effects of the COVID-19 pandemic. Lower load factors, due to COVID-19, also contributed to fuel efficiency during 2020. Despite the return to service of the MAX aircraft, the Company's 2021 fuel efficiency declined, as compared with 2020, due to higher load factors and the Company's return to service of more of its oldest, least fuel efficient Boeing 737-700 aircraft, which had been placed into storage in 2020 due to capacity cuts in response to the effects of the COVID-19 pandemic. The Company continues to undertake a number of other fuel conservation initiatives, which are discussed in detail under "Environmental Sustainability."

The table below sets forth the Company's available seat miles produced per fuel gallon consumed over the last five years:

| | Year ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2021 | 2020 | 2019 | 2018 | 2017 |
| Available seat miles per fuel gallon consumed | 79.2 | 81.3 | 75.7 | 76.3 | 75.2 |

The Company also enters into fuel derivative contracts to manage its risk associated with significant increases in fuel prices. The Company's fuel hedging activities, as well as the risks associated with high and/or volatile fuel prices, are discussed in more detail below under "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations," and Note 11 to the Consolidated Financial Statements.

Salaries, wages, and benefits expense constituted approximately 55.0 percent of the Company's operating expenses during 2021 and was the Company's largest operating cost. The Company's ability to control labor costs is limited by the terms of its collective-bargaining agreements, and increased labor costs have negatively impacted the Company's low-cost competitive position. The Company's labor costs, and risks associated therewith, are discussed

7

in more detail below under "Risk Factors," "Business - Employees," and "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**Fare Structure**

*General*

Southwest offers a relatively simple fare structure that features competitive fares and product benefits, including unrestricted fares, as well as lower fares available on a restricted basis. Southwest fare products include three major categories: "Wanna Get Away®," "Anytime," and "Business Select®," to provide Customers options when choosing a fare. All fare products include the privilege of two free checked bags (weight and size limits apply). Southwest does not charge fees for changes to flight reservations although fare differences may apply.

- "Wanna Get Away" fares are generally the lowest fares and are typically subject to advance purchase requirements. They are nonrefundable, but, subject to Southwest's No Show Policy, flight credit for the fare paid for unused travel by the Customer ("flight credit") may be applied towards future travel on Southwest. Wanna Get Away fares earn six Rapid Rewards® points, under Southwest's Rapid Rewards loyalty program, for each dollar spent on the base fare. The Company's loyalty program is discussed below under "Rapid Rewards Loyalty Program."
- "Anytime" fares are, subject to Southwest's No Show Policy, refundable if canceled, or flight credit may be applied towards future travel on Southwest. If this fare is purchased with nonrefundable flight credit, then the resulting flight credit will be nonrefundable if travel is canceled. Anytime fares earn 10 Rapid Rewards points for each dollar spent on the base fare.
- "Business Select" fares are, subject to Southwest's No Show Policy, refundable if canceled, or flight credit may be applied towards future travel on Southwest. If this fare is purchased with nonrefundable flight credit, then the resulting flight credit will be nonrefundable if travel is canceled. Business Select fares also include additional perks such as priority boarding with a boarding position in the first 15 boarding positions within boarding group "A," 12 Rapid Rewards points per dollar spent on the base fare - the highest loyalty point multiplier of all Southwest fare products, and "Fly By®" priority security and/or ticket counter access in participating airports. Business Select fares also ordinarily include one complimentary premium beverage coupon for the day of travel (Customers must be of legal drinking age to drink alcoholic beverages); however, the Company has temporarily suspended premium drink service in response to the COVID-19 pandemic.

Southwest's No Show Policy applies if a Customer does not change or cancel a flight segment at least ten minutes prior to scheduled departure and the Customer does not travel on the scheduled flight. In such event, subject to certain exceptions, all segments associated with the reservation will be canceled, and (i) with respect to a "Wanna Get Away" fare, the fare paid for unused travel will be forfeited; and (ii) with respect to an "Anytime" or "Business Select" fare, the fare paid for unused travel will be held as a flight credit for future travel on Southwest.

The Company has announced plans to add a new, fourth fare product that enhances the overall product offering for Customers. The Company also currently plans to increase benefits tied to existing fare product categories at various times in the future. The anticipated launch date for the new fare product is during second quarter 2022.

In response to the COVID-19 pandemic, in order to enhance and expand upon its already generous and flexible ticketing policies, the Company extended the expiration of the following Customer flight credits to September 7, 2022:

- Flight credits created because of a flight cancellation between March 1, 2020 and September 7, 2020; and
- Flight credits that would have expired between March 1, 2020 and September 7, 2020.

8

*Ancillary Services*

The Company offers ancillary services such as Southwest's EarlyBird Check-In®, Upgraded Boarding, and transportation of pets and unaccompanied minors, in accordance with Southwest's respective policies.

EarlyBird Check-In provides Customers with automatic check-in and an assigned boarding position before general boarding positions become available, thereby improving Customers' seat selection options (priority boarding privileges are already a benefit of being an "A-List" tier member under the Company's Rapid Rewards Loyalty Program). The Company has implemented a variable pricing model for EarlyBird Check-In based on the length of the flight and the historical popularity of EarlyBird Check-In on the route.

When available, Southwest sells Upgraded Boarding at the airport, which allows a Customer to pay for an open priority boarding position in the first 15 positions in its "A" boarding group.

Southwest's Pet Policy provides Customers an opportunity to travel with a small cat or dog in the aircraft cabin on domestic flights. Southwest also has an unaccompanied minor travel policy, with pricing to address the administrative costs and the extra care necessary to safely transport these Customers.

## Inflight Entertainment Portal and WiFi Service

Southwest offers inflight entertainment and connectivity service on WiFi-enabled aircraft on the majority of its fleet, where available. Southwest's suite of complimentary offerings onboard WiFi-enabled aircraft includes movies-on-demand, messaging, music, live and on-demand television, a flight tracker, and connecting flight information. The inflight entertainment service allows Customers to enjoy gate-to-gate entertainment directly on their personal wireless devices. Customers can also purchase satellite internet service while on WiFi-enabled aircraft, where available.

The free inflight entertainment offerings include approximately 45 free movies-on-demand each month and free app messaging via iMessage or WhatsApp. The television product consists of over 15 live channels and up to 75 on-demand recorded episodes from popular television series. In addition, the onboard entertainment portal offers free digital music and live streaming radio service to Customers within the onboard entertainment portal.

## Rapid Rewards Loyalty Program

Southwest's Rapid Rewards loyalty program enables program members ("Members") to earn points for every dollar spent on Southwest base fares, also including purchases paid with LUV Vouchers, gift cards, or flight credit, with no portion of the purchase price paid with Rapid Rewards points. The amount of points earned under the program is based on the base fare and fare class purchased, with higher fare products (e.g., Business Select) earning more points than lower fare products (e.g., Wanna Get Away). As discussed above under "Fare Structure - General," each fare class is associated with a points earning multiplier, and points for flights are calculated by multiplying the base fare for the flight by the fare class multiplier. The amount of points required to be redeemed for a flight is based on the base fare and a multiplier. Under the program, (i) Members are able to redeem their points for every available seat, every day, on every flight, with no blackout dates; and (ii) points do not expire.

Under the program, Members continue to accumulate points until the time they decide to redeem them. As a result, the program provides Members significant flexibility and options for earning and redeeming rewards. For example, Members can earn more points (and/or achieve tiered status such as A-List and Companion Pass faster) by purchasing higher fare tickets. Members also have significant flexibility in redeeming points, such as the opportunity to book in advance to take advantage of a lower fare ticket (including many fare sales) and redeem fewer points or by being able to redeem more points and book at the last minute if seats are still available for sale. Members can also earn points through qualifying purchases with Rapid Rewards Partners (which include, for example, car rental agencies, hotels, and restaurants), as well as by using Southwest's co-branded Chase® Visa credit card. In addition to earning points for revenue flights and qualifying purchases with Rapid Rewards Partners,

9

Members also have the ability to purchase, gift, and transfer points, as well as the ability to donate points to selected charities.

Southwest's Rapid Rewards loyalty program features tier status and Companion Pass programs for the most active Members, including "A-List" and "A-List Preferred" status. A Member who flies 25 qualifying one-way flight segments booked through Southwest or earns 35,000 tier qualifying points per calendar year will qualify for A-List status. A Member who flies 50 qualifying one-way flights booked through Southwest or earns 70,000 tier qualifying points per calendar year will qualify for A-List Preferred status. Except as noted below with respect to actions taken by the Company in response to the COVID-19 pandemic, the Member will maintain A-List or A-List Preferred status for the remainder of the calendar year in which the status is earned and for the entire calendar year immediately following. Both A-List and A-List Preferred Members enjoy benefits such as "Fly By®" priority check-in and security lane access, where available, as well as dedicated phone lines, standby priority, and an earnings bonus on eligible revenue flights (25 percent for A-List and 100 percent for A-List Preferred). In addition, A-List Preferred Members enjoy free inflight satellite internet service on WiFi-enabled aircraft, where available. Members who attain A-List or A-List Preferred status receive priority boarding privileges. When these Customers purchase travel at least 36 hours prior to flight time, they receive the best boarding position available (generally, an "A" boarding pass). During the day of travel, if an A-List or A-List Preferred Member's plans change, they have free same-day standby privileges, which allow them to fly on earlier flights between the same city pairs if space is available, but are required to pay any additional government taxes and fees associated with changes in their itinerary. Another feature of the Rapid Rewards loyalty program is the Companion Pass. Members who fly 100 qualifying one-way flights or earn 125,000 qualifying points in a calendar year automatically receive a Companion Pass, which provides for unlimited travel for the designated Companion free of charges (other than taxes and fees). Except as noted below with respect to actions taken by the Company in response to the COVID-19 pandemic, the Companion Pass is valid for the remainder of the calendar year in which status is earned and for the following full calendar year to any destination available on Southwest for a designated Companion of the qualifying Member. The Member and designated Companion must travel together on the same flight.

During 2021, the Company added Rapid Rewards Business, giving businesses the ability to earn Rapid Rewards points. By joining Rapid Rewards Business, companies earn Rapid Rewards points that can be applied toward travel on the company's behalf, while travelers who are Rapid Rewards Members also earn Rapid Rewards points in their personal accounts. Rapid Rewards business accounts generally have the same opportunities and benefits to earn and redeem points as individual Member accounts.

Southwest's Rapid Rewards loyalty program has been designed to drive more revenue by (i) bringing in new Customers, including new Members, as well as new holders of Southwest's co-branded Chase Visa credit card; (ii) increasing business from existing Customers; and (iii) strengthening the Company's Rapid Rewards hotel, rental car, credit card, and other partnerships.

For 2021, Customers of Southwest redeemed approximately 8.1 million flight awards, accounting for approximately 17.3 percent of revenue passenger miles flown. For 2020, Customers of Southwest redeemed approximately 4.1 million flight awards, accounting for approximately 15.8 percent of revenue passenger miles flown. For 2019, Customers of Southwest redeemed approximately 10.7 million flight awards, accounting for approximately 14.1 percent of revenue passenger miles flown. The Company's accounting policies with respect to its loyalty programs are discussed in more detail in Note 1 to the Consolidated Financial Statements.

The Company has taken significant measures in response to the COVID-19 pandemic to enhance its Rapid Rewards loyalty program including the following:

- For A-List and A-List Preferred Members who earned tier status in 2020, earned status was extended through December 31, 2021; and
- For Companion Pass Members who earned Companion Pass benefits to be used through December 2020, Companion Pass benefits were extended through June 30, 2021.

10

Additionally, in January 2021, in response to the COVID-19 pandemic, the Company made additional changes that affected tier status as well as Companion Pass eligibility, all with the intention of enhancing the Company's Rapid Rewards loyalty program and its Members' experiences:

- All Rapid Rewards Members with valid Rapid Rewards accounts as of December 31, 2020, received a "boost" of 15,000 tier qualifying points and 10 flight credits toward A-List and A-List Preferred status, and 25,000 Companion Pass qualifying points and 25 flight credits toward Companion Pass status;
- Through December 31, 2021, for Members with Southwest's co-branded Chase® Visa Premier or Priority Consumer credit cards, or Premier or Performance Business credit cards, for every $10,000 in spend on their credit cards, they were eligible for 1,500 Tier Qualifying Points (with no cap); and
- For Companion Pass Members who earned Companion Pass benefits to be used through December 2020, which were previously extended through June 30, 2021, those Companion Pass benefits were further extended through December 31, 2021.

**Southwest.com and Direct to Customer Distribution Approach**

The Company primarily offers its fare products directly to Customers through its Internet website, Southwest.com. For the years ended December 31, 2021, and December 31, 2020, approximately 86 percent and 83 percent, respectively, of the Company's Passenger revenues originated from Southwest.com (including revenues from SWABIZ®, the Company's online booking tool designed for business Customers who prefer a self-service and low-cost solution for booking their air travel on Southwest). This "direct to Customer" distribution approach has historically provided a cost advantage for the Company because it eliminates fees associated with the use of third party distribution channels such as third party online travel platforms. The Company augments its direct to Customer distribution approach by offering a broad suite of digital platforms to support Customers' travel needs, including full featured websites and apps. These digital platforms help Customers book and manage their Southwest air travel and also facilitate the purchase of the Company's ancillary products, including EarlyBird, vacation packages, rental car reservations, hotel reservations, and travel activities. In addition, the digital platforms provide self-service tools for reservation management and Customer support.

During 2021, the Company continued to invest in technology designed to enhance revenues and lower costs, while also enhancing digital options for its Customers. To enhance revenues, the Company improved the digital air booking experience through further improvements to the shopping page, the addition of fare upgrade offers, and increased prominence of expanded payment options. To help lower costs, in 2021 the Company increased its focus on improving the day of travel experience. For example, trip related messaging was added to improve awareness of the Company's baggage and boarding process, and a new customer center was added to provide key content about the Southwest experience. The resulting increased awareness of self-service options increased Customer self-service usage and thereby contributed to reduced costs. Further, improvements were made to the digital ticket change process, leading to a higher percentage of ticket changes occurring in digital experiences.

Early in 2021, the Company added an updated COVID travel center, providing location specific details about what to expect while traveling. This material was prominently focused across all shopping and trip related materials. Due to changing U.S. regulations regarding U.S. entry, the Company also deployed self-service workflows for Customers to complete their travel attestations and contact tracing information to reduce transactions at the airport. Automating these experiences reduced what would have been much longer lines while departing countries outside of the United States. These experiences were supplemented with additional day of travel alerts to increase readiness for travel.

**Southwest Business® Initiatives**

In addition to improvements in the Company's direct Southwest.com channel of distribution, in recent years the Company has taken significant action to grow its corporate travel business with the goal of making it easier for corporate travel Customers and travel management companies to do business with Southwest.

11

In 2019, the Company entered into an agreement with Amadeus IT Group, S.A. ("Amadeus"), and expanded its agreement with Travelport, LP and Travelport International Operations Limited (collectively, "Travelport"), to enable corporate travel Customers and travel management companies to book Southwest products on the Amadeus and Travelport global distribution system ("GDS") platforms. The Company began accepting corporate travel bookings through (i) Travelport's Apollo and Worldspan GDS platforms in second quarter 2020, (ii) Travelport's Galileo GDS platform in third quarter 2020, and (iii) the Amadeus GDS platform in fourth quarter 2020. The Company's expansion into the Travelport and Amadeus GDS channels is intended to facilitate corporate travel managers' ability to book, modify, and cancel Southwest reservations.

In 2020, the Company entered into a new full participation distribution agreement with Sabre Corporation ("Sabre"), to enable Sabre to continue to distribute Southwest content through traditional connectivity to corporations, government agencies, and travel management companies through Sabre's GDS. In July 2021, the Company began offering flights for sale within Sabre's GDS, the leading corporate booking channel in the United States. As a result, the Company now offers the ability for business travelers and travel decision makers to book Southwest fares within all major GDS platforms.

The Company also utilizes Airlines Reporting Corporation to implement industry-standard processes to handle the settlement of tickets booked through Travelport, Amadeus, and Sabre channels.

Southwest Business has continued to invest in and enhance its online booking tool SWABIZ®, with new mobile capabilities now available, as well as its direct connect channel, with connections to online booking tools, travel management companies, and corporate customers. SWABIZ is designed for business Customers who prefer a self-service and low-cost solution for booking their air travel on Southwest. The site also facilitates car and hotel booking.

### Marketing

During 2020, in response to the COVID-19 pandemic, the Company implemented and marketed the "Southwest Promise" to reassure Customers and Employees of the Company's commitment to their well-being, by focusing on cleanliness from check-in to deplaning the aircraft through additional stringent cleaning practices across the fleet and throughout the day, as well as measures to support physical distancing and personal protection and wellness throughout the Customer experience.

During early 2021, the Company continued to market the Southwest Promise. In addition, during 2021, the Company marketed its competitive points of differentiation, specifically focusing on flexibility and ease for Customers. Southwest continues to be the only major U.S. airline that offers to all ticketed Customers up to two checked bags that fly free (subject to weight and size limits). Further, Southwest continues to offer low fares and no unexpected bag fees, change fees (although fare differences may apply), or hidden fees. Southwest also does not impose additional fees for items such as seat selection, soft drinks and snacks where available, curb-side check-in where available, and telephone reservations.

The Company also continues to promote all of the many other reasons to fly Southwest in its marketing, such as its hospitality, low fares, expanded network and new destinations, Customer Service, free inflight entertainment, Southwest Business offerings, and its Rapid Rewards loyalty program.

### Technology Initiatives

Although during 2020 the Company narrowed its near-team technology focus and deferred a significant number of technology projects in response to the COVID-19 pandemic, over the past several years the Company has committed significant resources to technology improvements in support of its ongoing operations and initiatives. During 2021, the Company achieved the long-awaited milestone of getting all of its aircraft into a single system for aircraft maintenance and record-keeping. This was the Company's largest technology initiative for 2021, and was

one of the most critical system updates the Company has undertaken in the history of its maintenance program. In addition, during 2021 the Company continued its implementation of corporate GDS capabilities in connection with Southwest Business initiatives by initiating flights for sale within Sabre's GDS.

The Company continues to focus on the prioritization and execution of its technology investments and is in the process of continually executing an evolving multi-year plan for technology, with the goal of developing a stronger, more adaptable, and more efficient and reliable technology foundation to support the Company's strategic priorities. The Company continues to invest significantly in technology resources including, among others, the Company's systems related to (i) human resources management; (ii) flight planning and scheduling, including with respect to schedule changes and Customer reaccommodations; (iii) crew scheduling; (iv) revenue management; and (v) technology infrastructure.

### Environmental Sustainability

The Company remains steadfast in its desire to pursue, implement, and enhance initiatives to address the Company's impact on the environment. Over the years, the Company has undertaken a number of fuel conservation and emissions-related initiatives, such as the following:

- introduction of the MAX aircraft into the Company's fleet, which is more fuel-efficient and releases fewer $CO_2$ emissions per available seat mile than the Company's other aircraft;
- installation of winglets, which reduce drag and increase fuel efficiency, on all aircraft in the Company's fleet;
- application of periodic engine washes;
- use of electric ground power and pre-conditioned air for aircraft at the gate, when available;
- replacement of eligible internal combustion ground support equipment with electric equipment at select locations;
- deployment of auto-throttle and vertical navigation to maintain optimum cruising speeds;
- implementation of engine start procedures to support the Company's single engine taxi procedures;
- adjustment of the timing of auxiliary power unit starts on originating flights to reduce auxiliary power unit usage;
- implementation of fuel planning initiatives to safely reduce loading of excess fuel;
- retrofitting of aircraft cabin interiors to reduce weight;
- reduction of aircraft engine idle speed while on the ground, which also increases engine life;
- utilization of Company-optimized routes (flying the best wind routes to take advantage of tailwinds or to minimize headwinds);
- improvements in flight planning algorithms to better match the Company's aircraft flight management system and thereby enabling the Company to fly at the most efficient altitudes;
- substitution of Pilot and Flight Attendant flight bags with lighter Electronic Flight Bag tablets; and
- implementation of Real Time Descent Winds (automatic uplinking of up-to-date wind data to the aircraft, allowing crews to time the descent to minimize thrust inputs).

The Company has also participated in Required Navigation Performance ("RNP") operations as part of the FAA's Performance Based Navigation program, a key component of the Next Generation Transportation System ("NextGen"), which is intended to modernize the U.S. air traffic system by addressing limitations on air transportation capacity and making more efficient use of airspace. RNP combines the capabilities of advanced aircraft avionics, satellite navigation (instead of less precise ground-based navigation), and new flight procedures to enhance navigational and operational capabilities, improve fuel efficiency, and minimize greenhouse gas emissions. RNP approaches, which are published by the FAA, are currently available at 66 of the airports Southwest serves.

13

Southwest continues to work with the FAA to develop and seek more use of RNP approaches and to evolve air traffic control rules to support greater utilization of RNP.

In 2021, the Company announced goals to (i) achieve carbon neutrality by 2050, (ii) maintain carbon neutral growth (to 2019 levels) through the end of the decade, and (iii) reduce carbon emissions intensity per available seat mile (including scope 1 and scope 2 emissions) by at least 20 percent by 2030. The Company also announced a series of actions and initiatives designed to assist the Company in achieving these goals, including agreements with various third parties intended to facilitate the development, production, and usage of commercialized sustainable aviation fuel; the launch of a carbon-offset program that allows Customers to contribute funds for the purchase of carbon offsets for Southwest; and arrangements with nonprofit organizations seeking to address climate change and reduce carbon emissions in aviation.

As part of its commitment to corporate sustainability, the Company has published the Southwest One Report describing the Company's environmental sustainability goals, actions, initiatives, and strategies, which include the foregoing and other efforts to minimize greenhouse gas emissions and address other environmental matters such as energy and water conservation, waste minimization, and recycling. Information contained in the Southwest One Report is not incorporated by reference into, and does not constitute a part of, this Form 10-K. While the Company believes that the disclosures contained in the Southwest One Report and other voluntary disclosures regarding environmental, social, and governance ("ESG") matters are responsive to various areas of investor interest, the Company believes that these disclosures do not currently address matters that are material to the Company's operations, strategy, financial condition, or financial results, although this view may change in the future based on new information that could materially alter the estimates, assumptions, or timelines used to create these disclosures. Given the estimates, assumptions and timelines used to create the Southwest One Report and other voluntary disclosures, the materiality of these disclosures is inherently difficult to assess in advance.

**Regulation**

The airline industry is heavily regulated, especially by the federal government, and there are a significant number of governmental agencies and legislative bodies that have the ability to directly or indirectly affect the Company and/or the airline industry financially and/or operationally. Examples of regulations affecting the Company and/or the airline industry, imposed by several of these governmental agencies and legislative bodies, are discussed below.

**Economic and Operational Regulation**

***Consumer Protection Regulation by the U.S. Department of Transportation***

The DOT regulates economic operating authority for air carriers and consumer protection for airline passengers. The DOT may take legal enforcement action against air carriers for violating their regulations by imposing civil penalties up to $35,188 per occurrence.

To provide passenger transportation in the United States, a domestic airline is required to hold both a Certificate of Public Convenience & Necessity from the DOT and an Air Carrier Operating Certificate from the FAA. A Certificate of Public Convenience & Necessity is unlimited in duration, and the Company's certificate generally permits it to operate among any points within the United States and its territories and possessions. Additional DOT authority, in the form of a certificate or exemption from certificate requirements, is required for a U.S. airline to serve foreign destinations either with its own aircraft or via code-sharing with another airline. Exemptions granted by the DOT to serve international markets are generally limited in duration and are subject to periodic renewal requirements. The DOT may revoke a certificate or exemption, in whole or in part, for failure to comply with federal aviation statutes, regulations, orders, or the terms of the certificate or exemption itself.

The DOT's consumer protection and enforcement authority is derived primarily from a federal statutory prohibition on "unfair or deceptive practices or unfair methods of competition" by air carriers. A new DOT rule took effect in January 2021, codifying the definitions for the terms "unfair" and "deceptive" in the DOT's regulations by

14

adopting the definitions used by the Federal Trade Commission, and amending and clarifying the procedures the DOT will follow when engaging in aviation consumer protection rulemaking and enforcement. The purpose of this new rule is to help establish clear and consistent criteria for unfair or deceptive practices while aligning DOT's oversight of aviation entities with other government agencies' oversight of other sectors of the economy with regard to unfair or deceptive practices.

Under the above-described authority, the DOT has also adopted so-called "Passenger Protection Rules," which address a wide variety of matters, including flight delays on the tarmac, chronically delayed flights, denied boarding compensation, baggage liability requirements, ticket refunds, and advertising of airfares, among others. For example, under the DOT's tarmac delay rule and subject to limited exceptions, air carriers must not allow an aircraft to remain on the tarmac for more than 3 hours (for domestic delays) or more than 4 hours (for international delays), without allowing passengers to deplane.

In addition, the Passenger Protection Rules require airlines to (i) display ontime performance on their websites; (ii) adopt customer service plans, publish those plans on their website, and audit their own compliance with their plans; (iii) designate an employee to monitor the performance of their flights; (iv) provide information to passengers on how to file complaints; (v) respond in a timely and substantive fashion to consumer complaints; (vi) pay compensation to each passenger denied boarding involuntarily from an oversold flight; (vii) refund any checked bag fee for permanently lost luggage; (viii) prominently disclose all potential fees for optional ancillary services on their websites; and (ix) refund passenger fees paid for ancillary services if a flight cancels or oversells and a passenger is unable to take advantage of such services.

The Passenger Protection Rules also require that (i) advertised fares include all government-mandated taxes and fees; (ii) passengers be allowed to either hold a reservation for up to 24 hours without making a payment or cancel a paid reservation without penalty for 24 hours after the reservation is made, as long as the reservation is made at least seven days in advance of travel; (iii) fares may not increase after purchase; (iv) baggage fees must be disclosed to the passenger at the time of booking; (v) the same baggage allowances and fees must apply throughout a passenger's trip; (vi) baggage fees must be disclosed on e-ticket confirmations; and (vii) passengers must be promptly notified in the event of delays of more than 30 minutes or if there is a cancellation or diversion of their flight.

The DOT took actions throughout 2021 to bolster its Passenger Protection Rules in certain respects. For example, in January, the DOT issued a final rule increasing involuntary denied boarding and mishandled baggage compensation, and prohibiting airlines from denying boarding to passengers that have already boarded. In September, reacting to complaints filed in the earlier months of the COVID-19 pandemic related to carriers' refund practices, the DOT announced it plans to solicit comments on a proposed rule that would enhance passengers' rights when a flight is operating but the passenger decides not to fly because of government restrictions (possibly requiring refunds of non-refundable tickets in those situations). The Company does not believe that pending regulatory developments with respect to the DOT's Passenger Protection Rules will have a material effect on the Company's capital expenditures, earnings, or competitive position.

In addition to its statutory authority to prohibit unfair or deceptive practices or unfair methods of competition, the DOT is charged with prohibiting discrimination by airlines against consumers on the basis of (i) disability; and (ii) race, religion, national origin, sex, or ancestry.

Under this authority, the DOT has proposed a rule that would provide for changes to the accessibility of lavatories on single-aisle aircraft for passengers with disabilities. These proposed changes include modifications to the interior of the lavatory, additional services that airlines would provide with respect to lavatory access, training requirements, and improvements to the aircraft's onboard wheelchair. The DOT has indicated it intends to also propose and seek comments on a separate rule in 2022 that would eventually require airlines to offer a larger lavatory on single-aisle aircraft. Requirements to expand the size of lavatories could impose substantial costs on the Company and have a material effect on the Company's capital expenditures, earnings, and competitive position. Whether the DOT will

15

ultimately adopt a new rule requiring larger lavatories, and the timing and application of any new rule, are unknown at this time.

### *Aviation Taxes and Fees*

The statutory authority for the federal government to collect most types of aviation taxes, which are used, in part, to finance programs administered by the FAA, must be periodically reauthorized by the U.S. Congress. The FAA Reauthorization Act of 2018 (the "2018 Reauthorization Act") extends most commercial aviation taxes through September 30, 2023.

In addition to FAA-related taxes, there are additional federal taxes related to the U.S. Department of Homeland Security. These taxes do not need to be reauthorized periodically. Congress has set the Transportation Security Fee paid by passengers at $5.60 per one-way passenger trip originating in the U.S. In addition, international passengers arriving in the U.S. are subject to U.S. immigration and customs fees that are indexed to inflation. These fees are used to support the operations of U.S. Customs and Border Protection ("CBP"). Finally, the U.S. Department of Agriculture's Animal and Plant Health Inspection Service imposes an agriculture inspection fee on international passengers arriving in the United States.

Airline passengers are also required to pay a Passenger Facility Charge, a user fee that is authorized via federal statute but assessed by each airport. The maximum Passenger Facility Charge is $4.50 per passenger enplanement. New aviation taxes or regulations may be imposed through the annual congressional budget process. The annual appropriations bill funds the federal government - including the DOT, the FAA, the Transportation Security Administration (the "TSA"), and CBP. Passage of the fiscal year 2021 and 2022 appropriations bill will be considered throughout 2022 and could result in an increase in one or more of the taxes and fees discussed above, as well as new mandates on the DOT to begin or complete rulemakings related to airline consumer protection.

## Operational and Safety Regulation

The FAA, an agency within the DOT, has the authority to regulate safety aspects of civil aviation operations. Specifically, the Company and certain of its third-party service providers are subject to the jurisdiction of the FAA with respect to aircraft maintenance and operations, including equipment, ground facilities, dispatch, communications, training, and other matters affecting air safety. The FAA, from time to time, issues orders or directives relating to the maintenance and operation of aircraft that require significant expenditures or operational restrictions. The FAA, acting through its own powers or through the appropriate U.S. Attorney, has the power to bring proceedings for the imposition and collection of civil penalties for violation of the FAA's regulations.

The FAA requires airlines to obtain and maintain an Air Carrier Operating Certificate, as well as other certificates, approvals, and authorities. These certificates, approvals, and authorities are subject to amendment, suspension, or revocation for cause.

As the airlines' safety regulator, the FAA uses tools, such as temporary flight restrictions, to control aircraft operations within designated areas. The FAA may also issue advisory circulars to provide guidance for compliance with aircraft and pilot certification standards, operational standards, training standards, and other FAA rules. These regulatory tools may create additional costs and/or operational restrictions for the Company. For example, the FAA has expressed concern about the deployment of certain wireless telecommunications systems that may cause interference with certain aircraft avionics, such as radio altimeters. In response, the FAA could impose temporary flight restrictions until the agency believes any safety concerns are resolved. The FAA could also require mitigations from aircraft operators (e.g., aircraft retrofits) as a means to avoid any potential interference.

With respect to airline operations, the FAA has rules in effect with respect to crew flight, duty, and rest times. Among other things, the rules (i) require a ten hour minimum rest period prior to a pilot's flight duty period; (ii) mandate that a pilot must have an opportunity for eight hours of uninterrupted sleep within the rest period; and (iii) impose pilot "flight time" and "duty time" limitations based upon report times, the number of scheduled flight

segments, and other operational factors. The FAA has established flight attendant duty period limitations and rest requirements based on the length of a flight attendant's scheduled duty period, number of flight attendants assigned to a flight, and other operational factors.

The 2018 Reauthorization Act contains a provision requiring a modification to the FAA's rules to increase the required flight attendant rest period between duty periods. FAA rules currently provide that a flight attendant scheduled to a duty period of fourteen hours or less must be given a scheduled rest period of at least nine consecutive hours. This rest period can be reduced to eight consecutive hours under certain circumstances. On November 2, 2021, the FAA issued a proposed rule increasing the minimum rest period to ten consecutive hours and prohibiting a reduction of the minimum rest period under any circumstances. The comment period on the proposed rule closed on January 3, 2022. The implementation of the rule as proposed could require the Company to modify its technology systems and flight attendant staffing practices, which could have a material effect on the Company's operational performance, costs, earnings, competitive position, and Customer Experience. The FAA has indicated it expects to finalize the rule in 2022.

Pursuant to the 2018 Reauthorization Act, the FAA is required to issue an order requiring installation of a physical secondary cockpit barrier on "each new aircraft that is manufactured" for delivery to a passenger air carrier. A working group comprised of industry technical experts provided advice and recommendations to the FAA in 2020 on the most effective ways to implement the physical secondary cockpit barrier requirement. Depending on if and how the FAA reacts to the working group's advice and recommendations, as well as the FAA's interpretation and application of the statutory requirement, compliance with the future FAA order could impose a substantial cost on the Company. The FAA has indicated it plans to issue a proposed rule in 2022.

The 2018 Reauthorization Act also contains provisions directing the FAA to examine whether to issue new regulations establishing minimum dimensions for seat size based on safety considerations. Further, the 2018 Reauthorization Act expands human trafficking training requirements beyond flight attendants to include several public-facing Employee work groups, as well as requires air carriers to implement a plan and develop training with protocols for preventing and responding to verbal or physical assault committed against customer service agents. Human trafficking training is required for the Company's frontline Employees and recommended as voluntary curriculum for other Employees. The Company has also implemented an Employee Assault Prevention and Response Plan that includes training to de-escalate hostile situations, written protocols for dealing with hostile situations, and reporting of relevant incidents to appropriate authorities.

In addition to its role as safety regulator, the FAA operates the nation's air traffic control system and has continued its lengthy and ongoing effort to implement a multi-faceted, airspace modernization program, NextGen. According to the U.S. government, NextGen will help contribute to a safer, more efficient, and more predictable system, which may potentially contribute to reduced fuel burn, emissions, and noise. As part of the NextGen initiative, in 2010 the FAA published rules requiring most commercial aircraft operating in the national airspace system to be equipped with Automatic Dependent Surveillance - Broadcast ("ADS-B") technology by January 1, 2020. ADS-B technology is intended to enhance safety and efficiency by moving from ground-based radar and navigational aids to precise tracking using satellite signals. In addition to environmental and efficiency benefits, ADS-B technology gives pilots and air traffic controllers new tools to reduce the risk of runway incursions and aircraft collisions. The Company has implemented technology and programs intended to comply with all applicable ADS-B requirements. On November 9, 2021, the U.S. government announced an Aviation Climate Action Plan to reduce emissions by, among other initiatives and efforts, operationalizing NextGen to realize the full potential of modernized infrastructure and systems, and enhancing data quality and information distribution to enable operators to fly more fuel-efficient trajectories.

The Air Traffic Organization ("ATO") is the operational arm of the FAA. The ATO is responsible for providing safe and efficient air navigation services to all of the United States and large portions of the Atlantic and Pacific Oceans and the Gulf of Mexico. The Company is subject to any operational changes imposed by the FAA/ATO as they relate to the NextGen program, as well as the day-to-day management of the air traffic control system.

## Passenger and Occupational Health Regulation

The Company is subject to various other federal, state, and local laws and regulations relating to health and occupational safety, including Department of Health and Human Services, Centers for Disease Control and Prevention ("CDC"), Occupational Safety and Health Administration, and Food and Drug Administration regulations. In response to the COVID-19 pandemic, federal, state, and local government authorities implemented directives, orders, and regulations intended to mitigate the spread of the virus, and in response, the Company modified its practices, policies, and procedures, as appropriate. For example, the CDC and TSA issued orders, effective February 1, 2021, mandating the wearing of face masks on all commercial flights and within airports, subject to certain limited exceptions. The mask mandate has been extended through March 18, 2022, and could be extended again. In addition, on October 25, 2021, the CDC and CBP issued orders, effective November 8, 2021, requiring that adult non-citizen, non-immigrant passengers traveling to the United States by air be fully vaccinated against COVID-19 and show proof of their vaccination status. The orders also require that all passengers traveling to the United States by air provide basic contact tracing information to airlines before boarding.

In September 2021, the President of the United States issued an Executive Order establishing a vaccination requirement for employees of covered federal contractors. The federal government required that federal contractors have their workforce vaccinated (or request an accommodation) by December 8, 2021. The deadline was later extended to January 4, 2022. The Company started an active campaign to notify Employees of the need to submit proof of COVID-19 vaccination, or apply for an accommodation, by January 4, 2022. On December 3, 2021, the company announced that 93 percent of its Employees were vaccinated, or had requested an accommodation. Due to legal challenges to the vaccine mandate, the Company announced on December 20, 2021, that it is no longer targeting a January 4, 2022, deadline for compliance. However, if the vaccine mandate is revived, the Company will resume efforts to work with Employees who have not yet either submitted proof of vaccination or requested an accommodation.

Additional health requirements or standards, whether mandated by government agencies or voluntarily adopted by the Company, related to the COVID-19 pandemic or otherwise intended to mitigate the spread of communicable diseases could affect the Company's costs and performance.

For further information pertaining to the FAA's oversight and regulatory authority, as well as health and safety regulations related to COVID-19, see "Risk Factors - Legal, Regulatory, Compliance, and Reputational Risks, and COVID-19 Risks."

## Security Regulation

Pursuant to the Aviation and Transportation Security Act ("ATSA"), the TSA, a federal agency of the U.S. Department of Homeland Security, is responsible for certain civil aviation security matters. ATSA and subsequent TSA regulations and procedures implementing ATSA address, among other things, (i) flight deck security; (ii) the use of federal air marshals onboard flights; (iii) airport and aircraft access security; (iv) airline crew security training; (v) security screening of passengers, baggage, cargo, mail, employees, and vendors; (vi) training and qualifications of security screening personnel; (vii) provision of passenger data to CBP; and (viii) background checks.

Under ATSA, substantially all security officers at airports are federal employees, and significant other elements of airline and airport security are overseen and performed by federal employees, including federal security managers, federal law enforcement officers, and federal air marshals. TSA personnel and TSA-mandated security procedures can affect the Company's operations, costs, and Customer experience. For example, as part of its security measures, the TSA regulates the types of liquid items that can be carried onboard aircraft. In addition, as part of its Secure Flight program, the TSA requires airlines to collect a passenger's full name (as it appears on a government-issued ID), date of birth, gender, and Redress Number (if applicable). Airlines must transmit this information to Secure Flight, which uses the information to perform matching against terrorist watch lists. After matching passenger information against the watch lists, Secure Flight transmits the matching results back to airlines. This serves to

18

Table of Contents

identify individuals for more extensive security screening and to prevent individuals on watch lists from boarding an aircraft. It also helps prevent the misidentification of passengers who have names similar to individuals on watch lists. The TSA's multi-layered approach to airport security also includes physical pat down procedures at security checkpoints. These procedures have raised privacy concerns by some air travelers, and have caused delays at screening checkpoints.

The Company, in conjunction with the TSA, participates in TSA PreCheck™, a pre-screening initiative that allows passengers deemed low risk by the TSA to move through security checkpoints with greater efficiency and ease when traveling. Eligible passengers may use dedicated screening lanes at certain airports the Company serves for screening benefits, which include leaving on shoes, light outerwear, and belts, as well as leaving laptops and permitted liquids in carryon bags. A similar CBP-administered program, Global Entry®, allows expedited clearance for pre-approved, low-risk international travelers upon arrival in the United States. The TSA has expressed its plans to leverage advanced transportation security screening technologies, including biometric solutions, to improve security effectiveness and operational efficiency, while also enhancing the passenger experience. The advanced technologies have prompted privacy, cost, and legal concerns from air carriers, travelers, and advocacy groups, which could affect the timing and viability of the TSA's plans.

The Company also participates in the TSA Known Crewmember® program, which is a risk-based screening system that enables TSA security officers to positively verify the identity and employment status of flight-crew members. The program expedites flight crew member access to sterile areas of airports.

The Company works collaboratively with TSA, foreign national governments, and airports to provide risk-based security measures at international locations served by the Company.

The Department of Homeland Security has granted the Company designation coverage under the Support Anti-Terrorism by Fostering Effective Technologies Act of 2002 (the "SAFETY Act") through September 29, 2022. Designation coverage affords the Company certain limitations of liability for claims arising out of an "act of terrorism," as defined under the SAFETY Act. The designation is based on the security program used by the Company to protect its Employees, Customers, and assets from terrorists and other criminal activities.

The Company has made significant investments in facilities, equipment, and technology to process Customers, checked baggage, and cargo efficiently in compliance with applicable security regulations; however, the Company is not able to predict the impact, if any, that various security measures or TSA resource limitations at certain airports will have on Passenger revenues and the Company's costs, either in the short-term or the long-term.

**Environmental Regulation**

The Company is subject to various federal laws and regulations relating to the protection of the environment, including the Clean Air Act, the Resource Conservation and Recovery Act, the Clean Water Act, the Safe Drinking Water Act, and the Comprehensive Environmental Response, Compensation and Liability Act, as well as state and local laws and regulations. These laws and regulations govern aircraft drinking water, emissions, storm water discharges from operations, and the disposal of materials such as jet fuel, chemicals, hazardous waste, and aircraft deicing fluid.

Additionally, in conjunction with airport authorities, other airlines, and state and local environmental regulatory agencies, the Company, as a normal course of business, undertakes voluntary investigation or remediation of soil or groundwater contamination at various airport sites. The Company has not historically experienced any airport site environmental liability that has had a material adverse effect on its capital expenditures, earnings, or competitive position. However, many airports, as well as federal, state and local governmental authorities, are increasingly focused on groundwater contamination caused by so-called "forever chemicals," most notably per- and polyfluoroalkyl substances ("PFAS"). PFAS have been used in many manufacturing and industrial applications over many decades and can be found in numerous products, including building materials and household products. Most notably for aviation, PFAS are a key component in aqueous film-forming foam ("AFFF"), which is widely used to

19

fight petroleum-based fires at both commercial and military aviation facilities. The FAA and the U.S. Department of Defense have strict performance specifications for fire suppression systems, which has contributed to the use of AFFF/PFAS over the decades. PFAS is now the focus of regulatory oversight at airports, as well as the source of litigation by airports against AFFF manufacturers. Moreover, regulatory authorities at the federal, state, and local levels are contemplating both the prohibition of PFAS-based AFFF and costly remediation efforts at airports to address groundwater contamination. The evolving legal and regulatory activity surrounding PFAS could lead to an inadequate supply of FAA-certified AFFF throughout the aviation system and/or increased operating costs at certain airports.

The federal government, as well as several state and local governments, the governments of other countries, and the United Nations' International Civil Aviation Organization ("ICAO") have implemented legislative and regulatory proposals and voluntary measures to address climate change by reducing greenhouse gas emissions. At the federal level, in July 2016, the Environmental Protection Agency (the "EPA") issued a final endangerment finding for greenhouse gas emissions from certain types of aircraft engines, which the agency determined contribute to pollution that causes climate change and endangers public health and the environment. Following this endangerment finding, per the federal Clean Air Act, the EPA adopted aircraft greenhouse gas emissions standards in December 2020. These standards apply to airframe and aircraft engine manufacturers, and align with the standards previously adopted by ICAO. On November 15, 2021, the EPA affirmed the agency will not reconsider the rule adopting the standards; however, several states and non-government organizations have filed legal petitions challenging the EPA's adoption of the rule.

In addition to aircraft emissions standards, ICAO implemented a "global market-based measure" framework in an effort to control carbon dioxide emissions from international aviation. The focal point of this framework is a carbon offsetting system applicable to aircraft operators designed to cap the growth of emissions related to international aviation emissions. ICAO's Carbon Offsetting and Reduction Scheme for International Aviation ("CORSIA") program is a global market-based measure intended to cap carbon emissions from international civil aviation at their 2019 levels, enabling carbon-neutral growth for the international aviation sector by requiring that international aviation emissions above 2019 levels are offset or reduced through the use of eligible sustainable aviation fuels. The U.S. federal government has opted to participate in the voluntary phases of the CORSIA program from 2021-2026 (additional phases extend through 2035). As part of the CORSIA program, the Company is currently monitoring its international emissions for reporting purposes. Data collected from applicable international flight activity in 2019 forms the baseline and is used in the calculations to determine subsequent carbon offsetting requirements under the CORSIA program. Regardless of the method of regulation or application of CORSIA, further policy changes with regard to climate change are possible, which could significantly increase operating costs in the airline industry and, as a result, adversely affect operations.

In addition to climate change, aircraft noise continues to be an environmental focus, especially as the FAA implements new flight procedures as part of its NextGen airspace modernization program discussed above. The Airport Noise and Capacity Act of 1990 gives airport operators the right, under certain circumstances, to implement local noise abatement programs, provided they do not unreasonably interfere with interstate or foreign commerce or the national air transportation system. Some airports have established airport restrictions to limit noise, including restrictions on aircraft types to be used and limits on the number of hourly or daily operations or the time of operations. These types of restrictions can cause curtailments in service or increases in operating costs and can limit the ability of air carriers to expand operations at the affected airports.

At the federal level, the FAA has committed to inform and involve the public, engage with communities, and give meaningful consideration to community concerns and views when developing new flight procedures, and there is a possibility that Congress may enact legislation in the future to address local noise concerns at one or more commercial airports in the United States. In addition, the 2018 Reauthorization Act requires the FAA to consider community noise concerns when proposing a new navigation departure procedure or amending an existing navigation procedure that would direct aircraft over noise sensitive areas. This requirement could delay or otherwise impede the implementation or use of more efficient flight paths.

20

Government efforts at the international, federal, state, or local levels to address worldwide climate change, manage greenhouse gas emissions, and reduce aircraft noise could affect aircraft operators, original equipment manufacturers, producers and sellers of aviation fuel, and other third parties on which the Company is dependent. Additional legislative or regulatory activity in this area could require modifications to the Company's equipment, operations, and strategy, and have a material effect on the Company's capital expenditures, earnings, or competitive position.

**Data Privacy and Security Regulation**

Like all industries, the airline industry has experienced heightened legislative and regulatory focus on data privacy and data security in the United States and elsewhere. As a result, the Company has been monitoring a growing and fast-evolving set of legal requirements, including with respect to consumer access and control over their personal information.

The Company expects federal, state, and other governments to assess and implement cyber-security and data privacy protections, which could result in expanded compliance burdens, costs, and enforcement risks for the Company.

**International Regulation**

All international air service is subject to certain U.S. federal requirements and approvals, as well as the regulatory requirements of the appropriate authorities of the foreign countries involved. Foreign regulatory agencies located in jurisdictions served by the Company can impose requirements on various aspects of the Company's business, including safety, marketing, ticket sales, staffing, and tax. In response to the COVID-19 pandemic, certain U.S and foreign regulatory authorities have imposed health requirements for international passengers. For example, on October 25, 2021, the CDC issued orders, effective November 8, 2021, requiring that adult non-citizen, non-immigrant passengers traveling to the United States by air be fully vaccinated against COVID-19 and show proof of their vaccination status. The orders also require that all passengers traveling to the United States by air provide basic contact tracing information to airlines before boarding. These orders and other new or existing health requirements for international travel could adversely affect demand and the performance of the Company's international flight offerings.

The Company has obtained the necessary economic authority from the DOT, as well as approvals required by the FAA and applicable foreign government entities, to conduct operations, under certain circumstances, to points outside of the continental United States currently served by the Company. Certain international authorities and approvals held by the Company are subject to periodic renewal requirements. The Company requests extensions of such authorities and approvals when and as appropriate. To the extent the Company seeks to serve additional foreign destinations in the future, or to renew its authority to serve certain routes, it may be required to obtain necessary authority from the DOT and/or approvals from the FAA, as well as any applicable foreign government entity.

Certain international markets are governed by bilateral air transportation agreements between the United States and foreign countries. Changes in U.S. or foreign government aviation policies could result in the alteration or termination of such agreements, diminish the value of the Company's existing international authorities, present barriers to renewing existing or securing new authorities, or otherwise affect the Company's international operations. There are also capacity limitations at certain international airports, which could impact future service levels. In general, bilateral agreements between the United States and foreign countries the Company currently serves, or may serve in the future, may be subject to renegotiation or reinterpretation from time to time. While the U.S. government has negotiated "open skies" agreements with many countries, which allow for unrestricted access between the United States and respective foreign destinations, agreements with other countries may restrict the Company's entry into those destinations and/or its related growth opportunities.

The CBP is the federal agency of the U.S. Department of Homeland Security charged with facilitating international trade, collecting import duties, and enforcing U.S. regulations with respect to trade, customs, and immigration. To the extent the Company expands its international flight offerings, CBP and its requirements and resources will also become increasingly important considerations to the Company. For instance, with the exception of flights from a small number of foreign "preclearance" locations, arriving international flights may only land at CBP-designated airports, and CBP officers must be present and in sufficient numbers at those airports to effectively process and inspect arriving international passengers, baggage, and cargo. Thus, CBP personnel and CBP-mandated procedures can affect the Company's operations, costs, and Customer experience. The Company has made significant investments in facilities, equipment, and technologies at certain airports in order to improve the Customer experience and to assist CBP with its inspection and processing duties; however, the Company is not able to predict the impact, if any, that various CBP measures or the lack of CBP resources will have on the Company's revenues and costs, either in the short-term or the long-term.

**Insurance**

The Company carries insurance of types customary in the airline industry and in amounts the Company deems adequate to protect the Company and its property and to comply both with applicable regulations and certain of the Company's credit and lease agreements. The policies principally provide coverage for public and passenger liability, property damage, cargo and baggage liability, loss or damage to aircraft, engines, and spare parts, and workers' compensation. In addition, the Company carries a cyber-security insurance policy with regards to data protection and business interruption associated with both security breaches from malicious parties and from certain system failures. The Company also manages insured risk through the use of reinsurance programs, pooling mechanisms, and a wholly-owned captive insurance subsidiary.

Although the Company has been able to purchase aviation, property, liability, and professional insurance via the commercial insurance marketplace, available commercial insurance could be more expensive in the future and/or have material differences in coverage than insurance that has historically been provided and may not be adequate to protect the Company's risk of loss from future events, including acts of terrorism. Further, available cyber-security insurance with regards to data protection and business interruption could be more expensive in the future and/or have material differences in coverage than insurance that has historically been provided and may not be adequate to protect the Company's risk of loss. With respect to any insurance claims, policy coverages and claims are subject to acceptance by the many insurers involved and may require arbitration and/or mediation to effectively settle the claims over prolonged periods of time.

**Competition**

Competition within the airline industry is intense and highly unpredictable, and Southwest has historically competed with other airlines on virtually all of its scheduled routes. In recent years, the majority of domestic airline service has been provided by Southwest and the other largest major U.S. airlines, including American Airlines, Delta Air Lines, and United Airlines. The DOT defines major U.S. airlines as those airlines with annual revenues of at least $1 billion; there are currently 13 passenger airlines offering scheduled service, including Southwest, that meet this standard.

Key competitive factors within the airline industry have historically included (i) pricing and cost structure; (ii) routes, loyalty programs, and schedules; (iii) customer service, operational reliability, product offerings, and amenities; and (iv) balance sheet health. As discussed below, the COVID-19 pandemic has significantly altered the competitive landscape amongst the airlines, as the industry has been forced to prioritize liquidity and cost control, which in turn has driven actions such as taking on significantly more debt and instituting more widespread discounted fares and flexible customer policies to stimulate traffic.

Airlines, including Southwest, also compete for customers with alternatives to travel, such as videoconferencing and business communication platforms. These alternatives have become particularly prevalent as a result of the COVID-19 pandemic.

22

**Pricing and Cost Structure**

Pricing is a significant competitive factor in the airline industry, and the availability of fare information on the Internet allows travelers to easily compare fares and identify competitor promotions and discounts. During 2020 and 2021, as a result of the COVID-19 pandemic, the Company experienced an increasingly competitive fare environment, as airlines offered significantly discounted fares to attempt to address unprecedented decreases in consumer demand.

Pricing can be driven by a variety of factors. In addition to the need to stimulate traffic, as has occurred during the COVID-19 pandemic, under normal circumstances, airlines may discount fares to drive traffic in new markets and/or grow market share in existing markets.

The Company believes its low-cost operating structure has historically provided it with an advantage over many of its airline competitors by enabling it to continue to charge low fares. In addition, the Company believes its low-cost operating structure provided it with a significant financial competitive advantage relative to many of its competitors in responding to the financial impact of the COVID-19 pandemic. While it has become increasingly difficult for the Company to improve upon its industry cost position, the Company believes its Customer Service and flexible Customer and Rapid Rewards policies continue to positively differentiate it from many of its competitors.

**Routes, Loyalty Programs, and Schedules**

The Company also competes with other airlines based on markets served, loyalty opportunities, and flight schedules. While the Company has a robust, point-to-point route network in the United States, some major airlines have more extensive global route structures than Southwest, including more extensive international networks. In addition, many competitors have entered into significant commercial relationships with other airlines, such as strategic alliances, code-sharing, and capacity purchase agreements, which increase the airlines' opportunities to expand their route offerings. An alliance or code-sharing agreement enables an airline to offer flights that are operated by another airline and also allows the airline's customers to book travel that includes segments on different airlines through a single reservation or ticket. As a result, depending on the nature of the specific alliance or code-sharing arrangement, a participating airline may be able to, among other things, (i) offer its customers access to more destinations than it would be able to serve on its own, (ii) gain exposure in markets it does not otherwise serve, and (iii) increase the perceived frequency of its flights on certain routes. More extensive route structures, as well as alliance and code-sharing arrangements, not only provide additional route flexibility for participating airlines, they can also allow these airlines to offer their customers more opportunities to earn and redeem loyalty miles or points. A capacity purchase agreement enables an airline to expand its route structure by paying another airline (e.g., a regional airline with smaller aircraft) to operate flights on its behalf in markets that it does not, or cannot, serve itself. The Company continues to evaluate and implement initiatives to better enable itself to offer additional itineraries, and has opened 18 new airports since the COVID-19 pandemic began, which has significantly increased its domestic route network.

**Customer Service, Operational Reliability, Product Offerings, and Amenities**

Southwest also competes with other airlines with respect to Customer Service, operational reliability (such as ontime performance), product offerings, and passenger amenities. According to statistics published by the DOT, Southwest has historically ranked at or near the top among domestic carriers in Customer Satisfaction for having the lowest Customer complaint ratio. However, in particular in response to the COVID-19 pandemic, carriers are increasingly focusing on customer-friendly policies as opportunities to win and retain Customers. In addition, some airlines have more seating options and associated passenger amenities than Southwest, including first class, business class, and other premium seating and related amenities, which can appeal in particular to business customers. However, the Company believes its introduction of its fares in the Global Distribution Systems (GDS) provides an opportunity to increase the Company's market share of business customers. New and different types of aircraft

23

flown by competitors could have operational attributes and passenger amenities that could be considered more attractive to certain consumers than those associated with the Company's existing fleet.

### Balance Sheet Health

The Company believes it is emerging from the COVID-19 pandemic with a strengthened financial position relative to its competitors in the U.S. airline industry, which has put the Company in a better position to support future growth. Further, the Company has maintained its investment-grade rating by all three major credit agencies (Moody's, S&P Global, and Fitch) throughout the pandemic, and is currently the only major U.S. passenger airline with an investment-grade rating. The Company believes its balance sheet provided it advantaged access to liquidity during the pandemic.

### Other Forms of Competition

Technology advancements have provided alternatives to air travel, such as videoconferencing, business communication platforms, and the Internet, and these alternatives have significantly increased in scope during the COVID-19 pandemic. The Company is subject to the risk that the significantly increased use of these alternatives could result in permanent changes to consumer behavior and thereby negatively affect demand for air travel.

The airline industry is also subject to varying degrees of competition from other forms of transportation, including surface transportation by automobiles, buses, and trains. Inconveniences and delays associated with air travel security measures can increase surface competition. In addition, surface competition can be significant during economic downturns when consumers cut back on discretionary spending and fewer choose to fly, or when gasoline prices are lower, making surface transportation a less expensive option. Because of the relatively high percentage of short-haul travel provided by Southwest, it is particularly exposed to competition from surface transportation in these instances.

### Seasonality

The Company's business is ordinarily seasonal. Generally, in most markets the Company serves, demand for air travel is greater during the summer months, and, therefore, revenues in the airline industry tend to be stronger in the second (April 1 - June 30) and third (July 1 - September 30) quarters of the year than in the first (January 1 - March 31) and fourth (October 1 - December 31) quarters of the year. As a result, in many cases, the Company's results of operations reflect this seasonality. Factors that could alter this seasonality include, among others, global pandemics such as COVID-19, the price of fuel, general economic conditions, changes in consumer behavior, governmental action, extreme or severe weather and natural disasters, fears of terrorism or war, or changes in the competitive environment. Therefore, the Company's quarterly operating results are not necessarily indicative of operating results for the entire year, and historical operating results in a quarterly or annual period are not necessarily indicative of future operating results.

### Employees

### Total Employees and Labor Union Activity

At December 31, 2021, the Company had approximately 55,100 active fulltime equivalent Employees, consisting of approximately 23,500 flight, 3,200 maintenance, 21,000 ground, Customer, and fleet service, and 7,400 management, technology, finance, marketing, and clerical personnel (associated with non-operational departments). The Company continues to focus on its hiring needs to meet schedule demands. The labor force participation rate remains depressed despite an increase in jobs, especially in the transportation and hospitality industries. There is an ongoing battle for talent, leading to less candidate supply and a decline in qualified candidates.

Approximately 82 percent of Company Employees at December 31, 2021, were represented by labor unions. The Railway Labor Act establishes the right of airline employees to organize and bargain collectively. Under the

Railway Labor Act, collective-bargaining agreements between an airline and a labor union generally do not expire, but instead become amendable as of an agreed date. By the amendable date, if either party wishes to modify the terms of the agreement, it must notify the other party in the manner required by the Railway Labor Act and/or described in the agreement. After receipt of the notice, the parties must meet for direct negotiations. If no agreement is reached, either party may request the National Mediation Board to appoint a federal mediator. If no agreement is reached in mediation, the National Mediation Board may determine an impasse exists and offer binding arbitration to the parties. If either party rejects binding arbitration, a 30-day "cooling off" period begins. At the end of this 30-day period, the parties may engage in "self-help," unless a Presidential Emergency Board is established to investigate and report on the dispute. The appointment of a Presidential Emergency Board maintains the "status quo" for an additional period of time. If the parties do not reach agreement during this period, the parties may then engage in "self-help." "Self-help" includes, among other things, a strike by the union or the airline's imposition of any or all of its proposed amendments and the hiring of new employees to replace any striking workers.

The following table sets forth the Company's Employee groups subject to collective bargaining and the status of their respective collective-bargaining agreements as of December 31, 2021:

| Employee Group | Approximate Number of Employees | Representatives | Status of Agreement |
|---|---|---|---|
| Southwest Pilots | 8,300 | Southwest Airlines Pilots' Association ("SWAPA") | In negotiations |
| Southwest Flight Attendants | 14,600 | Transportation Workers of America, AFL-CIO, Local 556 ("TWU 556") | In negotiations |
| Southwest Ramp, Operations, Provisioning, Freight Agents | 12,600 | Transportation Workers of America, AFL-CIO, Local 555 ("TWU 555") | In negotiations |
| Southwest Customer Service Agents, Customer Representatives, and Source of Support Representatives | 6,100 | International Association of Machinists and Aerospace Workers, AFL-CIO ("IAM 142") | In negotiations |
| Southwest Material Specialists (formerly known as Stock Clerks) | 320 | International Brotherhood of Teamsters, Local 19 ("IBT 19") | Amendable April 2024 |
| Southwest Mechanics | 2,600 | Aircraft Mechanics Fraternal Association ("AMFA") | Amendable August 2024 |
| Southwest Aircraft Appearance Technicians | 170 | AMFA | In negotiations |
| Southwest Facilities Maintenance Technicians | 40 | AMFA | Amendable November 2022 |
| Southwest Dispatchers | 400 | Transportation Workers of America, AFL-CIO, Local 550 ("TWU 550") | In negotiations |
| Southwest Flight Simulator Technicians | 50 | International Brotherhood of Teamsters ("IBT") | Amendable May 2024 |
| Southwest Flight Crew Training Instructors | 130 | Transportation Workers of America, AFL-CIO, Local 557 ("TWU 557") | Amendable January 2022. In negotiations |
| Southwest Meteorologists | 10 | TWU 550 | In negotiations |

## Human Capital Resources

### *General*

The Company's approach to human capital is a critical strategy with priorities that include, among others: (i) attracting, developing, and retaining a diverse and talented workforce; (ii) providing opportunities for learning, development, career growth, and movement within the Company; (iii) evaluating compensation and benefits, and rewarding performance; (iv) investing in physical, emotional, and financial health of Employees; (v) obtaining

25

Employee feedback; (vi) maintaining and enhancing Company culture; and (vii) communicating with the Board of Directors on a routine basis on key topics, including executive succession planning.

The Company has implemented many programs designed to achieve these priorities, including strong Employee training and benefits programs. The Company's vast Employee training and development opportunities address, among other things, leadership development; diversity, equity, and inclusion; communication skills; and human trafficking awareness. The Company rewards Employees with competitive compensation and benefits packages, including attractive medical plans, a 401(k) plan with a dollar-for-dollar match for Employees other than Pilots (subject to vesting requirements and certain compensation limits), a 401(k) plan with a non-elective contribution of 15 percent for Pilots, and a profit sharing plan.

The Company regularly conducts Employee surveys to assess job satisfaction of its Employees, and uses information from the surveys to improve the Company's ability to attract, develop, and retain talented Employees who will help advance the Company. For many years, the bonus opportunity for the Company's senior leadership group, including its executive officers, has been tied to the Company's performance relative to multiple pre-established performance metrics, which have from time to time included the Company's voluntary turnover rate for Employees. In addition to bonus opportunities for the Company's senior leadership group, the Company has implemented performance-based compensation programs for other non-contract employee leaders, including managers, supervisors, team leads, and certain other Employees.

### Diversity, Equity, and Inclusion

Diversity, equity, and inclusion ("DEI") is also an integral part of the Company's culture and processes that support recruitment, hiring, training, retention, and advancement. In an effort to advance the Company's commitment to DEI, the Company has established the following goals:

- Evolve hiring and development practices to support diversity goals, including posting all open Leadership positions (Supervisor to Vice President) and requiring diverse candidate slates for each role;
- Measure progress in increasing diversity in Senior Leadership;
- Double the percentage of racial diversity and increase gender diversity in the Company's Senior Management Committee by 2025; and
- Engaging the Company's breadth of community partners to leverage relationships in sourcing diverse talent.

Additionally, the Company's Board of Directors has committed to increasing its diverse representation by 2025. The Company has a dedicated DEI Department that provides regular updates to the Compensation Committee of the Company's Board of Directors. To continue the Company's commitment to inclusion, the DEI Department has launched a multi-year training plan to increase the cultural competency of the Company's workforce.

During 2021, the Company took tangible steps to update the required infrastructure, processes, and practices to meet these objectives. The DEI Department formed an Executive Steering Committee to support the strategic direction of this progress. In addition, the Company evolved its talent acquisition processes by requiring diverse candidate pools, inclusion training for all hiring Leaders, and the creation of a Diversity Recruiting Center of Excellence. The Company also works with community partners in support of its efforts to continue developing diverse and inclusive talent pipelines and expanding recruiting efforts. The Company also recently launched a formal Sponsorship and Mentorship Program. In addition to current initiatives, the DEI Department has established a five-year enterprise strategic plan to continue advancing DEI efforts throughout the organization. The Company's motivation is to be a healthy organization where Employees thrive, feel appreciated, valued, and have an authentic sense of belonging.

**Additional Information About the Company**

The Company was incorporated in Texas in 1967. The following documents are available free of charge through the Company's website, www.southwest.com: the Company's annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and any amendments to those reports that are filed with or furnished to the Securities and Exchange Commission ("SEC") pursuant to Sections 13(a) or 15(d) of the Securities Exchange Act of 1934. These materials are made available through the Company's website as soon as reasonably practicable after

26

they are electronically filed with, or furnished to, the SEC. In addition to its reports filed or furnished with the SEC, the Company publicly discloses material information from time to time in its press releases, at annual meetings of Shareholders, in publicly accessible conferences and Investor presentations, and through its website (principally in its Press Room and Investor Relations pages). References to the Company's website in this Form 10-K are provided as a convenience and do not constitute, and should not be deemed, an incorporation by reference of the information contained on, or available through, the website, and such information should not be considered part of this Form 10-K.

27

## DISCLOSURE REGARDING FORWARD-LOOKING INFORMATION

This Form 10-K contains "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Forward-looking statements are based on, and include statements about, the Company's estimates, expectations, beliefs, intentions, and strategies for the future, and the assumptions underlying these forward-looking statements. Specific forward-looking statements can be identified by the fact that they do not relate strictly to historical or current facts and include, without limitation, words such as "anticipates," "believes," "estimates," "expects," "intends," "may," "will," "would," "could," "plans," "goal," and similar expressions. Although management believes these forward-looking statements are reasonable as and when made, forward-looking statements are not guarantees of future performance and involve risks and uncertainties that are difficult to predict. Therefore, actual results may differ materially from what is expressed in or indicated by the Company's forward-looking statements or from historical experience or the Company's present expectations. Known material risk factors that could cause these differences are set forth below under "Risk Factors." Additional risks or uncertainties (i) that are not currently known to the Company, (ii) that the Company currently deems to be immaterial, or (iii) that could apply to any company, could also materially adversely affect the Company's business, financial condition, or future results.

Caution should be taken not to place undue reliance on the Company's forward-looking statements, which represent the Company's views only as of the date this Form 10-K is filed. The Company undertakes no obligation to update publicly or revise any forward-looking statement, whether as a result of new information, future events, or otherwise.

### Item 1A.    *Risk Factors*

#### COVID-19 Risks

*The COVID-19 pandemic, including associated variants, has materially and adversely affected, and could continue to materially and adversely affect, the Company's results of operations, financial position, and liquidity.*

The COVID-19 pandemic, including associated variants, has materially and adversely affected passenger demand and bookings for both business and leisure travel, thereby materially and adversely affecting operating income and cash flows from operations. The extent of the continued impact of the COVID-19 pandemic on the Company's business and its financial and operational performance will depend on future developments, including (i) the duration, spread, severity, or any recurrence of the COVID-19 pandemic, including through any new variant strains of the underlying virus; (ii) the effectiveness, availability, and usage of vaccines; (iii) the duration and scope of governmental orders and restrictions related to the COVID-19 pandemic; (iv) the extent of the impact of the COVID-19 pandemic on overall demand for air travel and the Company's related business plans and decisions; (v) the impact of the COVID-19 pandemic on the Company's ability to retain Employees; and (vi) the impact of the COVID-19 pandemic on the Company's access to capital, all of which are highly uncertain and cannot be predicted.

The COVID-19 pandemic has caused public health officials to recommend precautions to mitigate the spread of the virus. Since the onset of the COVID-19 pandemic, federal, state, and local authorities have at various times instituted measures such as imposing testing and self-quarantine requirements, issuing directives forcing businesses to reduce operations or temporarily close, restricting international air travel, and issuing shelter-in-place and similar orders limiting the movement of individuals. Additionally, businesses have restricted non-essential travel for their employees. Such measures have depressed demand for air travel, disrupted the Company's operations, and materially adversely affected the Company's business. The Company will continue to be adversely affected if businesses continue to restrict travel for their employees.

Moreover, the ability to attract and retain passengers depends, in part, upon the perception and reputation of the Company and the public's concerns regarding the health and safety of travel generally, especially regarding airline travel. Actual or perceived risk of infection on Company flights could have a material adverse effect on the public's

28

comfort with air travel, which could harm the Company's reputation and business. The Company expects it will continue to incur COVID-19 related costs as it continues to take other actions to limit infection among its Employees and passengers. In addition, the industry may be subject to further health and hygiene requirements designed to counteract future outbreaks, which requirements may be costly and take a significant amount of time to implement.

The COVID-19 pandemic may also materially and adversely affect the Company's supply chain. For example, the Company is dependent on Boeing as its sole supplier for many of its aircraft parts. The Company is also dependent on (i) sole or limited suppliers for aircraft engines and certain other aircraft parts, equipment, and services; (ii) third party vendors; and (iii) service providers. The COVID-19 pandemic has resulted, and could continue to result, in delays and other performance issues, ceased operations, or even bankruptcies among these suppliers, third party vendors, and service providers. Further failures of suppliers, third party vendors, or service providers to timely provide adequate products or support for their products, or otherwise fulfill their commitments to the Company, could materially adversely affect the Company's operations.

The effects of the COVID-19 pandemic on the financial markets may materially and adversely affect the Company's access to capital and cost of capital, including its ability to raise funds through equity or debt financings. For example, as a result of the economic effects of the COVID-19 pandemic, in the first half of 2020, Moody's, S&P Global, and Fitch downgraded the Company's senior unsecured debt ratings and issuer ratings. If the Company's credit ratings were to be further downgraded, or general market conditions were to ascribe higher risk to the Company's rating levels, the airline industry, or the Company, the Company's access to capital and the cost of any debt financing would be negatively affected. The terms of future debt agreements could include more restrictive covenants or require incremental collateral, which could further restrict the Company's business operations. There is no guarantee that debt or equity financings will be available in the future to fund the Company's obligations, or that they will be available on terms consistent with the Company's expectations.

Even once the pandemic and fears of travel subside, demand for air travel may remain weak for a significant period of time. In particular, consumer behavior related to traveling may be negatively impacted by adverse changes in business travel patterns or adverse changes in the perceived or actual economic climate, including declines in income levels and/or loss of wealth resulting from the impact of the COVID-19 pandemic. The COVID-19 pandemic continues to evolve. The ultimate impact of the COVID-19 pandemic is highly uncertain and subject to change.

*In response to the COVID-19 pandemic, federal, state, and local agencies have issued laws, regulations, and orders relating to health and occupational safety. Laws, regulations, orders, or other government actions requiring that employees be vaccinated could materially adversely affect the Company's operations.*

In September 2021, the President of the United States issued an Executive Order establishing a vaccination requirement for employees of covered federal contractors. The federal government required that federal contractors have their workforce vaccinated (or request an accommodation) by December 8, 2021. The deadline was later extended to January 4, 2022. The Company started an active campaign to notify Employees of the need to submit proof of COVID-19 vaccination, or apply for an accommodation, by January 4, 2022. On December 3, 2021, the company announced that 93 percent of its Employees were vaccinated, or had requested an accommodation. Due to legal challenges to the vaccine mandate, the Company announced on December 20, 2021, that it is no longer targeting a January 4, 2022, deadline for compliance. However, if the vaccine mandate is revived, the Company expects to resume efforts to work with Employees who have not yet either submitted proof of vaccination or requested an accommodation.

The extent to which the Company's Employees choose not to get vaccinated or do not qualify for an accommodation could result in a negative impact to the Company's operations. Furthermore, the Company's ability to effectively hire and retain new Employees could be negatively impacted if potential candidates are unable or unwilling to comply with the vaccination requirement. Federal agencies employing personnel critical to the Company's operations, such as air traffic control, security, and customs staffing, could be similarly impacted by the Executive

29

Order requiring the vaccination of federal employees. A reduction in the number of federal employees available to support the Company's operations could materially adversely affect the Company's operations.

The Company is also dependent on third party vendors and service providers to support its operations. To the extent third party vendors or service providers are subject to vaccination laws, regulations, orders, or other government actions and they or their employees are unable or unwilling to comply with applicable requirements, the Company's arrangements with those vendors or providers could be adversely impacted, the Company might not be able to maintain its arrangement with such parties, or at competitive terms, and the Company's operations could be materially adversely affected.

***The Company has entered into agreements with Treasury with respect to funding support; pursuant to these agreements the Company has agreed to certain restrictions on how it operates its business and uses its cash, which could limit the ability of the Company to take actions that it otherwise might have determined were in the best interests of the Company and its Shareholders.***

Since the start of the pandemic, the Company entered into definitive documentation with Treasury with respect to Payroll Support pursuant to three separate Payroll Support programs: the "PSP1 Payroll Support Program" in April 2020 under the Coronavirus Aid, Relief, and Economic Security Act; the "PSP2 Payroll Support Program" in January 2021 under the Consolidated Appropriations Act, 2021; and the "PSP3 Payroll Support Program" in April 2021 under the American Rescue Plan Act of 2021. Pursuant to these agreements, the Company has agreed to certain ongoing restrictions on, and requirements with respect to, its business and operations, including the following:

- The Company is prohibited from repurchasing its common stock and from paying dividends or making capital contributions with respect to its common stock through September 30, 2022;
- The Company must place certain restrictions on certain higher-paid employee and executive pay, including limiting pay increases and severance pay or other benefits upon terminations, until April 1, 2023; and
- The Company must maintain certain internal controls and records relating to the Payroll Support funds, and is subject to additional reporting requirements.

These restrictions and requirements may necessitate that the Company take, or limit taking, actions it might otherwise believe to be in the best interests of the Company and its Shareholders. For example, the restrictions could require that the Company change certain of its business practices, risk the Company's ability to retain key personnel, and expose the Company to additional costs (including increased compliance costs).

**Financial Risks**

***The airline industry is particularly sensitive to changes in economic conditions; in the event of continued or future unfavorable economic conditions or economic uncertainty, the Company's results of operations could be further negatively affected, which could require the Company to further adjust its business strategies.***

The airline industry, which is subject to relatively high fixed costs and highly variable and unpredictable demand, is particularly sensitive to changes in economic conditions. Historically, unfavorable U.S. economic conditions have driven changes in travel patterns and have resulted in reduced spending for both leisure and business travel. For some consumers, leisure travel is a discretionary expense, and short-haul travelers, in particular, have the option to replace air travel with surface travel. As has become particularly evident as a result of the COVID-19 pandemic, businesses and other travelers are able to forego air travel by using communication alternatives such as videoconferencing, business communication platforms, and the Internet. In addition, to the extent businesses continue to permit air travel during the COVID-19 pandemic, they are more likely to require the purchase of less expensive tickets to reduce costs. This, in turn, can result in a decrease in average revenue per seat. Also, as has become particularly evident as a result of the COVID-19 pandemic, unfavorable economic conditions, when low fares are often used to stimulate traffic, hamper the ability of airlines to raise fares to counteract any increases in

30

fuel, labor, and other costs. Any continuing or future U.S. or global economic uncertainty could further negatively affect the Company's results of operations and could cause the Company to further adjust its business strategies. Additionally, because expenses of a flight do not vary significantly with the number of passengers carried, a relatively small change in the number of passengers can have a disproportionate effect on an airline's operating and financial results. Therefore, any general reduction in airline passenger traffic could adversely affect the Company's results of operations.

*The Company's business can be significantly impacted by high and/or volatile fuel prices, and the Company's operations are subject to disruption in the event of any delayed supply of fuel; therefore, the Company's strategic plans and future profitability are likely to be impacted by the Company's ability to effectively address fuel price increases and fuel price volatility and availability.*

Airlines are inherently dependent upon energy to operate, and jet fuel and oil represented approximately 23.5 percent of the Company's operating expenses for 2021. As discussed above under "Business - Cost Structure," Fuel and oil expense for 2021 increased significantly compared with 2020, primarily due to higher market jet fuel prices, and in part due to higher capacity in response to consumer demand. The cost of fuel can be extremely volatile and unpredictable, and even a small change in market fuel prices can significantly affect profitability. Furthermore, volatility in fuel prices can be due to many external factors that are beyond the Company's control. For example, fuel prices can be impacted by political, environmental, and economic factors, such as (i) dependency on foreign imports of crude oil and the potential for hostilities or other conflicts in oil producing areas; (ii) limitations and/or disruptions in domestic refining or pipeline capacity due to weather, natural disasters, or other factors; (iii) worldwide demand for fuel, particularly in developing countries, which can result in inflated energy prices; (iv) changes in U.S. governmental policies on fuel production, transportation, taxes, and marketing; and (v) changes in currency exchange rates.

The Company's ability to effectively mitigate the impact of fuel price increases could be limited by factors such as its historical low-fare reputation, the portion of its Customer base that purchases travel for leisure purposes, the competitive nature of the airline industry generally, and the risk that higher fares will drive a decrease in demand. The Company attempts to manage its risk associated with volatile jet fuel prices by utilizing over-the-counter fuel derivative instruments to hedge a portion of its future jet fuel purchases. However, energy prices can fluctuate significantly in a relatively short amount of time. Because the Company uses a variety of different derivative instruments at different price points, the Company is subject to the risk that the fuel derivatives it uses will not provide adequate protection against significant increases in fuel prices and in some cases could in fact result in hedging losses, which could result in the Company effectively paying higher than market prices for fuel, thus creating additional volatility in the Company's earnings.

In addition, the Company is subject to the risk that its fuel derivatives will no longer qualify for hedge accounting under applicable accounting standards, which can create additional earnings volatility. Adjustments in the Company's overall fuel hedging strategy, as well as the ability of the commodities used in fuel hedging to qualify for special hedge accounting, could continue to affect the Company's results of operations. In addition, there can be no assurance that the Company will be able to cost-effectively hedge against increases in fuel prices.

The Company's fuel hedging arrangements and the various potential impacts of hedge accounting on the Company's financial position, cash flows, and results of operations are discussed in more detail under "Management's Discussion and Analysis of Financial Condition and Results of Operations," "Quantitative and Qualitative Disclosures About Market Risk," and in Note 1 and Note 11 to the Consolidated Financial Statements.

The Company is also reliant upon the readily available supply and timely delivery of jet fuel to the airports that it serves. A disruption in that supply could present significant challenges to the Company's operations and could ultimately cause the cancellation of flights and/or the inability of the Company to provide service to a particular airport. The airline industry faces potential fuel shortages in 2022 due to pipeline shipping space constraints resulting from the shifting of allocations during the COVID-19 pandemic as well as a national shortage of interstate trucking capacity. The Company is working with aviation industry stakeholders to address these issues. However,

unless there is additional jet fuel distribution capacity, whether by pipeline and/or by truck, there could be temporary disruptions (e.g., flight cancellations or passenger lids) at one or more of the Company's airports in 2022, especially during peak travel periods.

***The Company's low-cost structure has historically been one of its primary competitive advantages, and many factors have affected and could continue to affect the Company's ability to control its costs.***

The Company's low-cost structure has historically been one of its primary competitive advantages, as it has enabled it to offer low fares, drive traffic volume, grow market share, and, prior to 2020, protect profits; however, as has been the case for the Company, the COVID-19 pandemic has forced the Company's competitors to implement significant cost reduction measures. Competitor cost reduction measures such as accelerated fleet retirements, capacity cuts, and network reductions, could have a negative impact on the Company's relative cost position.

Even before the pandemic, the Company's low-cost position had been challenged by the significant growth of "Ultra-Low Cost Carriers" ("ULCCs"), which in some cases have surpassed the Company's cost advantage with larger aircraft, increased seat density, and lower wages. ULCCs have further introduced "unbundled" service offerings which appeal to price-sensitive travelers through promotion to consumers of an extremely low relative base fare for a seat, while separately charging for related services and products. In response, most major U.S. airlines now offer expanded cabin segmentation fare products, such as "basic economy" and "premium economy" products. A basic economy product provides for a lower base fare to compete with a ULCC base fare, but may include significant additional restrictions on amenities such as seat assignments (including restrictions on group and family seating), order of boarding, checked baggage and use of overhead bin space, flight changes and refunds, and eligibility for upgrades. A "premium economy" fare targets consumers willing to pay a premium for certain amenities that were previously included in the carriers' base fare (e.g., more favorable seating locations in the main cabin). Also in response to competitive ULCC pricing, some carriers removed fare floors for certain routes, leading to a lower fare offering across the industry.

The Company's low-cost structure can also be negatively impacted by costs over which the Company has limited control. These include costs such as fuel, labor, airport, and regulatory compliance costs. Jet fuel and oil constituted approximately 23.5 percent of the Company's operating expenses during 2021, and the Company's ability to control the cost of fuel is subject to the external factors discussed in the fifth Risk Factor above.

Salaries, wages, and benefits constituted approximately 55.0 percent of the Company's operating expenses during 2021. The Company's ability to control labor costs is limited by the terms of its collective-bargaining agreements, and this limited control has negatively impacted the Company's low-cost position, in particular in the context of the Company's cost reduction efforts during the COVID-19 pandemic. As discussed further under "Management's Discussion and Analysis of Financial Condition and Results of Operations," the Company's unionized workforce, which makes up approximately 82 percent of its Employees, has had pay scale increases as a result of contractual rate increases, which has put pressure on the Company's labor costs. Additionally, as indicated above under "Business - Employees," the majority of Southwest's unionized Employee work groups, including its Pilots; Flight Attendants; Ramp, Operations, Provisioning, and Freight Agents; Customer Service Agents, Customer Representatives, and Source of Support Representatives; Aircraft Appearance Technicians; Dispatchers; Meteorologists; Facilities Maintenance Technicians; and Flight Instructors are in unions currently in negotiations for labor agreements or have labor agreements that become amendable in 2022, which could result in additional pressure on the Company's low-cost structure. Further, during 2021, in response to staffing challenges, the Company increased the minimum pay for certain of its workforce, and provided incentive pay in certain instances.

As discussed above under "Business - Regulation," the airline industry is heavily regulated, and the Company's regulatory compliance costs are subject to potentially significant increases from time to time based on actions by regulatory agencies that are out of the Company's control. Additionally, because of airport infrastructure updates and other factors, the Company has experienced increased space rental rates at various airports in its network. Further, the Company cannot control decisions by other airlines to reduce their capacity. When this occurs, as it has

at times during the pandemic, certain fixed airport costs are allocated among a fewer number of total flights, which can result in increased landing fees and other costs for the Company.

The Company is reliant upon third party vendors and service providers, and the Company's low-cost advantage is dependent in part on its ability to obtain and maintain commercially reasonable terms with those parties. Disruptions to capital markets, shortages of skilled personnel, supply chain disruptions, geopolitical developments, and/or adverse economic conditions could subject certain of the Company's third party vendors and service providers to significant financial pressures, which could lead to delays and other performance issues, ceased operations, or even bankruptcies among these third party vendors and service providers. If a third party vendor or service provider is unable to fulfill its commitments to the Company, the Company may be unable to replace that third party vendor or service provider in a short period of time, or at competitive terms, which could have a material adverse effect on the Company's results of operations.

As discussed above under "Business - Insurance," the Company carries insurance of types customary in the airline industry. Although the Company has been able to purchase aviation, property, liability, and professional insurance via the commercial insurance marketplace, available commercial insurance could be more expensive in the future and/or have material differences in coverage than insurance that has historically been provided and may not be adequate to protect against the Company's risk of loss from future events, including acts of terrorism. Further, available cyber-security insurance with regards to data protection and business interruption could be more expensive in the future and/or have material differences in coverage than insurance that has historically been provided and may not be adequate to protect the Company's risk of loss. With respect to any insurance claims, policy coverages and claims are subject to acceptance by the many insurers involved and may require arbitration and/or mediation to effectively settle the claims over prolonged periods of time. In addition, an accident or other incident involving Southwest aircraft could result in costs in excess of its related insurance coverage, which costs could be substantial. Any aircraft accident or other incident, even if fully insured, could also have a material adverse effect on the public's perception of the Company, which could harm its reputation and business.

As discussed below under "Management's Discussion and Analysis of Financial Condition and Results of Operations," the Company experienced significant unit cost pressure in 2020 and 2021 following the onset of the COVID-19 pandemic. Historically, except for changes in the price of fuel, changes in operating expenses for airlines have been largely driven by changes in capacity. However, the Company's operating expenses are largely fixed once flight schedules are published; and the Company experienced capacity lower than 2019 during 2020 and 2021 due to the COVID-19 pandemic, which has continued to pressure unit costs. During the COVID-19 pandemic, the Company has made schedule adjustments based on consumer demand, booking trends, and available crew resources. The continued impact of the COVID-19 pandemic, and the availability of crew resources, is expected to continue to require the Company to make additional schedule adjustments and could have a material adverse impact on the Company's results of operations.

### *The Company's results of operations could be adversely impacted if it is unable to effectively execute its strategic plans.*

The Company is reliant on the success of its revenue strategies and other strategic plans and initiatives to grow and to help offset increasing costs. The execution of the Company's strategic plans has been significantly negatively affected by the impacts of the COVID-19 pandemic, and the Company cannot predict the duration or scope of continued impacts from the pandemic. Nevertheless, the Company began to take actions in 2021 to add staffing and increase the starting wage rate for certain workgroups, manage its fleet and fleet order book, and better optimize its network in an effort to position itself to opportunistically recover and grow as the pandemic subsides. The timely and effective execution of the Company's strategies is dependent upon, among other factors, (i) the Company's ability to balance its network schedule and capacity with the availability and location of its crew resources; (ii) the Company's ability to effectively balance its investment of incremental operating expenses and capital expenditures related to its strategies against the need to effectively control costs; (iii) the Company's ability to timely and effectively implement, transition, and maintain related information technology systems and infrastructure; (iv) as discussed below, the Company's ability to maintain satisfactory relations with its Employees or its Employees'

33

representatives; and (v) the Company's dependence on third parties with respect to the execution of its strategic plans.

### *The airline industry is intensely competitive.*

As discussed in more detail above under "Business - Competition," the airline industry is intensely competitive. The Company's primary competitors include other major domestic airlines, as well as regional and new entrant airlines, surface transportation, and alternatives to transportation such as videoconferencing, business communication platforms, and the Internet. The Company's revenues are sensitive to the actions of other carriers with respect to pricing, routes, loyalty programs, scheduling, capacity, customer service, operational reliability, comfort and amenities, cost structure, aircraft fleet, strategic alliances, and code-sharing and similar activities.

### Information Technology Risks

*The Company is increasingly dependent on technology to operate its business and continues to implement substantial changes to its information systems; any failure, disruption, breach, or delay in implementation of the Company's information systems could materially adversely affect its operations.*

The Company is increasingly dependent on the use of complex technology and systems to run its ongoing operations and support its strategic objectives. These technologies and systems include, among others, the Company's website and reservation system; flight dispatch and tracking systems; flight simulators; check-in kiosks; aircraft maintenance, planning, and record keeping systems; telecommunications systems; flight planning and scheduling systems; crew scheduling systems; human resources systems; and financial planning, management, and accounting systems. The performance, reliability, and security of the Company's technology infrastructure and supporting systems are critical to the Company's operations and initiatives.

Implementation and integration of complex systems and technology present significant challenges in terms of costs, human resources, and development of effective internal controls. Implementation and integration require a balancing between the introduction of new capabilities and the managing of existing systems, and present the risk of operational or security inadequacy or interruption, which could materially affect the Company's ability to effectively operate its business and/or could negatively impact the Company's results of operations.

The Company is also reliant upon the performance of its third party vendors for timely and effective implementation and support of many of its technology initiatives and for maintaining adequate information security measures within the services and/or software they deliver. If any of the Company's significant technologies or automated systems were to cease functioning, or if its third party vendor service providers were to fail to adequately and timely provide technical support, system maintenance, security, or software upgrades for any of the Company's existing systems, the Company could experience service interruptions, delays, and loss of critical data, which could harm its operations, and result in financial losses and reputational damage.

In the ordinary course of business, the Company's systems will continue to require modification and refinements to address growth and changing business requirements. In addition, the Company's systems may require modification to enable the Company to comply with changing regulatory requirements. Modifications and refinements to the Company's systems have been and are expected to continue to be expensive to implement and can divert management's attention from other matters. In particular, during 2020, in connection with the Company's efforts to reduce capital and operating expenditures in response to the COVID-19 pandemic, the Company deferred a significant number of technology projects. In addition, the Company's operations could be adversely affected, or the Company could face imposition of regulatory penalties, if it were unable to timely or effectively modify its systems as necessary or appropriately balance the introduction of new capabilities with the management of existing systems.

The Company has experienced system interruptions and delays that have made its websites and operational systems unavailable or slow to respond, which has prevented the Company from efficiently processing Customer

34

transactions or providing services. Any future system interruptions or delays could reduce the Company's operating revenues and the attractiveness of its services, as well as increase the Company's costs.

The Company's technologies and systems and functions could be damaged or interrupted by catastrophic events beyond its control such as fires, floods, earthquakes, tornadoes and hurricanes, power loss, computer and telecommunications failures, acts of war or terrorism, computer viruses, security breaches, and similar events or disruptions. Any of these events could cause system interruptions, delays, and loss of critical data, and could prevent the Company from processing Customer transactions or providing services, which could make the Company's business and services less attractive and subject the Company to liability. Any of these events could damage the Company's reputation and be expensive to remedy.

***Developing and expanding data security and privacy requirements could increase the Company's operating costs, and any failure of the Company to maintain the security of certain Customer, Employee, and business-related information could result in damage to the Company's reputation and could be costly to remediate.***

The Company must receive information related to its Customers and Employees in order to run its business, and the Company's operations depend upon secure retention and the secure transmission of information over public networks, including information permitting cashless payments. This information is subject to the continually evolving risk of intrusion, tampering, and theft. Although the Company maintains systems to prevent or defend against these risks, these systems require ongoing monitoring and updating as technologies change, and security could be compromised, personal or confidential information could be misappropriated, or system disruptions could occur. In the ordinary course of its business, the Company also provides certain confidential, proprietary, and personal information to third parties. While the Company seeks to obtain assurances that these third parties will protect this information, there is a risk the security of data held by third parties could be breached. A compromise of the Company's security systems could adversely affect the Company's reputation and disrupt its operations and could also result in litigation against the Company or the imposition of penalties. In addition, it could be costly to remediate. Although the Company has not experienced cyber incidents that are individually, or in the aggregate, material, the Company has experienced cyber-attacks in the past, which have thus far been mitigated by preventative, detective, and responsive measures put in place by the Company.

In addition, in response to these types of threats, there has been heightened legislative and regulatory focus on data privacy and security in the United States and elsewhere. As a result, the Company must monitor a growing and fast-evolving set of legal requirements in this area. This regulatory environment is increasingly challenging and may present material obligations and risks to the Company's business, including significantly expanded compliance requirements, costs, and enforcement risks.

The Company has a dedicated cyber-security team and program that focuses on current and emerging data security matters. The Company continues to assess and invest in the growing needs of the cyber-security team through the allocation of skilled personnel, ongoing training, and support of the adoption and implementation of technologies coupled with cyber-security risk management frameworks.

During the majority of 2020, and continuing through 2021, the Company has offered the ability to work remotely to most of the Company's office and clerical Employees, including the vast majority of its Employees at the Company's headquarters campus. Maintaining a remote work force significantly increases the risk of cyber incidents and events, such as computer viruses and security breaches, due to increased targeted attacks, which have thus far been mitigated by preventative, detective, and responsive measures put in place by the Company.

The Company carries a cyber-security insurance policy with regards to data protection and business interruption associated with both security breaches from malicious parties and from certain system failures. However, available cyber-security insurance with regards to data protection and business interruption could be more expensive in the future and/or have material differences in coverage than insurance that has historically been provided and may not be adequate to protect the Company's risk of loss.

**Operational Risks**

***The Company is currently dependent on Boeing as the sole manufacturer of the Company's aircraft. Prolonged delays in the FAA issuing required certifications or approvals for the -7, or further regulatory actions by the FAA with respect to the MAX aircraft, could materially and adversely affect the Company's business plans, strategies, and results of operations.***

The Boeing 737 MAX aircraft are crucial to the Company's growth plans and fleet modernization initiatives. The Company's contractual delivery schedule for the -7 is dependent on the FAA issuing required certifications and approvals to Boeing and the Company. The FAA will ultimately determine the timing of the -7 certification and entry into service, and the Company therefore offers no assurances that current estimations and timelines are correct.

Boeing no longer manufactures versions of the 737 other than the 737 MAX family of aircraft. If the 737 MAX aircraft were to again become unavailable for the Company's flight operations, the Company's growth would be restricted unless and until it could procure and operate other types of aircraft from Boeing or another manufacturer, seller, or lessor, and the Company's operations would be materially adversely affected. In particular, if the Company's growth were to be dependent upon the introduction of a new aircraft make and model to the Company's fleet, the Company would need to, among other things, (i) develop and implement new maintenance, operating, and training programs; (ii) secure extensive regulatory approvals; and (iii) implement new technologies. The requirements associated with operating a new aircraft make and model could take an extended period of time to fulfill and would likely impose substantial costs on the Company. A shift away from a single fleet type could also add complexity to the Company's operations, present operational and compliance risks, and materially increase the Company's costs. Any of these events would have a material, adverse effect on the Company's business, operating results, and financial condition. The Company could also be materially adversely affected if the pricing or operational attributes of its aircraft were to become less competitive.

***The Company's business is labor intensive; therefore, the Company could be materially adversely affected in the event of conflict with its Employees or its Employees' representatives.***

The airline business is labor intensive, and for the year ended December 31, 2021, Salaries, wages, and benefits expense represented approximately 55.0 percent of the Company's operating expenses. As of December 31, 2021, approximately 82 percent of the Company's Employees were represented for collective bargaining purposes by labor unions, making the Company particularly exposed in the event of labor-related job actions. Employment-related matters (some of which relate to negotiated items) that have impacted the Company's results of operations include hiring/retention rates, attendance, pay rates, outsourcing, work rules, health care costs, and retirement benefits. The impact of the COVID-19 pandemic has heightened the Company's exposure and demonstrated the risk that the Company's results could be materially adversely affected in the event of conflicts with its Employees or its Employees' representatives.

***The Company's business is labor intensive; therefore, the Company would continue to be adversely affected if it were to continue to be unable to employ sufficient numbers of qualified Employees to maintain its operations.***

The Company's success depends on its ability to attract and retain skilled personnel. In connection with the drastic reduction in travel demand due to the pandemic, in 2020 the Company offered voluntary separation and extended time-off programs to Employees. As a result, as of December 31, 2021, the Company had a significantly smaller workforce than it did prior to the COVID-19 pandemic. This negatively impacted the Company's ability to staff appropriately when demand for leisure travel returned in 2021. At the same time, competition for skilled personnel became fierce, which along with COVID-19 decreases in Employees available to support the operations, led to operational challenges that have continued into 2022. In addition, the Company has been required to provide incentive pay and increase certain starting wage rates to address these challenges. Staffing-related challenges could continue to intensify and limit the Company's ability to optimally adjust capacity. The inability to recruit and retain

36

skilled personnel or the unexpected loss of key skilled personnel could continue to adversely affect the Company's operations.

*The Company is currently dependent on a single engine supplier, as well as single suppliers of certain other aircraft parts and equipment; therefore, the Company could be materially adversely affected (i) if it were unable to obtain timely or sufficient delivery of aircraft parts or equipment from Boeing or other suppliers or adequate maintenance or other support from any of these suppliers, or (ii) in the event of a mechanical or regulatory issue associated with the Company's aircraft parts or equipment.*

The Company is dependent on Boeing as its sole supplier for many of its aircraft parts. The Company is also dependent on sole or limited suppliers for aircraft engines and certain other aircraft parts, equipment, and services. If Boeing, or other suppliers, were unable or unwilling to timely provide adequate products or support for their products, or in the event of a mechanical or regulatory issue associated with engines or other parts, the Company's operations could be materially adversely affected. The Company could also be materially adversely affected if the pricing or operational attributes of its aircraft equipment were to become less competitive.

*The airline industry has faced on-going security concerns and related cost burdens; further threatened or actual terrorist attacks, or other hostilities, even if not made directly on the airline industry, could significantly harm the airline industry and the Company's operations.*

Terrorist attacks or other crimes and hostilities, actual and threatened, have from time to time materially adversely affected the demand for air travel and also have necessitated increased safety and security measures and related costs for the Company and the airline industry generally. Safety and security measures can create delays and inconveniences, which in turn can reduce the Company's competitiveness against surface transportation for short-haul routes and alternatives to transportation such as videoconferencing, business communication platforms, and the Internet. Additional terrorist attacks or other hostilities, even if not made directly on the airline industry, or the fear of such attacks or other hostilities (including elevated national threat warnings, government travel warnings to certain destinations, travel restrictions, or selective cancellation or redirection of flights due to terror threats) would likely have a further significant negative impact on the Company and the airline industry.

*The airline industry is affected by many conditions that are beyond its control, which can impact the Company's business strategies and results of operations.*

In addition to the unpredictable economic conditions and fuel costs discussed above, the Company, like the airline industry in general, is affected by conditions that are largely unforeseeable and outside of its control, including, among others:

- adverse weather and natural disasters;
- changes in consumer preferences, perceptions, spending patterns, or demographic trends (including, without limitation, changes in travel patterns due to government shutdowns or sequestration);
- actual or potential disruptions in the air traffic control system (including, for example, as a result of inadequate FAA staffing levels due to government shutdowns or sequestration);
- actual or perceived delays at various airports resulting from government shutdowns (including, for example, longer wait-times at TSA checkpoints due to inadequate TSA staffing levels);
- changes in the competitive environment due to industry consolidation, industry bankruptcies, and other factors;
- delays in deliveries of new aircraft (including, without limitation, due to delays in FAA certification or due to the closure of the FAA's aircraft registry during government shutdowns);
- outbreaks of disease such as the COVID-19 pandemic; and
- actual or threatened war, terrorist attacks, government travel warnings to certain destinations, travel restrictions, and political instability.

37

**Legal, Regulatory, Compliance, and Reputational Risks**

*The Company is subject to extensive FAA regulation that may necessitate modifications to the Company's operations, business plans, and strategies.*

The FAA promulgates and enforces regulations affecting the airline industry, and exercises extensive regulatory oversight of the Company's operations. The FAA from time to time also issues orders or directives relating to the maintenance and operation of aircraft. FAA orders and directives can be issued with little or no notice, and in certain instances, require the temporary grounding of aircraft and/or the responsive investment of operational and financial resources. The issuance of new FAA regulations, regulatory amendments, or orders or directives, such as FAA restrictions associated with certain wireless telecommunications systems, could result in flight schedule adjustments and groundings or delays in aircraft deliveries, as well as lower operating revenues, operating income, and net income due to a variety of factors, including, among others, (i) lost revenue due to flight cancellations and disruptions as a result of a smaller operating aircraft fleet, (ii) the lack of ability to make corresponding reductions in expenses because of the fixed nature of many expenses, and (iii) possible negative effects on Customer confidence and airline choice. Government regulation affecting the Company is discussed in more detail in the below risk factor and above under "Business - Regulation."

*Airport capacity constraints and air traffic control inefficiencies have limited and could continue to limit the Company's growth; changes in or additional governmental regulation could increase the Company's operating costs or otherwise limit the Company's ability to conduct business.*

Almost all commercial service airports are owned and/or operated by units of local or state governments. Airlines are largely dependent on these governmental entities to provide adequate airport facilities and capacity at an affordable cost. In order to operate efficiently, as well as to add service in current and new markets, the Company must be able to maintain and/or obtain space and facilities at desirable airports with adequate infrastructure. Airport space, facility, and infrastructure constraints may prevent the Company from maintaining existing service and/or implementing new service in a commercially viable manner.

Similarly, the federal government singularly controls all U.S. airspace, and airlines are dependent on the FAA controlling that airspace in a safe and efficient manner. The current air traffic control system is mainly radar-based, supported in large part by antiquated equipment and technologies, and heavily dependent on skilled personnel. As a result, the air traffic control system may not be able to effectively keep pace with future air traffic growth. The FAA's protracted transition to modernized air traffic control systems and newer technologies could adversely impact airspace capacity and the overall efficiency of the system, resulting in limited opportunities for the Company to grow, longer scheduled flight times, increased delays and cancellations, and increased fuel consumption and aircraft emissions. The continuation of these air traffic control constraints or the FAA's inability to meet staffing needs on a long-term basis may have a material adverse effect on the Company's operations.

As discussed above under "Business - Regulation," airlines are also subject to other extensive regulatory requirements. These requirements often impose substantial costs on airlines. The Company's strategic plans and results of operations could be negatively affected by changes in law and future actions taken by domestic and foreign governmental agencies having jurisdiction over its operations, including, but not limited to:

- increases in airport rates and charges;
- limitations on airport gate capacity or use of other airport facilities;
- limitations on route authorities;
- actions and decisions that create difficulties in obtaining access at slot-controlled airports (a "slot" is the right of an air carrier, pursuant to regulations of the FAA or local authorities, to operate a takeoff or landing at certain airports);
- actions and decisions that create difficulties in obtaining operating permits and approvals;
- changes to environmental regulations;

38

- new or increased taxes or fees, including with respect to potential increases to the federal corporate income tax rate or potential new taxes imposed on share repurchases;
- changes to laws that affect the services that can be offered by airlines in particular markets and at particular airports;
- restrictions on competitive practices;
- changes in laws that increase costs for safety, security, compliance, or other Customer Service standards;
- changes in laws that may limit the Company's ability to enter into fuel derivative contracts to hedge against increases in fuel prices;
- changes in laws that may limit or regulate the Company's ability to promote the Company's business or fares;
- airspace closures or restrictions, such as restrictions on operations in markets where certain wireless telecommunications systems may cause interference with certain aircraft avionics;
- grounding of commercial air traffic by the FAA; and
- the adoption of more restrictive locally-imposed noise regulations.

*The Company is subject to various environmental requirements and risks associated with climate change, including increased regulation, changing consumer preferences, and the potential increased impacts of severe weather events on the Company's operations and infrastructure.*

The Company is subject to federal, state, local, and international laws and regulations relating to the protection of the environment, including those relating to aircraft and ground-based emissions, discharges to water systems, safe drinking water, and the management of hazardous substances and waste materials. In addition, federal, state, local, and international legislative and regulatory bodies are increasingly focused on climate change and reducing greenhouse gas emissions ("GHG"), including $CO_2$ emissions. For example, as discussed in more detail under "Business – Regulation," the federal government, as well as several state and local governments, the governments of other countries, and the United Nations' International Civil Aviation Organization have implemented legislative and regulatory proposals and voluntary measures intended to reduce GHG emissions. Future policy, legal, regulatory, or other market developments could require the Company to reduce its emissions, modify its supply chain practices or aspects of its operations, make capital investments to purchase specific types of equipment or technologies, secure carbon offset credits, or otherwise incur additional costs related to climate objectives.

In addition to responding to legislative and regulatory requirements, the Company has voluntarily set environmental sustainability plans, targets, and goals, the achievement of which is materially dependent on the performance of third parties, in particular with respect to the production, transport, storage, and distribution of sustainable aviation fuel. Any non-performance by any such third parties, or any inability of the Company to timely and effectively implement and maintain the necessary processes to support the utilization of sustainable aviation fuel, could compromise the Company's ability to meet its environmental sustainability plans, targets and goals; increase the Company's costs associated with meeting such plans, targets, and goals; and/or have an adverse impact on the Company's reputation or brand. Furthermore, to the extent that the Company may seek to achieve its voluntary climate targets through the use of carbon offsets, it may be exposed to additional costs associated with the procurement of offsets or limited supply in the voluntary carbon offsets market.

In addition, concern among consumers of the impacts of climate change may mean some customers choose to fly less frequently or fly on an airline they perceive as operating in a manner that is more sustainable to the climate. Business customers may choose to use alternatives to travel, such as virtual meetings and workspaces. Greater development of high-speed rail in markets now served by short-haul flights could provide passengers with lower-carbon alternatives to flying. The Company's collateral to secure loans, including in the form of aircraft, could lose value as customer demand shifts and economies move to low-carbon alternatives, which may increase the Company's financing costs. In addition, major financial institutions have begun to announce greenhouse gas emissions reductions targets for their financed activities in the aviation sector. To the extent that the Company's climate targets are not perceived to align with those of its lenders, the Company's access to credit may be adversely impacted.

Finally, the potential acute and chronic physical effects of climate change, such as increased frequency and severity of storms, floods, fires, sea-level rise, excessive heat, longer-term changes in weather patterns, and other climate-related events, could affect the Company's operations, infrastructure, and financial results. Operational impacts, such as the canceling of flights, could result in loss of revenue. The Company could incur significant costs to improve the climate resiliency of its infrastructure and otherwise prepare for, respond to, and mitigate such physical effects of climate change. The Company is not able to predict accurately the materiality of any potential losses or costs associated with the physical effects of climate change.

*The Company's future results will suffer if it is unable to effectively manage its international operations and/or Extended Operations ("ETOPS").*

The Company's international flights are subject to CBP-mandated procedures, which can affect the Company's operations, costs, and Customer experience. The Company has made significant investments in facilities, equipment, and technologies at certain airports in order to improve the Customer experience and to assist CBP with its inspection and processing duties; however, the Company is not able to predict the impact, if any, that various CBP measures or the lack of CBP resources will have on Company revenues and costs, either in the short-term or the long-term.

International flying requires the Company to modify certain processes, as the airport environment is dramatically different in certain international locations with respect to, among other things, common-use ticket counters and gate areas, passenger entry requirements (including health requirements imposed in response to the COVID-19 pandemic), local operating requirements, and cultural preferences. Certain international routes served by the Company are also subject to specific aircraft equipage requirements and unique consumer behavior. Route-specific equipage requirements and unique consumer behavior, together or individually, may (i) restrict the Company's flexibility when scheduling and routing aircraft and crews; (ii) require the Company to modify its policies or procedures; and (iii) impact the Company's operational performance, costs, and Customer Experience. In addition, international flying exposes the Company to certain foreign currency risks to the extent the Company chooses to, or is required to, transact in currencies other than the U.S. dollar. To the extent the Company seeks to serve additional international destinations in the future, or to renew its authority to serve certain routes, it may be required to obtain necessary authority from the DOT and/or approvals from the FAA, as well as any applicable foreign government entity.

The Company's operations in non-U.S. jurisdictions may subject the Company to the laws of those jurisdictions rather than, or in addition to, U.S. laws. Laws in some jurisdictions differ in significant respects from those in the United States, and these differences can affect the Company's ability to react to changes in its business, and its rights or ability to enforce rights may be different than would be expected under U.S. laws. Furthermore, enforcement of laws in some jurisdictions can be inconsistent and unpredictable, which can affect both the Company's ability to enforce its rights and to undertake activities that it believes are beneficial to its business. As a result, the Company's ability to generate revenue and its expenses in non-U.S. jurisdictions may differ from what would be expected if U.S. laws governed these operations. Although the Company has policies and procedures in place that are designed to promote compliance with the laws of the jurisdictions in which it operates, a violation by the Company's Employees, contractors, or agents or other intermediaries could nonetheless occur. Any violation (or alleged or perceived violation), even if prohibited by the Company's policies, could have an adverse effect on the Company's reputation and/or its results of operations.

In 2019, the Company began service to Hawaii after receiving approval from the FAA for ETOPS, a regulatory requirement to operate between the U.S. mainland and the Hawaiian Islands. The Company is subject to additional, ongoing, ETOPS-specific regulatory and procedural requirements, which present operational and compliance risks to the Company's business, including costs associated therewith.

*The Company is currently subject to pending litigation, and if judgment were to be rendered against the Company in the litigation, such judgment could adversely affect the Company's operating results.*

40

As discussed below under "Legal Proceedings," the Company is subject to pending litigation. Regardless of merit, these litigation matters and any potential future claims against the Company may be both time consuming and disruptive to the Company's operations and cause significant expense and diversion of management attention. Should the Company fail to prevail in these or other matters, the Company may be faced with significant monetary damages or injunctive relief that could materially adversely affect its business and might materially affect its financial condition and operating results and could cause reputational harm.

*The Company's reputation and brand could be harmed if it were to experience significant negative publicity through social media or otherwise, including with respect to the Company's voluntary sustainability and ESG-related disclosures.*

The Company operates in a public-facing industry with significant exposure to social media. Negative publicity, whether or not justified, can spread rapidly through social media. The Company also makes certain disclosures regarding sustainability and certain ESG matters, including the Company's goals to achieve carbon neutrality and minimize carbon emissions, and many of these disclosures are necessarily based on (i) estimates and assumptions that are inherently difficult to assess and may involve third party data that the Company does not independently verify, and (ii) timelines that are longer than the timelines associated with the Company's required disclosures. Given the estimates, assumptions, and timelines used to create these disclosures, the materiality of these disclosures is inherently difficult to assess in advance, and given the uncertainty of the estimates and assumptions used to create these disclosures, the Company may not be able to anticipate in advance whether or the degree to which it will or will not be able to meet its sustainability and ESG-related plans, targets, or goals, or how expensive it will be to do so.

The Company's reputation or brand could be adversely impacted by, among other things, (i) any failure to meet its sustainability or ESG plans, targets, or goals, including those that relate to climate change; (ii) the Company's impact on the environment; (iii) public pressure from investors or policy groups to change the Company's policies; (iv) customer perceptions of the Company's advertising campaigns, sponsorship arrangements or marketing programs; (v) customer perceptions of the Company's use of social media; or (vi) customer perceptions of statements made by the Company, its Employees and executives, agents, or other third parties. In the future, the Company's efforts to meet its sustainability or ESG plans, targets, or goals may divert Company resources or management's attention from other matters.

To the extent that the Company is unable to respond timely and appropriately to negative publicity, the Company's reputation and brand can be harmed. Damage to the Company's overall reputation and brand could have a negative impact on its financial results and require additional resources for the Company to rebuild its reputation.

*The Company's Bylaws provide, to the fullest extent permitted by applicable law, that the United States District Court for the Northern District of Texas or, if such court lacks jurisdiction, the state district court of Dallas County, Texas, will be the exclusive forum for certain legal actions between the Company and its Shareholders, which could increase costs to bring a claim, discourage claims, or limit the ability of the Company's Shareholders to bring a claim in a judicial forum viewed by the Shareholders as more favorable for disputes with the Company or the Company's directors, officers, or other Employees.*

The Company's Bylaws provide, to the fullest extent permitted by law, that, unless the Company consents in writing to the selection of an alternative forum, the United States District Court for the Northern District of Texas or, if such court lacks jurisdiction, the state district court of Dallas County, Texas, will, to the fullest extent permitted by applicable law, be the sole and exclusive forum for (a) any derivative action or proceeding brought on behalf of the Company; (b) any action asserting a claim of breach of a fiduciary duty owed by any director, officer, or other Employee of the Company to the Company or the Company's Shareholders; (c) any action asserting a claim against the Company or any director, officer, or other Employee of the Company pursuant to any provision of the Company's Restated Certificate of Formation or Bylaws (as either may be amended from time to time) or the Texas

41

Table of Contents

Business Organizations Code; and (d) any action asserting a claim against the Company or any director, officer, or other Employee of the Company governed by the internal affairs doctrine.

The forum selection provision may increase costs to bring a claim, discourage claims, or limit a Shareholder's ability to bring a claim in a judicial forum that such Shareholder finds favorable for disputes with the Company or the Company's directors, officers, or other Employees, which may discourage such lawsuits against the Company or the Company's directors, officers, and other Employees. Alternatively, if a court were to find the forum selection provision contained in the Company's Bylaws to be inapplicable or unenforceable in an action, the Company could incur additional costs associated with resolving such action in other jurisdictions. The exclusive forum provision in the Bylaws will not preclude or contract the scope of exclusive federal or concurrent jurisdiction for actions brought under the federal securities laws including the Securities Exchange Act of 1934 or the Securities Act of 1933, or the respective rules and regulations promulgated thereunder.

**Item 1B.** *Unresolved Staff Comments*

None.

**Item 2.**    *Properties*

**Aircraft**

Southwest operated a total of 728 Boeing 737 aircraft as of December 31, 2021, of which 59 and 70 were under operating and finance leases, respectively. The following table details information on the 728 aircraft as of December 31, 2021:

| Type | Seats | Average Age (Yrs) | Number of Aircraft | Number Owned (a) | Number Leased (b) |
|---|---|---|---|---|---|
| 737-700 | 143 | 17 | 452 | 369 | 83 |
| 737-800 | 175 | 6 | 207 | 190 | 17 |
| 737 MAX 8 | 175 | 2 | 69 | 40 | 29 |
| Totals | | 13 | 728 | 599 | 129 |

(a) As discussed further in Note 7 to the Consolidated Financial Statements, 89 of the Company's aircraft were pledged as collateral as of December 31, 2021, for secured borrowings.

(b) During 2021, the Company had 7 leased Boeing 737-700 aircraft, for which the lease expired and the aircraft was subsequently purchased from the lessor, and thus the aircraft is now represented as owned.

The delivery schedule below reflects contractual commitments, although the timing of future deliveries is uncertain. The delivery schedule for the -7 is dependent on the FAA issuing required certifications and approvals to Boeing and the Company. The FAA will ultimately determine the timing of the -7 certification and entry into service, and the Company therefore offers no assurances that current estimations and timelines are correct. As of December 31, 2021, the Company had firm deliveries and options for Boeing 737 MAX 7 and 737 MAX 8 aircraft as follows:

| | The Boeing Company | | | |
|---|---|---|---|---|
| | -7 Firm Orders | -8 Firm Orders | -7 or -8 Options | Total |
| 2022 | 72 | — | 42 | 114 |
| 2023 | 52 | — | 38 | 90 |
| 2024 | 30 | — | 56 | 86 |
| 2025 | 30 | — | 56 | 86 |
| 2026 | 15 | 15 | 40 | 70 |
| 2027 | 15 | 15 | 6 | 36 |
| 2028 | 15 | 15 | — | 30 |
| 2029 | 20 | 30 | — | 50 |
| 2030 | 15 | 45 | — | 60 |
| 2031 | — | 10 | — | 10 |
| | 264 | 130 (a) | 238 (b) | 632 |

(a) The Company has flexibility to designate firm orders or options as -7s or -8s, upon written advance notification as stated in the contract.

(b) Subsequent to December 31, 2021, and through February 3, 2022, the Company has exercised 12 -8 options for delivery in 2022 and 12 -7 options for delivery in 2023.

**Ground Facilities and Services**

Southwest either leases or pays a usage fee for terminal passenger service facilities at each of the airports it serves, to which various leasehold improvements have been made. The Company leases the land and/or structures on a long-term basis for its aircraft maintenance centers (located at Dallas Love Field, Houston Hobby, Phoenix Sky Harbor, Chicago Midway, Hartsfield-Jackson Atlanta International Airport, and Orlando International Airport) and its main corporate headquarters building, also located near Dallas Love Field. The Company also leases a

warehouse and engine repair facility in Atlanta. The Company has announced its intent to build a new aircraft maintenance facility, scheduled to be completed in first quarter 2022, at Denver International Airport. The Company has also announced its intent to build a new aircraft maintenance facility, expected to be completed in 2025, at Baltimore-Washington International Airport.

The Company has commitments associated with various airport improvement projects, including construction at Los Angeles International Airport. These projects include the construction of new facilities and the rebuilding or modernization of existing facilities. Additional information regarding these projects is provided below under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and in Note 5 to the Consolidated Financial Statements.

The Company owns two additional headquarters buildings, located across the street from the Company's main headquarters building, on land owned by the Company including (a) an energy-efficient, modern building, called TOPS, which houses certain operational and training functions, including the Company's 24-hour operations and (b) the Wings Complex, consisting of a Leadership Education and Aircrew Development (LEAD) Center (housing the Company's 23 Boeing 737 flight simulators and classroom space for Pilot training), an additional office building, and a parking garage. Construction has been completed on an expansion of the LEAD Center, and the LEAD Center has overall space for a total of 26 Boeing 737 flight simulators.

As of December 31, 2021, the Company operated seven Customer Support and Services call centers. The centers located in Atlanta, San Antonio, Chicago, Albuquerque, and Oklahoma City occupy leased space. The Company owns its Houston and Phoenix centers.

The Company performs substantially all line maintenance on its aircraft and provides ground support services at most of the airports it serves. However, the Company has arrangements with certain aircraft maintenance providers for major component inspections and repairs for its airframes and engines, which comprise the majority of the Company's annual aircraft maintenance costs.

**Item 3.**    ***Legal Proceedings***

On June 30, 2015, the U.S. Department of Justice ("DOJ") issued a Civil Investigative Demand ("CID") to the Company. The CID sought information and documents about the Company's capacity from January 2010 to the date of the CID, including public statements and communications with third parties about capacity. In June 2015, the Company also received a letter from the Connecticut Attorney General requesting information about capacity. The Company is cooperating fully with the DOJ CID and the state inquiry.

Further, on July 1, 2015, a complaint was filed in the United States District Court for the Southern District of New York on behalf of putative classes of consumers alleging collusion among the Company, American Airlines, Delta Air Lines, and United Airlines to limit capacity and maintain higher fares in violation of Section 1 of the Sherman Act. Since then, a number of similar class action complaints were filed in the United States District Courts for the Central District of California, the Northern District of California, the District of Columbia, the Middle District of Florida, the Southern District of Florida, the Northern District of Georgia, the Northern District of Illinois, the Southern District of Indiana, the Eastern District of Louisiana, the District of Minnesota, the District of New Jersey, the Eastern District of New York, the Southern District of New York, the Middle District of North Carolina, the District of Oklahoma, the Eastern District of Pennsylvania, the Northern District of Texas, the District of Vermont, and the Eastern District of Wisconsin. On October 13, 2015, the Judicial Panel on Multi-District Litigation centralized the cases to the United States District Court in the District of Columbia. On March 25, 2016, the plaintiffs filed a Consolidated Amended Complaint in the consolidated cases alleging that the defendants conspired to restrict capacity from 2009 to present. The plaintiffs seek to bring their claims on behalf of a class of persons who purchased tickets for domestic airline travel on the defendants' airlines from July 1, 2011 to present. They seek treble damages, injunctive relief, and attorneys' fees and expenses. On May 11, 2016, the defendants moved to dismiss the Consolidated Amended Complaint, which the Court denied on October 28, 2016. On December 20,

Table of Contents

2017, the Company reached an agreement to settle these cases with a proposed class of all persons who purchased domestic airline transportation services from July 1, 2011, to the date of the settlement. The Company agreed to pay $15 million and to provide certain cooperation with the plaintiffs as set forth in the settlement agreement. After notice was provided to the proposed settlement class and the Court held a fairness hearing, the Court issued an order granting final approval of the settlement on May 9, 2019. On June 10, 2019, certain objectors filed notices of appeal to the United States Court of Appeals for the District of Columbia Circuit, which the Court dismissed on July 9, 2021, for lack of jurisdiction because the district court's order approving the settlements was not a final appealable order. The case is continuing as to the remaining defendants. The Company denies all allegations of wrongdoing.

On July 11, 2019, a complaint alleging violations of federal and state laws and seeking certification as a class action was filed against Boeing and the Company in the United States District Court for the Eastern District of Texas in Sherman. The complaint alleges that Boeing and the Company colluded to conceal defects with the Boeing 737 MAX ("MAX") aircraft in violation of the Racketeer Influenced and Corrupt Organization Act ("RICO") and also asserts related state law claims based upon the same alleged facts. The complaint seeks damages on behalf of putative classes of customers who purchased tickets for air travel from either the Company or American Airlines between August 29, 2017, and March 13, 2019. The complaint generally seeks money damages, equitable monetary relief, injunctive relief, declaratory relief, and attorneys' fees and other costs. On September 13, 2019, the Company filed a motion to dismiss the complaint and to strike certain class allegations. Boeing also moved to dismiss. On February 14, 2020, the trial court issued a ruling that granted in part and denied in part the motions to dismiss the complaint. The trial court order, among other things: (i) dismissed without prejudice various state law claims that the plaintiffs abandoned in response to the motions, (ii) dismissed with prejudice the remaining state law claims, including fraud by concealment, fraud by misrepresentation, and negligent misrepresentation on the grounds that federal law preempts those claims, and (iii) found that plaintiffs lack Article III standing to pursue one of the plaintiffs' theories of RICO injury. The order denied the motion to dismiss with respect to two RICO claims premised upon a second theory of RICO injury and denied the motion to strike the class allegations at the pleadings stage. On September 3, 2021, the trial court issued an order under Rule 23(a) and 23(b)(3) certifying four classes of persons associated with ticket purchases for flights during the period of August 29, 2017, through March 13, 2019, comprised of (i) those who purchased tickets (without being reimbursed) for flights on Southwest Airlines during the class period, except for those whose flights were solely on routes where, at the time of the ticket purchase(s), a MAX plane was not scheduled for use (or actually used) and had not previously been used, (ii) those who reimbursed a Southwest Airlines ticket purchaser and thus bore the economic burden for a Southwest Airlines ticket for a flight meeting the preceding criteria set forth in (i) above, (iii) those who purchased tickets (without being reimbursed) for flights on American Airlines during the class period, except for those whose flights were solely on routes where, at the time of ticket purchase(s), a MAX plane was not scheduled for use (or actually used) and had not previously been used, and (iv) those who reimbursed an American Airlines ticket purchaser and thus bore the economic burden for an American Airlines ticket for a flight meeting the preceding criteria set forth in (iii) above. On September 17, 2021, the Company filed a petition for permission immediately to appeal the class certification ruling to the Fifth Circuit Court of Appeals. Boeing also filed such a petition. Plaintiffs filed their oppositions to the petitions on September 27, 2021. On September 30, 2021, the Fifth Circuit Court of Appeals granted the Company (and Boeing) permission to appeal the class certification ruling. On December 22, 2021, in response to a motion to stay the trial court proceedings filed by the Company and Boeing, the Fifth Circuit stayed all proceedings, including the pursuit of any discovery, in the trial court pending disposition of the class certification appeal by the Fifth Circuit. The Company intends to strenuously pursue the appeal. On January 7, 2022, the Company and Boeing each filed briefs in support of the appeal. The plaintiffs have a deadline of March 9, 2022, to file response briefs. The Company further denies all allegations of wrongdoing, including those in the complaint that were not originally dismissed. The Company believes the plaintiffs' positions are without merit and intends to vigorously defend itself in all respects.

On February 19, 2020, a complaint alleging violations of federal securities laws and seeking certification as a class action was filed against the Company and certain of its officers in the United States District Court for the Northern District of Texas in Dallas. A lead plaintiff has been appointed in the case, and an amended complaint was filed on July 2, 2020. The amended complaint seeks damages on behalf of a putative class of persons who purchased the Company's common stock between February 7, 2017, and January 29, 2020. The amended complaint asserts claims

45

under Sections 10(b) and 20 of the Securities Exchange Act and alleges that the Company made material misstatements to investors regarding the Company's safety and maintenance practices and its compliance with federal regulations and requirements. The amended complaint generally seeks money damages, pre-judgment and post-judgment interest, and attorneys' fees and other costs. On August 17, 2020, the Company and the individual defendants filed a motion to dismiss. On October 1, 2020, the lead plaintiff filed a response in opposition to the motion to dismiss. The Company filed a reply on or about October 21, 2020, such that the motion is now fully briefed, although the parties have each supplemented their prior briefing with regard to more recent case holdings in other matters. The Company denies all allegations of wrongdoing, including those in the amended complaint. The Company believes the plaintiffs' positions are without merit and intends to vigorously defend itself.

On June 22, 2020, a derivative action for breach of fiduciary duty was filed in the United States District Court for the Northern District of Texas naming the members of the Company's Board of Directors as defendants and the Company as a nominal defendant (the "Derivative Action"). The plaintiff alleges unspecified damage to Company's reputation, goodwill, and standing in the community, as well as damage from exposure to civil and regulatory liability and defense costs. According to the lawsuit, these damages arise from the Company's alleged failure to comply with safety and record maintenance regulations and false statements in public filings regarding the Company's safety practices. The plaintiff alleges the Board, in the absence of good faith, exhibited reckless disregard for its duties of oversight. On October 7, 2020, the Court entered an order staying and administratively closing the Derivative Action. The plaintiff in the Derivative Action shall have the right to reopen the action following the resolution of the Company's motion to dismiss in the ongoing litigation brought under the federal securities laws or upon the occurrence of certain other conditions. The Board and Company deny all allegations of wrongdoing made in the Derivative Action.

On August 26, 2021, a complaint alleging breach of contract and seeking certification as a class action was filed against the Company in the United States District Court for the Western District of Texas in Waco. The complaint alleges that the Company breached its Contract of Carriage and other alleged agreements in connection with its use of the allegedly defective 737 MAX aircraft manufactured by The Boeing Company. The complaint seeks damages on behalf of putative classes of customers who provided valuable consideration, whether in money or other form (e.g., voucher, miles/points, etc.), in exchange for a ticket for air transportation with the Company, which transportation took place between August 29, 2017, and March 13, 2019. The complaint generally seeks money damages, declaratory relief, and attorneys' fees and other costs. On October 27, 2021, the Company filed a multi-faceted motion challenging the complaint, including seeking a stay or transfer of the case based upon prior pending litigation, dismissal of the Complaint based upon lack of subject matter jurisdiction, improper venue, and failure to state a claim, and seeking to have the complaint's class contentions stricken. That motion was fully briefed by both parties as of December 22, 2021, and is now awaiting determination by the court. The Company denies all allegations of wrongdoing and believes the plaintiffs' positions are without merit and intends to vigorously defend itself in all respects.

The Company is from time to time subject to various legal proceedings and claims arising in the ordinary course of business, including, but not limited to, examinations by the Internal Revenue Service.

The Company's management does not expect that the outcome in any of its currently ongoing legal proceedings or the outcome of any proposed adjustments presented to date by the Internal Revenue Service, individually or collectively, will have a material adverse effect on the Company's financial condition, results of operations, or cash flow.

**Item 4.    *Mine Safety Disclosures***

Not applicable.

46

**INFORMATION ABOUT OUR EXECUTIVE OFFICERS**

The following information regarding the Company's executive officers is as of February 3, 2022.

| Name | Position | Age |
|---|---|---|
| Gary C. Kelly | Executive Chairman of the Board | 66 |
| Robert E. Jordan | Chief Executive Officer | 61 |
| Michael G. Van de Ven | President & Chief Operating Officer | 60 |
| Tammy Romo | Executive Vice President & Chief Financial Officer | 59 |
| Linda B. Rutherford | Executive Vice President People & Communications | 55 |
| Mark R. Shaw | Executive Vice President & Chief Legal & Regulatory Officer | 59 |
| Andrew M. Watterson | Executive Vice President & Chief Commercial Officer | 55 |

Set forth below is a description of the background of each of the Company's executive officers.

*Gary C. Kelly* has served as the Company's Executive Chairman of the Board since February 2022 and has served as the Company's Chairman of the Board since May 2008. Mr. Kelly also served as Chief Executive Officer from July 2004 to February 2022, President from July 2008 to January 2017, Executive Vice President & Chief Financial Officer from June 2001 to July 2004, and Vice President Finance & Chief Financial Officer from 1989 to 2001. Mr. Kelly joined the Company in 1986 as its Controller.

*Robert E. Jordan* has served as the Company's Chief Executive Officer since February 2022 and has been a member of the Company's Board of Directors since February 2022. Mr. Jordan also served as Executive Vice President & Incoming Chief Executive Officer from June 2021 to February 2022, Executive Vice President Corporate Services from July 2017 to June 2021, Executive Vice President & Chief Commercial Officer from September 2011 to July 2017, Executive Vice President Strategy & Planning from May 2008 to September 2011, Executive Vice President Strategy & Technology from September 2006 to May 2008, Senior Vice President Enterprise Spend Management from August 2004 to September 2006, Vice President Technology from 2002 to 2004, Vice President Purchasing from 2001 to 2002, Controller from 1997 to 2001, Director Revenue Accounting from 1994 to 1997, and Manager Sales Accounting from 1990 to 1994. Mr. Jordan joined the Company in 1988 as a programmer.

*Michael G. Van de Ven* has served as the Company's President since September 2021 and as its Chief Operating Officer since May 2008. Mr. Van de Ven also served as Executive Vice President & Chief Operating Officer from May 2008 to January 2017, Chief of Operations from September 2006 to May 2008, Executive Vice President Aircraft Operations from November 2005 through August 2006, Senior Vice President Planning from August 2004 to November 2005, Vice President Financial Planning & Analysis from 2001 to 2004, Senior Director Financial Planning & Analysis from 2000 to 2001, and Director Financial Planning & Analysis from 1997 to 2000. Mr. Van de Ven joined the Company in 1993 as its Director Internal Audit.

*Tammy Romo* has served as the Company's Executive Vice President & Chief Financial Officer since July 2015. Ms. Romo also served as Senior Vice President Finance & Chief Financial Officer from September 2012 to July 2015, Senior Vice President of Planning from February 2010 to September 2012, Vice President of Financial Planning from September 2008 to February 2010, Vice President Controller from February 2006 to August 2008, Vice President Treasurer from September 2004 to February 2006, Senior Director of Investor Relations from March 2002 to September 2004, Director of Investor Relations from December 1994 to March 2002, Manager of Investor Relations from September 1994 to December 1994, and Manager of Financial Reporting from September 1991 to September 1994.

*Linda B. Rutherford* has served as the Company's Executive Vice President People & Communications since June 2021. Ms. Rutherford also served as Senior Vice President & Chief Communications Officer from October 2017 to June 2021, Vice President & Chief Communications Officer from January 2016 to October 2017, Vice President Communications & Strategic Outreach from April 2007 to January 2016, Vice President Public Relations & Community Affairs from December 2005 to April 2007, Director Public Relations from May 2001 to December

Table of Contents

2005, Senior Manager Public Relations from February 1999 to May 2001, and Manager Public Relations from February 1997 to February 1999. Ms. Rutherford joined the Company in 1992 as a Public Relations Coordinator.

*Mark R. Shaw* has served as the Company's Executive Vice President & Chief Legal & Regulatory Officer since November 2018. Mr. Shaw also served as Executive Vice President, Chief Legal & Regulatory Officer, & Corporate Secretary from August 2018 to November 2018, Senior Vice President, General Counsel, & Corporate Secretary from July 2015 to August 2018, Vice President, General Counsel, & Corporate Secretary from February 2013 to July 2015, and as Associate General Counsel - Corporate & Transactions from February 2008 to February 2013. Mr. Shaw joined the Company in 2000 as an Attorney in the General Counsel Department.

*Andrew M. Watterson* has served as the Company's Executive Vice President & Chief Commercial Officer since January 2020. Mr. Watterson also served as Executive Vice President & Chief Revenue Officer from July 2017 to January 2020, Senior Vice President & Chief Revenue Officer from January 2017 to July 2017, Senior Vice President of Network & Revenue from January 2016 to January 2017, and as Vice President of Network Planning & Performance from October 2013 to January 2016.

48

Table of Contents

**PART II**

**Item 5.**     *Market for Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities*

The Company's common stock is listed on the New York Stock Exchange ("NYSE") and is traded under the symbol "LUV." Although the Company has a history of declaring dividends on a quarterly basis, the Company has not paid a dividend since its 174th consecutive quarterly dividend which was declared and paid in first quarter 2020. Pursuant to the "PSP1 Payroll Support Program" under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), as supplemented by the "PSP2 Payroll Support Program" under the Consolidated Appropriations Act, 2021, and the "PSP3 Payroll Support Program" under the American Rescue Plan Act of 2021, the Company is prohibited from paying dividends with respect to its common stock through September 30, 2022. Following the expiration of these restrictions, the Company's Board of Directors will have sole discretion regarding the timing, amount, and payment of dividends on the basis of operational results, financial condition, cash requirements, future prospects, and other factors deemed relevant by the Board. As of February 2, 2022, there were approximately 11,553 holders of record of the Company's common stock.

49

**Stock Performance Graph**

*The following Performance Graph and related information shall not be deemed "soliciting material" or "filed" with the Securities and Exchange Commission, nor shall such information be incorporated by reference into any future filing under the Securities Act of 1933 or Securities Exchange Act of 1934.*

The following graph compares the cumulative total shareholder return on the Company's common stock over the five-year period ended December 31, 2021, with the cumulative total return during such period of the Standard and Poor's 500 Stock Index and the NYSE ARCA Airline Index. The comparison assumes $100 was invested on December 31, 2016, in the Company's common stock and in each of the foregoing indices and assumes reinvestment of dividends. The stock performance shown on the graph below represents historical stock performance and is not necessarily indicative of future stock price performance.

**COMPARISON OF FIVE YEAR CUMULATIVE TOTAL RETURN AMONG SOUTHWEST AIRLINES CO., S&P 500 INDEX, AND NYSE ARCA AIRLINE INDEX**



| | 12/31/2016 | 12/31/2017 | 12/31/2018 | 12/31/2019 | 12/31/2020 | 12/31/2021 |
|---|---|---|---|---|---|---|
| Southwest Airlines Co. | $ 100 | $ 132 | $ 95 | $ 112 | $ 97 | $ 89 |
| S&P 500 | $ 100 | $ 122 | $ 116 | $ 153 | $ 181 | $ 233 |
| NYSE ARCA Airline | $ 100 | $ 106 | $ 83 | $ 102 | $ 78 | $ 76 |

**Issuer Repurchases**

On May 15, 2019, the Company's Board of Directors authorized the repurchase of up to $2.0 billion of the Company's common stock. Subject to certain conditions, including restrictions on the Company pursuant to the PSP3 Payroll Support Program through September 30, 2022, repurchases may be made in accordance with applicable securities laws in open market or private, including accelerated, repurchase transactions from time to time, depending on market conditions. The Company has announced it has suspended further share repurchase activity until further notice. The Company has approximately $899 million remaining under its current share repurchase authorization.

51

**Item 7**.    *Management's Discussion and Analysis of Financial Condition and Results of Operations*

### YEAR IN REVIEW

In late February 2020, the Company began to see a negative impact from the COVID-19 pandemic, which quickly accelerated during first quarter 2020 and continued throughout 2021. While the pandemic has continued to negatively impact results, the Company saw steady improvement as the year progressed, with intermittent periods of decelerated demand that coincided with COVID-19 surges. The Company's financial results in both years, on both a GAAP and Non-GAAP basis, were significantly impacted by the pandemic and the resulting effect on demand and passenger bookings.

The Company recorded GAAP and non-GAAP results for 2021 and 2020 as noted in the following tables. See Note Regarding Use of Non-GAAP Financial Measures and the Reconciliation of Reported Amounts to Non-GAAP Financial Measures for additional detail regarding non-GAAP financial measures.

| (in millions, except per share amounts) | | Year ended December 31, | | | | | Percent Change |
|---|---|---|---|---|---|---|---|
| GAAP | | 2021 | | | 2020 | | |
| Operating income (loss) | $ | 1,721 | $ | | (3,816) | | n.m. |
| Net income (loss) | $ | 977 | $ | | (3,074) | | n.m. |
| Net income (loss) per share, diluted | $ | 1.61 | $ | | (5.44) | | n.m. |
| | | | | | | | |
| Non-GAAP | | | | | | | |
| Operating loss | $ | (1,281) | $ | | (5,032) | | (74.5) |
| Net loss | $ | (1,271) | $ | | (3,512) | | (63.8) |
| Net loss per share, diluted | $ | (2.15) | $ | | (6.22) | | (65.4) |

The significant improvement in both GAAP Net income (loss) and Operating income (loss), year-over-year, was primarily due to the rebound in domestic leisure demand and bookings in 2021 as impacts from the COVID-19 pandemic eased. This resulted in a 74.5 percent increase in Operating revenues in 2021 versus 2020, although 2021 Operating revenues were still well below 2019 levels. Further, the Company received $2.7 billion in grant allocations of payroll funding support ("Payroll Support") from the United States Department of Treasury ("Treasury") in 2021, compared with $2.3 billion received in 2020, which the Company utilized in both years to offset a portion of salaries, wages, and benefits. See below and Note 2 to the Consolidated Financial Statements for further information.

On a quarterly basis, demand for air travel improved each period of 2021. Although the Company's GAAP financial results benefited from the impact of Payroll Support recognized during the first three quarters of the year, the Company was able to generate a profit during fourth quarter 2021 despite having no further allocation of Payroll Support.

## Operating Statistics

The Company provides the operating data below for the three years ended December 31, 2021, because these statistics are commonly used in the airline industry and, therefore, allow readers to compare the Company's performance against its results for prior periods, as well as against the performance of the Company's peers.

| | | | Year ended December 31, | | | |
|---|---|---|---|---|---|---|
| | **2021** | **2020** | **2021 Change to 2020** | **2019** | **2020 Change to 2019** | **2021 Change to 2019**[l] |
| **Operating Data:** | | | | | | |
| Revenue passengers carried (000s) | 99,111 | 54,088 | 83.2 % | 134,056 | (59.7)% | (26.1)% |
| Enplaned passengers (000s) | 123,264 | 67,785 | 81.8 % | 162,681 | (58.3)% | (24.2)% |
| Revenue passenger miles (RPMs) (in millions)[a] | 103,562 | 54,221 | 91.0 % | 131,345 | (58.7)% | (21.2)% |
| Available seat miles (ASMs) (in millions)[b] | 132,006 | 103,456 | 27.6 % | 157,254 | (34.2)% | (16.1)% |
| Load factor[c] | 78.5 % | 52.4 % | 26.1 pts. | 83.5 % | (31.1) pts. | (5.0) pts. |
| Average length of passenger haul (miles) | 1,045 | 1,002 | 4.3 % | 980 | 2.2 % | 6.6 % |
| Average aircraft stage length (miles) | 790 | 743 | 6.3 % | 748 | (0.7)% | 5.6 % |
| Trips flown | 1,066,934 | 897,540 | 18.9 % | 1,367,727 | (34.4)% | (22.0)% |
| Seats flown (000s)[d] | 165,580 | 137,405 | 20.5 % | 206,390 | (33.4)% | (19.8)% |
| Seats per trip[e] | 155.2 | 153.1 | 1.4 % | 150.9 | 1.5 % | 2.8 % |
| Average passenger fare | $ 141.92 | $ 141.72 | 0.1 % | $ 154.98 | (8.6)% | (8.4)% |
| Passenger revenue yield per RPM (cents)[f] | 13.58 | 14.14 | (4.0)% | 15.82 | (10.6)% | (14.2)% |
| Operating revenues per ASM (cents)[g][j] | 11.96 | 8.75 | 36.7 % | 14.26 | (38.6)% | (16.1)% |
| Passenger revenue per ASM (cents)[h] | 10.66 | 7.41 | 43.9 % | 13.21 | (43.9)% | (19.3)% |
| Operating expenses per ASM (cents)[i] | 10.66 | 12.43 | (14.2)% | 12.38 | 0.4 % | (13.9)% |
| Operating expenses per ASM, excluding fuel (cents) | 8.15 | 10.65 | (23.5)% | 9.62 | 10.7 % | (15.3)% |
| Operating expenses per ASM, excluding fuel and profitsharing (cents) | 7.98 | 10.65 | (25.1)% | 9.19 | 15.9 % | (13.2)% |
| Fuel costs per gallon, including fuel tax | $ 1.98 | $ 1.45 | 36.6 % | $ 2.09 | (30.6)% | (5.3)% |
| Fuel costs per gallon, including fuel tax, economic | $ 2.01 | $ 1.49 | 34.9 % | $ 2.09 | (28.7)% | (3.8)% |
| Fuel consumed, in gallons (millions) | 1,668 | 1,273 | 31.0 % | 2,077 | (38.7)% | (19.7)% |
| Active fulltime equivalent Employees (j) | 55,093 | 56,537 | (2.6)% | 60,767 | (7.0)% | (9.3)% |
| Aircraft at end of period (k) | 728 | 718 | 1.4 % | 747 | (3.9)% | (2.5)% |

(a) A revenue passenger mile is one paying passenger flown one mile. Also referred to as "traffic," which is a measure of demand for a given period.

(b) An available seat mile is one seat (empty or full) flown one mile. Also referred to as "capacity," which is a measure of the space available to carry passengers in a given period.

(c) Revenue passenger miles divided by available seat miles.

(d) Seats flown is calculated using total number of seats available by aircraft type multiplied by the total trips flown by the same aircraft type during a particular period.

(e) Seats per trip is calculated by dividing seats flown by trips flown.

(f) Calculated as passenger revenue divided by revenue passenger miles. Also referred to as "yield," this is the average cost paid by a paying passenger to fly one mile, which is a measure of revenue production and fares.

(g) Calculated as operating revenues divided by available seat miles. Also referred to as "operating unit revenues" or "RASM," this is a measure of operating revenue production based on the total available seat miles flown during a particular period.

(h) Calculated as passenger revenue divided by available seat miles. Also referred to as "passenger unit revenues," this is a measure of passenger revenue production based on the total available seat miles flown during a particular period.

(i) Calculated as operating expenses divided by available seat miles. Also referred to as "unit costs" or "cost per available seat mile," this is the average cost to fly an aircraft seat (empty or full) one mile, which is a measure of cost efficiencies.

(j) Included less than 250 and 10,421 Employees participating in the Extended Emergency Time Off program as of December 31, 2021 and 2020, respectively. See Note 2 to the Consolidated Financial Statements for further information.

(k)  Included six Boeing 737 Next Generation aircraft in temporary storage and 60 in long-term storage as of December 31, 2021 and 2020, respectively. Also included 32 and 34 Boeing MAX 737 in long-term storage as of December 31, 2020 and 2019, respectively. See Note 17 to the Consolidated Financial Statements for further information.

(l)  The Company believes certain comparisons with 2019 are more relevant measures of performance than year-over-year comparisons due to the significant impacts in 2020 due to the pandemic.

*2022 Outlook*

The following tables present selected financial guidance for first quarter and full year 2022:

|  | 1Q 2022 Estimation | Previous estimation |
|---|---|---|
| **Operating revenue compared with 2019 (a)** | **Down 10% to 15%** | (e) |
| **Load factor** | **75% to 80%** | (e) |
| **ASMs compared with 2019** | **Down ~9%** | (e) |
| **Economic fuel costs per gallon** | **$2.25 to $2.35** | (e) |
| **Fuel hedging premium expense per gallon** | **$0.06** | (e) |
| **Fuel hedging cash settlement gains per gallon** | **$0.35** | (e) |
| **ASMs per gallon (fuel efficiency)** | **Nominally in line with 4Q21** | (e) |
| **CASM-X (b) compared with 2019** | **Up 20% to 24%** | (e) |
| **Debt repayments (millions)** | **~$60** | (e) |
| **Interest expense (millions)** | **~$90** | (e) |
| **Aircraft (c)** | **725** | (e) |

|  | 2022 Estimation | Previous estimation |
|---|---|---|
| **ASMs compared with 2019** | **Down ~4%** | (e) |
| **Economic fuel costs per gallon** | **$2.25 to $2.35** | (e) |
| **Fuel hedging premium expense per gallon** | **$0.05** | (e) |
| **Fuel hedging cash settlement gains per gallon** | **$0.28** | (e) |
| **CASM-X (b) compared with 2019** | **Up 12% to 16%** | (e) |
| **Debt repayments (millions)** | **~$455** | (e) |
| **Interest expense (millions)** | **~$360** | (e) |
| **Aircraft (c)** | **814** | (e) |
| **Effective tax rate** | **23% to 25%** | (e) |
| **Capital spending (billions) (d)** | **~$5.0** | (e) |

(a) The Company believes that operating revenues compared with 2019 is a more relevant measure of performance than a year-over-year comparison due to the significant impacts in 2021 due to the pandemic.

(b) Operating expenses per available seat mile, excluding fuel and oil expense, profitsharing, and special items.

(c) Aircraft on property, end of period; net of 6 and 28 retirements planned in first quarter 2022 and full year 2022, respectively. Two aircraft originally planned for delivery in first quarter 2022 have shifted into the Company's second quarter 2022 planned delivery schedule. Reflects 12 options exercised through February 3, 2022, five and seven for delivery in first quarter and second quarter 2022, respectively, and the assumption that the Company exercises all 30 remaining 2022 options. The delivery schedule for the Boeing 737-7 (-7) is dependent on the Federal Aviation Administration ("FAA") issuing required certifications and approvals to The Boeing Company ("Boeing") and the Company. The FAA will ultimately determine the timing of the -7 certification and entry into service, and the Company therefore offers no assurances that current estimates and timelines are correct.

(d) Represents current contractual payments to Boeing for firm aircraft and the assumptions that the Company exercises all 30 remaining 2022 options, in addition to ~$900 million non-aircraft capital spending. Excluding any further option exercises in 2022, the Company's 2022 capital spending would be ~$3.4 billion, also including ~$900 million in non-aircraft capital spending

(e) Remains unchanged from previously reported estimation.

Following strong travel demand during the fourth quarter 2021 holiday period, the Company is experiencing a revenue headwind in first quarter 2022 due to a softness in bookings and an increase in trip cancellations associated with the Omicron variant. January and February are seasonally weaker time periods for leisure travel demand, but further softness in leisure bookings related to the Omicron variant, combined with lower than expected business

travel demand, is estimated to reduce operating revenues in January and February 2022 by $330 million, combined. The Company canceled more than 5,600 flights in January 2022, with the majority attributable to available staffing challenges as a result of the Omicron variant, as well as weather-related cancellations, driving an estimated $50 million negative impact to January 2022 operating revenues. First quarter 2022 managed business revenues are expected to be down 45 percent to 55 percent versus first quarter 2019 levels. The Company remains optimistic about the return of business travel demand in 2022 based on the momentum experienced in fourth quarter 2021 before the impact of the Omicron variant. The Company is also encouraged by recent improvements in booking trends, especially for March 2022, and current revenue trends for spring break travel appear to be in line with typical seasonal expectations.

Based on current cost trends and reduced capacity plans, first quarter 2022 operating expenses, excluding fuel and oil expense, special items, and profitsharing, are expected to increase in the range of 20 percent to 24 percent on a unit basis as compared with first quarter 2019. The projection does not reflect the potential impact of Fuel and oil expense, special items, and profitsharing expense because the Company cannot reliably predict or estimate these items or expenses or their impact to the Company's financial statements in future periods, especially considering the significant volatility of the Fuel and oil expense line item. Accordingly, the Company believes a reconciliation of non-GAAP financial measures to the equivalent GAAP financial measures for projected results is not meaningful or available without unreasonable effort. The Company continues to experience cost pressure due to inflation in labor rates and airport costs, as well as unit cost headwinds from operating at suboptimal productivity levels. Additionally, the Company has temporarily extended incentive pay to its Operations Employees through early February 2022, which is expected to result in an additional $150 million of salaries, wages, and benefits expense in first quarter 2022, compared to the $100 million in incentive pay earned by Employees during fourth quarter 2021. Furthermore, the Company is reducing its first quarter 2022 capacity to provide additional stability during this challenging environment.

With the Omicron variant and weather impacting the Company's results, the Company expects losses in January and February and a return to profitability in March 2022. Based on the Company's current plan, while the Company no longer expects to be profitable in first quarter, the Company expects to be profitable for the remaining three quarters of this year, and for full year 2022.

### COVID-19 Pandemic Impacts

In response to the far-reaching impacts of the COVID-19 pandemic, the Company took, and continues to assess and modify, measures to support the well-being of both its Employees and passengers, including procedures and policies intended to maintain an elevated level of cleanliness on aircraft and at facilities, and mitigate the spread of the virus. The Company also continues to monitor guidelines and recommendations from the Centers for Disease Control and Prevention applicable to the Company's daily operations, and the manner in which the majority of the Company's office and clerical Employees work on a daily basis.

As detailed in Note 2 to the Consolidated Financial Statements, in connection with the major negative impact of COVID-19 on air carriers, the Company has received significant financial assistance from Treasury in the form of Payroll Support, and this assistance has had a significant impact on the Company's reported GAAP financial results in 2021. Such impact ended in third quarter 2021, and the Company's fourth quarter 2021 results do not reflect the benefit of this Payroll Support, and its future period results are not expected to benefit from such Payroll Support. However, future cash flows will be impacted through the portion of Payroll Support that was in the form of loans that will have to be repaid to Treasury.

During second quarter 2020, the Company introduced Voluntary Separation Program 2020 ("Voluntary Separation Program") and the Extended Emergency Time Off ("Extended ETO") program which helped closer align staffing to reduced flight schedules and enabled the Company to avoid involuntary furloughs and layoffs associated with the impacts of the pandemic. Approximately 16,000 Employees elected to participate in one of these programs. During 2021, approximately 11,400 Employees returned from the Extended ETO program and less than 250 Employees remained on Extended ETO leave as of December 31, 2021. In accordance with applicable accounting guidance, the

Company accrued a total charge of $1.4 billion in 2020 related to the special termination benefits for Employees who had accepted the Company's offer to participate in its Voluntary Separation Program and the special benefits for Employees who participated in its Extended ETO program. The accrual is being reduced as program benefits are paid or as it becomes no longer probable that Employees will remain on leave for their elected terms. The Company realized approximately $1.1 billion of full year 2021 cost savings from the Voluntary Separation Program and Extended ETO compared with full year 2019, and expects no material cost savings from these programs in 2022 and beyond. See Note 2 to the Consolidated Financial Statements for further information.

The Company continues to have a smaller workforce than it did prior to the COVID-19 pandemic. However, in addition to recalling nearly all of the Employees that participated in Extended ETO, the Company met its 2021 hiring goals and is planning to add at least 8,000 additional Employees during 2022 as it strives to provide sufficient staffing to support its anticipated flight schedule plans for 2022 and beyond. The Company is making additional investments to attract and retain talent, including the recent decision to further raise the Company's starting hourly pay rates from $15 per hour to $17 per hour for (i) Southwest Ramp, Operations, Provisioning, and Freight Agents, (ii) Southwest Customer Service Agents, Customer Representatives, and Source of Support Representatives, (iii) Southwest Flight Simulator Technicians, and (iv) Southwest Aircraft Appearance Technicians. The Company is currently in discussions with its workgroups to enact this increase in pay rates. The Company continues to evaluate staffing needs to align with planned flight activity.

In September 2021, the President of the United States issued an Executive Order establishing a vaccination requirement for employees of covered federal contractors. The federal government required that federal contractors have their workforce vaccinated (or request an accommodation) by December 8, 2021. The deadline was later extended to January 4, 2022. The Company started an active campaign to notify Employees of the need to submit proof of COVID-19 vaccination, or apply for an accommodation, by January 4, 2022. On December 3, 2021, the company announced that 93 percent of its Employees were vaccinated, or had requested an accommodation. Due to legal challenges to the vaccine mandate, the Company announced on December 20, 2021, that it is no longer imposing a deadline for compliance. However, if the vaccine mandate is revived, the Company will resume efforts to work with Employees who have not yet either submitted proof of vaccination or requested an accommodation.

**Company Overview**

The Company has entered into supplemental agreements with The Boeing Company ("Boeing") to increase aircraft orders and accelerate certain options with the goal of improving potential growth opportunities, restoring its network closer to pre-pandemic levels, lowering operating costs, and further modernizing its fleet with less carbon-intensive aircraft. During fourth quarter 2021, the Company exercised 22 Boeing 737 MAX 7 ("-7") options for delivery in 2023, and through February 3, 2022, the Company has exercised another 24 Boeing options- 12 -8 options for delivery in 2022, and 12 -7 options for delivery in 2023. The Company's order book with Boeing as of December 31, 2021, consists of a total of 394 MAX firm orders (264 -7 aircraft and 130 Boeing 737 MAX-8 ("-8") aircraft) and 238 MAX options (-7s or -8s) for years 2022 through 2031. The Company continues to expect that more than half of the MAX aircraft in its firm order book will replace a significant amount of its 452 Boeing 737-700 ("-700") aircraft over the next 10 to 15 years to support the modernization of its fleet, a key cost initiative and component of its environmental sustainability efforts.

The Company ended 2021 with 728 Boeing 737 aircraft, including 69 -8 aircraft. During 2021, the Company retired 8 owned -700 aircraft, which were accelerated from 2022 into fourth quarter 2021, and returned 10 leased -700 aircraft, of which one occurred during fourth quarter 2021. In addition, the Company took delivery of 28 -8 aircraft during 2021. As of December 31, 2021, six -700 aircraft remained in temporary storage due to fourth quarter 2021 and first quarter 2022 capacity remaining below respective 2019 levels.

The Company has published its flight schedule through September 5, 2022. During 2021, the Company pursued additional revenue opportunities that utilize idle aircraft to provide service to new, popular destinations. The Company is leveraging additional airports in or near cities where its Customer base is large, along with adding easier access to popular leisure-oriented destinations from across its domestic-focused network. These additional service points on the Company's route map are opportunities it can provide Customers now, all while better

positioning the Company for a travel demand rebound. During 2021, the Company began service to new destinations including:

- Chicago O'Hare International Airport and Sarasota Bradenton International Airport - February 14, 2021
- Colorado Springs Municipal Airport and Savannah/Hilton Head International Airport - March 11, 2021
- Houston's George Bush Intercontinental Airport and Santa Barbara Airport - April 12, 2021
- Fresno Yosemite International Airport - April 25, 2021
- Destin-Fort Walton Beach Airport - May 6, 2021
- Myrtle Beach International Airport - May 23, 2021
- Bozeman Yellowstone International Airport - May 27, 2021
- Jackson-Medgar Wiley Evers International Airport in Mississippi - June 6, 2021
- Eugene Airport in Oregon - August 29, 2021
- Bellingham International Airport in Washington - November 7, 2021
- Syracuse Hancock International Airport in New York - November 14, 2021

The COVID-19 pandemic had a particularly negative impact on the Company's international operations and led to the Company's suspension of international operations at the beginning of the pandemic. The Company has since resumed service to 13 of its 14 international destinations. The Company's operations to the Cayman Islands are temporarily suspended due to impacts from the COVID-19 pandemic, but with the easing of government restrictions and the continued increase in demand for beach and leisure destinations, the Company intends to resume service to the Cayman Islands in 2022.

In 2021, the Company announced goals to (i) achieve carbon neutrality by 2050, (ii) maintain carbon neutral growth (to 2019 levels) through the end of the decade, and (iii) reduce carbon emissions intensity per available seat mile (including scope 1 and scope 2 emissions) by at least 20 percent by 2030. The Company also announced a series of actions and initiatives designed to assist the Company in achieving these goals, including agreements with various third parties intended to facilitate the development, production, and usage of commercialized sustainable aviation fuel; the launch of a carbon-offset program that allows Customers to contribute funds for the purchase of carbon offsets for Southwest; and arrangements with nonprofit organizations seeking to address climate change and reduce carbon emissions in aviation.

As part of its commitment to corporate sustainability, the Company has published the Southwest One Report describing the Company's sustainability strategies, which include the Company's fuel conservation and emissions reduction initiatives and other efforts to reduce greenhouse gas emissions and address other environmental matters such as energy and water conservation, waste minimization, and recycling. Information contained in the Southwest One Report is not incorporated by reference into, and does not constitute a part of, this Form 10-K. While the Company believes that the disclosures contained in the Southwest One Report and other voluntary disclosures regarding environmental, social, and governance ("ESG") matters are responsive to various areas of investor interest, the Company believes that these disclosures do not currently address matters that are material in the near term to the Company's operations, strategy, financial condition, or financial results, although this view may change in the future based on new information that could materially alter the estimates, assumptions, or timelines used to create these disclosures. Given the estimates, assumptions and timelines used to create the Southwest One Report and other voluntary disclosures, the materiality of these disclosures is inherently difficult to assess in advance.

*2021 Compared with 2020*

**Operating Revenues**

Passenger revenues for 2021 increased by $6.4 billion, or 83.5 percent, compared with 2020. On a unit basis, Passenger revenues increased 43.9 percent, year-over-year. The increase in Passenger revenues on both a dollar and unit basis were primarily due to the improvements in leisure Passenger demand and bookings in 2021, compared with the severe decline in demand and bookings resulting from the COVID-19 pandemic for the majority of 2020.

57

Freight revenues for 2021 increased by $26 million, or 16.1 percent, compared with 2020, primarily due to increased demand for consumer goods.

Other revenues for 2021 increased by $315 million, or 25.8 percent, compared with 2020. The increase was primarily due to an increase in income from business partners, including Chase Bank USA, N.A. ("Chase"). The improving economy throughout 2021 and rebound in travel demand resulted in higher spend on the Company's co-branded credit card, as well as additional revenues earned through the Company's rental car and hotel partners.

## Operating Expenses

Operating expenses for 2021 increased by $1.2 billion, or 9.4 percent, compared with 2020, while capacity increased 27.6 percent over the same period. Historically, except for changes in the price of fuel, changes in Operating expenses for airlines have been largely driven by changes in capacity, or ASMs. However, the Company's Operating expenses are largely fixed once flight schedules are published, and ASM reductions as a result of flight schedule adjustments have a negative impact on Operating expenses per ASM. The following table presents the Company's Operating expenses per ASM for 2021 and 2020, followed by explanations of these changes on a dollar basis. Unless otherwise specified, changes on a per ASM basis were driven by changes in capacity, which increased with the improvement of travel demand, causing the Company's fixed costs to be spread over significantly more ASMs.

| | Year ended December 31, | | Per ASM | Percent |
|---|---|---|---|---|
| (in cents, except for percentages) | **2021** | **2020** | **change** | **change** |
| Salaries, wages, and benefits | 5.87 ¢ | 6.58 ¢ | (0.71)¢ | (10.8)% |
| Payroll support and voluntary Employee programs, net | (2.24) | (0.94) | (1.30) | 138.3 |
| Fuel and oil | 2.51 | 1.78 | 0.73 | 41.0 |
| Maintenance materials and repairs | 0.65 | 0.72 | (0.07) | (9.7) |
| Landing fees and airport rentals | 1.10 | 1.21 | (0.11) | (9.1) |
| Depreciation and amortization | 0.96 | 1.21 | (0.25) | (20.7) |
| Other operating expenses | 1.81 | 1.87 | (0.06) | (3.2) |
| Total | 10.66 ¢ | 12.43 ¢ | (1.77)¢ | (14.2)% |

Operating expenses per ASM for 2021 decreased by 14.2 percent, compared with 2020. The year-over-year unit cost decrease in 2021 was enhanced by the increase in Payroll Support funding as such allocations are accounted for as a direct reduction to the Company's operating expenses. This decrease in operating expenses was partially offset by an increase in both jet fuel prices and fuel gallons consumed, and $222 million of gains from the sale-leaseback of 20 aircraft to third parties in two separate transactions during second quarter 2020, which reduced Other operating expenses in second quarter 2020. See Note 8 to the Consolidated Financial Statements for further information. Operating expenses per ASM for 2021, excluding Fuel and oil expense, profitsharing, and special items (a non-GAAP financial measure), decreased 13.3 percent, year-over-year. See Note Regarding Use of Non-GAAP Financial Measures and the Reconciliation of Reported Amounts to Non-GAAP Financial Measures for additional detail regarding non-GAAP financial measures.

Salaries, wages, and benefits expense for 2021 increased by $932 million, or 13.7 percent, compared with 2020. On a per ASM basis, Salaries, wages, and benefits expense for 2021 decreased 10.8 percent, compared with 2020. On a dollar basis, approximately 55 percent of the increase was due to higher salaries and wages due to significantly more trips, step increases for certain workgroups, recalls from Extended ETO (which led to higher salaries), incentive pay offered to certain workgroups, and increased overtime hours across the network. The largest portion of the remainder of the increase was due to the $230 million profitsharing expense accrual in 2021, compared with no profitsharing expense accrual in 2020.

58

The following table sets forth the Company's unionized Employee groups with amendable contracts that are currently in negotiations on collective-bargaining agreements:

| Employee Group | Approximate Number of Employees | Representatives | Amendable Date |
|---|---|---|---|
| Southwest Pilots | 8,300 | Southwest Airlines Pilots' Association ("SWAPA") | September 2020 |
| Southwest Flight Attendants | 14,600 | Transportation Workers of America, AFL-CIO, Local 556 ("TWU 556") | November 2018 |
| Southwest Ramp, Operations, Provisioning, Freight Agents | 12,600 | Transportation Workers of America, AFL-CIO, Local 555 ("TWU 555") | February 2021 |
| Southwest Customer Service Agents, Customer Representatives, and Source of Support Representatives | 6,100 | International Association of Machinists and Aerospace Workers, AFL-CIO ("IAM 142") | December 2018 |
| Southwest Aircraft Appearance Technicians | 170 | AMFA | November 2020 |
| Southwest Dispatchers | 400 | Transportation Workers of America, AFL-CIO, Local 550 ("TWU 550") | June 2019 |
| Southwest Flight Crew Training Instructors | 130 | Transportation Workers of America, AFL-CIO, Local 557 ("TWU 557") | January 2022 |
| Southwest Meteorologists | 10 | TWU 550 | June 2019 |

During August 2021, the Company reached a tentative collective-bargaining agreement with IAM 142, which represents the Company's approximately 6,100 Employees in the Customer Service Agents, Customer Representatives, and Source of Support Representatives workgroup. However, the IAM 142 membership voted not to ratify the agreement. The Company will continue to engage in discussions on a new agreement with IAM 142.

Payroll support and voluntary Employee programs, net (a reduction to expense) for 2021 was an increase of $2.0 billion, or 206.1 percent, compared with 2020. On a per ASM basis, Payroll support and voluntary Employee programs, net for 2021 increased by 138.3 percent. On both a dollar and per ASM basis, the changes were due to the components of this line item as noted below:

- The $745 million accrual for charges related to the Voluntary Separation Program in 2020;
- The $140 million net reduction in the Extended ETO liability in 2021, compared with the $625 million accrual for charges related to the Extended ETO liability in 2020;
- The Payroll Support programs' grant allocation of $2.7 billion in 2021, compared with a $2.3 billion allocation in 2020; and
- The $117 million in Employee Retention Tax Credits recorded in 2021 for continuing to pay Employees' salaries during the time they were not working, as allowed under the CARES Act, and subsequent legislation.

See Note 2 to the Consolidated Financial Statements for further information.

Fuel and oil expense for 2021 increased by $1.5 billion, or 79.0 percent, compared with 2020. On a per ASM basis, Fuel and oil expense for 2021 increased 41.0 percent. On a dollar basis, approximately 60 percent of the increase was attributable to an increase in jet fuel prices per gallon, and the remainder of the increase was due to an increase in fuel gallons consumed. On a per ASM basis, the increase was primarily due to higher jet fuel prices. The

following table provides more information on the Company's economic fuel cost per gallon, including the impact of fuel hedging premium expense and fuel derivative contracts:

| (per gallon) | Year ended December 31, | | | |
| | 2021 | | 2020 | |
|---|---|---|---|---|
| Economic fuel costs per gallon | $ | 2.01 | $ | 1.49 |
| Fuel hedging premium expense (in millions) | $ | 100 | $ | 98 |
| Fuel hedging premium expense per gallon | $ | 0.06 | $ | 0.08 |
| Fuel hedging cash settlement gains per gallon | $ | 0.05 | $ | — |

See Note Regarding Use of Non-GAAP Financial Measures and the Reconciliation of Reported Amounts to Non-GAAP Financial Measures for additional detail regarding non-GAAP financial measures.

The Company's fourth quarter 2021 available seat miles per gallon ("fuel efficiency") declined 4.2 percent, year-over-year, due to the removal from storage and return to service of more of the Company's least fuel-efficient aircraft, the -700, to support sequentially increasing flight schedules. When compared with fourth quarter 2019, fuel efficiency improved 3.8 percent in fourth quarter 2021 due to the March 2021 return to service of the Company's most fuel-efficient aircraft, the MAX. The MAX remains critical to the Company's efforts to modernize its fleet, reduce carbon emissions intensity, and achieve its near-term environmental sustainability goals. See Note 17 to the Consolidated Financial Statements for further information.

As of January 20, 2022, on an economic basis, the Company had derivative contracts in place related to expected future fuel consumption as follows:

| Period | Maximum fuel hedged (gallons in millions) (a)(b) |
|---|---|
| 2022 | 1,220 |
| 2023 | 769 |
| 2024 | 358 |

(a) The Company's hedge position includes prices at which the Company considers "catastrophic" coverage. The maximum gallons provided are not indicative of the Company's hedge coverage at every price, but represent the highest level of coverage at a single price. See Note 11 to the Consolidated Financial Statements for further information.

(b) The Company's gallons that are covered by derivative contracts represent the maximum number of gallons hedged for each respective period, which may be at different strike prices and at strike prices materially higher than the current market prices. The volume of gallons covered by derivative contracts that ultimately get exercised in any given period may vary significantly from the volumes provided, as market prices and the Company's fuel consumption fluctuates. Based on the Company's available seat mile plans for full year 2022, its maximum percent of estimated fuel consumption covered by fuel derivative contracts is 64 percent. The Company believes that providing the maximum percent of fuel consumption covered by derivative contracts in future years relative to 2019 fuel gallons consumed is a more relevant measure for future coverage, due to uncertainty regarding available seat mile plans in future years. Based on 2019 fuel gallons consumed, the Company's maximum percent of fuel consumption covered by fuel derivative contracts is 37 percent in 2023 and 17 percent in 2024.

As a result of applying hedge accounting in prior periods, the Company has amounts in Accumulated other comprehensive income (loss) ("AOCI") that will be recognized in earnings in future periods when the underlying fuel derivative contracts settle. The following table displays the Company's estimated fair value of remaining fuel derivative contracts (not considering the impact of the cash collateral provided to or received from counterparties - see Note 11 to the Consolidated Financial Statements for further information), as well as the deferred amounts in AOCI at December 31, 2021, and the expected future periods in which these items are expected to settle and/or be recognized in earnings (in millions):

60

| Year | Fair value of fuel derivative contracts at December 31, 2021 | | Amount of gains deferred in AOCI at December 31, 2021 (net of tax) | |
|---|---|---|---|---|
| 2022 | $ | 409 | $ | 234 |
| 2023 | | 221 | | 117 |
| 2024 | | 66 | | 26 |
| Total | $ | 696 | $ | 377 |

Assuming no changes to the Company's current fuel derivative portfolio, but including all previous hedge activity for fuel derivatives that have not yet settled, and considering only the expected net cash receipts related to hedges that will settle, the Company is providing the below sensitivity table for first quarter 2022 and full year 2022 jet fuel prices at different crude oil assumptions as of January 20, 2022, and for expected premium costs associated with settling contracts each period, respectively.

| Average Brent Crude Oil price per barrel | Estimated economic fuel price per gallon, including taxes and fuel hedging premiums (e) | |
|---|---|---|
| | First Quarter 2022 (c) | Full Year 2022 (d) |
| $60 | $1.80 - $1.90 | $1.85 - $1.95 |
| $70 | $2.00 - $2.10 | $2.05 - $2.15 |
| **Current Market (a)** | **$2.25 - $2.35** | **$2.25 - $2.35** |
| $90 | $2.35 - $2.45 | $2.40 - $2.50 |
| $100 | $2.45 - $2.55 | $2.55 - $2.65 |
| Estimated fuel hedging premium expense per gallon (b) | $0.06 | $0.05 |
| Estimated premium costs (b) | $26 million | $96 million |

(a) Brent crude oil average market prices as of January 20, 2022, were approximately $87 and $84 per barrel for first quarter 2022 and full year 2022, respectively.
(b) Fuel hedging premium expense per gallon is included in the Company's estimated economic fuel price per gallon estimates above.
(c) Based on the Company's existing fuel derivative contracts and market prices as of January 20, 2022, first quarter 2022 economic fuel costs are estimated to be in the $2.25 to $2.35 per gallon range, including fuel hedging premium expense of approximately $26 million, or $0.06 per gallon, and $0.35 per gallon in favorable cash settlements from fuel derivative contracts. See Note Regarding Use of Non-GAAP Financial Measures.
(d) Based on the Company's existing fuel derivative contracts and market prices as of January 20, 2022, full year 2022 economic fuel costs are estimated to be in the $2.25 to $2.35 per gallon range, including fuel hedging premium expense of approximately $96 million, or $0.05 per gallon, and $0.28 per gallon in favorable cash settlements from fuel derivative contracts. See Note Regarding Use of Non-GAAP Financial Measures.
(e) The Company's current fuel derivative contracts contain a combination of instruments based in West Texas Intermediate ("WTI") and Brent crude oil; however, the economic fuel price per gallon sensitivities provided, assume the relationship between Brent crude oil and refined products based on market prices as of January 20, 2022. Economic fuel cost projections do not reflect the potential impact of special items because the Company cannot reliably predict or estimate the hedge accounting impact associated with the volatility of the energy markets, the impact of COVID-19 cases on air travel demand, or the impact to its financial statements in future periods. Accordingly, the Company believes a reconciliation of non-GAAP financial measures to the equivalent GAAP financial measures for projected results is not meaningful or available without unreasonable effort. See Note Regarding Use of Non-GAAP Financial Measures.

Maintenance materials and repairs expense for 2021 increased by $104 million, or 13.9 percent, compared with 2020. On a per ASM basis, Maintenance materials and repairs expense decreased 9.7 percent, compared with 2020. On a dollar basis, approximately 50 percent of the increase was due to the timing of regular airframe maintenance checks as some costs had previously been deferred while a portion of the fleet was placed into temporary storage during the COVID-19 pandemic. The majority of the remainder of the increase was due to higher engine maintenance expense due to the increase in flight hours.

Landing fees and airport rentals expense for 2021 increased by $216 million, or 17.4 percent, compared with 2020. On a per ASM basis, Landing fees and airport rentals expense decreased 9.1 percent, compared with 2020. On a dollar basis, approximately 50 percent of the increase was due to higher landing fees from the increased number of Trips flown, and the remainder of the increase was due to an increase in space rental rates at many airports.

Depreciation and amortization expense for 2021 increased by $17 million, or 1.4 percent, compared with 2020. On a per ASM basis, Depreciation and amortization expense decreased 20.7 percent, compared with 2020. On a dollar basis, the majority of the increase was associated with the deployment of new technology assets during 2021.

Other operating expenses for 2021 increased by $468 million, or 24.3 percent, compared with 2020. Included within this line item was aircraft rentals expenses in the amount of $205 million and $209 million for 2021 and 2020, respectively. On a per ASM basis, Other operating expenses decreased 3.2 percent, compared with 2020. On a dollar basis, the increase was primarily due to $222 million in gains from the sale-leaseback of 20 aircraft to third parties in two separate transactions during second quarter 2020, which reduced Other operating expenses in second quarter 2020. Excluding the impact of this 2020 sale-leaseback gain, the increase in Other operating expenses on a dollar basis was primarily due to higher revenue related expenses, including credit card processing charges. See Note 8 to the Consolidated Financial Statements for more information.

**Other**

Other expenses (income) include interest expense, capitalized interest, interest income, and other gains and losses.

Interest expense for 2021 increased by $118 million, or 33.8 percent, compared with 2020, primarily due to higher debt balances. See Note 7 to the Consolidated Financial Statements for more information.

Capitalized interest for 2021 increased by $1 million, or 2.9 percent, compared with 2020, primarily due to Boeing resuming production of the Company's undelivered MAX aircraft.

Interest income for 2021 decreased by $19 million, or 59.4 percent, compared with 2020, due to lower interest rates.

Other (gains) losses, net, primarily includes amounts recorded as a result of the Company's hedging activities. See Note 11 to the Consolidated Financial Statements for further information on the Company's hedging activities. The following table displays the components of Other (gains) losses, net, for 2021 and 2020:

| (in millions) | Year ended December 31, | | | |
|---|---|---|---|---|
| | **2021** | | **2020** | |
| Mark-to-market impact from fuel contracts settling in current and future periods | $ | (7) | $ | 40 |
| Premium cost of fuel contracts not designated as hedges | | 43 | | 34 |
| Mark-to-market impact from interest rate swap agreements | | — | | 28 |
| Mark-to-market gain on deferred compensation plan investment | | (33) | | — |
| Correction on investment gains related to prior periods | | (60) | | — |
| Loss on partial extinguishment of convertible notes | | 28 | | — |
| Post-retirement curtailment charge | | — | | 53 |
| Other | | 7 | | 3 |
| | $ | (22) | $ | 158 |

**Income Taxes**

62

Table of Contents

The Company's annual 2021 effective tax rate was 26.3 percent, compared with 27.8 percent in 2020. The higher tax rate for 2020 was primarily due to the net loss incurred during 2020, resulting in a tax benefit and refund of previously paid taxes, when the Company was subject to a higher federal statutory tax rate, as was allowed under the CARES act.

***2020 Compared with 2019***

The Company's comparison of 2020 results to 2019 results is included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2020, under Part II Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations.

63

**Reconciliation of Reported Amounts to Non-GAAP Financial Measures (excluding special items) (unaudited) (in millions, except per share amounts and per ASM amounts)**

| | Year ended December 31, | | Percent Change |
| --- | --- | --- | --- |
| | 2021 | 2020 | |
| **Fuel and oil expense, unhedged** | $ 3,350 | $ 1,810 | |
| Add: Premium cost of fuel contracts designated as hedges | 57 | 64 | |
| Deduct: Fuel hedge gains included in Fuel and oil expense, net | (97) | (25) | |
| **Fuel and oil expense, as reported** | $ 3,310 | $ 1,849 | |
| Add: Fuel hedge contracts settling in the current period, but for which losses were reclassified from AOCI (a) | 8 | 25 | |
| Add: Premium cost of fuel contracts not designated as hedges | 43 | 34 | |
| **Fuel and oil expense, excluding special items (economic)** | $ 3,361 | $ 1,908 | 76.2 % |
| | | | |
| **Total operating expenses, net, as reported** | $ 14,069 | $ 12,864 | |
| Add: Payroll support and voluntary Employee programs, net | 2,960 | 967 | |
| Add: Fuel hedge contracts settling in the current period, but for which losses were reclassified from AOCI (a) | 8 | 25 | |
| Add: Interest rate swap agreements terminated in a prior period, but for which losses were reclassified from AOCI (a) | 3 | — | |
| Add: Premium cost of fuel contracts not designated as hedges | 43 | 34 | |
| Add: Gain from aircraft sale-leaseback transactions | — | 222 | |
| Deduct: Impairment of long-lived assets | (12) | (32) | |
| **Total operating expenses, excluding special items** | $ 17,071 | $ 14,080 | 21.2 % |
| Deduct: Fuel and oil expense, excluding special items (economic) | (3,361) | (1,908) | |
| **Operating expenses, excluding Fuel and oil expense and special items** | $ 13,710 | $ 12,172 | 12.6 % |
| Deduct: Profitsharing expense | (230) | — | |
| **Operating expenses, excluding Fuel and oil expense, special items, and profitsharing** | $ 13,480 | $ 12,172 | 10.7 % |
| | | | |
| **Operating income (loss), as reported** | $ 1,721 | $ (3,816) | |
| Deduct: Payroll support and voluntary Employee programs, net | (2,960) | (967) | |
| Deduct: Fuel hedge contracts settling in the current period, but for which losses were reclassified from AOCI (a) | (8) | (25) | |
| Deduct: Interest rate swap agreements terminated in a prior period, but for which losses were reclassified from AOCI (a) | (3) | — | |
| Deduct: Premium cost of fuel contracts not designated as hedges | (43) | (34) | |
| Deduct: Gain from aircraft sale-leaseback transactions | — | (222) | |
| Add: Impairment of long-lived assets | 12 | 32 | |
| **Operating loss, excluding special items** | $ (1,281) | $ (5,032) | (74.5)% |
| | | | |
| **Other (gains) losses, net, as reported** | $ (22) | $ 158 | |
| Add (Deduct): Mark-to-market impact from fuel contracts settling in current and future periods | 7 | (40) | |
| Deduct: Premium cost of fuel contracts not designated as hedges | (43) | (34) | |
| Deduct: Mark-to-market impact from interest rate swap agreements | — | (28) | |
| Deduct: Loss on partial extinguishment of convertible notes | (28) | — | |
| Deduct: Post-retirement curtailment charge | — | (53) | |
| **Other (gains) losses, net, excluding special items** | $ (86) | $ 3 | n.m. |

64

| | | Year ended December 31, | | | Percent |
|---|---|---|---|---|---|
| | | **2021** | | **2020** | **Change** |
| | | | | | |
| **Income (loss) before income taxes, as reported** | $ | 1,325 | $ | (4,256) | |
| Deduct: Payroll support and voluntary Employee programs, net | | (2,960) | | (967) | |
| Deduct: Fuel hedge contracts settling in the current period, but for which losses were reclassified from AOCI (a) | | (8) | | (25) | |
| Deduct: Interest rate swap agreements terminated in a prior period, but for which losses were reclassified from AOCI (a) | | (3) | | — | |
| Deduct: Gain from aircraft sale-leaseback transactions | | — | | (222) | |
| Add: Impairment of long-lived assets | | 12 | | 32 | |
| Add (Deduct): Mark-to-market impact from fuel contracts settling in current and future periods (a) | | (7) | | 40 | |
| Add: Mark-to-market impact from interest rate swap agreements | | — | | 28 | |
| Add: Loss on partial extinguishment of convertible notes | | 28 | | — | |
| Add: Post-retirement curtailment charge | | — | | 53 | |
| **Loss before income taxes, excluding special items** | $ | (1,613) | $ | (5,317) | (69.7)% |
| | | | | | |
| **Provision (benefit) for income taxes, as reported** | $ | 348 | $ | (1,182) | |
| Deduct: Net income (loss) tax impact of fuel and special items (b) | | (690) | | (376) | |
| Deduct: GAAP to Non-GAAP tax rate difference (c) | | — | | (247) | |
| **Benefit for income taxes, net, excluding special items** | $ | (342) | $ | (1,805) | (81.1)% |
| | | | | | |
| **Net income (loss), as reported** | $ | 977 | $ | (3,074) | |
| Deduct: Payroll support and voluntary Employee programs, net | | (2,960) | | (967) | |
| Deduct: Fuel hedge contracts settling in the current period, but for which losses were reclassified from AOCI (a) | | (8) | | (25) | |
| Deduct: Interest rate swap agreements terminated in a prior period, but for which losses were reclassified from AOCI (a) | | (3) | | — | |
| Deduct: Gain from aircraft sale-leaseback transactions | | — | | (222) | |
| Add: Impairment of long-lived assets | | 12 | | 32 | |
| Add (Deduct): Mark-to-market impact from fuel contracts settling in current and future periods (a) | | (7) | | 40 | |
| Add: Mark-to-market impact from interest rate swap agreements | | — | | 28 | |
| Add: Loss on partial extinguishment of convertible notes | | 28 | | — | |
| Add: Post-retirement curtailment charge | | — | | 53 | |
| Add: Net income (loss) tax impact of special items (b) | | 690 | | 376 | |
| Add: GAAP to Non-GAAP tax rate difference (c) | | — | | 247 | |
| **Net loss, excluding special items** | $ | (1,271) | $ | (3,512) | (63.8)% |
| | | | | | |
| **Net income (loss) per share, diluted, as reported** | $ | 1.61 | $ | (5.44) | |
| Deduct: Impact of special items | | (4.80) | | (1.83) | |
| Deduct: Net impact of net income (loss) above from fuel contracts divided by dilutive shares | | (0.02) | | (0.04) | |
| Add: Net income (loss) tax impact of special items (b) | | 1.12 | | 0.66 | |
| Add: GAAP to Non-GAAP tax rate difference (c) | | — | | 0.43 | |
| Deduct: GAAP to Non-GAAP diluted weighted average shares difference (d) | | (0.06) | | — | |
| **Net loss per share, diluted, excluding special items** | $ | (2.15) | $ | (6.22) | (65.4)% |

| | Year ended December 31, | | Percent |
|---|---|---|---|
| | **2021** | **2020** | **Change** |
| **Operating expenses per ASM (cents)** | 10.66 ¢ | 12.43 ¢ | |
| Add: Impact of special items | 2.23 | 1.18 | |
| Deduct: Fuel and oil expense divided by ASMs | (2.51) | (1.84) | |
| Deduct: Profitsharing expense divided by ASMs | (0.17) | — | |
| **Operating expenses per ASM, excluding Fuel and oil expense, profitsharing, and special items (cents)** | 10.21 ¢ | 11.77 ¢ | (13.3)% |

(a) See Note 11 to Consolidated Financial Statements for further information.

(b) Tax amounts for each individual special item are calculated at the Company's effective rate for the applicable period and totaled in this line item.

(c) Adjustment related to GAAP and Non-GAAP tax rate differences, primarily due to the Payroll Support being excluded as a special item, and reflecting the anticipated benefit of carrying back full year 2020 projected net losses to claim tax refunds against previous cash taxes paid relating to tax years 2015 through 2019, some of which were at higher rates than the current year.

(d) Adjustment related to GAAP and Non-GAAP diluted weighted average shares difference, due to the Company being in a Net income position on a GAAP basis versus a Net loss position on a Non-GAAP basis for the year ended December 31, 2021. See Note 4 to the Consolidated Financial Statements for further information.

66

**Note Regarding Use of Non-GAAP Financial Measures**

The Company's Consolidated Financial Statements are prepared in accordance with accounting principles generally accepted in the United States ("GAAP"). These GAAP financial statements may include (i) unrealized noncash adjustments and reclassifications, which can be significant, as a result of accounting requirements and elections made under accounting pronouncements relating to derivative instruments and hedging and (ii) other charges and benefits the Company believes are unusual and/or infrequent in nature and thus may make comparisons to its prior or future performance difficult.

As a result, the Company also provides financial information in this filing that was not prepared in accordance with GAAP and should not be considered as an alternative to the information prepared in accordance with GAAP. The Company provides supplemental non-GAAP financial information (also referred to as "excluding special items"), including results that it refers to as "economic," which the Company's management utilizes to evaluate its ongoing financial performance and the Company believes provides additional insight to investors as supplemental information to its GAAP results. The non-GAAP measures provided that relate to the Company's performance on an economic fuel cost basis include Fuel and oil expense, non-GAAP; Total operating expenses, non-GAAP; Operating expenses, non-GAAP excluding Fuel and oil expense; Operating expenses, non-GAAP excluding Fuel and oil expense and profitsharing; Operating loss, non-GAAP; Other (gains) losses, net, non-GAAP; Loss before income taxes, non-GAAP; Benefit for income taxes, net, non-GAAP; Net loss, non-GAAP; Net loss per share, diluted, non-GAAP; and Operating expenses per ASM, non-GAAP, excluding Fuel and oil expense and profitsharing (cents). The Company's economic Fuel and oil expense results differ from GAAP results in that they only include the actual cash settlements from fuel hedge contracts - all reflected within Fuel and oil expense in the period of settlement. Thus, Fuel and oil expense on an economic basis has historically been utilized by the Company, as well as some of the other airlines that utilize fuel hedging, as it reflects the Company's actual net cash outlays for fuel during the applicable period, inclusive of settled fuel derivative contracts. Any net premium costs paid related to option contracts that are designated as hedges are reflected as a component of Fuel and oil expense, for both GAAP and non-GAAP (including economic) purposes in the period of contract settlement. The Company believes these economic results provide further insight into the impact of the Company's fuel hedges on its operating performance and liquidity since they exclude the unrealized, noncash adjustments and reclassifications that are recorded in GAAP results in accordance with accounting guidance relating to derivative instruments, and they reflect all cash settlements related to fuel derivative contracts within Fuel and oil expense. This enables the Company's management, as well as investors and analysts, to consistently assess the Company's operating performance on a year-over-year or quarter-over-quarter basis after considering all efforts in place to manage fuel expense. However, because these measures are not determined in accordance with GAAP, such measures are susceptible to varying calculations, and not all companies calculate the measures in the same manner. As a result, the aforementioned measures, as presented, may not be directly comparable to similarly titled measures presented by other companies.

Further information on (i) the Company's fuel hedging program, (ii) the requirements of accounting for derivative instruments, and (iii) the causes of hedge ineffectiveness and/or mark-to-market gains or losses from derivative instruments is included in Note 11 to the Consolidated Financial Statements.

The Company's GAAP results in the applicable periods may include other charges or benefits that are also deemed "special items," that the Company believes make its results difficult to compare to prior periods, anticipated future periods, or industry trends. Financial measures identified as non-GAAP (or as excluding special items) have been adjusted to exclude special items. For the periods presented, in addition to the items discussed above, special items include:

1. Proceeds related to the Payroll Support programs, which were used to pay a portion of Employee salaries, wages, and benefits;
2. Charges and adjustments to previously accrued amounts related to the Company's extended leave programs;
3. Adjustments for prior period losses reclassified from AOCI associated with forward-starting interest rate swap agreements that were terminated in prior periods related to 12 -8 aircraft leases;

67

4.  Gains associated with the sale-leaseback of ten Boeing 737-800 aircraft and ten Boeing -8 aircraft to third parties;

5.  A noncash impairment charge related to 20 Boeing 737-700 aircraft that were retired during 2020 and 8 Boeing 737-700 aircraft that were retired in 2021;

6.  Unrealized losses related to 12 forward-starting interest rate swap agreements. During 2020, the interest rate swap agreements, which were related to 12 -8 aircraft leases (with deliveries originally scheduled between June 2020 and September 2020), were de-designated as hedges due to the scheduled delivery range no longer being probable, resulting in the mark-to-market changes being recorded to earnings;

7.  Losses associated with the partial extinguishment of the Company's convertible notes; and

8.  A post-retirement curtailment charge related to Employees who accepted Voluntary Separation Program 2020 and elected to participate in the Company's retiree medical benefits plan.

Because management believes special items can distort the trends associated with the Company's ongoing performance as an airline, the Company believes that evaluation of its financial performance can be enhanced by a supplemental presentation of results that exclude the impact of special items in order to enhance consistency and comparativeness with results in prior periods that do not include such items and as a basis for evaluating operating results in future periods. The following measures are often provided, excluding special items, and utilized by the Company's management, analysts, and investors to enhance comparability of year-over-year results, as well as to industry trends: Fuel and oil expense, non-GAAP; Total operating expenses, non-GAAP; Operating expenses, non-GAAP excluding Fuel and oil expense; Operating expenses, non-GAAP excluding Fuel and oil expense and profitsharing; Operating loss, non-GAAP; Other (gains) losses, net, non-GAAP; Loss before income taxes, non-GAAP; Benefit for income taxes, net, non-GAAP; Net loss, non-GAAP; Net loss per share, diluted, non-GAAP; and Operating expenses per ASM, non-GAAP, excluding Fuel and oil expense and profitsharing (cents).

68

**Liquidity and Capital Resources**

The enormous impact of the COVID-19 pandemic on the U.S. travel industry created an urgent liquidity crisis for the entire airline industry, including the Company. However, due to the Company's pre-pandemic low balance sheet leverage, large base of unencumbered assets, and investment-grade credit ratings, the Company was able to quickly access additional liquidity during 2020, as Customer cancellations and ticket refunds spiked and sales and revenues dropped while the Company continued to experience significant fixed operating expenses. See Note 2 and Note 7 to the Consolidated Financial Statements for further information regarding the impact of the COVID-19 pandemic, as well as the transactions completed and assistance obtained under Payroll Support programs.

Net cash provided by operating activities for 2021 was $2.3 billion, and net cash used in operating activities for 2020 was $1.1 billion. Operating cash inflows are historically primarily derived from ticket sales associated with providing air transportation to Customers. The vast majority of tickets are purchased prior to the day on which travel is provided and, in some cases, several months before the anticipated travel date. Operating cash outflows are related to the recurring expenses of airline operations. Operating cash flows for 2021 included $2.7 billion in Payroll Support program grant proceeds received. The net increase in operating cash flows was also a result of a $591 million increase in Air traffic liability driven by increased ticket sales related to an increase in leisure travel demand. The operating cash flows for 2020 were affected primarily by (i) the initial, most significant, impacts of the COVID-19 pandemic, which resulted in a significant drop in travel demand, sales, and revenues, leading to the Company's Net loss (as adjusted for noncash items), and (ii) the Company's funding of its $667 million 2019 profitsharing distribution to Employees in 2020. In 2020, these net decreases in cash from operating activities were partially offset by a $1.6 billion increase in Air traffic liability and by $2.4 billion in Payroll Support program grant proceeds received. The increase in Air traffic liability was due to ticket sales in early 2020 for future travel that have not been flown as a result of the significant number of Customer trip cancellations associated with the COVID-19 pandemic, and growth in Rapid Rewards points earned due to multiple loyalty credit card promotions throughout 2020. Cash flows associated with entering into new fuel derivatives, which are classified as Other, net, operating cash flows, were net outflows of $34 million in 2021 and $129 million in 2020. See Note 11 to the Consolidated Financial Statements for further information. Net cash provided by operating activities is primarily used to finance capital expenditures, repay debt, and provide working capital. Historically, the Company has also used net cash provided by operating activities to fund stock repurchases and pay dividends; however these shareholder return activities have been suspended due to restrictions associated with the payroll assistance under the Payroll Support programs and the Company's $1.0 billion amended and restated revolving credit facility (the "Amended A&R Credit Agreement"). See Note 7 to the Consolidated Financial Statements for further information.

Net cash used in investing activities for 2021 and 2020 was $1.3 billion and $16 million, respectively. Investing activities in both years included Capital expenditures, and changes in the balance of the Company's short-term and noncurrent investments. During 2020, the Company also raised $815 million from the sale-leaseback of 20 aircraft (see Note 8 to the Consolidated Financial Statements for more details on the sale-leaseback transactions) and received $428 million of Supplier proceeds, which the Company considers an offset to its aircraft capital expenditures. See Note 17 to the Consolidated Financial Statements for further information. During 2021, Capital expenditures were $505 million, compared with $515 million in the same prior year period. The Company continues to estimate its 2022 capital spending to be approximately $5.0 billion, including approximately $900 million in non-aircraft capital spending. This includes 12 2022 -8 options exercised through February 3, 2022, and assumes the Company exercises all 30 remaining 2022 options. Fleet and other capital investment plans are expected to evolve as the Company continues to manage through the pandemic, and the Company intends to continue evaluating the exercise of its remaining 30 MAX options for 2022 as decision deadlines occur.

Net cash provided by financing activities for 2021 and 2020 was $359 million and $9.7 billion, respectively. During 2021, the Company borrowed $1.1 billion under Payroll Support programs. See Note 2 to the Consolidated Financial Statements for further information. The Company repaid $905 million in debt and finance lease obligations, including the extinguishment of $203 million in principal of its convertible notes for cash payments totaling $293 million during 2021. During 2020, the Company borrowed $13.6 billion, through various transactions, in order to improve its liquidity position as a result of the pandemic. An additional $2.3 billion was raised from a

69

public offering of 80.5 million shares of common stock. These financings were partially offset by the full repayment of $3.7 billion borrowed under the Company's Amended and Restated 364-Day Credit Agreement and $1.0 billion drawn under the Company's Amended A&R Credit Agreement. The Company also repurchased $451 million of its outstanding common stock and paid $188 million in cash dividends to Shareholders in 2020 prior to restrictions associated with the payroll assistance under the Payroll Support programs. Additionally, the Company repaid $839 million in other debt and finance lease obligations during 2020.

A discussion of the Company's most significant drivers impacting cash flow for 2019 are included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2020, under Part II Item 7, Liquidity and Capital Resources.

The Company is a "well-known seasoned issuer" and currently has an effective shelf registration statement registering an indeterminate amount of debt and equity securities for future sales. The Company currently intends to use the proceeds from any future securities sales off this shelf registration statement for general corporate purposes.

The Company has access to $1.0 billion under its Amended A&R Credit Agreement. The Amended A&R Credit Agreement has an accordion feature that would allow the Company, subject to, among other things, the procurement of incremental commitments, to increase the size of the facility to $1.5 billion. Interest on the facility is based on the Company's credit ratings at the time of borrowing. At the Company's current ratings, the interest cost would be LIBOR plus a spread of 200 basis points. The facility contains a financial covenant to maintain total liquidity, as defined in the Amended A&R Credit Agreement, of $1.5 billion at all times under the Amended A&R Credit Agreement; the Company was compliant with this requirement as of December 31, 2021. There were no amounts outstanding under the Amended A&R Credit Agreement as of December 31, 2021.

Although not the case at December 31, 2021 due to the Company's significant financing activities in 2020 and 2021, the Company has historically carried a working capital deficit, in which its current liabilities exceed its current assets. This is common within the airline industry and is primarily due to the nature of the Air traffic liability account, which is related to advance ticket sales, unused funds available to Customers, and loyalty deferred revenue, which are performance obligations for future Customer flights, do not require future settlement in cash, and are mostly nonrefundable. See Note 6 to the Consolidated Financial Statements for further information.

The Company believes it has various options available to meet its capital and operating commitments, including unrestricted cash and short-term investments of $15.5 billion as of December 31, 2021, and anticipated future internally generated funds from operations. However, the COVID-19 pandemic continues to evolve and could have a material adverse impact on the Company's ability to meet its capital and operating commitments. See Note 2 to the Consolidated Financial Statements for further information on the impacts of the COVID-19 pandemic.

The following discussion includes various short-term and long-term material cash requirements from known contractual and other obligations, but does not include amounts that are contingent on events or other factors that are uncertain or unknown at this time. Given the Company's current liquidity position, available resources, and prevailing outlook, it expects to be able to fulfill both its short-term and long-term material cash requirements. The amounts disclosed are based on various estimates, including estimates regarding the timing of payments, prevailing interest rates, volumes purchased, the occurrence of certain events and other factors. Accordingly, the actual results may vary materially from the amounts discussed herein.

*Debt*

See Note 7 to the Consolidated Financial Statements for further detail on the Company's debt and the timing of expected and future principal payments. The Company also has significant future obligations associated with fixed interest payments associated with its debt. As of December 31, 2021, future interest payments associated with its fixed rate debt (excluding interest associated with finance leases) were $343 million in 2022, $301 million in 2023, $271 million in 2024, $217 million in 2025, $163 million in 2026, and $193 million thereafter.

70

The Company's Convertible Notes did not meet the criteria to be converted by holders as of the date of the financial statements, and thus are classified as Long-term debt in the accompanying Consolidated Balance Sheet as of December 31, 2021. If the provisions were met to allow holders to exercise their conversion option on these instruments, all of the remaining convertible notes would be reclassified as a current obligation. Also, the Company has engaged in transactions with certain convertible debt holders to purchase their instruments in private transactions from time to time in cash, and may continue to do so in future periods. The Company considers its prevailing stock price, the trading price of its convertible debt instruments, and its available liquidity in determining how much of these instruments it may attempt to repurchase in such transactions.

*Leases*

The Company enters into leases for aircraft, airports and other real property, and other types of equipment in the normal course of business. See Note 8 to the Consolidated Financial Statements for further detail.

*Aircraft purchase commitments*

The Company is required to make cash deposits toward the purchase of aircraft in advance. These deposits are classified as Deposits on flight equipment purchase contracts in the Consolidated Balance Sheet until the aircraft is delivered, at which time deposits previously made are deducted from the final purchase price of aircraft and are reclassified as Flight equipment. See Part I, Item 2 for a complete table of the Company's contractual firm deliveries and options for -7 and -8 aircraft, and Note 5 to the Consolidated Financial Statements for the financial commitments related to these firm deliveries.

*Other*

The Company's other material cash requirements primarily consist of outlays associated with normal operating expenses of the airline, including payroll, fuel, airport costs, etc. While many of these expenses are variable in nature, some of the expenditures can be somewhat fixed in the short-term due to the lead-time involved in publishing the Company's flight schedule in advance and providing for resources to be available to operate those schedules.

The Company has a large net deferred tax liability on its Consolidated Balance Sheet. The deferral of income taxes has resulted in a significant benefit to the Company and its liquidity position. Since the Company purchases the majority of the aircraft it acquires, it has been able to utilize accelerated depreciation methods (including bonus depreciation) available under the Internal Revenue Code of 1986, as amended, in 2021 and in previous years, which has enabled the Company to accelerate cash tax benefits of depreciation. Based on the Company's scheduled future aircraft deliveries from Boeing and existing tax laws in effect, the Company will continue to accelerate the cash income tax benefits related to aircraft purchases. However, due to the Company's net taxable loss incurred in 2020, and a provision within the CARES Act that allows entities to carry back such 2020 losses to prior periods of up to five years, and claim refunds of federal taxes paid, the Company expects to receive a significant cash tax refund of $472 million associated with this taxable loss from the Internal Revenue Service in the first six months of 2022. See Note 15 to the Consolidated Financial Statements for further information. The Company has paid in the past, and will continue to pay in the future, significant cash taxes to the various taxing jurisdictions where it operates. The Company expects to be able to continue to meet such obligations utilizing cash and investments on hand, as well as cash generated from its ongoing operations.

**CRITICAL ACCOUNTING POLICIES AND ESTIMATES**

The Company's Consolidated Financial Statements have been prepared in accordance with GAAP. The Company's significant accounting policies are described in Note 1 to the Consolidated Financial Statements. The preparation of financial statements in accordance with GAAP requires the Company's management to make estimates and assumptions that affect the amounts reported in the Consolidated Financial Statements and accompanying footnotes. The Company's estimates and assumptions are based on historical experience and changes in the business environment. However, actual results may differ from estimates under different conditions, sometimes materially. Critical accounting policies and estimates are defined as those that both (i) are most important to the portrayal of the Company's financial condition and results and (ii) require management's most subjective judgments. The Company's critical accounting policies and estimates are described below.

*Revenue Recognition*

Tickets sold for Passenger air travel are initially deferred as Air traffic liability. Passenger revenue is recognized and Air traffic liability is reduced when the service is provided (i.e., when the flight takes place). Air traffic liability primarily represents tickets sold for future travel dates, funds that are past flight date and remain unused, but are expected to be used in the future, and the Company's liability for loyalty benefits that are expected to be redeemed in the future. Air traffic liability typically fluctuates throughout the year based on seasonal travel patterns, fare sale activity, and activity associated with the Company's loyalty program. See Note 1 to the Consolidated Financial Statements for information about the Company's revenue recognition policies.

For air travel on Southwest, the amount of tickets that will expire unused, referred to as breakage, are estimated and recognized in Passenger revenue once the scheduled flight date has passed, in proportion to the pattern of rights exercised by the Customer, as per Accounting Standards Codification 606, Revenue From Contracts With Customers. Estimating the amount of tickets that will expire unused involves some level of subjectivity and judgment. The majority of the Company's tickets sold are nonrefundable, although the funds remain reusable, for a period of time, in the form of a flight credit that can be applied towards the purchase of future travel. Flight credits are typically created when a Customer cancels or modifies an existing flight itinerary. These unused flight credits are the primary source of breakage. Breakage estimates are based on historical experience over many years, and the Company has consistently applied this accounting method to estimate revenue from unused tickets at the date of scheduled travel. Fully refundable tickets rarely expire unused.

As a result of the COVID-19 pandemic, for all Customer flight credits created or scheduled to expire between March 1 and September 7, 2020 associated with flight cancellations, the Company has extended the expiration date to September 7, 2022. See Note 6 to the Consolidated Financial Statements for further information regarding these extended flight credits. Since the Company did not have historical data to enable it to accurately estimate the pattern of usage of these extended credits, these credits have been classified as a current liability throughout their history. Due to the significant increase in time allowed by the Company for these Customers to redeem such credits for future travel, the percentage of the extended credits that will ultimately expire unused is currently expected to be lower than the Company's historical experience with flight credits that were not extended ("normal" flight credits), and this lack of historical experience also impacts the Company's ability to estimate ultimate expirations. Therefore, as a result of the significant volume of these extended credits and the Company's lack of historical experience associated with such extended travel credits, recognition of expected breakage will likely create volatility in certain Passenger revenue metrics through September 2022. For the year ended December 31, 2021, holding other factors constant, a 10 percent change in the Company's estimate of the amount of these extended credits that will expire unused would have resulted in an immaterial change in Passenger revenues recognized.

Also as a result of changes in observed Customer travel habits and behaviors during 2021, the Company has increased its estimates of "normal" Customer flight credits that are expected to expire unused. Although very little of these funds have yet to reach their expiration dates, Customer redemptions of these "normal" credits have been at a slower rate than the Company's historical data would suggest for similar credits in periods prior to the COVID-19 pandemic. Based on historical Customer behavior, holding other factors constant, a 10 percent change in the

72

Company's estimate of the amount of "normal" tickets and/or flight credits that will expire unused would have resulted in a $59 million, or less than one percent, change in Passenger revenues recognized for the year ended December 31, 2021.

Observed Customer behavior that differs from historical experience can cause actual ticket breakage to differ significantly from estimates. Assumptions about Customer behavior are reviewed frequently and corresponding adjustments are made to breakage estimates, as needed, when observed behaviors differ from historical experience. Assumptions about Customer behavior can be impacted by several factors including, but not limited to: fare increases, fare sales, changes to the Company's ticketing policies, changes to the Company's refund, exchange and unused funds policies, seat availability, and economic factors. The Company's estimation techniques have been consistently applied from year to year; however, as with any estimates, actual ticket breakage may vary from estimated amounts. Given the unprecedented amount of 2020 Customer flight cancellations and the amount of travel funds available to Customers for use through September 2022, the Company expects additional variability in the amount of breakage recorded in future periods, especially as a percentage of revenues, as the estimates of the portion of sold tickets that will expire unused may differ from historical experience and the Company's overall revenues remain below pre-COVID-19 pandemic levels.

### Fair Value Measurements and Financial Derivative Instruments

The Company utilizes unobservable (Level 3) inputs in determining the fair value of certain assets and liabilities. At December 31, 2021, these consisted of its fuel derivative option contracts, which were an asset of $696 million. The Company utilizes financial derivative instruments primarily to manage its risk associated with changing jet fuel prices. See "Quantitative and Qualitative Disclosures about Market Risk" for more information on these risk management activities, Note 11 to the Consolidated Financial Statements for more information on the Company's fuel hedging program and financial derivative instruments, and Note 12 to the Consolidated Financial Statements for more information about fair value measurements.

All derivatives are required to be reflected at fair value and recorded on the Consolidated Balance Sheet. At December 31, 2021, the Company was a party to over 175 separate financial derivative instruments related to its fuel hedging program for future periods. Changes in the fair values of these instruments can vary dramatically based on changes in the underlying commodity prices. For example, during 2021, market "spot" prices for Brent crude oil peaked at a high average daily price of approximately $86 per barrel and hit a low average daily price of approximately $51 per barrel. During 2020, market spot prices ranged from a high average daily price of approximately $69 per barrel to a low average daily price of approximately $19 per barrel. Market price changes can be driven by factors such as supply and demand, inventory levels, weather events, refinery capacity, political agendas, the value of the U.S. dollar, geopolitical events, the extent of the COVID-19 pandemic, and general economic conditions, among other items. Historically, the financial derivative instruments utilized by the Company primarily are a combination of collars, purchased call options, call spreads, put spreads, and fixed price swap agreements.

The Company enters into financial derivative instruments with third party institutions in "over-the-counter" markets. Since the majority of the Company's financial derivative instruments are not traded on a market exchange, the Company estimates their fair values. Depending on the type of instrument, the values are determined by the use of present value methods or standard option value models with assumptions about commodity prices based on those observed in underlying markets.

The Company determines the fair value of fuel derivative option contracts utilizing an option pricing model based on inputs that are either readily available in public markets, can be derived from information available in publicly quoted markets, or are quoted by its counterparties. In situations where the Company obtains inputs via quotes from its counterparties, it verifies the reasonableness of these quotes via similar quotes from another counterparty as of each date for which financial statements are prepared. The Company has consistently applied these valuation techniques in all periods presented and believes it has obtained the most accurate information available for the types of derivative contracts it holds. Due to the fact that certain inputs used in determining the estimated fair value of its

option contracts are considered unobservable (primarily implied volatility), the Company has categorized these option contracts as Level 3. Although implied volatility is not directly observable, it is derived primarily from changes in market prices, which are observable. Based on the Company's portfolio of option contracts as of December 31, 2021, a 10 percent change in implied volatility, holding all other factors constant, would have resulted in a change in the fair value of this portfolio of less than $105 million.

Fair values for financial derivative instruments are estimated prior to the time that the financial derivative instruments settle. However, once settlement of the financial derivative instruments occurs and the hedged jet fuel is purchased and consumed, all values and prices are known and are recognized in the financial statements. Although the Company continues to use a prospective assessment to determine that commodities continue to qualify for hedge accounting in specific locations where the Company hedges, there are no assurances that these commodities will continue to qualify in the future. This is due to the fact that future price changes in these refined products may not be consistent with historical price changes. Increased volatility in these commodity markets for an extended period of time, especially if such volatility were to worsen, could cause the Company to lose hedge accounting altogether for the commodities used in its fuel hedging program. Further, should the anticipated fuel purchases covered by the Company's fuel hedges no longer be probable of occurring, the Company would discontinue hedge accounting. The loss of hedge accounting would create further volatility in the Company's GAAP financial results.

As discussed in Note 11 to the Consolidated Financial Statements, any changes in fair value of cash flow derivatives designated as hedges are offset within AOCI until the period in which the expected future cash flow impacts earnings. Any changes in the fair value of fuel derivatives that do not qualify for hedge accounting are reflected in earnings within Other (gains) losses, net, in the period of the change. Because the Company has extensive historical experience in valuing the derivative instruments it holds, and such experience is continually evaluated against its counterparties each period when such instruments expire and are settled for cash, the Company believes it is unlikely that an independent third party would value the Company's derivative contracts at a significantly different amount than what is reflected in the Company's financial statements. In addition, the Company also has bilateral credit provisions in some of its counterparty agreements, which provide for parties (or the Company) to provide cash collateral when the fair value of fuel derivatives with a single party exceeds certain threshold levels. Since this cash collateral is based on the estimated fair value of the Company's outstanding fuel derivative contracts, this provides further validation to the Company's estimate of fair values.

### *Loyalty Accounting*

The Company utilizes estimates in the recognition of revenues and liabilities associated with its loyalty program. These estimates primarily include the liability associated with Rapid Rewards loyalty member ("Member") account balances that are expected to be redeemed for travel or other products at a future date. Loyalty account balances include points earned through flights taken, points sold to Customers, or points earned through business partners participating in the loyalty program.

Under the Southwest Rapid Rewards loyalty program, Members earn points for every dollar spent on Southwest base fares. The amount of points earned under the program is based on the fare amount and fare type, with higher fare types (e.g., Business Select) earning more points than lower fare types (e.g., Wanna Get Away). Each fare type is associated with a points earning multiplier, and points for flights are calculated by multiplying the fare amount for the flight by the fare type multiplier. Likewise, the amount of points required to be redeemed for a flight can differ based on the fare type purchased. Under the program, (i) Members are able to redeem their points for every available seat, every day, on every flight, with no blackout dates; and (ii) points do not expire. In addition, Members are able to redeem their points for items other than travel on Southwest Airlines, such as international flights on other airlines, cruises, hotel stays, rental cars, gift cards, event tickets, and more. In addition to earning points for revenue flights and qualifying purchases with Rapid Rewards Partners, Members also have the ability to purchase, gift, and transfer points, as well as the ability to donate points to selected charities.

The Company utilizes the deferred revenue method of accounting for points earned through flights taken in its loyalty program. The Company also sells points and related services to business partners participating in the loyalty program. Liabilities are recorded for the relative standalone selling price of the Rapid Rewards points which are

74

awarded each period. The liabilities recorded represent the total number of points expected to be redeemed by Members, regardless of whether the Members may have enough to qualify for a full travel award. At December 31, 2021, the loyalty liabilities were approximately $4.8 billion, including $2.6 billion classified within Air traffic liability and $2.2 billion classified as Air traffic liability – noncurrent.

In order to determine the value of each loyalty point, certain assumptions must be made at the time of measurement, which include an allocation of passenger revenue between the flight and loyalty points earned by passengers, and the fair value of Rapid Rewards points, which are generally based on their redemption value to the Customer. See Note 6 to the Consolidated Financial Statements for further information on determining the estimated fair value of each loyalty point.

The majority of the points sold to business partners are through the Southwest co-branded credit card agreement ("Agreement") with Chase Bank USA, N.A. Consideration received as part of this Agreement is subject to Accounting Standards Codification 606, Revenue From Contracts With Customers. The Agreement has the following multiple elements: travel points to be awarded, use of the Southwest Airlines' brand and access to Rapid Rewards Member lists, advertising elements, and the Company's resource team. These elements are combined into two performance obligations, transportation and marketing, and consideration from the Agreement is allocated based on the relative selling price of each performance obligation.

Significant management judgment was used to estimate the selling price of each of the performance obligations in the Agreement at inception, including each time in which the Agreement has been materially amended. The objective is to determine the price at which the Company would transact a sale if the product or service was sold on a stand-alone basis. The Company determines the best estimate of selling price by considering multiple inputs and methods including, but not limited to, the estimated selling price of comparable travel, discounted cash flows, brand value, published selling prices, number of points awarded, and the number of points redeemed. The Company estimates the selling prices and volumes over the term of the Agreement in order to determine the allocation of proceeds to each of the multiple performance obligations. The Company records revenue related to air transportation when the transportation is delivered and revenue related to marketing elements when the performance obligation is satisfied. A one percent increase or decrease in the Company's estimate of the standalone selling prices, implemented as of January 1, 2021, causing a change to the allocation of proceeds to air transportation would not have had a material impact on the Company's Operating revenues for the year ended December 31, 2021.

Under its current program, Southwest estimates the portion of loyalty points that will not be redeemed. In estimating the breakage, the Company takes into account the Member's past behavior, as well as several factors related to the Member's account that are expected to be indicative of the likelihood of future point redemption. These factors are typically representative of a Member's level of engagement in the loyalty program. They include, but are not limited to, tenure with the program, points accrued in the program, and points redeemed in the program. The Company believes it has obtained sufficient historical behavioral data to develop a predictive statistical model to analyze the amount of breakage expected for all loyalty points. The Company updates this model at least annually, and applies the new breakage rates effective October 1st each year, or more frequently if required by changes in the business. Changes in the breakage rates applied annually in recent years have not had a material impact on Passenger revenues. For the year ended December 31, 2021, based on actual redemptions of points sold to business partners and earned through flights, a hypothetical one percentage point change in the estimated breakage rate would have resulted in a change to Passenger revenue of approximately $100 million (an increase in breakage would have resulted in an increase in revenue and a decrease in breakage would have resulted in a decrease in revenue). Given that Member behavior will continue to develop as the program matures, the Company expects the current estimates may change in future periods. However, the Company believes its current estimates are reasonable given current facts and circumstances.

**Item 7A.** *Quantitative and Qualitative Disclosures About Market Risk*

The Company has interest rate risk in its floating-rate debt obligations and interest rate swaps, commodity price risk in jet fuel required to operate its aircraft fleet, and market risk in the derivatives used to manage its fuel hedging program and in the form of fixed-rate debt instruments. As of December 31, 2021, the Company operated a total of 129 aircraft under operating and finance leases. However, except for a small number of aircraft that have lease payments that fluctuate based in part on changes in market interest rates, the remainder of the leases are not considered market sensitive financial instruments and, therefore, are not included in the interest rate sensitivity analysis below. The Company also has 14 aircraft under operating leases that have been subleased to another carrier. Further information about these leases is disclosed in Note 8 to the Consolidated Financial Statements. The Company does not purchase or hold any derivative financial instruments for trading purposes. See Note 11 to the Consolidated Financial Statements for information on the Company's accounting for its hedging program and for further details on the Company's financial derivative instruments.

### Hedging

The Company purchases jet fuel at prevailing market prices, but seeks to manage market risk through execution of a documented hedging strategy. The Company utilizes financial derivative instruments, on both a short-term and a long-term basis, as a form of insurance against the potential for significant increases in fuel prices. The Company believes there can be significant risk in not hedging against the possibility of such fuel price increases, especially in energy markets in which prices are high and/or rising. The Company expects to consume approximately 1.9 billion gallons of jet fuel in 2022. Based on this anticipated usage, a change in jet fuel prices of just one cent per gallon would impact the Company's Fuel and oil expense by approximately $19 million for 2022, excluding any impact associated with fuel derivative instruments held.

As of December 31, 2021, the Company held a net position of fuel derivative instruments that represented a hedge for a portion of its anticipated jet fuel purchases for future periods. See Note 11 to the Consolidated Financial Statements for further information. The Company may increase or decrease the volume of fuel hedged based on its expectation of future market prices and its forecasted fuel consumption levels, while considering the significant cost that can be associated with different types of hedging strategies. The gross fair value of outstanding financial derivative instruments related to the Company's jet fuel market price risk at December 31, 2021, was an asset of $696 million. In addition, $175 million in cash collateral deposits were held by the Company in connection with these instruments based on their fair value as of December 31, 2021. The fair values of the derivative instruments, depending on the type of instrument, were determined by use of present value methods or standard option value models with assumptions about commodity prices based on those observed in underlying markets. An immediate 10 percent increase or decrease in underlying fuel-related commodity prices from the December 31, 2021, prices would correspondingly change the fair value of the commodity derivative instruments in place by approximately $185 million. Fluctuations in the related commodity derivative instrument cash flows may change by more or less than this amount based upon further fluctuations in futures prices, as well as related income tax effects. In addition, this does not consider changes in cash or letters of credit utilized as collateral provided to or by counterparties, which would fluctuate in an amount equal to or less than this amount, depending on the type of collateral arrangement in place with each counterparty. This sensitivity analysis uses industry standard valuation models and holds all inputs constant at December 31, 2021, levels, except underlying futures prices.

The Company's credit exposure related to fuel derivative instruments is represented by the fair value of contracts that are in an asset position to the Company. At such times, these outstanding instruments expose the Company to credit loss in the event of nonperformance by the counterparties to the agreements. As of December 31, 2021, the Company had nine counterparties for which the derivatives held were an asset. To manage credit risk, the Company selects and periodically reviews counterparties based on credit ratings, limits its exposure with respect to each counterparty, and monitors the market position of the fuel hedging program and its relative market position with each counterparty. However, if one or more of these counterparties were in a liability position to the Company and were unable to meet their obligations, any open derivative contracts with the counterparty could be subject to early termination, which could result in substantial losses for the Company. At December 31, 2021, the Company had

76

agreements with all of its active counterparties containing early termination rights and/or bilateral collateral provisions whereby security is required if market risk exposure exceeds a specified threshold amount based on the counterparty's credit rating. The Company also had agreements with counterparties in which cash deposits and/or letters of credit are required to be posted as collateral whenever the net fair value of derivatives associated with those counterparties exceeds specific thresholds. Refer to the counterparty credit risk and collateral table provided in Note 11 to the Consolidated Financial Statements for the fair values of fuel derivatives, amounts held as collateral, and applicable collateral posting threshold amounts as of December 31, 2021, at which such postings are triggered.

The Company is also subject to the risk that the fuel derivatives it uses to hedge against fuel price volatility do not provide adequate protection. The Company has found that financial derivative instruments in commodities, such as WTI crude oil, Brent crude oil, and refined products, such as heating oil and unleaded gasoline, can be useful in decreasing its exposure to jet fuel price volatility. In addition, to add further protection, the Company may periodically enter into jet fuel derivatives for short-term timeframes. Jet fuel is not widely traded on an organized futures exchange and, therefore, there are limited opportunities to hedge directly in jet fuel for time horizons longer than approximately 24 months into the future.

The Company also has agreements with each of its counterparties associated with its outstanding interest rate swap agreements in which cash collateral may be required based on the fair value of outstanding derivative instruments, as well as the Company's and its counterparty's credit ratings. As of December 31, 2021, no cash collateral deposits were provided by or held by the Company based on its outstanding interest rate swap agreements.

Due to the significance of the Company's fuel hedging program and the emphasis that the Company places on utilizing fuel derivatives to reduce its fuel price risk, the Company has created a system of governance and management oversight and has put in place a number of internal controls designed so that procedures are properly followed and accountability is present at the appropriate levels. For example, the Company has put in place controls designed to: (i) create and maintain a comprehensive risk management policy; (ii) provide for proper authorization by the appropriate levels of management; (iii) provide for proper segregation of duties; (iv) maintain an appropriate level of knowledge regarding the execution of and the accounting for derivative instruments; and (v) have key performance indicators in place in order to adequately measure the performance of its hedging activities. The Company believes the governance structure that it has in place is adequate given the size and sophistication of its hedging program.

### Financial Market Risk

The vast majority of the Company's tangible assets are aircraft, which are long-lived. The Company's strategy is to maintain a conservative balance sheet and grow capacity steadily and profitably under the right conditions. While the Company uses financial leverage, it strives to maintain a strong balance sheet and has a "BBB+" rating with Fitch, a "BBB" rating with Standard & Poor's, and a "Baa1" credit rating with Moody's as of December 31, 2021, all of which are considered "investment grade." See Note 7 to the Consolidated Financial Statements for more information on the material terms of the Company's short-term and long-term debt.

The following table presents the Company's fixed-rate senior unsecured notes outstanding as of December 31, 2021:

| (in millions) | December 31, 2021 |
|---|---|
| 2.75% Notes due 2022 | $ 300 |
| 4.75% Notes due 2023 | 1,250 |
| 5.25% Notes due 2025 | 1,550 |
| 3.00% Notes due 2026 | 300 |
| 3.45% Notes due 2027 | 300 |
| 5.125% Notes due 2027 | 2,000 |
| 7.375% Debentures due 2027 | 100 |
| 2.625% Notes due 2030 | 500 |

The $100 million 7.375% debentures due 2027 had at one point been converted to a floating rate, but the Company subsequently terminated the fixed-to-floating interest rate swap agreements related to it. The effect of this termination was that the interest associated with this debt prospectively reverted back to its original fixed rate. As a result of the gain realized on this transaction, which is being amortized over the remaining term of the corresponding notes, and based on projected interest rates at the date of termination, the Company does not believe its future interest expense, based on projected future interest rates at the date of termination, associated with these notes will significantly differ from the expense it would have recorded had the notes remained at floating rates.

The Company's total debt divided by total assets was 29.5 percent as of December 31, 2021.

The Company also has some risk associated with changing interest rates due to the short-term nature of its invested cash, which totaled $12.5 billion, and short-term investments, which totaled $3.0 billion at December 31, 2021. See Notes 1 and 12 to the Consolidated Financial Statements for further information. The Company currently invests available cash in certificates of deposit, highly rated money market instruments, investment grade commercial paper, treasury securities, U.S. government agency securities, and other highly rated financial instruments, depending on market conditions and operating cash requirements. Because of the short-term nature of these investments, the returns earned parallel closely with short-term floating interest rates. The Company has not undertaken any additional actions to cover interest rate market risk and is not a party to any other material market interest rate risk management activities.

A hypothetical 10 percent change in market interest rates as of December 31, 2021, would have resulted in an approximate $37 million change in the fair value of the Company's fixed-rate debt instruments. See Note 12 to the Consolidated Financial Statements for further information on the fair value of financial instruments. A change in market interest rates could, however, have a corresponding effect on earnings and cash flows associated with the Company's invested cash (excluding cash collateral deposits held, if applicable) and short-term investments because of the floating-rate nature of these items. Assuming floating market rates in effect as of December 31, 2021 were held constant throughout a 12-month period, a hypothetical 10 percent change in those rates would have an immaterial impact on the Company's net earnings and cash flows. Utilizing these assumptions and considering the Company's cash balance (excluding the impact of cash collateral deposits held from or provided to counterparties, if applicable) and short-term investments outstanding at December 31, 2021, an increase in rates would have a net positive effect on the Company's earnings and cash flows, while a decrease in rates would have a net negative effect on the Company's earnings and cash flows. However, a 10 percent change in market rates would not impact the Company's earnings or cash flow associated with the Company's publicly traded fixed-rate debt.

The Company is also subject to a financial covenant included in its Amended A&R Credit Agreement, and is subject to credit rating triggers related to its credit card transaction processing agreements, the pricing related to any funds drawn under its Amended A&R Credit Agreement, and some of its hedging counterparty agreements. Certain covenants include the maintenance of minimum credit ratings and/or triggers that are based on changes in these ratings. The Company's Amended A&R Credit Agreement contains a financial covenant to maintain total liquidity,

78

as defined therein, of $1.5 billion at all times. As of December 31, 2021, the Company was in compliance with this covenant and there were no amounts outstanding under the Amended A&R Credit Agreement. However, if conditions change and the Company fails to meet the minimum standards set forth in the Amended A&R Credit Agreement, there could be a reduction in the availability of cash under the facility, or an increase in the costs to keep the facility intact as written. The Company's hedging counterparty agreements contain ratings triggers in which cash collateral could be required to be posted with the counterparty if the Company's credit rating were to fall below investment grade by two of the three major rating agencies, and if the Company were in a net liability position with the counterparty. See Note 11 to the Consolidated Financial Statements for further information.

The Company currently has agreements with organizations that process credit card transactions arising from purchases of air travel tickets by its Customers utilizing American Express, Discover, and MasterCard/VISA. Credit card processors have financial risk associated with tickets purchased for travel because the processor generally forwards the cash related to the purchase to the Company soon after the purchase is completed, but the air travel generally occurs after that time; therefore, the processor will have liability if the Company does not ultimately provide the air travel. Under these processing agreements, and based on specified conditions, increasing amounts of cash reserves could be required to be posted with the counterparty. There was no cash reserved for this purpose as of December 31, 2021.

A majority of the Company's sales transactions are processed by Chase Paymentech. Should chargebacks processed by Chase Paymentech reach a certain level, proceeds from advance ticket sales could be held back and used to establish a reserve account to cover such chargebacks and any other disputed charges that might occur. Additionally, cash reserves are required to be established if the Company's credit rating falls to specified levels below investment grade. Cash reserve requirements are based on the Company's public debt rating and a corresponding percentage of the Company's Air traffic liability. As of December 31, 2021, no holdbacks were in place.

As of December 31, 2021, the Company was in compliance with all credit card processing agreements. The inability to enter into credit card processing agreements would have a material adverse effect on the business of the Company. The Company believes that it will be able to continue to renew its existing credit card processing agreements or will be able to enter into new credit card processing agreements with other processors in the future.

**Item 8.**     *Financial Statements and Supplementary Data*

<div align="center">

**Southwest Airlines Co.**
**Consolidated Balance Sheet**
(in millions, except share data)

</div>

| | December 31, 2021 | December 31, 2020 |
|---|---:|---:|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 12,480 | $ 11,063 |
| Short-term investments | 3,024 | 2,271 |
| Accounts and other receivables | 1,357 | 1,130 |
| Inventories of parts and supplies, at cost | 537 | 414 |
| Prepaid expenses and other current assets | 638 | 295 |
| Total current assets | 18,036 | 15,173 |
| | | |
| Property and equipment, at cost: | | |
| Flight equipment | 21,226 | 20,877 |
| Ground property and equipment | 6,342 | 6,083 |
| Deposits on flight equipment purchase contracts | — | 305 |
| Assets constructed for others | 6 | 309 |
| | 27,574 | 27,574 |
| Less allowance for depreciation and amortization | 12,732 | 11,743 |
| | 14,842 | 15,831 |
| Goodwill | 970 | 970 |
| Operating lease right-of-use assets | 1,590 | 1,892 |
| Other assets | 882 | 722 |
| | $ 36,320 | $ 34,588 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 1,282 | $ 931 |
| Accrued liabilities | 1,624 | 2,259 |
| Current operating lease liabilities | 239 | 306 |
| Air traffic liability | 5,566 | 3,790 |
| Current maturities of long-term debt | 453 | 220 |
| Total current liabilities | 9,164 | 7,506 |
| | | |
| Long-term debt less current maturities | 10,274 | 10,111 |
| Air traffic liability - noncurrent | 2,159 | 3,343 |
| Deferred income taxes | 1,770 | 1,634 |
| Construction obligation | — | 309 |
| Noncurrent operating lease liabilities | 1,315 | 1,562 |
| Other noncurrent liabilities | 1,224 | 1,247 |
| Stockholders' equity: | | |
| Common stock, $1.00 par value: 2,000,000,000 shares authorized; 888,111,634 shares issued in 2021 and 2020 | 888 | 888 |
| Capital in excess of par value | 4,224 | 4,191 |
| Retained earnings | 15,774 | 14,777 |
| Accumulated other comprehensive income (loss) | 388 | (105) |
| Treasury stock, at cost: 295,991,525 and 297,637,297 shares in 2021 and 2020, respectively | (10,860) | (10,875) |
| Total stockholders' equity | 10,414 | 8,876 |
| | $ 36,320 | $ 34,588 |

See accompanying notes.

Table of Contents

**Southwest Airlines Co.**
**Consolidated Statement of Income (Loss)**
(in millions, except per share amounts)

| | | Year ended December 31, | | |
|---|---|---|---|---|
| | | 2021 | 2020 | 2019 |
| **OPERATING REVENUES:** | | | | |
| Passenger | $ | 14,066 $ | 7,665 $ | 20,776 |
| Freight | | 187 | 161 | 172 |
| Other | | 1,537 | 1,222 | 1,480 |
| Total operating revenues | | 15,790 | 9,048 | 22,428 |
| | | | | |
| **OPERATING EXPENSES, NET:** | | | | |
| Salaries, wages, and benefits | | 7,743 | 6,811 | 8,293 |
| Payroll support and voluntary Employee programs, net | | (2,960) | (967) | — |
| Fuel and oil | | 3,310 | 1,849 | 4,347 |
| Maintenance materials and repairs | | 854 | 750 | 1,223 |
| Landing fees and airport rentals | | 1,456 | 1,240 | 1,363 |
| Depreciation and amortization | | 1,272 | 1,255 | 1,219 |
| Other operating expenses | | 2,394 | 1,926 | 3,026 |
| Total operating expenses, net | | 14,069 | 12,864 | 19,471 |
| | | | | |
| **OPERATING INCOME (LOSS)** | | 1,721 | (3,816) | 2,957 |
| | | | | |
| **OTHER EXPENSES (INCOME):** | | | | |
| Interest expense | | 467 | 349 | 118 |
| Capitalized interest | | (36) | (35) | (36) |
| Interest income | | (13) | (32) | (90) |
| Other (gains) losses, net | | (22) | 158 | 8 |
| Total other expenses (income) | | 396 | 440 | — |
| | | | | |
| **INCOME (LOSS) BEFORE INCOME TAXES** | | 1,325 | (4,256) | 2,957 |
| **PROVISION (BENEFIT) FOR INCOME TAXES** | | 348 | (1,182) | 657 |
| **NET INCOME (LOSS)** | $ | 977 $ | (3,074) $ | 2,300 |
| **NET INCOME (LOSS) PER SHARE, BASIC** | $ | 1.65 $ | (5.44) $ | 4.28 |
| **NET INCOME (LOSS) PER SHARE, DILUTED** | $ | 1.61 $ | (5.44) $ | 4.27 |

See accompanying notes.

81

**Southwest Airlines Co.**
**Consolidated Statement of Comprehensive Income (Loss)**
(in millions)

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | **2021** | **2020** | **2019** |
| NET INCOME (LOSS) | $ 977 | $ (3,074) | $ 2,300 |
| Unrealized gain (loss) on fuel derivative instruments, net of deferred taxes of $142, $2, and ($16) | 469 | 4 | (53) |
| Unrealized gain (loss) on interest rate derivative instruments, net of deferred taxes of $2, ($8), and ($8) | 7 | (25) | (25) |
| Unrealized gain (loss) on defined benefit plan items, net of deferred taxes of $25, ($15), and ($9) | 84 | (48) | (29) |
| Other, net of deferred taxes of ($13), $7, and $8 | (47) | 25 | 26 |
| OTHER COMPREHENSIVE INCOME (LOSS) | $ 513 | $ (44) | $ (81) |
| COMPREHENSIVE INCOME (LOSS) | $ 1,490 | $ (3,118) | $ 2,219 |

See accompanying notes.

82

**Southwest Airlines Co.**
**Consolidated Statement of Stockholders' Equity**
(in millions, except per share amounts)

| | Common Stock | | Capital in excess of par value | | Retained earnings | | Accumulated other comprehensive income (loss) | | Treasury stock | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Year ended December 31, 2021, 2020, and 2019 | | | | | | | |
| Balance at December 31, 2018 (as reported) | $ | 808 | $ | 1,510 | $ | 15,967 | $ | 20 | $ | (8,452) | $ | 9,853 |
| Cumulative effect of adopting Accounting Standards Update No. 2016-02, Leases, codified in Accounting Standards Codification 842 | | — | | — | | 55 | | — | | — | | 55 |
| Balance after adjustment for the new accounting standard | $ | 808 | $ | 1,510 | $ | 16,022 | $ | 20 | $ | (8,452) | $ | 9,908 |
| Repurchase of common stock | | — | | — | | — | | — | | (2,000) | | (2,000) |
| Issuance of common and treasury stock pursuant to Employee stock plans | | — | | 16 | | — | | — | | 11 | | 27 |
| Share-based compensation | | — | | 55 | | — | | — | | — | | 55 |
| Cash dividends, $0.700 per share | | — | | — | | (377) | | — | | — | | (377) |
| Comprehensive income | | — | | — | | 2,300 | | (81) | | — | | 2,219 |
| Balance at December 31, 2019 | $ | 808 | $ | 1,581 | $ | 17,945 | $ | (61) | $ | (10,441) | $ | 9,832 |
| Repurchase of common stock | | — | | — | | — | | — | | (451) | | (451) |
| Issuance of common stock, net of issuance costs | | 80 | | 2,144 | | — | | — | | — | | 2,224 |
| Issuance of common and treasury stock pursuant to Employee stock plans | | — | | 17 | | — | | — | | 17 | | 34 |
| Share-based compensation | | — | | 17 | | — | | — | | — | | 17 |
| Cash dividends, $0.180 per share | | — | | — | | (94) | | — | | — | | (94) |
| Stock warrants | | — | | 40 | | — | | — | | — | | 40 |
| Equity feature of convertible notes, net of issuance costs | | — | | 392 | | — | | — | | — | | 392 |
| Comprehensive loss | | — | | — | | (3,074) | | (44) | | — | | (3,118) |
| Balance at December 31, 2020 | $ | 888 | $ | 4,191 | $ | 14,777 | $ | (105) | $ | (10,875) | $ | 8,876 |
| Cumulative effect of adopting Accounting Standards Update No. 2016-01, Financial Instruments | | — | | — | | 20 | | (20) | | — | | — |
| Issuance of common and treasury stock pursuant to Employee stock plans | | — | | 22 | | — | | — | | 15 | | 37 |
| Share-based compensation | | — | | 58 | | — | | — | | — | | 58 |
| Stock warrants | | — | | 45 | | — | | — | | — | | 45 |
| Equity feature of partial extinguishment of convertible notes | | — | | (92) | | — | | — | | — | | (92) |
| Comprehensive income | | — | | — | | 977 | | 513 | | — | | 1,490 |
| Balance at December 31, 2021 | $ | 888 | $ | 4,224 | $ | 15,774 | $ | 388 | $ | (10,860) | $ | 10,414 |

See accompanying notes.

83

**Southwest Airlines Co.**
**Consolidated Statement of Cash Flows**
(in millions)

| | | Year ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2021** | | **2020** | | **2019** |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | | | |
| Net income (loss) | $ | 977 | $ | (3,074) | $ | 2,300 |
| Adjustments to reconcile net income (loss) to cash provided by (used in) operating activities: | | | | | | |
| Depreciation and amortization | | 1,272 | | 1,255 | | 1,219 |
| Impairment of long-lived assets | | 12 | | 32 | | — |
| Unrealized/realized (gain) loss on fuel derivative instruments | | (15) | | 15 | | — |
| Deferred income taxes | | (21) | | (716) | | (55) |
| Gain on sale-leaseback transactions | | — | | (222) | | — |
| Loss on partial extinguishment of convertible notes | | 28 | | — | | — |
| Changes in certain assets and liabilities: | | | | | | |
| Accounts and other receivables | | (701) | | (294) | | (94) |
| Other assets | | 75 | | 415 | | 239 |
| Accounts payable and accrued liabilities | | 38 | | 231 | | 298 |
| Air traffic liability | | 591 | | 1,623 | | 440 |
| Other liabilities | | (103) | | (306) | | (277) |
| Cash collateral received from derivative counterparties | | 141 | | 9 | | 25 |
| Other, net | | 28 | | (95) | | (108) |
| Net cash provided by (used in) operating activities | | 2,322 | | (1,127) | | 3,987 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | | | | |
| Capital expenditures | | (505) | | (515) | | (1,027) |
| Supplier proceeds | | — | | 428 | | 400 |
| Proceeds from sale-leaseback transactions | | — | | 815 | | — |
| Assets constructed for others | | (6) | | — | | — |
| Purchases of short-term investments | | (5,824) | | (5,080) | | (2,122) |
| Proceeds from sales of short-term and other investments | | 5,071 | | 4,336 | | 2,446 |
| Net cash used in investing activities | | (1,264) | | (16) | | (303) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | | | | |
| Issuance of common stock | | — | | 2,294 | | — |
| Proceeds from issuance of long-term debt | | — | | 5,622 | | — |
| Proceeds from term loan credit facility | | — | | 3,683 | | — |
| Proceeds from revolving credit facility | | — | | 1,000 | | — |
| Proceeds from convertible notes | | — | | 2,300 | | — |
| Proceeds from Payroll Support Program loan and warrants | | 1,136 | | 1,016 | | — |
| Proceeds from Employee stock plans | | 51 | | 48 | | 40 |
| Repurchase of common stock | | — | | (451) | | (2,000) |
| Payments of long-term debt and finance lease obligations | | (612) | | (839) | | (615) |
| Payments of term loan credit facility | | — | | (3,683) | | — |
| Payments of revolving credit facility | | — | | (1,000) | | — |
| Payments of cash dividends | | — | | (188) | | (372) |
| Payments of terminated interest rate derivative instruments | | — | | (59) | | — |
| Payments for repurchases and conversions of convertible debt | | (293) | | — | | — |
| Capitalized financing items | | — | | (134) | | — |
| Other, net | | 77 | | 49 | | (43) |
| Net cash provided by (used in) financing activities | | 359 | | 9,658 | | (2,990) |
| **NET CHANGE IN CASH AND CASH EQUIVALENTS** | | 1,417 | | 8,515 | | 694 |
| **CASH AND CASH EQUIVALENTS AT BEGINNING OF PERIOD** | | 11,063 | | 2,548 | | 1,854 |
| **CASH AND CASH EQUIVALENTS AT END OF PERIOD** | $ | 12,480 | $ | 11,063 | $ | 2,548 |
| **CASH PAYMENTS FOR:** | | | | | | |
| Interest, net of amount capitalized | $ | 336 | $ | 212 | $ | 88 |
| Income taxes | $ | 445 | $ | 19 | $ | 779 |
| **SUPPLEMENTAL DISCLOSURE OF NONCASH TRANSACTIONS:** | | | | | | |
| Flight equipment acquired against supplier credit memo | $ | 569 | $ | — | $ | — |
| Assets constructed for others | $ | 309 | $ | 145 | $ | 65 |
| Supplier receivables | $ | — | $ | — | $ | 428 |
| Remeasurement of right-of-use asset and lease liability | $ | 343 | $ | — | $ | — |

See accompanying notes.

84

**Southwest Airlines Co.**
**Notes to Consolidated Financial Statements**

1. Summary of Significant Accounting Policies

2. Worldwide Pandemic

3. New Accounting Pronouncements

4. Net Income (Loss) Per Share

5. Commitments and Contingencies

6. Revenue

7. Financing Activities

8. Leases

9. Common Stock

10. Stock Plans

11. Financial Derivative Instruments

12. Fair Value Measurements

13. Accumulated Other Comprehensive Income (Loss)

14. Employee Retirement Plans

15. Income Taxes

16. Supplemental Financial Information

17. Boeing 737 MAX Grounding and Return to Service

Report of Independent Registered Public Accounting Firm

85

# 1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Presentation

Southwest Airlines Co. (the "Company" or "Southwest") operates Southwest Airlines, a major domestic airline. The Consolidated Financial Statements include the accounts of the Company and its wholly owned subsidiaries, which include AirTran Holdings, LLC, the successor to AirTran Holdings, Inc., the former parent company of AirTran Airways, Inc., and Triple Crown Assurance Co., an insurance captive. The accompanying Consolidated Financial Statements include the results of operations and cash flows for all periods presented and all significant inter-entity balances and transactions have been eliminated. The preparation of financial statements in conformity with generally accepted accounting principles in the United States ("GAAP") requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from these estimates.

### Cash and Cash Equivalents

Cash in excess of that necessary for operating requirements is invested in short-term, highly liquid, income-producing investments. Investments with original maturities of three months or less when purchased are classified as cash and cash equivalents, which primarily consist of certificates of deposit, money market funds, and investment grade commercial paper issued by major corporations and financial institutions. Cash and cash equivalents are stated at cost, which approximates fair value.

As of December 31, 2021 and 2020, $175 million and $34 million, respectively, in cash collateral deposits were held by the Company from its fuel hedge counterparties, and no cash collateral deposits were held by or provided by the Company to its interest rate hedge counterparties for either period. Cash collateral amounts provided or held associated with fuel and interest rate derivative instruments are not restricted in any way and earn interest income at an agreed upon rate that approximates the rates earned on short-term securities issued by the U.S. Government. Depending on the fair value of the Company's fuel and interest rate derivative instruments, the amounts of collateral deposits held or provided at any point in time can fluctuate significantly. See Note 11 for further information on these collateral deposits and fuel derivative instruments.

### Short-term and Noncurrent Investments

Short-term investments consist of investments with original maturities of greater than three months but less than twelve months when purchased. These are primarily short-term securities issued by the U.S. Government and certificates of deposit issued by domestic banks. All of these investments are classified as available-for-sale securities and are stated at fair value, which approximates cost. For all short-term investments, at each reset period or upon reinvestment, the Company accounts for the transaction as Proceeds from sales of short-term and other investments for the security relinquished, and Purchases of short-term investments for the security purchased, in the accompanying Consolidated Statement of Cash Flows. Unrealized gains and losses, net of tax, if any, are recognized in Accumulated other comprehensive income (loss) ("AOCI") in the accompanying Consolidated Balance Sheet. Realized net gains and losses on specific investments, if any, are reflected in Interest income in the accompanying Consolidated Statement of Income (Loss). Both unrealized and realized gains and/or losses associated with investments were immaterial for all years presented.

Noncurrent investments consist of investments with maturities of greater than twelve months. Noncurrent investments are included as a component of Other assets in the Consolidated Balance Sheet.

### Accounts and Other Receivables

Accounts and other receivables are initially recorded at cost and are evaluated for collectability in every period. They primarily consist of the amounts due from the Company's business partners and other suppliers, amounts due from credit card companies associated with sales of tickets for future travel, amounts due from business partners in

86

the Company's loyalty program, and tax receivables from overpayment or net operating losses that are allowed to be carried back to prior periods to claim refunds against prior taxes paid. See Note 16 for further information. The allowance for doubtful accounts was immaterial at December 31, 2021 and 2020. In addition, the provision for doubtful accounts and write-offs for 2021, 2020, and 2019 were each immaterial.

### Inventories

Inventories primarily consist of aircraft fuel and flight equipment expendable parts, materials, and supplies. All of these items are carried at average cost, less an allowance for obsolescence. These items are generally charged to expense when issued for use. The reserve for obsolescence was immaterial at December 31, 2021, and 2020. In addition, the Company's provision for obsolescence and write-offs for 2021, 2020, and 2019 were each immaterial.

### Property and Equipment

Property and equipment is stated at cost. Capital expenditures include payments made for aircraft, other flight equipment, purchase deposits related to future aircraft deliveries, airport and other facility construction projects, and ground and other property and equipment. Depreciation is provided by the straight-line method to estimated residual values over periods of approximately 25 years for flight equipment, and 5 to 30 years for ground property and equipment. Residual values estimated for aircraft are approximately 15 percent, and generally range from 0 to 10 percent for ground property and equipment. Assets constructed for others consists of airport improvement projects in which the Company is considered to have control of the asset during the construction period. Once construction is effectively completed, the sale-leaseback model would apply when control passes from the lessee to the lessor. See Note 5 for further information.

The Company evaluates its long-lived assets used in operations for impairment when events and circumstances indicate that the undiscounted cash flows to be generated by that asset group are less than the carrying amounts of the asset group and may not be recoverable. Factors that would indicate potential impairment include, but are not limited to, significant decreases in the market value of the long-lived asset group, a significant change in the long-lived asset group's physical condition, and operating or cash flow losses associated with the use of the long-lived asset group. If an asset group is deemed to be impaired, an impairment loss is recorded for the excess of the asset group's book value in relation to its estimated fair value. During 2021 and 2020, the Company recorded impairment charges of $12 million and $32 million, respectively, associated with the accelerated retirement of 8 and 20 of its 737-700 aircraft.

### Leases

The Company determines if an arrangement is a lease at inception. Operating leases are included in Operating lease right-of-use assets, Current operating lease liabilities, and Noncurrent operating lease liabilities in the Consolidated Balance Sheet. Finance leases are included in Property and equipment, Current maturities of long-term debt, and Long-term debt less current maturities in the Consolidated Balance Sheet.

Right-of-use assets represent the Company's right to use an underlying asset for the lease term, and lease liabilities represent the Company's obligation to make lease payments arising from the lease. The lease liability is measured as the present value of the unpaid lease payments, and the right-of-use asset value is derived from the calculation of the lease liability. Lease payments include fixed and in-substance fixed payments, variable payments based on an index or rate, reasonably certain purchase options, termination penalties, fees paid by the lessee to the owners of a special-purpose entity for restructuring the transaction, and probable amounts the lessee will owe under a residual value guarantee. Lease payments do not include (i) variable lease payments other than those that depend on an index or rate, (ii) any guarantee by the lessee of the lessor's debt, or (iii) any amount allocated to non-lease components, if such election was made upon adoption, per the provisions of the Accounting Standards Codification ("ASC") 842. The Company uses its estimated incremental borrowing rate, which is derived from information available at the lease commencement date, in determining the present value of lease payments, since the Company does not know the actual implicit rates in its leases. The Company gives consideration to its recent debt issuances as well as

87

publicly available data for instruments with similar characteristics when calculating its incremental borrowing rate. Lease expense for operating lease payments is recognized on a straight-line basis over the lease term. The Company combines lease and non-lease components for all asset groups. The Company's lease term includes any option to extend the lease when it is reasonably certain to be exercised based on considering all relevant economic factors.

### Aircraft and Engine Maintenance

The cost of scheduled inspections and repairs and routine maintenance costs for all aircraft and engines are charged to Maintenance materials and repairs expense within the accompanying Consolidated Statement of Income (Loss) as incurred.

The Company has maintenance agreements related to certain aircraft engines with external service providers, including agreements that effectively transfer the risk of performance of such work to the service provider. Under the agreements where the risk of performance is deemed transferred to the counterparty, the appropriate expense is recorded commensurate with the period in which the corresponding level of service is provided. For its engine maintenance contracts that do not transfer risk to the service provider, the Company records expense on a time and materials basis when an engine repair event takes place.

Modifications that significantly enhance the operating performance or extend the useful lives of aircraft or engines are capitalized and amortized over the remaining life of the asset.

### Goodwill and Intangible Assets

The Company applies a fair value based impairment test to the carrying value of goodwill and indefinite-lived intangible assets annually on October 1st, or more frequently if certain events or circumstances indicate that an impairment loss may have been incurred. The Company assesses the value of goodwill and indefinite-lived intangible assets under either a qualitative or quantitative approach. Under a qualitative approach, the Company considers various market factors, including applicable key assumptions also used in the quantitative assessment listed below. These factors are analyzed to determine if events and circumstances could reasonably have affected the fair value of goodwill and indefinite-lived intangible assets. If the Company determines that it is more likely than not that an indefinite-lived intangible asset or reporting unit goodwill is impaired, the quantitative approach is used to assess the asset or reporting unit fair value and the amount of the impairment. Under a quantitative approach, the fair value of the Company's indefinite-lived intangible asset or reporting unit is calculated based on key market participant assumptions. If the indefinite-lived intangible assets' carrying value exceeds the fair value calculated using the quantitative approach, an impairment charge is recorded for the difference in fair value and carrying value. If the reporting unit carrying value exceeds the reporting unit fair value calculated using the quantitative approach, an impairment charge is recorded for the difference between fair value and carrying value, limited to the amount of goodwill in the reporting unit.

The Company's intangible assets primarily consist of acquired rights to certain airport owned takeoff and landing slots (a "slot" is the right of an air carrier, pursuant to regulations of the Federal Aviation Administration ("FAA"), to operate a takeoff or landing at a specific time at certain airports) at certain domestic slot-controlled airports. Indefinite lived slots of $295 million are included as a component of Other assets in the Company's Consolidated Balance Sheet, as of December 31, 2021 and 2020.

The Company applied the qualitative approach during its 2021 impairment tests, and no impairment was determined to exist for Goodwill or indefinite-lived intangible assets.

### Revenue Recognition

Tickets sold are initially deferred as Air traffic liability. Passenger revenue is recognized and Air traffic liability is reduced when transportation is provided. Air traffic liability primarily represents tickets sold for future travel dates, funds that are past flight date and remain unused, but are expected to be used in the future, and the Company's liability for loyalty benefits that are expected to be redeemed in the future. The majority of the Company's tickets

sold are nonrefundable. Southwest has a No Show policy that applies to fares that are not canceled or changed by a Customer at least ten minutes prior to a flight's scheduled departure. Nonrefundable tickets that are sold but not flown on the travel date, and are canceled in accordance with the No Show policy, can be applied to future travel. Refundable tickets that are sold but not flown on the travel date can also be applied to future travel. A small percentage of tickets (or partial tickets) expire unused. The Company estimates the amount of tickets that expire unused and recognizes such amounts in Passenger revenue in proportion to the pattern of flights taken by the Customers, once the flight date has lapsed. Based on the Company's revenue recognition policy, revenue is recorded at the flight date for a Customer who does not change his/her itinerary and loses his/her funds as the Company has then fulfilled its performance obligation. Amounts collected from passengers for ancillary services are also recognized when the service is provided, which is typically the flight date.

Initial breakage estimates for both tickets and funds available for future use are routinely adjusted and ultimately finalized once the tickets expire, which is typically twelve months after the original purchase date. However, during 2020, the Company extended the expiration dates for a significant amount of tickets and funds beyond its normal twelve months. Breakage estimates are based on the Company's Customers' historical travel behavior as well as assumptions about the Customers' future travel behavior. Assumptions about the Customers' future travel behavior can be impacted by several factors including, but not limited to: fare increases, fare sales, changes to the Company's ticketing policies, changes to the Company's refund, exchange, and unused funds policies, seat availability, and economic factors. Given the unprecedented amount of 2020 and 2021 Customer flight cancellations and the amount of flight credits provided, the Company expects additional variability in the amount of breakage revenue recorded in future periods, as the estimates of the portion of sold tickets that will expire unused may differ from historical experience. See Note 6 for further information.

Approximately $475 million, approximately $184 million, and approximately $615 million of the Company's Operating revenues in 2021, 2020, and 2019, respectively, were attributable to foreign operations. The remainder of the Company's Operating revenues, approximately $15.3 billion, approximately $8.9 billion, and approximately $21.8 billion in 2021, 2020, and 2019, respectively, were attributable to domestic operations.

### Loyalty Program

The Company records a liability for the relative fair value of providing free travel under its loyalty program for all points earned from flight activity or sold to companies participating in the Company's Rapid Rewards loyalty program as business partners that are expected to be redeemed for future travel. The loyalty liability represents performance obligations that will be satisfied when a Rapid Rewards loyalty member redeems points for travel or other goods and services. Points earned from flight activity are valued at their relative standalone selling price by applying fair value based on historical redemption patterns. Points earned from business partner activity, which primarily consist of points sold, along with related marketing services, to companies participating in the Rapid Rewards loyalty program, are valued using a relative fair value methodology based on the contractual rate which partners pay to Southwest to award Rapid Rewards points to the business partner's customers. For points that are expected to remain unused, the Company recognizes breakage in proportion to the pattern of points used by the Customer, which approximates the average period over which the population of Rapid Reward Members redeem their points. The Company records passenger revenue related to air transportation when the transportation is delivered. The marketing elements are recognized as Other - net revenue when earned. The Company's liability for loyalty benefits includes a portion that is expected to be redeemed during the following twelve months (classified as a component of Air traffic liability), and a portion that is not expected to be redeemed during the following twelve months (classified as Air traffic liability - noncurrent). The Company continually updates this analysis and adjusts the split between current and non-current liabilities as appropriate. See Note 6 for further information.

89

### Advertising

Advertising costs are charged to expense as incurred. Advertising and promotions expense for the years ended December 31, 2021, 2020, and 2019 was $185 million, $156 million, and $212 million, respectively, and is included as a component of Other operating expense in the accompanying Consolidated Statement of Income (Loss).

### Share-based Employee Compensation

The Company has share-based compensation plans covering certain Employees, including a plan that also covers the Company's Board of Directors. The Company accounts for share-based compensation based on its grant date fair value. See Note 10 for further information.

### Financial Derivative Instruments

The Company accounts for financial derivative instruments at fair value and applies hedge accounting rules where appropriate. The Company utilizes various derivative instruments, including jet fuel, crude oil, unleaded gasoline, and heating oil-based derivatives, to attempt to reduce the risk of its exposure to jet fuel price increases. These instruments are accounted for as cash flow hedges upon proper qualification. The Company also has interest rate swap agreements to convert certain floating-rate debt to a fixed-rate. The Company has forward-starting interest rate swap agreements, the primary objective of which is to hedge forecasted debt issuances. These interest rate hedges are appropriately designated as cash flow hedges.

Since the majority of the Company's financial derivative instruments are not traded on a market exchange, the Company estimates their fair values. Depending on the type of instrument, the values are determined by the use of present value methods or option value models with assumptions about commodity prices based on those observed in underlying markets.

All cash flows associated with purchasing and selling derivatives are classified as operating cash flows in the Consolidated Statement of Cash Flows, within Changes in certain assets and liabilities. The Company classifies its cash collateral provided to or held from counterparties in a "net" presentation on the Consolidated Balance Sheet against the fair value of the derivative positions with those counterparties. See Note 11 for further information.

### Software Capitalization

The Company capitalizes certain internal and external costs related to the acquisition and development of internal use software during the application development stages of projects. The Company amortizes these costs using the straight-line method over the estimated useful life of the software, which is typically five to fifteen years. Costs incurred during the preliminary project or the post-implementation/operation stages of the project are expensed as incurred. Capitalized computer software, included as a component of Ground property and equipment in the accompanying Consolidated Balance Sheet, net of accumulated depreciation, was $886 million and $697 million at December 31, 2021, and 2020, respectively. Computer software depreciation expense was $213 million, $203 million, and $177 million for the years ended December 31, 2021, 2020, and 2019, respectively, and is included as a component of Depreciation and amortization expense in the accompanying Consolidated Statement of Income (Loss). The Company evaluates internal use software for impairment on a quarterly basis; if it is determined the value of an asset was not recoverable or it qualifies for impairment, a charge will be recorded to write down the software to the lower of its carrying value or fair value. The Company had no significant impairments during 2021, 2020, or 2019.

### Insurance Reserves

The Company uses a combination of insurance and self-insurance mechanisms, including a wholly-owned captive insurance entity and participation in a reinsurance treaty, to provide for the potential liabilities associated with certain risks, including workers' compensation, healthcare benefits, general liability, and aviation liability.

90

Liabilities associated with the risks that are retained by the Company are not discounted and are estimated, in part, by considering historical claims experience, demographics, exposure and severity factors and other actuarial assumptions.

### Income Taxes

The Company accounts for deferred income taxes utilizing an asset and liability method, whereby deferred tax assets and liabilities are recognized based on the tax effect of temporary differences between the financial statements and the tax basis of assets and liabilities, as measured by current enacted tax rates. The Company also evaluates the need for a valuation allowance to reduce deferred tax assets to estimated recoverable amounts.

The Company's policy for recording interest and penalties associated with uncertain tax positions is to record such items as a component of Income (loss) before income taxes. Penalties are recorded in Other (gains) losses, net, and interest paid or received is recorded in Interest expense or Interest income, respectively, in the accompanying Consolidated Statement of Income (Loss). There were no material amounts recorded for penalties and interest related to uncertain tax positions for all years presented. See Note 15 for further information.

### Concentration Risk

Approximately 82 percent of the Company's full-time equivalent Employees are unionized and are covered by collective-bargaining agreements. A portion of the Company's unionized Employees, including its Pilots, Flight Attendants, Customer Service Agents, Ramp Agents, Dispatchers, Aircraft Appearance Technicians, and Meteorologists, which had contracts that became amendable on or before December 31, 2021, are in discussions on labor agreements. Those unionized Employee groups in discussions represent approximately 77 percent of the Company's full-time equivalent Employees as of December 31, 2021.

The Company attempts to minimize its concentration risk with regards to its cash, cash equivalents, and its investment portfolio. This is accomplished by diversifying and limiting amounts among different counterparties, the type of investment, and the amount invested in any individual security or money market fund.

To manage risk associated with financial derivative instruments held, the Company selects and will periodically review counterparties based on credit ratings, limits its exposure to a single counterparty, and monitors the market position of the program and its relative market position with each counterparty. The Company also has agreements with counterparties containing early termination rights and/or bilateral collateral provisions whereby security is required if market risk exposure exceeds a specified threshold amount or credit ratings fall below certain levels. Collateral deposits provided to or held from counterparties serve to decrease, but not totally eliminate, the credit risk associated with the Company's hedging program. See Note 11 for further information.

As of December 31, 2021, the Company operated an all-Boeing fleet, all of which are variations of the Boeing 737. The Boeing 737 MAX aircraft ("MAX") are crucial to the Company's growth plans and fleet modernization initiatives. On March 13, 2019, the FAA issued an emergency order for all U.S. airlines to ground the MAX aircraft, including the 34 MAX aircraft in the Company's fleet. On November 18, 2020, the FAA rescinded the emergency order and issued official requirements to enable U.S. airlines to return the MAX to service. The Company returned the MAX to revenue service on March 11, 2021, after the Company met all FAA requirements and its Pilots completed updated, MAX-related training.

Boeing no longer manufactures versions of the 737 other than the MAX family of aircraft. If the MAX aircraft were to again become unavailable for the Company's flight operations, the Company's growth would be restricted unless and until it could procure and operate other types of aircraft from Boeing or another manufacturer, seller, or lessor, and the Company's operations would be materially adversely affected. In particular, if the Company's growth were to be dependent upon the introduction of a new aircraft make and model to the Company's fleet, the Company would need to, among other things, (i) develop and implement new maintenance, operating, and training programs, (ii) secure extensive regulatory approvals, and (iii) implement new technologies. The requirements associated with

91

operating a new aircraft make and model could take an extended period of time to fulfill and would likely impose substantial costs on the Company. A shift away from a single fleet type could also add complexity to the Company's operations, present operational and compliance risks, and materially increase the Company's costs. Any of these events would have a material, adverse effect on the Company's business, operating results, and financial condition. The Company could also be materially adversely affected if the pricing or operational attributes of its aircraft were to become less competitive. See Note 17 for further information.

The Company is also dependent on sole or limited suppliers for aircraft engines and certain other aircraft parts and services and would, therefore, also be materially adversely impacted in the event of the unavailability of, inadequate support for, or a mechanical or regulatory issue associated with, engines and other parts.

The Company has historically entered into agreements with some of its co-brand, payment, and loyalty partners that contain exclusivity aspects which place certain confidential restrictions on the Company from entering into certain arrangements with other payment and loyalty partners. These arrangements generally extend for the terms of the agreements, none of which currently extend beyond October 31, 2030. Some of these agreements automatically renew on an annual basis, unless either party objects to such extension. None of these agreements are more than 10 years in length. The Company believes the financial benefits generated by the exclusivity aspects of these arrangements outweigh the risks involved with such agreements.

## 2. WORLDWIDE PANDEMIC

As a result of the rapid spread of the novel coronavirus, COVID-19, throughout the world, including into the United States, on March 11, 2020, the World Health Organization classified the virus as a pandemic. The speed with which the effects of the COVID-19 pandemic changed the U.S. economic landscape, outlook, and in particular the travel industry, was swift and unexpected. The Company saw a negative impact on bookings for future travel throughout 2020. The Company proactively canceled a significant portion of its scheduled flights in March 2020 and continued adjusting capacity throughout 2020, as the Company grounded a significant portion of its fleet and operated a significantly reduced portion of its previously scheduled capacity. The Company continued to experience negative impacts to passenger demand and bookings early in 2021 due to the pandemic, in particular with respect to business travel, although as a result of declining reported COVID-19 cases throughout the United States, easing travel restrictions, lifting of business restrictions, and an increase in the number of individuals vaccinated, domestic leisure travel demand and bookings improved during second quarter 2021. In third quarter 2021, the Company experienced softness in bookings and elevated trip cancellations, especially close-in, as a result of the rise in COVID-19 cases associated with the Delta variant. In fourth quarter 2021, the Company experienced increased leisure travel bookings due to holiday demand, despite the surge in COVID-19 cases associated with the Omicron variant. The Company continues to monitor demand for air travel and proactively adjust its published flight schedules and capacity in response.

Since the start of the pandemic, the Company entered into definitive documentation with the United States Department of Treasury ("Treasury") with respect to payroll funding support ("Payroll Support") pursuant to three separate Payroll Support programs: the "PSP1 Payroll Support Program" in April 2020 under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"); the "PSP2 Payroll Support Program" in January 2021 under the Consolidated Appropriations Act, 2021; and the "PSP3 Payroll Support Program" in April 2021 under the American Rescue Plan Act of 2021.

As consideration for each of these Payroll Support programs, the Company issued a promissory note in favor of Treasury and entered into a warrant agreement with Treasury, pursuant to which the Company agreed to issue warrants to purchase common stock of the Company to Treasury, subject to adjustment pursuant to the terms of the warrants. Under each of the three Payroll Support programs, funds were received in multiple disbursements. Upon each initial disbursement of Payroll Support under each of the three Payroll Support programs, the Company provided a promissory note and issued warrants to Treasury. Upon each subsequent disbursement of Payroll Support under each of the three Payroll Support programs, (i) the principal amount of the applicable promissory

92

note was increased and (ii) the Company issued additional warrants to Treasury. The following table provides the details from each of these programs:

| (in millions, except shares in thousands) | Grant | | Promissory Note | | Warrants | | Total Payroll Support Proceeds | Warrants (shares) |
|---|---|---|---|---|---|---|---|---|
| **PSP1 Payroll Support Program** | | | | | | | | |
| April 21, 2020 | $ | 1,152 | $ | 459 | $ | 18 | $ 1,630 | 1,258 |
| May 29, 2020 | | 448 | | 196 | | 8 | 652 | 536 |
| June 30, 2020 | | 448 | | 196 | | 9 | 652 | 536 |
| July 30, 2020 | | 225 | | 97 | | 3 | 326 | 268 |
| September 30, 2020 | | 64 | | 28 | | 2 | 94 | 78 |
| | $ | 2,337 | $ | 976 | $ | 40 | $ 3,354 | 2,676 |
| | | | | | | | | |
| **PSP2 Payroll Support Program** | | | | | | | | |
| January 15, 2021 | $ | 625 | $ | 229 | $ | 9 | $ 864 | 495 |
| March 5, 2021 | | 591 | | 259 | | 14 | 864 | 560 |
| April 23, 2021 | | 177 | | 78 | | 4 | 259 | 168 |
| | $ | 1,393 | $ | 566 | $ | 27 | $ 1,987 | 1,223 |
| | | | | | | | | |
| **PSP3 Payroll Support Program** | | | | | | | | |
| April 23, 2021 | $ | 670 | $ | 248 | $ | 9 | $ 926 | 424 |
| June 3, 2021 | | 640 | | 278 | | 9 | 926 | 475 |
| | $ | 1,310 | $ | 526 | $ | 18 | $ 1,852 | 899 |
| | | | | | | | | |
| **Total** | $ | 5,040 | $ | 2,068 | $ | 85 | $ 7,193 | 4,798 |

The promissory note under the PSP1 Payroll Support Program ("PSP1 Note") matures in full on April 19, 2030, and is subject to mandatory prepayment requirements in connection with certain change of control triggering events that may occur prior to its maturity. Amounts outstanding under the PSP1 Note bear interest at a rate of 1.00 percent before April 20, 2025, and afterwards, at a rate equal to the Secured Overnight Financing Rate ("SOFR") or other benchmark replacement rate consistent with customary market conventions plus a margin of 2.00 percent. The PSP1 Note contains customary representations and warranties and events of default. Each warrant issued pursuant to the PSP1 Payroll Support Program is exercisable at a strike price of $36.47 per share of common stock and will expire on the fifth anniversary of the issue date of such warrant.

The promissory note under the PSP2 Payroll Support Program ("PSP2 Note") matures in full on January 15, 2031, and is subject to mandatory prepayment requirements in connection with certain change of control triggering events that may occur prior to its maturity. Amounts outstanding under the PSP2 Note bear interest at a rate of 1.00 percent before January 15, 2026, and, afterwards, at a rate equal to the SOFR or other benchmark replacement rate consistent with customary market conventions plus a margin of 2.00 percent. The PSP2 Note contains customary representations and warranties and events of default. Each warrant issued pursuant to the PSP2 Payroll Support Program is exercisable at a strike price of $46.28 per share of common stock and will expire on the fifth anniversary of the issue date of such warrant.

The promissory note under the PSP3 Payroll Support Program ("PSP3 Note") matures in full on April 23, 2031, and is subject to mandatory prepayment requirements in connection with certain change of control triggering events that may occur prior to its maturity. Amounts outstanding under the PSP3 Note bear interest at a rate of 1.00 percent before April 23, 2026, and afterwards, at a rate equal to the SOFR or other benchmark replacement rate consistent with customary market conventions plus a margin of 2.00 percent. The PSP3 Note contains customary representations and warranties and events of default. Each warrant issued pursuant to the PSP3 Payroll Support

Program is exercisable at a strike price of $58.51 per share of common stock and will expire on the fifth anniversary of the issue date of such warrant.

In connection with the receipt of Payroll Support, the Company is subject to certain restrictions, including the elimination of share repurchases and dividends through September 30, 2022; and limits on executive compensation until April 1, 2023.

Under each of the three Payroll Support programs, funds received were used solely to pay qualifying employee salaries, wages, and benefits. As of December 31, 2021, all grant portions of the Payroll Support programs received had been allocated and classified as a contra-expense line item in the Consolidated Statement of Income (Loss). Although there is no directly applicable U.S. GAAP guidance related to such government assistance received, the Company analogized its facts and circumstances, and has utilized the accounting principles within International Accounting Standards 20, Accounting for Government Grants and Disclosure of Government Assistance, with respect to the Payroll Support funds received. The Company has an option to prepay the promissory notes at any time without premium or penalty. Warrants will be settled through net share settlement or net cash settlement, at the Company's option. The Company has also granted Treasury certain demand underwritten offering and piggyback registration rights with respect to the warrants and the underlying common stock. The warrants do not have voting rights and include adjustments for below market issuances, payment of dividends, and other customary anti-dilution provisions.

On June 1, 2020, the Company announced Voluntary Separation Program 2020 ("Voluntary Separation Program"), a voluntary separation program that allowed eligible Employees the opportunity to voluntarily separate from the Company in exchange for severance, medical/dental coverage for a specified period of time, and travel privileges based on years of service. A total of over 4,200 Employees initially elected to participate in Voluntary Separation Program.

In conjunction with Voluntary Separation Program, the Company also offered certain contract Employees the option to take voluntary Extended Emergency Time Off ("Extended ETO"), for periods between six and 18 months, with the exception of Pilots, who could elect to take Extended ETO for periods up to five years, all subject to early recalls. Approximately 12,000 Employees participated in the Extended ETO program in 2020 and 2021 combined. During 2021, approximately 11,400 Employees returned from the Extended ETO program and less than 250 Employees remained on Extended ETO as of December 31, 2021. The Company expects all remaining Employees on Extended ETO to be recalled in first quarter 2022. Contract employees who elected to take Extended ETO for periods between 12 and 18 months and had 10 or more years of service were given the opportunity to convert to the Voluntary Separation Program beginning on September 1, 2020, until up to 90 days before the end of their respective Extended ETO term. Approximately 360 Employees elected this conversion option during 2021.

The purpose of Voluntary Separation Program and Extended ETO was to maintain a reduced workforce to operate at reduced capacity relative to the Company's operations prior to the COVID-19 pandemic. In accordance with the accounting guidance in Accounting Standards Codification Topic 712 (Compensation — Nonretirement Postemployment Benefits), the Company accrued charges related to the special termination benefits described above upon Employees accepting Voluntary Separation Program or Extended ETO offers. The Company accrued expenses totaling $1.4 billion for its Voluntary Separation Program and Extended ETO program in 2020, which are being reduced as program benefits are paid. For both the Voluntary Separation Program and Extended ETO programs combined, approximately $446 million of the liability balances were relieved during 2021 through payments to Employees, leaving a balance of $328 million as of December 31, 2021. During 2021, the Company determined that it was no longer probable that a portion of the Employees on Extended ETO would remain on such leave for their entire elected term. Therefore, a portion of the accruals previously recorded were reversed, resulting in a net $140 million credit to expense during 2021. Both the initial charge and the partial reversal were classified within Payroll support and voluntary Employee programs, net, in the accompanying Consolidated Statement of Income (Loss), and are in addition to the allocation of the PSP2 Payroll Support Program and PSP3 Payroll Support Program funds utilized to fund salaries, wages, and benefits, which totaled $2.7 billion for the year ended December 31, 2021.

94

In response to flight schedule adjustments due to the effects of the COVID-19 pandemic, a number of aircraft were taken out of the Company's schedule beginning in late March 2020, and placed in short-term storage, as well as some in a longer term storage program. As of December 31, 2021, six aircraft remained in storage, and given the expectation that this storage was temporary in nature, the Company has continued to record depreciation expense associated with them.

## 3. NEW ACCOUNTING PRONOUNCEMENTS AND ACCOUNTING CHANGES

On November 17, 2021, the Financial Accounting Standards Board (the "FASB") issued ASU 2021-10, Government Assistance (Topic 832): Disclosures by Business Entities about Government Assistance. The new standard increases transparency of government assistance by focusing on the types of assistance given, an entity's accounting for the assistance, and the effect of the assistance on the entity's financial statements to allow for more comparable information for investors and other financial statement users. This standard is effective for all entities under the scope for financial statements issued for annual periods beginning after December 15, 2021, but early adoption is permitted. The Company adopted the standard early as of December 31, 2021. See Note 2 for further information on the Company's treatment of government assistance received.

On May 3, 2021, the FASB issued ASU 2021-04, Earnings Per Share (Topic 260), Debt—Modifications and Extinguishments (Subtopic 470-50), Compensation—Stock Compensation (Topic 718), and Derivatives and Hedging—Contracts in Entity's Own Equity (Subtopic 815-40): Issuer's Accounting for Certain Modifications or Exchanges of Freestanding Equity-Classified Written Call Options. This new standard provides clarification and reduces diversity in an issuer's accounting for modifications or exchanges of freestanding equity-classified written call options (such as warrants) that remain equity classified after modification or exchange. This standard is effective for fiscal years beginning after December 15, 2021, including interim periods within those fiscal years. Under this standard, issuers should apply the new standard prospectively to modifications or exchanges occurring after the effective date of the new standard. Early adoption is permitted, including adoption in an interim period. If an issuer elects to early adopt the new standard in an interim period, the guidance should be applied as of the beginning of the fiscal year that includes that interim period. The Company is evaluating this new standard, but does not expect it to have a material impact on the Company's financial statements or disclosures.

On January 7, 2021, the FASB issued ASU No. 2021-01, Reference Rate Reform (Topic 848). This new standard provides optional temporary guidance for entities transitioning away from London Interbank Offered Rate ("LIBOR") to new reference interest rates so that derivatives affected by the discounting transition are explicitly eligible for certain optional expedients and exceptions with Topic 848. These amendments do not apply to any contract modifications made after December 31, 2022, any new hedging relationships entered into after December 31, 2022, or to existing hedging relationships evaluated for effectiveness existing as of December 31, 2022, that apply certain optional practical expedients. This standard was effective immediately and may be applied (i) on a full retrospective basis as of any date from the beginning of an interim period that includes or is subsequent to March 12, 2020, or (ii) on a prospective basis to new modifications from any date within an interim period that includes or is subsequent to the date of the issuance of a final update, up to the date that financial statements are available to be issued. The Company had no material LIBOR-related contract modifications during the year ended December 31, 2021.

On August 5, 2020, the FASB issued ASU No. 2020-06, Debt—Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging—Contracts in Entity's Own Equity (Subtopic 815-40): Accounting for Convertible Instruments and Contracts in an Entity's Own Equity. This new standard reduces the number of accounting models for convertible debt instruments and convertible preferred stock, makes targeted improvements to the disclosures for convertible instruments and earnings-per-share (EPS) guidance, and amends the guidance for the derivatives scope exception for contracts in an entity's own equity to reduce form-over-substance-based accounting conclusions. This standard is effective for fiscal years beginning after December 15, 2021 and the Company will adopt this standard as of January 1, 2022, utilizing the modified retrospective method. Under the modified approach, the Company will apply the guidance to all financial instruments that are outstanding as of the

95

beginning of the year of adoption with the cumulative effect recognized as an adjustment to the opening balance of retained earnings. Upon adoption, the Company will reclassify the remaining equity component, estimated at $300 million, from Additional paid-in capital to Long-term debt associated with its convertible notes, and no longer record amortization of the debt discount to Interest expense. The cumulative effect from amortization of the debt discount that has been recorded to Interest expense, offset by reductions to Capital in excess of par value related to the requisition of the equity component through repurchases, will result in an estimated $56 million adjustment to the opening balance of retained earnings upon adoption. The computation of diluted net income (loss) per share will be affected in the numerator as the Company will no longer record the debt discount amortization in Interest expense and may have to add back Interest expense to the numerator. The denominator could also be affected as the Company will be required to use the if-converted method to calculate diluted shares, which assumes all shares to have been converted at the beginning of the period.

## 4. NET INCOME (LOSS) PER SHARE

The following table sets forth the computation of basic and diluted net income (loss) per share (in millions except per share amounts). An immaterial number of shares related to the Company's restricted stock units, stock warrants, and convertible notes were excluded from the denominator for the fiscal year ended December 31, 2020, because inclusion of such shares would be antidilutive.

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | 2021 | 2020 | 2019 |
| **NUMERATOR:** | | | |
| Net income (loss) | $ 977 | $ (3,074) | $ 2,300 |
| | | | |
| **DENOMINATOR:** | | | |
| Weighted-average shares outstanding, basic | 592 | 565 | 538 |
| Dilutive effects of convertible notes (a) | 15 | — | — |
| Dilutive effects of stock warrants | 1 | — | — |
| Dilutive effect of restricted stock units | 1 | — | 1 |
| Adjusted weighted-average shares outstanding, diluted | 609 | 565 | 539 |
| | | | |
| **NET INCOME (LOSS) PER SHARE:** | | | |
| Basic | $ 1.65 | $ (5.44) | $ 4.28 |
| Diluted | $ 1.61 | $ (5.44) | $ 4.27 |

(a) Because the Company intends to settle conversions by paying cash up to the principal amount of the convertible notes, with any excess conversion value settled in cash or shares of common stock, the convertible notes are being accounted for using the treasury stock method for the purposes of Net income (loss) per share. Using this method, the denominator will be affected when the average share price of the Company's common stock for a given period is greater than the conversion price of approximately $38.48 per share, and the Company reports Net income for the given period. For the year ended December 31, 2021, the average market price of the Company's common stock exceeded this conversion price per share and as such, the common shares underlying the convertible notes were included in the diluted calculation. See Note 7 for further information on the convertible notes.

## 5. COMMITMENTS AND CONTINGENCIES

### *Commitments*

The Company has contractual obligations and commitments primarily with regard to future purchases of aircraft, repayment of debt (see Note 7), and lease arrangements (see Note 8). During the year ended December 31, 2021, the Company leased nine new Boeing 737 MAX 8 ("-8") aircraft. The Company had firm orders in place with Boeing

for 130 -8 aircraft and 264 737 MAX 7 ("-7") aircraft, as well as options for 238 -8 aircraft, as of December 31, 2021. See Note 17 for further information on the Company's MAX aircraft.

Based on the Company's existing agreement with Boeing, capital commitments associated with its firm orders as of December 31, 2021, were: $1.8 billion in 2022, $1.6 billion in 2023, $1.1 billion in 2024, $837 million in 2025, $961 million in 2026, and $6.9 billion thereafter. In addition, subsequent to December 31, 2021, and through February 3, 2022, the Company has exercised 12 -8 options for delivery in 2022 and 12 -7 options for delivery in 2023, resulting in additional capital commitments associated with firm orders of $474 million and $254 million in 2022 and 2023, respectively.

**Los Angeles International Airport**

In October 2017, the Company executed a lease agreement with Los Angeles World Airports ("LAWA") (the "T1.5 Lease"). Under the T1.5 Lease, the Company oversaw and managed the design, development, financing, construction, and commissioning of a passenger processing facility between Terminals 1 and 2 (the "Terminal 1.5 Project"). The Terminal 1.5 Project included ticketing, baggage claim, passenger screening, and a bus gate. Construction on the Terminal 1.5 Project began during third quarter 2017 and was substantially completed at December 31, 2020. The project final cost was approximately $410 million. During second quarter 2021, LAWA repaid the outstanding loan and purchased the remaining completed assets for accounting purposes, at which time the Terminal 1.5 Project right-of-use asset and lease liability of $365 million on the balance sheet were de-recognized in accordance with applicable accounting guidance. This repayment was also reported as a supplemental noncash transaction on the Consolidated Statement of Cash Flows, net of Assets constructed for others additions during the period.

**Dallas Love Field**

During 2008, the City of Dallas approved the Love Field Modernization Project ("LFMP"), a project to reconstruct Dallas Love Field with modern, convenient air travel facilities. Pursuant to a Program Development Agreement with the City of Dallas and the Love Field Airport Modernization Corporation (or the "LFAMC," a Texas non-profit "local government corporation" established by the City of Dallas to act on the City of Dallas' behalf to facilitate the development of the LFMP), the Company managed this project. Major construction was effectively completed in 2014. During second quarter 2017, the City of Dallas approved using the remaining bond funds for additional terminal construction projects, which were effectively completed in 2018.

Although the City of Dallas received commitments from various sources that helped to fund portions of the LFMP project, including the FAA, the Transportation Security Administration, and the City of Dallas' Aviation Fund, the majority of the funds used were from the issuance of bonds. The Company guaranteed principal and interest payments on bonds issued by LFAMC (the "Series 2010" bonds and the "Series 2012" bonds). Given the Company's guarantee associated with the bonds issued to fund LFMP, the remaining debt service amount was considered a minimum lease payment under the adoption of ASC Topic 842, Leases, and therefore was recorded as a lease liability with a corresponding right-of-use asset within the Company's Consolidated Balance Sheet.

All of the outstanding Series 2010 bonds, in the principal amount of $310 million, were redeemed by LFAMC on September 28, 2021 (Redemption Date) at the redemption price plus accrued interest of $7 million. The source of the funds used to pay the principal and interest on the Series 2010 bonds was proceeds from the sale of LFAMC General Airport Revenue Bonds, Series 2021, which also occurred on the Redemption Date. As the Series 2010 bonds have been fully repaid following the Redemption Date, the Company's guarantee associated with the Series 2010 bonds no longer exists. This refinancing transaction was considered a lease modification in accordance with applicable guidance, and the Company's obligation was remeasured as of the transaction date. This remeasurement resulted in a reduction of the Company's right-of-use asset and lease liability in the amount of $343 million, which has been reflected in the Consolidated Balance Sheet as of December 31, 2021.

As of December 31, 2021, $79 million of principal remained outstanding associated with the Series 2012 bonds. The net present values of the future principal and interest payments associated with the bonds were $89 million and

$433 million as of December 31, 2021 and 2020, respectively, and were reflected as part of the Company's operating lease right–of–use assets and lease obligations in the Consolidated Balance Sheet.

*Contingencies*

The Company is from time to time subject to various legal proceedings and claims arising in the ordinary course of business, including, but not limited to, examinations by the Internal Revenue Service ("IRS"). The Company's management does not expect that the outcome of any of its currently ongoing legal proceedings or the outcome of any adjustments presented by the IRS, individually or collectively, will have a material adverse effect on the Company's financial condition, results of operations, or cash flow.

## 6. REVENUE

**Passenger Revenues**

The Company's contracts with its Customers primarily consist of its tickets sold, which are initially deferred as Air traffic liability. Passenger revenue associated with tickets is recognized when the performance obligation to the Customer is satisfied, which is primarily when travel is provided.

Revenue is categorized by revenue source as the Company believes it best depicts the nature, amount, timing, and uncertainty of revenue and cash flow. The following table provides the components of Passenger revenue recognized for the years ended December 31, 2021, 2020, and 2019:

| (in millions) | Year ended December 31, | | |
| | 2021 | 2020 | 2019 |
|---|---|---|---|
| Passenger non-loyalty | $ 11,377 | $ 6,303 | $ 17,578 |
| Passenger loyalty - air transportation | 2,136 | 1,003 | 2,487 |
| Passenger ancillary sold separately | 553 | 359 | 711 |
| **Total passenger revenues** | $ 14,066 | $ 7,665 | $ 20,776 |

Passenger non-loyalty includes all revenues recognized from Passengers for flights purchased primarily with cash or credit card. All Customers purchasing a ticket on Southwest Airlines are generally able to check up to two bags at no extra charge (with certain exceptions as stated in the Company's published Contract of Carriage), and the Company also does not charge a fee for a Customer to make a change to their flight after initial purchase, although fare differences may apply. Passenger loyalty - air transportation primarily consists of the revenue associated with award flights taken by loyalty program members upon redemption of loyalty points. Passenger ancillary sold separately includes any revenue associated with ancillary fees charged separately, such as in-flight purchases, EarlyBird Check-In®, and Upgraded Boarding.

In order to determine the value of each loyalty point, certain assumptions must be made at the time of measurement, which include the following:

- *Allocation of Passenger Revenue* - Revenues from Passengers, related to travel, who also earn Rapid Rewards Points have been allocated between flight (recognized as revenue when transportation is provided) and Rapid Rewards Points (deferred until points are redeemed) based on each obligation's relative standalone selling price. The Company utilizes historical earning patterns to assist in this allocation.
- *Fair Value of Rapid Rewards Points* - Determined from the base fare value of tickets which were purchased using prior point redemptions for travel and other products and services, which the Company believes to be indicative of the fair value of points as perceived by Customers and representative of the value of each point at the time of redemption. The Company's booking site allows a Customer to toggle between fares utilizing either cash or point redemptions, which provides the Customer with an approximation of the equivalent value of their points. The value can differ, however, based on demand, the amount of time prior to the

98

flight, and other factors. The mix of fare classes during the period measured represents a constraint, which could result in the assumptions above changing at the measurement date, as fare classes can have different coefficients used to determine the total loyalty points needed to purchase an award ticket. The mixture of these fare classes and changes in the coefficients used by the Company could cause the fair value per point to fluctuate.

For points that are expected to remain unused, the Company recognizes breakage in proportion to the pattern of points used by the Customer, which approximates the average period over which the population of Rapid Reward Members redeem their points. The Company utilizes historical behavioral data to develop a predictive statistical model to analyze the amount of breakage expected for points sold to business partners and earned through flight. The Company continues to evaluate expected breakage annually and applies appropriate adjustments in the fourth quarter of each year, or other times, if significant changes in Customer behavior are detected. Changes to breakage estimates impact revenue recognition prospectively. Due to the size of the Company's liability for loyalty benefits, changes in Customer behavior and/or expected future redemption patterns could result in significant variations in Passenger revenue.

The Company allocates consideration received to performance obligations based on the relative fair value of those obligations. The Company has a co-branded credit card agreement ("Agreement") with Chase Bank USA, N.A. ("Chase"), through which the Company sells loyalty points and certain marketing components, which consist of the use of the Southwest Airlines brand and access to Rapid Rewards Member lists, licensing and advertising elements, and the use of the Company's resource team. In fourth quarter 2021, Chase and the Company executed a multi-year extension of the Agreement, extending the decades-long relationship between the parties. The Company estimated the selling prices and volumes over the term of the Agreement in order to determine the allocation of proceeds to each of the two performance obligations identified in the Agreement, which have been characterized as a transportation component and a marketing component. The allocations utilized are reviewed to determine if adjustment is necessary any time there is a modification to the Agreement. The Company records Passenger revenue related to loyalty point redemptions for air travel when the travel is delivered, and the marketing elements are recognized as Other revenue when the performance obligations related to those services are satisfied, which is generally the same period consideration is received from Chase.

As performance obligations to Customers are satisfied, the related revenue is recognized. The events that result in revenue recognition that are associated with performance obligations identified as a part of the Rapid Rewards Program are as follows:

- *Tickets and Rapid Rewards Points* - When a flight occurs, the related performance obligation is satisfied and the related value provided by the Customer, whether from purchased tickets or Rapid Rewards Points, is recognized as revenue.
- *Loyalty points redeemed for goods and/or services other than travel* - Rapid Rewards Members have the option to redeem points for goods and services offered through a third party vendor, who acts as principal. The performance obligation related to the purchase of these goods and services is satisfied when the good and/or service is delivered to the Customer.
- *Marketing Royalties* - As part of its Agreement with Chase, Southwest provides certain deliverables, including use of the Southwest Airlines' brand, access to Rapid Rewards Member lists, advertising elements, and the Company's resource team. These performance obligations are satisfied each month that the Agreement is active.

As of the years ended December 31, 2021 and 2020, the components of Air traffic liability, including contract liabilities based on tickets sold and unused flight credits available to the Customer, both of which are net of recorded breakage, and loyalty points available for redemption, within the Consolidated Balance Sheet were as follows:

99

| (in millions) | Balance as of | |
| --- | --- | --- |
| | December 31, 2021 | December 31, 2020 |
| Air traffic liability - passenger travel and ancillary passenger services | $ 2,936 | $ 2,686 |
| Air traffic liability - loyalty program | 4,789 | 4,447 |
| **Total Air traffic liability** | $ 7,725 | $ 7,133 |

The balance in Air traffic liability - passenger travel and ancillary passenger services also includes unused funds that are available for use by Customers and are not currently associated with a ticket, although they remain reusable, for a period of time, in the form of a flight credit that can be applied towards the purchase of future travel. These flight credits are typically created as a result of a prior ticket cancellation or exchange. Rollforwards of the Company's Air traffic liability - loyalty program for the years ended December 31, 2021 and 2020 were as follows (in millions):

| | Year ended December 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| Air traffic liability - loyalty program - beginning balance | $ 4,447 | $ 3,385 |
| Amounts deferred associated with points awarded | 2,523 | 1,958 |
| Revenue recognized from points redeemed - Passenger | (2,136) | (1,003) |
| Revenue recognized from points redeemed - Other | (45) | (60) |
| Unused funds converted to loyalty points | — | 167 |
| Air traffic liability - loyalty program - ending balance | $ 4,789 | $ 4,447 |

Air traffic liability includes consideration received for ticket and loyalty related performance obligations which have not been satisfied as of a given date. Rollforwards of the amounts included in Air traffic liability as of December 31, 2021 and 2020 were as follows (in millions):

| | Air traffic liability |
| --- | --- |
| Balance at December 31, 2020 | $ 7,133 |
| Current period sales (passenger travel, ancillary services, flight loyalty, and partner loyalty) | 14,702 |
| Revenue from amounts included in contract liability opening balances | (2,945) |
| Revenue from current period sales | (11,165) |
| Balance at December 31, 2021 | $ 7,725 |

| | Air traffic liability |
| --- | --- |
| Balance at December 31, 2019 | $ 5,510 |
| Current period sales (passenger travel, ancillary services, flight loyalty, and partner loyalty) | 9,348 |
| Revenue from amounts included in contract liability opening balances | (2,317) |
| Revenue from current period sales | (5,408) |
| Balance at December 31, 2020 | $ 7,133 |

During 2020 and in parts of 2021, the Company experienced a significantly higher number of Customer-driven flight cancellations as a result of the COVID-19 pandemic, including those associated with the Delta variant of the virus. See Note 2 for further information. As a result, the amount of Customer travel funds held in Air traffic liability that are estimated to be redeemed for future travel as of December 31, 2021, remains much higher than historical levels. The amount of such Customer funds represents approximately 16 percent and 28 percent of the total Air traffic liability balance, net of breakage, at December 31, 2021, and December 31, 2020, respectively, compared to approximately 2 percent of the Air traffic liability balance as of December 31, 2019. In order to provide additional flexibility to Customers who hold these funds, the Company has significantly relaxed its previous policies with regards to the time period within which these funds can be redeemed, which is typically twelve months from the original date of purchase. For all Customer travel funds created or that would have otherwise expired

between March 1 and September 7, 2020 associated with flight cancellations, the Company extended the expiration date to September 7, 2022. At December 31 2021, $1.3 billion of extended Customer travel funds remain in Air traffic liability with a September 7, 2022 expiration date, although the Company has estimated that a portion of those will not be redeemed. The Company has limited data available to predict the occurrence or timing of performance obligation satisfaction on these funds due to certain constraints including, but not limited to, consumer confidence, economic health, vaccines, and uncertainty regarding customer travel fund redemption patterns for funds that exist longer than 12 months as this is unprecedented in Company history. As a result, recognition of these travel funds as flown revenue, refunds, or breakage revenue will likely be more volatile from period to period compared to what previous Customer behavior may indicate, as cumulative revenue recognized is constrained to amounts that are not probable of being reversed.

Recognition of revenue associated with the Company's loyalty liability can be difficult to predict, as the number of award seats available to members is not currently restricted and they could choose to redeem their points at any time that a seat is available. The performance obligations classified as a current liability related to the Company's loyalty program were estimated based on expected redemptions utilizing historical redemption patterns, and forecasted flight availability, and fares. The entire balance classified as Air traffic liability—noncurrent relates to loyalty points that were estimated to be redeemed in periods beyond the twelve months following the representative balance sheet date. Based on historical experience as well as current forecasted redemptions, the Company expects the majority of loyalty points to be redeemed within approximately two years of the date the points are issued.

All performance obligations related to freight services sold are completed within twelve months or less; therefore, the Company has elected to not disclose the amount of the remaining transaction price and its expected timing of recognition for freight shipments.

Other revenues primarily consist of marketing royalties associated with the Company's co-branded Chase® Visa credit card, but also include commissions and advertising associated with Southwest.com®. All amounts classified as Other revenues are paid monthly, coinciding with the Company fulfilling its deliverables; therefore, the Company has elected to not disclose the amount of the remaining transaction price and its expected timing of recognition for such services provided.

The Company recognized revenue related to the marketing, advertising, and other travel-related benefits of the revenue associated with various loyalty partner agreements including, but not limited to, the Agreement with Chase, within Other operating revenues. For the years ended December 31, 2021, 2020, and 2019 the Company recognized $1.4 billion, $1.1 billion, and $1.3 billion, respectively.

The Company is also required to collect certain taxes and fees from Customers on behalf of government agencies and remit these back to the applicable governmental entity on a periodic basis; however, some of these ticket taxes were suspended during 2020 as allowed by the CARES Act. These taxes and fees include foreign and U.S. federal transportation taxes, federal security charges, and airport passenger facility charges. These items are collected from Customers at the time they purchase their tickets, are excluded from the contract transaction price, and are therefore not included in Passenger revenue. The Company records a liability upon collection from the Customer and relieves the liability when payments are remitted to the applicable governmental agency.

**7. FINANCING ACTIVITIES**

| (in millions) | December 31, 2021 | | December 31, 2020 |
|---|---|---|---|
| 2.75% Notes due 2022 | $ | 300 | $ 300 |
| Pass Through Certificates due 2022 - 6.24% | | 71 | 137 |
| 4.75% Notes due 2023 | | 1,250 | 1,250 |
| 1.25% Convertible Notes due 2025 | | 1,842 | 1,945 |
| 5.25% Notes due 2025 | | 1,550 | 1,550 |
| Term Loan Agreement payable through 2025 | | — | 119 |
| 3.00% Notes due 2026 | | 300 | 300 |
| Term Loan Agreement payable through 2026 | | — | 159 |
| 3.45% Notes due 2027 | | 300 | 300 |
| 5.125% Notes due 2027 | | 2,000 | 2,000 |
| 7.375% Debentures due 2027 | | 116 | 119 |
| Term Loan Agreement payable through 2028 | | — | 184 |
| 2.625% Notes due 2030 | | 500 | 500 |
| 1.000% Payroll Support Program Loan due April 2030 (See Note 2) | | 976 | 976 |
| 1.000% Payroll Support Program Loan due January 2031 (See Note 2) | | 566 | — |
| 1.000% Payroll Support Program Loan due April 2031 (See Note 2) | | 526 | — |
| Finance leases | | 459 | 542 |
| | $ | 10,756 | $ 10,381 |
| Less current maturities | | 453 | 220 |
| Less debt discount and issuance costs | | 29 | 50 |
| | $ | 10,274 | $ 10,111 |

During 2020, the Company entered into agreements with a financing institution to borrow $125 million ($121 million, net of fees) secured by four Boeing 737-800 aircraft. These borrowings, which were recorded as a financing transaction in the Company's Consolidated Statement of Cash Flows, and as debt in the accompanying Consolidated Balance Sheet, bore interest at a rate equal to the 3 month LIBOR plus 1.4 percent, and were payable in quarterly installments through September 29, 2025. The Company prepaid the loans in full on December 29, 2021, utilizing available cash on hand.

During 2020, the Company issued $2.0 billion of unsecured notes due 2027, of which $1.3 billion was issued June 8, 2020 (the "$1.3 billion 2027 Notes") and $700 million was issued July 31, 2020 (the "$700 million 2027 Notes"). The notes bear interest at 5.125%. Interest is payable semi-annually in arrears on June 15 and December 15, beginning December 15, 2020. The $700 million 2027 Notes were offered as an additional issuance of the Company's $1.3 billion 2027 Notes issued on June 8, 2020. The $700 million 2027 Notes were issued at a premium and this premium has been included within Capitalized financing items in the Consolidated Statement of Cash Flows. A portion of the proceeds from the $1.3 billion 2027 Notes was used to repay a portion of the outstanding Amended and Restated 364-Day Credit Agreement balance. See below for more information regarding the Amended and Restated 364-Day Credit Agreement.

During 2020, the Company, through special purpose entities, entered into agreements with a financing institution and trusts to borrow $197 million ($190 million, net of fees) secured by six Boeing 737-800 aircraft. These borrowings, which were recorded as a financing transaction in the Company's Consolidated Statement of Cash Flows, and as debt in the accompanying Consolidated Balance Sheet, bore interest at a rate equal to the 3 month LIBOR plus 1.4 percent. The special purpose entities were determined to be variable interest entities for which the Company was the primary beneficiary, and therefore were consolidated in the accompanying Consolidated Financial Statements as of December 31, 2020. The Company prepaid the loans in full on December 31, 2021, utilizing available cash on hand.

During 2020, the Company issued $1.55 billion of unsecured notes due 2025, of which $1.25 billion was issued May 4, 2020 (the "$1.25 billion 2025 Notes") and $300 million was issued July 31, 2020 (the "$300 million 2025 Notes"). The notes bear interest at 5.250%. Interest is payable semi-annually in arrears on May 4 and November 4, beginning November 4, 2020. The $300 million 2025 Notes were offered as an additional issuance of the Company's $1.25 billion 2025 Notes issued on May 4, 2020. The $300 million 2025 Notes were issued at a premium and this premium has been included within Capitalized financing items in the Consolidated Statement of Cash Flows. The proceeds from the $1.25 billion 2025 Notes were used to repay a portion of the outstanding Amended and Restated 364-Day Credit Agreement balance.

During 2020, the Company issued $1.25 billion of unsecured notes due 2023, of which $750 million was issued May 4, 2020 (the "$750 million 2023 Notes") and $500 million was issued June 8, 2020 (the "$500 million 2023 Notes"). The notes bear interest at 4.750%. Interest is payable semi-annually in arrears on May 4 and November 4, beginning November 4, 2020. The $500 million 2023 Notes were offered as an additional issuance of the Company's $750 million 2023 Notes issued on May 4, 2020. The $500 million 2023 Notes were issued at a premium and this premium has been included within Capitalized financing items in the Consolidated Statement of Cash Flows. The proceeds from the $750 million 2023 Notes and a portion of the proceeds of the $500 million 2023 Notes were used to repay a portion of the outstanding Amended and Restated 364-Day Credit Agreement balance.

On May 1, 2020, the Company completed the public offering of $2.3 billion aggregate principal amount of 1.250% Convertible Senior Notes due 2025 (the "Convertible Notes"). The Convertible Notes bear interest at a rate of 1.25% and will mature on May 1, 2025. Interest on the notes is payable semi-annually in arrears on May 1 and November 1, beginning November 1, 2020. Upon conversion, the Company will pay or deliver, as the case may be, cash, shares of the Company's common stock or a combination of cash and shares of common stock, at the Company's election. The Company intends to settle conversions by paying cash up to the principal amount of the Convertible Notes, with any excess conversion value settled in cash or shares of common stock. The initial conversion rate is 25.9909 shares of common stock per $1,000 principal amount of Convertible Notes (equivalent to an initial conversion price of approximately $38.48 per share of common stock).

Upon issuance, the Company bifurcated the Convertible Notes for accounting purposes between a liability component and an equity component utilizing applicable guidance. The liability component was determined by estimating the fair value of a hypothetical issuance of an identical offering excluding the conversion feature of the Convertible Notes. The initial carrying amount of the equity component was calculated as the difference between the liability component and the face amount of the Convertible Notes. During the year ended December 31, 2021, the Company repurchased $203 million in principal of the Convertible Notes for $293 million in cash. The Company accounted for these repurchases as a partial debt extinguishment, which resulted in (i) a loss of $28 million reflected in Other (gains) losses, net, in the accompanying Consolidated Statement of Income (Loss) for the year ended December 31, 2021, (ii) a $30 million reduction in remaining unamortized debt discount and issuance costs, and (iii) a $92 million reduction to Capital in excess of par value related to the reacquisition of the equity component in the accompanying Consolidated Balance Sheet. Additionally, an immaterial number of conversions were exercised and settled during 2021. The following table details the equity and liability component recognized related to the Convertible Notes as of December 31, 2021 and 2020:

| (in millions) | December 31, 2021 | | December 31, 2020 | |
|---|---|---|---|---|
| Carrying amount of equity component | $ | 311 | $ | 403 |
| Liability component: | | | | |
| Principal amount | $ | 2,097 | $ | 2,300 |
| Unamortized debt discount | | (255) | | (355) |
| Net carrying amount | $ | 1,842 | $ | 1,945 |

The effective interest rate on the liability component was approximately 5.2 percent for the year ended December 31, 2021. The Company recognized $110 million of interest expense associated with the Convertible Notes during the year ended December 31, 2021, including $73 million of non-cash amortization of the debt

discount, $9 million of non-cash amortization of debt issuance costs, and $28 million of contractual coupon interest. The unamortized debt issuance costs have historically been recognized as non-cash interest expense based on the 5-year term of the notes, through May 1, 2025, less amounts that were or will be required to be accelerated immediately upon conversion or repurchases. Upon adoption of ASU 2020-06 as of January 1, 2022, the debt discount amortization will cease to be recorded to Interest expense. See Note 3 for further information.

As of December 31, 2021, the if-converted value of the Convertible Notes exceeded the principal amount by $238 million, using the closing stock price on December 31, 2021. The Convertible Notes did not meet the criteria to be converted as of the date of the financial statements, and thus are classified as Long-term debt in the accompanying Consolidated Balance Sheet as of December 31, 2021.

On March 12, 2020, the Company entered into a $1.0 billion 364-day term loan credit facility agreement (the "364-Day Credit Agreement") with a syndicate of lenders identified in the 364-Day Credit Agreement. The 364-Day Credit Agreement was drawn in full on the closing date. On March 30, 2020, the Company amended and restated the 364-Day Credit Agreement (the "Amended and Restated 364-Day Credit Agreement") with a syndicate of lenders identified in the Amended and Restated 364-Day Credit Agreement to add additional term loan commitments of approximately $2.3 billion, add an uncommitted accordion increase provision to permit additional term loans in an aggregate amount not to exceed approximately $417 million, amend the pricing, amend certain covenants, add certain covenants, and provide for the grant of a security interest in certain aircraft and related assets. The Company drew approximately $2.3 billion under the Amended and Restated 364-Day Credit Agreement on April 1, 2020. On April 24, 2020, the Company drew an additional $350 million under the $417 million accordion feature. The Amended and Restated 364-Day Credit Agreement was originally set to mature in full on March 29, 2021. The outstanding Amended and Restated 364-Day Credit Agreement balance was repaid in full in second quarter 2020, and the agreement was terminated.

Concurrently with entering into the Amended and Restated 364-Day Credit Agreement on March 30, 2020, the Company also amended its existing $1.0 billion revolving credit facility (the "Amended and Restated Revolving Credit Agreement") to (i) amend the pricing and fees, (ii) amend certain covenants and provisions, (iii) add certain covenants, and (iv) provide for the grant of a security interest in certain aircraft and related assets. In second quarter 2020, the Company repaid in full the $1.0 billion drawn on the Amended and Restated Revolving Credit Agreement.

On November 23, 2020, the Company amended the Amended and Restated Revolving Credit Agreement to (i) amend the pricing and fees, (ii) amend certain covenants and provisions, (iii) remove a financial covenant, and (iv) amend an exhibit for conforming changes to the compliance certificate (the "Second Amendment"). On July 28, 2021, the Company amended the Amended and Restated Revolving Credit Agreement, as amended by the Second Amendment, to (i) extend the maturity to August 3, 2023; (ii) add a covenant to prohibit the Company from purchasing any equity security of the Company listed on a national securities exchange and payment of dividends or other capital distributions with respect to the common stock of the Company during the period from July 28, 2021, through September 30, 2022; (iii) update certain provisions regarding a successor interest rate to LIBOR and certain other market changes; and (iv) amend certain other covenants and provisions (the "Third Amendment," and the Amended and Restated Revolving Credit Agreement as amended by the Second Amendment and the Third Amendment, the "Amended A&R Credit Agreement"). The amount of the loan commitments and the collateral under the Amended and Restated Revolving Credit Agreement remain unchanged by the Second Amendment and the Third Amendment. As of December 31, 2021, there were no amounts outstanding under the Amended A&R Credit Agreement.

Generally, amounts outstanding under the Amended A&R Credit Agreement bear interest at interest rates based on either the LIBOR rate (selected by the Company for designated interest periods) or the "alternate base rate" (being the highest of (1) the Wall Street Journal prime rate, (2) one-month adjusted LIBOR (one-month LIBOR plus a statutory reserve rate) plus 1 percent, and (3) the New York Fed Bank Rate, plus 0.5 percent). The underlying LIBOR rate is subject to a floor of 1 percent per annum and the "alternate base rate" is subject to a floor of 1 percent per annum.

The Amended A&R Credit Agreement contains customary representations and warranties, covenants, and events of default. The Amended A&R Credit Agreement is secured by a pool of 73 aircraft and related assets, each with a minimum appraised value ratio requirement. Under the Amended A&R Credit Agreement, the Company is required to maintain a minimum level of liquidity of $1.5 billion (defined as the sum of (i) the aggregate amount available to be borrowed under the Amended A&R Credit Agreement plus (ii) the aggregate amount of unrestricted cash and cash equivalents of the Company plus (iii) the aggregate amount of short-term investments of the Company). As of December 31, 2021, the Company was in compliance with this covenant and all other covenants in the Amended A&R Credit Agreement. The Amended A&R Credit Agreement is a series of short-term borrowings; at the end of each borrowing the Company must elect to roll the facility over into the next borrowing or pay down the facility. The Amended A&R Credit Agreement has an accordion feature that would allow the Company, subject to, among other things, the procurement of incremental commitments, to increase the size of the facility to $1.5 billion.

During February 2020, the Company issued $500 million senior unsecured notes due 2030. The notes bear interest at 2.625 percent. Interest is payable semi-annually in arrears on February 10 and August 10, beginning in 2020.

During November 2017, the Company issued $300 million senior unsecured notes due 2022. The notes bear interest at 2.75 percent. Interest is payable semi-annually in arrears on May 16 and November 16.

Also during November 2017, the Company issued $300 million senior unsecured notes due 2027. The notes bear interest at 3.45 percent. Interest is payable semi-annually in arrears on May 16 and November 16.

During November 2016, the Company issued $300 million senior unsecured notes due 2026. The notes bear interest at 3.00 percent. Interest is payable semi-annually in arrears on May 15 and November 15.

During October 2016, the Company entered into a term loan agreement providing for loans to the Company aggregating up to $215 million, to be secured by mortgages on seven of the Company's 737-800 aircraft. The Company borrowed the full $215 million and secured this loan with the requisite seven aircraft mortgages. The loan was set to mature on October 31, 2026, and was repayable via semi-annual installments of principal that began on April 30, 2018. The loan bore interest at the LIBO Rate (as defined in the term loan agreement) plus 1.10 percent, and interest was payable semi-annually in installments. The Company prepaid the loan in full on November 1, 2021, utilizing available cash on hand.

On October 3, 2007, grantor trusts established by the Company issued $500 million Pass Through Certificates consisting of $412 million 6.15 percent Series A certificates and $88 million 6.65 percent Series B certificates. A separate trust was established for each class of certificates. The trusts used the proceeds from the sale of certificates to acquire equipment notes in the same amounts, which were issued by the Company on a full recourse basis. Payments on the equipment notes held in each trust are passed through to the holders of certificates of such trust. The equipment notes were issued for each of 16 Boeing 737-700 aircraft owned by the Company and are secured by a mortgage on each aircraft. Beginning February 1, 2008, principal and interest payments on the equipment notes held for both series of certificates became due semi-annually until the balance of the certificates mature on August 1, 2022. Prior to their issuance, the Company also entered into swap agreements to hedge the variability in interest rates on the Pass Through Certificates. The swap agreements were accounted for as cash flow hedges, and resulted in a payment by the Company of $20 million upon issuance of the Pass Through Certificates. The effective portion of the hedge is being amortized to interest expense concurrent with the amortization of the debt and is reflected in the above table as a reduction in the debt balance. The ineffectiveness of the hedge transaction was immaterial.

On February 28, 1997, the Company issued $100 million of senior unsecured 7.375 percent debentures due March 1, 2027. Interest is payable semi-annually on March 1 and September 1. The debentures may be redeemed, at the option of the Company, in whole at any time or in part from time to time, at a redemption price equal to the greater of the principal amount of the debentures plus accrued interest at the date of redemption or the sum of the present values of the remaining scheduled payments of principal and interest thereon, discounted to the date of redemption at the comparable treasury rate plus 20 basis points, plus accrued interest at the date of redemption.

The Company is required to provide standby letters of credit to support certain obligations that arise in the ordinary course of business. Although the letters of credit are an off-balance sheet item, the majority of the obligations to which they relate are reflected as liabilities in the Consolidated Balance Sheet. Outstanding letters of credit totaled $124 million at December 31, 2021.

The net book value of the assets pledged as collateral for the Company's secured borrowings, primarily aircraft, was $2.2 billion at December 31, 2021.

As of December 31, 2021, aggregate annual principal maturities of debt and finance leases (not including amounts associated with interest on finance leases) for the five-year period ending December 31, 2026, and thereafter, were $453 million in 2022, $1.3 billion in 2023, $81 million in 2024, $3.7 billion in 2025, $350 million in 2026, and $5.1 billion thereafter.

## 8. LEASES

The Company enters into leases for aircraft, property, and other types of equipment in the normal course of business. The accounting for these leases follows the requirements of ASC 842, Leases.

As of December 31, 2021, the Company held aircraft leases with remaining terms ranging from one month to 12 years. The aircraft leases generally can be renewed for three months to three years at rates based on the fair market value at the end of the lease term. Residual value guarantees included in the Company's lease agreements are not material.

On July 9, 2012, the Company signed an agreement with Delta Air Lines, Inc. and Boeing Capital Corp. to lease or sublease 88 AirTran Airways, Inc. Boeing 717-200 aircraft ("B717s") to Delta at agreed-upon lease rates. The Company's future sublease income associated with the 14 remaining B717s on operating lease as of December 31, 2021, was as follows: $17 million in 2022, $7 million in 2023, and $1 million in 2024. There are no contingent payments and no significant residual value conditions associated with the transaction.

In second quarter 2020, the Company entered into transactions with third parties, involving ten of the Company's Boeing 737-800 aircraft and ten of the Company's Boeing 737 MAX 8 aircraft that qualified as sale-leaseback arrangements under applicable accounting guidance. The Company sold the ten 737-800 aircraft to a third party for $405 million, then immediately leased the aircraft back for approximately ten years. The Company sold the ten 737 MAX 8 aircraft to a third party for $410 million, then immediately leased the aircraft back for approximately 13 years. As such, the aircraft were de-recognized from Property and equipment at their remaining net book values. All of the leases from the sale-leasebacks are accounted for as operating leases, and thus are now reflected as part of the Company's Operating lease right-of-use assets and operating lease liabilities in the accompanying Consolidated Balance Sheet. For 2020, the 737-800 and 737 MAX 8 sale-leaseback transactions resulted in a recognized gain of $153 million and $69 million, respectively, reflected within Other operating expenses, net in the accompanying Consolidated Statement of Income (Loss).

At each airport where the Company conducts flight operations, the Company has lease agreements, generally with a governmental unit or authority, for the use of airport terminals, airfields, office space, cargo warehouses, gates, and/or maintenance facilities. These leases are classified as operating lease agreements and have lease terms remaining ranging from one month to 39 years. Certain leases can be renewed from 1 year to ten years. The majority of the airport terminal leases contain certain provisions for periodic adjustments to rates that depend upon airport operating costs or use of the facilities, and are reset at least annually. Due to the nature and variability of the rates, the majority of these leases are not recorded on the Consolidated Balance Sheet.

The Company also leases certain technology assets, fuel storage tanks, and various other equipment that qualify as leases under the applicable accounting guidance. The remaining lease terms range from three months to five years. Certain leases can be renewed from six months to three years.

Lease-related assets and liabilities recorded on the Consolidated Balance Sheet were as follows:

| (in millions) | Balance Sheet location | December 31, 2021 | December 31, 2020 |
|---|---|---:|---:|
| **Assets** | | | |
| Operating | Operating lease right-of-use assets (net) | $ 1,590 | $ 1,892 |
| Finance | Property and equipment (net of allowance for depreciation and amortization of $679 million and $567 million) | 556 | 667 |
| Total lease assets | | $ 2,146 | $ 2,559 |
| | | | |
| **Liabilities** | | | |
| Current | | | |
| Operating | Current operating lease liabilities | $ 239 | $ 306 |
| Finance | Current maturities of long-term debt | 82 | 83 |
| Noncurrent | | | |
| Operating | Noncurrent operating lease liabilities | 1,315 | 1,562 |
| Finance | Long-term debt less current maturities | 377 | 459 |
| Total lease liabilities | | $ 2,013 | $ 2,410 |

The components of lease costs, included in the Consolidated Statement of Income (Loss), were as follows:

| (in millions) | Statement of Comprehensive Income (Loss) location | Year ended December 31, 2021 | Year ended December 31, 2020 | Year ended December 31, 2019 |
|---|---|---:|---:|---:|
| Operating lease cost - aircraft (a) | Other operating expenses | $ 204 | $ 216 | $ 182 |
| Operating lease cost - other | Landing fees and airport rentals, and Other operating expenses | 81 | 89 | 89 |
| Short-term lease cost | Other operating expenses | 1 | 1 | 4 |
| Variable lease cost | Landing fees and airport rentals, and Other operating expenses | 1,406 | 1,260 | 1,377 |
| Finance lease cost: | | | | |
| Amortization of lease liabilities | Depreciation and amortization | 112 | 113 | 116 |
| Interest on lease liabilities | Interest expense | 19 | 22 | 26 |
| Total net finance lease cost | | $ 131 | $ 135 | $ 142 |

(a) Net of sublease income of $41 million, $78 million, and $97 million for the years ended December 31, 2021, 2020, and 2019.

Supplemental cash flow information related to leases, included in the Consolidated Statement of Cash Flows, was as follows:

| (in millions) | Year ended December 31, 2021 | Year ended December 31, 2020 | Year ended December 31, 2019 |
|---|---|---|---|
| Cash paid for amounts included in the measurement of lease liabilities: | | | |
| Operating cash flows for operating leases | $ 346 | $ 398 | $ 379 |
| Operating cash flows for finance leases | 19 | 22 | 26 |
| Financing cash flows for finance leases | 83 | 85 | 85 |
| Right-of-use assets obtained in exchange for lease obligations: | | | |
| Operating leases | 327 | 915 | 230 |
| Finance leases | — | — | 1 |

As of December 31, 2021, maturities of lease liabilities were as follows:

| (in millions) | Operating leases | Finance leases |
|---|---|---|
| 2022 | $ 285 | $ 98 |
| 2023 | 249 | 94 |
| 2024 | 221 | 90 |
| 2025 | 184 | 74 |
| 2026 | 176 | 54 |
| Thereafter | 680 | 102 |
| Total lease payments | $ 1,795 | $ 512 |
| Less imputed interest | (241) | (53) |
| Total lease obligations | 1,554 | 459 |
| Less current obligations | (239) | (82) |
| Long-term lease obligations | $ 1,315 | $ 377 |

The table below presents additional information related to the Company's leases:

| Weighted average remaining lease term | December 31, 2021 | December 31, 2020 |
|---|---|---|
| Operating leases | 8 years | 10 years |
| Finance leases | 6 years | 7 years |
| | | |
| **Weighted average discount rate** | | |
| Operating leases (a) | 3.5 % | 3.8 % |
| Finance leases | 3.8 % | 3.8 % |

(a) Upon adoption of ASU No. 2016-02, Leases, codified in ASC 842, the incremental borrowing rate used for existing leases was established as of January 1, 2019.

## 9. COMMON STOCK

The Company has one class of capital stock, its common stock. On May 1, 2020, the Company completed the public offering of 80.5 million shares of $1.00 par value common stock of the Company, which included the full exercise of the underwriters' option to purchase an additional 10.5 million shares of common stock, at a public offering price of $28.50 per share. As discussed further in Note 2, in connection with funding that the Company has received under the PSP1 Payroll Support Program, PSP2 Payroll Support Program, and PSP3 Payroll Support Program, the Company issued Warrants to acquire up to 4.8 million shares of the Company's common stock to Treasury.

Holders of shares of common stock are entitled to receive dividends when and if declared by the Board of Directors and are entitled to one vote per share on all matters submitted to a vote of the Shareholders. In connection with the receipt of Payroll Support, the Company is prohibited from paying dividends with respect to its common stock through September 30, 2022. See Note 2 for further information on the Payroll Support programs. At December 31,

2021, the Company had 60 million shares of common stock reserved for issuance pursuant to Employee equity plans (of which 22 million shares had not been granted) through various share-based compensation arrangements. See Note 10 to the Consolidated Financial Statements for information regarding the Company's equity plans.

## 10. STOCK PLANS

### Share-based Compensation

The Company accounts for share-based compensation utilizing fair value, which is determined on the date of grant for all instruments. The Consolidated Statement of Income (Loss) for the years ended December 31, 2021, 2020, and 2019, reflects share-based compensation expense of $58 million, $17 million, and $55 million, respectively. The total tax impact recognized in earnings from share-based compensation arrangements for the years ended December 31, 2021, 2020, and 2019, was not material. As of December 31, 2021, there was $36 million of total unrecognized compensation cost related to share-based compensation arrangements, which is expected to be recognized over a weighted-average period of 1.7 years. The Company expects substantially all unvested shares associated with time-based restricted stock unit awards to vest.

### Restricted Stock Units and Stock Grants

Under the Company's Amended and Restated 2007 Equity Incentive Plan ("2007 Equity Plan"), which has been approved by Shareholders, the Company granted restricted stock units ("RSUs") and performance-based restricted stock units ("PBRSUs") to certain Employees during 2021, 2020, and 2019.

The RSUs are scheduled to vest with respect to one-third of the shares covered thereby annually. Other than in connection with death or disability, vesting is subject to the individual's continued service as an Employee, Board member, or advisor through the vesting date. However, with respect to the RSUs granted in 2021, provided that the individual's service has terminated no earlier than 12 months after the date of grant, in the event of a "qualified retirement," any outstanding unvested RSUs will remain outstanding as if the individual's service has not terminated and will continue to vest in accordance with the schedule set forth in the notice of the grant. An individual's termination of service will be considered a "qualified retirement" if (a) the individual has completed at least 10 years of continuous service; (b) the individual's age plus completed years of continuous service equal at least 65 at the time of the individual's termination of service; and (c) the individual has not been terminated for cause.

With respect to PBRSUs granted in 2021, the number of PBRSUs vesting on the vesting date will be interpolated based on the Company's cumulative Adjusted Earnings Before Interest, Taxes, Depreciation, and Amortization (EBITDA) for the years 2022 and 2023 and ranges from 10 percent of granted PBRSUs to 300 percent of granted PBRSUs, only after a minimum performance level has been achieved. However, in the event the Company's pre-tax return on invested capital exceeds the median (i.e., 50th percentile) return on invested capital of certain of the Company's peer group of domestic mainline carriers subject to the Securities and Exchange Commission's reporting requirements, the minimum number of PBRSUs that will vest, as of the vesting date, will be equal to the grant amount times 50 percent. With respect to PBRSUs granted in 2021, provided that the individual's service has terminated no earlier than 12 months after the date of grant, in the event of a "qualified retirement," such individual's PBRSUs will remain outstanding as if the individual's service has not terminated and will otherwise be settleable in accordance with the notice of grant and applicable terms and conditions; however, the number of shares received upon settlement will be prorated based on the individual's number of days of service between the date of grant and the end of the performance period.

Under the 2019 and 2020 grants, PBRSUs granted are subject to the Company's performance with respect to a three-year simple average of return on invested capital, after taxes and excluding special items, for the defined performance period and are also subject generally to the individual's continued employment or service. Under the 2019 and 2020 grants, the number of PBRSUs vesting on the vesting date will be interpolated based on the Company's return on invested capital performance and ranges from zero PBRSUs to 200 percent of granted

109

PBRSUs. Forfeiture rates are estimated at the time of grant based on historical actuals for similar grants, and are trued-up to actuals over the vesting period. The Company recognizes all expense on a straight-line basis over the vesting period, with any changes in expense due to the number of PBRSUs expected to vest being modified on a prospective basis.

Aggregated information regarding the Company's RSUs and PBRSUs is summarized below:

| | All Restricted Stock Units | | |
|---|---|---|---|
| | Units (000) | | Wtd. Average Fair Value (per share) |
| Outstanding December 31, 2018 | 1,342 | $ | 52.56 |
| Granted | 994 | (a) | 57.49 |
| Vested | (744) | | 42.42 |
| Surrendered | (47) | | 57.72 |
| Outstanding December 31, 2019 | 1,545 | | 57.65 |
| Granted | 1,235 | (b) | 56.89 |
| Vested | (715) | | 54.70 |
| Surrendered | (103) | | 58.04 |
| Outstanding December 31, 2020, Unvested | 1,962 | | 57.81 |
| Granted | 1,463 | (c) | 46.58 |
| Vested | (790) | | 59.48 |
| Surrendered | (74) | | 51.36 |
| Outstanding December 31, 2021, Unvested | 2,561 | | 51.81 |

(a) Includes 387 thousand PBRSUs
(b) Includes 519 thousand PBRSUs
(c) Includes 466 thousand PBRSUs

In addition, the Company granted approximately 27 thousand shares of unrestricted stock at a weighted average grant price of $60.39 in 2021, approximately 54 thousand shares at a weighted average grant price of $29.60 in 2020, and approximately 31 thousand shares at a weighted average grant price of $52.01 in 2019, to members of its Board of Directors.

A remaining balance of up to 17 million shares of the Company's common stock may be issued pursuant to grants under the 2007 Equity Plan.

*Employee Stock Purchase Plan*

Under the Amended and Restated 1991 Employee Stock Purchase Plan ("ESPP"), which has been approved by Shareholders, the Company is authorized to issue up to a remaining balance of 5 million shares of the Company's common stock to Employees of the Company. These shares may be issued at a price equal to 90 percent of the market value at the end of each monthly purchase period. Common stock purchases are paid for through periodic payroll deductions.

The following table provides information about the Company's ESPP activity during 2021, 2020, and 2019:

**Employee Stock Purchase Plan**

| Year ended | Total number of shares purchased (in thousands) | | Average price paid per share | | (a) Weighted-average fair value of each purchase right under the ESPP |
|---|---|---|---|---|---|
| December 31, 2019 | 821 | $ | 47.60 | $ | 5.29 |
| December 31, 2020 | 1,386 | $ | 34.39 | $ | 3.82 |
| December 31, 2021 | 1,083 | $ | 47.31 | $ | 5.19 |

(a) The weighted-average fair value of each purchase right under the ESPP granted is equal to a ten percent discount from the market value of the Common Stock at the end of each monthly purchase period.

### *Taxes*

Grants of RSUs result in the creation of a deferred tax asset, which is a temporary difference, until the time the RSU vests. All excess tax benefits and tax deficiencies are recorded through the income statement. Due to the treatment of RSUs for tax purposes, the Company's effective tax rate from year to year is subject to variability.

111

## 11. FINANCIAL DERIVATIVE INSTRUMENTS

### *Fuel Contracts*

Airline operators are inherently dependent upon energy to operate and, therefore, are impacted by changes in jet fuel prices. Furthermore, jet fuel and oil typically represents one of the largest operating expenses for airlines. The Company endeavors to acquire jet fuel at the lowest possible cost and to reduce volatility in operating expenses through its fuel hedging program. Although the Company may periodically enter into jet fuel derivatives for short-term timeframes, because jet fuel is not widely traded on an organized futures exchange, there are limited opportunities to hedge directly in jet fuel for time horizons longer than approximately 24 months into the future. However, the Company has found that financial derivative instruments in other commodities, such as West Texas Intermediate ("WTI") crude oil, Brent crude oil, and refined products, such as heating oil and unleaded gasoline, can be useful in decreasing its exposure to jet fuel price volatility. The Company does not purchase or hold any financial derivative instruments for trading or speculative purposes.

The Company has used financial derivative instruments for both short-term and long-term timeframes, and primarily uses a mixture of purchased call options, collar structures (which include both a purchased call option and a sold put option), call spreads (which include a purchased call option and a sold call option), put spreads (which include a purchased put option and a sold put option), and fixed price swap agreements in its portfolio. Although the use of collar structures and swap agreements can reduce the overall cost of hedging, these instruments carry more risk than purchased call options in that the Company could end up in a liability position when the collar structure or swap agreement settles. With the use of purchased call options and call spreads, the Company cannot be in a liability position at settlement, but does not have coverage once market prices fall below the strike price of the purchased call option.

For the purpose of evaluating its net cash spend for jet fuel and for forecasting its future estimated jet fuel expense, the Company evaluates its hedge volumes strictly from an "economic" standpoint and thus does not consider whether the hedges have qualified or will qualify for hedge accounting. The Company defines its "economic" hedge as the net volume of fuel derivative contracts held, including the impact of positions that have been offset through sold positions, regardless of whether those contracts qualify for hedge accounting. The level at which the Company is economically hedged for a particular period is also dependent on current market prices for that period, as well as the types of derivative instruments held and the strike prices of those instruments. For example, the Company may enter into "out-of-the-money" option contracts (including "catastrophic" protection), which may not generate intrinsic gains at settlement if market prices do not rise above the option strike price. Therefore, even though the Company may have an economic hedge in place for a particular period, that hedge may not produce any hedging gains at settlement and may even produce hedging losses depending on market prices, the types of instruments held, and the strike prices of those instruments.

As of December 31, 2021, the Company had fuel derivative instruments in place to provide coverage at varying price levels. The following table provides information about the Company's volume of fuel hedging on an economic basis:

| Period (by year) | Maximum fuel hedged as of December 31, 2021 (gallons in millions) (a) | Derivative underlying commodity type as of December 31, 2021 |
|---|---|---|
| 2022 | 1,220 | WTI crude oil and Brent crude oil |
| 2023 | 769 | WTI crude oil and Brent crude oil |
| 2024 | 358 | WTI crude oil |

(a) Due to the types of derivatives utilized by the Company and different price levels of those contracts, these volumes represent the maximum economic hedge in place and may vary significantly as market prices and the Company's flight schedule fluctuate.

Upon proper qualification, the Company accounts for its fuel derivative instruments as cash flow hedges. Qualification is re-evaluated quarterly, and all periodic changes in fair value of the derivatives designated as hedges are recorded in AOCI until the underlying jet fuel is consumed. See Note 13.

If a derivative ceases to qualify for hedge accounting, any change in the fair value of derivative instruments since the last reporting period would be recorded in Other (gains) losses, net, in the Consolidated Statement of Income (Loss) in the period of the change; however, any amounts previously recorded to AOCI would remain there until such time as the original forecasted transaction occurs, at which time these amounts would be reclassified to Fuel and oil expense. Factors that have and may continue to lead to the loss of hedge accounting include: significant fluctuation in energy prices, significant weather events affecting refinery capacity and the production of refined products, and the volatility of the different types of products the Company uses in hedging. Increased volatility in these commodity markets for an extended period of time, especially if such volatility were to worsen, could cause the Company to lose hedge accounting altogether for the commodities used in its fuel hedging program, which would create further volatility in the Company's GAAP financial results. However, even though derivatives may not qualify for hedge accounting, the Company continues to hold the instruments as management believes derivative instruments continue to afford the Company the opportunity to stabilize jet fuel costs. When the Company has sold derivative positions in order to effectively "close" or offset a derivative already held as part of its fuel derivative instrument portfolio, any subsequent changes in fair value of those positions are marked to market through earnings. Likewise, any changes in fair value of those positions that were offset by entering into the sold positions and were de-designated as hedges are concurrently marked to market through earnings. However, any changes in value related to hedges that were deferred as part of AOCI while designated as a hedge would remain until the originally forecasted transaction occurs. In a situation where it becomes probable that a fuel hedged forecasted transaction will not occur, any gains and/or losses that have been recorded to AOCI would be required to be immediately reclassified into earnings.

During 2020 and 2021, as a result of the drastic drop in demand for air travel due to the COVID-19 pandemic, the Company's forecast for 2020 and 2021 fuel purchases and consumption was significantly reduced, causing the Company to be in an estimated "over-hedged" position for second, third, and fourth quarter 2020, and full year 2021. Therefore, the Company de-designated a portion of its fuel hedges related to these periods, and has reclassified approximately $39 million and $6 million in losses from AOCI into Other (gains) losses, net, during 2020 and 2021, respectively. The Company did not have any such situations occur during 2019.

Accounting pronouncements pertaining to derivative instruments and hedging are complex with stringent requirements, including the documentation of a Company hedging strategy, statistical analysis to qualify a commodity for hedge accounting both on a historical and a prospective basis, and strict contemporaneous documentation that is required at the time each hedge is designated by the Company. This statistical analysis involves utilizing regression analyses that compare changes in the price of jet fuel to changes in the prices of the commodities used for hedging purposes.

All cash flows associated with purchasing and selling fuel derivatives are classified as Other operating cash flows in the Consolidated Statement of Cash Flows. The following table presents the location of all assets and liabilities associated with the Company's derivative instruments within the Consolidated Balance Sheet:

113

| (in millions) | Balance Sheet location | Asset derivatives | | Liability derivatives | |
| --- | --- | --- | --- | --- | --- |
| | | Fair value at 12/31/2021 | Fair value at 12/31/2020 | Fair value at 12/31/2021 | Fair value at 12/31/2020 |
| **Derivatives designated as hedges (a)** | | | | | |
| Fuel derivative contracts (gross) | Prepaid expenses and other current assets | $ 409 | $ 9 | $ — | $ — |
| Fuel derivative contracts (gross) | Other assets | 287 | 121 | — | — |
| Interest rate derivative contracts | Other noncurrent liabilities | — | — | 4 | 6 |
| **Total derivatives designated as hedges** | | $ 696 | $ 130 | $ 4 | $ 6 |
| **Derivatives not designated as hedges (a)** | | | | | |
| Fuel derivative contracts (gross) | Prepaid expenses and other current assets | $ — | $ 4 | $ — | $ — |
| **Total derivatives** | | $ 696 | $ 134 | $ 4 | $ 6 |

(a) Represents the position of each trade before consideration of offsetting positions with each counterparty and does not include the impact of cash collateral deposits provided to or received from counterparties. See discussion of credit risk and collateral following in this Note.

In addition, the Company had the following amounts associated with fuel derivative instruments and hedging activities in its Consolidated Balance Sheet:

| (in millions) | Balance Sheet location | December 31, 2021 | December 31, 2020 |
| --- | --- | --- | --- |
| Cash collateral deposits held from counterparties for fuel contracts - current | Offset against Prepaid expenses and other current assets | $ 80 | $ 3 |
| Cash collateral deposits held from counterparties for fuel contracts - noncurrent | Offset against Other assets | 95 | 31 |
| Receivable from third parties for fuel contracts | Accounts and other receivables | 8 | — |

All of the Company's fuel derivative instruments and interest rate swaps are subject to agreements that follow the netting guidance in the applicable accounting standards for derivatives and hedging. The types of derivative instruments the Company has determined are subject to netting requirements in the accompanying Consolidated Balance Sheet are those in which the Company pays or receives cash for transactions with the same counterparty and in the same currency via one net payment or receipt. For cash collateral held by the Company or provided to counterparties, the Company nets such amounts against the fair value of the Company's derivative portfolio by each counterparty. The Company has elected to utilize netting for both its fuel derivative instruments and interest rate swap agreements and also classifies such amounts as either current or noncurrent, based on the net fair value position with each of the Company's counterparties in the Consolidated Balance Sheet. If its fuel derivative instruments are in a net asset position with a counterparty, cash collateral amounts held are first netted against current outstanding derivative asset amounts associated with that counterparty until that balance is zero, and then any remainder is applied against the fair value of noncurrent outstanding derivative instruments. As of December 31, 2021, no cash collateral deposits were provided by or held by the Company based on its outstanding interest rate swap agreements.

The Company has the following recognized financial assets and financial liabilities resulting from those transactions that meet the scope of the disclosure requirements as necessitated by applicable accounting guidance for balance sheet offsetting:

114

Notes to Consolidated Financial Statements

**Offsetting of derivative assets**

(in millions)

| | | (i) | (ii) | (iii) = (i) + (ii) | (i) | (ii) | (iii) = (i) + (ii) |
|---|---|---|---|---|---|---|---|
| | | | December 31, 2021 | | | December 31, 2020 | |
| Description | Balance Sheet location | Gross amounts of recognized assets | Gross amounts offset in the Balance Sheet | Net amounts of assets presented in the Balance Sheet | Gross amounts of recognized assets | Gross amounts offset in the Balance Sheet | Net amounts of assets presented in the Balance Sheet |
| Fuel derivative contracts | Prepaid expenses and other current assets | $ 409 | $ (80) | $ 329 | $ 13 | $ (3) | $ 10 |
| Fuel derivative contracts | Other assets | $ 287 | $ (95) | $ 192 (a) | $ 121 | $ (31) | $ 90 (a) |

(a) The net amounts of derivative assets and liabilities are reconciled to the individual line item amounts presented in the Consolidated Balance Sheet in Note 16.

**Offsetting of derivative liabilities**

(in millions)

| | | (i) | (ii) | (iii) = (i) + (ii) | (i) | (ii) | (iii) = (i) + (ii) |
|---|---|---|---|---|---|---|---|
| | | | December 31, 2021 | | | December 31, 2020 | |
| Description | Balance Sheet location | Gross amounts of recognized liabilities | Gross amounts offset in the Balance Sheet | Net amounts of liabilities presented in the Balance Sheet | Gross amounts of recognized liabilities | Gross amounts offset in the Balance Sheet | Net amounts of liabilities presented in the Balance Sheet |
| Fuel derivative contracts | Prepaid expenses and other current assets | $ 80 | $ (80) | $ — | $ 3 | $ (3) | $ — |
| Fuel derivative contracts | Other assets | $ 95 | $ (95) | $ — (a) | $ 31 | $ (31) | $ — (a) |
| Interest rate derivative contracts | Other noncurrent liabilities | $ 4 | $ — | $ 4 | $ 6 | $ — | $ 6 |

(a) The net amounts of derivative assets and liabilities are reconciled to the individual line item amounts presented in the Consolidated Balance Sheet in Note 16.

115

The following tables present the impact of derivative instruments and their location within the Consolidated Statement of Income (Loss) for the years ended December 31, 2021 and 2020:

**Location and amount recognized in income on cash flow and fair value hedging relationships**

| | Year ended December 31, 2021 | | | Year ended December 31, 2020 | | |
|---|---|---|---|---|---|---|
| (in millions) | Fuel and oil | Other (gains)/losses, net | Other operating expenses | Fuel and oil | Other (gains)/losses, net | Interest expense |
| Total | $ 4 | $ 6 | $ 6 | $ 70 | $ 39 | $ 6 |
| | | | | | | |
| Loss on cash flow hedging relationships | | | | | | |
| Commodity contracts: | | | | | | |
| Amount of loss reclassified from AOCI into income | 4 | 6 | — | 70 | 39 | — |
| Interest contracts: | | | | | | |
| Amount of loss reclassified from AOCI into income | — | — | 6 | — | — | 1 |
| | | | | | | |
| Impact of fair value hedging relationships: | | | | | | |
| Interest contracts: | | | | | | |
| Hedged items | — | — | — | — | — | 11 |
| Derivatives designated as hedging instruments | — | — | — | — | — | (6) |

**Derivatives designated and qualified in cash flow hedging relationships**

| | (Gain) Loss recognized in AOCI on derivatives, net of tax | |
|---|---|---|
| | Year ended December 31, | |
| (in millions) | 2021 | 2020 |
| Fuel derivative contracts | $ (461) | $ 80 |
| Interest rate derivatives | (2) | 26 |
| Total | $ (463) | $ 106 |

**Derivatives not designated as hedges**

| | (Gain) Loss recognized in income on derivatives | | |
|---|---|---|---|
| | Year ended December 31, | | |
| (in millions) | 2021 | 2020 | Location of (gain) loss recognized in income on derivatives |
| Fuel derivative contracts | $ (13) | $ 1 | Other (gains) losses, net |
| Interest rate derivatives | — | 28 | Other (gains) losses, net |
| Total | $ (13) | $ 29 | |

The Company also recorded expense associated with premiums paid for fuel derivative contracts that settled/expired during 2021, 2020, and 2019. Gains and/or losses associated with fuel derivatives that qualify for hedge accounting are ultimately recorded to Fuel and oil expense. Gains and/or losses associated with fuel derivatives that do not qualify for hedge accounting are recorded to Other (gains) and losses, net. The following table presents the impact

of premiums paid for fuel derivative contracts and their location within the Consolidated Statement of Income (Loss) during the period the contract settles:

| | Premium expense recognized in income on derivatives | | | | | | |
| | Year ended December 31, | | | | | | Location of premium expense recognized in income on derivatives |
| (in millions) | 2021 | | 2020 | | 2019 | | |
|---|---|---|---|---|---|---|---|
| Fuel derivative contracts designated as hedges | $ | 57 | $ | 64 | $ | 95 | Fuel and oil |
| Fuel derivative contracts not designated as hedges | $ | 43 | $ | 34 | $ | — | Other (gains) losses, net |

The fair values of the derivative instruments, depending on the type of instrument, were determined by the use of present value methods or option value models with assumptions about commodity prices based on those observed in underlying markets or provided by third parties. Included in the Company's cumulative net unrealized gains from fuel hedges as of December 31, 2021, recorded in AOCI, were approximately $234 million in unrealized gains, net of taxes, which are expected to be realized in earnings during the twelve months subsequent to December 31, 2021.

*Interest Rate Swaps*

The Company is party to certain interest rate swap agreements that are accounted for as cash flow hedges, and has in the past held interest rate swap agreements that have qualified as fair value hedges, as defined in the applicable accounting guidance for derivative instruments and hedging. Several of the Company's interest rate swap agreements qualify for the "shortcut" or "critical terms match" methods of accounting for hedges, which dictate that the hedges were assumed to be perfectly effective at origination, and, thus, there was no ineffectiveness to be recorded in earnings.

During 2019, the Company had entered into forward-starting interest rate swap agreements related to a series of 12 -8 aircraft leases for aircraft originally scheduled to be received between July 2019 and February 2020. These lease contracts exposed the Company to interest rate risk as the rental payments were subject to adjustment and would become fixed based on the 9-year swap rate at the time of delivery. As a result of the grounding of the MAX aircraft, those deliveries were significantly delayed. These original agreements were subsequently terminated in third quarter 2019, and the Company entered into new interest rate swap agreements based on revised expected aircraft delivery dates. As the revised delivery dates were also not met, these subsequent agreements were subsequently de-designated as hedges and the agreements terminated. All of the associated aircraft had been delivered to the Company as of September 30, 2021. As a result of the discontinued hedges, the Company had cumulative losses "frozen" in AOCI as of December 31, 2021, of $57 million, which will be recognized in earnings over the 9-year lease terms of each aircraft.

For the Company's interest rate swap agreements that do not qualify for the "shortcut" or "critical terms match" methods of accounting, ineffectiveness is assessed at each reporting period. If hedge accounting is achieved, all periodic changes in fair value of the interest rate swaps are recorded in AOCI.

The fair values of the interest rate swap agreements, which are adjusted regularly, have been aggregated by counterparty for classification in the Consolidated Balance Sheet. Agreements totaling a liability of $4 million are cash flow hedges and are classified as components of Other noncurrent liabilities. The corresponding offsetting adjustment related to the liability associated with the Company's cash flow hedges is to AOCI. See Note 13.

*Credit Risk and Collateral*

117

Credit exposure related to fuel derivative instruments is represented by the fair value of contracts that are an asset to the Company at the reporting date. At such times, these outstanding instruments expose the Company to credit loss in the event of nonperformance by the counterparties to the agreements. However, the Company has not experienced any significant credit loss as a result of counterparty nonperformance in the past. To manage credit risk, the Company selects and periodically reviews counterparties based on credit ratings, limits its exposure with respect to each counterparty, and monitors the market position of the fuel hedging program and its relative market position with each counterparty. At December 31, 2021, the Company had agreements with all of its active counterparties containing early termination rights and/or bilateral collateral provisions whereby security is required if market risk exposure exceeds a specified threshold amount based on the counterparty's credit rating. The Company also had agreements with counterparties in which cash deposits and letters of credit were required to be posted as collateral whenever the net fair value of derivatives associated with those counterparties exceeds specific thresholds. In certain cases, the Company has the ability to substitute among these different forms of collateral at its discretion.

The following table provides the fair values of fuel derivatives, amounts posted as collateral, and applicable collateral posting threshold amounts as of December 31, 2021, at which such postings are triggered:

| (in millions) | Counterparty (CP) | | | | | | | | |
| | A | B | C | D | E | F | G | Other (a) | Total |
|---|---|---|---|---|---|---|---|---|---|
| Fair value of fuel derivatives | $ 160 | $ 90 | $ 162 | $ 78 | $ 77 | $ 55 | $ 59 | $ 15 | $ 696 |
| Cash collateral held from CP | 175 | — | — | — | — | — | — | — | 175 |
| Letters of credit (LC) | — | — | — | — | — | — | — | — | — |
| Option to substitute LC for cash | N/A | N/A | (b) | (b) | (b) | N/A | (b) | | |
| **If credit rating is investment grade, fair value of fuel derivative level at which:** | | | | | | | | | |
| Cash is provided to CP | >(100) | >(50) | >(75) | >(125) | >(40) | >(65) | >(100) | | |
| Cash is received from CP | >0(c) | >150(c) | >250(c) | >125(c) | >100(c) | >70(c) | >100(c) | | |
| **If credit rating is non-investment grade, fair value of fuel derivative level at which:** | | | | | | | | | |
| Cash is received from CP | (d) | (d) | (d) | (d) | (d) | (d) | (d) | | |

(a) Individual counterparties with fair value of fuel derivatives <$10 million.

(b) The Company has the option to substitute letters of credit for 100 percent of cash collateral requirement.

(c) Thresholds may vary based on changes in credit ratings within investment grade.

(d) Cash collateral is provided at 100 percent of fair value of fuel derivative contracts.

118

## 12. FAIR VALUE MEASUREMENTS

Accounting standards pertaining to fair value measurements establish a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value. These tiers include: Level 1, defined as observable inputs such as quoted prices in active markets; Level 2, defined as inputs other than quoted prices in active markets that are either directly or indirectly observable; and Level 3, defined as unobservable inputs in which little or no market data exists, therefore requiring an entity to develop its own assumptions.

As of December 31, 2021, the Company held certain items that are required to be measured at fair value on a recurring basis. These included cash equivalents, short-term investments (primarily treasury bills and certificates of deposit), interest rate derivative contracts, fuel derivative contracts, and available-for-sale securities. The majority of the Company's short-term investments consist of instruments classified as Level 1. However, the Company has certificates of deposit, commercial paper, and time deposits that are classified as Level 2, due to the fact that the fair value for these instruments is determined utilizing observable inputs in non-active markets. Equity securities primarily consist of investments with readily determinable market values associated with the Company's excess benefit plan.

The Company's fuel and interest rate derivative instruments consist of over-the-counter contracts, which are not traded on a public exchange. Fuel derivative instruments currently consist solely of option contracts, whereas interest rate derivatives consist solely of swap agreements. See Note 11 for further information on the Company's derivative instruments and hedging activities. The fair values of swap contracts are determined based on inputs that are readily available in public markets or can be derived from information available in publicly quoted markets. Therefore, the Company has categorized these swap contracts as Level 2. The Company's Treasury Department, which reports to the Chief Financial Officer, determines the value of option contracts utilizing an option pricing model based on inputs that are either readily available in public markets, can be derived from information available in publicly quoted markets, or are provided by financial institutions that trade these contracts. The option pricing model used by the Company is an industry standard model for valuing options and is a similar model used by the broker/dealer community (i.e., the Company's counterparties). The inputs to this option pricing model are the option strike price, underlying price, risk free rate of interest, time to expiration, and volatility. Because certain inputs used to determine the fair value of option contracts are unobservable (principally implied volatility), the Company has categorized these option contracts as Level 3. Volatility information is obtained from external sources, but is analyzed by the Company for reasonableness and compared to similar information received from other external sources. The fair value of option contracts considers both the intrinsic value and any remaining time value associated with those derivatives that have not yet settled. The Company also considers counterparty credit risk and its own credit risk in its determination of all estimated fair values. To validate the reasonableness of the Company's option pricing model, on a monthly basis, the Company compares its option valuations to third party valuations. If any significant differences were to be noted, they would be researched in order to determine the reason. However, historically, no significant differences have been noted. The Company has consistently applied these valuation techniques in all periods presented and believes it has obtained the most accurate information available for the types of derivative contracts it holds.

Included in Other available-for-sale securities are the Company's investments associated with its deferred compensation plans, which consist of mutual funds that are publicly traded and for which market prices are readily available. These plans are non-qualified deferred compensation plans designed to hold contributions in excess of limits established by the Internal Revenue Code of 1986, as amended. The distribution timing and payment amounts under these plans are made based on the participant's distribution election and plan balance. Assets related to the funded portions of the deferred compensation plans are held in a rabbi trust, and the Company remains liable to these participants for the unfunded portion of the plans. The Company records changes in the fair value of plan obligations and plan assets, which net to zero, within the Salaries, wages, and benefits line and Other (gains) losses line, respectively, of the Consolidated Statement of Income (Loss).

119

The following tables present the Company's assets and liabilities that are measured at fair value on a recurring basis at December 31, 2021, and December 31, 2020:

| | | | | Fair value measurements at reporting date using: | | |
| | | | | Quoted prices in active markets for identical assets | Significant other observable inputs | Significant unobservable inputs |
| Description | | December 31, 2021 | | (Level 1) | (Level 2) | (Level 3) |
| **Assets** | | | | (in millions) | | |
| Cash equivalents: | | | | | | |
| Cash equivalents (a) | $ | 12,340 | $ | 12,340 | $ — | $ — |
| Commercial paper | | 90 | | — | 90 | — |
| Time deposits | | 50 | | — | 50 | — |
| Short-term investments: | | | | | | |
| Treasury bills | | 2,399 | | 2,399 | — | — |
| Time deposits | | 625 | | — | 625 | — |
| Fuel derivatives: | | | | | | |
| Option contracts (b) | | 696 | | — | — | 696 |
| Equity Securities | | 288 | | 288 | — | — |
| **Total assets** | $ | 16,488 | $ | 15,027 | $ 765 | $ 696 |
| **Liabilities** | | | | | | |
| Interest rate derivatives (see Note 11) | $ | (4) | $ | — | $ (4) | $ — |

(a) Cash equivalents are primarily composed of money market investments.

(b) In the Consolidated Balance Sheet amounts are presented as an asset. See Note 11.

| | | | | Fair value measurements at reporting date using: | | |
| | | | | Quoted prices in active markets for identical assets | Significant other observable inputs | Significant unobservable inputs |
| Description | | December 31, 2020 | | (Level 1) | (Level 2) | (Level 3) |
| **Assets** | | | | (in millions) | | |
| Cash equivalents: | | | | | | |
| Cash equivalents (a) | $ | 10,663 | $ | 10,663 | $ — | $ — |
| Commercial paper | | 90 | | — | 90 | — |
| Certificates of deposit | | 10 | | — | 10 | — |
| Time deposits | | 300 | | — | 300 | — |
| Short-term investments: | | | | | | |
| Treasury bills | | 1,800 | | 1,800 | — | — |
| Certificates of deposit | | 46 | | — | 46 | — |
| Time deposits | | 425 | | — | 425 | — |
| Fuel derivatives: | | | | | | |
| Option contracts (b) | | 134 | | — | — | 134 |
| Equity Securities | | 259 | | 259 | — | — |
| **Total assets** | $ | 13,727 | $ | 12,722 | $ 871 | $ 134 |
| **Liabilities** | | | | | | |
| Interest rate derivatives (see Note 11) | $ | (6) | $ | — | $ (6) | $ — |

(a) Cash equivalents are primarily composed of money market investments.

(b) In the Consolidated Balance Sheet amounts are presented as an asset. See Note 11.

The Company did not have any material assets or liabilities measured at fair value on a nonrecurring basis as of December 31, 2021 or 2020. The following tables present the Company's activity for items measured at fair value on a recurring basis using significant unobservable inputs (Level 3) for 2021 and 2020:

### Fair value measurements using significant unobservable inputs (Level 3)

| (in millions) | Fuel derivatives | |
| --- | --- | --- |
| Balance at December 31, 2020 | $ | 134 |
| Total gains for the period | | |
|   Included in earnings | | 7 (a) |
|   Included in other comprehensive income | | 609 |
| Purchases | | 41 (b) |
| Sales | | (7) (b) |
| Settlements | | (88) |
| Balance at December 31, 2021 | $ | 696 |
| The amount of total gains for the period included in other comprehensive income attributable to the change in unrealized gains or losses relating to assets still held at December 31, 2021 | $ | 541 |

(a) Included in Other (gains) losses, net, within the Consolidated Statement of Income (Loss).
(b) The purchase and sale of fuel derivatives is recorded gross based on the structure of the derivative instrument and whether a contract with multiple derivatives was purchased as a single instrument or separate instruments.

### Fair value measurements using significant unobservable inputs (Level 3)

| (in millions) | Fuel derivatives | |
| --- | --- | --- |
| Balance at December 31, 2019 | $ | 110 |
| Total losses for the period | | |
|   Included in earnings | | (40) (a) |
|   Included in other comprehensive loss | | (65) |
| Purchases | | 129 (b) |
| Balance at December 31, 2020 | $ | 134 |
| The amount of total losses for the period included in earnings attributable to the change in unrealized gains or losses relating to assets still held at December 31, 2020 | $ | (15) (a) |
| The amount of total losses for the period included in other comprehensive loss attributable to the change in unrealized gains or losses relating to assets still held at December 31, 2020 | $ | (41) |

(a) Included in Other (gains) losses, net, within the Consolidated Statement of Income (Loss).
(b) The purchase of fuel derivatives is recorded gross based on the structure of the derivative instrument and whether a contract with multiple derivatives was purchased as a single instrument or separate instruments.

The significant unobservable input used in the fair value measurement of the Company's derivative option contracts is implied volatility. Holding other inputs constant, an increase (decrease) in implied volatility would have resulted in a higher (lower) fair value measurement, respectively, for the Company's derivative option contracts.

The following table presents a range and weighted average of the unobservable inputs utilized in the fair value measurements of the Company's fuel derivatives classified as Level 3 at December 31, 2021:

**Quantitative information about Level 3 fair value measurements**

|  | Valuation technique | Unobservable input | Period (by year) | Range | Weighted Average (a) |
|---|---|---|---|---|---|
| Fuel derivatives | Option model | Implied volatility | 2022 | 21-53% | 41 % |
|  |  |  | 2023 | 29-40% | 34 % |
|  |  |  | 2024 | 26-33% | 28 % |

(a) Implied volatility weighted by the notional amount (barrels of fuel) that will settle in respective period.

The carrying amounts and estimated fair values of the Company's short-term and long-term debt (including current maturities), as well as the applicable fair value hierarchy tier, at December 31, 2021, are presented in the table below. The fair values of the Company's publicly held long-term debt are determined based on inputs that are readily available in public markets or can be derived from information available in publicly quoted markets; therefore, the Company has categorized these agreements as Level 2. All privately held debt agreements are categorized as Level 3. The Company has determined the estimated fair value of this debt to be Level 3, as certain inputs used to determine the fair value of these agreements are unobservable. The Company utilizes indicative pricing from counterparties and a discounted cash flow method to estimate the fair value of the Level 3 items.

| (in millions) | Carrying value | Estimated fair value | Fair value level hierarchy |
|---|---|---|---|
| 2.75% Notes due 2022 | $       300 | $       305 | Level 2 |
| Pass Through Certificates due 2022 - 6.24% | 71 | 73 | Level 2 |
| 4.75% Notes due 2023 | 1,250 | 1,311 | Level 2 |
| 1.25% Convertible Notes due 2025 | 1,842 | 2,802 | Level 2 |
| 5.25% Notes due 2025 | 1,550 | 1,724 | Level 2 |
| 3.00% Notes due 2026 | 300 | 314 | Level 2 |
| 3.45% Notes due 2027 | 300 | 321 | Level 2 |
| 5.125% Notes due 2027 | 2,000 | 2,294 | Level 2 |
| 7.375% Debentures due 2027 | 116 | 140 | Level 2 |
| 2.625% Notes due 2030 | 500 | 499 | Level 2 |
| 1.000% Payroll Support Program Loan due April 2030 | 976 | 958 | Level 3 |
| 1.000% Payroll Support Program Loan due January 2031 | 566 | 548 | Level 3 |
| 1.000% Payroll Support Program Loan due April 2031 | 526 | 507 | Level 3 |

## 13. ACCUMULATED OTHER COMPREHENSIVE INCOME (LOSS)

Comprehensive income (loss) includes changes in the fair value of certain financial derivative instruments that qualify for hedge accounting, unrealized gains and losses on certain investments, and actuarial gains/losses arising from the Company's postretirement benefit obligation. A rollforward of the amounts included in AOCI, net of taxes, is shown below for 2021 and 2020:

| (in millions) | Fuel derivatives | | Interest rate derivatives | | Defined benefit plan items | | Other | | Deferred tax impact | | Accumulated other comprehensive income (loss) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2019 | $ | (125) | $ | (33) | $ | 20 | $ | 59 | $ | 18 | $ | (61) |
| Changes in fair value | | (103) | | (34) | | (63) | | 32 | | 39 | | (129) |
| Reclassification to earnings | | 109 | | 1 | | — | | — | | (25) | | 85 |
| Balance at December 31, 2020 | $ | (119) | $ | (66) | $ | (43) | $ | 91 | $ | 32 | $ | (105) |
| Cumulative effect of adopting ASU 2016-01 as of January 1, 2018 | | — | | — | | — | | (31) | | 11 | | (20) |
| Changes in fair value | | 601 | | 3 | | 109 | | — | | (166) | | 547 |
| Reclassification to earnings | | 10 | | 6 | | — | | (60) (a) | | 10 | | (34) |
| Balance at December 31, 2021 | $ | 492 | $ | (57) | $ | 66 | $ | — | $ | (113) | $ | 388 |

(a) Investment gains related to prior periods that were reclassified from AOCI into Other (gains) losses, net. See Note 1.

The following table illustrates the significant amounts reclassified out of each component of AOCI for the year ended December 31, 2021:

**Year ended December 31, 2021**

| (in millions) AOCI components | Amounts reclassified from AOCI | | Affected line item in the Consolidated Statement of Income (Loss) |
|---|---|---|---|
| Unrealized loss on fuel derivative instruments | $ | 4 | Fuel and oil expense |
| | | 6 | Other (gains) losses, net |
| | | 2 | Less: Tax expense |
| | $ | 8 | Net of tax |
| Unrealized loss on interest rate derivative instruments | | 6 | Other operating expenses |
| | | 1 | Less: Tax expense |
| | $ | 5 | Net of tax |
| Unrealized gain on deferred compensation plan investment | $ | (60) | Other (gains) losses, net |
| | | (13) | Less: Tax expense |
| | $ | (47) | Net of tax |
| | | | |
| Total reclassifications for the period | $ | (34) | Net of tax |

## 14. EMPLOYEE RETIREMENT PLANS
### Defined Contribution Plans

Southwest has defined contribution plans covering substantially all of its Employees. Contributions under all defined contribution plans are primarily based on Employee compensation and performance of the Company. The Company sponsors Employee savings plans under section 401(k) of the Internal Revenue Code of 1986, as amended. The Southwest Airlines Co. 401(k) Plan includes Company matching contributions and the Southwest

123

Airlines Pilots Retirement Saving Plan has non-elective Company contributions. In addition, the Southwest Airlines Co. ProfitSharing Plan (ProfitSharing Plan) is a defined contribution plan to which the Company may contribute a percentage of its eligible pre-tax profits, as defined, on an annual basis. No Employee contributions to the ProfitSharing Plan are allowed.

Amounts associated with the Company's defined contribution plans expensed in 2021, 2020, and 2019, reflected as a component of Salaries, wages, and benefits, were $749 million, $561 million, and $1.2 billion, respectively.

### Postretirement Benefit Plans

The Company provides postretirement benefits to qualified retirees in the form of medical and dental coverage. Employees must meet minimum levels of service and age requirements as set forth by the Company, or as specified in collective-bargaining agreements with specific workgroups. Employees meeting these requirements, as defined, may use accrued unused sick time to pay for medical and dental premiums from the age of retirement until age 65.

The following table shows the change in the accumulated postretirement benefit obligation ("APBO") for the years ended December 31, 2021 and 2020:

| (in millions) | 2021 | 2020 |
|---|---:|---:|
| APBO at beginning of period | $ 428 | $ 288 |
| Service cost | 25 | 22 |
| Interest cost | 10 | 10 |
| Benefits paid | (24) | (10) |
| Actuarial (gain)/loss | (109) | 63 |
| Curtailment | — | 53 |
| Special termination benefits | — | 2 |
| APBO at end of period | $ 330 | $ 428 |

During 2021, the Company recorded a $109 million actuarial gain as a decrease to the APBO with an offset to AOCI. This actuarial gain is reflected above and resulted from changes in certain key assumptions used to determine the Company's year-end obligation. The assumption changes that resulted in the largest portion of the actuarial gain were the expected participation and retirement rates in the Plan for future qualifying retirees, which reflect lower expectations as to utilization of benefits based on recent history, combined with census data and other demographic changes.

All plans are unfunded, and benefits are paid as they become due. Estimated future benefit payments expected to be paid are $21 million in 2022, $20 million in 2023, $19 million in 2024, $20 million in 2025, $21 million in 2026, and $115 million for the next five years thereafter.

The following table reconciles the funded status of the plans to the accrued postretirement benefit cost recognized in Other non-current liabilities on the Company's Consolidated Balance Sheet at December 31, 2021 and 2020.

| (in millions) | 2021 | 2020 |
|---|---:|---:|
| Funded status | $ (330) | $ (428) |
| Unrecognized net actuarial (gain) loss | (69) | 40 |
| Unrecognized prior service cost | 3 | 3 |
| Accumulated other comprehensive income (loss) | 66 | (43) |
| Consolidated Balance Sheet liability | $ (330) | $ (428) |

The consolidated periodic postretirement benefit cost for the years ended December 31, 2021, 2020, and 2019, included the following:

| (in millions) | 2021 | | 2020 | | 2019 | |
|---|---|---|---|---|---|---|
| Service cost | $ | 25 | $ | 22 | $ | 17 |
| Interest cost | | 10 | | 10 | | 10 |
| Amortization of prior service cost | | — | | 1 | | 1 |
| Amortization of net gain | | — | | — | | (2) |
| Curtailment | | — | | 53 | | — |
| Special termination benefits | | — | | 2 | | — |
| Net periodic postretirement benefit cost | $ | 35 | $ | 88 | $ | 26 |

Service cost and Special termination benefits are recognized within Salaries, wages, and benefits expense, and all other costs are recognized in Other (gains) losses, net in the Consolidated Statement of Income (Loss). Unrecognized prior service cost is expensed using a straight-line amortization of the cost over the average future service of Employees expected to receive benefits under the plans. Actuarial gains are amortized utilizing the minimum amortization method. The following actuarial assumptions were used to account for the Company's postretirement benefit plans at December 31, 2021, 2020, and 2019:

| | 2021 | 2020 | 2019 |
|---|---|---|---|
| Weighted-average discount rate | 2.90 % | 2.45 % | 3.30 % |
| Assumed healthcare cost trend rate (a) | 6.25 % | 6.75 % | 7.13 % |

    (a)   The assumed healthcare cost trend rate is expected to be 6.25% for 2022, then decline gradually to 4.75% by 2028 and remain level thereafter.

The selection of a discount rate is made annually and is selected by the Company based upon comparison of the expected future cash flows associated with the Company's future payments under its consolidated postretirement obligations to a yield curve created using high quality bonds that closely match those expected future cash flows. This rate increased during 2021 due to market conditions. The assumed healthcare trend rate is also reviewed at least annually and is determined based upon both historical experience with the Company's healthcare benefits paid and expectations of how those trends may or may not change in future years.

**15. INCOME TAXES**

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. The components of deferred tax assets and liabilities at December 31, 2021 and 2020, are as follows:

| (in millions) | | 2021 | | 2020 |
|---|---|---|---|---|
| **DEFERRED TAX LIABILITIES:** | | | | |
| Accelerated depreciation | $ | 2,883 | $ | 2,939 |
| Prepaid insurance | | 189 | | 190 |
| Operating lease right-of-use assets | | 356 | | 423 |
| Other | | 188 | | 67 |
| Total deferred tax liabilities | | 3,616 | | 3,619 |
| **DEFERRED TAX ASSETS:** | | | | |
| Accrued employee benefits | | 341 | | 491 |
| Rapid rewards loyalty liability | | 636 | | 632 |
| Operating lease liabilities | | 371 | | 443 |
| Customer travel credits | | 305 | | 117 |
| Construction obligation | | — | | 72 |
| Net operating losses and tax credits | | 36 (a) | | 60 |
| Other | | 157 | | 170 |
| Total deferred tax assets | | 1,846 | | 1,985 |
| Net deferred tax liability | $ | 1,770 | $ | 1,634 |

(a) At December 31, 2021 and 2020, the Company had approximately $44 million and $65 million, respectively, of state net operating loss carryforwards (tax effected) to reduce future state taxable income. These state net operating loss carryforwards will expire in years 2025 - 2040 if unused.

The provision (benefit) for income taxes is composed of the following:

| (in millions) | | 2021 | | 2020 | | 2019 |
|---|---|---|---|---|---|---|
| **CURRENT:** | | | | | | |
| Federal (a) | $ | 337 | $ | (273) | $ | 610 |
| State | | 33 | | (5) | | 102 |
| Change in federal statutory rate (b) | | (2) | | (188) | | — |
| Total current | | 368 | | (466) | | 712 |
| **DEFERRED:** | | | | | | |
| Federal (a) | | (43) | | (589) | | (18) |
| State | | 2 | | (76) | | (6) |
| State net operating losses | | 21 | | (51) | | — |
| Change in federal statutory tax rate (c) | | — | | — | | (31) |
| Total deferred | | (20) | | (716) | | (55) |
| | $ | 348 | $ | (1,182) | $ | 657 |

(a) The CARES Act allows entities to carry back 2020 losses to prior periods of up to five years, and claim refunds of federal taxes paid. The Company has filed the refund claim with the IRS, and expects a refund of $472 million in the first six months of 2022.
(b) The benefit is representative of the excess refund generated as the result of carrying the 2020 losses back to a period when the federal statutory tax rate was 35 percent as opposed to the current tax rate of 21 percent.
(c) The Tax Cuts and Jobs Act was enacted in December 2017, which reduced the U.S. federal corporate tax rate from the previous rate of 35 percent to 21 percent.

The effective tax rate on Income (loss) before income taxes differed from the federal income tax statutory rate for the following reasons:

| (in millions) | 2021 | | 2020 | | 2019 | |
|---|---|---|---|---|---|---|
| Tax at statutory U.S. tax rates | $ | 278 | $ | (894) | $ | 621 |
| State income taxes, net of federal benefit | | 45 | | (115) | | 76 |
| Change in federal statutory tax rate | | (2) | | (188) (a) | | (31) (b) |
| Other, net | | 27 | | 15 | | (9) |
| Total income tax provision (benefit) | $ | 348 | $ | (1,182) | $ | 657 |

(a) The benefit is representative of the excess refund generated as the result of carrying the 2020 losses back to a period when the federal statutory tax rate was 35 percent as opposed to the current tax rate of 21 percent.
(b) The Tax Cuts and Jobs Act was enacted in December 2017, which reduced the U.S. federal corporate tax rate from the previous rate of 35 percent to 21 percent.

The only periods subject to examination for the Company's federal tax return are the 2020 and 2021 tax years. The Company is also subject to various examinations from state and local income tax jurisdictions in the ordinary course of business. These examinations are not expected to have a material effect on the financial results of the Company.

## 16. SUPPLEMENTAL FINANCIAL INFORMATION

| (in millions) | December 31, 2021 | | December 31, 2020 | |
|---|---|---|---|---|
| Trade receivables | $ | 58 | $ | 46 |
| Credit card receivables | | 83 | | 35 |
| Business partners and other suppliers | | 432 | | 274 |
| Taxes receivable (a) | | 699 | | 740 |
| Other | | 85 | | 35 |
| Accounts and other receivables (b) | $ | 1,357 | $ | 1,130 |

| (in millions) | December 31, 2021 | | December 31, 2020 | |
|---|---|---|---|---|
| Derivative contracts | $ | 192 | $ | 90 |
| Intangible assets, net | | 295 | | 295 |
| Other | | 395 | | 337 |
| Other assets | $ | 882 | $ | 722 |

| (in millions) | December 31, 2021 | | December 31, 2020 | |
|---|---|---|---|---|
| Accounts payable trade | $ | 156 | $ | 111 |
| Salaries payable | | 287 | | 201 |
| Taxes payable excluding income taxes | | 200 | | 49 |
| Aircraft maintenance payable | | 42 | | 95 |
| Fuel payable | | 170 | | 66 |
| Other payable | | 427 | | 409 |
| Accounts payable | $ | 1,282 | $ | 931 |

| (in millions) | December 31, 2021 | December 31, 2020 |
|---|---|---|
| Extended Emergency Time Off | $ 3 | $ 393 |
| Voluntary Separation Program | 92 | 143 |
| Profitsharing and savings plans | 262 | 25 |
| Vendor prepayment (b) | — | 600 |
| Vacation pay | 451 | 436 |
| Health | 152 | 111 |
| Workers compensation | 141 | 161 |
| Property and income taxes | 65 | 84 |
| Interest | 46 | 49 |
| Deferred supplier payments (c) | 80 | — |
| Other | 332 | 257 |
| Accrued liabilities | $ 1,624 | $ 2,259 |

| (in millions) | December 31, 2021 | December 31, 2020 |
|---|---|---|
| Extended Emergency Time Off | $ — | $ 57 |
| Voluntary Separation Program | 233 | 321 |
| Postretirement obligation | 330 | 428 |
| Other deferred compensation | 369 | 353 |
| Other | 292 | 88 |
| Other noncurrent liabilities | $ 1,224 | $ 1,247 |

(a) This amount includes approximately $472 million and $470 million, as of December 31, 2021 and 2020, respectively, associated with a significant cash tax refund expected as a result of the CARES Act allowing entities to carry back 2020 losses to prior periods of up to five years, and claim refunds of federal taxes paid. These amounts also includes excise taxes remitted to taxing authorities for which the subsequent flights were canceled by Customers, resulting in amounts due back to the Company. See Note 15 for further information.

(b) In fourth quarter 2020, the Company received a $600 million prepayment from Chase for Rapid Rewards points that were subsequently issued to Members during the first half of 2021, based on cardholder activity on the Visa credit card associated with its loyalty program. This resulted in a reduction in cash receipts from Chase during 2021, which were classified within Accounts and other receivables in the Consolidated Statement of Cash Flows.

(c) Represents amounts owed for aircraft deliveries received that will be relieved via future payments to supplier. See Note 17 for further information.

For further information on fuel derivative and interest rate derivative contracts, see Note 11.

### *Other Operating Expenses*

Other operating expenses consist of aircraft rentals, distribution costs, advertising expenses, personnel expenses, professional fees, and other operating costs, none of which individually exceed 10 percent of Operating expenses.

### 17. BOEING 737 MAX AIRCRAFT GROUNDING AND RETURN TO SERVICE

On March 13, 2019, the FAA issued an emergency order for all U.S. airlines to ground all MAX aircraft. The Company immediately complied with the order and grounded all 34 MAX aircraft in its fleet. On November 18, 2020, the FAA rescinded the emergency order and issued official requirements to enable U.S. airlines to return the

MAX to service. The Company returned the MAX to revenue service on March 11, 2021, after the Company met all FAA requirements and Pilots received updated, MAX-related training.

The most significant financial impacts of the grounding resulting from the FAA's emergency order were the lost revenues, operating income, and operating cash flows, and delayed capital expenditures, directly associated with the Company's grounded MAX fleet and other new aircraft that were not able to be delivered.

During 2019, the Company entered into a Memorandum of Understanding with Boeing to compensate Southwest for estimated financial damages incurred during 2019 related to the grounding of the MAX. The terms of the agreement are confidential, but were intended to provide for a substantial portion of the Company's financial damages associated with both the 34 MAX aircraft that were grounded as of March 13, 2019, as well as the 41 additional MAX aircraft the Company was scheduled to receive (28 owned MAX from Boeing and 13 leased MAX from third parties) from March 13, 2019 through December 31, 2019. In accordance with applicable accounting principles, the Company will account for substantially all of the proceeds received from Boeing as a reduction in cost basis spread across both the existing 31 owned MAX in the Company's fleet at the time, and the Company's future firm aircraft deliveries as of the date of the agreement. A total of $428 million in proceeds received in cash from Boeing are reflected within Investing Activities in the Consolidated Statement of Cash Flows for the year ended December 31, 2020. No material financial impacts of the agreement were realized in the Company's earnings during the years ended December 31, 2019, 2020, or 2021.

During December 2020, the Company entered into an agreement with Boeing to compensate the Company for estimated financial damages incurred during 2020 related to the grounding of the MAX. The terms of the agreement are confidential, but the compensation is in the form of credit memos taken against future payments due to Boeing as aircraft have been and are delivered in accordance with the amended delivery schedule, or as future progress payments are due. In accordance with applicable accounting principles, the Company has accounted for substantially all of the compensation received from Boeing as a reduction in cost basis spread across both the existing owned MAX in the Company's fleet, and the Company's future firm aircraft deliveries from Boeing as of the date of the agreement. No material financial impacts of the agreement were realized in the Company's earnings for the year ended December 31, 2021.

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and the Board of Directors of Southwest Airlines Co.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Southwest Airlines Co. (the Company) as of December 31, 2021 and 2020, the related consolidated statements of income (loss), comprehensive income (loss), stockholders' equity and cash flows for each of the three years in the period ended December 31, 2021, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the consolidated financial position of the Company at December 31, 2021 and 2020, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2021, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), and our report dated February 4, 2022 expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical audit matters**

The critical audit matters communicated below are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

### Valuation of financial derivative instruments

*Description of the Matter*

As explained in Notes 1, 11, and 12 to the financial statements, the Company's fuel derivative instruments consist of over-the-counter contracts, which are not traded on a public exchange and require the Company to estimate their fair values. The fair value of fuel option contracts are determined using option pricing models with inputs about commodity prices, strike prices, risk-free interest rates, term to expiration and volatility. Because certain inputs used to determine the fair value of option contracts are unobservable (principally implied volatility), the Company has categorized these option contracts as Level 3 fair value measures. The Company analyzes volatility information for reasonableness and compares it to similar information received from external sources and limited observable market data. The fair value of the option contracts considers both the intrinsic value and any remaining time value associated with the derivatives that have not settled. Auditing the fair value measurement of fuel option contracts is complex and requires significant judgment in order to evaluate the application of the option pricing model and evaluating the reasonableness of the unobservable input of implied volatility used in the fair value measurement of the Company's fuel option contracts.

*How We Addressed the Matter in Our Audit*

We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over the Company's process to calculate the fair value of fuel option derivative contracts, including controls that related to the volatility input.

We involved internal valuation specialists to assist in the testing of the significant inputs in the option pricing model by comparing the market data inputs, including volatility, to external sources. With the support of our specialists, we also tested the application of and the computational accuracy of the option pricing model by performing independent corroborative calculations. Additionally, we compared the Company's fuel option contract valuations to the counterparty valuations, which were independently obtained as part of our audit procedures.

### Air traffic liability breakage

*Description of the Matter*

As explained in Notes 1 and 6, tickets sold, but not yet used, are initially deferred as Air traffic liability, and are recognized in passenger revenue when transportation is provided. The Company estimates the amount of tickets that expire unused and recognizes such amounts in Passenger revenue once the scheduled flight date passes in proportion to the pattern of flights taken by the customers. During 2020, the Company experienced a significantly higher number of customer-driven flight cancellations related to the COVID-19 pandemic, and extended the expiration date for certain travel funds to September 7, 2022. At December 31, 2021, $1.3 billion of these extended funds remained available for customers to use on future travel.

Auditing the Company's breakage estimates on these extended funds requires judgment, as the Company has limited historical data available to predict both the amount of these funds estimated to expire and the expected pattern of flights to be taken by customers holding extended travel funds, since historically travel funds expired within 12 months of the original date of sale. In making its estimates, the Company considers historical customer travel behavior, as well as assumptions about customers' future travel behavior, which can be impacted by many factors including ticketing and other policies, fares, seat availability, and other economic factors.

*How We Addressed the Matter in Our Audit*

We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over management's determination of the breakage estimate, including controls over management's review of the estimation of breakage and the completeness and accuracy of the historical data analyzed as part of the breakage estimate.

We evaluated management's assumptions used in the breakage calculation by comparing current and historical actual expirations to the Company's estimates. Additionally, among other procedures, we assessed the reasonableness of other assumptions made by the Company as part of the breakage estimate, including the consideration of the constraint on variable consideration on cumulative revenue recognized.

/s/ Ernst & Young LLP

We have served as the Company's auditor since 1971.

Dallas, Texas
February 4, 2022

131

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and the Board of Directors of Southwest Airlines Co.

**Opinion on Internal Control over Financial Reporting**

We have audited Southwest Airlines Co.'s internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 Framework), (the COSO criteria). In our opinion, Southwest Airlines Co. (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2021, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of Southwest Airlines Co. as of December 31, 2021 and 2020, the related consolidated statements of income (loss), comprehensive income (loss), stockholders' equity and cash flows for each of the three years in the period ended December 31, 2021, and the related notes (collectively referred to as the "financial statements") of the Company and our report dated February 4, 2022 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying "Management's Annual Report on Internal Control Over Financial Reporting". Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP

Dallas, Texas
February 4, 2022

133

**Item 9.**     *Changes in and Disagreements With Accountants on Accounting and Financial Disclosure*

None.

**Item 9A.**   *Controls and Procedures*

*Evaluation of Disclosure Controls and Procedures.* The Company maintains disclosure controls and procedures (as defined in Rule 13a-15(e) of the Securities Exchange Act (the "Exchange Act")) designed to provide reasonable assurance that the information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms. These include controls and procedures designed to ensure that this information is accumulated and communicated to the Company's management, including its Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. Management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures as of December 31, 2021. Based on this evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective as of December 31, 2021, at the reasonable assurance level.

*Management's Annual Report on Internal Control over Financial Reporting.* Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act). The Company's internal control over financial reporting is a process, under the supervision of the Company's Chief Executive Officer and Chief Financial Officer, designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can provide only reasonable assurance of achieving their control objectives.

Management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's internal control over financial reporting as of December 31, 2021. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework (2013 Framework). Based on this evaluation, management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, concluded that, as of December 31, 2021, the Company's internal control over financial reporting was effective.

Ernst & Young, LLP, the independent registered public accounting firm who audited the Company's Consolidated Financial Statements included in this Form 10-K, has issued an attestation report on the Company's internal control over financial reporting, which is included herein.

*Changes in Internal Control over Financial Reporting.* There were no changes in the Company's internal control over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) during the quarter ended December 31, 2021, that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

Table of Contents

**Item 9B.**   *Other Information*

None.

**Item 9C.**   *Disclosure Regarding Foreign Jurisdictions that Prevent Inspections*

Not applicable.

135

Table of Contents

**PART III**

**Item 10.  *Directors, Executive Officers, and Corporate Governance***

**Directors and Executive Officers**

The information required by this Item 10 regarding the Company's directors will be set forth under the heading "Proposal 1 - Election of Directors" in the Proxy Statement for the Company's 2022 Annual Meeting of Shareholders and is incorporated herein by reference. The information required by this Item 10 regarding the Company's executive officers is set forth under the heading "Information about our Executive Officers" in Part I of this Form 10-K and is incorporated herein by reference.

**Section 16(a) Compliance**

If applicable, the information required by this Item 10 regarding compliance with Section 16(a) of the Exchange Act will be set forth under the heading "Delinquent Section 16(a) Reports" in the Proxy Statement for the Company's 2022 Annual Meeting of Shareholders and is incorporated herein by reference.

**Corporate Governance**

Except as set forth in the following paragraph, the remaining information required by this Item 10 will be set forth under the heading "Corporate Governance" in the Proxy Statement for the Company's 2022 Annual Meeting of Shareholders and is incorporated herein by reference.

The Company has adopted a Code of Ethics that applies to its principal executive officer, principal financial officer, and principal accounting officer or controller. The Company's Code of Ethics, as well as its Corporate Governance Guidelines and the charters of its Audit, Compensation, and Nominating and Corporate Governance Committees, are available on the Company's website, www.southwest.com. Copies of these documents are also available upon request to Investor Relations, Southwest Airlines Co., P.O. Box 36611, Dallas, TX 75235. The Company intends to disclose any amendments to, or waivers from, its Code of Ethics that apply to the Company's principal executive officer, principal financial officer, and principal accounting officer or controller on the Company's website, www.southwest.com, under the "About Southwest" caption, promptly following the date of any such amendment or waiver.

**Item 11.  *Executive Compensation***

The information required by this Item 11 will be set forth under the headings "Compensation of Executive Officers" and "Compensation of Directors" in the Proxy Statement for the Company's 2022 Annual Meeting of Shareholders and is incorporated herein by reference.

**Item 12.** *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters*

Except as set forth below regarding securities authorized for issuance under equity compensation plans, the information required by this Item 12 will be set forth under the heading "Voting Securities and Principal Shareholders" in the Proxy Statement for the Company's 2022 Annual Meeting of Shareholders and is incorporated herein by reference.

**Securities Authorized for Issuance under Equity Compensation Plans**

The following table provides information as of December 31, 2021, regarding compensation plans under which equity securities of the Company are authorized for issuance.

**Equity Compensation Plan Information**

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants, and Rights (a) | | Weighted-Average Exercise Price of Outstanding Options, Warrants, and Rights (b) | | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in Column (a)) (c) | |
|---|---|---|---|---|---|---|
| Equity Compensation Plans Approved by Security Holders | 2,561,384 | (1) | $ — | (2) | 22,036,227 | (3) |
| Equity Compensation Plans not Approved by Security Holders | — | | $ — | | — | |
| Total | 2,561,384 | | $ — | (2) | 22,036,227 | |

(1) Restricted share units settleable in shares of the Company's common stock.
(2) Restricted share units discussed in footnote (1) above do not have a weighted average exercise price because the restricted share units do not have an exercise price upon vesting.
(3) Of these shares, (i) 4,879,534 shares remained available for issuance under the Company's tax-qualified employee stock purchase plan; and (ii) 17,156,693 shares remained available for issuance under the Company's 2007 Equity Incentive Plan in connection with the exercise of stock options and stock appreciation rights, the settlement of awards of restricted stock, restricted stock units, and phantom shares, and the grant of unrestricted shares of common stock; however, no more than 1,071,969 shares remain available for grant in connection with awards of unrestricted shares of common stock, stock-settled phantom shares, and awards to non-Employee members of the Board. These shares are in addition to the shares reserved for issuance pursuant to outstanding awards included in column (a).

See Note 10 to the Consolidated Financial Statements for information regarding the material features of the above plans. Each of the above plans provides that the number of shares with respect to which options may be granted, the number of shares of common stock subject to an outstanding option, and the number of restricted share units granted shall be proportionately adjusted in the event of a subdivision or consolidation of shares or the payment of a stock dividend on common stock, and the purchase price per share of outstanding options shall be proportionately revised.

**Item 13.** *Certain Relationships and Related Transactions, and Director Independence*

The information required by this Item 13 will be set forth under the heading "Certain Relationships and Related Transactions, and Director Independence" in the Proxy Statement for the Company's 2022 Annual Meeting of Shareholders and is incorporated herein by reference.

137

**Item 14.** *Principal Accounting Fees and Services*

The Company's independent registered public accounting firm is Ernst & Young, LLP, Dallas, TX, Auditor Firm ID: 42.

The information required by this Item 14 will be set forth under the heading "Relationship with Independent Auditors" in the Proxy Statement for the Company's 2022 Annual Meeting of Shareholders and is incorporated herein by reference.

138

**PART IV**

**Item 15.**  *Exhibits and Financial Statement Schedules*

(a) 1. *Financial Statements:*

The financial statements included in Item 8. Financial Statements and Supplementary Data above are filed as part of this annual report.

2. *Financial Statement Schedules:*

There are no financial statement schedules filed as part of this annual report, since the required information is included in the Consolidated Financial Statements, including the notes thereto, or the circumstances requiring inclusion of such schedules are not present.

3. Exhibits:

| | |
|---|---|
| 3.1 | Restated Certificate of Formation of the Company, effective May 18, 2012 (incorporated by reference to Exhibit 3.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2012 (File No. 1-7259)). |
| 3.2 | Second Amended and Restated Bylaws of the Company, effective November 17, 2016 (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K filed November 21, 2016 (File No. 1-7259)). |
| 4.1 | Specimen certificate representing common stock of the Company (incorporated by reference to Exhibit 4.2 to the Company's Annual Report on Form 10-K for the year ended December 31, 1994 (File No. 1-7259)). |
| 4.2 | Indenture dated as of September 17, 2004, between the Company and Wells Fargo Bank, N.A., Trustee |
| 4.3 | Indenture dated as of February 25, 1997, between the Company and U.S. Trust Company of Texas, N.A. (incorporated by reference to Exhibit 4.12 to the Company's Annual Report on Form 10-K for the year ended December 31, 1996 (File No. 1-7259)). |
| 4.4 | First Supplemental Indenture, dated May 1, 2020, between the Company and Wells Fargo Bank, N.A., as trustee (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K filed May 1, 2020 (File No. 1-7259)). |
| 4.5 | Description of Common Stock (incorporated by reference to Exhibit 4.5 to the Company's Annual Report on Form 10-K for the year ended December 31, 2019 (File No. 1-7259)). |
| | The Company is not filing any other instruments evidencing any indebtedness because the total amount of securities authorized under any single such instrument does not exceed 10 percent of its total consolidated assets. Copies of such instruments will be furnished to the Securities and Exchange Commission upon request. |
| 10.1 | Form of Amended and Restated Executive Service Recognition Plan Executive Employment Agreement between the Company and certain Officers of the Company (incorporated by reference to Exhibit 10.2 to the Company's Annual Report on Form 10-K for the year ended December 31, 2008 (File No. 1-7259)). (2) |
| 10.2 | Letter Agreement between Southwest Airlines Co. and Gary C. Kelly, effective as of February 1, 2011 (incorporated by reference to Exhibit 99.1 to the Company's Current Report on Form 8-K filed February 1, 2011 (File No. 1-7259)). (2) |
| 10.3 | Southwest Airlines Co. Amended and Restated Severance Plan for Directors (as amended and restated effective May 19, 2009) (incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2009 (File No. 1-7259)). |

Table of Contents

| | |
|---|---|
| 10.4 | Southwest Airlines Co. Outside Director Incentive Plan (as amended and restated effective May 16, 2007) (incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2007 (File No. 1-7259)). |
| 10.5 | Southwest Airlines Co. 2002 SWAPIA Non-Qualified Stock Option Plan (incorporated by reference to Exhibit 4.1 to the Company's Registration Statement on Form S-8 filed October 30, 2002 (File No. 333-100862)). |
| 10.6 | Southwest Airlines Co. Amended and Restated 2007 Equity Incentive Plan (incorporated by reference to Exhibit 99.1 to the Company's Current Report on Form 8-K filed May 18, 2015 (File No. 1-7259)). (2) |
| 10.7 | Southwest Airlines Co. Excess Benefit Plan (incorporated by reference to Exhibit 10.32 to the Company's Annual Report on Form 10-K for the year ended December 31, 2008 (File No. 1-7259)). (2) |
| 10.8 | Amendment No. 1 to the Southwest Airlines Co. Excess Benefit Plan (incorporated by reference to Exhibit 10.33 to the Company's Annual Report on Form 10-K for the year ended December 31, 2008 (File No. 1-7259)). (2) |
| 10.9 | Amendment No. 2 to the Southwest Airlines Co. Excess Benefit Plan (incorporated by reference to Exhibit 10.34 to the Company's Annual Report on Form 10-K for the year ended December 31, 2008 (File No. 1-7259)). (2) |
| 10.10 | Amended and Restated Southwest Airlines Co. 2005 Excess Benefit Plan (as amended and restated, effective as of January 1, 2018) (incorporated by reference to Exhibit 10.5 to the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2017 (File No. 1-7259)). (2) |
| 10.11 | Form of Indemnification Agreement between the Company and its Directors (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed January 22, 2009 (File No. 1-7259)). |
| 10.12 | Southwest Airlines Co. Amended and Restated 2007 Equity Incentive Plan Form of Notice of Grant and Terms and Conditions for Restricted Stock Unit grants (incorporated by reference to Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2014 (File No. 1-7259)). (2) |
| 10.12(a) | Southwest Airlines Co. Amended and Restated 2007 Equity Incentive Plan Form of Notice of Grant and Terms and Conditions for Restricted Stock Unit grants (effective 2021) (incorporated by reference to Exhibit 10.13(a) to the Company's Annual Report on Form 10-K for the year ended December 31, 2020 (File No. 1-7259)). (2) |
| 10.13 | $1,000,000,000 Revolving Credit Facility Agreement among the Company, the Banks party thereto, Barclays Bank PLC, as Syndication Agent, Bank of America, N.A., BNP Paribas, Goldman Sachs Bank USA, Morgan Stanley Senior Funding, Inc., U.S. Bank National Association, and Wells Fargo Bank, N.A., as Documentation Agents, JPMorgan Chase Bank, N.A. and Citibank, N.A., as Co-Administrative Agents, and JPMorgan Chase Bank, N.A., as Paying Agent, dated as of August 3, 2016 (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed August 9, 2016 (File No. 1-7259)). |
| 10.14 | First Amendment to Revolving Credit Facility Agreement dated as of August 3, 2016, among Southwest Airlines Co., the banks party thereto, JPMorgan Chase Bank, N.A., as Paying Agent and Collateral Agent, and JPMorgan Chase Bank, N.A. and Citibank, N.A., as Co-Administrative Agents, dated as of March 30, 2020 (incorporated by reference to Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2020 (File No. 1-7259)). |
| 10.15 | Second Amendment to Revolving Credit Facility Agreement dated as of August 3, 2016, as amended by the First Amendment dated as of March 30, 2020, among Southwest Airlines Co., the banks party thereto, JP Morgan Chase Bank, N.A., as Paying Agent and Collateral Agent, and JPMorgan Chase Bank, N.A., and Citibank, N.A., as Co-Administrative Agents, dated as of November 23, 2020 (incorporated by reference to Exhibit 10.16 to the Company's Annual Report on Form 10-K for the year ended December 31, 2020 (File No. 1-7259)). |
| 10.16 | Mortgage and Security Agreement Supplement No. 1, dated March 30, 2021, between Southwest Airlines Co. and JPMorgan Chase Bank, N.A., acting as an administrative agent, pursuant to the Revolving Credit Facility Agreement dated as of August 3, 2016, as amended (incorporated by reference to Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2021 (File No. 1-7259)). |

| 10.17 | Third Amendment to Revolving Credit Facility Agreement dated as of August 3, 2016, as amended by the First Amendment dated as of March 30, 2020, and the Second Amendment dated as of November 23, 2020, among Southwest Airlines Co., the banks party thereto, JPMorgan Chase Bank, N.A., as Paying Agent and Collateral Agent, and JPMorgan Chase Bank, N.A. and Citibank, N.A., as Co-Administrative Agents, dated as of July 28, 2021 (incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2021 (File No. 1-7259)). |
|---|---|
| 10.18 | Purchase Agreement No. 3729 and Aircraft General Terms Agreement, dated December 13, 2011, between The Boeing Company and the Company; Supplemental Agreement No. 1; Supplemental Agreement No. 2; Supplemental Agreement No. 3; Supplemental Agreement No. 4; Supplemental Agreement No. 5; Supplemental Agreement No. 6; Supplemental Agreement No. 7; Supplemental Letter Agreement No. 6-1162-KLK-0059R3; Supplemental Agreement No. 8; Supplemental Agreement No. 9; Supplemental Agreement No. 10; and Supplemental Letter Agreement No. 03729-LA-1808800. (1) |
| 10.18(a) | Supplemental Agreement No. 11 (incorporated by reference to Exhibit 10.16(a) to the Company's Annual Report on Form 10-K for the year ended December 31, 2019 (File No. 1-7259)); Supplemental Letter Agreement No. 03729-MISC-2001512 (incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2020 (File No. 1-7259)); Supplemental Letter Agreement, dated April 23, 2020 (incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2020 (File No. 1-7259)); Supplemental Letter Agreement No. 6-1162-CJM-039 (incorporated by reference to Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2020 (File No. 1-7259)); Supplemental Agreement No. 12 (incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2021 (File No. 1-7259)); Supplemental Letter Agreement No. 6-1162-CAF-0390R2 (incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2021 (File No. 1-7259)); Supplemental Agreement No. 13 (incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2021 (File No. 1-7259)); Supplemental Agreement No. 14 (incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2021 (File No. 1-7259)); Supplemental Agreement No. 15 (incorporated by reference to Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2021 (File No. 1-7259)). (1) |
| 10.19 | Southwest Airlines Co. Senior Executive Short Term Incentive Plan (incorporated by reference to Exhibit 99.1 to the Company's Current Report on Form 8-K filed January 30, 2013 (File No. 1-7259)). (2) |
| 10.20 | Southwest Airlines Co. Deferred Compensation Plan for Senior Leadership and Non-Employee Members of the Southwest Airlines Co. Board of Directors (as amended and restated, effective as of January 1, 2018) (incorporated by reference to Exhibit 10.6 to the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2017 (File No. 1-7259)). (2) |
| 10.21 | Southwest Airlines Co. Amended and Restated 2007 Equity Incentive Plan Form of Notice of Grant and Terms and Conditions for Performance-Based Restricted Stock Unit grants (incorporated by reference to Exhibit 10.4 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2014 (File No. 1-7259)). (2) |
| 10.21(a) | Southwest Airlines Co. Amended and Restated 2007 Equity Incentive Plan Form of Notice of Grant and Terms and Conditions for Performance-Based Restricted Stock Unit grants (effective 2021) (incorporated by reference to Exhibit 10.20(a) to the Company's Annual Report on Form 10-K for the year ended December 31, 2020 (File No. 1-7259)). (2) |
| 10.22 | Payroll Support Program Agreement by and between Southwest Airlines Co. and the United States Department of the Treasury, dated April 20, 2020 (incorporated by reference to Exhibit 10.4 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2020 (File No. 1-7259)). |
| 10.23 | Warrant Agreement by and between Southwest Airlines Co. and the United States Department of the Treasury, dated April 20, 2020 (incorporated by reference to Exhibit 10.5 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2020 (File No. 1-7259)). |
| 10.24 | Promissory Note, from Southwest Airlines Co. to the United States Department of the Treasury, dated April 20, 2020 (incorporated by reference to Exhibit 10.6 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2020 (File No. 1-7259)). |

| 10.25 | Payroll Support Program Extension Agreement by and between Southwest Airlines Co. and the United States Department of the Treasury, dated January 15, 2021 (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed January 15, 2021 (File No. 1-7259)). |
|---|---|
| 10.26 | Warrant Agreement by and between Southwest Airlines Co. and the United States Department of the Treasury, dated January 15, 2021 (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed January 15, 2021 (File No. 1-7259)). |
| 10.27 | Promissory Note, from Southwest Airlines Co. to the United States Department of the Treasury, dated January 15, 2021 (incorporated by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K filed January 15, 2021 (File No. 1-7259)). |
| 10.28 | Form of Performance-Based Cash Award and Terms and Conditions (incorporated by reference to Exhibit 10.27 to the Company's Annual Report on Form 10-K for the year ended December 31, 2020 (File No. 1-7259)). (2) |
| 10.29 | Payroll Support Program 3 Agreement by and between Southwest Airlines Co. and the United States Department of the Treasury, dated April 23, 2021 (incorporated by reference to Exhibit 10.4 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2021 (File No. 1-7259)). |
| 10.30 | Warrant Agreement by and between Southwest Airlines Co. and the United States Department of the Treasury, dated April 23, 2021 (incorporated by reference to Exhibit 10.5 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2021 (File No. 1-7259)). |
| 10.31 | Promissory Note, from Southwest Airlines Co. to the United States Department of the Treasury, dated April 23, 2021 (incorporated by reference to Exhibit 10.6 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2021 (File No. 1-7259)). |
| 21 | Subsidiaries of the Company. |
| 23 | Consent of Ernst & Young LLP, Independent Registered Public Accounting Firm. |
| 31.1 | Rule 13a-14(a) Certification of Chief Executive Officer. |
| 31.2 | Rule 13a-14(a) Certification of Chief Financial Officer. |
| 32 | Section 1350 Certification of Chief Executive Officer and Chief Financial Officer. (3) |
| 101.INS | XBRL Instance Document - The instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document. |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document. |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document. |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101). |

(1)  Certain confidential information contained in this agreement has been omitted because it is both not material and is of the type that the registrant treats as private or confidential.
(2)  Management contract or compensatory plan or arrangement.
(3)  This exhibit is being furnished rather than filed and shall not be deemed incorporated by reference into any filing, in accordance with Item 601 of Regulation S-K.

A copy of each exhibit may be obtained at a price of 15 cents per page, $10.00 minimum order, by writing to: Investor Relations, Southwest Airlines Co., P.O. Box 36611, Dallas, Texas 75235-1611.

**Item 16.    *10-K Summary***

None.

142

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

SOUTHWEST AIRLINES CO.

February 4, 2022                                         By      /s/   Tammy Romo

                                                                Tammy Romo
                                                                *Executive Vice President & Chief Financial Officer*
                                                                *(On behalf of the Registrant and in*
                                                                *her capacity as Principal Financial*
                                                                *& Accounting Officer)*

143

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on February 4, 2022, on behalf of the registrant and in the capacities indicated.

| Signature | Title |
|---|---|
| /s/   ROBERT E. JORDAN<br>**Robert E. Jordan** | Chief Executive Officer and Director<br>(Principal Executive Officer) |
| /s/   TAMMY ROMO<br>**Tammy Romo** | Executive Vice President & Chief Financial Officer (Principal Financial<br>& Accounting Officer) |
| /s/   GARY C. KELLY<br>**Gary C. Kelly** | Executive Chairman of the Board |
| /s/   RON RICKS<br>**Ron Ricks** | Vice Chairman of the Board |
| /s/   DAVID W. BIEGLER<br>**David W. Biegler** | Director |
| /s/   J. VERONICA BIGGINS<br>**J. Veronica Biggins** | Director |
| /s/   DOUGLAS H. BROOKS<br>**Douglas H. Brooks** | Director |
| /s/   WILLIAM H. CUNNINGHAM<br>**William H. Cunningham** | Director |
| /s/   JOHN G. DENISON<br>**John G. Denison** | Director |
| /s/   THOMAS W. GILLIGAN<br>**Thomas W. Gilligan** | Director |
| /s/   DAVID P. HESS<br>**David P. Hess** | Director |
| /s/   GRACE D. LIEBLEIN<br>**Grace D. Lieblein** | Director |
| /s/   NANCY B. LOEFFLER<br>**Nancy B. Loeffler** | Director |
| /s/   JOHN T. MONTFORD<br>**John T. Montford** | Director |

144

- - - - - - - - - - - - - -

SOUTHWEST AIRLINES CO.

AND

WELLS FARGO BANK, N.A.,
TRUSTEE

- - - - - - - - - - - - - -

INDENTURE

Dated as of September 17, 2004

- - - - - - - - - - - - - -

TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| PARTIES |  | 1 |
| RECITALS: |  |  |
|     Purpose of Indenture |  | 1 |
|     Compliance with Legal Requirements |  | 1 |
|     Purpose of and Consideration for Indenture |  | 1 |

ARTICLE ONE
DEFINITIONS

| SECTION 1.01. Certain Terms Defined | 1 |
|---|---|
|     Affiliate | 2 |
|     Bankruptcy Code | 2 |
|     Board of Directors | 2 |
|     Business Day | 2 |
|     Commission | 2 |
|     Company | 2 |
|     Depositary | 2 |
|     Event of Default | 2 |
|     Global Security | 2 |
|     Indenture | 3 |
|     Interest | 3 |
|     Officers' Certificate | 3 |
|     Opinion of Counsel | 3 |
|     Original Issue Discount Security | 3 |
|     Outstanding | 3 |
|     Paying Agent | 4 |
|     Responsible Officer | 4 |
|     Security or Securities | 4 |
|     Securityholder | 4 |
|     Subsidiary | 4 |
|     Trustee; principal office | 4 |
|     Trust Indenture Act of 1939 | 4 |
|     Yield to Maturity | 5 |
| SECTION 1.02. References are to Indenture | 5 |
| SECTION 1.03. Conflict with Trust Indenture Act of 1939 | 5 |

ARTICLE TWO
ISSUE, DESCRIPTION, EXECUTION, REGISTRATION
AND EXCHANGE OF SECURITIES

SECTION 2.01. Forms Generally    5

SECTION 2.02. Form of Trustee's Certificate of Authentication    5

SECTION 2.03. Amount Unlimited; Issuable in Series    6

SECTION 2.04. Authentication and Delivery of Securities    7

SECTION 2.05. Execution of Securities    8

SECTION 2.06. Exchange of Securities    9

SECTION 2.07. Temporary Securities    10

SECTION 2.08. Mutilated, Destroyed, Lost or Stolen Securities    11

SECTION 2.09. Cancellation of Surrendered Securities    11

SECTION 2.10. Securities in Global Form    12

ARTICLE THREE
PARTICULAR COVENANTS OF THE COMPANY

SECTION 3.01. Payment of Principal of (and Premium, if any) and Interest on Securities    12

SECTION 3.02. Maintenance of Office or Agency for Registration of Transfer, Exchange and Payment of Securities    13

SECTION 3.03. Appointment to Fill a Vacancy in the Office of Trustee    13

SECTION 3.04. Provision as to Paying Agent    13

SECTION 3.05. Maintenance of Corporate Existence    14

SECTION 3.06. Officers' Certificate as to Default    14

SECTION 3.07. Further Assurance    14

ARTICLE FOUR
SECURITYHOLDERS' LISTS AND REPORTS BY THE COMPANY
AND THE TRUSTEE

SECTION 4.01. Company to Furnish Trustee Information as to Names and Addresses to Securityholders    14

SECTION 4.02. Preservation and Disclosure of Lists    15

SECTION 4.03. Reports by the Company    15

SECTION 4.04. Reports by the Trustee    16

ARTICLE FIVE
REMEDIES OF THE TRUSTEE AND SECURITYHOLDERS
ON EVENT OF DEFAULT

SECTION 5.01. Events of Default Defined; Acceleration of Maturity; Waiver of Default    17

SECTION 5.02. Payment of Securities on Default; Suit Therefor    19

SECTION 5.03. Application of Moneys Collected by Trustee    20

SECTION 5.04. Limitation on Suits by Holders of Securities 21

SECTION 5.05. Proceedings by Trustee; Remedies Cumulative and Continuing 22

SECTION 5.06. Rights of Holders of Majority in Principal Amount of Securities to Direct Trustee and to Waive Defaults 22

SECTION 5.07. Trustee to Give Notice of Defaults Known to It, But May Withhold in Certain Circumstances 23

SECTION 5.08. Requirement of an Undertaking to Pay Costs in Certain Suits Under this Indenture or Against the Trustee 23

ARTICLE SIX
CONCERNING THE TRUSTEE

SECTION 6.01. Duties and Responsibilities of Trustee 23

SECTION 6.02. Reliance on Documents, Opinions, etc. 25

SECTION 6.03. No Responsibility for Recitals, etc. 26

SECTION 6.04. Trustee, Paying Agent or Security Registrar May Own Securities 26

SECTION 6.05. Moneys Received by Trustee to be Held in Trust Without Interest 26

SECTION 6.06. Compensation and Expenses of Trustee 26

SECTION 6.07. Right of Trustee to Rely on Officers' Certificate Where No Other Evidence Specifically Prescribed 27

SECTION 6.08. Conflicting Interest of Trustee 27

SECTION 6.09. Requirements for Eligibility of Trustee 27

SECTION 6.10. Resignation or Removal of Trustee 28

SECTION 6.11. Acceptance by Successor to Trustee; Notice of Succession of a Trustee 29

SECTION 6.12. Successor to Trustee by Merger, Consolidation, or Succession to Business 30

SECTION 6.13. Limitations on Rights of Trustee as a Creditor 30

ARTICLE SEVEN
CONCERNING THE SECURITYHOLDERS

SECTION 7.01. Evidence of Action by Securityholders 31

SECTION 7.02. Proof of Execution of Instruments and of Holding of Securities 31

SECTION 7.03. Who May be Deemed Owners of Securities 31

SECTION 7.04. Securities Owned by Company or Controlled or Controlling Persons Disregarded for Certain Purposes 31

SECTION 7.05. Record Date for Action by Securityholders 32

SECTION 7.06. Instruments Executed by Securityholders Bind Future Holders 32

ARTICLE EIGHT
SECURITYHOLDERS' MEETINGS

SECTION 8.01. Purposes for Which Meetings May be Called 33

SECTION 8.02. Manner of Calling Meetings; Record Date 33

SECTION 8.03. Call of Meeting by Company or Securityholders 34

SECTION 8.04. Who May Attend and Vote at Meetings 34

SECTION 8.05. Regulations 34

SECTION 8.06. Manner of Voting at Meetings and Record to be Kept 35

SECTION 8.07. Exercise of Rights of Trustee and Securityholders Not to be Hindered or Delayed 35

SECTION 8.08. Written Consent in Lieu of Meeting of Securityholders 36

ARTICLE NINE
SUPPLEMENTAL INDENTURES

SECTION 9.01. Purposes for Which Supplemental Indentures May be Entered into Without Consent of Securityholders 36

SECTION 9.02. Modification of Indenture with Consent of Holders of a Majority in Principal Amount of Securities 37

SECTION 9.03. Effect of Supplemental Indentures 38

SECTION 9.04. Securities May Bear Notation of Changes by Supplemental Indentures 38

SECTION 9.05. Opinion of Counsel 38

ARTICLE TEN
CONSOLIDATION, MERGER AND SALE

SECTION 10.01. Company May Consolidate, etc., on Certain Terms 39

SECTION 10.02. Successor to be Substituted 39

ARTICLE ELEVEN
SATISFACTION AND DISCHARGE OF INDENTURE;
UNCLAIMED MONEYS

SECTION 11.01. Satisfaction and Discharge of Indenture 40

SECTION 11.02. Application by Trustee of Funds Deposited for Payment of Securities 41

SECTION 11.03. Repayment of Moneys Held by Paying Agent 41

SECTION 11.04. Repayment of Moneys Held by Trustee 41

SECTION 11.05. Satisfaction, Discharge and Defeasance of Securities of any Series 42

ARTICLE TWELVE
IMMUNITY OF INCORPORATORS, SHAREHOLDERS, OFFICERS
AND OTHERS

SECTION 12.01. Incorporators, Shareholders, Officers and Others Exempt from Individual Liability 44

ARTICLE THIRTEEN
MISCELLANEOUS PROVISIONS

SECTION 13.01. Successors and Assigns of Company Bound by Indenture 44

SECTION 13.02. Acts of Board, Committee or Officer of Successor Entity Valid — 44

SECTION 13.03. Required Notices or Demands May be Served by Mail; Waiver — 44

SECTION 13.04. Indenture and Securities to be Construed in Accordance with the Laws of the State of Texas — 45

SECTION 13.05. Evidence of Compliance with Conditions Precedent — 45

SECTION 13.06. Payments Due on Saturdays, Sundays, and Holidays — 46

SECTION 13.07. Provisions Required by Trust Indenture Act of 1939 to Control — 46

SECTION 13.08. Provisions of this Indenture and Security for the Sole Benefit of the Parties and the Securityholders — 46

SECTION 13.09. Indenture May be Executed in Counterparts — 47

SECTION 13.10. Article and Section Headings — 47

SECTION 13.11. Severability — 47

ARTICLE FOURTEEN
REDEMPTION OF SECURITIES AND SINKING FUNDS

SECTION 14.01. Applicability of Article — 47

SECTION 14.02. Notice of Redemption; Partial Redemptions — 47

SECTION 14.03. Payment of Securities Called for Redemption — 48

SECTION 14.04. Exclusion of Certain Securities from Eligibility for Selection for Redemption — 49

SECTION 14.05. Mandatory and Optional Sinking Funds — 49

THIS INDENTURE, dated as of September 17, 2004; between Southwest Airlines Co., a corporation duly organized and existing under the laws of the State of Texas (hereinafter sometimes referred to as the "Company"), party of the first part, and Wells Fargo Bank, N.A., a national banking association (hereinafter sometimes referred to as the "Trustee"), party of the second part;

WITNESSETH:

WHEREAS, for its lawful corporate purposes, the Company has duly authorized the issue from time to time of its debentures, notes or other unsecured evidences of indebtedness, which are to be issued in one or more series (the "Securities"), each such series ranking pari passu with each other series in contractual right of payment, as unsecured obligations of the Company, up to such principal amount or amounts as may from time to time be authorized in accordance with the terms of this Indenture; and to provide, among other things, for the authentication, delivery and administration thereof, the Company has duly authorized the execution of this Indenture; and

WHEREAS, all acts and things necessary to make the Securities, when executed by the Company and authenticated and delivered by the Trustee as in this Indenture provided, the valid, binding and legal obligations of the Company, and to constitute these presents a valid indenture and agreement according to its terms, have been done and performed, and the execution of this Indenture and the issue hereunder of the Securities have in all respects been duly authorized, and the Company, in the exercise of the legal right and power vested in it, executes this Indenture and proposes to make, execute, issue and deliver the Securities;

NOW, THEREFORE, THIS INDENTURE WITNESSETH:

That in order to declare the terms and conditions upon which the Securities are authenticated, issued, delivered and held, and in consideration of the premises, of the purchase and acceptance of the Securities by the holders thereof and of the sum of one dollar to it duly paid by the Trustee at the execution of these presents, the receipt whereof is hereby acknowledged, the Company covenants and agrees with the Trustee, for the benefit of the respective holders from time to time of the Securities, as follows:

ARTICLE ONE

DEFINITIONS

SECTION 1.01. Certain Terms Defined. The terms defined in this Section 1.01 (except as otherwise expressly provided or unless the context otherwise requires), for all purposes of this Indenture and of any indenture supplemental hereto, shall have the respective meanings specified in this Section 1.01. All other terms used in this Indenture that are defined in the Trust Indenture Act of 1939, or that are by reference therein defined in the Securities Act of 1933, as amended (except as herein otherwise expressly provided or unless the context otherwise requires), shall have the meanings assigned to such terms in the Trust Indenture Act of 1939 and in said

Securities Act as they were in force at the date of the execution of this Indenture, unless said Trust Indenture Act of 1939 or said Securities Act expressly provide for application of such statutes as of another date.

Affiliate:    The term "Affiliate" shall mean any person directly or indirectly controlling, controlled by, or under direct or indirect common control with, the Company.

Bankruptcy Code:    The term "Bankruptcy Code" shall mean Title 11, U.S. Code, or any similar federal or state law for the relief of debtors.

Board of Directors:    The term "Board of Directors," when used with reference to the Company, shall mean the Board of Directors of the Company or the Executive Committee of the Board of Directors of the Company.

Business Day:    The term "Business Day" shall mean, with respect to any Security, a day other than a Saturday, a Sunday or a day that shall be in the city (or in any of the cities, if more than one), in which amounts are payable, as specified on the face of the form of such Security, a day on which banking institutions are authorized or obligated by law to close.

Commission: The term "Commission" shall mean the Securities and Exchange Commission, as from time to time constituted, .created under the Securities Exchange Act of 1934, or if at any time after the execution and delivery of this Indenture such Commission is not existing and performing the duties now assigned to it under the Trust Indenture Act of 1939, then the body performing such duties on said date.

Company:    The term "Company" shall mean Southwest Airlines Co., a Texas corporation, and, subject to the provisions of Article Ten, shall also include its successors and assigns.

Depositary:    The term "Depositary" shall mean, with respect to the Securities of any series issuable or issued in whole or in part in the form of one or more Global Securities, the person designated as Depositary for such series by the Company pursuant to Section 2.03 or otherwise appointed by the Company as a successor to such person in the event such person is unwilling or unable to continue to serve in such capacity.

Event of Default:    The term "Event of Default" shall mean any event specified in Section 5.01, continued for the period of time, if any, and after the giving of notice, if any, therein designated.

Global Security:    The term "Global Security" shall mean a Security issued in accordance with Section 2.10 evidencing all or part of a series of Securities, which in each case is issued to the Depositary for such series, or part of a series, or its nominee and registered in the name of such Depositary or nominee.

2

Indenture:    The term "'Indenture" shall mean this instrument as originally executed, or, if amended or supplemented as herein provided, as so amended or supplemented or both, and shall include the forms and terms of particular series of Securities established as contemplated hereunder.

Interest:    The term "interest," when used with respect to a non-interest bearing Security, shall mean interest payable after the principal thereof has become due and payable, whether after maturity, by declaration of acceleration, by call for redemption pursuant to a sinking fund, or otherwise.

Officers' Certificate: The term "Officers' Certificate" shall mean a certificate signed by the Chairman of the Board or the President or any Vice Chairman of the Board or any Vice President and by the Treasurer or an Assistant Treasurer or the Secretary or an Assistant Secretary of the Company. Each such certificate shall include the statements provided for in Section 13.05, if and to the extent required by the provisions thereof.

Opinion of Counsel:    The term "Opinion of Counsel" shall mean an opinion in writing signed by legal counsel, who may be an employee of, or of counsel to, the Company or may be other counsel. Each such opinion shall include the statements provided for in Section 13.05, if and to the extent required by the provisions thereof.

Original Issue Discount Security:    The term "Original Issue Discount Security" shall mean any Security that provides for an amount less than the principal amount thereof to be due and payable upon a declaration of acceleration of the maturity thereof pursuant to Section 5.01.

Outstanding:    The term "outstanding," when used with reference to Securities, shall, subject to the provisions of Section 7.04, mean, as of any particular time, all Securities authenticated and delivered by the Trustee under this Indenture except:

(a)    Securities theretofore canceled by the Trustee or delivered to the Trustee for cancellation;

(b)    Securities, or portions thereof, for the payment or redemption of which moneys in the necessary amount shall have been deposited in trust with the Trustee or with any Paying Agent (other than the Company) or shall have been set aside and segregated in trust by the Company for the holders of such Securities (if the Company shall act as its own Paying Agent), provided that if such Securities are to be redeemed prior to the maturity hereof, notice of such redemption shall have been given as herein provided, or provision satisfactory to the Trustee shall have been made for giving such notice, and, if all such Securities are redeemed, such deposit shall be in accordance with Article Eleven and

(c)    Securities in lieu of or in substitution for which other Securities shall have been authenticated and delivered, or which shall have been paid, pursuant to the terms of Section 2.08, unless proof satisfactory to the Trustee is presented that any such Securities

3

are held by a person in whose hands such Security is a legal, valid and binding obligation of the Company.

In determining whether the holders of the requisite principal amount of outstanding Securities of any or all series have given any request, demand, authorization, direction, notice, consent or waiver hereunder, the principal amount of an Original Issue Discount Security that shall be deemed to be outstanding for such purposes shall be the amount of the principal thereof that would be due and payable as of the date of such determination upon a declaration of acceleration of the maturity thereof pursuant to Section 5.01.

Paying Agent: Any person authorized by the Company to pay the principal of, premium, if any, or interest on any securities on behalf of the Company.

Responsible Officer:    The term "Responsible Officer," when used with respect to the Trustee, shall mean any officer within the corporate trust and agency group or department of the Trustee, including any Vice President, any trust officer or any other officer of the Trustee performing functions similar to those performed by any of the above-designated officers and also means, with respect to a particular corporate trust matter, any other officer to whom such matter is referred because of his knowledge of and familiarity with the particular subject.

Security or Securities: The term "Security" or "Securities" shall mean any Security or Securities, as the case may be, authenticated and delivered under this Indenture.

Securityholder:    The term "Securityholder," "holder of Securities," or other similar term, shall mean any person who shall at the time be the registered holder of any Security or Securities on the books of the Company kept for that purpose in accordance with the provisions of this Indenture and shall also mean the executors, administrators and other legal representatives of such person.

Subsidiary:    The term "Subsidiary" shall mean any corporation or other entity at least a majority of the outstanding voting shares of which is at the time directly or indirectly owned or controlled (either alone or through Subsidiaries or together with Subsidiaries) by the Company or another Subsidiary.

Trustee; principal office:    The term "Trustee" shall mean Wells Fargo Bank, N.A., and, subject to the provisions of Article Six, shall also include its successors. The term "principal office" of the Trustee shall mean the principal office of the Trustee at which at any particular time its corporate trust business may be administered, which office at the date of execution of this Indenture is 505 Main Street, Suite 301, Fort Worth, Texas.

Trust Indenture Act of 1939: The term "Trust Indenture Act of 1939" shall mean the Trust Indenture Act of 1939, as amended, as in effect on the date of this Indenture, except as provided in Section 9.01 or 9.02 and except to the extent that any subsequent amendment to the Trust Indenture Act of 1939 shall retroactively apply to this instrument.

4

Yield to Maturity:    The term "Yield to Maturity" shall mean the yield to maturity on a series of Securities, calculated at the time of the issuance of such series, or, if applicable, at the most recent redetermination of interest on such series, and calculated in accordance with accepted financial practice.

SECTION 1.02. References are to Indenture. Unless the context otherwise requires, all references herein to "Articles," "Sections" and other subdivisions refer to the corresponding Articles, Sections and other subdivisions of this Indenture, and the words "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision hereof.

SECTION 1.03. Conflict with Trust Indenture Act of 1939. If any provision hereof limits, qualifies or conflicts with a provision of the Trust Indenture Act of 1939 that is required under such Act to be part of and govern this Indenture, the latter provision shall control. If any provision of this Indenture modifies or excludes any provision of the Trust Indenture Act of 1939 that may be so modified or excluded, the latter provision shall be deemed to apply to this Indenture as so modified or to be excluded, as the case may be.

ARTICLE TWO

ISSUE, DESCRIPTION, EXECUTION, REGISTRATION
AND EXCHANGE OF SECURITIES

SECTION 2.01. Forms Generally. The Securities of each series shall be substantially in the form (not inconsistent with this Indenture) as shall be established by the Board of Directors or in one or more indentures supplemental hereto, in each case with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture, and in case such form is not established by supplemental indenture, such form shall be approved by the Trustee if the Trustee's rights or obligations are adversely affected thereby and may have imprinted or otherwise reproduced thereon such legend or legends, not inconsistent with the provisions of this Indenture, as may be required to comply with any law or with any rules or regulations pursuant thereto, or with any rules of any securities exchange or to conform to general usage, consistently herewith, all as my be determined by the officer executing such Securities, as evidenced by his execution of the Securities.

The definitive Securities shall be printed, lithographed or engraved on steel engraved borders or, with the consent of the Trustee, may be produced in any other manner, all as determined by the officer executing such Securities, as evidenced by his execution of such Securities.

SECTION 2.02. Form of Trustee's Certificate of Authentication. The Trustee's certificate of authentication of all Securities shall be in substantially the following form:

This is one of the Securities of the series designated herein referred to in the within mentioned Indenture.

5

WELLS FARGO BANK, N.A.,

as Trustee

By: _____

Authorized Signatory

SECTION 2.03. Amount Unlimited; Issuable in Series. The aggregate principal amount of Securities that may be authenticated and delivered under this Indenture is unlimited.

The Securities may be issued in one or more series. There shall be established by the Board of Directors and set forth in an Officers' Certificate or established in one or more indentures supplemental hereto, prior to the issuance of Securities of any series, the following terms, which terms shall be approved by the Trustee if the Trustee's rights or obligations are adversely affected thereby, and thereafter such terms shall be deemed to be a part of this Indenture:

      (1)   the title of the Securities of the series (which shall distinguish the Securities of the series from all other Securities);

      (2)   any limit upon the aggregate principal amount of the Securities or the series that may be authenticated and delivered under this Indenture (except for Securities authenticated and delivered upon registration of transfer of, or.in exchange for, or in lieu of, other Securities of the series pursuant to Sections 2.06, 2.07, 2.08, 5.03, 9.04 and Article Fourteen);

      (3)   the date or dates on which the principal of the Securities of the series is payable;

      (4)   the rate or rates; or method by which the rate or rates are determined, at which the Securities of the series shall bear interest, if any, the date or dates from which such interest shall accrue, the interest payment dates on which such interest shall be payable and the record dates for the determination of Security holders to whom interest is payable;

      (5)   the offices or agencies of the Company in the United States of America where the principal of and any interest on Securities of the series shall be payable;

      (6)   the price or prices at which, the period or periods within which and the terms and conditions upon which Securities of the series may be redeemed, in whole or in part, at the option of the Company, pursuant to any sinking fund or otherwise;

6

(7)    the obligation, if any, of the Company to redeem, purchase or repay Securities of the series pursuant to any sinking fund or analogous provisions or at the option of a holder thereof and the price or prices at which and the period or periods within which and the terms and conditions upon which Securities of the series shall be redeemed, purchased or repaid, in whole or in part, pursuant to such obligation;

(8)    if other than denominations of $1,000 and any multiple thereof, the denominations in which Securities of the series shall be issuable;

(9)    if other than the principal amount thereof, the portion of the principal amount of Securities of the series that shall be payable upon declaration of acceleration of the maturity thereof or provable in bankruptcy;

(10)    any trustees, authenticating or Paying Agents, warrant agents, transfer agents or registrars with respect to the Securities of such series;

(11)    the applicability, if any, of Section 11.05 to such series;

(12)    whether the Securities of the series shall be issued in whole or in part in the form of one or more Global Securities and in such case, the Depositary for such Global Security or Securities, which Depositary shall be a clearing agency registered under the Securities Exchange Act of 1934, as amended; and

(13)    any other terms of the series (which terms shall not be inconsistent with the provisions of this Indenture), including any additional covenants with respect to such series.

All Securities of any one series shall be substantially identical except as to denomination and except as may otherwise be provided by the Board of Directors and set forth in such Officers' Certificate or as may be other-wise provided in any such indenture supplemental hereto.

SECTION 2.04. Authentication and Delivery of Securities. At any time and from time to time after the execution and delivery of this Indenture, the Company may deliver Securities of any series executed by the Company to the Trustee for authentication, and the Trustee shall thereupon authenticate and deliver said Securities to or upon the written order of the Company, signed on behalf of the Company by its Chairman of the Board or its President or a Vice Chairman of the Board or a Vice President and attested to by its Secretary or an Assistant Secretary or by its Treasurer or an Assistant Treasurer, without any further action by the Company. In authenticating such Securities and accepting the additional responsibilities under

7

this Indenture in relation to such Securities, the Trustee shall be entitled to receive, and (subject to Section 6.01) shall be fully protected in relying upon:

(1) certified copies of the Articles of Incorporation and bylaws of the Company (or an Officers' Certificate with respect to any amendment thereto) and of any resolutions of the Board of Directors authorizing the action taken pursuant to the resolutions delivered pursuant to clause (2) below;

(2) a copy of any resolutions of the Board of Directors relating to such Securities, in each case certified by the Secretary or an Assistant Secretary of the Company;

(3) an executed supplemental indenture, if any;

(4) an Officer ' Certificate setting forth the form or forms and terms of the Securities under, Sections 2.01 and 2.03, respectively, and stating that no Event of Default then exists and, in the case 01a series of Original Issue Discount Securities, the Yield to Maturity of such series; and

(5) an Opinion of Counsel, which shall state

(a)   that the form or forms and terms of such Securities have been established by the Board of Directors or by a supplemental indenture as permitted by, and in conformity with, the provisions of this Indenture;

(b)   that such Securities, when authenticated and delivered by the Trustee and issued by the Company in the manner and subject to any conditions specified in such Opinion of Counsel, will constitute valid, binding and enforceable obligations of the Company, subject to customary exceptions; and

(c)   such other matters as the Trustee may reasonably request.

The Trustee shall have the right to decline to authenticate and deliver any Securities under this Section if the Trustee, being advised by counsel, determines that such action may not lawfully be taken by the Company or if the Trustee in good faith shall determine that such action would expose the Trustee to personal liability to existing Securityholders.

SECTION 2.05. Execution of Securities. The Securities shall be signed on behalf of the Company, manually or in facsimile, by its Chairman of the Board or its President or a Vice Chairman of the Board or a Vice President either under its corporate seal (which may be in facsimile) reproduced thereon and attested, manually or in facsimile, by its Secretary or an Assistant Secretary or its Treasurer or an Assistant Treasurer, or not under its corporate seal, as the Company may elect. Typographical and other minor errors or defects in any such reproduction of the seal or any such signature shall not affect the validity or enforceability of any Security that has been duly authorized and delivered by the Trustee.

8

In case any officer of the Company whose signature appears on any of the Securities, manually or in facsimile, shall cease to be such officer before such Securities so signed shall have been authenticated and delivered by the Trustee, or disposed of by the Company, such Securities nevertheless may be authenticated and delivered by the Trustee, or disposed of by the Company, as though the person whose signature appears on such Securities had not ceased to be such officer of the Company; and any Security may be signed and the corporate seal reproduced thereon may be attested, on behalf of the Company, manually or in facsimile, by such persons as, at the actual date of the execution of such Security, shall be the proper officers of the Company, although at the date of the execution of this Indenture any such person was not such officer.

Only such Securities as shall bear thereon a certificate of authentication substantially in the form hereinbefore receipted, signed manually by an authorized signatory of the Trustee, shall be entitled to the benefits of this Indenture or be valid or obligatory for my purpose. Such certificate by the Trustee upon any Security executed by the Company shall be conclusive evidence that the Security so authenticated has been duly authenticated and delivered hereunder and that the holder is entitled to the benefits of this Indenture.

SECTION 2.06. Exchange of Securities. Securities of any series may be exchanged for a like aggregate principal amount of Securities of the same series in other authorized denominations. The Securities of any series to be exchanged shall be surrendered at the offices or agencies to be maintained by the Company in accordance with the provisions of Section 3.02, and the Company shall execute and the Trustee shall authenticate and deliver in exchange therefor the Security or Securities that the Securityholder making the exchange shall be entitled to receive.

The Company shall keep, at one of the offices or agencies to be maintained by the Company in accordance with the provisions of Section 3.02, a register or registers in which, subject to such reasonable regulations as it or the Securities registrar may prescribe, the Company shall register Securities and shall register the transfer of Securities as in this Article Two provided. Upon surrender for registration of transfer of any Security at such office or agency, the Company shall execute and the Trustee shall authenticate and deliver in the name of the transferee or transferees a new Security or Securities of the same series that the Securityholder making the exchange shall be entitled to receive, for a like aggregate principal amount.

All Securities presented or surrendered for exchange, registration of transfer, redemption or payment shall, if so required by the Company or the Trustee, be duly endorsed by, or accompanied by a written instrument or instruments of transfer in form satisfactory to the Company and the Trustee, duly executed by the Securityholder or by his attorney who shall be so duly authorized in writing.

No service charge shall be made for any exchange or registration of transfer of Securities, but the Company or the Securities registrar may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto.

9

The Company shall not be required to exchange or register a transfer of (i) any Securities of any series for a period of 15 days next preceding the first mailing of notice of redemption of Securities of such series to be redeemed, or (ii) any Securities selected, called or being called for redemption except, in the case of any Security where public notice has been given that such Security is to be redeemed in part, the portion thereof not so.to be redeemed.

Notwithstanding the foregoing, any Global Security shall be exchangeable pursuant to this Section 2.06 for Securities registered in the names of persons other than the Depositary for such Security or its nominee only if (i) such Depositary notifies the Company that it is unwilling or unable to continue as Depositary for such Global Security or if at any time such Depositary ceases to be a clearing agency registered under the Securities Exchange Act of 1934, as amended, and the Company fails to appoint a successor Depositary for such Global Security within 90 days after the Company receives such notice or becomes aware of such event, (ii) the Company executes and delivers to the Trustee written instructions that such Global Security shall be so exchangeable, or (iii) there shall have occurred and be continuing an Event of Default or an event which, with the giving of notice or lapse of time, or both, would constitute an Event of Default with respect to the Securities. Any Global Security that is exchangeable pursuant to the preceding sentence shall be exchangeable for Securities registered in such names as the depositary shall direct.

Except as provided in the immediately preceding paragraph, a Global Security may not be transferred except as a whole by the Depositary with respect to such Global Security to a nominee of such Depositary or by a nominee of such Depositary to such Depositary or another nominee of such Depositary or by such Depositary or any such nominee to a successor of such Depositary or a nominee of such successor.

None of the Company, the Trustee, any Paying Agent or the Security Registrar will have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests of a Global Security or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

SECTION 2.07. Temporary Securities. Pending the preparation of definitive Securities of any series, the Company may execute and the Trustee authenticate and deliver temporary Securities of such series (printed, typewritten or otherwise reproduced) of any authorized denomination and substantially in the form of the definitive Securities of such series, but with such omission, insertions and variations as may be appropriate for temporary Securities of such series, all as may be determined by the Company. Temporary Securities of any series may contain reference to any provisions of this Indenture as may be appropriate. Every such temporary Security shall be authenticated by the Trustee upon the conditions and in substantially the same manner, and with the same effect, as the definitive Securities of such series. Without unnecessary delay, the Company will execute and deliver to the Trustee definitive Securities of such series and thereupon any or all temporary Securities of such series may be surrendered in exchange therefor, at the offices or agencies to be maintained by the Company in accordance with the provisions of Section 3.02, and the Trustee s all authenticate and deliver in exchange for such temporary Securities of such series an equal aggregate principal amount of definitive Securities of such series. Until so exchanged, the temporary Securities of such series shall in all

10

respects be entitled to the same benefits under this Indenture as definitive Securities of such series authenticated and delivered hereunder.

SECTION 2.08. Mutilated, Destroyed, Lost or Stolen Securities. In case any temporary or definitive Security of any series shall become mutilated or be destroyed; lost or stolen, the Company, in the case of any mutilated Security of any series shall, and in the case of any destroyed, lost or stolen Security of any series in its discretion may, execute and upon its request the Trustee shall authenticate and deliver, a new Security of the same series bearing a number not contemporaneously outstanding in exchange and substitution for the mutilated Security, or in lieu of and substitution for the Security so destroyed, lost or stolen, or, if any such Security shall have matured or shall be about to mature, instead of issuing a substituted Security, the Company may pay the same without surrender thereof except in the case of a mutilated Security.

In every case the applicant for a substituted Security or for such payment shall furnish to the Company and to the Trustee such security or indemnity as may be required by them to save each of them harmless from all risk, however remote, and, in every case of destruction, loss or theft, the applicant shall also furnish to the Company and to the Trustee evidence to their satisfaction of the destruction, loss or theft of such Security and of the ownership thereof. The Trustee may authenticate any such substituted Security and deliver the same, or the Trustee or any Paying Agent of the Company may make any such payment, upon the written request or authorization of any officer of the Company, and shall incur no liability to anyone by reason of anything done or omitted to be done by it in good faith under the provisions of this Section 2.08. Upon the issue of any substituted Security, the Company may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any expenses connected therewith (including the fees and expenses of the Trustee).

Every substituted Security issued pursuant to the provisions of this Section 2.08 in substitution for any destroyed, lost or stolen Securities shall constitute an additional contractual obligation of the Company, whether or not the destroyed, lost or stolen Security shall be found at any time, and shall be entitled to all the benefits of (but shall be subject to all the limitations of rights set forth in) this Indenture equally and proportionately with any and all other Securities duly issued hereunder.

All Securities shall be held and owned upon the express condition that the foregoing provisions are exclusive with respect to the replacement or payment of mutilated, destroyed, lost or stolen Securities, and shall preclude (to the extent lawful) any and all other rights or remedies, notwithstanding any law or statute existing or hereafter enacted to the contrary with respect to the replacement or payment of negotiable instruments or other securities without their surrender.

SECTION 2.09. Cancellation of Surrendered Securities. All Securities surrendered for the purpose of payment, redemption, exchange, substitution or registration of transfer, shall, if surrendered to the Company or any Paying Agent or registrar, be delivered to the Trustee and the same, together with securities surrendered to the Trustee for cancellation, shall be promptly canceled by it, and no Securities shall be issued in lieu thereof except as expressly permitted by any of the provisions of this Indenture. The Trustee shall destroy canceled Securities and shall deliver certificates of destruction thereof to the Company from time to time. If the Company

shall purchase or otherwise acquire any of the Securities, however, such purchase or acquisition shall not operate as a payment, redemption or satisfaction of the indebtedness represented by such Securities unless and until the Company, at its option, shall deliver or surrender the same to the Trustee for cancellation.

SECTION 2.10. Securities in Global Form. If Securities of or within a series are issuable in whole or in part in temporary or permanent global form, as specified as contemplated by Section 2.03, then, notwithstanding clause (8) of Section 2.03, any such Security shall represent such of the outstanding Securities of such series as shall be specified therein and may provide that it shall represent the aggregate amount of outstanding Securities from time to time endorsed thereon and that the aggregate amount of outstanding Securities represented thereby may from time to time be reduced to reflect exchanges. Any endorsement of a Security in global form to reflect the amount, or any increase or decrease in the amount, or changes in the rights of holders, of outstanding Securities represented thereby, shall be made by the Trustee in such manner and upon instructions given by such person or persons as shall be specified therein or in the instructions by the Company to be delivered to the Trustee pursuant to Section 2.04 or 2.07. Subject to the provisions of Section 2.04 and, if applicable, Section 2.07, the Trustee shall deliver and redeliver any Security in global form in the manner and upon instructions given by the person or persons specified therein or in the applicable Company instructions. Any instructions by the Company with respect to endorsement or delivery or redelivery of a Security in global form shall be in writing but need not comply with Section 13.05 hereof and need not be accompanied by an Opinion of Counsel.

ARTICLE THREE

PARTICULAR COVENANTS OF THE COMPANY

The Company covenants as follows:

SECTION 3.01. Payment of Principal of (and Premium, if any) and Interest on Securities. The Company will duly and punctually pay or cause to be paid the principal of (and premium, if any) and interest on each series of the Securities at the respective times and places and in the manner provided in such Securities and this Indenture. Each payment from the Company to the Trustee or to the Paying Agent shall be accompanied by a written notice that designates the series to which such payment relates. As a condition precedent to the payment of any interest on a Security, the Company or the Paying Agent may require the holder of such Security to furnish such evidence as will enable the Company to determine whether it is required by law to deduct or to retain any tax or taxes from the interest so payable. An installment of principal, premium or interest shall be considered paid on the date it is due if the Trustee or Paying Agent holds by 11:00 a.m., New York City time, on that date money designated for and sufficient to pay the installment.

SECTION 3.02. Maintenance of Office or Agency for Registration of Transfer, Exchange and Payment of Securities. So long as any of the Securities shall remain outstanding, the Company will maintain an office or agency in the continental United State, where the Securities may be surrendered for exchange or registration of transfer as in this Indenture provided, and

12

where notices and demands to or upon the Company in respect of the Securities or of this Indenture may be served, and where the Securities may be presented or surrendered for payment. The Company will give to the Trustee prompt written notice of the location of any such office or agency and of any change of location thereof. In case the Company shall fail to maintain any such required office or agency or shall fail to give such notice of the location or of any change in the location thereof, such surrenders, presentations and demands may be made and notices may be served at the principal office of the Trustee, and the Company hereby appoints the Trustee its agent to receive at the aforesaid office all such surrenders, presentations, notices and demands.

The Company may from time to time designate-one or more other offices or agencies where the Securities may be presented or surrendered for any or all such purposes, and may from time to time rescind such designations; provided, however, that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency in the continental United States, for such purposes as stated in this Section. The Company will give prompt written notice to the Trustee of any such designation or rescission and any change in the location of any such office or agency.

SECTION 3.03. Appointment to Fill a Vacancy in the Office of Trustee. The Company, whenever necessary to avoid or fill a vacancy in the office of Trustee, will appoint, in the manner provided in Section 6.10, a Trustee, so that there shall at all times be a Trustee hereunder.

SECTION 3.04. Provision as to Paying Agent. (a) If the Company shall appoint a Paying Agent other than the Trustee, it will cause such Paying Agent to exec1:1.te and deliver to the Trustee an instrument in which such agent shall agree with the Trustee, subject to the provisions of this Section 3.04,

(1) that it will hold all sums held by it as such agent for the payment of the principal of (and premium, if any) or interest on any series of Securities (whether such sums have been paid to it by the Company or by any other obligor on such series of Securities) in trust for the benefit of the persons entitled thereto until such sums shall be paid to such persons or otherwise disposed of as herein provided, and

(2) that it will give the Trustee written notice of any failure by the Company (or by any other obligor on any series of Securities) to make any payment of the principal of (and premium, if any) or interest on such series of Securities when the same shall be due and payable; and

(3) at any time during the continuance of an Event of Default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent.

(b) The Company will, prior to each due date of the principal of (and premium, if any) or interest on any series of Securities, deposit with the Paying Agent a sum sufficient to pay the principal (and premium, if any) or interest so becoming due, such sum to be held in trust for the benefit of the holders of such series of Securities entitled to such principal, premium or interest,

13

and (unless such Paying Agent is the Trustee) the Company will promptly notify the Trustee in writing of its failure so to act

(c) If the Company shall act as its own Paying Agent, it will, on or before each due date of the principal of (and premium, if any) or interest on any series of Securities, set aside, segregate and hold in trust for the benefit of the persons entitled thereto, a sum sufficient to pay such principal (and premium, if any) or interest so becoming due until such sums shall be paid to such persons or otherwise disposed of as herein provided and will promptly notify the Trustee in writing of any such action or failure to take such action.

(d) Anything in this Section 3.04 to the contrary notwithstanding, the Company may, at any time, for the purpose of obtaining a satisfaction and discharge with respect to one or more or all series of Securities hereunder, or for any other reason, but only in accordance with Article Eleven, pay or cause to be paid to the Trustee or any Paying Agent all sums held in trust for any such series by it, or any Paying Agent hereunder, as required by this Section 3.04, such sums to be held by the Trustee or such Paying Agent upon the trusts herein contained. Upon such payment by any Paying Agent to the Trustee, such Paying Agent shall be released from all further liability with respect to such money.

(e) Anything in this Section 3.04 to the contrary notwithstanding, the agreement to hold sums in trust as provided in this Section 3.04 is subject.to the provisions of Sections 11.03 and 11.04.

SECTION 3.05. Maintenance of Corporate Existence. Subject to Article Ten, the Company will at all times do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence and its-franchise to be a corporation.

SECTION 3.06. Officers' Certificate as to Default. The Company will, so long as any series of Securities is outstanding, deliver to the Trustee, forthwith upon becoming aware of any default or defaults in the performance of any covenant, agreement or condition contained in this Indenture, an Officers' Certificate specifying such default or defaults.

SECTION 3.07. Further Assurance. From time to time whenever reasonably demanded by the Trustee, the Company will make, execute an deliver or cause to be made, executed and delivered any and all such further and other instruments and assurances as may be reasonably necessary or proper to carry out the intention of or to facilitate the performance of the terms of this Indenture or to secure the rights and remedies hereunder of the holders of any series of Securities.

ARTICLE FOUR

SECURITYHOLDERS' LISTS AND REPORTS BY THE COMPANY
AND THE TRUSTEE

SECTION 4.01. Company to Furnish Trustee Information as to Names and Addresses to Securityholders. The Company will furnish or cause to be furnished to the Trustee a list in such

14

form as the Trustee may reasonably require containing all information in the possession or control of the Company, or any of its Paying Agents other than the Trustee, as to the names and addresses of the holders of the Securities of each series obtained since the date as of which the next previous list if any, was furnished:

(a) semi-annually, not more than 15 days after each record date for the payment of semi-annual interest on such Securities, as hereinabove specified, as of such record date and not less than once every six months for non-interest bearing Securities in each year, and

(b) at such other times as the Trustee may request in writing, within 30 days after the receipt by the Company of any such request, a list of similar form and content as of a date not more than 15 days prior to the time such list is furnished; provided, that such list need not include information received after such date, provided; however, that so long as the Trustee is the Security registrar, no such list shall be required to be furnished.

SECTION 4.02. Preservation and Disclosure of Lists. (a) The Trustee shall preserve, in as current a form as is reasonably practicable, all information as to the names and addresses of the holders of Securities (1) contained in the most recent list furnished to it as provided in Section 4.01 and (2) received by it in the capacity of Paying Agent (if so acting) and Security registrar (if so acting).

The Trustee may destroy any list furnished to it as provided in Section 4.01 upon receipt of a new list so furnished.

(b) Securityholders may communicate pursuant to Section 312(b) of the Trust Indenture Act of 1939 with other Securityholders with respect to their rights under this Indenture or any or all series of the Securities.

(c) Each and every Securityholder, by receiving and holding the same, agrees with the Company and the Trustee that neither the Company nor the Trustee nor any Paying Agent nor the Security registrar shall be held accountable by reason of the disclosure of any such information as to the names and addresses of the holders of Securities in accordance with the provisions of subsection (b) of this Section 4.02, regardless of the source from which such information was derived, and that the Trustee shall not be held accountable by reason of mailing any material pursuant to a request made under said subsection (b).

SECTION 4.03. Reports by the Company. (a) The Company covenants and agrees to file with the Trustee, within 30 days after the Company is required to file the same with the Commission, copies of the annual reports and of the information, documents and other reports (or copies of such portions of any of the foregoing as the Commission may from time to time by rules and regulations prescribe) that the Company may be required to file with the Commission pursuant to Section 13 or Section 15(d) of the Securities Exchange Act of 1934, as amended; or, if the Company is not required to file information, documents or reports pursuant to either of such sections, then to file with the Trustee and the Commission, in accordance with rules and regulations prescribed from time to time by the Commission, such of the supplementary and periodic information, documents and reports that may be required pursuant to Section 13 of the

15

Securities Exchange Act of 1934, as amended, in respect of a security listed and registered on a national securities exchange as may be prescribed from time to time in such rules and regulations.

(b) The Company covenants and agrees to file with the Trustee and the Commission, in accordance with the rules and regulations prescribed from time to time by the Commission, such additional information, documents, and reports with respect to compliance by the Company with the conditions and covenants provided for in this Indenture as may be required from time to time by such rules and regulations.

(c) The Company covenants and agrees to transmit to the holders of Securities within 30 days after the filing thereof with the Trustee, in the manner and to the extent provided in subsection (c) of Section 4.04 with respect to reports pursuant to subsection (a) of said Section 4.04, such summaries of any information, documents and reports required to be filed by the Company pursuant to subsection (a) and (b) of this Section 4.03 as may be required by rules and regulations prescribed from time to time by the Commission.

(d) The Company covenants and agrees to furnish to the Trustee, not less often than annually, a brief certificate from the principal executive officer, principal financial officer or principal accounting officer of the Company as to his or her knowledge of the Company's compliance with all conditions and covenants under this Indenture; provided, for purposes of this paragraph, such compliance shall be determined without regard to any period of grace or requirement of notice provided under this Indenture.

SECTION 4.04. Reports by the Trustee. (a) On or before July 14, 2005, and on or before July 14th in every year thereafter, so long as any Securities are outstanding hereunder, if such report is required by the Trust Indenture Act of 1939, the Trustee shall transmit to the Securityholders of each series, as hereinafter in this Section 4.04 provided, a brief report dated as of May 15th of the year in which such report is made that complies with Section 313(a) of the Trust Indenture Act of 1939.

(b) The Trustee shall also comply with Section 313(b)(2) of the Trust Indenture Act of 1939.

(c) Reports pursuant to this Section 4.04 shall be transmitted by mail to all Securityholders, as the names and addresses of such holders appear upon the registry books of the Company and to all other person to whom such reports are required to be transmitted pursuant to Section 313(c) of the Trust Indenture Act of 1939.

(d) A copy of each such report shall, at the time of such transmission to holders of Securities, be filed by the Trustee with each stock exchange upon which the Securities of any applicable series are listed and also with the Commission. The Company will notify the Trustee when and as the Securities of such series become listed on any stock exchange.

16

ARTICLE FIVE

REMEDIES OF THE TRUSTEE AND SECURITYHOLDERS
ON EVENT OF DEFAULT

SECTION 5.01. Events of Default Defined; Acceleration of Maturity; Waiver of Default. In case one or more of the following Events of Default with respect to Securities of any series shall have occurred and be continuing, that is to say:

(a) default in the payment of any installment of interest upon any of the Securities of such series as and when the same shall become due and payable, and continuance of such default for a period of 30 days;

(b) default in the payment of the principal of (and premium, if any, on) any of the Securities of such series as and when the same shall become due and payable either at stated maturity, by declaration or otherwise;

(c) failure on the part of the Company duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Company in the Securities of such series or contained in this Indenture for a period of 90 days after the date on which written notice specifying such failure, stating that such notice is a "Notice of Default" hereunder and, requiring the same to be remedied, shall have been given to the Company by the Trustee, or to the Company and the Trustee by the holders of at least 25% in aggregate principal amount of the Securities of such series at the time outstanding;

(d) default under the terms of any agreement or instrument evidencing, or under which the Company has at the date of this Indenture or hereafter outstanding, any indebtedness for borrowed money and such indebtedness shall be accelerated so that the same shall be or become due and payable prior to the date on which the same would otherwise become due and payable and the aggregate principal amount thereof so accelerated exceeds $50,000,000 and such acceleration is not rescinded or annulled within ten days after there has been given, by registered or certified mail, to the Company by the Trustee or to the Company and the Trustee by the holders of at least 25% in aggregate principal amount of the outstanding Securities of that series a written notice specifying such default and stating that such notice is a "Notice of Default" hereunder; (it being understood however, that, subject to the provisions of Section 6.01, the Trustee shall not be deemed to have knowledge of such default under such agreement or instrument unless either (A) a Responsible Officer of the Trustee shall have actual knowledge of such default or (B) a Responsible Officer of the Trustee shall have received written notice thereof from the Company, from any Securityholder, from the holder of any such indebtedness or from the trustee wider any such agreement or other instrument); provided, however, that if such default under such agreement or instrument is remedied or cured by the Company or waived by the holders of such indebtedness, then the Event of Default hereunder by reason thereof shall be deemed likewise to have been thereupon

17

remedied, cured or waived without further action upon the part of either the Trustee or any of such Securityholders;

(e) a court having jurisdiction in the premises shall enter a decree or order for relief in respect of the Company in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of the Company or for any substantial part of its property, or ordering the winding-up or liquidation of its affairs, and such decree or order shall remain unstayed and in effect for a period of 60 consecutive days; or

(f) the Company shall commence a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case under any such law, or shall consent to the appointment of, or taking possession by, a receiver, liquidator, assignee, trustee, custodian, sequestrator (or similar official) of the Company or for all or substantially all of its property, or shall make any general assignment for the benefit of creditors, or shall fail generally to pay its debts as they become due or shall take any corporate action in furtherance of any of the foregoing,

then and in each and every such case, unless the principal of all the Securities of such series shall have already become due and payable, either the Trustee or the holders of not less than 25% in aggregate principal amount of the Securities of such series then outstanding hereunder, by notice in writing to the Company (and to the Trustee if given by Securityholders), may declare the principal of all the Securities of such series (or, if the Securities of such series are Original Issue Discount Securities, such portion of the principal amount as may be specified in the terms of that series) of all Securities of such series and the interest accrued thereon, if any, to be due and payable immediately, and upon any such declaration the same shall become and shall be immediately due and payable, anything in this Indenture or in the Securities contained to the contrary notwithstanding. This provision, however, is subject to the condition that if, at any time after the principal (or, if the Securities are Original Issue Discount Securities, such portion of the principal as may be specified in the terms thereof) of the Securities of any series (or of all the Securities, as the case may be) shall have been so declared due and payable, and before any judgment or decree for the payment of the moneys due shall have been obtained or entered as hereinafter provided, the Company shall pay or shall deposit with the Trustee a sum sufficient to pay all matured installments of interest upon all the Securities of such series (or of all the Securities, as the case may be) and the principal of (and premium, if any, on) all Securities of such series (or of all the Securities, as the case may be) that shall have become due otherwise than by declaration (with interest on overdue installments of interest to the extent permitted by law, and on such principal and premium, if any, -at the rate of interest borne by the Securities or Yield to Maturity (in the case of Original Issue Discount Securities) applicable to the Securities· of such series (or at the respective rates of interest or Yields to Maturity of all the Securities, as the case may be) to the date of such payment or deposit) and the expenses of the Trustee, and any and all defaults under this Indenture, other than the nonpayment of principal of and accrued interest on Securities that shall have become due by declaration, shall have been remedied, then and in every such case the Securityholders of a majority in aggregate principal amount of the

18

Securities of such series (or of all the Securities, as the case may be) then outstanding, by written notice to the Company and to the Trustee, may waive all defaults with respect to that series, each such series voting as a separate class (or with respect to all Securities, as the case may be, in such case treated as a single class) and rescind and annul such declaration and its consequences; but no such waiver of rescission and annulment shall extend to or shall affect any subsequent default, or shall impair any right consequent thereon.

In case the Trustee shall have proceeded to enforce any right under this Indenture and such proceedings shall have been discontinued or abandoned because of such rescission or annulment or for any other reason or shall have been determined adversely to the Trustee, then and in every such case the Company, the Trustee and the holders of the Securities of such series shall be restored respectively to their former positions and rights hereunder, and all rights, remedies and powers of the Company and the Trustee shall continue as though no such proceedings had been taken.

SECTION 5.02. Payment of Securities on Default; Suit Therefor. The Company covenants that (1) in case default shall be made in the payment of any installment of interest on any of the Securities of any series, as and when the same shall become due and payable, and such default shall have continued for a period of 30 days or (2) in case default shall be made in the payment of the principal of (or premium, if any, on) any of the Securities of any series when the same shall have become due and payable, whether upon maturity of the Securities for such series or otherwise, including any sinking fund payment, then, upon demand of the Trustee, the Company will pay to the Trustee for the benefit of the holders of the Securities of such series (and shall designate which series) the whole amount that then shall have become due and payable on all Securities of such series for principal (and premium, if any) or interest, or both, as the case may be, with interest on the overdue principal (and premium, if any) and installments of interest (to the extent permitted by law) at the rate of interest or Yield to Maturity (in the case of Original Issue Discount Securities) borne by such series of Securities; and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including a reasonable compensation to the Trustee, its agents, attorneys and counsel, and any expenses or liabilities incurred by the Trustee hereunder other than through its negligence or bad faith.

Until such demand is made by the Trustee, the Company may pay the principal of (and premium, if any, on) and interest on the Securities of any series to the holders thereof, whether or not the Securities of such series be overdue.

In case the Company shall fail forthwith to pay such amounts upon such demand, the Trustee, in its own name and as trustee of an express trust, shall be entitled and empowered to institute any action or proceedings at law or in equity for the collection of the sums so due and unpaid, and may prosecute any such action or proceeding to judgment or final decree, and may enforce any such judgment or final decree against the Company or any other obligor upon such Securities, and collect in the manner provided by law out of the property of the Company or any other obligor upon such Securities wherever situated the moneys adjudged or decreed to be payable.

19

In case there shall be pending proceedings for the bankruptcy or for the reorganization of the Company or any other obligor upon the Securities of any series under the Bankruptcy Code or any other applicable law or in connection with the insolvency of the Company or any other obligor upon any Securities or in the case a receiver or trustee shall have been appointed for its property, or in case of any other judicial proceedings relative to the Company or any other obligor upon such series of Securities or to creditors or property of the Company or such other obligor, the Trustee, irrespective of whether the principal of such series of Securities shall then be due and payable as therein expressed or by declaration or 0therwise and irrespective of whether the Trustee shall have made any demand pursuant to the provisions of this Section 5.02, shall be entitled and empowered by intervention in such proceedings or otherwise, to file and prove a claim or claims for the whole amount of principal, premium, if any, and interest (or if the Securities of any series are Original Issue Discount Securities, such portion of the principal amount as may be specified in the terms of that series) owing and unpaid in respect of the Securities of any series, and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Trust and of the Securityholders allowed in any judicial proceedings relative to the Company or any other obligor upon the Securities of any series, its creditors, or its property, and to collect and receive any moneys or other property payable or deliverable on any such claims, and to distribute the same after the deduction of its charges and expenses; and any receiver, assignee or trustee in bankruptcy or reorganization is hereby authorized by each of such holders to make such payments to the Trustee, and, in the event that the Trustee shall consent to the making of such payments directly to the holders, to pay to the Trustee any amount due it for compensation and expenses, including counsel fees incurred by it up to the date of such distribution. To the extent that such payment of reasonable compensation, expenses, liabilities and counsel fees out of the estate in any such proceedings shall be denied for any reason (except as a result of negligence or bad faith), payment of the same shall be secured by a lien on, and shall be paid out of, any and all distributions, dividends, moneys, securities and other property that the holders of the Securities of any series may be entitled to receive in such proceedings, whether in liquidation or under any plan of reorganization or arrangement or otherwise.

All rights of action and of asserting claims under this Indenture, or under any of the Securities of any series, may be enforced by the Trustee without the possession of any of the Securities, or the production thereof at any trial or other proceeding relative thereto, and any such suit or proceeding instituted by the Trustee shall be brought in its own name and as trustee of an express trust, and any recovery of judgment shall be for the ratable benefit of the holders of the Securities arid the Trustee.

SECTION 5.03. Application of Moneys Collected by Trustee. Any moneys collected by the Trustee pursuant to Section 5.02 with respect to any one or more series shall be applied in the order following, at the date or dates fixed by the Trustee for the distribution of such moneys and, in the case of the distribution of such moneys on account of principal or interest, upon presentation of the several Securities of a series in respect of which moneys have been collected, and stamping (or otherwise noting) thereon the payment, or issuing Securities of such series in reduced principal amounts in exchange for the presented Securities of such series if only partially paid, and upon surrender thereof if fully paid:

20

FIRST: To the payment of costs and expenses of collection applicable to such series, and reasonable compensation to the Trustee, its agent , attorneys and counsel, and of all other expenses and liabilities incurred, and all advances made, by the Trustee with respect to such series, except as a result of its negligence or bad faith;

SECOND: In case no principal of the outstanding Securities of such series shall have become due and be unpaid, to the payment of interest on the Securities of such series in default, in the order of the maturity of the installments of such interest, with interest upon the overdue installments of interest (so far as permitted by law and to the extent that such interest has been collected by the Trustee) at the rate of interest or Yield to Maturity (in the case of Original Issue Discount Securities) borne by the Securities of such series; and in case such moneys shall be insufficient to pay-in full the whole amount so due and unpaid upon the Securities of such series, then to the payment of such principal (and premium, if any) and interest, without preference or priority of principal (and premium, if any) over interest, or of interest over principal (and premium, if any), or of any installment of interest over any other installment of interest or of any Security of such series over any other Security of such series, ratably according to the aggregate of such principal (and premium, if any) and accrued and unpaid interest; and

THIRD: To the payment of the remainder, if any, to the Company, its successors or assigns, or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

SECTION 5.04. Limitation on Suits by Holders of Securities. No holder of a Security of any series shall have any right by virtue or by availing of any provision of this Indenture to institute any suit, action or proceeding in equity or at law or in bankruptcy or otherwise, upon or under or with respect to this Indenture or for the appointment of a receiver, liquidating custodian, trustee or similar official, or for any other remedy hereunder, unless such holder previously shall have given to the Trustee written notice of default and of the continuance thereof, as hereinabove provided, and unless also the holders of not less than 25% in aggregate principal amount of such series of Securities then outstanding shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby, and the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity, shall have neglected or refused to institute any such action, suit or proceeding and no direction inconsistent with such written request shall have been given to the Trustee pursuant to Section 5.06; it being understood and intended, and being expressly covenanted by the holder of every Security of a series with every other Securityholder and the Trustee, that no one or more holders of such series of Securities shall have any right in any manner whatsoever by virtue or by availing f any provision of this Indenture to affect, disturb or prejudice the rights of the holders of any other series of Securities, or to obtain or seek to obtain priority over or preference to any other such holder, or to enforce any right under this Indenture, except in the manner herein provided and for the equal, ratable and common benefit of all holders of Securities. For the protection and enforcement of the provisions of this Section

21

5.04 each and every Securityholder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

Notwithstanding any other provisions in this Indenture, the right of any holder of any Security to receive payment of the principal of (and premium, if any) and interest on such Security, on or after the respective due dates expressed in such Security, or to institute suit for the enforcement of any such, payment on or after such respective dates, shall not be impaired or affected without the consent of such holder.

SECTION 5.05. Proceedings by Trustee; Remedies Cumulative and Continuing. In case an Event of Default has occurred, has not been waived, and is continuing, the Trustee may in its discretion proceed to protect and enforce the rights vested in it by this Indenture by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any of such rights, either by suit in equity or by action at law or by proceeding in bankruptcy or otherwise, whether for the-specific enforcement of any covenant or agreement contained in this Indenture or in aid of the exercise of any power granted in this Indenture, or to enforce any other legal or equitable right vested in the Trustee by this Indenture or by law. All powers and remedies given by this Article Five to the Trustee or to the Securityholders shall, to the extent permitted by law, be deemed cumulative and not exclusive of any thereof or any other powers and remedies available to the Trustee or to the holders of the Securities, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements contained in this Indenture, and no delay or omission of the Trustee or of any holder of any of the Securities to exercise any right or power accruing upon any default occurring and continuing as aforesaid shall impair any such right or power, or shall be construed to be a waiver of any such default or any acquiescence therein; and, subject to the provisions of Section 5.04, every power and remedy given by this Article Five or by law to the Trustee or to the Securityholders may be exercised from time to time, and as often as shall be deemed expedient, by the Trustee or by the Securityholders.

SECTION 5.06. Rights of Holders of Majority in Principal Amount of Securities to Direct Trustee and to Waive Defaults. The holders of a majority in aggregate principal amount of the Securities of all series affected (voting as one class) at the time outstanding (determined as provided in Section 7.04),·or, if a record date is set in accordance with Section 7.05, as of such record date, shall have the right to direct the time, method, and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred on the Trustee by this Indenture with respect to the Securities of such series; provided, however, that subject to the provisions of Section 6.01, the Trustee shall have the right to decline to follow any such direction if the Trustee being advised by counsel shall determine that the action so directed may not lawfully be taken, or if the Trustee in good faith shall, by a Responsible Officer or Officers of the Trustee, determine that the proceedings so directed would be illegal or involve it in personal liability or be unjustly prejudicial to the Securityholders not consenting, and provided further that nothing in this-Indenture shall impair the right of the Trustee in its discretion to take any action deemed proper by the Trustee and which is not inconsistent with such direction by the Securityholders. Prior to the declaration of the maturity of the Securities of any series as provided in Section 5.01, the holders of a majority in aggregate principal amount of the Securities of such series at the time outstanding (each such series voting as a separate class)

22

(determined as provided in Sections 7.04 and 7.05) may on behalf of the holders of all of the Securities of such series waive any past default hereunder and its consequences, except a default in the payment of interest or premium on, or the principal of, any of the Securities. In the case of any such waiver the Company, the Trustee and the holders of the Securities of such series shall be restored to their former positions and rights hereunder, respectively; but no such waiver shall extend to any subsequent or other default or impair any right consequent hereon.

SECTION 5.07. Trustee to Give Notice of Defaults Known to It, But May Withhold in Certain Circumstances. The Trustee shall, within 90 days after the occurrence of a default hereunder, give to the Securityholders, in the manner and to the extent provided in subsection (c) of Section 4.04 with respect to reports pursuant to subsection (a) of Section 4.04, notice of such defaults known to the Trustee unless such default shall have been cured or waived before the giving of such notice (the term "defaults" for the purposes of this Section 5.07 being hereby defined to be the events specified in clauses (a), (b), (c), (d), (e) and (f) of Section 5.01, not including any periods of grace provided for therein, and irrespective of the giving of any required notice); provided that, except in the case of default in the payment of the principal of (and premium, if any) or interest on any of the Securities of such series, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors and/or Responsible Officers of the Trustee in good faith determined that the withholding of such notice is in the interest of the Securityholders of such series.

SECTION 5.08. Requirement of an Undertaking to Pay Costs in Certain Suits Under this Indenture or Against the Trustee. All parties to this Indenture agree, and each holder of any Security by his acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement or any right or remedy under this Indenture, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorney's fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section 5.08 shall not apply to any suit instituted by the Trustee, to any suit instituted by any Securityholder, or group of Securityholders of any series, holding in the aggregate more than ten percent in aggregate principal amount of the Securities of such series outstanding, or to any suit instituted by any Securityholder for the enforcement of the payment of the principal of (and premium, if any) or interest on any Security, on or after the due date expressed in such Security.

ARTICLE SIX

CONCERNING THE TRUSTEE

SECTION 6.01. Duties and Responsibilities of Trustee. The Trustee, prior to the occurrence of an Event of Default and after the curing or waiving of all Events of Default that may have occurred with respect to the Securities of a series, undertakes to perform such duties and only such duties as are specifically set forth in this Indenture. In case an Event of Default has occurred of which a Responsible Officer of the Trustee has actual knowledge (which has not been cured or waived) the Trustee shall exercise such of the rights and powers vested in it by this

23

Indenture with respect to the Securities of a series, and use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, provided, however, that:

(a) prior to the occurrence of an Event of Default with respect to the Securities of any series and after the curing or waiving of all Events of default with respect to such series that may have occurred

(1) the duties and obligations of the Trustee shall be determined solely by the express provisions of this Indenture, and the Trustee shall only be liable for the performance of such duties and obligations as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(2) in the absence of bad faith on the part of the Trustee, the Trustee may conclusively rely, as to the truth of the statement and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; but in the case of any such certificates or opinions that by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Indenture;

(b) the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer or Officers of the Trustee, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts; and

(c) the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the holders of not less than a majority in principal amount of the Securities of all series affected (voting as a class) at the time outstanding (determined as provided in Sections 7.04 and 7.05) relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture.

None of the provisions contained in this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur personal financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if there is reasonable grounds for believing that the repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

24

SECTION 6.02. Reliance on Documents, Opinions, etc. Subject to the provisions of Section 6.01:

(a) The Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond, note or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b) Any request, direction, order or demand of the Company mentioned herein shall be sufficiently evidenced by an Officers' Certificate (unless other evidence in respect thereof be herein specifically prescribed); and the Trustee by a copy thereof certified by the Secretary or any Assistant Secretary of the Company;

(c) The Trustee may consult with counsel and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in accordance with such advice or Opinion of Counsel;

(d) The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request, order or direction of any of the Securityholders, pursuant to the provisions of this Indenture, unless such Securityholders shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities that may be incurred therein or thereby; but nothing herein contained shall, however, relieve the Trustee of the obligation, upon the occurrence of an Event of Default (which has not been cured or waived), to exercise such of the rights and powers vested in it by this Indenture, and to use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs;

(e) The Trustee shall not be liable for any action taken or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Indenture;

(f) The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion report, notice, request, consent, order approval, bond, note or other paper or document unless requested in writing so to do by the holders of not less than a majority in aggregate principal amount of the Securities of all series affected then outstanding voting as one class (determined as provided in Sections 7.04 and 7.05); provided, however, that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not reasonably assured to the Trustee-by the security afforded to it by the terms of this Indenture, the Trustee may require reasonable indemnity against such expense or liability as a condition to so proceeding. The reasonable expense of every such examination shall be paid by the Company or, if paid by the Trustee, shall be repaid by the Company upon demand; and

25

(g) The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys. The Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder.

SECTION 6.03. No Responsibility for Recitals, etc. The statements and recitals contained herein and in the Securities and in any other document in connection with the sale of the Securities (other than the certificate of authentication of the Securities) shall be taken as the statements of the Company, and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representation as to the validity or sufficiency of this Indenture or of the Securities. The Trustee shall not be accountable for the use or application by the Company of any of the Securities or of the proceeds of such Securities, or for the use or application of any moneys paid over by the Trustee in accordance with any provision of this Indenture, or for the use or application of any moneys received by any Paying Agent other than the Trustee.

SECTION 6.04. Trustee, Paying Agent or Security Registrar May Own Securities. The Trustee or any Paying Agent or Security registrar, in its individual or any other capacity, may become the owner or pledgee of Securities and may otherwise deal with the Company or any Affiliate of the Company with the same rights it would have if it were not Trustee, Paying Agent or Security registrar.

SECTION 6.05. Moneys Received by Trustee to be Held in Trust Without Interest. Subject to the provisions of Section 11.04, all moneys received by the Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated from other funds except to the extent required by law. The Trustee shall be under no liability for interest on moneys received by it hereunder except such as it may agree with the Company to pay thereon. So long as no Event of Default shall have occurred and be continuing, all interest allowed on any such moneys shall be paid from time to time upon the written order of the Company, signed by its Chairman of the Board, any Vice Chairman of the Board, its President or any Vice President or its Treasurer or any Assistant Treasurer.

SECTION 6.06. Compensation and Expenses of Trustee. The Company covenants and agrees to pay to the Trustee from time to time, and the Trustee shall be entitled to, reasonable compensation (which shall not be limited by any provision of law in regard to the compensation of a Trustee of an express trust), and the Company will promptly pay or reimburse the Trustee upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in connection with the acceptance or administration of its trust under this Indenture (including the reasonable compensation and the expenses and disbursements of its counsel and of all persons not regularly in its employ) except any such expense, disbursement or advance as may arise from its negligence or bad faith. The Company also covenants to indemnify the Trustee for, and to hold it harmless against, any loss, liability or expense incurred without negligence or bad faith on the part of the Trustee and arising (a) out of or in connection with the acceptance or administration of this trust, or (b) from any action or failure to act as authorized or within the discretion or rights or powers conferred upon the Trustee hereunder, including the

26

costs and expenses of defending itself against any claim of liability in the premises. The obligations of the Company under this Section 6.06 to compensate the Trustee and to pay or reimburse the Trustee for expenses, disbursements, losses, liabilities and advances shall constitute additional indebtedness hereunder and shall survive the resignation or removal of the Trustee and the satisfaction and discharge of this Indenture. Such additional indebtedness shall be secured by a lien prior to that of the Securities upon all property and funds held or collected by the Trustee as such, except funds held in trust for the benefit of the holders of particular Securities.

SECTION 6.07. Right of Trustee to Rely on Officers' Certificate Where No Other Evidence Specifically Prescribed. Subject to the provisions of Section 6.01, whenever in the administration of the provisions of this Indenture the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of negligence or bad faith on the part of the Trustee, be deemed to be conclusively proved and established by an Officers' Certificate delivered to the Trustee, and such Certificate, in the absence of negligence or bad faith on the part of the Trustee, shall be full warrant to the Trustee for any action taken, suffered or omitted by it under the provisions of this Indenture upon the faith thereof.

SECTION 6.08. Conflicting Interest of Trustee. (a) If, after an Event of Default has occurred and is continuing, the Trustee has or shall acquire any conflicting interest, as defined in this Section 6.08, it shall, within 90 days after ascertaining that it has such conflicting interest, either eliminate such conflicting interest or, unless the Trustee's duty to resign is stayed as provided in Section 310(b) of the Trust Indenture Act of 1939, resign in the manner and with the effect specified in Section 6.10, such resignation to become effective upon the appointment of a successor trustee and such successor's acceptance of such appointment, and the Company shall take prompt steps to have a successor appointed in the manner provided in Section 6.10.

(b) In the event that the Trustee shall fail to comply with the provisions of subsection (a) of this Section 6.08, the Trustee shall, within 10 days after the expiration of such 90-day period, or, if the Trustee's duty to resign is stayed, after the end of such stay, transmit notice of such failure to the Securityholders in the manner and to the extent provided in subsection (c) of Section 4.04 with respect to reports pursuant to subsection (a) of Section 4.04.

(c) For the purposes of this Section 6.08, the Trustee shall be deemed to have a conflicting interest if the Trustee has a conflict within the provisions of Section 310(b) of the Trust Indenture Act of 1939.

SECTION 6.09. Requirements for Eligibility of Trustee. The Trustee hereunder shall at all times be a corporation organized and doing business under the laws of the United States or any State or territory thereof or of the District of Columbia authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least five million dollars, subject to supervision or examination by Federal, State, Territorial, or District of Columbia authority. If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then

27

for the purposes of this Section 6.09, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. In case at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section 6.09, the Trustee shall resign immediately in the manner and with the effect specified in Section 6.10. Neither the Company nor any persons directly or indirectly controlling, controlled by, or under common control with the Company shall serve as Trustee.

SECTION 6.10. Resignation or Removal of Trustee. (a) The Trustee, or any Trustee hereafter appointed, may at any time resign with respect to one or more series of Securities by giving written notice of such resignation to the Company or to the Securityholders, such notice to the Securityholders of applicable series of Securities to be given by mailing (by first class mail) the same. Upon receiving such notice of resignation, the Company shall promptly appoint a successor trustee with respect to the applicable series by written instrument, in duplicate, executed by order of the Board of Directors of the Company, one copy of which instrument shall be delivered to the resigning Trustee and one copy to the successor trustee. If no successor trustee shall have been so 'appointed and have accepted appointment within 60 days after the mailing of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee, or any Securityholder who has been a bona fide holder of a Security or Securities for at least six months may, subject to the provisions of Section 5.08, on behalf of himself and all others similarly situated, petition any such court for the appointment of a successor trustee. Such court may thereupon, after such notice; if any, as it may deem proper and prescribe, appoint a successor trustee.

(b) In case at any time any of the following shall occur:

(1) the Trustee shall fail to comply with the provisions of subsection (a) of Section 6.08 with respect to any series of Securities after written request therefor by the Company or by any Securityholder who has been a bona fide holder of a Security or Securities of such series for at least six months, or

(2) the Trustee shall cease to be eligible in accordance with the provisions of Section 6.09 and shall fail to resign after written request therefor by the Company or by any such Securityholder, or

(3) the Trustee shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or a receiver of the Trustee or of a substantial portion of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of a substantial portion of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in any such case, the Company may remove the Trustee with respect to the applicable series and appoint a successor trustee for such series by written instrument, in duplicate, executed by order of the Board of Directors of the Company, one copy of which instrument shall be delivered to the Trustee so removed and one copy to the successor trustee, or, subject to the provisions of Section 5.08, any Securityholder who has been a bona fide holder of a Security or

28

Securities of such series for at least six months may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor trustee with respect to such series. Such court may thereupon, after such notice, if any, as it may deem proper and prescribe, remove the Trustee and appoint a successor trustee.

(c) The holders of a majority in aggregate principal amount of the Securities of all series at the time outstanding voting as one class (determined as provided in Section 7.04) may at any time remove the Trustee with respect to Securities of all series and appoint a successor trustee with respect to securities of all series by written instrument or instruments signed by such holders or their attorneys-in-fact duly authorized, or by the affidavits of the permanent chairman and secretary of a meeting of the Securityholders evidencing the vote upon a resolution or resolutions submitted thereto with respect to such removal and appointment (as provided in Article Eight), and by delivery thereof to the Trustee so removed, to the successor trustee and to the Company.

(d) Any resignation or removal of the Trustee and appointment of any successor trustee pursuant to any of the provisions of this Section 6.10 shall become effective upon acceptance of appointment by the successor trustee as provided in Section 6.11.

SECTION 6.11. Acceptance by Successor to Trustee; Notice of Succession of a Trustee. Any successor trustee appointed as provided in Section 6.10 shall execute, acknowledge and deliver to the Company and to its predecessor trustee an instrument accepting such appointment hereunder, and thereupon the resignation or removal of the predecessor trustee with respect to all or any particular series shall become effective and such successor trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, duties and obligations with respect to such series of its predecessor hereunder, with like effect as if originally named as Trustee herein; but, nevertheless, on the written request of the Company or of the successor trustee, the Trustee ceasing to act shall, upon payment of any amounts then due it pursuant to the provisions of Section 6.06, pay over to the successor trustee, subject to Section 11.04, all monies at the time held by it hereunder with respect to such series, and execute and deliver an instrument transferring to such successor trustee all the rights and powers of the trustee so ceasing to act. Upon request of any such successor trustee, the Company shall execute any and all instruments in writing for more fully and certainly vesting in and confirming to such successor trustee all such rights and powers. Any Trustee ceasing to act shall, nevertheless, retain a lien upon all property or funds held or collected by such Trustee, except funds held in trust for the benefit of the holders of particular Securities, to secure any amounts then due it pursuant to the provisions of Section 6.06.

If a successor trustee is appointed with respect to the Securities of one or more (but not all) series, the Company, the predecessor Trustee and each successor trustee with respect to the Securities of any applicable series shall execute and deliver an indenture supplemental hereto that shall contain such provisions as shall be deemed necessary or desirable to confirm that all the rights, powers, trusts and duties of the predecessor Trustee with respect to the Securities of any series as to which the predecessor Trustee is not retiring shall continue to be vested in the predecessor Trustee, and shall add to or change any of the provisions of this Indenture as shall be

29

necessary to provide for or facilitate the administration of the trusts hereunder by more than one Trustee, it being understood that nothing herein or in such supplemental indenture shall constitute such Trustees as co-trustees of the same trust and that each such Trustee shall be Trustee of a trust or trusts under separate indentures.

No successor trustee with respect to any series of Securities shall accept appointment as provided in this Section 6.11 unless at the time of such acceptance such successor trustee shall be qualified under the provisions of Section 6.08 and eligible under the provisions of Section 6.09.

Upon acceptance of appointment by a successor trustee as provided in this Section 6.11, the Company shall mail to the holders of Securities of any series by first-class mail notice thereof. If the Company fails to mail such notice within 30 days after acceptance of appointment by the successor trustee, the successor trustee shall, in its discretion, cause such notice to be mailed at the expense of the Company.

SECTION 6.12. Successor to Trustee by Merger, Consolidation or Succession to Business. Any corporation into which the Trustee may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger or conversion or consolidation to which the Trustee shall be a party, or any corporation succeeding to the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder, provided such corporation shall be qualified under the provisions of Section 6.08 and eligible under the provisions of Section 6.09, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

In case at the time such successor to the Trustee shall succeed to the trusts created by this Indenture and the Securities of any series shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor Trustee, and deliver such Securities so authenticated; and in case at that time the Securities of any series shall not have been authenticated, any successor to the Trustee may authenticate such Securities either in the name of any predecessor hereunder or in the name of the successor Trustee; and in all such cases such certificates shall have the full force that it is anywhere in the Securities of such series or in this Indenture provided that the certificate of the Trustee shall have; provided, however, that the right to adopt the certificate of authentication of any predecessor Trustee or authenticate Securities of any series in the name of any predecessor Trustee shall apply only to its successor or successors by merger, conversion or consolidation.

SECTION 6.13. Limitations on Rights of Trustee as a Creditor. The Trustee shall comply with Section 311 of the Trust Indenture Act of 1939.

ARTICLE SEVEN

CONCERNING THE SECURITYHOLDERS

SECTION 7.01. Evidence of Action by Securityholders. Whenever in this Indenture it is provided that the holders of a specified percentage in aggregate principal amount of the Securities of any or all series may take any action (including the making of any demand or

30

request, the giving of any notice, consent, or waiver or the taking of any other action) the fact that the holders of such specified percentage, determined as of the time such action was taken or, if a record date was set with respect thereto pursuant to Section 7.05, as of such record date, have joined therein may be evidenced (a) by any instrument or any number of instruments of similar tenor executed by Securityholders in person or by agent or proxy appointed in writing, or (b) by the record of the holders of Securities voting in favor thereof at any meeting of Securityholders duly called and held in accordance with the provisions of Article Eight, or (c) by a combination of such instrument or instruments and any such record of such a meeting of Securityholders, or (d) in the case of Securities evidenced by a Global Security, by any electronic transmission or other message, whether or not in written format, that complies with the Depositary's applicable procedures.

SECTION 7.02. Proof of Execution of Instruments and of Holding of Securities. Subject to the provisions of Sections 6.01, 6.02 and 8.05, proof of the execution of any instrument by a Securityholder or his agent or proxy shall be sufficient if made in accordance with such reasonable rules and regulations as may be prescribed by the Trustee or in such manner as shall be satisfactory to the Trustee.

The ownership of Securities shall be proved by the register of such Securities, or by a certificate of the registrar thereof.

The Trustee may accept such other proof or require such additional proof of any matter referred to in this Section 7.02 as it shall deem reasonable, including electronic or other messages transmitted by the Depositary in accordance with its applicable procedures.

The record of any Securityholders' meeting shall be proved in the manner provided in Section 8.06.

SECTION 7.03. Who May be Deemed Owners of Securities. The Company, the Trustee, any Paying Agent and any Security registrar may deem and treat the person in whose name any Security shall be registered upon the books of the Company for such series on the applicable record date as the absolute owner of such Security (whether or not such Security shall be overdue and notwithstanding any notation of ownership or other writing thereon) for the purpose of receiving payment of or on account of the principal of, premium, if any, and interest such Security and for all other purposes and neither the Company nor the Trustee nor any Paying Agent nor any Security registrar shall be affected by any notice to the contrary. All such payments so made to; or upon the order of, any such holder shall be valid, and, to the extent of the sum or sums so paid, effectual to satisfy and discharge the liability for moneys payable upon any such Security.

SECTION 7.04. Securities Owned by Company or Controlled or Controlling Persons Disregarded for Certain Purposes. In determining whether the holders of the requisite aggregate principal amount of Securities have concurred in any demand, direction, request, notice, consent, waiver or other action under this Indenture, Securities that are owned by the Company or any other obligor on the Securities or by any person directly or indirectly controlling or controlled by or under direct-or indirect common control with the Company or any other obligor on the

31

Securities shall be disregarded and deemed not to be outstanding for the purpose of any such determination, provided that for the purposes of determining whether the Trustee shall be protected in relying on any such demand, direction, request, notice, consent or waiver, only Securities that the Trustee knows are so owned shall be so disregarded. Securities so owned that have been pledged in good faith may be regarded as outstanding for the purposes of this Section 7.04, if the pledgee shall establish to the satisfaction of the Trustee the pledgee's right to vote such Securities and that the pledgee is not a person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company or any such obligor. In case of a dispute as to such right, any decision by the Trustee taken upon the advice of counsel shall be full protection to the Trustee.

SECTION 7.05. Record Date for Action by Securityholders. Whenever in this Indenture it is provided that holders of a specified percentage in aggregate principal amount of the Securities of a series may take action (including the making of any demand or request, the giving of any direction, notice, consent or waiver or the taking of any action), other than any action taken at a meeting of Securityholders called pursuant to Article Eight, the Company, pursuant to a resolution of its Board of Directors, or the holders of at least ten percent in aggregate principal amount of the Securities of such series then outstanding, may request the Trustee to fix a record date for determining Securityholders entitled to notice of and to take any such action. In case the Company or the holders of Securities of such series in the amount above specified shall desire to request Securityholders of such series to take any such action and shall request the Trustee to fix a record date with respect thereto by written notice setting forth in reasonable detail the Securityholder action to be requested, the Trustee shall promptly (but in any event within five days of receipt of such request) fix a record date that shall be a Business Day not less than 15 nor more than 20 days after the date on which the Trustee receives such request. If the Trustee shall fail to fix a record date as hereinabove provided, then the Company or the holders of Securities of such series in the amount above specified may fix the same by mailing written notice thereof (the record date so fixed to be a Business Day not less than 15 nor more than 20 days after the date on which such written notice shall be given) to the Trustee. If a record date is fixed according to this Section 7.05, only persons shown as Securityholders of such series on the registration books for the Company at the close of business on the record date so fixed shall be entitled to take the requested action and the taking of any such action by the holders on the record date of the required percentage of the aggregate principal amount of the Securities of such series shall be binding on all Securityholders of such series, provided that the taking of the requested action by the holders on the record date of the percentage in aggregate principal amount of the Securities of such series in connection with such action shall have been evidenced to the Trustee, as provided in Section 7.01, not later than 180 days after such record date.

SECTION 7.06. Instruments Executed by Securityholders Bind Future Holders. At any time prior to (but not after) the evidencing to the Trustee, as provided in Section 7.01, of the taking of any action by the holders of the percentage in aggregate principal amount of the Securities of any or all series in connection with such action, any holder of a Security of such series the serial number of which is shown by the evidence to be included in the Securities of such series the holders of which have consented to such action may, by filing written notice with the Trustee at its principal office and upon proof of holding as provided in Section 7.02, revoke

32

such action so far as concerns such Security. Except as aforesaid any such action taken by the holder of any Security of such series and any direction, demand, request, waiver, consent, vote or other action of the holder of any Security of such series that by any provisions of this Indenture is required or permitted to be given shall be conclusive and binding upon such holder and upon all future holders and owners of such Security, and of any Security issued in lieu thereof, irrespective of whether or not any notation in regard thereto is made upon such Security. Any action taken by the holders of the percentage in aggregate principal amount of the Securities of such series in connection with such action shall be conclusively binding as the act of such holders upon the Company, the Trustee and the holders of the Securities of such series.

## ARTICLE EIGHT

### SECURITYHOLDERS' MEETINGS

SECTION 8.01. Purposes for Which Meetings May be Called. A meeting of holders of Securities of any or all series, the case may·be, may be called at any time and from time to time pursuant to the provisions of this Article Eight for any of the following purposes:

(1) to give any notice to the Company or to the Trustee, or to give any directions to the Trustee, or to consent to the waiving of any default or Event of Default hereunder and its consequences, or to take any other action authorized to be taken by Securityholders of any or all series pursuant to any of the provisions of Article Five;

(2) to remove the Trustee and appoint a successor Trustee pursuant to the provisions of Article Six;

(3) to consent to the execution of an indenture or indentures supplemental hereto pursuant to the provisions of Section 9.02; or

(4) to take any other action authorized to be taken by or on behalf of the holders of the percentage in aggregate principal amount of the Securities of any or all series under any other provisions of this Indenture or under applicable law.

SECTION 8.02. Manner of Calling Meetings; Record Date. The Trustee may at any time call a meeting of Securityholders of any or all series to take any action specified in Section 8.01, to be held at such time and at such place in the City of Dallas, Texas, as the Trustee shall determine. Notice of every meeting of the Securityholders of any or all series, setting forth the time and the place of such meeting and in general terms the action proposed to be taken at such meeting, shall be mailed nor less than thirty nor more than sixty days prior to the date fixed for the meeting to such Securityholders at their registered addresses. For the purpose of determining Securityholders entitled to notice of any meeting of Securityholders, the Trustee shall fix in advance a date as the record date for such determination, such date to be a Business Day not more than ten days prior to the date of the mailing of such notice as hereinabove provided. Only persons in whose name any Security shall be registered upon the books of the Company on a Record Date fixed by the Trustee as aforesaid, or by the Company or the Securityholders as in

33

Section 8.03 provided, shall be entitled to notice of the meeting of Securityholders with respect to which such record date was so fixed.

SECTION 8.03. Call of Meeting by Company or Securityholders. In case at any time the Company, pursuant to a resolution of its Board of Directors, or the holders of at least ten percent in aggregate principal amount of the Securities then outstanding of any or all series, as the case may be, shall have requested the Trustee to call a meeting of such Securityholders to take any action authorized in Section 8.01 by written request setting forth in reasonable detail the action proposed to be taken at the meeting, and the Trustee shall not have mailed notice of such meeting within twenty days after receipt of such request, then the Company or the holders of such Securities in the amount above specified, as the case may be, may fix the record date with respect to, and determine the time and the place in said City of Dallas, Texas for, such meeting and may call such meeting to take any action authorized in Section 8.01, by mailing notice thereof as provided in Section 8.02. The record date fixed as provided in the preceding sentence shall be set forth in a written notice to the Trustee and shall be a Business Day not less than 15 nor more than 20 days after the date on which such notice is sent to the Trustee.

SECTION 8.04. Who May Attend and Vote at Meetings. To be entitled to vote at any meeting of Securityholders a person shall be (i) a holder of one or more Securities of the series with respect to which the meeting is called or, should the meeting be called with respect to the Securities of all series, a holder of one or more of such series, or (ii) a person appointed by an instrument in writing as proxy by a holder of one or more Securities of the series. The only persons who shall be entitled to be present or to speak at any meeting of Securityholders shall be the persons entitled to vote at such meeting and their counsel and any representatives of the Trustee and its counsel and any representatives of the Company and its counsel. When a determination of Securityholders entitled to vote at any meeting of Securityholders has been made as provided in this Section 8.04, such determination shall apply to any adjournment thereof.

SECTION 8.05. Regulations. Notwithstanding any other provisions of this Indenture, the Trustee may make such reasonable regulations as it may deem advisable for any meeting of Securityholders, in regard to proof of the holding of Securities of the series with respect to which the meeting is called and of the appointment of proxies, and in regard to the appointment and duties of inspectors of votes, the submission and examination of proxies, certificates and other evidence of the right to vote, and such other matters concerning the conduct of the meeting as it shall think fit. Except as otherwise permitted or required by any such regulations, the holding of such Securities and the appointment of any proxy shall be proved in the manner specified in Section 7.02.

The Trustee shall, by an instrument in writing, appoint a temporary chairman of the meeting, unless the meeting shall have been called by the Company or by Securityholders as provided in Section 8.03, in which case the Company or the Securityholders calling the meeting, as the case may be, shall in like manner appoint a temporary chairman. A permanent chairman and a permanent secretary of the meeting shall be elected by a vote of the holders of a majority in principal amount of the Securities represented at the meeting and entitled to vote.

34

Subject to the provisions of Section 7.04, at any meeting each Securityholder or proxy entitled to vote thereat shall be entitled to one vote for each $1,000 principal amount of Securities held or represented by him; provided, however, that no vote shall be cast or counted at any meeting in respect of any Security challenged as not outstanding and ruled by the chairman of the meeting to be not outstanding. The chairman of the meeting shall have no right to vote other than by virtue of Securities held by him or instruments in writing as aforesaid duly designating him as the person to vote on behalf of other Securityholders. Any meeting of Securityholders duly called pursuant to the provisions of Section 8.02 or 8.03 may be adjourned from time to time, and the meeting may be held as so adjourned without further notice.

At any meeting of Securityholders, the presence of persons who held, or who are acting as proxy for persons who held, an aggregate principal amount of Securities of the series with respect to which the meeting is called on the record date for such meeting sufficient to take action on the business for the transaction of which such meeting was called shall constitute a quorum, but, if less than a quorum is present, the persons holding or representing a majority in aggregate principal amount of the Securities of the series with respect to which the meeting is called represented at the meeting may adjourn such meeting with the same effect, for all intents and purposes, as though a quorum had been present.

SECTION 8.06. Manner of Voting at Meetings and Record to be Kept. The vote upon any resolution submitted to any meeting of Securityholders shall be by written ballots on each of which shall be subscribed the signature of the Securityholder or proxy casting such ballot and the identifying number or numbers of the Securities held or represented in respect of which such ballot is cast. The permanent chairman of the meeting shall appoint two inspectors of votes who shall count all votes cast at the meeting for or against any resolution and who shall make and file with the secretary of the meeting their verified written reports in duplicate of all votes cast at the meeting. A record in duplicate of the proceedings of each meeting of Securityholders shall be prepared by the secretary of the meeting and there shall be attached to said record the original reports of the inspectors of votes on any vote by ballot taken thereat and affidavits by one or more persons having knowledge of the facts setting forth a copy of the notice of the meeting and showing that said notice was mailed as provided in Section 8.02. The record shall show the identifying numbers of the Securities voting in favor of or against any resolution. Each counterpart of such record shall be signed and verified by the affidavits of the permanent chairman and secretary of the meeting and one of the counterparts shall be delivered to the Company and the other to the Trustee to be preserved by the Trustee.

Any counterpart record so signed and verified shall be conclusive evidence of the matters therein stated and shall be the record referred to in clause (b) of Section 7.01.

SECTION 8.07. Exercise of Rights of Trustee and Securityholders Not to be Hindered or Delayed. Nothing in this Article Eight contained shall be deemed or construed to authorize or permit, by reason of any call of a meeting of Securityholders or any rights expressly or impliedly conferred hereunder to make such call, any hindrance or delay in the exercise of any right or rights conferred upon or reserved to the Trustee or to the Securityholders under any of the provisions of this Indenture or of the Securities of any or all series.

SECTION 8.08. Written Consent in Lieu of Meeting of Securityholders. The written authorization or consent of the requisite percentage of Securityholders herein provided, entitled to vote at any such meeting, evidenced as provided in Article Seven and filed with the Trustee, shall be effective in lieu of a meeting of Securityholders, with respect to any matter provided for in this Article Eight.

ARTICLE NINE

SUPPLEMENTAL INDENTURES

SECTION 9.01. Purposes for Which Supplemental Indentures May be Entered into Without Consent of Securityholders. The Company, when authorized by a resolution of its Board of Directors, and the Trustee may from time to time and at any time enter into an indenture or indentures supplemental hereto (which shall comply with the provisions of the Trust Indenture Act of 1939 as then in effect) for one or more of the following purposes:

(a) to evidence the succession of another entity to the Company, or successive successions, and the assumption by the successor entity of the covenants, agreements and obligations of the Company pursuant to Article Ten;

(b) to add to the covenants of the Company such further covenants, restrictions or conditions as its Board of Directors and the Trustee shall consider to be for the protection of the holders of all or any series of the Securities (and, if such covenants are to be for the benefit of less shall series of Securities stating that such covenants are expressly being included for the benefit of such series), and to make the occurrence, or the occurrence and continuance, of a default in any of such additional covenants, restrictions or conditions an Event of Default permitting the enforcement of all or any of the several remedies provided in this Indenture as herein set forth; provided, however, that in respect of any such additional covenant, restriction or condition such supplemental indenture may provide for a particular period of grace after default (which period may be shorter or longer than that allow d in the case of other defaults) or may provide for an immediate enforcement upon such Event of Default or may limit the remedies available to the Trustee upon such Event of Default or may limit the right of the holders of a majority in aggregate principal amount of the Securities of such series to waive such an Event of Default;

(c) to cure any ambiguity or to correct or supplement any provision contained herein or in any supplemental indenture that may be defective or inconsistent with any other provision contained herein or in any supplemental indenture, or to make such other provisions in regard to matters or questions arising under this Indenture or any supplemental indenture as shall not adversely affect the interests of the holders of the Securities;

(d) to provide for the issuance under this Indenture of Securities, whether or not then outstanding, in coupon form (including Securities registrable as to principal only)

36

and to provide for exchangeability of such Securities with Securities issued hereunder in fully registered form and to make all appropriate changes for such purpose;

(e) to establish the form or terms and to provide for the issuance of Securities of any series as permitted by Sections 2.01 and 2.03; and

(f) to evidence and provide for the acceptance of appointment hereunder by a successor trustee with respect to the Securities of one or more series and to add to or change any of the provisions of this Indenture as shall be necessary to provide for or facilitate the administration of the trusts hereunder by more than one trustee.

The Trustee is hereby authorized to join with the Company in the execution of any such supplemental indenture, to make any further appropriate agreements and stipulations that may be therein contained and to accept the conveyance, transfer or assignment of any property thereunder, provided that if any such supplemental indenture affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, the Trustee may in its discretion, but shall not be obligated to, enter into such supplemental indenture.

Any supplemental indenture authorized by the provisions of this Section 9.01 may be executed by the Company and the Trustee without the consent of the holders of any of the Securities at the time outstanding, notwithstanding any of the provisions of Section 9.02.

SECTION 9.02. Modification of Indenture with Consent of Holders of a Majority in Principal Amount of Securities. With the consent (evidenced as provided in Section 7.01) of the holders of not less than a majority in aggregate principal amount of the Securities at the time outstanding of all Securities affected by such supplement (voting as one class) (determined as provided in Section 7.04), or, if a record date is set with respect to such consent in accordance with Section 7.05, as of such record date, the Company, when authorized by a resolution of its Board of Directors, and the Trustee may from time to time and at any time enter into an indenture or indentures supplemental hereto (which shall comply with the provisions of the Trust Indenture Act of 1939 as then in effect) for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or of any supplemental indenture or of modifying in any manner the rights of the holders of the Securities of each such series; provided, however, that no such supplemental indenture shall (i) extend the stated maturity of any Security, or reduce the rate or extend the time of payment of interest thereon or reduce any amount payable on redemption thereof or reduce the amount of the principal of an Original Issue Discount Security that would be due and payable upon an acceleration of the maturity thereto pursuant to Section 5.01, or impair or affect the right of any Securityholder to institute suit for the payment thereof or the right of repayment if any, at the option of the Securityholder, without the consent of the holder of each Security so affected or (ii) reduce the aforesaid percentage of Securities of any series or of all series (voting as one class), as e case may be, the consent of the holders of which is required for any such supplemental indenture, without the consent of the holders of all Securities of each such series so affected.

A supplemental indenture that changes or eliminates any covenant or other provision of this Indenture that has expressly been included solely for the benefit of one or more particular

37

series of Securities, or that modified the rights of holders of such series with respect to such covenant or provision, shall be deemed not to affect the rights under this Indenture of the holders of any other series.

Upon the request of the Company, accompanied by a copy of a resolution of its Board of Directors certified by the Secretary or an Assistant Secretary of the Company authorizing the execution any such supplemental indenture, and upon the filing with the Trustee of evidence of the consent of Securityholders as aforesaid, the Trustee shall join with the Company in the execution of such supplemental indenture, provided that if such supplemental indenture affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, the Trustee may in its discretion, but shall not be obligated to, enter into such supplemental indenture.

It shall not be necessary for the consent of the Securityholders under this Section 9.02 to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such consent shall approve the substance thereof.

Promptly after the execution by the Company and the Trustee of any supplemental indenture pursuant to the provisions of this Section 9.02, the Company shall mail a notice to the Securityholders of each series affected thereby, setting forth in gene al terms the substance of such supplemental indenture. Any failure of the Company to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture.

SECTION 9.03. Effect of Supplemental Indentures. Upon the execution of any supplemental indenture pursuant to the provisions of this Article Nine, this Indenture shall be and be deemed to be modified and amended in accordance therewith and the respective rights, limitation of rights, obligations, duties and immunities under this Indenture of the Trustee, the Company and the holders of Securities of each series affected thereby shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modifications and amendments, and all the terms and conditions of any such supplemental indenture shall be and be deemed to be part of the terms and conditions of this Indenture for any and all purposes.

SECTION 9.04. Securities May Bear Notation of Changes by Supplemental Indentures. Securities of any series authenticated and delivered after the execution of any supplemental indenture affecting such series pursuant to the provisions of this Article Nine, or after any action taken at a Securityholders' meeting pursuant to Article Eight, may bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture or as to any action taken at any such meeting. If the Company or the Trustee shall so determine, new Securities of any series so modified as to conform, in the opinion of the Trustee and the Board of Directors of the Company, to any modification of this Indenture contained in any such supplemental indenture may be prepared by the Company, authenticated by the Trustee and delivered in exchange for the Securities of such series then outstanding.

SECTION 9.05. Opinion of Counsel. The Trustee, subject to the provisions of Sections 6.01 and 6.02, may rely upon, and shall be entitled to receive, an Opinion of Counsel as

38

conclusive evidence that any such supplemental indenture complies with the provisions of this Article Nine.

ARTICLE TEN

CONSOLIDATION, MERGER AND SALE

SECTION 10.01. Company May Consolidate, etc., on Certain Terms. Nothing contained in this Indenture or in any of the Securities shall prevent any consolidation or merger of the Company with or into any other corporation, limited partnership, limited liability company or other entity (whether or not affiliated with the Company) or successive consolidations or mergers in which the Company or its successor or successors shall be a party or parties, or shall prevent any sale or conveyance of the property of the Company as an entirety, or substantially as an entirety, to any other corporation, limited partnership, limited liability company or other entity (whether or not affiliated with the Company) authorized to acquire and operate the same; provided, however, and the Company hereby covenants and agrees, that any such consolidation, merger, sale or conveyance shall be upon the condition that (a) immediately after such consolidation merger, sale or conveyance no Event of Default, and no event that upon notice or lapse of time, or both, would become an Event of Default, shall have occurred and be continuing with respect to the entity (whether the Company or such other entity) formed by or surviving any such consolidation or merger, or to which such sale or conveyance shall have been made; (b) the entity (if other than the Company) formed by or surviving any such consolidation or merger, or to which such sale or conveyance shall have been made, shall be organized under the laws of the United States of America or any State thereof; and (c) the due and punctual payment of the principal of, premium, if any, and interest on all of the Securities, according to their tenor, and the due and punctual performance and observance of all the covenants and conditions of this Indenture to be performed or observed by the Company, shall be expressly assumed, by supplemental indenture complying with the requirements of Article Nine, satisfactory form to the Trustee, executed and delivered to the Trustee by the entity formed by such consolidation, or into which the Company shall have been merged, or by the entity that shall have acquired such property. If at any time there shall be any consolidation or merger or sale or conveyance of property to which the covenant of this Section 10.01 is applicable, then in any such event the successor entity will promptly deliver to the Trustee:

(1) an Officers' Certificate stating that as of the time immediately after the effective date of any such transaction the covenants of the Company and conditions contained in this Section 10.01 have been complied with and the successor entity is not in default under the provisions of this Indenture; and

(2) an Opinion of Counsel stating that in the opinion of such counsel such covenants have been complied with and that any instrument or instruments executed in the performance of such covenants comply with the requirements thereof.

SECTION 10.02. Successor to be Substituted. In case of any such consolidation, merger, sale or conveyance and upon the assumption by the successor entity, in the manner hereinabove provided, of the due and punctual payment of the principal or premium, if any, and

39

interest on all of the Securities and the due and punctual performance and observance of all of the covenants and conditions of this Indenture to be performed or observed by the Company, such successor entity shall succeed to and be substituted for the Company, with the same effect as if it had been named herein as the party of the first part. Such successor entity thereupon may cause to be signed, and may issue either in its own name or in the name of Southwest Airlines Co., any or all of the Securities issuable hereunder that theretofore shall not have been signed by the Company and delivered to the Trustee; and, upon the order of such successor entity (instead of the Company) and subject to all the terms, conditions and limitations in this Indenture prescribed, the Trustee shall authenticate and shall deliver any Securities that previously shall have been signed and delivered by the officers of the Company to the Trustee of authentication, and any Securities that such successor entity thereafter shall cause to be signed and delivered to the Trustee for that purpose. All the Securities so issued shall in all respects have the same legal rank and benefit under this Indenture as the Securities theretofore or thereafter issued in accordance with the terms of this Indenture as though all of such Securities had been issued at the date of the execution hereof. In the event of any such sale or conveyance and upon any such assumption, the Company or any successor entity that shall theretofore have become such in the manner described in this Article Ten shall be discharged from all obligations and covenants under this Indenture and the Securities so assumed and may be liquidated and dissolved.

In case of any such consolidation, merger, sale or conveyance such changes in phraseology and form (but not in substance) may be made in the Securities thereafter to be issued as may be appropriate.

## ARTICLE ELEVEN

### SATISFACTION AND DISCHARGE OF INDENTURE: UNCLAIMED MONEYS

SECTION 11.01. Satisfaction and Discharge of Indenture. If at any time (a) the Company shall have paid or caused to be paid the principal of and interest on all the Securities of each series outstanding hereunder, as and when the same shall have become due and payable, or (b) the Company shall have delivered to the Trustee for cancellation (i) all securities of any series theretofore authenticated (other than any Securities of any series that shall have been destroyed, lost or stolen and that shall have been replaced or paid as provided in Section 2.08) and (ii) Securities for whose payment moneys have theretofore been deposited in trust and segregated and held in trust by the Company and thereafter returned to the Company or discharged from such trust, as provided in Section 11.04 or (c)(i) all such Securities not theretofore delivered to the Trustee for cancellation shall have become due payable, or are by their terms to become due and payable within one year or are to be called for redemption under arrangements satisfactory to the Trustee for the giving of notice of redemption, and (ii) the Company shall have irrevocably deposited or caused to be deposited with the Trustee as trust funds an amount (other than moneys returned by the Trustee or any Paying Agent to the Company in accordance with Section 11.04) sufficient to pay at maturity or upon redemption all such Securities not theretofore delivered to the Trustee for cancellation, including principal and interest due or to become due to such date of maturity or date of redemption, as the case may be, and if, in any such case, the Company shall also pay or cause to be paid all other sums payable

40

hereunder by the Company with respect to Securities of such series, then this Indenture shall cease to be of further effect with respect to Securities of such series (except as to (i) rights of registration of transfer and exchange, (ii) substitution of apparently mutilated, defaced, destroyed, lost or stolen Securities, (iii) the rights, obligations and immunities of the Trustee hereunder and (iv) the rights of the Securityholders of such series as beneficiaries hereof with respect to the property so deposited with the Trustee payable to all or any of them), and the Trustee, on demand of the Company accompanied by an Officers' Certificate and an Opinion of Counsel (each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with) and at the cost and expense of the Company, shall execute proper instruments acknowledging such satisfaction of and discharging this Indenture with respect to such series; provided that the rights of holders of the Securities of such series to receive amounts in respect of principal of and interest on the Securities held by them shall not be delayed longer than required by then applicable mandatory rules or polices of any securities exchange upon which the Securities of such series are listed and provided further that the Company shall not be discharged from any payment obligations in respect of any Securities, and such obligations shall be reinstated, if the Trustee is unable to apply any money in accordance with this Section by reason of any legal proceeding or any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application until such time as the Trustee is able to apply such money or the obligations are otherwise satisfied. The Company agrees to reimburse the Trustee of any costs or expenses thereafter reasonably and properly incurred and to compensate the Trustee for any services thereafter reasonably and properly rendered by the Trustee in connection with this Indenture or the Securities of such series.

SECTION 11.02. Application by Trustee of Funds Deposited for Payment of Securities. Subject to Section 11.04, all moneys deposited with the Trustee pursuant to Section 11.01 shall be held in trust and applied by it to the payment, either directly or through any Paying Agent (including the Company acting as its own Paying Agent), to the holders of the particular Securities of such series, for the payment or redemption of which such moneys have been deposited with the Trustee, of all sums due and to become due thereon for principal, interest and premium, if any.

SECTION 11.03. Repayment of Moneys Held by Paying Agent. In connection with the satisfaction and discharge of this Indenture with respect to such series of Securities, all moneys then held by any Paying Agent under the provisions of this Indenture with respect to any such series of Securities shall, upon demand of the Company or the Trustee, be paid to the Trustee and thereupon such Paying Agent shall be released from all further liability with respect to such moneys.

SECTION 11.04. Repayment of Moneys Held by Trustee. Unless otherwise required by mandatory provisions of escheat or abandoned or unclaimed property laws, any moneys deposited with the Trustee or any Paying Agent, or then held by the Company, for the payment of the principal of, premium, if any, or interest on any Securities of any series and not applied but remaining unclaimed by the holders of Securities for two years after the date upon which such payment shall have become due, shall be repaid to the Company by the Trustee or by such Paying Agent on demand; or, if then held by the Company, shall be discharged from such trust;

41

and thereupon the Trustee and such Paying Agent or the Company as trustee shall be released from all further liability with respect to such moneys, and the holder of any of the Securities of such series entitled to receive such payment shall, unless otherwise required by mandatory provisions of applicable escheat or abandoned or unclaimed property laws, thereafter look only to the Company for the payment thereof; provided however, that the Trustee or Paying Agent, before being required to make any such payment, may at the expense of the Company cause to be published once, in a newspaper published in the English language, customarily published on each Business Day and of general circulation in New York City, or cause to be mailed to each Securityholder of such series, notice that such money remains unclaimed and that, after a date specified therein which shall not be less than 30 days from the date of such publication, any unclaimed balance of such money then remaining will be repaid to the Company.

SECTION 11.05. Satisfaction, Discharge and Defeasance of Securities of any Series. If this Section 11.05 is specified, as contemplated by Section 2.03, to be applicable to Securities of any series, the Company shall be deemed to have paid and discharged the entire indebtedness on all the Securities of any such series at the time outstanding, and the Trustee, at the expense of the Company, shall execute proper instruments acknowledging satisfaction discharge and defeasance of such indebtedness, when

(1)  either

(A)  with respect to all Securities of such series at the time outstanding,

(i)  the Company has deposited or caused to be deposited with the Trustee as trust funds in trust for the purpose an amount sufficient to pay and discharge the entire indebtedness on all such Securities for principal, premium, if any, and interest, on the days on which such principal, premium, if any, or interest, as the case may be, is due and payable in accordance with the terms of this Indenture and such Securities, to the date of maturity or date of redemption thereof as contemplated by the penultimate paragraph of this Section 11.05, as the case may be; or

(ii)  the Company has deposited or caused to be deposited with the Trustee as obligations in trust for the purpose such amount of non-callable direct obligations of, or obligations the principal of and interest on which are fully guaranteed by, the United States of America as will, together with the income to accrue thereon without consideration of any reinvestment thereof, be sufficient to pay and discharge the entire indebtedness on all such Securities for principal, premium, if any, and interest, on the days on which such principal, premium, if any, or interest, as the case may be, is due and payable in accordance with the terms of this Indenture and such Securities, to the date of maturity or date of redemption thereof as contemplated by the penultimate paragraph of this Section 11.05, as the case may be; or

42

(B)    the Company has properly fulfilled such other means of satisfaction and discharge as is specified, as contemplated by Section 2.03, to be applicable to the Securities of sue series;

(2)    the Company has paid or caused to be paid all other sums payable with respect to the Securities of such series at the time outstanding and all other amounts due under this Indenture with respect to such series;

(3)    such deposit will not result in a breach or violation of, or constitute a default under, this Indenture or any other agreement or instrument to which the Company is a party or by which it is bound;

(4)    no Event of Default or event that, after notice or lapse of time or both, would become an Event of Default shall have occurred and be continuing on the date of such deposit;

(5)    Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel to the effect that (i) the Company has received from, or that there has been published by, the Internal Revenue Service a ruling, or (ii) since the date of this Indenture there has been a change in applicable federal income tax law, in either case to the effect that holders of the Securities of such series will not recognize income, gain or loss for federal income tax purposes as a result of such deposit, satisfaction, discharge and defeasance and will be subject to federal income tax on the same amounts and in the same manner and at the same times, as would have been the case if such deposit, satisfaction, discharge and defeasance had not occurred; and

(6)    the Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction, discharge and defeasance of the entire indebtedness on all Securities of any such series at the time outstanding have been complied with.

Any deposits with the Trustee referred to in Section 11.05(l)(A) above shall be irrevocable and shall be made under the terms of an escrow trust agreement in form and substance satisfactory to the Trustee. If any Securities of such series at the time outstanding are to be redeemed prior to their stated maturity, whether pursuant to any optional redemption provisions or in accordance with any mandatory sinking fund requirement, the Company shall make such arrangements as are satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Company.

Upon the satisfaction of the conditions set forth in this Section 11.05 with respect to all the Securities of any series at the time outstanding, the terms and conditions of such series, including the terms and conditions with respect thereto set forth in this Indenture, shall no longer be binding upon, or applicable to, the Company, provided that the Company shall not be discharged from any payment obligations in respect of Securities of such series that are deemed not to be outstanding under clause (c) of the definition thereof if such obligations continue to be valid obligations in accordance with this Section by reason of any legal proceeding or any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application.

43

## ARTICLE TWELVE

### IMMUNITY OF INCORPORATORS, SHAREHOLDERS, OFFICERS
### AND OTHERS

SECTION 12.01. Incorporators, Shareholders, Officers and Others Exempt from Individual Liability. No recourse under or upon any obligation, covenant or agreement of this Indenture, or of any Security, or for any claim based thereon or otherwise in respect thereof shall be had against any incorporator, shareholder, officer, partner, member or director, as such, past, present or future, of the Company or of any successor entity, either directly or through the Company or such successor entity, whether by virtue of any constitution, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise; it being expressly understood that this Indenture and the obligations issued hereunder are solely corporate or similar obligations, and that no such personal liability whatever shall attach to, or is or shall be incurred by, the incorporators, shareholders, officers, partners, members or directors, as such, past, present or future, of the Company or of any successor entity, or any of them, because of the reason of the indebtedness hereby authorized, or under or by reason of the obligations, covenants or agreements contained in this Indenture or in any of the Securities or implied therefrom; and that any and all such personal liability of every name and nature, either at common law or in equity or by constitution or statute, of and any and all such rights and claims against, every such incorporator, shareholder, officer, partner, member or director, as such, because of the creation of the indebtedness hereby authorized, or under or by reason of the obligations, covenants or agreements contained in this Indenture or in any of the Securities or implied therefrom are hereby expressly waived and released as a condition of, and as a consideration for, the execution of this Indenture and the issue of such Securities.

## ARTICLE THIRTEEN

### MISCELLANEOUS PROVISIONS

SECTION 13.01. Successors and Assigns of Company Bound by Indenture. All the covenants, stipulations, promises and agreements in this Indenture contained by or on behalf of the Company shall bind its successors and assigns, whether so expressed or not.

SECTION 13.02. Acts of Board, Committee or Officer of Successor Entity Valid. Any act or proceeding by any provision of this Indenture authorized or required to be done or performed by any board, committee or officer of the Company shall and may be done and performed with like force and effect by the like board, committee or officer (or persons performing similar duties) of any entity that shall at the time be the lawful sole successor of the Company.

SECTION 13.03. Required Notices or Demands May be Served by Mail; Waiver. Any notice, direction, request or demand that by any provisions of this Indenture is required or permitted to be given or served by the Trustee or by the holders of Securities to or on the Company shall be in the English language and may be given or served by being deposited,

44

postage prepaid, certified or registered mail, addressed (until another address is filed by the Company with the Trustee for such purpose), as follows: Southwest Airlines Co., P.O. Box 3661l, Dallas, Texas 75235, Attention: Treasurer. Any notice, direction, request or demand by any Securityholder to or upon the Trustee shall be deemed to have been sufficiently given or made, for all purposes, if given or made at the principal office of the Trustee.

Where this Indenture provides for notice to Securityholders, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing in the English language and mailed, first class, postage prepaid, to each holder entitled thereto, at his last address as it appears in the Security register or registers. In any case where notice to holders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular holder shall affect the sufficiency of such notice with respect to other holders.

In case, by reason of the suspension of or irregularities in regular mail service, it shall be impracticable to mail notice to the Company or Securityholders when such notice is required to be given pursuant to any provision of this Indenture, then any manner of giving such notice as shall be satisfactory to the Trustee shall be deemed to be a sufficient giving of such notice.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by the person entitled to receive such notice, either before or after the event or action relating thereto, and such waiver shall be the equivalent of such notice. Waivers of notice by Securityholders shall be filed with the Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

SECTION 13.04. Indenture and Securities to be Construed in Accordance with the Laws of the State of Texas. This Indenture and each Security shall be deemed to be a contract made under the laws of the State of Texas, and for all purposes shall be construed in accordance with the laws of said State, except as otherwise required by mandatory provisions of law.

SECTION 13.05. Evidence of Compliance with Conditions Precedent. Upon any request or application by the Company to the Trustee to take any action under any of the provisions as of this Indenture, the Company shall furnish to the Trustee an Officers' Certificate stating that all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with, and an Opinion of Counsel stating that in the opinion of such counsel all such conditions precedent have been complied with, except that in the case of any such application or demand as to which the furnishing of such documents is specifically required by any provision of this Indenture relating to such particular application or demand, no additional certificate or opinion need be furnished.

Each certificate or opinion provided for in this Indenture and delivered to the Trustee with respect to compliance with a condition or covenant provided for in this Indenture shall include (1) a statement that the person making such certificate or opinion has read such covenant or condition; (2) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based; (3) a statement that, in the opinion of such person, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or

45

condition has been complied with; and (4) a statement as to whether or not, in the opinion of such person, such condition or covenant has been complied with.

Any certificate, statement or opinion of an officer of the Company may be based, insofar as it relates to legal matters, upon a certificate or opinion of or representations by counsel, unless such officer knows that the certificate or opinion or representations with respect to the matters upon which his certificate, statement or opinion may be based as aforesaid are erroneous, or in the exercise of reasonable care should know that the same are erroneous. Any certificate, statement or opinion of counsel may be based; insofar as it relates to factual matters, on information that is in the possession of the Company, upon the certificate, statement or opinion of or representations by an officer or officers of the Company, unless such counsel knows that the certificate, statement or opinion or representations with respect to the matters upon which his certificate, statement or opinion may be based as aforesaid are erroneous, or in the exercise of reasonable care should know that the same are erroneous.

Any certificate, statement or opinion of an officer of the Company or of counsel may be based, insofar as it relates to accounting matters, upon a certificate or opinion of or representations by an accountant or firm of accountants unless such officer or counsel, as the case may be, knows that the certificate or opinion or representations with respect to the accounting matters upon which his certificate, statement or opinion may be based as aforesaid are erroneous, or in the exercise of reasonable care should know that the same are erroneous. Any certificate or opinion of any independent firm of public accountants filed with the Trustee shall contain a statement that such firm is independent.

SECTION 13.06. Payments Due on Saturdays, Sundays, and Holidays. In any case where the date of payment of interest on or principal of the Securities of any series, or the date fixed for redemption or repayment of any such Security, shall not be a Business Day, then payment of interest or principal (and premium, if any) need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the date of payment or the date fixed for redemption, and no interest shall accrue for the period after such date.

SECTION 13.07. Provisions Required by Trust Indenture Act of 1939 to Control. If and to the extent that any provision of this Indenture limits, qualifies or conflicts with the duties imposed by operation of subsection (c) of Section 318 of the Trust Indenture Act of 1939, the imposed duties shall control.

SECTION 13.08. Provisions of this Indenture and Security for the Sole Benefit of the Parties and the Securityholders. Nothing in this Indenture or in the Securities, expressed or implied, shall give or be construed to give any person, firm or corporation, other than the parties hereto and their successors and the holders of the Securities, any legal or equitable right, remedy or claim under or in respect of this Indenture, or under any covenant; condition or provision herein contained; all its covenants, conditions and provisions being for the sole benefit of the parties hereto and their successors and the holders of the Securities.

46

SECTION 13.09. Indenture May be Executed in Counterparts. This Indenture may be executed in any number of counterparts, each of which shall be an original; but such counterparts shall together constitute but one and the same instrument.

SECTION 13.10. Article and Section Headings. The Article and Section heading references herein and in the Table of Contents are for convenience only and shall not affect the construction hereof.

SECTION 13.11. Severability. If any provision hereof shall be held to be invalid, illegal or unenforceable under applicable law, then the remaining provisions hereof shall be construed as though such invalid, illegal or unenforceable provision were not contained herein.

ARTICLE FOURTEEN

REDEMPTION OF SECURITIES AND SINKING FUNDS

SECTION 14.01. Applicability of Article. The provisions of this Article shall be applicable to the Securities of any series that are redeemable before their maturity or to any sinking fund for the retirement of Securities of a series, in either case as specified as contemplated by Section 2.03 for Securities of such series.

SECTION 14.02. Notice of Redemption; Partial Redemptions. Notice of redemption to the holders of Securities of any series to be redeemed as a whole or in part shall be given by mailing notice of such redemption by first class mail, postage prepaid, at least 20 days and not more than 60 days prior to the date fixed for redemption to such holders of Securities of such series at their last addresses as they shall appear upon the Security register or registers. Any notice that is mailed in the manner herein provided shall be conclusively presumed to have been duly given, whether or not the holder receives the notice. Failure to give notice by mail, or any defect in the notice to the holder of any Security of a series designated for redemption as a whole or in part shall not affect the validity of the proceedings for the redemption of any other Security of such series.

The notice of redemption to each such bolder shall specify the principal amount of each Security of such series held by such holder to be redeemed, the date fixed for redemption, the redemption price (or the method of calculating the redemption price), the place or places of payment, that payment will be made upon presentation and surrender of such Securities, that such redemption is pursuant to the mandatory or optional sinking fund, or both, if such be the case, that interest accrued to the date fixed for redemption will be paid as specified in said notice and that on and after said date interest thereon or on the portions thereof to be redeemed will cease to accrue. In case any Security of a series is to be redeemed in part only the notice of redemption shall state the portion of the principal amount thereof to be redeemed and shall state that on and after the date fixed for redemption, upon surrender of such Security, a new Security or Securities of such series in principal amount equal to the unredeemed portion thereof will be issued.

47

The notice of redemption of Securities of any series to be redeemed at the option of the Company shall be given by the Company or, at the Company's request, by the Trustee for such series in the name and at the expense of the Company.

No later than 11:00 a.m., New York City time, on the redemption date specified in the notice of redemption given as provided in this Section, the Company will deposit with the Trustee or with one or more Paying Agents (or, if the Company is acting as its own Paying Agent, set aside, segregate and hold in trust as provided in Section 3.04) an amount of money sufficient to redeem on the redemption date all the Securities of such series so called for redemption at the appropriate redemption price, together with accrued interest to the date fixed for redemption. If less than all the outstanding Securities of a series are to be redeemed, the Company will deliver to the Trustee at least 70 days (or such shorter period acceptable to the Trustee) prior to the date fixed for redemption an Officers' Certificate stating the aggregate principal amount of Securities to be redeemed.

If less than all the Securities of a series are to be redeemed, the Trustee shall select, in such manner as it shall deem appropriate and fair, Securities of such series to be redeemed in whole or in part. Securities may be redeemed in part in multiples equal to the minimum authorized denomination for Securities of such series or any integral multiple thereof. The Trustee shall promptly notify the Company in writing of the Securities of such series selected for redemption and, in the case of any Securities of such series selected for partial redemption, the principal amount of each such Security to be redeemed. For all purposes of this Indenture, unless the context otherwise requires, all provisions relating to the redemption of the Securities of any series shall relate, in the case of any Security redeemed or to be redeemed only in part, to the portion of the principal amount of such Security which has been or is to be redeemed.

SECTION 14.03. Payment of Securities Called for Redemption. If notice of redemption has been given as above provided, the Securities or portions of Securities specified in such notice shall become due and payable on the date and at the place or places stated in such notice at the applicable redemption price, together with interest accrued to the date fixed for redemption, and on and after said date (unless the Company shall default in the payment of such Securities at the redemption price, together with interest accrued to said date) interest on the Securities or portions of Securities so called for redemption shall cease to accrue and, except as provided in Sections 6.05 and 11.04, such Securities shall cease from and after the date fixed for redemption to be entitled to any benefit or security under this Indenture, and the holders thereof shall have no right in respect of such Securities except the right to receive the redemption price thereof and unpaid interest to the date fixed for redemption. On presentation and surrender of such Securities at a place of payment specified in said notice, said Securities or the specified portions thereof shall be paid and redeemed by the Company at the applicable redemption price, together with interest accrued thereon to the date fixed for redemption; provided that any semiannual payment of interest becoming due on the date fixed for redemption shall be payable to the holders of such Securities registered as such on the relevant record date subject to the terms and provisions of Section 2.03 hereof.

If any Security called for redemption shall not be so paid upon surrender thereof for redemption, the principal shall, until paid or duly provided for, bear interest from the date fixed

48

for redemption at the rate of interest or Yield to Maturity (in the case of an Original Issue Discount Security) borne by the Security.

Upon presentation of any Security redeemed in part only, the Company shall execute and the Trustee shall authenticate and deliver to or on the order of the holder thereof, at the expense of the Company, a new Security or Securities of such series, of authorized denominations, in principal amount equal to .the unredeemed portion of the Security so presented.

SECTION 14.04. Exclusion of Certain Securities from Eligibility for Selection for Redemption. Securities shall be excluded from eligibility for selection for redemption if they are identified by registration and certificate number in a written statement signed by an authorized offic.er of the Company and delivered to the Trustee at least 10 (or such lesser number as the Trustee may permit) days prior to the last date on which notice of redemption may be given as being owned by, and not pledged or hypothecated by, either (i) the Company or (ii) an Affiliate specifically identified in such written statement.

SECTION 14.05. Mandatory and Optional Sinking Funds. The minimum amount of any sinking fund payment provided for by the terms of Securities of any series is herein referred to as a "mandatory sinking fund payment," and any payment in excess of such minimum amount provided for by the terms of Securities of any series is herein referred to as an "optional sinking fund payment." The last date on which a sinking fund payment may be made in each year is herein referred to as the "sinking fund payment date."

In lieu of making all or any part of any mandatory sinking fund payment with respect to any series of Securities in cash, the Company may at its option (i) deliver to the Trustee Securities of such series theretofore purchased or otherwise acquired (except upon redemption pursuant to the mandatory sinking fund) by the Company or receive credit for Securities of such series (not previously so credited) theretofore purchased or otherwise acquired (except as aforesaid) by the Company and delivered to the Trustee for cancellation pursuant to Section 2.09, (ii) receive credit for optional sinking fund payments (not previously so credited) made pursuant to this Section, or (iii) receive credit for Securities of such series (not previously so credited) redeemed by the Company through any optional redemption provisions contained in the terms of such Securities. Securities so delivered or credited shall be received or credited by the Trustee at the sinking fund redemption price specified in such Securities.

On or before the sixtieth day (or such later day, no later than the twentieth, as the Trustee may permit) next preceding each sinking fund payment date for any series, the Company will deliver to the Trustee a written statement (which need not contain the statements required by Section 13.05) signed by an authorized officer of the Company (i) specifying the portion of the mandatory sinking fund payment to be satisfied by payment of cash and the portion to be satisfied by credit of Securities of such series, (ii) stating that none of the Securities of such series has theretofore been so credited, (iii) stating that no defaults in the payment of interest or Events of Default with respect to such series have occurred (which have not been waived or cured) and are continuing and (iv) stating whether or not the Company intends to exercise its right to make an optional sinking fund payment with respect to such series, and, if so, specifying the amount of such optional sinking fund payment that the Company intends to pay on or before

49

the next succeeding sinking fund payment date. Any Securities of such series to be credited and required to be delivered to the Trustee in order for the Company to be entitled to credit therefor as aforesaid that have not theretofore been delivered to the Trustee shall be delivered for cancellation pursuant to Section 2.09 to the Trustee with such written statement (or reasonably promptly thereafter if acceptable to the Trustee). Such written statement shall be irrevocable and upon its receipt by the Trustee the Company shall become unconditionally obligated to make all the cash payments therein referred to, if any, on or before the next succeeding sinking fund payment date. Failure of the Company, on or before any such sixtieth day (or such later day as the Trustee may have permitted), to deliver such written statement and Securities specified in this paragraph, if any, shall not constitute a default but shall constitute1 on and as of such date, the irrevocable election of the Company (i) that the mandatory sinking fund payment for such series due on the next succeeding sinking fund payment date shall be paid entirely in cash without the option to deliver or credit Securities of such series in respect thereof and (ii) that the Company will make no optional sinking fund payment with respect to such series as provided in this Section.

If the sinking fund payment or payments (mandatory or optional or both) made in cash plus any unused balance of any preceding sinking fund payments made in cash shall exceed $50,000 (or a lesser sum if the Company shall so request) with respect to the Securities of any particular series, such cash shall be applied on the next succeeding sinking fund payment date to the redemption of Securities of such series at the sinking fund redemption price together with accrued interest to the date fixed for redemption. If such amount shall be $50,000 or less and the Company makes no such request then it shall be carried over until a sum in excess of $50,000 is available. The Trustee shall select, in the manner provided in Section 14.02, for redemption on such sinking fund payment date a sufficient principal amount of Securities of such series to absorb said cash, as nearly as may be, and shall (if requested in writing by the Company) inform the Company or an entity known by the Trustee to be an Affiliate, as shown by the Security register or registers, and not known to the Trustee to have been pledged or hypothecated by the Company or any such entity or (ii) identified in a written statement delivered to the Trustee pursuant to Section 14.04 as being owned by, and not pledged or hypothecated by, the Company or an Affiliate shall be excluded from Securities of such series-eligible for selection for redemption. The Trustee, in the name and at the expense of the Company (or the Company, if it shall so request the Trustee in writing) shall cause notice of redemption of the Securities of such series to be given in substantially the manner provided in Section 14.02 (and with the effect provided in Section 14.03) for the redemption of Securities of such series in part at the option of the Company. The amount of any sinking fund payments not so applied or allocated to the redemption of Securities of such series shall be added to the next cash sinking fund payment and, together with such payment, shall be applied in accordance with the provisions of this Section 14.05. Any and all sinking fund moneys held on the stated maturity date of the Securities of any particular series (or earlier, if such maturity is accelerated), that are not held for the payment or redemption of particular Securities of such series shall be applied, together with other moneys if necessary, sufficient for the purpose, to the payment of the principal of, and interest on, the Securities of such series at maturity.

The Trustee shall not redeem or cause to be redeemed any Securities of a series with sinking fund moneys or mail any notice of redemption of Securities for such series by operation

50

of the sinking funds during the continuance of a default in payment of interest on such Securities or of any Event of Default except that, where the mailing of notice of redemption of any Securities shall theretofore have been made, the Trustee shall redeem or cause to be redeemed such Securities, provided that it shall have received from the Company a sum sufficient for such redemption. Except as aforesaid, any moneys in the sinking fund for such series at the time when any such default or Event of Default shall occur, and any moneys thereafter paid into the sinking fund, shall, during the continuance of such default or Event of Default, be deemed to have been collected under Article Five and held for the payment of all such Securities. In case such Event of Default shall have been waived as provided in Article Five or the default cured on or before the sixtieth day preceding the sinking fund payment date in any year, such moneys shall thereafter be applied on the next succeeding sinking fund payment date in accordance with this Section to the redemption of such Securities.

WELLS FARGO BANK, N.A., the party of the second part, hereby accepts the trust in this Indenture declared and provided, upon the terms and conditions hereinabove set forth.

IN WITNESS WHEREOF, SOUTHWEST AIRLINES CO. the party of the first part, has caused this Indenture to be signed by its Chairman of the Board, a Vice Chairman of the Board, its President or one of its Vice Presidents; and WELLS FARGO BANK, N.A., the party of the second part, has caused this Indenture to be signed by one of its Vice Presidents, all as of the day and year first written above.

SOUTHWEST AIRLINES CO.

By: /s/Laura Wright

Sr. Vice President - Finance and Chief Financial Officer

WELLS FARGO BANK, N.A.

By: /s/ Melissa Scott

(Title) Vice President

51

# PURCHASE AGREEMENT NUMBER PA-03729
## between
## THE BOEING COMPANY
## and
## Southwest Airlines Co.
## Relating to Boeing Model 737-8 Aircraft

**[\*\*\*] = Certain identified information has been excluded from the exhibits because it is both not material and is of the type that the registrant treats as private or confidential.**

SWA-PA-03729

**BOEING PROPRIETARY**

## TABLE OF CONTENTS

| **ARTICLES** | **TITLES** |
|---|---|
| Article 1 | Quantity, Model and Description |
| Article 2 | Delivery Schedule |
| Article 3 | Price |
| Article 4 | Payment |
| Article 5 | Additional Terms |
| **TABLE** | **TITLE** |
| 1 | Aircraft Information Table |
| **EXHIBIT** | |
| A | Aircraft Configuration |
| B | Aircraft Delivery Requirements and Responsibilities |
| **SUPPLEMENTAL EXHIBITS** | **TITLES** |
| AE1 | Escalation Adjustment/Airframe and Optional Features |
| BFE1 | BFE Variables |
| CS1 | Customer Support Variables |
| EE1 | Engine Escalation/Engine Warranty and Patent Indemnity |
| SLP1 | Service Life Policy Components |

| **LETTER AGREEMENTS** | **TITLES** |
|---|---|
| SWA-PA-03729-LA-1106463 | Open Matters |
| SWA-PA-03729-LA-1106464 | [***] |
| SWA-PA-03729-LA-1106465 | [***] |
| SWA-PA-03729-LA-1106466 | [***] |

SWA-PA-03729

**BOEING PROPRIETARY**

| LETTER AGREEMENTS | TITLES |
|---|---|
| SWA-PA-03729-LA-1106467 | [***] |
| SWA-PA-03729-LA-1106468 | [***] |
| SWA-PA-03729-LA-1106469 | [***] |
| SWA-PA-03729-LA-1106470 | [***] |
| SWA-PA-03729-LA-1106471 | Substitute Aircraft |
| SWA-PA-03729-LA-1106472 | [***] |
| SWA-PA-03729-LA-1106473 | [***] |
| SWA-PA-03729-LA-1106474 | Option Aircraft |
| SWA-PA-03729-LA-1106475 | [***] |
| SWA-PA-03729-LA-1106476 | [***] |
| SWA-PA-03729-LA-1106477 | [***] |
| SWA-PA-03729-LA-1106478 | [***] |
| SWA-PA-03729-LA-1106479 | [***] |
| SWA-PA-03729-LA-1106480 | [***] |
| SWA-PA-03729-LA-1106481 | [***] |
| SWA-PA-03729-LA-1106482 | [***] |
| SWA-PA-03729-LA-1106483 | [***] |
| SWA-PA-03729-LA-1106484 | [***] |
| SWA-PA-03729-LA-1106485 | [***] |

**BOEING PROPRIETARY**

**Purchase Agreement No. PA-03729
between
The Boeing Company
and
Southwest Airlines Co.**

This Purchase Agreement No. PA-03729 between The Boeing Company, a Delaware corporation, (**Boeing**) and Southwest Airlines Co., a Texas corporation, (**Customer**) relating to the purchase and sale of Model 737-8 aircraft together with all tables, exhibits, supplemental exhibits, letter agreements and other attachments thereto, if any, (**Purchase Agreement**) incorporates the terms and conditions (except as specifically set forth below) of the Aircraft General Terms Agreement dated as of December 13, 2011 between the parties, identified as SWA-AGTA (**AGTA**).

1. <u>Quantity, Model and Description</u>.

The aircraft to be delivered to Customer will be designated as Model 737-8 aircraft (**Aircraft**). Boeing will manufacture and sell to Customer Aircraft conforming to the configuration described in Exhibit A in the quantities listed in Table 1 to the Purchase Agreement.

2. <u>Delivery Schedule</u>.

The scheduled months of delivery of the Aircraft are listed in the attached Table 1. Exhibit B describes certain responsibilities for both Customer and Boeing in order to accomplish the delivery of the Aircraft.

3. <u>Price</u>.

    3.1    <u>Aircraft Basic Price</u>. The Aircraft Basic Price is listed in Table 1 and is subject to escalation in accordance with the terms of this Purchase Agreement.

    3.2    <u>Advance Payment Base Prices</u>. The Advance Payment Base Prices listed in Table 1 were calculated utilizing the latest escalation factors available to Boeing on the date of this Purchase Agreement projected to the scheduled delivery month of each Aircraft.

4. <u>Payment</u>.

    4.1    Boeing acknowledges receipt of a deposit in the amount shown in Table 1 for each Aircraft (**Deposit**).

    4.2    The standard advance payment schedule for the Model 737-8 aircraft requires Customer [***], on the effective date of the Purchase Agreement for the

**BOEING PROPRIETARY**

Aircraft. Additional advance payments for each Aircraft are due as specified in and on the first business day of the months listed in the attached Table 1.

4.3    For any Aircraft whose scheduled month of delivery is less than twenty-four (24) months from the date of this Purchase Agreement, the total amount of advance payments due for payment upon signing of this Purchase Agreement will include all advance payments which are past due in accordance with the standard advance payment schedule set forth in paragraph 4.2 above.

4.4    Customer will pay the balance of the Aircraft Price of each Aircraft at delivery.

5.    Additional Terms.

5.1    Aircraft Information Table. Table 1 consolidates information contained in Articles 1, 2, 3 and 4 with respect to (i) quantity of Aircraft, (ii) applicable Detail Specification, (iii) month and year of scheduled deliveries, (iv) Aircraft Basic Price, (v) applicable escalation factors and (vi) Advance Payment Base Prices and advance payments and their schedules.

5.2    Escalation Adjustment/Airframe and Optional Features. Supplemental Exhibit AE1 contains the applicable airframe and optional features escalation formula.

5.3    Buyer Furnished Equipment Variables. Supplemental Exhibit BFE1 contains supplier selection dates, on dock dates and other variables applicable to the Aircraft.

5.4    Customer Support Variables. Information, training, services and other things furnished by Boeing in support of introduction of the Aircraft into Customer's fleet are described in Supplemental Exhibit CS1.

5.5    Engine Escalation Variables. Supplemental Exhibit EE1 contains the applicable engine escalation formula, the engine warranty and the engine patent indemnity for the Aircraft describes the applicable engine escalation formula and contains the engine warranty and the engine patent indemnity for the Aircraft.

5.6    Service Life Policy Component Variables. Supplemental Exhibit SLP1 lists the SLP Components covered by the Service Life Policy for the Aircraft.

5.7    Public Announcement. Each of Customer and Boeing reserves the right to make a public announcement regarding Customer's purchase of the Aircraft upon approval from the authorized representative of the other party hereto.

5.8    Negotiated Agreement; Entire Agreement. This Purchase Agreement, including the provisions of Article 8.2 of the AGTA relating to insurance, and Article 11 of Part 2 of Exhibit C of the AGTA relating to DISCLAIMER AND RELEASE and EXCLUSION OF CONSEQUENTIAL AND OTHER DAMAGES, has been the subject of discussion and negotiation and is understood by the parties; the Aircraft Price and other agreements of the parties stated in this Purchase Agreement were arrived at in consideration of such provisions. This Purchase Agreement, including the AGTA,

**BOEING PROPRIETARY**

contains the entire agreement between the parties and supersedes all previous proposals, understandings, commitments or representations whatsoever, oral or written, and may be changed only in writing signed by authorized representatives of the parties.

AGREED AND ACCEPTED this

December 13, 2011
Date

**THE BOEING COMPANY**                    **SOUTHWEST AIRLINES CO.**

/s/ Cheri A Fischer                        /s/ Michael Van de Ven
Signature                                  Signature

Cheri A Fischer                            Michael Van de Ven
Printed name                               Printed name

Attorney-in-Fact                           EVP & Chief Operating Officer
Title                                      Title

SWA-PA-03729                                                       Page 6
**BOEING PROPRIETARY**

**Table 1 To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**

| | | | |
|---|---|---|---|
| **Airframe Model/MTOW:** | 737-8 | 175900 pounds | |
| **Engine Model/Thrust:** | CFMLEAP-1B24 | tbd pounds | |
| **Airframe Price:** | | [***] | |
| **Optional Features:** | | [***] | |
| **Sub-Total of Airframe and Features:** | | [***] | |
| **Engine Price (Per Aircraft):** | | [***] | |
| **Aircraft Basic Price (Excluding BFE/SPE):** | | [***] | |
| **Buyer Furnished Equipment (BFE) Estimate:** | | [***] | |
| **Seller Purchased Equipment (SPE) Estimate:** | | [***] | |
| | | | |
| **Deposit per Aircraft:** | | [***] | |

| | | |
|---|---|---|
| **Detail Specification:** | | D019A001-TBD (10/27/2011) |
| **Airframe Price Base Year/Escalation Formula:** | Jul-11 | ECI-MFG/CPI |
| **Engine Price Base Year/Escalation Formula:** | N/A | N/A |
| | | |
| **Airframe Escalation Data:** | | |
| **Base Year Index (ECI):** | | [***] |
| **Base Year Index (CPI):** | | [***] |

| Delivery Date | Number of Aircraft | Escalation [1] Factor (Airframe) | | | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| 2017 | 4 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| 2018 | 15 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| 2019 | 33 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| 2020 | 34 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| 2021 | 34 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| 2022 | 30 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Total: | 150 | | | | | | | | |

[1]  The escalation factor estimate reflects a July escalation factor which is used for determining the annual average Advance Payment Base Price per Aircraft. [***]

# AIRCRAFT CONFIGURATION

## between

## THE BOEING COMPANY

## and

## Southwest Airlines Co.

## Exhibit A to Purchase Agreement Number PA-03729

SWA-PA-03729-EXA

**BOEING PROPRIETARY**

**Exhibit A**
**AIRCRAFT CONFIGURATION**
**Dated December 13, 2011**
**relating to**
**BOEING MODEL 737-8 AIRCRAFT**


The initial configuration of Customer's Model 737-8 Aircraft has been defined by Boeing 7378 Airplane Description Document No. D019A007 Rev New dated November 4, 2011 and is more fully discussed in Letter Agreement SWA-PA-03729-LA-1106463 entitled "Open Matters."


Purchase Agreement 03729
EXA Page 2

SWA-PA-03729-EXA

**BOEING PROPRIETARY**

# AIRCRAFT DELIVERY REQUIREMENTS AND RESPONSIBILITIES
## between
## THE BOEING COMPANY
## and
## Southwest Airlines Co.
## Exhibit B to Purchase Agreement Number PA-03729

SWA-PA-03729-EXB

BOEING PROPRIETARY

**Exhibit B**
**AIRCRAFT DELIVERY REQUIREMENTS AND RESPONSIBILITIES**
**relating to**
**BOEING MODEL 737-8 AIRCRAFT**

Both Boeing and Customer have certain documentation and approval responsibilities at various times during the construction cycle of Customer's Aircraft that are critical to making the delivery of each Aircraft a positive experience for both parties. This Exhibit B documents those responsibilities and indicates recommended completion deadlines for the actions to be accomplished.

1.    GOVERNMENT DOCUMENTATION REQUIREMENTS.

Certain actions are required to be taken by Customer in advance of the scheduled delivery month of each Aircraft with respect to obtaining certain government issued documentation.

   1.1    Airworthiness and Registration Documents. Not later than **six (6) months prior to delivery** of each Aircraft, Customer will notify Boeing of the registration number to be painted on the side of the Aircraft. In addition, and not later than **three (3) months prior to delivery** of each Aircraft, Customer will, by letter to the regulatory authority having jurisdiction, authorize the temporary use of such registration numbers by Boeing during the pre-delivery testing of the Aircraft.

Customer is responsible for furnishing any Temporary or Permanent Registration Certificates required by any governmental authority having jurisdiction to be displayed aboard the Aircraft after delivery.

   1.2    Certificate of Sanitary Construction.

       1.2.1    U.S. Registered Aircraft. Boeing will obtain from the United States Public Health Service, a United States Certificate of Sanitary Construction to be provided by Boeing to Customer and displayed aboard each Aircraft after delivery to Customer.

       1.2.2    Non-U.S. Registered Aircraft. If Customer requires a United States Certificate of Sanitary Construction at the time of delivery of the Aircraft, Customer will give written notice thereof to Boeing at least **three (3) months prior to delivery**. Boeing will then use commercially reasonable efforts to obtain the Certificate from the United States Public Health Service and present it to Customer at the time of Aircraft delivery. The above Boeing obligation only applies to commercial passenger-configured aircraft.

   1.3    Customs Documentation.

       1.3.1    Import Documentation. If the Aircraft is intended to be exported from the United States, Customer must notify Boeing not later than **three (3) months prior to delivery** of each Aircraft of any documentation required by the customs authorities or by any other agency of the country of import.

Page 2

SWA-PA-03729-EXB

**BOEING PROPRIETARY**

1.3.2    General Declaration - U.S. If the Aircraft is intended to be exported from the United States, Boeing will prepare Customs Form 7507, General Declaration, for execution by U.S. Customs immediately prior to the ferry flight of the Aircraft. For this purpose, Customer will furnish to Boeing not later than **twenty (20) days prior to delivery** all information required by U.S. Customs and Border Protection, including without limitation (i) a complete crew and passenger list identifying the names, birth dates, passport numbers and passport expiration dates of all crew and passengers and (ii) a complete ferry flight itinerary, including point of exit from the United States for the Aircraft.

If Customer intends, during the ferry flight of an Aircraft, to land at a U.S. airport after clearing Customs at delivery, Customer must notify Boeing not later than **twenty (20) days prior to delivery** of such intention. If Boeing receives such notification, Boeing will provide to Customer the documents constituting a Customs permit to proceed, allowing such Aircraft to depart after any such landing. Sufficient copies of completed Form 7507, along with passenger manifest, will be furnished to Customer to cover U.S. stops scheduled for the ferry flight.

1.3.3    Export Declaration U.S. If the Aircraft is intended to be exported from the United States following delivery, and (i) Customer is a non-U.S. customer, Boeing will file an export declaration electronically with U.S. Customs and Border Protection (**CBP**), or (ii) Customer is a U.S. customer, it is the responsibility of the U.S. customer, as the exporter of record, to file the export declaration with CBP.

2.   Insurance Certificates.

Unless provided earlier, Customer will provide to Boeing not later than **thirty (30) days prior to delivery** of the first Aircraft, a copy of the requisite annual insurance certificate in accordance with the requirements of Article 8 of the AGTA.

3.   NOTICE OF FLYAWAY CONFIGURATION.

Not later than **twenty (20) days prior to delivery** of the Aircraft, Customer will provide to Boeing a configuration letter stating the requested "flyaway configuration" of the Aircraft for its ferry flight. This configuration letter should include:

(i)     the name of the company which is to furnish fuel for the ferry flight and any scheduled post-delivery flight training, the method of payment for such fuel, and fuel load for the ferry flight;

(ii)    the cargo to be loaded and where it is to be stowed on board the Aircraft, the address where cargo is to be shipped after flyaway and notification of any hazardous materials requiring special handling;

(iii)   any BFE equipment to be removed prior to flyaway and returned to Boeing BFE stores for installation on Customer's subsequent Aircraft;

(iv)    a complete list of names and citizenship of each crew member and non-revenue passenger who will be aboard the ferry flight; and

(v)     a complete ferry flight itinerary.

SWA-PA-03729-EXB

**BOEING PROPRIETARY**

4.    DELIVERY ACTIONS BY BOEING.

    4.1    Schedule of Inspections. All FAA, Boeing, Customer and, if required, U.S. Customs Bureau inspections will be scheduled by Boeing for completion prior to delivery or departure of the Aircraft. Customer will be informed of such schedules.

    4.2    Schedule of Demonstration Flights. All FAA and Customer demonstration flights will be scheduled by Boeing for completion prior to delivery of the Aircraft.

    4.3    Schedule for Customer's Flight Crew. Boeing will inform Customer of the date that a flight crew is required for acceptance routines associated with delivery of the Aircraft.

    4.4    Fuel Provided by Boeing. Boeing will provide to Customer, [***] the amount of fuel shown in U.S. gallons in the table below for the model of Aircraft being delivered and full capacity of engine oil at the time of delivery or prior to the ferry flight of the Aircraft.

| Aircraft Model | Fuel Provided |
|---|---|
| 737 | 1,000 |

    4.5    Flight Crew and Passenger Consumables. Boeing will provide reasonable quantities of food, coat hangers, towels, toilet tissue, drinking cups and soap for the first segment of the ferry flight for the Aircraft.

    4.6    Delivery Papers, Documents and Data. Boeing will have available at the time of delivery of the Aircraft certain delivery papers, documents and data for execution and delivery with drafts, to the extent reasonably available, to be provided to Customer not less than five (5) days prior thereto. If title for the Aircraft will be transferred to Customer through a Boeing sales subsidiary and if the Aircraft will be registered with the FAA, Boeing will preposition in Oklahoma City, Oklahoma, for filing with the FAA at the time of delivery of the Aircraft an executed original Form 8050-2, Aircraft Bill of Sale, indicating transfer of title to the Aircraft from Boeing's sales subsidiary to Customer.

        4.6.1    Boeing agrees that to the extent that the Cape Town Convention may be applicable to the sale of the Aircraft to Customer, Boeing as seller shall consent to the sale as reasonably requested by Customer (at Customer's cost and expense) to permit Customer to register the sale of the Aircraft on the International Registry (as defined in the Cape Town Convention) in favor of Customer.

            4.6.1.1    Definitions applicable to Article 0 herein.

            (i)    "**Cape Town Convention**" means Convention on International Interests in Mobile Equipment, concluded in Cape Town, South Africa, on November 16, 2001 (including the Protocol and as amended, supplemented or modified from time to time).

            (ii)    "**Protocol**" means Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft (as amended, modified or supplemented from time to time)

Page 4

SWA-PA-03729-EXB

**BOEING PROPRIETARY**

4.7     Delegation of Authority. Boeing will present a certified copy of a Resolution of Boeing's Board of Directors, designating and authorizing certain persons to act on its behalf in connection with delivery of the Aircraft.

5.     DELIVERY ACTIONS BY CUSTOMER.

5.1     Aircraft Radio Station License. At delivery Customer will provide its Aircraft Radio Station License to be placed on board the Aircraft following delivery.

5.2     Aircraft Flight Log. At delivery Customer will provide the Aircraft Flight Log for the Aircraft.

5.3     Delegation of Authority. Customer will present to Boeing at delivery of the Aircraft an original or certified copy of Customer's Delegation of Authority designating and authorizing certain persons to act on its behalf in connection with delivery of the specified Aircraft.

5.4     TSA Waiver Approval. Customer may be required to have an approved Transportation Security Administration (**TSA**) waiver for the ferry flight depending upon the Customer's en-route stop(s) and destination unless the Customer already has a TSA approved security program in place. Customer is responsible for application for the TSA waiver and obtaining TSA approval. Customer will provide a copy of the approved TSA waiver to Boeing upon arrival at the Boeing delivery center.

5.5     Electronic Advance Passenger Information System. Should the ferry flight of an Aircraft leave the United States, the Department of Homeland Security office requires Customer to comply with the Electronic Advance Passenger Information System (**eAPIS**). Customer needs to establish their own account with US Customs and Border Protection in order to file for departure. A copy of the eAPIS forms is to be provided by Customer to Boeing upon arrival of Customer's acceptance team at the Boeing delivery center.

Page 5

SWA-PA-03729-EXB

**BOEING PROPRIETARY**

# ESCALATION ADJUSTMENT
# AIRFRAME AND OPTIONAL FEATURES
## between
## THE BOEING COMPANY
## and
## Southwest Airlines Co.
## Supplemental Exhibit AE1
## to Purchase Agreement Number PA-03729

**BOEING PROPRIETARY**

**ESCALATION ADJUSTMENT**
**AIRFRAME AND OPTIONAL FEATURES**
**relating to**
**BOEING MODEL 737-8 AIRCRAFT**

1.  [***]

**BOEING PROPRIETARY**

2.    [***]

**BOEING PROPRIETARY**

SWA-PA-03729-AE1                                                                                                                  Page 4

**BOEING PROPRIETARY**

# BUYER FURNISHED EQUIPMENT VARIABLES

## between

## THE BOEING COMPANY

## and

## Southwest Airlines Co.

## Supplemental Exhibit BFE1
## to Purchase Agreement Number PA-03729

SWA-PA-03729-BFE1                                                         Page 1

**BOEING PROPRIETARY**

**BUYER FURNISHED EQUIPMENT VARIABLES**
**relating to**
**BOEING MODEL 737-8 AIRCRAFT**

This Supplemental Exhibit BFE1 contains supplier selection dates, on-dock dates and other requirements applicable to the Aircraft.

1.    <u>Supplier Selection</u>.

Customer will:

Select and notify Boeing of the suppliers and part numbers of the following BFE items by the following dates:

| | |
|---|---|
| Galley System | tbd |
| Galley Inserts | tbd |
| Seats (passenger) | tbd |
| Overhead & Audio System | tbd |
| In-Seat Video System | tbd |
| Miscellaneous Emergency Equipment | tbd |
| Cargo Handling Systems*<br>*(Single Aisle Programs only)* | tbd |

*For a new certification, supplier requires notification ten (10) months prior to Cargo Handling System on-dock date.

2.    <u>On-dock Dates and Other Information</u>.

On or before _____tbd_____, Boeing will provide to Customer the BFE Requirements electronically through My Boeing Fleet (**MBF** in My Boeing Configuration (**MBC**). These requirements may be periodically revised, setting forth the items, quantities, on-dock dates and shipping instructions and other requirements relating to the in-sequence installation of BFE. For planning purposes, preliminary BFE on-dock dates are set forth below:

SWA-PA-03729-BFE1                                                              Page 2

**BOEING PROPRIETARY**

| Item | Preliminary On-Dock Dates [Month of Delivery] Aircraft |
|---|---|
| Seats | TBD |
| Galleys/Furnishings | TBD |
| Antennas & Mounting Equipment | TBD |
| Avionics | TBD |
| Cabin Systems Equipment | TBD |
| Miscellaneous Emergency Equipment | TBD |
| Textiles/Raw Material | TBD |
| Cargo Systems (Single Aisle Programs) | TBD |
| Provision Kits (Single Aisle Programs) | TBD |
| Radomes (Single Aisle Programs) | TBD |

Additional Delivery Requirements - Import.

Customer will be the "**importer of record**" (as defined by the U.S. Customs and Border Protection) for all BFE imported into the United States, and as such, it has the responsibility to ensure all of Customer's BFE shipments comply with U.S. Customs Service regulations. In the event Customer requests Boeing, in writing, to act as importer of record for Customer's BFE, and Boeing agrees to such request, Customer is responsible for ensuring Boeing can comply with all U.S. Customs Import Regulations by making certain that, at the time of shipment, all BFE shipments comply with the requirements in the "International Shipment Routing Instructions", including the Customs Trade Partnership Against Terrorism (**C-TPAT**), as set out on the Boeing website referenced below. Customer agrees to include the International Shipment Routing Instructions, including C-TPAT requirements, in each contract between Customer and BFE supplier.

http://www.boeing.com/companyoffices/doingbiz/supplier_portal/index_general.html

SWA-PA-03729-BFE1                                                                 Page 3

**BOEING PROPRIETARY**

# CUSTOMER SUPPORT VARIABLES
## between
## THE BOEING COMPANY
## and
## SOUTHWEST AIRLINES CO.
## Supplemental Exhibit CS1
## to Purchase Agreement Number PA-03729

[***]

**BOEING PROPRIETARY**

**BOEING PROPRIETARY**

BOEING PROPRIETARY

**BOEING PROPRIETARY**

# ENGINE ESCALATION,
# ENGINE WARRANTY AND PATENT INDEMNITY
## between
## THE BOEING COMPANY
## and
## SOUTHWEST AIRLINES CO.
## Supplemental Exhibit EE1
## to Purchase Agreement Number PA-03729

**ENGINE ESCALATION**
**ENGINE WARRANTY AND PATENT INDEMNITY**
**relating to**
**BOEING MODEL 737-8 AIRCRAFT**

[***]

**BOEING PROPRIETARY**

**BOEING PROPRIETARY**

**BOEING PROPRIETARY**

**BOEING PROPRIETARY**

**BOEING PROPRIETARY**

**[\*\*\*]**

---

**[\*\*\*]**

**BOEING PROPRIETARY**

[***]

**BOEING PROPRIETARY**

# SERVICE LIFE POLICY COMPONENTS
## between
## THE BOEING COMPANY
## and
## SOUTHWEST AIRLINES CO.
## Supplemental Exhibit SLP1
## to Purchase Agreement Number PA-03729

**SERVICE LIFE POLICY COMPONENTS**
**relating to**
**BOEING MODEL 737-8 AIRCRAFT**

This is the listing of SLP Components for the Aircraft which relate to Part 3, <u>Boeing Service Life Policy</u> of Exhibit C, <u>Product Assurance Document</u> to the AGTA and is a part of Purchase Agreement No. PA-03729.

1.  <u>Wing</u>.
    (i)    Upper and lower wing skins and stiffeners between the forward and rear wing spars.
    (ii)   Wing spar webs, chords and stiffeners.
    (iii)  Inspar wing ribs.
    (iv)   Inspar splice plates and fittings.
    (v)    Main landing gear support structure.
    (vi)   Wing center section lower beams, spanwise beams and floor beams, but not the seat tracks attached to floor beams.
    (vii)  Wing-to-body structural attachments.
    (viii) Engine strut support fittings attached directly to wing primary structure.
    (ix)   Support structure in the wing for spoilers and spoiler actuators; for aileron hinges and reaction links; for leading edge devices and trailing edge flaps; and the winglets.
    (x)    Trailing edge flap tracks and carriages.
    (xi)   Aileron leading edge device and trailing edge flap internal, fixed attachment and actuator support structure.

2.  <u>Body</u>.
    (i)    External surface skins and doublers, longitudinal stiffeners, longerons and circumferential rings and frames between the forward pressure bulkhead and the vertical stabilizer rear spar bulkhead and structural support and enclosure for the APU but excluding all system components and related installation and connecting devices, insulation, lining, and decorative panels and related installation and connecting devices.
    (ii)   Window and windshield structure but excluding the windows and windshields.
    (iii)  Fixed attachment structure of the passenger doors, cargo doors and emergency exits, excluding door mechanisms and movable hinge components. Sills and frames around the body openings for the passenger doors, cargo doors and emergency exits, excluding scuff plates and pressure seals.

**BOEING PROPRIETARY**

(iv)   Nose wheel well structure, including the wheel well walls, pressure deck, bulkheads, and gear support structure.

(v)   Main gear wheel well structure including pressure deck and landing gear beam support structure.

(vi)   Floor beams and support posts in the control cab and passenger cabin area, but excluding seat tracks.

(vii)   Forward and aft pressure bulkheads.

(viii)   Keel structure between the wing front spar bulkhead and the main gear wheel well aft bulkhead including splices.

(ix)   Wing front and rear spar support bulkheads, and vertical and horizontal stabilizer front and rear spar support bulkheads including terminal fittings but excluding all system components and related installation and connecting devices, insulation, lining, and decorative panels and related installation and connecting devices.

(x)   Support structure in the body for the stabilizer pivot and stabilizer screw.

3.   <u>Vertical Stabilizer</u>.

(i)   External skins between front and rear spars.

(ii)   Front, rear and auxiliary spar chords, webs and stiffeners and attachment fittings.

(iii)   Inspar ribs.

(iv)   Rudder hinges and supporting ribs, excluding bearings.

(v)   Support structure in the vertical stabilizer for rudder hinges, reaction links and actuators.

(vi)   Rudder internal, fixed attachment and actuator support structure.

4.   <u>Horizontal Stabilizer</u>.

(i)   External skins between front and rear spars.

(ii)   Front and rear spar chords, webs and stiffeners.

(iii)   Inspar ribs.

(iv)   Stabilizer center section including hinge and screw support structure.

(v)   Support structure in the horizontal stabilizer for the elevator hinges, reaction links and actuators.

(vi)   Elevator internal, fixed attachment and actuator support structure.

5.  Engine Strut.
- (i)   Strut external surface skin and doublers and stiffeners.
- (ii)   Internal strut chords, frames and bulkheads.
- (iii)   Strut to wing fittings and diagonal brace.
- (iv)   Engine mount support fittings attached directly to strut structure and including the enginemounted support fittings.

6.  Main Landing Gear.
- (i)   Outer cylinder.
- (ii)   Inner cylinder, including axles.
- (iii)   Upper and lower side struts, including spindles, universals and reaction links.
- (iv)   Drag strut.
- (v)   Orifice support tube.
- (vi)   Downlock links including spindles and universals.
- (vii)   Torsion links.
- (viii)   Bell crank.
- (ix)   Trunnion link.
- (x)   Actuator beam, support link and beam arm.

7.  Nose Landing Gear.
- (i)   Outer cylinder.
- (ii)   Inner cylinder, including axles.
- (iii)   Orifice support tube.
- (iv)   Upper and lower drag strut, including lock links.
- (v)   Steering plates and steering collars.
- (vi)   Torsion links.

NOTE:   The Service Life Policy does not cover any bearings, bolts, bushings, clamps, brackets, actuating mechanisms or latching mechanisms used in or on the SLP Components.

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106463

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    Open Matters

Reference:    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

Given the long period of time between Purchase Agreement signing and delivery of the first Aircraft and the continued development of the 737-8 program, certain elements have not yet been defined. In consideration, Boeing and Customer agree to work together as the 737-8 program develops as follows:

1.    Aircraft Delivery Schedule.

    1.1 [***]

    1.2    Customer and Boeing will consult on a frequent basis to keep each other informed as to Customer's fleet plans and Boeing's production plans in order to meet the requirements of both parties. Based on such review and discussions, Boeing will use its best commercially reasonable efforts to meet Customer's fleet needs.

2.    Aircraft Configuration.

    2.1    The initial configuration of Customer's Model Aircraft has been defined by Boeing 737-8 Airplane Description Document No. D019A007 Rev New dated November 4, 2011 as described in Article 1 and Exhibit A of the Purchase Agreement (**Initial**

Page 1

SWA-PA-03729-LA-1106463
Open Matters

**BOEING PROPRIETARY**

**Configuration**). [***]

2.1.1   [***]

2.1.2   [***]

2.1.3   [***]

2.1.4   [***]

    2.1.4.1   [***]

    2.1.4.2   [***]

    2.1.4.3   [***]

    2.1.4.4   [***]

    2.1.4.5   [***]

SWA-PA-03729-LA-1106463
Open Matters

**BOEING PROPRIETARY**

3.    [***]

4.    <u>Other Letter Agreements</u>.

Boeing and Customer acknowledge that as they work together to develop the 737-8 program and as Boeing refines the definition of the Aircraft and associated production processes, there may be a need to execute additional letter agreements or amend letter agreements addressing one or more of the following:

4.1    <u>Software</u>. Additional provisions relating to software and software loading.

4.2    <u>Seller Purchased Equipment (</u>**SPE**<u>) and/or In-Flight Entertainment (</u>**IFE**). Provisions relating to the terms under which Boeing may offer or install SPE in the Aircraft.

4.3    <u>Buyer Furnished Equipment (</u>**BFE**). Provisions relating to the terms under which Boeing may install and certify Customer's BFE in the Aircraft.

5.    <u>Confidentiality</u>.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its

**BOEING**

obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By      /s/ Cheri A Fischer

Its

     Attorney-In-Fact

ACCEPTED AND AGREED TO this
Date:       December 13 , 2011

SOUTHWEST AIRLINES CO.

By      /s/ Michael Van de Ven

Its     EVP & Chief Operating Officer

SWA-PA-03729-LA-1106463                                                         Page 4
Open Matters

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA  98124-2207

SWA-PA-03729-LA-1106464

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    [***]

SWA-PA-03729-LA-1106464                                                          Page 1
[***]

**BOEING PROPRIETARY**



[***]

**BOEING PROPRIETARY**



**BOEING PROPRIETARY**



**BOEING PROPRIETARY**



9.    Order of Precedence.

In the event of any inconsistency between the terms of this Letter Agreement and the terms of any other provisions of the CSGTA, the terms of this Letter Agreement will control.

10.    Confidentiality

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance,

SWA-PA-03729-LA-1106464                                                                                  Page 5
[***]

**BOEING PROPRIETARY**



administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,
THE BOEING COMPANY
By

    /s/ Cheri A Fischer

Its    Attorney-In-Fact

ACCEPTED AND AGREED TO this
Date:    December 13, 2011

SOUTHWEST AIRLINES CO.
By

    /s/ Michael Van de Ven

Its    EVP & Chief Operating Officer

SWA-PA-03729-LA-1106464                                 Page 6
[***]

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106465

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    [***]

**BOEING PROPRIETARY**



6.     Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

SWA-PA-03729-LA-1106465                                                                                  Page 2
[***]
**BOEING PROPRIETARY**



Very truly yours,
THE BOEING COMPANY
By

     /s/ Cheri A Fischer

Its

        Attorney-In-Fact


ACCEPTED AND AGREED TO this
Date:      December 13 , 2011


SOUTHWEST AIRLINES CO.
By

     /s/ Michael Van de Ven

Its      EVP & Chief Operating Officer

[***]
**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106466

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    [***]

Reference:    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

[***]

1.    Definitions.

    1.1 **Commitment Limit** shall have the meaning set forth in Article 2, below.

    1.2 **Covered Aircraft** shall mean those Aircraft identified on Table 1 to the Purchase Agreement as of the date of signing of this Letter Agreement.

    1.3    [***]

    1.4    [***]

    1.5    [***]

SWA-PA-03729-LA-1106466                                                                Page 1
[***]



2.    [***]

3.    [***]

4.    [***]

5.    Assignment.

Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part, without the prior written consent of Boeing.

**BOEING PROPRIETARY**



6.     <u>Confidential Treatment</u>.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By

   /s/ Cheri A Fischer

Its

   Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:   December 13 , 2011

SOUTHWEST AIRLINES CO.

By

   /s/ Michael Van de Ven

Its   EVP & Chief Operating Officer

SWA-PA-03729-LA-1106466                                                                                    Page 3
[***]

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106467

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    [***]

Reference:    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.    [***]

SWA-PA-03729-LA-1106467                                                                    Page 1
[***]

**BOEING PROPRIETARY**



2.    [***]

3.    Assignment.

Unless otherwise noted herein, [***] described in this Letter Agreement are provided as a financial accommodation to Customer and in consideration of Customer's taking title to the Aircraft at time of delivery and becoming the operator of the Aircraft. This Letter Agreement cannot be assigned, in whole or in part, without the prior written consent of Boeing.

4.    Confidentiality

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.



Very truly yours,

THE BOEING COMPANY

By    /s/ Cheri A Fischer

Its

   Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:    December 13, 2011

SOUTHWEST AIRLINES CO.

By    /s/ Michael Van de Ven

Its    EVP & Chief Operating Officer

SWA-PA-03729-LA-1106467                                            Page 3
[***]

**BOEING PROPRIETARY**



The Boeing Company
 P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106468

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    [***]

Reference:    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

**Definition of Terms:**


[***]

SWA-PA-03729-LA-1106468                                                                                      Page 1
[***]

**BOEING PROPRIETARY**



Very truly yours,

THE BOEING COMPANY

By    /s/ Cheri A Fischer

Its

Attorney-In-Fact

ACCEPTED AND AGREED TO this
Date:    December 13 , 2011

SOUTHWEST AIRLINES CO.

By    /s/ Michael Van de Ven

Its    EVP & Chief Operating Officer



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106469

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:　　[***]

References:　　1) Purchase Agreement No. PA03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 7378 aircraft (**Aircraft**)

　　2)　Letter Agreement SWA-PA-03729-LA-1106471, "Substitute Aircraft," to the Purchase Agreement (**Substitution Letter Agreement**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.　　[***]

**BOEING PROPRIETARY**



2.    [***]

3.    [***]

**BOEING PROPRIETARY**



4.      [***]

5.      [***]

6.      [***]

7.      [***]

.

8.      [***]

**BOEING PROPRIETARY**

9.    [***]


10.    [***]


11.    Assignment.

Unless otherwise noted herein, [***] described in this Letter Agreement are provided [***] to Customer and in consideration of Customer's taking title to the Aircraft at time of delivery and becoming the operator of the Aircraft. This Letter Agreement cannot be assigned, in whole or in part, without the prior written consent of Boeing.

12.    Confidentiality.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.



Very truly yours,

THE BOEING COMPANY

By

   /s/ Cheri A Fischer

Its

     Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:    December 13 , 2011

SOUTHWEST AIRLINES CO.

By

   /s/ Michael Van de Ven

Its    EVP & Chief Operating Officer

SWA-PA-03729-LA-1106469        Page 5
[***]

**BOEING PROPRIETARY**

**_BOEING_**

The Boeing Company
 P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106470

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    [***]

Reference:    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.    [***]


2.    [***]


3.    [***]


SWA-PA-03729-LA-1106470                                                          Page 1
[***]
**BOEING PROPRIETARY**



4.　　[***]

5.　　[***]

6.　　[***]

[***]

**BOEING PROPRIETARY**



7.    [***]

8.    Assignment.

Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part.

9.    Confidential Treatment.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Section) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Section, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

SWA-PA-03729-LA-1106470                                                                                    Page 3
[***]

**BOEING PROPRIETARY**



Very truly yours,

THE BOEING COMPANY

By    /s/ Cheri A Fischer

Its    Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:    December 13 , 2011

SOUTHWEST AIRLINES CO.

By    /s/ Michael Van de Ven

Its    EVP & Chief Operating Officer

SWA-PA-03729-LA-1106470                                      Page 4
[***]

**BOEING PROPRIETARY**



The Boeing Company
 P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106471

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    Substitute Aircraft

References:    1)    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft (**Aircraft**)

2)    Letter Agreement No. SWA-PA-03729-LA-1106469, [***]

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.    [***]

2.    [***]

SWA-PA-03729-LA-1106471                                                                 Page 1
Aircraft Model Substitution

**BOEING PROPRIETARY**



3.    [***]

4.    [***]

**BOEING PROPRIETARY**

5.      [***]



6.    Assignment.

Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part.

7.    Confidential Treatment.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By

/s/ Cheri A Fischer

Its    Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:    December 13 , 2011

SOUTHWEST AIRLINES CO.

By

/s/ Michael Van de Van

Its    EVP & Chief Operating Officer



<div align="right">
The Boeing Company
 P.O. Box 3707
Seattle, WA 98124-2207
</div>

=

SWA-PA-03729-LA-1106472

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    [***]

Reference:    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.    [***]

2.    [***]

**BOEING PROPRIETARY**

3.      Confidentiality.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.


Very truly yours,

THE BOEING COMPANY

By      /s/ Cheri A Fischer

Its       Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:       December 13, 2011

SOUTHWEST AIRLINES CO.

By      /s/ Michael Van de Ven

Its      EVP & Chief Operating Officer


SWA-PA-03729-LA-1106472                                                                     Page 2
[***]

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106473

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    [***]

References:    1)    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft (**Aircraft**)

2)    Letter Agreement SWA-PA-03729-1106471 entitled "Aircraft Model Substitution" (**Substitution Letter**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.    [***]

SWA-PA-03729-LA-1106473                                                                                                    Page 1
[***]



2.      [***]

3.      <u>Assignment</u>.

Unless otherwise noted herein, [***] to Customer and in consideration of Customer's taking title to the Substitute Aircraft at time of delivery and becoming the operator of the Substitute Aircraft. This Letter Agreement cannot be assigned, in whole or in part, without the prior written consent of Boeing.

4.      <u>Confidentiality</u>

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

SWA-PA-03729-LA-1106473                                                                          Page 2
[***]
<center>**BOEING PROPRIETARY**</center>



Very truly yours,
 THE BOEING COMPANY
 By      /s/ Cheri A Fischer

 Its        Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:        December 13 , 2011

SOUTHWEST AIRLINES CO.

 By      /s/ Michael Van de Ven

 Its      EVP & Chief Operating Officer

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106474

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    Option Aircraft

Reference:    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.    Right to Purchase Option Aircraft.

    Subject to the terms and conditions contained in this Letter Agreement, in addition to the Aircraft described in Table 1 to the Purchase Agreement as of the date of execution of this Letter Agreement, Customer will have the option to purchase additional Boeing Model 7378 aircraft as option aircraft (**Option Aircraft**).

2.    Delivery.

The number of aircraft and delivery years are listed in the Attachment 1 to this Letter Agreement.

3.    Configuration.

    3.1    Subject to the provisions of Article 3.2, below, the configuration for the Option Aircraft will be the Detail Specification for Boeing Model 7378 aircraft at the revision level in effect at the time of Definitive Agreement (as defined in Article 8). Such Detail Specification will be revised to include (i) changes applicable to the Detail Specification that are developed by Boeing between the Option Exercise Date (as defined below) and the signing of the Definitive Agreement, (ii) changes required to obtain required regulatory certificates, and (iii) other changes as mutually agreed.

    3.2    Boeing reserves the right to configure the Option Aircraft starting from a different configuration specification, provided that it can achieve the same configuration which would result pursuant to the provisions of Article 3.1.

SWA-PA-03729-LA-1106474                                                                                    Page 1
Option Aircraft

**BOEING PROPRIETARY**



4.    [***]

5.    [***]

6.    [***]



7.    [***]

8.    [***]

.

9.    <u>Assignment</u>.

Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or in part.

**BOEING PROPRIETARY**



10.    <u>Confidentiality</u>

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By      /s/ Cheri A Fischer

Its         Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:        December 13 , 2011

SOUTHWEST AIRLINES CO.

By      /s/ Michael Van de Ven

Its     EVP & Chief Operating Officer

SWA-PA-03729-LA-1106474                                                    Page 4
Option Aircraft

**BOEING PROPRIETARY**

**Attachment 1 To**
**Letter Agreement No. SWA-PA-03729-LA-1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| | | |
|---|---|---|
| **Airframe Model/MTOW:** | 737-8    175900 pounds | **Detail Specification:** D019A007-NEW (11/4/2011) |
| **Engine Model/Thrust:** | CFMLEAP-1B24    TBD pounds | **Airframe Price Base Year/Escalation Formula:** Jul-11    ECI-MFG/CPI |
| **Airframe Price:** | [***] | **Engine Price Base Year/Escalation Formula:** N/A    N/A |
| **Optional Features:** | [***] | |
| **Sub-Total of Airframe and Features:** | [***] | **Airframe Escalation Data:** |
| **Engine Price (Per Aircraft):** | [***] | **Base Year Index (ECI):** [***] |
| **Aircraft Basic Price (Excluding BFE/SPE):** | [***] | **Base Year Index (CPI):** [***] |
| **Buyer Furnished Equipment (BFE) Estimate:** | [***] | |
| **Seller Purchased Equipment (SPE) Estimate:** | [***] | |
| **Non-Refundable Deposit/Aircraft at Def Agreemt:** | [***] | |

| Delivery Date | Number of Aircraft | Escalation[1] Factor (Airframe) | | | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Jul-2021 | 18 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2022 | 19 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2023 | 23 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2024 | 23 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2025 | 23 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2026 | 23 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2027 | 21 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Total: | 150 | | | | | | | | |

[1]The escalation factors reflect July 2Q2011 external forecast factors and are used for determining the annual average estimated advance payment price per aircraft. [***]

SWA-PA-03729-LA-1106474 58911-10.TXT    **BOEING PROPRIETARY**    Page 1



<div align="right">The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207</div>

SWA-PA-03729-LA-1106475

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    [***]

References:    1)    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft (**Aircraft**)

2)    Letter Agreement SWA-PA-03729-6474 entitled "Option Aircraft" (**Option Aircraft Letter Agreement**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.    [***]

**BOEING PROPRIETARY**



2.      [***]

3.      Assignment.

Unless otherwise noted herein, [***]

and in consideration of Customer's taking title to the Option Aircraft at time of delivery and becoming the operator of the Option Aircraft. This Letter Agreement cannot be assigned, in whole or in part, without the prior written consent of Boeing.

4.      Confidentiality

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.



Very truly yours,

THE BOEING COMPANY

By      /s/ Cheri A Fischer

Its            Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:      December 13 , 2011

SOUTHWEST AIRLINES CO.

By      /s/ Michael Van de Ven

Its      EVP & Chief Operating Officer

SWA-PA-03729-LA-1106475                                                                Page 3
[***]

**BOEING PROPRIETARY**

**_BOEING_**

The Boeing Company
 P.O. Box 3707
 Seattle, WA 98124-2207

SWA-PA-03729-LA-1106476

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:     [***]

Reference:     Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

The Purchase Agreement incorporates the terms and conditions of Aircraft General Terms Agreement dated as of December 13, 2011 identified as SWA-AGTA between Boeing and Customer (**AGTA**). This Letter Agreement modifies certain terms and conditions of the AGTA with respect to the Aircraft.

1.     [***]

SWA-PA-03729-LA-1106476                                                                                          Page 1
[***]

**BOEING PROPRIETARY**



2.      [***]

3.      Assignment. Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part.

Confidentiality. Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and



attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By      /s/ Cheri A Fischer

Its       Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:       December 13 , 2011

SOUTHWEST AIRLINES CO.

By      /s/ Michael Van de Ven

Its      EVP & Chief Operating Officer

SWA-PA-03729-LA-1106476                                                                    Page 3
[***]

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106477

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:     [***]

Reference:     Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

**Recitals**

1.     [***]

2.     [***]

**Agreement**

1.     Covered Aircraft.

The Program shall apply to each of the Aircraft operated by Customer on Customer's routes during the Program Term (**Covered Aircraft**).

2.     [***]

SWA-PA-03729-LA-1106477                                                              Page 1
[***]
**BOEING PROPRIETARY**



3.    [***]


4.    [***]

**BOEING PROPRIETARY**



5.    [***]

[***]
**BOEING PROPRIETARY**



6.    [***]

7.    [***]

**BOEING PROPRIETARY**



8.    [***]

BOEING PROPRIETARY



9.     [***]

**BOEING PROPRIETARY**





10.    Notice.

   10.1    All reports submitted to Boeing will be addressed to the attention of:

   Director - BCA Warranty and Product Assurance
   Boeing Commercial Airplanes
   P.O. Box 3707 Mail Code 2L-46
   Fax: 425-237-1706
   Seattle, Washington 98124-2207

**_BOEING_**

10.2    All reports submitted to Customer will be addressed to the attention of:

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235

11.    [***]

12.    [***]

13.    Assignment.

Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part.

14.    Confidential Treatment.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article)

SWA-PA-03729-LA-1106477                                                                 Page 9
[***]



without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By    /s/ Cheri A Fischer

Its    Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:    December 13 , 2011

SOUTHWEST AIRLINES CO.

By    /s/ Michael Van de Ven

Its    EVP & Chief Operating Officer

SWA-PA-03729-LA-1106477                                                                    Page 10
[***]

**BOEING PROPRIETARY**



**Attachment A: [***]**

| [***] | | | | | |
|---|---|---|---|---|---|
| | Year 1:____ | Year 2:____ | Year 3:____ | Year 4:____ | Year 5:____ |
| [***] | | | | | |
| [***] | | | | | |
| [***] | | | | | |
| [***] | | | | | |
| [***] | | | | | |
| [***] | | | | | |
| [***] | | | | | |
| [***] | | | | | |
| [***] | | | | | |
| [***] | | | | | |

**[***]**

| [***] | |
|---|---|
| [***] | |
| [***] | |
| [***] | |
| [***] | |

**BOEING PROPRIETARY**



**Attachment B: [***]**

[***]
1.    [***]

2.    [***]

3.    [***]

**BOEING PROPRIETARY**



[***]
**BOEING PROPRIETARY**



4.      [***]

[***]
**BOEING PROPRIETARY**



5.    [***]

[***]
**BOEING PROPRIETARY**



The rest of the page is intentionally blank.

**BOEING PROPRIETARY**

| [***] |
|---|
| |
| |

**BOEING PROPRIETARY**

| [***] |
| --- |
|  |
|  |

BOEING PROPRIETARY



**Attachment C: [***]**


To:    Southwest Airlines Co.

Reference:    Letter Agreement No. SWA-PA-03729-LA-1106477 to Agreement No. PA-03729 (**Purchase Agreement**) and [***]

Subject:    [***]

**BOEING PROPRIETARY**



**Attachment D**

To:      [***]

Reference:    Letter Agreement No. SWA-PA-03729-LA-1106477 to Agreement No. PA-03729 (**Purchase Agreement**) and [***]

Subject:    Data reported pursuant to Article 6 of the referenced Letter Agreement.

Reporting Period No. _____
Beginning date _____ ending date _____

[***]



[***]

Southwest Airlines Co.

By _____

Its

**BOEING PROPRIETARY**



**Attachment E**

To:   Southwest Airlines Co.

Reference:   Letter Agreement No. SWA-PA-03729-LA-1106477 to Agreement No. PA-03729 (**Purchase Agreement**) and [***]

Subject:   Data reported pursuant to Article 7 of the referenced Letter Agreement.

Reporting Period No. _____
Beginning date _____ ending date _____

[***]

SWA-PA-03729-LA-1106477                                                                                   Page 22
[***]

**BOEING PROPRIETARY**



**[\*\*\*]**

THE BOEING COMPANY

Reported By    _____

Its

Date

**BOEING PROPRIETARY**



**Attachment F: [***]**


To:    Southwest Airlines Co.

Reference:    Letter Agreement No. SWA-PA-03729-LA-1106477 to Agreement No. PA-03729 (**Purchase Agreement**) and [***]

Subject:    Data reported pursuant to Article 5.3 of the referenced Letter Agreement.

| [***] | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| One | | $ | + | $ | + | | $ | = | |
| Two | | $ | + | $ | + | | $ | = | |
| Three | | $ | + | $ | + | | $ | = | |
| Four | | $ | + | $ | + | | $ | = | |
| Five | | $ | + | $ | + | | $ | = | |

**BOEING PROPRIETARY**

**_BOEING_**

The Boeing Company
 P.O. Box 3707
Seattle, WA 98124-2207


SWA-PA-03729-LA-1106478


Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    [***]

References:    1)    Purchase Agreement No. A-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft (**Aircraft**)

2)    Supplemental Exhibit CS1 to the Purchase Agreement (**Supplemental Exhibit CS1**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.    [***]

**BOEING PROPRIETARY**



2.    [***]

3.   <u>Confidentiality</u>.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.



Very truly yours,

THE BOEING COMPANY

By    /s/ Cheri A Fischer

Its        Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:      December 13, 2011

SOUTHWEST AIRLINES CO.

By    /s/ Michael Van de Ven

Its    EVP & Chief Operating Officer

SWA-PA-03729-LA-1106478                                                Page 3
[***]
**BOEING PROPRIETARY**

[***]

[***]
**BOEING PROPRIETARY**

Attachment 1 to SWA-PA-03729-LA-1106478

[***]

SWA-PA-03729-LA-1106478                                                                    Page 2
[***]

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106479

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject: [***]

Reference: Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1. [***]



2.      Assignment. Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part.

3.      Confidentiality. Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Section) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Section, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.



Very truly yours,

THE BOEING COMPANY

By    /s/ Cheri A Fischer

Its        Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:    December 13 , 2011

SOUTHWEST AIRLINES CO.

By    /s/ Michael Van de Ven

Its    EVP & Chief Operating Officer

SWA-PA-03729-LA-1106479                                                    Page 3
[***]
**BOEING PROPRIETARY**

*BOEING*

The Boeing Company
 P.O. Box 3707
Seattle, WA 98124-2207

SWAPA03729LA1106480

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:     [***]

Reference:     Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.     [***]


2.     [***]


3.     Assignment. Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part.


SWA-PA-03729-LA-1106480                                                                                          Page 1
[***]
**BOEING PROPRIETARY**



<u>Confidentiality</u>. Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By    /s/ Cheri A Fischer

Its        Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:    December 13 ,2011

SOUTHWEST AIRLINES CO.

By    /s/ Michael Van de Ven

Its    EVP & Chief Operating Officer

SWA-PA-03729-LA-1106480                                                                                    Page 2
[***]

**BOEING PROPRIETARY**

**_BOEING_**

The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106481

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    [***]

Reference:    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.    [***]

2.    [***]

.

3.    [***]

**BOEING PROPRIETARY**



4.    [***]

5.    [***]

6.    [***]

7.    Assignment.

Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part.

**BOEING PROPRIETARY**



8.  <u>Confidentiality</u>.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By      /s/ Cheri A Fischer

Its     Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:       December 13 , 2011

Southwest Airlines Co.

By      /s/ Michael Van de Ven

Its     EVP & Chief Operating Officer



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106482

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    [***]

Reference:    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

[***]

[***]

1.    [***]

2.    Assignment.

Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part.

SWA-PA-03729-LA-1106482                                                                                      Page 1
[***]

**BOEING PROPRIETARY**



3.    <u>Confidentiality</u>.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By    /s/ Cheri A Fischer

Its    Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:    December 13 , 2011

SOUTHWEST AIRLINES CO.

By    /s/ Michael Van de Ven

Its    EVP & Chief Operating Officer

SWA-PA-03729-LA-1106482                                                          Page 2
[***]

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106483

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    [***]

Reference:    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.    [***]

2.    <u>Assignment</u>.

Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part.

3.    <u>Confidentiality</u>.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its

SWA-PA-03729-LA-1106483                                                                                    Page 1
[***]

**BOEING PROPRIETARY**



obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By      /s/ Cheri A Fischer

Its          Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:        December 13 , 2011

SOUTHWEST AIRLINES CO.

By      /s/ Michael Van de Ven

Its     EVP & Chief Operating Officer

SWA-PA-03729-LA-1106483                                                                         Page 2
[***]
**BOEING PROPRIETARY**



The Boeing Company
 P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106484

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    [***]

Reference:    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.    Defined Terms: The following capitalized terms have the following meaning:

   1.1.    **[***]**

   1.2.    **[***]**

   1.3.    **Program Aircraft** means each Aircraft specified in Table 1 of the Purchase Agreement as of the date of this Letter.

2.    [***]

3.    [***]

**BOEING PROPRIETARY**



4.     [***]

5.     [***]

BOEING PROPRIETARY



6.    [***]


7.    Assignment. Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part.

8.    Confidentiality. Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a

BOEING PROPRIETARY



confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations.  Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By    /s/ Cheri A Fischer

Its        Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:      December 13 , 2011

SOUTHWEST AIRLINES CO.

By    /s/ Michael Van de Ven

Its    EVP & Chief Operating Officer

SWA-PA-03729-LA-1106484                                                              Page 4
[***]
**BOEING PROPRIETARY**



**[\*\*\*]**

SWA-PA-03729-LA-1106484                                                                                           Page 1
[\*\*\*]

**BOEING PROPRIETARY**



[***]

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

SWA-PA-03729-LA-1106484                                                                    Page 1
[***]
**BOEING PROPRIETARY**



[***]

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

SWA-PA-03729-LA-1106484                                                                 Page 2
[***]

**BOEING PROPRIETARY**

[***]

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**BOEING PROPRIETARY**



[***]

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

SWA-PA-03729-LA-1106484                                                          Page 4
[***]

**BOEING PROPRIETARY**

**_BOEING_**

The Boeing Company
 P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106485

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    [***]

Reference:    Aircraft General Terms Agreement No. SWA-AGTA (**AGTA**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**)

   Purchase Agreement No. PA-03729 (**Purchase Agreement**) between Boeing and Customer relating to Model 737-8 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement, including the AGTA. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.    [***]

SWA-AGTA-03729-LA-1106485                                                                    Page 1
[***]



[***]

**BOEING PROPRIETARY**



BOEING PROPRIETARY



**BOEING PROPRIETARY**



2.    [***]

**BOEING PROPRIETARY**



**BOEING PROPRIETARY**



3.    [***]

[***]

**BOEING PROPRIETARY**



BOEING PROPRIETARY



4.    [***]

**BOEING PROPRIETARY**



**BOEING PROPRIETARY**

[***]

**BOEING PROPRIETARY**



[***]

**BOEING PROPRIETARY**



5.  Confidential Treatment.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise

SWA-PA-03729-LA-1106485                                                         Page 13
[***]
**BOEING PROPRIETARY**



bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.


Very truly yours,

THE BOEING COMPANY

By      /s/ Cheri A Fischer

Its     Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:      December 13 , 2011

Southwest Airlines Co.

By      /s/ Michael Van de Ven

Its     EVP & Chief Operating Officer


SWA-PA-03729-LA-1106485                                                      Page 14
[***]

**BOEING PROPRIETARY**

# AIRCRAFT GENERAL TERMS AGREEMENT

# SWA-AGTA

# between

# THE BOEING COMPANY

# and

# Southwest Airlines Co.

**TABLE OF CONTENTS**

|  | **ARTICLES** |  | **PAGE NUMBER** |
|---|---|---|---|
| 1. | Subject Matter of Sale | | 3 |
| 2. | Price, Taxes, and Payment | | 3 |
| 3. | Regulatory Requirements and Certificates | | 5 |
| 4. | Detail Specification; Changes | | 5 |
| 5. | Representatives, Inspection, Demonstration Flights, Test Data and Performance Guarantee Compliance | | 6 |
| 6. | Delivery | | 6 |
| 7. | Excusable Delay | | 7 |
| 8. | Risk Allocation/Insurance | | 8 |
| 9. | Assignment, Resale, or Lease | | 9 |
| 10. | Termination of Purchase Agreements for Certain Events | | 10 |
| 11. | Notices | | 10 |
| 12. | Miscellaneous | | 11 |

|  | **EXHIBITS** | | **PAGE NUMBER** |
|---|---|---|---|
| A | Buyer Furnished Equipment Provisions Document | | EXA 1 |
| B | Customer Support Document | | EXB 1 |
| C | Product Assurance Document | | EXC 1 |

|  | **APPENDICES** | | **PAGE NUMBER** |
|---|---|---|---|
| I | Insurance Certificate | | A-1 |
| II | Purchase Agreement Assignment | | A-5 |
| III | Post-Delivery Sale Notice | | A-11 |
| IV | Post-Delivery Lease Notice | | A-13 |
| V | Purchaser's/Lessee's Agreement | | A-16 |
| VI | Owner Appointment of Agent – Warranties | | A-19 |
| VII | Contractor Confidentiality Agreement | | A-22 |
| VIII | Post-Delivery Sale with Lease to Seller | | A-26 |
| IX | Sale with Lease | | A-29 |
| X | Post-Delivery Security | | A-33 |

**AIRCRAFT GENERAL TERMS AGREEMENT NUMBER SWA-AGTA**

**Between**

**The Boeing Company**

**And**

**Southwest Airlines Co.**

**Relating to**

**BOEING AIRCRAFT**

This Aircraft General Terms Agreement Number SWA-AGTA (**AGTA**) between The Boeing Company, a Delaware corporation, (**Boeing**) and Southwest Airlines Co., a Texas corporation, (**Customer**) will apply to all Boeing aircraft contracted for purchase from Boeing by Customer after the effective date of this AGTA.

Subject Matter of Sale.

Aircraft. Boeing will manufacture and sell to Customer and Customer will purchase from Boeing aircraft under purchase agreements that incorporate the terms and conditions of this AGTA.

Buyer Furnished Equipment. Exhibit A, Buyer Furnished Equipment Provisions Document to the AGTA, contains the obligations of Customer and Boeing with respect to equipment purchased and provided by Customer, which Boeing will receive, inspect, store, and install in an aircraft before delivery to Customer. This equipment is defined as Buyer Furnished Equipment (**BFE**).

Customer Support. Exhibit B, Customer Support Document to the AGTA, contains the obligations of Boeing relating to Materials (as defined in Part 3 thereof), training, services, and other things in support of aircraft.

Product Assurance. Exhibit C, Product Assurance Document to the AGTA, contains the obligations of Boeing and the suppliers of equipment installed in each aircraft at delivery relating to warranties, patent indemnities, software copyright indemnities, and service life policies.

Price, Taxes, and Payment.

Price.

**Airframe Price** is defined as the price of the airframe for a specific model of aircraft described in a purchase agreement. (For Models 737-600, 737-700, 737-800, 737-900, 737-7, 737-8, 737-9, 747-8, 777-200LR, and 777-300ER the Airframe Price includes the engine price at its basic thrust level.)

**Optional Features Prices** are defined as the prices for optional features selected by Customer for a specific model of aircraft described in a purchase agreement.

**Engine Price** is defined as the price set by the engine manufacturer for a specific engine to be installed on the model of aircraft described in a purchase agreement (not applicable

to Models 737-600, 737-700, 737-800, 737-900, 737-7, 737-8, 737-9, 747-8, 777-200LR and 777-300ER).

**Aircraft Basic Price** is defined as the sum of the Airframe Price, Optional Features Prices, and the Engine Price, if applicable.

**Escalation Adjustment** is defined as the price adjustment to the Airframe Price (which includes the basic engine price for Models 737-600, 737-700 737-800, 737-900, 737-7, 737-8, 737-9, 747-8, 777-200LR and 777-300ER) and the Optional Features Prices resulting from the calculation using the economic price formula contained in the Airframe and Optional Features Escalation Adjustment supplemental exhibit to the applicable purchase agreement. The price adjustment to the Engine Price for all other models of aircraft will be calculated using the economic price formula in the Engine Escalation Adjustment supplemental exhibit to the applicable purchase agreement.

**Advance Payment Base Price** is defined as the estimated price of an aircraft rounded to the nearest thousand U. S. dollars, as of the date of signing a purchase agreement, for the scheduled month of delivery of such aircraft using commercial forecasts of the Escalation Adjustment.

**Aircraft Price** is defined as the total amount Customer is to pay for an aircraft at the time of delivery, which is the sum of the Aircraft Basic Price, the Escalation Adjustment, and other price adjustments made pursuant to the purchase agreement.

Taxes.

**Taxes** are defined as all taxes, fees, charges, or duties and any interest, penalties, fines, or other additions to tax, including, but not limited to sales, use, value added, gross receipts, stamp, excise, transfer, and similar taxes imposed by any domestic or foreign taxing authority, arising out of or in connection with the performance of the applicable purchase agreement or the sale, delivery, transfer, or storage of any aircraft, BFE, or other things furnished under the applicable purchase agreement. Except for U.S. federal income taxes imposed on Boeing or Boeing's assignee, and Washington State business and occupation taxes imposed on Boeing or Boeing's assignee, Customer will be responsible for and pay all Taxes. Customer is responsible for filing all tax returns, reports, declarations and payment of any taxes related to or imposed on BFE.

Reimbursement of Boeing. Customer will promptly reimburse Boeing on demand, net of additional taxes thereon, for any Taxes that are imposed on and paid by Boeing or that Boeing is responsible for collecting.

Payment.

Advance Payment Schedule. Customer will make advance payments to Boeing for each aircraft in the amounts and on the dates indicated in the schedule set forth in the applicable purchase agreement.

Payment at Delivery. Customer will pay any unpaid balance of the Aircraft Price at the time of delivery of each aircraft.

Form of Payment. Customer will make all payments to Boeing by unconditional wire transfer of immediately available funds in United States Dollars in a bank account in the United States designated by Boeing.

<u>Monetary and Government Regulations</u>. Customer is responsible for complying with all monetary control regulations and for obtaining necessary governmental authorizations related to payments.

<u>Regulatory Requirements and Certificates</u>.

<u>Certificates</u>. Boeing will manufacture each aircraft to conform to the appropriate Type Certificate issued by the United States Federal Aviation Administration (**FAA**) for the specific model of aircraft and will obtain from the FAA and furnish to Customer at delivery of each aircraft either a Standard Airworthiness Certificate or an Export Certificate of Airworthiness issued pursuant to Part 21 of the Federal Aviation Regulations.

<u>FAA or Applicable Regulatory Authority Manufacturer Changes</u>.

A **Manufacturer Change** is defined as any change to an aircraft, data relating to an aircraft, or testing of an aircraft required by the FAA to obtain a Standard Airworthiness Certificate or by the country of import and/or registration to obtain an Export Certificate of Airworthiness.

Boeing will bear the cost of incorporating all Manufacturer Changes into the aircraft:

resulting from requirements issued by the FAA prior to the date of the Type Certificate for the applicable aircraft;

resulting from requirements issued by the FAA prior to the date of the applicable purchase agreement; and

for any aircraft delivered during the eighteen (18) month period immediately following the date of the applicable purchase agreement (regardless of when the requirement for such change was issued by the FAA).

Customer will pay Boeing's charges for incorporating all other Manufacturer Changes into the aircraft, including all changes for validation of an aircraft required by any governmental agency of the country of import and/or registration.

<u>FAA Operator Changes</u>.

An **Operator Change** is defined as a change in equipment that is required by Federal Aviation Regulations which (i) is generally applicable to transport category aircraft to be used in United States certified air carriage and (ii) the required compliance date is on or before the scheduled delivery month of the aircraft.

Boeing will deliver each aircraft with Operator Changes incorporated or, at Boeing's option, with suitable provisions for the incorporation of such Operator Changes, and Customer will pay Boeing's applicable charges.

<u>Export License</u>. If an export license is required by United States law or regulation for any aircraft or any other things delivered under the purchase agreement, it is Customer's obligation to obtain such license. If requested, Boeing will assist Customer in applying for any such export license. Customer will furnish any required supporting documents.

<u>Detail Specification; Changes</u>.

<u>Configuration Changes</u>. The **Detail Specification** is defined as the Boeing document that describes the configuration of each aircraft purchased by Customer. The Detail Specification for each aircraft may be amended (i) by Boeing to reflect the incorporation of Manufacturer Changes and Operator Changes or (ii) by the agreement of the parties. In either case the amendment will describe the particular changes to be made and any

effect on design, performance, weight, balance, scheduled delivery month, Aircraft Basic Price, Aircraft Price, and/or Advance Payment Base Price.

Development Changes. **Development Changes** are defined as changes to aircraft that do not affect the Aircraft Price or scheduled delivery month, and do not adversely affect guaranteed weight, guaranteed performance, or compliance with the interchangeability or replaceability requirements set forth in the applicable Detail Specification. Boeing may, at its option, incorporate Development Changes into the Detail Specification and into an aircraft prior to delivery to Customer.

Notices. Boeing will promptly notify Customer of any amendments to a Detail Specification.

Representatives, Inspection, Demonstration Flights, Test Data and Performance Guarantee Compliance.

Office Space. Twelve (12) months before delivery of the first aircraft purchased, and continuing until the delivery of the last aircraft on firm order, Boeing will furnish, free of charge, suitable office space and equipment for the accommodation of up to three representatives of Customer in or conveniently located near the assembly plant.

Inspection. Customer's representatives may inspect each aircraft at any reasonable time, provided such inspection does not interfere with Boeing's performance.

Demonstration Flights. Prior to delivery, Boeing will fly each aircraft up to four hours to demonstrate to Customer the function of the aircraft and its equipment using Boeing's production flight test procedures. Customer may designate up to five representatives to participate as observers.

Test Data; Performance Guarantee Compliance. **Performance Guarantees** are defined as the written guarantees in a purchase agreement regarding the operational performance of an aircraft. Boeing will furnish to Customer flight test data obtained on an aircraft of the same model to evidence compliance with the Performance Guarantees. Performance Guarantees will be met if reasonable engineering interpretations and calculations based on the flight test data establish that the particular aircraft being delivered under the applicable purchase agreement would, if actually flown, comply with the guarantees.

Special Aircraft Test Requirements. Boeing may use an aircraft for flight and ground tests prior to delivery, without reduction in the Aircraft Price, if the tests are considered necessary by Boeing (i) to obtain or maintain the Type Certificate or Certificate of Airworthiness for the aircraft or (ii) to evaluate potential improvements that may be offered for production or retrofit incorporation.

Delivery.

Notices of Delivery Dates. Boeing will notify Customer of the approximate delivery date of each aircraft at least thirty (30) days before the scheduled month of delivery and again at least fourteen (14) days before the scheduled delivery date.

Place of Delivery. Each aircraft will be delivered at a facility selected by Boeing in the same state as the primary assembly plant for the aircraft.

Bill of Sale. At delivery of an aircraft, Boeing will provide Customer a bill of sale conveying good title, free of encumbrances.

<u>Delay</u>. If Customer delays acceptance of an aircraft beyond the scheduled delivery date, Customer will reimburse Boeing for all costs incurred by Boeing as a result of the delay.

<u>Excusable Delay</u>.

<u>General</u>. Boeing will not be liable for any delay in the scheduled delivery month of an aircraft or other performance under a purchase agreement caused by (i) acts of God; (ii) war or armed hostilities; (iii) government acts or priorities; (iv) fires, floods, or earthquakes; (v) strikes or labor troubles causing cessation, slowdown, or interruption of work; (vi) inability, after due and timely diligence, to procure materials, systems, accessories, equipment or parts; or (vii) any other cause to the extent such cause is beyond Boeing's control and not occasioned by Boeing's fault or negligence. A delay resulting from any such cause is defined as an **Excusable Delay**.

<u>Notice</u>. Boeing will give written notice to Customer (i) of a delay as soon as Boeing concludes that an aircraft will be delayed beyond the scheduled delivery month due to an Excusable Delay and, when known, (ii) of a revised delivery month based on Boeing's appraisal of the facts.

<u>Delay in Delivery of Twelve (12) Months or Less</u>. If the revised delivery month is twelve (12) months or less after the scheduled delivery month, Customer will accept such aircraft when tendered for delivery, subject to the following:

The calculation of the Escalation Adjustment will be based on the previously scheduled delivery month.

The advance payment schedule will be adjusted to reflect the revised delivery month.

All other provisions of the applicable purchase agreement, including the BFE on-dock dates for the delayed aircraft, are unaffected by an Excusable Delay.

<u>Delay in Delivery of More Than Twelve (12) Months</u>. If the revised delivery month is more than twelve (12) months after the scheduled delivery month, either party may terminate the applicable purchase agreement with respect to such aircraft within 30 days of the notice. If either party does not terminate the applicable purchase agreement with respect to such aircraft, all terms and conditions of the applicable purchase agreement will remain in effect.

<u>Aircraft Damaged Beyond Repair</u>. If an aircraft is destroyed or damaged beyond repair for any reason before delivery, Boeing will give written notice to Customer specifying the earliest month possible, consistent with Boeing's other contractual commitments and production capabilities, in which Boeing can deliver a replacement. Customer will have thirty (30) days from receipt of such notice to elect to have Boeing manufacture a replacement aircraft under the same terms and conditions of purchase, except that the calculation of the Escalation Adjustment will be based upon the scheduled delivery month in effect immediately prior to the date of such notice, or, failing such election, the applicable purchase agreement will terminate with respect to such aircraft. Boeing will not be obligated to manufacture a replacement aircraft if reactivation of the production line for the specific model of aircraft would be required.

<u>Termination</u>. Termination under this Article will discharge all obligations and liabilities of Boeing and Customer with respect to any aircraft and all related undelivered Materials (as defined in Exhibit B, Customer Support Document), training, services, and other things terminated under the applicable purchase agreement, except that Boeing will return to Customer, without interest, an amount equal to all advance payments paid by

Customer for the aircraft. If Customer terminates the applicable purchase agreement as to any aircraft, Boeing may elect, by written notice to Customer within thirty (30) days, to purchase from Customer any BFE related to the aircraft at the invoice prices paid, or contracted to be paid, by Customer.

Exclusive Rights. The termination rights in this Article are in substitution for all other rights of termination or any claim arising by operation of law due to delays in performance covered by this Article.

Risk Allocation/Insurance.

Title and Risk with Boeing.

Boeing's Indemnification of Customer. Until transfer of title to an aircraft to Customer, Boeing will indemnify and hold harmless Customer and Customer's observers from and against all claims and liabilities, including all expenses and attorneys' fees incident thereto or incident to establishing the right to indemnification, for injury to or death of any person(s), including employees of Boeing but not employees of Customer, or for loss of or damage to any property, including an aircraft, arising out of or in any way related to the operation of an aircraft during all demonstration and test flights conducted under the provisions of the applicable purchase agreement, whether or not arising in tort or occasioned by the negligence of Customer or any of Customer's observers.

Definition of Customer. For the purposes of this Article, "**Customer**" is defined as Southwest Airlines Co., its divisions, subsidiaries, affiliates, the assignees of each, and their respective directors, officers, employees, and agents.

Insurance.

Insurance Requirements. Customer will purchase and maintain insurance acceptable to Boeing and will provide a certificate of such insurance that names Boeing as an additional insured for any and all claims and liabilities for injury to or death of any person or persons, including employees of Customer but not employees of Boeing, or for loss of or damage to any property, including any aircraft, arising out of or in any way relating to Materials, training, services, or other things provided under Exhibit B of the AGTA, which will be incorporated by reference into the applicable purchase agreement, whether or not arising in tort or occasioned by the negligence of Boeing, except with respect to legal liability to persons or parties other than Customer or Customer's assignees arising out of an accident caused solely by a product defect in an aircraft. Customer will provide such certificate of insurance at least thirty (30) days prior to the scheduled delivery of the first aircraft under a purchase agreement. The insurance certificate will reference each aircraft delivered to Customer pursuant to each applicable purchase agreement. Annual renewal certificates will be submitted to Boeing before the expiration of the policy periods. The form of the insurance certificate, attached as Appendix I, states the terms, limits, provisions, and coverages required by this Article 8.2.1. The failure of Boeing to demand compliance with this Article 8.2.1 in any year will not in any way relieve Customer of its obligations hereunder nor constitute a waiver by Boeing of these obligations.

Noncompliance with Insurance Requirements. If Customer fails to comply with any of the insurance requirements of Article 8.2.1 or if any of the insurers fails to pay a claim covered by the insurance or otherwise fails to meet any of insurer's obligations required by Appendix I, Customer will provide the same protection to Boeing as that required by Article 8.2.1 above.

Definition of Boeing. For purposes of this article, **Boeing** is defined as The Boeing Company, its divisions, subsidiaries, affiliates, assignees of each, and their respective directors, officers, employees, and agents.

Assignment, Resale, or Lease.

Assignment. This AGTA and each applicable purchase agreement are for the benefit of the parties and their respective successors and assigns. No rights or duties of either party may be assigned or delegated, or contracted to be assigned or delegated, without the prior written consent of the other party, except:

Either party may assign its interest to a corporation that (i) results from any merger, reorganization, or acquisition of such party and (ii) acquires substantially all the assets of such party;

Boeing may assign any of its rights and duties to any wholly-owned subsidiary of Boeing.

Transfer by Customer at Delivery. Boeing will take any requested action reasonably required for the purpose of causing an aircraft, at time of delivery, to be subject to an equipment trust, conditional sale, lien, or other arrangement for Customer to finance the aircraft. However, no such action will require Boeing to divest itself of title to or possession of the aircraft until delivery of and payment for the aircraft. A sample form of assignment acceptable to Boeing is attached as Appendix II.

Post-Delivery Sale or Lease by Customer. If, following delivery of an aircraft, Customer sells or leases the aircraft (including any sale and lease-back to seller for financing purposes), Customer may assign some or all of its rights with respect to the aircraft under the applicable purchase agreement to the purchaser or lessee of such aircraft, and all such rights will inure to the benefit of such purchaser or lessee effective upon Boeing's receipt of the written agreement of the purchaser or lessee, in a form satisfactory to Boeing, to comply with all applicable terms and conditions of the applicable purchase agreement. Sample forms of notice to Boeing of such assignments giving examples of language acceptable to Boeing are attached as Appendices III, IV, VIII, IX and X.

Notice of Post-Delivery Sale or Lease. Customer will give notice to Boeing as soon as practicable of the sale or lease of an aircraft, including in the notice the name of the entity or entities with title and/or possession of such aircraft.

Exculpatory Clause in Post-Delivery Sale or Lease. If, following the delivery of an aircraft, Customer sells or leases such aircraft and obtains from the transferee any form of exculpatory clause protecting Customer from liability for loss of or damage to the aircraft, and/or related incidental or consequential damages, including without limitation loss of use, revenue, or profit, Customer shall obtain for Boeing the purchaser's or lessee's written agreement to be bound by terms and conditions substantially as set forth in Appendix V. This Article 9.5 applies only if purchaser or lessee has not provided to Boeing the written agreement described in Article 9.3 above.

Appointment of Agent - Warranty Claims. If, following delivery of an aircraft, Customer appoints an agent to act directly with Boeing for the administration of claims relating to the warranties under the applicable purchase agreement, Boeing will deal with the agent for that purpose, effective upon Boeing's receipt of the agent's written agreement, in a form satisfactory to Boeing, to comply with all applicable terms and conditions of the applicable purchase agreement. A sample form of agreement acceptable to Boeing is attached as Appendix VI.

<u>No Increase in Boeing Liability</u>. No action taken by Customer or Boeing relating to the resale or lease of an aircraft or the assignment of Customer's rights under the applicable purchase agreement will subject Boeing to any liability beyond that in the applicable purchase agreement or modify in any way Boeing's obligations under the applicable purchase agreement.

<u>Termination of Purchase Agreements for Certain Events</u>.

<u>Termination</u>. If either party:

ceases doing business as a going concern, or suspends all or substantially all its business operations, or makes an assignment for the benefit of creditors, or generally does not pay its debts as they become due, or admits in writing its inability to pay its debts; or

petitions for or acquiesces in the appointment of any receiver, trustee or similar officer to liquidate or conserve its business or any substantial part of its assets; commences any legal proceeding such as bankruptcy, reorganization, readjustment of debt, dissolution, or liquidation available for the relief of financially distressed debtors; or becomes the object of any such proceeding, unless the proceeding is dismissed or stayed within a reasonable period, not to exceed sixty (60) days,

the other party may terminate any purchase agreement with respect to any undelivered aircraft, Materials, training, services, and other things by giving written notice of termination.

<u>Repayment of Advance Payments</u>. If Customer terminates the applicable purchase agreement under this Article, Boeing will repay to Customer, without interest, an amount equal to any advance payments received by Boeing from Customer with respect to undelivered aircraft.

<u>Notices</u>.

All notices required by this AGTA or by any applicable purchase agreement will be written in English, will be effective on the date of receipt, and will be delivered or transmitted by any customary means to the appropriate address or number listed below:

|  |  |  |
|---|---|---|
| Customer | Mail: | Southwest Airlines Co.<br>Attention: Laura Wright, Treasurer<br>2707 Love Field Drive<br>P.O. Box 36611<br>Dallas, Texas 75235 |
|  | Email: | laura.wright@wnco.com. |
|  | Facsimile: | (214) 792-4022 |
|  | Telephone: | (214) 792-4459 |

|          |                      |                                                                                                      |
|----------|----------------------|------------------------------------------------------------------------------------------------------|
| Boeing   | Delivery or Courier: | Boeing Commercial Airplanes<br>1901 Oakesdale Avenue SW<br>Renton, Washington 98055<br>U.S.A.        |
|          |                      | Attention:   Vice President - Contracts<br>Mail Code 21-34                                            |
|          | Mail:                | Boeing Commercial Airplanes<br>P.O. Box 3707<br>Seattle, Washington 98124-2207<br>U.S.A.             |
|          |                      | Attention:   Vice President - Contracts<br>Mail Code 21-34                                            |
|          | Facsimile:           | (425) 237-1706                                                                                        |
|          | Telephone:           | (206) 766-2400                                                                                        |

Miscellaneous.

Government Approval. Boeing and Customer will assist each other in obtaining any governmental consents or approvals required to effect certification and sale of aircraft under the applicable purchase agreement.

Headings. Article and paragraph headings used in this AGTA and in any purchase agreement are for convenient reference only and are not intended to affect the interpretation of this AGTA or any purchase agreement.

**GOVERNING LAW. THIS AGTA AND ANY PURCHASE AGREEMENT WILL BE INTERPRETED UNDER AND GOVERNED BY THE LAWS OF THE STATE OF WASHINGTON, U.S.A., EXCEPT THAT WASHINGTON'S CHOICE OF LAW RULES SHALL NOT BE INVOKED FOR THE PURPOSE OF APPLYING THE LAW OF ANOTHER JURISDICTION.**

Waiver/Severability. Failure by either party to enforce any provision of this AGTA or any purchase agreement will not be construed as a waiver. If any provision of this AGTA or any provision of any purchase agreement is held unlawful or otherwise ineffective by a court of competent jurisdiction, the remainder of the AGTA or the applicable purchase agreement will remain in effect.

Survival of Obligations. The Articles and Exhibits of this AGTA including but not limited to those relating to insurance, DISCLAIMER AND RELEASE and the EXCLUSION OF CONSEQUENTIAL AND OTHER DAMAGES will survive termination or cancellation of any purchase agreement or part thereof.

AGTA Changes. The intent of the AGTA is to simplify the standard contracting process for terms and conditions which are related to the sale and purchase of all Boeing aircraft. This AGTA has been mutually agreed to by the parties as of the date indicated below. From time to time the parties may elect, by mutual agreement to update, or modify the existing articles as written. If such changes are made, any existing executed Purchase Agreement(s) will be governed by the terms and conditions of the Revision level of the AGTA in effect on the date of the executed Purchase Agreement.

AGREED AND ACCEPTED this

December 13 , 2011
Date

THE BOEING COMPANY

/s/ Cheri A Fischer
Signature

C. A. Fischer
Printed name

Attorney-in-Fact
Title

SOUTHWEST AIRLINES CO.

/s/ Michel Van de Ven
Signature

Michael Van de Ven
Printed name

Chief Operating Officer
Title

**EXHIBIT A**

**to**

**AIRCRAFT GENERAL TERMS AGREEMENT**

**SWA-AGTA**

**between**

**THE BOEING COMPANY**

**and**

**Southwest Airlines Co.**

**<u>BUYER FURNISHED EQUIPMENT PROVISIONS</u>**
**<u>DOCUMENT</u>**

**EXHIBIT A**

**BUYER FURNISHED EQUIPMENT PROVISIONS DOCUMENT**

1.  <u>General</u>.

Certain equipment to be installed in the aircraft is furnished to Boeing by Customer at Customer's expense. This equipment is designated Buyer Furnished Equipment (**BFE**) and is listed in the Detail Specification. Boeing will provide to Customer a BFE Requirements On-Dock/Inventory Document (**BFE Document**) or an electronically transmitted BFE Report which may be periodically revised, setting forth the items, quantities, on-dock dates and shipping instructions relating to the in sequence installation of BFE as described in the applicable supplemental exhibit to a purchase agreement at the time of aircraft purchase.

2.  <u>Supplier Selection</u>.

Customer will:

2.1     Select and notify Boeing of the suppliers of BFE items by those dates appearing in the applicable supplemental exhibit to a purchase agreement at the time of aircraft purchase.

2.2     Meet with Boeing and such selected BFE suppliers promptly after such election to:

2.2.1   complete BFE configuration design requirements for such BFE; and

2.2.2   confirm technical data submittal requirements for BFE certification.

3.  <u>Customer's Obligations</u>.

Customer will:

3.1     comply with and cause the supplier to comply with the provisions of the BFE Document or BFE Report; including, without limitation,

3.1.1     deliver technical data (in English) to Boeing as required to support installation and FAA certification in accordance with the schedule provided by Boeing or as mutually agreed upon during the BFE meeting referred to in Article 2.2 above**;**

3.1.2     deliver BFE including production and/or flight training spares and BFE Aircraft Software to Boeing in accordance with the quantities, schedule, and other instructions provided therein; and

3.1.3     ensure that all BFE Aircraft Software is delivered in compliance with Boeing's then current standards for loadable systems;

3.1.4     ensure that all BFE parts are delivered to Boeing with appropriate quality assurance documentation;

3.2     authorize Boeing to discuss all details of the BFE directly with the BFE suppliers;

3.3     authorize Boeing to conduct or delegate to the supplier quality source inspection and supplier hardware acceptance of BFE at the supplier location;

3.3.1     require supplier's contractual compliance to Boeing defined quality assurance requirements, source inspection programs and supplier delegation programs, including availability of adequate facilities for Boeing resident personnel; and

3.3.2    ensure that all BFE supplier's quality systems are approved to Boeing's then current standards for such systems;

3.4    obtain from supplier a non-exclusive, perpetual, royalty-free, irrevocable license for Boeing to copy BFE Aircraft Software. The license is needed to enable Boeing to load the software copies in (i) the aircraft's mass storage device (**MSD**), (ii) media (e.g., diskettes, CD-ROMs, etc.), (iii) the BFE hardware and/or (iv) an intermediate device or other media to facilitate copying of the BFE Aircraft Software into the aircraft's MSD, BFE hardware and/or media, including media as Boeing may deliver to Customer with the aircraft;

3.5    grant Boeing a license, extending the same rights set forth in paragraph 3.4 above, to copy: (i) BFE Aircraft Software and data Customer has modified and/or (ii) other software and data Customer has added to the BFE Aircraft Software;

3.6    provide necessary field service representation at Boeing's facilities to support Boeing on all issues related to the installation and certification of BFE;

3.7    obtain, directly from BFE suppliers, the overhaul data, provisioning data, related product support documentation and any warranty provisions applicable to the BFE;

3.8    resolve any difficulties that arise, including defective equipment, by working closely with Boeing and BFE suppliers;

3.9    modify, adjust, calibrate, re-test and/or update BFE and data to the extent necessary to obtain applicable FAA and U.S. Food and Drug Administration (**FDA**) approval and shall bear the resulting expenses;

3.10    ensure that a proprietary information agreement is in place between Boeing and BFE suppliers prior to Boeing providing any documentation to such suppliers;

3.11    warrant that the BFE will comply with all applicable FARs and FDA sanitation requirements for installation and use in the aircraft at the time of delivery;

3.12    warrant that the BFE will meet the requirements of the applicable detail specification; and

3.13    provide equipment which is FAA certifiable at time of aircraft delivery, or obtain waivers from the applicable regulatory agency for non-FAA certifiable equipment.

4.    Boeing's Obligations.

Other than as set forth below, Boeing will provide for the installation of and install the BFE and obtain certification of the aircraft with the BFE installed.

5.    Nonperformance by Customer.

If Customer's nonperformance of obligations in this Exhibit and in the applicable supplemental exhibit to a purchase agreement, BFE Document or BFE Report causes a delay in the delivery of the aircraft or causes Boeing to perform out-of-sequence or additional work, Customer will reimburse Boeing for all resulting expenses and be deemed to have agreed to any such delay in aircraft delivery. In addition Boeing will have the right to:

5.1    provide and install specified equipment or suitable alternate equipment and increase the price of the aircraft accordingly; and/or

5.2    deliver the aircraft to Customer without the BFE installed.

6.    Return of Equipment.

BFE not installed in the aircraft will be returned to Customer in accordance with Customer's instructions and at Customer's expense.

7.    Title and Risk of Loss.

Title to and risk of loss of BFE will at all times remain with Customer or other owner. Boeing will have only such liability for BFE as a bailee for mutual benefit would have, but will not be liable for loss of use.

8.    Interchange of BFE.

To properly maintain Boeing's production flow and to preserve Boeing's delivery commitments, Boeing reserves the right, if necessary, due to equipment shortages or failures, to interchange new items of BFE acquired from or for Customer with new items of the same part numbers acquired from or for other customers of Boeing. Used BFE acquired from Customer or from other customers of Boeing will not be interchanged.

9.    Indemnification of Boeing.

Customer hereby indemnifies and holds harmless Boeing from and against all claims and liabilities, including costs and expenses (including attorneys' fees) incident thereto or incident to successfully establishing the right to indemnification, for injury to or death of any person or persons, including employees of Customer but not employees of Boeing, or for loss of or damage to any property, including any aircraft, arising out of or in any way connected with any nonconformance or defect in any BFE and whether or not arising in tort or occasioned by the negligence of Boeing. This indemnity will not apply with respect to any nonconformance or defect caused solely by Boeing's installation of the BFE.

10.    Patent Indemnity.

Customer hereby indemnifies and holds harmless Boeing from and against all claims, suits, actions, liabilities, damages and costs arising out of any actual or alleged infringement of any patent or other intellectual property rights by BFE or arising out of the installation, sale or use of BFE by Boeing.

11.    Definitions.

For the purposes of the above indemnities, the term **"Boeing"** includes The Boeing Company, its divisions, subsidiaries and affiliates, the assignees of each, and their directors, officers, employees and agents.

# EXHIBIT B

## to

## AIRCRAFT GENERAL TERMS AGREEMENT

## SWA-AGTA

## between

## THE BOEING COMPANY

## and
## Southwest Airlines Co.

## CUSTOMER SUPPORT DOCUMENT

This document contains:

| | |
|---|---|
| Part 1: | Boeing Maintenance and Flight Training Programs; Operations Engineering Support |
| Part 2: | Field and Engineering Support Services |
| Part 3: | Technical Information and Materials |
| Part 4: | Alleviation or Cessation of Performance |
| Part 5: | Protection of Proprietary Information and Proprietary Materials |

**EXHIBIT B**
**CUSTOMER SUPPORT DOCUMENT**
**PART 1:                    BOEING MAINTENANCE AND FLIGHT TRAINING PROGRAMS;**
**OPERATIONS ENGINEERING SUPPORT**

1.      Boeing Training Programs.

1.1     Boeing will provide maintenance training and flight training programs to support the introduction of a specific model of aircraft into service. The training programs will consist of general and specialized courses and will be described in a Supplemental Exhibit to the applicable purchase agreement.

1.2     Boeing will conduct all training at Boeing's primary training facility for the model of aircraft purchased unless otherwise agreed.

1.3     All training will be presented in the English language. If translation is required, Customer will provide interpreters.

1.4     Customer will be responsible for all expenses of Customer's personnel. Boeing will transport Customer's personnel between their local lodging and Boeing's training facility.

2.      Training Planning Conferences.

Customer and Boeing will conduct planning conferences approximately twelve (12) months before the scheduled delivery month of the first aircraft of a model to define and schedule the maintenance and flight training programs.

3.      Operations Engineering Support.

3.1     As long as an aircraft purchased by Customer from Boeing is operated by Customer in scheduled revenue service, Boeing will provide operations engineering support. Such support will include:

3.1.1 assistance with the analysis and preparation of performance data to be used in establishing operating practices and policies for Customer's operation of aircraft;

3.1.2 assistance with interpretation of the minimum equipment list, the definition of the configuration deviation list and the analysis of individual aircraft performance;

3.1.3 assistance with solving operational problems associated with delivery and route-proving flights;

3.1.4 information regarding significant service items relating to aircraft performance or flight operations; and

3.1.5 if requested by Customer, Boeing will provide operations engineering support during an aircraft ferry flight.

4.  Training at a Facility Other Than Boeing's.

      If requested by Customer, Boeing will conduct the classroom portions of the maintenance and flight training (except for the Performance Engineer training courses) at a mutually acceptable alternate training site, subject to the following conditions:

      4.1    Customer will provide acceptable classroom space, simulators (as necessary for flight training) and training equipment required to present the courses;

      4.2    Customer will pay Boeing's then current per diem charge for each Boeing instructor for each day, or fraction thereof, that the instructor is away from their home location, including travel time;

      4.3    Customer will reimburse Boeing for the actual costs of roundtrip transportation for Boeing's instructors and the shipping costs of training Materials between the primary training facility and the alternate training site;

      4.4    Customer will be responsible for all taxes, fees, duties, licenses, permits and similar expenses incurred by Boeing and its employees as a result of Boeing's providing training at the alternate site or incurred as a result of Boeing providing revenue service training; and

      4.5    Those portions of training that require the use of training devices not available at the alternate site will be conducted at Boeing's facility or at some other alternate site.

5.  General Terms and Conditions.

      5.1    Boeing flight instructor personnel will not be required to work more than five days per week, or more than eight hours in any one 24 hour period, of which not more than five hours per eight hour workday will be spent in actual flying. These foregoing restrictions will not apply to ferry assistance or revenue service training services, which will be governed by FAA rules and regulations.

      5.2    **Normal Line Maintenance** is defined as line maintenance that Boeing might reasonably be expected to furnish for flight crew training at Boeing's facility, and will include ground support and aircraft storage in the open, but will not include provision of spare parts. Boeing will provide Normal Line Maintenance services for any aircraft while the aircraft is used for flight crew training at Boeing's facility in accordance with the Boeing Maintenance Plan (Boeing document D6-82076) and the Repair Station Operation and Inspection Manual (Boeing document D6-25470). Customer will provide such services if flight crew training is conducted elsewhere. Regardless of the location of such training, Customer will be responsible for providing all maintenance items (other than those included in Normal Line Maintenance) required during the training, including, but not limited to, fuel, oil, landing fees and spare parts.

      5.3    If the training is based at Boeing's facility, and the aircraft is damaged during such training, Boeing will make all necessary repairs to the aircraft as promptly as possible. Customer will pay Boeing's reasonable charge, including the price of parts and materials, for making the repairs. If Boeing's estimated labor charge for the repair exceeds Twenty-five Thousand U.S. Dollars ($25,000), Boeing and Customer will enter into an agreement for additional services before beginning the repair work.

      5.4    If the flight training is based at Boeing's facility, several airports in surrounding states may be used, at Boeing's option. Unless otherwise agreed in the flight training planning conference, it will be Customer's responsibility to make arrangements for the use of such airports.

5.5     If Boeing agrees to make arrangements on behalf of Customer for the use of airports for flight training, Boeing will pay on Customer's behalf any landing fees charged by any airport used in conjunction with the flight training. At least thirty (30) days before flight training, Customer will provide Boeing an open purchase order against which Boeing will invoice Customer for any landing fees Boeing paid on Customer's behalf. The invoice will be submitted to Customer approximately sixty (60) days after flight training is completed, when all landing fee charges have been received and verified. Customer will pay to Boeing within thirty (30) days of the date of the invoice.

5.6     If requested by Boeing, in order to provide the flight training or ferry flight assistance, Customer will make available to Boeing an aircraft after delivery to familiarize Boeing instructor or ferry flight crew personnel with such aircraft. If flight of the aircraft is required for any Boeing instructor or ferry flight crew member to maintain an FAA license for flight proficiency or landing currency, Boeing will be responsible for the costs of fuel, oil, landing fees and spare parts attributable to that portion of the flight.

5.7     If any part of the training described in Article 1.1 of this Exhibit is not used by Customer within twelve (12) months after the delivery of the last aircraft under the relevant purchase agreement, Boeing will not be obligated to provide such training.

**EXHIBIT B**
**CUSTOMER SUPPORT DOCUMENT**
**PART 2:         FIELD AND ENGINEERING SUPPORT SERVICES**


1.  Field Service Representation.

        Boeing will furnish field service representation to advise Customer with respect to the maintenance and operation of an aircraft (**Field Service Representatives**).

        1.1.    Field Service representation will be available at or near Customer's main maintenance or engineering facility beginning before the scheduled delivery month of the first aircraft and ending twelve (12) months after delivery of the last aircraft covered by a specific purchase agreement.

        1.2.    Customer will provide at no charge to Boeing suitable enclosed office space with walls and a lockable door that is separated from other OEMs and the airline, located at the Customer's facility or other site as mutually agreed. Customer will provide the necessary infrastructure (i.e. Local Area Network (**LAN**) lines) to enable wired high-speed internet capability in the office. As required, Customer will assist each Field Service Representative with visas, work permits, customs, mail handling, identification passes and formal introduction to local airport authorities.

        1.3.    Boeing Field Service Representatives are assigned to various airports around the world. Whenever Customer's aircraft are operating through any such airport, the services of Boeing's Field Service Representatives are available to Customer.

2.  Engineering Support Services.

        Boeing will, if requested by Customer, provide technical advisory assistance for any aircraft and Boeing Product (as defined in Part I of Exhibit C). Technical advisory assistance, provided from the Seattle area or at a base designated by Customer as appropriate, will include:

        2.1    Operational Problem Support. If Customer experiences operational problems with an aircraft, Boeing will analyze the information provided by Customer to determine the probable nature and cause of the problem and to suggest possible solutions.

        2.2    Schedule Reliability Support. If Customer is not satisfied with the schedule reliability of a specific model of aircraft, Boeing will analyze information provided by Customer to determine the nature and cause of the problem and to suggest possible solutions.

        2.3    Maintenance Cost Reduction Support. If Customer is concerned that actual maintenance costs of a specific model of aircraft are excessive, Boeing will analyze information provided by Customer to determine the nature and cause of the problem and to suggest possible solutions.

        2.4    Aircraft Structural Repair Support. If Customer is designing structural repairs and desires Boeing's support, Boeing will analyze and comment on Customer's engineering releases relating to structural repairs not covered by Boeing's Structural Repair Manual.

        2.5    Aircraft Modification Support. If Customer is designing aircraft modifications and requests Boeing's support, Boeing will analyze and comment on

Customer's engineering proposals for changes in, or replacement of, systems, parts, accessories or equipment manufactured to Boeing's detailed design. Boeing will not analyze or comment on any major structural change unless Customer's request for such analysis and comment includes complete detailed drawings, substantiating information (including any information required by applicable government agencies), all stress or other appropriate analyses, and a specific statement from Customer of the substance of the review and the response requested.

2.6    Maintenance Engineering. Boeing will, at Customer's request, provide certain maintenance and ground operations support to Customer as further described in Supplemental Exhibit CS1 to the applicable purchase agreement.

2.7    Post-Delivery Service Support. Boeing will, at Customer's request, perform work on an aircraft after delivery but prior to the initial departure flight or upon the return of the aircraft to Boeing's facility prior to completion of that flight. In that event the following provisions will apply.

2.7.1    Boeing may rely upon the commitment authority of the Customer's personnel requesting the work.

2.7.2    As title and risk of loss has passed to Customer, the insurance provisions of Article 8.2 of the AGTA apply.

2.7.3    The provisions of the Boeing warranty in Part 2 of Exhibit C of this AGTA apply.

2.7.4    Customer will pay Boeing for requested work not covered by the Boeing warranty, if any.

2.7.5    The DISCLAIMER AND RELEASE and EXCLUSION OF CONSEQUENTIAL AND OTHER DAMAGES provisions in Article 11 of Part 2 of Exhibit C of this AGTA apply.

2.8    Additional Services. Boeing may, at Customer's request, provide additional services for an aircraft after delivery, which may include, but not be limited to, retrofit kit changes (kits and/or information), training, flight services, maintenance and repair of aircraft. Such additional services will be subject to a mutually acceptable price, schedule, scope of work and other applicable terms and conditions. The DISCLAIMER AND RELEASE and the EXCLUSION OF CONSEQUENTIAL AND OTHER DAMAGES provisions in Article 11 of Part 2 of Exhibit C of this AGTA and the insurance provisions in Article 8.2 of this AGTA will apply to any such work. Title to and risk of loss of any such aircraft will always remain with Customer.

**EXHIBIT B**
**CUSTOMER SUPPORT DOCUMENT**
**PART 3:**           **TECHNICAL INFORMATION AND MATERIALS**

1.  General.

**Materials** are defined as any and all items that are created by Boeing or a third party, which are provided directly or indirectly from Boeing and serve primarily to contain, convey or embody information. Materials may include either tangible embodiments (for example, documents or drawings), or intangible embodiments (for example, software and other electronic forms) of information but excludes Aircraft Software. **Aircraft Software** is defined as software that is installed on and used in the operation of the aircraft.

Boeing will furnish to Customer certain Materials to support the maintenance and operation of the aircraft to Customer. Such Materials will, if applicable, be prepared generally in accordance with Air Transport Association of America (**ATA**) iSpec 2200, entitled "Information Standards for Aviation Maintenance". Materials not covered by iSpec 2200 will be provided in a structure suitable for the Material's intended use. Materials will be in English and in the units of measure used by Boeing to manufacture an aircraft.

2.  Materials Planning Conferences.

Customer and Boeing will conduct planning conferences approximately twelve (12) months before the scheduled delivery month of the first aircraft of a model in order to mutually determine the proper format and quantity of Materials to be furnished to Customer in support of the aircraft.

Customer may select one Boeing digital format as the delivery medium. Should a Boeing digital format not be available, Customer may select a reasonable quantity of printed format.

3.  Information and Materials Incremental Increase.

Should the delivery medium be of printed format, until one year after the month of delivery of the last aircraft covered by a specific purchase agreement, Customer may annually request in writing a reasonable increase in the quantity of printed Materials. Boeing will provide the additional quantity of printed Materials at no additional charge beginning with the next normal revision cycle. Customer may request a decrease in revision quantities at any time.

4.  Advance Representative Copies.

All advance representative copies of Materials will be selected by Boeing from available sources. Such advance copies will be for advance planning purposes only.

5.  Customized Materials.

All customized Materials will reflect the configuration of each aircraft as delivered.

6.  Revisions.

6.1. Revision Service. The schedule for updating certain Materials will be identified in the planning conference. Such updates will reflect changes to Materials developed by Boeing.

6.2. Revisions Based on Boeing Service Bulletin Incorporation. If Boeing receives written notice that Customer intends to incorporate, or has incorporated, any Boeing service bulletin in an aircraft, Boeing will issue revisions to Materials with revision service reflecting the effects of such incorporation into such aircraft.

7.      Supplier Technical Data.

7.1.    For supplier-manufactured programmed airborne avionics components and equipment classified as Seller Furnished Equipment (**SFE**) which contain computer software designed and developed in accordance with Radio Technical Commission for Aeronautics Document No. RTCA/DO-178B dated December 1, 1992 (with an errata issued on March 26, 1999), or later as available, Boeing will request that each supplier of the components and equipment make software documentation available to Customer.

7.2.    The provisions of this Article will not be applicable to items of BFE.

7.3.    Boeing will furnish to Customer a document identifying the terms and conditions of the product support agreements between Boeing and its suppliers requiring the suppliers to fulfill Customer's requirements for information and services in support of the specific model of aircraft.

8.      Buyer Furnished Equipment Data.

Boeing will incorporate BFE maintenance information into the customized Materials providing Customer makes the information available to Boeing at least nine (9) months prior to the scheduled delivery month of each of Customer's aircraft purchased under a purchase agreement. Boeing will incorporate such BFE maintenance information into the Materials prior to delivery of each such aircraft reflecting the configuration of that aircraft as delivered. Upon Customer's request, Boeing may provide update service after delivery to such information subject to the terms of Part 2, Article 2.8 (**Additional Services**). Customer agrees to furnish all BFE maintenance information in Boeing's standard digital format if Materials are to be delivered in Boeing's standard digital format.

9.      Materials Shipping Charges.

Boeing will pay the reasonable transportation costs of the Materials. Customer is responsible for any customs clearance charges, duties, and taxes.

10.     Customer's Shipping Address.

The Materials furnished to Customer hereunder are to be sent to a single address to be specified. Customer will promptly notify Boeing of any change to the address.

**EXHIBIT B**
**CUSTOMER SUPPORT DOCUMENT**
**PART 4:**                    **ALLEVIATION OR CESSATION OF PERFORMANCE**

1.      Boeing will not be required to provide any services, training or other things at a facility designated by Customer if any of the following conditions exist:

1.1.    a labor stoppage or dispute in progress involving Customer;

1.2.    wars or warlike operations, riots or insurrections in the country where the facility is located;

1.3.    any condition at the facility which, in the opinion of Boeing, is detrimental to the general health, welfare or safety of its personnel or their families;

1.4.    the United States Government refuses permission to Boeing personnel or their families to enter into the country where the facility is located, or recommends that Boeing personnel or their families leave the country; or

1.5.    After the location of Boeing personnel at the facility, Boeing further reserves the right, upon the occurrence of any of such events, to immediately and without prior notice to Customer relocate its personnel and their families.

1.6.    Boeing will not be required to provide any Materials at a facility designated by Customer if the United States Government refuses permission to Boeing to deliver Materials to the country where the facility is located.

**EXHIBIT B**
**CUSTOMER SUPPORT DOCUMENT**
**PART 5:**                **PROTECTION OF PROPRIETARY INFORMATION**
**AND PROPRIETARY MATERIALS**

1.   General.

All Materials provided by Boeing to Customer and not covered by a Boeing CSGTA or other agreement between Boeing and Customer defining Customer's right to use and disclose the Materials and included information will be covered by, and subject to the terms of this AGTA. Title to all Materials containing, conveying or embodying confidential, proprietary or trade secret information (**Proprietary Information**) belonging to Boeing or a third party (**Proprietary Materials**), will at all times remain with Boeing or such third party. Customer will treat all Proprietary Materials and all Proprietary Information in confidence and use and disclose the same only as specifically authorized in this AGTA.

2.   License Grant.

Boeing grants to Customer a worldwide, non-exclusive, nontransferable license to use and disclose Proprietary Materials in accordance with the terms and conditions of this AGTA. Customer is authorized to make copies of Materials (except for Materials bearing the copyright legend of a third party), and all copies of Proprietary Materials will belong to Boeing and be treated as Proprietary Materials under this AGTA. Customer will preserve all proprietary legends, and all copyright notices on all Materials and insure the inclusion of those legends and notices on all copies.

3.   Use of Proprietary Materials and Proprietary Information.

Customer is authorized to use Proprietary Materials and Proprietary Information for the purpose of: (i) operation, maintenance, repair, or modification of Customer's aircraft for which the Proprietary Materials and Proprietary Information have been specified by Boeing and (ii) development and manufacture of training devices and maintenance tools for use by Customer.

4.   Providing of Proprietary Materials to Contractors.

Customer is authorized to provide Proprietary Materials to Customer's contractors for the sole purpose of maintenance, repair, or modification of Customer's aircraft for which the Proprietary Materials have been specified by Boeing. In addition, Customer may provide Proprietary Materials to Customer's contractors for the sole purpose of developing and manufacturing training devices and maintenance tools for Customer's use. Before providing Proprietary Materials to its contractor, Customer will first obtain a written agreement from the contractor by which the contractor agrees (i) to use the Proprietary Materials only on behalf of Customer, (ii) to be bound by all of the restrictions and limitations of this Part 5, and (iii) that Boeing is a third party beneficiary under the written agreement. Customer agrees to provide copies of all such written agreements to Boeing upon request and be liable to Boeing for any breach of those agreements by a contractor. A sample agreement acceptable to Boeing is attached as Appendix VII.

5.   <u>Providing of Proprietary Materials and Proprietary Information to Regulatory Agencies</u>.

      When and to the extent required by a government regulatory agency having jurisdiction over Customer or an aircraft, Customer is authorized to provide Proprietary Materials and to disclose Proprietary Information to the agency for use in connection with Customer's operation, maintenance, repair, or modification of such aircraft. Customer agrees to take all reasonable steps to prevent the agency from making any distribution, disclosure, or additional use of the Proprietary Materials and Proprietary Information provided or disclosed. Customer further agrees to notify Boeing immediately upon learning of any (i) distribution, disclosure, or additional use by the agency, (ii) request to the agency for distribution, disclosure, or additional use, or (iii) intention on the part of the agency to distribute, disclose, or make additional use of Proprietary Materials or Proprietary Information.

# EXHIBIT C

## to

## AIRCRAFT GENERAL TERMS AGREEMENT

## SWA-AGTA

## between

## THE BOEING COMPANY

## and
## Southwest Airlines Co.

## PRODUCT ASSURANCE DOCUMENT

This document contains:

| | |
|---|---|
| Part 1: | Exhibit C Definitions |
| Part 2: | Boeing Product Warranty |
| Part 3: | Boeing Service Life Policy |
| Part 4: | Supplier Warranty Commitment |
| Part 5: | Boeing Interface Commitment |
| Part 6 | Boeing Indemnities against Patent and Copyright Infringement |

**EXHIBIT C**
**PRODUCT ASSURANCE DOCUMENT**
**PART 1:** **EXHIBIT C DEFINITIONS**

**Authorized Agent** - Agent appointed by Customer to perform corrections and to administer warranties (see Appendix VI to the AGTA for a form acceptable to Boeing).

**Average Direct Hourly Labor Rate** - The average hourly rate (excluding all fringe benefits, premiumtime allowances, social charges, business taxes and the like) paid by Customer to its Direct Labor employees.

**Boeing Product** - Any system, accessory, equipment, part or Aircraft Software that is manufactured by Boeing or manufactured to Boeing's detailed design with Boeing's authorization.

**Boeing Warranty** - The organization within Boeing responsible for administration of warranties between Boeing and Customer.

**Correct(s)** - To repair, modify, provide modification kits or replace with a new product.

**Correction** - A repair, a modification, a modification kit or replacement with a new product.

**Corrected Boeing Product** - A Boeing Product which is free of defect as a result of a Correction.

**Direct Labor** - Labor spent by Customer's direct labor employees to access, remove, disassemble, modify, repair, inspect and bench test a defective Boeing Product, and to reassemble, reinstall a Corrected Boeing Product and perform final inspection and testing.

**Direct Materials** - Items such as parts, gaskets, grease, sealant and adhesives, installed or consumed in performing a Correction, excluding allowances for administration, overhead, taxes, customs duties and the like.

Rogue Unit - A Boeing Product, on which an unscheduled removal due to breach of warranty occurs three or more times both (i) within the warranty period and (ii) within either twelve (12) consecutive months or one thousand (1,000) consecutive operating hours.

**Specification Control Drawing (SCD)** - A Boeing document defining specifications for certain Supplier Products.

**Supplier** - The manufacturer of a Supplier Product.

**Supplier Product** - Any system, accessory, equipment, Part or Aircraft Software that is not manufactured to Boeing's detailed design. This includes but is not limited to parts manufactured to a SCD, all standards, and other parts obtained from nonBoeing sources.

**EXHIBIT C**
**PRODUCT ASSURANCE DOCUMENT**
**PART 2:          BOEING PRODUCT WARRANTY**

1. <u>Applicability</u>.

This warranty applies to all Boeing Products. Warranties applicable to Supplier Products are in Part 4. Warranties applicable to engines will be provided by Supplemental Exhibits to individual purchase agreements.

2. <u>Warranty</u>.

  2.1  <u>Coverage</u>. Boeing warrants that at the time of delivery:

    (i)    the aircraft will conform to the Detail Specification except for portions stated to be estimates, approximations or design objectives;

    (ii)    all Boeing Products will be free from defects in material, process of manufacture and workmanship, including the workmanship utilized to install Supplier Products, engines and BFE, and;

    (iii)    all Boeing Products will be free from defects in design, including selection of materials and the process of manufacture, in view of the state of the art at the time of design.

  2.1  <u>Exceptions</u>. The following conditions do not constitute a defect under this warranty:

    (i)    conditions resulting from normal wear and tear;

    (ii)    conditions resulting from acts or omissions of Customer; and

    (iii)    conditions resulting from failure to properly service and maintain a Boeing Product.

3. <u>Warranty Periods</u>.

  3.1   <u>Warranty</u>. The warranty period begins on the date of aircraft or Boeing Product delivery (**Delivery**) and ends at the applicable time specified in subsections 3.1 (i) through 3.1 (iii) below:

    (i)    for Boeing aircraft models 777F, 777-200, -300, 737-600, -700, -800, -900, 737-7, -8, -9, 787 or new aircraft models designed and manufactured with similar, new technology and for the model 747-8, the warranty period ends forty-eight (48) months after Delivery;

    (ii)    in addition, for a Boeing Product installed at the time of delivery in a 787 model aircraft but not inspected during the initial forty-eight (48) month warranty period, the warranty period continues until the date upon which Customer first inspects such Boeing Product pursuant to its Boeing Maintenance Planning Data Document

but not later than twelve (12) years after Delivery of such 787 aircraft;

(iii)    for any other Boeing aircraft model the warranty period ends thirty-six (36) months after Delivery.

3.2    <u>Warranty on Corrected Boeing Products</u>. The warranty period applicable to a Corrected Boeing Product shall begin on the date of delivery of the Corrected Boeing Product or date of delivery of the kit or kits furnished to Correct the Boeing Product and shall be for the period specified immediately below:

(i)    For Corrected Boeing Products which have been Corrected because of a defect in material, the applicable warranty period is the remainder of the initial warranty period for the defective Boeing Product.

(ii)    For Corrected Boeing Products which have been Corrected because of defect in workmanship, the applicable warranty period is the remainder of the initial warranty or twelve (12) months following the date of delivery of the Corrected Boeing Product, whichever is longer.

(iii)    For Corrected Boeing Products which have been Corrected because of a defect in design, the applicable warranty period is eighteen (18) months or the remainder of the initial warranty period, whichever is longer.

3.3    <u>Survival of Warranties</u>. All warranty periods are stated above. The Performance Guarantees will not survive delivery of the aircraft.

4.    <u>Remedies</u>.

4.1    <u>Correction Options</u>. Customer may, at its option, either perform a Correction of a defective Boeing Product or return the Boeing Product to Boeing for Correction. During the warranty period, Boeing will not charge Customer for tests on Boeing Products returned to Boeing for Correction on which Boeing is unable to confirm the failure claimed, provided:

(i)    Boeing's written instructions were followed by the Customer for testing the Boeing Product prior to its return to Boeing, and

(ii)    Customer's claim includes all applicable documentation of such tests with the returned Boeing Product, including but not limited to: Central Maintenance Computer (**CMC**), Flight Maintenance Computer System, (**FMCS**), Fault Isolation Manual (**FIM**), Engine Indicating and Crew Alerting System (**EICAS**) or Built In Test Equipment (**BITE**) messages.

4.2    <u>Warranty Inspections</u>. In addition to the remedies to Correct defects in Boeing Products described in Article 7.3, below, Boeing will reimburse Customer for the cost of Direct Labor to perform certain inspections of the aircraft to determine the occurrence of a condition Boeing has identified as a covered defect, provided the

inspections are recommended by a service bulletin or service letter issued by Boeing during the warranty period.

Such reimbursement will not apply to any inspections performed after a Correction is available to Customer and Customer has had a reasonable time to incorporate the Correction, given the Customer's fleet size and maintenance schedule.

4.3    Rogue Units.

4.3.1    Upon written request, Boeing will lend Customer at no charge an interchangeable Boeing Product in exchange for a Rogue Unit. Within ten (10) calendar days of its receipt of the loaned Boeing Product, Customer will ship the Rogue Unit to Boeing. Customer will provide with the Rogue Unit verification of the following requirements:

(i)    The removed Boeing Product failed three times within twelve (12) consecutive months or one thousand (1,000) consecutive operating hours during the warranty period following initial delivery,

(ii)    Removals were performed in compliance with flight or maintenance manuals approved by the FAA or the comparable regulatory agency for the country in which the aircraft is registered, and

(iii)    Any Corrections or tests to the Boeing Product were performed by Customer according to the latest revision of the Boeing Component Maintenance Manual (CMM), according to written instructions from Boeing, or by Boeing.

4.3.2    Upon receipt of a Rogue Unit and the required verifications, Boeing will, at no-charge to Customer, either replace the Rogue Unit with a new Boeing Product or, if otherwise agreed, allow Customer to retain the loaned, Boeing Product.

5.    Discovery and Notice.

5.1    For notice to be effective:

(i)    the defect must be discovered during the warranty period; and

(ii)    Boeing Warranty must receive written notice of the discovery no later than one hundred eighty (180) days after expiration of the warranty period. The notice must include sufficient information to substantiate the claim.

5.2    Receipt of Customer's or its Authorized Agent's notice of the discovery of a defect secures Customer's rights to remedies under this Exhibit C, even though a Correction is performed after the expiration of the warranty period.

5.3    Once Customer has given valid notice of the discovery of a defect, a claim will be submitted as soon as practicable after performance of the Correction.

5.4    Boeing may release service bulletins or service letters advising Customer of the availability of certain warranty remedies. When such advice is provided, Customer will be deemed to have fulfilled the requirements for discovery of the defect and submittal

of notice under this Exhibit C as of the in-warranty date specified in industry support information in a service bulletin or service letter.

6.    Filing a Claim.

    6.1    Authority to File. Claims may be filed by Customer or its Authorized Agent. Appointment of an Authorized Agent will only be effective upon Boeing's receipt of the Authorized Agent's express written agreement, in a form satisfactory to Boeing, to be bound by and to comply with all applicable terms and conditions of this Aircraft General Terms Agreement.

    6.2    Claim Information.

        6.2.1    Claimant is responsible for providing sufficient information to substantiate Customer's rights to remedies under this Exhibit C. Boeing may reject a claim for lack of sufficient information. At a minimum, such information must include:

        (i)    identity of claimant;

        (ii)    serial or block number of the aircraft on which the defective Boeing Product was delivered;

        (iii)    part number and nomenclature of the defective Boeing Product;

        (iv)    purchase order number and date of delivery of the defective spare part;

        (v)    description and substantiation of the defect;

        (vi)    date the defect was discovered;

        (vii)    date the Correction was completed;

        (viii)    the total flight hours or cycles accrued, if applicable;

        (ix)    an itemized account of direct labor hours expended in performing the Correction;

        (x)    an itemized account of any direct materials incorporated in the Correction; and

        (xi)    for 787 model aircraft claims submitted after the forty-eight (48) month warranty period, the specific reference within the Boeing Maintenance Planning Data Document to the inspection requirement for such Boeing Product.

        6.2.2    Additional information may be required based on the nature of the defect and the remedies requested.

    6.3    Boeing Claim Processing.

        6.3.1    Any claim for a Boeing Product returned by Customer or its Authorized Agent to Boeing for Correction must accompany the Boeing Product. Any claim not associated with the return of a Boeing Product must be submitted signed and in writing directly by Customer or its Authorized Agent to Boeing Warranty by any of the methods identified in Article 11, "Notice," of the AGTA or through an internet portal and process specified by Boeing.

6.3.2    Boeing will promptly review the claim and will give notification of claim approval or rejection. If the claim is rejected, Boeing will provide a written explanation.

7.    Corrections Performed by Customer or Its Authorized Agent.

7.1    Facilities Requirements. Provided Customer, its Authorized Agent or its third party contractor, as appropriate, are certified by the appropriate Civil Aviation Authority or Federal Aviation Authority, Customer or its Authorized Agent may, at its option, Correct defective Boeing Products at its facilities or may subcontract Corrections to a third party contractor.

7.2    Technical Requirements. All Corrections done by Customer, its Authorized Agent or a third party contractor must be performed in accordance with Boeing's applicable service manuals, bulletins or other written instructions, using parts and materials furnished or approved by Boeing.

7.3    Reimbursement.

7.3.1    Boeing will reimburse Customer's reasonable costs of Direct Materials and Direct Labor **by credit memorandum** (excluding labor hours expended for overhaul) at Customer's Warranty Labor Rate to Correct a defective Boeing Product. Claims for reimbursement must contain sufficient information to substantiate Direct Labor hours expended and Direct Materials consumed. Customer or its Authorized Agent may be required to produce invoices for materials.

7.3.2    Customer's established Warranty Labor Rate will be the greater of the standard labor rate or one hundred fifty percent (150%) of Customer's Average Direct Hourly Labor Rate. The standard labor rate paid by Boeing to its customers is established and published annually. Prior to or concurrently with submittal of Customer's first claim for Direct Labor reimbursement, Customer may notify Boeing of Customer's then current Average Direct Hourly Labor Rate and thereafter notify Boeing of any material change in such rate. Boeing will require information from Customer to substantiate such rates.

7.3.3    Reimbursement for Direct Labor hours to perform Corrections stated in a service bulletin will be based on the labor estimates in the service bulletin.

7.3.4    Boeing will provide to Customer a single, lump sum credit memorandum for Customer's Direct Labor hours expended to incorporate the Corrections (other than of random anomalies) identified in service bulletins and service letters in all in-warranty aircraft covered by such service bulletins or service letters after Customer's submission of a warranty claim and verification of the incorporation of such Corrections with respect to the first affected in-warranty aircraft. Such credit memoranda will not be provided in response to any other requests for reimbursement including, without limitation, those arising out of program letters or other special offers provided by Boeing.

7.3.5    Boeing will reimburse Customer's freight charges associated with a Correction of a defect on a Boeing Product performed by its Authorized Agent or a third party contractor.

7.3.6    Maximum Reimbursement. Unless previously agreed in writing, the maximum reimbursement for Direct Labor and Direct materials for repair of a defective Boeing Product will not exceed 65% of Boeing's then current sales price for a new replacement Boeing Product. Inspection, removal, reinstallation labor, final testing, inspection and transportation costs are separate and are not to be included in the cost

elements used to determine the 65% limit. By mutual agreement between Customer and Boeing, Boeing may provide a replacement Product to Customer in lieu of credit reimbursement.

7.4    Disposition of Defective Boeing Products Beyond Economical Repair.

7.4.1    A defective Boeing Product found to be beyond economical repair (see paragraph **7.3.6**) will be retained for a period of thirty (30) days from the date Boeing receives Customer's claim. During the thirty (30) day period, Boeing may request return of such Boeing Products for inspection and confirmation of a defect.

7.4.2    After the thirty (30) day period, a defective Boeing Product with a value of Four Thousand dollars ($4,000) or less may be scrapped without notification to Boeing. Boeing will reimburse Customer or its Authorized Agent for the charge for any item determined to be defective under this Aircraft General Terms Agreement. If such Boeing Product has a value greater than Four Thousand dollars ($4,000), Customer must obtain confirmation of unrepairability by Boeing's on-site field service representative prior to scrapping. Confirmation may be in the form of the representative's signature on Customer's claim or through direct communication between the representative and Boeing Warranty.

8.    Corrections Performed by Boeing.

8.1    Freight Charges. Customer or its Authorized Agent will pre-pay freight charges to return a Boeing Product to Boeing. If during the period of the applicable warranty Boeing determines the Boeing Product to be defective, Boeing will pre-pay shipping charges to return the Corrected Boeing Product. Boeing will reimburse Customer or its Authorized Agent for freight charges for Boeing Products returned to Boeing for Correction and determined to be defective.

8.2    Customer Instructions. The documentation shipped with the returned defective Boeing Product may include specific technical instructions for additional work to be performed on the Boeing Product. The absence of such instructions will evidence Customer's authorization for Boeing to perform all necessary Corrections and work required to return the Boeing Product to a serviceable condition.

8.3    Correction Time Objectives.

8.3.1    Boeing's objective for making Corrections is ten (10) working days for avionics and electronic Boeing Products, thirty (30) working days for Corrections of other Boeing Products performed at Boeing's facilities and forty (40) working days for Corrections of other Boeing Products performed at a Boeing subcontractor's facilities. The objectives are measured from the date Boeing receives the defective Boeing Product and a valid claim to the date Boeing ships the Corrected Boeing Product.

8.3.2    If Customer has a critical parts shortage because Boeing has exceeded a Correction time objective and Customer has procured spare Boeing Products for the defective Boeing Product in quantities shown in Boeing's Recommended Spare Parts List then Boeing will either expedite the Correction or provide an interchangeable Boeing Product, on a no charge loan basis, until the Corrected Boeing Product is returned.

8.4    Title Transfer and Risk of Loss.

8.4.1    Title to and risk of loss of any Boeing Product returned to Boeing will at all times remain with Customer or any other title holder of such Boeing Product. While

Boeing has possession of the returned Boeing Product, Boeing will have only such liabilities as a bailee for mutual benefit would have but will not be liable for loss of use.

8.4.2    If a Correction requires shipment of a new Boeing Product, then at the time Boeing ships the new Boeing Product, title to and risk of loss for the returned Boeing Product will pass to Boeing, and title to and risk of loss for the new Boeing Product will pass to Customer.

9.    Returning an Aircraft.

9.1    Conditions. An aircraft may be returned to Boeing's facilities for Correction only if:

(i)    Boeing and Customer agree a covered defect exists;

(ii)    Customer lacks access to adequate facilities, equipment or qualified personnel to perform the Correction; and

(iii)    it is not practical, in Boeing's estimation, to dispatch Boeing personnel to perform the Correction at a remote site.

9.2    Correction Costs. Boeing will perform the Correction at no charge to Customer. Subject to the conditions of Article 9.1, Boeing will reimburse Customer for the costs of fuel, oil, other required fluids and landing fees incurred in ferrying the aircraft to Boeing and back to Customer's facilities. Customer will minimize the length of both flights.

9.3    Separate Agreement. Prior to the return of an aircraft to Boeing, Boeing and Customer will enter into a separate agreement covering return of the aircraft and performance of the Correction. Authorization by Customer for Boeing to perform additional work that is not part of the Correction must be received within twenty-four (24) hours of Boeing's request. If such authorization is not received within twenty-four (24) hours, Customer will be invoiced for work performed by Boeing that is not Part of the Correction.

10.    Insurance.

The provisions of Article 8.2 "Insurance", of this AGTA, will apply to any work performed by Boeing in accordance with Customer's specific technical instructions to the extent any legal liability of Boeing is based upon the content of such instructions.

11.    Disclaimer and Release; Exclusion of Liabilities.

11.1    DISCLAIMER AND RELEASE. THE WARRANTIES, OBLIGATIONS AND LIABILITIES OF BOEING AND THE REMEDIES OF CUSTOMER IN THIS EXHIBIT C ARE EXCLUSIVE AND IN SUBSTITUTION FOR, AND CUSTOMER HEREBY WAIVES, RELEASES AND RENOUNCES, ALL OTHER WARRANTIES, OBLIGATIONS AND LIABILITIES OF BOEING AND ALL OTHER RIGHTS, CLAIMS AND REMEDIES OF CUSTOMER AGAINST BOEING, EXPRESS OR IMPLIED, ARISING BY LAW OR OTHERWISE, WITH RESPECT TO ANY NONCONFORMANCE OR DEFECT IN ANY AIRCRAFT, MATERIALS, TRAINING, SERVICES OR OTHER THING PROVIDED UNDER THIS AGTA AND THE APPLICABLE PURCHASE AGREEMENT, INCLUDING, BUT NOT LIMITED TO:

(i)    ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS;

(ii)    ANY IMPLIED WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE;

(iii)    ANY OBLIGATION, LIABILITY, RIGHT, CLAIM OR REMEDY IN TORT, WHETHER OR NOT ARISING FROM THE NEGLIGENCE OF BOEING; AND

(iv)    ANY OBLIGATION, LIABILITY, RIGHT, CLAIM OR REMEDY FOR LOSS OF OR DAMAGE TO ANY AIRCRAFT.

11.2    EXCLUSION OF CONSEQUENTIAL AND OTHER DAMAGES. BOEING WILL HAVE NO OBLIGATION OR LIABILITY, WHETHER ARISING IN CONTRACT (INCLUDING WARRANTY), TORT, WHETHER OR NOT ARISING FROM THE NEGLIGENCE OF BOEING, OR OTHERWISE, FOR LOSS OF USE, REVENUE OR PROFIT, OR FOR ANY OTHER INCIDENTAL OR CONSEQUENTIAL DAMAGES WITH RESPECT TO ANY NONCONFORMANCE OR DEFECT IN ANY AIRCRAFT, MATERIALS, TRAINING, SERVICES OR OTHER THING PROVIDED UNDER THIS AGTA AND THE APPLICABLE PURCHASE AGREEMENT.

11.3    Definitions. For the purpose of this Article, "BOEING" or "Boeing" is defined as The Boeing Company, its divisions, subsidiaries, affiliates, the assignees of each, and their respective directors, officers, employees and agents.

**EXHIBIT C**
**PRODUCT ASSURANCE DOCUMENT**
**PART 3:               BOEING SERVICE LIFE POLICY**

1.      <u>Definitions</u>.

Service Life Policy (**SLP**) Component - any of the primary structural elements (excluding industry standard parts), such as landing gear, wing, fuselage, vertical or horizontal stabilizer, listed in the applicable purchase agreement for a specific model of aircraft, either installed in the aircraft at time of delivery or purchased from Boeing by Customer as a spare part. The detailed SLP Component listing will be in Supplemental Exhibit SLP1 to each Purchase Agreement.

2.      <u>Service Life Policy</u>.

2.1.    <u>SLP Commitment</u>. If a failure is discovered in a SLP Component within the time periods specified in Article 2.2 below, Boeing will provide Customer a replacement SLP Component at the price calculated pursuant to Article 3.1, below. If requested by Customer as an alternative remedy, Boeing will reimburse Customer in accordance with the provisions of Exhibit C, Part 2, Article 7.3, for Direct Labor and Direct Material for repair of a failed SLP Component an amount not to exceed the difference between Boeing's then current spare parts price for such SLP Component and the price determined pursuant to Article 3, below.

2.2.    <u>SLP Policy Periods</u>.

2.2.1.  The policy period for SLP Components initially installed on an aircraft is twelve (12) years after the date of delivery of the aircraft except that for SLP Components initially installed on a 787 aircraft the policy period is fifteen (15) years after the date of delivery of the aircraft.

2.2.2.  The policy period for SLP Components purchased from Boeing by Customer as spare parts is twelve (12) years from delivery of such SLP Component or twelve (12) years from the date of delivery of the last aircraft produced by Boeing of a specific model, whichever first expires, except that for the 787 aircraft such policy period is fifteen (15) years from delivery of such SLP Component or fifteen (15) years from the date of delivery of the last 787 aircraft produced by Boeing, whichever first expires.

3.      <u>Price</u>.

The price Customer will pay for replacement of a failed SLP Component will be calculated pursuant to the following formulas:

(i)      For 787 aircraft only:

$$P \quad = \quad \frac{C(T-48)}{132}$$

where:

P  =      price to Customer for the replacement part
C  =      SLP Component sales price at time of replacement
T  =      total age in months of the failed SLP Component from the date of delivery to Customer to the date of discovery of such condition and is greater than forty-eight (48) months.

(ii)     For all other aircraft models:

$$P \quad = \quad \frac{CT}{144}$$

where:

| | | |
|---|---|---|
| P | = | price to Customer for the replacement part |
| C | = | SLP Component sales price at time of replacement |
| T | = | total age in months of the failed SLP Component from the date of delivery to Customer to the date of discovery of such condition. |

4.    Conditions.

Boeing's obligations under this Part 3 of Exhibit C, "Boeing Service Life Policy," (**Policy**) are conditioned upon the following:

4.1.    Customer must notify Boeing in writing of the failure within three months after it is discovered.

4.2.    Customer must provide reasonable evidence that the claimed failure is covered by this Policy and if requested by Boeing, that such failure was not the result of:

4.2.2.1.1.    a defect or failure in a component not covered by this Policy,

4.2.2.1.2.    an extrinsic force,

4.2.2.1.3.    an act or omission of Customer, or

4.2.2.1.4.    operation or maintenance contrary to applicable governmental regulations or Boeing's instructions.

4.3.    If return of a failed SLP Component is practicable and requested by Boeing, Customer will return such SLP Component to Boeing at Boeing's expense.

4.4.    Customer's rights and remedies under this Policy are limited to the receipt of a Correction pursuant to Article 2 above.

5.    Disclaimer and Release; Exclusion of Liabilities.

This Part 3 and the rights and remedies of Customer and the obligations of Boeing are subject to the DISCLAIMER AND RELEASE and EXCLUSION OF CONSEQUENTIAL AND OTHER DAMAGES provisions of Article 11 of Part 2 of this Exhibit C.

**EXHIBIT C**
**PRODUCT ASSURANCE DOCUMENT**
**PART 4:            SUPPLIER WARRANTY COMMITMENT**

1.      Supplier Warranties and Supplier Patent and Copyright Indemnities.

Boeing will use diligent efforts to obtain warranties and indemnities against patent and copyright infringement enforceable by Customer from Suppliers of Supplier Products (except for BFE and engines) installed on the aircraft at the time of delivery that were selected and purchased by Boeing, but not manufactured to Boeing's detailed design. Boeing will furnish copies of the warranties and patent and copyright indemnities to Customer contained in Supplier Product Support and Assurance Agreements, prior to the scheduled delivery month of the first aircraft under the initial purchase agreement to the AGTA.

2.      Boeing Assistance in Administration of Supplier Warranties.

Customer will be responsible for submitting warranty claims directly to Suppliers; however, if Customer experiences problems enforcing any Supplier warranty obtained by Boeing for Customer, Boeing will conduct an investigation of the problem and assist Customer in the resolution of those claims.

3.      Boeing Support in Event of Supplier Default.

3.1      If the Supplier defaults in the performance of a material obligation under its warranty, and Customer provides evidence to Boeing that a default has occurred, then Boeing will furnish the equivalent warranty terms as provided by the defaulting Supplier.

3.2      At Boeing's request, Customer will assign to Boeing, and Boeing will be subrogated to, its rights against the Supplier provided by the Supplier warranty.

**EXHIBIT C**
**PRODUCT ASSURANCE DOCUMENT**
**PART 5:          BOEING INTERFACE COMMITMENT**

1.      <u>Interface Problems</u>.

        An Interface Problem is defined as a technical problem in the operation of an aircraft or its systems experienced by Customer, the cause of which is not readily identifiable by Customer but which Customer believes to be attributable to either the design characteristics of the aircraft or its systems or the workmanship used in the installation of Supplier Products. In the event Customer experiences an Interface Problem, Boeing will, without additional charge to Customer, promptly conduct an investigation and analysis to determine the cause or causes of the Interface Problem. Boeing will promptly advise Customer at the conclusion of its investigation of Boeing's opinion as to the causes of the Interface Problem and Boeing's recommendation as to corrective action.

2.      <u>Boeing Responsibility</u>.

        If Boeing determines that the Interface Problem is primarily attributable to the design or installation of any Boeing Product, Boeing will Correct the design or workmanship to the extent of any then existing obligations of Boeing under the provisions of the applicable Boeing Product warranty.

3.      <u>Supplier Responsibility</u>.

        If Boeing determines that the Interface Problem is primarily attributable to the design or installation of a Supplier Product, Boeing will assist Customer in processing a warranty claim against the Supplier.

4.      <u>Joint Responsibility</u>.

        If Boeing determines that the Interface Problem is partially attributable to the design or installation of a Boeing Product and partially to the design or installation of a Supplier Product, Boeing will seek a solution to the Interface Problem through the cooperative efforts of Boeing and the Supplier and will promptly advise Customer of the resulting corrective actions and recommendations.

5.      <u>General</u>.

        Customer will, if requested by Boeing, assign to Boeing any of its rights against any supplier as Boeing may require to fulfill its obligations hereunder.

6.      <u>Disclaimer and Release; Exclusion of Liabilities</u>.

        This Part 5 and the rights and remedies of Customer and the obligations of Boeing herein are subject to the DISCLAIMER AND RELEASE and EXCLUSION OF CONSEQUENTIAL AND OTHER DAMAGES provisions of Article 11 of Part 2 of this Exhibit C.

**EXHIBIT C**
**PRODUCT ASSURANCE DOCUMENT**
**PART 6: BOEING INDEMNITIES AGAINST PATENT AND COPYRIGHT**
**INFRINGEMENT**

1.    Indemnity Against Patent Infringement.

Boeing will defend and indemnify Customer with respect to all claims, suits and liabilities arising out of any actual or alleged patent infringement through Customer's use, lease or resale of any aircraft or any Boeing Product installed on an aircraft at delivery.

2.    Indemnity Against Copyright Infringement.

Boeing will defend and indemnify Customer with respect to all claims, suits and liabilities arising out of any actual or alleged copyright infringement through Customer's use, lease or resale of any Boeing created Materials and Aircraft Software installed on an aircraft at delivery.

3.    Exceptions, Limitations and Conditions.

3.1.    Boeing's obligation to indemnify Customer for patent infringement will extend only to infringements in countries which, at the time of the infringement, were party to and fully bound by either: (i) Article 27 of the Chicago Convention on International Civil Aviation of December 7, 1944, or (ii) the International Convention for the Protection of Industrial Property (**Paris Convention**).

3.2.    Boeing's obligation to indemnify Customer for copyright infringement is limited to infringements in countries which, at the time of the infringement, are members of The Berne Union and recognize computer software as a "work" under The Berne Convention.

3.3.    The indemnities provided under this Part 6 will not apply to any BFE engines, Supplier Product, Boeing Product used other than for its intended purpose, or Aircraft Software not created by Boeing.

3.4.    Customer must deliver written notice to Boeing (i) within ten (10) days after Customer first receives notice of any suit or other formal action against Customer and (ii) within twenty (20) days after Customer first receives any other allegation or written claim of infringement covered by this Part 6.

3.5.    At any time, Boeing will have the right at its option and expense to: (i) negotiate with any party claiming infringement, (ii) assume or control the defense of any infringement allegation, claim, suit or formal action, (iii) intervene in any infringement suit or formal action, and/or (iv) attempt to resolve any claim of infringement by replacing an allegedly infringing Boeing Product or Aircraft Software with a noninfringing equivalent.

3.6.    Customer will promptly furnish to Boeing all information, records and assistance within Customer's possession or control which Boeing considers relevant or material to any alleged infringement covered by this Part 6.

3.7.    Except as required by a final judgment entered against Customer by a court of competent jurisdiction from which no appeals can be or have been filed, Customer will obtain Boeing's written approval prior to paying, committing to pay,

assuming any obligation or making any material concession relative to any infringement covered by these indemnities.

3.8.    BOEING WILL HAVE NO OBLIGATION OR LIABILITY UNDER THIS PART 6 FOR LOSS OF USE, REVENUE OR PROFIT, OR FOR ANY OTHER INCIDENTAL OR CONSEQUENTIAL DAMAGES. THE OBLIGATIONS OF BOEING AND REMEDIES OF CUSTOMER IN THIS PART 6 ARE EXCLUSIVE AND IN SUBSTITUTION FOR, AND CUSTOMER HEREBY WAIVES, RELEASES AND RENOUNCES ALL OTHER INDEMNITIES, OBLIGATIONS AND LIABILITIES OF BOEING AND ALL OTHER RIGHTS, CLAIMS AND REMEDIES OF CUSTOMER AGAINST BOEING, EXPRESS OR IMPLIED, ARISING BY LAW OR OTHERWISE, WITH RESPECT TO ANY ACTUAL OR ALLEGED PATENT, COPYRIGHT OR OTHER INTELLECTUAL PROPERTY INFRINGEMENT OR THE LIKE BY ANY AIRCRAFT, AIRCRAFT SOFTWARE, MATERIALS, TRAINING, SERVICES OR OTHER THING PROVIDED UNDER THIS AGTA AND THE APPLICABLE PURCHASE AGREEMENT.

3.9.    For the purposes of this Part 6, "BOEING or Boeing" is defined as The Boeing Company, its divisions, subsidiaries, affiliates, the assignees of each and their respective directors, officers, employees and agents.

**Appendix I**
**SAMPLE**
**Insurance Certificate**
**BROKER'S LETTERHEAD**

Date: +

Certificate of Insurance

**ISSUED TO:**          The Boeing Company
                       Post Office Box 3707
                       Mail Code 13-57
                       Seattle, Washington 98124
                       Attn:    Manager - Aviation Insurance for
                                Vice President - Employee Benefits,
                                Insurance and Taxes

**CC:**                Boeing Commercial Airplanes
                       P.O. Box 3707
                       Mail Code 21-34
                       Seattle, Washington 98124-2207
                       U.S.A.
                       Attn:    Vice President - Contracts

**NAMED INSURED:** Southwest Airlines Co.
        We hereby certify that in our capacity as Brokers to the Named Insured, the following described insurance is in force on this date:

**Insurer**                          **Policy No.**                    **Participation**

**POLICY PERIOD:** From **[date and time of inception of the Policy(ies)] to [date and time of expiration]**.

**GEOGRAPHICAL LIMITS**: Worldwide (however, as respects "Aircraft Hull War and Allied Perils" Insurance, as agreed by Boeing).

SWA-AGTA-APPEND                                      Appendix I Page A-1

**Appendix I**
**SAMPLE**
**Insurance Certificate**

**AIRCRAFT INSURED**: All Boeing manufactured aircraft owned or operated by the Named Insured which are the subject of the following purchase agreement(s), entered into between The Boeing Company and _____ (hereinafter **Aircraft**):

   Purchase Agreement No. _____ dated _____, 20_____
   Purchase Agreement No. _____ dated _____, 20_____

**COVERAGES**:

2.     Aircraft "all risks" Hull (Ground and Flight)

3.     Aircraft Hull War and Allied Perils (as per LSW 555, or its successor wording)

4.     Airline Liability

   Including, but not limited to, Bodily Injury, Property Damage, Aircraft Liability, Liability War Risks, Passenger Legal Liability, //Premises/Operations// Liability, Completed //Operations/Products// Liability, Baggage Legal Liability (checked and unchecked), Cargo Legal Liability, Contractual Liability and Personal Injury.
   The above-referenced Airline Liability insurance coverage is subject to War and Other Perils Exclusion Clause (AV48B) but all sections, other than Section (b) are reinstated as per AV52C, or their successor endorsements.

**LIMITS OF LIABILITY:** To the fullest extent of the Policy limits that the Named Insured carries from the time of delivery of the first Aircraft under the first Purchase Agreement listed under "Aircraft Insured" and thereafter at the inception of each policy period, but in any event no less than the following:
   Combined Single Limit Bodily Injury and Property Damage: U.S. Dollars ($) any one occurrence each Aircraft (with aggregates as applicable).

SWA-AGTA-APPEND                                    Appendix I Page A-2

**Appendix I**
**SAMPLE**
**Insurance Certificate**

| | |
|---|---|
| (737-500/600) | US$350,000,000 |
| (737-300/700) | US$400,000,000 |
| (737-400) | US$450,000,000 |
| (737-800/900) | US$500,000,000 |
| (737-7/8/9) | TBD |
| (757-200) | US$525,000,000 |
| (757-300) | US$550,000,000 |
| (767-200) | US$550,000,000 |
| (767-300) | US$700,000,000 |
| (767-400ERX) | US$750,000,000 |
| (787) | US$700,000,000 |
| (777) | US$800,000,000 |
| (747) | US$900,000,000 |

(In regard to all other models and/or derivatives, to be specified by Boeing).

(In regard to Personal Injury coverage, limits are Twenty-five million U.S. Dollars ($25,000,000) any one //offense/aggregate//.)

**DEDUCTIBLES / SELF-INSURANCE:** Any deductible and/or self-insurance amount (other than standard market deductibles) are to be disclosed and agreed by Boeing.

**SPECIAL PROVISIONS APPLICABLE TO BOEING:** It is certified that Insurers are aware of the terms and conditions of SWA-AGTA and the following purchase agreements:

Purchase Agreement No. _____ dated _____, 20_____
Purchase Agreement No. _____ dated _____, 20_____
Purchase Agreement No. _____ dated _____, 20_____

Each Aircraft manufactured by Boeing which is delivered to the Insured pursuant to the applicable purchase agreement during the period of effectivity of the policies represented by this Certificate will be covered to the extent specified herein.
Insurers have agreed to the following:

1.  In regard to Aircraft "all risks" Hull Insurance and Aircraft Hull War and Allied Perils Insurance, Insurers agree to waive all rights of subrogation or recourse against Boeing in accordance with SWA-AGTA which was incorporated by reference into the applicable purchase agreement.

**Appendix I**
**SAMPLE**
**Insurance Certificate**

2.      In regard to Airline Liability Insurance, Insurers agree:

2.1.    To include Boeing as an additional insured in accordance with Customer's undertaking in Article 8.2.1 of SWA-AGTA which was incorporated by reference into the applicable purchase agreement.

2.2.    To provide that such insurance will be primary and not contributory nor excess with respect to any other insurance available for the protection of Boeing;

2.3.    To provide that with respect to the interests of Boeing, such insurance shall not be invalidated or minimized by any action or inaction, omission or misrepresentation by the Insured or any other person or party (other than Boeing) regardless of any breach or violation of any warranty, declaration or condition contained in such policies;

2.4.    To provide that all provisions of the insurance coverage's referenced above, except the limits of liability, will operate to give each Insured or additional insured the same protection as if there were a separate Policy issued to each.

3.      In regard to all of the above referenced policies:

3.1.    Boeing will not be responsible for payment, set-off, or assessment of any kind or any premiums in connection with the policies, endorsements or coverage's described herein;

3.2.    If a policy is canceled for any reason whatsoever, or any substantial change is made in the coverage which affects the interests of Boeing or if a policy is allowed to lapse for nonpayment of premium, such cancellation, change or lapse shall not be effective as to Boeing for thirty (30) days (in the case of war risk and allied perils coverage seven (7) days after sending, or such other period as may from time to time be customarily obtainable in the industry) after receipt by Boeing of written notice from the Insurers or the authorized representatives or Broker of such cancellation, change or lapse; and

3.3.    For the purposes of the Certificate, "Boeing" is defined as The Boeing Company, its divisions, subsidiaries, affiliates, the assignees of each and their respective directors, officers, employees and agents.

Subject to the terms, conditions, limitations and exclusions of the relative policies.


_____
**[Signature]**

Name: _____

Title: _____

SWA-AGTA-APPEND                                             Appendix I Page A-4

**Appendix II**
**SAMPLE**
**Purchase Agreement Assignment**


THIS PURCHASE AGREEMENT ASSIGNMENT (**Assignment**) dated as of _____, 20_____ is between _____, a company organized under the laws of _____ (**Assignor**) and _____, a company organized under the laws of _____ (**Assignee**). Capitalized terms used herein without definition will have the same meaning as in the Boeing Purchase Agreement.

Assignor and The Boeing Company, a Delaware corporation (**Boeing**), are parties to the Boeing Purchase Agreement, providing, among other things, for the sale by Boeing to Assignor of certain aircraft, engines and related equipment, including the Aircraft.

Assignee wishes to acquire the Aircraft and certain rights and interests under the Boeing Purchase Agreement and Assignor, on the following terms and conditions, is willing to assign to Assignee certain of Assignor's rights and interests under the Boeing Purchase Agreement. Assignee is willing to accept such assignment.

It is agreed as follows:

1.    For all purposes of this Assignment, the following terms will have the following meanings:

**Aircraft** - one Boeing Model _____ aircraft, bearing manufacturer's serial number _____, together with all engines and parts installed on such aircraft on the Delivery Date.

**Boeing** - Boeing shall include any wholly-owned subsidiary of Boeing, and its successors and assigns.

**Boeing Purchase Agreement** - Purchase Agreement No. _____ dated as of _____ between Boeing and Assignor, as amended, but excluding _____, providing, among other things, for the sale by Boeing to Assignor of the Aircraft, as said agreement may be further amended to the extent permitted by its terms. The Purchase Agreement incorporated by reference Aircraft General Terms Agreement SWA-AGTA (**AGTA**).

**Delivery Date** - the date on which the Aircraft is delivered by Boeing to Assignee pursuant to and subject to the terms and conditions of the Boeing Purchase Agreement and this Assignment.

2.    Assignor does hereby assign to Assignee all of its rights and interests in and to the Boeing Purchase Agreement, as and to the extent that the same relate to the Aircraft and the purchase and operation thereof, except as and to the extent expressly reserved below, including, without limitation, in such assignment: **[TO BE COMPLETED BY THE PARTIES.]**


SWA-AGTA                                                    October 28, 2011
                                                           Appendix II Page A-5

**Appendix II**
**SAMPLE**
**Purchase Agreement Assignment**

*{EXAMPLES*

    *(i)    the right upon valid tender to purchase the Aircraft pursuant to the Boeing Purchase Agreement subject to the terms and conditions thereof and the right to take title to the Aircraft and to be named the "Buyer" in the bill of sale for the Aircraft;*

    *(ii)  the right to accept delivery of the Aircraft;*

    *(iii)   all claims for damages arising as a result of any default under the Boeing Purchase Agreement in respect of the Aircraft;*

    *(iv)  all warranty and indemnity provisions contained in the Boeing Purchase Agreement, and all claims arising thereunder, in respect of the Aircraft; and*

    *(v)  any and all rights of Assignor to compel performance of the terms of the Boeing Purchase Agreement in respect of the Aircraft.}*

Reserving exclusively to Assignor, however:
*{EXAMPLES*

    *(i)    all Assignor's rights and interests in and to the Boeing Purchase Agreement as and to the extent the same relates to aircraft other than the Aircraft, or to any other matters not directly pertaining to the Aircraft;*

    *(ii)  all Assignor's rights and interests in or arising out of any advance or other payments or deposits made by Assignor in respect of the Aircraft under the Boeing Purchase Agreement and any amounts credited or to be credited or paid or to be paid by Boeing in respect of the Aircraft;*

    *(iii)  the right to obtain services, training, information and demonstration and test flights pursuant to the Boeing Purchase Agreement; and*

    *(iv)  the right to maintain plant representatives at Boeing's plant pursuant to the Boeing Purchase Agreement.}*

SWA-AGTA

October 28, 2011
Appendix II Page A-6

**Appendix II**
**SAMPLE**
Purchase Agreement Assignment

Assignee hereby accepts such assignment.

3.      Notwithstanding the foregoing, so long as no event of default or termination under [specify document] has occurred and is continuing, Assignee hereby authorizes Assignor, to the exclusion of Assignee, to exercise in Assignor's name all rights and powers of Customer under the Boeing Purchase Agreement in respect of the Aircraft.

4.      For all purposes of this Assignment, Boeing will not be deemed to have knowledge of or need recognize the occurrence, continuance or the discontinuance of any event of default or termination under [specify document] unless and until Boeing receives from Assignee written notice thereof, addressed to its Vice President - Contracts, Boeing Commercial Airplanes at P.O. Box 3707, Seattle, Washington 98124, if by mail, or to 425-237-1706, if by facsimile. Until such notice has been given, Boeing will be entitled to deal solely and exclusively with Assignor. Thereafter, until Assignee has provided Boeing written notice that any such events no longer continue, Boeing will be entitled to deal solely and exclusively with Assignee. Boeing may act with acquittance and conclusively rely on any such notice.

5.      It is expressly agreed that, anything herein contained to the contrary notwithstanding: (a) prior to the Delivery Date Assignor will perform its obligations with respect to the Aircraft to be performed by it on or before such delivery, (b) Assignor will at all times remain liable to Boeing under the Boeing Purchase Agreement to perform all obligations of Customer thereunder to the same extent as if this Assignment had not been executed, and (c) the exercise by Assignee of any of the assigned rights will not release Assignor from any of its obligations to Boeing under the Boeing Purchase Agreement, except to the extent that such exercise constitutes performance of such obligations.

6.      Notwithstanding anything contained in this Assignment to the contrary (but without in any way releasing Assignor from any of its obligations under the Boeing Purchase Agreement), Assignee confirms for the benefit of Boeing that, insofar as the provisions of the Boeing Purchase Agreement relate to the Aircraft, in exercising any rights under the Boeing Purchase Agreement, or in making any claim with respect to the Aircraft or other things (including, without limitation, Material, training and services) delivered or to be delivered, the terms and conditions of the Boeing Purchase Agreement, including, without limitation, the <u>DISCLAIMER AND RELEASE</u> and <u>EXCLUSION OF CONSEQUENTIAL AND OTHER DAMAGES</u> in Article 11 of Part 2 of Exhibit C to the Aircraft General Terms Agreement which was incorporated by reference into the Boeing Purchase Agreement and the insurance provisions in Article 8.2 of the Aircraft General Terms Agreement which was incorporated by reference into the Boeing Purchase Agreement therein, will apply to and be binding on Assignee to the same extent as if Assignee had been the original "Customer" thereunder. Assignee further agrees, expressly for the benefit of Boeing, upon the written request of Boeing, Assignee will promptly execute and deliver such further assurances and documents and take such further action as Boeing may reasonably request in order to obtain the full benefits of Assignee's agreements in this paragraph.

SWA-AGTA                                                              October 28, 2011
                                                                     Appendix II Page A-7

**Appendix II**
**SAMPLE**
**Purchase Agreement Assignment**

7.      Nothing contained herein will subject Boeing to any liability to which it would not otherwise be subject under the Boeing Purchase Agreement or modify in any respect the contract rights of Boeing thereunder, or require Boeing to divest itself of title to or possession of the Aircraft or other things until delivery thereof and payment therefore as provided therein.

8.      Notwithstanding anything in this Assignment to the contrary, after receipt of notice of any event of default or termination under **[specify document]**, Boeing will continue to owe to Assignor moneys in payment of claims made or obligations arising before such notice, which moneys may be subject to rights of set-off available to Boeing under applicable law. Similarly, after receipt of notice that such event of default or termination no longer continues, Boeing will continue to owe to Assignee moneys in payment of claims made or obligations arising before such notice, which moneys may be subject to rights of set-off available to Boeing under applicable law.

9.      Effective at any time after an event of default has occurred, and for so long as such event of default is continuing, Assignor does hereby constitute Assignee, Assignor's true and lawful attorney, irrevocably, with full power (in the name of Assignor or otherwise) to ask, require, demand, receive, and give acquittance for any and all moneys and claims for moneys due and to become due under or arising out of the Boeing Purchase Agreement in respect of the Aircraft, to the extent assigned by this Assignment.

10.      Assignee agrees, expressly for the benefit of Boeing and Assignor that it will not disclose, directly or indirectly, any terms of the Boeing Purchase Agreement; provided, that Assignee may disclose any such information (a) to its special counsel and public accountants, (b) as required by applicable law to be disclosed or to the extent that Assignee may have received a subpoena or other written demand under color of legal right for such information, but it will first, as soon as practicable upon receipt of such requirement or demand, furnish an explanation of the basis thereof to Boeing, and will afford Boeing reasonable opportunity, to obtain a protective order or other reasonably satisfactory assurance of confidential treatment for the information required to be disclosed, and (c) to any bona fide potential purchaser or lessee of the Aircraft. Any disclosure pursuant to (a) and (c) above will be subject to execution of a confidentiality agreement substantially similar to this paragraph 10.

11.      This Assignment may be executed by the parties in separate counterparts, each of which when so executed and delivered will be an original, but all such counterparts will together constitute but one and the same instrument.

12.      This Assignment will be governed by, and construed in accordance with, the laws of _____.

SWA-AGTA                                                                October 28, 2011
                                                                        Appendix II Page A-8

**Appendix II**
**SAMPLE**
**Purchase Agreement Assignment**


_____                         _____
as Assignor                                                              as Assignee

By _____                         By _____

Name:                                                                    Name:

Title:                                                                   Title:


**[If the Assignment is further assigned by Assignee in connection with a financing, the following language needs to be included.]**

Attest:

      The undersigned, as **///**Indenture Trustee**/**Agent**//** for the benefit of the Loan **//**Participants**/**Mortgagee**///** and as assignee of, and holder of a security interest in, the estate, right, and interest of the Assignee in and to the foregoing Purchase Agreement Assignment and the Purchase Agreement pursuant to the terms of a certain **//**Trust Indenture**/**Mortgage**//** dated as of _____, 20\_\_\_\_\_, agrees to the terms of the foregoing Purchase Agreement Assignment and agrees that its rights and remedies under such **//**Trust Indenture**/**Mortgage**//** shall be subject to the terms and conditions of the foregoing Purchase Agreement Assignment, including, without limitation, paragraph 6.

**[Name of Entity]**
 as **//**Indenture Trustee**/**Agent**//**

  By:_____

  Name:

  Title:


 SWA-AGTA                                                       October 28, 2011
                                             Appendix II Page A-9

**Appendix II**
**SAMPLE**
**Purchase Agreement Assignment**

CONSENT AND AGREEMENT OF
THE BOEING COMPANY

     THE BOEING COMPANY, a Delaware corporation (**Boeing**), hereby acknowledges notice of and consents to the foregoing Purchase Agreement Assignment (**Assignment**) as it relates to Boeing in respect of the Aircraft. Boeing confirms to Assignee that: all representations, warranties, indemnities and agreements of Boeing under the Boeing Purchase Agreement with respect to the Aircraft will, subject to the terms and conditions thereof and of the Assignment, inure to the benefit of Assignee to the same extent as if Assignee were originally named "Customer" therein.

     This Consent and Agreement will be governed by, and construed in accordance with, the law of the State of Washington, excluding the conflict of laws principles thereof.

Dated as of _____, 20_____.

THE BOEING COMPANY

By _____
Name:

Title: Attorney-in-Fact


Aircraft Manufacturer's Serial Number(s) _____


  SWA-AGTA

October 28, 2011
Appendix II Page A-10

**Appendix III**
**SAMPLE**
**Post-Delivery Sale Notice**

Boeing Commercial Airplanes
P.O. Box 3707
Seattle, Washington 98124-2207
U.S.A.

<u>By Courier</u>
1901 Oakesdale Ave. SW
Renton, WA 98055
U.S.A.

Attention:   Vice President - Contracts
        Mail Code 21-34

In connection with the sale by Southwest Airlines Co. (**Seller**) to _____ (**Purchaser**) of the aircraft identified below, reference is made to Purchase Agreement No. _____ dated as of _____, 20_____, between The Boeing Company (**Boeing**) and Seller (**Purchase Agreement**) under which Seller purchased certain Boeing Model _____ aircraft, including the aircraft bearing Manufacturer's Serial No.(s) _____ (**Aircraft**). The Purchase Agreement incorporated by reference Aircraft General Terms Agreement SWA-AGTA (**AGTA**).

Capitalized terms used herein without definition will have the same meaning as in the Purchase Agreement.

Seller has sold the Aircraft, including in that sale the assignment to Purchaser of all remaining rights related to the Aircraft under the Purchase Agreement. To accomplish this transfer of rights, as authorized by the provisions of the Purchase Agreement:

1.      Purchaser acknowledges it has reviewed those provisions of the Purchase Agreement related to those rights assigned and agrees to be bound by and comply with all applicable terms and conditions of the Purchase Agreement, including, without limitation, the <u>DISCLAIMER AND RELEASE</u> and <u>EXCLUSION OF CONSEQUENTIAL AND OTHER DAMAGES</u> in Article 11 of Part 2 of Exhibit C to the AGTA and the insurance provisions in Article 8.2 of the AGTA. Purchaser further agrees upon the written request of Boeing, to promptly execute and deliver such further assurances and documents and take such further action as Boeing may reasonably request in order to obtain the full benefits of Purchaser's agreements in this paragraph; and

2.      Seller will remain responsible for any payments due Boeing as a result of obligations relating to the Aircraft incurred by Seller to Boeing prior to the effective date of this letter.

SWA-AGTA                                          October 28, 2011
                                                 Appendix III Page A-11

**Appendix III**
**SAMPLE**
**Post-Delivery Sale Notice**

We request that Boeing acknowledge receipt of this letter and confirm the transfer of rights set forth above by signing the acknowledgment and forwarding one copy of this letter to each of the undersigned.

Very truly yours,

Southwest Airlines Co.                                          Purchaser

By    _____          By    _____
Its   _____          Its   _____
Dated _____          Dated _____

Receipt of the above letter is acknowledged and the assignment of rights under the Purchase Agreement with respect to the Aircraft described above is confirmed, effective as of this date.

THE BOEING COMPANY

By _____

Its   <u>Attorney-in-Fact</u>

Dated _____

Aircraft Manufacturer's Serial Number _____

SWA-AGTA                                          October 28, 2011
                                                  Appendix III Page A-12

**Appendix IV**
**SAMPLE**
**Post-Delivery Lease Notice**

Boeing Commercial Airplanes
P.O. Box 3707
Seattle, Washington 98124-2207
U.S.A.

<u>By Courier</u>
1901 Oakesdale Ave. SW
Renton, WA 98055
U.S.A.

Attention:    Vice President - Contracts
        Mail Code 21-34

In connection with the lease by Southwest Airlines Co. (**Lessor**) to _____ (**Lessee**) of the aircraft identified below, reference is made to Purchase Agreement No. _____ dated as of _____, 20_____, between The Boeing Company (**Boeing**) and Lessor (**Purchase Agreement**) under which Lessor purchased certain Boeing Model _____ aircraft, including the aircraft bearing Manufacturer's Serial No.(s) _____ (**Aircraft**). The Purchase Agreement incorporated by reference Aircraft General Terms Agreement SWA-AGTA (**AGTA**).

Capitalized terms used herein without definition will have the same meaning as in the Purchase Agreement.

Lessor has leased the Aircraft, including in that lease the transfer to Lessee of all remaining rights related to the Aircraft under the Purchase Agreement. To accomplish this transfer of rights, as authorized by the provisions of the Purchase Agreement:

1.    Lessor authorizes Lessee to exercise, to the exclusion of Lessor, all rights and powers of Lessor with respect to the remaining rights related to the Aircraft under the Purchase Agreement. This authorization will continue until Boeing receives written notice from Lessor to the contrary, addressed to Vice President – Contracts, Mail Code 21-34, Boeing Commercial Airplanes, P.O. Box 3707, Seattle, Washington 98124-2207. Until Boeing receives such notice, Boeing is entitled to deal exclusively with Lessee with respect to the Aircraft under the Purchase Agreement. With respect to the rights and obligations of Lessor under the Purchase Agreement, all actions taken or agreements entered into by Lessee during the period prior to Boeing's receipt of this notice are final and binding on Lessor. Further, any payments made by Boeing as a result of claims made by Lessee will be made to the credit of Lessee.

SWA-AGTA

October 28, 2011
Appendix IV Page A-13

**Appendix IV**
**SAMPLE**
**Post-Delivery Lease Notice**

2.      Lessee accepts the authorization above, acknowledges it has reviewed those provisions of the Purchase Agreement related to the authority granted and agrees to be bound by and comply with all applicable terms and conditions of the Purchase Agreement including, without limitation, the <u>DISCLAIMER AND RELEASE</u> and <u>EXCLUSION OF CONSEQUENTIAL AND OTHER DAMAGES</u> in Article 11 of Part 2 of Exhibit C of the AGTA and the insurance provisions in Article 8.2 of the AGTA. Lessee further agrees, upon the written request of Boeing, to promptly execute and deliver such further assurances and documents and take such further action as Boeing may reasonably request in order to obtain the full benefits of Lessee's agreements in this paragraph.

3.      Lessor will remain responsible for any payments due Boeing as a result of obligations relating to the Aircraft incurred by Lessor to Boeing prior to the effective date of this letter.

        We request that Boeing acknowledges receipt of this letter and confirm the transfer of rights set forth above by signing the acknowledgment and forwarding one copy of this letter to each of the undersigned.

Very truly yours,

Southwest Airlines Co.                                    Lessee

By   _____          By   _____
Its  _____          Its  _____
Dated _____         Dated _____


        Receipt of the above letter is acknowledged and transfer of rights under the Purchase Agreement with respect to the Aircraft described above is confirmed, effective as of this date.

THE BOEING COMPANY

By _____

Its   <u>Attorney-in-Fact</u>

Dated _____

Aircraft Manufacturer's Serial Number _____

**Appendix V**
**SAMPLE**
**Purchaser's/Lessee's Agreement**

Boeing Commercial Airplanes
P. O. Box 3707
Seattle, Washington 98124-2207
U.S.A.

By Courier
1901 Oakesdale Ave. SW
Renton, WA 98055
U.S.A.

Attention          Vice President – Contracts
                   Mail Code 21-34

In connection with the sale/lease by Southwest Airlines Co. (**//Seller/Lessor//**) to _____ (**//Purchaser/Lessee//**) of the aircraft identified below, reference is made to the following documents:

(i)     Purchase Agreement No. _____ dated as of _____, 20_____, between The Boeing Company (**Boeing**) and **//**Seller**/**Lessor**//** (**Purchase Agreement**) under which **//**Seller**/**Lessor**//** purchased certain Boeing Model _____ aircraft, including the aircraft bearing Manufacturer's Serial No.(s) _____ (**Aircraft**); and

(ii)    Aircraft **//**Sale**/**Lease**//** Agreement dated as of _____, 20_____, between Seller/Lessor and **//**Purchaser**/**Lessee**//** (**Aircraft Agreement**) under which **//**Seller**/**Lessor**//** is **//**selling**/**leasing**//** the Aircraft.

Capitalized terms used herein without definition will have the same meaning as in the Purchase Agreement.

1.      **//**Seller**/**Lessor**//** has sold/leased the Aircraft under the Aircraft Agreement, including therein a form of exculpatory clause protecting **//**Seller**/**Lessor**//** from liability for loss of or damage to the aircraft, and/or related incidental or consequential damages, including without limitation loss of use, revenue or profit.

2.      Disclaimer and Release; Exclusion of Consequential and Other Damages.

2.1.    In accordance with **//**Seller**/**Lessor**//** obligation under Article 9.5 of the AGTA which was incorporated by reference into the Purchase Agreement, Purchaser/Lessee hereby agrees that:

SWA-AGTA                                      October 28, 2011
                                             Appendix V Page A-15

**Appendix V**
**SAMPLE**
**Purchaser's/Lessee's Agreement**

2.2.  <u>DISCLAIMER AND RELEASE</u>. IN CONSIDERATION OF THE SALE/LEASE OF THE AIRCRAFT, PURCHASER/LESSEE HEREBY WAIVES, RELEASES AND RENOUNCES ALL WARRANTIES, OBLIGATIONS AND LIABILITIES OF BOEING AND ALL OTHER RIGHTS, CLAIMS AND REMEDIES OF PURCHASER/LESSEE AGAINST BOEING, EXPRESS OR IMPLIED, ARISING BY LAW OR OTHERWISE, WITH RESPECT TO ANY NONCONFORMANCE OR DEFECT IN ANY AIRCRAFT, BOEING PRODUCT, MATERIALS, TRAINING, SERVICES OR OTHER THING PROVIDED UNDER THE AIRCRAFT AGREEMENT, INCLUDING, BUT NOT LIMITED TO:

(i)   ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS;

(ii)  ANY IMPLIED WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE;

(iii) ANY OBLIGATION, LIABILITY, RIGHT, CLAIM OR REMEDY IN TORT, WHETHER OR NOT ARISING FROM THE NEGLIGENCE OF BOEING; AND

(iv)  ANY OBLIGATION, LIABILITY, RIGHT, CLAIM OR REMEDY FOR LOSS OF OR DAMAGE TO ANY AIRCRAFT.

2.3.  <u>EXCLUSION OF CONSEQUENTIAL AND OTHER DAMAGES</u>. BOEING WILL HAVE NO OBLIGATION OR LIABILITY, WHETHER ARISING IN CONTRACT (INCLUDING WARRANTY), TORT, WHETHER OR NOT ARISING FROM THE NEGLIGENCE OF BOEING, OR OTHERWISE, FOR LOSS OF USE, REVENUE OR PROFIT, OR FOR ANY OTHER INCIDENTAL OR CONSEQUENTIAL DAMAGES WITH RESPECT TO ANY NONCONFORMANCE OR DEFECT IN ANY AIRCRAFT, MATERIALS, TRAINING, SERVICES OR OTHER THING PROVIDED UNDER THE AIRCRAFT AGREEMENT.

2.4.  <u>Definitions</u>. For the purpose of this paragraph 2, **BOEING** or **Boeing** is defined as The Boeing Company, its divisions, subsidiaries, affiliates, the assignees of each, and their respective directors, officers, employees and agents.

**Appendix V**
**SAMPLE**
**Purchaser's/Lessee's Agreement**

Very truly yours,

Southwest Airlines Co.                                    **//**Purchaser**/**Lessee**//**

By _____          By _____
Its _____          Its _____
Dated _____          Dated _____

SWA-AGTA                                                  October 28, 2011
                                                         Appendix V Page A-17

**Appendix VI**
**SAMPLE**
**Post-Delivery Owner Appointment of Agent - Warranties**

Boeing Commercial Airplanes
P. O. Box 3707
Seattle, Washington 98124-2207
U.S.A.

By Courier
1901 Oakesdale Ave. SW
Renton, WA 98055
U.S.A.

Attention                Vice President – Contracts
                         Mail Code 21-34

Reference is made to Purchase Agreement No. _____ dated as of _____, 20__ (**Purchase Agreement**), between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**), under which Customer purchased certain Boeing Model _____ aircraft including the aircraft bearing Manufacturer's Serial No(s) _____ (**Aircraft**). The Purchase Agreement incorporated by reference Aircraft General Terms Agreement SWA-AGTA (**AGTA**).

Capitalized terms used herein without definition will have the same meaning as in the Purchase Agreement.

To accomplish the appointment of an agent, Customer confirms:

1.      Customer has appointed _____ as agent (**Agent**) to act directly with Boeing with respect to the remaining warranties under the Purchase Agreement and requests Boeing to treat Agent as Customer for the administration of claims with respect to such warranties; provided however, Customer remains liable to Boeing to perform the obligations of Customer under the Purchase Agreement.

2.      Boeing may continue to deal exclusively with Agent concerning the matters described herein unless and until Boeing receives written notice from Customer to the contrary, addressed to Vice President - Contracts, Mail Code 21-34, Boeing Commercial Airplanes, P.O. Box 3707, Seattle, Washington 98124-2207, U.S.A. With respect to the rights and obligations of Customer under the Purchase Agreement, all actions taken by Agent or agreements entered into by Agent during the period prior to Boeing's receipt of such notice are final and binding on Customer. Further, any payments made by Boeing as a result of claims made by Agent will be made to the credit of Agent unless otherwise specified when each claim is submitted.

3.      Customer will remain responsible for any payments due Boeing as a result of obligations relating to the Aircraft incurred by Customer to Boeing prior to the effective date of this letter.

SWA-AGTA                                          October 28, 2011
                                                 Appendix VI Page A-18

**Appendix VI**
**SAMPLE**
**Post-Delivery Owner Appointment of Agent - Warranties**

We request that Boeing acknowledge receipt of this letter and confirm the appointment of Agent as stated above by signing the acknowledgment and forwarding one copy of this letter to each of the undersigned.

Very truly yours,

Southwest Airlines Co.

By _____

Its _____

Dated _____

By _____

Its _____

Dated _____

SWA-AGTA

October 28, 2011
Appendix VI Page A-19

**Appendix VI**
**SAMPLE**
**Post-Delivery Owner Appointment of Agent - Warranties**

<u>AGENT'S AGREEMENT</u>

Agent accepts the appointment as stated above, acknowledges it has reviewed the those portions of the Purchase Agreement related to the authority granted it under the Purchase Agreement and agrees that, in exercising any rights or making any claims thereunder, Agent will be bound by and comply with all applicable terms and conditions of the Purchase Agreement including, without limitation, the <u>DISCLAIMER AND RELEASE</u> and <u>EXCLUSION OF CONSEQUENTIAL AND OTHER DAMAGES</u> in Article 11 of Part 2 of Exhibit C to the AGTA. Agent further agrees, upon the written request of Boeing, to promptly execute and deliver such further assurances and documents and take such further action as Boeing may reasonably request in order to obtain the full benefits of the warranties under the Purchase Agreement.

Very truly yours,

Southwest Airlines Co.
Agent

By _____

Its _____

Dated _____


Receipt of the above letter is acknowledged and the appointment of Agent with respect to the above-described rights under the Purchase Agreement is confirmed, effective as of this date.

THE BOEING COMPANY


By _____

Its _____

Dated _____

Aircraft Manufacturer's Serial Number _____

**Appendix VII**
**SAMPLE**
**Contractor Confidentiality Agreement**

Boeing Commercial Airplanes
P. O. Box 3707
Seattle, Washington 98124-2207
U.S.A.

<u>By Courier</u>
1901 Oakesdale Ave. SW
Renton, WA 98055
U.S.A.

Attention        Vice President – Contracts
                 Mail Code 21-34

This agreement (**Agreement**) is entered into between _____ (**Contractor**) and Southwest Airlines Co. (**Customer**) and will be effective as of the date set forth below.

In connection with Customer's provision to Contractor of certain Materials, Proprietary Materials and Proprietary Information; reference is made to Purchase Agreement No. _____ dated as of _____ between The Boeing Company (**Boeing**) and Customer (**Purchase Agreement**), which incorporates by this reference SWA-AGTA.

Capitalized terms used herein without definition will have the same meaning as in the Purchase Agreement.

Boeing has agreed to permit Customer to make certain Materials, Proprietary Materials and Proprietary Information relating to Customer's Boeing Model _____ aircraft, Manufacturer's Serial Number _____, Registration No. _____ (**Aircraft**) available to Contractor in connection with Customer's contract with Contractor to maintain/repair/modify the Aircraft (**Contract**). In consideration of the Contract, and as a condition of receiving the Proprietary Materials and Proprietary Information, Contractor agrees as follows:

1.  For purposes of this Agreement:

**Aircraft Software** means software intended to fly with and be utilized in the operation of an Aircraft, but excludes software furnished by Customer.

**Materials** means any and all items that are created by Boeing or a Third Party, are provided directly or indirectly to Contractor from Boeing or from Customer, and serve primarily to contain, convey or embody information. Materials may include either tangible forms (for example, documents or drawings) or intangible embodiments (for example, software and other electronic forms) of information, but excludes Aircraft Software and software furnished by Customer.

**Appendix VII**
**SAMPLE**
**Contractor Confidentiality Agreement**


**Proprietary Information** means any and all proprietary, confidential and/or trade secret information owned by Boeing or a Third Party which is contained, conveyed or embodied in Materials.

**Proprietary Materials** means Materials that contain, convey, or embody Proprietary Information.

**Third Party** means anyone other than Boeing, Customer and Contractor.


2.	Boeing has authorized Customer to grant to Contractor a worldwide, non-exclusive, personal and nontransferable license to use Proprietary Materials and Proprietary Information, owned by Boeing, internally in connection with performance of the Contract or as may otherwise be authorized by Boeing in writing. Contractor will keep confidential and protect from disclosure to any person, entity or government agency, including any person or entity affiliated with Contractor, all Proprietary Materials and Proprietary Information. Individual copies of all Materials and Aircraft Software are provided to Contractor subject to copyrights therein, and all such copyrights are retained by Boeing or, in some cases, by Third Parties. Contractor is authorized to make copies of Materials (except for Materials bearing the copyright legend of a Third Party) provided, however, Contractor preserves the restrictive legends and proprietary notices on all copies. All copies of Proprietary Materials will belong to Boeing and be treated as Proprietary Materials under this Agreement.

3.	Contractor specifically agrees not to use Proprietary Materials or Proprietary Information in connection with the manufacture or sale of any part or design. Unless otherwise agreed with Boeing in writing, Proprietary Materials and Proprietary Information may be used by Contractor only for work on the Aircraft for which such Proprietary Materials have been specified by Boeing. Customer and Contractor recognize and agree that they are responsible for ascertaining and ensuring that all Materials are appropriate for the use to which they are put.

4.	Contractor will not attempt to gain access to information by reverse engineering, decompiling, or disassembling any portion of any software or Aircraft Software provided to Contractor pursuant to this Agreement.

5.	Upon Boeing's request at any time, Contractor will promptly return to Boeing (or, at Boeing's option, destroy) all Proprietary Materials, together with all copies thereof and will certify to Boeing that all such Proprietary Materials and copies have been so returned or destroyed.

**Appendix VII**
**SAMPLE**
**Contractor Confidentiality Agreement**

6. When and to the extent required by a government regulatory agency having jurisdiction over Contractor, Customer or the Aircraft, Contractor is authorized to provide Proprietary Materials and disclose Proprietary Information to the agency for the agency's use in connection with Contractor's authorized use of such Proprietary Materials and/or Proprietary Information in connection with Contractor's maintenance, repair, or modification of the Aircraft. Contractor agrees to take reasonable steps to prevent such agency from making any distribution or disclosure, or additional use of the Proprietary Materials and Proprietary Information so provided or disclosed. Contractor further agrees to promptly notify Boeing upon learning of any (i) distribution, disclosure, or additional use by such agency, (ii) request to such agency for distribution, disclosure, or additional use, or (iii) intention on the part of such agency to distribute, disclose, or make additional use of the Proprietary Materials or Proprietary Information.

7. Boeing is an intended third party beneficiary under this Agreement, and Boeing may enforce any and all of the provisions of the Agreement directly against Contractor. Contractor hereby submits to the jurisdiction of the Washington state courts and the United States District Court for the Western District of Washington with regard to any Boeing claims under this Agreement. It is agreed that Washington law (excluding Washington's conflict-of-law rules) will apply to this Agreement and to any claim or dispute under this Agreement.

8. No disclosure or physical transfer by Boeing or Customer to Contractor, of any Proprietary Materials or Proprietary Information covered by this Agreement will be construed as granting a license, other than as expressly set forth in this Agreement or any ownership right in any patent, patent application, copyright or proprietary information.

9. The provisions of this Agreement will apply notwithstanding any markings or legends, or the absence thereof, on any Proprietary Materials.

10. This Agreement is the entire agreement of the parties regarding the ownership and treatment of Proprietary Materials and Proprietary Information, and no modification of this Agreement will be effective as against Boeing unless embodied in writing and signed by authorized representatives of Contractor, Customer and Boeing.

11. Failure by either party to enforce any of the provisions of this Agreement will not be construed as a waiver of such provisions. If any of the provisions of this Agreement are held unlawful or otherwise ineffective by a court of competent jurisdiction, the remainder of the Agreement will remain in full force.

12. The obligations of Customer and Contractor relating to Proprietary Materials and Proprietary Information under this Agreement will remain in effect and will survive cancellation or termination of this Agreement.

**Appendix VII**
**SAMPLE**
**Contractor Confidentiality Agreement**

AGREED AND ACCEPTED this

Date: _____

Contractor                                    Southwest Airlines Co.

Signature _____            Signature _____

Printed Name _____          Printed Name _____

Title _____            Title _____

SWA-AGTA                                                              October 28, 2011
                                                                Appendix VII Page A-24

**Appendix VIII**
**SAMPLE**
**Post-Delivery Sale with Lease to Seller**

**[Notice from Owner/Seller and subsequent Buyer regarding post-delivery sale and lease back of an aircraft and transfer of all remaining Purchase Agreement rights.]**
Boeing Commercial Airplanes
P. O. Box 3707
Seattle, Washington 98124-2207
U.S.A.

<u>By Courier</u>
1901 Oakesdale Ave. SW
Renton, WA 98055
U.S.A.

Attention    Vice President – Contracts
        Mail Code 21-34

        In connection with _____'s (**Seller's**) sale to and lease back from _____ (**Buyer**) of the aircraft identified below, reference is made to the following documents:

1.      Purchase Agreement No. _____ dated as of _____, between The Boeing Company (**Boeing**) and Seller (**Agreement**) under which Seller purchased certain Boeing Model _____ aircraft, including the aircraft bearing Manufacturer's Serial No.(s) _____(**Aircraft**). The Agreement incorporates by reference the terms of SWA-AGTA dated _____ ___, between Seller and Boeing.

2.      Aircraft    Sale    Agreement    dated    as    of    _____,    between    Seller    and _____ (**Buyer**).

3.      Aircraft Lease Agreement dated as of _____, between Buyer and Seller.

        Capitalized terms used herein without definition will have the same meaning as in the Agreement.
        Seller confirms for the benefit of Boeing it owns and controls the rights it purports to assign herein.
        Seller has sold the Aircraft, including in that sale the transfer to Buyer of all remaining rights related to the Aircraft under the Agreement. To accomplish this transfer of rights, as authorized by the provisions of the Agreement:

SWA-AGTA                                                                                         October 28, 2011
                                                                                            Appendix VIII Page A-25

**Appendix VIII**
**SAMPLE**
**Post-Delivery Sale with Lease to Seller**

1.      Buyer acknowledges it has reviewed the Agreement and agrees that in exercising any rights under the Agreement or asserting any claims with respect to the Aircraft or other things (including without limitation, Materials, training and services) delivered or to be delivered, it is bound by and will comply with all applicable terms, conditions, and limitations of the Agreement including but not limited to those related to any exclusion or limitation of liabilities or warranties, indemnity and insurance; and

2.      Buyer authorizes Seller to exercise, to the exclusion of Buyer all rights and powers of "Customer" with respect to the remaining rights related to the Aircraft under the Agreement. This authorization will continue until Boeing receives written notice from Buyer to the contrary, addressed to Vice President - Contracts, Mail Code 21-34, Boeing Commercial Airplanes, P.O. Box 3707, Seattle, Washington 981242207 (if by mail) or (425) 237-1706 (if by facsimile). Until Boeing receives this notice, Boeing is entitled to deal exclusively with Seller as "Customer" with respect to the Aircraft under the Agreement. With respect to the rights, powers, duties and obligations of "Customer" under the Agreement, all actions taken by Seller or agreements entered into by Seller during the period prior to Boeing's receipt of that notice are final and binding on Buyer. Further, any payments made by Boeing as a result of claims made by Seller prior to receipt of such notice are to be made to the credit of Seller.

3.      Seller accepts the authorization set forth in paragraph 2 above, acknowledges it has reviewed the Agreement and agrees that in exercising any rights under the Agreement or asserting any claims with respect to the Aircraft or other things (including without limitation, Materials, training and services) delivered or to be delivered, it is bound by and will comply with all applicable terms, conditions, and limitations of the Agreement including but not limited to those relating to any exclusion or limitation of liabilities or warranties, indemnity and insurance.

4.      Seller agrees to remain responsible for any payments due Boeing as a result of obligations relating to the Aircraft incurred by Seller to Boeing prior to the effective date of this letter.

        We request that Boeing acknowledge receipt of this letter and confirm the transfer of rights set forth above by signing the acknowledgment and forwarding one copy of this letter to each of the undersigned.

SWA-AGTA

October 28, 2011
Appendix VIII Page A-26

**Appendix VIII**
**SAMPLE**
**Post-Delivery Sale with Lease to Seller**

Very truly yours,

Seller                                              Buyer

By    _____              By    _____
Its    _____              Its    _____
Dated _____              Dated _____

        Receipt of the above letter is acknowledged and transfer of rights under the Agreement with respect to the Aircraft described above is confirmed, effective as of the date indicated below.

THE BOEING COMPANY

By _____

Its    Attorney-in-Fact_____

Dated _____

SWA-AGTA                                                           October 28, 2011
                                                          Appendix VIII Page A-27

**Appendix IX**
**SAMPLE**
**SALE WITH LEASE**

**[NOTE: From 1st tier Owner/Seller and subsequent Buyer regarding post-delivery sale and lease of an aircraft. Remaining PA rights have been assigned to the new owner; the new owner authorizes a lessee to exercise such rights during the term of a lease. ]**
Boeing Commercial Airplanes
P. O. Box 3707
Seattle, Washington 98124-2207
U.S.A.

By Courier
1901 Oakesdale Ave. SW
Renton, WA 98055
U.S.A.

Attention    Vice President – Contracts
    Mail Code 21-34

In connection with the sale by _____ (**Seller**) to _____ (**Purchaser**) and subsequent lease of the aircraft identified below, reference is made to the following documents:

1.    Purchase Agreement No. _____ dated as of _____, _____, between The Boeing Company (**Boeing**) and Seller (**Agreement**) under which Seller purchased certain Boeing Model _____ aircraft, including the aircraft bearing Manufacturer's Serial No(s). _____ (**Aircraft**).

2.    Aircraft sale agreement dated as of _____, between Seller and Purchaser.

3.    Aircraft lease agreement dated as of _____, between Purchaser and _____ (**Lessee**)(**Lease**).

Capitalized terms used herein without definition will have the same meaning as in the Agreement.

Seller has sold the Aircraft, including in that sale the assignment to Purchaser of all remaining rights related to the Aircraft under the Agreement. To accomplish this transfer of rights, as authorized by the provisions of the Agreement:

3.1.    Seller confirms for the benefit of the Manufacturer it owns and controls the rights it purports to have assigned.

SWA-AGTA

October 28, 2011
Appendix IX Page A-28

**Appendix IX**
**SAMPLE**
**SALE WITH LEASE**

3.2.    Purchaser agrees that in exercising any rights under the Agreement or asserting any claims with respect to the Aircraft or other things (including without limitation, [data and documents/Materials], training and services) delivered or to be delivered, it is bound by and will comply with all applicable terms, conditions, and limitations of the Agreement including but not limited to those related to any exclusion or limitation of liabilities or warranties, indemnity and insurance; and

3.3.    Seller will remain responsible for any payment due Boeing as a result of obligations relating to the Aircraft incurred by Seller to Boeing prior to the effective date of this letter.

3.4.    Purchaser authorizes Lessee during the term of the Lease to exercise, to the exclusion of Purchaser all rights and powers of Buyer/Customer with respect to the remaining rights related to the Aircraft under the Agreement. This authorization will continue until Boeing receives written notice from Purchaser to the contrary, addressed to Vice President - Contracts, Mail Code 21-34, Boeing Commercial Airplanes, P.O. Box 3707, Seattle, Washington 981242207 (if by mail) or (425)237-1706 (if by facsimile). Until Boeing receives this notice, Boeing is entitled to deal exclusively with Lessee as Buyer/Customer with respect to the Aircraft under the Agreement. With respect to the rights, powers, duties and obligations of Buyer/Customer under the Agreement, all actions taken by Lessee or agreements entered into by Lessee during the period prior to Boeing's receipt of that notice are final and binding on Purchaser. Further, any payments made by Boeing as a result of claims made by Lessee prior to receipt of this notice are to be made to the credit of Lessee.

3.5.    Lessee accepts the authorization set forth in paragraph 3 above, acknowledges it has reviewed the Agreement and agrees that in exercising any rights under the Agreement or asserting any claims with respect to the Aircraft or other things (including without limitation, data and documents/Materials, training and services) delivered or to be delivered, it is bound by and will comply with all applicable terms, conditions, and limitations of the Agreement including but not limited to those related to any exclusion or limitation of liabilities or warranties, indemnity and insurance.

We request that Boeing acknowledge receipt of this letter and confirm the transfer of rights set forth above by signing the acknowledgment and forwarding one copy of this letter to each of the undersigned.

**Appendix IX**
**SAMPLE**
**SALE WITH LEASE**

Very truly yours,

Seller                                          Purchaser

By  _____            By  _____
Its  _____           Its  _____
Dated  _____         Dated  _____


_____(**Lessee**)


By _____

Its _____

Dated _____


SWA-AGTA                                                    October 28, 2011
                                                         Appendix IX Page A-30

**Appendix IX**
**SAMPLE**
**SALE WITH LEASE**

Receipt of the above letter is acknowledged and the transfers of rights under the Agreement with respect to the Aircraft described above are confirmed, effective as of the date indicated below.

THE BOEING COMPANY

By _____

Its   Attorney-in-Fact_____

Dated _____

MSN_____

**Appendix X**
**SAMPLE**
**Post-Delivery Security**

Boeing Commercial Airplanes
P. O. Box 3707
Seattle, Washington 98124-2207
U.S.A.

<u>By Courier</u>
1901 Oakesdale Ave. SW
Renton, WA 98055
U.S.A.

Attention              Vice President – Contracts
                       Mail Code 21-34

Reference is made to Purchase Agreement No. _____ dated as of _____, (**Agreement**) between The Boeing Company (**Boeing**) and _____ (**Borrower**) pursuant to which Borrower purchased from Boeing one (1) Boeing model _____ aircraft bearing Manufacturer's Serial Number _____(**Aircraft**). The Agreement incorporates by reference the terms of Aircraft General Terms Agreement SWA-AGTA (**AGTA**), dated _____, between Borrower and Boeing.

Capitalized terms used herein without definition will have the same meanings as in the Agreement.

Borrower confirms for the benefit of Boeing it owns and controls the rights it purports to assign herein.

In connection with Borrower's financing of the Aircraft, Borrower is entering into a Trust Indenture/Mortgage, dated as of _____, between Borrower and Indenture Trustee/Mortgagee (**Trust Indenture/Mortgage**), which grants a security interest in [the warranty rights/ all of its rights] contained in the Agreement related to the Aircraft (**Assigned Rights**). Borrower is authorized to exercise the Assigned Rights until such time as the Indenture Trustee/Mortgagee notifies Boeing as provided below that an Event of Default under the Trust Indenture/Mortgage has occurred and is continuing. In connection with this assignment for security purposes, as authorized by the provisions of the Agreement:

SWA-AGTA                                                    October 28, 2011
                                                          Appendix X Page A-32

**Appendix X**
**SAMPLE**
**Post-Delivery Security**

1.      <u>Indenture Trustee/Mortgagee</u>, as assignee of, and holder of a security interest in, the estate, right, and interest of the Borrower in and to the Agreement pursuant to the terms of a certain Trust Indenture/Mortgage, acknowledges that it has received copies of the applicable provisions of the Agreement and agrees that in exercising any rights under the Agreement or asserting any claims with respect to the Aircraft or other things (including without limitation, Materials, training and services) delivered or to be delivered, its rights and remedies under the Trust Indenture/Mortgage shall be subject to the terms and conditions of the Agreement including but not limited to those related to any exclusion or limitation of liabilities or warranties, indemnity and insurance.

2.      Borrower is authorized to exercise, to the exclusion of [Indenture Trustee/Mortgagee] all rights and powers of "Customer" under the Agreement, unless and until Boeing receives a written notice from Indenture Trustee/Mortgagee, addressed to its Vice President - Contracts, Boeing Commercial Airplanes at P.O. Box 3707, Seattle, Washington 98124, Mail Code 21-34 (if by mail), or (425) 237-1706 (if by facsimile) that an event of default under the Trust Indenture/Mortgage has occurred and is continuing. Until such notice has been given, Boeing will be entitled to deal solely and exclusively with Borrower. Thereafter, until Indenture Trustee/Mortgagee has provided Boeing written notice that any such event no longer continues, Boeing will be entitled to deal solely and exclusively with Indenture Trustee/Mortgagee. Boeing may act with acquittance and conclusively rely on any such notice.

Borrower will remain responsible to Boeing for any amounts due Boeing with respect to the Aircraft under the Agreement prior to Boeing's receipt of such notice. We request that Boeing acknowledge receipt of this letter and confirm the transfer of rights set forth above by signing its acknowledgment and forwarding one copy of this letter to each of the undersigned.

Very truly yours,

                                                 Indenture Trustee/Mortgagee

By _____                       By _____

Its _____                      Its _____

Dated _____                        Dated _____

By          _____              By          _____
Its         _____              Its         _____
Dated       _____              Dated       _____

SWA-AGTA                                                          October 28, 2011
                                                             Appendix X Page A-33

**Appendix X**
**SAMPLE**
**Post-Delivery Security**

Receipt of the above letter is acknowledged and the transfer of rights under the Agreement with respect to the Aircraft described above is confirmed, effective as of the date indicated below.

THE BOEING COMPANY

By _____

Its    Attorney-in-Fact_____

Dated _____

MSN_____



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

6-1162-CAF-0390

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    [***]

Reference:    Purchase Agreement Nos. 1810 and 3729 between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-700, -800 and 737-7/8/9 aircraft (**Purchase Agreements**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreements. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreements.

[***]

6-1162-CAF-0390
[***]

**BOEING PROPRIETARY**

Customer understands that certain information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the

contents for performing its obligations specifically relating to this Letter Agreement and who understand they are not to disclose its contents to any other person or entity without the prior written consent of Boeing and (c) attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this clause, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations.  Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By      /s/ Cheri A Fischer

Its     Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:      December 13 , 2011

SOUTHWEST AIRLINES CO.

By      /s/ Michael Van de Ven

Its     EVP & Chief Operating Officer

6-1162-CAF-0390
[***]                                                                                    Page 2

**BOEING PROPRIETARY**

**SUPPLEMENTAL AGREEMENT NO. 1**

**to**

**Purchase Agreement No. 3729**

**between**

**THE BOEING COMPANY**

**and**

**SOUTHWEST AIRLINES CO.**

**Relating to Boeing Model 737-8 Aircraft**

THIS SUPPLEMENTAL AGREEMENT, entered into as of May 13, 2013, is made between THE BOEING COMPANY, a Delaware corporation (**Boeing**), and SOUTHWEST AIRLINES CO. a Texas corporation (**Customer**);

Customer and Boeing entered into Purchase Agreement Number PA-03729 dated December 13, 2011 as amended and supplemented (**Purchase Agreement**), relating to the purchase and sale of Boeing Model 737-8 aircraft; and this Supplemental Agreement No. 1 is an amendment to and is incorporated into the Purchase Agreement:

WHEREAS, Customer and Boeing desire to amend the Purchase Agreement to i) add reference to letter agreement number SWA-PA-03729-LA-1209080, [***], which was previously executed on July 8, 2012; ii) revise certain terms of letter agreement number SWA-PA-03729-LA-1106481, [***]; and iii) add letter agreement number SWA-PA-03729-LA-1210419, [***];

NOW, THEREFORE, the parties agree that the Purchase Agreement is amended as set forth below and otherwise agree as follows:

1.      The Table of Contents is deleted in its entirety and a new Table of Contents is attached hereto and incorporated into the Purchase Agreement by this reference.

2.      Letter Agreement SWA-PA-03729-LA-1106481, [***], is deleted in its entirety and replaced with a revised Letter Agreement SWA-PA-03729-LA-1106481R1, attached hereto and incorporated into the Purchase Agreement by this reference.

3.      To document its previous execution and as an administrative matter, Letter Agreement SWA-PA-03729-LA-1209080, [***] and dated July 8, 2012 is hereby added and, by this reference, is incorporated into the Purchase Agreement.

**BOEING PROPRIETARY**

4.        Letter Agreement SWA-PA-03729-LA-1210419, [***], is hereby added and, by this reference, is incorporated into the Purchase Agreement.

5.        The Purchase Agreement is amended as set forth above, and all other terms and conditions of the Purchase Agreement remain unchanged and are in full force and effect.

6.        This Supplemental Agreement must be executed by Boeing and Customer on or before **May 15, 2012**.


AGREED AND ACCEPTED this

May 13, 2013
Date

THE BOEING COMPANY                              SOUTHWEST AIRLINES CO.


/s/ Jeff Solomon                                        /s/ Michael Van de Ven
Signature                                               Signature


Jeffery J. Solomon                                      Michael Van de Ven
Printed name                                            Printed name


Attorney-in-Fact                                        Executive Vice President
Title                                                   Title


SWA-PA-3729                          2                                      SA-1
**BOEING PROPRIETARY**

**TABLE OF CONTENTS**

| **ARTICLES** | **TITLES** |
|---|---|
| Article 1 | Quantity, Model and Description |
| Article 2 | Delivery Schedule |
| Article 3 | Price |
| Article 4 | Payment |
| Article 5 | Additional Terms |
| **TABLE** | **TITLE** |
| 1 | Aircraft Information Table |
| **EXHIBIT** | |
| A | Aircraft Configuration |
| B | Aircraft Delivery Requirements and Responsibilities |
| **SUPPLEMENTAL EXHIBITS** | **TITLES** |
| AE1 | Escalation Adjustment/Airframe and Optional Features |
| BFE1 | BFE Variables |
| CS1 | Customer Support Variables |
| EE1 | Engine Escalation/Engine Warranty and Patent Indemnity |
| SLP1 | Service Life Policy Components |

| **LETTER AGREEMENTS** | **TITLES** |
|---|---|
| SWA-PA-03729-LA-1106463 | Open Matters |
| SWA-PA-03729-LA-1106464 | [***] |
| SWA-PA-03729-LA-1106465 | [***] |
| SWA-PA-03729-LA-1106466 | [***] |

SWA-PA-3729                                                                    Page 1
                                                                              SA-1

**BOEING PROPRIETARY**

| LETTER AGREEMENTS | TITLES | |
|---|---|---|
| SWA-PA-03729-LA-1106467 | [***] | |
| SWA-PA-03729-LA-1106468 | [***] | |
| SWA-PA-03729-LA-1106469 | [***] | |
| SWA-PA-03729-LA-1106470 | [***] | |
| SWA-PA-03729-LA-1106471 | Substitute Aircraft | |
| SWA-PA-03729-LA-1106472 | [***] | |
| SWA-PA-03729-LA-1106473 | [***] | |
| SWA-PA-03729-LA-1106474 | Option Aircraft | |
| SWA-PA-03729-LA-1106475 | [***] | |
| SWA-PA-03729-LA-1106476 | [***] | |
| SWA-PA-03729-LA-1106477 | [***] | |
| SWA-PA-03729-LA-1106478 | [***] | |
| SWA-PA-03729-LA-1106479 | [***] | |
| SWA-PA-03729-LA-1106480 | [***] | |
| SWA-PA-03729-LA-1106481**R1** | [***] | **SA-1** |
| SWA-PA-03729-LA-1106482 | [***] | |
| SWA-PA-03729-LA-1106483 | [***] | |
| SWA-PA-03729-LA-1106484 | [***] | |
| SWA-PA-03729-LA-1106485 | [***] | |
| **SWA-PA-03729-LA-1209080** | **[***]** | **SA-1** |
| **SWA-PA-03729-LA-1210419** | **[***]** | **SA-1** |

SWA-PA-3729

Page 2
SA-1

**BOEING PROPRIETARY**



The Boeing Company
 P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106481**R1**

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    [***]

Reference:     Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.    [***]

2.    [***]

3.    [***]

SWA-PA-03729-LA-1106481**R1**
[***]                                                                                                Page 1

**BOEING PROPRIETARY**



4.    [***]


5.    [***]


6.    [***]



7.    <u>Assignment</u>.

Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in



SWA-PA-03729-LA-1106481**R1**
[***]                                                                              Page 2
**BOEING PROPRIETARY**

consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part.

8.    <u>Confidentiality</u>.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.


Very truly yours,


THE BOEING COMPANY

By      /s/ Jeff Solomon

Its      Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:      May 13, 2013

SOUTHWEST AIRLINES CO.

By      Michael Van de Ven

Its      Executive Vice President


SWA-PA-03729-LA-1106481**R1**
[***]                                                                                                                          Page 3
**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1209080

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:            [***]
Reference:

Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.      [***]

2.      Assignment.

This Letter Agreement cannot be assigned, in whole or in part, without the prior written consent of Boeing.

3.      Confidentiality.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees

SWA-PA-03729-LA-1209080
[***]                                                                                                    Page 1

**BOEING PROPRIETARY**



to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,
THE BOEING COMPANY


By      /s/ Jeff Solomon
Its        Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:      July 8, 2012

SOUTHWEST AIRLINES CO.

By

Its      EVP & Chief Operating Officer


SWA-PA-03729-LA-1209080
[***]                                                                                                    Page 2

**BOEING PROPRIETARY**



to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,
 THE BOEING COMPANY


By _____
Its       Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:       , 2012 _____

SOUTHWEST AIRLINES CO.

By       /s/ Laura Wright _____

Its _____


SWA-PA-03729-LA-1209080
[***]                                                                 Page 2
**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207


SWA-PA-03729-LA-1210419


Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611


Subject:           [***]

Reference:         Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.      [***]



2.      Assignment.

        Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part.


SWA-PA-03729-LA-1210419
[***]                                                                                              LA Page 1
**BOEING PROPRIETARY**



3.    Confidentiality.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By      /s/ Jeff Solomon

Its     Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:      May 13, 2013

SOUTHWEST AIRLINES CO.

By      /s/ Michael Van de Ven

Its     Executive Vice President

SWA-PA-03729-LA-1210419
[***]                                                                                    LA Page 2

**BOEING PROPRIETARY**

**SUPPLEMENTAL AGREEMENT NO. 2**

**to**

**Purchase Agreement No. 3729**

**between**

**THE BOEING COMPANY**

**and**

**SOUTHWEST AIRLINES CO.**

**Relating to Boeing Model 737-8 and 737-7 Aircraft**

THIS SUPPLEMENTAL AGREEMENT, entered into as of May <u>13</u>, 2013, is made between THE BOEING COMPANY, a Delaware corporation (**Boeing**), and SOUTHWEST AIRLINES CO. a Texas corporation (**Customer**);

Customer and Boeing entered into Purchase Agreement Number PA-03729 dated December 13, 2011 as amended and supplemented (**Purchase Agreement**), relating to the purchase and sale of Boeing Model 737-8 aircraft; and this Supplemental Agreement No. 2 is an amendment to and is incorporated into the Purchase Agreement:

WHEREAS, Boeing and Customer agree to amend the Purchase Agreement to document Customer's substitution of thirty (30) firm Model 737-700 aircraft (**Substitution Aircraft**) to firm Model 737-8 aircraft (**New Firm -8 Aircraft**), exercised pursuant to the terms of SA-83 to Purchase Agreement No. 1810 between Customer and Boeing (**SA-83**);

WHEREAS, Boeing and Customer agree to amend the Purchase Agreement to document Customer's substitution of forty-one (41) Model 737-700 option aircraft to Model 737-8 option aircraft (**New Option -8 Aircraft**), exercised pursuant to the terms of SA-83;

WHEREAS, Boeing and Customer agree that Customer will be the launch customer for the Model 737-7 aircraft and, accordingly, Customer elects to exercise its right to substitute thirty (30) firm Model 737-8 aircraft to Model 737-7 aircraft (**New Firm -7 Aircraft**) in accordance with Letter Agreement SWA-PA-03729-LA-1106471, "Substitute Aircraft";

WHEREAS, Boeing and Customer agree to amend the Purchase Agreement to revise the scheduled delivery stream and identify nominal delivery months for the aircraft;

WHEREAS, Boeing and Customer agree to amend the Purchase Agreement to make certain of its terms applicable to 737-7 Aircraft;

SWA-PA-03729                                1                                SA-2
**BOEING PROPRIETARY**



NOW, THEREFORE, the parties agree that the Purchase Agreement is amended as set forth below and otherwise agree as follows:

1.     The cover page and Table of Contents of the Purchase Agreement are deleted in their entirety and a new cover page and Table of Contents are attached hereto and incorporated into the Purchase Agreement by this reference, which reflect the addition of the Model 737-7 aircraft.

2.     Article 1 of the Purchase Agreement is deleted in its entirety and a new Article 1 is attached hereto and incorporated into the Purchase Agreement by this reference, which reflects (i) the addition of Model 737-7 aircraft, (ii) reference to new Exhibits A1 and A2 and (iii) reference to new Tables 1A and 1B.

3.     Article 4 of the Purchase Agreement is deleted in its entirety and a new Article 4 is attached hereto and incorporated into the Purchase Agreement by this reference, which reflects the addition of Model 737-7 aircraft.

4.     Table 1, "Aircraft Delivery, Description, Price and Advance Payments", to the Purchase Agreement is deleted in its entirety.

5.     Table 1A, "737-8 Aircraft Delivery, Description, Price and Advance Payments", to the Purchase Agreement is hereby added and is incorporated into the Purchase Agreement by this reference. Table 1A (i) adds the New Firm -8 Aircraft, (ii) accelerates the scheduled delivery of certain 2018 and 2019 737-8 Aircraft, (iii) identifies the Nominal Delivery Month for each 737-8 Aircraft and (iv) designates blocks of 737-8 Aircraft to differentiate applicable business terms.

6.     Table 1B, "737-7 Aircraft Delivery, Description, Price and Advance Payments", to the Purchase Agreement is hereby added and, by this reference, is incorporated in the Purchase Agreement. Table 1B contains description, price, advance payment and Nominal Delivery Month information for the 737-7 Aircraft.

7.     Exhibit A, "Aircraft Configuration", to the Purchase Agreement is deleted in its entirety.

8.     New Exhibit A1, "737-8 Aircraft Configuration", is attached hereto and incorporated into the Purchase Agreement by this reference, containing the aircraft configuration for 737-8 Aircraft.

9.     New Exhibit A2, "737-7 Aircraft Configuration", is attached hereto and incorporated into the Purchase Agreement by this reference, containing the aircraft configuration for 737-7 Aircraft.

10.     New Supplemental Exhibit CS1-7MAX, "Customer Support Variables", is attached hereto and incorporated into the Purchase Agreement by this reference, containing the customer support variables applicable to the 737-7 Aircraft.

11.     Letter Agreement SWA-PA-03729-LA-1106463, "Open Matters", is deleted in its entirety and replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1106463R1, "Open Matters", which reflects the addition of the Model 737-7 Aircraft.

12.     Letter Agreement SWA-PA-03729-LA-1106469, [***], is deleted in its entirety and replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1106469R1, [***], which reflects the addition of the Model 737-7 Aircraft.

13.     Letter Agreement SWA-PA-03729-LA-1106470, [***], is deleted in its entirety and replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1106470R1, [***], which reflects the addition of the Model 737-7 aircraft.

14.     Letter Agreement SWA-PA-03729-LA-1106471, "Substitute Aircraft", is deleted in its entirety and replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1106471R1, "Substitute Aircraft", which removes language made superfluous by this Supplemental Agreement.

15.     Letter Agreement SWA-PA-03729-LA-1106472, [***], is deleted in its entirety and replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1106472R1, [***], which revises the quantity of Eligible Aircraft and updates document references consistent with this Supplemental Agreement.

16.     Attachment 1 to Letter Agreement SWA-PA-03729-LA-1106474, "Option Aircraft", is deleted in its entirety and replaced with a new Attachment 1 (identified by "SA-2") attached hereto and incorporated into the Purchase Agreement by this reference. This new Attachment 1 reflects the addition of the New Option -8 Aircraft and designates a block of Option Aircraft to differentiate applicable business terms.

17.     Letter Agreement SWA-PA-03729-LA-1106479, [***], is deleted in its entirety and replaced with the attached revised and re-titled Letter Agreement SWA-PA-03729-LA-1106479R1, [***], which reflects the addition of the Model 737-7 Aircraft.

18.     Letter Agreement SWA-PA-03729-LA-1106480, [***], is deleted in its entirety and replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1106480R1, [***], which reflects the addition of the Model 737-7 Aircraft.

19.     Letter Agreement SWA-PA-03729-LA-1106481R1, [***] is deleted in its entirety and replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1106481R2, [***], which reflects the addition of the Model 737-7 aircraft.

20.     Attachment A to Letter Agreement SWA-PA-03729-LA-1106484, [***], is deleted in its entirety and replaced with a new Attachment A, which reflects the revised aircraft delivery stream extending through 2024.

21.     Attachment B to Letter Agreement SWA-PA-03729-LA-1106484, [***], is deleted in its entirety and replaced with a new Attachment B, which reflects the revised aircraft delivery stream extending through 2024.

22.     Page 1 or Page 2, as applicable, of each of the following Exhibits, Supplemental Exhibits and Letter Agreements are hereby deleted and replaced with the attached pages, which include revisions to add reference to 737-7 Aircraft:

**EXHIBIT**
B                                          Aircraft Delivery Requirements and Responsibilities
**SUPPLEMENTAL EXHIBITS**
AE1                                        Escalation Adjustment/Airframe and Optional Features
BFE1                                       BFE Variables

**BOEING PROPRIETARY**



| | |
|---|---|
| EE1 | Engine Escalation/Engine Warranty and Patent Indemnity |
| SLP1 | Service Life Policy Components |

**LETTER AGREEMENTS**

| | |
|---|---|
| SWA-PA-03729-LA-1106464 | [***] |
| SWA-PA-03729-LA-1106465 | [***] |
| SWA-PA-03729-LA-1106468 | [***] |
| SWA-PA-03729-LA-1106476 | [***] |
| SWA-PA-03729-LA-1106477 | [***] |
| SWA-PA-03729-LA-1106482 | [***] |
| SWA-PA-03729-LA-1106483 | [***] |
| SWA-PA-03729-LA-1106484 | [***] |
| SWA-PA-03729-LA-1106485 | [***] |

23.    New Letter Agreement SWA-PA-03729-LA-1300943, [***], is attached hereto and, by this reference, incorporated into the Purchase Agreement, [***]

24.    New Letter Agreement SWA-PA-03729-LA-1301168, [***], is attached hereto and, by this reference, incorporated into the Purchase Agreement, [***].

25.    New Letter Agreement SWA-PA-01810/03729-LA-1301169, [***], is attached hereto and, by this reference, incorporated into the Purchase Agreement, [***].

26.    New Letter Agreement SWA-PA-03729-LA-1301170, [***], is attached hereto and, by this reference, incorporated into the Purchase Agreement, [***]

27.    If Customer owes Boeing any additional Advance Payment amounts as a result of the execution of this Supplemental Agreement, Customer will pay such amounts to Boeing.   If as a result of the execution of this Supplemental Agreement, there is any excess in Advance Payments made by Customer to Boeing, Boeing will retain such excess amounts until the next Advance Payment is due, at which time Customer may reduce the amount of such Advance Payment by the amount of such excess.  A reconciliation regarding changes in Advance Payments arising from this Supplemental Agreement will be provided separately to Customer by Boeing.

28.    The Purchase Agreement is amended as set forth above, and all other terms and conditions of the Purchase Agreement remain unchanged and are in full force and effect.

29.    This Supplemental Agreement is contingent upon the prior execution of Supplemental Agreement No. 1 to the Purchase Agreement and must be executed by Boeing and Customer concurrently with Supplemental Agreement No. 83 to Purchase Agreement No. 1810 on or before **May 17, 2013**.

AGREED AND ACCEPTED this

May 13, 2013
Date

THE BOEING COMPANY                          SOUTHWEST AIRLINES CO.


/s/ Jeff Solomon                            /s/ Michael Van de Ven
Signature                                   Signature


Jeffery J. Solomon                          Michael Van de Ven
Printed name                                Printed name


Attorney-in-Fact                            Executive Vice President
Title                                       Title


SWA-PA-03729                          5                              SA-2
                          **BOEING PROPRIETARY**

# PURCHASE AGREEMENT NUMBER PA-03729
## between
## THE BOEING COMPANY
## and
## Southwest Airlines Co.
## Relating to Boeing Model 737-8 and 737-7 Aircraft

**TABLE OF CONTENTS**

| **ARTICLES** | **TITLES** | |
|---|---|---|
| Article 1 | Quantity, Model and Description | **SA-2** |
| Article 2 | Delivery Schedule | |
| Article 3 | Price | |
| Article 4 | Payment | **SA-2** |
| Article 5 | Additional Terms | |
| **TABLE** | **TITLE** | |
| 1A | 737-8 Aircraft Information Table | **SA-2** |
| 1B | 737-7 Aircraft Information Table | **SA-2** |
| **EXHIBIT** | | |
| A1 | 737-8 Aircraft Configuration | **SA-2** |
| A2 | 737-7 Aircraft Configuration | **SA-2** |
| B* | Aircraft Delivery Requirements and Responsibilities | |
| **SUPPLEMENTAL EXHIBITS** | **TITLES** | |
| AE1* | Escalation Adjustment/Airframe and Optional Features | |
| BFE1* | BFE Variables | |
| CS1 | Customer Support Variables | |
| CS1-7MAX | Customer Support Variables | **SA-2** |
| EE1* | Engine Escalation/Engine Warranty and Patent Indemnity | |
| SLP1* | Service Life Policy Components | |
| **LETTER AGREEMENTS** | **TITLES** | |
| SWA-PA-03729-LA-1106463R1 | Open Matters | **SA-2** |

| LETTER AGREEMENTS | TITLES | |
|---|---|---|
| SWA-PA-03729-LA-1106464* | [***] | |
| SWA-PA-03729-LA-1106465* | [***] | |
| SWA-PA-03729-LA-1106466 | [***] | |
| SWA-PA-03729-LA-1106467 | [***] | |
| SWA-PA-03729-LA-1106468* | [***] | |
| SWA-PA-03729-LA-1106469R1 | [***] | **SA-2** |
| SWA-PA-03729-LA-1106470R1 | [***] | **SA-2** |
| SWA-PA-03729-LA-1106471R1 | Substitute Aircraft | **SA-2** |
| SWA-PA-03729-LA-1106472R1 | [***] | **SA-2** |
| SWA-PA-03729-LA-1106473 | [***] | |
| SWA-PA-03729-LA-1106474 | Option Aircraft | |
| | Attachment 1 | **SA-2** |
| SWA-PA-03729-LA-1106475 | [***] | |
| SWA-PA-03729-LA-1106476* | [***] | |
| SWA-PA-03729-LA-1106477* | [***] | |
| SWA-PA-03729-LA-1106478 | [***] | |
| SWA-PA-03729-LA-1106479R1 | [***] | **SA-2** |
| SWA-PA-03729-LA-1106480R1 | [***] | **SA-2** |
| SWA-PA-03729-LA-1106481R2 | [***] | **SA-2** |
| SWA-PA-03729-LA-1106482* | [***] | |
| SWA-PA-03729-LA-1106483* | [***] | |
| SWA-PA-03729-LA-1106484* | [***] | |
| | Attachment A | **SA-2** |
| | Attachment B | **SA-2** |
| SWA-PA-03729-LA-1106485* | [***] | |

| **LETTER AGREEMENTS** | **TITLES** | |
|---|---|---|
| SWA-PA-03729-LA-1209080 | [***] | SA-1 |
| SWA-PA-03729-LA-1210419 | [***] | |
| | | SA-1 |
| SWA-PA-03729-LA-1300943 | [***] | **SA-2** |
| SWA-PA-03729-LA-1301168 | [***] | **SA-2** |
| SWA-PA-01810/03729-LA-1301169 | [***] | **SA-2** |
| SWA-PA-03729-LA-1301170 | [***] | **SA-2** |

**\* Denotes revision to Page 1 or Page 2 only to reference 737-7 (SA-2)**

**Purchase Agreement No. PA-03729**
**between**
**The Boeing Company**
**and**
**Southwest Airlines Co.**

This Purchase Agreement No. PA-03729 between The Boeing Company, a Delaware corporation, (**Boeing**) and Southwest Airlines Co., a Texas corporation, (**Customer**) relating to the purchase and sale of Model 737-8 and 737-7 aircraft together with all tables, exhibits, supplemental exhibits, letter agreements and other attachments thereto, if any, (**Purchase Agreement**) incorporates the terms and conditions (except as specifically set forth below) of the Aircraft General Terms Agreement dated as of December 13, 2011 between the parties, identified as SWA-AGTA (**AGTA**).

1.    Quantity, Model and Description.

The aircraft to be delivered to Customer will be designated as Model 737-8 and 737-7 aircraft (**Aircraft**). Boeing will manufacture and sell to Customer Aircraft conforming to the configurations described in Exhibits A1 and A2 (collectively referred to as **Exhibit A**) in the quantities listed in Tables 1A and 1B respectively (collectively referred to as **Table 1**) to the Purchase Agreement.

2.    Delivery Schedule.

The scheduled months of delivery of the Aircraft are listed in the attached Table 1. Exhibit B describes certain responsibilities for both Customer and Boeing in order to accomplish the delivery of the Aircraft.

3.    Price.

3.1    Aircraft Basic Price. The Aircraft Basic Price is listed in Table 1 and is subject to escalation in accordance with the terms of this Purchase Agreement.

3.2    Advance Payment Base Prices. The Advance Payment Base Prices listed in Table 1 were calculated utilizing the latest escalation factors available to Boeing on the date of this Purchase Agreement projected to the scheduled delivery month of each Aircraft.

4.    Payment.

4.1    Boeing acknowledges receipt of a deposit in the amount shown in Table 1 for each Aircraft (**Deposit**).

4.2    The standard advance payment schedule for the Aircraft requires Customer [***] on the effective date of the Purchase Agreement for the

SWA-PA-03729

**BOEING PROPRIETARY**

**SA-2**

Page 5

Aircraft. Additional advance payments for each Aircraft are due as specified in and on the first business day of the months listed in the attached Table 1.

4.3    For any Aircraft whose scheduled month of delivery is less than twenty-four (24) months from the date of this Purchase Agreement, the total amount of advance payments due for payment upon signing of this Purchase Agreement will include all advance payments which are past due in accordance with the standard advance payment schedule set forth in paragraph 4.2 above.

4.4    Customer will pay the balance of the Aircraft Price of each Aircraft at delivery.

5.    Additional Terms.

5.1    Aircraft Information Table. Table 1 consolidates information contained in Articles 1, 2, 3 and 4 with respect to (i) quantity of Aircraft, (ii) applicable Detail Specification, (iii) month and year of scheduled deliveries, (iv) Aircraft Basic Price, (v) applicable escalation factors and (vi) Advance Payment Base Prices and advance payments and their schedules.

5.2    Escalation Adjustment/Airframe and Optional Features. Supplemental Exhibit AE1 contains the applicable airframe and optional features escalation formula**.**

5.3    Buyer Furnished Equipment Variables. Supplemental Exhibit BFE1 contains supplier selection dates, on dock dates and other variables applicable to the Aircraft.

5.4    Customer Support Variables. Information, training, services and other things furnished by Boeing in support of introduction of the Aircraft into Customer's fleet are described in Supplemental Exhibit CS1.

5.5    Engine Escalation Variables. Supplemental Exhibit EE1 contains the applicable engine escalation formula, the engine warranty and the engine patent indemnity for the Aircraft describes the applicable engine escalation formula and contains the engine warranty and the engine patent indemnity for the Aircraft.

5.6    Service Life Policy Component Variables. Supplemental Exhibit SLP1 lists the SLP Components covered by the Service Life Policy for the Aircraft.

5.7    Public Announcement. Each of Customer and Boeing reserves the right to make a public announcement regarding Customer's purchase of the Aircraft upon approval from the authorized representative of the other party hereto.

5.8    Negotiated Agreement; Entire Agreement. This Purchase Agreement, including the provisions of Article 8.2 of the AGTA relating to insurance, and Article 11 of Part 2 of Exhibit C of the AGTA relating to DISCLAIMER AND RELEASE and EXCLUSION OF CONSEQUENTIAL AND OTHER DAMAGES, has been the subject of discussion and negotiation and is understood by the parties; the Aircraft Price and other agreements of the parties stated in this Purchase Agreement were arrived at in consideration of such provisions. This Purchase Agreement, including the AGTA,

Table 1A To
Purchase Agreement No. PA-03729
Aircraft Delivery, Description, Price and Advance Payments
737-8 Aircraft

| Airframe Model/MTOW: | 737-8 | 175900 pounds |
|---|---|---|
| Engine Model/Thrust: | CFMLEAP-1B26 | tbd |

| | | | |
|---|---|---|---|
| **Airframe Price:** | | [***] | |
| **Optional Features:** | | [***] | |
| **Sub-Total of Airframe and Features:** | | [***] | |
| **Engine Price (Per Aircraft):** | | [***] | |
| **Aircraft Basic Price (Excluding BFE/SPE):** | | [***] | |
| **Buyer Furnished Equipment (BFE) Estimate:** | | [***] | |
| **//Seller Purchased Equipment (SPE)/In-Flight Entertainment (IFE)// Estimate:** | | [***] | |

| | | |
|---|---|---|
| **Detail Specification:** | D019A001-TBD (10/27/2011) | |
| **Airframe Price Base Year/Escalation Formula:** | Jul-11 | ECI-MFG/CPI |
| **Engine Price Base Year/Escalation Formula:** | N/A | N/A |
| **Airframe Escalation Data:** | | |
| **Base Year Index (ECI):** | | [***] |
| **Base Year Index (CPI):** | | [***] |

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Jul-2017 | 1 | [***] | 36929 | A | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Jul-2017 | 2 | [***] | | C | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Aug-2017 | 3 | [***] | 36979, 36930, 36984 | A | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Aug-2017 | 3 | [***] | | C | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Sep-2017 | 1 | [***] | 36934 | A | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Oct-2017 | 1 | [***] | 36988 | A | | [***] | [***] | [***] | [***] | [***] |
| Oct-2017 | 1 | [***] | | C | | [***] | [***] | [***] | [***] | [***] |
| Nov-2017 | 1 | [***] | 36989 | A | | [***] | [***] | [***] | [***] | [***] |
| Nov-2017 | 1 | [***] | | C | | [***] | [***] | [***] | [***] | [***] |
| Jan-2018 | 1 | [***] | 42544 | A | | [***] | [***] | [***] | [***] | [***] |
| Jan-2018 | 1 | [***] | | C | | [***] | [***] | [***] | [***] | [***] |
| Mar-2018 | 1 | [***] | | C | | [***] | [***] | [***] | [***] | [***] |
| Jun-2018 | 1 | [***] | 42546 | A | | [***] | [***] | [***] | [***] | [***] |
| Jul-2018 | 1 | [***] | 42547 | A | | [***] | [***] | [***] | [***] | [***] |
| Jul-2018 | 1 | [***] | | C | | [***] | [***] | [***] | [***] | [***] |
| Aug-2018 | 1 | [***] | 42548 | A | | [***] | [***] | [***] | [***] | [***] |
| Sep-2018 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |

**Table 1A To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Sep-2018 | 1 | [***] | 37019 | A | | [***] | [***] | [***] | [***] | [***] |
| Oct-2018 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2018 | 1 | [***] | 42549 | A | | [***] | [***] | [***] | [***] | [***] |
| Nov-2018 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2018 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2019 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2019 | 1 | [***] | 37042 | A | | [***] | [***] | [***] | [***] | [***] |
| Feb-2019 | 1 | [***] | 42550 | A | | [***] | [***] | [***] | [***] | [***] |
| Mar-2019 | 1 | [***] | 42551 | A | | [***] | [***] | [***] | [***] | [***] |
| Jul-2019 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2019 | 1 | [***] | 37034 | A | | [***] | [***] | [***] | [***] | [***] |
| Sep-2019 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2019 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2019 | 1 | [***] | 42552 | A | | [***] | [***] | [***] | [***] | [***] |
| Dec-2019 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2020 | 1 | [***] | 42553 | A | | [***] | [***] | [***] | [***] | [***] |
| Feb-2020 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2020 | 1 | [***] | 35970 | B | | [***] | [***] | [***] | [***] | [***] |
| Mar-2020 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2020 | 1 | [***] | 35968 | B | | [***] | [***] | [***] | [***] | [***] |
| Apr-2020 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2020 | 1 | [***] | 35972 | B | | [***] | [***] | [***] | [***] | [***] |
| May-2020 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| May-2020 | 1 | [***] | 36736 | B | | [***] | [***] | [***] | [***] | [***] |
| Jun-2020 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2020 | 1 | [***] | 33941 | B | | [***] | [***] | [***] | [***] | [***] |
| **Jul-2020** | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| **Jul-2020** | 1 | [***] | 35963 | B | | [***] | [***] | [***] | [***] | [***] |

**Table 1A To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Aug-2020 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2020 | 1 | [***] | 36733 | B | | [***] | [***] | [***] | [***] | [***] |
| Sep-2020 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2020 | 1 | [***] | 35971 | B | | [***] | [***] | [***] | [***] | [***] |
| **Oct-2020** | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| **Oct-2020** | 1 | [***] | 38804 | B | | [***] | [***] | [***] | [***] | [***] |
| Nov-2020 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2020 | 1 | [***] | 38805 | B | | [***] | [***] | [***] | [***] | [***] |
| Dec-2020 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2021 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2021 | 1 | [***] | 36729 | B | | [***] | [***] | [***] | [***] | [***] |
| Feb-2021 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2021 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2021 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| May-2021 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2021 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2021 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2021 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2021 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2021 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2021 | 2 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2021 | 2 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2022 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2022 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2022 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2022 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| May-2022 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2022 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |

**Table 1A To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Jul-2022 | 2 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2022 | 2 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2022 | 2 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2022 | 2 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2022 | 2 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2022 | 2 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2023 | 2 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2023 | 2 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| May-2023 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2023 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2023 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2024 | 2 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2024 | 2 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2024 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| May-2024 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2024 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2024 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |

**Table 1A To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| **Nov-2024** | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| **Dec-2024** | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |

Total:     150

| |
|---|
| *[***] |
| Notes: |
| 1)       [***] |

**Table 1B To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-7 Aircraft**

| | | | |
|---|---|---|---|
| **Airframe Model/MTOW:** | 737-7 | 155500 pounds | |
| **Engine Model/Thrust:** | CFMLEAP-1B20 | tbd | |
| **Airframe Price:** | | [***] | |
| **Optional Features:** | | [***] | |
| **Sub-Total of Airframe and Features:** | | [***] | |
| **Engine Price (Per Aircraft):** | | [***] | |
| **Aircraft Basic Price (Excluding BFE/SPE):** | | [***] | |
| **Buyer Furnished Equipment (BFE) Estimate:** | | [***] | |
| **Seller Purchased Equipment (SPE) Estimate:** | | [***] | |
| **Deposit per Aircraft:** | | [***] | |

| | | |
|---|---|---|
| **Detail Specification:** | D019A001-TBD (10/27/2011) | |
| **Airframe Price Base Year/Escalation Formula:** | Jul-11 | ECI-MFG/CPI |
| **Engine Price Base Year/Escalation Formula:** | N/A | N/A |
| **Airframe Escalation Data:** | | |
| **Base Year Index (ECI):** | [***] | |
| **Base Year Index (CPI):** | [***] | |

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | | | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Apr-2019 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| May-2019 | 2 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2019 | 2 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2019 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2019 | 2 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2019 | 2 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2019 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2019 | 2 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2020 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2020 | 2 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2020 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| May-2020 | 2 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2020 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |

**Table 1B To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-7 Aircraft**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | | | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Jul-2020 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2020 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2020 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2020 | 2 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2020 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2020 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2021 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |

Total:    30

* [***]

# 737-8 AIRCRAFT CONFIGURATION

## between

## THE BOEING COMPANY

## and

## Southwest Airlines Co.

## Exhibit A1 to Purchase Agreement Number PA-03729

SWA-PA-03729-EXA1
Page 1

**SA-2**

BOEING PROPRIETARY

**Exhibit A1**
**737-8 AIRCRAFT CONFIGURATION**
**Dated December 13, 2011**
**relating to**
**BOEING MODEL 737-8 AIRCRAFT**

    The initial configuration of Customer's Model 737-8 Aircraft has been defined by Boeing 737-8 Airplane Description Document No. D019A007 Rev New dated November 4, 2011 and is more fully discussed in Letter Agreement SWA-PA-03729-LA-1106463 entitled "Open Matters."

SWA-PA-03729-EXA1
Page 2                                                                                                    **SA-2**
**BOEING PROPRIETARY**

# 737-7 AIRCRAFT CONFIGURATION

# between

# THE BOEING COMPANY

# and

# Southwest Airlines Co.

# Exhibit A2 to Purchase Agreement Number PA-03729

**BOEING PROPRIETARY**

**Exhibit A2**
**AIRCRAFT CONFIGURATION**
**Dated May 13, 2013**
**relating to**
**BOEING MODEL 737-7 AIRCRAFT**

The contents of Exhibit A2 will be defined in accordance with the provisions of Letter Agreement SWA-PA-03729-LA-1106463R1, "Open Matters", to the Purchase Agreement.

**SA-2**
SWA-PA-03729-EXA2                                                                                     Page 2
**BOEING PROPRIETARY**

**Exhibit B**
**AIRCRAFT DELIVERY REQUIREMENTS AND RESPONSIBILITIES**
**relating to**
**BOEING MODEL 737-8 and 737-7 AIRCRAFT**

Both Boeing and Customer have certain documentation and approval responsibilities at various times during the construction cycle of Customer's Aircraft that are critical to making the delivery of each Aircraft a positive experience for both parties. This Exhibit B documents those responsibilities and indicates recommended completion deadlines for the actions to be accomplished.

1.     GOVERNMENT DOCUMENTATION REQUIREMENTS.

Certain actions are required to be taken by Customer in advance of the scheduled delivery month of each Aircraft with respect to obtaining certain government issued documentation.

1.1     Airworthiness and Registration Documents. Not later than **six (6) months prior to delivery** of each Aircraft, Customer will notify Boeing of the registration number to be painted on the side of the Aircraft. In addition, and not later than **three (3) months prior to delivery** of each Aircraft, Customer will, by letter to the regulatory authority having jurisdiction, authorize the temporary use of such registration numbers by Boeing during the pre-delivery testing of the Aircraft.

Customer is responsible for furnishing any Temporary or Permanent Registration Certificates required by any governmental authority having jurisdiction to be displayed aboard the Aircraft after delivery.

1.2     Certificate of Sanitary Construction.

1.2.1   U.S. Registered Aircraft. Boeing will obtain from the United States Public Health Service, a United States Certificate of Sanitary Construction to be provided by Boeing to Customer and displayed aboard each Aircraft after delivery to Customer.

1.2.2   Non-U.S. Registered Aircraft. If Customer requires a United States Certificate of Sanitary Construction at the time of delivery of the Aircraft, Customer will give written notice thereof to Boeing at least **three (3) months prior to delivery**. Boeing will then use commercially reasonable efforts to obtain the Certificate from the United States Public Health Service and present it to Customer at the time of Aircraft delivery. The above Boeing obligation only applies to commercial passenger-configured aircraft.

1.3     Customs Documentation.

1.3.1   Import Documentation. If the Aircraft is intended to be exported from the United States, Customer must notify Boeing not later than **three (3) months prior to delivery** of each Aircraft of any documentation required by the customs authorities or by any other agency of the country of import.

**BOEING PROPRIETARY**

**ESCALATION ADJUSTMENT**
**AIRFRAME AND OPTIONAL FEATURES**
**relating to**
**BOEING MODEL 737-8 and 737-7 AIRCRAFT**

1.    [***]

**BUYER FURNISHED EQUIPMENT VARIABLES**
**relating to**
**BOEING MODEL 737-8 and 737-7 AIRCRAFT**

This Supplemental Exhibit BFE1 contains supplier selection dates, on-dock dates and other requirements applicable to the Aircraft.

1.    Supplier Selection.

Customer will:

Select and notify Boeing of the suppliers and part numbers of the following BFE items by the following dates:

| | |
|---|---|
| Galley System | tbd |
| Galley Inserts | tbd |
| Seats (passenger) | tbd |
| Overhead & Audio System | tbd |
| In-Seat Video System | tbd |
| Miscellaneous Emergency Equipment | tbd |
| Cargo Handling Systems* *(Single Aisle Programs only)* | tbd |

*For a new certification, supplier requires notification ten (10) months prior to Cargo Handling System on-dock date.

2.    On-dock Dates and Other Information.

On or before _____tbd_____, Boeing will provide to Customer the BFE Requirements electronically through My Boeing Fleet (**MBF** in My Boeing Configuration (**MBC**). These requirements may be periodically revised, setting forth the items, quantities, on-dock dates and shipping instructions and other requirements relating to the in-sequence installation of BFE. For planning purposes, preliminary BFE on-dock dates are set forth below:

# CUSTOMER SUPPORT VARIABLES

## between

## THE BOEING COMPANY

## and

## SOUTHWEST AIRLINES CO.

## Supplemental Exhibit CS1-7MAX
## to Purchase Agreement Number PA-03729

SWA-PA-03729-CS1-7MAX

**SA-2**
**Page 1**

**BOEING PROPRIETARY**

**[***]**

**BOEING PROPRIETARY**

SWA-PA-03729-CS1-7MAX

**SA-2**
**Page 3**

**BOEING PROPRIETARY**

**ENGINE ESCALATION**
**ENGINE WARRANTY AND PATENT INDEMNITY**
**relating to**
**BOEING MODEL 737-8 and 737-7 AIRCRAFT**

[***]

SWA-PA-03729-EE1

**BOEING PROPRIETARY**

**SERVICE LIFE POLICY COMPONENTS**
**relating to**
**BOEING MODEL 737-8 and 737-7 AIRCRAFT**

This is the listing of SLP Components for the Aircraft which relate to Part 3, Boeing Service Life Policy of Exhibit C, Product Assurance Document to the AGTA and is a part of Purchase Agreement No. PA-03729.

9.    Wing.

(i) Upper and lower wing skins and stiffeners between the forward and rear wing spars.

(ii) Wing spar webs, chords and stiffeners.

(iii) Inspar wing ribs.

(iv) Inspar splice plates and fittings.

(v) Main landing gear support structure.

(vi) Wing center section lower beams, spanwise beams and floor beams, but not the seat tracks attached to floor beams.

(vii) Wingtobody structural attachments.

(viii) Engine strut support fittings attached directly to wing primary structure.

(ix) Support structure in the wing for spoilers and spoiler actuators; for aileron hinges and reaction links; for leading edge devices and trailing edge flaps; and the winglets.

(x) Trailing edge flap tracks and carriages.

(xi) Aileron leading edge device and trailing edge flap internal, fixed attachment and actuator support structure.

3.    Body.

(i) External surface skins and doublers, longitudinal stiffeners, longerons and circumferential rings and frames between the forward pressure bulkhead and the vertical stabilizer rear spar bulkhead and structural support and enclosure for the APU but excluding all system components and related installation and connecting devices, insulation, lining, and decorative panels and related installation and connecting devices.

(ii) Window and windshield structure but excluding the windows and windshields.

(iii) Fixed attachment structure of the passenger doors, cargo doors and emergency exits, excluding door mechanisms and movable hinge components. Sills and frames around the body openings for the passenger doors, cargo doors and emergency exits, excluding scuff plates and pressure seals.



The Boeing Company
 P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106463R1

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:         Open Matters

Reference:

Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

Given the long period of time between Purchase Agreement signing and delivery of the first Aircraft and the continued development of the Aircraft program, certain elements have not yet been defined. In consideration, Boeing and Customer agree to work together as the Aircraft program develops as follows:

1.    Aircraft Delivery Schedule.

    1.1    [***]

    1.2    Customer and Boeing will consult on a frequent basis to keep each other informed as to Customer's fleet plans and Boeing's production plans in order to meet the requirements of both parties. Based on such review and discussions, Boeing will use its best commercially reasonable efforts to meet Customer's fleet needs.

SWA-PA-03729-LA-1106463R1                                                      **SA-2**
Open Matters                                                                    Page 1

**BOEING PROPRIETARY**



2.	Aircraft Configuration.

2.1	Model 737-8. The initial configuration of Customer's Model 737-8 Aircraft has been defined by Boeing 737-8 Airplane Description Document No. D019A007 Rev New dated November 4, 2011 as described in Article 1 and Exhibit A1 of the Purchase Agreement (**Initial Configuration**). [***]

SWA-PA-03729-LA-1106463R1	**SA-2**
Open Matters	Page 2
**BOEING PROPRIETARY**

Case 4:23-cv-00115     Document 56-9     Filed 11/20/23 in TXSD     Page 479 of 841



**BOEING PROPRIETARY**



3.      [***]

4.      <u>Other Letter Agreements</u>.

Boeing and Customer acknowledge that as they work together to develop the Aircraft program and as Boeing refines the definition of the Aircraft and associated production processes, there may be a need to execute additional letter agreements or amend letter agreements addressing one or more of the following:

4.1      <u>Software</u>. Additional provisions relating to software and software loading.

4.2      <u>Seller Purchased Equipment (**SPE**) and/or In-Flight Entertainment (**IFE**</u>). Provisions relating to the terms under which Boeing may offer or install SPE in the Aircraft.

4.3      <u>Buyer Furnished Equipment (**BFE**</u>). Provisions relating to the terms under which Boeing may install and certify Customer's BFE in the Aircraft.

<u>Confidentiality</u>.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has



value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By      /s/ Jeff Solomon

Its         Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:      May 13, 2013

SOUTHWEST AIRLINES CO.

By      /s/ Michael Van de Van

Its      Executive Vice President

SWA-PA-03729-LA-1106463R1                                                                                **SA-2**
Open Matters                                                                                                     Page 5

**BOEING PROPRIETARY**



The Boeing Company
 P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106464

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:                [***]

**SA-2**

SWA-PA-03729-LA-1106464

[***]                                                                                    Page 1

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106465

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:          [***]

**SA-2**

SWA-PA-03729-LA-1106465

[***]                                                                                                         Page 1

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106468

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:                    [***]

Reference:

Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

**<u>Definition of Terms:</u>**

**[***]**

**SA-2**

SWA-PA-03729-LA-1106468

[***]                                                                                                              Page 1

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106469R1

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:                [***]

References:        1)       Purchase Agreement No. PA03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft (**Aircraft**)

                      2)       Letter Agreement SWA-PA-03729-LA-1106471, "Substitute Aircraft," to the Purchase Agreement (**Substitution Letter Agreement**)

      This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.  [***]

**SA-2**

SWA-PA-03729-LA-1106469R1



2.    [***]


3.    [***]


**SA-2**

SWA-PA-03729-LA-1106469R1

[***]                                                                        Page 2

**BOEING PROPRIETARY**



4.  [***]

5.     [***]

6.     [***]

7.     [***]

8.     [***]



9.      [***]

10.     [***]

11.     Assignment.

        Unless otherwise noted herein, [***] described in this Letter Agreement are provided [***] in consideration of Customer's taking title to the Aircraft at time of delivery and becoming the operator of the Aircraft. This Letter Agreement cannot be assigned, in whole or in part, without the prior written consent of Boeing.

12.     Confidentiality.

        Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

**SA-2**

SWA-PA-03729-LA-1106469R1

[***]                                                                                                                                                  Page 4

**BOEING PROPRIETARY**

**_BOEING_**

Very truly yours,

THE BOEING COMPANY

By      /s/ Jeff Solomon

Its           Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:      May 13 , 2013

SOUTHWEST AIRLINES CO.

By      /s/ Michael Van de Ven

Its      Executive Vice President

**SA-2**

SWA-PA-03729-LA-1106469R1

[***]                                                                 Page 5

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106470R1

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:          [***]

Reference:

Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.     [***]


2.     [***]


3.     [***]

**SA-2**

SWA-PA-03729-LA-1106470R1

[***]                                                                                        Page 1

**BOEING PROPRIETARY**



4. [***]

5. [***]

6. [***]

**SA-2**

SWA-PA-03729-LA-1106470R1

**BOEING PROPRIETARY**



7.    [***]


8.    Assignment.

Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part.

9.    Confidential Treatment.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Section) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Section, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.


**SA-2**

SWA-PA-03729-LA-1106470R1

[***]                                                                                                      Page 3

**BOEING PROPRIETARY**

*BOEING*

Very truly yours,

THE BOEING COMPANY

By     /s/ Jeff Solomon

Its     Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:     May 13 , 2013

SOUTHWEST AIRLINES CO.

By     /s/ Michael Van de Ven

Its     Executive Vice President

**SA-2**

SWA-PA-03729-LA-1106470R1

[***]                                                                                                Page 4

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106471R1

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:          Substitute Aircraft

References:      1)
                         Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft (**Aircraft**)

                 2)      Letter Agreement No. SWA-PA-03729-LA-1106469, [***]

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.      [***]

2.      Deleted.

3.      [***]

SWA-PA-03729-LA-1106471R1                                                                                    **SA-2**

Aircraft Model Substitution                                                                                 Page 1
                                    **BOEING PROPRIETARY**



4.    [***]

5.    [***]

**SA-2**

SWA-PA-03729-LA-1106471R1

Aircraft Model Substitution                                                                              Page 2
**BOEING PROPRIETARY**



6.      <u>Assignment</u>.

Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part.

7.      <u>Confidential Treatment</u>.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

**SA-2**

SWA-PA-03729-LA-1106471R1

Aircraft Model Substitution                                                                                    Page 3

**BOEING PROPRIETARY**

**_BOEING_**

Very truly yours,
THE BOEING COMPANY

By    /s/ Jeff Solomon

Its    Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:    May 13 , 2013

SOUTHWEST AIRLINES CO.

By    /s/ Michael Van de Ven

Its    Executive Vice President

SWA-PA-03729-LA-1106471R1

**SA-2**

Aircraft Model Substitution                                                        Page 4

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106472R1

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:　　　　　[***]
Reference:
　　　　　　Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft (**Aircraft**)

　　This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.　　[***]

2.　　[***]

**SA-2**

SWA-PA-03729-LA-1106472R1

[***]　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 1

**BOEING PROPRIETARY**



3.    Confidentiality.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.


Very truly yours,

THE BOEING COMPANY


By       /s/ Jeff Solomon


Its          Attorney-In-Fact


ACCEPTED AND AGREED TO this


Date:       May 13, 2013


SOUTHWEST AIRLINES CO.


By       /s/ Michael Van de Ven


Its       Executive Vice President


**SA-2**

SWA-PA-03729-LA-1106472R1

[***]                                                                                          Page 2

**BOEING PROPRIETARY**

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| | | | | |
|---|---|---|---|---|
| **Airframe Model/MTOW:** | 737-8 | 175900 pounds | **Detail Specification:** | D019A007-NEW (11/4/2011) |
| **Engine Model/Thrust:** | CFMLEAP-1B26 | 0 pounds | **Airframe Price Base Year/Escalation Formula:** | Jul-11   ECI-MFG/CPI |
| **Airframe Price:** | | [***] | **Engine Price Base Year/Escalation Formula:** | N/A   N/A |
| **Optional Features:** | | [***] | | |
| **Sub-Total of Airframe and Features:** | | [***] | **Airframe Escalation Data:** | |
| **Engine Price (Per Aircraft):** | | [***] | **Base Year Index (ECI):** | [***] |
| **Aircraft Basic Price (Excluding BFE/SPE):** | | [***] | **Base Year Index (CPI):** | [***] |
| **Buyer Furnished Equipment (BFE) Estimate:** | | [***] | | |
| **//Seller Purchased Equipment (SPE)/In-Flight Entertainment (IFE)// Estimate:** | | [***] | | |
| | | | | |
| **Non-Refundable Deposit/Aircraft at Def Agreemt:** | | [***] | | |

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Jan-2021 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Jan-2021 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2021 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Mar-2021 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2021 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Apr-2021 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| May-2021 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| May-2021 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2021 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Jul-2021 | 2 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2021 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Aug-2021 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Sep-2021 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Oct-2021 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Oct-2021 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2021 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Dec-2021 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2022 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Jan-2022 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2022 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Feb-2022 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2022 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Mar-2022 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2022 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| May-2022 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2022 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Jul-2022 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2022 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Aug-2022 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2022 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Oct-2022 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2022 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Nov-2022 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2022 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Dec-2022 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2022 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Jan-2023 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2023 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Feb-2023 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2023 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| May-2023 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| May-2023 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Jul-2023 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2023 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Nov-2023 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2024 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Jan-2024 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2024 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Feb-2024 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Mar-2024 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Mar-2024 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| May-2024 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| May-2024 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2024 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Oct-2024 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2024 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Dec-2024 | 2 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2025 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2025 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2025 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2025 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| May-2025 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2025 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2025 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Aug-2025 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2025 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2025 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2025 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2025 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2026 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2026 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2026 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2026 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| May-2026 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2026 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2026 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2026 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2026 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2026 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2026 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2026 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2027 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2027 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2027 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2027 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| May-2027 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2027 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2027 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2027 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Sep-2027 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2027 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2027 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2027 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Total: | 191 | | | | | | | | |

* [***]



The Boeing Company
 P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106476

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:            [***]
Reference:
                    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

The Purchase Agreement incorporates the terms and conditions of Aircraft General Terms Agreement dated as of December13, 2011 identified as SWA-AGTA between Boeing and Customer (**AGTA**). This Letter Agreement modifies certain terms and conditions of the AGTA with respect to the Aircraft.

1.      [***]

**SA-2**

SWA-PA-03729-LA-1106476

[***]                                                                                                    Page 1

**BOEING PROPRIETARY**



The Boeing Company
 P.O. Box 3707
 Seattle, WA 98124-2207

SWA-PA-03729-LA-1106477

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:              [***]
Reference:

        Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft (**Aircraft**)

    This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

**<u>Recitals</u>**

1.    [***]

2.    [***]

**<u>Agreement</u>**

3.    <u>Covered Aircraft</u>.

    The Program shall apply to each of the Aircraft operated by Customer on Customer's routes during the Program Term (**Covered Aircraft**).

4.    [***]

**SA-2**

SWA-PA-03729-LA-1106477

[***]                                                                 Page 1

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106479R

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:          [***]
Reference:
                 Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft (**Aircraft**)

        This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.      [***]

**SA-2**

SWA-PA-03729-LA-1106479R1
[***]                                                                          Page 1

**BOEING PROPRIETARY**



2.    Assignment. Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part.

3.    Confidentiality. Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Section) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Section, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

**SA-2**

SWA-PA-03729-LA-1106479R1

[***]                                                                                              Page 2

**BOEING PROPRIETARY**

**BOEING**

Very truly yours,

THE BOEING COMPANY

By     /s/ Jeff Solomon
_____

Its          Attorney-In-Fact
_____

ACCEPTED AND AGREED TO this

Date:      May 13, 2013
_____

SOUTHWEST AIRLINES CO.

By     /s/ Michael Van de Ven
_____

Its     Executive Vice President



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106480R1

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:　　　　[***]
Reference:
　　　　　Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft (**Aircraft**)

　　This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.　　[***]

2.　　[***]

3.　　Assignment. Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part.

**SA-2**

SWA-PA-03729-LA-100648R1

[***]　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 1

**BOEING PROPRIETARY**



Confidentiality. Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By      /s/ Jeff Solomon

Its           Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:      May 13, 2013

SOUTHWEST AIRLINES CO.

By      /s/ Michael Van de Ven

Its      Executive Vice President

**SA-2**

SWA-PA-03729-LA-100648R1

[***]                                                                                                                    Page 2

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207


SWA-PA-03729-LA-1106481**R2**


Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:                    [***]

Reference:          Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft (**Aircraft**)


This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.      [***]


2.      [***]


3.      [***]


<div align="right">**SA-2**</div>

SWA-PA-03729-LA-1106481R2

[***]                                                                                                          Page 1

<div align="center">**BOEING PROPRIETARY**</div>



4.    [***]

5.    [***]

6.    [***]

7.    Assignment.

    Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in

**SA-2**

SWA-PA-03729-LA-1106481R2

[***]                                                                                                                         Page 2

**BOEING PROPRIETARY**



consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part.

8.    Confidentiality.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By    /s/ Jeff Solomon

Its    Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:    May 13 , 2013

SOUTHWEST AIRLINES CO.

By    /s/ Michael Van de Ven

Its    Executive Vice President

**SA-2**

SWA-PA-03729-LA-1106481R2

[***]                                                                                          Page 3

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106482

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:          [***]
Reference:

Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

[***]

[***]

1.    [***]

2.    Assignment.

Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part.

**SA-2**

SWA-PA-03729-LA-1106481R2

[***]                                                                 Page 1
**BOEING PROPRIETARY**



The Boeing Company
 P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106483

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:        [***]
Reference:

      Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.    [***]

2.    <u>Assignment</u>.

Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part.

3.    <u>Confidentiality</u>.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its

**SA-2**

SWA-PA-03729-LA-1106483

[***]                                                                 Page 1

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106484

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:        [***]

Reference:      Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.    <u>Defined Terms</u>: The following capitalized terms have the following meaning:

1.1 **[***]**

1.2 **[***]**

1.3 **Program Aircraft** means each Aircraft specified in Table 1 of the Purchase Agreement as of the date of this Letter.

2.    [***]

3.    [***]

**SA-2**

SWA-PA-03729-LA-1106484

[***]                                                                          Page 1

**BOEING PROPRIETARY**



**[\*\*\*]**

SWA-PA-03729-LA-110684R1 **SA-2**
[\*\*\*] Page 5

**BOEING PROPRIETARY**



[***]

SWA-PA-03729-LA-110684R1                                                      **SA-2**
[***]                                                                       Page 6
                        **BOEING PROPRIETARY**



[***]


SWA-PA-03729-LA-110684R1                                                                                    **SA-2**
[***]                                                                                                                      Page 7
**BOEING PROPRIETARY**



[***]

SWA-PA-03729-LA-110684R1                                                                                    **SA-2**
[***]                                                                                                      Page 8

**BOEING PROPRIETARY**



[***]

SWA-PA-03729-LA-110684R1                                                                 **SA-2**
[***]                                                                                     Page 9
<div align="center">**BOEING PROPRIETARY**</div>



**[\*\*\*]**

SWA-PA-03729-LA-110684R1 **SA-2**
[\*\*\*] Page 10

**BOEING PROPRIETARY**



The Boeing Company
 P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106485

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:          [***]

Reference:        Aircraft General Terms Agreement No. SWA-AGTA (**AGTA**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**)

                  Purchase Agreement No. PA-03729 (**Purchase Agreement**) between Boeing and Customer relating to Model 737-8 and 737-7 aircraft (**Aircraft**)

        This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement, including the AGTA. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.  [***]

**SA-2**

SWA-PA-03729-LA-1106485

[***]                                                                    Page 1
                          **BOEING PROPRIETARY**



The Boeing Company
 P.O. Box 3707
Seattle, WA 98124-2207


SWA-PA-03729-LA-1300943


Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611


Subject:           [***]

Reference:         Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft (**Aircraft**)


This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.     [***]

2.     <u>Confidentiality</u>.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.


**SA-2**

SWA-PA-03729-LA-1300943
[***]                                                                                                 LA Page 1
                              **BOEING PROPRIETARY**

**_BOEING_**

Very truly yours,

THE BOEING COMPANY

By      /s/ Jeff Solomon

Its     Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:      May 13, 2013

SOUTHWEST AIRLINES CO.

By      /s/ Michael Van de Ven

Its     Executive Vice President

**SA-2**

SWA-PA-03729-LA-1300943

[***]                                                              LA Page 2

**BOEING PROPRIETARY**



<div align="right">
The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207
</div>

SWA-PA-03729-LA-1301168

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235

Subject:          [***]

Reference:        Purchase Agreement No. 3729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-7 and 737-8 aircraft

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

[***]

1.      [***]

SWA-PA-03729-LA-1301168                                                                    **SA-2**

[***]                                                                                        Page 1

<div align="center">
**BOEING PROPRIETARY**
</div>



2.  <u>Assignment</u>.

[***] described in this Letter Agreement are provided [***] in consideration of Customer's taking title to the applicable Firm Aircraft or Block D Option Aircraft at time of delivery and becoming the operator of the applicable Firm Aircraft or Block D Option Aircraft. Under no circumstances will Customer be permitted to assign the business terms set forth herein.

3.  <u>Confidentiality</u>

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this paragraph) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this paragraph, or

**SA-2**

SWA-PA-03729-LA-1301168

[***]                                                                                                                    Page 2
<div align="center">**BOEING PROPRIETARY**</div>



are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By      /s/ Jeff Solomon

Its     Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:      May 13, 2013

SOUTHWEST AIRLINES CO.

By      /s/ Michael Van de Ven

Its     Executive Vice President

**SA-2**

SWA-PA-03729-LA-1301168

[***]                                                                                                    Page 3

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207


SWA-PA-01810/03729-LA-1301169

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235


Subject:           [***]

Reference:         (a) Purchase Agreement No. 1810 between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-700 and 737-800 aircraft (**NG Purchase Agreement**)
                   (b) Purchase Agreement No. 3729 between Boeing and Customer relating to Model 737-7 and 737-8 aircraft (**MAX Purchase Agreement**)
                   (c) Letter Agreement SWA-PA-01810-LA-1105884, "Option Aircraft", (**Option Letter Agreement**).


This letter agreement (**Letter Agreement**) amends and supplements the NG Purchase Agreement and MAX Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the NG Purchase Agreement and MAX Purchase Agreement.


1.    [***]

2.    [***]

**SA-2**

SWA-PA-03729-LA-01810/1301169

[***]                                                                          Page 1

**BOEING PROPRIETARY**



3.  [***]


4.    Assignment.

[***] described in this Letter Agreement are provided [***] in consideration of Customer's taking title to the Firm Aircraft and Option Aircraft at time of delivery and becoming the operator of the Firm Aircraft and Option Aircraft. Under no circumstances will Customer be permitted to assign the business terms set forth herein.


**SA-2**

SWA-PA-03729-LA-01810/1301169

[***]                                                                                                                      Page 2

**BOEING PROPRIETARY**



5. <u>Confidentiality</u>

      Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this paragraph) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this paragraph, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By     /s/ Jeff Solomon

Its     Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:     May 13, 2013

SOUTHWEST AIRLINES CO.

By     /s/ Michael Van de Ven

Its     Executive Vice President

**SA-2**

SWA-PA-03729-LA-01810/1301169

[***]                         Page 3

**BOEING PROPRIETARY**



<div align="right">
The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207
</div>

SWA-PA-03729-LA-1301170

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:         [***]
Reference:

      Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft

      This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.  [***]

2.  [***]

**SA-2**

SWA-PA-03729-LA-1301170

[***]                                                                 Page 1

**BOEING PROPRIETARY**



3.      Assignment.

Unless otherwise noted herein, [***] described in this Letter Agreement are provided [***] in consideration of Customer's taking title to the 737-7 Aircraft at time of delivery and becoming the operator of the 737-7 Aircraft. This Letter Agreement cannot be assigned, in whole or in part, without the prior written consent of Boeing.

4.      Confidentiality

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

**SA-2**

SWA-PA-03729-LA-1301170

[***]                                                                                                                                          Page 2

**BOEING PROPRIETARY**

**_BOEING_**

Very truly yours,
 THE BOEING COMPANY

By       /s/ Jeff Solomon

Its          Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:       May 13 , 2013

SOUTHWEST AIRLINES CO.

By       /s/ Michael Van de Ven

Its       Executive Vice President

**SA-2**

SWA-PA-03729-LA-1301170

[***]                                                                                              Page 3

**BOEING PROPRIETARY**

**SUPPLEMENTAL AGREEMENT NO. 3**

**to**

**Purchase Agreement No. 3729**

**between**

**THE BOEING COMPANY**

**and**

**SOUTHWEST AIRLINES CO.**

**Relating to Boeing Model 737-8 and 737-7 Aircraft**

THIS SUPPLEMENTAL AGREEMENT, entered into as of November 4, 2013, is made between THE BOEING COMPANY, a Delaware corporation (**Boeing**), and SOUTHWEST AIRLINES CO., a Texas corporation (**Customer**);

Customer and Boeing entered into Purchase Agreement Number PA-03729 dated December 13, 2011, as amended and supplemented, (**Purchase Agreement**) relating to the purchase and sale of Boeing Model 737-8 and Model 737-7 aircraft; and this Supplemental Agreement No. 3 is an amendment to and is incorporated into the Purchase Agreement:

WHEREAS, Boeing and Customer agree to amend the Purchase Agreement to document Customer's substitution of twenty (20) firm Model 737-700 and Model 737-800 aircraft (**Substitution Aircraft**) to firm Model 737-8 aircraft (**New Firm -8 Aircraft**), exercised pursuant to the terms of SA-85 to Purchase Agreement No. 1810 between Customer and Boeing (**SA-85**);

NOW, THEREFORE, the parties agree that the Purchase Agreement is amended as set forth below and otherwise agree as follows:

1.      The Table of Contents of the Purchase Agreement is deleted in its entirety and a new Table of Contents is attached hereto and incorporated into the Purchase Agreement by this reference.

2.      Table 1A, "737-8 Aircraft Delivery, Description, Price and Advance Payments", to the Purchase Agreement is deleted in its entirety and a new Table 1A (identified by "SA-3") is attached hereto and incorporated into the Purchase Agreement by this reference.

3.      Attachment 1 to Letter Agreement SWA-PA-03729-LA-1106474, "Option Aircraft", is deleted in its entirety and replaced with a new Attachment 1 (identified by

"SA-3") attached hereto and incorporated into the Purchase Agreement by this reference.

4.      Letter Agreement SWA-PA-03729-LA-1301168, [***], is deleted in its entirety and replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1301168R1, [***].

5.      If Customer owes Boeing any additional Advance Payment amounts as a result of the execution of this Supplemental Agreement, Customer will pay such amounts to Boeing. If as a result of the execution of this Supplemental Agreement, there is any excess in Advance Payments made by Customer to Boeing, Boeing will retain such excess amounts until the next Advance Payment is due, at which time Customer may reduce the amount of such Advance Payment by the amount of such excess. A reconciliation regarding changes in Advance Payments arising from this Supplemental Agreement will be provided separately to Customer by Boeing.

6.      The Purchase Agreement is amended as set forth above, and all other terms and conditions of the Purchase Agreement remain unchanged and are in full force and effect.


AGREED AND ACCEPTED this

November 4, 2013
Date

THE BOEING COMPANY                          SOUTHWEST AIRLINES CO.


/s/ Jeff Solomon                            /s/ Chris Monroe
Signature                                   Signature


Jeff Solomon                                Chris Monroe
Printed name                                Printed name


Attorney-in-Fact                            VP Treasurer
Title                                       Title


SWA-PA-03729                              2                                    SA-3
**BOEING PROPRIETARY**

# PURCHASE AGREEMENT NUMBER PA-03729
## between
## THE BOEING COMPANY
## and
## Southwest Airlines Co.
## Relating to Boeing Model 737-8 and 737-7 Aircraft

SWA-PA-03729

**BOEING PROPRIETARY**

SA-3

Page 1

**TABLE OF CONTENTS**

| **ARTICLES** | **TITLES** | |
|---|---|---|
| Article 1 | Quantity, Model and Description | SA-2 |
| Article 2 | Delivery Schedule | |
| Article 3 | Price | |
| Article 4 | Payment | SA-2 |
| Article 5 | Additional Terms | |
| **TABLE** | **TITLE** | |
| 1A | 737-8 Aircraft Information Table | **SA-3** |
| 1B | 737-7 Aircraft Information Table | SA-2 |
| **EXHIBIT** | | |
| A1 | 737-8 Aircraft Configuration | SA-2 |
| A2 | 737-7 Aircraft Configuration | SA-2 |
| B* | Aircraft Delivery Requirements and Responsibilities | |
| **SUPPLEMENTAL EXHIBITS** | **TITLES** | |
| AE1* | Escalation Adjustment/Airframe and Optional Features | |
| BFE1* | BFE Variables | |
| CS1 | Customer Support Variables | |
| CS1-7MAX | Customer Support Variables | SA-2 |
| EE1* | Engine Escalation/Engine Warranty and Patent Indemnity | |
| SLP1* | Service Life Policy Components | |
| **LETTER AGREEMENTS** | **TITLES** | |
| SWA-PA-03729-LA-1106463R1 | Open Matters | SA-2 |

| LETTER AGREEMENTS | TITLES | |
|---|---|---|
| SWA-PA-03729-LA-1106465* | [***] | |
| SWA-PA-03729-LA-1106466 | [***] | |
| SWA-PA-03729-LA-1106467 | [***] | |
| SWA-PA-03729-LA-1106468* | [***] | |
| SWA-PA-03729-LA-1106469R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106470R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106471R1 | Substitute Aircraft | SA-2 |
| SWA-PA-03729-LA-1106472R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106473 | [***] | |
| SWA-PA-03729-LA-1106474 | Option Aircraft | |
| | Attachment 1 | **SA-3** |
| SWA-PA-03729-LA-1106475 | [***] | |
| SWA-PA-03729-LA-1106476* | [***] | |
| SWA-PA-03729-LA-1106477* | [***] | |
| SWA-PA-03729-LA-1106478 | [***] | |
| SWA-PA-03729-LA-1106479R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106480R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106481R2 | [***] | SA-2 |
| SWA-PA-03729-LA-1106482* | [***] | |
| SWA-PA-03729-LA-1106483* | [***] | |
| SWA-PA-03729-LA-1106484* | [***] | |
| | Attachment A | SA-2 |
| | Attachment B | SA-2 |
| SWA-PA-03729-LA-1106485* | [***] | |

| **LETTER AGREEMENTS** | **TITLES** | |
|---|---|---|
| SWA-PA-03729-LA-1209080 | [***] | SA-1 |
| SWA-PA-03729-LA-1210419 | [***] | SA-1 |
| SWA-PA-03729-LA-1300943 | [***] | SA-2 |
| SWA-PA-03729-LA-1301168**R1** | [***] | **SA-3** |
| SWA-PA-01810/03729-LA-1301169 | [***] | SA-2 |
| SWA-PA-03729-LA-1301170 | [***] | SA-2 |

\* Denotes revision to Page 1 or Page 2 only to reference 737-7 (SA-2)

**Table 1A to**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| | | | | |
|---|---|---|---|---|
| | | | | D019A001-TBD |
| **Airframe Model/MTOW:** | 737-8 | 175900 pounds | **Detail Specification:** | (10/27/2011) 2Q11 External Fcst |
| **Engine Model/Thrust:** | CFMLEAP-1B26 | tbd | **Airframe Price Base Year/Escalation Formula:** | Jul-11    ECI-MFG/CPI |
| **Airframe Price:** | | [***] | **Engine Price Base Year/Escalation Formula:** | N/A    N/A |
| **Optional Features:** | | [***] | | |
| **Sub-Total of Airframe and Features:** | | [***] | **Airframe Escalation Data:** | |
| **Engine Price (Per Aircraft):** | | [***] | **Base Year Index (ECI):** | [***] |
| **Aircraft Basic Price (Excluding BFE/SPE):** | | [***] | **Base Year Index (CPI):** | [***] |
| **Buyer Furnished Equipment (BFE) Estimate:** | | [***] | | |
| **//Seller Purchased Equipment (SPE)/In-Flight Entertainment (IFE)// Estimate:** | | [***] | | |

| | | Escalation | Manufacturer | | | Escalation Estimate | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Factor | Serial | Aircraft | | Adv Payment Base | | | 21/18/12/9/6 Mos. | |
| **Delivery Date*** | **Number of Aircraft** | **(Airframe)** | **Number** | **Block** | **Notes** | **Price Per A/P** | **At Signing** [***] | **24 Mos.** [***] | [***] | **Total** [***] |
| Jul-2017 | 1 | [***] | 36929 | A | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Jul-2017 | 2 | [***] | | C | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Aug-2017 | 3 | [***] | 36979, 36930, 36984 | A | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Aug-2017 | 3 | [***] | | C | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Sep-2017 | 1 | [***] | 36934 | A | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Oct-2017 | 1 | [***] | 36988 | A | | [***] | [***] | [***] | [***] | [***] |
| Oct-2017 | 1 | [***] | | C | | [***] | [***] | [***] | [***] | [***] |
| Nov-2017 | 1 | [***] | 36989 | A | | [***] | [***] | [***] | [***] | [***] |
| Nov-2017 | 1 | [***] | | C | | [***] | [***] | [***] | [***] | [***] |
| Jan-2018 | 1 | [***] | 42544 | A | | [***] | [***] | [***] | [***] | [***] |
| Jan-2018 | 1 | [***] | | C | | [***] | [***] | [***] | [***] | [***] |
| Mar-2018 | 1 | [***] | | C | | [***] | [***] | [***] | [***] | [***] |
| Jun-2018 | 1 | [***] | 42546 | A | | [***] | [***] | [***] | [***] | [***] |
| Jul-2018 | 1 | [***] | 42547 | A | | [***] | [***] | [***] | [***] | [***] |
| Jul-2018 | 1 | [***] | | C | | [***] | [***] | [***] | [***] | [***] |
| Aug-2018 | 1 | [***] | 42548 | A | | [***] | [***] | [***] | [***] | [***] |
| Sep-2018 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2018 | 1 | [***] | 37019 | A | | [***] | [***] | [***] | [***] | [***] |

**Table 1A to**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Oct-2018 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2018 | 1 | [***] | 42549 | A | | [***] | [***] | [***] | [***] | [***] |
| Nov-2018 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2018 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2019 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2019 | 1 | [***] | 37042 | A | | [***] | [***] | [***] | [***] | [***] |
| Feb-2019 | 1 | [***] | 42550 | A | | [***] | [***] | [***] | [***] | [***] |
| Mar-2019 | 1 | [***] | 42551 | A | | [***] | [***] | [***] | [***] | [***] |
| Jul-2019 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2019 | 1 | [***] | 37034 | A | | [***] | [***] | [***] | [***] | [***] |
| Sep-2019 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2019 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2019 | 1 | [***] | 42552 | A | | [***] | [***] | [***] | [***] | [***] |
| Dec-2019 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2020 | 1 | [***] | 42553 | A | | [***] | [***] | [***] | [***] | [***] |
| Feb-2020 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2020 | 1 | [***] | 35970 | B | | [***] | [***] | [***] | [***] | [***] |
| Mar-2020 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2020 | 1 | [***] | 35968 | B | | [***] | [***] | [***] | [***] | [***] |
| Apr-2020 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2020 | 1 | [***] | 35972 | B | | [***] | [***] | [***] | [***] | [***] |
| May-2020 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| May-2020 | 1 | [***] | 36736 | B | | [***] | [***] | [***] | [***] | [***] |
| Jun-2020 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2020 | 1 | [***] | 33941 | B | | [***] | [***] | [***] | [***] | [***] |
| **Jul-2020** | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| **Jul-2020** | 1 | [***] | 35963 | B | | [***] | [***] | [***] | [***] | [***] |
| Aug-2020 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2020 | 1 | [***] | 36733 | B | | [***] | [***] | [***] | [***] | [***] |

**Table 1A to**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Sep-2020 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2020 | 1 | [***] | 35971 | B | | [***] | [***] | [***] | [***] | [***] |
| **Oct-2020** | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| **Oct-2020** | 1 | [***] | 38804 | B | | [***] | [***] | [***] | [***] | [***] |
| Nov-2020 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2020 | 1 | [***] | 38805 | B | | [***] | [***] | [***] | [***] | [***] |
| Dec-2020 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2021 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2021 | 1 | [***] | 36729 | B | | [***] | [***] | [***] | [***] | [***] |
| Feb-2021 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2021 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2021 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| May-2021 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2021 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2021 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2021 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2021 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2021 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2021 | 2 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2021 | 2 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2022 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2022 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2022 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2022 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| May-2022 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2022 | 3 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2022 | 2 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2022 | 2 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2022 | 2 | [***] | | | | [***] | [***] | [***] | [***] | [***] |

**Table 1A to**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Oct-2022 | 2 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2022 | 2 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2022 | 2 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2023 | 2 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2023 | 2 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | 36732 | B | | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | 38806 | B | | [***] | [***] | [***] | [***] | [***] |
| May-2023 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| May-2023 | 1 | [***] | 37043 | A | | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 1 | [***] | 42536 | A | | [***] | [***] | [***] | [***] | [***] |
| Jul-2023 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2023 | 1 | [***] | 36722 | B | | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 1 | [***] | 42537 | A | | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | 1 | [***] | 36727 | B | | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 1 | [***] | 42538 | A | | [***] | [***] | [***] | [***] | [***] |
| Nov-2023 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2023 | 1 | [***] | 38815 | B | | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 1 | [***] | 42539 | A | | [***] | [***] | [***] | [***] | [***] |
| Jan-2024 | 2 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2024 | 2 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2024 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2024 | 1 | [***] | 38817 | B | | [***] | [***] | [***] | [***] | [***] |

**Table 1A to**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Apr-2024 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | **1** | [***] | **42540** | **A** | | [***] | [***] | [***] | [***] | [***] |
| May-2024 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| May-2024 | **1** | [***] | **42541** | **A** | | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | **1** | [***] | **42542** | **A** | | [***] | [***] | [***] | [***] | [***] |
| Jul-2024 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2024 | **1** | [***] | **35967** | **B** | | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | **1** | [***] | **42543** | **A** | | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | **1** | [***] | **36730** | **B** | | [***] | [***] | [***] | [***] | [***] |
| Oct-2024 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2024 | **1** | [***] | **33940** | **B** | | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | **1** | [***] | **35974** | **B** | | [***] | [***] | [***] | [***] | [***] |
| Dec-2024 | 1 | [***] | | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2024 | **1** | [***] | **35975** | **B** | | [***] | [***] | [***] | [***] | [***] |

Total:     18

* [***]


Notes:
1) [***]

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| | | | | |
|---|---|---|---|---|
| Airframe Model/MTOW: | 737-8 | 175900 pounds | Detail Specification: | D019A007-NEW (11/4/2011) |
| Engine Model/Thrust: | CFMLEAP-1B26 | 0 pounds | Airframe Price Base Year/Escalation Formula: | Jul-11    ECI-MFG/CPI |
| Airframe Price: | | [***] | Engine Price Base Year/Escalation Formula: | N/A    N/A |
| Optional Features: | | [***] | | |
| Sub-Total of Airframe and Features: | | [***] | **Airframe Escalation Data:** | |
| Engine Price (Per Aircraft): | | [***] | Base Year Index (ECI): | [***] |
| Aircraft Basic Price (Excluding BFE/SPE): | | [***] | Base Year Index (CPI): | [***] |
| Buyer Furnished Equipment (BFE) Estimate: | | [***] | | |
| //Seller Purchased Equipment (SPE)/In-Flight Entertainment (IFE)// Estimate: | | [***] | | |
| Non-Refundable Deposit/Aircraft at Def Agreemt: | | [***] | | |

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. *** | 21/18/12/9/6 Mos. *** | Total *** |
| Jan-2021 | 1 | [***] | | D | [***] | *** | *** | *** | *** |
| Jan-2021 | 1 | [***] | | | [***] | *** | *** | *** | *** |
| Feb-2021 | 1 | [***] | | D | [***] | *** | *** | *** | *** |
| Mar-2021 | 1 | [***] | | | [***] | *** | *** | *** | *** |
| Apr-2021 | 1 | [***] | | D | [***] | *** | *** | *** | *** |
| Apr-2021 | 1 | [***] | | | [***] | *** | *** | *** | *** |
| May-2021 | 1 | [***] | | D | [***] | *** | *** | *** | *** |
| May-2021 | 1 | [***] | | | [***] | *** | *** | *** | *** |
| Jun-2021 | 1 | [***] | | D | [***] | *** | *** | *** | *** |
| Jul-2021 | 2 | [***] | | | [***] | *** | *** | *** | *** |
| Jul-2021 | 1 | [***] | | D | [***] | *** | *** | *** | *** |
| Aug-2021 | 1 | [***] | | D | [***] | *** | *** | *** | *** |
| Sep-2021 | 1 | [***] | | | [***] | *** | *** | *** | *** |

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Oct-2021 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Oct-2021 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2021 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Dec-2021 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2022 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Jan-2022 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2022 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Feb-2022 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2022 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Mar-2022 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2022 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| May-2022 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2022 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Jul-2022 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2022 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Aug-2022 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2022 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Oct-2022 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2022 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Nov-2022 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2022 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Dec-2022 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2022 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Jan-2023 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2023 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Feb-2023 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2023 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| May-2023 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| May-2023 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Jul-2023 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2023 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Nov-2023 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2024 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Jan-2024 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2024 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Feb-2024 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |

Attachment 1 To
Letter Agreement No. LA 1106474
Option Aircraft Delivery, Description, Price and Advance Payments

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Mar-2024 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Mar-2024 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| May-2024 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| May-2024 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2024 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Oct-2024 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2024 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | 1 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | 1 | [***] | | D | [***] | [***] | [***] | [***] | [***] |
| Dec-2024 | 2 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2025 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2025 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2025 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2025 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| May-2025 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2025 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2025 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |

Attachment 1 To
Letter Agreement No. LA 1106474
Option Aircraft Delivery, Description, Price and Advance Payments

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Aug-2025 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2025 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2025 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2025 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2025 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2026 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2026 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2026 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2026 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| May-2026 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2026 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2026 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2026 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2026 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2026 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2026 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2026 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2027 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2027 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2027 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2027 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| May-2027 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2027 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2027 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2027 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Sep-2027 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2027 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2027 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2027 | 3 | [***] | | | [***] | [***] | [***] | [***] | [***] |

Total:    12

\* [***]



<div align="right">
The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207
</div>

SWA-PA-03729-LA-1301168**R1**

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235

Subject:          [***]

Reference:        Purchase Agreement No. 3729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and
                  Southwest Airlines Co. (**Customer**) relating to Model 737-7 and 737-8 aircraft

        This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

        [***]

1.      [***]



2.      Assignment.

[***] described in this Letter Agreement are provided [***] in consideration of Customer's taking title to the applicable Firm Aircraft or Block D Option Aircraft at time of delivery and becoming the operator of the applicable Firm Aircraft or Block D Option Aircraft. Under no circumstances will Customer be permitted to assign the business terms set forth herein.

3.      Confidentiality.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this paragraph) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this paragraph, or

**BOEING**

are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By      /s/ Jeff Solomon

Its      Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:      November 4, 2013

SOUTHWEST AIRLINES CO.

By      /s/ Chris Monroe

Its      Chris Monroe
         VP, Treasurer

SWA-PA-03729-LA1301168**R1**                                                          **SA-3**
[***]                              **BOEING PROPRIETARY**                            Page 3

**SUPPLEMENTAL AGREEMENT NO. 4**

**to**

**Purchase Agreement No. 3729**

**between**

**THE BOEING COMPANY**

**and**

**SOUTHWEST AIRLINES CO.**

**Relating to Boeing Model 737-8 and 737-7 Aircraft**

THIS SUPPLEMENTAL AGREEMENT No. 4 (**SA-4**), entered into as of December 21, 2015, is made between THE BOEING COMPANY, a Delaware corporation (**Boeing**), and SOUTHWEST AIRLINES CO., a Texas corporation (**Customer**).

RECITALS:

WHEREAS, Customer and Boeing entered into Purchase Agreement Number PA-03729 dated December 13, 2011, as amended and supplemented, (**Purchase Agreement**) relating to the purchase and sale of Boeing Mode 737-8 (**737-8 Aircraft**) and Model 737-7 aircraft (**737-7 Aircraft**); collectively the "**Aircraft**". This Supplemental Agreement No. 4 is an amendment to and is incorporated into the Purchase Agreement. Capitalized terms used herein but not otherwise defined shall have the meaning set forth in the Purchase Agreement.

WHEREAS, Boeing has agreed to modify certain business considerations applicable to the firm Block A Aircraft, Block B Aircraft and Block C Aircraft identified in Table 1A of the Purchase Agreement.

WHEREAS, the parties desire to amend the Purchase Agreement as hereinafter set forth to make certain other changes;

NOW, THEREFORE, the parties agree that the Purchase Agreement is amended as set forth below and otherwise agree as follows:

SWA-PA-03729                                    1                                    SA-4
**BOEING PROPRIETARY**

1.      TABLE OF CONTENTS.

        The Table of Contents of the Purchase Agreement is deleted in its entirety and replaced with a new Table of Contents (attached), which lists Exhibits and Letter Agreements revised by this Supplemental Agreement No. 4 and identified by "SA-4". Such revised Table of Contents is incorporated into the Purchase Agreement by this reference.

2.      LETTER AGREEMENTS.

        2.1     Letter Agreement SWA-PA-03729-LA-1106472R1, [***], no longer applies, is deleted in its entirety and removed from the Purchase Agreement.

        2.2     Letter Agreement SWA-PA-03729-LA-1301168, [***], is deleted in its entirety and replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1301168R1, [***].

        2.3     Letter Agreement SWA-PA-01810/03729-LA-1301169, [***], no longer applies, is deleted in its entirety and removed from the Purchase Agreement.


The Purchase Agreement is deemed to be supplemented to the extent herein provided and as so supplemented will continue in full force and effect.


EXECUTED IN DUPLICATE as of the day and year first above written.

| THE BOEING COMPANY | SOUTHWEST AIRLINES CO. |
|---|---|
| By: /s/ Jon W. Lewis_____ | By: /s/ Michael Van de Ven_ |
| Its: Attorney-In-Fact_____ | Its: EVP & COO_____ |

# PURCHASE AGREEMENT NUMBER PA-03729
## between
## THE BOEING COMPANY
## and
## Southwest Airlines Co.
## Relating to Boeing Model 737-8 and 737-7 Aircraft

**TABLE OF CONTENTS**

| **ARTICLES** | **TITLES** | |
|---|---|---|
| Article 1 | Quantity, Model and Description | SA-2 |
| Article 2 | Delivery Schedule | |
| Article 3 | Price | |
| Article 4 | Payment | SA-2 |
| Article 5 | Additional Terms | |
| **TABLE** | **TITLE** | |
| 1A | 737-8 Aircraft Information Table | SA-3 |
| 1B | 737-7 Aircraft Information Table | SA-2 |
| **EXHIBIT** | | |
| A1 | 737-8 Aircraft Configuration | SA-2 |
| A2 | 737-7 Aircraft Configuration | SA-2 |
| B* | Aircraft Delivery Requirements and Responsibilities | |
| **SUPPLEMENTAL EXHIBITS** | **TITLES** | |
| AE1* | Escalation Adjustment/Airframe and Optional Features | |
| BFE1* | BFE Variables | |
| CS1 | Customer Support Variables | |
| CS1-7MAX | Customer Support Variables | SA-2 |
| EE1* | Engine Escalation/Engine Warranty and Patent Indemnity | |
| SLP1* | Service Life Policy Components | |
| **LETTER AGREEMENTS** | **TITLES** | |
| SWA-PA-03729-LA-1106463R1 | Open Matters | SA-2 |
| SWA-PA-03729-LA-1106464* | [***] | |

| LETTER AGREEMENTS | TITLES | |
|---|---|---|
| SWA-PA-03729-LA-1106465* | [***] | |
| SWA-PA-03729-LA-1106466 | [***] | |
| SWA-PA-03729-LA-1106467 | [***] | |
| SWA-PA-03729-LA-1106468* | [***] | |
| SWA-PA-03729-LA-1106469R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106470R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106471R1 | Substitute Aircraft | SA-2 |
| SWA-PA-03729-LA-1106473 | [***] | |
| SWA-PA-03729-LA-1106474 | Option Aircraft | |
| | Attachment 1 | SA-3 |
| SWA-PA-03729-LA-1106475 | [***] | |
| SWA-PA-03729-LA-1106476* | [***] | |
| SWA-PA-03729-LA-1106477* | [***] | |
| SWA-PA-03729-LA-1106478 | [***] | |
| SWA-PA-03729-LA-1106479R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106480R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106481R2 | [***] | SA-2 |
| SWA-PA-03729-LA-1106482* | [***] | |
| SWA-PA-03729-LA-1106483* | [***] | |
| SWA-PA-03729-LA-1106484* | [***] | SA-2 |
| | Attachment A | SA-2 |
| | Attachment B | |
| SWA-PA-03729-LA-1106485* | [***] | |
| SWA-PA-03729-LA-1209080 | [***] | SA-1 |
| SWA-PA-03729-LA-1210419 | [***] | SA-1 |

| **LETTER AGREEMENTS** | **TITLES** | |
| --- | --- | --- |
| SWA-PA-03729-LA-1300943 | [***] | SA-2 |
| SWA-PA-03729-LA-1301168**R2** | [***] | **SA-4** |
| SWA-PA-03729-LA-1301170 | [***] | SA-2 |

\* Denotes revision to Page 1 or Page 2 only to reference 737-7 (SA-2)

## INACTIVE / DELETED TABLES, EXHIBITS, AND LETTER AGREEMENTS

RESTRICTED LETTER AGREEMENTS

| Letter Agreement | Title | Last Updated under SA | Current Status |
|---|---|---|---|
| SWA-PA-03729-LA-1106472R1 | [***] | SA-2 | Deleted under SA-4 |
| SWA-PA-01810/03729-LA-1301169 | [***] | SA-2 | Deleted under SA-4 |



The Boeing Company
 P.O. Box 3707
Seattle, WA 98124-2207


SWA-PA-03729-LA-1301168**R2**


Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235


Subject:    [***]

Reference:      Purchase Agreement No. 3729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-7 and 737-8 aircraft


     This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.


     [***]

1.    [***]





2.  Assignment.

[***] described in this Letter Agreement are provided [***] in consideration of Customer's taking title to the applicable Firm Aircraft at time of delivery and becoming the operator of the applicable Firm Aircraft. Under no circumstances will Customer be permitted to assign the business terms set forth herein.

3.  Confidentiality.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this paragraph) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this paragraph, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By      /s/ Jon W. Lewis

Its     Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:       December 21, 2015

SOUTHWEST AIRLINES CO.

By      /s/ Michael Van de Ven

Its     EVP & COO

**SUPPLEMENTAL AGREEMENT NO. 5**

**to**

**Purchase Agreement No. 03729**

**between**

**THE BOEING COMPANY**

**and**

**SOUTHWEST AIRLINES CO.**

**Relating to Boeing Model 737-8 and 737-7 Aircraft**

THIS SUPPLEMENTAL AGREEMENT No. 5 (**SA-5**), entered into as of June 17, 2016, is made between THE BOEING COMPANY, a Delaware corporation (**Boeing**), and SOUTHWEST AIRLINES CO., a Texas corporation (**Customer**).

RECITALS:


WHEREAS, Customer and Boeing entered into Purchase Agreement Number PA-03729 dated December 13, 2011, as amended and supplemented, (**Purchase Agreement**) relating to the purchase and sale of Boeing Model 737-8 (**737-8 Aircraft**) and Model 737-7 aircraft (**737-7 Aircraft**); collectively the "**Aircraft**". This SA5 is an amendment to and is incorporated into the Purchase Agreement. Capitalized terms used herein but not otherwise defined shall have the meaning set forth in the Purchase Agreement.

WHEREAS, Boeing and Customer agree to amend the Purchase Agreement by revising the delivery month of certain 737-8 Aircraft;

WHEREAS, Boeing and Customer agree to revise the delivery month and other contractual terms applicable to certain Option Aircraft; and

WHEREAS, Customer has requested and Boeing has agreed to provide certain [***] and other business considerations;

NOW, THEREFORE, the parties agree that the Purchase Agreement is amended as set forth below and otherwise agree as follows:

1.  <u>TABLE OF CONTENTS</u>.

    The Table of Contents of the Purchase Agreement is deleted in its entirety and replaced with a new Table of Contents (attached), which lists Exhibits and Letter Agreements revised by this SA-5 and identified by "SA-5". Such revised Table of Contents is incorporated into the Purchase Agreement by this reference.

2.  <u>TABLE</u>.

Table 1A, <u>Aircraft Delivery, Description, Price and Advance Payments – 737-8 Aircraft</u> is deleted in its entirety and replaced by a new Table 1A (identified by "SA-5") is attached hereto and incorporated into the Purchase Agreement by this reference.

3.  <u>LETTER AGREEMENTS</u>.

    3.1. Letter Agreement SWA-PA-03729-LA-1106467, [***], is deleted in its entirety and replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1106467R1;

    3.2. Letter Agreement SWA-PA-03729-LA-1106473, [***], is deleted in its entirety and replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1106473R1;

    3.3. Letter Agreement SWA-PA-03729-LA-1106474, <u>Option Aircraft</u>, including Attachment 1 thereof, is deleted in its entirety and replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1106474R1 and Attachment 1;

    3.4. Letter Agreement SWA-PA-03729-LA-1106475, [***], is deleted in its entirety and replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1106475R1;

    3.5. Letter Agreement SWA-PA-03729-LA-1106476, [***], is deleted in its entirety and replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1106476R1;

    3.6. Letter Agreement SWA-PA-03729-LA-1301170, [***], is deleted in its entirety and replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1301170R1;

    3.7. New Letter Agreement SWA-PA-03729-LA-1602486, [***], is hereby added to the Purchase Agreement.

4. <u>MISCELLANEOUS</u>.

[***]

[Signature page follows.]

[Remainder of page intentionally left blank.]

**BOEING PROPRIETARY**

The Purchase Agreement is deemed to be supplemented to the extent herein provided and as so supplemented will continue in full force and effect.

EXECUTED IN DUPLICATE as of the day and year first above written.

THE BOEING COMPANY                     SOUTHWEST AIRLINES CO.

By: /s/ Jon W. Lewis                   By: /s/ Tammy Romo

Its: Attorney-In-Fact                  Its: EVP & CFO

SWA-PA-03729                                                                          SA-5

**4**
**BOEING PROPRIETARY**

# PURCHASE AGREEMENT NUMBER PA-03729
## between
## THE BOEING COMPANY
## and
## Southwest Airlines Co.
## Relating to Boeing Model 737-8 and 737-7 Aircraft

**TABLE OF CONTENTS**

| ARTICLES | TITLES | |
|---|---|---|
| Article 1 | Quantity, Model and Description | SA-2 |
| Article 2 | Delivery Schedule | |
| Article 3 | Price | |
| Article 4 | Payment | SA-2 |
| Article 5 | Additional Terms | |
| **TABLE** | **TITLE** | |
| **1A** | **737-8 Aircraft Information Table** | **SA-5** |
| 1B | 737-7 Aircraft Information Table | SA-2 |
| **EXHIBIT** | | |
| A1 | 737-8 Aircraft Configuration | SA-2 |
| A2 | 737-7 Aircraft Configuration | SA-2 |
| B* | Aircraft Delivery Requirements and Responsibilities | |
| **SUPPLEMENTAL EXHIBITS** | **TITLES** | |
| AE1* | Escalation Adjustment/Airframe and Optional Features | |
| BFE1* | BFE Variables | |
| CS1 | Customer Support Variables | |
| CS1-7MAX | Customer Support Variables | SA-2 |
| EE1* | Engine Escalation/Engine Warranty and Patent Indemnity | |
| SLP1* | Service Life Policy Components | |
| **LETTER AGREEMENTS** | **TITLES** | |
| SWA-PA-03729-LA-1106463R1 | Open Matters | SA-2 |
| SWA-PA-03729-LA-1106464* | [***] | |

| LETTER AGREEMENTS | TITLES | |
|---|---|---|
| SWA-PA-03729-LA-1106465* | [***] | |
| SWA-PA-03729-LA-1106466 | [***] | |
| **SWA-PA-03729-LA-1106467R1** | **[***]** | **SA-5** |
| SWA-PA-03729-LA-1106468* | [***] | |
| SWA-PA-03729-LA-1106469R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106470R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106471R1 | Substitute Aircraft | SA-2 |
| **SWA-PA-03729-LA-1106473R1** | **[***]** | **SA-5** |
| **SWA-PA-03729-LA-1106474R1** | **Option Aircraft** | **SA-5** |
| | **Attachment 1** | **SA-5** |
| **SWA-PA-03729-LA-1106475R1** | **[***]** | **SA-5** |
| **SWA-PA-03729-LA-1106476R1*** | **[***]** | **SA-5** |
| SWA-PA-03729-LA-1106477* | [***] | |
| SWA-PA-03729-LA-1106478 | [***] | |
| SWA-PA-03729-LA-1106479R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106480R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106481R2 | [***] | SA-2 |
| SWA-PA-03729-LA-1106482* | [***] | |
| SWA-PA-03729-LA-1106483* | [***] | |
| SWA-PA-03729-LA-1106484* | [***] | |
| | Attachment A | SA-2 |
| | Attachment B | SA-2 |
| SWA-PA-03729-LA-1106485* | [***] | |
| SWA-PA-03729-LA-1209080 | [***] | SA-1 |
| SWA-PA-03729-LA-1210419 | [***] | SA-1 |

| LETTER AGREEMENTS | TITLES | |
|---|---|---|
| SWA-PA-03729-LA-1300943 | [***] | SA-2 |
| SWA-PA-03729-LA-1301168R2 | [***] | SA-4 |
| SWA-PA-03729-LA-1301170R1 | [***] | SA-5 |
| SWA-PA-03729-LA-1602486 | [***] | SA-5 |

\* Denotes revision to Page 1 or Page 2 only to reference 737-7 (SA-2)

**INACTIVE / DELETED TABLES, EXHIBITS, AND LETTER AGREEMENTS**

RESTRICTED LETTER AGREEMENTS

| Letter Agreement | Title | Last Updated under SA | Current Status |
|---|---|---|---|
| SWA-PA-03729-LA-1106472R1 | [***] | SA-2 | Deleted under SA-4 |
| SWA-PA-01810/03729-LA-1301169 | [***] | SA-2 | Deleted under SA-4 |

**Table 1A To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| | | | |
|---|---|---|---|
| **Airframe Model/MTOW:** 737-8 | 175900 pounds | **Detail Specification:** | D019A001-TBD (10/27/2011)  2Q11 External Fcst |
| **Engine Model/Thrust:** CFMLEAP-1B26 | tbd | **Airframe Price Base Year/Escalation Formula:** | Jul-11  ECI-MFG/CPI |
| **Airframe Price:** | [***] | **Engine Price Base Year/Escalation Formula:** | N/A  N/A |
| **Optional Features:** | [***] | | |
| **Sub-Total of Airframe and Features:** | [***] | **Airframe Escalation Data:** | |
| **Engine Price (Per Aircraft):** | [***] | **Base Year Index (ECI):** | [***] |
| **Aircraft Basic Price (Excluding BFE/SPE):** | [***] | **Base Year Index (CPI):** | [***] |
| **Buyer Furnished Equipment (BFE) Estimate:** | [***] | | |
| **Seller Purchased Equipment (SPE) Estimate:** | [***] | | |

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
|---|---|---|---|---|---|---|---|---|---|---|
| Jul-2017 | 1 | [***] | 36929 | A | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Jul-2017 | 2 | [***] | 42558, 42559 | C | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Aug-2017 | 3 | [***] | 36979, 36930, 36984 | A | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Aug-2017 | 3 | [***] | 42563, 42566, 42567 | C | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Sep-2017 | 1 | [***] | 36934 | A | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Oct-2017 | 1 | [***] | 36988 | A | | [***] | [***] | [***] | [***] | [***] |
| Oct-2017 | 1 | [***] | 42556 | C | | [***] | [***] | [***] | [***] | [***] |
| Nov-2017 | 1 | [***] | 36989 | A | | [***] | [***] | [***] | [***] | [***] |
| Nov-2017 | 1 | [***] | 42554 | C | | [***] | [***] | [***] | [***] | [***] |
| Jan-2018 | 1 | [***] | 42544 | A | | [***] | [***] | [***] | [***] | [***] |
| Jan-2018 | 1 | [***] | 42570 | C | | [***] | [***] | [***] | [***] | [***] |
| Mar-2018 | 1 | [***] | 42571 | C | | [***] | [***] | [***] | [***] | [***] |
| Jun-2018 | 1 | [***] | 42546 | A | | [***] | [***] | [***] | [***] | [***] |
| Jul-2018 | 1 | [***] | 42547 | A | | [***] | [***] | [***] | [***] | [***] |
| Jul-2018 | 1 | [***] | 42572 | C | | [***] | [***] | [***] | [***] | [***] |
| Aug-2018 | 1 | [***] | 42548 | A | | [***] | [***] | [***] | [***] | [***] |
| Sep-2018 | 1 | [***] | 42574 | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2018 | 1 | [***] | 37019 | A | | [***] | [***] | [***] | [***] | [***] |

**Table 1A To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Oct-2018 | 1 | [***] | 42575 | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2018 | 1 | [***] | 42549 | A | | [***] | [***] | [***] | [***] | [***] |
| Nov-2018 | 1 | [***] | 42573 | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2018 | 1 | [***] | 42576 | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2021 | 1 | [***] | 42648 | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2021 | 3 | [***] | 42649, 42650, 42651 | | | [***] | [***] | [***] | [***] | [***] |
| May-2021 | 3 | [***] | 42652, 42653, 42654 | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2021 | 3 | [***] | 42655, 42656, 42670 | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2021 | 3 | [***] | 42657, 42658, 42671 | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2022 | 2 | [***] | 42678, 42679 | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2022 | 3 | [***] | 42680, 42681, 42688 | | | [***] | [***] | [***] | [***] | [***] |
| May-2022 | 3 | [***] | 42682, 42683, 42684 | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2022 | 3 | [***] | 42685, 42686, 42687 | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2022 | 2 | [***] | 42689, 42690 | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2022 | 2 | [***] | 42693, 42695 | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2023 | 3 | [***] | 42577, 42560, 42565 | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2023 | 2 | [***] | 42562, 42564 | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2023 | 1 | [***] | 37042 | A | | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | 42557 | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | 42550 | A | | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | 36732 | B | | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | 42555 | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | 42551 | A | | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | 38806 | B | | [***] | [***] | [***] | [***] | [***] |
| May-2023 | 2 | [***] | 42594, 42568 | | | [***] | [***] | [***] | [***] | [***] |
| May-2023 | 1 | [***] | 37043 | A | | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 1 | [***] | 42581 | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 2 | [***] | 37034, 42536 | A | | [***] | [***] | [***] | [***] | [***] |

Jul-2023

42597, 42582

SWA-PA-03729 58681.1F.TXT

**BOEING PROPRIETARY**

**SA-5**
Page 2

**Table 1A To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Jul-2023 | 1 | [***] | 36722 | B | | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 1 | [***] | 42593 | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 2 | [***] | **42552,** 42537 | A | | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | 2 | [***] | **42601,** 42578 | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | 1 | [***] | 36727 | B | | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 2 | [***] | **42605,** 42579 | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 1 | [***] | 42538 | A | | [***] | [***] | [***] | [***] | [***] |
| Nov-2023 | 1 | [***] | 42580 | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2023 | 1 | [***] | 38815 | B | | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 1 | [***] | 42583 | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 1 | [***] | 42539 | A | | [***] | [***] | [***] | [***] | [***] |
| Jan-2024 | 3 | [***] | **42611,** 42584, 42585 | | | [***] | [***] | [***] | [***] | [***] |
| **Jan-2024** | 1 | [***] | **42553** | A | | [***] | [***] | [***] | [***] | [***] |
| Feb-2024 | 3 | [***] | **42612,** 42596, 42599 | | | [***] | [***] | [***] | [***] | [***] |
| **Feb-2024** | 1 | [***] | **35970** | **B** | | [***] | [***] | [***] | [***] | [***] |
| Mar-2024 | 1 | [***] | 42607 | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2024 | 3 | [***] | 38817, **35968, 35972** | B | | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 2 | [***] | **42617,** 42606 | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 1 | [***] | 42540 | A | | [***] | [***] | [***] | [***] | [***] |
| **Apr-2024** | 1 | [***] | **36736** | **B** | | [***] | [***] | [***] | [***] | [***] |
| May-2024 | 3 | [***] | **42619, 42622,** 42608 | | | [***] | [***] | [***] | [***] | [***] |
| May-2024 | 1 | [***] | 42541 | A | | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | 42610 | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | 42542 | A | | [***] | [***] | [***] | [***] | [***] |
| **Jun-2024** | 1 | [***] | **33941** | **B** | | [***] | [***] | [***] | [***] | [***] |
| Jul-2024 | 1 | [***] | 42615 | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2024 | 2 | [***] | **35963,** 35967 | B | | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | 2 | [***] | **42624,** 42626 | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | 1 | [***] | 42543 | A | | [***] | [***] | [***] | [***] | [***] |

**BOEING PROPRIETARY**

**Table 1A To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Sep-2024 | 1 | [***] | 42630 | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | 2 | [***] | 36730, **36733** | B | | [***] | [***] | [***] | [***] | [***] |
| Oct-2024 | 2 | [***] | **42625**, 42636 | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2024 | 1 | [***] | 33940 | B | | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | 1 | [***] | 42639 | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | 2 | [***] | **35971**, 35974 | B | | [***] | [***] | [***] | [***] | [***] |
| Dec-2024 | 2 | [***] | **42628**, 42640 | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2024 | 1 | [***] | 35975 | B | | [***] | [***] | [***] | [***] | [***] |
| **Jan-2025** | 2 | [***] | **42633, 42634** | | | [***] | [***] | [***] | [***] | [***] |
| **Jan-2025** | 2 | [***] | **38804, 38805** | B | | [***] | [***] | [***] | [***] | [***] |
| **Feb-2025** | 3 | [***] | **42637, 42641, 42643** | | | [***] | [***] | [***] | [***] | [***] |
| **Feb-2025** | 1 | [***] | **36729** | B | | [***] | [***] | [***] | [***] | [***] |
| **Mar-2025** | 4 | [***] | **42644, 42645, 42646, 42647** | | | [***] | [***] | [***] | [***] | [***] |
| **Apr-2025** | 4 | [***] | **42659, 42660, 42661, 42662** | | | [***] | [***] | [***] | [***] | [***] |
| **May-2025** | 3 | [***] | **42663, 42664, 42666** | | | [***] | [***] | [***] | [***] | [***] |
| **Jun-2025** | 3 | [***] | **42665, 42667, 42669** | | | [***] | [***] | [***] | [***] | [***] |
| **Jul-2025** | 3 | [***] | **42668, 42672, 42673** | | | [***] | [***] | [***] | [***] | [***] |
| **Aug-2025** | 3 | [***] | **42674, 42675, 42691** | | | [***] | [***] | [***] | [***] | [***] |
| **Sep-2025** | 3 | [***] | **42676, 42677, 42694** | | | [***] | [***] | [***] | [***] | [***] |
| **Oct-2025** | 3 | [***] | **42692, 42696, 42697** | | | [***] | [***] | [***] | [***] | [***] |
| **Nov-2025** | 3 | [***] | **42698, 42699, 42700** | | | [***] | [***] | [***] | [***] | [***] |
| **Dec-2025** | 3 | [***] | **42701, 42702, 42703** | | | [***] | [***] | [***] | [***] | [***] |

Total: 170

* [***]

** Manufacturer Serial Numbers (MSN) are for reference only and are subject to change.

Notes:
[***]



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106467**R1**

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    [***]

Reference:    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and Model 737-7 aircraft

    This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.    [***]



2. [***]

3. <u>Assignment</u>.

Unless otherwise noted herein, [***] described in this Letter Agreement are provided as a financial accommodation to Customer and in consideration of Customer's taking title to the 737-8 Aircraft at time of delivery and becoming the operator of such 737-8 Aircraft. This Letter Agreement cannot be assigned, in whole or in part, without the prior written consent of Boeing.

4. <u>Confidentiality</u>

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without



Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By      /s/ Jon W. Lewis

Its      Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:       June 17, 2016

SOUTHWEST AIRLINES CO.

By      /s/ Tammy Romo

Its      EVP & CFO



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106473**R1**

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:          [***]
References:

        1) Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and Model 737-7 aircraft

        2) Letter Agreement SWA-PA-03729-LA-1106471 entitled "Substitute Aircraft" (**Substitution Letter**)

      This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

   1.   [***]



2.   [***]

3.   <u>Assignment</u>.

Unless otherwise noted herein, [***] to Customer and in consideration of Customer's taking title to the Substitute Aircraft at time of delivery and becoming the operator of the Substitute Aircraft. This Letter Agreement cannot be assigned, in whole or in part, without the prior written consent of Boeing.

4.   <u>Confidentiality</u>

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting,



finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By      /s/ Jon W Lewis

Its      Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:      June 17, 2016

SOUTHWEST AIRLINES CO.

By      /s/ Tammy Romo

Its      EVP & CFO

SWA-PA-03729-LA-1106473**R1**                                                         **SA-5**

[***]                                    **BOEING PROPRIETARY**                              Page 3



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106474**R1**

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    Option Aircraft

Reference:    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft and Model 737-7 aircraft

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.    Right to Purchase Option Aircraft.

Subject to the terms and conditions contained in this Letter Agreement, in addition to the Aircraft described in Table 1 to the Purchase Agreement as of the date of execution of this Letter Agreement, Customer will have the option to purchase additional Boeing Model 737-8 aircraft as option aircraft (**Option Aircraft)**.

2.    Delivery.

The number of aircraft and delivery years is listed in the Attachment 1 to this Letter Agreement.

3.    Configuration.

3.1    Subject to the provisions of Article 3.2, below, the configuration for the Option Aircraft will be the Detail Specification for Boeing Model 7378 aircraft at the revision level in effect at the time of Definitive Agreement (as defined in Article 8). Such Detail Specification will be revised to include (i) changes applicable to the Detail Specification that are developed by Boeing between the Option Exercise Date (as defined below) and the signing of the Definitive Agreement, (ii) changes required to obtain required regulatory certificates, and (iii) other changes as mutually agreed.

3.2    Boeing reserves the right to configure the Option Aircraft starting from a different configuration specification, provided that it can achieve the same configuration which would result pursuant to the provisions of Article 3.1.

SWA-PA-03729-LA-1106474**R1**                                                                **SA-5**

Option Aircraft                                                                                                Page 1
**BOEING PROPRIETARY**



4.  [***]

5.  [***]

SWA-PA-03729-LA-1106474**R1**

Option Aircraft

**BOEING PROPRIETARY**

**SA-5**

Page 2



6.   [***]

7.   [***]

SWA-PA-03729-LA-1106474**R1**                                          **SA-5**

Option Aircraft                                                        Page 3

**BOEING PROPRIETARY**



8.   [***]


9.   <u>Assignment</u>.

Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Option Aircraft and cannot be assigned in whole or in part.

10.   <u>Confidentiality</u>

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

[Signature page follows.]

[Remainder of page intentionally left blank.]


SWA-PA-03729-LA-1106474**R1**

Option Aircraft

**SA-5**

Page 4

**BOEING PROPRIETARY**



Very truly yours,
 THE BOEING COMPANY


By      /s/ Jon W Lewis

Its     Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:      June 17, 2016

SOUTHWEST AIRLINES CO.

By      /s/ Tammy Romo

Its     EVP & CFO


SWA-PA-03729-LA-1106474**R1**                                        **SA-5**

Option Aircraft                                                      Page 5
                        **BOEING PROPRIETARY**

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| | | | |
|---|---|---|---|
| **Airframe Model/MTOW:** | 737-8  175900 pounds | **Detail Specification:** | D019A007-NEW (11/4/2011)  2Q11 External Fcst |
| **Engine Model/Thrust:** | CFMLEAP-1B26  0 pounds | **Airframe Price Base Year/Escalation Formula:** | Jul-11  ECI-MFG/CPI |
| **Airframe Price:** | [***] | **Engine Price Base Year/Escalation Formula:** | N/A  N/A |
| **Optional Features:** | [***] | | |
| **Sub-Total of Airframe and Features:** | [***] | **Airframe Escalation Data:** | |
| **Engine Price (Per Aircraft):** | [***] | **Base Year Index (ECI):** | [***] |
| **Aircraft Basic Price (Excluding BFE/SPE):** | [***] | **Base Year Index (CPI):** | [***] |
| **Buyer Furnished Equipment (BFE) Estimate:** | [***] | | |
| **Seller Purchased Equipment (SPE) Estimate:** | [***] | | |
| **Non-Refundable Deposit/Aircraft at Def Agreemt:** | [***] | | |

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Jul-2019 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2019 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2019 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2020 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2020 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2020 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2020 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2020 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2021 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jan-2021 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2021 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Mar-2021 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2021 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Apr-2021 | 1 | [***] | *** | | [***] | [***] | [***] | [***] | [***] |
| May-2021 | 1 | [***] | *** | D | [***] | [***] | [***] | [***] | [***] |
| May-2021 | 1 | [***] | *** | | [***] | [***] | [***] | [***] | [***] |
| Jun-2021 | 1 | [***] | *** | D | [***] | [***] | [***] | [***] | [***] |
| Jul-2021 | 2 | [***] | *** | | [***] | [***] | [***] | [***] | [***] |
| Jul-2021 | 1 | [***] | *** | D | [***] | [***] | [***] | [***] | [***] |
| Aug-2021 | 1 | [***] | *** | D | [***] | [***] | [***] | [***] | [***] |
| Sep-2021 | 1 | [***] | *** | | [***] | [***] | [***] | [***] | [***] |
| Oct-2021 | 1 | [***] | *** | D | [***] | [***] | [***] | [***] | [***] |
| Oct-2021 | 1 | [***] | *** | | [***] | [***] | [***] | [***] | [***] |
| Nov-2021 | 1 | [***] | *** | D | [***] | [***] | [***] | [***] | [***] |
| Dec-2021 | 1 | [***] | *** | | [***] | [***] | [***] | [***] | [***] |
| Jan-2022 | 1 | [***] | *** | D | [***] | [***] | [***] | [***] | [***] |
| Jan-2022 | 1 | [***] | *** | | [***] | [***] | [***] | [***] | [***] |
| Feb-2022 | 1 | [***] | *** | D | [***] | [***] | [***] | [***] | [***] |
| Feb-2022 | 1 | [***] | *** | | [***] | [***] | [***] | [***] | [***] |
| Mar-2022 | 1 | [***] | *** | D | [***] | [***] | [***] | [***] | [***] |
| Mar-2022 | 1 | [***] | *** | | [***] | [***] | [***] | [***] | [***] |
| Apr-2022 | 1 | [***] | *** | D | [***] | [***] | [***] | [***] | [***] |
| May-2022 | 1 | [***] | *** | | [***] | [***] | [***] | [***] | [***] |
| Jun-2022 | 1 | [***] | *** | D | [***] | [***] | [***] | [***] | [***] |
| Jul-2022 | 1 | [***] | *** | | [***] | [***] | [***] | [***] | [***] |
| Jul-2022 | 1 | [***] | *** | D | [***] | [***] | [***] | [***] | [***] |
| Aug-2022 | 1 | [***] | *** | | [***] | [***] | [***] | [***] | [***] |
| Sep-2022 | 1 | [***] | *** | D | [***] | [***] | [***] | [***] | [***] |

SWA-PA-03729-LA1106474 58960-1O.TXT

BOEING PROPRIETARY

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
|---|---|---|---|---|---|---|---|---|---|
| Oct-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Nov-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Dec-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Dec-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jan-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Feb-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| May-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jul-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Nov-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Nov-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jan-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Feb-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Mar-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| May-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Oct-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |

SWA-PA-03729-LA1106474 58960-1O.TXT

**BOEING PROPRIETARY**

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Dec-2024 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Dec-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Dec-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |

SWA-PA-03729-LA1106474 58960-1O.TXT
**BOEING PROPRIETARY**

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Jan-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2027 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |

Total:   191

* [***]



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106475**R1**

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:              [***]

References:

1) Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and Model 737-7 aircraft

2) Letter Agreement SWA-PA-03729-LA-1106474 entitled "Option Aircraft" (**Option Aircraft Letter Agreement**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.    [***]

SWA-PA-03729-LA-1106475R1                                                    **SA-5**
[***]                                                                          Page 1
                              **BOEING PROPRIETARY**



2.    [***]

3.    Assignment.

Unless otherwise noted herein, [***] to Customer and in consideration of Customer's taking title to the Option Aircraft at time of delivery and becoming the operator of the Option Aircraft. This Letter Agreement cannot be assigned, in whole or in part, without the prior written consent of Boeing.

4.    Confidentiality

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its

*BOEING*

obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By      /s/ Jon W Lewis

Its     Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:      June 17, 2016

SOUTHWEST AIRLINES CO.

By      /s/ Tammy Romo

Its     EVP & CFO

SWA-PA-03729-LA-1106475R1                                              **SA-5**
[***]                                                                  Page 3

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA
98124-2207

SWA-PA-03729-LA-1106476**R1**

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    [***]

Reference:    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft and Model 737-7 aircraft

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

The Purchase Agreement incorporates the terms and conditions of Aircraft General Terms Agreement dated as of December 13, 2011 identified as SWA-AGTA between Boeing and Customer (**AGTA**). This Letter Agreement modifies certain terms and conditions of the AGTA with respect to the Aircraft.

1.    [***]



2.  [***]

3.  Assignment. Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part.

*BOEING*

4.    Confidentiality. Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By      /s/ Jon W Lewis

Its     Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:      June 17, 2016

SOUTHWEST AIRLINES CO.

By      /s/ Tammy Romo

Its     EVP & CFO

SWA-PA-03729-LA-1106476**R1**                                                    **SA-5**
[***]                                                                           Page 3
**BOEING PROPRIETARY**



The Boeing Company
 P.O. Box 3707
Seattle, WA 98124-2207


SWA-PA-03729-LA-1301170**R1**


Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    [***]

Reference:    Purchase Agreement No. PA03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 7378 and 737-7 aircraft

      This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.    [***]


SWA-PA-03729-LA-1301170**R1**                                                                                          **SA-5**
[***]                                                                                                                                   Page 1
**BOEING PROPRIETARY**



2.  [***]

3.  <u>Assignment</u>.

Unless otherwise noted herein, [***] described in this Letter Agreement are provided [***] in consideration of Customer's taking title to the 737-7 Aircraft at time of delivery and becoming the operator of the 737-7 Aircraft. This Letter Agreement cannot be assigned, in whole or in part, without the prior written consent of Boeing.

4.  <u>Confidentiality</u>

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.



Very truly yours,

THE BOEING COMPANY

By      /s/ Jon W. Lewis

Its      Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:        June 17, 2016

SOUTHWEST AIRLINES CO.

By      /s/ Tammy Romo

Its      EVP & CFO

SWA-PA-03729-LA-1301170**R1**                                                         **SA-5**
[***]                                                                                  Page 3

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1602486

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    [***]

Reference:    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

[***]

1.    Definitions.

In this Letter Agreement, the following terms have meanings as follows:

**Aircraft** refers to any of the Boeing Model 737-8 and 737-7 aircraft described in Table 1A and Table 1B, respectively, of the Purchase Agreement.

**[***]**

[***]

**Effective Date** means the date on which SA-5 is mutually executed by the parties.

**[***]**

2.    [***]



3.    [***]

4.    [***]

**BOEING PROPRIETARY**

5. [***]

6. [***]

7. [***]

**BOEING PROPRIETARY**

8. [***]

9. [***]

10. Assignment.

Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or in part.

11. Confidentiality.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.



Very truly yours,
 THE BOEING COMPANY

By      /s/ Jon W Lewis

ACCEPTED AND AGREED TO this

Date:      June 17, 2016

SOUTHWEST AIRLINES CO.

By      /s/ Tammy Romo

Its      EVP & CFO



**Attachment 1 To**
**Letter Agreement No. LA 1602486**
**[***]**

| [***] | [***] | [***] |
|-------|-------|-------|
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |

**BOEING PROPRIETARY**

**SUPPLEMENTAL AGREEMENT NO. 6**

**to**

**Purchase Agreement No. 03729**

**between**

**THE BOEING COMPANY**

**and**

**SOUTHWEST AIRLINES CO.**

**Relating to Boeing Model 737-8 and 737-7 Aircraft**

THIS SUPPLEMENTAL AGREEMENT No. 6 (**SA-6**), entered into as of July 21, 2017, is made between THE BOEING COMPANY, a Delaware corporation (**Boeing**), and SOUTHWEST AIRLINES CO., a Texas corporation (**Customer**).

<u>RECITALS</u>:

WHEREAS, Customer and Boeing entered into Purchase Agreement Number PA-03729 dated December 13, 2011, as amended and supplemented, (**Purchase Agreement**) relating to the purchase and sale of Boeing Model 737-8 (**737-8 Aircraft**) and Model 737-7 aircraft (**737-7 Aircraft**); collectively the "**Aircraft**". This SA6 is an amendment to and is incorporated into the Purchase Agreement. Capitalized terms used herein but not otherwise defined shall have the meaning set forth in the Purchase Agreement.

WHEREAS, Boeing and Customer agree to amend the Purchase Agreement to document Customer's substitution of four (4) Model 737-800 Option Aircraft (**737-800 Substitution Option Aircraft**) to four (4) Model 737-8 Option Aircraft (**737-8 Substitution Option Aircraft**), pursuant to the terms of SA-103 to Purchase Agreement No. 1810 between Customer and Boeing (**SA-103**).

WHEREAS, Boeing and Customer agree to amend the Purchase Agreement to include [***] the first four (4) Boeing Model 737-8 Option Aircraft to be executed [***]

WHEREAS, Boeing and Customer agree to amend the Purchase Agreement to incorporate the Service Ready Validation Program agreement.

NOW, THEREFORE, the parties agree that the Purchase Agreement is amended as set forth below and otherwise agree as follows:

SWA-PA-03729                                                    **1**                                                    **SA-6**

**BOEING PROPRIETARY**

1. <u>TABLE OF CONTENTS</u>.

     The Table of Contents of the Purchase Agreement is deleted in its entirety and replaced with a new Table of Contents (attached), which lists Letter Agreements revised by this SA-6 and identified by "SA-6". Such revised Table of Contents is incorporated into the Purchase Agreement by this reference.

2. <u>LETTER AGREEMENTS</u>.

    2.1.    Attachment 1 to Letter Agreement SWA-PA-03729-LA-1106474R1, <u>Option Aircraft</u>, is deleted in its entirety and replaced by a new Attachment 1 (attached). The new Attachment 1 reflects the addition of four (4) Boeing Model 737-8 Option Aircraft.

    2.2. Letter Agreement SWA-PA-03729-LA-1106475R1, [***] , is deleted in its entirety and replaced with the attached revised Letter Agreement -PA-03729-LA-1106475R2, which reflects the addition of the [***]

    2.3. Letter Agreement SWA-PA-03729-LA-1503792, <u>Service Ready Operational Validation</u>, is added to the Purchase Agreement.

    2.4. Letter Agreement SWA-PA-03729-LA-1301168R2, [***], is deleted in its entirety and replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1301168R3, [***]

3. [***]

**BOEING PROPRIETARY**

The Purchase Agreement is deemed to be supplemented to the extent herein provided and as so supplemented will continue in full force and effect.

EXECUTED IN DUPLICATE as of the day and year first above written.

THE BOEING COMPANY                                    SOUTHWEST AIRLINES CO.

By:   /s/ Kyle Kersavage                                By:   /s/ Chris Monroe
                                                        Chris Monroe
Its:   Attorney-In-Fact                                 Its:   SVP, Finance

SWA-PA-03729                                **3**                                    **SA-6**

**BOEING PROPRIETARY**

**TABLE OF CONTENTS**

| ARTICLES | TITLES | |
|---|---|---|
| Article 1 | Quantity, Model and Description | SA-2 |
| Article 2 | Delivery Schedule | |
| Article 3 | Price | |
| Article 4 | Payment | SA-2 |
| Article 5 | Additional Terms | |
| **TABLE** | **TITLE** | |
| 1A | 737-8 Aircraft Information Table | SA-5 |
| 1B | 737-7 Aircraft Information Table | SA-2 |
| **EXHIBIT** | | |
| A1 | 737-8 Aircraft Configuration | SA-2 |
| A2 | 737-7 Aircraft Configuration | SA-2 |
| B* | Aircraft Delivery Requirements and Responsibilities | |
| **SUPPLEMENTAL EXHIBITS** | **TITLES** | |
| AE1* | Escalation Adjustment/Airframe and Optional Features | |
| BFE1* | BFE Variables | |
| CS1 | Customer Support Variables | |
| CS1-7MAX | Customer Support Variables | SA-2 |
| EE1* | Engine Escalation/Engine Warranty and Patent Indemnity | |
| SLP1* | Service Life Policy Components | |
| **LETTER AGREEMENTS** | **TITLES** | |
| SWA-PA-03729-LA-1106463R1 | Open Matters | SA-2 |
| SWA-PA-03729-LA-1106464* | [***] | |

**BOEING PROPRIETARY**

| **LETTER AGREEMENTS** | **TITLES** | |
|---|---|---|
| SWA-PA-03729-LA-1106465* | [***] | |
| SWA-PA-03729-LA-1106466 | [***] | |
| SWA-PA-03729-LA-1106467R1 | [***] | SA-5 |
| SWA-PA-03729-LA-1106468* | [***] | |
| SWA-PA-03729-LA-1106469R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106470R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106471R1 | Substitute Aircraft | SA-2 |
| SWA-PA-03729-LA-1106473R1 | [***] | SA-5 |
| SWA-PA-03729-LA-1106474R1 | Option Aircraft | SA-5 |
| | Attachment 1 | SA-6 |
| SWA-PA-03729-LA-1106475R1 | [***] | SA-6 |
| SWA-PA-03729-LA-1106476R1* | [***] | SA-5 |
| SWA-PA-03729-LA-1106477* | [***] | |
| SWA-PA-03729-LA-1106478 | [***] | |
| SWA-PA-03729-LA-1106479R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106480R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106481R2 | [***] | SA-2 |
| SWA-PA-03729-LA-1106482* | [***] | |
| SWA-PA-03729-LA-1106483* | [***] | |
| SWA-PA-03729-LA-1106484* | [***] | |
| | Attachment A | SA-2 |
| | Attachment B | SA-2 |
| SWA-PA-03729-LA-1106485* | [***] | |
| SWA-PA-03729-LA-1209080 | [***] | SA-1 |
| SWA-PA-03729-LA-1210419 | [***] | SA-1 |

SWA-PA-03729

**SA-6**
Page 2

**BOEING PROPRIETARY**

| **LETTER AGREEMENTS** | **TITLES** | |
|---|---|---|
| SWA-PA-03729-LA-1300943 | [***] | SA-2 |
| **SWA-PA-03729-LA-1301168R3** | [***] | **SA-6** |
| SWA-PA-03729-LA-1301170R1 | [***] | SA-5 |
| **SWA-PA-03729-LA-1503792** | **Service Ready Operational Validation** | **SA-6** |
| SWA-PA-03729-LA-1602486 | [***] | SA-5 |

* Denotes revision to Page 1 or Page 2 only to reference 737-7 (SA-2)

SWA-PA-03729                                                                **SA-6**
                                                                          Page 3

**BOEING PROPRIETARY**

**INACTIVE / DELETED TABLES, EXHIBITS, AND LETTER AGREEMENTS**

RESTRICTED LETTER AGREEMENTS

| Letter Agreement | Title | Last Updated under SA | Current Status |
|---|---|---|---|
| SWA-PA-03729-LA-1106472R1 | [***] | SA-2 | Deleted under SA-4 |
| SWA-PA-01810/03729-LA-1301169 | [***] | SA-2 | Deleted under SA-4 |

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| | | | | | |
|---|---|---|---|---|---|
| **Airframe Model/MTOW:** | 737-8 | 175900 pounds | **Detail Specification:** | D019A007-NEW (11/4/2011) | 2Q11 External Fcst |

| | | | | |
|---|---|---|---|---|
| **Engine Model/Thrust:** CFMLEAP-1B26 | | 0 pounds | **Airframe Price Base Year/Escalation Formula:** | Jul-11   ECI-MFG/CPI |
| **Airframe Price:** | | [***] | **Engine Price Base Year/Escalation Formula:** | N/A    N/A |
| **Optional Features:** | | [***] | | |
| **Sub-Total of Airframe and Features:** | | [***] | **Airframe Escalation Data:** | |
| **Engine Price (Per Aircraft):** | | [***] | **Base Year Index (ECI):** | [***] |
| **Aircraft Basic Price (Excluding BFE/SPE):** | [***] | | **Base Year Index (CPI):** | [***] |
| **Buyer Furnished Equipment (BFE) Estimate:** | | [***] | | |
| **Seller Purchased Equipment (SPE) Estimate:** | | [***] | | |

**Non-Refundable Deposit/Aircraft at Def Agreemt:**    [***]

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Jul-2019 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2019 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2019 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2020 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2020 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2020 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2020 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2020 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2021 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jan-2021 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2021 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Mar-2021 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Apr-2021 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Apr-2021 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2021 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| May-2021 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2021 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jul-2021 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2021 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Aug-2021 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Sep-2021 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2021 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Oct-2021 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2021 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Dec-2021 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jan-2022 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Feb-2022 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Mar-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| May-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jul-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Aug-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Oct-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Nov-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Dec-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Dec-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jan-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Feb-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| May-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jul-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |

SWA-PA-03729-LA1106474 58960-1O.TXT

BOEING PROPRIETARY

SWA-PA-03729-LA1106474 58960-1O.TXT

BOEING PROPRIETARY

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Sep-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Nov-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jan-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Feb-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Mar-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| May-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Oct-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Dec-2024 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Dec-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Aug-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Dec-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2027 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |

Total:    **195**

* [***]



The Boeing Company
 P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106475**R2**

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:          [***]

References:        1)

Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and Model 737-7 aircraft

2)

Letter Agreement SWA-PA-03729-LA-1106474 entitled "Option Aircraft" (**Option Aircraft Letter Agreement**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.


1.      [***]

**BOEING PROPRIETARY**



2.    [***]


3.    Assignment.

Unless otherwise noted herein, [***] to Customer and in consideration of Customer's taking title to the Option Aircraft at time of delivery and becoming the operator of the Option Aircraft. This Letter Agreement cannot be assigned, in whole or in part, without the prior written consent of Boeing.



4.      Confidentiality

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,
THE BOEING COMPANY

By      /s/ Kyle Kersavage

Its     Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:      July 21 , 2017

SOUTHWEST AIRLINES CO.

By      /s/ Chris Monroe

Its     Chris Monroe
        SVP, Finance



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1503792

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:           Service Ready Operational Validation

References:        1)    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft (**Aircraft**)

                   2)    Letter Agreement SWA-PA-03729-LA-1106469R1, [***]


        This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All capitalized terms used but not defined in this Letter Agreement will have the same meaning as in the Purchase Agreement.

1.    Service Ready Operational Validation.

In order to ensure that the Aircraft is ready for entry into service upon delivery, Boeing and Customer will implement a service ready operational validation program (**SROV**) which will aid in validating the combination of the Aircraft, support products and services as well as Customer's own preparation for entry into service. The SROV will use [***]

to accomplish the validation.

2.    Validation Planning and Execution.

2.1    The SROV Plan will be carried out over the course of five (5) or fewer calendar days and simulate in-service operations.

2.2    The primary objectives of the SROV include validation in the following areas:(i) normal flight operations, (ii) limited non-normal flight operations, (iii) routine maintenance activities, (iv) select non-routine maintenance activities, (v) airplane connectivity options both on-ground and in-flight utilizing Customer's IT infrastructure, (vi) typical aircraft operations (e.g. servicing, cargo operations), and (vii) aircraft support products (e.g. flight data, maintenance data, parts data and ground support equipment/tooling).

        2.2.1    SROV planning documentation will describe SROV conditions and activities (**SROV Plan**). Boeing and Customer will jointly develop the SROV Plan in accordance with the following outline and constraints, to represent in-service operation.

**SA-6**
Page 1

**BOEING PROPRIETARY**

*BOEING*

[***]

2.2.2    Prior to the start date of the SROV, a Boeing SROV project leader (**SROV Project Lead**) will be the primary point of contact for communication and coordination between Customer and Boeing relating to the SROV Plan. After the SROV begins, a Boeing test director (**Boeing Test Director**) will direct the SROV Plan and will serve as the primary contact for Customer to discuss any matters relating to the SROV.

2.2.3    After the SROV begins, Customer will coordinate with the Boeing Test Director regarding any suggested changes to the SROV Plan or additional validation conditions, examples of which are listed below. Inclusion of such additional validation conditions will be at the discretion of the Boeing Test Director. If Boeing desires to make any changes to the SROV Plan, then Boeing will coordinate such changes with Customer's designated representative.

   a) Non-routine activities – flaps-15 landing, simulated removal and replacement of an LRU or other "one-off" or contingency scenarios related to normal operations.
   b) Routine activities with intervals longer than the SROV execution duration – "A-check equivalent" maintenance activity or demonstration of new (i) ground support equipment (**GSE**) or (ii) maintenance procedures.
   c) Airline-specific scenarios – passenger-related preparations that depend on aircraft/airlines systems or procedures to be successful.

3.    Operation of the SROV Aircraft.

3.1    [***]

3.2.   [***]

3.3   Customer's Participation in the SROV.

    3.3.1   Customer will submit to Boeing a list of personnel who may participate in flight activities as Essential Crew under the conditions of 3.2 above, including a description of each person's proposed role.

    3.3.2   All Customer Essential Crew scheduled to participate in a given validation block will be required to attend a mandatory preflight briefing scheduled by the Boeing Test Director which will be conducted prior to each validation block.

    3.3.3   Customer will assist Boeing with any emergency arrangements or contingency arrangements in the event of incident or damage to the SROV Aircraft or other difficulties.

    3.3.4   Customer will appropriately familiarize Boeing personnel with Customer's operations and procedures, at no charge to Boeing (including but not limited to Boeing flight crew and maintenance personnel).

3.4   Maintenance of the SROV Aircraft.

    3.4.1   [***]

    3.4.2   Records.

Boeing records will be the only official documentation of the SROV Aircraft.

**_BOEING_**

3.4.3   <u>Fuel and Other Goods and Services</u>.

3.4.3.1   Customer and Boeing will work together to ensure that appropriate landing slots, gates and other operational requirements and services are arranged in advance at all airports where the SROV Aircraft will land. Where Customer's established relationships and onsite personnel and resources will enable Customer to make more advantageous arrangements, Customer will, upon Boeing request, make necessary arrangements on Boeing's behalf or will assist Boeing in making such arrangements, as appropriate.

3.4.3.2   [***]

3.4.3.3 [***]

Boeing Commercial Airplane Group
P.O. Box 3707, Mail Stop T
Seattle, Washington 981242207

Attention:   TBD
   Flight Test
   Supporting Services
   Telephone: (206) TBD
   Facsimile: (206) TBD

3.4.3.3   [***]

4.   [***]





5.   Realization of Additional Objectives during SROV.

The primary objectives of the SROV are described in Paragraph 2.1 above. Other objectives are secondary, and may be pursued when, in Boeing's and Customer's reasonable judgment, such secondary objective will not: (i) interfere with nor jeopardize the primary objectives, (ii) lengthen the SROV schedule or (iii) [***]


[***]

*BOEING*

6.  Contingencies.

    6.1    SROV Aircraft Airworthiness Certification.

Boeing shall make reasonable and timely efforts to obtain an experimental airworthiness certificate or make other arrangements for airworthiness certification of the SROV Aircraft in order to conduct the SROV Plan. In the event that Boeing is not successful in obtaining the necessary airworthiness certification and cannot make alternate arrangements in support of the SROV Plan, Boeing and Customer will mutually agree to revisions to the SROV Plan to facilitate such airworthiness certification of the SROV Aircraft. If Boeing and Customer (i) cannot agree on such revisions to the SROV Plan or (ii) Boeing is unable to obtain an airworthiness certification of the SROV Aircraft, then Boeing may cancel any part or all of the SROV.

    6.2    Boeing Type Certificate Flight Testing.

Boeing will make every reasonable effort to ensure the SROV Aircraft is no longer required to support 737-8 type certification during the SROV period. However, in the event that unplanned type certification testing requires use of the SROV Aircraft during the period the parties plan to conduct the SROV, Boeing may (i) cancel the SROV (ii) re-schedule the SROV and/ or (iii) adjust the scope of the SROV Plan as appropriate.

    6.3    [***]

7.  [***]

8.  Confidentiality

    8.1    The parties understand that certain commercial and financial information contained in this Letter Agreement is considered by each party as confidential and has

**_BOEING_**

value precisely because it is not available generally to other parties. Each party agrees to limit the disclosure of the contents of this Letter Agreement to each respective party's (a) directors and officers, (b) employees with a need to know the contents (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose this Letter Agreement's contents to any other person or entity (other than those to whom disclosure is permitted by this paragraph) without the prior written consent of the other party and (c) any independent auditors and attorneys of each party who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this paragraph, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without the other party's consent except as may be required by applicable law or governmental regulations. Each party shall be fully responsible to the other for compliance with such obligations.

8.2     [***]

If the foregoing correctly sets forth your understanding of our agreement with respect to the matters treated above, please indicate your acceptance and approval below.

Very truly yours,

THE BOEING COMPANY

By     /s/ Jon W. Lewis

Its     Attorney-in-Fact

ACCEPTED AND AGREED TO this

Date:   August 30   , 2016

SOUTHWEST AIRLINES CO.

By      /s/ Chris Monroe
Chris Monroe
Its      VP, Treasurer

SWA-PA-03729-LA-1503792                                                      **SA-6**
Service Ready Operational Validation                                          Page 8

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207


SWA-PA-03729-LA-1301168**R3**


Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235


Subject:                [***]


Reference:              Purchase Agreement No. 03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-7 and 737-8 aircraft


This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.


[***]


1.    [***]


SWA-PA-03729-LA-1301168**R3**                                                                          **SA-6**
[***]                                                                                                    Page 1
                                        **BOEING PROPRIETARY**

SWA-PA-03729-LA-1301168**R3**

**SA-6**

[***]

Page 2

**BOEING PROPRIETARY**

2.  <u>Assignment</u>.

 The business terms described in this Letter Agreement are provided [***] in consideration of Customer's taking title to the applicable Firm Aircraft at time of delivery and becoming the operator of the applicable Firm Aircraft. Under no circumstances will Customer be permitted to assign the business terms set forth herein.

3.  <u>Confidentiality</u>.

 Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this paragraph) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this paragraph, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By /s/ Kyle Kersavage

Its Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date: July 21 , 2017

SOUTHWEST AIRLINES CO.

By /s/ Chris Monroe
  Chris Monroe
Its SVP, Finance

SWA-PA-03729-LA-1301168**R3**     **SA-6**
[***]     Page 3
**BOEING PROPRIETARY**

**SUPPLEMENTAL AGREEMENT NO. 7**

**to**

**Purchase Agreement No. 03729**

**between**

**THE BOEING COMPANY**

**and**

**SOUTHWEST AIRLINES CO.**

**Relating to Boeing Model 737-8 and 737-7 Aircraft**

THIS SUPPLEMENTAL AGREEMENT No. 7 (**SA-7**), entered into as of August 25, 2017, is made between THE BOEING COMPANY, a Delaware corporation (**Boeing**), and SOUTHWEST AIRLINES CO., a Texas corporation (**Customer**).

RECITALS:

WHEREAS, Customer and Boeing entered into Purchase Agreement Number PA-03729 dated December 13, 2011, as amended and supplemented, (**Purchase Agreement**) relating to the purchase and sale of Boeing Model 737-8 (**737-8 Aircraft**) and Model 737-7 aircraft (**737-7 Aircraft**); collectively the "**Aircraft**". This SA7 is an amendment to and is incorporated into the Purchase Agreement. Capitalized terms used herein but not otherwise defined shall have the meaning set forth in the Purchase Agreement.

WHEREAS, Boeing and Customer agree to amend the Purchase Agreement to incorporate a package of configuration options and master changes previously accepted by Customer for 737-8 Aircraft, in accordance with LA-1106463R1, paragraph 2, Open Matters.

WHEREAS, Boeing and Customer agree to amend the Purchase Agreement to document [***], in accordance with LA-1106463R1, paragraph 3, Open Matters.

WHEREAS, Boeing and Customer agree to amend the Purchase Agreement to revise Supplemental Exhibit BFE1 to reflect the selection dates and on dock dates of BFE for the 737-8 Aircraft, in accordance with LA-1106463R1, paragraph 2, Open Matters.

NOW, THEREFORE, the parties agree that the Purchase Agreement is amended as set forth below and otherwise agree as follows:

1    **SA-7**

SWA-PA-03729

**BOEING PROPRIETARY**

1.  <u>TABLE OF CONTENTS</u>.

The Table of Contents of the Purchase Agreement is deleted in its entirety and replaced with a new Table of Contents (attached), which lists the Tables, Exhibits, and Letter Agreements revised by this SA-7 and is identified by "SA-7". Such revised Table of Contents is incorporated into the Purchase Agreement by this reference.

2.  <u>TABLES</u>.

Table 1A, <u>Aircraft Delivery, Description, Price and Advance Payments – 737-8 Aircraft</u>, is deleted in its entirety and replaced by a new Table 1A (identified by "SA-7") attached hereto and incorporated into the Purchase Agreement by this reference.

3.  <u>EXHIBITS</u>.

    3.1. Exhibit A1, <u>737-8 Aircraft Configuration</u>, is deleted in its entirety and replaced by the updated Exhibit A1 attached hereto and incorporated into the Purchase Agreement by this reference.

    3.2. Exhibit BFE1, <u>Buyer Furnished Equipment Variables</u>, is deleted in its entirety and replaced by the updated Exhibit BFE1 attached hereto and incorporated into the Purchase Agreement by this reference.

4.  <u>LETTER AGREEMENTS</u>.

    4.1. Letter Agreement SWA-PA-03729-LA-1400371, [***]
    , is added to the Purchase Agreement.

    4.2. Letter Agreement SWA-PA-03729-LA-1500831, [***]
    , is added to the Purchase Agreement.

    4.3. Attachment 1 to Letter Agreement SWA-PA-03729-LA-1106474R1, <u>Option Aircraft</u>, is deleted in its entirety and is replaced by a new Attachment 1 (attached).

    4.4. Letter Agreement SWA-PA-03729-LA-1106463R1, <u>Open Matters</u>, is deleted in its entirety and is replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1106463R2.

5.  <u>ADVANCE PAYMENT IMPACTS</u>.

The revisions applied to Table 1A, <u>Aircraft Delivery, Description, Price and Advance Payments – 737-8 Aircraft</u>, result in [***]

**BOEING PROPRIETARY**

The Purchase Agreement is deemed to be supplemented to the extent herein provided and as so supplemented will continue in full force and effect.

EXECUTED IN DUPLICATE as of the day and year first above written.

THE BOEING COMPANY                              SOUTHWEST AIRLINES CO.

By: /s/ Kyle Kersavage_____                   By: /s/ Chris Monroe_____
                                                Chris Monroe
Its: __Attorney-In-Fact_____                  Its: __SVP, Finance_____

SWA-PA-03729                              3                                    SA-7

**BOEING PROPRIETARY**

**TABLE OF CONTENTS**

| ARTICLES | | TITLES | |
|---|---|---|---|
| Article 1 | | Quantity, Model and Description | SA-2 |
| Article 2 | | Delivery Schedule | |
| Article 3 | | Price | |
| Article 4 | | Payment | SA-2 |
| Article 5 | | Additional Terms | |
| **TABLE** | | **TITLE** | |
| **1A** | | **737-8 Aircraft Information Table** | **SA-7** |
| 1B | | 737-7 Aircraft Information Table | SA-2 |
| **EXHIBIT** | | | |
| **A1** | | **737-8 Aircraft Configuration** | **SA-7** |
| A2 | | 737-7 Aircraft Configuration | SA-2 |
| B* | | Aircraft Delivery Requirements and Responsibilities | |
| **SUPPLEMENTAL EXHIBITS** | | **TITLES** | |
| AE1* | | Escalation Adjustment/Airframe and Optional Features | |
| **BFE1** | | **BFE Variables** | **SA-7** |
| CS1 | | Customer Support Variables | |
| CS1-7MAX | | Customer Support Variables | SA-2 |
| EE1* | | Engine Escalation/Engine Warranty and Patent Indemnity | |
| SLP1* | | Service Life Policy Components | |
| | | | |
| | | | |
| **LETTER AGREEMENTS** | | **TITLES** | |
| **SWA-PA-03729-LA-1106463R2** | | **Open Matters** | **SA-7** |
| SWA-PA-03729-LA-1106464* | | [***] | |

**SA-7**

SWA-PA-03729

**BOEING PROPRIETARY**

| LETTER AGREEMENTS | TITLES | |
|---|---|---|
| SWA-PA-03729-LA-1106465* | [***] | |
| SWA-PA-03729-LA-1106466 | [***] | |
| SWA-PA-03729-LA-1106467R1 | [***] | SA-5 |
| SWA-PA-03729-LA-1106468* | [***] | |
| SWA-PA-03729-LA-1106469R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106470R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106471R1 | Substitute Aircraft | SA-2 |
| SWA-PA-03729-LA-1106473R1 | [***] | SA-5 |
| SWA-PA-03729-LA-1106474R1 | Option Aircraft | SA-5 |
| | **Attachment 1** | **SA-7** |
| SWA-PA-03729-LA-1106475R1 | [***] | SA-6 |
| SWA-PA-03729-LA-1106476R1* | [***] | SA-5 |
| SWA-PA-03729-LA-1106477* | [***] | |
| SWA-PA-03729-LA-1106478 | [***] | |
| SWA-PA-03729-LA-1106479R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106480R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106481R2 | [***] | SA-2 |
| SWA-PA-03729-LA-1106482* | [***] | |
| SWA-PA-03729-LA-1106483* | [***] | |
| SWA-PA-03729-LA-1106484* | [***] | |
| | Attachment A | SA-2 |
| | Attachment B | SA-2 |
| SWA-PA-03729-LA-1106485* | [***] | |
| SWA-PA-03729-LA-1209080 | [***] | |
| SWA-PA-03729-LA-1210419 | [***] | SA-1 |

**SA-7**

SWA-PA-03729

Page 2

**BOEING PROPRIETARY**

| LETTER AGREEMENTS | TITLES | |
|---|---|---|
| SWA-PA-03729-LA-1300943 | [***] | SA-2 |
| SWA-PA-03729-LA-1301168R3 | [***] | SA-6 |
| SWA-PA-03729-LA-1301170R1 | [***] | SA-5 |
| **SWA-PA-03729-LA-1400371** | **[***]** | **SA-7** |
| SASWA-PA-03729-LA-1503792 | Service Ready Operational Validation | SA-6 |
| **SWA-PA-03729-LA-1500831** | **[***]** | **SA-7** |
| SWA-PA-03729-LA-1602486 | [***] | SA-5 |

* Denotes revision to Page 1 or Page 2 only to reference 737-7 (SA-2)

**SA-7**

SWA-PA-03729

Page 3

**BOEING PROPRIETARY**

**INACTIVE / DELETED TABLES, EXHIBITS, AND LETTER AGREEMENTS**

RESTRICTED LETTER AGREEMENTS

| Letter Agreement | Title | Last Updated under SA | Current Status |
|---|---|---|---|
| SWA-PA-03729-LA-1106472R1 | [***] | SA-2 | Deleted under SA-4 |
| SWA-PA-01810/03729-LA-1301169 | [***] | SA-2 | Deleted under SA-4 |

**SA-7**

SWA-PA-03729

Page 4

**BOEING PROPRIETARY**

**Table 1A To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| | | |
|---|---|---|
| **Airframe Model/MTOW:**   737-8 | **181,200** pounds | **Detail Specification:**   D019A008-P (5/1/2017) |
| **Engine Model/Thrust:**   CFMLEAP-1B28B1 | **28,800** pounds | **Airframe Price Base Year/Escalation Formula:**   Jul-11   ECI-MFG/CPI |
| **Airframe Price:**   [***] *** *** | | **Engine Price Base Year/Escalation Formula:**   N/A   N/A |
| **Optional Features:**   [***] | | |
| **Sub-Total of Airframe and Features:**   [***] | | **Airframe Escalation Data:** |
| **Engine Price (Per Aircraft):**   [***] | | **Base Year Index (ECI):**   [***] |
| **Aircraft Basic Price (Excluding BFE/SPE):**   [***] | | **Base Year Index (CPI):**   [***] |
| **Buyer Furnished Equipment (BFE) Estimate:**   [***] | | |
| **Seller Purchased Equipment (SPE) Estimate:**   [***] | | |

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Jul-2017 | 1 | [***] | 36929 | [***] | A | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Jul-2017 | 2 | [***] | 42558, 42559 | [***] | C | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Aug-2017 | 3 | [***] | 36979, 36930, 36984 | [***] | A | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Aug-2017 | 3 | [***] | 42563, 42566, 42567 | [***] | C | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Sep-2017 | 1 | [***] | 36934 | [***] | A | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Oct-2017 | 1 | [***] | 42544 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Oct-2017 | 1 | [***] | 42570 | [***] | C | | [***] | [***] | [***] | [***] | [***] |
| Nov-2017 | 1 | [***] | 36988 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Dec-2017 | 1 | [***] | 42554 | [***] | C | | [***] | [***] | [***] | [***] | [***] |
| Mar-2018 | 1 | [***] | 36989 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Mar-2018 | 1 | [***] | 42571 | [***] | C | | [***] | [***] | [***] | [***] | [***] |
| Apr-2018 | 1 | [***] | 42546 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Jun-2018 | 1 | [***] | 42572 | [***] | C | | [***] | [***] | [***] | [***] | [***] |
| Jul-2018 | 1 | [***] | 42547 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Jul-2018 | 1 | [***] | 42556 | [***] | C | | [***] | [***] | [***] | [***] | [***] |
| Aug-2018 | 1 | [***] | 42548 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Sep-2018 | 1 | [***] | 42574 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2018 | 1 | [***] | 37019 | [***] | A | | [***] | [***] | [***] | [***] | [***] |

SWA-PA-03729 10697-1F.TXT                    **BOEING PROPRIETARY**                    SA-7
                                                                                 Page 1

SWA-PA-03729 10697-1F.TXT                    **BOEING PROPRIETARY**                    SA-7
                                                                                 Page 1

**Table 1A To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Oct-2018 | 1 | [***] | 42575 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2018 | 1 | [***] | 42549 | | A | | [***] | [***] | [***] | [***] | [***] |
| Nov-2018 | 1 | [***] | 42573 | | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2018 | 1 | [***] | 42576 | | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2021 | 1 | [***] | 42648 | | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2021 | 3 | [***] | 42649, 42650, 42651 | | | | [***] | [***] | [***] | [***] | [***] |
| May-2021 | 3 | [***] | 42652, 42653, 42654 | | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2021 | 3 | [***] | 42655, 42656, 42670 | | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2021 | 3 | [***] | 42657, 42658, 42671 | | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2022 | 2 | [***] | 42678, 42679 | | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2022 | 3 | [***] | 42680, 42681, 42688 | | | | [***] | [***] | [***] | [***] | [***] |
| May-2022 | 3 | [***] | 42682, 42683, 42684 | | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2022 | 3 | [***] | 42685, 42686, 42687 | | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2022 | 2 | [***] | 42689, 42690 | | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2022 | 2 | [***] | 42693, 42695 | | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2023 | 3 | [***] | 42577, 42560, 42565 | | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2023 | 2 | [***] | 42562, 42564 | | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2023 | 1 | [***] | 37042 | | A | | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | 42557 | | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | 42550 | | A | | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | 36732 | | B | | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | 42555 | | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | 42551 | | A | | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | 38806 | | B | | [***] | [***] | [***] | [***] | [***] |
| May-2023 | 2 | [***] | 42594, 42568 | | | | [***] | [***] | [***] | [***] | [***] |
| May-2023 | 1 | [***] | 37043 | | A | | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 1 | [***] | 42581 | | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 2 | [***] | 37034, 42536 | | A | | [***] | [***] | [***] | [***] | [***] |

42597, 42582

SWA-PA-03729 10697-1F.TXT                    **BOEING PROPRIETARY**                    SA-7
                                                                                      Page 2

**Table 1A To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Jul-2023 | 1 | [***] | 36722 | | B | | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 1 | [***] | 42593 | | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 2 | [***] | 42552, 42537 | | A | | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | 2 | [***] | 42601, 42578 | | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | 1 | [***] | 36727 | | B | | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 2 | [***] | 42605, 42579 | | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 1 | [***] | 42538 | | A | | [***] | [***] | [***] | [***] | [***] |
| Nov-2023 | 1 | [***] | 42580 | | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2023 | 1 | [***] | 38815 | | B | | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 1 | [***] | 42583 | | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 1 | [***] | 42539 | | A | | [***] | [***] | [***] | [***] | [***] |
| Jan-2024 | 3 | [***] | 42611, 42584, 42585 | | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2024 | 1 | [***] | 42553 | | A | | [***] | [***] | [***] | [***] | [***] |
| Feb-2024 | 3 | [***] | 42612, 42596, 42599 | | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2024 | 1 | [***] | 35970 | | B | | [***] | [***] | [***] | [***] | [***] |
| Mar-2024 | 1 | [***] | 42607 | | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2024 | 3 | [***] | 38817, 35968, 35972 | | B | | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 2 | [***] | 42617, 42606 | | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 1 | [***] | 42540 | | A | | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 1 | [***] | 36736 | | B | | [***] | [***] | [***] | [***] | [***] |
| May-2024 | 3 | [***] | 42619, 42622, 42608 | | | | [***] | [***] | [***] | [***] | [***] |
| May-2024 | 1 | [***] | 42541 | | A | | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | 42610 | | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | 42542 | | A | | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | 33941 | | B | | [***] | [***] | [***] | [***] | [***] |
| Jul-2024 | 1 | [***] | 42615 | | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2024 | 2 | [***] | 35963, 35967 | | B | | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | 2 | [***] | 42624, 42626 | | | | [***] | [***] | [***] | [***] | [***] |

SWA-PA-03729 10697-1F.TXT                    **BOEING PROPRIETARY**                    SA-7
                                                                                      Page 3

**Table 1A To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Sep-2024 | 1 | [***] | 42630 | | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | 2 | [***] | 36730, 36733 | | B | | [***] | [***] | [***] | [***] | [***] |
| Oct-2024 | 2 | [***] | 42625, 42636 | | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2024 | 1 | [***] | 33940 | | B | | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | 1 | [***] | 42639 | | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | 2 | [***] | 35971, 35974 | | B | | [***] | [***] | [***] | [***] | [***] |
| Dec-2024 | 2 | [***] | 42628, 42640 | | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2024 | 1 | [***] | 35975 | | B | | [***] | [***] | [***] | [***] | [***] |
| Jan-2025 | 2 | [***] | 42633, 42634 | | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2025 | 2 | [***] | 38804, 38805 | | B | | [***] | [***] | [***] | [***] | [***] |
| Feb-2025 | 3 | [***] | 42637, 42641, 42643 | | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2025 | 1 | [***] | 36729 | | B | | [***] | [***] | [***] | [***] | [***] |
| Mar-2025 | 4 | [***] | 42644, 42645, 42646, 42647 | | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2025 | 4 | [***] | 42659, 42660, 42661, 42662 | | | | [***] | [***] | [***] | [***] | [***] |
| May-2025 | 3 | [***] | 42663, 42664, 42666 | | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2025 | 3 | [***] | 42665, 42667, 42669 | | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2025 | 3 | [***] | 42668, 42672, 42673 | | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2025 | 3 | [***] | 42674, 42675, 42691 | | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2025 | 3 | [***] | 42676, 42677, 42694 | | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2025 | 3 | [***] | 42692, 42696, 42697 | | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2025 | 3 | [***] | 42698, 42699, 42700 | | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2025 | 3 | [***] | 42701, 42702, 42703 | | | | [***] | [***] | [***] | [***] | [***] |

Total:    170

* [***]
** Manufacturer Serial Numbers (MSN) are for reference only and are subject to change.

Notes:
[***]

SWA-PA-03729 10697-1F.TXT
BOEING PROPRIETARY

BOEING PROPRIETARY

# 737-8 AIRCRAFT CONFIGURATION

# between

# THE BOEING COMPANY

# and

# SOUTHWEST AIRLINES CO.

# Exhibit A1 to Purchase Agreement Number PA-03729

**SA-7**

SWA-PA-03729

Page A1-1

**BOEING PROPRIETARY**

**Exhibit A1**
**737-8 AIRCRAFT CONFIGURATION**
**Dated December 13, 2011**
**relating to**
**BOEING MODEL 737-8 AIRCRAFT**


The Detail Specification is Boeing document number D019A008SWA18P-1, revision NEW, released on June 30, 2017. The Detail Specification provides further description of Customer's configuration set forth in this Exhibit A1. Such Detail Specification will be comprised of Boeing configuration specification D019A008, Revision O, dated September 30, 2016 as amended to incorporate the optional features (**Options**) listed below, including the effects on Manufacturer's Empty Weight (**MEW**) and Operating Empty Weight (**OEW**). As soon as practicable, Boeing will furnish to Customer copies of the Detail Specification, which copies will reflect such Options. The Aircraft Basic Price reflects and includes all effects of such Options, except such Aircraft Basic Price does not include the price effects of any Buyer Furnished Equipment or Seller Purchased Equipment.


**SA-7**

SWA-PA-03729


Page A1-2

**BOEING PROPRIETARY**

| CR | Title | 2011 $ A/P 1 - 4 Price Per A/C | 2011 $ A/P 5 - 8 Price Per A/C | 2011 $ A/P 9 & on Price Per A/C |
|---|---|---|---|---|
| 0110-000030 | MAJOR MODEL 737 AIRPLANE | [***] | [***] | [***] |
| 0110E131A08 | MINOR MODEL 737-8 AIRPLANE | [***] | [***] | [***] |
| 0170B401A73 | CLIMATE - NORMAL WEATHER OPERATIONS | [***] | [***] | [***] |
| 0170B871A31 | GALLEY AFT COMPLEX - G4B GALLEY - DOMED AFT BULKHEAD (BASELINE) | [***] | [***] | [***] |
| 0170C204A96 | CARGO LINERS- HEAVY DUTY - FORWARD | [***] | [***] | [***] |
| 0170C204A99 | CARGO LINERS- HEAVY DUTY- AFT | [***] | [***] | [***] |
| 0170C430H07 | PC - FLIGHT DECK - ROLLER SUNSHADES - DELETION - NUMBER 2 AND 3 WINDOWS - FLIGHT DECK - SFE | [***] | [***] | [***] |
| 0170C939A02 | COMMUNICATIONS - BASIC COMMUNICATIONS CONFIGURATION WITH HF | [***] | [***] | [***] |
| 0170D347B33 | LAVATORY AFT COMPLEX - TWO ADVANCED LAVATORIES WITH TWO DOUBLE ATTENDANT SEATS | [***] | [***] | [***] |
| 0170D360B56 | PC - LAVATORY AFT COMPLEX - TWO LAVATORIES WITH TWO DOUBLE ATTENDANT SEATS, NO CURTAIN AND UNIQUE HANDSET FACEPLATE DISPLAY - BOEING SKY INTERIOR | [***] | [***] | [***] |
| 0170D387A08 | AVIONICS - DUAL FMC WITH MULTI-CONTROL DISPLAY UNIT | [***] | [***] | [***] |
| 0170D837A13 | FLEXIBLE CERTIFICATION | [***] | [***] | [***] |
| 0170E173B00 | FLIGHT DECK - TWO OBSERVERS | [***] | [***] | [***] |
| 0170E656A04 | AIRFRAME - 737-8 | [***] | [***] | [***] |
| 0220E684A09 | TYPE CERTIFICATE & CERTIFICATE OF AIRWORTHINESS | [***] | [***] | [***] |
| 0221A609B52 | DISPATCH WITH GEAR EXTENDED FOR REVENUE FLIGHT | [***] | [***] | [***] |
| 0221B463A04 | MP-CERT. OF TAKEOFF & LANDING WITH 15 KNOT TAILWIND | [***] | [***] | [***] |
| 0221E029A02 | SKID-RESISTANT RUNWAY TAKEOFF WITH ANTISKID SYSTEM INOPERATIVE | [***] | [***] | [***] |
| 0222E052A08 | SHORT FIELD PERFORMANCE ENHANCEMENT: INSTALLATION OF TWO POSITION TAIL SKID | [***] | [***] | [***] |
| 0226B694H86 | MP - GNSS LANDING SYSTEM (GLS) - CATEGORY I APPROACH CAPABILITY - ACTIVATION - IN LIEU OF PARTIAL PROVISIONS | [***] | [***] | [***] |
| 0226C594A28 | GNSS LANDING SYSTEM (GLS) - CATEGORY I APPROACH CAPABILITY- PARTIAL PROVISIONS | [***] | [***] | [***] |
| 0226E437D67 | MP- GNSS LANDING SYSTEM (GLS) - CHANGE INCORP- CATEGORY I APPROACH CAPABILITY - ACTIVATION - IN LIEU OF PARTIAL PROVISIONS | [***] | [***] | [***] |
| 0228E437A74 | AIRPLANE FLIGHT MANUAL | [***] | [***] | [***] |
| 0252A541A02 | ENGLISH UNITS FOR FLIGHT AND OPERATIONS MANUALS, CDS INDICATIONS, AND FMCS PARAMETERS - CELSIUS TEMPERATURE | [***] | [***] | [***] |
| 0254-000003 | USPHS CERTIFICATE OF SANITARY CONSTRUCTION | [***] | [***] | [***] |
| 0315E684A03 | CERTIFIED OPERATIONAL WEIGHTS AND STRUCTURAL DESIGN WEIGHTS | [***] | [***] | [***] |
| 1110E559D06 | EXTERIOR NON-REGULATORY MARKINGS | [***] | [***] | [***] |
| 1110E624B44 | EXTERIOR REGULATORY MARKINGS AND COLOR SCHEME | [***] | [***] | [***] |
| 1130E559D12 | CARGO COMPARTMENT PLACARDS | [***] | [***] | [***] |
| 1130E559D13 | LIGHTED SIGNS - BI-LINGUAL SPANISH/ENGLISH | [***] | [***] | [***] |
| 1130E559D15 | INTERIOR PLACARDS AND MARKERS - 737 BOEING SKY INTERIOR | [***] | [***] | [***] |

**SA-7**

SWA-PA-03729

Page A1-3

**BOEING PROPRIETARY**

| CR | Title | 2011 $ A/P 1 - 4 Price Per A/C | 2011 $ A/P 5 - 8 Price Per A/C | 2011 $ A/P 9 & on Price Per A/C |
|---|---|---|---|---|
| 2103E437E01 | MP - AC HEAT EXCHANGER OUTLET TEMPERATURE MONITORING SENSOR - INSTALLATION | [***] | [***] | [***] |
| 2103E437E14 | MP - AC HEAT EXCHANGER OUTLET TEMPERATURE MONITORING SENSOR - CHANGE INCORP - INSTALLATION | [***] | [***] | [***] |
| 2130-000010 | 600 FPM CABIN PRESSURE ASCENT RATE | [***] | [***] | [***] |
| 2130-000015 | 750 FPM CABIN PRESSURE DESCENT RATE | [***] | [***] | [***] |
| 2160-000025 | CABIN TEMPERATURE INDICATION - DEGREES FAHRENHEIT | [***] | [***] | [***] |
| 2170-000021 | OZONE CONTROL - SPACE PROVISIONS FOR CATALYTIC CONVERTERS | [***] | [***] | [***] |
| 2210-000003 | AUTOFLIGHT - INHIBIT GLIDE SLOPE CAPTURE PRIOR TO LOCALIZER CAPTURE | [***] | [***] | [***] |
| 2210-000123 | AUTOFLIGHT - FLIGHT DIRECTOR TAKEOFF MODE WINGS LEVEL | [***] | [***] | [***] |
| 2210-000128 | AUTOFLIGHT - CONTROL WHEEL STEERING WARNING | [***] | [***] | [***] |
| 2210-000142 | AUTOFLIGHT - ALTITUDE ALERT - 300/900 FEET | [***] | [***] | [***] |
| 2210C175A38 | AUTOFLIGHT - GO-AROUND ROLL MODE - LNAV | [***] | [***] | [***] |
| 2230-000137 | AUTOTHROTTLE - FMCS - TAKEOFF PROFILE THRUST REDUCTION ALTITUDE | [***] | [***] | [***] |
| 2310C410A91 | COMMUNICATIONS CONTROL PANELS - DUAL GABLES RADIO TUNING PANELS CAPABLE OF (2) HF SYSTEMS AND (3) VHF SYSTEMS (8.33 KHZ CAPABLE) - P/N G7404-124 - BFE/SPE | [***] | [***] | [***] |
| 2312A639A46 | VHF COMMUNICATIONS - ACTIVATION OF KEYLINE TIMER | [***] | [***] | [***] |
| 2312E173A49 | VHF COMMUNICATIONS - TRIPLE HONEYWELL ARINC 750 RTA-50D VHF FM IMMUNE TRANSCEIVERS WITH 8.33 KHZ CHANNEL SPACING, VDL MODE 2, AND CMC INTERFACE CAPABILITY - P/N 965-1696-021 - BFE/SPE | [***] | [***] | [***] |
| 2315E706A59 | MP - SATCOM - INSTALLATION OF PARTIAL WIRING AND MOUNTING PROVISIONS - ICG MODEL ICS-300 IRIDIUM SATCOM SYSTEM WITH A SINGLE TOP MOUNTED DUAL ELEMENT IRIDIUM ANTENNA | [***] | [***] | [***] |
| 2321-000050 | SELCAL - AVTECH FIVE CHANNEL DECODER - P/N 1200008-000 - BFE/SPE | [***] | [***] | [***] |
| 2321-000063 | SELCAL - ANNUNCIATION ON AUDIO SELECTOR PANELS | [***] | [***] | [***] |
| 2322C939A05 | CMU - INSTALLATION OF PARTIAL PROVISIONS FOR A SINGLE CMU IN ACCORDANCE WITH ARINC 758 | [***] | [***] | [***] |
| 2322C939A06 | COMMUNICATIONS MANAGEMENT UNIT (CMU) - DATA LINK RECORDING ACTIVATION | [***] | [***] | [***] |
| 2322E437D59 | MP - CMU - INSTALLATION OF WIRING PROVISIONS BETWEEN THE ONBOARD NETWORK SYSTEM (ONS) AND THE COMMUNICATION MANAGEMENT UNIT PROVISIONS | [***] | [***] | [***] |
| 2322E516A03 | CMU - INSTALLATION OF HONEYWELL MARK II ARINC 758 LEVEL AOA CMU W/ARINC SERVICE PROVIDER - DATA LINK RECORDING CAPABLE - P/N 965-0758-006 - BFE / SPE | [***] | [***] | [***] |
| 2324D197A18 | EMERGENCY LOCATOR TRANSMITTER (ELT) - ACR ELECTRONICS AUTOMATIC FIXED - WITH NAVIGATION INTERFACE UNIT (NIU) - MODE S BROADCAST - WITH ANTENNA P/N 110-337 - BFE/SPE | [***] | [***] | [***] |
| 2331B754B15 | PASSENGER ADDRESS (PA) SYSTEM - ARINC 715 - ROCKWELL COLLINS AMPLIFIER - BFE/SPE | [***] | [***] | [***] |

**SA-7**

SWA-PA-03729

Page A1-4

**BOEING PROPRIETARY**

| CR | Title | 2011 $ A/P 1 - 4 Price Per A/C | 2011 $ A/P 5 - 8 Price Per A/C | 2011 $ A/P 9 & on Price Per A/C |
|---|---|---|---|---|
| 2331E097A10 | PRAM/BMM SYSTEM - PANASONIC - FASTEN SEAT BELT/DECOMPRESSION DISCRETES ACTIVATED - BFE/SPE | [***] | [***] | [***] |
| 2350A150D50 | AUDIO INTEGRATING - INHIBIT AURAL ALERT TRANSMISSIONS THROUGH CAPTAIN, FIRST OFFICER'S AND FIRST OBSERVER'S HEADPHONES | [***] | [***] | [***] |
| 2350B872A08 | AUDIO CONTROL PANEL - INTEGRATED SELCAL, CREW CALL, AND SATCOM FUNCTIONS - INSTALLATION - 3 VHF/2 HF | [***] | [***] | [***] |
| 2351-000042 | CONTROL WHEEL PUSH TO TALK (PTT) SWITCH - STANDARD THREE POSITION | [***] | [***] | [***] |
| 2351A213A33 | AUDIO INTEGRATION - INSTALLATION - TWO-PLUG AUDIO JACKS IN THE FLIGHT DECK | [***] | [***] | [***] |
| 2351A213B77 | BOOM MICROPHONE HEADSETS - CAPTAIN AND FIRST OFFICER - TELEX AIRMAN 750 - P/N 64300-200 - BFE/SPE | [***] | [***] | [***] |
| 2351D360C80 | PASSENGER CABIN MEDICAL COMMUNICATIONS SYSTEM - BOEING SKY INTERIOR | [***] | [***] | [***] |
| 2371B628B32 | VOICE RECORDER AND MICROPHONE/MONITOR - HONEYWELL - 2 HOUR RECORDING TIME - WITH DATALINK RECORDING CAPABILITY - P/N 980-6032-001 & P/N 980-6116-001 - BFE/SPE | [***] | [***] | [***] |
| 2371B628B41 | VOICE RECORDER - RECORDER INDEPENDENT POWER SUPPLY (RIPS) - AFT LOWERED CEILING | [***] | [***] | [***] |
| 2371E437C25 | MP - VOICE RECORDER - REPLACEMENT - VOICE RECORDER WITH 90 DAY BATTERY IN LIEU OF VOICE RECORDER WITH 30 DAY BATTERY - HONEYWELL INTERNATIONAL INC - BFE | [***] | [***] | [***] |
| 2451B750A96 | GALLEY G2 POWER - 17.25 KVA - COMPLETE PROVISIONS | [***] | [***] | [***] |
| 2451B815K32 | POWER DISTRIBUTION - WIRING INSTALLATION FOR ADDITIONAL CAPACITY | [***] | [***] | [***] |
| 2451D360M03 | MP - MOD STD SEL - GALLEY G4B POWER - REVISION - 12 KVA INSTALLATION AND PROVISIONS FOR 17.25 KVA IN LIEU OF COMPLETE INSTALLATION | [***] | [***] | [***] |
| 2451E447B64 | GALLEY G1 & G7 POWER - 12 KVA | [***] | [***] | [***] |
| 2454E484B59 | IN-SEAT POWER OUTLETS - INSTALLATION - FULL CABIN WITH 59 USB POWER SUPPLIES AND 175 HIGH POWER USB OUTLETS - ASTRONICS AES - BFE/SPE | [***] | [***] | [***] |
| 2454E484C79 | MP - IN-SEAT POWER OUTLETS - DELETION - FULL CABIN WITH 59 USB POWER SUPPLIES AND 175 HIGH POWER USB OUTLETS - ASTRONICS AES - BFE | [***] | [***] | [***] |
| 2500E559K65 | MP - CLOSET - REPLACEMENT - FWD RH FULL HEIGHT CLOSET IN LIEU OF FULL HEIGHT/HALF HEIGHT G2 GALLEY - STA 325 - 343 - ENCORE - BFE | [***] | [***] | [***] |
| 2500E559K83 | MP - INTERIOR ARRANGEMENT - REVISION - DETACHABLE EMERGENCY EQUIPMENT - BFE | [***] | [***] | [***] |
| 2500E559M56 | MP - MOD STD SEL - CABIN INTERPHONE SYSTEMS - ATTENDANT HANDSETS WITH UNIQUE FACEPLATE | [***] | [***] | [***] |
| 2500E559R44 | MP - INTERIOR ARRANGEMENT - REVISION - ADDITION OF SLIDE-OUT STOWAGE IN LAVS D & E AND REVISION TO EMERGENCY EQUIPMENT | [***] | [***] | [***] |
| 2500E559Y62 | MP - NON-CERTIFIED FLYAWAY KIT - ADDITION - FIRST AID KIT BRACKET | [***] | [***] | [***] |
| 2513C410C22 | FLIGHT COMPARTMENT ACCOMMODATIONS - EMERGENCY EVACUATION CHECKLIST PLACARD ON THE CAPTAIN AND FIRST OFFICER'S CONTROL COLUMNS | [***] | [***] | [***] |

**SA-7**

SWA-PA-03729

Page A1-5

**BOEING PROPRIETARY**

| CR | Title | 2011 $ A/P 1 - 4 Price Per A/C | 2011 $ A/P 5 - 8 Price Per A/C | 2011 $ A/P 9 & on Price Per A/C |
|---|---|---|---|---|
| 2513E437A99 | LOG BOOK HOLDER - INSTALLATION - ON AFT FACE OF P8 AISLESTAND | [***] | [***] | [***] |
| 2514E559T12 | MP - SIDEWALL LINING AND AIR RETURN GRILLE - REVISION - ENHANCED FASTENING PROVISIONS | [***] | [***] | [***] |
| 2520E559D17 | INTERIOR COLOR AND MATERIAL - STANDARD OFFERING | [***] | [***] | [***] |
| 2520E559L37 | MP - PASSENGER COMPARTMENT - REVISION - DECORATIVE LAMINATE - FORWARD MONUMENTS | [***] | [***] | [***] |
| 2523E559E42 | PASSENGER SERVICE UNITS - 737 BOEING SKY INTERIOR | [***] | [***] | [***] |
| 2525A627A07 | DOUBLE ATTENDANT SEAT - WALL MOUNTED - STA 304 | [***] | [***] | [***] |
| 2525C204F39 | LARGE LOWER STOWAGE BOX FOR DOUBLE ATTENDANT SEAT - STA 304 LH | [***] | [***] | [***] |
| 2525C204F40 | LARGE LOWER STOWAGE BOX FOR DOUBLE ATTENDANT SEAT - STA 949 LH | [***] | [***] | [***] |
| 2525C204F41 | LARGE LOWER STOWAGE BOX FOR DOUBLE ATTENDANT SEAT - STA 949 RH | [***] | [***] | [***] |
| 2525C204K04 | HIC AND FEMUR LOAD COMPLIANCE - ECONOMY CLASS SEATS | [***] | [***] | [***] |
| 2525C204K05 | HIC AND FEMUR LOAD COMPLIANCE - ATTENDANT SEATS | [***] | [***] | [***] |
| 2525E559D22 | ECONOMY CLASS SEATS - BFE/SPE | [***] | [***] | [***] |
| 2527E559H50 | FLOOR COVERING - CARPET - BFE/SPE | [***] | [***] | [***] |
| 2527E559H51 | FLOOR COVERING - GALLEY AND ENTRYWAY FLOOR MAT - BFE/SPE | [***] | [***] | [***] |
| 2528C204J16 | FORWARD CENTER OVERHEAD STOWAGE COMPARTMENT - PROVISIONED FOR PALLETIZED EQUIPMENT AND LIFE RAFTS - 737 BOEING SKY INTERIOR | [***] | [***] | [***] |
| 2528C204J18 | SECOND FORWARD CENTER OVERHEAD STOWAGE COMPARTMENT - PROVISIONED FOR PALLETIZED EQUIPMENT AND LIFE RAFTS - 737 BOEING SKY INTERIOR | [***] | [***] | [***] |
| 2528C204J20 | FIRST MID CABIN CENTER OVERHEAD STOWAGE COMPARTMENT - PROVISIONED FOR PALLETIZED EQUIPMENT AND LIFE RAFTS - 737 BOEING SKY INTERIOR | [***] | [***] | [***] |
| 2528C204J22 | SECOND MID-CABIN CENTER OVERHEAD STOWAGE COMPARTMENT - PROVISIONED FOR PALLETIZED EQUIPMENT AND LIFE RAFTS - 737 BOEING SKY INTERIOR | [***] | [***] | [***] |
| 2528E559D23 | LITERATURE POCKETS | [***] | [***] | [***] |
| 2528E559D24 | OVERHEAD STOWAGE BINS - ADDITIONAL FEATURES - 737 BOEING SKY INTERIOR | [***] | [***] | [***] |
| 2529D360B52 | FORWARD ATTENDANT WORKSTATION - PANEL & HANDSET - UNIQUE FACEPLATE DISPLAY | [***] | [***] | [***] |
| 2530D383A11 | G1 GALLEY - AFT STATION 297 - BFE/SPE | [***] | [***] | [***] |
| 2530E559D10 | GALLEY G2 - STA 325-343 - BFE/SPE | [***] | [***] | [***] |
| 2530E559D27 | G7 GALLEY - AFT OF DOOR 1, LEFT - AFT STA 374 - BFE/SPE | [***] | [***] | [***] |
| 2530E559D29 | GALLEY INSERT PART NUMBERS - BFE/SPE | [***] | [***] | [***] |
| 2530E559K27 | MP - GALLEY - REVISION - G1 GALLEY AFT STA 293 IN LIEU OF STA 297 | [***] | [***] | [***] |
| 2530E624B45 | GALLEY PART NUMBERS - STANDARD EFFORT - BFE/SPE | [***] | [***] | [***] |
| 2530E624B63 | GALLEY CHILLER - AFT G4B GALLEY - PROVISIONS | [***] | [***] | [***] |
| 2540D347A92 | LA ADVANCED LAVATORY | [***] | [***] | [***] |
| 2540E559D31 | LA ADVANCED LAVATORY SELECTABLES | [***] | [***] | [***] |
| 2540E559D32 | LD ADVANCED LAVATORY SELECTABLES | [***] | [***] | [***] |
| 2540E559D33 | LE ADVANCED LAVATORY SELECTABLES | [***] | [***] | [***] |

**SA-7**

SWA-PA-03729

Page A1-6

**BOEING PROPRIETARY**

| CR | Title | 2011 $ A/P 1 - 4 Price Per A/C | 2011 $ A/P 5 - 8 Price Per A/C | 2011 $ A/P 9 & on Price Per A/C |
|---|---|---|---|---|
| 2540E559N20 | MP - LAVATORIES - REVISION - LAVS D AND E - NON-SPACEWALL IN LIEU OF SPACEWALL | [***] | [***] | [***] |
| 2560-000269 | CREW LIFE VEST STOWAGE - FLIGHT DECK, SECOND OBSERVER - CAPTAIN'S SEAT BACK | [***] | [***] | [***] |
| 2560C410D09 | CREW LIFE VESTS - FLIGHT DECK, WITH SECOND OBSERVER - EASTERN AERO MARINE INC - P/N P01202-301C - BFE/SPE | [***] | [***] | [***] |
| 2562E559E21 | OVERWATER EMERGENCY EQUIPMENT - BFE/SPE - 737 BOEING SKY INTERIOR | [***] | [***] | [***] |
| 2562E559K34 | MP - OVERWATER EMERGENCY EQUIPMENT - DELETION - LIFE RAFTS - EASTERN AERO MARINE - BFE | [***] | [***] | [***] |
| 2562E559U37 | MP - OVERWATER EMERGENCY EQUIPMENT - REPLACEMENT - PASSENGER LIFE VEST - EASTERN AERO MARINE INC - BFE | [***] | [***] | [***] |
| 2564E559D98 | DETACHABLE EMERGENCY EQUIPMENT - PASSENGER COMPARTMENT - BFE/SPE - 737 BOEING SKY INTERIOR | [***] | [***] | [***] |
| 2564E559X35 | MP - DETACHABLE EMERGENCY EQUIPMENT - PASSENGER COMPARTMENT - DELETION - FIRST AID KIT - MINE SAFETY APPLIANCES CO - BFE | [***] | [***] | [***] |
| 2622E088A14 | APU FIRE EXTINGUISHER BOTTLE - COMMON WITH ENGINE BOTTLES | [***] | [***] | [***] |
| 2841-000004 | STANDARD FUEL SYSTEM ACCURACY - NO FUEL DENSITOMETERS | [***] | [***] | [***] |
| 2841-000012 | FUEL QUANTITY INDICATORS ON RIGHT WING FUELING PANEL | [***] | [***] | [***] |
| 2844-000019 | FUEL MEASURING STICKS IN LINEAR UNITS WITH CONVERSION TABLES IN U.S. GALLONS | [***] | [***] | [***] |
| 2911-000042 | ENGINE-DRIVEN HYDRAULIC PUMPS WITH VESPEL SPLINE - EATON (VICKERS) - 10-62167 | [***] | [***] | [***] |
| 2911-000044 | AC MOTOR-DRIVEN HYDRAULIC PUMPS - EATON (VICKERS) - 10-60556 | [***] | [***] | [***] |
| 2911E684D00 | MP - AC MOTOR DRIVEN HYDRAULIC PUMPS - INSTALL TWO PARKER (ABEX) IN LIEU OF TWO EATON (VICKERS) - SFE | [***] | [***] | [***] |
| 3041-000003 | NO HEATED FLIGHT COMPARTMENT NUMBER 3 WINDOW | [***] | [***] | [***] |
| 3131-000143 | ACCELEROMETER - HONEYWELL P/N 971-4193-001 - BFE/SPE | [***] | [***] | [***] |
| 3131B628B16 | DIGITAL FLIGHT DATA RECORDER (DFDR) - HONEYWELL - 1024 WORDS PER SECOND MAXIMUM DATA RATE - P/N 980-4750-009 - BFE/SPE | [***] | [***] | [***] |
| 3131E103A15 | DIGITAL FLIGHT DATA ACQUISITION UNIT (DFDAU) - CATIIIB/IAN/GLS/NPS CAPABLE - WITH ACMS CAPABILITY - ONS - SFE | [***] | [***] | [***] |
| 3131E437C26 | MP - FLIGHT DATA RECORDER SYSTEM - REPLACEMENT - FLIGHT DATA RECORDER WITH 90 DAY BATTERY IN LIEU OF FLIGHT DATA RECORDER WITH 30 DAY BATTERY - HONEYWELL INTERNATIONAL INC - BFE | [***] | [***] | [***] |
| 3132E437D35 | MP - ARINC 615 PORTABLE DATA LOADER CONNECTOR - INSTALLATION - FLIGHT DECK - P61-4 MAINTENANCE BITE PANEL | [***] | [***] | [***] |
| 3133-000123 | ARINC 740 PRINTER PROVISIONS IN THE FLIGHT DECK AISLESTAND | [***] | [***] | [***] |
| 3135E437D40 | MP - ONBOARD NETWORK SYSTEM - QUICK ACCESS RECORDER - DAR OUTPUT 23300 | [***] | [***] | [***] |

**SA-7**

**BOEING PROPRIETARY**

| CR | Title | 2011 $ A/P 1 - 4 Price Per A/C | 2011 $ A/P 5 - 8 Price Per A/C | 2011 $ A/P 9 & on Price Per A/C |
|---|---|---|---|---|
| 3161-000133 | ENGINE FUEL FLOW - FULL TIME DISPLAY - PRIMARY ENGINE DISPLAY UNIT | [***] | [***] | [***] |
| 3161C175A22 | ENGINE OIL QUANTITY DISPLAY - PERCENT - ENGINE DISPLAY | [***] | [***] | [***] |
| 3162-000018 | ATTITUDE COMPARATOR - FLASHING - ADI | [***] | [***] | [***] |
| 3162-000022 | FLIGHT DIRECTOR COMMAND DISPLAY - SPLIT AXIS - ADI | [***] | [***] | [***] |
| 3162-000028 | RADIO ALTITUDE - BELOW ADI | [***] | [***] | [***] |
| 3162-000030 | RISING RUNWAY - DISPLAYED ON THE ADI | [***] | [***] | [***] |
| 3162-000036 | LANDING ALTITUDE REFERENCE BAR - PRIMARY FLIGHT DISPLAY | [***] | [***] | [***] |
| 3162-000040 | BARO MINIMUMS POINTER - DISPLAYED ON SELECTION OF RADIO ALTITUDE MINIMUMS - PRIMARY FLIGHT DISPLAY | [***] | [***] | [***] |
| 3162-000044 | TCAS RESOLUTION ADVISORY - VSI | [***] | [***] | [***] |
| 3162-000051 | ILS LOCALIZER DEVIATION EXPANDED SCALE - AUTOPILOT OR FLIGHT DIRECTOR MODE | [***] | [***] | [***] |
| 3162-000059 | MAP MODE ORIENTATION - TRACK UP - NAVIGATION DISPLAY | [***] | [***] | [***] |
| 3162-000064 | RANGE ARCS - NAVIGATION DISPLAY | [***] | [***] | [***] |
| 3162-000079 | MANUALLY TUNED VOR SELECTED COURSE LINES DISPLAYED - NAVIGATION DISPLAY | [***] | [***] | [***] |
| 3162-000084 | TCAS 3 NM RANGE RING - NAVIGATION DISPLAY | [***] | [***] | [***] |
| 3162-000088 | AIRSPEED BUG - ENABLED - 80 KNOT SETTING - MACH AIRSPEED INDICATOR | [***] | [***] | [***] |
| 3162A627A36 | CDS - SOFTWARE ACTIVATION - VNAV SPEED BANDS - ENABLE | [***] | [***] | [***] |
| 3162C594A29 | CDS - SOFTWARE ACTIVATION - NAVIGATION PERFORMANCE SCALES - ENABLE | [***] | [***] | [***] |
| 3162E437C95 | MP - FLIGHT AND NAVIGATION DISPLAYS - LANDING SYS ELECTRONIC PLACARD WORKSHEET - AUXILIARY DISPLAY | [***] | [***] | [***] |
| 3244-000008 | SERVICE INTERPHONE CONNECTOR - EXTERNAL POWER PANEL | [***] | [***] | [***] |
| 3245B290A77 | WHEELS AND TIRES - NOSE LANDING GEAR - WHEELS - GOODRICH - INSTALLATION WITH SFE 12 PR, 235 MPH RATED RADIAL TIRES | [***] | [***] | [***] |
| 3245B290A92 | BRAKES - CARBON - GOODRICH | [***] | [***] | [***] |
| 3245C927A08 | WHEELS AND TIRES - MAIN LANDING GEAR - WHEELS FOR CARBON BRAKES - GOODRICH - INSTALLATION WITH 30-PR, 235 MPH RADIAL TIRES | [***] | [***] | [***] |
| 3321C869A65 | PASSENGER CABIN LIGHTING - SINGLE-ZONE CONTROL - 737 BOEING SKY INTERIOR | [***] | [***] | [***] |
| 3324C195A04 | NO SMOKING SIGN - SILK SCREENED SYMBOL AND RETAIN CHIME FUNCTION | [***] | [***] | [***] |
| 3327D380B90 | GALLEY LIGHTS - 28 VDC POWER - GALLEY G7 / CLOSET | [***] | [***] | [***] |
| 3327E559L81 | MP - GALLEY LIGHTS - 28 VDC POWER - DELETION - GALLEY G7 / CLOSET | [***] | [***] | [***] |
| 3350E097A38 | EMERGENCY ESCAPE PATH LIGHTING - FLOOR MOUNTED - NARROW COLOR PHOTOLUMINESCENT | [***] | [***] | [***] |
| 3412-000022 | DUAL ELEMENT NON-ASPIRATED TAT PROBE | [***] | [***] | [***] |
| 3430B866A28 | ILS/GPS MULTI-MODE RECEIVER (MMR) - HONEYWELL - P/N 066-50029-1201 - BFE/SPE | [***] | [***] | [***] |

**SA-7**

**BOEING PROPRIETARY**

| CR | Title | 2011 $ A/P 1 - 4 Price Per A/C | 2011 $ A/P 5 - 8 Price Per A/C | 2011 $ A/P 9 & on Price Per A/C |
|---|---|---|---|---|
| 3430E437D65 | MP - MULTI-MODE RECEIVER (MMR) AND VOR/MARKER BEACON - REPLACEMENT - HONEYWELL 3G MMR P/N 69002600-0101 IN LIEU OF EXISTING HONEYWELL MMR P/N 066-50029-1201 AND HONEYWELL VOR/MARKER BEACON P/N 69001410-100 - BFE | [***] | [***] | [***] |
| 3430E437D69 | MP - MULTI-MODE RECEIVER (MMR) AND VOR/MARKER BEACON - CHANGE INCORP - REPLACEMENT - HONEYWELL 3G MMR P/N 69002600-0101 IN LIEU OF EXISTING HONEYWELL MMR P/N 066-50029-1201 AND HONEYWELL VOR/MARKER BEACON P/N 69001410-100 - BFE | [***] | [***] | [***] |
| 3431C175A06 | NAVIGATION CONTROL PANEL (NCP) - GNSS LANDING SYSTEM (GLS) CAPABLE - GABLES - P/N G7501-01- BFE/SPE | [***] | [***] | [***] |
| 3433C594A98 | LOW RANGE RADIO ALTIMETER (LRRA) - CAT IIIB CAPABLE - HONEYWELL - P/N 066-50007-0531- BFE/SPE | [***] | [***] | [***] |
| 3436E640B45 | MP - HEAD UP DISPLAY (HUD) SYSTEM - INSTALLATION - SINGLE ROCKWELL COLLINS HEAD-UP GUIDANCE SYSTEM (HGS) MODEL 6000 WITH MCDU INTERFACE - STC CERTIFIED - BFE | [***] | [***] | [***] |
| 3443B696L73 | SINGLE WEATHER RADAR SYSTEM CONTROL PANEL - HONEYWELL RDR-4000 RADAR SYSTEM - P/N 930-5101-001 - BFE/SPE | [***] | [***] | [***] |
| 3443E032A44 | SINGLE WEATHER RADAR SYSTEM - WITH PREDICTIVE WINDSHEAR - HONEYWELL RDR-4000, VERSION 2 TRANSCEIVER - 930-2000-001 - BFE/SPE | [***] | [***] | [***] |
| 3445C594B01 | TCAS SYSTEM - HONEYWELL TCAS COMPUTER P/N 940-0351-001 - TCAS CHANGE 7.1 COMPLIANT - BFE/SPE | [***] | [***] | [***] |
| 3446-000046 | LOW VOLUME FOR ALTITUDE CALLOUTS | [***] | [***] | [***] |
| 3446-000049 | 500 SMART CALLOUT INHIBITED | [***] | [***] | [***] |
| 3446-000057 | GROUND PROXIMITY WARNING SYSTEM ALTITUDE CALLOUTS - 100, 50, 30, 10 | [***] | [***] | [***] |
| 3446C174A14 | ENHANCED GROUND PROXIMITY WARNING SYSTEM (EGPWS) - BANK ANGLE CALLOUT (VARIABLE CALLOUT BELOW 130 FT) - ENABLE | [***] | [***] | [***] |
| 3451E097A30 | VOR/MARKER BEACON - HONEYWELL RECEIVER P/N 69001410-100 - BFE/SPE | [***] | [***] | [***] |
| 3453E052A56 | ATC SYSTEM - HONEYWELL INTERNATIONAL INC ATC TRANSPONDER P/N 066-01212-0301 - ADS-B OUT DO-260B COMPLIANT - HONEYWELL INTERNATIONAL INC CONTROL PANEL P/N 071-01503-2601 - BFE/SPE | [***] | [***] | [***] |
| 3455D338A05 | DISTANCE MEASURING EQUIPMENT (DME) SCANNING INTERROGATOR- HONEYWELL P/N 066-50013-0111 - BFE/SPE | [***] | [***] | [***] |
| 3461A150B73 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - ENGINE-OUT STANDARD INSTRUMENT DEPARTURES (SID'S) - ENABLE | [***] | [***] | [***] |
| 3461A425A10 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - NAVIGATION DATABASE - CUSTOMER SUPPLIED | [***] | [***] | [***] |
| 3461A425A17 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - AIRLINE OPERATIONAL COMMUNICATION DATA LINK (AOC DL) - FEATURE ACTIVATION | [***] | [***] | [***] |
| 3461A425A30 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS)- ABEAM WAYPOINTS- ENABLE | [***] | [***] | [***] |
| 3461A425A48 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - ACTIVATE COLOR OPERATION | [***] | [***] | [***] |

**SA-7**

SWA-PA-03729

Page A1-9

**BOEING PROPRIETARY**

| CR | Title | 2011 $ A/P 1 - 4 Price Per A/C | 2011 $ A/P 5 - 8 Price Per A/C | 2011 $ A/P 9 & on Price Per A/C |
|---|---|---|---|---|
| 3461A890A76 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - NAVIGATION DISPLAY - MISSED APPROACH IN CYAN UNTIL ACTIVE - ENABLE | [***] | [***] | [***] |
| 3461B430C49 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - REQUIRED NAVIGATION PERFORMANCE (RNP) DEFAULT VALUE CHANGE | [***] | [***] | [***] |
| 3461B696E14 | MP - FMCE - ADDITIONAL CONTROL DISPLAY UNIT FIX PAGES - ENABLE | [***] | [***] | [***] |
| 3461B696K97 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - VERTICAL RNP DEFAULT VALUE - REVISION | [***] | [***] | [***] |
| 3461C175A11 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - AIR TRAFFIC SERVICES DATA LINK (ATS DL) - FANS FEATURE ACTIVATION | [***] | [***] | [***] |
| 3461C175A14 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - FANS CAPABLE MCDU WITH ATC KEYBOARD - INSTALLATION-SFE | [***] | [***] | [***] |
| 3461C175A32 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - COMMON VNAV - ENABLE | [***] | [***] | [***] |
| 3461C175A34 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - SPEED PROPAGATION FROM THE CRUISE PAGE TO THE DESCENT PAGE - ENABLE | [***] | [***] | [***] |
| 3461C430J05 | FLIGHT MANAGEMENT COMPUTING SYSTEM (FMCS) - VOR INHIBIT | [***] | [***] | [***] |
| 3461C594A26 | FLIGHT MANAGEMENT COMPUTING SYSTEM (FMCS) - INTENT DATA TRANSMITTED TO ACARS - ENABLE | [***] | [***] | [***] |
| 3511B873B93 | CREW OXYGEN MASK - FULL FACE MASK WITH BUILT-IN SMOKE GOGGLES - SECOND OBSERVER - AV-OX INC - BFE/SPE | [***] | [***] | [***] |
| 3511B873B94 | CREW OXYGEN MASK - FULL FACE MASK WITH BUILT-IN SMOKE GOGGLES - FIRST OBSERVER - AV-OX INC - BFE/SPE | [***] | [***] | [***] |
| 3511B873B95 | CREW OXYGEN MASKS - FULL FACE MASK WITH BUILT-IN SMOKE GOGGLES - CAPTAIN AND FIRST OFFICER - AV-OX INC - BFE/SPE | [***] | [***] | [***] |
| 3811-000017 | POTABLE WATER - SERVICEABLE TO 40 GALLONS | [***] | [***] | [***] |
| 3812-000002 | NO WATER QUANTITY GAUGE - WATER SERVICE PANEL | [***] | [***] | [***] |
| 3832-000076 | NO SENSOR FOULED LIGHT - COVER PLATE | [***] | [***] | [***] |
| 3832-000078 | NO WASTE QUANTITY GAUGE - COVER PLATE | [***] | [***] | [***] |
| 3910E437A86 | AFT ELECTRONICS PANEL ARRANGEMENT WITH TWO RADIO TUNING PANELS AND ARINC 740 PRINTER PROVISIONS | [***] | [***] | [***] |
| 4435E484C78 | MP - HIGH SPEED COMMUNICATION - STRUCTURAL PROVISIONS - KU BAND RADOME INSTALLATION - 737 BOEING SKY INTERIOR 159200 | [***] | [***] | [***] |
| 4435E484D01 | MP - HIGH SPEED COMMUNICATION - PARTIAL PROVISIONS - GLOBAL EAGLE ENTERTAINMENT CABIN NETWORK SYSTEM WITH KU BAND CONNECTIVITY - THREE WIRELESS ACCESS POINTS (WAP) - 737 BOEING SKY INTERIOR | [***] | [***] | [***] |
| 4435E484D80 | MP - HIGH-SPEED COMMUNICATIONS - INSTALLATION INTO PARTIAL PROVISIONS - WIRELESS CABIN NETWORK WITH 3 CWLU'S AND KU BAND CONNECTIVITY - GLOBAL EAGLE ENTERTAINMENT - CSE/SPE | [***] | [***] | [***] |
| 4435E484H13 | MP - HIGH SPEED COMMUNICATION - REPLACEMENT - TRI-BAND RADOME IN LIEU OF KU BAND RADOME | [***] | [***] | [***] |

**SA-7**

SWA-PA-03729

Page A1-10

**BOEING PROPRIETARY**

| CR | Title | 2011 $ A/P 1 - 4 Price Per A/C | 2011 $ A/P 5 - 8 Price Per A/C | 2011 $ A/P 9 & on Price Per A/C |
|---|---|---|---|---|
| 4435E484H15 | MP - HIGH SPEED COMMUNICATION - CHANGE INCORP - REPLACEMENT - TRI-BAND RADOME IN LIEU OF KU BAND RADOME | [***] | [***] | [***] |
| 4610E437C72 | MP - GROUND BASED CONNECTIVITY - INSTALLATION - AIRCRAFT WIRELESS LAN UNIT CELLULAR - TELEDYNE CONTROLS - BFE | [***] | [***] | [***] |
| 4610E437E26 | MP - ONBOARD NETWORK SYSTEM - ACTIVATION OF ONS-ACARS CMU INTERFACE | [***] | [***] | [***] |
| 4610E437E28 | MP - ONBOARD NETWORK SYSTEM - CHANGE INCORP - ACTIVATION OF ONS-ACARS CMU INTERFACE | [***] | [***] | [***] |
| 4610E839A41 | MP - ONBOARD NETWORK SYSTEM - REPLACEMENT - AIRCRAFT WIRELESS LAN UNIT - CELLULAR AND WIFI IN LIEU OF CELLULAR GROUND BASED CONNECTIVITY ONLY - TELEDYNE CONTROLS - BFE | [***] | [***] | [***] |
| 5231A561C54 | CARGO DOOR - SOLID SKIN | [***] | [***] | [***] |
| 5300-000027 | UNDERSEAT FLOOR PANELS, LOW TRAFFIC CAPABILITY | [***] | [***] | [***] |
| 5352A298A28 | RADOME- NORDAM- SFE | [***] | [***] | [***] |
| 7200D422A12 | CFM LEAP-1B ENGINES - 1B28B1 RATING | [***] | [***] | [***] |
| 7200E430E27 | MP - CFM LEAP -1B ENGINES - CHANGE INCORP - REVISION - 1B28 RATING IN LIEU OF 1B28B1 RATING | [***] | [***] | [***] |
| 7200E684E22 | MP - CFM LEAP -1B ENGINES - REVISION - 1B28 RATING IN LIEU OF 1B28B1 RATING | [***] | [***] | [***] |
| 7900-000116 | LUBRICATING OIL - MOBIL JET II | [***] | [***] | [***] |
| MISC | INTERIOR ALLOWANCE | [***] | [***] | [***] |
| | **TOTALS:** | [***] | [***] | [***] |

**SA-7**

SWA-PA-03729

Page A1-11

**BOEING PROPRIETARY**

# BUYER FURNISHED EQUIPMENT VARIABLES

## between

## THE BOEING COMPANY

## and

## Southwest Airlines Co.

## Supplemental Exhibit BFE1
## to Purchase Agreement Number PA-03729

SWA-PA-03729-BFE1

**SA-7**

Page 1

**BOEING PROPRIETARY**

**BUYER FURNISHED EQUIPMENT VARIABLES**
**relating to**
**BOEING MODEL 737-8 AIRCRAFT**

This Supplemental Exhibit BFE1 contains supplier selection dates, on-dock dates and other requirements applicable to the Aircraft.

1.    <u>Supplier Selection</u>.

Customer will:

Select and notify Boeing of the suppliers and part numbers of the following BFE items by the following dates:

| | |
|---|---|
| Galley System | 5/1/2016 |
| Galley Inserts | 5/1/2016 |
| Seats (passenger) | 5/1/2016 |
| Overhead & Audio System | 5/1/2016 |
| In-Seat Video System | Same as seats |
| Miscellaneous Emergency Equipment | 7/1/2016 |
| Cargo Handling Systems*<br>*(Single Aisle Programs only)* | 11/1/2016 |

*For a new certification, supplier requires notification ten (10) months prior to Cargo Handling System on-dock date.

2.    <u>On-dock Dates and Other Information</u>.

On or before nine (9) months prior to aircraft delivery, Boeing will provide to Customer the BFE Requirements electronically through My Boeing Fleet (**MBF** in My Boeing Configuration (**MBC**)). These requirements may be periodically revised, setting forth the items, quantities, on-dock dates and shipping instructions and other requirements relating to the in-sequence installation of BFE. For planning purposes, preliminary BFE on-dock dates are set forth below:

SWA-PA-03729-BFE1

**SA-7**

Page 2

**BOEING PROPRIETARY**

| Nominal Del Date | Aircraft Qty | Seats | Galley / Furnishings | Antennas & Mounting Equipment | Avionics | Cabin Systems Equipment | Misc. Emergency Equipment | Textiles / Raw Materials | Cargo Systems | Provision Kits | Radomes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Jul-2017 | 3 | 05/23/17 | 05/16/17 | 03/27/17 | 05/16/17 | 05/16/17 | 05/16/17 | 02/09/17 | 05/02/17 | 01/09/17 | 04/17/17 |
| Aug-2017 | 6 | 06/21/17 | 06/14/17 | 04/24/17 | 06/14/17 | 06/14/17 | 06/14/17 | 03/09/17 | 05/31/17 | 02/06/17 | 05/15/17 |
| Sep-2017 | 1 | 07/25/17 | 07/18/17 | 05/25/17 | 07/18/17 | 07/18/17 | 07/18/17 | 04/11/17 | 07/03/17 | 03/09/17 | 06/16/17 |
| Oct-2017 | 2 | 08/22/17 | 08/15/17 | 06/23/17 | 08/15/17 | 08/15/17 | 08/15/17 | 05/09/17 | 08/01/17 | 04/06/17 | 07/17/17 |
| Nov-2017 | 2 | 09/22/17 | 09/15/17 | 07/26/17 | 09/15/17 | 09/15/17 | 09/15/17 | 06/09/17 | 08/31/17 | 05/08/17 | 08/16/17 |
| Jan-2018 | 2 | 11/13/17 | 11/06/17 | 09/15/17 | 11/06/17 | 11/06/17 | 11/06/17 | 08/01/17 | 10/23/17 | 06/28/17 | 10/06/17 |
| Mar-2018 | 1 | 01/22/18 | 01/15/18 | 11/14/17 | 01/15/18 | 01/15/18 | 01/15/18 | 09/29/17 | 12/22/17 | 08/28/17 | 12/07/17 |
| Jun-2018 | 1 | 04/24/18 | 04/17/18 | 02/26/18 | 04/17/18 | 04/17/18 | 04/17/18 | 01/11/18 | 04/03/18 | 12/01/17 | 03/19/18 |
| Jul-2018 | 2 | 05/23/18 | 05/16/18 | 03/27/18 | 05/16/18 | 05/16/18 | 05/16/18 | 02/09/18 | 05/02/18 | 01/09/18 | 04/17/18 |
| Aug-2018 | 1 | 06/22/18 | 06/15/18 | 04/26/18 | 06/15/18 | 06/15/18 | 06/15/18 | 03/13/18 | 06/01/18 | 02/08/18 | 05/17/18 |
| Sep-2018 | 2 | 07/25/18 | 07/18/18 | 05/29/18 | 07/18/18 | 07/18/18 | 07/18/18 | 04/13/18 | 07/04/18 | 03/13/18 | 06/19/18 |
| Oct-2018 | 2 | 08/22/18 | 08/15/18 | 06/26/18 | 08/15/18 | 08/15/18 | 08/15/18 | 05/11/18 | 08/01/18 | 04/10/18 | 07/17/18 |
| Nov-2018 | 1 | 09/24/18 | 09/17/18 | 07/27/18 | 09/17/18 | 09/17/18 | 09/17/18 | 06/13/18 | 09/03/18 | 05/11/18 | 08/17/18 |
| Dec-2018 | 1 | 10/24/18 | 10/17/18 | 08/28/18 | 10/17/18 | 10/17/18 | 10/17/18 | 07/13/18 | 10/03/18 | 06/12/18 | 09/18/18 |
| Mar-2021 | 1 | 01/20/21 | 01/13/21 | 11/24/20 | 01/13/21 | 01/13/21 | 01/13/21 | 10/09/20 | 12/30/20 | 09/08/20 | 12/15/20 |
| Apr-2021 | 3 | 02/22/21 | 02/15/21 | 12/25/20 | 02/15/21 | 02/15/21 | 02/15/21 | 11/11/20 | 02/01/21 | 10/09/20 | 01/15/21 |
| May-2021 | 3 | 03/24/21 | 03/17/21 | 01/26/21 | 03/17/21 | 03/17/21 | 03/17/21 | 12/11/20 | 03/03/21 | 11/10/20 | 02/16/21 |
| Jun-2021 | 3 | 04/22/21 | 04/15/21 | 02/24/21 | 04/15/21 | 04/15/21 | 04/15/21 | 01/11/21 | 04/01/21 | 12/09/20 | 03/17/21 |
| Jul-2021 | 3 | 05/24/21 | 05/17/21 | 03/26/21 | 05/17/21 | 05/17/21 | 05/17/21 | 02/10/21 | 05/03/21 | 01/08/21 | 04/16/21 |
| Mar-2022 | 2 | 01/20/22 | 01/13/22 | 11/24/21 | 01/13/22 | 01/13/22 | 01/13/22 | 10/11/21 | 12/30/21 | 09/08/21 | 12/15/21 |
| Apr-2022 | 3 | 02/22/22 | 02/15/22 | 12/27/21 | 02/15/22 | 02/15/22 | 02/15/22 | 11/11/21 | 02/01/22 | 10/11/21 | 01/17/22 |
| May-2022 | 3 | 03/23/22 | 03/16/22 | 01/25/22 | 03/16/22 | 03/16/22 | 03/16/22 | 12/10/21 | 03/02/22 | 11/09/21 | 02/15/22 |
| Jun-2022 | 3 | 04/22/22 | 04/15/22 | 02/24/22 | 04/15/22 | 04/15/22 | 04/15/22 | 01/11/22 | 04/01/22 | 12/09/21 | 03/17/22 |
| Jul-2022 | 2 | 05/24/22 | 05/17/22 | 03/28/22 | 05/17/22 | 05/17/22 | 05/17/22 | 02/10/22 | 05/03/22 | 01/10/22 | 04/18/22 |
| Aug-2022 | 2 | 06/22/22 | 06/15/22 | 04/26/22 | 06/15/22 | 06/15/22 | 06/15/22 | 03/11/22 | 06/01/22 | 02/08/22 | 05/17/22 |
| Jan-2023 | 3 | 11/23/22 | 11/16/22 | 09/27/22 | 11/16/22 | 11/16/22 | 11/16/22 | 08/12/22 | 11/02/22 | 07/12/22 | 10/18/22 |
| Feb-2023 | 3 | 12/23/22 | 12/16/22 | 10/27/22 | 12/16/22 | 12/16/22 | 12/16/22 | 09/13/22 | 12/02/22 | 08/11/22 | 11/17/22 |
| Mar-2023 | 1 | 01/20/23 | 01/13/23 | 11/24/22 | 01/13/23 | 01/13/23 | 01/13/23 | 10/11/22 | 12/30/22 | 09/08/22 | 12/15/22 |
| Mar-2023 | 2 | 01/20/23 | 01/13/23 | 11/24/22 | 01/13/23 | 01/13/23 | 01/13/23 | 10/11/22 | 12/30/22 | 09/08/22 | 12/15/22 |
| Apr-2023 | 3 | 02/22/23 | 02/15/23 | 12/27/22 | 02/15/23 | 02/15/23 | 02/15/23 | 11/11/22 | 02/01/23 | 10/11/22 | 01/17/23 |
| May-2023 | 3 | 03/22/23 | 03/15/23 | 01/24/23 | 03/15/23 | 03/15/23 | 03/15/23 | 12/09/22 | 03/01/23 | 11/08/22 | 02/14/23 |
| Jun-2023 | 3 | 04/24/23 | 04/17/23 | 02/24/23 | 04/17/23 | 04/17/23 | 04/17/23 | 01/11/23 | 04/03/23 | 12/09/22 | 03/17/23 |
| Jul-2023 | 3 | 05/24/23 | 05/17/23 | 03/28/23 | 05/17/23 | 05/17/23 | 05/17/23 | 02/10/23 | 05/03/23 | 01/10/23 | 04/18/23 |
| Aug-2023 | 3 | 06/22/23 | 06/15/23 | 04/26/23 | 06/15/23 | 06/15/23 | 06/15/23 | 03/13/23 | 06/01/23 | 02/08/23 | 05/17/23 |
| Sep-2023 | 3 | 07/25/23 | 07/18/23 | 05/29/23 | 07/18/23 | 07/18/23 | 07/18/23 | 04/13/23 | 07/04/23 | 03/13/23 | 06/19/23 |
| Oct-2023 | 3 | 08/23/23 | 08/16/23 | 06/27/23 | 08/16/23 | 08/16/23 | 08/16/23 | 05/12/23 | 08/02/23 | 04/11/23 | 07/18/23 |
| Nov-2023 | 2 | 09/22/23 | 09/15/23 | 07/27/23 | 09/15/23 | 09/15/23 | 09/15/23 | 06/13/23 | 09/01/23 | 05/11/23 | 08/17/23 |
| Dec-2023 | 2 | 10/24/23 | 10/17/23 | 08/28/23 | 10/17/23 | 10/17/23 | 10/17/23 | 07/13/23 | 10/03/23 | 06/12/23 | 09/18/23 |

SWA-PA-03729-BFE1

**SA-7**

Page 3

**BOEING PROPRIETARY**

| Nominal Del Date | Aircraft Qty | Seats | Galley / Furnishings | Antennas & Mounting Equipment | Avionics | Cabin Systems Equipment | Misc. Emergency Equipment | Textiles / Raw Materials | Cargo Systems | Provision Kits | Radomes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-2024 | 4 | 11/22/23 | 11/15/23 | 09/26/23 | 11/15/23 | 11/15/23 | 11/15/23 | 08/11/23 | 11/01/23 | 07/11/23 | 10/17/23 |
| Feb-2024 | 4 | 12/25/23 | 12/18/23 | 10/27/23 | 12/18/23 | 12/18/23 | 12/18/23 | 09/13/23 | 12/04/23 | 08/11/23 | 11/17/23 |
| Mar-2024 | 4 | 01/23/24 | 01/16/24 | 11/27/23 | 01/16/24 | 01/16/24 | 01/16/24 | 10/12/23 | 01/02/24 | 09/11/23 | 12/18/23 |
| Apr-2024 | 4 | 02/21/24 | 02/14/24 | 12/26/23 | 02/14/24 | 02/14/24 | 02/14/24 | 11/10/23 | 01/31/24 | 10/10/23 | 01/16/24 |
| May-2024 | 4 | 03/22/24 | 03/15/24 | 01/25/24 | 03/15/24 | 03/15/24 | 03/15/24 | 12/12/23 | 03/01/24 | 11/09/23 | 02/15/24 |
| Jun-2024 | 3 | 04/24/24 | 04/17/24 | 02/27/24 | 04/17/24 | 04/17/24 | 04/17/24 | 01/12/24 | 04/03/24 | 12/12/23 | 03/19/24 |
| Jul-2024 | 3 | 05/22/24 | 05/15/24 | 03/26/24 | 05/15/24 | 05/15/24 | 05/15/24 | 02/09/24 | 05/01/24 | 01/09/24 | 04/16/24 |
| Aug-2024 | 3 | 06/24/24 | 06/17/24 | 04/26/24 | 06/17/24 | 06/17/24 | 06/17/24 | 03/13/24 | 06/03/24 | 02/09/24 | 05/17/24 |
| Sep-2024 | 3 | 07/24/24 | 07/17/24 | 05/28/24 | 07/17/24 | 07/17/24 | 07/17/24 | 04/12/24 | 07/03/24 | 03/12/24 | 06/18/24 |
| Oct-2024 | 3 | 08/22/24 | 08/15/24 | 06/26/24 | 08/15/24 | 08/15/24 | 08/15/24 | 05/13/24 | 08/01/24 | 04/10/24 | 07/17/24 |
| Nov-2024 | 3 | 09/24/24 | 09/17/24 | 07/29/24 | 09/17/24 | 09/17/24 | 09/17/24 | 06/13/24 | 09/03/24 | 05/13/24 | 08/19/24 |
| Dec-2024 | 3 | 10/23/24 | 10/16/24 | 08/27/24 | 10/16/24 | 10/16/24 | 10/16/24 | 07/12/24 | 10/02/24 | 06/11/24 | 09/17/24 |
| Jan-2025 | 4 | 11/22/24 | 11/15/24 | 09/26/24 | 11/15/24 | 11/15/24 | 11/15/24 | 08/13/24 | 11/01/24 | 07/11/24 | 10/17/24 |
| Feb-2025 | 4 | 12/25/24 | 12/18/24 | 10/29/24 | 12/18/24 | 12/18/24 | 12/18/24 | 09/13/24 | 12/04/24 | 08/13/24 | 11/19/24 |
| Mar-2025 | 4 | 01/22/25 | 01/15/25 | 11/26/24 | 01/15/25 | 01/15/25 | 01/15/25 | 10/11/24 | 01/01/25 | 09/10/24 | 12/17/24 |
| Apr-2025 | 4 | 02/20/25 | 02/13/25 | 12/25/24 | 02/13/25 | 02/13/25 | 02/13/25 | 11/11/24 | 01/30/25 | 10/09/24 | 01/15/25 |
| May-2025 | 3 | 03/24/25 | 03/17/25 | 01/24/25 | 03/17/25 | 03/17/25 | 03/17/25 | 12/11/24 | 03/03/25 | 11/08/24 | 02/14/25 |
| Jun-2025 | 3 | 04/23/25 | 04/16/25 | 02/25/25 | 04/16/25 | 04/16/25 | 04/16/25 | 01/10/25 | 04/02/25 | 12/10/24 | 03/18/25 |
| Jul-2025 | 3 | 05/22/25 | 05/15/25 | 03/26/25 | 05/15/25 | 05/15/25 | 05/15/25 | 02/10/25 | 05/01/25 | 01/08/25 | 04/16/25 |
| Aug-2025 | 3 | 06/24/25 | 06/17/25 | 04/28/25 | 06/17/25 | 06/17/25 | 06/17/25 | 03/13/25 | 06/03/25 | 02/10/25 | 05/19/25 |
| Sep-2025 | 3 | 07/23/25 | 07/16/25 | 05/27/25 | 07/16/25 | 07/16/25 | 07/16/25 | 04/11/25 | 07/02/25 | 03/11/25 | 06/17/25 |
| Oct-2025 | 3 | 08/22/25 | 08/15/25 | 06/26/25 | 08/15/25 | 08/15/25 | 08/15/25 | 05/13/25 | 08/01/25 | 04/10/25 | 07/17/25 |
| Nov-2025 | 3 | 09/24/25 | 09/17/25 | 07/29/25 | 09/17/25 | 09/17/25 | 09/17/25 | 06/13/25 | 09/03/25 | 05/13/25 | 08/19/25 |
| Dec-2025 | 3 | 10/22/25 | 10/15/25 | 08/26/25 | 10/15/25 | 10/15/25 | 10/15/25 | 07/11/25 | 10/01/25 | 06/10/25 | 09/16/25 |
| Total | 170 | | | | | | | | | | |

1.      Additional Delivery Requirements - Import.

Customer will be the "**importer of record**" (as defined by the U.S. Customs and Border Protection) for all BFE imported into the United States, and as such, it has the responsibility to ensure all of Customer's BFE shipments comply with U.S. Customs Service regulations. In the event Customer requests Boeing, in writing, to act as importer of record for Customer's BFE, and Boeing agrees to such request, Customer is responsible for ensuring Boeing can comply with all U.S. Customs Import Regulations by making certain that, at the time of shipment, all BFE shipments comply with the requirements in the "International Shipment Routing Instructions", including the Customs Trade Partnership Against Terrorism (**C-TPAT**), as set out on the Boeing website referenced below. Customer agrees to include the International Shipment Routing Instructions, including C-TPAT requirements, in each contract between Customer and BFE supplier.

http://www.boeing.com/companyoffices/doingbiz/supplier_portal/index_general.html

**SA-7**

SWA-PA-03729-BFE1

Page 4

**BOEING PROPRIETARY**

*BOEING*

The Boeing Company
P.O. Box 3707
Seattle, WA 981242207

SWA-PA-03729-LA-1400371


Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235


Subject:    737-8 Aircraft [***]

Reference:    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft (**Aircraft**)


This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement will have the same meaning as in the Purchase Agreement.

Boeing agrees to provide Customer with [***]


1.    <u>Assignment</u>.

Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer becoming the operator of the Aircraft and cannot be assigned in whole or in part.


2.    <u>Confidential Treatment</u>.

The information contained herein represents confidential business information and has value precisely because it is not available generally or to other parties. Customer will limit the disclosure of its contents to employees of Customer with a need to know the contents for purposes of helping Customer perform its obligations under the Purchase Agreement and who understand they are not to disclose its contents to any other person or entity without the prior written consent of Boeing.


SWA-PA-03729-LA-1409371
737-8 [***]                                                                LA Page 1
**BOEING PROPRIETARY**



Very truly yours,

THE BOEING COMPANY
By       /s/ Kyle Kersavage

Its      Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:        August 25, 2017

SOUTHWEST AIRLINES CO.

By       /s/ Chris Monroe
Chris Monroe
Its      SVP, Finance

SWA-PA-03729-LA-1409371
737-8 [***]                                                      LA Page 2

**BOEING PROPRIETARY**

Attachment to Letter Agreement
No. LA-1400371
LEAP-1B28 Engines
Page 1

**MODEL 737-8 [\*\*\*]**

**FOR SOUTHWEST AIRLINES CO.**

| SECTION | | CONTENTS |
|---------|--------|---------|
| 1 | [***] | |
| 2 | [***] | |
| 3 | [***] | |
| 4 | [***] | |
| 5 | [***] | |
| 6 | [***] | |

P.A. No. 03729
AERO-B-BBA4-M13-1194C                                                                    SS 15-0540

**BOEING PROPRIETARY**

Attachment to Letter Agreement
No. LA-1400371
LEAP-1B28 Engines
Page 2

**1   [\*\*\*]**

**2   [\*\*\*]**

P.A. No. 03729

AERO-B-BBA4-M13-1194C

SS 15-0540

**BOEING PROPRIETARY**

Attachment to Letter Agreement
No. LA-1400371
LEAP-1B28 Engines
Page 3

Attachment to Letter Agreement
No. LA-1400371
LEAP-1B28 Engines
Page 4

P.A. No. 03729
AERO-B-BBA4-M13-1194C                                                                    SS 15-0540

**BOEING PROPRIETARY**

Attachment to Letter Agreement
No. LA-1400371
LEAP-1B28 Engines
Page 5

P.A. No. 03729

AERO-B-BBA4-M13-1194C

SS 15-0540

**BOEING PROPRIETARY**

Attachment to Letter Agreement
No. LA-1400371
LEAP-1B28 Engines
Page 6

P.A. No. 03729
AERO-B-BBA4-M13-1194C

**BOEING PROPRIETARY**

SS 15-0540

Attachment to Letter Agreement
No. LA-1400371
LEAP-1B28 Engines
Page 7

Attachment to Letter Agreement
No. LA-1400371
LEAP-1B28 Engines
Page 8

Attachment to Letter Agreement
No. LA-1400371
LEAP-1B28 Engines
Page 9

Attachment to Letter Agreement
No. LA-1400371
LEAP-1B28 Engines
Page 10

P.A. No. 03729

**BOEING PROPRIETARY**

Attachment to Letter Agreement
No. LA-1400371
LEAP-1B28 Engines
Page 11

**3 [\*\*\*]**

**4 [\*\*\*]**

P.A. No. 03729

AERO-B-BBA4-M13-1194C

**BOEING PROPRIETARY**

SS 15-0540

Attachment to Letter Agreement
No. LA-1400371
LEAP-1B28 Engines
Page 12

**5** **[\*\*\*]**

Attachment to Letter Agreement
No. LA-1400371
LEAP-1B28 Engines
Page 13

**6   [***]**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1500831

Southwest Airlines Co.
2702 Love Field Drive
Dallas, Texas 75235

Attention:              Jon Stephens, Director - Fleet Transactions

Subject:                [***]

Reference:          A)       Purchase Agreement No. PA-03729 **(Purchase Agreement)** between The Boeing Company **(Boeing)** and Southwest Airlines Co. **(Customer)** relating to Model 737-8 aircraft **(Aircraft)**

                          B)       Master Change Proposal No. 4435E484D80 [***]

provided under correspondence letter no. 6-1131-CMM-LL0-16872, dated March 20, 2015 **(Activation MC)**

    This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement will have the same meaning as in the Purchase Agreement.

1.    [***]

2.    [***]

3.    Effectivity of the Activation MC.

    Notwithstanding the aircraft effectivity set forth in the Activation MC, upon written Customer request on or before January 1, 2016, Boeing will [***]

March 20, 2015
LA Page 1

**BOEING PROPRIETARY**



4.     Assignment.

       Unless otherwise noted herein, [***]
described in this Letter Agreement is provided [***] to
Customer and in consideration of Customer's [***]
becoming the operator of the Aircraft. This Letter Agreement cannot be assigned, in whole or in part, without the prior written consent of
Boeing.

5.     Confidentiality.

       Customer understands and agrees that the information contained herein represents confidential business information and has
value precisely because it is not available generally or to other parties. Customer agrees to limit the disclosure of its contents to
employees of Customer with a need to know the contents for purposes of helping Customer perform its obligations under the Purchase
Agreement and who understand they are not to disclose its contents to any other person or entity without the prior written consent of
Boeing. [***]

       This Letter Agreement is contingent upon the concurrent acceptance of the Activation MC. Please sign and return this offer on or
before March 23, 2015, the date on which this offer will otherwise expire.

Very truly yours,

THE BOEING COMPANY

By      /s/ Jon W. Lewis

Its     Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:      March 23, 2015

SOUTHWEST AIRLINES CO.

By      /s/ Jon Stephens

Its     Director Fleet Transactions

SWA-PA-03729-LA-1500831                                                                                    **March 20, 2015**
[***]                                                                                                      LA Page #

**BOEING PROPRIETARY**

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| | | | | | |
|---|---|---|---|---|---|
| **Airframe Model/MTOW:** | 737-8 | **181,200 pounds** | **Detail Specification:** | D019A007-NEW (11/4/2011) | **4Q16 External Fcst** |
| **Engine Model/Thrust:** CFMLEAP-1B28B1 | | **28,800 pounds** | **Airframe Price Base Year/Escalation Formula:** | Jul-11 | ECI-MFG/CPI |
| **Airframe Price:** | | [***] | **Engine Price Base Year/Escalation Formula:** | N/A | N/A |
| **Optional Features:** | | [***] | | | |
| **Sub-Total of Airframe and Features:** | | [***] | **Airframe Escalation Data:** | | |
| **Engine Price (Per Aircraft):** | | [***] | **Base Year Index (ECI):** | [***] | |
| **Aircraft Basic Price (Excluding BFE/SPE):** | | [***] | **Base Year Index (CPI):** | [***] | |
| **Buyer Furnished Equipment (BFE) Estimate:** | | [***] | | | |
| **Seller Purchased Equipment (SPE) Estimate:** | | [***] | | | |
| **Non-Refundable Deposit/Aircraft at Def Agreemt:** | | [***] | | | |

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Jul-2019 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2019 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2019 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2020 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2020 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2020 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2020 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2020 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2021 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jan-2021 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2021 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Mar-2021 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |

SWA-PA-03729-LA 1106474 106097-1O.TXT

BOEING PROPRIETARY

**Attachment 1 To**

**Letter Agreement No. LA 1106474**

**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Apr-2021 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Apr-2021 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2021 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| May-2021 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2021 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jul-2021 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2021 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Aug-2021 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Sep-2021 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2021 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Oct-2021 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2021 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Dec-2021 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jan-2022 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Feb-2022 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Mar-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| May-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jul-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |

SWA-PA-03729-LA 1106474 106097-1O.TXT

BOEING PROPRIETARY

**Attachment 1 To**

**Letter Agreement No. LA 1106474**

**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Aug-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Oct-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Nov-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Dec-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Dec-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jan-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Feb-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| May-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jul-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |

SWA-PA-03729-LA 1106474 106097-1O.TXT

**BOEING PROPRIETARY**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Sep-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Nov-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jan-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Feb-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Mar-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| May-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |

SWA-PA-03729-LA 1106474 106097-1O.TXT

BOEING PROPRIETARY

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Oct-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Dec-2024 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Dec-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |

SWA-PA-03729-LA 1106474 106097-1O.TXT **BOEING PROPRIETARY**

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Aug-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Dec-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2027 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |

Total:    195

* [***]



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106463R2

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    Open Matters

Reference:    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

Given the long period of time between Purchase Agreement signing and delivery of the first Aircraft and the continued development of the Aircraft program, certain elements have not yet been defined. In consideration, Boeing and Customer agree to work together as the Aircraft program develops as follows:

1.   Aircraft Delivery Schedule.

[***]

1.2    Customer and Boeing will consult on a frequent basis to keep each other informed as to Customer's fleet plans and Boeing's production plans in order to meet the requirements of both parties. Based on such review and discussions, Boeing will use its best commercially reasonable efforts to meet Customer's fleet needs.

SWA-PA-03729-LA-1106463R2                                                                 SA-7
Open Matters                                                                                        Page 1

**BOEING PROPRIETARY**



2.    Aircraft Configuration.

    2.1    Reserved.

    2.2    Model 737-7. The initial configuration of Customer's Model 737-7 Aircraft has not been defined. [***]



3.   Other Letter Agreements.

Boeing and Customer acknowledge that as they work together to develop the Aircraft program and as Boeing refines the definition of the Aircraft and associated production processes, there may be a need to execute additional letter agreements or amend letter agreements addressing one or more of the following:

3.1   Software. Additional provisions relating to software and software loading.

3.2    Seller Purchased Equipment (**SPE**) and/or In-Flight Entertainment (**IFE**). Provisions relating to the terms under which Boeing may offer or install SPE in the Aircraft.

3.3   Buyer Furnished Equipment (**BFE**) for 737-7. Provisions relating to the terms under which Boeing may install and certify Customer's BFE in the Aircraft.

4.   Confidentiality.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.



Very truly yours,

THE BOEING COMPANY

By    /s/ Kyle Kersavage

Its

         Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:    August 25 , 2017

SOUTHWEST AIRLINES CO.

By    /s/ Chris Monroe

Its    Chris Monroe
      SVP, Finance

SWA-PA-03729-LA-1106463R2                                          SA-7
Open Matters                                                      Page 4
**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

**29 September 2017**
6-1162-KLK-0059**R3**

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:                      [***]

References:              (a) Purchase Agreement No. 03729 (**MAX Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co.
(**Customer**) relating to Model 737-8 and 737-7 (**MAX Aircraft**)

(b) Purchase Agreement No. PA-1810 (**NG Purchase Agreement,** and together with the **MAX Purchase Agreement,** the **Purchase Agreement**) between Boeing and Customer relating to Model 737-7H4 and 737-8H4 aircraft (**NG Aircraft,** and together with the **MAX Aircraft,** the **Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreements. All terms used but not defined in this Letter Agreement shall have the same meaning as in the respective referenced Purchase Agreements.

1.      [***]

2.      [***]

**BOEING PROPRIETARY**



3.    <u>Confidentiality</u>.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation.

Regards,

THE BOEING COMPANY

/s/ Kyle Kersavage

Kyle Kersavage
Regional Director
Boeing Commercial Airplanes, Contracts


ACCEPTED AND AGREED TO this

DATE: _September 29, 2017_____


SOUTHWEST AIRLINES CO.

By__/s/ Chris Monroe_____
Chris Monroe
Its___SVP, Finance_____


Letter Agreement No. 6-1162-KLK-0059R2
[***]

**BOEING PROPRIETARY**

**Attachment A To**
**Letter Agreement No. 6-1162-KLK-0059R1**
**[***]**


**Table 1**

| [***] | | |
|---|---|---|
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| | | [***] |


**Table 2**

| [***] | | |
|---|---|---|
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| [***] | [***] | [***] |
| | [***] | [***] |


Letter Agreement No. 6-1162-KLK-0059R2
[***]

**BOEING PROPRIETARY**

**SUPPLEMENTAL AGREEMENT NO. 8**

**to**

**Purchase Agreement No. 03729**

**between**

**THE BOEING COMPANY**

**and**

**SOUTHWEST AIRLINES CO.**

**Relating to Boeing Model 737-8 and 737-7 Aircraft**

THIS SUPPLEMENTAL AGREEMENT No. 8 (**SA-8**), entered into as of December 20, 2017, is made between THE BOEING COMPANY, a Delaware corporation (**Boeing**), and SOUTHWEST AIRLINES CO., a Texas corporation (**Customer**).

RECITALS:

WHEREAS, Customer and Boeing entered into Purchase Agreement Number PA-03729 dated December 13, 2011, as amended and supplemented, (**Purchase Agreement**) relating to the purchase and sale of Boeing Model 737-8 (**737-8 Aircraft**) and Model 737-7 aircraft (**737-7 Aircraft**); collectively the "**Aircraft**". This SA8 is an amendment to and is incorporated into the Purchase Agreement. Capitalized terms used herein but not otherwise defined will have the meaning set forth in the Purchase Agreement.

WHEREAS, Customer has elected to exercise its right to purchase forty (40) option aircraft, and to accelerate the scheduled deliveries of certain 737-8 Aircraft, all as identified in Table 1A, Aircraft Delivery, Description, Price, and Advance Payments 737-8 Aircraft, attached hereto.

WHEREAS, Boeing and Customer agree to reschedule the deliveries of certain 737-7 Aircraft as identified in Table 1B, Aircraft Delivery, Description, Price, and Advance Payments 737-7 Aircraft, attached hereto.

WHEREAS, Boeing and Customer agree to amend the Purchase Agreement to include [***] exercised option aircraft [***]

in LA-1106475R3,

[***]            attached hereto.

WHEREAS, Boeing and Customer agree to amend the Purchase Agreement to make certain changes to the Letter Agreement entitled [***] in LA-1106467R1.

WHEREAS, Boeing and Customer agree to amend the Purchase Agreement to incorporate a package of configuration options and master changes previously accepted by Customer for 737-7 Aircraft, in accordance with LA-1106463R3, paragraph 2, Open Matters.

WHEREAS, Boeing and Customer agree to amend the Purchase Agreement to revise Supplemental Exhibit BFE2 to reflect the selection dates and on dock dates of BFE for the 737-7 Aircraft, in accordance with LA-1106463R3, paragraph 3, Open Matters.

NOW, THEREFORE, the parties agree that the Purchase Agreement is amended as set forth below and otherwise agree as follows:

1. TABLE OF CONTENTS.

The Table of Contents of the Purchase Agreement is deleted in its entirety and replaced with a new Table of Contents (attached), which lists the Tables, Exhibits, and Letter Agreements revised by this SA8 and is identified by "SA8". Such revised Table of Contents is incorporated into the Purchase Agreement by this reference.

1. TABLES.

Table 1A, Aircraft Delivery, Description, Price and Advance Payments – 737-8 Aircraft, is deleted in its entirety and replaced by a new Table 1A (identified by "SA-8") attached hereto and incorporated into the Purchase Agreement by this reference.

Table 1B, Aircraft Delivery, Description, Price and Advance Payments – 737-7 Aircraft, is deleted in its entirety and replaced by a new Table 1B (identified by "SA-8") attached hereto and incorporated into the Purchase Agreement by this reference.

1. EXHIBITS.

3.1. Exhibit A1, 737-8 Aircraft Configuration, is deleted in its entirety and replaced by the updated Exhibit A1 attached hereto and incorporated into the Purchase Agreement by this reference.

3.2. Exhibit A2, 737-7 Aircraft Configuration, is deleted in its entirety and replaced by the updated Exhibit A2 attached hereto and incorporated into the Purchase Agreement by this reference.

3.3. Exhibit BFE2, Buyer Furnished Equipment Variables, is added to and incorporated into the Purchase Agreement by this reference.

4. LETTER AGREEMENTS.

4.1. Letter Agreement SWA-PA-03729-LA-1106463R2, <u>Open Matters</u>, is deleted in its entirety and is replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1106463R3.

4.2. Letter Agreement SWA-PA-03729-LA 1106467R1, [***] is deleted in its entirety and is replaced with the attached revised Letter Agreement SWA-PA-03729-LA 1106467R2.

4.3. Letter Agreement SWA-PA-03729-LA-1106474R1, <u>Option Aircraft</u>, and its Attachment 1 are deleted in their entirety and are replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1106474R2 and its Attachment 1.

4.4. Letter Agreement SWA-PA-03729-LA-1106475R2, [***] is deleted in its entirety and is replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1106475R3.

4.5. Letter Agreement SWA-PA-03729-LA-1106476R1, [***]

4.6. is deleted in its entirety and is replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1106476R2.

4.7. Letter Agreement SWA-PA-03729-LA-1106484, [***] and its Attachments A and B are deleted in their entirety and are replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1106484R1 and its Attachments A and B.

4.8. Letter Agreement SWA-PA-03729-LA-1301170R1,[***] is deleted in its entirety and is replaced with the attached revised Letter Agreement SWA-PA-03729-LA-1301170R2.

5. <u>ADVANCE PAYMENT IMPACTS</u>.

[***]

6. <u>IMPACTS TO PREVIOUSLY DELIVERED AIRCRAFT.</u>

6.1. In accordance with Letter Agreement SWA-PA-03729-LA-1106475R3.
[***]

6.2. In consideration of Boeing and Customer entering into an agreement to exercise (40) 737-8 options, [***]

7.  <u>SA-8 PAYMENT.</u>

[***]

The Purchase Agreement is deemed to be supplemented to the extent herein provided and as so supplemented will continue in full force and effect.

EXECUTED IN DUPLICATE as of the day and year first above written.

THE BOEING COMPANY                              SOUTHWEST AIRLINES CO.

By: /s/ Kyle Kersavage                          By: /s/ Chris Monroe

Its: Attorney-In-Fact                           Its: Chris Monroe
                                                SVP, Finance

SWA-PA-3729                           5                              SA-8

**BOEING PROPRIETARY**

**TABLE OF CONTENTS**

| **ARTICLES** | **TITLES** | |
|---|---|---|
| Article 1 | Quantity, Model and Description | SA-2 |
| Article 2 | Delivery Schedule | |
| Article 3 | Price | |
| Article 4 | Payment | SA-2 |
| Article 5 | Additional Terms | |
| **TABLE** | **TITLE** | |
| **1A** | **737-8 Aircraft Information Table** | **SA-8** |
| **1B** | **737-7 Aircraft Information Table** | **SA-8** |
| EXHIBIT | | |
| **A1** | **737-8 Aircraft Configuration** | **SA-8** |
| **A2** | **737-7 Aircraft Configuration** | **SA-8** |
| B* | Aircraft Delivery Requirements and Responsibilities | |
| **SUPPLEMENTAL EXHIBITS** | **TITLES** | |
| AE1* | Escalation Adjustment/Airframe and Optional Features | |
| BFE1 | BFE Variables for 737-8 | SA-7 |
| **BFE2** | **BFE Variables for 737-7** | **SA-8** |
| CS1 | Customer Support Variables | |
| CS1-7MAX | Customer Support Variables | SA-2 |
| EE1* | Engine Escalation/Engine Warranty and Patent Indemnity | |
| SLP1* | Service Life Policy Components | |
| **LETTER AGREEMENTS** | **TITLES** | |
| **SWA-PA-03729-LA-1106463R3** | **Open Matters** | **SA-8** |

SWA-PA-03729

SA-8
Page 1

**BOEING PROPRIETARY**

| LETTER AGREEMENTS | TITLES | |
|---|---|---|
| SWA-PA-03729-LA-1106464* | [***] | |
| SWA-PA-03729-LA-1106465* | [***] | |
| SWA-PA-03729-LA-1106466 | [***] | |
| **SWA-PA-03729-LA-1106467R2** | [***] | **SA-8** |
| SWA-PA-03729-LA-1106468* | [***] | |
| SWA-PA-03729-LA-1106469R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106470R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106471R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106473R1 | [***] | SA-5 |
| **SWA-PA-03729-LA-1106474R2** | **Option Aircraft** | **SA-8** |
| | **Attachment 1** | **SA-8** |
| **SWA-PA-03729-LA-1106475R3** | [***] | **SA-8** |
| **SWA-PA-03729-LA-1106476R2** | [***] | **SA-8** |
| SWA-PA-03729-LA-1106477* | [***] | |
| SWA-PA-03729-LA-1106478 | [***] | |
| SWA-PA-03729-LA-1106479R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106480R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106481R2 | [***] | SA-2 |
| SWA-PA-03729-LA-1106482* | [***] | |
| SWA-PA-03729-LA-1106483* | [***] | |
| **SWA-PA-03729-LA-1106484R1** | [***] | **SA-8** |
| | Attachment A | **SA-8** |
| | Attachment B | **SA-8** |
| SWA-PA-03729-LA-1106485* | [***] | |
| SWA-PA-03729-LA-1209080 | [***] | SA-1 |

**BOEING PROPRIETARY**

| **LETTER AGREEMENTS** | **TITLES** | |
|---|---|---|
| SWA-PA-03729-LA-1210419 | [***] | |
| | [***] | SA-1 |
| SWA-PA-03729-LA-1300943 | [***] | SA-2 |
| SWA-PA-03729-LA-1301168R3 | [***] | SA-6 |
| **SWA-PA-03729-LA-1301170R2** | [***] | **SA-8** |
| SWA-PA-03729-LA-1400371 | [***] | SA-7 |
| SASWA-PA-03729-LA-1503792 | [***] | SA-6 |
| SWA-PA-03729-LA-1500831 | [***] | |
| | [***] | SA-7 |
| SWAPA03729LA1602486 | [***] | SA-5 |

* Denotes revision to Page 1 or Page 2 only to reference 737-7 (SA-2)

SWA-PA-03729                                                                SA-8
                                                                            Page 3
**BOEING PROPRIETARY**

**INACTIVE / DELETED TABLES, EXHIBITS, AND LETTER AGREEMENTS**

RESTRICTED LETTER AGREEMENTS

| Letter Agreement | Title | Last Updated under SA | Current Status |
|---|---|---|---|
| SWA-PA-03729-LA-1106472R1 | [***] | SA-2 | Deleted under SA-4 |
| SWA-PA-01810/03729-LA-1301169 | [***] | SA-2 | Deleted under SA-4 |

SWA-PA-03729                                                                                                SA-8
                                                                                                            Page 4
**BOEING PROPRIETARY**

**Table 1A To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| | | | |
|---|---|---|---|
| Airframe Model/MTOW: | 737-8 | 181,200 pounds | Detail Specification: | D019A008-P (5/1/2017) |
| Engine Model/Thrust: | CFMLEAP-1B28 | 28,800 pounds | Airframe Price Base Year/Escalation Formula: | Jul-11  ECI-MFG/CPI |
| Airframe Price: | | [***] | Engine Price Base Year/Escalation Formula: | N/A  N/A |
| Optional Features: | | [***] | | |
| Sub-Total of Airframe and Features: | | [***] | Airframe Escalation Data: | |
| Engine Price (Per Aircraft): | | [***] | Base Year Index (ECI): | [***] |
| Aircraft Basic Price (Excluding BFE/SPE): | | [***] | Base Year Index (CPI): | [***] |
| Buyer Furnished Equipment (BFE) Estimate: | | [***] | | |
| Seller Purchased Equipment (SPE) Estimate: | | [***] | | |

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Jul-2017 | 1 | [***] | 36929† | [***] | A | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Jul-2017 | 2 | [***] | 42558†, 42559† | [***] | C | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Aug-2017 | 3 | [***] | 36979, 36930, 36984 | [***] | A | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Aug-2017 | 3 | [***] | 42563, 42566†, 42567 | [***] | C | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Sep-2017 | 1 | [***] | 36934 | [***] | A | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Oct-2017 | 1 | [***] | 42544 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Oct-2017 | 1 | [***] | 42570 | [***] | C | | [***] | [***] | [***] | [***] | [***] |
| Nov-2017 | 1 | [***] | 36988† | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Dec-2017 | 1 | [***] | 42554† | [***] | C | | [***] | [***] | [***] | [***] | [***] |
| Mar-2018 | 1 | [***] | 36989† | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Mar-2018 | 1 | [***] | 42571 | [***] | C | | [***] | [***] | [***] | [***] | [***] |
| Apr-2018 | 1 | [***] | 42546 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Jun-2018 | 1 | [***] | 42572 | [***] | C | | [***] | [***] | [***] | [***] | [***] |
| Jun-2018 | 1 | [***] | 42547 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Jul-2018 | 1 | [***] | 42556† | [***] | C | | [***] | [***] | [***] | [***] | [***] |
| Aug-2018 | 3 | [***] | 42548, 37019, 42549 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Aug-2018 | 1 | [***] | 42574 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2018 | 3 | [***] | 42575, 42573, 42576 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2019 | 1 | [***] | 42577 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2019 | 1 | [***] | 37042 | [***] | A | | [***] | [***] | [***] | [***] | [***] |

Table 1A To
Purchase Agreement No. PA-03729
Aircraft Delivery, Description, Price and Advance Payments
737-8 Aircraft

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Jul-2019 | 1 | [***] | 42550 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Jul-2019 | 2 | [***] | 65437, 65436 | [***] | E OPEX | | [***] | [***] | [***] | [***] | [***] |
| Sep-2019 | 2 | [***] | 65471, 65438 | [***] | E OPEX | | [***] | [***] | [***] | [***] | [***] |
| Oct-2019 | 2 | [***] | 42551, 37043 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Oct-2019 | 1 | [***] | 65439 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Oct-2019 | 1 | [***] | 65440 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Nov-2019 | 1 | [***] | 42536 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Nov-2019 | 1 | [***] | 65473 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Dec-2019 | 1 | [***] | 36722 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Dec-2019 | 1 | [***] | 42537 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Feb-2020 | 1 | [***] | 36727 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Mar-2020 | 2 | [***] | 42579, 42580 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2020 | 1 | [***] | 42539 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Apr-2020 | 1 | [***] | 65441 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| May-2020 | 1 | [***] | 42553 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| May-2020 | 1 | [***] | 35970 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Jun-2020 | 1 | [***] | 42607 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2020 | 1 | [***] | 65442 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jul-2020 | 1 | [***] | 42540 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Jul-2020 | 2 | [***] | 65443, 65444 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Aug-2020 | 1 | [***] | 42541 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Aug-2020 | 2 | [***] | 65445, 65446 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Sep-2020 | 1 | [***] | 33941 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Sep-2020 | 3 | [***] | 65447, 65448, 65472 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Oct-2020 | 1 | [***] | 42615 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2020 | 1 | [***] | 42543 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Oct-2020 | 1 | [***] | 65474 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Nov-2020 | 1 | [***] | 36733 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Nov-2020 | 1 | [***] | 65475 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Dec-2020 | 1 | [***] | 33940 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Jan- | 1 | [***] | | | | | [***] | [***] | [***] | [***] | [***] |

SWA-PA-03729 **107813**.1F. TXT        **BOEING PROPRIETARY**        SA-8
Page 2

SWA-PA-03729 **107813**.1F. TXT        **BOEING PROPRIETARY**        SA-8
Page 2

**Table 1A To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-2021 | 1 | [***] | 65450 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jan-2021 | 1 | [***] | 65449 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Feb-2021 | 1 | [***] | 65451 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Mar-2021 | 1 | [***] | 42648 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2021 | 1 | [***] | 65452 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Apr-2021 | 3 | [***] | 42649, 42650, 42651 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2021 | 1 | [***] | 65454 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Apr-2021 | 1 | [***] | 65453 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| May-2021 | 3 | [***] | 42652, 42653, 42654 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| May-2021 | 1 | [***] | 65455 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| May-2021 | 1 | [***] | 65456 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jun-2021 | 3 | [***] | 42655, 42656, 42670 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2021 | 1 | [***] | 65457 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jul-2021 | 3 | [***] | 42657, 42658, 42671 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2021 | 1 | [***] | 65460 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jul-2021 | 2 | [***] | 65459, 65458 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Aug-2021 | 1 | [***] | 65461 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Sep-2021 | 2 | [***] | 65463, 65462 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Oct-2021 | 1 | [***] | 65466 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Oct-2021 | 2 | [***] | 65465, 65464 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Nov-2021 | 1 | [***] | 65467 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Dec-2021 | 1 | [***] | 65468 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jan-2022 | 1 | [***] | 65469 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jan-2022 | 1 | [***] | 65470 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Mar-2022 | 2 | [***] | 42678, 42679 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2022 | 3 | [***] | 42680, 42681, 42688 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| May-2022 | 3 | [***] | 42682, 42683, 42684 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2022 | 3 | [***] | 42685, 42686, 42687 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2022 | 2 | [***] | 42689, 42690 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2022 | 2 | [***] | 42693, 42695 | [***] | | | [***] | [***] | [***] | [***] | [***] |

Jan-2023    2    42560, 42565

SWA-PA-03729 **107813**.1F. TXT          **BOEING PROPRIETARY**          SA-8
Page 3

Jan-2023    2    42560, 42565

SWA-PA-03729 **107813**.1F. TXT          **BOEING PROPRIETARY**          SA-8
Page 3

Table 1A To
Purchase Agreement No. PA-03729
Aircraft Delivery, Description, Price and Advance Payments
737-8 Aircraft

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Feb-2023 | 2 | [***] | 42562, 42564 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | 42557 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | 36732 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | 42555 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | 38806 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| May-2023 | 2 | [***] | 42594, 42568 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 1 | [***] | 42581 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 1 | [***] | 37034 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Jul-2023 | 2 | [***] | 42597, 42582 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 1 | [***] | 42593 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 1 | [***] | 42552 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | 2 | [***] | 42601, 42578 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 1 | [***] | 42605 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 1 | [***] | 42538 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Nov-2023 | 1 | [***] | 38815 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 1 | [***] | 42583 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2024 | 3 | [***] | 42611, 42584, 42585 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2024 | 3 | [***] | 42612, 42596, 42599 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2024 | 3 | [***] | 38817, 35968, 35972 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 2 | [***] | 42617, 42606 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 1 | [***] | 36736 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| May-2024 | 3 | [***] | 42619, 42622, 42608 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | 42610 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | 42542 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Jul-2024 | 2 | [***] | 35963, 35967 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | 2 | [***] | 42624, 42626 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | 1 | [***] | 42630 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | 1 | [***] | 36730 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Oct-2024 | 2 | [***] | 42625, 42636 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | 1 | [***] | | [***] | | | [***] | [***] | [***] | [***] | [***] |

| Nov-2024 | 1 | [***] | | [***] | | | [***] | [***] | [***] | [***] | [***] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 35971 | | B | | | | | | |

SWA-PA-03729 **107813**.1F. TXT       **BOEING PROPRIETARY**

**Table 1A To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Dec-2024 | 2 | [***] | 42628, 42640 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2024 | 1 | [***] | 35975 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Jan-2025 | 2 | [***] | 42633, 42634 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2025 | 2 | [***] | 38804, 38805 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Feb-2025 | 3 | [***] | 42637, 42641, 42643 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2025 | 1 | [***] | 36729 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Mar-2025 | 4 | [***] | 42644, 42645, 42646, 42647 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2025 | 4 | [***] | 42659, 42660, 42661, 42662 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| May-2025 | 3 | [***] | 42663, 42664, 42666 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2025 | 3 | [***] | 42665, 42667, 42669 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2025 | 3 | [***] | 42668, 42672, 42673 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2025 | 3 | [***] | 42674, 42675, 42691 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2025 | 3 | [***] | 42676, 42677, 42694 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2025 | 3 | [***] | 42692, 42696, 42697 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2025 | 3 | [***] | 42698, 42699, 42700 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2025 | 3 | [***] | 42701, 42702, 42703 | [***] | | | [***] | [***] | [***] | [***] | [***] |

Total:    **210**

* [***]
** Manufacturer Serial Numbers (MSN) are for reference only and are subject to change.
† [***]
Notes:
1)[***]
2)[***]

**Table 1B To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-7 Aircraft**

| | | |
|---|---|---|
| **Airframe Model/MTOW:** | 737-7    177,000 pounds | **Detail Specification:**    D019A008SWA17P-1 |
| **Engine Model/Thrust:** | CFMLEAP-1B27C(1)    26,400 pounds | **Airframe Price Base Year/Escalation Formula:**    Jul-11    ECI-MFG/CPI |
| **Airframe Price:** | [***] | **Engine Price Base Year/Escalation Formula**    N/A    N/A |
| **Optional Features:** | [***] | |
| **Sub-Total of Airframe and Features:** | [***] | **Airframe Escalation Data:** |
| **Engine Price (Per Aircraft):** | [***] | **Base Year Index (ECI):**    [***] |
| **Aircraft Basic Price (Excluding BFE/SPE):** | [***] | **Base Year Index (CPI):**    [***] |
| **Buyer Furnished Equipment (BFE) Estimate:** | [***] | |
| **Seller Purchased Equipment (SPE) Estimate:** | [***] | |

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | | Escalation Factor | Escalation Estimate Adv Payment Base Price Per A/P | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2019 | 3 | [***] | | [***] | [***] | [***] | [***] | [***] | [***] |
| May-2019 | 2 | [***] | | [***] | [***] | [***] | [***] | [***] | [***] |
| Aug-2019 | 2 | [***] | | [***] | [***] | [***] | [***] | [***] | [***] |
| Jan-2023 | 1 | [***] | | [***] | [***] | [***] | [***] | [***] | [***] |
| Feb-2023 | 1 | [***] | | [***] | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | | [***] | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | | [***] | [***] | [***] | [***] | [***] | [***] |
| May-2023 | 1 | [***] | | [***] | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 1 | [***] | | [***] | [***] | [***] | [***] | [***] | [***] |
| Jul-2023 | 1 | [***] | | [***] | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 1 | [***] | | [***] | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | 1 | [***] | | [***] | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 1 | [***] | | [***] | [***] | [***] | [***] | [***] | [***] |
| Nov-2023 | 1 | [***] | | [***] | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 1 | [***] | | [***] | [***] | [***] | [***] | [***] | [***] |

**Table 1B To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-7 Aircraft**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | | Escalation Factor | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing | 24 Mos. | 21/18/12/9/6 Mos. | Total |
| | | | | | | [***] | [***] | [***] | [***] |
| Jan-2024 | 1 | [***] | | [***] | [***] | [***] | [***] | [***] | [***] |
| Feb-2024 | 1 | [***] | | [***] | [***] | [***] | [***] | [***] | [***] |
| Mar-2024 | 1 | [***] | | [***] | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 1 | [***] | | [***] | [***] | [***] | [***] | [***] | [***] |
| May-2024 | 1 | [***] | | [***] | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | | [***] | [***] | [***] | [***] | [***] | [***] |
| Jul-2024 | 1 | [***] | | [***] | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | 1 | [***] | | [***] | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | 1 | [***] | | [***] | [***] | [***] | [***] | [***] | [***] |
| Oct-2024 | 1 | [***] | | [***] | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | 1 | [***] | | [***] | [***] | [***] | [***] | [***] | [***] |

Total:     **30**

* [***]

Notes:
[***]

# 737-8 AIRCRAFT CONFIGURATION

## between

## THE BOEING COMPANY

## and

## SOUTHWEST AIRLINES CO.

## Exhibit A1 to Purchase Agreement Number PA-03729

**BOEING PROPRIETARY**

**Exhibit A1**
**737-8 AIRCRAFT CONFIGURATION**
**Dated December 13, 2011**
**relating to**
**BOEING MODEL 737-8 AIRCRAFT**


The Detail Specification is Boeing document number D019A008SWA18P-1, revision NEW, released on June 30, 2017. The Detail Specification provides further description of Customer's configuration set forth in this Exhibit A1. Such Detail Specification will be comprised of Boeing configuration specification D019A008, Revision O, dated September 30, 2016 as amended to incorporate the optional features (**Options**) listed below, including the effects on Manufacturer's Empty Weight (**MEW**) and Operating Empty Weight (**OEW**). As soon as practicable, Boeing will furnish to Customer copies of the Detail Specification, which copies will reflect such Options. The Aircraft Basic Price reflects and includes all effects of such Options, except such Aircraft Basic Price does not include the price effects of any Buyer Furnished Equipment or Seller Purchased Equipment.


PA-03729                                                                                                    SA-8
Page A1-2

**BOEING PROPRIETARY**

| CR | Title | 2011 $ A/P 1 - 4 Price Per A/C | 2011 $ A/P 5 - 8 Price Per A/C | 2011 $ A/P 9 & on Price Per A/C |
|---|---|---|---|---|
| 0110-000030 | MAJOR MODEL 737 AIRPLANE | [***] | [***] | [***] |
| 0110E131A08 | MINOR MODEL 737-8 AIRPLANE | [***] | [***] | [***] |
| 0170B401A73 | CLIMATE - NORMAL WEATHER OPERATIONS | [***] | [***] | [***] |
| 0170B871A31 | GALLEY AFT COMPLEX - G4B GALLEY - DOMED AFT BULKHEAD (BASELINE) | [***] | [***] | [***] |
| 0170C204A96 | CARGO LINERS- HEAVY DUTY - FORWARD | [***] | [***] | [***] |
| 0170C204A99 | CARGO LINERS- HEAVY DUTY- AFT | [***] | [***] | [***] |
| 0170C430H07 | PC - FLIGHT DECK - ROLLER SUNSHADES - DELETION - NUMBER 2 AND 3 WINDOWS - FLIGHT DECK - SFE | [***] | [***] | [***] |
| 0170C939A02 | COMMUNICATIONS - BASIC COMMUNICATIONS CONFIGURATION WITH HF | [***] | [***] | [***] |
| 0170D347B33 | LAVATORY AFT COMPLEX - TWO ADVANCED LAVATORIES WITH TWO DOUBLE ATTENDANT SEATS | [***] | [***] | [***] |
| 0170D360B56 | PC - LAVATORY AFT COMPLEX - TWO LAVATORIES WITH TWO DOUBLE ATTENDANT SEATS, NO CURTAIN AND UNIQUE HANDSET FACEPLATE DISPLAY - BOEING SKY INTERIOR | [***] | [***] | [***] |
| 0170D387A08 | AVIONICS - DUAL FMC WITH MULTI-CONTROL DISPLAY UNIT | [***] | [***] | [***] |
| 0170D837A13 | FLEXIBLE CERTIFICATION | [***] | [***] | [***] |
| 0170E173B00 | FLIGHT DECK - TWO OBSERVERS | [***] | [***] | [***] |
| 0170E656A04 | AIRFRAME - 737-8 | [***] | [***] | [***] |
| 0220E684A09 | TYPE CERTIFICATE & CERTIFICATE OF AIRWORTHINESS | [***] | [***] | [***] |
| 0221A609B52 | DISPATCH WITH GEAR EXTENDED FOR REVENUE FLIGHT | [***] | [***] | [***] |
| 0221B463A04 | MP-CERT. OF TAKEOFF & LANDING WITH 15 KNOT TAILWIND | [***] | [***] | [***] |
| 0221E029A02 | SKID-RESISTANT RUNWAY TAKEOFF WITH ANTISKID SYSTEM INOPERATIVE | [***] | [***] | [***] |
| 0222E052A08 | SHORT FIELD PERFORMANCE ENHANCEMENT: INSTALLATION OF TWO POSITION TAIL SKID | [***] | [***] | [***] |
| 0226B694H86 | MP - GNSS LANDING SYSTEM (GLS) - CATEGORY I APPROACH CAPABILITY - ACTIVATION - IN LIEU OF PARTIAL PROVISIONS | [***] | [***] | [***] |
| 0226C594A28 | GNSS LANDING SYSTEM (GLS) - CATEGORY I APPROACH CAPABILITY- PARTIAL PROVISIONS | [***] | [***] | [***] |
| 0226E437D67 | MP- GNSS LANDING SYSTEM (GLS) - CHANGE INCORP- CATEGORY I APPROACH CAPABILITY - ACTIVATION - IN LIEU OF PARTIAL PROVISIONS | [***] | [***] | [***] |
| 0228E437A74 | AIRPLANE FLIGHT MANUAL | [***] | [***] | [***] |
| 0252A541A02 | ENGLISH UNITS FOR FLIGHT AND OPERATIONS MANUALS, CDS INDICATIONS, AND FMCS PARAMETERS - CELSIUS TEMPERATURE | [***] | [***] | [***] |

BOEING PROPRIETARY

| CR | Title | 2011 $ A/P 1 - 4 Price Per A/C | 2011 $ A/P 5 - 8 Price Per A/C | 2011 $ A/P 9 & on Price Per A/C |
|---|---|---|---|---|
| 0254-000003 | USPHS CERTIFICATE OF SANITARY CONSTRUCTION | [***] | [***] | [***] |
| 0315E684A03 | CERTIFIED OPERATIONAL WEIGHTS AND STRUCTURAL DESIGN WEIGHTS | [***] | [***] | [***] |
| 1110E559D06 | EXTERIOR NON-REGULATORY MARKINGS | [***] | [***] | [***] |
| 1110E624B44 | EXTERIOR REGULATORY MARKINGS AND COLOR SCHEME | [***] | [***] | [***] |
| 1130E559D12 | CARGO COMPARTMENT PLACARDS | [***] | [***] | [***] |
| 1130E559D13 | LIGHTED SIGNS - BI-LINGUAL SPANISH/ENGLISH | [***] | [***] | [***] |
| 1130E559D15 | INTERIOR PLACARDS AND MARKERS - 737 BOEING SKY INTERIOR | [***] | [***] | [***] |
| 2103E437E01 | MP - AC HEAT EXCHANGER OUTLET TEMPERATURE MONITORING SENSOR - INSTALLATION | [***] | [***] | [***] |
| 2103E437E14 | MP - AC HEAT EXCHANGER OUTLET TEMPERATURE MONITORING SENSOR - CHANGE INCORP - INSTALLATION | [***] | [***] | [***] |
| 2130-000010 | 600 FPM CABIN PRESSURE ASCENT RATE | [***] | [***] | [***] |
| 2130-000015 | 750 FPM CABIN PRESSURE DESCENT RATE | [***] | [***] | [***] |
| 2160-000025 | CABIN TEMPERATURE INDICATION - DEGREES FAHRENHEIT | [***] | [***] | [***] |
| 2170-000021 | OZONE CONTROL - SPACE PROVISIONS FOR CATALYTIC CONVERTERS | [***] | [***] | [***] |
| 2210-000003 | AUTOFLIGHT - INHIBIT GLIDE SLOPE CAPTURE PRIOR TO LOCALIZER CAPTURE | [***] | [***] | [***] |
| 2210-000123 | AUTOFLIGHT - FLIGHT DIRECTOR TAKEOFF MODE WINGS LEVEL | [***] | [***] | [***] |
| 2210-000128 | AUTOFLIGHT - CONTROL WHEEL STEERING WARNING | [***] | [***] | [***] |
| 2210-000142 | AUTOFLIGHT - ALTITUDE ALERT - 300/900 FEET | [***] | [***] | [***] |
| 2210C175A38 | AUTOFLIGHT - GO-AROUND ROLL MODE - LNAV | [***] | [***] | [***] |
| 2230-000137 | AUTOTHROTTLE - FMCS - TAKEOFF PROFILE THRUST REDUCTION ALTITUDE | [***] | [***] | [***] |
| 2310C410A91 | COMMUNICATIONS CONTROL PANELS - DUAL GABLES RADIO TUNING PANELS CAPABLE OF (2) HF SYSTEMS AND (3) VHF SYSTEMS (8.33 KHZ CAPABLE) - P/N G7404-124 - BFE/SPE | [***] | [***] | [***] |
| 2312A639A46 | VHF COMMUNICATIONS - ACTIVATION OF KEYLINE TIMER | [***] | [***] | [***] |
| 2312E173A49 | VHF COMMUNICATIONS - TRIPLE HONEYWELL ARINC 750 RTA-50D VHF FM IMMUNE TRANSCEIVERS WITH 8.33 KHZ CHANNEL SPACING, VDL MODE 2, AND CMC INTERFACE CAPABILITY - P/N 965-1696-021 - BFE/SPE | [***] | [***] | [***] |

**BOEING PROPRIETARY**

| CR | Title | 2011 $ A/P 1 - 4 Price Per A/C | 2011 $ A/P 5 - 8 Price Per A/C | 2011 $ A/P 9 & on Price Per A/C |
|---|---|---|---|---|
| 2315E706A59 | MP - SATCOM - INSTALLATION OF PARTIAL WIRING AND MOUNTING PROVISIONS - ICG MODEL ICS-300 IRIDIUM SATCOM SYSTEM WITH A SINGLE TOP MOUNTED DUAL ELEMENT IRIDIUM ANTENNA | [***] | [***] | [***] |
| 2321-000050 | SELCAL - AVTECH FIVE CHANNEL DECODER - P/N 1200008-000 - BFE/SPE | [***] | [***] | [***] |
| 2321-000063 | SELCAL - ANNUNCIATION ON AUDIO SELECTOR PANELS | [***] | [***] | [***] |
| 2322C939A05 | CMU - INSTALLATION OF PARTIAL PROVISIONS FOR A SINGLE CMU IN ACCORDANCE WITH ARINC 758 | [***] | [***] | [***] |
| 2322C939A06 | COMMUNICATIONS MANAGEMENT UNIT (CMU) - DATA LINK RECORDING ACTIVATION | [***] | [***] | [***] |
| 2322E437D59 | MP - CMU - INSTALLATION OF WIRING PROVISIONS BETWEEN THE ONBOARD NETWORK SYSTEM (ONS) AND THE COMMUNICATION MANAGEMENT UNIT PROVISIONS | [***] | [***] | [***] |
| 2322E516A03 | CMU - INSTALLATION OF HONEYWELL MARK II ARINC 758 LEVEL AOA CMU W/ARINC SERVICE PROVIDER - DATA LINK RECORDING CAPABLE - P/N 965-0758-006 - BFE / SPE | [***] | [***] | [***] |
| 2324D197A18 | EMERGENCY LOCATOR TRANSMITTER (ELT) - ACR ELECTRONICS AUTOMATIC FIXED - WITH NAVIGATION INTERFACE UNIT (NIU) - MODE S BROADCAST - WITH ANTENNA P/N 110-337 - BFE/SPE | [***] | [***] | [***] |
| 2331B754B15 | PASSENGER ADDRESS (PA) SYSTEM - ARINC 715 - ROCKWELL COLLINS AMPLIFIER - BFE/SPE | [***] | [***] | [***] |
| 2331E097A10 | PRAM/BMM SYSTEM - PANASONIC - FASTEN SEAT BELT/DECOMPRESSION DISCRETES ACTIVATED - BFE/SPE | [***] | [***] | [***] |
| 2350A150D50 | AUDIO INTEGRATING - INHIBIT AURAL ALERT TRANSMISSIONS THROUGH CAPTAIN, FIRST OFFICER'S AND FIRST OBSERVER'S HEADPHONES | [***] | [***] | [***] |
| 2350B872A08 | AUDIO CONTROL PANEL - INTEGRATED SELCAL, CREW CALL, AND SATCOM FUNCTIONS - INSTALLATION - 3 VHF/2 HF | [***] | [***] | [***] |
| 2351-000042 | CONTROL WHEEL PUSH TO TALK (PTT) SWITCH - STANDARD THREE POSITION | [***] | [***] | [***] |
| 2351A213A33 | AUDIO INTEGRATION - INSTALLATION - TWO-PLUG AUDIO JACKS IN THE FLIGHT DECK | [***] | [***] | [***] |

**BOEING PROPRIETARY**

| CR | Title | 2011 $ A/P 1 - 4 Price Per A/C | 2011 $ A/P 5 - 8 Price Per A/C | 2011 $ A/P 9 & on Price Per A/C |
|---|---|---|---|---|
| 2351A213B77 | BOOM MICROPHONE HEADSETS - CAPTAIN AND FIRST OFFICER - TELEX AIRMAN 750 - P/N 64300-200 - BFE/SPE | [***] | [***] | [***] |
| 2351D360C80 | PASSENGER CABIN MEDICAL COMMUNICATIONS SYSTEM - BOEING SKY INTERIOR | [***] | [***] | [***] |
| 2371B628B32 | VOICE RECORDER AND MICROPHONE/MONITOR - HONEYWELL - 2 HOUR RECORDING TIME - WITH DATALINK RECORDING CAPABILITY - P/N 980-6032-001 & P/N 980-6116-001 - BFE/SPE | [***] | [***] | [***] |
| 2371B628B41 | VOICE RECORDER - RECORDER INDEPENDENT POWER SUPPLY (RIPS) - AFT LOWERED CEILING | [***] | [***] | [***] |
| 2371E437C25 | MP - VOICE RECORDER - REPLACEMENT - VOICE RECORDER WITH 90 DAY BATTERY IN LIEU OF VOICE RECORDER WITH 30 DAY BATTERY - HONEYWELL INTERNATIONAL INC - BFE | [***] | [***] | [***] |
| 2451B750A96 | GALLEY G2 POWER - 17.25 KVA - COMPLETE PROVISIONS | [***] | [***] | [***] |
| 2451B815K32 | POWER DISTRIBUTION - WIRING INSTALLATION FOR ADDITIONAL CAPACITY | [***] | [***] | [***] |
| 2451D360M03 | MP - MOD STD SEL - GALLEY G4B POWER - REVISION - 12 KVA INSTALLATION AND PROVISIONS FOR 17.25 KVA IN LIEU OF COMPLETE INSTALLATION | [***] | [***] | [***] |
| 2451E447B64 | GALLEY G1 & G7 POWER - 12 KVA | [***] | [***] | [***] |
| 2454E484B59 | IN-SEAT POWER OUTLETS - INSTALLATION - FULL CABIN WITH 59 USB POWER SUPPLIES AND 175 HIGH POWER USB OUTLETS - ASTRONICS AES - BFE/SPE | [***] | [***] | [***] |
| 2454E484C79 | MP - IN-SEAT POWER OUTLETS - DELETION - FULL CABIN WITH 59 USB POWER SUPPLIES AND 175 HIGH POWER USB OUTLETS - ASTRONICS AES - BFE | [***] | [***] | [***] |
| 2500E559K65 | MP - CLOSET - REPLACEMENT - FWD RH FULL HEIGHT CLOSET IN LIEU OF FULL HEIGHT/HALF HEIGHT G2 GALLEY - STA 325 - 343 - ENCORE - BFE | [***] | [***] | [***] |
| 2500E559K83 | MP - INTERIOR ARRANGEMENT - REVISION - DETACHABLE EMERGENCY EQUIPMENT - BFE | [***] | [***] | [***] |
| 2500E559M56 | MP - MOD STD SEL - CABIN INTERPHONE SYSTEMS - ATTENDANT HANDSETS WITH UNIQUE FACEPLATE | [***] | [***] | [***] |
| 2500E559R44 | MP - INTERIOR ARRANGEMENT - REVISION - ADDITION OF SLIDE-OUT STOWAGE IN LAVS D & E AND REVISION TO EMERGENCY EQUIPMENT | [***] | [***] | [***] |

| CR | Title | 2011 $ A/P 1 - 4 Price Per A/C | 2011 $ A/P 5 - 8 Price Per A/C | 2011 $ A/P 9 & on Price Per A/C |
|---|---|---|---|---|
| 2500E559Y62 | MP - NON-CERTIFIED FLYAWAY KIT - ADDITION - FIRST AID KIT BRACKET | [***] | [***] | [***] |
| 2513C410C22 | FLIGHT COMPARTMENT ACCOMMODATIONS - EMERGENCY EVACUATION CHECKLIST PLACARD ON THE CAPTAIN AND FIRST OFFICER'S CONTROL COLUMNS | [***] | [***] | [***] |
| 2513E437A99 | LOG BOOK HOLDER - INSTALLATION - ON AFT FACE OF P8 AISLESTAND | [***] | [***] | [***] |
| 2514E559T12 | MP - SIDEWALL LINING AND AIR RETURN GRILLE - REVISION - ENHANCED FASTENING PROVISIONS | [***] | [***] | [***] |
| 2520E559D17 | INTERIOR COLOR AND MATERIAL - STANDARD OFFERING | [***] | [***] | [***] |
| 2520E559L37 | MP - PASSENGER COMPARTMENT - REVISION - DECORATIVE LAMINATE - FORWARD MONUMENTS | [***] | [***] | [***] |
| 2523E559E42 | PASSENGER SERVICE UNITS - 737 BOEING SKY INTERIOR | [***] | [***] | [***] |
| 2525A627A07 | DOUBLE ATTENDANT SEAT - WALL MOUNTED - STA 304 | [***] | [***] | [***] |
| 2525C204F39 | LARGE LOWER STOWAGE BOX FOR DOUBLE ATTENDANT SEAT - STA 304 LH | [***] | [***] | [***] |
| 2525C204F40 | LARGE LOWER STOWAGE BOX FOR DOUBLE ATTENDANT SEAT - STA 949 LH | [***] | [***] | [***] |
| 2525C204F41 | LARGE LOWER STOWAGE BOX FOR DOUBLE ATTENDANT SEAT - STA 949 RH | [***] | [***] | [***] |
| 2525C204K04 | HIC AND FEMUR LOAD COMPLIANCE - ECONOMY CLASS SEATS | [***] | [***] | [***] |
| 2525C204K05 | HIC AND FEMUR LOAD COMPLIANCE - ATTENDANT SEATS | [***] | [***] | [***] |
| 2525E559D22 | ECONOMY CLASS SEATS - BFE/SPE | [***] | [***] | [***] |
| 2527E559H50 | FLOOR COVERING - CARPET - BFE/SPE | [***] | [***] | [***] |
| 2527E559H51 | FLOOR COVERING - GALLEY AND ENTRYWAY FLOOR MAT - BFE/SPE | [***] | [***] | [***] |
| 2528C204J16 | FORWARD CENTER OVERHEAD STOWAGE COMPARTMENT - PROVISIONED FOR PALLETIZED EQUIPMENT AND LIFE RAFTS - 737 BOEING SKY INTERIOR | [***] | [***] | [***] |
| 2528C204J18 | SECOND FORWARD CENTER OVERHEAD STOWAGE COMPARTMENT - PROVISIONED FOR PALLETIZED EQUIPMENT AND LIFE RAFTS - 737 BOEING SKY INTERIOR | [***] | [***] | [***] |
| 2528C204J20 | FIRST MID CABIN CENTER OVERHEAD STOWAGE COMPARTMENT - PROVISIONED FOR PALLETIZED EQUIPMENT AND LIFE RAFTS - 737 BOEING SKY INTERIOR | [***] | [***] | [***] |

BOEING PROPRIETARY

| CR | Title | 2011 $ A/P 1 - 4 Price Per A/C | 2011 $ A/P 5 - 8 Price Per A/C | 2011 $ A/P 9 & on Price Per A/C |
|---|---|---|---|---|
| 2528C204J22 | SECOND MID-CABIN CENTER OVERHEAD STOWAGE COMPARTMENT - PROVISIONED FOR PALLETIZED EQUIPMENT AND LIFE RAFTS - 737 BOEING SKY INTERIOR | [***] | [***] | [***] |
| 2528E559D23 | LITERATURE POCKETS | [***] | [***] | [***] |
| 2528E559D24 | OVERHEAD STOWAGE BINS - ADDITIONAL FEATURES - 737 BOEING SKY INTERIOR | [***] | [***] | [***] |
| 2529D360B52 | FORWARD ATTENDANT WORKSTATION - PANEL & HANDSET - UNIQUE FACEPLATE DISPLAY | [***] | [***] | [***] |
| 2530D383A11 | G1 GALLEY - AFT STATION 297 - BFE/SPE | [***] | [***] | [***] |
| 2530E559D10 | GALLEY G2 - STA 325-343 - BFE/SPE | [***] | [***] | [***] |
| 2530E559D27 | G7 GALLEY - AFT OF DOOR 1, LEFT - AFT STA 374 - BFE/SPE | [***] | [***] | [***] |
| 2530E559D29 | GALLEY INSERT PART NUMBERS - BFE/SPE | [***] | [***] | [***] |
| 2530E559K27 | MP - GALLEY - REVISION - G1 GALLEY AFT STA 293 IN LIEU OF STA 297 | [***] | [***] | [***] |
| 2530E624B45 | GALLEY PART NUMBERS - STANDARD EFFORT - BFE/SPE | [***] | [***] | [***] |
| 2530E624B63 | GALLEY CHILLER - AFT G4B GALLEY - PROVISIONS | [***] | [***] | [***] |
| 2540D347A92 | LA ADVANCED LAVATORY | [***] | [***] | [***] |
| 2540E559D31 | LA ADVANCED LAVATORY SELECTABLES | [***] | [***] | [***] |
| 2540E559D32 | LD ADVANCED LAVATORY SELECTABLES | [***] | [***] | [***] |
| 2540E559D33 | LE ADVANCED LAVATORY SELECTABLES | [***] | [***] | [***] |
| 2540E559N20 | MP - LAVATORIES - REVISION - LAVS D AND E - NON-SPACEWALL IN LIEU OF SPACEWALL | [***] | [***] | [***] |
| 2560-000269 | CREW LIFE VEST STOWAGE - FLIGHT DECK, SECOND OBSERVER - CAPTAIN'S SEAT BACK | [***] | [***] | [***] |
| 2560C410D09 | CREW LIFE VESTS - FLIGHT DECK, WITH SECOND OBSERVER - EASTERN AERO MARINE INC - P/N P01202-301C - BFE/SPE | [***] | [***] | [***] |
| 2562E559E21 | OVERWATER EMERGENCY EQUIPMENT - BFE/SPE - 737 BOEING SKY INTERIOR | [***] | [***] | [***] |
| 2562E559K34 | MP - OVERWATER EMERGENCY EQUIPMENT - DELETION - LIFE RAFTS - EASTERN AERO MARINE - BFE | [***] | [***] | [***] |
| 2562E559U37 | MP - OVERWATER EMERGENCY EQUIPMENT - REPLACEMENT - PASSENGER LIFE VEST - EASTERN AERO MARINE INC - BFE | [***] | [***] | [***] |
| 2564E559D98 | DETACHABLE EMERGENCY EQUIPMENT - PASSENGER | [***] | [***] | [***] |

**BOEING PROPRIETARY**

| CR | Title | 2011 $ A/P 1 - 4 Price Per A/C | 2011 $ A/P 5 - 8 Price Per A/C | 2011 $ A/P 9 & on Price Per A/C |
|---|---|---|---|---|
|  | COMPARTMENT - BFE/SPE - 737 BOEING SKY INTERIOR | [***] | [***] | [***] |
| 2564E559X35 | MP - DETACHABLE EMERGENCY EQUIPMENT - PASSENGER COMPARTMENT - DELETION - FIRST AID KIT - MINE SAFETY APPLIANCES CO - BFE | [***] | [***] | [***] |
| 2622E088A14 | APU FIRE EXTINGUISHER BOTTLE - COMMON WITH ENGINE BOTTLES | [***] | [***] | [***] |
| 2841-000004 | STANDARD FUEL SYSTEM ACCURACY - NO FUEL DENSITOMETERS | [***] | [***] | [***] |
| 2841-000012 | FUEL QUANTITY INDICATORS ON RIGHT WING FUELING PANEL | [***] | [***] | [***] |
| 2844-000019 | FUEL MEASURING STICKS IN LINEAR UNITS WITH CONVERSION TABLES IN U.S. GALLONS | [***] | [***] | [***] |
| 2911-000042 | ENGINE-DRIVEN HYDRAULIC PUMPS WITH VESPEL SPLINE - EATON (VICKERS) - 10-62167 | [***] | [***] | [***] |
| 2911-000044 | AC MOTOR-DRIVEN HYDRAULIC PUMPS - EATON (VICKERS) - 10-60556 | [***] | [***] | [***] |
| 2911E684D00 | MP - AC MOTOR DRIVEN HYDRAULIC PUMPS - INSTALL TWO PARKER (ABEX) IN LIEU OF TWO EATON (VICKERS) - SFE | [***] | [***] | [***] |
| 3041-000003 | NO HEATED FLIGHT COMPARTMENT NUMBER 3 WINDOW | [***] | [***] | [***] |
| 3131-000143 | ACCELEROMETER - HONEYWELL P/N 971-4193-001 - BFE/SPE | [***] | [***] | [***] |
| 3131B628B16 | DIGITAL FLIGHT DATA RECORDER (DFDR) - HONEYWELL - 1024 WORDS PER SECOND MAXIMUM DATA RATE - P/N 980-4750-009 - BFE/SPE | [***] | [***] | [***] |
| 3131E103A15 | DIGITAL FLIGHT DATA ACQUISITION UNIT (DFDAU) - CATIIIB/IAN/GLS/NPS CAPABLE - WITH ACMS CAPABILITY - ONS - SFE | [***] | [***] | [***] |
| 3131E437C26 | MP - FLIGHT DATA RECORDER SYSTEM - REPLACEMENT - FLIGHT DATA RECORDER WITH 90 DAY BATTERY IN LIEU OF FLIGHT DATA RECORDER WITH 30 DAY BATTERY - HONEYWELL INTERNATIONAL INC - BFE | [***] | [***] | [***] |
| 3132E437D35 | MP - ARINC 615 PORTABLE DATA LOADER CONNECTOR - INSTALLATION - FLIGHT DECK - P61-4 MAINTENANCE BITE PANEL | [***] | [***] | [***] |
| 3133-000123 | ARINC 740 PRINTER PROVISIONS IN THE FLIGHT DECK AISLESTAND | [***] | [***] | [***] |
| 3135E437D40 | MP - ONBOARD NETWORK SYSTEM - QUICK ACCESS RECORDER - DAR OUTPUT 23300 | [***] | [***] | [***] |
| 3161-000133 | ENGINE FUEL FLOW - FULL TIME DISPLAY - PRIMARY ENGINE DISPLAY UNIT | [***] | [***] | [***] |

**BOEING PROPRIETARY**

| CR | Title | 2011 $ A/P 1 - 4 Price Per A/C | 2011 $ A/P 5 - 8 Price Per A/C | 2011 $ A/P 9 & on Price Per A/C |
|---|---|---|---|---|
| 3161C175A22 | ENGINE OIL QUANTITY DISPLAY - PERCENT - ENGINE DISPLAY | [***] | [***] | [***] |
| 3162-000018 | ATTITUDE COMPARATOR - FLASHING - ADI | [***] | [***] | [***] |
| 3162-000022 | FLIGHT DIRECTOR COMMAND DISPLAY - SPLIT AXIS - ADI | [***] | [***] | [***] |
| 3162-000028 | RADIO ALTITUDE - BELOW ADI | [***] | [***] | [***] |
| 3162-000030 | RISING RUNWAY - DISPLAYED ON THE ADI | [***] | [***] | [***] |
| 3162-000036 | LANDING ALTITUDE REFERENCE BAR - PRIMARY FLIGHT DISPLAY | [***] | [***] | [***] |
| 3162-000040 | BARO MINIMUMS POINTER - DISPLAYED ON SELECTION OF RADIO ALTITUDE MINIMUMS - PRIMARY FLIGHT DISPLAY | [***] | [***] | [***] |
| 3162-000044 | TCAS RESOLUTION ADVISORY - VSI | [***] | [***] | [***] |
| 3162-000051 | ILS LOCALIZER DEVIATION EXPANDED SCALE - AUTOPILOT OR FLIGHT DIRECTOR MODE | [***] | [***] | [***] |
| 3162-000059 | MAP MODE ORIENTATION - TRACK UP - NAVIGATION DISPLAY | [***] | [***] | [***] |
| 3162-000064 | RANGE ARCS - NAVIGATION DISPLAY | [***] | [***] | [***] |
| 3162-000079 | MANUALLY TUNED VOR SELECTED COURSE LINES DISPLAYED - NAVIGATION DISPLAY | [***] | [***] | [***] |
| 3162-000084 | TCAS 3 NM RANGE RING - NAVIGATION DISPLAY | [***] | [***] | [***] |
| 3162-000088 | AIRSPEED BUG - ENABLED - 80 KNOT SETTING - MACH AIRSPEED INDICATOR | [***] | [***] | [***] |
| 3162A627A36 | CDS - SOFTWARE ACTIVATION - VNAV SPEED BANDS - ENABLE | [***] | [***] | [***] |
| 3162C594A29 | CDS - SOFTWARE ACTIVATION - NAVIGATION PERFORMANCE SCALES - ENABLE | [***] | [***] | [***] |
| 3162E437C95 | MP - FLIGHT AND NAVIGATION DISPLAYS - LANDING SYS ELECTRONIC PLACARD WORKSHEET - AUXILIARY DISPLAY | [***] | [***] | [***] |
| 3244-000008 | SERVICE INTERPHONE CONNECTOR - EXTERNAL POWER PANEL | [***] | [***] | [***] |
| 3245B290A77 | WHEELS AND TIRES - NOSE LANDING GEAR - WHEELS - GOODRICH - INSTALLATION WITH SFE 12 PR, 235 MPH RATED RADIAL TIRES | [***] | [***] | [***] |
| 3245B290A92 | BRAKES - CARBON - GOODRICH | [***] | [***] | [***] |
| 3245C927A08 | WHEELS AND TIRES - MAIN LANDING GEAR - WHEELS FOR CARBON BRAKES - GOODRICH - INSTALLATION WITH 30-PR, 235 MPH RADIAL TIRES | [***] | [***] | [***] |
| 3321C869A65 | PASSENGER CABIN LIGHTING - SINGLE-ZONE CONTROL - 737 BOEING SKY INTERIOR | [***] | [***] | [***] |

**BOEING PROPRIETARY**

| CR | Title | 2011 $ A/P 1 - 4 Price Per A/C | 2011 $ A/P 5 - 8 Price Per A/C | 2011 $ A/P 9 & on Price Per A/C |
|---|---|---|---|---|
| 3324C195A04 | NO SMOKING SIGN - SILK SCREENED SYMBOL AND RETAIN CHIME FUNCTION | [***] | [***] | [***] |
| 3327D380B90 | GALLEY LIGHTS - 28 VDC POWER - GALLEY G7 / CLOSET | [***] | [***] | [***] |
| 3327E559L81 | MP - GALLEY LIGHTS - 28 VDC POWER - DELETION - GALLEY G7 / CLOSET | [***] | [***] | [***] |
| 3350E097A38 | EMERGENCY ESCAPE PATH LIGHTING - FLOOR MOUNTED - NARROW COLOR PHOTOLUMINESCENT | [***] | [***] | [***] |
| 3412-000022 | DUAL ELEMENT NON-ASPIRATED TAT PROBE | [***] | [***] | [***] |
| 3430B866A28 | ILS/GPS MULTI-MODE RECEIVER (MMR) - HONEYWELL - P/N 066-50029-1201 - BFE/SPE | [***] | [***] | [***] |
| 3430E437D65 | MP - MULTI-MODE RECEIVER (MMR) AND VOR/MARKER BEACON - REPLACEMENT - HONEYWELL 3G MMR P/N 69002600-0101 IN LIEU OF EXISTING HONEYWELL MMR P/N 066-50029-1201 AND HONEYWELL VOR/MARKER BEACON P/N 69001410-100 - BFE | [***] | [***] | [***] |
| 3430E437D69 | MP - MULTI-MODE RECEIVER (MMR) AND VOR/MARKER BEACON - CHANGE INCORP - REPLACEMENT - HONEYWELL 3G MMR P/N 69002600-0101 IN LIEU OF EXISTING HONEYWELL MMR P/N 066-50029-1201 AND HONEYWELL VOR/MARKER BEACON P/N 69001410-100 - BFE | [***] | [***] | [***] |
| 3431C175A06 | NAVIGATION CONTROL PANEL (NCP) - GNSS LANDING SYSTEM (GLS) CAPABLE - GABLES - P/N G7501-01- BFE/SPE | [***] | [***] | [***] |
| 3433C594A98 | LOW RANGE RADIO ALTIMETER (LRRA) - CAT IIIB CAPABLE - HONEYWELL - P/N 066-50007-0531- BFE/SPE | [***] | [***] | [***] |
| 3436E640B45 | MP - HEAD UP DISPLAY (HUD) SYSTEM - INSTALLATION - SINGLE ROCKWELL COLLINS HEAD-UP GUIDANCE SYSTEM (HGS) MODEL 6000 WITH MCDU INTERFACE - STC CERTIFIED - BFE | [***] | [***] | [***] |
| 3443B696L73 | SINGLE WEATHER RADAR SYSTEM CONTROL PANEL - HONEYWELL RDR-4000 RADAR SYSTEM - P/N 930-5101-001 - BFE/SPE | [***] | [***] | [***] |
| 3443E032A44 | SINGLE WEATHER RADAR SYSTEM - WITH PREDICTIVE WINDSHEAR - HONEYWELL RDR-4000, VERSION 2 TRANSCEIVER - 930-2000-001 - BFE/SPE | [***] | [***] | [***] |
| 3445C594B01 | TCAS SYSTEM - HONEYWELL TCAS COMPUTER P/N 940-0351-001 - TCAS CHANGE 7.1 COMPLIANT - BFE/SPE | [***] | [***] | [***] |

**BOEING PROPRIETARY**

| CR | Title | 2011 $ A/P 1 - 4 Price Per A/C | 2011 $ A/P 5 - 8 Price Per A/C | 2011 $ A/P 9 & on Price Per A/C |
|---|---|---|---|---|
| 3446-000046 | LOW VOLUME FOR ALTITUDE CALLOUTS | [***] | [***] | [***] |
| 3446-000049 | 500 SMART CALLOUT INHIBITED | [***] | [***] | [***] |
| 3446-000057 | GROUND PROXIMITY WARNING SYSTEM ALTITUDE CALLOUTS - 100, 50, 30, 10 | [***] | [***] | [***] |
| 3446C174A14 | ENHANCED GROUND PROXIMITY WARNING SYSTEM (EGPWS) - BANK ANGLE CALLOUT (VARIABLE CALLOUT BELOW 130 FT) - ENABLE | [***] | [***] | [***] |
| 3451E097A30 | VOR/MARKER BEACON - HONEYWELL RECEIVER P/N 69001410-100 - BFE/SPE | [***] | [***] | [***] |
| 3453E052A56 | ATC SYSTEM - HONEYWELL INTERNATIONAL INC ATC TRANSPONDER P/N 066-01212-0301 - ADS-B OUT DO-260B COMPLIANT - HONEYWELL INTERNATIONAL INC CONTROL PANEL P/N 071-01503-2601 - BFE/SPE | [***] | [***] | [***] |
| 3455D338A05 | DISTANCE MEASURING EQUIPMENT (DME) SCANNING INTERROGATOR- HONEYWELL P/N 066-50013-0111 - BFE/SPE | [***] | [***] | [***] |
| 3461A150B73 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - ENGINE-OUT STANDARD INSTRUMENT DEPARTURES (SID'S) - ENABLE | [***] | [***] | [***] |
| 3461A425A10 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - NAVIGATION DATABASE - CUSTOMER SUPPLIED | [***] | [***] | [***] |
| 3461A425A17 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - AIRLINE OPERATIONAL COMMUNICATION DATA LINK (AOC DL) - FEATURE ACTIVATION | [***] | [***] | [***] |
| 3461A425A30 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS)- ABEAM WAYPOINTS- ENABLE | [***] | [***] | [***] |
| 3461A425A48 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - ACTIVATE COLOR OPERATION | [***] | [***] | [***] |
| 3461A890A76 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - NAVIGATION DISPLAY - MISSED APPROACH IN CYAN UNTIL ACTIVE - ENABLE | [***] | [***] | [***] |
| 3461B430C49 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - REQUIRED NAVIGATION PERFORMANCE (RNP) DEFAULT VALUE CHANGE | [***] | [***] | [***] |
| 3461B696E14 | MP - FMCE - ADDITIONAL CONTROL DISPLAY UNIT FIX PAGES - ENABLE | [***] | [***] | [***] |
| 3461B696K97 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - VERTICAL RNP DEFAULT VALUE - REVISION | [***] | [***] | [***] |

**BOEING PROPRIETARY**

| CR | Title | 2011 $ A/P 1 - 4 Price Per A/C | 2011 $ A/P 5 - 8 Price Per A/C | 2011 $ A/P 9 & on Price Per A/C |
|---|---|---|---|---|
| 3461C175A11 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - AIR TRAFFIC SERVICES DATA LINK (ATS DL) - FANS FEATURE ACTIVATION | [***] | [***] | [***] |
| 3461C175A14 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - FANS CAPABLE MCDU WITH ATC KEYBOARD - INSTALLATION-SFE | [***] | [***] | [***] |
| 3461C175A32 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - COMMON VNAV - ENABLE | [***] | [***] | [***] |
| 3461C175A34 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - SPEED PROPAGATION FROM THE CRUISE PAGE TO THE DESCENT PAGE - ENABLE | [***] | [***] | [***] |
| 3461C430J05 | FLIGHT MANAGEMENT COMPUTING SYSTEM (FMCS) - VOR INHIBIT | [***] | [***] | [***] |
| 3461C594A26 | FLIGHT MANAGEMENT COMPUTING SYSTEM (FMCS) - INTENT DATA TRANSMITTED TO ACARS - ENABLE | [***] | [***] | [***] |
| 3511B873B93 | CREW OXYGEN MASK - FULL FACE MASK WITH BUILT-IN SMOKE GOGGLES - SECOND OBSERVER - AV-OX INC - BFE/SPE | [***] | [***] | [***] |
| 3511B873B94 | CREW OXYGEN MASK - FULL FACE MASK WITH BUILT-IN SMOKE GOGGLES - FIRST OBSERVER - AV-OX INC - BFE/SPE | [***] | [***] | [***] |
| 3511B873B95 | CREW OXYGEN MASKS - FULL FACE MASK WITH BUILT-IN SMOKE GOGGLES - CAPTAIN AND FIRST OFFICER - AV-OX INC - BFE/SPE | [***] | [***] | [***] |
| 3811-000017 | POTABLE WATER - SERVICEABLE TO 40 GALLONS | [***] | [***] | [***] |
| 3812-000002 | NO WATER QUANTITY GAUGE - WATER SERVICE PANEL | [***] | [***] | [***] |
| 3832-000076 | NO SENSOR FOULED LIGHT - COVER PLATE | [***] | [***] | [***] |
| 3832-000078 | NO WASTE QUANTITY GAUGE - COVER PLATE | [***] | [***] | [***] |
| 3910E437A86 | AFT ELECTRONICS PANEL ARRANGEMENT WITH TWO RADIO TUNING PANELS AND ARINC 740 PRINTER PROVISIONS | [***] | [***] | [***] |
| 4435E484C78 | MP - HIGH SPEED COMMUNICATION - STRUCTURAL PROVISIONS - KU BAND RADOME INSTALLATION - 737 BOEING SKY INTERIOR 159200 | [***] | [***] | [***] |
| 4435E484D01 | MP - HIGH SPEED COMMUNICATION - PARTIAL PROVISIONS - GLOBAL EAGLE ENTERTAINMENT CABIN NETWORK SYSTEM WITH KU BAND CONNECTIVITY - THREE WIRELESS ACCESS POINTS (WAP) - 737 BOEING SKY INTERIOR | [***] | [***] | [***] |

**BOEING PROPRIETARY**

| CR | Title | 2011 $ A/P 1 - 4 Price Per A/C | 2011 $ A/P 5 - 8 Price Per A/C | 2011 $ A/P 9 & on Price Per A/C |
|---|---|---|---|---|
| 4435E484D80 | MP - HIGH-SPEED COMMUNICATIONS - INSTALLATION INTO PARTIAL PROVISIONS - WIRELESS CABIN NETWORK WITH 3 CWLU'S AND KU BAND CONNECTIVITY - GLOBAL EAGLE ENTERTAINMENT - CSE/SPE | [***] | [***] | [***] |
| 4435E484H13 | MP - HIGH SPEED COMMUNICATION - REPLACEMENT - TRI-BAND RADOME IN LIEU OF KU BAND RADOME | [***] | [***] | [***] |
| 4435E484H15 | MP - HIGH SPEED COMMUNICATION - CHANGE INCORP - REPLACEMENT - TRI-BAND RADOME IN LIEU OF KU BAND RADOME | [***] | [***] | [***] |
| 4610E437C72 | MP - GROUND BASED CONNECTIVITY - INSTALLATION - AIRCRAFT WIRELESS LAN UNIT CELLULAR - TELEDYNE CONTROLS - BFE | [***] | [***] | [***] |
| 4610E437E26 | MP - ONBOARD NETWORK SYSTEM - ACTIVATION OF ONS-ACARS CMU INTERFACE | [***] | [***] | [***] |
| 4610E437E28 | MP - ONBOARD NETWORK SYSTEM - CHANGE INCORP - ACTIVATION OF ONS-ACARS CMU INTERFACE | [***] | [***] | [***] |
| 4610E839A41 | MP - ONBOARD NETWORK SYSTEM - REPLACEMENT - AIRCRAFT WIRELESS LAN UNIT - CELLULAR AND WIFI IN LIEU OF CELLULAR GROUND BASED CONNECTIVITY ONLY - TELEDYNE CONTROLS - BFE | [***] | [***] | [***] |
| 5231A561C54 | CARGO DOOR - SOLID SKIN | [***] | [***] | [***] |
| 5300-000027 | UNDERSEAT FLOOR PANELS, LOW TRAFFIC CAPABILITY | [***] | [***] | [***] |
| 5352A298A28 | RADOME- NORDAM- SFE | [***] | [***] | [***] |
| 7200D422A12 | CFM LEAP-1B ENGINES - 1B28B1 RATING | [***] | [***] | [***] |
| 7200E430E27 | MP - CFM LEAP -1B ENGINES - CHANGE INCORP - REVISION - 1B28 RATING IN LIEU OF 1B28B1 RATING | [***] | [***] | [***] |
| 7200E684E22 | MP - CFM LEAP -1B ENGINES - REVISION - 1B28 RATING IN LIEU OF 1B28B1 RATING | [***] | [***] | [***] |
| MISC THRUST | SIDE LETTER PRICING | [***] | [***] | [***] |
| 7900-000116 | LUBRICATING OIL - MOBIL JET II | [***] | [***] | [***] |
| MISC | INTERIOR ALLOWANCE | [***] | [***] | [***] |
| | **TOTALS:** | [***] | [***] | [***] |

# 737-7 AIRCRAFT CONFIGURATION

## between

## THE BOEING COMPANY

## and

## Southwest Airlines Co.

## Exhibit A2 to Purchase Agreement Number PA-03729

SWA-PA-03729-EXA2 **SA-8**
Page 1

**BOEING PROPRIETARY**

**Exhibit A2**
**AIRCRAFT CONFIGURATION**
**Dated November 13, 2017**
**relating to**
**BOEING MODEL 737-7 AIRCRAFT**

The Detail Specification is Boeing document number D019A008SWA17P-1, revision NEW, to be released on or about April 1, 2019. The Detail Specification provides further description of Customer's configuration set forth in this Exhibit A2. Such Detail Specification will be comprised of Boeing configuration specification D019A008, Revision P, dated May 1, 2017 as amended to incorporate the optional features (**Options**) listed below, including the effects on Manufacturer's Empty Weight (**MEW**) and Operating Empty Weight (**OEW**). As soon as practicable, Boeing will furnish to Customer copies of the Detail Specification, which copies will reflect such Options. The Aircraft Basic Price reflects and includes all effects of such Options, except such Aircraft Basic Price does not include the price effects of any Buyer Furnished Equipment or Seller Purchased Equipment.

SWA-PA-03729-EXA2                                                                                               **SA-8**
                                                                                                                          Page 2
                                                    **BOEING PROPRIETARY**

| | Exhibit A To | |
|---|---|---|
| | **Boeing Purchase Agreement** | |
| | | **Price** |
| **CR** | **Title** | **Per A/C $** |
| 0110-000030 | MAJOR MODEL 737 AIRPLANE | [***] |
| 0110E911A01 | MINOR MODEL 737-7150 AIRPLANE | [***] |
| 0170B401A73 | CLIMATE - NORMAL WEATHER OPERATIONS | [***] |
| 0170B871A31 | GALLEY AFT COMPLEX - G4B GALLEY - DOMED AFT BULKHEAD (BASELINE) | [***] |
| 0170C430H07 | PC - FLIGHT DECK - ROLLER SUNSHADES - DELETION - NUMBER 2 AND 3 WINDOWS - FLIGHT DECK - SFE | [***] |
| 0170C939A02 | COMMUNICATIONS - BASIC COMMUNICATIONS CONFIGURATION WITH HF | [***] |
| 0170D387A08 | AVIONICS - DUAL FMC WITH MULTI-CONTROL DISPLAY UNIT | [***] |
| 0170D837A13 | FLEXIBLE CERTIFICATION | [***] |
| 0170E173B00 | FLIGHT DECK - TWO OBSERVERS | [***] |
| 0170E388X59 | PC - GALLEY G4B POWER - 12 KVA INSTALLATION AND PROVISIONS FOR 17.25 KVA IN LIEU OF COMPLETE INSTALLATION | [***] |
| 0170E388X60 | PC - LAVATORY AFT COMPLEX - NO CURTAIN AND TRACK | [***] |
| 0170E526A93 | LAVATORY AFT COMPLEX - TWO ADVANCED LAVATORIES WITH ONE DOUBLE ATTENDANT SEAT | [***] |
| 0170E806A23 | CARGO LINERS- HEAVY DUTY - FORWARD | [***] |
| 0170E806A26 | CARGO LINERS- HEAVY DUTY- AFT | [***] |
| 0170E911A03 | AIRFRAME - 737-7 | [***] |
| 0220E308A03 | TYPE CERTIFICATE & CERTIFICATE OF AIRWORTHINESS | [***] |
| 0221-000026 | TAKEOFF AND LANDING WITH TAILWIND UP TO 15 KNOTS | [***] |
| 0221A609B52 | DISPATCH WITH GEAR EXTENDED FOR REVENUE FLIGHT | [***] |
| 0221E029A02 | SKID-RESISTANT RUNWAY TAKEOFF WITH ANTISKID SYSTEM INOPERATIVE | [***] |
| 0224E173A42 | EXTENDED OPERATIONS (ETOPS) | [***] |
| 0226C594A32 | GNSS LANDING SYSTEM (GLS) - CATEGORY I APPROACH CAPABILITY - ACTIVATION | [***] |
| 0228E308A06 | AIRPLANE FLIGHT MANUAL | [***] |
| 0252A541A02 | ENGLISH UNITS FOR FLIGHT AND OPERATIONS MANUALS, CDS INDICATIONS, AND FMCS PARAMETERS - CELSIUS TEMPERATURE | [***] |
| 0254-000003 | USPHS CERTIFICATE OF SANITARY CONSTRUCTION | [***] |
| 0315E447F96 | CERTIFIED OPERATIONAL WEIGHTS AND STRUCTURAL DESIGN WEIGHTS | [***] |
| 1110E388X57 | EXTERIOR REGULATORY MARKINGS AND COLOR SCHEME | [***] |
| 1110E388X58 | EXTERIOR NON-REGULATORY MARKINGS | [***] |
| 1110F086A19 | MP - EXTERIOR COLOR SCHEMES AND MARKINGS - REPLACEMENT - ETOPS HERO LIVERY | [***] |
| 1130E308A14 | LIGHTED SIGNS - BI-LINGUAL ENGLISH/SPANISH | [***] |

SWA-PA-03729-EXA2                                                                    **SA-8**

**BOEING PROPRIETARY**

| 1130E388X53 | INTERIOR PLACARDS AND MARKERS | [***] |
|---|---|---|
| 1130E559Y11 | CARGO COMPARTMENT PLACARDS - ENGLISH ONLY | [***] |
| 2103D839A04 | AC HEAT EXCHANGER OUTLET TEMPERATURE MONITORING SENSOR - INSTALLATION | [***] |
| 2130-000010 | 600 FPM CABIN PRESSURE ASCENT RATE | [***] |
| 2130-000015 | 750 FPM CABIN PRESSURE DESCENT RATE | [***] |
| 2160-000025 | CABIN TEMPERATURE INDICATION - DEGREES FAHRENHEIT | [***] |
| 2170-000021 | OZONE CONTROL - SPACE PROVISIONS FOR CATALYTIC CONVERTERS | [***] |
| 2210-000003 | AUTOFLIGHT - INHIBIT GLIDE SLOPE CAPTURE PRIOR TO LOCALIZER CAPTURE | [***] |
| 2210-000123 | AUTOFLIGHT - FLIGHT DIRECTOR TAKEOFF MODE WINGS LEVEL | [***] |
| 2210-000128 | AUTOFLIGHT - CONTROL WHEEL STEERING WARNING | [***] |
| 2210-000142 | AUTOFLIGHT - ALTITUDE ALERT - 300/900 FEET | [***] |
| 2210C175A38 | AUTOFLIGHT - GO-AROUND ROLL MODE - LNAV | [***] |
| 2230-000137 | AUTOTHROTTLE - FMCS - TAKEOFF PROFILE THRUST REDUCTION ALTITUDE | [***] |
| 2310C410A91 | COMMUNICATIONS CONTROL PANELS - DUAL GABLES RADIO TUNING PANELS CAPABLE OF (2) HF SYSTEMS AND (3) VHF SYSTEMS (8.33 KHZ CAPABLE) - P/N G7404-124 - BFE/SPE | [***] |
| 2310E437G55 | MP - COMMUNICATIONS CONTROL PANELS - DELETION OF REDUNDANT WIRING | [***] |
| 2312A639A46 | VHF COMMUNICATIONS - ACTIVATION OF KEYLINE TIMER | [***] |
| 2312E173A49 | VHF COMMUNICATIONS - TRIPLE HONEYWELL ARINC 750 RTA-50D VHF FM IMMUNE TRANSCEIVERS WITH 8.33 KHZ CHANNEL SPACING, VDL MODE 2, AND CMC INTERFACE CAPABILITY - P/N 965-1696-021 - BFE/SPE | [***] |
| 2315D347A65 | SATCOM - PARTIAL WIRING AND MOUNTING PROVISIONS - ROCKWELL COLLINS ICS-300 IRIDIUM SATCOM SYSTEM WITH A SINGLE TOP MOUNTED DUAL ELEMENT IRIDIUM ANTENNA | [***] |
| 2321-000050 | SELCAL - AVTECH FIVE CHANNEL DECODER - P/N 1200008-000 - BFE/SPE | [***] |
| 2321-000063 | SELCAL - ANNUNCIATION ON AUDIO SELECTOR PANELS | [***] |
| 2322C939A06 | COMMUNICATIONS MANAGEMENT UNIT (CMU) - DATA LINK RECORDING ACTIVATION | [***] |
| 2322E516A03 | CMU - INSTALLATION OF HONEYWELL MARK II ARINC 758 LEVEL AOA CMU W/ARINC SERVICE PROVIDER - DATA LINK RECORDING CAPABLE - P/N 965-0758-006 - BFE / SPE | [***] |
| 2322E516A28 | CMU - INSTALLATION OF PARTIAL PROVISIONS FOR A SINGLE CMU IN ACCORDANCE WITH ARINC 758 | [***] |
| 2324D197A18 | EMERGENCY LOCATOR TRANSMITTER (ELT) - ACR ELECTRONICS AUTOMATIC FIXED - WITH NAVIGATION INTERFACE UNIT (NIU) - MODE S BROADCAST - WITH ANTENNA P/N 110-337 - BFE/SPE | [***] |

**BOEING PROPRIETARY**

| | | |
|---|---|---|
| 2331B754B15 | PASSENGER ADDRESS (PA) SYSTEM - ARINC 715 - ROCKWELL COLLINS AMPLIFIER - BFE/SPE | [***] |
| 2331E097A10 | PRAM/BMM SYSTEM - PANASONIC - FASTEN SEAT BELT/DECOMPRESSION DISCRETES ACTIVATED - BFE/SPE | [***] |
| 2342E559Y13 | CABIN INTERPHONE SYSTEMS - ATTENDANT HANDSETS WITH UNIQUE MARKINGS | [***] |
| 2350A150D50 | AUDIO INTEGRATING - INHIBIT AURAL ALERT TRANSMISSIONS THROUGH CAPTAIN, FIRST OFFICER'S AND FIRST OBSERVER'S HEADPHONES | [***] |
| 2350B872A08 | AUDIO CONTROL PANEL - INTEGRATED SELCAL, CREW CALL, AND SATCOM FUNCTIONS - INSTALLATION - 3 VHF/2 HF | [***] |
| 2351-000042 | CONTROL WHEEL PUSH TO TALK (PTT) SWITCH - STANDARD THREE POSITION | [***] |
| 2351A213A33 | AUDIO INTEGRATION - INSTALLATION - TWO-PLUG AUDIO JACKS IN THE FLIGHT DECK | [***] |
| 2351A213B77 | BOOM MICROPHONE HEADSETS - CAPTAIN AND FIRST OFFICER - TELEX AIRMAN 750 - P/N 64300-200 - BFE/SPE | [***] |
| 2351D360C80 | PASSENGER CABIN MEDICAL COMMUNICATIONS SYSTEM - BOEING SKY INTERIOR | [***] |
| 2371B628B41 | VOICE RECORDER - RECORDER INDEPENDENT POWER SUPPLY (RIPS) - AFT LOWERED CEILING | [***] |
| 2371E568A71 | VOICE RECORDER AND MICROPHONE/MONITOR - HONEYWELL - 2 HOUR RECORDING TIME - WITH DATALINK RECORDING CAPABILITY - P/N 980-6032-003 AND P/N 980-6116-001 - BFE/SPE | [***] |
| 2451-000036 | GALLEY G1 POWER - 12 KVA | [***] |
| 2451A694A83 | GALLEY G2 POWER PROVISIONS- 17.25 KVA | [***] |
| 2500E388Y03 | ATTENDANT STATION - PARTIAL PROVISIONS - DOUBLE ATTENDANT SEAT, HANDSET, ATTENDANT WORKLIGHT, EMERGENCY EQUIPMENT, AND ATTENDANT SERVICE UNIT - STA 949 RH | [***] |
| 2500E559Y59 | NON-CERTIFIED FLYAWAY KIT - FIRST AID KIT BRACKETS | [***] |
| 2513C410C22 | FLIGHT COMPARTMENT ACCOMMODATIONS - EMERGENCY EVACUATION CHECKLIST PLACARD ON THE CAPTAIN AND FIRST OFFICER'S CONTROL COLUMNS | [***] |
| 2513E437A99 | LOG BOOK HOLDER - INSTALLATION - ON AFT FACE OF P8 AISLESTAND | [***] |
| 2514E388X62 | PASSENGER CABIN LINING - ENHANCED AIR RETURN GRILLE FASTENING PROVISIONS | [***] |
| 2520C995T39 | INTERIOR COLOR AND MATERIAL - UNIQUE DECORATIVE LAMINATE - VERTICAL WALLS | [***] |
| 2520E388X63 | INTERIOR COLOR AND MATERIAL - STANDARD OFFERING | [***] |
| 2523E388X64 | PASSENGER SERVICE UNITS - 737 BOEING SKY INTERIOR | [***] |
| 2524E388X73 | FULL HEIGHT WINDSCREEN/STOWAGE UNIT - AFT OF DOOR 1, LEFT - BFE/SPE | [***] |

| | | |
|---|---|---|
| 2524E388X75 | FORWARD RIGHT HAND FULL HEIGHT CLOSET - AFT STA 343 - BFE/SPE | [***] |
| 2525A627A07 | DOUBLE ATTENDANT SEAT - WALL MOUNTED - STA 304 | [***] |
| 2525C204K04 | HIC AND FEMUR LOAD COMPLIANCE - ECONOMY CLASS SEATS | [***] |
| 2525C204K05 | HIC AND FEMUR LOAD COMPLIANCE - ATTENDANT SEATS | [***] |
| 2525E388X66 | ECONOMY CLASS SEATS - BFE/SPE | [***] |
| 2525F135B11 | MP - PASSENGER COMPARTMENT SEATS - REVISION - MERIDIAN SEAT UPDATES - ROCKWELL COLLINS INC - BFE | [***] |
| 2527E388X67 | FLOOR COVERING - CARPET - BFE/SPE | [***] |
| 2527E388X68 | FLOOR COVERING - GALLEY AND ENTRYWAY FLOOR MAT - BFE/SPE | [***] |
| 2528C204J16 | FIRST FORWARD CENTER OVERHEAD STOWAGE COMPARTMENT - PROVISIONED FOR PALLETIZED EQUIPMENT OR LIFE RAFT - 737 BOEING SKY INTERIOR | [***] |
| 2528C204J20 | FIRST MID CABIN CENTER OVERHEAD STOWAGE COMPARTMENT - PROVISIONED FOR PALLETIZED EQUIPMENT OR LIFE RAFT - 737 BOEING SKY INTERIOR | [***] |
| 2528C204J22 | SECOND MID-CABIN CENTER OVERHEAD STOWAGE COMPARTMENT - PROVISIONED FOR PALLETIZED EQUIPMENT OR LIFE RAFT - 737 BOEING SKY INTERIOR | [***] |
| 2528E388X69 | LITERATURE POCKETS | [***] |
| 2528E388X71 | OVERHEAD STOWAGE BINS - 737 BOEING SKY INTERIOR | [***] |
| 2529C204J81 | FORWARD ATTENDANT WORKSTATION - PANEL & HANDSET - BOEING SKY INTERIOR | [***] |
| 2530E388X74 | GALLEY PART NUMBERS - STANDARD EFFORT - BFE/SPE | [***] |
| 2530E388X76 | GALLEY INSERT PART NUMBERS - BFE/SPE | [***] |
| 2530E388X77 | GALLEY CHILLER - AFT G4B GALLEY - PROVISIONS | [***] |
| 2530E559K26 | GALLEY G1 - AFT STATION 293 - BFE/SPE | [***] |
| 2540D347A92 | LA ADVANCED LAVATORY | [***] |
| 2540E388X78 | LA ADVANCED LAVATORY 2.0 SELECTABLES | [***] |
| 2540E388X79 | LD ADVANCED LAVATORY 2.0 SELECTABLES | [***] |
| 2540E388X80 | LE ADVANCED LAVATORY 2.0 SELECTABLES | [***] |
| 2560-000269 | CREW LIFE VEST STOWAGE - FLIGHT DECK, SECOND OBSERVER - CAPTAIN'S SEAT BACK | [***] |
| 2560C410D09 | CREW LIFE VESTS - FLIGHT DECK, WITH SECOND OBSERVER - EASTERN AERO MARINE INC - P/N P01202-301C - BFE/SPE | [***] |
| 2562E388X81 | OVERWATER EMERGENCY EQUIPMENT - BFE/SPE - 737 BOEING SKY INTERIOR | [***] |
| 2564E388X93 | DETACHABLE EMERGENCY EQUIPMENT - PASSENGER COMPARTMENT - BFE/SPE - 737 BOEING SKY INTERIOR | [***] |

**BOEING PROPRIETARY**

| 2564F086A27 | MP - DETACHABLE EMERGENCY EQUIPMENT - ADDITION - PASSENGER COMPARTMENT - OXYGEN BOTTLE AND MASK - AVOX - BFE | [***] |
| --- | --- | --- |
| 2622E088A14 | APU FIRE EXTINGUISHER BOTTLE - COMMON WITH ENGINE BOTTLES | [***] |
| 2841-000004 | STANDARD FUEL SYSTEM ACCURACY - NO FUEL DENSITOMETERS | [***] |
| 2841-000012 | FUEL QUANTITY INDICATORS ON RIGHT WING FUELING PANEL | [***] |
| 2844-000019 | FUEL MEASURING STICKS IN LINEAR UNITS WITH CONVERSION TABLES IN U.S. GALLONS | [***] |
| 2911-000042 | ENGINE-DRIVEN HYDRAULIC PUMPS WITH VESPEL SPLINE - EATON (VICKERS) - 10-62167 | [***] |
| 2911-000043 | AC MOTOR-DRIVEN HYDRAULIC PUMPS - PARKER (ABEX) - 10-60556 | [***] |
| 3041-000003 | NO HEATED FLIGHT COMPARTMENT NUMBER 3 WINDOW | [***] |
| 3131-000143 | ACCELEROMETER - HONEYWELL P/N 971-4193-001 - BFE/SPE | [***] |
| 3131E103A15 | DIGITAL FLIGHT DATA ACQUISITION UNIT (DFDAU) - CATIIIB/IAN/GLS/NPS CAPABLE - WITH ACMS CAPABILITY - ONS - SFE | [***] |
| 3131E568A70 | DIGITAL FLIGHT DATA RECORDER (DFDR) - HONEYWELL - 1024 WORDS PER SECOND MAXIMUM DATA RATE - P/N 980-4750-003 - BFE/SPE | [***] |
| 3132E437D33 | ARINC 615 PORTABLE DATA LOADER CONNECTOR - INSTALLATION - FLIGHT DECK - P61-4 MAINTENANCE BITE PANEL | [***] |
| 3133-000123 | ARINC 740 PRINTER PROVISIONS IN THE FLIGHT DECK AISLESTAND | [***] |
| 3135E526B33 | ONBOARD NETWORK SYSTEM - QUICK ACCESS RECORDER - DAR OUTPUT | [***] |
| 3161-000133 | ENGINE FUEL FLOW - FULL TIME DISPLAY - PRIMARY ENGINE DISPLAY UNIT | [***] |
| 3161C175A22 | ENGINE OIL QUANTITY DISPLAY - PERCENT - ENGINE DISPLAY | [***] |
| 3162-000018 | ATTITUDE COMPARATOR - FLASHING - ADI | [***] |
| 3162-000022 | FLIGHT DIRECTOR COMMAND DISPLAY - SPLIT AXIS - ADI | [***] |
| 3162-000028 | RADIO ALTITUDE - BELOW ADI | [***] |
| 3162-000030 | RISING RUNWAY - DISPLAYED ON THE ADI | [***] |
| 3162-000036 | LANDING ALTITUDE REFERENCE BAR - PRIMARY FLIGHT DISPLAY | [***] |
| 3162-000040 | BARO MINIMUMS POINTER - DISPLAYED ON SELECTION OF RADIO ALTITUDE MINIMUMS - PRIMARY FLIGHT DISPLAY | [***] |
| 3162-000044 | TCAS RESOLUTION ADVISORY - VSI | [***] |
| 3162-000051 | ILS LOCALIZER DEVIATION EXPANDED SCALE - AUTOPILOT OR FLIGHT DIRECTOR MODE | [***] |
| 3162-000059 | MAP MODE ORIENTATION - TRACK UP - NAVIGATION DISPLAY | [***] |
| 3162-000064 | RANGE ARCS - NAVIGATION DISPLAY | [***] |

| 3162-000079 | MANUALLY TUNED VOR SELECTED COURSE LINES DISPLAYED - NAVIGATION DISPLAY | [***] |
|---|---|---|
| 3162-000084 | TCAS 3 NM RANGE RING - NAVIGATION DISPLAY | [***] |
| 3162-000088 | AIRSPEED BUG - ENABLED - 80 KNOT SETTING - MACH AIRSPEED INDICATOR | [***] |
| 3162A627A36 | CDS - SOFTWARE ACTIVATION - VNAV SPEED BANDS - ENABLE | [***] |
| 3162C594A29 | CDS - SOFTWARE ACTIVATION - NAVIGATION PERFORMANCE SCALES - ENABLE | [***] |
| 3162E437C94 | FLIGHT AND NAVIGATION DISPLAYS - LANDING SYS ELECTRONIC PLACARD WORKSHEET - AUXILIARY DISPLAY | [***] |
| 3244-000008 | SERVICE INTERPHONE CONNECTOR - EXTERNAL POWER PANEL | [***] |
| 3245B290A77 | WHEELS AND TIRES - NOSE LANDING GEAR - WHEELS - GOODRICH - INSTALLATION WITH SFE 12 PR, 235 MPH RATED RADIAL TIRES | [***] |
| 3245B290A92 | BRAKES - CARBON - GOODRICH | [***] |
| 3245C927A08 | WHEELS AND TIRES - MAIN LANDING GEAR - WHEELS FOR CARBON BRAKES - GOODRICH - INSTALLATION WITH 30-PR, 235 MPH RADIAL TIRES | [***] |
| 3321C869A65 | PASSENGER CABIN LIGHTING - SINGLE-ZONE CONTROL - 737 BOEING SKY INTERIOR | [***] |
| 3324C195A04 | NO SMOKING SIGN - SILK SCREENED SYMBOL AND RETAIN CHIME FUNCTION | [***] |
| 3350E097A38 | EMERGENCY ESCAPE PATH LIGHTING - FLOOR MOUNTED - NARROW COLOR PHOTOLUMINESCENT | [***] |
| 3412-000022 | DUAL ELEMENT NON-ASPIRATED TAT PROBE | [***] |
| 3430E717A25 | MULTI-MODE RECEIVER (MMR) - HONEYWELL - P/N 69002600-0101 - BFE/SPE | [***] |
| 3431C175A06 | NAVIGATION CONTROL PANEL (NCP) - GNSS LANDING SYSTEM (GLS) CAPABLE - GABLES - P/N G7501-01- BFE/SPE | [***] |
| 3433E954A02 | LOW RANGE RADIO ALTIMETER (LRRA)- CAT IIIB CAPABLE - HONEYWELL - P/N 066-50007-0631 - BFE/SPE | [***] |
| 3436D972A01 | HEAD-UP DISPLAY (HUD) - PARTIAL PROVISIONS FOR SINGLE ROCKWELL COLLINS HEAD-UP GUIDANCE SYSTEM (HGS) MODEL 6000 WITH MCDU INTERFACE | [***] |
| 3436D972A02 | HEAD-UP DISPLAY (HUD) - INSTALLATION OF SINGLE ROCKWELL COLLINS HEAD-UP GUIDANCE SYSTEM (HGS) MODEL 6000 WITH MCDU INTERFACE - STC CERTIFIED - BFE/SPE | [***] |
| 3443B696L73 | SINGLE WEATHER RADAR SYSTEM CONTROL PANEL - HONEYWELL RDR-4000 RADAR SYSTEM - P/N 930-5101-001 - BFE/SPE | [***] |
| 3443E032A44 | SINGLE WEATHER RADAR SYSTEM - WITH PREDICTIVE WINDSHEAR - HONEYWELL RDR-4000, VERSION 2 TRANSCEIVER - 930-2000-001 - BFE/SPE | [***] |

**BOEING PROPRIETARY**

| | | |
|---|---|---|
| 3443E706F79 | MP - WEATHER RADAR (WXR) SYSTEM - REPLACEMENT - HONEYWELL MODEL RDR-4000 - WITH VERSION 2 SOFTWARE - WXR TRANSMITTER/RECEIVER P/N 930-2000-010 IN LIEU OF P/N 930-2000-001 - BFE | [***] |
| 3445C594B01 | TCAS SYSTEM - HONEYWELL TCAS COMPUTER P/N 940-0351-001 - TCAS CHANGE 7.1 COMPLIANT - BFE/SPE | [***] |
| 3446-000046 | LOW VOLUME FOR ALTITUDE CALLOUTS | [***] |
| 3446-000049 | 500 SMART CALLOUT INHIBITED | [***] |
| 3446-000057 | GROUND PROXIMITY WARNING SYSTEM ALTITUDE CALLOUTS - 100, 50, 30, 10 | [***] |
| 3446C174A14 | ENHANCED GROUND PROXIMITY WARNING SYSTEM (EGPWS) - BANK ANGLE CALLOUT (VARIABLE CALLOUT BELOW 130 FT) - ENABLE | [***] |
| 3453E052A56 | ATC SYSTEM - HONEYWELL ATC TRANSPONDER P/N 066-01212-0301 - ADS-B OUT DO-260B COMPLIANT - HONEYWELL CONTROL PANEL P/N 071-01503-2601 - BFE/SPE | [***] |
| 3455E954A03 | DISTANCE MEASURING EQUIPMENT (DME) - SCANNING INTERROGATOR - HONEYWELL P/N 066-50013-1511 - BFE/SPE | [***] |
| 3461A150B73 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - ENGINE-OUT STANDARD INSTRUMENT DEPARTURES (SID'S) - ENABLE | [***] |
| 3461A425A10 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - NAVIGATION DATABASE - CUSTOMER SUPPLIED | [***] |
| 3461A425A17 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - AIRLINE OPERATIONAL COMMUNICATION DATA LINK (AOC DL) - FEATURE ACTIVATION | [***] |
| 3461A425A30 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS)- ABEAM WAYPOINTS-ENABLE | [***] |
| 3461A425A48 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - ACTIVATE COLOR OPERATION | [***] |
| 3461A890A76 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - NAVIGATION DISPLAY - MISSED APPROACH IN CYAN UNTIL ACTIVE - ENABLE | [***] |
| 3461B430C49 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - REQUIRED NAVIGATION PERFORMANCE (RNP) DEFAULT VALUE CHANGE | [***] |
| 3461B696K97 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - VERTICAL RNP DEFAULT VALUE - REVISION | [***] |
| 3461C175A11 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - AIR TRAFFIC SERVICES DATA LINK (ATS DL) - FANS FEATURE ACTIVATION | [***] |
| 3461C175A14 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - FANS CAPABLE MCDU WITH ATC KEYBOARD - INSTALLATION-SFE | [***] |
| 3461C175A32 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - COMMON VNAV - ENABLE | [***] |
| 3461C175A33 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - ADDITIONAL CONTROL DISPLAY UNIT (CDU) FIX PAGES - ENABLE | [***] |

SWA-PA-03729-EXA2

**SA-8**

**BOEING PROPRIETARY**

| 3461C175A34 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - SPEED PROPAGATION FROM THE CRUISE PAGE TO THE DESCENT PAGE - ENABLE | [***] |
|---|---|---|
| 3461C430J05 | FLIGHT MANAGEMENT COMPUTING SYSTEM (FMCS) - VOR INHIBIT | [***] |
| 3461C594A26 | FLIGHT MANAGEMENT COMPUTING SYSTEM (FMCS) - INTENT DATA TRANSMITTED TO ACARS - ENABLE | [***] |
| 3511E837B11 | CREW OXYGEN MASK - FULL FACE MASK WITH BUILT-IN SMOKE GOGGLES - FIRST OBSERVER - AVOX - BFE/SPE | [***] |
| 3511E837B17 | CREW OXYGEN MASKS - FULL FACE MASK WITH BUILT-IN SMOKE GOGGLES - CAPTAIN AND FIRST OFFICER - AVOX - BFE/SPE | [***] |
| 3511E837B22 | CREW OXYGEN MASK - FULL FACE MASK WITH BUILT-IN SMOKE GOGGLES - SECOND OBSERVER - AVOX - BFE/SPE | [***] |
| 3811-000017 | POTABLE WATER - SERVICEABLE TO 40 GALLONS | [***] |
| 3812-000002 | NO WATER QUANTITY GAUGE - WATER SERVICE PANEL | [***] |
| 3832-000076 | NO SENSOR FOULED LIGHT - COVER PLATE | [***] |
| 3832-000078 | NO WASTE QUANTITY GAUGE - COVER PLATE | [***] |
| 3910E437A86 | AFT ELECTRONICS PANEL ARRANGEMENT WITH TWO RADIO TUNING PANELS AND ARINC 740 PRINTER PROVISIONS | [***] |
| 4435E484D00 | HIGH SPEED COMMUNICATION - PARTIAL PROVISIONS - GLOBAL EAGLE ENTERTAINMENT CABIN NETWORK SYSTEM WITH KU BAND CONNECTIVITY - THREE WIRELESS ACCESS POINTS (WAP) - 737 BOEING SKY INTERIOR | [***] |
| 4435E484D49 | HIGH-SPEED COMMUNICATIONS - SYSTEM INSTALLATION INTO PARTIAL PROVISIONS FOR A WIRELESS CABIN NETWORK WITH 3 CABIN WIRELESS LAN UNITS (CWLU) AND KU BAND CONNECTIVITY - GLOBAL EAGLE ENTERTAINMENT - CSE/SPE | [***] |
| 4435E484D79 | HIGH-SPEED COMMUNICATIONS - BROADBAND CONTROL PANEL WITH THREE POSITION SWITCH | [***] |
| 4435E484D92 | HIGH-SPEED COMMUNICATIONS - INSTALLATION - OPERATIONAL SOFTWARE - GLOBAL EAGLE ENTERTAINMENT - CSE/SPE | [***] |
| 4435E526E63 | HIGH-SPEED COMMUNICATIONS - STRUCTURAL PROVISIONS - TRI-BAND RADOME | [***] |
| 4435E837C85 | HIGH-SPEED COMMUNICATIONS - TRI-BAND RADOME INSTALLATION - BLUE COLOR (BAC 51705) | [***] |
| 4610E526A81 | ONBOARD NETWORK SYSTEM - PARTIAL PROVISIONS - GROUND BASED CONNECTIVITY | [***] |
| 4610E526B92 | ONBOARD NETWORK SYSTEM - CELLULAR AND WIFI GROUND BASED CONNECTIVITY - WIRELESS WIDE AREA NETWORK UNIT (WWU) - BFE/SPE | [***] |
| 4610E526E60 | ONBOARD NETWORK SYSTEM - ACTIVATION OF ONS-ACARS CMU INTERFACE | [***] |
| 5231A561C54 | CARGO DOOR - SOLID SKIN | [***] |

SWA-PA-03729-EXA2

**BOEING PROPRIETARY**

| 5300-000027 | UNDERSEAT FLOOR PANELS, LOW TRAFFIC CAPABILITY | [***] |
|---|---|---|
| 5352A298A28 | RADOME- NORDAM- SFE | [***] |
| 7200D422A09 | CFM LEAP-1B ENGINES - 1B27C RATING | [***] |
| MISC THRUST-1 | THRUST PRICING ADJUSTMENT FOR SIDE LETTER PRICING | [***] |
| 7900-000116 | LUBRICATING OIL - MOBIL JET II | [***] |
| MISC | INTERIOR ALLOWANCE | [***] |
| | | |
| | **TOTALS:** | [***] |
| | | |

SWA-PA-03729-EXA2                                                      **SA-8**

**BOEING PROPRIETARY**

# BUYER FURNISHED EQUIPMENT VARIABLES

## Between

## THE BOEING COMPANY

## And

## Southwest Airline

## Supplemental Exhibit BFE2
## to Purchase Agreement Number PA-03729

**BOEING PROPRIETARY**

**BUYER FURNISHED EQUIPMENT VARIABLES**

**relating to**

**BOEING MODEL 737-7 AIRCRAFT**

This Supplemental Exhibit BFE2 contains supplier selection dates, on-dock dates and other requirements applicable to the Aircraft.

1. <u>Supplier Selection</u>.

Customer will:

Select and notify Boeing of the suppliers and part numbers of the following BFE items by the following dates:

| | |
|---|---|
| Galley System | 2/1/2018 |
| Galley Inserts | 2/1/2018 |
| Seats (passenger) | 2/1/2018 |
| Overhead & Audio System | 2/1/2018 |
| In-Seat Video System | 2/1/2018 |
| Miscellaneous Emergency Equipment | 4/1/2018 |
| Cargo Handling Systems* <br> *(Single Aisle Programs only)* | 8/1/2018 |

*For a new certification, supplier requires notification ten (10) months prior to Cargo Handling System on-dock date.

Customer will enter into initial agreements with the selected Galley System, Galley Inserts, Seats, and In-Seat Video System suppliers on or before ten (10) days after the above supplier selection dates to actively participate with Customer and Boeing in coordination actions including the Initial Technical Coordination Meeting (**ITCM**).

## 2.   On-dock Dates and Other Information

On or before nine (9) months prior to Aircraft delivery, Boeing will provide to Customer the BFE requirements electronically through My Boeing Fleet (**MBF**) in My Boeing Configuration (**MBC**). These requirements may be periodically revised, setting forth the items, quantities, on-dock dates and shipping instructions and other requirements relating to the in-sequence installation of BFE. For planning purposes, preliminary BFE on-dock dates are set forth below:

| Nominal Del Date | Aircraft Qty | Seats | Galley / Furnishings | Antennas & Mounting Equipment | Avionics | Cabin Systems Equipment | Misc. Emergency Equipment | Textiles / Raw Materials | Cargo Systems | Provision Kits | Radomes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Apr-2019 | 3 | 02/20/19 | 02/13/19 | 12/25/18 | 02/13/19 | 02/13/19 | 02/13/19 | 11/09/18 | 01/30/19 | 10/09/18 | 01/15/19 |
| May-2019 | 2 | 03/22/19 | 03/15/19 | 01/24/19 | 03/15/19 | 03/15/19 | 03/15/19 | 12/11/18 | 03/01/19 | 11/08/18 | 02/14/19 |
| Aug-2019 | 2 | 06/24/19 | 06/17/19 | 04/26/19 | 06/17/19 | 06/17/19 | 06/17/19 | 03/13/19 | 06/03/19 | 02/08/19 | 05/17/19 |
| Jan-2023 | 1 | 11/23/22 | 11/16/22 | 09/27/22 | 11/16/22 | 11/16/22 | 11/16/22 | 08/12/22 | 11/02/22 | 07/12/22 | 10/18/22 |
| Feb-2023 | 1 | 12/23/22 | 12/16/22 | 10/27/22 | 12/16/22 | 12/16/22 | 12/16/22 | 09/13/22 | 12/02/22 | 08/11/22 | 11/17/22 |
| Mar-2023 | 1 | 01/20/23 | 01/13/23 | 11/24/22 | 01/13/23 | 01/13/23 | 01/13/23 | 10/11/22 | 12/30/22 | 09/08/22 | 12/15/22 |
| Apr-2023 | 1 | 02/22/23 | 02/15/23 | 12/27/22 | 02/15/23 | 02/15/23 | 02/15/23 | 11/11/22 | 02/01/23 | 10/11/22 | 01/17/23 |
| May-2023 | 1 | 03/22/23 | 03/15/23 | 01/24/23 | 03/15/23 | 03/15/23 | 03/15/23 | 12/09/22 | 03/01/23 | 11/08/22 | 02/14/23 |
| Jun-2023 | 1 | 04/24/23 | 04/17/23 | 02/24/23 | 04/17/23 | 04/17/23 | 04/17/23 | 01/11/23 | 04/03/23 | 12/09/22 | 03/17/23 |
| Jul-2023 | 1 | 05/24/23 | 05/17/23 | 03/28/23 | 05/17/23 | 05/17/23 | 05/17/23 | 02/10/23 | 05/03/23 | 01/10/23 | 04/18/23 |
| Aug-2023 | 1 | 06/22/23 | 06/15/23 | 04/26/23 | 06/15/23 | 06/15/23 | 06/15/23 | 03/13/23 | 06/01/23 | 02/08/23 | 05/17/23 |
| Sep-2023 | 1 | 07/25/23 | 07/18/23 | 05/29/23 | 07/18/23 | 07/18/23 | 07/18/23 | 04/13/23 | 07/04/23 | 03/13/23 | 06/19/23 |
| Oct-2023 | 1 | 08/23/23 | 08/16/23 | 06/27/23 | 08/16/23 | 08/16/23 | 08/16/23 | 05/12/23 | 08/02/23 | 04/11/23 | 07/18/23 |
| Nov-2023 | 1 | 09/22/23 | 09/15/23 | 07/27/23 | 09/15/23 | 09/15/23 | 09/15/23 | 06/13/23 | 09/01/23 | 05/11/23 | 08/17/23 |
| Dec-2023 | 1 | 10/24/23 | 10/17/23 | 08/28/23 | 10/17/23 | 10/17/23 | 10/17/23 | 07/13/23 | 10/03/23 | 06/12/23 | 09/18/23 |
| Jan-2024 | 1 | 11/22/23 | 11/15/23 | 09/26/23 | 11/15/23 | 11/15/23 | 11/15/23 | 08/11/23 | 11/01/23 | 07/11/23 | 10/17/23 |
| Feb-2024 | 1 | 12/25/23 | 12/18/23 | 10/27/23 | 12/18/23 | 12/18/23 | 12/18/23 | 09/13/23 | 12/04/23 | 08/11/23 | 11/17/23 |
| Mar-2024 | 1 | 01/23/24 | 01/16/24 | 11/27/23 | 01/16/24 | 01/16/24 | 01/16/24 | 10/12/23 | 01/02/24 | 09/11/23 | 12/18/23 |
| Apr-2024 | 1 | 02/21/24 | 02/14/24 | 12/26/23 | 02/14/24 | 02/14/24 | 02/14/24 | 11/10/23 | 01/31/24 | 10/10/23 | 01/16/24 |
| May-2024 | 1 | 03/22/24 | 03/15/24 | 01/25/24 | 03/15/24 | 03/15/24 | 03/15/24 | 12/12/23 | 03/01/24 | 11/09/23 | 02/15/24 |
| Jun-2024 | 1 | 04/24/24 | 04/17/24 | 02/27/24 | 04/17/24 | 04/17/24 | 04/17/24 | 01/12/24 | 04/03/24 | 12/12/23 | 03/19/24 |
| Jul-2024 | 1 | 05/22/24 | 05/15/24 | 03/26/24 | 05/15/24 | 05/15/24 | 05/15/24 | 02/09/24 | 05/01/24 | 01/09/24 | 04/16/24 |
| Aug-2024 | 1 | 06/24/24 | 06/17/24 | 04/26/24 | 06/17/24 | 06/17/24 | 06/17/24 | 03/13/24 | 06/03/24 | 02/09/24 | 05/17/24 |
| Sep-2024 | 1 | 07/24/24 | 07/17/24 | 05/28/24 | 07/17/24 | 07/17/24 | 07/17/24 | 04/12/24 | 07/03/24 | 03/12/24 | 06/18/24 |
| Oct-2024 | 1 | 08/22/24 | 08/15/24 | 06/26/24 | 08/15/24 | 08/15/24 | 08/15/24 | 05/13/24 | 08/01/24 | 04/10/24 | 07/17/24 |
| Nov-2024 | 1 | 09/24/24 | 09/17/24 | 07/29/24 | 09/17/24 | 09/17/24 | 09/17/24 | 06/13/24 | 09/03/24 | 05/13/24 | 08/19/24 |
| **Total** | **30** | | | | | | | | | | |

3.  <u>Additional Delivery Requirements - Import</u>

Customer will be the "**importer of record**" (as defined by the U.S. Customs and Border Protection) for all BFE imported into the United States, and as such, it has the responsibility to ensure all of Customer's BFE shipments comply with U.S. Customs Service regulations. In the event Customer requests Boeing, in writing, to act as importer of record for Customer's BFE, and Boeing agrees to such request, Customer is responsible for ensuring Boeing can comply with all U.S. Customs Import Regulations by making certain that, at the time of shipment, all BFE shipments comply with the requirements in the "International Shipment Routing Instructions", including the Customs Trade Partnership Against Terrorism (**C-TPAT**), as set out on the Boeing website referenced below. Customer agrees to include the International Shipment Routing Instructions, including C-TPAT requirements, in each contract between Customer and BFE supplier.

http://www.boeing.com/companyoffices/doingbiz/supplier_portal/index_general.html

**BOEING PROPRIETARY**



SWA-PA-03729-LA-1106463R3

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    Open Matters

Reference:    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

Given the long period of time between Purchase Agreement signing and delivery of the first Aircraft and the continued development of the Aircraft program, certain elements have not yet been defined. In consideration, Boeing and Customer agree to work together as the Aircraft program develops as follows:

1.    Aircraft Delivery Schedule.

1.1[***]

1.2    Customer and Boeing will consult on a frequent basis to keep each other informed as to Customer's fleet plans and Boeing's production plans in order to meet the requirements of both parties. Based on such review and discussions, Boeing will use its best commercially reasonable efforts to meet Customer's fleet needs.



2.    Reserved.

 3. Other Letter Agreements.

Boeing and Customer acknowledge that as they work together to develop the Aircraft program and as Boeing refines the definition of the Aircraft and associated production processes, there may be a need to execute additional letter agreements or amend letter agreements addressing one or more of the following:

3.1    Software. Additional provisions relating to software and software loading.

3.2 Reserved.

3.3 Reserved

4. Confidentiality.

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.



Very truly yours,
THE BOEING COMPANY

By:    /s/ Kyle Kersavage


Its:    Attorney-In-Fact

ACCEPTED AND AGREED TO this


Date:    December 20, 2017


SOUTHWEST AIRLINES CO.
By    /s/ Chris Monroe

Its    Chris Monroe
       SVP, Finance



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106474**R2**

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    Option Aircraft

Reference:    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft and Model 737-7 aircraft

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.    Right to Purchase Option Aircraft.

Subject to the terms and conditions contained in this Letter Agreement, in addition to the Aircraft described in Table 1 to the Purchase Agreement as of the date of execution of this Letter Agreement, Customer will have the option to purchase additional Boeing Model 737-8 aircraft as option aircraft (**Option Aircraft**).

2.    Delivery

The number of Option Aircraft and delivery dates are listed in the Attachment 1 to this Letter Agreement.

3.    Configuration

3.1    Subject to the provisions of Article 3.2, below, the configuration for the Option Aircraft will be the Detail Specification for Boeing Model 7378 aircraft at the revision level in effect at the time of Definitive Agreement (as defined in Article 0). Such Detail Specification will be revised to include (i) changes applicable to the Detail Specification that are developed by Boeing between the Option Exercise Date (as defined below) and the signing of the Definitive Agreement, (ii) changes required to obtain required regulatory certificates, and (iii) other changes as mutually agreed.

3.2    Boeing reserves the right to configure the Option Aircraft starting from a different configuration specification, provided that it can achieve the same configuration which would result pursuant to the provisions of Article 3.1.

4.[***]

5.[***]



6.[***]

7.Reserved

8.[***]

9.    Assignment

Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Option Aircraft and cannot be assigned in whole or in part.

10.    Confidentiality

    Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations



(including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,
THE BOEING COMPANY

By:      /s/ Kyle Kersavage

Its:      Attorney-In-Fact

ACCEPTED AND AGREED TO this
Date:      December 20, 2017

SOUTHWEST AIRLINES CO.
By      /s/ Chris Monroe
Its      Chris Monroe
          SVP, Finance

SWA-PA-03729-LA-1106474**R2**                                    **SA-8**
Option Aircraft                                                        Page 4

**BOEING PROPRIETARY**

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| | | | | | |
|---|---|---|---|---|---|
| **Airframe Model/MTOW:** | 737-8 | 181,200 pounds | **Detail Specification:** | **D019A008-P (5/1/2017)** | 4Q16 External Fcst |
| **Engine Model/Thrust:** CFMLEAP-1B28**(1)** | | 28,800 pounds | **Airframe Price Base Year/Escalation Formula:** | Jul-11 | ECI-MFG/CPI |
| **Airframe Price:** | | [***] | **Engine Price Base Year/Escalation Formula:** | N/A | N/A |
| **Optional Features:** | | [***] | | | |
| **Sub-Total of Airframe and Features:** | | [***] | **Airframe Escalation Data:** | | |
| **Engine Price (Per Aircraft):** | | [***] | **Base Year Index (ECI):** | | [***] |
| **Aircraft Basic Price (Excluding BFE/SPE):** | | [***] | **Base Year Index (CPI):** | | [***] |
| **Buyer Furnished Equipment (BFE) Estimate:** | | [***] | | | |
| **Seller Purchased Equipment (SPE) Estimate:** | | [***] | | | |
| **Non-Refundable Deposit/Aircraft at Def Agreemt:** | | [***] | | | |

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Mar-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| May-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jul-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Aug-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Oct-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Nov-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Dec-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Dec-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jan-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Feb-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| May-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jul-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Nov-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |

SWA-PA-03729-LA-1106474 **107813**. TXT     **BOEING PROPRIETARY**

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Jan-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Feb-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Mar-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| May-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Oct-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Dec-2024 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |

SWA-PA-03729-LA-1106474 **107813**. TXT **BOEING PROPRIETARY** SA-8
Page 3

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| May-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Dec-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Dec-2026 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |

SWA-PA-03729-LA-1106474 **107813**. TXT

**BOEING PROPRIETARY**

SA-8
Page 4

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Jun-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2027 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2027 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |

Total:　　155

\* [***]

**Note:**
(1)[***]

**BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106475**R3**

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:                    [***]

References:    1)    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and Model 737-7 aircraft

2)    Letter Agreement SWA-PA-03729-LA-1106474 entitled "Option Aircraft" (**Option Aircraft Letter Agreement**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

   1.[***]

**BOEING PROPRIETARY**



**BOEING PROPRIETARY**



2.[***]

3.     Assignment.

Unless otherwise noted herein, [***]

                                                                to Customer and in consideration

of Customer's taking title to the Option Aircraft at time of delivery and becoming the operator of the Option Aircraft. This Letter Agreement cannot be assigned, in whole or in part, without the prior written consent of Boeing.

4.     Confidentiality

     Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance,

SWA-PA-03729-LA-1106475**R3**                                                                          **SA-8**
[***]                                                                                                   Page 3
                                        **BOEING PROPRIETARY**

**BOEING**

administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,
THE BOEING COMPANY

By:        /s/ Kyle Kersavage
Its:        Attorney-In-Fact


ACCEPTED AND AGREED TO this
Date:        December 20, 2017



SOUTHWEST AIRLINES CO.



By        /s/ Chris Monroe
Its        Chris Monroe
            SVP, Finance




SWA-PA-03729-LA-1106475**R3**                                        **SA-8**
[***]                                                                      Page 4

**BOEING PROPRIETARY**

**_BOEING_**

The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106476**R2**

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    [***]

Reference:    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 aircraft and Model 737-7 aircraft

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

The Purchase Agreement incorporates the terms and conditions of Aircraft General Terms Agreement dated as of December 13, 2011 identified as SWA-AGTA between Boeing and Customer (**AGTA**). This Letter Agreement modifies certain terms and conditions of the AGTA with respect to the Aircraft.

1. [***]

**BOEING PROPRIETARY**



2.[***]

3.    Assignment. Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part.



4.    Confidentiality. Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,
THE BOEING COMPANY

By:    /s/ Kyle Kersavage

Its:    Attorney-In-Fact

ACCEPTED AND AGREED TO this
Date:    December 20, 2017

SOUTHWEST AIRLINES CO.

By    /s/ Chris Monroe

Its    Chris Monroe
    SVP, Finance

SWA-PA-03729-LA-1106476**R2**                                                                **SA-8**
[***]                                                                                          Page 3
                            **BOEING PROPRIETARY**



The Boeing Company
P.O. Box 3707
Seattle, WA 98124-2207

SWA-PA-03729-LA-1106484R1

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    [***]

Reference:    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and 737-7 aircraft (**Aircraft**)

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.    Defined Terms: The following capitalized terms have the following meaning:

1.1    **[***]**

1.2    **[***]**

1.3    **Program Aircraft** means each Aircraft specified in Table 1 of the Purchase Agreement as of the date of this Letter.

2.[***]

3.[***]



4.[***]

5.[***]

**BOEING PROPRIETARY**

**BOEING**

6.[***]

7.    Assignment. Notwithstanding any other provisions of the Purchase Agreement, the rights and obligations described in this Letter Agreement are provided to Customer in consideration of Customer's becoming the operator of the Aircraft and cannot be assigned in whole or, in part.

8.    Confidentiality. Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a

**_BOEING_**

confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,

THE BOEING COMPANY

By:     /s/ Kyle Kersavage

Its:     Attorney-In-Fact


ACCEPTED AND AGREED TO this

Date:     December 20, 2017



SOUTHWEST AIRLINES CO.



By     /s/ Chris Monroe


Its     Chris Monroe

         SVP, Finance




SWA-PA-03729-LA-1106484R1                                                                     **SA-8**

[***]                                                                                          Page 4

**BOEING PROPRIETARY**



**Attachment A**
[***]

SWA-PA-03729-LA-1106484R1                                                                   **SA-8**
[***]                                                                                          Page 5

**BOEING PROPRIETARY**

**_BOEING_**

**Attachment B**

[***]

**BOEING PROPRIETARY**

**BOEING**



**BOEING**



**BOEING PROPRIETARY**



SWA-PA-03729-LA-1301170**R2**

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:    [***]
Reference:    Purchase Agreement No. PA-03729 (**Purchase Agreement**) between
 The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**)
relating to Model 737-8 and 737-7 aircraft

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

1.[***]



2.[***]

3.Assignment.

Unless otherwise noted herein, [***]described in this Letter Agreement are provided [***]in consideration of Customer's taking title to the 737-7 Aircraft at time of delivery and becoming the operator of the 737-7 Aircraft. This Letter Agreement cannot be assigned, in whole or in part, without the prior written consent of Boeing.

4.Confidentiality

Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties.  Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance,

SWA-PA-03729-LA-1301170**R2**                                                                                          **SA-8**
[***]                                                                                                                                        Page 2



administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,
THE BOEING COMPANY

By:      /s/ Kyle Kersavage

Its:      Attorney-In-Fact

ACCEPTED AND AGREED TO this
Date:      December 20, 2017

SOUTHWEST AIRLINES CO.

By      /s/ Chris Monroe

Its      Chris Monroe
          SVP, Finance

SWA-PA-03729-LA-1301170R2                                                    **SA-8**
[***]                                                                          Page 3
                          **BOEING PROPRIETARY**



SWA-PA-03729-LA-1106467**R2**

Southwest Airlines Co.
2702 Love Field Drive
P.O. Box 36611
Dallas, Texas 75235-1611

Subject:     [***]

Reference:     Purchase Agreement No.PA-03729 (**Purchase Agreement**) between The Boeing Company (**Boeing**) and Southwest Airlines Co. (**Customer**) relating to Model 737-8 and Model 737-7 aircraft

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement shall have the same meaning as in the Purchase Agreement.

   1.[***]



2.[***]

3.Assignment.

Unless otherwise noted herein, [***]described in this Letter Agreement are provided [***]in consideration of Customer's taking title to the 737-8 Aircraft at time of delivery and becoming the operator of such 737-8 Aircraft. This Letter Agreement cannot be assigned, in whole or in part, without the prior written consent of Boeing.

4.    Confidentiality

        Customer understands that certain commercial and financial information contained in this Letter Agreement is considered by Boeing as confidential and has value precisely because it is not available generally to other parties. Customer agrees to limit the disclosure of the contents of this Letter Agreement to (a) its directors and officers, (b) employees of Customer with a need to know the contents for performing its obligations (including, without limitation, those employees performing accounting, finance, administration and other functions necessary to finance and purchase, deliver or lease the Aircraft) and who understand they are not to disclose its contents to any other person or entity (other than those to whom disclosure is permitted by this Article) without the prior written consent of Boeing and (c) any auditors and attorneys of Customer who have a need to know such information and have signed a confidentiality agreement in the same

form and substance similar to this Article, or are otherwise bound by a confidentiality obligation. Disclosure to other parties is not permitted without Boeing's consent except as may be required by applicable law or governmental regulations. Customer shall be fully responsible to Boeing for compliance with such obligations.

Very truly yours,
THE BOEING COMPANY

By:      /s/ Kyle Kersavage

Its:      Attorney-In-Fact

ACCEPTED AND AGREED TO this
Date:      December 20, 2017

SOUTHWEST AIRLINES CO.

By      /s/ Chris Monroe

Its      Chris Monroe

        SVP, Finance

SWA-PA-03729-LA-1106467**R2**                                                    **SA-8**
[***]                                                                          Page 3

**BOEING PROPRIETARY**

**SUPPLEMENTAL AGREEMENT NO. 9**

**to**

**Purchase Agreement No. 03729**

**between**

**THE BOEING COMPANY**

**and**

**SOUTHWEST AIRLINES CO.**

**Relating to Boeing Model 737-8 and 737-7 Aircraft**

THIS SUPPLEMENTAL AGREEMENT No. 9 (**SA-9**), entered into as of February 8, 2018, is made between THE BOEING COMPANY, a Delaware corporation (**Boeing**), and SOUTHWEST AIRLINES CO., a Texas corporation (**Customer**).

<u>RECITALS</u>:

WHEREAS, Customer and Boeing entered into Purchase Agreement Number PA-03729 dated December 13, 2011, as amended and supplemented, (**Purchase Agreement**) relating to the purchase and sale of Boeing Model 737-8 (**737-8 Aircraft**) and Model 737-7 aircraft (**737-7 Aircraft**); collectively the "**Aircraft**". This SA9 is an amendment to and is incorporated into the Purchase Agreement. Capitalized terms used herein but not otherwise defined will have the meaning set forth in the Purchase Agreement.

WHEREAS, Boeing and Customer agree to accelerate the deliveries of certain 737-8 Aircraft as identified in Table 1A, <u>Aircraft Delivery, Description, Price, and Advance Payments 737-8 Aircraft</u>, attached hereto.

NOW, THEREFORE, the parties agree that the Purchase Agreement is amended as set forth below and otherwise agree as follows:

1.  <u>TABLE OF CONTENTS</u>.

The Table of Contents of the Purchase Agreement is deleted in its entirety and replaced with a new Table of Contents (attached), which lists the Tables, Exhibits, and Letter Agreements revised by this SA-9 and is identified by "SA-9". Such revised Table of Contents is incorporated into the Purchase Agreement by this reference.

2.  <u>TABLES</u>.

Table 1A, <u>Aircraft Delivery, Description, Price and Advance Payments – 737-8 Aircraft</u>, is deleted in its entirety and replaced by a new Table 1A (identified by "SA-9") attached hereto and incorporated into the Purchase Agreement by this reference.

3.  <u>ADVANCE PAYMENT IMPACTS</u>.

    3.1 The revisions applied to Table 1A, Aircraft Delivery, Description, Price and Advance Payments – 737-8 Aircraft, result in [***]

The Purchase Agreement is deemed to be supplemented to the extent herein provided and as so supplemented will continue in full force and effect.

EXECUTED IN DUPLICATE as of the day and year first above written.

THE BOEING COMPANY                                  SOUTHWEST AIRLINES CO.

By:    /s/ Kyle Kersavage                            By:    /s/ Chris Monroe

Its:    Attorney-In-Fact                             Its: Chris Monroe
                                                     SVP, Finance

SWA-PA-03729                              2                              SA-9
**BOEING PROPRIETARY**

**TABLE OF CONTENTS**

| ARTICLES | TITLES | |
|---|---|---|
| Article 1 | Quantity, Model and Description | SA-2 |
| Article 2 | Delivery Schedule | |
| Article 3 | Price | |
| Article 4 | Payment | SA-2 |
| Article 5 | Additional Terms | |
| **TABLE** | **TITLE** | |
| **1A** | **737-8 Aircraft Information Table** | **SA-9** |
| 1B | 737-7 Aircraft Information Table | SA-8 |
| EXHIBIT | | |
| A1 | 737-8 Aircraft Configuration | SA-8 |
| A2 | 737-7 Aircraft Configuration | SA-8 |
| B* | Aircraft Delivery Requirements and Responsibilities | |
| SUPPLEMENTAL EXHIBITS | TITLES | |
| AE1* | Escalation Adjustment/Airframe and Optional Features | |
| BFE1 | BFE Variables for 737-8 | SA-7 |
| BFE2 | BFE Variables for 737-7 | SA-8 |
| CS1 | Customer Support Variables | |
| CS1-7MAX | Customer Support Variables | SA-2 |
| EE1* | Engine Escalation/Engine Warranty and Patent Indemnity | |
| SLP1* | Service Life Policy Components | |
| **LETTER AGREEMENTS** | **TITLES** | |
| SWA-PA-03729-LA-1106463R3 | Open Matters | SA-8 |

| **LETTER AGREEMENTS** | **TITLES** | |
|---|---|---|
| SWA-PA-03729-LA-1106464* | [***] | |
| SWA-PA-03729-LA-1106465* | [***] | |
| SWA-PA-03729-LA-1106466 | [***] | |
| SWA-PA-03729-LA-1106467R2 | [***] | SA-8 |
| SWA-PA-03729-LA-1106468* | [***] | |
| SWA-PA-03729-LA-1106469R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106470R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106471R1 | Substitute Aircraft | SA-2 |
| SWA-PA-03729-LA-1106473R1 | [***] | SA-5 |
| SWA-PA-03729-LA-1106474R2 | Option Aircraft | SA-8 |
| | Attachment 1 | SA-8 |
| SWA-PA-03729-LA-1106475R3 | [***] | SA-8 |
| SWA-PA-03729-LA-1106476R2 | [***] | SA-8 |
| SWA-PA-03729-LA-1106477* | [***] | |
| SWA-PA-03729-LA-1106478 | [***] | |
| SWA-PA-03729-LA-1106479R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106480R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106481R2 | [***] | SA-2 |
| SWA-PA-03729-LA-1106482* | [***] | |
| SWA-PA-03729-LA-1106483* | [***] | |
| SWA-PA-03729-LA-1106484R1 | [***] | SA-8 |
| | Attachment A | SA-8 |
| | Attachment B | SA-8 |
| SWA-PA-03729-LA-1106485* | [***] | |
| SWA-PA-03729-LA-1209080 | [***] | SA-1 |

| **LETTER AGREEMENTS** | **TITLES** | |
| --- | --- | --- |
| SWA-PA-03729-LA-1210419 | [***] | |
| | | SA-1 |
| SWA-PA-03729-LA-1300943 | [***] | SA-2 |
| SWA-PA-03729-LA-1301168R3 | [***] | SA-6 |
| SWA-PA-03729-LA-1301170R2 | [***] | SA-8 |
| SWA-PA-03729-LA-1400371 | [***] | SA-7 |
| SASWA-PA-03729-LA-1503792 | Service Ready Operational Validation | SA-6 |
| SWA-PA-03729-LA-1500831 | [***] | |
| | | SA-7 |
| SWA-PA-03729-LA-1602486 | [***] | SA-5 |

\* Denotes revision to Page 1 or Page 2 only to reference 737-7 (SA-2)

SWA-PA-03729

**BOEING PROPRIETARY**

SA-9
Page 3

**INACTIVE / DELETED TABLES, EXHIBITS, AND LETTER AGREEMENTS**

RESTRICTED LETTER AGREEMENTS

| Letter Agreement | Title | Last Updated under SA | Current Status |
|---|---|---|---|
| SWA-PA-03729-LA-1106472R1 | [***] | SA-2 | Deleted under SA-4 |
| SWA-PA-01810/03729-LA-1301169 | [***] | SA-2 | Deleted under SA-4 |

**Table 1A To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| | | |
|---|---|---|
| Airframe Model/MTOW: | 737-8 | 181,200 pounds |
| Engine Model/Thrust: | CFMLEAP-1B288(2) | 28,800 pounds |

| | |
|---|---|
| Airframe Price: | [***] |
| Optional Features: | [***] |
| Sub-Total of Airframe and Features: | [***] |
| Engine Price (Per Aircraft): | [***] |
| Aircraft Basic Price (Excluding BFE/SPE): | [***] |
| Buyer Furnished Equipment (BFE) Estimate: | [***] |
| Seller Purchased Equipment (SPE) Estimate: | [***] |

| | |
|---|---|
| Detail Specification: | D019A008-P (5/1/2017) |
| Airframe Price Base Year/Escalation Formula: | Jul-11  ECI-MFG/CPI |
| Engine Price Base Year/Escalation Formula: | N/A  N/A |
| **Airframe Escalation Data:** | |
| Base Year Index (ECI): | [***] |
| Base Year Index (CPI): | [***] |

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Jul-2017 | 1 | [***] | 36929† | [***] | A | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Jul-2017 | 2 | [***] | 42558†, 42559† | [***] | C | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Aug-2017 | 3 | [***] | 36979, 36930, 36984 | [***] | A | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Aug-2017 | 3 | [***] | 42563, 42566†, 42567 | [***] | C | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Sep-2017 | 1 | [***] | 36934 | [***] | A | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Oct-2017 | 1 | [***] | 42544 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Oct-2017 | 1 | [***] | 42570 | [***] | C | | [***] | [***] | [***] | [***] | [***] |
| Nov-2017 | 1 | [***] | 36988† | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Dec-2017 | 1 | [***] | 42554† | [***] | C | | [***] | [***] | [***] | [***] | [***] |
| Mar-2018 | 1 | [***] | 36989† | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Mar-2018 | 1 | [***] | 42571 | [***] | C | | [***] | [***] | [***] | [***] | [***] |
| Apr-2018 | 1 | [***] | 42546 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Jun-2018 | 1 | [***] | 42572 | [***] | C | | [***] | [***] | [***] | [***] | [***] |
| Jun-2018 | 1 | [***] | 42547 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Jul-2018 | 1 | [***] | 42556† | [***] | C | | [***] | [***] | [***] | [***] | [***] |
| Aug-2018 | 3 | [***] | 42548, 37019, 42549 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Aug-2018 | 1 | [***] | 42574 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| **Aug-2018** | **1** | [***] | **42575** | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2018 | 2 | [***] | 42573, 42576 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| **Dec-2018** | **1** | [***] | **42577** | [***] | | | [***] | [***] | [***] | [***] | [***] |

SWA-PA-03729 107813 / **108198**                    **BOEING PROPRIETARY**

**Table 1A To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Dec-2018 | 4 | [***] | 37042, 42550, 42551, 37043 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Jul-2019 | 2 | [***] | 65437, 65436 | [***] | E OPEX | | [***] | [***] | [***] | [***] | [***] |
| Sep-2019 | 2 | [***] | 65471, 65438 | [***] | E OPEX | | [***] | [***] | [***] | [***] | [***] |
| Oct-2019 | 1 | [***] | 65439 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Oct-2019 | 1 | [***] | 65440 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Nov-2019 | 1 | [***] | 42536 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Nov-2019 | 1 | [***] | 65473 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Dec-2019 | 1 | [***] | 36722 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Dec-2019 | 1 | [***] | 42537 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Feb-2020 | 1 | [***] | 36727 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Mar-2020 | 2 | [***] | 42579, 42580 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2020 | 1 | [***] | 42539 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Apr-2020 | 1 | [***] | 65441 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| May-2020 | 1 | [***] | 42553 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| May-2020 | 1 | [***] | 35970 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Jun-2020 | 1 | [***] | 42607 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2020 | 1 | [***] | 65442 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jul-2020 | 1 | [***] | 42540 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Jul-2020 | 2 | [***] | 65443, 65444 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Aug-2020 | 1 | [***] | 42541 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Aug-2020 | 2 | [***] | 65445, 65446 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Sep-2020 | 1 | [***] | 33941 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Sep-2020 | 3 | [***] | 65447, 65448, 65472 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Oct-2020 | 1 | [***] | 42615 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2020 | 1 | [***] | 42543 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Oct-2020 | 1 | [***] | 65474 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Nov-2020 | 1 | [***] | 36733 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Nov-2020 | 1 | [***] | 65475 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Dec-2020 | 1 | [***] | 33940 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Jan-2021 | 1 | [***] | 35974 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Jan-2021 | 1 | [***] | 65450 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |

**Table 1A To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Jan-2021 | 1 | [***] | 65449 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Feb-2021 | 1 | [***] | 65451 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Mar-2021 | 1 | [***] | 42648 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2021 | 1 | [***] | 65452 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Apr-2021 | 3 | [***] | 42649, 42650, 42651 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2021 | 1 | [***] | 65454 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Apr-2021 | 1 | [***] | 65453 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| May-2021 | 3 | [***] | 42652, 42653, 42654 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| May-2021 | 1 | [***] | 65455 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| May-2021 | 1 | [***] | 65456 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jun-2021 | 3 | [***] | 42655, 42656, 42670 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2021 | 1 | [***] | 65457 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jul-2021 | 3 | [***] | 42657, 42658, 42671 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2021 | 1 | [***] | 65460 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jul-2021 | 2 | [***] | 65459, 65458 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Aug-2021 | 1 | [***] | 65461 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Sep-2021 | 2 | [***] | 65463, 65462 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Oct-2021 | 1 | [***] | 65466 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Oct-2021 | 2 | [***] | 65465, 65464 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Nov-2021 | 1 | [***] | 65467 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Dec-2021 | 1 | [***] | 65468 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jan-2022 | 1 | [***] | 65469 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jan-2022 | 1 | [***] | 65470 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Mar-2022 | 2 | [***] | 42678, 42679 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2022 | 3 | [***] | 42680, 42681, 42688 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| May-2022 | 3 | [***] | 42682, 42683, 42684 | [***] | | | [***] | [***] | [***] | [***] | [***] |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Jun-2022 | 3 | [***] | 42685, 42686, 42687 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2022 | 2 | [***] | 42689, 42690 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2022 | 2 | [***] | 42693, 42695 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2023 | 2 | [***] | 42560, 42565 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2023 | 2 | [***] | 42562, 42564 | [***] | | | [***] | [***] | [***] | [***] | [***] |

**BOEING PROPRIETARY**

**Table 1A To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Mar-2023 | 1 | [***] | 42557 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | 36732 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | 42555 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | 38806 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| May-2023 | 2 | [***] | 42594, 42568 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 1 | [***] | 42581 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 1 | [***] | 37034 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Jul-2023 | 2 | [***] | 42597, 42582 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 1 | [***] | 42593 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 1 | [***] | 42552 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | 2 | [***] | 42601, 42578 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 1 | [***] | 42605 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 1 | [***] | 42538 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Nov-2023 | 1 | [***] | 38815 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 1 | [***] | 42583 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2024 | 3 | [***] | 42611, 42584, 42585 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2024 | 3 | [***] | 42612, 42596, 42599 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2024 | 3 | [***] | 38817, 35968, 35972 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 2 | [***] | 42617, 42606 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 1 | [***] | 36736 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| May-2024 | 3 | [***] | 42619, 42622, 42608 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | 42610 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | 42542 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Jul-2024 | 2 | [***] | 35963, 35967 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | 2 | [***] | 42624, 42626 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | 1 | [***] | 42630 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | 1 | [***] | 36730 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Oct-2024 | 2 | [***] | 42625, 42636 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | 1 | [***] | 42639 | [***] | | | [***] | [***] | [***] | [***] | [***] |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Nov-2024 | 1 | [***] | 35971 | [***] | B | | [***] | [***] | [***] | [***] | [***] | [***] |
| Dec-2024 | 2 | [***] | 42628, 42640 | [***] | | | [***] | [***] | [***] | [***] | [***] | |

**Table 1A To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Dec-2024 | 1 | [***] | 35975 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Jan-2025 | 2 | [***] | 42633, 42634 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2025 | 2 | [***] | 38804, 38805 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Feb-2025 | 3 | [***] | 42637, 42641, 42643 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2025 | 1 | [***] | 36729 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Mar-2025 | 4 | [***] | 42644, 42645, 42646, 42647 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2025 | 4 | [***] | 42659, 42660, 42661, 42662 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| May-2025 | 3 | [***] | 42663, 42664, 42666 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2025 | 3 | [***] | 42665, 42667, 42669 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2025 | 3 | [***] | 42668, 42672, 42673 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2025 | 3 | [***] | 42674, 42675, 42691 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2025 | 3 | [***] | 42676, 42677, 42694 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2025 | 3 | [***] | 42692, 42696, 42697 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2025 | 3 | [***] | 42698, 42699, 42700 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2025 | 3 | [***] | 42701, 42702, 42703 | [***] | | | [***] | [***] | [***] | [***] | [***] |

Total:    210

\* [***]
** Manufacturer Serial Numbers (MSN) are for reference only and are subject to change.
† [***]

Notes:
(1) [***]
(2) [***]

**SUPPLEMENTAL AGREEMENT NO. 10**

**to**

**Purchase Agreement No. 03729**

**between**

**THE BOEING COMPANY**

**and**

**SOUTHWEST AIRLINES CO.**

**Relating to Boeing Model 737-8 and 737-7 Aircraft**

THIS SUPPLEMENTAL AGREEMENT No. 10 (**SA-10**), entered into as of March 29, 2018, is made between THE BOEING COMPANY, a Delaware corporation (**Boeing**), and SOUTHWEST AIRLINES CO., a Texas corporation (**Customer**).

RECITALS:

WHEREAS, Customer and Boeing entered into Purchase Agreement Number PA-03729 dated December 13, 2011, as amended and supplemented, (**Purchase Agreement**) relating to the purchase and sale of Boeing Model 737-8 (**737-8 Aircraft**) and Model 737-7 aircraft (**737-7 Aircraft**); collectively the "**Aircraft**". This SA10 is an amendment to and is incorporated into the Purchase Agreement. Capitalized terms used herein but not otherwise defined will have the meaning set forth in the Purchase Agreement.

WHEREAS, Customer has elected to exercise its right to purchase forty (40) option aircraft (the "Exercised Option Aircraft"), and to accelerate the scheduled deliveries of certain 737-8 Aircraft, as identified in Table 1A, Aircraft Delivery, Description, Price, and Advance Payments 737-8 Aircraft, attached hereto.

NOW, THEREFORE, the parties agree that the Purchase Agreement is amended as set forth below and otherwise agree as follows:

1. TABLE OF CONTENTS.

The Table of Contents of the Purchase Agreement is deleted in its entirety and replaced with a new Table of Contents (attached), which lists the Tables, Exhibits, and Letter Agreements revised by this SA-10 and is identified by "SA-10". Such revised Table of Contents is incorporated into the Purchase Agreement by this reference.

SWA-PA-03729                                    1                                    SA-10
**BOEING PROPRIETARY**

2. <u>TABLES</u>.

Table 1A, <u>Aircraft Delivery, Description, Price and Advance Payments – 737-8 Aircraft</u>, is deleted in its entirety and replaced by a new Table 1A (identified by "SA-10") attached hereto and incorporated into the Purchase Agreement by this reference.

3. <u>LETTER AGREEMENTS</u>.

Attachment 1 to Letter Agreement SWA-PA-03729-LA-1106474R2, <u>Option Aircraft</u>, is deleted in its entirety and is replaced with the attached revised Attachment 1 to Letter Agreement SWA-PA-03729-LA-1106474R2.

4. <u>ADVANCE PAYMENT IMPACTS</u>.

    4.1 The revisions applied to Table 1A, <u>Aircraft Delivery, Description, Price and Advance Payments – 737-8 Aircraft</u>, result in [***]

    4.2 [***]

    4.3 [***]

The Purchase Agreement is deemed to be supplemented to the extent herein provided and as so supplemented will continue in full force and effect.

EXECUTED IN DUPLICATE as of the day and year first above written.

THE BOEING COMPANY                    SOUTHWEST AIRLINES CO.

By:   /s/ Kyle Kersavage_____           By:   /s/ Chris Monroe_____

                                        Chris Monroe

Its:   Attorney-In-Fact_____            Its:   SVP, Finance_____

**TABLE OF CONTENTS**

| ARTICLES | TITLES | |
|---|---|---|
| Article 1 | Quantity, Model and Description | SA-2 |
| Article 2 | Delivery Schedule | |
| Article 3 | Price | |
| Article 4 | Payment | SA-2 |
| Article 5 | Additional Terms | |
| **TABLE** | **TITLE** | |
| **1A** | **737-8 Aircraft Information Table** | **SA-10** |
| 1B | 737-7 Aircraft Information Table | SA-8 |
| EXHIBIT | | |
| A1 | 737-8 Aircraft Configuration | SA-8 |
| A2 | 737-7 Aircraft Configuration | SA-8 |
| B* | Aircraft Delivery Requirements and Responsibilities | |
| SUPPLEMENTAL EXHIBITS | TITLES | |
| AE1* | Escalation Adjustment/Airframe and Optional Features | |
| BFE1 | BFE Variables for 737-8 | SA-7 |
| BFE2 | BFE Variables for 737-7 | SA-8 |
| CS1 | Customer Support Variables | |
| CS1-7MAX | Customer Support Variables | SA-2 |
| EE1* | Engine Escalation/Engine Warranty and Patent Indemnity | |
| SLP1* | Service Life Policy Components | |

| LETTER AGREEMENTS | TITLES | |
|---|---|---|
| SWA-PA-03729-LA-1106463R3 | Open Matters | SA-8 |

| **LETTER AGREEMENTS** | **TITLES** | |
|---|---|---|
| SWA-PA-03729-LA-1106464* | [***] | |
| SWA-PA-03729-LA-1106465* | [***] | |
| SWA-PA-03729-LA-1106466 | [***] | |
| SWA-PA-03729-LA-1106467R2 | [***] | SA-8 |
| SWA-PA-03729-LA-1106468* | [***] | |
| SWA-PA-03729-LA-1106469R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106470R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106471R1 | Substitute Aircraft | SA-2 |
| SWA-PA-03729-LA-1106473R1 | [***] | SA-5 |
| SWA-PA-03729-LA-1106474R2 | Option Aircraft | SA-8 |
| | **Attachment 1** | **SA-10** |
| SWA-PA-03729-LA-1106475R3 | [***] | SA-8 |
| SWA-PA-03729-LA-1106476R2 | [***] | SA-8 |
| SWA-PA-03729-LA-1106477* | [***] | |
| SWA-PA-03729-LA-1106478 | [***] | |
| SWA-PA-03729-LA-1106479R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106480R1 | [***] | SA-2 |
| SWA-PA-03729-LA-1106481R2 | [***] | SA-2 |
| SWA-PA-03729-LA-1106482* | [***] | |
| SWA-PA-03729-LA-1106483* | [***] | |
| SWA-PA-03729-LA-1106484R1 | [***] | SA-8 |
| | Attachment A | SA-8 |
| | Attachment | BSA-8 |
| SWA-PA-03729-LA-1106485* | [***] | |
| SWA-PA-03729-LA-1209080 | [***] | SA-1 |

| **LETTER AGREEMENTS** | **TITLES** | |
|---|---|---|
| SWA-PA-03729-LA-1210419 | [***] | SA-1 |
| SWA-PA-03729-LA-1300943 | [***] | SA-2 |
| SWA-PA-03729-LA-1301168R3 | [***] | SA-6 |
| SWA-PA-03729-LA-1301170R2 | [***] | SA-8 |
| SWA-PA-03729-LA-1400371 | [***] | SA-7 |
| SASWA-PA-03729-LA-1503792 | Service Ready Operational Validation | SA-6 |
| SWA-PA-03729-LA-1500831 | [***] | SA-7 |
| SWAPA03729LA1602486 | [***] | SA-5 |

\* Denotes revision to Page 1 or Page 2 only to reference 737-7 (SA-2)

**<u>INACTIVE / DELETED TABLES, EXHIBITS, AND LETTER AGREEMENTS</u>**

<u>RESTRICTED LETTER AGREEMENTS</u>

| Letter Agreement | Title | Last Updated under SA | Current Status |
|---|---|---|---|
| SWA-PA-03729-LA-1106472R1 | [***] | SA-2 | Deleted under SA-4 |
| SWA-PA-01810/03729-LA-1301169 | [***] | SA-2 | Deleted under SA-4 |

**Table 1A To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| | | | |
|---|---|---|---|
| **Airframe Model/MTOW:** 737-8 | 181,200 pounds | **Detail Specification:** | D019A008-P |
| | | | (5/1/2017) |
| **Engine Model/Thrust:** CFMLEAP-1B28**(2)** | 28,800 pounds | **Airframe Price Base Year/Escalation Formula:** | Jul-11    ECI-MFG/CPI |
| **Airframe Price:** | [***] | **Engine Price Base Year/Escalation Formula:** | N/A    N/A |
| **Optional Features:** | [***] | | |
| **Sub-Total of Airframe and Features:** | [***] | **Airframe Escalation Data:** | |
| **Engine Price (Per Aircraft):** | [***] | **Base Year Index (ECI):** | [***] |
| **Aircraft Basic Price (Excluding BFE/SPE):** | [***] | **Base Year Index (CPI):** | [***] |
| **Buyer Furnished Equipment (BFE) Estimate:** | [***] | | |
| **Seller Purchased Equipment (SPE) Estimate:** | [***] | | |

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Jul-2017 | 1 | [***] | 36929† | [***] | A | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Jul-2017 | 2 | [***] | 42558†, 42559† | [***] | C | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Aug-2017 | 3 | [***] | 36979, 36930, 36984 | [***] | A | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Aug-2017 | 3 | [***] | 42563, 42566†, 42567 | [***] | C | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Sep-2017 | 1 | [***] | 36934 | [***] | A | Note 1 | [***] | [***] | [***] | [***] | [***] |
| Oct-2017 | 1 | [***] | 42544 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Oct-2017 | 1 | [***] | 42570 | [***] | C | | [***] | [***] | [***] | [***] | [***] |
| Nov-2017 | 1 | [***] | 36988† | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Dec-2017 | 1 | [***] | 42554† | [***] | C | | [***] | [***] | [***] | [***] | [***] |
| Mar-2018 | 1 | [***] | 36989† | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Mar-2018 | 1 | [***] | 42571 | [***] | C | | [***] | [***] | [***] | [***] | [***] |
| Apr-2018 | 1 | [***] | 42546 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Jun-2018 | 1 | [***] | 42572 | [***] | C | | [***] | [***] | [***] | [***] | [***] |
| Jun-2018 | 1 | [***] | 42547 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Jul-2018 | 1 | [***] | 42556† | [***] | C | | [***] | [***] | [***] | [***] | [***] |
| Aug-2018 | 3 | [***] | 42548, 37019, 42549 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Aug-2018 | 1 | [***] | 42574 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2018 | 1 | [***] | 42575 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2018 | 2 | [***] | 42573, 42576 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2018 | 1 | [***] | 42577 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2018 | 4 | [***] | 37042, 42550, 42551, 37043 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| **Jul-2019** | **1** | [***] | **42633** | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2019 | 2 | [***] | 65437, 65436 | [***] | E OPEX | | [***] | [***] | [***] | [***] | [***] |
| **Aug-2019** | **3** | [***] | **42634, 42637, 42641** | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2019 | 2 | [***] | 65471, 65438 | [***] | E OPEX | | [***] | [***] | [***] | [***] | [***] |
| **Oct-2019** | **4** | [***] | **42646, 42647, 42661, 42662** | [***] | | | [***] | [***] | [***] | [***] | [***] |

SWA-PA-03729 107813 / 108198 / **108732**          **BOEING PROPRIETARY**          SA-10
Page 1

Table 1A To
Purchase Agreement No. PA-03729
Aircraft Delivery, Description, Price and Advance Payments
737-8 Aircraft

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Oct-2019 | 1 | [***] | 65440 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| **Nov-2019** | **1** | [***] | **42664** | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2019 | 1 | [***] | 42536 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Nov-2019 | 1 | [***] | 65473 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| **Dec-2019** | **1** | [***] | **42666** | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2019 | 1 | [***] | 36722 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Dec-2019 | 1 | [***] | 42537 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Feb-2020 | 1 | [***] | 36727 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Mar-2020 | 2 | [***] | 42579, 42580 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2020 | 1 | [***] | 42539 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Apr-2020 | 1 | [***] | 65441 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| **May-2020** | **1** | [***] | **42669** | [***] | | | [***] | [***] | [***] | [***] | [***] |
| May-2020 | 1 | [***] | 42553 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| May-2020 | 1 | [***] | 35970 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Jun-2020 | 1 | [***] | 42607 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2020 | 1 | [***] | 65442 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| **Jul-2020** | **1** | [***] | **42665** | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2020 | 1 | [***] | 42540 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Jul-2020 | 2 | [***] | 65443, 65444 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| **Aug-2020** | **2** | [***] | **42672, 42673** | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2020 | 1 | [***] | 42541 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Aug-2020 | 2 | [***] | 65445, 65446 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| **Sep-2020** | **3** | [***] | **42691, 42674, 42694** | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2020 | 1 | [***] | 33941 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Sep-2020 | 3 | [***] | 65447, 65448, 65472 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Oct-2020 | 1 | [***] | 42615 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2020 | 1 | [***] | 42543 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Oct-2020 | 1 | [***] | 65474 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| **Nov-2020** | **2** | [***] | **42697, 42699** | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2020 | 1 | [***] | 36733 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Nov-2020 | 1 | [***] | 65475 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| **Dec-2020** | **1** | [***] | **42703** | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2020 | 1 | [***] | 33940 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Jan-2021 | 1 | [***] | 35974 | [***] | B | | [***] | [***] | [***] | [***] | [***] |

| Jan-2021 | 1 | [***] | 65450 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jan-2021 | 1 | [***] | 65449 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Feb-2021 | 1 | [***] | 65451 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| **Feb-2021** | **1** | **[***]** | | **[***]** | **OPEX** | **Note 3** | **[***]** | **[***]** | **[***]** | **[***]** | **[***]** |

SWA-PA-03729 107813 / 108198 / **108732**        **BOEING PROPRIETARY**        SA-10
Page 2

Table 1A To
Purchase Agreement No. PA-03729
Aircraft Delivery, Description, Price and Advance Payments
737-8 Aircraft

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P [***] | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Mar-2021 | 1 | [***] | 42648 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2021 | 1 | [***] | 65452 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Apr-2021 | 3 | [***] | 42649, 42650, 42651 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2021 | 1 | [***] | 65454 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Apr-2021 | 1 | [***] | 65453 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| May-2021 | 3 | [***] | 42652, 42653, 42654 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| May-2021 | 1 | [***] | 65455 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| May-2021 | 1 | [***] | 65456 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jun-2021 | 3 | [***] | 42655, 42656, 42670 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2021 | 1 | [***] | 65457 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jul-2021 | 3 | [***] | 42657, 42658, 42671 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2021 | 1 | [***] | 65460 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jul-2021 | 2 | [***] | 65459, 65458 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| **Jul-2021** | **1** | [***] | | [***] | **OPEX** | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Aug-2021 | 1 | [***] | 65461 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| **Aug-2021** | **4** | [***] | | [***] | **OPEX** | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Sep-2021 | 2 | [***] | 65463, 65462 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| **Sep-2021** | **2** | [***] | | [***] | **OPEX** | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Oct-2021 | 1 | [***] | 65466 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Oct-2021 | 2 | [***] | 65465, 65464 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Nov-2021 | 1 | [***] | 65467 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Dec-2021 | 1 | [***] | 65468 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| **Dec-2021** | **2** | [***] | | [***] | **OPEX** | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Jan-2022 | 1 | [***] | 65469 | [***] | D OPEX | | [***] | [***] | [***] | [***] | [***] |
| Jan-2022 | 1 | [***] | 65470 | [***] | OPEX | | [***] | [***] | [***] | [***] | [***] |
| Mar-2022 | 2 | [***] | 42678, 42679 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2022 | 3 | [***] | 42680, 42681, 42688 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| **Apr-2022** | **1** | [***] | | [***] | **OPEX** | Note 3 | [***] | [***] | [***] | [***] | [***] |
| May-2022 | 3 | [***] | 42682, 42683, 42684 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2022 | 3 | [***] | 42685, 42686, 42687 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2022 | 2 | [***] | 42689, 42690 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| **Jul-2022** | **3** | [***] | | [***] | **OPEX** | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Aug-2022 | 2 | [***] | 42693, 42695 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| **Aug-2022** | **3** | [***] | | [***] | **OPEX** | Note 3 | [***] | [***] | [***] | [***] | [***] |

| Month | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Oct-2022 | 2 | [***] | | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Dec-2022 | 1 | [***] | | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Jan-2023 | 2 | [***] | 42560, 42565 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2023 | 2 | [***] | 42562, 42564 | [***] | | | [***] | [***] | [***] | [***] | [***] |

**Table 1A To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
| Mar-2023 | 1 | [***] | 42557 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | 36732 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | 42555 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | 38806 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| May-2023 | 2 | [***] | 42594, 42568 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 1 | [***] | 42581 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 1 | [***] | 37034 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Jul-2023 | 2 | [***] | 42597, 42582 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 1 | [***] | 42593 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 1 | [***] | 42552 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | 2 | [***] | 42601, 42578 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 1 | [***] | 42605 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 1 | [***] | 42538 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Nov-2023 | 1 | [***] | 38815 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 1 | [***] | 42583 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jan-2024 | 3 | [***] | 42611, 42584, 42585 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Feb-2024 | 3 | [***] | 42612, 42596, 42599 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Mar-2024 | 3 | [***] | 38817, 35968, 35972 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 2 | [***] | 42617, 42606 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 1 | [***] | 36736 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| May-2024 | 3 | [***] | 42619, 42622, 42608 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | 42610 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | 42542 | [***] | A | | [***] | [***] | [***] | [***] | [***] |
| Jul-2024 | 2 | [***] | 35963, 35967 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | 2 | [***] | 42624, 42626 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | 1 | [***] | 42630 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | 1 | [***] | 36730 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Oct-2024 | 2 | [***] | 42625, 42636 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | 1 | [***] | 42639 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | 1 | [***] | 35971 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Dec-2024 | 2 | [***] | 42628, 42640 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2024 | 1 | [***] | 35975 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Jan-2025 | 2 | [***] | 38804, 38805 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| Jan-2025 | 2 | [***] | | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Feb- | 1 | [***] | 42643 | [***] | | | [***] | [***] | [***] | [***] | [***] |

| Feb-2025 | 1 | [***] | 36729 | [***] | B | | [***] | [***] | [***] | [***] | [***] |
| **Feb-2025** | 2 | [***] | | [***] | **OPEX** | **Note 3** | [***] | [***] | [***] | [***] | [***] |
| Mar-2025 | **2** | [***] | 42644, 42645 | [***] | | | [***] | [***] | [***] | [***] | [***] |

SWA-PA-03729 107813 / 108198 / **108732**     **BOEING PROPRIETARY**

**Table 1A To**
**Purchase Agreement No. PA-03729**
**Aircraft Delivery, Description, Price and Advance Payments**
**737-8 Aircraft**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Manufacturer Serial Number** | Escalation Factor | Aircraft Block | Notes | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Mar-2025 | 2 | [***] | | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Apr-2025 | 2 | [***] | 42659, 42660 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Apr-2025 | 2 | [***] | | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| May-2025 | 1 | [***] | 42663 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| May-2025 | 2 | [***] | | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Jun-2025 | 1 | [***] | 42667 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jun-2025 | 2 | [***] | | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Jul-2025 | 1 | [***] | 42668 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Jul-2025 | 2 | [***] | | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Aug-2025 | 1 | [***] | 42675 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Aug-2025 | 2 | [***] | | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Sep-2025 | 2 | [***] | 42676, 42677 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Sep-2025 | 1 | [***] | | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Oct-2025 | 2 | [***] | 42692, 42696 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Oct-2025 | 1 | [***] | | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Nov-2025 | 2 | [***] | 42698, 42700 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Nov-2025 | 1 | [***] | | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |
| Dec-2025 | 2 | [***] | 42701, 42702 | [***] | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2025 | 1 | [***] | | [***] | OPEX | Note 3 | [***] | [***] | [***] | [***] | [***] |

Total:    **250**

\* [***]
\*\* Manufacturer Serial Numbers (MSN) are for reference only and are subject to change.
† [***]
Notes:
(1) [***]
(2) [***]

**(3) [***]**

SWA-PA-03729 107813 / 108198 / **108732**          **BOEING PROPRIETARY**

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| | | | |
|---|---|---|---|
| **Airframe Model/MTOW:** | 737-8 | 181,200 pounds | **Detail Specification:** **D019A008-P (5/1/2017)** 4Q16 External Fcst |
| **Engine Model/Thrust:** | CFMLEAP-1B28**(1)** | 28,800 pounds | **Airframe Price Base Year/Escalation Formula:** Jul-11   ECI-MFG/CPI |
| **Airframe Price:** | | [***] | **Engine Price Base Year/Escalation Formula:** N/A   N/A |
| **Optional Features:** | | [***] | |
| **Sub-Total of Airframe and Features:** | | [***] | **Airframe Escalation Data:** |
| **Engine Price (Per Aircraft):** | | [***] | **Base Year Index (ECI):** [***] |
| **Aircraft Basic Price (Excluding BFE/SPE):** | | [***] | **Base Year Index (CPI):** [***] |
| **Buyer Furnished Equipment (BFE) Estimate:** | | [***] | |
| **Seller Purchased Equipment (SPE) Estimate:** | | [***] | |
| **Non-Refundable Deposit/Aircraft at Def Agreemt:** | | [***] | |

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Mar-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| May-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jul-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Aug-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Oct-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Nov-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Dec-2022 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Dec-2022 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |

SWA-PA-03729-LA 1106474 107813.TXT    **BOEING PROPRIETARY**    SA-10
Page 1

Attachment 1 To
Letter Agreement No. LA 1106474
Option Aircraft Delivery, Description, Price and Advance Payments

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Jan-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Feb-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| May-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jul-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Aug-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Sep-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Oct-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| | | [***] | [***] | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Nov-2023 | | | | | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Dec-2023 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jan-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |

**BOEING PROPRIETARY**

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Feb-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Feb-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Mar-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Apr-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| May-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Jun-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Oct-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2024 | 1 | [***] | [***] | D | [***] | [***] | [***] | [***] | [***] |
| | | [***] | [***] | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Dec-2024 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |

**Attachment 1 To**
**Letter Agreement No. LA 1106474**
**Option Aircraft Delivery, Description, Price and Advance Payments**

| Delivery Date* | Number of Aircraft | Escalation Factor (Airframe) | Option Exercise Date Deadline | Aircraft Block | Escalation Estimate Adv Payment Base Price Per A/P | Advance Payment Per Aircraft (Amts. Due/Mos. Prior to Delivery): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | At Signing [***] | 24 Mos. [***] | 21/18/12/9/6 Mos. [***] | Total [***] |
| Jun-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Nov-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Dec-2025 | 3 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jan-2026 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Feb-2026 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Mar-2026 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Apr-2026 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| May-2026 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jun-2026 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Jul-2026 | 1 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Aug-2026 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Sep-2026 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| Oct-2026 | 2 | [***] | [***] | | [***] | [***] | [TXSD] | [***] | [***] |
| Nov-2026 | 2 | [***] | [***] | | [***] | [***] | [***] | [***] | [***] |
| | | [***] | [***] | | | | | | |

| Dec-2026 | 2 | | | | [***] | [***] | [***] | [***] | [***] |

Total:          115

* [***]

**Note:**
(1) [***]



SWA-PA-03729-LA-1808800

Southwest Airlines Co.
2702 Love Field Drive
Dallas, Texas 75235

Attention:    Jon Stephens, Director - Fleet Transactions

Subject:    [***]

Reference:                          A) Purchase Agreement No. PA-03729 **(Purchase Agreement)** between The Boeing Company **(Boeing)** and Southwest Airlines Co. **(Customer)** relating to Model 737-8 aircraft **(Aircraft)**

B) [***]

This letter agreement (**Letter Agreement**) amends and supplements the Purchase Agreement. All terms used but not defined in this Letter Agreement will have the same meaning as in the Purchase Agreement.

1.    [***]

2.    [***]

3.    [***]

4.    Assignment.

SWA-PA-03729-LA-1808800
[***]                          **BOEING PROPRIETARY**                          LA Page 1



Unless otherwise noted herein,[***] described in this Letter Agreement is provided [***] in consideration of Customer taking delivery of the Aircraft [***] . This Letter Agreement cannot be assigned, in whole or in part, without the prior written consent of Boeing.

5.    Confidentiality.

Customer understands and agrees that the information contained herein represents confidential business information [***] . Customer agrees to limit the disclosure of its contents to employees of Customer with a need to know the contents for purposes of helping Customer perform its obligations under the Purchase Agreement and who understand they are not to disclose its contents to any other person or entity without the prior written consent of Boeing. [***]

[***]

Very truly yours,

THE BOEING COMPANY

By    /s/ Kyle Kersavage

Its    Attorney-In-Fact

ACCEPTED AND AGREED TO this

Date:    10 DECEMBER 2018

SOUTHWEST AIRLINES CO.

By    /s/ Chris Monroe

Its    SVP Finance and Treasurer

**Exhibit 21**

**Southwest Airlines Co.**
**Subsidiaries**

| Name | State or Other Jurisdiction of Incorporation or Organization |
| --- | --- |
| AirTran Airways 717 Leasing Corporation | Delaware |
| AirTran Airways, Inc. | Delaware |
| AirTran Holdings, LLC | Texas |
| Southwest Jet Fuel Co. | Texas |
| Triple Crown Assurance Co. | Texas |

**Exhibit 23**

Consent of Independent Registered Public Accounting Firm

We consent to the incorporation by reference in the following Registration Statements (Form S-8 Nos. 33-40652, 33-40653, 333-67627, 333-67631, 333-46560, 333-98761, 333-100862, 333-139362, 333-146891, 333-160762, 333-166980, 333-190268, 333-205979, Form S-3 Nos. 333-158397, 333-180969, 333-203761, 333-222963, 333-248077, 333-252849, and Form S-4 No. 333-170742) of Southwest Airlines Co. and in the related Prospectuses of our reports dated February 4, 2022, with respect to the consolidated financial statements of Southwest Airlines Co., and the effectiveness of internal control over financial reporting of Southwest Airlines Co., included in this Annual Report (Form 10-K) for the year ended December 31, 2021.

/s/ Ernst & Young, LLP

Dallas, Texas
February 4, 2022

Exhibit 31.1

CERTIFICATION

I, Robert E. Jordan, Chief Executive Officer of Southwest Airlines Co., certify that:

1.      I have reviewed this annual report on Form 10-K for the year ended December 31, 2021 of Southwest Airlines Co.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

 (a)      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      designed such internal control over financial reporting, or caused such internal control over financial reporting to be
designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)      disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:  February 4, 2022

                                        By:    /s/ Robert E. Jordan
                                               Robert E. Jordan
                                               Chief Executive Officer
                                               (Principal Executive Officer)

Exhibit 31.2

CERTIFICATION

I, Tammy Romo, Senior Vice President Finance & Chief Financial Officer of Southwest Airlines Co., certify that:

1.        I have reviewed this annual report on Form 10-K for the year ended December 31, 2021, of Southwest Airlines Co.;

2.        Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.        Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.        The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

 (a)        designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)        designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)        evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)        disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.        The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)        all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)        any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 4, 2022

By:    /s/ Tammy Romo
       Tammy Romo
       Executive Vice President & Chief Financial Officer
       (Principal Financial & Accounting Officer)

Exhibit 32

CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350,

AS ADOPTED PURSUANT TO

SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report on Form 10-K of Southwest Airlines Co. (the "Company") for the period ended December 31, 2021, as filed with the Securities and Exchange Commission (the "Report"), Robert E. Jordan, Chief Executive Officer of the Company, and Tammy Romo, Senior Vice President Finance & Chief Financial Officer of the Company, each certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:  February 4, 2022

By:    /s/ Robert E. Jordan
        Robert E. Jordan
        Chief Executive Officer
         (Principal Executive Officer)

By:    /s/ Tammy Romo
        Tammy Romo
        Executive Vice President & Chief Financial Officer
        (Principal Financial & Accounting Officer)