IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| TEROGANESIAN | § | CASE NO. 4:23-cv-00115 |
| | § | HOUSTON, TX |
| VERSUS | § | THURSDAY, |
| | § | APRIL 3, 2025 |
| SOUTHWEST AIRLINES CO., ET AL. § | | 2:00 PM TO 2:55 PM |

MOTION HEARING

BEFORE THE HONORABLE DREW B. TIPTON
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:


FOR THE PARTIES:                SEE NEXT PAGE

ELECTRONIC RECORDING OFFICER: STACY THOMAS

COURT CLERK:                    MAYRA MARQUEZ


TRANSCRIPTION SERVICE BY:

Veritext Legal Solutions
330 Old Country Road, Suite 300
Mineola, NY 11501
Tel: 800-727-6396 ▼ www.veritext.com

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

                              APPEARANCES:

FOR THE PLAINTIFF:            GEORGE BROTHERS KINCAID HORTON
                             LLP
                             B. Russell Horton
                             114 W. 7th Street
                             Austin, TX 78701
                             512-499-0999

                             BERNSTEIN LIEBHARD LLP
                             Laurence J. Hasson
                             10 E. 40th Street
                             New York, NY 10016
                             212-779-1414


FOR THE DEFENDANTS:          NORTON ROSE FULBRIGHT US LLP
                             Michael A Swartzendruber
                             Peter Andrew Stokes
                             Kelly A. Potter
                             2200 Ross Ave
                             Dallas, TX 75201
                             214-855-8000

ALSO PRESENT:                JEFFREY MCKENDRICKS

HOUSTON, TEXAS; THURSDAY, APRIL 3, 2025; 2:00 PM

CLERK:  Case Number 4:23-cv-00115, Teroganesian v. Southwest Airlines Company.  May I please have appearances for -- starting with the plaintiff, please?

MR. HORTON:  Just a second here, sorry.

CLERK:  Sure, not a problem.

May I have the --

THE COURT:  Oh, sure.

CLERK:  (Indiscernible).

THE COURT:  Yeah, she's excited.

CLERK:  Thank you very much.  I appreciate you.

MR. HORTON:  Your Honor, if I may, Russell Horton here today on behalf of plaintiff along with Laurence Hasson and Jeffrey --

MR. MCKENDRICKS:  McKendricks.

MR. HORTON:  Is that -- okay.  And Mr. Hasson, I believe, is going to be taking the lead today.

THE COURT:  Okay.

MR. SWARTZENDRUBER:  Good afternoon, Your Honor. Michael Swartzendruber at Norton Rose Fulbright on behalf of Southwest Airlines.  And with me today are my colleagues, Peter Stokes and...

MS. POTTER:  Kelly Potter.

MR. SWARTZENDRUBER:  Yeah, and Kelly Potter.  I'm embarrassed for not having that name.

THE COURT:  And that's now on the record, so I forgive you.

MR. SWARTZENDRUBER:  It is on the record, and my apologies.

THE COURT:  No problem.  All right, so we're here today for the motion for reconsideration, and I'll have to tell you, quite frankly, the reason why I did the terse order to begin with was, I was unaware of the more detailed finding requirement.  I hadn't had one of those cases before.  Happy to make more detailed findings one way or the other.

Typically, when I see something like that, that is a pleading deficiency that's not a fraud case, what I will do is give the plaintiff an opportunity to respond after a defendant has articulated what they think are the factual deficiencies, because I think, quite frankly, that's what this circuit makes me do.  If I 12(b)(6) it out without the fraud, without giving them a chance to amend, then it normally gets sent back to a district judge to give them that opportunity.

I understand that there is a different argument in addition that is being made by Southwest, which is that there's no set of facts or circumstances, I think, that you are alleging that can be pled.  I guess, and I'm going to hear from both parties, so whatever you've got prepared today, I'm prepared to hear it.  But the general, I guess, thought process is how we would proceed.

Obviously, I will get a detailed order out, either granting or denying.  And I guess I should ask whether or not it would be the motion to reconsider, or do you want to do a clean motion to dismiss?  Do you want the opportunity to replead based on what you hear today and then get a clean motion to dismiss with the more detailed findings?  Just kind of general thoughts.

MR. STOKES:  Your Honor, I was prepared to talk about the reasons we believe, as the Court has suggested two things.

THE COURT:  You don't have to tell me that I'm wrong for the terse order.  I got it.  I agree.  Okay, so I'm -- that's what we're here for.  No, and I just want to make sure. If I was going to grant it, and most of the time, I wouldn't have gotten into the weeds like you did, because I would normally be giving him a chance to replead or let them do it for summary judgment.  So this time around, I will be certainly looking to get in the weeds.  I'm just trying to figure out what is the most efficient way to present that to me.

