United States District Court
Southern District of Texas

**ENTERED**

April 01, 2026

Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ARTHUR TEROGANESIAN, individually and on behalf of all others similarly situated, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 4:23-CV-00115 |
| SOUTHWEST AIRLINES CO., GARY KELLY, TAMMY ROMO, ROBERT E. JORDAN, MICHAEL G. VAN DE VEN, THOMAS NEALON, and ANDREW WATTERSON, | § § § § § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

This is a securities fraud class action against Southwest Airlines Co. ("Southwest" or "the Company") and several of its current and former high-level executives: Gary Kelly (former Chief Executive Officer and current Executive Chairman), Tammy Romo (current Chief Financial Officer), Robert Jordan (current Chief Executive Officer), Michael Van de Ven (former Chief Operations Officer and President), Thomas Nealon (former President), and Andrew Watterson (current Chief Operations Officer) (the "Individual Defendants").

This action stems from allegations that Defendants made a series of misstatements to the investing public over a three-year period[1] about the Company's operational

---

[1]   The proposed Class Period is from February 4, 2020, through March 14, 2023, inclusive (the "Class Period").  (Dkt. No. 51 at 8).

resiliency and its technology infrastructure.  Plaintiffs, Southwest shareholders, claim that these misstatements artificially inflated the Company's stock price and that they incurred losses when three severe flight-disruption events exposed the fragility of Southwest's operations.

Pending before the Court is Defendants' Motion for Reconsideration, (Dkt. No. 65), and Plaintiffs' and Defendants' post-hearing submissions, (Dkt. No. 87).  For the following reasons, the Court **GRANTS** Defendants' Motion for Reconsideration, (Dkt. No. 65), **WITHDRAWS** its Order denying Defendants' Motion to Dismiss Plaintiffs' Complaint, (Dkt. No. 62), and **GRANTS** Defendants' Motion to Dismiss Plaintiffs' Complaint, (Dkt. No. 57).  Plaintiffs' claims are **DISMISSED without prejudice**.

## I.     BACKGROUND[2]

### A.     SOUTHWEST OPERATIONS

Southwest is the third largest airline in North America based on passengers flown. (Dkt. No. 51 at 22).  Unlike many competitors who utilize a "hub-and-spoke" system, the Company's "point-to-point" route structure flies directly between cities without a central hub.  (*Id.* at 23).  As a result of this decentralized structure, and as Plaintiffs acknowledge, "while flight and crew scheduling is complex and critical for all major airlines, it is uniquely and particularly challenging for Southwest—and even more so when [operational irregularities] occur."  (*Id.*).

---

[2]    Unless otherwise noted, the Court's recitation of facts is derived from the operative Complaint, (Dkt. No. 51), and are taken as true and viewed in the light most favorable to Plaintiffs, *see Sonnier v. State Farm Mut. Auto Ins.*, 509 F.3d 673, 675 (5th Cir. 2007).

To manage its logistics, Southwest utilizes a suite of legacy scheduling software, including SkySolver for crew assignments, Baker for aircraft and passenger routing, and the Crew Hotel and Accommodations Team ("CHATNOC") for communicating the assignments.  (*Id.* at 9 n.2).  Plaintiffs allege that SkySolver is "ancient by any standard" and struggled with short-notice cancellations, which then forced the Company into a process of manually matching planes, pilots, and crew members.  (*Id.* at 24).  Further, Baker did not work well with SkySolver because it failed to account for crew requirements during delays and cancellations.  (*Id.* at 24–25).  And these software incompatibilities were exacerbated by Southwest's lack of "an automated, internet-based system for [communicating] flight and crew scheduling changes." (*Id.* at 25).  Instead, Defendants relied on CHATNOC, a call center where pilots and crews learned what flights they were staffed on and booked hotels to ensure compliance with federal rest requirements.  (*See id.* at 9 n.2, 25).

Plaintiffs allege that Southwest Airlines Pilots Association ("SWAPA") and Southwest Flight Attendants' Union, Transport Workers Union of America Local 556 ("TWU"), publicly warned Defendants of their lingering technology issues for years leading up to the flight disruption events.  (*See id.* at 8, 9, 12).

B.    FLIGHT-DISRUPTION EVENTS

Plaintiffs contend that the scheduling software issues caused at least three severe flight-disruption events during the Class Period.[3]

First, the June 2021 disruptions. Beginning on June 14, 2021, Southwest canceled approximately 2,000 flights over a three-day period. (*Id.* at 31). The issues were reportedly triggered by a "network connectivity issue with weather data from a third-party vendor." (*Id.*).

Second, the October 2021 disruptions. Beginning on October 8, 2021, Southwest canceled approximately 2,000 flights over a four-day period. (*Id.* at 39). The cancellations coincided with thunderstorms in the Orlando, Florida area "that impacted many flights in and out of the region on all airlines." (*Id.*). That day, in a post on X (formerly Twitter), Southwest noted that air traffic control issues and weather caused the high volume of cancellations. (*Id.*). Air Traffic Control then posted that "widespread severe weather, military training, & limited staffing in one area of the Jacksonville en route center" had caused cancellations and "[s]ome airlines continue to experience scheduling challenges due to aircraft and crews being out of place." (*Id.* at 40).

And third, the December 2022 disruptions. Beginning on December 21, 2022, Southwest canceled over 16,700 flights during a ten-day period. (*Id.* at 71). Winter Storm Elliott, which generated snow, high winds, and record cold temperatures for five days,

---

3    Southwest experienced at least two other flight-disruption events before the Class Period, including the "Midway Meltdown" in 2014 and a "Router Burnout" or "Brownout" in 2016. (Dkt. No. 51 at 10, 164). In Plaintiffs' estimation, these events were early indicators of future systemic technological failures. (*Id.* at 163–64).

was the catalyst of the cancellations. (*Id.* at 54). Plaintiffs allege that "[e]very airline was initially impacted by the severe weather; however, as the severe weather abated, every major airline, except Southwest, was able to timely recover from the event and steadily return to normal operations." (*Id.*). An article published on January 3, 2023, explained that "[t]he primary reason for the [December 2022 disruptions] at Southwest was its outdated optimization technology." (*Id.* at 158).

### C.   POST-DECEMBER 2022 DEVELOPMENTS

In the aftermath of the December 2022 disruptions, federal lawmakers and regulatory agencies launched investigations into Southwest's operations, some of which are ongoing. (*Id.* at 11, 63–64). In February 2023, the Senate Committee on Commerce, Science, and Transportation ("the Committee") held a hearing where Southwest executives apologized for the cancellations. (*Id.* at 160–61). In March 2023, Southwest announced a $1.3 billion tactical plan to modernize its technology, including upgrades to address the "functional gap" in its scheduling software revealed during the December 2022 disruptions. (*Id.* at 161–62).

### D.   PROCEDURAL HISTORY

On January 12, 2023, Arthur Teroganesian brought a class action lawsuit against Southwest, Kelly, Romo, and Jordan for violations of (1) Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), *see* 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), *see* 17 C.F.R. § 240.10b-5; and (2) Section 20(a) of the Exchange Act, *see* 15 U.S.C. § 78t(a), (Dkt. No. 1).

Defendants requested that the response date be deferred until after the appointment of a lead plaintiff and after the timetable for an amended complaint was set, (Dkt. No. 8), which Judge Lynn N. Hughes, then presiding, granted, (Dkt. No. 10).  This case was reassigned to the undersigned shortly thereafter.  (Dkt. No. 12).

Four individuals requested that the Court appoint one of them as the lead plaintiff in this litigation, (Dkt. Nos. 13, 14, 16, 17), and two of the four moved to consolidate this case with a closely related, subsequently filed action,[4] (Dkt. Nos. 13, 14).  On July 15, 2023, the Court permitted consolidation of the cases and appointed Plaintiff Michael Berry as lead plaintiff.  (Dkt. No. 46).

On September 15, 2023, Lead Plaintiff Michael Berry ("Lead Plaintiff") and an additional named Plaintiff Jay Almer (collectively, "Plaintiffs") filed the operative Complaint (the "Complaint").  (Dkt. No. 51).  The Complaint was brought on behalf of the Plaintiffs and "all persons or entities who purchased Southwest Airlines Co. securities" during the Class Period.  (*Id.* at 8).  It alleges two counts against Southwest and the Individual Defendants.  (*Id.*).  In the first count, Plaintiffs assert a "misstatement" claim, alleging that the Defendants violated Section 10(b) and Rule 10b-5(b)[5] by making

---

[4]  *See Carlson v. Southwest Airlines Co., et al.*, Civil Action No. 4:23-CV-00920 (S.D. Tex. filed Mar. 13, 2023).

[5]  Section 10(b) of the Exchange Act provides:

> It shall be unlawful for any person, directly or indirectly, . . . To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

(continue)

several misleading statements about Southwest to investors. (*Id.* at 176–79). In the second count, Plaintiffs assert that the Individual Defendants controlled Southwest and are derivatively liable for Southwest's fraudulent misstatements under Section 20(a).[6] (*Id.* at 179–80).

Defendants moved to dismiss the Complaint under the mandatory pleading requirements imposed by the Private Securities Litigation Reform Act (the "PSLRA") and Federal Rules of Civil Procedure 9(b) and 12(b)(6). (Dkt. No. 57). The Court denied Defendants' Motion to Dismiss. (Dkt. No. 62). Defendants moved for reconsideration of the denial. (Dkt. No. 65).

The Court held a hearing on the Motion for Reconsideration. In it, the Court requested post-hearing submissions from the Parties on the purported factual and legal

---

15 U.S.C. § 78j(b).

> Rule 10b-5, promulgated by the SEC to enforce Section 10(b), provides:
>> It shall be unlawful for any person, directly or indirectly, . . . (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

6    Section 20(a) of the Exchange Act establishes control-person liability. A person who controls another person—i.e., a controlling person—shall be held liable to the same extent as the controlled person, unless the controlling person "acted in good faith and did not directly or indirectly induce" the fraud. 15 U.S.C. § 78t(a). Control in this context means "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.

deficiencies in the Complaint.  (Dkt. No. 81 at 34–35).  The Parties filed their post-hearing submissions.  (Dkt. No. 87).

## II.    LEGAL STANDARD

### A.    MOTION TO DISMISS

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss for "failure to state a claim upon which relief can be granted."  In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept the plaintiff's factual allegations as true and view those allegations in the light most favorable to the plaintiff.  *White v. U.S. Corrs., LLC*, 996 F.3d 302, 306–07 (5th Cir. 2021).  The court must evaluate whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. at 1965).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. at 1965).

Rule 9(b) creates a heightened pleading standard when alleging fraud or mistake and requires that "a party . . . state with particularity the circumstances constituting fraud or mistake."  Rule 9(b)'s particularity requirement "is an exception to Rule 8(a)'s simplified pleading that calls for a 'short and plain statement of the claim.'"  *United States*

8

*ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009) (citing Fed. R. Civ. P. 8(a)).

"To satisfy Rule 9(b)'s pleading requirements, the plaintiffs must 'specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.'" *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 362 (5th Cir. 2004) (quoting *Williams v. WMX Technologies, Inc.,* 112 F.3d 175, 177–78 (5th Cir. 1997)).

The Private Securities Litigation Reform Act ("PSLRA") also creates a heightened pleading standard in actions brought under Section 10(b) of the Exchange Act. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81, 126 S.Ct. 1503, 1511, 164 L.Ed.2d 179 (2006). A court must dismiss the complaint unless two requirements are met. 15 U.S.C. § 78u-4(b). First, if the plaintiff alleges that the defendant "made an untrue statement of material fact" or "omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading," "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." § 78u-4(b)(1). A fact is material if there is "a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *Southland Sec. Corp.*, 365 F.3d at 362; *see also Basic Inc. v. Levinson*, 485 U.S. 224, 240, 108 S.Ct. 978, 988, 99 L.Ed.2d 194 (1988) ("[M]ateriality depends on the

9

significance the reasonable investor would place on the withheld or misrepresented information.").

Second, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." § 78u-4(b)(2). The required state of mind is "an intent to deceive, manipulate, defraud, or severe recklessness." *Owens v. Jastrow*, 789 F.3d 529, 535–36 (5th Cir. 2015) (quoting *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 251 (5th Cir. 2009)). A reviewing court must "take into account plausible inferences opposing as well as supporting a strong inference of scienter." *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008).