MR. STOKES:  I'm here today prepared to talk about what we believe the standards are under the PSLRA, why those require dismissal based upon particular facts as they've been pleaded here.  And I'll go in and just cut to the chase.  The primary issue here is, PSLRA, and I'm really willing to start this, the bottom line is, we believe that every single fact that they claim was known to Southwest and was conceivable or

misrepresented with respect to Southwest's purported vulnerability to disruptions, to events like Winter Storm Elliott, et cetera, we believe every single fact in their very lengthy complaint, 464 paragraphs, was already in the public domain.

THE COURT:  Right.

MR. STOKES:  And there simply is no case in the country, and I don't believe they're going to be able to cite you one that -- they haven't done it so far, and I don't think they're going to give you a cite today where under those circumstances, where all the facts are already in the public domain, either primarily through disclosure to Southwest, through union complaints that were public.  They were extreme. They were vitriolic.  They were all over the source of things. And yet, they were out there in the public.  Southwest, even though it would have had an opportunity to do so based upon the sensationalistic nature of those, did not dispute those.

THE COURT:  Right.

MR. STOKES:  And so therefore, all of those facts are out.  They're in fact the cover of their amended complaint over --

THE COURT:  Let me ask you this real quick.  Say I agree with you on everything that you just said.

MR. STOKES:  Right.

THE COURT:  Is it not the appropriate approach to

give them the opportunity to replead to provide facts that would do that before I would flesh them out based on your request?

MR. STOKES:  I don't believe so, Your Honor.  And I think this issue has been taken up specifically in the Southern District.  I do have some cases here that I want to just give you excerpts from.  They're all cited in our briefing.  I can get a copy to opposing counsel.

But Judge, expert's opinion in the Coggins case, I think, is instructed here in that it teaches that the sufficiency of a pleading under the PSLRA is a question of law.  And that where, in a circumstance like this, there's already been an amended pleading.  There's been a consolidated amended pleading.  There are many lawyers involved in this case.

As I said, the pleading is 464 pages long.  It scours everything that has ever been said by Southwest Airlines with respect to its systems, with respect to disruptions, with respect to its level of preparedness, with respect to the fact that it did have things that needed to be addressed with regard to various failures, the disclosures it made after other disruptions.  They've gone through everything, going back to 2016.  There's nothing left.

THE COURT:  Okay, all right, well, you can go ahead and -- I didn't mean to get you off script there.  You can go ahead.

MR. STOKES:  So if I might, Your Honor, may I hand the Court just these printout slides?  I'm actually not going to go through these.  It's just that I'm going to talk about a number of these cases, and I thought it might be helpful.

THE COURT:  Okay.

MR. STOKES:  And I have given them to opposing counsel.

CLERK:  Thank you.

THE COURT:  Thank you.

MR. STOKES:  So that's just something (indiscernible) the Court (indiscernible).

CLERK:  Oh.

THE COURT:  Okay.  These are the same thing?  Is that right?  Is it an extra copy?

MR. STOKES:  Yes, I just gave --

THE COURT:  Okay.

MR. STOKES:  -- I just made two copies.

CLERK:  Okay.

MR. STOKES:  Do you prefer that I argue from there, or it doesn't make any difference?

THE COURT:  It doesn't matter.  It doesn't matter.  Whatever makes -- all I'm interested in is information, not how you deliver it.

MR. STOKES:  Certainly, Your Honor.  So as the Court knows from our briefing, it's our view that the Private

Securities Litigation Reform Act is essentially a compulsory dismissal statute.  It requires dismissal of securities fraud claims that are anything other than straw.  That's the language that was specifically used by Congress in passing the statute to avoid dismissal.

A securities fraud complaint must make specific allegations to do three things.  They must support a strong inference of scienter.  They must be made with particularity.  And they must show that the statements were materially misleading.  Congress made a deliberate, and as the Court noted at the beginning, a deliberate departure from typical Rule 12 standards.  And the reason it did that was specifically to prevent cases proceeding, given the undue cost and settlement pressures that can arise in these types of class action securities cases.

And the Supreme Court in the Telex case emphasized that this mandate requires a comparative evaluation of the allegations and whether they raised those strong inferences at the pleading stage.  It can't be done later.  It can't be done after discovery, et cetera.  Judge Rosenthal recognized this proposition in the Helix Energy case.

And to the point that the Court asked me about it and I addressed a bit earlier, the fundamental and incurable problem with this case is that by plaintiff's own admission from the allegations in their complaint, all or virtually all

of the supposedly undisclosed or misrepresented facts regarding Southwest's knowledge about its alleged vulnerabilities to disruptions were already public.