Taken together, to survive a motion to dismiss under Rule 9(b) and the PSLRA, a plaintiff must (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representations; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reasons why the statement is misleading. *Goldstein v. MCI WorldCom*, 340 F.3d 238, 245 (5th Cir. 2003). And for allegations made upon information and belief, the complaint must "state with particularity all facts" on which the belief is formed. 15 U.S.C. § 78u-4(b)(1). To survive a motion to dismiss on the Section 20(a) claim, a plaintiff must plead (1) a primary violation and (2) that the defendant had control over the primary violator. *See In re Venator Maters. PLC Sec. Litig.*, 547 F.Supp.3d 624, 652 (S.D. Tex. 2021) (citing *In re Kosmos*

10

*Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658, 674 (N.D. Tex. 2013)); *see also Heck v. Triche*, 775 F.3d 265, 283 (5th Cir. 2014).

"A complaint can be long-winded, even prolix, without pleading with particularity. Indeed, such a garrulous style is not an uncommon mask for an absence of detail." *Williams,* 112 F.3d at 178.

### B.   MOTION FOR RECONSIDERATION

"The Federal Rules of Civil Procedure do not recognize a general motion for reconsideration." *St. Paul Mercury Ins. Co. v. Fair Grounds Corp.*, 123 F.3d 336, 339 (5th Cir. 1997). Nevertheless, "[a] court retains the power to revise an interlocutory order before entering judgment adjudicating the parties' claims, rights, and liabilities." *W&T Offshore, Inc. v. Apache Corp.*, No. 4:11-CV-02931, 2014 WL 1600540, at *3 (S.D. Tex. Apr. 21, 2014). "Rule 59(e)'s legal standards are applied to motions for reconsideration of interlocutory orders." *T-M Vacuum Prods., Inc. v. TAISC, Inc.*, No. 4:07-CV-04108, 2008 WL 2785636, at *2 (S.D. Tex. July 16, 2008), *aff'd*, 336 F.App'x 441 (5th Cir. 2009).

### III.   DISCUSSION

The Court first reviews the claim under Section 10(b) of the Exchange Act (including Rule 10b-5, promulgated by the SEC to enforce the Section) and then the claim under Section 20(b) of the Exchange Act. For the reasons discussed below, the Court finds that the Complaint fails to state a claim for securities fraud under the PSLRA[7] and, therefore, must be dismissed.

---

[7]   Defendants' arguments focus primarily on Plaintiffs inability to meet the heightened standards under the PSLRA. That said, Defendants also argued that some of the statements

(continue)

11

### A.    DEFENDANTS' MOTION TO DISMISS SECTION 10(B) AND RULE 10B-5 CLAIMS

The Complaint alleges that dozens of statements violated Section 10(b) of the Exchange Act.    These statements allegedly downplayed or concealed Southwest's exposure to flight-disruption events.

These statements were made in: (1) Southwest's 2019 Annual Report on Form 10-K (the "2019 Annual Report") on February 4, 2020, (*id.* at 82–87); (2) Southwest's Form 10-Q for the period ending March 31, 2020 (the "1Q20 Report"), on April 28, 2020, (*id.* at 87–89); (3) Southwest's Form 10-Q for the period ending June 30, 2020 (the "2Q20 Report"), on July 27, 2020, (*id.* at 89–90); (4) Southwest's Form 10-Q for the period ending September 30, 2020, (the "3Q20 Report"), on October 27, 2020, (*id.* at 90–91); (5) Southwest's 2020 Annual Report on Form 10-K (the "2020 Annual Report") on February 8, 2021, (*id.* at 92–97); (6) Southwest's Form 10-Q for the period ending March 31, 2021 (the "1Q21 Report"), on April 27, 2021, (*id.* at 97–98); (7) a KTSM article published on June 14, 2021, (*id.* at 99); (8) a CNBC article published on June 15, 2021, (*id.* at 100); (9) a New York Times article published on June 16, 2021, (*id.* at 101); (10) an earnings conference call on July 22, 2021, (*id.* at 102); (11) Southwest's Form 10-Q for the period ending June 30, 2021 (the "2Q21 Report"), on July 27, 2021, (*id.* at 111); (12) a conference discussion on September 9, 2021, (*id.* at 112); (13) a post on X on October 9, 2021, (*id.* at 113); (14) an AZ Central article published on October 9, 2021, (*id.* at 114); (15) a news release on Southwest's website

---

alleged by Plaintiffs "fail to the extent they are premised on corporate statements and [posts on X] not specifically attributed to any individual."   (Dkt. No. 57 at 25).   Because the allegedly unattributed statements in question are not misleading, the Court need not decide whether Plaintiffs sufficiently pled the requisite details about the speaker.

published on October 11, 2021, (*id.* at 114–15); (16) a CNBC interview on October 12, 2021, (*id.* at 116–18); (17) an earnings conference call on October 21, 2021, (*id.* at 119–24); (18) Southwest's Form 10-Q for the period ending September 30, 2021 (the "3Q21 Report"), on October 26, 2021, (*id.* at 125–26); (19) a virtual Investor Day presentation on December 8, 2021, (*id.* at 126); (20) a ZDNet article published on January 15, 2022, (*id.* at 127–28); (21) Southwest's 2021 Annual Report on Form 10-K (the "2021 Annual Report") on February 7, 2022, (*id.* at 128–32); (22) an earnings conference call on April 28, 2022, (*id.* at 133–36); (23) Southwest's Form 10-Q for the period ending March 31, 2022 (the "1Q22 Report"), on May 2, 2022, (*id.* at 136–37); (24) a press release on Form 8-K on July 28, 2022, (*id.* at 137–38); (25) an earnings conference call on July 28, 2022, (*id* at 137–41); (26) Southwest's Form 10-Q for the period ending June 30, 2022 (the "2Q22 Report"), on August 2, 2022, (*id.* at 141–42); (27) an earnings conference call on October 27, 2022, (*id.* at 142–45); (28) Southwest's Form 10-Q for the period ending September 30, 2022 (the "3Q22 Report"), on October 31, 2022, (*id.* at 146–47); (29) an Investor Day presentation on December 7, 2022, (*id.* at 147–48); (30) a press release on December 21, 2022, (*id.* at 149); (31) a press release on December 22, 2022, (*id.* at 150); (32) a press release on December 23, 2022, (*id.* at 151); (33) a press release on December 24, 2022, (*id.* at 152); (34) a press release on December 26, 2022, (*id.* at 152–53); (35) a press release on December 27, 2022, (*id.* at 154); (36) a video press release on December 27, 2022, (*id.* at 155); (37) a press release on December 31, 2022, (*id.* at 157–58); (38) a conference call on January 26, 2023, (*id.* at 159–60); and (39) a hearing before the Committee on February 9, 2023, (*id.* at 160–61).

To determine whether the statements are actionable under Section 10(b), the Court first analyzes whether the statements are materially false or misleading and then analyzes whether the statements were made with the required state of mind.

### 1.      Alleged Material Misstatements or Omissions

The challenged statements fall into five general categories:[8] (1) statements that warned of certain risks inherent to Southwest's operations; (2) statements about the Company's technology investments and initiatives; (3) statements praising Southwest; (4) statements concerning Southwest's operational stability; and (5) statements about widespread flight-cancellation events in June and October 2021 and December 2022. For the reasons discussed below, the Court finds that the Complaint fails to adequately allege the existence of any materially false or misleading statements, with the exception of six statements.

### a.      Published Risk Warnings

The Complaint alleges that Southwest's risk disclosures in its annual and quarterly filings as well as public statements were misleading because they presented specific, known risks—such as the inadequacy of the scheduling software—as generic, hypothetical, or external risks. The Court finds that neither the risk warnings nor the "beyond Southwest's control" warnings are actionable misstatements.

---

[8]    Plaintiffs identified the allegedly actionable statements in chronological order; however, given the volume of statements asserted, the Court has organized and analyzed them in general categories for clarity and efficiency.

14

i.      Risk Warnings

Plaintiffs allege that several statements containing risk warnings from the 2019, 2020, and 2021 Annual Reports were materially false and omitted to disclose material facts:

- "The Company is increasingly dependent on technology to operate its business and continues to implement substantial changes to its information systems; any failure, disruption, breach, or delay in implementation of the Company's information systems could materially adversely affect its operations." (Dkt. No. 51 at 84, 93).

- "The Company is increasingly dependent on the use of complex technology and systems to run its ongoing operations and support its strategic objectives.  These technologies and systems include, among others, the Company's website and reservation system; flight dispatch and tracking systems; . . . [and]  crew  scheduling  systems . . . . Implementation  and integration of complex systems and technology present significant challenges in terms of costs, human resources, and development of effective internal controls."  (*Id.* at 130).

- "The Company is increasingly dependent on the use of complex technology and systems to run its ongoing operations and support its strategic objectives.  These technologies and systems include, among others, the Company's website and reservation system, flight dispatch and tracking systems, flight simulators, check-in kiosks, maintenance record keeping management systems, telecommunications systems, flight planning and scheduling systems, crew scheduling systems, and financial planning, management, and accounting systems. The performance, reliability, and security of the Company's technology infrastructure and supporting systems are critical to the Company's operations and initiatives."  (*Id.* at 84, 93–94).

- "If any of the Company's significant technologies or automated systems were to cease functioning, or if its third party vendor service providers were to fail to adequately and timely provide technical support, system maintenance, security, or software upgrades for any of the Company's existing systems, the Company could experience service interruptions, delays, and loss of critical data, which could harm its operations, and result in financial losses and reputational damage." (*Id.* at 84, 94, 130).

15

- "In the ordinary course of business, the Company's systems will continue to require modification and refinements to address growth and changing business requirements . . . ."  (*Id.* at 84, 94, 130).

- "[T]he Company's operations could be adversely affected, or the Company could face imposition of regulatory penalties, if it were unable to timely or effectively modify its systems as necessary or appropriately balance the introduction of new capabilities with the management of existing systems." (*Id.* at 84–85, 94, 130–31).

- "[T]he Company's systems may require modification to enable the Company to comply with changing regulatory requirements. Modifications and refinements to the Company's systems have been and are expected to continue to be expensive to implement and can divert management's attention from other matters."  (*Id.* at 130).

- "The Company has experienced system interruptions and delays that have made its websites and operational systems unavailable or slow to respond, which has prevented the Company from efficiently processing Customer transactions or providing services."  (*Id.* at 85, 94, 131).

- "Any future system interruptions or delays could reduce the Company's operating revenues and the attractiveness of its services, as well as increase the Company's costs."  (*Id.* at 131).

Plaintiffs explain that these statements were misleading because they drastically downplayed Southwest's reliance on systems that were "unconscionably exposed to meltdowns," "at high risk of not functioning," "were profoundly unreliable," and were "fundamentally inadequate to handle the complexity of the Company's operations."  (*Id.* at 85–86, 95–96, 131–32).

None of the challenged statements are misleading.  *See Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 433 (5th Cir. 2002) ("[A]s long as public statements are reasonably consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of the company's current performance.").  To the contrary, "[t]hese sobering disclosures provided investors with clearly stated information about the impact

and risks of" Southwest's technology shortfalls. *Dawes v. Imperial Sugar Co.*, 975 F.Supp.2d 666, 707 (S.D. Tex. 2013). Southwest is "not obligated to characterize its performance" negatively or "paint themselves in the most unflattering light possible." *Id.* (quoting *Solow v. Citigroup, Inc.*, No. 10 Civ. 2927 (RWS), 2012 WL 1813277, at *4 (S.D.N.Y. May 18, 2012)). Accordingly, the Court finds that the aforementioned risk warnings are not actionable.

ii.    "Beyond Southwest's Control" Warnings

Plaintiffs also challenge Southwest's frequent assertions in corporate filings that it was exposed to potential issues by circumstances that were "beyond Southwest's control." Namely:

- The 2019 Annual Report disclosed that "[t]he airline industry is affected by many conditions that are beyond its control, which can impact the Company's business strategies and results of operations. . . . [T]he Company, like the airline industry in general, is affected by conditions that are largely unforeseeable and outside of its control, including . . . adverse weather and natural disasters . . . ." (Dkt. No. 51 at 86).

- The 1Q20 Report disclosed that "[a]ir travel is also significantly impacted by . . . extreme or severe weather and natural disasters . . . and other factors beyond the Company's control." (*Id.* at 88).

- The 2Q20 Report disclosed that "[a]ir travel is also significantly impacted by . . . extreme or severe weather and natural disasters . . . and other factors beyond the Company's control. These and other factors . . . have created, and may continue to create, significant volatility in the Company's financial results." (*Id.* at 89).