That's primarily true, as I said through Southwest's own disclosures, but it's also true through union statements. It's also true through press reports. It's true through Southwest's response with respect to prior disruptions. So in other words, the plaintiffs allege that Southwest knew of red flags that its systems were particularly vulnerable to extreme weather events like Winter Storm Elliott, but every single reported red flag that they've pleaded in their complaint was already in the public domain. And as a matter of law, that defeats the sufficiency of a pleading to show a strong inference of scienter.

And again, as I said, under those circumstances -- and I don't think you're going to hear them cite you to a case. I likewise don't think you're going to hear them today say, there are facts out there that weren't already in the public domain, with any specificity. They may say Southwest didn't say it, they weren't emphatic enough about it, they didn't use the same type of sensationalistic languages that unions do.

But the cases make clear that a party does not have to be overly gloomy or use pejorative adjectives as long as what it is doing discloses the facts and is consistent with the actual circumstances. That's the Abrams v. Baker and Hughes

case out of the Fifth Circuit, 2002, "Disclosures need not be overly gloomy or cautious as long as reasonably consistent with reasonably available data."  That's -- Judge Rosenthal agreed completely with that position in the Dawes v. Imperial Sugar case, holding that companies need not paint themselves in the most unflattering light possible where disclosures are otherwise accurate.

And finally, we've cited the case to a -- the Court to a number of Southern District cases as well, and I want to read from one of those.  It's the In re GeoPharma Securities litigation case.  And this goes to the specific point about, well, Southwest should have said more, Southwest should have been more alarmist in terms of what it said.  The judge in GeoPharma said, "Plaintiffs have cited no case, and I'm aware of none, where a plaintiff adequately pled scienter based solely on the contradiction with the public information and the company's public statements."

And I -- that fits perfectly here with their allegations.  They admit in their pleadings that the press had reported that there were allegedly problems with Southwest's systems, problems with its recoverability, that the union had complained, oh, my goodness, we're only one bad storm away from a complete meltdown.  And the judge's comments here go precisely to that.

The fact that there is daylight between the way

someone chose to sensationalize something and the way the company objectively reported the facts will not support a finding of scienter, and again, they're not going to be able to cite you to a single case where dismissal was not required under the PSLA when all of the facts were already in the public domain.  That's one of the reasons I say there's no need for an opportunity here, and in fact, it would be inappropriate, we believe, to allow them to replead, because at the end of the day, we believe there's nothing left to be pled.

I want to take the Court through a couple of cases on that and some of the actual disclosures, and then with that, I could probably simply answer your questions that the Court has. First of all, the Fifth Circuit and many other courts have held that public disclosure, wherever it comes from, negates the required inference of scienter that a party or its officers are seeking to conceal something.  You can't be concealing something that has already been disclosed to the public. That's the Owens v. Jastrow case out of the Fifth Circuit, 2015, and I quote, "The red flags were disclosed to the public," which negates the inference that it has acted with scienter.

It's virtually the same holding with Lehman v. Holder, a 2017 opinion out of the Fifth Circuit.  I believe these are all the materials that I've given the Court.  We cited the Court to a number of Southern District of New York

cases, as I said. One of those is the Special Situations Fund v. Deloitte case. Red flags contained in publicly available documents do not support an inference of scienter.

And so what we're dealing with here is a situation where the claim is, Southwest didn't say enough about its purported old systems and that they could not keep up with a storm to the magnitude of Winter Storm Elliott and that that constituted a misrepresentation sufficient to bring a class action securities case under the PSLRA and sufficient to establish a strong inference of scienter.

But Southwest never represented that its system was fully upgraded, on the contrary. We're going to look at exactly what Southwest did say about its various systems. Southwest never represented that it was immune from large-scale disruptions associated with the weather. On the contrary, it made all sorts of representations about that and had been doing so since back in 2016, 2021, 2022. Southwest warned over and over back -- and these are specific examples. It lived with some old technology.

It had experienced cascading disruptions across its point-to-point network in the past. It needed better tools to recover. It disclosed that its scheduling technology was difficult to get back together once it got behind, which is precisely what it's alleged happened during Winter Storm Elliott, that the repeated cancellations of flights caused its

technology to get behind. These are specific disclosures made by Southwest in connection with particular events, all of which, or virtually all of which are actually contained and quoted in the complaint, the amended complaint to this case.

After disruptions in 2021, and some of these, by the way, are in exhibits to our motion to dismiss. I can tell the Court which are which if you prefer, but I want to go through probably five examples here that I think are virtually dispositive. After disruptions in June of 2021, Southwest disclosed that it had technology issues and was not able to absorb the significant events like we could in the past.

During an October 2021 series of disruptions in Florida, which are the specific subject of complaints in the amended complaint, the allegations in the amended complaint here, Southwest disclosed, "The out of place aircraft and continued strain on our crew resources created additional cancellations across our point-to-point network that cascaded throughout the weekend and into Monday." And then, immediately on the heels of that, they disclosed, "It would help for us to have better tools for recovery." Both those quotes are directly out of the amended complaint, Paragraphs 287 and 291.