- The 3Q20 Report disclosed that "[a]ir travel is also significantly impacted by . . . extreme or severe weather . . . and other factors beyond the Company's control. These and other factors . . . have created, and may continue to create, significant volatility in the Company's financial results. . . . Operating results for the three and nine months ended September 30, 2020, are not necessarily indicative of the results that may be

expected for future quarters or for the year ended December 31, 2020." (*Id.* at 90–91).

- The 1Q20, 2Q20, and 3Q20 Reports also referenced the 2019 Annual Report risk factors. *See supra* III(A)(1)(a)(i); (Dkt. No. 51 at 89, 90, 91).

- The 2020 Annual Report disclosed that "[t]he airline industry is affected by many conditions that are beyond its control, which can impact the Company's business strategies and results of operations. . . . [T]he Company, like the airline industry in general, is affected by conditions that are largely unforeseeable and outside of its control, including . . . adverse weather and natural disasters . . . ." (Dkt. No. 51 at 96).

- The 1Q21 Report disclosed that "[a]ir travel is also significantly impacted by . . . extreme or severe weather and natural disasters . . . and other factors beyond the Company's control.  These and other factors . . . have created, and may continue to create, significant volatility in the Company's financial results. . . . Operating results for the three months ended March 31, 2021, are not necessarily indicative of the results that may be expected for future quarters or for the year ended December 31, 2021." (*Id.* at 98).

- The 2Q21 and 3Q21 Reports disclosed that "[a]ir travel is also significantly impacted by . . . extreme or severe weather and natural disasters . . . and other factors beyond the Company's control.    These and other factors . . . have created, and may continue to create, significant volatility in the Company's financial results." (*Id.* at 111, 125).

- The 1Q21, 2Q21, and 3Q21 Reports also referenced the 2020 Annual Report risk factors. *See supra* III(A)(1)(a)(i); (Dkt. No. 51 at 91, 112, 126).

- The 2021 Annual Report disclosed that "[t]he airline industry is affected by many conditions that are beyond its control, which can impact the Company's business strategies and results of operations. In addition to the unpredictable economic conditions and fuel costs discussed above, the Company, like the airline industry in general, is affected by conditions that are largely unforeseeable and outside of its control, including, among others: adverse weather and natural disasters . . . ." (Dkt. No. 51 at 132).

- The 1Q22, 2Q22, and 3Q22 Reports disclosed that "[a]ir travel is also significantly impacted by . . . extreme or severe weather and natural disasters . . . and other factors beyond the Company's control." (*Id.* at 136, 141, 146).

18

- The 1Q22, 2Q22, and 3Q22 Reports also referenced the 2021 Annual Report risk factors. *See supra* III(A)(1)(a)(i); (*Id.* at 137, 142, 147).

Plaintiffs argue that Southwest should have disclosed (1) that it was less prepared for weather events than other airlines and (2) that such events would "overwhelm[]" the scheduling software, "forc[ing] the airline to resort to an unwieldy manual process." (*Id.* at 87, 88, 89–90, 91, 97, 98, 125–126, 132–33, 137, 141–42, 146). Defendants argue that Southwest's cautionary disclosures "made no promises that Southwest was immune to major disruptions and specifically warned disruptions could occur." (Dkt. No. 57 at 12). The Court agrees with Defendants.

As an initial matter, it is rather obvious that all airlines face operational risks due to factors outside of their control. Defendants explicitly warned that "extreme or severe weather" and factors beyond the Company's control would significantly impact air travel. Those risks materialized exactly as described—*significantly*. *See In re KBR, Inc. Secs. Litig.*, No. 4:17-CV-01375, 2018 WL 4208681, at *5 (S.D. Tex. Aug. 31, 2018) (explaining that statements do not become actionable unless such statements "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists" (quoting *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 541 (5th Cir. 2008))); *see also Hill v. Gozani*, 638 F.3d 40, 60 (1st Cir. 2011) ("To the extent that the plaintiff's complaint is that the precise degree of risk was not stated, that failure is not sufficient to have rendered the statements misleading.").

Turning to the first alleged omission, Plaintiffs complain that Southwest was less equipped than other airlines to combat severe weather. Even so, Plaintiffs did not plead

facts establishing that Southwest was an outlier in terms of its risk exposure to weather events.  For example, Plaintiffs did not allege that Southwest's scheduling software was inconsistent with industry norms or that it did not meet all relevant aviation-authority operational standards.  (*See generally* Dkt. No. 51).  Instead, Plaintiffs allege that, during a phone call in the wake of Winter Storm Elliott, Watterson privately admitted the Company had a "lack of tools" given the size and complexity of its operation and that "[t]he process of matching up [crew members] with the aircraft could not be handled by our [existing] technology."  (*Id.* at 66).  And "[a]ll told, Southwest's cancellations were radically higher than any other airlines" following Winter Storm Elliott.  (*Id.* at 67).

The problem is that Plaintiffs now have the benefit of hindsight.  At the time the disclosures were made, the scheduling software was functioning properly.  The fact that the software later failed under extreme stress does not mean the earlier disclosures were not true.  *See Lormand*, 565 F.3d at 254 ("This is not the classic fraud by hindsight case where a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly." (quoting *Miss. Pub. Emps.' Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 91 (1st Cir. 2008))).  Plaintiffs' argument that Southwest was uniquely exposed to weather risks due to its scheduling software is merely conjecture.

Next, the Court turns to the second alleged omission: that the Company's scheduling software would likely be disrupted by major weather events.  Southwest

20

disclosed precisely that. *See supra* III(A)(1)(a)(i).[9] The alleged "beyond our control" warnings cannot be evaluated in a vacuum, ignoring the Company's risk warnings in its Annual Reports. *See Magruder v. Halliburton Co.*, 359 F.Supp.3d 452, 460 (N.D. Tex. 2018) (noting that a court should assess all allegations holistically, not in isolation); *see also Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190, 135 S.Ct. 1318, 1330, 191 L.Ed.2d 253 (2015) (same). Considering the statements together, Southwest did not omit material facts.

To the extent Plaintiffs believe the warnings were not sufficiently pessimistic, it bears repeating that Southwest is "not obligated to characterize its performance" negatively or "paint themselves in the most unflattering light possible." *Dawes*, 975 F.Supp.2d at 707 (quoting *Solow v. Citigroup, Inc.*, No. 10 Civ. 2927 (RWS), 2012 WL 1813277, at *4 (S.D.N.Y. May 18, 2012)). Nor is Southwest obligated to catastrophize or catalog every contingency. *Carlton v. Cannon*, 184 F.Supp.3d 428, 457 (S.D. Tex. 2016) ("[S]ome information is of such dubious significance that insistence on its disclosure may accomplish more harm than good. . . . [M]anagement's fear of exposing itself to substantial liability may cause it simply to bury the shareholders in an avalanche of trivial

---

[9] "The Company is increasingly dependent on the use of complex technology and systems to run its ongoing operations and support its strategic objectives. These technologies and systems include, among others, . . . flight planning and scheduling systems [and] crew scheduling systems . . . . The performance, reliability, and security of the Company's technology infrastructure and supporting systems are critical to the Company's operations and initiatives." (Dkt. No. 51 at 84, 93–94). "If any of the Company's significant technologies or automated systems were to cease functioning, or if its third party vendor service providers were to fail to adequately and timely provide technical support, system maintenance, security, or software upgrades for any of the Company's existing systems, the Company could experience service interruptions, delays, and loss of critical data, which could harm its operations, and result in financial losses and reputational damage." (*Id.* at 84, 94, 130).

information[,] a result that is hardly conducive to informed decision[-]making." (quoting

*TCS Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757

(1976)). For these reasons, the Court finds that the aforementioned "beyond Southwest's

control" statements are not actionable.

### b.     Technology-Investment Statements

The Complaint alleges that Southwest's statements about its various technology

investments are misleading because the Company was not meaningfully investing and

had no plans to meaningfully invest in the scheduling software. The Court finds that

none of the then-current or future technology-investment statements are actionable.

### i.     Then-Current Investments

Plaintiffs allege several statements that recapped Southwest's technology

investments and initiatives were materially false and misleading:

- The 2019 Annual Report stated that the Company had "committed significant resources to technology improvements in support of its ongoing operations and initiatives" and was continuing "to invest significantly in technology resources including, among others, the Company's systems related to . . . flight planning and scheduling, [] crew scheduling, and [] technology infrastructure." (Dkt. No 51 at 82–83).

- The 2020 Annual Report stated that "[w]hile the Company deferred a significant number of technology projects in 2020 [in response to the COVID-19 pandemic], it continued to invest in and execute on major technology projects including, among others, the Company systems related to . . . flight planning and scheduling, including with respect to schedule changes and Customer reaccommodations; [] crew scheduling; and [] technology infrastructure." (*Id.* at 92).

- The 2021 Annual Report stated that "[a]lthough during 2020 the Company narrowed its near-term technology focus and deferred a significant number of technology projects in response to the COVID-19 pandemic, over the past several years the Company has committed significant resources to technology improvements in support of its ongoing operations and

22

initiatives. . . . The Company continues to focus on the prioritization and execution of its technology investments and is in the process of continually executing an evolving multi-year plan for technology, with the goal of developing a stronger, more adaptable, and more efficient and reliable technology foundation to support the Company's strategic priorities. The Company continues to invest significantly in technology resources including, . . . flight planning and scheduling, including with respect to schedule changes and Customer reaccommodations; [] crew scheduling; . . . and [] technology infrastructure." (*Id.* at 129).

- In December 2022, during a conference call with investment analysts and media members, Romo stated, "[T]echnology is another big piece of that [spending] as well. We spend several hundred millions in technology." (*Id.* at 148).

Plaintiffs argue that these statements were materially false and misleading because Southwest was not meaningfully investing in its scheduling software and Defendants had been repeatedly warned about scheduling software issues by SWAPA and TWU. (*Id.* at 83, 93, 129). Defendants maintain that Plaintiffs failed to allege facts showing that Southwest was not investing in operational technology. (Dkt. No. 57 at 20). The Court agrees with Defendants.

Plaintiffs believe Southwest's continued reliance on the same scheduling software after the statements were made proves that the Company was not significantly investing in technology. (Dkt. No. 51 at 83, 93, 129). But a lack of scheduling software improvements doesn't necessarily translate into a lack of significant technology investments. Companies routinely invest "significant" funds in technologies without overhauling entire systems. Even if Southwest supposedly "repeatedly rejected pleas and proposals made by SWAPA and TWU to overhaul and improve" its scheduling software, (*id.*), the conclusion that Southwest did not significantly invest in technology

23

does not necessarily flow therefrom.  For all Plaintiffs know, Southwest could have been building new scheduling software from scratch while continuing to use the existing software.  *See Johnson v. Costco Wholesale Corp.*, No. 2:18-CV-01611, 2019 WL 6327580, at *17 (W.D. Wash. Nov. 26, 2019) (finding company's statements that it was making "significant technology investments" was not misleading).

In short, Plaintiffs failed to allege the particularized facts necessary to show that Southwest's statements were misleading.  For instance, to contradict Romo's statement, Plaintiffs would need to plead that Southwest spent less than "several hundred millions" on technology.  (Dkt. No. 51 at 148).  They did not.  Likewise, Plaintiffs did not provide any reference point to assess whether Southwest's investments in its scheduling software were *insignificant* in 2019 through 2021.  *See Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 901 (5th Cir. 2018) (noting that "plaintiffs cannot plausibly allege that defendant lied about improving [their] prices without comparing the prices at the time of the alleged misrepresentations with prior prices").  Unsurprisingly, Plaintiffs fail to cite a single case in any jurisdiction where representing that a company made significant investments in technology was held actionable without any particularized allegations that such funds were not invested.  Accordingly, the Court finds that the then-current technology investment statements are not material misstatements.  (Dkt. No. 51 at 82–83, 92, 129).

ii.      Desired Future Investments

Plaintiffs allege several statements that explained Southwest's plans for technology investments and initiatives were materially false and misleading:

24

- In October 2021, on an earnings conference call, Jordan responded to a question about upcoming priorities for Southwest. "[Technology]'s central to everything that we do . . . . [I]f I had a headline, it's our investment in operational tools. . . . [A]t our size and scale and complexity, I think there is a need to continue to invest heavily in the operation and particularly heavily in the operational tools that we provide to our employees. They're terrific but they could use tools that better help manage their day, manage the complexity. . . . [T]he #1 objective is our continued investment in . . . modernizing our operational tools." (*Id.* at 123).