Also in connection with that October 2021 series of disruptions in Florida, there's technology that's required to reschedule our flight crews. So we have flight attendants. We have pilots. We have airplanes, and once it gets behind, it's

just difficult to get that back together.  That's, again, directly out of their complaint at Paragraph 291.

And that's specifically the thing that they complain about in this statement.  They say, Southwest didn't disclose that it had systems that could get behind and that it couldn't get the airplanes to the right place, and it couldn't get the crews to the right place, and it's all because they had this outdated technology and they concealed that from everybody.

On December 8th of 2021, Southwest publicly cautioned that there were, I quote, "too few options to get our customers and our crews to where they needed to be if our operating tempo was disrupted."  And then, perhaps most significantly, Your Honor, before Winter Storm Elliott happened in December of 2022 during the holiday, as you may recall, before that happened, Southwest disclosed that it was undertaking what it called a multi-year modernized operation program.

And it made press releases in that regard, and it said, this was being done with the intent, and I quote, "to lessen the impact of your regular events and reduce the cause of disruption."  Importantly, in that specific release about what was going to happen and about this program, Southwest also disclosed that specific network design and recovery and mobility digital tools were not included for delivery until after 2023.

So in other words, they disclosed, not only do we

have these deficiencies, not only could these create problems in dealing with disruptions, we're doing something about it, and we have a plan here, and here's what the plan is going to do, but the specific tools that are going to be necessary to deal with more efficient recovery are not going to be here until more than a year after what turned out to be the day of Winter Storm Elliott.

I have already talked about the union criticisms. The union, and then you can literally look at the first page. The cover of their complaint cites this big old union public statement, we're one storm away from the whole thing supposedly crumbling, et cetera. Again, very sensationalistic. That information is out there, and Southwest, even though it would have been justified in coming back and correcting some of the overstatements, didn't do that.

So this whole idea that it wasn't out there, that supposedly Southwest's systems were inadequate to deal with an extreme weather event, et cetera, and that Southwest acted with scienter to fail to disclose that because it didn't use the same sort of sensationalist unions did, is simply contrary to the law.

THE COURT: Do we know whether or not the unions said anything to Southwest privately?

MR. STOKES: There are certainly -- there are all manner of allegations in the complaint, but yes, they did say

things (indiscernible) --

THE COURT:  So what does that do --

MR. STOKES:  -- as well.

THE COURT:  Well, so that's not the public, right?

MR. STOKES:  Well, but it's all just a repeat of the same thing.

THE COURT:  How do you know?

MR. STOKES:  Including -- well, based upon their allegations in the complaint.  They don't have any allegations in the complaint of anything substantively different that was purportedly said to Southwest by the union.

THE COURT:  So you're saying that everything that the union said in private they said in public?

MR. STOKES:  Yes.

THE COURT:  Okay.

MR. STOKES:  In fact, they -- that's -- it's not -- I don't think I'm giving away any inside baseball secrets here, but the Southwest unions, like any pilots unions, particularly when they're in negotiations, do most of their negotiating in public anyway, and so yes, what they were saying about the company, the complaints that were made, it was all about, we've been telling them this for years, and here's what it is, et cetera.

THE COURT:  And you think that the complaint definitively establishes that, that those were -- that

everything that they said in private was in public?

MR. STOKES:  I think that the complaint definitively establishes that they've identified nothing that was ever purported, even purportedly said to the company that wasn't made public.

THE COURT:  Okay.

MR. STOKES:  Now, I've already talked to the Court about the cases, the Rosenthal opinion in Dawes v. Imperial, and the Abrams v. Baker Hughes opinion out of the Fifth Circuit, saying that you don't have to make overly gloomy disclosures.

The last couple of things I want to address here, Your Honor, before I answer any more questions the Court may have, is, the Paragraph 1 in the amended complaint talks about the fact that Winter Storm Elliott, there's no dispute about this, Winter Storm Elliott was unprecedented in terms of scope and effect and was unlike anything Southwest Airlines had ever seen in its 50-plus year history.  That's from straight out of Paragraph 1 of the amended complaint.

And the plaintiffs have cited no particularized facts or alleged no particularized facts that Southwest purportedly had any unique knowledge about when something like Winter Storm Elliott might actually happen, et cetera.  Whether they're trying to engage in fraud by hindsight, that won't work.  The Fifth Circuit, again, in Owens v. Jastrow held that even the

fact that a company had to write off the entire value of a billion-dollar portfolio of mortgage-backed securities as being worthless, did not -- was insufficient to plead a claim of strong inference of scienter that the executives had known that the actual value of those securities was worthless.  That's how extreme the proposition goes in terms of not being able to simply plead fraud by hindsight and claim they must have known.