- On the same call, Van de Ven stated, "We've got things that we want to do in flight planning. We've got things we want to do in our crewing systems. We have things that we want to do as we're coordinating and executing our turns on the ground. And then we have investments we want to make in our decision support and optimization of technology." (*Id.* at 124).

- In December 2021, in a virtual presentation, Jordan stated, "There's work to do, again, to become more efficient coming out of the pandemic. But it's not just that. We are a large and complex company. We have—I think there's software that we can work on. There are ways that we think about how we utilize data, how we move people appropriately to the aircraft, how we think about the turn we'll go on and on about some of those as they become more specific." (*Id.* at 126).

- In December 2022, during a conference call with investment analysts and media members, Jordan stated, "We have initiatives planned to help lessen the impact of disruptions and improve our recovery time and keep the operation better on track throughout the day. . . . Network design and recovery reverts to real time decision-making that can take advantage of our unique network design to lessen ripple effects through the network." (*Id.* at 147).

Plaintiffs argue that these statements were materially false and misleading because the statements implied that the issues were not urgent, (*id.* at 124–25, 127), and Southwest was proactively upgrading its technology, (*id.* at 124), while the Company was actually exposed to "massive operational and financial risk" while the "outdated" scheduling software remained, (*id.* at 148). Defendants contend that it disclosed that its operational

modernization projects were long-term, spanning into at least 2026. (*See* Dkt. No. 57 at 10). The Court agrees with Defendants.

Plaintiffs do not explain how Defendants' statements establish any expectations as to the "urgency" of the technology initiatives or the impression that Southwest was "proactively upgrading" its operational systems. Nor can the Court, upon reviewing the statements, reasonably infer such a characterization. The statements are silent as to timing. Instead, they discuss particular areas of focus for Southwest's technology objectives, such as tools that manage employees' daily activities, (Dkt. No. 51 at 123), assist with flight planning and crew management, (*id.* at 124), move people appropriately, (*id.* at 126), and improve recovery time, (*id.* at 147).

In any event, Southwest publicly disclosed the timing of its modernization efforts. On December 8, 2021, in a virtual presentation, Van de Ven stated, "*[O]ver the next 5 years*, we will have a laser focus on continuing to modernize the operation." (Dkt. No. 56-19 at 21 (emphasis added)). On December 7, 2022, in a presentation, Watterson stated that, "We have initiatives planned to help lessen the impact of disruptions and improve our recovery time" with four initiatives, only two of which were planned for "2023 delivery." (Dkt. No. 56-21 at 17). Specifically, the "[o]riginator performance" and "[t]ransfer operations" initiatives were slated for 2023 delivery, while the "[n]etwork design & recovery" and "[s]tation command centers" initiatives were not. (Dkt. No. 56-20 at 38); (*see also id.* at 6 (explaining that modernizing the operation was a strategic priority through 2026)).

26

Plaintiffs attempt to recast Southwest's strategic business decision to defer certain software upgrades into a misrepresentation that the issues did not demand urgency. But ultimately, a disagreement with Southwest's "business judgment does not state a claim under federal securities law." *Coates v. Heartland Wireless Comms., Inc. (Coates I)*, 26 F.Supp.2d 910, 922 (N.D. Tex. 1998) (quoting *Novak v. Kasaks*, 997 F.Supp. 425, 432 (S.D.N.Y. 1998)). The Court finds that the prospective technology statements are not actionable.

### c.     Corporate Praise Statements

Plaintiffs raise several other statements regarding Southwest generally that they argue were materially false and misleading, but none are actionable.

- In July 2021, on an earnings conference call, Kelly stated, "[W]e need to be a top drawer when it comes to our technology. . . . [W]e view ourselves as a technology company. We have an excellent team. We have ample dollars allocated for that effort. And one thing that the pandemic has done for us is it's made us a lot more efficient with our technology investment and management. . . . So I feel like we're better than ever at Southwest, and you can be sure that we're going to continue to make that a high strategic focus." (Dkt. No. 51 at 107).

- On October 12, 2021, on a CNBC program, Kelly responded to a question about whether Southwest was underspending on technology, "I think the answer is . . . a very emphatic no, we're not underspending. . . . [W]e have wonderful technology, we have a wonderful technology department. They're [] very well resourced." (*Id.* at 118).[10]

- On October 21, 2021, on an earnings conference call, Jordan responded to a question about upcoming priorities for Southwest, "[Technology]'s central to everything that we do . . . . [O]ur people are terrific. We have good tools. But at our size and scale and complexity, I think there is a need to continue

---

[10]    Kelly also stated that, "The two technology outages that occurred back in June were human error so it wasn't a lack of technological capability, it was simply, in one case, not adhering to a procedure." (*Id.* at 118). That portion of the statement is discussed in *infra* III(A)(1)(e)(i).

to invest heavily in the operation and particularly heavily in the operational tools that we provide to our employees.  They're terrific but they could use tools that better help manage their day, manage the complexity. . . ."  (*Id.* at 123).

- In December 2021, in a virtual presentation, Jordan stated, "[O]ur employees are terrifically efficient.  There's work to do, again, to become more efficient coming out of the pandemic." (*Id.* at 126).

Plaintiffs accuse Defendants of misleading investors because "Southwest was far from a 'top drawer' and could not credibly be called a 'technology company.'"  (*Id.* at 107).  In Plaintiffs' view, claiming that Southwest had an "excellent team," "ample dollars allocated," "wonderful technology," "good tools," "terrifically efficient" employees, and was taking steps for the Company to be "'better than ever' was a complete farce."  (*Id.* at 105, 107).

These statements are aspirational puffery and not actionable fraud.  *See Linenweber v. Southwest Airlines Co.*, 693 F.Supp.3d 661, 676 (N.D. Tex. 2023) ("None of these statements are actionable because investors understand generalized commitments to laudable goals are not promises of specific actions or results and that executives' vague praise of their business is not a guarantee of quality.").  Such statements are "of the vague and optimistic type that cannot support a securities fraud action."  *Southland Sec. Corp.*, 365 F.3d at 372.  "Because analysts 'rely on facts in determining the value of a security,' these statements 'are certainly not specific enough to perpetrate a fraud on the market.'"  *Id.* (quoting *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993)).  Accordingly, the Court finds that the aforementioned statements do not constitute material misstatements.

28

d.      Operational Stability Statements

The Complaint alleges that Defendants falsely assured investors that Southwest was operationally stable and prepared for weather events.  Specifically, Plaintiffs allege several statements, included below, that they believe were materially false and misleading.  Of these, only one is ultimately misleading.

- In July 2021, on an earnings conference call, Nealon stated, "So I feel like the worst part of all that is behind us.  And given all the information that we had, . . . we were planned appropriately well . . . . But I think the worst—clearly the worst of it is behind us in June."[11] (Dkt. No. 51 at 110).

- On that same call, Kelly stated, "So we're very well positioned and very well prepared to manage pretty much any scenario here in the next couple of years."[12]  (*Id.* at 103).

- In January 2022, ZDNet published an article about Southwest's technology and operations where Jordan "confessed the need to 'modernize.'"  (*Id.* at 127).  Jordan went on, "When you're in irregular operations (such as cancelations and delays caused by weather or other factors), I've got aircraft out of place and customers out of place, and this aircraft needs to end up in that maintenance base.  There are probably tools that we can use to more quickly notice problems and provide solutions."  (*Id.* at 127–28).

- In April 2022, on an earnings call, Van de Ven stated, "We've had a tough time during irregular operations given our thinner network and some of the unanticipated air traffic control slowdowns.  The good news is that we've made some adjustments to our network starting this month that we believe will help . . . ."  (*Id.* at 133–34).

---

[11]   Nealon also stated, "The biggest change that I think we faced this year with 2020 hindsight is we can't absorb those significant events as efficiently this year as we did in the past, because we don't have as much frequency in our network today that we did yesterday, but we will in the future. . . . And then also, we're going to come into a period of time where we don't have the thunderstorms and these pop-up weather events that we do here in June and July." That portion of the statement is addressed in *infra* III(A)(1)(e)(i).

[12]   Kelly also stated, "Normal summer demand is always a challenge to manage, and it's, of course, even more so here in 2021, especially in June when we had technology issues and bad weather combined."  (Dkt. No. 51 at 102).  That portion of the statement is addressed in *infra* III(A)(1)(e)(i).

29

- In July 2022, on an earnings call, Van de Ven stated, "Our new hires, combined with the scheduled reductions that we made earlier in the year as well as our ongoing operational modernization efforts, have stabilized the operation as we continue forward. . . . [W]e've improved the quality of the schedule for our operation with more depth and more nonstop flights. We've added short-haul flights in the business-oriented markets. That provides us more options when we have weather or ATC delays." (*Id.* at 139–40).

- On that same call, Jordan stated, "[W]e've gotten staffing stable. . . . [W]e are in so much better shape. We've gotten operationally stable, same thing." (*Id.* at 141).

- In October 2022, on an earnings call, Jordan stated, "[I]t makes a big difference in our ability to more effectively plan, set our flight schedules and avoid revising them, and deliver a more reliable operation both for our customers and our employees. That's exactly what we're doing in the second half of 2022 . . . ." (*Id.* at 142).

- On that same call, Van de Ven stated, "[J]ust as with last quarter, we have improved the quality of the schedule with more depth and more nonstop flights. . . . [W]e've added short-haul flights in business or in markets, and that provides more options when we have weather or ATC delays." (*Id.* at 142–43).

- On that same call, Jordan went on, "We continue to hire and train new employees. And that should have us well prepared for the upcoming holiday season, and we should continue just to get better as we continue our network restoration through next year and get even more employees through training." (*Id.* at 144).

- On that same call, Jordan was asked by an analyst about how the operations would respond to a "really bad winter storm." (*Id.* at 144). Jordan responded, "[T]here are several things in here that are . . . helping drive the operational improvement. . . . [W]e are so much better staffed today than we were even 3 to 4 months ago." (*Id.*).

- On that same call, Van de Ven stated, "[W]e've had really good experience over the summer in difficult weather conditions with high load factors, all the kind of things that would be an operational challenge during the holidays, and . . . we navigated through all of them very stably. So I feel like we're really set up to perform well over the holidays as we go into Thanksgiving and the Christmas season." (*Id.* at 145).

Generally, Plaintiffs allege that the aforementioned statements were materially false and misleading because the true root cause of the operational problems was the scheduling software—not weather, ATC delays, or staffing—and stability was impossible without addressing the scheduling software drawbacks first. (*Id.* at 103, 110–11, 134, 140, 141, 143, 144–45). Further, it was misleading to suggest that the software scheduling issues were minor or resolved. (*Id.* at 139, 140, 141, 143). Defendants argue that Southwest never represented that it had addressed all of the operational issues, and the representations are "too untethered to anything measurable." (Dkt. No. 87-9 at 1–3).

Several of these statements contain hedging language.[13] For opinions or hedges to be actionable as a "false statement of fact," the plaintiff must prove that the speaker did not hold the belief they professed, even if the opinion is ultimately wrong. *See Omnicare*, 575 U.S. at 184, 135 S.Ct. at 1326. Plaintiffs failed to plead any facts that demonstrate that the speakers didn't believe their statements. The statements are therefore not misstatements nor materially misleading.[14]

---

[13]   "So *I feel like* the worst part of all that is behind us," (Dkt. No. 51 at 110 (emphasis added)); "There are *probably* tools that we can use to more quickly notice problems and provide solutions," (*id.* at 128 (emphasis added)); "And that *should* have us well prepared for the upcoming holiday season, and we *should* continue just to get better . . . ," (*id.* at 143 (emphases added)); "The good news is that we've made some adjustments to our network starting this month that *we believe* will help . . . ," (*id.* at 133–34 (emphasis added)); "So *I feel like* we're really set up to perform well over the holidays as we go into Thanksgiving and the Christmas season," (*id.* at 145 (emphasis added)).