You have to show at the pleading stage specific facts that aren't already disclosed to the public that raise a strong inference of scienter.  And with respect to that, in terms of discussing scienter, it is a very, very high standard.  It means that the individual defendants, and by the way, it has to be pleaded with respect to each individual defendant.  You can't engage in group pleading.  That's very, very clear in the Fifth Circuit, and it's clear in this district, that they either intended to deceive, manipulate, or defraud, or that they acted with severe recklessness.

And severe recklessness is -- means that.  It means severe, as it's been defined by one court, "extreme departure from ordinary care and that the misleading nature of the disclosure must have been so obvious that the individual defendants must have known about it."  In a case called Nathensonzer (sic) v. Zonagen, the Fifth Circuit addressed it in this way, saying, "Recklessness is a slightly lesser species of potential misconduct, rather than some form of negligence."

Judge Bennett in this district held the same, citing that case, and said -- this is the Flotek Industries case from 2017. Judge Bennett wrote, "Even if Flotek could have provided clear disclosures, Flotek's actual disclosures are not so blatantly misleading as to be severely reckless." And that ruling, dismissing the complaint for lack of scienter, was affirmed by the Fifth Circuit in 2019.

I think, given the Court has already said you're going to engage in reconsideration et cetera, I think that's all I have on the standards, but I am very happy to answer any questions the Court may have.

THE COURT: Well, I don't want to step on there, because I've got some here, but I don't want to step on toes. Most of the thing that I wanted to do ahead of time so I didn't throw you off your presentations, was to find out procedurally how we thought that we should go, whether or not it needed to be a new motion to dismiss, just treat the motion for reconsideration like the motion to dismiss again. I don't even think the plaintiffs want my first order to stand.

In order for it to be able to stand appeal, at some point, I would need to put a little bit more meat on the bone as far as the analysis. So and whether or not there should be an amended complaint, if there's anything that the plaintiff feels like they need to add to the complaint, those are just kind of generally more process as opposed to substance, so all

right.

MR. HASSON:  All right.

THE COURT:  All right, go ahead.

MR. HASSON:  Thank you, Your Honor.  Laurence Hasson from Bernstein Liebhard, representing the plaintiffs.  This is very off script from where I expected the hearing to go.

THE COURT:  Where did you expect it to go?

MR. HASSON:  Well, Your Honor, I thought we were going to discuss the standard for reconsideration and the initial instance.

THE COURT:  I -- yeah, I think -- were you prepared to proceed?

MR. HASSON:  Well, I was going to discuss how, in order to get reconsideration, which is an extraordinary remedy here, there has to be good reason and good cause, even under Rule 54(b).  As I read Your Honor's order, it said that you reviewed the record, the briefing, and applicable law, and reached your findings based on that.

Defendants raised a host of -- argued that Your Honor's order was too short, but there is no requirement to write a long and detailed order in these types of cases, even with the heightened pleading standard of PSLRA.  We presented to you several instances in which courts have written similarly concise decisions, and I point you to the Torres case, which we cited in our brief.

It's a Northern District of Texas 2022 case, short order just like you had here in a PSLRA case.  And in that case, the defendants raised precisely the same arguments that the defendants do here, that the motion -- that the order should have been more detailed, should have gone through statement by statement.  And the Court flatly rejected that argument and said that the defendants can't rehash the arguments that failed on the motion to dismiss, which is --

THE COURT:  You don't think that the Fifth Circuit requires more detailed analysis of the scienter requirement than what I gave in the first order?

MR. HASSON:  Well, Your Honor, I mean --

THE COURT:  I mean, I think what I've read, at least in one of the Fifth Circuit cases, was a particularized assessment, individual by -- individual by individual defendant.

MR. HASSON:  Well, Your Honor, I believe you're referencing the (indiscernible) case that they cite.  Is that possible?  I -- the word "analysis" is very different from detailing that analysis into an order, so I took your order to mean that you reviewed everything, including the applicable law, and issued your order.  That doesn't mean you have to now rewrite a long and detailed order that goes statement by statement, and that's why we provide --

THE COURT:  Well, I plan on doing that.

MR. HASSON:  Yeah.

THE COURT:  Even if I wind up going the same way that I did, I just think that it is better, for the record, for me to have done a more detailed finding.

MR. HASSON:  Okay, so and even if you did that, so I would say, the thrust of what defendants have argued here today is a -- is an argument that's really not permissible on a motion to dismiss in any event.  I mean, they've stood here today and argued that there was truth on the market, that everything was disclosed.  That's inherently a fact-intensive inquiry that courts don't decide on motions to dismiss.

I would point you to, I believe, it's Page 19 of our motion to dismiss.  We -- of our motion to dismiss opposition where we detail this, determining the -- this is the Wyland v. Stone Energy case, determining the degree of intensity and credibility of corrective information is inappropriate on a motion to dismiss.  And there's a line of cases that we cited that all speak to that point.