[14]   Defendants argue that many of the opinion statements were also "[f]orward-looking statements . . . insulated under the PSLRA safe harbor." (Dkt. No. 57 at 26). Plaintiffs contend that the PSLRA safe harbor does not apply. (Dkt. No. 59 at 21–22). The safe harbor provides that "a person . . . shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that . . . the plaintiff fails to prove that the forward-looking statement . . . if made by a natural person, was made with actual knowledge by that person that

(continue)

While several statements[15] are objectively verifiable assertions, Plaintiffs do not allege the appropriate facts to challenge Southwest's representations. *See supra* III(A)(1)(b)(i). As one example, Southwest said it had added non-stop and short-haul flights. (Dkt. No. 51 at 140, 142). Plaintiffs did not plead facts to establish that Southwest maintained or reduced non-stop and short-haul flights, or that adding flights did not improve the overall stability of Southwest's operations. *See Emps.' Ret. Sys.*, 905 F.3d at 901; *see also Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 48 F.4th 195, 210, 212–15 (5th Cir. 2023) (finding that stating "our parks are progressing nicely" was misleading when alleged facts showed that "almost no progress" had been made). Instead, Plaintiffs speculate that adding flights without making scheduling-software changes was like rearranging the deck chairs on the Titanic. (*See* Dkt. No. 51 at 140, 143). But "securities fraud claims cannot rest on speculation and conclusory allegations." *Coates v. Heartland Wireless Comm., Inc. (Coates II)*, 100 F.Supp.2d 417, 425 (N.D. Tex. 2000) (citing *In re Comshare*, 183 F.3d 542, 553 (6th Cir. 1999)).

---

the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1). So, regardless of whether the statements are opinions or forward-looking statements, they are not actionable because again, Plaintiffs failed to plead any facts that demonstrate that the speakers knew that they didn't believe their statements.

[15] "Our new hires, combined with the scheduled reductions that we made earlier in the year as well as our ongoing operational modernization efforts, have stabilized the operation as we continue forward . . . . [W]e've improved the quality of the schedule for our operation with more depth and more nonstop flights. We've added short-haul flights in the business-oriented markets. That provides us more options when we have weather or ATC delays." (*Id.* at 139–40). "[I]t makes a big difference in our ability to more effectively plan, set our flight schedules and avoid revising them, and deliver a more reliable operation both for our customers and our employees. That's exactly what we're doing in the second half of 2022 . . . ." (*Id.* at 142). "[W]e've added short-haul flights in business or in markets, and that provides more options when we have weather or ATC delays." (*Id.* at 142–43). "[W]e are so much better staffed today than we were even 3 to 4 months ago." (*Id.* at 144).

Two statements present closer questions. The first statement, made by Kelly in July 2021, is misleading. He said the Company was "very well positioned and very well prepared to manage pretty much any scenario here in the next couple of years." (Dkt. No. 51 at 103). Just prior, Kelly explained that "things are much better" and would "continue to improve." (*Id.* at 102). Kelly discussed the Company's immediate focus—"running a very high-quality, on-time airline"—and its future goals—restoring traditional efficiencies and the route network, sustaining profitability, and resuming new aircraft deliveries. (*Id.*).

*Carlton* is similar and instructive. 184 F.Supp.3d at 493. An executive there said that an oil company was "well-positioned to build on [its] progress" to produce additional oil, was "seeing significant operational progress," and was "turning the corner toward steady-state operations." *Id.* at 493–94. The court observed that while generalized positive statements about the company's progress were not actionable, they became actionable when tethered to statements about its yield projections. *Id.* The court reasoned that "the promises were not so vague, subjective, or general that reasonable investors would find them unimportant." *Id.* at 494.

Similarly, Kelly's statements go further than simply saying that Southwest was well-positioned or prepared—they assert that the Company was solid enough to withstand "pretty much any scenario in the next couple of years." (Dkt. No. 51 at 103). Coupled with the information about Southwest's strategic priorities, it is plausible that

33

an investor would find the statement important. The Court finds that this statement is misleading.[16]

The second statement, made by Jordan in July 2022, is ultimately not misleading. Plaintiffs focus on the assertion that Southwest had "gotten staffing stable" and was "operationally stable." (*Id.* at 141). In isolation, the statement could be misleading and interpreted as Jordan promising that the Company would be operationally stable in perpetuity. (*See id.* at 141). But a broader review of Jordan's statement, as is required by *Omnicare*, 575 U.S. at 190, 135 S.Ct. at 1330, clarifies that he was referring to progress in the preceding six months. (Dkt. No. 51 at 141 ("If you look at just the past six months and where we were.")). Jordan was saying that, as compared to the Company's staffing and operations in February 2022, Southwest had improved. (*See id.* at 141). Because Plaintiffs offer no facts to refute that Southwest had stabilized its staffing or operations in July 2022 compared to the preceding six months, Jordan's statement is not actionable.

e.     Statements Regarding the Disruption Events

Southwest suffered three major flight disruption events during the Class Period. *See supra* I(B). The Complaint alleges that Southwest's statements about these events are misleading because the Company dishonestly blamed the events on non-scheduling software issues. The Court finds that the Complaint fails to adequately allege the statements are materially false or misleading statements, with the exception of three statements.

---

[16]     However, Plaintiffs' claim still fails because there are no well-pleaded facts to establish Kelly's scienter. *See infra* III(A)(2)(b).

i.      June 2021 Event

Plaintiffs allege several statements relating to the June 2021 disruptions were materially false and misleading:

- On June 14, 2021, in an article published in *KTSM*, Southwest stated that it had suffered a "technical difficulty" and "[w]e've resumed normal flight operations after our third-party weather data provider experienced intermittent performance issues Monday evening preventing transmission of weather information that is required to safely operate our aircraft." (Dkt. No. 51 at 99).

- On June 15, 2021, in a CNBC article, Southwest spokesman Chris Mainz stated, "Southwest is in the process of resuming normal operations after a brief pause in our flight activity resulting from intermittent performance issues with our network connectivity Tuesday afternoon. . . . Our Teams are working quickly to minimize flight disruptions and Customer impact." (*Id.* at 100).  Further, Southwest did not believe the issue was connected to the June 14, 2021, problem.  (*Id.*).

- On June 16, 2021, in a New York Times article, Southwest spokesman Dan Landson said, "While our technology issues from Tuesday have been resolved, we are still experiencing a small number of cancellations and delays across our network as we continue working to resume normal operations."  (*Id.* at 101).  The article also reported that Landson stated that the June 15 network connectivity issues were unrelated to the June 14 weather data problems.  (*Id.*).

- On July 22, 2021, on an earnings conference call, Kelly stated, "Normal summer demand is always a challenge to manage, and it's, of course, even more so here in 2021, especially in June when we had technology issues and bad weather combined. . . ."[17] (*Id.* at 102).

- On that same call, Van de Ven stated, "Mid-month [June], we did run into a combination of technology issues, followed by weaker weather challenges across our entire network.  And those introduced some extreme delays into the network, and it caused significant crew availability concerns as well as delays and cancellations that impacted our customers, and that dropped our OTP to 62.4% for June. . . . As we move through July, weather is still a

---

[17] Kelly also stated, "So we're very well positioned and very well prepared to manage pretty much any scenario here in the next couple of years."  That portion of the statement was addressed in *supra* III(A)(1)(d).

bit of a concern as is the overall tempo of the airport environment. But the entire industry is feeling the impact of those things, and that's reflected in the overall industry OTP thus far in July. We expect our operational reliability to continually improve from our June performance. We use planning models that require an adequate level of airplanes and people and facilities to run our schedules. As we entered into the second quarter, we had all those resources aligned and we were on track until roughly mid-June. And so there are a couple of focus areas for the operation as we move forward. . . . And we're still ramping up the operation, and we have 16 fewer flight [sic] than we did in June of 2019, which for us means there are fewer ways to reaccommodate customers when we have delays or cancellations, while higher volumes and fewer reaccommodation options translate for us into a longer operating day. . . . But our employees just navigate those—through those things heroically." (*Id.* at 104–05).

- On that call, Nealon stated, "I think that this is a network that is so technology-dependent and so network-dependent that I think that's an area of investment that everyone's probably investing more in." (*Id.* at 106).

- On that call, Nealon stated, "First of all, it was not a cybersecurity issue. It was not a hardware failure. It was not an engineering failure or an architectural issue. It was a human error. And it's just something that was a mistake made and we're dealing with it. But it was not a structural issue or investment level issue. It was just a simple human error. . . . But this was not a failure of technology, if you will, it was a human mistake." (*Id.* at 108).

- On that call, Kelly stated, "So weather, we factored in weather as best we could, and the weather was more spring-like in June, in particular, than normal. And so that kind of whacked us. That's out of our control. Technology are one-off things. . . . I blame it on the pandemic." (*Id.* at 109).

- On that call, Nealon stated, "The biggest change that I think we faced this year with 20/20 hindsight is we can't absorb those significant events as efficiently this year as we did in the past, because we don't have as much frequency in our network today that we did yesterday, but we will in the future. . . . And then also, we're going to come into a period of time where we don't have the thunderstorms and these pop-up weather events that we do here in June and July."[18] (*Id.* at 110).

---

[18] Nealon also stated, "So I feel like the worst part of all that is behind us. And given all the information that we had, as Gary said, we were planned appropriately well . . . . But I think the worst—clearly the worst of it is behind us in June." (Dkt. No. 51 at 110). That portion of the statement was addressed in *supra* III(A)(1)(d).

- In September 2021, at a conference, Jordan stated, "[W]e had a tough summer, operating sometimes in the 60s, and a lot of that was due to being understaffed. . . . But we need to get the operation and the staffing matched . . . ." (*Id.* at 112).

- In October 2021, in an interview, Kelly stated, "The two technology outages that occurred back in June were human error so it wasn't a lack of technological capability, it was simply, in one case, not adhering to a procedure." (*Id.* at 118).

Plaintiffs contend that these statements were misleading because Southwest blamed several factors, including a third-party provider and "network connectivity," when it knew that the scheduling software was "on the verge of triggering a catastrophic meltdown." (*Id.* at 99, 100–01); (*see also id.* at 101–02, 103, 108, 109). Further, Southwest had not begun to address the technology issues and ignored warnings from its employees. (*Id.* at 105, 107). Accordingly, it was misleading to suggest "the June Meltdown was a one-off event unlikely to occur again rather than . . . another example of a system problem very likely to occur again . . . ." (*Id.* at 108).

The Court does not agree with Plaintiffs' assessment. A majority of the statements are about the causes of the June 2021 disruptions—technology problems, third-party weather data issues, network connectivity, bad weather, human error, less network frequency, the pandemic, and understaffing. While Plaintiffs claim the scheduling software was the central cause, they have not pled any facts showing that the other problems did not contribute to the June 2021 disruptions.

At least two of the statements include comments about the Company's operations and technology.[19]  Neither are actionable.  First, in July 2021, Van de Ven explained that although Southwest had stabilized operations during the second quarter, the June disruptions stalled progress, and the Company was still "ramping up the operation." (Dkt. No. 51 at 104).  Plaintiffs have not pled facts to establish that operations were unstable during the second quarter of 2021 before the June disruptions or that Southwest was not restoring its operations in July.  Plaintiffs' argument that the comment was misleading by suggesting that the Company had acted responsibly in its planning is untenable and unsupported by the record.  (Dkt. No. 51 at 105).  Second, Nealon said that the airline industry was focused on investing in technology improvements.  (*Id.* at 106). Plaintiffs argue that the assertion was misleading because Southwest hadn't "adequately invested in optimizing Southwest's critical technology infrastructure."  (*See id.*).  But whether Southwest had invested "adequately" *in the past* has no bearing on determining whether technology would be a priority for the Company *moving forward.*  (*See id.*). Accordingly, the Court finds that these statements are not actionable.

---

[19]  "We expect our operational reliability to continually improve from our June performance.  We use planning models that require an adequate level of airplanes and people and facilities to run our schedules.  As we entered into the second quarter, we had all those resources aligned and we were on track until roughly mid-June.  And so there are a couple of focus areas for the operation as we move forward. . . . And we're still ramping up the operation, and we have 16 fewer flight [sic] than we did in June of 2019, which for us means there are fewer ways to reaccommodate customers when we have delays or cancellations, while higher volumes and fewer reaccommodation options translate for us into a longer operating day. . . . But our employees just navigate those—through those things heroically."  (Dkt. No. 51 at 104–05).  "I think that this is a network that is so technology-dependent and so network-dependent that I think that's an area of investment that everyone's probably investing more in."  (*Id.* at 106).

Two statements that attribute the June 2021 disruptions to solely human error are misleading.  Over a month after the June 2021 disruptions, Nealon insisted that it was "not a structural issue or investment level issue.  It was just a simple human error. . . . But this was not a failure of technology, if you will, it was a human mistake."  (*Id.* at 108).  Then, in the wake of the October disruptions, Kelly doubled down, reiterating that the June event was caused by "human error" and not "a lack of technological capability."  (*Id.* at 118).