We also fundamentally disagree with defendant's representations.  They took a lot of isolated quotes and put them before you today, but the fact of the matter is, Your Honor, is that at no point until after the epic meltdown, we call it the epic meltdown, after that occurred, that was the first time that the market learned and passengers learned about the precise vulnerability of defendant's systems, that it could

not handle, it had no contingency planning, five percent of flights that were cancelled on short notice, their systems could not address.

THE COURT: Maybe an oversimplification of what they argued was that everything that you had in the complaint was in the public domain, that it forms the basis of your -- I mean, is that generally what you're saying, that they haven't identified anything as a public -- is there anything, and again, I don't want to sandbag you if you aren't here prepared to have that conversation. And I'm open to the idea of having a supplemental briefing on an expedited schedule after the hearing so that everybody has plenty of time to get their thoughts in order.

I apologize if you were coming here to argue one issue and are getting surprised with another one. I don't want to put you in that position, but one of the things that they have been alleged, and one of the questions that I have is, are there facts in the complaint, or could you amend your complaint to add facts that weren't in the public domain, facts that deal with scienter of each individual defendant, things of that nature?

MR. HASSON: I mean, there are certainly facts. I mean, just to speak to this point generally, the facts that are in the public domain were generalized. Okay, so general facts that are not --

THE COURT:  No, no, I get that.

MR. HASSON:  Yeah.

THE COURT:  No, I'm trying to -- I completely understand that.  What I'm trying to say is, do you have in your complaint something that is not in the public domain?

MR. HASSON:  Yeah, so for example, I mean, Casey Murray, who was the head of SWAPA at the time, the pilots' union, he -- let me find the -- we reference it in the complaint, but he --

THE COURT:  And like I said, in supplemental briefing, we'll just agree to a schedule.  You can identify these facts were not in the public domain, see end complaint, blank, blank, blank.

MR. HASSON:  Well, so he said that SWAPA is a data-driven organization, and they provided both data and data-driven proposals on how to fix the vulnerability that was at issue.  Everything that the -- that SWAPA made public was just their general complaints, that we don't have adequate systems, but they did not go into any level of detail that they provided directly to Southwest management on how to fix the --

THE COURT:  And that's in your complaint?

MR. HASSON:  Yes, that they provided --

THE COURT:  Okay.

MR. HASSON:  -- data-driven proposals to -- directly to management.  And this was repeatedly ignored.  And

management sat in front of Congress, and when they were asked, hey, what happened here, how come you didn't heed the warnings provided by the pilots' unions and the other unions, they said we messed up.  That's another quote that's on our -- at the front of our complaint.  They said we messed up.

They paid the price.  They didn't dare turn around to Congress and say, you know what, we told you so, we told you we have bad technology.  And some of the other statements that opposing counsel raised like, we need to modernize and to upgrade, those are routine statements that any company would say about technology.  We don't underscore anyone that there was actually a problem, a real problem, a fundamental problem with the systems.

And in response to earlier meltdowns, like the June 2021 meltdown and the October 2021 meltdown, they expressly said that this was a one-off issue, it's a human error, it's not an issue of technology, we have wonderful technology, we have no lack of technological capability.  So what they're trying to do right now is put the facts on trial, and that's not -- even if Your Honor was no rewrite the motion to dismiss decision, it's not a place to try the facts today, so --

THE COURT:  Yeah, and I certainly wouldn't be trying the facts.  What I'm just trying to do is make sure that the facts are sufficiently pled.  That's it.  And I'll -- I have to take them as truth, okay, so I just want -- that's why I may

need some help from the parties in their assessment of what's in the complaint and what is not in the complaint that deals, for example, are you alleging that the defendant ignored non-public warnings?

MR. HASSON:  Yes.

THE COURT:  If so, can you point me to that in your complaint?  I don't need to hear argument that it's persuasive. I would just like to say, here are those paragraphs.  Here they are.  Give the Southwest an opportunity to respond, nope, that's not what that says, not what it means.  Same thing for scienter, all of the things that deal with, I guess, a more -- the elements of the complaint.  And so that's why I was trying to figure out the process in order for you to do that.  So what's in the public domain?  What was said by whom to whom, each individual defendant, and things of that nature?

MR. HASSON:  Yeah, so respectfully, rather than respond off the cuff to something like that --

THE COURT:  Right.

MR. HASSON:  -- I think it would be most appropriate to see how you ultimately rewrite the order.