Unlike the other statements that emphasize that the event was caused by a combination of issues including technology deficiencies, these statements convey the complete opposite message.  By suggesting that technology issues played no part in the June event, Plaintiffs believe Defendants Nealon and Kelly "gave the market the false impression that the June Meltdown was a one-off event unlikely to occur again . . . ." (Dkt. No. 51 at 108).  The Court agrees.

In addition to Southwest's own contradictory explanations, Plaintiffs pled at least some facts indicating that technology did, in fact, play a role in the disruptions.  (*See* Dkt. No. 51 at 31 (discussing a New York Times article published on June 16, 2021, that stated "technical troubles" and "technological problems" caused the cancellations)).  Because it is plausible than an investor would rely on them, the Court finds that the "human error" statements are misleading.[20]  *See Southland Sec. Corp.*, 365 F.3d at 362.

---

[20]   However, Plaintiffs' claim still fails because there are no well-pleaded facts to establish either Nealon's or Kelly's scienter.  *See infra* III(A)(2)(b), (f).

ii.   October 2021 Event

Plaintiffs allege several statements relating to the October 2021 disruptions were materially false and misleading:

- On October 9, 2021, Southwest published a post on X stating, "ATC [air traffic control] issues and disruptive weather have resulted in a high volume of cancellations throughout the weekend while we work to recover our operation." (Dkt. No. 51 at 113).

- Later that day, Southwest clarified that statement explaining, "We experienced significant impact in the Florida airports yesterday evening after an FAA-imposed air traffic management program was implemented due to weather and resulted in a large number of cancellations." (*Id.* at 114).

- On October 11, 2021, Southwest published a news release on its website stating, "On Friday evening, the airline ended the day with numerous cancellations, primarily created by weather and external constraints . . . . Unfortunately, the out-of-place aircraft and continued strain on our Crew resources created additional cancellations across our point-to-point network that cascaded throughout the weekend and into Monday." (*Id.* at 114–15).

- On October 12, 2021, on a CNBC program, Kelly stated, "[E]very single airport in the state of Florida was impacted by this. So it's, it's very unique. It's very unusual. It wasn't anything that Southwest caused. If you go back to the June outage, that was, that was us. That was a technology outage and those are, those are few and far between. . . . We were thinly staffed coming into the weekend and that certainly didn't help things as we were trying to recover. . . ." (*Id.* at 116).

- Kelly went on, in response to an interviewer's comment that the June and October outages were unrelated, "[N]ot related at all but I think in the, in this particular case, it would help for us to have better tools to recover. . . . And then, secondly, there's technology that's required to reschedule our flight crews . . . it's just difficult to get that back together so I think the opportunity is to improve on that process." (*Id.* at 117).

- On October 21, 2021, on an earnings conference call, Jordan stated, "Our challenges started with a widespread ATC ground stop and ground delay program that effectively shut down our Florida operation from that afternoon through the end of the day. . . . [T]hat caused a significant number of crews and aircraft to be out of position and then that took several

40

days to recover. . . . [T]he key to continued improvement is getting staffed and continuing to invest in our operation, and we are absolutely laser-focused on both of those.  Looking forward, our immediate goals are really basic: number one, to bulk up our staffing."  (*Id.* at 119).

- On that same call, Van de Ven stated, "[I]n a separate but still related issue from on-time performance is balancing our schedule with our crew resources. . . . [W]e continue to add staffing, and we've made schedule adjustments to both improve our on-time performance and add more staffing cushion to navigate through our current environment.  And as our environment and our staffing and scheduling balance begin to stabilize, we'll be in a good position to begin restoring our network frequencies during 2022."  (*Id.* at 119–20).

- On the call, Watterson stated, "So just the level of capacity versus staffing was the initial issue.  The second is the day-to-day recovery is more difficult when you have fewer options for reaccommodation, whether that's reaccommodating the customer, the crew or even the airplane to get it where it needs to be that night.  And so bringing back that density, we've identified as the #1 thing that will help our day-to-day operations recover more easily when there are things that are exogenous shocks from weather or something else that allows us to recover."  (*Id.* at 121).

- Jordan then stated, "So by the time we were ready to fly, for example, the summer, we just weren't staffed to the point that we thought we would be. . . . So to me, really the learning is on just how important it is . . . to have that margin in the crew network, especially as you operate. . . . [T]he learnings were really more there, the importance of staffing than they were on the network design."  (*Id.* at 121–22).

- Van de Ven echoed Jordan stating, "[T]he biggest learning that I've had is, and I talked about it earlier, is this industry ecosystem.  And it's dependent on having people at work. . . . And that's where I think everybody got into issues with their on-time performance and their staffing and their crews."  (*Id.* at 122).

Plaintiffs argue that these statements were materially false and misleading because the real cause of the issue was not disruptive weather or staffing but rather deficient technology.  (*Id.* at 114, 120, 121, 122, 123).  Further, the June and October outages were related and caused by the same systems, which "could not handle the inevitable short

41

notice cancellations that followed a brief inclement weather event." (*Id.* at 114); (*see also id.* at 115, 117, 120, 121, 122, 123). In support, Plaintiffs point to a post issued by ATC:

> Flight delays & cancellations occurred for a few hours Friday PM due to widespread severe weather, military training, & limited staffing in one area of the Jacksonville en route center. Some airlines continue to experience scheduling challenges due to aircraft and crews being out of place.

(*Id.* at 40).

The majority of the statements at issue implicate the causes of the October 2021 disruptions. As with the June 2021 disruptions, *see supra* III(A)(1)(e)(i), Plaintiffs claim that the scheduling software was the fundamental issue but did not plead any facts showing that the other cited problems did not contribute to the October 2021 disruptions. Indeed, the ATC post indicates that severe weather, military training, and limited staffing initially caused the flight delays and cancellations, (Dkt. No. 51 at 40), which is consistent with Defendants' representations.

At least three of the statements remark on anticipated technological and operational developments. For instance, Kelly stated that there was an opportunity to improve the technology to reschedule flight crews, (*id.* at 117), and Van de Ven mentioned adding staff and adjusting schedules to restore "network frequencies in 2022," (*id.* at 120). (*See also id.* at 121 (Watterson's statement)). These comments were not misleading, because they were general observations that were consistent with other statements made by the Company. Just three months prior, in July 2021, Southwest cautioned that the Company was still "ramping up the operation." (*Id.* at 104). Just one month prior, in September 2021, Southwest explained that it needed to "get the operation and the staffing

42

matched." (*Id.* at 112).  Southwest never promised—nor would any reasonable investor believe—that the Company would have every operational issue resolved by October.  In other words, the efforts Southwest mentioned in July and September were still on-going in October.  To the extent Plaintiffs disagree with Defendants' strategic decisions— including the pace and priority of technological upgrades—that is a dispute over the Company's business decisions.  Such disputes do "not state a claim under federal securities law."  *Coates I*, 26 F.Supp.2d at 922 (quoting *Novak*, 997 F.Supp. at 432).  Thus, the Court finds that these statements are not actionable.

Only one statement warrants a deeper dive.  Kelly stated that the June and October outages were "not related at all."  (Dkt. No. 51 at 117).  Plaintiffs pled facts indicating that technology was a factor in the June disruptions.  *See supra* III(A)(1)(e)(i).  Plaintiffs also pled at least some facts indicating that technology was a factor in the October disruptions. (Dkt. No. 51 at 14 ("SWAPA published an article explaining that the October Meltdown was primarily caused by Southwest's Flawed Systems.")).  Because it is plausible that an investor would rely on them, the Court finds that the statements indicating that the June and October 2021 disruptions were unrelated are misleading.[21]  *See Southland Sec. Corp.*, 365 F.3d at 362.

### iii. December 2022 Event

Plaintiffs allege several statements relating to the December 2022 disruptions were materially false and misleading:

---

[21]    However, Plaintiffs' claim still fails because there are no well-pleaded facts to establish Kelly's scienter.  *See infra* III(A)(2)(b).

- On December 21, 2022, Southwest issued a press release stating, "The Safety of Employees and Customers is Southwest's top priority and proactive schedule adjustments aim to ensure safe operations, protect the integrity of the entire Southwest Network, and limit subjecting our People to dangerous working conditions.  Of the nearly 8,000 scheduled flights for both Thursday, Dec. 22[,] and Friday, Dec. 23, Southwest has canceled about 500 flights."  (Dkt. No. 51 at 149).

- Southwest subsequently issued another press release that was largely a copy of the prior-day's release but added, "Most of these disruptions were proactive schedule adjustments to ensure safe operations, to protect the integrity of the entire Southwest Network, and to limit prolonged exposure in dangerous working conditions.  However, the changing operational environment and treacherous conditions led to additional later cancellations."  (*Id.* at 150).

- On December 23, 2022, Southwest issued another press release stating, "We continue to proactively manage and update our operational plan and flight schedules in response to Winter Storm Elliott.  With more than half of the airports where we operate in the continental U.S. under duress from the storm, Southwest has been uniquely effected [sic] given our size and structure.  As it remains a very dynamic situation, we don't have specific numbers to share on flight disruptions, but the storms have forced hundreds of cancelations throughout our network."  (*Id.* at 151).  A copy of the release was largely re-issued the next day.  (*Id.* at 152).

- On December 26, 2022, Southwest issued a press release stating, "We were fully staffed and prepared for the approaching holiday weekend when the severe weather swept across the continent, where Southwest is the largest carrier in 23 of the top 50 travel markets in the U.S.  These operational conditions forced daily changes of an unprecedented volume and magnitude to our flight schedule and the tools our teams use to recover the airline remain at capacity."  (*Id.* at 153).  Southwest issued a virtually identical statement the following day as well.  (*Id.* at 154).

- On December 27, 2022, Jordan stated, "[A]fter days of trying to operate as much of our full schedule across the busy holiday weekend, we reached a decision point to significantly reduce our flying to catch up. . . . The tools we use to recover from disruption serve us well, 99 percent of the time; but clearly, we need to double down on our already existing plans to upgrade systems for these extreme circumstances so that we never again face what's happening right now."  (*Id.* at 155).

44

- On December 31, 2022, Southwest issued a press release where Jordan stated, "One of our five-year strategic plan priorities established in 2021 is to modernize the operation along with a 2022 company focus area of getting back to our historic operational reliability and efficiency.  As Andrew stepped into his role, he told you all that one of his key areas of focus was to improve our ability to recover effectively from irregular operations and invest in processes, People, and technology that were already underway." (*Id.* at 157).

- In January 2023, during a conference call with investment analysts and media members, Jordan stated, "[B]ased on what we know at this point, our processes and technology generally worked as designed. But we were hit by an overwhelming volume of close-in cancellations, which put us behind in creating crew solutions, which, in turn, pushed us to manual efforts and solutions . . . . We're also currently budgeted to spend $1.3 billion of our 2023 annual operating plan on investments, upgrade and maintenance of our IT systems, which is higher than what we spent in 2022."  (*Id.* at 159–60).

- In February 2023, the Committee held a hearing and Watterson testified, "To be clear, our Crew Scheduling software didn't stop working during this event.  However, the pace and volume of close-in Crew and schedule changes over multiple days left our Crew Scheduling professionals unable to efficiently address the state of the operation. . . . Without updated Crew schedules, the Crew decision support software could not reassign Crews to solve for flights with Crew coverage issues."  (*Id.* at 161).

Plaintiffs argue that these statements were materially false and misleading because Southwest would not be able to recover after Winter Storm Elliott subsided due to the deficient scheduling software and because the Company would be forced to manually re-schedule flights, pilots, and crews for days.  (*Id.* at 149).  In their view, the December 2022 disruptions were not caused by Southwest's size and structure, the unprecedented weather, staffing, or close-in cancellations, but instead were due to its scheduling software.  (*Id.* at 151, 152, 153–54).  They contend that "every other airline was able to promptly resume normal operations when the bad weather subsided, and but for the

45

[scheduling software], Southwest would have been able to recover quickly like other airlines." (*Id.* at 156).

Plaintiffs allege no facts showing that Defendants' statements about the Company's ability to recover its operations were misleading. Southwest previously disclosed how cancellations cascaded for multiple days after the October 2021 disruption event and made no assurances that it had remedied those issues before December 2022. Just two months prior, in an October 2022 earnings call, Southwest executives discussed at length how they were working on improving the schedule and staffing but that those efforts were ongoing. (*Id.* at 142–45). Further, Southwest stated—and Plaintiffs do not dispute—that the Company had managed "difficult weather conditions with high load factors" stably that summer, justifying its prediction that it was set up to perform well that winter. (*Id.* at 145). And these statements are consistent with Southwest publicly disclosing in 2021 its modernization efforts over the next five years. *See supra* III(A)(1)(b)(ii).