THE COURT:  Well, I don't know.  So I don't know --

MR. HASSON:  Oh, well, so --

THE COURT:  Right.  I don't know what I'm going to do, so it's up for -- I mean, the motion to reconsider is -- it's just like granting a summary judgment.  The motion to

reconsider gets filed.  You go, oh, I'm granting the motion to reconsider.  I'm revisiting summary judgment.  That's certainly on the table in this case, based on where we are.  Typically, like I said, the benefit of the doubt I give in 12(b)(6) motions is to the plaintiff to allow them to do some discovery on certain things where I've thought were arguably could be read a certain way.

And in this case, given the more detailed analysis that I think the Fifth Circuit would require before we got off into discovery, I think it makes sense for you to just not do discovery, not put your case, but just to deal with the specific elements that they allege were not pled in your complaint.  And if you say, well, I can fix that by amending my complaint, amending your complaint.

MR. HASSON:  Yeah, I think our complaint sufficiently pleads those things.

THE COURT:  Okay.

MR. HASSON:  And if it's helpful for you, for us to try and digest them for you in a supplemental brief, I mean, we --

THE COURT:  Right.

MR. HASSON:  -- can certainly do that.  At this moment in time, I don't have all sorts of paragraph references, but --

THE COURT:  Yeah.

MR. HASSON:  -- I mean, I can say that, you know, from what I do have, again, defendants never disclosed that the Sky Solver systems would crash under just 200 or 300 short-notice cancellations.  That's at -- that's five to seven percent of their daily flights.  They fly 4,000 flights.  That's at Paragraph 57 of our complaint.

They never disclosed that their systems would require a manual process to reschedule pilots' flights, passengers, and crews across Southwest point to point network, I can refer you to Paragraph 157, 178, and 418 to 422 of our complaint, or that the systems were incompatible with each other, that the Sky Solver, Baker, and (indiscernible) systems could not interact well and were not optimized to do so, and I can refer you to Paragraphs 57 to 60 of our complaint.

With respect to the June 2021 meltdown, and there are more paragraph cites, like I said, defendants blamed third-party weather data providers, and Defendant Nealon said, "This was not a failure of technology."

And Kelly -- and Defendant Kelly said, "It was a one-off due to human error," and that's at Paragraph 14 of our complaint, and I think there are other references to this as well, Your Honor.

THE COURT:  This is your amended complaint?

MR. HASSON:  This is the -- yeah, so and that's another thing that I, actually, I just wanted to take a moment

to speak to.  The way these securities cases work is, there's an initial complaint that's filed.  The -- a lead plaintiff is ultimately appointed, which Your Honor did here.  And then an amended complaint is filed.  It's typically not treated as an amended as --

THE COURT:  Right.

MR. HASSON:  -- right, the only complaint.  So defendant's argument that, even if Your Honor were to find deficiencies with the plaintiff, we don't think that there are any, but even if Your Honor were to find that there are some deficiencies, we should have the right to amend the complaint, as is typically given in these types of cases.

THE COURT:  Okay.

MR. HASSON:  But anyway, just getting back to a couple more references, to the extent it's helpful, with respect to the October 2021 meltdown, you had the company blamed weather and external constraints but denied the system's central role.  Kelly, Defendant Kelly, at that time boasted that Southwest had wonderful technology and that Southwest had no lack of technological capability after the meltdown.  That's at Paragraph 18 and some others in the complaint.

And going into the holiday season, defendants also said that they were well positioned and prepared to handle any scenario.  That's at 261 of the complaint.  And as I mentioned, routine plans to modernize do not indicate that there are older

-- that technology is dysfunctional or deficient in any way, shape, or form.

The type of statements that defendants made here were also not just generic.  Okay, they were very context specific.  They were specifically about the systems.  They were specifically in response to, for example, those June and October meltdowns.  These were not just isolated statements that could be construed as puffery in any way, shape, or form.  And again, I'll refer you to Paragraph 64 for, "Defendants knew of the vulnerability years prior to the meltdown."  That's 64 of our complaint.

And there's a call between Defendant Jordan and Defendant Watterson that was leaked by Twitter.  That's at Paragraph 177 to 178 of the complaint, in which Defendant Jordan admitted that they'd been discussing Southwest's lack of tools long before the meltdown, it was at least a year prior to the meltdown, and to messing up into not heeding the union's warnings.  Those are just, again, some of the examples that I have at my disposal today, but --

THE COURT:  Well, I'm not going to rule today.

MR. HASSON:  Yeah, I understand.

THE COURT:  You don't have to worry that you're about to -- or you're playing in fear of plaintiffs' (indiscernible) --

MR. HASSON:  No, no, no, I just wanted to provide

some, at least, some citations that Your Honor could think about while we do whatever supplemental briefing Your Honor thinks is appropriate.

THE COURT:  Okay.

Did you have anything that you want to respond to?

MR. STOKES:  I -- very briefly, Your Honor.

THE COURT:  Sure.