As with the June 2021 disruptions, *see supra* III(A)(1)(e)(i), and October 2021 disruptions, *see supra* III(A)(1)(e)(ii), Plaintiffs claim the scheduling software was the fundamental issue but did not plead any facts showing that the other cited problems did not contribute to the December 2022 disruptions. Along the same lines, while they pleaded facts to show that other airlines recovered more quickly than Southwest, (*id.* at 67–68), Plaintiffs ultimately failed to rule out that Southwest's lag was due to its size and structure.

As for Jordan's statement that upgrades "were already underway" as Watterson stepped into his role, Plaintiffs argue that it was misleading because the December 2022 disruptions demonstrated that the scheduling software had not changed.  (Dkt. No. 51 at 158).  A lack of scheduling software improvements doesn't necessarily mean that system upgrades were not underway, especially considering Watterson began as Chief Operations Officer in October 2022.  Neither Watterson nor Jordan promised to overhaul the entire system in two months' time, nor would any reasonable investor have such unrealistic expectations.

Watterson's statement before the Committee that "our Crew Scheduling software didn't stop working" is a closer call but ultimately not misleading.  (Dkt. No. 51 at 161).  In isolation, the statement could be interpreted as Watterson claiming that the systems operated perfectly fine through the December 2022 disruptions.[22]  But upon broader review, Watterson clarifies what he meant by the software "didn't stop working." *See Omnicare*, 575 U.S. at 190, 135 S.Ct. at 1330 (requiring statements be considered in context). He explains that the "Crew Scheduling professionals [were] unable to efficiently address

---

[22]    To be sure, Plaintiffs pled facts indicating that the scheduling software at the very least malfunctioned during the December 2022 disruptions.  (Dkt. No. 51 at 62 (SWAPA published an article on December 26, 2022, stating, "We all know that the Company has had its head buried in the sand when it comes to its operational processes and IT.  Worst of all, through the numerous and ever-increasing meltdowns that we have endured during the last 20 months (much less the last decade) Southwest has had enough crews in place to operate the planned schedule.  It's not until SkySolver and scheduling roulette begin that the network spirals out of control.")); (*id.* (In an article published by the Dallas News on December 26, 2022, TWU stated, "This is not a staffing issue, this has nothing to do with flight attendants not being able to work, it has to do with archaic, outdated . . . systems.")); (*id.* at 64–65 (In a CNN interview on December 27, 2022, a SWAPA spokesperson stated, "[I]t really just has to do with outdated processes and outdated IT. . . . [I]t's the programs used to connect us . . . to airplanes—that's where the problem lies, and it's systemic throughout the whole airline.")).

the state of the operation" and that "[w]ithout updated Crew schedules, the Crew decision support software could not reassign Crews to solve for flights with Crew coverage issues." (Dkt. No. 51 at 161). Put differently, Watterson's "didn't stop working" comment was qualified by his surrounding explanation that the scheduling software encountered serious issues during the December 2022 disruptions. And this statement was not inconsistent with the Company's prior representations about prevalent scheduling-software issues. *See supra* III(A)(1)(a), (b), (d), (e). Thus, the Court finds that Watterson's statement is not actionable.

### 2.    Required State of Mind

Plaintiffs must allege that the misstatements were made with scienter, or that Defendants made them with "an intent to deceive, manipulate, or defraud or severe recklessness." *Ind. Elec.*, 537 F.3d at 533 (citation omitted). Simple and even gross negligence are insufficient to meet the PSLRA's scienter requirement. *See Abrams*, 292 F.3d at 430. "A district court may best make sense of scienter allegations by first looking to the contribution of each individual allegation to a strong inference of scienter . . . . Of course, the court must follow this initial step with a holistic look at all the scienter allegations." *Owens*, 789 F.3d at 537.

The Court first examines the scienter allegations raised as to the Individual Defendants collectively, then the scienter allegations as to Individual Defendants

individually,[23] and finally "all the scienter allegations" holistically. *See id.* For the reasons discussed below, the Court finds that the Complaint fails to plead facts creating the requisite strong inference of scienter as to any Defendant.

a.        Allegations Common to All Individual Defendants

Plaintiffs allege that (1) the occurrence of less severe prior disruptions and (2) public criticisms by Southwest's employee unions are evidence of the Individual Defendants' scienter. (Dkt. No. 51 at 163–67). Such "group pleading" allegations do not contribute to a strong inference of scienter. "[U]nder the PSLRA plaintiffs must 'distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud.' . . . Therefore, even if in a non-PSLRA case an assertion regarding 'defendants' collectively might be viewed deferentially to mean *all* the defendants in the case, in a PSLRA action an allegation made against the 'defendants' will normally have the effect of naming *no* defendant at all, because the assertion will not enlighten each defendant as to the person's particular part in the alleged fraud." *Fener v. Belo Corp.*, 425 F.Supp.2d 788, 797 (N.D. Tex. 2006) (quoting *Southland*, 365 F.3d at 365).

Even applying the allegations to those Individual Defendants that made a misleading statement—namely, Kelly and Nealon—those allegations do not contribute to a strong inference of scienter. Most importantly, the Complaint facially acknowledges that risk of disruption events and the unions' criticisms were publicly disclosed, which

---

[23]    Kelly and Nealon are the only Individual Defendants that the Court determined made misleading statements. *See supra* III(A)(1)(d), (e)(i), (e)(ii). Nevertheless, the Court considers the Complaint's allegations regarding all Individual Defendants' scienter as possible additional grounds for dismissal.

negates scienter.  *See Owens*, 789 F.3d at 540 ("Plaintiffs contend that several 'red flags' . . . should have alerted each defendant that the [portfolio] valuation was materially incorrect. . . . Even as to those alleged misstatements that occurred after the 'red flags' were apparent, the red flags were disclosed to the public, which negates the inference that defendants acted with scienter.").  To the extent Plaintiffs assert that Southwest received nonpublic communications, either from the employee unions or otherwise, the Complaint fails to allege any details about the contents, timing, or recipients of such communications or that the communications differed from the information already in the public domain.  *See Abrams*, 292 F.3d at 432 (noting that plaintiffs must allege "corroborating details regarding the contents of allegedly contrary reports, their authors and recipients"); *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 211 (5th Cir. 2009) (noting that a statement consistent with company's prior disclosures does not establish scienter).  As such, the Court finds that the allegations about the occurrence of less severe prior disruptions and public criticisms by Southwest's employee unions do not contribute to a strong inference of scienter.

Plaintiffs also allege that the Individual Defendants possessed the motive to commit fraud because "their compensation was heavily dependent on it." (Dkt. No. 51 at 168–69); (*see also id.* at 71 ("[T]he Individual Defendants' Southwest stock compensation was many multiples higher than their salaries.")).  Again, such "group pleading" allegations do not pass muster.  *Fener*, 425 F.Supp.2d at 797 (quoting *Southland*, 365 F.3d at 365).  Nevertheless, even assuming that the allegations apply individually to Kelly and Nealon, they do not meaningfully contribute to a strong inference of scienter.  While

50

"allegations of motive and opportunity . . . may enhance other allegations of scienter," the Fifth Circuit has stated that "the desire for enhanced incentive compensation and the desire to sell stock at inflated prices" are "not the types of motive that support a strong inference of scienter." *See Abrams*, 292 F.3d at 430, 434.  Indeed, "[i]t does not follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent." *Id.* at 434 (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068–69 (5th Cir. 1994)).  Accordingly, the Court finds that the allegations about the Individual Defendants' motivations do not contribute to a strong inference of scienter.

Plaintiffs allege that "because of their positions with the Company," the Individual Defendants had "access to material non-public information" and "knew that the adverse facts specified [in Plaintiffs' Complaint] had not been disclosed to, and were being concealed from, the public." (Dkt. No. 51 at 22).  That argument fails.  The Fifth Circuit has rejected arguments about presuming knowledge of internal facts based on an officer's position at the company.[24]  *See Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 958 (5th Cir. 2016).  Indeed,

> Conclusory allegations that [Defendants] had the requisite
> scienter based on their executive positions at [the Company],
> their involvement in day-to-day management of its business,

---

[24]  To be sure, the Fifth Circuit recognizes a narrow exception, where "special circumstances" support a strong inference of scienter for officers by virtue of their positions. *See Local 731*, 810 F.3d at 959.  When determining whether the exception applies, courts consider four factors. *Id.* "First, the smaller the company the more likely it is that corporate executive would be familiar with the intricacies of day to day operations. . . . Second, the transaction at issue may have been critical to the company's continued vitality. . . . Third, the misrepresented or omitted information at issue would have been readily apparent to the speaker. . . . Fourth, the defendant's statements were internally inconsistent with one another." *Id.* (internal citations omitted). Plaintiffs did not (and likely could not) raise the exception.

51

> their access to internal corporate documents, their conversations with corporate officers and employees, and their attendance at management and Board meetings are insufficient; [Plaintiffs] need to provide details about alleged negative internal reports, when they were prepared, who prepared them, their content, the sources from whom plaintiffs obtained such information, etc.

*In re Sec. Litig. BMC Software, Inc.*, 183 F.Supp.2d 860, 887 (S.D. Tex. 2001). The Court finds that the Individual Defendants' positions within the Company do not weigh in favor of a strong inference of scienter.

And finally, Plaintiffs characterize Defendants' scienter defenses as nothing more than a fact-intensive "truth-on-the-market" defense that cannot be decided in a motion to dismiss. (Dkt. No. 59 at 9); (Dkt. No. 87-2 at 13, 40). However, as the Court understands it, Defendants are not arguing that the alleged misrepresentations and "the truth" were "transmitted to the market with roughly equal intensity and credibility" such that the market was never misled. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1114 (9th Cir. 1989). Instead, Defendants are asserting "that the public disclosures regarding Southwest's need to 'modernize'—both through Southwest's own disclosures and through the admittedly public union press releases—undercuts an inference . . . that Defendants acted with scienter." (Dkt. No. 87-7 at 42). In other words, no inference of scienter arises when there is little daylight between Southwest's public statements and "the truth." The Court agrees and finds that Defendants' relative transparency negates any claim that they intended to defraud the market.

52

b.      Kelly's Scienter

While Kelly made three statements that were misleading in July and October 2021, *see supra* III(A)(1)(d), (e)(i), (e)(ii), Plaintiffs have failed to allege facts showing that he possessed the requisite scienter when the statements were made.  Allegations that Kelly was an executive, that he was warned by the employee unions about the Company's operational exposure, and that he was incentivized to raise Southwest's stock price are not enough to show that he knew (or recklessly disregarded) in July 2021 that Southwest was not positioned or prepared for future disruption events.  Nor are they enough to show that he knew (or recklessly disregarded) the causes of the June and October 2021 disruption events.  This is especially so considering that the Complaint does not allege that Kelly was individually apprised in advance of any undisclosed facts that contradicted his statements.  *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 868 (5th Cir. 2003) (dismissing complaint that "fail[ed] to identify exactly who supplied the information [that contradicted company's public disclosures] or when [management] knew the information").

The Complaint also alleges that Kelly signed certifications verifying the accuracy of any material changes to the Company's internal controls over financial reporting and the disclosure of all fraud under the Sarbanes-Oxley Act of 2002 ("SOX"), which were attached to the 2019 and 2020Annual Reports, (Dkt. No. 51 at 82, 92), and the 1Q20, 2Q20, 3Q20, 1Q21, 2Q21, and 3Q21 Reports, (*id.* at 87, 89, 90, 97, 111, 125).  A signature on a SOX certification may raise an inference of scienter if the signer had reason to know or should have suspected the filings were false and those filings form the basis of the claims

53

asserted.  *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 555 (5th Cir. 2007).  However, the Court previously found that the Complaint failed to sufficiently plead that the annual and quarterly reports contained any statements that were false or misleading.  *See supra* III(A)(1)(a), (b).  Accordingly, Kelly's signatures on the SOX certifications do not contribute to a strong inference of scienter.