MR. STOKES:  I think the courts make very clear that -- so we probably need to talk about process.  I just -- I do want to, for a moment, set context here again.  He said that Captain Murray claims to have given them data proposals that they ignored.  This isn't a case about ignoring things, not taking suggestions, business judgment, any of those things.  This is a case about whether specific misrepresentations or concealment was made with scienter.  That's what this is.

THE COURT:  Right.

MR. STOKES:  This is a securities fraud case.  They can't throw in other manners of purported -- other means of purported wrongdoing.  This either stands or falls in terms of whether or not they have pleaded their facts consistent with the standards, heightened standards, in the PSLRA.

Second thing I would point out, just as a matter of optics, he said that -- CEO had said, we believe we're ready, we're ready for the holidays, we're ready for anything that comes at us.  They've got to show that that was falsely made

with scienter, and they've got to show that information to the contrary wasn't already out in the public.

He talks about Captain Murray. I'll literally refer the Court to the cover page of the 100 and -- I don't know how many pages this is, but 464-paragraph complaint, this is Captain Murray, "I fear that we are one thunderstorm, one air traffic control event, one IT router failure," which is what happened in June of 2021 when Southwest said, got some -- can have problems catching up with this stuff, "away from a complete meltdown." That's Thanksgiving or Christmas or New Year.

That's the precarious situation we're in. That's Captain Murray. That's what was out in the public domain, and they've got to show, if they want to rely upon something like, "we're ready for the holidays" being a false -- a materially false statement with particularity, made with scienter, they have to plead facts adequate to do that.

The last thing I want to say is, I would refer the Court to two -- Footnote 15, and please help me. Is it our original brief or in our reply? Reconsideration reply, that's what I thought, where we cited the Court to four cases from this district, three Judge Bennett cases and one Rosenthal case, determining that the opportunity to replead after this type of circumstance, where an amended pleading has been filed, and where the scienter allegations failed, in particular, under

circumstances like these, where they either fail scienter fundamentally or they fail to -- with regard because facts are already out there.  I'd refer the Court to those cases, because in each of those cases, those judges determined that it's inappropriate to allow a repleading.  So the reason I raise that is, just procedurally, in terms of what the Court wants us to do next --

THE COURT:  Right.

MR. STOKES:  -- how we do that.  And I think that ought to be, with all due respect, I think they ought to be directed to refer the Court in their briefing to things that are in their amended pleading to --

THE COURT:  Well, I think I heard them say that they've got plenty in there.  I mean --

MR. STOKES:  I think they did, too, and that's what I heard him say, and I just -- I think they ought to be confined to that, because I think the opportunity to replead is yet a different animal for a different day, perhaps, Your Honor.

THE COURT:  Okay, let's go off the record for a second.

(Off the record).

THE COURT:  We're going to have some post-hearing submissions from the parties, and I'll give you all, the parties, an attempt to correct the understanding, so the minute entry will reflect that the defendants will identify the issues

that they think are factually or legally defective in the complaint and/or other reasons why the case should be dismissed by an agreed-upon date.  The plaintiffs will file a brief that identifies the complaint to the factual -- the paragraphs in the complaint and/or cases that respond to that by an agreed-upon date by the parties.  And then, the defense will be able to reply to that thing, what they think about the factual or legal deficiencies that they think were cured by the plaintiff by an agreed-upon date.  Does that sound right?

MR. HASSON:  That sounds correct to the defendant, Your Honor.

MR. STOKES:  Certainly, Your Honor.

THE COURT:  Okay, all right, so if there's nothing further, we'll stand adjourned, and I'll look forward to receiving that.  You can send it by email, or you can send a proposed order.  It doesn't matter to me.  Or you can just have an understanding.  Just make sure that we know, so that we can have a calendar to stay on top of it.  There's no rush.  It's whatever the parties agree to, I'm happy to defer to the parties.  All right?

MR. HASSON:  Actually, Your Honor, I have one last question.

THE COURT:  Sure.

MR. HASSON:  Do you want us to file the brief plan when it's ready?  Or how do you want us to communicate it to

you?

THE COURT:  You can file it whenever.  So you're -- when I'm saying, "Let me know," let me know the schedule.  And for example, your primary brief, which would be in response to what the deficiencies are, will be due by such and such a date.  Yeah, that will be a filed post-hearing submission, plaintiff's post-hearing submission, and then you'll have defendant's post-hearing response or reply, whatever you call it, by such and such a date.

MR. STOKES:  And we'll just submit a stipulation or a post-agreed order on that schedule to the Court so that you can --

THE COURT:  It can either -- it can be -- it can either be an --

(Hearing adjourned at 2:55 PM)

* * * * *

C E R T I F I C A T I O N


    I, Sonya Ledanski Hyde, certified that the foregoing

transcript is a true and accurate record of the proceedings.

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501


Date:  April 24, 2025