Taking the Complaint as a whole, the Court finds that the allegations do not raise a strong inference of Kelly's scienter.

c.      Romo's Scienter

Romo did not make any materially false or misleading statements during the Class Period.  *See supra* III(A)(1).  Even if she had, the scienter allegations against Romo fall short of the PSLRA's requirements.  Plaintiffs allege that Romo was an executive, that she was apprised of the Company's issues due to the warnings by the employee unions, and that she was motivated to inflate Southwest's stock price to increase her compensation. (Dkt. No. 51 at 163–69).  The Court previously determined that these allegations common to all Individual Defendants were deficient and do not contribute to a strong inference of scienter.  *See supra* III(A)(2)(a).

The Complaint also alleges that Romo signed the SOX certifications that were attached to the 2019, 2020, and 2021 Annual Reports, (Dkt. No. 51 at 82, 92, 128), and the 1Q20, 2Q20, 3Q20, 1Q21, 2Q21, 3Q21, 1Q22, 2Q22, and 3Q22 Reports, (*id.* at 87, 89, 90, 97, 111, 125, 136, 137–38, 146).  However, because the Complaint failed to sufficiently plead that the annual and quarterly reports contained any statements that were false or misleading, *see supra* III(A)(1)(a), (b), Romo's signatures on the SOX certifications do not

54

contribute to a strong inference of scienter. *See Cent. Laborers' Pension Fund*, 497 F.3d at 555.

Taking the Complaint as a whole, the Court finds that the allegations do not raise a strong inference of Romo's scienter.

### d.    Jordan's Scienter

Jordan did not make any materially false or misleading statements during the Class Period. *See supra* III(A)(1). Even assuming that he did, the Complaint fails to adequately plead that Jordan had the requisite scienter. Plaintiffs allege that Jordan was an executive, that he was apprised of the Company's issues due to the warnings by the employee unions, and that he was motivated to inflate Southwest's stock price to increase his compensation. (Dkt. No. 51 at 163–69). These allegations, made collectively as to all Individual Defendants, fail to contribute to a strong inference of scienter. *See supra* III(A)(2)(a).

The Complaint also alleges that Jordan signed the SOX certification that was attached to the 2021 Annual Report. (*Id.* at 128). Also, similar to Kelly and Romo, Jordan signed various SOX certifications that were attached to the 1Q22, 2Q22, and 3Q22 Reports. (Dkt. No. 51 at 136, 138, 146). And similar to the outcome with Kelly and Romo, the absence of any false or misleading statements in the annual and quarterly reports means that Jordan's signatures on the certifications do not contribute to a strong inference of scienter. *See Cent. Laborers' Pension Fund*, 497 F.3d at 555.

The Complaint alleges that Jordan knew "the seriousness" of the December 2022 disruptions by December 24, 2022. (Dkt. No. 51 at 168). Plaintiffs argue that "this

admission is significant because it further strengthens his scienter and illustrates that he was not being candid with the market." (*Id.*).  Generally, asserting admissions that postdate the alleged misrepresentations amounts to "classic fraud-by-hindsight pleading that is not sufficient to raise a strong inference of scienter." *Heck v. Orion Grp. Holdings, Inc.*, 468 F.Supp.3d 828, 854 (S.D. Tex. 2020) (citing first *Southland*, 365 F.3d at 383; and then citing *Lormand*, 565 F.3d at 254).  Nevertheless, in *Lormand,* the Fifth Circuit departed from the general rule and found later admissions *could* provide circumstantial evidence of a speaker's state-of-mind at the time of his misleading statements and omissions. 565 F.3d at 254.  There, the Fifth Circuit noted and explained:

> In the exhibits to his complaint, the plaintiff provides numerous contemporaneous documents, such as internal emails and memos, that support a strong inference that the defendants had a wrongful state of mind at the time of their representations.  The plaintiff also provides admissions from the defendants themselves regarding their state of mind at the time of their representations (as found in the defendants' post-class period deposition testimony and emails).  The contemporaneous documents and post-period admissions both consistently tell the same story: the defendants privately knew, at the time of the representations, that the . . . programs . . . would be disastrous for the company but continued to tout their benefits publicly.

*Id.*

This case is not like *Lormand*; it falls squarely in the "classic fraud-by-hindsight" camp.  Plaintiffs do not "directly and cogently" link Jordan's acknowledgment of operational problems on December 24, 2022, to any prior (or subsequent, for that matter) contradictory statements.  *Id.*  Moreover, Plaintiffs lack the "contemporaneous

documents, such as internal emails and memos" that the Fifth Circuit found gave credence to the subsequent admissions in *Lormand*. *See id.*

Taking the Complaint as a whole, the Court finds that the allegations do not raise a strong inference of Jordan's scienter.

### e. Van de Ven's Scienter

Van de Ven did not make any materially false or misleading statements during the Class Period. *See supra* III(A)(1). Allegations that Van de Ven was an executive, that he was warned by the employee unions about the Company's operational exposure, and that he was incentivized to raise Southwest's stock price do not give rise to a strong inference of scienter. *See supra* III(A)(2)(a). Plaintiffs also did not allege that Van de Ven individually knew in advance any undisclosed facts that contradicted his statements during the Class Period. *See Rosenzweig*, 332 F.3d at 868.

Taking the Complaint as a whole, the Court finds that the allegations do not raise a strong inference of Van de Ven's scienter.

### f. Nealon's Scienter

While he did make a misleading statement in June 2021, *see supra* III(A)(1)(e)(i), the scienter allegations against Nealon are deficient for many of the same reasons as Kelly. Allegations showing that Nealon was an executive, that he was warned by the employee unions about the Company's operational exposure, and that he was incentivized to raise Southwest's stock price[25] do not show that he knew (or recklessly disregarded) the causes

---

[25] While Plaintiffs allege that the "Individual Defendants," which includes Nealon, were motivated to inflate the value of Southwest stock, (Dkt. No. 51 at 168), Nealon's stock awards for
(continue)

of the June 2021 disruption event. And the Complaint fails to allege that Nealon individually was aware in advance of any undisclosed facts that conflicted with his statements. *See Rosenzweig*, 332 F.3d at 868.

Taking the Complaint as a whole, the Court finds that the allegations do not raise a strong inference of Nealon's scienter.

### g.     Watterson's Scienter

Watterson did not make any materially false or misleading statements during the Class Period. *See supra* III(A)(1). Even if he did, the Complaint does not adequately allege that Watterson had the requisite scienter. Plaintiffs allege that Watterson was an executive, that he was aware of the Company's issues due to the employee unions' warnings, and that he wanted to drive up Southwest's stock price to increase his compensation. (Dkt. No. 51 at 163–69). These allegations, made collectively as to all Individual Defendants, fail to contribute to a strong inference of scienter as to Watterson. *See supra* III(A)(2)(a).

Plaintiffs also contend that a "bombshell transcript" of a December 2022 phone call strongly supports a finding of scienter. (Dkt. No. 51 at 167). That bombshell misses the mark. The transcript reveals that Watterson's statements were consistent with virtually all the Company's disclosures around the time that the call presumably occurred,[26] which

---

the Class Period are not included in the Complaint, (*id.* at 169). It is therefore unclear whether Nealon was truly incentivized to raise Southwest's stock price.

[26]     Plaintiffs allege that the post on X (formerly Twitter) containing the transcript was leaked on December 27, 2022, and that it was revealed in a CNN article on that same date but never indicate when the call actually occurred. (*See* Dkt. No. 51 at 66).

negates scienter. *See Owens*, 789 F.3d at 540.  For instance, Watterson discussed the need to modernize, a lack of tools given the Company's size, and the difficulty of manually processing scheduling changes.  (Dkt. No. 51 at 66–67).  In December 2022, before the disruptions, Southwest disclosed that it was undertaking a multi-year "Modernize the Operation" program with the intent "to lessen the impact of irregular events and reduce the cause of disruption" with delivery scheduled after 2023.  (Dkt. No. 57 at 10–11).  And in December 2021, Southwest disclosed that there were "too few options to get our customers and our crews to where they needed to be if our operating tempo was disrupted."  (*Id.* at 10).

Plaintiffs' claim that Watterson admitted "to knowing the Systems were never designed to handle the scale of Southwest's operations" is a blatant mischaracterization. (*See* Dkt. No. 59 at 27).  Watterson merely conceded that the specific unprecedented weather event in December 2022 overwhelmed Southwest's scheduling capabilities. (Dkt. No. 51 at 66–67, 79).  And again, that is not inconsistent with Defendants' prior disclosures and statements about the Company's scheduling software.  *See Owens*, 789 F.3d at 541 ("Defendants' disclosure of the 'red flags' and candidness about the uncertainty underlying its models neutralize any scienter inference from 'red flags.'"). The Court therefore finds that the transcript does not support an inference of Watterson's scienter.

Taking the Complaint as a whole, the Court finds that the allegations do not raise a strong inference of Watterson's scienter.

h.    Conclusion

Considered holistically, Plaintiffs' allegations do not give rise to a strong inference that any of the Individual Defendants made any misstatements with the requisite scienter. Because the Court finds the Complaint does not allege scienter of the Individual Defendants under the PSLRA, the Court also finds that the Complaint does not allege Southwest's scienter. *See N. Port Firefighters' Pension--Loc. Option Plan v. Temple-Inland, Inc.*, 936 F.Supp.2d 722, 757 (N.D. Tex. 2013) ("A corporation only has the requisite scienter if the individual executive making the statement had that level of scienter.") (citing *Southland*, 365 F.3d at 366). Because Plaintiffs did not adequately allege a strong inference of scienter as to the Individual Defendants, there is no strong inference of scienter imputable to Southwest.

The Court therefore **GRANTS** Defendants' Motion to Dismiss as to the Section 10(b) and Rule 10b-5 claim against all Defendants. (Dkt. No. 57 at 17–26).

**B.    DEFENDANTS' MOTION TO DISMISS SECTION 20(A) CLAIMS**

Plaintiffs seek to establish secondary liability on the Individual Defendants through Section 20(a) of the Exchange Act. (Dkt. No. 51 at 179–80). However, Plaintiffs failed to allege a primary securities violation by a controlled person. *See Southland*, 365 F.3d at 383 ("Control person liability is secondary only and cannot exist in the absence of a primary violation."). Because the Complaint does not allege a primary securities violation, there is no basis for secondary liability of the Individual Defendants. The Court therefore **GRANTS** Defendants' Motion to Dismiss as to the Section 20(a) claim against the Individual Defendants. (Dkt. No. 57 at 27).

### C.     PLAINTIFFS' REQUEST TO AMEND

In their post-hearing submissions, Plaintiffs assert that they "have amply stated a claim but should be granted leave to replead if necessary" under Federal Rule of Civil Procedure 15(a).  (Dkt. No. 87-2 at 61–62).  Plaintiffs indicated additional grounds on which the amendment is sought in the post-submission briefing.  (*Id.* at 62 n.2).  And they note that the Complaint is the only complaint filed by the lead plaintiffs to date.  (*Id.* at 61–62).  Defendants argue that leave should be denied because the additional grounds on which the amendment is sought fail.  (Dkt. No. 87-7 at 44–45).

While the Court agrees with Defendants that the new grounds cited by Plaintiffs may not prevent dismissal, the Court will nevertheless permit Plaintiffs an opportunity to amend their complaint in accordance with the requirements of Rule 9(b) and the PSLRA.  *See N. Port Firefighters' Pension*, 936 F.Supp.2d at 767 (explaining that amendment was permissible "where it appears that more careful or detailed drafting might overcome the deficiencies on which dismissal is based").  It is not clear that the defects are incurable, and Plaintiffs have not "failed to plead with particularity after being afforded repeated opportunities to do so."  *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000).  Accordingly, the Court concludes that Plaintiffs should have one more opportunity to amend their pleading.

## IV.     CONCLUSION

Considering the foregoing analysis, the Court **GRANTS** Defendants' Motion for Reconsideration, (Dkt. No. 65), **WITHDRAWS** its Order denying Defendants' Motion to Dismiss Plaintiffs' Complaint, (Dkt. No. 62), and **GRANTS** Defendants' Motion to

Dismiss Plaintiffs' Complaint, (Dkt. No. 57). Plaintiffs' claims are **DISMISSED without prejudice**.

Plaintiffs are **GRANTED leave to amend** their pleadings <u>**no later than April 24, 2026**</u>. Any amended pleading must be accompanied by a synopsis of no more than ten pages, explaining how the amendments address the grounds stated for dismissal in this Order. Should Plaintiffs amend, Defendants are granted leave to file responses to Plaintiffs' synopsis. Any response shall not exceed ten pages and must be filed within fourteen days of the repleading. No further briefing will be permitted.

It is SO ORDERED.

Signed on March 31, 2026.

**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**

62